UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Crim. No. 17-20037 |
| ) | |
| BRENDT A. CHRISTENSEN, ) | |
| ) | |
| Defendant. ) | |

MOTION FOR CHANGE OF VENUE FOR TRIAL

Defendant BRENDT A. CHRISTENSEN, by and through his attorneys, and pursuant to the Fifth and Sixth Amendments to the United States Constitution and Rules 21(a) and (b), Fed.R.Crim.P., moves this Court for the entry of an Order granting a change of venue for trial in this case to either the Rock Island Division of the Central District of Illinois, or to the Eastern Division of the Northern District of Illinois, and in support thereof, states as follows:

**Introduction**

Not since the case of *United States v. John E. Ewing*, CD-IL No. 02-CR-20008[1], the lone, deranged man accused and convicted of firebombing Judge George Miller's

---

[1] In *Ewing,* the defendant was detained in federal custody for seven years undergoing psychiatric treatment before U.S. District Judge Michael McCuskey ultimately found him competent or fit to stand trial. And yet, even with the passage of such a significant period from April 8, 1997, the date of the offense, to May 24, 2004, when trial commenced in the Urbana Division, Judge McCuskey deemed it necessary to granted defense counsels' motion for change of venue to the Rock Island Division only after the Court found it all but impossible to select a jury composed of fair and impartial jurors who were not unduly influenced by the notoriety

1

courtroom at the old Champaign County Courthouse on April 8, 1997, has the Central District of Illinois seen another case involving such extensive, unrelenting, inflammatory, and inherently prejudicial pretrial publicity in the local media as Mr. Christensen's. And what makes the journalistic tsunami of pretrial publicity in this case so presumptively prejudicial to Mr. Christensen's constitutional right to a fair and impartial trial is the fact that **only six months** has elapsed from the date of his arrest on June 30, 2017, for the offense of kidnapping Ms. Zhang on the campus of the University of Illinois, to the present date, thus raising the specter that all of what we have seen thus far from the local media is but a "spit in the bucket" compared to the multi-media deluge that is expected to come in the next thirty days leading up to trial on February 27, 2018.

The constitutional guarantee of a fair and impartial trial, one in which a case is decided on its facts and not on community opinion, is not a new or recent development. One hundred-ten years ago, in the case of *Patterson v. Colorado*, 205 U.S. 454, 462 (1907), Justice Oliver Wendell Holmes wrote that, "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private or public print." More than seventy-seven years ago, in *Chambers v. Florida*, 309 U.S. 227, 236-37 (1940), the

---

and massive pretrial publicity in the case and had not prejudged Mr. Ewing's guilt. In September, 2004, the case proceeded to trial in the Rock Island Division, a jury was selected and impaneled with no serious difficulty, and the defendant was found guilty following a week-long trial. Mr. Ewing's conviction was affirmed on appeal. See *United States v. Ewing*, 494 F.3d 607 (7th Cir. 2007), *cert denied*, 552 U.S. 1120 (Jan. 7, 2008).

Supreme Court declared that "no man's life, liberty or property [should] be forfeited as criminal punishment for violation of [a] law without a charge fairly made and fairly tried in a public tribunal free of prejudice, excitement, and tyrannical power." And more than fifty years ago, in setting aside a conviction and death sentence based upon the failure to change venue, the Supreme Court wrote, "With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion." *Irvin v. Dowd*, 366 U.S. 717, 728 (1961).

Today, in 2018, more than any other time in our nation's history, when the broadcast, print, and electronic media is equipped with such vast technological power via the internet and the airwaves to influence community opinion negatively against a citizen accused of a heinous crime, this Court must be especially vigilant in protecting Mr. Christensen's fundamental constitutional right to a fair and impartial trial, and in preventing the irreparable and prejudicial taint of massive pretrial publicity from influencing the outcome of this case.

Accordingly, for the reasons that follow, this Court should grant a change of venue for trial in this case, and transfer venue to another division or district not so unduly affected and influenced by such extensive and prejudicial pretrial publicity.

### Legal Standard for Transfer or Change of Venue

The Sixth Amendment secures to an accused the right to trial "by an impartial jury of the state and district wherein the crime shall have been committed." See also U.S. Const., Art. III, §2, cl. 3. However, the constitutional place-of-trial prescriptions do

not prevent transfer to a different location at the defendant's request if extraordinary local prejudice will prevent a fair trial. *United States v. Skilling*, 561 U.S. 358, 130 S. Ct. 2896, 2913 (2010), citing *In Re Murchison*, 349 U.S. 133, 136 (1955).

Rule 21(a), Fed. R. Crim. P., provides that "[u]pon the defendant's motion, a court must transfer the proceeding … to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Such a transfer is warranted if "extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.' " *Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896, 2912, 177 L.Ed.2d 619 (2010) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)).

The Supreme Court has long held that, when the community from which jurors are drawn is sufficiently affected by adverse publicity, or by the effects of the events at issue, or both, there arises a presumption of prejudice such that *voir dire* cannot perform the usual function of securing a fair and impartial jury. See *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966); *Estes v. Texas*, 381 U.S. 532, 55051 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963); *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961). Granted, a presumption of prejudice will only arise in the extreme case. *Skilling*, 130 S. Ct. at 2915. But this is such a case. The massive and unrelenting pretrial publicity, tremendous local impact, and galvanizing community reaction that compelled a change of venue in the Champaign County Courthouse firebombing case, *United States v. John E. Ewing*, CD-IL 02-CR-20008, *appealed*, 494 F.3d 607 (7th Cir. 2007), *cert denied*, 552 U.S. 1120 (Jan. 7, 2008),

compels the same conclusion in the instant case that Mr. Christensen cannot receive a fair and impartial trial in the Urbana Division of the Central District of Illinois.

Supreme Court precedent supports Mr. Christensen's request that venue be changed to a more fair and impartial venue for trial. The leading case on the interplay of the accused's due process and the fair trial guarantee with prejudicial publicity and pre-formed community opinion remains *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In *Sheppard*, the defendant was convicted of murdering his wife amidst "massive, pervasive and prejudicial publicity," which included a coroner's inquest attended by the media, sensational headlines and articles documenting inadmissible evidence, and statements by agents of the prosecution detailing their opinions about the evidence and the strength of the case. 384 U.S. at 335, 338-42. In overturning the defendant's conviction, the Supreme Court wrote:

> Due Process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused… But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abides, or transfer it to another county not so permeated with publicity.

384 U.S. at 362-363.

In *Irvin v. Dowd*, 366 U.S. 717, 728 (1961), the defendant was convicted of murder following intensive and hostile news coverage. The trial judge had granted a defense motion for a change of venue, but only to an adjacent county, which had been exposed

to essentially the same news coverage. At trial, 430 persons were called for jury service; 268 were excused because they had fixed opinions as to guilt. Eight of the 12 who served as jurors thought the defendant guilty, but said they could nevertheless render an impartial verdict. On review, the Supreme Court vacated the conviction and death sentence and remanded to allow a new trial for, "(w)ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion . . . ." 366 U.S., at 728, 81 S.Ct., at 1645.

Similarly, in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the Court reversed the conviction of a defendant whose staged, highly emotional confession had been filmed with the cooperation of local police and later broadcast on television for three days while he was awaiting trial, saying "(a)ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.*, at 726, 83 S.Ct., at 1419.

And in its most recent pronouncement concerning the presumption of prejudice arising from pretrial publicity, the Supreme Court, in *Skilling v. United States,* 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), clarified that, although in prior cases it had overturned convictions obtained in a trial atmosphere corrupted by press coverage, those holdings " 'cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process.' " 130 S.Ct. at 2914 (quoting *Murphy v. Florida*, 421 U.S. 794, 798–99, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)). "Prominence does not necessarily produce prejudice, and

6

juror impartiality, we have reiterated, does not require ignorance." *Id.* (citing *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Reynolds v. United States*, 98 U.S. 145, 155–56, 25 L.Ed. 244 (1879)).

In *Skilling*, the Supreme Court considered several factors in holding that the district court did not exceed constitutional limitations by declining to grant the request to change venue. 130 S.Ct. at 2917. First, the Court considered the size and characteristics of the community in which the crime occurred. *Id.* at 2915. Second, the Court examined the nature of the news stories, noting that "they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* at 2916. Third, the Court addressed the timing of the trial in relation to the alleged crime, recognizing that over four years had elapsed between the fall of Enron Corporation and former CEO Skilling's trials and that, although news media coverage continued throughout the period, the level of attention "diminished somewhat" in the years following Enron's collapse. *Id.* Finally, and not relevant at this stage of the proceedings in the instant case, the Court considered the jury's acquittal of Skilling on nine insider-trading counts, noting that earlier instituted prosecutions of Enron also had not yielded an overwhelming victory for the Government. *Id.* The Court concluded that the pervasive pretrial publicity in that case did not inevitably lead to a finding of presumed prejudice and affirmed the denial of a change of venue under Rule 21(a). *Id.* at 2917.

Seventh Circuit authority mirrors the Supreme Court's analysis in *Skilling, supra*. See *United States v. Philpot*, 733 F.3d 734 (7th Cir. 2013). Under the Seventh Circuit's analysis, defendants can adduce "prejudice" in support of a transfer of venue for trial under Rule 21(a), Fed.R.Crim.P., by showing that individual jurors were actually exposed to material that prevented them from judging the case impartially, or alternatively, defendants can show presumed prejudice, which occurs when "pervasive and inflammatory pretrial publicity makes juror bias inevitable." *Id*. at 740; *United States v. Nettles*, 476 F.3d 508, 513 (7th Cir.2007). Moreover, the factors used to assess presumed prejudice include the size and characteristics of the community where the crime occurred; the nature of the news stories; and the time that elapsed between the news coverage and the date of trial. *United States v. Philpott*, 733 F.3d at 741.

### Size and Characteristics of Urbana Division

Under the first standard for assessing presumptive prejudice arising from pretrial publicity per the *Skilling* ruling, this Court must look to the size and characteristics of the Urbana Division of the Central District of Illinois.

Below is a chart showing the demographic profile of the Urbana Division of the Central District of Illinois using data provided by the U.S. Bureau of the Census:

DEMOGRAPHICS FOR THE URBANA DIVISION COUNTIES IN THE CDIL

| COUNTY | POPULATION EST. 2016 | %WHITE | %BLACK | %LATINO | %ASIAN | %BACHELORS OR HIGHER | MEDIAN HOUSEHOLD INCOME | %IN POVERTY |
|---|---|---|---|---|---|---|---|---|
| CHAMPAIGN | 208,419 | 72.9 | 13.1 | 5.8 | 10.7 | 43.4 | $46,495 | 20.1 |
| COLES | 52,343 | 92.9 | 4.2 | 2.5 | 1 | 24.1 | $39,588 | 21.8 |
| DOUGLAS | 19,630 | 97 | 0.7 | 7.4 | 0.8 | 17.8 | $51,810 | 10.2 |
| EDGAR | 17,566 | 98 | 0.5 | 1.2 | 0.3 | 18.1 | $45,691 | 13.9 |
| FORD | 13,575 | 96.9 | 1 | 3.2 | 0.4 | 16.6 | $49,947 | 11.3 |
| IROQUOIS | 28,334 | 96.5 | 1.1 | 6.7 | 0.6 | 15.3 | $47,834 | 13.3 |
| KANKAKEE | 110,008 | 81.2 | 15.3 | 10.4 | 1.1 | 18.8 | $52,110 | 15.2 |
| MACON | 106,550 | 78.3 | 17.3 | 2.2 | 1.2 | 22.9 | $47,176 | 18.2 |
| MOULTRIE | 14,827 | 98.1 | 0.5 | 1.2 | 0.3 | 15.7 | $49,681 | 8.6 |
| PIATT | 16,560 | 97.7 | 0.6 | 1.1 | 0.5 | 27.6 | $66,261 | 6.5 |
| VERMILLION | 78,111 | 82.6 | 13.8 | 5 | 0.9 | 13.8 | $42,997 | 18.4 |
| URBANA DIVISION AVERAGES | 60,538 | 90.19 | 6.19 | 4.24 | 1.61 | 21.28 | $49,053 | 14.31 |
| TOTAL POP. | 665,923 | | | | | | | |

SOURCE: United States Census Bureau website: www.census.gov

While the Urbana Division's total population is 665,923, almost one-third of the population resides in Champaign County, the home of the State's flagship university, the University of Illinois at Champaign-Urbana. The University of Illinois is world renowned and unique amongst elite academic institutions for a number of reasons, but particularly so in this case, because the University enrolls more Chinese students than any other American university—over 5000, or 12 per cent of its student body. (http://www.npr.org/2015/10/16/449238085).

Ms. Zhang came to the University of Illinois from her home in Nanping, a small

9

city in the Fujian province in southeast China, in April, 2017, as a visiting scholar studying photosynthesis and crop productivity for one year. Unquestionably, her disappearance since June 9, 2017, and the nature of the charges brought against Mr. Christensen, have not only drawn extensive national and international attention, but have also had, and will continue to have, a deep and profound impact upon the entire University of Illinois community, its Chinese student population, and all of the residents of the eleven East-Central Illinois counties that comprise the Central District of Illinois. Indeed, no one can seriously deny that this case has had as much impact, if not more impact, on the Champaign-Urbana community, and all of East Central Illinois, than the notorious Champaign County Courthouse firebombing case of U.S. v. John E. Ewing, in 1997, and that case required a change of venue to ensure the defendant a fair and impartial trial.

Therefore, the first *Skilling* factor—the size and characteristics of the Central District of Illinois, favors a change of venue in this case.

### Nature of News Stories

Under the second standard for assessing presumptive prejudice arising from pretrial publicity per the *Skilling* ruling, this Court must look to the nature of the news coverage and stories that have run since the case originated.

This case has been in the local and national news virtually uninterrupted since June 22, 2017. During that time, there has been extensive coverage of the case's development. A simple google search of Mr. Christensen's name results in 88,000 hits,

whereas a search of Yingying Zhang's name results in 460,000 hits.[2] The coverage has included articles in newspapers both in print and online, group discussions on social media, and stories on both television and radio. The press coverage which reaches potential jurors in the Urbana Division of the Central District of Illinois has been particularly relentless.

The News-Gazette is a newspaper based in Champaign, Illinois, that has covered the case closely. Between June 22, 2017, and December 31, 2017, the News-Gazette published no fewer than 55 articles about the case. (See Exhibit A – Spreadsheet of News-Gazette Press Coverage; Group Exhibit B – Copies of News-Gazette Articles) The printed edition of the News-Gazette has an estimated circulation of between 40,000 and 47,000 depending on the day of the week.[3] In addition to the printed edition, the News-Gazette has a website and a significant social media presence which includes 27,263 followers on Facebook and 38,600 followers on Twitter.[4]

The News-Gazette circulation area includes nine of the eleven counties that make up the Urbana Division of the Central District.[5] This case has been a huge boon to the News-Gazette's business. According to the Vice-President of the newspaper, posting

---

[2] All web searches and websites mentioned in this Motion were last performed/visited on January 12, 2018.
[3] http://classifieds.stores.yahoo.net/chamilnew.html
[4] https://www.facebook.com/newsgazette/; https://twitter.com/news_gazette
[5] The News-Gazette circulation area includes Champaign, Vermilion, Piatt, Ford, Douglas, and portions of Macon, McLean, Iroquois, Coles, Edgar and Moultrie counties. http://obits.oregonlive.com/Obituaries.asp?Page=PlaceAnObituary&NewspaperID=1817. The only two counties in the Urbana Division that do *not* get the News-Gazette are Kankakee and McLean counties.

articles about Brendt Christensen caused their web traffic to go "haywire," resulting in 2 million page views in one week. (See Exhibit C – Screenshot of Facebook post) The "most-viewed" photo gallery on news.gazette.com was related to this case. (See Exhibit D – Screenshot of Facebook post)

In addition to the News-Gazette, the case has received coverage in the Decatur Herald-Tribune and on social media. The Facebook page "Find Yingying" is followed by 5,046 people.[6] Ms. Zhang's family has used social media to solicit donations to help find her. (https://www.gofundme.com/missing-u-of-i-scholar). The family's account has raised $156,050, some of which has gone to fund a $50,000 reward being offered by Champaign County Crime Stoppers; it is the largest reward ever offered in the organization's history.[7]

Utilizing the search function on Facebook.com, anyone looking for links related to the name Yingying Zhang returns at least 13 full pages of results. (See Exhibit E). The hashtag #brendtchristensen on Twitter returns 17 pages of results. (See Exhibit F). The hashtag #findyingying returns 31 pages of results. (See Exhibit G). The hashtag #YingyingZhang returns 172 pages of results. (See Exhibit H). The user @find_yingying has 1280 followers, and produces 77 pages of results from Twitter. (See Exhibit I).

Between the News-Gazette, other local newspapers, online news outlets, TV news stories, and social media, the vast majority of people in the Urbana Division have

---

[6] https://www.facebook.com/findingyingying/
[7] http://www.news-gazette.com/news/local/2017-07-14/reward-info-ui-scholars-whereabouts-raised-50000.html

been exposed to information about the case. Many of the articles that have been published contain information that will be valuable to the prospective jurors who will be eventually selected and sworn to serve in this case. The press is following every procedural move made by both parties. For example, the Superseding Indictment in this case was filed on October 3, 2017. Within 24 hours, there was written coverage of the new charge twice in the News-Gazette, once in the Daily Illini, and on local news and radio.[8] The arraignment on the Superseding Indictment, which took place on October 11, 2017, received similar local coverage. After defense counsel filed a Motion to Continue the jury trial in early November, there were articles in the News-Gazette and the Daily Illini immediately following the filing.[9]

In addition to simple procedural coverage, the press has taken an interest in Ms. Zhang's family and has pursued multiple human interest pieces on their lives in relation to this case. Ms. Zhang's mother has been quoted multiple times expressing her pain at the absence of her daughter, and begging to know where she is: "I am in pain,

---

[8] http://www.news-gazette.com/news/local/2017-10-03/superseding-indictment-christensen-charged-with-kidnapping-resulting-scholars-;
https://dailyillini.com/news/crime/2017/10/03/christensen-facing-either-life-prison-death-penalty/; http://www.illinoishomepage.net/news/local-news/christensen-kidnapping-resulting-in-death/824429664; http://www.news-gazette.com/news/local/2017-10-04/yingyings-family-sorrowful-grateful-hopeful.html;
http://peoriapublicradio.org/post/grand-jury-indicts-alleged-kidnapper-yingying-zhang-her-murder#stream/0

[9] http://www.news-gazette.com/news/local/2017-11-08/accused-kidnappers-attorneys-want-trial-delayed-until-october-2018.html; https://dailyillini.com/news/2017/11/09/christensen-lawyers-ask-delay-alleged-kidnapping-trial/

every night when I go to bed. I hardly get any sleep. I just keep having dreams about my daughter. Please tell me where my daughter is."[10] The family published an open letter in which it was stated that Ms. Zhang's mother, upon learning of her daughter's disappearance, "passed out multiple times" and "suffered loss of sleep and appetite."[11] When the family decided to return to China, it was highly publicized that Ms. Zhang's mother was in ill health and continued to suffer emotional trauma over the events surrounding this case.[12]

Finally, there have been significant details about the case that have been exposed in the press, such as the fact that Mr. Christensen allegedly visited an abduction planning website, described an ideal victim, and engaged in a physical altercation with Ms. Zhang at his apartment.[13] The public is also aware of the government's theory of the crime:

> "Prosecutors say that Zhang got into the vehicle of Christensen, a former graduate student at the university. They say he forcibly abducted her and took her to his apartment. They say Christensen after initially denying any contact with Zhang, later said he had merely given "an Asian female" (in the words of the criminal complaint document) a ride, and dropped her off a few blocks later. The prosecutors say their court case will point to records from Christensen's smart phone that show he followed

---

[10] https://dailyillini.com/news/2017/10/28/the-evil-will-always-be-punished/
[11] http://www.news-gazette.com/pdf/2017-09-06/pdf-public-letter-zhang-family.html
[12] http://www.news-gazette.com/news/local/2017-11-12/search-yingying-zhang-family-returning-china-moms-health.html
[13] http://www.news-gazette.com/news/local/2017-07-05/now-bail-denied-christensen-allegedly-described-characteristics-ideal-victim-v; https://dailyillini.com/news/2017/07/05/alleged-kidnapper-denied-bail-described-ideal-victim/; http://www.news-gazette.com/news/local/2017-07-06/accused-kidnapper-held-without-bail-feds-say-scholar-fought-him-apartment.html

> threads about kidnapping and abduction fantasies on online fetish networking sites, prior to Zhang's disappearance."[14]

The public response to this intense coverage has been overwhelmingly negative from the beginning of the case. For example, on July 12, 2017, the News-Gazette published a Facebook post entitled "Indictment: Christensen 'decoyed, kidnapped, abducted' UI scholar."[15] The post linked to an article on the newspaper's website which discussed the procedural status of the case, some of the allegations contained in the Indictment, and the U.S. Attorney's statement on the case thus far.[16] Public comments on the article read, in part, as follows:

> "Turn him over to a black ops, wet work team and you will have an answer in days if not minutes, just keep the hand wringing blood sucking liberals away from the process."
>
> "This is going to sound horrible but I don't think he is keeping the whereabouts secret as a bargaining chip. He is doing it because holding her body hostage holds her family, friends and this town hostage. He gets off on the power of it all."
>
> "Just shoot him execution style fuck our tax dollars paying for him"
>
> "Extradite him to China. They'll handle it."
>
> "HANG THE SON OF S (*sic*) BITCH, HE IS S (*sic*) FUCKING COWARD"

---

[14] https://will.illinois.edu/news/story/family-of-yingying-zhang-awaits-new-year-and-trial-of-accused-kidnapper
[15] https://www.facebook.com/newsgazette/posts/10154537149482890
[16] http://www.news-gazette.com/news/local/2017-07-12/new-christensen-be-arraigned-federal-kidnapping-charge-july-20.html

More recently, the News-Gazette posted an article to Facebook on December 3, 2017, entitled "Death-penalty decision in missing scholar case could go either way." https://www.facebook.com/newsgazette/posts/10154907886207890. Public comments on the article read, in part, as follows:

> "Do the world a favor and put this man down like the rabid animal that he is."
>
> "Put him down. We the taxpayers don't want to pay for this POS to rot in the jail the rest of his life."
>
> "If he gets the death penalty he'll suffer through it. They still can't get it right. The last guy I know of yelled out in pain during it. Hopefully they pick it for him too."
>
> "He needs to die a very painful, long lasting death…"
>
> "Luckily lethal injection is poorly regulated and vastly understudied regarding suffering while being administered by those without major medical training. It's also running out of needed death chemicals. Time for 16improve! It's **sure** to be a very painful and long death. One he likely feels but cannot react to."

From the comments above, and the multitudinous others which are not reproduced herein but are plastered all over social media and in the comment sections of news articles, it is quite clear that the general opinion about Mr. Christensen is that he is definitively guilty of the offenses charged and deserves severe punishment.

Therefore, the second *Skilling* factor—the nature of the press coverage in this case, favors a change of venue in this case.

**Proximity of Time Between Coverage and Trial**

As previously mentioned, just a little over six months has elapsed from the date of Mr. Christensen's arrest on June 30, 2017, to the date of the filing of this motion. And with a firm trial date of February 27, 2018, having been set and reaffirmed by this Court, what we are about to witness over the next thirty days leading up to trial will be nothing short of an avalanche of pretrial publicity where the intensity of the media's coverage of this case will go from its current "red-hot" stage to a blinding "white hot" level. Respectfully, undersigned counsel would suggest that this is not hyperbole. Experience in high-profile cases involving heinous charges against the citizen accused teaches that once defense counsel file their pretrial motions on January 15, 2018, challenging almost every aspect of the Government's case against Mr. Christensen, and once the Government announces its decision whether to authorize the death penalty against Mr. Christensen on or before February 1, 2018, the media coverage in this case is expected to, and will go viral on all fronts, and will further imperil Mr. Christensen's ability to receive a fair and impartial trial in this case.

This unrelenting and inherently prejudicial coverage is notable not just for its sharpness, but also for the short time span that it covers. It has been ongoing from the earliest stages of the government's investigation and has continues with no sign of abating, and will only intensify and get even more prejudicial as the trial date approaches. This starkly contrasts with the publicity at issue in *Patton v. Yount*, 467 U.S. 1025, 1032 (1984), where the Supreme Court found that the publicity had "softened" in

17

the four years between the first and second trials, and that citizens no longer had the same fixed opinions about the defendant's guilt, which proved that there could no longer be a presumption of prejudice.

And similarly in *Skilling v. United States, supra,* 561 U.S. at 383, more than four years had elapsed from the date of Enron's fall to the trial of Mr. Skilling, during which "the decibel level of media attention had diminished somewhat," thus contributing to the Court's reasoning that a change of venue was not warranted. (See also, *In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015)(two years passed between Boston Marathon bombings and the date of defendant's change of venue motion allowed community's passions to diminish); *United States v. Philpot*, 773 F.3d 734, 741 (7th Cir. 2013)(where most of the media coverage occurred the year before the trial, there was no "circus atmosphere required for presumed prejudice" to warrant change of venue); *United States v. Peters*, 791 F.2d 1270, 1297 (7th Cir. 1986)(nearly a year had passed since the articles that the defendant submitted to the court had been published).

In contrast, Mr. Christensen's case is more akin to *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), where trial commenced two months after the media broadcast the defendant's videotaped confessions.

Therefore, because of the close proximity of time between the intense and pervasive media coverage and trial in this case, it is clear that the third *Skilling* factor strongly favors a change of venue in this case.

## Conclusion

Just as in the case of *United States v. John E. Ewing,* a fair weighing of the pre-trial publicity factors under *Skilling* compels the only just conclusion that can be reached in this case: Mr. Christensen cannot receive a fair and impartial trial in the Urbana Division of the Central District of Illinois. Therefore, this Court should grant a change of venue for trial in this case to either the Rock Island Division of the Central District of Illinois, or to the Eastern Division of the Northern District of Illinois.

Respectfully submitted,

BRENDT A. CHRISTENSEN, Defendant

By:    /s/ Elisabeth R. Pollock          /s/ George Taseff
Assistant Federal Public Defender    Assistant Federal Public Defender
300 West Main Street                 401 Main Street, Suite 1500
Urbana, IL 61801                     Peoria, IL 61602
Phone: 217-373-0666                  Phone: 309-671-7891
FAX:   217-373-0667                  Fax:   309-671-7898
Email: Elisabeth_Pollock@fd.org      Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the filing: Mr. Bryan David Freres and Mr. Eugene Miller, Assistant United States Attorneys, 201 South Vine Street, Urbana, IL 61801. A copy was also mailed to the Defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org