E-FILED
Monday, 15 January, 2018  02:37:27 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | 17-CR-20037 |

MOTION TO DISMISS COUNT ONE

On October 15, 2017, the grand jury returned a three count Indictment, charging the defendant, Brent Christensen, in Count One with the offense of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) and false statements to the FBI in violation of 18 U.S.C. § 1001(a)(2) in Counts Two and Three. R. 26.

Through undersigned counsel, the defendant moves the Court for an Order dismissing Count One of the Superseding Indictment on the grounds that: (1) the evidence will not demonstrate a violation of the substantive provisions of 18 U.S.C. § 1201(a); (2) the jurisdictional requirements of 18 U.S.C. § 1201(a)(1) are not satisfied in this case; and (3) the expansive interpretation of the phrase "means, facility, and instrumentality of interstate commerce," as envisioned in the Superseding Indictment, violates the Commerce Clause of the Constitution. *See* U.S. CONSTIT. art 1, § 8, cl. 3.

I.      **SUMMARY OF ARGUMENT**

As to the substantive offense charged in Count One, the offense of kidnapping as defined in 18 U.S.C. § 1201(a), requires that the victim be forced or confined against her

will or seized pursuant to a false representation of some kind. Here, there is no evidence that the alleged victim, Yingying Zhang, was coerced or forced into Mr. Christensen's car. Nor is there sufficient non-speculative evidence that she was tricked in any way to get into the car.

Regardless of whether the substantive elements of the crime of kidnapping defined in § 1202(a) are satisfied, before a federal court can assume jurisdiction, one of the five jurisdictional predicates defined in subsections § 1201(a)(1)-(5) must be met. The jurisdictional hooks described in (a)(2) through (a)(5) are plainly inapplicable. Thus, the government must establish one of the three alternative conditions for federal jurisdiction described in subsection (a)(1). Here, there is no evidence, and the Superseding Indictment does not allege, that the alleged victim was transported in interstate or foreign commerce or that Mr. Christensen traveled in interstate commerce in committing the offense. The government is then left with having to establish jurisdiction under the third option set out in subsection (a)(1), namely that Mr. Christensen committed the offense by "us[ing] the mail or any means, facility, or instrumentality of interstate or foreign commerce."[1] The Superseding Indictment, attempts to establish jurisdiction under this provision by alleging that Mr. Christensen used two such means of interstate commerce in committing the offense, a cellular

---

[1]To avoid unnecessary redundancy, the terms "instrumentality of interstate commerce" and "instrumentality" are used, at times, herein in lieu of the phrase "means, facility and instrumentality of interstate commerce," as found in § 1201(a)(1) and the Superseding Indictment.

telephone and a car. The means by which he used these alleged means of interstate commerce are not specified out in the Superseding Indictment.[2]

As to the first alleged "instrumentality," there is no evidence that Mr. Christensen used a telephone in committing the charged offense – for instance he did not lure the alleged victim in any way by means of a telephone, nor did he seek to obtain a ransom or reward by use of a telephone or direct anyone else in the commission of this offense by means of a telephone.

As for the second charged "instrumentality," neither the legislative history of § 1201, case law interpreting the statute, the Amendments in 2006 adding the "means, facility or instrumentality of interstate commerce" language as an alternative jurisdictional basis under subsection (a)(1), canons of statutory construction, nor the constitutional limitations on the federal government's usurpation of the State's Police Powers suggest that Congress intended that the use of a car in an intrastate kidnapping is sufficient to establish federal jurisdiction under § 1201(a)(1).

The Congressional intent argument is dispositive of this latter issue and thus the Court need not reach the underlying constitutional claim. But, the non-economic nature of an intrastate kidnapping where no ransom, reward or other financial consideration is involved does not have the requisite substantial effect on interstate commerce, either in isolation or the aggregate, to justify Congress's exercise of its commerce power. And, because this is a violent crime long regarded within our constitutional scheme as within

---

[2]Counsel has filed a Motion for a Bill of Particulars on this date, seeking a specification as to how Mr. Christensen allegedly used his cellphone to commit this offense.

the Police Power of the State to regulate in the absence of a sufficient interstate nexus, application of § 1201(a)(1) to the facts of this case would violate the Commerce Clause.

## II.  BACKGROUND

On June 9, 20117, Yingying Zhang, a visiting scholar at the University of Illinois, had an appointment to meet with the manager of an apartment complex in Urbana, Illinois for the purpose of signing a lease. Ms. Zhang left her office at the University of Illinois in Champaign around 12:30 pm that day, telling her colleagues that she was going to sign a lease on a new apartment. The circumstances suggest that Ms. Zhang intended to take a bus to the appointment, which required a transfer. At approximately 1:30 pm, Ms. Zhang sent a text message to the apartment manager, estimating her time of arrival as 2:10 pm. A few minutes later a surveillance tape of the Champaign-Urbana Metropolitan Transfer District depicts a person presumed to be Ms. Zhang boarding the first bus, from which she exits at approximately 1:52 pm near the vicinity of W. Springfield Ave. and Matthews Street. Thereafter, Ms. Zhang is seen unsuccessfully attempting to flag down another bus that was just pulling off.

Shortly after two o'clock a Saturn Astra, driven by Brendt Christensen, pulled up next to Ms. Zhang. Ms. Zhang is then seen leaning into the window of the car and speaking with the driver. Within a minute or so Ms. Zhang enters the vehicle, which then departs the area. To counsel's knowledge no witness observed anything that suggested Ms. Zhang was forced into the Saturn Astra or entered the Saturn Astra other than voluntarily. To counsel's knowledge no witness overheard any of the conversation between Ms. Zhang and Mr. Christensen prior to her entering the vehicle.

Ms. Zhang did not keep her appointment at the apartment complex. The government contends that Ms. Zhang has never been seen again.

## III.  THE EVIDENCE IS INSUFFICIENT TO SHOW A SUBSTANTIVE VIOLATION OF § 1201(a)

The substantive offense defined in 18 U.S.C. § 1201(a) provides:

> **(a)** Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when-[3]

The evidence does not suggest that Mr. Christensen forcibly seized, abducted or carried away Ms. Zhang without her consent. This leaves the government with having to show that Mr. Christensen enticed Ms. Zhang into his car through false pretense – in the terms of the statute, that he "decoyed" or "inveigled" her to get into the car. As stated, counsel is unaware of any evidence of the conversation that took place between Ms. Zhang and Mr. Christensen or that he lured her into his car through false representations.

Documents received in discovery suggest that the government may proffer an "inveiglement" theory through the testimony of a University of Illinois student who reported that a white male approached her on the morning of June 9 in the University area and attempted to get her to enter his car under suspicious circumstances and the testimony of a ten-time convicted felon, facing a sentence of life imprisonment, who claims Mr. Christensen used a similar pretext to lure Ms. Zhang into his car. *See Motion*

---

[3]The five alternative jurisdictional bases then follow in subsections (a)(1)-(5). *Infra.*

*to Suppress Identification* and *Motion to Suppress Statements Allegedly Made to Cellhouse Informant*, both filed on January 15, 2018. Regardless, the evidence suggests that the government will be unable to offer admissible and credible evidence sufficient to carry its burden to prove a violation of § 1202(a) beyond a reasonable doubt.

## IV.  THE FEDERAL GOVERNMENT DOES NOT HAVE JURISDICTION OF THIS OFFENSE   UNDER § 1201(a)(1)

In order to establish jurisdiction over the kidnapping offense defined in §1201(a), the government must establish one of the five grounds specified in subsections (a)(1) through (a)(5).

> **(1)** the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense;
>
> **(2)** any such act against the person is done within the special maritime and territorial jurisdiction of the United States;
>
> **(3)** any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 46501 of title 49;
>
> **(4)** the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title; or
>
> **(5)** the person is among those officers and employees described in section 1114 of this title and any such act against the person is done while the person is engaged in, or on account of, the performance of official duties, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

As stated in the Introduction, the Superseding Indictment places jurisdiction in "instrumentality of interstate commerce" language of § (a)(1), namely that Mr. Christensen used a telephone and a car in commission of the substantive offense. This theory is misplaced. First, counsel is unaware of any evidence that Mr. Christensen used a telephone to commit this offense, *see* IV-C, *infra*. Second, the evidence strongly suggests that, in amending § 1201(a)(1) in 2006, Congress did not intend that jurisdiction could be established by the mere use of a car in an intrastate kidnapping. This is the core of the argument Mr. Christensen presents in IV-D(1)-(8) below. The rule of constitutional avoidance does not require the Court to reach the underlying constitutional issue if the Court agrees with this argument. But, if Congress did intend that the use of a car in an intrastate kidnapping alone establishes federal jurisdiction, such an expansive and unprecedented jurisdictional grab over otherwise intrastate activity would violate the Commerce Clause and unacceptably erode the principles of federalism underlying our constitutional compact between the State and National Governments. *See* V, infra.

A.      **Legislative History of § 1201(a)**

In the wake of the kidnapping of the child of Charles Lindberg in 1932, Congress passed the Federal Kidnapping Act (Kidnapping Act), now codified at § 1201. Concerned with potential issues arising from the over-federalization of federal criminal law and the usurpation of activities long held to be the domain of the states, Congress specifically limited the jurisdiction over kidnappings to the transportation of victims in interstate or foreign commerce. Act of June 22, 1932, ch. 271, 47 Stat. 326 (1932). *See*

Robert C. Finley, *The Lindberg Law*, 28 Geo. L. R. 908-912 (1940) (reviewing legislative

history of 1932 Act and 1934 Amendment). The Kidnapping Act, also known by its

popular name, the "Lindberg Law," was specifically enacted for the purpose of

allowing the FBI to investigate and the federal government to prosecute kidnappings

where criminals transport their victims from one state to another to frustrate

investigation by state law enforcement authorities whose jurisdiction often ends at the

state line. *Chatwin v. United States*, 326 U.S. 455, 462-63 (1946). The 1932 Act thus focused

on the interstate transportation of the victim and also required that there be a ransom or

reward demand. While assorted amendments were made to the statute over the years,[4]

other than a 1972 amendment that expanded jurisdiction to include kidnappings within

the special territorial, maritime and aircraft jurisdiction of the United States and the

kidnapping of foreign officials, *see* Pub.L. 92-539 (1972), the interstate jurisdictional

nexus of the statute remained unchanged until the Amendment of 2006. *Infra*.

It is important to note that in upholding the Kidnapping Act's expansion of

federal jurisdiction as a legitimate exercise of Congress' powers under the Commerce

Clause, courts consistently emphasized that such jurisdiction was conditioned on a

showing that the victim was moved across state lines. *See United States v. Moore*, 571

F.2d 76, 81 (2d Cir. 1978) (reversal where evidence insufficient to establish what the

court characterizes as the "operative condition" of a § 1201 offense, the interstate

---

[4]Among other changes, later amendments removed the requirement of a ransom or reward demand by adding the "or otherwise" language, made the Kidnapping Act inapplicable to parental kidnappings and added the death penalty as a possible punishment.

transportation of victim); *United States v. Davis*, 19 F.3d 166, 169 (5th Cir. 1994)

(transportation of victim in interstate commerce a required element of kidnapping);

*United States v. Singh*, 483 F.3d, 493 (7th Cir. 2007)(same), *citing United States v. Green*,

680 F.2d 520 (7th Cir. 1982); *United States v. Larsen*, 596 F.2d 759, 767 (8th Cir. 1979)

(government must prove victim taken across state lines); *United States v. Broadwell*, 870

F.2d 594, 601, n. 16 (11th Cir. 1989) (crime of kidnapping complete once victim

transported across state lines);

Thus, from the very beginning, both the direct language of the Kidnapping Act

and cases interpreting the statute stressed that the movement of the victim across state

lines was a prerequisite to the federal government assuming jurisdiction over what

would otherwise be a crime solely within the jurisdiction of the States.

### B.      The 2006 Amendment to § 1201(a)(1)

In 2006, Congress amended § 1201 by striking the language requiring that a

person must be alive when the interstate transportation began and adding the second

and third jurisdictional bases now codified as § 1201(a)(1), namely if "the offender

travels in interstate or foreign commerce or uses the mail or any means, facility, or

instrumentality of interstate or foreign commerce in committing or in furtherance of the

commission of the offense." *See* Pub.L. 109-248, § 213, July 27, 2006; 120 Stat. 587 (2006).

This amendment of § 1201(a)(1) was the result of a *single sentence* inserted into a lengthy

bill entitled the Adam Walsh Child Protection and Safety Act of 2006, otherwise known

as the Sex Offender and Notification Act (SORNA),[5] the Preamble of which stated its purpose as "An Act To protect children from sexual exploitation and violent crime, to prevent child abuse and child pornography, to promote internet safety, and to honor the memory of Adam Walsh and other child crime victims." Pub.L. 109-248, Preamble.

Thus, § 213 of the Adam Walsh Act, codified as an Amendment to § 1201(a)(1), consisted of a single sentence in a comprehensive and detailed bill that was directed at protecting children against predators and otherwise had nothing to say about kidnapping in general. The legislative history unequivocally demonstrates that § 213 was designed to target the use of the internet by child predators to contact and entice children. There is nothing in the Act to suggest that Congress was concerned with a general expansion of kidnapping jurisdiction under § 1201(a)(1) or that it intended to alter the long-standing and fundamental principle that federal jurisdiction under §1201(a)(1) is premised on the interstate element of the crime. *See infra*. This reading of the purpose of the Adam Walsh Act is further corroborated by the signing statement

---

[5]The Adam Walsh Act (SORNA) consists of 49 single-spaced pages as it appears in Westlaw. It is broken into seven titles, respectively: Title I: Sex Offender Registration and Notification Act; Title II: Federal Criminal Law Enhancements Needed to Protect Children from Sexual Attacks and Other Violent Crimes; Title III: Civil Commitment of Dangerous Sex Offenders; Title IV: Immigration Law Reforms to Prevent Sex Offenders from Abusing Children; Title V: Child Pornography Prevention; Title VI: Grants, Studies, and Programs for Children and Community Safety; and Title VII: Internet Safety Act. Significantly, § 213 of the Act, subsequently codified as an amendment to § 1201(a)(1) of Title 18, is located in Title II. Most of its provisions were enacted as the Sex Offender and Notification Act and codified at 42 U.S.C. § 42 U.S.C. § 16901, *et seq*. While these headings are not controlling, "they supply cues that Congress did not intend" the statutory language "to sweep within its reach" matters unrelated to the purpose of the legislation. *Yates v. United States*, 135 S.Ct. 1077, 1083 (2015); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (title of statute and section headings are tools for interpreting reach of statute).

wherein President Bush described the four purposes of the bill, each related to crimes against children: expanding the National Sex Offender Registry; increasing federal crimes against children; making it harder for sexual predators to reach children through the internet and creating a National Child Abuse Registry. See Presidential Signing Statement, *President Signs H.R. 4472, the Adam Walsh Child Protection and Safety Act of 2006*, 2006 WL 2076691 (White House).

**C.      There is No Evidence that Mr. Christensen Used a Telephone In Violation of § 1201**

The Superseding Indictment does not specify the means by which Mr. Christensen supposedly used a telephone to commit a § 1201(a) violation. *See Defendant's Motion for Bill of Particulars*, filed this date. To counsel's knowledge there is no evidence suggesting that he contacted Ms. Zhang in any way whether by way of a telephone call or use of the internet on his phone. Nor is there any evidence that Mr. Christensen used his phone to demand a reward or ransom or otherwise for the specific purpose of furthering commission of the charged substantive § 1201(a) offense. *Compare United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014) (co-conspirators communicate by cellphone during execution of kidnapping and thus jurisdiction afforded under § 12019(a)(1)); *United v. Dais*, 559 Fed.Appx. 438 (6th Cir. 2014) (forcing victim to use his cellphone to call mother and communicate ransom request.).

D.    **Congress Did Not Intend that the Intrastate Use of a Car Establishes Jurisdiction Under § 1201**

(1) In Enacting the Adam Walsh Act Congress Was Concerned Only with the Problem of Exploitation of Children, Which is Often Accompanied by the Use of the Internet, Telephone, Mail and Other Means of Communication and Not With Kidnapping in General

This Court need not reach the constitutional issues presented by Count One's jurisdictional premise that the use of a car in an otherwise intrastate kidnapping qualifies as a "means, facility and instrumentality of interstate commerce" within the meaning of the amended § 1201(a)(1), as the evidence overwhelmingly suggests that Congress did not intend such a radical change to kidnapping jurisdiction when it inserted this language into § 213 of the Adam Walsh Act.

As noted above, the 2006 Amendment to § 1201(a)(1) was an isolated sentence in a lengthy bill whose clear purpose was countering the exploitation of children. A search of the bill reveals that the terms "car" or "automobile" are used nowhere in the bill. The term "motor vehicle" appears once – in Section 130, relating to limitations on liability for directors, officers and employees of the National Center for Missing and Exploited Children. The term "vehicle," standing alone, appears only once - in Section 210, requiring that those who must register under the SORNA provisions of the bill must submit to searches of their homes and vehicles by any law enforcement or probation officers who have reasonable suspicion that a condition of probation has been violated. Similarly, the bill does not contain the terms "truck," "airplane" or any other reference to modes of interstate transportation. *See* PL 109-248, *supra.*

In contrast, the term "internet" appears throughout the bill. The language of the Act itself suggests that the phrase was intended to cover use of the internet, telephone and mail, as other than the language in § 213, the only other reference to "instrumentality of interstate and foreign commerce" appears in in § 510(C), where Congress expressly finds that "[T]he interstate market in child pornography is carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce." This reading is confirmed by the Signing Statement of President Bush, cited above, wherein the President notes that one of the main purposes of the Act was to prevent sexual predators from reaching children via the internet. *Cf. United States v. Lopez,* 514 U.S. 549, 562-63 (1995) (lack of legislative findings of Congressional intent noted as the Court attempts to discern supposed effect of activity on interstate commerce).

Review of the legislative history, sparse though it is, leads to the same conclusion. The bill does not appear have been accompanied by any detailed House or Senate Report explaining its provisions. But, a review of the 38 legislative history documents related to the Adam Walsh bill on Westlaw indicates that while Congress was concerned with the kidnapping of children, there is no suggestion that it intended to expand the jurisdictional basis for kidnappings other than to include language that would expand liability under § 1201(a)(1) when the internet and other electronic means of communications are used to target children. That this is crystal clear is demonstrated by a search of each of these 38 documents in the legislative history for the term "instrument! of interstate commerce," which uncovers only three references, each of

which is simply found in a reprinting of the bill itself in the legislative history
document. Stated more clearly, *there is not a single reference in the legislative history* of the
Adam Walsh Act, whether by way of a legislative report, sponsor of the Act or member
of Congress indicating that other than expanding its reach to the use of the internet or
other cyber tools, Congress intended to substantively expand the jurisdictional reach of
the Federal Kidnapping Act,[6] that has been recognized since its passage in 1932 and
consistently interpreted by courts over the intervening years. *Nowhere* is the term
"instrumentality of interstate commerce" defined and there is no suggestion
whatsoever the Congress intended to alter long-standing doctrine by including the use
of a car or vehicle in an intrastate kidnapping within this phrase. From even the most
cursory review of the Adam Walsh Act, it is manifestly clear that Congress was not
concerned with interstate travel as such but with the use of the internet in connection
with the exploitation of children. *Cf. Bond v. United States*, 134 S.Ct. 2077 (2014) (holding
statute inapplicable because defendant's conduct not within "core concerns" of the
statute).

The importance of interpreting language in statutes in light of the concerns and
purpose expressed by Congress is illustrated by *Yates v. United States*, __U.S. __, 135
S.Ct. 1074 (2015). Yates was prosecuted under § 1519 of Title 18 for catching undersized

---

[6]As indicated below, amending § 1201(a)(1) to expand jurisdiction to offenders who travel in
interstate commerce is consistent with the customary understanding of the interstate character
of the offense and was added in recognition of the fact that child predators often cross state
lines to prey on children. Further, the addition of this language to § 1201(a)(1) language would
be unnecessary if the term "instrumentality of interstate commerce" is interpreted in the
manner suggested by the Superseding Indictment. *See* IV-D(3), *infra.*

fish in federal waters and ordering a crew member to toss the suspect catch into the sea.

Section 1519 was enacted as part of the Sarbanes-Oxley Act of 2002, which was

designed to protect investors and restore trust in financial markets and prohibits, *inter*

*alia*, the altering or destroying of "tangible objects" with intent to impede a lawful

investigation. The question presented was whether fish are included within the term

"tangible object" within meaning of § 1519. Although a fish is unquestionably a

"tangible object," the Court held that a fish is not included within the term as used in

the statute for "it would cut § 1519 loose from its financial-fraud mooring to hold that it

encompasses any and all objects . . . destroyed with obstructive intent. Mindful that in

Sarbanes-Oxley, Congress trained its attention on corporate and accounting deception

and cover-ups, we conclude that a matching construction of 1519 is in order." *Id*. at

1079.

> (2)     There is No Evidence that Congress Intended to Abrogate Existing
>           Law in the Manner Suggested by Count One.

Congress was obviously aware of the long-settled requirement that the victim of

a kidnapping under § 1201 be transported in interstate commerce. *See Lorillard v. Pons*,

434 U.S. 575, 580-81(1978) (In enacting legislation Congress is presumed to have

knowledge of prior judicial constructions of statute); *I.N.S. v. Phinpathya*, 464 U.S. 183,

200 (1984) (Congress presumed to have knowledge of prior judicial interpretations of

law it is amending).

The language in the 2006 Amendment adding jurisdiction when the offender

himself moves in interstate commerce to commit the offense was a modest addition to

the historical jurisdictional basis for § 1201(a) prosecutions, and fully consistent with the thrust of the statute concerning movement across state lines. But, interpreting the phrase "means, facilities or instrument of interstate commerce" in the amended §1201(a)(1) to include cars or other vehicles goes well beyond pre-existing law that required that the victim be moved across state lines and would work a wholesale change in settled doctrine. "A party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 521 (1989); *Finely v. United States*, 490 U.S. 545, 554 (1989) ("Under established canon of statutory construction, 'it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed,'"), *citing Anderson v. Pacific Coast S.S. Co.*, 225 U.S. 187, 199 (1912).  That inference is particularly strong where a statute purports to intrude upon jurisdiction traditionally reserved to the States. *Bond v. United States*, 134 U.S. at 2093-94 ("Absent a clear statement of that purpose, we will not presume Congress to have authorized such a stark intrusion into traditional state authority.").

As shown in the preceding section, the structure, purpose and language of the Adam Walsh Act shows that this burden cannot be carried here, especially where not a word of the Act itself suggests a Congressional intent to radically reformulate the Federal Kidnapping Act in the manner suggested in Count One.  *See Chisom v. Roemer*, 501 U.S. 380, 394-96 (1991) (Congress's intent in amending § 2 of the Voter Rights Act in 1982 to exclude voter dilution claims previously protected from the Act not established because "if Congress had such an intent, Congress would have made it explicit in the

statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 amendments."); *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 602 (1980) (Rehnquist, J. dissenting) ("In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night.").

Similarly, with issues of federalism and the appropriate roles of the state and federal government being matters of both public and juridical interest and discussion, it is difficult to imagine that a watchdog in Congress would not have at least barked a little if anyone understood the insertion of this one phrase into § 1201(a)(1) would have liquidated existing kidnapping law in one fell swoop and as a practical matter opened the federal jurisdictional floodgates not only to all kidnappings, but as discussed below, *see* IV-D(5), lay the groundwork for a blanket assumption of federal jurisdiction over a host of crimes long assumed to be exclusively the province of state regulation. *See Bond v. United States*, 134 S.Ct. at 2090-91 (rejecting "boundless reading" of statute's coverage that would override previous interpretations of federal jurisdiction); *Yates v. United States*, 135 S.Ct. at 1083 ("If Congress indeed meant to make [statute] an all-encompassing ban . . . one would have expected a clearer indication of that intent.").

> (3)     Reading the phrase "means, facility, or instrumentality of interstate commerce" in §120(a)(1) to include the use of a vehicle in an intrastate kidnapping would not only make the other language of the statute superfluous but also language in the 2006 Amendment itself

One of the "most basic interpretive canons," *Corley v. United* States, 556 U.S. 303, 314 (2009), is that a statute must be construed "so that no part will be inoperative or superfluous, void or insignificant," *quoting Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal citation omitted); *Kungys v. United States*, 485 U.S. 759, 778 (1988) ("cardinal rule of statutory construction that no provision should be construed to be entirely redundant.").

As kidnapping almost uniformly involves the eventual use of a vehicle of some sort, if Congress intended the draconian expansion of federal jurisdiction in the manner suggested by the Superseding Indictment, it would have stricken the long-standing requirement in the statute that the victim be "transported in interstate or foreign commerce," as that language would no longer be necessary. All the language after the first two words of the statute and prior to "uses the mail . . ." would then be excised as surplusage and § 1201(a)(1) would simply read: when-----(1) the person uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.

Indeed, if Congress intended the term "instrument of interstate commerce" as used in the 2006 Amendment to include a car or other vehicle, there would also have been no need to add the new language about the offender himself traveling in interstate commerce, for, practically speaking, how else is a person going to travel across state lines except by means of the "instrumentality of interstate commerce" found in the very next phrase? Thus, under the interpretation of the term suggested by the government, the 2006 Amendment not only makes the other jurisdictional language in (a)(1)

superfluous, but the Amendment itself would contain surplusage. *See Yates v. United States*, 135 S.Ct. at 1085 ("We resist a reading of 1519 that would render superfluous an entire provision passed in proximity as part of the same Act," *citing Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

    (4)    Statutory Interpretation of the phrase "means, facility or instrumentality of interstate commerce" to include the use of a vehicle to commit an intrastate kidnapping disregards important principles of federalism

"Federal statutes impinging upon important state interests "cannot . . . be construed without regard to the implications of our dual system of government . . ." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994); *Gregory v. Ashcroft*, 501 U.S. 452, 460-464 (1991) (to avoid constraints that a contrary interpretation would place on state-federal relations, Court holds that Age Discrimination in Employment Act is inapplicable to a provision of Missouri Constitution requiring judges to retire at age 70); *Bond v. United States*, 134 S.Ct. at 2088 ("[Th]e problem with this interpretation is that it would 'dramatically intrude [ ] upon traditional state criminal jurisdictions,' [citation omitted]). These sensitive concerns require that federal courts be "certain of Congress' intent" before finding that a federal law overrides the usual constitutional balance between the federal and state powers. *Id*. at 2089.

The allegations here suggest that this is a classic example of an intrastate violent crime normally prosecuted by States. Under our federal constitutional scheme, States

have "primary authority for defining and enforcing criminal law." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (internal citation omitted). "The wisdom of assigning the States the "core police power . . . includ[ing] authority to define criminal law and to protect the health, safety, and welfare of their citizens," *Gonzales v. Raich*, 545 U.S. 1, 42-43 (J. O'Connor, dissenting), is that it permits the States to "perform their role as laboratories for experimentation to devise various solutions" to difficult issues of policy regarding the punishment of crime. *United States v. Lopez*, 514 U.S. at 581-83 (J. Kennedy, concurring). These principles apply with particular force to violent crimes. *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

Thus, when Congress creates federal jurisdiction over criminal conduct historically within the Police Power of the States, it intrudes on the "sensitive balance" of power allocated between the two sovereign governments. *Lopez*, 514 U.S. at 561, n. 3 (1995). And where, as here, legislation is premised on Congress' authority under the Commerce Clause, "the scope of the interstate commerce power 'must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them . . . would effectively obliterate the distinction between what is national and what is local and create a completely centralized government.'" *Id.*, at 556-57, *quoting Jones v. Laughlin Steel* (cite omitted).

These principles take on additional force when the federal government attempts

to enlarge its jurisdiction to seek the death penalty for a crime traditionally within State

jurisdiction (i.e. an intrastate kidnapping resulting in death) in a State which has

discarded capital punishment as a matter of public policy. After public hearings and

prolonged and robust deliberations in the legislature and with the approval of the

Governor, the impetus of which was the exoneration and release of at least twenty

inmates who had been sentenced to die in Illinois, the elected representatives of the

State of Illinois decided to eliminate the death penalty and substitute a penalty of life

without parole for previous capital-eligible offenses. *See* Warden, *How and Why Illinois*

*Abolished the Death Penalty*, 30 Law and Ineq. (Minnesota Journal of Law and Inequality),

245 (2012). Thus, the very heart of the State's political processes is implicated here.

"Persons holding state elective [offices] . . . participate directly in the formulation,

execution, or review of broad public policy and perform functions that go to the heart of

representative government." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973).[7] The

Government's attempt to unilaterally override the policy decisions reached by the

---

[7]In striking down the Defense of Marriage Act (DOMA) in *Sugarman*, the Court punctuated the
importance accorded the State's political processes when a conflict arises between state and
federal law involving fundamental rights that are the subject of intense public interest and
debate, terming those state processes the "beginning point in deciding" the constitutionality of
DOMA.

> After a statewide deliberative process that enabled its citizens to discuss and
> weigh arguments for and against same-sex marriage, New York acted to
> enlarge the definition of marriage to correct what its citizens and elected
> representatives perceived to be an injustice that they had not earlier known or
> understood.

*Id.* 2689. This description precisely mirrors the history of the abolition of the death
penalty in Illinois. *See* Warden, *supra*.

State's elected officials in regard to a crime which occurred entirely within the State of Illinois inescapably raises sensitive questions of federalism and state-federal relations, which a court must consider in interpreting the jurisdictional reach of a federal statute.

      (5)     The Court Should Interpret § 1201(a)(1) in a Manner to Avoid the Constitutional Issues Raised by the Suggestion that a Federal Court Can Acquire Jurisdiction Over an Interstate Kidnapping Simply Because a Car Was Used in Commission of the Offense

As discussed in Part V, *infra*, an interpretation of the phrase "instrumentalities of interstate commerce" in § 1201(a)(1) to apply to intrastate kidnapping where a car or other vehicle is used raises serious questions under the Commerce Clause. Such a sweeping construction would surely federalize almost all kidnapping cases regardless of their local character – for instance, an offender who seizes someone against their will and drives them one block would be liable under this reading. And, more ominously for federal-state relations, this approach has no logical limiting principle and would permit the federal government to assume jurisdiction over a host of crimes that from the beginning of the Republic have been considered as solely within the Police Power of the States. The burglar who drives across town to break into a house can now be hauled to the federal courthouse if the Congress were to so choose, as could the rapist who drives his crime to the scene of the crime or the shoplifter who drives to the mall to steal a t-shirt. And, if the Congress elects to award the government the jurisdiction it envisions is conferred by Count One, the grandmother who runs a stop sign while driving her "instrumentality of interstate commerce" on her weekly grocery run would have to explain herself to the federal magistrate. Jurisdictional limitations previously

carefully crafted by the Congress would no longer be necessary. *See e.g.* Title 18, U.S. Code, Chapter 103 – Robbery and Burglary, §§ 2111- 2119 ( "special maritime and territorial jurisdiction," § 2111; personal property belonging to the United States, § 2112; federally insured banks etc., § 2113; mail, money or other property of the United States, § 2114; burglary of a post office, § 2115; burglary of a railway or steamboat post office, § 2116; burglary of a carrier facilities containing interstate or foreign shipments of freight, § 2117; robberies and burglaries pertaining to substances required to be registered with the DEA, § 2118; and the forcible taking of a car that has been transported, shipped or received in interstate commerce, § 2119.).[8] If Congress can award the federal courts jurisdiction over an intrastate kidnapping simply because a car was used, it could similarly do so in an unending number of other local crimes on the same theory and effectively blue-pencil the constitutional dichotomy at the heart of our democracy.

Where a theory of assumed federal jurisdiction has no logical limits, grave constitutional issues are presented under the Commerce Clause, 10th Amendment and federalism. *See Lopez*, 549 U.S. at 563-64 ("Under the theories that the Government presents in support of [statute], it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign."). *See* cases cited at V-A, *infra*, referencing Commerce Clause problems by potential floodgate problems created by overly broad interpretations of federal jurisdiction.

---

[8]This latter statute is a regulation against the forcible taking of a motor vehicle, not the use of one in an intrastate crime.

The Supreme Court has held that "[i]t is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 864 (1989). "[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (Brandeis, J., concurring); *Bond v. United States*, *supra* (as a matter of statutory construction Court holds federal statute inapplicable to defendant's conduct, thereby avoiding Tenth Amendment and federalism issues). *See* IV-D(8), *infra*. Interpreting § 1201 consistent with its historical antecedents avoids the serious constitutional issues suggested by Count One.

      (6)    There is Negligible Authority Suggesting That a Car is a "Means, Facility and Instrumentality" of Interstate Commerce Within the Meaning of § 1201(a)(1)

Lending further support to the defense's argument is the meager case law supporting the theory advanced in the Superseding Indictment. The Post-2006 cases sustaining § 1201(a)(1) jurisdiction in intrastate kidnappings on the basis of the "means, facility and instrumentality" language added by the 2006 Amendment have almost uniformly involved the use of cellphones, the internet, GPS or Instant Messaging in the commission of the kidnapping. *See United States v.* Morgan, 748 F.3d 1024, 1031-32 (10th Cir. 2014)(use of cellphone, internet, and GPS in intrastate kidnapping); *United States v. Dais*, 559 Fed.Appx. 438, 445 (6th Cir. 2014) (use of cellphone to demand ransom; *United*

*States v. Al-Din*, 631 Fed.Appx. 313, 330 (6th Cir. 2015) (cellphone); *United States v. Ramos*, 622 Fed.Appx. 29, 30 (2d Cir. 2015) (cellphone).[9]

Counsel has not found a reported circuit case in the 11 years that have passed since the 2006 Amendment directly holding that a car is an "instrumentality of interstate commerce within the meaning of §1201(a)(1).[10] The closest circuit case appears to be *United States v. Boykin*, 794 F.3d 939 (8th Cir. 2015), which involved an intrastate kidnapping whose purpose was a robbery. The *Boykin* indictment alleged the defendants used various "instrumentalities of interstate commerce," including cellphones, multimedia messaging service (MMS), Short Message Service (SMS), iMessage and an automobile, but the issue of whether the use of a car itself was sufficient to establish jurisdiction under 1201(a)(1) was not raised.[11]

---

[9]This opinion is a Summary Order, which has no precedential effect in the Second Circuit. *Id.*, at 29.

[10]Counsel has located two unreported district court cases containing language suggesting that a motor vehicle is an "instrumentality of interstate commerce within the meaning of § 1201(a)(1). In a Memorandum and Order in *United States v. Mitchell*, 2013 WL 5377869 (N.D. Texas 2013), the Court denied a pretrial motion to dismiss that argued that the "instrumentality of interstate commerce" language in § 1201(a)(1) was void for vagueness, a claim not made here. The facts of the kidnapping are not set out in *Mitchell*, but in denying the motion, the court stated that the "intrastate use of a telephone or automobile qualifies as a "means, facility or instrumentality of interstate commerce" within the meaning § 1201(a)(1). *Id.*, at *7. Similarly, in *United States v. Jenkins*, 2017 WL 3431916 (E.D. Kentucky 2017), an apparent intrastate kidnapping involving transportation of the victim in a personal truck, the court opined in dicta that a truck is an instrumentality of interstate commerce although there is no indication in the Court's opinion that a jurisdictional issue was raised. *Id.*, at *2. (The facts of the opinion indicate that a telephone was also used to effectuate the kidnapping).

[11]The only issue raised in reference to the kidnapping conviction in *Boykin* was whether the indictment was fatally defective because it did not allege the victim was "held for ransom or reward or otherwise." The Court rejected this argument, holding that the defendant's purpose is not essential element of the offense. 794 F.3d at 947-48.

In sharp relief are the host of Circuit decisions since 2006 involving the use of cars or other vehicles in § 1202(a) kidnappings. In light of the statute's history and consistent case law requiring the government to stay in its jurisdictional lanes in kidnapping prosecutions, it is unsurprising that these cases without exception show that the victim was transferred across state lines. This principle is illustrated by a survey of kidnapping convictions in the Seventh and Eighth Circuits since 2007, involving the use of cars, each of which has involved the transportation of the victim across state lines *See United States v. Eason*, 854 F.3d 922 (7th Cir. 2017) (two victims transported by car to Illinois, one from California and the second from Texas); *United States v. Smith*, 831 F.3d 793 (7th Cir. 2016)(victim driven from Wisconsin to Colorado); *Webster v. Daniels*, 784 F.3d 1123 (7th Cr. 2015) (transportation of victim by car from Texas to Arkansas); *United States v. Jenkins*, 772 F.3d 1092 (7th Cir. 2014) (transported in truck from Illinois to Missouri); *United States v. Jonasson*, 759 F.3d 653 (7th Cir. 2014) (victim driven from Missouri to Indiana); *United States v. Reynolds*, 714 F.3d 1039 (7th Cir. 2013) (driven from Indiana to Illinois); United *States v. Sanders*, 708 F.3d 976 (7th Cir. 2013) (victim driven from Indiana to Illinois); *United States v. Bresher*s, 684 F.3d 699 (7th Cir. 2012) (movement of victim by car from Illinois to Missouri); *United States v. Gooden,* 564 F.3d 887 (7th Cir. 2009) (truck used to transport from Illinois to Missouri); *United States* v. *Diekhoff,* 535 F.3d 611 (7th Cir. 2008) (victim driven by minivan from Illinois through various states in Midwest); *United States v. Singh,* 483 F.3d 489 (7th Cir. 2007) (victim driven from Wisconsin to New Jersey); *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012) (victim driven in van from Indiana to Illinois); *United States v. Montgomery,* 635

F.3d 1074 (8th Cir. 2011) (transporting victim by car from Kansas to Missouri); *United States v. Douglas*, 646 F.3d 1134 (8th Cir. 2011) (victim driven from Missouri to Mississippi); *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009) (transported by car from North Dakota to Minnesota); *United States v. Eizember*, 485 F.3d 400 (8th Cir. 2007) (victim forced to drive defendant from Arkansas to Texas); *United States v. Barraza*, 576 F.3d 798 (8th Cir. 2009) (victim moved by car from Illinois to Missouri).

While these post-2006 cases do not conclusively establish that the use of a vehicle in an intrastate kidnapping is not contemplated by the 2006 Amendment, coupled with lack of cases prosecuted on such a theory they demonstrate a general understanding that a vehicle's only jurisdictional significance in a § 1201(a) prosecution is when used as a mode of interstate transportation in relation to the kidnapping. *See Bond v. United States*, 134 U.S. at 2092 (lack of a history of prosecution under jurisdictional theory advanced by the government suggests Congress did not intend statute's to apply to defendant's conduct); *cf. National Federation of Independent Business v. Sebellius*, __ U.S. __, 132 S.Ct. 2566, 2586 (2012)("[S]ometimes 'the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent' for Congress's action."), *quoting Free Enterprise Fund v. Public Company Accounting Oversight*, 561 U.S. 477, 506 (2010) (internal quotation marks omitted).

> (7)     The Rule of Lenity Cautions Against the Federal Government's Jurisdiction Under the Facts of This Case

The Rule of Lenity is a canon of statutory construction that requires courts to resolve ambiguous statutes in favor of defendants. *Albernaz v. United States*, 450 U.S.

333, 342 (1981); *Yates v. United States* 135 S.Ct. at 1088 (2014). The rule applies when statutes are ambiguous as to their jurisdictional scope. *Jones v. United States*, 529 U.S. 848, 858-59 (2000) (rule "reinforces" conclusion that federal government does not have jurisdiction over arson of owner-occupied residence); *United States v. Errol D., Jr.*, 292 F.3d 1159, 1163 (9th Cir. 2002). "The plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). *See generally Yates,* 135 S.Ct. at 1081-83 (dictionary definition of term "bears consideration" in interpretation of statute but is not dispositive).

Here, like the statute at issue in *United States v. Bond*, *infra*, "the ambiguity [in § 1201(a)(1)] derives from the improbably broad reach of key statutory definition . . . the deeply serious consequences of adopting such a boundless reading; and "the lack of any apparent need to do so in light of the context from which the statute arose . . ." *Bond*, 134 U.S. at 2090. As discussed above, each of these concerns are starkly presented by an interpretation that the "means, facilities and instrumentality" language in § 1201(a)(1) includes commission of an intrastate kidnapping by means of a car.

(8) *United States v. Bond*

As just noted, the issue here is similar in many respects to that in *Bond v. United States*, __ U.S. __, 134 S.Ct. 2077 (2014), a case that arose when Carol Bond spread toxic chemicals on the car, mailbox and door knob of a romantic rival. The government attempted to prosecute Ms. Bond under 18 U.S.C. § 229(a)(1), which prohibits the

knowing use of "chemical weapons" and was passed pursuant to the United States'

duties to implement its obligations as a signatory to the International Convention on the

Use of Chemical Weapons. The issue presented was whether § 229, legislated by the

Congress for an entirely different purpose, nonetheless reached the purely local crime

committed by Ms. Bond in these circumstances. The Court held it did not.

Ms. Bond argued that, in violation of the Tenth Amendment, application of § 229

impermissibly intruded on the authority of the Commonwealth of Pennsylvania

(Pennsylvania) to punish local crimes under the Police Power reserved to the States. *See*

*infra.* Applying the rule of constitutional avoidance, the Court held that it need not

reach that issue, as there was insufficient evidence that Congress intended §229 to apply

to the conduct of Ms. Bond. *See* IV-D(5), *supra.* The Court rejected the government's

argument that the chemicals that Ms. Bond placed in the victim's home and on her car

were "toxic chemicals" within the meaning of the statute, noting that "the problem with

this interpretation is that it would 'dramatically intrude[ ] upon traditional state

criminal jurisdictions,' and we avoid reading statutes to have such reach in the absence

of a clear indication that they do." *Bond*, 134 S.Ct. at 2088, *citing United States v.* Bass, 404

U.S. 336, 350 (1951). *Bond* went on to note that before finding that a "federal law

overrides the usual constitutional balance between the federal and state powers," a

court should be "certain of Congress' intent." *Bond*, 134 S.Ct. at 2089, *citin*g *Gregory v.*

*Ashcroft*. 501 U.S. 452, 460 (1991).

> "If the Federal Government would 'radically readjust[ ] the balance of state and national authority, those charged with the duty of legislating [must be] reasonably explicit' about it."

*Bond*, 134 S.Ct. at 2089, *quoting* BFP v. *Resolution Trust Corporation*, 511 U.S. 531, 544 (1994) (internal citation omitted).

Citing the Court's holding in *United States v. Jones*, *supra*, that jurisdiction under federal statutes must be read narrowly to avoid overreaching, *Bond* observed that application of § 229 "would 'alter sensitive state-federal relationships,' convert an astonishingly amount of 'traditional local criminal conduct' into 'matters for federal enforcement' [and] transform the statute['s] . . . core concerns." *Id*. at 2090. The Court also reminded that the government that the laws of the State of Pennsylvania and those of every other state were sufficient to prosecute Ms. Bond for her conduct, *id*. at 2092, and that "in its zeal" to prosecute her, the government has "displaced the public policy" of the Commonwealth. *Id*. 2093. Finally, interpreting the reach of § 229 in light of Congress's "traditional reluctance to define as a federal crime conduct readily denounced as criminal by the States," *United States v. Bass*, 404 U.S. 336, 349 (1971), and "[a]bsent a clear statement of that purpose," the Court refused to "presume Congress to have authorized such a stark intrusion into traditional state authority." *Bond,* 134 S.Ct. at 2093-94.

These very considerations apply here. First, like, the interpretation of § 229 urged by the government in *Bond*, that suggested by Count One would "convert an astonishingly amount of "traditional local criminal conduct" into federal crime. The

overwhelming number of kidnappings, if not all, are accomplished by means of a car or vehicle of some type. Every local seizure or movement of a victim in a car against their will would be converted into a federal crime. And, as noted above, federal jurisdiction premised on such an interpretation would authorize the federal government to take jurisdiction over a host of crimes that have always been regarded as local crimes within the exclusive purview of the State's Police Power. *See* IV-D(6), *supra*.

Second, the "core concerns" of § 213 of the Adam Walsh Act (like those of § 229, which were unrelated to Ms. Bond's crime) were directed at the perceived problem of the exploitation of children by the use of the internet and related tools of communications, many of which had only arisen in recent years, and had nothing to do with a general expansion of long-established jurisdictional rules in kidnapping cases.

Third, as the cases cited in the IV-D(6) demonstrate, like the lack of prior case law applying § 229 to facts similar to those in Ms. Bond's case, here there is only minimal and non-precedential authority suggesting § 1201(a)(1) applies to an intrastate kidnapping.

Fourth, like those of Pennsylvania, the laws of Illinois (and every other state) are sufficient to prosecute Mr. Christensen and punish him severely if found guilty of the conduct charged in the Superseding Indictment. *See* ILCS 5/10-2: Aggravated Kidnapping (inflicting great bodily harm during kidnapping other than by discharge of firearm or committing another felony on victim: in addition to kidnapping sentence, mandatory additional 15 years for aggravated); 720 ILCS 5/9-1: First Degree Murder

defined and 730 ILCS 5/5-4.5-20, Sentencing for 1st Degree Murder (up to term of natural life imprisonment).[12]

Fifth, like its attempt to "displace the policy" of the Commonwealth of Pennsylvania, the government's attempt to prosecute Mr. Christensen for the use of a car in an intrastate kidnapping under § 1201(a) is seemingly a transparent attempt to seek the death penalty in a state whose public policy (like that of much of the world) rejects this form of punishment. *See* IV-D(4), *supra*.

The issues and concerns presented to this Court here are almost identical to those addressed by the Supreme Court in *Bond* and the reasoning of that case directly controls disposition of this motion.

In conclusion, the history of the federal crime of kidnapping as defined in § 1202(a), case law interpreting its limited jurisdictional reach, the purpose of the Amendments of 2006, principles of statutory construction and federalism, the lack of authority interpreting § 1201(a)(1) in the manner suggested by Count 1 and Supreme Court precedents applying these principles, all caution that this Court should apply the rule of constitutional avoidance and hold that Congress did not intend that § 213 of the Adam Walsh Act would turn established kidnapping law on its head and authorize a federal court to take jurisdiction over an intrastate kidnaping solely because a car was used.

---

[12]Felony-murder is also punished as first degree murder under Illinois law. *See People v. Hudson*, 856 N.E. 2d 1078 (Ill. 2006).

Otherwise, the Court must address the constitutionality of § 1202(a)(1) under the facts of this case.

## V.  INTERPRETING THE 2006 AMENDMENT AS INCLUDING THE USE OF A VEHICLE IN AN INTRASTATE KIDNAPPING VIOLATES THE COMMERCE CLAUSE

Mr. Christensen does not bring a facial challenge to the constitutionality of § 1202(a)(1). Rather, he contends that the "instrumentality of interstate commerce" language added by Amendment of 2006 is unconstitutional as applied to his case. *See Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 493 (10982) (facial challenges are rarely successful as statute must be unconstitutional in all cases; "as applied" challenges are based on statute as applied to facts of case).

### A.  Congress's Power to Legislature Under the Commerce Clause is Not Unlimited and is Circumscribed by the States' Police Power

"The Constitution [] creates a national government with defined and enumerated powers." *United States v. Lopez*, 514 U.S. at 552 (1995). "[R]ather than granting general authority to perform all the conceivable functions of government, the Constitution lists, or enumerates, the Federal Government's powers." *National Federal of Independent Bunsiness v. Sebelius*, 132 S.Ct. 2566, 2577 (2012). "The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292–293, *quoted in Lopez*, 514 U.S. at 552 (1995).

Among the enumerated powers not delegated to the federal government in Article One, Section 8 of the Constitution is the Police Power. From the earliest days of

the republic, it was accepted that the Police Power was assigned to the states under the Tenth Amendment. *See Cohens v. Virginia*, 6 Wheat. 264, 426, 428 (1821)(Marshall, C.J.) (Congress has no power to punish murder within the States or felonies generally). That principle persists through modern constitutional interpretation. *United States v. Lopez*, 514 U.S. at 566 ("The Constitution withholds from Congress a plenary police power."). Chief Justice Robert recently emphasized this fundamental maxim of constitutional adjudication:

> "I write separately to stress not only that a federal police power is immaterial to the result in this case, but also that such a power *could not* be material to the result in this case—because it does not exist. (Citation omitted) . . . Our resistance to congressional assertions of such a power has deep roots."

*See United States v. Kebodeaux*, __ U.S. __, 133 S.Ct. 2496, 2507 (2013) (Roberts, C.J., concurring in judgment).

As noted above, the Constitution confers primary responsibility for implementing criminal sanctions upon the States. *Brecht v. Abrahamson*, supra. These principles apply with particular force to violent crimes. *United States v. Morrison*, 529 U.S. at 618 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channel, or goods involved in interstate commerce has always been the province of the States.").

The Federal Kidnapping Act itself was premised on a particularized need for federal jurisdiction in limited circumstances (when a victim is transported across state lines) and passed pursuant to Congress' powers under the Commerce Clause. *See* IV-A,

*supra*. But, however broad as a general matter, Congress's power under the Commerce Clause has "judicially enforceable outer limits." *United States v. Lopez*, 514 U.S. at 566 ("[E]ven under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds."); *United States v. Morrison*, 529 U.S. at 608; *National Federation of Independent Business v. Sebellius*, 135 S.Ct. at 2579 (While deference is accorded, "our respect for Congress's policy judgment thus can never extend so far as to disavow restraints on federal power that the Constitutional carefully constructed."). The scope of the Commerce Clause power "is necessarily one of degree." *Lopez*, 514 U.S. at 555, *quoting Jones & Laughlin Steel*, 301 U.S. 1, 37 (1937).

The two leadings modern cases directly holding that Congress exceeded its powers under the Commerce Clause are *Lopez* and *Morrison*.[13] *Lopez* held that the Gun-Free Zones Act of 1990, which banned possession of handguns near schools, was unconstitutional because it did not involve economic conduct, did not have a defined jurisdictional element that permitted an assessment of interstate activity on a case-by-case basis and did not have a substantial impact on interstate commerce. *Morrison* struck down the Violence Against Women Act of 1994, which provided a federal civil remedy for gender-motivated violence, because it did not regulate economic concerns of interstate commerce and was primarily a regulation against violent crimes and thus invaded the province of the States. *Cf. United States v. Kebodeaux*, 133 S.Ct. at 2507 (2013)

---

[13]While upholding the Act on other grounds, *National Federation of Independent Business v. Sebellius,* 567 U.S. 519, 547-558 (2012) also held that certain provisions of the Affordable Care Act exceeded Congress' power to legislate under the Commerce Power.

(The Constitution does not give "Congress a freestanding, independent, and perpetual interest in protecting the public from the convict's purely intrastate conduct.") (Roberts, C.J., concurring in judgment).

The striking down of the respective Acts in *Lopez*, and *Morrison* reflect limitations imposed on Commerce Clause jurisdiction and illustrate the Constitution's rejection of a general federal police power. In other cases, the Supreme Court has read statutes narrowly to avoid Commerce Clause problems that would be created by a contrary interpretation. *See Jones v. United States*, *supra* (owner-occupied residence not used for any commercial purpose does not qualify as "property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce" within meaning of the federal arson statute, and arson of such a dwelling is not subject to federal prosecution under the statute); *Bond v. United States*, *supra* (statute imposing criminal penalties for using chemical weapons did not reach defendant's conduct); *Solid Waste Agency of Northern Cook County v. U.S. Army Corp of Engineers*, 531 U.S. 159 (2001) (Army Corps of Engineers' rule extending definition of "navigable waters" under Clean Water Act to include intrastate waters used as habitat by migratory birds which cross state lines raised a significant constitutional question whether Congress had power to regulate such waters under the Commerce Clause and thus not entitled to *Chevron* deference.).

In all these cases, whether directly holding the legislation at issue violated the Commerce Clause or interpreting terms so as to avoid Commerce Clause issues, the Court has been "conscious of the danger . . . to obliterate the distinction between what is

national and what is local," posed by overly expansive interpretations of Commerce Clause jurisdiction, *Gonzales v. Raich*, 545 U.S. *at* 35-36 (Scalia, J., concurring), and of inappropriately opening the floodgates of federal jurisdiction. *Bond*, 134 S.Ct. at 2090 (would convert an astonishingly amount of 'traditional local criminal conduct' into federal crimes); *Lopez*, 514 U.S. at 564 ("[I]f we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate."); *Solid Waste Agency of Northern Cook County*, 531 U.S. at 174 ("Permitting respondents to claim federal jurisdiction over ponds and mudflats falling within the "Migratory Bird Rule" would result in a significant impingement of the States' traditional and primary power over land and water use."); *Jones*, 529 U.S. at 859 ("[statute] is not soundly read to make virtually every arson in the country a federal offense.").

B.      Application of These Principles

In *Lopez*, the Court held that Congress may regulate three broad areas of activities under the Commerce Clause: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) those activities that have a "substantial relation to interstate commerce." 514 U.S. at 558-59 (1995). As to the first category, the "use of the channels of interstate commerce" language in § 213 of the Adam Walsh Act was not a regulation of a channel of interstate commerce, which permits Congress to regulate persons or things that travel or are transported through

interstate commerce.[14] For instance, the *Darby* case cited in *Lopez* as an example of this category upheld Congress' power to prohibit the shipment of lumber in interstate commerce that had been manufactured in a manner that did not comply with the Fair Labor Standards Act. *United States v. Darby*, 312 U.S. 100 (1940).[15] Despite use of the term, § 213 is also not a regulation of the instrumentalities of interstate commerce in the sense used in the second *Lopez* category, such as the railroad rate cases and statutes prohibiting destruction of aircraft or theft from interstate commerce that *Lopez* cites. Rather, the constitutionality of § 213 must be analyzed under the third category, as it is a regulation of an *activity* – kidnapping by use of an "instrumentality of commerce." *See generally National Federation of Independent Business*, 132 S.Ct. at 2587.

Mr. Christensen concedes that the commerce power can extend to intrastate activity, where such activity "substantially affects" interstate commerce, and that the *de minimis* effect on interstate commerce of his own activity is not controlling. *Lopez*, at 558-59; *United States v. Taylor*, 136 S.Ct. 2074, 2079-80 (2016). But, where the regulated activity is not commercial in nature, there still must be a showing that the activity "in the aggregate substantially affects interstate commerce," *Lopez* at 561-62, a requirement that is more imperative when the statute itself "contains no jurisdictional element which

---

[14]The part of the 2006 Amendment adding the jurisdiction over offenders who travel in interstate commerce is an example of jurisdiction under this category and is not challenged here.

[15]Similarly, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964), the second case cited by *Lopez* as an example of this category, upholding Title II of the Civil Rights Act of 1964, as prohibiting a motel from denying access to African-Americans, was a regulation of persons traveling in interstate commerce.

would ensure, through case-by-case inquiry, that [the activity] affects interstate commerce." *Id*. Even employing a macro analysis of the use of cars or other vehicles in intrastate kidnappings where, as here, no ransom or reward or other economic benefit is demanded, it is difficult to unearth a substantial effect on interstate commerce. The argument that violent crime, standing alone, affects the national economy sufficient to invoke Congress' commerce power was directly rejected in *Lopez* for the reasons previously stressed here:

We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce. See Tr. of Oral Arg. 8–9. Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example.

Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate. *Lopez*, 514 U.S. at 564. Thus, while jurisdiction under this third *Lopez* category is broad, "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only when that activity is economic in nature." *United States v. Taylor*, 136 S.Ct.

39

at 2079-80 (citation omitted); *Morrison*, 529 U.S. at 617 ("We [] reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.").

No matter how abhorrent and offensive, intrastate kidnappings in the circumstances presented here have no economic consequences within the meaning of Article 1, § 8, cl. 3 of the U.S. Constitution and thus cannot be punished by the national government. But, as the statutes of Illinois cited above show, that does not cripple our legal system's ability to prosecute and severely punish offenders who participate in such crimes, including, in appropriate circumstances, incarcerating them for the rest of their natural lives.

For the reasons stated herein, Mr. Christensen requests that the Court enter an Order dismissing Count One.

Respectfully submitted,

BRENDT A. CHRISTENSEN, Defendant

By:  /s/ Elisabeth R. Pollock  
       Assistant Federal Defender  
       300 West Main Street  
       Urbana, IL 61801  
       Phone: 217-373-0666  
       FAX:   217-373-0667  
       Email: Elisabeth_Pollock@fd.org  

/s/ George Taseff  
Assistant Federal Defender  
401 Main Street, Suite 1500  
Peoria, IL 61602  
Phone: 309-671-7891  
Fax:      309-671-7898  
Email: George_Taseff@fd.org

/s/ Robert Tucker  
Robert L. Tucker, Esq.  
7114 Washington Ave  
St. Louis, MO 63130  
Phone: 703-527-1622  
Email: roberttuckerlaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2018, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller. A copy

was also mailed to the defendant.

<div style="margin-left: 40%;">

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

</div>