UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 17-CR-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

<u>MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO THE ILLEGAL SEARCH
OF DEFENDANT'S APARTMENT ON JUNE 15, 2017</u>

Defendant Brendt A. Christensen, by and through his attorneys, hereby moves pursuant to Fed.R.Crim.P. 12(b)(3)(C) to suppress all items of physical evidence seized pursuant to an illegal search of 2503 W. Springfield Avenue, Champaign, Illinois, on June 15, 2017. In support of the motion Mr. Christensen states as follows:

**I.     Factual Background**

On the evening of June 14, 2017, FBI Special Agents and Detectives with the University of Illinois Police Department (UIPD) went to the apartment of Brendt and Michelle Christensen, located at 2503 W. Springfield Avenue, Unit B-2, in Champaign, Illinois. The purpose of their visit was to execute a search warrant for the Christensens' 2008 black Saturn Astra which had been issued by Magistrate Judge Eric Long that evening.

At approximately 11:45 p.m., the agents approached the door of the apartment

1

and knocked. Mr. Christensen and his wife, Michelle Christensen, were asleep. Mr. Christensen answered the door wearing a pair of sweatpants, having been awakened by the knocking. The agents then entered the apartment and found Mrs. Christensen naked, standing in the hallway. The lights in the apartment were not turned on, and agents shone flashlights in her face.

Mrs. Christensen retrieved a bathrobe from her bedroom and covered herself. When she emerged from the bedroom, she observed FBI Special Agent Manganaro and UIPD Detective Stiverson take Mr. Christensen away from the apartment to the local FBI office to be interviewed. This left Mrs. Christensen alone in the apartment with the remaining FBI agents; upon information and belief, there were at least seven agents in the apartment at the time.[1]

Special Agents Katherine Tenaglia and Andrew Huckstadt sat her down and began interviewing her just before midnight. At that time, the other agents who were in the apartment began taking photographs and going through her belongings. Mrs. Christensen felt confused and shocked by the intrusion into her residence. Tenaglia and Huckstadt interviewed her for approximately two hours. During the course of the interview, other agents were searching the premises.

According to the written reports from that morning, agents had Mrs. Christensen sign a FD-26 Consent to Search form at the conclusion of her interview that morning,

---

[1] An FD 302 form provided in discovery indicates that the FBI Agents present for the interview/search of the apartment were Justin Tennyson, Mark Hill, Joel Smith, Brian Schenkelberg, Katherine Tenaglia, Andrew Huckstadt, and Michael Carter.

2

which would have been at approximately 2:00 a.m. She does not specifically recall signing a written FD-26 Consent to Search form, although one of those forms appears in the discovery provided by the government and purports to have her signature affixed thereto. There is no time noted on the FD-26. Mrs. Christensen's recollection is that the agents began searching the premises and taking photographs immediately after Mr. Christensen left the apartment to be interviewed, which would have been approximately two hours before she allegedly signed the consent to search form. She was later left with a copy of the search warrant for the Saturn Astra, but no warrant to search the premises.

When the FBI agents left the residence, they took several items with them including but not limited to: computer towers, cellular telephones, a digital camera, an external hard drive, and laptop computers. If Mrs. Christensen had known she had a legal right to refuse to consent to the search, she would have exercised it at that time. She did not, however, realize that she could do so.

## II.   Argument

Michelle Christensen did not validly consent to the search of the apartment in question in the early morning hours of June 15, 2017. First, the totality of the circumstances indicate that any consent Mrs. Christensen provided was involuntarily given, thus all evidence seized pursuant to that consent should be excluded. Second, even if her consent could somehow be deemed voluntary, the removal of Mr. Christensen from the premises was not objectively reasonable as a lawful detention at

the time. Rather, it was a deliberate effort by law enforcement to isolate Mrs. Christensen from her husband and vitiate his right to refuse to consent to a search of his own property.

### A. Standing

As an initial matter, Mr. Christensen has standing to challenge the search of his residence. A person can claim the protection of the Fourth Amendment's bar against unlawful searches and seizures when he had a legitimate expectation of privacy in the invaded place that society is prepared to recognize as reasonable. *Minnesota v. Olson,* 495 U.S. 91, 95-96 (1990) (citing *Rakas v. Illinois,* 439 U.S. 128, 143 (1978)). A residence is the primary example of where a person has the highest expectation of privacy. As the Supreme Court recognizes, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York,* 445 U.S. 573, 585 (1980). When a third party consents to the search of a residence, the aggrieved party may challenge the validity of that consent. *United States v. Cellitti,* 387 F.3d 618, 621 (7th Cir. 2004) (citing *United States v. Matlock,* 415 U.S. 164 (1974)).

There is no dispute that Mr. Christensen resided at 2503 W. Springfield, Unit B-2, and as such had a reasonable expectation of privacy in the home. If his wife's constitutional rights were violated and she was coerced into consenting to a search of the apartment, Mr. Christensen's rights were also violated and he can challenge the voluntariness of her consent. *Cellitti,* 387 F.3d at 622.

**B.     Michelle Christensen did not freely and voluntarily consent to the search of the premises.**

A search conducted without a warrant is considered unreasonable subject only to a few well-delineated exceptions. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). One of those exceptions exists when the warrantless search is conducted pursuant to validly given consent. *Id.* at 222, citing *Katz v. United States,* 389 U.S. 347, 358 (1967). The giving of free and voluntary consent is a factual question. *Cellitti,* 387 F.3d at 622 (citing *United States v. Pedroza*, 269 F.3d 821, 826 (7th Cir. 2001). Several factors are considered in the analysis, including (1) the age, intelligence, and education of the person who gave consent, (2) whether she was advised of her constitutional rights, (3) how long she was detained before consenting, (4) whether she consented immediately or only after repeated requests by authorities, (5) whether physical coercion was used, and (6) whether she was in police custody at the time she gave her consent. *Id.*, citing *Schneckloth,* 412 U.S. at 226. Ultimately, no one factor is controlling; the evaluation of voluntariness is based on the totality of the circumstances. *Id.* However, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.* at 229.

It is a deeply-rooted principle that police encounters at a person's dwelling place in the middle of the night are known to be "especially intrusive." *United States v. Jerez,* 108 F.3d 684, 690-91 (7th Cir. 1997). "Indeed, the special vulnerability of the individual awakened at the privacy of his place of repose during the nighttime hours to face a nocturnal confrontation with the police was recognized in the common law that

antedates our separation from England." *Id.* (citations omitted). In this case, Michelle Christensen was awaked around midnight by multiple law enforcement agents banging on her apartment door. As vulnerable as that timing made her, it was made substantially worse by the fact that as the agents entered the apartment, she did not even have time to put clothes on before flashlights were shone into her eyes as she stood naked and humiliated before them.

When a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of caution. *Jerez,* 108 F.3d at 690. The Sixth Circuit has held a wife's consent to be involuntary where she was asked to permit a search in the middle of the night, while emotional, and just after the removal of her husband from the apartment. *United States v. Tatman,* 397 Fed.Appx. 152, 165 (6th Cir. 2010). Similar circumstances existed here. Although she is an intelligent woman who had attended college, Mrs. Christensen had virtually no experience with law enforcement. Even a highly educated and intelligent person is extremely vulnerable when confronted in the middle of the night in her dwelling place.

Second, Mrs. Christensen was under the impression that she had no choice in the events of that morning. She believed she had no control over their search of the premises. As noted above, the agents began searching the apartment and taking photographs immediately upon her husband's removal from the premises and while she was being interviewed by Special Agents Huckstadt and Tenaglia. According to the

6

FBI reports, she did not sign the FD-26 until two hours later, at the conclusion of her interview and after the agents had already been searching for a substantial amount of time. The search was fundamentally over at that point, the last photographs having been taken at 1:08 a.m.

Based on those circumstances, she felt she had no choice but to allow the search. In *United States v. Starnes,* 501 Fed.Appx. 379, 389 (6th Cir. 2012), the defendant's wife did not fully read or understand the FBI's consent form, and believed that her refusal to allow the search would have been utterly futile due to the fact that a search of the premises had already begun *prior* to her signing the consent form. Consent is not freely or voluntarily given when a scared, shaken up and confused woman is placed under highly distressing, fast moving circumstances such as those at issue in this case. *Id.* at 390.

In the present case, the totality of the circumstances indicate that Mrs. Christensen's alleged consent could not have been voluntary. She was wakened from sleep by multiple law enforcement officers pouring into her apartment and taking her husband away for questioning. Although intelligent, she was surprised, confused, and scared. She was also wholly unaware of her right to refuse to consent to a search of the apartment. Based on the foregoing, any alleged consent to search given by her should be deemed involuntary.

### C.  Brendt Christensen was intentionally removed from the premises with the intent of interfering with his constitutional right to refuse a consent search of his apartment.

Even if Michelle's consent can somehow be deemed voluntary, the search was still invalid because Mr. Christensen was removed from the premises and denied his right to refuse consent. In general, the consent of one person who possesses common authority over the premises is valid against the absent, non-consenting person. *United States v. Matlock*, 415 U.S. 164, 170 (1974). However, the Supreme Court has held that a narrow exception is recognized where a physically present inhabitant's express refusal of consent to search is unequivocally made, regardless of the consent of the other inhabitant. *Fernandez v. California,* 134 S.Ct. 1126, 1133 (2014) (citing *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006)). Taking it one step further, if the non-consenting person is unable to be physically present at the residence because he is removed from the premises without lawful authority, the third party's consent can also be deemed invalid. *Id.* at 1134.

When agents removed Mr. Christensen from the premises, he was not under arrest nor was there probable cause to arrest him. This is a distinguishable factual scenario from the majority of cases invoking the forced absence exception to third party consent. For example, in *United States v. Jones,* 861 F.3d 638, 642 (7th Cir. 2017), the defendant invoked *Randolph* and claimed that officers removed him prior to the search for the sake of avoiding a possible objection to his girlfriend's consent. The Seventh Circuit found that the defendant's removal from the premises was objectively

8

reasonable because officers had reason to believe that he was armed and dangerous (i.e. officer safety) and because there was independent probable cause to arrest him. *Id.* In *United States v. Groves,* 530 F.3d 506, 512 (7th Cir. 2008), the defendant was absent from the residence at the time officers approached his girlfriend and requested consent to search. The Seventh Circuit found no *Randolph* violation because the officers "did nothing to procure" the defendant's absence; rather, they went to the home knowing he was not present, which was insufficient to warrant relief under *Randolph*. *Id.* Similarly, in *United States v. Reed,* 539 F.3d 595, 598 (7th Cir. 2008), the defendant was absent from the residence at the time of the search as the result of a valid arrest, thereby rendering his girlfriend's consent proper.

When the agents arrived at Mr. Christensen's apartment, they were purportedly there to search his vehicle and to ask him some questions. He could have been questioned at the residence, but instead he was taken away, thereby isolating his wife inside with seven FBI agents. There was no discussion of a search, consensual or not, prior to his removal. As he was not under arrest at the time, there was no probable cause to arrest him, nor any threat to officer safety, his removal from the apartment can be viewed as an intentional attempt to interfere with his ability to refuse consent to search, thereby invalidating his wife's third party consent.

    **D.**    **The search warrant that existed for the vehicle was unlawfully used as an excuse to enter the apartment, therefore any evidence obtained pursuant Michelle's consent is fruit of the poisonous tree.**

It is undisputed that at the time the agents approached Apartment B-2, they had

9

a search warrant for the Saturn Astra that was parked outside of the building. They did not have any search warrant for the apartment, nor did they have an arrest warrant for Mr. Christensen. There was no indication that a protective sweep was necessary, nor were there any exigent circumstances present. Put simply, the agents had no legal right to enter the apartment when they arrived there at almost midnight on June 14, 2017. The agents may have chosen to approach the apartment a) to ask for the keys to the vehicle so as to facilitate the execution of the search warrant or b) to attempt to speak to the residents (commonly referred to as a "knock and talk.").

      i.    *The actions of the agents do not meet the requirements of a legal knock and talk.*

The home and the curtilage surrounding it are constitutionally protected areas. *Florida v. Jardines,* 569 U.S. 1, 6 (2013). It is presumptively unreasonable to search a home or its curtilage without a warrant, but under the "knock and talk" exception, a police officer may approach a home and known because it is the same type of action that any private citizen could take. *Jardines,* 569 U.S. at 8. As the Supreme Court noted, it is "managed without incident by the Nation's Girl Scouts and trick-or-treaters" as a matter of course. *Id.*

But the timing and purpose of the knock and talk is relevant in evaluating the constitutionality of such a technique. Most residents do not expect visitors to visit them in the middle of the night; rather, they are expected during normal waking hours. *United States v. Lundin,* 817 F.3d 1151, 1159 (9th Cir. 2016). The analysis underlying the holding of *Jardines* depended upon allowing the police to engage in conduct that

average, everyday people might engage in; this does *not* include knocking on a neighbor's door during time periods where normal residents would be asleep. Additionally, "[t]he scope of a license – express or implied – is limited not only to a particular area but also to a specific purpose." *Jardines,* 569 U.S. at 9. The only permissible result from a knock-and-talk is to ask questions of the occupants. *Lundin,* 817 F.3d at 1159. Officers who knock on the door of a residence for other purposes generally exceed the scope of the customary license and therefore overstep the bounds of the knock and talk exception. *Id.*

The decision to conduct a knock and talk at nearly midnight on a weeknight is questionable simply based on the timing, but subsequent actions by the agents utterly removes this case from the realm of constitutionality. Instead of waiting to be received or invited into the home as is contemplated by knock-and-talks, multiple agents entered the apartment *en masse* before Michelle Christensen could even cover her nudity. The purpose of entering the apartment in such an aggressive manner was to secure Brendt Christensen, get him to agree to an interview, and get Michelle Christensen to agree to let them search the property. Therefore, both the purpose and the timing of the entry into the apartment are inconsistent with the constitutional principles laid out by *Jardines*.

        ii.    *The illegal entry into the apartment cannot be cured, therefore the exclusionary rule should be applied.*

Otherwise voluntary consent can nonetheless be tainted by a prior illegal entry. *United States v. McMillian,* 786 F.3d 630 (7th Cir. 2015). An analogous case is that of

11

*United States v. Abarza,* 199 F.Supp.3d 1270 (D.Oregon 2016). In *Abarza,* law enforcement officers went to the home of an arrestee's wife at approximately 2:30 a.m. carrying flashlights. *Id.* at 1273. One of the officers approached the back door and knocked, and the defendant answered shortly thereafter; it was clear she had been sleeping. *Id.* at 1274. After a brief conversation, she let the officer into the residence and he began asking questions. *Id.* Within a few minutes she began making incriminating statements. *Id.* The district court in *Abarza* found that even though the defendant consented to the officer entering the home, the consent was fatally tainted by the prior illegal entry. *Id.* at 1276. The fact that the entry occurred in the middle of the night, when no reasonable homeowner would expect a visitor, without probable cause, without a warrant, and without the express invitation of the homeowner violates the Fourth Amendment. *Id.*

The exclusionary rule preventing the use of evidence obtained in violation of that amendment protects the Fourth Amendment guarantees by deterring lawless conduct by law enforcement officers. *United States v. Robeles-Ortega,* 348 F.3d 679, 681 (7th Cir. 2003) (citing *Brown v. Illinois,* 422 U.S. 590, 598 (1975); *Wong Sun v. United States,* 371 U.S. 471, 486 (1963)). In examining whether the exclusionary rule applies, privacy interests inherent in the Fourth Amendment are a concern in conjunction with considerations of deterrence and judicial integrity. *Id.*, citing *Brown,* 422 U.S. at 598. In determining whether evidence is tainted by a prior illegality, it must be determined whether the evidence was obtained by exploitation of the illegal or by means distinguishable from the primary taint. *Id.*, citing *United States v. Valencia,* 913 F.2d 378, 382 (7th Cir.1990).

"Where the search following the illegal entry is justified based on alleged consent, courts must determine whether that consent was voluntary, and in addition the court must determine whether the illegal entry tainted that consent. The Supreme Court has identified a number of factors relevant to that inquiry, including (1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." *Id.*, citing *Brown*, 422 U.S. at 603–04.

In this case, the illegal entry into the apartment directly resulted in the "consensual" search authorized by Mrs. Christensen. There were no intervening circumstances at all, and the agents went to the apartment in a *tour de force* with the intent of obtaining a confession from Mr. Christensen and consent from his wife to search the premises. Because the agents illegally entered the apartment, any subsequent consent given by Michelle Christensen should still be excluded as fruit of the poisonous tree.

WHEREFORE, Defendant Brendt A. Christensen respectfully requests that this Court enter an Order suppressing all physical evidence seized from 2503 W. Springfield Avenue, Champaign, Illinois, pursuant to the illegal search on June 15, 2017, and for any other relief that this Court deems appropriate.

Respectfully submitted,

BRENDT A. CHRISTENSEN, Defendant

By: /s/Elisabeth R. Pollock  /s/ George Taseff
Assistant Federal Public Defender  Assistant Federal Public Defender
300 West Main Street  401 Main Street, Suite 1500
Urbana, IL 61801  Peoria, IL 61602
Phone: 217-373-0666  Phone: 309-671-7891
FAX:   217-373-0667  Fax:    309-671-7898
Email: Elisabeth_Pollock@fd.org  Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:    217-373-0667
Email: Elisabeth_Pollock@fd.org