E-FILED
Monday, 15 January, 2018  02:40:39 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO BAR AND SUPPRESS IDENTIFICATION
## TESTIMONY AND EVIDENCE

Now comes the Defendant, BRENDT A. CHRISTENSEN, by and through his attorneys, and pursuant to Rule 12(b)(3)(C), Fed.R.Crim.P., and Rules 401, 403, and 404(b), Fed.R.Evid., moves this Court for the entry of an Order barring and suppressing certain identification testimony and evidence of a witness identified herein as "EH" whom the Government may call to testify against the Defendant at the trial of this cause, and in support thereof states as follows:

**Factual Background**

1.      On June 9, 2017, at approximately 9:27 a.m., a female graduate student at the University of Illinois at Champaign-Urbana, (hereinafter referred to as "EH"), telephoned the University of Illinois Police Department on its non-emergency number to report "suspicious activity" she witnessed on Stoughton Street, between Busey Avenue and Lincoln Avenue, in Urbana, Illinois. According to EH, just minutes earlier,

while walking eastbound on Stoughton toward a bus stop, she was approached by a man driving a black sedan who showed her a badge that was on a chain that he pulled out of his shirt and claimed to be an "undercover cop" who was "doing some undercover work in the area." EH told the police dispatcher that the man asked if he could ask her a few questions, and she replied, "yes." The man then asked her to get in his car, and EH said "no." The man then said, "Okay, well, I just wanted to ask you if you had seen anything strange in the area to give the police a call," and EH replied, "Okay," and the man drove away.

2.     On June 12, 2017, at approximately 6:20 p.m., EH was summoned to the University of Illinois Police Department where she met with Officer Hurless and FBI Agent Tenaglia who interviewed her about the "suspicious activity" call she had made to the police on June 9. During the interview, EH told Officer Hurless and Agent Tenaglia that on June 9, 2017, at approximately 9:30 a.m., she had parked her car on Stoughton and was walking toward a bus stop when a man, who was driving eastbound on Stoughton, pulled up and said, "excuse me." EH said that the man was leaning over in his car and was wearing a "sheriff's star" on a chain that was around his neck. The man stated, "I'm an undercover cop, working in the area, I was wondering if I could ask you a few questions." EH walked up to the car, and the man repeated what he had said. EH said yes, she would answer questions. The man asked her to get in the car, and she said no and began to walk away. The man stated that if she saw anything

suspicious she should call the police and drove away. EH could not recall which way the man drove off.

3.        EH described the man as a white male, in his early 30's, clean shaven, clear complexion, wearing dark aviator style sunglasses, a black shirt, dark short hair (not military style), no tattoos, and no earrings. She described the badge as a "sheriff's star" with black leather backing.

4.        EH described the car as a black, four door sedan. She did not know its make or model, nor could she recall anything distinctive about the vehicle in regards to damage, bumper stickers, or registration information.

5.        On June 14, 2017, at approximately 7:49 p.m., EH was summoned to the FBI Resident Agency Office in Champaign, Illinois, to view a photographic array depicting six white males that was composed by FBI Agent Manganaro from drivers' license photos pulled from the Illinois Secretary of State's data base. Attached hereto and marked "Exhibit 1-1 to 1-6," are black and white copies of the six photographs that Agent Manganaro used to compose the array. Of the six white males whose photographs composed the array, all of the men appear to have facial hair, even though EH described the man driving the black sedan as "clean shaven." Included within the array was a driver's license photo of the Defendant as the third photo in the six photo array.[1]

_____

[1]On December 28, 2017, Defense counsel served supplemental discovery requests upon Government counsel seeking additional discovery concerning the FBI's administration of the photographic array used in this case. Those requests include, but are not limited to, all reports

6.      Once EH arrived at the FBI office, she met with FBI Agents Tenaglia and Jerge who showed her the six photos one at a time and told her to take as much time as she needed to review the photos and to determine whether EH recognized any of the individuals.

7.      After viewing the six photos, EH stated that she believed that individual #3 [the defendant] "…may have shared the most characteristics with the individual who approached her in the car due to his short, dark hair and tan face." EH, however, "was not positive and could not say for certain if the individual she saw was depicted…[because]… [i]t was difficult due to the individual wearing sunglasses at the time." Moreover, EH said nothing to the agents about the fact that the individual in photograph #3 [the Defendant] clearly had facial hair, even though her earlier description of the man she had given to the police on June 12 was that he was "clean shaven."

**Argument**

8.      This Court should bar all evidence and testimony of EH's incident involving the white male in the black sedan on June 9, 2017, and her examination of the photographic array on June 14, 2017, for the simple reason that such evidence is not relevant to any material fact or proposition in this case. EH's utterly vague description

---

and memoranda relating to the FBI Agents' compliance with the US. Dept. of Justice Eyewitness Identification Procedures for Conducting Photo Arrays, as contained in the Memorandum of January 6, 2017, of the Deputy Attorney General to all Heads of Department Law Enforcement Components. As of the date of the filing of this motion, the Government's response to those supplemental requests remains outstanding.

of the "white male in the black four-door sedan" whom she encountered on the morning of June 9, 2017, and her selection of photograph #3 in the array because the person depicted therein "shared the most characteristics with the individual who approached her in the car," is so general and nondescript as to amount to no identification of the Defendant at all. And because such evidence does not come close to proving that Defendant was the man who approached her in his car on June 9, it should not be admissible as evidence at the trial of this case.

9.      It is axiomatic that evidence is relevant and admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Fed.R.Evid. Relevant evidence "may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Rule 403, Fed.R.Evid. In *United States v. Westmoreland*, 312 F.3d 302, (7th Cir. 2002), the Seventh Circuit found that it was error for the district court to admit into evidence a false letter that was purportedly authored by the defendant's wife and submitted at the sentencing hearing of the defendant's earlier drug trial. According to the Court, the relevance of the letter was questionable, given the letter's true author was never established, and there was no evidence that the defendant knew of or authorized the letter being submitted to the Court in an effort or attempt to obstruct justice. Similarly, in this case, EH's expected testimony concerning her vague description of the

5

white, clean-shaven male wearing dark aviator-style sunglasses and a badge who

approached her in a black, 4-door sedan, and her selection of photograph #3 (the

defendant's) from the array because she believed that person "may have shared the

most characteristics with the individual who approached her in the car," falls far short

in establishing that this Defendant was the individual who approached her that day and

attempted to get her into his car. And finally, whatever probative value, if any, such

evidence may have, it is substantially outweighed by the danger of unfair prejudice,

confusing the issues, and misleading the jury that would result to the Defendant if such

evidence is admitted at trial in a case where Defendant is charged with kidnapping

resulting in death. For all of these reasons, this Court should bar the Government from

making any use at trial of EH's testimony concerning the events of June 9, 12, and 14,

2017.

      10.     In the alternative, such evidence should be suppressed because, upon

receipt of additional discovery on this matter, and as will be proven at a hearing on this

motion, both the manner in which the photographic array was composed, as well as the

manner in which it was administered and shown to EH was "so [unnecessarily]

suggestive as to give rise to a very substantial likelihood of irreparable

misidentification. " *Perry v. New Hampshire*, 565 U.S. 228, 132 S.Ct. 716, 720, 181 L.Ed.2d

694 (2012); *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247

(1968).

11.     Courts conduct a two-step inquiry in assessing the admissibility of eyewitness identification testimony and evidence. First, courts look to whether the identification procedure employed by the police was unduly suggestive. Secondly, if it was, then courts determine whether the totality of the circumstances nevertheless shows that the testimony was reliable. *Perry v. New Hampshire, supra*; *Simmons v. United States*, supra; *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Curry*, 187 F.3d 762, 768 (7th Cir. 1999).

12.     The Supreme Court has said that "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In assessing whether an identification was reliable, a court should consider the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime (or prior to the identification), (2) the witness's degree of attention during such an opportunity, (3) the accuracy of the witness's prior description of the criminal, if he made one, (4) the level of certainty demonstrated at the time of the identification, and (5) the time between the crime and the identification. I*d*. at 114, 97 S.Ct. 2243; *Curry*, 187 F.3d at 768.

13.     In *United States v. Ford*, 683 F.3d 761, 766 (7th Cir. 2012), the Seventh Circuit observed that, "As awareness of the frequency of mistakes in eyewitness identification has grown (see, e.g., Jon B. Gould & Richard A. Leo, "One Hundred Years Later: Wrongful Convictions After a Century of Research," 100 J.Crim. L. & Criminology 825, 841–42 (2010); Innocence Project, "Reevaluating Lineups: Why

7

Witnesses Make Mistakes and How to Reduce the Chance of a Misidentification" 3–4

(2009), www. innocence project. org/ docs/ Eyewitness_ ID_ Report. pdf (visited May

31, 2012); Richard A. Wise et al., "How to Analyze the Accuracy of Eyewitness

Testimony in a Criminal Case," 42 Conn. L.Rev. 435, 440–41 (2009); Sandra Guerra

Thompson, "Beyond a Reasonable Doubt? Reconsidering Uncorroborated Eyewitness

Identification Testimony," 41 U.C. Davis L.Rev. 1487, 1490–91, 1497–98 (2008); Brandon

L. Garrett, "Judging Innocence," 108 Colum. L.Rev. 55, 60 (2008); Samuel R. Gross et al.,

"Exonerations in the United States 1989 Through 2003," 95 J.Crim. L. & Criminology

523, 542 (2005)), so has the need for judges to be especially wary about suggestive arrays

shown potential witnesses." This is so, because"[e]ven under the best circumstances, the

probability of erroneous identification of a stranger seen briefly is uncomfortably high."

*United States v. Brown*, 471 F.3d 802, 804 (7th Cir. 2006). And yet, "despite its inherent

unreliability, much eyewitness identification evidence has a powerful impact on juries."

*Watkins v. Sowders,* 449 U.S. 341, 352 (1981) (Brennan, J., dissenting).

14.     In fact, in recognition of such concerns, Deputy Attorney General Sally Q.

Yates, in her Memorandum to all heads of Department of Justice Law Enforcement

Agencies and all federal prosecutors concerning "Eyewitness Identification: Procedures

for Conducting Photo Arrays," issued January 6, 2017, stated, "Eyewitness

identifications play an important role in our criminal justice system, both by helping

officers and agents identify suspects during an investigation and by helping juries

determine guilt at trial. **It is therefore crucial that the procedures law enforcement**

**officers follow in conducting those identifications ensure the accuracy and reliability of evidence elicited from eyewitnesses**." (See attached Exhibit 2-1 through 2-12) (emphasis added). And to promote sound professional practices and consistency across the Department's law enforcement efforts, the memorandum outlines the various procedures that federal law enforcement agents are **required** to employ in composing and administering photo arrays in criminal investigations effective January 6, 2017. (See attached Exhibit 2-3 through 2-8).

15.     In this case, based on the discovery furnished to the defense by the Government to date, it is abundantly clear that the photographic array that FBI Agent Manganaro composed, and that Agents Tenaglia and Jerge administered to EH on June 14, 2017, was in total derogation of almost all of the procedures that the DOJ Memorandum requires that federal law enforcement officers and prosecutors to follow in administering photo arrays.

16.     For example, the DOJ procedures require that when selecting a photograph of the suspect for the photo array, the administrator should select a photo of the suspect, and at least 5 others to fill-out the array, that resemble the witness's description of the perpetrator at the time of the incident, and the administrator should avoid using a photo that is several years old or has different characteristics (e.g., hair style or facial hair) than those described. (Proc. 2.2, 2.3).

Here, however, while EH described the white male in the black, four door sedan as "clean shaven," all six of the white males appearing in the photo array are sporting

9

noticeable facial hair. And with the black and white photos provided in discovery, none of the photos would allow for EH or anyone else to discern the color of each individual's hair or tone of complexion, or the color of the background of the photo.

17.     Secondly, the DOJ procedures require that the administrator must ensure that he or she does not suggest to the witness- even unintentionally- which photograph contains the image of the suspect. Oftentimes, the best and simplest way to achieve this is by selecting an administrator who is not involved in the investigation and does not know what the suspect looks like. But if that is not practicable, then the administrator should adopt "blinded" procedures so that he or she cannot see the order or arrangement of the photographs viewed by the witness or which photograph(s) the witness is viewing at any particular moment. (Proc. 5.1-5.4).

In this case, however, FBI agent Tenaglia was actively involved in the investigation from its outset and knew of the Defendant's identity at the time she administered the array to EH, and yet she and Agent Jerge administered the photo array to EH, and did not adopt or employ "blinded" procedures as required by the DOJ memorandum to ensure against either or both agents from suggesting to the witness- even unintentionally- which photograph contains the image of the suspect.

18.     Thirdly, the procedures require that the administrator read specific instructions to the witness using language similar as follows:

6.3.1   "In a moment, you will be shown a group of photographs. The group of photographs may or may not contain a photograph of the person who committed the crime of which you are the victim [or witness]."

6.3.2   "Sometimes a person may look different in a photograph than in real life because of different hair styles, facial hair, glasses, a hat, or other changes in appearance. Keep in mind that how a photograph was taken or developed may make a person's complexion look lighter or darker than in real life."

6.3.3   "Please let me know if you recognize the person who committed the crime [or the actions you witnessed]. If you do recognize someone, please tell me how confident you are of your identification."

6.3.4   "You may not recognize anyone. That is okay. Just say so. Whether or not you select someone, we will continue to investigate the case."

6.3.5   "Do not assume that I know who committed this crime."

6.3.6   "Pay no attention to any marking or numbers on the photographs or any differences in the type or style of the photographs. They are not relevant to identifying anyone in the photographs."

6.3.7   "Please do not discuss this procedure or any photograph that you may pick with any other witness in this case."

6.3.8   "Please let me know if you do not understand these instructions or if you have any questions."

6.3.9   If sequential administration: "You are going to look at the photographs one at a time. You may make a decision at any time. If you select a photograph before you get to the end, our protocol requires that you look at the rest of the photographs anyway. If, after seeing all the photographs, you want to see one or more photographs again, you should look at the entire array again."

In this case, however, the discovery does not indicate that the Agents gave EH any instructions at all before showing her the six photos in the array "one at a time," and telling her to take as much time as she needed to review the photos and to determine whether she could recognize any of the individuals. Thus, by all indications, EH examined the array without any of the guidance and instructions that the DOJ requires prior to showing the witness the array, so EH could assume that the suspect's photo was included in the array.

19.   Fourthly, the DOJ procedures require that if a witness makes an identification, the administrator should ask the witness to state in his or her own words how confident he or she is in the identification (known as a "statement of confidence"). If the witness is vague in his or her answer, such as, "I think it's #4," the administrator should say: "You said [I think it's #4]. What do you mean by that?" (Proc. 8.2, 8.3).

In this case, however, EH stated that she believed that individual #3 [the defendant] "…may have **shared the most characteristics** with the individual who approached her in the car due to his short, dark hair and tan face," but "was not positive and could not say for certain if the individual she saw was

12

depicted…[because]… [i]t was difficult due to the individual wearing sunglasses at the time." Nothing is indicated in the Government's discovery that either agent ever asked EH what she meant that the individual #3 "shared the most characteristics with the individual who approached her in the car, nor did they ask her to state in her own words how confident she was in her identification as required by the procedures.

20.     And finally, the DOJ rules require that the witness's identification of a photo, if any, and the corresponding statement of confidence should be clearly documented by video- or audio-recording the photo array, or the administrator immediately writing down as close to verbatim as possible the witness's identification and statement of confidence, as well as any relevant gestures or non-verbal reactions. The witness should confirm the accuracy of the statement. (Proc. 9-1.1 and 9-1.2).

Here, again, there appears to have been no documentation by video- or audio-recording of the photo array, nor any official report providing a verbatim statement of the EH's responses and statement of confidence, as well as any relevant gestures or non-verbal reactions. Nor is there any report or documentation that EH confirmed the agents' account of the accuracy of her statement, as required by the DOJ procedures.

21.     The Defendant further contends that the corrupting effect of the FBI's composition and administration of the photographic array to EH makes any photographic identification by EH both unreliable and inadmissible as evidence.

22.     Accordingly, because the Government employed a photographic array that was both unnecessarily suggestive and conducive to give rise to a very substantial

likelihood of irreparable misidentification, this Court should bar the Government from introducing any identification testimony and evidence of EH at trial. *Perry v. New Hampshire*, 132 S. Ct. 716, 724 (U.S. 2012); *United States v. Ford*, 683 F.3d 761 (7th Cir. 2012).

WHEREFORE, the Defendant requests the entry of an Order suppressing:

a.      Any and all evidence relating to the pre-trial identification of defendant by such witnesses as were involved in the improper pre-trial identification procedures; and

b.      Any in-court identification of the defendant by such witnesses as were involved in the improper pre-trial identification procedures inasmuch as such identification is the product of the improper pre-trial identification, unless the Government shows by clear and convincing evidence that the in-court identification is not tainted and is fully independent of the pre-trial identification.

Respectfully submitted,

BRENDT A. CHRISTENSEN, Defendant

By:    <u>/s/Elisabeth R. Pollock</u>
        Assistant Federal Public Defender
        300 West Main Street
        Urbana, IL 61801
        Phone: 217-373-0666
        FAX:   217-373-0667
        Email: Elisabeth_Pollock@fd.org

<u>/s/ George Taseff</u>
Assistant Federal Public Defender
401 Main Street, Suite 1500
Peoria, IL  61602
Phone: 309-671-7891
Fax:     309-671-7898
Email: George_Taseff@fd.org

        <u>/s/ Robert Tucker</u>
        Robert L. Tucker, Esq.
        7114 Washington Ave
        St. Louis, MO 63130
        Phone: 703-527-1622
        Email: roberttuckerlaw@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller. A copy was also mailed to the defendant.

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org



EXHIBIT 1-1



EXHIBIT 1-2



EXHIBIT 1-3



EXHIBIT 1-4



EXHIBIT 1-5



EXHIBIT 1-6



**U. S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General                    *Washington, D.C. 20530*

January 6, 2017

MEMORANDUM FOR HEADS OF DEPARTMENT LAW ENFORCEMENT COMPONENTS
ALL DEPARTMENT PROSECUTORS

FROM:               Sally Q. Yates
                    Deputy Attorney General

SUBJECT:            Eyewitness Identification: Procedures for Conducting Photo Arrays

Eyewitness identifications play an important role in our criminal justice system, both by helping officers and agents identify suspects during an investigation and by helping juries determine guilt at trial. It is therefore crucial that the procedures law enforcement officers follow in conducting those identifications ensure the accuracy and reliability of evidence elicited from eyewitnesses.

There are several ways for law enforcement officers to test whether an eyewitness can identify a perpetrator, and the appropriate method for administering such a test varies depending on the circumstances. When the perpetrator is a stranger to the witness, the most common method involves the use of a "photo array," whereby a law enforcement officer displays a photograph of the suspect along with images of similar looking individuals for comparison.[1] This type of identification procedure has become particularly popular in recent years, in part because it can be assembled quickly and does not require the physical presence of the suspect or other individuals for a live line-up.

The Department of Justice last addressed procedures for photo arrays in its 1999 publication, *Eyewitness Evidence: A Guide for Law Enforcement.* Research and practice have both evolved significantly since then. For example, a growing body of research has highlighted the importance of documenting a witness's self-reported confidence at the moment of the initial identification, in part because such confidence is often a more reliable predictor of eyewitness accuracy than a witness's confidence at the time of trial. Similarly, there has been an evolution in views on whether the "sequential" administration of a photo array (presenting the witness one photo at a time) results in more accurate identifications than a "simultaneous" administration (presenting all of the photos at once). At the end of this memorandum is a summary of these and other recent developments in the field of eyewitness identification.

---

[1] A "photo array" is distinct from other law enforcement techniques involving photographs used to obtain investigative leads, such as "mug books" and single confirmatory photographs, which are outside the scope of this memorandum.

EXHIBIT 2-1

Over the past year, a team of Department experts—including prosecutors, law enforcement personnel, and social scientists—have worked together to study the research and identify best practices. Their work culminated in the attached document, which outlines procedures for the administration of photo arrays. These procedures are not a step-by-step description of how to conduct photo arrays, but rather set out principles and describe examples of how to perform them.

The heads of the Department's law enforcement components should review these procedures and, to the extent necessary, update their own internal policies to ensure that they are consistent with the procedures described in this document. In addition, all Department prosecutors should review these procedures and take them into consideration when deciding whether to charge a case involving an eyewitness identification. Although nothing in this memorandum implies that an identification not done in accordance with these procedures is unreliable or inadmissible in court, it is important that prosecutors identify potential issues in the administration of a photo array early in an investigation and take any such issues into account when evaluating the overall strength of the evidence in their case.

These procedures are designed to promote sound professional practices and consistency across the Department's law enforcement efforts. As stated in several sections, the principles may be adjusted in light of specific circumstances—including, but not limited to, exigent circumstances, limitations on personnel or other resources, concerns for a witness's fears and safety, and sensitivity to victims—and each identification must be evaluated on its own merits.

Thank you for your attention to this issue and for everything you do at this Department to ensure the administration of justice.

2

EXHIBIT 2-2

# U.S. DEPARTMENT OF JUSTICE

## EYEWITNESS IDENTIFICATION
## PROCEDURES FOR CONDUCTING PHOTO ARRAYS[1]

### Location of the Photo Array

1.1    Unless impracticable, the witness should view the photo array out of earshot and view of others and in a location that avoids exposing the witness to information or evidence that could influence the witness's identification, including information about the case, the progress of the investigation, or the suspect.

1.2    Neither the suspect nor any photographs of the suspect (including wanted posters) should be visible in any area where the witness will be present.

### Photograph of the Suspect

2.1    When selecting a photograph of the suspect for the photo array, the administrator should include only one suspect in each photo array regardless of the total number of photographs and regardless of whether multiple suspects fit the same description.

2.2    Unless impracticable, the administrator should select a photograph of the suspect that resembles the witness's description of the perpetrator or the perpetrator's appearance at the time of the incident.

2.3    The administrator should avoid using a photo that is several years old or has different characteristics (for example, hair style, or facial hair) than those described, unless a current photograph cannot be taken or procured.

### Selection of Filler Photographs

3.1    A photo array should include at least five filler, or non-suspect, photographs.

3.2    Fillers should generally fit the witness's description of the perpetrator, including such characteristics as gender, race, skin color, facial hair, age, and distinctive physical features. They should be sufficiently similar so that a suspect's photograph does not stand

---

[1] This document is not intended to create, does not create, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nothing in these procedures implies that an identification not done in accordance with them is unreliable or inadmissible in court.

EXHIBIT 2-3

out, but not so similar that a person who knew the suspect would find it difficult to distinguish him or her. When viewed as a whole, the array should not point to or suggest the suspect to the witness.

3.3     Where the suspect has a unique feature, such as a scar, tattoo, or mole, or distinctive clothing that would make him or her stand out in a photo array, filler photographs should include that unique feature either by selecting fillers who have such a feature themselves or by altering the photographs of fillers to the extent necessary to achieve a consistent appearance. If the suspect's distinctive feature cannot be readily duplicated on the filler photographers, then the suspect's feature can be blacked out and a similar black mark can be placed on the filler photographs. The administrator should document any alterations to either the fillers or the suspect's photograph as well as the reason(s) for doing so.

3.4     Photographs should be of similar size, background, format, and color. Photographs should be numbered or labeled in a manner that does not disclose any person's identity or the source of the photograph. No other writing or information should be visible.

3.5     Nothing should appear on the photos that suggests a person's name, his or her inclusion in a previous array, or any information about previous arrests or identifications.

3.6     If there are multiple perpetrators or multiple suspects, the administrator should inform the witness in advance that more than one array will be shown.

3.7     Fillers should not be reused in arrays for different suspects shown to the same witness.

### Method of Presenting Photographs

4.1     Administrators may employ either sequential or simultaneous procedures. Under a sequential procedure, the witness looks at one photograph at a time in a finite number of photographs until he or she has seen all in the array (with each photo being taken back before the next one is shown). In a simultaneous procedure, the witness observes all of the photos in the array at once.

### Administrator's Knowledge of the Suspect

5.1     The administrator must ensure that he or she does not suggest to the witness – even unintentionally – which photograph contains the image of the suspect. Oftentimes, the best and simplest way to achieve this is by selecting an administrator who is not involved in the investigation and does not know what the suspect looks like.

2

EXHIBIT 2-4

5.2     There are times when such "blind" administration may be impracticable, for example, when all of the officers in an investigating office already know who the suspect is, or when a victim-witness refuses to participate in a photo array unless it is administered by the investigating officer. In such cases, the administrator should adopt "blinded" procedures, so that he or she cannot see the order or arrangement of the photographs viewed by the witness or which photograph(s) the witness is viewing at any particular moment.

5.3     "Blinded" administration can be accomplished by:

    5.3.1   *If simultaneous administration:* Randomizing the order of photographs and shielding the administrator from the photographs (for example, by displaying the images on a computer screen between the witness and the administrator, so that the witness can see it but the administrator cannot).

    5.3.2   *If sequential administration:* Putting each photograph in its own physical folder, shuffling the order of the folders, and standing where the administrator cannot see which photographs the witness is viewing.

5.4     There may be exceptional circumstances in which it is not practicable to conduct either a blind or blinded photo array. In those instances, the administrator should document the reasons for the non-blind(ed) procedure and be prepared to explain the reasons for conducting such an alternative procedure.

**Instructions to Witness**

6.1     The administrator should read instructions to the witness and then permit the witness to read them and ask any questions. The witness and administrator should sign and date the instructions.

6.2     The administrator should not interrupt the witness so long as she or he is looking at the array. However, when it becomes apparent that the witness is finished and no longer looking at the array, the administrator should end the procedure.

6.3     Instructions should use language similar to that below:

    6.3.1   "In a moment, you will be shown a group of photographs. The group of photographs may or may not contain a photograph of the person who committed the crime of which you are the victim [*or witness*]."

3

EXHIBIT 2-5

6.3.2 "Sometimes a person may look different in a photograph than in real life because of different hair styles, facial hair, glasses, a hat, or other changes in appearance. Keep in mind that how a photograph was taken or developed may make a person's complexion look lighter or darker than in real life."

6.3.3 "Please let me know if you recognize the person who committed the crime [*or the actions you witnessed*]. If you do recognize someone, please tell me how confident you are of your identification."

6.3.4 "You may not recognize anyone. That is okay. Just say so. Whether or not you select someone, we will continue to investigate the case."

6.3.5 "Do not assume that I know who committed this crime."

6.3.6 "Pay no attention to any marking or numbers on the photographs or any differences in the type or style of the photographs. They are not relevant to identifying anyone in the photographs."

6.3.7 "Please do not discuss this procedure or any photograph that you may pick with any other witness in this case."

6.3.8 "Please let me know if you do not understand these instructions or if you have any questions."

6.3.9 *If sequential administration*: "You are going to look at the photographs one at a time. You may make a decision at any time. If you select a photograph before you get to the end, our protocol requires that you look at the rest of the photographs anyway. If, after seeing all the photographs, you want to see one or more photographs again, you should look at the entire array again."

## Multiple Witnesses

7.1 If multiple witnesses are to be presented with photo arrays, each witness should be instructed and view the photo array separately.

7.2 A witness should not be able to hear or observe other witnesses during an identification procedure.

7.3 A witness who has seen the array should not return to the same area when other witnesses are waiting to see the array.

4

EXHIBIT 2-6

7.4  For each suspect, the administrator should use the same photo array for multiple
     witnesses. However, the order of appearance in the photo array should be changed if
     possible.

## Administrator Feedback

8.1  The administrator must avoid any words, sounds, expressions, actions or behaviors that
     suggest who the suspect is. Before, during, or after conducting the photo array, the
     administrator should not:

    8.1.1  Volunteer information about the suspect or the case;

    8.1.2  Indicate that the administrator knows who the suspect is;

    8.1.3  Indicate to the witness that he or she has picked the "right" or "wrong"
         photograph; or

    8.1.4  Tell the witness that any other witness has made an identification.

8.2  If the witness makes an identification, the administrator should ask the witness to state in
     his or her own words how confident he or she is in the identification (known as a
     "statement of confidence").

8.3  If the witness is vague in his or her answer, such as, "I think it's #4," the administrator
     should say: "You said [I think it's #4]. What do you mean by that?"

## Documentation[2]

9.1  The witness's identification of a photo, if any, and the corresponding statement of
     confidence should be clearly documented by:

    9.1.1  Video- or audio-recording the photo array;[3] or

    9.1.2  The administrator immediately writing down as close to verbatim as possible the
         witness's identification and statement of confidence, as well as any relevant

---

[2] This section assumes the use of printed photographs. If the photo array is presented on a computer
screen, the administrator should ensure that the same information described in this section is captured and
saved electronically.

[3] Electronic recording serves several important purposes: it preserves the identification process for
later review in court, it protects officers against unfounded claims of misconduct, and it allows fact
finders to directly evaluate a witness's verbal and nonverbal reactions and any aspects of the array
procedure that would help to contextualize or explain the witness' selection.

5

EXHIBIT 2-7

gestures or non-verbal reactions.  The witness should confirm the accuracy of the statement.

9.2     The witness should indicate his or her identification in writing.

   9.2.1   *If simultaneous administration*:  The witness should circle the photograph chosen and then sign and date the photograph.

   9.2.2   *If sequential administration*: The witness should sign and date the front or back of the photograph chosen.

   9.2.3   If a witness fails to make an identification, the administrator should record so in writing.

9.3     The administrator should document the following elements of the identification procedure:

   9.3.1   The approximate amount of time it took the witness to make an identification;

   9.3.2   The presentation method and order of the photographs displayed;

   9.3.3   The names of all persons present during administration; and

   9.3.4   Any other facts or circumstances that would help contextualize or explain the witness's selection.

9.4     In addition to documenting information about an identification, the administrator should preserve as evidence:

   9.4.1   The written copy of the instructions signed and dated by the witness and the administrator; and

   9.4.2   All photographs shown to the witness, including any identified, signed, and dated by the witness.

6

EXHIBIT 2-8

## PROCEDURES FOR CONDUCTING PHOTO ARRAYS

### APPENDIX

For decades, law enforcement agencies at the federal, state, and local levels have used varying practices for the identification of suspects by eyewitnesses to crimes, while researchers have studied the science of human perception underlying eyewitness identification. In recognition of advancements in scientific knowledge and changes in practice, the National Academies of Science (NAS) convened a committee of experts to evaluate eyewitness identification procedures and, in 2014, published a report summarizing its findings entitled, *Identifying the Culprit: Assessing Eyewitness Identification.*[1] Although acknowledging that more research is still needed, the committee concluded that "a range of [identification] practices has been validated by scientific methods and research and represents a starting place for efforts to improve eyewitness identification procedures."[2]

This appendix provides a brief explanation of both the research and practical experience behind several of the procedures outlined earlier in this memorandum. This summary is not meant to be exhaustive, in part because research continues to advance on eyewitness identification procedures, including photo arrays. Furthermore, the described procedures are only exemplary and do not create an enforceable right in any civil or criminal matter. The intent of this summary is to provide law enforcement agents and prosecutors an understanding of the reasons behind several of the procedures that either are not widely known or were not addressed in a prior publication on eyewitness identification from the National Institute of Justice.[3]

### Sequential vs. Simultaneous Identification Methods

Historically, many law enforcement agencies employed simultaneous identification procedures, in which an eyewitness views all of the photos in an array at once. In the late 1980s, psychological research began to suggest that sequential methods, in which witnesses are shown one photo at a time, would be better at preventing erroneous identifications without reducing the rate of correct identifications.[4] As a result, several police agencies, including those in North Carolina[5] and Massachusetts,[6] turned to the sequential method for photo arrays. More recently,

---

[1] National Academies of Science, *Identifying the Culprit: Assessing Eyewitness Identification* (2014), available at: https://www.nap.edu/catalog/18891/identifying-the-culprit-assessing-eyewitness-identification.

[2] *Id.* at xiv.

[3] National Institute of Justice, *Eyewitness Evidence: A Guide for Law Enforcement* (1999).

[4] Roderick Lindsay & Gary Wells, "Improving Eyewitness Identifications from Lineups: Simultaneous Versus Sequential Lineup Presentation," 70 *Journal of Applied Psychology* 556 (1985); Nancy Steblay, Jennifer Dysart, Solomon Fulero & R.C.L. Lindsay, "Eyewitness Accuracy rates in Sequential and Simultaneous Lineup Presentations: A Meta-Analytical Comparison," 25 *Law and Human Behavior* 459 (2001).

[5] N.C. Gen. Stat. § 15A-284.52 (2007).

[6] *See* Massachusetts Supreme Judicial Court Study Group on Eyewitness Identification, *Report and Recommendations to the Justices* (2013).

7

EXHIBIT 2-9

2:17-cr-20037-CSB-EIL  # 45   Page 32 of 34

however, some research has raised questions about the superiority of sequential methods. Those studies tested techniques in the field[7] as well as in the laboratory[8] and employed different statistical tests to evaluate the accuracy of an eyewitness' identification. This research reached different conclusions, suggesting that simultaneous procedures may result in more true identifications and fewer false ones.[9] Until additional research is conducted, however, it is not possible to say conclusively whether one identification method is better than the other. Indeed, the NAS recommended "that caution and care be used when considering changes to" sequential or simultaneous procedures "until such time as there is clear evidence for the advantages of doing so."[10] For this reason, this document does not take a position on which procedure should be used.

### Investigator Influence and Blind vs. Blinded Procedures

An investigator's statements when administering an identification procedure can influence a witness' selection of a suspect in a photo array as well as his or her confidence in the choice.[11] Influence can occur, for example, when the investigator suggests in advance that the perpetrator is in the array ("We found the guy with your credit cards" or "We arrested someone we want you to identify"), when the investigator confirms or disconfirms the witness's pick ("Good work! You picked the right guy"), or when the administrator communicates such messages through nonverbal gestures.[12] In either case, witnesses may be more inclined to select a photograph from the array or to be more confident in their selection than they otherwise would be. "Suggestiveness during an identification procedure can result in suppression of both out-of-court and in-court identifications and thereby seriously impair the prosecution's ability to prove

---

[7] Karen Amendola & John Wixted, "The Role of Site Variance in the American Judicature Society Field Study Comparing Simultaneous and Sequential Lineups." *Journal of Quantitative Criminology* (2015), doi:10.1007/s10940-015-9273-6.

[8] David Dobolyi & Chad Dodson, "Eyewitness Confidence in Simultaneous and Sequential Lineups: A Criterion Shift Account for Sequential Mistaken Identification Overconfidence,"19 *Journal of Experimental Psychology: Applied* 345 (2013).

[9] John Wixted, Laura Mickes, John Dunn, Steven Clark & William Wells, "Estimating the Reliability of Eyewitness Identifications from Police Lineups," 113 *Proceedings of the National Academy of Sciences,* 304 (January 12, 2016); John Wixted, Laura Mickes, Steven Clark, Scott Gronlund & Henry Roediger, "Initial Eyewitness Confidence Reliably Predicts Eyewitness Identification Accuracy," 70 *American Psychologist* 515 (September 2015).

[10] National Academies of Science, *supra* note 1, at 118. *See also* International Association of Chiefs of Police, *Model Policy* (2016).

[11] Amy Bradfield Douglass & Nancy Steblay, "Memory Distortion in Eyewitnesses: A Meta-Analysis of the Post-Identification Feedback Effect," 20 *Applied Cognitive Psychology* 859 (2006); Carla Maclean, C.A. Elizabeth Brimacombe, Meredith Allison & Helena Kadlec, "Post-Identification Feedback Effects: Investigators and Evaluators," 25 *Applied Cognitive Psychology* 739 (2011); Gary Wells & Amy Bradfield, "Good, You identified the Suspect: Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience," 83 *Journal of Applied Psychology* 360 (1993); Nancy Steblay, Gary Wells, & Amy Bradfield Douglass, "The Eyewitness Post Identification Feedback Effect 15 Years Later: Theoretical and Policy Implications," 20 *Psychology, Public Policy & Law* 1 (2014).

[12] National Academies of Science, *supra* note 1.

8

EXHIBIT 2-10

its case beyond a reasonable doubt."[13]

There are several recommended approaches to avoid inappropriate investigator influence or an allegation of inappropriate investigator influence. First, as the procedures in this document outline, administrators of photo arrays must consciously "avoid any words, sounds, expressions, actions or behaviors that suggest who the suspect is." Second, feedback is virtually impossible when the administrator does not know who the suspect is or which photograph is that of the suspect. As the NAS explains, "if administrators are not involved with the construction of the lineup and are unaware of the placement of the potential suspect in the sequence, then they cannot influence the witness."[14]

Although the NAS recommends blind procedures, it acknowledges that such procedures may not be feasible in some circumstances because of "financial costs and human resource demands."[15] In these situations, investigators should at least use "blinded" procedures in which the administrator cannot see the order or arrangement of the photographs viewed by the witness or which photograph(s) the witness is viewing at any particular moment. However, even in these circumstances the NAS believes that law enforcement should consider "new technologies" such as "computer-based presentation technology" to prevent inadvertent suggestiveness.[16] If neither blind nor blinded procedures are practicable under certain circumstances, administrators should document the steps they took to avoid any influence before or after the array was shown and a confidence statement was taken.

## Confidence Statements

When the Supreme Court decided *Manson v. Brathwaite*,[17] establishing criteria to evaluate the reliability of eyewitness identification, it premised admissibility in part on the witness's self-reported confidence at the time of the initial identification procedure. After decades of research investigating and even questioning the science behind the Court's holding,[18] new research finds that a witness's confidence at the time of an initial identification is a reliable indicator of accuracy.[19] For this reason, the NAS has recommended "that law enforcement document the witness' level of confidence verbatim at the time when she or he first identifies a

---

[13] *Id.* at 107.

[14] *Id.* at 106.

[15] *Id.*

[16] *Id.*

[17] *Manson v. Brathwaite*, 432 U.S. 98 (1977).

[18] *See., e.g.*, Gary Wells, Elizabeth Olson & Steve Charman, "The Confidence of Eyewitnesses in their Identifications from Lineups," 5 *Current Directions in Psychological Sciences*, 151 (2002); Steven Penrod & Brian Cutler, "Witness Confidence and Witness Accuracy: Assessing Their Forensic Relation," 1 *Psychology, Public Policy & Law* 817 (1995); National Academies of Science, *supra* note 1.

[19] John Wixted & Gary Wells, "The Relationship between Eyewitness Confidence and Identification Accuracy: A New Synthesis," *Psychological Science in the Public Interest* (in press); Wixted, et al., *supra* note 9.

9

EXHIBIT 2-11

suspect . . . ."[20] Further, to prevent any undue suggestion and to ensure that investigators and fact-finders fully understand the level of the witness' confidence, the NAS recommends that the "witness' self-report . . . should be given in the witness' own words."[21]

### Recording the Photo Array

A witness's identification and assessment of certainty cannot be easily challenged if law enforcement agencies electronically record the identification procedure and the witness's response. Electronic recording preserves the identification process for later review in court and also protects officers against unfounded claims of misconduct. Video-recording is helpful because it allows fact finders to directly evaluate a witness's verbal and nonverbal reactions and any aspects of the array procedure that would help to contextualize or explain the witness' selection. As of 2013, approximately one-fifth of state and local law enforcement agencies had instituted video-recording of photo arrays.[22] The NAS recommended "that the video recording of eyewitness identification procedures become standard practice,"[23] and the practice continues to expand as legislation[24] and model policies[25] urge its implementation. If video is impracticable, however, an audiotape may be useful because it allows judges and jurors to hear exactly what was said by both the administrator and the witness rather than relying exclusively on an oral or written report about the procedure.

---

[20] National Academies of Science, *supra* note 1, at 108.

[21] *Id.*

[22] Police Executive Research Foundation, *A National Survey of Eyewitness Identification Procedures in Law Enforcement Agencies* (2013).

[23] National Academies of Science, *supra* note 1, at 108.

[24] Ill. Comp. Stat. 725 § 5/107A-2 (2015); N.C. Gen. Stat. §15-284.52 (2007).

[25] *See* International Association of Chiefs of Police, *Model Policy: Eyewitness Identification* (2010); Municipal Police Training Council of New York, *Identification Procedures: Photo Arrays and Line-ups Model Policy* (2015); Attorney General of Wisconsin, *Model Policy and Procedure for Eyewitness Identification* (2010).

EXHIBIT 2-12