E-FILED
Wednesday, 07 February, 2018 09:37:14 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | Case No. 17-20037 |

<u>MEMORANDUM IN SUPPORT OF PROPOSED SCHEDULING ORDER</u>

Counsel for the defendant, Brendt Christensen, submits this memorandum in support of the proposed Scheduling Order, attached hereto as Exhibit A.

I.    **Introduction**

As reflected in the proposed Scheduling Order, the defense requests a trial date in the early summer of 2019, approximately sixteen months from the filing of this memorandum, sixteen and 1/2 months from the filing of the Notice of Intent to Seek Death (NOI) and twenty-one months after the appointment of present counsel in September 2017. The time which counsel requests to prepare this capital trial is on the lower end of both the mean and median intervals between indictment, NOI and trial dates in other federal capital cases. Moreover, this period of time is necessary for counsel to provide the representation required by the Fifth, Sixth and Eighth Amendments in a capital case and comply with professional standards governing such representation.

In proposing a specific date for trial, counsel does not mean to be presumptuous as to the Court's docket and does not object to the trial commencing at a date thereafter convenient to the Court. But in light of the preference accorded criminal cases and

consistent with the minimum time necessary to prepare this case for trial, the attached
order proposes that *voir dire* begin on Monday, June 4, 2019. Other dates in the proposed
Scheduling Order work forward and backward from that date. Thus, allowing for two
weeks of *voir dire*, the order proposes that the evidentiary portion of the trial commence
on Monday, June 18, 2019. The proposed Scheduling Order takes a categorical approach
and attempts to establish a logical progression of intermediate deadlines to ensure the
timely and orderly processing of this case consistent with the obligation of all parties and
the Court in a capital case.

Thus, the proposed schedule begins with issues relating to discovery, for only after
receiving and reviewing all the evidence can all relevant motions be identified. The
schedule then addresses, in order, motions concerning dispositive motions, the selection
and composition of the grand and petit juries, jury selection procedures, motions and
notices required by Fed. R. Crim. P. 12.2(b), motions *in limine* and other evidentiary based
motions, *voir dire* questions, jury instructions and other required disclosures. *See* Exhibit
A.

Because this case is so different from other non-capital cases that the Court
regularly presides over and involves a far more extensive and involved investigation and
motion practice than that in a non-capital case, counsel submit this memorandum to
explain why this period of time is necessary for the defense to adequately prepare this
case for trial. This memorandum emphasizes four points in this regard. First, the
necessary social history and mitigation investigation requires a detailed and
comprehensive collection and analysis of every record that exists concerning the
defendant, in-person interviews with individuals who have known or had contact with

Mr. Christensen throughout his entire life and a multigenerational investigation of the family tree. These are not requirements invented by counsel for the purpose of this memorandum. They are part of the recognized standard of performance in capital cases. This necessarily takes a significant amount of time. *See* III-A *infra*. Second, a comprehensive mental health evaluation is an essential part of the mitigation investigation in a capital case. But, the selection of the appropriate experts (which may require several different areas of expertise), appropriate referral questions and required testing cannot be determined without the background of an adequate social history investigation. This requires additional time and is why the Rule 12.2(b) notice cannot be provided until later in the scheduling process. *See* III-B, *infra*. Third, a capital case requires a motion practice that far surpasses that in the normal non-capital case and this, coupled with counsel's duty to fully investigate every potential defense and raise all arguable legal claims, as well as their obligation to supervise and direct the mitigation investigation, makes a capital trial earlier than that in the proposed Scheduling Order not feasible. *See* III-C, *infra*. Finally, the trial date proposed in the attached Scheduling Order is entirely reasonable in a capital case and in line with that routinely granted in other such cases. *See* III-D, *infra*.

Before proceeding to these points, it is instructive to review at the procedural history in some detail.

## II.     Procedural History

### A.     Prior to Appointment of the Federal Public Defender

On June 30, 2017, the government filed a complaint charging Mr. Christensen with the offense of un-aggravated kidnapping in violation of 18 U.S.C. § 1202(a)(1), a non-

capital offense. (R. 1). Three days later, Evan S. Bruno, a private attorney in Urbana, Illinois, entered a Notice of Appearance on behalf of Mr. Christensen. (R. 4). On July 12, 2017, the grand jury returned a *non-capital eligible* indictment charging Mr. Christensen with the offense of kidnapping in violation of 18 U.S.C. § 1202(a)(1). (R. 13.). On July 20, 2017, Magistrate Long set a trial date of September 12, 2007, before this Court. (R. 16).

On August 23, 2018, an Agreed Order was filed, requesting the trial date be continued. The pleading cited the "voluminous" discovery as well, as the fact that the government expected to receive additional discoverable materials in the future. (R. 18). A text entry on the docket indicates that a hearing was held on August 28, 2017, at which time the Court set a new trial date of February 27, 2018. Although present counsel does not have a transcript, it appears that the government announced at this hearing that it expected to file a Superseding Indictment that would implicate the death penalty.[1] Three days later, on September 1, 2017, the Bruno firm moved to withdraw, stating that it had only been retained to represent Mr. Christensen on the initial non-capital kidnapping

---

[1]It is unclear to present counsel who proposed the February 27, 2017, trial date and what considerations were taken into account. In its *Response to the Defendant's Motion to Bar Expert Testimony*, at 2, n.1, the government alleges that then-defense counsel "set the February 2018 trial date on motion of the defendant." The government is thus apparently claiming that then-defense counsel suggested the date since there was an Agreed Motion to Continue (which did not propose a specific date). Counsel's conversation with a member of the Bruno law firm does not confirm the government's recollection. In any event, it is unclear whether then counsel was aware of the exact amount of "voluminous" discovery that had not yet been produced, the nature of that discovery, when it would be produced, what would be required to review and respond to the discovery once it was produced and how the filing of a capital-eligible indictment would influence the amount and nature of preparation required even before the question of whether the death penalty would be pursued was decided by the Department of Justice. Further, a reading of the Brunos' *Motion to Withdraw,* filed only three days later, suggests that then-counsel was aware on August 28th that they would be likely be moving to withdraw and that, assuming the Court would grant their request, the actual trial date would not be on their watch.

indictment. (R. 20). At a hearing on September 8, 2017, the Court granted the motion to
withdraw and appointed the Federal Public Defender to represent Mr. Christensen and
set a trial date of February 27, 2018.

**B.    Appointment of the Federal Public Defender Until Denial of the Motion
to Continue on November 15**

Prior to the day before the appointment of September 8, 2017, the newly appointed
counsel had no contact with Mr. Christensen or this case and had only passing familiarity
with the nature of the allegation as a result of publicity in the local media. Acknowledging
the potential capital nature of the Superseding Indictment, on September 14, 2017, the
Court appointed learned counsel to represent Mr. Christensen. Learned counsel also had
no relationship to or familiarity with this case prior to that time.

Newly-appointed counsel quickly determined that the February 27, 2018, trial date
– less than six months after their appointment – was not feasible in a potential capital case
and on October 24, 2017, filed a *Motion to Continue Final Pretrial and Trial Dates* (*Motion to
Continue*). (R. 29). The *Motion to Continue* specifically directed the Court's attention to the
ethical obligations and standard of care for defense counsel in capital cases as set out in
the American Bar Association Guidelines for the Appointment and Performance of
Defense Counsel in Death Penalty Cases (rev. ed. 2003) (hereinafter "ABA Guidelines"),
the recommendations in the CJA Guidelines in the Guide to Judicial Policy of the Judicial
Conference concerning the provision and representation of defense counsel in capital
cases, and the Supplementary Guidelines for the Mitigation Function of Defense Teams in
Death Penalty Cases. *See* R. 20, ¶¶ 7-9.  Counsel contended that these well-recognized
responsibilities rendered it impossible for them to conduct even the most basic

background and life history investigation sufficient to discharge their obligation to present mitigating evidence to the Department of Justice as to why the death penalty should not be sought,[2] while also having to prepare for trial of such a serious case involving voluminous discovery on such an abbreviated schedule.

On November 2, 2017, the government responded to and opposed the motion to continue. (R. 30). The government argued that the reasons for a continuance set forth in the defense's motion all "relate[d] to the death penalty" and suggested that the Court should treat this case as non-capital case unless and until the government filed a NOI. *Id.* at 8. The *Response* made no reference to the obligations of defense counsel or the authorities cited in the *Motion to Continue*.

On November 7, 2017, defense counsel filed *Defendant's Reply to Government's Response to Defendant's Motion to Continue Final Pretrial and Trial Date* (*Reply*), describing in more detail counsel's duty to treat the case as capital from the outset, the responsibilities that flow from this obligation and their inability to fulfill those responsibilities within the present schedule. (R. 33).

These pleadings made it clear that the parties had fundamentally different positions as to how the case should be treated for scheduling purposes. On November 15, 2017, the Court issued a Memorandum Order wherein it adopted the government's view that at that point this case was no different than any other non-capital case. (R. 34). The Court "emphasize[d]," however, that its ruling was "premised" on the fact that the government was not yet seeking the death penalty and invited a renewed motion to

---

[2]As set out below, government counsel had informed defense counsel on October 3, 2017, that it should present any mitigating evidence by November 1, 2017.

6

continue by either party in the event the government elected to pursue the death penalty. *Id*. at 10. The Court also accepted the government's suggestion that the Court set a deadline of February 1, 2018, to file any notice of intent to seek death and set a deadline of December 15, 2017, for the government to produce various Rule 16 materials.

The effect of this ruling was that the defense had to concentrate its efforts on attempting to prepare this case for trial on February 27, 2018, then only 105 days away and in the absence of a large amount of discovery that had not yet been produced, while simultaneously dealing with an unreasonable schedule that was initially set by the Department of Justice in response to the Court's February 1 deadline. As shown below, the setting of the February 1 deadline has driven much of what has thus far taken place and further delayed counsel's preparation.

    **C.**    **The Authorization Process and Motion to Exclude Expert Evidence**

On October 3, 2017, the parties met to discuss the status of the case. The government informed defense counsel that in light of the February 27 trial date, the Capital Case Section at the Department of Justice had directed the U.S. Attorney to submit its memorandum on the death penalty by November 1, 2017, and that the defense should submit any mitigating evidence it wished the government to consider by that date. Counsel demurred that this short period did not provide the defense sufficient time to conduct even a basic mitigation investigation in light of the additional obligations dictated by the compressed trial schedule. The parties agreed to meet again at which time the defense would propose a schedule for further consideration by the government.

On Friday, October 20, 2017, the parties again convened. Defense counsel asked the government to agree to a joint request to continue the non-capital trial date until October

2018, provide the defense until April 3, 2018, to investigate and present mitigating evidence to the U.S. Attorney and the Department of Justice and set a date of July 3, 2018, for the government to determine whether to file a NOI. If the government decided not to file a NOI, the defense suggested that the non-capital trial would proceed in October 2018 – 13 months after counsel's appointment. If a NOI was filed, the defense suggested that the schedule would be adjusted and a scheduling order for a capital case entered.

The following Tuesday, October 24, 2017, the government informed defense counsel by e-mail that in light of the trial date of February 27, 2018, and after consultation with the Capital Case Committee, it would not agree to join the defendant's request. The government specifically wrote that "[B]ased on that trial date" and the need to provide the Department of Justice "sufficient time to decide whether to seek the death penalty," the defense's submission to the Capital Case Committee must be made by November 1.[3] The e-mail also represented that any mitigation evidence which the defense wished to consider after November 1 would be considered before the Attorney General made a final decision.

On November 8th, the Assistant United States Attorney informed counsel for the defense by telephone that the Capital Case Committee would meet on December 4th to consider any mitigation that the defense wished to present either in person or by video conference. In a confirmatory e-mail on November 13, the Assistant United States

---

[3] *See* U.S.A.M. §9-10.060 (U.S. Attorney "must submit a capital-eligible case for review no fewer than 90 days before the Government is required, by an order of the Court, to file a notice that it intends to seek the death penalty.").

Attorney reiterated that the Department would consider any information that the defense wished to submit after that date.

Two days after the Court's Order of November 15th denying the continuance motion, defense counsel delivered a letter to the United States Attorney and the Chief of the Capital Case Section at the Department of Justice, asking them to join a request that the Court extend the February 1 deadline. The letter noted that the defense had received only a fraction of the discovery, was only in the "earliest stage" of its relationship with Mr. Christensen and that it was unreasonable to expect the defense to be able to conduct a sufficient life history and mitigation investigation to enable a meaningful presentation by December 4th. On November 20th, the government informed defense counsel by telephone that the request was denied. On November 30th, 2017, defense counsel informed the Capital Case Committee by letter that given the time constraints that had been imposed, the defense had not had an opportunity to conduct any meaningful mitigation investigation and thus would not be appearing at the December 4th hearing. Counsel did point out that Mr. Christensen had no prior criminal record and referenced evidence received in discovery that suggested emotional and other problems that had surfaced near the time of the alleged offense.

During December 2017, and early January, 2018, counsel directed their attention to motions which the Court had directed must be filed by January 15, 2018, the first of which was a *Motion to Bar Introduction of Expert Testimony*, which was filed on December 31. (R. 35). The defense cited the Court's Order of November 15, directing the government to provide all forensic evidence analysis as well as written summaries under F.R.Cr.P. 16(a)(1)(G) no later than December 15, 2017, and noted that over two weeks had passed

since the Court-ordered deadline without production of the Rule 16 materials referenced in the motion. The defense argued that in light of the government's uncompromising posture in opposing the defendant's *Motion to Continue* and the rapidly approaching trial date, it was reasonable to expect the government to comply with the Court's deadline, especially where no request for relief from the discovery production deadline had been requested by the government. *See* (R. 35, ¶ 12.).

On January 9, the government opposed the motion, proffering that it had provided the disputed Rule 16 materials or their equivalent when received and that any delays were attributed to untimely receipt from the originators. At this point counsel was immersed in the preparation of a number of motions that the Court had ordered be filed by January 15th. Because of this, and the circumstances described in sealed Exhibit D (suggesting that a trial on February 27 was unlikely), counsel elected to concentrate on the motions due on January 15th and not reply to the government's response, knowing these discovery issues could be sorted out later, if necessary.

On January 17, 2018, the Court filed an Order denying the defendant's motion to bar the expert testimony. (R. 51). The Order emphasized the discovery that the government had provided the defense and seemingly reflected the Court's conclusion that the provision of these materials was, at least, the "functional equivalent" of the summaries required by Rule 16(a)(1)(G*). See e.g.* Order, Dkt 51, at 5, n. 1.[4]

---

[4]In the concluding portion of the Order, the Court appeared to chastise the defense for filing the motion, accusing counsel of making "inaccurate claims" and noting that the defense had not stated "with specificity, what was received and what was deficient about the disclosures with regard to each disclosed expert, and why exactly Defendant was prejudiced."  (R. 51, at 12).  The Court also criticized the defense for seeking "the most drastic and punishing remedy available

On January 9, 2018, defense counsel notified the Assistant United States Attorney that the defense wished to make an additional written submission to the Capital Case Committee on January 15, reminding the government of prior representations that they would consider additional material submitted prior to a decision by the Attorney General.

_____

under Rule 16(d)(2)." *Id.* In the following paragraph the Court returned to this theme, faulting the defense for "hyperbole and inflated claims."

While defense counsel understands the Court's concerns, with all respect the observation on page 12 of the Order that counsel filed a motion with "inaccurate claims" as to the government's disclosures is incorrect. A close reading of the defense motion indicates that counsel alleged that the government had only produced one report that satisfied the requirements of Rule 16(a)(1)(F) and no "summary" of expert testimony that satisfied those of Rule 16(a)(1)(G), both of which were the subject to the Court's deadline of December 15th. In addition, the motion complained that the government's letter of December 14th, informing the defense that it intended to call at least ten additional experts on various subjects did not comply with either the letter or the spirit of the above provisions of Rule 16 or the Court's Order of November 15th. While the motion could have been more specific as to what the government had provided, defense counsel had *already* acknowledged that "the government ha[d] timely delivered a significant amount of discovery in this case." *See Defendant's Reply to Government's Response to Defendant's Motion to Continue Final Pretrial and Trial Dates*, R. 33 at 9. The subject of the defense's motion was not what the government had produced but what it had *not* produced. In the defense's view, the government to this date still has not complied with the provisions of Rule 16(a)(1)(G). Understanding that the Court has ruled, it is the defense's position that the language of the rule is clear as to what constitutes a summary of expert testimony, the rule is not satisfied by the mere production of the test results and work papers required to be produced under Rule 16(a)(1)(F), and counsel is not required to search out and attempt to put together these required summaries from other discovery materials.

Of course, counsel fully appreciates the Court's obligation to determine the issue of prejudice, a legal issue regularly presented to courts. But, as to the Court's implied criticism of the remedy sought by the defense, counsel was well within its right, if not its obligation, to seek exclusion of the evidence, one of several possible remedies directly provided for in Rule 16(d)(2)(C). While counsel could have sought one of the alternative remedies provided for in the rule such as a continuance, the Court had already proved inhospitable to such a request and, in any event, it was counsel's obligation to "consider all legal claims potentially available," and "present the claim as forcefully as possible . . ." *ABA Guidelines* 10.8(A)(1)-(2); s*ee also id.*, Commentary: ("[C]ounsel should object to anything that appears unfair or unjust even if it involves challenging well-accepted practices."). Further, the defense was not hiding the ball on either the facts or the law, as the motion directly and candidly referenced the availability of other remedies, such as ordering late disclosure or granting a continuance, that the issue involved the Court's discretion, and the standard for establishing prejudice." See *Motion to Continue* (R. 29, at 3-4).

The following day defense counsel received an e-mail stating that the Capital Case Unit had responded that "given the Court-ordered deadline of February 1, its process must continue to move forward," and that defense counsel should submit any additional material before January 15th (despite the fact that this was only five days away and the Court's deadline was 21 days away). Defense counsel did forward an additional submission to the Capital Case Committee on January 15th. Two days later, the government filed its NOI.

III.   **The Defense Needs Well Over a Year From this Date to Prepare This Capital Case for Trial**

   A.   **The Necessary Social History Investigation**

   In *Defendant's Reply to Government's Response to Defendant's Motion to Continue Final Pretrial and Trial Dates*, at 5-6, counsel quoted the ABA Guidelines' premise that a higher level of competence, more extensive investigation and more detailed preparation is necessary in capital cases, which generally require "unparalleled investigation into personal and family history." Counsel forewent further itemization of those obligations at that time,[5] but because of the necessity that this Court set a realistic schedule to enable

---

[5] The ABA Guidelines have been accepted by the Supreme Court and lower courts as stating the standard of care required of defense counsel in capital cases. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'" (quoting *Strickland v. Washington*, 466 U.S., at 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052)); *Rompilla v. Beard*, 545 U.S. 374, 389 (same); *Smith v. Quarterman*, 471 F.3d 565, 570 (5th Cir. Tex. 2006) (citing *Guidelines*); *Lewis v. Dretke*, WL22998819 (5th Cir. 2003); *Roberts v. Dretke*, No. 02-51339 (5th Cir. January 9, 2004); *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th. Cir. 2003) ("(T)he *Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases."); *United States v. Karake*, 370 F.Supp.2d 275, 278 (D.D.C. 2005) (". . . the Supreme Court has counseled that the ABA *Guidelines for Counsel in Death Penalty Cases* provide the governing norms.").

counsel to fully implement its professional obligations, a more detailed discussion is

helpful at this time.

ABA Guideline 10.7 address counsel's duty to independently and thoroughly

investigate all issues relating to both guilt and penalty regardless of any admission by the

defendant or evidence of guilt. The Commentary to the Guideline details the scope of a

guilt and penalty investigation in a capital case.

> Because the sentencer in a capital case must consider in mitigation "anything in the
> life of a defendant which might militate against the appropriateness of the death
> penalty for the defendant," "penalty phase preparation requires extensive and
> generally unparalleled investigation into personal and family history." At least in
> the case of the client, this begins with the moment of conception.

Commentary, Guideline 10.7, 31 Hofstra L. Rev. at 1022. Among the areas counsel must

explore are:

> (1) Medical history (including hospitalizations, mental and physical illness or
> injury, alcohol and drug use, pre-natal and birth trauma, malnutrition,
> developmental delays, and neurological damage);
>
> (2) Family and social history (including physical, sexual, or emotional abuse; family
> history of mental illness, cognitive impairments, substance abuse, or domestic
> violence; poverty; familial instability, neighborhood environment, and peer
> influence); other traumatic events such as exposure to criminal violence, the loss of
> a loved one, or a natural disaster; experiences of racism or other social or ethnic
> bias; cultural or religious influences; failures of government or social intervention
> (e.g. failure to intervene or provide necessary services, placement in poor quality
> foster care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior, and
> activities), special educational needs (including cognitive limitations and learning
> disabilities) and opportunity or lack thereof, and activities;
> …

*Id.* at 1022-23.

_____

13

Guideline 1.1 of the Supplementary Guidelines for the Mitigation Function of

Defense Teams in Death Penalty Cases, *id*. at 677, provides

> Mitigation evidence includes, but is not limited to, compassionate factors stemming from the diverse frailties of humankind, the ability to make a positive adjustment to incarceration, the realities of incarceration and the actual meaning of a life sentence, capacity for redemption, remorse, execution impact, vulnerabilities related to mental health, explanations of patterns of behavior, negation of aggravating evidence regardless of its designation as an aggravating factor, positive acts or qualities, responsible conduct in other areas of life (e.g. employment, education, military service, as a family member), any evidence bearing on the degree of moral culpability, and any other reason for a sentence less than death.

Supplementary Guideline 5.1, *id*. at 682, describes the breadth of the investigation

and the skills needed by those who conduct it:

> B. The defense team must include individuals possessing the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history. Life history includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

> C. Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance.

14

E.   At least one member of the team must have specialized training in identifying, documenting and interpreting symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma. Team members acquire knowledge, experience, and skills in these areas through education, professional training and properly supervised experience.

Supplementary Guideline 10.1 goes into more detail as to the required methodology, including multiple, face-to-face interviews often necessary to elicit embarrassing and sensitive information, the creation of genealogies, social history reports and chronologies and the identification of various experts that are often needed, such as "medical doctors, psychologists, toxicologists, pharmacologists, social workers, and person with specialized knowledge of medical conditions, mental illnesses and impairments; substance abuse, physical emotional and sexual maltreatment, trauma and the effects of such factors on the client's development and functioning." *Id*. at 689-692.

The attached Declarations from two nationally recognized experts in mitigation investigations and mental health evaluations in capital cases confirm these requirements. See Exhibit B, Declaration of Russell Stetler (National Mitigation Coordinator for federal death penalty projects);[6] Exhibit C, Declaration of David Freedman, PhD (Psychiatric Epidemiologist).[7]

---

[6] Mr. Stetler's qualifications are set out in ¶¶ 2-11 of his Declaration.

[7] Dr. Freeman's qualifications are set out in ¶¶ 1-5 of his Declaration.

After confirming the depth of the necessary social history investigation in a capital case, as described in the Supplementary Guidelines, *see* ¶ 14, Mr. Stetler offers the following observation directly germane to the proposed scheduling order:

> As is evident from these standards, *an adequate social history investigation can take a significant amount of time*. It takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries may invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation. *Only with sufficient time* can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions.

*Id.*, ¶ 16 (emphasis added).

Dr. Freeman's Declaration explains from a mental health perspective *why* a complete and thorough social history is necessary in a capital case:

> Social histories provide neurodevelopmental trajectory evidence, clinical substantiation and evidentiary corroboration of the client's present condition. Beyond the simple factual details (what, when, who), they are the foundation for recognizing the how and why of a client or patient's every day experience; the factors that influenced and shaped the person's life and options and decisions; how she/he makes sense of the world and interacts with it; the scope and breadth of the world from the patient/client's perspective of it; and, the specific ways in which his/her functional capacity manifests across the life course, in family and social interactions, in institutional settings, and in the community (Haney 2008, Holdman and Seeds 2008, Wayland 2008). In contrast, inadequate social history development can prevent the acquisition of a full understanding of the link between impairments and everyday functioning, as well as leave open counter arguments

16

such as malingering, personality disorders or character failings. As an example, some people with executive functioning impairments may exhibit asocial or antisocial behavior (Volavka, Martell et al. 1992, Anderson, Damasio et al. 2000, Raine, Lencz et al. 2000). Without social history to provide context, these impairments are associated with behaviors which simply look like criminality and bad acts. Social history is necessary in order for lawyers and clinicians to be able to understand and present the everyday effects of those environmental and genetic factors which manifest in functional impairments that lead to a multitude of observable behaviors of interest to the courts. While these factors may be managed with supports oftentimes, and may have nothing to do with criminal intent or personal characteristics, without social history to provide context and course of behavior, it is not possible to differentiate types and causes of these behaviors. Without social history, the judicial system's default treatment of these behaviors is to consider them to be willful, chosen characteristics which define the person, as opposed to behaviors which manifest from underlying, potentially treatable factors which drive the behavior, but do not define the character. Actions which have no context are more likely to be misidentified and mislabeled, typically as character or personality disorders which are immutable characteristics.

Exhibit C , ¶ 9.

From the diagnostic and clinical assessment perspective, the bio-psychosocial history is the factual basis upon which to reach an understanding of the developmental course which defines the client's life. The neurodevelopmental approach to cognition and mental illness posits that altered, pathological, or delayed maturation of the developing brain shifts the neurodevelopmental trajectory, followed by later onset of neuropsychiatric illness. The shift from the range of expected development marks these conditions as illnesses. The quality and degree of the shift must be documented through the bio-psychosocial history of multigenerational genetic and environmental risk factors for disease

*Id.* ¶ 11.

In addition to the depth of investigation required, other factors suggest why adequate time is necessary, as the investigation is not limited to the capital defendant. "Life history" includes a "multi-generational family history, genetic disorders and vulnerabilities, as well as

17

multi-generational patterns of behavior . . ." Supplementary Guideline 5.1B, 36 Hofstra L. Rev.

at 682. The investigation should seek out and interview witnesses familiar with the family

history (and obtain corroborating records) "extending at least three generations back."

Guideline 10.11.E.2.a., *id*, at 691; *see also* Exhibit B, ¶ 13 (Declaration of Russell

Stetler)(discussing need to "complete a detailed, multi-generation social history to highlight

the complexity of the client's life and identify multiple risk factors and mitigation themes").

> Dr. Freeman again explains from the viewpoint of a mental health professional:

>> The model of the multigenerational bio-psychosocial history is
>> focused on at least three prior generations of data because medical
>> and psychiatric conditions often aggregate in families either by
>> genetic or environmental causes. As research continues to identify
>> prenatal risks for later life medical and psychiatric disorders, focus
>> on multigenerational life experiences has continued to grow (Millan
>> 2013). Even such common events as preterm birth and low birth
>> weight, which disproportionately affect impoverished people and
>> people with limited access to prenatal care, are associated with later
>> psychiatric and medical illnesses (Barker, Thornburg et al. 2010,
>> Freedman, Bao et al. 2012, Nosarti, Reichenberg et al. 2012); and
>> parental and grandparent exposure to famine and stress have been
>> shown to increase the risk of psychiatric illnesses generations later
>> (Yehuda and Bierer 2009, Matthews and Phillips 2010).

Exhibit C, ¶ 10; *see also id.*, ¶¶ 6-8, 11, 15 (discussing importance of multigenerational

investigation).

        As the quoted passage from Mr. Stetler's Declaration suggests the social history

investigation is far from straightforward, often requiring multiple in-person interviews to

develop the rapport necessary to elicit very sensitive and often embarrassing information

that individuals are often reluctant to discuss. The recognition that the mitigation

investigator often will need to engage in multiple "face-to-face, one-on-one interviews" to

"establish trust, elicit sensitive information and conduct a thorough and reliable life-

history investigation" is emphasized in Supplemental Guideline 10.11.C., 36 Hofstra L.

Rev. at 689.

### B.       The Relationship of the Social History Investigation and Mental Health Issues

A mental health evaluation of the defendant is an essential component of the

mitigation investigation. ABA Guideline 4.1 states that "[T]he defense team should

contain at least one member qualified by training and experience to screen individuals for

the presence of mental or psychological disorders or impairments." 31 Hofstra L. Rev. 952;

*see also* Supplementary Guideline 1.1A ("Mitigation evidence includes, but is not limited

to . . . vulnerabilities related to mental health, explanations of patterns of behavior . . .").

36 Hofstra L. Rev. 679. For this reason mitigation specialists must be "skilled interviewers

who can recognize and elicit information about mental health signs and symptoms, both

prodromal and acute, that may manifest over the client's lifetime." Supplementary

Guideline 5.1C; *id.* at 682.

The Commentary to ABA Guideline 4.1 explains why mental health experts are

particularly imperative in capital cases:

> In particular, mental health experts are essential to defending capital cases.
> Neurological and psychiatric impairment, combined with a history of
> physical and sexual abuse, are common among persons convicted of violent
> offenses on death row. . . . [T]he defendant's psychological and social history
> and his emotional and mental health are often of vital importance to the
> jury's decision at the punishment phase. Creating a competent and reliable
> mental health evaluation consistent with prevailing standards of practice is a
> time-consuming and expensive process. Counsel must compile extensive
> historical data, as well as obtain a through physical and neurological
> examination. Diagnostic studies, neuropsychological testing, appropriate
> brain scans, blood tests or genetic studies, and consultation with additional
> mental health specialists may also be necessary.

31 Hofstra L. Rev. at 956.

In ¶ 17 of his Declaration, Exhibit B, Mr. Stetler also notes the responsibility of the mitigation specialist in reference to the mental health assessment.

> An important role of the mitigation specialist is advising counsel on appropriate mental health and other expert assistance." *Id*. As described in Supplementary Guideline 5.1.E., a core team member, usually the mitigation specialist, must have the specialized training, as described in Supplementary Guideline 5.1.E. to identify, document and interpret "symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma." (Citation Omitted).

The important point for purposes of scheduling is that the social history should be substantially conducted prior to any expert mental health evaluations and testing because it serves as the foundation and guide for the mental health assessment. *See* Exhibit B, Stetler Declaration, ¶¶ 18-20. Mr. Stetler explains that: "Only after the social-history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of mental health expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert." *Id*. ¶ 20.

Dr. Freeman explains in more detail why the social history investigation must come first:

> A comprehensive, multigenerational social history is the foundation of an accurate and reliable mental health assessment. This is true in all assessment contexts: clinical, medical, civil, criminal, disability, and academic. The social science underlying the development of multigenerational bio-psychosocial histories in the assessment of a patient or group of people is many decades in the making (Healy and Bronner 1936, Faris 1939, Reprinted 1965, Shaw and McKay 1969, Bronfenbrenner 1977, Cicchetti and Lynch 1993). One critical motivational force behind this research has been the recognition that environmental influences

in one generation, including family and neighborhood factors, affect health and development across the lifespan in subsequent generations (Williams and Sternthal 2010, Bohacek, Gapp et al. 2013, Behforouz, Drain et al. 2014, Pierce, Kaczor et al. 2014).

Exhibit C, ¶ 7.

### C.      Responsibilities of Counsel

#### 1.      The Mitigation Investigation

While many of the tasks are delegated to other members of the team, counsel is intimately involved throughout the mitigation investigation, as "ultimate responsibility for the investigation of such issues rests irrevocably with counsel." Supplementary Guidelines, Introduction, 36 Hofstra L. Rev. 677. It is counsel's responsibility to "supervise and direct the work of all team members," Supplementary Guideline 4.1, *id.*, at 680, and in consultation with all team members and experts, review the evidence and analyze the most effective way to present the case in mitigation. This is an on-going process throughout the mitigation investigation. Supplemental Guideline 10.4, *id.*, at 688.

Counsel's responsibility for the conduct of the mitigation investigation is demonstrated by numerous cases finding counsel ineffective for failing to uncover and present mitigating evidence in a capital case. *See, e.g., Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009); *Sears v. Upton*, 561 U.S. 945 (2010). *Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001) (counsel ineffective in capital sentencing for failing to adequately investigate and present mitigating evidence of, *inter alia*, the defendant's "involvement in a serious car accident at age 18, during which he sustained a serious

head injury and after which he heavily used alcohol and drugs"); *Bloom* v. *Calderon*, 132

F.3d 1267 (9th Cir. 1997); *Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988) (failure to

conduct investigation into petitioner's background, to uncover mitigating, psychiatric,

IQ, and childhood information, and to present that information at penalty phase of

death penalty case ineffective); *Stephens v. Kemp*, 846 F.2d 642 (11th Cir. 1988) (counsel

ineffective for failing to investigate, present, and argue to jury at sentencing evidence of

defendant's mental history and condition); *Commonwealth* v. *Alvarez,* 740 N.E.2d 610

(Mass.2000) (counsel ineffective in a murder case where failure to provide expert with

all relevant medical records left expert unable to testify credibly about defendant's

organic brain damage and subjected him to devastating cross-examination).

### 2.      Counsel's Other Responsibilities

Counsel has a duty to "thoroughly investigate" all potential legal claims "in light

of . . . the unique characteristics of death penalty law and practice." ABA Guideline

10.8A.1.-3., 31 Hofstra L. Rev. 1028. The Commentary to this Guideline cautions that

"counsel must be significantly more vigilant about litigating all potential issues . . . in a

capital case including those where the "prospect of immediate success is 'modest,' in

order to preserve claims in light of foreseeable future developments." *Id.*, at 1032, 1034.

"One of the most fundamental duties of an attorney defending a capital case . . . is the

preservation of any and all conceivable errors." *Id.* at 1030.

As a practical matter this means that in addition to those motions already filed,

counsel will have to research and prepare a significant number of pleadings dealing with

unique issues presented in death penalty cases, including challenges to the Federal Death

Penalty Act, both facially and as applied, factual and legal challenges to the NOI and

statutory and non-statutory aggravating factors,[8] including those related to future

dangerousness, discovery motions relating to the penalty phase, the scope and timing and

other substantive and procedural questions pertaining to Rule 12.2 notices and

disclosures, jury selection and *voir dire* issues, juror questionnaires, potential

constitutional challenges to the composition of the grand and petit jury panels and

motions related to the authorization process etc. All of this takes a significant amount of

time.

Finally, the Court should not be under the misimpression that counsel would

have been prepared to go forward on February 27, 2017, on a non-capital trial. As

explained in Sealed Exhibit D, although counsel had to continue preparation, including

filing the motions dictated by the Court's deadline, by the middle of December it was

apparent that such a trial would not likely take place on February 27, 2018. Thus, there

was no need to file another motion to continue or, as noted above, reply to the

government's response to the motion to exclude the experts' testimony. But, counsel

was, and is, a long way from preparation on the guilt phase.

Investigations described in the motion to continue pleadings have not been

completed. The discovery received in this case has been voluminous, and particularly

complicated to process. In addition to approximately 4,800 pages of written discovery, the

defense has received twelve discs of photographs, fourteen discs of recorded phone calls

and personal interactions between the defendant and the CHS, hundreds of recorded jail

---

[8] For example, the NOI alleges that Mr. Christensen committed an unrelated rape five years ago.
(R. 54, at III-4). This, alone, is a serious felony that will have to be thoroughly investigated.
Standing as a separate charge, the trial on this allege offense alone would not reasonably take place
for months.

calls, and subpoena responses containing telephone records, email records, and internet
data. Most burdensome has been the time required to download, process, and review the
forensic evidence obtained from electronic devices, including but not limited to mirror
images of seven computer hard drives and four cellular telephones. Each of these devices
was processed by agency professionals using proprietary software such as Access Data's
Forensic Took Kit and Cellebrite's telephone extraction device. The defense was unable to
view this data in the form provided by the Government, and only recently procured the
necessary forensic software to analyze the electronic evidence. That review is ongoing,
and is being conducted by defense team attorneys; unlike the Government, which has a
team of expert forensic processors at its disposal, defense counsel is navigating these
complicated systems without the benefit of the assistance of dozens of federal agents.
With the broad inquiry of a capital sentencing hearing, and vague non-specific allegations
of future dangerousness in the NOI, it cannot be overemphasized that counsel has a duty
to review *all* of this evidence. Needless to say, this is a time-consuming task, especially in
light of the other things that must be accomplished.[9]

---

[9] The timing of the Rule 16 disclosures prejudiced the defense in reference to the February 27,
2018, in other particulars. For instance, the DNA Report, an 11-page document describing test
results, was disclosed on November 28, 2017. However, the underlying case report notes, bench
notes, communication logs, electropherograms, and other supporting documentation were not
disclosed until December 14, 2017. In preparation for receiving the expected DNA evidence, the
defense team had already contacted a reviewing expert to analyze the data received and provide
guidance as to what further forensic analysis may be necessary. The defense reviewing expert, after
analyzing the lab reports over a period of weeks, indicated that significant additional testing and
analysis was necessary. In analyzing the data, the FBI lab utilized probabilistic genotyping,
performed using specialized proprietary software, to calculate likelihood ratios identifying the
DNA and matching it to a particular person. Many of the samples were mixed, extremely small,
and/or required probabilistic analysis, i.e. educated guessing, to determine results. Additional
experts are needed on two fronts: one, to conduct any re-testing of material that remains in the
custody of the FBI (and which requires coordination with the lab to preserve chain of custody) and
two, to analyze and explain the mathematical algorithms that cause the GeneMapper software to

The task is further complicated by the fact that the Superseding Indictment alleges that Mr. Christensen used his telephone to commit the offense with no specification of how he allegedly did so, requiring counsel to closely review this material to understand any evidence the government may attempt to use and how to rebut it. *See Motion for a Bill of Particulars*, (R.38); *Motion to Dismiss Count One*. (R. 42).

Further, there are several outstanding discovery requests. On December 28, 2017, the defense sent the government a letter requesting fourteen different categories of evidence. The government has not responded. When counsel inquired further in a meeting with the prosecution on February 5, 2018, they were told that the letter had been overlooked and that a written response would be forthcoming.[10]

### D. The Proposed Trial Date is on the Lower End of the Time for Preparation of Capital Trials Normally Allowed in Other Federal Cases

"Death penalty litigation is extraordinarily complex, both for the courts and for the attorneys involved. Not only do the cases incorporate the evidentiary and procedural issues that are associated with virtually every noncapital case, but they also involve a host of issues that are unique to capital cases." ABA Criminal Justice Section, *Toward A More Just And Effective System of Review in State Death Penalty Cases*, 40 Am. U. L. Rev. 1, 5-12 (1990). As the above discussion shows, the time requested in the attached proposed Scheduling Order is necessary for counsel to discharge their professional obligations and

---

function and to identify how it produces results. Before that analysis can be conducted, the defense requires additional discovery related to the proprietary software; those additional requests will be made shortly. To date, the defense has not been able to identify an expert to conduct the second analysis although attempts to do so are in progress.

[10] Items 3 and 4 were the subject of the defendant's Motion to Bar Expert Testimony.

for Mr. Christensen to receive the representation required by the Fifth, Sixth and Eighth Amendments in a capital case. And, as Exhibit A to *Defendant's Motion to Continu*e reflects, *see* R. 29, the twenty months from the date of the capital Indictment in this case, October 3, 2017, to the proposed commencement of *voir dire* on June 4, 2019, is well below the time periods normally associated with capital trials.[11]

For all these reasons counsel for Mr. Christensen urge the Court to adopt the substance of the attached proposed Scheduling Order.[12]

---

[11] It is true that the non-capital indictment was returned in July 2017, but undersigned counsel was not appointed until September 2017.  Even adding the additional month that present counsel was appointed before the Superseding Indictment in October, the period of 22 months between this Indictment and the suggested commencement of trial is well within that found in the average capital trial.

[12] As previously represented, counsel met with the government on Monday, February 5, in an effort to agree on scheduling issues.  At the outset of the meeting government counsel stated that it had already determined that it would request a trial date in October 2017, which it knew from prior discussions would be unacceptable to the defense.  In explaining its press for October, the government verbalized a generalized concern about witnesses becoming unavailable, but did not identify any particular witness or reason to believe an identified witness might be available in October 2017, but not in June 2018.  Nor did the government indicate why available procedures to preserve the testimony of such a witness would not suffice even if such a specific concern could be identified.  *See* Fed. R. Crim. P. 15.  The government also noted the victims' rights, presumably referencing the Crime Victim's Rights Act, 18 U.S.C. § 3771(a)(7), which it cited in its Response to the defendant's *Motion to Continue*.  *See* R. 30, at 3 ("right to proceedings free from unreasonable delay.").  But, as indicated herein, the dates suggested in the defendant's proposed scheduling are more than reasonable in a capital trial and the defense is aware of no case holding the generalized enumeration of victim rights in § 3771 trumps a capital defendant's right to a trial consistent with required constitutional protections. Further, setting a realistic trial date at the beginning, rather than having counsel repeatedly requesting additional time because of insufficient preparation, will inure to the victims' benefit, especially where they live in China and can plan on a definite date to arrange for travel to the United States for this trial. Parenthetically, counsel also suggests that a trial date in the summer of 2019 might  provide an additional benefit of counteracting to some extent the effect of the extensive prejudicial publicity generated in this case. *See Motion For Change of Venue for Trial*. (R. 41).

Respectfully submitted,

BRENDT A. CHRISTENSEN, Defendant

By:     /s/Elisabeth R. Pollock                    /s/ George Taseff
        Assistant Federal Public Defender          Assistant Federal Public Defender
        300 West Main Street                       401 Main Street, Suite 1500
        Urbana, IL 61801                           Peoria, IL 61602
        Phone: 217-373-0666                        Phone: 309-671-7891
        FAX:    217-373-0667                       Fax:     309-671-7898
        Email: Elisabeth_Pollock@fd.org            Email: George_Taseff@fd.org

        /s/ Robert Tucker
        Robert L. Tucker, Esq.
        7114 Washington Ave
        St. Louis, MO 63130
        Phone: 703-527-1622
        Email: roberttuckerlaw@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2018, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to

Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller. A copy was also

mailed to the defendant.

                        /s/Elisabeth R. Pollock
                        Assistant Federal Public Defender
                        300 West Main Street
                        Urbana, IL 61801
                        Phone: 217-373-0666
                        FAX:    217-373-0667
                        Email: Elisabeth_Pollock@fd.org

# EXHIBIT A

## **DEFENDANT'S PROPOSED SCHEDULING ORDER**

Counsel for the defendant, Brendt Christensen, propose the following schedule in this capital case:

| | |
|---|---|
| April 1, 2018: | Government to Provide Defense with All Discovery Relating to Statutory and Non-Statutory Aggravators, Rule 16 Material and Evidence Required to be Disclosed under *Brady v. Maryland* and *Giglio v. United States*. |
| May 1, 2018: | Defense to File Motions Concerning any Contested Discovery Matters Relating to Either Guilt/Innocence or Penalty Phases of the Trial. |
| July 1, 2018: | Defense to File Dispositive Motions Relating to Facial Challenges to Indictment, Death Penalty, Notice of Intent to Seek Death, Statutory and Non-Statutory Aggravators. |
| August 1, 2018: | Parties to File Motions Relating to Selection and/or Composition of Grand and Petit Jury Venires. |
| November 1, 2018: | Parties to File Motions Concerning Jury Selection Procedures, Including Stipulated and Disputed Questions for Jury Questionnaire and Procedures to be Followed in Selection of the Jury. |
| February 1, 2018: | Defense to Comply with Reciprocal Discovery Obligations. |
| March 1, 2019: | Jury Questionnaire Mailed to Prospective Jurors. |
| April 1, 2019: | Defense to Give Any Notice required by F.R.Cr.P. 12.2(b). |
| April 8, 2019: | Government Motion to Examine Defendant Pursuant to F.R.Cr.P. 12.2(c), Objections to Adequacy of Defendant's Notice (if Defendant Files 12.2(b) Notice), and any Firewall Requests . |
| May 1, 2019: | Parties to File Motions in Limine, *Daubert* motions and Any Other Motions Relating to the Evidentiary Portion of the Trial. |
| May 15, 2019: | Pretrial Conference; Parties to Submit Proposed Voir Dire and Jury Instructions. |

May 29, 2019:          Government to Provide Defense with Jencks material pursuant to 18 U.S.C. ¶ 3500 and F.R.Cr.P. 26.2, Witness List and Exhibit List.

June 4, 2019:          Voir Dire

June 18, 2019:         Trial


The parties are directed to meet and encouraged to attempt to reach agreement, if possible, prior to presenting issues to the Court for resolution.

The parties should file any Responses with 14 days and Replies within 7 days.

# EXHIBIT B

## DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

1. I have been asked by counsel for Brent A. Christensen to provide this declaration concerning the prevailing professional norms governing the investigation and preparation of the penalty phase of capital cases, the standard of care in capital mental-health evaluations, and the temporal relationship between the social history investigation and mental health evaluations in capital cases.

### *Background and Qualifications*

2. I am the National Mitigation Coordinator for the federal death penalty projects.[1] This national position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), and the 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255).

---

[1] *See* JON B. GOULD & LISA GREENMAN, REPORT TO THE COMMITTEE ON DEFENDER SERVICES, JUDICIAL CONFERENCE OF THE UNITED STATES, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES, 111-112, September 2010 (Commentary describes authorization of the position "to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts" and the role of the National Mitigation Coordinator in case consultations and training).

3. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

4. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco that coordinated appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

5. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in post-conviction proceedings. Most of these conferences were organized and attended by attorneys specializing in capital work. I investigated mitigation evidence in over two dozen death-penalty cases in California in the 1980s.

2

6. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death penalty cases are prosecuted. I have also lectured on numerous occasions under the auspices of the Administrative Office of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over the past two and a half decades, I have lectured at over three hundred fifty continuing legal education programs around the country (including eleven in the state of Illinois), as well as dozens of additional programs at law schools and related professional conferences in the United States, Europe, and Asia.

7. Since the 1990s, I have lectured on mitigation investigation in death penalty cases at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conference), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times over the past twenty-five years, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), which is attended by over a thousand

3

practitioners.  I was a co-chair of the planning committee for this seminar in 2009 and from 2011

to 2015.  I have also taught at the death-penalty colleges at the Santa Clara University School of

Law in California and the DePaul University College of Law in Illinois.  I have taught at over a

dozen capital defense seminars throughout the country under the auspices of the National

Institute of Trial Advocacy and over a dozen "bring-your-own-case" capital brainstorming

seminars under the auspices of the National Consortium for Capital Defense Training and its

regional counterparts.  I also designed and organized the annual Capital Mitigation Skills

Workshop which has been held annually since 2012 under the auspices of the federal Habeas

Assistance and Training Counsel Project.

     8.  Since 1993, I have contributed extensively to the California Death Penalty Defense

Manual published by the California defense bar (CACJ and CPDA).  This multi-volume

reference has a volume devoted to the investigation and presentation of mitigation evidence

which I helped to shape in the 1990s.  In 1999, I published articles on *Mitigation Evidence in

Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly

magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled

*Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the

National Legal Aid and Defender Association.  These and other articles of mine were cited in the

Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel

in Death Penalty Cases, rev. 2003, 31 HOFSTRA L. REV. 913 (2003), available at

www.ambar.org/2003guidelines. At the request of HOFSTRA LAW REVIEW, I wrote an article for

their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty

to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA LAW

REVIEW 1157 (2003). At the request of HOFSTRA LAW REVIEW, I also wrote an article for their

symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense

Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 1067 (2008). At the request of UMKC LAW

REVIEW, I contributed an article to their symposium issue devoted to "Death Penalty Stories,"

*The Unknown Story of a Motherless Child*, 77 UMKC L. REV. 947 (2009). I have written three

additional articles on prevailing norms in the development of mitigation and mental health

evidence: *The ABA Guidelines and the Norms of Capital Defense Representation* (written in

collaboration with Professor W. Bradley Wendel), 41 HOFSTRA L. REV. 635 (2013); *Mental

Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC LAW REVIEW

407 (2014); and *The ABA Guidelines: A Historical Perspective* (written in collaboration with

Aurélie Tabuteau), 43 HOFSTRA LAW REVIEW 731 (2015). At the request of *Hofstra Law Review*,

I have written an article entitled *The Past, Present, and Future of the Mitigation Profession:

Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases*, to be

published later this year in a symposium issue commemorating the fifteenth anniversary of the

2003 revision of the ABA Death Penalty Representation Guidelines.

    9. I am the coauthor of chapters on psychiatric issues in death penalty cases in two

books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL

HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., &

Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and

*Punishment*, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2d ed. (Richard Rosner,

M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University

Press). I am also a coauthor of A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS

WITH MENTAL DISORDERS AND IMPAIRMENTS (Bishop Auckland, U.K.: International Justice Project, 2008). I am the co-author of the opening chapter, *Mitigation Works,* of Tell the Client's Story: Mitigation in Criminal and Death Penalty Cases (Edward Monahan & James Clark eds., 2017), published last year by the American Bar Association.

10.  I have qualified as an expert witness in multiple state and federal courts and have provided opinion evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by live testimony or affidavit over two hundred times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky,  Louisiana, Michigan, Mississippi, Missouri, Nebraska, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and Wyoming.  I have testified as an expert witness thirty-one times, including testimony in federal proceedings in the Districts of Arizona, Arkansas (Eastern), California (Eastern), Iowa (Northern), Louisiana (Middle), Missouri (Western), Tennessee (Middle), Texas (Northern), and Wyoming, as well as in state capital trial and post-conviction proceedings in Alabama, Arkansas, California, Colorado, Louisiana, Nevada, Pennsylvania, South Carolina, and Wyoming.

11.  Over the years, I have been directly involved in hundreds of capital cases, including scores of trials and post-conviction hearings. I have also been consulted in various capacities on capital cases in numerous other jurisdictions around the country, including many federal death-penalty cases.

6

*Prevailing Norms in the Development of Mitigating Evidence in Capital Cases*

12.  The generally accepted standards of care for defense of a capital case are set out in

the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty

Cases (rev. 2003) (hereinafter ABA Guidelines), published in 31 HOFSTRA L. REV. 913 (2003),

*available at* www.ambar.org/2003guidelines and the Supplementary Guidelines for the

Mitigation Function of Defense Teams in Death Penalty Cases (2008) (hereinafter

Supplementary Guidelines), developed in cooperation with the ABA Death Penalty Project,

published in 36 HOFSTRA L. REV. 677 (2008).  Counsel appointed on death penalty cases in the

federal courts are expected to comply with Guideline 1.1 and 10.2 et seq. of the ABA Guidelines

and the Supplementary Guidelines. *See* Defender Services Program Strategic Plan, Goal 2

(Quality of Representation), Strategy 16 (Capital Representation)[2]; Guide to Judicial Policy,

Appx. 2A: Model Plan for Implementation and Administration of the Criminal Justice Act, XIV.

Appointment of Counsel and Case Management in CJA Capital Cases, B.9 (page 28).[3]

13.  In a capital case, competent defense counsel have a duty to conduct life-history

investigations, but generally lack the skill to conduct the investigations themselves.  *See*,

*generally*, Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't*

*Be Delegated*, THE CHAMPION (March 2007) at 61.  Moreover, even if lawyers had the skills, it is

more cost-effective to employ those with recognized expertise in developing mitigation

evidence.  It has therefore long been the accepted practice for capital counsel to retain a

"mitigation specialist" to complete a detailed, multigenerational social history to highlight the

---

[2] Cited in GOULD & GREENMAN, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN DEATH PENALTY CASES, *supra* note 1, at 91.

[3] *Available at:* http://www.uscourts.gov/sites/default/files/vol07a-ch02-appx2a.pdf (last substantive revision Oct. 3, 2016; last revised (minor technical changes) Nov. 29, 2016).

complexity of the client's life and identify multiple risk factors and mitigation themes.  The

Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial

Conference of the United States, for example, noted in 1998 that mitigation specialists "have

extensive training and experience in the defense of capital cases.  They are generally hired to

coordinate an investigation of the defendant's life history, identify issues requiring evaluation by

psychologists, psychiatrists or other medical professionals, and assist attorneys in locating

experts and providing documentary material for them to review."[4]  The Commentary further

emphasized that the work of mitigation specialists "is part of the existing 'standard of care' in a

federal death penalty case."  *Id.*, Commentary to 7. Experts, Sec. II, Recommendations and

Commentary.

14.  The Supplementary Guidelines discuss in detail the skills that mitigation specialists

provide to the defense team – skills that most lawyers simply do not possess.  Supplementary

Guideline 5.1.B, for example, specifies the need for someone with "the training and ability to

obtain, understand and analyze all documentary and anecdotal information relevant to the

client's life history.  Life history includes, but is not limited to: medical history; complete,

prenatal, pediatric and adult health information; exposure to harmful substances in utero and in

the environment; substance abuse history; mental health history; history of maltreatment and

neglect; trauma history; educational history; employment and training history; military

experience; *multi-generational family history, genetic disorders and vulnerabilities, as well as*

---

[4] FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference (May 1998) (also known as "the Spencer Report"), *available at* http://www.americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/Standards/National/fede ral_judicial_conference_recommendations.authcheckdam.pdf.

*multi-generational patterns of behavior*; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors." 36 HOFSTRA L. REV. at 682 (emphasis added). The investigation of family relationships, especially in the developmental years, is a critical part of this inquiry. This investigation generally involves a multigenerational inquiry into the biological, psychological and social influences on the development and adult functioning of the accused.

15. The social history investigation must also include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. An adequate social history investigation thus requires a comprehensive collection, review and analysis of all records pertaining to the defendant's life, a process which, in turn, often discloses the existence of collateral documentation and investigation which needs to be pursued.

15. The Commentary to ABA Guideline 10.7 (Investigation) notes, "Records should be requested concerning *not only the client, but also his parents, grandparents, siblings, cousins, and children. . . .* Counsel should use all appropriate avenues including *signed releases, subpoenas, court orders*, and requests or litigation pursuant to applicable open records statutes . . ." 31 HOFSTRA L. REV. at 1024-25 (emphasis added).

9

16.   As is evident from these standards, an adequate social history investigation can take a significant amount of time.  It takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history.  It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members.  These inquiries may invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed.  Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.  Only with sufficient time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions.

### The Relationship of the Social History Investigation and Mental Health

17.   An important role of the mitigation specialist is "advis[ing] counsel on appropriate mental health and other expert assistance." Supplementary Guideline 5.1.C. 36 HOFSTRA L. REV. at 682.  As described in Supplementary Guideline 5.1.E., a core team member, usually the mitigation specialist, must have the specialized training to identify, document and interpret "symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the

10

presence, severity and consequences of exposure to trauma." 36 HOFSTRA L. REV. at 683.

18.  The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation.  A leading psychiatric text has described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis."  H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985).  *See* Richard G. Dudley, Jr., and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); and Douglas Liebert and David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994).  *See also* George W. Woods, David Freedman, and Stephen Greenspan, *Neurobehavioral assessment in forensic practice*, 35 INT'L J. OF L. & PSYCHIATRY 432 (2012); Russell Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC LAW REVIEW 407 (2014).  Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client for clinical, not simply forensic, reasons.

19.  Without the thorough social history investigation that a skilled mitigation specialist can provide, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence.  *Moreover, as explained below, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain*, in order to gauge the nature and extent of a client's possible mental disorders and impairments.  Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation and

11

consider the significance of relationships, symptoms and behaviors that the mitigation investigation has uncovered

20.   Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel must conduct a thorough social-history investigation before retaining mental-health experts.   Only after the social-history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of mental health expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert.   Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including the disciplines that study the effects of trauma on human development.   The potential roles of experts include consultants; fact gatherers needed to measure cognitive capacities or to elicit client disclosures (and/or to assess their credibility); and testifying witnesses, to name but a few.   To make informed decisions about the kind of experts that may be needed and the referral questions they will address, counsel first needs a reliable social-history investigation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, and under the laws of the States of California and Illinois, that the foregoing is true and correct and was executed this _5_ day of February at Oakland, California.

RUSSELL STETLER

12

# EXHIBIT C

I, David Freedman, Ph.D., declare the following under penalty of perjury:

1.   I am a psychiatric epidemiologist, having obtained my Ph.D. at Columbia University's Mailman School of Public Health in Epidemiology. My course of study and research was supported by a training grant from the National Institute of Mental Health (NIMH). I subsequently worked as a Postdoctoral Scholar in the Departments of Psychiatry and Biobehavioral Sciences at the Semel Institute for Neuroscience and Human Behavior, University of California, Los Angeles; and I previously obtained Masters of Science from the Harvard School of Public Health. I currently teach a seminar entitled Mental Illness and Criminal Defense as a lecturer in law at Columbia Law School in New York City.

2.   Psychiatric epidemiology is the study of the distribution and determinants of mental illnesses in populations. My work and research has specifically focused on neurodevelopmental disorders, primarily psychotic disorders, intellectual disability and trauma. Each condition is a type of mental illness that may have origins during the perinatal period, including both genetic and environmental causes, altering the life course and neurodevelopment over time.

3.   I have published numerous papers on prenatal and perinatal risks for psychotic disorders, cognitive functioning and behavior, forensic assessment and issues related to mental illness, indigent defense and death penalty litigation. The focus of my academic research has been on the early life risk factors for neurodevelopmental disorders and the cognitive and functional impairments which affect the life course development of people who develop mental illness and cognitive impairments.

4.   In addition, beginning in 1991, I have worked as an investigator and mitigation specialist, and now as a consulting mental health expert, in capital cases. I have a contract with the Federal Death Penalty Resource Counsel Project (FDPRC) to provide assistance to defense teams at all stages of capital proceedings focused specifically on

developing and presenting issues related to mental illness and cognitive functioning. FDPRC provides assistance to all federally charged, death eligible cases. I also provide assistance to capital defense teams directly, typically being retained as a mental health consultant. Between 2002 and 2009, I was a full time staff member of the Capital Resource Counsel project, a component of the Federal Death Penalty Resource Counsel Project. My consulting focuses primarily on providing assistance to legal teams on recognition of mental health symptoms; diagnostic and cognitive functioning testing and evaluation, including evaluating the reliability and validity of scientific and psychometric assessment tools; reviewing and interpreting testing and assessment data, including IQ and neuropsychological testing to assess cognitive functioning and the reliability and validity of current and prior tests; preparation and presentation of scientific evidence; more generally, guidance and supervision on the investigation of neurodevelopmental psychopathology and bio-psychosocial, multi-generational social history; and assistance in determining what types of experts are appropriate to the specific case facts. I have assisted in the development and presentation of mental health evidence in numerous federal capital trial and habeas corpus cases.

5.   I have co-authored a number of papers on the standard of care for assessment in legal contexts, specifically the assessment of mental illness in criminal cases. For instance, in 2012, I co-authored a paper on the standard of care for neurobehavioral assessment in civil and criminal forensic practice (Woods, Freedman et al. 2012). That paper sets out the responsibilities of legal teams to investigate and develop multigenerational, bio-psychosocial history evidence as the basis for reliable and valid assessments and expert opinion. Further, I have lectured extensively and taught at numerous legal trainings on the standard of care for assessment and the development of evidence related to social history and mental illness in criminal cases.

6.    The Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 Hofstra L Rev.677 (2008), set out the responsibilities of lawyers and defense teams to investigate and develop a multigenerational, bio-psychosocial history in every case as part of the duty to present mitigation evidence. From the clinical and expert perspective, the development of such information is critical because it is only with such extensive data that a reliable and valid opinion can be formed. Without a multigenerational, bio-psychosocial history, experts and expert opinion risks errors, misdiagnosis and falsely characterizing functioning and behavior. Without a competently developed bio-psychosocial history, the genetic and environmental factors which are associated with later life mental illness and alterations in the developmental trajectory will be missed or misunderstood. For instance, differentiating the symptoms of Intellectual Disability from those of early, chronic exposure to child physical and sexual abuse can be difficult without adequate history (Woods and Freedman 2015), but more importantly, understanding the lived experience of a patient or client is critical to developing supports and planning treatment approaches, as well as accurate diagnosis.

7.    A comprehensive, multigenerational social history is the foundation of an accurate and reliable mental health assessment. This is true in all assessment contexts: clinical, medical, civil, criminal, disability, and academic. The social science underlying the development of multigenerational bio-psychosocial histories in the assessment of a patient or group of people is many decades in the making (Healy and Bronner 1936, Faris 1939, Reprinted 1965, Shaw and McKay 1969, Bronfenbrenner 1977, Cicchetti and Lynch 1993). One critical motivational force behind this research has been the recognition that environmental influences in one generation, including family and neighborhood factors, affect health and development across the lifespan in

subsequent generations (Williams and Sternthal 2010, Bohacek, Gapp et al. 2013, Behforouz, Drain et al. 2014, Pierce, Kaczor et al. 2014).

8.   The multigenerational, bio-psychosocial history is required for reliable and valid assessments and should be fully developed in all capital case litigation. Beyond its central role in assessment and evaluation of a client or patient, developing a social history in the forensic or institutional context is a task which requires a team-based approach to factual development and clinical evaluation. Medical, psychological, social work, academic, and legal professionals have an ethical (and in the legal context, constitutional) duty to investigate and discover evidence which shines a light on the developmental course and influences on a client/patient (Woods, Freedman et al. 2012).

9.   Social histories provide neurodevelopmental trajectory evidence, clinical substantiation and evidentiary corroboration of the client's present condition. Beyond the simple factual details (what, when, who), they are the foundation for recognizing the how and why of a client or patient's every day experience; the factors that influenced and shaped the person's life and options and decisions; how she/he makes sense of the world and interacts with it; the scope and breadth of the world from the patient/client's perspective of it; and, the specific ways in which his/her functional capacity manifests across the life course, in family and social interactions, in institutional settings, and in the community (Haney 2008, Holdman and Seeds 2008, Wayland 2008). In contrast, inadequate social history development can prevent the acquisition of a full understanding of the link between impairments and everyday functioning, as well as leave open counter arguments such as malingering, personality disorders or character failings. As an example, some people with executive functioning impairments may exhibit asocial or antisocial behavior (Volavka, Martell et al. 1992, Anderson, Damasio et al. 2000, Raine, Lencz et al. 2000). Without social history to

provide context, these impairments are associated with behaviors which simply look like criminality and bad acts. Social history is necessary in order for lawyers and clinicians to be able to understand and present the every day effects of those environmental and genetic factors which manifest in functional impairments that lead to a multitude of observable behaviors of interest to the courts. While these factors may be managed with supports oftentimes, and may have nothing to do with criminal intent or personal characteristics, without social history to provide context and course of behavior, it is not possible to differentiate types and causes of these behaviors. Without social history, the judicial system's default treatment of these behaviors is to consider them to be willful, chosen characteristics which define the person, as opposed to behaviors which manifest from underlying, potentially treatable factors which drive the behavior, but do not define the character. Actions which have no context are more likely to be misidentified and mislabeled, typically as character or personality disorders which are immutable characteristics.

10.  The model of the multigenerational bio-psychosocial history is focused on at least three prior generations of data because medical and psychiatric conditions often aggregate in families either by genetic or environmental causes. As research continues to identify prenatal risks for later life medical and psychiatric disorders, focus on multigenerational life experiences has continued to grow (Millan 2013). Even such common events as preterm birth and low birth weight, which disproportionately affect impoverished people and people with limited access to prenatal care, are associated with later psychiatric and medical illnesses (Barker, Thornburg et al. 2010, Freedman, Bao et al. 2012, Nosarti, Reichenberg et al. 2012); and parental and grandparent exposure to famine and stress have been shown to increase the risk of psychiatric illnesses generations later (Yehuda and Bierer 2009, Matthews and Phillips 2010).

11.  From the diagnostic and clinical assessment perspective, the bio-psychosocial history is the factual basis upon which to reach an understanding of the developmental course which defines the client's life. The neurodevelopmental approach to cognition and mental illness posits that altered, pathological, or delayed maturation of the developing brain shifts the neurodevelopmental trajectory, followed by later onset of neuropsychiatric illness. The shift from the range of expected development marks these conditions as illnesses. The quality and degree of the shift must be documented through the bio-psychosocial history of multigenerational genetic and environmental risk factors for disease.

12.  Investigating and documenting the comprehensive bio-psychosocial history of a client/patient requires two sets of inter-related tasks which occur in concert: extensive interviewing of collateral witnesses who knew the client at every stage of life and extensive records gathering from every institutional setting for the client and extended family. This is not a controversial position. For example, the Federal Bureau of Prisons Psychological Evaluation Program Guidelines state that reviewing prior medical and psychiatric records and interviewing collateral witnesses is critical to forming forensic opinions and must be done in every case (BOP 2004). The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev.2003), 31 Hofstra L Rev. 913, 1024-5), define the scope of required interviews to include, in addition to the client and family, extended family and estranged family members, "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others" and likewise mandate collection of records and documentary evidence "concerning not only the client, but also his parents, grandparents, siblings, cousins, and children" [at 1024-5].

13.  Records should be obtained for as many of these family members as possible through the use of releases of information, as well as subpoenas, court orders and open records requests as needed. The goal is to obtain sufficient institutional and contemporaneously documented evidence which expands the information obtained through interviews, provides substantiation and corroboration, and points to new potential witnesses to be interviewed.

14.  The investigation is on-going throughout the development of a case and should be exhaustive, to include every aspect of the patient/client's character, history, record and any circumstances of the offense, or other factors, which may provide an expert information about the patient/client's trajectory and/or be presented directly to explain the patient/client's life and experiences.

15.  Contemporaneous records are intrinsically credible because they were created long-prior to the current legal situation. This minimizes the potential for bias and quite often is critical to the determination of whether an individual is or is not malingering or faking symptoms in the present. Whereas all self-reported symptoms in the criminal case context are viewed as potentially being biased, historical records and evidence of the life course of symptoms rebut the contention that the present manifestation is faked. In addition, multigenerational records may document events that the client and his siblings were too young to remember or too impaired to understand or too ashamed to report, as well as past generations' experiences of which a patient/client and patient/client's immediate family may be unaware.

I certify under penalty of perjury under the laws of the State of Illinois and the United States of America that the foregoing is true and correct.

Signed and dated on this 4th day of February, 2018.

David Freedman, Ph.D.

Anderson, S. W., H. Damasio, D. Tranel and A. R. Damasio (2000). "Long-term sequelae of prefrontal cortex damage acquired in early childhood." Developmental neuropsychology **18**(3): 281-296.

Barker, D. J. P., K. L. Thornburg, C. Osmond, E. Kajantie and J. G. Eriksson (2010). "Beyond birthweight: the maternal and placental origins of chronic disease." Journal of Developmental Origins of Health and Disease **1**(6): 360-364.

Behforouz, H. L., P. K. Drain and J. J. Rhatigan (2014). "BECOMING A PHYSICIAN Rethinking the Social History." New England Journal of Medicine **371**(14): 1277-1279.

Bohacek, J., K. Gapp, B. J. Saab and I. M. Mansuy (2013). "Transgenerational Epigenetic Effects on Brain Functions." Biological Psychiatry **73**(4): 313-320.

BOP (2004). Guidelines for Forensic Evaluations. F. B. o. Prisons**:** p. 7.

Bronfenbrenner, U. (1977). "TOWARD AN EXPERIMENTAL ECOLOGY OF HUMAN-DEVELOPMENT." American Psychologist **32**(7): 513-531.

Cicchetti, D. and M. Lynch (1993). "TOWARD AN ECOLOGICAL TRANSACTIONAL MODEL OF COMMUNITY VIOLENCE AND CHILD MALTREATMENT - CONSEQUENCES FOR CHILDRENS DEVELOPMENT." Psychiatry-Interpersonal and Biological Processes **56**(1): 96-118.

Faris, R. a. H. D. (1939, Reprinted 1965). Mental disorders in urban areas. Chicago, University of Chicago Press.

Freedman, D., Y. Bao, W. S. Kremen, S. Vinogradov, I. W. McKeague and A. S. Brown (2012). "Birth Weight and Neurocognition in Schizophrenia Spectrum Disorders." Schizophr Bull.

Haney, C. (2008). "SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES: IMAGINING MITIGATION: EVOLVING STANDARDS OF DECENCY: ADVANCING THE NATURE AND LOGIC OF CAPITAL MITIGATION." Hofstra Law Review **36**(3): 835.

Healy, W. and A. F. Bronner (1936). New light on delinquency and its treatment; results of a research conducted for the Institute of human relations. New Haven,, Pub. for the Institute of human relations by Yale university press.

Holdman, S. and C. Seeds (2008). "SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES: IMAGINING MITIGATION: CULTURAL COMPETENCY IN CAPITAL MITIGATION." Hofstra Law Review **36**(3): 883-892.

Matthews, S. G. and D. I. W. Phillips (2010). "Minireview: Transgenerational Inheritance of the Stress Response: A New Frontier in Stress Research." Endocrinology **151**(1): 7-13.

Millan, M. J. (2013). "An epigenetic framework for neurodevelopmental disorders: From pathogenesis to potential therapy." Neuropharmacology **68**: 2-82.

Nosarti, C., A. Reichenberg, R. M. Murray, S. Cnattingius, M. P. Lambe, L. Yin, J. MacCabe, L. Rifkin and C. M. Hultman (2012). "Preterm Birth and Psychiatric Disorders in Young Adult Life." Archives of General Psychiatry **69**(6): 610-617.

Pierce, M. C., K. Kaczor and R. Thompson (2014). "Bringing Back the Social History." Pediatric Clinics of North America **61**(5): 889-+.

Raine, A., T. Lencz, S. Bihrle, L. LaCasse and P. Colletti (2000). "Reduced prefrontal gray matter volume and reduced autonomic activity in antisocial personality disorder." Arch Gen Psychiatry **57**(2): 119-127; discussion 128-119.

Shaw, C. R. and H. D. McKay (1969). Juvenile delinquency and urban areas; a study of rates of delinquency in relation to differential characteristics of local communities in American cities. Chicago,, University of Chicago Press.

Volavka, J., D. Martell and A. Convit (1992). "Psychobiology of the violent offender." Journal of forensic sciences **37**(1): 237-251.

Wayland, K. (2008). "SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES: IMAGINING MITIGATION: THE IMPORTANCE OF RECOGNIZING TRAUMA THROUGHOUT CAPITAL MITIGATION INVESTIGATIONS AND PRESENTATIONS." Hofstra Law Review **36**(3): 923.

Williams, D. R. and M. Sternthal (2010). "Understanding Racial-ethnic Disparities in Health: Sociological Contributions." Journal of Health and Social Behavior **51**: S15-S27.

Woods, G. W. and D. Freedman (2015). "Symptom presentation and functioning in neurodevelopmental disorders: Intellectual disability and exposure to trauma." Ethics, Medicine and Public Health **1**(3): 348-358.

Woods, G. W., D. Freedman and S. Greenspan (2012). "Neurobehavioral assessment in forensic practice." <u>International Journal of Law and Psychiatry</u> **35**(5-6): 432-439.

Yehuda, R. and L. A. Bierer (2009). "The Relevance of Epigenetics to PTSD: Implications for the DSM-V." <u>Journal of Traumatic Stress</u> **22**(5): 427-434.