E-FILED
Friday, 24 August, 2018  05:17:57 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | <u>Hearing Requested</u> |

**<u>MOTION TO SUPPRESS JAIL COMMUNICATIONS AND FRUITS THEREOF</u>**

**I.     Introduction**

The defendant, Brendt Christensen, moves the Court for an Order suppressing any evidence obtained as a result of government agents' listening in on all of Mr. Christensen's phone calls while incarcerated at the Macon County and Livingston County jails without probable cause, without a warrant and for the sole purpose of providing evidence against him in this capital case. The actions of the government agents here violated both the Fourth and Fifth Amendments.

Mr. Christensen acknowledges that several circuits have held that the Fourth Amendment is not violated by the monitoring and recording of an inmate's communications. Courts normally proffer two justifications for the practice: the institution's need to monitor such communications for security purposes and the inmate's reduced expectation of privacy because of his status as a prisoner.[1]

---

[1] Some cases have relied on an implied consent theory based on the inmate's notice that his communications would be monitored and/or recorded. *See e.g. United States v. Novak*, 531 F.3d 99, 102

Mr. Christensen does not challenge the jails' right to record his conversations for purposes of security. But, the evidence will show that was not the purpose here. On information and belief, these calls were not reviewed by officials at the respective jails or, if so, only on a most cursory basis. Rather, all these recordings were simply turned over to federal investigators upon their request for the sole purpose of a detailed and exhaustive forage through Mr. Christensen's thoughts about his case and his emotional and mental state, beliefs and intimate familial relationships in an effort to bolster the government's case for his execution. The evidence will show that the animating principle of cases upholding the monitoring and recording of a pretrial detainee's communications - the need for institutional security - is not presented here.

Mr. Christensen also does not take issue with the fact that he has a *reduced* expectation of privacy due to his status as an inmate. But, the Supreme Court has never held that an inmate, much less a pretrial detainee, absolutely has no expectation of privacy regardless of the circumstances. The ultimate inquiry for Fourth Amendment purposes involves a balancing of Mr. Christensen's expectation of privacy under the circumstances against the government's need to obtain this information without a warrant.

---

(1st Cir. 2008) (sign near phone and recording at beginning of call warns inmates of random monitoring); *United States v. Faulkner*, 439 F.3d 1221, 1224 (10th Cir. 2006) ( defendant received an inmate handbook that "telephone conversations may be monitored and/or recorded for security reasons"). Because the government bears the burden of pleading and proving consent, *infra*, and that issue has not been raised, Mr. Christensen will not address any issues pertaining to implied consent at this time.

The blanket recording and review of all of Mr. Christensen's recordings for more than a year without a warrant solely for the purpose of gathering evidence against him also violated the Fifth Amendment, which prohibits the punishment of a pretrial detainee, who is presumed innocent and has not been convicted of any crime. The evidence will show that Mr. Christensen's communications were reviewed for the primary, if not exclusive, purpose of both retribution and deterrence, two principal aims of, and rationales for, punishment.

It is important to distinguish what Mr. Christensen is *not* arguing. As stated, he does not take issue with the respective jails' right to record and monitor his communications for purposes of *security*. Nor does he suggest that jail officials could not notify the FBI and/or prosecutors if, in monitoring the recordings for security, evidence developed concerning admissions of guilt or attempts to obstruct justice or commit new crimes. Based on such information, the government could seek a warrant to listen to the recording if it could establish probable cause. *See* n. 5, *infra*. The issue presented here is whether the federal government is entitled as a matter of course, without probable cause, to listen to all of a pretrial detainee's communications with family, friends and others for the purpose of introducing evidence at a capital sentencing proceeding. Mr. Christensen submits that this practice violates both the Fourth and Fifth Amendments.

## II.   Background

Within a week after his arrest and incarceration at the Macon County Jail, Task Force Officer Barbara Robbins of the University of Illinois Police Department contacted

officials at the Jail to inquire about gaining access to Mr. Christensen's communications through the inmate monitoring system. (Gov't Bates No. at 11037) Moments later, TFO Trevor Stalets provided TFO Robbins with log-in information and a password and offered to help walk her through the system. *Id.* The following day, TFO Robbins sent an e-mail to several FBI agents indicating that she would be doing a spreadsheet to log in the content of the Mr. Christensen's calls. *Id*. Thereafter, until his transfer to the Livingston County Jail in late September 2017, Ms. Robbins monitored in excess of 100 conversations Mr. Christensen had with family and friends from the Macon County Jail and prepared summaries which she uploaded every couple of weeks into the FBI case file.

On or about September 29, 2017, Mr. Christensen was transferred from the Macon County Jail to the Livingston County Jail. While the discovery does not disclose the initial communications between the FBI/Task Force and Livingston County officials concerning the recording and monitoring of Mr. Christensen's communications,[2] summaries of Mr. Christensen's calls indicate that the FBI/Task Force began accessing Mr. Christensen's phone calls almost immediately after his transfer.

On November 27, 2017, FBI Intelligence Analyst, Alex Wedderspoon, requested "electronic copies of all incoming/outgoing mail for Brendt Christensen." *Id.* at 11029-30. The following day, Livingston County Jail Administrator Inman wrote back that

---

[2] The discovery contains an e-mail dated October 18, 2017, from FBI Agent Manganaro to Agent Wedderspoon, enclosing Livingston County Administrator Stu Inman's contact information, although the purpose is not clear. Presumably, this related to monitoring Mr. Christensen's communications. *Id*. 11036.

"We don't copy incoming or on [sic] going mail unless requested." *Id.* at 11030. Agent Wedderspoon then requested copies of all future incoming and outgoing mail and expressed a "particular[] interest in getting a copy the letter he apparently wrote on November 24 if it hasn't gone out yet." *Id.*

On January 17, 2018, Agent Wedderspoon notified FBI Agent Anthony Manganaro by e-mail that he had contacted Lt. Kris Thompson who "could serve as our expert witness in the matter concerning their jail call monitoring system."[3] *Id.* at 11035.

On January 31, 2018, Agent Wedderspoon again contacted Administrator Inman about the incoming and outgoing mail and stated that he had only received an electronic copy of one incoming letter from Mr. Christensen's mother. *Id.* at 11029-30. Later that day, Wedderspoon wrote that "DOJ is also requesting copies of any/all visitor logs" for Mr. Christensen and noted that the FBI itself could "pull" the "Ctel Skype visits." *Id.* at 11029. An official at the Livingston County Jail promptly responded with an email, titled "Copies of Inmate Mail," to the three prosecutors in this case, asking them to contact Administrator Inman concerning this request. *Id.* Later that evening, Mr. Nelson, the attorney from the Capital Case Section of the Department of Justice assigned to this case, sent an e-mail to Administrator Inman stating that the information was needed "for Mr. Christensen's trial, *in particular the death penalty phase*." (Emphasis added). *Id.* at 11032.

---

[3] The same e-mail indicates that Lt. Thompson has also spoken with the U.S. Attorney's Office "about being listed as an expert witness for another matter on the kidnapping case." *Id.* The defense has received no Rule 16 notice for Lt. Thompson.

On February 18, 2018, Mr. Nelson informed his co-counsel by e-mail (copying three FBI agents) that Administrator Inman had "set me up with an account on Smart Jail, because Livingston County is going to an electronic system for inmates [which] allows for instant messages, postal mail, and photographs, and records them all so that we can look at them at any time." Mr. Nelson sent the login information and password and wished his colleagues "Happy Hunting!" *Id.* at 11033.

The discovery indicates that over 500 calls between Mr. Christensen and his wife and family members have been listened to by government agents over a period of some 14 months without probable cause, without a warrant or other judicial authorization, *see* 18 U.S.C. §§ 2510-2522, and for purposes other than institutional security. Summaries of these calls, often containing verbatim quotes, were routinely distributed to the prosecution team.

In a letter dated June 14, 2018, Mr. Christensen asked the government to disclose any memoranda, agreements or understandings between the Macon County Jail and the Livingston County Jail concerning their providing recordings and correspondence of inmates to the FBI, other federal law enforcement agencies or federal prosecutors in the absence of a search warrant. In a meeting on June 19, 2018, to discuss outstanding discovery issues, the government indicated that e-mails responsive to this request would be provided. Shortly thereafter, the defense received those referenced above. In the same meeting government counsel indicated they were unaware of any formal agreement or memoranda concerning the routine disclosure of inmate communications to the government. The government has also declined to identify which of these

intercepts, or portions thereof, it intends to use at trial, merely stating that it intends to

"use the materials and recordings it has provided to the defense pursuant to Rule 16

during the trial." *See* Mr. Christensen's sealed *Motion to Compel Discovery*, (R. 82, Exhibit

E, ¶ 9)[4]

### III.   Although Incarcerated, Mr. Christensen Maintains a Limited Expectation of Privacy in His Communications That is Protected by the Fourth Amendment

"The Fourth Amendment protects people, not places." *Katz v. United States*, 389

U.S. 347, 351 (1967). *Katz* extended protections afforded by the Fourth Amendment from

constitutionally protected areas to individual "expectations of privacy." *See United*

*States v. Carpenter*, 138 S. Ct. 2206, 2221 (2018). Because the Fourth Amendment only

prohibits "unreasonable" searches and seizures, the threshold question for Fourth

Amendment purposes is whether the expectation of privacy is "one that society is

prepared to recognize as reasonable." *Id.*  If so, the search either requires a warrant or

must come within one of the "carefully guarded" exceptions to the warrant

requirement:

> [T]he most basic constitutional rule in this area is that
> 'searches conducted outside the judicial process, without
> prior approval by judge or magistrate, are per
> se unreasonable under the Fourth Amendment—subject
> only to a few specifically established and well delineated
> exceptions.' The exceptions are 'jealously
> and carefully drawn,' and there must be 'a showing by those
> who seek exemption . . . that the exigencies of the situation
> made that course imperative.' '(T)he burden is on those
> seeking the exemption to show the need for it.'

---

[4] The instant motion seeks suppression of *all* these communications. In the event it is denied, the government's refusal to identify what portion of these communications it intends to introduce at either phase of this trial will ultimately result in the Court having to rule on scores of motions in limine.

*Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, (1971) (citations omitted).

Thus, the Court must first determine if Mr. Christensen, a pretrial detainee, has a reasonable expectation of privacy in not having his communications handed over by jail officials *en masse* to prosecutors, whose sole purpose is to "hunt" through such communications for fodder to use in putting him to death. (Gov't Bates No. 11033)

The Supreme Court "has not set forth a single metric or exhaustive list of considerations" to consider in determining whether an individual has an expectation of privacy which society is prepared to recognize. *Byrd v. United States*, 138 S. Ct. 1518, 1522 (2018). In making this determination the Court must weigh not only the Amendment's original purpose of preventing the government from "rummag[ing] . . . in an unrestrained search for evidence of criminal activity," *Riley v. California*, 134 S. Ct. 2473, 2494 (2014); *see also Carpenter*, 138 S. Ct. at 2214 (courts should consider "historical understandings"), but also the fact that the Fourth Amendment protects "the privacies of life" against "arbitrary power." *Id*. (citation omitted).

Although significantly reduced in some cases, an inmate does retain some privacy rights. *Bell v. Wolfish*, 441 U.S. 520, 558 (1979) (assuming pretrial detainees retain some Fourth Amendment protections); *United States v. Friedman*, 300 F.3d 111, 123 (2d Cir. 2002)(same); *Franklin v. Oregon,* 662 F.2d 1337, 1347 (9th Cir. 1981) ("Although a prisoner has little expectation of privacy that society is prepared to recognize as reasonable, a prisoner does not lose all rights to privacy.") (citation omitted); *United States v. Van Poyck*, 77 F.3d 285, 290–91 (9th Cir. 1996)("Although prisoners do not

8

forfeit all their privacy rights at the jailhouse steps . . . they do have those rights severely curtailed."); *United States v. Cohen*, 796 F.2d 20, 23 (2d Cir 1986)(declining government's invitation to hold that a pretrial detainee has no Fourth Amendment rights and noting that "[t]he door on prisoner's rights against unreasonable searches has not been shut and locked."

Nonetheless, almost all courts stress the institution's interest in *security* in characterizing the recording and monitoring of inmate calls as reasonable under the Fourth Amendment. *See United States v. Huart*, 735 F.3d 972 (7th Cir. 2013) (defendant serving sentence had no reasonable expectation of privacy in cell phone he brought into halfway house against the rules); *Davenport v. Rodgers*, 626 Fed. Appx. 636 (7th Cir. 2015) (jail's interest in security measures override detainee's privacy interests where mail clerk at jail forwarded letter of pretrial detainee in which detainee confessed to committing crime to prosecutor); *Van Poyck*, 77 F.3d at 291 (Fourth Amendment not violated because "institutional security concerns" override defendant's privacy rights in outgoing calls); *United States v. Willoughby*, 860 F.3d 15, 21 (2d Cir. 1988) (stressing security justification for recording calls and noting inmate was given form noting that calls would be monitored "to preserve the security and orderly management of the institution"); *see also Wolfish*, 441 U.S. at 547 (body cavity search of pretrial detainee after visit from person outside prison upheld where detention facility officials believed such searches necessary to "preserve internal order and discipline and to maintain institutional security").

Mr. Christensen accepts both that his right of privacy is significantly reduced by the fact of incarceration and that, in appropriate cases, the monitoring and recording of his communications may be consistent with his limited privacy rights. But, the *sine qua non* of this justification is that the monitoring is done for purposes of *security*. Here, the evidence will show that was not the case. Reduced or not, Mr. Christensen's privacy interests have been brushed aside not for the purpose of institutional security but for gathering evidence to be used against him. This, coupled with its all-encompassing nature, exposes the unreasonableness of the intrusion.

## IV.  The Wholesale Intrusion into Mr. Christensen's Communications was Unreasonable Within the Meaning of the Fourth Amendment

### A.  The Search of Mr. Christensen's Communications Was Solely for the Purpose of Obtaining Evidence to Use Against Him in this Capital Trial and Unrelated to the Security Interests of the Jails

The "ultimate measure of the constitutionality of a governmental search is 'reasonableness'." *Carpenter*, 138 S. Ct. at 2221. This, in turn:

> "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the *scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it*, and the place in which it is conducted."

*Wolfish*, 441 U.S. at 559 (emphasis added). Warrantless searches are "typically unreasonable" where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing." *Carpenter*, 138 S. Ct. at 2221 (quoting *Veronica School Dis. 47J v. Acton*, 515 U.S. 646, 658 n.2 (1995) (random urinalysis requirement for participation in school athletic programs did not violate the Fourth Amendment

because "undertaken for prophylactic and distinctly *non*punitive purposes.) (emphasis in original)).

Although it is expected that the government will proffer institutional security as the justification for the intrusion, the facts at a hearing will demonstrate that this is simply not the case. As noted, in response to an inquiry, government counsel informed the defense that the recordings from the jail were more or less handed over to the government as a matter of course when requested and were unable to cite any memoranda of understanding or other agreement concerning this practice. On information and belief, counsel believes the evidence will show that these recordings were never reviewed by the jail officials for security concerns,[5] and that with the exception of a reference to a suicide note, the Task Force officials did not notify the jails if they overheard matters that might raise such concerns.[6]

From almost Day 1 after Mr. Christensen's arrest these recordings were simply forwarded to the government for their review. The evidence now available to the defense supports the allegation that this was for no purpose other than to search for

---

[5] The government is not left helpless when institutional officials review communications for security purposes. Mr. Christensen does not contest that when such review indicates criminal conduct, that information may be conveyed to the government, who may then apply for a warrant, a procedure implicitly approved by this Circuit. *See United States v. Huart*, 735 F.3d 972 (7th Cir. 2013) (after official at halfway house discovered child pornography on cell phone of defendant serving a sentence pursuant to security regulations, they contacted FBI, who then obtained a warrant); *United States v. Shell*, 448 F.3d 951 (7th Cir. 2006)(government obtained a Title III warrant to authorize interception of electronic communications between prisoner and visitor).

[6] Mr. Christensen referenced a suicide note he had written in a conversation with his wife on August 28, 2017. Officer Robbins later brought this to the attention of the Macon County officials who put Mr. Christensen on suicide watch. Had those officials been monitoring the communications for security purposes, they would, of course, already have been aware of the matter.

evidence to help the government take Mr. Christensen's life. This is directly evidenced by Mr. Nelson's e-mail of January 31, 2018, informing Administrator Inman that the government needed the recordings for the "death penalty phase" of Mr. Christensen's trial. (Gov't Bates No. 11032) And, Mr. Nelson was surely not exhorting his comrades to search for evidence indicating security concerns when he wished them "Happy Hunting," as they scoured through Mr. Christensen's communications. *Id*. at 11033. That these searches were not for the purpose of institutional security is further evidenced by Administrator Inman's response to FBI Agent Wedderspoon's request for "electronic copies of all incoming/outgoing mail" of Mr. Christensen, wherein he informed Wedderspoon that the institution does not copy such mail unless requested, evidencing that this was not done for purposes of institutional security. *Id*. at 11030. [7]

The Supreme Court has directly held that warrantless searches not based on individualized suspicion "whose primary purpose [is] to detect evidence of ordinary criminal wrongdoing" violate the Fourth Amendment. *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000). *City of Indianapolis* involved a highway checkpoint set up by the city in its efforts to interdict the movement of drugs. The program involved brief stops (five minutes or less) of all vehicles coming through the checkpoint. Distinguishing prior decisions upholding brief stops in the absence of reasonable suspicion where special needs were involved, the stops were brief and appropriately limited, and the

---

[7] As noted, the Livingston Jail subsequently complied, at least partially, to this request as Wedderspoon later wrote that he had only received one such letter, while renewing his request. *Id*. 11029-30.

checkpoints were "designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety," *id*. at 41,[8] the Court drew a firm line "where the police seek to employ a checkpoint primarily for the ordinary purpose of investigating crimes," *id*. at 44. As set out above, the warrantless "hunting" through all Mr. Christensen's communications for well over a year was, per Mr. Nelson's direction, for the direct purpose of discovering evidence to put him to death.

In *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986), the court confronted the issue where a search of a prisoner's cell was, in reality, conducted for the purpose of obtaining evidence to be used against him in his upcoming trial. The issue concerned a cell search initiated as a result of a request from the United States Attorney. The Supreme Court had previously upheld cell searches against Fourth Amendment claims, emphasizing security concerns and the legitimate need to keep drugs, weapons and contraband out of penal institutions. *See Hudson v. Palmer*, 468 U.S. 517 (1984). But, as here, the facts demonstrated that the cell search conducted at the request of the prosecutor had nothing to do with institutional security. Distinguishing *Hudson*, and in language directly applicable here, the court held that the defendant's Fourth Amendment rights were violated by this particular cell search:

> The decision to search for contraband was not made by those officials in the best position to evaluate the security needs of the institution, nor was the search even colorably motivated by institutional security concerns.

---

[8] *See United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (seizures of motorists at fixed Border Patrol checkpoints) and *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990) (sobriety checkpoints).

The Supreme Court in *Hudson* did not contemplate a cell search intended solely to bolster the prosecution's case against a pre-trial detainee awaiting his day in court . . .

The door on a prisoner's rights against unreasonable searches has not been slammed shut and locked. We take seriously the Court's statement that no iron curtain separates prisoners from the Constitution, and that the loss of such rights is occasioned only by the *legitimate* needs of institutional security . . .

In this case it is plain that no institutional need is being served. Were it a prison official that initiated the search of Barr's cell, established decisional law holds that the search would not be subject to constitutional challenge, regardless of whether security needs could justify it. But here the search was initiated by the prosecution solely to obtain information for a superseding indictment. In our view, this kind of warrantless search of a prisoner's cell falls well outside the rationale of the decided cases. Barr retains a Fourth Amendment right-though much diminished in scope-tangible enough to mount the attack on this warrantless search.

*Id.* at 23-24 (emphasis in original); *see also McCoy v. State*, 639 So. 2d 163, 165-166 (Fla. App. 1 Dist. 1994) (following "persuasive reasoning" of *Cohen* and holding the search of pretrial detainee's cell with officer for potentially incriminating evidence violated Fourth Amendment where not initiated by institutional personnel and "not even colorably motivated by concerns about institutional security."

B.  The Fourth Amendment Violation is Exacerbated by the Scope of the Intrusion

"The Founding generation crafted the Fourth Amendment as a 'response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.'" *Carpenter*, 138 S.Ct. at 2213 (quoting *Riley v. California*, 134 S. Ct. 2473, 2494 (2014); *Payton v. New York*, 445 U.S. 573, 583 (1980) ("indiscriminate searches and

seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment."). "[T]he forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a *too permeating police surveillance*, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment." *United States v. Di Re,* 332 U.S. 581, 595 (1948).

The degree of the intrusion and the dangers emanating from overly intrusive surveillance has been a factor in several Fourth Amendment cases. Thus, while upholding the installation of a "beeper" in a five-gallon drum purchased by a suspect in order to track the movement of a car carrying the drum, the Court noted that the use of the beeper was limited to a single "automotive journey," reserving the question of whether a "dragnet-type law enforcement practice" such as warrantless round-the-clock surveillance would implicate "different constitutional principles." *United States v. Knotts*, 460 U.S. 276, 283-84 (1983). Following up on this theme in *United States v. Jones*, 565 U.S. 400 (2012), the Court held that the tracking of a vehicle for 28 days through installation of a GPS device did violate the Fourth Amendment. *See id.* at 430 (distinguishing between "relatively short-term monitoring of a person's movements on public streets" and "longer term GPS monitoring," which "impinges on expectations of privacy.") (Alito, J., concurring in judgment); *see also Walter v. United States*, 447 U.S. 649, 659, n. 13 ("A partial invasion of privacy cannot automatically justify a total invasion.").

And, just last term, in holding that the government's access to 127 days of cell-site information without a probable cause warrant violated the Fourth Amendment, the

Court noted that the degree of this intrusion was "detailed, encyclopedic, and effortlessly compiled," *Carpenter*, 138 S. Ct. at 2216, an even more salient concern here where fourteen months of surveillance has not been directed to the defendant's mere physical movements but involved a deep dive into intimate private thoughts being shared with his spouse and closest family. Here, government investigators listened in while Mr. Christensen and his wife broke down and cried on several occasions, discussed their most intimate sexual practices and fantasies, religious beliefs, mental health, medications, family history and private feelings about close family members. While not eavesdropping on Mr. Christensen's conversations with his attorneys, governments agents were often apprised of the attorney's visits, advice and intentions. And, each of these conversations were meticulously summarized and promptly circulated to other government agents. In short, this surveillance "provide[d] an all-encompassing record [and] an intimate window into [Mr. Christensen's] life," including his "'familial, political, professional, religious, and sexual associations.' [citation omitted]." *Carpenter,* 138 S. Ct. at 2216.

**V.     The Government Bears the Burden of Establishing that its Monitoring of Mr. Christensen's Communications Comes Within the Ambit of a Recognized Exception to the Fourth Amendment's Warrant Requirement**

Warrantless searches are deemed to be "*per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993); *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). The burden rests on the government to establish the applicability of one of the narrow exceptions to the warrant requirement. *United States*

*v. Jeffers*, 342 U.S. 48, 51 (1951); *Basinski, supra.* The Seventh Circuit, citing the Supreme

Court's decision in *Skinner v. Ry. Labor Execs' Ass'n*, 489 U.S. 602 (1989), has set out the

governing principles:

> Under the Fourth Amendment, a search usually is not
> reasonable unless the government obtains a warrant issued
> upon probable cause; there are, however, certain limited
> exceptions. *See Skinner*, 489 U.S. at 619. To be a reasonable
> search without a warrant and probable cause, the
> government must show a "special need," beyond the normal
> need for law enforcement, that makes the warrant and
> probable cause requirement impracticable. *See id*. The
> Supreme Court in *Skinner* explained that, when such a
> special need exists, court should "balance the governmental
> and privacy interests to assess the practicality of the warrant
> and probable-cause requirements in the particular context.

*Joy v. Penn-Harris-Madison School Corp.*, 212 F.3d 1052, 1058 (7th Cir. 2000).

It would not be useful at this point for Mr. Christensen to cycle through and

discuss the various exceptions to the warrant requirement. The burden is on the

government to proffer any exception it deems applicable. Mr. Christensen will reply to

the government's response, as appropriate.

**VI.    The Seizure and Search of Mr. Christensen's Communications for Purpose of
Finding Evidence to Be Used Against Him in the Penalty Phase of this Capital
Case Violated His Fifth Amendment Right to Due Process**

As a pretrial detainee Mr. Christensen has not been convicted of any offense, is

presumed to be innocent and is not subject to being "punished" until that situation

changes. *Wolfish*, 441 U.S. at 579 ("The pretrial detainees whose rights are at stake . . .

are innocent men and women who have been convicted of no crimes") (Stevens, J.,

dissenting). Accordingly, "the Due Process Clause protects a detainee from certain

conditions and restrictions of pretrial detainment." *Id.* at 533.[9] Admittedly, because of

his detention Mr. Christensen's due process rights are not coextensive to those he

possessed prior to that detention, but conditions imposing restrictions on his liberty

must be strictly limited to those necessary for institutional security. Thus, the

government "may subject [pretrial detainees] to the restrictions and conditions of the

detention facility *so long as* those conditions and restrictions do not amount to

punishment." *Id.* at 536-537 (emphasis added). In assessing the constitutionality of

conditions imposed on pretrial detainees that implicate deprivations of liberty, "the

proper inquiry is whether those conditions amount to punishment of the detainee." *Id.*

at 535.

The factors to weigh in determining whether actions taken by the government

amount to unconstitutional punishment prior to conviction were laid out in *Kennedy v.*

*Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), where the Court was called on to decide

the constitutionality of a statute authorizing the automatic revocation of citizenship for

leaving the country to avoid military service without providing the protections

guaranteed by the Fifth and Sixth Amendments. *Id.* at 164. In finding that the statute

violated the petitioners' constitutional rights not to be punished without due process of

law, the Court described the factors to consider:

> Whether the sanction involves an affirmative disability or
> restraint, whether it has historically been regarded as a
> punishment, whether it comes into play only on a finding of

---

[9] Whether a condition imposed on a pretrial detainee complies with the Constitution is assessed under the Due Process Clause of the Fifth Amendment rather than the Eighth Amendment, as the latter is only implicated after a defendant is convicted and sentenced. *Id.*, n. 6.

> scienter, whether its operation will promote the traditional
> aims of punishment—retribution and deterrence, whether
> the behavior to which it applies is already a crime, whether
> an alternative purpose to which it may rationally be
> connected is assignable for it, and whether it appears
> excessive in relation to the alternative purpose assigned are
> all relevant to the inquiry, and may often point in differing
> directions.

*Id*. at 168-169. Applied in the pretrial detainee-conditions of confinement context, the

Court in *Wolfish* reduced the issue to "the determination whether these restrictions and

practices constitute punishment in the constitutional sense depends on whether they are

rationally related to a legitimate nonpunitive governmental purpose and whether they

appear excessive in relation to the purpose." 441 U.S. at 561.

Here, whether the analysis focuses on the more exhaustive factors described in

*Mendoza-Martinez* or the abridged test of *Bell*, the result is the same. As noted, both Mr.

Nelson's e-mail to the Livingston County Jail Administrator Inman on January 31, 2018,

and the "Happy Hunting" e-mail to his co-counsel on February 18, 2018, makes it

perfectly clear that the intent of rummaging through these communications at will was

for one purpose and one only – to discover evidence that could be used to ask a jury to

sentence Mr. Christensen to the ultimate punishment of death. It is difficult to conjure a

scenario that implicates punishment in a more direct manner. Thus, this case is the

polar opposite of the cavity search and other confinement conditions at issues in *Wolfish*

where there was no evidence of an "intent to punish." 441 U.S. at 538, 561.

Wolfish noted that once an intent to punish is shown, the inquiry for Fifth

Amendment purposes is settled.

> "*Absent a showing of an expressed intent to punish* on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" [citation omitted]

*Id*. at 538. Thus, where, as here, the evidence establishes an "expressed intent" to punish, the Court need look no further. But, even if an "institutional security" argument is proffered, the intrusion must be "reasonably related" to that interest, *id*. at 540, and not an "exaggerated [] response" to that need. *Id*; *Mendoza-Martinez*, 372 U.S. at 168-169 ("whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose"). As stated above, the evidence will establish that the indiscriminate monitoring, rummaging through and sharing of all of Mr. Christensen's communications by FBI agents, Task Force Officers and the prosecutors in this case had no rational relationship to the security of the Macon County and Livingston County Jails and was, in any event, an exaggerated response to any issues of security.

Finally, in regard to these principles, the importance of a pretrial detainee maintaining relationships with his family and having avenues for expression without the government continually eavesdropping and burrowing into the nuance of every intimate exchange with his wife and close family should be not overlooked – especially when done so for the purposes already discussed. The Supreme Court's consistent emphasis on the duty of defense counsel to investigate and present family history and relationships in a capital case attests to their importance and the potential prejudice

inherent in procedures having the potential to sunder such. *Porter v. McCollum*, 558 U.S.

30 (2009) (counsel ineffective, *inter alia*, for failure to uncover and present evidence of

family history); *Eddings v. Oklahoma*, 455 U.S. 104 (1982) (reversing death sentence

where state court refused to consider family history); *Lockett v. Ohio*, 438 U.S. 586 (1978)

(sentencer must consider evidence of family history).

> When the prison gates slam behind an inmate, he does not
> lose his human quality; his mind does not become closed to
> ideas; his intellect does not cease to feed on a free and open
> interchange of opinions; his yearning for self-respect does
> not end; nor is his quest for self-realization concluded. If
> anything, the needs for identity and self-respect are more
> compelling in the dehumanizing prison environment.
> Whether an O. Henry writing his short stories in a jail cell or
> a frightened young inmate writing his family, a prisoner
> needs a medium for self-expression.

*Procunier v. Martinez*, 416 U.S. 396, 428 (1974) (Marshall, J., concurring), *overruled by*

*Thornburg v. Abbot*, 490 U.S. 401 (1989).

While these principles admittedly must give some ground to reasonable

institutional practices that clearly and rationally relate to security and are appropriately

administered, they stand firm when a prosecutor decides to stalk a pretrial detainee's

most intimate communications in the manner done here.

Mr. Christensen moves the Court for an evidentiary hearing and an Order

suppressing all evidence and the fruits thereof obtained as a result of the government's

monitoring of his communications from the Macon County and Livingston County

Jails.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:    309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2018, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and

Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<u>/s/ Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org