E-FILED
Friday, 24 August, 2018  05:21:20 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 17-CR-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | Hearing Requested |

MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO THE ILLEGAL SEARCH
OF DEFENDANT'S APARTMENT ON JUNE 15, 2017

Defendant Brendt A. Christensen, by and through his attorneys, hereby moves

pursuant to Fed. R. Crim. P. 12(b)(3)(C) to suppress all items of physical evidence seized

pursuant to an illegal search of 2503 W. Springfield Avenue, Champaign, Illinois, on

June 15, 2017. In support of the motion Mr. Christensen states as follows:

I.      Factual Background

On the evening of June 14, 2017, FBI Special Agents and Detectives with the

University of Illinois Police Department (UIPD) went to the apartment of Brendt and

Michelle Christensen, located at 2503 W. Springfield Avenue, Unit B-2, in Champaign,

Illinois. The purpose of their visit was to execute a search warrant for the Christensens'

2008 black Saturn Astra which had been issued by Magistrate Judge Eric Long that

evening.

At approximately 11:45 p.m., the agents approached the door of the apartment

1

and knocked. Mr. Christensen and his wife, Michelle Christensen, were asleep. Mr. Christensen answered the door wearing a pair of underwear, having been awakened by the knocking. The agents then entered the apartment and found Mrs. Christensen naked, standing in the hallway. The lights in the apartment were not turned on, and agents shined flashlights in her face.

Mrs. Christensen retrieved a bathrobe from her bedroom and covered herself. When she emerged from the bedroom, she observed FBI Special Agent Manganaro and UIPD Detective Stiverson take Mr. Christensen away from the apartment to the local FBI office to be interviewed. This left Mrs. Christensen alone in the apartment with the remaining FBI agents; upon information and belief, there were at least seven agents in the apartment at the time.[1]

Special Agents Katherine Tenaglia and Andrew Huckstadt sat her down and began interviewing her just before midnight. Throughout the time that she was being interviewed, the other agents who were in the apartment were taking photographs and going through her and her husband's belongings. Mrs. Christensen felt confused and shocked by the intrusion into her residence. Tenaglia and Huckstadt interviewed her for approximately two hours. Not until the conclusion of her interview, at approximately 1:45am, did the agents secure a signed FD-26 Consent to Search form from Mrs. Christensen. By then, the search was approximately two thirds' complete.

---

[1]An FD 302 form provided in discovery indicates that the FBI Agents present for the interview/search of the apartment were Justin Tennyson, Mark Hill, Joel Smith, Brian Schenkelberg, Katherine Tenaglia, Andrew Huckstadt, and Michael Carter.

When the FBI agents left the residence, they took several items with them including but not limited to: computer towers, cellular telephones, a digital camera, an external hard drive, and laptop computers. If Mrs. Christensen had known she had a legal right to refuse to consent to the search, she would have exercised it prior to its commencement. She was not asked to provide consent at that time, however, and had no knowledge that she could refuse to permit the search.

## II.    Argument

Michelle Christensen did not validly consent to the search of the apartment in question in the early morning hours of June 15, 2017. First, consent was not given until the search had already been ongoing for two hours. Second, the totality of the circumstances indicate that any consent Mrs. Christensen provided at that late juncture was involuntarily given, thus all evidence seized pursuant to that consent should be excluded. Third, even if her consent could somehow be deemed valid, the removal of Mr. Christensen from the premises was objectively unreasonable as a lawful detention at the time. Rather, it was a deliberate effort by law enforcement to isolate Mrs. Christensen from her husband and vitiate his right to refuse to consent to a search of his own property.

### A.    Standing

As an initial matter, Mr. Christensen has standing to challenge the search of his residence. A person can claim the protection of the Fourth Amendment's bar against unlawful searches and seizures when he had a legitimate expectation of privacy in the

3

invaded place that society is prepared to recognize as reasonable. *Minnesota v. Olson,* 495 U.S. 91, 95-96 (1990) (citing *Rakas v. Illinois,* 439 U.S. 128, 143 (1978)). A residence is the primary example of where a person has the highest expectation of privacy. As the Supreme Court recognizes, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York,* 445 U.S. 573, 585 (1980). When a third party consents to the search of a residence, the aggrieved party may challenge the validity of that consent. *United States v. Cellitti,* 387 F.3d 618, 621 (7th Cir. 2004) (citing *United States v. Matlock,* 415 U.S. 164 (1974)).

There is no dispute that Mr. Christensen resided at 2503 W. Springfield, Unit B-2, and as such had a reasonable expectation of privacy in the home. If his wife's constitutional rights were violated and she was coerced into consenting to a search of the apartment, Mr. Christensen's rights were also violated and he can challenge the voluntariness of her consent. *Cellitti*, 387 F.3d at 622.

**B.    Michelle Christensen did not freely and voluntarily consent to the search of the premises.**

A search conducted without a warrant is considered unreasonable subject only to a few well-delineated exceptions. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). One of those exceptions exists when the warrantless search is conducted pursuant to validly given consent. *Id.* at 222 (citing *Katz v. United States,* 389 U.S. 347, 358 (1967)Whether consent was freely and voluntarily given is a factual question. *Cellitti,* 387 F.3d at 622 (citing *United States v. Pedroza*, 269 F.3d 821, 826 (7th Cir. 2001)). Several factors are considered in the analysis, including (1) the age, intelligence, and education of the

person who gave consent, (2) whether she was advised of her constitutional rights, (3) how long she was detained before consenting, (4) whether she consented immediately or only after repeated requests by authorities, (5) whether physical coercion was used, and (6) whether she was in police custody at the time she gave her consent. *Id.* (citing *Schneckloth,* 412 U.S. at 226). Ultimately, no one factor is controlling; the evaluation of voluntariness is based on the totality of the circumstances. *Id.* However, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.* at 229.

It is a deeply-rooted principle that police encounters at a person's dwelling place in the middle of the night are "especially intrusive." *United States v. Jerez,* 108 F.3d 684, 690-91 (7th Cir. 1997). "Indeed, the special vulnerability of the individual awakened at the privacy of his place of repose during the nighttime hours to face a nocturnal confrontation with the police was recognized in the common law that antedates our separation from England." *Id.* (citations omitted). In this case, Michelle Christensen was awakened around midnight by multiple law enforcement agents banging on her apartment door. As vulnerable as that timing made her, the situation was made substantially worse by the fact that as the agents entered the apartment, she did not even have time to put clothes on before flashlights were shined into her eyes as she stood naked and humiliated before them.

When a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of

caution. *Jerez,* 108 F.3d at 690. The Sixth Circuit has held a wife's consent to be involuntary where she was asked to permit a search in the middle of the night, while emotional, and just after the removal of her husband from the apartment. *United States v. Tatman,* 397 Fed. Appx. 152, 165 (6th Cir. 2010). Similar circumstances existed here. Although she is an intelligent woman who had attended college, Mrs. Christensen had virtually no experience with law enforcement. Even an educated and intelligent person is extremely vulnerable when confronted in the middle of the night in her dwelling place.

Second, Mrs. Christensen was under the impression that she had no choice in the events of that morning. She believed she had no control over their search of the premises. As noted above, the agents began searching the apartment and taking photographs immediately upon her husband's removal from the premises and while she was being interviewed by Special Agents Huckstadt and Tenaglia. She did not sign the FD-26 until two hours later, at the conclusion of her interview and after the agents had already been searching for a substantial amount of time. The search was already two-thirds over at that point.

Based on those circumstances, Mrs. Christensen felt she had no say in whether the search would be conducted. In *United States v. Starnes,* 501 Fed. Appx. 379, 389 (6th Cir. 2012), the defendant's wife did not fully read or understand the FBI's consent form, and believed that her refusal to allow the search would have been utterly futile due to the fact that a search of the premises had already begun *prior* to her signing the consent

form. Consent is not freely or voluntarily given when a scared, shaken up and confused woman is placed under highly distressing, fast moving circumstances such as those at issue in this case. *Id.* at 390.

In the present case, the totality of the circumstances indicate that Mrs. Christensen's alleged consent could not have been voluntary. She was wakened from sleep by multiple law enforcement officers pouring into her apartment and taking her husband away for questioning. Although intelligent, she was surprised, confused, and scared. She was also wholly unaware of her right to refuse to consent to a search of the apartment. Based on the foregoing, any alleged consent to search given by her should be deemed involuntary.

> **C.     Brendt Christensen was removed from the premises with the intent of interfering with his constitutional right to refuse a consent search of his apartment.**

Even if Michelle's consent can somehow be deemed voluntary, the search was still invalid because Mr. Christensen was removed from the premises and denied his right to refuse consent. In general, the consent of one person who possesses common authority over the premises is valid against the absent, non-consenting person. *United States v. Matlock*, 415 U.S. 164, 170 (1974). However, the Supreme Court has recognized a narrow exception where a physically present inhabitant's express refusal of consent to search is unequivocally made, regardless of the consent of the other inhabitant. *Fernandez v. California,* 134 S. Ct. 1126, 1133 (2014) (citing *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006)). By extension, if the non-consenting person is physically absent from

the residence because he is removed from the premises without lawful authority, the third party's consent should also be deemed invalid. *Randolph,* 547 U.S. at 121.

When agents removed Mr. Christensen from the premises, he was not under arrest nor was there probable cause to arrest him. This is a distinguishable factual scenario from the majority of cases invoking the forced absence exception to third party consent. For example, in *United States v. Jones,* 861 F.3d 638, 642 (7th Cir. 2017), the defendant invoked *Randolph* and claimed that officers removed him prior to the search for the sake of avoiding a possible objection to his girlfriend's consent. The Seventh Circuit found that the defendant's removal from the premises was objectively reasonable because officers had reason to believe that he was armed and dangerous and therefore a threat to officer safety and because there was independent probable cause to arrest him. *Id.* In *United States v. Groves,* 530 F.3d 506, 512 (7th Cir. 2008), the defendant was absent from the residence at the time officers approached his girlfriend and requested consent to search. The Seventh Circuit found no *Randolph* violation because the officers "did nothing to procure" the defendant's absence; rather, they went to the home knowing he was not present, which was insufficient to warrant relief under *Randolph. Id.* Similarly, in *United States v. Reed,* 539 F.3d 595, 598 (7th Cir. 2008), the defendant was absent from the residence at the time of the search as the result of a valid arrest, thereby rendering his girlfriend's consent proper.

When the agents arrived at Mr. Christensen's apartment, they were purportedly there to search his vehicle and to ask him some questions. He could have been

questioned at the residence, but instead he was taken away, thereby isolating his wife

inside with seven FBI agents. There was no discussion of a search, consensual or not,

prior to his removal. As he was not under arrest at the time, there was no probable

cause to arrest him, nor any threat to officer safety, his removal from the apartment can

be viewed as an intentional attempt to interfere with his ability to refuse consent to

search, thereby invalidating his wife's third party consent.

> **D.      The search warrant that existed for the vehicle was unlawfully used as an excuse to enter the apartment, therefore any evidence obtained pursuant Michelle Christensen's alleged consent must be suppressed as fruit of the poisonous tree.**

It is undisputed that at the time the agents approached Apartment B-2, they had

a search warrant for the Saturn Astra that was parked outside of the building. They did

not have a search warrant for the apartment, nor did they have an arrest warrant for

Mr. Christensen. There was no indication that a protective sweep was necessary, nor

were there any exigent circumstances present. Put simply, the agents had no legal right

to enter the apartment when they arrived there at almost midnight on June 14, 2017.

They were permitted only to approach the apartment a) to ask for the keys to the

vehicle so as to facilitate the execution of the search warrant or b) to ask to speak to the

residents (commonly referred to as a "knock and talk").

> i.      *The actions of the agents do not meet the requirements of a legal knock and talk.*

The home and the curtilage surrounding it are constitutionally protected areas.

*Florida v. Jardines,* 569 U.S. 1, 6 (2013). It is presumptively unreasonable to search a home

or its curtilage without a warrant, but under the "knock and talk" exception, a police officer may approach a home and knock because it is the same type of action that any private citizen could take. *Jardines,* 569 U.S. at 8. As the Supreme Court noted, it is "managed without incident by the Nation's Girl Scouts and trick-or-treaters" as a matter of course. *Id.*

But the timing and purpose of the knock and talk is relevant in evaluating the constitutionality of such a technique. Most residents do not expect visitors to visit them in the middle of the night; rather, they are expected during normal waking hours. *United States v. Lundin,* 817 F.3d 1151, 1159 (9th Cir. 2016). The analysis underlying the holding of *Jardines* depended upon allowing the police to engage in conduct that average, everyday people might engage in; this does *not* include knocking on a neighbor's door during time periods where normal residents would be asleep. Additionally, "[t]he scope of a license – express or implied – is limited not only to a particular area but also to a specific purpose." *Jardines,* 569 U.S. at 9. The only permissible result from a knock-and-talk is to ask questions of the occupants. *Lundin,* 817 F.3d at 1159. Officers who knock on the door of a residence for other purposes generally exceed the scope of the customary license and therefore overstep the bounds of the knock and talk exception. *Id.*

The decision to conduct a knock and talk at nearly midnight on a weeknight is questionable simply based on the timing, but subsequent actions taken by the agents utterly remove this case from the realm of constitutionality. Instead of waiting to be

received or invited into the home as is contemplated by knock-and-talks, multiple agents entered the apartment *en masse* before Michelle Christensen could even cover her nudity. The purpose of entering the apartment in such an aggressive manner was to secure Brendt Christensen, get him to agree to an interview remove him from the premises and, ultimately, to get Michelle Christensen to agree to let them search the property. Therefore, both the purpose and the timing of the entry into the apartment are inconsistent with the constitutional principles laid out by *Jardines*.

> ii.     *The illegal entry into the apartment cannot be cured, therefore the exclusionary rule should be applied.*

Otherwise voluntary consent can nonetheless be tainted by a prior illegal entry. *United States v. McMillian,* 786 F.3d 630 (7th Cir. 2015). An analogous case is that of *United States v. Abarza,* 199 F. Supp. 3d 1270 (D. Or. 2016). In *Abarza,* law enforcement officers went to the defendant's home at approximately 2:30 a.m. carrying flashlights. *Id.* at 1273. One of the officers approached the back door and knocked, and the defendant answered shortly thereafter; it was clear she had been sleeping. *Id.* at 1274. After a brief conversation, she let the officer into the residence and he began asking her questions. *Id.* Within a few minutes she began making incriminating statements. *Id.* The district court found that, even though the defendant consented to the officer entering the home, the consent was fatally tainted by the circumstances under which that consent was made. *Id.* at 1276. The fact that the officer entered the curtilage of the home in the middle of the night, when no reasonable homeowner would expect a visitor, without probable cause, without a warrant, and without the express invitation of the

11

homeowner violated the Fourth Amendment and required suppression of the

defendant's statements. *Id.*

The exclusionary rule preventing the use of evidence obtained in violation of the

Fourth Amendment is designed to deter lawless conduct by law enforcement officers.

*United States v. Robeles-Ortega,* 348 F.3d 679, 681 (7th Cir. 2003) (citing *Brown v. Illinois,*

422 U.S. 590, 598 (1975); *Wong Sun v. United States,* 371 U.S. 471, 486 (1963)). In

determining whether evidence is tainted by a prior illegality, it must be determined

whether the evidence was obtained by exploitation of the illegal act or by means

distinguishable from the primary taint. *Id.* (citing *United States v. Valencia,* 913 F.2d 378,

382 (7th Cir.1990)). "Where the search following the illegal entry is justified based on

alleged consent, courts must determine whether that consent was voluntary, and in

addition the court must determine whether the illegal entry tainted that consent. The

Supreme Court has identified a number of factors relevant to that inquiry, including (1)

the temporal proximity of the illegal entry and the consent, (2) the presence of

intervening circumstances, and, particularly, (3) the purpose and flagrancy of the

official misconduct." *Id.*(citing *Brown,* 422 U.S. at 603–04).

In this case, the illegal entry into the apartment directly resulted in the

"consensual" search authorized by Mrs. Christensen. There were no intervening

circumstances at all, and the agents went to the apartment in a deliberate show of force

with the intent of obtaining a confession from Mr. Christensen and consent from his

wife to search the premises. Because the agents illegally entered the apartment, any

subsequent consent given by Michelle Christensen should still be excluded as fruit of the poisonous tree.

WHEREFORE, Defendant Brendt A. Christensen respectfully requests that this Court enter an Order suppressing all physical evidence seized from 2503 W. Springfield Avenue, Champaign, Illinois, pursuant to the illegal search on June 15, 2017, and for any other relief that this Court deems appropriate.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:    217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:     309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

CERTIFICATE OF SERVICE

I hereby certify that on Aguust 24, 2018, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and

Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:    217-373-0667
Email: Elisabeth_Pollock@fd.org