E-FILED
Friday, 24 August, 2018  05:23:11 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | Hearing Requested |
| | ) | |
| Defendant. | ) | |

**MOTION TO STRIKE THE NOTICE OF INTENT TO SEEK THE
DEATH PENALTY ON THE GROUNDS THAT THE
FEDERAL DEATH PENALTY ACT IS UNCONSTITUTIONAL
AS APPLIED TO THIS CASE**

NOW COMES the Defendant, BRENDT A. CHRISTENSEN, by and through his

attorneys, and pursuant to the Fifth, Sixth, and Eighth Amendments to the United

States Constitution, moves this Court for the following relief:

1.   An order striking the Notice of Intent (NOI) to seek a sentence of death,

because the Supreme Court's decisions in *Ring v. Arizona* and *Hurst v. Florida*

have rendered the Federal Death Penalty Act of 1994 ("FDPA")

unconstitutional as applied to this case;

2.   An order striking the NOI to seek a sentence of death, because even if the

FDPA can be rendered constitutional by a finding by the grand jury of

gateway and statutory aggravating factors, the "notice of special findings" in

the superseding indictment and the notice of the non-statutory aggravating

factors in the NOI should be stricken, because the government has not

1

obtained an indictment consistent with the requirements of the Fifth

Amendment;

3.  An order striking the NOI seeking a sentence of death, because the FDPA

    fails to provide a structure which permits jurors to make a reasoned choice

    between execution and a sentence of life in prison without the possibility of

    release.

In support thereof, Mr. Christensen submits the following memorandum of law

challenging various aspects of the Federal Death Penalty Act as unconstitutional as

applied in this case.

## I.  Procedural History

On July 12, 2017, Defendant BRENDT A. CHRISTENSEN was charged by

Indictment with one count of kidnapping in violation of 18 U.S.C. § 1201(a)(1). (R. 13) A

Superseding Indictment was filed on October 3, 2017, alleging one count of kidnapping

resulting in death in violation of 18 U.S.C. § 1201(a)(1) and two counts of false

statements in violation of 18 U.S.C. § 1001(a)(2). The Superseding Indictment also

contained a Notice of Special Findings listing four gateway intent factors under 18

U.S.C. § 3591(a)(2) and three statutory aggravating factors under 18 U.S.C. § 3592(c):

that Y.Z.'s death occurred during the commission of a kidnapping (Section 3592(c)(1));

that the defendant committed the offense in an especially heinous, cruel or depraved

manner (Section 3592(c)(6)); and that the defendant committed the offense after

substantial planning and premeditation (Section 3592(c)(9)). (R. 26)

Count 1 of the Superseding Indictment was a death-eligible charge, and on

January 19, 2018, the government filed its Notice of Intent to seek the death penalty

(NOI). (R. 54) The NOI re-alleged the four intent factors as well as the three statutory

aggravating factors contained in the Superseding Indictment, and added six non-

statutory aggravating factors: victim impact evidence, future dangerousness, lack of

remorse, other serious acts of violence, vulnerable victim, and obstruction of justice. (R.

54)

## II.    Argument

### POINT ONE

THE SUPREME COURT'S *RING* AND *HURST* DECISIONS HAVE RENDERED THE
FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL, AND THE ACT MAY
NOT BE SAVED BY A JUDICIAL "CONSTRUCTION" THAT CREATES A NEW
CRIMINAL OFFENSE WHOSE ELEMENTS AND INTERTWINED PROCEDURES
HAVE NEITHER BEEN CONSIDERED, NOR ENACTED INTO LAW, BY CONGRESS.

### A.  Introduction and Summary of Argument

In enacting the FDPA in 1994, and the predecessor ADDA scheme in 1988,

Congress granted exclusive statutory authority to allege aggravating factors to the

prosecutor. If that aspect of the FDPA is not operative, the statute lacks any

congressionally-approved method of alleging aggravating factors. But that is exactly the

case. In the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), the FDPA lacks any legislatively-

selected method of initiating a capital prosecution.  While the Constitution requires that

the elements of capital murder be presented to a grand jury and charged in an

indictment, Congress, in passing the FDPA, chose another route. And it is up to Congress

to make the necessary corrections. Thus, the Federal Death Penalty is presently unconstitutional and this court should resist and reject the government's efforts to invent a "*Ring* fix."

It is fundamental to our system of government that "[i]t is the legislature which is to define a crime and ordain its punishment." *United States v. Wiltberger*, 18 U.S. 76, 93 (1820) (Marshall, C.J.). In *Ring v. Arizona,* 536 U.S. 584 (2002), the Court held that, with respect to the framework of Arizona's death penalty statute, the "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'....", 536 U.S. at 585 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)).[1] That holding, coupled with the Court's earlier holding in *Jones v. United States*, 526 U.S. 227, 251-52 (1999), that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt[,]"[2] *see also Harris v. United States*, 536 U.S. 545 (2002) ("those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis"), in effect rendered the FDPA unconstitutional because under

---

[1] The FDPA and Arizona capital schemes are similar in that each establishes death as a possible sentence in the statute defining the offense, and then sets forth the further fact-finding and procedural steps necessary to establish a particular defendant's – and the set of relevant facts' – eligibility for a capital sentence. As in the Arizona system addressed and invalidated in *Ring*, under the FDPA the fact that a jury returns a guilty verdict in a case of capital murder does not, without more, allow for imposition of a death sentence. It is the further fact-finding, and intertwined procedures, that determine, in the post-*Ring* era, that constitute the new elements of "federal capital murder," a crime that presently exists only by judicial fiat.

[2] *Ring* did not discuss the grand jury issue because the case arose in the context of a state statute to which the Fifth Amendment's Indictment Clause does not apply. *See Hurtado v. California*, 110 U.S. 516 (1884).

*Ring* the statute's aggravating factors, like the factors at issue in the Arizona statute, are necessary for a death sentence, are elements of the capital offense, and must be charged in the indictment and proved to a jury beyond a reasonable doubt. Under the FDPA, and for the purposes of this discussion only, the "elements" of capital murder are *at least*[3] murder + intent + one or more statutory aggravating factors.

The FDPA, of course, nowhere provides for presentation of aggravating factors to a grand jury.  But neither is the statute silent on the issue of how such factors are to be alleged. On that score, the FDPA explicitly reserves the selection and notice of aggravating factors to the exclusive discretion of the prosecutor. This Court must not allow the government to re-write the FDPA to its own liking. Instead, the FDPA must be declared unconstitutional pending further congressional action.

In a closely analogous circumstance, the Supreme Court, in *United States v. Jackson*, 390 U.S. 570 (1968), condemned the very practice now at issue, *i.e.*, where a district court was asked to engage in the judicial amendment of a capital statute in order to preserve its constitutionality.  In that case, the court declined to do so. As a result, the Supreme Court's admonition in *Jackson* is equally powerful and appropriate here:

---

[3] Elsewhere in this Motion, counsel argue that the elements of capital murder include decisions reached by the jury right up to and including the point where it makes a fact-finding that the aggravating circumstances outweigh the mitigating circumstances. In truth, the final "selection" or ultimate sentencing decision is not made until the jury reaches the final decision-point of determining, factually, "whether all the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e) (emphasis added). A simple "outweighing" is insufficient. Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and mitigating factors. That is precisely why the legislature needs to amend this statute, not the courts or the Department of Justice.

> It is unnecessary to decide here whether this conclusion
> [the Government's proposed "fix" of the death-penalty
> aspects of the federal kidnapping statute] would follow
> from the statutory scheme the Government envisions, for it
> is not the scheme that Congress enacted.

390 U.S. at 573.

The principles which flow logically and inexorably to the conclusion that the

FDPA cannot survive *Ring* and *Hurst* will be presented below in the following order:

(1)     in *Ring* and related cases such as *Jones, Harris*, and *Hurst*, the Supreme
        Court held that aggravating factors necessary to a capital verdict are
        essential elements of the capital offense, and must be pleaded in the
        indictment and proved to a jury beyond a reasonable doubt;

(2)     the FDPA does not provide for presentation of aggravating factors to a
        grand jury (and thereby inclusion of them in an indictment), but instead
        vests authority to identify aggravating factors exclusively with the
        prosecutor;

(3)     the FDPA cannot be amended by the prosecutor or the courts to permit
        presentation of aggravating factors to a grand jury because, as the
        Supreme Court held in *Jackson*, and consistent with centuries of
        constitutional jurisprudence and statutory construction, it is for the
        legislature, not the courts or the prosecutor, to define crimes and
        punishment and the contours of a statute, and the presentation of
        aggravating factors to a grand jury is contrary to the unambiguous intent
        of Congress as expressed in the FDPA; and

(4)     contrary decisions from courts of appeals have been wrongly decided
        because they have failed either to (a) address *Jackson* and the fundamental
        separation of powers principles incorporated therein; and/or (b)
        acknowledge, much less reconcile, the explicit allocation of authority to
        the prosecutor to determine the propriety of aggravating factors. Nor do
        severability analysis or the post-*Apprendi* drug cases, or the principle of
        "constitutional avoidance" save the FDPA; indeed, those doctrines and the

6

cases, as well as post-*Ring* Supreme Court cases, including *United States v. Booker*, 543 U.S. 220 (2005), and *Blakely v. Washington*, U.S. 542 U.S. 296 (2004), establish that a judicially imposed solution cannot redefine or reconfigure a federal criminal statute to do what Congress has not intended.

**B.    Aggravating factors necessary to a capital verdict are essential elements of the capital offense and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt.**

In *Ring*, in which the Supreme Court overruled *Walton v. Arizona*, 497 U.S. 639 (1990), and in subsequent cases, the Court established beyond dispute that aggravating factors necessary to imposition of the death penalty under the FDPA must be charged in the indictment, and proved to the satisfaction of a jury beyond a reasonable doubt. As noted earlier, the Supreme Court explained in both *Ring* and *Harris* that facts which increase the maximum penalty faced by the defendant create new, different, and "greater offense[s]." In *Harris*, 536 U.S. at 555-566, the Court noted repeatedly that any "fact" which increases the maximum possible penalty beyond that authorized by the findings implicit in the jury's verdict of guilt is an element of an offense:

> [r]ead together, *McMillan* [*v. Pennsylvania*, 477 U.S. 79 (1986)] and *Apprendi* mean that those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis.

536 U.S. at 567. Concurring in *Ring*, Justice Scalia famously observed:

> [All] facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

*Ring*, 436 U.S. at 610 (Scalia, J., concurring.)

7

Similarly, in *Apprendi*, the Court had observed that, "[t]he judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements' of a separate legal offense." 530 U.S. at 483, n. 10. *See also Harris*, 536 U.S. at 560 (stating that the principle "by which history determined what facts were elements . . . defined elements as 'fact[s] legally essential to the punishment to be inflicted'") (quoting *United States v. Reese*, 92 U.S. 214, 232 (1876) (Clifford, J., dissenting)).

In *Jones*, the Court had presaged what has since occurred by holding that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." 526 U.S. at 227. *See also United States v. Cotton,* 535 U.S. 625 (2002) (in federal prosecutions, any fact increasing the maximum punishment "must also be charged in the indictment").

Thus, *Ring* and *Harris* have established beyond dispute that the facts alleged in the "Special Findings" section of the superseding indictment and the statutory and non-statutory aggravating factors alleged in the NOI in this case constitute elements of an offense, because they "are facts that expose [this] defendant to a punishment greater than that otherwise legally prescribed . . . ," *i.e.*, the death penalty. That conclusion is further confirmed by the Supreme Court's subsequent decisions in *Blakely* and *Booker*, in which first state and then federal sentencing guidelines factors, respectively, were held

to constitute the functional equivalent of elements that required proof to a jury beyond a reasonable doubt. 542 U.S. at 303; 543 U.S. at 244.

Capital cases since *Ring* have continued in the same vein. For example, in *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), in which the Court considered whether double jeopardy was a bar to the second prosecution of a capital case when the Commonwealth of Pennsylvania again sought (and received) a sentence of death after a divided jury at the first trial had spared the defendant's life and the defendant then succeeded in having the underlying conviction set aside on appeal, with the Court ruling 5-4 that double jeopardy did not bar a second opportunity to seek a death sentence, Justice Scalia – joined by the Chief Justice and Justice Thomas – discussed the implications of the Court's decision in *Ring*:

> [i]n *Ring v. Arizona*, 536 U.S. 584 (2002), we held that aggravating circumstances that make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a *greater offense*.'"  *Id.* at [609] (emphasis added). That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of "murder plus one or more aggravating circumstances": Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death.

537 U.S. at 111.

The three justices who joined that portion (Part III) of the main opinion concluded that there could be no principled reason to distinguish between what constitutes an offense for purposes of the Sixth Amendment and an "offence" for

purposes of the Double Jeopardy Clause of the Fifth Amendment. *Id.*

Yet even the four dissenting justices agreed with Justice Scalia's proposition with respect to capital murder constituting a *greater* offense based on the additional elements – the aggravating factors – needed to prove that offense:

> [t]his Court has determined . . . that for the purposes of the Double Jeopardy Clause, capital sentencing proceedings involving proof of one or more aggravating factors are to be treated as trials of separate *offenses*, not mere sentencing proceedings. *See, ante*, at [537 U.S. at 736-738, 739-740]; *Ring v. Arizona*, 536 U.S. 584 (2002); *Bullington v. Missouri*, 451 U.S. 430 (1981).

537 U.S. at 126 n. 6 (emphasis in original) (Ginsburg, J., dissenting).

Thus, at least seven justices agreed that, under the principles set forth in *Ring*, capital sentencing schemes that employ aggravating factors create, from a constitutional perspective, new offenses, greater than ordinary willful homicide, that are distinguished by the additional *elements* those aggravating factors represent. Pursuant to *Jones* and *Cotton*, when those greater offenses are prosecuted under federal law in federal court, it is beyond question that they must not only be proved to a jury beyond a reasonable doubt, but that they must first be presented to a grand jury and included within the indictment.

And finally, in the Supreme Court's most recent decision in *Hurst v. Florida*, ___ U.S.___, 136 S. Ct. 616 (2016), the Court held that, under *Apprendi,* 530 U.S. at 466, and *Ring*, 536 U.S. at 584, sentencing procedures that Florida had used for more than forty years violated the Sixth Amendment right to jury trial. *Hurst* has already led one

10

jurisdiction to reexamine and alter its sentencing procedures in capital cases. The Delaware Supreme Court, which had previously held that "*Ring* does not extend to the weighing phase" of capital sentencing, *Brice v. State*, 815 A. 2d 314, 322 (Del. 2003), now has held, relying on *Hurst v. Florida*, that the "weighing" of aggravating factors against mitigating factors is a **factual** determination that only the **jury**, and not the judge, could determine, and that determination must be **unanimous** and found by **proof beyond a reasonable doubt**. *See Rauf v. State of Delaware,* 145 A.3d 430 (Del. 2016) (emphasis added), attached as Exhibit 1.

Significantly, in *Hurst*, Justice Sotomayor spoke for seven Justices in characterizing the weighing required by Florida law as a finding of *fact*, which warrants considering again the proper treatment under the Constitution of the weighing required by the FDPA. In light of *Hurst*, there is no sound basis to treat that weighing as outside the scope of the *Apprendi* doctrine.

Further, in *Hurst*, the Supreme Court reversed a death sentence under Florida's sentencing scheme and declared that scheme unconstitutional. Under pre-*Hurst* Florida law, after an evidentiary hearing, a jury made a "recommendation" of life or death. But the judge was still required to hold a separate hearing and determine "whether sufficient aggravating circumstances existed to justify imposing the death penalty" – the jury's recommended sentence was merely "advisory." This, the Supreme Court held, is forbidden, because "[t]he Sixth Amendment requires a jury, not a judge, to find each *fact* necessary to impose a sentence of death." 136 S. Ct. at 619-21 (emphasis added):

11

> Florida concedes that *Ring* required a jury to find every fact necessary to render Hurst eligible for the death penalty. . . . [Yet t]he State fails to appreciate the central and singular role the judge plays under Florida law. . . . [T]he Florida sentencing statute does not make a defendant eligible for death until "*findings by the court* that such person shall be punished by death." Fla. Stat. § 775.082(1) (emphasis added). The trial court alone must find "the facts ... [t]hat sufficient aggravating circumstances exist" and "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances." § 921.141(3); *see Steele*, 921 So.2d, at 546. . . . The State cannot now treat the advisory recommendation by the jury as the necessary factual finding that *Ring* requires.

*Id.* at 622 (emphasis added). This demonstrates that the Court viewed the trial judge's weighing determination as a finding of a fact for purposes of *Apprendi*. The Fifth and Sixth Amendments require that such finding be made beyond a reasonable doubt. *See Alleyne v. United States*, -- U.S. --, 133 S. Ct. 2151, 2158 (2013); *Ring*, 536 U.S. at 610 (Scalia, J., concurring) ("[A]ll facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.").

Certainly the structure of the FDPA conforms with that conclusion. As with the Arizona scheme at issue in *Ring*, and the Florida scheme at issue in *Hurst*, a jury's verdict finding a federal defendant guilty of murder cannot support a sentence of death without additional fact-finding. For example, although a guilty verdict in a case of a federal prison murder carries with it an *authorized* potential death sentence, such a

defendant is not actually exposed to a death sentence unless and until the jury (or the judge, where a jury has been waived) makes determinations, unanimously and beyond a reasonable doubt, that the crime was committed with one of the four "intent" factors listed at 18 U.S.C. § 3591(a)(2)(A-D) and that there is present in the case at least one of the 16 statutory aggravating factors set forth at 18 U.S.C. § 3592(c)(1-16). In addition, arguably, a defendant may not be sentenced to death unless it is also established that the attorney for the Government believes that executing the defendant is justified, 18 U.S.C. § 3593(a), that the defendant was not less than 18-years old at the time of the offense, 18 U.S.C. § 3591(a), and that he is not mentally-retarded, *Atkins v. Virginia*, 536 U.S. 304 (2002). It is also argued in this Motion, at Point Three, *infra*, that the ultimate decision on whether aggravating factors substantially outweigh mitigating factors is itself an element of capital murder.

It thus follows that the aggravating factors the government has alleged in the superseding indictment and in the NOI  are viewed by the government, and for purposes of statutory and constitutional analysis, as elements of a greater offense that require the proof of those elements before a death sentence can be imposed.

**C. The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests exclusive authority to identify aggravating factors exclusively with the prosecutor**.

With respect to federal capital offenses prosecuted in federal court, *Ring* and the Fifth Amendment's indictment clause require that aggravating factors necessary to a

death sentence be presented to a grand jury and included in the indictment.[4]  The FDPA neither contemplates affording, nor permits, the grand jury any role in determining which aggravating factors are to be alleged in a federal capital prosecution. Pursuant to the FDPA scheme chosen by Congress, a sentence of death may not be sought unless, as set forth in the statute itself, "the attorney for the Government believes that the circumstances of the offense are such that a sentence of death is justified." 18 U.S.C. § 3593(a). If the "attorney for the government" believes death is warranted, the next step in the legislatively-selected process is for that attorney to serve and file a notice, signed by the attorney for the Government, stating, *inter alia*, that "the Government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the Government will seek a sentence of death." 18 U.S.C. § 3593(a)(1).

Although not in and of themselves aggravating factors, the pre-*Ring* FDPA also required proof – and allegation in the notice by government attorneys – of one or more of four "gateway" state-of-mind factors. 18 U.S.C. § 3591(2). The notice, in addition, is required to set forth the aggravating factors– statutory and non-statutory – the government proposes to prove if the defendant is convicted which may include victim-impact evidence. 18 U.S.C. § 3593(a). The ADAA scheme was similar. *See* 21 U.S.C. §

---

[4] The Fifth Amendment provides in pertinent part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury[,]" including those accused of felony offenses. *See Stirone v. United States*, 361 U.S. 212, 215 (1960) ("[t]he crime charged here is a felony and the Fifth Amendment requires that prosecution be begun by indictment").

848(h) (Repealed). Consequently, the unambiguous language of the FDPA statutes themselves establishes that Congress, rightly or wrongly, elected to enact a scheme where the decision to set the machinery of death in motion would be reserved to the government's attorneys and no one else, not grand juries, not the court, and not any other individual or entity. Nonetheless, the government seeks to establish in this case a substitute method for introducing aggravating factors now that *Ring* has rendered the exclusive statutorily prescribed mechanism selected by Congress constitutionally invalid. Fidelity to the fundamental principle of separation of powers, embedded deeply in the constitutional form of government our nation has adopted, and detailed below, is even more important when applied to the government's efforts to execute one of its citizens, thereby imposing "the most irremediable and unfathomable of penalties." *Ford*, *supra*, 477 U.S. at 411.

> D. ***Jackson*** **and the Separation of Powers Doctrine demonstrate that the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because it is for the legislature to define crimes and punishment, and presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA.**

As noted, this is not an instance in which congressional silence permits flexibility in rescuing an otherwise unconstitutional statute from invalidation. Indeed, given the express and unambiguous language and structure of the FDPA, if, prior to *Ring*, a defendant had argued that the aggravating factors could not be applied unless they were presented to and charged by a grand jury in the indictment, the government's response undoubtedly, and correctly, would have been that the statute does not ascribe

15

any such role to the grand jury, and that the statute plainly reserves that authority solely to the prosecutor.

1.   Congress, not the courts or prosecutors, is vested with legislative authority to define federal criminal offenses and the punishment for such conduct.

That view, of course, conforms with centuries of federal criminal jurisprudence. Since at least as early as *United States v. Hudson*, 11 U.S. 32 (1812) (Marshall, C.J.), it has been clear that the Constitution affords Congress the sole power to define and create all offenses against the United States, and the punishment therefor. *See also United States v. Worrall*, 2 U.S. (2 Dall.) 384, 393-4 (1798); *United States v. Wiltberger*, 18 U.S. 76, 93 (1820), ("[i]t is the legislature, not the court, which is to define a crime and ordain its punishment"); *Hudson*, 11 U.S. at 34 ("[t]he legislative authority of the Union must first make an act a crime, fix a punishment to it, and declare the Court that shall have jurisdiction of the offense" and "[t]he power of punishment is vested in the legislative, not in the judicial department"). *See also Bousley v. United States*, 523 U.S. 614, 620-21 (1998) ("under our federal system it is only Congress, and not the courts, which can make conduct criminal"); *Staples v. United States*, 511 U.S. 600, 604 (1994) ("[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute") (citation omitted).

As a result, "[o]ne may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress."

*Viereck v. United States*, 318 U.S. 236, 241 (1943) (citations omitted). *See also United States v. Lanier*, 520 U.S. 259, 267-68 n.6 (1997) ("[f]ederal crimes are defined by Congress, not the courts, . . . ."); *Logan v. United States*, 144 U.S. 263, 283 (1982) ("[a]lthough the constitution contains no grant, general or specific, to congress of the power to provide for the punishment of crimes, [with certain exceptions] . . . no one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States"). Applying these principles in *Bouie v. City of Columbia*, 387 U.S. 347 (1964), in which the state courts of South Carolina, in an obvious effort to prosecute civil rights protesters, had construed an existing statute in a manner that created a new crime, the Supreme Court intervened and set aside the statute, as interpreted, as contrary to *Wiltberger*. *See also Crandon v. United States*, 494 U.S. 152, 158 (1990) ("legislatures, not courts, define criminal liability").

    2.    <u>*Jackson* provides a direct and "all fours" analogy to the circumstances present herein, and compels invalidation of the FDPA.</u>

It is in that context that the Supreme Court's decision in *United States v. Jackson*, 390 U.S. 570 (1968), provides precedent directly and specifically applicable to capital statutes, and to improper attempts to cure them by judicial fiat rather than by legislative action. As stated earlier, this is not the first time that the government has attempted to enlist the judiciary in an effort to rescue, through ersatz construction, a constitutionally flawed federal death penalty.

In *Jackson*, the Court held that when a particular federal sentencing statute is unconstitutional, a court lacks authority to devise its own procedure, unauthorized by statute or rule, simply because the procedure, if properly enacted by Congress, would pass constitutional muster. In *Jackson*, the Court considered the federal kidnapping statute, which contained a mandatory death penalty when a jury recommended it – thereby making the death penalty possible only for those defendants who exercised their right to trial by jury.

In an effort to salvage the death penalty provision, the government proposed a number of alternative "constructions" of the statute and cited *ad hoc* procedures developed by other district courts as "cures" for the constitutional problems. However, the Court, after finding the statute unconstitutional rejected the government's proposed remedy of directing the trial court to convene a special penalty phase jury after a guilty plea, as well as every other approach proposed by the government because those proposals represented judicial, rather than *legislative* action. *Id.* at 572–81.[5]

In analyzing and explicating the limits of judicial authority to construe legislation, even when such construction would "save" the legislation from a declaration of unconstitutionality, the *Jackson* Court pointed out that the kidnapping

---

[5] For example, the government proposed a "construction" of the statute under which "even if the trial judge accepts a guilty plea or approves a jury waiver, the judge remains free . . . to convene a special jury for the limited purpose of deciding whether to recommend the death penalty." *Id.* at 572. The Government also suggested that the court might save the statute by reading it to make imposition of the death penalty discretionary on the part of the sentencing judge. *Id.* at 575. The Court rejected these proposed reconstructions and adhered, instead, to the plain language of the statute as the best evidence of Congress' intent.

statute "sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or one who pleads guilty." *Id.* at 571.

Thus, the Court declined to read into the statute congressional authority for the courts to develop such a procedure. The Court was concerned principally with overreaching its authority by imposing the alternate sentencing scheme. According to the Court, "it would hardly be the province of the courts to fashion [such] a remedy," *id.* at 579, absent "the slightest indication that Congress contemplated any such scheme." *Id.* at 578.

Applying *Jackson*'s analysis to this case, it is manifest that once the provision allocating to the prosecutor the power to charge aggravating factors is declared unconstitutional, the FDPA "sets forth no procedure" for alleging aggravating factors. Indeed, as the *Jackson* opinion explained, "[t]o accept the Government's suggestion that the jury's sentencing role be treated as merely advisory would return to the judge the ultimate duty that Congress deliberately placed in other hands." *Id.* at 576.

Here, as in *Jackson*, Congress has "deliberately placed in [the prosecution's] hands" the responsibility for alleging aggravating factors under the FDPA. Consequently, in this case, "construing" the FDPA to allow the grand jury to assume that responsibility would violate the FDPA and contravene Congressional intent without "the slightest indication that Congress contemplated" according the grand jury such a role in the federal capital decision-making process. Presented with the option, Congress, in light of the change of law from *Walton* to *Ring*, might very well enact a

comprehensive death penalty scheme that allocated a role to the grand jury. Congress might also choose to enact a wholly new and different scheme, one which fully defined the new offense of "capital murder," specified its elements, and set forth comprehensive procedures for trial of those offenses.[6]

Jackson, however, proscribes a court from implementing what Congress *might* do, or what the prosecutor proposes as a "fix" for a constitutionally deficient statute. Instead, *Jackson*, requires that courts, under such circumstances, invalidate, and not legislate:

> [i]t is unnecessary to decide here whether this conclusion would follow from the statutory scheme the Government envisions, *for it is not the scheme that Congress enacted*.

*Id.* at 573 (emphasis added).

Also, the Court in *Jackson* recognized that the government's proposal "would be fraught with the gravest difficulties." *Id.* at 579. As the Court explained, "it is one thing to fill a minor gap in a statute," but "quite another thing to create from whole cloth a complex and completely novel procedure and thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality." *Id.* at 580. *See also Blount v. Rizzi*, 400 U.S. 410, 419 (1971) (statute that permitted the Postmaster General to determine that material was obscene struck down by the Court which, in the

---

6. Indeed, the dangers of judicial legislation are patently evident from the divergent attempts, following *Ring*, to salvage the FDPA despite the obvious defect in the method of factors. For example, in *United States v. Jackson*, 327 F.3d 273, 284-87 (4th Cir. 2003), the court held that the presentation of but one statutory aggravating factor to the grand jury (and inclusion in the indictment) was sufficient to permit the government to seek death on the basis of several statutory aggravating factors not so included.

process of rejecting the government's suggestion that Congress's plain language could be "construed" to allow a judge to make that determination instead of the Postmaster General, explained that "it is for Congress, not this Court, to rewrite the statute").

The very same type of judicial and prosecutorial restructuring of a statute to conform with constitutional imperatives was rejected by the Court in *United States v. Booker*, 543 U.S. 220 (2005). In the course of invalidating the mandatory nature of the federal sentencing guidelines because they permitted a judge to find, by a preponderance of the evidence, facts necessary to an enhanced punishment, the Court did not create a hybrid system, inconsistent with the Sentencing Reform Act (hereinafter "SRA"), under which those sentencing factors would be incorporated in indictments and presented to a jury. Rather, a separate majority in *Booker* (in what has generally been denominated the "remedy opinion," *id*. at 245-46, severed the offending section – that which made the guidelines mandatory – but retained the essential character of the remainder of the SRA. Indeed, in *Blakely v. Washington*, *Booker*'s predecessor, Justice Breyer, who wrote the remedial opinion in *Booker*, recognized quite clearly the practical and due process concerns attendant to charging sentencing enhancement facts and submitting them to a jury. 542 U.S. 296, 334-35 (2004) (Breyer, J., dissenting). Justice Breyer's admonition about the practical implications of presenting  sentencing factors to a jury absent any legislative or procedural framework is mirrored by the issues raised by the submission of aggravating factors to a grand jury in the similarly barren context of the FDPA – none of which the government recognizes

21

or addresses. For example, there are questions regarding which aggravating factors must be included in the indictment, whether the defendant must plead to those factors, whether the lessened evidentiary standard of the FDPA remains applicable to some or all aggravating factors, and, if so, to the presentation of mitigating evidence, and any procedural changes in the two phases of the trial.

Here, the government's position, by implication, is that prosecutors can fashion their own remedy independent of both Congress' intent and clear and limiting legislative language. This view, however, mirrors the position taken by the government, and rejected by the Supreme Court, in *Booker*:

> Severing the requirement that judges, not juries, apply the Guidelines would require courts to make the legal and policy decisions necessary to resolve all of those questions. There is no indication that Congress delegated that role to the courts. It is one thing to recharacterize a single factor that increases a statutory maximum and treat it as an element of the crime. It is quite another to take an entire system expressly designed to channel sentencing discretion and treat it as if Congress was attempting to rewrite the criminal code.

*Id.* at 363.

Accordingly, *Jackson* is precisely on point and controls this case. In enacting the FDPA, Congress, relying on *Walton*, created a scheme in which the prosecutor was granted the exclusive authority to make the threshold determination whether to seek the death penalty, and, once a decision was made to pursue death, which aggravating factors to allege. Allowing the government to seek indictment of what Congress unambiguously defined as sentencing factors would give "to the [grand jury] the

ultimate duty that Congress deliberately placed in other hands," *i.e.,* those of the

government attorney – precisely the kind of end-run that *Jackson* forbids.

As a result, if the FDPA's treatment of aggravating factors is unconstitutional

after *Ring*, then it is undeniable, under *Jackson* and the doctrine of Separation of Powers,

that only Congress can cure the problem, and only by enacting – should it choose to do

so in light of the changed constitutional landscape augured by *Ring* – a new death

penalty scheme.

> 3. <u>The Non-Delegation Doctrine provides further compelling support for the conclusion that the FDPA's defects cannot be cured by judicial action</u>.

A corollary to the Separation of Powers problems posed by the prosecution's

proposed unilateral *Ring* fix for the FDPA is the non-delegation doctrine's [7] preclusion

of either Executive or the Judiciary action, whether separately or in tandem,

substituting either's judgment for that of Congress in relation to prescribing the

elements and the procedures for application of the federal death penalty. As Justice

Scalia stated in his dissent in *Mistretta v. United States*, 488 U.S. 361 (1989):

> It is difficult to imagine a principle more essential to
> democratic Government than that upon which the doctrine
> of unconstitutional delegation is founded: Except in a few
> areas constitutionally committed to the Executive Branch,
> the basic policy decisions governing society are to be made
> by the Legislature.
>                          * * *
> That Congress cannot delegate legislative power to the
> President is a principle universally recognized as vital to the

---

[7] "The non-delegation doctrine originated in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989); U.S. CONST., ART. 1, § 1.

> integrity and maintenance of the system of Government
> ordained by the Constitution.

488 U.S. at 415 (Scalia, J., dissenting).

The majority in *Mistretta* ultimately found that the non-delegation doctrine had not been violated by creation of the United States Sentencing Commission and the guidelines it promulgated because, in constituting the Commission, Congress had "[laid] down by legislative act an intelligible principle to which the [Sentencing Commission] is directed to conform." 488 U.S. at 372 (quoting *N.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Nevertheless, the Court reaffirmed the principle that "'the integrity and maintenance of the system of Government ordained by the Constitution's mandate that Congress generally cannot delegate its legislative power to another Branch." *Id.* at 371-72 (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

Thus, *Mistretta* involved the delegation only of authority to determine sentencing factors within the limits of a legislatively determined "intelligible principle." It did not include the authority to determine the very elements of an offense, as would be the case under a hypothetical post-*Ring* FDPA.

Because Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-*Ring* liking, *a fortiori* the Executive Branch cannot simply assume that power by attempting to substitute new procedures and elements for those originally provided by Congress, but rendered constitutionally infirm by the *Ring, Jones, Apprendi* trilogy.

24

4.    <u>The grand jury lacks any authority to issue "special findings."</u>

In this case, the superseding indictment contains a section labeled, "Notice of Special Findings." Grand juries are not, however, permitted to return anything denominated as "Special Findings." The Federal Rules of Criminal Procedure provide that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." F. R. Crim. P. 7(c)(1). In 1979, Rule 7 was amended specifically to allow notice of criminal forfeitures to be alleged by indictment. Obviously, nothing in the text of the Rule, and nothing in the Indictment Clause of the Fifth Amendment, contemplates or permits a grand jury to make "Special Findings" that serve the function of the triggering requirements of the FDPA that are now invalid in light of *Ring*.

In addition, while the Supreme Court's decision in *Schriro v. Summerlin*, 542 U.S. 348, 354-55 (2004), held that, for purposes of collateral review, *Ring* involved issues of procedure rather than substantive criminal law, that does not place the method of alleging the FDPA's aggravating factors within the purview of the government's authority or role in a three-branch form of government. Rather, the principles established in *Jackson* continue to apply, and the express language of the statute remains controlling and dispositive. Consequently, the prosecutor's attempt to rescue the FDPA via the grand jury's "Special Findings" is void.

**E.** **Courts of appeals' decisions to the contrary have been wrongly decided, and neither severability analysis, nor the post-*Apprendi* drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA.**

1.   <u>The decisions by the courts of appeal have been wrongly decided</u>.

While various courts of appeals have considered the issue herein and concluded that there is no constitutional or statutory impediment to presenting the FDPA's aggravating factors to a grand jury in order to avoid unconstitutionality under *Ring*, the cursory reasoning in each case is fatally flawed for two principal reasons:

(a)   the decisions all fail to address *Jackson*, and/or to distinguish its clearly applicable holding and principles; and

(b)   the decisions ignore the plain language of the FDPA with respect to whether the grand jury is authorized to allege aggravating factors.

For example, in *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), the Eleventh Circuit not only failed to mention *Jackson* at all, but also joined other circuits in claiming that while "'nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment . . . there is nothing in that law inhibiting such a charge.'" *Id.* at 1367 (quoting *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004)). *See also United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006) ("[t]he major flaw in LeCroy's argument is that nothing in the [FDPA] forbids, or is inconsistent with, prosecutors' taking the additional step of including the statutory aggravating factors in the indictment and submitting same to the grand jury. Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury"); *United States v. Allen*, 406 F.3d

940, 949 (8th Cir. 2005) ("[w]hile it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment"); *United States v. Barnette*, 390 F.3d 775, 789 (4th Cir. 2004) ("[a] review of the statute itself reveals no language that restricts the government from submitting aggravating factors to the grand jury. Neither does the legislative history indicate any such intent").  The First Circuit's attempt to distinguish *Jackson* is likewise flawed in that, the reasoning requires that the plain language of the statute which ordains a procedure completely at odds with presentment to a grand jury be ignored. *See United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007).

That contention is wrong on two counts: (1) the FDPA not only does not "require" prosecutors to present aggravating factors to the grand jury, it prescribes a precise and exclusive method for alleging aggravating factors: the prosecutor's exclusive discretion and judgment; and (2) the assertion that "nothing in the [FDPA] inhibit[s]" presentation of aggravating factors to the grand jury ignores the explicit and exclusive statutory delegation to the prosecutor, the rules of statutory construction and the clear and controlling precedent provided by *Jackson*.

Again, this is not an instance in which a statute simply does not "expressly provide for submitting elements of an offense to the grand jury;" rather, the FDPA expressly and comprehensively provides for another, exclusive method for alleging aggravating factors. Thus, the decisions upholding the validity of the FDPA were

27

wrongly decided, and this Court should, consistent with *Jackson* and the clear language of the FDPA, declare the statute unconstitutional as applied to Mr. Christensen in this case.

> 2.   The post-*Apprendi* drug-quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury.

Nor can the FDPA find refuge in post-*Apprendi* cases that required drug quantity in federal prosecutions under 21 U.S.C. § 841, previously deemed a sentencing factor to be determined by a judge by a preponderance of evidence, to be pleaded in an indictment and proved to a jury beyond a reasonable doubt. *See, e.g., United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001) (*en banc*). *See also United States v. Cotton*, 535 U.S. 625 (2002) (government concedes that it was error not to include drug quantity in all post-*Apprendi* federal drug indictments, but conviction affirmed because the defendant failed to object, and omission constituted harmless error).

In fact, the difference between Title 21's treatment of drug quantity and the FDPA's handling of aggravating factors is striking and dispositive. Regarding drug quantity, Congress enacted statutes in which the penalty ranges increase directly with the quantity of the specified drug. [8] For those statutes, though, Congress was silent on whether drug quantities were elements of the offense or sentencing factors. Thus, requiring drug quantities to be alleged by indictment did not alter the structure of the

---

[8] See, e.g., 21 U.S.C. § 841(b)(1)(A) (possession of one kilogram or more of heroin exposes a defendant to a sentence of 10 years to life; possession of less than 50 grams of heroin exposes a defendant to a sentence of 0 - 20 years, 21 U.S.C. § 841(b)(1)(c)).

drug laws, or offend Congressional intent.[9]

In fundamental contrast, however, Congress clearly never intended the aggravating factors in the FDPA to constitute elements of the offense. Rather, Congress, relying on *Walton*, which permitted such aggravating factors to be treated as sentencing factors, patently described them as such, and directed that they be determined and identified in each case *not* by a grand jury (or any other body or institution), but by the prosecutor *alone*.

Moreover, when the Supreme Court has been required to determine whether a statute sets forth elements-of-an-offense, as distinct from sentencing factors, it has looked to Congressional intent. Accordingly, in *Castillo v. United States*, 530 U.S. 120 (2000), the Court explained that "[t]he question before us is *whether Congress intended* the statutory references . . . to define a separate crime or simply to authorize an enhanced penalty." *Id.* at 123 (emphasis added). *Accord, Jones*, 526 U.S. at 232–39. *See also Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998); *Harris*, 536 U.S. at 582.

In both *Harris* and *Almendarez-Torres*, the Court found the aspects at issue to be sentencing factors; in *Castillo* and *Jones*, they were found to be elements of the offense. In both sets of cases, the Court proceeded by the same exhaustive statutory, not constitutional, analysis, because the Constitution, though it places limits upon

---

[9] The same is true of the federal carjacking statute at issue in *Jones*, 526 U.S. at 239, 251-252. The statute, 18 U.S.C. § 2119, did not make any distinction with respect to whether serious bodily injury was an element or a sentencing factor. Thus, including that factor in an indictment did not involve the redrafting of a statute as is proposed by the government in this case with respect to the FDPA's aggravating factors.

Congress' ability to designate certain facts as sentencing factors, does *not* afford the courts authority to recast statutes so that they fit within those limits.

For example, in *Harris*, the Court comprehensively considered "the distinction the law has drawn between the elements of a crime and factors that influence a criminal sentence." 536 U.S. at 549 The Court reaffirmed that the threshold question of statutory construction is *whether Congress intended* relevant facts to be offense elements or sentencing factors. *Id.* at 551. The Court further explained that the distinction is significant because "*[l]egislatures define crimes in terms of the facts that are their essential elements*, and constitutional guarantees attach to these facts." *Id.* at 549 (emphasis added).

Here, Congress's intent is plain and unmistakable. Consistent with the state of the law pre-*Ring* (and governed by *Walton*), Congress structured the FDPA so that aggravating factors were sentencing considerations that were within the exclusive province of the prosecutor. As a result, the government is not empowered to subvert Congressional intent and, in effect, create by prosecutorial fiat, a brand new criminal statute.

      3.    <u>Severability analysis cannot save the FDPA from unconstitutionality</u>.

Additionally, the severability cases also undercut any analogy to the drug cases discussed earlier. Under those cases, the critical question is whether the statute at issue,

upon removal of its unconstitutional portion, can function independently.[10]  For example, in *Booker*, as noted, rather than cobble together a hybrid system that would permit presentation of sentencing factors to both grand and petit juries, the Supreme Court severed the sentencing guidelines' mandatory nature because that *preserved* the character of the SRA, and Congress's intent in enacting it, as opposed to creating a new system inconsistent with Congressional intent, and which raised more procedural issues and questions than it resolved.

The structure of the FDPA plainly requires that the government's notice of aggravating factors, and only that mechanism, triggers the entire operation of the FDPA. Absent that enabling act by the prosecutor, the statute cannot function as a capital statute, since without aggravating factors, the government cannot seek the death penalty. The same conclusion was reached in *Jackson*, in which the Court found that severing the unconstitutional death penalty provision of the Kidnapping Act left an otherwise fully functional criminal statute, albeit one that could not carry with it a potential sentence of death.

Here, deciding what Congress intended with regard to the FDPA is an easy task – it is obvious from the FDPA that Congress, relying on *Walton*, believed it was creating sentencing factors. It is equally clear that, after *Ring,* aggravating factors constitute elements of an offense. Accordingly, the statute may not be construed; it must be

---

[10] *See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *Leavitt v. Jane*, 518 U.S. 137 (1990); *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678 (1987).

voided.

4.     The doctrine of "constitutional avoidance" is inapplicable.

The doctrine of constitutional avoidance applies when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909). Here, since the FDPA is, for the reasons set forth *supra*, plainly not "susceptible of two constructions," the simple answer is that the doctrine of constitutional avoidance does not apply.

In *Harris*, for example, the Court found the doctrine of constitutional avoidance inapplicable because, at the time Congress enacted 18 U.S.C. § 924(c), Supreme Court precedent allowed Congress to label as sentencing factors certain facts which increased the *minimum* punishment for a crime. As the Court explained:

> The avoidance canon rests upon our "respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991). The statute at issue in this case was passed when *McMillan* [*v. Pennsylvania*, 477 U.S. 79 (1986)] provided the controlling instruction, and Congress would have had no reason to believe that it was approaching the constitutional line by following that instruction. We would not further the canon's goal of eliminating friction with our coordinate branch, moreover, if we alleviated our doubt about a constitutional premise we had supplied by adopting a strained reading of a statute that Congress had enacted in reliance on the premise. And if we stretched the text to avoid the question of *McMillan*'s continuing vitality, the canon would embrace a dynamic view of statutory interpretation, under which the

32

> text might mean one thing when enacted yet another if the
> prevailing view of the Constitution later changed. We
> decline to adopt that approach.

536 U.S. at 556.

Thus, the doctrine of constitutional avoidance was irrelevant to the Court's

analysis, and the Court, in accord with Congress' intent, concluded that "brandishing"

was a sentencing factor. *Id.* Here, too, Congress relied on the state of the law existing at

the time it enacted the FDPA – in *Walton,* 497 U.S. at 649 , the Court had permitted a

judge to decide sentencing factors in capital cases – and manifested that reliance in

reserving for the prosecutor the exclusive authority to allege aggravating factors.

Reconstructing the FDPA based on *Ring*'s precedence over *Walton* would constitute the

type of "dynamic" statutory interpretation that was precluded by *Harris*, and would

vitiate Congress's clear intent.

Consequently, the doctrine of constitutional avoidance is as inapplicable here as

it was in *Harris.* As with § 924(c), with the FDPA there is no ambiguity about Congress's

choice. As stated in *Miller v. French*, 530 U.S. 327, 341 (2000) (quotations omitted),

"[w]here Congress has made its intent clear, we must give effect to that intent."

Similarly, in *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986), the

Court stated:

> Federal statutes are to be so construed as to avoid serious
> doubt of their constitutionality. Where such serious doubts
> arise, a court should determine whether a construction of the
> statute is fairly possible by which the constitutional question
> can be avoided. *It is equally true, however, that this canon of*

> *construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . . or judicially rewriting it.*

*Id.* at 841 (citations and internal quotations omitted) (emphasis added).

Here, Congress made its intent clear in the FDPA – the allegation of aggravating factors is the province solely of government attorneys. The *Jones-Apprendi-Ring* trilogy has now altered the status of the law, and aggravating factors (and other aspects of the FDPA) are now properly, and constitutionally, elements of an offense not yet enacted by Congress and beyond the authority of the courts (or the prosecutor) to create via "construction" that amounts to judicial and executive legislation.

Accordingly, it is respectfully submitted that the FDPA cannot be rewritten to permit presentation of aggravating factors to the grand jury, and that, because those aggravating factors are elements pursuant to *Ring*, the FDPA is unconstitutional as applied to Mr. Christensen. The capital aspects of this case should be dismissed.

<u>POINT TWO</u>

EVEN IF THE FDPA CAN BE RENDERED CONSTITUTIONAL BY A FINDING BY THE GRAND JURY OF GATEWAY AND STATUTORY AGGRAVATING FACTORS, THE "SPECIAL FINDINGS" IN THE SUPERSEDING INDICTMENT AND THE NON-STATUTORY AGGRAVATING FACTORS ALLEGED IN THE NOI SHOULD BE STRICKEN, AND THE DEATH NOTICE SHOULD BE DISMISSED, BECAUSE THE GOVERNMENT HAS NOT OBTAINED AN INDICTMENT CONSISTENT WITH THE REQUIREMENTS OF THE FIFTH AMENDMENT.

### A.    Introduction.

As outlined above, the superseding indictment does not allege any non-statutory aggravating factors. Nor does the superseding indictment allege that the "special findings" should subject Mr. Christensen to the death penalty or otherwise indicate that the grand jury intended to return an indictment charging a capital offense. Nor does the superseding indictment allege that the aggravating factors present in this case outweigh the mitigating factors and do so to an extent that is sufficient to justify imposition of a sentence of death. Under these circumstances, the superseding indictment does not comport with the Grand Jury Clause of the Fifth Amendment and does not charge a capital offense.

### B.    The grand jury was not given the choice of holding Mr. Christensen to answer for a capital crime because it was (presumably) unaware of the consequences of its "Special Findings."

The Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V. As the Supreme Court has explained:

> [T]he grand jury is a central component of the criminal
> justice process. The Fifth Amendment requires the Federal
> Government to use a grand jury to initiate a prosecution....
> The grand jury, like the petit jury, 'acts as a vital check
> against the wrongful exercise of power by the State and its
> prosecutors.' It controls not only the initial decision to indict,
> but also significant decisions such as how many counts to
> charge and whether to charge a greater or lesser offense,
> *including the important decision to charge a capital crime.*

*Campbell v. Louisiana*, 523 U.S. 392, 398 (1998) (emphasis supplied). *See also Vasquez v. Hillary*, 474 U.S. 254, 263 (1986) (power to charge capital or noncapital offense lies in the hands of the grand jury); Fed. R. Crim. P. 7(a).

When Congress adopted the Bill of Rights, only the indicting grand jury, by choosing the offense to charge, could make an offense punishable by death. In 1789, Congress sought to ratify the Fifth Amendment and also passed the first federal criminal laws. Laws that authorized the death penalty mandated it; they left no other sentencing option. *See generally*, Rory Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Ford. Urb. L. J. at 361-63. This practice was consistent with that of the states, which at the time the Bill of Rights was adopted in 1791, "followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses." *Woodson v. North Carolina*, 428 U.S. 280, 289 (1976). Thus, the intent of the framers of the Fifth Amendment was that the grand jury retain the power to choose which defendants would receive a sentence of death upon conviction.

The grand jury's historical role in choosing which defendant would receive a

death sentence upon conviction is well documented. *See* LaFave, W.R., *et al.*, 1 *Criminal Procedure* .5(b) (2d ed.) (noting that grand juries played a critical role in reducing the number of offenses for which capital punishment could be imposed by downgrading charges to non-capital offenses); Andrew Hirsch, *The Rise of the Penitentiary* (1992) ("[a]t the indictment stage, grand juries often refused to charge person with capital crimes. They simply downgraded indictments to non-capital charges of their own devising."). The Supreme Court has acknowledged this historical role, writing in *Vasquez*, 474 U.S. at 263, that "the Grand Jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. *In the hands of a grand jury lies the power to charge* a greater or lesser offense; numerous counts or a single count; and perhaps the most significant of all, *a capital offense or a noncapital offense.*"

In this case, the government presented to the grand jury some of the elements of capital murder so as to make Mr. Christensen "death-eligible" for Eighth Amendment purposes – the intent requirements under 18 U.S.C. § 3591(a)(2) and the alleged statutory aggravating factors under 18 U.S.C. § 3592(c). On information and belief, however, the government did not inform the grand jury of the consequences of those special findings, *i.e.*, that by returning the indictment, Mr. Christensen would be held to answer to an offense punishable by death. Certainly nothing on the face of the indictment shows that the grand jury was aware that it was being asked to determine if Mr. Christensen should be held to answer for a capital offense. The model grand jury charge of the Administrative Office of the United States Courts indicates that the jury

37

would not have been told that Mr. Christensen would face the death penalty upon conviction. That charge expressly instructs the jury: "When deciding whether or not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment." *See* Tomer, *Ring Around the Grand Jury*, *supra*. Presumably, the grand jury that returned the indictment against Mr. Christensen was given this instruction. By not informing the jury that it was returning an indictment charging a capital offense, and misinforming the grand jury about who determines punishment in a federal capital case, the government turned the proceeding into one that gave only the appearance of complying with the Fifth Amendment, but that deprived Mr. Christensen of his constitutional and statutory rights.

The Supreme Court, in a related context, has refused to countenance such disregard for the Fifth Amendment. In *Smith v. United States*, 360 U.S. 1, 9 (1959), the Court reversed a kidnapping conviction initiated by information even though it was a capital offense. The Court stated:

> [t]he Fifth Amendment made the [grand jury indictment] rule mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings . . . [T]o permit the use of informations where . . . the charge states a capital offense, would . . . make vulnerable to summary treatment those accused of . . . our most serious crimes.

*Id*. (citations omitted). Similarly, to permit the government to obtain from a grand jury an indictment alleging the elements of a capital offense, but not informing the grand

jury that by finding those elements it was holding the defendant to answer to a capital crime, makes vulnerable those accused of the most serious crimes. If the grand jury is not informed of the capital nature of the offense, it cannot express the conscience of the community or perform its constitutionally assigned role as a "barrier . . . between the liberties of the people and the prerogative of the [government])." *Harris*, 536 U.S. at 564 (grand and petit juries "form a 'strong and two-fold barrier'").

The grand jury's constitutional and historical role in deciding whether a defendant should face the death penalty is perhaps more critical now than ever. Few checks exist on the federal government's power to pursue the ultimate punishment against one of its citizens and fewer opportunities exist for the local community to express its desires about the appropriateness of the death penalty in any given case. Prosecutorial decision making in capital cases is centralized at the Department of Justice in Washington, D.C. *See United States v. Navarro-Vargas*, 367 F.3d 896, 902 (9th Cir. 2004) (Kozinski, J., dissenting) ("[a]n independent grand jury – one that interposes the local community's values on prosecutorial decisions that are controlled by policies set in Washington as to the enforcement of laws passed in Washington – seems like an important safeguard that is entirely consistent with the grand jury's traditional function").

Nor is the petit jury in a capital case a meaningful barrier between "the liberties of the people and the prerogative of the [government])." *Harris*, 536 U.S. at 564. This is because petit jurors, to-date, have been "death-qualified." Individuals with

disqualifying scruples against the death penalty, no matter how many exist in a given community, have not been permitted to sit in judgment in a capital case. Instead, capital juries consist exclusively of individuals who believe that the death penalty is an appropriate punishment and who express a willingness to impose it. Empirical evidence shows that such "death-qualified" jurors are more prone to believe government witnesses, generally evaluate evidence differently than other jurors, and give little meaning to the presumption of innocence, *i.e.*, death qualified jurors are more conviction prone.[11]  The death-qualifying process also tends to exclude women and African-Americans from jury service. *Id*. The net effect of death qualification is that capital jurors do not represent the conscience of the local community or its rich diversity; at best, they represent only those members of the community who share similar views on the death penalty. Jurors that represent such a small segment of the community are ill-equipped to act as a barrier between the "liberties of the people" and the power of a government, particularly a government so centralized that it can force local prosecutors to take a capital case to trial against their will.[12]

---

[11] *See* Jesse Nason, *Mandatory Voir Dire Questions in Capital Cases: A Potential Solution to the Biases of Death Qualification*, 10 Roger Williams U. L. Rev. 211, 219 (2004) (summarizing research on how death-qualified jurors may presume guilt, resolve ambiguities against the defendant, more readily accept the government's version of events, distrust defense witnesses, fill evidentiary gaps with their beliefs that defendant committed the crime; and were more likely to infer premeditation). *See also United States v. Green*, 324 F. Supp. 2d 311, 329 (D. Mass. 2004) (citing studies that note death-qualified juries are more conviction prone).

[12] Public opinion polls "consistently show that opposition to capital punishment runs around 45% to 55% for black Americans, while for whites it is much lower, ranging from 17% in 1992 to 24% in 2000. That is opposition to the death penalty is about twice as high among black Americans as among white, and a much larger majority of whites than blacks support the death penalty." Rory Little, *What Federal*

Thus, the Constitution and the Bill of Rights sets up a carefully crafted system of checks and balance. Under the Fifth Amendment, the grand jury, like the petit jury, is supposed to "act[] as a vital check against the wrongful exercise of power by the State and its prosecutors." *Campbell*, 523 U.S. at 398 (citations omitted). Unless the grand jury is aware of its capital charging power and the consequences of returning an indictment with "special findings" like those in this case, it cannot perform its constitutionally assigned function and make "*the important decision to charge a capital crime.*" *Id*. Because the grand jury did not perform its constitutionally assigned role of deciding whether Mr. Christensen should be held to answer for a capital crime, the death notice should be dismissed and the indictment's "special findings" stricken.

### C.   The government did not obtain an indictment alleging all elements of a capital crime.

Even if the grand jury had been aware that it its "special findings" would hold Mr. Christensen to answer for a capital crime, the notices should be dismissed because the government did not present further elements necessary for the grand jury to make the decision as to whether Mr. Christensen should be subject to the death penalty, *i.e.*, whether (1) the aggravating factors outweigh the mitigating factors and (2), whether they outweighed the mitigating factors *sufficiently* to justify a sentence of death. The failure of the grand jury to examine all relevant factors to determine if the death penalty was justified conflicts with the framers' intent, discussed above, that the grand jury

---

*Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh*, 53 DePaul L. Rev. 1591, 1596 (2004).

retain the power to decide which defendants should receive a sentence of death upon conviction. Moreover, as argued earlier, the process that was followed violated Mr. Christensen's Fifth and Sixth Amendment rights to have all elements of the crime submitted to the grand jury for its consideration. *See Jones*, 526 U.S. at 251-52.

The elements of capital murder include decisions reached by the jury right up to the point where it makes a fact-finding that the aggravating circumstances actually outweigh the mitigating circumstances to a sufficient degree that a sentence of death is justified. In truth, then, the "selection" decision is not made until the jury reaches the final decision-point of determining "whether all the aggravating factors found to exist *sufficiently* outweigh all the mitigating factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e) (emphasis added). A simple "outweighing" is not enough. As a matter of human experience, one can imagine a conscientious juror reaching the conclusion that, although the aggravating circumstances do barely tip the balance in favor of death, the degree to which that balance tips is not sufficient to justify imposition of a sentence of death. It is not until the moment that the finding of sufficient outweighing is made that the defendant's potential punishment increases to death. Recall Justice Scalia's point:

> [All] facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

*Ring*, 436 U.S. at 610 (Scalia, J., concurring.)

42

Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and mitigating factors. That is precisely why, as argued in these motions, the legislature needs to amend this statute. It is not the role of courts and prosecutors to "fix" a statute that no longer reflects what congress intended. The grand jury's failure to indict on all elements of capital murder – even assuming the viability of a "*Ring* fix" – means the notice must be dismissed.

**D.      The non-statutory aggravating factors alleged in the death notice must be dismissed because they are not supported by the indictment.**

In *United States v. Green*, 372 F. Supp. 2d 168 (D. Mass. 2005), Judge Gertner examined the issue of whether a non-statutory aggravating factor of unadjudicated criminal activity alleged in a death notice should be stricken under the Fifth Amendment because the factor had not been previously found by the grand jury. Holding that the factor must be stricken, she relied primarily on *Blakely*'s mandate that "every defendant [has]  · · · the right to insist that the prosecutor prove to a jury *all facts legally essential to the punishment*." *Id.* (emphasis added). She reasoned that "any aggravating factor is 'legally essential to punishment' because, while not linearly triggering a higher sentence within the statutory maximum, as Federal Sentencing Guidelines factors do, it may effectively tip the scale from life to death in combination with the other factors at play." *Id.* at 177-178. She continued:

> The FDPA makes the death penalty jury a sentencing jury,
> not only conducting fact-finding, as any jury does, but also
> weighing aggravating and mitigating facts for the purpose
> of determining punishment, as judges typically do. The

43

penalty jury's unique role muddies the distinction between offense facts, traditionally screened by grand juries, and sentencing facts, which traditionally went unscreened.

The trilogy of *Apprendi*, *Ring*, and *Blakely* further conflates the line between sentencing facts and offense facts. *Blakely* explicitly rejected methodical distinctions between formal offense elements and sentencing factors, holding that all facts "essential" to punishment must be treated to the formalities of grand jury presentment and a jury trial. The Supreme Court specifically deemed it an "absurd result" that "the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors – no matter how much they may increase the punishment – may be found by the judge." *Blakely*, 124 S.Ct. at 2539. Even the government agrees that certain "sentencing facts"– here the listed statutory aggravating factor – must be screened by a grand jury.

Moreover, once a defendant is deemed death-eligible, the FDPA requires that the penalty jury impose the death penalty only if the aggravating factors "sufficiently outweigh" the mitigating factor or factors. 18 U.S.C. § 3593(e). This burden is not optional. Even if the defendant presents no mitigating factors, to return a sentence of death after the first two death-eligibility burdens have been met, the jury must find that the aggravating factors "alone are sufficient to justify a sentence of death." *Id.* Because we will never know exactly how each factor influences the jurors' ultimate punishment determination, logic dictates that all aggravating factors – together – be considered legally essential to the punishment. Indeed, the government's argument that non-statutory factors are not essential is disingenuous; if the government does not require additional evidence to convince the jury to vote for death, why is it invoking non-statutory factors at all?

*Id.* at 177.

Judge Gertner limited her holding to unadjudicated criminal activity, finding on

the basis of Supreme Court precedent that unadjudicated criminal activity, in particular, required the procedural protection of grand jury screening. *Id*. at 180-182. However, the court's logic is obviously applicable to all non-statutory aggravating factors, as is made clear in *United States v. Mills*, 446 F. Supp. 2d 1115 (C.D. Cal. 2006).

In *Mills*, Judge Carter considered whether the Confrontation Clause was applicable to evidence offered to prove non-statutory aggravating factors. He concluded that the Confrontation Clause was applicable based on his analysis that non-statutory aggravating factors were elements under *Apprendi*, *Ring*, and *Blakely*. He began by noting that "[w]hile the Court finds the reasoning in *Green* persuasive, *Green* fails to consider *Booker's* lesson that there are some facts – those which are not binding on the court – that do not rise to the level of constitutional significance. From the Court's perspective, *Booker* and *Blakely* appear to present three potential applications to the issue of confrontation during the selection portion of the penalty phase: (1) pure fact-finding; (2) pure sentencing discretion; and (3) constitutionally significant fact-finding." *Id*. at 1133.

Judge Carter acknowledged that if, as *Green* held, *Booker* and *Blakely* applied to pure fact-finding, then the implication was that non-statutory aggravating factors, as well as the ultimate weighing decision on penalty, were elements under the *Ring* line of cases, as argued above:

> In *Blakely*, the Court relied on *Apprendi* in striking down
> Washington's sentencing guideline scheme that permitted
> the judge to impose a sentence higher than the standard

45

range if he found certain aggravating factors justifying a departure. 542 U.S. at 299, 304-05, 124 S.Ct. 2531. The Court held: Our precedents make clear . . . that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. . . ." In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," . . . and the judge exceeds his proper authority. *Id*. at 303-04, 124 S. Ct. 2531 (internal citations omitted).

As to pure fact finding, one could take *Blakely* literally, to mean that the judge may impose the death penalty "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S. Ct. at 2531; *see* 18 U.S.C. § 3594 (requiring court to impose sentence on recommendation of jury). Thus, the Sixth Amendment's protections would no longer stop once the jury has found a statutory aggravating factor and a statutory intent factor. Even if these facts have been found, the judge still cannot impose a death sentence under the FDPA until the jury has found that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." *See* 18 U.S.C. §§ 3593(e), 3594. Thus, if steps three through six are fact finding, placement of the weighing after the jury has already engaged in the eligibility determination is not dispositive.

*Id*. at 1131-33.[13]

---

[13] In a footnote, the court noted that "[s]everal state supreme courts have determined that 'weighing' is a factual determination" *id*. (citing *State v. Whitfield*, 107 S.W.3d 253, 261 (Mo. 2003); *Woldt v. People*, 64 P.3d 256, 265-66 (Colo. 2003); *Johnson v. State*, 59 P.3d 450 (2002). And in the case of *Rauf v.*

Instead of reaching this issue, he focused instead on non-statutory aggravating factors, which he reasoned were elements because they involved "constitutionally significant fact finding":

> Under the Act, the jury is required to find these facts unanimously and beyond a reasonable doubt. 18 U.S.C. §3593(c). The jury may consider only the factors upon which it has rendered such a finding when it weighs the factors in aggravation and mitigation. 18 U.S.C. § 3593(d). Further, a jury renders these findings after a contested adversarial hearing that bears many of the features of a trial. *See* 18 U.S.C. § 3593(b)-(e). The Court finds that these features of the Act render steps three and four significantly different than the judicially found facts that inform a court's calculation of the now non-binding Guidelines. In essence, the FDPA completely limits the jury's discretion until it has rendered its findings on the aggravating factors (whether statutory or non-statutory). Only upon finding these facts is the jury permitted to move on to the more discretionary task of finding the mitigating factors, and the broadly discretionary task of weighing aggravation against mitigation. 18 U.S.C. § 3593(c)-(e). Because of these fundamental structural differences, findings on the aggravating factors bear many of the hallmarks of constitutionally significant facts falling under the ambit of *Blakely*.

> It is possible that the jury could return a verdict of death without finding any additional aggravating facts, provided the proven aggravator alone is sufficient to outweigh whatever mitigation has been found. *See* 18 U.S.C. § 3593(e). However, given the allocation of fact- finding and discretionary tasks under the FDPA, the Court finds that this possibility alone is not sufficient to render these facts

*Delaware*, 145 A.3d 430 (Del. 2016), the Delaware Supreme Court, relying on *Hurst v. Florida*, 136 S. Ct. 616 (2016), held that the "weighing" of aggravating factors against mitigating factors is a factual determination that only the jury, and not the judge, could determine, and that determination must be found by proof beyond a reasonable doubt.

> constitutionally insignificant for the purposes of
> confrontation.

*Id*. at 1134-1135.

The reasoning of *Green* and *Mills* is persuasive and should be followed here. Although *Green* only addressed one particular class of non-statutory aggravating factors and *Mills* addressed the Sixth Amendment Confrontation Clause, *Green* correctly points out that "[t]he FDPA already complies with *Ring's* holding in the sense that it requires a jury to find both statutory and non-statutory aggravating factors. Although *Ring* does not address the Fifth Amendment, other Supreme Court and circuit court opinions have paired Fifth and Sixth Amendment protections. And, as *Ring* and some state courts following it have suggested, these procedural protections apply to more than one aggravating factor when the government presents multiple aggravating factors." 372 F. Supp. 2d at 179. *See also United States v. Barrett*, 496 F. 3d 1079, 1107 (10th Cir. 2007) ("The Court's *Apprendi* line of cases reveals that the reasonable doubt standard is appurtenant to the right to jury trial.")

In this case, as indicated above, the death notice alleges numerous non-statutory aggravating factors. None of them are alleged in the indictment. Because Mr. Christensen was entitled under the Fifth Amendment Indictment Clause to grand jury screening of these factors, the non-statutory aggravating factors alleged in the Notice of Intent must be stricken. *Id*. (citations omitted). Similarly, to permit the government to obtain from a grand jury an indictment alleging the elements of a capital offense, but

not informing the grand jury that by finding those elements it was holding the defendant to answer to a capital crime, makes vulnerable those accused of the most serious crimes. If the grand jury is not informed of the capital nature of the offense, it cannot express the conscience of the community or perform its constitutionally assigned role as a "barrier . . . between the liberties of the people and the prerogative of the [government])." *Harris*, 536 U.S. at 564 (grand and petit juries "form a 'strong and two-fold barrier'").

For all of the foregoing reasons, the notice of aggravating factors should be stricken.

<u>POINT THREE</u>

THE FPDA FAILS TO PROVIDE A STRUCTURE WHICH PERMITS JURORS TO MAKE A REASONED CHOICE BETWEEN A SENTENCE OF LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE AND EXECUTION.

The FDPA has created a scheme that mixes concepts and burdens of proof, and results in an overall process which is likely incomprehensible to jurors. In the penalty phase of the trial, twelve jurors previously indoctrinated in the traditional culture of unanimity will be expected to understand that, unlike in the guilt phase, a lack of unanimity is not a failure but a legally cognizable outcome. Jurors schooled in the burden of proof in the guilt phase, *beyond a reasonable doubt*, will be expected in the penalty phase to apply that burden to aggravating factors and another burden, *preponderance of the evidence*, to mitigating factors. Jurors will be expected to segregate the mental state threshold factors from aggravating and mitigating factors, and from the

weighing process, by not considering them in determining the appropriateness of a death sentence. In the final analysis, jurors are asked, under the FDPA, to determine at what point aggravating factors outweigh mitigating factors "sufficiently" to justify a sentence of death. It is unreasonable to expect even the most conscientious and reasonably intelligent jurors to parse this melange of concepts and come out with an understanding of the process or a principled verdict. This very real possibility of confusion causes the FDPA to be unconstitutional. In essence, the FDPA has returned the process to an era of un-guided discretion.

Because death is qualitatively different from other forms of punishment, the greater need for the reliability of the process by which a death sentence is arrived at has been long recognized. *See, e.g., Woodson*, 428 U.S. at 303-305. The Eighth and Fourteenth Amendments therefore require that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.).

A death penalty sentencing scheme that creates an unreasonable risk that jurors will misunderstand their role and their assignments violates the Eighth Amendment and the Due Process Clause. *See Simmons v. South Carolina*, 512 U.S. 154 (1994). In order for a jury's decision to impose a death sentence to withstand Eighth Amendment scrutiny, the jury's discretion must be "suitably directed and limited so as to minimize

the risk of wholly arbitrary and capricious action." *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980).

Study after study shows that jurors, no matter how sincere and well-intentioned, misunderstand what they are supposed to do during the penalty phase of a death penalty trial. One such study was detailed in C. Haney, L. Sontag and S. Constanzo, *Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death*, 50 J. of Social Issues 149- 176 (1994). The authors interviewed 57 capital jurors from 19 death penalty trials conducted under a California system that was very similar to the FDPA construct. Among the study's findings were the following:

- One third of the California jurors sampled focused in the penalty phase discussion solely on the nature of the crime itself in a way that essentially created a presumption of death;

- For many of the jurors, the absence of mitigation was the only reason given for the imposition of a death sentence, shifting the burden to the accused;

- The sampled jurors used their instructions to limit their consideration of some of the evidence admitted during the penalty phase, and to insulate themselves from the impact of their decision;

- Many of the sampled jurors dismissed mitigation evidence outright because they believed that mitigation evidence failed to "fit into" the rubric contained in the instructions, indicating a failure to understand what constituted mitigating evidence;

- 80% of the sampled jurors rejected mitigation evidence from their consideration because it did not directly reduce the defendant's responsibility for the crime

- 60% of the sampled jurors rejected mitigation evidence because

51

> it did not completely account for the defendant's actions;
>
> • Less than one third of the interviewed jurors demonstrated a workable understanding of what constituted mitigation evidence; and
>
> • 80% of the juries returning a death verdict did so believing that life imprisonment without the possibility of parole did not really mean life without parole.

Other studies have demonstrated a similarly alarming and comprehensive misunderstanding of the sentencing mission in general, and mitigation in particular, among jurors deciding death penalty cases. *See, e.g.*, C. Haney and M. Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions*, 18 L. and Hum. Behav. 411-436 (1994); P.M. Tiersma, *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, Utah L. Rev. 1 (1995); J. Luginbuhl, *Comprehension of Judges' Instructions in the Penalty Phase of a Capital Trial: Focus on Mitigating Circumstances*, 16 L. and Hum. Behav. 203 (April 1992); M. Constanzo and S. Constanzo, *Jury Decision Making in the Capital Penalty Phase: Legal Assumptions, Empirical Findings and a Research Agenda*, 16 L. and Hum. Behav. 185 (1992). Juries in actual death penalty cases often believe, completely erroneously, that once an aggravating factor has been found, death is mandatory. *See, e.g.*, U. Bentele and W.J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse*, 66 Brook. L. Rev. 1011, 1031-41 (2001).[14]

---

[14] The article draws on the findings of the Capital Jury Project, an ongoing study funded by the National Science Foundation of decision-making actual jurors in actual capital cases. As noted in the article, at the

Indeed, statistically valid surveys of capital-case jurors show that a substantial

number of jurors who actually serve on capital cases *automatically* vote for death if the

defendant is found guilty of murder. *See, e.g.,* W. S. Geimer & J. Amsterdam, *Why Jurors*

*Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials*, 15 Am. J. Crim. L.

1, 41 (1989) ("A significant number of jurors in death penalty cases believed that the

death penalty was mandatory or presumed for first degree murder . . .  In the cases in

which the jury recommended death, over half of the jurors believed that death was to be

the punishment for first degree murder, or at least that death was to be presumed

appropriate unless defendant could persuade the jury otherwise"); S. P. Garvey,

*Aggravation and Mitigation in Capital Cases: What do Jurors Think?* 98 Colum. L. Rev. 1538

(1998) ("Many jurors wrongly think they must return a death sentence if they find the

defendant's crime was especially heinous, or the defendant is especially likely to

present a risk of future danger"); T. Eisenberg, S. P. Garvey & M. T. Wells, *Jury*

*Responsibility in Capital Sentencing: An Empirical Study*, 44 Buff. L. Rev. 339, 360 (1996)

("Nearly one-third of the jurors were under the mistaken impression that the law

required a death sentence if they found heinousness or dangerousness, a result

replicated in the multi-state study of the interview data"); W. J. Bowers, *The Capital Jury*

---

time it was written the ongoing CJP had completed interviews of 1,155 capital jurors from 340 trials in 14
states. 66 Brook. L. Rev. at 1017. For a full description of the Project, and its methodology, see W.J.
Bowers, *The Capital Jury Project: Rationale, Design & Preview of Early Findings*, 70 Ind. L. J. 1043,
1079 (1995). Professor William J. Bowers, who holds a Ph.D. in Sociology, is a Principal Research
Scientist at the College of Criminal Justice, Northeastern University, and serves as the Principal
Investigator for the Capital Jury Project. *Id.* at 1011, n. ††.

*Project: Rationale, Design and Preview of Early Findings*, 70 Ind. L. J. 1043, 1091, n. 32 (1995) ("Many jurors believe that the death penalty is mandatory if the crime is heinous or vicious"); W. J. Bowers, M. Sandys & B. Steiner, *Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 Cornell L. Rev. 1476 (1998) ("There appears to be a presumption that clear unequivocal proof of guilt justifies the death penalty); T. Eisenberg and M. T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 Cornell L. Rev. 1, 12, 38n.12 (1992) ("There is a 'presumption of death'"):

> [Our] data suggest that the sentencing phase of a capital trial commences with a substantial bias in favor of death. This is not in and of itself an indictment of the death trial phase. But the tilt towards death suggests that a defendant with a confused jury may receive the death sentence by default, without having a chance to benefit from the legal standards deigned to give him a chance for life.

*Id.* at 38 *n.* 12. These and other studies show that jurors in death penalty cases misunderstand what they are permitted to consider much more often than not, and that instructions rarely cure the profound misunderstandings.

The most comprehensive study to date on the actual means by which death sentences are meted out is, as noted earlier, the one undertaken by the Capital Jury Project. The Capital Jury Project ("CJP") is a consortium of studies of the methods of death penalty juries over a long period of time. Supported by the National Science Foundation, the CJP had, by 2003, interviewed 1201 members of 354 different juries sitting in death penalty cases in 14 states. See W. J. Bowers and W. Foglia, *Still Singularly*

*Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. L. Bull. 51 (2003). In June of 2007, a New Mexico state district judge dismissed the death notice in a case in part because of the findings of the CJP.[15]

Those findings include the propensity (more than 50% of the time) by juries to decide the penalty issues before the penalty phase begins, which means that the jurors never allow mitigation into their deliberations; a comprehensive lack of understanding of what constitutes mitigation and how it applies; a broad-based lack of understanding of the instructions given by the judge; and that the jury decision-making process in death penalty cases is so flawed that it violates constitutional principles. For example, the CJP's comprehensive, on-the-ground research on these issues demonstrate that even in jurisdictions in which the jurors are specifically instructed that they do not have to unanimously find mitigating factors, or that mitigating factors are not restricted to a statutory list, a terrifying percentage of the jurors never grasped those critical features of the law.  *Id.* at 68-69.

The CJP's findings provide a window into a process which has been designed with as much care as this politically sensitive issue permits, but which in practice is grossly arbitrary, unfocused and very often influenced by racial factors. The CJP underscores what seems obvious – that this process is insufficiently narrowed and focused to be constitutional. A jury's decision on whether or not a defendant should be

---

[15] *State v. Dominguez*, D-0101-CR 200400521, *State v. Good*, D-0101-CR- 00522, order entered June 8, 2007.

put to death appears to have little to do with the instructions given by the court or the care with which the process has been constructed or managed. The FDPA is unconstitutional as applied.

The Supreme Court's decisions in various death penalty cases are based on assumptions shown by the CJP's research to be unfounded. For example, in *Boyde v. California*, 494 U.S. 370 (1990), the Court's decision was based on inaccurate assumptions about how the jurors assessed categories of information presented during trial. Likewise, the Court's decision in *Tuilaepa v. California*, 512 U.S. 967 (1994), included the conclusion that instructions given to the penalty phase jurors to guide their handling of aggravating factors, mitigating factors and the various burdens of proof were "phrased in conventional and understandable terms." *Id*. at 976. Conventional as the instructions may be, the CJP research clearly demonstrates that they are not understandable to jurors. In *Tuilaepa*, the Court said that whether a penalty phase instruction is constitutional depends on whether it has a "common sense core of meaning . . . that criminal juries should be capable of understanding." *Id*. at 975. The perhaps most shocking lesson from the CJP is that criminal juries are incapable of understanding and applying the trial court's instructions. Underthe reasoning of *Tuilaepa*, the instructions, and the process and overarching scheme which has produced them, is unconstitutional. The Supreme Court's decisions upholding the death penalty are based on assumptions which are belied by the most reliable empirical evidence available. Rory Little, an Associate Deputy Attorney General from 1996-1997 who served on the capital case

56

review committee, wrote an article about this process. *See R. Little*, *supra,* 26 Firrd.. Urb. L. J. 347.  In that article he writes that, given  the "generality of these statutory aggravating factors and their commonality in many murders [] considered together with the added authority to invoke non-statutory aggravating factors, it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense." *Id*. at 402.

This Court should declare the FDPA unconstitutional and permit this case to proceed as a non-death penalty case. In the alternative, Mr. Christensen requests that an evidentiary hearing be scheduled to permit the presentation of expert testimony and empirical evidence in support of the argument that the FDPA is so incomprehensible to jurors as to prevent, or substantially impair, their performance in the task of deciding between a death sentence and a life sentence.

<u>CONCLUSION</u>

For the reasons set forth above, this Motion should be granted in all respects together with any and all such other relief as the Court deems just and proper. A hearing is requested on all disputed facts.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:    309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2018, I electronically filed the foregoing with
the Clerk of the Court using the CM/ECF system which will send notification of such
filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and
Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by State v. Mason, Ohio, April 18, 2018

145 A.3d 430
Supreme Court of Delaware.

Benjamin RAUF, Defendant–Appellant,

v.

STATE of Delaware, Plaintiff–Appellee.

No. 39, 2016
|
Submitted: June 15, 2016
|
Decided: August 2, 2016

**Synopsis**

**Background:** In prosecution for first-degree intentional murder, first-degree felony murder, and other offenses, after State announced its intention to seek the death penalty if defendant was convicted of either of the murder counts, the Superior Court, Paul R. Wallace, J., certified questions of law.

**Holdings:** The Supreme Court held that:

[1] Delaware's capital sentencing statute unconstitutionally allows a judge to find an aggravating circumstance for the weighing phase;

[2] Delaware's capital sentencing statute unconstitutionally fails to require jury unanimity regarding an aggravating circumstance for the weighing phase, overruling State v. Cohen, 604 A.2d 846;

[3] Delaware's capital sentencing statute unconstitutionally allows a judge rather than the jury to weigh aggravating and mitigating circumstances, overruling Brice v. State, 815 A.2d 314, Swan v. State, 28 A.3d 362, Ortiz v. State, 869 A.2d 285, Reyes v. State, 819 A.2d 305, and Norcross v. State, 816 A.2d 757;

[4] Delaware's capital sentencing statute unconstitutionally fails to require the finding that aggravating circumstances outweigh mitigating circumstances to be made beyond a reasonable doubt; and

[5] the unconstitutional procedures in the statute could not be severed.

Certified questions answered.

Strine, C.J., filed a concurring opinion, in which Holland and Seitz, JJ., joined.

Holland, J., filed a concurring opinion, in which Strine, C.J., and Seitz, J., joined.

Valihura, J., filed an opinion concurring in part and dissenting in part.

Vaughn, J., filed a dissenting opinion.

West Headnotes (6)

[1]     **Jury**
        👉 Statutory provisions
        **Sentencing and Punishment**
        👉 Procedure

Delaware's capital sentencing statute violates the Sixth Amendment by allowing a sentencing judge in a capital jury proceeding, independent of the jury, to find the existence of an aggravating circumstance, statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of the capital sentencing proceeding. U.S. Const. Amend. 6; 11 Del. Code § 4209(d)(1).

8 Cases that cite this headnote

[2]     **Jury**
        👉 Statutory provisions
        **Sentencing and Punishment**
        👉 Procedure

Delaware's capital sentencing statute violates the Sixth Amendment by failing to require unanimity for the jury's finding, beyond a reasonable doubt, of an aggravating circumstance, statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of the capital sentencing

proceeding; overruling *State v. Cohen*, 604 A.2d 846. U.S. Const. Amend. 6; 11 Del. Code § 4209(c)(3)(b)(2).

2 Cases that cite this headnote

**[3]** **Jury**
👉 Statutory provisions

**Sentencing and Punishment**
👉 Procedure

Delaware's capital sentencing statute violates the Sixth Amendment by failing to require the jury, rather than the sentencing judge, to make the critical finding that the aggravating circumstances outweigh the mitigating circumstances; overruling *Brice v. State*, 815 A.2d 314, *Swan v. State*, 28 A.3d 362, *Ortiz v. State*, 869 A.2d 285, *Reyes v. State*, 819 A.2d 305, and *Norcross v. State*, 816 A.2d 757. U.S. Const. Amend. 6; 11 Del. Code § 4209.

1 Cases that cite this headnote

**[4]** **Jury**
👉 Statutory provisions

**Sentencing and Punishment**
👉 Procedure

Delaware's capital sentencing statute violates the Sixth Amendment by allowing a finding by a preponderance of the evidence, rather than beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating circumstances. U.S. Const. Amend. 6; 11 Del. Code § 4209.

4 Cases that cite this headnote

**[5]** **Statutes**
👉 Criminal justice

The unconstitutional procedures in Delaware's capital sentencing statute could not be severed from the remainder of the statute, because the respective roles of the judge and jury were so complicated under the statute and the court was unable to discern a method by which to parse the statute so as to preserve it, and thus, the entire statute was

unconstitutional. U.S. Const. Amend. 6; 11 Del. Code § 4209.

4 Cases that cite this headnote

**[6]** **Jury**
👉 Death penalty

**Sentencing and Punishment**
👉 Unanimity

The Sixth Amendment right to a jury trial extends to all phases of a death penalty case, and specifically to the ultimate sentencing determination of whether a defendant should live or die, and although states may give judges a role in tempering the harshness of a jury or in ensuring proportionality, they may not execute a defendant unless a jury has unanimously recommended that the defendant should suffer that fate. (Per Strine, C.J., for a majority of the court.) U.S. Const. Amend. 6.

3 Cases that cite this headnote

**West Codenotes**

**Held Unconstitutional**
11 Del. C. § 4209

**\*432** Certification of questions of law from the Superior Court. Questions answered. Cr. ID No. 1509009858

**Attorneys and Law Firms**

Santino Ceccotti, Esquire (Argued), Ross A. Flockerzie, Esquire, David C. Skoranski, Esquire, Office of the Public Defender, Wilmington, Delaware for Appellant.

Elizabeth R. McFarlan, Esquire, John R. Williams, Esquire, Sean P. Lugg, Esquire (Argued), Delaware Department of Justice, Wilmington, Delaware for Appellee.

Elena C. Norman, Esquire, Kathaleen St. J. McCormick, Esquire, Nicholas J. Rohrer, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Marc Bookman, Esquire, Atlantic Center for Capital

Representation, Philadelphia, Pennsylvania, Amicus Curiae for the Atlantic Center for Capital Representation.

Jeffrey S. Goddess, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; G. Ben Cohen, Esquire, The Promise of Justice Initiative, New Orleans, Louisiana, Amicus Curiae for the Charles Hamilton Houston Institute for Race and Justice.

Richard H. Morse, Esquire, American Civil Liberties Union Foundation of Delaware, Wilmington, Delaware; Cassandra Stubbs, Esquire, Brian W. Stull, Esquire, American Civil Liberties Union Capital Punishment Project, Durham, North Carolina, Amicus Curiae for the American Civil Liberties Union Foundation of Delaware and the American Civil Liberties Union Capital Punishment Project.

Before STRINE, Chief Justice; HOLLAND, VALIHURA, VAUGHN, and SEITZ, Justices, constituting the Court en Banc.

**Opinion**

PER CURIAM of Chief Justice Strine, Justice Holland, and Justice Seitz:

The State has charged the Defendant, Benjamin Rauf with one count of First Degree Intentional Murder, one count of First Degree Felony Murder, Possession of a Firearm During those Felonies, and First Degree Robbery. The State has expressed its intention to seek the death penalty if Rauf is convicted on either of the First Degree Murder counts. On January 12, 2016, the United States Supreme Court held in *Hurst v. Florida* that Florida's **\*433** capital sentencing scheme was unconstitutional because "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." [1] On January 25, 2016, the Superior Court certified five questions of law to this Court for disposition in accordance with Supreme Court Rule 41. On January 28, 2016, this Court accepted revised versions of the questions certified by the Superior Court and designated Rauf as the appellant and the State as the appellee. [2]

In this case, we are asked to address important questions regarding the constitutionality of our state's death penalty statute. The Superior Court believed that *Hurst* reflected an evolution of the law that raised serious questions about the continuing validity of Delaware's death penalty

statute. Specifically, *Hurst* prompted the question of whether our death penalty statute sufficiently respects a defendant's Sixth Amendment right to trial by jury.

Because answering the certified questions requires us to interpret not simply the Sixth Amendment itself, but the complex body of case law interpreting it, we have a diversity of views on exactly why the answers to the questions are what we have found them to be. But that diversity of views is outweighed by the majority's collective view that Delaware's current death penalty statute violates the Sixth Amendment role of the jury as set forth in *Hurst*. We also have a shared belief that the importance of the subject to our state and our fellow citizens, reflected in the excellent briefs and arguments of the parties, makes it useful for all the Justices to bring our various perspectives to bear on these difficult questions.

For the sake of clarity, we set forth the five questions asked and the succinct answers to them.

### Question One

**[1]** Under the Sixth Amendment to the United States Constitution, may a sentencing judge in a capital jury proceeding, independent of the jury, find the existence of "any aggravating circumstance," statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding?

**No.** Because Delaware's capital sentencing scheme allows the judge to do this, [3] it is unconstitutional.

### Question Two

**[2]** If the finding of the existence of "any aggravating circumstance," statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding **\*434** must be made by a jury, must the jury make the finding unanimously and beyond a reasonable doubt to comport with federal constitutional standards?

**Yes.** The jury must make the finding unanimously and beyond a reasonable doubt. Because the Delaware death

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

penalty statute does not require juror unanimity,[4] it is unconstitutional.

### Question Three

[3]  Does the Sixth Amendment to the United States Constitution require a jury, not a sentencing judge, to find that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist because, under 11 *Del. C.* § 4209, this is the critical finding upon which the sentencing judge "shall impose a sentence of death"?

**Yes.** Because Delaware's death penalty statute does not require the jury to perform this function,[5] it is unconstitutional.

### Question Four

[4]  If the finding that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist must be made by a jury, must the jury make that finding unanimously and beyond a reasonable doubt to comport with federal constitutional standards?

**Yes**. We answer question four in the identical manner in which we have answered question two.

### Question Five

[5]  If any procedure in 11 *Del. C.* § 4209's capital sentencing scheme does not comport with federal constitutional standards, can the provision for such be severed from the remainder of 11 *Del. C.* § 4209, and the Court proceed with instructions to the jury that comport with federal constitutional standards?

**No.** Because the respective roles of the judge and jury are so complicated under § 4209, we are unable to discern a method by which to parse the statute so as to preserve it. Because we see no way to sever § 4209, the decision whether to reinstate the death penalty—if our ruling ultimately becomes final—and under what procedures, should be left to the General Assembly.

*Summary*

This Court's prior cases on the constitutionality of Delaware's capital sentencing scheme are hereby overruled to the extent they are inconsistent with the answers in this opinion. Having answered the certified questions, the Clerk is directed to transmit the opinions in this matter to the Superior Court.

STRINE, Chief Justice, concurring in the Majority per curiam, with whom Justice HOLLAND and Justice SEITZ join:

### I.

I join with a majority of my colleagues in concluding that Delaware's current death penalty statute conflicts with the Sixth Amendment of the United States Constitution. The importance and complexity of the subject before us is illustrated by  **\*435**  the somewhat different ways that each of us approach how the questions put to us should be answered and why they should be answered "yes," "no," or not answered in part. I agree with the succinct answers given to the five certified questions before us in the Majority's *per curiam* opinion, in which I happily and fully join. The questions posed involve the application of a fundamental constitutional right that is easy to state—the right to a trial by a jury—but that has been the subject of complex judicial explication during the past forty-four years since *Furman v. Georgia*[1] made the administration of the death penalty a constant subject of federal constitutional rulings. Given these decisions and the compelling importance of the subjects we now must address, I therefore burden the interested reader with an explanation of how I reached the answers I did. The core of my reasoning, however, is as follows.

Distilled to their essence, the most critical questions before us ask whether the Sixth Amendment requires a jury, rather than a judge, to make all of the factual findings in capital sentencing—including balancing those factors for itself in assessing whether death is the appropriate punishment—and, if so, whether the jury must make such findings unanimously and beyond a reasonable doubt. Although I acknowledge that the meaning of *Hurst v. Florida*[2] is contestable, it states that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact

necessary to impose a sentence of death." [3] A combination of settled U.S. Supreme Court cases makes it impossible for a state to enact a statute under which a defendant must receive the death penalty if he is convicted. Rather, even if a jury unanimously finds that a defendant is guilty of a crime that is punishable by death—by for example, finding that a defendant has committed a particular type of murder for which the legislature has said death is a possible penalty—additional findings must be made. To sentence a defendant to death, the sentencing authority must consider all relevant factors bearing on whether the defendant should live or die, weigh those factors rationally against each other, and make an ultimate determination of whether the defendant should die or receive a comparatively more merciful sentence, typically life in prison. The option for the sentencing authority to give a prison sentence, rather than a death sentence, must always exist. After consideration of these factors and a determination that the balance of the relevant factors weighs in favor of a death sentence, the defendant cannot receive a death sentence.

For these reasons, if the core reasoning of *Hurst* is that a jury, rather than a judge must make all the factual findings "necessary" for a defendant to receive a death sentence, [4] then Delaware's statute cannot stand. Because our General Assembly has acted with alacrity to address the mandates of the U.S. Supreme Court, our statute necessarily mandates a fact-intensive inquiry at the ultimate stage of sentencing, in which the factors that aggravate toward a death sentence and mitigate against it are considered and weighed. This application of the sentencing authority's judgment, conscience, and experience to the facts of record is what drives the ultimate decision whether the defendant should live or die. Without that exercise, no defendant **\*436** can receive a death sentence consistent with the principles established by U.S. Supreme Court cases pre-dating *Hurst*.

I recognize that this reading of *Hurst* is contestable, and that *Hurst* can be read as simply reiterating that any factual finding that makes a defendant eligible to receive the death penalty must be made by the jury. Under that approach, once a jury has done all that is statutorily required to make death a permissible punishment, the jury's constitutionally required role goes away entirely and the use of a jury at all is optional. Past case law, whose reasoning is in sharp tension with the central reasoning

of *Hurst* and its predecessors such as *Apprendi v. New Jersey*, [5] embraces this narrow approach.

For myself, however, I find it impossible to embrace a reading of *Hurst* that judicially draws a limit to the right to a jury in the death penalty context to having the jury make only the determinations necessary to make the defendant eligible to be sentenced to death by someone else, rather than to make the determinations itself that must be made if the defendant is in fact to receive a death sentence. I am unable to discern in the Sixth Amendment any dividing line between the decision that someone is eligible for death and the decision that he should in fact die. The post-*Furman* jurisprudence has created a regime governing death penalty cases that is intricate in design and often in tension with itself. Candor requires an acknowledgment that that jurisprudence, although no doubt well-intended, has helped impel a reduction in the historical role of American juries in the death sentencing process in a small number of states, including our own.

At the beginning of our Republic and throughout most of its history, defendants did not go to the gallows unless juries said they should. And the role of the jury was seen as especially important when a defendant's life was in the balance, because it made sure that a defendant would suffer the ultimate punishment only if twelve members of the community deliberated together and unanimously concluded that should be so. To me, *Hurst* and its predecessors surface a reality that had been somewhat obscured in the development of the law in the decades since *Furman*, which is that the Sixth Amendment right to a jury is most important and fundamental when the issue is whether a defendant should live or die. As the U.S. Supreme Court has long recognized, death is different. The proposition that any defendant should go to his death without a jury of his peers deciding that should happen would have been alien to the Founders, and starkly out of keeping with predominant American practices as of the time of *Furman* itself. The cost of useful precedent mandating that each defendant who commits a capital offense must also be accorded a rational sentencing proceeding that must include a careful consideration of those factors weighing in favor of mercy does not have to include depriving the defendant of the fundamental protection of a jury having to make the final judgment about his fate. If the right to a jury means anything, it means the right to have a jury drawn from the community and acting as a proxy for its diverse views and mores,

rather than one judge, make the awful decision whether the defendant should live or die.

 **[6]**  I therefore give *Hurst* its plain meaning and concur in the *per curiam* opinion's answers to the questions before us. Under our statute that faithfully respects the requirement to consider all relevant sentencing factors and allow a death penalty only after those factors are  **\*437** weighed and the option for mercy is considered, findings beyond the eligibility stage are necessary if a defendant is to receive a death sentence. Thus, our statute cannot stand. And to put my opinion in more basic terms, I embrace the notion that the Sixth Amendment right to a jury extends to all phases of a death penalty case, and specifically to the ultimate sentencing determination of whether a defendant should live or die. Although states may give judges a role in tempering the harshness of a jury or in ensuring proportionality, they may not execute a defendant unless a jury has unanimously recommended that the defendant should suffer that fate.

I also note that this same result can be reached by a more oblique and alternative route, which is holding that the practice of executing a defendant without the prior unanimous vote of a jury is so out of keeping with our history as to render the resulting punishment cruel and unusual. The jury's historical role as an important safeguard against overreaching in this most critical of contexts was recognized at the founding, and prevails in most states today, making our own state one of the few outliers. *Hurst* recognizes the centrality of the jury's historic role, and my opinion gives effect to that recognition.

Consistent with this reasoning, I also conclude that the Delaware death penalty statute is inconsistent with the Sixth Amendment to the extent that it does not require a unanimous jury to make the key discretionary findings necessary to impose a death sentence by employing a beyond a reasonable doubt standard. From the inception of our Republic, the unanimity requirement and the beyond a reasonable doubt standard have been integral to the jury's role in ensuring that no defendant should suffer death unless a cross section of the community unanimously determines that should be the case, under a standard that requires them to have a high degree of confidence that execution is the just result.

## II.

To explain how I address the certified questions and the U.S. Supreme Court cases that occasion the certified questions before us, it is critical to understand, at least in rough outline, how we as a nation and state got to where we are in the administration of the death penalty, and how different things look from when our nation was founded. By necessity, my recitation of this process is truncated, involves some simplification of a very complicated subject, and is compromised by the reality that I am a judge, and do not claim to be a historian. That said, I am aided by the many scholars and lay commentators who have lucidly outlined the basic directional facts.[6]

At the beginning of our Republic, prisons of the kind we now have, where many defendants spend lengthy periods of their lives, were unknown.[7] Instead, nearly all  **\*438** felonies carried mandatory death sentences,[8] as was traditional in England—the primary example upon which our criminal justice system was built.[9] Because of greater American antipathy toward the death penalty, however, American criminal statutes had already begun to narrow the long list of crimes for which death was the mandatory sentence.[10] For example, in the 1790s, Pennsylvania became the first state "to alleviate the undue severity of the law by confining the mandatory death penalty to 'murder of the first degree,' "[11] a trend that would gain momentum.[12]

From the beginning of our nation's history, the jury's role as the sentencer in capital cases "was unquestioned."[13] This was true in Delaware, where juries made the life or death decision at the beginning of our history.[14] And, without any exception I have been able to identify, no defendant was put to death in the early stages of our nation's history without a jury making all the necessary determinations required.[15] Of course, it is a bit of a misnomer to say that juries "sentenced" defendants to death. Capital trials were not bifurcated, and "[t]he question of guilt and the question of death both were decided in a single jury verdict at the end of a single proceeding conducted as an adversarial trial."[16] But, it would be even more inaccurate to say that the jury did not have an important role in exercising its discretion

and conscience in a manner that determined whether the defendant should live or die.

The starkest way in which juries did this was by acquitting a defendant who was obviously guilty. [17] By this crude action of **\*439** nullification, a jury could exercise its conscience by refusing to convict a guilty defendant precisely because the jury thought that death was too harsh a punishment for the crime. Rather than this practice of nullification leading to hostility to juries by our founding generation, it was seen as an example of the bedrock importance of the jury in securing the liberties of our citizens. [18] John Adams, for example, wrote: "It is not only [the juror's] right, but his duty ... to find the verdict according to his own best understanding, judgment, and conscience, though in direct opposition to the direction of the court." [19]

The practice of nullification also exposed an important community viewpoint that statute writers began to recognize, which is that crimes could be serious but yet not be considered so injurious to society as to always warrant a death sentence. Therefore, as Pennsylvania had done, states increasingly narrowed the felonies for which death was a mandatory sentence. [20] Degrees of murder were in large measure introduced to allow juries to convict a defendant of a degree of homicide while not exposing the defendant to death. And over time, jury discretion over sentencing was more candidly introduced, as several states moved to statutory regimes under which even a defendant convicted of the most serious of crimes —such as intentional murder—could nonetheless be given a sentence other than death. In the 1830s and 40s, the first states abandoned mandatory death sentences even in first degree murder cases and granted juries discretion in capital sentencing. [21] Our own General Assembly divided murder into two degrees in 1852, with first degree murder carrying a mandatory death sentence and second degree murder carrying various harsh, non-capital sentences. [22] This gave the jury an option to convict, but to exempt the defendant from death if its sense of mercy moved in that direction. [23]

About half of the states adopted discretionary statutes by 1900, and even more states followed soon after. [24] In 1899, the U.S. Supreme Court itself well-summarized some of the key developments:

The hardship of punishing with death every crime coming within the definition of murder at common law, and the reluctance of jurors to concur in a capital conviction, have induced American legislatures, in modern times, to allow some cases of murder to be punished by imprisonment, instead of by death. That end has been generally attained in one of two ways: First. In some states and **\*440** territories, statutes have been passed establishing degrees of the crime of murder, requiring the degree of murder to be found by the jury, and providing that the courts shall pass sentence of death in those cases only in which the jury return a verdict of guilty of murder in the first degree, and sentence of imprisonment when the verdict is guilty of murder in the lesser degree.... Second. The difficulty of laying down exact and satisfactory definitions of degrees in the crime of murder, applicable to all possible circumstances, has led other legislatures to prefer the more simple and flexible rule of conferring upon the jury, in every case of murder, the right of deciding whether it shall be punished by death or by imprisonment. [25]

Some exceptions to the jury tradition emerged, albeit in an unsavory context that actually underscores the importance of the right to a jury. A few states, unhappy with the rights accorded to black citizens by the Fourteenth and Fifteenth Amendments, cut back on unanimity requirements for juries, in order to mute the voice of newly eligible black jurors. [26] But even with these exceptions, the overall picture was remarkably consistent: Defendants received death sentences only when the jury determined they should. And that jury determination had to be unanimous. [27]

One byproduct of the jury's more explicit role in exercising sentencing discretion over whether a defendant should

live or die was the emergence of a greater judicial
**\*441** role in sentencing defendants convicted by juries
of committing a crime for which death was not a
possible sentence. Early in our history, those few crimes
that did not carry the death penalty had relatively
short, if any, prison sentences attached to them.[28] As
mentioned, the term "prison" was itself not the right
word, as we did not have an institutionalized system
for incarcerating defendants.[29] In England and then in
the early stages of our Republic, there was a tradition
of sentencing by judges in non-capital, misdemeanor
cases.[30] As society determined through law that not
all serious crimes should subject defendants to death
and that there needed to be other serious sentencing
options to fulfill objectives such as retribution and even
loftier goals such as rehabilitation, institutions such as
so-called "penitentiaries" where defendants could do
penance for their misdeeds emerged.[31] Consistent with
the tradition that judges had often decided on the
appropriate punishment when life or death was not the
binary choice, judicial sentencing for non-capital offenses
became more prevalent.[32] And, when the question was
not the stark one of life or death, but the more nuanced
one of what number of years a defendant should spend in
prison, judicial expertise was perhaps seen as valuable.

Before fast-forwarding to the status of these trends in
practice as of when *Furman* was decided in 1972, another
important factor must be considered. This evolution
of practices emerged without intrusion by the federal
Judiciary or the federal Constitution. One cannot find
U.S. Supreme Court cases addressing the constitutionality
of the various state approaches to these issues. That is
because it was not until 1932 that the U.S. Supreme
Court first began to apply the provisions in the Bill of
Rights protecting criminal defendants to the states.[33]
And the wave of cases holding that the Fourteenth
Amendment incorporated the procedural protections of
criminal defendants and that the states had to abide
by those protections to the same extent as the federal
government rose in the era after World War II and crested
in the 1960s.[34]

**\*442** Coincident with this wave was a general trend
toward making the death penalty rarer in application.
Some states went so far as to abolish the death penalty.[35]
Delaware even did that for a brief period, from 1958

to 1961.[36] Although Delaware then reenacted the death
penalty, it did so only for first degree murder. And the
Delaware statute made a death sentence for first degree
murder mandatory but with a safety valve involving the
jury. The jury could not only use the traditional means
of convicting of a lesser degree of murder as a way of
avoiding the imposition of a death sentence, but could
convict of first degree murder and recommend mercy
and a non-capital sentence to the judge[37]—a choice
juries did not have in the early years of Delaware's death
penalty.[38] This mercy safety valve was first instituted in
Delaware for murder cases in 1917.[39] In giving juries
discretion to exercise mercy, Delaware was consistent
with the overall trends in states that retained the death
penalty in the twentieth century.[40] But, by allowing the
sentencing judge to disregard that mercy recommendation
and instead impose death, Delaware was nearly alone.[41]
**\*443** "By the end of World War I, all but eight States,
Hawaii, and the District of Columbia either had adopted
discretionary death penalty schemes or abolished the
death penalty altogether. By 1963, all of these remaining
jurisdictions had replaced their automatic death penalty
statutes with discretionary jury sentencing."[42]

Given the continued centrality of the jury in capital
sentencing in the United States, it was perhaps mundane
for the Supreme Court to say in *Witherspoon v. Illinois*[43]
in 1968 that capital juries "express the conscience of the
community on the ultimate question of life or death."[44]
After all, as of the time *Witherspoon* was decided, jury
sentencing in capital cases was not only the norm, but
was used in all but two states.[45] By contrast, judicial
sentencing for non-capital cases had become prevalent,
with prison sentences the primary form of punishment for
most serious crimes. Importantly, it was only in this same
time period that the Supreme Court held in *Duncan v.
Lousiana*[46] that the Fourteenth Amendment incorporates
the Sixth Amendment's right to a jury trial.[47]

As of that time, the U.S. Supreme Court had still not
held that the Constitution placed any particular limits on
states' imposition of the death penalty. Before then, "the
death penalty was widely authorized" and states were not
required by any judicial mandate implementing the federal
Constitution to narrow the class of defendants eligible for
death or to otherwise ensure that the death penalty was

not applied in an arbitrary or discriminatory manner. [48] Consistent with the traditional lack of a federal role in these areas, the Supreme Court issued a decision in 1971 in *McGautha v. California*, [49] holding that a state did not need to provide capital sentencing juries with any kind of guidance or list of considerations to use in making the life-or-death determination. The Court explained why:

> In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution. The **\*444** States are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of defense counsel. [50]

By the beginning of the 1970s, the death penalty was being more sparingly applied than at any previous time in our nation's history, and public support for the death penalty was relatively low. [51] *McGautha* seemed to signal the Supreme Court's view that juries could, as a general matter, be trusted to exercise the awesome power historically entrusted to them of making the life or death decisions put to them without prescriptive federal judicial guideposts. Likewise, *McGautha* seemed to signal that the Supreme Court would allow death penalty law to continue to evolve based on determinations by state legislatures. But that, of course, did not turn out to be the case.

### III.

The very next year, in 1972, *Furman v. Georgia* upset the traditions and destabilized the foundations on which state death penalty statutes stood, causing some states to respond with approaches that reduced the jury's role in the death penalty sentencing process. [52] In *Furman*,

the Supreme Court reviewed two Georgia Supreme Court decisions, which affirmed death sentences for a defendant convicted of murder and a defendant convicted of rape, and one Texas Supreme Court decision, which affirmed a death sentence for a defendant convicted of rape. [53] In each of the death statutes at issue, "the determination of whether the penalty should be death or a lighter punishment was left by the State to the discretion of the judge or of the jury." [54] Because there was a jury trial in each of the three cases, under the Georgia and Texas statutes a jury ultimately sentenced each of the defendants to death. [55]

The defendants in *Furman* argued that the Georgia and Texas statutes contained "unbridled discretion [that] made it impossible to rationally distinguish between those who would live and those who would die." [56] "Certiorari was granted limited to the following question: 'Does the imposition and carrying out of the death penalty in (these cases) constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments?' " [57] The splintered Court held that it did.

Although the Court struck down death sentences in the cases on appeal, it stopped short of holding the death penalty unconstitutional as a categorical matter. In **\*445** a one-paragraph *per curiam* opinion, the *Furman* majority held "that the imposition and carrying out of the death penalty *in these cases* constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." [58] But, like the situation we find ourselves in today, the Court's majority could not agree on exactly why that was so. [59] Three Justices, each authoring a separate concurring opinion, voted to strike down the death sentences because the death penalty statutes in question did not provide sufficient protections to ensure that the death penalty was not imposed in an arbitrary and capricious manner, and as a result, were applied in a racially discriminatory manner. [60] As one respected treatise explains it, the *Furman* plurality "held that the death penalty was so arbitrarily and randomly imposed that it violated the Eighth Amendment." [61] The views of the two other Justices who voted to overturn the convictions is easier to state: They viewed any imposition of the death penalty to any defendant to be cruel and unusual punishment, and therefore as unconstitutional under the Eighth and Fourteenth Amendments. [62]

Despite the lack of consensus, *Furman* clarified that a capital sentencing scheme must meet a basic hurdle to avoid violating the Eighth Amendment: "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." [63] In other words, what *Furman* established is that the sentencer in a capital case cannot have "unbridled discretion" in sentencing a defendant. [64]

### IV.

Given that the common practice in the states before *Furman* was to give to the jury the discretion to impose a life or death sentence, *Furman* had the practical effect of "str[iking] down virtually every death penalty law nationwide," [65] and creating a de facto moratorium on executions. [66] In fact, "[w]hen the Supreme Court decided *Furman* in 1972, almost everyone—including the Justices themselves—believed that America had seen its last execution." [67] But after *Furman*, the prior **\*446** trends in the states reversed course. Instead of reacting to *Furman* by abolishing death penalty statutes as most people had expected, states responded by passing new death penalty statutes that they thought would satisfy the requirements *Furman* established. [68] Indeed, after *Furman* defendants again began being given death sentences at very high rates. [69]

To avoid arbitrariness and comply with the Eighth Amendment as interpreted in *Furman*, states experimented. Some states changed their capital sentencing schemes after *Furman* to allow the trial judge to make the ultimate life-or-death decision. [70] Many other states enacted mandatory statutes, which outlined a specific category of crimes for which the death penalty was the required sentence. [71] The rationale behind these statutes was an obvious response to *Furman*'s concern about arbitrariness and discrimination: If every defendant who committed a capital offense was subject to death, there would be no discrimination or arbitrariness in the sentencing process. Conviction would invariably equal death. [72]

Still other states took a different approach. To rationally narrow the crimes for which death was a possibility, states began to adopt more specific statutes under which a defendant would be eligible for a death sentence only if he was found to have committed, for example, not just a homicide, but a type of homicide that the statute identified as especially egregious and deserving of harsh punishment. [73] Thus, the post-*Furman* capital sentencing statutes often included lists of aggravating factors intended to narrow the scope of death eligible crimes and defendants. [74]

### V.

By the bicentennial, this period of legislative reaction had resulted in cases ripe for Supreme Court consideration. On July 2, 1976, the Supreme Court decided four cases that addressed the constitutional adequacy of several states' attempts to comply with *Furman*. The most famous of these so-called "July 2nd cases" was, of course, *Gregg v. Georgia*. [75] At issue in *Gregg* was the constitutionality of Georgia's capital sentencing scheme that was structurally similar to that which had been struck down in *Furman*, [76] but which attempted to address *Furman*'s requirements by "provid[ing] some sort of criteria to guide the jury's discretion in determining whether to impose death." [77] The Supreme Court upheld Georgia's new capital sentencing scheme and clarified that its holding in *Furman* was limited to the imposition of the death penalty in the specific Georgia and Texas cases at issue in *Furman* under the then-existing statutes. [78] In **\*447** keeping with what it then viewed as the popular opinion in the United States, [79] the Court held in *Gregg* "that the punishment of death does not invariably violate the Constitution," and specifically the Eighth Amendment. [80] And, the Court held that capital punishment is not a cruel and unusual punishment for the crime of murder, but is "an extreme sanction, suitable to the most extreme of crimes." [81]

Of equal importance to *Gregg*'s validation of state approaches involving what some have called "guided discretion" was the Supreme Court's rejection of mandatory statutes as an answer to its concerns over capricious imposition of the death penalty. In *Woodson v.*

*North Carolina*, [82] the Court reviewed the death sentences of four defendants who had been convicted of first degree murder resulting from their participation in an armed robbery. North Carolina was one of the states that amended their capital sentencing schemes after *Furman* to make death the mandatory sentence for eligible crimes. After "sketching the history of mandatory death penalty statutes in the United States," the Court noted that its findings "reveal[ ] that the practice of sentencing to death all persons convicted of a particular offense has been rejected as unduly harsh and unworkably rigid." [83] And, the Court observed, "a mandatory death penalty statute ... does not fulfill *Furman*'s basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." [84]

*Woodson* then observed that an additional "constitutional shortcoming of the North Carolina statute is its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." [85] The Court explained:

> [I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. *This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two.* Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the

appropriate punishment in a specific case. [86]

After *Woodson*, it was widely believed that states could not specify by statute a list of crimes for which conviction would automatically result in a death sentence. Although the Supreme Court had supposedly left open that the murder of a prison **\*448** guard by a prisoner might be an exception [87]—a possibility the Supreme Court later expressly rejected in 1987 [88]—commentators viewed the mandatory approach as having been soundly rejected. [89]

And in *Jurek v. Texas*, [90] the Supreme Court reviewed the conviction of a Texas man sentenced to death for murder. The Texas statute at issue required the sentencing jury to consider the aggravating factors during sentencing, but did not allow consideration of mitigating factors. The Supreme Court invalidated that statute, holding that "in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances." [91] "A jury," the Court reasoned, "must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." [92]

In the final July 2nd case, the Supreme Court upheld the capital sentencing schemes that were amended after *Furman* to switch from jury to judge sentencing in capital cases from an Eighth Amendment challenge. In *Proffitt v. Florida*, [93] the Court recognized "that jury sentencing in a capital case can perform an important societal function," but nevertheless explained that the Court had "never suggested that jury sentencing is constitutionally required." [94] Of course, *Proffitt* was decided only in 1976, less than a decade after the Court had first held that the Sixth Amendment right to a jury applied against the states. [95] And *Proffitt* never examined that there had not been much basis as of 1976 to ponder the question of whether a defendant had a right to have a jury make the final decision as to death, given the overwhelming historical prevalence of jury sentencing authority in that most sensitive of realms.

What followed *Gregg* and the other July 2nd cases was another wave of new death penalty statutes that confirmed that *Furman* and its progeny had unsettled tradition. [96]

Perhaps unsurprisingly, the complexity of the procedures necessary for states to implement the death penalty in a manner consistent with the Supreme Court's evolving case law raised new questions regarding the respective roles of judge and jury. [97] One consequence of the Supreme Court's jurisprudence was clear, which is that it was no longer practicable for a capital defendant to be subject to a singular proceeding after which his guilt and punishment were determined simultaneously, **\*449** because states could not establish a mandatory death sentence regime. [98] And, states were required to take steps to limit the arbitrariness in the application of the death penalty. [99] Thus, "all death-penalty states abandoned unitary trials in favor of bifurcated proceedings that separate the case into a 'guilty' phase and a 'penalty' phase." [100] By and large, this meant that states had to set up a process for the consideration of all relevant factors bearing on whether a particular defendant deserved the death penalty, including mitigating factors relevant only to sentencing and not to guilt or innocence. Likewise, it meant having a process to try to ensure proportionality in the imposition of the death penalty, by making sure that it was not imposed for crimes that were not sufficiently egregious. [101] This proportionality review necessarily required a consideration of not just the case at hand, but of other similar cases, and was more fitting for judicial rather than jury performance. [102]

In reaction to the very cases that gave capital defendants constitutional protections against arbitrary and capricious imposition of the death penalty, some states adopted statutes that left them exposed to a new fate that was historically unusual in American history—the possibility of being executed without a jury unanimously saying that should happen. That is, as states adopted statutes that provided specific processes to meet *Furman*'s core concerns, some of them increasingly shifted the locus of authority for capital sentencing determinations away from juries and toward judges. [103] In effect then, *Furman* and the July 2nd cases set in motion a historically unprecedented period in which sentencing in capital cases was distinct from the conviction phase, in which judges in some states came to have a more critical role, and in which it was not even clear that juries had to have a role at all. [104]

When the U.S. Supreme Court reviewed these capital sentencing statutes that state legislatures enacted or

revised in the wake of *Furman* and *Gregg*, the Court also addressed cases focused on defendants' rights under the Sixth Amendment. More specifically, after the states enacted statutory approaches to satisfy *Furman*'s key mandates, the U.S. Supreme Court issued a number of decisions addressing various issues regarding the respective roles of judges and juries in capital sentencing.

In *Spaziano v. Florida*, [105] for example, the Supreme Court reviewed Florida's capital sentencing scheme, which allowed the sentencing judge to override a jury's recommendation of life imprisonment and impose a death sentence. [106] This is precisely what happened at Spaziano's sentencing, **\*450** and Spaziano contended "that allowing a judge to override a jury's recommendation of life violates the Eighth Amendment's proscription against 'cruel and unusual punishments,' " and "that the [judicial override] practice violates the Sixth Amendment." [107] Despite the fact that the Supreme Court had recently held in a number of cases that procedural protections from the guilt stage of a criminal case—including those guaranteed by the Sixth Amendment—also applied at the penalty stage, [108] the Court rejected Spaziano's arguments and upheld Florida's capital sentencing scheme, holding "that there is no constitutional imperative that a jury have the responsibility of deciding whether the death penalty should be imposed." [109] As to Spaziano's Sixth Amendment argument, the Court's reasoning—echoing its slight Eighth Amendment discussion in *Proffitt*—was so cursory that it can be quoted in full:

> This Court, of course, has recognized that a capital proceeding in many respects resembles a trial on the issue of guilt or innocence. Because the "embarrassment, expense and ordeal ... faced by a defendant at the penalty phase of a ... capital murder trial ... are at least equivalent to that faced by any defendant at the guilt phase of a criminal trial," the Court has concluded that the Double Jeopardy Clause bars the State from making repeated efforts to persuade a sentencer to impose the death penalty. The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause, however, does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial. The Court's concern in *Bullington* was with the risk that the State, with all its resources,

would wear a defendant down, thereby leading to an erroneously imposed death penalty. There is no similar danger involved in denying a defendant a jury trial on the sentencing issue of life or death. The sentencer, whether judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer's decision for life is final. More important, despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding—a determination of the appropriate punishment to be imposed on an individual. The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue. [110]

**\*451** Turning to Spaziano's Eighth Amendment argument, the Court explained that the fact that the only three states allowed a judge to override a jury's recommendation of life does not mean that those states' capital sentencing schemes are unconstitutional because "[t]he Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws." [111]

The Court reaffirmed and extended its holding in *Spaziano* in several later cases, many of which also involved Florida's capital sentencing scheme. In *Hildwin v. Florida*, [112] for example—"a *per curiam* decision without briefing, argument, or plenary consideration" [113] —the Court held that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." [114] Using *Spaziano* as a springboard, the Court reasoned that because "the Sixth Amendment permits a judge to impose a sentence of death when the jury recommends life imprisonment, ... it follows that it does not forbid the judge to make the written findings that authorize imposition of a death sentence *when the jury unanimously recommends a death sentence.*" [115]

And, in *Clemons v. Mississippi*, [116] the U.S. Supreme Court reaffirmed its view that the Constitution did not require jury sentencing or that a jury make all factual findings that are necessary to sentence a defendant to death. [117] The Court also explained in *Clemons* that a state appellate court may uphold a death sentence that is based in part on an invalid statutory aggravating factor—or, as I refer to it for the sake of simplicity and functional

clarity, a "death eligibility factor"—as long as that error is harmless because, for example, a different death eligibility factor existed. [118]

The Supreme Court again rejected a defendant's argument that the Constitution requires jury sentencing in capital cases in *Walton v. Arizona*. [119] There, a capital defendant challenged Arizona's capital sentencing scheme under both the Sixth and Eighth Amendments. The Court first rejected Walton's argument that Arizona's capital sentencing scheme, which required the trial judge to make all factual findings involved in capital sentencing and gave the jury no advisory role, was sufficiently distinct from the Florida scheme the Court had upheld in *Spaziano* and *Hildwin* scheme, which did give the jury at least an advisory role, to make the Arizona statute more vulnerable under the Sixth Amendment. [120] The Court was not troubled by any lesser role for the jury. Instead, relying on *Spaziano*, *Hildwin*, and *Clemons*, the Court then held "that **\*452** the Arizona capital sentencing scheme does not violate the Sixth Amendment." [121] Second, the Court rejected Walton's Eighth Amendment argument, concluding that a death penalty statute does not violate the Eighth Amendment solely because it puts the burden of proving mitigating factors by a preponderance of the evidence on the defendant. [122]

Finally, in *Harris v. Alabama*, [123] the Supreme Court held that a capital sentencing scheme that "vests capital sentencing authority in the trial judge, but requires the judge to consider an advisory jury verdict" was not unconstitutional. [124] The Court noted the similarities between the Florida and Alabama schemes, and observed that the key difference was that the Florida scheme which it had previously upheld in the cases discussed above, unlike its Alabama counterpart, required a trial judge to "give 'great weight' to the jury's recommendation and ... not override the advisory verdict of life unless 'the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ.' " [125] Harris argued that the failure of Alabama's statute to provide similar guidelines for considering the jury's advisory verdict rendered the statute unconstitutional. [126] But the Court disagreed: "The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a

jury's recommendation and trusts the judge to give it the proper weight." [127]

* * *

In sum, as the law stood at the turn of the twentieth century, the Supreme Court itself held that jury sentencing was not required in capital cases, even though jury sentencing in death penalty cases had been predominant throughout our nation's history before *Furman* [128] and continued to be so. [129] But, the Supreme Court had placed some limits on death sentences, such as holding mandatory death sentences unconstitutional and requiring that the sentencer consider mitigating factors. [130] And, the Supreme Court itself had recognized that its own jurisprudence had essentially required at least two different stages within a case if a state was to impose the death penalty consistent with the Constitution. To address the requirement of *Furman* that capital sentencing discretion be narrowed to help avoid arbitrary results, there must first be a phase that the Supreme Court has at different times called the "definition stage" [131] and the "eligibility phase," [132] the latter of which I adopt as the more appropriate term. I refer to it as **\*453** the eligibility phase because that is the phase in which the defendant is found eligible for the death penalty, typically as a result of a finding that one or more aggravating factors exists that qualify his crime as making death an authorized punishment. This eligibility phase responds to the requirements of *Furman* and its progeny, such as *Godfrey v. Georgia* [133] and *Maynard v. Cartwright* [134] that there be a meaningful "narrowing" of the class of offenders eligible for the death penalty. [135] The statutory eligibility factors are typically referred to as aggravating factors, because they are seen as special circumstances that take a very serious crime, such as an unlawful homicide, and make it particularly blameworthy and thus subject to the perpetrator to a possible death sentence. Common aggravators include killing a victim who is a peace officer and committing murder in the course of another felony. [136] As the U.S. Supreme Court itself has done for precision at times, I use the term "death eligibility factor" to describe these circumstances because it more clearly articulates what they are, and distinguishes them from the broader use of an aggravating circumstance in the next required phase. [137] Although having their origins

in *Furman*'s mandate that the circumstances in which the death penalty be imposed be narrowed, death eligibility factors have proliferated. [138] In Delaware, for example, there are now twenty-two circumstances that can make a defendant death eligible. [139]

That next phase, which has been referred to among other things as the "weighing phase," the "selection phase," or in my view, the "ultimate sentencing phase," is when there is an individualized determination of the sentence for the defendant. [140] This phase was required because the Supreme Court made clear that even if a state had narrowed the circumstances for which death was the authorized punishment to address the concerns raised in *Furman*, it still could not make death a mandatory sentence. [141] Instead, *Furman* and the July 2nd cases taken together mandated that a sentencing phase occur **\*454** during which all relevant factors bearing on whether the defendant should live or die must be considered, and during which the defendant has a constitutional right to effective representation in presenting evidence mitigating against the imposition of death. In all circumstances, the state must afford the option for the defendant to be given the comparatively more merciful option of a lengthy prison sentence as opposed to death. [142] As discussed, these developments and their complexity gave rise to a small number of statutes that cabined the jury's historical role in the death penalty sentencing process. A notable example was the amendment to Delaware's capital sentencing scheme in 1991, which eliminated the unanimous jury requirement in capital sentencing as a direct response to the failure of prosecutors to convince an entire jury to vote for death in a high-profile case. [143] As scholars observed, "the presumption that judges would be more willing to than juries to impose capital punishment appeared to motivate the statutory change to judge sentencing." [144]

With the intricacy of this two-stage process arose further questions about the respective role of judge and jury in the sentencing phase process, questions that came to the fore early in this century in an important non-capital case, which I now discuss.

VI.

In 2000, the Supreme Court decided *Apprendi*, which marked a major shift in the U.S. Supreme Court's Sixth Amendment jurisprudence and created the momentum behind the line of cases leading directly to *Hurst*. The relevant facts of that non-death penalty case were simple. Apprendi, who was white, had pled guilty to multiple felonies arising from an event in which he fired several bullets into the home of a black family. [145] After holding an evidentiary hearing on Apprendi's intent, the trial judge concluded that Apprendi had been motivated by racial bias. [146] Under New Jersey law, if a defendant "acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity," he could be deemed to have committed a "hate crime" and be eligible for a longer sentence. [147] Thus, the trial judge found that the "hate crime" sentencing enhancement applied, and the judge increased Apprendi's sentence accordingly. [148] The issue the U.S. Supreme Court faced in *Apprendi* was whether a judge, as opposed to a jury, could find facts that increased the defendant's maximum sentence. [149] The Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and **\*455** proved beyond a reasonable doubt." [150] In extending *Apprendi* into the sentencing guidelines context in *Blakely v. Washington*, [151] the Supreme Court explained "that the 'statutory maximum' for *Apprendi* purposes is that maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*…. In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." [152]

Shortly after *Apprendi*, the Supreme Court decided *Ring v. Arizona*, [153] which applied *Apprendi* for the first time to the death penalty sentencing process. [154] *Ring* was a case in which the Court was again faced with the constitutionality of the Arizona capital sentencing scheme that it had upheld against both Sixth and Eighth Amendment challenges in *Walton*. [155] *Ring* confirmed that *Apprendi*'s rule extends to the death context, reasoning that "[c]apital defendants, no less than noncapital defendants …, are entitled

to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." [156] In other words, the Court explained, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." [157] And then, recognizing that *Walton* and *Apprendi* were irreconcilable, *Ring* "overrule[d] *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." [158] The Court held that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." [159]

## VII.

### A.

*Ring* occasioned one of the last major changes to Delaware's own death penalty statute, and is the logical point at which to explain what our current statute provides. As of *Ring*, the Delaware statute had last been amended in relevant part in 1991 and provided that the jury's findings as to whether any death eligibility factors existed and whether the aggravating factors outweighed the mitigating factors were just advisory. [160] The sentencing judge had the final say in both the eligibility and ultimate sentencing stages. [161] Delaware's **\*456** approach was logical in light of the post-*Furman* decisions. By providing that only certain homicides that involved statutorily defined circumstances would make a defendant eligible for the death penalty, [162] the statute addressed the need to narrow the class of defendants who could be executed. By providing for a sentencing phase during which those factors that aggravated toward the death penalty and those that mitigated against it would be rationally considered, [163] the Delaware statute addressed the constitutional mandate that a death sentence not be mandatory, and instead be the product of a rational, individualized process whereby any mitigating factor could be considered. And, the statute also provided for an appellate process of proportionality review as a further

safeguard against the arbitrary imposition of the death penalty. [164]

In *Ring* itself, the U.S. Supreme Court took note that Delaware's then-existing capital sentencing scheme was different from the Arizona statute it was addressing. The *Ring* Court explained that Delaware was one of four "hybrid systems, in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determinations." [165] But *Ring* seemed to make Delaware's statute vulnerable because the jury's determination as to eligibility was not necessary, just advisory. Thus, the General Assembly amended Delaware's death penalty statute, § 4209, to reflect its current form. The amendment changed the jury's role in the eligibility phase "from one that was advisory under the 1991 version of § 4209 into one that is now determinative as to the existence of any statutory aggravating circumstances [i.e., death eligibility factors]." [166]

One year after *Ring* and the accompanying amendment to § 4209, this Court decided *Garden v. State*, [167] which impelled an amendment that went in the other direction and reduced the jury's role in the death penalty sentencing process even further. In *Garden*, this Court reviewed the Superior Court's imposition of a death sentence despite the jury's recommendation of life sentences by ten-to-two and nine-to-three votes on intentional murder and felony murder charges, respectively. In response to that judicial override, *Garden* reversed the sentence of death and held "that a trial judge must give a jury recommendation of life 'great weight' and may override such a recommendation only if the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ." [168] As was the case with the legislation in 1991 eliminating the unanimity requirement for § 4209, [169] the failure of the State to obtain a death sentence because juror opposition prevented that result led to legislation to diminish the influence of the cross-section of the community empanelled to decide whether the defendant was guilty. To wit, to overrule *Garden*'s "great weight" standard, § 4209 was amended "to provide that the jury's recommendation shall only be **\*457** 'given such consideration as deemed appropriate.' " [170]

Under the current version of § 4209, the Superior Court holds a separate hearing to determine whether a defendant

found guilty of first degree murder should be sentenced to death or life imprisonment without parole. Unless the defendant has waived her right to a jury trial, the jury that found the defendant guilty is charged with answering two questions: (1) "[w]hether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance [i.e., death eligibility factor] as enumerated in subsection (e)"; and (2) "[w]hether, by a preponderance of the evidence ..., the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist." [171]

The jury's answers to the two questions in § 4209(c)(3) are used in the two phases of sentencing described above, the eligibility phase and the ultimate sentencing phase. The eligibility phase involves only the jury, not the judge. Specifically, the jury determines whether at least one death eligibility factor exists beyond a reasonable doubt. "[T]he jury must be unanimous as to the existence of that statutory aggravating circumstance [i.e., death eligibility factor]." [172] If the jury finds that no death eligibility factor exists, the judge must sentence the defendant to life imprisonment. [173] But, if the jury finds that at least one death eligibility factor exists, then the defendant is death eligible and the process moves on to the ultimate sentencing phase. [174]

Unlike the eligibility phase, under § 4209 the ultimate sentencing phase involves both the jury and the judge. The ultimate sentencing "phase does not increase the maximum punishment, but only ensures that the punishment is appropriate and proportional." [175] First, the jury decides "[w]hether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation ..., the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist." [176] Then,

> the Court, after considering the findings and recommendation of the jury and without hearing or reviewing any additional evidence, shall impose a sentence of death if the Court finds by a preponderance of the evidence ... that the aggravating circumstances found by the Court to exist outweigh the

mitigating circumstances found by the Court to exist. [177]

As discussed, the jury's finding as to whether the aggravating circumstances outweigh the mitigating circumstances "shall not be binding upon the Court," but "shall be given such consideration as deemed appropriate by the Court." [178] The trial judge thus has the final say in deciding whether a capital defendant is sentenced to death and need not give any particular weight to the jury's view.

**\*458 B.**

After § 4209 was amended in the wake of *Ring*, this Court answered four certified questions from the Superior Court in *Brice v. State*. [179] *Brice* found that the jury's finding of a death eligibility factor in the eligibility phase—not the judge's determination in the ultimate sentencing phase—is what makes a defendant eligible for a death sentence under § 4209:

> Once the jury determines that a statutory aggravating factor exists, the defendant becomes death eligible. Although a judge cannot sentence a defendant to death without finding that the aggravating factors outweigh the mitigating factors, it is not that determination that increases the maximum punishment. Rather, the maximum punishment is increased by the finding of the statutory aggravator [i.e., death eligibility factor]. At that point a judge can sentence a defendant to death, but only if the judge finds that the aggravating factors outweigh the mitigating factors. Therefore, the weighing of aggravating circumstances against mitigating circumstances does not increase the punishment. Rather, it ensures that the punishment imposed is appropriate and proportional. [180]

*Brice* also considered the ultimate sentencing phase of the Delaware statute, which requires the sentencing judge to

make her own determination of whether the aggravating circumstances outweigh the mitigating circumstances, a decision that is informed by a jury vote but not dictated by it unless the jury majority recommends a life sentence. In other words, this Court examined the reality that the sentencing judge could rely on aggravating factors in addition to whatever death eligibility factors were found by the jury. These factors—which I have defined as aggravating factors for clarity—need not have been found by the jury. But, the Court did not view that feature of Delaware's capital sentencing scheme as problematic: "*Ring* does not ... require that the jury find every fact relied upon by the sentencing judge in the imposition of the sentence." [181] Thus, as long as the jury has already found one death eligibility factor as required by *Ring*, the reality that a sentencing judge under our statute may consider aggravating factors that the jury does not find beyond a reasonable doubt "does not 'increase' the maximum penalty that a defendant can receive." [182] In other words, *Brice* embraced the reading of *Ring* summarized by Justice Scalia in his concurrence in that case, in which he stated:

> What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor [i.e., a death eligibility] existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so—by requiring a prior jury finding of [an] aggravating factor [i.e., a death eligibility factor] in the sentencing phase or, more simply, by placing the aggravating-factor determination [i.e., death eligibility determination] (where it logically belongs anyway) in the guilt phase. [183]

**VIII.**

This lengthy tour has now arrived at *Hurst*, the new decision of the U.S. Supreme **\*459** Court that our Superior Court considered such a materially new addition to our nation's constitutional jurisprudence to certify us questions covering essentially the same issues as we confronted in *Brice*. The reason our learned colleague

did so is obvious from a close reading of *Hurst*, because *Hurst* can either be seen, as I candidly admit, either as a plain application of *Ring* to a state, Florida, that did not respond to *Ring*'s mandate, or as signaling the recognition that a jury's role in the death penalty process cannot be rigidly confined to the eligibility phase.

As is now widely known, *Hurst* held that Florida's capital sentencing scheme was unconstitutional.[184] The Florida scheme evaluated in *Hurst* differed from Delaware's in three material ways. First, Florida's statute charged the jury with deciding by a majority vote both (1) whether a death eligibility factor exists; and (2) whether the aggravating circumstances outweigh the mitigating circumstances. Second, Florida's statute did not require the jury to decide whether a death eligibility factor exists beyond a reasonable doubt. And third, a jury under Florida's statute made "an 'advisory sentence' of life or death without specifying the factual basis of its recommendation."[185] In Delaware, by contrast, a jury must find a death eligibility factor unanimously and beyond a reasonable doubt. The jury in Delaware is then charged with making a non-unanimous decision of whether the aggravating factors outweigh the mitigating factors, under a preponderance of the evidence standard. That recommendation, like in Florida, is advisory,[186] but unlike Florida, does not ask jurors to specifically vote whether they believe death is the appropriate punishment. Despite these differences, there are important similarities between the capital sentencing scheme struck down in *Hurst* and § 4209: "Both Florida's invalidated law and Delaware's leave the ultimate sentencing phase and the final sentencing decision in the hands of a judge. Both have a jury make a recommendation to the court, but this is merely advisory."[187]

In finding that the Florida capital sentencing scheme was unconstitutional, the Supreme Court focused on the fact that it required the judge to find facts because the jury's "recommendation" was just that—a recommendation that was advisory and to which the judge was not bound. The Court explained that "the Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court*' that such person shall be punished by death.' "[188] That statute was unconstitutional, the Court explained, because "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death."[189]

In explaining its understanding of *Ring*, the *Hurst* Court observed that "Ring's death sentence ... violated his right to have a jury find the facts behind his punishment" because "[h]ad Ring's judge not **\*460** engaged in factfinding, Ring would have received a life sentence."[190] The Court then explained:

> As with Timothy Ring, the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst's authorized punishment based on her own factfinding. In light of *Ring*, we hold that Hurst's sentence violates the Sixth Amendment.[191]

In holding that Florida's capital sentencing scheme was unconstitutional, *Hurst* expressly overruled its prior decisions addressing Florida's death penalty statute in *Spaziano* and *Hildwin* "in relevant part"[192]—both cases in which the Court had rejected a defendant's argument that jury sentencing is constitutionally required in capital cases: "*Spaziano* and *Hildwin* summarized earlier precedent to conclude that the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury. Their conclusion was wrong, and irreconcilable with *Apprendi*."[193] This was a move that some Justices had been advocating for some time.[194] But, by overruling those cases only "in relevant part," the Court left open the notion that they were problematic only insofar as Florida had not required a jury to make every fact finding required to render the defendant eligible for death. The use of the term "authorizing" could be read as supporting that view, although the term could also be seen as ambiguous and functionally indistinct from the term "necessary."

That is, the meaning of *Hurst* is contestable because it uses language at critical points in a way that is not necessarily consistent. For example, there is a portion of *Hurst* that seems to be a vanilla application of *Ring*. The Court explained that "[t]he analysis the *Ring* Court applied to Arizona's sentencing scheme applies equally to Florida's."[195] But, there are other portions of *Hurst* which use broader, or at least less narrowly cabined

language, and I understand these portions to be those which largely motivate the questions posed to us and the contesting positions of the parties. For example, the Court couched its holding in broader language, explaining that a jury must "find each fact *necessary* to impose a sentence of death." [196]

The Supreme Court's use of the term "necessary" in *Hurst* also has relevance because the author of *Hurst*, Justice Sotomayor, had earlier issued a dissenting opinion from a denial of certiorari, in which she wrote that the "required finding that the aggravating factors of a defendant's crime outweigh the mitigating factors is ... necessary to impose the death penalty." [197] In other words, if by "necessary" in *Hurst*, the Supreme Court in fact meant what it said in an unqualified way, these factors must include the findings that its own jurisprudence mandate must be made at the ultimate sentencing phase before a defendant can be given a death sentence. If these necessary findings must **\*461** be made by a jury, then the approach taken by Delaware would be problematic.

Notably, *Hurst* was not a unanimous decision. It generated a concurrence from Justice Breyer, who is a passionate defender of judicial sentencing discretion in the context of non-capital cases, and dissented in both *Apprendi* and *Ring*. [198] At the same time, Justice Breyer takes the position, which he anchors in the Eighth Amendment, that no death penalty sentence can be imposed without "a jury, not a judge, mak[ing] the decision to sentence a defendant to death." [199] "[T]he danger of unwarranted imposition of the [death] penalty," Justice Breyer believes, "cannot be avoided unless 'the decision to impose the death penalty is made by a jury rather than by a single governmental official.' " [200] "Even in jurisdictions where judges are selected directly by the people, the jury remains uniquely capable of determining whether, given the community's views, capital punishment is appropriate in the particular case at hand." [201] One can summarize Justice Breyer's position this way. He believes that it is so vital to the fairness, regularity, and non-cruelty of any administration of the death penalty that it must be preceded by a unanimous determination by a jury that the defendant should die. He believes that without a cross-section of the community unanimously agreeing a defendant should die, the resulting penalty is cruel and unusual, because it so drastically departs from the American tradition. As I note later, this sounds like an oblique way of saying that there is a fundamental right to have a jury say you should die before the state can execute you.

Finally, Justice Alito dissented in *Hurst*. Most importantly for present purposes, Justice Alito called for reconsideration of *Ring* because he believes that there is no Sixth Amendment right to have a jury decide any fact other than those necessary to guilt. [202] Justice Alito then explained that "even if *Ring* is assumed to be correct," he would not extend it to Florida's capital sentencing scheme because of the differences between Florida's and Arizona's at the time of *Ring*. [203]

After the Supreme Court decided *Hurst*—and after we accepted the certified question before us—the Court vacated three Alabama death penalty convictions "in light of *Hurst*." [204] Although these orders provide no extensive guidance on why or how *Hurst* affected the Alabama convictions, the obvious connection between these cases and *Hurst* is that they collectively involve two of the three capital sentencing schemes that permitted a judge to override a jury's recommendation of a life sentence before *Hurst*—those of Florida and Alabama. [205] The third such scheme is our own.

## **\*462  IX.**

### **A.**

The five certified questions are:

(1) Under the Sixth Amendment to the United States Constitution, may a sentencing judge in a capital jury proceeding, independent of the jury, find the existence of "any aggravating circumstance," statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding?

(2) If the finding of the existence of "any aggravating circumstance," statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding must be made by a jury, must the jury make the finding unanimously and beyond a reasonable doubt to comport with federal constitutional standards?

(3) Does the Sixth Amendment to the United States Constitution require a jury, not a sentencing judge, to find that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist because, under 11 *Del. C.* § 4209, this is the critical finding upon which the sentencing judge "shall impose a sentence of death"?

(4) If the finding that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist must be made by a jury, must the jury make that finding unanimously and beyond a reasonable doubt to comport with federal constitutional standards?

(5) If any procedure in 11 *Del. C.* § 4209's capital sentencing scheme does not comport with federal constitutional standards, can the provision for such be severed from the remainder of 11 *Del. C.* § 4209, and the Court proceed with instructions to the jury that comport with federal constitutional standards?

Fundamentally, the first four questions may be summarized this way: Must any death sentence be preceded by a unanimous jury verdict concluding that after considering all the relevant aggravating and mitigating factors, the defendant should suffer execution as his punishment, rather than the comparatively more merciful option of a lengthy prison sentence? And, if so, must the jury make that decision beyond a reasonable doubt?

The advocates before us take dividing positions on these questions and do so with clarity and skill, and with a close attention to the precedent. From the State's perspective, the answer to the question above is no. The State's well-written and well-argued position is that *Hurst* must be read contextually and narrowly, and that its use of the term "necessary" cannot be divorced from other language in the opinion relying on *Ring* and *Apprendi*. By "necessary," says the State, *Hurst* refers only to those fact findings necessary to make the defendant statutorily eligible to receive a death sentence. That is, in the parlance I use, the State argues that the jury need only determine unanimously and beyond a reasonable doubt that a death eligibility factor exists. Beyond that point, any role for the jury is entirely optional, and a state can in fact dispense altogether with a role for the jury, and allow a judge to use his own reasoned discretion to weigh the aggravating

and mitigating factors and decide whether to impose the death penalty. Put **\*463** simply, the State argues that *Hurst* should be seen as a clean-up case, where a state, Florida—that did not view *Ring* as applying to its statute because the Supreme Court had not overruled its decisions in *Spaziano* and *Hildwin*, in which it had upheld Florida's capital sentencing scheme—was informed that it had to abide by *Ring*. The bright line for the Sixth Amendment, in the State's conception, is that a jury must find any fact necessary to authorize a form of punishment, for the narrow purpose of making a defendant eligible for that punishment. By making the defendant eligible to receive that punishment, though, a jury need not play any role in the ultimate sentencing phase, even in a capital case. In other words, the State embraces the reading of *Ring* given in Justice Scalia's concurrence in that case, and argues that his joinder in the *Hurst* majority opinion is further evidence of its limited meaning.

By contrast, counsel for Rauf (and several of the amicus curiae) view *Hurst* as going beyond *Ring*, and as standing for the proposition that if any finding of fact is necessary as a pre-condition to a death sentence, the Sixth Amendment requires that finding of fact to be made by a unanimous jury. Rauf argues from the plain language of the Delaware statute that findings of fact that go beyond the existence of guilt and of a death eligibility factor are "necessary" for a death sentence to be imposed in Delaware. Absent factual findings that the aggravating factors outweigh the mitigating factors, a defendant must be given a life sentence under the Delaware statute. Thus, these sentencing stage findings are literally "necessary to impose a death sentence." [206] Rauf's argument builds on other U.S. Supreme Court case law, which prevents states from having a statute whereby a death sentence is the automatic consequence of a guilty verdict, and which requires states to have a sentencing phase in which all mitigating factors must be rationally considered and after which the option of giving a non-capital sentence must exist.

Rauf is joined by amicus curiae, who echo his arguments, but who also make a more fundamental argument, which is that there is no more fundamentally important role for a jury fairly drawn from the community than determining whether a defendant should live or die. [207] They read *Hurst* as recognizing a more essential consideration that has been obscured in the complexity of the post-*Furman* world, which is that the Sixth Amendment right to a

jury has perhaps its most powerful importance when the question is whether the defendant should live or die.

### B.

Against this backdrop of § 4209 and the U.S. Supreme Court's capital sentencing decisions, I explain my answer to the five certified questions. But, rather than addressing the first four questions in piecemeal fashion, I consider the broader implications of the federal Constitution and the Supreme Court's precedent addressing it on the role of the judge and the jury under § 4209. The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be **\*464** confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense. [208]

I focus here on the question of who—jury or judge—may make the determination whether a defendant should receive a death sentence or not because I believe it is inarguable that the required determination in all contexts where the sentencing authority can give a defendant death or life involves factual determinations. That is clearly so under our own statute, which plainly requires that a specific finding be made before a death sentence can be issued. [209] That finding is whether "the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist." [210] Our prior decisions have often noted that sentencing decisions, including those in the death penalty context, involve an exercise of discretion based on a weighing of facts. [211] In doing so, we broke no ground, but simply recognized an obvious reality reflected broadly in American jurisprudence that the weighing of aggravating and mitigating factors is "a clear factfinding directive to which there is no exception." [212]

Thus, the question in this context is not whether factual determinations are involved in the weighing phase of capital sentencing, but whether the Sixth Amendment requires those factual judgments to be made by a jury.

In one sense, the answer to the certified questions could be simple. If when *Hurst* said "necessary," it meant that, then Delaware's death penalty statute is unconstitutional. Under our statute the findings required to make a defendant "eligible" for the death penalty are not sufficient to enable him to be sentenced to death. Rather, it is obvious that § 4209 makes other findings necessary. That necessity is in fact dictated by U.S. Supreme Court precedent.

In concluding that *Hurst* requires the invalidation of our state's approach to the death penalty, I do not wish to elide the potency of the other side of the question. *Hurst* can be read as having used the loose language of necessity to describe only what is necessary to make a defendant death eligible, especially because the statute at issue in *Hurst* failed on that narrower basis, which Delaware's does not. But, I am reluctant to conclude that the Supreme Court was unaware of the implications of requiring "a jury, not a judge, to find each fact necessary to impose a sentence of death." [213] If those words mean what they say, they extend the role of a death penalty jury beyond the question of eligibility. **\*465** Even more, these words seem to be the latest spade work in the judicial unearthing of an unattractive byproduct of a lengthy period of judicial innovation.

That byproduct is that the *Furman* line of U.S. Supreme Court precedent has been a causal factor in impelling a small number of states (of which Delaware is one) to adopt a death penalty system that would have been fundamentally alien to the founding generation, a system under which a defendant can be executed even if a unanimous jury does not believe that is the correct penalty. [214] What has emerged is a system whereby there is a strange admixture of the role of judge and jury in this most sensitive of areas—an admixture that allows a defendant to go to his death without a jury of his peers unanimously concluding that he should do so. Although perhaps not compelled to do so by the formal logic of *Hurst*, [215] I am persuaded that it is not tenable under the broader logic of the case, and a consideration of related provisions of the Constitution, including the

Eighth Amendment, to pretend any longer that this admixture is consistent with the fundamental guarantee of a jury trial as it was understood throughout most of our history—one in which "[t]he Founders viewed juries as so fundamental to the democratic experience that the right to a jury in criminal trials is the only right expressly included twice in the Constitution" [216]—and as most states still understand **\*466** it today. [217]

In so finding, I acknowledge the argument, made powerfully by Justice Scalia and others, that *Furman* unsettled the traditional practice and that the deviation from the traditional practice that a jury simultaneously decided guilt and punishment resulted from the decisions of three justices in *Furman* that said that the death penalty could be imposed only if the sentence is imposed in some non-arbitrary way. [218] In *Furman* and the decisions that followed it, the Supreme Court said that states could not find that certain crimes, such as intentional murder, were so heinous that a verdict of guilt automatically resulted in a death sentence. [219] Instead, each defendant, regardless of whether he committed an intentional murder, had a right to have the sentencing authority consider all mitigating factors and weigh them against the aggravating factors. [220] And, of course, the full bite of *Strickland v. Washington* [221] enforced the duty of counsel to present those factors with effectiveness. Not only that, to avoid arbitrariness, statutes were revised to include procedures such as the proportionality review as a way to ensure that capital punishment was meted out non-capriciously. [222] It was these and other mandates that states like Delaware reacted to in shaping their current death penalty statutes. Even my long earlier account of the evolution of past death penalty jurisprudence slights the complexity of the law in this area. For present purposes, what must be acknowledged is that much effort has been expended by many states since *Furman*, including by our own, [223] to design procedures that complied with the intricate Supreme Court case law designed to ensure that capital sentences would only issue in conformity with the Constitution.

Obscured in the complexity of the *Furman* line of cases, however, was something fundamental: The overwhelming trend before 1972 was that a defendant was not sentenced to death without the support of a unanimous jury of the defendant's peers determining that was appropriate. [224]

Scholars [225] and judges [226] have set forth this **\*467** history in compelling terms. In fact, the U.S. Supreme Court itself expressed the importance of jury sentencing in capital cases in *Winston v. United States* [227] in 1899:

> The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court or the jury is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment. How far considerations of age, sex, ignorance, illness, or intoxication, of human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of congress to the sound discretion of the jury, and of the jury alone. [228]

And, as noted above, [229] the Supreme Court in 1968 described the jury's role in capital cases as "express[ing] the conscience of the community on the ultimate question of life or death." [230]

That juries historically acted as the sentencing authorities in capital cases is not an anomaly. Rather, it makes sense. After all, it was the jury's role as the conscience of the community on issues of proportionality and mercy that was recognized as making its role in capital sentencing so vital. [231] As Declaration of Independence signee and future federal judge Francis Hopkinson wrote in 1786:

> [The authority to sentence] can no where be lodged so safely as with the jury who find the fact. The proportion of punishment,

equitably due according to the nature of the offence, is not a question involved in the technical subtleties of the law; but arises from the particular circumstances of the case, ... and an honest, impartial, and conscientious jury, are as competent to this purpose, as the most profound judge. They will necessarily have heard the state of the whole matter, with the arguments for the prosecution, and in behalf of the prisoner; and being a temporary body, accidentally brought together, and impaneled for the occasion, are more likely to do substantial justice, than a judge who is so hackneyed in criminal prosecutions.... [232]

Given the significance that jury sentencing has historically had, then, it should come as no surprise that "jury sentencing is ... the norm for capital cases." [233]

**\*468** Further, one need look no further than the aggravating and mitigating factors that the U.S. Supreme Court approved for use in making capital sentencing determinations to see the factual nature of questions involved and how they came to bear on the issue of what punishment the defendant should suffer. As to aggravating factors, for example, the sentencing authority may consider "whether the crime was committed in the course of one of several enumerated felonies, whether it was committed for pecuniary gain, whether it was committed to assist in an escape from custody or to prevent a lawful arrest, and whether the crime was especially heinous, atrocious, or cruel." [234] As to mitigating factors, approved considerations include "whether the defendant has a prior criminal record, whether the defendant acted under duress or under the influence of extreme mental or emotional disturbance, whether the defendant's role in the crime was that of a minor accomplice, and whether the defendant's youth argues in favor of a more lenient sentence than might otherwise be imposed." [235] The core of each of these questions is a factual inquiry that a cross-section of the community is best suited to make. [236] And on an even more basic level that extends beyond the

capital sentencing context, appellate courts give enormous deference to a judge's or jury's sentencing determination precisely because of the factual nature of the issues involved in sentencing generally and the inescapable requirement for the sentencing authority to apply its discretionary sense of conscience and mercy to the case at hand. [237]

In my view, *Hurst* has starkly revealed a perverse result of some of the post-*Furman* efforts to adopt capital sentencing schemes that are constitutionally satisfactory, which is that perhaps the most fundamental protection of the Sixth Amendment has been dropped from the panoply of rights accorded to the defendant—the right to be put to death only if twelve members of his community agree that should happen. [238] There are, of course, reasons why this fundamental issue has been elided. They include the reality that for most crimes, judges make the key sentencing determination. Times have changed greatly since the founding, when prison sentences were rare, and with changing times has come a diminution (although by no means an elimination) [239] of statutorily mandated sentences. Some cognitive dissonance can be caused by holding that, unlike other sentencing options, a sentence of death may only be issued consistent **\*469** with the Sixth Amendment if the jury itself believes that is appropriate.

But if ever Emerson's famous maxim had purchase, it would be here. The Supreme Court has long said that "death is different." [240] *Furman* was based on that notion, and however Balkanized the five votes in *Furman* were, that case has remained part of our nation's jurisprudence for forty-four years. [241] Many cases recognize that the Constitution's protections apply with special force to capital cases, because of their uniquely high stakes. [242] No doubt there are Justices who have disclaimed any explicit reliance on the distinction between a case involving a potential for a death sentence and one involving only potential incarceration. Still, it is easy to say that the approach taken in, for example, *Strickland* cases—which suggest that what an attorney must do to be effective in a death penalty case involves greater effort than in a non-capital case [243]—arises from the recognized principle that when what is at stake is of greater importance, what is a reasonable effort must be measured against that reality. Of course, that is another way in this context of taking into

account that death is different, a point the Supreme Court has made by:

- Narrowing the class of crimes for which the death penalty may be imposed by holding that death may not be imposed for rape of an adult woman, [244] kidnapping, [245] murder where the defendant had not killed, attempted to kill, or intended to kill anyone, [246] and rape of a child that does not result in the child's death; [247]

- Narrowing the class of defendants eligible for the death penalty by holding that the death penalty may not be imposed upon defendants who are insane, [248] mentally retarded, [249] or **\*470** minors; [250] and

- Continually explaining that capital sentencing requires special considerations and rules that are not applicable in non-capital sentencing, including special hearsay considerations, [251] special consideration of mitigating aspects of a defendant's character, [252] and mandatory consideration of lesser-included offenses. [253]

For present purposes, the precise reason why that inspires the differential approach is immaterial. The important thing is the undisputed reality that the Supreme Court often applies the protections of the Constitution **\*471** differently to death penalty cases than to other criminal cases. [254]

Although it might be possible to resolve the case before us on the narrow basis we did in *Brice* by qualifying the broad use of "necessary" in *Hurst* to mean only necessary to death eligibility, I believe that would involve ignoring the core issue that *Hurst* and its predecessor cases have laid bare, which is how it can be consistent with the Sixth Amendment (or for that matter the Eighth Amendment) for a state to deny a defendant the right to have a jury make the determination whether he should live or die. It is only by reference to the intricate post-*Furman* jurisprudence of the U.S. Supreme Court that I can rationalize a justification for current practice. [255] That rationalization is this unsatisfactory one: Having interpreted the Constitution to make states comply with procedures after *Furman* that were not recognized before it, it would be unfair to make states do

so while requiring them to condition any death sentence on a unanimous jury verdict to that effect.

This is not to say that close consideration of complex case law is not important. But, it is to say that when much of that case law has slighted one of the most central protections of the Sixth Amendment in the most compelling of contexts, [256] a consideration of the Constitution itself and its purposes is more important. [257] And **\*472** the cursory rejection of the Sixth Amendment claims in *Spaziano* and *Hildwin* by conclusory language without persuasive reasoning for support is a gruel too thin to sustain the failure to recognize the vital importance of the jury's role in the capital sentencing process. *Hurst*, of course, overruled *Spaziano* and *Hildwin* only in relevant part, but I cannot discern interpretive wisdom in those cases that survives *Hurst*, if it was ever existent. [258] And to the extent early post-*Furman* cases like *Proffitt* were grounded in the hypothesis that judges would be better positioned to ensure the proportional, non-discriminatory application of the death penalty than unanimous juries drawn from the community, [259] empirical evidence since then seems to have contradicted that prediction. [260] As one scholar has explained:

> [W]hen it comes to capital cases, there is no historical support for the line that *Ring* attempts to draw between factfinding to establish death eligibility, on the one hand, and the ultimate sentencing, or selection decision, on the other. There simply was no eighteenth-century practice that limited juries to a purely factfinding role, while granting judges the ultimate power to choose a death sentence. To the contrary, in 1791—and indeed for more than a century thereafter—the unified nature of capital trials left the ultimate decision of life or death in the hands of juries. [261]

To my mind, the deeper logic of *Apprendi*, *Ring*, and *Hurst* cannot be confined neatly to the death eligibility stage of a capital case. [262] That confinement can be **\*473** done only by accepting an admixture of the historical understanding of the role of the jury, based on the (understandable,

but not ultimately satisfying) notion that states have to be given wiggle room after *Furman*, because *Furman* unsettled long-standing practices. [263]

Likewise, I do not find convincing an attempt to draw fine lines between the role of the jury as a fact-finder and the role played by the sentencing authority. Since *Furman*, it has been understood that whatever authority is given the power to determine the sentence in a capital case must consider the relevant aggravating and mitigating factors, balance them, have an option to give life, and base any determination to give a death sentence on a determination that the aggravating factors outweigh those mitigating for the comparatively more merciful one. [264] Not only does this involve a consideration of the facts, it results in a decision of existential fact: Whether the defendant should live or die. If U.S. Supreme Court jurisprudence has and therefore can turn on a determination that death is different, [265] it is certainly appropriate to recognize that the decision to give death or life is the most important one that can be made in any criminal trial, and that the Sixth Amendment right was understood as of its adoption and for much of our history as allocating that authority to the jury. [266]

**\*474** As this discussion suggests, the intricacy of the judicially built regime for capital sentencing has contributed to legal arguments, and even judicial opinions, built on non-bearing foundations. Perhaps fearing that determining that the Sixth Amendment requires that any death sentence be predicated at minimum on a unanimous jury verdict would somehow require a determination that the Sixth Amendment also requires that a jury determine any criminal sentence, judicial opinions have taken the view that it is only those fact findings that make a defendant eligible to receive a death sentence that must be made by a jury. [267] In other words, they read the Sixth Amendment jury right as extending only up to those findings they view as necessary to establish the minimum and maximum sentences, even though other trial rights in the Constitution persist throughout the full sentencing process, whether the sentence is imposed by a judge or jury. [268] The logic these opinions are missing, however, is that because the U.S. Supreme Court has held that a consideration of mitigating factors, and a balancing of the aggravating and mitigating factors are prerequisites to death, the weighing stage of capital sentencing will always be "necessary" for

the imposition of a death sentence. [269] That is, because the constitutionally required weighing phase comes after the finding of a death eligibility factor, a step necessary for the imposition of death will always remain after the eligibility phase occurs and no state will be able to draft a statute in which the factual findings that occur after the eligibility phase are not necessary for death.

Not only that, I cannot find in the text of the Constitution any dividing line involving facts necessary to get the "maximum" or "authorized" punishment. Rather, judges have construed this as a notice requirement inherent in the Due Process Clause, and as providing a right to have a jury make the factual determination as to any matter that establishes the maximum authorized sentence. [270] This judicial interpretation led to Justices tussling over whether it is applicable only to the maximum, or also to the minimum, [271] a debate **\*475** resolved only in 2013 in *Alleyne v. United States* [272] in favor of it applying it to both. This approach is often justified as considering factual findings necessary to set a range of sentence as an element of the crime itself, [273] even though that is formally not the case. They treat the factors making the defendant eligible for a higher punishment as essentially "elements" of an "aggravated" version of the underlying crimes. [274] And as to this point, it is not clear what constitutional line exists involving facts that aggravate toward greater punishment or those that mitigate toward leniency. These are both key factual components, and yet only the former are even considered in *Ring* and *Hurst*. [275] Perhaps that is because mitigating factors do not go the maximum sentence. But, a consideration of the mitigating factors is every bit as crucial—as necessary —to the determination of life or death. [276] In *Blakely v. Washington*, as noted, the Supreme Court said "that the 'statutory maximum' for *Apprendi* purposes is that maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." [277] If that is so, in the death penalty context, the fact finding necessary to sentence a defendant to death cannot avoid a consideration of mitigating factors too.

At the same time, those who would stretch *Ring* and *Hurst*—including the defendant here—embrace arguments that also have a strained quality. These arguments ensnare states in their own efforts to comply in good faith with cases like *Furman*. Thus, because

every state retains some role for the jury in the capital sentencing process, and because Supreme Court jurisprudence such as *Woodson* requires that any death sentence be premised upon a consideration of whether the aggravating factors outweigh those in mitigation, gotcha arguments with a somewhat artificial quality naturally arise. [278] Seizing **\*476** on the reality that any ultimate and rational sentencing determination that involves the discretion to give a heavier or lighter punishment will involve the sentencing authority's exercise of weighing the circumstances that justify a greater sentence against those counseling for a lesser one, advocates can logically argue that any death sentence must be made by a jury. [279] Why? Because the Supreme Court-mandated default is that a defendant receive a life, not death sentence, unless it is ultimately found that the aggravating circumstances outweigh those in mitigation. As the Supreme Court noted in *Kansas v. Marsh*, [280] "the State always has the burden of demonstrating that mitigating evidence does not outweigh aggravating evidence. Absent the State's ability to meet that burden, the default is life imprisonment." [281] By considering this a "fact finding" essential to the imposition of a death sentence, voila, a Sixth Amendment right is created. But, rather than this conclusion being the result of a focused consideration of the jury right in the Sixth Amendment and what it means, this conclusion emerges as the product of piecing together judicial decisions, all of which were rendered in the last fifty years. And the conclusion is therefore only as good as you think the prior decisions were, and if they, as some have felt, were not based on an accurate reading of the Constitution, the outcome is hardly convincing. [282] Thus, the retort to this line of reasoning is available to those making it only because of prior cases that, in the view of jurists and advocates of a different view, imposed upon the states a regime of death penalty jurisprudence not recognized in this nation until the 1970s.

I recognize that this type of jurisprudential serve-and-volley is to some extent endemic to our system of law, and its use of judicial review, and sometimes encourages judicial opinions that read like exercises in predicting the outcome of our political sporting contests. But, the death penalty context represents one in which our nation's Supreme Court is increasingly called on to build out the interior of an edifice **\*477** entirely of its own construction. The hazards for statute writers, prosecutors, defense attorneys, defendants, trial courts, and state appellate judges of trying to anticipate what designs will prove durable are formidable. In particular, determining the respective roles of jury and judge has been especially challenging.

In deciding as I do, I therefore am reluctant to rest my answers on this kind of reasoning, because there is no predictable or principled way to choose between these approaches, which turn on irresolvable debates about what current or future Justices might think about the wisdom, meaning, and application of complex precedent to state legislative attempts to comply with the post-*Furman* mandates. Those who argue that a greater role for the jury is required do not want a full return to pre-*Furman* practices. [283] Those who argue that the jury's role can stop short of capital sentencing itself contend that it would be unfair to the states to lard a jury sentencing requirement on top of judicially constructed death penalty requirements that were established only since the early 1970s. [284]

Instead of entering a guess-work world to which I am an outsider, I prefer to isolate the fundamental interests at stake. Accepting *Furman*, for all its fractures, as establishing that states cannot establish crimes for which death is the automatic sentence, and accepting *Gregg* and its progeny as establishing that any death sentence must be based on a rational consideration of the aggravating and mitigating factors and that there must be an option to give life, I also accept another reality of the case law, which is that the Supreme Court cases acknowledge what our history shows, which is that death is different. [285] Under this line of cases, fact findings beyond eligibility are not optional; they must be made and are necessary. Rather than write more and more intricate judicial decisions parsing different kinds of fact findings, I conclude that *Hurst* is best read as restoring something basic that had been lost. At no time before *Furman* was it the general practice in the United States for someone to be put to death without a unanimous jury verdict calling for that final punishment. Overlooking the role juries played in capital sentencing before *Furman* and its progeny altered the status quo would be ignoring nearly 200 years of our nation's customs and traditions.

The U.S. Supreme Court has often drawn lines regarding when constitutional rights come into play and when they are transgressed. [286] That has long been true in **\*478**

criminal law itself. [287] If, as I conclude, the jury right is a fundamental one that was understood at founding to involve the right to have a jury determine whether a death sentence should be imposed, [288] then that right should be enforced. The recognition that death is different is not one first made by judges in the 1970s. It was recognized throughout our nation's history, and was a key reason why a jury was required to unanimously agree that any death sentence would be imposed. There is no more important part of the criminal trial process than the sentencing phase in a capital case. In allowing judges rather than juries to make "a choice between life and death," the Delaware statute "sanctions a practice that the Framers never saw and would not have tolerated." [289] Throughout our history, capital sentencing has been a "responsibility traditionally left to juries," [290] and the decision of whether a "fellow citizen should live or die" has been considered a responsibility too great for any one person to make alone. [291]

\* \* \*

Two other considerations are at play here. First, as members of the U.S. Supreme Court have eloquently written, disconnecting the right to a jury from the death penalty creates a strong argument that the resulting punishment is unusual. [292] The reason for that is that the role of the jury was understood as especially critical when the punishment for a crime involved death, and that a defendant should be executed only if a jury of his peers unanimously determined that was so. It was understood that this would make giving a death sentence harder in some important circumstances, and that was why the jury right was important. By sending someone to the grave based on the determination, not of a unanimous jury, but simply of a judge, a state denies the defendant a fundamental procedural protection long part of the American tradition. The unanimous jury requirement also best assures that defendants are sent to death only when a representative sample of the community **\*479** agrees, because the voice of minority perspectives in the jury room is assured equal weight in this most high stakes of decisions. [293] But, in my view, the Eighth Amendment bank-shot approach of requiring jury sentencing is just an intricate way of confronting the implication of a direct Sixth Amendment approach. That implication is that it

was understood that no defendant would go to the gallows unless a jury of his peers said he should. That is, that a defendant had a right to have a jury say whether he should live or die. That this fundamental, historical right is respected and restored is more important than the numerical constitutional amendment under which that happens.

Second, a requirement that a jury unanimously decide that a defendant should receive a death sentence does not mean that there can be no role for the judge. Rather, it would remain constitutional for states to provide a meaningful role for the trial judge in reviewing any death sentence recommendation made by a jury and giving the trial judge the option to give a more merciful sentence if she believed that was justified. [294] As with any other case, traditional motions addressed to the jury's determinations could be addressed to the trial judge.

In sum, I find that no death sentence can be given unless that sentence is first determined to be appropriate by a unanimous jury, properly charged with weighing the aggravating and mitigating factors for itself.

### C.

Before concluding, I must also address two specific issues posed by the first four certified questions before us. [295] The first **\*480** issue regards unanimity. I have used the term "unanimously" throughout this opinion, presaging my answer to part of the fourth certified question, which is that a defendant cannot be sentenced to death without a unanimous jury decision to that effect. Not only is the tradition in Delaware is that a jury act unanimously, [296] that is the American tradition and the understanding of how the jury right worked when it was embodied in the Sixth Amendment to our Constitution. [297] The unanimity requirement is vital to making sure that jurors deliberate and take each other's vote seriously, and that all jurors have equal voice in making this most critical of decisions. [298]

Indeed, the only anomaly to the tradition of the unanimous jury verdict in Delaware is the recent one introduced into our own death penalty statute, an innovation expressly intended to bypass the safeguard that a unanimous jury requirement provides against the

imposition of the ultimate punishment of death.[299] If *Hurst* means what it says, then the finding required to be made for the imposition of a death sentence must not only be made by a jury, it must be made by a unanimous jury.[300]

**\*481** The other issue is whether the jury must find any fact that constitutes an aggravating circumstance in the ultimate sentencing phase beyond a reasonable doubt, and whether any determination it makes that a defendant should suffer death because the factors aggravating for that outcome outweigh any mitigating factors, including the jury's own sense of mercy, must be found beyond a reasonable doubt. As is well-explained in Justice Holland's excellent concurring opinion, which I happily join, the answer to those questions is "yes." As Justice Holland shows, § 4209 requires the state to identify any non-statutory aggravating factors that it is relying upon in the sentencing phase in aid of its pursuit of a death sentence. And as discussed, it is clear that statute requires the jury to consider whether the aggravating factors relevant to sentencing, be they a statutory death eligibility factor or any pure sentencing aggravator, outweigh the mitigating factors.

As I have discussed, the jury's role in the administration of the death penalty was considered essential from the inception of our Republic. Part of the protective armor the right gave to a defendant against unwarranted imposition of the death penalty was not just that a jury be unanimously convinced that the death penalty was appropriate, but that the jury had to have an extremely high level of confidence that the ultimate punishment should be imposed. The beyond a reasonable doubt standard employed throughout our history in criminal proceedings reflects the importance our society places on ensuring that criminal punishment is not imposed lightly.[301] When juries found defendants not guilty at all when any kind of murder or serious felony resulted in a mandatory death sentence, or guilty of a lesser degree of murder because first degree murder carried mandatory death sentence when degrees of murder came in to temper that feature of the law, the beyond a reasonable doubt standard was, along with the unanimity requirement, a critical feature in ensuring that no one was executed unless the jury was highly confident that that was the equitable result. To wit, because for much of our history death was the mandatory result of conviction, the beyond

a reasonable doubt standard acted as a safeguard in punishment too, not just conviction.[302]

There is no circumstance in which it is more critical that a jury act with the historically required confidence than when it is determining whether a defendant should live or die. If, as a majority of us have **\*482** concluded, the Sixth Amendment requires a jury to make all the necessary factual determinations relevant to a capital defendant's fate, there is no reason to depart from the long-standing beyond a reasonable doubt standard when the jury is making the crucial fact-laden judgment of whether the defendant should be executed.[303] Put simply, the Sixth Amendment right to a jury includes a right not to be executed unless a jury concludes unanimously that it has no reasonable doubt that is the appropriate sentence.[304]

HOLLAND, Justice, concurring in the Majority per curiam, with whom Chief Justice STRINE and Justice SEITZ join:

The State has charged the Defendant, Benjamin Rauf ("Rauf") by indictment with one count of First Degree Intentional Murder, one count of First Degree Felony Murder, Possession of a Firearm During those Felonies and First Degree Robbery. The State has expressed its intention to seek the penalty of death in the event Rauf is convicted on either of the First Degree Murder counts. On January 12, 2016, the United States Supreme Court held in *Hurst v. Florida*,[1] that Florida's capital sentencing scheme was unconstitutional because "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death."[2] On January 25, 2016, the Superior Court certified five questions of law to this Court for disposition in accordance with Rule 41 of the Supreme Court rules. On January 28, 2016, this Court accepted revised versions of the questions certified by the Superior Court and designated Rauf as the appellant and the State as the appellee.[3] What follows in this opinion are the reasons for my answers to each question.

### Question One

Under the Sixth Amendment to the United States Constitution, may a sentencing judge in a capital jury proceeding, independent of the jury, find the existence of "any aggravating circumstance," statutory or non-

statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding?

The answer to question one is no. In *Hurst*, the United States Supreme Court held that: "The Sixth Amendment requires a jury, not a judge, to find *each fact necessary* **\*483** to impose a sentence of death." [4] In *Hurst*, the Supreme Court applied its prior holdings in *Apprendi v. New Jersey*, [5] and *Ring v. Arizona*. [6] In *Apprendi*, the Supreme Court held "that any fact that 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to a jury." [7]

In *Hurst*, the Supreme Court stated: "In *Ring*, we concluded that Arizona's capital sentencing scheme violated *Apprendi*'s rule because the State allowed a judge to find the facts necessary to sentence a defendant the death." [8] The relevant inquiry in *Hurst*, as in *Ring*, was what maximum sentence the defendant could receive in the absence of judicial fact-finding. The United States Supreme Court answered that inquiry, as follows:

> As with Timothy Ring, the maximum punishment Timothy *Hurst* could have received without any judge-made findings was life in prison without parole. As with *Ring*, a judge increased *Hurst*'s authorized punishment based on her own factfinding. In light of *Ring*, we hold that *Hurst*'s sentence violates the Sixth Amendment. [9]

The Florida sentencing statute at issue in *Hurst* did "not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.' " [10] The holding in *Hurst* means that when a state statute requires a trial judge, instead of a jury, to make factual findings that are necessary before a death sentence can be imposed, the Sixth Amendment is violated.

In *Kansas v. Carr*, [11] the United States Supreme Court held that the finding that aggravating circumstances exist is without question a "purely factual determination." [12] Thus, finding the existence of aggravating circumstances is the functional equivalent of a criminal element in

support of the ultimate penalty. In *Hurst*, the United States Supreme Court overruled *Spaziano v. Florida*, [13] and *Hildwin v. Florida*, [14] and held sentencing schemes that "allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty," is impermissible under the Sixth Amendment. [15]

The Delaware death penalty statutes *requires* the State to give "[n]otice in writing of any aggravating circumstances [statutory and non-statutory] ... prior to the punishment hearing, and after the verdict on guilt." [16] The Delaware statute requires the judge to instruct the jury that "in **\*484** order to find the existence of a *statutory* aggravating circumstances" they must do so beyond a reasonable doubt and must be unanimous. [17] The Delaware statute also requires that "[a]s to any *statutory* aggravating circumstances ... which were alleged but for which the jury is not unanimous, the jury shall report the number of affirmative and negative votes on each such [statutory aggravating] circumstance." [18]

The Delaware statute does not require the jury to be instructed that the existence of non-statutory aggravating circumstances must be found unanimously and beyond a reasonable doubt. It does not require the jury to specifically identify any of the non-statutory aggravating circumstances that it found to exist. It also does not require the jury to report the affirmative and negative votes on any alleged non-statutory aggravating circumstance for which there was not unanimity.

After the jury finds at least one statutory aggravating circumstance, the defendant is death eligible. However, as with Timothy Ring and Timothy Hurst, the maximum punishment a defendant in Delaware can receive without any additional judge-made factual findings is life in prison. [19] Under the current Delaware capital sentencing scheme, the judge alone, without knowledge of which, if any, non-statutory aggravating circumstances the jury found unanimously and beyond a reasonable doubt or otherwise, independently finds the existence of non-statutory aggravating circumstances. [20] As with the capital sentencing schemes at issue in *Ring* and *Hurst*, a Delaware judge alone can increase a defendant's jury authorized punishment of life to a death sentence, based on her own additional factfinding of non-statutory

aggravating circumstances. In light of *Hurst*'s application of *Ring*, this violates the Sixth Amendment. Accordingly, that provision in the Delaware death penalty statute is unconstitutional.

### Question Two

If the finding of the existence of "any aggravating circumstance," statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding must be made by a jury, must the jury make the finding unanimously and beyond a reasonable doubt to comport with federal constitutional standards?

The answer to question two is yes. First, unanimous verdicts are an essential component of the Sixth Amendment guarantee to the right to a trial by jury: "[T]he historical foundation for our recognition of these principles extends down centuries into the common law. '[T]o guard against a spirit of oppression and tyranny,' ... trial by jury has been understood to require that '*the truth of every accusation* ... be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours....' " [21] Although Justice Powell wrote, in an opinion concurring in judgment with the United States Supreme Court's plurality opinion in *Apodaca v. Oregon*, [22] that non-unanimous jury verdicts were permissible, [23] his reasoning has since **\*485** been called into question. [24] Moreover, when Justice Scalia concurred in *Apprendi*, he wrote that charges against the accused, and the maximum exposure the accused faces, must be determined "*beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens.*" [25] Nevertheless, there is no doubt that unanimous jury verdicts are required by the Delaware Constitution even though that question is not before us. [26] Second, in *Hurst*, the Supreme Court stated: "The Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury....' This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt." [27] As succinctly summarized by Justice Scalia, when he concurred in *Ring*: "[T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition

of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt." [28]

### Question Three

Does the Sixth Amendment to the United States Constitution require a jury, not a sentencing judge, to find that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist because, under 11 *Del. C.* § 4209, this is the critical finding upon which the sentencing judge "shall impose a sentence of death"?

The answer to question three is yes. This Court has recognized that the weighing determination in Delaware's statutory sentencing scheme is a factual finding necessary to impose a death sentence. [29] "[A] judge cannot sentence a defendant to death without finding that the aggravating factors outweigh the mitigating factors...." [30] The relevant "maximum" sentence, for Sixth Amendment purposes, that can be imposed under Delaware law, in the absence of any judge-made findings on the relative weights of the aggravating and mitigating factors, is life imprisonment. In *Hurst*, the Supreme Court noted "the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole." [31]

As in Florida's statutory scheme that was held to be unconstitutional in *Hurst*, in Delaware, the judge alone "must find the facts that sufficient aggravating circumstances **\*486** exist and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances" before a death sentence may be imposed. [32] When the Delaware death penalty statute was amended in 2003, the synopsis to that legislation stated, in relevant part:

> This Act will reverse the Delaware Supreme Court's judicial misinterpretation of Delaware's death penalty statute by repealing the Tedder standard adopted by the Supreme Court in [*Garden v State*]. It will clarify that

it is and has been the intent of the General Assembly that while the sentencing judge must consider a jury's recommended finding on the question of whether the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist, he or she shall not be bound by the recommendation, but instead shall give it such weight as he or she deems appropriate under the circumstances present in a given case. [33]

In *Hurst*, the Supreme Court explained why Delaware's advisory system, in which the jury provides its non-binding recommendation whether or not the aggravating circumstances outweigh the mitigating circumstances, does not qualify as a "finding" by a jury for Sixth Amendment purposes. [34] After the decision in *Hurst*, when a statute provides for the judge alone to make the factual findings necessary for the imposition of a death sentence, it violates Sixth Amendment.

In 2003, in *Brice v State*, [35] this Court held that the Delaware statute did not violate the Sixth Amendment under *Ring*. [36] In *Brice*, this Court determined that the jury's verdict finding proof of a statutory aggravating circumstance satisfied the Sixth Amendment because it was this death eligibility finding alone that served to increase the maximum punishment to death. [37] This Court's holding in *Brice* was based upon the United States Supreme Court's decision in *Hildwin*. [38] However, in *Hurst*, the decisions in *Hildwin* and *Spaziano* were both "overruled to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty." [39] Thus, just as "[t]ime and subsequent cases have washed away the logic of *Spaziano* and *Hildwin*," the reasoning of *Brice* is no longer viable following the decision *Hurst*.

The only constitutional infirmity at issue in *Ring* and *Hurst* was the judicial determination of aggravating circumstances. On the other hand, *Woodward v. Alabama*, [40] involved a challenge to Alabama's capital punishment scheme, which allows judges to independently weigh aggravating and mitigating circumstances and impose death sentences, even where a jury has recommended a sentence of life in prison. [41] Justice Sotomayor, dissenting from the denial **\*487** of certiorari in *Woodward* made this observation:

> A defendant is eligible for the death penalty in Alabama only upon a specific factual finding that any aggravating factors outweigh the mitigating factors he has presented. The statutorily required finding that the aggravating factors of a defendant's crime outweigh the mitigating factors is therefore necessary to impose the death penalty. It is clear, then, that this factual finding exposes the defendant to a greater punishment than he would otherwise receive: death, as opposed to life without parole. Under *Apprendi* and *Ring*, a finding that has such an effect must be made by a jury. [42]

Justice Sotomayor was the author of *Hurst*, which held: "The Sixth Amendment requires a jury, not a judge, to find *each fact necessary* to impose a sentence of death." [43] Although the United States Supreme Court's holding in *Hurst* only specifically invalidated a judicial determination of aggravating circumstances, it also stated unequivocally that the jury trial right recognized in *Ring* now applies to *all* factual findings *necessary* to impose a death sentence under a state statute. The logical extension of that broader statement in *Hurst* is that a jury must determine the relative weight of aggravating and mitigating circumstances. [44] Therefore, according to the broader statement in *Hurst*, the weighing process provision in the Delaware death penalty statute is unconstitutional because it violates the Sixth Amendment.

### Question Four

If the finding that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist must be made by a jury, must the jury make that finding

unanimously and beyond a reasonable doubt to comport with federal constitutional standards?

The answer to question four is yes for the same reasons given in response to question two.

### Question Five

If any procedure in 11 *Del. C.* § 4209's capital sentencing scheme does not comport with federal constitutional standards, can the provision for such be severed from the remainder of 11 *Del. C.* § 4209, and the Court proceed with instructions to the jury that comport with federal constitutional standards?

The answer to question five is no. The multiple infirmities in the Delaware death penalty statute, as a result of the United States Supreme Court's decision in *Hurst*, must be addressed by the General Assembly.

VALIHURA, Justice, concurring in part and dissenting in part as to the per curiam Opinion:
In light of the United States Supreme Court's decision in *Hurst v. Florida*, [1] this Court certified five questions from the Superior Court concerning the constitutionality of 11 *Del. C.* § 4209. My answers are as follows:

1. Under the Sixth Amendment to the United States Constitution, may a sentencing judge in a capital jury proceeding, independent of the jury, find the existence of "any aggravating circumstance," statutory or non-statutory, that has been alleged by the **\*488** State for weighing in the selection phase of a capital sentencing proceeding? *Answer: Negative.*

2. If the finding of the existence of "any aggravating circumstance," statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding must be made by a jury, must the jury make the finding unanimously and beyond a reasonable doubt to comport with federal constitutional standards? *Answer: Negative as to unanimity (as a matter of federal law only, and not Delaware constitutional law, which requires unanimity); affirmative as to the burden of proof.*

3. Does the Sixth Amendment to the United States Constitution require a jury, not a sentencing judge, to find that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist because, under 11 *Del. C.* § 4209, this is the critical finding upon which the sentencing judge "shall impose a sentence of death"? *Answer: Negative.*

4. If the finding that the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist must be made by a jury, must the jury make that finding unanimously and beyond a reasonable doubt to comport with federal constitutional standards? *Answer: Given my answer to Question 3, Question 4 is inapplicable.*

5. If any procedure in 11 *Del. C.* § 4209's capital sentencing scheme does not comport with federal constitutional standards, can the provision for such be severed from the remainder of 11 *Del. C.* § 4209, and the Court proceed with instructions to the jury that comport with federal constitutional standards? *Answer: Negative.*

## I. CERTIFIED QUESTION 1, AS TO WHETHER A JUDGE, INDEPENDENT OF A JURY, MAY FIND AGGRAVATING CIRCUMSTANCES, SHOULD BE ANSWERED IN THE NEGATIVE

Question 1 should be answered in the negative. In *Hurst*, the United States Supreme Court concluded that Florida's capital sentencing statute did not comport with *Ring v. Arizona*.[2] *Ring* "required a jury to find every fact necessary to render [a defendant] eligible for the death penalty." [3] Because "Florida's sentencing scheme ... required the judge alone to find the existence of an aggravating circumstance," the Supreme Court concluded that it was unconstitutional. [4] The *Hurst* Court held that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." [5] Finding that "[t]he analysis the *Ring* Court applied to Arizona's sentencing scheme applie[d] equally to Florida's," [6] *Hurst* overruled **\*489** *Spaziano v. Florida* [7] and *Hildwin v. Florida*, [8] but only "*in relevant part*" [9] and "*to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's*

factfinding, that is necessary for imposition of the death penalty." [10]

In my view, 11 *Del. C.* § 4209 complies with the Sixth Amendment to the United States Constitution so long as the judge finds and relies upon only those aggravating circumstances found by the jury beyond a reasonable doubt. To the extent that it permits the death penalty to be imposed as a result of aggravating circumstances found only by the judge, and not the jury, then our statute runs afoul of *Hurst*. [11]

There is no question that the Delaware statute permits the trial court to find aggravating factors that were never found by the jury. [12] In addition to the plain language of the statute itself, this Court's decision in *Ploof v. State*, [13] which cited *Ortiz v. State* [14] with approval, makes this clear. [15] Because an aggravating circumstance **\*490** found by a judge, but not by a jury, may be necessary for imposition of the death penalty, it operates as "the functional equivalent of an element of a greater offense" [16] and the Sixth Amendment requires that it be found by a jury. [17]

The following hypothetical illustrates how 11 *Del. C.* § 4209 may run afoul of *Hurst* in the instance where a judge finds an aggravating factor, or multiple aggravating factors, not found by the jury. Assume the defendant is convicted of first-degree murder by a jury that later finds the existence of one statutory aggravating factor unanimously and beyond a reasonable doubt. The jury recommends a life sentence. The judge, without hearing any new evidence, finds three aggravating circumstances not found by the jury and gives *de minimis* or no weight to the aggravating factor found by the jury. She concludes that the aggravating circumstances that she found outweigh the mitigating circumstances. The judge imposes a sentence of death, overriding the jury's advisory recommendation primarily on the basis of the three aggravators that she found.

In my hypothetical, the court's three independent factual findings of aggravating circumstances were "necessary for imposition of the death penalty." [18] Absent factfinding by the court, the maximum punishment the defendant could receive under our statute is life, since the judge was not persuaded that the sole aggravating circumstance found

by the jury outweighed the mitigating circumstances. [19] The plain language of *Hurst* provides that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." [20]

*Hurst* is the next step in a progression of cases that have enhanced the jury's role in certain, but not all, aspects of capital cases. In 2000, the United States Supreme **\*491** Court decided *Apprendi v. New Jersey*. [21] The defendant in *Apprendi* pled guilty to multiple felonies. Pursuant to a New Jersey statute that increased the maximum sentence from 10 years to 20 years if the court found that the defendant committed his crime with racial bias, the defendant was sentenced to a 12–year term of imprisonment after the judge found that the "hate crime" sentencing enhancement applied. On appeal, the United States Supreme Court found the defendant's sentence to have been unconstitutionally enhanced by judicial factfinding. The *Apprendi* Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." [22]

Four years later, in a non-capital case, *Blakely v. Washington*, [23] Justice Scalia, writing for the Majority, stated that the United States Supreme Court's "precedents make clear ... that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" [24] *Blakely* further stated that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority." [25]

In *Blakely*, the defendant's plea supported a maximum sentence of 53 months. But the judge imposed a 90–month sentence after finding the defendant had acted with deliberate cruelty. The State of Washington contended that there was no *Apprendi* violation because the maximum sentence was not 53 months, but rather the 10–year maximum corresponding to a certain classification of felonies. Rejecting that contention, the *Blakely* Court stated that "[t]he 'maximum sentence' is no more 10 years here than it was 20 years in *Apprendi* (because that is what the judge could have imposed upon finding a hate crime)

or death in *Ring* (because that is what the judge could have imposed upon finding an aggravator)." [26]

In 2013, in *Alleyne v. United States*, [27] a non-capital case, the United States Supreme Court overruled its decision in *Harris v. United States*, [28] where the Court declined to extend *Apprendi* to facts that increased the mandatory minimum sentence **\*492** but not the maximum sentence. The *Harris* Court held that judicial factfinding that increased the mandatory minimum did not implicate the Sixth Amendment. "Because the jury's verdict 'authorized the judge to impose the minimum with or without the finding,' the Court was of the view that the factual basis for increasing the minimum sentence was not 'essential' to the defendant's punishment. Instead, it merely limited the judge's 'choices within the authorized range.' " [29] *Alleyne* overruled *Harris*.

In *Alleyne*, the defendant was charged with using or carrying a firearm in relation to a crime of violence, which carried a five-year mandatory minimum sentence that increased to a seven-year mandatory minimum sentence if the firearm was "brandished." [30] The jury convicted the defendant. The sentencing range supported by the jury's verdict was five years' imprisonment to life, but the judge, rather than the jury, found that the defendant brandished the firearm, increasing the mandatory minimum sentence from five years to seven years. The judge's finding that the defendant brandished the firearm, the *Alleyne* Court held, violated the Sixth Amendment right to a jury trial. [31] *Alleyne* made clear that *Apprendi*'s definition of an element of an offense necessarily included not only facts that increased the punishment ceiling, but also those that increased the floor. As Justice Thomas wrote in *Alleyne*, "[d]efining facts that increase a mandatory statutory minimum to be part of the substantive offense enables the defendant to predict the legally applicable penalty from the face of the indictment," and "[i]t also preserves the historic role of the jury as an intermediary between the State and criminal defendants." [32] The United States Supreme Court further concluded in *Alleyne* that

> the essential Sixth Amendment inquiry is whether a fact is an element of the crime. When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent

part of a new offense and must be submitted to the jury. It is no answer to say that the defendant could have received the same sentence with or without that fact. [33]

Accordingly, the Supreme Court stated that "if a judge were to find a fact that increased the statutory maximum sentence, **\*493** such a finding would violate the Sixth Amendment, even if the defendant ultimately received a sentence falling within the original sentencing range (*i.e.*, the range applicable without that aggravating fact)." [34] *Apprendi*, *Ring*, *Blakely*, *Alleyne*, and *Hurst*—decided in the years 2000, 2002, 2004, 2013, and 2016, respectively—can be read as a linear development of the United States Supreme Court's Sixth Amendment jurisprudence. [35]

This Court's principal case upholding the constitutionality of the post-*Ring* variant of 11 *Del. C.* § 4209, *Brice v. State*, [36] is no longer viable as a result of *Hurst*. *Brice*'s statement that "a finding of non-statutory factors does not 'increase' the maximum penalty that a defendant can receive" [37] conflicts with *Hurst*'s plain language, which prohibits judicial findings of aggravating circumstances that are "necessary for imposition of the death penalty." [38] As my hypothetical illustrates, the judge was statutorily required to sentence the defendant to life because she would not have imposed death absent her independent findings of additional aggravating circumstances. Thus, the additional judicial findings were necessary for imposition of the death penalty. [39] If it remained unclear how the principles espoused in *Alleyne* and *Blakely* apply in the capital sentencing context, the Supreme Court's language in *Hurst* makes clear that the foundational "underpinnings" of *Brice* have been "eroded." [40]

## II. CERTIFIED QUESTION 2 SHOULD BE ANSWERED IN THE NEGATIVE AS TO UNANIMITY AND IN THE AFFIRMATIVE AS TO THE BURDEN OF PROOF

Question 2 should be answered in the negative with respect to unanimity, as a matter of federal constitutional law—not as a matter of the Delaware Constitution. [41] **\*494** However, Question 2 should be answered in the affirmative as to the burden of proof.

Under Delaware's present capital sentencing framework, the jury's primary function in the sentencing phase is to make a factual finding concerning the existence of a statutory aggravating circumstance. The jury also makes a sentencing recommendation regarding whether the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.

In *Apodaca v. Oregon*, [42] the United States Supreme Court held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in State criminal trials. [43] There, the Supreme Court considered whether convictions of crimes by less-than-unanimous juries violated the right to trial by jury in criminal cases under the Sixth Amendment. A plurality of the Court "perceive[d] no difference between juries required to act unanimously and those permitted to convict or acquit by votes of 10 to two or 11 to one." [44] The plurality concluded that "in either case, the interest of the defendant in having the judgment of his peers interposed between himself and the officers of the State who prosecute and judge him is equally well served." [45]

In *McDonald v. City of Chicago*, [46] the United States Supreme Court observed that the outcome in *Apodaca* "was the result of an unusual division among the Justices," where "four Justices took the view that the Sixth Amendment does not require unanimous jury verdicts in either federal or state criminal trials, and four other Justices took the view that the Sixth Amendment requires unanimous jury verdicts in federal and state criminal trials." [47] The *McDonald* Court nevertheless observed that "Justice Powell's concurrence in the [*Apodaca*] judgment broke the tie, and he concluded that the Sixth Amendment requires juror unanimity in federal, but not state, cases." [48]

More recently, in *Hurst*, the petitioner challenged the viability of *Apodaca*, but the Supreme Court declined to address whether the Sixth Amendment right to trial by jury requires a unanimous jury **\*495** verdict in State criminal trials. [49] Thus, *Apodaca* remains the federal constitutional law. *Apodaca*'s precariousness notwithstanding, as a matter of the Delaware Constitution, the jury must unanimously find

beyond a reasonable doubt the existence of at least one statutory aggravating factor as a predicate to the imposition of the death penalty. [50] But, as currently interpreted, the Sixth Amendment does not require jury unanimity in State criminal trials.

With respect to the burden of proof, the Sixth Amendment, as interpreted in *Apprendi*, *Ring*, and *Hurst*, requires that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." [51] In *Hurst*, the United States Supreme Court reiterated its holding in *Apprendi* that any fact that " 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' [of a crime] that must be submitted to a jury." [52] Because the determination of the existence of an aggravating circumstance is "purely factual," [53] and such a finding exposes the defendant to a greater punishment than "the maximum he would receive if punished according to the facts reflected in the jury verdict alone," it must be found by a jury beyond a reasonable doubt. [54]

### III. CERTIFIED QUESTION 3, WHICH ASKS WHETHER THE WEIGHING FUNCTION MUST BE PERFORMED BY A JURY, SHOULD BE ANSWERED IN THE NEGATIVE

As certified to this Court, Question 3 should be answered in the negative. I reach this conclusion for two reasons. *First*, *Hurst* overruled *Spaziano* and *Hildwin* only in part. *Hurst* leaves undisturbed the United States Supreme Court's clear statement in *Spaziano* that "the Sixth Amendment does not require jury sentencing" **\*496** in capital cases. [55] *Second*, the most logical reading of *Hurst* is that it, like *Ring*, requires a jury to find an aggravating circumstance necessary for imposition of the death penalty, but it does not require the jury to perform the weighing function. [56]

Further, *Hurst*—which does not speak to the weighing function directly—should not be viewed as *implicitly* overruling the constitutionality of judicial sentencing in capital cases in the face of such clear authority to the contrary, and especially when the author of *Hurst*, Justice Sotomayor, has *explicitly* addressed the weighing function

in a separate opinion dissenting from the denial of *certiorari* in *Woodward v. Alabama*. [57] The *Hurst* decision does not refer to *Woodward*, where Justice Sotomayor, in her dissent, observed that the Alabama capital sentencing scheme rendered a defendant death eligible upon a

> factual finding that any aggravating factors outweigh the mitigating factors he has presented. *The statutorily required finding that the aggravating factors of a defendant's crime outweigh the mitigating factors is therefore necessary to impose the death penalty.* It is clear, then, that this factual finding exposes the defendant to a greater punishment than he would otherwise receive: death, as opposed to life without parole. Under *Apprendi* and *Ring*, a finding that has such an effect must be made by a jury. [58]

*Hurst* does not hold that a jury determination of the appropriate sentence to be imposed is a necessary element of a constitutional capital sentencing framework. The distinguished author of *Hurst* could have said so—as she did in *Woodward*—if that is what the Supreme Court intended in *Hurst*.

Finally, given that our legislature has, in recent amendments to 11 *Del. C.* § 4209, stated that weighing is a *judicial* function under our statutory scheme, I cannot embrace a reading of *Hurst*—in the face of unambiguous United States Supreme Court precedent to the contrary— that would subvert our General Assembly's clear intent to have judges be the ultimate sentencing authority. I explain each of these points more fully below.

### A. *The United States Supreme Court Has Expressly Approved of Judicial Sentencing, and Hurst Did Not Overrule Those Decisions*

#### 1. Prior to *Hurst*, Judicial Sentencing Was Explicitly Sanctioned

The United States Supreme Court has, on multiple occasions, expressly sanctioned judicial sentencing in capital cases. Prior to *Hurst*, the Supreme Court "made

abundantly clear that a defendant does not enjoy a constitutional right to a jury determination as to the appropriate sentence to be imposed." [59] The *Spaziano* Court stated **\*497** that "[t]he Sixth Amendment never has been thought to guarantee a right to a jury determination" of "the appropriate punishment to be imposed on an individual." [60]

The death penalty is not "frustrated by, or inconsistent with, a scheme in which the imposition of the penalty in individual cases is determined by a judge." [61] Concurring in *Ring*, Justice Scalia observed that "[t]hose States that leave the ultimate life-or-death decision to the judge may ... do so—by requiring a prior jury finding of aggravating factor in the sentencing phase or, more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase." [62] *Hurst* and *Ring* do not require a jury to make the determination that the aggravating circumstances outweigh the mitigating circumstances. [63]

#### 2. *Hurst* Overrules *Spaziano* Only in "Relevant Part" and Does Not Address *Proffitt*

*Hurst* overruled *Spaziano* and *Hildwin* "in relevant part" and "to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty." [64] The *Hurst* Court did not hold that the Sixth Amendment requires that a jury must make the determination as to the appropriate sentence to be imposed in capital cases. Nor did *Ring* address whether "the Sixth Amendment require[s] the jury to make **\*498** the ultimate determination whether to impose the death penalty." [65]

In *Proffitt v. Florida*, [66] a plurality of the United States Supreme Court did address whether the Sixth Amendment requires jury sentencing in capital cases. *Proffitt* states clearly that judicial sentencing is constitutionally permissible. [67] *Proffitt* "pointed out that jury sentencing in a capital case can perform an important societal function," but it also emphasized that the Supreme Court "has *never* suggested that jury sentencing is constitutionally required." [68] Following *Proffitt*, where the Court has considered sentencing authorities in capital

cases, it has embraced judicial sentencing. [69] *Hurst* does not mention *Proffitt*.

Moreover, Justice Breyer's concurrence in *Hurst*—which has not yet garnered majority support on the United States Supreme Court—would not have been necessary if the Court's Opinion contemplated weighing by a jury as opposed to a judge. He wrote:

> For the reasons explained in my opinion concurring in the judgment in *Ring v. Arizona*, I cannot join the Court's opinion. As in that case, however, I concur in the judgment here based on my view that "the Eighth Amendment requires that a jury, not a judge, make the decision to sentence a defendant to death." [70]

Justice Breyer concurred in the *Hurst* judgment precisely because the Majority did not hold that jury sentencing was constitutionally required, either by the Sixth or Eighth Amendment, in capital cases.

### B. *Principles of Federalism and Separation of Powers Call for Judicial Restraint and Favor a Narrower Holding That Judicial Sentencing Remains Permissible*

Within our constitutional system of checks and balances, a State statute can be invalidated on the grounds that it violates the United States Constitution. [71] However, **\*499** I believe that a decision to render 11 *Del. C.* § 4209 unconstitutional here should only occur if *Hurst* unambiguously calls for such a result. [72] As to judicial sentencing, *Hurst*, in my view, is at least ambiguous. This fact should be counterbalanced against the undeniable reality that our State statute could not be more clear that judicial sentencing was intended.

To illustrate, in 1991, Delaware's legislature amended 11 *Del. C.* § 4209 to effect a change from jury sentencing to judge sentencing. The synopsis of that amendment to the statute states:

> This bill would cause the judge to make the final determination as to whether a person convicted of first degree murder should be sentenced to death or life imprisonment. The bill provides a clear statutory framework to guide the judge

and the jury would assist in this determination by rendering, after deliberations, as [*sic*] an advisory sentence to be imposed. This bill generally follows the Florida statute as approved by the United States Supreme Court. [73]

In 2002, following *Ring*, our statute was amended to largely reflect its present form. [74] 11 *Del. C.* § 4209 was amended **\*500** again in 2003 to reflect our General Assembly's desire to have the ultimate sentencing authority reside with the judge as opposed to the jury. [75] The synopsis to the 2003 amendment states: "This Act re-affirms the intent of the General Assembly that the sentencing judge in a capital murder case shall be ultimately responsible for determining the penalty to be imposed." [76]

These legislative enactments endorsing judicial sentencing are the result of our General Assembly's reactions to criminal cases that deeply impacted Delaware's citizenry. Particularly because *Hurst* does not expressly address judicial sentencing, and instead suggests that certain aspects of *Spaziano* and *Hildwin* survive, principles of federalism and separation of powers call for judicial restraint so as to not so easily unravel what our State legislature has deemed appropriate on more than one occasion. While the progression of United States Supreme Court jurisprudence discussed in my response to Certified Question 1 may evolve to eventually require jury sentencing, *Hurst* does not clearly mandate jury sentencing in capital cases.

### IV. CERTIFIED QUESTION 4 IS INAPPLICABLE

Given my answer to Question 3, Question 4 is inapplicable.

### V. CERTIFIED QUESTION 5, AS TO WHETHER ANY UNCONSTITUTIONAL PROVISION CAN BE SEVERED, SHOULD BE ANSWERED IN THE NEGATIVE

In view the integral nature of the provisions of 11 *Del. C.* § 4209 that involve the findings of aggravating circumstances, the needed correction cannot

be adequately addressed with jury instructions. [77] Instead, the revisions must be addressed by the General Assembly.

## VI. CONCLUSION

What we address today is not whether capital punishment is categorically constitutional or not. In this regard, the United States Supreme Court has recently said that, as a matter of federal constitutional law, the death penalty is constitutional. Last year, for example, in *Glossip v. Gross*, [78] the Supreme Court stated that it has "time and again reaffirmed that capital punishment is not *per se* unconstitutional." [79] Indeed, the Fifth Amendment to the United States Constitution expressly contemplates capital punishment. [80]

Nor is what the Delaware Constitution may require the subject of the certified **\*501** questions. Rather, we focus on whether the United States Supreme Court's decision in *Hurst* invalidates any portion of our State death penalty statute as a matter of federal constitutional law only. The constitutional issues addressed in *Hurst*—and, for that matter, *Ring*—concerned the judicial determination of aggravating circumstances. Based upon a plain reading of *Hurst*, I conclude that the only portions of our statute that are adversely impacted concern judicial findings of aggravating circumstances not found by the jury.

From my perspective, *Hurst* does not reach our statute's provision for judicial weighing of aggravating and mitigating circumstances. Judicial restraint calls for leaving the issue of judicial sentencing in capital cases to a day when the United States Supreme Court unambiguously addresses the matter. As the Supreme Court reiterated in *Schad v. Arizona*, [81] "[i]t goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government." [82] The *Schad* Court further observed that "we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States." [83] Based upon the Supreme Court's recent remand of three cases involving Alabama's death penalty statute [84]—a statute which bears some similarity to Delaware's—the Court may eventually reconsider the issue of judicial sentencing. But until then, I am persuaded by Justice Scalia's observations in his separate concurrence in *Glossip*, where he stated:

Capital punishment presents moral questions that philosophers, theologians, and statesmen have grappled with for millennia. The Framers of our Constitution disagreed bitterly on the matter. For that reason, they handled it the same way they handled many other controversial issues: they left it to the People to decide. [85]

Accordingly, I would leave to the citizens of Delaware to decide certain issues regarding capital punishment not directly addressed by *Hurst*—and I would not declare unconstitutional other aspects of 11 *Del. C.* § 4209 without a clear directive from the United States Supreme Court.

VAUGHN, Justice, dissenting:

I am not persuaded that *Hurst v. Florida* [1] requires a finding that Delaware's death penalty statute violates the Sixth Amendment to the United States Constitution. While I have seen it written that the Florida statute, in effect at the time of *Hurst*, and the Delaware statute are similar, **\*502** they are fundamentally different on a point which is central to this case. Under Florida's statute as it then existed, the jury's finding of the existence of a statutory aggravating factor was purely advisory. In addition, it did not need to be unanimous. A majority vote was enough. The jury made no express finding as to the existence of any specific statutory aggravating factor, which means that some jurors could find the existence of one statutory aggravating factor while others could find the existence of a different factor. Since the jury's role was purely advisory, the judge could reject a jury finding that no statutory aggravating factor existed and sentence the defendant to death based on his or her own findings. That cannot happen under Delaware's statute. In Delaware the jury must find the existence of at least one specific statutory aggravating factor unanimously and beyond a reasonable doubt in order for the defendant to be eligible to receive the death penalty. If the jury does not find the existence of a specific statutory aggravating factor unanimously and beyond a reasonable doubt, the process stops, and the judge sentences the defendant to life imprisonment.

For me, the analysis in this case begins with *Apprendi v. New Jersey* [2] and *Ring v. Arizona*. [3] In *Apprendi*, the U. S. Supreme Court held that a factual determination authorizing an increase in a maximum prison term must be found by a jury beyond a reasonable doubt. [4] In *Ring*, the Court applied *Apprendi* to Arizona's death penalty statute. [5] The Arizona statute in effect at the time of *Ring* gave the jury no role in sentencing. [6] The law authorized a judge to sentence a defendant to death for the crime of murder if the judge found at least one of certain, enumerated aggravating circumstances to exist and "there [were] no mitigating circumstances sufficiently substantial to call for leniency." [7] This language created a form of a weighing process which the judge engaged in if he or she found that an aggravating circumstance existed.

The U.S. Supreme Court observed that under Arizona's statute, a "death sentence may not legally be imposed ... unless at least one aggravating factor is found to exist beyond a reasonable doubt." [8] It stated that "[t]he question presented was whether that aggravating factor may be found by a judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury." [9] The Court reasoned that a jury must determine "any fact on which the legislature conditions an increase in [a defendant's] maximum punishment," [10] and overruled *Walton v. Arizona* [11] "to the extent that it allows a sentencing judge, sitting without a **503** jury, to find an aggravating circumstance necessary for the imposition of the death penalty." [12] The opinion did not discuss any jury fact-finding role in the weighing process that followed the finding of the existence of an aggravating circumstance.

In his concurrence in *Ring*, Justice Scalia said that "today's judgment has nothing to do with jury sentencing. ... Those States that leave the ultimate life-or-death decision to the judge may continue to do so...." [13] This statement brought no comment from the majority. Justice Breyer concurred in the judgment because of his view that the Eighth Amendment requires jury sentencing. All of the other eight Justices passed on the opportunity to join his concurrence.

It follows, in my view, that in 2002 when *Ring* was decided, the U.S. Supreme Court held the view that the Sixth Amendment required the jury to find the existence of an aggravating factor, unanimously and beyond a reasonable doubt, in order for a defendant to be sentenced to death, but did not require that all the facts underlying the weighing process be found by a jury, and did not require jury sentencing. *Ring* stands only for the principle that the jury must find the existence of at least one statutory aggravating factor, unanimously and beyond a reasonable doubt, in order to elevate the defendant's maximum punishment from life imprisonment to death. That is the view of *Ring* which this Court adopted in *Brice v. State*, [14] which I think was correct then and remains correct after *Hurst*.

The pertinent difference between Arizona's statute at the time of *Ring* and Florida's statute was that under Arizona's statute the jury had no role in sentencing, whereas under the Florida statute it had only an advisory role. After *Ring*, that is a distinction without a difference. It is clear that the characteristics of Florida's statute failed to comply with *Ring*'s requirement that a jury must determine "any fact on which the legislature conditions an increase in [a defendant's] maximum punishment." [15] Florida never changed its statute to bring it into compliance with *Ring*. [16] Although Florida attempted to defend its statute before the U. S. Supreme Court in *Hurst*, the statute's failure to comply with *Ring* is actually quite obvious. I think that after *Ring* was decided, the eventual overruling of *Hildwin v. Florida* [17] and *Spaziano v. Florida*, [18] which occurred in *Hurst*, was very predictable.

Much is made of the sentence in *Hurst* which reads "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." [19] When this sentence is read as supporting a conclusion that the Sixth Amendment requires jury fact finding in the weighing process or jury sentencing, I think it is read out of context. I believe that the most reasonable explanation of *Hurst* is that it applied *Ring* without broadening *Ring*. In *Hurst*, the majority as much as says so, in my opinion:

> The analysis the *Ring* Court applied to Arizona's sentencing scheme applies **504** equally to Florida's. Like Arizona at the time of *Ring*,

Florida does not require the jury to make the critical findings necessary to impose the death penalty. [20]

Another passage in *Hurst* recognizes the rule set forth in *Ring*. Referring to the Florida Supreme Court, the Court stated:

As relevant here, the court rejected *Hurst*'s argument that his sentence violated the Sixth Amendment in light of *Ring*. *Ring*, the court recognized, "held that capital defendants are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum punishment." But the court considered *Ring* inapplicable in light of this Court's repeated support of Florida's capital sentencing scheme in pre-*Ring* cases. [21]

In responding to the State of Florida's arguments, the Court again refers to death eligibility:

Florida concedes that *Ring* required a jury to find every fact necessary to render *Hurst* eligible for the death penalty.... The State fails to appreciate the central and singular role the judge plays under Florida law. As described above and by the Florida Supreme Court, the Florida sentencing statute does not make a defendant eligible for death until findings *by the court* that such person shall be punished by death. [22]

Whether a jury should be required to find the existence of all facts which underlie the weighing process or have a greater role in the weighing process was not before the Court in *Hurst*. In my opinion, the Court was not discussing the weighing process in *Hurst*. The question presented in *Hurst* was simple and straightforward:

Whether Florida's death sentencing scheme violates the Sixth Amendment or the Eighth Amendment in light of this Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). [23]

The question presented did not ask whether the jury's fact finding role should be broadened. Timothy Lee Hurst's attorneys did not argue, as far as I can determine, that the Sixth Amendment requires that the jury must find all facts underlying the weighing process. They did not need to because the Florida statute failed to comply with *Ring*'s requirement that the jury make all findings of fact which make a defendant death eligible.

In their opening brief in the U.S. Supreme Court, the attorneys for Timothy Lee Hurst included an argument which I read as an argument that Florida's death penalty statute is unconstitutional because it is not like Delaware's. After arguing that *Hildwin*—a case which had previously upheld Florida's death penalty statute [24]— should be overruled, counsel for Timothy Lee Hurst argued:

Tellingly, the three other States that, at the time of *Ring*, had "hybrid systems, in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determinations," *Ring*, 536 U.S. at 608 n.6, 122 S.Ct. 2428, modified their capital sentencing schemes after *Ring* to ensure that the jury makes all findings necessary for imposition of the death penalty (even if the judge still **\*505** selects the sentence). *See Brice v. State*, 815 A.2d 314, 320 (Del. 2003).... [25]

Timothy Lee Hurst's attorneys themselves described Delaware's statute as one under which "the jury makes all findings necessary for imposition of the death penalty." [26] In my opinion, they are obviously referring to the death eligibility finding. Notice the similarity of this passage from Timothy Lee Hurst's opening brief to the statement in the majority opinion in *Hurst* that a jury must "find each fact necessary to impose a sentence of death."

At oral argument before the Court, the first remark made by the attorney representing Timothy Lee Hurst referred to death eligibility:

[Attorney for Timothy Lee Hurst]: Under Florida law, Timothy Hurst will go to his death despite the fact that a judge, not a jury, made the factual finding that rendered— rendered him eligible for death. That

violates the Sixth Amendment under *Ring*. [27]

Just a question later, he answers a question by again referring to death eligibility:

> Justice Scalia: Is there ever a case in which the jury found aggravators and recommended the death sentence, and the judge reversed that finding?

> [Attorney for Timothy Lee Hurst]: There may well be. This is principally a case about the finding of death eligibility, not sentence selection. [28]

Later in the argument, the attorney for Timothy Lee Hurst, in response to another question from Justice Scalia, refers to death eligibility and not the determination of the sentence:

> [Attorney for Timothy Lee Hurst]: Justice Scalia—exactly. And, Justice Scalia, leaving aside our Eighth Amendment point in our brief— that followed on Justice Breyer's concurrence in *Ring*, the—this is all about the eligibility, not the determination of what sentence applies. [29]

I interpret the statement in the majority opinion in *Hurst* that a jury must find "each fact necessary to impose a death sentence" to mean that the jury must find each fact that is necessary to increase the maximum punishment that the defendant may receive from a sentence of life imprisonment to the death penalty. Those facts are, in this case, with respect to Count I, (1) Rauf caused the death of the victim, (2) he did so intentionally, and (3) at least one, specific statutory aggravating factor exists; and, with respect to Count II, (1) Rauf, while engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit the felony of Robbery in the First Degree, (2) did recklessly cause the death of the victim. Since the elements of Count II contain a statutory aggravating factor within them, no finding of an additional statutory aggravating factor is required with respect to that Count. In my view, those are the facts "necessary" to impose the death penalty. If the U.S. Supreme Court in *Hurst* had intended to broaden *Ring* to require that **\*506** the jury make findings of fact in the weighing process or be the actual sentencing authority,

I think it would have said so more directly and more expressly.

Recently, in May and June of this year, the U. S. Supreme Court vacated the judgments in three Alabama death penalty cases; and remanded one to the Alabama Supreme Court and two to the Court of Criminal Appeals of Alabama for further consideration in light of *Hurst*. [30] Alabama law is relevant to the Delaware statute. Its statute, like Florida's, gives the jury only an advisory role in a death penalty sentencing. After *Ring*, Alabama did not amend its death penalty statute, but the Alabama Supreme Court performed a judicial "repair" to bring Alabama into compliance with *Ring*. [31] In *Ex parte McGriff*, it stated as follows:

> At no time during a retrial of the charge against McGriff should the jury be told that its decision on the issue of whether the proffered aggravating circumstance exists is "advisory" or "recommending." Rather, the jury should be instructed that, if it determines that the aggravating circumstance does not exist, the jury must return a verdict, binding on the trial court, assessing life imprisonment without the possibility of parole as the penalty. The jury should further be instructed that, if and only if, it unanimously finds the aggravating circumstance to exist beyond a reasonable doubt, the jury should weigh the aggravating circumstance against the mitigating circumstance or circumstances, if any, and to return a verdict in accordance with § 13A–5–46(e)(2) and (3) and (f).... [32]

The jury's verdict in the weighing process, like in Delaware, is advisory.

On June 17, 2016, after the remand orders, the Court of Criminal Appeals of Alabama, in *Ex parte State*, [33] in essence published its reconsideration of *Ring* after *Hurst*. It soundly rejected the view that *Hurst* broadened *Ring*, stating:

The Court in *Hurst* did nothing more than apply its previous holdings in *Apprendi* and *Ring* to Florida's capital-sentencing scheme. The Court did not announce a new rule of constitutional law, nor did it expand its holdings in *Apprendi* and *Ring*. As the State correctly argues, "*Hurst* did not add anything of substance to *Ring*." [34]

Until the U.S. Supreme Court speaks more clearly otherwise, I agree with this ruling by the Court of Criminal Appeals of Alabama.

Justice Scalia, who at the time of his concurrence in *Ring* believed the Sixth Amendment allows a State to give death penalty sentencing authority to a judge, is with the majority in *Hurst*. If he had changed his mind since *Ring*, I think he would have said so and explained why. Justice Breyer is still just concurring in the judgment only because he believes the Eighth Amendment requires jury sentencing. **\*507** And, as before, all of the other Justices passed on the opportunity to join in his concurrence.

I do think that there is ambiguity in *Hurst*. A concurring judge in the June 17, 2016 Alabama case I mention above suggests that the vagueness may be deliberate, and I wonder the same thing. [35] Justice Sotomayor, for instance, states in her dissent from the denial of certiorari in *Woodward v. Alabama* that a finding that the aggravating factors outweigh the mitigating factors is a finding of fact which must be made by a jury. [36] The case would have given the U.S. Supreme Court an opportunity to review the Alabama death penalty statute. However,

there apparently were not three other Justices who agreed with her that certiorari should be granted. In *Woodward* she was writing for herself. In *Hurst* she was writing for a majority of seven. I read *Hurst* as stopping short of what Justice Sotomayor stated very clearly in her dissent in *Woodward*.

Until the U.S. Supreme Court resolves this vagueness, I resolve it by concluding that *Hurst* applies *Ring* as interpreted by *Brice* but does not broaden it. I am satisfied that Delaware's death penalty statute complies with the Sixth Amendment as the law on that amendment is currently interpreted by the U.S. Supreme Court. Therefore, I answer the certified questions as follows:

1. Yes, so long as the jury has first found the existence of at least one statutory aggravating factor unanimously and beyond a reasonable doubt;

2. Given my answer to Number 1, my answer to Number 2 is No;

3. No;

4. Given my answers to the previous questions, my answer to Number 4 is No; and

5. Given my answers to the previous questions, Number 5 is not applicable. I do agree that 11 *Del. C.* § 4209 is not severable.

**All Citations**

145 A.3d 430

Footnotes

1    —— U.S. ——, 136 S.Ct. 616, 619, 193 L.Ed.2d 504 (2016).

2    *Rauf v. State*, No. 39, 2016 (Del. Jan. 28, 2016) (ORDER).

3    *See* 11 *Del. C.* § 4209(d)(1) ("If a jury has been impaneled and if the existence of at least 1 statutory aggravating circumstance as enumerated in subsection (e) of this section has been found beyond a reasonable doubt by the jury, the Court, after considering the findings and recommendation of the jury and without hearing or reviewing any additional evidence, shall impose a sentence of death if the Court finds by a preponderance of the evidence ... that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist. The jury's recommendation concerning whether the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist shall be given such consideration as deemed appropriate by the Court in light of the particular circumstances or details of the commission of the offense and the character and propensities of the offender as found to exist by the Court. The jury's recommendation shall not be binding upon the Court.").

4    *See* § 4209(c)(3)(b)(2) ("The jury shall report to the Court by the number of the affirmative and negative votes its recommendation on the question as to whether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bear upon the particular circumstances or details of the commission of the offense

and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.").

5   *See supra* note 3.

1   408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

2   —— U.S. ——, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

3   *Id.* at 619.

4   *Id.* at 624.

5   530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

6   *See, e.g.,* John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing,* 105 COLUM. L. REV. 1967 (2005); Nancy Gertner, *A Short History of American Sentencing: Too Little Law, Too Much Law, or Just Right,* 100 J. CRIM. L. & CRIMINOLOGY 691 (2010); Morris B. Hoffman, *The Case for Jury Sentencing,* 52 DUKE L.J. 951 (2003); Erik Lillquist, *The Puzzling Return of Jury Sentencing: Misgivings About Apprendi,* 82 N. C. L. REV. 621 (2004).

7   *See United States v. Grayson,* 438 U.S. 41, 45, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), *superseded by statute,* Sentencing Reform Act of 1984, 18 U.S.C. § 3551 et seq., 28 U.S.C. §§ 991–998, *as recognized in Barber v. Thomas,* 560 U.S. 474, 130 S.Ct. 2499, 177 L.Ed.2d 1 (2010); Lillquist, *supra* note 6, at 641–43.

8   *See Woodson v. North Carolina,* 428 U.S. 280, 289, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); EVAN J. MANDERY, CAPITAL PUNISHMENT IN AMERICA: A BALANCED EXAMINATION xxi (2d ed. 2012).

9   *See* Douglass, *supra* note 6, at 1977–78.

10   *See Woodson,* 428 U.S. at 289, 96 S.Ct. 2978; John W. Poulos, *The Supreme Court, Capital Punishment and the Substantive Criminal Law: The Rise and Fall of Mandatory Capital Punishment,* 28 ARIZ. L. REV. 143, 200 (1986).

11   *Woodson,* 428 U.S. at 290, 96 S.Ct. 2978; *see also* HUGO ADAM BEDAU, THE DEATH PENALTY IN AMERICA: CURRENT CONTROVERSIES 4 (1997).

12   *See* BEDAU, *supra* note 11, at 4–5 ("In rapid order most states followed Pennsylvania's lead, so that today every American jurisdiction that authorizes the death penalty for murder does so by limiting it to those convicted of murder in the first degree...."); *see also* RAYMOND TAYLOR BYE, CAPITAL PUNISHMENT IN THE UNITED STATES 5–6 (1919); 6 WAYNE R. LAFAVE, ET AL., CRIMINAL PROCEDURE § 26.1(b), at 670–71 (3d ed. 2007).

13   *Walton v. Arizona,* 497 U.S. 639, 710–11, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (Stevens, J., dissenting) (quoting Welsh S. White, *Fact–Finding and the Death Penalty: The Scope of a Defendant's Right to Jury Trial,* 65 NOTRE DAME L. REV. 1, 10–11 (1989)) (internal quotation marks omitted); *see also* Ronald F. Wright, *Rules for Sentencing Revolutions,* 108 YALE L.J. 1355, 1373 (1999).

14   *See, e.g., State v. Baynard,* 1 Del.Cas. 662 (O. & T. 1794); *State v. Donavan,* 1 Del.Cas. 168 (O. & T. 1798); *see also State v. Jeandell,* 5 Del. 475, 483 (Gen. Sess. 1854).

15   *See* Lillquist, *supra* note 6, at 628–29; Nancy J. King, *The Origins of Felony Jury Sentencing in the United States,* 78 CHI.–KENT L. REV. 937 (2003).

16   Douglass, *supra* note 6, at 1972.

17   *See Woodson,* 428 U.S. at 293, 96 S.Ct. 2978; *see also Roberts v. Louisiana,* 428 U.S. 325, 360, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (White, J., dissenting); *Furman v. Georgia,* 408 U.S. 238, 298, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring); JEFFREY B. ABRAMSON, WE, THE JURY: THE JURY SYSTEM AND THE IDEAL OF DEMOCRACY 217 (1994); VALERIE P. HANS & NEIL VIDMAR, JUDGING THE JURY 149–58 (1986); Jenia Iontcheva, *Jury Sentencing as Democratic Practice,* 89 VA. L. REV. 311, 321–22 (2003); *see also* Rachel E. Barkow, *Recharging the Jury: The Criminal Jury's Constitutional Role in an Era of Mandatory Sentencing,* 152 U. PA. L. REV. 33, 79 (2003); Thomas A. Green, *The Jury and the English Law of Homicide 1200–1600,* 74 MICH. L. REV. 413, 430–31 (1976).

18   *See* CLAY S. CONRAD, JURY NULLIFICATION: THE EVOLUTION OF A DOCTRINE 47–48 (2014); White, *supra* note 13, at 30–31 ("[I]t became accepted that in homicide cases the jury would exercise its nullification power when it believed that the defendants—although they might be technically guilty of the capital offense—did not deserve to die. Thus, in this context, the jury's fact-finding power has historically been used to temper the application of capital punishment so that it will mirror the community's perception as to when that punishment is appropriate.").

19   C.F. ADAMS, THE WORKS OF JOHN ADAMS 255 (1865).

20   *See supra* note 12 and accompanying text.

21   *See Woodson,* 428 U.S. at 291, 96 S.Ct. 2978.

22   *See Del. C.* ch. 127 §§ 1, 2 (1852).

23   *See State v. Reidell,* 14 A. 550, 550 (Del. 1888).

24    *See Woodson*, 428 U.S. at 291, 96 S.Ct. 2978; BEDAU, *supra* note 11, at 5–6; BYE, *supra* note 12, at 7–8.

25    *Winston v. United States*, 172 U.S. 303, 310–12, 19 S.Ct. 212, 43 L.Ed. 456 (1899).

26    *E.g.*, Robert J. Smith & Bidish J. Sarma, *How and Why Race Continues to Influence the Administration of Criminal Justice in Louisiana*, 72 LA. L. REV. 361, 375–78 (2012).
      Regrettably, Delaware was among the many states that embarked on a century-long campaign of resistance to the rights granted to black people by the Fourteenth and Fifteenth Amendments, including those related to juries. In justifying the total absence of any black citizens in grand and petit jury pools as "nowise remarkable," Delaware's then-Chief Justice said that "the great body of black men residing in this State are utterly unqualified by want of intelligence, experience or moral integrity to sit on juries." *Neal v. Delaware*, 103 U.S. 370, 402, 26 L.Ed. 567 (1880) (Waite, C.J., dissenting) (quoting the Delaware Supreme Court's opinion) (internal quotation marks omitted). A divided U.S. Supreme Court held that this exclusion violated the Fourteenth Amendment, but dissenters embraced the rationale that categorical exclusion of black people from jury pools on the basis of their presumed unfitness to serve was constitutional. *See id.* at 397–98 (Harlan, J.) (finding that Delaware's practice of restricting juries to "free white male citizens, of the age of twenty-two years and upwards" was in violation of the Fourteenth Amendment); *id.* at 407–08 (Waite, C.J., dissenting) ("No one can truly affirm that women, the aged, and the resident foreigner, whether Caucasian or Mongolian, though excluded from acting as jurors, are not as equally protected by the laws of the State as those who are allowed or required to serve in that capacity. To afford equality of protection to all persons by its laws does not require the State to permit all persons to participate equally in the administration of those laws, or to hold its offices, or to discharge the trusts of government.").

27    *See Andres v. United States*, 333 U.S. 740, 748, 68 S.Ct. 880, 92 L.Ed. 1055 (1948) ("In criminal cases this requirement of unanimity extends to all issues—character or degree of the crime, guilt and punishment—which are left to the jury."); *id.* at 763, 68 S.Ct. 880 (Frankfurter, J., concurring) ("The fair significance to be drawn from State legislation and the practical construction given to it is that it places into the jury's hands the determination whether the sentence is to be death or life imprisonment, and, since that is the jury's responsibility, it is for them to decide whether death should or should not be the consequence of their finding that the accused is guilty of murder in the first degree. Since the determination of the sentence is thus, in effect, a part of their verdict, there must be accord the entire jury in reaching the full content of the verdict.").

28    *See* JOEL SAMAHA, CRIMINAL PROCEDURE 475 (2011); Corinna Barrett Lain, *Furman Fundamentals*, 82 WASH. L. REV. 1, 23 (2007).

29    *See supra* note 7 and accompanying text.

30    *See* Wright, *supra* note 13, at 1374–75; King, *supra* note 15, at 985–86.

31    *See United States v. Moreland*, 258 U.S. 433, 448, 42 S.Ct. 368, 66 L.Ed. 700 (1922); *see also* ARTHUR W. CAMPBELL, LAW OF SENTENCING § 1.2, at 6–9 (3d ed. 2004); Douglass, *supra* note 6, at 2018.

32    *See* Hoffman, *supra* note 6, at 965; Lillquist, *supra* note 6, at 628–29.

33    *See Powell v. Alabama*, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

34    *See, e.g., In re Oliver*, 333 U.S. 257, 271–73, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (incorporating the Sixth Amendment right to a public trial and to notice of accusations); *Wolf v. Colorado*, 338 U.S. 25, 27–28, 33, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) ("[T]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society [and i]t is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause."), *overruled in part by Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Mapp*, 367 U.S. at 655–56, 81 S.Ct. 1684 (further incorporating the Fourth Amendment exclusionary rule by holding that "all evidence obtained by searches and seizures in violation of the Constitution is ... inadmissible in a state court"); *Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (incorporating the Eighth Amendment protection against cruel and unusual punishment); *Gideon v. Wainwright*, 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (incorporating the Sixth Amendment guarantee of counsel for indigent defendants in felony cases); *Ker v. California*, 374 U.S. 23, 34, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (confirming that the Fourth Amendment protection against unreasonable searches and seizures apply to the states); *Malloy v. Hogan*, 378 U.S. 1, 10–11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (incorporating the Fifth Amendment protection against compelled self-incrimination); *Aguilar v. Texas*, 378 U.S. 108, 110, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) ("[T]he standard for obtaining a search warrant is [ ] 'the same under the Fourth and Fourteenth Amendments.' " (quoting *Ker*, 374 U.S. at 33, 83 S.Ct. 1623)), *abrogated by Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (incorporating the Sixth Amendment right of an accused to confront prosecution witnesses); *Parker v. Gladden*, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (incorporating the Sixth Amendment right to trial by an impartial jury); *Klopfer v. North Carolina*, 386 U.S. 213, 222–23,

87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (incorporating the Sixth Amendment right to a speedy trial); *Washington v. Texas*, 388 U.S. 14, 19–20, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (incorporating the Sixth Amendment right to have compulsory process for obtaining defense witnesses); *Duncan v. Louisiana*, 391 U.S. 145, 149, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (incorporating the Sixth Amendment right to a trial by jury in all criminal cases, except for "petty" offenses); *Benton v. Maryland*, 395 U.S. 784, 796, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) (incorporating the Fifth Amendment protection against double jeopardy); *see also* Jerold H. Israel, *Selective Incorporation: Revisited*, 71 GEO. L.J. 253, 296 (1982) ("The decisions of the 1960's had selectively incorporated all but four of the Bill of Rights guarantees relating to the criminal justice process: public trial, notice of charges, prohibition of excessive bail, and prosecution by indictment.").

35    *See Woodson*, 428 U.S. at 291, 96 S.Ct. 2978.

36    *See State v. Dickerson*, 298 A.2d 761, 764 n.6 (Del. 1972); Hugo Adam Bedau, *The Death Penalty in America*, 35 FED. PROBATION 32, 32 (1971); Valerie P. Hans et al., *The Death Penalty: Should the Judge or the Jury Decide Who Dies*, 12 J. EMPIRICAL L. STUD. 70, 73 (2015); Glenn W. Samuelson, *Why Was Capital Punishment Restored in Delaware*?, 60 J. CRIM. L. & CRIMINOLOGY 148, 148 (1969).

37    *See* 29 *Del. C.* ch. 266 (1917); *see also State v. Thomas*, 111 A. 538, 539 (Del. 1920); *State v. Carey*, 178 A. 877, 878 (Del. O. & T. 1935).

38    *See Dickerson*, 298 A.2d at 764 n.6.

39    *See id.*

40    *See Woodson*, 428 U.S. at 289, 96 S.Ct. 2978; *see also* Sheri Lynn Johnson et al., *The Delaware Death Penalty: An Empirical Study*, 97 IOWA L. REV. 1925, 1929 (2012).

41    *See Andres*, 333 U.S. at 758, 68 S.Ct. 880 (Frankfurter, J., concurring) ("In three States a jury's recommendation of life imprisonment is not binding on the trial court: Delaware, New Mexico, and Utah."). It appears that there was only one instance in which a trial judge imposed death when a jury recommended mercy, and that sentence was overturned on other grounds, depriving this Court of the chance to address whether that judicial override was proper. *See Jenkins v. State*, 230 A.2d 262, 265 & n.1 (Del. 1967).

42    *Woodson*, 428 U.S. at 291–92, 96 S.Ct. 2978; *see also Andres*, 333 U.S. at 759, 68 S.Ct. 880 (Frankfurter, J., concurring); Brief for the United States as Amicus Curiae at 36, *McGautha v. California*, 402 U.S. 183 (1971).

43    391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

44    *Id.* at 519, 88 S.Ct. 1770.

45    *See id.* at 525–27 & nn. 2–8, 88 S.Ct. 1770; Bryan A. Stevenson, *The Ultimate Authority on the Ultimate Punishment*, 54 ALA. L. REV. 1091, 1140 (2003); *see also Johnson v. Texas*, 509 U.S. 350, 359, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); *Lockett v. Ohio*, 438 U.S. 586, 597–98, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Stephen P. Garvey, "*As the Gentle Rain From Heaven": Mercy in Capital Sentencing*, 81 CORNELL L. REV. 989, 996 (1996); Susan R. Klein & Jordan M. Steiker, *The Search for Equality in Criminal Sentencing*, 2002 SUP. CT. REV. 223, 262–65; Lillquist, *supra* note 6, at 648; *infra* note 228 and accompanying text.

46    391 U.S. 145, 88 S.Ct. 1444.

47    *See id.* at 149, 88 S.Ct. 1444; *see also Parker*, 385 U.S. at 364, 87 S.Ct. 468.

48    Stephen F. Smith, *The Supreme Court and the Politics of Death*, 94 VA. L. REV. 283, 287 (2008); *see also* Lain, *supra* note 28, at 18.

49    402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *overruled by Crampton v. Ohio*, 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972).

50    *Id.* at 207–08, 91 S.Ct. 1454.

51    *See* ANDREA D. LYON, THE DEATH PENALTY, WHAT'S KEEPING IT ALIVE 7 (2014); Sam Kamin & Justin Marceau, *Waking the Furman Giant*, 48 U.C. DAVIS L. REV. 981, 990 (2015); Lain, *supra* note 28, at 18–19.

52    *See Lockett*, 438 U.S. at 598, 98 S.Ct. 2954; Smith, *supra* note 48, at 288–91; Kamin & Marceau, *supra* note 51, at 986–87; James S. Liebman, *Slow Dancing With Death: The Supreme Court and Capital Punishment, 1963–2006*, 107 COLUM. L. REV. 1, 23 (2007).

53    *See Furman*, 408 U.S. at 239, 92 S.Ct. 2726.

54    *See id.* at 240, 92 S.Ct. 2726 (Douglas, J., concurring).

55    *See id.*; Bryan A. Stevenson, *The Politics of Fear and Death: Successive Problems in Capital Federal Habeas Corpus Cases*, 77 N.Y.U. L. REV. 699, 716 n.80 (2002).

56    Lain, *supra* note 28, at 16–17.

57    *Furman*, 408 U.S. at 239, 92 S.Ct. 2726.

58   *Id.* at 239–40, 92 S.Ct. 2726 (emphasis added).

59   *See* Lain, *supra* note 28, at 10–11.

60   *See Furman,* 408 U.S. at 256–57, 92 S.Ct. 2726 (Douglas, J., concurring; *id.* at 308, 310, 92 S.Ct. 2726 (Stewart, J., concurring; *id.* at 310–11, 313, 92 S.Ct. 2726 (White, J., concurring).

61   6 LAFAVE, ET AL., *supra* note 12, § 26.1(b), at 671.

62   *See Furman,* 408 U.S. at 305, 92 S.Ct. 2726 (Brennan, J., concurring; *id.* at 369, 92 S.Ct. 2726 (Marshall, J., concurring).

63   *Gregg,* 428 U.S. at 189, 96 S.Ct. 2909; *see also Zant v. Stephens,* 462 U.S. 862, 876–77, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Douglass, *supra* note 6, at 1994.

64   *Woodson,* 428 U.S. at 285, 96 S.Ct. 2978 (emphasis added); *see also Eddings v. Oklahoma,* 455 U.S. 104, 110–12, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Douglass, *supra* note 6, at 1995.

65   Smith, *supra* note 48, at 288; FRANKLIN E. ZIMRING & GORDON HAWKINS, CAPITAL PUNISHMENT AND THE AMERICAN AGENDA 41 (1986); Lieberman, *supra* note 52, at 23.

66   *See Baze v. Rees,* 553 U.S. 35, 88, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (Scalia, J., concurring); Lain, *supra* note 28, at 19.

67   Lain, *supra* note 28, at 45; *see also Furman,* 408 U.S. at 313, 92 S.Ct. 2726 (White, J., concurring); LEE EPSTEIN & JOSEPH F. KOBYLKA, THE SUPREME COURT AND LEGAL CHANGE: ABORTION AND THE DEATH PENALTY 81 (1992); Arthur J. Goldberg, *The Death Penalty and the Supreme Court,* 15 ARIZ. L. REV. 355, 367 (1973).

68   *See Callins v. Collins,* 510 U.S. 1141, 1144, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Scalia, J., concurring).

69   *See* Lain, *supra* note 28, at 47–49; Smith, *supra* note 48, at 290; ZIMRING & HAWKINS, *supra* note 65, at 39.

70   *See* Stephen Gillers, *Deciding Who Dies,* 129 U. PA. L. REV. 1, 17–18, 43 (1980) (eight states switched from jury sentencing to judge sentencing after *Furman* ).

71   *See* Lain, *supra* note 28, at 56–57.

72   *See* Poulos, *supra* note 10, at 186.

73   *See* Liebman, *supra* note 52, at 10.

74   *See id.*; Douglass, *supra* note 6, at 1994.

75   428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

76   *See* Liebman, *supra* note 52, at 28.

77   Lain, *supra* note 28, at 55 n.317.

78   *See Gregg,* 428 U.S. at 168–69, 96 S.Ct. 2909.

79   *See id.*

80   *Id.* at 169, 96 S.Ct. 2909; *see also Jurek v. Texas,* 428 U.S. 262, 268, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

81   *Gregg,* 428 U.S. at 187, 96 S.Ct. 2909; *see also Kansas v. Marsh,* 548 U.S. 163, 173–74, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006).

82   428 U.S. 280, 96 S.Ct. 2978.

83   *Id.* at 289, 293, 96 S.Ct. 2978; *see also Roberts v. Louisiana,* 428 U.S. 325, 335–36, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (same).

84   *Id.* at 303, 96 S.Ct. 2978.

85   *Id.*

86   *Id.* at 304–05, 96 S.Ct. 2978.

87   *See id.* at 287 n.7, 96 S.Ct. 2978; *id.* at 292 n.25, 96 S.Ct. 2978.

88   *See Sumner v. Shuman,* 483 U.S. 66, 77–78, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987).

89   *See, e.g.,* Margaret Jane Radin, *The Jurisprudence of Death: Evolving Standards for the Cruel and Unusual Punishments Clause,* 126 U. PA. L. REV. 989, 999 (1978); *Death Penalty,* 90 HARV. L. REV. 63, 64, 69 (1976).

90   428 U.S. 262, 96 S.Ct. 2950.

91   *Id.* at 271, 96 S.Ct. 2950; *see also Woodson,* 428 U.S. at 303–04, 96 S.Ct. 2978; *Lockett,* 438 U.S. at 605, 98 S.Ct. 2954; Douglass, *supra* note 6, at 1994–95.

92   *Jurek,* 428 U.S. at 271, 96 S.Ct. 2950.

93   428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

94   *Id.* at 252, 96 S.Ct. 2960.

95   *See supra* note 47 and accompanying text.

96   *See Johnson v. Texas,* 509 U.S. 350, 360, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

97   *See* Douglass, *supra* note 6, at 2024–25 (discussing this issue).

98   *See supra* notes 82–89 and accompanying text.

99   *See supra* notes 63–64 and accompanying text.

100  Douglass, *supra* note 6, at 1995; *see also id.* at 2020.

101  *See Gregg*, 428 U.S. at 173, 96 S.Ct. 2909; *Enmund v. Florida*, 458 U.S. 782, 815, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (same); *Weeks v. State*, 653 A.2d 266, 270 (Del. 1995).

102  *See, e.g., Coker v. Georgia*, 433 U.S. 584, 596, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); *Clark v. State*, 672 A.2d 1004, 1010 (Del. 1996).

103  *See* Douglass, *supra* note 6, at 1984; Stevenson, *supra* note 45, at 1140.

104  *See* Liebman, *supra* note 52, at 30–34.

105  468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), *overruled by Hurst v. Florida*, ––– U.S. ––––, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

106  *See id.* at 451, 104 S.Ct. 3154.

107  *Id.* at 457–58, 104 S.Ct. 3154.

108  *See, e.g., Strickland v. Washington*, 466 U.S. 668, 686–87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (holding that criminal defendants have a right to effective assistance of counsel at "[a] capital sentencing proceeding" because such a proceeding "is sufficiently like a trial in its adversarial format and in the existences of standards for decision"); *Mempa v. Rhay*, 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) (explicitly extending the Sixth Amendment right to counsel to sentencing); *see also* White, *supra* note 13, at 18 n.145 ("Prior to *Spaziano*, the Court had decided a series of cases holding that procedural protections at the guilt stage are also applicable at the penalty stage. *See, e.g., Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (privilege against self-incrimination and right to counsel under *Massiah* ); *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) (double jeopardy); *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (right to confront and rebut government evidence).").

109  *Spaziano*, 468 U.S. at 465, 104 S.Ct. 3154; *see also id.* at 464, 104 S.Ct. 3154.

110  *Id.* at 458–59, 104 S.Ct. 3154 (citations omitted) (quoting *Bullington v. Missouri*, 451 U.S. 430, 445, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981)) (internal quotation marks omitted).

111  *Spaziano*, 468 U.S. at 464, 104 S.Ct. 3154.

112  490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), *overruled by Hurst v. Florida*, ––– U.S. ––––, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

113  White, *supra* note 13, at 18.

114  *Hildwin*, 490 U.S. at 640–41, 109 S.Ct. 2055.

115  *Id.* at 640, 109 S.Ct. 2055 (emphasis added); *see also* White, *supra* note 13, at 18–19.

116  494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

117  *See id.* at 745, 110 S.Ct. 1441.

118  *See id.*

119  497 U.S. 639, 110 S.Ct. 3047, *overruled by Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

120  *See id.* at 648, 110 S.Ct. 3047.

121  *Id.* at 649, 110 S.Ct. 3047.

122  *See id.* at 650, 110 S.Ct. 3047.

123  513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).

124  *Id.* at 505, 115 S.Ct. 1031.

125  *Id.* at 509, 115 S.Ct. 1031 (quoting *Tedder v. State*, 322 So.2d 908, 910 (Fla. 1975)).

126  *See id.* at 511, 115 S.Ct. 1031.

127  *Id.* at 515, 115 S.Ct. 1031.

128  *See supra* note 15 and accompanying text.

129  *See Harris*, 513 U.S. at 516–17, 115 S.Ct. 1031 (Stevens, J., dissenting).

130  *See supra* notes 85–92 and accompanying text.

131  *See, e.g., Zant*, 462 U.S. at 879, 103 S.Ct. 2733.

132  *See, e.g., Kansas v. Carr*, ––– U.S. ––––, 136 S.Ct. 633, 642, 193 L.Ed.2d 535 (2016); *Jones v. United States*, 527 U.S. 373, 381, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

133  446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

134  486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

135  *See Godfrey*, 446 U.S. at 433, 100 S.Ct. 1759; *Maynard*, 486 U.S. at 363–64, 108 S.Ct. 1853; *see also* White, *supra* note 13, at 20 n.160.

136  *See* Garvey, *supra* note 45, at 1035; Smith, *supra* note 48, at 297–98.

137  *See Brown v. Sanders*, 546 U.S. 212, 216 n.2, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006) ("Our cases have frequently employed the terms 'aggravating circumstance' or 'aggravating factor' to refer to those statutory factors which determine death eligibility in satisfaction of *Furman*'s narrowing requirement. This terminology becomes confusing when, as in this case, a State employs the term 'aggravating circumstance' to refer to factors that play a different role, determining which defendants *eligible* for the death penalty will actually *receive* that penalty. To avoid confusion, this opinion will use the term 'eligibility factor' to describe a factor that performs the constitutional narrowing function." (emphasis in original) (citations omitted)).

138  *See* Robert J. Smith, *Forgetting* Furman, 100 IOWA L. REV. 1149, 1160 (2015); Jeffrey L. Kirchmeier, *Casting a Wider Net: Another Decade of Legislative Expansion of the Death Penalty in the United States*, 34 PEPP. L. REV. 1, 25 (2006); James S. Liebman & Lawrence C. Marshall, *Less is Better: Justice Stevens and the Narrowed Death Penalty*, 74 FORDHAM L. REV. 1607, 1649 (2006).

139  *See* 11 *Del. C.* § 4209(e)(1).

140  Smith, *supra* note 48, at 364–65.

141  *See* Douglass, *supra* note 6, at 1994–95.

142  *See supra* notes 83–84 and accompanying text.

143  *See* Hans et al., *supra* note 36, at 75 (the General Assembly eliminated the unanimity requirement from § 4209 because the jury in a highly publicized murder case could not agree unanimously on death for any of the four defendants); Joseph T. Walsh, *The Limits of Proportionality Review in Death Penalty Cases*, 21 DEL. LAW. 13, 14 (2004). This Court upheld that amendment in *State v. Cohen*, 604 A.2d 846 (Del. 1992).

144  Johnson et al., *supra* note 40, at 1954.

145  *See Apprendi*, 530 U.S. at 469–70, 120 S.Ct. 2348.

146  *See id.* at 470–71, 120 S.Ct. 2348.

147  *Id.* at 469, 120 S.Ct. 2348 (quoting N.J. Stat. Ann. § 2C:44–3(e) (West Supp. 1999–2000)) (internal quotation marks omitted).

148  *See id.* at 471, 120 S.Ct. 2348.

149  *See id.* at 469, 120 S.Ct. 2348.

150  *Id.* at 490, 120 S.Ct. 2348.

151  542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

152  *Id.* at 303–04, 124 S.Ct. 2531 (emphasis in original).

153  536 U.S. 584, 122 S.Ct. 2428.

154  *See* W. David Ball, *Heinous, Atrocious, and Cruel:* Apprendi*, Indeterminate Sentencing, and the Meaning of Punishment*, 109 COLUM. L. REV. 893, 896–97 (2009).

155  *See supra* notes 119–122 and accompanying text.

156  *Ring*, 536 U.S. at 589, 122 S.Ct. 2428.

157  *Id.* at 602, 122 S.Ct. 2428.

158  *Id.* at 609, 122 S.Ct. 2428.

159  *Id.* (internal citation omitted) (quoting *Apprendi*, 530 U.S. at 494 n.19, 120 S.Ct. 2348).

160  *See Brice v. State*, 815 A.2d 314, 320 (2003).

161  *See* 11 *Del. C.* § 4209(d) (1991); S.B. 79, 137th Gen. Assemb., Reg. Sess. (Del. 1991); S.B. 449, 141st Gen. Assemb., Reg. Sess. (Del. 2002).

162  *See* 11 *Del. C.* § 4209(d)(1)(a) (1991).

163  *See id.* § 4209(d)(1)(b).

164  *See id.* § 4209(g).

165  *Ring*, 536 U.S. at 608 n.6, 122 S.Ct. 2428.

166  *Brice v. State*, 815 A.2d 314, 320 (Del. 2003); *see also House Debate on S.B. 449*, 141st Gen. Assembly (Del. 2002) (statement on behalf of the Delaware Department of Justice); *Senate Debate on S.B. 449*, 141st Gen. Assembly (Del. 2000) (statement on behalf of the Delaware Department of Justice).

167  815 A.2d 327 (Del. 2003).

168  *Id.* at 343.

169  *See supra* note 143 and accompanying text.

170  Michael L. Radelet, *Overriding Jury Sentencing Recommendations in Florida Capital Cases: An Update and Possible Half–Requiem,* 2011 MICH. ST. L. REV. 793, 800.

171  11 *Del. C.* § 4209(c)(3).

172  *Id.* § 4209(c)(3)(b)(1); *see also id.* § 4209(e)(1).

173  *Id.* § 4209(d)(2).

174  *Id.* § 4209(d)(1).

175  *Swan v. State,* 28 A.3d 362, 390 (Del. 2011); *see also Reyes v. State,* 819 A.2d 305, 317 (Del. 2003).

176  11 *Del. C.* § 4209(c)(3)(a)(2).

177  *Id.* § 4209(d)(1).

178  *Id.*

179  815 A.2d 314.

180  *Id.* at 322 (internal citations omitted); *see also Swan,* 28 A.3d at 390; *Ortiz v. State,* 869 A.2d 285, 305–06 (Del. 2005); *Reyes,* 819 A.2d at 316; *Norcross v. State,* 816 A.2d 757, 767 (Del. 2003).

181  *Brice,* 815 A.2d at 322.

182  *Id.*

183  *Ring,* 536 U.S. at 612–13, 122 S.Ct. 2428 (Scalia, J., concurring).

184  *See Hurst,* 136 S.Ct. at 619.

185  *Id.* at 620 (quoting Fla. Stat. § 921.141(2) (2015)); *see also* Robin Maher, Hurst v. Florida: *How Much Does the Sixth Amendment Really Protect?,* GEO. WASH. L. REV. DOCKET (Jan. 17, 2016), http://www.gwlr.org/hurst-v-florida-how-much-does-the-sixth-amendment-reallyprotect/; Judith L. Ritter, *Time to Rethink Delaware's Death Penalty?,* 34 DEL. LAW. 1, 15 (2016).

186  *See* 11 *Del. C.* § 4209(c)–(d).

187  Ritter, *supra* note 185, at 16.

188  *Hurst,* 136 S.Ct. at 620 (quoting Fla. Stat. § 775.082(1)) (emphasis in original).

189  *Hurst,* 136 S.Ct. at 619.

190  *Id.* at 621.

191  *Id.* at 622 (emphasis added).

192  *Id.* at 623.

193  *Id.* (internal quotation marks omitted).

194  *See, e.g., Woodward v. Alabama,* —— U.S. ——, 134 S.Ct. 405, 407, 187 L.Ed.2d 449 (2013) (Sotomayor, J., dissenting from denial of cert.) (calling for reconsideration of *Spaziano*); *Harris,* 513 U.S. at 524–26, 115 S.Ct. 1031 (Stevens, J., dissenting).

195  *Hurst,* 136 S.Ct. at 621–22.

196  *Id.* at 619 (emphasis added).

197  *See Woodward,* 134 S.Ct. at 410–11 (Sotomayor, J., dissenting from denial of cert.).

198  *See Apprendi,* 530 U.S. at 555, 120 S.Ct. 2348 (Breyer, J., dissenting); *Ring,* 536 U.S. at 613, 122 S.Ct. 2428 (Breyer, J., dissenting).

199  *Hurst,* 136 S.Ct. at 624 (quoting *Ring,* 536 U.S. at 614, 122 S.Ct. 2428 (Breyer, J., dissenting)).

200  *See Ring,* 536 U.S. at 618, 122 S.Ct. 2428 (Breyer, J., dissenting) (quoting *Spaziano,* 468 U.S. at 469, 104 S.Ct. 3154 (Stevens, J., concurring in part and dissenting in part)).

201  *See id.* at 616, 122 S.Ct. 2428.

202  *See Hurst,* 136 S.Ct. at 625 (Alito, J., dissenting).

203  *Id.*

204  *Johnson v. Alabama,* —— U.S. ——, 136 S.Ct. 1837, 194 L.Ed.2d 828 (2016); *Wimbley v. Alabama,* —— U.S. ——, 136 S.Ct. 2387, 195 L.Ed.2d 760 (2016); *Kirksey v. Alabama,* —— U.S. ——, 136 S.Ct. 2409, 195 L.Ed.2d 777 (2016).

205  *Woodward,* 134 S.Ct. at 407 (Sotomayor, J., dissenting from denial of cert.); Ross Kleinstuber, "*Only a Recommendation": How Delaware Capital Sentencing Law Subverts Meaningful Deliberations and Jurors' Feelings of Responsibility,* 19 WIDENER L. REV. 321, 325 (2013).

206  *Hurst,* 136 S.Ct. at 619.

207  *See, e.g.,* Br. of Charles Hamilton Houston Institute for Race and Justice at 9–12 (hereinafter "C. H. Houston Br.").

208  U.S. Const. amend. VI.

209  *See* 11 *Del. C.* § 4209(c)–(d).

210  *Id.* § 4209(c)(3).

211  *See, e.g., Zebroski v. State,* 715 A.2d 75, 84 (Del. 1998) ("The balancing of aggravating and mitigating circumstances is not a quantitative exercise, but rather a reasoned judgment as to what *factual situations* require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present." (emphasis added) (internal quotation marks omitted)); *Ferguson v. State,* 642 A.2d 772, 782 (Del. 1994) ("The weighing of aggravating and mitigating circumstances involves a qualitative rather than a quantitative consideration of the circumstances to determine the appropriate punishment. That qualitative process requires that the jury and the judge carefully consider the specific facts of each case and, when appropriate, not to give one or more aggravating factors independent weight." (internal quotation marks omitted) (footnotes omitted)).

212  *Cunningham v. California,* 549 U.S. 270, 279, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007); *see also* CAMPBELL, *supra* note 31, § 9.3 at 354–59.

213  *Hurst,* 136 S.Ct. at 619.

214  *See Woodson,* 428 U.S. at 289–93, 96 S.Ct. 2978; *McGautha v. California,* 402 U.S. at 200 nn. 10, 11, 91 S.Ct. 1454; *see also* Green, *supra* note 17, at 421–25.

215  Because I admit that *Hurst* can be read more than one way, I understand why my respected colleague in dissent views *Hurst* as simply an application of *Ring,* and as a case-specific ruling that a jury must make all findings necessary to make a defendant eligible for the death penalty.

216  *See* Kleinstuber, *supra* note 205, at 329; *see also* THE DECLARATION OF INDEPENDENCE para. 3 (U.S. 1776) (listing among the reasons for separation from England: "For depriving us in many cases, of the benefits of Trial by Jury."); Letter from Thomas Jefferson to Thomas Paine (1789) ("I consider trial by jury as the only anchor yet imagined by man, by which a government can be held to the principles of its constitution."); THOMAS JEFFERSON, NOTES ON THE STATE OF VIRGINIA 140 (J.W. Randolph ed., 1853) ("[I]f the question relate to any point of public liberty, or if it be one in which the judges may be suspected of bias, the jury undertake to decide both law and fact."); Statement of John Adams (1774) ("Representative government and trial by jury are the heart and lungs of liberty."); THE FEDERALIST NO. 83 (Alexander Hamilton) ("The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury...."); *Georgia v. Brailsford,* 3 U.S. (3 Dall.) 1, 4, 1 L.Ed. 483 (1794) (Chief Justice John Jay instructed the jury: "It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide. But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy. On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. But still both objects are lawfully, within your power of decision."); *Zylstra v. Corp. of Charleston,* 1 S.C.L. 382, 389 1794 ("[T]he trial by jury is a common law right; not the creature of the constitution, but originating in time immemorial; it is the inheritance of every individual citizen, the title to which commenced long before the political existence of this society; and which has been held and used inviolate by our ancestors in succession from that period to our own time; having never been departed from, except in the instances before mentioned. This right then, is as much out of the reach of any law, as the property of the citizen; and the legislature has no more authority to take it away, than it has to resume a grant of land which has been held for ages."); Klein & Steiker, *supra* note 45, at 265 ("Throughout this country's history, judge sentencing has been the norm in the non-capital context, and jury sentencing has been the norm in capital cases."); Hoffman, *supra* note 6, at 967; Roger Roots, *The Rise and Fall of the American Jury,* 8 SETON HALL CIRCUIT REV. 1, 6 (2011) (" 'When courts exercised their properly judicial (as opposed to administrative) functions, the decision-makers were juries. The most striking feature of colonial sentencing was the bare modicum of authority that judges actually exercised.' " (quoting JACK N. RAKOVE, ORIGINAL MEANINGS: POLITICS AND THE IDEAS IN THE MAKING OF THE CONSTITUTION 30 (1996))).

217  *See Woodward,* 134 S.Ct. at 407 (Sotomayor, dissenting from denial of cert.) (citations omitted); 6 LAFAVE, ET AL., *supra* note 12, § 26.2(b), at 699; *see also* Lillquist, *supra* note 6, at 650.

218  *See, e.g., Ring,* 536 U.S. at 610, 122 S.Ct. 2428 (Scalia, J. concurring).

219  *See supra* note 84 and accompanying text.

220   *See supra* notes 85, 91–92 and accompanying text.

221   466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

222   *See* Garvey, *supra* note 45, at 997–98; Liebman, *supra* note 52, at 28; *supra* and accompanying text.

223   *See* Johnson et al., *supra* note 40, at 1931; Hans et al., *supra* note 36, at 73–78 (same).

224   *See supra* notes 13–15, 45 and accompanying text.

225   *See, e.g.*, Smith, *supra* note 52, at 287–91; Lillquist, *supra* note 6, at 641–52; *The Changing Role of the Jury in the Nineteenth Century*, 74 YALE L.J. 170, 170–74 (1964).

226   *See, e.g.*, *Woodson*, 428 U.S. at 289–93, 96 S.Ct. 2978 (Stewart, J.); Hoffman, *supra* note 6, at 963–68.

227   172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456 (1899).

228   *Id.* at 313, 19 S.Ct. 212.

229   *See supra* note 44 and accompanying text.

230   *Witherspoon*, 391 U.S. at 519, 88 S.Ct. 1770; *see also Furman*, 408 U.S. at 439–40, 92 S.Ct. 2726 (Powell, J., dissenting); *Gregg*, 428 U.S. at 181, 96 S.Ct. 2909.

231   *See Winston*, 172 U.S. at 313, 19 S.Ct. 212; *see also Carr*, 136 S.Ct. at 642; *Andres*, 333 U.S. at 753–54, 68 S.Ct. 880 (Frankfurter, J., concurring); *Garden*, 815 A.2d at 344; White, *supra* note 13, at 30–31.

232   2 THE MISCELLANEOUS ESSAYS AND OCCASIONAL WRITINGS OF FRANCIS HOPKINSON, ESQ. 101–02 (1792).

233   6 LAFAVE, ET AL., *supra* note 12, § 26.2(b), at 699.

234   *Proffitt*, 428 U.S. at 251, 96 S.Ct. 2960; *see also Schriro v. Summerlin*, 542 U.S. 348, 361–62, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (Breyer, J., dissenting).

235   *Proffitt*, 428 U.S. at 251, 96 S.Ct. 2960.

236   *See Carr*, 136 S.Ct. at 642; Stevenson, *supra* note 45, at 1121.

237   *See* 24 C.J.S. *Criminal Law* § 2374 Westlaw (database updated 2016); *see also Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Dorszynski v. United States*, 418 U.S. 424, 431, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); 3 CHARLES ALAN WRIGHT ET AL., FED. PRAC. & PROC. CRIM. § 552 (4th ed. 2016).

238   *See Gregg*, 428 U.S. at 190, 96 S.Ct. 2909; *Ring*, 536 U.S. at 616, 122 S.Ct. 2428 (Breyer, J., concurring); *Harris*, 513 U.S. at 526, 115 S.Ct. 1031 (Stevens, J., dissenting); Gillers, *supra* note 70, at 89; MANDERY, *supra* note 8, at 164 (internal quotation marks omitted); *see also Woodward*, 134 S.Ct. at 410 (Sotomayor, J., dissenting from denial of cert.).

239   *E.g.*, *Quick Facts: Mandatory Minimum Penalties*, 28 FED.SENT.R. 217, 217 (2016) (of the nearly 76,000 cases reported to the U.S. Sentencing Commission in 2014, offenders in 23.6% of cases were "convicted of an offense carrying a mandatory minimum penalty," and at sentencing, 13.6% of offenders "remained subject to a mandatory minimum penalty").

240   Many cases stand for this proposition. *E.g.*, *Streetman v. Lynaugh*, 484 U.S. 992, 995, 108 S.Ct. 588, 98 L.Ed.2d 634 (1988); *Ford v. Wainwright*, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); *see also Beck v. Alabama*, 447 U.S. 625, 637, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); *Gardner v. Florida*, 430 U.S. 349, 357–58, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *Harmelin v. Michigan*, 501 U.S. 957, 993–94, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Pennell v. State*, 604 A.2d 1368, 1375 (Del. 1992); *see also* Scott W. Howe, *The Futile Quest for Racial Neutrality in Capital Selection and the Eighth Amendment Argument for Abolition Based on Unconscious Racial Discrimination*, 45 WM. & MARY L. REV. 2083, 2157 (2004).

241   *See Glossip v. Gross*, ––– U.S. ––––, 135 S.Ct. 2726, 2759–64, 192 L.Ed.2d 761 (2015); *Wright v. State*, 633 A.2d 329, 336–37 (Del. 1993) (same).

242   *See Gilmore v. Taylor*, 508 U.S. 333, 342, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993); *Murray v. Giarratano*, 492 U.S. 1, 8–9, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (quoting *Lockett*, 438 U.S. at 604, 98 S.Ct. 2954) (internal citations omitted); *Ake v. Oklahoma*, 470 U.S. 68, 86, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (Burger, C.J., concurring); *Walton*, 497 U.S. at 657, 110 S.Ct. 3047 (Scalia, J., dissenting).

243   *See Williams v. Taylor*, 529 U.S. 362, 396–99, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Wiggins v. Smith*, 539 U.S. 510, 523–25, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Rompilla v. Beard*, 545 U.S. 374, 388–89, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Douglass, *supra* note 6, at 1986–87.

244   *See Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).

245   *See Eberheart v. Georgia*, 433 U.S. 917, 917, 97 S.Ct. 2994, 53 L.Ed.2d 1104 (1977).

246   *See Enmund*, 458 U.S. at 798–801, 102 S.Ct. 3368; *see also Harmelin*, 501 U.S. at 994, 111 S.Ct. 2680.

247   *See Kennedy v. Louisiana*, 554 U.S. 407, 412, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008).

248   *Ford v. Wainwright*, 477 U.S. 399, 410, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

249  *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

250  See *Roper v. Simmons*, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); *see also Thompson v. Oklahoma*, 487 U.S. 815, 838, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988).

251  See *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979).

252  See *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality).

253  See *Beck*, 447 U.S. at 627, 100 S.Ct. 2382; *see also Powell v. Alabama*, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ("[I]n a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble-mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case."); *Williams v. Florida*, 399 U.S. 78, 103, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (holding that the Sixth Amendment does not require the use of a jury of twelve in noncapital cases); *Gardner*, 430 U.S. at 362, 97 S.Ct. 1197 (holding that a death sentence imposed even in part upon information which the offender had no opportunity to deny or explain violates the defendant's due process); *Roberts v. Louisiana*, 431 U.S. 633, 637–38, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977) (holding that mandatory death penalty for a particular crime violates the Eighth Amendment); *Presnell v. Georgia*, 439 U.S. 14, 15–17, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) (per curiam) (holding that death sentence cannot be based on an aggravating factor that was previously used to establish guilt); *Godfrey v. Georgia*, 446 U.S. 420, 428–29, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (because of the death penalty's unique nature, the Constitution requires that states clearly define the aggravating factors that can result in death sentences); *Caldwell v. Mississippi*, 472 U.S. 320, 341, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (the Eighth Amendment prohibits a death sentence determination to be made by a jury which is told that the ultimate responsibility for determining the appropriateness of death rests with appellate courts); *Turner v. Murray*, 476 U.S. 28, 36–37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (because of "the special seriousness of the risk of improper sentencing in a capital case," "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias"); *Sumner*, 483 U.S. at 77, 107 S.Ct. 2716 (answering question that was expressly reserved in *Roberts v. Louisiana* and holding that the Eighth Amendment prohibits a mandatory death sentence for murder in prison by an inmate serving a life sentence); *Burger v. Kemp*, 483 U.S. 776, 785, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) ("Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case."); *Mills v. Maryland*, 486 U.S. 367, 377, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) ("In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds."); *Lankford v. Idaho*, 500 U.S. 110, 127, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991) (defendant's "lack of adequate notice that the judge was contemplating the imposition of the death sentence" violated the defendant's constitutional rights); *Simmons v. South Carolina*, 512 U.S. 154, 168–69, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (when a capital defendant's future dangerousness is at issue and the only alternative sentence to death is life imprisonment without possibility of parole, the defendant has the right to inform the jury of her ineligibility of parole); *see also* 1 LAFAVE, ET AL., *supra* note 12, § 1.8(e), at 415–17; 6 LAFAVE, ET AL., *supra* note 12, § 26.1(b), at 673–76.

254  For an overview of how the review of capital sentences is treated differently than the review of non-capital sentences, a topic which the U.S. Supreme Court has not directly spoken about but which state courts have addressed, see 24 C.J.S. *Criminal Law* §§ 2374–75 Westlaw (database updated 2016); *see also* ARTHUR W. CAMPBELL, LAW OF SENTENCING § 14.4, at 579–82 (3d ed. 2004).

255  See Gillers, *supra* note 70, at 18 ("[E]ach of the eight states currently opting for judge sentencing made that choice after *Furman*. Each had previously embraced jury sentencing in some form. Their adoption of judge sentencing is an apparent attempt to meet *Furman's* unclear commands."); Ritter, *supra* note 185, at 16 ("There is a rational argument that *Apprendi* requires jury verdicts for all aggravating circumstances because these factual findings expose a defendant to a death rather than a life sentence.").

256  See Stevenson, *supra* note 45, at 1103 ("Looking back on the entire line of pre-*Ring* cases on the right to jury sentencing in capital cases, it is apparent that the die was indelibly cast in *Proffitt* [*v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) ] and *Spaziano*.").

257  See David A. Strauss, *Foreword: Does the Constitution Mean What It Says?*, 129 HARV. L. REV. 1, 29 (2015) ("Implicit in all of this [discussion of constitutional interpretation] is Chief Justice Marshall's famous statement that 'it is *a constitution* we are expounding.' We should not expect to treat the Constitution as if it were any ordinary text. But Chief Justice Marshall's dictum is just the starting point. The idea is to see, as best we can, what we are doing when we 'expound' the Constitution. Expounding the U.S. Constitution means operating in a mixed system that comprises precedent as well as the text, and in which provisions of the Constitution often, as I have suggested, seem to function roughly in the same way

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

as precedents." (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819)) (emphasis in original)); *see also Duncan*, 391 U.S. at 155–56, 88 S.Ct. 1444 ("The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power —a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.").

258   *See* Douglass, *supra* note 6, at 1985 ("The Court's Sixth Amendment ruling is remarkable for its brevity and, I suggest, for its shallow analysis. The portion of the opinion dealing with the Sixth Amendment occupies only two paragraphs. It makes no mention of the constitutional text. It says nothing of the history, origin, and purpose of the Sixth Amendment right to a jury. It makes no attempt to explain, distinguish, or limit *Witherspoon*.... [T]he sum of *Spaziano*'s Sixth Amendment analysis is merely that (a) the principal issue in capital sentencing is essentially the same as ordinary sentencing, and (b) there has never been a right to a jury for ordinary sentencing.").

259   *See Proffitt*, 428 U.S. at 252, 96 S.Ct. 2960 ("[I]t would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than is a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases." (internal citation omitted)).

260   *See, e.g.*, Hoffman, *supra* note 6, at 985–90; Iontcheva, *supra* note 17, at 356–60. As our own state's experience since *Furman* shows, reductions in the role of the jury have not been inspired by any error-reducing motive, but instead to make it easier for the state to obtain a death sentence. *See supra* note 143 and accompanying text. Scholars suggest that this has also been a factor in other states' impingement on juries' ability to make the ultimate life or death decision. *See, e.g.*, Smith, *supra* note 48, at 294.

261   Douglass, *supra* note 6, at 2022.

262   *See* Smith, *supra* note 48, at 364–65 ("Theoretically, capital sentencing proceedings can be disaggregated into two discrete issues: whether the defendant's crime is eligible for the death penalty (aggravation) and, if so, whether the defendant nonetheless lacks the moral culpability necessary for the ultimate sanction (mitigation). In the real world of litigation, however, the two issues are not so neatly divided. Rather, the issue at any capital sentencing hearing is the singular one of whether or not the defendant should be put to death."); White, *supra* note 13, at 30 ("[F]rom a functional perspective, the content of the specific aggravating circumstances enumerated in a sentencing statute is not critical. Regardless of the specific aggravating and mitigating circumstances to be determined, the sentencer is required to make an essentially moral judgment as to whether the defendant should live or die. Thus, it may be argued that the capital defendant's right to jury trial should not vary depending on the particular aggravating circumstances to be determined."); Hoffman, *supra* note 6, at 982 ("The Court [in *Apprendi* and *Ring*] seems balanced on an impossibly difficult saddlepoint: if the Sixth Amendment means anything, it must mean that legislatures cannot deprive criminal defendants of their right to a jury trial by the simple artifice of labeling elements as 'sentencing factors'; yet there seems to be no principled basis upon which to truly distinguish elements from sentencing factors. This dilemma is so sharp that the slightest change of perspective or wording by one or two Justices seems to have a magnified effect on the outcomes in these cases."); *id.* at 1000 ("Of course, the very reason *Apprendi* leads to the threshold of jury sentencing is because of the impossible distinctions it forces the system to make between the jury's role in deciding 'elements' and the judge's role in deciding 'sentencing factors.' ").

263   *See* Douglass, *supra* note 6, at 1972–73 ("Unitary capital trials were the norm when the Sixth Amendment was created.... Bifurcation—separating the guilt determination from the choice of an appropriate penalty—was a procedure that evolved after the founding, initially for noncapital sentencing. Bifurcation spread as popular resistance to the death penalty and the corresponding rise of a prison system gave judges new options and new powers in fixing sentences. Bifurcation came to capital cases quite late in our history, primarily in response to the Court's Eighth Amendment decisions in the mid– 1970s. My point in reviewing this history is not that bifurcation is a bad idea, nor that we must try capital cases today as we did in 1791. My point is simply that the separation of trial from capital sentencing is a post-constitutional idea that was born from a movement away from capital punishment, not as a means to implement it. We cannot assume, as the Court

seems to have done, that separation of trial and sentencing is part of the natural order of things, or that the 'trial rights' of the Sixth Amendment were conceived with such a separation in mind."); *supra* notes 52, 96, 218 and accompanying text.

264    *See Eddings,* 455 U.S. at 117, 102 S.Ct. 869; *Gregg,* 428 U.S. at 206–07, 96 S.Ct. 2909.

265    *See supra* note 240 and accompanying text.

266    *See Furman,* 408 U.S. at 449, 92 S.Ct. 2726 (Powell, J., dissenting) (quoting *McGautha,* 402 U.S. at 207, 91 S.Ct. 1454); *see also Witherspoon,* 391 U.S. at 518–22, 88 S.Ct. 1770 (explaining the vital role a jury plays in capital sentencing and holding that a jury that excludes jurors opposed to capital punishment violates the defendant's Sixth and Fourteenth Amendment right to an impartial sentencer); *supra* note 45 and accompanying text.

267    *See, e.g., Bell v. Cone,* 543 U.S. 447, 454 n.6, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005); *United States v. Gabrion,* 719 F.3d 511, 533 (6th Cir. 2013); *People v. Montour,* 157 P.3d 489, 498 (Colo. 2007); *Brice,* 815 A.2d at 322; *see also* Jeffrey Abramson, *Death–Is–Different Jurisprudence and the Role of the Capital Jury* OHIO ST. J. CRIM. L. 117, 121 (2004).

268    *See, e.g., Mitchell v. United States,* 526 U.S. 314, 327, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (the Fifth Amendment right against compelled self-incrimination extends to sentencing); *McConnell v. Rhay,* 393 U.S. 2, 3–4, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968) ("[The Sixth Amendment right to counsel extends through sentencing and] must ... be treated like the right to counsel at other stages of adjudication.").

269    *See Woodward,* 134 S.Ct. at 411 (Sotomayor, dissenting from denial of cert.); *Blystone v. Pennsylvania,* 494 U.S. 299, 322 n.15, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (Brennan, J., dissenting); *see also* Douglass, *supra* note 6, at 2004; *Criminal Procedure—Confrontation Clause—Fourth Circuit Finds No Right to Confrontation During Sentence Selection Phase of Capital Trial,* 128 HARV. L. REV. 1027, 1032 (2015); Margery Malkin Koosed, *Averting Mistaken Executions by Adopting the Model Penal Code's Exclusion of Death in the Presence of Lingering Doubt,* 21 N. ILL. U. L. REV. 41, 101 (2001).

270    *See Apprendi,* 530 U.S. at 475–76, 120 S.Ct. 2348.

271    *Compare Harris,* 536 U.S. at 565–66, 122 S.Ct. 2406 (finding that juries need only determine any fact that increases a maximum authorized sentence, and not a fact that increases a minimum sentence), *with id.* at 577–78, 122 S.Ct. 2406 (Thomas, J., dissenting) (arguing that juries must also determine any fact that increases a minimum sentence).

272    —— U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013) (overruling *Harris,* 536 U.S. 545, 122 S.Ct. 2406).

273    *See id.* at 2158.

274    *See id.* at 2161.

275    *See Hurst,* 136 S.Ct. at 621–24; *Ring,* 536 U.S. at 597–609, 122 S.Ct. 2428.

276    In concluding this for myself, I again acknowledge that *Hurst* can be read in different ways, and respect that one of my learned colleagues who concurs in part in the result we reach views *Hurst* as extending only to those findings that aggravate in favor of a death sentence, and not to those that mitigate against them. Our difference in this respect is not as important as the effect of our shared agreement, which is that findings beyond the mere eligibility stage are necessary before a defendant can be sentenced to death under our statute, and that those findings must be made by a jury under the logic of *Hurst.* My principle disagreement with my colleague is that I believe that the role of the jury in the death penalty process has long encompassed all the factors bearing on the appropriate punishment, and that frequent references to the role of the jury in exercising its conscience and sense of mercy cannot be explained solely by the jury's role in deciding facts in the strict sense of how a crime was committed. Instead, I believe it extended to all factors, including those personal to the defendant, bearing on the jury's sense of the blame-worthiness of the crime and the fitting punishment for it. *See, e.g., Winston,* 172 U.S. at 310–12, 19 S.Ct. 212; *Witherspoon,* 391 U.S. at 528, 88 S.Ct. 1770.

277    *Blakely,* 542 U.S. at 303, 124 S.Ct. 2531 (emphasis in original).

278    For example, it is possible to form this gotcha syllogism that has the effect of grounding a holding that a unanimous jury verdict must buttress any death penalty judgment. That would go like this. States cannot make the death penalty the mandatory punishment for any crime. *See Woodson,* 428 U.S. at 303, 96 S.Ct. 2978. Nor can a state execute a defendant before both the aggravating and mitigating factors are fairly considered, and rationally weighed against each other and the factors that weigh in favor of death are found to outweigh those mitigating against it. *See id.* at 303–04, 96 S.Ct. 2978; *Jurek,* 428 U.S. at 271, 96 S.Ct. 2950. As a result, the default penalty will always be life imprisonment, absent a specific fact intensive inquiry beyond the stage where guilt and even death eligibility is the sole factor. *See Marsh,* 548 U.S. at 179, 126 S.Ct. 2516. Thus, as this would go, when you put together all the Supreme Court cases, a jury must now determine whether any defendant should get the death penalty.

279    *See, e.g.,* Hoffman, *supra* note 6; Iontcheva, *supra* note 17; Sam Kamin & Justin Marceau, *The Facts About* Ring v. Arizona *and the Jury's Role in Capital Sentencing,* 13 U. PA. J. CONST. L. 529 (2011); Betrall L. Ross II, *Reconciling the*

Booker *Conflict: A Substantive Sixth Amendment in a Real Offense Sentencing System*, 4 CARDOZO PUB. L. POL'Y & ETHICS J. 725 (2006).

280    548 U.S. 163, 126 S.Ct. 2516.

281    *Id.* at 178–79, 126 S.Ct. 2516; *see also Sattazahn v. Pennsylvania*, 537 U.S. 101, 110, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003).

282    This, of course, is exactly why several Justices have focused on death eligibility factors being considered as an element of a crime, and that the jury right only extends to having the jury decide all the facts necessary to make a defendant eligible to be executed. They rationalize this by saying that all are on notice of the criminal laws, and if the criminal laws say that if you do X crime, the range of punishment is Y, then your jury trial right is fully preserved if you are not exposed to Y until a jury says you should be. *See supra* note 218 (discussing Justice Scalia's view on this point); *see also* Hoffman, *supra* note 6, at 976–77.

283    *See, e.g.*, Hoffman, *supra* note 6, at 1009–10 (advocating for jury sentencing in capital cases without the arbitrary sentencing in death cases that existed before *Furman* ).

284    *See, e.g.*, *Ring*, 536 U.S. at 610, 122 S.Ct. 2428 (Scalia, J., concurring) ("What compelled Arizona (and many other States) to specify particular 'aggravating factors' that must be found before the death penalty can be imposed was the line of this Court's cases beginning with *Furman v. Georgia*. In my view, that line of decisions had no proper foundation in the Constitution. I am therefore reluctant to magnify the burdens that our *Furman* jurisprudence imposes on the States. Better for the Court to have intended an evidentiary requirement that a judge can find by a preponderance of the evidence, than to invent one that a unanimous jury must find beyond a reasonable doubt."); *see also* Lillquist, *supra* note 6.

285    *See supra* note 240 and accompanying text.

286    *See, e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 207–08, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (establishing five-part test for determining when Congress's conditional spending is Constitutional); *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (establishing "*Tinker* test" for determining whether a school's censuring speech violates the First Amendment).

287    *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (reformulating test for determining whether hearsay statements are admissible under the Sixth Amendment's Confrontation Clause); *Illinois v. Gates*, 462 U.S. 213, 230–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (establishing test for determining when probable cause exists under Fourth Amendment).

288    *See Spaziano*, 468 U.S. at 484, 104 S.Ct. 3154 (Stevens, J., dissenting) ("[T]he lesson history teaches is that the jury—and in particular jury sentencing—has played a critical role in ensuring that capital punishment is imposed in a manner consistent with evolving standards of decency. This is a lesson of constitutional magnitude, and one that was forgotten during the enactment of the Florida statute."); *supra* note 216 and accompanying text.

289    Douglass, *supra* note 6, at 1974; *see also id.* at 2012–15; Lillquist, *supra* note 6, at 650; Hoffman, *supra* note 6, at 964.

290    Adriaan Lanni, *Jury Sentencing in Noncapital Cases: An Idea Whose Time Has Come (Again)?*, 108 YALE L.J. 1775, 1800 (1999).

291    James Wilson, *Lectures of James Wilson*, *in* 2 COLLECTED WORKS OF JAMES WILSON 1008–09 (Kermit L. Hall & Mark David Hall, eds., 2007)

292    *See Hurst*, 136 S.Ct. at 624 (Breyer, J., concurring); *Schriro*, 542 U.S. at 360, 124 S.Ct. 2519 (Breyer, J., dissenting); *Ring*, 536 U.S. at 619, 122 S.Ct. 2428 (Breyer, J., concurring); *Harris*, 513 U.S. at 515–16, 519–20, 115 S.Ct. 1031 (Stevens, J., dissenting); *Patten v. Florida*, 474 U.S. 876, 876, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985) (Marshall, J., dissenting from denial of cert.); *Spaziano*, 468 U.S. at 477–81, 104 S.Ct. 3154 (Stevens, J., dissenting); *see also* Gillers, *supra* note 70, at 39–74.

293    As amicus points out, the requirement of a unanimous jury was settled as of the time of our founding as a nation. *See* C. H. Houston Br. at 4–5; *see also* 1 JOHN ADAMS, A DEFENCE OF THE CONSTITUTIONS OF GOVERNMENT OF THE UNITED STATES OF AMERICA 376 (1797) ("[I]t is the unanimity of the jury that preserves the rights of mankind...."); JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON, L.L.D. 350 (1804) ("To the conviction of a crime, the undoubting and the unanimous sentiment of the twelve jurors is of indispensable necessity.... [T]he consequence unquestionably is, that a single doubt or single dissent must produce a verdict of acquittal."); *Claudio v. State*, 585 A.2d 1278, 1301 (Del. 1991) ("[U]nanimity of the jurors is required to reach a verdict since such was the common law rule.").

294    *See Parker v. Dugger*, 498 U.S. 308, 314, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991).

295    The Delaware statute in its current form also has another potential problem, which is related to these two points. That is, it distances the role of the jury from the actual decision about life or death, by stating the jury only has to make

a finding of whether a certain aggravator exists and whether the aggravating factors outweigh the mitigating factors, under a preponderance standard. An academic study of the reflections of actual jurors in eight Delaware death penalty cases found that Delaware's approach of having the jurors simply vote on whether the aggravating or mitigating factors predominate had the effect of distancing jurors from having a sense of responsibility that their vote was actually one about life or death. The scholars believed the data "suggest[ed] that capital jurors in Delaware are not taking their sentencing responsibilities seriously" and "take mental strides to effectively distance themselves as much as possible from the sentencing decision." Kleinstuber, *supra* note 205, at 340; *see also id.* at 325 ("Further divesting Delaware capital jurors of a sense of responsibility for their decisions, they are not actually asked whether or not the defendant should be sentenced to death."). For these reasons, it is arguable under the Sixth Amendment that a jury must deliver a sentencing verdict, in which it specifically imposes either a death sentence or the alterative prison sentence. Either that, or the jury must be told that it always has an option to exercise mercy and that if its sense of mercy counsels for the less harsh penalty, it may and should find that the mitigators outweigh the aggravators. Consistent with that, the jury should also have to be told that a finding that the aggravators outweigh the mitigators means the jury believes that death should be the defendant's penalty.

296    *See Capano v. State,* 889 A.2d 968, 978 (Del. 2006); *Claudio v. State,* 585 A.2d 1278, 1301 (Del. 1991).

297    *See supra* notes 27, 42 and accompanying text.

298    *See* Smith, *supra* note 48, at 244 ("More than four decades of social science research indicates that unanimous juries deliberate longer, discuss and debate the evidence more thoroughly, and are more tolerant and respectful of dissenting voices. Non-unanimous decision rules also tend to promote perilous racial dynamics."); *see also Zylstra,* 1 S.C.L. (1 Bay) at 389 ("[W]hen the rights of the citizens are to be determined on by 12 men, changed at every Court, and indiscriminately drawn from every class of their fellow citizens, there will be a better chance generally, that the poor will receive an equal measure of justice with the rich, and that the decision of facts will be according to the truth of them.").

299    The unanimity requirement has long been celebrated as an important protective safeguard for a defendant's rights, precisely because it makes every voice in the jury room of critical importance, and thereby has been seen as ensuring that the ultimate outcome is a good proxy for how the larger community would decide the matter if that were feasible. *See Andres,* 333 U.S. at 761–65, 68 S.Ct. 880 (Frankfurter, J., concurring). *See generally* JEFFREY ABRAMSON, WE, THE JURY (2004). For the obvious reason that eliminating the unanimity requirement reduces the importance of individual jurors and the incentive for the jury to deliberate in an inclusive manner because the agreement of every juror is no longer necessary to reach an outcome, it is unsurprising that scholars have developed empirical evidence that they believe demonstrates that non-unanimous jury statutes diminish the voice of minority jurors and produce results that seem to reflect greater racial bias. *See, e.g.,* Kim Taylor–Thompson, *Empty Votes in Jury Deliberations,* 113 HARV. L. REV. 1261 (2000); Robert J. Smith, *The Geography of the Death Penalty and Its Ramifications,* 92 B.U. L. REV. 227 (2012). Among those studies is one that noted that "Delaware has the highest death-sentencing rate in the country in black defendant/ white victim cases." Hans et al., *supra* note 36, at 72.

300    I acknowledge the odd cases of *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), and *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), in which the U.S. Supreme Court held that the Sixth Amendment applies differently to the federal government than to the states. That rationale, I confess, is not convincing to me, and I do not believe that the Supreme Court would allow a state to depart from unanimity in the death penalty context. *See McDonald v. City of Chicago,* 561 U.S. 742, 765, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality) ("[I]ncorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal enforcement.' ") (quoting *Malloy v. Hogan,* 378 U.S. 1, 10, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)); *see also id.* at 823, 130 S.Ct. 3020 (Thomas J., joining plurality opinion and concurring) ("Section 1 [of the Fourteenth Amendment] protects the rights of citizens 'of the United States' specifically. The evidence overwhelmingly demonstrates that the privileges and immunities of such citizens included individual rights enumerated in the Constitution....").

301    *See* Linda E. Carter, *A Beyond a Reasonable Doubt Standard in Death Penalty Proceedings: A Neglected Element of Fairness,* 52 OHIO ST. L.J. 195, 204–05 (1991); Erik Lillquist, *Absolute Certainty and the Death Penalty,* 42 AM. CRIM. L. REV. 45, 47–53 (2005).

302    *See supra* notes 17–19 and accompanying text (jury's historical role in acquitting guilty defendants they believed should not suffer death when that was the penalty); *supra* notes 20–23 and accompanying text (degrees of murder and lesser included offenses arose in part to give the jury an option to convict a defendant of a lesser crime when guilty of a first degree murder for which death was the mandatory penalty, when they could not reach an agreement unanimously and beyond a reasonable doubt that death was the fitting punishment).

303  *See United States v. Gabrion*, 648 F.3d 307, 325–26 (6th Cir. 2011), *rev'd en banc*, 719 F.3d 511 (6th Cir. 2013); Carter, *supra* note 301, at 215–21.

304  In so concluding, I acknowledge that post-*Furman* case law does not apply the beyond a reasonable doubt standard to the ultimate sentencing phase of a capital trial, and that this Court's own decision in *State v. Cohen* took that approach. *See Cohen*, 604 A.2d at 850–52. I also acknowledge that the U.S. Supreme Court has recently suggested that freighting a sentencing inquiry with a specific standard of review is inconsistent with the discretionary nature of sentencing. *See Carr*, 136 S.Ct. at 642. But, the reality is that American law has long required that certain decisions be made with a high level of confidence. In family law, for example, our state requires a determination that parental rights should be terminated to be made under a clear and convincing standard. *See Barr v. Div. Fam. Servs.*, 974 A.2d 88, 94 (Del. 2009). And in the death penalty context itself, several states in fact sensibly direct that any death sentence be imposed only when the jury is convinced beyond a reasonable doubt that execution is the just sentence. *See, e.g.*, ARK. CODE ANN. § 5–4–603 (West 2016); UTAH CODE ANN. § 76–3–207 (West 2016).

1   —— U.S. ——, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

2   *Id.* at 619.

3   *Rauf v. State*, No. 39, 2016 (Del. Jan. 28, 2016) (ORDER).

4   *Hurst*, 136 S.Ct. at 619 (emphasis added).

5   530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

6   536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

7   *Hurst*, 136 S.Ct. at 621 (quoting *Apprendi*, 530 U.S. at 494, 120 S.Ct. 2348).

8   *Id.*

9   *Id.* at 622.

10  *Id.* (quoting Fla. Stat. § 775.082(1)).

11  —— U.S. ——, 136 S.Ct. 633, 193 L.Ed.2d 535 (2016).

12  *Id.* at 642.

13  468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), *overruled by Hurst v. Florida*, —— U.S. ——, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

14  490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), *overruled by Hurst v. Florida*, —— U.S. ——, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

15  *Hurst*, 136 S.Ct. at 624.

16  11 *Del. C.* § 4209(c).

17  11 *Del. C.* § 4209(c)(3)(b.1) (emphasis added).

18  *Id.* (emphasis added).

19  *See id.*; *Hurst*, 136 S.Ct. at 622.

20  11 *Del. C.* § 4209(d)(1).

21  *Apprendi*, 530 U.S. at 477, 120 S.Ct. 2348 (internal citations omitted).

22  406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).

23  *Johnson v. Louisiana*, 406 U.S. 356, 369–80, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (Powell, J., concurring in the judgment in *Apocada* ).

24  *See McDonald v. City of Chicago*, 561 U.S. 742, 765–66, 766 n.14, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

25  *Apprendi*, 530 U.S. at 498, 120 S.Ct. 2348 (Scalia, J., concurring) (emphasis in original).

26  *Claudio v. State*, 585 A.2d 1278, 1290–1301 (Del. 1991) (discussing Delaware's history of jury trials and the requirement of a unanimous jury verdict pursuant to the right to a trial by jury); *see also Capano v. State*, 889 A.2d 968, 973 (Del. 2006) (vacating the defendant's death sentence because the defendant's "eligibility for the death penalty was decided by the sentencing judge without a unanimous jury finding," and "[i]n Delaware, the elements of any criminal offense, including the greater offense of capital murder, must be found by a unanimous jury.").

27  *Hurst*, 136 S.Ct. at 621 (quoting *Alleyne v. United States*, —— U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013)).

28  *Ring*, 536 U.S. at 610, 122 S.Ct. 2428 (Scalia, J., concurring).

29  *Brice v. State*, 815 A.2d 314, 322 (Del. 2003).

30  *Id.*

31  *Hurst*, 136 S.Ct. at 622.

32  *Id.* (internal quotations marks and alterations omitted). *Accord* 11 *Del. C.* § 4209(d)(1).

33  Del. H.B. 287 syn., 142nd Gen. Assem., 74 Del. Laws ch. 174 (2003).

34  *See Hurst*, 136 S.Ct. at 622; 11 *Del. C.* § 4209.

35  815 A.2d 314 (Del. 2003).

36  *Id.* at 322.

37  *Id.*

38  *Id.* at 319.

39  *Hurst*, 136 S.Ct. at 624.

40  ––– U.S. –––, 134 S.Ct. 405, 187 L.Ed.2d 449 (2013).

41  *Id.* at 406.

42  *Id.* at 410–11 (Sotomayor, J., dissenting).

43  *Hurst*, 136 S.Ct. at 619 (emphasis added).

44  *Id.* at 622.

1  ––– U.S. –––, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

2  536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

3  *Hurst*, 136 S.Ct. at 622.

4  *Id.* at 624.

5  *Id.* at 619.

6  *Id.* at 621–22. The *Hurst* Court summarized *Ring* as follows:

In *Ring*, we concluded that Arizona's capital sentencing scheme violated *Apprendi's* rule because the State allowed a judge to find the facts necessary to sentence a defendant to death. An Arizona jury had convicted Timothy Ring of felony murder. Under state law, "Ring could not be sentenced to death, the statutory maximum penalty for first-degree murder, unless further findings were made." Specifically, a judge could sentence Ring to death only after independently finding at least one aggravating circumstance. Ring's judge followed this procedure, found an aggravating circumstance, and sentenced Ring to death.

The Court had little difficulty concluding that " 'the required finding of an aggravated circumstance exposed Ring to a greater punishment than that authorized by the jury's guilty verdict.' " Had Ring's judge not engaged in any factfinding, Ring would have received a life sentence. Ring's death sentence therefore violated his right to have a jury find the facts behind his punishment.

*Id.* at 621 (internal citations omitted).

7  468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), *overruled in part by Hurst v. Florida*, ––– U.S. –––, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

8  490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989) (*per curiam* ), *overruled in part by Hurst v. Florida*, ––– U.S. –––, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016).

9  *Hurst*, 136 S.Ct. at 623 (emphasis added).

10  *Id.* at 624 (emphasis added).

11  *See id.* at 619. The United States Supreme Court has made clear that the determination as to whether aggravating circumstances exist is "purely factual." *Kansas v. Carr*, ––– U.S. –––, 136 S.Ct. 633, 642, 193 L.Ed.2d 535 (2016).

12  Under 11 *Del. C.* § 4209, the sentencing judge cannot impose the sentence of death unless the jury "first finds unanimously and beyond a reasonable doubt the existence of at least 1 statutory aggravating circumstance...." 11 *Del. C.* § 4209(d)(1). However, if a jury finds unanimously and beyond a reasonable doubt the existence of at least one statutory aggravating circumstance, the court, "after considering the findings and recommendation of the jury and without hearing or reviewing any additional evidence, *shall* impose a sentence of death *if* the Court finds by a preponderance of the evidence" that the "aggravating circumstances *found by the Court* to exist outweigh the mitigating circumstances found by the Court to exist." *Id.* (emphasis added). "Otherwise, the Court shall impose a sentence of imprisonment for the remainder of the defendant's natural life without benefit of probation or parole or any other reduction." 11 *Del. C.* § 4209(d)(2).

13  75 A.3d 840 (Del. 2013).

14  869 A.2d 285 (Del. 2005), *cert. denied*, 546 U.S. 832, 126 S.Ct. 55, 163 L.Ed.2d 84 (2005).

15  *See Ploof*, 75 A.3d at 846 n.12 (citing *Ortiz*, 869 A.2d 285) ("[A] jury's lack of unanimity regarding [a] statutory aggravating factor ... does not preclude the sentencing judge from considering such evidence as a non[-]statutory aggravating factor as part of his weighing calculus."). As recounted by the *Ploof* Court, *Ortiz* "affirmed the imposition of the death penalty after a jury, having considered two statutory aggravating factors, unanimously found that the defendant was previously convicted of a violent felony, but found only by a vote of 9–3 the circumstance of premeditation and substantial planning.

Although it was not entitled to qualify as a statutory aggravating factor, the trial court found that sufficient evidence existed of premeditation and substantial planning to warrant its use as a non[-]statutory aggravating factor." *Id.* (internal citations omitted). The Superior Court also found seven additional non-statutory aggravating factors in *Ortiz. Ortiz,* 869 A.2d at 308–09.

16  *Apprendi v. New Jersey,* 530 U.S. 466, 494 n.19, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *see also Ring,* 536 U.S. at 609, 122 S.Ct. 2428 (citing *Apprendi,* 530 U.S. at 494.n19, 120 S.Ct. 2348) ("Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." (internal citation omitted)).

17  *Hurst,* 136 S.Ct. at 621; *see also Ring,* 536 U.S. at 589, 122 S.Ct. 2428 ("Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment."); *id.* at 610, 122 S.Ct. 2428 (Scalia, J., concurring) ("[T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt."); *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348; *id.* at 499, 120 S.Ct. 2348 (Scalia, J., concurring) ("And the guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right to ... trial, by an impartial jury,' has no intelligible content unless it means that all the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury." (emphasis in original) (alterations in original)).

18  *Hurst,* 136 S.Ct. at 624.

19  *See* 11 *Del. C.* § 4209(d)(1)-(2).

20  *Hurst,* 136 S.Ct. at 619; *see also id.* at 624 ("The Sixth Amendment protects a defendant's right to an impartial jury. This right required Florida to base Timothy Hurst's death sentence on a jury's verdict, not a judge's factfinding. Florida's sentencing scheme, which required the judge alone to find the existence of an aggravating circumstance, is therefore unconstitutional.").

21  530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

22  *Id.* at 490, 120 S.Ct. 2348.

23  542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

24  *Id.* at 303, 124 S.Ct. 2531 (citing *Ring,* 536 U.S. at 602, 122 S.Ct. 2428 (" '[T]he maximum he would receive if punished according to the facts reflected in the jury verdict alone.' ")) (emphasis in original) (citations omitted).

25  *Id.* at 304, 124 S.Ct. 2531 (internal citation omitted).

26  *Id.*

27  —— U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013).

28  536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002). In *Harris,* the defendant was charged with carrying a firearm in the course of committing a drug trafficking crime. Under 18 U.S.C. § 924, the mandatory minimum sentence based on the jury's verdict alone was five years. The United States District Court for the Middle District of North Carolina nonetheless imposed a seven-year mandatory minimum sentence on the defendant, based on its finding that the defendant brandished the firearm. On appeal to the United States Supreme Court, the defendant unsuccessfully challenged the imposed mandatory minimum sentence as unconstitutional under *Apprendi.*

29  *Alleyne,* 133 S.Ct. at 2157 (quoting *Harris,* 536 U.S. at 557, 560–61, 567, 122 S.Ct. 2406) (internal citations omitted) (internal quotation marks omitted).

30  *Id.* at 2155 (quoting 18 U.S.C. § 924(c)(1)(A)) (internal quotation marks omitted).

31  The *Alleyne* Court was careful to point out that their ruling "does not mean that any fact that influences judicial discretion must be found by a jury," since the Supreme Court has "long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." *Id.* at 2163 (citing *Dillon v. United States,* 560 U.S. 817, 828–29, 130 S.Ct. 2683, 177 L.Ed.2d 271 (2010) ("[W]ithin established limits[,] ... the exercise of [sentencing] discretion does not contravene the Sixth Amendment even if it is informed by judge-found facts." (alterations in *Alleyne* )); *Apprendi,* 530 U.S. at 481, 120 S.Ct. 2348 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion— taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." (alteration in *Alleyne* ) (emphasis in original)) (citations omitted)).

32  *Id.* at 2161 (internal citations omitted).

33  *Id.* at 2162; *see also id.* at 2162–63 ("The essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime. It must, therefore, be submitted to the jury and found beyond a reasonable doubt.").

34   *Id.* at 2162 (citations omitted); *see also Blakely,* 542 U.S. at 303–04, 124 S.Ct. 2531 ("[T]he relevant 'statutory maximum,' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." (emphasis in original)).

35   *See Alleyne,* 133 S.Ct. at 2165 (Sotomayor, J., concurring) (observing that *Apprendi*'s "rule has become even more firmly rooted in the Court's Sixth Amendment jurisprudence in the decade since *Harris*").

36   815 A.2d 314 (Del. 2003).

37   *Id.* at 322.

38   *Hurst,* 136 S.Ct. at 624; *see also id.* at 619 ("The Sixth Amendment requires a jury, not a judge, to find *each* fact necessary to impose a sentence of death." (emphasis added)); *id.* at 622 ("*Ring* required a jury to find *every* fact necessary to render [a defendant] eligible for the death penalty." (emphasis added)).

39   *See supra* note 12.

40   *Hurst,* 136 S.Ct. at 623 (observing that "in the *Apprendi* context, we have found that '*stare decisis* does not compel adherence to a decision whose "underpinnings" have been "eroded" by subsequent developments of constitutional law' " (internal citations omitted)) (internal quotation marks omitted); *compare id.* at 624 (holding that a judge cannot find an aggravating circumstance, independent of a jury, that is necessary to impose the death penalty), *with Brice,* 815 A.2d at 322 ("Non-statutory aggravators, if considered at all, do not enter the mix until after the jury performs its essential function during the narrowing phase. Accordingly, a finding of non-statutory factors does not 'increase' the maximum penalty that a defendant can receive. Rather, non-statutory aggravators are part of the total mix, including mitigating factors, when the sentencing judge performs his function during the weighing phase.").

41   *See Claudio v. State,* 585 A.2d 1278, 1301 (Del. 1991) (citing *Fountain v. State,* 275 A.2d 251 (Del. 1971)) ("This Court has expressly held that under the Delaware Constitution, unanimity of the jurors is required to reach a verdict since such was the common law rule." (footnote omitted)).

42   406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).

43   *See Johnson v. Louisiana,* 406 U.S. 366, 369–75, 92 S.Ct. 1635, 32 L.Ed.2d 162 (1972) (Powell, J., concurring in the *Apodaca* judgment and concurring in *Johnson*); *see also McDonald v. City of Chicago,* 561 U.S. 742, 766 n.14, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (citing *Apodaca,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184; *Johnson,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (holding that the Due Process Clause does not require unanimous jury verdicts in state criminal trials)); *Jordan v. Massachusetts,* 225 U.S. 167, 176, 32 S.Ct. 651, 56 L.Ed. 1038 (1912) ("In criminal cases due process of law is not denied by a state law ... which dispenses with the necessity of a jury of twelve, or unanimity in the verdict.").

44   *Apodaca,* 406 U.S. at 411, 92 S.Ct. 1628 (joint opinion of White, J., Burger, C.J., Blackmun and Rehnquist, JJ.).

45   *Id.*

46   561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

47   *Id.* at 766 n.14, 130 S.Ct. 3020 (internal citations omitted).

48   *Id.*; *see also Richardson v. United States,* 526 U.S. 813, 821, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) ("The cases are not federal but state, where this Court has not held that the Constitution imposes a jury-unanimity requirement." (citation omitted)).

49   *See* Brief for Petitioner at 45–47, *Hurst v. Florida,* ––– U.S. ––––, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016) (No. 14–7505), 2015 WL 3523406.

50   This Court has provided that "it is untenable to conclude that the right to trial by jury in the Delaware Constitution means exactly the same thing as that right in the United States Constitution." *Claudio,* 585 A.2d at 1298 (citation omitted). Delaware law has long recognized the significance of juror unanimity in criminal proceedings. *See Wilson v. Oldfield,* 1 Del.Cas. 622, 624–27 (Del. Com. Pl. 1818). This Court, in *Fountain v. State,* 275 A.2d 251 (Del. 1971), re-affirmed that it is "fundamental under our law that the verdict of a jury must be unanimous." *Id.* at 251. There, we recognized that the requirement of juror unanimity under Delaware law follows from Article I, § 4 of the Delaware Constitution, which provides: "Trial by jury shall be as heretofore." Del. Const. art. I, § 4. *Fountain* thus interpreted Article I, § 4 to "guarantee[ ] the right to trial by jury as it existed at common law." *Fountain,* 275 A.2d at 251 (citing *Nance v. Rees,* 161 A.2d 795 (Del. 1960)). Accordingly, "[t]his Court and the other courts of Delaware have always construed that provision in the Delaware Constitution as 'guaranteeing the right to trial by jury as it existed at common law.' " *Claudio,* 585 A.2d at 1297 (quoting *Fountain,* 275 A.2d at 251) (emphasis removed). "Unanimity of the jurors is therefore required to reach a verdict since such was the common law rule." *Fountain,* 275 A.2d at 251 (citation omitted).

51   *Ring,* 536 U.S. at 602, 122 S.Ct. 2428 (citing *Apprendi,* 530 U.S. at 482–83, 120 S.Ct. 2348).

52    *Hurst*, 136 S.Ct. at 621 (quoting *Apprendi*, 530 U.S. at 494, 120 S.Ct. 2348) (alterations in *Hurst* and added).

53    *Carr*, 136 S.Ct. at 642.

54    *See Ring*, 536 U.S. at 602, 122 S.Ct. 2428 (quoting *Apprendi*, 530 U.S. at 483, 120 S.Ct. 2348) (internal quotation marks omitted).

55    *Spaziano*, 468 U.S. at 464, 104 S.Ct. 3154.

56    *Compare Hurst*, 136 S.Ct. at 624 ("Time and subsequent cases have washed away the logic of *Spaziano* and *Hildwin*. The decisions are overruled to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty."), *with Ring*, 536 U.S. at 609, 122 S.Ct. 2428 ("[W]e overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." (citation omitted)).

57    ——— U.S. ———, 134 S.Ct. 405, 410–11, 187 L.Ed.2d 449 (2013) (Sotomayor, J., dissenting from denial of *certiorari* ).

58    *Id.* (emphasis added) (internal citations omitted).

59    *Libretto v. United States*, 516 U.S. 29, 49, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995) (citing *Spaziano*, 468 U.S. at 459, 104 S.Ct. 3154 (no right to a jury determination as to the imposition of the death penalty)) (citations omitted); *see also Morgan v. Illinois*, 504 U.S. 719, 725–26, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) ("We have emphasized previously that there is not 'any one right way for a State to set up its capital sentencing scheme,' and that no State is constitutionally required by the Sixth Amendment or otherwise to provide for jury determination of whether the death penalty shall be imposed on a capital defendant." (internal citations omitted)); *id.* at 740, 112 S.Ct. 2222 (Scalia, J., dissenting) (citing *Clemons v. Mississippi*, 494 U.S. 738, 745–46, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Spaziano*, 468 U.S. at 464, 104 S.Ct. 3154 (citations omitted)) ("The Court today reaffirms our oft-repeated holding that the Sixth Amendment (which is binding on the States through the Fourteenth Amendment) does not require a jury trial at the sentencing phase of a capital case.").

60    *Spaziano*, 468 U.S. at 459, 104 S.Ct. 3154 (citations omitted).

61    *Id.* at 462–63, 104 S.Ct. 3154 (footnote omitted).

62    *Ring*, 536 U.S. at 612–13, 122 S.Ct. 2428 (Scalia, J., concurring).

63    Various concurring and dissenting opinions have expressed support for jury sentencing in capital cases, but, to date, jury sentencing has not garnered majority support on the United States Supreme Court. *See, e.g.*, *Hurst*, 136 S.Ct. at 624 (Breyer, J., concurring in the judgment) (quoting *Ring*, 536 U.S. at 614, 122 S.Ct. 2428 (Breyer, J., concurring in the judgment)) ("[T]he Eighth Amendment requires that a jury, not a judge, make the decision to sentence a defendant to death." (internal quotation marks omitted)); *Woodward*, 134 S.Ct. at 407 (Sotomayor, J., dissenting from denial of *certiorari*) ("One such safeguard, as determined by the vast majority of States, is that a jury, and not a judge, should impose any sentence of death." (footnote omitted)); *see also id.* at 407 n.2 ("It is perhaps unsurprising that the national consensus has moved towards a capital sentencing scheme in which the jury is responsible for imposing capital punishment. Because capital punishment is an expression of society's moral outrage at particularly offensive conduct, jurors, who express the conscience of the community on the ultimate question of life or death, seem best-positioned to decide whether the need for retribution in a particular case mandates imposition of the death penalty." (internal citations omitted) (internal quotation marks omitted)).

64    *Hurst*, 136 S.Ct. at 623–24.

65    *Ring*, 536 U.S. at 597 n.4, 122 S.Ct. 2428 (citing *Proffitt v. Florida*, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) ("[I]t has never [been] suggested that jury sentencing is constitutionally required." (alterations in *Ring* ))).

66    428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion).

67    *See id.* at 252, 96 S.Ct. 2960 (joint opinion of Powell, Stewart, Stevens, JJ.) ("And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases." (citations omitted)).

68    *Id.* (citing *Witherspoon v. Illinois*, 391 U.S. 510, 519 n.15, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)) (emphasis added).

69    *See, e.g.*, *Clemons*, 494 U.S. at 745, 110 S.Ct. 1441 ("Any argument that the Constitution requires that a jury impose the sentence of death ... has been soundly rejected by prior decisions of this Court."); *id.* ("[T]he decision whether a particular punishment—even the death penalty—is appropriate in any given case is not one that has ever required to be made by a jury." (citation omitted) (internal quotation marks omitted)).

70    *Hurst*, 136 S.Ct. at 624 (Breyer, J., concurring in the judgment) (quoting *Ring*, 536 U.S. at 614, 122 S.Ct. 2428 (Breyer, J., concurring in the judgment)) (internal citations omitted).

71    Indeed, the Supremacy Clause of Article VI of the United States Constitution makes clear that federal constitutional rights supersede any contrary State laws: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

72    A requirement of such clarity before mandating State officials to alter their statutory schemes exists, relatedly, in other contexts, such as addressing ambiguities in federal statutes. *See* Bond v. United States, ––– U.S. ––––, 134 S.Ct. 2077, 2089, 189 L.Ed.2d 1 (2014) (referring to the established principle that "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers," and observing that "if the Federal Government would radically readjust[ ] the balance of state and national authority, those charged with the duty of legislating [must be] reasonably explicit" (internal citations omitted) (internal quotation marks omitted) (alterations in original)). Writing for the Court in Bond v. United States, Chief Justice Roberts commented that "[b]ecause our constitutional structure leaves local criminal activity primarily to the States, we have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach." *Id.* at 2083; *cf.* Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation [in a grant of federal funds].")." Accordingly, although it is "the province and duty of the judicial department to say what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), I reject the more expansive interpretation of *Hurst* that three of my distinguished colleagues gave it.

73    S.B. 79, 136th Gen. Assemb., 2d Sp. Sess., 68 Del. Laws ch. 189 (Del. 1991) (citing Proffitt, 428 U.S. at 260, 96 S.Ct. 2960 (White, J., concurring in the judgment) ("Under Florida law, the sentencing judge is [r]equired to impose the death penalty on all first-degree murderers as to whom the statutory aggravating factors outweigh the mitigating factors.")) (citation omitted); *see also* H.B. 287, 142nd Gen. Assemb., 1st Reg. Sess., 74 Del. Laws ch. 174 (Del. 2003) ("In 1991, the 136th General Assembly changed Delaware's death penalty statute so that the final sentencing authority in such cases was vested with the trial judge. [The synopsis to the 1991 amendment] clearly stated that the intent of the bill was to ensure that the judge would 'make the final determination as to whether a person convicted of first degree murder should be sentenced to death or life imprisonment.' "); *id.* ("[This Act] will clarify that it is and has been the intent of the General Assembly that while the sentencing judge must consider a jury's recommended finding on the question of whether the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist, he or she shall not be bound by the recommendation, but instead shall give it such weight as he or she deems appropriate under the circumstances present in a given case.").

74    S.B. 449, 141st Gen. Assemb., 2d Reg. Sess., 73 Del. Laws ch. 423 (Del. 2002) ("This Act will conform Delaware's death penalty sentencing procedures to the new rule announced by the United States Supreme Court in Ring v. Arizona." (italics added)).

75    H.B. 287, 142nd Gen. Assemb., 1st Reg. Sess., 74 Del. Laws ch. 174 (Del. 2003).

76    *Id.*

77    *Cf.* 1 Del. C. § 308 ("If any provision of this Code or amendments hereto, or the application thereof to any person, thing or circumstances is held invalid, such invalidity shall not affect the provisions or application of this Code or such amendments that can be given effect without the invalid provisions or application, and to this end the provisions of this Code and such amendments are declared to be severable.").

78    ––– U.S. ––––, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015).

79    *Id.* at 2739 (citing Baze v. Rees, 553 U.S. 35, 47, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008); *id.* at 87–88, 128 S.Ct. 1520 (Scalia, J., concurring in judgment); Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *id.* at 226, 96 S.Ct. 2909 (White, J., concurring in judgment); Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464, 67 S.Ct. 374, 91 L.Ed. 422 (1947); In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890); Wilkerson v. Utah, 99 U.S. 130, 134–35, 25 L.Ed. 345 (1878)).

80    U.S. Const. amend. V ("No person shall ... be deprived of life ... without due process of law...."); *see also* Glossip, 135 S.Ct. at 2747 (Scalia, J., concurring) ("Mind you, not once in the history of the American Republic has this Court ever suggested the death penalty is categorically impermissible. The reason is obvious: It is impossible to hold unconstitutional that which the Constitution explicitly *contemplates*. The Fifth Amendment provides that '[n]o person shall be held to answer for a capital ... crime, unless on a presentment or indictment of a Grand Jury,' and that no person shall be 'deprived of life ... without due process of law.' " (emphasis in original) (alterations in Glossip )).

81    501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion).

82   *Id.* at 638, 111 S.Ct. 2491 (citation omitted) (internal quotation marks omitted).

83   *Id.* (quoting *Patterson v. New York*, 432 U.S. 197, 201, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)) (internal quotation marks omitted).

84   *Kirksey v. Alabama*, —— U.S. ——, 136 S.Ct. 2409, 195 L.Ed.2d 777 (2016); *Wimbley v. Alabama*, —— U.S. ——, 136 S.Ct. 2387, 195 L.Ed.2d 760 (2016); *Johnson v. Alabama*, —— U.S. ——, 136 S.Ct. 1837, 194 L.Ed.2d 828 (2016).

85   *Glossip*, 135 S.Ct. at 2749–50 (Scalia, J., concurring).

1   —— U.S. ——, 136 S.Ct. 616, 616, 193 L.Ed.2d 504 (Jan. 12, 2016).

2   530 U.S. 466, 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

3   536 U.S. 584, 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

4   *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348.

5   *Ring*, 536 U.S. at 596, 122 S.Ct. 2428.

6   *Id.* at 592, 122 S.Ct. 2428.

7   *Id.* at 593, 122 S.Ct. 2428 (quoting Ariz. Rev. Stat. Ann. § 13–703(F) (2001)).

8   *Id.* at 597, 122 S.Ct. 2428 (quoting *State v. Ring*, 200 Ariz. 267, 25 P.3d 1139, 1151 (2001) (*en banc* )).

9   *Id.*

10   *Id.* at 589, 122 S.Ct. 2428.

11   497 U.S. 639, 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

12   *Ring*, 536 U.S. at 609, 122 S.Ct. 2428.

13   *Id.* at 612, 122 S.Ct. 2428 (Scalia, J., concurring).

14   815 A.2d 314, 314 (Del. 2003).

15   *Ring*, 536 U.S. at 589, 122 S.Ct. 2428.

16   *Hurst*, 136 S.Ct. at 620.

17   490 U.S. 638, 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989).

18   468 U.S. 447, 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1968).

19   *Hurst*, 136 S.Ct. at 619.

20   *Id.* at 621–22.

21   *Id.* at 620–21 (citations omitted).

22   *Id.* at 622 (internal quotation marks omitted).

23   *Hurst v. Florida*, —— U.S. ——, 135 S.Ct. 1531, 1531, 191 L.Ed.2d 558 (2015).

24   *Hildwin*, 490 U.S. at 640–41, 109 S.Ct. 2055.

25   Brief of Petitioner at 25, *Hurst v. Florida*, —— U.S. ——, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016) (No. 14–7505), 2015 WL 3542784 at *25.

26   *Id.*

27   Transcript of Oral Argument at 3, *Hurst v. Florida*, —— U.S. ——, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016) (No. 14–7505), 2015 WL 5970064, at *3.

28   *Id.* at *4.

29   *Id.* at *12.

30   *See Kirksey v. Alabama*, —— U.S. ——, 136 S.Ct. 2409, 195 L.Ed.2d 777 (2016); *Wimbley v. Alabama*, —— U.S. ——, 136 S.Ct. 2387, 195 L.Ed.2d 760 (2016); *Johnson v. Alabama*, —— U.S. ——, 136 S.Ct. 1837, 1837, 194 L.Ed.2d 828 (2016).

31   *Ex parte McGriff*, 908 So.2d 1024, 1037–39 (Ala. 2004).

32   *Id.* at 1038.

33   2016 WL 3364689 (Ala. Crim. App. June 17, 2016).

34   *Id.* at *6.

35   *Id.* at *13.

36   *Woodward v. Alabama*, —— U.S. ——, 134 S.Ct. 405, 410–11, 187 L.Ed.2d 449 (2013).