E-FILED
Friday, 24 August, 2018  06:10:23 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | Hearing Requested |
| | ) | |
| Defendant. | ) | |

## MOTION TO STRIKE NOTICE OF INTENT TO SEEK THE DEATH PENALTY ON THE GROUND THAT CAPITAL PUNISHMENT VIOLATES THE EIGHTH AMENDMENT

On the last day of the last 2014-15 Term, Justices Breyer and Ginsburg issued a clarion call for reconsideration of the constitutionality of the death penalty, aligning themselves with the views of several other justices who have expressed similar sentiments in the four decades since the Court reversed its earlier decision that capital punishment violates the Eighth Amendment. See *Glossip v. Gross*, __ U.S. __; 135 U.S. 2726, 2760 (2015)(Breyer and Ginsburg, JJ., dissenting) Answering that call, the Connecticut Supreme Court shortly thereafter held that "the death penalty is so out of step with our contemporary standards of decency as to violate the state constitutional ban on excessive and disproportionate punishment. *State v. Santiago*, 318 Conn. 1, 46 (2015). Mr. Christensen asks this Court to do the same.

## I. INTRODUCTION

On June 29, 1972, the United State Supreme Court held that "the imposition and carrying out of the death penalty . . . constitutes cruel and unusual punishment in

violation of the Eighth and Fourteenth Amendments." *Furman v. Georgia*, 408 U.S. 238, 239-240 (1972). Four years later, in a series of cases decided the same day, the Court reversed field and held that statutes that sufficiently cabin juror discretion by identifying factors which purport to either aggravate or mitigate a capital offense could sufficiently address Eighth Amendment concerns. *See Gregg v. Georgia*, 428 U.S. 153 (1976)(lead case). Evidence developed in the intervening 39 years has tempered the promise of *Gregg*. Recurring exonerations of defendants sentenced to die by a flawed system, unmasked by tools unavailable in 1976, have demonstrated the incompatibility of capital punishment with an enlightened and progressing society - as has evidence of racial, gender and geographic biases, as well as protracted delays which undermine purported justifications for the death penalty and generate detention of death row inmates for decades under conditions which themselves raise Eighth Amendment issues.

The United States has noticed its intent to seek the death penalty in this case. Dkt. 54. Mr. Christensen moves to strike that notice because the evidence strongly suggests that imposition of capital punishment in the United States is no longer consonant with the values of a progressive 21st Century society and thus violates the Eighth Amendment. Ms. Christensen is aware of this Court's duty to apply the doctrine of *stare decisis* and that the Supreme Court has not, as yet, declared capital punishment unconstitutional – indeed it has not revisited the issue of the constitutionality *per* se of the death penalty since the *Gregg* line of cases in 1976. Instead, the Court has embarked on a course of circumscribing its application, holding the Eighth Amendment bars the

penalty as applied to certain categories of offenders or cases. *See Coker v. Georgia*, 428 U.S. 153 (1976) (rape of adult woman); *Enmund v. Florida*, 458 U.S. 782 (where no intent to kill or use deadly force); *Atkins v. Virginia*, 536 U.S. 304 (2002) (mentally retarded offenders); *Roper v. Simmons*, 543 U.S. 551 (juveniles under 18 years old); *Kennedy v. Louisiana*, 554 U.S. 407 (2008) (rape of a child not resulting in death and where no intent to kill).

The Eighth Amendment looks to "contemporary standards regarding the infliction of punishment." *Woodson v. North Carolina*, 428 U.S. 280 (1976) (emphasis added). In terms of a maturing society, 1976 was light years away, as evidenced not only by then unimagined technological innovations such as the internet and social media, but also progressing social and cultural shifts such as the right of same-sex couples to marry, a development that would have been inconceivable forty years ago. The changing mores of an evolving and maturing society and new evidence concerning the operation of the death penalty has similarly unraveled the 1976 construct for capital punishment.

## II.   THE DEATH PENALTY VIOLATES THE EIGHTH AMENDMENT IF IMPOSED ARBITRARILY AND CAPRICIOUSLY

The Eighth Amendment's prohibition against "cruel and unusual punishment" is unadorned. The imprecise formulation was deliberate as the Framers knew that what constituted such punishment would be clarified and interpreted in conformity with "the evolving standards of decency that mark a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 [1958]. Accordingly, the Supreme Court has held various punishments

barred by the Eighth Amendment irrespective of how they likely would have been so considered in 1788. *See Weems v. United States*, 217 U.S. 349 (1910) (20 years at hard labor in chains for falsifying a public document); *Roper v. Simmons*, *supra* (Eighth Amendment bars death penalty for offenses committed by juveniles); *Atkins v. Virginia*, *supra* (same for offenses committed by those suffering from mental retardation). As *Weems* noted, a court's task under the Eighth Amendment is to ascertain not only what punishments were constitutionally allowed in the past, but those which today accord with society's evolving knowledge and values: "Time works changes, brings into existence new conditions and purposes . . . In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be." 217 U.S. at 373. Although arriving at different conclusions as to its application, no Supreme Court case in the 105 years since *Weems* has repudiated the principle that the concept of what constitutes "cruel and unusual" punishment under the Eighth Amendment is not set in stone.

The issue presented here is whether the death penalty as practiced and imposed in the United State at this time is "arbitrarily and capriciously" applied in a manner inconsistent with the Eighth Amendment. This formulation follows directly from *Furman* and *Gregg*. *See Gregg*, 428 U.S. at 188 ("Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner."). Nothing in the 39 years since *Gregg* has reformulated the underlying issue.

The only thing that has changed is a mountain of evidence bearing on its resolution that was unavailable in 1976.

The main opinion in *Furman* constituted only an unsigned single paragraph holding that the death sentences in that and its companion cases could not be squared with the bar on cruel and unusual punishment imposed by the Eighth Amendment. 408 U.S. at 238-239. Each Justice then wrote separately. Justices Brennan and Marshall concluded that, in light of the "evolving standards of decency that mark a maturing society," 408 U.S. at 269-270, the death penalty could not under any circumstances be reconciled with the command of the Eighth Amendment. In their view, the death penalty was unconstitutional *per* se. 408 U.S. at 257 (Brennan, J., concurring); *id*. at 314 (Marshall, J., concurring), positions they maintained throughout their remaining tenures on the Supreme Court.[1]

The remaining three justices in the *Furman* plurality were more flexible. Justices Stewart, White and Douglas focused on the arbitrary imposition of death sentences. In an oft-quoted passage, Justice Stewart analogized the randomness of the imposition of the death penalty to that of being hit by lightning.

> "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. My

---

[1] *E.g.: Stafford v. Oklahoma*, 467 U.S. 1212 (1984) ("Adhering to our views that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg v. Georgia*, [citation omitted], we would grant certiorari and vacate the death sentence in this case.") (Brennan and Marshall, JJ., dissenting from denial of certiorari).

> concurring Brothers have demonstrated that, if any basis can
> be discerned for the selection of these few to be sentenced to
> death, it is the constitutionally impermissible basis of race.
> See *McLaughlin v. Florida* 379 U.S. 184 (1964). But racial
> discrimination has not been proved, and I put it to one side.
> I simply conclude that the Eighth and Fourteenth
> Amendments cannot tolerate the infliction of a sentence of
> death under legal systems that permit this unique penalty to
> be so wantonly and so freakishly imposed."

408 U.S. at 309. Chief Justice Burger, accompanied by Justices Blackman, Powell, Rehnquist and Stevens dissented. As discussed below, two of the four dissenters would come to see things differently as they saw how the administration of capital punishment unfolded post-*Gregg*.

Because the concurring opinions of Justices Stewart, White and Douglas had not closed the door on the possibility of devising statutory schemes that might satisfy their concerns with arbitrariness, several states revised their statutes. The first approach was a simple fix. The state would simply require the mandatory imposition of capital punishment upon conviction for certain crimes, thus removing all discretion from the process.[2] The second approach attempted to cabin arbitrariness by specifically directing the jury's attention to particular circumstances of the offense - in most schemes designated "aggravating" or "mitigating" factors. The hope (unfulfilled, as we will see) was that this approach would remove – or at least significantly minimize - the happenstance of who is, and who is not, selected for execution.

---

[2] Even this approach did not eliminate the problem of arbitrariness created by charge-selection and plea bargaining practices. *Infra*.

On July 2, 1976, the Supreme Court decided five cases, each presenting a variation on these two categorical approaches to the *Furman*-arbitrariness concerns. The mandatory sentencing schemes of North Carolina and Louisiana were found to violate the Eighth Amendment because they left no room for consideration of such factors as the defendant's background and other circumstances, which might otherwise mitigate the offense. *See Woodson v. North Carolina*, 428 U.S. 280 (1976); *Roberts v. Louisiana*, 428 U.S. 325 (1976). But, those of Georgia, Florida and Texas were upheld. Although tacking differently, each adopted the second approach to arresting the random strike of lightning envisioned by Justice Stewart. *See Gregg v. Georgia*, 428 U.S. 153 (1976) (non-weighing scheme where jury had to find at least one statutorily-enumerated aggravating factor and then assigned whatever weight it deemed appropriate to mitigating factors);[3] *Profitt v. Florida*, 428 U.S. 242 (1976)(weighing scheme where jury also had to find at least one aggravating factor but then weighed the aggravating and mitigating factors); *Jurek v. Texas*, 428 U.S. 262 (1976) (instead of aggravating factors, the definition of "capital murder" was limited to five distinct situations and the jury then considered three "special issues," one of which required an assessment of the defendant's future dangerousness).

As a result of *Gregg*, capital punishment was revived in the United States. But, it is important to note that *Gregg* did not repudiate the principal holding of *Furman* that the Eighth Amendment bars the imposition of the death penalty if the available

---

[3] *Gregg* was the lead opinion and most fully explains the Court's reasoning.

evidence suggests it is arbitrarily and capriciously imposed. That principle remains a core of Eighth Amendment jurisprudence. The collective *Gregg* cases reflected the majority's view, as seen from its perspective in 1976 and with the then-available knowledge, that the discretionary statutes it was reviewing would eliminate the arbitrary and capriciousness problem it had identified in *Furman*. Subsequent events have pellucidly proven they have not.

The Supreme Court has not re-visited the *per se* constitutionality of the death penalty under the Eighth Amendment since *Gregg*. During the almost four decades since, several developments have occurred that have dashed the central premise of that opinion that schemes could be devised to eradicate the arbitrariness inherent in the administration of capital punishment. These developments have strengthened the call for abolition of the death penalty across a broad spectrum of society from secular and faith-based as well as national and local organizations. *See* Pilgrim Pathways, Anti-Death Penalty Organizations in the U.S., https://pilgrimpathways.wordpress.com/2011/05/29/anti-death-penalty-organizations-in-the-u-s/; Elisabeth Povoledo and Laurie Goodstein, Pope Francis Declares Death Penalty Unacceptable in All Cases), NY Times, Aug. 2, 2018, https://www.nytimes.com/2018/08/02/world/europe/pope-death-penalty.html (visited 8-6-18). And, as discussed below, these developments, along with their experiences with the death penalty, have led several Supreme Court Justices to reexamine previously-held views that the death penalty is constitutional. *See* Andrew Cohen, Why Don't Supreme Court Justices Ever Change Their Minds in *Favor* of the

Death Penalty?, The Atlantic, Dec. 10, 2013 ("No one who digs deeply into these grim cases ever seems to evolve from being a staunch opponent of capital punishment into being a fervent supporter of the practice. The movement, over the past 40 years anyway, has almost always been in the opposite direction: The closer one gets to capital punishment, the more dubious it appears to be.").

III.    **THE EXPECTATIONS OF *GREGG* HAVE BEEN UNFILLED: THE DEATH PENALTY IS PRESENTLY IMPOSED IN AN ARBITRARY AND CAPRICIOUS MANNER**

The touchstone Eighth Amendment inquiry is whether the evidence now available demonstrates that the death penalty is being "inflicted in an arbitrary and capricious manner." *Gregg*, 428 U.S. at 188 (Opinion of Stewart, Powell, and Stevens, JJ);[4] *Kennedy v. Louisiana*, 554 U.S. at 436 (2008) ("[D]eath penalty statutes [must] be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion)," *quoting California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). "Arbitrary" in the sense used in *Furman*-Gregg describes decisions "existing or coming about seemingly at random or by chance or as a capricious and unreasonable act of will." *See* "arbitrary," *Merriam-Webster.com*, 2018, http://www.merriam-webster.com/dictionary/arbitrary (August 10, 2018). The term "capriciously" implies unpredictability. *See* "caprice," *Merriam-Webster.com*, 2018, http://www.merriam-webster.com/dictionary/caprice (August 10, 2018). In sum,

---

[4] This is the controlling *Gregg* opinion, as it decided the case on the narrowest ground.

"arbitrary and capricious" implies an unacceptable level of random, erratic and irrational decision-making rather than consistent, reliable and dependable judgments.

The evidence suggests that the imposition of the death penalty runs afoul of these principles in several ways.

First, the available evidence suggests that these decisions are unreasonable in the sense that, when analyzed on a macro-level, they suggest reflect racial, gender and geographical biases that are the very antithesis of principled judgment. Second, sentences of death in the United States are unpredictable because there is no discernible correlation between the egregiousness of the offense and resulting life or death sentences. The evidence in this regard bears out Justice Stewart's lightning analogy. Third, arbitrariness is demonstrated by the widely divergent, inconsistent and often standard-less exercise of prosecutorial discretion both in the initial decision to charge and pursue a capital crime and later whether to offer a plea bargain allowing the offender to avoid the death penalty. Fourth, because there is no demonstrably reliable method for making such an assessment, the frequent practice of asking a jury to make a finding as to whether the defendant poses a future danger introduces a random and unreliable variable into the process. Fifth, the development of forensic and other evidence in the last four decades has conclusively demonstrated over and over again that innocent men have been condemned to death - again the antithesis of reliable decision-making and an unacceptable result in a democratic society.

A.      **Unprincipled Biases in the Administration of the Death Penalty**

1.      **Racial Disparity**

"Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979) (discrimination in selection of grand jury foreman violates Equal Protection). Such discrimination "strikes at the fundamental values of our judicial system and our society as a whole." *Id*. at 556.

Numerous studies have documented this racial disparity. *See Racial Disparities in Federal Death Penalty Prosecutions 1988-1994*, Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, March 1994 (finding significant racial disparity on the state level in the selection of white victims and on the federal level in the selection of those targeted for capital prosecution); *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities*, GAO/GGD-90-57, Feb. 1990, at 5 (General Accounting Office study on effect of race in death penalty process: result of synthesis of 28 studies "shows a pattern of evidence indicating racial disparity in the charging, sentencing and imposition of the death penalty after the *Furman* decision"), *cited in* Glossip *v. Gross*, __ U.S. __; 135 U.S. 2726, 2760 (2015)(Breyer, J., dissenting) (noting GAO conclusion that 82% of the analyzed studies found race influenced both the charging and selection decisions in capital cases where the victim was white and that these studies were "remarkably consistent across data sets, states, data collection methods, and analytic techniques."); United States Department of Justice, Survey of the Federal Death Penalty System, at 2, Table 1A, Distribution of Defendants Within Each Stage of the Federal Death Penalty Process

(1995-2000) (64.8% of authorized federal capital prosecutions and 65% of actual death

sentences were rendered against African-Americans or Hispanics), *available at*

http://www.justice.gov/dag/survey-federal-death-penalty-system; *see generally* Race

and the Death Penalty, Death Penalty Information Center,

http://www.deathpenaltyinfo.org/race-and-death-penalty (collecting studies)(last

visited 8-10-18).

    These studies reflect an across-the-board consensus that the race of both the

defendant and the victim plays a significant role in the death penalty process from the

prosecutorial decision to pursue a capital prosecution to the ultimate decision by a jury.

Although he reserves the right to do so upon the development of additional evidence,

Mr. Christensen is not arguing here that these studies, *standing alone* and consistent

though they may be, establish either an Eighth Amendment or an Equal Protection

violation. *See McClesky v. Kemp*, 487 U.S. 279 (1987) (defendant must prove intentional

discrimination in his particular case). But, irrespective of a causal explanation, at a

minimum the evidence consistently suggests that the race of both the defendant and the

victim plays into the ultimate decision of who is spared and who is not.

    Consideration of race, at any point and by any actor, in the administration of the

death penalty is inconsistent with principled, non-arbitrary decision-making. *See Turner

v. Murray*, 476 U.S. 28, 36 (1986) (Finding "the risk that racial prejudice may have

infected petitioner's capital sentencing unacceptable . . .").

        **2.**      **Gender Bias**

The evidence also suggests that the gender of both the offenders and victims plays a significant role in the outcome of capital prosecutions. The number of capital prosecutions against women who commit capital offenses is vanishingly small. This problem was identified by Justice Marshall in his *Furman* dissent when he observed the "overwhelming evidence that the death penalty is employed against men and not women . . . [although] . . . the purposes allegedly served by capital punishment seemingly are equally applicable to both sexes." 408 U.S. at 365. Evidence has confirmed Justice Marshall's concern. *See e.g.*, Victor L. Streib, *Rare and Inconsistent: The Death Penalty for Women*, 33 Fordham Urb. L.J. 609, 621–22 (2006) (although women constitute 10% of those arrested for murder, they comprise only 2% of those actually sentenced to death and 1% of those executed), *available at*

*http://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=1928&context=ulj*.

Equally problematic, studies have consistently confirmed that the gender of the victim plays a large role in the outcome of capital cases. *See* Michael L. Radelet & Glenn L. Pierce, *Choosing Those Who Will Die: Race and the Death Penalty in Florida*, 43 Fla. L. Rev. 1, 25-26 (1991) (defendants in Florida 2.8 times as likely to be sentenced to death for killing a woman than a man). In a similar study of Illinois, the same authors found that a defendant was 3.5 times more likely to be sentenced to death for killing a woman than a man. *Id*. at 62, n. 131. Similar discrepancies have been found in studies of capital punishment in Utah, Colorado and California. *See generally* Shatz and Dalton, Challenging the Death Penalty with Statistics: *Furman*, McCleskey, and a Single County

Case Study, 34 Cardozo L. Rev. 1227, 1251-52 (2013), *available at*

*http://www.cardozolawreview.com/content/34-4/SHATZ.DALTON.34.4.pdf.*

### 3.      Geographic Bias

The data also demonstrates a geographical bias, both on a national level in respect to application of the federal death penalty[5] and on a state level with respect to county-to-county and urban-rural differences. On the federal level, a 2010 study showed that six out of the 94 federal judicial districts accounted for 1/3 of all death-authorizations and more than half came from only 14. As for the population of the federal death row, 40% came from only 7 judicial districts. G. Ben Cohen & Robert J. Smith, "The Racial Geography of the Federal Death Penalty," 85 Washington Law Review 425, 429-430 (2010), *available at* https://digital.law.washington.edu/dspace-law/bitstream/handle/1773.1/470/Racial%20Geography%20of%20the%20Federal%20Death%20Penalty.pdf?sequence=1. Crushing geographic disparities also exist within individual states that retain the death penalty. Robert J. Smith, The Geography of the Death Penalty and its Ramifications, 92 B. U. L. Rev. 227, 232 (2012) (8 states account for 2/3 of death sentences from 2004 to 2009), *available at*

*https://www.bu.edu/law/central/jd/organizations/journals/bulr/documents/SMITH_001.pdf.*

---

[5] "The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime." Transcript of the President Clinton 6/28/2000 press conference. *See* Kevin McNally, Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse, 53 DePaul L. Rev. 1615, 1622, n. 16 (2004), *available at* http://via.library.depaul.edu/law-review/vol53/iss4/9

And, "even in the most active death-sentencing states most counties do not use the death penalty with any regularity." *Id.*, at 232.

> [J]ust 10% of counties in the United States account for all death sentences imposed between 2004 and 2009. Even within that 10% of counties, the divide between the most and least active jurisdictions is stark: only 4% of counties (121) in the United States sentenced more than one person to death in that period. Those 4% of counties account for roughly 76% of the death sentences returned nationally. Twenty-nine counties - few than 1% of the counties in the country – rendered death sentences at a rate of one or more new sentences per year. That 1% of counties accounts for roughly 44% of all death sentences.

*Ibid.*, at 233; *see also* Shatz and Dalton, *supra*, at 1253-56.[6]

Whether these geographical disparities are attributed to racial considerations, *see* Cohen and Smith, *supra*, unequal defense resources, or contrasting attitudes of the public and prosecutors toward the death penalty, *see Glossip*, 135 S. Ct. at 2761-62 (Breyer, J., dissenting), the result is the same – arbitrariness imported into the administration of the death penalty in the United States based on the happenstance of where the defendant is prosecuted.

## B.     Random Correlation Between Death Sentences and the Offense

In a non-arbitrary process consistent and reliably predictable results are expected. As applied to the death penalty, this requires that "capital punishment be imposed fairly, and with reasonable consistency, or not at all." *Eddings v.* Oklahoma, 455 U.S. 104, 112 (1982). The rational expectation is that this ultimate punishment would

---

[6] Similar disparities in Illinois were found by both the Governor's Commission on Capital Punishment and the General Assembly's Capital Punishment Reform Committee. *See Motion to Strike Notice of Intent to Seek the Death Penalty*: *Tenth Amendment*, at 33.

be reserved for the most heinous offenses. Instead, several studies have documented wildly random outcomes, the very essence of arbitrariness. *See* John J. Donohue III, An Empirical Evaluation of the Connecticut Death Penalty System Since 1973: Are There Unlawful Racial, Gender, and Geographic Disparities?, 11 J. Empirical Legal Studies 637 (2014), *available at*

*http://www.readcube.com/articles/10.1111%2Fjels.12052?r3_referer=wol&tracking_action=preview_click&show_checkout=1&purchase_referrer=onlinelibrary.wiley.com&purchase_site_license=LICENSE_DENIED_NO_CUSTOMER* (visited 8-6-18); *Glossip*, 135 S.Ct. at 2763 (Breyer, J., dissenting) (studies confirm Justice's observation that "after considering thousands of death penalty cases and last-minute petitions over the course of more than 20 years," he could find "no rational explanation" for such discrepancies.").

But this Court need not depend solely on statistical analyses. Just as Justice Stewart once observed that he could rely on his own eyes in evaluating whether a work was pornographic,[7] the briefest review of the facts and outcomes of a sampling of federal capital cases shows inexplicable arbitrariness in the decisions to seek the death penalty, decisions to resolve cases short of trial and outcomes of trials. *See Glossip*, 135 S. Ct. at 2763-64 (Breyer, J. dissenting). Attached hereto as Exhibit A is a synopsis of the results in 43 federal death penalty trials prepared by the Federal Death Penalty Resource Counsel, an organization created by the Administrative Office of the United

---

[7] "I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description ["hard-core pornography"], and perhaps I could never succeed in intelligibly doing so. But *I know it when I see it*, and the motion picture involved in this case is not that." *Jacobellis v. Ohio*, 378 U.S. 184, 197 (Stewart, J., concurring)(emphasis added).

States Courts, Defender Services Division (now the Office of Defender Services). These summaries graphically reveal a lack of correlation between the relative egregiousness of different offenses and the life-death decisions eventually reached. All these offenses are fairly characterized as "horrendous," but the results are starkly dissimilar. As with Justice Stewart when looking at obscene materials, so with arbitrariness in the context of these results – one knows it when one sees it.

### C.       Arbitrariness Produced by Prosecutorial Discretion

As one commentator has noted: "[T]he selection process for imposition of the death penalty begins in the prosecutor's office." William Schabas, The Death Penalty as Cruel Treatment and Torture: Capital Punishment 74 (discussing effect of plea bargaining on arbitrariness problem in capital cases). Another observes that the most important factor in determination of a sentence in a capital case is prosecutorial discretion in both the decision to charge a capital crime and the decision whether to offer a plea bargain less than death. *See* Elisabeth Semel, *Reflections on Justice John Paul Stevens's Concurring Opinion in Baze v. Rees: A Fifth Gregg Justice Renounces Capital Punishment*, 43 *U.C. Davis L. Rev.* 783, 788 (2009), *available at*:

http://scholarship.law.berkeley.edu/facpubs/989 (visited 8-6-18).

> But discrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury. The selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office. His decision whether or not to seek capital punishment is no less important than the jury's. Just like the jury, then, where death is the consequence, the prosecutor's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

> [citation omitted]. Instead, the decisions whether to
> prosecute, what offense to prosecute, whether to plea
> bargain or not to negotiate at all are made at the unbridled
> discretion of individual prosecutors. The prosecutor's
> choices are subject to no standards, no supervision, no
> controls whatever. There are, of course, benefits associated
> with granting prosecutors so much discretion, but there are
> also costs. Some of these costs are simply accepted as part of
> our criminal justice system. But if the price of prosecutorial
> independence is the freedom to impose death in an
> arbitrary, freakish, or discriminatory manner, it is a price the
> Eighth Amendment will not tolerate.

*DeGarmo v. Texas*, 474 U.S. 973 (1985)(Brennan, J., dissenting from denial certiorari).

Reform commissions have also noted the problem of arbitrariness created by prosecutorial discretion: See Report and Recommendation on the Administration of the Death Penalty in California, California Commission on the Fair Administration of Justice, 102-04, JUNE 30, 2008 (Finding "great variation in the practices for charging special circumstances, a lack of racial diversity among the individuals who made the decision, great variation in when the decision was made, and significant variation in the involvement of the defense in the process."), *available at*

*http://deathpenalty.org/downloads/FINAL%20REPORT%20DEATH%20PENALTY%20ccfaj %20June%2030.2008.pdf*; Report of the Governor's Comm. On Capital Punishment, April 15, 2002, at 82 (noting criticisms that Illinois' procedure "contains no standards elucidating the criteria to be considered in determining whether or not to seek the death penalty in a particular case."), *available at*

http://illinoismurderindictments.law.northwestern.edu/docs/Illinois_Moratorium_Co mmission_complete-report.pdf. (visited 8-6-18).

And, like the seemingly random results of federal death penalty trials, a comparison of the facts of other capital-eligible federal cases, where the death penalty was either not authorized or the defendant was nonetheless allowed to plead to a lesser sentence, are equally probative of arbitrariness, as suggested by Exhibit B, attached, which is a synopsis of the facts in a sample of 22 cases prepared by the Federal Death Penalty Resource Counsel. As can be seen, as a group there is little to distinguish the facts in these cases from those in Exhibit A where prosecutors proceeded to trial and sought the death penalty.

### D.   Arbitrariness Induced by Doomed Efforts to Predict Future Danger

A disturbing trend has developed since *Gregg* of relying heavily on a jury's ability to forecast an offender's "future dangerousness" to quarantine those selected to die from those not selected. This futile exercise has introduced another level of unreliability into the death penalty process.

In some states juries are required by statute to make a finding concerning future dangerousness. Although the phrasing may vary, the inquiry is basically the same – jurors are asked to predict whether the defendant will likely engage in violence in the future. *See e.g.: Jurek v. Texas, supra*. In others, and in the federal system, future dangerousness is frequently cited as a non-statutory aggravating factor. In a federal case in which the only alternative to death is life without parole, the aggravating factor of future dangerousness is limited to how the defendant would behave in a prison setting if incarcerated for life. *See Simmons v. South Carolina*, 512 US 154,166, n. 5 (1994).

Between 1995 and 2006, future danger was alleged as non-statutory aggravating

factor in 77% of federal death penalty prosecutions and a death sentence was imposed in 80% of cases where future dangerousness was found. Michael L Perlin, Mental Disability and the Death penalty: The Shame of the States, at 26, Rowman and Littlefield Publishers, at 26 (2013)

This data suggests the ascendant importance of a jury's attempt to assess future danger. But, the attempt to predict future conduct is a challenging assignment, at best. It is especially so when attempting to forecast the future danger posed by a defendant in a controlled prison environment where so many unforeseeable variables are at play, including correction officials' decisions as to where, and the conditions under which, the offender will be housed. As to this task, detailed studies show that juries are routinely being asked to do the undoable. *See* Cunningham, M.D., Reidy, T.J. & Sorenson, J.E., Assertion of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence, 32 Law and Hum. Behav. 46, 55-57, 59, 61 (2008)(finding no significant difference in the rates of serous disciplinary infractions between those against whom the government alleged future danger as an aggravating factor and those against whom it did not); Cunningham, M.D., Reidy, T.J. & Sorenson, J.E., Capital Jury Decision-Making: The Limitations of Predictions of Future Violence, 15 Psychology, Public Policy & Law, 223, 239-240, 243 & Table 4 (2009) (among defendants found to be a future danger but sentenced to life, jurors' positive predictions proved wrong more than 2/3 of time); Eugenia T. La Fontaine, A Dangerous Preoccupation with Future Danger: Why Expert Predictions of Future Dangerousness in Capital Cases are Unconstitutional, 44 B.C.L. Rev. 207, 233-36

(2002)(citing studies establishing unreliability of such predictions by mental health

professionals), *available at*

http://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=2223&context=bclr

(visited 8-6-18); Future Dangerousness Predictions Wrong More Than 95% of the Time,

Death Penalty Information Center, http://www.deathpenaltyinfo.org/node/1099

(visited 8-6-18). The bottom line is clear - there is no proven methodology from which

jurors, or anyone else, can reliably determine which few offenders will engage in violent

conduct in prison. Cunningham Capital Jury Decision-Making, at 227-228, 246.

Asking a jury to make a critical determination concerning a factor that cannot be

determined with any reasonable degree of accuracy is, by definition, likely to produce

arbitrariness. And, asking a juror to make such troublesome forecasts in a death penalty

case has constitutional implications under the Eighth Amendment. *See Roper v.*

*Simmons*, 543 U.S. at 573 (concerning experts' inability to diagnose whether a juvenile

offender is acting from immaturity or with more malignant mindset: "If trained

psychiatrists with the advantage of clinical testing and observation refrain, despite

diagnostic expertise . . . from [such] assess[ments] . . . we conclude that the State should

refrain from asking jurors to issue a far graver condemnation.").

E.     **Arbitrariness Resulting From Now-Demonstrated Wrongful**
       **Convictions**

Perhaps the most breathtaking developments since 1976 regarding the

arbitrariness problem that infects capital cases have been advances in science which

have repeatedly, and often conclusively, shown that several individuals have been

convicted and sentenced to death when they were, in fact, later shown to be innocent. As discussed in Mr. Christensen's *Motion to Declare the Federal Death Penalty Act Unconstitutional As Applied . . .* (violates the Tenth Amendment and Principles of Federalism)(filed 8-24-2018), at 5-20, the alarming number of post-*Furman* exonerations in Illinois jump-started the abolition movement in this state. But, the problem has not been confined to Illinois. Studies have shown this to be an across-the-board nationwide phenomenon in capital cases. *See* National Registry of Exonerations, Exonerations in the United States, 1989-2012, pp. 607 (2012) (citing number of exonerations in capital cases at 115); Death Penalty Information Center: Innocence List of Those Freed from Death Row: [www.deathpenaltyinfo.org/innocence-and-death-penalty.](www.deathpenaltyinfo.org/innocence-and-death-penalty.) (visited 8-10-18) (putting number of exonerations at 162). *See also Motion to Declare Federal Death Penalty Unconstitutional Due to Unacceptable Error Rates* (filed 8-24-18).

While there may be room for argument as to whether the defendant in every cited exoneration case was factually innocent, DNA evidence, not available at the time of the *Gregg* decisions, has put the lie to the Pollyannaish view that innocent people are not convicted. The notion that *all* these statistics and exonerations are wrong-headed is unimaginable. Innocent people have been, and there is no evidence suggesting they will not continue to be, convicted and sentenced to death. That alone should end the discussion in a democratic society. And, more disturbingly, it is likely that innocent people have been executed. *See Glossip* 136 S.Ct. at 2756 (Breyer, J., dissenting). Just as the presence of one juror on the panel who would automatically vote for the death penalty is "one too many," *Morgan v. Illinois*, 504 U.S. 719, 734, n. 8 (1922), citing *Ross v.*

*Oklahoma*, 487 U.S. 81, 85 (1988), the wrongful conviction – much less execution - of even

one person is "one too many."

Naturally, the unmasking of wrongful convictions through DNA or other

scientific evidence has prompted investigations to determine what went wrong.

Reexamination of the DNA-exoneration cases has brought into sharp focus the roots of

many of these systemic breakdowns, including mistaken eyewitness testimony, perjury

from jailhouse informants or those trying to protect themselves or others, inadequate

investigation and representation by defense counsel and the suppression of evidence by

the police or prosecution. The Illinois cases documented in Mr. Christensen's *Motion to

Strike Death Penalty: 10th Amendment*, as well as the summaries of exoneration

compilations referenced above, demonstrate that these flaws are not easily exposed and

the very real risk they may never be.[8]

Further complicating matters is that most capital cases do not involve DNA

testimony. Common sense debunks any pie-in-the-sky fancy that these same problems

discovered in the DNA cases do not also present an unacceptable risk of miscarriages in

---

[8] Rather than demonstrating some divined ability of the "system" to ultimately self-correct, it is clear that some exonerations occur only as the result of "fortuitous or improbable events." Warden, *How and Why Illinois Abolished the Death Penalty*, 30 Law and Ineq. (Minnesota Journal of Law and Inequality) 245, 247 (2012). When officials attempted to proffer a similar rationalization after one highly-publicized exoneration, the Chicago Tribune rejoined in an editorial by recounting the work of a network of "volunteers," whose work prevented a potentially wrongful execution.  "That's not a 'system,' but happenstance: the charity of concerned strangers and sheer luck." Editorial, *Fatal Flaws of Capital Punishment*, CHI. TRIB., Feb 11, 1999, at 26, cited in Warden*, supra*, at 257-58. And, of course, the self-correcting arguments ignore the fact that many of those exonerated often spend years and sometimes decades on dehumanizing death rows before the miscarriage is brought to light. *Infra*. If "[E]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold," *Robinson v. California*, 370 U.S. 660, 667 (1972), so much more so for an innocent individual being imprisoned for decades under death row conditions.

the numerous capital cases not involving DNA or other scientific evidence capable of providing clear-cut exonerations.

While many of these same concerns are present in any criminal case, two considerations magnify their importance in criminal cases. First, these reliability-adulterators are more likely to present themselves in capital cases which are "typically horrendous murders, and thus accompanied by intense community pressure on police, prosecutors, and jurors to seek a conviction." *Glossip*, 135 S. Ct. at 2757-58 (Breyer, J., dissenting) (citations omitted).

The second differentiating feature is obvious – the finality of the punishment. This qualitative difference between death and any other punishment resides at the core of the Eighth Amendment jurisprudence of capital punishment. Justice Stewart's observation in *Woodson v. North Carolina*, 428 U.S. at 305-06, that "the penalty of death is qualitatively different from a sentence of imprisonment" has been repeatedly acknowledged in the ensuing years by both the Court, s*ee e.g., Gregg*, 428 U.S. at 187 ("the death penalty is unique in its severity and irrevocability."); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986)("this especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties."); *Roper v. Simmons*, 543 U.S. at 568 ("Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force." (citation omitted)); and scholarly publications. *See e.g.: Death-is-Different Jurisprudence and the Role of the Capital Jury*, 2 Ohio State Criminal Law 117, *available at*

http://moritzlaw.osu.edu/osjcl/Articles/Volume2_1/Symposium/Abramson.pdf

(visited 8-6-18); Deborah W. Denno, *Death Is Different and Other Twists of Fate*, 83 J. Crim. L. & Criminology, 437 (1992-1993), *available at*

*http://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6746&context=jclc*.

(visited 8-6-18).

     The proposition that the execution of an innocent defendant would violate the Eighth Amendment cannot be reasonably debated. *See Herrera v. Collins*, 506 U.S. 390, 417, 419 (1993). ("The execution of a legally and factually innocent person would be a constitutionally intolerable event.")(O'Connor, J., concurring); *Ibid*. at 430 ("[N]othing could be more contrary to contemporary standards of decency, or more shocking to the conscience, than to execute a person who is actually innocent.") (Blackman, J. dissenting, joined by Stevens and Souter, JJ.). The frequent recital of Justice Stewart's observation that "death is different" is thus neither hackneyed nor rhetorical. What Shakespeare described as "the undiscovered country from whose bourn no traveler ever returns,"[9] is not only a universal truth but also poetical confirmation that the lack of reliability in a procedure with a demonstrated, non-negligible and potentially non-remediable risk of condemnation of innocent targets cannot be harmonized with a 21st Century Eighth Amendment. *Cf. Ford v. Wainwright*, 477 U.S. 399, 411 (1986)(" In capital

---

[9]  "Who would fardels bear
  To grunt and sweat under a weary life,
  But that the fear of something after death,
  The undiscovered country from whose bourn
  No traveler returns, puzzles the will
  And makes us rather bear those ills we have
  Than fly to others we know not of?"

  William Shakespeare, *Hamlet*, Act 3, Scene 1 (Soliloquy), Barnes & Noble Shakespeare (2007).

proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability," *citing Spaziano v. Florida,* 468 U.S. 447, 456 (1984)).

## IV. THE UNAVOIDABLE DELAY ASSOCIATED WITH THE ADMNISTRATION OF THE DEATH PENALTY VIOLATES THE EIGHTH AMENDMENT

The Eighth Amendment's prohibition on "cruel and unusual" punishment reaches beyond the arbitrary and capricious concerns of *Furman* and *Gregg*. Widely-acknowledged uneasiness with the unreliability and fairness of the death penalty process has resulted in years of delay from conviction to execution, contemplated neither by *Gregg* nor the Founding Fathers when the Eighth Amendment was adopted in 1790. This, in turn, has resulted in years of dehumanizing incarceration on death rows that presents an additional Eighth Amendment snare, especially in light of the availability of alternative sentences of life without parole, which do not involve such protracted delay and which undermines marginal penological justifications for the death penalty.

The average time between conviction for a capital offense and executions in 2014 was almost 18 years, an increase of more than 50% just in the last decade and a nine-fold increase since 1960, when the average interval was two years. And it is not unusual for a death sentence, if ever carried out, to be done so 25 years or more years after the conviction. *Glossip*, 135 S. Ct. at 2764-65 (Breyer, J., dissenting)(citing sources).[10]

---

[10] *See also*, Tr. Oral Argument, *Hall v. Florida*, Case # 12-10882, March 3, 2013, at 46 (Justice Kennedy pointing out that "the last ten people Florida has executed have spent an average of 24.9 years on death row."), *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/12-10882_6kh7.pdf . (visited 8-6-18).

These delays are unavoidable, "given the special need for reliability and fairness in capital cases." *Id.*, at 2770-72 (citing examples where DNA evidence exonerated defendants who otherwise would have been wrongly executed years before but for the delays occasioned by necessary appellate and post-conviction review). Justice Breyer described real-life cases in the Supreme Court where these lengthy delays have avoided unthinkable mistakes, but the need to avoid sacrificing reliability for swift execution was perhaps even more eloquently expressed by Gordon (Randy) Steidl, who was exonerated after 17 years of incarceration, 12 of which were on Illinois' Death Row. *See* Hal Dardick, *Inmates Free After 17 Years*, CHI. TRIB., May 29, 2004 (Metro), at 16. Testifying before Illinois legislators some seven years after his release, Mr. Steidl pointed out: "If you want to kill John Wayne Gacy, you have to kill me, as well." *See* Warden, supra, 245, 269-270 (2012). Translated: the price of a rush to execution increases the specter of an unthinkable and irremediable miscarriage of justice.

Such prolonged delays have an Eighth Amendment corollary. Defendants sentenced to death are normally housed under brutal, approaching barbaric, conditions on "death rows." *Johnson v. Bredesen*, 558 U.S. 1067, 1069 (2009)(Statement of Stevens, J., respecting denial of certiorari)(after recounting petitioner's confinement in a solitary cell awaiting his execution for nearly 29 years: "the delay itself subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement."); *accord Glossip*, 135 S. Ct. at 2764-65 (Breyer, J., dissenting). This often entails what functionally amounts to solitary confinement for years and sometimes decades. *See Davis v. Ayala*, 135 S. Ct. 2187, 2208-2210 (2015) ("[I]f his confinement follows the usual

pattern, it is likely respondent has been held all or most of the past 20 years or more in a windowless cell no larger than a typical parking spot for 23 hours a day; and in the one hour when he leaves he likely is allowed little or no opportunity for conversation or interaction with anyone.").

This type of isolation is known to cause a psychiatric syndrome accompanied by symptoms including perceptual distortions, illusions, hallucinations, panic attacks, difficulty with thinking, concentration and memory, intrusive obsessional thoughts, overt paranoia, problems with impulse control and even delirium. Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash U. J. L. & Policy 325, 333-337 (2006), *available at* http://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1362&context=law_journal_law_ policy (visited 8-6-18); *see also In re Medley,* 134 U.S. 160, 167-68 (1890) (describing psychiatric harm occasioned by solitary confinement: "A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide . . ."). *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015) (citing studies documenting the "serious psychological consequences" of solitary confinement).

Decades-long delay also undermines the deterrence and retribution rationales for capital punishment. Whether the death penalty is consonant with the "penological justifications" is relevant to the Eighth Amendment assessment. *See Roper v. Simmons*, 543 U.S. at 571 ("it is evident that the penological justifications for the death penalty apply to them [juveniles] with lesser force than to adults."); *Thompson v. McNeil*, 556

U.S. 1114, 1115 (2009)(Statement of Stevens, J., respecting denial of certiorari) ("[D]elaying an execution does not further public purposes of retribution and deterrence . . .").

As to deterrence, the idea that the unlikely prospect of being executed some 20 or more years in the future provides more of a deterrent than the far more immediate one of a definite sentence of life without parole is implausible. Although expressed in the context of juveniles, the likelihood that an adult offender engages in this kind of "cost-benefit analysis . . . is so remote as to be virtually nonexistent." *Thompson v.* Oklahoma, 487 U.S. 818, 837 (1988). Fanciful reasoning, such as this, is blunted by the severity of life-without-parole sentences. *See Roper v. Simmons*, 543 U.S. at 572. And, there is little question that the Eighth Amendment has a role in constraining punishments justified by deterrence arguments. The execution of offenders at noon in the public square, al la Saudi Arabian style, would likely increase the deterrent effect, but such a public spectacle would hardly be tolerable in light of the Eighth Amendment's concern for the "dignity of man." *See Trop v. Dulles*, 356 U.S. at 100.

Execution of offenders after the necessarily drawn-out judicial proceedings also erodes retributive arguments where the identity and feelings of both the community and offender may have changed. *Glossip*, 135 S. Ct. 2769 (Breyer, J., dissenting). If "justice delayed is justice denied," the prompt imposition of life without parole arguably satisfies retribution more than an execution years after many family members may have passed. *Id*. And, like deterrence, the Eighth Amendment has something to say about the limits of retribution, as it forbids punishments that are "cruel and unusual"

regardless of proffered retribution justifications. This is demonstrated by the fact that no current Justice seemingly questions the Eighth Amendment's bar on the deliberate and infliction of unnecessary pain in executions. *See Baze v. Rees*, 553 U.S. 35 (2008); *Glossip v. Gross,* 135 S. Ct. 2726 (2015). After reviewing the Court's jurisprudence on methods of execution in *Baez v. Rees*, *supra*, Chief Justice Roberts summed up the governing principle: "What each of the forbidden punishments had in common was the deliberate infliction of pain for the sake of pain – 'superadd[ing]' pain to the death sentence through torture and the like." 553 U.S. at 48. Retribution, without constitutional constraint, could justify, again a la Saudi Arabian style, cutting off the hands of thieves, or, as applied to capital punishment, some equally unacceptable violation of human dignity.

Justice Kennedy perhaps said it best when he warned of the danger of using the retribution card in the capital punishment context:

> "It is the last of these, retribution, that most often can contradict the law's own ends. This is of particular concern when the Court interprets the meaning of the Eighth Amendment in capital cases. When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."

*Kennedy v. Louisiana*, 554 U.S. at 420.

**V.   THIS COURT HAS THE POWER TO, AND BECAUSE OF THE DEVELOPMENTS SINCE *GREGG* SHOULD, DECLARE THAT THE DEATH PENALTY IS NO LONGER COMPATIBLE WITH THE "EVOLVING STANDARDS OF A MATURING SOCIETY" AND THEREFORE VIOLATES THE EIGHTH AMENDMENT**

A.        **The Determination of Contemporary Standards.**

Before turning to the mechanics of determining "contemporary standards

regarding the infliction of punishment," *Woodson v. North Carolina*, 428 U.S. 280 (1976),

the question of *who* makes the determination must be addressed. As discussed below,

the actions of legislatures sheds some light on the issue, but the ultimate resolution is

judicial, as constitutional rights are not auctioned off for majority vote.

> '[T]he freedom secured by the Constitution consists, in one
> of its essential dimensions, of the right of the individual not
> to be injured by the unlawful exercise of governmental
> power.' [citation omitted]. Thus, when the rights of persons
> are violated, 'the Constitution requires redress by the
> courts,' [citation omitted], notwithstanding the more general
> value of democratic decisionmaking. This holds true even
> when protecting individual rights affects issues of the
> utmost importance and sensitivity.

*Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015).

The meaning of constitutional terms such as what constitutes an "unreasonable"

search or a "speedy trial" are not left to legislatures. The determination of what

constitutes "cruel and unusual punishment" is no different. The ultimate judgment is

quintessentially a judicial one. While the Court considers "objective indicia of society's

standards, as expressed in legislative enactment and state practice, . . . the Constitution

contemplates that in the end our judgment will be brought to bear on the question of

the acceptability of the death penalty under the Eighth Amendment." *Kennedy v.

Louisiana*, 554 U.S. at 434; *see also Roper v. Simmons*, 543 U.S. at 575. This, in turn,

depends "upon the standards elaborated by controlling precedents and the Court's own

understanding and interpretation of the Eighth Amendment's text, history, meaning and purpose." *Kennedy*, 554 U.S. at 421.

Although "consensus is not dispositive" of Eighth Amendment rights, *id.* at 554, there are objective indicia which can aid a court in determining contemporary views. One is the direction of change in state legislatures. "It is not so much the number of these States that is significant, but the consistency of the direction of change." *Atkins v. Virginia*, 536 US at 315. "Consistent change might counterbalance an otherwise weak demonstration of consensus." *See also Kennedy*, 554 U.S. at 431.

Clearly, the wind of change in state legislatures since *Gregg* blows leeward toward abolition. At the time of *Furman,* 41 states had enacted the death penalty. *Glossip*, 135 S.Ct. at 2773 (Breyer, J., dissenting). At present, only 27 states effectively have a death penalty, as 19 have abolished the penalty and 4 have governor-imposed moratoriums. See Death Penalty Information Center, States With and Without the Death Penalty, http://www.deathpenaltyinfo.org/states-and-without-death-penalty (visited 8-6-18). Moreover, 7 states (Connecticut, Illinois, Maryland, Nebraska, New Jersey, New Mexico) have enacted legislation abolishing the death penalty in the past 11 years and one legislature refused to pass a new capital punishment statute after its Supreme Court declared its statute unconstitutional. *Id*.

This trend compares favorably to the shift on execution of juveniles under the age of 18 at the time of their offenses, when only 5 states had changed their position between the Supreme Court's decision sustaining the practice in *Stanford v. Kentucky*, 492 U.S. 361 (1989), and its ruling sixteen years later in *Roper* that the practice was

32

prohibited by the Eighth Amendment. *See Roper*, 543 U.S. at 565; *Kennedy* v. Louisiana, 554 U.S. at 432. And, although this change was significantly less than the 16 states that had changed their position on mental retardation from the Court's decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989), to its overruling in *Atkins v. Virginia*, *supra*, the change of 5 states from *Stanford* to *Rope*r was nonetheless characterized as "telling" because of its direction. *Roper*, 543 U.S. at 565.

Further corroborating the capital punishment trend is that in the last two decades only Nebraska has passed legislation to reinstate the death penalty.[11] *See Glossip*, 135 S. Ct. at 2775 (Breyer, J., dissenting). This "carries special force in light of the general popularity of anticrime legislation." *Roper*, 543 U.S. at 566. And, the fact that somewhat less than half of the states now prohibit capital punishment similarly compares with the statistics in *Atkins* and *Roper*. In both, after discounting the 12 states that at the time of those decisions barred the death penalty across-the-board, less than half of the remaining barred the execution of mentally retarded offenders (*Atkins*) or offenders less than 18 years old at the time of their offense. (*Roper*).[12]

The number of states that currently retain the death penalty is also similar to the number that maintained life-without-parole sentences for juveniles when the Supreme

---

[11] Nebraska reinstated the death penalty in 1973 after *Furman* and abolished it in 2015. It was reinstated again the following year after a referendum. *See* https://deathpenaltyinfo.org/nebraska-1 (visited 8-10-18).

[12] The statistics were identical in both cases: In each, 12 states barred capital punishment. Of the remaining 38 capital punishment states only 18, or less than ½, precluded execution of mentally retarded offenses. *Atkins*, 536 U.S. at 313-15. And, the same held true in *Roper* with only 18 of 38 death penalty states barring execution of juveniles under 18 at the time of their offense. 543 US at 564.

Court ruled such sentences violate the Eighth Amendment, *see Miller v. Alabama*, 132 S.

Ct. 2455, 2471 (2012) (28 states and the Federal Government provided for life-without-

parole sentences for some juveniles convicted of murder); and significantly less than the

39 jurisdictions that provided for such sentences in non-homicide cases at the time of

the Court's similar decision in *Graham v. Florida*, 560 U.S. 48, 97 (2011)(Thomas, J.,

dissenting).

      These statistics are also comparable to the Court's decisions in the consensual

same-sex and right-to-marry cases. See *Lawrence v. Texas*, 539 U.S. 558, 573

(2003)(finding constitutional right of same-sex adults to engage in consensual sex:

number of states that prohibited this activity had been reduced approximately in half

since the Court's contrary decision in *Bowers v. Hardwick*, 478 U.S 186 (1986); *Obergefell v.*

*Hodges*, 135 S. Ct. 2584, 2615 (2015) (Roberts, C.J., dissenting)(finding constitutional right

of same-sex couples to marry even though the practice was sanctioned by the

legislatures of only 11 states and the District of Columbia).

      This directional change is telling in another way. Inertia is often the safer

political course in dealing with issues of capital punishment. Political expediency based

on fears of a vocal minority trumpeting tough crime measures and attack ads against

anyone purported to be "soft" on crime makes repeal of capital punishment statutes a

hazardous undertaking, even though the statutes may no longer be used, or rarely so.

As a consequence, the *practice* of death penalty states is as important an indicator as the

fact that the statutes are still on the books. In this regard, statistics show that the

number of persons sentenced to death in this country declined from average of 286 a

year between 1986 and 1999, to 73 in 2014, and executions declined from 98 in 1999, to

35 in 2014. Further, in 11 states with death penalty, there has been no execution for

more than 8 years. *Glossip*, 135 S. Ct. at 2773 (Breyer, J., dissenting). This, again, is

persuasive. *See Atkins*, 536 US at 316 (noting the infrequency of executions of mentally

retarded offenders in the 20 states that did not formally prohibit the practice). "There

are measures of consensus other than legislation. Statistics about the number of

executions may inform the consideration whether capital punishment . . . is regarded as

unacceptable in our society." *Kennedy* v. *Louisiana*, 554 U.S. at 433.

While constitutional rights are not determined by polls, they offer additional

evidence that public support for the death penalty in this country is trending

downwards. *See* National Polls and Studies, Death Penalty Information Center,

http://deathpenaltyinfo.org/national-polls-and-studies#Pew;CBS (visited 8-6-

18)(collecting polls, which clearly show declining public support for capital

punishment).[13] This is especially true where the shortcomings and miscarriages in the

administration of capital punishment have received extensive media coverage, as in

Illinois. When, in March 2007, the *Chicago Tribune* reversed the editorial position it had

maintained for 138 years and called for an end to capital punishment, the paper noted

three weeks later that "there [had been] barely a ripple" in opposition. Timothy J.

McNulty, *Opinion Shift Passes Quietly*, CHI. TRIB., Apr. 10, 2007, at 13. When given the

---

[13] *See* E.g.: Poll conducted in April 2015 by Pew Research Center and CBS News  showing support in favor of death penalty at 56%, a "near historic low."  http://deathpenaltyinfo.org/national-polls-and-studies#Pew;CBS (visited 8-6-18).

option the death penalty or life without parole, a joint June 2014 poll by ABC News and

the Washington Post showed that Americans preferred the latter by a 52%-42% margin.

*See* Damila Ergun, New Low In Preference for the Death Penalty, June 5, 2014, *available*

*at http://www.langerresearch.com/wp-content/uploads/1161a4DeathPenalty.pdf* (visited 8-6-

18).[14]

      Finally, the views of the international community shine light on the "evolving

standards of decency that mark the progress of a maturing society." *Thompson v.*

*Oklahoma,* 487 U.S. 815, 830 (1988) (plurality opinion noting that prohibition on

executing offenders less than 16 years old is consistent with the views expressed by

"other nations that share our Anglo-American heritage, and by leading members of the

Western European community."); *Roper v. Simmons*, 543 U.S. at 575-76 (noting

"relevance of the views of the international community in determining whether a

punishment is cruel and unusual," and referencing UN Conventions and other

international agreements). *Roper* notes that the United Kingdom's experience "bears

particular relevance here in light of the Eighth Amendment's own origins." *Id.*, at 577.

      While the death penalty remains in use in many countries, the trend

internationally is progressing to abolition. *See Glossip*, 135 S. Ct. at 2775-76 (Breyer J.,

dissenting)("many nations – indeed, 95 out of 193 members of the United Nations -

have formally abolished the death penalty and an additional 42 have abolished it in

practice," with only 22 countries in the world carrying out an execution in 2013). In

---

[14] Without a life without parole alternative, 61% supported for the death penalty. *Id*.

resisting this trend, the United States is keeping company neither with its "Anglo-American heritage," nor the "leading members of the Western European community." The United Kingdom abolished the death penalty in 1965, *see generally* Frederick C. Millett, *Will the United States Follow England (and the Rest of the World) in Abandoning Capital Punishment?*, 6 Pierce L. Rev. 3 548, 549, *available at* https://scholars.unh.edu/unh_lr/vol6/iss3/11/ (visited 8-6-18); and the death penalty is banned under Article 2 of the Charter of Fundamental Rights of the European Union, 2012/C 326/02, *available at* http://www.europarl.europa.eu/charter/pdf/text_en.pdf (visited 8-6-18). Instead, in executing more than ten people in 2013, the United States' fellow-travellers were China, Iran, Iraq, Saudi Arabia, Somalia, Sudan and Yemen, *Glossip*, 135 S. Ct. at 2776 (Breyer J., dissenting), a collection of countries that hardly reflect contemporary public opinion in this country as to what constitutes "evolving and maturing" societies.

**B.    The Doctrine of *Stare Decisis***

Experience over 40 years has shown that the *Gregg* approach has not tamed the arbitrariness problem identified in *Furman*. But, the question remains: In light of *Gregg*, what can this Court do about it?

Mr. Christensen acknowledges the Court's obligation to give due consideration to the doctrine of *stare decisis*. But the protections afforded by the Eighth Amendment's prohibition of cruel and unusual punishment require reconsideration when necessary to ensure that its underlying values have not become moribund by later developments

and knowledge. This Court can therefore discount precedent when "special

justifications" are present. *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984).

> Such justifications include the advent of "subsequent
> changes or development in the law" that undermine a
> decision's rationale, *Patterson v. McLean Credit Union, supra* . .
> . the need "to bring [a decision] into agreement with
> experience and with facts newly ascertained," *Burnet v.
> Coronado Oil & Gas Co., supra* . . . ; and a showing that a
> particular precedent has become a "detriment to coherence
> and consistency in the law . . . " (citations omitted)

*Payne v. Tennessee*, 501 U.S. 808, 849, (Marshall, J. dissenting).

While the above relates to the Supreme Court reconsidering its own precedents,

the doctrine of anticipatory overruling, which allows a lower court to reject precedent

where circumstances have changed, applies to both courts of appeals, *see United States v.

City of Philadelphia*, 644 F.2d 187, 191-92 (3d Cir. 1980) (declining to follow *Wyandotte

Transportation Co. v. United States*, finding it "merely one step in the development of

current standards" and refusing to be "blind to subsequent developments. . ."); *United

States v. White*, 405 F.2d 838, 847-48 (7th Cir. 1969) (declining to follow *On Lee v. United

States*, even though factually "directly on point" because of subsequent developments);

and to lower courts, especially when called upon to reconsider issues of overriding

constitutional importance. *See Barnette v. West Virginia Board of Education*, 47 F. Supp.

251 (S.D. West Virginia) (1942) (refusing to follow Supreme Court decision in *Minersville

School District v. Gobitis*, 310 U.S. 586 (1940), holding that public schools could require

students to salute the flag and recite the *Pledge of Allegiance* over their religious

objections as Jehovah's Witnesses), *affirmed in West Virginia State Board of Education v.*

*Barnette*, 319 U.S. 643 (1943) (overruling *Minersville School District*); *Gebhart v. Belton*, 87

A.2d 862 (Del. Ch. 1952), *affirmed* 91 A.2d 137 (De. 1952) (Delaware Chancellor Collins

Seitz (later Chief Judge of the Third Circuit) orders public schools integrated despite

Supreme Court decision in *Plessy v. Ferguson*, 163 U.S. 537 (1896)), *affirmed in Brown v.*

*Board of Education*, 347 U.S. 483 (1954).[15]

Finally, this Court would not be a voice in the wilderness in ruling the death

penalty is no longer consistent with the Eighth Amendment. Comments of several

Justices since *Gregg* support the anticipatory view that, upon full reconsideration, it will

be overruled. When Justice Stevens announced his view, based on "countless" cases,

that the death penalty is "patently excessive and cruel and unusual punishment

violative of the Eighth Amendment," *see Baze v. Rees*, 553 U.S. 35, 86 (2008)(Stevens, J.,

concurring in judgment)(citation omitted), he became the fifth *Gregg* justice to

ultimately come to this conclusion, joining *Gregg* dissenters, Justices Brennan and

Marshall; Justice Blackmun who announced his view, had changed after 20 years of

experience with capital cases, that the death penalty no longer comports with the Eighth

Amendment and that he would "no longer tinker with the machinery of death," *see*

*Callins v. Collins*, 510 U.S. 1141, 1145 (Blackmun, J., dissenting from denial of certiorari);

and Justice Powell, who expressed a similar change of heart to his biographer. John C.

Jeffries, Jr., Justice Lewis F. Powell, Jr.: A Biography 451 (1994)(Quoting Justice Powell:

---

[15] Judge Seitz did not directly rule *Plessy* was no longer good law but instead held that the evidence did not support *Plessy*'s underlying assumption that the segregated schools in New Castle, Delaware were equal. Similarly, there is no need for this Court to say *Gregg* is no longer applicable. The Court need only rule that the now-available evidence does not support its underlying assumption that the death penalty can be imposed in a non-arbitrary and non-capricious manner.

"I have come to think that capital punishment should be abolished."). *See generally* John Paul Stevens, Six Amendments: How and Why We Should Change the Constitution, 107-123 (2014); Semel, *Reflections on Justice John Paul Stevens' Concurring Opinion in Baze v. Rees: A Fifth Gregg Justice Renounces Capital Punishment*, *supra*.

Former Justice Souter also came to doubt the continued constitutionality of the death penalty in this age of DNA. *See Kansas v. Marsh*, 548 U.S. 163, 207-08 (2008)("Today, a new body of fact must be accounted for in deciding what, in practical terms, the Eighth Amendment guarantees should tolerate, for the period starting in 1989 has seen repeated exonerations of convicts under death sentences, in numbers never imagined before the development of DNA tests.").[16]

Current Justices have announced similar skepticism. In their dissenting opinion in *Glossip*, *supra*, Justices Breyer and Ginsburg all but said the death penalty cannot in this day of time be reconciled with the Eighth Amendment. Justice Sotomayor has similarly expressed a willingness to reconsider prior death penalty decisions. See *Mario Dion Woodward v. Alabama,* 134 S. Ct. 405 (2013) (Sotomayor, J., dissenting from denial of certiorari)("[T]he time has come for us to reconsider" opinions in *Spaziano v. Florida*, 468 U. S. 447 (1984), and *Harris v. Alabama*, 513 U. S. 504 (1995) (both upholding judicial override statutes)).[17]

---

[16] Among the examples of exonerations, Justice Souter cited the Illinois experience, where, at the time of his writing, 13 death row inmates had been exonerated between 1977 and 2000, while only 12 had been executed during this period. And, like Justices Breyer and Ginsburg in their *Glossip* dissent, 135 S.Ct. at 2757-58, Justice Souter also observed the data show that "false verdicts" are "probably disproportionately high in capital cases." *Marsh*, at 210.

[17] Only three years later, the Supreme Court did exactly that. *See Hurst v. Florida*, 136 S. Ct. 616 (2016).

As Justice Sotomayor pointed out, in *Roper v. Simmons*, *supra*, the Supreme Court reconsidered and reversed its decision on the execution of juveniles who committed offenses under the age of 18 after the passage of only16 years from *Stanford v. Kentucky*, *supra*; and in *Atkin*s v. *Virginia*, *supra*, reversed its decision concerning the application of the Eighth Amendment to those suffering from mental retardation only 13 years after *Penry v. Lynaugh*, *supra*. *Woodward,* 134 S. Ct. at 407. Here, 42 years have passed since *Gregg.* Like the issue concerning the relationship between *stare decisis*, the passage of time and changing cultural values presented in *Lawrence v. Texas*, *supra*, "our laws and traditions in the past half century are of most relevance here." 539 U.S. at 558.

Mr. Christensen recognizes that Justice Breyer's opinion in *Glossip* was a dissent, as have been some of the other positions of Justices quoted above. But, history has shown that dissenting opinions are often written by Justices who correctly discern the direction the law will take in matters of public importance. *See Dred Scott v. Sandford*, 60 U.S. 393, 529-564, 564-633 (1857)(J. McClean and J. Curtis dissenting from majority holding that, as a slave, Dred Scott could not sue in federal court, that "Negroes" could never be citizens of the United States under the Constitution and that Congress had no power to ban slavery in the territories); *The Civil Rights Cases*, 109 U.S. 3, 26-62 (1883) (J. Harlan dissenting from majority holding that 1875 statute passed by Congress as part of Reconstruction exceeded power granted Congress by the Fourteenth Amendment); *Plessy v. Ferguson*, 163 U.S. 537, 552-564 (1896) (Justice Harlan dissenting from majority holding that "separate but equal" facilities of common carriers violated neither the Thirteenth nor Fourteenth Amendments); *Lockner v. New York*, 198 US 45, 65-76 (1905) (J.

Harlan and J. Holmes dissenting from majority holding that "liberty of contract" implied in the Fourteenth Amendment voided New York law limiting number of hours bakers could work, thereby hamstringing legislation designed to ameliorate harmful social conditions);[18] *Olmstead v. United States*, 277 U.S. 438, 471-85 (1928) (J. Brandeis dissenting from majority holding that Fourth Amendment not violated by wiretapping because there was no physical intrusion of defendant's home and articulating the concept of a zone of individual privacy protected by the Constitution); *Korematsu v. United States*, 323 U.S. 214, 225-272 (1944) (opinions of J. Roberts, J. Murphy and J. Jackson, dissenting from majority holding that blanket removal of Japanese-Americans from the West Coast to "detention centers" solely on account of their race did not violate due process or equal protection guaranteed by the Fifth Amendment); *Rudolph v. Alabama*, 375 U.S. 889 (1963) (J. Goldberg dissenting from denial of certiorari in case involving capital punishment for offense of rape).[19] These and many other dissents have proven throughout our history the importance and influence of a well-reasoned dissent. The predictive value of such dissents is only enhanced by evidence suggesting, as set out above, the agreement of several other Justices over a period of years.

## VI.   CONCLUSION

Rather than a slow burn, arbitrariness in the administration of capital

---

[18] Apropos of the current attitude toward capital punishment, Justice Holmes began his dissenting opinion: "This case is decided upon an economic theory which a large part of the country does not entertain." *Id*. 75

[19] Justice Goldberg's dissent is generally regarded as jump-starting the discussion about the constitutionality of the death penalty, leading to the Court's decision in *Furman*. *See* Evan J. Mandery, A Wild Justice: The Death and Resurrection of Capital Punishment in America , 23-33 (2013).

punishment has metastasized into an out-of-control wildfire. No matter the direction one looks, capital punishment presents seemingly intractable problems. Decisions such as *Rope*r, *Simmons* and *Kennedy*, show that the death penalty is now wobbling on its last Eighth Amendment leg. Mr. Christensen therefore asks this Court to enter an Order striking the government's Notice of Intent to Seek Death.

Respectfully submitted,

/s/Elisabeth R. Pollock                    /s/ George Taseff
Assistant Federal Defender           Assistant Federal Defender
300 West Main Street                     401 Main Street, Suite 1500
Urbana, IL 61801                            Peoria, IL 61602
Phone: 217-373-0666                     Phone: 309-671-7891
FAX:   217-373-0667                      Fax:      309-671-7898
Email: Elisabeth_Pollock@fd.org   Email: George_Taseff@fd.org


/s/ Robert Tucker                           /s/ Julie Brain
Robert L. Tucker, Esq.                    Julie Brain, Esq.
7114 Washington Ave                     916 South 2nd Street
St. Louis, MO 63130                       Philadelphia, PA 19147
Phone: 703-527-1622                     Phone: 267-639-0417
Email: roberttuckerlaw@gmail.com   Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2018, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and

Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<div style="margin-left: 40%;">

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

</div>

**EXHIBIT A: SUMMARY OF RESULTS IN FEDERAL DEATH PENALTY TRIALS**

• United States v. William Sabalan and Rudy Sablan (D. CO). Two cousins housed at USP Florence killed their cellmate, eviscerated his body, hung his entrails around the cell, and, on videotape, display the victim's heart and liver to responding officers. Defendants tried separately. Life verdicts in each case.

• United States v. Barry Mills, et al. (C.D. CA). A RICO mega-indictment targeting 40 members of the Aryan Brotherhood prison gang charged in 17 murders. Initially 27 defendants were death-eligible and 14 defendants were actually authorized for capital prosecutions. After two lengthy trials, juries spared the first four defendants facing the death penalty – the alleged leaders of the gang – and the government withdrew its efforts to seek a death sentence as to the remaining authorized capital defendants.

• United States v. Howard Smith (E.D. VA). Stabbing death of a Lorton Correctional Center inmate by a defendant serving 20 to life for a murder committed ten years previously. Tried and convicted of a lesser included offense.

• United States v. Steven Green (W.D. KY). The 2006 murders of an Iraqi family, including two children and the rape and murder of the daughter. Tried, convicted, sentenced to life.

• United States v. Timothy McVeigh (D. CO). The Oklahoma City bombing case. 168 dead. Hundreds injured. Tried, convicted, sentenced to death, executed.

• United States v. Terry Nichols (D. CO). McVeigh's co-defendant. Tried, convicted, sentenced to life.

• United States v. Khalfan Mohamed and Daoud Rashed al`-Owhali (S.D. NY). Two defendants associated with Usama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa. 224 killed, including 12 Americans; thousands injured. Tried, convicted, sentenced to life.

• United States v. Zacharias Moussaoui (E.D. VA). Defendant convicted of causing thousands of deaths in the September 11, 2001 attacks on the United States. Sentenced to life by jury.

• United States v. Basciano (E.D. NY). Mafia crime boss serving life sentence for RICO murder accused of another Mafia hit murder. On June 1, 2011, after deliberating for less than 2 hours, a unanimous jury rejected the death penalty and sentenced Basciano to life imprisonment.

• United States v. Thomas Pitera (E.D. NY). Seven drug-related murders in organized crime and large-scale drug trafficking context. Victims tortured and bodies dismembered. Tried, convicted, sentenced to life.

• United States v. Duong (N.D. CA). Mr. Duong was previously sentenced to death in California state court for 4 murders that occurred in a nightclub in 1999. Federal prosecutors in the Northern District of California indicted Mr. Duong in a 29-count, multi-defendant racketeering indictment, alleging 3 capital homicides (arising out of a string of robberies), and an additional 5 RICO ACT murders. On December 15, 2010, a federal jury sentenced Anh The Duong to life in prison.

• United States v. Joseph Minerd (W.D. PA). Arson/pipebomb murder of pregnant girlfriend, her fetus and three-year old daughter. Tried, convicted, sentenced to life.

• United States v. Coleman Johnson (W.D. VA). Pipe-bomb used to kill pregnant girlfriend and their unborn child to avoid child support. Tried, convicted, sentenced to life.

• United States v. Christopher Dean (D. VT). Defendant sends pipebomb through the mails killing victim and disfiguring victim's mother. Plea agreement. Sentenced to life.

• United States v. Billy Cooper (S.D. MS). Car-jacking double homicide. Tried, convicted, sentenced to life.

• United States v. Christopher Vialva and Brandon Bernard (W.D. TX). Carjacking double homicide. Tried, convicted, sentenced to death.

• United States v. Gary Sampson (D. MA). Two murders during separate car-jackings. Plead guilty, sentenced to death by jury.

• United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng (E.D. NY). Chinese gang members who kidnap, rape and murder victims held for ransom. Fu Xin Chen and Jai Wu Chen enter plea agreements. Attorney General withdraws death authorization shortly before Peng trial. Peng convicted after trial. All three sentenced to life.

• United States v. Louis Jones (N.D. TX). Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier. Tried, convicted, sentenced to death, executed.

• United States v. Chevy Kehoe and Daniel Lee (D. AR) Triple murder of two adults and small child in connection with activities of white supremacist organization. Tried and convicted together. Kehoe – considered more culpable – sentenced to life. Lee sentenced to death by the same jury.

• United States v. Gurmeet Singh Dhinsa (E.D. NY). Millionaire Sikh businessman hires killers of two employees cooperating with authorities in criminal investigation of defendant. Tried, convicted, sentenced to life.

• United States v. Trinity Ingle and Jeffrey Paul (W.D. AR). Murder of elderly retired National Parks employee. Victim shot while bound and gagged. At separate trials, Ingle is convicted and sentenced to life; Paul is convicted and sentenced to death.

• United States v. Kristen Gilbert (D. MA) VA nurse murders four patients and attempts to murder three more. Tried, convicted, sentenced to life.

• United States v. LaFawn Bobbitt and Rashi Jones (E.D. VA). Fatal shooting of bank teller during robbery. Security guard also shot and blinded. Tried, convicted, sentenced to life.

• United States v. Bille Allen and Norris Holder (W.D. MO). Fatal shooting of bank teller during robbery. Tried, convicted, and both defendants sentenced to death.

• United States v. Azibo Aquart (D. CT). Three drug-related murders. Tried, convicted, sentenced to death.

• United States v. Corey Johnson, James Roane and Richard Tipton (E.D. VA). Eleven drug-related murders. Tried, convicted, sentenced to death.

• United States v. Dean Anthony Beckford, Leonel Cazaco, Claude Dennis and Richard Thomas (E.D. VA). Six drug-related murders. Tried, convicted, sentenced to life.

• United States v. Alan Quinones and Diego Rodriguez (S.D. NY). Torture murder of suspected informant. Tried, convicted, sentenced to life.

• United States v. Elijah Williams and Michael Williams (S.D. NY). Execution-style triple murder by father and son. Tried, convicted, sentenced to life.

• United States v. German Sinisterra and Arboleda Ortiz (W.D. MO). One drug-related murder and one attempted murder. Tried, convicted, sentenced to death.

• United States v. John Bass (E.D. MI). Four drug-related murders. Tried, convicted, sentenced to life.

• United States v. Kevin Grey and Rodney Moore (D. DC). Thirty-one drug related murders. Tried, convicted, sentenced to life.

• United States v. Daryl Johnson (N.D. IL). Two drug-related murders. Tried, convicted, sentenced to death. Death sentence vacated. Sentenced to life.

• United States v. Tommy Edelin (D. DC). Fourteen drug-related murders. Tried, convicted, sentenced to life.

• United States v. Reynaldo Villarreal and Baldemar Villarreal (E.D. TX). Drug-related murder of law enforcement officer. Tried, convicted, sentenced to life.

• United States v. Shahem Johnson and Raheem Johnson (E.D. VA). Brothers tried for five drug-related murders. Tried, convicted, sentenced to life.

• United States v. Juan Raul Garza (S.D. TX). Three drug-related murders. Tried, convicted, sentenced to death, executed.

• United States v. Claude Dennis (E.D. VA). Six drug-related murders. Tried, convicted, sentenced to life.

• United States v. Emile Dixon (E.D. NY). Two drug-related murders, including machine-gunning death of suspected informant. Tried, convicted, sentenced to life.

• United States v. Anthony Jones (D. MD). Six drug-related murders. Tried, convicted, sentenced to life.

• United States v. Walter Diaz and Tyrone Walker (N.D. NY). Two defendants kill a drug-dealer as part of 848 CCE and flee to New York City where, in a failed effort to steal a car, they shoot and kill a woman in lower Manhattan. Later in same day the defendants fired at, but missed, a retired school teacher in Coney Island in a failed armed robbery. Defendant Walker was also found by the jury to have beaten to death an elderly man during a burglary when Walker was 19 years old. Both defendants tried, convicted, sentenced to life.

**EXHIBIT B: SUMMARY OF FACTS IN SAMPLING OF FEDERAL CAPITAL-ELIGIBLE CASES WHERE DEATH PENALTY WAS EITHER NOT SOUGHT OR DEFENDANT WAS ALLOWED TO PLEAD TO LESSER SENTENCE**

• United States v. Michael Wayne Thompson (D. NM). Mr. Thompson was serving a life sentence for murder in Alabama when he escaped from custody and traveled to New Mexico, kidnaping several innocent people during his crime spree. After Mr. Thompson arrived in New Mexico, he and his accomplice kidnaped British Major David James Graham Nichols and Mr. Thompson ultimately murdered Major Nichols. The government accepted a life plea offer in that case and Mr. Thompson avoided the death penalty. Mr. Thompson was then charged within the BOP system (M.D. FL) with a gang-related inmate stabbing murder at USP Coleman, which was on video. He was alleged to be one of the heads of the Aryan Resistance Militia prison gang. The government did not seek the death penalty.

• United States v. McCullah (M.D. FL). This former federal death row inmate is accused of the murder of his cellmate at USP Coleman. Authorization was not sought as to death.

• United States v. Storey (D. KS). Prison inmate with Aryan Brotherhood ties killed fellow prisoner at USP Leavenworth. Plea agreement. Sentenced to less than life sentence, 327 months.

• United States v. Douglas Black and Steven Riddle (D. CO). Inmates at USP Florence attacked two suspected "snitches," one killed, one injured. Plea agreements. Substantially less than life sentences: 78 months and 120 months. Black committed a prior murder.

• United States v. Cleveland White Feather (S.D. IL). Murder at USP Marion by disembowlment by defendant who was serving a life sentence for murder of an 80 year old with a baseball bat. The Attorney General rejected a request for authorization to seek the death penalty.

• United States v. James Ninente Leon Guerrero (E.D. CA). The stabbing death of a prison guard at USP Atwater. The defendant was serving life for armed robbery and was previously implicated in the murder of a guard in 1987. Defendant was authorized and allowed to plead guilty.

• United States v. Shawn Cooya and Ritz Williams (M.D. PA). Stabbing murder on videotape, motivated by victim's conversion to Christianity. Williams had a prior murder conviction. The Attorney General approved a guilty plea as to both defendants.

• United States v. Gary Watland (D. CO). Stabbing murder by defendant who was serving 25 years for a previous murder. The Attorney General authorized a guilty plea.

• United States v. Samuel Stone (E.D. CA). Stabbing death by an inmate serving a life sentence for a prior murder. The Department of Justice did not seek the death penalty.

• United States v. Jeremy Sneed (S.D. IN). While serving a life sentence for murders in Iowa (a federal case where the defendant was not authorized), Sneed killed an inmate at USP Terre Haute. He was allowed to plead guilty and was not authorized.

• United States v. Jimmy Benge, Gerald Lee Sizemore and Vernon Renus Delph (E.D. KY). A witness killing. The death penalty was not sought.

• United States v. Eugene Slone (E.D. KY). A gun murder of two potential witnesses. The death penalty was not sought.

• United States v. Gary Benton (E.D. KY). A carjacking from a Walmart parking lot of three people - one was killed. The death penalty was not sought.

• United States v. Ricky Lewis Kelly and Dion Dajuan Neal (W.D. KY). A drug related RICO murder of a witness. Kelly is suspected of involvement in seven other homicides. The death penalty was not sought.

• United States v. Joe Logan and Suresh Kumar (W.D. KY). The arson murder of four in a hotel fire, set to collect insurance proceeds. The Attorney General refused a request to seek authorization.

• United States v. Patrick Noble and Dominic Palazzola (E.D. KY). The beating death of an inmate at the Lexington Federal Medical Center. The defendants were allowed to plead guilty. Noble was sentenced to 97 months and Palazzola was sentenced to 297 months, to run concurrent with the sentence he was serving.

• United States v. Eric Rudolph (N.D. AL). The Olympic and abortion-clinic bomber. Victims included a police officer. Arrested after five-year manhunt. Described by Attorney General Ashcroft as "America's most notorious fugitive." Negotiated guilty plea for life sentence.

• United States v. Theodore Kaczynski (E.D. CA). The Unabomber. Three murders by mailbombs. Plea agreement. Sentenced to life.

• United States v. Johnson (W.D. VA). Mr. Johnson had been indicted for a murder at USP Lee where he was serving a virtual life sentence when he stabbed another inmate to death. On March 21, 2012 – after DOJ approval of a life plea – Antonio Johnson entered a guilty plea.

• United States v. Edgar Diaz and Emile Fort (N.D. CA). Attorney General approved 40 year plea agreements for both defendants, in a case involving seven gang-related murders, including (in Mr. Fort's case) the murder of an innocent child.

• United States v. Christopher Dean (D. VT). Defendant sends pipebomb through the mails killing victim and disfiguring victim's mother. Plea agreement. Sentenced to life.

• United States v. Azikiwi Aquart (D. CT). Same three drug-related murders committed with his brother Azibo. Pled guilty to all three murders with no cooperation agreement, sentenced to life.

• United States v. Clarence Heatley and John Cuff (S.D. NY). Fourteen drug-related murders. Plea agreement. Sentenced to life.

• United States v. Peter Rollock (S.D. NY). Eight drug-related murders, including some ordered by defendant while incarcerated. Plea agreement. Sentenced to life.