**E-FILED**
Friday, 24 August, 2018  06:12:06 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | <u>Hearing Requested</u> |

**<u>MOTION TO DISMISS COUNT ONE DUE TO LACK OF JURISDICTION</u>**

On October 15, 2017, a grand jury sitting in this District returned a three count Indictment, charging the defendant, Brendt Christensen, in Count One with the offense of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) and false statements to the FBI in violation of 18 U.S.C. § 1001(a)(2) in Counts Two and Three. R. 26. Through undersigned counsel, Mr. Christensen moves the Court for an Order dismissing Count One of the Superseding Indictment because the jurisdictional elements of 18 U.S.C. § 1201(a)(1), as alleged in the Superseding Indictment, are not satisfied. Alternatively, Mr. Christensen contends that the expansive interpretation of the phrase "means, facility, and instrumentality of interstate commerce," as envisioned in the Superseding Indictment, violates the Commerce Clause of the Constitution. *See* U.S. CONSTIT. Art 1, § 8, cl. 3.

## I.    SUMMARY OF ARGUMENT

Before a federal court can assume jurisdiction of the substantive offense defined in § 1201(a), one of the five jurisdictional predicates defined in subsections § 1201(a)(1)-

(5) must be met. The jurisdictional hooks described in (a)(2) through (a)(5) are plainly inapplicable. Thus, the government must establish one of the three alternative conditions for federal jurisdiction described in subsection (a)(1). Here, there is no evidence, and the Superseding Indictment does not allege, that the alleged victim was transported in interstate or foreign commerce or that Mr. Christensen traveled in interstate commerce in committing the offense. The government is then left with having to establish jurisdiction under the third option set out in subsection (a)(1), namely that Mr. Christensen committed the offense by "us[ing] the mail or any means, facility, or instrumentality of interstate or foreign commerce."[1] The Superseding Indictment, attempts to establish jurisdiction under this provision by alleging that Mr. Christensen used two such means of interstate commerce in committing the offense, a cellular telephone and a car. The means by which he used these alleged means of interstate commerce are not specified out in the Superseding Indictment.[2] Regardless, both jurisdictional theories of the Superseding Indictment are misguided.

As to the first alleged "instrumentality," there is no evidence that Mr. Christensen used the Motorola cell phone to commit the charged offense or further its commission. He did not lure the alleged victim in any way by means of the cell phone,

---

[1] To avoid unnecessary redundancy, the terms "instrumentality of interstate commerce" and "instrumentality" are used, at times, herein in lieu of the phrase "means, facility and instrumentality of interstate commerce," as found in § 1201(a)(1) and the Superseding Indictment.

[2] Counsel has filed a Motion for a Bill of Particulars on this date, seeking a specification as to how Mr. Christensen allegedly used his cell phone to commit this offense.

nor did he seek to obtain a ransom or reward by its use or direct anyone else in the commission of this offense by its use. *See* III-C, *infra*.

As for the second charged "instrumentality," neither the legislative history of § 1201, case law interpreting the statute, the Amendments in 2006 adding the "means, facility or instrumentality of interstate commerce" language as an alternative jurisdictional basis under subsection (a)(1), canons of statutory construction, nor the constitutional limitations on the federal government's usurpation of the State's Police Powers suggest that Congress intended that the use of a car in an intrastate kidnapping is sufficient to establish federal jurisdiction under § 1201(a)(1). *See* III-D, *infra*.

Because these arguments are dispositive of the jurisdiction issues, the rule of constitutional avoidance does not require the Court to reach the underlying constitutional claim. But, if the Court were to reject these arguments, it would then need to address the issue of whether this expansive and unprecedented jurisdictional grab over otherwise intrastate activity violates the Commerce Clause and unacceptably erodes the principles of federalism underlying the constitutional compact between our State and National Governments. The non-economic nature of an intrastate kidnapping where no ransom, reward or other financial consideration is involved does not have the requisite substantial effect on interstate commerce, either in isolation or the aggregate, to justify Congress' exercise of its commerce power. And, because this is a violent crime long regarded within our constitutional scheme as within the Police Power of the State to regulate in the absence of a sufficient interstate nexus, application of § 1201(a)(1) to

the facts of this case would exceed Congress' powers under the Commerce Clause. *See* IV, *infra*.

## II.    BACKGROUND

On June 9, 2017, Yingying Zhang, a visiting scholar at the University of Illinois, had an appointment to meet with the manager of an apartment complex in Urbana, Illinois for the purpose of signing a lease. Ms. Zhang left her office at the University of Illinois in Champaign around 12:30 pm that day, telling her colleagues that she was going to sign a lease on a new apartment. The circumstances suggest that Ms. Zhang intended to take a bus to the appointment, which required a transfer. At approximately 1:30 pm, Ms. Zhang sent a text message to the apartment manager, estimating her time of arrival as 2:10 pm. A few minutes later a surveillance tape of the Champaign-Urbana Metropolitan Transfer District depicts a person presumed to be Ms. Zhang boarding the first bus, from which she exits at approximately 1:52 pm, near the vicinity of W. Springfield Ave. and Matthews Street. Thereafter, Ms. Zhang is seen unsuccessfully attempting to flag down another bus that was just pulling off.

Shortly after two o'clock a Saturn Astra, driven by Brendt Christensen, pulled up next to Ms. Zhang, who is then seen leaning into the window of the car and speaking with the driver. Within a minute or so Ms. Zhang enters the vehicle, which immediately departs the area. To counsel's knowledge no witness observed anything that suggested Ms. Zhang was forced into the Saturn Astra or entered the Saturn Astra other than voluntarily. To counsel's knowledge no witness overheard any of the conversation between Ms. Zhang and Mr. Christensen prior to her entering the vehicle.

Ms. Zhang did not keep her appointment at the apartment complex. The government contends that Ms. Zhang has never been seen again.

## III.   THE FEDERAL GOVERNMENT DOES NOT HAVE JURISDICTION OF THIS OFFENSE UNDER § 1201(a)(1)

In order to establish jurisdiction over the kidnapping offense defined in §1201(a), the government must establish one of the five grounds specified in subsections (a)(1) through (a)(5).

> **(1)** the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense;

> **(2)** any such act against the person is done within the special maritime and territorial jurisdiction of the United States;

> **(3)** any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 46501 of title 49;

> **(4)** the person is a foreign official, an internationally protected person, or an official guest as those terms are defined in section 1116(b) of this title; or

> **(5)** the person is among those officers and employees described in section 1114 of this title and any such act against the person is done while the person is engaged in, or on account of, the performance of official duties,

> shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

### A.   Legislative History of § 1201(a)

In the wake of the kidnapping of the child of Charles Lindberg in 1932, Congress passed the Federal Kidnapping Act (Kidnapping Act), now codified at § 1201. Concerned with potential issues arising from the overreaching of federal criminal law and the usurpation of activities long held to be the domain of the states, Congress specifically limited the jurisdiction over kidnappings to the transportation of victims in interstate or foreign commerce. Act of June 22, 1932, ch. 271, 47 Stat. 326 (1932). *See* Robert C. Finley, *The Lindberg Law*, 28 Geo. L. R. 908-912 (1940) (reviewing legislative history of 1932 Act and 1934 Amendment). The Kidnapping Act, also known by its popular name, the "Lindberg Law," was specifically enacted for the purpose of allowing the FBI to investigate and the federal government to prosecute kidnappings where criminals transport their victims from one state to another to frustrate investigation by state law enforcement authorities whose jurisdiction often ends at the state line. *Chatwin v. United States*, 326 U.S. 455, 462-63 (1946). The 1932 Act thus focused on the interstate transportation of the victim and also required that there be a ransom or reward demand. While assorted amendments were made to the statute over the years,[3] other than a 1972 amendment that expanded jurisdiction to include kidnappings within the special territorial, maritime and aircraft jurisdiction of the United States and the

---

[3] Among other changes, later amendments removed the requirement of a ransom or reward demand by adding the "or otherwise" language, made the Kidnapping Act inapplicable to parental kidnappings and added the death penalty as a possible punishment.

kidnapping of foreign officials, *see* Pub.L. 92-539 (1972), the interstate jurisdictional nexus of the statute remained unchanged until the Amendment of 2006. *Infra.*

It is important to note that in upholding the Kidnapping Act's expansion of federal jurisdiction as a legitimate exercise of Congress' powers under the Commerce Clause, courts consistently emphasized that such jurisdiction was conditioned on a showing that the victim was moved across state lines. *See United States v. Moore*, 571 F.2d 76, 81 (2d Cir. 1978) (reversal where evidence insufficient to establish what the court characterizes as the "operative condition" of a § 1201 offense, the interstate transportation of victim); *United States v. Davis*, 19 F.3d 166, 169 (5th Cir. 1994) (transportation of victim in interstate commerce a required element of kidnapping); *United States v. Singh*, 483 F.3d, 493 (7th Cir. 2007)(same), *citing United States v. Green*, 680 F.2d 520 (7th Cir. 1982); *United States v. Larsen*, 596 F.2d 759, 767 (8th Cir. 1979) (government must prove victim taken across state lines); *United States v. Broadwell*, 870 F.2d 594, 601, n. 16 (11th Cir. 1989) (crime of kidnapping complete once victim transported across state lines).

Thus, from the very beginning, both the direct language of the Kidnapping Act and cases interpreting the statute stressed that the movement of the victim across state lines was a prerequisite to the federal government assuming jurisdiction over what would otherwise be a crime solely within the jurisdiction of the States.

### B.    The 2006 Amendment to § 1201(a)(1)

In 2006, Congress amended § 1201 by striking the language requiring that a person must be alive when the interstate transportation began and adding the second

and third jurisdictional bases now codified as § 1201(a)(1), namely if "the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." *See* Pub.L. 109-248, § 213, July 27, 2006; 120 Stat. 587 (2006). This amendment of § 1201(a)(1) was the result of a *single sentence* inserted into a lengthy bill entitled the Adam Walsh Child Protection and Safety Act of 2006, otherwise known as the Sex Offender and Notification Act (SORNA),[4] the Preamble of which stated its purpose as "An Act To protect children from sexual exploitation and violent crime, to prevent child abuse and child pornography, to promote internet safety, and to honor the memory of Adam Walsh and other child crime victims." Pub.L. 109-248, Preamble. Thus, § 213 of the Adam Walsh Act, codified as an Amendment to § 1201(a)(1), consisted of a single sentence in a comprehensive and detailed bill that was directed at protecting children against predators and otherwise had nothing to say about kidnapping in general. The legislative history unequivocally demonstrates that § 213 was designed to target the use of the internet by child predators to contact and entice

---

[4] The Adam Walsh Act (SORNA) consists of 49 single-spaced pages as it appears in Westlaw. It is broken into seven titles, respectively: Title I: Sex Offender Registration and Notification Act; Title II: Federal Criminal Law Enhancements Needed to Protect Children from Sexual Attacks and Other Violent Crimes; Title III: Civil Commitment of Dangerous Sex Offenders; Title IV: Immigration Law Reforms to Prevent Sex Offenders from Abusing Children; Title V: Child Pornography Prevention; Title VI: Grants, Studies, and Programs for Children and Community Safety; and Title VII: Internet Safety Act. Significantly, § 213 of the Act, subsequently codified as an amendment to § 1201(a)(1) of Title 18, is located in Title II. Most of its provisions were enacted as the Sex Offender and Notification Act and codified at 42 U.S.C. § 16901, *et seq*. While these headings are not controlling, "they supply cues that Congress did not intend" the statutory language "to sweep within its reach" matters unrelated to the purpose of the legislation. *Yates v. United States*, 135 S.Ct. 1077, 1083 (2015); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (title of statute and section headings are tools for interpreting reach of statute).

children. There is nothing in the Act to suggest that Congress was concerned with a general expansion of kidnapping jurisdiction under § 1201(a)(1) or that it intended to alter the long-standing and fundamental principle that federal jurisdiction under §1201(a)(1) is premised on the interstate element of the crime. *See infra*. This reading of the purpose of the Adam Walsh Act is further corroborated by the signing statement wherein President Bush described the four purposes of the bill, each related to crimes against children: expanding the National Sex Offender Registry; increasing federal crimes against children; making it harder for sexual predators to reach children through the internet and creating a National Child Abuse Registry. See Presidential Signing Statement, *President Signs H.R. 4472, the Adam Walsh Child Protection and Safety Act of 2006*, 2006 WL 2076691 (White House).

C.    **Mr. Christensen Did Not Use the Motorola Cell Phone to Commit or Further the Commission of the Offense Charged in Count One**

The Superseding Indictment does not specify the means by which Mr. Christensen allegedly used the Motorola cell phone telephone to kidnap Ms. Zhang. To cure this deficiency, Mr. Christensen has on this date filed a *Motion for Bill of Particulars*, requesting an Order that government identify with particularity the uses of the Motorola cell phone that form the basis of the allegation in Count One. Nonetheless, a review of the voluminous discovery in this case suggests that there is no evidence supporting this proposed jurisdictional nexus.

Section 1201(a)(1) provides that jurisdiction for the substantive offense is established if the offender "uses . . . the mail or any means, facility, or instrumentality of

interstate or foreign commerce *in committing or in furtherance of the commission of the offense.*" (Emphasis added). Thus, pursuant to § 1201(a)(1), jurisdiction may be established by: (1) proof that the Motorola cell phone was used during the actual commission of the substantive offense; or (2) proof that the Motorola cell phone was used in furtherance of the offense. This jurisdictional element must be proven beyond a reasonable doubt. *Torres v. Lynch*, 136 S. Ct. 1619, 1630 (2016); *United States v. McGuire*, 178 F.3d 203, 205 (3rd Cir. 1999).

(a) "Use" of the Motorola Cell Phone to Commit the Offense

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Burns v. Alcala*, 420 U.S. 575, 580–581 (1975), quoted in *Perrin v. United States*, 444 U.S. 37, 42 (1979). The term "use" is not defined in § 1201(a)(1), but syntax and placement suggest an active verb describing an activity in the present. As the Supreme Court has held, the term "use" is commonly understood as employing or actively using an instrument in commission of a crime.

> Webster's defines "to use" as "[t]o convert to one's service" or "to employ." Webster's New International Dictionary 2806 (2d ed. 1939). Black's Law Dictionary contains a similar definition: "[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of." Black's Law Dictionary 1541 (6th ed. 1990). Indeed, over 100 years ago we gave the word "use" the same gloss, indicating that it means " 'to employ' " or " 'to derive service from.' " *Astor v. Merritt,* 111 U.S. 202, 213, 4 S.Ct. 413, 419, 28 L.Ed. 401 (1884).

10

*Smith v. United States*, 508 U.S. 223, 228–29 (1993); *see also Bailey v. United States*, 516 U.S. 137 (1995) ("use" of a firearm "during and in relation to any crime of violence or drug trafficking crime" requires "active deployment" of the firearm during commission of the crime).

After reviewing the discovery in this case, to counsel's knowledge there is no evidence suggesting that Mr. Christensen "used" his Motorola phone to commit the charged offense. The government's theory is that Ms. Zhang got into Mr. Christensen's car as a result of a random encounter on the street. There is nothing to suggest that Mr. Christensen contacted Ms. Zhang in any way whether by way of a telephone call or use of the internet on the Motorola cell phone prior to Ms. Zhang getting into his car. There is no evidence Mr. Christensen used the cell phone during actual commission of the offense. And, there is no evidence that, afterwards, Mr. Christensen used his phone to demand a reward or ransom. *Compare United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014) (co-conspirators communicate by cell phone during execution of kidnapping and thus jurisdiction afforded under § 1201(a)(1)); *United v. Dais*, 559 Fed. Appx. 438 (6th Cir. 2014) (forcing victim to use his cell phone to call mother and communicate ransom request.). Thus, the government is left with only the "in furtherance of" language of § 120l(a)(1).

> (b) "In furtherance of" the Substantive Offense

Likewise, the government has provided no evidence that Mr. Christensen used the Motorola cell phone "in furtherance of" the kidnapping of Ms. Zhang.

> 1. What the Government Must Show to Establish "In Furtherance of"

As noted above, the "in furtherance of" language of § 1201(a)(1 was added by the 2006 Amendments. The few cases citing use of a cell phone to establish a basis for jurisdiction under § 1201(a)(1) each involved the direct use of the cell phone during the commission of the offense, and thus did not require exegesis of the "in furtherance of" language in § 1201(a)(1). *See United States v. Morgan*, 748 F.3d at 1031-32 (10th Cir. 2014) (defense does not contest that a cell phone was used to accomplish the kidnapping); *United States v. Dais*, 559 Fed.Appx. at 445 (6th Cir. 2014) (use of cell phone to demand ransom); *United States v. Al-Din*, 631 Fed.Appx. 313, 330 (6th Cir. 2015) (cell phone used to "orchestrate and facilitate the kidnapping"); *United States v. Ramos*, 622 Fed.Appx. 29, 30 (2d Cir. 2015) (defendants communicating by cell phone during the kidnapping).

Although the "in furtherance of" language in § 1201(a)(1) suggests a more indirect relationship of the cell phone to the kidnapping, interpretation of identical language in other statutes and legal contexts suggests that a remote, attenuated or speculative connection between the cell phone and the offense is insufficient. *See generally Bragdon v. Abbott*, 524 U.S. 624, 645 ("when . . . judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well."); *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice it presumably knows and adopts the cluster of ideas that were attached . . . and the meaning its use will convey to the judicial mind unless otherwise instructed.").

Thus, in interpreting the "in furtherance of" element of mail fraud,[5] "a mailing will be considered in furtherance of the scheme if it is 'incidental to an essential part of the scheme. . . in other words, the success of the scheme must in some measure depend on the mailing.'" *United States v. Fernandez,* 282 F.3d 500, 508 (7th Cir.2002) (citation omitted); *see also United States v. Rauhoff*, 525 F.2d 1170, 1176 (7th Cir. 1975) ("[M]ailings made after the scheme has reached its fruition are not in furtherance of the scheme [citation omitted] . . . nor are mailings which have little effect on the scheme."). The same language in 18 U.S.C. § 924(c), prohibiting possession of a firearm in furtherance of a drug trafficking offense, requires that the weapon "further, advance, move forward, promote or facilitate" the underlying offense. *United States v. Eller*, 670 F.3d 762, 765 (7th Cir. 2012); *United States v. Ray*, 238 F.3d 828, 833 (7th Cir. 2001) ("in furtherance of" a CCE "means working to promote or advance the interests of the enterprise). Similarly, in the context of determining the admissibility of statement pursuant to the co-conspirator exception of Fed.R.Evid. 801(d)(2)(E), "mere idle chatter, narrative declarations and superfluous casual remarks," are not statements made "in furtherance of" a conspiracy. *United States v. Curry*, 187 F.3d 762, 766 (7th Cir. 1999), *quoting United States v. Johnson*, 927 F.2d 999, 1002 (7th Cir. 1991).[6]

---

[5] In mail fraud prosecutions, government must prove that: (1) defendant participated in a scheme to defraud; (2) defendant intended to defraud; and (3) defendant used the mails *in furtherance of* the scheme. *United States v. Montani*, 204 F.ed 761, 769 (7th Cir. 2000) (Emphasis added).

[6] A crucial difference between the analysis of the "in furtherance of" requirement for admission of co-conspirator hearsay under Rule 801(d)(2) and proof of an element of the offense (whether jurisdictional or not), is that the former requires a showing only by a preponderance of the evidence, *United States v. Pust*, 798 F.3d 597, 602 (2015), while, as noted above, the government bears the burden of proving beyond a reasonable doubt "in furtherance of" for jurisdictional purposes of § 1201(a)(1).

2. The Data Extracted from the Motorola Cell phone

The government has given notice that it intends to call two experts who "processed, duplicated and examined" the Motorola cell phone referenced in Count One and introduce a color-coded report, which identifies data pulled off the cell phone. *See* Attachment 1.[7]

Although the Superseding Indictment does not hint how the Motorola phone was used to further the kidnapping of Ms. Zhang, discovery provided by the government, including notice concerning the aforementioned experts, averments in applications for search warrants and the government's sealed *Motion to Admit Evidence Pursuant to Rules 404(b) and 413 of the Federal Rules of Evidence*, Dkt. 50, at 6-10, suggest that the government will likely cite two lines of usage as satisfying the "in furtherance of" element: (1) searches for information relating to serial killers; and (2) visits to a website known as FetLife, a social media site for individuals with what might be colloquially described as "kinky" interests. An analysis of the data in Attachment 1 shows that neither theory is sufficient to establish jurisdiction:

a. The Serial Killer Searches

Attachment 1 indicates that on April 17, 2017, three Google searches related to serial killers were performed on the Motorola cell phone and two Wikipedia websites

---

[7] The Motorola cell phone is identified in Attachment 1 as QSI2. Entries coded in green represent use of the cell phone to access the internet. Orange-coded entries represent SMS text messages sent to and received by the cell phone.

related to serial killers were visited that day.[8] The first of the five entries bears a Date/Time stamp of 4/17/2017 01:47:14; the last 4/17/2017 01:49:32. Thus, the three Google "searches" and two website visits were performed within a period of two minutes and 38 seconds. Setting aside the brevity of the visits, a closer look at the Wikipedia websites does not reasonably suggest anything which would have furthered the kidnapping of Ms. Zhang. For instance, the web page identified as

https://en.m.wikipedia.org/wiki/serial_killer (visited 8-23-18) bears a Date/Time stamp of 4/17/2017 01:47:22.[9] The article is several pages long and summarizes different topics relating to the subject, including the etymology and definition of the term, the history of serial killers, their characteristics, development, fantasies etc. *See* Attachment 2. This article would be the type of resource consulted by any person interested in a topic that has captured the attention of untold thousands or millions. *Infra*. That the user of the Motorola cell phone (for purposes herein, presumed to be Mr. Christensen) did nothing more than quickly glimpse its contents, if that, is evidenced by the fact that only 31 seconds after accessing this website, the user accessed a second Wikipedia website related to serial killers. *See* 4/17/2017 01:47:53. This, again, is a multi-page document listing in chart form known serial killers around the world, their country, years of activity, number of proven and possible victims and brief notes

---

[8] The relevant entries are color-coded green on the page marked Christensen-003464 in the bottom right corner of Attachment 1.

[9] Although the page was apparently bookmarked, there is no suggestion that it was ever visited again on the cell phone. And, regardless of the number of visits, the government would still be left with the lack of any "in furtherance of" nexus to the kidnapping.

associated with each. *See* Attachment 3,

*https://en.m.wikipedia.org/wiki/List_of_serial_killers_by_number_of_victims* (visited 8-23-18).

The user of the cell phone spent 70 seconds at this site before performing the next

Google search for a list of American serial killers, a site visited for 29 seconds. *See*

Date/Time entries 4/17/2017 01:49:03 and 4/17/2017 01:49:32. [10]

  Finally, the first entry on Attachment 1 indicates that an academic paper entitled

"A Critical Analysis of Research Related to the Criminal Mind of Serial Killers," was

downloaded onto the cell phone on February 26, 2017. This paper was written by a

graduate student from the University of Wisconsin-Stout in August of 2000. *See*

Attachment 4. The purpose of the study was to compare past and present trends in

serial killing in both Wisconsin and the United States, and to identify and analyze their

characteristics with a goal of developing prospective characteristics of serial killers for

identification and treatment purposes. The paper is fundamentally an academic

analysis of the various psychological, biological, and social theories underlying research

of serial killings, and ultimately makes recommendations as to how to fill the research

gaps that exist in current scholarship.

  The downloading of this paper, as well as the Google searches and website visits

on April 17, occurred during the spring semester of 2017, when Mr. Christensen was

---

[10] Two additional "serial killer" searches on April 17, both with apparent misspellings, were repetitive. The first, at 01:47:13, lists a search for "serial killer dog slave instrucy." A run of this search by counsel on July 26, 2018, returned several citations to articles about David Parker Ray and John Wayne Gacy. Both of their Wikipedia profiles hyperlink back to https://en.wikipedia.org/wiki/Serial_killer, which is the next website visited 9 seconds after the above search. *Supra*. The last of this series is the almost identical Google search, "serial killer dog slave instructib" at 1:49:32.

taking SOCI 310, an online class at the University entitled "The Sociology of Deviance." The Syllabus from the class indicates that students would examine "something of the range of deviance," including "fetishists" and "criminals." *See* Attachment 5. Several class discussions focused on deviant behavior, including murder/killing. *See* Attachment 6. These circumstances aside, the Google searches and website visits depicted in Attachment 1 no more "further[ed], advance[d], move[d] forward, promote[d] or facilitate[d]" the underlying offense, *United States v. Eller*, *supra*, than reading a biography of Billy the Kid on a Kindle App on a cell phone would form a jurisdictional basis for the federal government to assume jurisdiction over the killing of an individual in a saloon brawl.

Finally, the attempt to lay jurisdiction based on vague and inconclusive internet searches such as these raises issues not only of jurisdictional relevance but also jurisdictional overreaching by the federal government and unconstitutional intrusion on state sovereignty. *See generally* IV, *infra*; *Motion to Declare Federal Death Penalty Act Unconstitutional as Applied on the Ground . . . That Its Application Here Violates the Tenth Amendment and Principles of Federalism of the Constitution of the United States* (filed August 24, 2018).

As the Supreme Court recently noted in *Carpenter v. United States*, 138 S. Ct. 2206, 2211 (2018), there are 396 million cell phone service accounts in a nation of only 326 million people. Anyone walking down the street or eating in a restaurant can easily observe someone on their cell phone, many undoubtedly accessing the internet. Google data indicates that there are 15.2 *billion* Google searches in the U.S. every month.

https://expandedramblings.com/index.php/by-the-numbers-a-gigantic-list-of-google-stats-and-facts/(visited 7-27-18). The federal government's attempt to find jurisdiction over otherwise local violent crime, long regarded as exclusively assigned to the State's Police Power, based on such nebulous and remote inferences as it attempts to draw here surfaces the real specter of a national police force due to the ubiquity of cell phones and frequency of their use in this country. The result would award the national government sweeping jurisdiction on far-flung theories never imagined by the Framers of the Constitution. Is the local burglar now to be brought into federal court because six months before breaking into his neighbor's house, he visited a website that explains the science of fingerprinting?

These concerns are further deepened when the federal government attempts to draw jurisdictional inferences from a citizen's interest in topics that hold an unexplained fascination for large segments of the population.[11] Serial killers are prevalent in popular culture and draw the attention of millions of average Americans. *See* https://www.psychologytoday.com/us/blog/wicked-deeds/201409/here-s-why-we-love-serial-killers (visited 7-26-18) (psychologist explaining why "the public loves serial killers for a number of interrelated reasons."). This is evident in media searches for movies and television shows about serial killers, which return thousands upon thousands of results: *See e.g.* Mindhunter (2018), Seven (1995), The Silence of the Lambs

---

[11] As discussed below, there is a critical distinction here between evidence that might conceivably be admissible under a preponderance standard as bearing on the substantive offense itself, and the very distinct showing required for jurisdictional purposes.

(1991), Taxi Driver (1976), Zodiac (2007), American Psycho (2000), Mr. Brooks (2007),
Natural Born Killer (1994), Red Dragon (2002), Monster (2003), Perfume (2006),
Kaliforia (1993), Summer of Sam (1999), Copycat (1995), Saw (2004), From Hell (2001),
The Bone Collector (1999), Kiss the Girls (1997), The Killer Inside Me (2010). Although it
apparently would like to do so, the federal government may not assume jurisdiction
over an otherwise local murder case because the perpetrator previously watched
Zodiac[12] on his cell phone.

     While this presents a serious overreaching issue, *see* IV, *infra*, the Court need not
reach it, as the government cannot show how the "serial killer" searches and visits in
April "furthered" the commission of the charged offense, as required by § 1201(a)(1).

          b. The Fetlife and Related Searches

     The repeated references in its 404(b) motion, Dkt. 50 at 6, suggests that the
government may argue that the Motorola cell phone visits to the FetLife website that
caters to alternative sexual interests, such as BDSM, with sub-threads on topics such as
abduction fantasies as well as Google searches for topics such as "flogging" and
"abduction play," suffices for jurisdiction under § 1201(a)(1). *See* Attachment 1, at 3464,
Date/Time 4/17/2017 17:21:16 to 4/22/2017 11:53:06; 4/26/17 00:27:49 to 4/26/2017
02:31:13; 4/28/2017 13:28:02 to 4/28/2017 13:31:02.

     The usages of the Motorola cell phone between April 17 and May 11, must be
understood in the context of Mr. Christensen's budding relationship with a woman

---

[12] This movie recounts search for a serial killer in the Bay Area who called himself the "Zodiac."
https://en.wikipedia.org/wiki/Zodiac_(film) (visited 8-5-18).

referenced here as T.B. The government has interviewed T.B. on several occasions and continues to provide monthly "support" to her. Accordingly, the government is aware that Mr. Christensen's sudden interests in these websites in the spring of 2017, was the result of a consensual dominant/submissive relationship with T.B., who advised him of the existence of, and encouraged him to join, the FetLife community where he could learn more about these types of relationships, and related fantasies. T.B. was intimately familiar with the FetLife, as well as the nature of dominant/submissive relationships. Mr. Christensen was not.

Mr. Christensen and T.B. exchanged messages on the OK Cupid dating site on April 2, 2017, and met in person the following day. Two days later Mr. Christensen opened a Fetlife membership. Prior to this time there is no evidence that Mr. Christensen had shown any prurient interest in bondage or other forms of alternative consensual sexual activity that attracts visitors to the Fetlife website. In contrast, T.B. was a member of the alternative sexual practices community in Champaign-Urbana (and perhaps elsewhere). T.B. encouraged Mr. Christensen to get involved in this community in Champaign-Urbana, at one point taking him to a party at an Urbana bar where members of this community sometimes congregated. Describing herself as "polyamorous," T.B. told the FBI that she and Mr. Christensen practiced bondage and flogging and admitted that she had purchased the flogger they used.[13] Having more

---

[13] In one text message to Mr. Christensen in mid-April, T.B. notes that "flogging is . . . so beautiful," [that] she "just drooled" after seeing a man "florentine flogging" in a convention in St. Louis, and suggests she would like a "set of floggers if[sic] my own for my birthday."

experience in this alternative milieu and explaining that she undertook the "submissive" role in their activities, T.B. taught Mr. Christensen various concepts, including the use of code words to indicate if the boundaries of consent were being approached in dominant/submissive activities, and the two of them freely shared various sexual fantasies. Nowhere in the several interviews she had with the FBI or the numerous text messages found on their respective phones is there any suggestion that T.B.'s relationship with Mr. Christensen was anything other than consensual.

The thrust of the visits to the FetLife website directly relate to Mr. Christensen's exploration of this new type of sexual activity to which T.B. had shortly before introduced him. Visits to FetLife websites concerning flogging[14], begging,[15] rules of consent,[16] and other dominant/submissive sub-threads[17] on Fetlife were all part and parcel of, and can be directly traced to, this relationship with T.B. And, even though some of these visits suggested Mr. Christensen was perhaps exploring the possibility of relationships with others,[18] this was not surprising inasmuch as he and his wife had agreed to an "open" marriage and T.B. had made it clear that she was "polyamorous" and had other boyfriends.

---

[14] *E.g.:* Attachment 1 at 3464: 4/17/2017 17:39:44 (Google search flogging);

[15] *E.g.:* Attachment 1 at 3464: 4/17/2017 00:13:19 (begging fetish)

[16] *E.g.:* Attachment 1 at 3464: 4/19/2017 00:22:58 (Rope bondage: About and Rules); 4/19/2017 00:23:55 (Consent/Nonconsent Blackmail and Slavery); 5/1/17 13:23:59 (What Makes a Good Dominant?)

[17] *E.g.:* Attachment 1 at 3464: 4/19/2017 00:24:08 (Mail Owner/Female Property)

[18] *E.g.:* Attachment 1 at 3464: 4/26/2017 01:32:46; 4/26/2017 02:30:16; 4/26/2017 02:31:13

From the very outset of this case, the government has stressed that Mr.

Christensen used his Motorola cell phone to "visit[] a forum on the FetLife website,

entitled 'Abduction' 101, to include sub-threads 'Perfect abduction fantasy' and

'planning a kidnapping.'" Affidavit in Support of Criminal Compliant, Dkt. 1, at 8 (6-30-

17); *see also Motion to Admit Evidence Pursuant to Rules 404(b) and 413 of the Federal Rules of*

*Evidence*, Dkt. 50, at 6. Contrary to the government's suggestion that Mr. Christensen

regularly visited this site in the "weeks and months" before June 9, 2017, *id.*,

Attachment 1 only shows brief "visits" on three different dates, April 19, 22, and 26,

2017. Attachment 1 reveals that Mr. Christensen first visited the "abduction 101"

website at 00:17:28 on the 19th and remained on the first page for *seven seconds* before

accessing another page on this sub-thread entitled "About & Rules", where he remained

for an even shorter time.[19] Approximately twenty minutes later he again accessed

"abduction 101," visiting five pages on the sub-thread over a period of approximately

seven minutes.[20] One week later, on April 26, 2017, he accessed four pages on the

"abduction 101" sub-thread over a period of eight minutes.[21]

It strains credulity to suggest, without any further evidence, that these briefs

visits to this sub-thread on the FetLife website in April furthered the kidnapping of Ms.

Zhang on June 9. A closer look at the *other pages* Mr. Christensen *contemporaneously*

---

[19] *See* Attachment 1, at 3464 4/19/2017 00:17:21; 00:17:28 (seven seconds later); and 00:17:31.

[20] *See* Attachment 1, at 3464 4/19/2017 00:40:08 through 00:46:49.

[21] *See* Attachment 1, at 3464 4/26/17 00:27:49 through 00:35:53.

visited on FetLife on April 19 shed light on his intent and corroborate the relationship of all these visits to his evolving consensual relationship with T.B. For instance, the initial visit to the abduction 101 page at 00:17:21 is *immediately followed* by visiting four pages dealing with *consensual* abductions. *See* 4/19/17 0017:28 (About & *Rules* – abduction 101)(emphasis added); 4/19/17 00:17:31 (Abduction *Play* – Fetish) (emphasis added); 4/19/17 00:22:58 (About & *Rules* – Rope Bondage)(emphasis added); 4/19/17 00:23:55 (*Consensual Nonconsent* Blackmail and Slavery)(emphasis added).

The same pattern of accessing pages dealing with consent again presents when Mr. Christensen later accesses the "abduction 101" sub-thread on the 19th, with concurrent visits to pages titled "Abduction *Play*"(emphasis added), at 00:51:40; Abduction *Fantasy* (emphasis added), at 00:56:59 and two pages of listings by two individuals who want to engage in a consensual abduction fantasy. *See* 4/19/17 00:54:48 and 01:01:18. The pattern again appears with the visits to "abduction 101" pages on the 22nd, both of which suggest consensual relationships.[22]

The inference which the government wants to draw – that access to these website pages suggests a criminal intent and somehow furthered the kidnapping of Ms. Zhang

---

[22] The first page is entitled "Serious experienced slave for abduction," implying consent while the second page was, again, "Abduction fantasy." *See* Attachment 1, at 3464, 4/22/17 01:44:25 and 11:53:06.  In its 404(b) motion, the government references Mr. Christensen's "attempt to arrange a 'fake' abduction through the FetLife website around April 2017." Dkt. 50, at 6. Assuming the government is pointing to the FetLife activity in April, as depicted in Attachment 1, the effort to downplay the consensual nature of such by placing quotation marks around 'fake' ignores the evident fantasy aspects of his communications on FetLife, in general, *supra*, and, in particular, with respect to the alleged "arranged kidnapping." The two pages to which the government apparently refers are entitled "I WANT YOU TO ABDUCT ME (Female seeking), *id.* 04/19/2017 01:01:18, and "Serious experienced slave for abduction." *Id.* 04/22/2017 01:44:25. Consent is implicit in both with the first post from a female who wants to engage in such abduction play. While the second does not indicate gender, assuming it's a male, consent is also implied.

must also be evaluated in the context of the popularity of this website. The Fetlife Home

Page describes the site as "The Social Network for the BDSM, Fetish and Kinky

Community," and lists almost 7 million members, who share over 36 million pictures

and over a half million videos and participate in over 8 million discussions in 121,845

different groups. In addition, its members read almost 3 million blog posts, a degree of

participation which the FetLife home page proudly describes as "Kinky heaven!"

https://fetlife.com (visited 8-5-18). While the government would like to leave the

impression that visits to these website and forums evidence a propensity to engage in

non-consensual violent behaviors, the more salient conclusion is that a large segment of

the population engages in these type of alternative sexual practices or fantasize about

doing so.  And, even if access to these websites suggests an interest in paraphilic, or

what may be regarded by some as abnormal sexual desires, there is no showing as to

how accessing these forums promoted, facilitated or furthered the kidnapping of Ms.

Zhang.

The above indicates that the Motorola cell phone was not "used" to commit the

kidnapping or in furtherance thereof, and thus does not constitute "direct evidence" of

the offense. *See Motion to Admit Evidence Pursuant to Rules 404(b) and 413 of the Federal

Rules of Evidence*, Dkt. 50, at 2-3. The admissibility of the data in Attachment 1,[23] as well

---

[23] At various points in the cited motion, the government seemingly suggests that evidence of the use of the cell phone to conduct the referenced internet searches is intrinsic to, and directly part, of the offense. *Id*., at 6 (arguing admissibility under Fed.R.Evid 401 and 402); *but see United States v. Gorman*, 613 F.3d. 711, 719 (7th Cir. 2010) (characterizing inextricable intertwined doctrine as "overused, vague and quite unhelpful" and concluding "the doctrine has outlived its usefulness."); *United States v. Conner*, 583 F.3d 1011, 1019, 1021 (7th Cir. 2009) (evidence of other drug activity erroneously admitted under "intricately related" doctrine, even though it would have been admissible under Rule 404(b)). Although Rule 403

as that laid out in the government's 404(b) motion, raises serious issues that will be

addressed in accordance with the Court's Scheduling Order,[24] but, assuming *arguendo*,

admissibility of pieces of this evidence under some 404(b) theory, it is important to

recognize the distinction between the use of evidence of "other acts" evidence to show

motive, intent, knowledge, preparation etc. and evidence that establishes jurisdiction in

the first instance.

> Just as important, a *settled practice of distinguishing between substantive and jurisdictional elements of federal criminal laws* supports reading § 1101(a)(43) to include state analogues lacking an interstate commerce requirement. As already explained, the substantive elements of a federal statute describe the evil Congress seeks to prevent; the jurisdictional element connects the law to one of Congress's enumerated powers, thus establishing legislative authority. See *supra,* at 1624 – 1625; ALI, Model Penal Code § 1.13(10) (1962). Both kinds of elements must be proved to a jury beyond a reasonable doubt; and because that is so, both may play a real role in a criminal case. But still, they are not created equal for every purpose. To the contrary, courts have often recognized—*including when comparing federal and state offenses*—that Congress uses substantive and jurisdictional elements for different reasons and does not expect them to

---

applies to both, the distinction between intrinsic evidence relevant under Rules 401 and 402 and extrinsic evidence admissible under 404(b) is significant because of the latter's focus on the dangers present in evidence suggesting propensity.

[24]*See* e.g.: *United States v.* Preston, 873 F.3d 829 (2017) ("[A]s this court has recognized, in many cases, 'the link between fantasy and intent is too tenuous to be probative', as 'people commonly fantasize about doing things they have no intention of actually doing.'"); United *States v. Loughry*, 660 F.3d 965 (7th Cir. 2011)(because "perverse sexual fantasies generate . . . intense disgust," [citation omitted], admission of "hard core" pornography videos found in defendant's home held reversible error); *United States v. Harvey*, 991 F.2d 981 (2d Cir. 1993) (error to allow Postal Inspector to read titles of X-rated films and videos connected to defendant); *United States v. Grimes*, 244 F.3d 375, 384-85 (5th Cir. 2001)(same); *cf. United States v.* Laureys, 866 F.3d 432 (D.C. Cir. 2017) (counsel found ineffective for failure to secure expert testimony to explain existence of internet fantasy subculture, "the prevalence of fantasy in internet chat rooms, or the use of fantasy as a coping mechanism to deal with inappropriate or unlawful sexual urges.").

   Motions *in limine* are scheduled to be filed on February 19, 2019. Dtk. 67, at 3.

receive identical treatment.

*Torres v. Lynch*, 136 S. Ct. 1619, 1630 (2016) (emphasis added); *United States v. One Big Six Wheel*, 166 F.3d 498, 502 (2d Cir. 1999) ("[T]he government's argument ignores the 'real distinctions between a jurisdictional element of a crime and a substantive element. The distinction important in this case is that a jurisdictional element does not define the *essence* of what constitutes a criminal offense, and does not contribute to the culpability of the proscribed conduct.'"). (citation omitted) (emphasis in original).

Because there is no evidence that Mr. Christensen used the Motorola cell phone to commit the kidnapping of Ms. Zhang or to further such kidnapping, the government cannot claim jurisdiction on the cell phone theory alleged in Count One.

### D.   Congress Did Not Intend for the Intrastate Use of a Car to Establish Jurisdiction Under § 1201(a)(1)

#### (1) In Enacting the Adam Walsh Act Congress Was Concerned Only with the Problem of Exploitation of Children, Which is Often Accompanied by the Use of the Internet, Telephone, Mail and Other Means of Communication and Not With Kidnapping in General

The evidence overwhelmingly suggests that Congress did not intend that the use of a car in an otherwise intrastate kidnapping qualifies as a "means, facility and instrumentality of interstate commerce" within the meaning of the amended § 1201(a)(1) when it inserted this language into § 213 of the Adam Walsh Act.

As noted above, the 2006 Amendment to § 1201(a)(1) was an isolated sentence in a lengthy bill whose clear purpose was countering the exploitation of children. A search of the bill reveals that the terms "car" or "automobile" are used nowhere in the bill. The term "motor vehicle" appears once – in Section 130, relating to limitations on liability

for directors, officers and employees of the National Center for Missing and Exploited Children. The term "vehicle," standing alone, appears only once - in Section 210, requiring that those who must register under the SORNA provisions of the bill must submit to searches of their homes and vehicles by any law enforcement or probation officers who have reasonable suspicion that a condition of probation has been violated. Similarly, the bill does not contain the terms "truck," "airplane" or any other reference to modes of interstate transportation. *See* PL 109-248, *supra*.

In contrast, the term "internet" appears throughout the bill. The language of the Act itself suggests that the phrase was intended to cover use of the internet, telephone and mail, as other than the language in § 213, the only other reference to "instrumentality of interstate and foreign commerce" appears in in § 510(C), where Congress expressly finds that "[T]he interstate market in child pornography is carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce." This reading is confirmed by the Signing Statement of President Bush, cited above, wherein the President notes that one of the main purposes of the Act was to prevent sexual predators from reaching children via the internet. *Cf. United States v. Lopez,* 514 U.S. 549, 562-63 (1995) (lack of legislative findings of Congressional intent noted as the Court attempts to discern supposed effect of activity on interstate commerce).

Review of the legislative history, sparse though it is, leads to the same conclusion. The bill does not appear to have been accompanied by any detailed House or Senate Report explaining its provisions. But, a review of the 38 legislative history

27

documents related to the Adam Walsh bill on Westlaw indicates that while Congress was concerned with the kidnapping of children, there is no suggestion that it intended to expand the jurisdictional basis for kidnappings other than to include language that would expand liability under § 1201(a)(1) when the internet and other electronic means of communications are used to target children. That this is crystal clear is demonstrated by a search of each of these 38 documents in the legislative history for the term "instrument! of interstate commerce," which uncovers only three references, each of which is simply found in a reprinting of the bill itself in the legislative history document. Stated more clearly, *there is not a single reference in the legislative history* of the Adam Walsh Act, whether by way of a legislative report, sponsor of the Act or member of Congress indicating that other than expanding its reach to the use of the internet or other cyber tools, Congress intended to substantively expand the jurisdictional reach of the Federal Kidnapping Act,[25] that has been recognized since its passage in 1932 and consistently interpreted by courts over the intervening years. *Nowhere* is the term "instrumentality of interstate commerce" defined and there is no suggestion whatsoever the Congress intended to alter long-standing doctrine by including the use of a car or vehicle in an intrastate kidnapping within this phrase. From even the most cursory review of the Adam Walsh Act, it is manifestly clear that was Congress was not

---

[25] As indicated below, amending § 1201(a)(1) to expand jurisdiction to offenders who travel in interstate commerce is consistent with the customary understanding of the interstate character of the offense and was added in recognition of the fact that child predators often cross state lines to prey on children. Further, the addition of this language to § 1201(a)(1) language would be unnecessary if the term "instrumentality of interstate commerce" is interpreted in the manner suggested by the Superseding Indictment. *See* IV-D(3), *infra*.

concerned with interstate travel as such but with the use of the internet in connection with the exploitation of children. *Cf. Bond v. United States*, 134 S.Ct. 2077 (2014) (holding statute inapplicable because defendant's conduct not within "core concerns" of the statute).

The importance of interpreting language in statutes in light of the concerns and purpose expressed by Congress is illustrated by *Yates v. United States*, __U.S. __, 135 S.Ct. 1074 (2015). Yates was prosecuted under § 1519 of Title 18 for catching undersized fish in federal waters and ordering a crew member to toss the suspect catch into the sea. Section 1519 was enacted as part of the Sarbanes-Oxley Act of 2002, which was designed to protect investors and restore trust in financial markets and prohibits, *inter alia*, the altering or destroying of "tangible objects" with intent to impede a lawful investigation. The question presented was whether fish are included within the term "tangible object" within the meaning of § 1519. Although a fish is unquestionably a "tangible object," the Court held that a fish is not included within the term as used in the statute for "it would cut § 1519 loose from its financial-fraud mooring to hold that it encompasses any and all objects . . . destroyed with obstructive intent. Mindful that in Sarbanes-Oxley, Congress trained its attention on corporate and accounting deception and cover-ups, we conclude that a matching construction of 1519 is in order." *Id*. at 1079.

      (2)     There is No Evidence that Congress Intended to Abrogate Existing Law in the Manner Suggested by Count One.

Congress was obviously aware of the long-settled requirement that the victim of a kidnapping under § 1201 be transported in interstate commerce. *See Lorillard v. Pons*, 434 U.S. 575, 580-81(1978) (In enacting legislation Congress is presumed to have knowledge of prior judicial constructions of statute); *I.N.S. v. Phinpathya*, 464 U.S. 183, 200 (1984) (Congress presumed to have knowledge of prior judicial interpretations of law it is amending).

The language in the 2006 Amendment adding jurisdiction when the offender himself moves in interstate commerce to commit the offense was a modest addition to the historical jurisdictional basis for § 1201(a) prosecutions, and fully consistent with the thrust of the statute concerning movement across state lines. But, interpreting the phrase "means, facilities or instrument of interstate commerce" in the amended §1201(a)(1) to include cars or other vehicles goes well beyond pre-existing law that required that the victim be moved across state lines and would work a wholesale change in settled doctrine. "A party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 521 (1989); *Finely v. United States*, 490 U.S. 545, 554 (1989) ("Under established canon of statutory construction, 'it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed,'"), *citing Anderson v. Pacific Coast S.S. Co.*, 225 U.S. 187, 199 (1912). That inference is particularly strong where a statute purports to intrude upon jurisdiction traditionally reserved to the States. *Bond v. United States*, 134

U.S. at 2093-94 ("Absent a clear statement of that purpose, we will not presume Congress to have authorized such a stark intrusion into traditional state authority.").

As shown in the preceding section, the structure, purpose and language of the Adam Walsh Act shows that this burden cannot be carried here, especially where not a word of the Act itself suggests a Congressional intent to radically reformulate the Federal Kidnapping Act in the manner suggested in Count One. *See Chisom v. Roemer*, 501 U.S. 380, 394-96 (1991) (Congress's intent in amending § 2 of the Voter Rights Act in 1982 to exclude voter dilution claims previously protected from the Act not established because "if Congress had such an intent, Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it at some point in the unusually extensive legislative history of the 1982 amendments."); *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 602 (1980) (Rehnquist, J. dissenting) ("In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night.").

Similarly, with issues of federalism and the appropriate roles of the state and federal government being matters of both public and juridical interest and discussion, it is difficult to imagine that a watchdog in Congress would not have at least barked a little if anyone understood the insertion of this one phrase into § 1201(a)(1) would have liquidated existing kidnapping law in one fell swoop and as a practical matter opened the federal jurisdictional floodgates not only to all kidnappings, but as discussed below, *see* IV-D(5), lay the groundwork for a blanket assumption of federal jurisdiction over a

host of crimes long assumed to be exclusively the province of state regulation. *See Bond v. United States*, 134 S.Ct. at 2090-91 (rejecting "boundless reading" of statute's coverage that would override previous interpretations of federal jurisdiction); *Yates v. United States*, 135 S.Ct. at 1083 ("If Congress indeed meant to make [statute] an all-encompassing ban . . . one would have expected a clearer indication of that intent.").

> (3)   Reading the phrase "means, facility, or instrumentality of interstate commerce" in §120(a)(1) to include the use of a vehicle in an intrastate kidnapping would not only make the other language of the statute superfluous but also language in the 2006 Amendment itself

One of the "most basic interpretive canons," *Corley v. United* States, 556 U.S. 303, 314 (2009), is that a statute must be construed "so that no part will be inoperative or superfluous, void or insignificant," *quoting Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal citation omitted); *Kungys v. United States*, 485 U.S. 759, 778 (1988) ("cardinal rule of statutory construction that no provision should be construed to be entirely redundant.").

As kidnapping almost uniformly involves the eventual use of a vehicle of some sort, if Congress intended the draconian expansion of federal jurisdiction in the manner suggested by the Superseding Indictment, it would have stricken the long-standing requirement in the statute that the victim be "transported in interstate or foreign commerce," as that language would no longer be necessary. All the language after the first two words of the statute and prior to "uses the mail . . ." would then be excised as surplusage and § 1201(a)(1) would simply read:

> when-----

> (1) the person uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.

Indeed, if Congress intended the term "instrument of interstate commerce" as used in the 2006 Amendment to include a car or other vehicle, there would also have been no need to add the new language about the offender himself traveling in interstate commerce, for, practically speaking, how else is a person going to travel across state lines except by means of the "instrumentality of interstate commerce" found in the very next phrase? Thus, under the interpretation of the term suggested by the government, the 2006 Amendment not only makes the other jurisdictional language in (a)(1) superfluous, but the Amendment itself would contain surplusage. *See Yates v. United States*, 135 S.Ct. at 1085 ("We resist a reading of 1519 that would render superfluous an entire provision passed in proximity as part of the same Act," *citing Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

> (4)   Statutory Interpretation of the phrase "means, facility or instrumentality of interstate commerce" to include the use of a vehicle to commit an intrastate kidnapping disregards important principles of federalism

"Federal statutes impinging upon important state interests "cannot . . . be construed without regard to the implications of our dual system of government . . ." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994); *Gregory v. Ashcroft*, 501 U.S. 452,

460-464 (1991) (to avoid constraints that a contrary interpretation would place on state-federal relations, Court holds that Age Discrimination in Employment Act is inapplicable to a provision of Missouri Constitution requiring judges to retire at age 70); *Bond v. United States*, 134 S.Ct. at 2088 ("[Th]e problem with this interpretation is that it would 'dramatically intrude [ ] upon traditional state criminal jurisdictions,' [citation omitted]). These sensitive concerns require that federal courts be "certain of Congress' intent" before finding that a federal law overrides the usual constitutional balance between the federal and state powers. *Id.* at 2089.

The allegations here suggest that this is a classic example of an intrastate violent crime normally prosecuted by States. Under our federal constitutional scheme, States have "primary authority for defining and enforcing criminal law." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993) (internal citation omitted). "The wisdom of assigning the States the "core police power . . . includ[ing] authority to define criminal law and to protect the health, safety, and welfare of their citizens," *Gonzales v. Raich*, 545 U.S. 1, 42-43 (J. O'Connor, dissenting), is that it permits the States to "perform their role as laboratories for experimentation to devise various solutions" to difficult issues of policy regarding the punishment of crime. *United States v. Lopez*, 514 U.S. at 581-83 (J. Kennedy, concurring). These principles apply with particular force to violent crimes. *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

Thus, when Congress creates federal jurisdiction over criminal conduct

historically within the Police Power of the States, it intrudes on the "sensitive balance" of power allocated between the two sovereign governments. *Lopez*, 514 U.S. at 561, n. 3 (1995). And where, as here, legislation is premised on Congress' authority under the Commerce Clause, "the scope of the interstate commerce power 'must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them . . . would effectively obliterate the distinction between what is national and what is local and create a completely centralized government.'" *Id.*, at 556-57, *quoting Jones v. Laughlin Steel* (cite omitted).

These principles take on additional force when the federal government attempts to enlarge its jurisdiction to seek the death penalty for a crime traditionally within State jurisdiction (i.e. an intrastate kidnapping resulting in death) in a State which has discarded capital punishment as a matter of public policy. After public hearings and prolonged and robust deliberations in the legislature and with the approval of the Governor, the impetus of which was the exoneration and release of at least twenty inmates who had been sentenced to die in Illinois, the elected representatives of the State of Illinois decided to eliminate the death penalty and substitute a penalty of life without parole for previous capital-eligible offenses. *See* Warden, *How and Why Illinois Abolished the Death Penalty*, 30 Law and Ineq. (Minnesota Journal of Law and Inequality), 245 (2012). Thus, the very heart of the State's political processes is implicated here. "Persons holding state elective [offices] . . . participate directly in the formulation, execution, or review of broad public policy and perform functions that go to the heart of

representative government." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973).[26] The

Government's attempt to unilaterally override the policy decisions reached by the

State's elected officials in regard to a crime which occurred entirely within the State of

Illinois inescapably raises sensitive questions of federalism and state-federal relations,

which a court must consider in interpreting the jurisdictional reach of a federal statute.

> (5)    The Court Should Interpret § 1201(a)(1) in a Manner to Avoid the
>        Constitutional Issues Raised by the Suggestion that a Federal Court
>        Can Acquire Jurisdiction Over an Interstate Kidnapping Simply
>        Because a Car Was Used in Commission of the Offense

As discussed in Part V, *infra*, an interpretation of the phrase "instrumentalities of

interstate commerce" in § 1201(a)(1) to apply to intrastate kidnapping where a car or

other vehicle is used raises serious questions under the Commerce Clause. Such a

sweeping construction would surely federalize almost all kidnapping cases regardless

of their local character – for instance, an offender who seizes someone against their will

and drives them one block would be liable under this reading. And, more ominously

for federal-state relations, this approach has no logical limiting principle and would

permit the federal government to assume jurisdiction over a host of crimes that from

---

[26]In striking down the Defense of Marriage Act (DOMA) in *Sugarman*, the Court punctuated the
importance accorded the State's political processes when a conflict arises between state and federal law
involving fundamental rights that are the subject of intense public interest and debate, terming those state
processes the "beginning point in deciding" the constitutionality of DOMA.

> After a statewide deliberative process that enabled its citizens to discuss
> and weigh arguments for and against same-sex marriage, New York
> acted to enlarge the definition of marriage to correct what its citizens and
> elected representatives perceived to be an injustice that they had not
> earlier known or understood.

*Id.* 2689. This description precisely mirrors the history of the abolition of the death penalty in
Illinois. *See* Warden, *supra*.

the beginning of the Republic have been considered as solely within the Police Power of the States. The burglar who drives across town to break into a house can now be hauled to the federal courthouse if the Congress were to so choose, as could the rapist who drives his car to the scene of the crime or the shoplifter who drives to the mall to steal a t-shirt. And, if the Congress elects to award the government the jurisdiction it envisions is conferred by Count One, the grandmother who runs a stop sign while driving her "instrumentality of interstate commerce" on her weekly grocery run would have to explain herself to the federal magistrate.

Jurisdictional limitations previously carefully crafted by the Congress would no longer be necessary. *See e.g.* Title 18, U.S. Code, Chapter 103 – Robbery and Burglary, §§ 2111- 2119 ( "special maritime and territorial jurisdiction," § 2111; personal property belonging to the United States, § 2112; federally insured banks etc., § 2113; mail, money or other property of the United States, § 2114; burglary of a post office, § 2115; burglary of a railway or steamboat post office, § 2116; burglary of a carrier facilities containing interstate or foreign shipments of freight, § 2117; robberies and burglaries pertaining to substances required to be registered with the DEA, § 2118; and the forcible taking of a car that has been transported, shipped or received in interstate commerce, § 2119.).[27] If Congress can award the federal courts jurisdiction over an intrastate kidnapping simply because a car was used, it could similarly do so in an unending number of other local

---

[27] This latter statute is a regulation against the forcible taking of a motor vehicle, not the use of one in an intrastate crime.

crimes on the same theory and effectively blue-pencil the constitutional dichotomy at the heart of our democracy.

Where a theory of assumed federal jurisdiction has no logical limits, grave constitutional issues are presented under the Commerce Clause, 10th Amendment and federalism. *See Lopez*, 549 U.S. at 563-64 ("Under the theories that the Government presents in support of [statute], it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign."). *See* cases cited at V-A, *infra*, referencing Commerce Clause problems by potential floodgate problems created by overly broad interpretations of federal jurisdiction.

The Supreme Court has held that "[i] t is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 864 (1989). "[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (Brandeis, J., concurring); *Bond v. United States*, *supra* (as a matter of statutory construction Court holds federal statute inapplicable to defendant's conduct, thereby avoiding Tenth Amendment and federalism issues). *See* IV-D(8), *infra*. Interpreting § 1201 consistent with its historical antecedents avoids the serious constitutional issues suggested by Count One.

    (6)    There is Negligible Authority Suggesting That a Car is a "Means, Facility and Instrumentality" of Interstate Commerce Within the Meaning of § 1201(a)(1)

Lending further support to the defense's argument is the meager case law supporting the theory advanced in the Superseding Indictment. The Post-2006 cases sustaining § 1201(a)(1) jurisdiction in intrastate kidnappings on the basis of the "means, facility and instrumentality" language added by the 2006 Amendment have almost uniformly involved the use of cell phones, the internet, GPS or Instant Messaging in the commission of the kidnapping. *See United States v.* Morgan, 748 F.3d 1024, 1031-32 (10th Cir. 2014)(use of cell phone, internet, and GPS in intrastate kidnapping); *United States v. Dais*, 559 Fed.Appx. 438, 445 (6th Cir. 2014) (use of cell phone to demand ransom; *United States v. Al-Din*, 631 Fed.Appx. 313, 330 (6th Cir. 2015) (cell phone); *United States v. Ramos*, 622 Fed.Appx. 29, 30 (2d Cir. 2015) (cell phone).[28]

Counsel has not found a reported circuit case in the 11 years that have passed since the 2006 Amendment directly holding that a car is an "instrumentality of interstate commerce within the meaning of §1201(a)(1).[29] The closest circuit case appears

---

[28] This opinion is a Summary Order, which has no precedential effect in the Second Circuit. *Id*., at 29.

[29] Counsel has located two unreported district court cases containing language suggesting that a motor vehicle is an "instrumentality of interstate commerce within the meaning of § 1201(a)(1). In a Memorandum and Order in *United States v. Mitchell*, 2013 WL 5377869 (N.D. Texas 2013), the Court denied a pretrial motion to dismiss that argued that the "instrumentality of interstate commerce" language in § 1201(a)(1) was void for vagueness, a claim not made here. The facts of the kidnapping are not set out in *Mitchell*, but in denying the motion, the court stated that the "intrastate use of a telephone or automobile qualifies as a "means, facility or instrumentality of interstate commerce" within the meaning § 1201(a)(1). *Id*., at *7. Similarly, in *United States v. Jenkins*, 2017 WL 3431916 (E.D. Kentucky 2017), an apparent intrastate kidnapping involving transportation of the victim in a personal truck, the court opined in dicta that a truck is an instrumentality of interstate commerce although there is no indication in the Court's opinion that a jurisdictional issue was raised. *Id*., at *2. (The facts of the opinion indicate that a telephone was also used to effectuate the kidnapping).

to be *United States v. Boykin*, 794 F.3d 939 (8th Cir. 2015), which involved an intrastate kidnapping whose purpose was a robbery. The *Boykin* indictment alleged the defendants used various "instrumentalities of interstate commerce," including cell phones, multimedia messaging service (MMS), Short Message Service (SMS), iMessage and an automobile, but the issue of whether the use of a car itself was sufficient to establish jurisdiction under 1201(a)(1) was not raised.[30]

In sharp relief are the host of Circuit decisions since 2006 involving the use of cars or other vehicles in § 1201(a) kidnappings. In light of the statute's history and consistent case law requiring the government to stay in its jurisdictional lanes in kidnapping prosecutions, it is unsurprising that these cases without exception show that the victim was transferred across state lines. This principle is illustrated by a survey of kidnapping convictions in the Seventh and Eighth Circuits since 2007, involving the use of cars, each of which has involved the transportation of the victim across state lines *See United States v. Eason*, 854 F.3d 922 (7th Cir. 2017) (two victims transported by car to Illinois, one from California and the second from Texas); *United States v. Smith*, 831 F.3d 793 (7th Cir. 2016)(victim driven from Wisconsin to Colorado); *Webster v. Daniels*, 784 F.3d 1123 (7th Cr. 2015) (transportation of victim by car from Texas to Arkansas); *United States v. Jenkins*, 772 F.3d 1092 (7th Cir. 2014) (transported in truck from Illinois to

---

[30] The only issue raised in reference to the kidnapping conviction in *Boykin* was whether the indictment was fatally defective because it did not allege the victim was "held for ransom or reward or otherwise." The Court rejected this argument, holding that the defendant's purpose is not essential element of the offense. 794 F.3d at 947-48.

Missouri); *United States v. Jonasson*, 759 F.3d 653 (7th Cir. 2014) (victim driven from

Missouri to Indiana); *United States v. Reynolds*, 714 F.3d 1039 (7th Cir. 2013) (driven from

Indiana to Illinois); *United States v. Sanders*, 708 F.3d 976 (7th Cir. 2013) (victim driven

from Indiana to Illinois); *United States v. Bresher*s, 684 F.3d 699 (7th Cir. 2012)

(movement of victim by car from Illinois to Missouri); *United States v. Gooden,* 564 F.3d

887 (7th Cir. 2009) (truck used to transport from Illinois to Missouri); *United States* v.

*Diekhoff*, 535 F.3d 611 (7th Cir. 2008) (victim driven by minivan from Illinois through

various states in Midwest); *United States v. Singh*, 483 F.3d 489 (7th Cir. 2007) (victim

driven from Wisconsin to New Jersey); *United States v. Vizcarra*, 668 F.3d 516 (7th Cir.

2012) (victim driven in van from Indiana to Illinois); *United States v. Montgomery*, 635

F.3d 1074 (8th Cir. 2011) (transporting victim by car from Kansas to Missouri); *United

States v. Douglas*, 646 F.3d 1134 (8th Cir. 2011) (victim driven from Missouri to

Mississippi); *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009) (transported by car

from North Dakota to Minnesota); *United States v. Eizember*, 485 F.3d 400 (8th Cir. 2007)

(victim forced to drive defendant from Arkansas to Texas); *United States v. Barraza*, 576

F.3d 798 (8th Cir. 2009) (victim moved by car from Illinois to Missouri).

　　While these post-2006 cases do not conclusively establish that the use of a vehicle

in an intrastate kidnapping is not contemplated by the 2006 Amendment, coupled with

lack of cases prosecuted on such a theory they demonstrate a general understanding

that a vehicle's only jurisdictional significance in a § 1201(a) prosecution is when used

as a mode of interstate transportation in relation to the kidnapping. *See Bond v. United

States*, 134 U.S. at 2092 (lack of a history of prosecution under jurisdictional theory

advanced by the government suggests Congress did not intend statute's to apply to defendant's conduct); *cf. National Federation of Independent Business v. Sebelius*, __ U.S. __, 132 S.Ct. 2566, 2586 (2012)("[S]ometimes 'the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent' for Congress's action."), *quoting Free Enterprise Fund v. Public Company Accounting Oversight*, 561 U.S. 477, 506 (2010) (internal quotation marks omitted).

(7)     The Rule of Lenity Cautions Against the Federal Government's Jurisdiction Under the Facts of This Case

The Rule of Lenity is a canon of statutory construction that requires courts to resolve ambiguous statutes in favor of defendants. *Albernaz v. United States*, 450 U.S. 333, 342 (1981); *Yates v. United States* 135 S.Ct. at 1088 (2014). The rule applies when statutes are ambiguous as to their jurisdictional scope. *Jones v. United States*, 529 U.S. 848, 858-59 (2000) (rule "reinforces" conclusion that federal government does not have jurisdiction over arson of owner-occupied residence); *United States v. Errol D., Jr.*, 292 F.3d 1159, 1163 (9th Cir. 2002). "The plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). *See generally Yates,* 135 S.Ct. at 1081-83 (dictionary definition of term "bears consideration" in interpretation of statute but is not dispositive).

Here, like the statute at issue in *United States v. Bond*, *infra*, "the ambiguity [in § 1201(a)(1)] derives from the improbably broad reach of key statutory definition . . . the

42

deeply serious consequences of adopting such a boundless reading; and "the lack of any apparent need to do so in light of the context from which the statute arose . . ." *Bond*, 134 U.S. at 2090. As discussed above, each of these concerns are starkly presented by an interpretation that the "means, facilities and instrumentality" language in § 1201(a)(1) includes commission of an intrastate kidnapping by means of a car.

(8) *Bond v. United States*

As just noted, the issue here is similar in many respects to that in *Bond v. United States*, __ U.S. __, 134 S.Ct. 2077 (2014), a case that arose when Carol Bond spread toxic chemicals on the car, mailbox and door knob of a romantic rival. The government attempted to prosecute Ms. Bond under 18 U.S.C. § 229(a)(1), which prohibits the knowing use of "chemical weapons" and was passed pursuant to the United States' duties to implement its obligations as a signatory to the International Convention on the Use of Chemical Weapons. The issue presented was whether § 229, legislated by the Congress for an entirely different purpose, nonetheless reached the purely local crime committed by Ms. Bond in these circumstances. The Court held it did not.

Ms. Bond argued that, in violation of the Tenth Amendment, application of § 229 impermissibly intruded on the authority of the Commonwealth of Pennsylvania (Pennsylvania) to punish local crimes under the Police Power reserved to the States. *See infra.* Applying the rule of constitutional avoidance, the Court held that it need not reach that issue, as there was insufficient evidence that Congress intended § 229 to apply to the conduct of Ms. Bond. *See* IV-D(5), *supra*. The Court rejected the government's argument that the chemicals that Ms. Bond placed in the victim's home

and on her car were "toxic chemicals" within the meaning of the statute, noting that

"the problem with this interpretation is that it would 'dramatically intrude[ ] upon

traditional state criminal jurisdictions,' and we avoid reading statutes to have such

reach in the absence of a clear indication that they do." *Bond*, 134 S.Ct. at 2088, *citing*

*United States v.* Bass, 404 U.S. 336, 350 (1951).  *Bond* went on to note that before finding

that a "federal law overrides the usual constitutional balance between the federal and

state powers," a court should be "certain of Congress' intent." *Bond*, 134 S.Ct. at 2089,

*citin*g *Gregory v. Ashcroft*. 501 U.S. 452, 460 (1991).

> "If the Federal Government would 'radically readjust[ ] the
> balance of state and national authority, those charged with
> the duty of legislating [must be] reasonably explicit' about
> it."

*Bond*, 134 S.Ct. at 2089, *quoting* BFP v. *Resolution Trust Corporation*, 511 U.S. 531, 544

(1994) (internal citation omitted).

Citing the Court's holding in *United States v. Jones*, *supra*, that jurisdiction under

federal statutes must be read narrowly to avoid overreaching, *Bond* observed that

application of § 229 "would 'alter sensitive state-federal relationships,' convert an

astonishingly amount of 'traditional local criminal conduct' into 'matters for federal

enforcement' [and] transform the statute['s] . . . core concerns." *Id*. at 2090. The Court

also reminded the government that the laws of the Commonwealth of Pennsylvania and

those of every other state were sufficient to prosecute Ms. Bond for her conduct, *id*. at

2092, and that "in its zeal" to prosecute her, the government has "displaced the public

policy" of the Commonwealth. *Id*. 2093. Finally, interpreting the reach of § 229 in light

of Congress's "traditional reluctance to define as a federal crime conduct readily denounced as criminal by the States," *United States v. Bass*, 404 U.S. 336, 349 (1971), and "[a]bsent a clear statement of that purpose," the Court refused to "presume Congress to have authorized such a stark intrusion into traditional state authority." *Bond,* 134 S.Ct. at 2093-94.

These very considerations apply here. First, like, the interpretation of § 229 urged by the government in *Bond*, that suggested by Count One would "convert an astonishingly amount of "traditional local criminal conduct" into federal crime. The overwhelming number of kidnappings, if not all, are accomplished by means of a car or vehicle of some type. Every local seizure or movement of a victim in a car against their will would be converted into a federal crime. And, as noted above, federal jurisdiction premised on such an interpretation would authorize the federal government to take jurisdiction over a host of crimes that have always been regarded as local crimes within the exclusive purview of the State's Police Power. *See* IV-D(6), *supra*.

Second, the "core concerns" of § 213 of the Adam Walsh Act (like those of § 229, which were unrelated to Ms. Bond's crime) were directed at the perceived problem of the exploitation of children by the use of the internet and related tools of communications, many of which had only arisen in recent years, and had nothing to do with a general expansion of long-established jurisdictional rules in kidnapping cases.

Third, as the cases cited in the IV-D(6) demonstrate, like the lack of prior case law applying § 229 to facts similar to those in Ms. Bond's case, here there is only minimal

and non-precedential authority suggesting § 1201(a)(1) applies to an intrastate kidnapping.

Fourth, like those of Pennsylvania, the laws of Illinois (and every other state) are sufficient to prosecute Mr. Christensen and punish him severely if found guilty of the conduct charged in the Superseding Indictment. *See* ILCS 5/10-2: Aggravated Kidnapping (inflicting great bodily harm during kidnapping other than by discharge of firearm or committing another felony on victim: in addition to kidnapping sentence, mandatory additional 15 years for aggravated); 720 ILCS 5/9-1: First Degree Murder defined and 730 ILCS 5/5-4.5-20, Sentencing for 1st Degree Murder (up to term of natural life imprisonment).[31]

Fifth, like its attempt to "displace the policy" of the Commonwealth of Pennsylvania, the government's attempt to prosecute Mr. Christensen for the use of a car in an intrastate kidnapping under § 1201(a) is seemingly a transparent attempt to seek the death penalty in a state whose public policy (like that of much of the world) rejects this form of punishment. *See* IV-D(4), *supra.*

The issues and concerns presented to this Court here are almost identical to those addressed by the Supreme Court in *Bond* and the reasoning of that case directly controls disposition of this motion.

In conclusion, the history of the federal crime of kidnapping as defined in § 1201(a), case law interpreting its limited jurisdictional reach, the purpose of the

---

[31] Felony-murder is also punished as first degree murder under Illinois law. *See People v. Hudson*, 856 N.E. 2d 1078 (Ill. 2006).

Amendments of 2006, principles of statutory construction and federalism, the lack of

authority interpreting § 1201(a)(1) in the manner suggested by Count 1 and Supreme

Court precedents applying these principles, all caution that this Court should apply the

rule of constitutional avoidance and hold that Congress did not intend that § 213 of the

Adam Walsh Act would turn established kidnapping law on its head and authorize a

federal court to take jurisdiction over an intrastate kidnaping solely because a car was

used.

Otherwise, the Court must address the constitutionality of § 1201(a)(1) under the

facts of this case.

## IV.     APPLICATION OF § 1201(a)(1) TO THIS CASE VIOLATES THE COMMERCE CLAUSE

Mr. Christensen does not bring a facial challenge to the constitutionality of §

1201(a)(1). Rather, he contends that the "instrumentality of interstate commerce"

language added by the Amendment of 2006 is unconstitutional as applied to his case.

*See Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 493 (10982) (facial

challenges are rarely successful as statute must be unconstitutional in all cases; "as

applied" challenges are based on statute as applied to facts of case).

### A.     Congress' Power to Legislature Under the Commerce Clause is Not Unlimited and is Circumscribed by the States' Police Power

"The Constitution [] creates a national government with defined and enumerated

powers." *United States v. Lopez*, 514 U.S. at 552 (1995). "[R]ather than granting general

authority to perform all the conceivable functions of government, the Constitution lists,

or enumerates, the Federal Government's powers." *National Federal of Independent*

47

*Bunsiness v. Sebelius*, 567 U.S. 519, 534 (2012). "The powers delegated by the proposed

Constitution to the federal government are few and defined. Those which are to remain

in the State governments are numerous and indefinite." The Federalist No. 45, pp. 292–

293, *quoted in Lopez*, 514 U.S. at 552 (1995).

Among the enumerated powers not delegated to the federal government in

Article One, Section 8 of the Constitution is the Police Power. From the earliest days of

the republic, it was accepted that the Police Power was assigned to the states under the

Tenth Amendment. *See Cohens v. Virginia*, 6 Wheat. 264, 426, 428 (1821)(Marshall, C.J.)

(Congress has no power to punish murder within the States or felonies generally). That

principle persists through modern constitutional interpretation. *United States v. Lopez*,

514 U.S. at 566 ("The Constitution withholds from Congress a plenary police power.").

Chief Justice Roberts recently emphasized this fundamental maxim of constitutional

adjudication:

> "I write separately to stress not only that a federal police
> power is immaterial to the result in this case, but also that
> such a power *could not* be material to the result in this case—
> because it does not exist. (Citation omitted) . . . Our
> resistance to congressional assertions of such a power has
> deep roots."

*See United States v. Kebodeaux*, __ U.S. __, 133 S.Ct. 2496, 2507 (2013) (Roberts, C.J.,

concurring in judgment).

As noted above, the Constitution confers primary responsibility for

implementing criminal sanctions upon the States. *Brecht v. Abrahamson*, supra. These

principles apply with particular force to violent crimes. *United States v. Morrison*, 529

U.S. at 618 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channel, or goods involved in interstate commerce has always been the province of the States.").

The Federal Kidnapping Act itself was premised on a particularized need for federal jurisdiction in limited circumstances (when a victim is transported across state lines) and passed pursuant to Congress' powers under the Commerce Clause. *See* III-A, *supra.* But, however broad as a general matter, Congress' power under the Commerce Clause has "judicially enforceable outer limits." *United States v. Lopez*, 514 U.S. at 566 ("[E]ven under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds."); *United States v. Morrison*, 529 U.S. at 608; *National Federation of Independent Business v. Sebellius*, 135 S.Ct. at 2579 (While deference is accorded, "our respect for Congress' policy judgment thus can never extend so far as to disavow restraints on federal power that the Constitutional carefully constructed."). The scope of the Commerce Clause power "is necessarily one of degree." *Lopez*, 514 U.S. at 555, *quoting Jones & Laughlin Steel*, 301 U.S. 1, 37 (1937).

The two leadings modern cases directly holding that Congress exceeded its powers under the Commerce Clause are *Lopez* and *Morrison*.[32] *Lopez* held that the Gun-Free Zones Act of 1990, which banned possession of handguns near schools, was unconstitutional because it did not involve economic conduct, did not have a defined

---

[32]While upholding the Act on other grounds, *National Federation of Independent Business v. Sebellius*, 567 U.S. 519, 547-558 (2012) also held that certain provisions of the Affordable Care Act exceeded Congress' power to legislate under the Commerce Power.

jurisdictional element that permitted an assessment of interstate activity on a case-by-case basis and did not have a substantial impact on interstate commerce. *Morrison* struck down the Violence Against Women Act of 1994, which provided a federal civil remedy for gender-motivated violence, because it did not regulate economic concerns of interstate commerce and was primarily a regulation against violent crimes and thus invaded the province of the States. *Cf. United States v. Kebodeaux*, 133 S.Ct. at 2507 (2013) (The Constitution does not give "Congress a freestanding, independent, and perpetual interest in protecting the public from the convict's purely intrastate conduct.") (Roberts, C.J., concurring in judgment).

The striking down of the respective Acts in *Lopez* and *Morrison* reflect limitations imposed on Commerce Clause jurisdiction and illustrate the Constitution's rejection of a general federal police power. In other cases, the Supreme Court has read statutes narrowly to avoid Commerce Clause problems that would be created by a contrary interpretation. *See Jones v. United States*, *supra* (owner-occupied residence not used for any commercial purpose does not qualify as "property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce" within meaning of the federal arson statute, and arson of such a dwelling is not subject to federal prosecution under the statute); *Bond v. United States*, *supra* (statute imposing criminal penalties for using chemical weapons did not reach defendant's conduct); *Solid Waste Agency of Northern Cook County v. U.S. Army Corp of Engineers*, 531 U.S. 159 (2001) (Army Corps of Engineers' rule extending definition of "navigable waters" under Clean Water Act to include intrastate waters used as habitat by migratory birds which cross state

lines raised a significant constitutional question whether Congress had power to

regulate such waters under the Commerce Clause and thus was not entitled to *Chevron*

deference.[33]).

In all these cases, whether directly holding the legislation at issue violated the

Commerce Clause or interpreting statutory provisions so as to avoid Commerce Clause

issues, the Court has been "conscious of the danger . . . to obliterate the distinction

between what is national and what is local," posed by overly expansive interpretations

of Commerce Clause jurisdiction, *Gonzales v. Raich,* 545 U.S. *at* 35-36 (Scalia, J.,

concurring), and of inappropriately opening the floodgates of federal jurisdiction. *Bond*,

134 S.Ct. at 2090 (would convert an astonishingly amount of 'traditional local criminal

conduct' into federal crimes); *Lopez*, 514 U.S. at 564; *Solid Waste Agency of Northern Cook*

*County*, 531 U.S. at 174 ("Permitting respondents to claim federal jurisdiction over

ponds and mudflats falling within the "Migratory Bird Rule" would result in a

significant impingement of the States' traditional and primary power over land and

water use."); *Jones*, 529 U.S. at 859 ("[statute] is not soundly read to make virtually every

arson in the country a federal offense.").

B.      Application of These Principles

*Lopez* held that Congress may regulate three broad areas of activities under the

Commerce Clause: (1) the use of the channels of interstate commerce; (2) the

instrumentalities of interstate commerce; and (3) those activities that have a "substantial

---

[33] *Chevron, U.S.A. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984) (standard for deference to government agency determinations).

relation to interstate commerce." 514 U.S. at 558-59 (1995). As to the first category, the "instrumentalities of interstate commerce" language in § 213 of the Adam Walsh Act is not a regulation of a channel of interstate commerce, which permits Congress to regulate persons or things that travel or are transported through interstate commerce.[34] For instance, the *Darby* case cited in *Lopez* as an example of this category upheld Congress' power to prohibit the shipment of lumber in interstate commerce that had been manufactured in a manner that did not comply with the Fair Labor Standards Act. *United States v. Darby*, 312 U.S. 100 (1940).[35] Despite use of the term, § 213 is also not a regulation of the instrumentalities of interstate commerce in the sense used in the second *Lopez* category, such as the railroad rate cases and statutes prohibiting destruction of aircraft or theft from interstate commerce that *Lopez* cites. Rather, the constitutionality of § 213 must be analyzed under the third category, as it is a regulation of an *activity* – kidnapping by use of an "instrumentality of commerce." *See generally National Federation of Independent Business*, 132 S.Ct. at 2587.

Mr. Christensen concedes that the commerce power can extend to intrastate activity, where such activity "substantially affects" interstate commerce, and that the *de minimis* effect on interstate commerce of his own activity is not controlling. *Lopez*, at 558-59; *United States v. Taylor*, 136 S.Ct. 2074, 2079-80 (2016). But, where the regulated

---

[34] The part of the 2006 Amendment adding the jurisdiction over offenders who travel in interstate commerce is an example of jurisdiction under this category and is not challenged here.

[35] Similarly, *Heart of Atlanta Motel*, *Inc. v. United States*, 379 U.S. 241 (1964), the second case cited by *Lopez* as an example of this category, interpreting Title II of the Civil Rights Act of 1964, to prohibit a motel from denying access to African-Americans, was a regulation of persons traveling in interstate commerce.

activity is not commercial in nature, there still must be a showing that the activity "in the aggregate substantially affects interstate commerce," *Lopez* at 561-62. Even employing a macro analysis of the use of cars or other vehicles in intrastate kidnappings where, as here, no ransom or reward or other economic benefit is demanded, it is difficult to unearth a substantial effect on interstate commerce.[36] The argument that violent crime, standing alone, affects the national economy sufficient to invoke Congress' commerce power was directly rejected in *Lopez* for the reasons previously stressed here:

> We pause to consider the implications of the Government's arguments. The Government admits, under its "costs of crime" reasoning, that Congress could regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce. See Tr. of Oral Arg. 8–9. Similarly, under the Government's "national productivity" reasoning, Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example. Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate.

*Lopez*, 514 U.S. at 564. While jurisdiction under this third *Lopez* category is broad, "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only when that activity is economic in nature." *United States v. Taylor*,

---

[36]Only the use of the car is noted here because, as noted above, there is no evidence that Mr. Christensen used the cell phone.

136 S.Ct. at 2079-80 (citation omitted); *cf. Morrison*, 529 U.S. at 617 ("We [] reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."). No matter how abhorrent and offensive, intrastate kidnappings in the circumstances presented here have no economic consequences within the meaning of Article 1, § 8, cl. 3 of the U.S. Constitution and thus cannot be punished by the national government.

For the reasons stated herein, Mr. Christensen requests that the Court enter an Order dismissing Count One.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:     309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org
