UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Crim. No. 17-20037 |
| ) | |
| BRENDT A. CHRISTENSEN, ) | |
| ) | |
| Defendant. ) | Hearing Requested |

**MOTION TO DECLARE THE FEDERAL DEATH PENALTY ACT
UNCONSTITUTIONAL DUE TO UNACCEPTABLE ERROR RATES**

NOW COMES the Defendant, BRENDT A. CHRISTENSEN, by and through his attorneys, and for his Motion to Declare the Federal Death Penalty Act Unconstitutional Due to Unacceptable Error Rates states as follows:

**I. INTRODUCTION**

In the United States, since 1973, 162 death row inmates have been exonerated[1]. That is, in one out of every 25 cases, our capital system sentenced an individual to die for a crime he or she did not commit. Legal errors also abound, as evidenced by the high rates of reversals in the state and federal systems. Justice Breyer's dissent in *Glossip v. Gross,* 135 S. Ct. 2726, 2758 (2015), notes the causes of these errors are varied: false confessions, mistaken eyewitnesses, ineffective lawyers, untruthful jailhouse informants. These problems affect the reliability of fact-finding at all stages of a capital case, including the assessment of guilt, the determination of death eligibility, the proof of aggravating circumstances and existence of mitigating evidence. In light of the overwhelming evidence that continued enforcement of the

---

[1] Staff Report, House Judiciary Subcommittee on Civil & Constitutional Rights, 1993, with updates by the Death Penalty Information Center, available at https://deathpenaltyinfo.org/ (last visited 8/1/2018)

federal death penalty will lead to the execution of innocent people, the federal death penalty must be declared unconstitutional.

## II. ARGUMENT

### A. The Imposition of Death Requires a Heightened Standard of Reliability

The Supreme Court has consistently held that a defendant facing the death penalty is entitled to adjudication of his case under a heightened standard of reliability:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (Op. of Stewart, Powell & Stevens, JJ.); *see also Deck v. Missouri*, 544 U.S. 622, 632 (2005) (noting the "the 'acute need' for reliable decision making when the death penalty is at issue."); *Ford v. Wainwright*, 477 U.S. 280, 411 (1986).

This heightened protection is designed to ensure accuracy in identifying those defendants who are guilty of a capital crime and for whom execution is the appropriate punishment. *Ford*, 477 U.S. at 414 (court's consideration of capital cases has been characterized by "heightened concern for fairness and accuracy").

The rationale for the constitutional distinction between capital cases and every other type of criminal case is best articulated in Justice Stewart's concurrence in *Furman v. Georgia*:

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity. 408 U.S. 238, 306 (1972) (Stewart, J., concurring).

The Court has also in recent years explicitly linked its demand for reliability with its concern about the risk of execution of the innocent:

> The problem of unreliable, induced, and even imagined child testimony means there is a "special risk of wrongful execution" in some child rape cases. *Atkins*[]. This undermines, at least to some degree, the meaningful contribution of the death penalty to legitimate goals of punishment.

*Kennedy v. Louisiana*, 554 U.S. 407, 443 (2008) (citing *Atkins v. Virginia,* 536 U.S. 304, 306-07 (2002)). Similarly, the Court stressed in *Atkins* that "we cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated. These exonerations have included at least one mentally retarded person [Earl Washington,] who unwittingly confessed to a crime that he did not commit." *Atkins*, 536 U.S. at 320 n. 25.

### B. The Death Penalty Carries an Unacceptably High Rate of Error

In recent years, dozens of people have been exonerated from death row and new studies have reliably projected the number of innocent individuals who have been sentenced to death. To date, 162 people have been exonerated from death row.[2] And those are just the innocent who have actually been identified and vindicated. A study

---

[2] Death Penalty Information Center, *The Innocence List*, https://deathpenaltyinfo.org/innocence-list-those-freed-death-row (last visited August 5, 2018).

published in 2014 by the Proceedings of the National Academy of Science engaged in a rigorous statistical analysis, extrapolated from known exonerations and concluded that there exists approximately a 4.1% false-conviction rate among death sentences in the United States.[3] That error rate would mean that about one in every twenty five capital defendants was convicted of a crime he or she did not commit.

In recent years, there have been reports collecting evidence strongly suggesting that two innocent people have been executed. In 2012, the Columbia Human Rights Law Review explained how Carlos DeLuna was almost certainly wrongly executed in Texas in 1989, after a searching investigation revealed glaring flaws in the eyewitness testimony and the forensic evidence that led to his conviction—and pinpointed the likely murderer. Mr. DeLuna maintained his innocence until the day he died.[4] Additionally, The Washington Post published an investigation revealing new evidence that Cameron Todd Willingham was wrongly executed in Texas in 2004, when the eyewitness whose testimony was "crucial" to the prosecution's case recanted his testimony and revealed that he had falsely testified in order to have his own sentence reduced and to secure fundraising support for the prosecutor. Mr. Willingham also maintained his innocence until his death.[5]

Wrongful convictions are not just a state problem. There were significant doubts

---

[3] http://www.pnas.org/content/111/20/7230 (last visited 8/5/2018).
[4] James S. Liebman, *et al*, 43 Colum. Hum. Rts. L. Rev. 711 (Summer 2012).
[5] Possley, Maurice, *Fresh doubt over a Texas execution: New evidence reveals concerns that a man was wrongly put to death in 2004*, The Washington Post (Aug, 3, 2014); Possley, Maurice, *A Dad Was Executed for Deaths of His 3 Girls. Now a Letter Casts More Doubt*, The Washington Post (Mar. 9, 2015).

about the guilt of David Ronald Chandler, the first person to have been sentenced to death since the federal death penalty was reinstated in 1988. Chandler was originally sentenced in 1991. In 1999, the Eleventh Circuit vacated his death sentence on grounds of ineffective assistance of counsel at the penalty phase. *Chandler v. United States*, 193 F.3d 1297 (11th Cir. 1999). That opinion was itself vacated, however, and the sentence of death was re-affirmed. *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) (en banc). Citing Attorney General Reno's serious concerns about whether Chandler was actually innocent of the crime for which he had been prosecuted and condemned to death, President Clinton, on January 20, 2001, commuted Chandler's death sentence to one of life imprisonment, noting that "the defendant's principal accuser later changed his testimony, casting doubt on the defendant's guilt."[6]

Causes of wrongful conviction are well documented: eyewitness misidentification, false confessions, invalid forensic evidence, and unreliable informant testimony. There is also a disturbing trend that government misconduct causes a significant number of wrongful convictions. For example, in 1997, the DOJ learned that the FBI crime lab engaged in flawed forensic work, including "the use of unreliable analysis and overstated testimony by FBI Lab examiners in criminal cases."[7] Though 7,609 cases were identified for follow-up, it took nearly five years to identify the 64 death-row defendants whose cases involved the questionable evidence and testimony and even then only local prosecutors were notified. Three defendants were executed

---

[6] W. J. Clinton, *My Reasons for the Pardons*, N.Y. Times (Feb. 18, 2001).
[7] U.S. DOJ Office of Inspector General, *An Assessment of the 1996 Department of Justice Task Force Review of the FBI Laboratory* ("2014 OIG Report"), *available at* www.justice.gov/oig/reports/2014/e1404.pdf (last visited August 5, 2018).

before their cases were identified for formal review by the task force, one of whom, the Report concluded would not have been death-eligible but for the tainted FBI testimony. *Id.* at 52, 66-67, 86. Some defendants still had not been notified, as of the publication of the report in 2014. *Id.* at 82.

The inaccurate fact-finding infects not just the first phase of capital trials, but also the jury determinations relating to sentencing. The Federal Death Penalty Act requires the government to prove each statutory and non-statutory aggravating factor to the jury beyond a reasonable doubt. 18 U.S.C. § 3593(c). The statutory aggravating factors include a broad range of prior offenses, *id.*, the proof of which would require the jury to assess the same kinds of evidence (eyewitnesses, informants, confessions, forensic evidence) that result in the high rate of wrongful convictions discussed above. The fact that our capital system gets it wrong so often proves that it does not comply with the heightened reliability required for this most serious and irrevocable decision. At least one federal judge has concluded that the risk of executing the innocent was of sufficient constitutional magnitude that the federal death penalty could not be enforced. *United States v. Quinones*, 205 F. Supp. 2d 256 (S.D.N.Y. 2002). Summarizing his findings, Judge Rakoff wrote:

> [T]he best available evidence indicates that, on the one hand, innocent people are sentenced to death with materially greater frequency than was previously supposed and that, on the other hand, convincing proof of their innocence often does not emerge until long after their convictions. It is therefore fully foreseeable that in enforcing the death penalty a meaningful number of innocent people will be executed who otherwise would eventually be able to prove

> their innocence. It follows that implementation of the
> Federal Death Penalty Act not only deprives innocent people
> of a significant opportunity to prove their innocence, and
> thereby violates procedural due process, but also creates an
> undue risk of executing innocent people and thereby
> violates substantive due process. *Id.* at 25.

It is true that *Quinones* was later reversed by the Second Circuit. *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002). It is also true that this argument was rejected by the Ninth Circuit in 2007, when it was presented in a single sentence with "no particulars." *United States v. Mitchell*, 502 F.3d 931, 982-93 (9th Cir. 2007). That denial does not preclude consideration of a more fully developed motion. Moreover, the Ninth Circuit relied on the Second Circuit denial. *Id.* (citing *Quinones*, 313 F.3d 49). But the evidence has gotten stronger since the Ninth and Second Circuit decisions: there have been multiple exonerations since those two cases were decided.[8] Thus, this Court should now reevaluate in light of current evidence whether the demonstrated high rate of wrongful convictions satisfies the constitution's exacting standards.

### C. The Rate of Legal Error Is Also Unacceptably High

The capital sentencing system also produces a high rate of legal error. A study investigating reversals of death sentences found a 68% rate of prejudicial error in state capital sentences nationwide.[9] Judge Rakoff described the precursor to the Liebman study, "A Broken System: Error Rates in Capital Cases, 1973-1995 (2000), as "the

---

[8] Death Penalty Information Center, *The Innocence List*, https://deathpenaltyinfo.org/innocence-list-those-freed-death-row (last visited August 5, 2018).
[9] J.S. Liebman, et al., *A Broken System, Part II: Why There is So Much Error in Capital Cases, and What Can be Done About It* (2002), available at http://www2.law.columbia.edu/brokensystem2/sectionI.html#b (last visited August 5, 2018)

most careful and comprehensive study in this area, and one based, moreover, almost exclusively on public records and court decisions," *Quinones*, 205 F. Supp. 2d at 268 (noting that the first Liebman *study* was cited by Justice Breyer in his concurring opinion in *Ring v. Arizona*, describing the study as one that has generally been favorably received by scholars).

The federal system also shows significant legal error. Since the reinstatement of the federal death penalty, 78 people have been sentenced to death. Of those, twelve have been permanently removed from death row for reasons including ineffective assistance of counsel, prosecutorial misconduct, jury misconduct and trial-court error. That is at least a 15% rate of reversible legal error in federal capital sentences.[10]

### III.   CONCLUSION

The capital sentencing system in America is fraught with mistakes. Studies reveal a high rate of error, both factual and legal. As it stands, this error-ridden system cannot be said to meet the heightened standard of reliability that is required of it. Given the many sources of inaccuracy and error, whether from investigators, prosecutors, jurors, witnesses, or even the defendant's own counsel, it is simply unrealistic to believe that the American death-penalty system is capable of identifying and remedying them with the constitutionally requisite accuracy. In light of the overwhelming evidence that continued enforcement of the federal death penalty will lead to the execution of innocent people, this Court should declare the federal death penalty unconstitutional.

---

[10] Death Penalty Information Center, *Federal Death Row Prisoners*, http://www.deathpenaltyinfo.org/federal-death-row-prisoners (updated through June 14, 2018).

Alternatively, Mr. Christensen requests an evidentiary hearing to present evidence of the rate of wrongful conviction and legal error in the capital-sentencing system.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:    309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org
