UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Crim. No. 17-20037 |
| ) | |
| BRENDT A. CHRISTENSEN, ) | Hearing Requested |
| ) | |
| Defendant. ) | |

MOTION TO EXCLUDE DNA AND SEROLOGY TEST
RESULTS AND REQUEST FOR *DAUBERT* HEARING

NOW COMES the Defendant, BRENDT A. CHRISTENSEN, by and through his attorneys, and for his Motion to Exclude DNA and Serology Test Results and Request for *Daubert* Hearing states as follows:

I.     Background

During the course of the investigation in this case, various law enforcement agencies executed search warrants on Mr. Christensen's vehicle, a 2008 Saturn Astra, and his residence, located at 2503 West Springfield Avenue in Champaign, Illinois. The vehicle was searched on June 15, 2017, and again on July 6, 2017. The apartment was searched on June 15, 2017, June 30, 2017, and July 1, 2017. During one of the searches of the apartment, Luminol was applied to various areas in an attempt to locate blood. Additionally, pursuant to the various searches, law enforcement collected multitudinous physical objects and samples for forensic testing. Approximately 250

items were sent to the FBI lab in Quantico, Virginia, for forensic testing, to include DNA, latent fingerprints, serology, and trace evidence. Of the more than approximately 250 items submitted for testing, very few forensic results were obtained. Those that were obtained included a handful of DNA samples and positive blood samples.

### A. DNA Testing

With respect to DNA, the government asserts that FBI Biologist Amanda Bakker will testify that she identified DNA belonging to alleged victim Y.Z. on swabs taken in Mr. Christensen's bedroom. The DNA testing procedure consisted of using relatively new technology involving a probabilistic genotyping software program called STRmix. Probabilistic genotyping "refers to the use of biological modeling, statistical theory, computer algorithms, and probability distributions to calculate likelihood ratios (LRs) and/or infer genotypes for the DNA typing results of forensic samples ('forensic DNA typing results'). Human interpretation and review is required for the interpretation of forensic DNA typing results . . . Probabilistic genotyping is not intended to replace the human evaluation of the forensic DNA typing results or the human review of the output prior to reporting."[1] In simpler terms, these programs are "computer programs that apply various algorithms to interpret complex mixtures" and small samples. Most agree that these software programs are an improvement over wholly subjective interpretation, but still "require careful scrutiny to determine (1) whether the methods

---

[1] Scientific Working Group on DNA Analysis Methods (SWGDAM), "Guidelines for the Validation of Probabilistic Genotyping Systems" (June 15, 2015), available at https://www.swgdam.org/publications (last visited 8/22/2018).

2

are scientifically valid, including defining the limitations on their reliability (that is, the circumstances in which they may yield unreliable results) and (2) whether the software correctly implements the methods."[2]

The process of testing by Ms. Bakker and/or other employees of the FBI lab included the following steps: First, the sample was extracted from the physical object or swab; second, the sample was quantitated to determine the amount of human DNA, if any, using the Quantifiler DUO Kit; third, the sample was amplified using GlobalFiler PCR Amplification Kit, whereby the sample was fundamentally copied multiple times to increase the amount of genetic material to be tested; and fourth, the sample was processed using a machine (Genetic Analyzer) which separates the DNA fragments in the sample (capillary electrophoresis) so that a software program (GeneMapper ID-X v. 1.5) can produce an electropherogram showing the DNA profile(s) present. The final step, the interpretation and analysis of the DNA profile, used to be done solely by a forensic scientist, who visually evaluated the data and rendered an opinion. In this new era of probabilistic genotyping, the analyst imports any DNA profile of interest into the STRmix software, which then calculates a likelihood ratio (LR) as to whether or not the DNA profile of the person of interest (be that a victim or an alleged perpetrator) is present in the sample or excluded from the sample.

---

[2] President's Council of Advisors on Science and Technology (PCAST), Report to the President: Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods, pg. 79 (2016) (hereinafter referred to as "PCAST Report"), available at https://obamawhitehouse.archives.gov/administration/eop/ostp/pcast/docsreports (last visited 8/22/2018).

### B. Serology Testing

With respect to the presence of blood, the government asserts that Ms. Bakker will testify that she identified the *possible* presence of blood in Mr. Christensen's bedroom and bathroom. The test for the presence of blood begins as a presumptive test only, conducted by applying a mixture of phenolphthalin and hydrogen peroxide to the sample. If the sample contains hemoglobin, a reaction will occur resulting in the production of phenolphthalein which is pink in appearance. But a positive phenolphthalein reaction does not mean that blood is present. According to Ms. Bakker's report, a positive phenolphthalein reaction, without subsequent confirmation using the Takayama hemochromogen test, provides an indication that blood *may* be present on an item but does *not* constitute an identification of blood. A positive phenolphthalein test which is then unconfirmed could be the result of insufficient quantity and/or quality of biological material, or it could be a false positive.[3] In the present case, there were positive phenolphthalein reactions on swabs from Mr. Christensen's mattress, the bathroom sink trap, and on the bedroom wall and floor that were not able to be confirmed through additional testing. There were two areas (a piece of carpet and a piece of baseboard) where the presumptive test was confirmed with later testing.

## II.  Argument

---

[3] https://dps.mn.gov/divisions/bca/bca-divisions/forensic-science/Pages/forensic-programs-crime-scene-phenol.aspx (last visited 8/22/2018).

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. "Rule 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific evidence…is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharma., Inc.,* 509 U.S. 579, 589 (1993)). In furtherance of this inquiry, a trial court may consider several factors, including whether the method has been tested, subjected to peer review and publication, the known rate or potential rate of error, whether there are standards controlling the method's operation, and whether the method is generally accepted within the relevant scientific community. *Id.* at 149-50.

**A. DNA**

A *Daubert* hearing is particularly important in DNA cases. *See McDaniel v. Brown*, 558 U.S. 120, 136 (2010) ("Given the persuasiveness of [DNA] evidence in the eyes of the jury, it is important that it be presented in a fair and reliable manner.") Because DNA evidence, surrounded as it is by a media-inspired aura of infallibility, by its very nature will be particularly compelling to lay jurors, and because DNA typing is used in the present capital case for purposes of identifying the perpetrator of a particularly serious

crime, extreme circumspection in evaluating the techniques and protocols of DNA typing is mandated. As was stated in *United States v. Chischilly*, 30 F. 3d 1144, 1156 (9th Cir. 1994),

> Notwithstanding *Daubert's* express preference for exposing novel scientific theories and methodologies to the glare of the adversarial process, *Daubert* enjoins watchful assessment of the risk that a jury would assign undue weight to DNA profiling statistics even after hearing appellant's opposing evidence, the testimony of Government witnesses under vigorous cross-examination and the careful instructions of the district court on burdens of proof. Of particular concern is where the Government seeks to present probability testimony derived from statistical analysis, the third main phase of DNA profiling. Numerous hazards attend the courtroom presentation of statistical evidence of any sort. Accordingly, Rule 403 requires judicial vigilance against the risk that such evidence will inordinately distract the jury from or skew its perception of other, potentially exculpatory evidence lacking not so much probative force as scientific gloss.

See also *Government of Virgin Islands v. Byers*, 941 F. Supp. 513, 527 (D.P.R. 1996) ("For the lay person . . . it is easy to conceive that th[e] same science that can reveal the genetic secrets of the living, the dead, and the yet unborn is potent enough to solve the most perplexing crime. There is something very primal about DNA and genetic science that lends itself to a posture of 'mythic infallibility'").

In addition, because DNA typing methodologies for use in the forensic arena are rapidly evolving at a rate that generally outpaces the ability of appellate courts to review the changes, keen attention to these issues is required. There are still a number of potential problems with the application of probabilistic genotyping software that

remain in question. For example, there are concerns about the scientific validity of probabilistic genotyping algorithms.[4] *See* Katherine Kwong, *The Algorithm Says You Did It: The Use of Black Box Algorithms to Analyze Complex DNA Evidence,* 31 Harv. J. L. & Tech. 275, 288 (2017). Although several validation studies exist, most have been conducted by the companies who produce and market the software at issue or are authored by individuals associated with the company, making them "questionable in the eyes of the broader scientific community." *Id.* at 289. Additionally, the algorithms that are an integral part of the software and assist in the comparison process are not free of subjectivity. *Id.* at 291. More importantly, since human beings draft the source code which is at the heart of the algorithmic process, errors can occur. In fact, STRmix, the software utilized in this case, has publicly been acknowledged to have contained two source code errors in previous cases. *Id.* at 292. *See also* Natalie Ram, *Innovating Criminal Justice,* 112 Nw. U. L. Rev. 659, 681-82 (2018). To date, the source code for STRmix has not been provided to the defense for examination by an expert in the field, although upon information and belief, it can be accomplished so long as a confidentiality agreement is signed.

      Therefore, Mr. Christensen requests that the government facilitate the disclosure of the source code for STRmix so that it can be examined for errors by a defense expert. Additionally, once the discovery process is complete, a *Daubert* hearing should be held to determine the reliability, and hence the admissibility, of this evidence.

---

[4]

### B. Serology

#### i. Inconclusive test results are irrelevant, inadmissible, and substantially more prejudicial than probative under Federal Rules of Evidence 401, 402 and 403.

As an initial threshold objection, inconclusive results are not relevant and are therefore inadmissible under Federal Rules of Evidence 401 and 402. In *State v. Moody*, 573 A.2d 716 (Conn. 1990), the Connecticut Supreme Court reversed the defendant's murder conviction because it concluded that the trial court had abused its discretion when it admitted into evidence the result of a "presumptive test for blood" performed on a stain located on the defendant's shoe. Although an expert had testified that the stain had produced a positive test result, and he had explained that this meant only that "the stain could be human blood, animal blood or something other than blood," the supreme court held that "the result of the 'presumptive test for blood' had no probative value whatsoever. The test result did nothing toward establishing the likelihood of the presence of human blood on the sole of the defendant's shoe. Therefore, we hold that the test result was entirely irrelevant, and thus, the trial court abused its discretion by admitting it into evidence." *Id.*

Similarly, the Arkansas Supreme Court has held that "[b]ecause luminol testing can return false positive results by reacting with substances other than human blood, and because luminol testing is not time-specific, luminol test results are not relevant per se and their admission without additional factors that relate that evidence to the crime would confuse a jury." *Houston v. State*, 906 S.W.2d 286 (1995). *See also Brenk v. State*, 847

S.W.2d 1 (1993) ("Given the lack of follow-up testing, the results of the luminol test, which are presumptive only, had no probative value and did nothing to establish the likelihood of the presence of Lou Alice Brenk's blood, or even human blood, in the trailer, the block building, appellant's car, or on any of the other items tested where follow-up testing was not able to confirm the presence of human blood, much less blood of the same blood type as Lou Alice Brenk.")

Additionally, in *State v. Fukusaku*, 946 P.2d 32 (1997), the Hawaii Supreme Court upheld a trial court's rejection of the introduction of luminol and phenolphthalein tests without confirming blood tests, reasoning as follows:

> We believe that the trial court did not abuse its discretion in excluding the expert testimony. The trial court apparently ruled that the luminol and phenolphthalein test results failed the relevancy prong of the analysis, but that, even if they did not, the test results were more prejudicial than probative. Wagner testified that luminol and phenolphthalein tests are subject to false positive reactions and that confirmatory tests must be conducted to conclusively establish the presence of human blood. Confirmatory tests were not conducted on the sites in the apartment. Thus, the record more than adequately supports the trial court's ruling. Therefore, we cannot say that the trial court abused its discretion in excluding expert testimony on the test results.

In the present case, as reasoned above, none of the presumptive phenolphthalin tests that were unconfirmed by later testing make any fact more or less probable and thus they have no consequence in determining this case. Fed. R. Evid. 401. Allowing the evidence would be akin to telling the jury "we thought there was blood present but in

9

fact we can't tell." Because they can add nothing to the analysis in this case, the inconclusive test results should be excluded. Fed. R. Evid. 402.

Even if some relevance could be established by inconclusive test results, the information is far more prejudicial than probative and should be excluded under Fed. R. Evid. 403. In *United States v. McCluskey,* 1:10-cr-02734 (D.N.M. February 26, 2013), the district court granted the defense motion to exclude serology evidence on the basis that the phenolphthalin tests were presumptive only and were not confirmed by any additional testing. As such, the "weak probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury." *Id.* at 9.

> ii. **For those test results which underwent confirmatory testing and produce positive results, a *Daubert* hearing is required to assess the admissibility of the testing process.**

With respect to the few positive phenolphthalin tests which were later confirmed by Takayama hemochromogen tests, a *Daubert* hearing is required to test the reliability and admissibility of that evidence. The FBI's Serology Manual sets forth the "Procedure for the Confirmatory Identification of Blood," noting that such confirmation can be obtained "through application of the Takayama hemochromogen test procedure." *See* Exh. A at 1) Assuming that correct procedures were followed, the development of "characteristic red or salmon-pink, feathery and branched, rhomboid crystals is recorded in the case notes as a positive result (or POS)." *Id.* at 3. In Ms. Bakker's report, there are no photographs, descriptions, or other representations of when the crystals

were observed or whether the proper methodology was followed. The only indication in the report is a Serology Note with the exam name (Takayama) and an exam result (POS). The evidence provided is therefore insufficient to show that the testing complied with lab standards.

Additionally, such testing is inadmissible under *Daubert* because it appears that nobody has ever taken the time to validate such a test as reliable, and the little work that has been done in this area indicates that the test is unreliable. Research indicates that the "two most often used confirmatory tests for the presence of hemoglobin are the Takayama test (1) and spectrophotometric methods (2)."[5] However, these methods cannot determine whether or not bloodstains are human in origin and additional tests must be performed" to make that determination *Id.* at 597. The validation study for the new test included testing to establish that the test was human specific, and did not produce false positive results with the blood of various animals or microorganisms. The conclusion of the study was that "[t]he Hexagon OBTI test has been demonstrated to be a powerful and robust tool as a confirmatory test for human blood, because it is human specific (or at least primate specific) and is suitable for use with both aged and degraded material." *Id.* at 602.

---

[5] See, Hochmeister, T., Budowle, B., *Validation Studies of an Immunochromatographic 1-Step Test for the Forensic Identification of Human Blood*, J. Forensic Sci. 597–602 (1998) (available at *https://pdfs.semanticscholar.org/2523/68026f1f513d0894f32d05745c699a7fa782.pdf* , last visited 8/22/2018).

11

Very few cases address the validity of Takayama testing in the *Daubert* context. One federal case, *United States v. Williams,* 2013 WL 4518215 *9 (D. Haw.), briefly disposed of the defendant's *Daubert* argument by concluding that the arguments about Takayama testing go to the weight of the evidence and not the admissibility. It also claimed, pursuant to an expert declaration, that studies have concluded that false positive in Takayama testing are unlikely. *Id.* But it did not address the concerns of the Hochmeister journal article, whereas other cases have recognized that the test does not distinguish between human and animal blood. *See Balshy v. Pennsylvania State Police* 988 A.2d 813, 817 (Pa. Commw. Ct. 2010) (noting that the Takayama test did not distinguish between human blood and the blood of an animal. If the substance was determined to be blood, a third test was then performed to establish whether the blood originated from a human source.)

Additionally, other scholarly articles have noted the deficiency with Takayama testing. "Crystal tests (confirmatory) require, by today's standards, relatively large amounts of material (0.1 mg hemoglobin), and crystal formation can decline with age of the sample (Takayama) . . . Species cannot be determined by this method."[6] In light of the foregoing, unless the government can show the reliability of this test, the Court should exclude the results of the Takayama test under *Daubert* and Rules 403 and 702.

---

[6] Prinz, M., Tang, Y., *et al*,*Establishment of a Fast and Accurate Proteomic Method for Body Fluid/Cell Type Identification*, Final Technical Report NIJ Grant 2008-DN-BX-K011 (Nov. 2011) at pg. 16, available at https://www.ncjrs.gov/pdffiles1/nij/grants/236538.pdf (last visited 8/22/2018).

WHEREFORE, Defendant asks that the Court for the following relief:

1. To order the production of the source code for the STRmix software program, subject to any required protective orders;

2. To conduct a *Daubert* hearing concerning the reliability of probabilistic genotyping in general and STRmix in particular;

3. To exclude any evidence of presumptive blood testing and luminol applications which were never confirmed by subsequent testing as irrelevant and overly prejudicial; and

4. To conduct a *Daubert* hearing concerning the reliability of Takayama hemochromogen testing.

Respectfully submitted,

/s/Elisabeth R. Pollock  
Assistant Federal Defender  
300 West Main Street  
Urbana, IL 61801  
Phone: 217-373-0666  
FAX:   217-373-0667  
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff  
Assistant Federal Defender  
401 Main Street, Suite 1500  
Peoria, IL 61602  
Phone: 309-671-7891  
Fax:    309-671-7898  
Email: George_Taseff@fd.org

/s/ Robert Tucker  
Robert L. Tucker, Esq.  
7114 Washington Ave  
St. Louis, MO 63130  
Phone: 703-527-1622  
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain  
Julie Brain, Esq.  
916 South 2nd Street  
Philadelphia, PA 19147  
Phone: 267-639-0417  
Email: juliebrain1@yahoo.com

CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org