E-FILED
Friday, 24 August, 2018  06:37:38 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | <u>Hearing Requested</u> |
| | ) | |
| Defendant. | ) | |

## <u>MOTION TO STRIKE AGGRAVATING FACTOR ALLEGING FUTURE DANGEROUSNESS</u>

Mr. Christensen moves the Court for an Order striking the non-statutory aggravating factor of "future dangerousness" from the *Notice of Intent to Seek a Sentence of Death* (NOI). *See* (R. 54) ¶ III-2 of the NOI sets out the following non-statutory aggravating factor:

> **Future dangerousness of the defendant:** *The defendant is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others*, as evidenced by, at least, his demonstrated lack of remorse for his acts of violence; his other serious acts of violence; his expressed desire to be known as a killer; and his claims of additional victims and expertise in avoiding detection.

(emphasis added). This aggravating factor violates both the Eighth and Fifth Amendments. Further, the probative value of the evidence which the government cites in support is, in the context of an allegation of future dangerousness, "outweighed by the danger of creating unfair prejudice, confusing the issues or misleading the jury," and thus is excludable under 18 U.S.C. § 3593(c).

I.        **Summary of Argument**

In two cases, both decided decades ago, *Jurek v*. Texas, *infra,* and *Barefoot v. Texas*, *infra,* the Supreme Court ruled that knowledge at that time was insufficient to exclude evidence of "future dangerousness" because of its unreliability. In the latter case, *Barefoot*, the Court intimated that there might come a time when the evidence suggests otherwise. That time is now. As discussed in Section III, *infra*, consistent and reliable studies, conducted over many years and in regard to diverse populations, all point in the same direction: Both prosecutors and juries are notoriously inaccurate when attempting to predict whether a particular defendant will in the future endanger the lives and safety of others, especially when the defendant is sentenced to life without parole. While *stare decisis* requires that these decisions be given great weight and followed absent countervailing developments, recent pronouncements of the Supreme Court have made it clear that precedent must in some circumstances "yield to the lessons of subsequent experience." *Johnson v. United States*, 135 S. Ct. 2551, 2562 (2017). Because the Eighth Amendment requires a "heightened" degree of reliability, the admission of "future dangerousness" evidence cannot be sanctioned.

As to the particular "future danger" allegation in this case, the language of ¶ III-2 of the NOI is almost identical to that found unconstitutionally vague in both *Johnson v. United States*, *supra*, and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018). *See* Section IV, *infra*. Like, its counterpart in *Johnson*, ¶ III-2 offers no guidance as to how to measure the actual risk that Mr. Christensen would commit criminal acts of violence, as defined

therein, while serving a sentence of life without parole, or how much risk is enough to justify a sentence of death. Adding to the constitutional problems engendered by the language of ¶ III-2 is the fact that the jury will be asked to interpret the meaning and applicability of this phrase in reference to hypothetical and speculative facts that may or may not occur in the future, a far more difficult interpretative problem than presented in *Johnson*.

Irrespective of the constitutional issues, the probative value of the evidence alleged in ¶ III-2 in support of the "future dangerousness" allegation is outweighed by dangers of unfair prejudice and its potential to confuse the issues and mislead the jurors. In light of previous statements by the government as to their intended scope of proof, references, for example, to a lack of remorse implicate Mr. Christensen's Fifth Amendment rights and also encourage jurors to decide the issue on an improper basis. Other evidentiary references in ¶ III-2, such as that to an alleged prior assault on M.D., rely on evidence that is not credible and cannot hurdle the heightened evidentiary threshold. The same holds true for statements attributable to Mr. Christensen that are palpably false and thus have little or no probative value. 18 U.S.C. § 3593(c) directs courts to be even more vigilant in the probative-prejudice weighing process than is required by Fed. R. Evid. 403 in a non-capital case and application of this provision of the Federal Death Penalty Act requires exclusion of the "evidence" referenced in ¶ III-2. *See* Section V, *infra.*

## II.   Supreme Court Decisions Concerning Determinations of "Future Danger" in a Capital Case

3

The two leading cases addressing the role of "future danger" in a capital case are *Jurek v. Texas*, 428 U.S. 262 (1976), and *Barefoot v. Estelle*, 463 U.S. 880 (1983). *Jurek*, one of the five cases which the Supreme Court decided as a group in 1976 to determine the constitutionality of different state responses to *Furman v. Georgia*, 408 U.S. 238 (1972), presented the question of the post-*Furman* Texas statute that required jurors to determine three "special issues," one of which was "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id*. at 269; *see generally Motion to Strike Notice of Intent to Seek the Death Penalty on Ground That Capital Punishment Violates the Eighth Amendment*, at 6-7 (filed August 24, 2018). Acknowledging the difficulty of predicting future behavior, the Court pointed to similar judgments that must be made in the criminal context, including whether to release a defendant on bail, the nature and length of sentence to impose and parole decisions, each of which take into account considerations of likely future criminal conduct. *Id*. at 274-275.

In *Barefoot v. Estelle*, 463 U.S. 880 (1963), the Court held that the Eighth Amendment is not violated by admission of expert testimony addressing the issue of future dangerousness under the Texas statute. Discounting the views of the American Psychiatric Association that psychiatrists should not be permitted to offer such forecasts because studies have shown their unreliability, the Court held that the pitfalls in such testimony can be tested through "cross-examination and contrary evidence by the opposing party." *Id*. at 898. But, the Court went on to imply that future developments in this area might change the picture: "We are unconvinced, however, *at least as of now*,

that the adversary process cannot be trusted to sort out the reliable from the unreliable

evidence and opinion about future dangerousness." *Id*. at 901 (emphasis added).[1]

Although the Supreme Court has not directly reconsidered the issue of

admissibility of future dangerousness evidence since *Jurek* and *Barefoot*, it has

recognized that the issue often arises in capital proceedings and carefully scrutinized its

potential for abuse. *See, e.g, Buck v. Davis*, 137 S. Ct. 759 (2017) (noting that future

dangerousness was focus of the penalty phase and finding defense counsel ineffective

for calling expert whose report and testimony indicated that race is a factor in such

forecasts); *Satterwhite v. Texas*, 486 U.S. 249, 259-260 (1988) (testimony from psychiatrist

that defendant was "beyond the reach of psychiatric rehabilitation" reversible where

finding of future danger was "critical to the death sentence"); *Ake v. Oklahoma*, 407 U.S.

68, 83 (1985) (capital defendant entitled to appointment of psychiatrist "when the State

presents psychiatric evidence of the defendant's future dangerousness.").

## III.   Developments Since *Jurek* and *Barefoot* Establish that the Admission of Future Dangerousness Testimony Violates the Eighth Amendment

### A.   Both the Eighth Amendment and The Federal Death Penalty Act (FDPA) Require that Evidence Introduced in a Capital Sentencing Hearing Must Hurdle a Heightened Threshold of Reliability

The Supreme Court has stressed the need for heightened reliability in capital

cases. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("[I]n capital cases [because

---

[1] Mr. Christensen does not directly address the issue, *vel non*, of the admissibility of expert testimony on the issue of future dangerousness or the issues that would be presented by such testimony under *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993), as the government has not noticed any such expert testimony.

of] the fundamental respect for humanity underlying the Eighth Amendment . . . [and the] qualitative difference [between a sentence of life and death] there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability."); *Spaziano v. Florida*, 468 U.S. 447, 456 (1984) ("We reaffirm our commitment to the demands of reliability in decisions involving death"); *Beck v. Alabama*, 447 U.S. 625, 638 (1980) (Eighth Amendment's reliability requirement in capital cases applies not only to sentencing phase but determination of guilt and thus capital sentence set aside where jury was not permitted to consider a lesser-included offense).

This reliability requirement is also implicit in § 3593(c), which requires the exclusion of evidence in a capital sentencing proceeding, where its probative value is "*outweighed* by the danger of creating unfair prejudice, confusing the issues, or misleading the jury," in contrast to the similar provision in Fed. R. Evid. 403, which states that otherwise probative evidence is admissible unless it is "*substantially outweighed*" by such dangers, further evidencing Congress' intent to impose heightened reliability requirements in capital sentencing proceedings. (Emphasis added)

B.     Studies Have Consistently Established that the Government is Unable to Reliably Charge and Jurors are Unable to Reliably Determine The Issue of Future Dangerousness in a Capital Case

In most non-capital cases the reliability of the prosecution's allegations and juror findings are never tested except for the occasional case where appellate or post-

conviction relief is granted. Even then such relief is often based on legal error rather

than the unreliability *ab initio* of the allegations and findings. But, there are numerous

consistent studies over the years demonstrating that capitally-charged defendants

commit serious acts of violence in prison at a very low base rate, no more frequently

than other inmates,[2] and that *more important*, neither the government,[3] nor juries,[4] have

---

[2] *See* Sorensen, Jon R. & Cunningham, Mark D, *Once a Killer, Always a Killer? Prison Misconduct of Former Death-Sentenced Inmates in Arizona*, 37 J. Psychiatry & L. 237 (2009) (study of 80 capitally-sentenced defendants who later obtained relief and were housed in general prison population shows that over average period of thirteen years, only 3.8% of inmates committed a prison assault resulting in serious bodily injury, a number not statistically different from overall prison rates); Cunningham, Mark D., Reidy, Thomas J. & Sorensen, Jon R., *Is Death Row Obsolete? A Decade of Mainstreaming Death-Sentenced Inmates in Missouri*, 23 Loy. L.A. L. Rev. 5 (1989) (similar finding regarding relative infrequency of violence and at a rate well-below those of non-capital inmates).

[3] *See* Mark D. Cunningham, Thomas J. Reidy, and Jon R. Sorenson, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 L. & Hum. Behav. 46 (2007) (study of 145 capitally charged murderers who received life sentences between 1991 and 2005 found that there was no statistically significant difference between those against whom the government had alleged future dangerousness as an aggravating factor and those where no such allegation was made; less than 1% of the life-sentenced inmates that the government had alleged would constitute a future danger had committed an assault even causing 'moderate injuries' and none had committed an assault resulting in a major or life-threatening injury. The study concluded that the only *reliable* prediction that can be made is that of the *improbability* of serious acts of violence being committed by the life-sentenced inmate.).

[4] *See* Mark D. Cunningham, Jon R. Sorensen, Thomas J. Reidy, *Capital Jury Decision-Making: the Limitations of Predictions of Future Violence*, 15 Psychology, Pub.c Po'y & L. 223, 239-40 & Table 4 (2009) (study of 72 federal inmates over twenty years (with an average period of incarceration of approximately five years) against whom the government alleged an aggravating factor of future dangerousness. More than 90% of the inmates whom the jury found would constitute a future danger had not committed any serous act of violence in the two decades of the study, creating a false positive rate of 94%.  Stated otherwise, the jury was wrong over 90% of the time. Some of these defendants had received death sentences and therefore were housed on death row under more stringent security, but even discounting this group and focusing solely on the life-sentenced inmates who were thus housed under more ameliorative conditions, the jury proved wrong more than two-thirds of the time.); Thomas J. Reidy, Jon R. Sorensen, & Mark D. Cunningham, *Probability of Acts of Criminal Violence: A Test of Jury Predictive Accuracy*, 31 Behav. Sci. & L., 286-305 (2013) (study of disciplinary records of 65 inmates sentenced to life and 50 inmates sentenced to death over a 23 year period in Oregon finds that where juries rejected future danger aggravator it was correct 90% of the time; when the jury found the aggravator is was wrong 90% of the time.); Cunningham, Mark D., Sorensen, Jon R. & Vigen, Mark P, *Life and Death in the Lone Star State: Three Decades of Violence Predictions by Capital Juries*, 29 Behav. Sci. & L. 29 (2011) (juror estimates of future homicide are inflated from 50 to 250-fold); Marquart, James W., Ekland-Olson, Sheldon & Sorensen, Jonathan R., *Gazing into the Crystal Ball: Can*

any ability to reliably predict whether a particular defendant is likely to commit a serious violent act in the future. *See e.g. Flores v. Johnson*, 210 F.3d 456, 463 (5th Cir.) (Garza, J., specially concurring) ("The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific."); *United States v. Sampson*, 335 F.2d 166, 218-223 (D. Mass. 2004) (suggesting Supreme Court revisit issue in light of recent evidence suggesting such evidence is unreliable).

Summarizing the data from several relatively recent studies, the only reasonable conclusion is that asking jurors to make such a determination is little more than a fool's errand with no more (indeed, even less) reliability than dropping alternate slips marked "yes" and "no" into a hat and asking a blindfolded juror to draw one.

> The inability of capital juries to predict future prison violence has implications beyond a high rate of error. In other words, it is not simply that capital juries are wrong 90% of the time in predicting serious assaults and virtually always wrong in anticipating life-threatening assaults; rather these juries show *no improvement over random guesses* . . . . Such arbitrary guesses are the antithesis of a reasoned, individualized death penalty determination.

Reidy *et al*, *Probability of Acts of Criminal Violence: A Test of Jury Predictive Accuracy*, fn. 2, *supra*. As the authors of this study conclude, the evidence concerning future danger irresistibly suggests that the only reliable predictions are those based on the extremely

---

*Jurors Predict Dangerousness in Capital Cases?* 23 L. & Soc'y Rev. 23:449 (1989) (study of 92 Texas inmates who later obtained relief from capital sentences, each of whom had been found by jurors to constitute a future danger: similar result indicating high degree of juror inaccuracy).

low *probability* of and *minimal risk* that a particular inmate will engage in a serious act of violence while serving a sentence of life without parole.

The irresistible conclusion of all these studies is that jurors have no ability to predict future dangerousness and are basically just left to their best hunch. A process which results in such high error rates cannot be harmonized with the trustworthiness required in a decision as to whether someone lives or dies. *Cf. Chambers v. United States*, 555 U.S. 122 (2009) (relying on a statistical report prepared by the Sentencing Commission to conclude lack of significant risk); *Sykes v. United States*, 564 U.S. 1 (2011) (relying on statistics to show that that Indiana's offense of vehicular flight did not create the potential risk as defined in the residual clause of 922(g)); *see generally*, *Johnson v. United* States, 135 S. Ct. 2551, 2574 (2015).

C.    In light of Subsequent Developments, This Court Should Decline to
      Follow *Jurek* and *Barefoot*

Citing the evidence suggesting such unprincipled conclusions, at least one court[5] and several commentators[6] have called for re-examination of the role of future danger in capital cases. Several reasons suggest that this Court should not be bound by *Jurek*

---

[5] *See United States v. Sampson*, 335 F. Supp. 2d 166 217-223 (D. Mass. 2003) ("However, the evolution of the law, and of scientific research, presents the question of whether it can now be said that future dangerousness can generally be predicted with sufficient reliability to assure that the death penalty is not being imposed arbitrarily and capriciously. Therefore . . . it may be appropriate for the Supreme Court to consider again its ruling in *Jurek*.).

[6] *See, e.g*, Brian Sites, *The Danger of Future Dangerousness in Death Penalty Use*, 34 Fla. St. Univ. L. Rev. Issue 3 (2207); Eugenia T. La Fontaine, *A Dangerous Preoccupation with Future Danger: Why Expert Predictions of Future Dangerousness in Capital Cases Are Unconstitutional*, 44 Boston C. L. Rev., V. 4, Issue 1, Number 1 (2002).

and *Barefoot*. As noted, both cases were premised on an assumption that juries could reliably predict future dangerousness. *Jurek*, 428 U.S. at 275; *Barefoot*, 463 U.S. at 898. But, the "as for now" language in *Barefoot* and the Court's recognition in both cases of the obstacles triers-of-fact face in making such prognostications, suggest that the issue is ripe for reconsideration where consistent studies of the issue from all perspectives have confirmed the reservations initially expressed by the American Psychiatric Association in its *amicus* brief in *Barefoot*.

In addition, both *Jurek* and *Barefoot* addressed the issue of future dangerousness in the context of a Texas statute that provided for parole. Thus, both cases were at least implicitly premised on the possible future danger to society if the defendant was released, a night-and-day inquiry from the question of whether a defendant would present a future danger in prison when serving a life sentence without the possibility of parole. In this latter scenario, the defendant is not free to move about in society, but almost always is housed in secure facilities and subject to measures designed to significantly minimize, if not practically eliminate, the potential dangers that are presented to society when a parolee is released. *See Simmons v. South Carolina*, 512 U.S. 154, 165, n.5 (1994) (capital defendant entitled to rebut claim of future danger by showing parole ineligibility); *Lynch v. Arizona*, 136 S. Ct. 1818 (2016) (defendant has a due process right to an instruction under *Simmons* that he would not be eligible for parole). This factor alone distinguishes the types of decisions which *Jurek* cites regarding everyday judgments made in criminal cases as to when and under what

10

conditions an individual is released into society, whether by way of bail, probation or parole.

Mr. Christensen has discussed the application of *stare decisis* in his *Motion to Strike Notice of Intent to Seek the Death Penalty On Ground That Capital Punishment Violates the Eighth Amendment*, at 34-39, and incorporates that discussion here. These principles were recently applied in *Johnson v. United States*, 135 S. Ct. at 2562-2563 (2015), where the Court overruled prior decisions in *James v. United States*, 550 U.S. 192 (2005), and *Sykes v. United States*, 564 U.S. 1 (2011). Citing several cases, *Johnson* noted "that even decisions rendered after full adversarial presentation may have to yield to the lessons of subsequent experience." 135 S. Ct. at 2562. Reasoning that neither *James* nor *Sykes* sufficiently considered "the riskiness" of applying "abstract" definitions in the criminal context, the Court concluded that "standing by" these decisions would "undermine, rather than promote, the goals that stare decisis is meant to serve." *Id*. at 2563.

Here, the consistent across-the-board data cited above similarly suggests that to "stand by" the holdings over 35 years ago in *Jurek* and *Barefoot* and permit this jury to do no more than render a wild "guess" concerning the aggravating factor alleged in ¶ III-2 of the NOI would similarly undermine the reliability demanded by the Eighth Amendment. *Id*. at 2559 ("[prior cases interpreting §922(g)] failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition").

IV.    **Submission of the Non-Statutory Future Dangerousness Aggravating Factor Described in ¶ III-2 of the NOI Would Violate the Fifth Amendment**

The language preceding "as evidenced by" constitutes the core allegation of ¶ III-2, namely that: "The defendant is *likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others*, as evidenced by" (emphasis added). This language is remarkably similar to, and constitutionally indistinguishable from, that recently found to be unconstitutionally vague in *Johnson v. United States*, *supra*. *Johnson* held that the language of the residual clause in 18 U.S.C. § 922(g), referencing "*conduct that presents a serious potential risk of physical injury to another,*" fails to provide adequate notice and "invites arbitrary enforcement," *id*. at 2557, a particular concern here, as avoiding arbitrariness is the lodestar guiding capital litigation. *Gregg v. Georgia,* 428 U.S. 153, 189 (1976) ("*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (Eighth Amendment forbids the "arbitrary and capricious infliction of the death penalty.").

The same problems identified in *Johnson* are present in ¶ III-2. First, *how* is a jury *to measure* the risk that Mr. Christensen will commit the "criminal acts in the future," as characterized in ¶ III-2? *Johnson* referenced several equally unsettling possibilities such as statistical analyses, surveys, expert evidence, Google, or even "gut instinct" (citation omitted), before concluding that there was no reliable measure. 135 S. Ct. at 2557. As the studies of juries' floundering attempts to accurately gauge future danger suggest, this conclusion is more than borne out as applied to the almost identical language in ¶ III-2.

12

Second, *Johnson* noted the problem of attempting to determine "*how much risk* it takes for a crime to qualify as a violent felony," *id* at 2558 (emphasis added), a particularly salient problem in any attempt to apply the future danger allegation of ¶ III-2 to the "real-world facts" presented by a sentence of life without parole. *Id*. For example, would a first disciplinary offense of simple battery of a guard by Mr. Christensen fifteen years into his sentence qualify as an "act of violence" and come within the language of ¶ III-2, on the theory that any such non-consensual encounter carries a risk of escalation and thus would present a "threat to the lives and safety of others?" Or should a jury infer that guards are trained to respond in a manner that minimizes the risk of such escalation? Similarly, the destruction of prison property or even the most tangential participation in a prison strike or riot could be regarded as a "criminal violent act" and would always present a possible risk of escalation. Is that speculative possibility sufficient for a juror to find that Mr. Christensen would constitute a future danger in prison? Other troubling examples abound. If the prisoner conspires with another to escape, would that present such a risk even though no attempt was ever made? Does the prisoner who conceals a homemade shank for protection commit a violent act that threatens the lives and safety of others? As *Johnson* recognized in a much less serious context, there is simply no way for a jury to reliably make such a determination. *Id.* at 2560.

At least three other factors suggest that the future dangerousness aggravator of ¶ III-2 is actually more vague than the residual clause of § 924(e). First, unlike *Johnson*, where the Court was attempting to apply the residual clause to identifiable *past* conduct,

here ¶ III-2 requires a jury to make an almost identical determination on *future hypothetical* incidents based on no facts whatsoever. This point was emphasized in *Johnson*:

> More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual engages *on a particular* occasion (emphasis in original) . . . As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct . . . Because 'the elements necessary to determine the imaginary ideal are *uncertain both in nature and degree of effect*,' this abstract inquiry offers significantly less predictability than one 'that deals with the actual, not with an imaginary condition other than the facts.'" (citation omitted) (emphasis added).

*Id.* at 2561. The attempt to forecast the effect of non-specific hypothetical conduct that *may* occur in the future, as required by ¶ III-2, is imbued with far more uncertainty "both in degree and of effect" than the specific conduct at issue in *Johnson*. This same difficulty was identified in *United States v. Taylor*, 495 U.S. 575 (1990), where the Court adopted a categorical, rather than fact-based, approach to determine whether a prior offense triggered a sentencing enhancement, noting that "the practical difficulties and potential unfairness of a factual approach are daunting." *Id.* at 601. The task imposed by ¶ III-2 is significantly more "daunting" than that addressed in either *Johnson* or *Taylor*.

Second, in interpreting the residual clause of § 924(e), judges at least had the benefit of attempting to determine its scope and applicability in light of the more specific, less vague terms preceding the clause. That is not true of the language of III-2, which stands in isolation without comparable interpretive aids.

Finally, the heightened standard of reliability applicable to capital cases makes it even more critical that terminology used to define an aggravating factor not be unconstitutionally vague. *See* Section III-A, *supra*.

Finding *Johnson* a "straightforward decision," the Court reaffirmed its principles last term in holding that the residual clause of 18 U.S.C. § 16, defining a "crime of violence," as incorporated into the definition of an "aggravated felony" in the Immigration and Nationality Act, is unconstitutionally vague. Despite the fact that *Dimaya* announced no new vagueness principles, one aspect of the decision is noteworthy here. The government argued that application of *Johnson* principles should be less demanding in a civil immigration case. In firmly rejecting this premise, the Court pointed to the "grave nature of deportation," noting it is a "drastic measure" that often amounts to "lifelong 'banishment or exile.'" *Id*. at 1214 (citations omitted). It hardly needs to be said that banishment or exile is less "grave" or "drastic" than death. *Dimaya* thus forecloses any contention that the principles of *Johnson* do not apply to ¶ III-2.

## V. The Evidence of Future Danger Proposed in ¶ III-2 of the NOI Should Be Excluded Under 18 U.S.C. § 3593(c)

While providing that the rules of evidence applicable to criminal trials do not necessarily apply at a capital sentencing hearing, 18 U.S.C. § 3593(c) provides that evidence should be excluded where its probative value is "*outweighed* by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." As noted in the Summary of Argument, *supra*, this language reflects the heightened reliability

requirements in capital sentencing hearings. Unlike a normal criminal trial, potentially prejudicial evidence need not *substantially* outweigh its probative value to be excluded.

Discounting the vague and inappropriate "at least" language, *see Motion for a Bill of Particulars*, at 2 (filed August 24, 2018), ¶ III-2 of the NOI describes four pieces of evidence that suggest Mr. Christensen is "likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others": (1) lack of remorse; (2) the commission of other serious acts of violence; (3) a desire to be known as a killer; and (4) claims of additional victims and expertise in avoiding detection. Irrespective of the Eighth and Fifth Amendment arguments, evidence concerning each of the above should be excluded because of a lack of probative value or the danger of creating unfair prejudice.

(a) Lack of remorse

Although not specifying how Mr. Christensen "demonstrated" a lack of remorse, ¶ III-2 recasts the identical non-statutory aggravating factor of ¶ III-3 as a factor suggesting "future dangerousness." The "lack of remorse" referenced in ¶ III-2 should be stricken, or at least severely limited, for that reason.  *See United States v.* Caro, 597 F.3d 608, 630 (4th Cir. 2010 ("Future dangerousness and lack of remorse are similar factors that pertain to character rather than to circumstances of criminal conduct."); *Motion to Strike Non-Statutory Aggravating Factor of Lack of Remorse as Duplicative of "Future Dangerousness*," (filed August 24, 2018), as well as those set out in Mr. Christensen's *Motion to Strike Non-Statutory Aggravating Factor of "Lack of Remorse"* (filed

August 24, 2018) (discussing Fifth Amendment issues presented by attempts to use defendant's silence to prove lack of remorse).

While ¶ III-2 provides no insight into how the government proposes to prove that Mr. Christensen "demonstrated" lack of remorse, ¶ III-3 adds a little more information, limiting the evidence to "statements he made following the offense." Given the duplication, Mr. Christensen assumes that the "lack of remorse" allegation reincorporated into III-2 is similarly circumscribed. So limited, a review of the discovery and correspondence from the government suggests that two broad categories of evidence will be offered to prove a lack of remorse: (1) statements made by Mr. Christensen during a benefit walk for Y.Z. on June 29, 2017; and (2) Mr. Christensen's recorded phone calls from the Macon County and Livingston County Jails.[7] *See Motion to Suppress Jail Communications and Fruits Thereof* (filed August 24 2018.).[8]

As opposed to direct statements and affirmative conduct that clearly suggest a lack of remorse, *see, e.g., Emmet v. Kelly*, 474 F.3d 154, 170 (4th Cir. 2007) (post-offense use of epithets in characterizing the victim), the government's apparent view that lack

---

[7] The government has also written the defense that *each* of Mr. Christensen's recorded calls "taken as a whole and individually, indicates a lack of remorse." Letter from Eugene L. Miller to Defense Counsel, 7-11-18, ¶ 22.

[8] In an enigmatic response to the Court's Scheduling Order requiring the government to disclose expected evidence in support of the aggravating factors, government counsel sent counsel a letter on May 18, 2017, listing six broad areas of such evidence. References to "internet usage" and "photographs," for example would not seem to reflect "statements" of Mr. Christensen. And, it is far from clear how Mr. Christensen's "academic records" would reflect post-offense statements, inasmuch he had graduated from the University of Illinois before the events of June 9, 2017. *See* (R. 82) *Sealed Motion to Compel*, Exhibit C, at 4, ¶ 6 (filed July 13, 2018). In any event, as stated, Mr. Christensen assumes here that the references in III-2 of the NOI are limited to the similar allegation in III-3.

of remorse inheres in the fact that Mr. Christensen never directly expressed such in his many calls (and that it is entitled to so claim) raises serious Fifth Amendment issues. It is basic black-letter Fifth Amendment doctrine that a defendant may not be penalized for exercise of his right not to incriminate himself, and the government cannot comment of the exercise of the right. *Griffin v. California*, 380 U.S. 609, 614-615 (1965); *Murphy v. Waterfront Comm'n of N. Y. Harbor*, 378 U.S. 52, 55 (1964). These principles apply to a capital sentencing hearing. *Estelle v. Smith*, 451 U.S. 454, 462-463 (The Court can "discern no basis to distinguish between the guilt and penalty phases of the respondent's murder trial so far as the protection of the Fifth Amendment is concerned.); *Mitchell v. United States*, 526 U.S. 314, 316-17 (1999) (Prohibition of drawing adverse inferences from defendant's silence at non-capital sentencing hearing improperly penalized assertion of Fifth Amendment rights).

Obviously, an expression of remorse presupposes an admission of guilt, as it is illogical to say you're sorry for something you didn't do. As the court in *Lesko v. Lehman*, 925 F.3d 1527, 1544 (3d Cir. 1991), stated in finding the prosecutor violated the no-comment rule of *Griffin*, when he told the jury that it is "common decency to say I'm sorry for what I did," and that the failure to do so evidenced lack of remorse:

> "To the jury, the natural and necessary interpretation of these comments would be that Lesko had a moral or legal obligation to address the charges against him - indeed, to apologize for his crimes . . . and that the jury could and should punish him for his failure to do so.

Suggesting adverse inferences because Mr. Christensen did not express remorse and thereby implicate himself in post-offense statements violates the Fifth Amendment.

For purposes of the § 3593 analysis, this theory also creates unfair prejudice by confusing the issue and, as language from *Lesko* indicates, misleading jurors into believing that he had a "moral or legal obligation" to do so.

(b)     Other Serious Acts of Violence

Again, disregarding inclusion of the vague "at least" language in ¶ III-4, the inclusion of the "other serious acts of violence" language in ¶ III-2 apparently refers to the alleged assault on M.D. Mr. Christensen has filed a *Motion to Strike Non-Statutory Aggravating Factor of Other Serious Acts of Violence* (filed August 24, 2018), setting out how injection of this highly prejudicial and utterly unreliable evidence into this case transgresses the Eighth Amendment, and incorporates that discussion herein.  For the same reasons, § 3593(c) precludes its admission as evidence of future dangerousness and the reference thereto should be stricken from III-2.

(c)     Claims of additional victims, expertise in avoiding detection and a desire to be known as a 'killer'

These allegations come from a cooperating witness, T.B., whose relationship with Mr. Christensen has been described in some detail in his *Motion to Dismiss Count One for Lack of Jurisdiction,* at 19-21 (filed August 24, 2018). The probative value of these alleged statements must be assessed in light of the described fantasy relationship, the fact that Mr. Christensen was highly intoxicated at the time and, *most important*, the fact that, in their most crucial aspects, the statements are demonstrably false.

As to the claims of several additional victims, the evidence will show that the government has made exhaustive and unsuccessful efforts to verify such claims. The

fact that a capital defendant has killed before is, unsurprisingly, one of the most important considerations in whether to impose the death penalty. *See* 18 U.S.C. §§ 3592(c)(2)-(4) (statutory aggravators based on prior convictions for offenses involving the death or infliction of serious body injury on another). And, irrespective of a prior conviction, if the government had any evidence suggesting that Mr. Christensen had previously killed anyone, this clearly would have been charged as a separate non-statutory aggravating factor, just as the supposed sexual assault on M.D. was. Given the circumstances in which the statement was made, the questionable probative value suggested by the lack of verification, and its potential to create unfair prejudice and mislead the jury, this allegation should be stricken

The same reasoning applies to Mr. Christensen's alleged self-proclaimed expertise in avoiding detection - another imaginative claim that, according to the government's own evidence, is again demonstrably false. Such assertions cannot be reconciled with the theory that Mr. Christensen "kidnapped" Y.Z. in broad daylight in a busy area with a multitude of cameras recording the event, left the supposed murder weapon in his apartment and later made the admissions attributed to him by the government. If credited, such behavior is patently that of an inexperienced criminal actor rather than one with the "expertise" allegedly claimed by Mr. Christensen in his fanciful interactions with T.B. The government will likely argue that, regardless of their truth, Mr. Christensen nonetheless made the statements. But, such reasoning misses the mark under § 3593(c), as the jury is likely to consider these statements for highly prejudicial purposes other than suggesting future dangerousness.

In assessing the admission of these statements for the purposes described in ¶ III-2, it must also be kept in mind that the only issue is Mr. Christensen's "future dangerousness" in the context of a sentence of life without parole - one likely to be served in a high-security institution where, for example, it is unlikely that a claim of avoiding detection would have any "real-world" traction. *See Simmons*, *supra*. Nor is it clear how a false claim of additional victims under these circumstances has any tendency to prove that Mr. Christensen would present a danger in prison of committing violent acts that would endanger the lives and safety of others in prison. And, even if a theory could be proffered that attaches some minimal probative value in the context of such a sentence, the prejudicial effect of leaving the idea lingering in the jurors' minds that Y.Z. was not Mr. Christensen's first and only victim requires exclusion of these statements.

Finally, the § 3593 issue must be approached with cases in mind from this Circuit that have found evidence improperly admitted under the more inclusionary provisions of Fed. R. Evid. 403. Rule 403 directs courts to exclude evidence whose probative value is *substantially outweighed* by, *inter alia,* unfair prejudice. "'[U]nfair prejudice,' as applied to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The Seventh Circuit "use[s] a sliding scale approach; as the probative value increases, so does [] [the] tolerance of the risk of prejudice." *United States v. Loughry*, 738 F.3d 166, 170 (7th Cir. 2013) (quoting *United States v. Earls*, 704 F.3d 466, 471 (7th Cir. 2012)).  The court has not

hesitated to enforce Rule 403 when necessary to ensure a jury's attention is not inappropriately directed to collateral issues detrimental to a fair trial. *See United States v. Ciesiolka*, 614 F.3d 347, 355-359 (7th Cir. 2010) (trial court erred in not performing on-the-record analysis of why the probative value of prior bad acts evidence under Rule 404(b) was not substantially outweighed by its potential for prejudice, citing the "damning nature" of the evidence); *United States v. Heath*, 188 F.3d 916, 922-23 (7th Cir. 1999) (evidence that defendant, charged with distribution based primarily on possession of a small amount of crack, was in the company of a drug dealer several months previously to show intent to distribute violated Rule 403, as the prejudicial effect of such evidence far outweighed by any probative value).

The purpose of Rule 403 (and by extension its more stringent analogue in § 3593(c)) is the exclusion of evidence bearing minimal probative value in relation to its tendency to evoke either an emotional response or misdirect the jury away from the issues. *See United States v. Cerno*, 529 F.3d 926, 935 (10th Cir. 2008). As discussed above, the evidence which the government describes in ¶ III-2 would shed little light on Mr. Christensen's future dangerousness while serving a sentence of life without parole in a federal penitentiary, while simultaneous creating a serious potential to overwhelm and distract the jury.

## VI.    Conclusion

For all the reasons stated herein, Mr. Christensen moves the Court to strike the

aggravating factor of future dangerousness set out in ¶ III-2 of the NOI.

Respectfully submitted,

/s/Elisabeth R. Pollock              /s/ George Taseff
Assistant Federal Defender           Assistant Federal Defender
300 West Main Street                 401 Main Street, Suite 1500
Urbana, IL 61801                     Peoria, IL 61602
Phone: 217-373-0666                  Phone: 309-671-7891
FAX:   217-373-0667                  Fax:     309-671-7898
Email: Elisabeth_Pollock@fd.org      Email: George_Taseff@fd.org


/s/ Robert Tucker                    /s/ Julie Brain
Robert L. Tucker, Esq.               Julie Brain, Esq.
7114 Washington Ave                  916 South 2nd Street
St. Louis, MO 63130                  Philadelphia, PA 19147
Phone: 703-527-1622                  Phone: 267-639-0417
Email: roberttuckerlaw@gmail.com     Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<div style="margin-left:40%">

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

</div>