E-FILED
Friday, 21 September, 2018  11:40:41 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | <u>Hearing Requested</u> |
| | ) | |
| Defendant. | ) | |

<u>MOTION FOR ADEQUATE TIME TO SUBMIT 12.2. NOTICE</u>

NOW COMES the Defendant, BRENDT A. CHRISTENSEN, by and through his

attorneys, and for his Motion for Adequate Time to Submit 12.2 Notice, states as

follows:

I.     **Introduction**

"Creating a competent and reliable mental health evaluation consistent with

prevailing standards of practice is a time-consuming and expensive process." American

Bar Association, *ABA Guidelines for the Appointment and Performance of Defense Counsel in

Death Penalty Cases*, 31 Hofstra L. Rev. 913, 956 (2003) (Commentary, Guideline 4.1).

Truer words have never been spoken.  To provide constitutionally adequate assistance

to a defendant in a capital case under the 5th, 6th and 8th Amendments to the

Constitution with respect to the investigation and presentation of mental health

evidence, whether at the guilt phase, the penalty phase, or both, is an enormous

undertaking.  It is necessarily an intricate, multi-step process. Defense counsel have been appointed to represent Mr. Christensen for approximately 12 months, the first five of which were consumed by the capital authorization process, attempts to resolve the matter short of a death sentence, preparing and filing numerous unnecessary pre-trial motions and preparing for trial under a wholly unrealistic and unreasonable schedule.

In the seven months that followed, counsel have been working diligently to complete the critically important social history investigation of Mr. Christensen's background, to identify the types of mental health expertise that are required in his particular case based on the results of that investigation, to identify and retain individuals who possess such expertise and are willing and available to become involved in a capital case, and to arrange for them to conduct the necessary examinations of Mr. Christensen.  It has simply not been possible, however, for counsel to complete the process in time to file meaningful notice of whether it will present mental health evidence pursuant to Fed. R. Crim. P. 12.2 under the existing schedule.

## II.    Procedural History

### 1.  Prior to Appointment of the Federal Public Defender

On June 30, 2017, the government filed a complaint charging Mr. Christensen with the offense of kidnapping in violation of 18 U.S.C. § 1202(a)(1), a non-capital offense. (R. 1).  Three days later, Evan S. Bruno, a private attorney in Champaign, Il., entered a Notice of Appearance on behalf of Mr. Christensen. (R. 4).  He was joined by his colleague, Thomas A. Bruno, on July 5, 2017, (R. 10), and Anthony A. Bruno on July

2

6, 2017, (R. 12). On July 12, 2017, the grand jury returned a non-capital eligible indictment charging Mr. Christensen with the offense of kidnapping in violation of 18 U.S.C. § 1202(a)(1). (R. 13.). On July 20, 2017, Magistrate Long set a trial date of September 12, 2007, before this Court. (R. 16).

On August 23, 2017, an Agreed Motion to Continue was filed, requesting the trial date be continued. The pleading cited the "voluminous" discovery, as well as the fact that the government expected to receive additional discoverable materials in the future. (R. 18). A minute entry on the docket indicates that a hearing was held on August 28, 2017, at which time the Court set a new trial date of February 27, 2018. Neither the entry nor the Motion reflect who proposed that date for trial. The minute entry does indicate that the government announced at this hearing that it expected to file a Superseding Indictment that would implicate the death penalty. Three days later, on September 1, 2017, the Bruno firm moved to withdraw from the case, stating that it had only been retained to represent Mr. Christensen on the initial non-capital kidnapping indictment. (R. 20). At a hearing on September 8, 2017, the Brunos further represented that they were unqualified to represent a defendant in a death penalty case. The Court granted the motion to withdraw and appointed the Federal Public Defender to represent Mr. Christensen. The existing trial date of February 28, 2018, was left in place.

2.  **Appointment of the Federal Public Defender Until Denial of the Motion to Continue on November 15, 2017**

Acknowledging the potential capital nature of the anticipated superseding indictment, and pursuant to 18 U.S.C. § 3005, on September 14, 2017, the Court

appointed Robert L. Tucker as learned counsel to represent Mr. Christensen alongside the Federal Public Defender.[1]  On October 3, 2017, the superseding indictment was returned, charging Mr. Christensen with one count of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) and two counts of false statements in violation of 18 U.S.C. § 1001(a)(2) and alleging special findings that triggered a potential death sentence.  (R. 26).

With a capital eligible indictment on file, the first order of business was for counsel to prepare a submission first to the United States Attorney for the Central District of Illinois and second to the Capital Case Section of the Criminal Division of the Department of Justice in Washington, D.C.  Such a submission is a defendant's opportunity to outline mitigating factors that are present in the case and that may persuade the Attorney General not to authorize the United States Attorney to seek the death penalty against him.  However, the due date for such a submission is directly linked to the scheduled trial date.

On October 3, 2017, the parties met to discuss the status of the case. The government informed defense counsel that, in light of the February 28 trial date, the Capital Case Section at the Department of Justice had directed the U.S. Attorney to submit its memorandum on the death penalty by November 1, 2017, and that the defense should submit any mitigating evidence it wished the government to consider

---

[1]  On May 18, 2018, after the government filed its Notice of Intent to Seek the Death Penalty, Julie Brain was appointed as additional counsel.

by that date.  Counsel explained that this unreasonably short period – one month after the filing of the Superseding Indictment and less than two months after capitally-qualified counsel was appointed – foreclosed the defense's ability to conduct even a rudimentary mitigation investigation in time to prepare their submission, especially in light of the additional obligations dictated by the compressed trial schedule.  The parties agreed to meet again at which time the defense would propose a schedule for further consideration by the government.

On October 20, 2017, the parties again convened.  Defense counsel asked the government to agree to a joint request to continue the non-capital trial date until October 2018, to provide the defense until April 3, 2018, to investigate and present mitigating evidence to the U.S. Attorney and the Department of Justice and to set a date of July 3, 2018, for the government to determine whether to file a Notice of Intent to Seek the Death Penalty ("NOI").  If a NOI was filed, the defense suggested that the schedule would be adjusted and a scheduling order for a capital case entered.

The following Tuesday, October 24, 2017, the government informed defense counsel by e-mail that in light of the trial date of February 27, 2018, and after consultation with the Capital Case Committee, it would not agree to join the defendant's request.  The government specifically wrote that "based on that trial date" and the need to provide the Department of Justice "sufficient time to decide whether to seek the death penalty," the defense's submission to the Capital Case Committee must be made by November 1.

Based upon their inability to make any meaningful submission of mitigating evidence to the DOJ under that schedule, as well as the general infeasibility of preparing to defend against capital charges within less than six months of their appointment, on October 24, 2017, defense counsel filed a Motion to Continue Final Pretrial and Trial Dates.  (R. 29)  The Motion to Continue specifically directed the Court's attention to the ethical obligations and standard of care for defense counsel in capital cases as set out in the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), the recommendations in the CJA Guidelines in the Guide to Judicial Policy of the Judicial Conference concerning the provision and representation of defense counsel in capital cases, and the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases.  *See* (R. 20 at ¶¶ 7-9)  Counsel explained that these well-recognized responsibilities rendered it impossible for them to conduct even the most basic background and life history investigation sufficient to discharge their obligation to present mitigating evidence to the Department of Justice as to why the death penalty should not be sought, while also having to prepare for trial of such a serious case involving voluminous discovery on such an abbreviated schedule.

On November 2, 2017, the government responded to and opposed the motion to continue. (R. 30)  The government argued that the reasons for a continuance set forth in the defense's motion all "relate[d] to the death penalty" and suggested that the Court should treat this case as non-capital case unless and until the government filed a formal

NOI.  *Id*. at 8.  It further proposed that it be given a deadline of February 1, 2018, in which to file an NOI, and asked the Court to defer ruling on the request for a continuance until after that date – i.e., 27 days or less before the trial was set to begin. *Id*.  The Response made no reference to the obligations of defense counsel or the authorities cited in the Motion to Continue. On November 7, 2017, defense counsel filed a Reply to the government's Response, describing in more detail counsel's duty to treat the case as capital from the outset, the responsibilities that flowed from this obligation and their inability to fulfill those responsibilities within the unreasonable schedule proposed by the government.  (R. 33).

On November 15, 2015, the Court issued a Memorandum Order wherein it adopted the government's view that at that point this case was no different than any other non-capital case. (R. 34).  The Court also accepted the government's suggestion that the Court set a deadline of February 1, 2018, for it to file any notice of intent to seek death and set a deadline of January 15, 2018, for the defense to file all pre-trial motions.

The effect of this ruling was that the defense had to continue attempting to prepare this case for trial on February 28, 2018, then only 105 days away and in the absence of a large amount of discovery that had not yet been produced, while simultaneously dealing with an unreasonable schedule that had been set by the Department of Justice in anticipation of the Court's February 1 deadline for the filing of the NOI.

3.      The Authorization Process and Filing of the NOI

On November 8th, the assigned Assistant United States Attorney had informed counsel for the defense by telephone that the Capital Case Committee would meet on December 4th and would consider any mitigation that the defense wished to present either in person or by video conference.  In a confirmatory e-mail on November 13th, the Assistant United States Attorney reiterated that the Department would consider any information that the defense wished to submit after that date.

Two days after the Court's Order of November 15th denying the continuance motion, defense counsel delivered a letter to the United States Attorney and the Chief of the Capital Case Section at the Department of Justice, asking them to join a request that the Court extend the February 1 deadline.  The letter noted that the defense had received only a fraction of the anticipated discovery, was only in the "earliest stage" of its relationship with Mr. Christensen and that it was unreasonable to expect the defense to be able to conduct a sufficient life history and mitigation investigation to enable a meaningful presentation by December 4th.  On November 20th, the government informed defense counsel by telephone that the request was denied.  On November 30th, 2017, defense counsel informed the Capital Case Committee by letter that given the time constraints that had been imposed, the defense had had no opportunity to conduct any meaningful mitigation investigation and thus would not be appearing at the December 4th hearing.  Counsel did point out that Mr. Christensen had no prior

8

criminal record and referenced evidence received in discovery that suggested emotional and other problems that had surfaced near the time of the alleged offense.

Throughout this time period of October through early December, 2017, counsel were working intensively with Mr. Christensen to establish the attorney-client relationship and to prepare for a possible meeting at the Department of Justice.  Having been required to devote the first three months of their appointment to this task and to secure a continuance, from mid-December 2017, until mid-January, 2018, counsel were obligated to direct their attention to preparing the pre-trial motions that the Court had directed must be filed by January 15, 2018, as well as attempting to prepare for a trial that remained set for February 28, 2018.  A total of 14 motions were filed.  (R. 35-48). On January 19, 2018, the government filed its NOI.  (R. 54).

### 4.    The Imposition of the Current Scheduling Order

In light of the fact that the case was now indisputably a death penalty case, defense counsel filed a Motion to Continue the trial and interim deadlines on January 23, 2018. (R. 55).  In their Motion, defense counsel requested that all existing dates and deadlines be vacated and stated that they would confer with the government to attempt to reach agreement on a proposed new scheduling order.  *Id.*  Finally, counsel requested that the Court convene a status conference for February 12, 2018, to discuss scheduling. *Id.*  The government thereafter filed a Response indicating that it had no objection to these requests.  (R. 57).

The Court duly scheduled a status conference to be held on February 12, 2018.
Although they conferred, the parties were unable to reach agreement on a schedule.  On
February 7, 2018, the government filed its Proposed Start Date for the Trial, in which it
urged the Court to schedule the trial for October 16, 2018.  (R. 58). Also on February 7,
2018, defense counsel filed their Proposed Scheduling Order and Memorandum in
Support, in which they requested that trial be scheduled to commence on June 4, 2019.
(R. 59).  Counsel supplemented their Memorandum with the declarations of two
preeminent experts on the field of capital litigation who provided an overview of just
how complex, multifaceted and time-consuming an endeavor it is to investigate and
prepare to present mitigating evidence in a capital case.  *Id.* Counsel also outlined some
of the particularly complex issues raised by the underlying facts of this case, including
the forensic and digital evidence.  *Id.*

Without hearing argument or discussion by the parties, at the status conference
on February 12, 2018, the Court announced that trial would be scheduled to begin on
April 3, 2019.  On February 14, 2018, the Court filed a written Order confirming the new
trial date.  (R. 67).  That Order also set the deadline for the defense to file notice under
Fed. R. Crim. P. 12.2 as September 21, 2018, over six months prior to the scheduled trial
date.  *Id.*  The defense had proposed that it be required to provide such notice no more
than 60 days prior to trial.  (R. 59 at 29).

**III.    The Scheduling Order Currently in Place Allotted Woefully Insufficient Time for Defense Counsel to Investigate and Submit Meaningful Notice of Intent to Introduce Evidence Relating to Mental Condition as Required by Fed. R. Crim. P. 12.2.**

In order to make a meaningful determination as to whether to introduce evidence regarding a capitally-charged client's mental condition at either the guilt phase or the penalty phase, counsel must complete a lengthy, multi-step process.  First, counsel must substantially complete a constitutionally adequate investigation of their client's background and social history.  Second, based upon the information revealed by that investigation, counsel must identify the types of mental health professionals whose areas of expertise are potentially implicated in the defendant's particular case.  Third, counsel must identify and retain individual experts who both have the necessary expertise in those areas and are willing and able to participate in a capital criminal proceeding.  Fourth, counsel's retained experts must review the evidence uncovered by the social history investigation.  Fifth, counsel must arrange for their experts to perform all necessary evaluative procedures, including interviewing and testing their client. Sixth, after their experts have performed their evaluations, synthesized the social history information and reached their conclusions, counsel must review those conclusions and determine whether to present the experts' testimony at either the guilt or the penalty phase of trial, or both.  Seventh, counsel must repeat steps three through six in the event that the retained experts direct that additional experts with different areas of expertise need to be engaged.

11

As can readily be appreciated, this process requires a considerable expenditure of time and resources and counsel have unsurprisingly been unable to complete it in this case in the time available thus far.  As a result, as explained more fully below, counsel are unable to file a meaningful notice of their decision regarding whether to present mental health evidence at either the guilt or penalty phase of Mr. Christensen's trial or, at this juncture, to accurately predict precisely how much time is required before they will be in a position to make that decision.  However, their work has progressed far enough that counsel are confident that, by December, 2018, they will be in a position to quantify the additional time that is needed with precision.  Counsel therefore respectfully request that the Court convene a status conference on a day convenient to the Court in December, 2018, for the purpose of establishing a deadline for the filing of their 12.2 notice.[2]

       1.      **Counsel Have a Constitutional Obligation to Conduct a Thorough Investigation of Mr. Christensen's Social History and Background.**

It is firmly established that defense counsel in a capital case have a constitutional obligation to conduct a thorough investigation of their client's background and social history.  "It is unquestioned that under the prevailing professional norms at the time of [the defendant's] trial, counsel had an 'obligation to conduct a thorough investigation of

---

[2]  Counsel acknowledge that this delay will necessitate that the date of the trial be moved beyond the current date of April 3, 2018. Given the unreasonableness of the scheduling of this case from its inception, as set forth in the Procedural History section of the motion, the April 3, 2019, trial date was never realistic.

the defendant's background.'" *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) (quoting *Williams v. Taylor*, 569 U.S. 362, 396 (2000)). *See also Wiggins v Smith*, 539 U.S. 510, 524 (2003) (finding that counsel's unreasonably truncated social history investigation violated prevailing professional norms and constituted ineffective assistance of counsel under the Sixth Amendment); *Pruitt v. Neal*, 788 F.3d 248, 272 (7th Cir. 2015) (holding that "trial counsel's failure to investigate Pruitt's mental illness fell below an objective standard of reasonableness" and constituted ineffective assistance of counsel); *Doe v. Ayers*, 782 F.3d 425, 434 (9th Cir. 2015) (noting that counsel has a "'sacrosanct duty to conduct a full and complete mitigation investigation'") (quoting *Earp v. Ornoski*, 431 F.3d 1158, 1175 (9th Cir. 2005)).

The scope of the investigation that is required is outlined in the American Bar Association's *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003) ("ABA Guidelines") and its *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 676 (2008) ("Supplementary Guidelines"). The Supreme Court has long recognized the ABA Guidelines as "'guides to determining what is reasonable,'" and thus constitutionally adequate, performance by defense counsel in a capital case. *Wiggins*, 539 U.S. at 524 (quoting *Strickland v Washington*, 466 U.S. 668, 688 (1984)). *See also Stevens v. McBride*, 489 F.3d 883, 897 (7th Cir. 2007) (same).

With respect to the social history investigation, ABA Guideline 10.7A. directs that "[c]ounsel at every stage have an obligation to conduct thorough and independent

13

investigations relating to the issues of both guilt and penalty."  The Commentary to this

Guideline elaborates:

> Because the sentencer in a capital case must consider in mitigation
> anything in the life of a defendant which might militate against the
> appropriateness of the death penalty for the defendant, penalty phase
> preparation requires extensive and generally unparalleled investigation
> into personal and family history.  At least in the case of the client, this
> begins with the moment of conception.

Commentary, Guideline 10.7, 31 Hofstra L. Rev. at 1022 (internal quotations omitted).

Among the areas that counsel must explore are:

> (1) Medical history (including hospitalizations, mental and physical illness
> or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition,
> developmental delays, and neurological damage);
>
> (2)  Family and social history (including physical, sexual, or emotional
> abuse; family history of mental illness, cognitive impairments, substance
> abuse, or domestic violence; poverty; familial instability, neighborhood
> environment, and peer influence); other traumatic events such as exposure
> to criminal violence, the loss of a loved one, or a natural disaster;
> experiences of racism or other social or ethnic bias; cultural or religious
> influences; failures of government or social intervention (e.g. failure to
> intervene or provide necessary services, placement in poor quality foster
> care or juvenile detention facilities);
>
> (3) Educational history (including achievement, performance, behavior,
> and activities), special educational needs (including cognitive limitations
> and learning disabilities) and opportunity or lack thereof, and activities;
>
> (4) Military service, (including length and type of service, conduct, special
> training, combat exposure, health and mental health services);
>
> (5) Employment and training history (including skills and performance, and
> barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education and training, and regarding clinical services).

*Id.* at 1022-23.

To thoroughly explore each of these and any other relevant areas of the client's

life,

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others.  Records -from courts, government agencies, the military, employers, etc. – can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins and children.  A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.  The collection of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

*Id.* at 1024-25.

The Supplementary Guidelines explain the task that defense counsel faces in still

further detail:

The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death.  The investigation into the client's life history must survey a broad set of sources and includes, but is not limited to:  medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the

environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

Supplementary Guidelines, 36 Hofstra L. Rev. at 689.

The investigation outlined above is required not just in preparation for the penalty phase case; it necessarily must precede the decision whether to present mental health evidence at the guilt phase, also. Commentary, ABA Guideline 10.7, 31 Hofstra L. Rev. at 1023 ("The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., . . . decisions about the need for expert evaluations (including competency, mental retardation, or insanity)").

Where defense counsel fails to satisfy the requirements of these Guidelines, courts have not hesitated to find that counsel rendered ineffective assistance. *See, e.g.,* *Wiggins*, 539 U.S. at 524 (vacating death sentence where, "[d]espite these well-defined

norms" in the ABA Guidelines, "counsel abandoned their investigation of petitioner's

background after having acquired only rudimentary knowledge of his history for a

narrow set of sources" and failed to uncover extensive history of child abuse); *Williams*,

529 U.S. at 395-96 (finding that counsel rendered ineffective assistance that fell below

professional standards by "fail[ing] to conduct an investigation that would have

uncovered extensive records graphically describing Williams' nightmarish childhood"

and revealed that he was "borderline mentally retarded"); *Porter*, 558 U.S. at  31-34

(holding that counsel rendered constitutionally ineffective assistance by failing to

conduct investigation that would have revealed client's "abusive childhood, his heroic

military service and the trauma he suffered because of it, his long-term substance abuse,

and his impaired mental health and mental capacity"); *Griffin v. Pierce*, 622 F.3d 831,

844-45 (7th Cir. 2010) (holding that trial counsel's failure to conduct adequate

investigation required reversal of death sentence in light of available evidence of child

abuse, a diagnosis of schizophrenic reaction with suicidal tendencies, past suicide

attempts and drug addictions); *Pruitt*, 788 F.3d at 272 (finding that counsel's failure to

investigate defendant's mental illness, even after they learned that he had been recently

diagnosed with schizophrenia, "fell below an objective standard of reasonableness").

  In Mr. Christensen's case, we have been diligently pursuing the investigation of

his background and social history from the moment we were able to turn our attention

to it seven months ago.  Although we still have investigative work to do, we have made

significant progress.  The defense team has spent many, many hours interviewing many

different witnesses who are located in at least six different states and gathering records

from numerous sources in a large number of different jurisdictions.  We have

painstakingly constructed our client's family tree in order to identify the universe of

people that must be interviewed and for whom records must be gathered, and to

identify patterns across generations of our client's blood relatives as the data

accumulates that allow us to hone in on the most potentially fruitful areas of pursuit.

Indeed, our investigation has proceeded sufficiently far that we have begun the second

step of identifying the types of expert assistance that the facts of this particular case

demand.

> **2.      Only After They Substantially Completed the
> Thorough Investigation of Mr. Christensen's Social History and
> Background Could Counsel Proceed to Identify the Types of
> Mental Health Experts that are Required in this Particular Case**

As noted, counsel have begun to identify the areas of expertise in mental health

that their investigation indicates must be brought to bear on this case.  This task could

not begin until the social history investigation was substantially completed.  As the

Supplementary Guidelines make clear, the range of mental health experts that may be

required in a capital case is broad, and includes:

> Medical doctors, psychologists, toxicologists, pharmacologists, social
> workers and persons with specialized knowledge of medical conditions,
> mental illnesses and impairments; substance abuse, physical, emotional
> and sexual maltreatment, trauma and the effects of such factors on the
> client's development and functioning.

Supplementary Guidelines, 36 Hofstra L. Rev. at 690. *See also* Richard G. Dudley, Jr.

and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation*

*for a Reliable Mental Health Assessment*, 36 Hofstra L. Rev. 963, 979 (2008):

> It is common for defense teams to call upon pediatricians;
> neuropsychologists; school psychologists; social workers; psycho-
> pharmacologists; endocrinologists, who understand the effects of medical
> disorders on behavior; geneticists, who can assess the physical traits of
> Fetal Alcohol Syndrome; neurologists and neurosurgeons, who
> understand the effects of nerve and brain diseases; and radiologists or
> other experts in the interpretation of various types of scans and images,
> experts in child neglect, child sexual abuse and other types of childhood
> psychological or physical trauma, the impact of environmental factors on
> childhood growth and development, or substance abuse.

Obviously, not all of these types of experts will be necessary or appropriate in

every case. As several commentators have observed, the only way to identify the subset

that is required is by analyzing the fruits of the social history investigation.

> [C]apital defense counsel are well advised to conduct a thorough social
> history investigation before retaining mental health experts. Only after
> the social history data have been meticulously digested and the multiple
> risk factors in the client's biography have been identified will counsel be
> in a position to determine what kinds of culturally competent experts are
> appropriate to the needs of the case, what role the experts will play, and
> what referral questions will be asked of the experts.

Russel Stetler, *Mental Health Evidence and the Capital Defense Function – Prevailing Norms*,

82 U.M.K.C. L. Rev. 407, 427 (2014). *See also* Dudley and Blume Leonard, *supra*, at 975

("All too often, defense teams permit premature and inappropriate mental health

evaluations to take place . . . In capital litigation, an accurate and reliable life history

investigation is the foundation for developing and presenting pivotal mental health

issues"); Douglas S. Liebert, Ph.D. and David V. Foster, M.D., *The Mental Health*

*Evaluation in Capital Cases: Standards of Practice*, 15 Am. J. of Forensic Psychiatry 43, 46-

47 (1994) ("An adequate social, developmental and medical history is the crucial first

step in a mental health evaluation in a capital case . . . Only after a social and

developmental history has been provided and reviewed, is it appropriate to determine

the kinds of diagnostic tests to administer and the types of other professionals to

collaterally involve in the assessment").

     Failure to heed this common-sense advice frequently leads to a later finding that

counsel's performance was constitutionally defective for failure to identify necessary

experts.  In *Stevens v. McBride*, 489 F.3d 883 (7th Cir. 2007), the Seventh Circuit found

that trial counsel rendered ineffective assistance with respect to their inadequate

handling of expert psychological testimony at the penalty phase of the defendant's

capital trial.  Counsel retained a psychologist, the director of a child and adolescent

psychiatric center, to evaluate their client whom they knew to have been the victim of

extensive sexual abuse and to have been given a diagnosis of major depression and

possible schizophrenia.  *Id*. at 887-88.  The psychologist thereafter prepared a report that

was "extremely detrimental" to the client's case, describing him in disparaging terms

and denying the existence of any major mental health symptoms.  *Id*. at 888.  Despite

apparently realizing that their expert was "a quack," counsel called him to testify

anyway, not once but twice, and, predictably, it was a disaster.  *Id.* at 888-89.

In post-conviction proceedings, it came to light that the defendant in fact was "severely mentally ill" and had a "very severe dissociative disorder" that was active at the time of the capital crime. *Id.* at 892. The court vacated the defendant's death sentence on the grounds of ineffective assistance of counsel for their failure to identify the appropriate experts to evaluate and testify regarding the defendant's condition. *Id.* at 897-98.

Similarly, in *Pruitt*, 788 F.3d at 272, the Seventh Circuit found trial counsel to be ineffective where, although they investigated and presented evidence of the defendant's intellectual disability, they failed to investigate and retain experts regarding his mental illness. This failure to properly investigate first, and the resultant failure to recognize that they needed the assistance of an expert in psychosis, deprived the defendant of testimony that he suffered from paranoid schizophrenia causing hallucinations and paranoid delusions. *Id.* at 271. The court held that "Pruitt's trial counsel did not conduct a thorough investigation into Pruitt's mental health and therefore did not make 'an informed choice' about what mental health evidence to present at sentencing. The failure to contact an expert in dealing with psychosis and schizophrenia left counsel ignorant about the potential mitigation evidence," and vacated the defendant's death sentence. *Id.* at 275-76.

Other circuit courts of appeals have reached similar conclusions. In *Caro v. Woodford*, 165 F.3d 1223 (9th Cir. 1999), the Ninth Circuit found that counsel performed deficiently where, although they retained four different mental health experts, their

21

inadequate investigation led to the failure to identify the most important area of expertise that was necessary in the case – namely, expertise in the effects of chronic exposure to neurotoxins on brain function and behavior.  The oldest son of immigrant farm laborers, the defendant had spent his entire life living and working around pesticides and had been exposed to a staggering amount of toxic chemicals.  *Id.* at 1225.  As the court stated, "[c]ounsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult."  *Id.* at 1226.  Their failure to perform this constitutional duty required remand for an evidentiary hearing on the defendant's claim of ineffective assistance of counsel, *id.* at 1228, following which his death sentence was vacated, *Caro v. Vasquez*, No. 93-04159 (N.D. Cal. June 22, 2000).

The Fifth, Sixth, Tenth and Eleventh Circuits are in accord.  *See Lockett v. Anderson*, 230 F.3d 695, 713-16 (5th Cir. 2000) (finding ineffective assistance where counsel conducted inadequate investigation of defendant's background and mental health and failed to present expert testimony that he suffered from seizures due to temporal lobe epilepsy); *Skaggs v. Parker*, 235 F.3d 261, 267 (6th Cir. 2000) (finding counsel ineffective for failing to investigate mitigating evidence and presenting the unhelpful testimony of an incompetent and fraudulent psychologist instead of expert testimony regarding the defendant's mental retardation and diminished mental capacity that was available); *Littlejohn v. Trammell*, 704 F.3d 817, 862-63 (10th Cir. 2013) (finding ineffective assistance where, while counsel presented testimony of a psychologist regarding defendant's troubled childhood, he failed to even investigate

whether defendant suffered from a brain-related condition and thus failed to present available neuropsychological testimony revealing organic brain damage); *Ferrell v. Hall*, 640 F.3d 1199, 1227, 1234 (11th Cir. 2011) (finding that counsel rendered ineffective assistance where they conducted "a profoundly incomplete investigation" and retained an expert to address only mental retardation and the validity of the defendant's Miranda waiver, failing to present available expert evidence that the defendant suffered from "organic brain damage, bipolar disorder, an epileptic or seizure disorder, and borderline mental retardation").

Our investigation to date has uncovered information about Mr. Christensen's life course and those of numerous members of his family from several different generations that indicates at least three types of mental health experts must be consulted in this case.

### 3. Counsel are in the Process of Identifying and Retaining Experts Who Possess the Necessary Expertise on the Issues that Have Been Identified as Present in this Case.

As outlined above, having identified the areas of expertise that are required based upon the social history investigation that has been conducted, the next step is to identify individual experts who possess the requisite qualifications and expertise. "[T]he qualifications, experience, and credibility of mental health experts are critically important when selecting an expert." Dudley and Blume Leonard, *supra*, at 976. "Defense teams need to look at an expert's clinical training, current experience, and earned expertise in his field."  *Id.* at 978.  "It is up to counsel to define the purpose of a

23

mental health evaluation, discuss the purpose and scope of the assessment with the expert, explore biases and vulnerabilities of the expert, and conclude that the expert is suited to the case before engaging him." *Id.* at 976.  *See Stevens*, 489 F.3d at 888-89 (noting that "[t]he general qualifications of an expert witness do not guarantee that the witness will provide proficient assistance in any given instance" and finding that counsel rendered ineffective assistance by presenting the testimony of a witness about whom there were "serious and well-founded doubts" about his fitness).

Not only must a mental health expert possess sufficient qualifications and expertise, they must also be willing (a) to become involved in a death penalty case and (b) in a position to devote sufficient time to conduct a thorough evaluation of Mr. Christensen.  Counsel have identified and retained two of the three experts with which they have determined they must consult and are working diligently to identify and retain the third.

In some cases, and this is one of them, a highly specialized area of expertise is required.  In such a circumstance, the pool of appropriate individuals is significantly reduced as compared to those in more common fields.  The most qualified and esteemed experts are in high demand and typically have other obligations, such as academic posts or clinical practices, that place severe constraints upon their time and availability.  *See* Dudley and Blume Leonard, *supra*, at 977-78 ("counsel must not rely solely on an expert's forensic experience when selecting a mental health expert.  Experts who work solely in the forensic setting may keep their composure during testimony but

they may risk losing clinical sharpness in their field . . . [M]any of the most appropriate experts in capital cases are experts who have the empathy and understanding of clinicians plus the communicative skills of teachers").

To identify an individual who can fill the role that is vitally important in this case, we have been consulting with resource counsel from the national Federal Death Penalty Resource Counsel Project, consulting with our retained consulting psychiatrist and seeking recommendations from our extensive network of colleagues engaged in capital defense throughout the nation.  We expect to be able to identify and retain an appropriate person by December, 2018.

> 4. **Counsel Have Begun Providing Their Retained Experts With the Information Revealed by Their Social History Investigation, Which is a Prerequisite for any Reliable Mental Health Evaluation.**

Another reason why no meaningful mental health evaluations can occur until counsel have substantially completed their investigation of a capital client's social history is that counsel's retained experts must have access to the fruits of that investigation in order to perform a competent evaluation.  To perform an evaluation that satisfies the requirements of "thoroughness and acceptable limits of reliability and validity" demanded in a capital case, the expert must first be provided with "an accurate medical, developmental, psychological and social history.  Historical biopsychosocial data must be obtained not only from the accused, but from independent and multiple sources to provide an adequate data base of convergent validity . . . An accurate and broad based history has been called the 'single most

25

valuable element help the clinician reach an accurate diagnosis.'"  Liebert and Foster, *supra*, at 46 (quoting H.I. Kaplan and B.J. Sadock, *Comprehensive Textbook of Psychiatry*, (4th ed. 1985)).

Indeed, "[u]ntil the life history investigation is complete, the mental health expert can render only a preliminary diagnosis or a differential diagnosis based on the incomplete information available to him. When life history information is incomplete, the mental health expert must request further life history investigation to gather the information necessary to reach a credible and firm diagnosis." Dudley and Blume Leonard, *supra*, at 984.  *See also* George W. Woods, David Freedman and Stephen Greenspan, *Neurobehavioral Assessment in Forensic Practice*, 35 Int'l J. Law and Psychiatry 432, 434 (2012) ("A multigenerational and comprehensive social history . . . is critical in creating a longitudinal and holistic understanding of the individual and illustrating how his or her test scores translate into behaviors in the real world over time that may be relevant to the criminal . . . case").

Once again, the courts are keenly aware of this standard of practice in a capital case and have found grounds for reversal where counsel have violated this basic professional norm. For example, in *Caro*, 165 F.3d at 1226, the Ninth Circuit held that, once the determination of which experts are required has been made, "counsel must present those experts with information relevant to the conclusion of the expert."  Not only did Mr. Caro's counsel fail to recognize that he needed to consult a neurologist or a toxicologist, "he failed to provide those experts who did examine Caro with the

information necessary to make an accurate evaluation of Caro's neurological system."
*Id*.  As noted above, the combination of these failures ultimately led to the reversal of
Mr. Caro's death sentence.

In *Doe*, 782 F.3d at 439-440, 446, the Ninth Circuit found "overwhelming"
evidence that counsel performed deficiently based in part upon the fact that, although
he hired an appropriate mental health expert, "[t]he only background materials he
provided her were police reports.  When she left a message saying that she had 'no
documents on background,' he did not bother to return her call.  This left [counsel]
effectively without the assistance of any expert at all at the penalty phase," a situation
that the court deemed "objectively unreasonable."  *See also Wallace v. Stewart*, 184 F.3d
1112, 1114 (9th Cir. 1999) (finding ineffective assistance where, inter alia, counsel
provided his retained psychiatrist with "no information about Wallace's background or
family history"); *Bloom v. Calderon*, 132 F,3d 1267, 1278 (9th Cir. 1997) ("As a result of
trial counsel's woefully deficient performance . . . [the defense mental health expert]
was not provided with sufficient information and, as a result, his testimony not only
failed to help the defense, it significantly hindered it").

Other circuits have approached the issue similarly. In *Ferrell*, 640 F.3d at 1219, the
Eleventh Circuit found ineffective assistance where, inter alia, counsel provided her
retained psychiatrist with only the report of a limited evaluation by a psychologist and
the defendant's jail records and failed to tell him "anything about Ferrell's visions,
anything about his courtroom seizure during the charge conference, or even about his

mother's nervous breakdown."  The psychiatrist later testified in post-conviction proceedings that "'[i]f I had been given information related to Mr. Ferrell's history of hearing voices and hallucinations, and history of head injuries, I would have referred him for neuropsychological testing and would have attempted to conduct a more extensive evaluation.'" *Id.*at 1220.  *See also Jacobs v. Horn*, 395 F.3d 92, 103-04 (3rd Cir. 2005 (finding ineffective assistance where trial counsel failed to provide his mental health expert "with any background information concerning the crimes or Jacob's history" and, "[a]s a result, no psychological testing occurred"); *Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 594 (3rd Cir. 2015) (faulting trial counsel for failing to secure full psychiatric evaluation of his client and "never even provid[ing psychiatrist] with Saranchak's medical records or mental health background, information that [the psychiatrist] opined would have been necessary to conduct a more general clinical evaluation beyond Saranchak's competency").

In this case, counsel have already provided their two retained experts with voluminous background and social history materials regarding Mr. Christensen and his family and are diligently working to organize and produce additional materials that will be provided to the experts shortly.

> **5.      Counsel Have Also Begun to Make Arrangements
> for Their Retained Experts to Perform All Necessary
> Evaluation Procedures.**

As noted above, the next step of the process of obtaining competent, reliable mental health evaluations of Mr. Christensen is for our retained experts to perform all

necessary procedures, including interviewing and conducting appropriate testing of

Mr. Christensen himself.  Because of the requirement that counsel complete all previous

steps before reaching this one, neither of the experts that counsel have retained to date

have seen Mr. Christensen.  One expert was tentatively scheduled to see Mr.

Christensen in August, 2018.  However, subsequent irreconcilable conflicts prevented

the expert from complying with that schedule.  That expert is now scheduled to see Mr.

Christensen in October, 2018.  The second expert will see Mr. Christensen either in

October or November of this year.  As soon as the third expert is identified and

retained, and has had an opportunity to review the results of the social history

investigation, counsel will expeditiously make arrangements for that expert to see Mr.

Christensen, also.

> **6.      Once Counsel's Retained Experts Have Completed Their
> Evaluations and Reached Their Conclusions, Counsel Will Be in
> a Position to Make a Determination Regarding Whether to
> Present Mental Health Evidence at Either the Guilt or
> Penalty Phases of Trial.**

Once counsel's retained experts have completed their evaluations and reached

their conclusions, counsel will be in a position to make the necessary determination of

whether to present mental health evidence at either the guilt or penalty phase of Mr.

Christensen's trial, or both.  By December, 2018, we anticipate that two of counsel's

retained experts will have seen Mr. Christensen and begun their evaluative processes

and thus they will be able to provide us with an accurate estimate of how much time

they need to complete their assessments and formulate their conclusions. Additionally,

the third expert known to be required will have been identified and retained and we

will be able to estimate when the expert will be able to see Mr. Christensen and how

much time he or she will require to complete an evaluation.  In the event that either or

both retained experts identifies a need for further testing or for the addition of a mental

health professional with a different area of expertise, we will know that by December,

also. We therefore believe that, by then, we will be able to pinpoint a realistic date by

which the final determinations can be made and thus that meaningful 12.2 notice can be

filed.  Accordingly, we respectfully request that the Court schedule a status conference

in December, 2018, for the purpose of setting a deadline for the defense 12.2 notice.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:   309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 21, 2018, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller

and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org