**E-FILED**
Friday, 28 September, 2018  06:11:59 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

### MOTION FOR CHANGE OF VENUE FOR TRIAL

Defendant BRENDT A. CHRISTENSEN, by and through his attorneys, and

pursuant to the Fifth and Sixth Amendments to the United States Constitution and Fed.

R. Crim. P. 21(a) and (b), moves this Court for the entry of an Order granting a change

of venue for trial in this case from the Urbana Division of the Central District of Illinois,

to the Peoria Division of the Central District of Illinois, and in support thereof, states as

follows:

### Introduction

Not since the case of *United States v. John E. Ewing*, No. 02-CR-20008 (C.D. Ill),[1]

the lone, deranged man accused and convicted of firebombing Judge George Miller's

---

[1] In *Ewing,* the defendant was detained in federal custody for seven years undergoing
psychiatric treatment before U.S. District Judge Michael McCuskey ultimately found him
competent or fit to stand trial. And yet, even with the passage of such a significant period from
April 8, 1997, the date of the offense, to May 24, 2004, when trial commenced in the Urbana
Division, Judge McCuskey deemed it necessary to grant defense counsels' motion for change of
venue to the Rock Island Division after the Court found it all but impossible to select a jury
composed of fair and impartial jurors who were not unduly influenced by the notoriety and

courtroom at the old Champaign County Courthouse on April 8, 1997, has the Central

District of Illinois seen another case involving such extensive, unrelenting,

inflammatory, and inherently prejudicial pretrial publicity in the local media as Mr.

Christensen's. And what makes the journalistic tsunami of publicity in this case so

presumptively prejudicial to Mr. Christensen's constitutional right to a fair and

impartial trial is the fact that only fifteen months have elapsed from the date of his

arrest on June 30, 2017, for the offense of kidnapping Ms. Zhang on the campus of the

University of Illinois, to the present date, thus raising the specter that all of what we

have observed thus far from the local media is but a "spit in the bucket" compared to

the multi-media deluge that is expected to come in the time leading up to trial.

The constitutional guarantee of a fair and impartial trial, one in which a case is

decided on its facts and not on community opinion, is not a recent development. One

hundred-eleven years ago, in the case of *Patterson v. Colorado*, 205 U.S. 454, 462 (1907),

Justice Oliver Wendell Holmes wrote that, "[t]he theory of our system is that the

conclusions to be reached in a case will be induced only by evidence and argument in

open court, and not by any outside influence, whether of private or public print." More

than seventy-eight years ago, in *Chambers v. Florida*, 309 U.S. 227, 236-37 (1940), the

Supreme Court declared that "no man's life, liberty or property [should] be forfeited as

---

massive pretrial publicity in the case and had not prejudged Mr. Ewing's guilt. In September, 2004, the case proceeded to trial in the Rock Island Division, a jury was selected and impaneled with no serious difficulty, and the defendant was found guilty following a week-long trial. Mr. Ewing's conviction was affirmed on appeal. *See United States v. Ewing*, 494 F.3d 607 (7th Cir. 2007).

criminal punishment for violation of [a] law without a charge fairly made and fairly tried in a public tribunal free of prejudice, excitement, and tyrannical power." And more than fifty-seven years ago, in setting aside a conviction and death sentence based upon the failure to change venue, the Supreme Court wrote, "[w]ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion." *Irvin v. Dowd*, 366 U.S. 717, 728 (1961).

Today, in 2018, more than any other time in our nation's history, the broadcast, print, and electronic media is equipped with vast technological power via the internet and the airwaves to influence community opinion negatively against a citizen accused of a heinous crime.  This Court must therefore be especially vigilant in protecting Mr. Christensen's fundamental constitutional right to a fair and impartial trial, and in preventing the irreparable and prejudicial taint of massive pretrial publicity from influencing the outcome of this case.

Accordingly, for the reasons that follow, this Court should grant a change of venue for trial in this case, and transfer venue to the Peoria division which has not been so unduly affected and influenced by such extensive and prejudicial pretrial publicity.

### Legal Standard for Transfer or Change of Venue

The Sixth Amendment secures to an accused the right to trial "by an impartial jury of the state and district wherein the crime shall have been committed." *See also* U.S. Const., Art. III, §2, cl. 3. However, the constitutional place-of-trial prescriptions do not prevent transfer to a different location at the defendant's request if extraordinary local

prejudice will prevent a fair trial. *Skilling v. United States*, 561 U.S. 358 (2010)(citing *In Re Murchison*, 349 U.S. 133, 136 (1955)).

Federal Rule of Criminal Procedure 21(a) provides that "[u]pon the defendant's motion, a court must transfer the proceeding . . .  to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Such a transfer is warranted if "extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling*, 561 U.S. at 378 (quoting *Murchison*, 349 U.S. at 136).

The Supreme Court has long held that, when the community from which jurors are drawn is sufficiently affected by adverse publicity, or by the effects of the events at issue, or both, there arises a presumption of prejudice such that voir dire cannot perform the usual function of securing a fair and impartial jury. *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966); *Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963); *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961). Granted, a presumption of prejudice will only arise in the extreme case. *Skilling*, 561 U.S. at  381. But this is such a case. The massive and unrelenting pretrial publicity, tremendous local impact, and galvanizing community reaction that compelled a change of venue in the Champaign County Courthouse firebombing case compels the same conclusion in the instant case that Mr. Christensen cannot receive a fair and impartial trial in the Urbana Division of the Central District of Illinois.

Supreme Court precedent supports Mr. Christensen's request that venue be changed to a more fair and impartial venue for trial. The leading case on the interplay of the accused's due process and the fair trial guarantee with prejudicial publicity and pre-formed community opinion remains *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In *Sheppard*, the defendant was convicted of murdering his wife amidst "massive, pervasive and prejudicial publicity," which included a coroner's inquest attended by the media, sensational headlines and articles documenting inadmissible evidence, and statements by agents of the prosecution detailing their opinions about the evidence and the strength of the case. *Id.* at 335, 338-42. In overturning the defendant's conviction, the Supreme Court wrote:

> Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused . . . But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abides, or transfer it to another county not so permeated with publicity.

*Id.* at 362-363.

In *Irvin v. Dowd*, 366 U.S. 717, 728 (1961), the defendant was convicted of murder following intensive and hostile news coverage. The trial judge had granted a defense motion for a change of venue, but only to an adjacent county, which had been exposed to essentially the same news coverage. At trial, 430 persons were called for jury service; 268 were excused because they had fixed opinions as to guilt. Eight of the 12 who

served as jurors thought the defendant guilty, but said they could nevertheless render an impartial verdict. On review, the Supreme Court vacated the conviction and death sentence and remanded to allow a new trial for, "[w]ith his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion ." 366 U.S. at 728.

Similarly, in *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Court reversed the conviction of a defendant whose staged, highly emotional confession had been filmed with the cooperation of local police and later broadcast on television for three days while he was awaiting trial, saying "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726.

In its most recent pronouncement concerning the presumption of prejudice arising from pretrial publicity, in *Skilling,* 561 U.S. at 380, the Court clarified that, although in prior cases it had overturned convictions obtained in a trial atmosphere corrupted by press coverage, those holdings "'cannot be made to stand for the proposition that juror exposure to . . .  news accounts of the crime . . .  alone presumptively deprives the defendant of due process.'" "Prominence does not necessarily produce prejudice, and juror impartiality, we have reiterated, does not require ignorance." *Id.* (citing *Irvin*, 366 U.S. at 722 and *Reynolds v. United States*, 98 U.S. 145, 155–56 (1879)).

In *Skilling*, the Supreme Court laid out several factors to be considered when deciding whether the district court exceeded constitutional limitations by declining to grant the request to change venue. 561 U.S. at 382. First, the Court considered the size and characteristics of the community in which the crime occurred. *Id*. Second, the Court examined the nature of the news stories, noting that "they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id*. at 382-83. Third, the Court addressed the timing of the trial in relation to the alleged crime, recognizing that over four years had elapsed between the fall of Enron Corporation and former CEO Skilling's trials and that, although news media coverage continued throughout the period, the level of attention "diminished somewhat" in the years following Enron's collapse. *Id*. at 383. Finally, and not relevant at this stage of the proceedings in the instant case, the Court considered the jury's acquittal of Skilling on nine insider-trading counts, noting that earlier instituted prosecutions of Enron also had not yielded an overwhelming victory for the Government. *Id*. at 383-84.  The Court concluded that the pervasive pretrial publicity in that case did not inevitably lead to a finding of presumed prejudice and affirmed the denial of a change of venue under Rule 21(a). *Id*. at 384-85.

Seventh Circuit authority mirrors the Supreme Court's analysis in *Skilling*. *See United States v. Philpot*, 733 F.3d 734 (7th Cir. 2013). Under the Seventh Circuit's analysis, defendants can adduce "prejudice" in support of a transfer of venue for trial under Rule 21(a) by showing that individual jurors were actually exposed to material that

prevented them from judging the case impartially or, alternatively, defendants can show presumed prejudice, which occurs when "pervasive and inflammatory pretrial publicity makes juror bias inevitable." *Id.* at 740.  *See also United States v. Nettles*, 476 F.3d 508, 513 (7th Cir. 2007). The factors used to assess presumed prejudice include the size and characteristics of the community where the crime occurred; the nature of the news stories; and the time that elapsed between the news coverage and the date of trial. *Philpot*, 733 F.3d at 741.

### Size and Characteristics of Urbana Division

Under the first criterion for assessing presumptive prejudice arising from pretrial publicity under *Skilling*, this Court must look to the size and characteristics of the Urbana Division of the Central District of Illinois. Below is a chart showing the demographic profile of the Urbana Division using data provided by the U.S. Bureau of the Census:

DEMOGRAPHICS FOR THE URBANA DIVISION COUNTIES IN THE CDIL

| COUNTY | POPULATION EST. 2016 | %WHITE | %BLACK | %LATINO | %ASIAN | %BACHELORS OR HIGHER | MEDIAN HOUSEHOLD INCOME | %IN POVERTY |
|---|---|---|---|---|---|---|---|---|
| CHAMPAIGN | 208,419 | 72.9 | 13.1 | 5.8 | 10.7 | 43.4 | $46,495 | 20.1 |
| COLES | 52,343 | 92.9 | 4.2 | 2.5 | 1 | 24.1 | $39,588 | 21.8 |
| DOUGLAS | 19,630 | 97 | 0.7 | 7.4 | 0.8 | 17.8 | $51,810 | 10.2 |
| EDGAR | 17,566 | 98 | 0.5 | 1.2 | 0.3 | 18.1 | $45,691 | 13.9 |
| FORD | 13,575 | 96.9 | 1 | 3.2 | 0.4 | 16.6 | $49,947 | 11.3 |
| IROQUOIS | 28,334 | 96.5 | 1.1 | 6.7 | 0.6 | 15.3 | $47,834 | 13.3 |
| KANKAKEE | 110,008 | 81.2 | 15.3 | 10.4 | 1.1 | 18.8 | $52,110 | 15.2 |
| MACON | 106,550 | 78.3 | 17.3 | 2.2 | 1.2 | 22.9 | $47,176 | 18.2 |
| MOULTRIE | 14,827 | 98.1 | 0.5 | 1.2 | 0.3 | 15.7 | $49,681 | 8.6 |
| PIATT | 16,560 | 97.7 | 0.6 | 1.1 | 0.5 | 27.6 | $66,261 | 6.5 |
| VERMILLION | 78,111 | 82.6 | 13.8 | 5 | 0.9 | 13.8 | $42,997 | 18.4 |
| URBANA DIVISION AVERAGES | 60,538 | 90.19 | 6.19 | 4.24 | 1.61 | 21.28 | $49,053 | 14.31 |
| TOTAL POP. | 665,923 | | | | | | | |

SOURCE: United States Census Bureau website: www.census.gov

While the Urbana Division's total population is 665,923, almost one-third of the population resides in Champaign County, the home of the State's flagship university, the University of Illinois at Champaign-Urbana. The University of Illinois is world-renowned and unique amongst elite academic institutions for a number of reasons. As particularly relevant in this case, the University enrolls more Chinese students than any other American university—over 5000, or 12 per cent of its student body. http://www.npr.org/2015/10/16/449238085.

Ms. Zhang came to the University of Illinois from her home in Nanping, a small city in the Fujian province in southeast China, in April, 2017, as a visiting scholar studying photosynthesis and crop productivity for one year. Unquestionably, her

disappearance since June 9, 2017, and the nature of the charges brought against Mr.

Christensen have not only drawn extensive national and international attention, but

have also had, and will continue to have, a deep and profound impact upon the entire

University of Illinois community, its Chinese student population, and all of the

residents of the eleven East-Central Illinois counties that comprise the Urbana

Division. Therefore, the first *Skilling* factor—the size and characteristics of the Urbana

Division - strongly favors a change of venue in this case.

### Nature of News Stories

Under the second criterion for assessing presumptive prejudice arising from

pretrial publicity set forth in *Skilling*, this Court must look to the nature of the news

coverage and stories that have run since the case originated.

This case has been in the local and national news virtually uninterrupted since

June 22, 2017. During that time, there has been extensive coverage of the case's

development that continues to grow at an exponential rate. For example, as of January

12, 2018, a simple Google search of Mr. Christensen's name resulted in 88,000 hits; as of

September 25, 2018, a search of Mr. Christensen's name results in 397,000 hits. Likewise,

as of January 12, 2018, a Google search of Yingying Zhang's name resulted in 460,000

hits; as of September 25, 2018, a search of Ms. Zhang's name results in 924,000 hits.[2] The

coverage has included articles in newspapers both in print and online, group

---

[2] All web searches and websites mentioned in this Motion were last performed/visited on
January 12, 2018, and September 25, 2018.

discussions on social media, and stories on both television and radio. The press coverage which reaches potential jurors in the Urbana Division has been particularly relentless.

The News-Gazette is a newspaper based in Champaign, Illinois, that has covered the case closely. Between June 22, 2017, and August 26, 2018, the News-Gazette published 82 articles about the case. *See* Exhibit A – Spreadsheet of News-Gazette Press Coverage; Exhibit B – Copies of News-Gazette Articles.

The printed edition of the News-Gazette has an estimated circulation of between 40,000 and 47,000 depending on the day of the week.[3] In addition to the printed edition, the News-Gazette has a website and a significant social media presence which includes 30,286 followers on Facebook and 40,100 followers on Twitter.[4]

The News-Gazette's circulation area includes nine of the eleven counties that make up the Urbana Division of the Central District.[5]  This case has been a huge boon to the News-Gazette's business. According to the Vice-President of the newspaper, posting articles about Brendt Christensen caused their web traffic to go "haywire," resulting in 2 million page views in one week. *See* Exhibit C – Screenshot of Facebook post. The

---

[3] http://classifieds.stores.yahoo.net/chamilnew.html
[4] https://www.facebook.com/newsgazette/; https://twitter.com/news_gazette
[5] The News-Gazette circulation area includes Champaign, Vermilion, Piatt, Ford, Douglas, and portions of Macon, McLean, Iroquois, Coles, Edgar and Moultrie counties. http://obits.oregonlive.com/Obituaries.asp?Page=PlaceAnObituary&NewspaperID=1817. The only two counties in the Urbana Division that do *not* get the News-Gazette are Kankakee and McLean counties.

"most-viewed" photo gallery on news.gazette.com was related to this case. *See* Exhibit

D – Screenshot of Facebook post.

In addition to the News-Gazette, the case has received extensive coverage on

other social media. The Facebook page "Find Yingying" is followed by 5,007 people.[6]

Ms. Zhang's family has used social media to solicit donations to help find her.

(https://www.gofundme.com/missing-u-of-i-scholar). The family's account has raised

$156,811, some of which has gone to fund a $50,000 reward being offered by

Champaign County Crime Stoppers; it is the largest reward ever offered in the

organization's history.[7]

The hashtag #brendtchristensen on Twitter returns 26 pages of results. *See*

Exhibit E. The hashtag #findyingying returns 35 pages of results. *See* Exhibit F. The

hashtag #YingyingZhang returns 233 pages of results. *See* Exhibit G. The user

@find_yingying has 1503 followers and produces 95 pages of results from Twitter. *See*

Exhibit H.

Between the News-Gazette, other local newspapers, online news outlets, TV

news stories, and social media, the vast majority of people in the Urbana Division have

been exposed to information about the case. The press is following every procedural

move made by both parties. For example, the Superseding Indictment in this case was

filed on October 3, 2017. Within 24 hours, there was written coverage of the new charge

---

[6] https://www.facebook.com/findingyingying/
[7] http://www.news-gazette.com/news/local/2017-07-14/reward-info-ui-scholars-whereabouts-raised-50000.html

twice in the News-Gazette, once in the Daily Illini, and on local news and radio.[8] The

arraignment on the Superseding Indictment, which took place on October 11, 2017,

received similar local coverage. After defense counsel filed a Motion to Continue the

jury trial in early November, there were articles in the News-Gazette and the Daily Illini

immediately following the filing.[9] And since that date, there have been articles

published and stories broadcast on every motion filed, and every hearing conducted,

and every ruling entered by the Court.

     In addition to simple procedural coverage, the press has taken an interest in Ms.

Zhang's family and has pursued multiple human interest pieces on their lives in

relation to this case. Ms. Zhang's mother has been quoted multiple times expressing her

pain and personal agony at the absence of her daughter, and begging to know where

she is: "I am in pain, every night when I go to bed. I hardly get any sleep. I just keep

having dreams about my daughter. Please tell me where my daughter is."[10] The family

published an open letter in which it was stated that Ms. Zhang's mother, upon learning

---

[8] http://www.news-gazette.com/news/local/2017-10-03/superseding-indictment-christensen-charged-with-kidnapping-resulting-scholars-;
https://dailyillini.com/news/crime/2017/10/03/christensen-facing-either-life-prison-death-penalty/; http://www.illinoishomepage.net/news/local-news/christensen-kidnapping-resulting-in-death/824429664; http://www.news-gazette.com/news/local/2017-10-04/yingyings-family-sorrowful-grateful-hopeful.html;
http://peoriapublicradio.org/post/grand-jury-indicts-alleged-kidnapper-yingying-zhang-her-murder#stream/0

[9] http://www.news-gazette.com/news/local/2017-11-08/accused-kidnappers-attorneys-want-trial-delayed-until-october-2018.html; https://dailyillini.com/news/2017/11/09/christensen-lawyers-ask-delay-alleged-kidnapping-trial/

[10] https://dailyillini.com/news/2017/10/28/the-evil-will-always-be-punished/

of her daughter's disappearance, "passed out multiple times" and "suffered loss of sleep and appetite."[11] When the parties appeared in court on October 11, 2017, for the arraignment on the superseding indictment, Ms. Zhang's mother became emotionally distraught and tearful and had to be escorted from the courtroom while demanding of Mr. Christensen in her native Mandarin in open court, "give my daughter back!"[12] These events were immediately reported in the media.

When the family decided to return to China, it was highly publicized that Ms. Zhang's mother was in ill health and continued to suffer emotional trauma over the events surrounding this case.[13]  And on June 6, 2018, there was extensive reporting of a memorial service for Ms. Zhang that was attended by members of her family and by several law enforcement officials, University of Illinois faculty, staff, and students, and scores of community members.[14]

Finally, there have been significant details about the case that have been exposed in the press, such as the fact that Mr. Christensen allegedly visited a fantasy website

---

[11] http://www.news-gazette.com/pdf/2017-09-06/pdf-public-letter-zhang-family.html
[12] https://foxillinois.com/news/local/give-my-daughter-back-the-cry-of-yingyings-mom-inside-the-courtroom
[13] http://www.news-gazette.com/news/local/2017-11-12/search-yingying-zhang-family-returning-china-moms-health.html
[14] http://www.news-gazette.com/news/local/2018-06-06/memorial-service-planned-anniversary-ui-scholars-disappearance.html,, https://www.illinoishomepage.net/news/local-news/yingying-s-year-anniversary-nears/1222879142,
http://www.wandtv.com/story/38361517/memorial-service-to-mark-1-year-since-yingying-zhangs-disappearance, https://dailyillini.com/news/2018/06/06/chinese-students-and-scholars-association-to-hold-memorial-for-yingying-zhang/.

that included information about abduction fantasies, described an ideal victim, and

engaged in a physical altercation with Ms. Zhang at his apartment.[15]

   The public is also aware of the government's theory of the crime:

> "Prosecutors say that Zhang got into the vehicle of
> Christensen, a former graduate student at the university.
> They say he forcibly abducted her and took her to his
> apartment. They say Christensen after initially denying any
> contact with Zhang, later said he had merely given "an
> Asian female" (in the words of the criminal complaint
> document) a ride, and dropped her off a few blocks later.
> The prosecutors say their court case will point to records
> from Christensen's smart phone that show he followed
> threads about kidnapping and abduction fantasies on online
> fetish networking sites, prior to Zhang's disappearance."[16]

   The public response to this intense coverage has been overwhelmingly negative

towards Mr. Christensen from the beginning of the case. For example, on July 12, 2017,

the News-Gazette published a Facebook post entitled "Indictment: Christensen

'decoyed, kidnapped, abducted' UI scholar."[17] The post linked to an article on the

newspaper's website which discussed the procedural status of the case, some of the

---

[15] http://www.news-gazette.com/news/local/2017-07-05/now-bail-denied-christensen-
allegedly-described-characteristics-ideal-victim-v;
https://dailyillini.com/news/2017/07/05/alleged-kidnapper-denied-bail-described-ideal-
victim/; http://www.news-gazette.com/news/local/2017-07-06/accused-kidnapper-held-
without-bail-feds-say-scholar-fought-him-apartment.html
[16] https://will.illinois.edu/news/story/family-of-yingying-zhang-awaits-new-year-and-trial-
of-accused-kidnapper
[17] https://www.facebook.com/newsgazette/posts/10154537149482890

allegations contained in the indictment, and the U.S. Attorney's statement on the case

thus far.[18] Public comments on the article read, in part, as follows:

> "Turn him over to a black ops, wet work team and you will have an answer in days if not minutes, just keep the hand wringing blood sucking liberals away from the process."

> "This is going to sound horrible but I don't think he is keeping the whereabouts secret as a bargaining chip. He is doing it because holding her body hostage holds her family, friends and this town hostage. He gets off on the power of it all."

> "Just shoot him execution style fuck our tax dollars paying for him"

> "Extradite him to China. They'll handle it."

> "HANG THE SON OF S (*sic*) BITCH, HE IS S (*sic*) FUCKING COWARD"

On December 3, 2017, the News-Gazette posted an article to its Facebook.com

page entitled "Death-penalty decision in missing scholar case could go either way."

https://www.facebook.com/newsgazette/posts/10154907886207890. Public comments

on the article read, in part, as follows:

> "Do the world a favor and put this man down like the rabid animal that he is."

> "Put him down. We the taxpayers don't want to pay for this POS to rot in the jail the rest of his life."

> "If he gets the death penalty he'll suffer through it. They still can't get it right. The last guy I know of yelled out in pain during it. Hopefully they pick it for him too."

---

[18] http://www.news-gazette.com/news/local/2017-07-12/new-christensen-be-arraigned-federal-kidnapping-charge-july-20.html

"He needs to die a very painful, long lasting death…"

"Luckily lethal injection is poorly regulated and vastly
understudied regarding suffering while being administered
by those without major medical training. It's also running
out of needed death chemicals. Time for 17improve! It's
**sure** to be a very painful and long death. One he likely
feels but cannot react to."

On January 16, 2018, another article posted to the News-Gazette's Facebook page

entitled "Accused kidnapper's attorneys want main charge dropped, venue changed,"

included comments such as:

"Well the community wants to know where she is, and we
want him hung. Can we take a vote on this dirtbag? Speak, u
pile of poo"

"Let the Chinese lawyers interrogate him in private
confinement away from the ACLU and LIBERAL SNOW
FLAKES and you will have a body location and guilty plea
within the hour."

"He's a dead man walking anyway!"

"Send him to China and let them give him a fair trial!"

https://www.facebook.com/newsgazette/posts/christensens-lawyers-said-this-case-

has-had-and-will-continue-to-have-a-deep-and/10155015120417890/.

To an article posted on July 27, 2018, entitled "Prosecutors: Brendt Christensen's

defense on improper 'fishing expedition,'"

https://www.facebook.com/newsgazette/posts/the-alleged-kidnapper-and-killers-

lawyers-reportedly-have-requested-information-/10155476691237890/, the following

comments were posted:

> "Really!!!! This POS needs prosecuted."

> "Fry his ass"

> "The evidence is substantial so let's not wait any longer its
> time he gets the death penalty we have waited long enough"

> "The defense is grasping at straws."

> "They say when you get the lethal injection you can taste the
> poison and it's a burning sensation he will find out in
> terrehaute Indiana in about 8 years after his appeals run
> out"

From the comments above, and the multitudinous others which are not

reproduced herein but are plastered all over social media and in the comment sections

of news articles, it is quite clear that the general opinion about Mr. Christensen is that

he is definitively guilty of the offenses charged and deserves severe punishment.

Therefore, the second *Skilling* factor—the nature of the press coverage in this case -

heavily favors a change of venue in this case.

### The Community Attitude Survey Commissioned by the Defense Warrants the Relief Sought

To measure the effects of the pretrial publicity on the citizens who reside in the

eleven counties that comprise the Urbana Division of the Central District of Illinois, Mr.

Christensen's defense counsel retained an expert, Dr. Thomas O'Toole, Ph.D., of Seattle,

Washington, to design and conduct a community attitude survey on his behalf. In

September, 2018, Dr. O'Toole designed and analyzed a community attitude survey of

400 jury-eligible citizens from the Urbana and Peoria divisions of the Central District of

Illinois using standards set forth by the American Society of Trial Consultants. A

population sample of this size is recognized and accepted as standard for such surveys.

A copy of Dr. O'Toole's report is attached to this Motion. *See* Exhibit I.

Dr. O'Toole's findings from the survey demonstrate widespread knowledge of

the Christensen case in the Urbana Division. The majority of Urbana respondents

indicated familiarity with the case, and had read or watched media coverage related to

it. Several respondents articulated specific details about the case that they recall being

reported in the media. For example, one responded, "he may have targeted her and

there was some time between his arrest and her disappearance and he was

photographed at a gathering at a vigil before he was arrested."

Specifically, 76.5% of Urbana respondents indicated familiarity with the case,

compared to 59% in the Peoria. Approximately 50% of Urbana respondents have read

or watched media coverage about this case, with a similar percentage indicating they

have closely or somewhat closely followed that media coverage. In contrast, 36% of the

Peoria Division have read or watched media coverage, with 40% indicating they have

closely or somewhat closely followed that media coverage.

One-third of the respondents from the Urbana Division have actually talked with

friends, family, or other community members about the case, compared to only 17%

from the Peoria Division. For example, one Urbana respondent commented, "[t]he lady who cuts my hair spoke with me about her."

Finally, 22% of the respondents from the Urbana Division indicated that they have prejudged the case, compared to 14% in the Peoria Division. When asked specifically about their opinions in the case, 29% of respondents from the Urbana Division said Christensen was "definitely" or "probably" guilty, compared to 20% in the Peoria Division.

Based upon the results of this survey research, which are detailed in this report, it is Dr. O'Toole's opinion that Mr. Christensen "will have difficulty receiving a fair and impartial trial in the Urbana Division of the Central District of Illinois.

### Proximity of Time Between Coverage and Trial

As previously mentioned, just fifteen months have elapsed from the date of Mr. Christensen's arrest on June 30, 2017, to the date of the filing of this Motion. Leading up to trial there will be nothing short of an avalanche of publicity where the intensity of the media's coverage of this case will go from its current "red-hot" stage to a blinding "white hot" level. Experience in high-profile cases involving heinous charges against the citizen accused teaches that once this Court conducts evidentiary hearings later this year on the bevy of pretrial motions filed by defense counsel on August 24, 2018, challenging almost every aspect of the Government's case against Mr. Christensen, the media coverage in this case will most certainly go viral on all fronts and will further imperil Mr. Christensen's ability to receive a fair and impartial trial in this case.

This unrelenting and inherently prejudicial coverage is notable not just for its sharpness, but also for the relatively short time span that it covers. It has been ongoing from the earliest stages of the government's investigation and has continues with no sign of abating, and will only intensify and get even more prejudicial as the trial date approaches. This starkly contrasts with the publicity at issue in *Patton v. Yount*, 467 U.S. 1025, 1032 (1984), where the Supreme Court found that the publicity had "softened" in the four years between the first and second trials, and that citizens no longer had the same fixed opinions about the defendant's guilt, which proved that there could no longer be a presumption of prejudice.

And similarly in *Skilling*,  561 U.S. at 383, more than four years had elapsed from the date of Enron's fall to the trial of Mr. Skilling, during which "the decibel level of media attention had diminished somewhat," thus contributing to the Court's reasoning that a change of venue was not warranted. *See also In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015) (the two years that passed between Boston Marathon bombings and the date of defendant's change of venue motion allowed community's passions to diminish); *Philpot*, 773 F.3d at 741(where most of the media coverage occurred the year before the trial, there was no "circus atmosphere required for presumed prejudice" to warrant change of venue); *United States v. Peters*, 791 F.2d 1270, 1297 (7th Cir. 1986) (nearly a year had passed since the articles that the defendant submitted to the court had been published). Therefore, because of the close proximity in time between the intense and

pervasive media coverage and trial in this case, the third *Skilling* factor also favors a change of venue in this case.

## Conclusion

A fair weighing of the pre-trial publicity factors under *Skilling* compels the only just conclusion that can be reached in this case: Mr. Christensen cannot receive a fair and impartial trial in the Urbana Division of the Central District of Illinois. Therefore, this Court should grant a change of venue for trial in this case from the Urbana Division of the Central District of Illinois, to the Peoria Division of the Central District of Illinois.

Respectfully submitted,

BRENDT A. CHRISTENSEN, Defendant

By:   /s/ Elisabeth R. Pollock          /s/ George Taseff
      Assistant Federal Public Defender     Assistant Federal Public Defender
      300 West Main Street                  401 Main Street, Suite 1500
      Urbana, IL 61801                      Peoria, IL 61602
      Phone: 217-373-0666                   Phone: 309-671-7891
      FAX:   217-373-0667                   Fax:    309-671-7898
      Email: Elisabeth_Pollock@fd.org       Email: George_Taseff@fd.org


      /s/ Robert Tucker                     /s/ Julie Brain
      Robert L. Tucker, Esq.                Julie Brain, Esq.
      7114 Washington Ave                   916 South 2nd Street
      St. Louis, MO 63130                   Philadelphia, PA 19147
      Phone: 703-527-1622                   Phone: 267-639-0417
      Email: roberttuckerlaw@gmail.com      Email: juliebrain1@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock

Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:    217-373-0667
Email: Elisabeth_Pollock@fd.org