IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 17-CR-20037 |
| ) | |
| BRENDT A. CHRISTENSEN, ) | |
| ) | |
| Defendant. ) | |

**THE UNITED STATES OF AMERICA'S RESPONSE
TO THE DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

COMES NOW the United States of America, by John E. Childress, United States Attorney for the Central District of Illinois, and Eugene L. Miller and Bryan D. Freres, Assistant United States Attorneys, and James B. Nelson, Department of Justice Trial Attorney, and hereby requests that this Court deny Defendant Brendt A. Christensen's Motion to Suppress Statements (R.97) for the reasons stated herein.

## BACKGROUND

I.  **Procedural Background.**

On June 30, 2017, federal agents arrested the defendant, Brendt A. Christensen, pursuant to a criminal complaint which charged him with kidnapping Yingying Zhang in violation of Title 18, United States Code, Section 1201(a)(1). (R.1) A federal grand jury later indicted the defendant on the same kidnapping charge outlined in the complaint. (R.13)

On October 3, 2017, the grand jury returned a superseding indictment charging the defendant with kidnapping resulting in Ms. Zhang's death, and two counts alleging that he made false statements to FBI agents investigating the kidnapping. (R.26) On January 19, 2018, the United States filed its notice of intent to seek the death penalty. (R.54) On August 24, 2018, the defendant filed the present motion along with a host of additional motions. (R.94-122) The case is currently set for trial on April 3, 2019. (R.67)

II.     **Factual Background.**

On June 9, Yingying Zhang, a visiting Chinese scholar at the University of Illinois, disappeared as she was traveling by bus to sign an apartment lease in Urbana, Illinois. Ms. Zhang's co-workers at the University of Illinois quickly reported her missing when she failed to respond to phone calls and uncharacteristically missed a scheduled meeting. The University of Illinois Police department (hereinafter "UIPD") and Federal Bureau of Investigation (hereinafter "FBI") began investigating Ms. Zhang's disappearance shortly thereafter.

Knowing that Ms. Zhang intended to sign a lease at the One North apartments in Urbana, law enforcement attempted to follow her path on June 9 through campus and mass transit camera systems. While tracking her last known movements, law enforcement learned that Ms. Zhang missed a connecting bus, and then walked to an area across the street from another bus stop near the intersection of W. Clark Street and N. Goodwin Avenue in Urbana. As she stood alone waiting for another bus, a black Saturn Astra circled the block after passing Ms. Zhang's location and pulled over next to

her. A closed-circuit camera captured Ms. Zhang entering the Astra after a prolonged discussion with the driver. She has been missing ever since.

In their search for Ms. Zhang, law enforcement focused on finding the subject Saturn Astra. They searched public records to identify all Saturn Astra owners in Champaign County. On June 12, FBI special agents interviewed the defendant at his apartment after learning that he owned a black Saturn Astra. When agents inquired where he was during Ms. Zhang's abduction, the defendant claimed he was sleeping and playing video games all day on June 9.

On June 14, UIPD officers determined the Saturn Astra that Ms. Zhang entered had a unique hubcap deformity. At 5:50 p.m. that same evening, FBI special agents determined that the defendant's own Saturn Astra had a matching hubcap deformity. Still faced with the exigency of Ms. Zhang's kidnapping, agents sought and obtained a federal search warrant for the defendant's Astra at 9:58 p.m. that evening. Because of the exigency, the warrant allowed the officers to execute the search at any time during the day or night.

At approximately 11:45 p.m. that same night, agents sought to execute the warrant for the defendant's Astra.[1] To do so, however, they needed the keys to the Astra. The agents attempted to phone the defendant multiple times at the number he provided during the June 12 interview, but he did not answer. Agents knocked on the

---

[1] The events of June 14 and the early morning of June 15 are discussed in more detail in the United States' response to the Defendant's Motion to Suppress Evidence Seized From His Apartment on June 15, 2017 (R.100). That response is incorporated herein by reference as necessary for factual completion and context.

defendant's apartment door, and he partially opened the door. FBI Special Agent Mark Hill identified himself as a law enforcement officer and told the defendant he was there because the FBI had a search warrant for his Astra. He asked the defendant if they could discuss the situation. The defendant agreed and opened the door fully to allow the agents inside.

As the agents entered the apartment's entry area, the defendant's wife, M.C., walked into the living room, as well. At this time, the agents ensured M.C. was comfortable and fully clothed while they were present, and they checked to ensure nobody else presented a danger inside the apartment while they were there. They did not search the apartment. Once all parties were back in the living room, Special Agent Manganaro asked the defendant if he would be willing to speak with the agents at the FBI office near the apartment. The defendant asked M.C. what she thought, and stated to her that he "should probably ask for a lawyer in situations like this." M.C. told the defendant that he should go speak with the agents. The defendant agreed, and he left with the agents voluntarily.[2] He was not under arrest, and was not handcuffed or otherwise detained by the officers. The encounter inside the defendant's apartment took a matter of minutes.

Once at the Champaign FBI office, the defendant sat in a room with FBI Special Agent Anthony Manganaro and UIPD Detective Eric Stiverson. Agent Manganaro provided the defendant a form outlining his rights, went over the form, and read the

---

[2] Other than two agents who remained at the apartment with M.C. because she consented to an interview, the remaining agents left the apartment with the defendant.

defendant his *Miranda* warnings. At 12:07 a.m.,[3] the defendant signed the form indicating he understood his rights and was willing to speak with officers. As the defendant signed the form, Agent Manganaro acknowledged again that the defendant was free to refuse to answer questions.

During the subsequent interview, the defendant changed his story and admitted he had picked up Ms. Zhang in his Astra. He claimed, however, that he let her out in a residential neighborhood after she got extremely upset. The defendant knew the agents who spoke with him on June 12 were looking for Ms. Zhang. Nonetheless, he claimed that he did not tell the questioning agents about picking her up, because he mistakenly thought he picked Ms. Zhang up on Saturday, June 10, not Friday, June 9. Detective Stiverson eventually told the defendant he knew the defendant did not drop Ms. Zhang off in a residential neighborhood as he claimed. Immediately after this, around 1 a.m., the parties engaged in the following exchange:

> MANGANARO: Where'd you take her, Brendt? We need to find Yingying.
>
> STIVERSON: Tonight.
>
> CHRISTENSEN: I think it's time that I stop ans-answering questions. I know the typical advice is to get a lawyer before answering anything, and I think I've tried to help enough.

The agents left the room shortly thereafter. At 1:15 a.m., Agent Manganaro and Detective Stiverson returned to bring the defendant a glass of water. They reiterated that

---

[3] The recording date and time appears to be approximately seven minutes ahead of Agent Manganaro's watch, as Agent Manganaro checked his watch at this point and said it was "seven minutes after," but the recording showed 12:14 a.m. as the defendant signed the form.

they had been exhaustively searching for Ms. Zhang and they were trying to "reunite her with her family." At 1:19 a.m., the defendant said, "I really don't want to talk no more without a lawyer." Agent Manganaro and Detective Stiverson stopped questioning with the defendant, and soon left the room.

At 1:28 a.m., FBI Special Agent Harvey Pettry entered the room and spoke to the defendant. The defendant did not state anything new related to the case. The United States does not to use any statements the defendant made to Agent Pettry.

Given that the defendant had given two different versions of events to FBI agents investigating Ms. Zhang's disappearance on June 12 and June 15, respectively, the agents held the defendant that night for the U.S. Attorney's Office to review potential false statement charges under Title 18, United States Code, Section 1001. The defendant was held at the Ford County Detention Center on June 15. The defendant was released shortly after midnight on June 16 without formal charges being filed.

On June 15, FBI Special Agent Andrew Huckstadt met and interviewed T.B., the defendant's girlfriend. Agent Huckstadt met with T.B. again on June 16. She told Agent Huckstadt that the defendant sought her out that morning, and she met with him at her residence. At the conclusion of the June 16 interview, T.B. signed an FD-472 form and voluntarily agreed to record her conversations with the defendant. Agent Huckstadt provided T.B. with recording equipment and instructions on how to operate it. He maintained contact with her thereafter.[4]

---

[4] The procedures Agent Huckstadt and T.B. maintained are discussed in more detail in the United States' response to Defendant's Motion to Suppress Statements Surreptitiously

On June 17, the defendant met with T.B., who was recording their conversation at her residence. Near the outset of their conversation, the defendant told T.B. that he wanted to reestablish contact with the FBI to "cooperate" with them and "get this over with." T.B. did not push the defendant to contact the agents, and in fact, questioned the defendant as to why he wanted to speak with the agents:[5]

| | |
|---|---|
| CHRISTENSEN: | So can't really decide, umm, what time is it? Okay so it's 12:02. I'm going to go talk to one of the FBI agents, willingly, soon. And I want you to know when, so I want you to stay here and be there at like 1:15. Would that work for you? |
| T.B. | Yeah. |
| CHRISTENSEN: | [Unintelligible] in my phone is Katie FBI. I have to use a calling card every time I call someone. |
| T.B. | That sucks. |
| CHRISTENSEN: | We got a … we got a card that could text and stuff but it didn't work.  I'll try to get it to work better today. I'm just trying to do other stuff right now. [*Christensen calls FBI Special Agent Katie Tenaglia*] [Unintelligible] She didn't respond. Okay, umm, I'll try again soon. |
| T.B. | Why do you have to talk to them? |
| CHRISTENSEN: | I want to. I don't, but I will. I'm trying to clear my name. Just, I want to cooperate. I want to get this over with. |

Approximately five minutes later, while still talking with T.B., the defendant stated, "I'm going to try to call her again," referring to Agent Tenaglia. This time he was able to

---

Recorded by T.B. (R.96) That response is incorporated herein by reference as necessary for additional context.

[5] The defendant's assertion in paragraph 10 that the FBI agents "initiated contact with Mr. Christensen" on June 17 is demonstrably false, as shown by the recorded conversations.

connect with Agent Tenaglia, and his portion of the conversation was captured on the recording:

> Hi, is this Katie? This is Brendt Christensen. Uh, I'm doing alright. Yeah. Yeah. [unintelligible]…Yes. Yes, of course. I just want to help and clear this all up. I just want to help and clear this all up. Yeah. Yep. I would be willing. Yes. Umm, a little after one. Something like that? Ummm, I'm on a new phone and I don't know the number of it unfortunately. So do you want me to give you a call back? If I don't respond, I'll give you a call back in like 20-30 minutes. Would that work? Cause, yeah this phone is…I still haven't figured it out yet. It can't text or anything. It's a little weird so I'm just trying to…yeah. Yeah. That works. […]

During some additional later discussion, the defendant arranged to meet with FBI agents at the Champaign FBI office that afternoon. No FBI agents had any contact with the defendant between the time he was released from the Ford County Jail and the time he called Agent Tenaglia on June 17 to reinitiate dialogue. The defendant met with FBI Special Agents Michael Carter and Brian Schenkelberg at the Champaign FBI office at the scheduled time that afternoon. The agents read the defendant his rights prior to interviewing him, and he signed a form indicating he had been advised of and waived his rights at 1:52 p.m. The defendant was not in custody, and he did not invoke his right to counsel or seek to terminate this interview. He returned to his apartment at the end of the interview.

The defendant met with T.B. several times in the following weeks. T.B. voluntarily recorded all of those conversations. She met with Agent Huckstadt after these meetings so he could collect the recordings and refresh the recording equipment.

On June 29, 2017, the defendant ordered T.B. to join him at the memorial walk being held for Ms. Zhang in Champaign-Urbana. T.B. joined the defendant and recorded

8

their conversation. The defendant made numerous incriminating statements related to kidnapping Ms. Zhang that were captured on the recording. Agents arrested the defendant on June 30, based on probable cause that he kidnapped Zhang.

## ANALYSIS

In his motion, the defendant seeks to suppress all of his statements, whether given to FBI agents directly or recorded by T.B., because he claims he invoked his right to counsel on the evening of June 14.[6] The United States concedes that the defendant invoked his right to counsel during an interview in the early morning hours of June 15. Therefore, the United States does not intend to use any statements the defendant made to FBI Special Agent Harvey Pettry on that date during its case-in-chief at trial. The defendant overstates his position. The defendant did not unequivocally invoke his right to counsel during his encounter with FBI agents inside his apartment on June 14, 2017. Moreover, his interview with Agent Manganaro and Detective Stiverson occurred only after he agreed to speak with the agents and was advised of his rights and agreed to waive those rights. While the defendant invoked his right to counsel at the end of that interview, he reinitiated contact with FBI agents on June 17. During his interviews on June 14 and June 17, the defendant was advised of his rights and signed a form indicating he understood his rights and wanted to waive them. For these reasons, the

---

[6] The defendant references both the Fifth and Sixth Amendments in his motion, but does not elaborate on any Sixth Amendment arguments. The Sixth Amendment is not at issue because the defendant was not formally charged after he was interviewed on June 15. *E.g., Illinois v. Perkins*, 496 U.S. 292, 299 (1990) (noting Sixth Amendment arguments "are not applicable" in case where "no charges had been filed on the subject of the interrogation[.]").

only statements implicating the Sixth Amendment are those made to Agent Pettry in the early morning hours of June 15, which the United States does not intend to use.

Additionally, none of the defendant's statements to T.B. are subject to suppression, including their recorded conversations after he had invoked his right to counsel, because these conversations were not custodial interrogations. For these reasons, the defendant's motion should be denied.

I. **The Defendant's Statement That He "Should Probably Ask For A Lawyer In Situations Like This" Did Not Prohibit Agents From Questioning Him.**

The defendant argues he invoked his right to counsel when FBI agents executed the federal search warrant for the Saturn Astra at his apartment on June 14. The defendant allowed the agents inside his apartment to discuss the warrant and related matters. Once inside, the agents asked the defendant if he would agree to speak with them again. The defendant subsequently told his wife that he "should probably ask for a lawyer in situations like this." M.C. encouraged the defendant to speak with the agents, and he agreed. He then voluntarily went with the agents to the FBI office, and agreed to speak with Agent Manganaro and Detective Stiverson after they advised him of his rights and he signed a form waiving those rights. The defendant argues that his ambiguous statement to his wife that he "should probably" ask for a lawyer taints all of his other statements, whether given to the FBI or recorded by T.B. The defendant's position is incorrect because he made this comment to his wife, and it was not a clear invocation of his right to counsel.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that when a person who is in custody "states that he wants an attorney, the interrogation must cease until an attorney is present."[7] *Id.* at 474. "If an accused makes a reference to an attorney that is ambiguous 'in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [the Supreme Court's] precedents do not require the cessation of questioning.'" *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005) (quoting *Davis v. United States*, 512 U.S. 452, 458-59 (1994)). "The police are under no obligation to clarify an ambiguous statement by the accused." *Lee*, 413 F.3d at 625. "Rather, the accused must make a clear and unambiguous assertion of his right to counsel to stop questioning[.]" *Id.*

There are several reasons the defendant's statement that he "should probably ask for a lawyer in situations like this" did not serve to invoke his right to counsel. First, he was not in custody at the time he made the statement, and "[t]he Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody." *United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999) (noting that right to counsel cannot be made "even in anticipation of future custodial interrogation"). The agents were there to execute a search warrant on his car, not to arrest him, and the defendant had just invited agents inside his apartment at the time. The agents did not burst into his apartment, they did not draw their weapons, they did not physically restrain the

---

[7] As discussed in more detail below, and as happened here, the Supreme Court later clarified that law enforcement may continue speaking with an individual who invokes their right to counsel and then "himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

11

defendant, and they politely addressed him. He agreed to be interviewed at the FBI office after a brief discussion with his wife, and he left with the agents voluntarily and unrestrained. Nothing about the encounter suggests he was in custody. *E.g., United States v. Valley*, 755 F.3d 581, 585-86 (7th Cir. 2014) (individual was not in custody for *Miranda* purposes when agents executed search warrant at his residence even though handcuffs were used on the individual while agents secured the residence); *United States v. Salyers*, 160 F.3d 1152, 1160 (7th Cir. 1998).

Second, the defendant's statement was not made to the agents; it was part of his discussion with his wife about what he should do. She was not acting as an agent for law enforcement. During their brief discussion and after he made the statement, the defendant and M.C. both agreed that he should speak with the agents, and the defendant voluntarily left with them. A statement to his wife as part of a discussion about how to proceed is not sufficient to put the agents on notice that he did not want to speak to them without a lawyer. *See Cobb v. Kernan*, 346 F. App'x 206, 207-08 (9th Cir. 2009) (statement made to girlfriend that the defendant wanted a lawyer, which was overheard by officers, did not amount to an unambiguous request for counsel where girlfriend was not acting at the direction of law enforcement).

Finally, and most importantly, even assuming the defendant was in custody, and further assuming the statement was made to the officers and not his wife, the statement that one "should probably ask for a lawyer in situations like this" is not an unequivocal request for counsel. In *Davis v. United States*, 512 U.S. 452, 462 (1994), the Supreme Court held that the phrase "maybe I should talk to a lawyer" was too ambiguous to be an

12

unequivocal request for counsel. In this instance, the defendant's statement that he "should probably" ask for a lawyer strongly mirrors the ambiguous language in *Davis*. *Id.* Similar to the "maybe" and "should" used in *Davis*, both "should" and "probably" connote equivocation, hesitation, and uncertainty. *E.g., United States v. Hunter*, 708 F.3d 938, 943-44 (7th Cir. 2013) (noting that words such as "should" or "might" "suggest that the defendants were still undecided about whether they wanted a lawyer"); *see also United States v. Cloud*, 594 F.3d 1042, 1046 (8th Cir. 2010) (response of "yeah, probably," to officer question about whether defendant wanted an attorney was not unequivocal request for counsel); *United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2017) (finding that statement "I really should have a lawyer, huh," "strongly mirrored" ambiguous language in *Davis* and other cases); *Luna v. Lamarque*, 400 F. App'x 169, 172 (9th Cir. 2010) ("I should probably get a lawyer, I guess" was ambiguous); *Wyatt*, 179 F.3d at 537 ("Accordingly, Wyatt's argument that his ambiguous statement that 'I think I should talk to a lawyer' invoked his right to counsel is without merit.").

For these reasons, the defendant's statement inside his apartment should not be construed as an unequivocal request for counsel.[8] The defendant's subsequent statements to Agent Manganaro and Detective Stiverson, which were made after he was advised of his *Miranda* rights and signed a form waiving them, should be admitted at trial.

---

[8] Even if Court were to construe this statement as an unequivocal request for counsel made to officers while he was in custody, the defendant's subsequent decision to speak with the officers was made without the agents doing or saying anything more, and he was thereafter advised of his rights, and agreed to waive those rights. Under these circumstances, the defendant voluntarily reengaged the agents.

## II. The Defendant Reengaged the Agents of His Own Accord on June 17.

Each of the defendant's June 14 statements to Agent Manganaro and Detective Stiverson prior to requesting counsel are admissible. The defendant unequivocally requested counsel near the end of the discussion. This request prompted Agent Manganaro and Detective Stiverson to stop the interview. After invoking his right to counsel, however, the defendant reinitiated conversation with the agents on June 17 by calling Special Agent Tenaglia. By reestablishing contact, the defendant's prior invocation of his right to counsel dissipated.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held that when a suspect invokes his right to counsel under *Miranda*, he is not subject to further interrogation until counsel is present, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85. In other words, the defendant's invocation of his rights does not mean law enforcement must forever after ignore him whenever he approaches them to communicate.[9] Prior to calling Agent Tenaglia on June 17, the defendant told T.B. (during a recorded conversation) that he was "going to go talk to one of the FBI agents, willingly, soon." When T.B. asked why he had to talk to the agent, the defendant responded: "I want to. I don't, but I will. I'm trying to clear my name. Just, I want to cooperate. I want to get this over with." He then called Agent Tenaglia multiple times until he reached her, and arranged to meet agents

---

[9] The defendant references *Maryland v. Shatzer*, 559 U.S. 98 (2010), and claims he was interrogated again within the 14-day window prohibited in *Shatzer*. While *Shatzer* did discuss a 14-day break in custody for dissipation of a Fifth Amendment invocation of right to counsel, the case does not apply to the situation here, where the defendant elected to reinitiate contact on his own within the 14-day window.

14

at the FBI office that afternoon. At the outset of that meeting, he was again advised of his *Miranda* rights, and he again waived those rights and agreed to speak with the agents. The agents had no direct contact with the defendant between the time he was released from the Ford County Jail and the time he called Agent Tenaglia. Under these facts, any *Miranda* and *Edwards* prohibition is inapplicable to the defendant's statements on June 17 and thereafter. *See id.*; *United States v. Briggs*, 273 F.3d 737, 740-41 (7th Cir. 2001); *United States v. Jackson*, 189 F.3d 502, 511 (7th Cir. 1999) (defendant's request to speak with police to "clear up" an issue showed that the defendant initiated communication).

The defendant also tries to argue "on information and belief" that agents pressured him through a third party, namely his wife, to reinitiate contact with the agents. Per the defendant, Agent Tenaglia allegedly "solicited" M.C. "to encourage and insist that [the defendant] contact the FBI," and M.C. "agreed to follow Special Agent Tenaglia's suggestions, and thereafter strongly encouraged, pressured, and insisted that [the defendant] contact the FBI." There is no evidence to support such an assertion, though there is evidence that M.C. unilaterally felt the defendant should cooperate with authorities, as evidenced by her actions during the apartment encounter on June 14. Regardless, when the defendant called Agent Tenaglia to reinitiate contact, he was with T.B. at her residence, not being pressured by his wife. The defendant repeatedly indicated that he wanted to reinitiate contact with the FBI, and was doing so "willingly." When T.B. asked why he had to speak with the FBI, the defendant said he "want[ed] to" call the agents in an effort to clear his name, not because M.C. was pressuring or encouraging him to do so.

15

The recorded conversation also makes clear that T.B. had no influence on his decision. The defendant told her he was going to contact the FBI near the outset of their conversation with no prompting from T.B. Moreover, she questioned why he was doing it. In short, the defendant's decision to reinitiate contact was a calculated and self-serving decision made solely by the defendant to try to mislead the FBI during the investigation. He cannot now credibly claim that his wife or anyone else coerced him, even if they may have encouraged him to do so. *See United States ex rel. Church v. De Robertis*, 771 F.2d 1015, 1017-19 (7th Cir. 1985).

Because the defendant voluntarily reinitiated contact with the FBI on June 17, his prior invocation of his right to counsel on June 15 does not impact the admissibility of any statements made after he reinitiated contact with authorities.

### III. The Defendant's Statements to T.B. Are Unaffected by His Request for Counsel.

Finally, the defendant seeks to suppress all of his recorded conversations with T.B., ostensibly because they allegedly involved "police-initiated, surreptitious interrogation in the absence of counsel." The defendant cites no cases supporting this argument. Moreover, only two of the recorded conversations, a phone call on June 16 and an in-person meeting on June 17 (where he told T.B. he wanted to and actually did reengage the FBI) occurred at a time when he had invoked his right to counsel and had not fully reinitiated contact with law enforcement. Those two recorded conversations are the only ones implicated by the defendant's argument. Regardless, as discussed below, the defendant's argument fails because he was not in custody for any of his discussions

with T.B., and even if he was, the conversations were not "interrogations" implicating *Miranda* or Fifth Amendment concerns.

In *Illinois v. Perkins*, 496 U.S. 292 (1990), the Supreme Court upheld the admission of a jailhouse confession to an undercover law enforcement agent posing as a cellmate even though the undercover agent never advised the defendant of his *Miranda* rights. *Perkins*, 496 U.S. at 300. The *Perkins* court noted that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*[,]" because *Miranda* is concerned with custodial interrogation, and there can be no custodial interrogation absent a "police-dominated atmosphere." *Id.* at 296. "The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Id.* In other words, there are no *Miranda* or Fifth Amendment issues when an undercover agent poses as a cellmate and engages an individual in conversation because "[c]oercion is determined from the perspective of the suspect[,]" and "[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." *Id.*; *see also United States v. Stubbs*, 944 F.2d 828, 831-32 (11th Cir. 1991) ("*Miranda* and Fifth Amendment concerns are not implicated when a defendant misplaces her trust in a cellmate who then relays the information—whether voluntarily or by prearrangement—to law enforcement officials.").

While the *Perkins* case dealt with a suspect who unknowingly made a statement to an undercover officer without ever being advised of or invoking his right to counsel, the analysis is the same where an individual invokes their right to counsel and thereafter

17

unknowingly makes incriminating statements to a police informant. *See Stubbs*, 944 F.2d at 832; *United States v. Taylor*, 660 F. Supp. 2d 1230, 1235 (D.N.M. 2009) (noting *Perkins* "foreclosed" argument by defendant who had invoked his right to counsel that his later statement unknowingly made to a police informant should be suppressed). This is because, as noted in *Perkins* and *Miranda*, the Fifth Amendment is concerned with custodial interrogation and coercion, which is evaluated from the perspective of the suspect. "When a suspect considers himself in the company of [friends] and not officers, the coercive atmosphere is lacking." *Perkins*, 496 U.S. at 297 ("*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner."); *Stubbs*, 944 F.2d at 832; *Taylor*, 660 F. Supp. 2d at 1235-36.

All of the recorded conversations took place at T.B.'s residence or in public without police being immediately present. The defendant and T.B. shared a dominant-submissive romantic relationship where T.B. was submissive to the defendant. Nothing about these circumstances suggest a "coercive" or police-dominated environment. As such, the conversations cannot be considered "interrogation" or its functional equivalent, therefore, the conversations do not implicate *Miranda* or the Fifth Amendment. *Stubbs*, 944 F.2d at 832; *Taylor*, 660 F. Supp. 2d at 1235-36; *see also Whitehead v. Cowan*, 263 F.3d 708, 717-18 (7th Cir. 2001); *Snethen v. Nix*, 885 F.2d 456, 459-60 (8th Cir. 1989); *Throop v. Jacquez*, Case No. 05-04312, 2009 WL 5386125, at *8-9 (C.D. Cal. Oct. 27, 2009)

The defendant's argument also fails because none of his discussions with T.B. occurred while he was in custody. As noted, the recorded conversations between June 16 and June 30 mostly took place on T.B.'s front porch, but also occurred while the two were walking in public. Law enforcement was not immediately present for any of the conversations. Without a *custodial* interrogation, the Fifth Amendment and *Miranda* are not implicated. *See Perkins*, 496 U.S. at 296; *Stubbs*, 944 F.2d at 832. For these reasons, the admissibility of the defendant's conversations with T.B. are not impacted by his request for counsel.

WHEREFORE, the United States respectfully requests that this Court deny the Defendant's Motion to Suppress Statements.

Respectfully submitted,

JOHN E. CHILDRESS
UNITED STATES ATTORNEY

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
eugene.miller@usdoj.gov

s/ Bryan D. Freres
Bryan D. Freres
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
bryan.freres@usdoj.gov

s/ James B. Nelson
James B. Nelson
Trial Attorney
Capital Case Section
United States Department of Justice
Washington, DC 20004
1331 F St. NW, Room 625
Washington, DC 20004
Phone: 202/598-2972
james.nelson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all CM/ECF participants.

                                              s/ Bryan D. Freres
                                              Assistant United States Attorney
                                              201 S. Vine St., Suite 226
                                              Urbana, IL 61802
                                              Phone:  217/373-5875
                                              Fax:  217-373-5891
                                              bryan.freres@usdoj.gov