E-FILED
Tuesday, 16 October, 2018  09:06:47 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-CR-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

### THE UNITED STATES OF AMERICA'S RESPONSE
### TO THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
### SEIZED FROM HIS APARTMENT ON JUNE 15, 2017

COMES NOW the United States of America, by John E. Childress, United States Attorney for the Central District of Illinois, and Eugene L. Miller and Bryan D. Freres, Assistant United States Attorneys, and James B. Nelson, Department of Justice Trial Attorney, and hereby requests this Court to deny the Defendant's Motion to Suppress Evidence Seized Pursuant to the Illegal Search of Defendant's Apartment on June 15, 2017 (R.100) for the reasons stated herein.

## BACKGROUND

### I.      Procedural Background

On June 30, 2017, federal agents arrested the defendant, Brendt A. Christensen, pursuant to a criminal complaint which charged him with kidnapping Yingying Zhang in violation of Title 18, United States Code, Section 1201(a)(1). (R.1) A federal grand jury later indicted the defendant on the same kidnapping charge outlined in the complaint. (R.13)

On October 3, 2017, the grand jury returned a superseding indictment charging the defendant with kidnapping resulting in Ms. Zhang's death, and two counts alleging that he made false statements to FBI agents investigating her kidnapping. (R.26) On January 19, 2018, the United States filed its notice of intent to seek the death penalty. (R.54) On August 24, 2018, the defendant filed the present motion along with a host of additional motions. (R.94-122) The case is currently set for trial on April 3, 2019. (R.67)

## II.    Factual Background[1].

The events of June 14 and 15 stem from an investigation that began on June 9, 2017. On June 9, Yingying Zhang, a visiting Chinese scholar at the University of Illinois, disappeared as she was traveling by bus to sign an apartment lease in Urbana, Illinois. Ms. Zhang's co-workers at the University of Illinois quickly reported her missing when she failed to respond to phone calls and uncharacteristically missed a scheduled meeting. The University of Illinois Police department (hereinafter "UIPD") and Federal Bureau of Investigation (hereinafter "FBI") began investigating Ms. Zhang's disappearance shortly thereafter.

Knowing she intended to sign a lease at the One North apartments in Urbana, law enforcement attempted to follow Ms. Zhang's path on June 9 through campus and

---

[1] The allegations in the defendant's motion have no basis in any police report, interview, or item provided in discovery. His alleged version of the facts, which appear to be written as if from M.C.'s recollection, contradict M.C.'s actions and the statements she gave to FBI agents throughout the investigation. Notably, the defendant offers no affidavit from M.C. or any other person to support this version of events. Moreover, the defendant ignores details that are damaging to his claims in this motion, but then includes those details in his other motions. (R.97) Thus, the defendant's recitation of the events on June 14 and 15 in this motion is misleading.

mass transit camera systems. While tracking her last known movements, law enforcement learned that Ms. Zhang missed a connecting bus and then walked to an area across the street from another bus stop near the intersection of W. Clark Street and N. Goodwin Avenue in Urbana. As Ms. Zhang stood alone waiting for another bus, a black Saturn Astra circled the block after passing her location and pulled over next to her. A closed-circuit camera captured Ms. Zhang entering the Astra after a prolonged discussion with the driver. She has been missing ever since.

In their search for Ms. Zhang, law enforcement focused on finding the Saturn Astra. They utilized public records to identify all Saturn Astra owners in Champaign County. On June 12, FBI special agents interviewed the defendant at his apartment after learning that he owned a black Saturn Astra. When agents inquired about his whereabouts during Ms. Zhang's abduction, the defendant claimed he was sleeping and playing video games all day on June 9.

On June 14, UIPD officers determined the Saturn Astra that Ms. Zhang entered had a unique hubcap deformity. At 5:50 p.m. that same evening, FBI special agents determined that the defendant's own Saturn Astra had a matching hubcap deformity. Still faced with the exigency of Ms. Zhang's kidnapping, agents sought and obtained a federal search warrant for the defendant's Astra at 9:58 p.m. Because of the exigency, the warrant allowed the officers to execute the search at any time during the day or night.

Within hours of obtaining the warrant, at approximately 11:45 p.m. that same night, agents sought to execute the warrant for the defendant's Astra. To do so,

however, they needed the keys to the Astra. The agents attempted to phone the

defendant multiple times at the number he provided during the June 12 interview, but

he did not answer. Agents knocked on the defendant's apartment door, and he partially

opened the door. FBI Special Agent Mark Hill told the defendant they were law

enforcement and were there because they had a search warrant for his Astra. He asked

the defendant if they could discuss the situation. The defendant agreed, and opened the

door fully to allow the agents inside.[2]

Around the time the agents entered the apartment's entry area, M.C. walked into

the living room as well. She was fully nude at the time. The agents asked her if she

wanted to put some clothes on, and she initially declined. The agents then asked her to

put a robe on during the time they were present. FBI Special Agent Katherine Tenaglia

escorted M.C. to the bedroom so she could get a robe. FBI Special Agent Anthony

Manganaro maintained visual contact on Special Agent Tenaglia for her safety. He also

looked very briefly in the bathroom and other bedroom to ensure nobody else was

present in the apartment, again for the safety of all involved. The agents did not search

anything at this time. M.C. and Special Agent Tenaglia returned to the main living area

near the door once M.C. got her robe.

Once all parties were back in the living room, Special Agent Manganaro asked

the defendant if he would be willing to speak with the agents at the FBI office near the

---

[2] The defendant alleges that he answered the door, and the agents entered his apartment "*en masse*" without any further discussion. He ignores the officers' polite request to speak with him more and that he allowed them inside. Thus, the defendant's motion creates the false impression that the officers entered without his permission.

apartment. Agent Manganaro made this request because he wanted to record any interview if the defendant agreed, and the FBI office was a very short drive from the apartment and had the recording equipment readily available. The defendant asked M.C. what she thought, and he told her that he "should probably ask for a lawyer in situations like this." M.C. told the defendant that she thought he should go speak with the agents. The defendant agreed, and he left with the agents voluntarily.[3] He was not under arrest, and was not handcuffed or otherwise detained by the officers. The encounter inside the defendant's apartment took a matter of minutes.[4]

During his subsequent interview, the defendant changed his story and admitted he had picked up Ms. Zhang in his Astra. He claimed, however, that he let her out in a residential neighborhood after she got extremely upset. The defendant was detained that night only after contradicting his prior statement to FBI agents on June 12. Ultimately, however, charges were not filed, and the defendant was released the following day.

While most of the agents left the apartment with the defendant, Special Agents Katherine Tenaglia and Andrew Huckstadt remained at the apartment with M.C. to see

---

[3] In his motion, the defendant ignores his conversation with his wife, as well as his own agreement to answer more questions. Instead, he asserts that M.C. returned from putting clothes on to "observe[] FBI Special Agent Manganaro and UIPD Detective Stiverson take [the defendant] away from the apartment to the local FBI office to be interviewed." The defendant's allegations do not comport with his allegation in his Motion to Suppress Statements. (R.97) There, he needed to focus on the alleged invocation of his rights to support his argument. His alleged facts here are drafted in such a way to falsely imply he was "take[n]…away," when, in fact, he left with the agents voluntarily.

[4] The encounter began at 11:45 p.m., and the defendant had already traveled to the FBI office, got to an interview room, had been read his rights, and signed the forms waiving his rights by 12:07 a.m.

if she would also consent to an interview.[5] It was only the three of them at the apartment at the time. She agreed, and she gave an extensive and detailed interview covering many topics. At the completion of this interview, which lasted over an hour, the agents asked M.C. if she would consent to a search of the residence. None of the agents had searched the apartment before this time, and the only agents inside the apartment between the time the defendant left and the time of M.C.'s consent were the two agents interviewing M.C.[6] She agreed, and signed a form documenting her consent. Some of the FBI agents returned to the apartment at this point to assist in the search. They seized multiple electronic devices and various other physical evidence from the residence. The agents only searched the electronic devices after later obtaining federal search warrants.

---

[5] The defendant states that on "information and belief, there were at least seven agents in the apartment at the time[,]" referring to the time after the defendant voluntarily left with the agents. This is inaccurate. As written in the police reports, all but two of the agents left the apartment with the defendant. The two remaining agents only stayed when M.C. agreed to an interview, after she had encouraged the defendant to do the same. M.C.'s voluntary interview lasted until 1:45 a.m., at which time M.C. consented to the apartment search and signed a form showing her consent. At that point, agents returned to the apartment to conduct the search. To suggest that M.C. did not consent, or was coerced, is contradicted by the evidence, including the sensitive nature of her disclosures to law enforcement that night, and her continued voluntary cooperation in the following days.

[6] The defendant again inaccurately claims that "the search was approximately two thirds' complete" at this time. He claims that "[t]hroughout the time that she was being interviewed, the other agents who were in the apartment were taking photographs and going through her and her husband's belongings." Only the interviewing agents were in the apartment with M.C., so his allegation is factually impossible. The defendant's assertion has no foundation in any police report or statement, has no support by way of affidavit or declaration, and is contradicted by all of M.C.'s and the defendant's actions, statements, and assertions.

M.C. continued to meet with the agents voluntarily and on her own initiative in the days following the June 14-15 encounter. On June 15, at 8:23 p.m., UIPD officers obtained and later executed a separate search warrant for the defendant's apartment.

## ANALYSIS

In his motion, the defendant seeks to suppress all of the evidence seized from his apartment in the morning hours of June 15, 2017. He argues that M.C.'s consent was involuntary and was allegedly only given after the agents had already been searching for two hours. He also argues that the agents impermissibly entered his apartment and removed him from the residence during an "objectively unreasonable" detention which was a "deliberate effort by law enforcement to isolate [M.C.] from [the defendant] and vitiate his right to refuse to consent to a search of his own property." When examining the actual facts and circumstances, it is clear that the defendant's arguments are without support, and his motion should be denied. Even assuming, however, that his allegations were correct, the evidence is still be admissible under the inevitable discovery and independent source doctrines.

## I.    The Agents Were Lawfully Inside the Defendant's Apartment and Did Not Search Prior to Obtaining Consent From M.C.

In the evening hours of June 14, FBI and UIPD agents and officers had been working around the clock for almost five days trying to find Ms. Zhang. The first break in the investigation came that evening, when the officers both discovered a flaw in the Saturn Astra hubcap Ms. Zhang was last seen entering, and confirmed the defendant's Astra had the same flaw. The agents immediately sought a federal search warrant to

7

search and seize the Astra. U.S. Magistrate Judge Eric Long signed the warrant at 9:58 p.m., which authorized the agents to execute the search at any time of day or night. With Ms. Zhang seemingly to have disappeared, the circumstances were exigent.

Fully within their authority under the warrant, FBI agents tried to contact the defendant as soon as possible that night.[7] They called his cell phone multiple times, but he did not answer. When they knocked on his door, the defendant answered, and the agents told him why they were there. They did not display any weapons, and the encounter was calm and non-confrontational. The agents asked if the defendant would speak with them. The defendant agreed, and opened the door to let the agents inside his apartment. Contrary to the defendant's allegation of an illegal entry,[8] the agents lawfully entered the defendant's apartment with his consent. *E.g.*, *United States v. Sabo*, 724 F.3d 891, 893-94 (7th Cir. 2013); *United States v. Lewis*, 608 F.3d 996, 999 (7th Cir. 2010); *United States v. Walls*, 225 F.3d 858, 862-63 (7th Cir. 2000); *United States v. Cotnam*,

---

[7] The defendant's suggestion that the officers conducted an impermissible late night knock and talk is both factually incorrect and legally irrelevant. *E.g.*, *United States v. Wilderness*, 160 F.3d 1173, 1173-74 (7th Cir. 1998) (knock and talk at 4:45 a.m. followed by consent to search by third party co-tenant was permissible and led to valid search and arrest). The agents had legal authority, via the warrant, to knock on his door at any time to facilitate executing the warrant. See Fed. R. Crim. P. 41(e)(2)(A)(ii). This required, at a minimum, getting the Astra's keys from the defendant. Agents were fully within their purview to ask if he would agree to more questioning during this encounter. He let the agents inside, he agreed to the interview, and M.C. consented to the search. No constitutional violation occurred. *See Wilderness*, 160 F.3d at 1174.

[8] The defendant cites *United States v. Abarza*, 199 F. Supp. 3d 1270 (D. Or. 2016), for the proposition that the allegedly illegal entry here vitiated any later consent. He based this assertion on his misrepresentation that law enforcement burst into his house "*en masse* before M.C. could even cover her nudity," and without the defendant's permission. The *Abarza* case offers him no support even under his theory because it dealt with a situation where law enforcement entered the curtilage of a home late at night without a warrant. *See id.*; *see also Wilderness*, 160 F.3d at 1174-75.

88 F.3d 487, 495 (7th Cir. 1996); *United States v. Rosario*, 962 F.2d 733, 736-37 (7th Cir. 1992). The defendant then agreed to speak with the agents at the FBI office where an interview could be recorded, and everyone left the apartment other than agents Huckstadt and Tenaglia, who stayed with M.C. at the apartment and interviewed her pursuant to her consent.

The defendant falsely claims several agents searched the apartment while agents Tenaglia and Huckstadt interviewed M.C., but no other agents were present during the interview with M.C. None of the agents conducted any search prior to M.C. giving the agents consent to search. In fact, the only time any of the agents even ventured from the main living area prior to M.C.'s consent to search was when agents accompanied M.C. and the defendant to get clothing, and when Agent Manganaro briefly looked in the other rooms for security to ensure that nobody else was present. Because the agents were investigating a violent missing person crime and were lawfully on the premises with the defendant's permission, these safety measures were permissible and did not constitute an unlawful search.[9] *E.g., United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013) (citing cases); *United States v. Burrows*, 48 F.3d 1011, 1017 (7th Cir. 1995); *see also United States v. Thompson*, 842 F.3d 1002, 1008-09 (7th Cir. 2016); *United States v. Henderson*, 748 F.3d 788 (7th Cir. 2014).

---

[9] Moreover, while the agents had M.C.'s consent to search the apartment and seize the items therein, exigent circumstances also arguably and independently justified the seizure of the electronic devices because the agents were investigating a kidnapping and missing woman, and had just confirmed that she was last seen entering the defendant's car. *See United States v. Bell*, 500 F.3d 609 (7th Cir. 2007) (finding exigent circumstances justified officers searching closed container without a warrant when they were lawfully inside a residence investigating a kidnapping and missing person).

## II.     M.C.'s Consent to Search Was Free, Voluntary, and Valid.

The defendant argues the apartment search was improper because M.C.'s consent was invalid. "A search conducted without a warrant is considered *per se* unreasonable and a violation of the Fourth Amendment unless the search falls within a specifically established exception." *United States v. DiModica*, 468 F.3d 495, 499 (7th Cir. 2006). "An exception to the general rule permits searches based upon the voluntary consent of a person authorized to provide consent." *Id.* "The consent of one who possesses common authority over premises or effects is valid against the absent, non-consenting person with whom that authority is shared." *Id.* (*quoting United States v. Matlock*, 415 U.S. 164, 170 (1974)). "Common authority is based upon mutual use of property by persons generally having joint access or control." *United States v. Aghedo*, 159 F.3d 308, 310 (7th Cir. 1998).

M.C. lived in the apartment with the defendant, shared a bedroom with him, and possessed "common authority over [the] premises." At the time of the incident, M.C. was a college-educated adult female who was not detained or under arrest; the agents were polite and respectful to her throughout with no show of force or coercion; and she consented to both the request for an interview and the request for consent to search at the agents' first request. *See United States v. Richards,* 741 F.3d 843, 848 (7th Cir. 2014) (outlining factors to consider when weighing whether a third-party's consent is voluntary). As such, her consent was valid and justified the agents' search and seizure. *See id.* at 848-49; *DiModica*, 468 F.3d at 499-500; *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006); *Aghedo*, 159 F.3d at 310-11; *United States v. Chaidez*, 919 F.2d 1193,

1201-02 (7th Cir. 1990); *see also United States v. Rodriguez*, 888 F.2d 519, 523-24 (7th Cir. 1989).

While the defendant acknowledges M.C. consented to the apartment search, he argues her consent was invalid because the encounter occurred around midnight and because she allegedly only signed the consent form after several agents had mostly completed the search. As discussed *supra*, the latter assertion is inaccurate. No search was conducted prior to M.C. signing the consent form. Regarding the time of night, a late night encounter does not vitiate valid consent on its own. *E.g., United States v. Wilderness*, 160 F.3d 1173, 1174-75 (7th Cir. 1998); *see also United States v. Strache*, 202 F.3d 980, 985-86 (7th Cir. 2000). The agents were searching for a missing person, and they had lawful authority to be at the residence to execute the search and seizure warrant for the Astra at any time during the day or night.

The defendant cites *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997), for his proposition that the late night encounter here invalidated M.C.'s consent.[10] The *Jerez* case, however, is not on point, other than both encounters happened at night. *Jerez* did

---

[10] The defendant also cites two unpublished Sixth Circuit cases, neither of which are binding precedent, for the proposition that a wife's consent is involuntary when given in the middle of the night, while emotional, and "just after the removal of her husband." *See United States v. Starnes*, 501 F. App'x 379, 389 (6th Cir. 2012); *United States v. Tatman*, 397 F. App'x 152, 165 (6th Cir. 2010). Defendant ignores that he was not "removed" from the premises; he voluntarily left with the agents. Regardless, both of the cited cases have little in common with this one. In both *Starnes* and *Tatman*, the consenting wife just watched her husband get arrested—she did not encourage him to go speak with FBI agents, and then consent to their own separate interview with the agents prior to granting the consent to search, as here. *Starnes*, 501 F. App'x at 389; *Tatman*, 397 F. App'x at 156. Moreover, in *Starnes*, the wife had been forced to the ground and handcuffed during law enforcement's entry prior to the consent. *Starnes*, 501 F. App'x at 389.

not deal with whether late-night consent was valid on its own—it dealt with whether a seizure occurred, and how that seizure impacted the subsequent consent. *Id.* at 696-97; *but see United States v. Taylor*, 549 F. App'x 562, 566 (7th Cir. 2013) (distinguishing *Jerez* in part on this basis); *Wilderness*, 160 F.3d at 1175. In *Jerez*, the officers banged on doors and windows for several minutes in the middle of the night, shined flashlights in windows, and yelled they were police and wanted to speak with the occupants. *Id.* at 687. Ultimately, the problem in *Jerez* was that the officers "conveyed the message that compliance with their requests was required," and the court found an illegal seizure of the occupants that vitiated the later consent. *See United States v. Adeyeye*, 359 F.3d 457, 462 (7th Cir. 2004) (examining *Jerez*).

In contrast, the agents here went to the apartment to execute a warrant that allowed them to search and seize the defendant's car, even at night. When the defendant answered the door, the agents did not have guns drawn or use a show of force; they politely asked if the defendant would speak with them. The defendant agreed to do so, and he opened the door and allowed the officers inside. After the agents requested M.C. put her clothes on and assisted her in obtaining a robe, M.C. and the defendant engaged in a conversation wherein she encouraged him to speak with the officers at the FBI office, and he agreed to do so. All but two of the agents then left the apartment with the defendant, who was not handcuffed or under arrest, and those two agents remained only after asking and receiving permission to interview M.C. It was only after that lengthy interview, wherein M.C. divulged very personal information on a wide range of topics that the officers asked for consent to search.

Unlike *Jerez*, nothing about these facts suggest a seizure or coercion. This was a consensual encounter between M.C. and the agents. The fact that the encounter occurred at night, on its own, does not control the voluntariness analysis. *E.g.*, *Wilderness*, 160 F.3d at 1174-75 (finding third party consent given at 4:45 a.m. to officer holding a gun in his hand was valid); *Strache*, 202 F.3d at 985-86; *see also United States v. Fields*, Case No. 02-CR-906, 2003 WL 1868750, at *4 (N.D. Ill. Apr. 11, 2013). Instead, the agents conducted their business professionally, rendering M.C.'s subsequent consent voluntary and valid. The defendant's argument to the contrary is without merit.

## III.   The Defendant Was Not Detained and Left With Agents Voluntarily.

The defendant also argues that M.C.'s consent was invalid under *Georgia v. Randolph*, 547 U.S. 103, 121 (2006), because he was "removed" from the premises by the agents, thereby denying him his opportunity to be asked for and to deny consent to search. *Id.* (discussing in dicta that police may violate the Fourth Amendment when they conduct a search authorized by a person with apparent authority to consent over the objection of a physically present potential defendant who shares the premises and declines consent). This argument is nonsensical because the defendant concedes, as he must, that he was neither detained, removed from the premises, nor under arrest when he voluntarily left with the agents for the interview. Notably, the defendant cites no case that supports his position beyond the dicta in *Randolph* itself. The Seventh Circuit has explicitly held that *Randolph* "applies only when the defendant is both present and objects to the search of his home." *See United States v. Henderson*, 536 F.3d 776, 777 (7th Cir. 2008) (finding that removal of defendant who expressly refused consent and then

13

obtaining consent from co-tenant did not violate *Randolph*); *United States v. Groves*, 530 F.3d 506, 512 (7th Cir. 2008) ("Groves was not objecting at the door, as *Randolph* requires."). The defendant was not present because he agreed to an interview at the FBI office, he never objected to any search; and the agents had no obligation to bring the defendant back to the apartment so he could be "a party to the discussion regarding consent." *United States v. Wilburn*, 473 F.3d 742, 744-45 (7th Cir. 2007); *see also Henderson*, 536 F.3d at 779-85.

Even if the agents had "removed" the defendant, it was not to prevent him from objecting to a search. The agents wanted to seize the car and interview him if he consented. The most convenient place to record an interview was at the nearby FBI office. The defendant had also consented to agents searching his apartment only days before. Additionally, UIPD officers obtained a warrant to search the apartment later that day. Therefore, the agents had little reason to think the defendant would impede their ability to search the apartment if they did not "remove" him. Moreover, even after the defendant left, the remaining agents did not immediately ask M.C. for consent to search—they first asked her to consent to an interview. Under these circumstances, the defendant's alleged "removal," did not run afoul of *Randolph* because it was both objectively reasonable and was not designed to "deliberately remove him from the area to avoid hearing him invoke an objection to the search." *Wilburn*, 473 F.3d at 745 (arresting a defendant and holding him in a squad car while obtaining consent from a co-tenant girlfriend did not violate *Randolph*); *see also United States v. Jones*, 861 F.3d 638, 642 (7th Cir. 2017) (officers did not violate *Randolph* where defendant voluntarily left

14

residence and stood nearby while officers received consent from co-tenant); *Henderson*, 536 F.3d at 777-86 (reversing district court ruling that officers violated *Randolph* by removing an objecting defendant and then obtaining consent from co-tenant); *United States v. Reed*, 539 F.3d 595, 598-99 (7th Cir. 2008); *DiModica*, 468 F.3d at 499-500; *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006).

For these reasons, this argument should be denied.

## IV.   The Inevitable Discovery and Independent Source Doctrines Apply.

Finally, even if the defendant's allegations were true, none of the evidence seized from the early morning June 15 search should be suppressed because both the inevitable discovery and independent source doctrines apply. The evidence seized during the challenged consent search was virtually all electronic devices, including computers and phones. None of that evidence was searched until the agents obtained federal search warrants for each device. Moreover, UIPD officers obtained a search warrant for the defendant's apartment later on June 15. If not seized during the consent search, the electronic devices would inevitably have been seized at that time.

### A.  Inevitable discovery doctrine.

The doctrine of inevitable discovery provides that illegally obtained evidence will not be excluded if the government can prove, by a preponderance of the evidence, that the officers ultimately or inevitably would have discovered the challenged evidence by lawful means. *Jones*, 861 F.3d at 643. "To meet this burden, 'the government must show (1) that it had, or would have obtained, an independent, legal justification

for conducting a search that would have led to the discovery of the evidence; and (2) that it would have conducted a lawful search absent the challenged conduct.'" *Id.*

Had M.C. not granted consent to search in the early morning hours of June 15, the officers still would have recovered all of the electronic devices later that day when UIPD officers executed an independent warrant to search the apartment. The probable cause for that warrant was based on the statements of the defendant and M.C., as well as the other evidence suggesting Ms. Zhang disappeared after her contact with the defendant. This provided legal justification for seizing (and searching) the devices independent of M.C.'s consent, rendering discovery of the evidence inevitable.[11] *United States v. Brown*, 328 F.3d 352, 356-57 (7th Cir. 2003) (invalid consent did not warrant suppression because the agents could have gotten a warrant instead); *see United States v. Goins*, 437 F.3d 644, 649-50 (7th Cir. 2006); *United States v. Jones*, 72 F.3d 1324, 1333-34 (7th Cir. 1995); *see also United States v. Williams*, 400 F.3d 1023, 1025-26 (7th Cir. 2005).

### B.  Independent source doctrine.

"The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 443 (1984) (noting that "[w]hen the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse

---

[11] Moreover, the agents offered facts establishing more than sufficient probable cause in the warrant application for the Astra, as well as the later warrant applications to search the electronic devices seized from the apartment. Those same facts would have supported a warrant to search the apartment as well. Given that, the agents had probable cause to search the apartment at the time of M.C.'s consent and could have easily gotten a warrant in lieu of her consent. Hence, the search and seizure of these items was inevitable. *United States v. Tejada*, 524 F.3d 809, 813-14 (7th Cir. 2008); *Brown*, 328 F.3d at 356-57.

position than they would have been in absent any error or violation."). Under the independent source doctrine, a district court need not suppress evidence if: (1) the illegally obtained evidence did not affect the magistrate's decision to issue the search warrant, and (2) the decision to seek the warrant was not prompted by what was seen during the illegal search. *United States v. Ginglen*, 467 F.3d 1071, 1076 (7th Cir. 2006) (*citing United States v. Markling*, 7 F.3d 1309, 1315-16 (7th Cir. 1993)).

The real evidence seized from the apartment during the early morning consent search were the files and data on the electronic devices. None of the electronic devices containing the files and data were searched at that time. Instead, they were merely seized with M.C.'s consent. The agents did not view the evidence on the electronic devices until after obtaining federal search warrants to search the devices. Those federal search warrants did not rely on any evidence recovered from the consent search to establish probable cause to search the electronic devices. Moreover, the UIPD officers obtained a search warrant later on June 15 to search the apartment that did not rely on any of the evidence recovered during the consent search. As such, even assuming M.C.'s consent was somehow invalid, those warrants operated as an independent source for discovery of the evidence that renders suppression inappropriate. *See Ginglen*, 467 F.3d at 1076-77; *United States v. Hall*, 142 F.3d 988, 993-94 (7th Cir. 1998); *see also Williams,* 400 F.3d at 1025-26.

WHEREFORE, the United States of America respectfully requests that this Court deny the Defendant's Motion to Suppress Evidence Seized Pursuant to the Illegal Search of Defendant's Apartment on June 15, 2017.

Respectfully submitted,

JOHN E. CHILDRESS
UNITED STATES ATTORNEY

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217-373-5875
Fax:  217-373-5891
eugene.miller@usdoj.gov

s/ James B. Nelson
James B. Nelson
Trial Attorney
Capital Case Section
United States Department of Justice
Washington, DC 20004
1331 F St. NW, Room 625
Washington, DC 20004
Phone: 202/598-2972
james.nelson@usdoj.gov

s/ Bryan D. Freres
Bryan D. Freres
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
bryan.freres@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all CM/ECF participants.

s/ Bryan D. Freres

Bryan D. Freres
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
bryan.freres@usdoj.gov
