E-FILED
Tuesday, 16 October, 2018  11:55:11 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-CR-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

## THE UNITED STATES OF AMERICA'S CONSOLIDATED RESPONSE TO DEFENDANT'S MOTIONS FOR CHANGE OF VENUE AND INTRADISTRICT TRANSFER

COMES NOW the United States of America, by John E. Childress, United States Attorney for the Central District of Illinois, and Eugene L. Miller and Bryan D. Freres, Assistant United States Attorneys, and James B. Nelson, Department of Justice Trial Attorney, and requests that this Court deny Defendant's Motion for Change of Venue for Trial (R.131), and Motion for Intradistrict Transfer of Case (R.132) for the reasons stated herein.

## SUMMARY ARGUMENT

On June 9, 2017, University of Illinois visiting scholar Yingying Zhang disappeared while waiting at a bus stop to sign a lease in Urbana, Illinois. She was last seen entering defendant Brendt Christensen's Saturn Astra. Her disappearance generated significant local interest, and because of her national origin and the large Chinese student population at the University of Illinois, the case also garnered

significant interest in China. In the aftermath of her disappearance, Ms. Zhang's economically disadvantaged family traveled from China to help with the search. The University of Illinois and local Chinese population provided housing, translation, and significant cultural and economic support for the family while they were in Champaign-Urbana. To date, Ms. Zhang's remains have not been found. The defendant stands charged with Ms. Zhang's kidnapping and murder, and the trial is set to begin in the Urbana federal courthouse on April 3, 2019. While interest in the case amongst the press remains, particularly for events honoring Ms. Zhang's memory, the press coverage has slowed as time passed. Only one member of the press has been at each of the past two hearings in the case, and the courtrooms were mostly empty except for a few curious court staff members. Despite this, the defendant seeks to move the case from Urbana. He is not the first federal defendant to seek to move his trial from the place of the crime.

The Boston Marathon is an annual marathon in the greater Boston area that draws participants and press coverage from across the world. On April 15, 2013, two radicalized terrorists planted pressure cooker bombs near the Boston Marathon finish line. The bombs, which were planted and timed for both maximum damage and publicity for the murderers' message, killed three people and maimed and disfigured many others. In the aftermath, breathless press coverage tracked the manhunt for the killers, who murdered a police officer, kidnapped a man in his car, and had a shootout with police. One of the terrorists, Dzhokhar Tsarnaev, was eventually apprehended and charged with a host of capital offenses in United States District Court for the District of Massachusetts. The United States sought the death penalty against Tsarnaev. Because of

the extensive press coverage for such a high profile case, Tsarnaev's attorneys sought to move the trial from Boston to the federal courthouse in Washington, D.C. Despite the relentless press coverage, on September 24, 2014, United States District Judge George O'Toole expressed confidence that impartial jurors could be found in Boston, and he found no appropriate basis to transfer venue. *See United States v. Tsarnaev*, 2014 WL 4823882 (D. Mass. Sept. 24, 2014); *In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015). The trial began in Boston on March 4, 2015.

On June 17, 2015, a group of parishioners, including South Carolina State Senator Clementa Pinckney, gathered for a Bible study at the Emanuel African Methodist Episcopal Church in Charleston, South Carolina. The parishioners welcomed a young man named Dylann Roof to their study that night. Unbeknownst to the parishioners, Roof was a white nationalist terrorist. He murdered nine of the parishioners, including Senator Pinckney, to advance his racial hatred agenda. Roof was eventually arrested and charged with capital offenses in the United States District Court for the District of South Carolina. Like the Boston Marathon bombing, the Charleston church shooting and subsequent prosecution generated extensive local, national, and international press coverage. Despite this coverage, the parties were able to find impartial jurors in Charleston, and the trial remained there.

Over the past two decades, there have been several high-profile kidnapping-murder prosecutions in the United States where extensive press coverage prompted the defendants to seek a new venue. On November 22, 2003, Alfonso Rodriguez, Jr. abducted, raped, and murdered University of North Dakota student Dru Sjodin. Sjodin's

disappearance and Rodriguez's subsequent trial in the United States District Court for the District of North Dakota generated extensive outrage and media coverage. The case was the first death penalty trial in a century in North Dakota. Despite Rodriguez's efforts to move the trial to Minnesota because of the extensive press coverage, United States District Judge Ralph Erickson refused to change the venue, and the parties found twelve impartial jurors in North Dakota. *See United States v. Rodriguez*, 581 F.3d 775, 785 (8th Cir. 2009).

Similarly, on June 25, 2008, Michael Jacques abducted, raped, and murdered his 12-year old niece, Brooke Bennett, in rural Vermont. The subsequent federal prosecution, wherein the United States sought the death penalty, generated extensive press coverage. The case was so traumatic to Vermont citizens that less than a year after her death, and while Jacques' trial was pending, then-Governor Jim Douglas signed "Brooke's Law" into effect on March 4, 2009, which increased penalties for child sex offenders. Given the extensive coverage, Jacques' attorneys sought to move the trial to New York, but the U.S. District Judge found no basis to move the case from Vermont prior to voir dire. *United States v. Jacques*, 2011 WL 1706770 (D. Vt. May 4, 2011).

Despite their limited means, Ms. Zhang's family plans to be present for as much of this trial as they are able. Moreover, as family members of the deceased victim, they have the right to attend any and all public court proceedings. 18 U.S.C. § 3771(a)(3). ("Crime Victim's Rights Act"). In preparing this response, counsel for the United States conferred with Ms. Zhang's family regarding the defendant's motions to move the trial

location. *See* 18 U.S.C. § 3771(a)(5)(victims have reasonable right to confer with the attorney for the United States in the case). They responded as follows:

> As family members of Yingying Zhang, we strongly hope the venue of the case against her alleged killer remains in the federal court in Urbana, Illinois. This would be most convenient for us, provide us with the most emotional support, and keep us close to the place our daughter was last seen alive.
>
> When we learned that Yingying was missing, we immediately traveled to the United States. Upon our arrival in the U.S., many difficulties awaited us besides the language barrier. We needed help with all of the basic needs, such as housing, food, clothing and transportation, all while dealing with the heartbreaking disappearance of our precious daughter. Then, we were informed that our worst fears were true, that Yingying had been murdered. We could not have survived, emotionally or physically, without the full support and help from the administration, faculty and students of the University of Illinois Urbana – Champaign and from the local Chinese community. While we went through the hardest time in our lives, the help and support from the university and local Chinese community was everywhere. For example, the university provided us with free housing for the first few months after we arrived. Local Chinese people who knew we did not have a car and did not know the area helped us in every trip to the court. They also provided us with delicious food and warm clothes to stay comfortable during Illinois' cooler weather. Also, a local Chinese realtor helped us find a place to live after it became clear that we would need to stay for an extended period while we waited for news about our daughter. While we understand that Peoria is a nice place, it would not be able to provide us with the amazing support we have received in Urbana-Champaign.
>
> Losing our daughter has been, unquestionably, the most dreadful blow in our lives. During the months we spent in Urbana, our deep sorrow was slightly relieved by the love and emotional support we received from the local Chinese community. Their invaluable mental support was, beyond doubt, the l[y]nchpin for our survival. Local Chinese friends and members of the university's Chinese student association often came to our apartment with timely consolation. Hardly can we deny the emotional nexus between their aids and our persistence. Therefore, we strongly hope the venue of the legal case will remain in the Urbana Division of the federal court.

If high profile terrorists like Tsarnaev and Roof can be impartially tried in the cities where they murdered many innocent civilians, and extensively covered kidnapping-murder cases like Rodriguez and Jacques can remain in rural North Dakota and Vermont, respectively, then it seems unlikely that impartial jurors cannot be found in the Central District of Illinois for this trial in Urbana. The defendant offers a much less compelling case for a new venue than Tsarnaev, Roof, Rodriguez, and Jacques, respectively. Press coverage and negative comments on social media do not mean 12 impartial people cannot be found in the 11 counties comprising the Urbana Division, or even in other nearby counties, if necessary. While impartial jurors can be found and brought here as needed, moving the trial from Champaign County would present substantial difficulties for all of the witnesses, and especially for Yingying Zhang's family, who has developed an emotional, cultural and economic support network through the University of Illinois and Chinese communies that is unavailable in Peoria or anywhere else. For these reasons, and all the reasons discussed herein, the Urbana federal courthouse is the appropriate venue for this trial.

## ANALYSIS

Over a year after the commission of the charged offenses, the defendant seeks to transfer venue of this trial to the Peoria Division of the Central District of Illinois based on local press articles and a survey commissioned by the defense team. The defendant's motion, however, is both premature and insufficient. Factually correct and non-inflammatory press reports, comments on social media, and a bought-and-paid-for survey do not overcome the constitutional command and public interest in using the

voir dire process to seat a qualified jury in the District and Division where the crimes were committed. Rather than change the location of the trial, the United States respectfully recommends that the Court summon potential jurors from counties in and near the Urbana Division in the Central District of Illinois, and issue a detailed questionnaire regarding exposure to pretrial publicity. These simple measures would obviate the need for the defendant's extraordinary request, which would otherwise inconvenience the various witnesses, and burden Ms. Zhang's family's ability to be present for the duration of the trial.

## I.     **Legal Standard.**

"The trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3.  Such trials should be held before a "jury of the State and district wherein the crime shall have been committed[.]" U.S. Const. amend. 6.  Criminal defendants are entitled to due process of law and the right to trial by "an impartial jury." U.S. Const. amends 5, 6.  Taken together, these constitutional provisions require a change of venue if, but only if, "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see also In re Tsarnaev*, 780 F.3d 14, 18 (1st Cir. 2015) (noting that the "constitutional command that trials take place where crimes are committed" may only be overcome if "there is an ever-prevalent risk that the level of prejudice permeating the trial setting is so dense that a defendant cannot possibly receive an impartial trial.").

The mechanism for seeking a change of venue based on pretrial prejudice is found at Federal Rules of Criminal Procedure Rule 21(a), which provides:

> Upon the defendant's motion, the court must transfer the proceedings against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

"Defendants can adduce evidence of Rule 21 prejudice by showing that individual jurors were actually exposed to material that prevented them from judging the case impartially[,]" or "defendants can show presumed prejudice, which occurs when 'pervasive and inflammatory pretrial publicity makes juror bias inevitable.'" *United States v. Philpot*, 733 F.3d 734, 740 (7th Cir. 2013). The defendant bears the burden of establishing pretrial prejudice. *Stafford v. Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994); *Wansley v. Slayton*, 487 F.2d 90, 94 (4th Cir. 1973). "In order to prevail on a Rule 21(a) motion, a defendant must show 'a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.'" *United States v. Jacques*, 2011 WL 1706770, at *3 (D. Vt. May 4, 2011) (*quoting Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966)). The Supreme Court has identified multiple factors to consider when deciding whether presumed juror prejudice exists, including: (1) the size and characteristics of the community in which the crime occurred; (2) the nature of the publicity; and (3) the time between the crime and the trial. *Skilling*, 561 U.S. at 382-84; *see also Philpot*, 733 F.3d at 741.

Granting or denying a Rule 21(a) venue motion is within the discretion of the trial court. *United States v. Garza*, 664 F.2d 135, 139 (7th Cir. 1981). So is the request for an evidentiary hearing on such a motion. *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986). "A court in its discretion may defer a determination of a pretrial venue motion until after the voir dire of the prospective jurors when the effects of pretrial publicity can

be fully assessed." *Id.* at 1296 ("The ultimate question is whether it is possible to select a fair and impartial jury, and in most situations the voir dire examination adequately supplies the facts upon which to base that determination."). "Abuse of discretion will not be found unless the facts compel—and not merely support—a finding that a change of venue is necessary." *United States v. Nettles*, 476 F.3d 508, 513 (7th Cir. 2007).

## II.   Defendant's Venue Transfer Motions are Premature.

As an initial matter, the defendant's venue transfer motions are premature. "The ultimate question is whether it is possible to select a fair and impartial jury, and in most situations the voir dire examination adequately supplies the facts upon which to base that determination." *Peters*, 791 F.2d at 1296. Defendant would be hard pressed to suggest that the press coverage in this case is so extensive that the risk of juror prejudice, and the accompanying need for an exceptional remedy, is more egregious than it was in the Boston Marathon bombing case, in which the defendant's change of venue motion was denied. *United States v. Tsarnaev*, 157 F. Supp. 3d 57, 59–68 (D. Mass. 2016); *United States v. Tsarnaev*, 2014 WL 4823882, at *1-4 (D. Mass. 2014); *In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015).  Nor do the facts of this differ from the case of *United States v. Jacques* (discussed in more detail below), which was a high-profile federal death penalty case in rural Vermont where the defense request for a change of venue was denied.  *See Jacques*, 2011 WL 1706770 at *3.

As the Supreme Court has noted, screening questionnaires and voir dire are typically sufficient to "detect and defuse juror bias" and ensure a fair trial.  *See Skilling*, 561 U.S. at 381, 385.  Accordingly, most courts, including the Seventh Circuit, agree that:

When a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity. . . . *Indeed, we have ruled that a trial court's method of holding its decision . . . in abeyance until the conclusion of the voir dire is clearly the preferable procedure.*

*E.g., United States v. Campa*, 459 F.3d 1121, 1145, 1146-47 (11th Cir. 2006) (emphasis added) (internal quotation and citation omitted); *see also United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir dire reveals that an impartial jury cannot be empaneled would a change of venue be justified."); *United States v. Green*, 983 F.2d 100, 102 (8th Cir. 1992) ("This court has often stated that it is preferable for the trial court to await voir dire before ruling on motions for a change of venue."); *Peters*, 791 F.2d at 1295 ("[It] was an appropriate exercise of the district court's discretion and ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors."); *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976) ("[If] an impartial jury actually cannot be selected, that fact should become evident at the voir dire. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial.").

Even if the Court were to find a presumption of prejudice based on pretrial publicity in this case, several circuits have held that such a presumption may be rebutted

10

by a thorough voir dire process. *United States v. Wilcox*, 631 F.3d 740, 749 (5th Cir. 2011) ("[E]ven if this court were to find a presumption of prejudice, the presumption would be rebuttable by an examination of the voir dire procedure."); *United States v. Moreno Morales*, 815 F.2d 725, 739 n.18 (1st Cir. 1987); *Coleman v. Kemp*, 778 F.2d 1487, 1541 n.25 (11th Cir. 1985).

Against the weight of this authority, the defendant opens his motion by citing *United States v. Ewing*, Case No. 02-CR-20008 (C.D. Ill. 2002), a case that involved a defendant who firebombed the Champaign County courthouse, and ultimately was transferred to the Rock Island Division. The defendant's rhetoric aside, *Ewing* offers the defendant no actual support since the court transferred the case to Rock Island only *after* conducting voir dire,[1] as the Seventh Circuit suggested in *Peters,* 791 F.2d at 1295. In other words, even the primary case the defendant highlights cuts against his requested relief.

Rather than grant an extraordinary remedy in response to the defendant's premature motion, the Court should follow the precedent laid out above and hold defendant's motion in abeyance until it can conduct a "searching" voir dire of prospective jurors summonsed from an expanded, as necessary, jury draw and instructed to complete a thorough questionnaire.

---

[1] Upon information and belief, one contributing factor to United States District Judge Michael P. McCuskey being unable to seat a jury was summoning an insufficient number of veniremembers.

III.     **Defendant Failed to Demonstrate a Sufficient Presumption of Prejudice to Warrant an End-Run on the Court's Voir Dire Process.**

As will be discussed below, neither the publicity that exists in this case, nor the survey data provided by the defendant, warrant a presumption that the voir dire process will be insufficient to screen any jurors so tainted by pretrial publicity that they cannot impartially follow the Court's instructions. The circumstances of this case are not even close to the publicity surrounding *Tsarnaev*, 780 F.3d at 14-22, where the courts found insufficient prejudice to move the Boston Marathon bombing trial out of Boston. Nor does this case even rise to the circumstances of *Jacques*, 2011 WL 1706770, at *3, an analogous case where the venue issue was raised in the District of Vermont. In that case, defendant Michael Jacques was charged with kidnapping resulting in death for the abduction, sexual assault, and murder of his 12-year-old niece, Brooke Bennett. *Id.* at *1. The case involved Vermont's first ever nationwide Amber Alert notifying the public of a suspected child abduction. *Id.* As here, the United States sought the death penalty in a state where it had long since been abolished. *Id*. The defendant moved to transfer the case to the Northern District of New York, claiming the jury pool was tainted by inflammatory pretrial publicity.  *Id.* The *Jacques* court issued a detailed order discussing the evidence the defense presented, and ultimately concluded that a change of venue was not necessary. *Id.*

As opposed to the instant case, the *Jacques* case involved the abduction, rape and murder of a child – perhaps one of the most egregious crimes that a person can commit. Similarly, the publicity surrounding the case, and the effect the case had on the

community, was much greater than that at issue in the instant case. Although lengthy,

the *Jacques* court's summation of the press in that case and the effect on the community is

worth highlighting for comparison to the instant case:

> After Jacques's arrest the details of Miss Bennett's death and Jacques's alleged role in her kidnapping continued to be a major news topic for television stations, radio broadcasts, Internet blogs and newspapers around the country, as well as in Vermont. Media coverage addressed every aspect of the case, including Jacques's alleged efforts to avoid detection by falsifying evidence, his long-time sexual abuse of a minor and his formation of an elaborate fictitious sex ring, of which Bennett was supposedly the next victim. Major Vermont publications continued to report on the progress of Jacques's case well after his arrest. The story of Miss Bennett's alleged abduction and murder by her uncle was one of the most widely covered stories in Vermont during 2008.
>
> The crime sparked sweeping reform of Vermont laws pertaining to sex crimes, sex offenders, and registration for sex offenders. The Governor called for an overhaul of corrections policy, and tougher penalties for sex crimes. The Lieutenant Governor collected signatures of Vermonters who supported more severe penalties for sex offenders. Eventually some 52,000 petition signatures were collected, approximately one-fifth of the adult population of Vermont. The state Senate Judiciary Committee held a series of hearings, which included testimony from a woman who alleged that Jacques raped her in 1985 when she was thirteen years old.
>
> In response, the Department of Corrections instituted internal reforms. The state legislature enacted "Brooke's Law," which provides for twenty-five year mandatory minimum sentences for sex crimes against children.
>
> On the anniversary of Brooke Bennett's death, media revisited the case, detailing the investigation, the manipulation of emails to create the appearance of multiple people involved in a sex ring, the scheme to kidnap and rape, and the changes to Vermont laws and policies with respect to sexual abuse of children. Shortly thereafter, the Vermont United States Attorney's Office announced that it would seek the death penalty in the case should Jacques be convicted, and media attention spiked once again. At each stage of the prosecution, the press recapped the story and reported recent developments. The news stories have highlighted the fact that Jacques is a convicted sex offender who served four years of a six to twenty year sentence imposed in 1993, and achieved release from probation in 2006. The stories

13

> repeat what the media believe are the facts surrounding Miss Bennett's abduction and murder, the prolonged sexual abuse of another juvenile, the fabrication and planting of evidence, and the attempted enlistment of others to lay false trails.
>
> Some commentators have blamed the state of Vermont for what they perceived as lax or lenient treatment of sex offenders. Members of the public have posted numerous comments online that vilify the defendant and excoriate the state of Vermont—its people, courts, defense attorneys and legislators—for allowing such a crime to occur, and for what they perceive as shortcomings in the judicial process.
>
> Jacques has submitted exhibits containing hundreds of newspaper articles, online stories, transcripts of television broadcasts, Internet blogs and other publicly available accounts of this case.

*Id.* at *1-2. As demonstrated in the court's decision, the *Jacques* case involved a crime that deeply affected the people of Vermont, caused wide-spread reform to the law, and involved detailed media attention.

In addition to the press involved with the case, and like the defendant here, *Jacques* presented polling data to support his motion. In *Jacques*, a survey conducted approximately a year before trial revealed that 80% of respondents had heard something about the case and half had formed an opinion that Jacques was guilty. A survey conducted closer in time to trial showed 81% of respondents were aware of the case, although the later survey did not screen respondents for jury eligibility, and did not ask respondents if they had formed any opinions about the case. *Id.* at *3.

The facts the defendant has presented here fall far short of the facts of either *Jacques* or *Tsarnaev,* both of which involved more extensive press coverage. A change of venue was not warranted in either *Jacques* or *Tsarnaev*, and it is not warranted here. Additionally, the *Skilling* factors, Seventh Circuit precedent, and various other federal

death penalty cases all militate against a venue transfer, even intradistrict. The cases the defendant cites are all distinguishable, and his survey data is both routinely dismissed by courts, and less compelling than data offered in *Jacques* and other cases that have denied venue transfers.

**A.  The *Skilling* factors weigh against venue transfer.**

As the Supreme Court has held, "[a] presumption of prejudice attends only the extreme case." *Skilling*, 130 S. Ct. at 2902. In *Skilling*, the Supreme Court identified multiple factors for courts to consider in weighing whether presumed prejudice exists, including: (1) the size and characteristics of the community in which the crime occurred; (2) the nature of the publicity; and (3) the time between the crime and the trial. *Skilling*, 561 U.S. at 382-84; *see also Philpot*, 733 F.3d at 741. None of these factors weigh in favor of transferring the case out of Urbana.

**1.  The size and characteristics of the community.**

Regarding the first factor, the Central District of Illinois, and the Urbana Division in particular, is large enough that it weighs against any presumed prejudice finding. As the defendant notes in his motion, the Urbana Division comprises 11 counties with a total population of roughly 666,000 people. This constitutes the low end of the possible juror pool, as pulling from the entire Central District of Illinois offers roughly 2.2 million total persons.[2] The Supreme Court, Seventh Circuit, and various District Courts have routinely held there is a reduced likelihood of prejudice where the venire was drawn

---

[2] https://www.illinois-demographics.com/counties_by_population.

from 600,000 or more individuals.[3] *E.g., Skilling*, 561 U.S. at 382; *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (reduced liklehood of prejudice where venire drawn from pool of over 600,000 persons); *Philpot*, 733 F.3d at 741 (noting there was a reduced likelihood of prejudice because "[r]oughly 600,000 people live in Porter and Lake Counties, from which the jury pool was drawn."); *Jacques*, 2011 WL 1706770, at *1 ("A jury pool drawn from a population of similar size to that of the District of Vermont [roughly 600,000] reduces the likelihood of prejudice."); *United States v. Diehl-Armstrong*, 739 F. Supp. 2d 793-94 (W.D. Pa. 2010) (district population of 545,615 weighs against presuming prejudice), *aff'd*, 504 F. App'x 153 (3d Cir. 2012).

The characteristics of the communities also weigh against any presumed prejudice associated with keeping the case in the Urbana Division. The population of the Urbana Division and the greater Central District of Illinois is scattered and diversified amongst numerous medium and small-sized communities, as opposed to one dominant community such as Chicago. The majority of the newspaper coverage the defendant cites comes from one community's newspaper, that being the News-Gazette, which primarily serves Champaign-Urbana. It is also worth noting that the defendant, a white male, is seeking to remove his case from the one county with any significant population of individuals with shared racial and cultural heritage to his Chinese-national victim. *E.g., Skilling*, 561 U.S. at 382 (noting the preference for a large and diverse pool of jurors);

---

[3] The cases the defendant cites involved trials in small communities where it is much easier for community sentiment to be swayed against a defendant. *See Rideau v. State of La.*, 373 U.S. 723, 724 (1963); *Irvin v. Dowd*, 366 U.S. 717, 719-20 (1961).

*United States v. Bills*, 93 F. Supp. 3d 899, 903 (N.D. Ill. 2015) (same). To the extent the

defendant is attempting to influence the racial balance of the jury by moving the case

from Urbana, such a request is not appropriate. *See United States v. McKinney*, 53 F.3d

664, 673 (5th Cir. 1995). In sum, the size and characteristics of the Urbana Division and

the Central District of Illinois weigh against any presumed prejudice finding.

### 2.    Nature of the publicity.

"[P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead

to an unfair trial." *Skilling*, 561 U.S. at 384 (*quoting Nebraska Press Ass'n v. Stuart*, 427 U.S.

539, 554 (1976)). While there has been significant publicity in this case, the nature of the

publicity does not favor a presumed prejudice finding. The nature of the publicity only

weighs in favor of a presumption of prejudice when the publicity contains extremely

damaging "smoking gun" information about the case, or the publicity is largely

inflammatory rather than factual. *E.g., Skilling*, 561 U.S. at 382-83; *Murphy v. Florida*, 421

U.S. 794, 802 (1975); *Philpot*, 733 F.3d at 741; *United States v. Chagra*, 669 F.2d 241, 251-52

n.11 (5th Cir. 1982). Neither of these issues are present here.

In his motion, the defendant offers no news stories reporting any "evidence of the

smoking-gun variety [that] invited prejudgment of his culpability." *Skilling*, 561 U.S. at

383. As explained in *Skilling*, "smoking gun" news coverage typically means a widely

disseminated confession by the defendant that is virtually impossible to set aside. *Id.*

(quoting *Chagra*, 669 F.2d at 251-52 n.11 ("A jury may have difficulty in disbelieving or

forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the

opinions of others because they may not be well-founded.")); *Parker v. Randolph*, 442 U.S.

17

62, 72 (1979) ("[T]he defendant's own confession [is] probably the most probative and damaging evidence that can be admitted against him."); *see also Rideau v. State of La.*, 373 U.S. 723, 725-26 (1963) (recording of the defendant confessing broadcast to the community multiple times proved prejudicial); *Irvin v. Dowd*, 366 U.S. 717, 725-26 (1961) (same).

The defendant must clear an extremely high bar to show "smoking gun" presumptive prejudice, as shown both by the few cases the Supreme Court has found presumptive prejudice,[4] as well as by the numerous decisions refusing to find incriminating news stories sufficient to support presumptive prejudice. *E.g.*, *Skilling*, 561 U.S. at 385 (stating that publicity about a codefendant's guilty plea does not ordinarily

---

[4] The defendant cites four Supreme Court cases from the 1960s as his only real support. *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966); *Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963); *Irvin v. Dowd*, 366 U.S. 717, 725-28 (1961). These cases are all distinguishable.

*Estes* and *Sheppard* both involved intrusions by the press into the trial itself. The trial in *Estes* was "conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment." *Murphy*, 421 U.S. at 799. Similarly, in *Sheppard*, "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." *Sheppard*, 384 U.S. at 355. Notably, the *Sheppard* court held that, absent the carnival atmosphere that pervaded the trial, the "virulent publicity" surrounding the case would not have been sufficient to create presumptive prejudice. *Id.* at 354-55. Given the most recent hearings in this case were held in mostly empty courtrooms with little press, these cases are inapposite. Even the height of publicity early in this case offered nothing close to the situations in *Estes* and *Sheppard*. Moreover, modern cases offer far more publicity, yet courts routinely find insufficient presumed prejudice. *See Tsarnaev*, 780 F.3d at 14-22.

*Rideau* and *Irvin* were problematic because the defendant's confessions were widely broadcast in small communities with limited jury pools. *Rideau*, 373 U.S. at 724-26; *Irvin*, 366 U.S. at 725-26. Nothing similar occurred here. The public has never heard the defendant's statements about the crime. Ironically, in *Irvin*, the prejudice occurred even though the court actually granted a transfer to a nearby county that was largely within the same news coverage umbrella—which would effectively be the case with a transfer from Urbana to Peoria even if the defendant could show prejudice here. *Irvin*, 366 U.S. at 720.

merit presumptive prejudice); *Patton v. Yount*, 467 U.S. 1025 (1984); *Murphy*, 421 U.S. at 795, 803 (reports of prior convictions for an infamous jewel heist and murders, and having been nicknamed by the press, did not create presumption of prejudice); *Tsarnaev*, 780 F.3d at 21-22 (distinguishing the publicity in Boston Marathon bombing case from the presumptive prejudice found in *Rideau*); *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011) (finding that media accounts that the defendant confessed to the crime and had been secretly recorded confessing to the crime was not enough to constitute presumptive prejudice); *Hayes v. Ayers*, 632 F.3d 500, 509 (9th Cir. 2011) (finding that media coverage including descriptions of the victims' remains, reports of the defendant's criminal history including two acquittals for murder, and witnesses' descriptions of how the defendant murdered and dismembered the victims did not merit a presumption of prejudice); *Bills*, 93 F. Supp. 3d at 905 ("The fact that the March 2, 2013 Chicago Tribune article reports that Redflex 'admits it likely bribed Chicago official' is not 'evidence of the smoking-gun variety' that invites prejudgment of Bills's culpability.").

Not only is there no "smoking gun" circulating in the press about this case, but as virtually every news article covering the case notes, the victim's remains have never been found. The public has never directly heard the defendant's statements regarding the crime. *See Tsarnaev*, 780 F.3d at 21-22 (noting the lack of a confession weighed against presumptive prejudice, even though the public saw Boston Marathon bomber in numerous broadcast videos in the act of committing heinous crime). The limited information that is public, which has been publicized by necessity through the course of the prosecution, is not presumptively prejudical. *See id.*; *Petters*, 663 F.3d at 385 (reports

that accused had been secretly recorded confessing to crime not enough for presumptive prejudice). Moreover, the News-Gazette published statements by the defendant's attorneys that the public should not prejudge the limited evidence that has been made public,[5] which certainly limits the impact of the publicized information. In short, this case has almost nothing in common with *Rideau* and the other cases referenced by the defendant. *Compare Tsarnaev*, 780 F.3d at 21-22; *with Rideau*, 373 U.S. at 725-26.

While the defendant cites several news articles discussing his case, the number of news articles is not dispositive, or even persuasive, evidence of presumed prejudice. *E.g.*, *Skilling*, 561 U.S. at 382; *Tsarnaev*, 780 F.3d at 21-22; *Philpot*, 733 F.3d at 741; *Bills*, 93 F. Supp. 3d at 904. Nor is knowledge of the crimes in the community via adverse publicity enough to presume prejudice. *See Dobbert v. Florida*, 432 U.S. 282, 303 (1977) ("[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair."); *United States v. Garza*, 664 F.2d 135, 138 n.1 (7th Cir. 1981) (noting "[i]mpartiality . . . does not mean complete juror ignorance of issues and events[,]" and "more often trials are deemed fair in spite of widespread publicity.").

More importantly, the defendant does not highlight a single article that offers anything more than objective factual descriptions of the case. News coverage is not prejudicial if it is mostly factual in nature. *E.g.*, *Skilling*, 561 U.S. at 382-83; *Murphy*, 421

---

[5] Mary Schenk, "UPDATE:  Judge OK's request by alleged kidnapper's attorneys." The News-Gazette (September 8, 2017) (quoting Federal Public Defender Thomas Patton as telling reporters that "I ask everyone to recall [that the defendant is] presumed innocent and the allegations are only allegations. All you've heard so far is one party's version of the facts[.]")

U.S. at 802; *Tsarnaev*, 780 F.3d at 22; *Philpot*, 733 F.3d at 741; *United States v. Sabhnani*, 599 F.3d 215, 233 (2d Cir. 2010) ("Coverage of actual developments in a criminal case generally will not rise to the level of prejudicial publicity that will warrant a venue change."); *United States v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990) ("If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice."); *Bills*, 93 F. Supp. 3d at 903-04 (reasoning that news articles that are informative and discuss the indictment and other court proceedings are not prejudicial); *Jacques*, 2011 WL 1706770, at *6 (refusing to presume prejudice where "[t]he extensive Vermont press coverage has been largely factual and focused on the investigation and prosecution of the case*"); *Diehl-Armstrong*, 739 F. Supp. 2d at 806 (refusing to presume prejudice where "the media stories generally have tended to be factual accounts of the underlying crime, the allegations being made by the Government, issues being litigated in these criminal proceedings, or positions taken by the respective parties as stated in open court or in official court papers").

Because the Urbana Division (and the Central District of Illinois) is a scattered collection of medium and small-sized communities, the venire receives its news coverage from many different media outlets, not just the News-Gazette.[6] This further reduces any presumed prejudice and undercuts the defendant's heavy focus on the News-Gazette's coverage in support of his arguments. *E.g.*, *Tsarnaev*, 780 F.3d at 21; *Bills*,

---

[6] The defendant focuses on the News-Gazette. As he notes, it has a circulation under 50,000. While the News-Gazette is a quality newspaper and does an excellent job serving its community, its reach is relatively limited compared to the multi-county size of the venire. *See Bills*, 93 F. Supp. 3d at 905 (extensive news articles in Chicago Tribune and Chicago Sun-Times not enough for presumed prejudice).

21

93 F. Supp. 3d at 905 (when venire pulls its news from a vast array of sources, less likely to be presumed prejudice).

Rather than discuss the factual-based news stories in any detail, the defendant chose to highlight comments on social media and the comment sections of the online news articles. As the Seventh Circuit has noted, however, such comments have little impact on the presumed prejudice analysis because "few readers would take the comments section of an online news story to be anything but mostly-anonymous opinions." *Philpot*, 733 F.3d at 741; *see also United States v. Warren,* 989 F. Supp. 2d 494, 500 (E.D. La. 2013) ("[The defendants] argue that public comments on news sites should be considered as another cause and indication of community prejudice . . . [but] there is no evidence that these comments are representative of the hundreds of thousands of individuals who are eligible to serve as jurors[.]"); *United States v. Salad*, 915 F. Supp. 2d 755, 758-59 (E.D. Va. 2012) (dismissing negative online commentary as "irrelevant" or at best "unpersuasive" in presumed prejudice analysis); *United States v. Lindemuth*, 2017 WL 2572819, at *9-10 (D. Kan. June 14, 2017) (noting online comments are not publicity, "at least not in the sense that the relevant case law uses the term[,]" and "the fact that many of the comments here show the author's belief that [the defendant] is guilty of the crimes he is charged with [...] is not sufficient to warrant a transfer."); *Jacques*, 2011 WL 1706770, at *8 ("That there are individuals with access to the Internet who are willing to post their strong opinions about the case does not provide evidence that potential jurors in the District of Vermont believe that Jacques is guilty and/or that he should be

sentenced to death if he is convicted."); *United States v. Benzer*, Case No., 2014 WL 7359078, at *13 (D. Nev. Dec. 24, 2014).

There is nothing to suggest the News-Gazette or any other media outlet endorsed the opinions of the commenters.[7] *Benzer*, 2014 WL 7359078, at *13; *United States v. Philpot*, 2012 WL 2064620, at *3 (N.D. Ind. June 7, 2012). The comments the defendant highlights did not appear in the traditional print version of the newspaper. *Philpot*, 2012 WL 2064620, at *3. Moreover, the defendant cannot discern what percentage of those who viewed the articles about his case also viewed the comments, which cuts heavily against finding presumed prejudice. *Id.*; *Lindemuth*, 2017 WL 2572819, at *11; *Jacques*, 2011 WL 1706770, at *8. Finally, and most importantly, it is a relatively simple task in voir dire to ask potential jurors if they have commented on newspaper comment sections or social media about the case, or have been influenced somehow by the comments of others. *Lindemuth*, 2017 WL 2572819, at *11 ("[T]he court believes that the solution to the problem that these comments may pose is a thorough voir dire, not a venue change.").

For these reasons, the articles and commentary the defendant cites are insufficient to find the nature of this case's publicity supports a presumptive prejudice finding.

---

[7] The News-Gazette has eliminated the comments section of its online articles. This is a strong statement that the comments do not reflect the opinions of the paper. The defendant's references to comments on the News-Gazette's Facebook page offer little in support of his argument, since it is another level removed from the entirety of the News-Gazette's readership. In other words, one has to not only read the article, they have to read it online, have Facebook, and seek out the article's link on the Facebook page to comment.

### 3.      Time between the news coverage and trial.

Finally, the third *Skilling* factor - the time between the news coverage and the trial - does not support presumptive prejudice. While there is no bright line rule, most courts presume that a year or more between the height of news coverage (which usually is around the time of the crime itself) and the trial weighs against a presumption of prejudice. *E.g., Skilling*, 561 U.S. at 383 ("[U]nlike cases in which trial swiftly followed a widely reported crime, over four years elapsed between Enron's bankruptcy and Skilling's trial.") (internal citations omitted); *Tsarnaev*, 780 F.3d at 22 (two years between Boston Marathon bombing and trial mitigated against prejudice finding); *Philpot*, 733 F.3d at 741 (noting "most of the media coverage occurred over a year before trial," which weighed against prejudice finding); *Hayes*, 632 F.3d at 510; *Peters*, 791 F.2d at 1297 ("almost a year" between sensational press coverage and voir dire weighed against prejudice).

The defendant's trial is scheduled for April 3, 2019. The crime occurred on June 9, 2017, meaning that almost two years will have passed between the crime and the trial. This weighs against a finding of prejudice. *See Philpot*, 733 F.3d at 741; *Tsarnaev*, 780 F.3d at 22; *Peters*, 791 F.2d at 1297. Moreover, the defendant's rhetoric about the press coverage bears little resemblance to the current reality, as the pace of the news coverage has slowed considerably since June and July 2017, which also weighs against the defendant's position. *Skilling*, 561 U.S. at 383 ("[T]he decibel level of media attention diminished somewhat in the years following Enron's collapse."); *Philpot*, 733 F.3d at 741; *Bills*, 93 F. Supp. 3d at 906; *Jacques*, 2011 WL 1706770, at *8 ("Granted that this case has

24

generated publicity at every new development, filing or hearing, press coverage—

whether potentially inflammatory or no—has diminished.").

Press coverage of his case has slowed so much that the past two court hearings,

one in Peoria and one in Urbana, occurred with one member of the press at each hearing,

and mostly empty courtrooms. While this case remains of interest to the public, the

passage of time has prompted the public to move on to other issues affecting the

community. The cases the defendant cites as support offer him none, as empty

courtrooms suggest there is no "wave of public passion" showing "a pattern of deep and

bitter prejudice against [him]," *Irvin*, 366 U.S. at 726, 728, nor does anything about this

case resemble the "carnival atmosphere," *Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966), or

"kangaroo court proceedings," *Rideau*, 373 U.S. at 726, in the cases he cites, which

happen to be the few cases where the Supreme Court found sufficient pretrial prejudice

for a venue change.

For these reasons, none of the *Skilling* factors suggest presumptive prejudice exists

here. Urbana is the appropriate place for this trial, and this Court should deny

defendant's motion. *E.g., Philpot*, 733 F.3d at 741; *Tsarnaev*, 780 F.3d at 14-28; *Jacques*, 2011

WL 1706770, at *1-9.

**B.     The defendant's survey information does not merit venue change.**

The defendant commissioned an expert, Dr. Thomas O'Toole, to conduct a

"community attitude survey" about this case. This survey was paid for by the defense

team using an expert they picked[8] and was conducted unilaterally at their request. Yet, the survey offers virtually nothing of relevance to the current issues.

Courts facing change of venue motions have discretion to disregard polling data and often do. *E.g.*, *United States v. Rodriguez*, 581 F.3d 775, 785-86 (8th Cir. 2009) ("This court has expressed doubts about the relevance of such polls when reviewing rejected change-of-venue motions."); *United States v. Campa*, 459 F.3d 1121, 1145 ("It was entirely within the district court's prerogative to reject outright Professor Moran's survey as a basis upon which to grant a motion to change venue."); *United States v. Malmay*, 671 F.2d 869, 875-76 (5th Cir. 1982); *United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) ("It is our judgment that in determining whether a fair and impartial jury could be empaneled the trial court did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures, practices and principles developed by the common law since the reign of Henry II.").

---

[8] Dr. O'Toole is a jury consultant based out of Seattle, and has no known particular understanding of Champaign-Urbana other than what he was paid to provide. http://soundjuryconsulting.com/Consultants.html#Tom. Dr. O'Toole's company, "Sound Jury Consulting" works with civil litigators and criminal defense attorneys. http://soundjuryconsulting.com/trial-litigation-practice-areas.html. In addition to working on the defense-side of criminal cases, Dr. O'Toole hosts a podcast entitled "The Sniper Defense" which features such topics as "An Effective Process for Developing Defense Strategies (Episode 5)" and "The Podcast Playbook for Defense Attorneys (Episode 3")." Given Dr. O'Toole's obvious bias, it is understandable why the defendant chose him to conduct the "survey" upon which he relies.

Even the district court in *United States v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996), which ultimately transferred that case from Oklahoma to Colorado on other grounds, dismissed the importance of polling data. *Id.* at 1473 ("Such surveys are but crude measures of opinion at the time of the interviews. [...] There is no laboratory experiment that can come close to duplicating the trial of criminal charges."). The polling results on which the defendant relies are an unreliable indicator of actual jury bias. They certainly do not warrant a presumption that 12 impartial jurors cannot be found in either the Urbana Division or additional counties in the Central District of Illinois, as necessary.

Even taking the poll results at face value, they still do not warrant a change of venue. The Supreme Court has held for more than 130 years that "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155–56 (1879). As such, courts have repeatedly held that "the due process guarantee of trial by a fair and impartial jury can be met even where . . . virtually all of the veniremen admit to some knowledge of the defendant due to pretrial publicity." *United States v. Bliss*, 735 F.2d 294, 297–98 (8th Cir. 1984). As the Supreme Court has explained:

> It is not required . . . . that the jurors be totally ignorant of the facts and issues involved.   In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.   This is particularly true in criminal cases.   To hold that the mere existence of any preconceived notion as to the guilt or innocence of an

accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.   It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23.

Assuming the defendant's survey is accurate, which the United States does not concede, the survey does not make a persuasive case of presumptive prejudice. The survey selected only 400 citizens from each of the Urbana and Peoria Divisions. According to the survey, the highest percentage of people with some familiarity with the case is the city of Urbana itself, where 76.5% of respondents allegedly "indicated some familiarity with the case, compared to 59% in Peoria." Per the survey, 22% of Urbana Division respondents have "prejudged" the case, while 14% in the Peoria Division have done so.  Moreover, while 29% of Urbana Division respondents allegedly said the defendant is "definitely" or "probably" guilty, 20% of Peoria Division respondents allegedly said the same. The difference between the two Divisions is insignificant.  If anything, they show a significant majority of the venire in even the Urbana Division remain open-minded about the case even having heard the publicity, and even without instructions from the Court. *See United States v. Lentz*, 352 F. Supp. 2d 718, 721-24 (E.D. Va. 2005) (denying transfer where it was unlikely that jury could be empaneled appreciably easier in requested transfer location). The survey information, commissioned by the defendant, limited as it is to a very small number of the eligible jurors, and only addressing the Urbana and Peoria Divisions, is ultimately unhelpful

when the Court can pull unbiased jurors from additional counties in the Central District of Illinois, if necessary.

The numbers also fall far short of those in *Jacques*. In that case, 80% of the jury-eligible respondents had heard of the case, and half had formed an opinion that Jacques was guilty. *Jacques*, 2011 WL 1706770, at *3. In comparison, the venue to which Jacques sought to transfer featured only 2% of people that believed Jacques was guilty. *Id.* Nevertheless, the *Jacques* court found insufficient presumptive prejudice, and refused to transfer the case. *Id.* at *3-9. The same was true in *Rodriguez*, where the Court refused to transfer venue from North Dakota in a highly-publicized case involving the kidnapping-murder of a University of North Dakota student. In *Rodriguez*, the polling data showed "42 percent of the respondents strongly held an opinion of Rodriguez's guilt[.]" *Rodriguez*, 581 F.3d at 786. Nevertheless, the *Rodriguez* court dismissed the polling data in favor of thorough voir dire and upheld the district court's denial of the venue transfer request. *Id.*

The survey results simply cannot establish prejudice or an inability to select a jury. The manner and form of polling questions is not analogous to the voir dire process and so the results are of limited value. Respondents to polls have not been given any preliminary instructions, they are not subject to questioning, and they are given discrete responses from which they can choose. The questions are asked with no context by which respondents can form their responses. The respondents were not asked whether they could set aside an opinion about the defendant's guilt and form an opinion and base a verdict solely on the evidence. The *Jacques* decision noted that without

29

questioning whether or not the eligible jurors could set aside that opinion and reach a verdict based on the evidence, the poll "offer[ed] little assistance in determining whether an impartial jury can be empaneled." *Jacques*, 2011 WL 1706770 at *6.

Rather than relying on the defendant's paid expert and the result of the unscientific poll of what 400 people told him, the Court should rely on the constitutionally-directed voir dire process to determine whether an unbiased jury can be seated in this District, and in particular, the Urbana Division. This result satisfies both precedent and common sense. *See Skilling*, 561 U.S. at 386 ("When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.'"); *see also Bishop v. Wainwright*, 511 F.2d 664, 666 (5th Cir. 1975) (noting that "[t]he trial court is necessarily the first and best judge of community sentiment").

The defendant has provided insufficient evidence to carry his burden of showing the jury pool in the Urbana Division is prejudiced against him.

## IV.   The Court Should Also Decline a Rule 18 Transfer to Peoria.

The defendant also invokes Rule 18 of the Federal Rules of Criminal Procedure in support of his venue transfer request. Rule 18 provides that the Court "must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Fed. R. Crim. P. 18. "Although the text of Rule 18 refers only to convenience and prompt

administration, the district court may consider other factors." *United States v. Lipscomb*, 299 F.3d 303, 340 (5th Cir. 2002). In fact, the Advisory Committee Notes to Rule 18 specifically reference Rule 21 when a court weighs transferring venue based on alleged prejudice:

> If the court is satisfied that there exists in the place fixed for trial prejudice against the defendant so great as to render the trial unfair, the court may, of course, fix another place of trial within the district (if there be such) where such prejudice does not exist. Cf. Rule 21 dealing with transfers between districts.

Fed. R. Crim. P. 18 advisory committee's note, 1966 amendment; *see also United States v. Walker,* 890 F. Supp. 954, 958 n.5 (D. Kan. 1995) (citing Advisory Committee Notes as supporting consideration of Rule 21 framework in evaluating Rule 18 requests); *United States v. Bartelt*, 1997 WL 436229, at *2 (N.D. Ill. July 7, 1997) (same).

When faced with Rule 18 intradistrict transfer requests based on presumed prejudice, several courts have applied the same considerations as under Rule 21. *E.g., Lentz*, 352 F. Supp. 2d at 721-25 (denying requested Rule 18 intradistrict transfer of kidnapping-murder case after evaluating same factors as relevant for Rule 21 considerations); *Salad*, 915 F. Supp. 2d at 757 ("The same framework [as Rule 21] for legal analysis governs intradistrict transfers under Rule 18[.]"); *Bartelt*, 1997 WL 436229, at *2 ("Apart from the fact that Rule 18, and not Rule 21, governs here, the analysis is essentially the same."); *Walker*, 890 F. Supp. at 958 n.5 (denying intradistrict transfer request); *see also Malmay*, 671 F.2d at 876 ("The district court was not, however, required to move the trial [under Rule 18] absent a strong showing of prejudice.").

31

As discussed above, the defendant has failed to show sufficient presumed prejudice to satisfy Rule 21. All of the *Skilling* considerations weigh against transfer. Given the defendant seeks to transfer under either Rule 21 or 18 based on the same allegations, nothing about the analysis should be appreciably different under Rule 18. *See Lentz*, 352 F. Supp. 2d at 721-25; *Salad*, 915 F. Supp. 2d at 757; *Bartelt*, 1997 WL 436229, at *2; *Walker*, 890 F. Supp. at 958 n.5. The defendant offers nothing beyond his allegations of presumed prejudice to support his Rule 18 transfer request.

In contrast, the Peoria Division presents a serious inconvenience to all of the witnesses. Almost all of the law enforcement witnesses are in Champaign County, as are many of the lay witnesses, including University of Illinois professors and students, as well as local business managers, who will be inconvenienced traveling from Urbana at that time of year. Meanwhile, the United States is unaware at this time of a single likely witness for either side that hails from the Peoria Division. Further, all of the evidence is stored in Champaign County. This is likely to be a lengthy trial, and forcing all of the witnesses to travel and wait to testify while far from home will cause inconvenience for all of them, and significant additional expense for the government.

Most importantly, Ms. Zhang's family must be considered. The loss of their daughter is the most traumatic event in their lives. They intend to be present for the trial, as is their statutory right under the Crime Victims' Rights Act. During that time, they will be forced to deal with the emotional pain while far from home in a foreign country. The victim's family is not wealthy. They developed a strong emotional, economic, and cultural support network in Champaign-Urbana thanks to the University of Illinois and

32

the Chinese community here. That support network is unique to Champaign-Urbana, and is unavailable in Peoria. If the Court were to move this case to Peoria, the victim's family would be forced to cope for weeks, if not months, with the trauma of this trial while in a foreign country and without their established support network. All of the considerations weigh in favor of keeping this case in Urbana. *See Lentz,* 352 F. Supp. 2d at 721-25 (denying Rule 18 transfer); *Salad,* 915 F. Supp. 2d at 757 (same); *Bartelt,* 1997 WL 436229, at *2 (same); *Walker,* 890 F. Supp. at 958 n.5 (same); *see also Lipscomb*, 299 F.3d at 340-48 (finding trial court abused its discretion in granting Rule 18 transfer when the "facts of convenience militate exclusively against transfer, and no factor other than pretrial publicity—some favorable and some unfavorable to both the prosecution and the defense—might, if properly developed and analyzed, militate in favor of transfer.").

Rather than grant the defendant's extraordinary request, this Court should keep the case in the Urbana Division, have potential jurors answer a thorough questionnaire, and conduct a searching voir dire of those prospective jurors. If necessary, the Court can pull jurors from counties near the Urbana Division as well, thereby achieving the same benefit of transferring the case to Peoria. This common sense approach is the most convenient for the witnesses and the parties, and ensures maximum opportunities to find a fair and impartial jury in the location with the greatest public interest in this case. Only if a searching voir dire reveals that an impartial jury cannot be found in the Urbana Division would the requested relief be warranted.

For these reasons, and all reasons offered herein, the defendant's motions should be denied.

33

WHEREFORE, the United States of America respectfully requests that this Court deny the Defendant's Motion for Change of Venue for Trial and Motion for Intradistrict Transfer of Case.

JOHN E. CHILDRESS
UNITED STATES ATTORNEY

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
eugene.miller@usdoj.gov

s/ Bryan D. Freres
Bryan D. Freres
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
bryan.freres@usdoj.gov

s/ James B. Nelson
James B. Nelson
Trial Attorney
Capital Case Section
United States Department of Justice
Washington, DC 20004
1331 F St. NW, Room 625
Washington, DC 20004
Phone: 202/598-2972
james.nelson@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all CM/ECF participants.

s/Bryan D. Freres
Bryan D. Freres
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217-373-5891
bryan.freres.doj.gov