E-FILED
Friday, 07 December, 2018  05:07:39 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | <u>Hearing Requested</u> |
| | ) | |
| Defendant. | ) | |

<u>DEFENDANT'S REPLY TO RESPONSE TO MOTION TO DECLARE
THE FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL
UNDER THE TENTH AMENDMENT (R. 117)</u>

Mr. Christensen submits this *Reply* to the government's *Response to Defendant's Motion to Declare the Federal Death Penalty Unconstitutional Under the Tenth Amendment* (*Response*) Dkt. 141.[1]

If the Court were to reject Mr. Christensen's *Motion to Dismiss Count One Due to Lack of Jurisdiction* (R. 114), the issue remains whether federal jurisdiction in this case would nonetheless violate the Tenth Amendment and thereby unconstitutionally encroaches on the principles of federalism underlying the Constitution.

---

[1] The full title of Mr. Christensen's *Motion* reads: *Motion to Declare the Federal Death Penalty Act Unconstitutional, As Applied, on the Ground that the Facts of this Case Coupled with the Sovereign Decision of the State of Illinois to Abolish Capital Punishment, Demonstrates that its Application Here Violates the Tenth Amendment and Principles of Federalism of the Constitution of the United States.* (*Motion*), Dkt. 117. The Response understandably truncates the title of the *Motion* in the heading of its *Response*, but it is important to note that this particular *Motion* does not argue, as the *Response's* truncated heading suggests, that the Federal Death Penalty Act (FDPA) facially violates the Tenth Amendment, but only as applied to the facts of this case. *See Motion*, at 4, n. 3.

1

I.     **The Issues and General Principles Governing Their Resolution**

Mr. Christensen's *Motion* presents two arguments in reference to the Tenth Amendment: (a) the commandeering of State resources to enforce a federal regulatory scheme that directly conflicts with the laws and policies of the State violates the Tenth Amendment, Dkt. 117, at 25-34; and (2) where interests fundamental to the integrity of the State substantially outweigh those of the national government, the Tenth Amendment and principles of federalism prohibit Congress from overriding the State's policy judgments. *Id.* at 34-51. As the *Motion* indicates, these issues must be analyzed within the following framework:

- the role and importance of dual sovereignty in the constitutional compact between the States and the National government, Dkt 117, at 5, 43;

- the federal government's powers are few and defined with the remainder reserved for the States, *id.* 23;

- the Tenth Amendment was designed to emphasize the State's sovereign integrity and to allay fears concerning the accumulation of federal power, *id.* 24;

- the Tenth Amendment assigns the Police Power to the States, which, accordingly, have primary authority to enforce criminal law and protect the health, safety and welfare of their citizens, *id.* 24;

- these principles apply with particular force to violent crimes, *id.* 25; and

- Congress's power under the Commerce Clause is one of degree and has judicially enforceable out limits. *Id.* 45.

The *Response* begins its substantive discussion by incorrectly asserting that the "defendant's Tenth Amendment argument relies entirely on his arguments" that the FDPA violates the Eighth Amendment and that, as applied here, Congress exceeded its

power under the Commerce Clause. *Id.* 141, at 4.[2] While Mr. Christensen has raised both issues in other filings, his Tenth Amendment argument neither relies upon nor argues either of these points. In fact, the Mr. Christensen's Tenth Amendment arguments *assume* that the Congress has not exceeded its power under the Commerce Clause – if it has, there would be no reason for the Court to reach the Tenth Amendment issues. *See Motion*, 114, at 48 ("Regardless of whether it [Congress] has crossed the jurisdictional line, the federal government's interest in pursuing the death penalty must be accorded far less weight than if jurisdiction is asserted on the basis of more uniquely federal interests . . ."). Similarly, the *Motion* assumes the constitutionality of the death penalty when it nonetheless argues that in weighing the respective sovereigns' interests, the availability of life without parole diminishes those of the federal government. *Id.* 48.

II.     **Crediting *Aguendo* the Expansive Jurisdictional Theory Proposed by the Government, the Court Can Still in Appropriate Cases Weigh the Relative Interests of the Two Sovereigns to Determine Whether the Exercise of Jurisdiction by the Federal Government Violates the Tenth Amendment**

Because of the difficulty of constructing a credible argument that the marginal interest in obtaining a sentence of death rather than life without parole outweighs the significant sovereign interests of the State, the *Response* does not engage the issue. Instead, it argues that because (in its view) Congress has unconstrained authority to regulate instrumentalities of interstate, this settles the Tenth Amendment issue, reasoning that if Congress has the constitutional authority to pass a particular law,

---

[2]The purpose of *Response*'s approach is apparently designed to reframe the issue such that if the Eighth Amendment and Commerce Clause arguments fail, the Tenth Amendment automatically follows. As seen below, this is not so.

then the subject matter has not been reserved to the States and the Tenth Amendment does not come into play. *Response*, at 5-6.[3]

In support of this proposition, the government first cites the same cases it did in its response to Mr. Christensen's *Motion to Dismiss Count One for Lack of Jurisdiction*. *See Response*, at 5. None of these cases support the government's jurisdictional claim, *see Reply to Response to Motion to Dismiss Count One*, at 17-22, but that is of no matter here because, once again, the Tenth Amendment *Motion* is premised on at least *de minimis* jurisdiction. Thus, the government is left with only one district court case, *United States v. McCluskey*, 2012 WL 13076173, at * 10 (D.N.M. Sept. 24, 2012), adopting the absolutist view that no matter how trivial the basis for federal jurisdiction or how substantial the State interest, the Tenth Amendment is inapplicable. *Response*, at 6-7.[4]

In determining whether application of a federal law infringes on State sovereignty in violation of the Tenth Amendment, a finding that there is a jurisdictional basis under federal law does not end the inquiry, as suggested by the *Response*, as a court can consider the respective interests of each sovereign. *New York v. United States*, 505 U.S. 144, 177-78 (1992) (citing cases); *Hodel v. Virginia Surface Mining*, 452 U.S. 264,

---

[3]Redirecting attention from the lack of any substantial authority to support this proposition and its inconsistency with Supreme Court precedent, *infra*, the *Response* remakes the issue and then promptly proceeds to belittle its own formulation, arguing that "the Tenth Amendment does not apply here because the FDPA is a valid exercise of congressional power, and the defendant's argument to the contrary is frivolous." *Response*, at 7. The problem is, as noted above, this *Motion* does not suggest, or depend on the proposition, that the FDPA is not a constitutionally valid enactment. The FDPA has nothing to say about jurisdictional issues or whether its application in a case such as that presented here would violate the Tenth Amendment.

[4]*McCluskey* involved a carjacking, which, as noted elsewhere, provides a far stronger basis for federal jurisdiction than the *de minimus* jurisdictional basis that is assumed for purposes of this motion. *See Reply to Response to Motion to Dismiss Count One Due to Lack of Jurisdiction*, at 17.

4

288, n. 29 (1981). And, in this respect, the Supreme Court has made it clear that the commerce power is "subject to outer limits," *Lopez*, 514 U.S. at 557, that are "judicially enforceable," *id.* 557, and "the scope of the interstate commerce 'must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectively obliterate the distinction between what is national and what is local and create a completely centralized government.'"*Id.*, *quoting NLRB v. Jones and Laughlin Steel*, 301 U.S. 1, 37 (1937). This statement suggests that even if a "relatively trivial impact," *Lopez*, 514 U.S. at 558, on commerce technically satisfies jurisdiction under the Commerce Clause, it is still a judicial function to determine, in the context of the historical division between the functions of the two sovereigns, whether the exercise of such jurisdiction by the federal government in a particular case violates the defendant's rights under the Tenth Amendment – a function that can only be performed by evaluating and weighing the respective interests of the two sovereigns. Exercise of this judicial function is especially important in the criminal context because "federalism protects the liberty of the individual from arbitrary power," *Bond v. United States*, 564 U.S. 211, 222 (2011). To effectuate this protection the Tenth Amendment that permits a defendant to "object[] to laws that upset the constitutional balance between the National government and the State. . . ." *Id.*

IV.    **The Supremacy Clause is Irrelevant to the Issues Presented Here Because It Only Applies to Laws that are Otherwise Constitutionally Valid**

 The *Response* argues that the Supremacy Clause "precludes the defendant's theory" because the laws of Congress trump those of the States where the latter would frustrate the purposes and objectives of the former. *Id.* 7-9. This argument fails because it overlooks the fact that the Supremacy Clause does not come into play unless the Congressional enactment, as applied, is itself constitutional. If application of § 1201(a)(1) to the facts of this case falls short under either the Commerce Clause or the Tenth Amendment, the Supremacy Clause has nothing more to say about the matter.

The *Response,* at 8, quotes from the second and third sub-clauses of art. VI, cl. 2 of the Constitution, the "Supremacy Clause," but entirely omits the crucial first sub-clause, which is imposes a condition precedent to its applicability that is directly relevant here. Art VI, cl 2. of the Constitution reads, in full:

> This Constitution and the *Laws of the United States which shall be made in Pursuance thereof*; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Law of any State to the Contrary notwithstanding. (emphasis added)

It is self-evident that a law, which, as applied, violates the Constitution, is not "made in Pursuance thereof." Rather, the application of such a law is, by definition, in disregard of the Constitution. The idea that an *unconstitutionally* applied federal law trumps an otherwise valid state law is counterintuitive, at best, and the *Response* cites no authority for such an odd result. The Supreme Court directly rejected this specious

6

reasoning in a similar constitutional context in *Printz v. United States*, 521 U.S. 898, 924-925 (1997). After noting the "Pursuance of the Constitution" qualification in the Supremacy Clause, the Court held that its invocation could not otherwise rescue the Tenth Amendment violation because "the Supremacy Clause merely brings us back to the question, discussed earlier, whether laws conscripting state officers violate state sovereignty and are thus not in accord with the Constitution." *See also Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1479 (2018) (statute alleged to preempt state law "must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do."). In short, where the federal law, as applied, is constitutional it will normally control; otherwise not.

## IV. The Cases Cited by the *Response* Rejecting Tenth Amendment Claims Based on a State's Abolition of the Death Penalty are Irrelevant to Mr. Christensen's Argument

The discussion and citations at pages 9-11 of the *Response* suggest that the Supremacy Clause is invoked in service of another effort to distort Mr. Christensen's argument. Thus, the *Response* states: "Applying the Supremacy Clause, federal courts have unanimously rejected the *stock capital defense argument* that the FDPA infringes on state sovereignty and is unconstitutional under the Tenth Amendment if applied in a state that does not currently have the death penalty." *Id.* (emphasis added). That's all well and good, but it appears the government has pulled out the *stock prosecutor*'s *response* rather than directly confronting the actual Tenth Amendment claim of the *Motion*, which *expressly disavowed* the argument which the *Response* want to attribute to

Mr. Christensen. *See Motion,* at 4.[5] The *Motion* makes it crystal clear that his Tenth

Amendment claim is a narrow one, unlike the expansive across-the-board claims in the

cases cited in the *Response*. Mr. Christensen only argues that in the unusual case, such as

this, involving a crime historically considered as squarely within the Police Power of the

State, one not involving a uniquely federal interest and presenting, at best, a narrow

jurisdictional claim under the Commerce Clause, the substantial interests of the State, as

outlined at pages 35-43 of the *Motion*, more than substantially outweigh those of the

national government.

Mr. Christensen's argument was not presented (or, for that matter, even

applicable) in the cases cited by the *Response*. The only Circuit case referenced in the

*Response*, *United States v. Acosta-Martinez*, 252 F.3d 13, 18-20 (1st Cir. 2001), is easily

dispensed with because the Tenth Amendment does not even apply to Puerto Rico,

which is a Commonwealth and not a sovereign under the U.S. Constitution. *See Franklin*

*California Tax-Free Trust v. Puerto Rico*, -- F.3d --, 2015 WL 4079422 ("The limits of the

Tenth Amendment do not apply to Puerto Rico, which is 'constitutionally a territory.'

[citation omitted]"). Further, the Tenth Amendment is not even mentioned in *Acosta-*

*Martinez*, as the defendant's argument was that due process prevents application of the

federal death penalty in Puerto Rico because its citizens may not elect representatives to

Congress and thus were not represented in its decision to pass a death penalty statute.

---

[5]"Before proceeding further, Mr. Christensen underscores what he is *not* arguing. Mr. Christensen does
not suggest that the Constitution categorically prohibits the Federal government from seeking the death
penalty in any state that has jettisoned capital punishment. Mr. Christensen concedes that the federal
government may proceed in the face of the State's discordant political judgment, where paramount
interests uniquely assigned to and enforceable by the national government are involved . . ." *Id.*

The four district court cases cited in the *Response*, at 9-10, also provide little guidance as to Mr. Christensen's argument. Putting aside that none of these decisions are binding on this Court, examination of these opinions reveals the only similarity to the issue here is that the cases cited the Tenth Amendment. In *United States v. Tuck Chong*, 123 F. Supp. 2d 563 (D. Hawaii 1999), the defendant argued that the federal government had no jurisdiction to even try him under 18 U.S.C. § 924(j)(killing resulting from use of a firearm during a crime of violence or drug trafficking offense) because Hawaii had not delegated such jurisdiction to the national government. *Id*. 567. Mr. Christensen makes no such argument. Mr. Tuck Chong then took the absolutist position that the Tenth Amendment bars the federal death penalty in all abolitionist States unless the State explicitly authorizes this action. Id. 567-68. Again, no such claim is made here.  *United States v. O'Reilly*, 2007 WL 2421378 (E.D. Mich. 2007), for the most part just relies on *Tuck Chong*.

In both *United States v. Jacques*, 2011 WL 3881033 (D. Vt. September 2, 2011), and *United States v. Johnson*, 900 F. Supp. 2d 949 (N.D. Ia. 2012), the defendants' Tenth Amendment argument was inextricably intertwined with an Eighth Amendment claim that the state's abolition of the death penalty alone establishes its unconstitutionality under the Eighth Amendment, again arguments not presented here.[6]

---

[6]In addition, with the exception of *Jacques*, unlike here, each case involved crimes committed with the requisite commerce or economic dimension, thus affording clear a jurisdictional basis under the Commerce Clause: *Tuck Chong* (murder during drug trafficking conspiracy); *O'Reilly* (murder during a bank robbery); *Johnson* (murders during drug and CCE conspiracy).

As to the cases cited at 10-11 of the *Response*, the fact that a federal death sentence was obtained in States that do not have or enforce a death penalty is of no moment if the issues before this Court were not raised or discussed.[7]

On page 10, the *Response* once again warps Mr. Christensen's argument by manufacturing an easily refutable one that he never makes. According to the *Response*, Mr. Christensen attempts to distinguish his case from the ones discussed above on the ground that Illinois, to quote the *Response*, "*really* does not support the death penalty." (emphasis in original). The *Response* then quickly pivots to rebut its own argument, writing: "The defendant cites no authority for the quite novel argument that the strength of a state's purported opposition to the death penalty or the particular jurisdictional basis of a federal crime can render the FDPA unconstitutional under the Tenth Amendment." *Id*. It is true, as the *Response* argues, that it would be difficult to gauge the relative degree of different States' opposition to capital punishment, but Mr. Christensen had no warrant to cite authority in support of this "quite novel argument" that he never made.[8]

---

[7]Like the cases cited in the preceding footnote, the federal jurisdictional basis in each of these cases was clear. *Tsarnaev* (terrorism); *Gabrion* (murder in a National Forest); *Wilson* and *Johnson* (drug trafficking - commerce); *Fell* and *Rodriguez* (kidnapping where victims transported across state lines).

[8]The *Response*'s similar suggestion that it is "difficult" to judge the "jurisdictional strength" of a case is incorrect. As the discussion throughout the motions on jurisdiction indicate, in the overwhelming majority of cases jurisdiction is clear. As to the Commerce Clause, for instance, no issue arises when the offender crosses state lines or the offense has the requisite connection to commerce or economic activity. *See generally Defendant's Reply to Response to Motion to Dismiss Count One* (filed December 6, 2018). Further, where jurisdiction is an element of the offense, juries are routinely asked to judge the "jurisdictional strength" and determine whether the element has been proven beyond a reasonable doubt. *See Motion to Dismiss Count One*, Dkt. 114, at 10, 25.

Contrary to the *Response*, Mr. Christensen's argument does not require a court to gauge the degree of various States' opposition to the death penalty. The only relevant consideration is whether the State has abolished capital punishment.[9] None of the State interests identified in the *Motion* are peculiar to Illinois – they apply to *any* State that has abolished capital punishment. But, as the *Motion* makes clear, that does not translate to the argument the *Response* wants to put in the mouth of the defense, for these interests – the existence and importance of which the *Response* makes no effort to contest – are only one side of the coin. The *Motion* is pellucid that these State interests are admittedly entitled to less weight when the federal interest is one that has been traditionally assigned to the national government, such as the prosecution of terrorism cases, crimes against federal or international officials, traditional state court crimes committed on federal property, espionage, treason, civil rights offenses etc., or where jurisdiction under Commerce Clause is more indisputable than here.

---

[9]As to resolution of the same issues when arising in different abolitionist States, the Response's argument at 12-13, that the "Constitution does not change from state to state" assumes that the necessary balancing of interests in the rare case where the federal jurisdictional claim is as tenuous, as here, requires assigning different interests to different abolitionist States, depending on the degree of opposition to the death penalty. But, as stated, the only relevant consideration on the State's side of the balance would be the fact of abolition. The balancing would then focus on the strength of the federal interest in the particular case, an inquiry that can easily be determined pursuant to ascertainable standards.

The same issue would not be presented in non-abolitionist States because in these States the State interests cited in the *Motion* would be irrelevant. Any resulting difference in the treatment of defendants in abolitionist and non-abolitionist States would arise not from the Constitution but their divergent treatment of the death penalty. There is nothing unusual about the application of federal crimes being dependent on State law. *See e.g.*: 18 U.S.C. § 13 (Assimilative Crimes Act: crimes committed in federal territorial jurisdiction dependent on State law); § 921(a)(20) (definition of firearm offenses dependent on State law).

The *Motion* does not question that in the vast majority of cases the State's interests will not outweigh those of the federal government to the extent of defeating the latter's jurisdiction. *Id*. 47-48. But, that likely result does not relieve the court of the duty to make the determination in those rare cases where the issue is fairly presented. *Cf. Jones v. United States,* 529 U.S. 848, 859 (2000)(J. Stevens, concurring) (noting reluctance of Court to "authorize federal intervention in local law enforcement in a marginal case such as this."). And contrary to the *Response*'s suggestion, at 10, this is not a task that courts are ill-equipped to undertake, as "[i]t is frequently the case in constitutional litigation . . . that courts are called upon to balance interests that are not readily translated into rough equivalents." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 474 (1988).

## V.      The Role of Federalism in the Balancing of Interests

The *Response*, at 7, n.3, dismisses the developments and political processes leading to abolition of the death penalty in Illinois, as recounted in the *Motion*, at 6-21, as an "exercise in futility," painting it as nothing more than a "diatribe against capital punishment." This dismissive characterization will likely surprise (and perhaps offend) many citizens of Illinois, as well as their elective representatives, who grappled with the disturbing issues attendant to the death penalty over a period of three decades and only after the extensive deliberation and discussion of all elements of the State's polity decided that capital punishment was not in the best interests of the State or its citizens. The dismissive and, frankly, arrogant attitude inherent in the *Response's* "diatribe" description gives meaning to the Tenth Amendment's purpose "to allay lingering

concerns about the extent of the national power." *Alden v. Maine*, 527 U.S. 706, 713-14 (1999). Further, the *Response*'s cavalier brushing aside of this history ignores the constitutional significance of the political process which the Supreme Court has termed the "beginning point in deciding" how to resolve conflicts between the sovereigns' resolution of issues involving fundamental rights. *United States v. Windsor*, 570 U.S. 744, 764 (2013); *see also Motion*, at 51-52.

Despite the fact that concerns of "federalism" and its role in our constitutional structure are noted throughout the *Motion*, the word appears only once in the body of the *Response* and then only in restating the defense's claim. *See Response*, at 11. But, the concept of federalism and respect for the considered policy judgments of the State, as well as the derivative interests of Mr. Christensen, are at the heart of the Tenth Amendment claim here.

As Chief Justice Roberts stated in *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519, 536 (2012): "State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power," *quoting New York v. United States,* 505 U.S. 144, 181 (1992). These concerns and resulting need to balance the interests of both the defendant and the national government in the context of federalism have animated such decisions such as *United States v. Lopez*, 514 U.S. 549, 583 (1995) ("Absent a stronger connection or identification with commercial concerns that are central to the Commerce Clause, that interference contradicts the federal balance the Framers designed and that this Court is obliged to enforce.")(J. Kennedy, concurring); *Bond v. United States*, 572 U.S. 844, 856

13

(2014) (§ 229 must be read consistent with principles of federalism inherent in our constitutional structure."); and *Jones v. United States*, 529 U.S. 848, 858 (2000) (rejecting government's interpretation of § 844(i), as it would "significantly change[] the federal-state balance." [citation omitted]).

## VI.    The Issues Presented Here are Ripe

The *Response* begins by citing three civil cases concerning the "ripeness" doctrine that have nothing to do with the issues in this case, *id.* 3, and then in the next paragraph beginning at the bottom of page 3, cites two district court cases that have invoked the ripeness doctrine in reference to a limited Tenth Amendment claim in capital cases, *United States v. Madison*, 2018 WL 4907698, at *6 (M.D. Fla. Oct. 10, 2018), and *United States v. Sampson*, 2017 WL 3495703, at *32, n. 45 (D. Mass. Aug. 15, 2017). The defendants in *Madison* and *Sampson* raised the same issue of whether the FDPA commandeers state officials in carrying out federal death sentences in violation of the anti-commandeering provisions of the Tenth Amendment. In each case the court held the issue was not ripe because neither defendant had yet received a death sentence. Mr. Christensen has made a similar claim. *See Motion*, at 30-33. Mr. Christensen does not, however, quarrel with the reasoning of *Madison* or *Sampson* on this point and thus has no objection to the *Response*'s argument that resolution of this limited part of his Tenth Amendment claim need not be addressed at this time.[10]

---

[10]The *Motion* raises a second commandeering argument that is ripe. *Id.* at 27-29. That argument is dependent, in large part, on the nature and content of the written instructions that this Court's Jury Selection Plan requires the Clerk to issue to the State Board of Elections. The Clerk denied the defense's request to review these instructions, preferring that the matter be taken up with the Court. The defense will thus reserve replying on this part of his commandeering claim until that issue is resolved.

But, the government goes too far when it implicitly suggests that *Madison* or *Sampson* stand for the proposition that the other Tenth Amendment claims, although not premised on the existence of a death sentence, are nonetheless subject to this reasoning. Nothing in either case even remotely supports such an extension and the government cites no authority and offers no reasoning supporting such an approach. In fact, the district court decisions cited at page 9 of the *Response* counter this premise, as each court addressed the Tenth Amendment issue pretrial. Mr. Christensen's Tenth Amendment motion functionally seeks dismissal of the *Notice of Intent*, a claim for relief that is routinely presented and decided pretrial.

Respectfully submitted,

BRENDT A. CHRISTENSEN, Defendant

By:   /s/ Elisabeth R. Pollock                    /s/ George Taseff
      Assistant Federal Public Defender           Assistant Federal Public Defender
      300 West Main Street                        401 Main Street, Suite 1500
      Urbana, IL 61801                            Peoria, IL 61602
      Phone: 217-373-0666                         Phone: 309-671-7891
      FAX:   217-373-0667                         Fax:   309-671-7898
      Email: Elisabeth_Pollock@fd.org             Email: George_Taseff@fd.org


      /s/ Robert Tucker                           /s/ Julie Brain
      Robert L. Tucker, Esq.                      Julie Brain
      7114 Washington Ave.                        916 South 2nd
      St. Louis, MO 63130                         Philadelphia, Pa. 19147
      Phone: 703-527-1622                         Phone: 267-639-0417
      Email: roberttuckerlaw@gmail.com            juliebrain1@yahoo.com

15

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<div style="margin-left: 45%">

<u>/s/ Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

</div>

16