E-FILED
Friday, 07 December, 2018  05:11:46 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | <u>Hearing Requested</u> |
| | ) | |
| Defendant. | ) | |

<u>REPLY TO GOVERNMENT'S RESPONSE TO THE MOTION
TO SUPPRESS JAIL COMMUNICATIONS AND FRUITS THEREOF (R. 98)</u>

Mr. Christensen submits this reply to the government's response to his *Motion to Suppress Jail Communications and Fruits Thereof* (*Response*), Dkt 142; *Motion*, Dkt. 98.

1.      Mr. Christensen's *Motion* alleges that the government's monitoring of all his phone calls and other communications from the Macon County Jail and then the Livingston County Jail since his arrest for the purpose of gathering evidence to be used against him in this capital case violates both his Fourth and Fifth Amendment rights.

At the outset, it is important to note that the *Response* does not take issue with the most crucial factual allegations of the *Motion*. Thus, the *Response* does not challenge that: (1) the monitoring by federal agents was done without the benefit of a warrant, *Motion*, at 1; (2) the calls and communications were not reviewed by officials at the respective jails, or, if so, only on a cursory basis, *Motion*, at 2; (3) the communications were turned

1

over to federal agents at their request[1], *id*.; (4) the purpose of the monitoring of these communications was not related to security of the institutions, but to gather evidence to use against Mr. Christensen; and (5) federal agents listened to and catalogued hundreds of Mr. Christensen's phone calls and other communications.

2.      The *Response* cites several cases holding a pretrial detainee has no expectation of privacy in his calls and communications because of the security concerns of the institutions. *Response*, at 3-5. Many of these same cases were cited in the *Motion*, at 8-10. But, the *Response* is incorrect when it reads these cases as holding that a pretrial detainee has *no* Fourth Amendment protections. *See* Motion, at 7-10; ¶ 3, *infra*. The rationale underlying all these cases is that a pretrial detainee surrenders his privacy rights when the warrantless interception is for the purpose of *security*. When done simply to gather evidence to be used against him, that justification vanishes. *See Motion*, at 13-14.

As noted, the *Response* does not take issue with the fact that the purpose of the monitoring of Mr. Christensen's communications was to gather evidence to be admitted against him, particularly in the penalty proceeding, an allegation that could hardly be denied in light of the communications between federal agents, including those between a prosecutor and jail officials. *See Motion*, 3-7. Indeed, the government *directly admits* the purpose of the federal agents' listening to all these calls was for purpose of obtaining

---

[1]In this regard, the *Response* states nothing more than: "The recordings of those phone calls have been received by the United States and immediately turned over to the defendant." *Id.* 2.

evidence to use against Mr. Christensen, *Response*, at 2, claiming that "[i]t is a common practice for federal and state investigators to review jail recorded calls to obtain evidence that can be used in a criminal prosecution." *Id*. 8. Nowhere does the *Response* suggest that the monitoring was done for security of the institution.

3.      At pages 8-9, the *Response* suggests some dispensation because, allegedly, its "sole" purpose was not to scavenge for evidence in search of a death sentence but to locate the remains of Ms. Zhang. While the defense does not question the strong interest in locating the remains of Ms. Zhang, the government cannot realistically claim this to be the real purpose in light of its repeated statements that it reserves the right to use the contents of all these calls against Mr. Christensen despite the fact that none relate any information concerning the remains. Further, the January 31, 2017 e-mail from the prosecutor to the Administrator of the Livingston County Jail clearly states that the government agents wanted to review the recordings for use in the "death penalty phase" of Mr. Christensen's trial. And despite the ineffectual and unexplained insistence that the e-mails are somehow "removed from context," *Response*, at 8, they cannot reasonably be interpreted for any purpose other than the plain import of their words.

Ultimately, this explanation makes no difference, as it amounts to the same thing – a search for evidence. In any event, this does not constitute an exception to the Fourth Amendment's warrant requirement absent a showing of exigent circumstances.

4.    To the extent that the *Response* is suggesting that the interest in locating the remains excuses the failure to obtain a warrant, it is incorrect. Exigent circumstances permit warrantless searches in certain emergencies such as hot pursuit, prevention of the imminent destruction of evidence or to save property or lives. *See generally Warden v. Hayden*, 387 U.S. 294 (1967); *Michigan v. Tyler*, 436 U.S. 499 (1978). None of these situations is applicable to the warrantless search of Mr. Christensen's communications months after the disappearance of Ms. Zhang.

Two recent cases of the Supreme Court in drunk driving cases, rejecting governmental claims of an important or compelling state interest to justify searches without a warrant, bear on this issue. *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), rejected Missouri's request for a *per se* rule allowing the drawing of blood after an arrest for drunk driving, holding that exigent circumstances must be evaluated on a case-by-case basis. In discrediting Missouri's argument that it could proceed without a warrant, the Court emphasized that such "compelled intrusions"[2] into the body invade an individual's "most personal and deep-rooted expectations of privacy." *Id*. 1558. The

---

[2]In *McNeely*, the compulsion resulted from the threat of suspension of one's driver's license for refusal to submit to the withdrawal of blood. In a capital case, the compulsion to "consent" to the monitoring by the government for the purpose of obtaining evidence is even stronger – the threat to be cut off from the support of family and friends during the pendency of a proceeding where your life is at stake and where maintaining those very relationships is more far important than in the normal case. *See Motion*, at 20-21. Allowing the government free access to the jail recordings also potentially inhibits the development of mitigation, which depends to some extent on family and friends being able to continue and express close relationships with one another. Mr. Christensen reserves issues relating to the Eighth Amendment implications of this practice, depending on the resolution of these issues raised in this *Motion* and the extent of any permitted use of the phone calls if a sentencing hearing is required.

Court also rebuffed Missouri's arguments that a warrant was unnecessary because there was probable cause to arrest and the blood was drawn in a reasonable medical manner, *id*. 1560, and that the warrantless procedure should be permitted because of a motorist's diminished expectation of privacy. *Id*. 1564. In conclusion, *McNeely* held that the general importance of the government's interest "does not justify departing from warrant requirement without showing exigent circumstances that make securing a warrant impractical in a particular case." *Id*. 1565

While considering the issues in the context of the search-incident-to-an-arrest doctrine rather than exigent circumstances, the Supreme Court's subsequent decision in *Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016), is still instructive. *Birchfield* again examined issues surrounding the application of "implied consent" laws that require drivers arrested for drunk driving to consent to tests upon pain of losing their licenses for refusal to do so. Two different regimes were at issue in *Birchfield*, the drawing of blood and the administration of a breathalyzer. For Fourth Amendment purposes, the outcome was different. As to breathalyzers, the Court held that the intrusion on privacy interests was "negligible," reveals only limited information, which is not unduly exposed to the public, and is "[un]likely to cause any great embarrassment [beyond] [] that inherent in any arrest." *Id*. 2166-67. But the Court held "blood tests are a different matter." *Id*. 2178. Noting that they are "significantly more intrusive" and potentially reveal more information than the limited purpose of the extraction, *id*., the Court held

5

there is "no satisfactory justification for demanding the more intrusive alternative

justification without a warrant." *Id. 2184.*

In addition to the point noted in the preceding footnote and the discussion of the

government's "implied consent" argument in the next numbered paragraph, there are

several lessons from *McNeely* and *Birchfield* that apply here. First, *Birchfield* reaffirmed

several prior cases holding that the degree of the intrusion is important to the Fourth

Amendment analysis. *See Motion*, at 14-16. Like, the blood extraction in *Birchfield*, and

unlike the breathalyzer, the degree of the intrusion here – listening to literally hundreds

of calls over a period of approximately a year and a half - is far more than minimal. This

invasion does not involve the retrieval of "limited information," as in the breathalyzer.

Second, unlike *Bloomfiel*d, where the Court found that the breathalyzer was "unlikely to

cause embarrassment," as noted in the *Motion*, at 16, the subjects discussed, particularly

between Mr. Christensen and his wife, allowed the government to pry into the

innermost recesses of Mr. Christensen's mind on the most intimate and private matters,

violating the "most personal and deep-rooted expectations of privacy." Third, while

recognizing that an arrestee has a "diminished expected of privacy," *Birchfield*, 136 S. Ct.

at 2177, *McNeely*, 569 U.S. at 159, both cases nonetheless held that status does not

extinguish the arrestee's Fourth Amendment rights, as suggested by the *Response.* Just

as the existence of a purported compelling governmental justification "does not

diminish a motorist's privacy interest in preventing an agent of the government

piercing his skin," *McNeely*, 569 U.S. at 159, Mr. Christensen's incarceration as a pretrial

detainee did not diminish his interest in government agents not piercing his mind and insinuating themselves into his most intimate relationships except to the extent necessary to ensure the security interests of the institutions.

5.      The *Response* argues that because Mr. Christensen was informed the calls were being recorded, this constitutes implied consent. *Id. at 7-8.* With the exception of one case that doesn't even address the issue,[3] all the cases cited by the *Response* were decided before the Supreme Court's decision in *Birchfield*, which addressed North Dakota's claim that the driver impliedly consented to such testing by virtue of his decision to drive on public roads. In North Dakota, the refusal to consent not only resulted in civil and evidentiary penalties, but also subjected the refusing driver to a misdemeanor conviction. Distinguishing its prior decisions approving the concept of implied consent laws as a basis for evidentiary or civil consequences, the Court drew a distinction as to the imposition of criminal penalties:

> It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads.

*Id*. 2186. Finding North Dakota's suggestion of "implied consent" unreasonable under the Fourth Amendment, the Court "conclude[d] that motorists cannot be deemed to have consented to submit to a blood test on pain on committing a criminal offense." *Id*.

---

[3]*United States v. O'Brien*, 870 F.3d 11, 16 (1st Cir. 2017), does not directly address the issue as it was not raised, but does cite *Novak* for the proposition that such recordings are legal. Its significance in light of *Birchfield*'s treatment of implied consent is minimal.

Similarly, it is unreasonable to attribute any realistic consent, implied or otherwise, to

Mr. Christensen's forced election between maintaining his contact with his wife and

family in a capital case or the government's unlimited eavesdropping and monitoring

all his communications for purpose of convicting him of a capital offense. *Cf. Bullington*

*v. Missouri*, 451 U.S. 430, 438-39 (1981) (double jeopardy prohibited defendant from

facing death penalty after sentence of life imposed in first trial under a bifurcated

proceeding where government bore burden of proving certain elements beyond a

reasonable doubt because *second proceeding had all the "hallmarks of the trial on guilt or*

*innocence."*) (emphasis added).

　　　6.　　　In his *Motion*, at 7-10, Mr. Christensen asserts that he had a reasonable

expectation of privacy that his hundreds of phone calls would not be turned over *en*

*masse* to federal agents to rummage through at will in an effort to execute him. The

*Response*, at 5, answers by citing *California v. Greenwood*, 486 U.S. 35 (1988).

　　　It is true *Greenwood* held that an individual has no reasonable expectation of

privacy in trash he discards. But, there is a grand canyon of difference between the

voluntary act of throwing away trash with no antecedent involvement of the

government and the forced choice of either "consenting" to monitoring or being

effectively isolated from your closest family after the government has incarcerated you.

*Greenwood* reasoned that trash left on the streets is readily accessible to other members

of the public and that a person who discards trash has voluntarily done so "for the

express purpose of conveying it to a third party," and "'in an area particularly suited for public inspection." *Id*. 40-41. This is not analogous to the circumstances here.

7.      Mr. Christensen's *Motion* also raised a Fifth Amendment Due Process claim, based on the unrestricted listening of his communications for the purpose of punishment. *Motion,* at 17-21. Because Mr. Christensen is a pretrial detainee, the Fifth Amendment does not permit punishment prior to conviction, a distinction made clear in *Bell v. Wolfish*, 441 U.S. 520 (1979), which upheld the prison searches at issue there because they were imposed for the institution's security concerns and there was "no intent to punish." *Motion*, at17-21.

The *Response* takes no issue with the authority cited in the *Motion* that the infliction of punishment before conviction violates the Fifth Amendment or with the factors relevant to that determination. The *Response* does not even address the Fifth Amendment issue, a failure that cannot be explained by reliance on its Fourth Amendment position, as the two constitutional claims are entirely separate and one does not depend on the other. As Mr. Christensen has made it clear in his *Motion*, he does not argue that the Fourth Amendment prohibited the jails from monitoring his communications for security purposes. If such monitoring reveals evidence or other criminal conduct, the government is not required to turn its head and if probable cause exists, it may obtain a warrant authorizing more extensive surveillance for purposes beyond the security interests of the jails. But, for the reasons already stated, further

2:17-cr-20037-JES-JEH  # 171  Page 10 of 16

confirmed by the detailed summary of these calls which were disseminated to various federal agents, punishment was the real objective here.

8.      The *Response* objects that the recital of the substance of the e-mails in the *Motion* was "unfair and gratuitous." *Id.* at 8. In particular, it claims that the e-mails "are removed from context and twisted well beyond their obvious meaning." *Id*. The *Motion* makes clear that referencing the language of the e-mails was for the purpose of demonstrating that the federal agents were monitoring them not for the purpose of security of the local jails but to obtain evidence to use against Mr. Christensen in pursuit of a death sentence. There was nothing gratuitous about the references as they are directly relevant to Mr. Christensen's argument. In complaining that the e-mails are "removed from context" and "twisted from their obvious meaning" the *Response* not only fails to suggest any alternative context or meaning, it turns around in the next sentence and concedes the very point for which these e-mails were offered when it states "[i[t is a common practice for federal and state investigators to review recorded jail calls to obtain evidence that can be used in a criminal prosecution." *Id*.[4] Further, the claim that reference to the e-mails was gratuitous "because it does not support [the] legal argument," simply assumes its own conclusion.

---

[4]That it's a "common practice," even if true, does not translate to a legal practice, especially if not limited in the manner suggested by the justification to protect the security of the institution.

9.      Apparently miffed at the light in which the e-mails show the participants or perhaps seeking to redirect the issues, the government unleashes a barrage of accusations at pages 8-10 of the Response. In one respect this is more of the same, as throughout its pleadings the government repeatedly injects disparaging characterizations such as, for example, describing defense arguments as "a diatribe against capital punishment," "meandering," or nothing more than "stock capital defense arguments," unmindful or uncaring of the obligations imposed on defense counsel in capital cases to "consider all legal claims potentially available" and "present the claim as forcibly as possible." *See American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (February 2003), Guideline 10.8, 31 Hofstra Law Review 913 (2003).

Sensitive to the professional obligation of advocates to demonstrate respect for other attorneys,[5] recognizing that the government attorneys have the same obligation to zealously represent the United States as do defense counsel their client, and proceeding on the assumption that the Court is not interested in these sorts of exchanges between counsel, we would normally just assign such tactics to misplaced adversarial zeal and not comment further. But, because the tone and substance of the harangue of the Response's closing escalates prior false accusations unfairly suggesting misconduct by counsel,[6] and, more

---

[5]*See* Illinois Rules of Professional Conduct of 2010: Preamble, Par. 5: "A lawyer should demonstrate respect for the legal system and all who participate in it."

[6]For instance, in its *Response to the Defendant's Motion to Bar and Suppress Identification Testimony and Evidence*, Dkt. 146, at 11, the government suggests that the defense "*improperly attache[d]* [an]

11

important, appears to be designed to prejudice the defense in the eyes of this Court and infect the record, thereby potentially harming Mr. Christensen, they cannot go unanswered.

a.     The Accusation that Counsel Violated the Protective Order

The *Response* claims that the defense was specifically informed that the e-mails were "work product," protected by Rule 16(a)(2), and that counsel violated a Protective Order prohibiting the dissemination of discovery material. *Id*. 10. Neither charge is correct.

It is true that the defense signed a Protective Order agreeing not to "allow it [discovery] out of [their] custody" nor "allow it to be disseminated in any way." It is commonly understood that such provisions in Protective Orders do not apply to the use of the discovery materials in connection with the criminal case and certainly do not prohibit their use in proceedings before the Court. The Protective Order we signed reflects, in essence, the requirements of Local Criminal Rule 16.2(B), which prohibits the dissemination of discovery "for any purpose other than in *direct relationship to the criminal case* to which the discovery pertains." (Emphasis added). Obviously, the use of this material was directly related to the criminal case and was consistent with the commonly understood meaning of such language in Protective Orders.

_____

*internal DOJ memorandum* to his motion. The document in question is a January 2017 memorandum from Deputy Attorney General Sally Yates setting out recommendations for identification procedures in criminal cases. *See* Dkt. 99, Exhibit 2-1. While the government's legal arguments concerning the significance of the memorandum are fair enough, not content with simply presenting them, the government tosses in this implied accusation that the defense has improperly revealed some confidential document of the Department of Justice *despite the fact that the memorandum was the subject of a press release and is published on the Department's website. See* *https://www.justice.gov/archives/opa/press-release/file/923201/download.*

Additional reasons suggest the unreasonableness of the allegation. First, the government itself has repeatedly indicated that it "intends to use the materials and recordings it has provided to the defense pursuant to Rule 16 during the trial" despite requests by the defense to more specifically identify the evidence it intends to use. Letter of Defense Counsel, July 11, 2018, at 5, Request # 9. The government has made the same representation to the Court in its response to the defense's Rule 12(b)(4)(B) motion. Dkt 85, at 7 ("[T]he United States has also advised the defendant that it is considering using *all* of the Rule 16 evidence in its *case-in-chief* at this time." (Emphasis added). Stated otherwise, these statements make it clear that the government intends to "disseminate" part or all of the discovery during the proceedings as it sees fit. There is no logical distinction between such "dissemination" during pretrial proceedings and trial and, other than seeking a Protective Order, which was not done,[7] defense counsel are unaware of any provision in the rules that permits the government to use at its pleasure, while the defense is somehow limited to its use only at the direction and permission of the government.

Further, none of the four defense counsel who met with the government to discuss discovery requests recall the government asking the defense to treat this discovery as protected work product under Rule 16(a)(2), as alleged in the *Response*, and no such request was made in the letter transmitting the material. Had such a request

---

[7]*See* Fed. R. Crim. P. 16(b).

been made, counsel would have had no issue with accommodating the government and filing the e-mails under seal.

      b.    The Suggestion that Defense Counsel Was Attempting to Influence Press Coverage

The most feigned outrage was saved for footnote 4, at 9-10, where the government suggests the need to take care in pleadings because of their "potential to taint the jury pool." This remark elevates irony and chutzpah[8] to a new level in light of prior events in this case. On February 7, 2018, the defense filed a *Sealed Exhibit D* to its *Memorandum in Support of Proposed Scheduling Order* that referenced a confidential matter that had the potential to taint the jury pool in the most fundamental way. *See* Dkt. 60. Apparently sensing an advantage of having this confidential matter made public, the government filed a motion to strike the Exhibit or unseal it, allegedly to permit the government to file a response (which it could have done without the unsealing). Dkt. 69. After the defense filed a response pointing out the potential prejudice and violations of canons of ethics entailed in the government's request, Dkt. 72, the Court denied the government's motion to unseal. Sealed Dkt. 75. In light of these events, the Court should give no weight to the government's claims of misconduct and gently remind the government that such accusations should not be lightly made.

---

[8]For a legal definition of "chutzpah," *see Harbor Ins. Co. v. Schnabel Foundation Co., Inc.*, 946 F.2d 930, 938, n.5 (1991)("a young man convicted of murdering his parents, who argues for mercy, on the ground that he is an orphan.").

WHEREFORE, Defendant requests that the relief requested in the Motion be granted.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:     309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

16