E-FILED
Friday, 07 December, 2018  05:12:44 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | Hearing Requested |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT ONE DUE TO LACK OF JURISDICTION (R. 114)**

Mr. Christensen submits this *Reply* to the government's *Response to Defendant's Motion to Dismiss Count One Due to Lack of Jurisdiction* (*Response*). (Dkt. 140).

Mr. Christensen is admittedly charged with an extremely serious crime in Count One, an offense that is severely punished under both federal and state law, with the former providing for the possibility of a sentence of death and the latter a sentence of life without parole. Not content with a sentence of life without parole, the government attempts to wedge this case into a federal courtroom by proffering a dubious theory of jurisdiction. Neither Mr. Christensen's *Motion to Dismiss Count One* nor this *Reply* suggest that he cannot be prosecuted and if convicted severely punished for the offense of kidnapping Yingying Zhang and later killing her – indeed incarcerated for the rest of his natural life. But, simply put, this case is in the wrong courtroom and the government's insistence on a death sentence cannot disguise this fundamental problem.

## I.      Introduction

Commentators and professionals from all sectors of the criminal justice system have long questioned the creeping over-federalization of criminal law. *See e.g.:* James A. Strazzella (Reporter), American Bar Association Task Force on the Federalization of Criminal Law, February 1, 1999,

https://www.americanbar.org/content/dam/aba/publishing/criminal_justice_section _newsletter/crimjust_pubs_catalog_fedcrimlaw1.authcheckdam.pdf (visited November 26, 2018) ("Inappropriate federalization undermines the critical role of the states and their courts, *id.* at 1, and Congress should avoid doing so "unless there is a strong reason for making wrongful conduct a federal crime – unless there is a distinct federal interest of some sort involved. *Id.* 11);[1]

Michael C. Carroll, *United States v. Lopez, Reevaluating Congressional Authority Under the Commerce Clause*, 69 St. John's Law Review, 579, 608 (2012) (On the lesson of *Lopez*: "Congress, long accustomed to the expansion of its powers must now learn to temper its lawmaking in accordance with stricter constitutional limits"); *see generally* Sanford H. Kadish, *The Folly of Overfederalization*, 46 Hastings L.J. 1247 (1995); Renee M. Landers, *Reporter's Draft for the Working Group on the Mission of the Federal Courts. Id.* 1255.

---

[1]The ABA Task Force was chaired by former Attorney General Edwin Meese, III, and included former Congressmen, federal prosecutors, a State Attorney General and former federal and state prosecutors. *Id.*, Preface.

These concerns have not been limited to fuzzy-headed academics. The problems resulting from often ill-considered[2] expansion of federal laws has been flagged by the Supreme Court not only in its decisions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), but also in testimony given by Justices before Congress. *See e.g.:* Hearings on H.R. 4603 before a Subcommittee of the Senate Committee on Appropriations, 103d Cong., 2d Sess., 100–107 (1994) (testimony of Justices Kennedy: "We are very concerned about the character of our Federal system, of our Federal courts. We need judges that can try complicated antitrust cases and securities cases and to enforce the Federal law in copyright and patent cases . . . So we are very concerned about what these proposals [expanding federal jurisdiction] will do to the character of the Federal Court and, of course, the underlying observation that . . . it involves the whole Federal system the Federal balance [sic]." *Id.* 100; (testimony of Justice Souter: "I have to say that when I go back to my own home town, if I could capsulate the concerns of the Federal judges there into one sentence, it is that they are being turned and are in jeopardy of being turned into police court judges."). *Id.* 103.

---

[2] *See United States v. Lopez*, 514 U.S. 541, 577-78 (J. Kennedy, concurring)(noting the "momentary political inconvenience often attendant," upon legislators' failure to "preserve and protect the Constitution in maintaining the federal balance."). Id. 578. The same point was made by Justice Scalia in rebutting the suggested significance of the fact that the extension of some provisions of the Voting Rights Act in 2006, passed the Senate by a vote of 98-0: "Or [congressmen] decided perhaps they'd better not vote against it, that there's no - - none of their interest in voting against it."). Transcript of Oral Argument, at 16-17, *Shelby County v. Holder*, Dkt 12-96 (February 27, 2013), opinion reported at 570 U.S. 529 (2013). Similarly, it would have hardly surprise if congressmen attached no moment to possible jurisdictional issues in an enactment titled the *Adam Walsh Children Safety and Protection Act*. Little political capital accrues from voting against laws denominated as protecting children. Better to leave such nuances to the courts.

But, even by prior deferential interpretations of the Commerce Clause, the jurisdictional theory proffered by the government in its *Response* – in an intrastate kidnapping not involving a ransom request or other economic or commercial dimension[3] - is particularly audacious. If accepted, the gate to federal jurisdiction over traditional state court crimes would be opened far beyond that ever imagined by the Framers, envisioned by Congress or sanctioned by the Supreme Court or any circuit court.[4]

Mr. Christensen has filed two motions that focus on distinct, but contextually related,[5] constitutional provisions that are implicated by this unprecedented jurisdictional reach. This *Reply* first addresses whether Congress's Commerce Clause power reaches as far as necessary to provide jurisdiction in this case; and, second, if so, whether, Congress intended to press federal jurisdiction to the limits suggested by the *Response*. Although referenced where appropriate, related issues presented by the Tenth

---

[3]For an example of an intrastate kidnapping not involving a ransom but nonetheless having the requisite nexus to commerce, *see United States v. Ochoa*, 2009 WL 3878520 (D. New Mexico 2009), where the defendant lured the victim with a cell phone and forced her to go to a bank and withdraw all the money in her account. *See also* § II(d)(2), *infra*.

[4]As discussed below, one outlier district court case cited in the *Response*, though not directly addressing the issue raised here, would support the government's theory. *See* § IV(b)(2), *infra*.

[5]*See New York v. U.S.,* 505 U.S. 144, 156-57 (1992)(discussing Tenth Amendment's role as a restraint on Congress's authority under the Commerce Clause); *United States v. Lopez*, 514 U.S. 549, 583 (1995) (J. Kennedy, concurring)("Absent a stronger connection or identification *with commercial concerns that are central to the Commerce Clause* that interference (with state sovereignty) contradicts the federal balance the Framers designed and that this Court is obliged to enforce.")(emphasis added).

Amendment and principles of federalism are more fully discussed in Mr. Christensen's

separate reply. (filed Dec. 7, 2018).[6]

The *Response* essentially presents two arguments. As to Congress' intent, the

government principally relies on the plain meaning canon of statutory construction and

urges the Court to look no further. As to the Congress' power under the Commerce

Clause, the government claims that because cars and cellphones are "instrumentalities

of interstate commerce," the authority to regulate pursuant to the Commerce Clause is

unbounded and untethered to any requirement that the instrumentality is being used in

relation to commerce. In the world seen by the government, step into your car or pickup

your cellphone (or even purchase one) and you are in the clutches of the federal

government, regardless of whether you are engaging in any economic or commercial

activity, or anything affecting such.

The government is wrong on both counts.

Reversing the order of presentation in the *Motion*,[7] this *Reply* begins with the

issue of Congress's power to regulate instrumentalities of interstate commerce where,

as here, that instrumentality is used in the commission of an offense unrelated to

---

[6]*See Motion to Declare Federal Death Penalty Act Unconstitutional As Applied on the Ground that the Facts of this Case, Coupled with the Sovereign Decision of the State of Illinois to Abolish Capital Punishment, Demonstrate That its Application Here Violates the Tenth Amendment and Principles of Federalism of the Constitution of the United States*, *Dkt. 117*; Response, Dkt 141.

[7]The *Motion* first addressed the *intent* of Congress in enacting the 2006 Amendments to § 1201(a)(1). *Id.* at 27-47. The issue of Congress's *power* was discussed at pp. 47-54 of the *Motion*. Although courts should, where possible, interpret statutes so as to avoid constitutional issues, *infra*, the order is reversed here, as the lack of congressional authority to legislate in the manner suggested by the government, also evidences Congress's unlikely intent to do so.

commerce or economic activity. Congress has no such authority under the Commerce Clause, art. 1, § 8, cl. 3 of the Constitution. A contrary reading would award the federal government far-reaching powers not only undreamt-of when the Constitution was adopted, but never thereafter explicitly asserted by Congress.

Before proceeding further, it is important to emphasize what is, and is not, in issue. Mr. Christensen does not question that Congress can regulate an instrumentality of interstate commerce when used either in relation to interstate commerce or with respect to intrastate activities that affect commerce. Thus, the discussion at pages 15-18 of the *Response* is not in dispute. Rather the dispositive issue, in respect to the jurisdictional theory proffered by the *Response*, is whether Congress can regulate instrumentalities of interstate commerce *solely* because they are such instrumentalities and *regardless* of their use in an activity related to commerce or economic activity. This is the theory offered at pages 13-15 of the *Response*. The answer is Congress cannot. With the exception of one district court case, buried in a list of unanalyzed string cites, *see* IV(b)(2), *infra*, the *Response* offers neither persuasive authority nor argument supporting the unbounded jurisdictional principle it proposes. No one would reasonably argue that Congress could pass a law prohibiting the shoplifting of a cell phone or making it a crime for a homeless person to sleep in a car solely because each references the respective instrumentality. Yet, this is the import of the theory that the *Response* asks this Court to accept.

II.  **The Supreme Court's Decisions in *Lopez* and *Morrison* and the Authority to Regulate Activities under the Commerce Clause**

To understand why the *Response* takes the approach it does, it is instructive to briefly review the Supreme Court's decisions in *United States v. Lopez, supra*, and *United States v. Morrison, supra*.

*Lopez* held that the Guns-Free School Zone Act, which prohibited an individual from knowingly possessing a firearm within a 1000 feet of a school, exceeded Congress's authority under the Commerce Clause. Prior to analyzing the substantive issue, the Court summarized the three broad areas in which Congress has authority pursuant to the Commerce Clause:[8] (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) activities that have a "substantial relation" to interstate commerce. 514 U.S. at 558; *see also Motion*, at 51-52. As to the last category, *Lopez* held that Congress's commerce power extends only to activities that have a "substantial effect" on interstate commerce. Analyzing possession of a firearm in a school zone as an "activity," the Court held that such offenses do not satisfy the "substantial effect" test. *Lopez,* and subsequently *Morrison, infra*, made it clear that a "substantial effect" may not be justified by sweeping generalizations concerning the "costs of crime" or impact on "national productivity," as these types of unconstrained abstractions would, in effect, award the federal government unlimited power in violation of the Constitution. 514 U.S. at 564; *Motion*, at 53.

---

[8]The *Lopez* categorization of congressional power under the Commerce Clause was not new. The same three categories were described in *Perez v. United States*, 402 U.S. 146, 150 (1971).

7

Justice Kennedy's concurring opinion in *Lopez*, which detailed the history of the Court's Commerce Clause jurisprudence, *id.* 570-77, repeatedly emphasized the idea that, no matter how broadly the power is interpreted or how indirect the connection, Congress's Commerce Clause authority is, as the name suggests, inextricably dependent on a nexus to commerce.[9] In language equally applicable to the instant case, Justice Kennedy noted that jurisdiction in *Lopez* failed because "neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute has an evident commercial nexus." *Id.* 580.

In *United States v. Morrison*, 529 U.S. 598 (2000), the Court reaffirmed the principles previously announced in *Lopez*, and held that the Violence Against Women's Act of 1994, similarly exceeded Congress's commerce power because its subject was violent crime, an area of regulation principally allocated to the domain of the States, and did not sufficiently implicate economic concerns - the backbone of Congress's power to legislate under the Commerce Clause. Like *Lopez*, the analysis in *Morrison* focused on rape as an *activity*: "where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity

---

[9]"Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having *nothing to do with the regulation of commercial activities*, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." *Id.* 577;. ". . . unless Congress can revise its law to *demonstrate its commercial character*. . . [it is] our duty to recognize meaningful limits on the commerce power of Congress." *Id.* 580; [Gun-Free Zones Act] does so by regulating an activity *beyond the realm of commerce* in the ordinary and usual sense of that term. *Id.* 583. *Absent a stronger connection or identification with commercial concerns* that are central to the Commerce Clause, that interference contradicts the federal balance the Framers designed and that this Court is obliged to enforce. *Id.* (Emphasis added in all).

in question has been some sort of *economic endeavor*." *Id*. 611 (emphasis added). The Court further observed that "we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims," *Id*. 618.

Mr. Christensen's *Motion* contended that the offense of kidnapping, defined in § 1201 is, like *Lopez* and *Morrison*, a regulation of an *activity*, which requires a showing of a substantial effect on interstate commerce. Acknowledging the Supreme Court's decision in *United States v. Taylor*, -- U.S. --, 136 S. Ct. 2074 (2016), Mr. Christensen conceded that the substantial effect inquiry looks to the aggregate effect of the conduct at issue on interstate commerce, but contended that intrastate kidnappings where no ransom, reward or other commerce is involved do not meet this standard. *Motion*, at 52-54.

In response, the government does not challenge the conclusion that an intrastate kidnapping not involving a ransom or other economic demand has no substantial effect on commerce, even when viewed in the aggregate. *See Motion*, at 53. Instead, the *Response* retreats to the second *Lopez* category and attempts to salvage jurisdiction from Congress's power to regulate "instrumentalities of interstate commerce." *Response*, at 12. This argument asks for too much, as it turns a blind eye to two critical factors: (1) each of the cases and statutes cited in *Lopez* and *Perez* as examples of the Congress's authority to regulate the instrumentalities of interstate commerce involved either *regulation of the instrumentalities themselves* (such as railroads in the two cited cases), rather than a private actor's use of the instrumentality, or acts destroying the

instrumentality or inhibiting its usefulness in relation to commerce; and (2) in each of the cited cases, the regulation actually involved the use of the instrumentality in *commerce*.

As set out in the *Motion*, the act of kidnapping is an activity involving the commission of a violent crime and thus subject to the substantial effects requirement of *Lopez* and *Morrison*. But, because the *Response* effectively concedes this issue, this *Reply* focuses on the *Response*'s alternative "instrumentality" theory.[10]

**III.   Congress's Authority to Regulate Instrumentalities of Interstate Commerce Refers to Regulation of the Instrumentality Itself or to Acts Which Impede or Destroy the Use of the Instrumentality in Relation to Interstate Commerce. The Commerce Power Does Not Extend to the Regulation of Private Actors Who Merely Use an Instrumentality of Interstate Commerce in the Absence of a Showing that Such Use is Substantially Related to Commerce.**

*Lopez* cites two cases and two statutes as examples of congressional authority to regulate instrumentalities of interstate commerce. 514 U.S. at 558. The two cases, *infra*, demonstrate the first area, the regulation of instruments of interstate commerce *when used in commerce*. The two statutes illustrate the second component of such regulation – conduct which destroys or impedes the usefulness of the instrumentality in commerce. Neither the cases or statutes cited in *Lopez* support the *Response*'s theory that Congress

---

[10]Although analyzed as an "activity" case, the recent decision of the district court in *United States v. Nagarwala*, 2018 WL 6064968 (E.D. Mich. November 20, 2018), stressed the importance of the requirement that Congress's power to regulate behavior pursuant to the Commerce Clause is dependent on the commercial or economic aspect of the behavior. In finding that Congress exceeded its powers under the Commerce Clause in enacting 18 U.S.C. § 116(a), prohibiting the mutilation of female genitalia, the Court noted that the federal government has no plenary police power, *id.* *4, and that the first inquiry is to "evaluate the economic nature of the regulated activity." *Id.* *11. The Court concluded that, deplorable as it may be, there is nothing commercial or economic about the offense, *id.* *12, and that the case was governed by *Morrison*'s holding that the Commerce Clause provides no warrant for Congress to regulate rape or sexual assault against women. *Id.*

has the power to regulate actors who use the instrumentality in a manner unrelated to commerce and who are not engaging in conduct that impedes the use of the instrumentality for that purpose. In other words, there is no suggestion in any of the citations in *Lopez* or any case cited by the *Response* (other than the one outlier district court opinion discussed below) that Congress can regulate an instrumentality of interstate commerce solely because of that designation alone.

As noted above, both cases cited in *Lopez* involved the regulation of railroads. *The Shreveport Rate Cases*, 234 U.S. 342 (1914),[11] involved a challenge by various railroad companies in Texas to an order of the Interstate Commerce Commission,[12] requiring the railroads to cease a practice whereby they charged substantially lower rates for transportation of freight within the state of Texas than they charged for hauling freight an equal distance from Shreveport, Louisiana to cities within Texas. The railroad companies argued that Congress did not have the power to control the intrastate charges of an interstate carrier. In ruling in favor of the ICC, the Court noted that Congress' power to legislate under the Commerce Clause extends to interstate carriers and:

> "necessarily embraces the right to control their *operations in all matters having such a close and substantial relation to interstate traffic* that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the

---

[11]This is the case name as it appears in *Lopez*. 514 U.S. at 558. In the U.S. Reporter, the case is styled *Houston, East and West Texas Railway Company and Texas and Pacific Railway Company, Appeals from the Commerce Court*.

[12]The ICC was created in 1887. Its original purpose was regulation of railroads, later expanded to trucking. It was disbanded in 1995. *See* https://en.m.wikipedia.org/wiki/Interstate_Commerce_Commission (visited Dec. 3, 2018).

> maintenance of conditions under which interstate commerce may
> be conducted upon fair terms and without molestation or
> hindrance. . . . Congress [may] legislate . . . by requiring that the
> agencies of interstate commerce shall not be used in such manner
> as to cripple, retard or destroy it."

*Id*. 351 (emphasis added). The Court based its holding on "the principle that Congress

in the exercise of its paramount power may prevent the common instrumentalities of

interstate and intrastate commercial intercourse *from being used in their intrastate*

*operations to the injury of interstate commerce*." *Id*. 353 (emphasis added). This language

makes it clear that the *Shreveport Rates Cases* held the regulation was within the

commerce power not merely because of the railroads' status as instrumentalities of

interstate commerce but because of the requisite connection of the *operation* of the

railroad to *commerce*. If jurisdiction could simply be based upon the theory imagined by

the *Response*, no such discussion would have been needed – a brief reference to railroads

as instruments of interstate commerce would have sufficed.

The second case cited by *Lopez* as an example of the regulation of an

instrumentality of interstate commerce is *Southern Railway Co. v. United States*, 222 U.S.

20 (1911), which involved the application of the Safety Appliance Act that required train

cars be equipped with automatic couplers. The issue presented was whether the

particular provision could be applied to railroad cars that were only used to transport

goods moving intrastate on the intrastate portion of the railroad or was it limited to cars

which moved in interstate commerce? Holding that it was within the power of

Congress to regulate both, the Court emphasized the "close relation between the two

classes of traffic moving over the same railroad." *Id*. at 26. "Both classes of traffic are at

times carried in the same car, and when this is not the case, the cars in which they are carried are frequently commingled in the same train and in the switching and other movements at terminals. Cars are seldom set apart for exclusive use in moving either class of traffic, but generally are used interchangeably in moving both; and the situation is much the same with trainmen, switchmen, and like employees, for they usually, if not necessarily, have to do with both classes of traffic." *Id*. at 27. There is no suggestion in *Southern Railway* that the regulation was upheld simply because it pertained to the instrumentality of interstate commerce (the railroad). Rather, the regulation was upheld because the activity of the carrier had a sufficient relationship to interstate commerce.

The two statutes cited in *Lopez*, 514 U.S. at 558, prohibit, respectively, the destruction of aircraft, 18 U.S.C. § 32, and thefts from interstate shipments. 18 U.S.C. § 659. Both, the destruction of an instrumentality of interstate commerce and the theft therefrom have the requisite effect on, or substantial relation, to commerce that permits Congress to regulate pursuant to the Commerce Clause.

In short, each of the cases and statutes cited by *Lopez* as examples of Congress's authority to regulate the instrumentalities of interstate commerce involved factual patterns where the instrumentality was being used in some fashion in connection with commerce or was prohibited from being so used. None suggested that the commerce power extends to unlimited regulation of private actors' use of such instrumentalities or because of the characterization, standing alone, of the instrument as pertaining to

interstate commerce.[13] Citing several cases, *Lopez* set down a marker that despite the

expansive interpretation of some "modern era" precedents, the Commerce Clause has

---

[13]Two related cases regarding the regulation of railroads demonstrate the point. *Employers' Liability Cases*, 207 U.S. 463 (1908), styled in the U.S. Reports as *Howard v. Illinois Central Railroad Co*, involved a claim by the estate of an employee of an interstate carrier for damages resulting from his death caused by the negligence of a fellow employee. Resolution of the case required the Court to interpret a provision of the Employer's Liability Act of 1906, providing that every common carrier (i.e. instruments or facility of interstate commerce) shall be liable for the death or injury of any employee as a result of the negligence of another employee. The Act purported to apply to all employees regardless of the nature of their activities and irrespective of whether either the injured employee or tortfeasor-co-employee was engaged in interstate activity. After noting that the Act would apply to employees who are not engaged in interstate commerce, the Court held it therefore "includes subjects wholly outside of the power of Congress to regulate commerce. *Id*. 498.

*Second Employer*'s Liability Cases, 223 U.S. 1 (1912), reached a different conclusion, holding that Congress did have the power to regulate the liability of a carrier for injuries sustained by one employee through the negligence of another even though the negligent employee was only engaged in intrastate commerce. The distinction between the two cases was that in *Employer's Liability* the tortfeasor-employee was not engaged in work involving commerce. In *Second Employer's Liability*, the tortfeasor employee was engaged in commerce. It made no difference that the work of the tortfeasor in *Second Employer's Liability* only involved intrastate commerce. As explained by the Court, the *decisive distinction was commerce v. no commerce, not intrastate v. interstate commerce*:

> ". . . it is not a valid objection that the act embraces instances where the causal negligence is that of an employe' [sic] engaged in intrastate commerce; for such negligence, when operating injuriously upon an employee engaged in interstate commerce, *has the same effect upon that commerce,* as if the negligent employe' were also engaged therein."

*Id*. 51-52. (emphasis added).

 Read together, *Employers' Liability* and *Second Employer's Liability* indicate that it is not enough to claim that a regulation is valid simply because it pertains to an "instrumentality of interstate commerce." The activity which is being regulated must have the requisite nexus to commerce or economic activity.

Because of the Court's evolving views of the Commerce Clause, *see Lopez*, 514 U.S. at 568-75 (J. Kennedy, concurring and summarizing development of the relevant jurisprudence), interpreting the significance of the Court's Commerce Clause decisions during the early Twentieth Century is sometimes problematic. That said, it does not appear that either case has been overruled or, more important, the distinction between the two cases rejected. And, both *The Shreveport Rate Cases, supra,* and *Southern Railway, supra*, the two cases cited in *Lopez* as examples of Congress's power to legislate concerning "instrumentalities of interstate commerce," are from this same period and the former extensively discusses and reaffirms the distinction and reasoning of both *Employers' Liability* cases. S*ee Shreveport*, 234 U.S. at 350-53.

judicially-enforceable "outer limits," 514 U.S. at 557, and that marker requires that Congress's authority to regulate under the Commerce Clause requires just that – commerce.

IV.   **The Authorities Cited in the *Response* Do Not Support Its All-Encompassing Theory of Jurisdiction**

   A.   *United States v. Mandel*

The *Response* relies heavily on the Seventh Circuit's decision in *United States v. Mandel*, 647 F.3d 710 (7th Cir. 2011), which rejected a *plain error* Commerce Clause challenge to 18 U.S.C. § 1958, the murder-for-hire statute. *Response*, at 14-15, 17. The *Response* reasons that  § 1201(a) and § 1958 are "similarly-worded," *id.* at 13, and "there is no logical reason to distinguish" the two statutes in reference to Congress's commerce power. *Id.* at 15. The government's reliance on *Mandel* is misplaced for several reasons.

First, while the language "facility or instrument of interstate commerce" in § 1958 is substantially identical to that in § 1201(a)(1), in the most critical aspect – *the nexus to commerce* - the two statutes are crucially dissimilar. As implied in "murder for *hire*," § 1958 requires an agreement to pay something of "pecuniary value . . . ," which is defined as "anything of value in the form of *money, a negotiable instrument, a commercial interest*, or anything else the primary significance of which is *economic advantage* . . ." (emphasis added). Thus, § 1958 addresses commerce, an activity squarely within Congress's power when a facility of interstate commerce is used.

Although *Mandel* contains some loose dicta that § 1958 is an example of the second *Lopez* category, the gravamen of the offense for Commerce Clause purposes is

clearly the pecuniary aspect. Section 1958 does not attempt to assert federal jurisdiction over all murders involving a car or other means of transportation – only those having the necessary relationship to Congress's authority to regulate commerce. Without the economic connection, no one would reasonably suggest, for instance, that Congress' could exert Commerce Clause jurisdiction over an otherwise local murder simply because the defendant drove the victim across town before killing him.[14] Taken further, such indeterminate reasoning would permit the federal government to assume jurisdiction over manslaughter offenses with a car or even driving while intoxicated offenses solely because they involve a car.[15]

Second, it should be emphasized that Mr. Christensen is *not* making the same unrestrained argument that Mandel did or that the government addresses in its Response at 15-17. As noted, Mr. Christensen concedes that Congress' power to regulate instrumentalities of interstate commerce extends to the intrastate use of such instrumentality *provided* a substantial relationship of such use to some form of commerce or economic activity.

Third – and particularly important if the court reaches the issue of Congress's intent, *infra* – in § 1958(b)(2), Congress specifically defined a "facility of interstate or

---

[14]The same reasoning applies to *United States v. Richeson*, 338 F.3d 653 (2003), which also involved a murder-for-hire prosecuted under § 1958. *See Response*, at 14-15.

[15]Congress *has* passed legislation whose purpose is to establish national standards to address the problem of drunk driving, but it has not attempted to use the Commerce Clause to legislate private actors' use of their cars, which the *Response*'s theory would authorize. Instead, Congress uses its power under the Spending Clause, precisely because that Clause gives Congress powers to legislate in areas not otherwise authorized by the Constitution. *See* VI-C, *infra.*

foreign commerce," as used in § 1958(a), as including "means of transportation or communication," language which does not appear in § 1201(a)(1). The inclusion of this language evidences that Congress's understanding that a reference to "facility of interstate or foreign commerce," standing alone, does not include a vehicle – otherwise, subsection (b)(2) would have been unnecessary.

Finally, the *Response* ignores the plain error context of *Mandel*, which was spotlighted at least twice in the opinion. Because the defendant had not raised the issue below, the court stressed at the outset that its review was limited to "plain error *alone*." *Id*. 720 (emphasis added). And, again in concluding its discussion of the § 1958 issue, *Mandel* pointedly recognized a contrary decision of the Eleventh Circuit, while giving no indication that it disagreed with the logic of its reasoning. Because of the lack of objection, mandating the circumscribed standard of review, the Court merely stated that the contrary circuit authority "demonstrate[s] a difference of opinion as to the reach of federal authority vis-a-vis automobiles, not plain error." *Id*. 722.

The contrary authority cited in *Mandel* is *Garcia v. Vanguard Car Rental*, 540 F.3d 1242 (11th Cir. 2008). *Garcia* addressed the question of whether the Graves Act, which shielded rental car companies from vicarious liability suits, was within Congress's Commerce Clause authority under the second *Lopez* category simply because a car could be characterized as an instrumentality of interstate commerce. In declining to endorse this argument, the court noted its questionable implications:

> But the implications of this argument give us reason to doubt its premise. If cars are always instrumentalities of commerce, as suggested by *Bishop*, Congress would have plenary power not only

> over the commercial rental car market, but over many aspects of
> automobile use.
> . . . Congress could exercise even broader power to make laws
> necessary and proper to effectuate its plenary power over
> automobiles including, presumably, regulation of such
> quintessentially state law matters as traffic rules and licensing
> drivers, under the banner of protecting the instrumentalities of
> commerce. *We have our doubts about an interpretation which produces
> these results, which makes us suspect the premise that all methods of
> transportation and communication are per se instrumentalities of
> commerce even when they are not used in interstate commerce.*
> Moreover, there is sensible authority that channels and
> instrumentalities of commerce refer only to "the ingredients of
> interstate commerce itself." *Gonzales v. Raich,* 545 U.S. 1, 34, 125
> S.Ct. 2195, 162 L.Ed.2d 1 (2005) (Scalia, J., concurring in the
> judgment) (citing *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 189–90, 6
> L.Ed. 23 (1824)); *see also Bishop,* 66 F.3d at 597–600 (Becker, J.,
> dissenting) (automobiles can be used as instrumentalities of
> commerce, but are not per se instrumentalities subject to plenary
> federal regulation).

*Id*. 1250.[16]

As noted in the *Garcia* quote, *supra*, Judge Becker dissented from the Third

Circuit's opinion in *United States v. Bishop*, 66 F.3d 569 (3d Cir. 1995), holding that

enactment of the federal carjacking statute, 18 U.S.C. § 2119, did not exceed

Congress's authority under the Commerce Clause. Nonetheless, Judge Becker's

analysis is directly relevant here:

> The fact that automobiles can be used as instrumentalities of
> interstate commerce does not grant to Congress plenary
> authority to regulate the use and operation of every
> individual's automobile. Such an approach would constitute

---

[16]*Garcia* went on to uphold the Graves Act under the third *Lopez* category, finding that the business of
rental car leasing obviously involves commerce and economic activity, and has a substantial effect on
interstate commerce. *Id*. 1250-52. It should be noted that the argument that Congress can regulate rental
cars as *per se* "instrumentalities of interstate commerce," which was rejected in *Garcia*, is even stronger
than the *Response*'s claim that such power extends to cars (or other instrumentality of interstate
commerce) that are not employed for commercial purposes.

a dramatic encroachment on the regulation of automobiles, a traditional area of state concern, and would permit Congress to pass federal laws requiring individuals to wear seatbelts (as opposed to requiring that cars be manufactured with seatbelts) or banning motorists from making a right turn at a red light. [footnote omitted]. Previous Commerce Clause jurisprudence has never before viewed congressional power to regulate the instrumentalities of interstate commerce this broadly. With its decision, the majority dramatically and improperly enhances the scope of federal power under this branch of Congress's Commerce Clause authority.

*Id*. 599. While the *Bishop* majority upheld § 2119, Judge Becker's reasoning applies with far more force here, as the carjacking statute is a crime *against the instrumentality itself* and thus akin to the destruction of an aircraft and theft from interstate shipment examples cited in *Perez* and *Lopez*.

   **B.     The cites at pages 13-14 of the *Response* Do Not Support the Proposition that Congress Can Regulate Instruments of Interstate Commerce Not Being Used in Relation to Commerce**

   Substituting string-citation for analysis, the *Response* characterizes three circuit cases and six district court cases as purportedly having "analyzed §1201(a) as a regulation of the instrumentalities of interstate commerce." *Response*, at 13-14. To a limited extent this is true, but a closer look at the cited cases reveals that other than one questionable district court case, none supports the proposition that Congress has authority to regulate an "instrumentality of interstate commerce" solely because of that characterization and in the absence of any nexus of the regulated activity to commerce.

### (1) The Circuit Cases Cited in the *Response*

In addition to its reliance on *Mandel*, the *Response* cites three Circuit cases on pages 13-14. In *United States v. Chambers*, 681 F. App'x 72, 80-81 (2d Cir. 2017),[17] involving a kidnapping-robbery, the defendant was convicted of a violating the Hobbs Act, 18 U.S.C. § 1951 and § 1201(a). The defendant raised both broad facial and as-applied Commerce Clause challenges to § 1201(a). As to an across-the-board facial challenge, Mr. Christensen makes no claim that § 1201(a) exceeds Congress' power under the Commerce Clause, as Congress can clearly regulate kidnappings involving the interstate transportation of the victim, travel by the offender in interstate commerce to commit the offense and the intrastate use of an instrumentality of interstate commerce *where* the offense has a substantial relationship to commerce. But, it has no power to regulate the intrastate use of an instrumentality without the required nexus to commerce or economic activity, and neither *Chambers* nor the Tenth Circuit case in the string cite, *United States v. Morgan*, 748 F.3d 1024 (10th Cir. 2014), support an argument otherwise, as both involved kidnapping-*robberies*. The *Response* is correct that *Chambers* and *Morgan* characterized the facts as presenting examples of the regulation of instrumentalities of interstate commerce. But because each involved a robbery there was no need to address the question of whether the use of the instrumentality had any

---

[17]The *Response* also fails to note that the cited *Chambers* opinion is actually a Summary Order. As captioned in capital letters at its heading, the rule in the Second Circuit is that its Summary Orders have no precedential effect. See *also* Fed. R. App. P. 32.1. As the full cite in the *Response* indicates, the judgment in *Chambers* was vacated when the Supreme Court remanded for reconsideration on another issue in light of its intervening decision in *Carpenter v. United States* (citation omitted). *See* 138 S. Ct. 2018. On remand, the Second Circuit denied reconsideration on the *Carpenter* issue and reaffirmed its original order. 2018 WL 4523607 (2018).

effect on or relationship to commerce – the economic aspects of the robbery supplied the required connection to commerce. *See United States v. Bailey*, 227 F.3d 792 (7th Cir. 2000) (robbery involves commerce because of its economic consequences).

As Mr. Christensen pointed out in his *Motion*, at 12 & 39, the remaining circuit case cited by the government, *United States v. Dais*, 559 F. App'x 438, 445 (6th Cir. 2014), involved the use of a cellphone to demand a ransom, which, again, is the essence of commerce. Mr. Christensen admits that Congress has the authority to regulate intrastate kidnappings where a ransom is demanded and where the kidnapping involves an effect on or direct relationship to commerce, such as in the *Ochoa* case, cited in n.1, *supra*, and discussed below.

### (2) The District Court Cases Cited in the *Response*

Similarly, none of the district court cases cited in the *Response* directly reach the issue of whether Congress's authority to regulate instrumentalities exists in the absence of a demonstrated effect on, or relationship to, commerce or economic activity because, with the exception of the *Jacques* decision, *infra*, all satisfy this jurisdictional requirement.

*United States v. Renteria*, 2014 WL 2616630 (E.D. N.C. June 12, 2014) is an omnibus opinion addressing several issues in a case charging kidnapping, conspiracy to violate the murder-for-hire statute and travel in interstate commerce in the commission of a murder. *Id.* *6. Although the facts are not set out in any detail in the opinion, it is clear from the charges that both the channels of commerce (interstate travel) and economic activity (murder-for-hire) were involved.

Like *Chambers*, *supra*, *United States v. Graves*, 2014 WL 2589428 (N.D. Ga. June 9, 2014), involved a meritless facial claim that the Federal Kidnapping Act exceeded Congress's commerce authority. More important, the facts of the case involved a ransom demand and robbery in connection with the kidnaping, both economic activity. Further, the Eleventh Circuit's prior decision in *Garcia v. Vanguard Car Rental, Inc. supra*, suggests the district court would have been compelled to ruled differently absent the controlling economic aspects of the case.

The issue raised by the defendant in *United States v. Mitchell*, 2013 WL 5377869, (N.D. Texas, September 26, 2013), at 6-7, was whether the term "instrumentality of interstate commerce" in § 1201(a)(1) was void-for-vagueness. After rejecting that argument, the Court addressed, in dicta, what it saw as the real issue of whether the intrastate use of a car or telephone came within the statute's reach. Although the facts are not fully set out, the reference to the allegation that the defendant kidnaped the victim for the purpose of selling her into "sex slavery," at *2, establishes the economic or commercial aspect associated with the use of the instrumentality of interstate commerce. The court's heavy reliance on prior circuit law upholding the murder-for-hire statute against a Commerce Clause attack further underscores existence of the requisite economic nexus.

*United States v. Taylor*, 2012 WL 3522528 (S.D. Ala. Aug. 14, 2012), rejected both a facial and as-applied attack on § 1201(a). Although the facts are not given in the opinion, the indictment demonstrates the connection to commercial activity, as the case involved a drug trafficking organization that kidnapped and robbed other drug dealers

of their drugs and money. *See United States v. Taylor*, S.D. Alabama, Case # 12-0056, Dkt. 46 (Superseding Indictment).

In *United States v. Ochoa*, 2009 WL 3878520 (D.N.M. 2009), the defendant was charged with violating § 1201(a) after she lured the victim with a cellphone and then forced her to go to a bank and withdraw all the money in her account. *Id*. *1. Rejecting the defendant's broad Commerce Clause attack on § 1201(a), the court held that a cell phone is an instrumentality of interstate commerce within the meaning of the statute, even when used only intrastate, again arguments Mr. Christensen does not raise. And, like the preceding cases, *Ochoa* clearly involved commerce – the forcible withdrawal of money from a bank.

Like *Graves*, *supra*, *United States v. Augustin*, 2010 WL 2639966 (E.D. Tenn. 2010), involved the use of a cell phone both to demand a ransom and to commit robbery during a kidnapping – again, activities affecting commerce.

The single case cited by the *Response* that does not involve commerce associated with the use of an instrumentality of interstate commerce in an intrastate kidnapping is *United States v. Jacques*, 2011 WL 1706765 (D. Vt. May 4, 2011). The defendant in *Jacques* lured his 12-year old step-niece by means of text messages and e-mails from his cell phone to a location where he raped and murdered her. Like Mr. Christensen's case, and unlike every other case cited in the *Response*, the facts in *Jacques* do not suggest a nexus of the kidnapping to commerce. Mr. Jacques, however, did not raise this point. Instead, Jacques broadly argued that "under *no* circumstances does Congress have the power to proscribe a kidnapping where the perpetrator used the mail or any means, facility, or

instrumentality of interstate commerce or foreign commerce in committing or in furtherance of the offense." *Id*. *5 (emphasis added). This argument has no traction, as Congress clearly has the power to proscribe kidnapping involving the use of an instrumentality of interstate commerce *when* the kidnapping has the requisite nexus to commerce.

Even though *Jacques* had no occasion to address this argument, and even though the opinion has no precedential value,[18] it is instructive to look at the reasoning employed by *Jacques*, as each of the authorities relied upon by the court actually involved the requisite nexus to commerce. The principal case discussed in the opinion, *United States v. Giordano*, 442 F.3d 30 (2d Cir. 2006), involved a conviction for the use of a facility of interstate commerce with intent to entice a minor to engage in prostitution. *Id*. *7-8. Prostitution obviously involves commerce. The remaining cases cited by *Jacques* involve either the movement of items in interstate commerce, which comes within the first *Lopez* category, the murder-for-hire statute, already shown to involve commerce, or the Travel Act, 18 U.S.C. § 1952, which also requires commercial activity as an element.[19] *Id*. *9-10. Finally, the two district court cases cited by *Jacques* were *Augustin* and *Ochoa*, both of which, as already shown, involved commerce.

---

[18]Of course, this Court is not bound by the opinion of another district court, as the government notes when it disagrees with a district court opinion. *See e.g. Response to Defendant's Motion to Suppress Evidence Seized from his Apartment on June 15, 2017*, Dkt. 147, at 11, n. 10.

[19]18 U.S.C. § 1952 prohibits travel in interstate commerce or the use of a facility of interstate commerce to commit or distribute the proceeds of "unlawful activity." As defined in subsection (b), the economic and commercial underpinnings of statute are clear. "Unlawful activities" refers to (i) certain "business activities" involved in gambling, liquor and narcotics; (ii) extortion, bribery or arson; and (iii) money laundering (subchapter 2 of chapter 53 of Title 31).

V.     **The Theory Proffered by the *Response* Would Obliterate the Distinction Between Local and National Crimes and Open the Door to the Federal Government's Assumption of Jurisdiction Over Local Crimes Never Before Sanctioned**

The theory that Congress has plenary jurisdiction over any crime involving the use of a car, cell phone or other instrumentality of interstate commerce in the absence of the requisite nexus to commerce has far-reaching implications that the *Response* ignores. The Supreme Court has, time and again, rejected the federal government's attempt to spin a jurisdictional justification in a particular case without due deliberation of the consequences and effect on the federal-state relationship under our Constitution. Just as the Supreme Court stated in rejecting the government's interpretation of 18 U.S.C. § 229(a)(1) in *Bond v. United States*, 572 U.S. 844 (2014), acceptance of the *Response*'s theory would "convert an astonishing amount of 'traditional local criminal conduct' into 'matters for federal enforcement' and 'involve a substantial extension of federal police resources.'" *Id*. at 863, *quoting United States v. Bass*, 404 U.S. 336 (1971). In dismissing the government's argument in *Lopez*, the Court noted the same concerns:

> "Under the theories that the Government presents in support of § 922(q), it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate."

514 U.S. at 564; *see also Morrison*, 529 U.S. at 616 ("If Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence . . ."); *Jones v. United States*, 529 U.S. at 857 (in holding that § 844(i) does not apply to non-

25

commercial buildings: "Were we to adopt the Government's expansive interpretation . .

. hardly a building in the land would fall outside the federal statute's domain.").

These were the same concerns expressed by the Eleventh Circuit in *Garcia,* as

well as Judge Becker's dissent in *Bisho*p. *See* II(b), *supra*.

In the Introduction to this pleading and in his initial *Motion*, at 36-37, Mr.

Christensen has suggested the aberrant results which would follow from the

jurisdictional theory espoused by the government. These examples will not be repeated

here, as the illogical and undesirable consequences of the *Response's* jurisdiction theory

are as endless as were similar theories in *Bond*, *Morrison Jones* and *Lopez*. But, it is worth

asking how the *Response*'s theory reconciles with the results of those cases. For

instance, the opinion in *Lopez* merely states the 12th-grade student "arrived" at the

school carrying a concealed weapon. 514 U.S. at 551. It is, of course, quite likely that a

senior in high school "arrived" in a car and that the firearm was thus transported into

the prohibited zone by means of this "instrument of interstate commerce." Although §

922(q) did not base jurisdiction on an instrumentality theory, from reading the *Lopez*

opinion it is difficult to imagine that the result would have been different if the

defendant had transported the firearm to school that day in a car, which would follow

from the *Response*'s theory. And, Mr. Christensen is unaware of any subsequent action

by Congress or decision of any court that would accept such a distinction. Congress

did later amend § 922(q) to add a jurisdiction element after making extensive findings

as to the effect on commerce, but did not suggest that a violation of the statute could be

shown merely by its possession or transportation in an "instrumentality of interstate commerce." *See* Pub. L. 104-208, § 657.

And, what about the rape and sexual violence at issue in *Morrison*? The *Response*'s far-fetched theory suggests that the Court's reasoning and holding would have changed if the sexual attack had occurred in a car rather than a dormitory room. Neither the careful reasoning of *Morrison* nor any subsequent court opinion or action of Congress would suggest such a distinction has any constitutional significance under the Commerce Clause. But, the theory of the *Response* would imbue the location of the rape with special constitutional significance and would permit the national government to assume jurisdiction over rapes and sexual assaults simply because they occur in a car.[20] Under the *Response*'s theory, Congress could pass a law prohibiting unlawful sexual battery by impermissible touching of a person of the opposite sex while parked at a drive-in (assuming they still exist) or in the driveway of one's house.

 The overreach of the *Response*'s theory is not limited to cars. The potential abuses of federal power are just as easy to imagine if Congress has unlimited power to legislate in regard to cell phones simply because they may be characterized as "instruments of interstate commerce." The *Response* would sanction a national law by Congress prohibiting the use of cell phones in restaurants or, for that matter, on the streets. While many would praise such laws as in the public interest, no one would seriously contend that the Commerce Clause gives Congress such authority simply

---

[20]The location of the offense would have constitutional significance if committed in the *territorial jurisdiction* of the United States. *See* U.S. Constitution, art. IV, Section 3.

because the subject is an "instrumentality of interstate commerce." And, why couldn't Congress decide that it is not in children's best interest to spend unlimited hours on cell phones playing games or watching videos and thus pass a law limiting such use to two hours a day? And, while they're at it, why not limit adult usage to four hours a day? Both laws would be fine under the theory of the Commerce Clause imagined by the *Response*.[21] And, as noted, Congress could assume jurisdiction over thefts of cell phones and a host of otherwise local crimes where a cell phone is used.

All this suggests that Congress does not have the authority imagined by the *Response*.

## VI.   In Amending § 1201(a)(1) in 2006, Congress Did Not Intend that the Use of a Car or a Cell Phone Without Any Interstate Movement by the Offender or the Victim or Economic Dimension to the Kidnapping Would Suffice to Establish Jurisdiction

Even if the Commerce Clause authorizes Congress to regulate an instrumentality of interstate commerce when not used in connection with commercial or economic activity, the issue remains whether Congress *intended* to do so. In his *Motion*, Mr. Christensen identified several reasons suggesting that in enacting SORNA,[22] Congress

---

[21]Such laws might be contested on First Amendment grounds, but neither would be content-based and the First Amendment does not prohibit reasonable "time, manner and place" restrictions on speech. *See generally McCullen v. Coakley,* 134 S. Ct. 2518, 2529 (2014). These issues would never be reached, as no one would seriously suggest in the first instance that Congress has such authority under the Commerce Clause. *See Lopez*, 514 U.S. at 565 (noting the limits of the Commerce Clause as affecting traditional State concerns involving matters pertaining to the family and education.).

[22]The Adam Walsh Child Protection Act of 2006, is also known as the Sex Offender and Notification Act (SORNA). *See Motion, at 8.*

did not intend that the amendment to § 1201(a)(1) would be interpreted as urged by the

government. In support of his argument, Mr. Christensen pointed to:

> the fact that the isolated sentence amending § 1201(a)(1) is
> unrelated to SORNA's core concerns, as well as the lack of any
> suggestion in the abbreviated legislative history indicating the
> Congress intended the unprecedented expansive and questionable
> jurisdictional reach which the government proposes, *id*. at 27-30;

> the lack of evidence that Congress intended to abrogate long-
> standing existing law, *id*. 30-32;

> the expansive interpretation suggested by the government would
> make other language added by the 2006 Amendment superfluous,
> *id*. 32-34;

> the disregard of principles of federalism that would follow from the
> government's theory of jurisdiction, *id*. 34-36;

> the jurisdictional floodgates that would thereby be opened, *id*. 36-
> 39;

> the role of the rule of lenity, *id*. 42-43; and

> the fact that the jurisdictional issues and concerns presented here
> are on all fours with the Supreme Court's decision in *Bond v. United
> States*, 572 U.S. 844 (2014), which rejected a literal interpretation of
> the term "chemical weapons" in § 229(a)(1) - a case that the
> *Response* studiously avoids mentioning. *Id*. 43-46.

Mr. Christensen also referenced the numerous federal kidnapping cases post-

2006, almost all of which involve the interstate transportation of the victim or travel by

the victim in interstate commerce, as well as the dearth of authority suggesting that the

use of a car alone suffices to award the federal government jurisdiction. *Motion,* at 39-42.
[23]

## A.    The *Response's* Plain Meaning Argument

The *Response* principally stakes its fortune on the "plain meaning" canon.

*Response*, at 4-6. Putting almost all its eggs in this basket, the *Response* takes the position

that the defense's arguments based on "legislative history, the canon against

surplusage, federalism, constitutional avoidance and the rule of lenity . . . need not be

addressed." *Id*. 11. Then, accepting its own invitation, the *Response* proceeds not to do

so, and thereby avoids any meaningful rejoinder to the core arguments of the *Motion*.

In taking this absolutist position, the *Response* ignores the fact that the so-called

plain meaning rule is not an end in itself, but a canon of statutory construction, the

significance of which depends on several factors. Where the "naked text" leads to a

---

[23]In n. 3-4 of its *Response*, at 7-8, the government notes that the *Motion* focuses on the sufficiency of the evidence regarding the use of the cellphone rather than directly asserting that, like the use of a car, Congress did not intend this provision of § 1201(a)(1) to apply to cell phones in the first instance. The government is not prejudiced by this supposed omission, as the *Response* correctly asserts that there is no "principled distinction" between the two and addresses both. *Id.,* n 4. As to the sufficiency of the evidence in support of the cell phone allegation, the *Response* is correct when it asserts in n. 3 that such claims are normally not subject to a determination pretrial, but must await a Rule 29 motion. There is authority to reach sufficiency issues pretrial where, for instance, the government has agreed to a stipulated record or made a proffer of its evidence by affidavit or otherwise. *See Yakou v. United States*, 393 F.3d 231, 236-37 (D.C. Cir. 2003) (where the government has not objected and the facts concerning the jurisdictional basis are undisputed); *United States v. Delaurentis*, 230 F.3d 659, 660 (3rd Cir. 2000) ("Unless there is a stipulated record); *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998) ("Unless the government had made what can fairly be described as a full proffer of the evidence it intends to present at trial; *United States v. Mennuti*, 639 F. 2d 107 (2d Cir. 1981) (pretrial dismissal of indictment affirmed because government proffer of its evidence through an affidavit of Assistant U.S. Attorney did not establish that government could satisfy the required jurisdictional element). Here, the government has elected not to have the sufficiency of the evidence issue addressed pretrial and thus the defense will not further press this argument at this time.

result that is "difficult to fathom" or Congress likely did not intend, the plain-meaning canon is best viewed as "an axiom of experience than a rule of law." *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440, 445 (1989), *quoting Boston Sand & Gravel v. United States* (citation omitted). "The circumstances of the enactment of particular legislation, for example, may persuade a court that Congress did not intend words of common meaning to have their literal effect." *Watt v. Alaska*, 451 U.S. 259, 266 (1981).

These principles are particularly salient where a literal reading of the language would lead to absurd or "odd" results. "Frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act." *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892); *Public Citizen*, 491 U.S. at 454 ("Where the literal reading of a statutory term would 'compel an odd result,' (citation omitted), we must search for other evidence of congressional intent to lend the term its proper scope."); *Lexington Ins. Co. v. Rugg & Knopp*, 165 F.3d 1087, 1092 (7th Cir. 1999) ("A starting place is not an ending place. Sometimes a court may be forced to read a statute otherwise than literally, if, for instance, it leads to absurd results."). Finally, rejection of a broad literal reading of statutory terms is particularly appropriate "where the text fairly admits of a less problematic construction" and looking to the statute's purposes and origins "avoid[s] deciding difficult constitutional questions." *Public Citizen*, 491 U.S. at 455.

31

The *Response* argues that automobiles and cell phones are "instrumentalities of interstate commerce" and that the meaning of the phrase "*uses . . . an instrumentality of interstate commerce*" (emphasis added) is plain. *Id.*, at 4-6. But, in *Public Citizen v. U.S. Dept. of Justice*, *supra*, the Supreme Court cast aside the plain meaning canon when a literal interpretation of the similar term, "utilize," would lead to a result that Congress likely did not foresee or intend. The issue in *Public Citizen* was whether the Federal Advisory Committee Act (FACA), which applies to any advisory committee which is "utilized" by any federal agency that provides advice to the President, applies to the advice and consultation which Standing Committee of the American Bar Association (ABA) provides to the Department of Justice regarding judicial appointments.[24] Read literally, FACA would apply as the ABA Standing Committee is an "advisory committee," which provides "advice or recommendations" to the Department of Justice concerning judicial appointments, which are then forwarded to and "utilized" by the President in the broadest sense of the word. *Id.* 452. Nonetheless, the Court ruled otherwise, noting that the term " '[u]tilize' is a wooly verb, its contours left undefined by the statute itself." *Id.* 452. Despite its so-called "plain meaning," the Court held that an "unqualified[]," *id.* 452, and "straightforward," *id.* 453, reading of the term would lead to a result that Congress likely never intended. Further noting "FACA was enacted to cure specific ills," *id.* 453, the Court engaged in a lengthy review of the statute's legislative history and found nothing to suggest that the statute was meant to apply as

---

[24]FACA imposes detailed regulations on certain committees that provide advice to officers and agencies in the Executive Branch. *See* 5 U.S.C. App. § 3(2).

broadly as a literal reading of "utilize" would otherwise suggest. *Id.* 456-465; *see also Jones v United States*, 529 U.S. 848, 855 (2000) (requirement that a building be "used" in an activity affecting interstate commerce is "most sensibly read to mean active employment for commercial purposes.").

In *Green v. Bock Laundry*, 490 U.S. 504 (1989), the Court held that all parties in civil suits must be allowed to impeach witnesses with prior felony convictions regardless of ensuing prejudice to either the witness or the party calling the witness, despite the fact that the plain language of Fed. R. Evid. 609(a)(1) suggested a contrary result. Otherwise, "a literal reading would compel an odd result in a case like this," *id.* 509, with impeachment detrimental to a civil plaintiff always admitted while a different balancing standard would apply to civil defendants. In reaching this conclusion, the Court examined, at length, the law prior to adoption of Rule 609(a), as well as the history of its adoption. *Id.* 511-524; s*ee also Campbell v. Greer*, 831 F.2d 700 (7th Cir. 1987) ("As is true of many rules and statutes, Rule 609(a) "can't mean what it says.").[25]

*Watts v. Alaska*, 451 U.S. 259 (1981), presented the question of whether amendments to the Wildlife Refuge Revenue Sharing Act (WRRS) in 1964, which established a statutory distribution formula relating to oil and gas leases, superseded a different formula under the Mineral Leasing Act of 1920 (MLA). Relying on the "plain language" and "clarity" of the key term "minerals" in the WRRS, the plaintiff argued

---

[25]Although the conclusions in both *Bock Laundry* and *Campbell* were both later superseded by an amendment to Rule 609(a), the principle animating both the Supreme Court and the Seventh Circuit's interpretation of the former Rule remains – the plain language canon is only a guide and not to be blindly followed where a literal reading leads to results that are either absurd on their face or inconsistent with the likely intent of Congress.

that it was unnecessary to look further. *Id*. 265. Agreeing that the "starting point" is the

language of the statute itself, the Court nonetheless observed that this "need not end the

inquiry . . . [because] . . . the circumstances of the enactment of particular legislation

may persuade a court that Congress did not intend words of common meaning to have

their literal effect." *Id*. 266. Reviewing the statutory history, the Court found, contrary to

the supposed plain meaning of the statutory language, Congress did not intend that the

WRRS distribution formula would override that of the previously enacted WLS. *Id*. 267-

273. Of particular interest is the Court's reliance on the principle that repeals by

implication are not favored, *id*. 266-267, and "Congress might be expected to have

mentioned" such a significant change to prior existing law." *Id*. 271; *see also Motion*, at 31

(quoting Chief Justice Rehnquist's observation that where sweeping changes are

intended to be made to long-standing existing law, one would expect a "watchdog to

bark.").

     The *Response* also makes no effort to harmonize its plain meaning argument with

the Supreme Court's decision in *Bond v. United States*, 532 U.S. 844 (2014), which was

discussed, at length, in the *Motion*, at 43-47. In fact, the *Response* completely ignores

*Bond*, a stratagem that cannot be explained by its insistence that the plain meaning

canon obviates the need to address Mr. Christensen's argument since *Bond*, itself,

exposes the fallacies of a reflexive incantation of "plain meaning." Interpreted literally,

the term "chemical weapons" in the statute at issue in *Bond* encompassed the toxic

chemicals Carol Bond placed on the car, door knob and mailbox of the victim. But,

based on the statute's history, its purpose and the constitutional issues that such a literal

reading would present under the Tenth Amendment, the Court held that Congress did not intend that the defendant's conduct came within the terms of the statute.

As the Court noted in *Watts*, *Bond* and *Public Citizen*, where a literal interpretation of statutory language leads to troublesome results, courts may examine the circumstances surrounding the particular enactment to determine Congress's intent. Here, like *Public Citizen*, SORNA was enacted to "cure [a] specific il[]," that of sexual predators against children. *Motion*, at 8-9. Nothing in either SORNA's legislative history, or the extensive history and interpretation of the jurisdictional basis of the Federal Kidnapping Act, suggests that by virtue of the insertion of a single sentence in SORNA, Congress intended the Act to apply as broadly as the *Response* desires. *See Motion*, at 7-9. Both the text of the Act and President Bush's Signing Statement, *Motion*, at 9, confirm that the focus and "core concern," of SORNA was crimes against children. *See Bond*, 134 U.S. at 863. A literal and "problematic construction," *Public Citizen*, *supra*, of the phrase "use an instrumentality of interstate commerce," without a nexus to actual commerce in the particular case at hand, leads to the same odd or, in some cases, absurd results that has led the Supreme Court to reject the plain meaning canon in cases such as *Public Citizen*, *Watts*, *Bock Laundry* and *Bond*.

**B.    The *Response*'s Other Arguments Addressing Congress's Intent**

While emphasizing its plain meaning approach, the *Response* briefly makes three additional points:

(1) The Analogy to § 1958 and its Amendment

On pages 8-9, the *Response* argues that Congress's amendment of § 1958 evidences its intention that an automobile, standing alone, confers jurisdiction under § 1201(a)(1). This contention quickly runs out of gas when the two statutes are compared. As noted above, Congress did specifically intend for § 1958 to apply to automobiles (and cell phones). We know that *because Congress directly said so* in § 1958(b)(2): "'facility of interstate or foreign commerce' includes means of transportation and communication." A similar intent on the part of Congress in amending §1201(a)(1) is conspicuously absent, an inconvenience the *Response* glosses over. As to the amendment of § 1958, referenced in the *Response*, that has no significance because, as stated throughout this *Reply,* Mr. Christensen's argument is not based on a distinction between intrastate and interstate use of the instrumentality but whether on whether § 1201(a)(1) applies to the personal use of the instrumentality unconnected to commerce. Thus, the *Response*'s attempt to get mileage from the language and subsequent amendment of § 1958 fails on both relevant points: (a) whether the term "instrumentality of interstate commerce" in § 1201(a)(1), as amended by SORNA, was intended to cover automobiles and cell phones - § 1958(b)(2) demonstrates that Congress knew exactly how to say this when it so intended; and (b) whether the term "instrumentality of interstate commerce," standing alone in § 1201(a)(1), is fairly interpreted to require nothing more in the way of commerce - § 1958 demonstrates Congress's awareness that it cannot simply authorize federal courts to assume jurisdiction over murders without some nexus to commerce.

(2) The Quote from the Congressional Record

Because there is no legislative finding suggesting Congress gave due consideration of its powers to act under the Commerce Clause, *see e.g. Gonzales v. Raich*, 545 U.S. 1, 20 (2005) (findings concerning the interstate and foreign market related to marijuana); *Perez v. United States*, 402 U.S. at 147, n. 1 (findings concerning relationship of "loansharking" to organized crime and commerce), the *Response* attempts to make do with an isolated, truncated and unattributed quote from the Congressional Record. *Response*, at 10-11. A search of the daily proceedings of Congress suggests that the remark was made by Representative Sensenbrenner in characterizing Section 507 of House Resolution 4472, which was later included in SORNA and codified at § 1201(a)(1). 152 Cong. Rec. H657 (daily ed. March 8, 2006). In the absence of a detailed legislative history, the statement of a single legislator is of no moment. *See Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. 102, 118 (1980) ("Ordinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history."); *General Dynamic Land Systems, Inc. v. Cline*, 540 U.S. 581, 599 (2004) ("Even from a sponsor, a single outlying statement cannot stand against a tide of context and history, not to mention 30 years of judicial interpretation producing no apparent legislative qualms."). In any event, the quotation is meaningless in the context of the issue here because it only states that"this section (unidentified) expands the federal jurisdictional nexus *comparable to that of many other federal crimes . . .* " (emphasis added), without identifying what the so-called other "comparable federal crimes" are (and the *Response* provides no help), it is difficult to understand the

unexplained relevance of this statement because the subject of almost every offense in Title 18 referencing instruments or facilities of interstate commerce involves either commerce or economic activity or acts that damage such instruments or facilities and therefore interfere with commerce.

(3) The Reference to Adam Walsh in the Preamble

Finally, in what appears to have been an afterthought dropped in a footnote, the *Response* suggests that because SORNA is officially titled the Adam Walsh Child Protection and Safety Act of 2006, this somehow evidences Congress's intent to assert federal jurisdiction over any otherwise local kidnapping offense involving a car since Adam was allegedly transported in a car (the *Response* cites Wikipedia). *Response*, at 9-10, n. 7.[26] It is true that the Preamble of the Act recites that the Act "honors the memory of Adam Walsh and other child crime victims," but the *Response* cites no evidence suggesting that Congress intended to establish jurisdiction over factual scenarios identical to that in a particular case or any law suggesting that an honorific appearing in the Preamble of an enactment has any legal significance.

**C.     When Congress Wants to Regulate the Personal Use of an Instrumentality of Interstate Commerce Such as an Automobile It Relies on the Spending Clause Rather the Commerce Clause**

Finally, Congress's use of the Spending Clause, art. 1, § 8, Cl. 1, rather than the Commerce Clause, to regulate the personal use of automobiles unrelated to commerce

---

[26]This footnote begins by denouncing some imagined distinction of the defense as "wild speculation," without any citation. As is made perfectly clear in this *Reply*, the defense's arguments apply equally to cars and cell phones – the use of neither by a private actor is sufficient to provide federal jurisdiction in the absence of the requisite nexus of such use to commerce.

38

strongly suggests that it did not intend the result urged by the *Response*. It has long been understood that the Constitution assigns to the States primary authority to enforce criminal law and protect the health, safety and welfare of its citizens. *See Gonzales v. Raich*, 545 U.S. 1, 42-43 (J. O'Connor, dissenting)( "The States' core police power have included authority to define criminal law and to protect the health, safety, and welfare of their citizens."). When Congress wanted to address the problem of underage drinking while driving, it turned to the Spending Clause, which gives Congress the authority to condition the grant of public funds to the States *even though Congress does not have the power to directly legislate on the subject. See United States v. Butler*, 297 U.S. 1, 66 (1936) ("[T]he power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution.").

Thus, in *South Dakota v. Dole*, 483 U.S. 203 (1987), the Court upheld a provision of The Uniform Drinking Age Act of 1984, directing the Secretary of Transportation to withhold a percentage of highway funds otherwise allocated to the State unless the State prohibited the purchase or public possession of alcohol by persons less than 21 years of age.  The legislation made it clear that Congress believed this would be in the public welfare by reducing traffic accidents and resulting fatalities. *Id.* at 209, 215. Had Congress believed it had the authority the *Response* suggests to directly regulate the personal use of automobiles not involved in commerce, the most direct and effective method to accomplish its goal would have been to proceed pursuant to the Commerce Clause, as this would have ensured the national standard it was attempting to establish.

Using the Spending Clause was purposeful because, as noted, it permits Congress to exercise powers not otherwise granted by the Constitution.

Similarly, when Congress wanted to establish a nationwide maximum blood alcohol level for driving and ensure that repeat drunk driving offenders are adequately punished, it turned to the Spending Clause in the Transportation Equity Act for the 21st Century in 1998, to encourage States to adopt these standards. States that don't comply are penalized by the withholding of a designated percentage of federal transportation funds.  *See* 23 U.S.C. § 165. Again, had Congress believed it possessed authority to do so simply because a car is an instrument of interstate commerce, the most direct way to accomplish its purpose would have been to directly impose these standards under the Commerce Clause.

This legislation further evidences that in adding the "instrument of interstate commerce" language to § 1201(a)(1), Congress did not intend that this term would apply to the personal use of an automobile or other instrumentality of interstate commerce that did not involve interstate travel of either the perpetrator or the offender or the commission of the crime of kidnapping in connection with a crime substantially related to commerce.

> **D.    To Avoid the Constitutional Issues Presented by the Response's Theory, the Use of an Instrumentality in an Intrastate Kidnapping under § 1201(a)(1) Must Have a Substantial Relation to Commerce**

The canon of constitutional avoidance is a "tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that

Congress did not intend the alternative which raises serious constitutional doubts."

*Clark v. Martinez*, 543 U.S. 371, 381–82 (2005); *Jones v. United States*, 529 U.S. at 857

(where a statute is susceptible of different constructions it is a court's duty to adopt the

one that doesn't raise "grave and doubtful constitutional questions." [citation

omitted]).[27]

At a minimum, if § 1201(a)(1) is applicable to the use of an instrumentality of

interstate commerce in an intrastate kidnapping unconnected to commerce, serious

issues would be presented as to Congress's power under the Commerce Clause to so

pervasively regulate a local violent crime and "'be deemed to have significantly

changed the federal-state balance' in the prosecution of crimes." *Id.*, at 858, *quoting*

*United States v. Bass*, 404 U.S. 336, 349 (1971).

**VII.   CONCLUSION**

The jurisdiction theory advanced by the *Response* is inconsistent with Supreme

Court precedent, contrary to basic principles of statutory interpretation when issues of

federal-state relations are presented and unsupported by the authority offered by the

*Response*. The constitutionality of the 2006 Amendment to § 1201(a)(1) can be saved by

finding that, consistent with prior law and its approach to regulation of prior actors'

uses of instrumentalities of interstate commerce, Congress intended the 2006

Amendment to cover the use of instrumentalities of interstate commerce in intrastate

---

[27]*Jones* relied on this canon to avoid the constitutional issues that would arise from interpreting the
federal arson statute, 18 U.S.C. § 844(i), to apply to a private residence. The Court had previously held
the statute applied to a rental property, but drew the line in *Jones* at commerce, finding § 844(i)
inapplicable to a private residence.

kidnappings having a substantial relation to commerce. This interpretation would still significantly extend the reach of the federal kidnapping statute, as prior to the Amendment, § 1201(a)(1) only reached kidnappings where the victim was transported or the offender traveled in interstate commerce.[28] Without this limitation, the 2006 Amendment exceeds Congress's authority under the Commerce Clause.

Respectfully submitted,

BRENDT A. CHRISTENSEN, Defendant

By:   /s/ Elisabeth R. Pollock                    /s/ George Taseff
      Assistant Federal Public Defender        Assistant Federal Public Defender
      300 West Main Street                      401 Main Street, Suite 1500
      Urbana, IL 61801                          Peoria, IL 61602
      Phone: 217-373-0666                       Phone: 309-671-7891
      FAX:   217-373-0667                       Fax:     309-671-7898
      Email: Elisabeth_Pollock@fd.org           Email: George_Taseff@fd.org

      /s/ Robert Tucker                         /s/ Julie Brain
      Robert L. Tucker, Esq.                    Julie Brain
      7114 Washington Ave.                      916 South 2nd
      St. Louis, MO 63130                       Philadelphia, Pa. 19147
      Phone: 703-527-1622                       Phone: 267-639-0417
      Email: roberttuckerlaw@gmail.com          juliebrain1@yahoo.com

---

[28]This interpretation would be consistent with the *Response*'s explanation for the amendment of *§* 1958, to ensure that it reached intrastate murder-for-hire offenses. *Id*. 8-9.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<u>/s/ Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:    217-373-0667
Email: Elisabeth_Pollock@fd.org