E-FILED
Friday, 07 December, 2018  06:34:03 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION IN SUPPORT OF DEFENDANT'S PROPOSED SUPPLEMENT TO THE JOINT JURY QUESTIONNAIRE

Defendant, Brendt Christensen, through undersigned counsel, respectfully moves this Court to include in the Juror Questionnaire appropriate questions in four categories:

(1) case-specific questions to discover potential bias and elicit information to assist the Court and parties in evaluating the prospective jurors and eventually ensuring that they are life-qualified and death-qualified for this type or category of case;

(2) questions addressing aggravation and mitigation to discover potential bias and confirm the jurors are able to fairly and impartially consider these factors in this case;

(3) the inclusion of an overview of the process and legal principles that apply to a sentencing trial and questions addressing these principles; and

(4) an introduction to the case including the government's allegations in the Indictment and Notice of Intent to set an appropriate context for

1

learning about potential bias and feelings and views about the sensitive

issues in this case.

In support of this Motion, Mr. Christensen states as follows:

## I.      Introduction

On December 6, 2018, the parties met and conferred regarding the preparation of

a Proposed Joint Jury Questionnaire to present to this Court. Although many areas of

agreement were reached, there remain several categories of questions for which the

parties were not able to reach consensus. With the consent of defense counsel, the

government filed R. 164, a Notice of Filing of Agreed, Proposed Jury Questionnaire,

reflecting the agreements that were reached by the parties. Nevertheless, Mr. Christensen

requests that several additional questions be included in the Court's Jury Questionnaire

that is ultimately distributed to potential jurors in this case.

The additional questions requested by Mr. Christensen were presented to this

Court under seal on December 6, 2018. (R. 165)[1] This Motion and the exhibits attached

hereto represent the legal basis and justification for Mr. Christensen's requested

questions.

---

[1]For the purposes of this Motion, the defense requested questions are identified by the question number
in the Word version of the MS Word file emailed to Chambers on Friday, December 7, 2018,
*Combined Jury Questionnaire (Agreements of the Parties and Def. Proposed Supplement, combined).docx*.
For example, the defense requested question in blue colored text below is referred to as Question 165:

## II.      Overview Regarding Category-Specific and Case-Specific Questions and Jury Selection

During the jury selection process a capital defendant must not be limited to general or theoretical inquiries as to whether a venire member has a bias for the death penalty or a bias against mitigation as a general proposition. The defendant must also be allowed to elicit information from potential jurors as to whether they can give meaningful consideration to a life sentence in a case involving the category of murder and aggravation anticipated in the case, and whether they can consider and give effect to the mitigating factors relevant in the particular case.

There are two potential types of case-specific questions: impermissible "stake-out" or "pre-commitment" questions, and properly framed case-specific questions. The distinction is sometimes subtle, but crucial for separating allowable questions from prohibited ones. In short, stake-out questions ask potential jurors *how they would vote* based on certain evidence, or how they would weigh or assess that evidence. Permissible questions ask merely *whether they could fairly consider* specific types of information in specific circumstances, without asking what they would do with it. With this distinction

---

165.    Do you have an opinion about whether Brendt Christensen should be sentenced to life in prison without the possibility of release, or to death, if it is proven he committed the crime of kidnapping resulting in the death of Ms. Zhang? (There is nothing wrong or inappropriate with having an opinion. Please be honest.)

❏ Yes        ❏ No

If yes, please explain: _____

_____

~~145.~~166.      Is there any other information that you feel you should share with the Judge that you believe may bear upon your service as a juror in this case?

❏ Yes        ❏ No        ❏ I would like to speak privately about this issue

Please explain: _____

3

in mind case law clearly prohibit stake-out questions and permit properly framed case-specific questions.

Judge Bennett of the Northern District of Iowa reached precisely this conclusion after conducting perhaps the most exhaustive review of federal and state case law and comprehensive analysis of the issue ever undertaken in a published opinion in *United States v. Johnson,* 366 F.Supp.2d 822 (N.D. Iowa 2005). After doing so, he concluded as follows:

> This court acknowledges that *Morgan* does not require "case-specific" questions during *voir dire* of prospective jurors in capital cases, but neither does *Morgan* bar such questions, because the Supreme Court never addressed in *Morgan* the issue of whether such questions are permissible. The court also does not purport to answer here the question of whether "case specific" questions are constitutionally required during *voir dire* of prospective jurors in capital cases. Nevertheless, the court holds that, in this case, "case specific" questions are appropriate – indeed necessary – during *voir dire* of prospective jurors to allow the parties to determine the ability of jurors to be fair and impartial *in the case actually before them,* not merely in some "abstract" death penalty case. After all, if the jury selected in this case imposes the death penalty on Angela Johnson, there will be nothing "abstract" about that determination or the penalty imposed.

366 F.Supp.2d at 849-50. (Emphasis in original).[2] *Accord United States v. Fell,* 372 F.Supp.2d 766, 770 (D. Vt. 2005) (following *Johnson* because it "thoroughly and persuasively discusses this question."); *Id.* at 771 ("If properly formed, case-specific questions help identify various forms of juror bias.") *Cf. United States v. Wilson,* 493 F.Supp.2d 402, 404-

---

[2]Although Judge Bennett did not definitively decide the broader constitutionality issue, he did opine "that 'case-specific' questions may well be *constitutionally required* in order to impanel a fair and impartial jury, because a prohibition on 'case-specific' questions may unconstitutionally impede a party's 'ability to exercise intelligently [a] challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose' either a life or death sentence after a finding of guilt (citing *Morgan,* 504 U.S. at 733-34)." *Johnson,* 366 F.Supp.2d at 848. (Emphasis in original).

05 (E.D.N.Y. 2006) (agreeing with *Johnson* "that certain case-specific questions *can* be appropriate in capital *voir dire.* Such questions may be proper, indeed necessary, if they deal with subject matter that would demonstrate impermissible bias on the part of a juror (citing *Fell*).")

The court in *Johnson* took pains to distinguish proper case-specific questions, on the one hand, from "stake-out" or "pre-commitment" questions that are universally condemned as improper, on the other hand:

> While any "case-specific" question that asks *how a prospective juror would vote* on life or death, if presented with proof of certain facts, *is* a "stake-out" question, and does attempt to "pre-commit" the juror to a certain position, a properly framed case-specific question does not necessarily do any of these things. For example, a question about whether a juror "could (not would) find" that certain facts establish a legal requirement for imposition of the death penalty, (citation omitted), or that a prospective juror *could fairly consider* either a death or life sentence, notwithstanding proof of certain facts, commits a juror to no other position than fair consideration of the appropriate penalty in light of all of the facts and the court's instructions (citing *Morgan,* 504 U.S. at 729)."

*Johnson,* 366 F.Supp.2d at 845. (Emphasis in original).

Defense counsel urges the Court to recognize the distinction between permissible case-specific questions and impermissible "stake-out" questions that was adopted in *Johnson* and the cases following it, as succinctly articulated in *Fell*:

> The Court holds that case-specific questions are sometimes proper and useful. Nevertheless, the Court will prohibit questions which are framed solely to educate the jury or to have jurors commit to particular points of view. A balance must be struck between seeking to discover biased jurors who could not be impartial given particular facts and getting jurors to commit to support a particular perspective on the evidence.
>
> This balance suggests that case-specific questions regarding significant and potentially prejudicial facts may be asked if couched in terms of asking whether or not the jury could still consider aggravating and mitigating

circumstances in light of the existence of those prejudicial facts. Thus, the Court will permit counsel to ask questions raising case-specific facts if the questions are reasonably directed towards discovering whether the juror will be able to fairly and impartially weigh aggravating and mitigating factors. Any questions that attempt to commit the juror to a particular position will be struck.

*Fell,* 372 F.Supp.2d at 773. *Cf. People v. Coffman,* 34 Cal. 4th 1, 47, 96 P.3d 30, 69, 17 Cal.Rptr.3d 710, 756 (2004) ("Our decisions have explained that death-qualification *voir dire* must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented." (Internal quotations and citations omitted).)[3]

## III.   Case-Category Questions in the Juror Questionnaire

The Courts in *Johnson* and *Fell* concluded that the necessity of case-specific questions follows logically from the Supreme Court's reasoning in *Morgan*:

> [T]he Supreme Court's reasoning in *Morgan supports* the use of case-specific questions in some circumstances. The entire premise of the *Morgan* decision is that highly general questions may not be adequate to detect specific forms of juror bias. *See* 504 U.S. at 734-36, 112 S.Ct. 2222. Thus, *Morgan* suggests that, in appropriate circumstances, the parties should be allowed to ask more specific questions to investigate potential bias.

---

[3]*Johnson* synopsized the holding in *Coffman,* as follows: "Thus, the California Supreme Court recognizes that 'abstract' questions may not be sufficient and that 'case-specific' questions can serve the purpose of empaneling a fair and impartial jury, so long as they are not framed as 'stake-out' questions, because 'case-specific' questions will help identify jurors who would be prevented or substantially impaired in the performance of their duties." 366 F.Supp.2d at 847.

*Fell,* 372 F.Supp.2d at 769. (Emphasis in original). The Court in *Johnson* went even further and suggested, without deciding, that case-specific *voir dire* may be constitutionally mandated following *Morgan*:

> [W]hile *Morgan* does not require "case-specific" questioning of prospective jurors to satisfy constitutional requirements for life- and death-qualifying prospective jurors, "case-specific" questions are nevertheless appropriate – indeed, necessary – to empanel a fair and impartial jury in this particular case. *Morgan,* 504 U.S. at 730-34, 112 S.Ct. 2222 (*voir dire* is an important tool to determine whether jurors can be fair and impartial). . . . On the other hand, this court believes that "case-specific" questions may well be *constitutionally required* in order to impanel a fair and impartial jury, because a prohibition on "case-specific" questions may unconstitutionally impede a party's "ability to exercise intelligently [a] challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose" either a life or death sentence after a finding of guilt. *Morgan,* 504 U.S. at 733-34, 112 S.Ct. 2222.

*Johnson,* 366 F.Supp.2d at 848. (Emphasis in original).

Under the holding in *Johnson,* "no principled line can be drawn to distinguish facts that can be included in 'case-specific' questions from facts that cannot, apart from the requirement that the facts included in any 'case-specific' question, to have any probative value as to a juror's views, should be facts that are likely to be shown by the trial evidence or genuinely in dispute in the case (citation omitted)." 366 F.Supp.2d at 849. "Indeed, . . . a sensible rule about 'case-specific' questions cannot be based on the content of the questions, but must be based *on the form of such questions.*" *Id.* (Emphasis in original).

## A. Properly framed "case-specific" questions are not improper "stake-out" or "pre-commitment" questions; the critical distinction lies in the form of the question.

"Some courts have simply excluded case-specific questions on the ground that they are stake-out questions." *Fell,* 372 F.Supp.2d at 770 (citing *Richmond v. Polk,* 375 F.3d 309, 329-31 (4th Cir. 2004); *McVeigh,* 153 F.3d at 1207-08). But the universe of case-specific and

"stake-out" questions are not fully coextensive. Just because stake-out questions are generally case-specific does not mean that all case-specific questions are stake-out questions. They manifestly are not, as the courts in *Johnson* and *Fell* made clear. *See Fell,* 372 F.Supp.2d at 770 ("[T]he Court agrees with *Johnson* that not all case-specific questions are stake-out questions); *Johnson,* 366 F.Supp.2d at 842 ("With all due respect to the courts in *McVeigh* and *Richmond*, this court does not find that the questions actually at issue in either of those cases fit the definitions of 'stake-out' questions purportedly applied by those courts."); *Id.* at 845 ("[I]t is a misconception to assume that *any* 'case-specific' question is necessarily a 'stake-out' question. (Emphasis in original). The distinction is simple, but legally significant:

> There is a crucial difference between questions that seek to discover how a juror might vote and those that ask whether a juror will be able to fairly consider potential aggravating and mitigating evidence. For example, a juror may not be asked whether evidence of rape would lead him or her to vote for the death penalty. However, a juror may be asked if, in a murder case involving rape, he or she could fairly consider either a life or death sentence. The first question is an improper stake-out question. The second question is not a stake-out question because it only asks whether the juror is able to fairly consider the potential penalties. To the extent that this question 'commits' a juror it "commits a juror to no other position than fair consideration of the appropriate penalty in light of all of the facts and the court's instructions." [*Johnson,* 366 F.Supp.2d] at 844-45. A similar analysis applies to questions that ask whether prospective jurors would be able to fairly consider potential mitigating or aggravating factors. For example, a juror may be asked whether he or she could fairly consider evidence relating to the defendant's upbringing or potential for rehabilitation.

*Fell,* 372 F.Supp.2d at 771.

> *Johnson* is to like effect:

> [T]he proper tests for whether a question is a "stake-out" question are the following:   (1) Does the question ask a juror to speculate or precommit to how that juror *might vote* based on any particular facts? or (2) Does it seek to discover in advance *what a prospective juror's decision will be* under a certain state of the evidence? or (3) Does it seek to cause prospective jurors

to pledge themselves to a future course of action and indoctrinate them regarding potential issues before the evidence has been presented and they have been instructed on the law? While any "case-specific" question that asks *how a prospective juror would vote* on life or death, if presented with proof of certain facts, *is* a "stake-out" question, and does attempt to "pre-commit" the juror to a certain position, a properly framed case-specific question does not necessarily do any of these things.

366 F.Supp.2d at 845 (internal citations and quotations omitted). (Emphasis in original).

Thus, any "case-specific" question should be prefaced by 'if the evidence shows,' or some other reminder that an ultimate determination *must be based on the evidence at trial and the court's instructions.* Furthermore, to avoid "stake-out" questions, which this court agrees are improper, questions must be in the form of whether or not the prospective juror "could fairly consider" a life sentence, a death sentence, or both, not whether the prospective juror would vote for life or death in light of particular facts.

*Id.* at 849. (Emphasis in original).

**B. Social Science Research Has Established that Inadequate "Life Qualification" Jury Selection in Capital Cases Fails to Identify Jurors Who Harbor Pro Death Penalty-Bias and Are Constitutionally Unqualified and Impaired Under the *Witt* Standard.**

Inadequate "life qualification" jury selection results in the seating of unqualified jurors. This has been consistently borne out by empirical studies of actual capital jurors, a surprising number of whom find their way onto capital juries despite these disqualifying biases. *See* Marla Sandys & Adam Trahan, *Life Qualification: Automatic Death Penalty Voter Status and Juror Decision Making in Capital Cases*, 29 Just. Sys. J. 385, 393 (2008); John Blume et al., *"Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1244-45 (Summer 2001) ("all too often . . . the potential jurors are . . . thinking of circumstances that would make the crime not a murder at all, let alone a capital murder").

The Capital Jury Project – created in 1990, with funding from the Law and Social Sciences Program of the National Science Foundation – has researched the decision-making of actual capital jurors.[4] The CJP's interviews chronicle the jurors' experiences and decision-making over the course of the trial, identify points at which various influences come into play, and reveal the ways in which jurors reach their final sentencing decisions.

The CJP began in eight states and has grown to a total of fourteen states. States were chosen for the CJP research to reflect the principal variations in guided discretion capital statutes. Within each state, 20 to 30 capital trials were picked to represent both life and death sentencing outcomes. From each trial, a target sample of four jurors was systematically selected for in-depth three-to-four-hour personal interviews. Interviewing began in the summer of 1991. The present CJP working sample includes 1,198 jurors from 353 capital trials in 14 states. These 14 states are responsible for 76.1% of the 3,718 persons on death row as of June 1, 2002, and for 79.0% of the 795 persons who were executed between 1977 and September 1, 2002. Data collected and analyzed by CJP researchers played a substantial role in *Simmons v. South Carolina*, 512 U.S. 154 (1994). Since 1993, some 78 articles and book chapters presenting and discussing the findings of the CJP have been published.

---

[4]Indeed, the Supreme Court invited this very research by rejecting earlier studies on the grounds that they did not address how "actual jurors sworn under oath apply the law to facts of an actual case involving the fate of an actual capital defendant." *Lockhart v. McCree*, 476 U.S. 162, 171 (1986). The recent CJP research addresses the very question the Supreme Court posed.

As the national data from the following tables indicate, the CJP survey results documented profound deviations between what capital jurisprudence requires and what actual capital jurors believe. **Twenty-four percent of jurors believed that a sentence of death was the only acceptable punishment for a defendant who murdered during another crime, and fifty-seven percent of jurors believed that a sentence of death was the only acceptable punishment for a defendant who planned and premeditated murder.** These jurors – who had been screened as capital jurors under *Morgan* standards, and who made the life or death decision in an actual capital case – approached the sentencing decision believing the death penalty was the only appropriate penalty for many categories and types of murder. In effect, mandatory death penalty laws, while banned by the Supreme Court under *Woodson*, may be applied by unqualified – yet relatively common – jurors unless adequate jury selection procedures, starting with an appropriate Juror Questionnaire, are followed.

Percentages of Jurors Considering Death the Only Acceptable Punishment for Six Types of Murder by State

| States | By defendant with prior murder conviction | Planned premeditated murder | Murder with multiple victims | Killing police/ prison guard | Murder by drug dealer | Murder during another crime | N |
|---|---|---|---|---|---|---|---|
| Alabama | 66.7% | 54.4% | 57.9% | 37.5% | 46.4% | 36.8% | 56 |
| California | 58.6% | 41.4% | 41.1% | 41.4% | 33.6% | 17.8% | 151 |
| Florida | 77.6% | 64.1% | 62.1% | 51.3% | 52.6% | 19.7% | 115 |
| Georgia | 70.8% | 54.8% | 46.6% | 51.4% | 47.2% | 23.6% | 72 |
| Indiana | 74.7% | 54.5% | 55.6% | 44.4% | 52.5% | 23.2% | 99 |
| Kentucky | 71.2% | 56.7% | 50.5% | 46.6% | 48.5% | 18.1% | 103 |
| Missouri | 75.4% | 54.1% | 52.5% | 45.9% | 38.3% | 19.7% | 61 |
| North Carolina | 73.8% | 68.8% | 55.0% | 58.8% | 45.0% | 21.5% | 79 |
| Pennsylvania | 71.8% | 65.4% | 62.8% | 55.1% | 47.4% | 28.2% | 78 |
| South Carolina | 76.3% | 61.4% | 54.4% | 43.0% | 49.1% | 26.5% | 113 |
| Tennessee | 78.3% | 67.4% | 58.7% | 54.3% | 43.5% | 30.4% | 46 |
| Texas | 76.9% | 57.3% | 59.5% | 58.6% | 48.7% | 35.3% | 116 |
| Virginia | 55.6% | 46.7% | 40.0% | 48.9% | 42.2% | 15.6% | 45 |
| All States | 71.6% | 57.1% | 53.7% | 48.9% | 46.2% | 24.2% | 1164 |

* The number of subjects answering each question varied slightly, and the number (N) for each state is the lowest number of subjects answering any of the questions.

Bowers, Foglia, "Still Singularly Agonizing: Law's Failure to Purge Arbitrariness From Capital Sentencing," 39 Crim. Law Bulletin 51, 63 tbl. 2 (2003).

| Percent of Capital Jurors Who Feel the Death Penalty Is Only Acceptable, Sometimes Acceptable, or Unacceptable as Punishment for Various Crimes | | | | |
|---|---|---|---|---|
| Various crimes | Only acceptable | Sometimes acceptable | Unacceptable | (No. of Jurors) |
| Murder by someone previously convicted of murder | 70.4 | 27.4 | 2.2 | (892) |
| A planned, premeditated murder | 57.0 | 40.5 | 2.5 | (888) |
| Murders in which more than one victim is killed | 52.0 | 45.2 | 2.8 | (892) |
| Killing of a police officer or prison guard | 47.9 | 48.6 | 3.5 | (888) |
| Murder by a drug dealer | 45.5 | 50.8 | 3.7 | (890) |
| When an outsider to the community kills an admired and respected member of the community | 21.5 | 73.4 | 5.1 | (883) |
| A killing that occurs during another crime | 23.1 | 69.2 | 7.6 | (891) |
| A rape with permanent injury to the victim | 24.4 | 55.0 | 20.7 | (886) |
| A planned murder, when the victim survives | 15.7 | 52.5 | 31.9 | (888) |

William J. Bowers et al., "Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt Trial Experience, and Premature Decision Making," 83 Cornell L. Rev. 1476. 1505 tbl. 6 (1998).

The CJP data indicates that "life-qualification" and "death qualification" *voir dire* failed to identify a significant portion of jurors who believed that the death penalty was the only appropriate punishment for a number of different categories of murder. What is particularly striking in the case before this Court is that the criminal conduct and aggravating factors alleged in the case include *several* of the categories identified by the CJP researchers as eliciting automatic death penalty views: "A planned, premeditated murder," (government's third statutory aggravating factor, "Substantial planning and

premeditation", *Notice of Intent to Seek a Sentence Of Death*, Docket No. 54), "A killing that occurs during another crime," (government's first statutory aggravating factor, "Death during commission of another crime", *Id.*), and "A rape with a permanent injury to the victim," (government's second statutory aggravating factor, "Heinous, cruel, or depraved manner of committing the offense" addressing torture or serious physical abuse of the victim, *Id.*, and government's fourth non-statutory aggravating factor, "Other serious acts of violence" addressing an alleged sexual assault of another victim *Id.*) The CJP research tells us that many prospective jurors – when asked to consider a case involving a defendant who plans and premeditates murder, who kills during another crime, and who kills after sexually assaulting the victim – will be unable and unwilling to consider mitigation and will believe the only appropriate penalty in this category or type of case is death.

Sexual assault is an issue that arouses strong emotional responses in prospective jurors, and many jurors report that they could not give meaningful consideration to a sentence of life imprisonment for a defendant who had sexually assaulted his victim before killing her. If jurors are not asked about their ability to consider mitigation and a life sentence in a case involving a defendant who sexually assaulted the victim before killing her, the Court risks empaneling jurors who – despite having indicated that they are open and willing to consider and give effect to mitigating factors and to consider a life sentence if the case proceeds to a sentencing hearing – have firmly held views and feelings about the appropriateness and necessity of a death sentence for a person who sexually assaults and then murders his victim. A juror with these views – who cannot

give meaningful consideration to mitigation and a life sentence in this category of case –

harbors a penalty bias and is unqualified to sit in this case. Appropriate questions should

be included in the Juror Questionnaire to elicit information from the prospective jurors

on these issues to ensure potential bias may be uncovered and then explored during voir

dire.

      Defense counsel have proposed appropriate case-category questions (104 – 106,

111,115, 118 – 121) designed to provide the Court and parties with relevant information

regarding potential bias. Including these questions in the Juror Questionnaire encourages

juror reflection and disclosure on these sensitive topics and facilitates a more focused and

efficient oral voir dire following up on responses provided in the Juror Questionnaire. These

types of questions are routinely included in Juror Questionnaires in federal capital cases.[5]

**Examples from Recent Federal Capital Cases of Case-Specific Punishment Questions**

| 79. | In a case in which a defendant has killed or participated in the killing of two people before kidnapping a third person, stealing her car, and later killing her, do you believe that you would *always* vote for: |
| --- | --- |
| | a. the death penalty?  _____ Yes  _____ No |
| | b. life in prison without possibility of parole?  _____ Yes  _____ No |
| | Please explain the reasons for your answer:  _____ |
| | _____ |
| | _____ |

---

[5]Several examples are listed in this pleading. For a more comprehensive listing, please see Exhibit 1, *Declaration Regarding Examples of Case-Specific, Case-Category, and Related Questions about Punishment Views in Juror Questionnaires from Recent Federal Capital Cases.*

> **95.** Do you have an opinion now about whether Donald Fell should be sentenced to life in prison with the possibility of release or sentenced to death, if it is proved he murdered or participated in the murder of two individuals and then committed the crime of kidnapping resulting in death or carjacking resulting in the death of Mrs. King?  (There is nothing wrong or inappropriate about having an opinion.  Please be honest.)
>
> YES _____        NO _____
>
> IF YES, what is that opinion?
>
> _____
>
> _____
>
> _____

*United States v. Donald Fell*, No. 5:01-cr-00012-GWC (D. Vt.) Jan. 27, 2017, ECF No. 1146 (Juror Questionnaire).

> **24.** Would the fact that this trial involves the death of a child under the age of six affect your ability to consider the evidence with an open mind or to render a fair and impartial verdict?
>
> Yes ☐        No ☒        Not Sure ☐        If yes, please explain:
>
> _____

*United States v. Naeem Williams,* No. 1:06-cr-00079-JMS-KSC (D. Haw.) Oct. 29, 2013 (Juror Questionnaire).

> **39.** Please describe in detail your views and beliefs about the death penalty for someone who killed two police officers, and why, including whether you have ever had a different view.
>
> _____
>
> _____
>
> _____
>
> _____

*United States v. Ronell Wilson,* No. 1:04-cr-01016-NGG (E.D.N.Y.) Mar. 13, 2013, ECF No. 1051 (Juror Questionnaire).

108.  Are your views such that you would have difficulty voting for life imprisonment without the possibility of release for an individual who deliberately set fire to an occupied house that resulted in the killing of other people?

☐ Yes          ☐ No

Please explain: _____

---

110.  What are your views of life imprisonment without the possibility of release for a person who deliberately and intentionally uses arson fire to murder family members of a government witness, including children?

_____

---

106.  Are your views on the death penalty such that you would be unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant sought the murder of a government witness?

☐ Yes          ☐ No

Please explain: _____

---

107.  Based on your feelings and values, could life without the possibility of release be a severe enough sentence for a defendant found guilty of premeditated intentional murder and who has previously been convicted of murder?

☐ Yes          ☐ No

Please explain: _____

*United States v. Savage, et al.*, No. 2:07-CR-00550-RBS (E.D. Pa.) Nov. 5, 2012 (Juror Questionnaire).

---

70.  What are your views of life imprisonment without the possibility of release for a prisoner who deliberately and intentionally kills a corrections officer in a United States Penitentiary?

_____

_____

_____

---

74.   If the evidence at trial showed a defendant planned and premeditated intentional murder while having previously been convicted of murder, could you consider either a sentence of life imprisonment without the possibility of release or the death penalty for that defendant?

☐ Yes        ☐ No

Please explain:  _____

_____

_____

---

75.   Based on your feelings and values, could life imprisonment without the possibility of release be a severe enough sentence for a prisoner, already serving a sentence for murder, who then intentionally kills a corrections officer with premeditation and malice?

☐ Yes        ☐ No

Please explain:  _____

_____

_____

---

*United States v. Jessie Con-Ui*, No. 3:13-cr-00123-ARC (M.D. Pa.) Aug. 18, 2016, ECF No. 911 (Juror Questionnaire).

---

93.   Mr. Millner is already serving a life sentence without release for a murder he committed before the death of Mr. Smith.  Would you be more inclined to give Mr. Millner the death penalty because he is already serving a life sentence for murder?

❏  Yes          ❏  No

Please explain:_____

_____

---

*United States v. John Travis Millner*, No. 7:13-cr-00015-ART (E.D. Ky.) June 11, 2015, ECF No. 140 (Juror Questionnaire).

72.   In general, what are your personal views on the death penalty for a defendant who is guilty of two willful, deliberate, malicious, and premeditated murders?

_I believe the family of the victims should be allowed to "flip the switch"._

*United States v. John McCluskey,* No. 1:10-cr-02734-JCH (D.N.M.) Oct. 2012 (Juror Questionnaire).

**Juror No.** _____

41A.   Are your beliefs about the death penalty such that you would never impose a sentence of life imprisonment without the possibility of release in a case <u>where there were many murder victims, one of whom was an unborn child, and the defendant had spent time in prison in the past for prior convictions of murder</u>?

☐ Yes        ☐ No

Please explain your beliefs: _____

*United States v. Alexis Candelario-Santana,* No. 3:09-cr-00427-JAF (D.P.R.) Dec. 28, 2012, ECF No. 737-2 (Juror Questionnaire).

115.   Are your views on the death penalty such that you would be unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant sought the murder of a federal prosecutor?

Yes _____          No _____

If <u>yes</u>, please explain:  _____

---

Case 1:05-cr-00060-NGG   Document 1054-1    Filed 02/07/11   Page 59 of 67

116.   Are your views on the death penalty such that you would be unable to consider a sentence of life without the possibility of release if the evidence at trial showed a defendant sought the murder of a cooperating witness?

Yes _____          No _____

If <u>yes</u>, please explain:  _____

---

73. The defendant is charged with illegal activity carried out as part of an enterprise called the "Bonanno organized crime family."  Is there anything about the nature of these charges that would interfere with your ability to decide this case based solely on the evidence related to the specific charges alleged in the Indictment and nothing more, meaning whether the government has proved the defendant to be guilty beyond a reasonable doubt?

Yes _____ No _____

*United States v. Vincent Basciano,* No. 1:05-CR-00060-NGG (E.D.N.Y.) Mar. 1, 2011, ECF No. 1054-1 (Juror Questionnaire).

---

**XII ALLEGATIONS & TRIAL PROCEDURES**

167. In this case Mr. Lecco is charged with several crimes including conspiracy to distribute cocaine, use of a firearm in furtherance of drug trafficking, murder with a firearm during and in relation to cocaine conspiracy, and witness tampering and retaliation by killing a witness. Would the nature of the charges – cocaine distribution, murder of someone assisting in a drug investigation – affect your ability to be a fair and impartial juror?
☐ Yes    ☒ No    ☐ Unsure                              Please explain.

---

Juror Initials: ███████

195. Would you always vote for a particular sentence (death, or life imprisonment without possibility of release) for someone convicted of murder committed in connection with drug trafficking?    ☐ Yes         ☐ No      ☒ Unsure

a. If Yes, which sentence would it be?

☐ Death        ☐ Life imprisonment without possibility of release

---

*United States v. Lecco,* 2:05-CR-00107 (S.D.W. Va.) Apr. 10, 2010 (Juror Questionnaire).

---

**The following summary of the charges is a condensed version of the description which the Court has already provided**

In this case Mr. Duong is charged with being the leader of a Racketeer Influenced and Corrupt Organization. As a part of that organization he is accused of personally murdering eight people and committing sixteen robberies during which he and other persons were armed with firearms. The firearms included assault rifles and handguns.

Some of these offenses are charged only as racketeering acts. Some are charged as crimes in this District. Four of the homicides occurred during robberies. Two of the robbery/homicide victims were security guards at jewelry stores that were robbed. One of the stores was in Las Vegas, Nevada, and was called Chong Hing Jewelers. The second was in Cupertino, California, and was a store named Jade Galore. Two other robbery/homicide victims were persons at the scenes of robberies. One of those robberies was of a grocery store in San Jose, named Thien Thanh. The other was of a computer business in Fremont, named Wintec Industries.

The four remaining homicides are charged as racketeering acts and occurred in a single incident at a nightclub in Los Angeles County called the International Club. Mr. Duong has been tried in California State Court for those four homicides. He was found guilty of three counts of first degree murder and one count of second degree murder for those four murders in California state court.

All of the crimes are alleged to have occurred between 1993 and 2001.

> **84.** **Do you believe that a person who committed eight intentional murders should automatically receive the death penalty?** ___ Yes    ___ No    ___ Not sure
>
> **If YES or NOT SURE, please explain:**

*United States v. Duong,* No. 01-CR-20154 (N.D. Cal.) Jan. 2010 (Juror Questionnaire).

> 93. The victim, whom the defendant is charged with murdering in this case, was killed while working as an undercover police officer and posing as an individual wishing to engage in a drug transaction.
>
> Would the fact that the victim was killed while working as an undercover police officer and posing as a drug dealer make it difficult for you to fairly and impartially evaluate all the evidence in this case?
>
> ___Yes    _X_No. If yes, please explain._____

*United States v. Lashaun Casey,* No. 3:05-cr-00277-ADC (D.P.R.) August 21, 2012 (Juror Questionnaire).

> 103. You may hear evidence during the course of the trial about money laundering of drug proceeds that involved purchasing expensive homes and real estate investment properties, lavish lifestyles, convoluted financial transactions, false tax returns, etc. Have you, or anyone you know, ever had any experiences related to money laundering?      Yes ____    No _X_
>
> (a)    If yes, please explain:
>
> _____
>
> _____
>
> Would the nature of these allegations in and of themselves, affect your ability to fairly judge this case?      Yes ____    No _X_
>
> (b)    If yes, please explain:
>
> _____

*United States v. Maurice Phillips*, No. 2:07-CR-00549-JCJ (E.D. Pa.) Nov. 2009 (Juror Questionnaire).

## IV.  The Need to Include Questions Addressing Aggravating and Mitigating Factors to Discover Potential Bias

The case law is clear that jurors may not make their life or death decision on the basis of the crime itself, no matter how horrific. The circumstances of the offense and the offender must be considered. *See, e.g., Penry v. Lynaugh*, 492 U.S. 302 (1989); *Shuman v. Sumner*, 483 U.S. 66 (1987); *Spaziano v. Florida*, 468 U.S. 447 (1984); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Bell v. Ohio*, 438 U.S. 637 (1978); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

Unfortunately, a growing body of social science research demonstrates that capital sentencing jurors often fail to understand or give any effect to the mitigating evidence offered by a convicted capital defendant. *See* Craig Haney, *Exoneration and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Death Penalty Cases*, 37 Golden Gate U. L. Rev. 131 (2006) ("Death-qualified jurors also weigh and evaluate penalty phase evidence differently. Specifically, they are more likely to endorse numerous aggravating factors while diminishing the significance of both statutory and non-statutory mitigation."); Susan Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. St. L.J. 769, 790 (2006) ("Nearly half of the CJP respondents admitted to deciding the proper punishment before they had heard a single piece of evidence on the issue of punishment. Of these, the overwhelming majority were 'absolutely convinced' and almost all of those remaining were 'pretty sure.'"); Brooke M. Butler & Gary Moran, *The Role of Death Qualification in Venirepersons' Evaluations of*

*Aggravating and Mitigating Circumstances in Capital Trials*, 26 Law & Hum. Behav. 175, 183 (2002) ("[D]efendants in capital trials are subjected to juries that are oriented toward accepting aggravating circumstances and rejecting mitigating circumstances."); John Blume, et. al, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra Law Rev. 1209, 1228 (2001)("[Capital Jury Project] data convincingly demonstrate that a substantial number of empaneled capital jurors are indeed 'mitigation-impaired.'"); Marla Sandys, *Cross-Overs – Capital Jurors Who Change Their Minds About the Punishment: A Litmus Test for Sentencing Guidelines*, 70 Ind. L. J. 1183, 1220-21 (1995) (same); Constanza & Constanza, *Jury Decision Making in the Capital Penalty Phase*, 16 L. & Hum. Behav. 185 (1992) (same).

The defense respectfully requests question 122 be included to learn about the prospective jurors' views on mitigation generally. Defense proposed question 126 is modeled after a similar question eliciting views on a variety of aggravating and mitigating issues present in the case. *See* the following examples.

**Examples from Recent Federal Capital Cases of Questions Addressing Types of Aggravation and Mitigation:**

77. Do you believe that the personal circumstances, childhood and background of a defendant is relevant and should be taken into account in making a decision on whether to impose a sentence of life imprisonment without the possibility of release or the death penalty?

    31                                          _____
                                                            Juror Last Name

    Case 3:13-cr-00123-ARC  Document 911-3  Filed 08/18/16  Page 32 of 42

                                                    ☐ Yes          ☐ No
    Why or why not? _____
    _____
    _____

78. In deciding whether to impose a sentence of death or life imprisonment without the possibility of release, how much importance would you attach to each of the following:

| | Not At all | A little | Some- what | Very important |
|---|---|---|---|---|
| (a) Even someone who kills can change for the better | 1 | 2 | 3 | 4 |
| (b) A defendant previously committed violent crimes | 1 | 2 | 3 | 4 |
| (c) A defendant's remorse | 1 | 2 | 3 | 4 |
| (d) The costs of keeping someone in prison for life | 1 | 2 | 3 | 4 |
| (e) The impact on family/friends who lost a loved one | 1 | 2 | 3 | 4 |
| (f) The defendant's difficult childhood | 1 | 2 | 3 | 4 |
| (g) Federal prisons can safely and securely incapacitate prisoners | 1 | 2 | 3 | 4 |

*United States v. Jessie Con-Ui*, No. 3:13-cr-00123-ARC (M.D. Pa.) Aug. 18, 2016, ECF No. 911 (Juror Questionnaire).

43. Have you, a family member, or anyone close to you ever become aware of a situation in which a pregnant woman was drinking substantial amounts of alcohol?

    YES _____   NO _____

    If YES, please tell us your relationship to this person and describe the situation:

    _____

    _____

44. Have you ever read, seen, or heard about, or otherwise have personal knowledge about, fetal alcohol syndrome or fetal alcohol effect?

    YES _____   NO _____

    If YES, please describe: _____

    _____

45. Have you, a family member, or anyone close to you, been diagnosed or treated for any mental health disorder or illness such as depression, dissociation, post-traumatic stress disorder, bipolar disorder, personality disorder, or any other mental health-related issue, including but not limited to treatment with medications?

    YES _____   NO _____

    If YES, please tell us who was diagnosed or treated, the diagnosis or treatment, and when and for how long the diagnosis or treatment took place.

    _____

    _____

25

46.   Have you, a family member or someone close to you had any type of brain or head injury, a TBI (traumatic brain injury), and/or concussion?

YES _____   NO _____

If YES, please explain the type of injury, the age of the person at the time of the injury, whether the injury was considered mild or severe, and any long-term effects:

_____

48.   Do you or a family member know anyone who has been tested, diagnosed or treated for

Juror # _____

Case 5:01-cr-00012-gwc   Document 1146   Filed 01/27/17   Page 16 of 36

16

any type of brain or cognitive impairment, intellectual or learning disability or any other similar deficit (for example, dyslexia, autism, senility, Alzheimer's)?

YES _____   NO _____

If YES, please explain: _____

_____

_____

50.   Do you believe the "abuse excuse" is used too frequently by people who have committed a violent offense in efforts to avoid responsibility for their criminal behavior?

YES _____   NO _____

If, YES, please explain: _____

_____

_____

80. (a) In what kinds of murder cases do you feel that the penalty of life imprisonment without the possibility of parole is appropriate?

_____

_____

(b) In what kinds of murder cases do you feel that the death penalty is appropriate?

_____

_____

81. What factors would be important to you in deciding whether a person who committed the type of offense described in question #80 (above) should be sentenced to life imprisonment without the possibility of release instead of the death penalty?

Please explain: _____

_____

_____

---

84. In deciding whether to impose a sentence of death or life imprisonment without the possibility of release for someone who murdered or participated in the murder of two innocent individuals before then killing a third innocent victim, how much importance would you attach to each of the following:

|  |  | Not at All | A Little | Somewhat | Very Important |
|---|---|---|---|---|---|
| (a) | The number of people killed | 1 | 2 | 3 | 4 |
| (b) | The offenses were committed in an especially heinous, cruel and depraved manner | 1 | 2 | 3 | 4 |
| (c) | The impact on family/friends who lost a loved one | 1 | 2 | 3 | 4 |
| (d) | A defendant planned and premeditated the killings | 1 | 2 | 3 | 4 |
| (e) | A victim was particularly vulnerable | 1 | 2 | 3 | 4 |
| (f) | A defendant committed other serious acts of violence | 1 | 2 | 3 | 4 |
| (g) | A defendant who kills is a danger to others even in prison | 1 | 2 | 3 | 4 |
| (h) | The death penalty is a deterrent | 1 | 2 | 3 | 4 |
| (i) | The costs of keeping someone in prison for life | 1 | 2 | 3 | 4 |

27

| (j) | If you intentionally take a life, you forfeit your life | 1 | 2 | 3 | 4 |
|-----|---------------------------------------------------------|---|---|---|---|
| (k) | Federal prison can safely and securely confine prisoners | 1 | 2 | 3 | 4 |
| (l) | A defendant's remorse | 1 | 2 | 3 | 4 |
| (m) | A defendant's mental disease or defect | 1 | 2 | 3 | 4 |
| (n) | A defendant's mild traumatic brain damage | 1 | 2 | 3 | 4 |
| (o) | Childhood head injuries | 1 | 2 | 3 | 4 |
| (p) | A defendant's dysfunctional family | 1 | 2 | 3 | 4 |
| (q) | The defendant's background and how he was raised | 1 | 2 | 3 | 4 |
| (r) | Even someone who kills can change for the better | 1 | 2 | 3 | 4 |
| (s) | A defendant had never killed anyone before | 1 | 2 | 3 | 4 |
| (t) | A defendant's emotional distress at the time of the murders | 1 | 2 | 3 | 4 |
| (u) | The defendant was sexually abused as a child | 1 | 2 | 3 | 4 |
| (v) | There are people who love the defendant | 1 | 2 | 3 | 4 |
| (w) | Another person, equally culpable in the offense, will not be sentenced to death | 1 | 2 | 3 | 4 |
| (x) | Mercy or the potential for redemption | 1 | 2 | 3 | 4 |

*United States v. Donald Fell*, No. 5:01-cr-00012-GWC (D. Vt.) Jan. 27, 2017, ECF No. 1146 (Juror Questionnaire).

| 136. | In deciding whether to impose a sentence of death or life imprisonment without the possibility of release, how much importance would you attach to each of the following: | Not at all | A little | Some-what | Very Important |
|---|---|---|---|---|---|
| (a) | Even someone who kills can change for the better | | | | |
| (b) | If you intentionally take a life, you forfeit your life | | | | |
| (c) | The killing occurred in prison | | | | |
| (d) | A defendant's remorse | | | | |
| (e) | A defendant's mental condition | | | | |
| (f) | The costs of keeping someone in prison for life | | | | |
| (g) | A victim's behavior | | | | |
| (h) | The impact on family/friends who lost a loved one | | | | |
| (i) | The defendant committed a prior murder | | | | |
| (j) | A defendant's difficult childhood | | | | |
| (k) | The defendant is gay | | | | |

*United States v. Gary Watland*, No. 1:11-cr-00038-JLK (D. Colo.) Nov. 8, 2013, ECF No. 1298 (Juror Questionnaire).

85. In deciding whether to impose a sentence of death or life imprisonment without the possibility of release, how much importance would you attach to each of the following:

| | Not At All | A Little | Some-what | Very Important |
|---|---|---|---|---|
| (a) The number of people killed | 1 | 2 | 3 | (4) |
| (b) The defendant was the actual killer | 1 | 2 | 3 | (4) |
| (c) The impact on family/friends who lost a loved one | 1 | 2 | 3 | (4) |
| (d) The defendant was an escapee | 1 | 2 | 3 | (4) |
| (e) A defendant has previously committed violent crimes | 1 | 2 | 3 | (4) |
| (f) The costs of keeping someone in prison for life | 1 | 2 | 3 | (4) |
| (g) If you intentionally take a life, you forfeit your life | 1 | 2 | 3 | (4) |
| (h) Others involved in the crime received sentences less than death | (1) | 2 | 3 | 4 |
| (i) Federal prison can safely and securely incapacitate the defendant | (1) | 2 | 3 | 4 |
| (j) A defendant's remorse | (1) | 2 | 3 | 4 |
| (k) A defendant's mental disease or defect | (1) | 2 | 3 | 4 |
| (l) A defendant's unstable childhood | (1) | 2 | 3 | 4 |
| (m) Even someone who kills can change for the better | (1) | 2 | 3 | 4 |
| (n) A defendant had never killed anyone before | (1) | 2 | 3 | 4 |
| (o) A defendant's emotional distress at the time of the murder | (1) | 2 | 3 | 4 |
| (p) The lack of certainty about what led up to the murder | (1) | 2 | 3 | 4 |

*United States v. John McCluskey,* No. 1:10-cr-02734-JCH (D.N.M.) Oct. 2012 (Juror Questionnaire).

72.  How important would each of the following factors be to you in making a decision between the death penalty and life in prison without the possibility of release? (Check one answer for each factor.)

| | Not at all important | A little important | Moderately important | Very important |
|---|---|---|---|---|
| a) A defendant given life without the possibility of release will remain in prison for the rest of his or her life. | | | | |
| b) Someone who kills another is always a danger to others, even in prison. | | | | |
| c) Even someone who kills can change for the better. | | | | |
| d) When you take a life through intentional murder, you forfeit your own life. | | | | |
| e) It is wrong to take a life, even as punishment. | | | | |
| f) The costs of keeping someone in prison | | | | |
| g) A defendant's specific role in the offense | | | | |

*United States v. Ahmen M. Salad, et al.*, No. 2:11-cr-00034-RBS (E.D. Va.) Apr. 15, 2013, ECF No. 606-1 (Juror Questionnaire).

| 126. | In deciding whether to impose a sentence of death or life imprisonment without the possibility of release, how much importance would you attach to each of the following: | Not At All | A Little | Some-what | Very Important |
|---|---|---|---|---|---|
| (a) | Even someone who kills can change for the better | ① | 2 | 3 | 4 |
| (b) | If you intentionally take a life, you forfeit your life | 1 | 2 | 3 | ④ |
| (c) | A defendant's remorse | ① | 2 | 3 | 4 |
| (d) | A defendant's unstable childhood | ① | 2 | 3 | 4 |
| (e) | A defendant's mental disease or defect | ① | 2 | 3 | 4 |
| (f) | The costs of keeping someone in prison for life | ① | 2 | 3 | 4 |
| (g) | The impact on family/friends who lost a loved one | 1 | 2 | 3 | ④ |
| (h) | Defendant on drugs when killing occurred | ① | 2 | 3 | 4 |

*United States v. Lujan,* No. 2:05-CR-00924-RB (D.N.M.) June 20, 2011, ECF No. 762-4 (Juror Questionnaire).

## IV.  Request to Include an Overview of the Process and Legal Principles that Apply to a Sentencing Trial and Follow Up Questions

Capital instructions typically use complex language, unfamiliar words, one-sentence definitions of terms, and many sentences with double negatives, all of which make the instructions difficult for jurors to understand. Luginbuhl & Howe, *Discretion in Capital Sentencing Instructions: Guided or Misguided?*, 70 Ind. L. J. 1161, 1169 (1995). Without a coherent guiding explanation, jurors fall back on their own knowledge, but have little appreciation of many of the concepts in a capital sentencing trial, especially mitigation.[6] *Id.*

---

[6]According to Professor Craig Haney,
> Some of this derives from the fact that we seem to have become a society that has, at this time in our history, a very difficult time conceptualizing and legitimizing compassion, mercy, charity, and understanding – all concepts that are intertwined with mitigation but

Many jurors believe that they must unanimously agree that a mitigating circumstance is present in the case before it can be considered. In fact, as Eisenberg and Wells report, over sixty percent of jurors in South Carolina capital cases labor under this significant misperception. Eisenberg & Wells, *Deadly Confusion: Juror Instructions in Capital Cases* 79 Corn. L. Rev. 1, 11[7]; *see also* Luginbuhl & Howe, 70 Ind. L. J. at 1167 (49% of jurors thought unanimity was required to give effect to mitigating circumstances). Many jurors also believe that mitigating circumstances must be established beyond a reasonable doubt. *See* Luginbuhl & Howe, 70 Ind. L. J. at 1167 (41% of jurors thought standard of proof for mitigating factors was 'beyond a reasonable doubt'); Eisenberg & Wells, 79 Corn. L. Rev. at 11 (almost half); Cornell Study (four of twenty-three thought standard was 'beyond a reasonable doubt'; seven thought standard was 'preponderance of the evidence'; four did not know).

Some prospective jurors – once they learn that jurors in a capital sentencing hearing evaluate the mitigating factors individually – indicate that they are not

---

which now have become terribly hard for our citizens to define, harder to assert, and virtually impossible to connect to something resembling a principled point of view. Craig Haney, *Symposium: The Capital Jury Project, Taking Capital Jury Seriously* 70 Ind. L.J 1223, 1227 (1995).

[7]Moreover, in a test conducted by the Cornell Death Penalty Project to study juror comprehension (hereinafter "Cornell Study"), the subject of greatest confusion was whether unanimity was required in considering mitigating evidence. In the study, conducted at Cornell Law School, twenty-three mock jurors were read a set of model South Carolina instructions for a capital sentencing jury. The jurors were then immediately given a questionnaire to assess their comprehension of the substance of the instructions. Even with the instructions having just been read to them, only five of the twenty-three jurors understood that they did not have to unanimously agree as to the existence of a mitigating circumstance in order to give it effect. Fifteen of the twenty-three jurors said they all had to agree, and three did not know. John H. Blume, Theodore Eisenberg & Stephen P. Garvey, *Lessons from the Capital Jury Project*, in Beyond Repair? Americ''s Death Penalty 144 (Stephen P. Garvey ed., 2002).

comfortable or not able to do this. The following is a transcript highlighting this phenomenon from a capital voir dire in a federal capital case from 2011.

[Defense counsel] These [pointing to a schematic chart identifying the aggravating factors side of the scale] have to be made unanimously, but if we get to this place (indicating), these are mitigating factors which are reasons that the defense present that support a life sentence for any one juror. So the law requires each juror to decide for him- or herself that's mitigating or it's not. Each one of you has to make that decision for yourself.

Can you do that?

A. I'm not really sure what "mitigating" means.

Q. It's anything that supports a life sentence for any juror. So it could be something like a person is a good influence over young people or young family members. It may mean nothing to you and you would then say, "It wasn't proven; that's not mitigating to me." Another juror could say, "I find that to be mitigating." But it's an individual decision if we get here.

Do you understand that?

A. It's an individual -- it's not a group, it's an individual?

Q. Exactly. It's like you're 12 judges evaluating the mitigating factors.

Can you do that?

A. I don't think so.

Q. Share that with me. How come?

A. I would believe that we're here as a jury. There's just 12 or 14 people here. It should be a group. It shouldn't be an individual. It should be a group because we are here as 12, not as 1.

. . . .

[The Court] And of course, when we think in terms of juries, we always think in terms of 12 people arriving at a decision through a deliberative process because that's what we've been exposed to. That's what we know. That's what is described on TV. That's what we know. But what Counsel is describing for you here is a slightly different process when you get down to this third level. The law says we're going to take a different approach to this and everybody individually looks at these mitigating factors, these things that would mitigate toward a life sentence rather than a death sentence. You have to look at them personally. You have to give them serious consideration. And the question is, can you do that? If that's the way the law works and if that's what the law requires of you at that point, could you do that?

34

JUROR: **No, I could not do it.**

*United States v. Larry Lujan* No. CR 05-924 RB (D. N.M.) (examination of Juror 290, June 21, 2011, at 38-42) (emphasis added) (See Exhibit 2).

As discussed above in the section addressing the propriety of including case-specific questions in the Juror Questionnaire, the Capital Jury Project has established that many jurors who have ended up on capital juries believe the death penalty is the only appropriate sentencing in many categories of homicide. The defense respectfully suggests that when opportunities arise to address these systemic failures that have resulted in jurors with these types of disqualifying views being seated, the Court should take advantage of these opportunities during the jury selection process. The Juror Questionnaire is an appropriate vehicle for providing an introduction and overview of these legal principles (e.g. the death penalty is never a mandatory sentence in a capital case) and then including questions inquiring if the prospective jurors can follow and abide by these principles.

The defense respectfully requests the Court include the introductory language in the section *Questions Concerning Punishment* in order to provide an overview of the process and principles that apply in a sentencing trial. The proposed language is modeled after similar language in recent federal Juror Questionnaires. See Exhibit 3, *Declaration Regarding Language Providing a Brief Overview of the Sentencing Hearing Process in Juror Questionnaires from Recent Federal Capital Cases.* The example below was used in *United States v. Ritz Williams* No. 4:08-cr-00070-YK (M.D. Pa.) (Judge Presiding: The Hon. Yvette Kane (Chief Judge), jury selection was scheduled to commence on April 16, 2013, and

prospective jurors filled out the juror questionnaires; however, the case was resolved by a negotiated life settlement on April 15, 2013; note that this questionnaire had been stipulated to by the parties and was filed as ECF No. 712 on January 9, 2013).

---

### PART V: QUESTIONS CONCERNING PUNISHMENT

If the jury determines that Ritz Williams is guilty beyond a reasonable doubt of the first degree murder of Alvin Allery, your jury service will not be over. The same jury must also decide, at a second sentencing trial, whether or not Mr. Williams will be sentenced to life imprisonment without the possibility of release or death. In the federal system there is no parole and if a defendant is sentenced to life imprisonment he will spend the rest of his life in prison and never be released.

The questions in this section are not meant to imply that Mr. Williams is guilty or that you will, in fact, be called upon to decide punishment in this case. In a case where jurors may have to consider lifetime incarceration and death as possible punishments, it is important that we know your opinions and feelings regarding punishment.

The decision whether to impose a sentence of life imprisonment without the possibility of release or to impose a sentence of death is one the law leaves entirely up to the jurors. Each juror must ultimately make a unique individual moral judgment about whether to sentence a defendant to life imprisonment without the possibility of release or death. The law never requires any member of the jury to vote for a sentence of death.

During a sentencing trial, if one is required, jurors consider certain evidence referred to in the law as "aggravating factors" and "mitigating circumstances." Aggravating factors are factors that could support a sentence of death. In order for an aggravating factor to be considered, all twelve jurors must agree that the factor has been proved by the government beyond a reasonable doubt. Jurors may not consider anything else as an aggravating factor.

Mitigating circumstances are circumstances about the crime, the defendant or anything else that would suggest, for any individual juror, that life imprisonment without the possibility of release, rather than the death, is the appropriate punishment. Mitigating circumstances do not excuse or justify the crime and the law does not require that there be a connection between the mitigating circumstances and the crime committed.

Unlike aggravating factors, the law does not require mitigating circumstances to be proved beyond a reasonable doubt or be found unanimously by all twelve jurors. Any single juror may find, and consider, any mitigating circumstance proved by a preponderance of the evidence. This is a lower standard of proof than required for aggravating factors. Furthermore, unlike aggravating factors, the jurors may also consider mitigating circumstances that have not been specifically presented to them by the court or parties.

After considering the aggravating factors unanimously found proven beyond a reasonable doubt and the mitigating circumstances found proven by a preponderance of the evidence by one or more jurors, the jurors then assign the significance each feels is appropriate to the aggravating factors and mitigating circumstances. Jurors then determine whether the aggravating factors so sufficiently outweigh the mitigating circumstances to justify the sentence of death, or, in the absence of any mitigating circumstance, whether the aggravating factors alone are sufficient to justify a sentence of death.

If, and only if, all twelve jurors unanimously find that death is the appropriate sentence for Mr. Williams, will a death sentence be imposed. On the other hand, if one or more jurors find that a sentence of life imprisonment without the possibility of release is the appropriate sentence for Mr. Williams, the judge will impose a sentence of life imprisonment without the possibility of release.

Please bear in mind that life imprisonment without the possibility of release is always an possible sentence in a capital case and the law never requires that a juror vote for a sentence of death. If even one juror concludes that life imprisonment without the possibility of release is appropriate for Mr. Williams, then the judge will impose a sentence of life imprisonment without the possibility of release. In other words, a decision to agree to disagree will result in the Court imposing a sentence of life imprisonment without the possibility of release.

The sentence imposed by the jury, whether a unanimous vote for life imprisonment without the possibility of release, a non-unanimous vote that results in a life imprisonment without release sentence, or a unanimous vote for death, is final. The judge must follow the jury's sentencing determination.

This is only an overview of the law about a juror's consideration of life imprisonment without the possibility of release and the death penalty. If this case requires a sentencing trial, the judge will instruct the jurors in greater detail about their duties.

With the above overview in mind, please answer the following questions completely and honestly, always remembering that there are no right or wrong answers.

77.     In general, what are your views on the death penalty?

_____

_____

_____

_____

78.     In general what are your views on the death penalty for a prisoner who intentionally kills another prisoner with premeditation and malice and without any legal excuse or justification (e.g., not insane, not acting under the heat of passion, etc.)?

_____

_____

The defense requested questions 132 – 134 and 154 – 159 address a number of these oft misunderstood principles – that the ultimate life or death sentencing decision is an individual moral judgment every juror makes; the law never requires a juror vote for a sentence of death; the different manner in which jurors evaluate and consider aggravating and mitigating factors; the result of a non-unanimous vote by the jurors on life or death – and will help the Court and parties identify those jurors who do not understand these principles or who indicate a concern or unwillingness to follow them. This is critical to ensuring the jurors who sit in judgement in this case will be able to

follow the Court's instructions and do not have a bias that interferes in their ability to follow these Constitutionally-mandated legal principles..

## V.  The Defense Requests an Introduction to the Case Including Information About the Indictment and an Introduction to the Case

The defense respectfully requests the Court include the defense requested language under the heading "The Indictment" and "Introduction to the Case" on page 3 of the MS Word file emailed to Chambers on Friday, December 7, 2018, *Combined Jury Questionnaire (Agreements of the Parties and Def. Proposed Supplement, combined).docx.*



The language addressing the Indictment tracks the government's allegations in this case and are the basis of the issue to be litigated in this trial. It is appropriate to advise the prospective jurors of the charges in order to set a context for accurately learning about potential bias and learning their views and feelings about these charges and this type of case. Including this information in the Juror Questionnaire will also make it more likely

jurors who have learned of some information about the case – having seen, heard, or read anything about the case – will have their memory of having learned this information prodded when they read the basic overview of the allegations in the case. This then facilitates the jurors sharing this information early in the process which allows the Court and parties to utilize court time most effectively by starting the voir dire by inquiring about this case knowledge.

It is common in federal capital cases to include this type of information in the Juror Questionnaire. (See Exhibit 4, *Examples of Introductions to the Juror Questionnaire and Case Overviews*)

**Examples from Recent Federal Capital Cases of "Introduction to the Case" Language:**

CASE SUMMARY

The charges contained in the Indictment stem from allegations that, on or about August 2, 2010, John McCluskey, an individual who had recently escaped from a prison in Arizona, and others carjacked at gunpoint and robbed Gary and Linda Haas, a couple from Tecumseh, Oklahoma, at a rest stop in eastern New Mexico. The indictment further alleges that Mr. McCluskey subsequently shot and killed the Haases in their camper trailer, burned the trailer with the Haases bodies inside, and took property from the Haases, including their pick-up truck.

*United States v. John McCluskey,* No. 1:10-cr-02734-JCH (D.N.M.) Oct. 2012 (Juror Questionnaire).

## INTRODUCTION TO CASE

On February 25, 2013, the accused, Jessie Con-Ui, was an inmate serving a federal sentence in the United States Penitentiary at the Canaan Federal Correctional Complex in Waymart, Pennsylvania. Mr. Con-Ui has been charged with intentionally and repeatedly stabbing and beating to death United States Corrections Officer Eric Williams, while he was engaged in the performance of his official duties at the penitentiary. Mr. Con-Ui is alleged to have acted intentionally without any excuse or justification. Mr. Con-Ui is charged with the offense of first degree murder, first degree murder of a corrections officer, and possession of contraband, that is a sharpened weapon. Mr. Con-Ui was born in the Republic of the Philippines and came to the United States when he was 9-years old. He is a United States citizen and grew up in upstate New York and Phoenix, Arizona.

The evidence in this case includes videotape from the February 25, 2013 incident showing the murder. Other evidence includes the autopsy report, physical evidence which was recovered from the scene, and DNA evidence. Jurors will also hear evidence that at the time of the killing, Mr. Con-Ui was serving time for a federal drug offense and that he also has a prior state conviction for murder. Mr. Con-Ui is now 40 years old.

Mr. Con-Ui has entered a plea of not guilty. He is presumed innocent of the crimes which have been charged. If the jury finds Mr. Con-Ui not guilty, or guilty of second degree murder or manslaughter, that is, not premeditated intentional murder, then the jury's service will be completed. If, however, the jury finds Jessie Con-Ui guilty of premeditated intentional murder, the jurors selected in the case will then return for a second "sentencing trial" in which they will hear additional evidence and argument, receive further legal instructions, and then determine whether Mr. Con-Ui shall be sentenced to life imprisonment without the possibility of release or be executed.

In the federal system the only possible sentences for someone convicted of first degree murder are life imprisonment without the possibility of release or death. Thus, the questionnaire includes questions about your views and feelings regarding life imprisonment without the possibility of release and the death penalty. The fact that the questionnaire contains questions about punishment does not mean the Court expects that the jury will find Mr. Con-Ui guilty or that the

---

Case 3:13-cr-00123-ARC   Document 911-3   Filed 08/18/16   Page 6 of 42

case will proceed to a sentencing trial.  However, we have to ask questions about your views on punishment in order to be prepared for all possible outcomes.

---

*United States v. Jessie Con-Ui*, No. 3:13-cr-00123-ARC (M.D. Pa.) Aug. 18, 2016, ECF No. 911 (Juror Questionnaire).

---

### THE INDICTMENT

The Defendant, Larry Lujan, is charged in an Indictment with Kidnapping Resulting in Death of Dana Joe Grauke II, and Aiding and Abetting, in violation of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 2. An Indictment is simply the document used to advise a defendant of the accusations against him.  The Indictment is not evidence.  Mr. Lujan has pleaded not guilty to the charge in the Indictment.  Mr. Lujan is presumed innocent of the charge. The government has the burden of proof under our system of law.  The prosecution must come forward with proof, beyond a reasonable doubt, that the defendant has committed the crime before the defendant can be found guilty.  Mr. Lujan has no obligation to produce any evidence, or to do anything else, at trial.  You must keep in mind that Mr. Lujan is presumed to be innocent of the charge against him.  This presumption stays with him unless each element of the charge has been proven by the government beyond a reasonable doubt.

### SUMMARY OF THE CASE

The charge contained in the Indictment stems from allegations that, on or about March 5, 2005, Larry Lujan, and others, kidnapped 16-year-old Dana Joe Grauke II, from his home in San Antonio, Texas; brought him to Chamberino, New Mexico; and Larry Lujan killed him because Larry Lujan believed that the victim owed him a drug debt.

---

*United States v. Lujan*, No. 2:05-CR-00924-RB (D.N.M.) June 20, 2011, ECF No. 762-4 (Juror Questionnaire).

<div style="border:1px solid black; padding:10px;">

**KNOWLEDGE AND OPINIONS ABOUT THE CASE**

The defendant, Timothy Dennis O'Reilly, has been charged with violations of federal law involving bank robbery, conspiracy, and the use of a firearm to commit murder during the course of a bank robbery. The government charges that in the early morning hours of December 14, 2001, the defendant and five other men armed with shotguns and pistols robbed armored truck guards who were loading money into ATM machines at the Dearborn Federal Credit Union near the Fairlane Mall. The government charges that during the course of the robbery, the defendant shot and killed Norman Anthony Stephens, one of the armored truck guards. The government is seeking the death penalty against the defendant for the count charging the murder of Norman Anthony Stephens with a firearm during and in relation to a bank robbery and for the count charging a bank robbery which resulted in the death of Norman Anthony Stephens.

The defendant also is charged with robbing armored truck guards who were filling ATM machines at a Comerica Bank in Detroit in June 2003.One of the truck guards was shot and wounded during that robbery. The defendant has pleaded not guilty to all charges.

If the defendant is convicted of an offense for which death is a possible penalty, the government alleges that his offense is aggravated by his conduct while incarcerated, specifically that he had conversations with other inmates during which he allegedly sought their assistance in killing witnesses.

63. Have you read, seen, or heard anything about this case or crime? ☐YES ☐NO ☐UNSURE

</div>

*United States v. Timothy O'Reilly,* No. 05-80025 (E.D. Mich.) May 11, 2010 (Juror Questionnaire).

<div style="border:1px solid black; padding:10px;">

**VI.    PUBLICITY AND CASE KNOWLEDGE**

The defendant in this case, George "Porgy" Lecco is charged with several crimes including conspiracy to distribute cocaine and the killing of Carla Collins, someone allegedly assisting the government in a Federal investigation. Carla Collins death is alleged to have occurred in Mingo County, WV on April 16, 2005. This case has received media coverage. There is nothing wrong with your having read or heard media coverage of the case, or to have participated in discussions or having overheard others discussing these events. However, the Court and the parties need to know what you have heard and your sources of information about these events, as well as your familiarity and connections with anyone connected to this case or the criminal investigation.

</div>

*United States v. Lecco,* 2:05-CR-00107 (S.D.W. Va.) Apr. 10, 2010 (Juror Questionnaire).

---

**TO THE PROSPECTIVE JUROR:**

    This case is a criminal prosecution. The indictment in this case charges that from approximately 1998 through 2007, Maurice Phillips, David Garica, Sherman Kemp and others conspired to distribute in excess of five kilograms of cocaine, in the Eastern District of Pennsylvania and elsewhere.

    Additionally, Mr. Phillips alone is charged with engaging in a continuing criminal enterprise in violation of the so-called drug kingpin statute, various money laundering offenses, conspiracy to use interstate commerce facilities in the commission of murder for hire, use of interstate commerce facilities to commit murder for hire, and witness-tampering murder. More specifically, the indictment charges that in connection with the charged drug conspiracy, Mr. Phillips and others were responsible for the June 25, 2002 shooting deaths of Chinéta Glanville and Dane King in Wyndmoor, Springfield Township, Montgomery County, Pennsylvania. As a result of the murder charges, Mr. Phillips faces the possible punishment of death.

---

*United States v. Maurice Phillips*, No. 2:07-CR-00549-JCJ (E.D. Pa.) Nov. 2009 (Juror Questionnaire).

## VI.    The Defense Requests Questions Addressing Prospective Jurors' Opinions About Sexual Assault and a Defendant's Failure to Testify at Trial

The defense respectfully request the Court include Questions 69 and 70, relating to potential jurors' opinions about sexual assault victims, because the government has alleged as one of its aggravating factors (R. 54, pg. 3) that Mr. Christensen committed other serious acts of violence including, at least, the following: in or about 2013, the defendant choked and sexually assaulted M.D., in the Central District of Illinois. The government, as of today's date, intends to introduce this evidence at trial. (R. 50) The defense contests this allegation. The questions posed in Paragraphs 69 and 70 are common in Juror Questionnaires in cases involving allegations of sexual assault. The credibility of an alleged sexual assault victim is highly relevant in this case where the defense challenges her veracity. This question elicits information relevant to evaluating

potential bias on this emotionally charged issue that is also an aggravating factor alleged by the government.

The defense further request the inclusion of Question 90 addressing the situation when a defendant chooses not to testify. Public opinion surveys have established that it is a very common sentiment that defendants who choose not to testify are guilty. "The apparently widespread belief that an innocent defendant would testify looms ominously over jury deliberations involving silent defendants." Bellin, Jeffrey. "The Silence Penalty." 103 Iowa L. Rev. 395 (2018) (available at https://ilr.law.uiowa.edu/print/volume-103-issue-2/the-silence-penalty/) This all too prevalent assumption by jurors constitutes a great risk of harm to a defendant who elects to exercise his right to remain silent. As such, counsel should be permitted to inquire regarding this issue.

## VII.   Conclusion

"Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S.719, 729 (1992); *see Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *Dennis v. United States*, 339 U.S. 162, 171-172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez*, 451 U.S. at 188. "Although the Constitution makes no mention of voir dire, the law recognizes the important role this process plays in ensuring the fair and impartial criminal jury mandated by the Sixth Amendment." *United States v. Quinones*,

511 F.3d 289, 299 (2d Cir. 2007). Adequate voir dire enables a capital defendant to exercise his constitutional right to an impartial jury by challenging prospective jurors for cause before a judge able to accurately rule on their removal. *See Morgan*, 504 U.S. at 729-730; *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). The questions recommended by the defense in this case comply with the Court's obligations under the Constitution and will ensure a fair jury selection process.

WHEREFORE, Defendant BRENDT A. CHRISTENSEN respectfully requests that this Court adopt the Combined Jury Questionnaire, incorporating both the agreements of the parties as well as those supplemental questions provided by the defense, in this cause.

Respectfully submitted,

/s/ Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:      309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org