E-FILED
Monday, 10 December, 2018  08:05:29 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-CR-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES OF AMERICA'S RESPONSE TO THE DEFENDANT'S MOTION FOR AN ORDER ESTABLISHING PROCEDURES PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 12.2**

NOW COMES the United States of America, by John C. Milhiser, United States Attorney for the Central District of Illinois, Eugene L. Miller and Bryan Freres, Assistant United States Attorneys, and Department of Justice Trial Attorney James B. Nelson, and hereby files this Response to the Defendant's "Motion for Order Establishing Procedures Pursuant to Fed. R. Crim. P. 12.2(c)." (R.162) (hereinafter "Def. Motion"). More specifically, the United States requests that the Court adopt the procedures outlined below because they will protect the defendant's constitutional rights, result in the fair disclosure of information, and will eliminate the inefficiencies regarding the retention and disclosure of experts that would result from the defendant's proposed procedures.[1]

---

[1] The procedures proposed by the United States mirror those that were proposed by the United States and adopted in *United States v. Watts*. Memorandum and Order, Case No. 14-cr-4063-JPG (S. D. Ill. Dec. 19, 2016) (D.E. 468).

## INTRODUCTION

The defendant has provided noticed under Rule 12.2(b)(2) of his intent to introduce expert evidence relating to a mental disease or defect bearing on the issue of punishment in a capital case. Therefore, the United States has moved this Court in a separate motion pursuant to Rule 12.2(c)(1)(B) to order the defendant to be examined under procedures ordered by the Court. Rule 12.2(c)(2) insulates a defendant from the prosecution team's acquisition and use during the guilt phase of any court-compelled statements in the capital sentencing proceeding. Rule 12.2 itself does not otherwise dictate how the United States' experts conduct their examinations. The underlying reason, however, for allowing the United States' experts to examine the defendant is to allow it to acquire proper rebuttal evidence.

To advance the goal of full and fair discovery of penalty phase mental health evidence, courts have adopted procedures for the appointment of "firewall" counsel to receive defense disclosures that may contain information subject to constitutional or other protections. The use of firewall counsel protects the defendant's rights while allowing the United States to fairly and timely respond to defense evidence. This comports with Rule 12.2's purpose of requiring pretrial notice so that mental condition examinations are conducted without unnecessarily delaying capital sentencing proceedings.

Therefore, the United States requests that the Court reject the defendant's proposed Rule 12.2 procedures that do not include the use of firewall counsel. Instead, and for the reasons set forth below, the United States requests that the Court issue an

order adopting the United States' proposed Rule 12.2 procedures, including the use of firewall counsel.

## RESPONSE

### A.      The Defendant's Notice Relates Only to the Penalty Phase and Not the Guilty Phase, Pursuant to Federal Rule of Criminal Procedure 12.2(a) and (b)(1)

The Scheduling Order (R.67), as amended by the Court on October 11, 2018, required the defendant to give notice of his intent to present evidence during either the guilt or penalty phases by December 3, 2018. On that date, the defendant gave notice of his intent to present mental health evidence during the penalty phase pursuant to Rule 12.2(b)(2). No such notice was given with regard to the guilt phase pursuant to Rule 12.2(a) and (b)(1). Therefore, the United States presumes that the defendant does not intend to introduce evidence of insanity or mental condition during the guilt phase and that any such expert evidence would be excluded from trial during the guilt phase pursuant to Rule 12.2(d)(1).

### B.      The Defendant's Requested Rule 12.2 Procedures Include Inefficient or Improper Requests

The defendant asks the Court to adopt thirteen "Requested Procedures" regarding the investigation and presentation of Rule 12.2(b)(2) evidence. Def. Motion, at 2-5.  While the United States does not object to all of the requested procedures, many of these procedures are either inefficient or improper and should not be followed. This section addresses those objectionable proposed procedures.

1. **The United States is under no obligation to identify and disclose its experts at this time, and the defendant has no right to challenge them prior to their examinations.**

The defendant requests that the Court require the United States to identify its experts, their qualifications, and the tests they will perform so that he may challenge them before they examine the defendant. Def. Motion, at 2.  The defendant's request is premature.

The defendant refused to identify his own experts, except by professional title. (R. 161), presumably to preserve a tactical advantage.  The United States is entitled to the same consideration; the parties' experts will be identified through the Rule 12.2(c) and Rule 16(b)(1)(C) procedures described below. The United States has not, as of today's date, contracted with particular experts given the defendant's delay in complying with the original scheduling order for its Rule 12.2 notice.

Additionally, the defendant has no right to challenge any experts retained by the United States at this time. To the extent that defense counsel challenges the United States' ultimate choice of experts, or their tests, manner of examination, or methodology of diagnosis, those matters should be addressed in a *Daubert* challenge, in a motion *in limine*, or during the cross-examination of the experts. *See United States v. Wilson*, 920 F. Supp. 2d 287, 290 (E.D.N.Y. 2012) (finding that objections by the defense to particular tests were only properly made after the examination); *see also id.* at 298 (holding that, because "psychiatric examination requires considerable freedom to the examiner" any perceived flaws in the examiner's choice of tests will  be addressed in cross examination or briefing to the court after the examination); *United States v. Hardy*,

644 F. Supp. 2d 749, 751 (E.D. La. 2008) (refusing to "restrict the scope of the examination" because the court was "not in a position to know what lines of inquiry are appropriate from the standpoint of the experts," and noting that the defense could later "object to the admission of any conclusions by the government expert that i[t] found to be based on improper lines of inquiry").

Fairness dictates that the defendant and the United States should learn the identity of each other's experts at the same time – when they exchange the experts' reports. This will provide each party the same amount of time to prepare a *Daubert* challenge, if one is justified, and to prepare to rebut each other's experts through cross-examination and direct testimony from the party's own experts.

## 2. The United States' experts should not be delayed from examining the defendant.

The purpose of Rule 12.2's obligations on the defense is to provide the United States sufficient time to prepare to respond to any mental health issues the defendant raises and avoid unnecessary delays during trial. *See* Fed. R. Crim. Pro. 12.2, advisory committee notes. As the Eleventh Circuit explained:

> Rule 12.2 serves both efficiency and fairness purposes in criminal trials. It implicates fairness because it alerts the Government to a defendant's intention to introduce expert mental-health evidence, thereby giving the Government a chance to prepare its own mental-health evidence in rebuttal. This, in turn, implicates efficiency in the courts because the preparation of mental-health evidence frequently requires the use of expensive and time-consuming experts. Early notice and reciprocity, then motivate the Rule 12.2 requirement.

*LeCroy v. United States*, 739 F.3d 1297, 1305 n.6 (11th Cir. 2014); *see also Wilson,* 493 F. Supp. 2d 348; *United States v. Johnson*, 383 F. Supp. 2d 1145 (N.D. Iowa 2005); *United*

*States v. Fell*, 372 F. Supp. 2d 753 (D. Vt. 2005); *Johnson*, 362 F. Supp. 2d 1043; *Sampson*,

335 F. Supp. 2d 166.

Once a defendant provides notice under Rule 12.2(b), Rule 12.2(c) permits the

court to order a defendant to submit to an examination by a United States expert.

Fed. R. Crim. P. 12.2(c); *United States v. Lewis*, 53 F.3d 29, 35 n.9 (4th Cir. 1995)

(finding no error in a district court's order compelling a United States mental health

examination in light of the defendant's 12.2(b) notice). Such an order directing the

defendant to submit to a mental health examination by the United States' retained

experts is necessary for the United States to be able to rebut any expert mental health

evidence offered by the defendant.

The United States has a compelling need to conduct its own examinations of

the defendant to further the truth-seeking function of trial through its review and

response to any mental health evidence the defendant chooses to present in any

penalty phase hearing. The Fourth Circuit has emphasized the value and importance

of medical examinations by United States experts:

> Not only to enable the government to carry its full load, but also to
> respect the inviolability of the human personality, the [mental]
> examination [of the defendant by government experts] here was
> indicated. . . . The government, to meet its burden of proof, would have
> access to only three kinds of proof: cross-examination of defendant's
> experts, lay testimony, and testimony of government experts
> predicated upon courtroom observations and hypothetical questions.
> *Medical science . . . deems these poor and unsatisfactory substitutes for
> testimony based upon prolonged and intimate interviews between the
> psychiatrist and the defendant.* Half-truths derived from these
> unsatisfactory substitutes do more to violate human personality than
> full disclosure, especially because there is always the possibility that
> the psychiatrist who examines for the government and thus has full

6

knowledge of a defendant, may corroborate his contention . . . .

*United States v. Albright*, 388 F.2d 719, 724-25 (4th Cir. 1968) (emphasis added) (internal

citations and quotations omitted), *cited in Beckford*, 962 F. Supp. at 758; *see also United*

*States v. Haworth*, 942 F. Supp. 1406, 1407-08 (D.N.M. 1996) (recognizing that "the

basic tool of psychiatric study remains the personal interview. . . [and] *[t]he*

*Government's expert cannot meaningfully address the defense expert's conclusions unless the*

*Government's expert is given similar access to the 'basic tool' of his or her area of expertise:*

*an independent review with and examination of the defendant*") (emphasis added).

Moreover, when a defendant places his own mental health at issue by filing a

Rule 12.2 notice, he waives the right to remain silent and creates the need for the

type of examination that is essential to the review and consideration of the

defendant's assertions. *See, e.g., United States v. Curtis*, 328 F.3d 141, 144-45 (4th Cir.

2003) ("When a defendant asserts a mental status defense and introduces

psychiatric testimony in support of that defense . . . he may be required to submit to

an evaluation conducted by the prosecution's own expert. That defendant has no

Fifth Amendment protection . . . [T]he defendant waives his right to remain silent . . .

by indicating that he intends to introduce psychiatric testimony.") (quoting *Savino v.*

*Murray*, 82 F.3d 593, 604 (4th Cir. 1996) and citing *Buchanan v. Kentucky*, 483 U.S. 402,

422-23 (1987)); *Beckford*, 962 F. Supp. at 763 ("if a defendant elects, with the advice of

counsel, to put his mental status into issue in the penalty phase, then he has waived

his right to refrain from self-incrimination arising from a mental health examination,

and there is no Fifth or Sixth Amendment concern").

7

To ensure compliance with Rule 12.2 and provide for fundamental fairness, judicial economy, and efficient proceedings, the United States respectfully requests that this Court issue an order directing the defendant to submit to a mental health examination by the United States' experts.

### 3. The defendant is not entitled to limit either the scope of the United States' examination of the defendant, or the tests that its experts will administer.

In his Requested Procedures Two, Three, and Four, the defendant contends that he is entitled to receive advance notice of the scope of the United States' expert's examination so that he may challenge those experts, the scope of their examination, and the tests they will administer. Def. Motion at 2-3, 6-9, 17-21. The weight of authority does not support the defendant's contention. The defendant has placed his mental health into question by asserting that he suffers from "a Schizophrenia Spectrum or Other Psychotic Disorder." Def. Notice (R. 161). Accordingly, the United States has the right to conduct appropriate testing, within current clinical standards, to determine whether the defendant actually suffers from that diagnosis. This necessarily includes testing to determine if another diagnosis is more clinically appropriate or whether the defendant suffers from no mental health malady at all.

The Supreme Court recently addressed this issue in *Kansas v. Cheever*, 134 S. Ct. 596, 598 (2013). There, the Supreme Court considered the question of whether "the Fifth Amendment prohibits the United States from introducing evidence from a court-ordered mental evaluation of a criminal defendant to rebut the defendant's presentation of expert testimony in support of a defense of voluntary intoxication." *Id.* The Court

held that it did not. In *Cheever*, the defendant was charged with capital murder. *Id*. Cheever gave notice pursuant to Rule 12.2(b)(1) that he intended to raise a defense of intoxication by methamphetamine, so the Court ordered Cheever to submit to an examination by the prosecution. *Id*. At trial, Cheever presented his expert testimony regarding intoxication, while the prosecution presented expert mental testimony in rebuttal. *Id*. at 600. Cheever was convicted, sentenced to death, and appealed.

In upholding the trial court's admission of the prosecution's expert testimony, the Supreme Court held:

> Where a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal. *Any other rule would undermine the adversarial process, allowing a defendant to provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state* at the time of the alleged crime.

*Id*. at 601 (quoting *Buchanan v. Kentucky*, 483 U.S. 402, 408 (1987)) (emphasis added).[2]

The Court further held that allowing expert testimony in rebuttal was not a Fifth Amendment violation, even though the Court had ordered the defendant to be examined, because "[w]hen a defendant presents evidence through a psychological

---

[2] The defendant cited *Cheever* and *Buchanan*. Def. Motion, at 6-7. Specifically, the defendant claims those cases support his assertion that the United States' experts may only test the defendant for a "limited rebuttal purpose." *Id*. While the defendant is correct that the words "limited rebuttal purpose" appear in the *Cheever* opinion, the Court did not hold, or even suggest, that the United States was limited in its testing of the defendant, and the Court certainly did not suggest that the defendant could prevent a government expert from performing a certain test or type of tests. Rather, the Court explained that "*admission of this rebuttal testimony harmonizes with the principle that when a defendant chooses to testify in a criminal case, the Fifth Amendment does not allow him to refuse to answer related questions on cross-examination.*" *Id*. at 601 (emphasis added). Thus, examinations as to the defendant's mental health - even examinations that go beyond the specific tests conducted in the defense examinations - are permissible for rebuttal.

expert who has examined him, the United States likewise is permitted to use the only effective means of challenging that evidence: testimony from an expert who has also examined him." *Id*. at 601 (citing *United States v. Byers*, 740 F.2d 1104, 1113 (D.C. Cir. 1984) (noting that rebuttal expert testimony is perhaps "'the most trustworthy means of attempting to meet' the burden of proof.")) Furthermore, "[a] full psychiatric examination requires considerable freedom to the examiner." *Wilson*, 920 F. Supp. 2d at 298 (internal quotation and citation omitted).

Likewise, the Eleventh Circuit has held that "the purpose of rebuttal testimony is to explain, repel, counteract, or disprove the evidence of the [a]dverse party and if the defendant opens the door to the line of testimony, he cannot successfully object to the prosecution accepting the challenge and attempting to rebut the proposition asserted." *United States v. Troya*, 733 F.3d 1125, 1138 (11th Cir. 2013) (quoting *United States v. Delk*, 586 F.2d 513, 516 (5th Cir. 1978)). In *Troya*, the defendants faced the death penalty for the gangland murders of two adult drug dealers and their two young children. *Troya*, 733 F.3d at 1129-30. Defendant Sanchez gave notice pursuant to Rule 12.2 that he would raise a mental status defense. *Id*. at 1138. At the United States' request, the Court required Sanchez to submit to an examination by its experts. *Id*. at 1139. The defense argued that the Court should limit the United States' expert to testing Sanchez's I.Q. because that was the only evidence that the defense intended to present in the penalty phase. *Id*. The Court held that the United States' rebuttal was not limited to the parallel I.Q. test and instead allowed full testing of Sanchez's mental health and mental status. *Id*. When the defense experts testified during the penalty phase, the United States'

experts were allowed to testify in rebuttal regarding their examinations and Sanchez's statements to them (which contradicted the testimony of the defense experts). *Id*. at 1139-40.

District courts have repeatedly applied this principle in permitting freedom to mental health experts in conducting examinations in federal death penalty cases. *See, e.g., Wilson*, 920 F. Supp. 2d at 298 (holding that because "psychiatric examination requires considerable freedom to the examiner" any perceived flaws in the examiner's choice of tests will be addressed in cross examination or briefing to the court after the examination); *Hardy*, 644 F. Supp. 2d 749, 751 (E.D. La. 2008) (refusing to "restrict the scope of the examination" because the court was "not in a position to know what lines of inquiry are appropriate from the standpoint of the experts," and noting that the defense could later "object to the admission of any conclusions by the United States expert that i[t] found to be based on improper lines of inquiry").

Ignoring this precedent, the defendant relies heavily on *United States v. Williams*, 731 F. Supp. 2d 1012, 1019 (D. Haw. 2010). <u>Def. Motion</u>, at 17-19. Importantly, *Williams* precedes *Cheever* and is in conflict with its interpretation of "limited rebuttal purpose." Thus, *Williams* is unpersuasive on this point. Further, *Williams* does not support the defendant's proposed limitation of the United States' rebuttal case – it merely holds that a defendant's assertion of a mental capacity defense does not "open the door" to a "fishing expedition" for any mental defect. 731 F. Supp. 2d at 1018-19. The United States does not intend, and has not proposed, to go on a fishing expedition for any possible

mental health diagnosis – only those that are relevant to whether the defendant actually suffers from the asserted diagnoses.

After months of considering his best strategic defense, the defendant has asserted that he suffers from a schizophrenic spectrum or other psychotic disorder. The United States has been provided with no evidence that the defendant suffers from such a disorder; it is under no obligation to either accept his representations or limit its experts to performing only those tests that he would prefer. The adversarial process demands that the United States have a full opportunity to examine the defendant in the most effective means possible - through a full psychological and/or psychiatric examination. *Cheever*, 134 S. Ct. at 601. Such examination must be sufficient for the United States' experts to either confirm or to "explain, repel, counteract, or disprove" any evidence submitted by the defendant with regard to his alleged "Schizophrenia Spectrum or Other Psychotic Disorder." *Troya*, 733 F.3d at 1138; *Delk*, 586 F.2d at 516.

The need for an extensive rebuttal examination is especially necessary here, where the defendant has alleged a broad and substantial mental health defect.  Def. Notice (R. 161) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, pp. 87-122 (5th ed. 2013) (hereinafter "DSM-5")). The defendant cites to 35 pages of DSM-5. These 35 pages include 12 separate disorders:

    a.  Delusional Disorder;[3]
    b.  Brief Psychotic Disorder;
    c.  Schizophreniform Disorder;
    d.  Schizophrenia;
    e.  Schizoaffective Disorder;
    f.  Substance/Medication-Induced Psychotic Disorder;
    g.  Psychotic Disorder Due to Another Medical condition;
    h.  Catatonia Associated With Another Mental Disorder
    i.  Catatonic Disorder Due to Another Medical Condition
    j.  Unspecified Catatonia
    k.  Other Specified Schizophrenia Spectrum and Other Psychotic Disorder
    l.  Unspecified Schizophrenia Spectrum and Other Psychotic Disorder.

DSM-5, at 87-122. Each of the above disorders has its own diagnostic features, which must be present to sustain a diagnosis. DSM-5, at 92, 94-95, 97-98, 100-01, 106-07, 112-13, 116, 120-21. Further compounding the need for an extensive examination, each of these disorders has multiple "differential diagnoses" – *i.e.,* a different disorder that could be diagnosed based on the same symptoms. DSM-5, at 93, 96, 98-99, 104-05, 109-10, 114-15, 118, 121

Not surprisingly, the differential diagnoses for most of the above-disorders include other disorders from this same section. *Id*. Many of the listed differential diagnoses, however, are completely unrelated to schizophrenic disorders. *Id.* For example:

    a.  Obsessive-Compulsive Disorder (*Id*. at 93, 104);
    b.  Body Dysmorphic Disorder (*Id*. at 104);
    c.  Delirium (*Id*. at 93);
    d.  Major Neurocognitive Disorder (*Id*. at 93);
    e.  Depressive and Bipolar Disorders (*Id*. at 93, 96, 109);
    f.  Major Depressive or Bipolar Disorder with Psychotic or Catatonic Features (*Id*. at 104);

---

[3] Delusional Disorder has multiple "subtypes," which must also be identified and differentiated. *Id.* at 91.

    g.  Substance-Related Disorders (*Id.* at 96, 114);
    h.  Substance Intoxication or Substance Withdrawal (*Id.* at 114);
    i.  Malingering and Facetious Disorders (*Id.* at 96);
    j.  Personality Disorders (*Id.* at 96, 104);
    k.  Posttraumatic Stress Disorder (*Id.* at 104);
    l.  Autism Spectrum Disorder (*Id.* at 105);
    m. Communication Disorders (*Id.* at 105);
    n.  Other Mental Disorders (*Id.* at 98, 105, 109);
    o.  Other Medical Conditions (*Id.* at 96, 98, 109).

Thus, to reliably diagnose the defendant, an examiner would need to conduct sufficient testing to establish that he was not suffering from one of the above-listed differential diagnoses in addition to, or instead of, a schizophrenia spectrum or psychotic disorder.[4]

By way of example, one of the disorders that the defendant asserts in his Notice is Brief Psychotic Disorder. (R.161); <u>DSM-5</u>, at 94. To diagnose someone with Brief Psychotic Disorder, the examiner must find that three diagnostic criteria are met:

    A.  Presence of one (or more) of the following symptoms. At least one of these must be (1), (2), or (3)
        (1) Delusions
        (2) Hallucinations
        (3) Disorganized speech (e.g. frequent derailment or incoherence).
        (4) Grossly disorganized or catatonic behavior.

    B.  Duration of an episode of the disturbance is at least 1 day but less than 1 month, with eventual full return to premorbid level of functioning.

    C.  The disturbance is not better explained by major depressive or bipolar disorder with psychotic features or another psychotic disorder such as schizophrenia or catatonia, and is not attributable to the psychological effects of substance (e.g., a drug of abuse, a medication) or another medical condition.

---

[4] Comorbidity, *i.e.*, the existence of multiple disorders at the same time, further compounds this issue. DSM-5 identifies whether the possibility of comorbidity exists for each disorder and identifies specific disorders that may be comorbid with each other. <u>DSM-5</u>, at 105, 110, 118. An accurate diagnosis must not only consider the possibility of differential and comorbid conditions.

<u>DSM-5</u>, at 94.  Once those criteria have been identified, the expert must specify whether the disorder is with, or without, marked stressors or catatonia. *Id*. The expert must also specify the severity of the symptoms. *Id*.

The DSM-5 goes on to describe the features that the expert would expect to find with Brief Psychotic Disorder, such as:

> The essential feature of brief psychotic disorder is a disturbance that involves the sudden onset of at least one of the following positive psychotic symptoms: delusions, hallucinations, disorganized speech (e.g. frequent derailment or incoherence), or grossly abnormal psychomotor behavior, including catatonia. . . In addition to the five symptom domain areas identified in the diagnostic criteria, *the assessment of cognition, depression, and mania symptom domains is vital for making critically important distinctions between the various schizophrenia spectrum and other psychotic disorders*. . . .
>
> Individuals with brief psychotic disorder typically experience emotional turmoil or overwhelming confusion.  They may have rapid shifts from one intense affect to another.  Although the disturbance is brief, the level of impairment may be severe, and supervision may be required to ensure that nutritional and hygienic needs are met and that the individual is protected from the consequences of poor judgement, cognitive impairment, or acting on the basis of delusions.

*Id*. at 94-95 (emphasis added).  As the DSM-5 recognizes, however, these symptoms and features would also support a number of other diagnoses. As such, to reliably diagnose Brief Psychotic Disorder, an expert must consider, and rule out, the following:

> **Other Medical Conditions**.  A variety of medical disorders can manifest with psychotic symptoms of short duration . . . .
>
> **Substance-related disorders**.  Substance/medication-induced psychotic disorder, substance-induced delirium, and substance intoxication are distinguished from brief psychotic disorder by the fact that a substance . . . is judged to be etiologically related to the psychotic symptoms . . . .
>
> **Depressive and bipolar disorders.**  *The diagnosis of brief psychotic disorder cannot be made if the psychotic symptoms are better explained by a mood episode* (i.e., the

psychotic symptoms occur exclusively during a full major depressive, manic, or mixed episode).

**Other psychotic disorders.**  [The other disorders contained within the section of DSM-5 cited by Defendant].

**Malingering and factitious disorders.**  *An episode of factitious disorder, with predominantly psychological signs and symptoms, may have the appearance of brief psychotic disorder, but in such cases there is evidence that the symptoms are intentionally produced.  When malingering involves apparently psychotic symptoms, there is usually evidence that the illness is being feigned for an understandable goal.*

**Personality disorders.**  In certain individuals with personality disorders,[5] psychosocial stressors may precipitate brief periods of psychotic symptoms. These symptoms are usually transient and do not warrant a separate diagnosis. If psychotic symptoms persist for at least 1 day, an *additional* diagnosis[6] of brief psychotic disorder may be appropriate.

*Id*. at 96 (emphasis added).  For their examination to be of any value, the United States' experts must be allowed to investigate the possibility of differential diagnoses.

The above is just one example from the 12 disorders that were identified as possible mitigation by the defendant.  Def. Notice (R.161); DSM-5, 87-122. To rebut the defendant's proffered mental health defense, the clinical standard requires the United

---

[5] There is an entire chapter of DSM-5 devoted to personality disorders which might form a differential diagnosis to Brief Psychotic Disorder.  DSM-5, at 645-84.  These include: Paranoid Personality Disorder; Schizoid Personality Disorder, Schizotypal Personality Disorder; Antisocial Personality Disorder; Borderline Personality Disorder; Histrionic Personality Disorder; Narcissistic Personality Disorder; Avoidant Personality Disorder; Dependent Personality Disorder; Obsessive-Compulsive Personality Disorder; Personality Change Due to Another Medical Condition; and Other Specified Personality Disorder and Unspecified Personality Disorder.  *Id*. at 645.  Given that any of these personality disorders might supplant the diagnosis to Brief Psychotic Disorder diagnosis, all personality disorders must be considered.  *Id*. at 96.

[6]  The use of the word "additional" is telling here, as it notes that personality disorders may be comorbid with Brief Psychotic Disorder, in addition to serving as a differential diagnosis.

States' experts to follow this same process of diagnosis and elimination for each of those 12 disorders. As is clear from consulting the DSM-5, the clinical standard for mental health diagnosis is far more nuanced than simply asking "does Defendant have this disorder, yes or no." Def. Motion, at 2-3, 17-20.

Rather, as the DSM-5 identifies, the clinical standard "is to allow multiple diagnoses to be assigned for those presentations that meet criteria for more than one DSM-5 disorder." DSM-5, at 21. The procedures identified by the defendant do not allow the United States, or the Court, to comply with the clinical standard. *Moore v. Texas*, 572 U.S. ___, ___, 137 S. Ct. 1039, 1048-53 (2017) (holding that the Court must apply prevailing clinical standards in ruling on mental health issues in death penalty cases). Accordingly, implementing the defendant's requested procedures regarding the United States' experts would violate the clinical standard and deny the United States a full opportunity to rebut the defendant's Rule 12.2 evidence. *Id*.; *Cheever*, 134 S. Ct. at 601; *Troya*, 733 F.3d at 1138; *Delk*, 586 F.2d at 516.

**4. Defense counsel is not entitled to be present while the United States' experts examine the defendant.**

The defendant incorrectly contends that the Sixth Amendment requires that his counsel be present during the testing. Def. Motion, at 3, 8. The caselaw says otherwise.

As then-Judge Scalia wrote more than thirty years ago, the argument that a defendant has a Sixth Amendment right to have counsel present during a psychiatric examination "has been squarely addressed and uniformly rejected. . . ." *Byers*, 740 F.2d at 1121-22. This long-held rule is, not surprisingly, applied regularly in federal death

17

penalty cases. *Wilson*, 920 F. Supp. 2d at 304-305 (rejecting capital defense counsel's request to be present for the Government's examination); *Beckford*, 962 F. Supp. at 763 ("if a defendant elects, with the advice of counsel, to put his mental status into issue in the penalty phase, then he has waived his right to refrain from self-incrimination arising from a mental health examination, and there is no Fifth or Sixth Amendment concern"); *Sampson*, 335 F. Supp. 2d at 247 (same) (collecting cases).  Not only is there no Sixth Amendment requirement that counsel be present, but the presence of defense counsel would violate the clinical standard and irreparably disrupt the examination: "Even if counsel were uncharacteristically to sit silent and interpose no procedural objections or suggestions, one can scarcely imagine a successful psychiatric examination in which the subject's eyes move back and forth between the doctor and his attorney." *Byers*, 740 F.2d at 1120; *see also Sampson*, 335 F. Supp. 2d at 248 (noting that there is "potential harm to [a] test's reliability if a defense representative were to attend.")

It is black-letter law that the Sixth Amendment does not apply to court-ordered psychiatric examinations, regardless of whether it is a capital case. Furthermore, defense counsel's presence would chill the evaluation and rob it of its value --- allowing the defendant to "provide the jury, through an expert operating as proxy, with a one-sided and potentially inaccurate view of his mental state . . . ." in violation of Supreme Court precedent. *Cheever*, 134 S. Ct. at 601; *Buchanan*, 483 U.S. at 408. Accordingly, defense counsel should be precluded from attending the defendant's examination by the United States' experts.

18

5.   **The Court should appoint firewall counsel to avoid the unnecessary delay that would accompany holding all 12.2 evidence under seal until a guilty verdict is returned.**

The defendant further contends that all Rule 12.2 evidence should be held under seal by the Court until the close of the guilt phase. Def. Motion, at 4-5, 11-14.  The procedure outlined by the defendant will force the United States to choose between requesting an otherwise avoidable delay between the guilt and penalty phases or proceeding to the penalty phase with insufficient time to prepare a rebuttal to the defendant's Rule 12.2 evidence. Neither option is appropriate or necessary.

Rather, to avoid implicating the defendant's Fifth Amendment right against self-incrimination and to comply with the prohibition of early disclosure of the results and reports of the defendant's mental condition examinations, the United States requests the Court to approve firewall counsel to be named by the United States—similar to the process adopted by the courts in *Johnson*, 362 F. Supp. 2d at 1082–84, *Sampson*, 335 F. Supp. 2d at 243–45, and *Watts*, Case No. 14-cr-4063-JPG (S. D. Ill., Dec. 19, 2016) (D.E. 468). The United States will designate as firewall counsel an experienced federal prosecutor who is not assigned to either the United States Attorney's Office for the Central District of Illinois or the Department of Justice's Capital Case Section.

Rule 12.2(c)(2) prohibits the disclosure of the "results and reports" to any attorney for the United States unless the defendant is found guilty and confirms an intent to offer expert mental condition evidence. This framework assures that a defendant is insulated against the United States' acquisition and use in the guilt phase of court-compelled statements for the sentencing proceeding. *Williams*, 731 F. Supp. 2d

at 1026. Rule 12.2's construct, however, "does not resolve how, as a practical matter, the United States experts are to conduct their mental condition examinations while adhering to the prohibition against early disclosure to the prosecutors of the 'results and reports' of those examinations." *Sampson*, 335 F. Supp. 2d at 244.

Foreseeable issues can arise during the examination of a defendant—such as a defendant's lack of cooperation or a need to administer additional testing—that will require guidance from an attorney for the United States. This communication, however, could risk that the premature revelations of the expert's results in violation of Rule 12.2(c)(1)(B). "Rule12.2's goal of avoiding delays in capital sentencing proceedings would not be served if any problems with the United States testing were not revealed until after the guilt phase." *Id*. at 245.

The *Sampson* court found that the reasonable interpretation of "any attorney for the United States" in Rule 12.2(c)(2) includes those United States attorneys in a particular prosecution except those representing the United States' interests "solely in connection with its experts' testing." *Id*. To avoid premature disclosure of the "results and reports" to the prosecution team, the *Sampson* court directed that firewall counsel would handle the United States' interests in the examination of the defendant. *Id*. The court held that firewall counsel could not be a member of the prosecution team and was not allowed to join the prosecution team until after the penalty phase began. *Id*.

The purpose of appointing a firewalled prosecutor is to avoid derivative use issues regarding the mental condition examination intended for sentencing. In addition, it provides a procedure by which the United States' experts can conduct their

examinations immediately while adhering to the prohibition on early disclosure of their results and reports to the prosecution trial team. Moreover, disputes that may arise prior to and during the examinations that require communication with the United States' experts can be handled by firewall counsel to protect the defendant's Fifth Amendment rights. Other courts have used the appointment of firewalled counsel to ensure adherence to the early disclosure prohibition of Rule 12.2(c)(2) and to facilitate the pre-trial examination of defendants to avoid delaying the capital sentencing proceeding. *See Johnson*, 362 F. Supp. at 1088–93; *United States v. Umana*, 2009 WL 2489309 (W.D.N.C. August 12, 2009); *Wilson*, 493 F. Supp. 2d at 353–57; *United States v. Lujan*, 530 F. Supp. 2d 1224, 1240 (D.N.M. 2008).

6. **Once the Court approves firewall counsel, it should order the defendant to produce certain discovery to firewall counsel.**

The approval of firewall counsel eliminates any concern about premature discovery to the prosecution team of information that is only relevant to the defendant's Rule 12.2 defense during the penalty phase. As such, firewall counsel should be permitted immediate discovery of the following information once appointed.

a. *Evidence that the defendant intends to introduce in support of his mental health claim.*

The filing of a notice of intent to present expert evidence regarding the defendant's mental condition pursuant to Rule 12.2(b) triggers a discovery obligation to provide the United States with a written summary of the testimony that it intends to offer, which includes the expert witness's "opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C)(ii). Providing

meaningful discovery in advance of trial is crucial to the United States' ability to

adequately identify, investigate, and, where appropriate, rebut the defendant's claims

regarding his mental condition. *See Cheever*, 134 S. Ct. at 601.

Pursuant to Fed. R. Crim. P. 16(b)(1)(C)(ii), the United States requests an order

that discovery be provided to firewall counsel as soon as it is available to facilitate the

United States' mental examination of the defendant. Rule 16(b)(1)(C) addresses a

defendant's disclosure obligations with respect to expert witnesses:

> The defendant must, at the government's request, give to the government a
> written summary of any testimony that the defendant intends to use under
> Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial,
> if—. . .

> (ii) the defendant has given notice under Rule 12(b) of an intent to present
> expert testimony on the defendant's mental condition.

Rule 16 applies to the penalty phase of a death penalty trial. *See United States v. Lorenzo-*

*Catalan*, 376 F. Supp. 2d 108, 113–14 (D.P.R. 2005); *Wilson*, 493 F. Supp. 2d at 354–57; *see*

*also Beckford,* 962 F. Supp. at 754–57 (pre-2002 Rule 12.2 amendment ordering penalty

phase mental health evidence disclosure because "the authority to impose notice and

reciprocal discovery is an inherent judicial power which need not be grounded in a

specific statute or rule"). The *Lorenzo-Catalan* court found that the goals served by Rule

16 disclosure—fair and efficient administration of justice and avoiding surprise—

applied equally to ensuring an informed sentencing determination. 376 F. Supp. 2d at

114. The court further stated:

> It is no less imperative that the facts affecting a sentencing determination
> be as trustworthy as those informing a guilty verdict, and it is beyond
> dispute that the adequate preparation eased by early disclosure will

contribute to the truth-seeking process, resulting in a more reliable sentencing determination.

*Id.*

Timely disclosure of the defense experts' results and reports to firewall counsel will vindicate the United States' right to acquire appropriate rebuttal evidence. To protect the defendant's Fifth Amendment rights, firewall counsel, not the prosecution team, will be able to provide the United States' experts with the necessary information to appropriately examine the defendant. This early disclosure also comports with Rule 12.2's stated goal of avoiding unnecessarily delays in capital sentencing proceedings. Any communication between the prosecution team and firewall counsel shall cease when firewall counsel receives the defendant's required Rule 16 disclosures. The prosecution team and firewall counsel can resume communication only if the defendant is found guilty of a capital eligible offense and he reaffirms his intent to introduce expert mental condition evidence in the sentencing proceeding.

> b. *Identities and/or records of anyone that defense counsel retained to examine the defendant's mental health.*

It is possible that the defendant was examined by potential defense expert witnesses whose opinion as to his mental health was contradictory to his current claim. The United States is entitled to discovery of the names of all such examiners, as well as any reports or records authored by them. *Pawlyk v. Wood*, 248 F.3d 815, 821-28 (9th Cir. 2001), *cert. denied* 534 U.S. 1085 (2002).

William Pawlyk stabbed two people to death in the state of Washington, for which he was charged with first degree murder and faced the possibility of the death

penalty.[7]  *Id*. at 820.  Pawlyk raised an insanity defense at trial and, in preparation for

that defense, he was examined by two potential expert witnesses. *Id*. : Drs. Harris and

Tanay.  *Id*.  Dr. Harris concluded Pawlyk was not legally insane at the time of the

murders.  Dr. Taney concluded that he was.  *Id*.  Pawlyk's counsel only relied on Dr.

Tanay at trial – Dr. Harris was not listed as a witness, and his report was ignored by Dr.

Tanay.  *Id*.  In response to Dr. Tanay's testimony, the Court granted the state's request

(over objection) for an order identifying anyone other than Dr. Tanay who had

examined Pawlyk and/or written a report.  *Id*.  The trial court also allowed the State

(over objection) to subpoena Dr. Harris to testify in rebuttal.  *Id*.  The jury rejected

Pawlyk's insanity defense, convicted him of both murders, and he was sentenced to life

in prison.  *Id*.

 The case reached the Ninth Circuit on Pawlyk's *habeas* petition.  That court noted

that "[a]criminal defendant's constitutional right to the assistance of a psychiatrist arises

from the concept of due process, and is founded upon the principle that due process

guarantees fundamental fairness." *Id*. at 822 (citing *Ake v. Oklahoma*, 470 U.S. 68, 76, 87 n.

13 (1985)). The Ninth Circuit further pointed out, however, that a defendant's due

process right to a neutral psychiatrist does not entitle the defendant to determine the

scope of the psychiatrist's duties or to withhold the psychiatrists report from the court

and the prosecution. This is true because a court-appointed expert is "required to

disclose his evaluation to the court sitting as fact-finder." *Id*. at 824 (citing *Tuggle v.*

---

[7] Ultimately, the prosecutor declined to seek to death penalty.  248 F.3d at 820.

*Netherland*, 516 U.S. 10, 12 (1995); *Smith v. McCormick*, 914 F.2d 1153, 1159 (9th Cir.

1990)). Thus, the Ninth Circuit held that there was no Due Process violation in

compelling the defendant to provide this information to the prosecution.

The Ninth Circuit also dispatched Pawlyk's claims that the compelled disclosure

violated the right against self-incrimination.  The court reaffirmed that "a defendant

who asserts a mental status defense lacks a Fifth Amendment right to remain silent

regarding the mental status that he has placed at issue." *Id*. at 825 (citing *Buchanan*, 483

U.S. at 422–23; *Estelle v. Smith*, 451 U.S. 454, 465 (1981)). Accordingly, "'if a defendant

requests [a mental health] evaluation or presents psychiatric evidence, then, at the very

least, the prosecution may rebut this presentation with evidence from the reports of the

examination that the defendant requested.'" *Id*. (quoting *Buchanan*, 483 U.S. at 422–23).

Likewise, the Court rejected Pawlyk's Sixth Amendment argument, noting that

"when counsel requests a psychiatric examination it can be assumed . . . that defense

counsel consulted with petitioner about the nature of this examination[,]" and noting

further that "both *Estelle* and *Buchanan* certainly placed counsel on notice that the

evaluation could be used by prosecution in rebuttal to a mental status defense." *Id*.

(internal quotation and citation omitted).

Based on the reasoning of *Pawlyk*, the United States has a right to discovery of

the identity of any mental health expert who has examined the defendant, regardless of

whether they are included within the Notice filed on December 3, 2018.  (R. 161). The

defense is not entitled to suppress relevant psychiatric evidence any more than the

United States could, revealing only favorable experts and opinions and preventing the

jury from learning about the rest. *Id*. at 824-25. Accordingly, the United States requests that the Court require the defendant to provide to firewall counsel with the identity of any such "non-testifying" experts, as well as a copy of any and all reports, notes, or substantive correspondence regarding their examination of the defendant.

> c.   *All records related to mental health examination or treatment that the defendant received at the University of Wisconsin, University of Illinois, or since he has been incarcerated.*

The United States is aware that the defendant may have received mental health counseling and treatment while he was student at the University of Wisconsin and at the University of Illinois. The United States is also aware that the defendant may have received mental health counseling while he was incarcerated at the Macon County jail in connection with this case.

By raising a mental health claim pursuant to Rule 12.2(b)(2), defendant has waived any privileges he might have with regard to any record of the above mental health records. Accordingly, the United States respectfully requests that the Court find that the defendant has waived his privilege so that firewall counsel can subpoena those records. To the extent that defense counsel is already in possession of those records, the United States would request that the Court require the defense to disclose them to firewall counsel pursuant to Rule 16(b)(1)(C).

**C.**   **The United States' Proposed Procedures.**

The United States hereby requests that this Court issue an Order adopting the following procedures and timelines:

1. The United States will file its Motion to Examine the defendant contemporaneous with this Response (*i.e.*, on December 10, 2018);

2. The United States will name firewall counsel, with notice to the Court and the defendant, not later than December 24, 2018;

3. The defendant will provide disclosure of all of the following material not later than January 7, 2019:

   a. The identity of testifying experts alluded to in his Notice (R. 161), as well as all of those experts' results and reports (including raw data), notes, and any documents and records relied upon by his experts;

   b. The identity of any experts that examined the defendant but are not alluded to in his Notice (R. 161), as well as all of those experts' results and reports (including raw data), notes, and any documents and records relied upon by his experts;

   c. Any and all mental health records in Defendant's possession from the University of Wisconsin, University of Illinois, Macon County Jail (or its contracting providers), or any other source.

4. The United States trial and firewall counsel may not communicate regarding the defendant's mental health defense from the time firewall counsel receives the defendant's expert mental condition reports and evidence until the defendant is found guilty of a capital eligible offense and has reaffirmed his intent to introduce expert mental condition evidence in the sentencing proceeding.

The United States further requests that the Court issue a separate order declaring that the defendant, by raising a mental health defense pursuant to Rule 12.2(b)(2) has waived all legal privileges with regard to the records of anyone who has ever examined his mental health for any reason, and that the United States may subpoena the defendant's mental health records from any source for consideration in their rebuttal of the defendant's mental health claim.

Respectfully submitted,

JOHN C. MILHISER
UNITED STATES ATTORNEY

*/s/Eugene L. Miller*
Eugene L. Miller
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217/373-5891
eugene.miller@usdoj.gov

*/s/ James B. Nelson*
James B. Nelson
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F. Street NW, Room 625
Washington, DC  20004
Phone: 202/598-2972
james.nelson@usdoj.gov

*/s/Bryan D. Freres*
Bryan D. Freres, Bar No. IL 6294791
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217/373-5891
bryan.freres@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2018, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to counsel of record.

*/s/ James B. Nelson*
James B. Nelson, Bar No. NV 9134
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F. Street NW, Room 625
Washington, DC  20004
Tel: (202) 598-2872
james.nelson@usdoj.gov