E-FILED
Friday, 04 January, 2019  05:26:22 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN | ) | |
| | ) | |
| Defendant. | ) | |

REPLY TO RESPONSE TO MOTION FOR ORDER ESTABLISHING
PROCEDURES PURSUANT TO FED. R. CRIM. P. 12.2(c)
AND MEMORANDUM OF LAW IN SUPPORT

NOW COMES the Defendant, BRENDT A. CHRISTENSEN, by and through his

attorneys, and for his Reply to the government's Response to his Motion for Order

Establishing Procedures Pursuant to Fed. R. Crim. P. 12.2(c), states as follows:

**I.      The Government's Requested Procedures are Significantly Different than
         Those Adopted in *United States v. Watts*.**

Contrary to the government's statement in its Response, (R. 180 at 1 n.1), the

procedures that the government asks the Court to impose in this case do not mirror the

procedures that the district court ordered in *United States v. Watts*, No. 14-cr-40063-JPG

(S.D. Il. December 19, 2016) ("*Watts II*"). That court did order the appointment of

firewall counsel over objection by the defense, as the government asks this Court to do,

but that is essentially where the similarities end. Here, the government asks the Court to

order the defense to disclose, inter alia, the defense experts' "results and reports

1

(including raw data), notes and any documents and records relied upon by" those experts, before the government's expert even conducts an evaluation of Mr. Christensen. (R. 180 at 27.) In *Watts II*, the court imposed no such requirement.

The *Watts II* court also denied a request from the government, like the one made here, (R. 180 at 27), for disclosure of the defense experts' results and reports months in advance of trial, suggesting that 21 days before trial would be reasonable. *Watts II* at 9. And the opinion says nothing regarding the permissible scope of the government's rebuttal evaluation, or about the advance disclosure of the identity and qualifications of the government expert, the referral question provided to him or her and the tests he or she proposes to administer, because the defense did not ask for rulings on those issues. *See United States v. Watts*, No. 14-cr-40063-JPG ECF No. 459 (S.D. Il.).

We can gain insight into what the court would have decided regarding those latter issues if it had been asked by looking at its earlier rulings with respect to the government's rebuttal examination on the defendant's intellectual disability or *Atkins* claim. *See United States v. Watts*, No. 14-cr-40063-JPG (S.D. Il. June 28, 2016) ("*Watts I*"). In that opinion, the court allowed the government to conduct a rebuttal examination, but in so doing it specifically invoked the requirement under the Supreme Court's opinions in *Buchanan v. Kentucky*, 483 U.S. 402 (1987) and *Kansas v. Cheever*, 134 S. Ct. 496 (2013), that the government be allowed to use the evaluation only for the "limited rebuttal purpose" of countering the defendant's intellectual disability evidence. *Watts I* at 1. The court also cited *Powell v. Texas*, 492 U.S. 680, 685-86 (1989) (per curiam), for the

proposition that a "defendant does not 'open the door' to admission of mental health evidence on all mental health issues by placing limited issues in question." *Watts I,* at 1-2. And it restated the holding of *Estelle v. Smith*, 451 U.S. 454, 470-71 (1981), that "[a] defendant's Sixth Amendment right to counsel is violated when his counsel is not given advance notice of the scope, nature and purposes for which a mental health examination is performed such that counsel can advise the defendant in making the decision whether to submit to the examination." *Watts I*, at 2.

In accordance with these principles the court explicitly ordered that the government's evaluation: be "for the sole purpose of determining whether [the defendant] is intellectually disabled as that condition is understood in *Atkins"* and other relevant authority; "be limited to testing and inquiries relevant to that determination;" and "shall not include administration of the MMPI in any form" unless the court is supplied with an affidavit from the government's expert explaining its relevance to the intellectual disability inquiry. *Id.* at 2-3. The opinion is thus very much in line with the procedures requested by Mr. Christensen in his Motion.

## II.    The Court May Not Appoint Firewall Counsel to Circumvent the Requirements of Fed. R. Crim. P. 12.2 over Mr. Christensen's Objection.

While relying heavily on Rule 12.2 in some parts of its Response, (R. 180 at 5-6, 8), the government then asks the Court to disregard its requirements regarding the timing of the defense disclosures and to appoint firewall counsel for the purpose of allowing it to receive the defense mental health evidence months before it is entitled to under the Rule, *id.* at 19-21. In support of its position, the government cites a single case

3

in which a district court has appointed firewall counsel over defense objection, namely *Watts II*, as noted above.[1]

In contrast, there are at least four cases in which courts have refused the government's request for firewall counsel where the defense has declined to waive the requirements of Rule 12.2. *See United States v. Roof*, No. 15-472 (D.S.C. July 19, 2016) ("Because Defendant has not agreed to waive the sealing requirements of Rule 12.2(c)(2), the Court will not authorize the appointment of firewall counsel to receive the results of mental health examinations conducted pursuant to Rule 12.2 before trial."); *United States v. Ciancia*, No. 13-cr-00902 (C.D. Cal. May 13, 2015) (denying government request for firewall counsel where defendant objects to procedure); *United States v. Richardson*, No. 08-CR-0139 (N.D. Ga. July 12, 2010) (same); *United States v. O'Reilly*, No. 05-80025, (E.D. Mich. February 19, 2010) (vacating order appointing firewall counsel where defendant withdrew his earlier motion for the appointment and requested alternative procedure).

The majority position is the correct one, because district courts are not free to simply ignore the requirements of Rule 12.2 as the government urges this Court to do. The Federal Rules of Criminal Procedure are promulgated by the United States

---

[1] Somewhat ironically, the court in *Watts II* based its decision to appoint firewall counsel of the defendant's objection almost entirely upon the opinion of the district court in *United States v. Wilson*, 493 F. Supp. 2d 348 (E.D.N.Y. 2006). *See Watts II*, at 5-7. But *Wilson* was a case in which the defendant consented to the use of firewall counsel. *Id.* at 357-58 ("Both sides are in agreement that a firewalled AUSA must be appointed in this case to oversee the Government's mental condition mitigation rebuttal case in the time before the penalty phase begins.").

4

Supreme Court and approved by Congress pursuant to the Rules Enabling Act, 28

U.S.C. § 2072. Rule 1 of the Rules themselves plainly states that "[t]hese Rules govern

the procedure in all criminal proceedings." Addressing Fed. R. Crim. P. 52, the Supreme

Court held in *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), that the rule is "in

every pertinent respect, as binding as any statute duly enacted by Congress, and federal

courts have no more discretion to disregard the Rule's mandate than they do to

disregard constitutional or statutory provisions. *See also United States v. Whitted*, 454

F.2d 642 (8th Cir. 1972) (holding that "[t]he Federal Rules of Criminal Procedure set

forth the procedures to be followed by the District Court in conducting criminal trials.

They have the force and effect of law and are binding on the lower federal courts.").

As is clear from his Motion, Mr. Christensen declines to waive the requirements

of Rule 12.2(c)(2). The Court is therefore required to deny the government's request for

the appointment of firewall counsel.

### III.   The Government Should be Required to Disclose the Identity of its Expert, His or Her Qualifications, the Referral Question Posed and Any Tests that the Expert Proposes to Administer Prior to Conducting its Rebuttal Evaluation.

At the hearing on December 14, 2018, the government appeared to concede that

Mr. Christensen's request for prior notice of the scope of its proposed rebuttal exam

should be granted. (12/14/18 Tr. at 106) ("I suppose that's fine, Your Honor."). In its

Response, however, the government argued that it should not be required to provide

any notice whatsoever. (R. 180 at 4-5.) Such a position is flatly inconsistent with the

requirements of the 5th and 6th Amendments as well as at odds with the overwhelming majority of district courts that have considered these issues.

As set forth in the Motion, (R. 162 at 2, 14-21), Mr. Christensen requests that the Court direct the government to provide him with notice of the name of its expert, his or her qualifications, the referral question that he or she is directed to answer and the tests he or she proposes to give, at least two weeks in advance of the evaluation. As to the identity of the expert, the Supreme Court held in *Smith* that the "biases and predilections" of "the particular psychiatrist" selected by the government are part of the information that must be provided to counsel ahead of the examination in order to allow counsel to perform their constitutional duty under the 6th Amendment to advise the client whether to submit to the procedure. *Smith*, 451 U.S. at 471.

The government states in its Response that: "Fairness dictates that the defendant and the United States should learn the identity of each other's experts at the same time – when they exchange the experts' reports." (R. 180 at 5.) But this contention ignores the indisputable fact that Mr. Christensen has constitutional rights that are directly implicated by the government's request to evaluate him, and those rights must be protected in the manner prescribed by the Supreme Court.[2]

---

[2] In fact, by the end of its Response the government abandons even this position and asks the Court to take the even more extreme and constitutionally indefensible step of ordering Mr. Christensen to disclose the identities of his experts - together with their results, reports, raw data, notes and any documents and records relied upon - before the government's expert even conducts his or her evaluation. (R. 180 at 27.)

Another reason to require advance disclosure of the identity of the government expert, in addition to the fact that it is required by the 6th Amendment, is the government's use of the plural "experts" throughout its Response, implying that it plans to have Mr. Christensen evaluated multiple times by multiple experts. In fact, the government should be limited to one evaluation by one rebuttal expert, in the absence of a showing that additional experts are necessary and not simply duplicative of those already hired. *See United States v. Fell*, 372 F. Supp. 2d 753, 761 (D. Vt. 2005) ("Rule 12.2 gives the government the ability to select one expert, not three"). The Court should therefore require the government to disclose the identity of its proposed expert(s) in order to provide Mr. Christensen with an opportunity to object to any impermissible duplicative examinations.

As to the expert's qualifications and the tests that he or she proposes to give, undersigned counsel's research has uncovered no case in which a district court has declined a defense request to receive this information prior to a court-ordered rebuttal examination. Again, defense counsel are required under the Sixth Amendment to provide their client with meaningful advice regarding whether or not to submit to the evaluation. *Smith*, 451 U.S. at 471. Unless they are in possession of information regarding what the examination will entail, it is impossible for defense counsel to perform that constitutionally mandated function. Mr. Christensen should also be given the opportunity to object to any tests that are outside the scope of the defense experts' evaluations or otherwise inappropriate.

7

The same is true with respect to the referral question that the government asks its expert to answer. The referral question is the starting point for any forensic evaluation and is a shorthand way of defining the scope of the examination and the information it will be designed to yield. Advance notice of the referral question will similarly facilitate timely objections to any impermissible areas of inquiry and meaningful advice to Mr. Christensen.

Requiring these disclosures in advance will not only protect Mr. Christensen's constitutional rights, it will also serve interests such as judicial economy and efficiency. If the government's expert is given carte blanche to question and test Mr. Christensen in whatever manner he or she chooses, and the expert thereafter conducts an improper examination, neither party would become aware of the problem until the expert's report is unsealed at the conclusion of the guilt phase as required by Rule 12.2(c)(2). If the expert's testimony is then required to be excluded, as has indeed occurred in the past, *see United States v. Richardson*, No. 08-CR-139 (N.D. Ga. April 18, 2012) (excluding testimony of government's expert Michael Welner due to improprieties in manner in which evaluation was procured and conducted), the result would be significant delay of the penalty phase. Even just the necessity of litigating whether the testimony should be excluded would likely result in significant delay, as evidentiary hearings would be required as they were in *Richardson*. *Id.* As the Court noted at the December 14, 2018, hearing, some issues regarding the admissibility of the government's evidence may arise after its report in unsealed even if the requested disclosures are ordered. However,

ordering the government to provide information in advance will significantly reduce the number and significance of any issues that may arise at that juncture.

## IV.   The Scope of the Government's Evaluation Must be Limited to That Which is Appropriate to Rebut Mr. Christensen's Mental Health Evidence.

As to the permissible scope of examination itself, some of the issues cannot be addressed by the defense or the Court until the government provides the necessary notice but, as noted in the Motion, (R. 162 at 21-25), there are some limits that should be imposed no matter what the government proposes. The government's position is that its examination should be free from any limitations whatsoever, and that Mr. Christensen should be limited to raising objections to the government's evidence after the fact. (R. 180 at 4-5.) Once again, this argument falls afoul of the constitutional restrictions placed upon government rebuttal evaluations and the conclusions of the vast majority of district courts.

### 1.   The caselaw limiting the scope of the government's rebuttal evaluation is not limited to cases involving intellectual disability determinations.

As set forth in the Motion, the scope of the government's examination must be limited to proper rebuttal of the issue that the defense has put into play. At the December 14, 2018, hearing the government asserted that all of the cases Mr. Christensen cited in his Motion as authority for the proposition that a government rebuttal evaluation must be appropriately limited in scope are cases involving intellectual disability determinations. (12/14/18 Tr. at 95-96.) That is obviously not the case. Mr. Christensen discussed the law governing the scope of rebuttal evaluations in

Section III of the Motion, (R. 162 at 6-7), wherein he cited *Kansas v. Cheever*, 134 S. Ct. 596, 601 (2013), and *Buchanan v. Kentucky*, 483 U.S. 402, 423-24 (1987), in which the Supreme Court restricted the scope of all government evaluations of defendants to that which is appropriate for "the limited purpose of rebutting the defendant's evidence." Neither of those cases involved intellectual disability. Nor did *Powell v. Texas*, 492 U.S. 680, 685-86 (1989) (per curiam), also cited in Section III, in which the Court held that the scope of the waiver of Fifth Amendment rights with respect to a government mental evaluation is limited in the same way that the scope of cross examination is limited when a defendant takes the stand at trial – i.e., it is limited to matters that the defendant himself has put in issue. *See Brown v. United States*, 356 U.S. 148, 156 (1958).[3]

Mr. Christensen also discussed relevant caselaw on the question of appropriate scope in Section VI.3. of the Motion, (R. 162 at 19), wherein he cited *United States v. Taylor*, 320 F. Supp. 2d 790, 791 (N.D. Ind. 2004), a case in which the court precluded the government from administering tests that were irrelevant to the defense mental health evidence which concerned substance abuse, and in Section VII, (R. 162 at 21-24), wherein he cited *United States v. Johnson*, 383 F. Supp. 2d 1145 (N.D. Iowa 2005) (precluding questioning of the defendant regarding the crime in case involving unspecified mental condition evidence for mitigation at penalty phase); *United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004) (precluding questioning regarding

---

[3] The government in fact acknowledges in its Response that this is the correct analysis, (R. 180 at 9 n.2), but then argues that the principle places no restrictions on what a government rebuttal evaluator may do. This is a non sequitur.

aggravating factors in case that did not involve intellectual disability); *United States v. Basham*, No. 02-cr-992 (D.S.C. January 8, 2004) (no issue regarding intellectual disability noted); and *United States v. Williams*, 731 F. Supp. 2d 1012, 1019 (D. Haw. 2010) (noting that mental condition at issue was borderline intellectual functioning).[4]

### 2. None of the cases cited by the government supports its claim that its evaluation should be unlimited in scope.

None of the cases that that the government relies on in its Response, (R. 180 at 8-12), support its position that neither the scope of the evaluation its expert may conduct nor the tests the expert may administers may be limited in any way. First, undersigned counsel struggle to understand the government's assertion that "[t]he Supreme Court recently addressed this issue in *Kansas v. Cheever*, 134 S. Ct. 596, 598 (2013)." (R. 180 at 8.) As may be gleaned from the language of the opinion quoted in the Response, none of which has anything to do with the scope of a government rebuttal examination, *id.* at 8-10, the Court did nothing of the sort.

Rather, the Court merely reaffirmed and applied the rule of *Buchanan* that, when a defendant places his mental state at issue, the government may present psychiatric evidence in rebuttal. *Cheever*, 134 S. Ct. at 601. The principal question before the Court was whether the lower court correctly held that voluntary intoxication, which was the mental state defense that the defendant raised, does not constitute the type of mental

---

[4] Indeed, it is the cases that the government cites, (R. 180 at 10-11), that are intellectual disability cases. *See United States v. Wilson*, 920 F. Supp. 2d 287 (E.D.N.Y. 2012) and *United States v. Hardy*, 644 F. Supp. 2d 749 (E.D. La. 2008).

11

state that triggers the government's right to rebuttal under *Buchanan*. *Cheever*, 134 S. Ct. at 600 (citing *State v. Cheever*, 284 P. 3d 1007, 1023 (Kan. 2012)). The lower court was incorrect, the Court held, and its judgment was accordingly vacated. *Id.* at 602-03.

Although not mentioned in the government's Response, there was a second question raised by the defendant before the Court, and that was his claim that the rebuttal testimony that was presented exceeded the permissible scope under the Fifth Amendment. *Id.* at 603. The Kansas Supreme Court had failed to address that question, however, and so the Court declined to reach it, instead remanding the case to the state courts. *Id.* In so doing, however, the Court reiterated its prior holdings that "testimony based on a court-ordered psychiatric evaluation is admissible only for a 'limited rebuttal purpose,'" *id.* (quoting *Buchanan*, 483 U.S. at 424), and that "'nothing' in our precedents 'suggests that a defendant opens the door to the admission of psychiatric evidence on future dangerousness by raising an insanity defense at the guilt stage of the trial,' *id.* (quoting *Powell*, 492 U.S. at 685-86 n.3). In no sense, therefore, can the opinion in *Cheever* be read as supporting the government's argument that there can be no limits placed upon the scope of its rebuttal evaluation; quite the opposite is true.

The remaining three cases upon which the government relies similarly fail to support its position. The government asserts that *United States v. Wilson*, 920 F. Supp. 2d 287, 298 (E.D.N.Y. 2012), stands for the proposition that "any perceived flaws in the examiner's choice of tests" should be "addressed in cross examination or briefing to the court after the examination," implying that the district court in that case gave the

government carte blanche to do whatever it wanted without notice to the defense. (R.
180 at 11.) That is not what happened. First, the court had already required the
government to disclose in advance the names and qualifications of its experts and the
tests that they proposed to administer, exactly as we are asking this Court to do. *Id.* at
291. Based on those disclosures, the defense raised a series of specific objections to the
government's proposals that the court carefully considered then decided on the merits.
*Id.* at 297-304.

For example, the defense objected to the government's expert's proposal to
administer two adaptive behavior testing instruments to the defendant himself on the
grounds of unreliability. *Id.* at 297-300. The court reviewed the scientific literature and
concluded that, while the psychological community uniformly cautioned against
placing too much reliance on the results of using the tests in that manner, it could not
find that the results would be completely irrelevant. *Id.* Therefore, the court reasoned, in
that instance the defendant's rights would be fully protected by allowing the tests to be
performed and then permitting the parties to litigate how much weight the results
should be accorded. *Id.* at 300.

The defense also objected to an interview of the client by the government's
forensic psychiatrist, who was not an expert on intellectual disability. *Id.* at 301. Again,
the court carefully reviewed the matter and eventually concluded that the defense had
made an insufficient showing that the examination could not be a legitimate part of an
intellectual disability assessment. *Id.* The court therefore allowed the interview subject

13

to later challenge. *Id.* Nothing about these rulings, or the opinion as a whole, supports the argument that the government should be given unlimited access to Mr. Christensen and the defense restricted to objecting to the appropriateness of the examination after the fact.

Similarly, in *United States v. Hardy*, 644 F. Supp. 2d 749, 750 (E.D. La. 2008), which also involved a pre-trial intellectual disability determination, the court specifically ordered at the outset that the government's testing and questioning of the defendant be limited to only that which was relevant to the diagnosis of intellectual disability. It declined to further restrict the scope of the evaluation because it found that it was not in a position to determine what lines of inquiry would be appropriate, *id.* at 751, meaning that the defense had failed to provide the court with sufficient information to rule on those issues. Indeed, the only restrictions upon the scope of the evaluation requested by the defense were "questions about the crime, allegations of remorse or the lack thereof, or about testimony or evidence concerning the crime or the alleged unproven aggravators," and the request was supported only by counsel's bare assertion that "none [of these lines of inquiry] have any bearing on the question of mental retardation." *Id.* at 751. Unsurprisingly, such a slim reed failed to persuade the court that it should grant the defendant's request. And so, once again, the case offers no support for the proposition that the government should be permitted to perform any type of testing or questioning of Mr. Christensen that it chooses.

14

Finally, the government relies on dicta in *United States v. Troya*, 733 F. 3d 1125 (11th Cir. 2013), in support of its argument. The 11th Circuit did note in its opinion that the trial court had declined a defense request to limit the government's evaluation to an IQ test, made based on the representation that the defense presentation would be so limited. *Id.* at 1139. However, that fact was irrelevant to the court's decision because the actual defense evidence presented at trial went far beyond that limited issue and legitimately opened the door to the entirety of the government's evaluation. *Id.* at 1139-40.

Moreover, the question of the scope of the government's evaluation was so poorly litigated at trial as to render the district court's "ruling" meaningless. An examination of the docket and pertinent documents in the case reveals that the defense filed no pleadings seeking the limit the examination, *see United States v. Sanchez*, No. 06-cr-80171, and only raised the issue orally during a hearing on another issue, *see* Exhibit 1 – Excerpt of Transcript. During that hearing, the following transpired:

> DEFENSE COUNSEL: Judge, that brings up another issue we haven't touched upon, the type of testing that ought to be done here. The only testing we intend to introduce results on bears on our client's I.Q. The Government keeps alluding to the tests we want done.

> THE COURT: I think they are talking about the tests they want done.

> DEFENSE COUNSEL: It should be simply I.Q. testing to rebut or cooperate [sic] our testing, not a broad psychological investigation . . .

THE COURT: I am not prepared to deal with that at this point. I am going
to allow the testing previously indicated in my order.[5]

*Id.* This exchange constituted the sum and substance of the discussion regarding the

scope of the government's evaluation. The dicta in the 11th Circuit's subsequent

opinion should therefore be given no weight by this Court.

**3.    The Court should adopt the analysis of the district court in *United States v. Williams* and reject the government's attempt to obtain a wide-ranging evaluation of Mr. Christensen that is far outside of that which is necessary and appropriate for rebuttal.**

In its Response, the government argues that it is entitled to "a full psychological

and/or psychiatric examination" of Mr. Christensen that is "extensive" and "includes

testing to determine if another diagnosis is more clinically appropriate." (R. 180 at 8,

11.) Indeed, the government proposes to assess Mr. Christensen to determine whether

he meets full diagnostic criteria for every single differential diagnosis for every

Schizophrenia Spectrum or Other Psychotic Disorder, asserting that such a process is

"the clinical standard," and "the clinical standard for mental health diagnosis is far

more nuanced that simply asking does Defendant have this disorder, yes or no." *Id.* at

12-17.

First, even if the government's expert were charged with conducting a complete

and thorough examination of all aspects of Mr. Christensen's mental condition without

regard to the findings of the defense experts, the medical process of differential

---

[5] A review of the court's order reveals that it says nothing about the scope of the government's
rebuttal examinations. *See* Exhibit 2 (11/26/2008 Order).

diagnosis in psychiatry is not what the government represents it to be. If an expert were to literally go through every single diagnostic criterion for every single other possible diagnosis, the evaluation would take an utterly unreasonable and unworkable amount of time.[6] Rather, psychiatrists – and psychologists – undergo many years of specialized training to enable to them to identify salient symptoms in their patients and to understand the significance of patterns of symptoms and behavior, which enables them to arrive at an appropriate diagnosis while efficiently considering other possible causes for the patient's presentation. As the Court has no doubt observed, when a clinician prepares a report of his or her diagnostic conclusions it assuredly does not include an assessment of the presence of every diagnostic criterion for every potential alternative diagnosis that he or she has ruled out.

More importantly, conducting a from-the-ground-up, comprehensive examination of every possible aspect of Mr. Christensen's mental condition is *not* the job of the government rebuttal expert. As set forth extensively above and in the Motion, constitutional mandates permit the expert *only* to examine a defendant for an appropriately limited rebuttal purpose. The government expert's sole remit is to

---

[6] Mr. Christensen of course acknowledges that his 12.2 Notice indicates that his mental health evidence ultimately may encompass one or more of a range of diagnoses, rather than specifying one specific disorder. Due to the deadline imposed for filing the 12.2 Notice and the extensive amount of investigative work that had to be accomplished before appropriate experts could even be identified, *see* (R. 129), as well as the difficulty in identifying qualified experts willing to take on the case once the appropriate specialties had been identified, the defense experts are still in the early stages of the evaluation process and were thus not in a position to provide any further diagnostic specificity than that specified in the Notice.

determine whether or not Mr. Christensen suffers from a Schizophrenia Spectrum or Other Psychotic Disorder. If he or she answers that question in the negative or in the positive, their function is fulfilled. Whether the expert harbors suspicions that some other disorder may be present is irrelevant, for Mr. Christensen has made no claim that he suffers from another disorder and no such matter has been put in issue. Such information is therefore beyond the government's reach under the Fifth Amendment.

The District Court of Hawaii was presented with the same argument the government makes here in *Williams*, 731 F. Supp. 2d at 1018-20, and it flatly rejected it. As here, the government argued that it could not be limited to testing and evaluating the defendant in order to determine whether or not the diagnosis rendered by the defense experts – in that case, borderline intellectual functioning – was present. *Id.* at 1017. Rather, it asserted, its experts must be allowed to examine the defendant "in order to ascertain, and later testify to, any other possible motive, condition, or disease that may have caused" the crime. *Id.*

Mindful of the constitutional restrictions placed upon government rebuttal mental health evaluations, the district court declined to grant the virtually unlimited evaluation that the government sought. Noting that, as here, the government had pointed to "no case law holding that a defendant's decision to raise a mental status defense opens the door to allow the prosecution to assert diagnoses or defects other than to rebut those specifically placed at issue by the defendant," *id.* at 1019, the court wrote:

The Court generally agrees with the Government and its experts that in order to properly prepare a mental diagnosis regarding why Defendant allegedly committed the crime, the Government's experts need to determine from a neutral viewpoint not only whether Defendant suffers from [borderline intellectual functioning] but also whether there is any possible alternative diagnosis for explaining why Defendant allegedly committed the acts as charged in the . . . Indictment. However, preparing a mental diagnosis as to why Defendant committed the alleged acts exceeds the scope of the government's experts' role in this case. Here, the Government's experts are limited to rebutting the Defendant's mental status evidence, *not ascertaining another possible motive for Defendant's actions.*

*Id.* at 1017 (emphasis in original).

In its Response, and at the December 14, 2018, hearing, the government asserts that the decision in *Williams* is somehow undermined by the Supreme Court's subsequent opinion in *Cheever*. (R. 180 at 11); (12/14/Hrg. Tr. at 98-99). In fact, the opposite is true – to the extent they cover the same ground – and, as set forth above, they cover very little of the same ground - the *Cheever* opinion completely supports the conclusion in *Williams* that the scope of the government's evaluation must be limited to appropriate rebuttal. This Court should adopt the same reasoning and reject the government's legally unsupported and constitutionally indefensible position.

## V. One Member of the Defense Team Should be Permitted to be Present During the Government's Rebuttal Examination of Mr. Christensen.

In its Response, the government incorrectly characterizes Mr. Christensen's request that one member of the defense team be permitted to be present during the government's examination as an assertion that the Sixth Amendment requires counsel's presence. (R. 180 at 17.) Mr. Christensen made no such claim, and readily acknowledges

19

that allowing a team member to be present is not a constitutional requirement. It is, however, certainly within the court's discretion to grant the request and we respectfully submit that such an order is particularly appropriate in this case given the high stakes nature of the examination and the fact that there are a number of topics that the government agrees its expert may not inquire into. *See* (R. 162 at 21-25.) The presence of defense counsel would ensure those limits are adhered to.

The government additionally claims that allowing counsel to be present would "violate the clinical standard and irreparably disrupt the examination." (R. 180 at 18.) The government cites no scientific or medical support for its contention and, in fact, the relevant psychological and psychiatric professional organizations recognize that there are occasions when it is appropriate for a third party to be present during an examination and have said so in white papers and practice guidelines. *See, e.g.,* American Psychological Association, *Statement on Third Party Observers in Psychological Testing and Assessment: A Framework for Decision Making* (APA 2007) (noting that, while there are countervailing considerations, "the psychologist may conclude that the assessment can be conducted with an observer in a way that would neither impair the validity or fairness of the evaluation and findings nor raise ethical or legal problems.").

Additionally, the government's concern that Mr. Christensen's "eyes [will] move back and forth between the doctor and his attorney" during the evaluation, (R. 180 at 18), is easily remedied by requiring that counsel sit behind Mr. Christensen, out of his line of sight, and remain completely silent unless a problem arises that necessitates a

brief statement. Counsel envisage the latter being necessary only if the examiner were to ask a question designed to elicit information that the Court has previously ruled the government may not gather.

## VI.    The Government May Not Discover Privileged Materials From Defense Counsel's Files in the Form of the Opinions and Reports of Non-Testifying Experts.

The government's request for access to privileged defense work product and protected attorney-client communications, in the form of the identities and reports of experts that Mr. Christensen has retained but will not call to testify, (R. 180 at 23-26), should be denied. As an initial matter, the request is predicated upon the assumption that the Court will appoint firewall counsel to receive these materials. *Id.* at 21. As set forth above, *see* Section II, *infra*, the Court is constrained to deny the request for firewall counsel. Accordingly, the government is no more entitled to these materials at this juncture than it is entitled to receive Rule 16 discovery regarding the defense penalty phase mental health evidence prior to Mr. Christensen's reaffirmance of his intent to offer that evidence following the conclusion of the guilt phase of the trial. *See, e.g., United States v. O'Reilly*, No. 05-cr-80025 (E.D. Mich. May 10, 2010) (noting that Rule "12.2(c) limits the timing of Rule 16(b) disclosures in death penalty cases" and government may therefore request these materials only after defendant "is convicted of a capital charge, confirms his intent to introduce expert mental health testimony at the penalty phase, and does not withdraw his confirmation 48 hours after he receives the Government's rebuttal expert reports").

More to the point, however, the government is never entitled to discover the reports or opinions of non-testifying experts retained by the defense. Such materials are fully exempt from disclosure under the work product doctrine. *See generally Hickman v. Taylor*, 329 U.S. 495 (1947). Additionally, to the extent that the materials are based on communications between a client and a member of his defense team such as a non-testifying expert, they are further protected by attorney-client privilege. The government is not even entitled to the material it seeks in a civil dispute over money. *See* Fed. R. Civ. P. 26(b)(4)(D) ("ordinarily a party may not . . . discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial). Especially in a high stakes case such as this, the Fifth Amendment protects a defendant from being forced to help the government convict him or sentence him to death.

The only authority cited by the government in support of its argument is *Pawlyk v. Wood,* 248 F.3d 815 (9th Cir. 2001), a habeas case in which a divided panel rendered an opinion that can only be described as an extreme outlier, followed by no other circuit court of appeal before or since. No other court has ever sanctioned allowing the government to reach into defense counsel's files and help themselves to any confidential materials and reports they may find there, even though the defense has no intention of presenting the evidence in any fashion at trial.

The court's rather tortured analysis in *Pawlyk* centers around a defendant's due process right to the assistance of a mental health professional at government expense where reasonably necessary for his defense. *Id.* at 821-28. Although it made mention of the Fifth Amendment, *id.* at 825, the court devoted no consideration to the stark differences between the use in rebuttal of defense-generated reports already in the government's legitimate possession, as was sanctioned in *Buchanan* and *Smith*, and the far more intrusive and constitutionally significant - and unprecedented - step of requiring the defense to turn over work product that the government has no right to see.[7]

In effect, what the government is asking this Court to do is impose a non-existent obligation on Mr. Christensen to disclose information akin to the government's obligation to disclosure exculpatory information to a criminal defendant under *Brady v. Maryland*, 373 U.S. 83 (1963), minus the requirements that the information be both helpful to the government and material. Our system of criminal justice simply does not work that way.

---

[7] While the logical basis for the court's decision is frankly difficult to fully discern, it certainly did not, as the government asserts, ground its decision on the fact that an expert appointed for an indigent defendant at government expense is required to disclose his report to the factfinder. (R. 180 at 24); (12/14/18 Hrg. Tr. at 109.) First, the expert at issue in *Pawlyk* was hired privately by the defense and not paid for with public funds. *Id.* at 820. Second, as the court expressly noted in its opinion, a requirement that a government-funded defense expert automatically disclose his report to the court regardless of defense objection renders the appointment of the expert insufficient to satisfy the constitutional requirement that a defendant receive the services of an independent expert to assist him in his defense. *Id.* at 824 (citing *Smith v. McCormick*, 914 F.2d 1153, 1158-59 (9th Cir. 1990)).

23

**VII.   The Government May Not Subpoena Mr. Christensen's Mental Health Records.**

The final issue is the propriety of the government's request that it be permitted to subpoena Mr. Christensen's mental health treatment records from the University of Wisconsin, the University of Illinois and the Macon County Jail, whom it believes may have treated Mr. Christensen in the past. (R. 180 at 26.) Without citation to a single authority, the government asserts that, by providing notice under R. 12.2(b)(2), Mr. Christensen "has waived any privileges he might have" with respect to the records sought. *Id.* The request must be denied.

Firstly, once again this request is predicated upon the assumption that the Court will appoint firewall counsel to receive these materials; the government makes no claim that it could receive these records themselves under any circumstances. *Id.* at 26. However, the Court is constrained to deny the request for firewall counsel, and it should summarily deny this request also.

Furthermore, any records of mental health treatment received by Mr. Christensen in the past are protected from disclosure by the psychotherapist-patient privilege embodied in Fed. R. Evid. 501. *See Jaffe v. Redmond*, 518 U.S. 1, 15-16 (1996) (holding that confidential communications between a licensed psychotherapist, psychiatrist, psychologist or social worker and her patient are protected from compelled disclosure under Fed. R. Evid. 501"). Mr. Christensen has not, and does not, waive his privilege, either expressly or constructively by filing 12.2 Notice of a provisional intent to offer mental health evidence at the penalty phase of his trial.

24

Should he decide to rely upon evidence of past mental health treatment himself such evidence may, at the conclusion of the guilt phase, become discoverable under Rules 12.2. and 16. In the meantime, the government is not permitted to make an end run around the requirements of those Rules by issuing subpoenas for protected information.

Mr. Christensen also notes that the government has made no showing whatsoever that the records sought even exist, much less contain information that is relevant and probative on the issues for which the government requests them. *Cf. Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923 (7th Cir. 2004) (affirming denial of subpoena duces tecum inter alia because government made no showing that the records sought contained anything of probative value); *Dietrich v. Smith*, 701 F.3d 1192, 1196 (7th Cir. 2012) (noting that a criminal defendant is not entitled to even an in camera review by the court of confidential records absent a plausible showing that the records contain material evidence). As such, the government's request is a quintessential fishing expedition and should be denied on that ground, also.

Respectfully submitted,

/s/Elisabeth R. Pollock                    /s/ George Taseff
Assistant Federal Defender                 Assistant Federal Defender
300 West Main Street                       401 Main Street, Suite 1500
Urbana, IL 61801                           Peoria, IL 61602
Phone: 217-373-0666                        Phone: 309-671-7891
FAX:   217-373-0667                        Fax:    309-671-7898
Email: Elisabeth_Pollock@fd.org            Email: George_Taseff@fd.org

/s/ Robert Tucker                          /s/ Julie Brain
Robert L. Tucker, Esq.                     Julie Brain, Esq.
7114 Washington Ave                        916 South 2nd Street
St. Louis, MO 63130                        Philadelphia, PA 19147
Phone: 703-527-1622                        Phone: 267-639-0417
Email: roberttuckerlaw@gmail.com           Email: juliebrain1@yahoo.com

CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2019, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and

Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org