# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cr-20037-JES-JEH |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

Now before the Court is Defendant Brendt A. Christensen's Motion (Doc. 97) to Suppress Statements. The United States has filed a Response (Doc. 145), and Defendant has filed a Reply (Doc. 174). An evidentiary hearing was held on December 17 and 18, 2018. For the reasons set forth below, the Motion (Doc. 97) is DENIED.

### BACKGROUND

Federal agents arrested Defendant Brendt A. Christensen on June 30, 2017, pursuant to a criminal complaint charging him with the kidnapping of Yingying Zhang, a female Chinese national, in violation of 18 U.S.C. § 1201(a)(1). Doc. 1. Christensen was later indicted by a federal grand jury sitting in the Urbana Division of the Central District of Illinois. *See* Doc. 13 (Indictment), Doc. 26 (Superseding Indictment). The Superseding Indictment charged Christensen with kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) (Count 1), and with making false statements to FBI agents investigating Ms. Zhang's disappearance, in violation of 18 U.S.C. § 1001(a)(2) (Counts 2, 3). Doc. 26. The Superseding Indictment also included a notice of special findings regarding the nature of the offense charged in Count 1, including that the death of the victim was intentional, that it occurred during the commission of kidnapping, that it was committed in an especially heinous, cruel, or depraved manner, and that

1

Defendant committed the offense after substantial planning and premeditation. *Id.* The special findings alleged in the Superseding Indictment made the case eligible for capital punishment. *See* 18 U.S.C. § 3591 *et seq.* On January 19, 2018, the United States filed its Notice of Intent to Seek a Sentence of Death ("NOI"). Doc. 54; *see also* 18 U.S.C. §3593(a).

This Motion concerns a series of statements Defendant made to law enforcement, his then-wife[1] (Ms. Zortman), and his girlfriend (referred to herein as "T.B.") between June 14, 2017 and June 29, 2017, before his arrest.

*(1) Statements to Law Enforcement*

The parties agree that on June 14, 2017, around 11:45 p.m., law enforcement came to Defendant's residence to execute a search warrant for his car. Agents asked Defendant to come answer some questions at the FBI office. Defendant remarked to Ms. Zortman that he "should probably ask for a lawyer in situations like this," and asked her what she thought he should do. Ms. Zortman advised him to go with the agents, and Defendant left with the agents of his own accord. He was not handcuffed or restrained. After arriving at the FBI office for the interview, FBI agents advised Defendant of his rights, then questioned him until around 1:26 a.m. At that point, Defendant said, "I really don't want to talk no more without a lawyer," and the agents ended the interrogation. Doc. 97, at 2. Another agent came into the room and spoke with Defendant after he invoked his right to counsel, eliciting statements that the United States concedes were improperly drawn out after Defendant had invoked his right to counsel—the United States does not intend to introduce those statements into evidence, and the parties agreed at the evidentiary hearing that those statements are no longer at issue. *See* Doc. 145, at 6.

---

[1] During the events in question and at the time this Motion was filed, Defendant was still married to Michelle Christensen. The two have since divorced, and Michelle Christensen has changed her name to Michelle Zortman. The Court will refer to her as Ms. Zortman herein.

After Defendant invoked his right to counsel, Defendant claims that an FBI agent pressured Ms. Zortman to convince him to speak with the FBI, and that on June 17, 2017, agents initiated contact with Defendant again and questioned him despite his previous invocation of his right to counsel. Doc. 97, at 5. However, the United States points to Defendant's recorded statements to T.B. to show that he was actually the one to initiate contact with law enforcement after his invocation:

| | |
|---|---|
| CHRISTENSEN: | I'm going to go talk to one of the FBI agents, willingly, soon. … She didn't respond. Okay, umm, I'll try again soon. |
| T.B.: | Why do you have to talk to them? |
| CHRISTENSEN: | I want to. I don't, but I will. I'm trying to clear my name. Just, I want to cooperate. I want to get this over with. |

Doc. 145, at 7. The United States also references a recording of Defendant's side of his call to Special Agent Tenaglia, in which he asks to set up a meeting. This recording was played at the evidentiary hearing on December 17, 2018, and it contained statements from Defendant such as "I just want to clear this all up," and "I would be willing, yes." Doc. 190, Gov. Exh. 8. When Defendant did meet with FBI agents again, the United States claims that Defendant was again read his *Miranda* rights, and signed a form indicating his waiver of those rights at 1:52 p.m. on June 17, 2017. Doc. 145, at 8.

Defendant maintains that although he called Special Agent Tenaglia and asked to speak with law enforcement, this reinitiation was improper because the FBI had pressured both T.B. and Ms. Zortman to push Defendant to reach out to law enforcement. At the evidentiary hearing on this matter, Ms. Zortman testified that she did encourage Defendant to cooperate with law enforcement. She stated that Special Agent Tenaglia had told her that Defendant's full

cooperation with law enforcement would be the best course of action, and that Ms. Zortman believed it would be the fastest way for them to move on with their lives.

Additionally, as addressed below, Defendant claims that certain statements he made to T.B. should be treated as the fruit of illegal questioning by law enforcement due to T.B.'s role as a cooperating witness for law enforcement. Doc. 97, at 9 ("Notwithstanding his invocation of his *Miranda* rights, Mr. Christensen was subject to … police-initiated, surreptitious interrogation in the absence of counsel by FBI confidential human source 'TLB' … ."). At the evidentiary hearing, Defendant also alleged that the questions Ms. Zortman posed to Defendant at Special Agent Tenaglia's request violated his invocation of his *Miranda* rights, as Ms. Zortman was effectively acting as a proxy for law enforcement questioning.

*(2) Statements to T.B.*

The parties agree that on June 16, 2017, T.B. agreed to record her interactions with Defendant for the FBI. Doc. 97, at 4. At that time, she signed an FD-472 form that indicated that her consent to record Defendant was given "voluntarily, and without threats or promises of any kind." That form also indicated that she agreed not to "take any action which is likely to result in the recording or monitoring of communications to which I am not a party." She then recorded in-person conversations with Defendant on June 19–23, and 29. On June 23, she recorded a telephone call with Defendant and exchanged text messages with him. The in-person conversation she recorded on June 29, 2017 took place in public, at a benefit walk being held for the victim in this case, Ms. Zhang. Doc. 96, at 3.

Defendant claims that T.B. effectively acted as a law enforcement officer, eliciting incriminating statements from Defendant at the FBI's behest, despite the FBI's knowledge that

Defendant had invoked his right to counsel. Doc. 97, at 9. Defendant does not allege that any questioning by T.B. took place in law enforcement custody.

### LEGAL STANDARD

Under *Miranda v. Arizona* and its progeny, law enforcement officers must advise suspects in police custody of their right to have counsel present before interrogating those suspects. *Miranda v. Arizona*, 384 U.S. 436, 469–73 (1966). In order to invoke one's right to counsel and stop the interrogation, an individual "must make a clear and unambiguous assertion" of the right. *See United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005). The statement "maybe I should talk to a lawyer," for example, is not an unequivocal request for counsel. *Davis v. United States*, 512 U.S. 452, 462 (1994); *see also United States v. Hunter*, 708 F.3d 938, 943–44 (7th Cir. 2013) (treating "should" and "might" as equivocal language in this context).

Additionally, one must be in police custody to invoke a right to counsel. *See United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999). Invocation should likely be directed at law enforcement, rather than third parties within earshot of law enforcement. *See, e.g., Cobb v. Kernan*, 346 F. App'x 206, 207–08 (9th Cir. 2009) (statement that defendant wanted a lawyer, directed at girlfriend, was insufficient to invoke *Miranda* despite officers hearing the statement). Once the right to counsel is successfully invoked, law enforcement may not question a suspect again unless 1. counsel is present, 2. fourteen days have passed, or 3. the suspect himself reinitiates contact with law enforcement. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *United States v. McKinley*, 84 F.3d 904, 908 (7th Cir. 1996); *Maryland v. Shatzer*, 559 U.S. 98 (2010). A request to talk to law enforcement to "clear up" an issue is sufficient to show reinitiation by the suspect. *See United States v. Jackson*, 189 F.3d 502, 511 (7th Cir. 1999).

Again, *Miranda* is only implicated in police custody—the concerns at the heart of that case arise from the coercive effect of a "police-dominated atmosphere." *Illinois v. Perkins*, 496 U.S. 292, 296–97 (1990) ("[W]here a suspect does not know that he is conversing with a government agent, these pressures do not exist. … *Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust."). Thus, an invocation of the right to counsel does not prohibit agents acting on behalf of the government from speaking with a suspect who is not in police custody. *Id*. In some situations, even questioning by private parties may violate *Miranda*, but the circumstances must indicate a custodial arrest. *See Wilson v. O'Leary*, 895 F.2d 378, 380 (7th Cir. 1990) (an off-duty sheriff who pulled his gun, flashed his badge, and held a defendant against his will while a private party questioned him implicated *Miranda*).

**DISCUSSION**

First, Defendant seeks to suppress the statements he made to law enforcement in the late hours of June 14, 2017 into the morning of June 15, 2017. Defendant claims that the statements he made before 1:26 a.m. are inadmissible because of his statement "I should probably ask for a lawyer in situations like this." That statement, which was directed at his wife before he was in police custody, would not constitute an unequivocal request for counsel even if it had been directed at law enforcement while Defendant was in custody. *See Davis*, 512 U.S. at 462. Defendant's Motion to Suppress the statements he made before 1:26 a.m. on June 15, 2017 is therefore DENIED.

Second, Defendant seeks to suppress statements he made to Special Agent Pettry after Defendant had invoked his right to counsel, between 1:30 a.m. and 2:36 a.m. on June 15, 2017. The United States concedes that these statements were elicited after Defendant requested

6

counsel, and indicates that they do not intend to introduce these statements in their case-in-chief. The Court therefore does not examine this issue. The parties may brief this matter in a motion *in limine* if necessary.

Third, Defendant seeks to suppress statements he made in a June 17, 2017 interview with FBI agents. Although he asserts that the FBI agents "initiated contact" and thus that his prior invocation of his right to counsel should have prohibited any custodial interrogation, the United States demonstrated at the evidentiary hearing that Defendant himself reinitiated contact with law enforcement and asked to speak with them. Furthermore, Ms. Zortman's encouragement for Defendant to cooperate with law enforcement does not affect the validity of his subsequent initiation of contact with the FBI and *Miranda* waiver.[2] Defendant relies on *Van Hook v. Anderson*, 488 F.3d 411, 418 (6th Cir. 2007), for the proposition that an *Edwards* initiation only occurs when a suspect himself desires to reach out to law enforcement "without influence by the authorities." Doc. 97, at 8. According to Defendant, Special Agent Tenaglia used Ms. Zortman as a proxy to pressure Defendant into reaching out, and therefore Defendant's waiver was involuntary, induced by law enforcement. *Id.* It is true that a subsequent waiver "at the authorities' behest, and not at the suspect's own instigation" falls outside of what the Supreme Court contemplates as a voluntary waiver. *Arizona v. Roberson*, 486 U.S. 675, 681 (1988). However, when a defendant himself asks to speak with law enforcement, law enforcement officers need not turn him away. *United States v. Jackson*, 189 F.3d 502, 511 (7th Cir. 1999) ("Obviously, as a result of Jackson's request to speak with the police to 'clear up' the traffic stop,

---

[2] For the same reasons that follow, encouragement from T.B. to cooperate with law enforcement would not affect Defendant's initiation of the June 17, 2017 interview with FBI agents. However, the record shows that T.B., rather than encouraging Defendant to speak with law enforcement, questioned his own existing decision to contact them, asking "Why do you have to talk to them?" Doc. 145, at 7. Defendant responded by saying "I'm trying to clear my name. Just, I want to cooperate. I want to get this over with." *Id.*

it was Jackson who 'initiate[d] further communication.'"). In the Seventh Circuit, the concern for "influence by the authorities" is much more immediate and concrete than concern that authorities might encourage relatives or friends of defendants to tell defendants to speak with law enforcement. "A police awareness that suspects sometimes confess after they speak with close friends or family does not mean this court should adopt a rule that encourages police to bar friends or family members from seeing a suspect." *Whitehead v. Cowan*, 263 F.3d 708, 719 (7th Cir. 2001) (citing cases where no interrogation was done by a police-employed aunt of a defendant urging him to speak with police, nor when a defendant confessed after speaking with his mother, who had told police beforehand that the defendant would tell her if he had committed the crime). Indeed, even where agents of law enforcement such as mental health staff in a jail pressure defendants to confess, such pressure does not implicate *Miranda* nor necessarily render statements involuntary. *See United States v. Higgins-Vogt*, --- F.3d ---, 2018 WL 6712508 (7th Cir. Dec. 21, 2018) (finding that defendant's efforts to secure interviews with law enforcement came "only on his own initiative" despite pressure from a law enforcement agent acting as a mental health counselor and a conversation with his girlfriend that was "the straw that broke the camel's back").

Here, as in *Higgins-Vogt*, there is sufficient evidence that Defendant's decision to contact law enforcement came from himself, not through law enforcement coercion. He called Special Agent Tenaglia more than once in an attempt to set up a meeting, telling T.B. "I want to cooperate." When he finally reached Special Agent Tenaglia, he is on tape saying "I just want to help you clear this all up. … I would be willing, yes," and indicating he would call back with his availability for the interview. Although FBI agents told Ms. Zortman that cooperation was the best strategy for Defendant, and Ms. Zortman agreed, there is reason to believe Ms. Zortman

would have encouraged Defendant to cooperate with law enforcement no matter what—even on June 14, 2017, before any law enforcement officer had suggested that she push Defendant to cooperate, Ms. Zortman encouraged Defendant to go speak with the FBI agents who showed up at their residence in the late hours of the night. Ms. Zortman testified at the evidentiary hearing that she suggested he speak with them, despite her concerns that he might possibly be involved in the kidnapping, because "I thought truth, whichever way the truth goes, would come to light." On June 17, 2017, Defendant clearly made his own decision to call Special Agent Tenaglia and set up a meeting. Thus, the interview that followed was not in violation of *Miranda*, even if it had taken place in police custody. *See Jackson*, 189 F.3d at 511. Defendant's Motion to Suppress statements he made during that interview is also DENIED.

Fourth, Defendant seeks to suppress statements he made to T.B. after his June 15, 2017 invocation of his right to counsel. According to Defendant, T.B. was acting under the direction of law enforcement to question him and record his statements for FBI purposes, and doing so after he invoked his right to counsel violated his Fifth and Sixth Amendment rights. Doc. 97, at 9. T.B. was indeed acting as a cooperating witness to assist law enforcement, as evidenced by the documentation of her agreement to record her conversations with Defendant and by the testimony of Special Agent Huckstadt, who instructed her on how to use the recording equipment and how to turn it over to the FBI. Special Agent Huckstadt testified that he instructed T.B. to listen to Defendant, but not to ask any particular questions or focus on any particular topics. The only time Special Agent Huckstadt states that he told T.B. what to say was when she asked him what she should tell Defendant about her contact with the FBI (he told her to go ahead and admit that the FBI had talked to her about Defendant).

Any questioning that T.B. initiated was not conducted when Defendant was in police custody.[3] *Miranda* thus clearly does not apply to the situation at hand. *See Perkins*, 496 U.S. at 296–97 ("[W]here a suspect does not know that he is conversing with a government agent, these pressures do not exist."). Although Defendant may regret his "misplaced trust" in T.B., this is not a ground for evidence suppression. *Id.* Defendant argues that, regardless of whether a suspect is in custody, "police may not avoid *Miranda* by delegating the questioning to the victims of the crime or their relatives." Doc. 174, at 4 (citing *Wilson v. O'Leary*, 895 F.2d 378, 380 (7th Cir. 1990)). However, in the case Defendant relies upon for this argument, the person being questioned was not relaxing with a trusted girlfriend; he was being held at gunpoint by an off-duty sheriff who flashed his badge and held him against his will. *Wilson*, 895 F.2d at 379–81 ("[Defendant] had been dragged by the scruff of his neck into a vacant lot and was being detained by [the sheriff] for [a questioner's] benefit. … Questioning of this kind poses exactly the risks with which *Miranda* is concerned.") Again, any and all questioning by T.B. was conducted in situations where Defendant was free to leave and free from the presence of known law enforcement officers, and thus free from the concerns implicating *Miranda*. Therefore, Defendant's Motion to Suppress his statements to T.B. on *Miranda* grounds is DENIED.

---

[3] Although arguments about statements to Ms. Zortman were not raised in the written filings, they were brought up during the evidentiary hearing. To the extent that Defendant claims Ms. Zortman violated his *Miranda* rights by speaking with him under law enforcement direction, the same rationale applies.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion (Doc. 97) to Suppress Statements is

DENIED.[4]

Signed on this 14th day of January, 2019.

/s James E. Shadid
James E. Shadid
Chief United States District Judge

---

[4] The Court does not address the statements Defendant made to Agent Pettry between 1:30 a.m. and 2:36 a.m. on June 15, 2017, which the Government has represented that it will not use in its case-in-chief.

11