UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17-cr-20037-JES-JEH |
| ) | |
| BRENDT A. CHRISTENSEN, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION

Now before the Court is Defendant Brendt A. Christensen's Motion (Doc. 100) to Suppress Evidence Seized Pursuant to the Illegal Search of Defendant's Apartment on June 15, 2017. The United States has filed a Response (Doc. 147), and Defendant has filed a Reply (Doc. 173). A hearing was held on December 17 and 18, 2018. For the reasons set forth below, Defendant's Motion (Doc. 100) is DENIED.

### BACKGROUND

Defendant Brendt A. Christensen was arrested by federal agents on June 30, 2017, pursuant to a criminal complaint which charged him with the kidnapping of Yingying Zhang, a female Chinese national, in violation of 18 U.S.C. § 1201(a)(1). Doc. 1. Christensen was later indicted by a federal grand jury sitting in the Urbana Division of the Central District of Illinois. *See* Doc. 13 (Indictment), Doc. 26 (Superseding Indictment). The Superseding Indictment charged Christensen with kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) (Count 1), and with making false statements to FBI agents investigating Ms. Zhang's disappearance, in violation of 18 U.S.C. § 1001(a)(2) (Counts 2, 3). Doc. 26. The Superseding Indictment returned by the grand jury also included a notice of special findings regarding the nature of the offense charged in Count 1, including that the death of the victim was intentional,

1

that it occurred during the commission of kidnapping, that it was committed in an especially heinous, cruel, or depraved manner, and that Defendant committed the offense after substantial planning and premeditation. *Id*. The special findings alleged in the Superseding Indictment made the case eligible for capital punishment. *See* 18 U.S.C. § 3591 *et seq.* On January 19, 2018, the United States filed its Notice of Intent to Seek a Sentence of Death ("NOI"). Doc. 54; *see also* 18 U.S.C. §3593(a).

This Motion concerns the late hours of June 14, 2017, about two weeks before Defendant's arrest. The parties agree that two agents had previously gone to Defendant's apartment on June 12, 2017 and had spoken with Mr. Christensen and his then-wife, Ms. Zortman,[1] in their living room about Ms. Zhang's disappearance. At that meeting, both Defendant and Ms. Zortman provided their phone numbers and generally cooperated, allowing the agents to take a cursory look around the apartment and around the car outside. The parties also agree that on June 14, 2017, FBI Special Agents and University of Illinois Police Detectives went to Defendant's apartment around 11:45 p.m., seeking Defendant's cooperation in executing a search warrant for Defendant's car. Law enforcement officers searched Defendant's apartment that night. The parties dispute the circumstances of that search.

According to Defendant's Motion, the law enforcement officers knocked on the door, awakening Defendant and Ms. Zortman, and proceeded to enter the apartment without being invited. Ms. Zortman was nude at the time, and she went into a bedroom to put on a bathrobe. When she returned, Defendant was being led away, and seven agents remained in the apartment "taking photographs and going through her and her husband's belongings." Doc. 100, at 2.

---

[1] During the events in question and at the time this Motion was filed, Defendant was still married to Michelle Christensen. The two have since divorced, and Michelle Christensen has changed her name to Michelle Zortman. The Court will refer to her as Ms. Zortman herein.

Special Agents Tenaglia and Huckstadt interviewed Ms. Zortman for about two hours, and then secured her signature on a Consent to Search form around 1:45 a.m., at which point "the search was approximately two thirds' complete." *Id.* Defendant asserts that Ms. Zortman did not know she was allowed to refuse to permit law enforcement to search her home. *Id.* at 3.

    According to Ms. Zortman's testimony at the evidentiary hearing on this matter, agents awoke her around midnight by knocking on the door. Defendant went to answer the door, and when she came out into the hallway to investigate, agents were standing in the hallway shining flashlights into the residence, although Defendant had turned on a hall lamp. She asked who they were, and they said they were FBI, and that they had a search warrant for Mr. Christensen's car. She was nude at the time. An agent asked her to put some clothes on, so she went into the bedroom alone and put on a robe. When she came back out, agents said they wanted to take Mr. Christensen in for questioning. He said that he didn't know what he should do, and Ms. Zortman advised him that he should probably go with them. He left with a few agents within about five minutes of the initial knock on the door. Then, multiple agents started going through her belongings, taking pictures, and taking things away. Ms. Zortman testified that she was never overtly asked for permission, and that she did not actively object because she did not believe she had a choice. Two agents, Special Agent Tenaglia and someone else, sat down with her at the kitchen table and asked her questions for about two hours. At some point, the interviewing agents asked if they could look around and take some pictures, and Ms. Zortman said "sure." During the interview, she volunteered some information that she wasn't asked for, and she produced a bank statement that she allowed agents to photograph. At the end of the interview, the agents presented Ms. Zortman with a consent form for the search. She claims that they did not read it aloud to her, she did not really process it when she looked at it, she did not know she could refuse to sign it,

and the search was already complete when she did sign it. After she had signed the consent form, she claims that an agent picked up a pair of sunglasses nearby and asked to take a picture of it. She agreed, and the agent took the sunglasses with him.

According to the United States, law enforcement officers did knock on the door, but only after attempting to reach Defendant by phone several times. The officers were attempting to contact Defendant so that he could give them the keys to his car and they could execute their search warrant for his car. When Defendant answered the door to his apartment, he agreed to discuss the search warrant, opened the door fully, and allowed the agents inside. His wife then walked into the living room nude, and initially declined the agents' request that she put some clothes on. Doc. 147, at 4. Special Agent Manganaro asked Defendant if he would be willing to talk with the FBI agents at their office. After conferring with his wife, Defendant agreed to go to the FBI office to talk. Two agents remained at the apartment, and the rest departed with Defendant. The only conceivable "searches" that occurred prior to Ms. Zortman's written consent were when a female agent accompanied Ms. Zortman to the bedroom where she got a robe, and when an agent briefly checked each room for other people. *Id.* at 6. The two agents who remained with Ms. Zortman interviewed her for over an hour, and then asked her if she would consent to a search of the residence. She agreed, signing a form that documented her consent. Only then did the search begin, for which some FBI agents returned to the apartment. *Id.*

According to the six FBI agents who testified at the evidentiary hearing, they initially tried calling Defendant at the number he had previously provided. When he did not answer, they knocked on his door until he opened it. They were aware that it was a late hour, but the search warrant for Defendant's car specifically authorized them to execute the warrant at any time of

4

day or night. When Defendant opened the apartment door, they showed him identification and asked if they could come in and talk. He agreed, opened the door, and stepped aside to let the agents through. There was no yelling, no pushing, and no shining of flashlights. Agents did perform a preliminary visual sweep of the apartment to make sure there were no other people unaccounted for. When agents came in, Ms. Zortman was standing near the hallway, naked, with her hands on her hips. Special Agent Hill asked her to put some clothes on, and she initially declined. When he asked again, she went into a bedroom, and Special Agent Tenaglia accompanied her. Ms. Zortman picked a robe to put on, Special Agent Tenaglia checked the pockets of the robe, then gave it to Ms. Zortman. When they returned to the main entryway, agents were asking Defendant if he would be willing to come to the FBI office for an interview. The reason they wanted to interview him at the office instead of in the home was because of the audio/video equipment available at the FBI office to record the interview. Defendant said to Ms. Zortman that, in these situations, people say to get a lawyer. He asked her what she thought he should do, and she advised him to go with the agents. Defendant got dressed, put shoes on, and left with Special Agent Manganaro. He was not handcuffed, no weapons were displayed, and all of the remaining agents except Special Agent Tenaglia and Special Agent Huckstadt left the apartment when Defendant did. They waited outside, not visible from the apartment, for about two hours while Special Agents Tenaglia and Huckstadt spoke with Ms. Zortman.

      According to Special Agents Tenaglia and Huckstadt, Ms. Zortman was very cooperative. She agreed to be interviewed without hesitation, and she did not appear scared or nervous to them. They did not use any tricks or ruses in their conversation with her, and she generally led the conversation. They offered her breaks, which she took sometimes. At one point, the agents even acknowledged that it was late and they could resume another time, but Ms. Zortman wanted

to keep going. She discussed very personal information with them, and actively got up to provide information that might be useful to the agents, including her bank statement and a book she thought Defendant had been reading. At the end of the interview, the agents asked Ms. Zortman if she would consent to a search of the apartment, and she said yes. She signed a consent form that indicated that she had been advised of her right to refuse consent and that she provided the permission to search voluntarily. Only then did Special Agent Huckstadt go outside and invite the waiting FBI agents to come into the apartment and search. The search took about an hour, during which time Ms. Zortman spoke casually with Special Agent Tenaglia about television shows and other topics. Ms. Zortman did not object to the removal of any items, nor did she ask agents to cease the search at any time. When the agents left, Special Agent Tenaglia provided her business card and cell phone number to Ms. Zortman, which Ms. Zortman used regularly starting within a few hours and going on through June 30, 2017. In her communications with Special Agent Tenaglia in the first few days after the search, she did not express hesitation, regret, or frustration, and she continued cooperating with the investigation. Before Defendant was released, Ms. Zortman asked Special Agent Tenaglia about the possibility of getting a restraining order against Defendant. However, when he was released, the tone of her communications with Special Agent Tenaglia changed. Some messages indicated frustration, including that her computer (taken the night of the search) was not returned to her in a timely manner.

    At the hearing, Defendant introduced Special Agent Hill's report from the night of the search and noted that it did not mention Ms. Zortman declining to dress. The United States introduced a photograph taken by agents at the beginning of the apartment search, where the metadata indicated that the photograph was taken at 1:58 a.m., consistent with the agents' testimony that the search began only after the two-hour interview with Ms. Zortman. Defendant

introduced the same photograph, which the United States agreed that the Defense had not intentionally altered, where the metadata indicated that it was taken at 11:58 p.m., just after the agents' arrival at the apartment. Similarly, the United States had introduced an exit photograph taken at 3:08 a.m., while Defendant introduced the same photograph indicating it was taken at 1:08 a.m., before the interview with Ms. Zortman had concluded. Special Agent Huckstadt returned to the stand and testified that although he is not an expert on metadata, he knows that the pictures were taken at 1:58 a.m. and 3:08 a.m. respectively, and therefore that the United States' copies reflected the accurate time-stamps.

## **LEGAL STANDARD**

Generally, a search conducted without a warrant is considered *per se* unreasonable unless it falls within one of several exceptions to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967). Searches based upon the voluntary consent of an authorized person are one such exception. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Any person with common authority over the premises may consent, despite the lack of consent from an absent party who shares that authority. *United States v. Matlock*, 415 U.S. 164, 170 (1974); *see also United States v. DiModica*, 468 F.3d 495, 500 (7th Cir. 2006) ("Once DiModica was arrested and removed from the scene, Anita's consent alone was valid and permitted the officers to legally search the residence."). In evaluating whether consent is voluntary, courts examine the totality of the circumstances, including such factors as "(1) the age, intelligence, and education of the person who gave consent, (2) whether she was advised of her constitutional rights, (3) how long she was detained before consenting, (4) whether she consented immediately or only after repeated requests by authorities, (5) whether physical coercion was used, and (6) whether she was in

police custody at the time she gave her consent." *United States v. Celitti*, 387 F.3d 618, 622 (7th Cir. 2004) (citing *Schneckloth*, 412 U.S. at 226).

## DISCUSSION

1. **Timing of the Search**

Defendant alleges that the warrantless search of his apartment was unlawful in part because it commenced before Ms. Zortman consented to it. Doc. 100, at 6 (citing *United States v. Starnes*, 501 F. App'x 379, 389 (6th Cir. 2012)). The United States contends that each action by law enforcement leading up to the apartment search was lawful, and that the search did not begin until after Ms. Zortman's consent. Doc. 147, at 6. After reviewing the filings from both parties and weighing the testimony elicited during the evidentiary hearing, this Court finds that the officers did not begin their search prior to Ms. Zortman's consent. When officers were invited into the home, one female agent followed Ms. Zortman into the bedroom while she dressed, and another agent did a brief protective sweep. All but two of the agents left with Defendant, and the remaining two spoke with Ms. Zortman at some length. At the end of their interview, Ms. Zortman agreed to allow the agents to search the apartment, and only then did the search begin. Therefore, the search was not unlawful based on its timing.

2. **Voluntariness of Consent**

The voluntariness of Ms. Zortman's consent is a factual matter requiring this Court to consider the totality of the circumstances, including "(1) the age, intelligence, and education of the person who gave consent, (2) whether she was advised of her constitutional rights, (3) how long she was detained before consenting, (4) whether she consented immediately or only after repeated requests by authorities, (5) whether physical coercion was used, and (6) whether she was in police custody at the time she gave her consent." *Celitti*, 387 F.3d at 622. Based on the

information provided by the parties in their filings and at the evidentiary hearing, it is clear that Ms. Zortman's consent was voluntary.

Multiple factors weigh in favor of voluntariness. Defendant does not dispute that Ms. Zortman is intelligent and attended college. Doc. 100, at 6. He also does not allege that she was repeatedly asked for consent, nor that any physical force or threat of physical force was employed by the law enforcement officers in order to secure her consent. Rather, Defendant bases his claim on the circumstances of that night—namely, as he describes it, officers bursting in the door in the middle of the night, without giving her time to dress, crowding seven agents around her, and then only asking for her consent when the search was complete. If Defendant's contentions and Ms. Zortman's testimony were accurate, they would indeed point toward involuntariness. However, six FBI agents testified credibly that they entered the apartment at Defendant's invitation, requested that Ms. Zortman put on clothes, and asked her consent to search when only two agents remained in the apartment and no search was yet underway. She was cooperative from the moment agents came in, she was not in police custody, she was advised of her right to refuse, and her demeanor throughout her interview with Special Agents Huckstadt and Tenaglia indicated understanding and cooperation. In fact, she continued cooperating with Special Agent Tenaglia in the days following the search. Thus, taking into account the totality of the circumstances, Ms. Zortman's consent to the search of the shared apartment was voluntary. Agents lawfully conducted the search, and evidence seized as a result of the search should not be excluded. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

### 3. Propriety of Defendant's Removal

Defendant argues that, even if Ms. Zortman's consent had been voluntary, it should be deemed invalid because he was "removed from the premises without lawful authority." Doc. 100,

at 171. Defendant cites *dicta* from *Georgia v. Randolph* that suggests that the consent of one occupant might not be sufficient in a scenario where police had removed the potentially objecting tenant "for the sake of avoiding a possible objection." *Georgia v. Randolph*, 547 U.S. 103, 121 (2006). However, another Supreme Court case cited by Defendant precludes the argument that improper motives on the part of the agents would invalidate objectively justified removal and subsequent third-party consent. *Fernandez v. California*, 571 U.S. 292, 302 (2014). In *Fernandez*, the potentially objecting tenant was removed by police for safety reasons and because there was probable cause to arrest him. The Court denied his challenge to his co-tenant's consent, saying "[A]n occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason." *Id.* at 303.

In this case, it appears that Defendant was not "removed" by police as contemplated by *Randolph*. *See Fernandez*, 571 U.S. at 302 (referring to *Randolph* as applying where police "detain or arrest" a potential objector). Instead, Defendant voluntarily agreed to be interviewed at the FBI office, and he left the apartment of his own accord. Even if Defendant's consensual departure from the apartment constituted "removal," Defendant would have to show that the removal was not objectively reasonable. *See United States v. Jones*, 861 F.3d 638, 642. Here, the agents were seeking his assistance in executing the warrant to search Defendant's car, and they had a valid interest in interviewing him with regard to their investigation. Their practice of recording interviews meant that the FBI office was a more convenient location, and Defendant agreed to go there with them. It was objectively reasonable for the agents to ask Defendant to join them at the FBI office, and although there does not appear to be any credible evidence here of an improper motive, such evidence would not be appropriate for this inquiry in any event. *See Fernandez*, 571 U.S. at 302 ("The *Randolph* dictum is best understood not to require an inquiry

10

into the subjective intent of officers who detain or arrest a potential objector but instead to refer to situations in which the removal of the potential objector is not objectively reasonable."). Therefore, Defendant's absence from the apartment does not invalidate Ms. Zortman's consent to the search.

## CONCLUSION

The record demonstrates that the search of Defendant's apartment was performed only after valid, voluntary consent from Ms. Zortman. For the reasons set forth herein, Defendant's Motion (Doc. 100) to Suppress Evidence is DENIED.

Signed on this 14th day of January, 2019.

/s James E. Shadid
James E. Shadid
Chief United States District Judge