IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-CR-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES OF AMERICA'S SUR-REPLY TO THE DEFENDANT'S MOTION FOR AN ORDER ESTABLISHING RULE 12.2 PROCEDURES**

NOW COMES the United States of America, by John C. Milhiser, United States Attorney for the Central District of Illinois, Eugene L. Miller and Bryan Freres, Assistant United States Attorneys, and Department of Justice Trial Attorney James B. Nelson, and respectfully files this sur-reply to the Defendant's motion for an order establishing Rule 12.2 procedures. (R.162).

**PROCEDURAL HISTORY**

The defendant filed his motion to establish Rule 12.2 procedures on December 3, 2018. (R. 162). On December 10, 2018, the United States filed a response to the defendant's motion, and proposed alternate Rule 12.2 procedures to the Court. (R.180). On December 14, 2018, the parties presented oral argument on this issue before the Court in Peoria. On January 4, 2019, the defendant filed a reply brief with regard to Rule 12.2 procedures. (R.198). On January 11, 2019, the United States filed a motion for leave to file a sur-reply on the limited issue of how the Supreme Court's prevailing

clinical standard rule, as announced in *Moore v. Texas* affects the proper scope of the Government's rebuttal examination. (R.200). The Court granted the United States' motion on January 14, 2019.

## ARGUMENT

In his reply brief, the defendant contends that the United States' rebuttal examination must be limited to an extremely narrow scope. (R.198, at 11-19). The defendant, who put his mental health into issue by filing a claim under Rule 12.2, seeks to narrow the tests administered, the questions asked, and the material reviewed during the rebuttal examination – all while demanding the presence of defense counsel. *Id.* Each of those arguments contravenes the clinical standard.

1. **The Court Must Consider the Prevailing Clinical Standard in Establishing Rule 12.2 Procedures in this Case**

The Supreme Court recently reaffirmed that Courts may not substitute their own judgment for that of the clinical community with regard to mental health issues that arise in death penalty litigation. *Moore v. Texas*, ___ U.S. ___, ___, 137 S. Ct. 1039, 1048-53 (2017). In *Moore*, the Texas Court of Criminal Appeals relied on the so-called "*Briseno* factors," Court-created adaptive functioning measures, and held that the defendant had failed to satisfy his *Atkins* claim. *Id.* In reversing that decision, the Supreme Court held that such reliance was improper, and that Courts must rely on the "prevailing clinical standard," as described in the applicable diagnostic manuals, when ruling on mental health claims. *Id.*

2

*Moore* emphasized that clinicians, not lawyers and judges, should determine the proper framework for diagnosing a mental health disorder. *Id*. at 1050 (noting that the trial court improperly focused on multiple *Briseno* factors that were directly at odds with the diagnostic manuals on the adaptive functioning determination). As *Moore* recognized, current diagnostic manuals "offer 'the best available description of how mental disorders are expressed and can be recognized by trained clinicians[.]'" *Id*. at 1039 (quoting DSM–5, at xli). Although the views of medical experts do not "dictate" the Court's actions, such actions "must be 'informed by the medical community's diagnostic framework[.]'" *Id*. at 1048 (quoting *Hall v. Florida*, 572 U.S. 701, 721 (2014)). Put another way, the Court may not "disregard . . . current medical standards." *Id*. at 1049.

Although *Moore* was focused on intellectual disability, the Court's logic is equally apt in the Rule 12.2 context. Here, as in *Moore*, the Court is faced with the issue of what information is, or is not, necessary and relevant to satisfy a mental health diagnosis. As the Supreme Court made abundantly clear, the "trained clinicians" are in the best position to inform the Court as to that decision for the simple reason that they are "trained clinicians" and, as such, they consider these issues every day. Trained clinicians, in turn, rely on diagnostic manuals rather than arbitrary factors created by lawyers and judges. So, too, must this Court. *Id*. at 1048-53. To that end the United States respectfully submits that the Court's Rule 12.2 procedures should defer to the DSM-5 as that manual is interpreted by trained clinicians.

2. **Defendant's Attempts to Limit the United States' Rebuttal Examination is Contrary to Controlling Caselaw and the Clinical Standard**

   a. <u>The rebuttal examination must consider, at a minimum, the known differential diagnoses to the disorders listed in the defendant's Rule 12.2 notice</u>

The defendant repeatedly and incorrectly argues that the United States intends to conduct an "unlimited" and "wide-ranging" examination in response to his Rule 12.2 notice. (R.198 at 11-19). The United States does not intend, nor has it proposed, a fishing expedition for any possible mental health diagnosis. Rather, the United States seeks only to have its own expert determine whether the defendant suffers from the disorders that the defendant has given notice of. (R.161).

The defendant claims that he suffers from a schizophrenic spectrum disorder or other psychotic disorder. Fairness dictates that the United States have a full opportunity to examine the defendant through a full psychological and/or psychiatric examination. *Kansas v. Cheever*, 571 U.S. 87, 94 (2013). As Justice Sotomayor noted in *Cheever*, this issue is akin to a defendant's decision to waive his Fifth Amendment rights at trial: defendants are not entitled to testify on their own behalf, and then refuse to answer the government's questions on cross-examination. *Id*. Having asserted that he suffers from one or more specific disorders enumerated within DSM-5, the defendant has waived the right to object to a "full examination" to determine whether or not the asserted diagnoses are accurate.

As noted in the United States' Response, the scope of the "proper rebuttal examination" in this case is dictated by the breadth of the defendant's Rule 12.2 notice. (R.180, at 12-17). The defendant's notice cites to 35 pages of DSM-5, which include 12

4

separate disorders. (R. 161) (citing DSM-5, at 87-122). Each of those disorders has its own diagnostic features and differential diagnoses. *Id*. The United States cannot rebut the defendant's purported diagnoses without, at the very least, ruling out the differential diagnoses listed in the diagnostic manual.

Moreover, the defendant's unsupported assertion that "the medical process of differential diagnosis in psychiatry is not what the government represents it to be" (R.198, at 16-17) is wrong. *See* Attachment One, Declaration of Dr. Robert L. Denney, Psy.D., A.B.P.P., at ¶ 14 (hereinafter "Denney Declaration").

> It is expected that when a clinician performs the diagnostic interviewing and testing, that any and all conditions that could relate to, or masquerade as, the referring concern be considered and ruled out. In fact, the practice of generating and ruling out alternative diagnoses is central to proper clinical standard of care.

*Id*. As Dr. Denney observes, the fact that an expert's report does not specifically indicate that differential diagnosis were ruled out does not mean that the process was not performed. *Id*. ¶ 15. That is because the ruling out of differential diagnoses is a necessary part of making a diagnosis – thus, by making a diagnosis, the psychologist is stating that the differential diagnoses are not present. As noted by Dr. Denney, the clinical standard *requires* the psychological examiner to utilize interviews and instruments to "consider[ ] alternative symptoms and conditions that might explain the concern at hand." *Id*. ¶ 16 (citations omitted).

Differential diagnoses are especially important because "[g]enerating a differential diagnosis—that is, developing a list of the possible conditions that might produce a patient's symptoms and signs—is an important part of clinical reasoning." *Id*.

5

¶ 14.  Accordingly, "[i]t would be impossible for a clinician to accurately diagnose someone as 'having a disorder on schizophrenia spectrum' or 'not having a disorder on the schizophrenia spectrum' unless that clinician has identified the presence and nature of any condition that might be a differential diagnosis."  *Id.* ¶ 17.

The Supreme Court requires the Courts to defer to the prevailing clinical standard as defined in the applicable diagnostic manuals and applied by trained clinicians.  *Moore*, ___ U.S. at ___, 137 S. Ct. at 1048-53.  The clinical standard clearly states that differential diagnoses must be ruled out to make an accurate diagnosis.  (R.180, at 12-17); Denney Declaration, ¶¶ 14-17.  Thus, *Moore* requires that the United States' experts be allowed to administer any instrument necessary to confirm or exclude the presence of either: (a) a disorder on the schizophrenic or other psychotic spectrum; or (b) a known differential diagnosis to such disorder.

   b.  <u>The United States' experts should not be limited in the tests they administer or the questions that they are allowed to ask the defendant</u>

In performing the rebuttal examination according to the clinical standard, the United States' experts should be permitted to perform a complete examination using whatever instruments or interviews are deemed necessary in their professional opinion.  *United States v. Wilson*, 920 F. Supp. 2d 287, 298 (E.D.N.Y. 2012); *United States v. Hardy*, 644 F. Supp. 2d 749, 751 (E. D. La. 2008).

The defendant objects to this logic, contending that allowing the United States' experts to fully examine the defendant without their prior knowledge of the tests would

6

violate the constitution. (R.198, at 7) (citing *Estelle v. Smith*, 451 U.S. 454, 470 (1981). [1] An identical argument was rejected in *Wilson*, because *Estelle* involved a forced examination where the defendant had not put his mental health in issue. 920 F. Supp. 2d at 303. In *Wilson*, as here, the defendant gave notice of his intent to rely on a mental health claim, thus waiving his constitutional rights as to the rebuttal examination. *Id*. (noting that "when the defendant initiates a 'defense of mental incapacity or disturbance,' he makes a limited waiver of his Fifth Amendment rights that permits the Government to conduct an examination of the defendant as a "'rebuttal to the psychiatric defense.'") (citations omitted). The United States' rebuttal examination ought not to be limited to protect rights that the defendant has waived.

The defendant also contends that the United States' experts should be limited in the types of questions they ask or the subject matters they ask about. This is also a violation of the clinical standard. Denney Declaration ¶¶ 9-12. As Dr. Denney explains,

> It would be contrary to the clinical standard for an examination to restrict the clinical interviewing of Mr. Christensen to a limited area of questioning, because the beliefs and feelings associated with the "excluded" facts and issues might very well encompass psychotic thinking or other thinking that would either be consistent with, or inconsistent with, a "Schizophrenia Spectrum or Other Psychotic Disorder" as defined by DSM-5.

*Id*. ¶ 10. Dr. Denney cites to numerous scientific texts that support his assertion of the clinical standard. *Id*. ¶¶ 10-12. Any concerns about the results of such inquiry are

---

[1] The defendant couches his reliance on *Estelle v. Smith* as a Sixth Amendment consideration. (R.198, at 7). The courts have held that this right is also waived under these circumstances. *United States v. Byers*, 740 F.2d 1104, 1121-22 (D.C. Cir. 1984); *Wilson*, 920 F. Supp. 2d at 304-305; *Sampson*, 335 F. Supp. 2d 166, 247 (D. Mass. 2004).

moot, because the prosecution team is forbidden from reading its experts reports until after the defendant is convicted. Fed. R. Crim. P. 12.2(c)(2). Further, the defendant will have an opportunity to move to suppress any objectionable portion of the experts' testimony from the penalty phase. Given the numerous procedural safeguards in place, the Court should follow the Supreme Court's guidance and allow the United States' experts to examine the defendant in accord with the clinical standard.

Finally, the defendant asserts that the United States must be limited to a single expert examiner. (R.198, at 7) (quoting *United States v. Fell*, 372 F. Supp. 2d 753, 761 (D. Vt. 2005)). This assertion is remarkable, considering that two government experts examined Donald Fell – a fact which is clearly stated on the very page cited by the defendant. *Fell*, 327 F. Supp. 2d at 761 (noting that "[b]oth Drs. Wetzel and Rabun conducted extensive interviews of the defendant at the direction of the government[,]" and "Drs. Wetzel and Rabun . . . should be permitted to complete their evaluation[.]").[2]

Indeed, it is commonplace for multiple experts from both sides to examine a federal capital defendant pursuant to a mental health claim. *See, e.g., United States v. Roof*, 225 F. Supp. 3d 419, 420 (D.S.C. 2016) (holding that "[g]overnment mental health experts may conduct examinations of Defendant necessary to rebut defense experts' anticipated mental health testimony [offered under Rule 12.2(b)(2)]"); *Wilson*, 920 F.

---

[2] The issue in *Fell* was whether the United States could appoint a third expert to re-examine the defendant after the initial examinations had already been performed. *Fell*, 327 F. Supp. 2d at 761-62. This is clearly not the case here. Moreover, the United States notes that the plain language of Rule 12.2(c) does not limit the number of examining experts in any way.

Supp. 2d at 300-01 (holding that the United States' psychologist and psychiatrist could both examine the defendant, as the examinations would not be duplicative); *United States v. Montgomery*, 2014 WL 1516147, at ** 12-16 (W.D. Tenn. Jan. 28, 2014) (defendant examined by two government experts); *United States v. Northington*, 2012 WL 4024944, at **2-5 (E.D. Pa. Sept. 12, 2012) (allowing multiple experts to examine the defendant and administer all of the tests that they deem appropriate). Thus, there is no basis to limit the United States to a single expert.

3. **Defendant's Demand That His Counsel Be Present for the Rebuttal Examination Violates the APA Standard and is Contrary to Prevailing Caselaw**

Though he concedes that there is no legal basis for doing so, defendant insists that his counsel should be present during the examination by the United States' experts. (R.198, at 19-20). In fact, such a request is universally rejected. *See*, *e.g.*, *Sampson*, 335 F. Supp. 2d at 247 (citing cases); *see also Byers*, 740 F.2d at 1121-22.

The defendant's request also runs afoul of the clinical standard. As Dr. Denney explains, empirical research shows that the presence of a third party "alters the testing session in such a manner that test results may no longer reflect a valid performance of the examinee." Denney Declaration ¶ 21. Furthermore, defense counsel's presence would be "inconsistent with the requirements for standardized test administration as set forth in the APA's Ethical Principles of Psychologists and Code of Conduct in that it creates the potential for distraction and/or interruption of the examination." *Id.* (citations omitted).

9

Dr. Denney notes that the clinical standard excludes third party observers because the presence of an observer makes the testing less reliable:

> Observer effects can be such that performance on more complex tasks decline in the observer's presence, leading to a spuriously magnified picture of neuropsychological deficit. The sum total of the effect is to create unknown variability and cause the test results to not correspond to the tests' established known error rates. Ultimately the effect makes the test results unreliable. A recent meta-analysis of third-party observer effects reveals that, overall, test results were significantly poorer when such observation occurred.

*Id.* ¶ 23 (citations omitted).

The defendant conceded during oral argument on January 14, 2019, that there were no third party observers present during the defendant's examination by defense experts – and certainly no one from the prosecution team was present. This difference is critical, because the conditions of the government's rebuttal examination should mirror the defense's examination as closely as possible to maximize the validity of the rebuttal examination. As Dr. Denney points out,

> observation of an examination being conducted for a second opinion may fundamentally alter the test session, in comparison to the initial (unobserved) examination that the patient has already undergone, increasing the risk of motivational effects influencing the testing process. Observer effects can be magnified by the presence of involved parties who have a significant relationship with the patient (e.g. legal representatives or parents who have a stake in the outcome of the examination). In that the presence of third-parties or video camera has been reported to have largely an adverse effect on test performance, insistence on third-party observation may cynically be viewed as an attempt to maximize the likelihood that deficits, even potentially contrived ones, are observed during testing.

*Id.* ¶ 24 (citations omitted). In order to ensure test security and assessment accuracy, the official position of both the National Academy of Neuropsychology and the American Academy of Clinical Neuropsychology is that neuropsychologists "should make every

effort to exclude observers from the evaluation." *Id.* ¶ 26 (citations omitted). The American Psychological Association has also published concerns about the presence of observers. *Id.* (citation omitted).

Given that the presence of defense counsel during the rebuttal examination threatens its accuracy and validity, as recognized by courts and the neuropsychological community alike, the defendant's request for defense counsel to be present when the United States' experts examine the defendant must be rejected.

4. **The Defendant Waived His Psychotherapist-Patient Privilege, and the Clinical Standard Requires the United States' Experts to Review the Defendant's Prior Mental Health Treatment Records As Part of Their Diagnosis**

Finally, the defendant contends that the United States' experts should not have access to prior mental health treatment records as part of their rebuttal examination. This argument also runs afoul of both the law and the clinical standard.

Defendant contends that the United States has not made a showing that such records exist. (R.198, at 25). However, the defendant is in possession of discovery provided by the United States that it received from the University of Illinois pursuant to a subpoena. In its communications with University of Illinois counsel, the United States was specifically informed that such material existed but would not be turned over until the Court ordered them to do so. Moreover, as the defendant is aware, he sought out and received mental health treatment while he was detained at the Macon County Jail. In fact, the defendant was transferred to the Livingston County Jail, in part, because the Livingston County jail has in-house mental health counselors and the defendant wanted

11

to avail himself of that service. Thus, both the United States and the defendant are aware that past mental health records exist.

Not only do the records exist, the defendant has waived any privilege he may have in keeping them confidential pursuant to Rule 501. This is true, because the defendant waived that privilege by giving notice of his intent to present Rule 12.2 evidence, as such notice placed his mental health directly in issue in this case. *See, e.g., United States v. Wilson*, 2012 WL 3890951, at *7 (E.D.N.Y. Sept. 7, 2012) (citing *John Doe Co. v. United States*, 350 F.3d 299, 303 (2d. Cir. 2003); *Kronenberg v. Baker & McKenzie, LLP*, 747 F. Supp. 2d 983, 989 (N.D. Ill. 2010)). The United States' experts are separately entitled to any mental health records relied upon by the defendant's experts because, the defendant's act of providing those records to an expert witness for use in this trial waived the privilege. *United States v. Bolander*, 722 F.3d 199, 223 (4th Cir. 2013).

The defendant's mental health records at the University of Illinois and the Macon County Jail are particularly relevant because, as defense counsel pointed out during the suppression hearing, the defendant was taking prescription medication for depression at the time of the offense. Depression and depressive disorders are specifically enumerated as differential diagnosis for "Schizophrenic spectrum disorder and other psychotic disorders." DSM-5, at 93, 96, 104, 109. As noted above, the United States' rebuttal examination must consider differential diagnoses to comply with the clinical standard.

More importantly, the clinical standard requires that the United States' experts review all prior mental health records prior to making a diagnosis. As Dr. Denney

12

explains, "the nature of neuropsychological examinations in the criminal forensic setting is based on a multi-modal, multi-method examination." Denney Declaration ¶ 5 (citation omitted). The examination "must include subjective accounts of relevant issues (self-report during clinical interview), objective record review, and relevant test data results. That objective record review during a thorough examination should include any already-completed psychological and psychiatric examinations, because past examinations can have an effect on current examinations." Id.³

The United States' experts must be allowed access to the defendant's mental health records from the University of Illinois and the Macon County Jail, because past mental health records "are relevant to ascertaining whether an examinee has symptoms and signs of a mental illness." Id. ¶ 27 (citation omitted). Indeed, "it would fall short of proper clinical standard of practice, and possibly even be unethical to complete a forensic mental health examination without obtaining available prior health records." Id. (citation omitted). As Dr. Denney explains, a mental health diagnosis that does not consider past mental health records would be unreliable because:

> Most severe mental illnesses, such as Schizophrenia Spectrum Disorders and Other Psychotic Disorders, are rather enduring and indications of such conditions would almost certainly present themselves in past clinical records of adults. Thorough forensic mental health assessment requires a multi-data source

---

³ As noted in the United States' Response, this review should include reports or communications prepared by "non-testifying" defense experts. (R. 180, at 24-25) (quoting *Pawlyk v. Wood*, 248 F.3d 815, 821-28 (9th Cir. 2001), *cert. denied* 534 U.S. 1085 (2002)). Not only is the fact-finder entitled to this evidence, the clinical standard requires a review of all past examinations, because "past examinations can have an effect on current examination." *Id.*; Denney Declaration, ¶ 5. *See also Williams v. Florida*, 399 U.S. 78, 82 (1970) (noting that trial is a search for truth, not "a poker game in which players enjoy an absolute right always to conceal their cards. . . .").

>model. . . that incorporates historical documents, including hospital/infirmary records because the natural course of the condition (i.e., its time of onset and evolution over time) must make clinical sense. Genuine mental health conditions make clinical sense over time. The clinical standard for both clinical and forensic psychological assessment clearly requires a review of any existing mental health treatment records in order to provide an accurate diagnosis.

*Id.* (citation omitted).

The defendant has waived the psychotherapist-patient privilege as to mental health treatment records at the University of Illinois and the Macon County Jail. The prevailing clinical standard requires that the United States' experts review those documents as part of their rebuttal examination to ensure an accurate diagnosis. Accordingly, the United States respectfully requests that the Court issue an order declaring that the defendant has waived his privilege as to records for mental health treatment at the University of Illinois and Macon County Jail so that the United States' experts can obtain those records via subpoena.[4]

## CONCLUSION

The Supreme Court requires that this Court use the prevailing clinical standard in establishing Rule 12.2 procedures in this case. That clinical standard, as well as the caselaw, requires that the United States' experts be permitted to conduct a comprehensive and thorough rebuttal examination. As part of this examination, they should be entitled to utilize any testing instruments or interviews that they, in their

---

[4] In the event that the Court does not allow the United States to appoint a firewall counsel, the United States would respectfully request that the Court issue the subpoena and disclose the records directly to both the United States' experts and the defendant, so as not to run afoul of Rule 12.2(c)(2).

clinical judgment, consider to be useful in determining whether the defendant suffers the disorders listed in his notice, differential diagnoses to those disorders, or no disorder at all. Their examinations must also include all of the defendant's prior mental health records. Defense counsel must be excluded from the examinations to preserve their validity and reliability.

Respectfully submitted,

JOHN C. MILHISER
UNITED STATES ATTORNEY

/s/Eugene L. Miller
Eugene L. Miller
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217/373-5891
eugene.miller@usdoj.gov

/s/ James B. Nelson
James B. Nelson
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F. Street NW, Room 625
Washington, DC 20004
Phone: 202/598-2972
james.nelson@usdoj.gov

/s/Bryan D. Freres
Bryan D. Freres, Bar No. IL 6294791
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217/373-5891
bryan.freres@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ James B. Nelson*
James B. Nelson
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F. Street NW, Room 625
Washington, DC  20004
Tel: (202) 598-2872
james.nelson@usdoj.gov