UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17-cr-20037-JES-JEH |
| ) | |
| BRENDT A. CHRISTENSEN, ) | |
| ) | |
| Defendant. ) | |

### ORDER AND OPINION

Now before the Court is Defendant Brendt A. Christensen's Motion (Doc. 99) to Suppress Identification Testimony and Evidence. The United States has filed a Response (Doc. 146) and Defendant has filed a Reply (Doc. 169). An evidentiary hearing was held on January 18, 2019. For the reasons set forth below, Defendant's Motion (Doc. 99) is DENIED.

### BACKGROUND

Defendant Brendt A. Christensen was arrested by federal agents on June 30, 2017, pursuant to a criminal complaint which charged him with the kidnapping of Yingying Zhang, a female Chinese national, in violation of 18 U.S.C. § 1201(a)(1). Doc. 1. Christensen was later indicted by a federal grand jury sitting in the Urbana Division of the Central District of Illinois. *See* Doc. 13 (Indictment), Doc. 26 (Superseding Indictment). The Superseding Indictment charged Christensen with kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) (Count 1), and with making false statements to FBI agents investigating Ms. Zhang's disappearance, in violation of 18 U.S.C. § 1001(a)(2) (Counts 2, 3). Doc. 26. The Superseding Indictment returned by the grand jury also included a notice of special findings regarding the nature of the offense charged in Count 1, including that the death of the victim was intentional, that it occurred during the commission of kidnapping, that it was committed in an especially

1

heinous, cruel, or depraved manner, and that Defendant committed the offense after substantial planning and premeditation. *Id*. The special findings alleged in the Superseding Indictment made the case eligible for capital punishment. *See* 18 U.S.C. § 3591 *et seq.* On January 19, 2018, the United States filed its Notice of Intent to Seek a Sentence of Death ("NOI"). Doc. 54; *see also* 18 U.S.C. §3593(a).

This Motion concerns two witnesses, E.H. and K.K., whom the United States may call to testify against Defendant at trial. Both E.H. and K.K. contacted the University of Illinois Police Department ("UIPD") to report incidents involving a white male driving a black car in the days leading up to Ms. Zhang's kidnapping. At the evidentiary hearing on this matter, Defendant withdrew the portion of the Motion that related to K.K., and so the Court will address only the portion of Defendant's Motion that relates to E.H. For the purposes of this Motion, the following facts are undisputed by the parties.

*(1) Undisputed Facts*

On June 9, 2017, a little before 9:30 a.m. on the day Ms. Zhang was kidnapped, a female graduate student (E.H.) called the UIPD to report suspicious activity. She stated that as she was walking on the University of Illinois campus, a white man driving a black sedan pulled up next to her, showed her a badge on a chain around his neck, and claimed to be an undercover cop. When he asked her to get into the car to answer some questions, she refused, and he drove away. She called the UIPD within minutes of this occurrence.

On June 14, 2017, after Defendant had become a suspect in Ms. Zhang's disappearance, the UIPD requested that E.H. come to the FBI office in Champaign to view a photo array. FBI Agent Manganaro had assembled six driver's license photographs of white men with facial hair. After viewing all six photos, E.H. stated that the third photo (depicting Defendant) may have

shared the most characteristics with the person who approached her, based on his short, dark hair, thin lips, and skin tone. She also stated that she was not positive that the person in the third photo had approached her, because the man who did was wearing sunglasses at the time.

*(2) Disputed Facts*

In their Response, the United States stated that procedure of the photo identifications was not suggestive, and conducted as follows:

Special Agent Manganaro obtained six color photographs of white, male individuals, 25 to 35 years old, with dark hair, including Defendant. Doc. 146, at 3. These photos were drawn from Illinois driver's license photographs, and depicted men of a similar age and skin tone as Defendant. *Id.* E.H. came in around 7:49 p.m. on June 14, 2017. *Id.* An agent not involved with the investigation, Special Agent Jerge, presented the photo array sequentially to E.H. *Id.* Although Special Agent Tenaglia (who was involved with the investigation) was present, she did not influence it. Doc. 169, at 9–10. Before presenting the array, Special Agent Jerge admonished the witness that the individual she had seen might or might not be in any of the photographs shown. *Id.* at 3–4. She was given as much time as she felt she needed to determine if she recognized any individuals, and the agent noted her level of certainty. *Id.* at 4. E.H. said that she was "not positive" and "could not say for certain" but that the picture she identified may have shared the most characteristics with the man she had seen earlier. *Id.*

Defendant contends that both Special Agent Jerge and Special Agent Tenaglia (who was involved in investigating this case) were present during the photo identification procedures. Doc. 99, at 4, 6. Defendant states that the discovery materials make no indication that E.H. received any instructions at all before the sequential photo array. Doc. 99, at 14. Defendant also claims that there is no evidence that the FBI agents asked for the witness to describe her level of

certainty of the identification in her own words, as Defendant claims is required by DOJ policy. *Id.* at 15. Similarly, Defendant asserts that FBI agents violated DOJ policy by failing to record the identifications by audio or video and failing to write the witnesses' reactions down as close to verbatim as possible, with a confirmation from the witness that the statement was accurate. *Id.* Further, Defendant claims that the photo array was suggestive because the photos collected resembled Defendant's driver's license photo (in which he has facial hair) rather than the witnesses' description of the man they encountered (who was clean-shaven), in violation of what they call "required" DOJ policy. *Id.* at 11. Although the United States indicates that the photographs provided to E.H. were in color, Defendant notes that the photographs provided in discovery were black and white, such that one cannot discern the individuals' hair or skin colors. *Id.*

   A hearing was held on January 18, 2019 at which E.H. testified, along with Special Agents Manganaro, Tenaglia, and Jerge. Special Agent Manganaro testified that he had requested driver's license photographs of 25- to 35-year-old men who resembled Mr. Christensen's appearance in his driver's license photo. Special Agent Manganaro then provided these photos to Special Agent Jerge, without telling him which one was Mr. Christensen, and instructed him to conduct a photo lineup. He told Special Agent Jerge to give E.H. however much time she needed and let her know that the person she saw may not be in any of the photographs. Special Agent Tenaglia testified that she was present for the lineup, but that she did not do or say anything that would indicate which photo depicted their suspect, Mr. Christensen. Special Agent Jerge testified that he did admonish the witness that she should take her time and that the man she saw might not be depicted in any of the photos. Special Agent Jerge was the agent who directly administered the lineup, showing each photo to E.H. sequentially. According to Special Agent

Jerge, E.H. looked through the pile sequentially more than once, examining each picture for about a minute or two. Special Agent Jerge testified that at some point E.H. fanned out the photographs on the table, before finally identifying the picture of Mr. Christensen.

E.H. testified that when she first showed up for the identification procedure, she had not planned to identify anyone: she was concerned about the risk that she would identify the wrong person. When she arrived at the FBI office, E.H. followed Special Agent Tenaglia to a small room where a male agent she had not met before (Special Agent Jerge) conducted the lineup procedure. Special Agent Tenaglia stayed in the room, but E.H. did not remember her saying anything. E.H. viewed the photos one by one, and she had a physical reaction to the third photo (depicting Mr. Christensen). She said she felt sick to her stomach and thought that it might be him, but looked through all six photographs and then went back to the top of the pile again. E.H. did not have a physical reaction to any of the other pictures. She pointed out the third photo as the man she had seen, and Special Agent Jerge asked her if she was sure. When she said "pretty sure," he instructed her to look at all six photographs again. At some point, she hesitated between photograph five and photograph three, and she set those pictures side by side before deciding that the third photograph did depict the man she had seen. She again indicated that she was "pretty sure." Special Agent Jerge asked her to assign a percentage value to her certainty, and she clarified that it was difficult because the man she had seen had been wearing sunglasses at the time, but that she was about 60% sure. E.H. testified that because Special Agent Jerge kept asking if she was sure and suggesting she look through the photos again, she thought maybe she had picked the wrong person, but that even after reviewing all of the other photos and thinking hard about it, she continued to believe that the third photo showed the man who had approached her in his car on June 9, 2017.

**LEGAL STANDARD**

Federal Rule of Evidence 401 provides that evidence is relevant where it has any tendency to make a fact more or less likely and the fact is of consequence in the action at hand. This is a broad standard. "To be relevant, evidence need not conclusively decide the ultimate issue in a case, nor make the proposition appear more probable, but it must in some degree advance the inquiry." *Thompson v. City of Chicago*, 472 F.3d 444, 453 (7th Cir. 2006) (internal citations omitted). Federal Rule of Evidence 403 provides that the Court may exclude even relevant evidence where the probative value of such evidence is substantially outweighed by unfair prejudice, confusing the issues, misleading the jury, or other factors. "Most relevant evidence is, by its very nature, prejudicial." *United States v. Boswell*, 772 F.3d 469, 476 (7th Cir. 2014) (quoting *United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010). Courts must determine whether the evidence is so prejudicial that it will cause the jury to decide the case on a basis other than the evidence presented, or, in other words, whether the potential harm that could come from the evidence is greater than its probative value. *United States v. Klebig*, 600 F.3d 700, 713–15 (7th Cir. 2009).

Courts may also exclude identification testimony and evidence where the identification procedures were so unnecessarily suggestive that they created a substantial chance of a misidentification. First, courts examine whether the procedure used by law enforcement was unduly suggestive. Second, if the procedure was unduly suggestive, courts look at the totality of the circumstances to determine whether the testimony is reliable despite the suggestive procedure. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012) ("[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification ordinarily will be admitted, and the jury will ultimately determine its worth.").

When courts reach the second step of this inquiry, factors to be considered in determining reliability include 1. the opportunity the witness had to view the subject originally, 2. the witness' degree of attention at the initial incident, 3. the accuracy of the witness' previous description of the subject, 4. the witness' level of certainty during the identification, and 5. the length of time between the initial sighting and the identification. *See Perry*, 565 U.S. at n.5 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)).

## DISCUSSION

*(1) Relevance of the Identification*

Defendant has moved to suppress the evidence related to E.H.'s identification on the ground that "such evidence is not relevant to any material fact or proposition in this case," because the testimony is too general and unreliable. Doc. 99, at 6. In response, the United States contends that this evidence makes it more likely that Defendant had been driving his black Saturn Astra during the relevant time period; that he had been driving around campus looking for female student victims; that he was not merely giving Ms. Zhang a ride on the day she disappeared but was instead pretending to be a police officer to lure her into the car for the purpose of kidnapping her; and that his statement to the FBI that he was home all day on June 9, 2017 was false. Doc. 146, at 5. In his Reply, Defendant argues that these reasons are "specious," as there is "no basis for [E.H.'s] expected testimony as having any tendency of proving it was the defendant" who approached her. Doc. 169, at 2. At the evidentiary hearing, Defendant reiterated the position that E.H.'s description was utterly vague, and that her identification of the third photograph was so nondescript that it could have identified almost anyone. The United States maintained that E.H.'s description of the man she saw, together with her description of the car he drove, the fact that she reported her interaction before Ms. Zhang was abducted, and the nature

7

of her described interaction with him, suffice to link the evidence to the Defendant reliably enough to permit its admission at trial.

In a similar case, the Seventh Circuit affirmed the admission of a defendant's prior conversations with potential victims before he ultimately committed the crime for which he was on trial, because such testimony was relevant to show his intent. *United States v. Romero*, 189 F.3d 576, 588 (7th Cir. 1999). Defendant asserts that this is a different situation because the identity of the defendant in *Romero* as the person speaking with the prior potential victims was established beyond any doubt. Doc. 169, at 3. Instead, Defendant suggests that this situation is more akin to *United States v. Westmoreland*, 312 F.3d 302, 311 (7th Cir. 2002), in which the Seventh Circuit could not discern the relevance of a letter whose author was never established. Doc. 169, at 3. However, the evidence at issue here does make it more likely that Defendant was driving around in a black car on June 9, 2017, intending to convince a female student to get in the car by pretending he was a police officer. E.H.'s description of the man who approached her included a description that matched Defendant and a description of a car that matched Defendant's car. Possible defects in the credibility or ultimate accuracy of the identification are appropriately attacked by Defendant at trial, not by suppression. *See Manson v. Braithwaite*, 432 U.S. 98, 116 (1977) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."). The Court determines that the evidence involving E.H. is relevant, and thus DENIES this ground of the Motion.

*(2) Probative Value and Prejudicial Effect of the Identification*

Defendant claims that "whatever probative value" the identification may have, "it is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury that would result to Mr. Christensen if such evidence is admitted at trial in a case where

he is charged with kidnapping resulting in death." Doc. 99, at 8. Defendant does not elaborate on how the identification would cause unfair prejudice or confuse or mislead the jury, even in his Reply. Doc. 169, at 4.

"Most relevant evidence is, by its very nature, prejudicial." *United States v. Boswell*, 772 F.3d 469, 476 (7th Cir. 2014) (quoting *United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010). Courts must determine whether the evidence is so prejudicial that it will cause the jury to decide the case on a basis other than the evidence presented, or, in other words, whether the potential harm that could come from the evidence is greater than its probative value. *United States v. Klebig*, 600 F.3d 700, 713–715 (7th Cir. 2009). Here, the evidence appears to be probative on a number of fronts, including the falsity of certain statements Defendant made to FBI agents about his whereabouts on June 9, 2017. Any prejudicial effect the evidence would have is outweighed by its probative value—evidence that Defendant may have approached another woman on campus and asked her to get in his car is not likely to cause the jury to act irrationally, such that it should be excluded. *See United States v. Miller*, 688 F.3d 322, 327 (7th Cir. 2012); *see also Romero*, 189 F.3d at 588 (finding that prior conversations attempting to lure other victims were "highly probative of [Defendant's] intent," and denying a Rule 403 challenge on appeal). Thus, the Court DENIES this ground of the Motion as well.

*(3) Suggestiveness and Reliability of the Identifications*

Defendant primarily argues that the identification procedure used by police in this case was unduly suggestive, and that the identification itself was unreliable. Doc. 99, at 8–9. At the evidentiary hearing, Defendant argued that the witnesses had described three different versions of the identification procedure, which the Defendant considered nothing short of astounding.

These differences included details like the duration E.H. spent looking at each photograph and where she placed the photographs when she was not looking at them.

The Seventh Circuit has previously found that even non-sequential photo arrays are not unduly suggestive, although "careful officers tell a witness that a photo spread does not necessarily include any suspect." *United States v. Johnson*, 745 F.3d 228 (7th Cir. 2014). In this case, the photographs were shown sequentially, depicting five other men with similar physical appearance to Defendant, and shown to the witness by an agent who did not know which photo depicted Defendant. Additionally, the witness was told that the suspect might not be in any of the photos. Doc. 146, at 3–4. Although law enforcement deviated from a Department of Justice guidance memorandum suggesting that officers show witnesses photographs matching their initial descriptions, there is a simple explanation for that here—law enforcement had reason to believe Defendant might be the perpetrator, and they did not have a neutral-looking photograph of Defendant without facial hair. *Id.* at 8, n.2.

The procedures of the photo identification at issue in this case provided that the real perpetrator might not be in the photographs, were administered by a party who did not know which photograph depicted Mr. Christensen, and were sufficient to prevent any impermissible suggestion. The FBI agents testified inconsistently about whether E.H. observed the photographs for "minutes" versus "seconds," and about whether E.H placed the photographs in a pile face-up or face-down. However, as the United States argued at the evidentiary hearing, none of the varying accounts of that procedure pointed toward impermissible suggestion. If anything, E.H. testified that the manner in which the lineup was conducted made her *less* sure that her identification of Defendant was correct, not more.

For the reasons listed above, the Court finds that the identification was not unduly suggestive. Therefore, like the Court in *Johnson*, this Court need not address its underlying reliability. *Johnson*, 745 F.3d at 230. This ground of Defendant's Motion to Suppress is therefore DENIED.

## CONCLUSION

For the reasons set forth above, Defendant's Motion (Doc. 99) is DENIED.

Signed on this 29th day of January, 2019.

/s James E. Shadid
James E. Shadid
Chief United States District Judge