## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-CR-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES OF AMERICA'S RESPONSE TO THE DEFENDANT'S MOTION TO EXCLUDE DNA AND SEROLOGY TEST RESULTS AND REQUEST FOR *DAUBERT* HEARING**

NOW COMES the United States of America, by John C. Milhiser, United States Attorney for the Central District of Illinois, Eugene L. Miller and Bryan D. Freres, Assistant United States Attorneys, and James B. Nelson, Department of Justice Trial Attorney, and hereby requests that this Court deny the Defendant's Motion to Exclude DNA and Serology Test Results and Request for *Daubert* Hearing (R.119) because (1) the probabilistic genotyping software used in this case is a reliable methodology to assign a weight to a DNA match; (2) the defendant does not need and is not entitled to the source code for the proprietary software; (3) comparing alleles by size (*i.e.,* length) is a reliable methodology to determine a match or inclusion of a sample to a known source; (4) the presumptive serology test results using luminol and phenolphthalein are relevant and not unfairly prejudicial; and (5) the confirmatory serology test results were obtained by use of a reliable methodology.

## BACKGROUND

A federal grand jury charged the defendant, Brendt A. Christensen, with kidnapping Yingying Zhang, and further alleged that he intentionally killed her in an especially heinous, cruel, and depraved manner after substantial planning and premeditation. (R.26) The defendant has made recorded statements that he took the victim to his apartment and engaged in conduct that would result in her bleeding in the apartment.

At trial, the United States intends to present expert testimony regarding the identification of deoxyribonucleic acid (DNA) and blood identified from samples taken from the defendant's apartment, which confirm the defendant's statements. Some of the samples were identified by the use of luminol, which can detect minute traces of blood even after an attempt has been made to wash the blood away. The samples were analyzed at the FBI Laboratory in Quantico, Virginia, using reliable principles and methods generally accepted in the scientific community. More specifically, in conducting its DNA analysis, the FBI Laboratory compared the length of alleles and used proprietary probabilistic genotyping software called STRmix™. Regarding the serology results, the FBI laboratory used phenolphthalein and Takayama hemochromogen testing.

Thereafter, the United States produced to the defendant multiple reports of examinations and tests under Rule 16(a)(1)(F) of the Federal Rules of Criminal Procedure, including reports concerning the results of the use of luminol, DNA testing, and serology testing. The United States also disclosed to the defendant under Rule

2

16(a)(1)(G) the written summary of the expected expert testimony of FBI Forensic Examiner Amanda Bakker, which the United States intends to use during its case-in-chief at trial, as well as proficiency testing regarding Ms. Bakker.

Additionally, the United States also provided the defendant with the notes (over 500 pages) of Ms. Bakker, the 1A Case File generated by the FBI Evidence Control Coordinator, a CD Rom containing relevant raw computer data files, including raw data collected in the course of a capillary electrophoretic run, and a CD Rom containing the Laboratory Operations Manual and the Standard Operating Procedure to include the FBI Approved Standards for Testimony and Report Language utilized by the DNA Unit and STR frequency tables. The United States also made relevant STR databases and data files related to the FBI's internal validation study available for the defense's inspection at the FBI Laboratory in Quantico, Virginia. Furthermore, the United States referred the defense to multiple journals detailing the samples used in the databases, allele frequencies, developmental validation studies of STRmix, and the FBI's internal validation study.

On July 11, 2018, after providing all of this information, the United States requested that the defendant provide to the United States, pursuant to Rule 16(b)(1)(C), a written summary of any testimony that the defendant intended to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, which described the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications. (The request noted that, at the time, the Court's scheduling order required

disclosure of the defendant's non-Rule 12.2 expert witnesses, including rebuttal experts,

on or before August 24, 2018.)

On August 24, 2018, the defendant disclosed that he intended to elicit expert

testimony on the following subject:

> DNA, to rebut the government's expert testimony if necessary, and to challenge the reliability of the DNA and serology results from the FBI Laboratory in Quantico, Virginia. The specific expert on this topic has not yet been identified, although he/she will be associated with and/or employed by Forensic Bioinformatics, 2850 Presidential Drive, Suite 160, Fairborn, OH, 45324.

In the same disclosure, the defendant noted that he had not yet identified and/or

retained the individual witness who would testify and that, recognizing his obligations

under Rule 16(b)(1)(C), he would disclose all written summaries of any testimony that he

intended to offer as soon as it became available. To date, the defendant has not identified

his expert witness or disclosed a written summary of testimony beyond the paragraph

quoted above.[1]

On that same date, the defendant filed a motion to exclude the DNA and serology

test results and requested a *Daubert* hearing. (R.119) Regarding the DNA test results, the

defendant alleged that there are "potential problems with the application of probabilistic

genotyping software," including "the scientific validity of probabilistic genotyping

---

[1]The defendant recently filed a motion alleging that the lapse in government funding has prevented retention of his mental health experts. (R.213) Although the United States responded to the motion separately (R.219) and the motion does not discuss DNA experts, the United States would note that the defendant had identified the employer of their DNA expert by August 24, 2018. As the lapse in government funding did not begin until December 22, 2018, it is unclear why the defendant could not provide an expert report, or at the very least, identify an expert from the disclosed employer in the intervening four months.

algorithms" and that the algorithms "are not free of subjectivity." Therefore, the defendant requested the Court (1) require the United States to disclose the source code for STRmix to be examined for errors by a defense expert; and (2) conduct a *Daubert* hearing regarding the reliability of the probabilistic genotyping and STRmix.

Regarding the serology testing, the defendant requested that the Court (1) exclude the results of any luminol[2] or phenolphthalein tests from trial under Rules 401, 402, and 403 of the Federal Rules of Evidence; and (2) conduct a *Daubert* hearing regarding the reliability of any serology confirmatory testing, specifically, Takayama hemochromogen testing.

On January 30, 2019, the defendant filed a supplemental memorandum in support of his motion to exclude the DNA test results. The supplemental memorandum did not disclose the identity of the defense DNA expert or a written report. Instead, the defendant raised a new issue. He claimed that the FBI's DNA test results are unreliable because he alleges the FBI analyst should have used a new DNA analysis methodology referred to as next-generation sequencing (NGS), rather than the procedure that has been used for years at the FBI Laboratory and at forensic laboratories throughout the United States.

---

[2] Luminol was not used by the FBI Laboratory, but by the crime scene technicians at the defendant's apartment to identify locations from which to obtain suspected biological samples for further testing. Because this evidence has evidentiary value beyond the identification of blood itself and explains why and where the technicians obtained the samples they sent to the FBI Laboratory, the evidence should be admitted, as argued, *infra.* Moreover, the technicians who applied the luminol and obtained the samples would be testifying as fact witnesses, not expert witnesses.

The defendant still has not identified an expert who will testify regarding the reliability of the evidence he challenges at any *Daubert* hearing or at trial. In fact, at a previous hearing, the defendant indicated he intended merely to call the government expert at the scheduled *Daubert* hearing and cross-examine her. This is improper. The defendant should not be allowed, under the guise of a *Daubert* motion, to cross-examine the government's expert prior to trial, while shielding his own expert not only from cross-examination, but also from disclosure and a possible *Daubert* challenge. The defendant's motion should be denied without a hearing, or in the alternative, the hearing should be limited to relevant pre-trial matters, as argued, *infra*.[3]

## APPLICABLE LAW

### I.   Scientific Testimony And Rule 702 Of The Federal Rules Of Evidence

In 1993, the Supreme Court interpreted Rule 702 of the Federal Rules of Evidence as abandoning the prior requirement that a necessary precondition to admissibility of scientific evidence was that it be generally accepted in the scientific community (the so-called "*Frye* test"). *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Instead, the Court held that the Federal Rules of Evidence require a trial judge to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* The Supreme Court later suggested the same analysis might apply in

---

3 Based on the defendant's claims, including his most recent claims made on January 30, 2019, the United States would intend to call FBI Forensic Examiner Jerrilyn M. Conway to rebut the defendant's claims, if an evidentiary hearing is held.

assessing the reliability of non-scientific expert testimony. *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167 (1999).

In 2000, Rule 702 was amended in response to *Daubert* and *Kumho*, causing the Seventh Circuit to recently note that Rule 702 has superseded *Daubert. Kansas City S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016); *but see Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (noting that "*Daubert* interpreted an earlier version of Rule 702, but it remains the gold standard for evaluating the reliability of expert testimony and is essentially codified in the current version of Rule 702"). Rule 702 allows a qualified expert to testify if (a) the expert's scientific knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In evaluating whether the testimony is the product of reliable principles and methods, a district court should focus solely on the reliability of the principles and methods. The reliability of the ultimate conclusion is for the jury to decide, not the district court during a pretrial hearing:

> Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . . Rule 702's requirement that the district judge determine that the expert used reliable methods does not ordinarily extend to the reliability of the conclusions those methods produce — that is, whether the conclusions are unimpeachable." The district court usurps the

> role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed.

*Manpower*, 732 F.3d at 806 (citations omitted) (reversing district court where it "supplanted that adversarial process with its admissibility determination"); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) (finding that trial "judge's exclusion of . . . expert testimony on reliability grounds intruded too far into the province of the jury"); *In re Processed Egg Products Antitrust Litigation*, 81 F. Supp. 3d 412, 416 (E.D. Pa. Jan. 26, 2015) ("Proponents of expert testimony do not 'have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.'") (citations omitted).

In assessing the reliability of a scientific expert's principles and methods, a district court should look at factors such as (1) whether the scientific theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*).

II.     **DNA Testing Using Probabilistic Genotyping Software**

As long ago as 2009, the Supreme Court stated that "DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty. It has the potential to significantly improve both the criminal justice system and police investigative practices." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009). The Supreme Court's acceptance of DNA testing has only grown over the years: "The advent of DNA technology is one of the most significant scientific advancements of our era. The . . . utility of DNA identification in the criminal justice system is already undisputed. Since the first use of forensic DNA analysis to catch a rapist and murderer in England in 1986, law enforcement, the defense bar, and the courts have acknowledged DNA testing's" reliability. *Maryland v. King*, 469 U.S. 435, 442 (2013) (citation omitted).

Thus, the results of DNA tests are universally admitted by courts in the United States, which have found that DNA analysis has the capacity to consistently, and with a high degree of certainty, demonstrate a connection between an evidentiary sample and a specific individual source. *Osborne*, 5557 U.S. at 80 (Alito, J. concurring) ("DNA tests can, in certain circumstances, establish to a virtual certainty whether a given individual did or did not commit a particular crime.") (citing *Harvey v. Horan*, 285 F.3d 298, 305 (4th Cir. 2002)). In fact, DNA testing is so well-accepted, that Congress had codified it in the United States Code. 18 U.S.C. § 3600. In 2013, the Supreme Court recognized that, although current DNA technology made it "possible to determine whether a biological

tissue matches a suspect with near certainty," "[f]uture refinements may improve present technology." *King*, 569 U.S. at 443.

Those future refinements have included the use of probabilistic genotyping and related software, such as STRmix. *See United States v. Morgan*, 675 F. App'x 53, 56 (2d Cir.), *cert. denied*, 138 S. Ct. 176 (2017) (noting that the New York Office of the Chief Medical Examiner was "discontinuing its use of LCN testing in favor of newer technology that produces reliable results," namely, probabilistic genotyping and new STR analysis software); *see also United States v. Lee*, No. 17-3559, 2018 WL 6600956 (2d Cir. Dec. 14, 2018) (rejecting defendant's challenge to use of STRmix probabilistic genotyping software).

Relevant here, probabilistic genotyping and STRmix software only come into play after an analyst finds a match between two DNA samples. At that point, the analyst assigns a weight to the match through statistical analysis. STRMix is a probabilistic genotyping software that calculates a likelihood ratio for DNA typing results. The FBI began using STRMix in its forensic laboratories in 2015 to assist in assigning statistical weights to its DNA typing results.

Every court to have considered the issue has found that the use of probabilistic genotyping and STRmix software are scientifically reliable and the results admissible. *See, e.g., People v. Smith,* No. 340845, 2018 WL 4926977, at *8 (Mich. App. Oct. 9, 2018); *People v. Muhammad,* No. 338300, 2018 WL 4927094, at *5 (Mich. App. Oct. 2, 2018); *People v. Blash,* No. 2015-CR-156, 2018 WL 4062322, at *8 (V.I. Super. Aug. 24, 2018); *United States v. Pettway*, No. 12-CR-103S, 2016 WL 6134493, at *3 (W.D.N.Y. Oct. 21, 2016); *People*

*v. Bullard-Daniel*, 42 N.Y.S.3d 714, 725-26 (N.Y. Cty. Ct. Mar. 10, 2016); *see also United States v. Oldman,* No. 18-CR-0020, Document 227, at 12 (D. Wyo. Dec. 31, 2018) (unpublished opinion) (finding probabilistic genotyping and STRmix software "are scientifically valid, proven, and tested"); *Smith v. State,* No. 12-16-139-CR, 2017 WL 1534048, at *2 (Tex. App.-Tyler Apr. 28, 2017) ("The new [STRmix] software can reliably consider all the available data"); *State v. Wakefield*, 9 N.Y.S.3d 540, 547 (N.Y. Sup. Ct. 2015) (holding as matter of first impression that DNA evidence using computerized probabilistic genotype analysis (*i.e.*, TrueAllele) is reliable and admissible).

## III.   DNA Testing Comparing Alleles By Length

Relevant to the defendant's supplemental memorandum, all forensic DNA analysts – including the analyst in this case – compare subject DNA samples with known DNA samples by comparing the size (*i.e.*, length) of alleles at different locations (or loci). The current approach is to compare the length of these alleles for the 23 short tandem repeat (STR) loci most commonly used in the United States and the world. For example, in this case, the analyst conducted a comparison between the victim's known DNA to the DNA recovered from various samples from the defendant's apartment and calculated a likelihood ratio. Given the DNA results, the likelihood ratios ranged from 1.4 quintillion ($1.4 \times 10^{18}$) to 97 octillion ($9.7 \times 10^{28}$). These likelihood ratios provide support that the victim was a contributor to the DNA in the defendant's apartment.

Next-generation sequencing (NGS) of the alleles is a potential improvement on current technology, much like probabilistic genotyping and STRmix software. Nonetheless, unlike those improvements, NGS has not yet been fully developed and

validated for forensic laboratories and is not commonly used in forensic analysis.

Moreover, NGS is simply a more discriminating technology; it in no way suggests that

the long-established methods of DNA analysis used in this case are unreliable. In fact,

NGS would not result in an exclusion; it would be used simply to bolster the likelihood

ratios determined through length analysis. Here, given the incredibly high likelihood

ratios already generated (1.4 quintillion to 97 octillion), NGS would add little to the

relevant analysis. More importantly, the development of NGS methodologies do not in

any way draw into question the reliability of the DNA results in this case.

**IV.    Serology Testing**

Forensic serology is the scientific identification and analysis of bodily fluids,

including blood, on items of evidence. Today, serology is not used for source attribution

because forensic DNA identity tests are more sensitive, specific, and easier to perform.

Instead, serology is used to identify the tissue type of stain or biologic material. DNA,

because it is present in all cells and tissues, cannot be used to distinguish between tissue

types. At crime scenes, stains may or may not be obvious. Luminol sprayed over

surfaces will cause blood to fluoresce bright blue under UV irradiation. The test is so

sensitive it can detect minute traces of blood even after an attempt has been made to

wash the blood away.

Serologic tests can be presumptive or confirmatory. Presumptive tests are

typically chemical color tests, which are generally sensitive, but nonspecific.

Confirmatory tests are highly specific, but can lack sensitivity. Serologic testing, which

does not interfere with DNA tests, is followed by DNA testing, which itself is specific to humans.

Presumptive blood tests take advantage of the peroxidase activity of blood. For example, in the presence of hydrogen peroxide solution, blood will cause phenolphthalein to turn pink. The confirmatory Takayama hemochromogen test procedure produces a positive result where the ferrous iron from hemoglobin reacts with pyridine to create red feathery crystals of pyridine ferroprotoporphyrin.

"[C]ourts . . . regularly admit evidence of Luminol testing for the presence of blood . . . ." *Cooper v. Brown*, 565 F.3d 581, 596 (9th Cir. 2009) (Fletcher, J. dissenting*)*. For example, a district court has noted that "[w]e have held that luminol testing, as a scientific procedure, is sufficiently reliable for what it purports to do: presumptively indicate the possible presence of blood." *Dodd v. Workman*, No. CIV-06-140-D, 2011 WL 3299101, at *60 (W.D. Okla. Aug. 2, 2011) (citing *Robedeaux v. State*, 866 P.2d 417, 425, *cert. denied*, 513 U.S. 833 (1994)), *aff'd in part, re'd in part on other grounds sub nom. Dodd v. Trammell*, 753 F.3d 971 (10th Cir. 2013); *cf. Holtzer v. Davis,* No. 2:06-CV-169, 2009 WL 723881, at *1 (W.D. Mich. Mar. 11, 2009) (affirming conviction where testimony presented at trial was that luminol testing was a first line test for blood and could possibly detect the presence of blood).

Similarly, the confirmatory serological test used here (the Takayama hemochromogen test) to identify the biologic material as blood has been found reliable and admissible. *See, e.g., United States v. Williams*, No. 06-79, 2013 WL 4518215 at (*9 (D. Haw. Aug. 26, 2013) (rejecting *Daubert* challenge to the Takayama confirmatory test,

13

which "was developed between 1910 and 1912 and has become a standard confirmatory test for the presence of blood").

## V.   No Pretrial Hearing Is Required to Admit Scientific Testimony Under Rule 104

Under Rule 104(a) of the Federal Rules of Criminal Procedure, the proponent of expert testimony has the burden of demonstrating it satisfies Rule 702's requirements by a preponderance of the evidence. Fed. R. Evid. 702, advisory committee's note to 2000 amendment (citing *Bourjaily v. United States,* 483 U.S. 171 (1987)). This burden may be satisfied without an evidentiary hearing, as Rule 104(a) specifically provides that the court is not bound by evidence rules in making its determination; in other words, a defendant is not entitled to an evidentiary hearing under Rule 702 simply because he requests one.

In fact, where the proponent proffers sufficient evidence that the expert used reliable principles and methods, and the defendant presents no evidence to the contrary, the trial court should not hold an evidentiary hearing. *See, e.g., United States v. Eastman*, 645 F. App'x 476, 481 (6th Cir. 2016) (affirming admission of DNA testimony at trial without *Daubert* hearing where defendant "present[ed] no groundbreaking evidence that leads us to question" the reliability of DNA evidence); *United States v. Pettway*, No. 12-CR-103S, 2016 WL 6134493, at *2 (W.D.N.Y. Oct. 21, 2016) (denying *Daubert* hearing regarding DNA evidence based on defendant's failure to present any expert opinion or scientific evidence challenging reliability of STRmix); *United States v. Fell,* No. 5:01-CR-12-01, Document 914, at 9 (D. Vt. Sept. 19, 2016) (unpublished opinion) (refusing to hold evidentiary hearing on admissibility of DNA evidence because defense arguments went

to weight of evidence and did not "raise credible systemic concerns about the practice

and use of DNA identification"); *United States v. McCluskey*, 954 F. Supp. 2d 1224, 1233-34

(D.N.M. 2013) (finding pretrial *Daubert* hearing on DNA not warranted because

sufficient record to determine reliability); *see also, e.g., United States v. John*, 597 F.3d 263,

274–75 (5th Cir. 2010) (holding district court did not err in refusing to hold a *Daubert*

hearing on fingerprint evidence because reliability of the technique had already been

tested in the adversarial system); *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 523

(3d Cir. 2008) (finding "no benefit in holding a *Daubert* hearing" where sufficient record

to ascertain methodology and make reliability determination); *United States v. Crisp*, 324

F.3d 261, 268 (4th Cir. 2003) ("Under Daubert, a trial judge need not expend scarce

judicial resources reexamining a familiar form of expertise every time opinion evidence

is offered. In fact, if a given theory or technique is 'so firmly established as to have

attained the status of scientific law,' then it need not be examined at all, but instead may

properly be subject to judicial notice); *United States v. Nichols*, 169 F.3d 1255, 1263 (10th

Cir. 1999) (finding trial court did not err in declining to hold a preliminary evidentiary

hearing where the challenged evidence did not involve any new scientific theory or

testing methodologies).

    Finally, over 20 years ago, the Eighth Circuit held that district courts were not

required to conduct *Daubert* hearings regarding the reliability of DNA analysis because

they could take judicial notice of its reliability:

> Having considered all of Beasley's arguments, we conclude that the District Court did not abuse its discretion in admitting the government's evidence showing a "match" between the DNA in the hairs found in the rubber mask and Beasley's DNA. Moreover, we believe that the reliability of the PCR method of DNA analysis is sufficiently well established to permit the courts of this circuit to take judicial notice of it in future cases.

*United States v. Beasley,* 102 F.3d 1440, 1448 (8th Cir. 1996). Cf. *United States v. Beverly*, 369 F.3d 516, 528 (6th Cir. 2004) ("[t]he use of nuclear DNA analysis as a forensic tool has been found to be scientifically reliable by the scientific community for more than a decade").

**RESPONSE**

**I.     The Reliability Of DNA Testing Using Probabilistic Genotyping And Strmix**

The specific issue raised by the defendant's motion is the reliability of the principles and methods used to analyze the DNA in this case. More specifically, the defendant's motion raises "concerns about the scientific validity of probabilistic genotyping algorithms" based primarily on one cited article. (R.119 at 7) In other words, the defendant has not challenged (1) the qualifications of Ms. Bakker; (2) whether her testimony would help the jury understand the evidence or to determine a fact in issue; (3) whether her expected testimony is based on sufficient facts or data; or (4) whether she has reliably applied the principles and methods to the facts of the case. Thus, the sole issue raised by the defendant's motion as to the DNA analysis is the reliability of probabilistic genotyping, STRmix, and the length analysis of alleles.

As noted earlier, there are four areas the courts have identified as particularly relevant to whether scientific principles and methods are reliable: (1) whether the

scientific technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community. In this case, application of each of those factors shows that the use of probabilistic genotyping and STRmix software is a reliable scientific methodology.

As the court addresses reliability of the methodology, it is helpful to realize that STRmix "represents an evolution in the process of DNA interpretation using existing accepted biological models and scientific principles rather than a completely new or novel approach to DNA analysis." *Pettway*, 2016 WL 6134493, at *2 (quoting John P. Simich, Ph.D., Director of the Erie County Forensic Laboratory).

### A.    Testing

Probabilistic genotyping using STRmix has been subjected to validation studies. First, the developer itself subjected STRmix to various different validation studies. *Muhammad,* 2018 WL 4927094, at *3; *Blash*, 2018 WL 4062322, at *7. The mathematics underlying the software involve a well-established method, and the development team performed the first 500 steps of the mathematics chain by hand, performed "true donor" and "false donor" tests, and tested STRmix against other software. *Muhammad,* 2018 WL 4927094, at *3; *see also Oldman,* No. 18-CR-0020, Document 227, at 12 (finding probabilistic genotyping process and STRmix software "are scientifically valid, proven, and tested").

Moreover, the FBI also conducted its own internal validation study prior to implementing STRMix. The validation study involved the use of over 300 mixtures of DNA from known contributors and around 200 non-contributor DNA samples that were analyzed against those mixtures. In total, the study included about 60,000 tests. The findings were published in the peer-reviewed journal, Forensic Science International: Genetics. *Blash*, 2018 WL 4062322, at *7. Other laboratories have also subjected STRmix to validation studies. *Muhammad*, 2018 WL 4927094, at *3.

Attached hereto are the published findings of several of these validation studies. *See, e.g., Scientific Working Group on DNA Analysis Methods (SWGDAM) Guidelines for the Validation of Probabilistic Genotyping Systems* (June 15, 2015) (Exhibit A); *Developmental validation of STRmix, expert software for the interpretation of forensic DNA profiles*, Forensic Science International: Genetics 23 (2016) 226-239 (Exhibit B); *Internal validation of STRmix for the interpretation of single source and mixed DNA profiles*, Forensic Science International: Genetics 29 (2017) 126-144 (Exhibit C); *Internal validation of STRmix – A multi laboratory response to PCAST,* Forensic Science International: Genetics 34 (2018) 11-14 (Exhibit D).

### B.  Peer Review and Publication

STRmix has been favorably reviewed in at least 19 peer-reviewed scientific journals, *Smith*, 2018 WL 4926977, at 8*, and peer-reviewed in more than 90 articles. *Pettway*, 2016 WL 6134493, at *2. Research regarding the reliability, validation, and underlying principles of STRmix has been published in a multitude of peer-reviewed journals such as *Forensic Science International, Australian Journal of Forensic Sciences, and Journal of Forensic Sciences. Blash*, 2018 WL 4062322, at *6. The National Institute for

Standards Technology presented scientific information on probabilistic genotyping, and
SWGDAM published guidelines for probabilistic genotyping in June 2015; STRmix was
presented to the New York Commission on Forensic Science, which adopted the DNA
Subcommittee's recommendation to accept STRmix for casework. *Muhammad*, 2018 WL
4927094, at *4. The DNA Subcommittee consisted of scientists in the fields of molecular
biology, population genetics, laboratory standards and quality assurance, and forensic
science. *Bullard-Daniel*, 42 N.Y.S.3d at 723.

Additionally, the FBI has instituted several standard operating procedures and
policies that govern the DNA Casework Unit's work, as well as the use of STRMix, and
those policies and procedures align with the standards established by the International
Organization for Standardization (ISO) and Quality Assurance Standards for Forensic
DNA Testing Laboratories. *Blash*, 2018 WL 4062322, at *6. The FBI laboratories undergo
accreditation by an outside accreditation body to ensure that the laboratories are
satisfying ISO standards for testing laboratories, and the DNA Casework Unit
specifically is audited against national DNA casework standards by other DNA experts
in the field. *Blash*, 2018 WL 4062322, at *6.

C.     **Rate of Error**

There is no evidence that STRmix's software has ever caused a false inclusion, and
its developers only know of two errors causing false exclusions, both of which occurred
during specific testing exercises rather than when used in an actual case. *Smith*, 2018 WL
4926977, at *8. In fact, STRmix has been subjected to "massive tests of false donors,

hundreds of millions," and the software had not made a "false positive" identification. *Muhammad*, 2018 WL 4927094, at *4.

### D.      Generally Accepted in Relevant Scientific Community

By 2018, STRmix was being used in at least 17 laboratories in the United States, including the laboratories of the FBI and the United States Army, and at least 65 additional laboratories have purchased the software are in the validation process for transitioning to its use. *Smith*, 2018 WL 4926977, at *8. Additionally, all but one of the states in Australia use STRmix, and there have been at least 40,000 cases processed in Australia without any discernable error. *Muhammad*, 2018 WL 4927094, at *4. To date, STRmix software is now being used by 43 labs in the United States, all 9 state and territory labs in Australia, and 11 labs elsewhere in the world. https://johnbuckleton. wordpress.com /strmix/.

### E.      No Evidentiary Hearing Is Warranted

Given that the reliability of probabilistic genotyping and STRmix has been established in numerous courts based on its extensive validation, favorable peer review, low error rate, and general acceptance in the relevant scientific community, the United States has met its burden of establishing the reliability of the methodology by a preponderance of the evidence. The defendant has offered no expert or other scientific evidence to support a challenge to the reliability of the methodology. Therefore, the Court should deny his motion without an evidentiary hearing.

Moreover, it would not be appropriate to allow the defendant the opportunity to cross-examine the government expert prior to trial as to the reliability of her conclusions,

as opposed to the reliability of the methodology. The defendant has already shown a general litigation strategy of using pre-trial hearings to cross-examine government witnesses on matters, such as the reliability of an expert's opinion, that should not be permitted until trial.

## II.    The Defendant's Request To Obtain The Source Code For Strmix

In his motion, the defendant requests that the Court order the United States to provide the source code for the STRmix software to the defendant for review by an unidentified "defense expert." This appears to be a discovery request. Prior to filing the motion, the defendant did not request the source code from the United States. On July 11, 2018, the United States informed the defendant in response to a prior request as to any commercial software programs used in the DNA testing in this case, that the United States used STRmix software and directed the defendant to its website at strmix.esr.cir.nz/.

The source code for STRmix commercial software is proprietary information that is not in the possession of the FBI or the United States. Therefore, the United States is unable to provide the defendant with the source code.[4] Regardless, for the numerous reasons set forth, *supra,* review of the proprietary source code is not necessary to find that using STRmix software to assist with probabilistic genotyping is a reliable methodology. *See., e.g., Blash,* 2018 WL 4062322, at *8 (finding STRmix scientifically valid,

---

4 The STRmix website provides information for defense legal teams on how to access STRmix software. *See* http://strmix.esr.cri.nz/assets/Uploads/Defence-Access-to-STRmix-April-2016.pdf.

reliable, and relevant despite defendant's argument that he needed access to its source code); http://strmix.esr.cri.nz/assets/Uploads/Defence-Access-to-STRmix-April-2016.pdf ("The developers consider that the STRmix™ software is best tested by examining the Extended Output for the compiled STRmix™ software, rather than the source code. The Extended Output of STRmix™ contains the intermediate steps of the STRmix™ interpretation process, allowing individual forensic laboratories, or experts for the defence, to verify the accuracy of STRmix™.")

### III.  Comparing Alleles By Length Is A Reliable Methodology

In his supplemental memorandum, the defendant requests that the Court bar the admission of the DNA test results simply because a more discriminating methodology, *i.e.,* next-generation sequencing (NGS), is being developed. As discussed, *infra,* the method used in this case of comparing the length of alleles is the standard method used by DNA forensic analysts. The United States has found no case that has found this method to be unreliable, and the defendant cites none in his supplemental memorandum. Moreover, the United States has found no case finding that NGS somehow renders prior DNA methodologies unreliable.[5] Again, the defendant cites to no such cases, but relies solely on citations to various literature. For example, no court has excluded fingerprint evidence as unreliable just because DNA evidence might be more discriminating.

---

[5] In fact, the United States has found no case finding that the use of NGS itself is reliable and admissible, nor has the defendant cited any. No doubt, if the United States attempted to introduce evidence of NGS, the defendant would argue (as he has regarding STRmix) that it has not yet been sufficiently validated. If the defendant's argument were accepted, no DNA test results would be admitted in courts throughout the United States.

Importantly, the literature cited by the defendant does not support his claim that "evaluating an allele by length alone is, in fact, not the most reliable way to interpret DNA." (Def. Memo. at 5) While NGS has the potential to be more *discriminating*, none of the literature suggests it is more *reliable* than prior methodologies. Moreover, where the likelihood ratios are already in the quintillions, as in this case, NGS offers little forensic improvement.

By way of analogy, a witness may identify a suspect that they already know by his height, weight, skin color, a scar on his face, a tattoo on his forehead, and a gold tooth. To say the witness was not as discriminating as he could be (*e.g.,* he could not number the hairs on the suspect's head), is not to question the reliability of the identification. None of the literature cited by the defendant supports excluding the DNA test results in this case, and no court has done so based on the ongoing development of "next-generation sequencing." The defendant's argument that the DNA results in this case should be excluded based on his unsupported claim that NGS is the only appropriate DNA testing method should be rejected.

## IV.  The Admissibility Of Luminol And Phenolphthalein Testing.

In his motion, the defendant also requests the Court to bar the admission of evidence of the results of the use of luminol or phenolphthalein testing as more prejudicial than probative under Rule 401, 402, and 403 of the Federal Rules of Evidence. The defendant first argues that, because these tests are not conclusive, they are irrelevant. This argument conflicts with the plain language of Rule 401(a), which defines

evidence as relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence."

In other words, evidence need not be conclusive to be relevant; it only must make a fact of consequence more or less probable. The results of the luminol testing in this case make it more probable that blood was found in the defendant's apartment. Thus, the evidence is highly relevant. Here, the defendant "mistakenly equates a presumptive, *i.e.* inconclusive, scientific procedure with an unreliable, and therefore inadmissible, one. To be admissible, evidence need not be irrefutably conclusive of anything; it must only tend to make the existence of a particular fact of consequence more or less probable." *Dodd*, 2011 WL 3299101, at *60.

Moreover, in the context of the other evidence in this case, the results of these presumptive tests is highly relevant. First, where enough evidence remained for testing, the presumptive testing identifying blood was confirmed by later testing and corroborated by the results of DNA testing. Second, the identification, location, and pattern of the blood (including human hand prints) were consistent with the defendant's own later recorded statements as to what occurred in the apartment. Third, the evidence will show the defendant took extensive steps to clean the apartment after his alleged offense, thereby preventing confirmatory testing, but leaving trace amounts that were detected by the preliminary testing.

In 2010, the California Supreme Court addressed and rejected similar arguments that the results of presumptive blood testing are irrelevant and unfairly prejudicial:

24

The circumstance that presumptive tests for blood on a jacket that might have been defendant's indicated the jacket might have had bloodstains in a pattern consistent with the murder in issue tends "in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The factors raised in defendant's challenge to this evidence— that the presumptive tests could not confirm the substance tested was human blood, that confirmatory tests failed to confirm the presence of blood, and that it is unknown when the jacket might have been exposed to the substance that created the positive results—do not mean the test results have no tendency in reason to establish that defendant shot Agent Cross. Those issues affect the probative weight of the evidence, not whether the test results meet the threshold requirement of relevancy. The trial court did not abuse its discretion in finding this evidence was relevant.

Similarly, the trial court did not abuse its discretion by finding that the danger of undue prejudice, confusion of the issues, or misleading the jury did not substantially outweigh the evidence's probative value. " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " Evidence need not be excluded under this provision unless it "poses an intolerable ' "risk to the fairness of the proceedings or the reliability of the outcome." ' " The testimony regarding the presumptive blood tests had no particularly emotional component, nor did it consume an unjustified amount of time. Further, because the defense fully explored the limitations of the presumptive tests through cross-examination, there is no likelihood this evidence confused or misled the jury. The trial court did not err, and defendant's constitutional rights were not violated.

*People v. Alexander*, 235 P.3d 873, 924 (2010), *as modified on denial of reh'g* (Sept. 29, 2010); *see also Dyleski v. Grounds*, No. 12-CV-05336, 2016 WL 3194997, at *34 (N.D. Cal. June 9, 2016) (no error admitting testimony that a portion of the overcoat tested presumptively positive for blood, where it "responded fluorescently," because any potential issues went to the test's weight, not admissibility).

Other states have joined California in admitting evidence of presumptive blood tests. *See, e.g., Com. v. Hetzel*, 822 A.2d 747, 763 (Pa. Super. 2003) (phenolphthalein

testing); *State v. Canaan*, 964 P.2d 681, 694 (Kan. 1998) (luminol testing); *State v. Stenson*, 940 P.2d 1239, 1264 (Wash. 1997) (en banc) (phenolphthalein testing); *State v. Moseley*, 445 S.E.2d 906, 912 (N.C. 1994) (phenolphthalein testing); *Johnston v. State*, 497 So.2d 863, 870 (Fla. 1986) (luminol testing).

The non-controlling, minority state cases cited by the defendant present different factual situations, have been distinguished by their own courts, and do not counsel against admission of presumptive test results in this case. For example, in the Connecticut state case cited by the defendant, the police seized clothing and a pair of black shoes from the defendant's apartment; no blood was found on the clothing, but a stain was found on one of the soles of the defendant's shoes. *State v. Moody*, 573 A.2d 716, 722 (1990). The court, concerned that this isolated stain on the bottom of a shoe might only be animal blood, held that it was error to admit it into evidence. *Id.* This is far from the fact pattern presented here, where there is other substantial evidence tending to establish that the blood is the victim's blood, including DNA testing, the defendant's own statements, and the shape, pattern, and location of the stains revealed through the use of luminol.

In fact, Connecticut's own courts have distinguished *Moody* in precisely such a situation. For example, a court found that where the results of the presumptive testing of stains were also corroborated based on their shape, pattern, and location, "the facts in the present case are sufficiently distinguishable from those in *Moody* so as to render *Moody* inapplicable here." *State v. Downing,* 791 A.2d 649, 654 (Conn. App. 2002) (admitting evidence of presumptive blood tests). Moreover, multiple other courts have

likewise distinguished *Moody,* including the Connecticut Supreme Court itself. *See, e.g., State v. Grant,* 944 A.2d 947, 971 (Conn. 2008) (holding trial court properly admitted blood evidence because "*Moody* stands only for the proposition that, when the *sole* evidence that a substance was blood is the result of a presumptive testing method . . . the evidence is nonprobative") (emphasis in original); *State v. Jeffrey,* 601 A.2d 993, 998 (Conn. 1991) (declining to extend *Moody* and noting that "challenges to the evidence do not require its exclusion, however, because 'evidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion, even to a slight degree.'"); *Weinberg v. Comm'r of Correction,* 962 A.2d 155, 166 (Conn. App. 2009) (finding that admission of evidence that presumptive blood found on knife seized from apartment "is easily distinguishable from *Moody*").

Here, the blood was not identified as a small stain on the bottom of a shoe; it was identified in significantly larger areas, including handprints, in the defendant's apartment. Some of the samples have been positively identified as blood (through confirmatory testing) with the victim's DNA located in those same samples. Moreover, unlike in *Moody,* the other evidence in the case, including the defendant's own statements, establish the presence of the victim's blood, making the presumptive test results tending to establish the location of the blood highly relevant.

Similarly, the Arkansas state cases cited by the defendant do not warrant exclusion of the presumptive testing in this case. In one case, the defendant wanted to offer into evidence the results of a *negative* luminol test to prove the absence of blood, but offered no evidence as to the likelihood of a false negative test. *Houston v. State,* 906

S.W.2d 286, 287 (Ark. 1995). The court held that the district court did not abuse its

discretion in excluding the evidence of this novel use of luminol for lack of reliability

(not relevance). *Id.* It also noted that "luminol test results are not relevant per se . . .

*without* additional factors that relate that evidence to the crime . . . ." *Id.* (emphasis

added). As noted above, there are many additional factors here that relate the luminol

evidence to the defendant's alleged crime. Moreover, the Arkansas court's decision in

*Brenk v. State,* 847 S.W.2d 1, 9 (Ark. 1993), was based on now-outdated science. The court

was concerned with admitting preliminary testing because it "could not establish the

blood type of the samples or connect the samples in any way with the victim." *Id.* With

the advent of DNA testing, analysts do not conduct blood type testing to connect the

samples to the victim; they use DNA testing. Here, such testing was used and confirms

the presence of the victim's DNA in some of the same samples from the apartment that

were presumptively identified as blood.

Finally, the Alaska case cited by the defendant simply affirmed the district court's

decision to exclude the preliminary testing because no confirmatory tests whatsoever

were conducted. *State v. Fukusaku*, 85 Haw. 462, 497, 946 P.2d 32, 67 (1997). Here,

confirmatory and DNA tests established the presence of blood and the victim's DNA,

respectively, in the defendant's apartment. Therefore, the evidence is not only relevant,

but as found by the majority of the courts to address the issue, its probative value is not

substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

V.      **The Reliability Of Takayama Hemochromogen Testing**

Interestingly, after arguing that presumptive tests should not be admissible

without confirming blood tests (R.119 at 8-10), the defendant goes on to argue that

confirmatory testing is unreliable.[6] The defendant does not present any expert opinion or

scientific evidence, however, challenging the reliability of Takayama hemochromogen

testing. Instead, the defendant claims that, even though the test has been a standard

confirmatory test for blood for over 100 years, "nobody has ever taken the time to

validate such a test as reliable." While he cites to articles that note that Takayama

hemochromogen testing itself does not distinguish between human blood and blood of

an animal, this does not indicate that the test is unreliable in identifying blood, only that

it has limitations. Moreover, he fails to note that, when coupled with DNA testing, the

test is capable of identifying a biological sample as human blood.

The Takayama hemochromogen test, which has long been in use to confirm the

presence of blood, has been found reliable and admissible. *See, e.g., Williams*, 2013 WL

4518215, at *9 (rejecting *Daubert* challenge). The defendant cites no case that supports his

challenge to the reliability of the confirmatory testing.

In fact, the defendant in *Williams* advanced the same arguments as the defendant

here, namely, that (1) the analyst failed to sufficiently document what she had done; and

(2) the test had not been validated. *Id.* The district court rejected these arguments

---

[6] The defendant also suggests that there is insufficient evidence to show Ms. Bakker conducted the testing correctly, but as argued, *supra,* that is a matter for trial, not a pretrial hearing under Rule 702. *See Manpower*, 732 F.3d at 806 ("Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced.").

because (1) the analyst recorded her observations in a report; and (2) given that the Takayama confirmatory test has been a standard confirmatory test for the presence of blood for over 100 years, the lack of recent validation is unsurprising. *Id.* Moreover, the court also noted that studies established that false positives using the Takayama test are unlikely. *Id.* Therefore, the court found the defendant's arguments went to the weight of the evidence, not its admissibility. *Id.* The same is true of the defendant's arguments here.

WHEREFORE, the United States of America respectfully requests that this Court deny the Defendant's Motion to Exclude DNA and Serology Test Results and Request for *Daubert* Hearing without an evidentiary hearing.

Respectfully submitted,

JOHN C. MILHISER
UNITED STATES ATTORNEY

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
eugene.miller@usdoj.gov

s/ James B. Nelson
James B. Nelson
Trial Attorney
Capital Case Section
United States Department of Justice
Washington, DC 20004
1331 F St. NW, Room 625
Washington, DC 20004
Phone: 202/598-2972
james.nelson@usdoj.gov

s/ Bryan D. Freres
Bryan D. Freres
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875; Fax:  217-373-5891
bryan.freres@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2019, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send notification of the

filing to all CM/ECF participants.

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217-373-5891
eugene.miller@usdoj.gov