IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-CR-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES OF AMERICA'S MOTION
FOR AN ORDER ESTABLISHING JURY SELECTION PROCEDURES**

NOW COMES the United States of America, by John C. Milhiser, United States Attorney for the Central District of Illinois, Eugene L. Miller and Bryan D. Freres, Assistant United States Attorneys, and Department of Justice Trial Attorney James B. Nelson and, pursuant to the Court's scheduling order (R.67), respectfully files this motion for an order establishing the jury selection procedures outlined below.

**HISTORICAL BACKGROUND**

The Federal Death Penalty Act (FDPA) of 1994 was enacted as Title VI of the Violent Crime Control and Law Enforcement Act of 1994 and became effective on September 13, 1994 (codified at 18 U.S.C. 3591-3598). In passing this legislation, Congress established constitutional procedures for imposition of the death penalty for 60 offenses under 13 existing and 28 newly-created Federal capital statutes. The FDPA created a bifurcated trial and sentencing scheme whereby the court or jury that determined the defendant's guilt determines whether the penalty of death is the

appropriate punishment for crime committed. Federal Rule of Criminal Procedure 24(b) provides for 20 peremptory challenges for defendants in a capital case and 10 challenges in other felony cases. The exercise of peremptory challenges is a statutory or rule-based right, and is "not of federal constitutional dimension." *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000). Moreover, a district court is not required to give any additional peremptory challenges in multiple defendant capital cases. *See United States v. Lopez*, 649 F.3d 1222 (11th Cir. 2011).

The FDPA did not alter or dictate the jury selection process or the mechanics. At least one federal district court has conducted panel voir dire exclusively and not allowed the attorneys for either the government or the defense to question prospective jurors. *See United States v. Caro*, Case No. 1:06-CR-00001 (W.D. Va.) (R.402). Jury selection in that federal capital trial took four days. *Id*. (R.536-1).

On the other end of the spectrum, some courts have allowed individual, sequestered voir dire and allowed extensive attorney participation in the voir dire process by both the prosecution and the defense. *United States v. Tsarnaev*, Case No. 13-CR-10200 (D. Mass.) (voir dire lasted approximately two months); *United States v. Savage*, Case No. 2:07-cr-00550 (E.D. Pa) (voir dire lasted more than four months); *United States v. Williams*, 06-cr-79 (D. Haw.) (voir dire lasted more than two months).[1]

---

[1] These numbers are not anomalies. *See Davis v. Ayala*, ___ U.S. ___, ___, 135 S. Ct. 2187, 2193 (2015) (noting that individual voir dire "lasted more than three months, and during this time the court and the parties interviewed the prospective jurors and then called back a subset for general voir dire."

Still other courts have taken a middle road and conducted most of the voir dire themselves, but allowed counsel for the prosecution and defense to ask limited questions on the issue of death qualification. Under those procedures, voir dire has been completed in three days. *See United States v. Coonce, Hall*, Case No. 10-cr-3029 (W.D. Mo.) (R. 727); *United States v. Ebron*, Case No. 1:08-cr-00036 (E.D. Tex.) (R.218)

## LEGAL FRAMEWORK

Jury selection must be adequate to assure the defendant receives a jury whose members are able to impartially follow the Court's instructions and evaluate the evidence. *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). The exact scope of questioning is committed to the broad discretion of the Court. *United States v. Tipton*, 90 F.3d 861, 877 (4th Cir. 1996) (citing *Rosales-Lopez*, 451 U.S. at 188 and *Ham v. South Carolina*, 409 U.S. 524, 527 (1973)); *accord* Fed. R. Crim. P. 24(a). With limited exceptions, no particular questions are constitutionally required, unless a failure to ask them would "render the trial fundamentally unfair." *See Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991) (rejecting any requirement to ask questions about the content of pretrial publicity to which prospective jurors were exposed). Federal Rule of Criminal Procedure 24 does not even mandate that a jury questionnaire be used.

Nevertheless, certain areas of inquiry are required in capital cases. Questioning must consist of more than general fairness and "follow the law" questions. *Morgan v. Illinois*, 504 U.S. 719, 734-35 (1992). General inquiries are inadequate to determine if a venire member has views about the death penalty that would prevent him or her from following the law and considering all aggravating and mitigating evidence. *Id*. at 735.

Upon a capital defendant's request, the Court must ask if a venire member would automatically vote for the death penalty, regardless of the facts, if the defendant was convicted of a capital offense. *Id*. at 726-27. Thus, the Court should permit direct questions to determine if prospective jurors would automatically vote for or against the death penalty. *See Morgan*, 504 U.S. at 733-34,738; *Tipton*, 90 F.3d at 878 (stating the best method for determining if a prospective juror would automatically vote for the death penalty is to ask directly).

Jury selection should be conducted in the courtroom and open to the public. "The process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Press-Enter. Co. v. Superior Court of California, Riverside Cnty.*, 464 U.S. 501, 505 (1984) ("Press-Enterprise I"). The right to a public trial flows from the First and Sixth Amendments of the Constitution and applies to every phase of the criminal trial, including pre-trial motions. *See Waller v. Georgia*, 467 U.S. 39, 43 (1984); *Gannett Co. v. DePasquale*, 443 U.S. 368, 379 (1979); *In re Oliver*, 333 U.S. 257, 266-73 (1948). The explicit Sixth Amendment right of the defendant to a public trial is complemented by an implicit, albeit "qualified," First Amendment right of the press and public to attend the proceedings. *See Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 9 (1986) ("Press-Enterprise II"). The First Amendment privilege extends to jury selection. *Press-Enterprise I*, 464 U.S. 509-10.

## ARGUMENT

As argued more fully below, both judicial economy and the interests of justice support an order by this Court to utilize panel *voir dire* in the jury selection process and prevent the defendant from utilizing the "Colorado Method" which is designed to delay and prejudice the jury selection process rather than to ensure that a fair and impartial jury is seated in this case.[2]

---

[2] The Court need look no further than the attachments to the defendant's Motion in Support of Defendant's Proposed Supplement to the Joint Jury Questionnaire (R.179) to see the real impact the defendant's proposed jury selection procedures has on the jury selection process and the length of voir dire. Attached to that motion is the Declaration of Matthew Rubenstein regarding the purported use of the defendant's proposed jury selection procedures in other federal cases (the Colorado Method). The Colorado Method, which the defendant proposes to use here, includes impermissible stakeout questioning throughout the jury selection process (or what the defendant calls "case-specific" or "case-category" questions) for the purpose of building a record to challenge jurors and avoid finding a fair and impartial jury. Rubenstein offers 21 cases in his declaration where the defendant's proposed procedures and questioning has allegedly been allowed in at least some fashion. Of those 21 cases, 17 went to trial, and the United States was able to find data on 16 of those 17 cases. The voir dire process in those 16 cases took an average of 15 ½ days of in-court time, and around one month of actual time to pick a jury. *See United States v. Wilson*, No. 1:04-CR-01016-NGG (E.D.N.Y. 2013) (30 days of court time, 2 ½ months of actual time to select jury); *United States v. Savage*, No. 2:07-CR-00550-RBS (E.D. Pa. 2012) (30 days of court time, just under 3 months of actual time to select jury); *United States v. Burgos-Montes*, No. 3:06-CR-00009-JAG (D.P.R. 2012) (25 days of court time, 2 months of actual time); *United States v. Sampson*, No. 1:01-CR-10384-LTS (D. Mass. 2016) (21 days of court time, over one month of actual time); *United States v. Candelario-Santana*, No. 3:09-CR-00427-JAF-1 (D.P.R. 2013) (16 days of in-court time, over three weeks of actual time); *United States v. Basciano*, No. 1:05-CR-00060-NGG (E.D.N.Y. 2011) (15 days of in-court time, over 3 weeks of actual time); *United States v. Anh the Duong*, No. 01-CR-20154 (N.D. Cal. 2010) (14 days of court time, approximately one month of actual time); *United States v. McCluskey*, No. 1:10-CR-02734-JCH (D.N.M. 2013) (14 days of in-court time, approximately 3 weeks of actual time); *United States v. Phillips*, No. 2:07-CR-00549 (E.D. Pa. 2009) (14 days of in-court time, approximately three weeks of actual time); *United States v. O'Reilly*, No. 2:05-CR-80025-VAR-1 (E.D. Mich. 2010) (13 days of in-court time, approximately one month of actual time); *United States v. Casey*, No. 3:05-CR-00277-

**1. The Court Should Utilize Panel *Voir Dire* During the Selection Process**

The United States respectfully suggests that the legal decision that most impacts the length of trial will be the Court's decision concerning whether to conduct voir dire individually or in small panels. No particular type of voir dire is constitutionally required, but the disparity in judicial economy can be enormous.

The trial court retains great flexibility in determining how voir dire is conducted in a capital case. *Mu'Min*, 500 U.S. at 427. The Supreme Court has not directly addressed whether individual voir dire is required in a capital case, but the Courts of Appeal have held that it is not. *United States v. Nelson*, 347 F.3d 701, 706-07 (8th Cir, 2003), *cert. denied*, 543 U.S. 978 (2004); *Trujillo v. Sullivan*, 815 F.2d 597, 606-607 (10th Cir. 1987), *cert. denied*, 484 U.S. 929 (1987); *Wingo v. Blackburn*, 783 F.2d 1046, 1051-52 (5th Cir. 1986), *cert. denied*, 481 U.S. 1042 (1987); *McCorquodale v. Balkcom*, 721 F.2d 1493, 1496 (11th Cir. 1983), *cert. denied,* 466 U.S. 954 (1984). The Supreme Court declined the opportunity to review these cases and rule that such a constitutional right exists. *See also Sheffield v. Lack*, 862 F.2d 316 (Table), at *1 (6th Cir. 1988).

The United States respectfully submits that panel voir dire conducted by the Court, with opportunities for follow-up questions by counsel is the most efficient means

---

ADC (D.P.R. 2013) (13 days of in-court time, approximately three weeks of actual time); *United States v. Lujan*, No. 2:05-CR-00924 (D.N.M. 2011) (12 days of in-court time, approximately three weeks of actual time); *United States v. Con-Ui*, No. 3:13-CR-00123-ARC (M.D. Pa. 2017) (11 days of in-court time, over two weeks of actual time); *United States v. Lecco*, No. 2:05-CR-00107 (S.D. W. Va. 2010) (8 days of in-court time, just under two weeks of actual time); *United States v. Williams*, No. 1:06-CR-00079-JMS-KSC (D. Haw. 2014) (8 days of in-court time); *United States v. Salad*, No. 2:11-CR-00034-RBS (E.D. Va. 2013) (3 days of in-court time).

of selecting an impartial jury in this case. This method was utilized, and approved by the Supreme Court, in *Mu'Min*. 500 U.S. at 431. As the Supreme Court held,

> The voir dire examination conducted by the trial court in this case was by no means perfunctory. The court asked the entire venire of jurors four separate questions about the effect on them of pretrial publicity or information about the case obtained by other means. One juror admitted to having formed a belief as to petitioner's guilt and was excused for cause. The trial court then conducted further voir dire in panels of four, and each time an individual juror indicated that he had acquired knowledge about the case from outside sources, he was asked whether he had formed an opinion; none of the jurors seated indicated that he had formed an opinion. One juror who equivocated as to her impartiality was excused by the trial court on its own motion. Several other jurors were excused for other reasons. It is quite possible that if voir dire interrogation had revealed one or more jurors who had formed an opinion about the case, the trial court might have decided to question succeeding jurors more extensively.

*Id*. This method allowed the Court to exclude jurors that could not fairly sit for the trial without creating a series of mini-trials as to each prospective juror's answer to every inquiry in the questionnaire as well as their thoughts on the application of the death penalty in hypothetical circumstances.

On the other hand, giving the parties a lengthy time to conduct "individual" voir dire might unnecessarily complicate and lengthen the jury selection process with no appreciable value added. This is true because individualized, sequestered voir dire allows for the implementation of the "Colorado Method," which was developed by capital defense attorneys in order to "conduct capital voir dire in a manner that maximizes the opportunity to obtain life verdicts." *See* Rubenstein, *Overview of the Colorado Method of Capital Voir dire*, 34 Champion 18 (2010). The Colorado Method

advocates that "attorneys should discourage the court from using language that suggests the voir dire process is designed to identify jurors who can be 'fair' or 'appropriate' for the case." *Id.* at 21.

During individual voir dire, there may be a broad spectrum of case-specific questions that interfere with the Court's ability to efficiently select an unbiased and impartial jury. *See United States v. Johnson*, 366 F. Supp. 2d 822, 835-44 (N.D. Iowa 2005) (Describing the use of "abstract questions," "Defendant status" questions, "Case-categorization" questions, "case-specific" questions, and "stakeout" questions). These questions are designed and asked in an effort to manufacture inconsistency in a potential juror's answers and, thus, disqualify them from the jury.

As noted in *Johnson*, "Abstract questions" include such questions as "If you found the defendant guilty, would you automatically vote to impose the death penalty no matter what the facts are?" *Id.* at 835. "Defendant status" questions include questions such as those related to racial bias. *Id.* at 836. "Case-categorization" questions ask a prospective juror about his or her ability to consider a life or death sentence, or both, in the particular category of capital case, such as murder-for-hire, felony-murder, or rape-murder, that the jurors would hear. *Id.* at 838. "Case-specific" questions are "questions that ask whether or not jurors can consider or would vote to impose a life sentence or a death sentence in a case involving stated facts, either mitigating or aggravating, that are or might be actually at issue in the case that the jurors would hear." *Id.* at 840. Finally,

8

"stake-out" questions are certain case-specific questions that seek "to ask a juror to speculate or pre-commit to how that juror might vote based on any particular facts" *Id*. at 842.

The Eighth Circuit considered the scope of appropriate jury questions in *Ramsey v. Bowersox*, 149 F.3d 749 (8th Cir. 1998). In *Ramsey*, the defendant challenged his death sentence by claiming that the court impermissibly refused to ask jurors the following questions:

1. Could each of you consider the death penalty in this case with the understanding that under Missouri law you are never required to impose it?

2. If Roy Ramsey is convicted of first-degree murder, are there any of you who feel he should get the death penalty regardless of any mitigation circumstances?

3. If you are convinced beyond a reasonable doubt, that Roy Ramsey is guilty of first-degree murder, would the defense have to convince you that he should not get the death penalty?

4. Would your views on the death penalty prevent or substantially impair your ability to follow the following instruction: You are not compelled to fix death as the punishment, even if you do not find the existence of one or more mitigating circumstances, sufficient to outweigh the aggravating circumstances or circumstances which you find to exist. You must consider all of the circumstances in deciding whether to assess and declare the punishment at death. Whether that is to be your final decision rests with you. If you find one or all of the aggravating circumstances exist beyond a reasonable doubt, could you still consider life without parole as a possible punishment?

5. If you find aggravating circumstances beyond a reasonable doubt and find that the mitigating circumstances do not outweigh the aggravating circumstances, would you still consider life without probation or parole as a possible punishment?

149 F. 3d at 757. Instead, the court told jurors "If you were selected as a juror in this case, you must be able to vote for both of the punishments authorized by law. My question is would you be capable of voting for a sentence of death? Would you be capable of voting for a sentence of life without parole?" *Id*. The Eighth Circuit rejected the defendant's claims holding:

> The trial court's queries were more direct and succinct than Ramsey's proposed questions, and addressed the crucial disqualification issue of whether the prospective jurors would automatically vote for or against the death penalty in every case. Because the trial court's questioning reasonably assured Ramsey of a chance to detect a potential juror's prejudice about the death penalty, Ramsey was not denied his rights to due process and a fair trial.

*Id.* (citation omitted).

The United States recognizes the defendant's right to a fair and impartial jury, and to have the Court and counsel conduct voir dire that is constitutionally sufficient to ensure that all of the jurors who hear his case are fit to make an unbiased determination of his guilt, and the penalty he should face, based solely on the evidence presented. The United States respectfully submits that the most effective and efficient means of selecting such a jury is through panel voir dire.

   2. **The Court Should Preclude the Defense From Asking Objectionable Questions During Voir Dire**

Regardless of the Court's determination regarding panel voir dire, counsel for both parties will have an opportunity to examine potential jurors either in groups or individually. The United States respectfully submits that such questioning should be limited to determining whether the potential jurors may fairly and impartially serve,

10

rather than attempting to waste the Court's time by creating a mini trial for each potential juror. To that end, the United States respectfully urges the Court to disallow so-called "stakeout" and "nullification" questions, and the use of demonstrative exhibits.

    a.  *The Court should not allow the defendant to ask "stakeout" questions*

As noted above, among the types of objectionable questions asked by defense counsel during voir dire in a capital case is the so-called "stakeout" question. *Johnson*, 366 F. Supp. 2d at 842-44. The defendant refers to "stakeout" questions by the term "case-specific" questions. (R.165, proposed questions 8-10, 14-19, and 22-30) These inflammatory questions are routinely offered in federal capital cases, and they are routinely rejected by the Courts. *See*, *e.g.*, Order Denying Request for Additional Questions in Juror Questionnaire (R. 297), *United States v. Ulysses Jones, Jr.*, Case No. 6:10-cr-3090-DGK (W.D. Mo. June 27, 2017) (rejecting the defendant's proposed stakeout questions because they were "not necessary and, in fact, may be unfair in that some of the questions would 'pre-commit' perspective jurors to certain propositions which would make them less likely to vote for the death penalty based on the specific facts of this case"); Final Jury Questionnaire (R. 449-1, at 1, 27-29), *Watts*, Case No. 4:14-cr-40063-JPG (S.D. Ill. Nov. 2, 2016).

These "stake-out" or "pre-committal" questions are also at the heart of the Colorado Method discussed above. For example, Rubenstein states that "*Capital defense lawyers use leading questions with the goal of building a record that establishes the juror is impaired. . . .*" Rubenstein at 24 (emphasis added). Under this method, the prospective

11

jurors are not being questioned, they are being cross-examined. Defense counsel is not seeking the truth about a prospective juror's opinions, s/he is building a case to exclude that juror.

> Rubenstein further urges counsel to attempt to:
>
> . . . establish that the juror believes that the death penalty is the only appropriate punishment ("case-specific penalty bias"), cannot give meaningful consideration to life imprisonment without release, cannot give meaningful consideration and effect to mitigating circumstances ("case-relevant mitigating evidence bias"), will "burden shift" on the life or death issue and vote for death unless presented with compelling evidence to do otherwise by the defense, and will impose a death sentence based on an illegal basis (such as a concern about the cost of incarcerating an offender for life).

*Id*. The apparent goal of the Colorado Method is to create an incomplete and misleading record to paint potential jurors as "impaired" and strike them for cause. *Id.* This purpose is made clearer as follows:

> *The defense seeks to develop multiple impairments to support the challenge for cause; however, the defense attorney must consider the strategic implications of seeking to develop additional impairments if the attorney believes the effort may ultimately detract from the argument that the juror is impaired.* For example, if a prospective juror has made statements suggesting that the juror believes that a death sentence is the only appropriate sentence for a defendant who has committed the category of case charged in the case (e.g., a kidnapping-murder, murder of two people, or murder in prison, etc.), but the juror has made statements that lead the defense to believe the juror may indicate that he is interested in hearing about a defendant's background, the defense avoids unnecessary risk and skips questioning designed to develop a "mitigation impairment."

*Id.* (emphasis added). This method is not focused on a search for the truth; it is focused on finding fault with every potential juror the defendant does not favor.

Accordingly, the use of the so-called Colorado Method in general, and the use of stakeout questions in particular should be disallowed in voir dire. Such questioning will succeed only in lengthening the jury selection process while defense counsel, by their own words, attempt to "build a record" to disqualify every potential juror so that a qualified jury can never be seated.

   b.  *The Court should not allow the defendant to ask "nullification" questions*

At numerous points in his proposed additions to the jury questionnaire, the defendant proposed that the Court include questions designed to encourage the potential jurors to employ their "unique moral judgment" and nullify on the issue of punishment in derogation of their duty to deliberate. (R.165 at 7-9, 19-23) Based on these questions, and the stated purpose of the Colorado Method, the United States anticipates that the defendant may attempt to ask improper "nullification" questions in voir dire which are designed to encourage jurors to disregard the duty to deliberate on the issue of punishment. Such questions are improper and should be prohibited.

As the Court is aware, the law requires jurors to deliberate on the facts and law – not their unique moral judgment. Indeed, jurors are instructed to:

> [M]ake every reasonable effort to reach a verdict. In doing so, you should consult with each other, express your own views, and listen to your fellow jurors' opinions. Discuss your differences with an open mind. Do not hesitate to re-examine your own view and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or effect of evidence just because of the opinions of your fellow jurors or just so that there can be a unanimous verdict.
> . . .
> You should deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror.

Seventh Circuit Pattern Criminal Jury Instruction 7.03. The United States Supreme Court considered this issue in *Jones v. United States*, wherein the defendant argued that he was entitled to an instruction as to the consequences of a jury deadlock on the issue of sentencing. 527 U.S. 373, 379 (1999). Jones asked for, and did not receive, the following instruction:

> In the event, after due deliberation and reflection, the jury is unable to agree on a unanimous decision as to the sentence to be imposed, you should so advise me and I will impose a sentence of life imprisonment without possibility of release . . . .
> . . .
> In the event you are unable to agree on [a sentence of] Life Without Possibility of Release or Death, but you are unanimous that the sentence should not be less than Life Without Possibility of Release, you should report that vote to the Court and the Court will sentence the defendant to Life Without the Possibility of Release.

*Jones*, 527 U.S. at 379. The defendant has requested substantively identical instructions for the juror questionnaire in this case. (R.165 at 22-23)

*Jones* argued that the Eighth Amendment required the trial court to instruct the jury as to the effect of their inability to agree and that the Supreme Court should invoke its supervisory power over the federal courts and require that such an instruction be given. In affirming the trial court's refusal to give the requested instruction, the Court held that "[t]he truth of the matter is that the proposed instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role -- when deliberations break down and the jury is unable to produce a unanimous sentence recommendation." *Id.* at 382. The Court continued, noting that:

> [W]e have long been of the view that "the very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States*, 164 U.S. 492, 501 (1896). We further have recognized that in a capital sentencing proceeding, the Government has "a strong interest in having the jury express the conscience of the community on the ultimate question of life or death." *Lowenfield v. Phelps*, 484 U.S. 231, 238 (1988) (citation omitted). *We are of the view that a charge to the jury of the sort proposed by petitioner might well have the effect of undermining this strong governmental interest.*

*Id.* Indeed, as the *Jones* Court noted, the Courts of Appeal had unanimously rejected the argument that such a question was constitutionally required. *Id.* (citing *Coe v. Bell*, 161 F.3d 320, 339-30 (6th Cir. 1998); *Green v. French*, 143 F.3d 865, 890 (4th Cir. 1998); *United States v. Chandler*, 996 F.2d 1073, 1088-89 (11th Cir. 1993); *Evans v. Thompson*, 881 F.2d 117, 123-24 (4th Cir. 1989)).

Consistent with the Seventh Circuit's Pattern Criminal Jury Instruction 7.03, the Supreme Court has held that questions which discourage potential jurors from exercising their duty to deliberate are improper. As such, in order to efficiently seat a qualified jury in this case, the Court should prohibit the defendant from asking such questions in voir dire.

  c. *The Court should not allow the defendant to use demonstrative exhibits*

As part of their implementation of the Colorado Method, defense counsel in other federal capital cases have sought to utilize demonstrative exhibits during voir dire. *See, e.g., United States v. Fell*, Case No. 5:01-cr-00012 (D. Vt.) (R.885-4) (Sept. 1, 2016).

These exhibits are designed, in part, to reinforce the notion that jurors can abandon their duty to deliberate and simply nullify on the issue of punishment. For that reason alone, they run afoul of the Supreme Court's holding in *Jones* and should not be permitted. Furthermore, the exhibits are misleading and intrude upon the province of the Court to instruct potential jurors. As such, they should be prohibited.

### 3. The United States' Proposed Procedures

1. Beginning on April 1, 2019, potential jurors will be summoned each day and questioned with regard to their qualifications until a venire of 70 has been qualified.

2. Each day of jury selection should be split into a morning session (9:00 a.m. to 12:00 p.m.) and an afternoon session (2:00 p.m. to 5:00 p.m). A panel of 10 jurors should be called for each session, with the parties knowing in advance which jurors will be called for each session.

3. At the beginning of each session, the Court will conduct voir dire of the panel of potential jurors according to its standard practice on all issues, including bias, hardship, exposure to pre-trial media coverage, and views that would prevent or substantially impair the performance of duties as a juror.

4. Once the Court has had an opportunity to conduct voir dire of the panel, the parties will have an opportunity to question individual members of the panel. Each

16

party shall have 10 minutes to question each prospective juror, not including any time spent arguing legal matters. The parties will alternate the order in which they question jurors, and each party shall have only one opportunity to question each juror, except with leave of the Court.

5. Cause challenge as to a potential juror will be argued after each party has questioned the prospective juror. Each prospective juror not excused for cause will remain at the call of the Court for possible jury service. Once 70 prospective jurors have been qualified and accepted by the parties voir dire shall cease.

6. The 70 prospective jurors shall be ordered back on the next available regular court day. The Court will randomly select 12 prospective jurors and seat them in the jury box. The parties will exercise peremptory challenges on an alternating basis, beginning with the defense. As challenges are exercised, the Court will randomly select a venire member to take the stricken juror's place.

7. Each party may exercise 20 peremptory strikes. See Fed. R. Crim. P. 24. Once a jury of 12 is selected, the parties will continue the process to select four alternate jurors. When selecting alternate jurors, each party may exercise two peremptory strikes. Peremptory strikes not used in picking the petit jury may not carry over to be used in

selecting the alternate jurors. Once four alternate jurors are selected, any remaining prospective jurors will be excused.

Respectfully submitted,

JOHN C. MILHISER
UNITED STATES ATTORNEY

| | |
|---|---|
| */s/Eugene L. Miller* | */s/ James B. Nelson* |
| Eugene L. Miller | James B. Nelson |
| Assistant United States Attorney | Trial Attorney |
| 201 S. Vine St., Suite 226 | Capital Case Section |
| Urbana, IL 61802 | United States Department of Justice |
| Phone: 217/373-5875 | 1331 F. Street NW, Room 625 |
| Fax: 217/373-5891 | Washington, DC 20004 |
| eugene.miller@usdoj.gov | Phone: 202/598-2972 |
| | james.nelson@usdoj.gov |

*/s/Bryan D. Freres*
Bryan D. Freres
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875; Fax: 217/373-5891
bryan.freres@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ James B. Nelson*
James B. Nelson, Bar No. NV 9134
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F. Street NW, Room 625
Washington, DC  20004
Tel: (202) 598-2872
james.nelson@usdoj.gov