E-FILED
Friday, 08 February, 2019  09:40:08 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 17-20037 |
| | ) |
| BRENDT A. CHRISTENSEN, | ) |
| | ) |
| Defendant. | ) |

## THE UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY REGARDING CADAVER SNIFFING CANINE, AND MOTION TO VACATE HEARING OR PRECLUDE TESTIMONY

COMES NOW the United States of America, by John C. Milhiser, United States Attorney for the Central District of Illinois, and Eugene L. Miller and Bryan D. Freres, Assistant United States Attorneys, and James B. Nelson, Department of Justice Trial Attorney, and hereby requests that this Court vacate any evidentiary hearing and deny defendant Brendt A. Christensen's Motion to Exclude Expert Testimony Regarding Cadaver Sniffing Canine, and Request for *Daubert* Hearing (R.118) for the reasons stated herein.

## BACKGROUND

### I.    Procedural Background

On June 30, 2017, federal agents arrested the defendant, Brendt A. Christensen, pursuant to a criminal complaint which charged him with kidnapping Yingying Zhang in violation of Title 18, United States Code, Section 1201(a)(1). (R.1) A federal grand jury

later indicted the defendant on the same kidnapping charge outlined in the complaint. (R.13)

On October 3, 2017, the grand jury returned a superseding indictment charging the defendant with kidnapping resulting in Ms. Zhang's death, and two counts alleging that he made false statements to FBI agents investigating the kidnapping. (R.26) On January 19, 2018, the United States filed its notice of intent to seek the death penalty. (R.54) On August 24, 2018, the defendant filed the present motion along with a host of others. (R.94-122) The case is currently set for trial on April 1, 2019.

## II.    Factual Background

### A. Investigation

On June 9, 2017, Yingying Zhang, a visiting Chinese scholar at the University of Illinois, disappeared as she was traveling by bus to sign an apartment lease in Urbana, Illinois. Ms. Zhang's co-workers at the University of Illinois quickly reported her missing when she failed to respond to phone calls and uncharacteristically missed a scheduled meeting. The University of Illinois Police department (hereinafter "UIPD") and Federal Bureau of Investigation (hereinafter "FBI") began investigating Ms. Zhang's disappearance shortly thereafter.

Knowing that Ms. Zhang intended to sign a lease at the One North apartments in Urbana, law enforcement attempted to follow her path on June 9 through campus and mass transit camera systems. While tracking her last known movements, law enforcement learned that Ms. Zhang missed a connecting bus, and then walked to an area across the street from another bus stop near the intersection of W. Clark Street and

2

N. Goodwin Avenue in Urbana. As she stood alone waiting for another bus, a black

Saturn Astra circled the block after passing Ms. Zhang's location and pulled over next

to her. A closed-circuit camera captured Y.Z. entering the Astra after a prolonged

discussion with the driver. She has been missing ever since.

On June 14, 2017, agents identified the defendant's Saturn Astra as the one used

to kidnap Ms. Zhang through a visible hubcap deformity on both the defendant's Astra

and the one used in the abduction. The defendant admitted he picked up Ms. Zhang in

his Saturn Astra during a post-*Miranda* interview in the early morning hours of June 15.

Agents surveilled the defendant around the clock from that point until his arrest.

On June 29, the defendant attended a memorial walk in Champaign-Urbana for

Ms. Zhang. While attending the walk with his girlfriend, who was an FBI source at the

time, he described abducting Ms. Zhang, holding her against her will, and her

subsequent struggle for her life inside his apartment on June 9. Per the defendant's

statements, he physically abused and sexually assaulted Ms. Zhang before he

eventually bludgeoned her head with a baseball bat, stabbed her in the neck and

decapitated her in his bathroom. The defendant disposed of Ms. Zhang's body and

claimed she would never be found. Federal agents arrested the defendant the following

day.

In addition to arresting the defendant, FBI agents also obtained and executed a

federal search warrant for the defendant's apartment on June 30. As part of that search,

law enforcement requested the assistance of McHenry County (Illinois) Sheriff's

Department Deputy Jeremy Bruketta and his canine partner, Sage. Sage is a multi-

3

purpose canine trained in several areas, including cadaver searching. Deputy Bruketta deployed Sage inside the defendant's apartment with the command to search for cadavers. Sage alerted to the defendant's bathroom vanity.

### B. Sage's Training

Deputy Jeremy Bruketta has worked with the McHenry County (Illinois) Sheriff's Department since 2007. He worked on patrol from the time he began at McHenry County through September 2018, when he joined the investigation division. Whether working on patrol or investigations, Deputy Bruketta has served as a canine handler for McHenry County since September 2008. He has worked with two different dogs during that time.

In April 2010, Deputy Bruketta started working with Sage, his current canine partner. Sage was a 14-month-old German Shepherd at the time. On June 11, 2010, Deputy Bruketta and Sage completed the 8-Week Basic Canine Officer Training approved by North East Multi-Regional Training ("NEMRT"), and conducted by TOPS Kennels ("TOPS").[1] Deputy Bruketta passed the written examination with a perfect score, and he and Sage passed the final course testing with "Very Good" ratings, the top score given, on every category. This process initially certified Sage in drug detection

---

[1] NEMRT is the regional training coordination agency used in the metropolitan Chicago area. TOPS is an ILETSB-approved training facility and kennel that actually conducts the testing and training, and provides follow-up maintenance training in a variety of areas for police dogs. *See* Illinois Law Enforcement Training and Standards Board, Narcotic Detection Canine Approved Trainers http://www.ptb.illinois.gov/media/1433/NarcoticDetectionCanineComplianceProgramApprovedVendors.pdf (updated January 2019)

under Illinois law, and also qualified him in tracking, apprehension, and articles searching.[2] Sage has continued his training in all of these areas ever since.

Cadaver searching is generally not included in the initial courses to certify police dogs, and most police dogs never certify or pursue cadaver work. Agencies that wish to train their dogs in cadaver searching typically wait a year or more after the initial basic course to allow the dog to acclimate to its duties. Sage showed extraordinary proficiency in police work from the outset, and he was recommended and selected for the cadaver training courses at an early age.

Deputy Bruketta and Sage undertook the Basic Cadaver Land Recovery training course approved by NEMRT and conducted by TOPS in June 2011. This course is designed to give an already-trained police dog specific training on detecting the odors of human remains. The trainer starts the dog with blank testing – tests with no "finds" to ensure the dog is not falsely alerting on improper things. The handler gradually introduces the cadaver smell, and teaches the dog to exhibit its final response to the smell. The dog is also taught to search for the cadaver smell upon being given a unique command by the handler, which for Sage is "find Waldo." The handler rewards the dog when it properly finds the smells, and corrects the dog when it does not. The trainers gradually introduce distractors and proofing odors to the blank testing, meaning the

---

[2] Illinois law only requires police dog certification in narcotics detection. *See* 50 ILL. COMP. STAT. 705/10.12 (titled "Police dog training standards," but only discussing training programs and certification for drug detection dogs).

dog learns to distinguish the human cadaver smell from other scents. Finally, the trainer introduces blind testing for the dog with actual human remains odors.

TOPS conducts their Basic Cadaver Land Recovery course at a rock quarry that also has hills and forested areas nearby. During blind testing, the trainer places the finds in a variety of terrain areas, with some on the surface, others in trees or other heightened areas, and still others buried in differing fashions and at different depths. The trainer uses different types of human remains, including body parts, blood or fluid-soaked rags, and burnt human tissue as the finds. The body parts used are in varying stages of decomposition, and some of the parts can be months old. When conducting a test search, the trainer will advise the handler of some very generic search parameters, but not the location of the items. The handler then gives the dog the unique command to search for human remains, and they attempt to find the items using best practices for searching, such as maximizing the wind direction and other techniques. Through this process, the dog and handler learn to search for remains in a variety of real life scenarios. Deputy Bruketta and Sage successfully completed the Basic Cadaver Land Recovery course on June 15, 2011.

While Illinois does not require any certification or recertification for cadaver dogs, Deputy Bruketta and Sage have conducted regular maintenance training on cadaver searching (as well as Sage's other specialties) since completing the original basic course. Deputy Bruketta and Sage spend several hours every week on training exercises, with cadaver work typically taking place on Mondays and Tuesdays. A single cadaver maintenance training session could take anywhere between thirty minutes to

four hours or more, depending on the difficulty of the exercise and the parameters of the search.

When conducting a cadaver maintenance training session, Deputy Bruketta will ask TOPS about formulating an exercise, and TOPS trainers will procure the "find," which, as noted, may be human tissue in varied stages of decomposition, blood or fluid-soaked rags, bones, or burnt tissue, among other things. The trainers will hide the find, often incorporating blank areas and proofing odors, and tell the handler of the search parameters. The find may be buried, placed in a tree or heightened area, or on the surface. Search locations and terrain vary to maximize the dog's exposure to real world conditions. The test is blind, meaning the handler does not know anything about the find other than the generic search parameters. These tests, which can be extraordinarily difficult depending on the find and the terrain, are routine for Deputy Bruketta and Sage.

Deputy Bruketta and Sage also completed NEMRT's Advanced Cadaver Water Recovery course on July 25, 2012. For water training, the finds may be submerged or on the shoreline. The dog sniffs the surface of the water for the cadaver odors, and is trained to alert on a dig plate attached to the boat when the scent is detected at the appropriate location.

Deputy Bruketta and Sage have worked with a variety of state and federal agencies, including the FBI, DEA, U.S. Marshals Service, Department of Homeland Security, Illinois State Police, and various local agencies. While they work primarily in

the greater Chicago area, they have performed cadaver work in Wisconsin and Central Illinois. Sage is the primary cadaver dog in the Chicago area for many of these agencies.

Sage has proven his cadaver searching capabilities in multiple real world settings. As one such example, in June 2012, the Kane County Sheriff's Department was searching for an individual who officers believed had committed suicide after he was reported missing. Coordinated search efforts by several local law enforcement agencies failed to find his body. The Kane County Sheriff's Department requested Deputy Bruketta and Sage's assistance. Deputy Bruketta agreed, and he began a cadaver search procedure using known information about possible locations. After approximately 45 minutes of searching the Pratt Wayne Woods, Sage caught the cadaver odor and led Deputy Bruketta to a location 25 – 30 yards into the woods off some railroad tracks where they discovered the individual's body. The individual had shot himself and was located on the surface at that location.

Deputy Bruketta has served as a guest speaker and given presentations on his cadaver dog work. He has also been honored as an "Officer of the Year" for his work in this area.

## ANALYSIS

In his motion, the defendant seeks a hearing to challenge the cadaver dog's training and reliability. While styled as a *Daubert* motion, the defendant's motion does

not challenge the underlying science of the dog's alert,[3] which is nothing more than a dog's ability to smell certain odors and notify a handler through a response.[4] Instead, this motion is a challenge to the evidence itself—the defendant wants a hearing to test reliability and depose witnesses. The defendant's opportunity to challenge the credibility and reliability of witnesses is at trial, not a pretrial hearing. He should not be given the opportunity to depose the United States' witnesses on the basis of inapplicable standards, inconclusive proposed expert testimony, and incorrect assertions about Sage's training.

If the Court is inclined to continue with an evidentiary hearing, the defendant's proposed expert should be precluded from testifying because her anticipated testimony revolves around comparing Sage to an inapplicable standard, and she headlines her report opinion with, "The Reliability of the K9 'Sage' Cannot Be Determined," an inconclusive opinion on the central issue of the proposed evidentiary hearing. Her report does not justify an evidentiary hearing.

Sage is a well-trained multi-purpose police dog, and the evidence of his alert inside the defendant's apartment on June 30, 2017, is relevant and probative evidence that should be considered by the jury in this case. The defendant will have ample opportunity at trial to challenge the alert.

---

[3] At the conclusion of the identification procedures hearing on January 18, 2019, defense counsel clarified that the present motion was not intended to challenge the science of a canine alerting to odors, but solely to challenge the reliability of the alert in this case.

[4] Using dogs to assist police by detecting odors has been widely accepted in many contexts in state and federal courts for decades.

## I.      A *Daubert* Hearing Is Neither Required Nor Appropriate

The defendant argues he is "entitled to a *Daubert* hearing challenging the reliability of Sage's alert." The defendant bases this assertion on the Supreme Court's decision in *Florida v. Harris*, 568 U.S. 237, 246 (2013), which he argues stands for the proposition that a "defendant must have the opportunity to challenge the dog's reliability[,]" and that "in the context of the admissibility at trial, the vehicle to challenge the expert testimony should be a *Daubert* hearing." (R.118, pp.2-3) The defendant is incorrect.

As noted by multiple courts, a *Daubert* hearing is not the appropriate procedural vehicle through which to challenge the reliability of a canine alert. *See United States v. Berrelleza*, 90 F. App'x 361, 365 (10th Cir. 2004) (district court properly rejected request for *Daubert* hearing to test expertise of "either dog or handler," because *Daubert* "is the wrong procedural tool to challenge" a dog's reliability); *United States v. Outlaw*, 134 F. Supp. 2d 807, 810 (W.D. Tex. 2001*); United State v. Fisher*, 2002 WL 563581, at *1 n.2 (E.D. Pa. Apr. 15, 2002); *see also United States v. Gadson*, 763 F.3d 1189, 1201-03 (9th Cir. 2014); *Debruler v. Commonwealth*, 231 S.W.3d 752, 756-57 (Ky. 2007) (collecting cases, and noting testimony concerning analogous canine scent tracking "is not subject to the reliability analysis of *Daubert*."); *Jackson v. City of Bloomington*, No. 17-CV-1046-JES-JEH, 2019 WL 202160, at *1-6 (C.D. Ill. Jan. 15, 2019) (Shadid, J.) (rejecting without a hearing a *Daubert* motion challenging a dog expert).

While the United States does not dispute the long-standing principle that a "defendant […] must have an opportunity to challenge such evidence of a dog's

reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses[,]" *Harris,* 568 U.S. at 247, the appropriate opportunity to do so is at trial, not a *Daubert* or other pretrial hearing. *E.g., Gadson*, 763 F.3d at 1201-03. The *Harris* case does not support the defendant's position, as it dealt only with a defendant challenging whether a dog's alert was sufficiently reliable to establish probable cause to search. In other words, it was dealing with suppression proceedings, which are pretrial proceedings by necessity. Nothing in the *Harris* opinion suggests that a *Daubert* hearing is either necessary or appropriate to determine whether an alert is sufficiently reliable to be admitted into evidence at trial, and at least one circuit court since the *Harris* decision has held the contrary. *E.g., Gadson*, 763 F.3d at 1202 (noting "*Harris* did not suggest that a district court had to perform a full-fledged *Daubert* hearing to determine whether the dog sniff testimony was sufficiently reliable[.]").

In sum, the defendant is not entitled to any pretrial hearing on this issue, and no such hearing should be granted. *Id.* at 1201-03 (upholding district court's denial of *Daubert* hearing challenging the admission of dog alert evidence at trial). His motion seeks to challenge the reliability and credibility of a witness, not the science underlying the testimony. Such challenges are for trial, and he will have ample opportunity at trial to challenge Deputy Bruketta and Sage's credibility and reliability through cross-examination. *See Harris*, 568 U.S. at 247 (recognizing cross-examination as sufficient basis to challenge reliability). This procedural safeguard ensures his opportunity to challenge Sage's alert. *E.g., Gadson*, 763 F.3d at 1201; *Jackson*, 2019 WL 202160, at *5 (Shadid, J.) (denying *Daubert* motion without hearing).

## II.    The Court Should Preclude The Testimony Of Dr. Mary Cablk

On February 14, 2018, the Court issued a scheduling order that, among other things, required the defendant to give notice of non-Rule 12.2 expert witnesses, including rebuttal witnesses, by August 24, 2018. (R.67) The defendant notified the United States on August 24, 2018, the same day he filed the present motion, that he intends to call Dr. Mary Cablk as an expert to "challenge the reliability of canine cadaver identification." The defendant did not disclose any report from Dr. Cablk at that time. The United States received Dr. Cablk's report on January 25, 2019. Dr. Cablk's anticipated testimony does not support holding a pretrial hearing to analyze Sage's reliability.

Dr. Cablk's belated report is full of inconclusive opinions and inapplicable standards. As noted, she headlines her opinion section with, "The Reliability of the K9 'Sage' Cannot Be Determined," which is an inconclusive assertion on the only issue presented for hearing. As discussed in more detail below, she frequently uses SWGDOG guidelines as a baseline comparison for Sage, but SWGDOG does not apply to Sage's cadaver work. As Dr. Cablk concedes, she has done no scientific testing on Sage, the defendant's bathroom, or anything else related to this case, and she then asserts, "[w]ithout independent validation through established chemical or physical processing methods, there is no way to determine what the K9 'Sage' might have been responding to" in the defendant's bathroom. This unscientific and inconclusive report does not justify an evidentiary hearing.

The United States is concerned because the defendant earlier proffered an expert (Dr. Lofthus) in support of a request for pretrial evidentiary hearing on identification procedures. In that instance, the defendant cross-examined the United States' witnesses, his expert was allowed to sit in the courtroom and observe, and then the defendant declined to call his expert and subject him to cross-examination. The Court should not allow this to repeat. The defendant's motion does not warrant an evidentiary hearing, nor does Dr. Cablk's speculative and unscientific report.

## III.  Sage's Alert In The Defendant's Bathroom Should Be Admissible

Sage's alert to the presence of human remains odors in the defendant's bathroom is both relevant and probative. Sage is a well-trained, multi-purpose police dog and his alert is consistent with the other evidence in the case. At the memorial walk for the victim, the defendant stated that he abducted the victim from the bus stop and brought her back to his apartment. Once there, he physically abused and sexually assaulted her in various fashions. The defendant eventually carried the victim into the same bathroom where Sage alerted, and then he bludgeoned her in the head with a baseball bat, stabbed her in the neck, and decapitated her. He then disposed of the victim's body, and stated that it would not be found. Her remains have not been found.

Courts across the country have routinely allowed trial testimony from a cadaver dog handler in homicide cases.[5] *E.g., State v. Hunter*, Case No. 1 CA-CR 15-0499, 2017

---

[5] The same is also true for analogous dog tracking evidence, which is a dog tracking a live human's scent, instead of human cadaver odor. *E.g., State v. St. John*, 919 A.2d 452 (Conn. 2007); *Debruler v. Commonwealth*, 231 S.W.3d 752, 756-57 (Ky. 2007) (noting that similar "testimony concerning canine scent tracking is not subject to the reliability analysis of *Daubert*").

WL 4173605, at *7-10 (Ariz. Ct. App. 2017); *State v. Bailey*, No. 2016-UP-068, 2016 WL

635154 (S.C. Ct. App. 2016); *People v. Lane*, 862 N.W.2d 446, 455-59 (Mich. Ct. App. 2014);

*Prater v. State*, 18 So.3d 884, 891 (Miss. Ct. App. 2009); *Trejos v. State*, 243 S.W.3d 30, 48-

54 (Tex. Ct. App. 2007); *Clark v. State*, 781 A.2d 913, 932-36 (Md. Ct. Spec. App. 2001);

*People v. Lifrieri*, 646 N.Y.S.2d 172, 173 (N.Y. App. Div. 1996).

The defendant failed to cite any case where cadaver dog handler testimony was

ruled impermissible at trial. Nor did he cite any cases where courts found a cadaver dog

too unreliable for trial, or any other basis for this Court to find Sage unreliable. Indeed,

the defendant's claim rests entirely on Dr. Cablk's report, which in turn relies on

inapplicable standards and no scientific testing.

### A.  Sage is a Well-Trained Police Dog

In *Florida v. Harris*, the Supreme Court held that "evidence of a dog's satisfactory

performance in a certification or training program can itself provide sufficient reason to

trust his alert." 568 U.S. at 246 ("After all, law enforcement units have their own strong

incentive to use effective training and certification programs, because only accurate []

dogs enable officers to locate contraband without incurring unnecessary risks or

wasting limited time and resources."). The defendant acknowledges in his motion that

Deputy Bruketta and Sage completed the 8-Week Basic Canine Officer Training on

June 11, 2010, the Basic Cadaver Land Recovery course on June 15, 2011, and the

Advanced Cadaver Water Recovery course on July 25, 2012. All of these courses were

offered by NEMRT, and conducted by TOPS Kennels. NEMRT is the regional

coordination training agency serving the greater Chicago area, and TOPS is an ILETSB-

approved training facility. By completing the 8-Week Basic Canine Officer Training, Deputy Bruketta and Sage were certified by the State of Illinois in the only area the state requires formal certification, which is drug detection. Sage has remained certified in drug detection ever since.

That same course also provided the training foundation for Sage's other non-cadaver specialties, none of which require certification. Sage then learned his cadaver specialty, which also does not require certification in Illinois, through the Basic Cadaver Land Recovery and Advanced Cadaver Water Recovery courses. Sage has conducted hundreds of hours of regular maintenance training and field performance in all of his purposes ever since. Under Supreme Court precedent, these training programs, courses, and maintenance training "provide sufficient reason to trust [Sage's] alert." *Id*. The defendant can challenge Sage's training and question his alert through cross-examination at trial, but the Court may presume Sage's reliability as the starting point. *Id.*

Sage's cadaver training mimics real world scenarios. The dog is subjected to blank and blind testing, proofing odors, and other mechanisms to teach him to distinguish between cadaver and other odors, and to only alert when sniffing the appropriate odor for the given command. The trainers use real cadaver materials such as human tissue, bones, burnt tissue, and blood or fluid-soaked rags. The cadaver materials used are in varying stages of decomposition, which trains Sage on finding cadavers that may be weeks or even months old. Trainers place the cadaver materials in varying locations, such as underground (at various depths), in elevated positions, or on

15

the surface. The training locations may be inside or outside, and in a variety of terrains and settings. Sage has also received advanced training in water cadaver recovery. This training has been going on regularly for over seven years. Deputy Bruketta and Sage have proven their cadaver finding skills in real world settings time and again. There is no credible basis to challenge Sage's training.

### B.  The Standards the Defendant Cites as a Baseline are Inapplicable

In his motion, the defendant discusses SWGDOG guidelines at length. These guidelines are inapplicable, impractical, and irrelevant. SWGDOG was a group of scientists who tried to put together a series of proposed standards for canine training. The group had no mandate from any governing body, and their suggestions carry no weight or force of law unless a state independently adopts them. Many of their suggested "best practices" are ambiguous, and even more are impractical, which perhaps reflects the lack of law enforcement (i.e., real world practical application) involvement in the project. The group is no longer active.

The defendant implies that these guidelines somehow apply to Sage's cadaver work by suggesting, "Illinois has adopted the standards for training and certification set forth in the SWGDOG guidelines." (R.118, p.4) The statement and implication are both misleading, however, because Illinois never adopted the SWGDOG guidelines for human remains detection, or any of Sage's other specialties, save in part historically for drug detection. *See* 50 ILL. COMP. STAT. 705/10.12 (titled "Police dog training standards," but only discussing training programs and certification for drug detection dogs); *see also* Illinois Law Enforcement Training and Standards Board, "Narcotic Detection Canines

16

Compliance Program" (updated 07-2018),

http://www.ptb.illinois.gov/media/1243/narcoticdetectioncaninerequirements.pdf

(noting Illinois' drug detection dog guidelines were originally "based upon the

SWGDOG SC8 guidelines").

The State of Illinois has since abandoned SWGDOG even in drug detection

because of the SWGDOG guidelines' impractical and inflexible nature, the non-

responsiveness of the working group, and the ambiguity of the guidelines.[6] Regardless,

Sage has always remained certified under any Illinois standards for drug detection

dogs, and his trainers at TOPS Kennels are ILETSB-approved to conduct drug detection

and all other training. *See* Illinois Law Enforcement Training and Standards Board,

"Narcotic Detection Canines Compliance Program" (updated 07-2018),

http://www.ptb.illinois.gov/media/1243/narcoticdetectioncaninerequirements.pdf

(listing TOPS Kennels as meeting certification requirements for training narcotic

detection canines). Though Illinois requires no cadaver certification, and the SWGDOG

standards do not apply to him or his trainers, Sage's training in cadaver work

nevertheless largely comports with SWGDOG's suggestions.[7]

---

[6] The differences between SWGDOG and Illinois' most recently adopted drug detection training procedures, which went into effect January 1, 2019, include considerations such as drug weights to be used and certain procedures for testing. *Compare* Illinois Law Enforcement Training and Standards Board, "Annual Narcotic Canine Requalification Instructions" (outlining new procedures), http://www.ptb.illinois.gov/media/1433/canine-evaluation-instructions-pdf-for-website-jan-2019.pdf; *with* Scientific Working Group on Dog and Orthogonal Detector Guidelines, "SWGDOG SC8 – Substance Detector Dogs" (posted 5/10/07).

[7] The SWGDOG human remains detection guidelines suggest using human blood, human decomposition tissue, and burned human tissue in training. Sage's training does that. The guidelines suggest varying quantities of target odors and periods of decomposition. Sage's

The fact that Illinois once adopted some of the SWGDOG guidelines, but not others, and has since abandoned them altogether, shows clearly that the State never intended for the SWGDOG guidelines to apply to Sage's work as a police cadaver dog. Thus, SWGDOG is not an appropriate comparative baseline for training standards in Illinois. These guidelines have no weight or bearing on admissibility in federal court. As the Seventh Circuit has recognized, there are no national standards for dog training. *See United States v. Bentley*, 795 F.3d 630, 636-37 (7th Cir. 2015) (recognizing defendant's "argument [about poor dog training] cannot get off the ground" because "there are no national standards by which we can judge the training [the dog] received").

Given that the defendant's motion, and Dr. Cablk's report, rely on SWGDOG, they carry no persuasive weight for the Court, and do not merit a hearing.

---

training does that. The guidelines suggest training that exposes the dog to different types of searches, locations, and environments. TOPS and Sage do that in training. The SWGDOG guidelines suggest blind testing where the handler is advised of the search parameters and the numbers of finds. Sage routinely does that in training. The guidelines suggest placing finds on the surface, buried, and elevated to expose the dog to different variables. Sage's training does that. *See* SWGDOG SC8 – Substance Detector Dogs, "Human Remains Detection (HRD)" (approved 9/15/09), https://swgdog.fiu.edu/approved-guidelines/sc8_human_remains.pdf.

## <u>CONCLUSION</u>

For the reasons stated herein, defendant Brendt A. Christensen's Motion to Exclude Expert Testimony Regarding Cadaver Sniffing Canine, and Request for a *Daubert* Hearing (R.118) should be denied. No evidentiary hearing is necessary or warranted.

Respectfully submitted,

JOHN C. MILHISER
UNITED STATES ATTORNEY

*/s/Bryan D. Freres*
Bryan D. Freres
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217/373-5891
bryan.freres@usdoj.gov

*/s/Eugene L. Miller*
Eugene L. Miller
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217/373-5891
eugene.miller@usdoj.gov

*/s/ James B. Nelson*
James B. Nelson
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F. Street NW, Room 625
Washington, DC  20004
Tel: (202) 598-2872
james.nelson@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Robert Tucker, George Taseff, Elisabeth Pollock, and Julie Brain.

*/s/ Bryan D. Freres*