E-FILED
Friday, 08 February, 2019  03:49:57 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

MOTION FOR CONTINUANCE OF TRIAL

NOW COMES the Defendant, BRENDT A. CHRISTENSEN, by and through his

attorneys, and for his Motion for Continuance of Trial, states as follows:

**I.     Introduction**

As indicated in his Rule 12.2 Notice, (R. 161), Mr. Christensen intends to present

evidence of severe mental illness and associated neurocognitive dysfunction at the

penalty phase of his capital trial.  To this end, Mr. Christensen has retained a number of

expert mental health professionals to evaluate him and to prepare to present that

evidence at trial. He will shortly be retaining individuals with expertise in two

additional specialties. Substantial progress has been made by all experts retained to

date towards completing the highly complex, multi-faceted and time-intensive process

of conducting evaluations of sufficient caliber to meet constitutional standards in a

death penalty case. However, it is impossible for those experts to complete the

necessary work in the time available before the currently scheduled trial date of April 3, 2019.  If trial were to proceed on that date, Mr. Christensen would be forced to fight for his life without the central feature of his case in mitigation, namely expert evidence regarding his serious mental illness.  Such a proceeding would fail to meet even minimally adequate constitutional requirements for a fair trial, and Mr. Christensen accordingly respectfully moves the Court to continue the trial until a date in or after October, 2019.

## II.     Procedural History

### A.     Events Leading Up to the Trial Setting

On July 12, 2017, Defendant Brendt A. Christensen was charged by indictment with one count of kidnapping in violation of 18 U.S.C. § 1201(a)(1), a non-capital-eligible offense. (R. 13.) On July 20, 2017, Magistrate Long set a trial date of September 12, 2007, before this Court, (R. 16), which was continued on August 28, 2017, to February 28, 2018. The Federal Public Defender was appointed to represent Mr. Christensen on September 8, 2017, following a hearing at which previously retained counsel were permitted to withdraw from the case.  In anticipation of a superseding indictment containing capital-eligible charges, and pursuant to 18 U.S.C. § 3005, on September 14, 2017, the Court appointed Robert L. Tucker as learned counsel to represent Mr. Christensen alongside the Federal Public Defender. The existing trial date of February 28, 2018, was left in place.

A Superseding Indictment was returned on October 3, 2017, charging Mr.

Christensen with one count of kidnapping resulting in death in violation of 18 U.S.C. §

1201(a)(1) and two counts of false statements in violation of 18 U.S.C. § 1001(a)(2) and

alleging special findings that triggered a potential death sentence.  (R. 26.)

With a capital eligible indictment on file, counsel were obliged to immediately

begin preparing a submission first to the United States Attorney for the Central District

of Illinois and second to the Capital Case Section of the Criminal Division of the

Department of Justice in Washington, D.C.  Such a submission is a defendant's

opportunity to outline mitigating factors that are present in the case and that may

persuade the Attorney General not to authorize the United States Attorney to seek the

death penalty against him.  However, the due date for such a submission is directly

linked to the scheduled trial date.

On October 3, 2017, the parties met to discuss the status of the case. The

government informed defense counsel that, in light of the existing February 28 trial

date, the Capital Case Section at the Department of Justice had directed the U.S.

Attorney to submit its memorandum on the death penalty by November 1, 2017, and

that the defense should submit any mitigating evidence it wished the government to

consider by that date. Counsel explained that this unreasonably short period – one

month after the filing of the Superseding Indictment and less than two months after

capitally-qualified counsel was appointed – foreclosed the defense's ability to conduct

even a rudimentary mitigation investigation in time to prepare their submission,

especially in light of the additional obligations dictated by the compressed trial schedule. The parties agreed to meet again at which time the defense would propose a schedule for further consideration by the government.

On October 20, 2017, the parties again convened.  Defense counsel asked the government to agree to a joint request to continue the trial date until October 2018, to provide the defense until April 3, 2018, to investigate and present mitigating evidence to the U.S. Attorney and the Department of Justice and to set a date of July 3, 2018, for the government to determine whether to file a Notice of Intent to Seek the Death Penalty ("NOI").  If a NOI was filed, the defense suggested that the schedule would need to be adjusted and a scheduling order appropriate for a capital case entered.

The following Tuesday, October 24, 2017, the government informed defense counsel by e-mail that in light of the trial date of February 27, 2018, it would not agree to the defendant's request.  The government specifically wrote that "based on that trial date" and the need to provide the Department of Justice "sufficient time to decide whether to seek the death penalty," the defense's submission to the Capital Case Committee must be made by November 1, one week hence.

Based upon their inability to make any meaningful submission of mitigating evidence to the DOJ under that schedule, as well as the general infeasibility of preparing to defend against capital charges within less than six months of their appointment, on October 24, 2017, defense counsel filed a Motion to Continue Final Pretrial and Trial Dates.  (R. 29.)  The Motion to Continue specifically directed the

Court's attention to the ethical obligations and standard of care for defense counsel in capital cases as set out in the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), the recommendations in the CJA Guidelines in the Guide to Judicial Policy of the Judicial Conference concerning the provision and representation of defense counsel in capital cases, and the American Bar Association Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases.  *See* (R. 20 at ¶¶ 7-9.)   Counsel explained that these well-recognized responsibilities were impossible to discharge in the time available to present mitigating evidence to the Department of Justice as to why the death penalty should not be sought, especially while also having to prepare for trial of such a serious case involving voluminous discovery on such an unreasonably abbreviated schedule.

On November 2, 2017, the government responded to and opposed the Motion to Continue. (R. 30.)  The government argued that the reasons for a continuance set forth in the defense's motion all "relate[d] to the death penalty" and suggested that the Court should treat this case as non-capital case unless and until the government filed a formal NOI.  *Id*. at 8.  It further proposed that it be given a deadline of February 1, 2018, in which to file an NOI, and asked the Court to defer ruling on the request for a continuance until after that date – i.e., 27 days or less before the trial was set to begin. *Id*.  The Response made no reference to the obligations of defense counsel or the authorities cited in the Motion to Continue. On November 7, 2017, defense counsel filed

a Reply to the government's Response, describing in more detail counsel's duty to treat the case as capital from the outset, the responsibilities that flowed from this obligation and their inability to fulfill those responsibilities on the schedule proposed by the government.  (R. 33.)

On November 15, 2017, the Court issued a Memorandum Order wherein it adopted the government's view that, at that point, this case was no different than any other non-capital case. (R. 34.)   The Court also adopted the government's suggestion that the Court set a deadline of February 1, 2018, for it to file a NOI and a further deadline of January 15, 2018, for the defense to file all pre-trial motions. The effect of this ruling was that the defense had to continue attempting to prepare this case for trial on February 28, 2018, then only 105 days away and in the absence of a large amount of discovery that had not yet been produced, while simultaneously dealing with the unworkable schedule set by the Department of Justice.

Having been required to devote the first three months of their appointment to their unsuccessful efforts to obtain a reasonable opportunity to make a meaningful mitigation presentation and to secure a continuance, from mid-December 2017, until mid-January, 2018, counsel were obligated to direct their attention to preparing the pre-trial motions that the Court had ordered to be filed by January 15, 2018, as well as attempting to prepare for a trial that remained set for February 28, 2018.   A total of 14 motions were filed.  (R. 35-48.) On January 19, 2018, the government filed its NOI.  (R. 54.)

Now that the case was indisputably a death penalty case, on January 23, 2018, defense counsel filed another Motion to Continue the trial and interim deadlines. (R. 55.)  In their Motion, defense counsel requested that all existing dates and deadlines be vacated and proposed to confer with the government to attempt to reach agreement on a new scheduling order.  *Id.*  Finally, counsel requested that the Court convene a status conference for February 12, 2018, to discuss scheduling.  *Id.*   The government thereafter filed a Response indicating that it had no objection to these requests. (R. 57.)

Although they conferred, the parties were unable to reach agreement on a proposed schedule.  On February 7, 2018, the government filed its Proposed Start Date for the Trial, in which it urged the Court to schedule the trial for October 16, 2018.  (R. 58.) Also on February 7, 2018, defense counsel filed their Proposed Scheduling Order and Memorandum in Support, in which they requested that trial be scheduled to commence on June 4, 2019.  (R. 59.)  Counsel supplemented their Memorandum with the declarations of two preeminent experts on the field of capital litigation who provided an overview of just how complex, multifaceted and time-consuming an endeavor it is to investigate and prepare to present mitigating evidence in a capital case. *Id.* Counsel also outlined some of the particularly complex issues raised by the underlying facts of this case, including the forensic and digital evidence.  *Id.*

Without hearing argument or discussion by the parties, at a status conference on February 12, 2018, the Court announced that trial would be scheduled to begin on April 3, 2019.  On February 14, 2018, the Court filed a written Order confirming the new trial

date.  (R. 67). On May 18, 2018, Julie Brain was appointed as additional learned counsel specifically to lead the mental health portion of the defense.

**B.      Mr. Christensen's Rule 12.2 Notice**

In its Order scheduling the trial for April 3, 2019, the Court also directed Mr. Christensen to file notice of his intent to present mental health evidence at the guilt and/or penalty phase of his trial by September 28, 2018.  (R. 67.) This deadline allotted only seven months for Mr. Christensen to conduct a thorough, multi-generational psychosocial history investigation in accordance with prevailing standards of practice in death penalty cases; to identify the categories of mental health professionals whose areas of expertise are potentially implicated in the case based upon the information revealed by that investigation; to identify and retain individual experts with the necessary expertise and willingness to participate in a capital case; for the retained experts to review the evidence uncovered by the psychosocial history investigation; for the retained experts to perform all necessary assessment procedures, including extensive interviewing and testing of Mr. Christensen as well as interviews of key collateral sources; and for the experts to synthesize all information gathered and present counsel with their conclusions and opinions. *See* (R. 129 at 11.)

Such a compressed schedule would be unworkable in just about any capital proceeding; in Mr. Christensen's case it became apparent that the relevant and available psychosocial history information was especially vast and the time required to conduct the investigation was correspondingly lengthy.  Mr. Christensen is a part of a large

extended family with living members spread across at least 10 different states. We have painstakingly uncovered, and continue to uncover, an extraordinary amount of evidence of mental disease and disorder in the family going back for multiple generations.  Gathering a sufficient amount of this information to enable to counsel to identify the categories of mental health professionals whose expertise they required and to select and retain qualified individuals within the allotted time proved to be an insurmountable task. Accordingly, on September 21, 2018, Mr. Christensen filed his Motion for Adequate Time to Submit 12.2 Notice. (R. 129.)

In his Motion, Mr. Christensen asked the Court to set a status conference for a date in December, 2018, by which time he believed he could provide the Court with a meaningful estimate of how much time he required in order to be in a position to file his 12.2 Notice.  (R. 129 at 12.) Mr. Christensen acknowledged in the Motion that he would eventually be required to seek a postponement of the trial date.  *Id*. at 12 n.2 (noting that "[g]iven the unreasonableness of the scheduling of this case from its inception . . . the April 3, 2019, trial date was never realistic").  The Court declined to schedule a status conference, instead directing Mr. Christensen to file his 12.2 Notice by December 3, 2018.

Mr. Christensen duly filed his 12.2 Notice on December 3, 2018. (R. 161.) He was able by that date to state that he intended to present the testimony of three mental health professionals: A psychiatrist, a neuropsychologist and a clinical psychologist.  *Id.* The neuropsychologist had been able to administer a battery of tests to Mr. Christensen,

and so the 12.2 Notice contained a list of the tests that had been conducted. *Id.* It also

specified the type of mental illness that the experts anticipated their testimony to

address, in light of their preliminary assessment procedures. *Id.* Mr. Christensen

emphasized, however, that "there remains a great deal of work still to be accomplished

before the experts will be in a position to finalize their opinions, finalize their reports

and testify at trial. To meet the applicable standard of care in a forensic capital case,

each expert will need to spend a significant amount of additional time continuing to

interview Mr. Christensen, reviewing the extensive background materials that they

have been provided, reviewing additional records that are being provided on an

ongoing basis and consulting with collateral sources." *Id*. Mr. Christensen now moves

for a continuance of the trial date in order to allow sufficient time for that work to be

completed.

III.    **Conducting a Thorough and Reliable Assessment of a Defendant's Mental
        Health and Functioning for the Penalty Phase of a Capital Case is a Complex,
        Multifaceted and Exceedingly Time-Consuming Endeavor.**

As Mr. Christensen has previously described to the Court, investigating and

preparing to present expert mental health evidence in mitigation in a capital case is a

multistep, labor-intensive and time-consuming process that requires a gargantuan effort

by the entire defense team. (R. 129.) Even after the constitutionally required

psychosocial history investigation has progressed far enough to allow counsel to

identify the necessary areas of expertise and then to identify and retain suitable

professionals, the assessment process itself requires still further consumption of time and resources before the experts can reach valid, reliable and supported conclusions.

In clinical as well as forensic settings there are a number of factors that may challenge the mental health professional's ability to obtain a complete and accurate picture of a client's symptoms and presentation and necessitate many hours of interviews over an extended period of time. For example, building rapport with a client sufficient to facilitate the disclosure of deeply personal and potentially embarrassing and/or frightening information takes time. Benjamin James Sadock, Virginia Alcott Sadock and Pedro Ruiz, *Kaplan & Sadock's Comprehensive Textbook of Psychiatry*, § 7.1 p. 945 (10th ed. 2017) ("successful development of a trusting relationship is what allows the patient to feel comfortable enough to share information that is often sensitive and quite private"). Building such rapport is often particularly challenging when the patient suffers from a psychotic disorder. *Id.* at § 12.2, p.1409 (noting that one of most prevalent symptoms of psychotic disorders is "poor rapport").

Additionally, one of the most common symptoms manifested by patients with psychotic disorders is a lack of insight into their illness and a correspondingly decreased ability to understand and describe their symptoms and experiences. *Id.* (noting that other prevalent symptoms of psychosis are "lack of insight and an inadequate description of problems"). *See also* Richard G. Dudley, Jr. and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 Hofstra L. Rev. 963, 980 (2008) ("persons with serious

mental health disorders often have little insight into their illness"). Insight refers to a

patient's "[d]egree of personal awareness and understanding of [their] illness." Sadock

et al., supra, at § 7.2, p.967.  A patient's level of insight falls on a continuum, from

complete denial of any illness all the way to full awareness of symptoms and their

underlying meaning. *Id.* The lower the level of the patient's insight, the more difficult

and painstaking it is for the mental health professional to elicit relevant clinical

information from that patient. Conversely, the greater the level of insight, the more

reluctant the patient may be to reveal information due to the stigma surrounding

mental illness in our culture and a desire not to be perceived as sick or abnormal.

It is also a truism that symptoms of serious mental illness tend to manifest

differently over time. "Psychiatric signs and symptoms are usually not static entities;

depending on the circumstances, they often vary in intensity or even in their existence."

*Id.* at § 8, p.1117. Multiple interviews over an extended period of time are therefore

necessary to ensure that the full range of the patient's experiences is captured.  *See*

George W. Woods, David Freedman and Stephen Greenspan, *Neurobehavioral*

*Assessment in Forensic Practice*, 35 Int'l J. Law Psychiatry 432 (2012) ("Cognitive deficits

and diseases may wax and wane.  These undulations should be captured, if possible, by

documenting and assessing changes during the course of successive visits."). The same

phenomenon puts a premium upon supplementing multiple clinical interviews of the

patient with other information from as many sources as possible.  Sadock et al., supra,

at § 8, p 1114 ("whenever possible, complete assessment of a psychiatric patient requires

12

consultation with family, friends, coworkers, and other professional observers to enrich

the history and to provide supplemental observations of the patient over time").

In addition to the challenges of psychiatric interviewing that are present in all

settings, evaluations for forensic purposes bring with them an additional layer of

complexity. Examinees in all forensic settings labor under a cloud of suspicion that they

may be malingering, or exaggerating their symptoms in order to improve their legal

position. In order to withstand the inevitable hailstorm of cross-examination and to be

accepted as credible by a jury, a defense mental health professional's testimony must be

meticulously supported and corroborated by data from multiple independent sources.

Douglas S. Liebert, Ph.D. and David V. Foster, M.D., *The Mental Health Evaluation in*

*Capital Cases: Standards of Practice*, 15 Am. J. of Forensic Psychiatry 43, 63 (1994) ("By

conducting an exhaustive evaluation with multiple sources of information , convergent

or divergent data is generated, thus dramatically increasing the odds of diagnostic

precision and thus assisting the trier of fact"). *See also* American Psychological

Association, *Ethical Principles of Psychologists and Code of Conduct*, 9.01(a) (1992)

("Psychologists base the opinions contained in their recommendations, reports, and

diagnostic or evaluative statements, including forensic testimony, on information and

techniques sufficient to substantiate their findings."); American Bar Association,

*Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty*

*Cases*, 36 Hofstra L. Rev. 676, 10.11.F. (2008) ("It is the duty of team members to gather

documentation to support the testimony of expert . . . witnesses").

The most important source of corroboration of an expert's opinions is the information gathered during the psychosocial history investigation.  *See* Liebert et al., *supra*, at 46 ("An accurate and broad based social history has been called the "single most valuable element to help the clinician reach an accurate diagnosis") (quoting Kaplan HI, Sadock BJ: Comprehensive Textbook of Psychiatry (4th ed. 1985)).  The expert must therefore review and digest the typically vast amounts of documents and witness accounts that a competent investigation generates.  Only then will the expert be able to demonstrate to the jury how multiple sources for the same fact corroborate each other; how collateral sources corroborate the client's self-reporting; how the results of standardized tests have ecological validity, i.e. the deficits revealed have also manifested in real-life settings; and thus that his or her conclusions rest upon a solid factual foundation in addition to valid scientific and medical principles.

The expert's opinions must also be shown to be based upon interviews of the client of sufficient length and quality not only to meet clinical standards but also to persuade the fact finder that all relevant information has been obtained and considered. By way of example, Dr. Raquel Gur, one of the psychiatrists who diagnosed Colorado movie theater shooter James Holmes with schizophrenia, testified that she spent a total of 28 hours with the defendant over the course of six days, beginning three years prior to the trial. *See* Julie Turkewitz, *Aurora Gunman Legally Insane, Psychiatrist Says*, N.Y. Times, July 8, 2015, at A19.  Even then, she was attacked on cross-examination for writing a report on the case after only 13 hours of interviews with Holmes. *See*

*Prosecutor Spars with Expert Who Says Colorado Theater Shooter is Insane*, Chicago Trib.,

July 8, 2015; Joel Mathis, *Penn Expert "Star Witness" in Colorado Theater Shooting Trial*,

Philadelphia Magazine, July 8, 2015.

Finally, while forensic evaluations in general have unique requirements and

considerations as noted above, a forensic evaluation for purposes of presenting

mitigation evidence at the penalty phase of a capital trial is in a class of its own in terms

of the enormity of the task.  *See* Kirk Heilbrun, Geoffrey R. Marczyk and David

DeMatteo, *Forensic Mental Health Assessment: A Casebook*, 116 (2002) ("[C]apital

sentencing evaluations are among the most detailed and demanding forensic

assessments that are performed"). Unlike an evaluation focused on providing an

answer to a narrow legal question, such as competence to stand trial, an evaluation for

mitigation purposes is based upon a much wider swath of information and must be at

least as descriptive as it is diagnostic.  The goal is to present the most complete picture

possible of the client as an individual, where he comes from and how his history, life

experiences and other factors shaped who he is.  In order to perform such an evaluation

competently, "the evaluator has to synthesize and integrate a lifetime of relevant

history, behavior and psychological status to convey to the trier of fact."  Liebert et al.,

*supra*, at 45. Indeed, the amount of material that the evaluator must synthesize and

present is not necessarily even limited to a single lifetime; a constitutionally adequate

psychosocial history investigation must be multigenerational.  *See* ABA Guideline 10.7

("A multi-generational investigation extending as far as possible vertically and

horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment."). Using such information, the evaluator can then demonstrate to the jury that the client was in part shaped by forces that were in action before he was even born.

## IV.   SEALED SECTION

A Sealed Section will be submitted separately and provided to the Court and the government. Mr. Christensen hereby moves, pursuant to Local Rules, to seal this Section as it contains defense work product and is only being filed with the Court out of absolutely necessity to provide context for this Motion.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:    309-671-7898
Email: George_Taseff@fd.org

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

2:17-cr-20037-JES-JEH  # 226  Page 17 of 17

CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2019, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and

Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<div style="margin-left: 45%;">

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

</div>