UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

MOTION TO ESTABLISH JURY SELECTION PROCEDURES

NOW COMES the Defendant, BRENDT A. CHRISTENSEN, by and through his

attorneys, and for his Motion to Establish Jury Selection Procedures states as follows:

# Table of Contents

I.   Introduction ..................................................................................................3

II.  Proposed Jury Selection Procedures .........................................................4

A.  Exclusion of Jurors with a Reverence for Life Violates the Express
Terms of 18 U.S.C. §3592(a)...................................................................4

B.  The Constitution Demands That the Defendant Be Tried Before a
Jury Composed of Individuals Who Will Consider and Give
Effect to All Relevant Mitigating Evidence...........................................6

C.  Mr. Christensen is entitled to a meaningful *voir dire,* which
allows inquiry sufficient to ensure that the jury is composed of
individuals who will consider and give effect to real mitigating
evidence...................................................................................................11

D.  Mr. Christensen is entitled to a meaningful *voir dire,* which
allows inquiry sufficient to ensure that the jury is composed of
individuals who will consider a life sentence, assuming all
relevant statutory aggravating factors have been proven..........................15

E.  Form of oral *voir dire*: special precautions....................................................19

i.   *Avoiding "Processing" Effect.* ................................................................19

ii.  *Obtain Information Before Instructing or Imposing Artificial
Categories* ................................................................................................22

iii. *Leeway to Ask Open-Ended Questions* ....................................................23

*iv.*    *Leeway to Probe Jurors' Understanding of the Concept of Mitigation* ..............................................................................26

**F.**    **The Court should allow counsel to question potential jurors** ................30

*i.*    *Introduction* ...............................................................................30

*ii.*    *Capital Punishment Questioning is Unique* ............................33

*iii.*    *Judge As Referee or Advocate?* ................................................37

*iv.*    *Other Jurisdictions* ..................................................................39

*v.*    *Cause Challenges* ......................................................................40

*vi.*    *Peremptory Challenges* ............................................................41

*vii.*    *Social Science Evidence* ...........................................................41

*viii.*    *ABA Standards* ..........................................................................43

*ix.*    *Judicial Economy* ......................................................................44

**III.**    **Examples From Other Federal Capital Cases.** .........................................48

## I.     Introduction

This Motion argues for the establishment of certain specified procedures for jury

selection in this cause. In a case of this magnitude, the *voir dire* must be conducted in a fair

and efficient manner that elicits all necessary information to discern whether potential

jurors harbor any disqualifying prejudice. This will allow both counsel to intelligently

request removal of venire members for cause and to exercise peremptory challenges.

In the argument that follows, Mr. Christensen urges this Court to recognize the

fundamental constitutional principle that any juror who would: 1) automatically vote for

the death penalty if the accused is found guilty of a qualifying intentional and/or

statutorily aggravated murder, or who is 2) so supportive of capital punishment as to be

"substantially impaired" in considering any alternative to the death penalty, or 3) who is

unable to consider and give effect to mitigating circumstances relating to Brendt

Christensen or to the circumstances of this case, must be disqualified for cause. In order to

implement these concepts, the scope of *voir dire* should be defined so as to allow inquiry

*and follow-up inquiry* by defense counsel sufficient to determine whether individual

prospective jurors are: (1) predisposed to give the death penalty in all or nearly all such

cases (so called, but misnamed, "automatic death penalty" jurors or ADP's), (2) incapable

of considering and giving effect to all relevant mitigating evidence, or (3) do not think or

believe that life in prison without release is an adequate punishment for someone who

commits capital murder in the circumstances of the present case.

This motion also seeks a procedure under which the Court informs each individual

juror that punishment questions are required in every such case as part of the jury

selection process and that in the asking of such questions, there is absolutely no

suggestion that Brendt Christensen must be, or is, guilty merely because such questions

are asked. Although this concept has been proposed as part of the defense's Jury

Questionnaire (filed separately under seal), Mr. Christensen also requests that the parties

be given an opportunity to question prospective jurors outside the presence of other

jurors via individual *voir dire* so as to avoid possible contamination within the jury pool

and to encourage candid responses.

Finally, this Motion attempts to present the Court with information about jury

selection approaches that have been adopted in other capital jury selection efforts for

reference.

## II.    Proposed Jury Selection Procedures

This case presents a number of complicating issues for jury selection, especially

given the local interest and press coverage of the matter. In addition to presenting the

complexities of death penalty jury selection, the history of this case requires focused and

case-specific jury selection approaches.

### A.    Exclusion of Jurors with a Reverence for Life Violates the Express Terms of 18 U.S.C. §3592(a).

The Federal Death Penalty Act specifically instructs that, "in determining whether

a sentence of death is to be imposed on a defendant, [the jury] shall consider *any*

*mitigating factor.*" 18 U.S.C. §3592(a)(emphasis added). The statute further provides that

each juror shall consider "other factors in the defendant's background, record, or

character . . . that mitigate against imposition of the death penalty." 18 U.S.C. § 3592(a)(8).

Thus, that a juror may view human life as sacred be inclined to believe that an

4

accused's existence as a human being, in and of itself, is a death-trumping mitigating factor, cannot be considered a basis for disqualification under the federal death statute.

Though the process of "death qualification," is constitutionally permissible if a valid state statute provides for it, (*Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 469 U.S. 412 (1985)) the procedure is neither required nor permitted under the Federal death scheme. The *Witherspoon/Witt* rule is predicated on the notion that some jurors may possess death penalty views that would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). But *Witherspoon* does not provide a "ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude." *Adams*, 448 U.S. at 47-48. Congress can and has given capital defendants more protection than the Constitution requires.

A juror who enters the box believing absolutely in the sanctity of human life as a mitigating factor is not "prevented or substantially impair[ed]" from doing his duty under federal law. This is because under federal death scheme, (1) anything may be considered a mitigating factor, and (2) a sentence of death is never required. 18 U.S.C. §3592(e).[1] In short, the systematic removal of jurors who believe in the sanctity of human

---

[1] See, *United States v. Fields*, 516 F. 3d 923, 938 (10th Cir. 2008)("[T]he FDPA...(as the instructions in this case explicitly affirmed) never mandates the death penalty but, rather, requires jurors to exercise their discretion and decide for themselves whether the death penalty is warranted under the court's instructions."); *United States v. Haynes*, 265 F.Supp.2d 914, 917 (W.D.Tenn.2003)( "Indeed, the [c]ourt infers that Congress elected to use the terms 'sufficient' and 'justify' rather than applying traditional burdens such as 'beyond a reasonable doubt' or 'by a preponderance of the evidence' precisely because they wanted to afford juries the opportunity to exercise their discretion not to impose the death penalty regardless of the quantitative weight of the aggravating or mitigating information."); *United States v. Henderson*, 485 F.Supp.2d 831, 853 (S.D.Ohio 2007)(finding that section 3592(a) of the FDPA does not limit a defendant's right to present mitigating evidence). Cf., *United States v. Caro*, 483

life violates the intent and explicit directive of the statute that jurors "shall consider *any* mitigating factor." A juror who believes that the defendant's human life is sacred may consider that to be mitigating factor, and regardless of what other jurors think, may give the factor decisive weight: the statute says "any" mitigating factor, and the word that Congress chose should be given plain meaning. *See, e.g., Connecticut National Bank v. Germain*, 503 U.S. 249, 253-254 (1992) ("We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.")

Further, in light of the fact that Congress continues to legislate an ever-expanding list of capital crimes, courts should be particularly careful to perform their balancing role by observing the limits inherent in the legislative language Congress chooses. In this case, because jurors may consider *any* mitigating factor, disqualifying a juror who finds the sanctity of life a mitigating factor directly contravenes the broad language that Congress chose for its death penalty statute. The remaining portion of this jury selection memorandum argues in the alternative, without waiving the above contention or any of the contentions made in Section II.

> **B.** **The Constitution Demands That the Defendant Be Tried Before a Jury Composed of Individuals Who Will Consider and Give Effect to All Relevant Mitigating Evidence.**

The Sixth and Eighth Amendments of the United States Constitution guarantee a

---

F.Supp.2d 513, 518 (W.D.Va.2007)("The defendant is correct that mercy may be incorporated into the jury's decision-making process. The FDPA does not preclude the jury from considering mercy when weighing the aggravating and mitigating factors.")

capital defendant the right to a fair trial before a panel of impartial and indifferent jurors. *Uttecht v. Brown*, 551 U.S. 1, 8-9, 127 S.Ct. 2218, 2224 (2007); *Morgan v. Illinois*, 504 U.S. 719, 728 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Duncan v. Louisiana*, 391 U.S. 145, 147-158 (1968); *Turner v. Louisiana*, 379 U.S. 466, 471-473 (1965); *Irwin v. Dowd*, 366 U.S. 717, 722-723 (1961). In *Morgan*, the Supreme Court confirmed that in order to protect a capital defendant's right to a fair trial, a juror is properly removed for cause at any stage of the proceedings if the juror's views in favor of the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 728-729 (*quoting Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Adams v. Texas*, 448 U.S. 38, 45 (1980).[2] In *Morgan*, the Court "reiterate[d]" that a juror, who would "automatically" impose a death sentence following conviction for murder is properly excluded under this standard. *Morgan*, 504 U.S. at 729, 736. Such "ADP" jurors are properly excused because they "obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty; they not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 736.

The *Morgan* standard of exclusion (sometimes referred to as "life qualification"),

---

[2] Death qualification, which "[limits] the State's power to exclude" jurors for cause based upon their conscientious scruples against the death penalty, *Wainwright*, 469 U.S. at 423, is governed by the same standard. See *Morgan*, 504 U.S. at 728, 734-735 ("jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath...whether they be unalterably in favor of or opposed to the death penalty in every case...by definition are ones who cannot perform their duties in accordance with the law") (emphasis added); *Wainwright*, 469 U.S. at 423-424; *Adams*, 448 U.S. at 47-48; *Witherspoon v. Illinois*, 391 U.S. 510, 512-513 (1968).

however, encompasses more than the class of ADP jurors, i.e., those who would "automatically" choose death as a general proposition for all convicted of murder. Pursuant to *Morgan*, "[a]ny juror to whom mitigating factors are. . . irrelevant"--not merely those jurors who "obviously" deem it so–"should be disqualified for cause, for [they have] formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id*. at 738-739.  Justice Scalia pinpointed the Court's holding in his dissent: "The Court today holds that the Constitution requires that *voir dire* directed to this specific 'bias' be provided upon the defendant's request; and that the  more general questions about 'fairness' and ability to 'follow the law' that were asked during *voir dire* in this case were inadequate." *Id*. at 739 (Scalia, J., dissenting).

Importantly, *Morgan* also indicates that a broad range of mitigation-impaired jurors are constitutionally unqualified. As Justice Scalia pointed out in his dissent:

> [I]t is impossible in principle to distinguish between a juror who does not believe that any factor can be mitigating from one who believes that a particular factor–e.g., "extreme mental or emotional disturbance[]"–is not mitigating (presumably, under today's decision a juror who thinks a "bad childhood" is never mitigating must also be excluded).

(*Id*., at 744, n.3.)

"In other words, the class of mitigation-impaired–and constitutionally unqualified–jurors includes not only those who are unable or unwilling to ever consider any form of mitigation, but also those who are either unable or unwilling ever to consider a particular mitigating factor." John Blume, et. al, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra Law Rev. 1209, 1218 (2001).

*Morgan* establishes, then, that any prospective juror must be disqualified if that

person's preconceptions about the propriety of the death penalty–either generally or

related to the specific case–substantially impair that juror's ability to follow the trial

court's penalty phase instruction that he or she must consider and give effect to the

mitigating evidence presented by the defendant. In other words, if a juror is substantially

impaired in his or her ability to meaningfully consider and give effect *to any mitigating*

*evidence relevant in the defendant's particular case*, the juror must be removed.[3]

------------------

[3]The *Morgan* holding is rooted in a long line of Supreme Court cases requiring that jurors consider and be permitted to give effect to mitigating factors relating to the individual defendant before assessing the ultimate punishment. *See, e.g.*, *Morgan,* 504 U.S., at 736 (explaining that the dissenting opinion rejects "the line of cases tracing from *Woodson* and *Lockett*, developing the nature and role of mitigating evidence in the trial of capital offenses"). In *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), the Supreme Court first held that imposition of a mandatory death sentence without consideration of the character and record of the individual offender is inconsistent with the fundamental respect for humanity that underlies the Eighth Amendment. The Court reaffirmed and extended this principle in *Shuman v. Sumner*, 483 U.S. 66 (1987), by invalidating a mandatory death sentence imposed on a Nevada inmate (who had been serving a life term without parole) for killing a prison guard on the ground that the sentencing scheme failed to give individualized consideration to the defendant's character and record. The Court's holdings in *Woodson* and *Shuman*–that the Constitution does not permit mandatory death sentencing in theory–are given practical effect in *Morgan*, which prohibits mandatory death sentencing in fact.

In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court struck down the Ohio death penalty statute based on this principle because it did not permit the type of individualized consideration of mitigating factors required by the Eighth and Fourteenth Amendments. *See id.,* at 605 ("a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments"). The Court went further in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), vacating a death sentence because the state court declined to consider the defendant's unhappy upbringing, emotional disturbance, and turbulent family history as relevant mitigating circumstances. As the Court explained this extension of *Lockett*, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." *Id*., at 113-114. The Court exercised this principle in *Skipper v. South Carolina*, 476 U.S. 1 (1986), reversing a death sentence where the petitioner was prevented from introducing the testimony of prison guards and a frequent jail visitor as evidence of his good adjustment in prison. *Id*., at 9. Exclusion of this testimony at the sentencing phase "deprived [petitioner] of his right to place before the sentencer relevant evidence of mitigation of punishment." *Id*., at 4.

Finally, in *Penry v. Lynaugh*, 492 U.S. 302 (1989), the Court extended the *Lockett* principle once again. Although, consistent with *Lockett* and *Eddings*, neither the Texas legislature nor the Texas trial court prohibited the jury from "considering" mitigating factors, that was not enough. The Court held that the trial court had to allow the jurors to "give effect" to these factors by specifically instructing them that they must be considered in making the life or death decision. *Id*., at 328. See also, *Abdul-Kabir v.Quarterman*, 550 U.S.233, 244, 127 S.Ct. 1654, 1664, 167 L.Ed.2d 585 ("A careful review of our jurisprudence in this area makes clear that well before our decision in *Penry I*, our cases

Importantly, the post-*Lockett* cases (see note 4, supra) show that "consideration" of mitigating evidence requires more than a mere passive willingness to listen to the defendant present his case. As used by the Supreme Court, the term "consider" means to actively take into account, "enter into the decision" or "weigh in the balance." As Justice Powell explained in *Eddings*, "[the jurors] may determine the weight to be given relevant mitigating evidence...[b]ut they may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114. *Penry* reinforced this notion by requiring that the trial court not only ensure that the jurors "consider" mitigating evidence in the passive sense of listening, but also guarantee that jurors both "consider and give effect to" the mitigation in their deliberation. *Penry*, 492 U.S., at 319 ("*Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence"); *compare id.,* at 355 (Scalia, J., concurring/dissenting in part) ("What the Court means by 'fully consider' is to consider for all purposes . . ."). See also, *Abdul-Kabir v. Quarterman*, 550 U.S.233, 127 S.Ct. 1654, 1672, 167 L.Ed.2d 585 ("[T]he jury must be permitted to 'consider fully' such mitigating evidence and ... such consideration 'would be meaningless' unless the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Smith v. Texas*, 543 U.S. 37, 46, 125 S.Ct. 400 (2004)("("

---

had firmly established that sentencing juries must be able to give meaningful consideration *and effect* to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.")(emphasis added).

'[A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances'")(emphasis in original); *United States v. Fulks*, 454 F. 3d 410, 427 (4th Cir. 2006)("[I]n a capital sentencing proceeding,  a juror's duties include giving meaningful consideration to any mitigating evidence that the defendant can produce.")

In sum, a capital defendant's constitutional right to a fair trial is protected–and the constitutional mandate satisfied–only where each individual juror actively considers all relevant mitigating evidence as a meaningful part of his or her life or death decision.

    **C.**    **Mr. Christensen is entitled to a meaningful *voir dire,* which allows inquiry sufficient to ensure that the jury is composed of individuals who will consider and give effect to real mitigating evidence.**

"Part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan*, 504 U.S. at 729; *see Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *Dennis v. United States*, 339 U.S. 162,  171-172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950). "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."  *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). "Although the Constitution makes no mention of *voir dire*, the law recognizes the important role this process plays in ensuring the fair and impartial criminal jury mandated by the Sixth Amendment." *United States v. Quinones*, 511 F. 3d 289, 299 (2d. Cir. 2007). Adequate *voir dire* enables a capital defendant to exercise his constitutional right to an impartial jury by challenging prospective jurors for cause before a judge able to accurately rule on their removal. See *Morgan*, 504 U.S. at 729-730; *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).

Of course, *voir dire* is "conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Ristaino v. Ross*, 424 U.S. 589, 594-95 (1976). Yet, in exercising this discretion, the court must meet the requirements of the Constitution. "Whether a trial court is constitutionally compelled to ask certain questions or has unduly restricted questioning by counsel is dictated by the essential demands of fairness." *Nicklasson v. Roper*, 491 F. 3d 830, 835 (8th Cir. 2007). The Supreme Court has "not hesitated, particularly in a capital case, to find that certain inquires must be made to effectuate constitutional protections." *Morgan*, 504 U.S., at 730.

In any criminal case, "a suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." *Mu'Min*, 500 U.S., at 431. *Morgan* clarifies that, in a capital case, questioning of potential capital jurors as to whether they would automatically or nearly always vote for the death penalty on the facts of the particular case, or could consider and give effect to the relevant mitigating factors in the case, is not only suitable, but constitutionally *required* if a capital defendant is to receive a *voir dire* adequate to protect his right to a trial before an impartial tribunal. See, *Kater v. Maloney*, 459 F. 3d 56, 66 (1st Cir. 2006)("Death penalty cases present special concerns about what *voir dire* may be constitutionally required, and there are special *voir dire* rules in such cases.")(citing *Morgan*); *United States v. Fulks*, 454 F. 3d 410, 430, n.7 (4th Cir. 2006)("In addition to establishing that a capital defendant is entitled to a jury that will consider mitigating evidence, the Court in *Morgan* concluded that such a defendant must also receive the benefit of a *voir dire* 'adequate' to identify unqualified jurors."); *Van Poyck v.*

*Florida Dept. Of Corrections*, 290 F. 3d 1318, 1328 (11th Cir. 2002)("[A] trial court has a duty to question (or allow questioning of) prospective jurors to ensure that a person who would automatically vote for the death penalty is disqualified.")(citing *Morgan*).

During *voir dire*, therefore, a capital defendant is not limited to general or theoretical inquiries as to whether a venire member has a bias for the death penalty as a general proposition. The defendant must also be allowed to question potential jurors as to whether they will consider and give effect to the mitigating factors relevant in the particular case. See, *United States v. Johnson*, 366 F. Supp. 2d 822, 845 (N.D. Iowa 2005)("[T]he court holds that, in this case, 'case specific' questions are appropriate–indeed, necessary–during *voir dire* of prospective jurors to allow the parties to determine the ability of jurors to be fair and impartial in the case actually before them, not merely in some 'abstract' death penalty case. After all, if the jury selected in this case imposes the death penalty on Angela Johnson, there will be nothing 'abstract'") (comprehensive review of all state and federal cases); *United States v. Fell*, 372 F. Supp. 2d 766 (D. Vt. 2005)(following *Johnson* because it "thoroughly and persuasively discusses this question.")("If properly formed, case-specific questions help identify various forms of juror bias.")

The Federal Death Penalty Act and the Eighth Amendment mandate consideration of a broad range of mitigating evidence. *See* 18 U.S.C. § 3592(a). See also, *Tennard v. Dretke*, 542 U.S. 274, 285, 124 S.Ct. 2562 (2004)("[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances"). Here, as in *Morgan,* only active consideration of mitigating evidence can

satisfy the statutory and constitutional mandates with regard to mitigation. Accordingly, the Sixth Amendment right of a capital defendant to adequate *voir dire* of potential jurors must include the right to inquire into a juror's ability to consider and give effect to any and all relevant mitigating evidence in a particular case. This includes the use of case-specific hypothetical questioning of jurors insofar as it is necessary to ascertain a juror's ability to weigh mitigating evidence. See, *United States v. Fell, supra*, 372 F. Supp. 2d 766, 771 ("For example, a juror may be asked whether he or she could fairly consider evidence relating to the defendant's upbringing or potential for rehabilitation. ....Other jurors may have biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing."); *United States v. Basciano*, 2011 WL 913197 * 2 (E.D.N.Y. Feb. 4, 2011)( "[C]ertain case-specific questions can be appropriate in capital *voir dire*. Such questions may be proper, indeed necessary, if they deal with subject matter that would demonstrate impermissible bias on the part of a juror....Accordingly, the court will permit Basciano to include case-specific questions in the jury questionnaire so long as they are phrased so as to serve a legitimate purpose.").[4]

---

[4]In *United States v. Flores*, 63 F.3d 1342, 1356 (5th Cir.1995), the court concluded that "[i]n [the juror's] case, the source of his bias was not the death penalty in the abstract, or in some irrelevant hypothetical case. [The juror] volunteered that he would not be able to overcome his bias and vote in favor of the death penalty where the victim was a co-conspirator in a drug trafficking case. The district court was not required to ignore this bias and did not abuse its discretion by excusing [the juror]." As indicated by former Chief Judge Bennett in *United States v. Johnson, supra*, 366 F. Supp. 2d 822, 839, the *Flores* court "found it appropriate to probe a juror's attitude toward imposition of the death penalty in a case in a certain

**D.**   **Mr. Christensen is entitled to a meaningful *voir dire*, which allows inquiry sufficient to ensure that the jury is composed of individuals who will consider a life sentence, assuming all relevant statutory aggravating factors have been proven.**

In this case, Mr. Christensen must also be allowed to qualify jurors on aggravating factors which will be in issue. The government's Notice of Intent to Seek the Death Penalty (R. 54) specifies a number of issues that require inquiry. In the penalty hearing, the government will be addressing an alleged prior sexual assault along with allegedly aggravated circumstances surrounding the victim's death. The allegations related to penalty thus raise potential jurors' attitudes about their views on assessing penalty for an individual alleged to have committed a prior sexual assault (among other allegations) in a violent manner. Seating a juror whose beliefs would compel a vote for death under such circumstances would have the same effect as the Nevada statute mandating death sentences for those who murder while incarcerated. Of course, this law was struck down as unconstitutional in *Shuman v. Sumner*, 483 U.S. 66 (1987). In other words, just as the legislature may not mandate death for inmates who kill while imprisoned–nor for another particular type of aggravated murder--neither may a juror's beliefs be allowed to accomplish the same impermissible result.  Thus, in order to determine whether jurors can follow the law as set forth in *Shuman*, the court must permit questioning on the salient aggravating facts of this case. See, *United States v. Johnson, supra*, 366 F. Supp. 2d 822; *United States v. Fell, supra*, 372 F. Supp. 2d 766; *United States v. Basciano, supra*, 2011 WL

category, a case in which both the defendant and the victim were "in drugs," not just in the "abstract"; indeed, the court seemed to suggest that merely "abstract" or "irrelevant hypothetical" questions were not as instructive about a juror's true attitude as the juror's response to the category of case actually at issue."

913197 * 2 (E.D.N.Y. Feb. 4, 2011).[5]

The scope of questioning that the defendant seeks to pursue regarding the ability of potential jurors to meaningfully consider mitigating evidence–to establish that they could truly consider and evaluate it–is distinct in form and intent from an inquiry into how jurors would weigh particular evidence at trial. The latter approach, to which the labels "staking out," "sneak preview" or "loaded questioning" are frequently applied, is often prohibited. See *United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996) (overruling *United States v. Evans*, 917 F.2d 800 (4th Cir. 1990)) (no error to disallow question whether juror would give more weight to testimony of a law enforcement official than to that ordinary citizen); *State v. Southerland*, 316 S.C. 377, 382, 447 S.E.2d 862, 866 (S.C. 1994) ("[a]n inquiry as to the weight a juror would give one kind of witness over another invades the province of the jury").

Nonetheless, many federal courts allow this type of questioning. *Lancaster*, 96 F.3d at 747-49 (dissent); see, e.g., *United States v. Quinones, supra*, 511 F. 3d 289, 297- 300; *Brown v. United States*, 338 F.2d 543 (D.C.Cir. 1964); *United States v. Martin*, 507 F.2d 428, 432-33 (7th Cir. 1974); *United States v. Baldwin*, 607 F.2d 1295 (9th Cir. 1979); *United States v. Gelb*, 881 F.2d 1155, 1164-65 (2nd Cir. 1989); *United States v. Victoria-Peguero*, 920 F.2d 77,

---

[5] See also, *United States v. Fulks*, 454 F. 3d 410, 430 n. 7 (4th Cir. 2006)("In this case, the court asked each juror whether he or she would automatically impose the death penalty for capital murder, inquired into how each juror would vote when faced with evidence of a double murder, and permitted Fulks to extensively question the prospective jurors concerning their views on the death penalty. Such an examination was plainly sufficient to satisfy *Morgan*."); *United States v. Honken*, 381 F. Supp. 2d 936, 993 (N.D. Iowa 2005)("[T]he *voir dire* of Juror 902 demonstrated that she would weigh the aggravating and mitigating factors, with an open mind to both possible sentences, even if the evidence proved the murder of children.... Thus, this juror was both life- and death-qualified as required by *Morgan*.')

84 (1st Cir. 1990); *United States v. Amerson*, 938 F.2d 116, 117-18 (8th Cir. 1991); *United States v. Nielsen*, 1 F.3d 855, 859 (9th Cir. 1993).

In contrast, Mr. Christensen does not seek to ask prospective jurors to assess the weight they would give certain substantive evidence or the weight they would give to evidence presented by certain classes of people. As former Chief Judge Bennett ruled in *United States v. Johnson, supra*, 366 F. Supp. 2d 822, 845:

> It is a misconception to assume that any 'case-specific' question is necessarily a 'stake-out' question.....While any 'case-specific' question that asks how a prospective juror would vote on life or death, if presented with proof of certain facts, is a 'stake-out' question, and does attempt to 'pre-commit' the juror to a certain position, a properly framed case-specific question does not necessarily do any of these things. For example, a question about whether a juror 'could (not would) find' that certain facts establish a legal requirement for imposition of the death penalty, ..., or that a prospective juror could fairly consider either a death or life sentence, notwithstanding proof of certain facts, commits a juror to no other position than fair consideration of the appropriate penalty in light of all of the facts and the court's instructions.

Therefore, defendant's inquiry on *voir dire* to ascertain a juror's ability to weigh or give effect to mitigating evidence, will not result in an unsanctioned "sneak preview" of how jurors will weigh specific mitigating or aggravating evidence at trial. Rather than an improper "preview," such inquiry is a necessary and constitutionally sanctioned *view* into whether a juror is already biased. (Such case-specific penalty bias remains a basis for disqualification even if the juror, in the hypothetical capital case, could consider a penalty less than death). *Morgan*, supra. Nor is the scope of inquiry proposed by the defendant an attempt to "stake out" jurors. The defendant merely seeks to protect his constitutional

right to a fair trial by assuring that all jurors before whom he is tried are capable of weighing all relevant mitigating factors.

In *Adams v. Texas, supra*, the Supreme Court ruled that opposition to the death penalty, even when grounded in religious conviction, does not by itself support removal for cause because such views might indicate "only that the potentially lethal consequences of their [sentencing] decision would invest [these prospective jurors'] deliberations with greater seriousness and gravity or would involve them emotionally." 448 U.S. at 49, 100 S.Ct. 2521. "Such reasoning presumes that a person who did not think that any listed aggravating factor necessarily warranted a death sentence might, on further inquiry, indicate an ability to conceive of some circumstances in which an aggravating factor could prompt him to vote for the death penalty. Similarly, a person who thought that any of a list of mitigating factors could support a life sentence rather than death might, upon further questioning, indicate that not all circumstances involving these mitigating factors would necessarily support that conclusion." *United States v. Quinones, supra*, 511 F. 3d 289, 305.

During *voir dire* and in the jury questionnaire, therefore, the court should permit defendant's counsel, at the very least, to inquire (or have the Court inquire) about each juror's ability to consider and give effect to the relevant statutory mitigating factors listed in 18 U.S.C. § 3592, in the event that the government proves up the particular crimes and aggravating factors charged in the third superseding indictment and death notice. See, *United States v. Quinones, supra*, 511 F. 3d 289, 297-300; *United States v. Fell, supra*, 372 F. Supp. 2d 766, 771 ("There is a crucial difference between questions that seek to discover

how a juror might vote and those that ask whether a juror will be able to fairly consider

potential aggravating and mitigating evidence. For example, a juror may not be asked

whether evidence of rape would lead him or her to vote for the death penalty. However, a

juror may be asked if, in a murder case involving rape, he or she could fairly consider

either a life or death sentence. The first question is an improper stake-out question. The

second question is not a stake-out question because it only asks whether the juror is able

to fairly consider the potential penalties.")

### E.     Form of oral *voir dire*: special precautions

Case law, social science studies, and experience teach that the process of a capital

*voir dire* can have deleterious effects on the ability of counsel and the Court to obtain all

necessary information and may actually *incline* jurors toward conviction and a sentence of

death. The Court heard some evidence that has a bearing on these issues during the

hearings held in July 2016. For the reasons discussed below, the defense asks this Court to

take specific precautions during *voir dire* at defendant's trial to ensure fairness of process.

i.     *Avoiding "Processing" Effect.*

Scholarship in fields like law and society and in the social sciences establishes that

the process of death qualification itself has a prejudicial effect on the jurors who end up

sitting on the jury. *See, e.g.*, Craig Haney, *On the Selection of Capital Juries*, 8 Law & Hum.

Behav. 121-33 (1984) ("Haney I"); Craig Haney, *Examining Death Qualification: Further

Analysis of the Process Effect, 8 Law & Hum. Behav*. 133-151 (1984) ("Haney II"); Craig

Haney, *Exoneration and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in

Death Penalty Cases*, 37 Golden Gate U. L. Rev. 131 (2006)("Haney III").

"Death qualification is an anomalous feature of the capital trial process; it requires penalty to be discussed with jurors at the outset of the case, before any evidence has been presented and long before penalty is relevant. The attention of prospective jurors is drawn away from the presumption of innocence and onto what will happen after they have convicted the defendant." (Haney III, p. 153). As another legal commentator put it, "[d]eath qualification as currently practiced tilts the jury first towards guilt and then towards death, both by removing too many of certain kinds of people from the pool, and by affecting the expectations and perceptions of those who remain." Susan Rozelle, *The Utility of Witt: Understanding the Language of Death Qualification*, 54 Baylor L. Rev. 677, 699 (2002). Similarly, two social science researchers concluded: "At all stages of the trial–jury selection, determination of guilt or innocence, and the final judgment of whether the defendant lives or dies–death qualification results in bias against the capital defendant of a nature that occurs for no other criminal defendant." James Luginbuhl & Kathi Middendorf, *Death Penalty Beliefs and Jurors' Responses to Aggravating and Mitigating Circumstances in Capital Trials*, 12 Law & Hum. Behav. 263, 279 (1988).

Death qualification biases capital juries "not only because it alters the composition of the group 'qualified' to sit, but also because it exposes them to an unusual and suggestive legal process." Haney I, at 121. The "process" of death qualification involves the asking of questions that presume the likelihood of a penalty phase. This inclines jurors toward returning a guilty verdict in the initial phase and a death verdict at sentencing:

> Exposure to death qualification increased subjects' belief in the guilt of the defendant and their estimate that he would be convicted. It also increased their estimate of the prosecutor, defense attorney, and judge's belief in the guilt of the

defendant. The death qualification process led subjects to
perceive both prosecutor and judge as more strongly in favor
of the death penalty, and to believe that the law disapproves
of people who oppose the death penalty. And it led jurors to
choose the death penalty as an appropriate punishment much
more frequently than persons not exposed to it. Thus, persons
who had been exposed to death qualification not only differed
from non-death-qualified subjects, but they differed in ways
that were consistently prejudicial to the interests and rights of
the defendants.

Haney I, at 128-29.

The "processing effect" stems from the necessarily extended discussion of penalty

before any determination of guilt. Jurors in novel or unfamiliar situations are especially

sensitive to cues from authority figures like judges. When judges, from the very start of

*voir dire*, begin to focus and dwell on the death penalty, it resolves uncertainty in the

minds of the jurors in a way prejudicial to the defendant. Because expectations are

important determinants of the way subsequent information is received, interpreted, and

acted upon, "[o]nce jurors have imagined themselves in the penalty phase of the trial,

they may come to assume that it will occur, and begin to organize subsequent

information in a manner consistent with that assumption." *Id*. at 130, 131.

Another distorting factor is that death qualification requires jurors to take a public

stand, affirming their willingness to consider imposing the death penalty. Because public

advocacy of a position intensifies one's belief in it, "[t]he public affirmation required by

death qualification may thus intensify jurors' commitments to use the death penalty[or

cause jurors to] become invested in a 'tough' image that will affect them in deliberations."

*Id*., at 130-31.

The Court, therefore, should remain vigilant at all times that the method by which

32

questions are asked does not implicitly convey the notion that a penalty phase is likely or inevitable, or that the law would favor a guilty verdict followed by a death sentence.

The Court should therefore make strong efforts to minimize the processing effects of the death penalty *voir dire* by employing the tendered admonition in the defense questionnaire and reemphasizing the admonition prior to and throughout *voir dire*. The Court must carefully ascertain whether the prospective juror recognizes that questioning on punishment issues during jury selection must occur in every potential capital case.

The prospective juror must understand that the procedure cannot affect his or her view of the defense, the presumption of innocence, or the prosecution's burden of proof. See generally *Darden v. Wainwright*, 477 U.S. 168, at 178, 106 S.Ct. 2464 (1986) (noting the removal decision was properly informed by juror's presence throughout process that "made the purpose and meaning of the *Witt* inquiry absolutely clear").

    ii.    *Obtain Information Before Instructing or Imposing Artificial Categories*

Counsel should also have the opportunity to fully explore the depth and strength of any punishment related feelings, biases, opinions or prejudices before the jurors are instructed about legal obligations or requirements of the law or before artificial categories of answers are suggested. Otherwise, both counsel and the Court are deprived of the opportunity to learn the jurors' true feelings, on which counsel must rely to intelligently exercise challenges, and which the Court must assess to rule reliably and fairly on cause challenges. "[S]ufficient information concerning the juror's predilections. . . is much more likely to be expressed freely when the juror is not constrained by an instruction from the court on what kind of answer leads to automatic dismissal." *State v. Williams*, 550 A.2d 1172, 1182 (N.J. 1988).

As explained in John Blume, et. al, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra Law Rev. 1209, 1234 (2001), "(t)he typical three-category death-penalty-opinion framework that many trial courts pose to jurors in *voir dire*, though designed to expedite the for-cause challenge process, has the unintended consequence of making introspection and honest responses extremely difficult." "Eliminating the initial and suggestive choice between three simplistic categories should be the first step in a genuinely illuminating *voir dire*. The judge can, instead, productively begin inquiry into a juror's attitudes by asking an open-ended question such as 'How would you describe your attitude toward the death penalty?' For jurors whose answers are vague, or non-responsive, judges should be prepared with alternative phrasings, such as 'How do you feel about the death penalty?,' or 'When, if ever, do you think its appropriate?'" (*Id.* at 1248).

### iii.    *Leeway to Ask Open-Ended Questions*

The Court should also permit counsel to ask open-ended questions designed to inquire into the actual feelings, opinions, and knowledge of prospective jurors relating to punishment views. To conduct a proper capital *voir dire* that fully protects the defendant's rights and interests, the Court must permit counsel to fully develop each prospective juror's feelings about the death penalty in general, with repeated inquiries if the questionnaire, in-court answers, demeanor or body language of the person suggest that repetition is advisable and necessary. It is only through a penetrating *voir dire* that a juror's feelings, beliefs, views, opinions, attitudes, and convictions about the death penalty can be adequately explored. Importantly, the Supreme Court has ruled that a trial

32

court's ruling on a challenge for cause is entitled to deference when "there is lengthy

questioning of a prospective juror and the trial court has supervised a diligent and

thoughtful *voir dire*." *Uttecht v. Brown, supra*, 127 S. Ct., at 2230. See also, *United States v.*

*Quinones, supra*, 511 F. 3d 289, 301 ("[S]imply to maximize their claim on our deference,

district courts are well advised to employ some oral *voir dire* in making *Witt-Witherspoon*

decisions.")

Moreover, such *voir dire* is particularly important to discover those jurors who may

harbor pro-death penalty views that are well camouflaged:

> [A] far greater percentage of death penalty skeptics identify
> themselves at *voir dire* than do death penalty supporters.
> Review of the *voir dire* transcripts of automatic appeals
> decided by this court confirms the existence of the problem.
> Although death penalty supporters vastly outnumber
> opponents, it is a rare *voir dire* transcript where more venire
> persons acknowledge support for capital punishment than
> opposition.

*People v. Turner*, 690 P.2d 669, 699 (Cal. 1984) (Bird, C.J., concurring and dissenting).

*Compare, Ross v. Oklahoma*, 487 U.S. 81, 83-84 (1988) (juror initially indicated he could vote

to recommend life if the circumstances were appropriate, but "on further examination by

defense counsel [] declared that if the jury found petitioner guilty, he would vote to

impose death automatically"). See also, Andrea D. Lyon, *The Negative Effects of Capital Jury*

*Selection*, 80 Ind. L.J. 52, 53 (2005) ("It's been my experience that people who oppose the

death penalty tend to be pretty honest about it, but people who support it tend to lie and

will say upon rehabilitation, 'oh, sure, I'll consider mitigation if the judge tells me to.'").

See also Andrea D. Lyon, *The Capital Jury, Open Discussion*, 80 Ind. L.J. 60, 61 (2005)

(noting that to discern automatic death penalty voters "you have to ask really specific

questions").

As explained in Susan Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. St. L.J. 769, 788 (2006):

> Despite [*Morgan*], the CJP [Capital Jury Project][6] has demonstrated that our real-world juries in fact include an astonishing number of "automatic death penalty" voters, whose opinions about punishment do not depend on the evidence offered at sentencing, but instead are triggered simply by the fact of conviction....It seems unlikely that jurors are intentionally lying about their willingness to follow the judge's instructions to consider the evidence at trial and then coming clean about it with researchers after the fact. More likely, the shockingly high number of automatic death penalty jurors seated on capital trials results from a number of factors. First, automatic life penalty voters (those who would fail to death-qualify for their failure to consider death as a possible punishment) tend to have come to their positions through conscious reflection.

Presuming candor at *voir dire*, these individuals may readily be identified for exclusion; they know themselves. In contrast, it seems likely that many automatic death penalty voters simply do not realize that is their position. As Rozelle points out, most people presumably believe themselves to be open-minded, and willing to consider the evidence for or against a death sentence. "But when asked to give examples of situations where 'they would not vote for the death penalty,' actual capital jurors offered the

---

[6] The Capital Jury Project ("CJP") is a National Science Foundation-funded, multi-state research effort designed to better understand the dynamics of juror decision-making in capital cases. The CJP is a loose association of academics from different disciplines (primarily law and criminology) and institutions who in 1990 began interviewing jurors in a number of different states who had served on capital cases, some of which resulted in a sentence of death, and some a sentence of life imprisonment. Analyses of the data collected during these interviews began appearing as early as 1993. The studies are maintained by Dr. Jon Sorensen at East Carolina University.

following: (1) war time; (2) children playing with a gun; (3) hunting accident or (4) [i]f the guy was not guilty. "Jurors' unwillingness to impose a death sentence in these circumstances is reassuring since, generally speaking, they are not crimes. Thus, while automatic life penalty voters systematically are swept from capital juries, automatic death penalty voters regularly are overlooked and seated." (*Id.*) A searching *voir dire* is the only way in which this problem will be remedied. See, *United States v. Quinones*, 511 F. 3d 289, 301 (2d. Cir. 2007)("The bluntness or hesitancy, confidence or discomfort displayed by prospective jurors as they respond to questions about the possibility of returning a capital verdict often reveals as much about bias as the actual answers given.")

> iv.    *Leeway to Probe Jurors' Understanding of the Concept of Mitigation*

The case law is clear that jurors may not make their life or death decision on the basis of the crime itself, no matter how horrific. The circumstances of the offense and the offender must be considered. *See, e.g., Penry v. Lynaugh*, 492 U.S. 302 (1989); *Shuman v. Sumner*, 483 U.S. 66 (1987); *Spaziano v. Florida*, 468 U.S. 447 (1984); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Bell v. Ohio*, 438 U.S. 637 (1978); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

A growing body of social science research demonstrates that capital sentencing jurors often fail to understand or give any effect to the mitigating evidence offered by a convicted capital defendant. See, Craig Haney, *Exoneration and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Death Penalty Cases*, 37 Golden Gate U. L. Rev. 131 (2006)("Death-qualified jurors also weigh and evaluate penalty phase evidence differently. Specifically, they are more likely to endorse numerous aggravating factors while diminishing the significance of both statutory and non-statutory mitigation.");

Susan Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. St. L.J. 769, 790 (2006)("Nearly half of the CJP respondents admitted to deciding the proper punishment before they had heard a single piece of evidence on the issue of punishment. Of these, the overwhelming majority were 'absolutely convinced' and almost all of those remaining were 'pretty sure.'"); Brooke M. Butler & Gary Moran, *The Role of Death Qualification in Venirepersons' Evaluations of Aggravating and Mitigating Circumstances in Capital Trials*, 26 Law & Hum. Behav. 175, 183 (2002) ("[D]efendants in capital trials are subjected to juries that are oriented toward accepting aggravating circumstances and rejecting mitigating circumstances."); John Blume, et. al, *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra Law Rev. 1209, 1228 (2001)("[Capital Jury Project] data convincingly demonstrate that a substantial number of empaneled capital jurors are indeed 'mitigation-impaired.'") ; Marla Sandys, *Cross-Overs– Capital Jurors Who Change Their Minds About the Punishment: A Litmus Test for Sentencing Guidelines*, 70 Ind. L. J. 1183, 1220-21 (1995)(same); Constanza & Constanza, *Jury Decision Making in the Capital Penalty Phase*, 16 L. & Hum. Behav. 185 (1992)(same).

Capital instructions typically use complex language, unfamiliar words, one-sentence definitions of terms, and many sentences with double negatives, all of which make the instructions difficult for jurors to understand. Luginbuhl & Howe, *Discretion in Capital Sentencing Instructions: Guided or Misguided?*, 70 Ind. L. J. 1161, 1169 (1995). Without a coherent guiding explanation, jurors fall back on their own knowledge, but have little appreciation of many of the concepts in a capital sentencing trial, especially

mitigation.[7] *Id.*

Specifically, many jurors believe that they must unanimously agree that a mitigating circumstance is present in the case before it can be considered. In fact, as Eisenberg and Wells report, over sixty percent of jurors in South Carolina capital cases labor under this significant misperception. Eisenberg & Wells, *Deadly Confusion: Juror Instructions in Capital Cases* 79 Corn. L. Rev. 1, 11[8]; see, also Luginbuhl & Howe, 70 Ind. L. J. at 1167 (49% of jurors thought unanimity was required to give effect to mitigating circumstances).

Many jurors also believe that mitigating circumstances must be established beyond a reasonable doubt. *See* Luginbuhl & Howe, 70 Ind. L. J. at 1167 (41% of jurors thought standard of proof for mitigating factors was 'beyond a reasonable doubt'); Eisenberg & Wells, 79 Corn. L. Rev. at 11 (almost half); Cornell Study (four of twenty-three thought standard was 'beyond a reasonable doubt'; seven thought standard was 'preponderance of the evidence'; four did not know).

---

[7] According to Haney: "Some of this derives from the fact that we seem to have become a society that has, at this time in our history, a very difficult time conceptualizing and legitimizing compassion, mercy, charity, and understanding–all concepts that are intertwined with mitigation but which now have become terribly hard for our citizens to define, harder to assert, and virtually impossible to connect to something resembling a principled point of view." Craig Haney, *Symposium: The Capital Jury Project, Taking Capital Jury Seriously* 70 Ind. L.J 1223, 1227 (1995) ("Haney IV).

[8] Moreover, in a test conducted by the Cornell Death Penalty Project to study juror comprehension (hereinafter "Cornell Study"), the subject of greatest confusion was whether unanimity was required in considering mitigating evidence. In the study, conducted at Cornell Law School, twenty-three mock jurors were read a set of model South Carolina instructions for a capital sentencing jury. The jurors were then immediately given a questionnaire to assess their comprehension of the substance of the instructions. Even with the instructions having just been read to them, only five of the twenty-three jurors understood that they did not have to unanimously agree as to the existence of a mitigating circumstance in order to give it effect. Fifteen of the twenty-three jurors said they all had to agree, and three did not know. John H. Blume, Theodore Eisenberg & Stephen P. Garvey, *Lessons from the Capital Jury Project*, in Beyond Repair? America's Death Penalty 144 (Stephen P. Garvey ed., 2002)

In addition, many jurors do not understand that they can consider *any* factor in mitigation. See Luginbuhl & Howe, 70 Ind. L. J. at 1167 (only 59% understood that they could consider any evidence as be constituting a mitigating factor); Eisenberg & Wells, 79 Corn. L. Rev. at 11 (less than a third of the jurors understood that a mitigating circumstance must be proven only to the juror's satisfaction). Furthermore, a significant number of jurors believe that the death penalty is mandatory for an intentional or vicious or heinous murder. *See* Eisenberg, Garvey & Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study,* 44 Buffalo Law Review 339 (1996)("nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness"); William S. Bowers, The Capital Jury Project: *Rationale, Design and Preview of Early Findings*, 70 Ind. L. J. 1043, 1091 n.32 (1995) (many jurors); William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials*, 15 Am. J. Crim. L. 1, 41 (1989) (significant number of jurors believed that death penalty was mandatory or presumed for first degree murder). In the Cornell Study, only nine of twenty-three jurors understood that once an aggravating circumstance is established, neither a presumption of a life sentence nor a presumption of a death sentence exists. Of the remaining jurors, six thought the death penalty was presumed.

Indeed, empirical research suggests that capital jurors enter the sentencing phase with a substantial bias in favor of, or a "presumption" of, death. See Eisenberg & Wells, 79 Corn. L. Rev. at 12-14, 38 n.12; compare Bowers, 70 Ind. L. J. at 1090, Table 6 (in study of actual capital jurors, one-half had made up their minds as to penalty once they had

convicted the defendant); Sandys, 70 Ind. L. J. at 1228 ("one half of the jurors had actually made up their minds [were 'absolutely convinced' or 'pretty sure'] about the appropriate penalty once they had convicted the defendant at the guilt phase").

Even when jurors do understand, they are likely to operate independently of the judge's instructions and fail to properly utilize that information in reaching a fair and just verdict. For example, in Geimer and Amsterdam's study of Florida jurors, over half of the jurors interviewed attached little or no significance to the aggravating circumstances and mitigating circumstances presented. Geimer & Amsterdam, 15 Am. J. Crim. L. at 24. To the extent such circumstances were considered important, it was for the wrong reasons. "Some jurors indicated that the list may have helped confirm their understanding that death was the mandatory or expected recommendation." *Id*. In the words of one juror, "[i]t seemed that the State of Florida called for the death penalty. There didn't seem to be any choice." *Id*. at 25.

Thus, the Court at *voir dire* should be permitted to probe deeply into jurors' understanding of the concept of mitigation. In particular, counsel should be free, in formulating these questions, to "clearly articulate and underscore the importance of broadening the focus of the penalty phase inquiry" and be assured that the jurors can extend their "moral assessment to the issues beyond the guilt-phase crime itself." *Id*., at 1229. Otherwise, the defendant may be confronted with a jury likely to decide the punishment issue during the guilt phase, and unlikely to consider fairly all mitigating evidence.

F.    **The Court should allow counsel to question potential jurors**

i.    *Introduction*

32

Counsel for Mr. Christensen are aware that many Federal trial judges personally conduct *voir dire*. In courts where this is the practice, lawyers often do not bother to ask to participate. The Supreme Court has never held that there is a constitutional right compelling judges to permit defense counsel an opportunity to question prospective jurors.[9] *See e.g., United States v. Duke*, 409 F.2d 669, 671 (4th Cir. 1969), *Turner v. Commonwealth*, 221 Va. 513, 273 S.E.2d 36, 41 (1980), *cert. denied*, 451 U.S. 1011 (1981), rev'd on other grounds, 476 U.S. 28 (1986). But this is no ordinary case.  This is a capital case that has previously been tried once. The conviction and sentence were reversed in this Court. Attorney conducted *voir dire* is necessary to safeguard defendant's due process and fair trial rights.

While Rule 24(a) of the Federal Rules of Criminal Procedure gives trial courts discretion in deciding the scope and method of jury *voir dire*, *United States v. Magana-Arevalo*, 639 F.2d 226 (5th Cir. 1981), this Court has a duty to ensure that capital defendants receive a fair trial under the Fifth Amendment to the United States Constitution by uncovering and neutralizing juror prejudice. See generally *Turner v. Louisiana*, 379 U.S. 466 (1964) (bailiffs who were also prosecution witnesses were  never asked whether they talked to the jury about the case); *Irvin v. Dowd*, 366 U.S. 717 (1961)

---

[9]In contrast, some courts do see constitutional rights implicated when attorneys are not allowed to participate in *voir dire*. See, e.g., *Maddux v. State*, 825 S.W.2d 511, 514 (Tex. App. 1992) ("The right to pose such questions is part of the right to counsel under ... the Texas constitution ..."). See also, *Oden v. State*, 90 N.W.2d 356, 358 (Neb. 1958) ("The usual and better practice is to permit counsel to conduct the examination under the direction and supervision of the court."); *State v. Hankins*, 441 N.W.2d 854, 866 (Neb. 1989) ("The defendant... has the right to put pertinent questions to prospective jurors..."). Cf. *Strube v. State*, 739 P.2d 1013, 1016 (Okl. Cr. 1987) ("Rule six, as well as the ABA Standards Relating to Trial Courts, Section 2.12 (1976) and the ABA Standards for Trial by Jury, section 15-2.4 (1978), make clear that participation by ... the defense in *voir dire*, at least in criminal proceedings, is a right.")

(jury infected by prejudice due to pretrial publicity); *Turner v. Murray*, 476 U.S. 28 (1986)

(*voir dire* required on racial bias when interracial capital crime alleged). While this Court

may well be able to meet any constitutional minimum, or to choose a procedure which

will mask any failing, defendant asks the Court to exercise its discretion and to err, if at

all, on the side of fairness and caution.

Federal courts have recognized, even in non-capital cases, the importance of

attorney participation in the jury selection process. See, e.g., *United States v. Ible*, 630 F.2d

389 (5th Cir. 1980); *United States v. Ledee*, 549 F.2d 990 (5th Cir. 1977). In *Ible*, the Court

stated:

> [W]hile Federal Rule of Criminal Procedure 24(a) gives wide discretion to
> the trial court, voir dire may have little meaning if it is not conducted at
> least in part by counsel.  The "federal" practice of almost exclusive voir
> dire examination by the court does not take into account the fact that it is
> the parties, rather than the court, who have a full grasp of the nuances and
> the strengths and weaknesses of the case ... Experience indicates that in
> the majority of situations questioning by counsel would be more likely to
> fulfill the need than an exclusive examination in general terms by the trial
> court.
>
> * * * * * * * * * * * * *
>
> More recently, records reviewed in this court reflect a new pattern by
> trial courts. The trial judge will explain the nature of the case in general
> terms, point out the parties and counsel, cover the most basic points of
> law (burden of proof, presumption of innocence, right to remain silent,
> etc.), explain the procedures and schedule to be followed and then turn
> the questioning over to trial counsel. We encourage this approach.

*Ible,* 630 F.2d at 395, n. 8; emphasis added. As Federal judges experiment with attorney

participation in *voir dire*, a majority find the practice preferable in certain cases. *See, Report*

*of the Committee on Juries of the Judicial Council of the Second Circuit*, 12-31 (August 1984)

(Judges in criminal cases favored the experimental procedure by a 12-4 vote). See also,

Ninth Circuit, <u>Manual on Jury Trial Procedures</u> (2013) § 2.5 Attorney Participation in Voir Dire ("Under both the criminal and civil rules (Fed. R. Crim. P. 24(a) and Fed. R. Civ. P. 47(a)), direct attorney participation in the *voir dire* examination is discretionary with the court. Many courts permit attorney *voir dire*. The extent of attorney participation varies greatly from court to court. Some courts permit attorneys to participate orally in *voir dire*, some permit attorney participation via written questions, and others use a combination of the practices.")

### ii.  Capital Punishment Questioning is Unique

In capital cases, requests for attorney participation in *voir dire* are routinely made and routinely granted. Both the legislative and judicial branches recognize that death penalty cases are different when it comes to determining the structure of jury selection. Fed. R. Crim. P. 24(b) itself demonstrates that capital trials are different from non-capital actions.[10] Death penalty cases are different, and nearly every member of the Supreme Court since *Furman*, has so declared.[11] *Furman v. Georgia*, 408 U.S. 238 (1972). Any lawyer who has experienced *voir dire* in a capital case knows why this is true.

In the modern era, probing juror punishment views, particularly about death as a

---

[10]18 U.S.C. § 3432 requires that "at least three entire days before commencement of trial ... a person charged with ... [a] capital offense ... shall ... be furnished with ... list of the veniremen." Fed. Crim. Proc., Rule 24(b) requires "20 peremptory challenges" for "each side" in cases where the "offense charged is punishable by death ..." Otherwise, the "defendant or defendants jointly" are entitled to "10 peremptory challenges.

[11]"[E]very member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any punishment, and hence must be accompanied by unique safeguards ...." *Spaziano v. Florida*, 468 U.S. 447, 468 (1985) (Stevens, J., dissenting); *Woodson v. North Carolina*, 428 U.S. 280, 304-305 (1976).

sanction, is unfamiliar in federal courts, particularly in jurisdictions like the District of Vermont located in a state that does not employ the death penalty. Experience from the trial of capital cases in state courts teaches that extracting reliable information regarding venire members' views on the death penalty is a delicate operation. To the uninitiated, it is often confusing and complex. "Given the important, delicate and complex nature of the death qualification process, there can be no substitute for thorough and searching inquiry...." *State v. Williams*, 550 A.2d, at 1182; see also, *United States v. Quinones, supra*, 511 F. 3d 289, 300-301 ("[W]e observe that this case appears to present a rare exception to the general practice of district courts in this circuit, which, in selecting capital juries, have routinely employed some oral *voir dire* in resolving disputed *Witt- Witherspoon* challenges. The practice is commendable.").

For example, courts and commentators recognize that many jurors' initial responses to death-qualifying questions cannot be taken at face value. The Supreme Court observed as much in *Gray v. Mississippi*, 481 U.S. 648, 662-663 (1987) ("[D]espite their initial responses, the venire members might have clarified their positions upon further questioning and revealed that their concerns about the death penalty were weaker than they originally stated. It might have become clear that they could set aside their scruples and serve as jurors.") The Court in *Wainwright v. Witt, supra*, 469 U.S. 423, 425, recognized that a searching inquiry is often necessary before jurors can be excluded on the basis of moral, philosophical or practical reservations regarding a particular punishment: "[T]hese veniremen may not know how they will react when faced with imposing the death

sentence, or may be unable to articulate, or may wish to hide their true feelings."[12] It is for

this reason that the Supreme Court has often assumed, without suggesting it was

deciding, that counsel would at least be permitted to participate in the death qualification

process.

> As with any other trial situation where an adversary wishes to
> exclude a juror because of bias, then, it is the adversary
> seeking exclusion who must demonstrate, through
> questioning, that the potential juror lacks impartiality.

*Wainwright v. Witt, supra*, 469 U.S., at 423.

The Supreme Court has often noted defense counsel's failure to participate in

death-qualification as indicative of support for, or at least acquiescence in, the court's

ruling on a juror's impartiality. "In this regard it is noteworthy that in this case the court

was given no reason to think that elaboration was necessary; defense counsel did not ...

attempt rehabilitation." *Id.*, at 430-431.

*Adams v. Texas, supra,* 448 U.S. 38 (1980), as interpreted in *Wainwright v. Witt, supra,*

469 U.S. 412 (1984), modified the stringent "automatic" and "unmistakably clear"

standard that must be met before a juror's punishment views could result in

disqualification. Compare *Witherspoon v. Illinois, supra*, 391 U.S. 510, 520 n. 9, 522, n.21,

with *Adams v. Texas*, 448 U.S., at 45 (before a cause challenge is granted, the juror's

punishment views must "prevent or substantially impair the performance of his duties as

---

[12]By way of example, the *Witt* Court cited excerpts from *voir dire* in *O'Bryan v.
Estelle*, 714 F.2d 365, 379 (5th Cir. 1983), *cert. denied*, 465 U.S. 1013 (1984), demonstrating a
juror's confused and seemingly contradictory answers to punishment related questions. 469 U.S., at
425, n.6.

a juror ...") and *Wainwright v. Witt*, 469 U.S. at 424 (the "standard is whether the jurors

views would 'prevent or substantially impair the performance of his duties as a

juror...'."). While this relaxed somewhat the rigors of inquiry on the "anti-death penalty"

side of the punishment equation, in the long run it complicates matters. This is because

"death-qualification," actually "punishment-qualification" now becomes a

three-dimensional phenomenon for the interrogator.

*First*, jurors who are "substantially impaired" by virtue of anti-capital punishment

views must be identified. *Second*, jurors who are "substantially impaired" by virtue of

pro-capital punishment views must be identified.[13] See *Morgan*, *supra*. *Third*, identification

of venire members who are substantially impaired in considering lawful mitigating

evidence is necessary. "Presumably ...a juror who thinks a 'bad childhood' is never

mitigating must also be excluded." *Morgan*, 504 U.S. at 7, n.3 (Scalia, J., dissenting).

Counsel is simply in a better position to accomplish this required line of questioning,

especially as to mitigation questions.[14]

---

[13]Sometimes phrased in now-outdated Witherspoon terms, courts refer to such jurors as having "automatic death penalty" views. This means they are jurors "biased in favor of the death penalty under all circumstances," *Patterson v. Commonwealth*, 222 Va. 653, 659, 283 S.E.2d 212, 216 (1981), or who have "an unalterable bias in favor of...the extreme death penalty." *Clozza v. Commonwealth*, 228 Va. 124, 142, 321 S.E.2d 273, 276 (1984) cert. denied, 469 U.S. 1230 (1985). After Witt, "automatic" is not the applicable standard. Nevertheless, these potential jurors are often referred to as "automatic death penalty jurors" or ADPs.

[14]In *State v. Williams*, 550 A.2d, at 1182-83, this type of death qualification was discussed.
Our examination of the record indicates ten instances in which the trial
court, faced with a jury who favored the death penalty in certain cases,
refused defendant's request to inquire whether a conviction for both murder
and rape should cause the juror to refuse to consider mitigating factors. As
we stated in *State v. Bey* II, 112 N.J. 123, 152 (1988), the standard for
exclusion for cause of jurors derived from *Witherspoon v. Illinois*, 391 U.S.
510 (1968), *Adams v. Texas*, 448 U.S. 38 (1980), and *Wainwright v. Witt*,

### iii.  Judge As Referee or Advocate?

Each of the participants in capital *voir dire* has a role which is highly differentiated. It is unwise and indeed unseemly for a trial judge to be placed in a position of pulling a juror in one direction or another (i.e., trying to rehabilitate) when the juror is uncertain of his own views or, perhaps, is even dissembling.[15]

Additionally, the trial judge does not know enough of the facts of the case, from the defense perspective, to thoroughly protect defendant's rights. "This Court has previously stressed that *voir dire* examination not conducted by counsel has little meaning." *United States v. Corey*, 625 F.2d 704, 707 (5th Cir. 1980). While a defense lawyer's failure to adequately cover all critical aspects of capital *voir dire* is almost certain to meet constitutional standards,[16] no such presumption of competency or tactical motivation will aid a trial judge in his or her lonely journey across the jury selection minefield.[17] *See, e.g.,*

---

469 U.S. 412 (1985), applies to jurors who support the death penalty as well as those opposed . . . The issue is whether the juror's capacity to credit the evidence in mitigation would be 'substantially impaired' within the meanings of *Adams* and *Witt*. *Bey II*, *supra*, 112 N.J. at 154.

[15] Citizens are unfortunately not always candid during death qualification. They may wish to "get on" or "get off" the jury depending on their motivation. See, e.g., *Gray v. Mississippi*, 481 U.S. at 653 n. 4, where the "plurality . . . hints that . . . potential jurors may not have been properly excludable for cause because they were merely feigning objections to capital punishment in order to avoid jury service." Although the dissent argues "the Constitution certainly permits the exclusion for cause of potential jurors who lie under oath about their views of capital punishment", no one suggests such jurors do not exist. *Gray*, 481 U.S. at 676 (Scalia, J., dissenting).

[16] *But see generally, Marzullo v. Maryland*, 561 F.2d 540, 546 (4th Cir. 1977), cert. denied, 435 U.S. 1011 (1978) (The attorney's conduct at the *voir dire* . . . failed to protect client); *Cannellas v. McKenzie*, 160 W.Va. 431, 236 S.E.2d 327, 331 (1977) ("other instances" of ineffective assistance included counsel's failure to interrogate prospective jury members about whether they had read prejudicial newspaper articles immediately before trial).

[17] It seems counter-productive to appoint "learned" counsel, pursuant to 18 U.S.C. § 3599(a) and (b), experienced in capital jury selection and then limit counsel's input to the awkward and time consuming

47

*See, e.g., Nicklasson v. Roper*, 491 F. 3d 830, 836 (8ᵗʰ Cir., 2007)("By failing to recognize the need for additional death qualification *voir dire* in the face of contradictory responses by fifteen potential jurors, the Missouri Supreme Court may have overlooked essential demands of fairness."); *State v. Williams*, 550 A.2d at 1186 (reversing death penalty case) ("Based on an independent review . . . we find the trial court relied much too heavily on close-ended questions, and on several occasions did not ask adequate follow up questions...").

On a more practical level, it is essential for the Court to pay strict attention to the jurors' responses and demeanor. *Wainwright v. Witt, supra*, 469 U.S. at 426, 428, 105 S.Ct. 844 (noting trial court's finding of bias "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province" and "this is why deference must be paid to the trial judge who sees and hears the juror"). See also, *United States v. Quinones, supra*, 511 F. 3d 289, 300-301 ("Mindful of this fact, the Supreme Court, in virtually every capital *voir dire* case from *Witt* through *Uttecht*, has emphasized a trial court's opportunity to observe demeanor in according deference to removal decisions.") "[T]he manner of the juror while testifying is oft times more indicative of the real character of his opinion than his words." *Reynolds v. United States*, 98 U.S. 145, 156 (1879). Such a focus is "peculiarly within a trial judge's province" and is undermined by concentration on the next question or topic required of the interrogator. *Witt*, 469 U.S. at 428.

---

role of suggesting follow-up questions to the Court for each juror.

iv.    *Other Jurisdictions*

Many states, either through statute or court rule, specifically permit attorney-conducted *voir dire* as of right in all criminal proceedings.[18] Some only do so in capital cases.[19] But the common practice in American death penalty trials is to permit the lawyers to ask questions. Citing Gutman, *The Attorney-Conducted Voir Dire of Jurors: A Constitutional Right*, 39 Brooklyn L.Rev. 290, 324 (1972), the Commentary to the American Bar Association Standards for Criminal Justice (2nd Ed. 1986), Trial by Jury, § 15-2.4, states that "the overwhelming majority of state courts hold that attorney-conducted *voir dire* in criminal cases is essential to fundamental fairness under state constitutions, as well as the Sixth Amendment." *Id.*, at 55. The Standards at issue remained in the Third Edition (1996) and through some addenda published in 2005. This

---

[18] See, e.g., Ala. Rule Crim. Proc. 18.4(c) ("The court shall permit the parties or their attorneys a reasonable examination of prospective jurors."); *Fields v. City of Alexander City*, 597 So.2d 242, 244 (Ala. Cr. App. 1992) ("It is readily apparent that the use of mandatory term 'shall' in Rule 18.4(c) . . . requires that parties or their attorneys have the absolute right to conduct a reasonable examination of prospective jurors . . ." The rule is "in line with Alabama practice and local custom." *Id.*); Ark. Rule Crim. Proc. 32.2 ("The judge shall also permit such additional questions by the defendant or his attorney . . ."); *Fauna v. State*, 582 S.W.2d 18, 19 (Ark. 1979) (The trial judge is required to permit reasonable questions by the defendant or his attorney.); Article 786, La. Code Crim. Proc. ("The court, the state and the defendant shall have the right to examine prospective jurors."); Nev. Rev. Stat. 175.031 ("The . . . defendant or his attorney . . . are entitled to supplement the examination by such further inquiry as the Court deems proper. Any supplemental examination must not be unreasonably restricted."); N.C. Gen. Stat. §15 A-1214(c) ("The . . . defense counsel . . . may personally question the prospective jurors individually . . . . [and] is not foreclosed from asking a question merely because the court has previously asked the same or similar question."); Ohio Rule Crim. Proc. 24(A) (The "court shall permit the state and defense to supplement the examination by further inquiry."); Okl. Rule Dist. Courts 6 (1992) ("The parties or the attorneys shall be allowed a reasonable opportunity to supplement such examination.").

[19] South Carolina and Texas confer upon defense counsel a right by statute to personally question jurors in death penalty cases. See S.C. Rev. Stat. § 16-3-20 (In "cases involving capital punishment any person called as a juror shall be examined by the attorney for the defense."); *State v. Atkins*, 350 S.E.2d 302, 304 (S.C. 1987) (denial of attorney participation in capital *voir dire* error); Tex. Code Crim. Proc. Art. 35.17(2) ("Then, on demand of the state or defendant, either is entitled to examine each juror on *voir dire* individually and apart from the entire panel, and may further question the juror on the principle propounded by the court.").

is surely true of the practice in the vast majority of states.

  v.    Cause Challenges

While a judge is obviously capable of asking whether venire members would follow the law and "lay aside" any objectionable opinions or impressions and "render a verdict based upon admissible evidence alone," or ask similar boilerplate and leading questions, *voir dire* of that nature will be inadequate in this racially sensitive death penalty case. "This is because the deeply rooted nature of juror bias often precludes discovering it through general fairness and 'follow the law' type questions." *Nicklasson v. Roper*, 491 F.3d 830, 837 (8th Cir.2007) (quoting *Morgan v. Illinois, supra*, 504 U.S. 719, 734-36, 112 S.Ct. 2222, 119 L.Ed.2d 492); see *Witt*, 469 U.S. at 424, 105 S.Ct. 844 (observing that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism").

In *State v. Williams*, *supra*, the Court reversed a death sentence in part because "the tenor of the questions often appears to lead the juror inevitably to the 'correct' response..." A capital defendant has a due process right to ferret out venire members who are prejudiced. It is not up to the Court to do this for defendant. "[O]ur jury selection system permits parties to protect themselves against prejudice by allowing [attorney *voir dire*] . . . to exclude unacceptable jurors." *State v. Hedgepath*, 310 S.E.2d 920, 922 (N.C. App. 1984). In capital cases, attorney participation will lead to an "enhanced record [which] is imperative to society's interest in a fair trial." *State v. Williams*, 550 A.2d at 1182. As a practical matter, how can a judge actually and thoroughly commit to using his or her considerable authority to "discover basis for intelligent exercise of cause and peremptory

47

challenge . . ." *State v. Jones*, 596 So.2d 1360, 1366 (La.App. 1992). "We are convinced that

prohibiting attorney-conducted *voir dire* altogether may seriously impede that objective."

*Whitlock v. Salmon*, 752 P.2d 210, 212 (Nev. 1988).

        *vi.     Peremptory Challenges*

Peremptory challenges remain one of the most important rights of the accused.

*Swain v. Alabama*, 380 U.S. 202 (1965). "A trial court commits reversible error if, by unduly

restricting *voir dire*, it substantially impairs the peremptory challenge right." *United States*

*v. Johnson*, 584 F.2d 148, 155 (6th Cir.1978), cert. denied, 440 U.S. 918,

99 S.Ct. 1239, 1240, 59 L.Ed.2d 469 (1979).

     In view of the sensitive and complex issues in this case, counsel's participation in

questioning of prospective jurors on certain limited topics is essential. Such a ruling

would permit counsel to make an individual judgment regarding peremptory challenges

rather than a stereotypical assumption or a crude guess, thereby impairing the

peremptory challenge right.  See *United States v. Harris*, 542 F.2d 1283, 1294 (7th Cir.), *cert.*

*denied*, 430 U.S. 934 (1976) ("T]he defendants must be permitted sufficient inquiry into the

backgrounds and attitudes of prospective jurors to enable them to exercise intelligently

their peremptory challenges"); *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir.), *cert.*

*denied*, 434 U.S. 902 (1977) ("Peremptory challenges are worthless if trial counsel is not

afforded an opportunity to gain the necessary information upon which to base such

strikes.").

        *vii.    Social Science Evidence*

When the judge conducts the *voir dire*, it usually consists of leading questions which

cause prospective jurors to agree unquestioningly. It is not uncommon to hear a judge ask

a prospective juror, "You can be fair and impartial, can't you?" to which the obvious appropriate answer is, "yes." Few jurors ever dare to disagree. Social science studies have repeatedly shown that jurors are acutely aware of even the most subtle cues or indications from the judge. Fearing the court's disapproval, jurors will usually respond to the court's queries in a manner they believe is acceptable to the court without actually considering their own individual and honest responses. Note, *Judges' Non-Verbal Behavior in Jury Trials: A Threat to Judicial Impartiality*, 61 Va. L. Rev. 1266 (1975); see Broeder, *Voir dire Examinations: An Empirical Study*, 38 S.Cal. L. Rev. 503, 506, 513 (1965). As the Supreme Court has noted, the influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is received with deference, and may prove controlling." *Oeurcia v. United States*, 289 U.S. 466, 470 (1933) (quoting *Starr v. United States*, 150 U.S. 614, 626 (1894)).

Thus, attorney conducted *voir dire* is a more effective tool for eliciting bias than questioning from the court alone. The social distance between the attorney-questioner and the prospective jurors is reduced, and jurors may feel less inhibited about offering more candid responses. Furthermore, the judge cannot have the same interest in discerning juror bias as do the adversaries, who may also be more sensitive to juror responses that require follow-up inquiry. Moreover, the trial judge is less familiar with the evidence and case theories than are the parties. In *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977), the Court stated:

> A judge cannot have the same grasp of the facts, the
> complexities and nuances as the trial attorneys entrusted with
> the preparation of the case. The court does not know the
> strength and weakness of each litigant's case. Justice requires
> that each lawyer be given an opportunity to ferret out possible

47

> bias and prejudice of which the juror himself may be unaware
> until certain facts are revealed.

See also Frates & Green, *Jury Voir Dire: The Lawyer's Perspective*, 2 A.B.A. Litigation

(1976).

Attorney conducted *voir dire* is the standard practice in most state courts in death

penalty cases, and for good reason. Social science research demonstrates that attorneys

are more effective than judges in eliciting candid self-disclosure from potential jurors.

Attorney conducted *voir dire* minimizes the pressure to conform to a set of

perceived judicial standards that arises due to questions from the judge. In one study,

subjects changed their answers almost twice as much when questioned by a judge as

when interviewed by an attorney. Jones, *Judge-Versus Attorney-Conducted Voir dire*, 2

Law and Human Behavior 131 (1987). Thus, "trial courts should be especially sensitive

to counsel's requests to supplement the court's *voir dire* examination [and] should be

sensitive to permitting attorneys to conduct some *voir dire*." *State v. Williams*, 550 A.2d at

1189, n.10.

>        *viii.    ABA Standards*

After initially recommending that judges have the option of conducting *voir dire*

without permitting counsel to question jurors personally, the American Bar Association

reversed its position. It now recommends at least some personal participation in *voir*

*dire* by counsel in every case, not just death penalty cases. American Bar Association,

Standards for Criminal Justice (2nd Ed, 1986 and 3rd Ed, 1995), Trial by Jury, § 15-2.4

provides:

> Questioning of jurors should be conducted initially and primarily by the judge, but counsel for each side should have the opportunity, subject to reasonable time limits, to question jurors directly, both individually and as a panel.

The Standard further advises that if the court has reason to believe that jurors have been previously exposed to information about the case, "counsel should be given liberal opportunity to question jurors individually about the existence and extent of their preconceptions." *Id*.

The Commentary to the 1986 Standard recognizes "[t]here are limits to what a trial judge can do in conducting an adequate examination." *Id*. at 54. This is so because the trial judge will not be familiar with many important aspects of the case. "The court's task in *voir dire* examination must be to control counsel's inquiry and not to presume unto itself the role of defendant's advocate." Gutman, *supra*, at 326-327.

### ix. *Judicial Economy*

Upon request, *voir dire* must cover certain topics, and the Court must ask certain questions.[20] Permitting counsel to simply ask questions is far more efficient

---

[20]A trial judge does not have unlimited discretion to ignore proposed questions, nor to arbitrarily refuse such questions. See *Nicklasson v. Roper*, 491 F.3d 830, 836, n.4 (8th Cir.2007); *United States v. Lewin*, 467 F.2d 1132 (7th Cir. 1972). For example, in *United States v. Hill*, 738 F.2d 152 (6th Cir. 1984), the district court refused to ask the venire regarding the presumption of innocence. Reversing, the Court of Appeals reasoned: "A negative or hesitant answer from any prospective juror would surely have produced a defense challenge and, if the judge did not excuse the prospective juror, the exercise of a peremptory challenge by defense counsel." 738 F.2d at 153. See also *United States v. Contreras-Castro*, 825 F.2d 185 (9th Cir. 1987) (although the court questioned prospective jurors regarding their relationship with law enforcement officers and general questions regarding impartiality, the court's failure to question the entire panel about specific bias concerning the veracity of government-agent

that wasting time proposing written questions, and requesting follow up questions after a juror discloses information on certain critical topics. This seems a small request from a citizen who is facing death.[21]

Individual and sequestered *voir dire* is also necessary in a capital case.

witnesses was reversible error); *United States v. Ible*, 630 F.2d 389 (5th Cir. 1980) (questions concerning prospective juror's moral or religious beliefs regarding alcohol was a "very appropriate" area for inquiry in a trial for possession of counterfeit currency where the government intended to introduce evidence that the defendant traded the currency for alcohol); *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972) (failure to conduct minimal inquiry into jurors' attitudes regarding the Vietnam protest and towards the youth culture was held to be error in a prosecution arising out of anti-war demonstration), cert. denied, 410 U.S. 970 (1973); *United States v. Poole*, 450 F.2d 1082 (3rd Cir. 1971) (reversed for failure to ask whether "you or any member of your family ever been the victim . . ."); *United States v. Napoleone*, 349 F.2d 350 (3rd Cir. 1965) (reversible error to refuse to inquire into whether jurors had a repugnance towards liars or lying where crux of defense to charge of false impersonation was that while defendant had lied regarding the purpose of his investigation he did not present himself as a federal officer); cf. *United States v. Magee*, 821 F.2d 234 (5th Cir. 1987) (refusal to question jurors in a drug conspiracy case regarding their use of marijuana was not error where the court questioned jurors concerning their use and attitude regarding drugs in general).

[21] Permitting the defense attorney leave to ask questions of venire members creates no hurdle for the government in obtaining a death verdict. Judge Hancock ruled that counsel could ask questions of jurors in *United States v. Chandler* (N.D. Al. No. 90-CR-226). (See 1/31/91 *Chandler* hearing transcript at 6). Mr. Chandler was sentenced to death. *United States v. Chandler*, 996 F.2d 1073 (11th Cir. 1993), cert. denied, 512 U.S. 1227 (1994). Likewise, capital defendants in *United States v. Garza*, 63 F.3d 1342 (5th Cir. 1995), cert. denied, 519 U.S. 825 (1996); *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), cert. denied sub nom., *Roane v. United States*, 520 U.S. 1253 (1997); *United States v. McCullah*, 76 F.3d. 1087 (10th Cir. 1996), cert. denied, 520 U.S. 1213 (1997); *United States v. Jones*, 132 F.2d 232 (5th Cir. 1998), cert. granted, 525 U.S. 809 (1998), aff'd, 527 U.S. 373 (1999); *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), cert. denied, 119 S.Ct. 1767 (1999); *United States v. McVeigh*, 153 F.3d 1166 (1998), cert. denied 119 S.Ct. 1148 (1999); *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998), cert. denied, 120 S.Ct. 83 (1999); *United States v. Battle*, 173 F.3d 1343 (11th Cir. 1999), cert. denied, 2000 U.S. LEXIS 1971 (3/20/00); *United States v. Aquila Marcivicci Barnette* (W.D. NC No. 3:97CR23-P); *United States v. Billie Allen and Norris Holder* (E. D. MO CR No. 4:97 CR 0141 ERW (TCM)); *United States v. David Paul Hammer* (M.D. PA No. 4-96-CR-239); *United States v. Jeffrey Williams Paul* (W.D. AR No. 6:96CR60022-001); *United States v. Richard Stitt* (E.D. VA 2:98CR47); and *United States v. Daniel Lee* (D. AR CR No. LR-CR-97-243) were also sentenced to death. In each case, the lawyers were allowed to ask potential jurors questions.

45

Punishment questioning in a group setting carries with it 1) a danger that other jurors, who listen to the answers of fellow potential jurors, may be contaminated or improperly influenced by those responses and thus 2) may shade their answers based on what they hear and 3) is demonstrably inferior in identifying biased jurors and 4) requires repeated exposure to questions about the death penalty which presume guilt and creates a less than neutral jury. *The Benchbook for United States District Court Judges*, §3.01, ¶(A)(7), p. 117, recommends that punishment questions be posed individually "at sidebar ..." See also Chambers to Chambers, Vol. 10, No. 1, pp. 3-7 (Federal Judicial Center 1995). The *Resource Guide for Managing Capital Cases*, Chapter III, states that district judges used a combination of group (for general issues) and individual (for death penalty issues) *voir dire*. The recommended procedure should be followed in this case for death penalty issues, as well as for pretrial publicity issues, because the danger of jury contamination is the same.

Individual questioning of jurors is necessary in a capital case. This is the near uniform practice in federal capital cases. Likewise, district courts consistently perform or permit such individual questioning out of the presence of other jurors so as to avoid the potential contamination of an entire group of jurors and to reduce the deleterious effects of questions regarding punishment. Since individual questioning is already necessary, it takes no additional time to question jurors separated from the pool.

One need only review the defense Motion to Change Venue to understand how

46

much publicity has been generated by Mr. Christensen's case. Virtually every court hearing results in the publication of an article by the local newspaper, and local news stations cover the case as well. At the risk of sounding repetitive, this is the most high profile case to strike this area in a generation. While the events that are the subject of the charges in this case were not as dramatic or nationally publicized as the Oklahoma Federal Building bombing and resulting loss of life discussed by the Tenth Circuit in *United States v. McVeigh*, 153 F.3d 1166 (10th Cir., 1998), *McVeigh* is cited in the 2013 *Benchbook for U.S. District Court Judges* on the issue of *voir dire* both to death qualify and on pretrial publicity. The Tenth Circuit's ruling in the *McVeigh* case explains in various ways that there, the District Court took "...strong measures to ensure juror impartiality in the face of publicity." *Id.*, at 1184-85. In Mr. McVeigh's case, there had been a confession, and media coverage concerning the nature of the investigation. The *McVeigh* court explained that: "Granted, the fact that potential jurors declare that they can remain impartial in the face of negative pretrial publicity is not always dispositive the question." [citation omitted] *Id.*, at 1184-85. The Tenth Circuit in *McVeigh* noted in passing that "...each of the seated jurors was individually questioned about his or her ability to set aside the effects that any exposure to pretrial publicity may have had...." *Id.*, at 1184-85.

III.    **Examples From Other Federal Capital Cases.**

In an effort to provide this Court with exemplars of materials and information
that has been used during the course of death penalty case jury selection in other cases,
the defense is submitting some supporting exhibits. These exhibits are as follows:

A.  The display that was used by District Judge J. Michael Seabright in selecting a
    jury in 2014 in *United States v. Naeem Williams*, in the District of Hawaii (Case
    No. CR-06-00079-JMS).

B.  District Judge Sorokin's introductory comments to the jury panel prior to voir
    dire in 2016 in *United States v. Gary Lee Sampson* (Case No. CR 01-10384-LTS).

C.  A series of visual aids explaining death penalty concepts to jurors that
    were used in several other cases. These exhibits are preceded by a
    declaration from Capital Resource Counsel Matthew Rubenstein. Mr.
    Rubenstein also assisted in the preparation of the jury selection 'exhibit'
    used in the Naeem Williams trial.

D.  Declaration of Kevin McNally regarding the need for individual and
    sequestered *voir dire.*

E.  Order regarding jury selection entered by Judge A. Richard Caputo in 2016
    in *United States v. Con-Ui,* in the Middle District of Pennsylvania (Case No.
    13-CR-00123-ARC) (twelve jurors called per day for voir dire).

F.  Order regarding jury selection entered by Judge Geoffrey W. Crawford, in

48

2018 in the District of Vermont (Case No. 01-CR-00012-gwc) (ten jurors

called per day for voir dire).

WHEREFORE, Defendant requests the following:

1.  Inform each individual venireperson, at every stage of the

    proceedings, that punishment questions are required as part of the

    selection process, and that there is absolutely no suggestion that

    Brendt Christensen is guilty simply because such questions are asked;

2.  Allow counsel to conduct individual *voir dire*, outside the presence of

    other venirepersons; and

3.  Carefully evaluate challenges with an eye towards the principles

    articulated within this Motion.

Respectfully submitted,

/s/Elisabeth R. Pollock                    /s/ George Taseff
Assistant Federal Defender                 Assistant Federal Defender
300 West Main Street                       401 Main Street, Suite 1500
Urbana, IL 61801                           Peoria, IL 61602
Phone: 217-373-0666                        Phone: 309-671-7891
FAX:   217-373-0667                        Fax:     309-671-7898
Email: Elisabeth_Pollock@fd.org            Email: George_Taseff@fd.org


/s/ Robert Tucker                          /s/ Julie Brain
Robert L. Tucker, Esq.                     Julie Brain, Esq.
7114 Washington Ave                        916 South 2nd Street
St. Louis, MO 63130                        Philadelphia, PA 19147
Phone: 703-527-1622                        Phone: 267-639-0417
Email: roberttuckerlaw@gmail.com           Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

**Trial**   Case 1:06-cr-00079-3-MSK-SCH  Document 222   Page 51   Filed 01/15/14   Page 1 of 1   PageID #:
35170  **Sent** **Trial**

Note: See next page for version with ECF heading removed.

**Eligibility Phase**

**Determination of Punishment**

**Sentence**

**Indictment**
**Count 1:** Capital Eligible

**Count 2:** Capital Eligible

**Counts 2-4:** <u>Not</u> Capital Eligible

1. Defendant at least 18 when capital offense committed

**AND**

2. Defendant acted with the required level of intent

**AND**

3. Statutory aggravating factor

Statutory & Non Statutory Aggravating Factors

Mitigating Factors



**Guilty**
Counts 1 or 2
**or**
Counts 1 and 2

All 3 Unanimously Found Beyond a Reasonable Doubt

Jury to decide whether the proved aggravating factors sufficiently outweigh the proved mitigating factors sufficiently to justify a sentence of death.

12 Votes for life → **Life**

Not Unanimous → **Life**

**Not Guilty**
Counts 1 and 2

**Guilty or**
**Not Guilty**
Counts 2-4



 All 3 <u>NOT</u> Unanimously Found Beyond a Reasonable Doubt 

12 Votes for Death → **Death**

EXHIBIT A

**Eligibility Phase**

**Determination of Punishment**

**Sentence**

**Indictment**
**Count 1:** Capital Eligible

**Count 2:** Capital Eligible

**Counts 2-4:** <u>Not</u> Capital Eligible

1. Defendant at least 18 when capital offense committed

**AND**

2. Defendant acted with the required level of intent

**AND**

3. Statutory aggravating factor

Statutory & Non Statutory Aggravating Factors

Mitigating Factors



**Guilty**
Counts 1 or 2
**or**
Counts 1 and 2

 All 3 Unanimously Found Beyond a Reasonable Doubt 

12 Votes for life  **Life**

Jury to decide whether the proved aggravating factors sufficiently outweigh the proved mitigating factors sufficiently to justify a sentence of death.

Not Unanimous  **Life**

**Not Guilty**
Counts 1 and 2

**Guilty or**
**Not Guilty**
Counts 2-4



All 3 <u>NOT</u> Unanimously Found Beyond a Reasonable Doubt 

12 Votes for Death  **Death**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
UNITED STATES OF AMERICA          )
                                                    )
v.                                                   )          Criminal Action No. 01-10384-LTS
                                                    )
GARY LEE SAMPSON                    )
_____)

JUDGE SOROKIN'S STATEMENT TO PROSPECTIVE JURORS

The following explanation of the law that the jury will apply in this case will help you

understand and answer the questions that may be posed to you during the individual conversation

you will have with me and the lawyers.  It is not the same statement I read to you when you were

last in Court, so please read it carefully.

This is a criminal case brought by the United States government.  I will sometimes refer

to the government as the prosecution.  The defendant is Gary Sampson.  He has been charged

with two counts of carjacking resulting in death.  The first count charges that on July 24, 2001, in

connection with a carjacking, Mr. Sampson stabbed to death Philip McCloskey in Marshfield,

Massachusetts.  At the time of his death, Mr. McCloskey was 69 years old.  The second count

charges that on July 27, 2001, Mr. Sampson, also in connection with a carjacking, stabbed to

death Jonathan Rizzo in Abington, Massachusetts.  At the time of his death, Mr. Rizzo was 19

years old.  Mr. Sampson pled guilty to these two charges in 2003.  In addition, jurors will hear

evidence that on July 30, 2001, Mr. Sampson strangled to death Robert Whitney in Meredith,

New Hampshire.  At the time of his death, Mr. Whitney was 58 years old.  This murder was not a

federal crime.  In 2004, Mr. Sampson pled guilty in New Hampshire state court to the charge of

murder.

1

Under the laws of the United States, each of the two charges brought by the federal government – the charges arising from the killings of Mr. McCloskey and Mr. Rizzo – can, if certain circumstances are proven, be punished by death. Such a charge is sometimes called a "capital offense." Here, the prosecution is asking the jury to impose the death penalty. The defense is asking the jury to impose life imprisonment without the possibility of release.

The law typically requires that a judge decide the sentence for a defendant who is guilty. In this case, however, the Constitution requires that the jury decide the sentence, because the prosecution seeks to impose a death sentence. A jury of fair and impartial citizens will decide whether the prosecution has proven that death is the appropriate penalty for Mr. Sampson's crimes as opposed to a sentence of life in prison without the possibility of release, the only other sentence the law permits. Each juror selected will make his or her own decision based upon the law as I explain it, the facts as found by the jurors, and each juror's personal weighing of whether death or life imprisonment is the appropriate punishment.

In this case, the jury will first have to decide if the prosecution has proven that Mr. Sampson is eligible to be sentenced to death. If so, then the jury will have to determine whether the prosecution has proven that a death sentence is the appropriate penalty or whether Mr. Sampson should instead be imprisoned for life without the possibility of release. These are the only two sentences possible for Mr. Sampson's federal crimes.

Under federal law, the crime of carjacking resulting in death, alone, is not a basis for imposing a death sentence. More is required. To prove Mr. Sampson is eligible for the death penalty, the government must prove three things beyond a reasonable doubt: (1) that Mr. Sampson was at least 18 years old at the time he killed Mr. McCloskey and Mr. Rizzo; (2) that Mr. Sampson killed Mr. McCloskey and Mr. Rizzo with the requisite level of intent; and (3) the

existence of one or more statutory "aggravating factors." Simply defined, aggravating factors are circumstances that tend to favor a death sentence. "Statutory" aggravating factors are specific aggravating factors defined by Congress. The government must specify which statutory aggravating factors it alleges, and it bears the burden of proving each aggravating factor beyond a reasonable doubt to the satisfaction of each juror. The government has alleged the following statutory aggravating factors in this case: that Mr. Sampson killed Mr. McCloskey and Mr. Rizzo in a heinous, cruel and depraved manner; that Mr. McCloskey was a particularly vulnerable victim due to his infirmity; and that Mr. Sampson killed Mr. Rizzo after substantial planning and premeditation.

If the jury determines that Mr. Sampson is eligible for the death penalty, it must also consider whether the government has proven beyond a reasonable doubt the existence of any additional "non-statutory" aggravating factors. The government must specify which non-statutory aggravating factors it alleges, and it bears the burden of proving each such factor beyond a reasonable doubt to the satisfaction of each juror. The government has alleged the following non-statutory aggravating factors in this case: that Mr. Sampson committed other serious acts of violence (specifically, the murder of Mr. Whitney in New Hampshire, another carjacking in Vermont, and the robbery of several banks in North Carolina); that Mr. Sampson is a continuing and serious threat to the lives and safety of prison officials and inmates as demonstrated by his conduct in prison; that Mr. Sampson caused injury, harm, and loss to the families of Mr. McCloskey and Mr. Rizzo; and that Mr. Sampson killed Mr. McCloskey and Mr. Rizzo to prevent the reporting of the carjackings.

The law defines each of these factors as "aggravating." Each juror must accept this proposition of law. At the conclusion of the trial, the jury must fairly and impartially decide

whether each aggravating factor is present in this case and, if so, the weight or significance of each factor.  In weighing the appropriate punishment in this case, the jury will consider only the aggravating factors charged and proven by the government to the satisfaction of every juror.

Mr. Sampson will have the opportunity to introduce evidence of what are referred to as "mitigating factors."  Mitigating factors, simply defined, are anything that suggests that life imprisonment without the possibility of release is a more appropriate sentence than death.  Mitigating factors are not justifications or excuses under the law for the crimes.  Mr. Sampson has pled guilty, acknowledging that his actions were not legally justified.  You should understand that the law does not require that there be a connection between the mitigating evidence and the crime committed, though you may conclude that there is.  For example, if the defendant presents evidence of a difficult childhood, it is not necessary for the defense to prove that the difficult circumstances in the defendant's childhood caused him to commit the crimes to which he pled guilty.  Whether any mitigating factor has a direct connection to the crimes does not affect its status as a mitigating circumstance that you are required to consider in the weighing process.

Mitigating factors in this case might include information about the circumstances surrounding the crimes and about Mr. Sampson's background and character.  For example, Mr. Sampson alleges as mitigating evidence that he called the FBI and tried to turn himself in before he killed Mr. McCloskey and Mr. Rizzo; that Mr. Sampson surrendered himself after the killings and gave voluntary confessions to various law enforcement officers which led to the discovery of evidence, including the location of Mr. Rizzo's body; and that Mr. Sampson suffers from brain damage.  The law defines these factors as mitigating.  Each juror must accept this proposition of law.  A mitigating factor must be proven only by a preponderance of the evidence, which is a lower standard of proof than proof beyond a reasonable doubt.  Mitigating factors do not have to

4

be proven to the satisfaction of every juror. Any juror who finds a mitigating factor to have been proven by a preponderance of the evidence may consider that factor in deciding the appropriate sentence in this case. At the conclusion of the trial, each juror must fairly and impartially decide whether each mitigating factor is present in this case and, if so, the weight or significance of each factor. In weighing the appropriate punishment in this case, each juror will consider every mitigating factor he or she finds Mr. Sampson has proven by a preponderance of the evidence.

Before a jury could vote to impose the death penalty, every juror would have to be persuaded that Mr. Sampson is eligible for the death penalty, and that any proven aggravating factors sufficiently outweigh any mitigating factors that one or more jurors found existed such that a sentence of death is justified. You should understand that a jury is never required to find that a sentence of death is justified. The decision whether the government has proven that Mr. Sampson should be sentenced to death is ultimately a moral judgment that must be made by each juror himself or herself. If one or more jurors believes that life imprisonment without the possibility of release is the appropriate sentence to impose upon Mr. Sampson, I would be required, as the judge, to sentence him to life imprisonment without the possibility of release. If, however, every juror is persuaded that the death penalty should be imposed upon Mr. Sampson, I would be required, as the judge, to sentence him to death. In other words, I could not change the jury's decision.

Finally, at this trial, everything the jury will need to make its decision will be presented in the courtroom. The law requires that the only information the jury may consider is the information presented in Court. When information is presented in Court, the parties to the case can test the accuracy, reliability, truthfulness, and importance of the information, and may respond to the information as appropriate. This is the essence of fairness and the core of our

system of justice.  If the jury considers or discusses information not presented in Court, the jury would violate its oath and undermine the basic fairness of this (or any) trial.  This explains why you must set aside anything you may have heard about this case or the persons or events involved in the case.  It also explains why you may not discuss the case with anyone or research the case in any way on your own.  This is a standard instruction given in every jury trial, and it is particularly important that jurors understand and adhere to it in this case.

I want to thank you again for your taking part in this important process, and for returning to the Courthouse today.

DECLARATION REGARDING EXHIBITS USED DURING CAPITAL VOIR DIRE

1.      I currently serve as a Capital Resource Counsel with the Capital Resource Counsel Project. The Capital Resource Counsel Project works in coordination with the Federal Death Penalty Resource Counsel Project and is funded and administered by the Defender Services Office of the Administrative Office of the United States Courts. In this position I provide training, consultation, and support to attorneys in Federal Defender organizations and CJA panel attorneys appointed to represent persons charged with federal capital crimes, and provide direct representation in federal capital cases.

2.      I have attached as exhibits to this declaration copies of exhibits used during voir dire in eight recent federal capital cases. The Court in *United States v. Naeem Williams*, No. 06-CR-0079 JMS (D. Haw. 2014) provided the attached graphic for display during jury selection (docket entry 2283-3); defense counsel Theresa Duncan provided me a copy of the exhibits used in *United States v. John McCluskey*, No. 10-CR-2734 JCH (D.N.M. 2013); defense counsel Mark Henricksen provided me a copy of the exhibit used in *United States v. Connell C. Williams*, No. CR-11-0298-F (W.D. Okla. 2013); defense counsel David Ruhnke provided me a copy of the exhibits used in *United States v. Alexis Candelario-Santana*, No. 09-427 (JAF) (D.P.R. 2013); defense counsel Christopher Adams provided me a copy of the exhibits used in *United States v. Lashaun Casey*, No. 05-277 (ADC) (D.P.R. 2013); defense counsel Brian Mendelsohn provided me a copy of the exhibit used in *United States v. Brian Richardson*, No. 1:08-CR-139-CC (N.D. Ga. 2012); defense counsel Peter Schoenburg provided me a copy of the exhibits used in *United States v. Larry Lujan*, No. 2:05-CR-00924-RB (D. N.M. 2011); and defense counsel David Andersen provided me a copy of the exhibit used in *United States v. Anh The Duong*, No. 01-CR-20154 (N.D. Ca. 2010).

I declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that the foregoing is true and correct. Executed this 8th day of February, 2019.

/s/ Matthew Rubenstein
Matthew Rubenstein

1

EXHIBIT C

*United States v. Naeem Williams*
No. 06-CR-00079 (D. Haw.)
Judge Presiding: The Hon. J. Michael Seabright
(Voir dire began January 28, 2014.)

**Eligibility Phase**

**Determination of Punishment**

**Sentence**

**Indictment**

**Count 1:** Capital Eligible

**Count 2**: Capital Eligible

**Counts 2-4:** <u>Not</u> Capital Eligible

1. Defendant at least 18 when capital offense committed

**AND**

2. Defendant acted with the required level of intent

**AND**

3. Statutory aggravating factor

Statutory & Non Statutory Aggravating Factors

Mitigating Factors



**Guilty**
Counts 1 or 2
**or**
Counts 1 and 2



All 3 Unanimously Found Beyond a Reasonable Doubt

12 Votes for life  **Life**

Jury to decide whether the proved aggravating factors sufficiently outweigh the proved mitigating factors sufficiently to justify a sentence of death.

Not Unanimous  **Life**

**Not Guilty**
Counts 1 and 2

**Guilty or Not Guilty**
Counts 2-4



All 3 <u>NOT</u> Unanimously Found Beyond a Reasonable Doubt



12 Votes for Death  **Death**

*United States v. John McCluskey*
No. 01-CR-2734 (D. N.M.)
Judge Presiding: The Hon. Judith Herrera
(Voir dire began July 22, 2010.)

# Trial                 Sentencing Hearing

## Threshold Determination

## Weighing Determination

### Sentence

### Indictment

*Capital Counts*
*[Or aids and abets]*
Count 2 & 3. Carjacking resulting in death
Count 4 & 5. Murder with intent to prevent testimony of a witness
Count 9 & 10. Using a carrying a firearm during and in relation to a crime of violence - Consp. to commit carjacking
Count 11 & 12 - Firearm - Carjacking
Count 13 & 14 - Firearm - Tampering with a witness
Count 15 & 16 - Firearm - Consp. to interfere with commerce
Count 17 & 18 - Firearm - Interference with commerce

### Mental Intent Factor
The defendant
• intentionally killed the victims; and or
• intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victims died as a direct result of the act; and or
• intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victims died as a direct result of the act.

**and**

### Statutory Aggravating Factor
• Previous convictions involving the use or attempted or threatened use of a firearm against another person;
• Previous convictions involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person;
• Committing the offense in an especially heinous, cruel, and depraved manner; and or
• Intentionally killed more than one person in a single criminal episode.

Statutory &
Non statutory
Aggravating
Factors

Mitigating
Factors



Guilty



Not Guilty

12 votes ➡ **Death**

1 vote ➡ **Life**
(or more)      **Imprisonment**
              **Without**
              **Release**

Unanimously Found ➡



Not Found Unanimously



## United States v. John McCluskey

**Count 1 -- Conspiracy to Commit Carjacking** – On or about **August 2, 2010**, JOHN MCCLUSKEY and others did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree to carjack Gary Haas and Linda Haas, and as a result of this act, caused their death.

**Overt Acts Committed In Furtherance of The Conspiracy:**

a. JOHN MCCLUSKEY, and others known to the grand jury, agreed to take a 2006 Chevrolet pick-up and camper trailer from a man and woman at a rest stop. This vehicle and trailer belonged to Gary Haas and Linda Haas.

b. JOHN MCCLUSKEY, and another person known to the grand jury, approached the pick-up and forced Linda Haas into the pick-up at gunpoint.

c. JOHN MCCLUSKEY, and another person known to the grand jury, forced Gary Haas at gunpoint to drive the pick-up and trailer away from the rest stop.

d. JOHN MCCLUSKEY ordered Gary Haas and Linda Haas out of the pick-up at gunpoint and thereafter shot and killed them.

e. JOHN MCCLUSKEY, and others known to the grand jury, then drove away in the Haases' pick-up.

| | | |
|---|---|---|
| *Or Aids and Abets:* Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. | **Count 2 -- Carjacking Resulting in Death (Capital Count)** – With the intent to cause death and serious bodily harm, did take a 2006 Chevrolet Pick-Up Truck ... which had been transported in interstate commerce, from the person and presence of Gary Haas by force and violence, and by intimidation, resulting in the death of Gary Haas. | **Count 3 --** **(Capital Count)** – Linda Haas |
| *Or Aids and Abets* | **Count 4 -- Murder with the intent to prevent testimony of a witness (Capital Count)** – Unlawfully and with malice aforethought killed Gary Haas with the intent to prevent the communication to any law enforcement officer and judge of the United States . . .  and such killing was willful, deliberate, malicious, and premeditated. | **Count 5 --** **(Capital Count)** – Linda Haas |

**Count 6 -- Conspiracy to Interfere with Commerce (robbery)** – Gary Haas and Linda Haas

| | |
|---|---|
| **Count 7 -- Interference with Commerce (robbery)** – Gary Haas | **Count 8 --** Linda Haas |

| | | |
|---|---|---|
| *Or Aids and Abets* | **Count 9 -- Using and Carrying a Firearm During and in Relation to Crime of Violence (Capital Count)** – Did knowingly use and carry a firearm during and in relation to a crime of violence, Conspiracy to Commit Carjacking, and ... caused the death of Gary Haas through the use of a firearm, which killing is a murder ... in that the defendant unlawfully and with malice aforethought killed Gary Haas, and such killing was willful, deliberate, malicious, and premeditated. | **Count 10 --** **(Capital Count)** – Linda Haas |
| *Or Aids and Abets* | **Count 11 -- Using and Carrying a Firearm During and in Relation to Crime of Violence (Capital Count)** – Carjacking and ... caused the death of Gary Haas through the use of a firearm, which killing is a murder ... in that the defendant unlawfully and with malice aforethought killed Gary Haas, and such killing was willful, deliberate, malicious, and premeditated. | **Count 12 --** **(Capital Count)** – Linda Haas |
| *Or Aids and Abets* | **Count 13 -- Using and Carrying a Firearm During and in Relation to Crime of Violence (Capital Count)** – Tampering With A Witness and ... caused the death of Gary Haas through the use of a firearm, which killing is a murder ... in that the defendant unlawfully and with malice aforethought killed Gary Haas, and such killing was willful, deliberate, malicious, and premeditated. | **Count 14 --** **(Capital Count)** – Linda Haas |
| *Or Aids and Abets* | **Count 15 -- Using and Carrying a Firearm During and in Relation to Crime of Violence (Capital Count)** – Conspiracy to Interfere with Commerce, and ... caused the death of Gary Haas through the use of a firearm, which killing is a murder ... in that the defendant unlawfully and with malice aforethought killed Gary Haas, and such killing was willful, deliberate, malicious, and premeditated. | **Count 16 --** **(Capital Count)** – Linda Haas |
| *Or Aids and Abets* | **Count 17 -- Using and Carrying a Firearm During and in Relation to Crime of Violence (Capital Count)** – Interference with Commerce and ... caused the death of Gary Haas through the use of a firearm, which killing is a murder ... in that the defendant unlawfully and with malice aforethought killed Gary Haas, and such killing was willful, deliberate, malicious, and premeditated. | **Count 18 --** **(Capital Count)** – Linda Haas |

**Count 19 -- Felon in possession of a firearm** –JOHN MCCLUSKEY, a person who had been convicted of felony crimes punishable by imprisonment for a term exceeding one year, to wit: attempted second degree murder, discharge of a firearm at a structure, and aggravated assault in Maricopa County, Arizona; and robbery, criminal conspiracy, and aggravated assault in, Lancaster County, Pennsylvania … did knowingly possess firearms[.]

**Count 20 -- Felon in possession of a firearm (fugitive from justice)** – A fugitive from justice, did knowingly possess firearms[.]

*United States v. Connell C. Williams*
No. CR-11-0298-F (W.D. Okla.)
Judge Presiding: The Hon. Stephen P. Friot
(Voir dire began February 11, 2013. Case was resolved by negotiated
settlement on February 25, 2013.)

# Trial

# Sentencing Trial

---

### Indictment

Connell C. Williams and Candice C. Holloway unlawfully killed M.H., with malice aforethought, while perpetrating child abuse, in that, the defendants knowingly and intentionally caused serious bodily injury to M.H. by depriving M.H. of food resulting in his starvation and death.

### Threshold Determination

### Mental Intent Factor

Intentionally inflicted serious bodily injury that resulted in the death of M.H..

**and**

### Statutory Aggravating Factor

• Committed the offense in an especially heinous, cruel, and depraved manner in that the offense involved torture and serious physical abuse to M.H.; and / or
• M.H. was particularly vulnerable due to his youth, and he was in the care, custody, and control of defendant Connell C. Williams.

### Weighing Determination

Statutory & Non statutory Aggravating Factors

Mitigating Factors



### Sentence

12 votes ➡ **Death**

1 vote
(or more) ➡ **Life**
**Imprisonment Without Release**

Guilty ➡

Not Guilty 

Unanimously Found ➡

Not Found Unanimously 

*United States v. Lashaun Casey*
No. 05-277 (ADC) (D.P.R.)
Judge Presiding: The Hon. Aida M. Delgado Colon (Chief Judge)
(Voir dire began February 4, 2013.)

# Parts of a Capital Trial



### LIFE OR DEATH DECISION-MAKING IN A FEDERAL DEATH-PENALTY CASE

- **No juror is ever required to impose a sentence of death.**

- **The alternative to a sentence of death is lifetime imprisonment without the possibility of release.**

- **In the federal system, there is no parole, so life means life.**

- **The decision is a moral one that each juror must decide for himself or herself.**

- **Every juror's views are entitled to the respect of every other juror.**

- **The decision of the jury is final.  The Judge cannot change it.**

- **If all 12 vote for death, the sentence will be death.**

- **If even one juror votes for life, the sentence will be lifetime imprisonment without the possibility of release.**

*United States v. Alexis Candelario-Santana*
No. 09-427 (JAF) (D.P.R.)
Judge Presiding: The Hon. José A. Fusté (former Chief Judge)
(Voir dire began January 28, 2013.)

# Trial

# Sentencing Trial

**Capital Counts**

**Threshold Determination**

**Weighing Determination**

**Sentence**

Cts 2 – 9  Carry and use a firearm during and in relation to a crime of violence
Cts 11 – 18 – Carry and use a firearm during and in relation to a crime of violence
Cts 20-27 – Drug related murder

### Mental Intent Factor

A. **intentionally** killed; and/or
B. **intentionally inflicted serious bodily injury** that resulted in death; and/or
C. intentionally participated in an act, contemplating that the life of a person would be taken or **intending that lethal force would be used in connection with a person and the victim died as a direct result;** and/or
D. intentionally and specifically engaged in an act of violence, knowing that the act created a **grave risk of death to a person such that participation in the act constituted a reckless disregard for human life and the person died as a direct result.**

**and**

Not Guilty 

Statutory & Non statutory Aggravating Factors

Mitigating Factors

**Death**

Guilty of Capital Offense 

### Statutory Aggravating Factor
A. Previous conviction of violent felony involving firearm;
B. Previous conviction of other serious offenses;
C. Grave risk of death to additional persons;
D. Pecuniary gain;
E. Substantial Planning and Premeditation; and/or
F. Multiple killings or attempted killings.

**Life Imprisonment Without Release**

**Unanimously Found** 



## LIFE OR DEATH DECISION-MAKING IN A FEDERAL DEATH-PENALTY CASE

- **No juror is ever required to impose a sentence of death.**

- **The alternative to a sentence of death is lifetime imprisonment without the possibility of release.**

- **In the federal system, there is no parole, so life means life.**

- **The decision is a moral one that each juror must decide for himself or herself.**

- **Every juror's views are entitled to the respect of every other juror.**

- **The decision of the jury is final. The Judge cannot change it.**

- **If all 12 vote for death, the sentence will be death.**

- **If even one juror votes for life, the sentence will be lifetime imprisonment without the possibility of release.**

*United States v. Brian Richardson*
No. 1:08-CR-139-CC (N.D. Ga.)
Judge Presiding: The Hon. Clarence Cooper
(Voir dire began February 27, 2012.)

# Trial

# Sentencing Trial



**Threshold Determination**

**Sentence Determination**

**Sentence**

Not Guilty

**Mental Intent Factor**

and

Death

**Statutory Aggravating Factor**

Guilty
of Capital
Offense

Statutory &
Non statutory
Aggravating
Factors

Mitigating
Factors

Life
Imprisonment
Without
Release

**Unanimously Found**

*United States v. Larry Lujan*
No. 2:05-CR-00924-RB (D. N.M.)
Judge Presiding: The Hon. Robert C. Brack
(Voir dire began June 20, 2011.)

# Trial | Sentencing Hearing

### Threshold Determination

### Weighing Determination

**Sentence**

Not Guilty 

### Mental Intent Factor

A. **intentionally** killed; and/or
B. **intentionally inflicted serious bodily injury** that resulted in death; and/or
C. intentionally participated in an act, contemplating that the life of a person would be taken and **intending that lethal force would be used and the person died as a direct result;** and/or
D. intentionally and specifically engaged in an act of violence, knowing that the act created a **grave risk of death to a person such that participation in the act constituted a reckless disregard for human life and the person died as a direct result.**

Statutory & Non statutory Aggravating Factors

Mitigating Factors



**Death**

Guilty of Capital Offense 

### and

### Statutory Aggravating Factor

A. **during the commission of another crime**, namely kidnapping; and/or
B. **especially heinous, cruel, or depraved manner** in that it involved torture or serious physical abuse; and/or
C. **substantial planning and premeditation; and/or**
D. **particularly vulnerable victim** due to infirmity.

**Life Imprisonment Without Release**

### Unanimously Found 

# UNITED STATES V. LARRY LUJAN

## Kidnapping Resulting in Death

Beginning on or about March 7, 2005 and continuing until about March15, 2005 in San Antonio, Texas, and thereafter in Dona Ana County, in the State and District of New Mexico, the defendants, **Larry Lujan**, Kacey Lamunyon, and Eugenio M. Edina, and others did **knowingly and unlawfully seize, confine, inveigle, decoy, kidnap, abduct, carry away and hold for any benefit to the defendants, Dana Joe Grauke II**, a then living person, and the defendants, Larry Lujan, Kacey Lamunyon, and Eugenio M. Edina and others, acting in concert with Larry Lujan, Kacey Lamunyon, and Eugenio M. Edina, did **willfully transport Dana Joe Grauke II, a then living person, in interstate commerce resulting in the death of Dana Joe Grauke II.**

### Statutory Aggravating Factors:

Larry Lujan

a. caused the death of Dana Joseph Grauke II **during the commission of another crime, namely kidnapping;**

b. committed the offense in an **especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse** to the person;

c. committed the offense after **substantial planning and premeditation** to cause the death of Dana Joseph Grauke II; and

d. committed the offense against the victim, Dana Joseph Grauke II, who was **particularly vulnerable due to infirmity**.

### Non-Statutory Aggravating Factors:

a. **Future dangerousness.** Larry Lujan represents a continuing danger to the lives and safety of other persons. Larry Lujan is likely to commit criminal acts of violence in the future that would constitute a continuing and serious threat to the lives and safety of others, as evidenced by, at least, one or more of the following:

    (1) *Continuing pattern of violence.*
    (2) *Low rehabilitative potential.*
    (3) *Lack of remorse.*
    (4) *Gang participation.*

b. **Victim impact evidence:** As reflected by the victim's personal characteristics as an individual human being and the impact of the offense on the victim and the victim's family, the defendant caused loss, injury, and harm to the victim and the victim's family.

*United States v. Anh The Duong*
No. 01-CR-20154 (N.D. Ca.)
Judge Presiding: The Hon. Jeremy Fogel
(Voir dire began February 23, 2010.)

*Note:*

Judge Fogel became the Director of the Federal Judicial Center in 2011. The Federal Judicial Center was created by Congress in 1967 to "further the development and adoption of improved judicial administration in the courts" through research and education. The Center is headquartered in the Thurgood Marshall Federal Judiciary Building in Washington, DC. *See* http://www.uscourts.gov/News/NewsView/11-07-01/Judge_Jeremy_Fogel_Selected_to_Head_Federal_Judicial_Center.aspx (last visited January 23, 2014).

# UNITED STATES OF AMERICA V. ANH THE DUONG
# INDICTMENT

## COUNT 1:    Racketeer Influenced and Corrupt Organization

### The Racketeering Enterprise

1.      At various times relevant to this Indictment, **ANH THE DUONG** . . . and others, were members and associates of a **criminal organization whose members and associates engaged in acts of violence, including robbery, assault, and murder**, and which operated principally in the Northern. District of California and the Central District of California, and also operated in the District of Nevada.

2.      The organization, including its leadership, members and associates, **constituted an "enterprise,** as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the enterprise"), that is, **a group of individuals associated in fact**. The enterprise constituted an ongoing organization whose members, though changing at times, **functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise**. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

. . . .

**ANH THE DUONG was the leader of the enterprise** and directed other members of the enterprise in carrying out unlawful and other activities in furtherance of the conduct of the enterprise's affairs.

. . . .

### Manner and Means of the Racketeering Enterprise

5.      It was part of the racketeering enterprise that **the defendants and other members of the enterprise would generate income for the enterprise through the commission of armed robberies of jewelry stores, banks, computer chip companies and other retail businesses, and through the transportation and sale to various buyers of the jewelry, computer parts, and other assets taken during the course of the robberies**. Various members of the enterprise traveled throughout the State of California and to and from the District of Nevada for the purpose of planning and executing the robberies.

6.      It was part of the racketeering enterprise that various defendants would assist in the identification of robbery targets and then plan and coordinate the robberies.

7.      It was part of the racketeering enterprise that various defendants and other members of the enterprise would promote and protect the enterprise by supplying weapons, ammunition, and other equipment for the robberies, and concealing evidence and the whereabouts of fugitive members of the enterprise from law enforcement.

8.      It was part of the racketeering enterprise that **various defendants and other members of the enterprise would commit assaults and murders to accomplish the goals of the enterprise**, avoid apprehension, and protect members and associates who assisted the enterprise.

. . . .

**Racketeering Act One - November 9, 1993**
- **feloniously take personal property & armed robbery**
- **approximately $500,000 worth of loose diamonds from employees of <u>NGY Jewelers</u>** at the Plaza Jewelry Mart on Bristol Street in Santa Ana, California

**Racketeering Act Two [Counts 3 & 4] - April 11, 1997**
- **feloniously take personal property & armed robbery**
- **cash and personal property of employees and customers at <u>J.D.' s Steal A Deal Sports Cards</u>** in Hayward, California

**Racketeering Act Three [Counts 5, 6, 7, & 8; <mark>Counts 6 & 7 – Capital</mark>] - May 3, 1997**
- **feloniously take personal property & armed robbery**
- **approximately $300,000 in cash from an owner of the <u>Thien Thanh Supermarket</u>** in San Jose, California
- **<u>unlawfully kill Chau Quach with malice aforethought</u>**, during the commission of the robbery

**Racketeering Act Four [Counts 9 & 10] - October 9, 1997**
- **feloniously take personal property & armed robbery**
- **approximately$500,000 in computer chips and computer parts from employees of <u>Ma Laboratories</u>** in San Jose, California

**Racketeering Act Five [Counts 11 & 12] - January 14, 1998**
- **feloniously take personal property & armed robbery**
- **approximately $4,378,319 in jewelry from employees of <u>Chong Hing Jewelers</u>** in Milpitas, California

**Racketeering Act Six [Counts 13 &14] - March 21, 1998**
- **feloniously take personal property & armed robbery**
- **approximately $350,000 in computer chips and computer parts from employees of <u>UMA Technologies, Inc.,</u>** in Fremont, California

**Racketeering Act Seven [Counts 15 & 16] – June 7, 1998**
- **feloniously take personal property & armed robbery**
- **approximately$30,000in currency from employees of the <u>United Commercial Bank</u>** in **San Jose**, California

**Racketeering Act Eight – August 1998**
- **feloniously take personal property & armed robbery**
- **expensive watches from employees of <u>Swiss Watch and Jewelers</u>** in Alhambra, California

**Racketeering Act Nine [Counts 17, 18, & 19; <mark>Counts 18 & 19 – Capital</mark>] – August 28, 1998**
- **attempt to feloniously take personal property & armed robbery**
- **computer chips and components from employees of <u>Wintec Industries</u>** in Fremont, California
- **<u>unlawfully kill Hsu-Pin Tsai with malice aforethought</u>, during the commission of the attempted robbery**

2

**Racketeering Act Ten – May 6, 1999**
- <u>unlawfully kill Minh Dieu Tram with malice aforethought</u>

**Racketeering Act Eleven – May 6, 1999**
- <u>unlawfully kill Hoa The Tang with malice aforethought</u>

**Racketeering Act Twelve – May 6, 1999**
- <u>unlawfully kill Robert Anthony Norman with malice aforethought</u>

**Racketeering Act Thirteen – May 6, 1999**
- <u>unlawfully kill Lan Thi Dang with malice aforethought</u>

**Racketeering Act Fourteen [Counts 20 & 21] – July 19, 1999**
- feloniously take personal property & armed robbery
- approximately $2,059,610 worth of watches from employees of <u>Chong Hing Jewelers</u> in Milpitas, California

**Racketeering Act Fifteen – September 16, 1999**
- feloniously take personal property & armed robbery
- approximately $885,880 worth of watches from employees of <u>Chong Hing Jewelers</u> in Las Vegas, Nevada
- unlawfully <u>kill Kenneth Bailey with malice aforethought,</u> during the commission of the robbery

**Racketeering Act Sixteen – January 26, 2000**
- attempt to feloniously take personal property & armed robbery
- jewelry, including expensive watches and loose gems, from employees at the <u>Plaza Jewelry Mart</u> on Bristol Street in Santa Ana, California

**Racketeering Act Seventeen [Counts 22 & 23] – August 6, 2000**
- unlawfully attempt to feloniously take personal property & armed robbery
- expensive watches from employees of <u>Chong Hing Jewelers</u> in Milpitas, California

**Racketeering Act Eighteen – September 22, 2000**
- feloniously take personal property & armed robbery
- approximately $592,115 worth of watches from employees of <u>Tournai Jewelers</u> in Costa Mesa, California

**Racketeering Act Nineteen [Count 27] – January 16, 2001**
- unlawfully attempt to feloniously take personal property & armed robbery
- expensive watches from employees of <u>Traditional Jewelers</u> in Newport Beach, California

**Racketeering Act Twenty [<mark>Counts 28 & 29 - Capital</mark>] – March 13, 2001**
- feloniously take personal property & armed robbery
- approximately $532,650 worth of watches from employees of <u>Jade Galore Watch and Jewelry</u> in Cupertino, California
- <u>unlawfully kill Josefino Cambosa with malice aforethought,</u> during the commission of the robbery

**COUNT 2:**    **RICO Conspiracy**
Between November 9, 1993, and July 16, 2001 - did <u>knowingly and intentionally conspire</u> to conduct and participate, directly and indirectly, in the conduct of the affairs of the above-described enterprise through a pattern of racketeering activity

**COUNT 3:**    **Interference with Commerce by Violence, Aiding and Abetting**
April 11, 1997 - <u>armed robbery</u> - J.D.'s Steal A Deal Sports Cards in Hayward, California,
**COUNT 4:**    **Using / Carrying Firearms in Crime of Violence, Aiding and Abetting**
April 11, 1997 - <u>knowingly use and carry firearms</u> during and in relation to a crime of violence, namely, the offense alleged in Count Three of this indictment

**COUNT 5:**    **Interference with Commerce by Violence**
May 3, 1997 - approximately $300,000 in cash, by <u>armed robbery</u> - <u>Thien Thanh Supermarket</u> in San Jose, California
**COUNT 6:**    **Using / Carrying Firearms in Crime of Violence Resulting in Death, Aiding and Abetting**
May 3, 1997 - knowingly use and carry firearms during and in relation to a crime of violence - Count Five . . . and in so doing, the defendants committed murder - the <u>unlawful killing of Chau Quach, with malice aforethought,</u> such murder being willful, deliberate, malicious, premeditated and committed in the perpetration of, and attempt to perpetrate, a robbery.
**COUNT 7:**    **Violent Crimes in Aid of Racketeering**
May 3, 1997 - for the purpose of maintaining and increasing his position in the above-described enterprise engaged in racketeering activity, did unlawfully, <u>willfully and knowingly murder Chau Quach</u>
**COUNT 8:**    **Violent Crimes in Aid of Racketeering**
May 3, 1997 - for the purpose of maintaining and increasing his position in the above-described enterprise engaged in racketeering activity, did <u>unlawfully, willfully and knowingly assault Thien Tang</u> resulting in <u>serious bodily injury</u>

**COUNT 9:**    **Interference with Commerce by Violence, Aiding and Abetting**
October 9, 1997 – approximately $500,000 in computer chips and computer parts, by <u>armed robbery</u> - <u>Ma Laboratories</u> in San Jose, California
**COUNT 10:**    **Using / Carrying Firearms in Crime of Violence, Aiding and Abetting**
October 9, 1997 - <u>knowingly use and carry firearms</u> during and in relation to a crime of violence, namely, the offense alleged in Count Nine

**COUNT 11:**    **Interference with Commerce by Violence, Aiding and Abetting**
January 14, 1998 - approximately $4,378,319 in jewelry, <u>by armed robbery</u> - <u>Chong Hing Jewelers</u> in Milpitas, California
**COUNT 12:**    **Using / Carrying Firearms in Crime of Violence, Aiding and Abetting**
January 14, 1998 - did <u>knowingly use and carry firearms</u> during and in relation to a crime of violence, namely, the offense alleged in Count Eleven

**COUNT 13:**    **Interference with Commerce by Violence, Aiding and Abetting**
March 21, 1998 - approximately $350,000 in computer chips and computer parts, by <u>armed robbery</u> - <u>UMA  Technologies, Inc.,</u> in Fremont, California
**COUNT 14:**    **Using / Carrying Firearms in Crime of Violence, Aiding and Abetting**
March 21, 1998 - <u>knowingly use and carry firearms</u> during and in relation to a crime of violence, namely, the offense alleged in Count Thirteen

**COUNT 15:   Armed Bank Robbery, Aiding and Abetting**
June 7, 1998 - approximately $30,000 from employees of the <u>United Commercial Bank</u> in San Jose, California - <u>did assault and put in jeopardy the lives of employees and customers</u> of said bank, by the use of dangerous weapons, to wit, firearms.
**COUNT 16:   Using / Carrying Firearms in Crime of Violence, Aiding and Abetting**
June 7, 1998 - <u>knowingly use and carry firearms</u> during and in relation to a crime of violence, namely, bank robbery as alleged in Count Fifteen

**COUNT 17:   Attempt to Interfere with Commerce by Violence, Aiding and Abetting**
August 28, 1998 - <u>armed robbery</u> - employees of <u>Wintec Industries</u> in Fremont, California
**COUNT 18:   Using / Carrying Firearms in Crime of Violence Resulting in Death, Aiding and Abetting**
August 28, 1998 - did knowingly use and carry firearms during and in relation to a crime of violence - Count Seventeen . . . and in so doing, the defendants committed murder - the <u>unlawful killing of Hsu-Pin Tsai with malice aforethought</u>, such murder being willful, deliberate, malicious, premeditated and committed in the perpetration of, and attempt to perpetrate, a robbery.
**COUNT 19:   Violent Crimes in Aid of Racketeering**
August 28, 1998 - as <u>consideration for the receipt of</u>, and as consideration for a promise and an agreement to pay, <u>something of pecuniary value</u> from the above-described enterprise engaged in racketeering activity, and for the purpose of maintaining and increasing his position in the above-described enterprise engaged in racketeering activity, did <u>unlawfully, willfully and knowingly murder Hsu-Pin Tsai at Wintec Industries</u> in Fremont, California

**COUNT 20:   Interference with Commerce by Violence, Aiding and Abetting**
July 19, 1999 - approximately $2,059,610 worth of watches, by <u>armed robbery</u> - <u>Chong Hing Jewelers</u> in Milpitas, California
**COUNT 21:   Using / Carrying Firearms in Crime of Violence, Aiding and Abetting**
July 19, 1999 - did <u>knowingly use and carry firearms</u> during and in relation to a crime of violence, namely, interference with commerce by violence as alleged in Count Twenty

**COUNT 22:   Attempt to Interfere with Commerce By Violence, Aiding and Abetting**
August 6, 2000 - expensive watches, <u>by armed robbery</u> - <u>Chong Hing Jewelers</u> in Milpitas, California
**COUNT 23:   Using / Carrying Firearms in Crime of Violence, Aiding and Abetting**
August 6, 2000 - <u>knowingly use and carry firearms</u> during and in relation to a crime of violence, namely, attempt to interfere with commerce by violence as alleged in Count Twenty-two

**COUNT 27:   Interference With Commerce by Violence, Aiding and Abetting**
March 13, 2001 - approximately $532,650 worth of watches, by <u>armed robbery</u> - <u>Jade Galore Watch and Jewelry</u> in Cupertino, California
**COUNT 28:   Using / Carrying Firearms in Crime of Violence Resulting in Death, Aiding and Abetting**
March 13, 2001 - did knowingly use and carry firearms during and in relation to a crime of violence - Count Twenty-seven . . . and in so doing, the defendants committed murder - the <u>unlawful killing of Josefino Cambosa, with malice aforethought</u>, such murder being willful, deliberate, malicious, premeditated and committed in the perpetration of, and attempt to perpetrate, a robbery.
**COUNT 29:   Violent Crimes in Aid of Racketeering**
March 13, 2001 - for the purpose of maintaining and increasing his position in the above-described enterprise engaged in racketeering activity, did <u>unlawfully, willfully and knowingly murder Josefino Cambosa</u>, a security guard at Jade Galore Watch and Jewelry in Cupertino, California

## DECLARATION REGARDING JURY SELECTION PRACTICES

1.  I currently serve with the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project (RCP) in January, 1992.  I was the Director of the Project between 2007 and 2018.  The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases.  This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. http://www.uscourts.gov/sites/default/files/original_spencer_report.pdf. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable." http://www.uscourts.gov/services-forms/defender-services/publications/update-cost-and-quality-

3.  In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases.  I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel.  The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4.  I have personally assisted appointed counsel in voir dire in the following federal capital trials:  *United States v Richard Tipton, et al.,* (E.D. Va. No. 3-92-CR-68); *United States v. John Javilo McCullah* (E.D. OK. CR-92-032-S); *United States v. Michael Murray* (M.D. Penn. No. 1:CR-92-200); *United States v. Jean Claude Oscar, et al.* (E.D. Va. 93-CR-131-Morgan); *United States v. Stacey Culbert* (E.D. Mich. No. CR-92-81127); *United States v. Louis Jones* (N.D. Texas No. 6-95 CR 0015-C); *United States v. Orlando Hall* (N.D. Tex. No. 4:94-CR-121-Y); *United States v. Bruce Webster* (N.D. Tex. No. 4:94-

defense-representation-federal

2

CR-121-Y) and *United States v. Len Davis* (E.D. La. No. 94-381). I have observed portions of the jury selections in other cases: *United States v. Thomas Pitera* (E.D. N.Y. No. CR 90-0424 (RR)) and *United States v. Dennis B. Moore* (W.D. Mo. No. CR 94-00194-01-12-CR-W-9). I have selected  federal capital trial juries as counsel of record. *United States v. Quinones and Rodriguez* (S.D. NY CR No. 00 CR 0761 (JSR)) and *United States v. Valerie Friend* (S.D. WV CR No. 2:05-00107). I have assisted in preparing defense counsel for jury selection in other cases: *United States v. Jason De la Torre* (D.N.M. No. CR 95-538-MV); *United States v. Timothy McVeigh* (W.D. OK CR No. M-95-98-H) (Alley) on change of venue to (D. CO CR No. 96-CR-68-M) (Matsch); *United States v. Theodore Kaczysnki* (E.D. CA. No. CR-S-96-259) and *United States v. Angela Johnson* (N.D. IA CR No. 00 CR 3034-MWB).

## A. Attorney Questioning

5. In the vast majority of federal capital trials, attorneys are permitted to ask the jury questions. As of November 29, 2018, jury selection has begun 236 times in a federal capital case. Attorney questioning of potential jurors was allowed in 193 (or 82%) of these trials (193/236).[2]

---

[2] In one trial, attorney questioning was permitted for a defendant for almost half of the jury panel, then was stopped (*Battle*). In three other cases, attorney questioning was not allowed initially, but then was allowed (*Acosta-Martinez/Rivera-Alejandro* (D PR), *Bobbitt/Jones* (ED VA) and *Tsarnaev* (D MA)).

## B. Jury Questionnaires

6.   In the vast majority of cases, jury questionnaires containing additional questions beyond those found in standard questionnaires have been used in order to reduce the amount of in-court time necessary to select a jury.

7.   In all but 11 of these trials, the district court ordered or approved a juror questionnaire which asked questions in addition to the standard questions.  In a few of these 236 trials, there was no request for use of an extensive questionnaire.  In a majority of the 225 trials where a questionnaire was used (95%, 225 of 236), the questionnaire was extensive.[3]

8.   The reason that so many district judges approve the use of prospective juror questionnaires, including extensive questionnaires, is that it conserves precious judicial resources by eliminating the need for time-consuming in-person questioning on a variety of topics.[4]   Rather, district court judges have chosen to use an expanded

---

[3]Five of the "expanded" questionnaires were very brief.

[4]*The Benchbook for United States District Court Judges*, §3.01 "Death Penalty Procedures," Pretrial ¶(A)(5), p. 117 (March 2000 rev), suggests consideration of "having veniremembers complete a jury questionnaire" prior to a federal capital trial and providing the same to counsel.  This is the reason the *Resource Guide for Managing Capital Cases*, Chapter III A1, p. 33 (Federal Judicial Center, 2002) states: "All the judges we interviewed used questionnaires."  The Guide also states: "Nearly all federal judges who have had a death penalty trial to date have used a written jury questionnaire."  *Id.,* Chapter III A2, p. 34.  "Most questionnaires have been in the range of ten to fifteen pages."  *Id.*

4

questionnaire as a tool to identify specific areas that may require testimony by potential jurors.

9.  Appellate courts have rejected claims in federal capital cases that voir dire was inadequate, in part relying upon the district court's use of in-depth questionnaires. *See, e.g., United States v. McVeigh,* 153 F.3d 1166, 1208 (10th Cir. 1998) ("an extensive questionnaire"); *United States v. Ortiz,* 315 F.3d 873, 888 (8th Cir. 2002) ("a questionnaire of 103 questions")*.*

### C.  Individual and Sequestered Voir Dire

10.  Similarly, relatively few judges have declined to conduct individual, sequestered (away from other potential jurors) voir dire, *at least on the issue of punishment views* in federal death penalty cases.[5]  To our knowledge, judges refused individual, sequestered (private - apart from other jurors) voir dire on the issue of the death penalty 31 times.[6]  So, 87% of federal judges conduct "private" individual

---

[5]The *Benchbook for United States District Court Judges*, §3.01, ¶(A)(7), p. 119, recommends that punishment questions be posed individually "at sidebar ..."  *See also Chambers to Chambers,* Vol. 10, No. 1, pp. 3-7 (Federal Judicial Center 1995). The *Resource Guide for Managing Capital Cases,* Chapter III A3a, p. 36, states that all the district judges interviewed used a combination of group (for general issues) and individual (for death penalty issues) voir dire.  Of course, group voir dire is well suited and time efficient for non-sensitive topics – although some judges have conducted all questioning in private and individually.

[6]Five judges permitted individual questions in private "as necessary."

questioning of potential jurors *at least on the issue of capital punishment views* (205 of 236).

11.   Punishment questioning in a group setting carries with it 1) a danger that other jurors, who listen to the answers of fellow potential jurors, may be contaminated or improperly influenced by those responses and thus 2) may shade their answers based on what they hear and 3) is demonstrably inferior in identifying biased jurors and 4) requires repeated exposure to questions about the death penalty which presume guilt and creates a less than neutral jury.

12.   In those federal cases where the district court required small group questioning, sensitive issues (the death penalty, exposure to pretrial publicity or racial or ethnic attitudes) often end up requiring some questioning out of the hearing of other jurors, usually at the bench.  In the end, the process is not time efficient, particularly if there is no questionnaire allowing counsel and the court to focus on troublesome topics.  Rather than bring individual jurors in on a scheduled basis for questioning, the group approach often requires a large panel of jurors to sit idly (whether they can hear the answers of other jurors or not). This unnecessarily wastes the time of many citizens, as opposed to setting up an individual interview schedule, which creates the least imposition on each citizen.

I  declare under the penalty of perjury under the laws of the United States of

American, 28 U.S.C. §1746, that the foregoing is true and correct.

Executed this 29th day of November, 2018.

                 /s/ Kevin McNally          

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA  :

        vs.              :    No.  3:CR-13-123

JESSIE CON-UI         :    Judge A. Richard Caputo

        Defendant      :

## ORDER

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

The Court has ordered that trial would commence in this case beginning April 24, 2017. The parties have jointly submitted a proposed order for jury selection procedures in which the parties agreed to a comprehensive set of procedures and deadlines for the jury selection process.

AND NOW, on the _____2nd____ of September, 2016, **IT IS HEREBY ORDERED THAT:**

1.    The Court will mail hardship questionnaires to a venire of approximately 750 persons on or about January 9, 2017. The venire persons are directed to return the questionnaires no later than February 6, 2017.

2.    Upon review of responses to the hardship questionnaires, the Court may excuse any potential juror it finds to be exempt or ineligible to serve based upon local rules.

3.    The remaining jurors will be summoned to appear in panels for completion of the special questionnaire the week of March 6, 2017. The size of the

EXHIBIT E

panels to be summoned will be determined by the Court. Panels will be summoned for morning and afternoon sessions, and will complete the questionnaires under the supervision of court personnel.

4.      The Court will make completed special questionnaires electronically available to the parties for review the week of March 13, 2017.

5.      The parties must confer and file with the Court no later than March 31, 2017, a list of stipulated strikes for cause. The Court will excuse all members of the venire appearing on this stipulated list.

6.      The Jury Division shall create a list of remaining prospective jurors by name and number and the order in which they will be called. The jurors will be called in numerical order starting with the lowest number. The Clerk will provide this list to the parties by close of business on Friday, April 14, 2017.

7.      On the date the trial is scheduled to commence, April 24, 2017, 12 jurors will be summoned per day until a requisite number of jurors are qualified. This number may be adjusted up or down at the Court's discretion as jury selection proceeds and the Court sees how much time is necessary to complete individual voir dire.

8.      The 12 summoned jurors per day will be brought together into the courtroom where the Court will provide an overview of the process and general applicable legal concepts, including the possibility of the death sentence during the penalty phase. Thereafter, the Court will conduct general voir dire on issues for which individual voir dire is thought not to be necessary, including hardships, pretrial publicity, bias, prior contact with the defendant, attorneys, witnesses, etc.

Following this general voir dire, the prospective jurors will be excused to the jury room and cause challenges will be argued. Individual voir dire will then commence for the remaining prospective jurors.

9.     When an individual juror returns to the courtroom, one attorney from either the government or the defense will take turns questioning that juror, alternating which side begins the questioning. Cause challenges will be argued after the completion of individual voir dire for each prospective juror. The procedure is then repeated for those prospective jurors who remain. Each prospective juror not excused for cause would remain at the call of the Court for possible jury service.

10.     Once at least 70 jurors have been qualified and accepted by the parties, individual voir dire shall cease. The court will allow the parties two business days to review the qualified panel at which time the parties will exercise peremptory challenges and the petit jury will be selected. The parties will alternate going first in choosing whether to strike or pass each juror. If a party passes an opportunity to strike a juror, that challenge will be deemed to have been exhausted. The parties may strike a juror in any part of the qualified pool, not just as to the 12 seated in the jury box. Each party may exercise a maximum of 20 peremptory strikes. Consecutive passes will mean the jury is acceptable no matter how many strikes remain. Once a jury of 12 is selected, the parties will continue the process to select six alternative jurors. When selecting alternative jurors, each party may exercise three peremptory strikes utilizing the process set forth with regard to selecting the main panel. Peremptory strikes not used in picking the main panel may not carry over to be used

in selecting the alternate jurors. Once six alternate jurors are selected, any remaining prospective jurors will be excused.

_____

Judge A. Richard Caputo
United States District Court
Middle District of Pennsylvania

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 AUG 28 PM 3: 55

CLERK

BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA )
)
v. ) Case No. 5:01-cr-12-01
)
DONALD FELL )

**ORDER ON MOTION FOR SETTING JURY SELECTION PROCEDURES**
**(Doc. 885)**

The court has previously ruled on portions of Defendant's Motion (Doc. 885) for Setting

Jury Selection Procedures. (*See* Docs. 1142, 1260.) The court addresses some of the undecided

portions of the motion here, and also outlines additional details of the proposed jury selection

process. Additional suggestions from counsel are welcome.

The court has summoned 900 jurors. With the assistance of counsel, the court is now

ruling on requests to be excused pursuant to 28 U.S.C. § 1866(c). In September, jurors will

begin to appear to answer the Case Questionnaire ("CQ"). (*See* Doc. 1142 at 3.) Counsel are

welcome to stipulate to the excusal of jurors based on the CQs. October 1, 2018 will be the first

day of individual voir dire.

Voir dire will be conducted with one potential juror present in the courtroom at a time.

The court will begin with a standard set of questions as well as questions related to that juror's

CQ. Counsel will have an opportunity to ask questions of their own. (Doc. 1142 at 3.) The

parties will alternate going first. After voir dire is completed for a juror, the court will hear cause

objections. Counsel may also stipulate to the excusal of a juror during his or her questioning

when it becomes evident that both sides agree. A total of ten jurors will be called each day, five

in the morning and five in the afternoon. Based on prior experience, it is likely that some jurors

EXHIBIT F

will be eliminated for cause very quickly. If we find that we are not reaching everyone or that we are running out too soon, the court will adjust the number of jurors called for each day.

The individual voir dire session will be the only time a juror is questioned in court. The scope of questioning will cover issues related to cause as well as peremptory challenges.

The court will sit 12 jurors plus 4 alternates. That final group will be selected as follows. As soon as 66 jurors have been qualified as to cause through the individual voir dire process, the court will suspend individual voir dire and schedule a final jury selection hearing. The 66 jurors will be seated in the courtroom, including the jury box, in no particular order. Each will be identified by the panel number assigned to them when they first appeared for the CQ session.[1] Counsel will be provided with a list of the 66 names and associated panel numbers in advance. Peremptory challenges will be made against the entire group of 66.

Each side receives 20 peremptory challenges. Fed. R. Crim. P. 24(b)(1). Challenges may be asserted against any juror in the group of 66. The challenges will be exercised in turn starting with the Government. A pass is equivalent to the use of a challenge and reduces the challenges held by that party by one. The jury will consist of the first 12 jurors holding the lowest juror numbers.

At the conclusion of the 20 peremptory challenges, the court will excuse the jurors who were struck. Those jurors will leave the courtroom. The jury box will be cleared and the 12 jurors will be seated.

---

[1] As each group of 50 jurors appears for the CQ sessions (one group in the morning and one group in the afternoon), the members will be randomly assigned panel numbers. The first 50 will receive panel numbers between one and 50. The second 50 will receive panel numbers between 51 and 100. These panel numbers will appear on the cover sheet of the CQ and will be the numbers by which the court and counsel will refer to potential jurors throughout the jury selection process.

After the 12-person jury is selected, the court will select four alternates. *See* Fed. R. Crim. P. 24(c)(1). Each side will get two peremptory alternate challenges. Fed. R. Crim. P. 24(c)(4)(B). These will be executed against the remaining group. Again, the four jurors holding the lowest remaining panel numbers will be the alternates. The remaining jurors will be excused.

The court appreciates the discussion of "reverence for life," ability to consider mitigating evidence, and willingness to consider a possible life sentence in the parties' memoranda. (Docs. 885-1, 912.) The court will take up these issues with counsel at a hearing in late September before the start of individual voir dire.

The court will remind each juror that questions about his or her attitudes toward the death penalty should not give rise to an expectation that a death sentence is more likely than a life sentence without opportunity for release and that Donald Fell is presumed innocent of the charges in the case. (*See* Doc. 1260 at 5.) The court will ask open-ended questions and counsel may do the same. (*See id.* at 6.) "Stake-out" questions seeking to commit a juror to a particular result if he or she hears evidence of one description or another will not be allowed. Jurors may be asked about their willingness to consider potential mitigating or aggravating factors, but not what effect the facts would have on their verdict. The focus of the voir dire will be on receiving information from the jurors about their views and beliefs. If the focus of attorney questioning becomes primarily about informing the juror about possible information in the case and asking how it might affect his or her decision-making, the court will redirect the voir dire or bring it to a close for that juror.

3

CONCLUSION

The Motion for Setting Jury Selection Procedures is GRANTED IN PART.

Dated at Rutland, in the District of Vermont, this 28th day of August, 2018.

Geoffrey W. Crawford, Chief Judge
United States District Court

4