UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 17-cr-20037-JES-JEH |
| BRENDT A. CHRISTENSEN, | ) | |
| Defendant. | ) | |

### ORDER AND OPINION

Now before the Court is Defendant Brendt A. Christensen's Motion (Doc. 119) to Exclude DNA and Serology Test Results and Request for *Daubert* Hearing. Defendant also filed a sealed Supplement (Doc. 218) to this Motion. The United States has filed a Response (Doc. 222). An evidentiary hearing on this matter was held on February 11, 2019. For the reasons set forth below, Defendant's Motion (Doc. 119) is DENIED.

### BACKGROUND

Defendant Brendt A. Christensen was arrested by federal agents on June 30, 2017, pursuant to a criminal complaint which charged him with the kidnapping of Yingying Zhang, a female Chinese national, in violation of 18 U.S.C. § 1201(a)(1). Doc. 1. Christensen was later indicted by a federal grand jury sitting in the Urbana Division of the Central District of Illinois. *See* Doc. 13 (Indictment), Doc. 26 (Superseding Indictment). The Superseding Indictment charged Christensen with kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) (Count 1), and with making false statements to FBI agents investigating Ms. Zhang's disappearance, in violation of 18 U.S.C. § 1001(a)(2) (Counts 2, 3). Doc. 26. The Superseding Indictment returned by the grand jury also included a notice of special findings regarding the nature of the offense charged in Count 1, including that the death of the victim was intentional,

that it occurred during the commission of kidnapping, that it was committed in an especially heinous, cruel, or depraved manner, and that Defendant committed the offense after substantial planning and premeditation. *Id.* The special findings alleged in the Superseding Indictment made the case eligible for capital punishment. *See* 18 U.S.C. § 3591 *et seq*. On January 19, 2018, the United States filed its Notice of Intent to Seek a Sentence of Death ("NOI"). Doc. 54; *see also* 18 U.S.C. § 3593(a).

This Motion concerns DNA and serology tests that were performed on swabs taken from various locations in Defendant's home. With regard to the DNA tests, Defendant moves to examine the source code of the probabilistic genotyping algorithm STRmix, which law enforcement used to compare the DNA samples they took from Defendant's apartment to samples from Defendant, Defendant's then-wife, and Ms. Zhang. Defendant also moves for a *Daubert* hearing on the reliability of the STRmix program, suggesting that its use of allele length rather than more detailed sequencing analysis makes it unreliable. With regard to the serology tests, Defendant moves to exclude the preliminary luminol and phenolphthalein tests on the grounds that they are irrelevant and that they are more prejudicial than they are probative. Defendant also moves for a *Daubert* hearing on the reliability of the Takayama hemochromogen test used to confirm the presence of blood, in addition to the reliability with which the standard methods were applied by the Government expert testing the samples in this case. *See* Docs. 119, 218.

## LEGAL STANDARD

Rule 702 authorizes an expert witness—qualified by their knowledge, skill, experience, training, or education—to present opinion testimony if the testimony will help the trier of fact understand the evidence or determine a fact in issue, as long as the testimony is based on

sufficient data, using reliable methods, and the expert has applied the principles reliably to the facts of the case. Fed. R. Evid. 702. Although Rule 702 was updated in 2000, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), continues to be the "gold standard for evaluating the reliability of expert testimony and is essentially codified in the current version of Rule 702." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). *Daubert* requires the Court to evaluate "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis in original); *see also Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014). The party seeking to introduce the expert testimony must meet the *Daubert* standard by a preponderance of the evidence. *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). The factors listed in *Daubert*, which are non-exhaustive, include whether a method has been tested, whether a theory or technique has been subject to peer review and publication, any known or potential error rates in a technique, and general acceptance within a scientific community. *Daubert*, 509 U.S. at 593–95.

## DISCUSSION

### DNA Tests

First, Defendant has requested the STRmix source code so that they can evaluate it for potential errors. The United States indicates that it does not have this proprietary information, and that errors in STRmix are better evaluated by examining the Extended Output within the software, which is available to Defendant on the STRmix website. Doc. 222, pp. 21–22. At the evidentiary hearing, Defendant claimed that the only way to obtain the source code through the website would be by purchasing the program, which is priced in the six figures. The United States contended that Defendant had not attempted to contact the company through the website's

resources for defense counsel, which provides that defense counsel may submit a written request to inspect the source code and the company would grant it under certain conditions. Given the remote chance of relevant errors in the source code (Defendant could find documentation of only two past source code errors, both false exclusions and both in testing exercises rather than real cases), together with the impracticability of acquiring the source code from the New Zealand company that produces STRmix and Defendant's failure to explain why the resources identified on the company's website are insufficient, the Court hereby denies this request.

Second, Defendant moved for a *Daubert* hearing on the reliability of the STRmix program. The United States argues that there is no need for a hearing—the STRmix software has been subject to numerous validation studies and peer review, its only known errors have been false exclusions rather than false positives, and it is used in many U.S. labs. Doc. 222, pp. 17–20. The Government notes that every court to have considered the reliability of probabilistic genotyping and STRmix has found the results admissible. Doc. 222, p. 10 (citing cases from Michigan, the Virgin Islands, New York, Wyoming, and Texas). Nonetheless, a hearing was held on February 11, 2019, effectively granting that aspect of Defendant's Motion.

Third, Defendant moved to exclude the DNA test results on the grounds that STRmix is unreliable. At the evidentiary hearing, the United States called Ms. Jerrilyn Conway, a forensic examiner for the FBI, who testified that STRmix has been validated internally by the FBI and also by numerous studies conducted by employees of the company that produced it. She noted that STRmix is used by at least 43 laboratories in the United States, including the U.S. Army. Defendant argues that the STRmix program, which utilizes a probabilistic genotyping algorithm based on allele length, is not as reliable as next-generation sequencing analyses. Doc. 218, p. 7. Ms. Conway agreed at the hearing that next-generation sequencing could be more precise.

However, she testified that STRmix is nonetheless reliable, partly because it compares allele length at not just one locus (where sequencing would prevent false matches among alleles with identical lengths but different contents), but at 21 regions of the sample. She testified that the probability of two different individuals having matching allele lengths at one locus would be approximately 1 in 50, but that the probabilities STRmix generates are in the quintillions to octillions, due to the numerous loci compared. The evidence shows that STRmix has been repeatedly tested and widely accepted by the scientific community. Although there may be more precise tests available, such tests do not affect STRmix's reliability. Accordingly, Defendant's Motion to exclude the DNA evidence based on the alleged unreliability of STRmix is denied.

**Serology Tests**

First, Defendant moves to exclude the results of the luminol and phenolphthalein tests that indicated the possible presence of blood but could not be confirmed by later testing, stating that these tests are either irrelevant or substantially more prejudicial than probative. Doc. 119, p. 8. While the United States acknowledges that some courts have excluded such preliminary tests, they argue that the circumstances in this case do not warrant exclusion on relevance or prejudice grounds. That is, the United States notes that the presumptive tests for blood at issue are corroborated by Defendant's own recorded statements, the shape of some of the identified samples, as well as by the fact that other samples in the apartment were confirmed to be blood containing Ms. Zhang's DNA. Doc. 222, p. 27. At the evidentiary hearing, Ms. Conway testified that these preliminary tests "indicate" blood but do not confirm it—they could react to other oxidizing agents like some cleaning products. She went on to state that they could indicate that blood was "probably" present, in the right factual circumstances.

Given the corroborating evidence suggesting the presence of blood in the locations where preliminary testing was conducted, the preliminary test results are relevant and not substantially more prejudicial than probative. Defendant's arguments about the reliability of the test results and the appropriate weight to assign them may be presented to the jury at trial, but they do not persuade the Court to exclude the results of the luminol or phenolphthalein tests.

Second, Defendant moves for a *Daubert* hearing on the reliability of the Takayama hemochromogen test and the methods of the law enforcement official who performed that test. The United States responds that such a hearing is unnecessary because the test has been the standard confirmatory test for blood for over 100 years, and the law enforcement official's application of this reliable method is a subject appropriate for cross-examination at trial, not a pre-trial hearing. Doc. 222, pp. 29–30 (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("Reliability, however, is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced.")). The Court held an evidentiary hearing on this matter on February 11, 2019, effectively granting this aspect of Defendant's Motion.

At that hearing, Ms. Conway testified that the Takayama hemochromogen test is the prevailing confirmatory blood test in the field. She stated that multiple studies have confirmed that the Takayama test does not react to substances other than blood, and that the FBI has control testing protocols to avoid errors. Ms. Conway further testified that standard procedure in conducting the Takayama hemochromogen test does not involve photographic or descriptive records other than documenting whether the analyst determined that it was positive or negative. According to Ms. Conway, a second examiner always checks positive results to ensure accuracy. The Court finds that the Takayama test is well-known, widely used, not prone to errors, subject

to peer review, and applied reliably in this case. Thus, Defendant's Motion to exclude the test results on reliability grounds is denied.

## CONCLUSION

For the reasons set forth above, Defendant's Motion (Doc. 119) is DENIED.

Signed on this 15th day of February, 2019.

/s James E. Shadid
James E. Shadid
Chief United States District Judge