E-FILED
Monday, 29 April, 2019 03:24:09 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

<u>SEALED[1] RESPONSE TO GOVERNMENT'S MOTION TO PRECLUDE THE TESTIMONY OF DR. SUSAN ZOLINE</u>

The defendant submits this response to the *United States' Motion In Limine to Preclude the Testimony of Dr. Susan Zoline* (*Motion*). Dkt. 264.

## I.    Introduction

Shortly after noon on March 21, 2017, approximately eleven weeks before the kidnapping of Yingying Zhang, Brendt Christensen walked into the University of Illinois Counseling Center (UICC) and reported that had a serious substance abuse problem (involving both alcohol and prescription drugs that he was taking for depression and sleep issues) and that he was experiencing intrusive homicidal and suicidal ideations. On the intake form Brendt reported that "alcohol and drug addiction

---

[1] Pursuant to the Court's question at the conclusion of the hearing on March 14, 2019, the defense takes no position in this Motion as to whether or not the government's Motion to Bar the Testimony Dr. Susan Zoline (R. 265) was properly sealed under local rules. Regardless, we have filed this Response under seal in a reciprocal fashion and will be prepared to discuss this matter at the upcoming status hearing on April 8, 2019.

is ruining my life;" he had been hospitalized for mental health concerns two to three times in the past; he had purposely injured himself within the past year; he had seriously considered attempting suicide two to three times, including within the past month; he had considered causing physical injury to another person within the past year; he was currently taking medications (for depression and sleep issues).[2] Exhibit A, Copy of UICC Records at DEF 23980-23983.[3] Another intake document, styled CCAPs 62 Profile Report, rated Brendt as close to or at 100% on scales measuring Depression, Generalized Anxiety, Family Distress, Substance Abuse and what was apparently an overall assessment called the Distress Index. *Id*. at 23984. An accompanying rating scale of various symptoms evidences Brendt's state of mind when he approached the UICC that day, with each of the following symptoms receiving the highest severity score of 4.

"I lose touch with reality;"

"I feel helpless;"

" I feel disconnected from myself;"

"I feel isolated and alone;"

"I have spells of terror or panic;"

"I experience nightmares or flashbacks;"

" I get sad or angry when I think of my family;"

---

[2]Brendt had been treated by a psychiatrist at the McKinley Health Center at the University over the preceding year and was prescribed medications for depression and sleep issues.

[3]The citation reference a defense Bates number placed in the lower right corner of the record.

2

"I wish my family got along better;"

A similar severity score was registered as to questions concerning substance abuse (alcoholism). *Id.*[4]

After executing forms consenting to a recording of an interview and a "Psychological Services Agreement," *id,*. DEF 23989, Brendt was interviewed by a student intern, Carin Molenaar, who later produced a narrative summary of her interview. *See Id.* DEF 23996-23998. Ms. Molenaar's interview was also recorded on video. *See* Exhibit B (video recording[5]). The recording vividly confirms Brendt's evident depression and the symptomatology he described in the intake forms. As reflected in Exhibit B, Brendt discussed several subjects with Ms. Molenaar:

**Substance Abuse:**

> Brendt explained that he began abusing substances (legal substances, except for marijuana a few years before) after a severe accident at age 19, for which he was given a continuing supply of Vicodin for pain. He explained that he had been seeing a psychiatrist at the McKinley Health Center for the past year, who had prescribed antidepressants and sleep medications, each of which he abuses. Brendt also described, at length, his problem with alcohol, which had caused problems in his marriage. He explained to Ms. Molenaar that he is not a violent nor an angry person and does not a have bad temper, but it's nonetheless unpleasant for his wife when he is drinking.

**Depression and Sleep Issues:**

---

[4] The severity ratings are filled out by the patient on a computer.

[5] The video file is too large to electronically file on CM/ECF. As such, counsel will provide a copy to the Court. The government already has the referenced video, disclosed earlier this month.

Brendt described his depression, at length throughout the interview, as noted, a description, fully borne out by the video. Brendt explained that he believes he has probably had some form of depression since he was a teenager, but he didn't seek help or fully realize that he should be getting help until two years ago when, as indicated above, he saw a psychiatrist at the University. The antidepressants helped for awhile, but he later "relapsed."

Brendt also stated that he was only getting four hours or so sleep a night and this was presenting more problems.

**Feelings of Guilt and Failure:**

Brendt talked about his feelings of failure and guilt because of his decision to drop out of the Ph.D. program and settle for his Masters. He described feeling like a failure for the first time in his life, stating that he tried as hard as he could to get a Ph.D. and just couldn't do it.

**Relationship with His Wife, Lack of Support and Suicidal Ideation**

Brendt recounted how his wife recently rejected him for another man and how he didn't feel he could go on in life without her. He explained that the only person he relates to is his wife; he always drinks at home and has no real friends at the University, a personal choice he made because his wife had always been enough for him - they met in early in undergraduate school and thereafter he never felt a need to make new friends.

About two weeks previously, his wife had told him she wanted to open up their marriage, an idea that he reluctantly went along with to keep her from leaving. But, when she told him on the preceding Sunday she wanted to leave him for a man she had just started seeing, he felt blindsided and hurt.

Brendt explained that he didn't want to live without Michelle. He had some thoughts of suicide a year or two before, which resurfaced with his wife's news on Sunday. Brendt stated that he doesn't want to live anymore and doesn't know how else to describe it. He didn't think that it would be worthwhile to continue living without his wife.

**Protective Factors:**

4

> Asked about his family, Brendt explained that his mother was an alcoholic; he doesn't talk to his brother or sister or father that much; and has lost touch with some good friends he grew up with. When directly asked at the end of the interview what protective factors he had, he answered none.

**Homicidal Ideations:**

> Brendt explained that after his academic hopes waned, he began to develop an irrational interest in serial killers. He went on to say that he had thoughts of committing a murder. He explained that he had taken steps to put a plan in place by purchasing some items but had returned them. He stated that he realized how foolish and "horrible" these thoughts were, that they must have come from drinking and he thought they were probably temporary because he didn't want to live with guilt and doesn't think he is a psychopath or sociopath because he has empathy for others. He explained that he has been afraid to confide these thoughts in others because he knows what people will think. Finally, he acknowledged an awareness that these thoughts are dangerous and suggested that by telling someone about them, he hoped they would go away.

The records indicate that at the conclusion of this meeting, Ms. Molenaar requested a "consult" with someone else, Exhibit A at DEF 23994, though there is nothing in the record to indicate whether this took place and, if so, the nature of the consultation.

Brendt returned to the UICC on March 30, 2017. He was initially seen that day by Jennifer Maupin, MSW. The records indicate that Ms. Maupin's primary purpose was an AOD Assessment. Exhibit A at DEF 24021. Brendt told Ms. Maupin (who had reviewed the report of Ms. Molenaar) about his distress from his wife's decision to open their marriage and spend the night last week with another partner. Brendt explained that he felt she was choosing a man she had just met and throwing away their marriage of nine years, that he broke down crying with his wife and hinted at possible suicide

5

although he was now feeling better. He explained that his wife was not interested in resuming marriage counseling.

Ms. Maupin then informed Brendt that she wanted him to see Tom Miebach, LCSW, apparently for the purpose of providing further support. Brendt told Ms. Maupin that he was amenable to having someone at the center "continue to evaluate his risk for harm to self/others." Exhibit A at DEF 24021.

Brendt was then interviewed by Mr. Miebach. During the course of this interview, Brendt admitted "passive suicidal ideations in response to conflicts inside his marriage;" he had recently thought about murder "in an analytical fashion," particularly ruminating about how one might go about killing a person and 'get away with it.'" He also admitted to having purchased items that could be used in the "transport and disposal" of a body, but said he had disposed of these items. He denied any current suicidal or homicidal plans and expressed his fear of imprisonment. Exhibit A at DEF 24022.

## II.  The Noticed Testimony of Dr. Zoline

On February 20, 2019, the defense sent the government the following notice pursuant to Fed. R. Crim. P. 16(b)(1)(C):[6]

---

[6] In a footnote, without any analysis or discussion, the government suggests that the Court should exclude Dr. Zoline because of untimeliness. *Motion*, at 2, n. 1. That the government places this request in a footnote without further ado is unsurprising from its knowledge of the relevant law, as well as positions it has previously taken in this very case. Exclusion of expert testimony that is relevant and otherwise admissible based solely on timing is an extreme remedy, and employed only in the most extreme circumstances. *see e.g.*: United *States v. Duvall*, 272 F.3d 825, 829 (7th Cir. 2001); *United States v. Slough*, 51 F. Supp. 3d 1, 9 (D.D.C. 2014) (notice one week before trial); *United States v. Aceves-Rosales*, 832 F.2d 1155, 1156 (9th Cir. 1987) (defense waited until conclusion of government's case-in-

It is expected that Dr. Zoline will testify that the treatment of Mr. Christensen by the University of Illinois Counseling Center did not comply with the applicable standards of care, including but not limited to failure to provide appropriate services in response to the clinical concerns identified in the sessions; failure to seek client consent to notify and adequately coordinate with psychiatrists who were treating Mr. Christensen at the McKinley Health Center; failure to seek client consent to obtain medical records that would have assisted in evaluating and treating Mr. Christensen; failure to adequately assess and evaluate the specifics of the homicidal and suicidal ideations Mr. Christensen expressed in the sessions with regard to a thorough ongoing threat assessment, and failure to develop an adequate treatment and safety plan in light of Mr. Christensen's unique situation and vulnerable presentation; failure to make appropriate referrals for further treatment; and failure to conduct an adequate follow-up with Mr. Christensen. Dr. Zoline will base her testimony on her educational background; her professional experience as both a Licensed Clinical Psychologist and Professor of Psychology, as set out in her CV, and her familiarity with the standards of care in the mental health professions.[7]

---

chief before disclosing it); *United States v. Benedict,* 855 F.3d 880, 885 (8th Cir. 2017) (five days prior to trial); *United States v. Santos,* 53 F. Supp. 2d 802, 846 (N.D. Il. 1999) (two days before trial). The test is one of unfair surprise and prejudice. *United States v. Smith*, 502 F.3d 680, 689 (7th Cir. 2007). The government cited *Smith* in its *Response to Defendant's Motion to Bar Expert Testimony*, Dkt. 36, at 16, arguing that the defense had suffered no prejudice by the government's then late and incomplete disclosure of expert summaries because it had acted in good faith and the defense had suffered no prejudice, as the then non-capital trial was still 50 days away. *Id*., at 5, 16-17. The *Motion* makes no attempt to demonstrate prejudice and indeed cannot do so, or cite any case that would permit such a drastic sanction, when the Zoline notice has been provided approximately three and one-half months before commencement of *voir dire* and almost five months before the anticipated beginning of the penalty phase. For a more extended discussion of the prejudice requirement, see pages 14-19 of the cited pleading. As the government wrote: "Any remedy that excludes otherwise relevant and competent evidence thwarts a jury's truth-seeking function and should be a remedy of last resort." Dkt 36, at 15.

[7] Rule 16(b)(1)(C) requires Mr. Christensen to provide a written summary of expected expert testimony which describes the witness's opinion(s), the bases and reasons for the opinion(s), and the witness's qualifications. As part of its scatter-gun approach, and without discussion or explanation, the *Motion*, at 3, claims that the defense has not provided a summary of Dr. Zoline's opinion, despite having itself set out verbatim the lengthy summary on the preceding page of the *Motion*. The summary clearly sets out Dr. Zoline's opinion (that the treatment of Mr. Christensen by the University of Illinois Counseling Center

III. **Dr. Zoline's Testimony is Admissible Mitigating Evidence and Its Exclusion Would Violate Both the Eighth Amendment and the Federal Death Penalty Act.**

The government raises three substantive arguments in support of its request that the Court exclude Dr. Zoline as a witness.[8]

A. **Whether Illinois Law Provides a Cause of Action Against UICC is Irrelevant**

The government first argues that Dr. Zoline's testimony should be excluded because it amounts to a negligence claim against the University of Illinois and Illinois law does not provide for "a cause of action against health care providers." *Motion*, at 3-4. This argument is nonsensical at best, a sophism, at worst, and requires little response. It is obvious that this is not a civil lawsuit, and the government does not deign to explain why Illinois' state law concerning the liability of health care providers (whatever that law may actually be) is of any import in the context of a federal capital case. Certainly, it cites no authority that would fill in such a logical gap.

---

did not comply with the applicable standards of care in several clearly delineated area); the basis of her opinion (her background as a Licensed Clinical Psychologist and Professor of Psychology through which she is familiar with the standards of care in the mental health professions); and finally, her qualifications (in the form of her lengthy curriculum vitae). It is difficult to understand why this summary does not provide the notice required by Rule 16(b)(1)(C) and the *Motion* provides no help in this regard. As the government has written, it is hard to imagine what more notice was required "short of providing . . . [the] direct examination questions." *See Response to Defendant's Motion for a Bill of Particulars*, Dkt. 128, at 8.

[8] The government does not argue for the exclusion of evidence concerning Mr. Christensen's visits to the UICC, as indeed it cannot. That he voluntarily sought out treatment for his homicidal and suicidal ideation and addiction is highly relevant to a host of issues in a capital trial, including his character, the circumstances preceding the offense, his rehabilitative potential and future dangerousness.

**B.     Dr. Zoline's Evidence is Proper Evidence in a Capital Trial**

The government's next argument is that the proffered testimony of Dr. Zoline is not proper mitigation. *Motion*, at 5-7.

(1)     Dr. Zoline's Evidence is Admissible Both as Mitigation and to Rebut the Allegation of Future Dangerousness

The almost unlimited scope of a capital defendant's right to present evidence that a juror may find to be a reason for sparing his life is well-established. *Lockett v. Ohio,* 438 U.S. 586, 604 (1978) ("the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (no requirement that mitigation be linked to the crime and exclusion of post-crime, pretrial in-custody good behavior "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment").

The scope of mitigating evidence permitted by the Federal Death Penalty Act is even more expansive, as 18 U.S.C. § 3592(a)(8) provides that "factors in the defendant's background, record, or character or *any other circumstance of the offense* that mitigate against imposition of the death sentence" may be admitted for the jury's consideration. (emphasis added). *See United States v. Caro*, 433 F. Supp. 2d 726, 727-28, *aff'd in part and rev'd in part on other grounds*, 461 F. Supp. 2d 459 (W.D. Va. 2006) (holding § 3592

9

requires admission of *any mitigating factor* and rejecting government's argument to exclude evidence of "the effect that the defendant's execution would have on his family and loved ones"); *United States v. Bodkins*, 2005 WL 1118158, *8 (W.D. Va. May 11, 2005) (FDPA "goes somewhat further" than the constitutional mandate of *Lockett*); *United States v. Davis*, 132 F. Supp. 2d 455, 464 (E.D.La. 2001) (holding that the scope of permissible mitigation, as defined in § 3592(a)(8) of the FDPA, is "substantially broader than what the Supreme Court has declared to be the minimal requirements under the Constitution," and is not circumscribed by the introductory "background, record, or character" language); *United States v. Bin Laden*, 156 F. Supp. 2d 359, 369-370 (S.D.N.Y. 2001)(same).

Regardless of whether the right is grounded in the Eighth Amendment or the FDPA, "sentencing juries must be able to give meaningful consideration and effect to *all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual*, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 248 (2007) (emphasis added). "Relevant mitigating evidence is evidence which tends logically to prove or disprove *some fact or circumstance which a fact-finder could reasonably deem to have mitigating value*." *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990) (citation omitted) (emphasis added). "Thus, a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.'" *Tennard v. Dretke*, 542 U.S. 274, 285 (2004), *quoting McKoy*, *id.*, at 441; *see also Payne v. Tennessee*,

10

*supra*; *Eddings v. Oklahoma*, 455 U.S. 104 (1982). This broad view of mitigation is required by "the fundamental respect for humanity underlying the Eighth Amendment." *Sumner v. Shuman*, 483 U.S. 66, 85 (1987) (requiring "that the defendant be able to present any relevant mitigating evidence that could justify a lesser sentence").

While it cherry-picks dicta from cases reciting the obvious proposition that the defendant's right to introduce what he believes the be mitigating evidence is not completely unbounded, *Motion*, at 6,[9] the government doesn't quarrel with the general principles cited above and, more important, cites no case that would justify exclusion of Dr. Zoline's testimony in a capital case.

The defense has not finally settled on the mitigating factors it will submit for the jury's consideration, but some version of the following will likely relate to, and be grounded in, Dr. Zoline's testimony.

> After he sought professional help for his homicidal and suicidal ideations in March 2016, the University of Illinois Counseling Center failed to provide appropriate services to Mr. Christensen.

> After he sought professional help for his homicidal and suicidal ideations in March 2016, the University of Illinois Counseling Center failed to provide appropriate mental health services to Brendt Christensen, including referring him to mental health professionals at the Clinic.

> After he sought professional help for his homicidal and suicidal ideations in March 2016, the University of Illinois Counseling Center failed to seek his

---

[9] For instance, no one would contend that a reasonable juror would find mitigation based on the position of the moon and the planets at the time of the offense, an example of the limits of mitigation referenced in *United States v. Gabrion*, 719 F.3d 511, 522 (6th Cir. 2013) (*en banc*), cited in the *Motion*, at 5, or based on "personal hygiene," the example referenced in *Rhoades v. Davis*, 914 F.3d 357, 366 (5th Cir. 2019), cited at 6.

11

consent to notify and adequate coordinate with psychiatrists at McKinley Health Center who were treating Mr. Christensen.

After he sought professional help for his homicidal and suicidal ideations in March 2016, the University of Illinois Counseling Center failed to obtain medical records that would have assisted in evaluating and treating Mr. Christensen.

After he sought professional help for his homicidal and suicidal ideations in March 2016, the University of Illinois Counseling Center failed to develop and adequate treatment and safety plan to address the homicidal and suicidal ideations expressed by Mr. Christensen, including conduct an adequate follow-up with Mr. Christensen.

Consideration of the importance of the defense's right to present and argue such mitigation starts not only with the principles of mitigation just discussed, but also with first principles of the deliberative process in a capital case. 18 U.S.C. § 3593(d) provides that a mitigating factor need be found by only a *single* juror, who may then consider the factor for purposes of his/her own individual weighing decision, a result dictated by the Eighth Amendment. *See Mills v. Maryland*, 486 U.S. 367 (1988). The exclusion of evidence with the potential of satisfying a single juror that it should be included in the weighing decision violates both the Constitution and the FDPA.

Thus, the ultimate question of admissibility is whether a reasonable juror could find that the particular evidence is, in his/her mind, a reason to spare the defendant's life. If so, the evidence must be admitted. *See Abdul-Kabir v. Quarterma*, *supra*; *McCoy v. North Carolina*, *supra*. To pose the question is to answer it, as certainly a reasonable juror may conclude that he/she should give life consideration to the fact that the UICC did not bother to contact or notify Mr. Christensen's treating psychiatrist at the

University's McKinley Health Center when he came in and confessed his deepening depression and homicidal thoughts in the Spring of 2017. A juror who believes that the UICC's failure to develop an adequate treatment plan or conduct an adequate follow-up, especially in light of the known lack of protective factors, is certainly not thinking irrationally or unreasonably. And, while there is no requirement that there be a showing that the death of Ms. Zhang would not occurred if the UICC had acted in accordance with professional standards, a juror would be entitled to so conclude, even if there was a low probability, and accordingly give whatever weight the juror thinks the evidence should be accorded in their individual weighing decision.

The government seemingly argues that Dr. Zoline's evidence does not bear on the defendant's character, prior record, or circumstances of the offense. *Motion*, at 6. But, the evidence clearly bears on, at a minimum, the circumstances of the offense. The government's theory is that Mr. Christensen became enamored with serial killers and premeditated the kidnapping and murder of Ms. Zhang. The evidence of what took place in March at the UICC directly relates to the charged offense – imore so than Mr. Christensen's use of his cell phone to research serial killers during the same time frame, which the government claims is directly related to the offense. *See Response to Defendant's Sealed Omnibus Motions in Limine to Exclude Evidence at Trial*, Dkt 281, at 15. .

Further, two rules of evidence are important here. First, Fed. R. Evid. 401 provides that evidence is relevant if it has any tendency to make a fact of consequence "more or less probable than it would be without the evidence." The decision as to

13

whether Mr. Christensen should live or die is certainly better informed by Dr. Zoline's testimony than it would be without it, regardless of the weight the jury ultimately accords the evidence. Second, the helpfulness standard of Fed. R. Evid. 702 provides a special rule of relevancy pertaining to expert testimony, providing that it need only "help the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591 ("helpfulness" standard is essentially a question of relevance); *United States v. Young,* 316 F.3d 649, 656-59 (7th Cir. 2002) (expert testimony concerning common reactions of abuse victims helpful because "beyond the realm of acquired knowledge normally possessed by lay jurors"); *United States v. Mansoori,* 304 F. 3d 635, 653-54 (7th Cir. 2002) (expert testimony on history, structure and narcotics operations of street gangs helpful because "[T]he average juror is unlikely to be familiar with the operations of narcotics traffickers or of street gangs."). *Daubert* abandoned the older and more rigid *Frye* [citation omitted] test for admissibility of expert evidence because it was "at odds with the 'liberal thrust' of the Federal Rules of Evidence" and their "'general approach of relaxing the traditional barriers to 'opinion' testimony,'" 509 U.S. at 589, *quoting Beech Aircraft Corp. v. Rainey,* 488 U.S. at 169.

Here, the average juror is "unlikely to be familiar with" a mental health provider's responsibilities when confronted with an individual with Mr. Christensen's presentation, including the need to contact the individual's treating psychiatrist, obtain the relevant records, make the appropriate referrals and conduct the necessary follow-

up with the patient. Nor would an average juror be familiar with the factors which

indicated how vulnerable Mr. Christensen actually was at that point in light of his

suicidal thoughts, his situation with his wife, lack of friends, dysfunctional family and

lack of meaningful family relationships. Dr. Zoline's testimony would help the jury

evaluate the significance of what took place at the UICC only a few weeks before the

death of Ms. Zhang and give it whatever weight each juror believes it deserves in their

decision as to whether to spare Mr. Christensen's life.

Further, with the government having elected to inject the issue, Dr. Zoline's

testimony is relevant and helpful as to whether Mr. Christensen will present a danger

if sentenced to spend the rest of his life in prison. A juror could easily reason that the

problems presented by the failures of the UICC to provide adequate services, referrals

and follow-up will not be repeated in a prison setting where services are presumably

available and Mr. Christensen will be monitored on a daily basis. And, again, the

exclusion of Dr. Zoline's testimony in this regard, is fundamentally inconsistent with

the very structure of the FDPA, which requires that the aggravating factor of future

danger must be found *unanimously* before it can even be considered in the ultimate

weighing process. Thus, if the testimony of Dr. Zoline's leads even *one* juror to

conclude that the deficiencies in the UICC's response to Mr. Christensen in March

2017, will likely not be presented when he is incarcerated in a prison for life and this, in

turn, leads to the juror's conclusion that he does not present a future danger, then *no*

juror can consider the aggravating factor of future danger in their individual weighing decision, and the Court will have to so instruct.

(2)     The Government's Fault Argument

The *Motion* sets up a straw man "fault" argument that the defense does not make. *Id*. 6-7.  The point is that the UICC's failure to adequately respond to Mr. Christensen's reaching out for help is a mitigating factor relevant to the offense, which the jury is free to accept or reject. The defense is not arguing that "blame" lies "at the feet" of the UICC and the evidence is not offered on the issue of guilt or innocence. More troubling, the *Motion*'s claim that courts "routinely" refuse to allow evidence of the contributory action of another as relevant mitigation is not only unsupported by the *Motion*'s citations,[10] it is incorrect. *Id*. 6. The truth is that courts "routinely" do admit evidence concerning the contributory actions of others. Such mitigation factors

---

[10]     *Buchanan v. Angelone*, 522 U.S. 269 (1998), *Motion*, at 6, has nothing to do with issue here. In fact, in holding that a state trial court had not violated the Eighth Amendment when it failed to provide the jury with guidance in its instructions as to what constitutes mitigating evidence, the Court repeatedly emphasized that "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Id*. 276-77.

     *Chambers v. Quarterman*, 191 F. App'x 290, 297 (5th Cir. 2006), *Motion*, at 6, involved federal habeas review of a state court ruling precluding the defendant from introducing an accomplice's criminal record in mitigation where it had no relationship to the offense. The case held that the claim was procedurally defaulted and, in any event, the state court ruling was not an unreasonable application of federal law where the trial judge had permitted the defense to introduce evidence that the accomplice received two life sentences for the crime for which the defendant was being tried.

     *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), *Motion*, at 6, merely held that it was not an abuse of discretion to exclude evidence that the defendant's wife had at some unknown time in the past mixed some rat poison with his drugs (to dissuade his consumption of drugs) where the evidence was equivocal whether this was done within the time frame of the murder and as to the effect of the rat poison when mixed with drugs in this manner.

     None of these cases remotely stand for the proposition on page 6 of the *Motion* that courts "routinely" refuse to introduce mitigating evidence concerning the fault of others.

are a staple of verdict sheets in capital cases and often endorsed by jurors as a

mitigating factor.[11] *See e.g:*

> Akubar Beyle, at 4 (Mitigating Factor # 10 – "According to his teacher, Abukar Osman Beyle was a respectful, dedicated student who only stopped his education *when the government collapsed and the schools were closed*") (4);

> Alexis Candelario-Santana, at 11 (Mitigating Factor # 13 [Write-in finding] - "*The system failed Mr. Candelario Santana* after his previous convictions in 2003 by, not applying appropriate punishment, not adequately monitoring his incarceration, applying rehabilitation programs "just to get it out-of-the-way.) (6);

> Billie Allen, at 14 (Mitigating Factor # 25 (write-in) - "*Several government sponsored support systems, including education and probation, failed to intervene* in Billie's downward spiraling path") (5);

> John Bass, at 9 (Write-in Mitigating Factor - "*John Bass' conduct was caused in part, by an inadequate social service system [i.e., child protective services]*,") (9);

> LaShaun Casey, at 7 (Mitigating Factor # 13 ("*The school system* in New York recognized that Lashaun needed additional assistance but *did not provide all that was needed*") (1);

> Leonel Cazaco, at 16 (Mitigating Factor # 10 - defendant was "deprived of financial support by his mother and *abandoned by child protective agencies in his early teen years*") (11);

> Jesse Con-Ui, at 13 (Mitigating Factor ## 11-12 - defendant"*not offered any services when he left the juvenile system.*"; "*Arizona Juvenile Justice system did nothing to assist Jessie Con-Ui with his problems.*") (12,12 respectively);

> Dennis Cyrus, at 13 (Mitigating Factor # 16 - "*The failure of the defendant's peers, associates, and family to intervene*, and to provide help and guidance

---

[11]Verdict sheets from approximately 224 completed federal capital trials from 1991-2018 are available at https://www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=803&folder_id=5633.
The verdict sheets are in alphabetical order by last name of the defendant and each of the verdict forms cited below may be found at that location. The citation form used below is defendant's name, page number of verdict form where the cited mitigating factor is listed, the mitigating factor number on the verdict sheet, the language of the mitigating factor and the number of jurors who ultimately endorsed the mitigating factor in parenthesis. The language in italics refers the fault of others).

after the Marcus Atkinson shooting, and that this tends to indicate that he should not be sentenced to death") (7);

Anh The Duong, at 9 (Write-in Mitigating Factor # 2 - "*Early intervention by law enforcement could have prevented later crimes.* (8);

Ricky Fackrell, at 12 (Mitigating Factor # 95 - "*In violation of BOP practice regarding Ronald Griffith's security status as a sex offender, correctional officers placed Ronald Griffith in a recreation cage* with Ricky Fackrell and Erik Rekonen knowing that Ricky Fackrell and Erik Rekonen might assault Ronald Griffith because of his sex offender status")(6);

Edgar Garcia, at 10 (Mitigating Factors ## 72-76, 78 - "*The BOP Beaumont facility employees habitually failed to follow proper policies;*" "*employees failed to properly shackle* Edgar Baltazar Garcia."; "The BOP Beaumont facility employees *failed to properly escort* Edgar Baltazar Garcia."; "The BOP Beaumont facility *failed to keep Edgar Baltazar Garcia separate from the other inmates*."; "*The failure of the BOP Beaumont facility employees to follow proper policies* contributed to the occurrence of the offense."; "The offense would not have occurred if the BOP Beaumont facility had followed proper policies.". (3,7,10,4,5,2, respectively);

Ulysses Jones, Jr., at 16 (Write-in Mitigating Factor - "*BOP lack of consideration* for his previous crimes for housing placements") (6 jurors);

John McCluskey, at 5-6 (Mitigating Factor ## 136-139 - "*The failure of the Arizona Department of Corrections to properly supervise its private contracto*r, MTC, contributed to the occurrence of the offenses"; "The *failure of MTC to follow proper security policy* contributed to the occurrence of the offenses."; "*The offenses would not have occurred had the Arizona Department of Corrections properly supervised its private contractor*, MTC."; "The offenses *would not have occurred had MTC followed proper security policy*.") (All marked "Yes" – number of jurors not given on verdict sheet);

Steven Northington, at 11,12, 14 (Mitigating Factor ## 23,33 - "*The Philadelphia School System failed to identify* Steven Northington as candidate for remedial or special education when he was in elementary school."; "*While in state prison, Mr. Northington's mental health issues and brain damage were not adequately addressed*."; and Write-in Findings - "*The Philadelphia School District failed to identify Steve as a candidate for intervention at an early*

18

*age*."; "*Social Services failed to follow up* on Annette Northington's parental negligence") (8,12,12,12);

Rudy Sablan, at 6 (Mitigating Factor # 11 - "The circumstances that led to Joey Estrella's death existed, at least in part, *because of failure(s) by BOP officials to properly do their job(s)*, by allowing alcohol and weapons in the cell; and Write-in Findings - "The *BOP didn't do their job*, by faulty logic of putting William and Rudy in the same cell."; "Joey died *because the guards failed to do 30 minute rounds*." (2,8,7, respectively);

Brian Richardson, at 10 (Mitigating Factor ## 23-24 - "The circumstances that led to Steven Obara's death existed, at least in part, *because BOP officials put Brian Richardson and Mr. Obara in the same cell when they should not have been housed together*."; "This *crime never would have happened if the BOP had* paid proper attention to the cell assignments of Brian Richardson and Mr. Obara or if Brian Richardson had been properly medicated prior to the offense.") (1 juror);

Ahmed Salad, at 4 (Mitigating Factor # 15 - "When Ahmed Muse Salad was approximately five years old, the Dictator of Somalia, General Mohammed Siad Barre, was overthrown in a military coup, beginning a period of political chaos, and, thus, *from the time Ahmed Muse Salad was approximately five years old until he departed Somalia, there was no stable central Somali government*")(8);

And, of course, these cites do not even reflect the frequent evidence of mitigation concerning neglect of parents and others, which also implicates contributory fault. Finally, although the statutory mitigating factors listed in 18 U.S.C. § 3592(a) are limited and the myriad of potentially relevant non-statutory factors are "potentially infinite," *Ayers v. Belmonte*, 549 U.S. 7, 21 (2006), with "virtually no limits," *Payne v. Tennessee*, 521 U.S. 808, 822 (1991), the idea that the negative contributory actions of others may be mitigating evidence is baked into

the statute. *See* § 3592(a)(3) (offense primarily the fault of another – defendant's

participation minor); (a)(7) (victim consented to the offense).

In short, the government offers almost no support for its bald assertion that

evidence concerning the fault of others is not mitigating. The reality is quite the

opposite.

### C. There is no Risk that Dr. Zoline's Testimony Would Confuse the Jury

In a last-ditch effort to exclude Dr. Zoline, the government claims that admission

of Dr. Zoline's testimony would "confuse" the jury, although no attempt is made to

explain why this relatively straightforward evidence would be so difficult to

understand or process. *Motion*, at 8. This argument receives abbreviated treatment in

the *Motion*, and is basically a replay of the initial mischaracterized argument. As noted

above, the evidence is not being admitted for the jury to determine the UICC's "civil

duty under Illinois law." *See Motion*, at 8. Moreover, Dr. Zoline's testimony is

uncomplicated and will not result in any long-drawn out "battle of the experts." In an

effort to convince the Court that this evidence will be overly-time consuming, the

government offers an "in terrorem" argument and claims it will have "no choice" but

to hire its own expert. Of course, if the government can find an expert who will

contradict Dr. Zoline's testimony as to the deficiencies of the UICC response (unlikely),

it is free to do so.

Despite the government's best efforts at obfuscation, the fact remains that the

evidence is not for the purpose of establishing liability but for the jury's consideration

20

on the issue of mitigation and to rebut future dangerousness. Dr. Zoline's evidence is

no more confusing (even less so) than evidence concerning the failures of school

systems, prison officials, juvenile agencies, child protective services etc., referenced in

the above cases.

At various points the *Motion* argues that Mr. Christensen's homicidal intentions

were not directed to a "specific and identified victim," *id*. 4, did not create "a legal duty

by the University to protect Ying Ying Zhang," *id.*, and were "vague." *Id.* 7. Reading

these assertions, one would think they were written by attorneys for the University, as

they appear to be directed to the idea that the UICC had no duty to warn others. But,

nowhere does Dr. Zoline's noticed testimony suggest a duty to warn the public. The

issue is not whether the UICC had a duty to warn others – it is about the interaction

with Mr. Christensen. Noteworthy is that the *Motion* raises *no issue with the thrust of Dr.*

*Zoline's testimony concerning the steps that the UICC should have taken with respect to Mr.*

*Christensen.*

Finally, the only case cited by the government in its short discussion of the so-

called "confusion" issue, *United States v. Fell*, 360 F.3d 135 (2d Cir. 2004), *Motion*, at 8,

does not help its argument at all. The issue in *Fell* involved an interlocutory appeal

after the trial judge had declared the FDPA unconstitutional because the statutory

scheme permits evidence beyond that otherwise licensed by the Federal Rules of

Evidence, and thus allegedly violates the Fifth and Sixth Amendments. *Id.* 138. In

reversing, the Second Circuit noted: "What the district court failed to acknowledge,

however, is that the Supreme Court has made clear that in order to achieve such 'heightened reliability,' *more* evidence, not less, should be admitted on the presence or absence of aggravating or mitigating factors." *Id*. 145.

While the broad parameters of mitigating evidence in capital cases do not discharge the Court's role as an evidentiary gatekeeper, they do limit it. At the end of the day, rather than presenting whatever arguments it wishes to make to the jury that Dr. Zoline's testimony is not mitigating evidence (and does not rebut its claim of future dangerousness), the government is essentially asking the Court to direct a finding on these issues. The defense respectfully submits that neither the Constitution nor the FDPA permits this.

WHEREFORE, Defendant requests that the government's Motion to Bar Dr. Zoline's Testimony be denied.

Respectfully submitted,

/s/ Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:    309-671-7898
Email: George_Taseff@fd.org

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org