UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

**RESPONSE TO UNITED STATES' MOTION *IN LIMINE* TO PRECLUDE EXECUTION IMPACT EVIDENCE OR ARGUMENT**

The defendant submits this response to the *United States' Motion In Limine to Preclude the Testimony of Dr. Jonathan Sorensen* (*Motion*). Dkt. 265.

**I.    The Government is Not Prejudiced by the Timing of the Notice Approximately Five Months Before the Penalty Phase**

The government begins by mischaracterizing a statement made at the hearing on October 11, 2018, by defense counsel, as suggesting that the defense would not be presenting any expert testimony concerning the issue of future dangerousness. *Motion*, at 3. The individual referenced in that statement is a Ph.D. psychologist, who has testified in numerous federal capital cases concerning various issues related to the death penalty, including intellectual disability, risk factors for violence identified by the Department of Justice and available housing options of the Bureau of Procedures for violent inmates, in addition to mental health and future dangerousness issues. The statement attributed to defense counsel was made in the context of potential mental

1

health issues and the defense's need for adequate time to investigate and present a mental health defense and was unrelated to any discussion of future danger.

As both the government and the defense have previously acknowledged, the investigation and preparation of this case for trial is ongoing. As such, the defense first contacted Dr. Sorensen in early February and gave notice to the government of his expected testimony shortly thereafter, and well before final preparation of his expected testimony, which has not, as yet, been completed. The notice provided to the government on February 20th complied with the requirements of F. R. Crim. P. 16(b)(1)(D):

> Dr. Sorensen will testify consistent with the studies that he co-authored and which are referenced in *Defendant's Motion to Strike Aggravating Factor Alleging Future Dangerousness*, Dkt. 22, and other relevant studies, including correlation of allegations of future dangerousness by the prosecution and others with the available data; studies of the ability to accurately predict future dangerousness; the low base rates of of violence in prison and various erroneous factors that influence such decisions. Assuming you have access to these articles and are familiar with the nature of this evidence, we have not enclosed the articles of Dr. Sorensen referenced in the cited motion, but are happy to do so if requested.

The notice specifically referenced the studies that Dr. Sorensen's testimony will address with the defense offering to provide copies to the government upon request, which has not been received. The reason the government has not requested the information is clear from the detailed discussion in the *Motion*, which effectively acknowledges that the government is very much aware of the expected testimony of Dr. Sorensen, as this kind of evidence is often presented in federal death penalty cases. The

"bases and reasons" for Dr. Sorensen's testimony are exhaustively documented in the peer-reviewed articles cited in the referenced pleading, all of which are published in respectable journals in the field. At this point, it is contemplated that when finally prepared, Dr. Sorensen's testimony will be accompanied by a Power Point presentation, summarizing in bullet form the basics of his testimony.[1] Although the government has repeatedly objected to any request by the defense which, in its review, would require it to reveal its "trial strategy" or "preview its case," *see Response to Defendant's Motion for an Order Requiring the United States to Comply with Rule 12(4)(B)*, at 5, 11; *Response to Defendant's Motion for a Bill of Particulars*, Dkt. 128, at 7 (defendant has "no right . . . to force the government to reveal the details of how it plans to prove its case."), defense counsel plan to provide the government with the Power Point slides which Dr. Sorensen will use once they are essentially finalized.[2]

The government concedes that the testimony of Dr. Sorensen is "frequently" presented in capital trials and goes on to describe his expected testimony. *Motion*, at 4. While the description is not entirely accurate as to what will be presented here, *infra*, the *Motion* confirms that the government is quite familiar with this type of evidence in

---

[1] The government's familiarity with and lack of surprise as to the expected testimony is further evidenced by the *Motion*'s description of Dr. Sorensen's mode of presentation through a slide show. *Id*. at 4.

[2] The "essentially" qualification here will be an agreement by the government that the material cannot be used to impeach Dr. Sorensen until in its final form. This is consistent with what has been the government's position concerning production of its transcript of the tape recording of the events of June 29, 2017. Despite repeated requests, the government has repeatedly delayed producing the transcript, claiming, in part, that it was not yet in final form. In a meeting this week, government counsel agreed to produce the transcript in its current form subject to the defense's agreement that it would not attempt to use the draft transcript in the event the final product changed.

capital trials and, accordingly, can claim neither surprise, nor prejudice, especially where the notice was provided almost five months before this testimony will be presented in July. Moreover, a "Rule 16 violation prejudices a defendant only when he is unfairly surprised by the evidence and cannot adequately prepare his defense or when the violation has a substantial influence on the jury." *United States v. Smith*, 502 F.3d 680, 689 (7th Cir. 2007). The government cited *Smith* in its *Response to Defendant's Motion to Bar Expert Testimony*, Dkt. 36, at 16, arguing defense had suffered no prejudice by its then late and incomplete disclosure of expert summaries because it had acted in good faith and the defense had suffered no prejudice because the then non-capital trial was still 50 days away. *Id.*, at 5, 16-17.

II.  **The Testimony of Dr. Sorensen is Admissible both to Rebut the Aggravating Factor of Future Dangerousness and in Support of the Mitigating Factor that Mr. Christensen Will Not Present a Risk if Sentenced to Life Without Release.**

**A. The Sorensen Testimony**

While not finalized, it is expected that Dr. Sorensen will broadly testify to the following:

> a. The data provided by the Bureau of Prisons corroborates that the *base rate* of violence in federal prisons in extremely low. This conclusion is consistent with numerous studies conducted by Dr. Sorensen over the years.[3]
>
> b. Capital defendants sentenced to life without release (LWOR) commit violent assaults at no greater rate than other prisoners in United States penitentiaries.
>
> c. There is generally no correlation between the nature of the street crime and the likelihood that an inmate sentenced to LWOR will commit a serious assault.

---

[3] This is an important point, as many jurors likely have a misconception about the pervasiveness of violence in prisons, gathered from television shows etc. Dr. Sorensen will attribute this low rate, especially in the federal Bureau of Prisons (BOP), in part, to the variety of security measures available to control recalcitrant inmates. *See* n. 9, *infra*.

4

>d. There is a correlation between violent prison assaults and education with more educated defendants less likely to commit such assaults.

>e. There is a correlation between gang affiliation and the prevalence of violence in prison, as well as other factors such as age, lack of violent arrest history and prior behavior in prison.

>f. The data shows that prisoners convicted of violent attacks on women are more likely to be victims, rather than perpetrators, of violent assaults in prisons.

Dr. Sorensen will base this testimony on numerous studies he has personally conducted of violence in prison as reflected in the published peer-reviewed articles which have been made available to the government and are recited in his CV; his knowledge of the literature in the field; and recent data produced by the Bureau of Prisons in response to court orders in other cases. *See generally* Fed. R. Evid. 702 (witness may be qualified as an expert by "knowledge, skill, experience, training, or education") and 703 (expert "may base an opinion on facts or data that the expert has been made aware of or personally observed."). The data forming the basis of Dr. Sorensen's testimony concerning violent assaults in the Bureau of Prisons was produced pursuant to the court's order in *United States v. Jesse Con-Ui*, 13-CT-00123 (ARC) (M.D. Pa.). The government is, of course, well aware of this data, having been a party to the litigation in *Con-Ui*, as well as prior cases where similar data was required to be produced.[4] In fact,

---

[4] The *Con-Ui* data was basically the same as that that initially required to be produced in *United States v. Sampson*, Criminal 1:01-CT-10384 (D. Mass.). The initial production in *Sampson* was accompanied by a blanket protective order that prohibited its use in any other case, necessitating re-litigation and a renewed production order in *Con-Ui*. To avoid having to repetitively re-litigate the production issues in future cases, the government apparently agreed to a more relaxed protective order in *Con-Ui*, which only precludes the identification of BOP inmates by name and the dissemination of inmate disciplinary histories and confidential information about individual inmates. The *Con-Ui* production and protective orders are attached hereto as Exhibits A and B.

as referenced above, and as acknowledged in the government's *Motion*, there is nothing surprising about this evidence, as it is frequently presented in capital trials.[5]

The government makes no serious attempt to argue that Dr. Sorensen is not qualified to testify as an expert or that his methodology fails to meet acceptable scientific standards. The *Motion* does not request a *Daubert* hearing[6] and is content with merely observing in a footnote that Dr. Sorensen is not a psychologist, without any explanation why a witness offering the noticed testimony would need to be a mental health professional. *See Motion*, at 3, n. 3. Nothing in the noticed testimony suggests that Dr. Sorensen is going to testify about "the defendant's psychological state or adaption to prison life," and the defense does not intend to offer such testimony through Dr. Sorensen.[7]

### B. Dr. Sorensen's Testimony is Relevant to Rebut the Government's Allegation of Future Dangerousness

Having elected to inject a highly speculative and unreliable allegation as a non-statutory aggravating factor, *see generally Motion to Strike Aggravating Factor Alleging*

---

[5] For a listing of scores of federal capital trials where testimony similar to that about which the government complains has been admitted, *see* https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/public/project_declarations/future_dangerousness/individualized_violence_risk_assessment_and_custody_and_classification_9-25-14.pdf (Declaration of Kevin McNally, then-Director of Federal Death Penalty Resource Counsel Project, at n. 5-6).

[6] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (expert testimony must be based on scientific and reliable methodology).

[7] While similar testimony based on a psychological profile of a defendant has been presented, at times, through a psychologist, who is familiar with, or in the case of Dr. Sorensen, has co-authored some of the relevant studies, Dr. Sorensen has not seen Mr. Christensen and is not qualified to offer psychological opinions. The government makes no effort to explain why a Ph.D. criminologist with Mr. Sorensen's educational, academic and professional qualifications would not be qualified to give the evidence noticed here.

*Future Dangerousness*, Dkt. 122, if the Court ultimately permits future danger evidence, the government can hardly be heard to complain about evidence rebutting the incomplete and misleading impression it wishes to leave with the jury. Fed R. Evid 702 merely requires that the expert's testimony "help the trier of fact to understand the evidence or to determine a fact in issue." *See also Daubert*, *supra*, 509 U.S. at 591 ("helpfulness" standard is essentially a question of relevance – "will [the expert'a evidence] aid the jury in resolving a factual dispute"[citation omitted]); *United States v. Young*, 316 F.3d 649, 656-59 (7th Cir. 2002) (expert testimony concerning common reactions of abuse victims helpful because "beyond the realm of acquired knowledge normally possessed by lay jurors"); *United States v. Mansoori*, 304 F. 3d 635, 653-54 (7th Cir. 2002) (expert testimony on history, structure and narcotics operations of street gangs helpful because "[T]he average juror is unlikely to be familiar with the operations of narcotics traffickers or of street gangs."].

The proliferation of crime shows and series in the media leave the misleading impression that prisons are hotbeds of rampant and unremitting violence.[8] Evidence that the actual base rate of violence in federal prisons is quite low,[9] inmates sentenced to

---

[8] E.g. *see* https://www.hbo.com/oz, HBO's description of *Oz*, a series that last six seasons and followed the travails of Tobias Beecher, a former lawyer who is convicted of vehicular homicide and ends up in a maximum-security prison. ("At Oswald Maximum Security Penitentiary, inmates are considered lucky if they get into the prison's "Emerald City Unit. They're even luckier if they get out alive.").

[9] For example, a 2008 study by Dr. Sorensen and others revealed that the overall rate of significant prison violence in USP's, specifically by federal capital offenders, is vanishingly small: over a 14-year period, just 0.7% for assaults with moderate injuries — an annualized rate of 1.1 such incidents per 1000 inmates — and no fatalities or assaults with major injuries. Cunningham, M.D., Reidy, T.J. and Sorensen, J.R., *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46, 55-57 & Table 3 (2008). Dr. Sorensen's testimony here will show that similar results

longer terms such as LWOR are no more likely to be violent (and even less so) than others and that there is no correlation between the nature of the crime for which the inmate has been sentenced and violent assaults in prison is knowledge not possessed by the normal juror. Similarly, the average juror will have no knowledge concerning the relationship between age, education and continuing relationships with family and community to the likelihood of future violence. And while lay jurors may have a general idea that a defendant's lack of prior violent history or lack of a criminal record is a relevant consideration as to whether a defendant is likely to commit future violent acts in prison, because the government is attempting to argue otherwise, the defense must be allowed to present evidence showing that is, indeed, the case. Further, the average juror is likely to be misinformed as to various factors that in the public imagination are assumed to be predictive of future violence in prison, when, in fact, the available evidence shows those assumptions are wrong.

The government's argument essentially boils down to an assertion that, irrespective of the actuarial data, various factors in this case suggest that Mr. Christensen nonetheless presents a future danger. As pointed out in the defense's motion to bar future danger evidence, study after study has shown the fallacy of such predictions. *See* Dkt. 122. But, if the Court permits the government to pursue the future

---

attain with the more recent data obtained from the BOP, as described in n. 4, *supra.* Yet jurors who find future-dangerousness often believe the likelihood to be dramatically higher. See, e.g., Cunningham, *et al.*, *Life and Death in the Lone-Star State: Three Decades of Violence Predictions by Capital Juries*, 29 Behav. Sci. Law 1, 2 (Jan.-Feb. 2011) (post-trial interviews of Texas capital jurors showed they "estimated a 50 percent probability that the defendant would kill again in the future if not given the death penalty").

danger aggravator, the government's "but this case is different" approach can be pursued through cross-examination and argument, as well as presenting evidence which it believes contradicts Dr. Sorensen. And, of course, the Court will instruct the jury that it can attach whatever weight it deems appropriate to the evidence or disregard it in its entirety if it so chooses. *See Manssori*, 304 F. 3d at 653 (in discounting any possible prejudicial effect of expert evidence, the Court notes that the district court instructed the jury it "was not obliged to accept the opinion testimony of experts.").

Of course, if evidence is overly prejudicial, an instruction does not necessarily cure the problem, but the government makes no effort to allege prejudice. Instead, in a strained effort at the end, *Motion,* at 10-11, the government puts forth an *in terrorem* argument that it would "have no choice" but to retain its own expert evidence to counter Professor Sorensen's "base rate" evidence and this would result into a "time-consuming battle of the experts." The government can retain whoever it chooses if it elects to challenge the methodology or substantive testimony of Dr. Sorensen, but this "threat" is simply nonsense and designed to lead the Court into excluding the evidence on a non-existent and constitutionally-suspect theory of expediency. In reality, the base rate and other evidence which Dr. Sorensen will provide is basically uncontested and the government rarely embarks on a quixotic and ultimately pointless challenge to the statistical and demographic evidence which has been noticed and which it cannot successfully discredit. The government will, of course, try to show that serious acts of violence are, at times, committed in prisons, a fact that the defense will not likely challenge. In the final analysis, the government's approach ignores two basic

propositions: (1) expert evidence does not have to be conclusive to be admissible - it merely has to be helpful; and (2) the weight to be given to that evidence is a question for the jury.

Further, the Fifth, Sixth and Eighth Amendments, as well as the Federal Death Penalty Act (FDPA), require that Mr. Christensen be given a full and fair opportunity to rebut the future danger aggravating factor, which the government has elected to put into issue. The Due Process Clause requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Gardner v. Florida*, 430 U.S. 349, 358, 362 (1977) (denial of due process "when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain."). Similarly, the FDPA requires that a defendant must be "permitted to rebut any information" presented by the government. 18 U.S.C. § 3593(c).[10] In fact, the availability of a full opportunity to rebut underpinned the Supreme Court's initial decision to permit future danger evidence. *See Barefoot v. Texas*, 463 U.S. 880, 898 (1983) (dangerousness assessments are not constitutionally unreliable since capital juries will also have the benefit of "contrary evidence by the opposing party.").[11] These principles require that Mr. Christensen must

---

[10] The FDPA also recognizes the need for "more evidence, not less" to achieve "heightened reliability," *United States v. Fell*, 360 F.3d 135, 143 (2d Cir. 2004), and thus "erects very low barriers to the admission of evidence at capital sentencing hearings." *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001).

[11] For a discussion of the continuing validity of *Barefoot*, see *Motion to Strike Aggravating Factor Alleging Future Dangerousness*, Dkt 122, at 4-15.

be given a full opportunity to present evidence such as that noticed here to rebut any inference by the government that his incarceration for life will present a danger in the context of prison, whether that inference is put in play by directly alleging, as here, an aggravating factor, or indirectly by introducing extensive evidence extensive propensity evidence suggesting future danger. *Kelly v. South Carolina*, 534 U.S. 246 (2002) (defendant entitled to rebut future danger inference even if implied and not explicitly argued); *United States v. Troya*, 733 F. 3d 1125, 1134-35 (11th Cir. 2013).[12]

Finally, the importance of Mr. Christensen's opportunity to fully rebut the future dangerousness aggravating factor cannot be overemphasized. As an aggravating factor, the FDPA requires that the aggravating factor be proven beyond a reasonable doubt. 18 U.S.C. § 3593(d). This requirement is doubly important because of the concomitant unanimity requirement and the ultimate weighing process. Thus, the court must instruct the jury that if the jury does not *unanimously* find that the future danger aggravating factor has been proven *beyond a reasonable doubt*, *no juror* can consider the aggravating factor in the weighing process *even if* that individual juror does believe that future danger has been proven. The failure to permit a meaningful opportunity to rebut an aggravating factor thus infects the entire process in the most fundamental way.

---

[12] In *Troya*, the government attempted to foreclose similar testimony as that noticed here, by withdrawing future danger as an aggravating factor. *Id.* 1133. But, because the government then proceeded to introduce a substantial amount of uncharged criminal conduct, which portrayed the defendant as a violent person and argued, in effect, the defendant presented a future danger because he is "evil" and "doesn't care who he hurts," *id.*, 1134-35, the evidence proffered by the defense was nonetheless admissible. Here, because there is little credible evidence of any prior violent conduct, the defense reserves on the rebuttal argument if the government elects to abandon the future danger allegation. Regardless, as discussed in the next section, the testimony of Dr. Sorensen is also admissible on the issue of mitigation.

### C. Dr. Sorensen's Testimony is Relevant to Mitigation

In addition to rebutting the government's inclusion of future dangerousness as an aggravating factor, the noticed testimony is independently relevant to mitigation. In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Court held that a defendant must be permitted to introduce evidence that he will *not* pose a risk. Citing the all-encompassing mitigation principle announced in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), *Skipper* held that "such evidence may not be excluded from the sentencer's consideration." 476 U.S. at 5. This principle has been held to require the admission of expert evidence such as the noticed testimony of Dr. Sorensen. *See Lawlor v. Zook*, 909 F.3d 614 (4th Cir. 2018) (constitutional error to exclude "predictive evidence of [defendant's] risk of violence in prison); *United States v. Troya,* 733 F.3d at 1135-36 (In addition to rebuttal, "Dr. Cunningham's testimony was also admissible as non-statutory mitigating evidence.").

The government's principal argument is that the noticed testimony of Dr. Sorensen is inadmissible because it is not "personalized" or "grounded on the defendant's individual circumstances of the crime and character." *Motion*, at 5-6. While some of the noticed testimony, such as that pertaining to base rates, is more statistical in nature, much of it is, in fact, directly personalized to Mr. Christensen, such as the relevance of age, education, lack of prior violent history or criminal record etc. But, regardless, the government's argument has been soundly rejected. *See Lawlor v. Zook*, 909 F.3d at 632 (finding that a state court's exclusion of expert evidence based, in part, on an analysis of the defendant's past behaviors and "statistical and actuarial models," was contrary to and an unreasonable application of clear Supreme Court precedent);

12

*United States v. Troya*, 733 F. 3d at 1133 (rejecting the government's argument that similar testimony was not specific to the defendant).[13]

And, similar to future dangerousness as an aggravating factor, *supra*, the structure of the FDPA and the Eighth Amendment underscore the gravity of any procedure that impairs the defendant's right to present mitigation evidence. The Supreme Court's broad mandate as to the scope of mitigating evidence has been discussed elsewhere and will not be repeated here. *See Response to United States' Motion in Limine to Preclude Execution Impact Evidence or Argument*, Dkt. 275 at 2. But, as most relevant to this discussion, in contrast to the unanimity requirement for aggravating factors, 18 U.S.C. § 3593(d) provides that a mitigating factor need be found by only a *single* juror, who may then consider the factor for purposes of his/her own individual weighing decision, a result dictated by the Eighth Amendment. *See Mills v. Maryland*, 486 U.S. 367 (1988). Thus, exclusion of evidence with the potential of satisfying a single juror that the lack of future danger is the consideration that, for him or her, tips the balance toward life, *see* n. 9, violates both the Constitution and the FDPA.

Finally, the government argues that Dr. Sorenson should not be permitted to testify concerning the "BOP's ability to manage and guard against inmate misconduct," *Motion*, at 8, alleging that such testimony is "beyond the scope of [his] actual knowledge

---

[13] The government cites a single unreported case in support of its theory that Dr. Sorensen's testimony is inadmissible because it does not relate to the defendant. *See Motion*, at 6, *citing Mendoza v. Thaler*, 2012 WL 12817334. The government fails to note that *Mendoza* did not even reach the merits of the state court's exclusion of Dr. Sorensen's testimony because it found the alleged error had been procedurally defaulted. *Id*., at * 8-9. Nor does the government mention the recent authority cited above that directly rejects its arguments. Further, in qualifying Dr. Sorensen, the defense will bring out that he has testified in various jurisdictions, including several times in Texas state courts.

and expertise" and that he is an "academic" and has "never worked for BOP." Of course, "academics" are frequently qualified under Fed. R. Evid. 702 and there is no requirement that Dr. Sorensen has to have worked at BOP to offer such testimony, as long as he otherwise has the requisite "specialized knowledge," as required by the evidentiary rule. While the defense may ask Dr. Sorensen a general question concerning the relationship between the low base rates of violence in federal prisons and the availability of various levels of security at the BOP, the defense agrees that in light of Mr. Christensen's lack of a prior criminal record or history of violence and his exemplary conduct while incarcerated for almost two years in this case, there is little likelihood that he would be sent to ADX. Thus, assuming the government does not open the door, the defense does not intend to get into the type of prolonged presentation concerning the specifics of BOP security measures (and, more particularly, those in place and available at ADX) that is envisioned in the *Motion*.[14]

WHEREFORE, Mr. Christensen respectfully requests that the government's Motion be denied.

---

[14] Curiously the government cites *United States v. Johnson,* 223 F.3d 665 (7th Cir. 2000), in support of its point, *Motion*, at 8-9, a case where the defense was *permitted* to call a psychologist, who had toured ADX and testified as to the security arrangements in the control unit, to rebut the government's evidence of future dangerousness. *Id* 671.

Respectfully submitted,

/s/Elisabeth R. Pollock  
Assistant Federal Defender  
300 West Main Street  
Urbana, IL 61801  
Phone: 217-373-0666  
FAX:   217-373-0667  
Email: Elisabeth_Pollock@fd.org  

/s/ George Taseff  
Assistant Federal Defender  
401 Main Street, Suite 1500  
Peoria, IL 61602  
Phone: 309-671-7891  
Fax:    309-671-7898  
Email: George_Taseff@fd.org  

/s/ Robert Tucker  
Robert L. Tucker, Esq.  
7114 Washington Ave  
St. Louis, MO 63130  
Phone: 703-527-1622  
Email: roberttuckerlaw@gmail.com  

/s/ Julie Brain  
Julie Brain, Esq.  
916 South 2nd Street  
Philadelphia, PA 19147  
Phone: 267-639-0417  
Email: juliebrain1@yahoo.com  

CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock  
Assistant Federal Public Defender  
300 West Main Street  
Urbana, IL 61801  
Phone: 217-373-0666  
FAX:   217-373-0667  
Email: Elisabeth_Pollock@fd.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

v.

JESSIE CON-UI,

    Defendant.

No. 3:13-CR-123

(JUDGE CAPUTO)

**ORDER**

**NOW**, this 4th day of August, 2016, in accordance with the accompanying memorandum, **IT IS HEREBY ORDERED** that:

(1) The request for an Order directing that the prosecutors in this case comply with the mandates and procedures of the "Ogden Memo", or in the alternative, that the Court confirm whether or not the government has complied with the Odgen Memorandum with respect to its discovery obligations to Mr. Con-Ui is **DENIED**.

(2) The supplemental request for nationwide Bureau of Prisons ("BOP") data is **GRANTED in PART,** as modified, **and DENIED in PART**. The following data is to be provided to Mr. Con-Ui. Any requests not listed below are **DENIED.** Mr. Con-Ui shall also ensure that any defense expert witnesses sign a confidentiality agreement to be forwarded to the Government.

    a. List of BOP homicides including dates, location, perpetrator and victim names and register numbers, from **2005-2015**; Inmate discipline data for each perpetrator; sentence monitoring computation data for each perpetrator; inmate profile form for each perpetrator; assignment history for each perpetrator; inmate history–security threat group for each perpetrator; inmate housing history for each perpetrator; documents memorializing the inmate's criminal history for each perpetrator; documents memorializing the inmate's education, work and programming history for each perpetrator;

    b. For each of the ten staff homicide perpetrators listed (*see* Doc. 872-1, 24.): sentence monitoring computation data; an inmate profile form; assignment history; the inmate history–security threat group ("STG"); the inmate housing history; documents memorializing the inmate's criminal history; documents memorializing the inmate's education, work and programming history;

    c. Administrative Maximum facility ("ADX") Inmates:

        1. List of names and register number of inmates currently at ADX for a prison homicide; the date of entry and unit placement history at ADX and current placement unit;

        2. List of names and register numbers for inmates

# EXHIBIT A

    previously at ADX for a prison homicide, beginning with **2005 to present**; dates of entry and discharge from ADX, and BOP housing history after leaving ADX, including prison release dates, if applicable;

   3. From **2005 to the present**, a list of inmates committing prison homicide that were never sent to ADX, including register number and post-homicide housing history;

  d. List of names for all death row inmates along with Inmate discipline data from **2005 to 2015**; including Additional Tracking Indicators ("ATI") (type of victim, weapon, severity of injury) for each inmate involved in 100,101 and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; gang affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; criminal history and offense[s] of conviction.

  e. List of names of all current Federal Death Sentence inmates along with inmate discipline data; current location of each; ATI for each involved in 100, 101, and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; any documents showing Institutional Risk Score; gang affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; data or documents memorializing the criminal history and offense[s] of conviction.

  f. List of names of all Life Without Parole ("LWOP") inmates sentenced for capital homicide from **2005 to 2015**, along with inmate discipline data; current location of each; ATI for each involved in 100, 101, and 224 assaults; disciplinary hearing officer reports for 100, 101 and 224 involved assaults; mental health status code; any documents showing Institutional Risk Score; gang affiliation and/or STG status; sentencing monitoring computation data form; inmate profile form; assignment history report; inmate history form; inmate housing history form; inmate education history; documents memorializing the criminal history and offense[s] of conviction.

  g. For LWOP inmates:

   1. Yearly totals of LWOP inmates for **2010-2016**, including identification of the number and percent housed in either medium security or maximum-security facilities each year;

   2. The number and percent of crimes committed by the LWOP inmates in medium and maximum-security facilities.

(3) The Government is directed to comply with this Court's order of May 8, 2015, and provide to Mr. Con-Ui all reports, memorandum, video, and audiotapes, emails and any other information regarding post-incident communication

between Mr. Con-ui and Chaplin Ngozi Osuju from USP Canaan.

(4) The request for job performance evaluations for corrections officers who worked at USP Canaan in C-Unit from September 10, 2011 to February 25, 2013 is **GRANTED.** It is further **ORDERED** that the parties shall agree on a protective order/confidentiality agreement and, upon approval by the court, the evaluations are to be provided in accordance with the protective order/confidentiality agreement.

(5) The request for the USP Pollock Inmate roster from November 21, 2010 is **GRANTED**.

(6) The request for the USP Victoryville Inmate roster from October 23, 2009 is **GRANTED**.

(7) The request for all correspondence and communications between the United States Attorney's Office, OSHA and the Bureau of Prisons related to OSHA's investigation of USP Canaan is **DENIED.**

(8) The request for investigative, forensic analysis, chain-of-custody, expert reports and notices of experts' ADX "shakedown" logs for 2012, 2013 and 2014; All disciplinary allegations and findings of contraband at ADX for 2012, 2013 and 2014; and all BOP materials pertaining to seizure of "stringers", is **GRANTED**.

(9) The request for documents and data underlying the 2012 and 2013 BOP Institutional Character Profile and Social Climate studies is **GRANTED**.

          /s/ A. Richard Caputo  
          A. Richard Caputo  
          United States District Judge

LIMITED USE AND DISCLOSURE AGREEMENT

*United States v. Jessie Con-Ui*, 13-cr-00123(ARC)
United States District Court for the Middle District of Pennsylvania

********************************************************************
*

The Honorable A. Richard Captuo, in the matter of *United States v. Jessie Con-Ui*, Case No. 13-CR-123, ordered specific nationwide Federal Bureau of Prisons (BOP) data produced to the defense, provided that a confidentiality agreement, signed by all defense experts with access to the data, is sent to the Government.

The undersigned hereby agrees not to identify any BOP inmates by name and/or disseminate any specific inmate disciplinary histories and other confidential information about individual inmates. Raw data provided through this Court Order will not be disseminated to any individual or entity unless authorized by the parties to this agreement. Only group statistical information will be reported in any dissemination of the results from analyses of the data provided by the BOP.

X _____

# EXHIBIT B