IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17-CR-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES OF AMERICA'S NOTICE
OF PENALTY PHASE EXPERTS AND TESTS IN RESPONSE
TO THE DEFENDANT'S RULE 12.2(b)(2) NOTICE**

NOW COMES the United States of America, by John C. Milhiser, United States Attorney for the Central District of Illinois, Eugene L. Miller and Bryan D. Freres, Assistant United States Attorneys, and Department of Justice Trial Attorney James B. Nelson, and, pursuant to the Court's Order (R.220), hereby gives notice of its expert witnesses and the tests they will administer in response to the Defendant's Rule 12.2(b)(2) Notice.[1]

---

[1] As the Court is aware, the defendant retained a second psychiatric expert after revealing that his expert was not available for the scheduled April 4, 2019, trial date. (R.226, 227, 255, 257, 259) During the hearing on April 8, 2019, the defendant suggested that he might "amend" his Rule 12.2 notice, which has been on file since December 3, 2018. As the United States has previously noted, Rule 12.2 does not allow for such an amendment. (R.219)

Allowing the defendant to amend his Rule 12.2 notice at this time would prejudice the United States' approach to its rebuttal examination on the eve of trial. Furthermore, if the defendant's "amendment" differs in its diagnoses, then the reports and findings of the defendant's original expert would be discoverable to the United States for impeachment purposes. *See, e.g., Pawlyk v. Wood*, 248 F./3d 815, 821-28 (9th Cir. 2001), *cert. denied* 534 U.S. 1085 (2002). "Impeachment of an expert witness through contradictory testimony by another qualified expert is permitted under the federal rules of evidence, and it actually supports admissibility of the original expert's opinion because it presents a proper question of credibility

1. **The Defendant's Rule 12.2(b)(2) Notice**

The defendant's Rule 12.2 notice alleges an extensive, potential mental health defect. (R.161) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, pp. 87-122 (5th ed. 2013) (hereinafter "DSM-5")). The defendant cites to 35 pages of DSM-5. *Id.* These 35 pages include 12 separate disorders:

   a. Delusional Disorder;[2]
   b. Brief Psychotic Disorder;
   c. Schizophreniform Disorder;
   d. Schizophrenia;
   e. Schizoaffective Disorder;
   f. Substance/Medication-Induced Psychotic Disorder;
   g. Psychotic Disorder Due to Another Medical Condition;
   h. Catatonia Associated With Another Mental Disorder;
   i. Catatonic Disorder Due to Another Medical Condition;
   j. Unspecified Catatonia;
   k. Other Specified Schizophrenia Spectrum and Other Psychotic Disorder; and
   l. Unspecified Schizophrenia Spectrum and Other Psychotic Disorder.

DSM-5, at 87-122. Each of the above disorders has its own diagnostic features, which must be present to sustain a diagnosis. *Id.* at 92, 94-95, 97-98, 100-01, 106-07, 112-13, 116, 120-21. Further compounding the need for an extensive examination, each of the listed disorders has multiple "differential diagnoses" – *i.e.*, a different disorder that could be diagnosed based on the same symptoms. *Id.* at 93, 96, 98-99, 104-05, 109-10, 114-15, 118, 121.

---

for the jury." *TAMKO Bldg. Prod., Inc. v. Factual Mut. Ins. Co.*, 890 F. Supp. 2d 1129, 1144 (E.D. Mo. 2012) (citing *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000)).

[2] Delusional Disorder has multiple "subtypes," which must also be identified and differentiated between. *Id.* at 91.

Not surprisingly, the differential diagnoses for most of the above disorders include other disorders from this same section. *Id*. Many of the differential diagnoses, however, are completely unrelated to schizophrenic disorders. *Id.* For example:

a. Obsessive-Compulsive Disorder (*Id*. at 93, 104);
b. Body Dysmorphic Disorder (*Id*. at 104);
c. Delirium (*Id.* at 93);
d. Major Neurocognitive Disorder (*Id.* at 93);
e. Depressive and Bipolar Disorders (*Id*. at 93, 96, 109);
f. Major Depressive or Bipolar Disorder with Psychotic or Catatonic Features (*Id*. at 104);
g. Substance-Related Disorders (*Id*. at 96, 114);
h. Substance Intoxication or Substance Withdrawal (*Id*. at 114);
i. Malingering and Factitious Disorders (*Id*. at 96);
j. Communication Disorders (*Id*. at 105);
k. Other Mental Disorders (*Id*. at 98, 105, 109);
l. Other Medical Conditions (*Id*. at 96, 98, 109)
m. Autism Spectrum Disorder (*Id*. at 105);
n. Posttraumatic Stress Disorder (*Id*. at 104); and
o. Personality Disorders[3] (*Id*. at 96, 104).

## 2. The United States' Rebuttal Expert Witnesses

In response to the defendant's Notice, the United States has hired two expert witnesses to examine the defendant. Though they will both examine the defendant, their examinations will not be duplicative as they have different specialties and will conduct different types of examinations. The purpose of the combined examinations is

---

[3] DSM-5 devotes an entire chapter to the personality disorders that might form a differential diagnosis. DSM-5, at 645-84. These include: Paranoid Personality Disorder; Schizoid Personality Disorder, Schizotypal Personality Disorder; Antisocial Personality Disorder; Borderline Personality Disorder; Histrionic Personality Disorder; Narcissistic Personality Disorder; Avoidant Personality Disorder; Dependent Personality Disorder; Obsessive-Compulsive Personality Disorder; Personality Change Due to Another Medical Condition; and Other Specified Personality Disorder and Unspecified Personality Disorder. *Id*. at 645. Because any of these personality disorders might constitute a differential diagnosis, all must be considered. *Id.* at 96.

to determine whether the defendant suffers from one of the disorders identified in his Notice; a disorder that has been identified as a differential diagnosis to those disorders; or no disorder at all. The United States' experts are:

1. Dr. Park Dietz, M.D., M.P.H., Ph.D.
2. Dr. Robert L. Denney, Psy.D., ABPP

The Curriculum Vitae for Drs. Dietz and Denney are attached to this Notice.

**3. The United States' Rebuttal Examination**

Drs. Dietz and Denney have coordinated their schedules, and they will examine the defendant April 29 – May 3, 2019. In compliance with the Court's Order (R.300), the examinations will not be audio or video recorded. Once Drs. Dietz and Denney have begun their examination of the defendant, the "firewall" will come into being. From that point forward, Drs. Dietz and Denney will cease communications with the trial team and communicate only with firewall counsel until after the defendant has been convicted and renews his intent to present Rule 12.2 evidence in mitigation at the penalty phase.

A.   Dr. Dietz's Examination

Dr. Dietz is a forensic psychiatrist, and he will be conducting a forensic psychiatric examination. As the parties discussed during the teleconference on January 31, forensic psychiatrists do not conduct "testing" in the same way that a forensic psychologist does. Rather, Dr. Dietz's examination will involve a thorough interview about a number of topics. Given the nature of the science, the precise

4

questions that Dr. Dietz asks the defendant will be determined largely by the defendant's answers to Dr. Dietz's initial questions.

> B.   Dr. Denney's Examination

As noted in his CV, Dr. Denney is one of seven people in the world who is board-certified in both forensic psychology and clinical neuropsychology. Dr. Denney will administer a psychological testing battery to examine the defendant's psychological performance vis-à-vis the disorders listed in the Notice and the tests performed by the defendant's experts.

The section of the DSM-5 dealing with Schizophrenia Spectrum and Other Psychotic Disorders highlights the need to assess for related symptoms (*e.g.*, depression & mania) because the dimensional assessments of depression and mania for all psychotic disorders alert clinicians to mood pathology. DSM-5, at 90. Additionally, DSM-5 notes, "Many individuals with psychotic disorders have impairments in a range of cognitive domains that predict functional status" *Id*.

Research and practice guidelines reveal the primary domains measured during neuropsychological assessment include intellectual functions; academic skills, receptive and expressive language skills (*e.g.*, verbal comprehension, fluency, confrontation naming); simple and complex attention (including speed of mental processing), learning and memory (encoding, recall, recognition); visuospatial abilities; executive functions,

problem solving and reasoning abilities; and sensorimotor skills (AACN 2007[4]; Larrabee, 2015[5]).

The AACN Practice Guidelines for Neuropsychological Assessment and Consultation (2007) also note that "Ideally, assessments should also include measures designed to assess personality, social-emotional functioning, and adaptive behavior." (p. 220) Neuropsychological tests are designed to measure varying constructs within a broader domain, and it is recommended that clinicians use more than one assessment within these domains to verify the accurate measure of those constructs (Larrabee, 2015). Clinical practice and consensus guidelines also highlight the importance of including measures to verify the validity of test results (AACN, 2007; 2009[6]). Validity measures are especially important in this case, given that Malingering and Factitious Disorder is an enumerated differential diagnosis. DSM-5, at 96.

The following tests are common and published clinical measures to capture the above domains:

Continuous Performance Test (CPT-3)
(Focused and sustained attention)

---

[4] AACN Board of Directors (2007). American Academy of Clinical Neuropsychology (AACN) practice guidelines for neuropsychological assessment and consultation, *The Clinical Neuropsychologist, 21*, 209-231.

[5] Larrabee, G. J. (2015). The Multiple validities of neuropsychological assessment. *American Psychologist, 70*(8), Nov 2015, 779-788.

[6] Heilbronner, R. L., Sweet, J. J., Morgan, J. E., Larrabee, G. J., Millis, S., & Conference Participants. (2009). American Academy of Clinical Neuropsychology Consensus Conference Statement on the neuropsychological assessment of effort, response bias, and malingering. *The Clinical Neuropsychologist, 23*, 1093-1129.

Trail Making Test A & B
(Speed of mental processing, mental flexibility)
Grooved Pegboard
(Sensorimotor speed)

Finger Tapping Test
(Sensorimotor speed)

Wechsler Adult Intelligence Scale-IV (WAIS-IV)
(Intellectual functions, verbal reasoning, non-verbal reasoning, concentration & speed of mental processing)

Neuropsychological Assessment Battery (NAB):
a. Attention Module (focused attention, processing speed)
b. Language Module (receptive and expressive language skills)
c. Memory Module (verbal and non-verbal learning and memory)
d. Spatial Module (visuospatial abilities)
e. Executive Functions Module (judgment & problem solving)

Controlled Oral Word Association Test
(verbal fluency-letter & semantic)

Test of Premorbid Functioning (TOPF)
(premorbid intellectual assessment)

Wisconsin Card Sorting Test (WCST)
(concept formation, mental flexibility)

Connors' Adult ADHD Rating Scale
(Self-report measure of symptoms related to Attention Deficit Disorder)

Validity Measures
(Interspersed throughout the neuropsychological assessment)

The following self-report inventories are the most commonly administered measures of psychopathology administered in forensic psychology and

neuropsychology examinations (Archer, Buffington-Vollum, Stredny, & Handel, 2006[7]; LaDuke, Barr, Brodale, & Rabin, 2017[8]; Rabin, Paolillo, & Barr, 2016[9]). These inventories measure the varying symptoms and behavioral constructs that are present in most every diagnosis or differential diagnosis listed within the DSM-5 Schizophrenia Spectrum and Other Psychotic Disorders section.

<u>Minnesota Multiphasic Personality Inventory-2 (MMPI-2-RF)</u>
(Depression, anxiety, paranoia, psychosis, neurological & neurocognitive)

<u>Personality Assessment Inventory (PAI)</u>
(Disorganized thought, depression, anxiety, somatic, mania, persecutory ideas, borderline features, delusional ideation, substance abuse, suicidal ideation, affective instability)

<u>Millon Clinical Multiaxial Inventory-IV (MCMI-IV)</u>
(Various personality characteristics such as paranoid, schizoid, avoidant, melancholic, dependent, histrionic, turbulent, narcissistic, as well as clinical syndromes related to anxiety, somatization, mania, depression, substance use, schizophrenic spectrum, delusions)

---

[7] Archer, R. P., Buffington-Vollum, J. K., Stredny, R. V. & Handel, R. W. (2006). A survey of psychological test use patterns among forensic psychologists, *Journal of Personality Assessment, 87*(1), 85-95.

[8] LaDuke, C., Barr, W. Brodale, D. L., & Rabin, L. A. (2017). Toward generally accepted forensic assessment practices among clinical neuropsychologists: A survey of professional practice and common test use, The Clinical Neuropsychologist, 32, 145-164.

[9] Rabin, L. A., Paolillo, E., & Barr, W. B. (2016). Stability in test-usage practices off clinical neuropsychologists in the United States and Canada over a 10-year period: A follow-up survey of INS and NAN members, *Archives of Clinical Neuropsychology, 31*, 206-230.

**4.      The Defendant Should Not Have Advance Notice of the Testing Protocol**

The defendant has given notice that he will rely on some combination of the Schizophrenia Spectrum and other Psychotic Disorders enumerated in the DSM-5 as mitigation during the penalty phase. In rebuttal, the United States' experts will be conducting thorough examinations to either confirm or refute this diagnosis. The quality of their analysis, naturally, depends on the accuracy of the test results. The accuracy of the test results rely, in turn, on the defendant not having advance notice of what tests will be given and when.

Having advance notice of what tests will be given, and what types of inquiry are contained within those tests, creates the opportunity for a subject to alter his responses in an effort to meet the diagnosis he is asserting.[10] In other words, it is possible to defeat the testing if a subject knows what the questions will be. The United States does not know at this moment whether or not the defendant's symptoms are genuine or feigned,

---

[10] Brennan, A. M., Meyer, S., David, E., Pella, R., Hill, B. D., & Gouvier, W. D. (2009). The vulnerability to coaching across measures of effort. *The Clinical Neuropsychologist, 23*, 314-328; Victor, T. L. & Abeles, N. (2004). Coaching clients to take psychological and neuropsychological tests: A clash of ethical obligations. *Professional Psychology: Research and Practice, 35*(4), 373-379; Gutheil, T. G. (2003). Reflections on coaching by attorneys. *Journal of the American Academy of Psychiatry and the Law, 31*, 6-9; Lees-Haley, P. R. (1997). Attorneys influence expert evidence in forensic psychological and neuropsychological cases. Assessment, 4(4), 321-324; Wetter, M. W., & Corrigan, S. K. (1995). Providing information to clients about psychological tests: A survey of attorneys' and law students' attitudes. *Professional Psychology: Research and Practice, 26*(5), 474-477; Youngjohn, J. R. (1995). Confirmed attorney coaching prior to neuropsychological evaluation. *Assessment, 2*(3), 279-283.

and its experts will not be able to accurately diagnose him unless they are able to conduct a valid examination.

Undersigned counsel has conferred with counsel for the defendant, and they have agreed that – to ensure the validity of the experts' examination – no one on the defense team will provide advance notice to the defendant the tests that will be performed by the United States' experts. In accordance with the Court's Order (R.220), the United States does not object to the defendant being notified that he will be examined and that he may contact his counsel if need be during the examination, so long as he does not compromise the validity of the testing.

Respectfully submitted,

JOHN C. MILHISER
UNITED STATES ATTORNEY

*/s/Eugene L. Miller*
Eugene L. Miller
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217/373-5891
eugene.miller@usdoj.gov

*/s/ James B. Nelson*
James B. Nelson
Trial Attorney
Capital Case Section
United States Department of Justice
1331 F. Street NW, Room 625
Washington, DC 20004
Phone: 202/598-2972
james.nelson@usdoj.gov

*/s/Bryan D. Freres*
Bryan D. Freres, Bar No. IL 6294791
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone: 217/373-5875
Fax: 217/373-5891
bryan.freres@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

>
> */s/ James B. Nelson*
> James B. Nelson
> Trial Attorney
> Capital Case Section
> United States Department of Justice
> 1331 F. Street NW, Room 625
> Washington, DC 20004
> Tel: (202) 598-2872
> james.nelson@usdoj.gov