E-FILED
Sunday, 26 May, 2019  07:49:49 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

UNITED STATES OF AMERICA,        )
                                 )
        Plaintiff,               )
                                 )
vs.                              )        Crim. No. 17-20037
                                 )
BRENDT A. CHRISTENSEN,           )
                                 )
        Defendant.               )

**DEFENDANT BRENDT A. CHRISTENSEN'S REQUEST FOR VISUAL AIDS
TO BE USED IN VOIR DIRE**

Now comes the Defendant, BRENDT A. CHRISTENSEN, by his undersigned

counsel, and respectfully requests the Court utilize the two visual aids identified below

(attached as Exhibit 1 and 2) during voir dire.

1



**Schematic of a Federal Capital Trial (Exhibit 1)**

LIFE OR DEATH DECISION-MAKING IN A
FEDERAL CAPITAL CASE

- No juror is ever required to impose a sentence of death.

- The alternative to a sentence of death is lifetime imprisonment without the possibility of release.

- In the federal system, there is no parole, so life means life.

- The decision is a moral one that each juror must decide for himself or herself.

- Every juror's views are entitled to the respect of every other juror.

- The decision of the jury is final. The Judge cannot change it.

- If all 12 vote for death, the sentence will be death.

- If even one juror votes for life, the sentence will be lifetime imprisonment without the possibility of release.

**Decision-Making in a Federal Capital Case (Exhibit 2)**

## ARGUMENT FOR USE OF EXHIBIT 2
### Decision-Making in a Federal Capital Case

Defense counsel respectfully request the Court permit the parties to utilize the

*Decision-Making in a Federal Capital Case* (attached hereto as Exhibit 2) as a visual aid

during voir dire. The visual aid addresses eight concepts or principles of law that are

poorly understood by many prospective jurors. In highlighting these critical concepts the

visual aid facilitates the effective review and greater comprehension of these principles

by jurors and facilitate efficient questioning of jurors regarding their understanding of

these concepts and the juror's willingness and ability to follow them.

Extensive social-science data gathered by the Capital Jury Project[1] (CJP) proves

that capital jurors frequently fail to perform their duties as required by the constitution.

---

[1] The Law and Social Sciences Program of the National Science Foundation (grant NSF SES-9013252) first funded the Capital Jury Project ("CJP") in 1990. For the more than twenty-nine years since its creation in 1990, the CJP has systematically researched the decision-making of actual capital jurors. *See* William 1. Bowers, *The Capital Jury Project: Rationale, Design, and a Preview of Early Findings,* 70 Ind.L. J. 1043 (1995).

Within each state chosen for its research study, the CJP picked 20 to 30 capital trials to represent both life and death sentencing decisions. From each trial, four jurors were selected for in-depth three-to-four-hour personal interviews. Interviewing began in the summer of 1991. The current CJP working sample includes 1,201 jurors from 354 capital trials in 14 states. Bowers and Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing,* 39 Crim. Law. Bull. 51, 51 (1993) [hereinafter, Bowers and Foglia].

Data collected and analyzed by CJP researchers, has been cited by the United States Supreme Court and other state and federal courts in capital cases. *See* e.g., *Schriro* v. *Summerlin,* 542 U.S. 348, 356 (2004); *Simmons v. South Carolina,* 512 U.S. 154,170 (1994); *United States* v. *Young,* 376 F. Supp.2d 787, 797 (U.S. App. 6th Cir. 2005); *People* v. *LaValle,* 817 N.E.2d 341,357 (N.Y. 2004); *People* v. *Cahill,* 809 N.E.2d 561,600-602 (N.Y. 2003). Further, since 1993, some 30 articles presenting and discussing the findings of the CJP have been published in scholarly journals. *See, e.g.,* Eisenberg, Garvey & Wells, *The Deadly Paradox of Capital Jurors.* 74 S. Cal. L. Rev. 371 (2001); Garvey, .Johnson & Marcus, *Correcting Deadly Confusion: Responding to Jury Inquiries in Capital Cases,* 85 Cornell L. Rev. 627 (2000); Bowers & Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing,* 77 Tex. L. Rev. 605 (1999); Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?,* 98 Colum. L. Rev. 1538 (1998); Hoffman, *Where's the Buck – Juror Misperception of Sentencing*

Studies show that these missteps are caused by juror's failure to understand the complex rules meant to guide and constrain their life or death decision-making.

For example, many jurors do not understand the meaning of the sentence of life imprisonment without the possibility of release. W. Bowers and W. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. L. Bulletin 51, 82-83 (2003). "Many of the CJP jurors volunteered that they believed they had to vote for death to ensure that the defendant would not get back on the streets." *Id.* In another study, only about a third of actual jurors surveyed post-trial showed an adequate understanding of "mitigating" and "aggravating" evidence. P. Tiersma, *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, 1995 Utah L. Rev. 1, 18 (1995). And the CJP data reveals that almost half of CJP jurors surveyed wrongly thought that mitigating evidence had to be proven beyond a reasonable doubt. 39 Crim. L. Bulletin at 69.

These problems do not result from mere omissions in the instructions. Rather, the CJP's data demonstrate that even in jurisdictions in which the jurors are specifically instructed that they do not have to unanimously find mitigating factors, or that mitigating factors are not restricted to a statutory list, a substantial percentage of the jurors did not understand those critical features of the law. *Id.* at 68-69 (2003). Some jurors did not believe that there is no parole from a life sentence even when the trial judge specifically instructed the jury on this fact. *Id.* at 82-83. In sum, "a great many people who actually

---

*Responsibility in Death Penalty Cases*, 70 Ind. L.J. 1137 (1995). According to Bowers and Foglia (and other articles on the same subject) the CJP data reveal profound discrepancies between what the federal constitution requires and how actual capital jurors make their decisions.

served as capital jurors did not understand the instructions they were supposed to be following." *Id.* at 65; *see also* Tiersma, *supra*, Utah L. Rev. at 22-23 ("There is no serious question that many individual jurors as well as entire juries do not understand the instructions that they must follow in reaching a verdict.").

Capital sentencing systems have been carefully designed and rigorously constrained by the Supreme Court. But these protections are undermined by every-day misunderstandings. A jury cannot be guided or constrained by what it does not comprehend. Thus, utilizing appropriate pre-voir dire introductory instructions and visual aids to help jurors understand the core principles that guide juror sentence decision-making is critical to ensuring the jurors and the FDPA are operating in a principled, guided, non-arbitrary and constitutional manner.

Each of these eight principles contained in the *Decision-Making in a Federal Capital Case* visual aid is listed below followed by the support and rationale for including the principle in the visual aid.

1. **No juror is ever required to impose a sentence of death.**

A significant number of jurors believe that the death penalty is mandatory for an intentional or vicious or heinous murder. *See* Eisenberg, Garvey & Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study,* 44 Buffalo Law Review 339 (1996). ("nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness"); William S. Bowers, The Capital Jury Project: *Rationale, Design and Preview of Early Findings*, 70 Ind. L. J. 1043, 1091 n.32 (1995) (many jurors); William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life*

*or Death: Operative Factors in Ten Florida Death Penalty Trials*, 15 Am. J. Crim. L. 1, 41 (1989) (significant number of jurors believed that death penalty was mandatory or presumed for first-degree murder). In a study conducted by the Cornell Death Penalty Project to evaluate juror comprehension (hereinafter "Cornell Study"), twenty-three mock jurors were read a set of model South Carolina instructions for a capital sentencing jury. The jurors were then immediately given a questionnaire to assess their comprehension of the substance of the instructions. Only nine of twenty-three jurors understood that once an aggravating circumstance is established, neither a presumption of a life sentence nor a presumption of a death sentence exists. Of the remaining jurors, six thought the death penalty was presumed. John H. Blume, Theodore Eisenberg & Stephen P. Garvey, *Lessons from the Capital Jury Project*, in <u>Beyond Repair? America's Death Penalty</u> 144 (Stephen P. Garvey ed., 2002).

The large majority of district courts in FDPA cases, emphasizing the highly discretionary nature of the jury's ultimate sentencing decision, instruct that a death sentence is never required. *See, e.g., United States v. Jones*, 527 U.S. 373, 384 (1999) (jury instructed that "regardless of your findings with respect to aggravating and mitigating factors, you are never required to recommend a death sentence"). Two published decisions by district courts have also approved such an instruction. *See United States v. Sampson*, 335 F.Supp.2d 166 (D. Mass. 2004)[2]; *United States v. Haynes*, 265 F.Supp.2d 914

---

[2] ("The law does not define what is sufficient to make death the appropriate penalty. Here, the law relies on each of you as a representative of our community to consult your conscience and determine what is sufficient to justify Mr. Sampson's execution. Thus, your decision as to what the appropriate sentence is will depend in part on what is sufficient for you.") *Id.* at 239, n. 42.

(W.D. Tenn. 2003). *See also* Judge Sand's pattern instructions. 1 Leonard B. Sand, *et al.*, Modern Federal Jury Instructions — Criminal, Inst. 9A-19 & Comment (Lexis 2008) (while FDPA does not contain same explicit "mercy" provision as ADAA, "it is strongly suggested that the court impress upon the jury that it is never obligatory to impose the death penalty. Thus, the instruction states that, 'no juror is ever required by the law to impose a death sentence.'").

Finally, social science studies have established that the process of death qualification itself has a prejudicial effect on the jurors who end up sitting on the jury leading many to believe the law disapproved of jurors who were life scrupled or opposed the death penalty. *See, e.g.*, Craig Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process*, 8 Law & Hum. Behav. No. 1 & 2, 121-33 (1984); Craig Haney, *Examining Death Qualification; Further Analysis of the Process Effect*, 8 Law & Hum. Behav. No. 1 & 2, 133-151 (1984). The study confirmed his hypothesis:

> Exposure to death qualification increased subjects' belief in the guilt of the defendant and their estimate that he would be convicted. It also increased their estimate of the prosecutor, defense attorney, and judge's belief in the guilt of the defendant. The death qualification process led subjects to perceive both prosecutor and judge as more strongly in favor of the death penalty, *and to believe that the law disapproves of people who oppose the death penalty*. And it led jurors to choose the death penalty as an appropriate punishment much more frequently than persons not exposed to it. Thus, persons who had been exposed to death qualification not only differed from non-death qualified subjects, but they differed in ways that were consistently prejudicial to the interests and rights of the defendants.

Haney, *On the Selection of Capital Juries*, at 128-29.

> **2. The alternative to a sentence of death is lifetime imprisonment without the possibility of release, and**
> **3. In the federal system, there is no parole, so life means life.**

In *Simmons v. South Carolina,* 512 U.S. 154 (1994), the Court believed the jury that sentenced Simmons to death reasonably may have believed he could be released on parole if he were not sentenced to death. This misunderstanding "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." *Id.* at 162. In *Shafer v. South Carolina,* 532 U.S. 36 (2001), the Court reaffirmed the principles established in *Simmons.* A capital jury's choice to sentence someone to death should never be premised upon false, misleading, or inaccurate beliefs about parole eligibility or early release.

As *Simmons* and *Shafer* hold, a death sentence returned by a jury that was "forced" to impose a death sentence because of its false belief that a life sentenced defendant would be eligible for release on parole is unconstitutional.

> The data revealed that most capital jurors grossly underestimated the amount of time a defendant would serve in prison if not sentenced to death, and that the sooner jurors believed (wrongly) a defendant would return to society if not given the death penalty, the more likely they were to vote for death . ..
>
> Both statistical analyses and jurors' narrative accounts of the decision process demonstrate that these unrealistically low estimates made jurors more likely to vote for death. Jurors who gave low estimates were more likely to take a pro-death stand on the defendant's punishment at each of the four points in the decision process.

*Shafer* at 80, 82. As cited above, many jurors do not understand the meaning of life imprisonment without the possibility of release even when the trial judge specifically instructed the jury on this fact. *See* W. Bowers and W. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. L. Bulletin 51, 82-83 (2003).

Judge Sand's pattern instructions. 1 Leonard B. Sand, *et al.*, Modern Federal Jury Instructions — Criminal, attempt to address this juror confusion regarding the possibility of release.

> If you determine that Defendant should be sentenced to death, or to life imprisonment without possibility of release, the Court is required to impose that sentence. . . . There is no parole in the federal system.

1 Modern Federal Jury Instructions-Criminal P 9A.02 (Lexis 2018).

Jurors who mistakenly believe the federal system has parole or believe that a capital defendant sentenced to life imprisonment without the possibility of release may be released would be deciding whether to sentence Mr. Christensen to life or death premised upon false, misleading, or inaccurate beliefs. The visual aid directly and squarely addresses this potential confusion. If a prospective juror indicates that he does not believe the Court's instruction on this issue or indicates that he believes if Mr. Christensen is not sentenced to death that the Court may impose a sentence less than life imprisonment without the possibility of release, this juror will have exhibited a disqualifying bias. The visual aid will assist the Court and parties in questioning the prospective jurors to uncover this potential confusion and or bias.

**4.  The decision is a moral one that each juror must decide for himself or herself.**

As the Supreme Court explained, each capital juror must reach "'a reasoned *moral* response to the defendant's background, character, and crime.'" *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 252 (2007), quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (emphasis in original).

"Failure to conduct [] an individualized moral inquiry 'treats all persons convicted of a designated offense not as unique individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.'" *McCleskey v. Kemp*, 481 U.S. 279, 336 (1987) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). In a capital sentencing proceeding before a jury, the jury is called upon to make a "highly subjective, 'unique, individualized judgment regarding the punishment that a particular person deserves.'" *Caldwell v. Mississippi*, 472 U.S. 320, 340, n. 7 (1985) (quoting *Zant v. Stephens*, 462 U.S. 862, 900 (1983)). Writing for a majority of the Court, the late Justice Scalia described the consideration of mitigation as an inherently individual value call. "Whether mitigation exists, however, is largely a judgment call (or perhaps a value call); what one juror might consider mitigating another might not. And of course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy—the quality of which, as we know, is not strained." *Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 642 (2016).

Jurors must be "confronted with the truly awesome responsibility of decreeing death for a fellow human" for only then "will [they] act with due regard for the consequences of their decision. . . ." *McGautha v. California*, 402 U.S. 183, 208 (1971)

11

(quoted in *Caldwell*, 472 U.S. at 329-330). *Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982),

*cert. denied*, 460 U.S. 1098 (1983) (Capital sentencing instruction must clearly give jury the

option to recommend a life sentence although aggravating circumstances are found.)

The final sentencing responsibility lies with each individual juror, to exercise her

individual moral judgment in considering and weighing any aggravating factors found

unanimously and beyond a reasonable doubt and any mitigating factors that she

individually found by a preponderance of the evidence, and then determining whether

the aggravating factors so sufficiently outweigh all the mitigating factors to justify a

sentence of death. 18 U.S.C. § 3593(e).

Research about how jurors who returned life verdicts and death verdicts actually

made their sentencing decision highlights the manner in which many jurors fail to

understand that the decision regarding whether to impose a sentence of death or life

imprisonment is a personal, moral decision that each juror must make individually.

> Shortly after the *McCleskey* decision, researchers undertook
> studies based on in-depth interviews with persons who had
> served on capital juries in Florida, California, and Oregon.
> These interviews focused on how jurors actually made their
> decisions and whether, or to what extent they were guided by
> the capital statutes in their respective states. The questioning
> was largely an open ended inquiry into what factors
> influenced the sentencing decision, and whether jurors'
> decision making was being guided by statutory provisions
> and the Court's conception of the sentencing decision as a
> reasoned moral choice.
>
> . . . .
>
> Concerning both the California and Oregon studies, <u>the
> investigators observed that "there was a tendency among
> jurors from both samples to shift or abdicate responsibility for</u>

the ultimate decision--to the law, to the judge, or to the legal instructions--rather than to grapple personally with the life and death consequences of the verdicts they were called upon to render" (Haney *et al.* 1994: 160). In addition, the researchers concluded: "Capital penalty instructions fail to acknowledge (let alone clearly frame or carefully guide) the inherently moral nature of the task that they direct jurors to undertake. They seem to imply that death sentencing involves nothing more than simple accounting, an adding up of the pluses and minuses on the balance sheet of someone's life (at 172)."

These studies raised serious questions about the operation of post-*Furman* capital statutes. Jurors appear to understand sentencing instructions poorly, especially their obligation to give effect to mitigation. Many appear to presume that death is the appropriate punishment for capital offenses without regard for mitigation. They seem to focus narrowly on a single issue to simplify decision making and to reach consensus on punishment. In explaining the decision to impose the death penalty, they invoke guilt related considerations as if the sentencing process was merely a replay of the guilt decision. These soundings were sufficiently ominous to justify a more extensive investigation of the capital sentencing process, one that would take a more systematic look into the black box of jury decision making.

Bowers, Fleury-Steiner & Antonio, *The Capital Sentencing Decision: Guided Discretion, Reasoned Moral Judgment, Or Legal Fiction,* (chapter 14 in Acker, Bohm, Lanier, *America's Experiment With Capital Punishment.* Carolina Academic Press, 2d ed., 2003) at 8-11 (emphasis added).

In a seminal 1983 article, using the infamous Milgram obedience studies as a point of departure, Robert Weisberg posed an important empirical question; "whether [capital] jurors artificially distance themselves from choices by relying on legal formalities?" Robert Weisberg, *Deregulating Death*, 1983 Sup. Ct. Rev. 305, 391. Recent empirical work suggests this is a dire reality. Capital jurors try to detach themselves emotionally and

morally from the capital decision-making process. Jurors frequently misperceive on whom responsibility lies for the ultimate death penalty decision, and there is widespread difficulty in accepting responsibility for the defendant's fate. *See* Craig Haney, Taking Capital Jurors Seriously, 70 Ind. L.J. 1223, 1230 31 (Fall 1995). For example, one study found that the most vividly recalled portion of the judge's instructions was that instruction "indicating the jury's decision was only 'a recommendation.'" Joseph L. Hoffman, *Where's the Buck? -- Juror Misperception of Sentencing Responsibility in Death Penalty Cases*, 70 Ind. L. J. 1137, 1147 (1995).

Thus, unless prospective jurors clearly understand that each juror is required to make an individual moral judgment, the weighing process ordained by the Federal death penalty sentencing scheme is likely to be misunderstood by jurors. A juror may get the false impression that he or she need only act like a merciless adding machine, churning out an answer after being given all the inputs, with no subjective role to play and no latitude to make the profoundly moral discretionary decision the Constitution compels. Defense counsel respectfully encourage this Court to take the opportunity to ensure prospective jurors understand the tremendous personal responsibility each juror will ultimately have for deciding whether another human being lives or dies. An uncorrected confusion on the part of a juror "that the responsibility for any ultimate determination of death will rest with others [or with 'the law'] presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Caldwell v. Mississippi*, 472 U.S. 320, 333 (1985).

**5.  Every juror's views are entitled to the respect of every other juror.**

"From beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect." *Wellons v. Hall*, 558 U.S. 220 (2010) (per curium). The voir dire process should be conducted in a manner that maximizes candor and self-disclosure from prospective jurors. Ensuring every prospective juror understands that there are no "right" or "wrong" answers to the questions asked in voir dire, and that she will be treated with dignity and respect throughout the process and regardless of her answers, creates an environment in which prospective jurors are most inclined to provide honest and candid responses to questions during voir dire.

**6.  The decision of the jury is final. The Judge cannot change it.**

Capital jurors must not be misled so as to diminish their sense of responsibility for any death sentence imposed. *Caldwell* v. *Mississippi*, 472 U.S. 320 (1985). Each juror must understand that he or she, alone, is responsible for his or her sentencing decision. Uncorrected beliefs that "responsibility for any ultimate determination of death will rest with others" create an impermissible bias toward a death sentence. *Id.* at 333.

A jury unconvinced that death is the appropriate punishment, "might nevertheless wish to 'send a message' of extreme disapproval for the defendant's acts" and vote for death on the assumption that the ultimate sentencer will correct any error. *Id.* at 332. A jury led to believe a life sentence cannot be increased to death may vote death because it understands any decision to "delegate responsibility" for a sentence of death "can only be effectuated by returning" a death sentence. *Id.*

As the Court explained in *Caldwell*, "[b]elief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an 'awesome responsibility' has allowed this Court to view sentencer discretion as consistent with – and indeed as indispensable to – the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" 472 U.S. 320, 330 (1985). CJP data demonstrates, however, that this assumption is false.

Almost no capital jurors view themselves as most responsible for the decision they make. They place primary responsibility elsewhere:

> The vast majority of jurors did not see themselves as most responsible for the sentence. Over 80% assigned primary responsibility to the defendant or the law, with 49.3% indicating the defendant and 32.85% indicating the law was most responsible. In contrast, only 5.5% thought the individual juror was most responsible, and only 8.9% believed the jury as a whole was most responsible. . . .

Bowers & Foglia, 39 Crim. Law Bulletin 51, 74-75 (2003).

Death penalty statutes are not effectively guiding discretion when jurors misunderstand the instructions, mistakenly believe death is required by law, and do not appreciate their responsibility for the sentence imposed. The CJP finding that a large majority of jurors believe the law is "primarily responsible for the sentence is particularly ironic considering their lack of understanding of the law." *Id.* at 75.

7. **If all 12 vote for death, the sentence will be death; and**
8. **If even one juror votes for life, the sentence will be lifetime imprisonment without the possibility of release.**

In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the Supreme Court held that the responsibility for sentencing a capital defendant rests firmly on each individual juror and

explained that jurors must be "confronted with the truly awesome responsibility of decreeing death for a fellow human" for only then "will [they] act with due regard for the consequences of their decision." *Caldwell*, 472 U.S. at 328-30, *quoting*, *McGautha v. California*, 402 U.S. 183, 208 (1971). Ensuring that prospective jurors are cognizant of this responsibility for sentencing is particularly appropriate in jury selection because this is the only opportunity the Court and parties have to learn if a prospective juror is aware of and willing to assume this responsibility and to assess the prospective jurors responses to these questions in order to meaningfully exercise peremptory challenges.

In *Jones v. United States*, 527 U.S. 373, 381 (1999), the Supreme Court addressed the question of what ensues if a federal capital sentencing jury is not unanimous on life imprisonment or death and held that section § 3594 provides that the district court shall impose a sentence other than death, which could include life imprisonment without release or, if statutorily available, a lesser sentence. Thus, the FDPA operates in such a way that if a juror – after considering the evidence and deliberating with her fellow jurors – makes an individual personal judgement that the aggravating factors do not so sufficiently outweigh the mitigating factors to justify a sentence of death (and thus arrives at a moral determination that life imprisonment is an appropriate sentence and votes for life imprisonment) and there is at least one juror who is a holdout for death, the non-unanimous sentencing decision requires the Court to impose a sentence of life imprisonment without the possibility of release. 18 U.S.C. § 3594.

As Judge Simon instructed the jurors in *United States v. Briseno*, No. 2:11-cr-00077 (N.D. Ind. 2015), the last federal capital case tried in this Circuit, "If you cannot

unanimously agree that a sentence of death should be imposed, you should answer the question 'No' and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the count you are considering. In the federal system, a sentence of life imprisonment without the possibility of release means just that — the defendant will never be released from prison. There is no parole in the federal system." COURT'S INSTRUCTION NO. 12, Determination of Sentence (Section VI of Special Verdict Form), (DE 1528, at 30 (March 6, 2015)).

The *Briseno* sentencing trial verdict form likewise included this direction, "Note: If you cannot unanimously agree that a sentence of death should be imposed, you should answer the above question 'No,' and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the murder of Mr. [victim]."



*United States v. Briseno*, No. 2:11-cr-00077 (N.D. Ind. 2015) (sentencing trial verdict form DE 1529 as filled out by jury).

Informing each juror that if the case proceeds to a sentencing trial (1) he or she will – by their individual vote – potentially have the power over the life or death of another human being, and (2) that in arriving at this individual vote – after considering the evidence and deliberating with the other jurors – if the juror votes for life and there is a death holdout, the Court will, by law, sentence Mr. Christensen to a life sentence without the possibility of release, is necessary to ensure that prospective jurors will not answer questions in *voir dire* or perform their duties as jurors based on a misunderstanding of the law rooted in speculation and incorrect assumptions. This practice of clearly and accurately advising prospective jurors that if the case proceeds to a sentencing hearing each juror individually must arrive at a life or death sentencing decision, and that a sentence of life imprisonment without release will be imposed if one or more jurors vote for a life sentence has been followed in *Briseno,* the most recent Federal capital cases brought in this Circuit, and by the majority of federal capital cases tried across the United States in the past ten years.

There are at least three reasons why so many federal courts have exercised their discretion in this manner. First, deprived of any instructions on the consequences of non-unanimous vote for life or death, many jurors will wrongly assume that a failure to agree on sentence would require retrial. This concern is not just theoretical. Anecdotal evidence suggests that capital jurors may fear that a failure to unanimously agree on a sentence will require a complete guilt-innocence do-over, with all the attendant trauma, time, and

expense – and that this fear can undermine holdouts for death and holdouts for life. *See Hooks v. Workman*, 606 F.3d 715, 733-734, 742-744 & n.33 (10th Cir. 2010) (prosecutor's misleading argument that non-unanimous sentencing vote would require retrial contributed to unconstitutional coercion of the jury).

Especially after a case as lengthy and emotionally exhausting as this one is likely to be, such a misapprehension would surely have a coercive effect on jurors to abandon conscientiously-held views out of a misplaced fear that a failure to reach agreement would result in a re-trial that would force grieving victims to sit through the trial again.

Second, instructions that appear to demand unanimity are in arguable tension with the express statutory (and Constitutional) requirement that jurors not be required to render unanimous verdicts on the existence of mitigating factors. *See* 18 U.S.C. § 3593(c) ("[a] finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established."); *accord Mills v. Maryland*, 486 U.S. 367 (1988) (this principle required by the Eighth Amendment); accord *McKoy v. North Carolina*, 494 U.S. 433, 439-443 (1990). Indeed, requiring jurors who have arrived at substantially different conclusions regarding mitigating factors (both with regard to finding their existence and then assigning the weight or significance each juror feels is appropriate to each mitigating factor) to nevertheless achieve unanimity before a juror can vote for and return a life sentence may unduly pressure a juror to harmonize her

findings regarding mitigating factors in a manner that neither the FDPA nor the Eighth Amendment permits.

And third, failing to provide accurate instructions on the effect of non-unanimity on the issue of sentence will require a series of additional instructions to ensure that the jury is not prejudicially misled. Such instructions would include:

- a caution that jurors should not attempt to harmonize their individual findings concerning mitigating factors simply to justify or permit a unanimous sentencing decision;

- an assurance that lack of unanimous agreement on either life imprisonment *or* death will neither require or permit imposition of any *lesser* sentence than life imprisonment without release, which could lead to the defendant's eventual release, *see People v. LaValle*, 3 N.Y.3d 88 (2004) (finding New York's post-*Gregg* death penalty statute unconstitutional on this ground); and

- a further assurance that any failure to agree on sentence will have no effect upon the validity of the defendant's underlying *convictions*.

We respectfully submit that the Court would do best to obviate the need for these additional safeguards by simply allowing the jurors to be told the truth from the very start: if the defendant is convicted of the capital count, unless all twelve jurors vote for death the defendant must and will receive the alternative sentence of life imprisonment without the possibility of release.

Thus, it is essential that prospective jurors be accurately and unambiguously instructed on the law related to the legal effect of one or more votes for life imprisonment. In alerting potential jurors to an accurate and unambiguous statement of the law, the Court shall identify jurors would be unable to conform to the requirements of the law if

they understood their vote alone could result in a life sentence. Cause will exist for such impaired juror's removal.

During jury selection prospective jurors should be made to understand that by their vote in a sentencing hearing they will have the defendant's life in their hands. It is respectfully submitted by defense counsel that the Court should ensure the jurors are not left to speculate or be confused about the possibility of a retrial with attendant trauma, time, and expense. This could easily result in jurors deciding to impose a sentence of death based upon fear rather than reason and operation of the law.

The simplest and most logical way to ensure that the defendant will not be prejudiced in this manner, is to instruct the jury from the outset that a unanimous jury is only required to sentence a defendant to death, but that unanimity is not required during the sentencing trial of a capital and that if even a single juror determines that a sentence of life imprisonment is the appropriate sentence in this case then this Court will be required to impose a sentence of life imprisonment.

## ARGUMENT FOR USE OF EXHIBIT 1
### Schematic of a Federal Capital Trial

Defense counsel respectfully request the Court permit the parties to utilize the *Schematic of a Federal Capital Trial* (Exhibit 1) as a visual aid during voir dire. The visual aid provides a general overview or "road map" of how a federal capital trial may proceed. It illustrates the manner in which a federal capital trial is potentially bifurcated or divided between a "Guilty / Not Guilty – Trial" and a "Sentencing Trial," the "Threshold Determination" the jurors must consider if the case proceeds to a "Sentencing Trial" involves consideration of both a "Mental Intent Factor" and a "Statutory Aggravating Factor," the "Weighing Determination" process involves weighing the Statutory and Non-Statutory Aggravating Factors and the Mitigating Factors, and finally the determination of sentence is based on whether the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death. Providing this general overview in a graphic or schematic manner helps prospective jurors follow along and understand the overview of the process the Court provides in instructions prior to voir dire and facilitates more effective and efficient questioning by the Court and parties. For example, if a juror with strong pro-death bias indicates that he could consider a life sentence in a case in which the killing was accidental, the schematic could be used to explain that in that scenario the case would not proceed to a sentencing trial.

As argued above, defense counsel respectfully urge the Court to ensure prospective jurors understand the full weight of the responsibility each juror will have with regard to deciding life or death in this case if the case proceeds to a sentencing trial

and that to do so the jurors must understand that one or more votes for life – and regardless of whether there are holdouts for death – will result in Mr. Christensen being sentenced to life imprisonment without the possibility of release.

Defense counsel will file a request for a preliminary instruction to the panels of prospective jurors summoned to court each day for jury selection, citing a similar instructions given in *United States v. Briseno*, No. 2:11-cr-00077 (N.D. Ind. 2015), the last federal capital case tried in this Circuit, and *United States v. Con-Ui*, No. 3:13-cr-00123-ARC (M.D. Pa. April 24, 2017).

Judge Simon's preliminary instruction to the prospective jurors during voir dire in *Briseno* is as follows:

> "So if after weighing the aggravating and mitigating factors 11 jurors believe that a death sentence is justified but one juror believes that it is not, then the defendant, under that circumstance, would receive a sentence of life imprisonment. Now, when I say 'life imprisonment,' I mean just that. There's no parole in the federal system."

*Briseno*, No. 2:11-cr-00077, DE 1315 at 19.

```
 1    sufficiently outweigh the mitigating factors that one or more
 2    juror believe exist.
 3         I want to impress upon you that this weighing process is
 4    not some mechanical process where you're simply counting up
 5    factors.  It's a qualitative process.  It is not a quantitative
 6    process.  For example, one mitigating factor may be enough to
 7    outweigh several aggravating factors.  And even if no one on
 8    the jury finds that any mitigating factors exist, the jury
 9    still cannot find in favor of the death penalty unless everyone
10    on the jury finds that the aggravating factors that the jurors
11    have unanimously found are sufficiently serious to justify a
12    death sentence.
13         So if after weighing the aggravating and mitigating
14    factors 11 jurors believe that a death sentence is justified
15    but one juror believes that it is not, then the defendant,
16    under that circumstance, would receive a sentence of life
17    imprisonment.  Now, when I say "life imprisonment," I mean just
18    that.  There's no parole in the federal system.
19         I know that this process, it sounds complicated, and I can
20    assure you if we get to that point in the trial where a penalty
21    phase is necessary, I'm gonna give you more detailed
22    instructions on the law and how you should proceed with the
23    decision-making that you'll be asked to do as a juror.
24         But for now I want you to understand the basic process so
25    you have some framework, including, you know, what would happen
```

Stacy L. Drohosky, FCRR, CRR, RPR
(219) 852-3462 · stacy_drohosky@innd.uscourts.gov

*Id.*

It is our understanding from communication with the Government that the Government will base an objection to these visual aids on the fact that "the demonstratives [] inform the jury that the defendant receives a sentence of life imprisonment if the jury cannot reach a unanimous verdict" and that doing so might have the effect of undermining "the Government's [] 'strong interest in having the jury express the conscience of the community on the ultimate question of life or death'."

(citing *Jones v. United States*, 527 U.S. 373, 382 (1999) and *Lowenfield v. Phelps*, 484 U.S. 231, 238 (1988)). Seeing as the Government can never be unduly prejudiced by an accurate and unambiguous application of the law, we respectfully submit that all parties' interest in a fair and just trial militates in favor of the language requested by the defense.

In *United States v. Sampson*, 335 F.Supp.2d 166 (D.Mass. 2004), Judge Wolf issued a post-trial memorandum opinion that succinctly sets forth the reasons for informing the jury of the consequences of non-unanimity. (The question arose in *Sampson* in the context of the sentencing trial jury instructions and sentencing trial verdict form, however Judge Wolf's reasoning is equally applicable here.) As Judge Wolf explained:

> The [Supreme Court] recognized that the Eighth Amendment does not require that the jury be told the consequences of their failure to agree and that the government has a strong interest in a unanimous verdict – one way or the other – in a death penalty prosecution. *See Jones v. United States*, 527 U.S. 373, 381–82 (1999). However, the Supreme Court in *Jones* did not forbid this sort of instruction. Instead, it held that the constitution does not require it and that the Court would not exercise its supervisory powers to require that it be given in every case.
>
> This court chose to inform the jury of the consequences of deadlock for several reasons. First, viewing this instruction as part of the overall instructions regarding deliberations, the court believed that the government's interest in a unanimous verdict was adequately protected.
>
> Second, informing the jurors of the consequences of deadlock emphasized the individual responsibility of each juror. Ensuring that jurors were cognizant of this responsibility was also an important government interest.
>
> Third, the instruction also ensured that jurors undertook their deliberations accurately understanding the consequences of their actions. Declining to instruct the jury on the

> consequences of a deadlock could result in jurors deliberating based on a misunderstanding of the law rooted in speculation and incorrect assumptions.[43]

*Sampson*, 335 F.Supp.2d at 240-41 (footnote in original). Footnote 43 provided the Court's instruction to the jury (emphasis added):

> If, after making all reasonable efforts, at the conclusion of your deliberations on a particular count, you have not reached unanimous agreement on whether the prosecution has proven that the death penalty is justified, *you will not be a hung jury*. And in contrast to the conventional criminal case, this case will not have to be tried again because the jury did not reach a unanimous verdict. Rather, if you are unable to reach a unanimous verdict on whether the government has proven the death penalty is justified on a particular count, the law provides that I must sentence Mr. Sampson to life in prison without possibility of release on that count, and I will do so.

*Sampson*, 335 F.Supp.2d at 241 n.43, *quoting*, Transcript, dated, December 19, 2003, at 72.

Although, as Judge Wolf noted, the Supreme Court's decision in *Jones* does permit District Courts to withhold from the jury the fact that a life sentence will automatically follow from the jurors failing to unanimously agree on a sentence, many federal courts that have tried cases under the Federal Death Penalty Act since its enactment in 1994 have exercised their discretion to provide this information in some form.

The Tenth Circuit Pattern Jury Instructions includes such a non-unanimity charge. *See* Tenth Circuit Pattern Jury Instructions, Inst. 3.01 (2011 Ed., updated Sept. 2015) ("If you cannot unanimously agree on the appropriate punishment, I will sentence the defendant to life imprisonment without the possibility of release"). A comment by the

10th Circuit's Criminal Pattern Jury Instruction Committee explains this pattern instruction as follows:

> Upon a [jury's] recommendation under [the Federal Death Penalty Act, 18 U.S.C. section 3591 et seq.] that the defendant should be sentenced to death or life imprisonment without possibility of release, the court shall sentence the defendant accordingly." 18 U.S.C. section 3594. As explained in *Jones v. United States*, 527 U.S. 373, 380-81 (1999), if the jury is unable to reach a unanimous verdict, the sentencing determination passes to the court (i.e., the court does not discharge the jury and hold a second sentencing hearing). When the sentencing options are limited to death or life without possibility of release (which is the basic case this set of instructions is drafted to cover), there is only one sentence the court may impose. Thus, if the jury does not unanimously agree on a death sentence, it has effectively chosen a sentence of life without possibility of release, regardless of whether the jurors unanimously agreed on that alternative sentence, and it makes no sense to ask the jury whether they have done so. Therefore these instructions are most naturally written simply to ask the jury whether they have unanimously agreed on a death sentence and, if not, to direct them to indicate that a sentence of life without release should be imposed. Although a jury need not as a general matter always be told the consequences of their failure to return a unanimous verdict, *Jones*, 527 U.S. at 381-83, in this context it seems to be the most straightforward approach.

Numerous other federal trial courts to have tried cases under the Federal Death Penalty Act have followed this approach. *See* Exhibit 3 (Declaration of Kevin McNally).

For the reasons cited above, the defense respectfully requests that the *Schematic of a Federal Capital Trial* clearly indicate that if one or more jurors vote for life – regardless of the number of death holdouts – that the Court will impose a sentence of life imprisonment without the possibility of release.

Respectfully submitted,

/s/Elisabeth R. Pollock                    /s/ George Taseff
Assistant Federal Defender               Assistant Federal Defender
300 West Main Street                     401 Main Street, Suite 1500
Urbana, IL 61801                         Peoria, IL 61602
Phone: 217-373-0666                      Phone: 309-671-7891
FAX:   217-373-0667                      Fax:    309-671-7898
Email: Elisabeth_Pollock@fd.org          Email: George_Taseff@fd.org


/s/ Robert Tucker                        /s/ Julie Brain
Robert L. Tucker, Esq.                   Julie Brain, Esq.
7114 Washington Ave                      916 South 2nd Street
St. Louis, MO 63130                      Philadelphia, PA 19147
Phone: 703-527-1622                      Phone: 267-639-0417
Email: roberttuckerlaw@gmail.com         Email: juliebrain1@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing

to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial

Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

EXHIBIT 1

# Trial

# Sentencing Trial

## Indictment

**Count 1. Kidnapping Resulting in Death**
[capital]

**Count 2. False Statement**
[non-capital]

**Count 3. False Statement**
[non-capital]

## Threshold Determination

### Mental Intent Factor

The defendant

• <u>intentionally killed</u>; and or

• <u>intentionally inflicted serious bodily injury</u> that resulted in the death; and or

• <u>intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used (victim died)</u>

• <u>intentionally and specifically engaged in an act of violence</u>, knowing that the act created a grave risk of death to a person (constituted a reckless disregard and victim died)

**and**

### Statutory Aggravating Factor

• The death, or injury resulting in death, occurred <u>during the commission</u> of, or during the immediate flight from the commission of, a <u>kidnapping</u>.

• Committed the offenses in an <u>especially heinous, cruel, and depraved manner</u> in that it involved torture or serious physical abuse to the victim.

• The defendant committed the offense after <u>substantial planning and premeditation</u> to cause the death of a person.

## Weighing Determination

Aggravating Factors (Statutory & Non statutory)

Mitigating Factors



Each juror must decide what weight or value is to be given to a particular Aggravating or Mitigating Factor in the decision-making process.

### Other (Non-Statutory) Aggravation

-Unanimous
-BARD
-only those specifically listed:

• Victim impact evidence.
• Future dangerousness of the defendant.
• Lack of remorse.
• Other serious acts of violence.
• Vulnerability of victim.
• Obstruction.

### Mitigation

-Individual finding and
-More Likely than Not
-Listed by Court **or** Identified by a Juror:

• Not excuses or justifications
• Not required to be connected to the crime

"shall consider whether all the *aggravating* factor or factors found to exist <u>sufficiently outweigh</u> all the *mitigating* factor or factors found to exist to justify a sentence of death"

Unanimous
**Death**

Unanimous / Not Unanimous
**Life wo Release**

Guilty

Not Guilty 

Unanimously Found

Not Found Unanimously 

EXHIBIT 2

# LIFE OR DEATH DECISION-MAKING IN A FEDERAL DEATH-PENALTY CASE

• No juror is ever required to impose a sentence of death.

• The alternative to a sentence of death is lifetime imprisonment without the possibility of release.

• In the federal system, there is no parole, so life means life.

• The decision is a moral one that each juror must decide for himself or herself.

• Every juror's views are entitled to the respect of every other juror.

• The decision of the jury is final. The Judge cannot change it.

• If all 12 vote for death, the sentence will be death.

• If even one juror votes for life, the sentence will be lifetime imprisonment without the possibility of release.

EXHIBIT 3

**DECLARATION OF KEVIN McNALLY REGARDING PENALTY-PHASE
SENTENCING OPTIONS PRESENTED TO FEDERAL JURIES IN CAPITAL TRIALS
PURSUANT TO THE FEDERAL DEATH PENALTY ACT, 18 U.S.C. §3593**

1.  I currently serve with the Federal Death Penalty Resource Counsel Project, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal courts.  I have served as Resource Counsel since the inception of the Resource Counsel Project (RCP) in January, 1992.  I was the Director of the Project between 2007 and 2018.  The Project is funded and administered under the Criminal Justice Act by the Defender Services Office of the Administrative Office of the United States Courts.

2.  My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases.[1]

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. http://www.uscourts.gov/sites/default/files/original_spencer_report.pdf.   The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

An update to the Report states: "Many judges and defense counsel spoke with appreciation and admiration about the work of Resource Counsel. Judges emphasized their assistance in recruiting and recommending counsel for appointments and their availability to consult on matters

3.    In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information about these cases.  I accomplish this by internet news searches, by reviewing dockets and by downloading and obtaining indictments, pleadings of substance, notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated and is checked for accuracy by consulting with defense counsel.  The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4.    Numerous district courts have presented three penalty verdict options giving juries the option of a 1) unanimous vote for death, 2) unanimous vote for life or 3) a non-unanimous decision that will result in the imposition of a sentence other than death, usually life without the possibility of release.  In some cases, judges have limited the jury to a single choice, simply asking jurors whether they unanimously agreed on a sentence of death or not.  *See, e.g.,* the instructions and verdict sheets

---

relating to the defense, including case budgeting. Defense counsel found their knowledge, national perspective, and case-specific assistance invaluable."
http://www.uscourts.gov/services-forms/defender-services/publications/update-cost-and-quality-defense-representation-federal

in the following cases[2]: 1) *United States v. Davis* (E.D. LA No. 94-CR-381); 2) *United States v. Hall and Webster* (N.D. TX No. 94-CR-121-Y); 3) *United States v. Battle* (N.D. GA No. 95-CR-528-ODE); 4) *United States v. Johnson and Ray* (N.D. IL No. 96 CR 379); 5) *United States v. Jones* (D. MD No. 96-455-WMN); 6) *United States v. John Bass* (E.D. MI CR No. 97-80235); 7) *United States v. Dhinsa* (E.D. NY No. 97-CR-672 (ERK)); 8) *United States v. Holder* (E.D. MO No. 97-CR-141-ERN); 9) *United States v. Finley* (W.D. NC No. 98-CR-243); 10) *United States v. Higgs* (D. MD No. 98-520-PJM); 11) *United States v. Lightfoot* (W.D. MO No. 98-CR-149); 12) *United States v. Mohamed and al-Owhali* (S.D. NY No. S6 98-CR-1023); 13) *United States v. Gilbert* (D. MA No. 98-30044-MAP); 14) *United States v. Lyon* (W.D. KY CR No. 4:99-CR-11-M); 15) *United States v. Joseph Minerd* (W.D. PA CR No. 99-215); 16) *United States v. Johnson* (E.D. VA No. 00-CR-26); 17) *United States v. Mitchell* (D. AZ No. 01-CR-1062-ALL); 18) *United States v. Sablan* (D. CO No. 00-CR-00531-WYD); 19) *United States v. Duong* (N.D. CA No. 5:01CR20154 JF); 20) *United States v. Fell* (D. VT No. 01-CR-12); 21) *United States v. Brown* (S.D. GA No. 01-CR-403); 22) *United States v. Frye* (D. MS No. 01-CR-8-BN); 23) *United States v. Purkey* (W.D. MO No. 01-308-FJG); 24) *United States v. Dixon* (E.D. NY No. 01-CR-389-ALL); 25) *United States v. Moussaoui* (E.D. VA

---

[2]Trials pursuant to 21 U.S.C. §848, or both federal death penalty statutes, are not included.

No. 01-CR-455); 26) *United States v. Sampson* (D. MA CR No. 01-CR-10384-ALL); 27) *United States v. James and Mallay* (E.D. NY CR No. 02-778 (S-1) (SJ)); 28) *United States v. Houston and Bridgewater* (C.D. CA CR No. 02-00938-GHK); 29) *United States v. Catalan-Roman and Medina Villegas* (D. PR CR No. 3:02-CR-117-ALL); 30) *United States v. Fulks* (D. SC No. 02-CR-992-FJA); 31) *United States v. Perez* (D. CT No. 02-CR-7-JBA); 32) *United States v. Breeden* (W.D. VA No. 03-CR-13-ALL); 33) *United States v. Baskerville* (D. NJ No. 03-CR-386-JAP); 34) *United States v. Mayhew* (S.D. OH No. 03-CR-165); 35) *United States v. Simmons* (W.D. VA CR No. 5:04-CR-00014-SGW-ALL); 36) *United States v. Barnes* (S.D. NY No. 7:04-CR-00186-SCR); 37) *United States v. Cisneros and Grande* (E.D. VA CR No. 04-CR-283-ALL); 38) *United States v. John Johnson* (E.D. LA No. 2:04-CR-00017-HGB-SS); 39) *United States v. McGriff* (E.D. NY No. 04-CR-966-FB); 40) *United States v. Natson* (M.D. GA No. 05-CR-21); 41) *United States v. Hans* (D. SC No. 6:05 CR 01227-HMH); 42) *United States v. Solomon* (W.D. PA No. 2:05-CR-00385-TFM); 43) *United States v. Timothy O'Reilly* (E.D. MI No. 05-80025); 44) *United States v. Vincent Basciano* (E.D. NY No. 05-CR-0060 (S-3) (NGG)); 45) *United States v. Lujan* (D. NM No. 05-924); 46) *United States v. Casey* (D. PR No. 3:05-CR-0277-JAG); 47) *United States v. Dinkins and Gilbert* (D. MD No. 1:06-CR-00309-JFM); 48) *United States v. Azibo Aquart* (D. CT 3:06CR160 (PCD)); 49) *United*

4

States v. Burgos-Montes (D. PR No. 06-009 JAG); 50) *United States v. Williams* (D. HI No. 1:06-CR-00079-DAE); 51) *United States v. Duncan* (D. ID CR No. 07-23-N-EJL); 52) *United States v. Savage, et al.* (E.D. PA No. 2:07-CR-00550-RBS); 53) *United States v. Richardson* (N.D. GA No. 1:08-CR-139); 54) *United States v. Byers* (D. MD No. 08-056); 55) *United States v. Runyon* (E.D. VA CR No. 4:08-CR-16); 56) *United States v. Candelario-Santana* (D. PR No. 3:09-CR-00427-JAF); 57) *United States v. McCluskey* (D. NM No. 1:10-CR-02734); 58) *United States v. Sanders* (W.D. LA No. 1:10CR00351); 59) *United States v. Briseno* (N.D. IN No. 2:11-CR-77) and 60) *United States v. Jesse Con-Ui* (M.D. PA No. 3:CR-13-123).

I declare under the penalty of perjury under the laws of the United States of American, 28 U.S.C. §1746, that the foregoing is true and correct. Executed this 24th day of May, 2019.

__/s/ Kevin McNally____
KEVIN McNALLY