UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | |
|       Plaintiff,   ) | |
| ) | |
| vs.   ) | Crim. No. 17-20037 |
| ) | |
| BRENDT A. CHRISTENSEN,   ) | |
| ) | |
|       Defendant.   ) | |

<u>DEFENDANT'S MOTION IN SUPPORT OF JURY INSTRUCTIONS AND A VERDICT FORM IN THE SENTENCING HEARING INFORMING THE JURY THAT A NON-UNANIMOUS VOTE ON LIFE OR DEATH WILL RESULT IN THE COURT IMPOSING A SENTENCE OF LIFE IMPRISONMENT WITHOUT RELEASE</u>

NOW COMES the Defendant, BRENDT A. CHRISTENSEN, by and through his attorneys, and requests the Court instruct the jury that a non-unanimous vote on life or death will result in the Court imposing a sentence of life imprisonment without release.

**In Order for the Jurors to Understand and Appreciate Their "Truly Awesome Responsibility" for Deciding Life or Death for Mr. Christensen, the Jurors Must be Informed that if One or More Jurors Votes for Life the Court Will Impose a Sentence of Life Imprisonment without the Possibility of Release**

In *Caldwell v. Mississippi*, 472 U.S. 320 (1985), the Supreme Court held that the responsibility for sentencing a capital defendant rests firmly on each individual juror and explained that jurors must be "confronted with the truly awesome responsibility of decreeing death for a fellow human" for only then "will [they] act with due regard for the consequences of their decision." *Caldwell*, 472 U.S. at 328-30, *quoting*, *McGautha v. California*, 402 U.S. 183, 208 (1971).

1

The defense respectfully requests the Court instruct the jury in the preliminary penalty phase instructions as follows,

> After weighing the aggravating and mitigating factors, if any one of you determines that a sentence of life without the possibility of release is more appropriate than a sentence of death, you shall enter a decision on your special verdict form to that effect and the Court shall thereafter impose on the defendant a sentence of life imprisonment without the possibility of release.

Defense Proffered Penalty Phase Preliminary Jury Instructions (email sent to Chambers and government counsel July 7, 2019).

And the Defendant's proposed instruction 12 (Doc. 354 at 67) for the conclusion of the sentencing hearing includes the following relevant language,

> If you cannot unanimously agree that a sentence of death should be imposed, you should answer the question "No" and the Court will sentence Mr. Christensen to a life sentence without the possibility of release for Count 1 of the Superseding Indictment. In the federal system, a sentence of life imprisonment without the possibility of release means just that — the defendant will never be released from prison. There is no parole in the federal system.

> It is your duty as jurors to discuss all aspects of these sentencing issues with one another frankly and candidly in an effort to reach agreement, if you can reach agreement. Each of you must decide these questions for yourselves and not go along with the conclusions of your fellow jurors, but only after full consideration of the evidence with the other members of the jury and due respect for one another's opinions.

The defendants proposed verdict form (Doc. 354 at 84) likewise includes the following proposed language (again modeled after *Briseno*),

> Do you, the jury, unanimously find that a sentence of death shall be imposed on the defendant BRENDT A. CHRISTENSEN as punishment for the offense of kidnapping resulting in the death of Yingying Zhang?

YES __        NO __
Note: If you cannot unanimously agree that a sentence of death should be
imposed, you should answer the above question "No," and the Court will
sentence Mr. Christensen to a life sentence without the possibility of release
for the offense of kidnapping resulting in death of Yingying Zhang.

Jurors in the sentencing hearing are given the responsibility and duty to decide
whether another human being will be sentenced to life or death. In order to carry out
this responsibility in a constitutionally appropriate manner, the jury must not exercise
this power and discretion while misunderstanding the law rooted in speculation and
incorrect assumptions. Clearly and accurately advising prospective jurors that each
juror individually must arrive at a life or death sentencing decision, and that a sentence
of life imprisonment without release will be imposed if one or more jurors vote for a life
sentence is necessary to ensure this.

There are at least three reasons why the vast majority (see below for statistics
indicating that in 70% or more of the federal capital cases tried since 2010 the Court has
instructed the jury on the consequences of non-unanimity) of federal courts have
exercised their discretion in this manner.  First, deprived of any instructions on the
consequences of non-unanimous vote for life or death, many jurors will wrongly
assume that a failure to agree on sentence would require either a re-trial of the
sentencing hearing or an entire new trial on the issue of culpability (guilty / not guilty).
This concern is not just theoretical. Anecdotal evidence suggests that capital jurors may
fear that a failure to unanimously agree on a sentence will require a complete guilt-

innocence do-over, with all the attendant trauma, time, and expense – and that this fear can undermine holdouts for death and holdouts for life. See *Hooks v. Workman*, 606 F.3d 715, 733-734, 742-744 & n.33 (10th Cir. 2010) (prosecutor's misleading argument that non-unanimous sentencing vote would require retrial contributed to unconstitutional coercion of the jury).

Especially after a case as lengthy and emotionally exhausting as this one has been, such a misapprehension would surely have a coercive effect on jurors to abandon conscientiously-held views out of a misplaced fear that a failure to reach agreement would result in a re-trial that would force grieving victims to sit through the trial again.

Second, instructions that appear to demand unanimity are in arguable tension with the express statutory (and Constitutional) requirement that jurors not be required to render unanimous verdicts on the existence of mitigating factors. See 18 U.S.C. § 3593(c) ("[a] finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established."); *accord Mills v. Maryland*, 486 U.S. 367 (1988); *McKoy v. North Carolina*, 494 U.S. 433, 439-443 (1990). Indeed, requiring jurors who have arrived at substantially different conclusions regarding mitigating factors (both with regard to finding their existence and then assigning the weight or significance each juror feels is appropriate to each mitigating factor) to nevertheless achieve unanimity before a juror can vote for and

return a life sentence may unduly pressure a juror to harmonize her findings regarding

mitigating factors in a manner that neither the FDPA nor the Eighth Amendment

permits.

And third, failing to provide accurate instructions on the effect of non-unanimity

on the issue of sentence will require a series of additional instructions to ensure that the

jury is not prejudicially misled. Such instructions would include:

- a caution that jurors should not attempt to harmonize their individual findings concerning mitigating factors simply to justify or permit a unanimous sentencing decision;

- an assurance that lack of unanimous agreement on either life imprisonment or death will neither require or permit imposition of any lesser sentence than life imprisonment without release, which could lead to the defendant's eventual release, *see People v. LaVa*lle, 3 N.Y.3d 88 (2004) (finding New York's post-Gregg death penalty statute unconstitutional on this ground); and

- a further assurance that any failure to agree on sentence will have no effect upon the validity of the defendant's underlying convictions.

The Court would do best to obviate the need for these additional safeguards by

simply allowing the jurors to be told that  a death sentence is only imposed if all twelve

jurors vote for death; if one or more jurors votes for life imprisonment the defendant

will be sentenced to life imprisonment.

**The failure to instruct the jury about the consequences of failure to reach unanimity (or, put another way, to instruct the jury that one vote for life will result in the defendant being sentenced to life imprisonment without release) will almost certainly result in a death verdict in this case and would violate the constitutional protections against the arbitrary imposition of the death penalty secured under both the Eighth Amendment and the due process and equal protection guarantees of the Fifth Amendment.**

Although the vast majority of District Courts that have presided over federal capital trials that have taken place since 2010 have instructed the jury on the consequences of failure to reach unanimity, in all but one of the federal capital trials which have occurred since 2010 in which the jury was *not* informed about the consequences of failure to reach unanimity, the jury returned death.

The government knows this and this is the reason the government has been so aggressive in requesting that the Court *not* inform the jury on the consequences of failure to reach unanimity and advocated that the Court preclude the defense from making a so-called "nullification argument" – a novel government position that members of the Federal Death Penalty Resource Counsel Project consulted by undersigned counsel have never before seen advocated by the government in a federal capital case.

In *Jones v. United States*, 527 U.S. 373 (1999) the Court rejected the defendant's claim that FDPA and the Eighth Amendment requires that the jury be instructed, in the main sentencing charge, that a non-unanimous vote on life and would result in the district court imposing a sentence of life. The Court, though, did not forbid such an instruction. Rather, it stated: "In light of the legitimate reasons for not instructing the jury as to the consequences of deadlock, and in light of congressional silence, we will not exercise our supervisory powers to require" it "be given in every case." *Id.* at 384.

In seventy percent (70%) of the federal capital trials completed since 2010 (twenty-one of the thirty trials) the District Court instructed the jury on the

6

consequences of failure to reach unanimity. See *DECLARATION REGARDING THE PREVAILING PRACTICE OF TRIAL COURTS (70% OF CASES TRIED SINCE 2010) ON INSTRUCTING JURORS OF THE EFFECT OF A NON-UNANIMOUS VOTE OF THE JURORS ON THE ULTIMATE ISSUE OF LIFE IMPRISONMENT OR DEATH (WITH RELEVANT EXTRACTS FROM JURY INSTRUCTIONS AND VERDICT FORMS ATTACHED)* Doc. 430 filed June 28, 2019. Of the nine trials in which the jury was not formally instructed on the consequences of failure to reach unanimity on life or death, six trials[1] resulted in death verdicts and three trials[2] resulted in life verdicts. Defense counsel were able to review the closing argument in two of the three trials that resulted in life verdict, and in both trials defense counsel were permitted to argue in the closing of the sentencing hearing that a non-unanimous vote on life or death would result in the Court imposing a sentence of life imprisonment without release.[3]

---

[1] In three of these six trials ending in death the jury sentenced both co-defendants to death. *United States v. Snarr and Garcia*, No. 1:09-cr-00015 (E.D. Tex. 2010), *United States v. Coonce and Hall*, No. 10-cr-03029 (W.D. Mo. 2014), and *United States v. Cramer and Fackrell*, No. 1:16-cr-26 (E.D. Tex. 2018). In one of these six trials ending in death the jury sentenced only one of the capital eligible co-defendants (one of three) was sentenced to death. *United States v. Savage*, No. 14-cr-9003 (E.D. Pa. 2013).

[2] One trial, *United States v. Salad, et al.*, No. 2:11-cr-00034 (E.D. Va. 2013), involved three capital defendants, Ahmed Muse Salad, Abukar Osman Beyle, and Shani Nurani Shiekh Abrar. The jury returned life imprisonment sentences on each defendant.

[3] Defense counsels' arguments were as follows:

> If one vote, one juror, can stop a death verdict and put in place life punishment, you know it's not majority rule, and it is your individual conscience that rules the day on that.

When these two trials are included in the group of trials categorized as instances in which the jury was informed about the consequences of failure to reach unanimity, the percentage of the federal capital trials completed since 2010 in which the jury was accurately informed of the law rises to 76% (twenty-three of the thirty trials). More significantly for purposes of considering this issue under an Eighth Amendment arbitrariness analysis, in trials in which the jury was *not* informed about the consequences of failure to reach unanimity, all but one (six of seven) resulted in death.

---

*United States v. Basciano*, No. 05-CR-060 (E.D.N.Y.), TR 9240 (June 1, 2011).

> The Court is going to instruct you, as I said, about mitigation and aggravation and the role of waiting and what life imprisonment means, on instruction number 16, that you don't have to be unanimous. If one of you decide that one or more mitigating factors, the ones that we have suggested to you, or the ones that you have come up by yourselves, analyzing and listening to the evidence and the circumstances of Shani's life, if you believe that one or more of those mitigating factors, that you have determined by preponderance of a doubt, outweigh the aggravating factors, then you can impose a sentence of life.

> Remember, one juror can give life, one juror can find mitigation, one juror can find mitigation of his own or her own. The judge will tell you that with regards to mitigating factors, circumstances that some of you accept and others don't, each of you has to make that determination by yourself and you don't need to be unanimous. That is because death is never required.

> In the end, when you render your verdict, the Court will respect it, the Government will respect it, and we will respect it, but it's an individual decision. Each one of you has a vote and each vote is as important as the others.

*United States v. Salad, et al.*, No. 2:11-cr-00034, DE 933 at 168, TR 4523 (July 31, 2013).

As discussed above, in all trials but one, when the information has been withheld from the jury, the jury has returned death verdicts. Under these circumstances, although *Jones* held that a District Court has discretion whether or not to inform the jury of the consequences of a non-unanimous vote on life or death, the refusal to instruct the jury on this issue would result in the unconstitutional arbitrary and capricious imposition of a death sentence. This decision about informing the jury of the consequences of a non-unanimous vote on life or death effectively determines whether or not a life imprisonment without release sentence is a realistic, possible sentence returned by the sentencing jury. (Note that death verdicts were recently returned in several cases in which this instruction was provided to the sentencing jury. *See, e.g.,* *United States v. Tsarnaev*, No. 1:13-cr-10200 (D. Mass. 2015) and *United States v. Dylann Storm Roof,* No. 2:15-cr-00472 (D.S.C. 2016).)

Under these circumstances – whether the instruction is given or not is discretionary yet determines whether a life sentence outcome is even a possibility, and when it is given in the vast majority of federal capital cases – the Federal Death Penalty Act would be applied in an arbitrary and capricious manner in cases in which the District Court refuses to instruct the jury on this issue. This is particularly true here, where, since 2010, the only other capital case tried in the Seventh Circuit has been *United States v. Briseno*, No. 2:11-cr-00077 (N.D. Ind. 2015), and the District Court in *Briseno* followed the practice of the majority of District Courts presiding in capital cases and instructed the jury on the consequences of failure to reach unanimity.

9

The *Briseno* sentencing trial verdict form included the following instruction, "Note: If you cannot unanimously agree that a sentence of death should be imposed, you should answer the above question 'No,' and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the murder of Mr. [victim]."



**SECTION VI. DETERMINATION OF SENTENCE**

*Instructions:* Consider whether the Aggravating Factor or Factors found to exist sufficiently outweigh any Mitigating Factor or Factors found to exist, or in the absence of any Mitigating Factors, whether the Aggravating Factor or Factors are themselves sufficient to justify a sentence of death, and whether death is therefore the appropriate sentence in this case. A sentence of death shall only be imposed if your decision in favor of it is <u>unanimous</u>. Based upon that consideration, answer the following question:

Do you, the jury, <u>unanimously</u> find that a sentence of death shall be imposed on the defendant JUAN BRISENO aka Tito as punishment for the murder of Michael Sessum?

YES _____   NO __✓____

**Note:** If you cannot unanimously agree that a sentence of death should be imposed, you should answer the above question "No," and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the murder of Mr. Sessum.

After answering the above question, each juror should sign his or her name below, and the date should be filled in. Once each juror has signed proceed to Section VII of this Special Verdict Form.

*United States v. Briseno*, No. 2:11-cr-00077 (N.D. Ind. 2015) (sentencing trial verdict form DE 1529 as filled out by jury).

Judge Simon also instructed the jury as follows, "If you cannot unanimously agree that a sentence of death should be imposed, you should answer the question 'No'

and the Court will sentence Mr. Briseno to a life sentence without the possibility of release for the count you are considering. In the federal system, a sentence of life imprisonment without the possibility of release means just that — the defendant will never be released from prison. There is no parole in the federal system." COURT'S INSTRUCTION NO. 12, Determination of Sentence (Section VI of Special Verdict Form), (DE 1528, at 30 (March 6, 2015)).

A death penalty that operates on an arbitrary basis is unconstitutional under both the Eighth Amendment and the due process and equal protection guarantees of the Fifth Amendment. *See, Bush v. Gore*, 531 U.S. 98, 106, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (equal protection and due process violations found where "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another. This is not a process with sufficient guarantees of equal treatment."); *see also*, *United States v. Bin Laden*, 126 F. Supp. 2d 256, 263 (S.D.N.Y. 2000) (finding that the Eighth Amendment would be violated if the federal government had decided to seek the death penalty on the basis of geographic considerations); *accord*, *United States v. Jacques*, 2011 WL 3881033 * 4 (D. Vt. Sept. 2, 2011); *United States v. Johnson*, 900 F.Supp.2d 949, 962-963 (N.D.Iowa,2012).

The Eighth Amendment and the Fifth Amendment's due process and equal protection clauses prohibit allowing or disallowing the death penalty based solely on an arbitrary factor. The federal system, in which most District Courts exercise discretion and inform the jury of the consequence of a non-unanimous vote on life or death (with

11

some jury sentencing verdicts in trials resulting in life and some in death) and a minority of District Courts exercise discretion to withhold this information (with all but one jury sentencing verdicts in trials resulting in death) is a capital punishment scheme which operates to arbitrarily deny the possibility of a life sentence outcome not based on an assessment of the moral blameworthiness of the capital defendant and the seriousness of the crime but rather on whether the jury is accurately advised of how the law operates.

The Supreme Court has held that the constitution will not tolerate sentences of death that are imposed in a manner that is arbitrary or capricious. In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court held "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." More recently in *Kennedy v. Louisiana*, 554 U.S. 407 (2008), the Court warned, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." 128 S.Ct. 2650. For that reason, the Court wrote, "[C]apital punishment must 'be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them 'the most deserving of execution.'" *Id.* In practice, the federal death penalty, which operates in such a manner that the failure to instruct the jury about the consequences of a non-unanimous vote on life or death effectively precludes the possibility of a life sentence, fails to meet this constitutional standard and operates in an arbitrary and irrational manner.

"The arbitrary imposition of punishment is the antithesis of the rule of law."

*Glossip v. Gross*, 135 S.Ct. at 2759 (Breyer and Ginsburg, JJ., dissenting). For that reason,

Justice Potter Stewart (who supplied critical votes for the holdings in *Furman v. Georgia*,

408 U.S. 238(1972) (per curiam ), and *Gregg* found the death penalty unconstitutional as

administered in 1972:

> These death sentences are cruel and unusual in the same way that being
> struck by lightning is cruel and unusual. For, of all the people convicted of
> [death eligible crimes], many just as reprehensible as these, the[se]
> petitioners are among a capriciously selected random handful upon which
> the sentence of death has in fact been imposed."

*Furman*, 408 U.S., at 309–310 (concurring opinion). *See also Id.*, at 310("[T]he Eighth and

Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal

systems that permit this unique penalty to be so wantonly and so freakishly imposed");

*Id.*, at 313 (White, J., concurring) ("[T]he death penalty is exacted with great infrequency

even for the most atrocious crimes and ... there is no meaningful basis for distinguishing

the few cases in which it is imposed from the many cases in which it is not").

**The Reason for the Unanimity Provision In 18 USC 3594 Is Not Because of the
Historic Preference for Unanimity in Guilty / Not Guilty Determinations in the Jury
System; Rather the Statute Had a Very Particular Legislative History and Was
Written in a Way That Provided for a Unanimous Verdict Not Only for Death But
Also Life Without Release to Cover Those Cases Where the Jury Was Rejecting a
Lesser Term of Years**

David Bruck, counsel for Dylan Roof, and Rich Burns, Acting Chief, Capital Case

Section, Department of Justice, addressed these issues during the charge conference in

*United States v. Roof*, No. 2:15-cr-00472-RMG (D.S.C. 2017) Doc. 947 at 70. *See* Exhibit 1.

13

As Professor Bruck described in this hearing, the first modern death penalty statute, passed in 1988, was quite narrow. And when the Senate Judiciary Committee was drafting a new statute in 1993 the Supreme Court granted certiorari in *Simmons vs. South Carolina*, 512 U.S. 154 (1994) that raised a raft of issues related to the so-called "blind option sentencing" where the jury  was allowed to decide death, but they had no idea whether the defendant  could receive a sentence short of life imprisonment with no possibility of release if they did not impose the death penalty. The challenge facing the drafters of the statute was  that some of the capital statutes that would be covered by the Federal Death Penalty Act had a less than life option. Because of this there had to be some mechanism for the jury to make a choice between three options: death, life without release, or something less, which applied in some cases, but not others.

Professor Bruck provided background on the use of this instruction by Judge Brinkema in *Moussaoui* and Judge Sand who tried *Owhali* the East Africa Embassy bombing case, and the fact that federal capital juries instructed on the issue continue to return unanimous verdicts for death. Finally, Professor Bruck addressed the issue of what happens when you don't tell the truth:

> Everybody in the courtroom knows except the jury how this thing works, and they get in the jury room, and it's 10 to 2 for death or 11 to 1. And there is a juror who conscientiously believes that life is the correct verdict, but that juror is left to think that it will be a failure, that that juror will fail his or her fellow jurors, will fail the Court, will fail the community, will fail the victims, will require a retrial. They will come out hanging their heads thinking they have not done their job that the Court entrusted them with, and that is coercive.

14

*Id.*

Knowledge is always better than ignorance. Refusing to truthfully tell the jury that non-uniformity results in life imprisonment without the possibility of release results in death sentences rendered through ignorance. That is not a system the Court should support.

Therefore, for all the forgoing reasons, this Court should instruct this jury that a non-unanimous vote on life or death will result in the Court imposing a sentence of life imprisonment without release.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:     309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2019, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing

to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and Trial

Attorney James B. Nelson. A copy was also mailed to the defendant.

<div style="margin-left:40%">

<u>/s/Elisabeth R. Pollock</u>
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

</div>

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 70 of 131
2:17-cr-20037-JES-JEH    # 451    Page 17 of 78
CHARGE CONFERENCE                                717

1           MR. BURNS:  Your Honor, the next has to do with the

2     Court's inclusion on both instructions and the verdict form

3     of an option for the jury to signal that it is not unanimous

4     in its findings and its determination.  I think that is an

5     extremely important point, Your Honor, I would like to

6     address.

7           The American criminal justice system has as its

8     heart the jury, and the Supreme Court has noted for over a

9     hundred years, the central feature of the jury, the thing

10    that makes it so unique, is the requirement of unanimity.

11    That requirement is what fuels the deliberations.  It makes

12    12 people go back into a room and argue and debate and

13    examine the evidence and examine their own views.

14          If you take it away and tell them they don't really

15    have to be unanimous, and you tell them that at the outset,

16    it completely takes away the fuel that requires them to

17    deliberate and undermines the very essence --

18          THE COURT:  Let me tell you this, Mr. Burns:  This

19    is a very interesting issue because in virtually all of my

20    cases, unanimity is required.  It's not required here for the

21    sentence.

22          MR. BURNS:  It is, Your Honor.

23          THE COURT:  It is not required; that is, we know

24    that the consequence of nonunanimity is a life without the

25    possibility of release.  And I'm struggling.  You know, I

EXHIBIT 1

CHARGE CONFERENCE                                  718

1    initially considered putting it in, you know this, just fully

2    disclose that to the jury.  I thought you made a very good

3    argument under *U.S. vs. Jones* I could not do that.  But I

4    don't want to mislead the jury either.  And I'm -- I'm

5    neutral about it.  I don't talk about consequences, but

6    it's -- I don't want to mislead them into believing that

7    nonunanimity requires a retrial because in every other case

8    it does.  I wasn't impressed with the defendant's argument

9    that about the *Slager* case, but in every other case,

10   nonunanimity requires a retrial.  This is another one of

11   those unique characteristics of the capital sentencing

12   phase --

13            MR. BURNS:  Your Honor --

14            THE COURT:  -- so I come, Mr. Burns, to the middle

15   ground.  I come to you on *U.S. vs. Jones*, and I haven't gone

16   as far as the defense wants me to do, but I've come in the

17   middle to say, "I just want you to record your verdict."  And

18   I don't think I'm inviting nonunanimity.  It's just one of

19   our options, and it's just recording what they -- they may

20   say.

21            Now, you suggested the Allen charge.  I've given the

22   Allen charge.  Let me give you the Allen charge:  "Ladies and

23   gentlemen of the jury, if you do not make a decision in this

24   case, another jury will have to make this decision."  That is

25   the essence of Allen.

2:15-cr-00472-RMG   Date Filed 03/29/17   Entry Number 947   Page 72 of 131
2:17-cr-20037-JES-JEH   # 451   Page 19 of 78
CHARGE CONFERENCE                                    719

```
 1                MR. BURNS:  That is not how we suggest an Allen

 2       charge be phrased in a penalty phrase.  We suggest it's

 3       consistent with what has been done in other courts in a

 4       penalty phase.

 5                THE COURT:  I'm telling you the traditional Allen

 6       charge is based on this very premise that unanimity is

 7       required.  I'm going to think about it again after this

 8       hearing.  One of the things -- some of these things I'm not

 9       going to make a final decision until I think about it a

10       little bit more.  But I am just sort of -- I kind of think

11       where it is is sort of where it ought to be.

12                Mr. Bruck, what are your thoughts about this?

13                MR. BRUCK:  Well, I am going to take a very serious

14       run at persuading the Court that your original decision was

15       correct.

16                THE COURT:  But assuming for just a moment we won't

17       get to that yet, if I don't do that --

18                MR. BRUCK:  I'm a little bit with Mr. Burns on this

19       because I don't think to tell the jury to check that box and

20       not tell them that is the end of litigation leaves them with

21       the misconception that when the jury hangs the case has to be

22       retried --

23                THE COURT:  If I don't agree with you, you want me

24       to take it out?

25                MR. BRUCK:  I don't want you to take it out, but I
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 73 of 131
2:17-cr-20037-JES-JEH    # 451    Page 20 of 78
CHARGE CONFERENCE                                    720

```
 1       don't want you to leave the jury with the impression that all

 2       of these families are going to have to testify again.

 3              THE COURT:  Mr. Bruck, I noted -- am I correct that

 4       in the Tsarnaev case that the Judge had the fourth option?

 5              MR. BRUCK:    Tsarnaev, he thought that the minority

 6       position -- he over and over again said, "The minority

 7       position is that you don't tell them what the consequences of

 8       deadlock is."  Most judges after Jones do tell them.  Jones

 9       is discretionary.  Jones does not say that you can't; it says

10       that you don't have to tell them.

11              And most judges -- I mean, this is one of those

12       classic situations where the life of the law is not logic,

13       but experience.  Jones itself was the first federal death

14       penalty case tried under the Federal Death Penalty Act.  I

15       don't mean the first case that reached the Supreme Court.  I

16       don't mean the first case on appeal or the first death

17       sentence.  It was the first trial in the entire country, and

18       everyone was feeling their way, and there was all sorts of

19       errors in Jones.  Some of it was ruled to be invited or

20       waived or defaulted, and ended up as a 5 to 4 decision in

21       most of the issues in the case.  It's not much of a model to

22       go by.  And had the Judge given the instruction in Jones that

23       we are asking for here, none of the issues in Jones would

24       have arisen.

25              So, yes, Jones allows you to keep the jury in the
```

2:15-cr-00472-RMG   Date Filed 03/29/17   Entry Number 947   Page 74 of 131
2:17-cr-20037-JES-JEH   # 451   Page 21 of 78
CHARGE CONFERENCE                                    721

1    dark and to leave them thinking wrongly.  If you don't tell

2    them what happens if they don't agree, the case will have to

3    be retried, and all of the heartbreak and all the trauma and

4    all of the distress that they have witnessed to and they have

5    been through.  But it ain't so.  It's not true, and they

6    should not be left in the dark about that.

7            You know, we can say what we want about *Slager*, but

8    everyone in this community knows when that case hung, the

9    first thing that had to happen was to schedule a retrial and

10   put everyone through it again.  And that is what this jury

11   will assume about this fourth sentencing option.  And it's

12   not true.  And they shouldn't be allowed to think that.  If

13   we didn't have reason to believe that they would think that,

14   it wouldn't be such a big problem.  But we do.

15           THE COURT:  Okay.  So let's just sort of leave where

16   we are here.  If I don't -- I'm going to consider what you

17   are saying.  I'm going to go back and --

18           MR. BRUCK:  No more to say about it than just that,

19   but we hadn't gotten there yet.

20           THE COURT:  But if I don't take your view, do you

21   want me to take out that fourth option?

22           MR. BRUCK:  Yes.

23           THE COURT:  Okay.  Mr. Burns?

24           MR. BURNS:  Your Honor, the Government's next point

25   has to do with the definition of nonstatutory aggravating and

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 75 of 131
2:17-cr-20037-JES-JEH    # 451    Page 22 of 78
CHARGE CONFERENCE                                              722

1    mitigating factors.  And so far as the Government had

2    proposed and the Court had included in its instructions that

3    the jury must find not only an aggravator or mitigator that

4    the facts are established, but that they are in fact

5    aggravating or mitigating.

6              THE COURT:  I thought that the law has sort of

7    established that the issue is not whether the -- if a factor

8    is mitigating -- they find by a preponderance of the evidence

9    that the mitigating factor has been proven, it's a mitigating

10   factor.  The weight given to that is the issue.  Now, that's

11   how I understand it.  And, thus, to say that even if they

12   find -- I mean I've already ruled certain things aren't

13   mitigating, and I will probably rule some more things are not

14   mitigating.

15             But once I rule they are mitigating and they are

16   proven, then they are mitigating.  The jury may then

17   conclude -- I'm not -- I don't think that is important, but

18   that is something for the jury to decide, individual jurors

19   to decide whether it's mitigating.

20             So I'm kind of bothered under that body of law that

21   says that -- and I can go dig it out if I need to, how I tell

22   them, "Even if you find it mitigating, you are still -- you

23   still can -- you don't even have to weigh it.  You don't have

24   to consider it."  Is that really what you want me to tell

25   them?

CHARGE CONFERENCE                    723

1           MR. BURNS:  The law is that the jury does not have

2      to accept what the Government proposes as nonstatutory

3      aggravators, or what the defense proposes as nonstatutory

4      mitigators.  They are free to decline.  The fact that it is

5      alleged and argued to them, they are only -- the second step

6      is if they find the factor and find it mitigating, then they

7      decide what kind of weight that they want to attach to it.

8      And the *United States vs. Higgs*, a Fourth Circus case, Your

9      Honor --

10          THE COURT:  U.S. versus?

11          MR. BURNS:  Higgs, H-i-g-g-s.

12          THE COURT:  Give me the citation.

13          MR. BURNS:  353 F.3d, 281, and the pincite is 327

14     where it says, "There is no constitutional requirement that

15     the jury find a mitigating factor, even when it is supported

16     by uncontradicted evidence."  And that is the case we have as

17     well.

18          THE COURT:  You interpret that to mean that they can

19     say, "Yeah, he's 21, but it's not mitigating."

20          MR. BURNS:  Correct, Your Honor.  And an example, if

21     I can argue by -- *reduction ad absurdum* I think is the Latin

22     phrase --

23          THE COURT:  I had the law professor say, "Answering

24     in Latin makes you no less wrong."  You know what I'm saying?

25          MR. BURNS:  Well, that is part of my Latin, Your

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 77 of 131
2:17-cr-20037-JES-JEH   # 451   Page 24 of 78
CHARGE CONFERENCE                                        724

1    Honor.

2            But you could conceive, for example, if the

3    defendant had been 30 years old, and the defense proposed as

4    a mitigating factor his youthfulness, the fact is he's

5    30 years old, and the jury would have to find that it's

6    uncontradicted.  But no jury should ever be required to

7    accept the proposition that being 30 is youthful; and,

8    therefore, find that the fact can mitigate it.  They can

9    reject it as mitigation, but if they accept it as mitigation,

10   they still remain free to give whatever weight they think

11   it's worth.

12           THE COURT:  So it's the language I took out that

13   said -- I recall it said something like, "And you must find

14   it mitigating."

15           MR. BURNS:  That is in fact mitigating.  And that

16   also, Your Honor, is exactly how the Eighth Circuit death

17   penalty instructions read.  The Eighth Circuit was the first

18   circuit to create pattern instructions for the death penalty,

19   and the Tenth Circuit has followed suit.  As far as I'm

20   aware, those are the only two circuits that have pattern

21   instructions.

22           THE COURT:  How about the Tenth Circuit?  Did they

23   do it?

24           MR. BURNS:  I don't think the Tenth Circuit did it.

25   Cases within the Tenth Circuit aren't precluded from making

2:15-cr-00472-RMG   Date Filed 03/29/17   Entry Number 947   Page 78 of 131
2:17-cr-20037-JES-JEH   # 451   Page 25 of 78
CHARGE CONFERENCE                                     725

1        that instruction.

2                THE COURT:  Mr. Bruck, what's the argument on the

3        other side?

4                MR. BRUCK:  Well, I mean, if the defendant was one

5        day past his 18th birthday, the jury ought not to be free to

6        say, "That is not even a mitigating factor to consider."  The

7        weight be obviously -- I agree with Mr. Burns and I agree

8        with the Court -- is for the jury, but not to say that youth

9        in this Court isn't mitigating.  Youth is mitigating.  And if

10       a factor makes the cut, and the Court submits it, it's

11       because it has potential to be -- to have weight as a

12       mitigating factor.

13               THE COURT:  The -- Mr. Burns has sent me to *U.S. vs.*

14       *Higgs*, and I'm going to go back and read it again.  Do you

15       want to send me another case to look at on this?

16               MR. BRUCK:  I don't have one off the top of my head.

17               MR. BURNS:  I do, Your Honor, another Fourth Circuit

18       case, *United States vs. Basham*.

19               THE COURT:  I'm familiar with *Basham*.  Give me the

20       cite, please.

21               MR. BURNS:  561 F.3d 302, pincite 337.

22               THE COURT:  Okay.

23               MR. BRUCK:  I'm reasonably sure that all those cases

24       concern where a jury didn't make a finding, or didn't make a

25       unanimous finding, of an undisputed fact and the claim is

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 79 of 131
2:17-cr-20037-JES-JEH    # 451    Page 26 of 78
CHARGE CONFERENCE                                        726

 1    that is a mitigating fact.  The jurors had to find it even if

 2    they don't give it much weight, the courts have uniformly

 3    rejected that claim.  That is not the same as telling the

 4    jury that they are free to commit the same error that the

 5    trial judge made in *Eddings vs. Oklahoma* where it said, "I

 6    can't consider the fact the undisputed evidence of the

 7    turbulent violence of a childhood of a 16-year-old offender,"

 8    and the Supreme Court said, "You absolutely can consider it.

 9    You could have given it any weight, but you have to consider

10    it."

11            MR. BURNS:  Your Honor, the *Eddings* case only said

12    that the jury cannot refuse to give weight to a mitigating

13    factor by eliminating it from their consideration.  We are

14    not arguing that.

15            THE COURT:  We put on the verdict form, and we are

16    having them determine it, right?

17            MR. BURNS:  That's right.  So it's going to be in

18    evidence.  The jury will consider it, but after considering

19    it, they are free to find that it is not mitigating.  So

20    *Eddings* only has to do with precluding their consideration of

21    the factor, not that they didn't give it any --

22            MR. BRUCK:  *Eddings* was a judge sentencing.  There

23    was no jury in it.  And the Supreme Court said that is

24    reversible error.

25            THE COURT:  Let me -- you know, one of the helpful

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 80 of 131
2:17-cr-20037-JES-JEH   # 451   Page 27 of 78
CHARGE CONFERENCE                                      727

1    things is when you are doing the jury charge -- I've got, you

2    know, dozens of pages of this stuff.  When we get down to

3    just a couple of issues, I can zero in and be more focused on

4    these issues.  I'll look at it this afternoon, and we'll come

5    to a conclusion.

6            MR. BURNS:  We also wanted to point out that with

7    respect to the mitigating factors, with our stipulations, the

8    Government's position is that we stipulated to the facts.  We

9    did not stipulate --

10           THE COURT:  I figured this was very related to this

11   very argument you are making.

12           MR. BURNS:  It is, Your Honor.

13           THE COURT:  I'll tie that to what I decide on this

14   other issue.

15           MR. BURNS:  Thank you, Your Honor.

16           We next would object to the defense's proposal for

17   rewriting the federal death penalty weighing standard, which

18   is 18 USC 3593(e) by adding the language about after -- the

19   statute -- I'm sorry, Your Honor -- reads that, "The jury

20   shall consider whether all the aggravating factor or factors

21   found to exist sufficiently outweigh all the mitigating

22   factor or factors found to exist justify the sentence of

23   death," and here is where the defense wanted to add in a

24   clause "rather than a sentence of life imprisonment."  That

25   is not how the statute reads.  We just object to the jury

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 81 of 131
2:17-cr-20037-JES-JEH    # 451    Page 28 of 78
CHARGE CONFERENCE                                      728

1      trying -- the defense trying to interject persuasiveness into

2      the instruction.  That is contrary to the statute.

3              THE COURT:  We are always admonished when doing

4      charges that we are talking to a jury, and we shouldn't be

5      quoting from cases because the case citation may not best

6      communicate the knowledge the jury might have.  And, you

7      know, I just thought -- I was fully aware I deviated from the

8      statute.  I was aware of that.  But I thought it was just

9      sort of a more balanced statement.

10             The statute is not trying to talk to a jury, it's

11     stating the law, okay?  And the law is this weighing process,

12     but the jury -- in the end, these are the two choices, and

13     I'll look at the language again.  I just -- it sort of just

14     rung right to me, frankly, Mr. Burns.  It just seemed like a

15     reasonable suggestion.  But I will look at it again.  Let me

16     write . . .

17             I don't presume, Mr. Burns -- in quoting the

18     statute, I don't tell them I'm quoting the statute.  I'm

19     trying to communicate with them, and I don't -- I'm trying so

20     hard that I don't tip a decision to anyone.  I'm just trying

21     to be a neutral party here and trying to do it in a way that

22     the jury makes their own -- the jurors make their own

23     individualized moral judgment not influenced by me.  That is

24     my goal.

25             MR. BURNS:  I appreciate that, Your Honor.

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 82 of 131
2:17-cr-20037-JES-JEH    # 451    Page 29 of 78
CHARGE CONFERENCE                                       729

```
 1                  THE COURT:  Next one.

 2                  MR. BURNS:  Did you want to move at all to the

 3      verdict form at this point?

 4                  THE COURT:  I'll be glad to do the verdict form.

 5                  MR. BURNS:  The only suggestion we had to the

 6      verdict form was on page 18.

 7                  THE COURT:  Yes.

 8                  MR. BURNS:  The Court deleted the language that

 9      completes the weighing standard, and that is the portion that

10      reads:  "Or in the absence of any mitigating factors, whether

11      the aggravating factor" --

12                  THE COURT:  We did that because we were -- because

13      it all ties to the same issue.  I'll try to -- I will deal

14      with that one consistent with how I deal with these other

15      issues.

16                  MR. BURNS:  Thank you, Your Honor, and I think

17      without saying that Section 6D, the unable to reach a

18      unanimous decision portion of the verdict form, ties back to

19      the instructions.

20                  THE COURT:  That's it?

21                  MR. BURNS:  Yes, Your Honor.

22                  THE COURT:  Very good.  Thank you, Mr. Burns.

23                  Okay, Mr. Bruck.

24                  MR. BRUCK:  If I may, Your Honor?  There are two

25      really important issues.  Before I wear out the Court's
```

CHARGE CONFERENCE                          730

1      patience, I would like to approach the counts in our

2      objections, if I could do that, rather than go

3      chronologically.  I would like to finish the discussion that

4      we started about advising the jury of the consequences of a

5      failure to disagree.

6             Mr. Burns invokes the value of unanimity, the

7      importance of it in the American jury system.  This is

8      sentencing.  This is a very different situation.  The -- we

9      set out in some of the pleadings a little bit of the

10     legislative history.  The reason for the unanimity provision

11     in 34 -- 3594 is not because of the historic preference for

12     unanimity in guilt or innocence determinations in the jury

13     system, it had a very particular legislative history, and if

14     you will bear with me for a moment --

15            THE COURT:  I would like to hear it.

16            MR. BRUCK:  I'll tell you what it is.  The original

17     draft of the Federal Death Penalty Act was patterned after

18     the antidrug use.  The first modern death penalty statute,

19     passed in 1988, was quite narrow, but it created -- it did

20     not allow the jury to choose between life and death.  It

21     simply said the jury should decide whether death was

22     justified, period.  Yes or no.  And if the answer was no,

23     then the jury had no further sentencing function, and it went

24     to the Court.  What was wrong with that was that the jury

25     didn't know what the alternative sentence was.

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 84 of 131
2:17-cr-20037-JES-JEH    # 451    Page 31 of 78
CHARGE CONFERENCE                                    731

1          THE COURT:  And there was a concern that they might

2     get five years or something.

3          MR. BRUCK:  Exactly.

4          THE COURT:  And the potential for imposing death to

5     prevent that from happening.

6          MR. BRUCK:  Exactly.

7          Now, that was the situation in 1988 until 1993.  The

8     Senate Judiciary Committee had this draft in October of 1993.

9     The Supreme Court granted certiorari in a case called *Simmons*

10    *vs. South Carolina* --

11         THE COURT:  I'm familiar with that one as you are.

12         MR. BRUCK:  -- that raised this raft of issues about

13    what we call "a blind option sentencing" where the jury got

14    to decide death, but they had no idea whether the defendant

15    would be cut loose if they didn't impose the death penalty.

16    The Court didn't know what the outcome would be -- I mean,

17    the Senate, the Congress, or how it would be decided.  But

18    everybody could tell it was something that had to be fixed.

19    What they did was with -- Senator Biden proposed amendments

20    to the draft which was to give the jury the choice between

21    death and life.

22         The problem was it couldn't be made a simple choice

23    between death and life because some, although not all of the

24    many, many capital statutes that will be covered by the

25    Federal Death Penalty Act procedures, had a less than life

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 85 of 131
2:17-cr-20037-JES-JEH    # 451    Page 32 of 78
CHARGE CONFERENCE                                  732

```
 1        option.  So there had to be some mechanism for the jury to

 2        choose to make a choice between three options:  Death, life

 3        without release, or something less, which applied in some

 4        cases, but not others.

 5                   THE COURT:  It does not apply in this case.

 6                   MR. BRUCK:  It does -- right.  This case could

 7        have -- right.  But --

 8                   MR. BURNS:  I just want to clarify for the record

 9        that there is a term of years options for some of the

10        statutes in this case, but by agreement would not be

11        presented to the jury.

12                   MR. BRUCK:  Right.

13                   THE COURT:  But there are some statutes that would

14        be mandatory life, correct?

15                   MR. BURNS:  No, no.  Not in this case, no, Your

16        Honor.

17                   THE COURT:  Okay.

18                   MR. BRUCK:  That is right.  This had to be done by

19        agreement.

20                   MR. BURNS:  I'm sorry.  I just wanted to --

21                   THE COURT:  Are there any capital offenses that,

22        absent this agreement, life would be mandatory?

23                   MR. BURNS:  No, Your Honor.  And if -- if in fact

24        the sentencing defaulted back to the Judge, Your Honor would

25        have the option to impose a term of years.
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 86 of 131
2:17-cr-20037-JES-JEH   # 451   Page 33 of 78
CHARGE CONFERENCE                                       733

1          MR. BRUCK:  Fat chance of that happening; and, of

2     course, the Court would be well aware of that.  But so --

3          THE COURT:  Yes.

4          MR. BRUCK:  So the statute had to be written in a

5     way that provided for a unanimous verdict, not only for

6     death, because of the original draft, but also for life

7     without parole to cover those cases where the jury was

8     rejecting a lesser term of years.  And that is why 349 --

9     3593 refers to that.

10         Now, I realize that that legislative history is

11    not -- you know, the statute says what it says, but I think

12    we ought to appreciate the background, that that is the only

13    reason why the statute provides for unanimity.

14         THE COURT:  The argument of the Government basically

15    is that the jurors won't take their responsibility seriously

16    if they know the consequences of nonunanimity.  I'm not sure

17    that is true.  I mean --

18         MR. BRUCK:  I don't think it is either, and the

19    majority of cases that have been tried under the Federal

20    Death Penalty Act have been tried exactly the way we are

21    urging.  And the jurors have taken their responsibility

22    seriously, and they have imposed life in some cases, death in

23    others.  There have been cases in which the jury has not

24    reached a -- *Moussaoui* was one, Judge Brinkema handled it in

25    exactly this fashion.

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 87 of 131
2:17-cr-20037-JES-JEH    # 451    Page 34 of 78
CHARGE CONFERENCE                                      734

1                THE COURT:  Tell me what Judge Brinkema did.

2                MR. BRUCK:  Judge Brinkema submitted a single

3        verdict which was -- a single option which was, "We the jury

4        find the" -- "vote unanimously or -- "to impose the death

5        penalty:  Yes or no."  That's it.  Yes or no on death.  And

6        they were instructed that if the answer was no, he would be

7        sentenced to life.

8                Now, there were two different ways the jury could

9        reach a no.  They could reach a no unanimously, or they could

10       reach a divided verdict by a nonunanimous verdict.  Either

11       way, it would be the same verdict, the same outcome, the same

12       sentence, and the jury was told that.  So the -- and the

13       answer came back no, and --

14               THE COURT:  I believe one juror in that case --

15               MR. BRUCK:  You know, that was what you heard in the

16       newspaper.  There is no court record about that.  The -- and

17       I've heard that there was, you know, more jurors on some

18       counts and not others, but --

19               THE COURT:  Whatever.

20               MR. BRUCK:  -- whatever.  That is how Judge Brinkema

21       handled it.

22               And now there are other ways of doing it that are

23       more literally faithful to the requirement of unanimous

24       verdict for life.  Judge Sand, who tried the *Owhali* case, the

25       East Africa Embassy bombing, recommends in his federal jury

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 88 of 131
2:17-cr-20037-JES-JEH    # 451    Page 35 of 78
CHARGE CONFERENCE                                    735

1      instructions, and the Tenth Circuit does the same, the

2      instructions that Mr. Burns referred to, is simply to said --

3      to ask the jury to return a verdict -- essentially what Judge

4      Brinkema did, as I recall -- to say unanimous for life, for

5      death, or you are not unanimous for death, in which event the

6      Court will sentence the defendant to life imprisonment.

7              THE COURT:  That's in the Tenth Circuit pattern

8      instructions?

9              MR. BRUCK:  That is the Tenth Circuit.  We provide

10     it in 472 in the discussion of this issue.

11              I might mention within the last 15 minutes, a

12     federal jury in Boston has returned a unanimous death

13     sentence in the Gary Sampson resentencing trial after Judge

14     Sorokin in that case gave exactly the instruction we are

15     asking for.  So to say that that the jury did not

16     conscientiously follow its instructions after 16 hours of

17     deliberations, what I hear, is just wrong.  Juries do do

18     that.

19              But here is the alternative; here is what happened

20     when you don't tell the truth:  Everybody in the courtroom

21     knows except the jury how this thing works, and they get in

22     the jury room, and it's 10 to 2 for death or 11 to 1.  And

23     there is a juror who conscientiously believes that life is

24     the correct verdict, but that juror is left to think that it

25     will be a failure, that that juror will fail his or her

CHARGE CONFERENCE                                    736

1    fellow jurors, will fail the Court, will fail the community,

2    will fail the victims, will require a retrial.  They will

3    come out hanging their heads thinking they have not done

4    their job that the Court entrusted them with, and that is

5    coercive.  That is a reason why --

6           THE COURT:  Of course I asked at the request of the

7    defendant every one of my -- every one of my individual

8    jurors, I believe, "Would you stand up if you thought you

9    were right," and they all assured me they would.

10          MR. BRUCK:  Easier said than done.  This pushes the

11   jury system past the breaking point.

12          THE COURT:  I'm going to say to you I hear you.  I'm

13   going to think about it.  I want to go back and read the

14   cases.  I'm going to focus.  It's a lot easier when there are

15   a half-dozen issues for me to look at rather than 60.  Let me

16   spend more time thinking about it.

17          MR. BURNS:  Would you like any more comments on this

18   issue?

19          THE COURT:  Yes, I'll be glad to hear any more

20   comments.

21          MR. BURNS:  First and foremost, the rules of

22   statutory construction are clear that you go to the language

23   of the statute.  It is completely transparent what the

24   Congress decided to do in terms of requiring jury unanimity

25   for either a vote for death or for life imprisonment.  There

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 90 of 131
2:17-cr-20037-JES-JEH    # 451    Page 37 of 78
CHARGE CONFERENCE                                737

1    is no ambiguity in the statute.  The legislative history does

2    not get involved in this at all.

3              THE COURT:  Let me -- I mean obviously you phrase

4    the Eighth Circuit pattern instruction, and then you say the

5    Tenth Circuit goes the other way.  They got it wrong in your

6    view?  Judge Sand got it wrong?

7              MR. BURNS:  Yes, Your Honor.

8              THE COURT:  Let me spend some time focusing.  It's

9    going to be helpful this afternoon for me to pull these

10   documents together and study them.

11             One more point, go ahead.

12             MR. BURNS:  I appreciate it, Your Honor.

13             A key part of the defense argument here is based on

14   a supposition and speculation about what jurors know about

15   the legal consequences of hung juries.  Certainly that

16   information is available in the public, but it does not mean

17   that every juror is aware of it or thinks about it.  And the

18   fact is in every noncapital criminal trial in America every

19   single day, jurors are not told about the consequences of

20   deadlock before they begin to deliberate.  Even though the

21   law on it is clear, that it will result in mistrial and

22   potentially a new trial, no judge ever tells the jury before

23   they deliberate that, "By the way, if you are not unanimous,

24   I will declare a mistrial and we can try this case over

25   again."

CHARGE CONFERENCE                    738

1            And the reason for that is the same as you would see

2    in the penalty phase here, it undermines the very purpose of

3    the jury system, which is to drive them to deliberate, and to

4    think by forcing them to be unanimous.

5            THE COURT:  Let me tell you something.  I'm not sure

6    you are right that they wouldn't think that they would have

7    to have a new trial.  Every other proceeding -- and I'm

8    sitting there talking about unanimity -- I don't know.  Let

9    me go back --

10           Yes, Mr. Roof?

11           THE DEFENDANT:  Can I say something about --

12           THE COURT:  You absolutely can.

13           THE DEFENDANT:  Okay.  It's just if they are in here

14   and they go up to deliberate, where are they going to be able

15   to find out what will happen?  In other words, don't they

16   have a right to know?  If you don't tell them then and they

17   are going out to deliberate, how do they find out?  How would

18   they know?  That's all I'm saying.

19           THE COURT:  Well, they can't research because I've

20   told them to stay away from the books, so. . .

21           MR. BURNS:  And their purpose, Your Honor, is to

22   focus on the facts developed here in this trial and the law

23   provided by this Court and make a decision on that, not on

24   speculation on what legal consequences may follow.  So you

25   want to zero in on that.

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 92 of 131
2:17-cr-20037-JES-JEH    # 451    Page 39 of 78
CHARGE CONFERENCE                                  739

```
 1              THE COURT:  You, the Government, would not want
 2    people to make a decision they otherwise would not make if
 3    they knew.  You wouldn't want that.  Nobody would want that.
 4              MR. BURNS:  No, Your Honor.  Again, I'll just --
 5    it's the same thing as in the guilt phase.  You don't tell
 6    the jury about the consequences.
 7              THE COURT:  Listen, these are really good arguments
 8    on both sides.
 9              Mr. Bruck?
10              MR. BRUCK:  The second important issue has to do
11    with the question of the death penalty not being required.
12    Again, this is an instruction that most judges give in most
13    Federal Death Penalty Act cases.  We have briefed that at
14    some length in our docket entry 472.
15              And the principle that is contained in the word
16    "sufficient," that is a word that creates a very high degree
17    of discretion in the jury.  And we gave a legislative
18    history.  That word masks the fact that there was a huge
19    legislative battle over the extent of discretion that was
20    going to be given to the jury in Federal Death Penalty Act
21    sentencing hearings.
22              And the history in a nutshell is that the Court --
23    Supreme Court in the case called *Limestone vs. Pennsylvania*,
24    upheld the Pennsylvania statute that requires death to be
25    imposed when aggravating factors outweigh mitigating factors.
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 93 of 131
2:17-cr-20037-JES-JEH    # 451    Page 40 of 78
CHARGE CONFERENCE                                        740

1    The moment the jury finds that, their deliberations are over,

2    or if there are no mitigating factors found, even a single

3    aggravating factor requires the death penalty.  And the

4    congressman from Pennsylvania, Congressman Gekas, offered an

5    amendment to the Federal Death Penalty Act on the floor of

6    the House -- and it passed the House -- that would have

7    created that sort of semi-mandatory statute.  The Gekas

8    amendment was removed in conference, and when it went back to

9    the House, the amended statute passed.

10          The difference between this statute and what you

11   have before you in a Federal Death Penalty Act is the

12   requirement that the jury determine that the aggravating

13   factors sufficiently outweigh mitigating factors in order to

14   justify the death penalty.  And we put that together --

15          THE COURT:  How about this:  If they make that

16   determination, that it does sufficiently outweigh it, is

17   death then mandatory?

18          MR. BRUCK:  For the sake of this argument, I will

19   concede that, and --

20          THE COURT:  That's my -- you see, that is the nub of

21   my problem with it.

22          MR. BRUCK:  But look at the actual language that we

23   have asked for.

24          THE COURT:  I will look at it, but, Mr. Bruck, that

25   is the problem I'm faced with.  I've tried to communicate

CHARGE CONFERENCE                    741

1     that the reasoned moral judgment -- I have been putting a lot

2     of language you like in it, but that is misleading.  You talk

3     about you are worried about -- I think it's misleading to the

4     jury, and it's never required.  Because if they determine

5     that it does sufficiently outweigh, then the death penalty in

6     that situation is warranted.  That is what the statute says.

7               MR. BRUCK:  If you will look at the actual language

8     that we filed at quarter to five last night --

9               THE COURT:  I want to congratulate you getting it in

10    before midnight this time so I wouldn't have to deal with it

11    at 6 AM.

12              MR. BRUCK:  Glad to do it.

13              The -- all we have said in that language -- and let

14    me find it right quick -- is that what is sufficient -- let's

15    see.  Where is it?  Right.  At the bottom of page 5:  "You

16    may not impose the death penalty unless you also find that

17    the aggravating factors sufficiently outweigh the mitigating

18    factors so to justify a sentence of death rather than life.

19    What is sufficient for this purpose is a question the law

20    leaves entirely to each one of you.  For this reason you are

21    never required to impose the death penalty."  But -- but

22    clearly that does not contravene the notion that once the

23    jury finds that --

24              THE COURT:  See, I found that confusing.  And you

25    want me to add another sentence:  "However, if you find that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 95 of 131
2:17-cr-20037-JES-JEH   # 451   Page 42 of 78
CHARGE CONFERENCE                               742

```
 1      it does sufficiently outweigh, you must give death."  I don't
 2      do that either.  I mean, I don't do either one of those.  So
 3      I mean -- I think it's a very balanced place I am in.  I
 4      don't do either.
 5                MR. BRUCK:  Well, I think a jury -- the jurors -- I
 6      mean, this is an area that has been studied by the Capital
 7      Verdict Project for 20 years across the country.  It is
 8      juries do not get the extent of their discretion, and there
 9      is a very good reason for that which is no one wants to have
10      virtually unfettered discretion.
11                THE COURT:  They shouldn't have unfettered
12      discretion because it would be arbitrary and capricious.
13                MR. BRUCK:  Once an aggravating factor is found,
14      they do have discretion to determine whether the aggravating
15      outweigh --
16                THE COURT:  They must make a reasoned,
17      individualized, moral judgment.  I put all that in there, but
18      to say they are not required under any circumstances is
19      inaccurate.
20                MR. BRUCK:  It does not say "under any
21      circumstances," but the problem is that -- I mean, we can
22      parse these instructions all day long, but the elephant in
23      the room is that juries do not understand the extent of their
24      discretion.  They think that death is mandatory if
25      aggravating factors are found, if there are a lot aggravating
```

CHARGE CONFERENCE                        743

```
 1      factors --

 2              THE COURT:  And I address every one of those in the

 3      charge.  Every one of those concerns you just expressed, I

 4      have language in the charge to say that is not true.  So

 5      again, Mr. Bruck, I'm going to go back and read it again in

 6      light of what your comments are, but my gut reaction in

 7      reading that language was that it was misleading.

 8              Yes, Mr. Burns?

 9              MR. BURNS:  The Government asks when you do go back

10      to consider that, there are two Fourth Circuit cases, United

11      States vs. Caro, C-a-r-o.

12              THE COURT:  Give me the citation.

13              MR. BURNS:  597 F.3d 608, 32 to 33, and the second

14      case, United States vs. Lighty, L-i-g-h-t-y, which is

15      616 F.3d 321, pincite of 366 to 67.

16              MR. BRUCK:  Your Honor, neither Caro nor Lighty

17      involved a requested instruction that was tied to the words

18      "sufficiently," which as we have done.  So they are

19      indistinguishable.

20              THE COURT:  Hold on just a second.

21              "For this reason, you are never required to impose

22      the death penalty," I can't say that sentence.  That is just

23      not happening.

24              MR. BRUCK:  Let's figure out language that pinpoints

25      the importance of that notion of sufficiency because
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 97 of 131
2:17-cr-20037-JES-JEH    # 451    Page 44 of 78
CHARGE CONFERENCE                               744

```
 1          otherwise the jury will look at this like a tax return, and

 2          they total it up.

 3                  THE COURT:  I put all this language in there -- I'm

 4          sure the Government wouldn't be too happy if I put some of

 5          that in there -- that really addressed each of these issues,

 6          their reasoned, moral, individualized judgment.  But again

 7          let me read -- I know Caro; I don't know Lighty.  Let me go

 8          back and look at Lighty.  Let me look at your language again,

 9          and let me just look again at this issue.

10                  MR. BRUCK:  Maybe the answer, Judge, is to amend our

11          request to just say that, "The law never requires you to find

12          that aggravation out -- sufficiently outweighs mitigation;

13          it's always up to you."  That is the same principle.

14                  THE COURT:  I thought I basically said that already.

15          I thought I said that.

16                  MR. BRUCK:  Well, that -- you know, it is just such

17          a frequently misunderstood issue.  And there is a strong bias

18          why there is a misunderstanding, which is no normal human

19          being wants this responsibility, and there is a very powerful

20          biased to imagine that if you just squint at the instructions

21          long enough --

22                  THE COURT:  I have that.  I wrote about the

23          mathematical equation, and I've added language to that -- to

24          try to highlight this very point you make, Mr. Bruck.  And I

25          don't know about y'all, I have watched this jury.  I think
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 98 of 131
2:17-cr-20037-JES-JEH   # 451   Page 45 of 78
CHARGE CONFERENCE                              745

1    this is a very fair, very capable jury.  I think both sides

2    ought to be very pleased with the jurors selected.  They have

3    been incredibly conscientious, phenomenally the level of

4    attention to this thing.

5               MR. BRUCK:  It's not battering on the other juries

6    that have not understood this principle.  It's a hard one.

7               THE COURT:  Anyway, I'm going to look at it again, I

8    assure you.

9               MR. BRUCK:  Okay.  Thank you.

10              Okay.  The remaining issues, the -- I hope the Court

11   will reconsider its decision not to add our request under 4

12   on page 2 of victim impact testimony, which was we asked the

13   Court to caution the jury not to draw the commonsense

14   inference that because the Government called a victim impact

15   witness, or in this case many, many, many family members,

16   that that family member had any particular view about -- or

17   that they were called because of their position on whether --

18              THE COURT:  I told them what to consider of them

19   repeatedly.  And you want me to say not only what I told them

20   they could consider, but all the things I couldn't -- they

21   can't consider?

22              MR. BRUCK:  Not everything, but that thing, because

23   the instructions that --

24              THE COURT:  I think raising it in my -- inferring

25   that -- I don't know what the views of the family victims are

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 99 of 131
2:17-cr-20037-JES-JEH   # 451   Page 46 of 78
CHARGE CONFERENCE                                    746

```
1     on the death penalty.  I'm not -- I don't -- you probably
2     have more information on that than I do.  I have no idea.
3     But I don't want to act like -- and my guess is, like any
4     other significant group of people, there are probably
5     different views.  So I just -- I'm very reluctant to raise
6     what they should not consider.
7              MR. BRUCK:  I would suggest that the instructions
8     that the Court has given are so bare-bones that the jury will
9     not infer -- I mean, you know, in common law that --
10             THE COURT:  I several times sua sponte said to them,
11    "Listen, these are the only things about victims you can
12    consider," and I say it again in the jury charge.  I think
13    it's adequate.  Next.
14             MR. BRUCK:  Then the -- well, the last thing -- I
15    don't want to beat a dead horse.  The last thing about it is
16    that we should keep in mind the psychological roots of the
17    old voucher rule:  Each side vouches for their witness, or
18    there is a presumption that witnesses support the side of the
19    party that calls them.  That is not the rule anymore, but
20    that is a psychological fact that people assume to be true
21    and is not true.
22             THE COURT:  I'm not sure that is true, but --
23             MR. BRUCK:  We have also, the Court has declined to
24    include, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 - 12 additional
25    mitigating factors that we submitted, nonstatutory mitigating
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 100 of 131
2:17-cr-20037-JES-JEH    # 451    Page 47 of 78
CHARGE CONFERENCE                                  747

 1    factors, and I don't know if a few of these have been

 2    discussed and litigated in the course of these proceedings.

 3    Most of them have not.  And we do think that they should be

 4    included and not -- and not ruled on.

 5              I can go through there in the record on why we think

 6    each one is supported.

 7              THE COURT:  I went through them.  I read the case

 8    law about what is mitigating, and I have reached a conclusion

 9    that the first two were -- appeared to be mitigating, and the

10    rest, for one reason or another, I concluded they are not.

11    And --

12              MR. BRUCK:  I am protecting the record as to each of

13    these, or do I need to go through each one and make the

14    argument?

15              THE COURT:  If you wish to make an argument -- you

16    are adequately protected, but if you want to raise anything

17    to bring any particular point to my attention, I'm glad to --

18              MR. BRUCK:  Well, if these issues are preserved, I

19    think the Court is at least aware of the evidence that has

20    been heard as we are.  And I don't know that I need to

21    belabor it any further.

22              THE COURT:  Okay.

23              MR. BRUCK:  The -- at -- on page -- there was

24    originally page 29, it's our request 12 that the Court in

25    discussing the burden of proof or aggravation -- I think that

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 101 of 131
2:17-cr-20037-JES-JEH    # 451    Page 48 of 78
CHARGE CONFERENCE                                    748

1        is what this is -- we wanted the Court to draw a contrast

2        with -- directly a contrast with the burden of proof

3        permitting --

4                THE COURT:  I had it done.  It's duplicative.  I had

5        it earlier, and I repeat it there, I didn't think was

6        necessary.

7                MR. BRUCK:  That was our request.  Well, I see I'm

8        back at 13, and to be precise about what we are now asking

9        for, preserving our request under request number 13, I think

10       the problem would be solved if we insert the word in the last

11       sentence, "For this reason, you are never required to find

12       that the aggravating factors sufficiently outweigh the

13       mitigating factors."

14               THE COURT:  I'll consider it.

15               MR. BRUCK:  Thank you.

16               We covered number 14, and we appreciate the Court's

17       consideration of that.

18               And 15 -- oh, um, in -- on page 32, I think there

19       may have been just a sentence or two that is left over from

20       the guilt phase instruction, the bottom of page 32, remember?

21       I'll let the Court find that.  I don't think it is accurate

22       to say, "You are judge and judges of the facts.  Your sole

23       interest is to judge the facts and the evidence in the case."

24       That is a guilt phase instruction.

25               THE COURT:  What do you want me to say?  Do you want

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 102 of 131
2:17-cr-20037-JES-JEH    # 451    Page 49 of 78
CHARGE CONFERENCE                                    749

1        me to take out the last sentence?

2                    MR. BRUCK:  Yes, I think --

3                    THE COURT:  I mean, I don't know if it matters.

4                    MR. BRUCK:  I think the last sentence should be

5        taken out.

6                    THE COURT:  Does the Government care?

7                    MR. BURNS:  Your Honor, this is sort of an axiomatic

8        part of the jury's duty is to judge the facts of the case.

9                    THE COURT:  I'm leaving the next-to-the-last

10       sentence -- paragraph, "Simply to reach a verdict, remember

11       at all times you are not partisans, you're judges of facts,"

12       that part stays in.  Their concern is, "Your sole interest is

13       to judge the facts and the evidence in the case."

14                   Exactly why is that objectionable, Mr. Bruck?

15                   MR. BRUCK:  Because it is not true that in a

16       sentencing the only role of the jury is to judge facts.

17                   THE COURT:  That is actually -- they do have to

18       weigh.  That's the problem.  They are not just judging the

19       fact?  They've got to weigh --

20                   MR. BRUCK:  And make a reasoned, moral judgment.

21                   MR. BURNS:  We don't object.

22                   THE COURT:  Take the last sentence out.  This is one

23       of those 100 things that when you look at it in light of what

24       you are doing, it may be better to leave it out.  Okay.

25                   MR. BRUCK:  And then we would also ask if you take

CHARGE CONFERENCE                              750

1       out "judges of the facts" in the second-to-last sentence.

2                   THE COURT:  Well, they are judges of the facts.

3                   MR. BURNS:  We think that that should stay.

4                   THE COURT:  I don't have any problem with that.

5                   MR. BRUCK:  Then I would like the Court to consider

6       again our request number 16, which is to make clear that

7       something may be obvious to us, but, you know, it is at least

8       anecdotal evidence that it's not clear to the jury that a

9       life sentence doesn't trump a death sentence.

10                  THE COURT:  That would strike me as a surprise if

11      someone says, "I'm voting got death." I think people know

12      that that is death for that.  I mean --

13                  MR. BRUCK:  A juror might think --

14                  THE COURT:  I mean, you get death, you get death.

15                  MR. BRUCK:  Why not tell them?

16                  MR. BURNS:  On that point it undermines the purpose

17      of that instruction, which is to tell the jury that they have

18      to separately consider each count.

19                  THE COURT:  See, we are telling them over and over

20      again, "You've got to separately consider each count." I

21      think that is accurate.

22                  MR. BRUCK:  Well, again, not to belabor that, but

23      the jury would think, well, what is the purpose of separating

24      the counts unless there could be some significance to split.

25                  THE COURT:  They are separate counts so they don't

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 104 of 131
2:17-cr-20037-JES-JEH    # 451    Page 51 of 78
CHARGE CONFERENCE                                    751

```
 1        condemn the defendant collectively for a little piece of

 2        three or four different counts.  We want them -- I think it's

 3        a pro defendant charge.

 4             MR. BRUCK:  Well, I mean, I just don't see what

 5        possible harm could be given to let the jury know that a

 6        sentence to death on even a single count he would be executed

 7        and not allowed to serve his life sentence first.

 8             THE COURT:  I have trouble imagining anybody would

 9        think that.

10             MR. BRUCK:  If you will bear with me, I just want to

11        make sure I have covered everything else.  We did not renew

12        our objection to -- because the Court had ruled on it -- on

13        including friends and coworkers as within the scope of victim

14        impact evidence.  We just wanted the record to be clear that

15        we stand on that objection.  We are not waiving it by failing

16        to object to the instruction.

17             And as a more general matter, by failing to object

18        to the instruction, I trust the Court appreciates that we are

19        not waiving any prior objection that was raised ruled on

20        adversely to us.

21             THE COURT:  You -- I think we all understand that I

22        have effectively ruled on your objections by giving a draft

23        that doesn't include it.  And your prior objections are noted

24        in the record.

25             MR. BRUCK:  Very well.  In that connection, Your
```

2:15-cr-00472-RMG   Date Filed 03/29/17   Entry Number 947   Page 105 of 131
2:17-cr-20037-JES-JEH   # 451   Page 52 of 78
CHARGE CONFERENCE                                    752

1    Honor, since the defendant is, of course, pro se before the

2    jury, our filing last night asks that the -- as to these

3    issues, or whatever, however the Court finally rules on them,

4    that the Court not require him to renew these objections, or

5    in the alternative that it allow me to do this for him

6    outside the presence of the jury after the jury retires.

7              THE COURT:  Why can't you prepare as standby counsel

8    a document he could hand to the Court?

9              MR. BRUCK:  Okay.

10             THE COURT:  I'm just trying -- you know, there is a

11   certain amount of a role of self-representation that your

12   client agreed to undertake, and so my suggestion to you is --

13   is you can assist him.  He can hand the document up as his

14   motion once he reviews it, agrees with it, and signs it.

15             MR. BRUCK:  Okay.  I'm trying to think of -- does

16   the Court anticipate allowing us to have the final draft

17   instructions in advance so that we can --

18             THE COURT:  Yes.  You will get them.  And you are

19   keeping me here, so it's going to be later every time you

20   keep me here.  We are going to get them to you as soon as

21   we -- you will have them in your hands when I read it.

22             MR. BRUCK:  Very well.  Thank you very much, Your

23   Honor.  I think that completes our issues.  We had a couple

24   other matters hanging, if this is the right time.

25             THE COURT:  Oh, no, you are talking about the

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 106 of 131
2:17-cr-20037-JES-JEH    # 451    Page 53 of 78
CHARGE CONFERENCE                        753

```
 1          closing argument motion?

 2                    MR. BRUCK:  Yes.  The defendant has filed a closing

 3          argument.

 4                    THE COURT:  It's been filed under seal.  Why would

 5          it be under seal?

 6                    MR. BRUCK:  Speaking of which, I'm glad the Court

 7          mentioned that.  We have filed all these instructional issues

 8          under seal because that is how we started doing it a long

 9          time ago.

10                    THE COURT:  Of course, we had an unpanelled jury.

11          As to this motion, I unseal it.

12                    So, Ms. Ravenel, if you will unseal that.

13                    MR. BRUCK:  We would ask that all of our

14          instructions filings be unsealed as well.  We don't --

15                    THE COURT:  Is this thing actually filed?  My copy

16          it doesn't have a stamp across it.

17                    MR. BRUCK:  It has not been electronically filed

18          because we are following the protocol.

19                    THE COURT:  Right.  We are not going to -- we are

20          going to -- you are asking all your motions regarding the

21          instructions --

22                    MR. BRUCK:  Yes.

23                    THE COURT:  -- be unsealed?

24                    MR. BRUCK:  Yes.

25                    THE COURT:  I've got an empaneled jury.  I don't
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 107 of 131
2:17-cr-20037-JES-JEH    # 451    Page 54 of 78
CHARGE CONFERENCE                                    754

 1    know why we would seal them, so that's fine.  You might want

 2    to confer with Ms. Ravenel to make sure you are on the right

 3    page with the Court.

 4            MR. BRUCK:  I should also just mention -- make sure

 5    the record is complete that I did lodge an additional exhibit

 6    with our objections, which was Judge Sorokin's jury

 7    instructions from the *Sampson* case.

 8            THE COURT:  Mr. Bruck, that is not the way of an

 9    objection.  I can't go through Judge Sorokin's 55-page charge

10    and go scavenger hunt and compare it.  If you've got an

11    objection, make it.

12            MR. BRUCK:  We have made it.

13            THE COURT:  I just can't go -- I read it.  I just

14    can't sit there and go on an Easter egg hunt on my

15    30-some-odd page charge and see what I left out.

16            MR. BRUCK:  I understand.  It was just in the nature

17    of a document that is a further illustration of the way

18    that -- the points that we have separately raised and clearly

19    raised for the Court have been resolved in other courts.

20            THE COURT:  Okay.  Has the Government had a chance

21    to look at the motion regarding closing argument?

22            MR. BURNS:  The 100-plus-page --

23            THE COURT:  You noticed that.

24            MR. BURNS:  Yes.

25            -- addendum?  No, Your Honor.

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 108 of 131
2:17-cr-20037-JES-JEH    # 451    Page 55 of 78
CHARGE CONFERENCE                                      755

1          THE COURT:  As I understand it, the defense raises

2     essentially ten points in a 100-page document.  Looks like an

3     off-the-shelf standard kind of thing, and he refers -- he

4     uses that to refer to some authority.

5               Mr. Bruck, is that fair?

6          MR. BRUCK:  That is a fair statement.

7          THE COURT:  It's really the 10 that we are talking

8     about, not the 27 listed in the attachment.  Who is going to

9     be making closing argument?

10         MR. RICHARDSON:  I am, Your Honor.

11         THE COURT:  So why don't you just walk through with

12    me your response to this to see if there is something we

13    don't have any disagreement about, some we need to talk

14    about.

15         MR. RICHARDSON:  I don't anticipate 1 and 2 being an

16    issue.  We do believe that 2 and 4, however, are wholly

17    appropriate.

18         THE COURT:  What is the context?

19         MR. RICHARDSON:  We are talking about, as we have

20    seen reflected, the characterization of his views as

21    expressing racist hatred, right? -- that that is the type of

22    hatred that he has.  It is race-based hatred.  You've heard

23    us talk about that from the opening statement through each of

24    the arguments we've had throughout.  I think that is a fair

25    characterization of the writings, the statements.

CHARGE CONFERENCE                        756

1              THE COURT:  I believe one of the predicate statutes

2    is something called "the hate crime."

3              MR. RICHARDSON:  The hate crime.

4              THE COURT:  The Hate Crime Act.

5              MR. RICHARDSON:  It's hard not to imagine how that

6    word would come up.  That is simply a characterization of --

7    and I think a fair one -- of the views that he expresses

8    about African-Americans, and we think that is certainly a

9    fair characterization of those statements.

10             THE COURT:  You know, I think -- so the difference

11   is characterizing conduct and characterizing the person.  You

12   know what I'm saying?

13             MR. RICHARDSON:  I do, Your Honor.

14             THE COURT:  And I think that is the point here.  You

15   are talking about his conduct and reasoning and cause, I mean

16   goes to malice is the hate crime.  It goes to all these

17   issues which are relevant and in my view not improper.

18             MR. RICHARDSON:  Hatred, I think the definition --

19   and I have to ask Ms. Hahn this -- I think that word doesn't

20   describe a person, but describes views.  And so in that

21   sense, I think we would -- that word --

22             THE COURT:  It's like the heart of hate, didn't want

23   you to say --

24             MR. RICHARDSON:  We have said that throughout.  We

25   think that that is a fair characterization of what we have

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 110 of 131
2:17-cr-20037-JES-JEH    # 451    Page 57 of 78
CHARGE CONFERENCE                                757

1    seen, that he came to the church with a hateful heart.  That

2    he did, indeed, and we know that, because he expressed it.

3         THE COURT:  Well, that's -- again you are going with

4    his -- his thinking, his conduct in this case.

5         MR. RICHARDSON:  But we think that is a fair

6    characterization of what the evidence showed.  He wrote down

7    what he was thinking, what was in his heart and mind when he

8    went to the church.  Right?  And to limit the Government from

9    their ability to talk about what he said he was doing --

10        THE COURT:  In fact, they asked him in number 4,

11   "How you can talk about what you wrote?"

12        MR. RICHARDSON:  Well, can't even mention the word

13   "Hitler."  That is a central part of what this defendant's

14   views have shown, right?  I mean, he throughout the case, and

15   indeed taking 88 bullets into the church, because it refers

16   to Heil Hitler, I mean, that is a central part of the actions

17   and the choices and the writings that he took.  We can't

18   describe what he does without a reference to the symbology.

19        THE COURT:  When you are talking about what he does

20   and his actions and what motivated this crime, you are on

21   solid ground.  If you just start talking about him as a

22   person -- you read these cases -- you start getting into

23   quick sand.

24        MR. RICHARDSON:  That is true, Your Honor, but if we

25   can't refer to Hitler or Nazi symbols, to me that is a

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 111 of 131
2:17-cr-20037-JES-JEH    # 451    Page 58 of 78
CHARGE CONFERENCE                                    758

```
 1        necessity.  If I wanted to refer to him as Hitler, right,

 2        that might be a problem, right?  And the Government --

 3                THE COURT:  As everyone knows, I, you know, entered

 4        an order in the case in which I reversed a death penalty

 5        involving calling someone King Kong, absolutely, and the

 6        Fourth Circuit affirmed.  But that was -- that was like

 7        calling him a name.  It was animalistic.  It was racist.  It

 8        had all these other elements.  But when you categorize his

 9        conduct in this case, that is different, and the prosecution

10        can discuss that.

11                MR. RICHARDSON:  I add further, Your Honor, because

12        I do think that it's in this particular case worth

13        considering, that the defense has opened the door to the

14        question of who this defendant is.  Right?  And so unlike in

15        most cases where that question of who he is is not at issue,

16        the defense lawyer is going to put that at issue.  Mr. Roof

17        in his opening put who he is at issue.  And so we do think

18        who he is --

19                THE COURT:  What exactly was said that put it at

20        issue?

21                MR. RICHARDSON:  The reflection of what his mental

22        states were, right?  And so they have raised this idea.

23        Mr. Bruck wanted to suggest that there must be something

24        wrong with him, and so I think the Government's entitled to

25        talk about that aspect of --
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 112 of 131
2:17-cr-20037-JES-JEH   # 451   Page 59 of 78
CHARGE CONFERENCE                                    759

```
 1                  THE COURT:  Be careful.

 2                  MR. RICHARDSON:  I understand.  And the Government

 3       is careful about it, but I do think, unlike --

 4                  THE COURT:  Mental health is not --

 5                  MR. RICHARDSON:  We are not even --

 6                  THE COURT:  I admonished Mr. Bruck every time he did

 7       it.  It was proper in the sentencing phase.  The defendant

 8       for his own reasons elected not to do it.  I wouldn't be

 9       spending much time talking about it if I were you.

10                  MR. RICHARDSON:  I understand that, Your Honor.  But

11       it has been -- it was also raised by the defendant in his

12       opening, and so the Government is not focused on that he

13       issue.

14                  THE COURT:  He said he's not.

15                  MR. RICHARDSON:  Right.

16                  THE DEFENDANT:  And I also asked them to forget

17       anything David said.

18                  THE COURT:  So you are kind of on the same team on

19       that one.

20                  MR. RICHARDSON:  Well, I certainly won't claim that,

21       Your Honor, but I do think -- I just -- I mentioned that in

22       the context, not that the Government is going to get into

23       that as a central part of what is happening, but I think

24       unlike the typical case where any reference to who this

25       defendant is gets close to the line, there is a little bit of
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 113 of 131
2:17-cr-20037-JES-JEH   # 451   Page 60 of 78
CHARGE CONFERENCE                                760

 1    a broader view.

 2            THE COURT:  Let me just say my admonition to you is

 3    you've got plenty of material on what the defendant himself

 4    has written, and you don't need to be getting too

 5    imaginative.  You don't need to start talking about what is

 6    inherent in him.  You've got plenty available in the

 7    evidence.

 8            MR. RICHARDSON:  I can assure you the discussions

 9    about that are focused on the evidence in the case.

10            THE COURT:  That would be fine.

11            How about number 5?

12            MR. RICHARDSON:  We do think, Your Honor, that

13    number 5 is appropriate.  We think what we have seen is that

14    these are particularly good individuals, and they were

15    targeted by this defendant because they were particularly

16    good.  This is the Wednesday night Bible study crowd.  It's

17    not as the defendant suggests in this context some sort of an

18    attempt to engage in some covert comparison.

19            THE COURT:  You are not -- I think your point is

20    that the "to create the greatest wave" argument, anything

21    along those lines would be fine.

22            MR. RICHARDSON:  And we are not -- when they came --

23            THE COURT:  You cannot compare.

24            MR. RICHARDSON:  We are not making a comparison.

25            THE COURT:  You cannot in any way suggest that they

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 114 of 131
2:17-cr-20037-JES-JEH    # 451    Page 61 of 78
CHARGE CONFERENCE                               761

1        should take the life of the defendant because in comparison.

2        None of that.

3                MR. RICHARDSON:  I, too, have read the cases.

4                THE COURT:  Yeah, we both.

5                MR. RICHARDSON:  With respect to 6, we are not going

6        to discuss individual private conversations with God.  And

7        I'm not exactly sure, frankly, what the last phrase of that

8        is, but to the extent that I understand it, the Government

9        doesn't intend to do it.

10               THE COURT:  I didn't understand it either.

11               MR. RICHARDSON:  So I don't envision 6 being a

12       particular issue.

13               I think with respect to 7, the Government agrees and

14       understands that.  However, I think we are getting to a

15       little bit of a different question because this is going to

16       be a defendant who is standing before this jury and talking

17       to them.  And to the extent that the Court -- you know, I

18       think there are two different possibilities here, and I'm not

19       trying to reargue their issue with respect to whether the

20       arguments are evidence or information or not.  But to the

21       extent what the Court is saying is that he can raise issues

22       that are not in the record; he could discuss, for example --

23               THE COURT:  He can't raise issues not in the record.

24       He can comment on issues that are in the record.

25               MR. RICHARDSON:  Okay.  And --

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 115 of 131
2:17-cr-20037-JES-JEH    # 451    Page 62 of 78
CHARGE CONFERENCE                                          762

1            THE COURT:  Fair comment about -- just like you can

2       argue about things that you can put one and two together to

3       say three, that is argument, he can do the same thing.

4            MR. RICHARDSON:  Right.  And so what the

5       Government's obviously concerned about, and the Court I think

6       is aware of, if he goes beyond that and wants to talk about

7       things that are beyond what is comment on the evidence and

8       discuss other views that he may have --

9            THE COURT:  I'll be listening.

10           MR. RICHARDSON:  So in that context, I think the

11      Government's not going to comment on his demeanor outside of

12      that context, but when he is up speaking --

13           THE COURT:  You can talk about -- in rebuttal, you

14      can talk about his argument.  That is what is rebuttal, but

15      responding to the argument.

16           MR. RICHARDSON:  Exactly.  And that is the context

17      in which the Government is going to potentially -- it doesn't

18      know what is going to be said, but potentially respond to

19      the -- not just what was said, the manner in which it was

20      said.

21           The reference to number 8, we do not anticipate a

22      reference to that in this argument.

23           Number 9, number 9, we do -- there are two choices.

24      There is one more severe, and there is one less severe, and

25      so we will characterize those in that way, and we do think

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 116 of 131
2:17-cr-20037-JES-JEH    # 451    Page 63 of 78
CHARGE CONFERENCE                                   763

1       that that is appropriate to refer to them as separate and

2       less or greater significance.

3                   THE COURT:  But exactly what do you mean by that?

4                   MR. RICHARDSON:  The most significant sentence that

5       is available on this case.  There are two sentences that are

6       available.  By definition, one is more severe than the other.

7       Right?  One is a lesser sentence; one is a greater sentence.

8       There are only two.  In that context we will discuss them as

9       one being a greater and one being a lesser.  You know, I

10      think that is the fair description of, "You have a binary

11      choice.  One is greater and one is lesser."

12                  THE COURT:  You are going to give the argument

13      for --

14                  MR. RICHARDSON:  For why the greater is appropriate

15      in this case?  Absolutely.

16                  With respect to number 10, that I think goes back to

17      this issue we talked about earlier.  The Government is not

18      getting into the issue of whether a specific burden should be

19      given for the benefit of the victim.

20                  THE COURT:  Can't talk about that.

21                  MR. RICHARDSON:  That is not what -- it is not about

22      that for us.  It is not about that for them, and it certainly

23      should not be about that for the jury.

24                  And I believe --

25                  THE COURT:  That is 10.  Let me hear Mr. Bruck.

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 117 of 131
2:17-cr-20037-JES-JEH   # 451   Page 64 of 78
CHARGE CONFERENCE                                            764

```
 1        You've heard the argument.  Do you have any concerns?
 2              MR. BRUCK:  Well, I think the motion largely speaks
 3        for itself.  I want to make clear that number 9 refers
 4        specifically to the notion that life is a minimum, and it's
 5        intended to prevent the Government, if they were intending
 6        to, for asking the jury to determine does this crime deserve
 7        the minimum?  That is a -- that the question before the jury
 8        is whether the aggravating factors --
 9              THE COURT:  Justify.
10              MR. BRUCK:  -- so outweigh as to justify the death
11        penalty, not whether the defendant should get the minimum.
12        And when you rephrase the questioning in that sort of way,
13        there is hardly any need for a sentencing phase.  And I have
14        heard that in -- that argument made before.  It is extremely
15        unfair.  It is not faithful to the structure of the Federal
16        Death Penalty Act, and that particular -- I'm not saying that
17        the Court -- that the prosecution can't argue for a more
18        severe sentence as opposed to a less severe sentence.  The
19        point is the rhetorical device of, "Does he deserve the
20        minimum punishment?"
21              THE COURT:  Well, they are going to argue something
22        else which is that the aggravating factors when weighed
23        against the mitigating factors support the death penalty.
24              MR. RICHARDSON:  Your Honor, the point of this is --
25        and I don't know whether I'll intend to use that phrase or
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 118 of 131
2:17-cr-20037-JES-JEH   # 451   Page 65 of 78
CHARGE CONFERENCE                                    765

```
 1        not, but this is exactly what the defense wanted you to add

 2        to the jury instructions in the weighing provision.  They

 3        don't get to have their cake and eat it too.  Either they

 4        want to follow, does it justify death or not.  Which is it?

 5        Does it justify death, or does it justify life?  And so it is

 6        the minimum.  That is a binary choice.  There is a minimum

 7        and a maximum.  There is a greater and there is a lesser.

 8        There is no reason they want the Court to instruct the

 9        question about greater or lesser if the Government can't

10        discuss greater or lesser, maximum or minimum.

11                THE COURT:  I think each party can argue the

12        relative of the binary choice.

13                MR. RICHARDSON:  Thank you, Your Honor.

14                THE COURT:  Okay.  Are there other matters to come

15        before the Court at this point?

16                MR. BURNS:  May we have a moment, Your Honor?

17                THE COURT:  Yes.

18                MR. BURNS:  Your Honor, I just want to take extra

19        care for the record with respect to the Court's ruling that

20        several of the newly-proposed aggravating factors are not

21        going to be admitted.  I'm not suggesting that it necessarily

22        have to go through them one by one.  I think the Court's

23        reference was the familiarity with the law applicable to the

24        scope of proper mitigation, and I just wanted the record to

25        be clear, for example, that the factors that are alleged here
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 119 of 131
2:17-cr-20037-JES-JEH    # 451    Page 66 of 78
CHARGE CONFERENCE                                        766

```
 1          either are not related to the defendant's character --
 2                  THE COURT:  Let me walk through that a little bit
 3          here.
 4                  The -- give me just a moment.  We've already
 5          indicated that A and B are going to be allowed.  So I don't
 6          think I need to address -- 7-A and B are included, correct?
 7                  MR. BURNS:  Yes, Your Honor.
 8                  THE COURT:  We are now on C.  You know, this is --
 9          all of this goes to -- I'm relying heavily on U.S. vs.
10          Hagger, which says that it must go to "the defendant's
11          individual characteristics, his record, or the circumstances
12          of the crime."  And C is an argument, basically; that's all
13          it is.  It's not a mitigation.  It's an argument.
14                  D, Dylann Roof's life has value to the members of
15          his family is, um -- is inappropriate in execution and fact
16          evidence.
17                  MR. BURNS:  And in addition, Your Honor, there is
18          absolutely no evidence in the record for -- to make that.
19                  THE COURT:  Correct.  But even if it -- we wouldn't
20          have let it in because it would have been improper evidence.
21                  MR. BURNS:  That's right, Your Honor.
22                  THE COURT:  When he committed this crime, the
23          defendant expected to die, and then he had to, that's just a
24          backdoor trying to get mental health evidence in, which we've
25          already ruled on.
```

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 120 of 131
2:17-cr-20037-JES-JEH    # 451    Page 67 of 78
CHARGE CONFERENCE                                    767

1          G, the punishment of life imprisonment is harsher

2     than the death penalty, it's argument.  It can be made.  I

3     wouldn't stop counsel or Mr. Roof from making that argument,

4     but it's not mitigation evidence.

5          Failure of the FBI to identify Dylann Roof as

6     ineligible to buy a gun contributed to the occurrence of this

7     crime, that is extremely attenuated, and in my view is not

8     proper mitigation evidence.

9          I, executing Dylann Roof may not reduce or alleviate

10    the victims' families' or survivors' suffering, that, you

11    know, the victims, it's sort of again getting into the

12    position of what the victims want.  We aren't going to put it

13    in.  It's not proper, and it doesn't mitigate the crime.  And

14    it's not about the defendant, not the about the crime, not

15    improper testimony.

16         J, executing Dylann Roof will cause members of his

17    family to suffer, that's inappropriate execution impact

18    testimony.

19         Showing mercy for Dylann Roof is consistent with the

20    values of the lives of the victims and survivors of this

21    tragedy, an argument.

22         Sentenced to life in prison, he may grow to

23    understand what he did, become remorseful, I've allowed a

24    variation of this when it was tied to his age.  But this is

25    not tethered to that, and it's just not individually

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 121 of 131
2:17-cr-20037-JES-JEH   # 451   Page 68 of 78
CHARGE CONFERENCE                                    768

1    mitigating.  I think what we have already is adequate.

2         Dylann Roof is a human being and his life has

3    intrinsic value, nothing individual about him.  It's

4    generally about humanity.

5         Showing mercy to Dylann Roof is a statement that

6    hate will not be met with hate, argument, not mitigation.

7         And then O, any other factor, Dylann Roof's

8    background, record, character, any other circumstances of the

9    crime that mitigates the imposition of the death penalty, I

10   already have that included.

11        Does that help you, Mr. Burns?

12        MR. BURNS:  Thank you very much, Your Honor.

13   Appreciate it.

14        THE COURT:  Okay.  Any other matters to come before

15   the Court?

16        MR. BRUCK:  Mr. Roof has a concern which is that he

17   is very anxious to know when the Court will take up the issue

18   of redaction before mental health materials are made public,

19   and I'm simply passing that along.

20        THE COURT:  Mr. Roof, stand up.  Let me talk to you

21   about that.  You know, I need to -- we are going to get this

22   verdict done, and then I'm going to ask the parties for their

23   own recommendations on redaction.  And I will consider those.

24   So you will have input in that decision.  But I'm going to

25   make the final decision.  There is a strong public interest I

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 122 of 131
2:17-cr-20037-JES-JEH    # 451    Page 69 of 78
CHARGE CONFERENCE                                769

1    have got to weigh, and it's going to probably involve, for

2    instance, Dr. Ballenger's report going in and redacting

3    portions of that report.  And it's going to be a little bit

4    of a tedious process, and I know you are concerned about it.

5    There is a strong public interest in the release of

6    information.  And I'm going to balance those and do it in a

7    careful fashion.

8         So fairly soon after a verdict is rendered in this

9    case, I'm going to -- I'm going to request that if there is

10   an objection of either party to the release of any -- of any

11   sealed documents, that they provide me their objections.  For

12   those that aren't -- in which there are no objections, I'm

13   going to immediately unseal them.  And those in which there

14   are objections, I'm going to weigh and consider those and

15   make a final decision and release them as I -- if a redaction

16   is necessary, we'll make the necessary redactions, and then

17   release.

18        THE DEFENDANT:  Um, is there going to be like a --

19   am I going to come to court?

20        THE COURT:  I think we'll do this in writing

21   primarily.  A fairly voluminous amount of sealed documents, I

22   don't think it would be practical to do it in court.  But

23   your standby counsel can assist you in identifying those

24   documents, and you will have your own right to have input on

25   that.  I mean ultimately you are going to have to sign

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

CHARGE CONFERENCE                                770

1    anything that is submitted in your name.  So the answer to

2    your concern, you will be heard.  It's going to be most

3    likely in writing.  So I will take that process seriously.

4    Okay?

5              THE DEFENDANT:  Thank you.

6              MR. BRUCK:  Finally, we would -- as standby counsel,

7    we would like leave of the Court to file a motion requesting

8    of the Court call certain nonmental health witnesses under

9    Rule 706.  And these -- this bears, we think, on our

10   response.

11             THE COURT:  Have -- first of all, is this signed by

12   the defendant?

13             MR. BRUCK:  It is not.

14             THE COURT:  Have you consulted with the defendant?

15             MR. BRUCK:  We have not.  This --

16             THE COURT:  Mr. Bruck, this is not proper.  I

17   have -- you know, he is the -- he is self-representing, and

18   we are not going to make a mockery of self-representation.

19   He has a right to do this, and the law recognizes his right

20   to make decisions when he is self-representing, and I'm not

21   going to call witnesses -- you know, I'm aware in the Fifth

22   Circuit that a judge presumed to do that.  And I believe as

23   they say, they grant -- the Fifth Circuit granted a mandamus

24   by return mail, probably by return e-mail.  I'm not doing

25   that.  And the defendant, the law recognizes the defendant's

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 124 of 131
2:17-cr-20037-JES-JEH  # 451  Page 71 of 78
CHARGE CONFERENCE                                    771

1    right to self represent.

2            And, Mr. Bruck, I very much respect your view that

3    in capital cases a defendant should not have the right to do

4    that.  I understand your view.  You and I both know that the

5    case law is to the contrary unless there is a serious mental

6    illness, which I have repeatedly found after two full

7    competency evaluations and hearings not to be present.  And

8    he is competent to make -- he has a constitutional right to

9    make these decisions.  That is what the foundation of *Faretta*

10   is.

11           So I deny your motion to call witnesses, and I don't

12   think it would be proper.  And I think it would undermine

13   your client's constitutional right to self-representation.

14   That motion is denied.

15           MR. RICHARDSON:  We would ask that it be stricken.

16   It should not be accepted under the Court's ruling that

17   standby counsel is not permitted to file motions against the

18   wishes of their client.

19           MR. BRUCK:  Your Honor, the motion states the basis,

20   and it is related to and integral to our --

21           THE COURT:  You know, Mr. Bruck.  I -- Mr. Bruck, I

22   deny your motion.  Your leave to file.

23           MR. BRUCK:  Very well.

24           THE COURT:  Mr. Roof, I presume you agree with that

25   decision?

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 125 of 131
2:17-cr-20037-JES-JEH   # 451   Page 72 of 78
CHARGE CONFERENCE                                    772

1                    MR. BRUCK:  If we could confer.

2                    THE DEFENDANT:  Yes, I --

3                    THE COURT:  I thought you might.

4                    THE DEFENDANT:  Yes, I agree.

5                    THE COURT:  Thank you, sir.

6                    MS. STEVENS:  Your Honor, Mr. Roof asked me to raise

7          one more question with the Court.

8                    THE COURT:  Whoa, Ms. Stevens, sit down.

9                    Mr. Roof, if you want to raise something with me.

10                   MS. STEVENS:  It's about the issue just before this

11         one.

12                   THE COURT:  That's okay.

13                   THE DEFENDANT:  It was just about the redaction

14         again.

15                   THE COURT:  Yes.

16                   THE DEFENDANT:  My only worry about presenting it in

17         writing is that specifically my argument on the video visits

18         might not be as effective in writing than if I'm --

19                   THE COURT:  Here is -- let me say this:  I read

20         pretty well and carefully when things are filed with me.  I

21         am fully aware of your sensitivity on this issue, and if you

22         write it, I'll understand it, I assure you.  And, you know,

23         obviously you are in every one of those videos.  I know your

24         concern, and I have to weigh that against the public right to

25         know, and it's something I've got to consider.  Right this

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 126 of 131
2:17-cr-20037-JES-JEH   # 451   Page 73 of 78
CHARGE CONFERENCE                          773

1    moment I've got my mind on getting my jury back here tomorrow

2    morning and rendering a verdict, and as soon as that is over,

3    I'm going to turn my attention to this issue.  Okay?

4              THE DEFENDANT:  Thank you.

5              THE COURT:  Yes.

6              MR. RICHARDSON:  I'm sure before you -- that if you

7    determine that such a hearing is necessary, you will --

8              THE COURT:  If I determine that I need it, I will

9    certainly do that.  I think my general experience with

10   something as voluminous as this that sitting and arguing for

11   days about the lines on a document is not particularly

12   effective and not useful to me, personally.  And -- but I

13   have laid out my basic premise is that most of what I sealed

14   was to protect the defendant's right to a fair trial.  And

15   once he's had that trial in this court, my concerns about my

16   jury are obviously diminished.

17             What is unique about this situation, and I have to

18   sort it out, is that there is actually a pending death

19   penalty case in the state court and the potential impact of

20   that.  That is just another issue I've got to think through

21   and address.  And, again, I want to get a chance to get

22   beyond the verdict before I fully address that.  I do think

23   that underlying all of this is a very compelling First

24   Amendment right for public access.

25             MR. BRUCK:  Your Honor, with respect to the last

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 127 of 131
2:17-cr-20037-JES-JEH    # 451    Page 74 of 78
CHARGE CONFERENCE                                    774

1    matter before this one, the motion for Rule 706, I'm just

2    concerned that there be some way that the appellate court can

3    identify what it was we were attempting to offer.  And I

4    should say it is true that there is one case in the country,

5    the Fifth Circuit case, *United States vs. Davis*, that went

6    the way Your Honor said it did.  But that is it.  This --

7                 THE COURT:  I don't think the Judge -- they say

8    that, Mr. Bruck, down here, "There is no education in the

9    second kick of the mule."

10               MR. BRUCK:  I'm not rearguing the merits of the

11   issue.  I'm simply saying that this is an open issue for

12   appellate review.

13               THE COURT:  And you can -- what you are going to be

14   able to do is -- I've denied your leave to file.  You can

15   preserve what you have, and then you can ask the Court on

16   appeal to allow you to add it to the record.  I'm not adding

17   it to the record because you don't have the authority to file

18   it, and your client does not want you to file it.

19               MR. BRUCK:  I guess my question is --

20               THE COURT:  Actually, the representative of the

21   defense does not want you to file it on his behalf.  And you

22   are standby counsel.

23               MR. BRUCK:  Yes, sir.  All I'm saying is that the

24   document is in the possession of the Court.  I would ask that

25   it be identified in some way so that it is not extra *Faretta*

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 128 of 131
2:17-cr-20037-JES-JEH    # 451    Page 75 of 78
CHARGE CONFERENCE                                            775

1    material.

2                THE COURT:  I will indicate that it is a three-page

3    document dated January 10, 2017, signed by you and your other

4    standby counsel, and it lacks the signature line required,

5    which is Mr. Roof's signature.  And it's titled "Standby

6    counsel's motion requesting that the Court call mitigation

7    witnesses at penalty phase."  Put it in an envelope and seal

8    it today, and you can hold on to it and then make a motion to

9    an appellate court.  I'm not going to allow you to file it.

10               MR. BRUCK:  Very well.  Thank you, Your Honor.

11               THE COURT:  Anything further?

12               MR. BRUCK:  I would simply like the record to

13   reflect that the motion itself states the authority that we

14   believe authorizes us to file it.

15               THE COURT:  I understand.  I've looked over it.  I'm

16   aware of the issue.  I believe it conflicts with the

17   defendant's constitutional right to self-representation.

18               MR. BRUCK:  Very well.

19               THE COURT:  Okay.  Anything else further?

20               MR. RICHARDSON:  Nothing from the Government, Your

21   Honor.

22               THE COURT:  Very good.  I will -- Mr. Bruck, I will

23   e-mail to you, and if you would promptly deliver to Mr. Roof

24   the final charge and verdict form after I weigh and consider

25   these issues here today.

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 129 of 131
2:17-cr-20037-JES-JEH    # 451    Page 76 of 78
CHARGE CONFERENCE                                    776

1           Thank you both.  I will say that both of your

2      efforts here through this have been very helpful to the

3      Court.

4           MR. BRUCK:  There was one procedural request that we

5      wanted to suggest, which is that not only should the

6      mitigating suggestions be provided to the jury, but we think

7      it would be helpful to provide verdict forms to all members

8      of the jury, rather than simply the foreman.

9           THE COURT:  You know, I think it's hard enough to

10     have them follow it, and to give them two documents I think

11     is like too much.  The -- you know, as y'all could tell, I

12     tracked the verdict form and the charge very carefully.

13     Very.  I mean, we went back over and over because I think

14     they both are kind of a manual for the other.  So I think if

15     everybody has got the verdict -- the closing charge and the

16     foreperson has the verdict form, he's merely recording their

17     votes.

18          And I think there is a risk of overwhelming them,

19     and I don't want to do that.  I will tell you this:  If they

20     came back and asked me for it, I would do it -- I mean if

21     they wanted it for some reason.  I will tell you that not

22     long ago, Mr. Bruck, you practiced in these courts of law.

23     You know that not every judge gives the charge to the jury.

24     It's a lot of work to do that.  And my wife, believe it or

25     not, was called in state court to be a juror, and crazily,

2:15-cr-00472-RMG    Date Filed 03/29/17    Entry Number 947    Page 130 of 131
2:17-cr-20037-JES-JEH   # 451   Page 77 of 78
CHARGE CONFERENCE                          777

 1    they put her on a jury.  And she immediately asked when the

 2    jury went to deliberate, "Where is the closing charge?  My

 3    husband gives it to every jury."  And the judge had to cough

 4    up the closing charge to the jury.

 5           I think frankly we all would be better served by

 6    every juror having the closing charge.  I think it will be

 7    very helpful, and I certainly do it.  I don't want to

 8    overwhelm them.  There is too much of a good thing.  So I

 9    decline that, but if they happen to make the request, I would

10    honor -- I would provide it to them.

11           Anything further?

12           MR. RICHARDSON:  Nothing, Your Honor.

13           THE COURT:  Very good.  See everyone tomorrow

14    morning, 9:30.

15           (Thereupon, the Court was in recess.)

16

17

18

19

20

21

22

23

24

25

CHARGE CONFERENCE                                    778

1                          *****      *****      *****

2

3

4              I certify that the foregoing is a correct transcript

5        from the record of proceedings in the above-titled matter.

6

7

8        _____

9        Amy C. Diaz, RPR, CRR                        March 27, 2017

10

11       /S Amy Diaz

12

13

14

15

16

17

18

19

20

21

22

23

24

25