UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 17-20037 |
| | ) | |
| BRENDT A. CHRISTENSEN, | ) | <u>Hearing Requested</u> |
| | ) | |
| Defendant. | ) | |

<u>SEALED OMNIBUS MOTIONS *IN LIMINE* TO EXCLUDE EVIDENCE AT TRIAL</u>

NOW COMES the Defendant, BRENDT A. CHRISTENSEN, by and through his attorneys, and for his Omnibus Motions *in Limine* to Exclude Evidence at Trial states as follows:

## I.    Introduction

The standards governing admissibility of evidence differ between the guilt/innocence phase of a capital trial and the potential penalty phase. At the guilt/innocence phase, evidence is relevant if "it has any tendency to make a fact more or less probable that it would be without the evidence" and is a "fact of consequence." FRE 401. However, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FRE 403. Evidence may also be excluded if it runs

1

afoul of the rules against hearsay (FRE 801 *et. seq.*), violates a protected privilege (FRE 501), or constitutes improper character evidence (FRE 404).

At the penalty phase of a capital trial, the defendant may present any information relevant to a mitigating factor, and the government may present any information relevant to an aggravating factor for which notice has been provided. 18 U.S.C. § 3593(c). The Federal Rules of Evidence do not apply, except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. *Id.* The information does not need to qualify as *substantially* more prejudicial than probative, unlike the standard governing admissibility under FRE 403; the mere fact that it is more prejudicial is sufficient. *Id.*

The hallmark of a capital penalty phase is the need for "heightened reliability," which is essential to the process of imposing a death sentence. *United States v. Christensen,* 360 F.3d 135, 143 (2d Cir. 2004). "The Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death. The finality of the death penalty requires a 'greater degree of reliability' when it is imposed." *Id.* (citing *Murray v. Giarratano,* 492 U.S. 1, 8-9 (1989)). Generally, more evidence, not less, allows courts to facilitate the meeting of this standard. *Id.*

However, the admissibility of evidence at a capital penalty phase is not without limitation. It is true "that in order to achieve 'heightened reliability' more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating

factors." *United States v. Pepin*, 514 F.3d 193, 203 (2d Cir. 2008) (citing *Christensen*, 360 F.3d at 143). "But it hardly follows from that general observation that relevant evidence is always permitted. Acceptance of that reasoning would eviscerate the trial court's ability to exclude unduly prejudicial material from the penalty hearing inasmuch as any decision to exclude necessarily means less evidence, not more." *Id.* at 204. In fact, the FDPA's presumption of the admissibility of relevant evidence is actually narrower than the FRE. *Id.*

There is significant danger in allowing evidence to be presented to the jury in the guilt phase which would otherwise be inadmissible at the penalty phase. Even if the Court were to issue an instruction for the jury to disregard said evidence, curative instructions can be "very close to an instruction to unring a bell." *United States v. Murray*, 784 F.2d 188, 189 (6th Cir. 1986). Limiting instructions may not in fact erase the prejudice that occurred. *Bruton v. United States*, 391 U.S. 123, 132 (1968). In some circumstances, a limiting instruction may be "a recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else." *Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir. 1932).

Additionally, logic dictates that if a piece of evidence is *substantially* more prejudicial than probative under FRE 403, it will also meet the lesser standard of simply being more prejudicial than probative under § 3593(c). For the foregoing reasons, any piece of evidence which is excluded from the guilt phase should similarly be excluded from the penalty phase.

Defense counsel notes that the list of motions contained herein is lengthy and some may seem insignificant in the grand scheme of the case. Counsel has no choice in the matter since the government has insisted at every turn that it intends to use *every single piece of evidence* disclosed to date. Additionally, because there is undoubtedly more evidence coming, and potentially in the form of computer and other electronic data, Mr. Christensen reserves the right to raise additional motions at a later date prior to trial.

## II.  MOTIONS *IN LIMINE*

### A.  Motion to Exclude Evidence of Starlight Bloodhound and Luminol Test Results

On June 15, 2017, officers of the University of Illinois Police Department conducted a search of Mr. Christensen's apartment pursuant to a search warrant. As part of the search, several swabs were taken of stains around the apartment, including on the utility room door, the clothes hamper in the bedroom, the bedroom mattress, and a baseball bat from the bedroom. During the examination at the scene, a product called "Starlight Bloodhound" was applied to various items, purportedly with "positive" results. Two weeks later, on July 1, 2017, agents from the FBI's Evidence Response Team conducted a thorough search of the same apartment. During the search, Luminol and/or alternative light sources (ALS) were applied to various surfaces throughout the apartment, including the bathroom sink, wall, bathtub, closet wall, bedroom wall, and bedroom floor. Results were "positive" (i.e. illuminated) in several locations. Each of the

positive locations from this second search were documented in photographs, which indicate a glowing blue appearance in several areas of the apartment.

Further forensic testing indicated that the majority of the initial "positive" results could not be confirmed by subsequent testing. Specifically, stains from the utility room door, laundry hamper, bath mat, bathroom vanity, bathtub drain, bathtub drain stopper, carpet, and many more items ultimately tested negative for the presence of blood.

There are many reasons why an application of Luminol or similar substance would react to show luminescence even in cases where no blood was present. For example, it is commonly known that Luminol can react with household cleaners and bleaches, both of which would generally be present in a bathroom.[1] Regardless of the reason *why* the false positive results occurred, the evidence should be excluded from trial. The standard for relevance is whether or not the evidence makes any fact more or less probable. FRE 401. Here, the government is seeking to admit the evidence to prove that there was blood present at the crime scene and to explain why investigators decided to test certain pieces of evidence.

With respect to how the Luminol/ALS results furthered the agents' investigatory decisions, their conversations with crime scene techs and education as to this fact is

---

[1] Kent, EJ, et al, "Inhibition of bleach-induced luminol chemiluminescence," 2003 J. Forensic Sci. 48 (available at https://www.ncbi.nlm.nih.gov/pubmed/12570200 ); Creamer, J. et al, "Attempted cleaning of bloodstains and its effect on the forensic luminol test," Nov-Dec 2005 Luminescence 20, 411-413 (available at https://www.ncbi.nlm.nih.gov/pubmed/15966054)

inadmissible as improper "course of investigation" hearsay. "Although an out-of-court statement offered to show the reason a police investigation proceeded as it did 'could be said not to be [inadmissible] hearsay,' the 'reasons for [an] investigation [are] most assuredly not something the Government [has] to prove to carry its burden' of proof in a criminal trial." *Jones v. Basinger,* 635 F.3d 1030, 1045 (7th Cir. 2011) (citing *United States v. Mancillas,* 580 F.2d 1301, 1309-10 (7th Cir. 1978)). Aside from those limited details necessary to show "that the evidence [found] is actually relevant," the details of an investigation are generally "of only minimal consequence to the determination of the action." *Id.* "Such statements offered to show 'background' or 'the course of the investigation' can easily violate a core constitutional right, are easily misused, and are usually no more than minimally relevant. Courts asked to admit such statements for supposed non-hearsay purposes must be on the alert for such misuse." *Id.* at 1046.

In this case, the majority of areas where Luminol and/or ALS were applied did not in fact contain blood, despite the initial test results. It is irrelevant for the jury to understand *why* the FBI decided to take certain samples for testing, and if allowed, would require the admission of hearsay to explain that decision. For example, the Evidence Response Team would be required to explain how they were educated on what samples to take, who told them/taught them to do so, and would implicate the need for an expert opinion. In fact, the preliminary reactions do not prove anything of consequence and, if presented, would require significant scientific testimony to explain why preliminary positive tests can in fact turn out to be negative but require testing

anyway. Allowing this evidence will be confusing to the jury and risk misleading the jury regarding the significance of those results.

Additionally, the admission of false positive results is substantially more prejudicial than probative in that it could allow the jury to conclude that there was a large amount of blood in Mr. Christensen's apartment even where none was confirmed. The prejudicial impact of the visual images of the illuminated areas could far outweigh any possible relevance elicited by presenting the evidence at trial. Based on the foregoing, the defense requests that any evidence and testimony about positive presumptive blood tests which later resulted in negative findings be excluded pursuant to FRE 401 and FRE 403.

**B. Motion to Exclude Evidence of Mr. Christensen's Statements Regarding a Desire to Look Intimidating**

Discovery indicates that sometime in the spring of 2017, Mr. Christensen told his then-wife and then-girlfriend that he enjoyed looking "intimidating" to those around him, and that he liked appearing scary to people. This information is wholly irrelevant to this case. If, for example, the alleged kidnapping had included intimidation, either physically or mentally, of the victim, this information could be relevant to establishing Mr. Christensen's behavior and/or state of mind leading up to the actual kidnapping itself. But that is not the government's theory of the case. Instead, it is defense counsel's belief that the government will claim that Mr. Christensen tricked Ms. Zhang into entering his vehicle through the use of a police badge, although evidence of that theory

is circumstantial only. There is no information, circumstantial or otherwise, that Mr. Christensen used his physical size or any kind of verbal abuse to intimidate Ms. Zhang into entering his vehicle. As such, statements made to romantic partners discussing whether or not he had an intimidating presence are irrelevant and should be excluded from trial.

### C. Motion to Exclude References to "American Psycho"

During the investigation of this case, the government discovered that Mr. Christensen had allegedly told at least two people that his favorite book was "American Psycho," published in 1991 and authored by Bret Easton Ellis. Since publication, it has been adapted into a movie (2000) starring Christian Bale, and a Broadway musical (2013), and has been widely distributed in the United States.[2] The contents of the book can be extremely disturbing. It includes the use of racist terminology ("nigger") and racist sentiments (referring to a black sales person as "dumb, slow"), as well as prolific drug use and several references to homophobia. It also includes scenes where the main character (Patrick Bateman) inflicts gratuitous torture on various individuals and animals. These scenes include, but are not limited to, the stabbing and evisceration of a dog, followed by the slicing of a man's throat with the same knife; the beheading of a man with an axe; the murder of a child at the zoo by stabbing him in the neck; and the rape of a woman after he has nailed her to the floor with a nail gun and cut out her tongue, after which point he saws her arm off and bites her lips off. At one point, the

---

[2] https://en.wikipedia.org/wiki/American_Psycho (last visited 2/7/19)

book depicts a scene where the main character has restrained and is raping a woman while forcing her to watch a video of him eating the brain of his previous victim, spiced with Grey Poupon mustard; he then inserts a live rat into her vagina and lets it eat the woman while she is still alive. Suffice it to say, the scenes are grotesque and repulsive.

Counsel assumes that the government seeks to introduce this evidence at the guilt phase as proof in support of their claim that Mr. Christensen is a sick and depraved man who is capable of vile acts, and anyone who enjoys this type of literature could surely commit murder. Since there is no actual proof of what happened inside Mr. Christensen's apartment or how this alleged death occurred, there is no argument that the facts of this case are similar in any way, shape or form to the depictions referenced herein. As such, the presentation of this evidence is irrelevant. However, even if some relevance could be deduced, allowing these depictions into evidence in this case would be substantially more prejudicial than probative. FRE 401, 403. Even defense counsel, who has been exposed to horrific facts in previous cases, felt ill after reading the excerpts provided by the government.

"'Unfair prejudice' refers to an 'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one' or 'evidence designed to elicit a response from the jurors that is not justified by the evidence.' *United States v. Ellis,* 147 F.3d 1131, 1135 (9th Cir. 1998) (quoting 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 403.04[1][b] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1997)). In *Ellis,* the Court found that the admission into evidence

of a copy of the Anarchist Cookbook was substantially more prejudicial than probative because it did not tend to prove whether the defendant knew that he had explosives in his possession or not. *Id.* His intent regarding the use of those explosives was irrelevant. *Id.* at 1135-36. Similarly, in this case, Mr. Christensen's possession of a vulgar and repulsive account of sexual abuse and murder, not committed in the fashion alleged here, is also irrelevant. And, a lay juror will doubtlessly be more affected by the contents of the book and will be substantially prejudiced against Mr. Christensen as a result. A such, the evidence should be excluded.

**D.  Motion to Exclude Testimony of** ▮▮▮▮▮▮ **and** ▮▮▮▮▮▮▮

Discovery materials furnished to the defense by government counsel indicate that on June 30, 2017, FBI agents interviewed ▮▮▮▮▮ and ▮▮▮▮▮▮, both residents of the Stonegate Village Apartments in Champaign, Illinois. According to ▮▮ ▮▮ "around the first weekend in June, during the evening, possibly on a Sunday night," he was at his residence and heard "two really quick screams a couple hours apart." The screams sounded "as if they could have been made by an Asian female since they kind of had a slight accent to them," and came from the direction of Building B of the apartment complex.

According to ▮▮▮▮, she went swimming in the neighborhood pool almost every day after work, and that "near the beginning of June, possibly on a Tuesday, in mid/late afternoon, she heard screaming that could have been like a woman being beaten."

It is important to note that reference to a calendar for June, 2017, establishes that the "first weekend in June" was June 3-4, 2017, and that the first Tuesday in June was June 1, 2017. And according to FBI case reports, and evidence adduced at hearings before this Court, Ms. Zhang was first reported missing to the authorities late Friday afternoon, June 9, 2017.

Clearly, evidence of "screams" being heard coming from an apartment building more than one week before Ms. Zhang's disappearance is not relevant to any material fact or proposition in this case where Mr. Christensen is charged with kidnapping resulting in death and making false statements to federal agents. FRE 401. Moreover, whatever negative inference that the Government attempts to draw from such evidence to articulate a theory of relevancy to this case is nothing short of rank speculation and conjecture and devoid of any factual foundation. And finally, whatever probative value, if any, such evidence may have, it is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury that would result to Mr. Christensen if such evidence is admitted at trial in a case where he is charged with the capital offense of kidnapping resulting in death. FRE 403.

For all of these reasons, this Court should bar the Government from making any use at trial of ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ testimony concerning the "screams" they claim to have heard during the first weekend in, or the beginning of, June, 2017.

### E. Motion to Exclude Evidence of Internet Searches Referencing Serial Killers, Statements Relating Generally or Specifically to Serial Killers, and the Class "Sociology of Deviance"

11

i. **Evidence Relating to Serial Killers**

Discovery indicates that the government intends to introduce certain statements made by Mr. Christensen to his then-wife and then-girlfriend regarding serial killers, specifically his critique of certain famous serial killers for being "sloppy" and his statement that he had looked into information about serial killers, along with extremely brief visits to websites and attending a class entitled "The Sociology of Deviance." This information is irrelevant and substantially more prejudicial than probative for the following reasons.

First, the government vastly exaggerates the frequency of Mr. Christensen's discussions and/or research on this topic. As previously noted in the Motion to Dismiss Count 1 (R. 114), the evidence of Mr. Christensen's internet searches concerning "serial killers" is a miniscule portion of his overall internet activity. On April 17, 2017, three Google searches related to serial killers were performed on Mr. Christensen's cell phone and two Wikipedia websites related to serial killers were visited that day. The first of the five entries bears a Date/Time stamp of 4/17/2017 01:47:14; the last 4/17/2017 01:49:32. Thus, the three Google "searches" and two website visits were performed within a period of two minutes and 38 seconds. With respect to his statements to Ms. Zortman and Ms. Bullis, the evidence refers to a single conversation with each woman and one text message to Ms. Bullis.

Setting aside the brevity of the internet visits, a closer look at the Wikipedia websites does not reasonably suggest anything which would have furthered the

12

kidnapping of Ms. Zhang. For instance, the web page identified as

https://en.m.wikipedia.org/wiki/serial_killer (visited 2/10/19). The article is several

pages long and summarizes different topics relating to the subject, including the

etymology and definition of the term, the history of serial killers, their characteristics,

development, fantasies etc. This article would be the type of resource consulted by any

person interested in a topic that has captured the attention of untold thousands or

millions. *See infra.* That the user of the Motorola cell phone (for purposes herein,

presumed to be Mr. Christensen) did nothing more than quickly glimpse its contents, as

evidenced by the fact that only 31 seconds after accessing this website, the user accessed

a second Wikipedia website related to serial killers. This, again, is a multi-page

document listing in chart form known serial killers around the world, their country,

years of activity, number of proven and possible victims and brief notes associated with

each. The user of the cell phone spent 70 seconds at this site before performing the next

Google search for a list of American serial killers, a site visited for 29 seconds.

Finally, Mr. Christensen apparently downloaded an academic paper entitled "A

Critical Analysis of Research Related to the Criminal Mind of Serial Killers" onto the

cell phone on February 26, 2017. This paper was written by a graduate student from the

University of Wisconsin-Stout in August of 2000. The purpose of the study was to

compare past and present trends in serial killing in both Wisconsin and the United

States, and to identify and analyze their characteristics with a goal of developing

prospective characteristics of serial killers for identification and treatment purposes.

13

The paper is fundamentally an academic analysis of the various psychological, biological, and social theories underlying research of serial killings, and ultimately makes recommendations as to how to fill the research gaps that exist in current scholarship.

The downloading of this paper, as well as the conversations, Google searches and website visits occurred during the spring semester of 2017, when Mr. Christensen was taking SOC 310, an online class at the University entitled "The Sociology of Deviance." The Syllabus from the class indicates that students would examine "something of the range of deviance," including "fetishists" and "criminals." Class discussions focused on deviant behavior, including but not limited to nerds, street gangs, nudists, terrorists, hackers, hippies, the mentally ill, and more. The class was a short-term class of eight weeks, and was likely taken because Mr. Christensen required credit hours to graduate with his Master's Degree but was utterly failing in his physics classes. In that same semester, he also took Environmental Policy, the Biology of Dinosaurs, and Insect Pathology. His research paper for SOC 310 was a study of the movie "Fight Club," which contains not a single murder.

### ii.  The Prevalence of Interest in Serial Killers in Modern Society

Serial killers are prevalent in popular culture and draw the attention of millions of average Americans. *See* https://www.psychologytoday.com/us/blog/wicked-deeds/201710/our-curious-fascination-serial-killers (visited 2/14/19) (psychologist explaining why "the public loves serial killers for a number of interrelated reasons.")

This is evident in media searches for movies and television shows about serial killers, which return thousands upon thousands of results: *See, e.g.*, Mindhunter (2018), Seven (1995), The Silence of the Lambs (1991), Taxi Driver (1976), Zodiac (2007), American Psycho (2000), Mr. Brooks (2007), Natural Born Killer (1994), Red Dragon (2002), Monster (2003), Perfume (2006), Kalifornia (1993), Summer of Sam (1999), Copycat (1995), Saw (2004), From Hell (2001), The Bone Collector (1999), Kiss the Girls (1997), The Killer Inside Me (2010).

### iii.  Mr. Christensen's Brief Visits to Certain Websites, General Comments Concerning Serial Killers and his Attendance in an Academic Class Are Not Relevant to any Ultimate Issue in this Case

The fact that Mr. Christensen briefly looked at websites examining serial killers does not in any way support an element of the offense, specifically whether or not he unlawfully kidnapped a person and held her for ransom, reward, or otherwise, resulting in death. 18 U.S.C. § 1201(a). Hordes of people have been fascinated by the exploits of famous serial killers, as evidenced by the prevalence of books, movies, and other media available in popular culture. Though the government might seek to argue that Mr. Christensen kidnapped Ms. Zhang in an effort to become a serial killer, that position has no support in the evidence. The argument might hold more weight if Mr. Christensen had spent a lot of time researching the methods of serial killers, or if there were any evidence whatsoever that he had killed before, but as the evidence stands, brief forays on publicly available websites which are visited millions of time per year hardly support that theory and merely serve to prejudice the defendant in the eyes of

the jury. Nothing is added to this fact because he told two people that he was interested in them, or that he took an academic class which touched on deviant behavior. As such, under FRE 401 and FRE 403, the evidence referenced herein should be excluded from trial.

### F.  Motion to Exclude Testimony of ████████████

During the investigation, a woman named ████████ was interviewed by the University of Illinois Police and by the FBI. On July 27, 2017, Detective Eric Stiverson noted that he had received an anonymous tip that ████████ and Mr. Christensen had gone out on a date, and that Mr. Christensen had asked ████████ questions about how to bury a body, how to conceal a body, and other things in line with her employment as a ████████████████████. According to Detective Stiverson's report, ████████ met Mr. Christensen through a dating app and went on one date with him at the ████████████. The date took place in early April of 2017. She stated that they ate dinner, engaged in small talk, paid for their own food and left. She could not recall specific details about their dinner conversation, but she did *not* recall him asking about her job as a ████████ or how to conceal a body. The reason she decided not to see him again was because she was uncomfortable with him being married.

Special Agent Anthony Manganaro was with Detective Stiverson during that interview in July of 2017. In his synopsis, ████████ recalled discussing the use of lye to remove odors associated with body decomposition. Upon review of the recorded

interview of ████████, she did state that they talked about how to use lyme to cover up odors on a farm so that dogs did not dig up animals, but that it was unrelated to her job as a █████. SA Manganaro also noted in his report that ████████ did not recall anything unusual about their conversation and that the reason she did not contact the FBI after learning of Mr. Christensen's charges was that she did not believe she had anything relevant to say.

With respect to any potential guilt phase, this evidence is irrelevant under FRE 401. Defense counsel assumes that the government may attempt to use this evidence to establish premeditation, in that Mr. Christensen was researching how to dispose of a body two months prior to the offense. But anything ████████ could say would not support that theory. She and Mr. Christensen went on one date and she recalled nothing unusual about their conversation. She even claimed that the hardly talked about her job as ████████ at all. The fact that she was describing her life growing up on a farm and the use of lyme, unprompted, does not support a theory of premeditation in any way. In fact, Mr. Christensen seems not to have pursued a number of relevant topics that a person could regarding a coroner's employment which may have been useful in planning to dispose of a body. As such, the testimony is irrelevant. Any inference otherwise is an evidentiary stretch and would be substantially more prejudicial than probative, thereby requiring exclusion.

### G. Motion to Exclude References to Other Murder Victims and the ViCap Report

On June 29, 2017, Mr. Christensen attended a public event to honor Ms. Zhang. By his side was his then-girlfriend, Terra Bullis, a/k/a Bunny. Unbeknownst to Mr. Christensen, Ms. Bullis was wearing a body wire and recorded large portions of their conversation during the course of the evening. At one point, Mr. Christensen made statements that Ms. Zhang was his thirteenth victim, although he gave no details about where or when these supposed other offenses occurred.

As any decent investigator would, the FBI followed up on this claim by sending the case to the Violent Criminal Apprehension Program[3] (ViCap) for assessment. The FBI provided a case synopsis, consisting of all of the known facts about Ms. Zhang's disappearance and Mr. Christensen's characteristics, and ViCap searched for similar cases which could possibly be linked to this one. According to the final report, ViCap located numerous prospective cases, and after evaluating and assessing each case, the results were narrowed down to two similar case leads: 1) an open homicide case from Wisconsin Rapids, WI, from 6/10/2006; and 2) an open homicide case from Madison, WI, from 6/23/2007.

Further investigation has revealed that neither case is related to Mr. Christensen. In Case Number 1, the victim, Deidre Harm, was last seen in a strip club in Wisconsin Rapids, Wisconsin (approximately 30 minutes from Mr. Christensen's home in Stevens

---

[3]The Violent Criminal Apprehension Program (ViCap) maintains the largest investigative repository of major violent crime cases in the U.S. It is designed to collect and analyze information about homicides, sexual assaults, missing persons, and other violent crimes involving unidentified human remains. https://www.fbi.gov/wanted/vicap/unidentified-persons (last visited 2/7/19)

Point, WI) in the company of an unidentified white male on June 10, 2006. The ViCap report provides no description to enable to reader to determine whether the description of the suspect matches that of a 17 year-old and gives short shrift to the fact that, at 17, Mr. Christensen likely would not have been allowed in a strip club. Even more problematic than the pure speculation contained in the report is that it fails to note that the suspect in the murder of Ms. Harm in 2006 was publicly known to be Christopher Revak, who was also a suspect in several killings of other young women and had lived in, and had connections to Wisconsin Rapids, WI.[4] Revak was 34 at the time of the killing of Ms. Harm and thus far more likely to be in the company of a woman in a strip bar than a 17 year-old. The man seen in the strip bar also had a tattoo on his left arm, which Mr. Christensen does not, and media reports suggest that DNA linked Revak to the crime (a circumstance we assume that the government could easily verify if it hasn't already). Mr. Revak hung himself in a Missouri jail shortly after his arrest in 2009.

Any inference of a connection to the second case referenced in the ViCap report is equally unreliable and speculative. This involved a murder by asphyxiation, strangulation and blunt-force trauma of an intoxicated 22-year-old University of Wisconsin-Whitewater student in Madison in 2007, when Mr. Christensen was 18 years old and still living in Stevens Point, an hour and 45-minute drive from Madison, Wisconsin. No facts link Mr. Christensen to this crime.

---

[4] https://wrcitytimes.com/case-of-deidre-harm-to-be-featured-on-investigation-discovery-special/; https://www.wsaw.com/home/headlines/Cold_Case_Series__Deidre_Harm_133077623.html; http://www.truecrimereport.com/2009/08/did_christopher_revak_murder_d/ (last visited 2/7/19)

In pursuit of additional leads, the defense is aware that the FBI has sent out follow-up requests to various law enforcement agents in Wisconsin and have to date received no useful information. The defense assumes that Mr. Christensen's DNA has also been run through CODIS and has achieved no useful results, otherwise they would have been disclosed by now. As such, the allegation that Mr. Christensen engaged in any prior murders or had any other victims is false. Allowing his bizarre statements into evidence does not make any fact at issue more or less probable; what it does is smear the defendant and allow the jury to question whether or not he has other victims, which he *clearly* does not. While relevance is absent, prejudice abounds. If the jury hears these statements and the allegations of the ViCap report, even if eventually told that they are baseless, jurors will question just what kind of person claims credit for heinous acts when there are, in fact, none. Mr. Christensen's character will be impugned and any seed of doubt as to his nature will be terribly prejudiced under any standard, both substantially and as equally weighed.

### H.  Motion to Exclude Evidence Relating to FetLife.com and BDSM Relationships

Discovery materials furnished to the defense by government counsel indicate that from April through June, 2017, Ms. Bullis and Mr. Christensen maintained an intimate and entirely consensual relationship involving BDSM (bondage, domination, sadism, masochism) wherein they engaged in such acts as bondage, flogging and physical restraints while having sex. In fact, Ms. Bullis acknowledges and admits that

their relationship and activities were voluntary and consensual, and that she was an avid and willing participant in such activities with Mr. Christensen, and an active member of Champaign-Urbana's BDSM community.

Here, Ms. Bullis's expected testimony concerning the intimate details of her sexual relationship with Mr. Christensen, and their practicing BDSM while having sex, are not relevant to any material fact or proposition in this case where Mr. Christensen is charged with kidnapping resulting in death and making false statements to federal agents. Moreover, such testimony is nothing more than an attempt to malign Mr. Christensen's character to show that in the instant case, he acted in accordance with the bad character and acts, all of which is flatly prohibited by FRE 404(a) and (b).

Additionally, whatever probative value, if any, such evidence may have, it is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury that would result to Mr. Christensen if such evidence is admitted at trial in a case where he is charged with the capital offense of kidnapping resulting in death. For all of these reasons, this Court should bar the government from making any use at trial of Ms. Bullis's testimony concerning the intimate details of her and Mr. Christensen practicing BDSM during their sexual relationship.

As part of this BDSM relationship, evidence shows that in April of 2017, Mr. Christensen was made aware of a website called FetLife.com by Ms. Bullis, who was a long-time and active member of the site. FetLife is referred to as "the Social Network for

the BDSM, Fetish, and Kinky Community."[5] It operates as the Facebook for kinky

people and provides a platform for individuals interested in alternative sexual practices

to find like-minded people to share sexual experiences with.

Prior to his relationship with Ms. Bullis, which began in April of 2017, there is no

evidence that Mr. Christensen had shown any interest in bondage or other forms of

alternative consensual sexual activity that attract visitors to the Fetlife website. In

contrast, Ms. Bullis was a member of the alternative sexual practices community in

Champaign-Urbana (and perhaps elsewhere). She encouraged Mr. Christensen to get

involved in this community in Champaign-Urbana, at one point taking him to a party at

an Urbana bar where members of this community sometimes congregated. Describing

herself as "polyamorous," Ms. Bullis told the FBI that she and Mr. Christensen practiced

bondage and flogging and admitted that she had purchased the flogger they used.[6]

Having more experience in this alternative milieu and explaining that she undertook

the "submissive" role in their activities, Ms. Bullis taught Mr. Christensen various

concepts, including the use of code words to indicate if the boundaries of consent were

being approached in dominant/submissive activities, and the two of them freely shared

various sexual fantasies. Nowhere in the several interviews she had with the FBI or the

---

[5] https://fetlife.com/ (last visited 2/8/19)

[6] In one text message to Mr. Christensen in mid-April, Ms. Bullis notes that "flogging is . . . so beautiful," [that] she "just drooled" after seeing a man "florentine flogging" in a convention in St. Louis, and suggests she would like a "set of floggers if[sic] my own for my birthday."

numerous text messages found on their respective phones is there any suggestion that

her relationship with Mr. Christensen was anything other than consensual.

In the present case, there is no evidence that FetLife.com in any way informed or

encouraged Mr. Christensen to commit a crime. Contrary to the government's

suggestion that Mr. Christensen regularly visited this site in the weeks and months

before June 9, 2017, the evidence shows that he visited the site on three different dates,

April 19, 22, and 26, 2017. Mr. Christensen first visited the "abduction 101" website at

00:17:28 on the 19th and remained on the first page for *seven seconds* before accessing

another page on this sub-thread entitled "About & Rules", where he remained for an

even shorter time. Approximately twenty minutes later he again accessed "abduction

101," visiting five pages on the sub-thread over a period of approximately seven

minutes. One week later, on April 26, 2017, he accessed four pages on the "abduction

101" sub-thread over a period of eight minutes.

It strains credulity to suggest, without any further evidence, that these brief visits

to this sub-thread on the FetLife website in April furthered the kidnapping of Ms.

Zhang on June 9. It is true that he had one text conversation with another FetLife

member, ▮▮▮▮▮▮▮, about possibly engaging in a sexual kidnapping fantasy, but

in no way was the encounter to be nonconsensual. In fact, Mr. Christensen and his

prospective partner planned every element of the interaction down to the smallest

detail, including suggesting signing a written consent form so that if anyone observed

their interaction and called the police, it would be clear that the act was *consensual.* In

23

the end, nothing came of the online conversation and Mr. Christensen never met the

other member. The government has presented no evidence that Mr. Christensen's

activities or interests on the FetLife website are relevant *in any way* to committing a

crime, or engaging in nonconsensual conduct.

It is not a crime to have fantasies about alternative sexual behavior, but it will

certainly be construed by the jury to be strange, perverse, and indicative of deviant

character if this evidence were presented at trial. Besides being irrelevant under FRE

401, the nature of this evidence is substantially more prejudicial than probative, and as

such should be excluded from trial.

### I.  Motion to Exclude Testimony of ██████████

Evidence will show that a former colleague of Mr. Christensen's from the physics

department, ██████████, became aware that he had a crush on her sometime in the

spring of 2017. At one point, he tried to hang out with her alone, and even told her that

he wanted to kiss her. She rejected his advances, and nothing more came of the

situation. This interaction is not relevant to any issue in the case. No force was used,

and Mr. Christensen did not pursue the relationship after she made it clear that she was

not interested in him romantically. At the time, he was in an open relationship with his

then-wife, and was not being disingenuous or sneaky in his attempts to approach ██

██ Because this interaction is not relevant and, if admitted, would be substantially

more prejudicial than probative, it should be excluded from trial.

### J.  Motion to Exclude Testimony That Constitutes Violations of Marital Privilege

Federal Rule of Evidence (FRE) 501 governs the applicability of evidentiary privileges and recites that, unless otherwise provided by the Constitution, federal statute, or rules prescribed by the Supreme Court, claims of privilege are governed by common law, as interpreted by the courts of the United States. The so-called "marital privilege" has "ancient roots" in the common law and is a privilege recognized by Rule 501. *Trammel v. United* States, 445 U.S. 43-44 (1980).

At a time when the common law treated women as chattels and property of their husbands, a wife was categorically disqualified to testify either for or against her husband. *Id.* at 52. These outmoded ideas have long been discarded and one spouse is no longer automatically disqualified as a witness. Nonetheless, more limited formulations of the marital privilege survive as an adjunct to society's interest both in protecting the sanctity of existing marriages and encouraging confidentiality between marital partners. In furtherance of these goals, modern courts analyze spousal privilege claims under two separate regimens: (1) the confidential marital communications privilege; and (2) the spousal testimonial privilege. *Id*. The two privileges are distinct, not only in their justifications but also in terms of what they protect and who may invoke them. *United States v. Brock*, 724 F.3d 817, 820 (7th Cir. 2013).

The confidential marital communications privilege does not enjoin all testimony of a spouse. Properly invoked and otherwise applicable, it only bars testimony concerning "[i]nformation privately disclosed between [spouses] in the confidence of

the marital relationship." *Brock*, 724 F.3d at  820; *Blau v. United States*, 340 U.S. 332, 333,

n. 5 (1951) ("confidential communications between husband and wife" are privileged).

In this regard, *all* communications between spouses are *presumed* to be confidential and

privileged. *Wolfle v. United States*, 291 U.S. 7, 14 (1934). The confidential communications

privilege does not, however, prevent a spouse from testifying as to matters she *observed*

during the marriage or concerning spousal communications made in the presence of

third parties. *Brock*, 724 F.3d at 821. Thus, for example, the spouse can be required to

testify as to actions he or she saw the defendant-spouse engage in.

Unlike the testimonial privilege, the communications privilege independently

belongs to both spouses and thus can be invoked by either. *Brock*, 721 F.3d at 820. Also,

unlike the testimonial privilege, the confidential communication privilege survives

dissolution of the marriage, as its purpose is to protect the confidentiality of

communications during the marriage and not the marriage itself. *Id*. at 821; *United States

v. Byrd*. 750 F.2d 585, 590 (7th Cir. 1985).

Counsel has been provided statements in discovery that Michelle Zortman gave

to the FBI wherein she disclosed conversations between herself and Mr. Christensen

that are at the heart of confidential spousal privilege. In part, these statements recite

statements to Michelle Zortman wherein her husband described disturbing dreams and

otherwise revealed his most private thoughts. As such, upon appropriate objection

which Mr. Christensen herein raises, Michelle Zortman cannot testify concerning these

matters or any other presumptively confidential communications between herself and

Mr. Christensen during their marriage. And, because either party to confidential marital communications may invoke the privilege, Michelle Zortman's revelation of these statements to the FBI does not constitute a waiver by Mr. Christensen. *United States v. Wood*, 924 F.2d 399, 401-02 (1st Cir. 1991) (distinguishing the spousal testimonial privilege which can be waived, court holds wife could not waive husband's privilege against disclosure of confidential marital communications and thus incriminating letter he sent her from jail was inadmissible); *United States v. Neal*, 532 F. Supp. 942, 947 (D. Colo. 1982), aff'd 743 F.2d 1441 (10th Cir. 1984) (privilege not lost where one spouse let police eavesdrop on conversation with spouse).

In light of the above principles, counsel seeks an order barring any testimony from or questioning of Michelle Zortman concerning any conversation with or communication from her husband during their marriage, or any reference thereto during the trial of this case, including not only her statements to the FBI, as referenced above, but all communications with Mr. Christensen while they were still married that were monitored or recorded by the Macon County or Livingston County Jail during which they were required to either involuntarily accede to the recording or cut off their privilege to communicate confidentially as spouses.

### K.  Motion to Exclude Prejudicial Victim Impact Evidence

The defense respectfully moves the Court to impose limitations on victim impact evidence so that it does not become "so unduly prejudicial that it renders the trial fundamentally unfair" as discussed in *Payne v. Tennessee,* 501 U.S. 808, 825 (1991), and

*Jones v. United States*, 527 U.S. 373, 401-02 (1999). The defense seeks appropriate instructions to victim impact witnesses and then to the jury that will avoid a death sentence that may be based on "caprice or emotion" as cautioned against, in general terms, in *Gardner v. Florida*, 430 U.S. 349, 358 (1977).

Mr. Christensen files this motion in an effort to prompt timely discussion of victim impact evidence in this case as well as the application of 18 U.S.C. § 3771 in this matter. The issue of disclosure of this evidence has come up multiple times in this case, first as a Motion to Compel filed by the defense (R. 82), which was denied by Judge Colin Bruce (R. 91), then as part of the Motion to Strike Victim Impact Evidence (R. 106) and again as a Renewed Motion to Compel (R. 167). Neither R. 106 nor R. 167 have been ruled on by the Court as of this date. To avoid a lengthy argument as to why the defense requires the disclosure of specific victim impact evidence in order to properly litigate this issue, Mr. Christensen hereby incorporates all of the arguments made in the previously mentioned pleadings.

Mr. Christensen again reiterates that at this juncture, he is unable to discern whether the government's proposed evidence exceeds the well-established bounds that have been applied by the Supreme Court and various other courts across the country. This is a particularly dangerous area in which to ignore potential errors. Courts have recognized that victim impact testimony is perhaps the most inflammatory, emotional and potentially prejudicial evidence that could possibly be presented at a capital sentencing proceeding. *See, e.g., United States v. McVeigh*, 944 F. Supp. 1478, 1491 (D.

Col. 1996) (noting that victim impact evidence is "the most problematical of all of the aggravating factors and may present the greatest difficulty in determining the nature and scope of the information to be considered").

Once heard, it is virtually impossible for a listener to forget such evidence. *See United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005) (noting that victim impact testimony "was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years . . . It has now been over four months since I heard this testimony . . . and the jurors' sobbing during the victim impact testimony still rings in my ears"). It is therefore critical that victim impact testimony be carefully scrutinized ahead of time, before something inadmissible and inflammatory is blurted out in front of the jury. This cannot be achieved without pretrial disclosure by the government of the evidence it seeks to present.

### L.  Motion to Exclude Lay Opinion and Speculative Testimony Regarding Mr. Christensen's Alleged Lack of Remorse and Emotional State

This Motion seeks to exclude any lay opinions, comments, or observations about Mr. Christensen's demeanor; emotions; characterizations of emotions; lack of reaction; lack of remorse; lack of emotion, including but not limited to during police interviews, jail telephone calls, and/or jail video recordings. The opinions, or characterizations of Mr. Christensen's behavior or appearance during an interview or on recorded jail

telephone calls/videos, or descriptions of him as lacking of emotion, showing no emotion, lacking remorse or showing no remorse–or opinions like those–are not relevant and have a high danger (more than substantial) of unfair prejudice and of misleading the jury.

"Lack of remorse is a subjective state of mind, difficult to gauge objectively since behavior and words don't necessarily correlate with internal feelings. In a criminal context, it is particularly ambiguous since guilty persons have a constitutional right to be silent, to rest on a presumption of innocence, and to require the government to prove their guilt beyond a reasonable doubt. To allow the government to highlight an offender's 'lack of remorse' undermines those safeguards." *United States v. Davis*, 912 F. Supp. 938, 946-47 (E.D. La. 1996). A number of courts have discussed the implications of remorse in a death penalty case. *See, e.g., United States v. Sampson*, 335 F. Supp. 2d 166, 185-88 (D. Mass. 2004).

As explained here, the objections to these lines of inquiry, and to the responses given, are based on several different matters, including the lack of useful foundation for a lay witness's testimony about demeanor during trial; the lack of any explanation of the circumstances of any instructions given to Mr. Christensen, including the notion that there is no indication that Mr. Christensen was informed that his apparent or alleged lack of emotion or 'sorrow' might be argued as a basis of a factor in aggravation; the inherent unreliability and constitutional issues presented by an attempt to draw conclusions from a defendant's post-offense conduct where he has likely been

instructed not to discuss the offense, in particular the failure to acknowledge remorse or blameworthiness in post-offense statements or conduct; the problem with allowing opinion testimony about demeanor that can also be inferred to apply to state of mind at the time of the crimes charged, and discussed in a statement to law enforcement, intertwined with F.R.E. 704(b) objections and the objection that a lack of emotion, or the inference that a lack of emotion shows a lack of remorse, or that there is a lack of any expression of sorrow or remorse, is not in itself a non-statutory factor in aggravation on which a jury can base the death penalty. *United States v. Cooper*, 91 F. Supp. 2d 90, 113 (D.D.C. 2000).

### M. Motion to Exclude References to Lock-Picking and Knife Sharpening

Discovery materials furnished to the defense by government counsel indicate that on or about June 15, 2017, Michelle Zortman, who was then Mr. Christensen's wife, told FBI agents that approximately three months earlier (i.e., sometime in March, 2017), he purchased "a cheap lock picking kit off the internet," but threw it away after a couple of weeks because Ms. Zortman was not comfortable with him having it.

Clearly, evidence of Mr. Christensen having purchased such an item, and his quick disposal of it at his wife's urging, is not relevant to any material fact or proposition in this case where Mr. Christensen is charged with kidnapping resulting in death and making false statements to federal agents. FRE 401. Moreover, whatever negative inference that the government attempts to draw from such evidence to articulate a theory of relevancy to this case is nothing short of rank speculation and

conjecture and devoid of any factual foundation. And finally, whatever probative value, if any, such evidence may have, it is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury that would result to the Mr. Christensen if such evidence is admitted at trial in a case where he is charged with the capital offense of kidnapping resulting in death. FRE 403. For all of the foregoing reasons, this Court should bar the government from using any evidence concerning this matter at trial.

### N. Motion to Exclude Evidence of Pornographic Photos

Pornography is common and does not correlate with deviance. According to the 2018 Year-In-Review published by www.pornhub.com, a leading provider of online pornography, 33.5 billion people visited their website in 2018, with a daily average of 92 million visitors.[7] More than four in 10 Americans say pornography is morally acceptable.[8] An estimated 87% of college-age men—and around 30% of women—double-click for sex either weekly or every day. *Id.*

Indeed, the Supreme Court has long recognized the sanctity of an individual's constitutional right to possess pornography. "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." *Stanley v. Georgia,* 394 U.S. 557, 565

---

[7] https://www.pornhub.com/insights/2018-year-in-review (last visited 2/7/19).

[8] https://enough.org/stats_porn_industry (last visited 2/7/19).

(1969). In *Stanley,* the Court recognized that the state of Georgia's purported

justification for regulating obscenity, i.e. that exposure to obscene materials may lead to

deviant sexual behavior or crimes of sexual violence, had virtually no empirical basis.

*Id.* at 566.[9]

The photographs that were found on Mr. Christensen's computer, numbering in

the hundreds, generally consist of individual women in provocative sexual positions.

There were only four photos depicting what can be described as bondage images, and

no videos at all. The existence of these photos on Mr. Christensen's hard drive is

irrelevant because they do not support any element of the offense and do not prove any

motive or intent on his behalf. A large percentage of American males watch

pornography and look at pictures on the computer. But, it is still viewed as socially

unacceptable by a large portion of society and will likely prejudice the jury against Mr.

Christensen. Since it has no relevance to this case, but will substantially prejudice the

jury, this evidence should be excluded.

### O.  Motion to Exclude Lay Psychiatric Opinions and Speculation Evidence

At various points during interviews with the FBI, Mr. Christensen's then-wife,

Michelle Zortman, stated that although she was not an expert in psychology, she

believed Mr. Christensen was a "psychopath" and that she was "80% sure that Brendt

kidnapped and killed" the missing student. She later stated that if he did so, he would

---

[9] See also https://www.psychologytoday.com/us/blog/all-about-sex/201601/evidence-mounts-more-porn-less-sexual-assault (last visited 2/14/19)

have "probably strangled her" and disposed of her body in water or in the woods somewhere. Ms. Zortman also speculated that he would not be remorseful for his actions.

Terra Bullis, Mr. Christensen's then-girlfriend, also rendered several speculative opinions about his mental state. Specifically, she "felt" that Mr. Christensen "had a grandiose idea that he could kill someone and get away with it;" that "hypothetically, *if* Mr. Christensen was involved in the disappearance of the international student, he would have tied her up and raped her;" she "felt" that if he had participated in the crime that "he would not be remorseful" because he has "classic sociopathic tendencies."

Both Ms. Zortman's and Ms. Bullis' lay witness opinions concerning Mr. Christensen's mental state and the likelihood of his perpetrating the alleged offense in the manner they describe are speculative and conjecture and are barred by Rules of Evidence 401, 403, 404(a), and 701.

Rule 701 states: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Although opinion testimony, whether offered by a lay witness pursuant to Rule 701, or by an expert pursuant to Rule 702, is not inadmissible simply "because it embraces an ultimate issue to be decided by the trier of fact," Rule 704(a), is not properly received "merely [to] tell the jury what result to reach," id., Advisory Committee Notes on 1972 Proposed Rules; see 4 Weinstein's Federal Evidence § 701.05 (2d ed.2004) (noting that courts should be wary of opinion testimony whose "sole function is to answer the same question that the trier of fact is to consider in its deliberations"). Indeed, the purpose of the foundation requirements of the federal rules governing opinion evidence is to ensure that such testimony does not usurp the fact-finding function of the jury. See FRE 704, Advisory Committee Notes on 1972 Proposed Rules.

Not surprisingly, courts have consistently held that a lay witness is generally forbidden from expressing any opinion or conclusion that the defendant is guilty, because to allow such testimony is not helpful to the trier of fact, but instead, usurps the fact-finding function of the jury and violates Rule 701. *See United States v. Garcia*, 413 F.3d 210, 213 (2d Cir. 2005); *United States v. Grinage*, 390 F.3d 746, 749–51 (2d Cir. 2004) (error to allow law enforcement witnesses to express lay opinions under Rule 701 as to defendants' culpability based on the totality of information gathered in the course of their investigations); *United States v. Dukagjini*, 326 F.3d 45, 54 (2nd Cir. 2003) (rejecting receipt of such evidence as expert opinion under Rule 702); *United States v. Noel*, 581 F.3d 490, 496-97 (7th Cir. 2009)(detective's testimony that images on defendant's

computer met federal definition of child pornography was inadmissible opinion testimony from an expert witness, since it offered nothing more than a bare conclusion); *United States v. Wantuch*, 525 F.3d 505, 514 (7th Cir. 2008) (holding that the question of whether the defendant knew his actions were legal "demanded a conclusion as to the legality of [the defendant's] conduct, which is unhelpful to the jury under Rule 701"); *United States v. Espino*, 32 F.3d 253, 257 (7th Cir. 1994) ("[T]he question posed to Espino, '[Y]ou're admitting the conspiracy, aren't you,' required a conclusion regarding the legal implications of his conduct. Espino's lay answer to this question was therefore objectionable as being unhelpful opinion testimony and should have been excluded")*United States v. Kilpatrick*, 798 F.3d 365, 381 (6th Cir. 2015) (it is not "helpful" to the jury when a witness, lay or expert, forms conclusions for a jury that the jurors are competent to reach on their own; to "merely tell the jury what result to reach" violates the rule).

Because both Ms. Zortman's and Ms. Bullis's respective opinions concerning the likelihood of Mr. Christensen perpetrating the alleged offense in the manner they describe is nothing more than speculation and conjecture. Such testimony is clearly violative of Rule 701 and must be barred as proof in the government's case.

Moreover, although a lay witness may opine as to the sanity or mental state of the defendant, *United States v. Lawson*, 653 F.2d 299, 303 (7th Cir. 1981), the foundational requirements for such opinion testimony under Rule 701, must still be met, namely, that the opinion be (a) rationally based on the perception of the witness, (b) helpful to a clear

36

understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Here, there is nothing in the government's discovery produced to date that even remotely suggests that Ms. Zortman, who stated to the FBI that "although she was not an expert in psychology," that she believed Mr. Christensen was a "psychopath," possessed the knowledge, training, education, and qualifications to render such an opinion as to Mr. Christensen's mental state. Nor is there any evidence to suggest that Ms. Bullis has any rational basis for opining that Mr. Christensen has "classic sociopathic tendencies." Further, since neither Ms. Zortman nor Ms. Bullis are trained mental health professionals, it is not clear what they mean by the term psychopath. Under Rule 701, such opinions could only be rendered by a qualified expert and not unqualified lay persons such Ms. Zortman and Ms. Bullis.

Accordingly, both witnesses should be barred from rendering such improper lay opinions as to Mr. Christensen's mental state at trial.

### P.  Motion to Exclude Testimony Regarding the Alleged Death of a Guinea Pig and Public Urination

Discovery materials furnished to the defense by government counsel indicate that according Ms. Bullis, Mr. Christensen allegedly told her that on some unspecified date, time, and place, he had "got drunk and urinated all over a public, female restroom on campus." Further, according to Ms. Bullis, Mr. Christensen told her that on some

unspecified date and time and place, "he had killed a guinea pig" in some unspecified manner and for some unspecified purpose. Michelle Zortman's boyfriend, Ryan Vela, also recalls being told by Michelle that Mr. Christensen had a desire to harm an animal.

It is axiomatic that evidence is relevant and admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FRE 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. FRE 403.

Here, any testimony concerning Mr. Christensen's alleged statements concerning public urination in a women's restroom and the desired or actual killing of a guinea pig are not relevant to any material fact or proposition in this case where he is charged with kidnapping resulting in death and making false statements to federal agents. Moreover, such testimony is nothing more than evidence of bad character and other crimes, wrongs, or "bad acts" that is intended to show that on a particular occasion, Mr. Christensen acted in accordance with the bad character and acts, all of which is flatly prohibited by Rules 404(a)(1) and 404(b)(1).

And finally, whatever probative value, if any, such evidence may have, it is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury that would result to the Mr. Christensen if such evidence is admitted at trial in a case where he is charged with the capital offense of kidnapping

resulting in death. For all of these reasons, this Court should bar the government from making any use at trial of any testimony concerning these two totally irrelevant and inflammatory matters.

### Q. Motion to Exclude Evidence of Properly Conducted Defense Interviews

Discovery materials produced to the defense by the government indicate that various civilian witnesses have expressed concerns to government counsel and case agents merely because they were contacted by defense investigators who sought to interview them concerning their expected testimony. This Court should bar the government and its witnesses from mentioning or referencing that fact in any manner at trial.

"The importance to a litigant of interviewing potential witnesses is undeniable. In particular, in criminal cases, where a defendant's very liberty is at stake, such interviews are especially crucial. Thus it is that one of the first things responsible counsel does in preparing a case is to seek to interview those witnesses involved in the litigation." *United States v. Fischel*, 686 F.2d 1082, 1092 (5th Cir. 1982); *see also United States v. White*, 454 F.2d 435, 438–39 (7th Cir. 1971) (witnesses "are the special property of neither party," and "both sides have an equal right and should have an equal opportunity to interview them"). Moreover, Seventh Circuit Pattern Instruction No. 3.02 states that "[i]t is proper for an attorney to interview any witness in preparation for trial."

Therefore, any suggestion or implication that Mr. Christensen's counsel or their investigators acted improperly in attempting to interview witnesses concerning their expected testimony should be excluded from evidence at trial. FRE 403.

**R. Motion to Preclude All Statements Made During the "Memorial Walk" of June 29, 2017, that Do Not Concern the Alleged Kidnapping and Murder of Ms. Zhang.**

On June 29, 2017, Mr. Christensen attended a public memorial event for Ms. Zhang on the University of Illinois campus. Accompanying him was Terra Bullis, his then-girlfriend. Unbeknownst to him, Ms. Bullis was wearing a body wire, and recorded most of their time together that evening. During those hours, Mr. Christensen made several extremely inflammatory, prejudicial, and ultimately false statements which the jury should be precluded from hearing. Specifically, those statements relate to other offenses for which there has been no corroboration whatsoever even after diligent investigation by the FBI. Additionally, on July 1, 2017, at approximately 1:12 a.m., Ms. Bullis transmitted via email to FBI Agent Andrew Huckstadt a lengthy, typewritten narrative detailing her recollection of events while attending the event for Ms. Zhang. This calculated written narrative, consisting of six single-spaced typewritten pages, was authored and transmitted by Ms. Bullis more than twenty-four hours after the events she that she describes therein. Her written narrative constitutes inadmissible hearsay under FRE 801 and 802 and should be barred as proof at trial.

**i. Ms. Bullis's Written Narrative**

Indeed, Ms. Bullis's written narrative does not, and cannot constitute a "present sense impression" admissible under FRE Rule 803(1), or a "spontaneous declaration" under FRE 803(2). First, to be admissible as a present sense impression under Rule 803(1), the proponent must demonstrate that: (1) the statement must describe an event or condition without calculated narration; (2) the speaker must have personally perceived the event or condition described; and (3) the statement must have been made while the speaker was perceiving the event or condition, or immediately thereafter. *United States v. Boyce*, 742 F.3d 792, 797 (7th Cir. 2014).

By definition, to qualify as a present sense impression, a statement must be made without calculated narration and contemporaneously with the speaker's observance of the events, or immediately thereafter. *Id.* Unless both of these elements are met, the hearsay exception does not apply. *See Miller v. Greenleaf Orthopedic Assoc.*, 827 F.3d 569 (7th Cir. 2016) (employee's diary entries were not admissible in her trial in discrimination action against employer under ADA as "present sense impressions" without evidence that entries described relevant events without calculated narration and that they were made while she was perceiving the events or immediately thereafter); *Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016) (in civil rights action against Cook County Jail, a doctor's monitor report concerning conditions of the jail "was a communication crafted with care for the court and parties based on scheduled visits to the jail," and there was no evidence that it was made at the time of, or immediately after the doctor's observations; as such, the monitor report was not

admissible as a present sense impression and was properly excluded by the district

court).

Second, for the excited utterance exception to apply under Rule 803(2), the

proponent must demonstrate that: "(1) a startling event occurred; (2) the declarant

makes the statement under the stress of the excitement caused by the startling event;

and (3) the declarant's statement relates to the startling event." *Boyce,* 742 F.3d at 798.

As the Third Circuit aptly noted in *United States v. Green*, 556 F.3d 151, 155-56

(3rd Cir. 2009) in discussing the timing issue for a present sense impression exception

(and by analogy, the excited utterance exception) to apply:

> The fundamental premise behind this hearsay exception "is
> that substantial contemporaneity of event and statement
> minimizes unreliability due to [the declarant's] defective
> recollection or conscious fabrication." *United States v. Manfre,*
> 368 F.3d 832, 840 (8th Cir. 2004) (quoting *United States v.*
> *Blakey*, 607 F.2d 779, 785 (7th Cir. 1979)); 5 Weinstein's
> Federal Evidence § 803.03[1]; see *Miller v. Keating*, 754 F.2d
> 507, 512 (3d Cir. 1985) (lack of time to deliberately
> manipulate truth of account is key). "The idea of immediacy
> lies at the heart of the exception," thus, the time requirement
> underlying the exception "is strict because it is the factor that
> assures trustworthiness." 4 Christopher B. Mueller and Laird
> C. Kirkpatrick, Federal Evidence § 8:67, 559, 562 (3d
> ed.2007); *see also Chambers v. Mississippi*, 410 U.S. 284, 298-99,
> 93 S. Ct. 1038, 35 L.Ed.2d 297 (1973) (hearsay exceptions are
> premised on the idea that the particular circumstances
> surrounding the making of certain utterances guarantee
> their reliability). Put differently, the temporality requirement
> must be rigorous because the passage of time-or the lack
> thereof-is the effective proxy for the reliability of the
> substance of the declaration; hence the greater the passage of
> time, the less truthworthy the statement is presumed to be,
> and the more the scales should tip toward inadmissibility.

*Manfre*, 368 F.3d at 840 ("The opportunity for strategic modification undercuts the reliability that spontaneity insures."). Nevertheless, some brief temporal lapse is permissible so as to accommodate "the human realities that the condition or event may happen so fast that the words do not quite keep pace." 4 Federal Evidence § 8:67, at 562; Fed.R.Evid. 803(1) Adv. Comm. Notes (1975) ("[w]ith respect to the time element, [803(1) ] recognizes that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable").

While it is true, that courts have not adopted any bright-line rule as to when a lapse of time becomes too lengthy to preclude Rule 803(1)'s application, *see Blakey*, 607 F.2d at 785 (no per se rule exists), **we are nevertheless unaware of any legal authority for the proposition that 50 minutes after the fact may appropriately be considered "immediately thereafter**." On the contrary, given the clear language of the rule and its underlying rationale, courts consistently require substantial contemporaneity. *See, e.g.*, *United States v. Shoup*, 476 F.3d 38, 42 (1st Cir. 2007) (911 phone call made "only one or two minutes ... immediately following" event admissible); *United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2006) (statement made "less than 60 seconds" after witnessing robbery qualified as present-sense impression); *United States v. Jackson*, 124 F.3d 607, 618 (4th Cir. 1997) (statement by witness to police upon their arrival at scene that defendant was threatening to kill her family was admissible as "description of ongoing events"); *Blakey*, 607 F.2d at 779, 785-86 (not error to admit statement made at most 23 minutes after event); *cf. Manfre*, 368 F.3d at 840 (statement made after "an intervening walk or drive" following event not admissible; "The present-sense-impression exception ... is rightfully limited to statements made while a declarant perceives an event or immediately thereafter, and we decline to expand it to cover a declarant's relatively recent memories."); *Hilyer v. Howat Concrete Co., Inc.*, 578 F.2d 422, 426 n. 7 (D.C. Cir. 1978) (excluding statement made between 15 and 45 minutes following event). Indeed, we have previously expressed skepticism that a statement made some 40 minutes after the fact could be properly admitted as a

present-sense impression. *Mitchell*, 145 F.3d at 577 (where robbery occurred between 9:00am and 9:15am and notes were found in getaway car a mile from the crime scene at approximately 10:00am, intervening lapse was "probably too long for applicability of the present-sense impression[,] ... which requires the statement to be made virtually contemporaneous with the event being perceived"); *see also Miller*, 754 F.2d at 512 (concluding it was "not necessarily an abuse of discretion" to admit statement made "several minutes" after the fact as excited utterance, but noting "courts have recognized that the length of time separating the event from the statement [for admission as an excited utterance] may be considerably longer than for statements qualifying under the present sense impression exception of Rule 803(1)") (emphasis added).

Here, it is clear from the text of Ms. Bullis's lengthy written account that it was composed by her with calculated and meticulous narration and more than twenty-four hours after the events she observed during the Memorial Walk of June 29, 2017, for transmittal to the supervising FBI supervising agent with whom she was working in an undercover capacity during the course of the investigation. Therefore, just as the employee diary in *Miller v. Greenleaf Orthopedic Assoc.*, *supra*, and the doctor's jail monitor report in *Daniel v. Cook County*, *supra*, Ms. Bullis's written narrative to Agent Huckstadt cannot constitute a "present sense impression" under FRE 803(1) or a "spontaneous declaration" under FRE 803(2) to be admissible at trial.

### ii. Any Statements Unrelated to the Alleged Kidnapping and Murder of Ms. Zhang

At issue in this case is whether or not Mr. Christensen kidnapped and murdered Yingying Zhang. As summarized above in the *Motion to Exclude References to Other Murder Victims and the ViCap Report,* Mr. Christensen made several inflammatory and

damaging statements, including but not limited to the fact that he had killed twelve

other people in his past, comparing Ms. Zhang's murder to those prior offenses, and

that he considered himself to be the most prolific serial killer of the modern era. The

only problem is, these statements are completely false. To the extent that the FBI has

been able to discern, there is not a shred of evidence that Mr. Christensen committed

any prior murders. The false claims are not relevant to the issues presented in this case,

and are clearly the most prejudicial type of evidence that exists. For the same reasons

articulated in the prior Motion, *supra,* the jury should not be allowed to hear this

evidence.[10]

### S.  Motion to Exclude Testimony of ██████████ concerning Mr. Christensen's presence on his property in June, 2017

Discovery materials furnished to the defense by government counsel indicate

that on July 1, 2017, the day after Mr. Christensen's arrest, ██████████ of

Champaign, Illinois, reported to the authorities that he had "four confrontations" with

Mr. Christensen on ██████████ property during the month of June, 2017. ██

██████ owns a two-acre tract of land due south of the Stonegate Village Apartments

where Mr. Christensen and his wife resided, and one acre of the land is heavily

wooded.

According to ██████████ on four occasions during June, 2017, the first

occurring in "early June, 2017," and the last occurring on or either June 21 or 23, 2017,

---

[10] Mr. Christensen does not dispute that the statements he made relevant to Ms. Zhang are admissible; the other statements on the recording can be redacted or excised so as not to substantially prejudice the jury.

and all occurring between 6:15 pm and 7:30 pm, he confronted Mr. Christensen who was walking across his property and advised him that his land was private property and that he should not trespass on ███████ property. After the fourth confrontation, ███████ told Mr. Christensen that he would call the police if he saw Mr. Christensen on his property again. On all four occasions, ███████ reported that Mr. Christensen advised that he was just cutting across the property when ███ ███████ confronted him.

On July 2, 2017, three FBI agents conducted a consensual search of ███ ███████ property with the assistance of two county sheriff's deputies and their canines. No items of evidentiary value were recovered from the property.

Clearly, evidence of ███████ four "confrontations" with Mr. Christensen ███████ property during June, 2017, is not relevant to any material fact or proposition in this case where Mr. Christensen is charged with kidnapping resulting in death and making false statements to federal agents. FRE 401. Moreover, whatever negative inference that the government attempts to draw from such evidence to articulate a theory of relevancy to this case is nothing short of rank speculation and conjecture and devoid of any factual foundation. And finally, whatever probative value, if any, such evidence may have, it is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury that would result to the Mr. Christensen if such evidence is admitted at trial in a case where he is charged with the capital offense of kidnapping resulting in death. FRE 403.

For all of these reasons, this Court should bar the government from making any use at trial of ███████ testimony concerning his four "confrontations" with Mr. Christensen on his property during the month of June, 2017.

### T. Motion to Exclude Evidence of the Lost Sheriff's Badge Found on 6/13/2017

Discovery materials furnished to the defense by government counsel indicate that on June 13, 2017, local police received a report from a motorist who, while driving to work, found an Illinois State Police badge and a belt buckle in the roadway just south of the intersection of Rising Road and Illinois Route 10 in rural Champaign County, Illinois. Police recovered the property and confirmed that the badge belonged to a 92 year old retired Illinois State Police Lieutenant whom the authorities were unable to contact for more information concerning the property. There is no indication as to when the badge was placed on the roadway.

Reference to Google maps indicates that the location where the badge and belt buckle were found by the motorist in the roadway is approximately 2.5 miles west of 2503 W. Springfield Ave. in Champaign, Illinois, where Mr. Christensen resided during the month of June, 2017.

Also, there is nothing in the discovery that would indicate that the badge that was found in the roadway on June 13, 2017, resembled "a silver sheriff's star" with a black leather backing and chain as described by Emily Hogan in reporting to authorities her encounter with the white male in the black car on the morning of June 9, 2017, while walking to a bus stop just north of the U of I campus in Urbana, Illinois.

Evidence of the ISP badge found by the motorist on a remote rural roadway 2.5 miles from Mr. Christensen's residence is not relevant to any material fact or proposition in this case where Mr. Christensen is charged with kidnapping resulting in death and making false statements to federal agents. FRE 401. Moreover, whatever negative inference that the government attempts to draw from such evidence to articulate a theory of relevancy to this case is nothing short of rank speculation and conjecture and devoid of any factual foundation. And finally, whatever probative value, if any, such evidence may have, it is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury that would result to the Mr. Christensen if such evidence is admitted at trial in a case where he is charged with the capital offense of kidnapping resulting in death. FRE 403. For all of these reasons, this Court should bar the government from using any evidence of the ISP badge found in the roadway on June 13, 2017, at trial.

### U.  Motion to Exclude Tape Recorded Phone Calls Made by Mr. Christensen from Macon and Livingston County Jails

Throughout the pendency of this case, defense counsel have challenged the government's expected use of evidence at trial of tape recorded phone calls that Mr. Christensen is alleged to have made while detained at the Macon County Jail and the Livingston County Jail. (R.39, Motion for Order Requiring Government to Comply With Rule 12(b)(4); R.81, Motion for Order Requiring Government to Comply With Rule 12(b)(4); R.98, Motion to Suppress Jail Communications and Fruits Thereof).

And in connection with those challenges, defense counsel have repeatedly requested that government counsel disclose which of the hundreds, if not thousands, of tape recorded jail calls it intends to use as evidence at trial, so that defense counsel can file fact-specific motions challenging those particular calls. (R. 39 and 81).

In response to those requests for disclosure of the particular calls to be used, the government has represented to the Court and to defense counsel that it intends to use "all of the Rule 16" discovery and tape recordings at trial. (R. 92, pp. 15-16). And to date, the government is adamant and resists disclosing which particular jail calls it intends to use at trial, thus forcing defense counsel to defend against the entirety of the enormous volume of discovery in this case, and to unnecessarily expend substantial amounts of time and resources searching for and/or anticipating what "needles in the government's haystack" of discovery and evidence it intends to offer at trial that would be subject to motions to suppress and motions *in limine*.

Counsel therefore once again requests that the Court order the government to identify by March 11, 2019 (the current date to disclose exhibit lists), all jail calls or communications of any type that it intends to reference in the trial of this case, regardless of whether it intends to introduce such communications as exhibits, mark them for identification, or otherwise reference the same. In view of the government's position on this matter, defense counsel respectfully request leave to reserve any and all objections to the government's use of any recorded or intercepted jail calls communications until such time that the Court orders their parties to file their

respective exhibit lists. That way, defense counsel can file fact-specific motions

challenging the government's intended use of the calls, and the Court can address and

adjudicate those matters that are clearly in issue.

### V.  Motion to Exclude the Testimony of ███████████

Discovery has been produced including an interview of a woman named

███████████, who had previously posted comments on a website called

websleuths.com regarding this case. Specifically, she posted that she had met Mr.

Christensen on a dating app named PlentyofFish.com and had been "turned off' by his

photos because he looked "mean" and had a "weird mustache." When she expressed a

lack of interest in dating him, she alleges that he called her names and she was forced to

block him. Interestingly, her posts on websleuth.com claim that she met Mr.

Christensen in 2014 or 2015, long before he and his wife opened their marriage and long

before he had accounts on any dating websites. In fact, his PlentyofFish account was

opened on March 28, 2017, according to the discovery.

It is clear from ███████████ statements that she is mistaken about Mr.

Christensen. Her recollections are completely in the wrong time frame, and are

speculative.[11] They bear no relevance to this case, where the alleged kidnapping had

nothing to do with social media or dating apps, but is claimed to have been a random

kidnapping on the street. Even if there was a shred of evidence, to allow a woman to

---

[11] ███████████ claimed that she was not his "type" because she was not an Asian female and that she believes he "saw an opportunity and acted" in kidnapping Ms. Zhang.

claim verbal abuse by Mr. Christensen will substantially prejudice the jury and outweigh any potential probative value. As such, under FRE 401 and 403, this testimony should be excluded.

### W. Motion to Exclude Summaries of Mr. Christensen's Library Rentals, YouTube Playlists, and Music Playlists

During its investigation, the government obtained Mr. Christensen's rental history from the public library, his music playlist, and his video playlist from YouTube.com. For the most part, the contents of these lists are innocuous and include movies such as "The Incredibles," "Star Wars," "Ghostbusters," "Indiana Jones," and more. It is also true that Mr. Christensen and his then-wife had a penchant for listening to heavy metal music, renting horror movies (i.e. "Alien", "Halloween") and indulging in frequent video-gaming. Mr. Christensen's YouTube playlist also indicates that he liked Taylor Swift, Lady Gaga, Madonna, and Miley Cyrus. It is unclear what, if any, purpose the government intends to use this information at trial. To the extent the government wants to use the information, there is no discernable relevance and it should be excluded under FRE 401.

### X.  Motion to Exclude Testimony of ███████████████

In December of 2018, Terra Bullis provided information to the FBI indicating that she and Mr. Christensen had entertained becoming romantically involved with a married couple, ████████████████████. ████████ indicated that she met Mr. Christensen on OK Cupid in the Spring of 2017 and had planned to go on a date with him at that time. Due to scheduling issues, the two never actually connected.

████████ has no knowledge of the offense or of Mr. Christensen apart from vague memories of his OK Cupid profile. As such, neither ████████████ should be permitted to testify in this case, nor should any commentary be allowed concerning an almost-date.

### Y. Motion to Exclude Testimony of ████████████████████

In December of 2018, the FBI interviewed ████████████, a woman who apparently worked out at the same gym (The Refinery) as Michelle Zortman and Brendt Christensen. ████████████ "did not have any substantive conversations" with either of them, but stated that she observed their "behavior" at the gym for approximately one year. In her observations, she noted that she and her friends referred to the couple as "the Murder Twins" or "the Psycho Twins" because they were socially "strange." Specifically, they were not socially interactive with other people working out at the gym, and when they did interact, it was awkward. ████████████ also claims to have observed bruises on Ms. Zortman's arms and legs.

Apparently, about one month prior to Mr. Christensen's arrest, Ms. Zortman began talking to a man who also worked out at the gym named ████████████. Ms. Zortman allegedly told ████████████ that she was depressed, and they would text back and forth in an effort to cheer her up. ████████████ himself stated that he and Ms. Zortman are friends and have never been romantically involved. She has never spoken to him about Mr. Christensen or this case.

Both of these witnesses would only present irrelevant testimony, and would very likely prejudice the jury with statements about nicknames like "the Murder Twins." Being socially awkward and declining to interact with fellow gym rats hardly qualifies as evidence of anything pertinent at issue in this case. As such, all of the aforementioned testimony should be excluded as irrelevant. FRE 401 and 403.

### Z.  Motion to Exclude Listed Interests on Tinder.com

Discovery has revealed that Mr. Christensen had a Tinder account during the Spring of 2017, which is a dating application where a user swipes left or right on the profile of another user to decide if they "match" and want to meet in person. The government issued a subpoena for Mr. Christensen's Tinder records, which include a list of "interests" that he wrote on his profile for other people to see. Mr. Christensen's listed interests are diverse and include Japanese cartoons, music, video games (i.e. "Street Fighter"), TV shows (i.e. "Scrubs," "Shark Tank," "Its Always Sunny in Philadelphia"), movies (i.e. "Lord of the Rings"), and more. Among the listed interests is the book "American Psycho," which should be excluded for the reasons articulated in the previous Motion, *supra*. In truth, apart from that single reference, it is unclear what possible relevance this information has to the present case. As such, it should be excluded. FRE 401.

### AA.     Motion to Exclude Mr. Christensen's Suicide Note

In the summer of 2017, soon after his arrest, Mr. Christensen was housed in the

Macon County Jail in Decatur, Illinois. Within several weeks of his incarceration, he wrote a letter indicating his intent to commit suicide. He was immediately placed on suicide watch and isolated from the general population for several months. Although the letter does contain statements made by Mr. Christensen in which he denies committing the instant offense, allowing this into evidence could have drastic implications in a capital case. For example, a juror could assume that since Mr. Christensen wants to die, he or she would be completely justified in imposing the death penalty. This level of prejudice outweighs any possible probative value in the statements contained within the letter.

### BB.    Motion to Exclude Statements Regarding "the Perfect Victim"

Evidence shows that Terra Bullis has recounted an incident when Mr. Christensen was out shopping with his then-wife and saw a woman who he described as the "perfect victim." Mr. Christensen allegedly looked over the shoulder of the woman while she was checking out and observed her contact information. Ms. Bullis also noted that she recalled that the woman was of Asian descent. Speculating, Ms. Bullis claimed that she would be the "perfect victim" because Mr. Christensen was attracted to Asian females; that information did not come from Mr. Christensen himself.

That was the first version of the story, as told to the FBI in June of 2017. In the second version of the story, recounted over a year later, Mr. Christensen actually drove past this woman's residence but never acted. This evidence is irrelevant to any issue in the case. Further, if some minimal theory of relevance can be posited, it is substantially

54

outweighed by the potential prejudice. First, it is completely uncorroborated: Ms. Bullis *speculates* that Mr. Christensen is attracted to Asian females, but he never said this mystery woman would be the perfect victim due to her national origin or race. Second, her story is unreliable, as evidenced by the fact that it magically changed and *worsened* significantly over the course of a year. Finally, it is completely inconsistent with the allegations of this case, which are that Mr. Christensen was driving around town and randomly selected Ms. Zhang as his target, after failing to coerce Emily Hogan into his vehicle (who incidentally is Caucasian and above average height). For all of the foregoing reasons, allowing Ms. Bullis to testify regarding this story of hers is substantially more prejudicial than probative. FRE 403.

WHEREFORE, Defendant requests that the Court hold hearings on each of the previously filed Motions *in Limine*, and grant the relief requested in said Motions.

Respectfully submitted,

/s/Elisabeth R. Pollock
Assistant Federal Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org

/s/ George Taseff
Assistant Federal Defender
401 Main Street, Suite 1500
Peoria, IL 61602
Phone: 309-671-7891
Fax:   309-671-7898
Email: George_Taseff@fd.org

/s/ Robert Tucker
Robert L. Tucker, Esq.
7114 Washington Ave
St. Louis, MO 63130
Phone: 703-527-1622
Email: roberttuckerlaw@gmail.com

/s/ Julie Brain
Julie Brain, Esq.
916 South 2nd Street
Philadelphia, PA 19147
Phone: 267-639-0417
Email: juliebrain1@yahoo.com

CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2019, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to Assistant United States Attorneys Bryan D. Freres and Eugene L. Miller and

Trial Attorney James B. Nelson. A copy was also mailed to the defendant.

/s/Elisabeth R. Pollock
Assistant Federal Public Defender
300 West Main Street
Urbana, IL 61801
Phone: 217-373-0666
FAX:   217-373-0667
Email: Elisabeth_Pollock@fd.org