USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF ILLINOIS


UNITED STATES OF AMERICA,
                                   Docket No. 17-20037
              Plaintiff,

    vs.                            Urbana, Illinois
                                   October 11, 2018
                                   9:16 a.m.
BRENDT A. CHRISTENSEN,

              Defendant.




                         MOTION HEARING


              BEFORE THE HONORABLE JAMES E. SHADID
               CHIEF UNITED STATES DISTRICT JUDGE



A P P E A R A N C E S :

For the Plaintiff:      EUGENE L. MILLER, ESQUIRE
                        BRYAN DAVID FRERES, ESQUIRE
                        Assistant United States Attorney
                        201 South Vine Street
                        Urbana, Illinois 61802
                        217-373-5875


                        JAMES B. NELSON, ESQUIRE
                        U.S. DEPARTMENT OF JUSTICE
                        Criminal Division
                        Capital Case Section
                        1331 F Street N.W., Suite 625
                        Washington, DC 20004
                        202-598-2872
```

A P P E A R A N C E S  (Continued):


For the Defendant:          JULIE C. BRAIN, ESQUIRE
                            Attorney at Law
                            916 South 2nd Street
                            Philadelphia, Pennsylvania 19147
                            267-639-0417


                            ELISABETH R. POLLOCK, ESQUIRE
                            Assistant Federal Public Defender
                            300 West Main Street
                            Urbana, Illinois 61801
                            217-373-0666


                            GEORGE F. TASEFF, ESQUIRE
                            Assistant Federal Public Defender
                            401 Main Street, Suite 1500
                            Peoria, Illinois 61602
                            309-671-7891


Proceedings recorded by mechanical stenography; transcript
produced by computer.

```
 1                    (In open court, 9:16 a.m.)

 2              THE COURT:  Good morning.  This is the United

 3   States versus Brendt Christensen.

 4              Mr. Christensen is present in open court with

 5   Ms. Brain, Ms. Pollock, and Mr. Taseff.

 6              Government present by Mr. Freres, Mr. Miller,

 7   and Mr. Nelson.

 8              Thank you for making yourselves available on

 9   short notice to address a couple of motions.

10              Let's address the 12.2 request first.  The

11   defense has filed a Motion for Adequate Time to Submit

12   12.2 Notice, document 129.  The government has responded

13   with document 136; and, in some part, their response is

14   also entailed in document 137 as to the protective order.

15              Who's going to be heard from the defense first

16   today?  I have a couple of questions that address

17   breaking up 12.2 here in this request into guilt and

18   penalty phase.  Who will be heard first?

19              MS. BRAIN:  I will, Your Honor.

20              THE COURT:  Okay.  Go ahead.

21              MS. BRAIN:  A couple of things that we

22   brought -- pardon me.  My voice is not very loud.

23              DEPUTY CLERK:  That's the light; so the bar is

24   the microphone, in front of you.

25              THE COURT:  Ms. Brain, do you have experts in
```

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1  hand ready to go?

2        MS. BRAIN:  We have two in hand ready to go.

3  We're still looking for a third.  We haven't been able to

4  get anybody thus far in to conduct examinations of Mr.

5  Christensen.

6        THE COURT:  The two in hand, is one having to

7  do with insanity?

8        MS. BRAIN:  They all potentially have to do

9  with insanity.  I mean, all of the experts --

10  essentially, what we're doing is, based on the social

11  history investigation, identifying the issues that we

12  believe may be present and then identifying the types of

13  experts that we need to address those.  So we're really

14  looking at his mental condition globally and not --

15        THE COURT:  Presum--

16        MS. BRAIN:  -- a different --

17        THE COURT:  Do I understand that Atkins --

18  there won't be an Atkins claim here?

19        MS. BRAIN:  That's correct.

20        THE COURT:  Okay.  So that's off the table?

21        MS. BRAIN:  That's off the table.  Yes.

22        THE COURT:  So 12(a) would have to do with

23  insanity; 12(b) -- 12.2(a); 12.2(b), other mental

24  conditions or issues, and then those would be broken up

25  as to guilt or punishment?

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1          MS. BRAIN:  Yes, Your Honor.

2          THE COURT:  So you're saying the two that you

3    have -- why can't they be disclosed at this point?

4          MS. BRAIN:  They haven't seen our client yet;

5    so we are, we are certainly not in a position to be able

6    to say whether or not we're going to present any mental

7    health evidence --

8          THE COURT:  But aren't those two -- aren't

9    those two separate issues?  I mean, disclosure and then a

10   decision whether to go forward or not?

11         MS. BRAIN:  I --

12         THE COURT:  I guess that's what I'm, I'm a

13   little confused on, so help me out here.

14         As I understand it, there would be -- do you

15   believe you have your -- these experts need to see your

16   client and make certain determinations before they'll

17   even be, can even be disclosed?

18         MS. BRAIN:  Yes, Your Honor, we do.  Because

19   the government's certainly not entitled to information

20   about our investigation or our theories and the experts

21   that we're using to pursue them until we make a

22   determination that we will, in fact, be seeking to

23   present mental health evidence, either at guilt or

24   penalty.  And we're just not in a position to be able to

25   do that at this point.

1          THE COURT:  But don't you have the option under

2    the rules to disclose and then make a later determination

3    whether you will or not?

4          MS. BRAIN:  Certainly an option of whether we

5    want to present it or not, but the disclosure -- it's

6    hard to know what we would disclose, to be honest.  I

7    mean, --

8          THE COURT:  Well, but a name.  A name and a

9    title.  What, what --

10          MS. BRAIN:  I think the government would argue

11    that would be insufficient under 12.2.

12          THE COURT:  Well, let me ask that.

13          Who's going to be heard from the government

14    today?  Mr. Miller?

15          MR. MILLER:  Your Honor, we were -- I was going

16    to be heard on the insanity and the disclosure of mental

17    health defense in guilt phase, and Mr. Nelson was going

18    to address disclosure for the penalty phase.

19          THE COURT:  All right.  Well, let's talk about

20    guilt phase for a second then.  What do you think a

21    disclosure for the guilt phase requires?

22          MR. MILLER:  We believe they have to notify us

23    by the deadline set by the Court whether or not the

24    defendant intends to assert an insanity defense.  And

25    once they make that assertion, then we are entitled to

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1   have the defendant examined by our own expert, or at

2   least by a Court-appointed expert at that time; and the

3   defense would be required to disclose, pursuant to Rule

4   16, any expert that they intended to call in support of

5   that insanity defense and, ultimately, disclose that

6   expert's reports and opinions and qualifications.

7           THE COURT:  Well, given where we are today, how

8   do we accomplish this?

9           Ms. Brain, go ahead.

10          MS. BRAIN:  Your Honor, what we're requesting

11  is that we reconvene on a date certain in December, by

12  which point we're confident that we'll be able to give

13  the Court a meaningful estimate of where we are and how

14  much time we think we may need; and the Court --

15          THE COURT:  Well, --

16          MS. BRAIN:  -- can make a determination

17  thereon.

18          THE COURT:  -- what's -- why -- what's changed

19  that -- in your motion, you indicate that you had

20  somebody ready to see Mr. Christensen but, for a

21  scheduling purpose, couldn't?  Why can't that person --

22  what's changed in that regard that we have to now wait

23  until December to have this discussion?

24          MS. BRAIN:  Nothing's changed, Your Honor.

25  It's just that we can't know whether or not that

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1  expert -- we do have an expert who is lined up and will

2  be seeing Mr. Christensen shortly.  We had hoped that

3  that expert would be able to have seen him in August and

4  so we wouldn't be here at this point asking for more time

5  to make the determinations.

6          But he -- scheduling issues came up.  He wasn't

7  able to go in August, and so he has yet to see Mr.

8  Christensen.

9          THE COURT:  What about, what about the other

10  expert?  When can that person go?

11          MS. BRAIN:  The second one would be easy to

12  schedule within the same kind of time frame.  We are,

13  however, having significant difficulties identifying the

14  third type of expert that we have identified that we know

15  we need.  That's been a struggle.  But we are working

16  very hard on it, and we should -- as I say, we should

17  be -- or will be in a position in December to be able to

18  tell the Court precisely what we've been told we need to

19  do by the various experts and how long it might take.

20          THE COURT:  What is the third type of expert

21  that you're having -- what, what are the issues there?

22          MS. BRAIN:  Your Honor, I don't feel like I can

23  disclose at this point the types of experts that we're

24  considering until the government is entitled to 12.2

25  notice.  They're not entitled --

1             THE COURT:  Well, that was a week ago, so --

2             MS. BRAIN:  Yes.

3             THE COURT:  -- you're past a lot of these

4    things right now.

5             MS. BRAIN:  Yes.

6             THE COURT:  All right.  I won't press you on

7    that.

8             But I guess I don't get why, if you have two

9    ready to go, why we have to regroup in December just to

10   tell us why, or what your next step is.  I don't see why

11   we can't make some accommodation here but keep this on a

12   clearer track.

13            MS. BRAIN:  We -- I think we will be able to

14   put that on a very clear track in December.

15            The problem is the third expert that we know

16   that we need is not identified yet.  There's also a

17   reason --

18            THE COURT:  What's to say you'll have that

19   information in December?  I mean, I don't know if you're

20   talking about a specific person or just a type of expert.

21            MS. BRAIN:  Type of expert, Your Honor.  A

22   type.  We've been banging on doors very diligently trying

23   to get somebody who is both available and with the

24   necessary qualifications.  We believe that we'll be able

25   to do that by December.  We haven't been able to do it

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1  thus far.

2          And there's also the possibility that the

3  experts who see our client initially will recommend

4  further, either areas of expertise or tests or other

5  procedures that may need to be done.  We just don't know

6  at this point whether or not that's going to be the case.

7          THE COURT:  All right.  If you didn't have this

8  third expert hanging out there that was so uncertain,

9  what would be your proposal as to the two that you

10 have --

11          MS. BRAIN:  It would be --

12          THE COURT:  -- as far as scheduling?

13          MS. BRAIN:  It would be exactly the same, Your

14 Honor, because they haven't seen him yet.  They haven't

15 seen our client.  I have no idea whether or not they're

16 going to find anything that may be of use to us in the

17 defense.  We've simply identified the areas that we

18 think, based on history, that there are issues.  But

19 until they see him, we have no idea whether we have a

20 mental health case or not.  We strongly suspect we do

21 because the --

22          THE COURT:  All right.  Narrow down for me,

23 with these two, when you think they can see him.

24          MS. BRAIN:  We have one who is already

25 scheduled for this month, and the second one will either

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1  be this month or next.

2          THE COURT:  When you say "this month," you mean

3  October?

4          MS. BRAIN:  Yes, sir.

5          THE COURT:  And what's your estimate that,

6  after seeing him, they will be able to give you some idea

7  as to your, where you would go?

8          MS. BRAIN:  Within days.  It would simply be a

9  matter of scheduling a call.  They would be able to give

10  us preliminary impressions.

11          THE COURT:  And then --

12          MS. BRAIN:  We've already provided them a

13  history.

14          THE COURT:  And then you, and then you would be

15  in a position, based on that, to disclose?  Or at least

16  make some kind of disclosure?

17          MS. BRAIN:  Well, --

18          THE COURT:  I mean, you wouldn't have full

19  reports.  I understand all of that.

20          MS. BRAIN:  Right, right.

21          I mean, it's difficult to parse it out.  I

22  mean, as you see, we're approaching the mental health

23  areas, as we're required to do, as sort of a big picture

24  with different components.  Until we have all the

25  components, we aren't going to be in a position to know

1  whether or not we're actually going to want to present

2  any of this information.  So if the first expert has his

3  piece of the puzzle, we're not going to know whether we

4  need to -- will, in fact, want to present that until we

5  have the other pieces and we figure out what our mental

6  health evidence is, or will be.

7              THE COURT:  Yeah.  But at some point, you're

8  going to -- it sounds like -- so I'd like to -- I think

9  we can parcel it because I plan to continue to be open,

10 as I should be I believe, to address the discovery issues

11 or the scheduling issues as we go forward.  And so I

12 don't want to just put it in all one nice, neat box if

13 we -- today, because we can't.  Because your third expert

14 is out there, and I don't want to schedule around

15 somebody who's so unknown or uncertain.  So I see -- I

16 think we can schedule otherwise.

17             So if we went -- if we had two, we use these

18 two and we put a schedule in place and, say, pick up a

19 date at some point in early November for disclosure of

20 those and you determine -- in the meantime, then, you

21 have a few more weeks to continue to do what you're doing

22 with this potentially third one, which may never even

23 materialize.

24             MS. BRAIN:  It would definitely materialize,

25 Your Honor.  It's already identified as a vital piece of

1  the picture.  So we definitely will need that type of

2  expert, and we will keep banging on doors until we find

3  one.

4          THE COURT:  And that one goes both to guilt and

5  to penalty, the third piece as well?

6          MS. BRAIN:  Yes, more so actually than the

7  other two even.

8          THE COURT:  And is this a determination you

9  made as a group or in consultation with your other

10  experts?  Because I guess I'm just not clear, without

11  pressing you, what the -- why it's been so difficult,

12  given the amount of time, to make this puzzle come

13  together.

14          MS. BRAIN:  It, it's the -- many reasons for

15  that.  One is that it hasn't actually been all that much

16  time in the grand scheme of things because of the way

17  that the case was started out, with the trial date set.

18  It was considered -- it was not treated as a death

19  penalty case until January of this year when the Notice

20  of Intent was filed.  And so the first seven months,

21  literally, of the representation were burned up with the

22  authorization process because the existence of the trial

23  date meant that DOJ squeezed an otherwise very lengthy

24  authorization process into the final months of 2017.

25          The puzzle work had to be done with the client

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

```
 1   in order to do what little could be done in that time
 2   frame to help with the authorization process.  Then there
 3   were motions deadlines which were set based on that trial
 4   date.  They were later declared moot, but they still had
 5   to be filed.
 6           So it's really only been since February that
 7   we've been able to really pay attention to the, sort of,
 8   history investigation.  We do all that massive amount of
 9   work that we had to do --
10           THE COURT:  Well, --
11           MS. BRAIN:  -- before we can identify the kind
12   of experts that we need.
13           THE COURT:  -- I, I get that the death penalty
14   notice took this to a whole other level.
15           But 12.2 doesn't just apply to death -- I mean,
16   insanity/mental health issues, they come into play in --
17   can come into play in any criminal case, so --
18           MS. BRAIN:  But these --
19           THE COURT:  -- I'd like to push this a little
20   bit.  I'd like to have a disclosure -- here's what I'm
21   getting at.  Today, I don't want to be kicking that trial
22   date down the road.  We'll never get the case tried.  So
23   I'd like to work within it.  If at some point later we're
24   going to make adjustments, then that's one thing; but I'm
25   not interested in redoing this whole schedule today.
```

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1          So I'd like to pick a point here in early/mid

2     November for disclosure.  So maybe I'll hear from the

3     government here and give you an opportunity to visit with

4     Mr. Taseff and Ms. Pollock and regroup, and then we'll

5     come right back to it.  Okay?

6          MS. BRAIN:  Very good, Your Honor.

7          THE COURT:  Mr. Miller.

8          MR. MILLER:  Thank you, Your Honor.  And I'll

9     address the insanity defense or a mental health defense

10    at trial.

11         We completely agree with the Court.  Our main

12    concern is maintaining that April trial date because,

13    otherwise, we have the same sense that this case could be

14    continued in perpetuity.

15         The frustration we have is that early in the

16    case -- and we understand it from speaking with the

17    defense; we were trying to agree to a scheduling order --

18    was the sense that the defense could control the

19    scheduling order rather than the Court because they

20    could -- there would always be claims of ineffective

21    assistance, or whatever it might be, if deadlines weren't

22    met.

23         And this 12.2 deadline, again, wasn't a

24    surprise, as the Court knows.  It was scheduled out seven

25    months after the notice of the death penalty was given.

1   And although I understand the comment that it was not

2   considered a death penalty case until January, it was

3   certainly represented by defense counsel well before that

4   in October when we were scheduling the sentencing order

5   that they had to view this as a death penalty case

6   because it was a potential death penalty case.

7           So, really, from, from their entry in the case,

8   certainly the mental health issues have always been an

9   issue.  And, in fact, as we noted in our response, one of

10  their bases for their motion to continue back in October

11  of 2017 was that they needed to add mental health experts

12  to the defense team.  That was in October of 2017.

13          Having said that, we haven't asked the Court to

14  bar their experts.  That would be a possible remedy under

15  12.2(a).  It says if the defense doesn't meet the

16  deadline, the Court could bar the insanity defense.

17  We're not asking for that because I think, as the defense

18  knows, we want to make sure that the defense has every

19  opportunity to represent the defendant.  We want him to

20  have a fair trial.  We want them to have the opportunity

21  to obtain the evidence that they need, but we also want

22  that to be done on a diligent schedule and to not put in

23  the hands of the defense the ability to delay the

24  schedule simply by delaying their disclosures.

25          So all that to say:  We, we would agree with

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1    the Court, the idea that the insanity defense could be

2    disclosed in November.  I know they're talking there are

3    multiple parts on this.  At least in my experience,

4    though, in an insanity defense case, you have an

5    expert -- or maybe multiple experts -- who will opine on

6    a very specific issue, whether the defendant can

7    appreciate the wrongfulness of his conduct and the nature

8    of his actions at the time of the offense.

9            "At the time of the offense," as alleged in the

10   indictment, is in Octob-- I'm sorry, in June 2017.  At

11   least from my experience in trying two insanity cases,

12   the further we get from the time of the offense,

13   actually, the less effective the expert opinion is

14   regarding what, trying to opine backwards as to what the

15   defendant's mental state was at that time when the

16   evaluation occurs longer after.

17           So we appreciate the defense has scheduled

18   these, these examinations.  We are not -- it's, it's sort

19   of a difficult position, right?  We're not trying to

20   invade the defense camp.  We don't want to know what

21   they're doing in their own investigation until those

22   disclosures are required, but then it makes it very

23   difficult to argue to the Court when those disclosures

24   should be made when we're not privy to the nature of the

25   investigation that's requiring the --

1             THE COURT:  On that, on that point -- which I

2    wasn't planning to get to just yet, but let me -- who's

3    going to argue the protective order issue?

4             MR. MILLER:  Um --

5             THE COURT:  I mean, so if you don't -- what do

6    you care if I tell Livingston County don't tell you who's

7    coming in and out of that jail to see Mr. Christensen?

8             MR. MILLER:  Your Honor, we don't -- I just

9    don't believe there's --

10            THE COURT:  Well, maybe Livingston County won't

11   challenge it.

12            MR. MILLER:  That could be, Your Honor.

13            THE COURT:  Okay.

14            MR. MILLER:  We -- yeah, I hope we made that

15   clear.  We don't want --

16            THE COURT:  All right.

17            MR. MILLER:  -- that information --

18            THE COURT:  Okay.

19            MR. MILLER:  -- until the disclosures are

20   required.

21            THE COURT:  Then I think we've cleared up that

22   issue --

23            MR. MILLER:  Yeah.

24            THE COURT:  -- already.  Very good.  All right.

25            MR. MILLER:  But they were required, as the

 1  Court noted, on September 21; --

 2          THE COURT:  I understand.

 3          MR. MILLER:  -- and so we just want to get to

 4  that point where we get those disclosures made.

 5          Frankly, we haven't seen -- obviously, we've

 6  heard something different here today, evidence that would

 7  suggest this is an insanity defense; but if it is, --

 8          THE COURT:  So, if I pick --

 9          MR. MILLER:  -- then we want to be able to

10  respond to that.

11          THE COURT:  -- November 16 -- if I pick

12  November 16 as a, as a date to disclose, guilt phase,

13  what do you expect that disclosure should look like?

14          MR. MILLER:  We believe that on the 16th it

15  should -- they should file a formal notice that they

16  would intend to raise the defense of insanity at trial,

17  which would --

18          THE COURT:  Or, or any other mental health

19  issue under 12.2(b).

20          MR. MILLER:  Or any other mental health issue.

21  And, obviously, if it's another mental health issue, it

22  would identify that mental health issue that would be

23  raised at trial, which would then allow the government to

24  file a motion -- which was in the scheduling order to

25  begin with -- to file a motion -- and we'd probably do

1    that within 7 to 14 days -- to have the defendant then

2    examined so that we can have our, an expert examine the

3    defendant regarding sanity or whatever additional mental

4    health issue they intend to raise during guilt phase.

5              THE COURT:  And that, and that to me is --

6    maybe whatever date we pick, the most important thing is

7    to get, to move this along in the guilt phase issues

8    first.  So, say, we could kick back punishment issues.

9              Now, you're telling me, Ms. Brain, that maybe

10   these are all interrelated anyway.

11             MS. BRAIN:  We are, Your Honor.  We can't

12   separate it by that.  We're not going to be in a position

13   in November -- I understood the Court to be suggesting we

14   disclose the experts that we have in November.  We're

15   certainly not going to be in a position to be able to say

16   whether or not we have a guilt phase or -- insanity

17   defense because we won't have our third and, in many

18   ways, most influential expert on that point by then.  So

19   we're just not going to know.

20             And so we're going to be in a position,

21   potentially, where -- I mean, we could, we could file a

22   notice.  We could say, "Okay, we'll say insanity because

23   we're not sure yet; we haven't been able to definitively

24   rule it out," because it's a lot of work to do that in a

25   death penalty case.

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1           And that triggers, as the government just said,

2    their opportunity to seek to evaluate the client.  So

3    we're facing a situation where the government experts may

4    evaluate our client before we've decided whether we're

5    going to put forth any mental health evidence and also

6    before our own experts -- at least with some, not all of

7    them, but part of them -- will actually be able to see

8    our client.

9           So we're not going to be able to make an

10   informed decision on guilt phase by December -- or,

11   sorry, by November.

12          THE COURT:  Well, then, help me.  Help me out

13   here.

14          MS. BRAIN:  Yes.

15          THE COURT:  Help me give you what you're asking

16   for without re-doing this whole schedule and moving the

17   trial date.

18          MR. MILLER:  And, Your Honor, maybe -- if

19   I could just -- and maybe the defense could explain

20   this "it's hard to give that insanity defense notice in a

21   death penalty case."

22          Again, the government's at a loss to understand

23   how in a capital -- or a non-capital -- case there is a

24   difference between determining whether, at the time of

25   the offense, the defendant met the legal definition of

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)    22

```
 1   insanity.
 2           And in typical cases, that decision can be
 3   made, and is made, within sometimes weeks or months of
 4   the indictment.  And so, again, we're -- it's unclear to
 5   us how it could possibly be that by November that person
 6   could not -- the defendant could not be examined and that
 7   decision made whether to assert that defense.
 8           MS. BRAIN:  That's just not how it works.  It's
 9   how it works in some cases.  And the one the government
10   cited in their pleading, Mr. Ewing, the notice of
11   insanity defense was filed early.  That's because on the
12   day of his initial appearance he came to court; accused
13   his lawyer, Mr. Taseff, of conspiring with the FBI to
14   steal his intellectual property in his head.  The judge
15   sua sponte said, "I assume we'll need a competency
16   evaluation of this guy."  They sent him to Springfield;
17   and in three months, Springfield said, "This guy's
18   absolutely floridly psychotic, and he's not going to be
19   fit for a very, very long time."  So that's one kind of
20   case.
21           This is not that kind of case.  Many of them
22   are not.  We don't have that kind of stereotypical
23   "homeless guy muttering to himself in a corner" sort of a
24   case.  This is much more complicated.  And the
25   different -- when the death penalty is being sought, we
```

```
1   can't just rule out an insanity defense in the same way
2   that we might in a straightforward criminal case.
3   There's lot of work.  If you don't have the floridly
4   psychotic courthouse bomber guy, then you have to do a
5   lot of work, a lot of social history investigation to
6   really understand the defendant's mental condition to
7   know whether or not there is a viable insanity or of a
8   guilt phase case.
9            THE COURT:  Are you in a position to say
10  whether you think that it's possible someone could have
11  an insanity defense, or raise insanity issues, at the
12  penalty phase but not at the guilt phase?
13           MS. BRAIN:  Insanity at the penalty phase, Your
14  Honor?  I'm not sure --
15           THE COURT:  Well, that's -- I guess that's why
16  I'm at a loss to know why insanity can't be disclosed as
17  to the guilt phase; and you're telling me because they're
18  all wrapped up, both guilt and penalty.
19           MS. BRAIN:  It's not really that guilt and
20  penalty are wrapped up.
21           It's that the -- in a case where you don't have
22  somebody who is actively, floridly psychotic and it's
23  obvious to everyone around them, then you have to dig
24  deeper.  You have to dig deeper into history.  You have
25  to have a much more thorough understanding of mental
```

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

```
 1   health before you can actually determine whether or not

 2   there is a viable insanity defense.

 3           It's a two-part question.  Yes, you have to ask

 4   the defendant:  What was going on in your mind the day of

 5   the offense?  But you also have to first establish there

 6   is a, in fact, a mental disease or defect.  It doesn't

 7   matter what's going on in his head if there isn't one.

 8           THE COURT:  And these two experts can't do that

 9   without the third expert?

10           MS. BRAIN:  No, they cannot.

11           THE COURT:  Are they -- I'm, I'm -- that's

12   where I'm at a loss.  And I don't -- and I'm, I'm taking

13   your word for it.  I'm not challenging you on it.  I'm

14   just at a loss.

15           MS. BRAIN:  I appreciate that, Your Honor.

16           It's because they're in very different fields.

17   There are a number of separate issues.  Like, for

18   example, you know, psychologists can do testing.

19   Neuropsychologists can do neuropsychological testing.

20   Psychiatrists can't do testing.  Their, their role is

21   something entirely different.

22           THE COURT:  So, really, because you can't find

23   this third person yet, or can't get this third person on

24   board yet, everything sits and waits?

25           MS. BRAIN:  No, Your Honor.  We're committed,
```

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1   absolutely committed --

2           THE COURT:  Well, but we're not -- I know what

3   you're committed to; but as far as scheduling, we can't

4   get -- we can't schedule because we can't get a

5   disclosure until this third person is somehow in a

6   position to, to do that.

7           MS. BRAIN:  I know it's --

8           THE COURT:  So this he or she, this unknown he

9   or she is driving the train, and we'll all just wait

10  until --

11          MS. BRAIN:  No, Your Honor.  Absolutely not.

12  We're not seeking indefinite time.  We know we can't have

13  indefinite time.

14          THE COURT:  All right.  So tell me how to help

15  you get you what you want so that you're fully prepared

16  on Mr. Christensen's behalf without disrupting this whole

17  schedule and the current trial date.

18          MS. BRAIN:  By granting us what we seek in our

19  motion, Your Honor.

20          THE COURT:  But your motion asks to continue

21  the trial date.

22          MS. BRAIN:  It recognizes that that may well be

23  an issue, but that's not something the Court needs to

24  decide in order to deal with the 12.2 notice.  We're

25  committed to be in a position in December to tell the

1  Court precisely what, if anything, is left to do and give

2  the Court our meaningful estimate of when we will be able

3  to provide proper 12.2 notice.  So we're really just

4  asking for a short delay.

5          If we were to come back --

6          THE COURT:  No.  You're asking for a delay into

7  almost February, basically, because in December you're

8  going to now tell me what you can do.  And, I mean,

9  seriously, is that sufficient?  Is that -- I mean, and

10  I'm -- and I can't do anything about that?

11          I don't, I don't see it that way.  I think

12  we -- I think we need a better net --

13          MS. BRAIN:  Well, Your Honor, --

14          THE COURT:  -- and still provide Mr.

15  Christensen all of the defense that he's entitled to

16  have.

17          MS. BRAIN:  Yes, Your Honor, of course.

18          I think that, you know, if we were to be in a

19  position of coming back in December and not having,

20  having moved the ball at all, then I think, you know, we

21  would be, we would be remiss.  It would -- that's not

22  what we're going to do.  We've been peddling as fast as

23  we can to try to get these experts and get the experts

24  identified, so we're just asking for a --

25          THE COURT:  Well, you know realistically that

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1    I'm never really going to deny you the ability to do what

2    you're asking to do because that would be wrong.  It

3    would have to be something drastic before I would do

4    that.  You know that.  Everybody knows that.

5          But I just don't see how -- I think -- I don't

6    see how we come just -- I don't see coming back in

7    December and have, almost, the same conversation.

8          MS. BRAIN:  It wouldn't be the same

9    conversation, Your Honor.  Absolutely not.  Because, as I

10   say, we will be remiss.  We will have had two experts

11   already in by that point.  We'll know if there's anything

12   more that they are calling for.  We'll have their

13   preliminary conclusions.  We'll know when the third is

14   going to be.  It in no way needs to be February.  Once we

15   get somebody identified and who's available, then they

16   can, they can be scheduled to see him quickly.

17         All of our history materials that we are

18   required to give experts before they go in have already

19   been given to two.  They're all ready to go for another.

20   So it's not a -- it won't be a lengthy process.  We're

21   just asking for the extra couple of months to be in a

22   position to say where we are.

23         We, we're hoping to be in -- we were criticized

24   in the motion for, on the response, for not filing our

25   request earlier.  We did so because we were hoping -- and

1    really hoping -- that we would be in a position to file

2    before September the 21st and let the Court know by then

3    what time we would need because we believed we'd have our

4    first expert in August; the second one would come in

5    shortly thereafter, and we were hopeful we'd be

6    identifying the third.  It didn't work out that way.  The

7    expert --

8            THE COURT:  Let me, let me turn the table a

9    minute because Mr. Miller hasn't been asked enough

10   questions.

11           Why can't we do this simultaneously?  Why --

12   how does delaying their disclosure and then you still

13   have an opportunity to get an expert on hand, even if

14   we're into December or January at that point, how does

15   that otherwise disrupt the schedule?  We can do

16   everything else and go along and do things at different

17   times and still get this matter tried in April, can't we?

18           MR. MILLER:  And we'll do everything we can to

19   make that happen, Your Honor.  Although, when we look at

20   the defense, they've had -- in fact, they claim they've

21   needed over a year to put together a mental health

22   defense.  We're now past that.

23           Now they need at least until December -- so an

24   additional two months after their experts see the

25   defendant -- to then tell the Court when they're going to

1   make their disclosures, which, let's say, there's -- in

2   December they say, "We can do it next month.  We can do

3   it in January," then --

4           THE COURT:  Yeah.  Let's play this out

5   hypothetically.

6           MR. MILLER:  Yeah.

7           THE COURT:  Say -- what date are you -- you're

8   just looking in December sometime?

9           MS. BRAIN:  Mid-December at the Court's

10  convenience.

11          THE COURT:  All right, so mid-December we

12  reconvene and you tell me that all your experts are ready

13  to go; they've seen Mr. Christensen, and you're prepared

14  to make disclosures.  When would that be?

15          MS. BRAIN:  If they've all been able to see

16  him?

17          THE COURT:  Well, we know two will have been

18  able to see him, right?

19          MS. BRAIN:  Two definitely will have.  Then we

20  can do it within a week, maybe less.

21          THE COURT:  Okay.  And if we did that, then,

22  the government would have a certain amount of time -- a

23  couple weeks -- to decide if they wanted to have Mr.

24  Christensen examined.  You have people in mind, I

25  presume.  How long would it take for you to have your

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

```
 1  examinations?
 2          MR. MILLER:  Well, again, if we knew the
 3  schedule -- over the holidays, obviously, we're --
 4          THE COURT:  No, no.  Say, say it was by the end
 5  of January/first of February you had your examination.
 6          MR. MILLER:  Yeah.  It would take -- I mean,
 7  again, if we're going to use the, sort of, the defense:
 8  An examination in October and then they could have
 9  reports in December -- so they're talking about two
10  months or so -- so if we could get the examinations
11  scheduled in January, which usually it's about 30 days,
12  then the end of January -- or end of February --
13          THE COURT:  Or even February.
14          MR. MILLER:  -- end of March.
15          THE COURT:  What if --
16          MR. MILLER:  End of March, we could get them
17  our expert's report and rebuttal, which would be right
18  before trial.  We could, we could probably just get it
19  done that way, Your Honor.
20          And then, of course, the defense would have to
21  understand that's when they were going to get the
22  government's responsive disclosures; it would be --
23          THE COURT:  Do --
24          MR. MILLER:  -- provided prior to trial.
25          THE COURT:  Does anybody anticipate that then,
```

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

```
 1   after the government conducts their examination, if that
 2   were to occur, that the defense would then be seeking
 3   for, based on that, any further or additional examination
 4   by somebody else?
 5              MS. BRAIN:  No, Your Honor.  We would want
 6   to --
 7              THE COURT:  So what if everybody got all their
 8   disclosures and reports -- obviously, the government
 9   would get their reports from your experts before you
10   would get from theirs, but --
11              MR. MILLER:  Well, we would need those,
12   obviously, --
13              THE COURT:  Correct.
14              MR. MILLER:  -- to rebut what the defense --
15              THE COURT:  Understood.  So that occurs by
16   mid-March.  Why does that affect the trial date, other
17   than you have to -- you have less time to prepare for
18   cross-examination of their experts?
19              MS. BRAIN:  I, I -- that seems -- we're talking
20   here about insanity in guilt phase; is that correct?
21              THE COURT:  Yeah.
22              MS. BRAIN:  Yeah.
23              THE COURT:  Well, but, but -- do you antic--
24   don't you -- didn't you tell me that you anticipate your
25   experts -- that this is all wrapped up in one; so when
```

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1   the disclosures are made and the reports are presented,

2   they are going to address guilt and potential punishment

3   phase?

4           MS. BRAIN:  The reports might.  The disclosures

5   would be separate.  The disclosures would be --

6           THE COURT:  Right.

7           MS. BRAIN:  -- per the particular issue.  So if

8   it's insanity, if it's guilt phase, or if it's penalty.

9   So, our disclosures would be separate.  The evidence

10  behind them and the, the theory of the mental health

11  case --

12          THE COURT:  I mean, the disclosure shouldn't --

13  isn't made until after we know whether Mr. Christensen is

14  guilty or not, right?

15          MS. BRAIN:  For penalty phase, yes.

16          THE COURT:  For penalty phase.

17          MR. MILLER:  The disclosure of the intention to

18  offer it during the guilt phase needs to be made at the

19  same time in --

20          THE COURT:  Right.

21          MR. MILLER:  -- December because the government

22  also needs to be able to have an evaluation examination

23  done of the defendant on those penalty phase issues.

24          THE COURT:  Under--

25          MR. MILLER:  Now, we would not have the ability

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1   to review that evidence and --

2            THE COURT:  Until --

3            MR. MILLER:  -- reports until after the guilt

4   phase, but it needs to be done before; otherwise, we'd

5   have to delay the trial --

6            THE COURT:  Right.

7            MR. MILLER:  -- sixty days or longer in the

8   middle of the trial.

9            THE COURT:  And I think Ms. Brain is not

10  stating otherwise in that regard.

11           MS. BRAIN:  Actually, yes.

12           THE COURT:  You are?

13           MS. BRAIN:  With respect to penalty, we would.

14  Yeah.

15           THE COURT:  So you want examination -- if Mr.

16  Christensen's found guilty, then you'll want examination

17  again after the --

18           MS. BRAIN:  Not us, Your Honor.  We would take

19  the position -- and it's not something, actually, that

20  we've decided today by any means, but we would take the

21  position that the government should not be allowed to

22  evaluate Mr. Christensen for penalty phase issues until

23  he's found guilty.

24           MR. MILLER:  Your Honor, that isn't what the

25  rule contemplates.

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

```
 1              And I should defer to Mr. Nelson here, but
 2   that's not what the rule contemplates or the Court's
 3   prior scheduling order which required the disclosure
 4   during the --
 5              THE COURT:  Okay.  Mr. Nelson, your turn.
 6              MR. NELSON:  Thank you, Your Honor.
 7              THE COURT:  On that specific issue.
 8              MR. NELSON:  Well, I think that's right, Your
 9   Honor, because --
10              THE COURT:  First of all, let me ask Ms. Brain:
11   How would that work then?  How long would we delay the
12   penalty phase after the guilt phase if there's -- if Mr.
13   Christensen's guilty?
14              MS. BRAIN:  Simply the amount of time that it
15   would take for the government's experts to interview Mr.
16   Christensen -- so a matter of days, presumably.  And then
17   prepare a report, so maybe it would be a little bit
18   longer.  But that's certainly been done in other cases --
19              THE COURT:  That would seem to put you in a
20   real bind, to have a disclosure of reports the day we're
21   going to do -- go into sentencing, to start sentencing
22   phase.
23              MS. BRAIN:  It would need a little bit of
24   time, --
25              THE COURT:  Okay.
```

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1          MS. BRAIN:  -- but we're not talking months, or

2    even multiple weeks.  It's been done in cases where it's

3    just been a short break between guilt and penalty, and

4    the --

5          THE COURT:  Well, what --

6          MS. BRAIN:  -- government can do their

7    evaluation then.

8          THE COURT:  All right.  Go ahead, Mr. Nelson.

9          MR. NELSON:  Respectfully, Your Honor, I would

10   just note that sauce for the goose is sauce for the

11   gander.  They want a year plus three months to do their

12   investigation, plus two months to write their report.

13   And then they want to give notice.  And they want to

14   push, push, push, push, push.  And then they want to give

15   us a handful of days, on no notice, to have an expert

16   examine the defendant, and then a couple more days to

17   write a report.  That's not how this works.

18          THE COURT:  So you think --

19          MR. NELSON:  And, in fact, --

20          THE COURT:  You think whenever the disclosure

21   is made and the reports are revealed, they address guilt

22   and penalty.  And then you ask for your experts, and they

23   go -- and they go and interview, and then they prepare

24   their reports.  The guilt phase reports are exchanged.

25   The penalty phase reports are not until they become --

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1  until it matters?

2         MR. NELSON:  That's exactly right, Your Honor.

3  That's how it was done in United States v. Watts, a

4  Southern District of Illinois case.  It's how it was done

5  in Dylann Roof.  It's how it was done in Tsarnaev from

6  Massachusetts.

7         The notice is given.  A taint attorney is

8  appointed.  We've already been in the process of looking

9  for a taint attorney who's an assistant United States

10  attorney -- not in this district, not affiliated with the

11  case -- who can supervise the hiring of experts, the

12  response to these motions, and keep us rolled off from

13  that information which the rules say we're not entitled

14  to.

15         But, you know, here again, Your Honor -- and I

16  just -- I know you asked me to answer one question, but I

17  think this is important because this didn't all just

18  happen all at once in a vacuum.  This is not the first

19  capital case where all of a sudden this issue crops up

20  after the deadline has gone by.  This is something that,

21  you know, happens frequently and results in delays.

22         The defense had an opportunity here to

23  communicate with the Court -- ex parte, in camera -- on

24  their experts, who they have to get funding for.  If

25  there were issues, this could have been brought up

1   sooner.

2           This issue of Rule 12.2 notice, we at the

3   Justice Department have been fighting for a long time to

4   try and get notice brought earlier in the case so that

5   this sort of last-minute ambush doesn't happen, so that

6   fair trials can be had for all parties.

7           THE COURT:  Well, we're not, we're not last

8   minute.  We're going to get this done and still have an

9   April trial date.  I don't -- I believe that.

10          MR. NELSON:  I understand, Your Honor.  But if

11  notice is given on the penalty phase in December, we will

12  not be having an April trial date.

13          THE COURT:  Why not?

14          MR. NELSON:  Because there will not be -- the

15  government has to have time to hire its experts, and they

16  have to have time to examine the defendant.  They have to

17  have time to write the reports.

18          And then what will always happen -- what always

19  happens is they will want to have an opportunity to hire

20  rebuttal evidence.  And, you know, we know --

21          THE COURT:  Ms. Brain just said that wasn't the

22  case.

23          MR. NELSON:  Then this will be the first death

24  penalty case in the history of death penalty where

25  there's no rebuttal mental health experts.  You know, it

1  will be Dr. First or Dr. Gur or Dr. Woods or Dr. Arambula

2  or Dr. Cunningham or Dr. Stewart or Dr. Hendricks.  It's

3  the same people in every case.  This happens in every

4  case.

5          And so I would refer back to what Mr. Miller

6  said:  At some point, a decision has to be made about

7  who's in control of the schedule.  And if we're going to

8  have a trial in April -- and I say that as respectful as

9  possible, Your Honor -- we cannot keep extending

10 deadlines, extending deadlines, and not expect the other

11 dominoes to topple.

12         THE COURT:  Okay.  You're certain about

13 December, so you must know that you have this third

14 person out there that can get it done by then?

15         MS. BRAIN:  That we can identify by then and be

16 able to tell the Court when they can go in.  I can't

17 represent to the Court that the third expert will be

18 identified and be able to schedule to see Mr. Christensen

19 by then, but we'll certainly be able to tell the Court

20 when that's going to happen.  And it won't be a lengthy

21 period.

22         THE COURT:  See, that just doesn't give me much

23 to help you with though.  I know -- and so you're in a,

24 in a box, I guess, about what you feel like you can and

25 can't reveal.

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

```
 1            But I think that, for me, it's just as easy,
 2    then, to set something in November and then have you come
 3    back and argue to me why you couldn't do that as opposed
 4    to just agree to December.  I mean, if we're going to end
 5    up in December, you might, you might have to say this
 6    twice.
 7            MS. BRAIN:  We won't, Your Honor.  We're
 8    absolutely committed to getting that.  We know we can't
 9    have an indefinite time.  We contacted many, many
10    experts.  We're not simply going down the list of the --
11            THE COURT:  Well, could there be --
12            MS. BRAIN:  -- people that appear in every
13    case.
14            THE COURT:  All right.
15            MS. BRAIN:  And just because we don't -- won't
16    require further examination doesn't mean we won't have
17    rebuttal experts.  Our experts will already be in place.
18    It's just that --
19            THE COURT:  Okay.  Well, let me ask it this
20    way.  This is a different way to ask it.
21            You've said you, you've contacted many experts;
22    and for whatever reason then, I'm just going to assume
23    that they're not either interested, willing, or able.  So
24    how long do we go before you find one ready, willing, or
25    able?
```

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

```
 1                MS. BRAIN:  December, Your Honor.

 2                THE COURT:  Well, what --

 3                MS. BRAIN:  We're --

 4                THE COURT:  Why, though?  How can you say

 5     that --

 6                MS. BRAIN:  Well, maybe --

 7                THE COURT:  -- unless you already know that?

 8                MS. BRAIN:  Maybe we have to settle --

 9                THE COURT:  Maybe you can't.  Maybe you can't.

10     Maybe when we come back in December, you can't find that

11     third person.

12                MS. BRAIN:  Maybe we have to settle.

13                THE COURT:  Maybe nobody's ready, willing, and

14     able.

15                MS. BRAIN:  Maybe we have to settle, Your

16     Honor.  We're trying desperately not to do that.  We have

17     some very specific mental health issues to which we need

18     highly trained clinicians with experience in that field;

19     not forensic people who testify, you know, in half a

20     dozen cases a year.  This is not that kind of a case.

21                We want to do it right.  We want to have people

22     who really know what they're talking about and that can

23     be effective experts and witnesses for Mr. Christensen.

24                We're not calling, you know, Mark Cunningham

25     and all those people that testify over and over and over
```

1    again.  We're not doing that.  That's why it's a little

2    bit harder to identify someone.  You don't just pick off

3    a list of people who testify in any, all different kinds

4    of mental health cases.  There are a whole array of

5    mental health issues that can come up in a case.  Ours

6    are very, very specific.  They don't come up in a lot of

7    cases.

8              THE COURT:  So whatever, whatever date we pick

9    here for what you're asking, that's not even a disclosure

10   date.

11             MS. BRAIN:  Correct.

12             THE COURT:  That's a report that, when you can

13   disclose.

14             MS. BRAIN:  Yes, Your Honor.  Meaningful and

15   short time period --

16             THE COURT:  Which means -- which in my mind

17   means that that third person then still has to interview

18   and then give you a report, and then you decide whether

19   to actually disclose?

20             MS. BRAIN:  Yes, Your Honor.

21             But that does-- it wouldn't -- they wouldn't

22   have to complete a final report.  They'd simply have to

23   do the work, orally give us their conclusions so that we

24   can make 12.2 disclosure.  We'll make the determinations

25   and then make the appropriate disclosures.

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1              THE COURT:  And then the full report would

2     follow?

3              MS. BRAIN:  The full report, yes.

4              THE COURT:  Because they need the full report

5     before they can make their request.

6              MS. BRAIN:  They don't, Your Honor.  They don't

7     get the reports.

8              Well, I misspoke.  For insanity and guilt

9     phase, yes, of course.

10             THE COURT:  Right.

11             MS. BRAIN:  Yeah.

12             THE COURT:  Yeah.  No, I --

13             MR. NELSON:  Your Honor?

14             THE COURT:  Go ahead.

15             MR. NELSON:  May I propose a solution?  And I

16    realize --

17             THE COURT:  Yes.

18             MR. NELSON:  And I mean no disrespect to Ms.

19    Brain.

20             This is something that, you know, we have to

21    educate about.  We both have positions.  And it's also

22    critically important that we get it right, for everyone

23    in this room.  And I understand that, and she understands

24    that as well.  I'm sure the Court does as well.

25             But for the purposes of trying to solve this

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1   issue, this quandary that we have in this case, I would

2   submit that a possibility might be that the Court set

3   November 16th as a date for -- we'll call it an initial

4   notice; that, you know, there will be -- you know, "We

5   intend to raise an insanity defense.  We intend to

6   raise," you know, "a 12(b)(1) defense," or "We intend to

7   present mitigation evidence at a Rule 12(b)(2)."

8          We can then petition the Court to examine the

9   defendant with experts.  We will have time to hire

10  experts without rushing.  They can examine the defendant.

11  We can get all that under way, get people under contract

12  and prepared to do that; and then they can have until

13  December 15th to decide, you know, what specifically

14  they're going to raise.  Basically, give us a chance to

15  get our experts hired so that we're not playing catch up,

16  and no one's having to rush.

17         And then, you know, not -- we can put a gag

18  order on the experts:  They not disclose anything to us

19  until they finalize their notice at some point in late

20  December.  And then we won't be -- the work will be done.

21  We just won't necessarily know if it's going to be

22  admissible in court or not.

23         MS. BRAIN:  There's nothing preventing the

24  government from hiring its own experts now.  This Court

25  suggested they may already have identified people.

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1    There's nothing preventing that work going on

2    simultaneously.  The amount of information they get under

3    12.2 that triggers it is minimal.  It's not like they

4    need our reports in order to, you know --

5              THE COURT:  Well, what if he wanted to take the

6    position that they didn't want to just pick a name off

7    the old list as well?  So --

8              MR. NELSON:  And also, Your Honor, --

9              THE COURT:  -- I just --

10             MR. NELSON:  I'm sorry.  Go ahead.

11             THE COURT:  Go ahead.

12             MR. NELSON:  I'm suggesting not just hiring an

13   expert, but having him go examine the defendant so that

14   the information is in a vault, for lack of a better way

15   of saying it.  And then at whatever date -- let's say

16   it's late December; the Court says, "You have to give

17   notice."  If they give the notice, the vault opens up,

18   and the parties have access to that information.

19             THE COURT:  Would you --

20             MS. BRAIN:  That's not what the rules say.

21             THE COURT:  -- have your experts examining the

22   defendant before you receive the reports from the defense

23   or -- and so simply just after the disclosure?

24             MR. NELSON:  Your Honor, I mean, I think that

25   for 12(b)(2), for example, for mitigation stuff, we're

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1    not going to have access to those reports initially.

2              THE COURT:  Right.

3              MR. NELSON:  You know, for insanity, it is a

4    little different deal.

5              What I'm trying to do, Your Honor -- and I

6    concede -- and Ms. Brain is right.  This is not exactly

7    what the rule calls for; but if we're trying to resolve

8    the issues in a way to protect both parties and preserve

9    the trial date, then we may have to come up with a way

10   that's fair to the defendant but also moves things along

11   at a more rapid pace because, otherwise, you know -- and

12   what's becoming clear, at least to me, is what they said

13   in their footnote in their motion is that, in fact, what

14   they're asking for will necessitate -- not it "will

15   become an issue"; they said "will necessitate" -- a

16   continuance of the trial date.  And that's what's going

17   to happen if they get what they're asking for.

18             MR. MILLER:  And, Your Honor, if I could speak

19   to the initial issues, I think the Court is exactly

20   right, though.  It's sort of an interesting offer from

21   the defense -- "the government can hire their experts" --

22   when their entire argument is:  These issues are so

23   complex that they haven't been able to find the right

24   expert for over a year, and then the government is

25   supposed to go hire some generic expert to be able to

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1    respond to this very unique defense that we have no idea

2    what it is.

3            So we will obviously need to have some

4    disclosures before we're able to retain our experts; and

5    certainly regarding any defense, mental health defense at

6    trial that goes to guilt that is not insanity, we would

7    need some disclosure as to what that defense is before we

8    could retain an expert to examine the defendant regarding

9    that issue as well.

10           THE COURT:  Okay.

11           MR. MILLER:  I think the Court understands

12   that.

13           THE COURT:  Ms. Brain, give me a proposal other

14   than the one that you've already asked for.  And if you

15   can't, then I'll rule.  But I'm trying to be --

16           MS. BRAIN:  We can't, Your Honor.  We can't.

17   We're just not in a position to, to give the Court

18   anything meaningful until we get our, our case together.

19   We can't decide whether we're going to present anything

20   at trial, or at the penalty phase.  We can't decide what

21   it might be.  No -- not a single expert has seen Mr.

22   Christensen yet, not for want of trying, believe us.  But

23   not a single one has.  So we're not in a position to rule

24   in or out anything.

25           But we've been working very hard, and we're

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

```
1   committed to being able to give the Court that
2   information with, like, sixty days' extra time.
3              THE COURT:  And you're -- sixty days from
4   today.  Sixty days from September 1 would have us in
5   middle-to-late November.
6              MS. BRAIN:  September 21st was the original
7   12.2.
8              THE COURT:  Right.  So sixty days from that
9   would have been -- would be November 21, right?
10             MS. BRAIN:  Right.  That's right, Your Honor,
11  but we're asking for sixty days from --
12             THE COURT:  Today.
13             MS. BRAIN:  Yeah.
14             THE COURT:  I'm not going there, not yet.
15             So the next date I pick, then, will be --
16  you'll anticipate, what, reporting where you are?
17             MS. BRAIN:  Yes, Your Honor.
18             THE COURT:  That doesn't move us -- doesn't
19  even move the, doesn't even move the ball.
20             MS. BRAIN:  It would, Your Honor, because when
21  we say reporting what, where we are, we'll be able to
22  give the Court a firm time frame in which the next step
23  would be taken.  So it would be -- we'd have one date.
24  Then we'd have a firm second date.  We're not just
25  indefinitely delaying.  We just need time to be able to
```

1    give the Court something meaningful.

2            THE COURT:  What does Mr. Christensen say about

3    all of this, without violating any attorney-client

4    privilege?  Does he want -- does he want this case moved

5    along here?

6            MS. BRAIN:  I couldn't possibly answer that

7    without violating some kind of privilege.  I'm not sure

8    if we've ever asked him.

9            THE COURT:  Okay.  Well, --

10           MS. BRAIN:  And I meant to offer the Court,

11   too, if it would be -- we are plenty able to proffer to

12   the Court *ex parte* the nature of our experts and where we

13   are and what their different expertise is and why we

14   believe we need the time that we need and why we believe

15   that we need the experts that we need, if that would help

16   our findings with the Court.

17           THE COURT:  I think we should avoid that at

18   this point.

19           MS. BRAIN:  Very good.

20           THE COURT:  Okay.  Anything else on the

21   subject?

22           MR. MILLER:  Just, and in -- one thing just as

23   we go forward here is I did hear the defense say that

24   they would have filed a motion prior to September 21st,

25   but they, you know, really hoped to meet that

1   September 21st deadline.

2           That's -- what's hard to accept on that is here

3   we are today and they're -- they clearly know -- they're

4   saying, "Because our experts haven't seen the defendant

5   yet, we cannot tell the Court for at least another

6   sixty days when we're going to be able to disclose."

7           So, certainly, sixty days before September 21st

8   they knew that their experts had not gone in to see the

9   defendant and they were not going to meet the

10  September 21st deadline.  So, I think it is a little bit

11  disingenuous to say that waiting until September 21st was

12  because "we thought we would -- up until that date, we

13  thought we were going to meet that deadline."

14          MS. BRAIN:  That's not what I said.  If I did,

15  I misspoke.

16          What I meant to say was we had hoped by

17  September 21st, or a short time before that, we'd have

18  our first two experts in; we'd have more information and,

19  hopefully, have retained the third.  And so we'd be able

20  to file with the Court a meaningful motion for extension.

21  We knew we weren't going to meet it, but we wanted to

22  file something meaningful to tell the Court:  That is

23  what we found; this is what we need; and this is how long

24  we need to do it.  We just weren't able to do that.

25          I'm not suggesting we thought right up until

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)   50

1   September 20th we might meet the deadline.  We were never

2   going to meet that deadline.  So I just wanted to be

3   clear about that.

4          We wanted to give the Court something

5   meaningful.  We thought we would be able to, and then the

6   expert who was going in in August said, "I can't do

7   anything until October."

8          THE COURT:  What's the first Monday in

9   December?  December what?

10         COURTROOM DEPUTY:  3rd.

11         THE COURT:  All right.  Here's what we're going

12  to do, and I'll wrap it up by saying this:  I appreciate

13  the discussion today, the arguments, your positions.  I'm

14  not questioning any motivations here from either side.  I

15  believe all of you -- I know some of you, and I'm

16  learning about others -- are all doing what you think is

17  right for your cases.  It will be my job to try to keep

18  this on, maybe, a tighter track than, than it would

19  otherwise.

20         So what we're going to do is I'm going to set

21  December 3rd for the disclosures, the 12.2 disclosures.

22         If for some reason -- and I don't have to tell

23  you this -- if there's some reason that you're not going

24  to be able to do that, then we're going to have the

25  motion -- we should have the motion ahead of December 3rd

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1    so that we can address it.

2            I know what you're telling me today is that's

3    already not possible.  That's what I'm hearing.  But I

4    think it is possible, and I think that that moves it out

5    75 days from when the initial disclosure was agreed to,

6    or ordered, or you were on notice of.  So December 3 for

7    the disclosures.  I don't think that -- if that's the

8    case, then I don't think that's going to jeopardize the

9    April trial setting.

10           Having said that, my goal is to keep this on

11   trial for April 3rd.  But, then, again, if it's a matter

12   of weeks, one way or another, that's not going to -- you

13   know, we're going to make this -- we'll get there; and

14   when we get there, everybody will have done what they

15   need to do and, to be ready for trial.  So for now, we'll

16   leave things as they are otherwise.

17           With that in mind, then, is there anything else

18   we need to address on the 12.2 issue?

19           MS. BRAIN:  I don't believe so on the 12.2

20   issue.

21           Your Honor, had you resolved the question about

22   protective order?

23           THE COURT:  The protective order, I'm not going

24   to -- what -- really, you just don't want Livingston

25   County correctional officers, or anybody, telling anybody

1    who's coming and going to see Mr. Christensen.

2              MS. BRAIN:  That's exactly right, Your Honor.

3    The government's not entitled to the identity of our

4    experts.  It's only because he's in jail that they would

5    possibly get that information.  And, of course, a party

6    would want advance notice of even just the identity of

7    the other party's expert because that gives one leg up to

8    do vetting, to figure out what kind of things we're

9    doing, what their expertise is.  And, I mean, they're not

10   entitled to any of that, and so --

11             THE COURT:  Well, the reason I -- and this goes

12   back to the *ex parte*.  So the *ex parte* filing request,

13   everybody's aware of how I handled that.  I think,

14   obviously, the less *ex parte* conversation or discussion

15   or filings we have the better.  So we're handling it in

16   open court here the way we should.

17             I don't want -- and the basis for it, in part,

18   is I don't want the government to inadvertently be a

19   party to something that they shouldn't be a party to.  So

20   I think a protective order makes sense.  We'll ask

21   Livingston County not to share who's coming and going to

22   visit Mr. Christensen with anybody, let alone the

23   government.

24             Now the government's on notice.  If they become

25   aware, you know, bring it to my attention.  So to the

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1  effect that we can enter an order to that, in that

2  effect, Mr. Miller, wish to be heard?  Mr. Freres?  Mr.

3  Nelson?

4            MR. MILLER:  Your Honor, as we said, we have no

5  desire to have any information until we're entitled to

6  the information.

7            Obviously, we were entitled to the information

8  on September 21st, but the Court's extended that; and so

9  I presume that the defense will, since they're

10 interacting with him, will coordinate that information

11 with Livingston County.  If they have any difficulties

12 with Livingston County, they could have them contact us,

13 I guess, just on that issue.

14           But, but I guess so that we are not having the

15 contact, I'd ask for defense counsel to have that

16 conversation with Livingston County.  I know the marshals

17 are in the courtroom here as well.  I don't want to put a

18 burden on them; but at least they're aware, so they can

19 point --

20           THE COURT:  No.  I'll prepare an order that

21 requests Livingston County not share the information.

22 I'm not in a position to tell them how to conduct -- how

23 they run their jail.  On the other hand, they're housing

24 federal prisoners, so I think that -- I don't see it as

25 an issue.

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1          MR. MILLER:  That's fine, Your Honor.

2          THE COURT:  Okay.  Anything else we should

3   address on this matter?  I don't see that it affects the

4   other scheduling unless we already know that other

5   schedulings -- I'm waiting on, for October 16th now for a

6   response to certain pretrial motions and the change of

7   venue issue.  Clearly, nothing's going to come up about

8   experts at this point, right?  There aren't any?

9          MR. MILLER:  Well, Your Honor, actually -- I

10  mean, and we, we will be filing on October 16 a request

11  for an extension of our opportunity to challenge the

12  defendant's non-Rule 12.2 experts, as well as our ability

13  to raise any <u>Daubert</u> motions regarding them because that

14  disclosure was due on August 24, 2018.  As of now, that

15  disclosure's been incomplete, and so we'll bring that to

16  the Court's attention on the 16th.

17         THE COURT:  So there's been no disclosure.

18         MS. POLLOCK:  There has been, Your Honor.

19         THE COURT:  There has.

20         MS. POLLOCK:  We disclosed the names and the

21  areas of expertise that we expect to present during the

22  guilt phase of the trial.  We gave the information we

23  expect to the government, along with either the company

24  or the name of the individual had that person been

25  identified.

1          We currently have one area of expertise where

2     we have not formally identified an expert yet, and we

3     have not received reports from those experts under Rule

4     16; however, we have given them the general outline of

5     the expert evidence that we intend to present.

6          THE COURT:  So based on that, what was the

7     government's motion going to ask for?

8          MR. MILLER:  Well, all we received, Your

9     Honor -- and we received five areas.  We received in

10    those five areas of just general expertise, we received

11    two names.  We have not received -- as the disclosure

12    was, we haven't received any reports from any of those

13    experts.

14         THE COURT:  When will that happen?

15         MS. POLLOCK:  When we get them, Your Honor.  We

16    have provided --

17         THE COURT:  I figured that.

18         MS. POLLOCK:  We don't, we don't have them yet.

19    I mean, the theme of this entire hearing is:  What we

20    haven't given, we don't -- we don't have it.

21         You know, I can't go to Walmart and pick out a

22    DNA expert and say, "Here, give me an opinion."  I had to

23    find them.  I had to provide the information to them, and

24    I had to work with them to get that done.

25         I'm hoping that sometime within the next few

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1    weeks we'll have all that information for the government,
2    but it's not like I'm keeping something in my back pocket
3    here and refusing to disclose it.
4              MR. MILLER:  And, Your Honor, we have a -- as I
5    was noting, we weren't complaining about that.  We were
6    only indicating we were going to notify the Court we had
7    not received that information and, therefore, asked for
8    additional time --
9              THE COURT:  So when you receive it, how much
10   time do you need?
11             MR. MILLER:  I believe the original motion
12   provided us -- because I think our disclosure was
13   supposed to be on the 16th from the 24th -- so the
14   equivalent amount of time that was in the original
15   scheduling order.
16             THE COURT:  Which is what?
17             MR. MILLER:  Which appears to be approximately
18   a little -- maybe about seven weeks.
19             MS. POLLOCK:  To which we have no objection.
20             THE COURT:  Okay.  Let's just do that now.  So
21   seven weeks is -- well, look back here.
22             MR. MILLER:  Well, we haven't received the
23   disclosures yet, Your Honor.
24             THE COURT:  Right.  Seven weeks from the
25   receipt of them.

```
 1              MR. MILLER:  Very good.

 2              THE COURT:  Okay?

 3              MR. MILLER:  Very good, Your Honor.

 4              THE COURT:  So we'll -- and that pertains to

 5   disclosure of rebuttal experts to challenge defense

 6   experts and response to the defendant's challenge --

 7   well, there's -- you don't have any experts yet.  The

 8   government's response to the defendant's challenge to

 9   government experts.

10              So we're -- the government disclosure of

11   rebuttal experts to challenge the defense expert witness,

12   you want seven weeks from the disclosure?

13              MR. MILLER:  Yes, Your Honor.

14              THE COURT:  Okay.  No objection from the

15   defense?

16              MS. POLLOCK:  No, Your Honor.

17              THE COURT:  So that's done.  We'll include that

18   in the order, too.

19              MS. POLLOCK:  We do have one more request to

20   amend the scheduling order, Your Honor.

21              THE COURT:  All right.

22              MS. POLLOCK:  Currently, our replies to all of

23   the government's responses to our pretrial motions are

24   due on December 7th.

25              The order also includes in italics that it is
```

1    only with prior leave of Court that said replies can be

2    filed.  We'd request the Court to strike that.  That will

3    simply necessitate me filing a motion for leave to reply

4    in fundamentally every single one of those cases.  I

5    don't think we need a motion for leave to reply if the

6    Court gives us leave to simply file the reply on the

7    deadline.  That would be much appreciated.

8              THE COURT:  How can we hear these on

9    December 14, 17, 18, and 19 now?  So we need to regroup

10   again, it looks like, and pick dates in January, right?

11             MR. MILLER:  Well, I believe that the majority

12   of the motions will -- now, the motions that were all

13   filed by the defense on August 24th, which the government

14   will respond to -- has responded to or will respond to by

15   August -- I'm sorry, by October 16th, that those could be

16   still heard in those December dates.

17             MS. POLLOCK:  We would agree with that, Your

18   Honor.  In fact, I believe that the only motions that may

19   need to be moved at the Court's discretion are the

20   Daubert motions challenging admission of expert testimony

21   since that is what is the subject of our late disclosures

22   on the experts.

23             In terms of the motions to suppress and the

24   motions to strike, they're either legal in nature and can

25   be ruled on without evidentiary hearing or require

USA v. CHRISTENSEN, No. 17-20037 -- Motion Hearing (10/11/2018)

1   evidentiary facts which have nothing to do with the

2   current discovery that is outstanding.

3           THE COURT:  Okay.  So the request to leave, to

4   strike "only with prior leave of Court," you want to be

5   heard on that?  Or does it matter?

6           MR. MILLER:  Your Honor, if the Court wants a

7   reply in all of those cases, we certainly wouldn't object

8   to that.

9           THE COURT:  That's fine.  I'll strike that.

10          MS. POLLOCK:  Thank you, Your Honor.

11          THE COURT:  Okay, then, with that in mind --

12  drum beat -- before I get to the government response on

13  October 16th, do I read the Motion for Change of Venue

14  correctly in that you're, you're saying that you're okay

15  with Peoria?

16          MS. POLLOCK:  Yes, Your Honor.

17          THE COURT:  All right.  Okay.  Thank you for

18  regrouping on short notice.  We'll be in recess.

19          COURTROOM DEPUTY:  What about the hearing for

20  next Friday?

21          THE COURT:  Oh, next Friday we have a

22  telephone, right?

23          MS. POLLOCK:  Right.

24          THE COURT:  Is that -- I don't think that would

25  be necessary.  Do you?

```
 1              MS. POLLOCK:  I agree, Your Honor.

 2              THE COURT:  Let's strike -- let's vacate that

 3   for now.  All right?

 4              Thank you.

 5              (Hearing concluded, 10:17 a.m.)

 6

 7                   *  *  *  *  *  *  *  *  *  *

 8

 9                   REPORTER'S CERTIFICATE

10         I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

11   that the foregoing is a correct transcript from the

12   record of proceedings in the above-entitled matter.

13         Dated this 7th day of February, 2019.

14

15         _____  s/Lisa Knight Cosimini_____
                  Lisa Knight Cosimini, RMR-CRR
16                Illinois License # 084-002998

17

18

19

20

21

22

23

24

25
```