UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS


UNITED STATES OF AMERICA,    ) Docket No. 17-cr-20037
                             )
        Plaintiff,           )
vs.                          )   Urbana, Illinois
                             )   December 14, 2018
BRENDT A. CHRISTENSEN,       )
                             )
        Defendant.           )
_____ )


RECORD OF PROCEEDINGS
MOTION HEARING
BEFORE THE HONORABLE JAMES E. SHADID
UNITED STATES DISTRICT JUDGE


Nancy Mersot, CSR, RPR
United States District Court Reporter
100 N.E. Monroe Street
Peoria, IL  61602

Proceedings recorded by mechanical stenography,
transcript produced by computer-aided transcription.

1
2                        THE APPEARANCES

3                     EUGENE L. MILLER, ESQ.
                      BRYAN DAVID FRERES, ESQ.
4                     Assistant U.S. Attorney
                          201 South Vine
5                       Urbana, IL 61802
                     On behalf of the Plaintiff
6
7                     JAMES B. NELSON, ESQ.
             United States Department of Justice
8           Criminal Division Capital Case Section
                          Suite 625
9                       1331 F. Street NW
                      Washington, DC  2004
10                   On behalf of the Plaintiff
11
                     ELISABETH R. POLLOCK, ESQ.
12                    Federal Public Defender
                        300 W. Main Street
13                      Urbana, IL  61801
                     On behalf of the Defendant
14
15                    GEORGE F. TASEFF, ESQ.
                   401 Main Street, Suite 1500
16                      Peoria, IL  61602
                     On behalf of the Defendant
17
18                    ROBERT L. TUCKER, ESQ.
                      7114 Washington Avenue
19                     St. Louis, MO  63130
                     On behalf of the Defendant
20
21
                      JULIE C. BRAIN, ESQ.
22                       916 S 2nd Street
                      Philadelphia, PA  19147
23                   On behalf of the Defendant
24
25

1          (Proceedings were held in open court.)

2          THE COURT:  Thank you.  Please be seated.

3          Okay.  Good morning, everybody.

4          This is the United States v. Brendt

5   Christensen in 17-20037.

6          Mr. Freres, Mr. Miller, Mr. Nelson present

7   for the government.

8          Mr. Tucker -- in order I guess, Mr. Taseff,

9   Miss Pollock, Mr. Tucker, and Miss Brain present for

10  the defense.

11         The matter is set today on a number of

12  pretrial motions, as I recall.  Let's do it in this

13  order, if it's okay; maybe jurisdiction first; the

14  issue as to Document 117, the death penalty second;

15  and then have a discussion about the 12.2

16  disclosures.  Fair enough?

17         MR. MILLER:  That's fine, Your Honor.

18         THE COURT:  Okay.  For the defense first, I

19  guess, jurisdiction.

20         MR. TUCKER:  Good morning, Your Honor.

21         THE COURT:  Good morning, Mr. Tucker.

22         MR. TUCKER:  The defense moves to dismiss

23  Count 1 for -- on the grounds that this case is

24  simply is in the wrong courtroom, Your Honor.  This

25  is an attempt to convert a quintessentially local

crime into a federal crime for the apparent purpose
of simply seeking the death penalty because this
crime would be punished by a life without parole in
the State of Illinois also.

There are several different points we want
to make.  And as we proceed through this, I will
just summarize some at the outset.  One, a personal
automobile or cell phone is not an instrumentality
of interstate commerce, and Congress has never
really believed that in the sense that we know, or
course, when Congress has wanted to legislate
concerning cars, personal use of cars or in the
instance in the area of DUI, minimum age to drink,
blood alcohol level, they're using the Spending
Clause.  The reason they use the Spending Clause is
because the Supreme Court has made it clear that you
can use the Spending Clause to try to accomplish a
goal that you otherwise do not have the authority
under the Constitution.

Congress does not have the authority under
the Constitution to make a personal use of an
automobile or a use of a personal automobile that is
not used for commercial purposes, that's one point.

THE COURT:  Tell me in the Spending Clause
world, they would regulate if they wanted a speed

1  limit or something like that, correct?

2          MR. TUCKER:  Yeah, they withhold.

3          THE COURT:  How would they do it if they

4  wanted to regulate as to kidnapping?  How would they

5  move it into a Spending Clause.

6          MR. TUCKER:  I don't think they could.

7          THE COURT:  Okay.

8          MR. TUCKER:  I don't believe they could

9  actually do it that way on a kidnapping.  Congress

10  does not have the authority.  And of course there

11  are -- we will get to four of the cases,

12  particularly in last 23 years; but they do not have

13  the authority to legislate under the Commerce Clause

14  local violent crime.  They do not have that

15  authority, Your Honor.  And the whole idea of the

16  Commerce Clause is inherent in the word "commerce,"

17  "commerce."  Congress does not have the authority to

18  federalize a kidnapping that has no economic or

19  commercial aspect to it.  That -- there is no

20  authority for that.  There is case after case, and

21  we can cite in the language that it is all about

22  commerce, if you're going to use the Commerce

23  Clause.

24          The theory that the government is putting

25  forth here would seriously intrude on federal/state

relationships.  And I can get to the specific
language in some of these cases in a moment but just
summarizing some of the principles here.

It would open the flood gates to
unimaginable jurisdiction.  I mean, if the
government's theory is correct here that the one
that they've come up with in their response that,
well, we agree it is not an activity, basically; but
if their theory is correct, Congress has just
complete authority over all personal automobiles and
cell phones.  And we set out in the reply how far
that would allow Congress to go.  So it completely
obliterates the constitutional distinction that has
been repeated over and over again; that there are
limits to the Commerce Clause, and those limits are
evaluated in terms of federal, state limits and the
impact on dual sovereignty.

It would also completely, completely extend
the federal kidnapping law beyond anything that has
been imagined before.  Historically, since 1933, the
kidnapping statute required interstate travel.  And
we are not saying that -- we are not saying
necessarily in certain situations that intrastate
kidnapping cannot come within the confines of the
statute, but it certainly could not come without

1 kidnappings that are economic related or commerce;

2 that is the key here.

3        As we said, there are at least four Supreme

4 Court cases:  *Lopez*, *Morrison*, *Bond*, and *Jones* that

5 particularly have not accepted these kinds of

6 expansive jurisdictional theories that the

7 government is trying to use here.  In fact, this

8 case is directly controlled by *Morrison*.  This case

9 is directly controlled by *Morrison*.

10        So, with those principles in mind, perhaps

11 it would be helpful to at least hear -- set out how

12 this issue seems to me to be presented at this

13 point.  Of course *Lopez* categorizes -- *Lopez* was

14 just repeating what *Perez* had said in 1971, that

15 there are basically three categories that Congress

16 can legislate concerning interstate commerce.

17        The channels of interstate commerce, that's

18 the traditional kidnapping statute:  crossing state

19 lines, traveling across state lines.  So you can

20 regulate channels of movement of people and things

21 in interstate commerce, that's number one.

22        Two, what the government is trying to latch

23 on to here and stretch it beyond any possible

24 rational meaning is instrumentalities of interstate

25 commerce.

 1          And third -- and this was *Lopez* and several
 2  cases.  And this is -- this is the category that is
 3  most presented in cases; they can regulate
 4  activities of -- that -- intrastate activities that
 5  substantially affects interstate commerce.  So they
 6  can't regulate -- this is not an issue about
 7  interstate versus intrastate.  It is an issue about
 8  commerce versus no commerce.  That's the issue for
 9  the Court here and why this government's
10  interpretation does not travel, really.
11          THE COURT:  So you are saying -- you think
12  that for this to stand, they need not only to have
13  instrumentality but have to have the substantial
14  effect, so prong two and three?
15          MR. TUCKER:  If you have substantial effect,
16  you don't have to go to prong three.  The government
17  doesn't argue that.  They cannot postulate.  And we
18  said in our original motion, it is hard to even
19  imagine what the substantial effect would be of an
20  intrastate kidnapping not involving economics or
21  commerce.  We specifically said in -- I think we use
22  the language of difficulty to unearth anything that
23  would support that theory.  The government did not
24  respond to that.  The government did not proffer any
25  effect like that.  What they did is said, oh, no, no

1 this is an instrumentality of interstate commerce.

2        THE COURT:  And you are disagreeing that a

3 car is a instrumentality of interstate commerce?

4        MR. TUCKER:  A personal car, not being used

5 for commercial basis, is not an instrumentality of

6 interstate commerce within the meaning of the second

7 category of *Lopez*.  Now, how do we know that?  We

8 know that for several reasons.

9        One, *Lopez* specifically, Your Honor, gave

10 the examples -- two case examples, two statute

11 examples of what would constitute an instrumentality

12 of interstate commerce.  In other words, what are

13 the examples in our case law that this was a

14 regulation of instrumentality of interstate

15 commerce?  What that is, that is regulation of the

16 two cases they cited, the *Shreveport Rate Cases* and

17 *Southern Railway* cases were both cases that they

18 were regulating railroads; trucking industry,

19 railroads, that sort of thing.  And in both cases,

20 if you look at them, they both involve commerce

21 anyway.  The regulations involve commerce.

22        THE COURT:  So I just want to understand

23 your position.  So if it's a personal car that's not

24 used for any commercial purpose, then to come under

25 the Commerce Clause, you would need prong three; it

1  would somehow have to be used to substantially
2  affects interstate commerce?
3          MR. TUCKER:  Right.
4          THE COURT:  But if it was a commercial car
5  that is generally or is normally or commonly used in
6  interstate commerce, then prong two would be enough?
7          MR. TUCKER:  I'm not sure it would be
8  enough, actually, to be honest with you.  It
9  depends.  If the kidnapping has nothing to do -- for
10  instance, suppose that -- just hypothecating here;
11  maybe it is a limo driver who is not driving in his
12  limo capacity, driving it at night when he goes home
13  and uses it; I don't believe that would probably be
14  enough.
15          I think one of the things to look at, Your
16  Honor, is not only the two cases they cited, this
17  *Shreveport Case* and the *Southern Railway* case, which
18  both did not go off on the fact that they were
19  quote/unquote, "Instrumentalities of interstate
20  commerce," because the whole discussion in the case
21  was about the interstate commerce that they were
22  being used.  If the cases just went off on, okay,
23  those are instrumentalities of interstate commerce,
24  that's the end of the game, then there wouldn't have
25  been any of this long discussion about, you know,

for instance in *Shreveport* went on for pages about,
well, this affects interstate commerce because, you
know, you are traveling, moving freight in Texas
from Houston to Dallas and you're charging a lesser
rate than if you moved it from Houston to
Shreveport, the same distance, that affects
interstate commerce.  They went on for pages about
that.  It wasn't enough to say, okay, it's a
regulation of instrumentality of interstate
commerce.

        So, the cars are not, clearly they are not;
phones are not, unless they are used in relationship
to kidnappings that at a minimum have a -- that are
involved in economic or commercial activity.  So it
is an activity is really the test here.

        So -- but if you look at -- and also I think
we put in the footnote there the distinction between
two old cases about *Employers' Liability* and
*Employer's Liability Two*, and the difference of that
distinction there where one -- the one exceeded
Congress's power and one did not, and it was because
of the commerce connection; that one of them didn't
have any connection to commerce.

        So that is not a viable theory.  As we said,
it just totally opens up the door to unlimited

1  jurisdiction almost.

2        Every -- as we said, you know, in *Morrison*,

3  the Supreme Court was clear in *Morrison* that

4  Congress cannot federalize local crimes of rape.

5  There is nothing in there -- does anybody actually

6  think that this decision would be different if it

7  happened in a driving car, in a backseat of a car.

8  That makes no sense.  There is nothing in that case

9  that would suggest that.  There is nothing in *Lopez*

10 that would suggest that the difference would change

11 had the defendant driven the car -- driven to school

12 that day with the gun in his car.  There is just

13 nothing that suggests that theory; that theory as we

14 postulate in many, many, examples.  And same thing

15 goes to the cell phone, Your Honor.

16        Congress cannot -- you know, was it last

17 term or a couple terms ago in *Carpenter* where the

18 Supreme Court talked about the fact that there are

19 more cell phones in the country than there are

20 people.  And limited -- you know, you had to have a

21 warrant.  That if Congress can legislate just,

22 government says, oh, well it's a instrumentality of

23 interstate commerce, see you later.  Why can't they

24 prohibit -- Congress could prohibit use of the cell

25 phone, people walking down the streets, which a lot

of people might think would be a pretty good social
goal, or the use in restaurants?  Or we -- even more
than that, why can't Congress say, you know, we are
legislating a cell phone and we think kids couldn't
be on -- shouldn't be on cell phones more than three
hours a day.  Why not?  That's a cell phone.  That's
a cell phone.  It is not content based.  And that it
is precisely the type of thing that *Lopez* -- that's
exactly what *Lopez* looked at and talked about in
throwing out the Gun-Free Zones Act; that if you go
this far -- the government tried to postulate some
far-fetched theory there -- if you go that far, you
can start regulating anything that, you know,
involving schools, school curriculums; it's just
never ending.

        So the government's theory has no limiting
principle here.  It is completely contrary to the
history of the statute; that the statute -- if the
statute is read as the government would like you to
read that statute, Your Honor, it would totally,
totally be contrary to, what, 1932; 76 years, 86
years of law.  It would totally expand the federal
kidnapping statute beyond what it has been for years
and years and years, and there is nothing, nothing
in that Act, in that Adam Walsh Act, that really,

1  this is just one phrase that is stuck in there.
2  There is no discussion.  There is no findings about
3  the affects on interstate commerce.  There is no --
4  the word "automobile" or "car" in that long, long
5  Act doesn't even appear in it.  Doesn't even appear
6  in that Act.
7      THE COURT:  Why do you think -- or am I
8  incorrect -- that a circuit hasn't addressed this
9  specific issue but some district courts have?
10     MR. TUCKER:  Well, for one thing, one of the
11  things I think -- we cited several cases in the
12  motion post-2006 prosecutions.  Very rarely has the
13  government --
14     THE COURT:  Used.
15     MR. TUCKER:  -- used this.
16     THE COURT:  Fair enough.
17     MR. TUCKER:  And this was something that
18  Chief Justice Roberts pointed out in the *Bond* case.
19  One thing we know also that this has hardly ever
20  been used like this, stretched this far.  The
21  problem with most of the districts --
22     THE COURT:  But when it has been, a couple
23  of district courts have actually found contrary to
24  your position, right?
25     MR. TUCKER:  Yes.  Sort of.

1       THE COURT:  Okay.

2       MR. TUCKER:  Sort of.  And I say "sort of"

3   because the problems with those district court cases

4   is that the defendants went in there, for most of

5   the time they made these broad arguments.  They came

6   in and said, well, you know, 1201 violates a

7   Commerce Clause; you know Congress can't legislate

8   that broadly.  Well, there is nothing to that

9   argument.  We know that has been around for 86

10  years.

11       So most of these were broad, broad facial

12  attacks.  And none of them, as we pointed out, was

13  the issue raised about this doesn't involve

14  commerce.  And the reason it wasn't raised -- not

15  knocking the defendants there -- is because commerce

16  was present in the cases.  That's the big hole here.

17  You know, most of those cases involve drugs,

18  robberies of drug dealers, kidnappings involved in

19  drugs.  We know that Congress can regulate that

20  because there is a national market for drugs, there

21  is a *Taylor* case in 2006 -- excuse me -- in 2016,

22  Congress can regulate drugs.  So therefore they can

23  regulate the commerce by kidnapping when it involves

24  a robbery.  Those cases, except for one case, there

25  is one case that the government cites that would be

 1   fairly interpreted as being analogous to this case
 2   and that's the -- I don't know whether you call it
 3   Jacks or Jakes, J-a-c-q-u-e-s.  That's the case
 4   where the issue wasn't raised here where *Jacques*
 5   raised one of these broad, broad attacks instead of
 6   as applied, but that's a case I think it's out of
 7   Vermont, Your Honor, if I'm not mistaken.  And it's
 8   discussed at some length in the reply brief.  That
 9   involved the defendant using a cell phone and maybe
10   his car, whatever, and he was convicted of a
11   kidnapping and he -- I assume -- I'm not clear what
12   his ultimate purpose was, but he killed his niece or
13   a step-niece or somebody of that relation to him;
14   didn't take her across state lines.  That is the
15   only case that's analogous to this case and that
16   there is no economic dimension to it.
17          But the -- that argument was not
18   specifically raised.  *Jacques* raised some broader
19   argument.  If you look at -- excuse me -- if you
20   look at the opinion very closely, you see that in
21   fact the Court relied on cases that all involved
22   economic activity.  They relied -- they cited the
23   Travel Act or the Travel Act clearly in the
24   definitions, as we point out, that involves economic
25   travel for pecuniary benefit; the Murder-for-Hire

statute, the Murder-for-Hire statute 1958 has built
in economics, and also I think that statute was
passed as part of some organized crime bill.  But
the economic dimension is built into that statute.
That statute is fairly interesting, Your Honor.
It's 1958.

          The government relies on the *Mandel* case out
of the Seventh Circuit.  They cite that both on the
intent argument and Congress's power under the
Constitution.  They cited -- that case is clearly
distinguishable for several, several reasons,
including one very important reason, Your Honor, is
that in that statute, it has the language similar to
here; means of instrumentalities of interstate
commerce; and what it has there, there is a
subsection down at the bottom of that statute that
Congress specifically said in that situation that
instrumentalities of interstate commerce includes
means of transportation or communication.  So when
Congress wanted a means of transportation to be
included within the terms of instrumentality of
interstate commerce, they knew directly how to say
it.  They knew directly how to say it.  That raises
two points.  Number one, that doesn't go to the
economic argument, because the economic commerce

1 argument is already in that statute as it is in

2 almost every other federal statute; that this basis

3 of jurisdiction was for economic purposes the fact

4 that it's a murder for hire and that involves

5 obviously money and commerce and that sort of thing.

6 So they -- what they did though, not only that issue

7 but the other issue is what I just alluded to, Your

8 Honor, which supports our argument that

9 instrumentality of interstate commerce is not

10 considered to be a personal car.  In that particular

11 situation they apparently decided they wanted to

12 include that, which they did, which they certainly

13 didn't hear.  So they clearly knew how to say it.

14        Another thing is, Your Honor, as Chief

15 Justice Rehnquist noted in one of the opinions we

16 cited for the *Yates* case, I don't remember, but

17 years ago; he said, you know, when the government

18 came in with some broad, one of these broad

19 interpretations, the federal government, they always

20 want to get everything that they can as far as

21 jurisdiction, so that's what they think their

22 mission is.  So Chief Justice Rehnquist specifically

23 said, you know, this would work a radical, radical

24 change in the prior law of jurisdiction.  And we

25 would expect that if Congress had intended to do

 1  this, that somebody would raise the issue.  It would
 2  have been discussed somewhere.  I think he said you
 3  would assume you would have heard a watch dog
 4  barking in the night somewhere about this, I think
 5  that's the way he phrased it.  That this was never
 6  discussed here; clearly, clearly, Your Honor,
 7  several -- in four of the cases that we principally
 8  rely on *Bond*, *Morrison*, *Lopez*, and *Jones*; there are
 9  discussions about the fact that, you know, if
10  Congress was borne to legislate and intrude on
11  federal-state relationships to this extent, then
12  they have to clearly say so; that doesn't mean they
13  get away with it, but *as Morrison* indicated, they
14  clearly have to make the statement and say that this
15  is -- this is our intent here.
16          Just one second, Your Honor.
17          In fact there is -- as the chief justice
18  wrote in the *Bond* case, We presume there is a
19  presumption that Congress does not intend to intrude
20  on historically -- what has historically been state
21  court matters or state court crimes, but the Court
22  specifically, specifically said in -- let me get
23  that for you.
24          THE COURT:  What was the crime?  What was
25  the criminal act in *Bond*?  Refresh me.

1      MR. TUCKER:  *Bond* was the case where a woman
2  named Carol Bond was upset because her husband got
3  pregnant by her best friend, so she was a little mad
4  about it, hacked off, whatever you might say.  So
5  she decided -- she was a chemist herself; she was a
6  microbiologist, I'm sorry.  So she kind of knew
7  chemicals and stuff like that.
8      So she went and sprayed chemicals on the
9  door knob of the car, the mailbox of her house -- of
10  her rival's -- not intended to kill her or anything,
11  but she knew -- Carol Bond knew these chemicals
12  would irritate the skin and cause rashes and stuff.
13  Seems a little minor there but --
14      THE COURT:  I ask that only because you said
15  that the presumption that Congress does not intend
16  to intrude on what has historically been a state
17  crime, but historically kidnapping, as we know it,
18  has been a federal crime, right?
19      MR. TUCKER:  It's a state crime, too.  Every
20  state seriously punishes kidnapping as evidenced
21  here.
22      It has historically been a federal crime if
23  you cross state borders.  That's the way it has
24  always been.  In fact up until 2006 this language
25  that just -- this one phrase that appears in this

1   Adam Walsh Act -- and again I can't emphasize
2   enough.  There was nothing in that Act to indicate
3   that Congress intended to run off and expand
4   jurisdiction to this point.
5           And, you know, in the reply brief, we noted
6   you know, a long bill like that, who is going to,
7   you know, if you title it the Adam Walsh Act to
8   Protect Children, you know, there is not too many
9   people going to be raising their hand and worrying
10  about that sort of stuff, you know, let the courts
11  figure out later.  But there is no intent whatsoever
12  there was any discussion in Congress about how this
13  would extend the federal jurisdiction.  And look at
14  how this does.  There are several reasons you can
15  figure that they didn't really intend this anyway.
16          There are two different questions.  Did
17  Congress intend this?  Okay.  We say no.  There are
18  so many reasons which we can repeat here so why
19  don't -- repeat what's in the brief why Congress
20  didn't intend it.  But there is the other issue even
21  if they did, do they have the power; they do not;
22  they do not.  The only reason the intent issue is
23  raised is because it is the principle of
24  constitutional avoidance, of course.  If you can
25  decide a statute where there is some question about

1  its applicability on nonconstitutional grounds, you

2  usually do that.  But even if they intended to, they

3  couldn't do it.  *Morrison* said that; can't

4  federalize this crime.

5          So back to Carol Bond, so the -- so the

6  government tried to prosecute that under a statute

7  that is adopted pursuant to a treaty about chemical

8  weapons, right?  And the Court repeatedly -- the

9  Court rejected that, number one, saying, regardless

10 although this may in fact be a chemical weapon,

11 that's not what Congress meant.  One of the examples

12 that chief justice -- I believe the chief justice

13 used in *Bond* was that, you know, if we read this

14 literally like the government wants us to do, you

15 can prosecute a child or somebody who puts chemicals

16 in their -- that kill, I think, in the goldfish bowl

17 or whatever.

18          What the Court -- in fact we note -- we

19 mention this in several places, Your Honor, in the

20 opening brief about how *Bond* is -- we think this

21 case is directly controlled by *Morrison*, but *Bond*

22 itself is extremely important too because this case

23 is almost on all fours with *Bond*.  And if you can

24 just give me one quick second, Your Honor, I will

25 pull this up.

1          So on page 45 to, I think, 49 or whatever,
2   of the opening pleading here, motion on this issue,
3   we talked about this, how similar this case is
4   actually to *Bond*.  The chief justice in *Bond* noted
5   that, you know, if we -- if we accept the
6   government's theory here, it would, I quote, convert
7   an astonishingly amount of traditional local
8   criminal conduct in the federal crime.  Here the
9   overwhelming number of kidnappings would involve
10  transportation in some way.  In fact, if you look at
11  the -- regressing just a second to a topic that I
12  started to address a moment ago -- the 2006
13  amendment, Your Honor.  If it's interpreted as the
14  way the government wants to interpret this, for
15  instance, that amendment not only added the means
16  and instrumentality of interstate commerce language,
17  but it also added a provision that before 2006,
18  jurisdiction under the federal kidnapping statute
19  required moving the victim across state lines.
20          In the 2006 amendment, it added the
21  provision "the offender," also jurisdiction if the
22  offender moves across state lines; that would be
23  totally unnecessary if -- totally superfluous if in
24  fact an instrumentality of interstate commerce is
25  interpreted as broadly as the government wants; how

1  is he going to go across state lines, how is he
2  going to cross?
3          Also if you read the government's
4  interpretation of the second category, going back to
5  *Lopez* and *Perez*, Your Honor, the example of the
6  authority to regulate interstate commerce is
7  Category One, the movement of goods or people across
8  state lines, that's what it traditionally started
9  out as and that's the classic example.  But if you
10 accept the government's theory, why do you even have
11 the second category?  I mean, you are going to move
12 people and goods across state lines if as the
13 government says instrumentality is as broad as they
14 want to make it here, by some instrumentality.  I
15 mean, you wouldn't even need the first one.  You
16 could just say instrumentality of interstate
17 commerce, that would cover everything.  The
18 government's theory never has been interpreted as
19 broadly as they want us to believe here.
20         And secondly, it also, Your Honor, would
21 just -- it would just eat up the statute totally and
22 allow the federal government to essentially
23 federalize an enumerable amount of crimes that have
24 traditionally been considered local.
25         But going back to *Bond*, Your Honor, the

 1  second thing that the Court noted was that the core
 2  concerns of the statute in *Bond* were not related to
 3  the conduct of Carol Bond.  It was a statute adopted
 4  to implement a treaty obligation.  Here it's the
 5  same thing.  The core concerns here was not the
 6  kidnapping statute; the core concerns were child
 7  pornography and children; children, as evidenced by
 8  the fact that automobiles and cars are not even
 9  mentioned in the long Act.  There is no talk about
10  that.
11        Third, *Bond* relied on the fact that there
12  was lack of prior case law applying the statute
13  similar as the government wanted.  Well, there is
14  very, very little here too; very, very little to
15  support that.
16        Fourth, and this is important, *Bond* pointed
17  out that this is not only a local crime, but the
18  laws of Pennsylvania are sufficient to punish this.
19  This was an assault committed by Carol Bond.
20  Pennsylvania punishes assault as a few other states
21  by criminal sanctions.  And the Court noted, Your
22  Honor, that -- well, I'll go to fifth and tie those
23  together.
24        Fifth, it is important here that the Court
25  in *Bond* noted this -- and I think there is another

1  case I could cite in those four where I think
2  Justice Kennedy writes the same thing -- this was an
3  attempt by the government to displace the -- this is
4  what *Bond* court's chief justice said, The attempt to
5  grab jurisdiction under that statute was an attempt
6  to displace the policy of the Commonwealth of
7  Pennsylvania in a seemingly transparent -- well, to
8  impose a sentence far beyond what Pennsylvania
9  wanted, apparently, and because Pennsylvania offered
10  to let her plead to simple assault apparently.
11       So here we have the same thing.  This case,
12  the laws of Illinois severely punished the crime
13  that Mr. Christensen is charged with committing by
14  incarceration for the rest of his life without
15  parole.  The federal government is coming in here
16  trying to convert this local crime into a federal
17  crime to seek the death penalty.  We know that.
18  There are reasons we know that.  So that's what they
19  are trying to do here.
20       They are trying to displace the policy of
21  the State of Illinois just as *Bond* was.  And as the
22  chief justice says, We have no reason to believe
23  that Pennsylvania cannot adequately do their duty to
24  prosecute criminal cases.  And it is not up for us
25  to be second guessing and trying to come in second

```
 1  guessing on a local crime where there is no
 2  jurisdiction.
 3          So that's what is happening here, Your
 4  Honor.  It's the same thing that they are attempting
 5  to do here.
 6          The -- if I can go back to my notes for just
 7  a quick second here.
 8          THE COURT:  You will have time to come up
 9  after the government.
10          MR. TUCKER:  Okay.  Do you want me to sit
11  down?  Sure.  Thank you.
12          THE COURT:  All right.  Mr. Miller.
13          MR. MILLER:  I will start out by --
14  Mr. Tucker will have a chance to respond, to answer
15  how he knows that this case is in federal court
16  because we want to seek the death penalty against
17  the defendant, because that's not true.  He says
18  that we know that to be true.
19          This case was initially investigated by the
20  FBI from the outset.  The U.S. Attorney's Office is
21  involved when the FBI gets involved in an
22  investigation.  We have a Chinese national who, it
23  is alleged, this defendant kidnapped and killed.
24  And to suggest that the only reason the United
25  States is involved in this case, not only to suggest
```

the only reason we are involved is to seek the death
penalty, but that he knows that; when we know that
not to be true.  Perhaps he will explain how he
knows that to be the answer, but let's discuss his
argument.

I think the Court got to the heart of this
when it asked him -- when he went on for time
explaining how, apparently, Congress had lost all
constitutional mooring and decided to enact a
statute that would result in the downfall of
federalism as we know it, why no single court in the
United States has stepped up to recognize the
unconstitutionality the defendant claims exists.
And the answer is because the law is clear that
Section 1201 is constitutional.

This isn't --  we start back, as the Court
knows, kidnapping has been, at least since the '30s,
since the Lindbergh baby, has been a traditional
federal crime.  When people think of kidnapping,
they think of the FBI being involved in
investigating; they think of federal prosecution.
Kidnapping, in fact the statute itself says it can
be investigated immediately even without evidence of
any interstate travel and then after 24 hours, it is
presumed interstate travel, because that's the

1  nature of kidnapping; when someone is gone, they can
2  be taken anywhere.
3      THE COURT:  Where are the limits then to the
4  Commerce Clause as it pertains to automobiles?
5      MR. MILLER:  And, Your Honor, I will answer
6  that question.  I think you asked a good question to
7  the defense when it came to *Lopez.*  And what the
8  defense would say is that the second prong -- their
9  argument really says the second prong doesn't exist,
10 because they are saying that to be an
11 instrumentality of interstate commerce, which is
12 what *Lopez* says, Congress can regulate an
13 instrumentality of interstate commerce -- to be an
14 instrumentality, you also have to satisfy the third
15 prong.  You have to substantially affect interstate
16 commerce.  And that's clearly not the law.  It
17 wouldn't be two separate prongs.
18      So the law is that it has to be an
19 instrumentality of interstate commerce.  And
20 Congress has -- the Supreme Court has held if it is
21 an instrumentality, Congress can regulate it.  They
22 try to make it sound like when you get into that
23 personal car of yours or when you get into that --
24 pick up that cell phone, you are in the clutches of
25 the federal government.  Well, the United States

1  government can regulate those instrumentalities,

2  meaning the FCC is involved.  When you pick up your

3  cell phone, whether you know it or not, the FCC is

4  vetting law in their regulation of those telephones.

5  When you get in your car, there is federal

6  regulations.  They are going to affect air bags.

7          THE COURT:  Let's get real basic.  So every

8  car is an instrumentality of interstate commerce.

9          MR. MILLER:  Absolutely, Your Honor.  And

10 the courts have held that.

11         THE COURT:  And that is because parts are

12 made elsewhere or it can drive from Illinois to

13 Indiana?

14         MR. MILLER:  It's because it can drive.  And

15 in fact I think the courts have said it may be one

16 of the moist obvious instrumentalities of interstate

17 commerce.  If you are going to take a road trip from

18 here to D.C., what do you take?  Probably your car

19 and your cell phone.

20         THE COURT:  So where does the limit ever

21 occur then?  I mean on the way down here, I turned

22 right, maybe I didn't stop completely at the stop

23 sign before I turned right.

24         MR. MILLER:  We can have that discussion,

25 Your Honor.  I'm happy to go there, but that's not

 1  necessary to decide this case at all, because we are
 2  not even close to that limit.
 3          If we look at what Congress did in this
 4  case, it was in the Adam Walsh Act, it was in
 5  response to two years earlier they -- in the
 6  Murder-for-Hire statute, they amended that because
 7  the statute before it said -- and I'm going to go
 8  back to the plain language because the defense had
 9  said Congress didn't intend and yet they never
10  discussed the plain language.  The language is clear
11  when they say "instrumentality of interstate
12  commerce" because the Murder-for-Hire statute used
13  to say "instrumentality in interstate commerce,"
14  that was the language.  And the Seventh Circuit said
15  that included purely intrastate activity including,
16  for example, a personal automobile; that would be
17  used intrastate.  Some courts said no, "in" mean
18  that it had to go across straight lines, but if you
19  used the word "of," "instrumentality of interstate
20  commerce," you are clearly regulating those
21  instrumentalities, and that's what they did in the
22  Murder-for-Hire statute.
23          We cited the cases; *Mandel* have held that
24  cars and cell phones are instrumentalities of
25  interstate commerce.  Once they are classified as

instrumentality of interstate commerce, which phones
and cell phones clearly are under case law under
common sense, then they are under the second prong
of *Lopez*.  And the defense says, well, you have to
show some other commerce.  In other words, they want
to double up commerce.  He says there is no commerce
involved in the use of a facility of interstate
commerce.  I mean commerce is already involved by
being the instrumentality of interstate commerce
under *Lopez* and therefore Congress can regulate it.
There is no necessity -- and the courts have been
clear, at least no court has held -- that in
addition to showing its instrumentality of
interstate commerce, you are going to have to show
some additional use in commerce.  The language is
clear.

          And so then when we look at, for example,
again, if you look at the plain language clearly
Congress intended to apply here, and we look at the
Adam Walsh Act itself as we note in our brief.  The
irony, according to the defense.  Is that in the
Adam Walsh case, six-year-old Adam Walsh was
abducted from a mall in Florida, taken a hundred --
about a hundred miles away when he was found dead
later.  There is no indication a cell phone was ever

1   used in that case, but it was a motor vehicle.

2          So the statute was amended in 2006, the

3   kidnapping statute to give federal jurisdiction

4   where there is the use of an instrumentality of

5   interstate commerce, just like the Murder-for-Hire

6   statute.  So Congress knew what they were doing.

7          And the defense's claim would be that when

8   Congress in enacting the expanding jurisdiction, the

9   federal jurisdiction, under the Federal Kidnapping

10  Act in the Adam Walsh Act, was doing so in a manner

11  that would not give jurisdiction in the Adam Walsh

12  case.  Again, we don't have to go there because we

13  look at the plain language --

14          THE COURT:  You are saying in the Adam Walsh

15  case under the defense theory or argument there

16  would be no jurisdiction.

17          MR. MILLER:  There would be no federal

18  jurisdiction.  It was a purely intrastate use of a

19  personal automobile.

20          THE COURT:  Let me ask this, without -- I'm

21  not meaning to throw you off your argument, but jump

22  ahead for me, tell me what you think the government

23  has to prove assuming I agree with you, that a cell

24  phone is an instrument and then used in furtherance

25  of.  And that's a sufficiency evidence down the

1  road, so we are not addressing that part today.  The

2  car is an instrument.  We are addressing that, then

3  in furtherance of, down the road, right?

4          MR. MILLER:  That's correct, Your Honor.

5          THE COURT:  Okay.  Are they -- can they --

6  are they separate at trial or can they be

7  intertwined?  In other words, can you survive

8  jurisdiction on the cell phone and then be able to

9  argue that the car was used in furtherance of?  Are

10  they separate all the way through?

11          MR. MILLER:  No.  We have to prove an

12  instrumentality of interstate commerce, and prove

13  that that instrumentality of interstate commerce was

14  used.  So we couldn't prove an instrumentality of

15  interstate commerce and then prove something else

16  that was not instrumentality was used in the

17  kidnapping.

18          THE COURT:  Okay.  Related to cell phone

19  that follows, and then related to the car that

20  follows and/or, right?

21          MR. MILLER:  Correct.  Correct, Your Honor.

22          THE COURT:  Okay.

23          MR. MILLER:  The -- I would just comment

24  that it was an interesting discussion on what --

25  arguing that a car is not an instrumentality of

interstate commerce, but the -- that would make the
definition in any case case specific on what
instrumentality of interstate commerce is, because
the defense is arguing it would have to be used in
that specific case in some commercial way.  So some
cars would be facilities of interstate commerce,
other cars wouldn't.  In fact, a car on one day
might be an instrumentality of interstate commerce;
a car on another day wouldn't be an instrumentality
of interstate commerce.  And the law is clear that's
not what Congress intended.  When it's regulated
facilities of interstate commerce; that there are
vehicles; there are cell phones; there are things
like internet; mail; those things are all listed as
facilities of interstate commerce.

THE COURT:  But you do have to admit, don't
you, that as the defense argues and as the facts
appear to be, if a car is an instrument of
interstate commerce, can you regulate it and you
said -- I gave you the stop sign example -- and you
said we don't have to go there because we're not
even close to that; but what stops you at some point
from going there?  Discretion of the specific U.S.
Attorney's Office?

MR. MILLER:  What stops Congress.

1          THE COURT:  What stops Congress from going
2  there?
3          MR. MILLER:  That would be the question,
4  what stops Congress from going there.  The main
5  thing that stops Congress from going there is that
6  there are elected representatives and that they pass
7  laws that they think are good for the county.
8          But certainly there are the -- under
9  *Lopez* -- for example, I think we can say the example
10  they gave under the law about, well, if you murdered
11  somebody using a personal vehicle and Congress had
12  made it a crime to commit murder through use of a
13  facility of interstate commerce, that -- see how
14  ridiculous that would be.  I think Congress could do
15  that.  I don't think they have any intention on
16  doing that.  I think if they made findings through
17  hearings that murder was a federal issue, a federal
18  problem that required federal attention, that under
19  Lopez's second prong that they could have
20  jurisdiction as an instrumentality of interstate
21  commerce.
22          The *Lopez* case was clear; there was no
23  instrumentality of interstate commerce.  In fact,
24  that was a third-prong case, and they found that
25  there was no affect on interstate commerce from the

1  Gun-Free Zone, but if they could -- if they had --
2  there could be separate jurisdiction under the
3  second prong, that is correct.  And I think the
4  limits there are -- that is for another case.  I
5  think that, obviously, that Congress itself has to
6  assess its own ability under the Constitution to
7  enact statutes.  But in this case where we have a
8  traditional, despite -- a traditional federal crime
9  of kidnapping; one that Congress amended the
10  statute, clearly in the Adam Walsh Act just as they
11  amended the Murder-for-Hire statute, to include the
12  use of facilities of interstate commerce that
13  clearly include cars and cell phones.
14          This isn't even a close case, and no court
15  has even found it as a close case.  If this court
16  ruled that Section 1201 was unconstitutional, this
17  would be the first court to do so in the entire
18  country.  And the implication would be to rule, for
19  example, the Murder-for-Hire statute and other
20  statutes as unconstitutional as well.
21          THE COURT:  Okay.  Thank you.
22          Let me ask one more question and it's sort
23  of related, and you don't even have to answer it,
24  but it's just food for thought, I guess.  If I agree
25  with you, and I'm wrong, and at some point,

1  jurisdiction is -- I'm told I'm wrong and there was
2  no jurisdiction and we have gone through all of
3  this, has the government jeopardized any state
4  prosecution or have I?
5          MR. MILLER:  I don't believe so, Your Honor.
6  There is to statute of limitations.
7          THE COURT:  But you have had that
8  conversation?  Maybe you haven't.  It doesn't
9  matter.
10          MR. MILLER:  If you are asking, we are
11  extremely confident that this Court has
12  jurisdiction.  We don't think that it is a close
13  case.  We don't even think that it is an arguable
14  case.
15          THE COURT:  All right.  Thank you.
16          Anything further, Mr. Tucker?
17          MR. TUCKER:  Yes, a brief response, Your
18  Honor.
19          In regard to the point where Mr. Miller said
20  that he believed that Congress could just
21  criminalize any murders that were committed with an
22  automobile involved, I respectfully submit he's
23  completely wrong on that.  The argument that he --
24          THE COURT:  Well, under your theory what
25  stops him from doing so?  If you just said if a car

1  is an instrument, where is the ending?

2      MR. TUCKER:  I'm saying that a car is not an

3  instrument.

4      THE COURT:  I'm sorry.  You are saying a car

5  is not an instrument --

6      MR. TUCKER:  Right.

7      THE COURT:  -- because otherwise Congress

8  could go and do whatever they wanted to do.

9      MR. TUCKER:  What Mr. Miller just argued

10  when you asked him that question, he said, Well, I

11  think they could.

12      I submit that that's totally incorrect.  We

13  know that from *Morrison*.  They specifically said

14  that Congress couldn't criminalize violent sex

15  offenses because it is a violent local crime just on

16  that basis.

17      We also -- the analogy to the

18  Murder-for-Hire statute, that involves pecuniary

19  considerations, and if Congress just wanted to say,

20  we are going to take jurisdiction over all murders

21  on a theory of an automobile, why wouldn't they have

22  just said that?  Why wouldn't they just say that?

23      MR. MILLER:  We didn't say they wanted to.

24  They don't want to, that's why they don't say it.

25      MR. TUCKER:  That statute was meant to

1  address a large part of organized crime.

2  Although --

3          THE COURT:  Let's ask about something that

4  Mr. Miller brought up.  Wasn't Adam Walsh a

5  kidnapping case?

6          MR. TUCKER:  Oh, yes.  I guess.

7          THE COURT:  Would I have jurisdiction --

8  would the court have lost their jurisdiction under

9  your argument?

10          MR. TUCKER:  Would you have jurisdiction?

11          THE COURT:  Would the court in Adam Walsh

12  have jurisdiction under the argument that you have

13  today?

14          MR. TUCKER:  No.  But I think you have to

15  look at this --

16          THE COURT:  Why would Congress do the Adam

17  Walsh Act on a kidnapping fact without meaning it to

18  address that?

19          MR. TUCKER:  Congress did not intend, Your

20  Honor, that that Act was necessarily tied to the

21  facts of the Adam Walsh case.  In fact, the Act is

22  sort of an honorific name of the title of the Act.

23  The Act is called the child -- the Adam Walsh Child

24  Protection and Predatory Act of something of 19 --

25  or 2006, but we also know that because if you look

at the statute at large, which is the official

version of the Act, immediately after the title,

they say an Act in memory of Adam Walsh, and then

there is 17 additional victims.  I think that we --

from all around the country, different cases

involving all sorts of different situations

apparently.  So that Act was not tied to, oh, we are

going to go out and pass legislation that will

address the Adam Walsh Act or the Adam Walsh case.

There is no indication of that whatsoever.  And as I

mentioned that was just honorifically cited to the

statute-at-large cite there.  In fact, I have got it

right here if you would like to see it.  It has 17

victims listed right after -- and Adam Walsh is one

of them.  Not all of them are children.  Some of

them are adults because it has their ages.  I don't

think that argument travels anywhere.

I do want to make sure -- I do have a couple

more things to say.

THE COURT:  Go ahead.

MR. TUCKER:  I cited this case -- we cited

this case in the reply.  It's an opinion that came

down.  I could pass it up to the Court.  I have

extra copies here, but it is an opinion that came

down just a couple of weeks ago on November 20,

1  2018, by the district court in the Eastern district
2  of Michigan.  It's called *Nagarwala*,
3  N-a-g-a-r-w-a-l-a, and I would be happy to pass it
4  up to the Court.
5          THE COURT:  If you have an extra copy, that
6  would be fine.
7          MR. TUCKER:  I do.
8          And there the district court applied the
9  same principles and reasoning that we have argued
10 throughout here, Your Honor, throughout and said
11 that Congress did not have the authority under the
12 Commerce Clause to pass the law that prohibited the
13 mutilation -- sexual mutilations of females, the FGM
14 statute.
15         The objection was that exceeded Congress's
16 power under on the Commerce Clause, and also every
17 principle that we cited and discussed in both briefs
18 are mentioned here, including the relevant cases,
19 and should I pass this up to -- should I hand it to
20 your clerk?
21         THE COURT:  You can hand it to me.  Thank
22 you.
23         MR. TUCKER:  You're welcome.
24         A couple just other brief remarks, Your
25 Honor.

43

1          Nobody is saying that the -- as Mr. Miller
2    said that we are trying to do away with the second
3    prong.  No, the second prong is the second prong,
4    but it involves the regulation of industry such as
5    trucking, railroads.  And more important than that,
6    it involves, as the examples specifically cited --
7    the cases specifically cited as examples in *Lopez* of
8    the second prong both involve commerce.  That's the
9    issue here.  Commerce.

10          Now, we are not saying that you have to --
11   we never said -- the government often makes these
12   arguments for us that we never make, and then answer
13   them themselves.  We are not saying that the second
14   category; if you have commerce that you have to
15   necessarily meet the substantial effect case.  I
16   think probably what you have to meet is the
17   substantial relation case that the use of the second
18   -- or the second substantial relation test -- that
19   the use of the Category Two instrument has to have a
20   substantial relationship to interstate commerce or
21   to commerce in any event.

22          *Mandel*, I want to briefly touch on *Mandel*.
23   The government goes back and says, Well, the Seventh
24   Circuit has held this identical language.  Well, if
25   you look at that *Mandel* opinion, that is an

1  important opinion.  We mentioned that for ourselves.
2          Number one, it interprets the
3  Murder-for-Hire statute, which also already has
4  commerce involved because of the pecuniary
5  consideration.  It also is the statute that has when
6  Congress wanted to say "automobile" or "cell phone,"
7  they specifically said that as part of the -- as
8  meaning a part of an instrumentality of interstate
9  commerce.
10         But more important, Your Honor, if you read
11 *Mandel*, *Mandel* says -- they emphasize twice.  Right
12 at the beginning of the discussion and again that we
13 are deciding this only on a plain error analysis
14 because the defendant never raises below.  And then
15 it goes on to acknowledge, And we acknowledge that
16 the Eleventh Circuit has decided this very issue
17 different, very issue.  And they also cite Judge
18 Becker's dissent in the *Bishop* case, the same
19 principle that, look, automobiles can't be
20 instrumentalities of personal -- of interstate
21 commerce.  Is Congress going to start passing laws
22 you have to wear your seatbelts?  They don't do
23 that.  They go to manufacturers, because
24 manufacturers have to put them on the cars.
25         So it is important to look at that *Mandel*

```
 1  case for what it is, where they specifically say,
 2  essentially, that, well, we are not saying -- we
 3  can't say that it is plain; you didn't raise it; and
 4  we acknowledge that there is other authority there
 5  otherwise.  And we are not saying, as Mr. Miller
 6  said, Well, they are trying to -- no court has ever
 7  said that Section 1201 is unconstitutional.  Nobody
 8  has said that.  Nobody has even implied that in any
 9  way whatsoever.  Most of the Section 1201 is
10  perfectly constitutional.  That is the sort of
11  arguments that sometimes have been made in broad
12  arguments that had no merit.  It is just
13  unconstitutional as applied to a kidnapping not
14  involving any commerce or economic activity.  And
15  it's the same, exact same reasoning that the Court
16  used in the Nagarwala case.  Exactly the same, it's
17  the exact same situation.
18          So, I just wanted to make sure that we make
19  it clear that the government -- when the government
20  tries to broaden these arguments beyond what we are
21  making, that it is not our argument.
22          THE COURT:  Thank you.
23          Mr. Miller, go ahead.  Last word.
24          MR. MILLER:  Just on the Nagarwala case, and
25  I can't imagine we can broaden the argument any
```

broader than it was made, but to the extent that we
did that, I think we put in our written brief why
that argument doesn't succeed.

Nagarwala, just a brief look at this, is a
third-prong case under Lopez.  Whether it
substantially affects interstate commerce has no --
it does not address at all the facility of
interstate commerce, the second prong of Lopez, so
we don't believe that it has any application.

MR. TUCKER:  Can I make one point that I
didn't touch on?

THE COURT:  Yes.

MR. TUCKER:  We kind of got off on the
instrumentality of interstate commerce to answer
their theory, right?  Because they didn't even
challenge the substantial effect test, the third
category.  They didn't even go there.  They just
tried to go the second category.

This is an activities case.  This is no
different.  Kidnapping is an activity.  The
inclusion of that language did not change the fact
that it is an activity.  It is just as much of an
activity as the rape was in Morrison, the possession
of the gun was in Lopez.  So I just want to make
sure that we made that clear.  That is our theory,

it is, but their theory doesn't work.

THE COURT:  You have argued that Congress didn't intend for.  Do you think Congress had the authority to actually set out the statute designed to do it -- to accomplish exactly what the government is saying?  In other words, just use the car, that's an instrument of interstate commerce no matter how it is defined or where it is used; and if you use that, you can commit federal kidnapping?

MR. TUCKER:  Absolutely not, number one.

And number two, Congress knows that. Congress knows that.  We know that from the cases we discussed at the outset.  The *South Dakota v. Doyle* situation.  The use, where, look, we would like to have a national -- you know, drunk driving is a problem across the country.  They made these findings.  So we would like to set up a blood alcohol.  We think that it should be .08 instead of .10.  They knew they couldn't legislate that.  They don't have any authority to do that.  That's the quintessential local concern.  What the government is trying to do is obliterate them.  Obliterate the history of the Constitution and Federalism and each of those four cases we cited, Your Honor, each one of them in rejecting the government's theory relied

1  on federalism, a word that you don't even hear in
2  their response.  Every case.  If you look at all
3  four of those cases.  The government is trying to
4  obliterate.  And the reason that Congress knows that
5  they don't have this plenary authority to call an
6  automobile or a cell phone just not involved in any
7  commerce as an instrumentality and legislate on,
8  that is precisely because of what they did, because
9  they know that they can use the Spending Clause if
10  they do not otherwise have the power.
11          THE COURT:  All right.  Let's take ten
12  minutes and then argue the death penalty issue.
13          (The court took a recess.)
14          THE COURT:  All right.  I do want to have a
15  follow-up that we need to think about I think on the
16  jurisdiction issue.
17          If I find with the government here, what
18  does that do down at jury selection time?  Are we
19  just limited to -- if I made a finding of law in a
20  sense that the instrumentality part has been
21  established, and then it's just argued -- it's just
22  in furtherance of that we are going to address?  So
23  I need you to keep that in mind down the road as
24  well.
25          Go ahead.

49

1      MR. MILLER:  I will just say that I believe
2  that that will just be covered as an element of the
3  offense.  It will be covered by the jury
4  instruction, if I understand the Court's question
5  correctly.
6      THE COURT:  If I find a jurisdiction today
7  saying that a car is an instrument, a cell phone is
8  an instrument, has that then made a finding as to
9  one of the elements as well or are we really going
10 to argue to a jury what you argued today about
11 whether or not and then have them decide again
12 whether it's an instrument?
13     MR. MILLER:  We anticipate asking for a jury
14 instruction that would instruct them an
15 instrumentality of interstate commerce is an
16 automobile and a cellular telephone, that is
17 consistent with other, for example, a controlled
18 substance; that someone could argue something is not
19 a controlled substance, but at trial, as a matter of
20 law, the Court instructs that a controlled
21 substance -- cocaine is a controlled substance.
22     So we believe the law is clear on that; that
23 would be our position is that the jury would be
24 instructed that they wouldn't make that
25 determination.  Otherwise, we would have a mini

1  trial over that issue.

2        THE COURT:  All right.  Anything on that?

3  Otherwise I'm just presenting this as something to

4  anticipate if that's where we end up.

5        Okay.  Now are you getting up to address my

6  question or are we going to start on the --

7        MR. TUCKER:  I was going to start on the

8  other one, but I will do whatever you want.

9        THE COURT:  I'm ready to start on the other

10  one.  Thank you.

11        MR. TUCKER:  Your Honor, the next motion,

12  the Tenth Amendment Federalism Motion.

13        Of course, we made it clear we don't believe

14  there is jurisdiction, but it assumes that there is

15  jurisdiction just for the purposes of arguing.  And

16  basically, the import of that motion is that the

17  Court should not -- should strike the death penalty

18  based on a weighing of the interest here.

19        I will say this, we made a couple of

20  arguments in the motion concerning any commandeering

21  arguments.  We agreed with the government that one

22  of them is not right, and the other one I don't

23  think we are ready to proceed on at this point.  We

24  just want to proceed and talk about the weighing of

25  the interest argument; that the instruments here or

1  the interest of the two parties are so
2  overwhelmingly out of whack here that the interest
3  being essentially life without parole versus the
4  death penalty, that the Court should strike that.
5         So let me start with just a couple of --
6  under the Tenth Amendment, basically what we are
7  saying is if we don't prevail completely on the
8  Commerce Clause argument that the Tenth Amendment
9  they cannot proceed would bar that.  I mean many of
10  the same principles are in play here, Your Honor.
11  And if I can just repeat a couple of them.
12         As background here the Court has repeatedly
13  emphasized the role and the importance of dual
14  sovereignty and the constitutional compact between
15  the state and federal governments; that the federal
16  government's powers are few and defined; that the
17  police power is assigned to the state; that the
18  states are generally the parties responsible for
19  enforcing violent crime or felonies in general; and
20  also the power of Congress under the Commerce Clause
21  is one, a degree.  It is a judicial function for the
22  Court to make that determination.
23         Now, basically what we have argued here is
24  that if you look at the interest of the defendant in
25  this case or the interest of the state in which the

defendant can assert versus the federal government,
that they are so overwhelmingly in favor of the
state here being the party to proceed that you
should at least strike the death penalty.  What are
the federal government's interest here?  We will
start with that.

The federal government's interest, Your
Honor:  First of all, this case does not involve a
case involving traditional unique interest of the
federal government.  It simply does not.
Kidnapping, as we also said, is punished severely by
every other state.  A kidnapping murder is punished
by life without parole in this state.  There is
nothing unique about the federal interest in this
case.

Now there are many statutes, federal
statutes, of course, and most of them do invoke the
very unique federal interest, for instances, crimes,
violent crimes under executive officials or members
of Congress or any type of crime within the special
maritime, territorial jurisdiction of the United
States, territorial crimes, terrorist crimes,
espionage, treasons.  There is a whole host of these
and this is not just us.  In the *Bond* case, the
chief justice pointed this out.  The chief justice

said the federal government undoubtedly has a
substantial interest in enforcing criminal laws
against the assassination, terrorism, and acts with
the potential to cause mass suffering.  Those crimes
are not traditionally left to -- predominantly to
the state.  There the crime was predominantly left
to the state.

THE COURT:  Mr. Tucker, every day in this
district, Mr. Miller, Mr. Freres, and Mr. Taseff,
and Miss Pollock try guns and drug cases that could
be tried in state court and they are tried -- from
the same jury pools that are tried from the state
courts; what's the difference here?

MR. TUCKER:  Well, I think most of the
firearm cases are not simply -- they are related to,
you know, for instance, *Lopez*.

THE COURT:  I get that, but they could be
tried in state court.

MR. TUCKER:  It's not a matter of could be
in our view.  It's a matter of what is a crime in
weighing the interest here.  On the government's
side, the federal side, the federal interest is not
one -- there are certain interests of the federal
government that are uniquely pretty much considered
within the federal government's sphere.  There are

1  others that are within both governments here, right?
2  There are a lot of them.  And then there are others,
3  which we say -- this is one of them which is not
4  within the federal government's sphere at all.

5        But in weighing the first thing to look at
6  and argue is that -- in the weighing as far as the
7  federal government's interest, Your Honor, is that
8  this is not one of those offenses that is uniquely
9  assigned, traditionally been considered as uniquely
10  assigned to the federal government.  That's number
11  one.

12        Second, in weighing what is the federal
13  government's interest here, well -- and of course
14  this argument proceeds on the assumption that we
15  have not prevailed on the Commerce Clause argument.
16  But at best, Your Honor, and argue the government's
17  Commerce Clause theory at best, and we don't believe
18  it even meets this line at all, but at best its
19  marginal.  At best it is marginal.  Involves no
20  traditional economic or commercial activity.  It
21  just -- it involves a very, very strained theory
22  about personal cars and cell phones; we can just
23  legislate anything that we want.  Even now it
24  involves the government telling us Congress just
25  prohibit all or legislate all murders if the car is

 1  involved at all.

 2          So it's a strained theory.  Even if the

 3  Court were to accept it, it seems to be a very

 4  minimal interest of the government in this case;

 5  that's second.

 6          Third interest of the government is, and

 7  there was a little back and forth about this, and we

 8  didn't really get back up and respond, although

 9  perhaps we should have, but the interest of the

10  government seems to be here its attempt to obtain

11  the death penalty rather than a sentence of life

12  without parole; that sentence is available in the

13  state court; that Mr. Miller got up and first thing

14  he said was he made an issue very strongly, well, we

15  don't know what their thinking is on this.  Well, we

16  believe we do know.  And we can come to the bench

17  and tell Your Honor here why we make that statement.

18  That is what the government's interest apparently

19  is, is they -- and we know this from discussions

20  with the government that -- not that they have said

21  that's our interest out and out -- but we can back

22  up our statement, but we would need to do that at

23  the bench.

24          THE COURT:  Does that go to your argument as

25  to the interest balancing; is that what you are

1   saying?

2           MR. TUCKER:  Yes.  We come back to that.

3           MR. MILLER:  Are we going to approach so

4   that we can --

5           THE COURT:  Sure.  Let's go in chambers.

6            (In Camera Hearing held and not

7             transcribed without Court order.)

8                        *****

9           (The following proceedings were held in open

10           court with all parties present.)

11          THE COURT:  All right.  Let's resume.  Thank

12  you.

13          All right.  Mr. Tucker, it's all yours.

14  Back to business.

15          MR. TUCKER:  Thank, you, Your Honor.

16          So anyway, the federal interests, basically,

17  we believe are fairly minimal, three interests that

18  we have cited; the lack of a uniquely federal

19  interest present in many statutes; the, at best,

20  very marginal Commerce Clause argument; and then

21  just the marginal, perhaps the difference -- their

22  interest seems to be for reasons that we -- from our

23  view -- seeking the death penalty rather than a

24  sentence of life without parole, which would not

25  only be available in Illinois but basically under

1  the same procedures.

2       The state's interest, we would submit, are

3  far, far outweighed as indicated by -- and I will

4  get back to this in a little bit, the political

5  processes of the state -- but Illinois, rescinding

6  the death penalty, they have a strong interest as

7  all states do in the protection of the lives of

8  their citizens, no matter who those citizens are.

9  They have a very strong interest in that.

10      Illinois abolished the death penalty in

11 large part because of all of the problems that

12 surfaced.  I think we cite for about 15 or 20 pages

13 the cases of the innocent people being convicted,

14 problems with the system that really reflected a

15 lack of public confidence in the administration of

16 death penalty in Illinois.  Now government can say,

17 well, this is the federal government.  But the most

18 average citizens aren't going to pick up on that

19 difference.

20      And so the State of Illinois does have an

21 interest in public confidence in the judicial

22 system.  It has an interest in protecting vulnerable

23 groups.  And the defendant in a death penalty case

24 is very vulnerable.  It is not only the obvious, his

25 life is at stake, but just the problems that have

1  surfaced; racial discrimination or racial disparity,
2  I should say, is more accurate; gender disparity;
3  geographic disparity.  So the state has an interest
4  in that.
5          They also have an interest, Your Honor, in
6  protecting the psychological welfare of its citizens
7  who are asked to come in here and decide whether
8  another human being lives or dies.  Now we cited
9  several studies that have been of capital jurors at
10  a later time -- even though they went through the
11  qualification process and qualified, how that
12  decision weighed heavily on them for years.  Some of
13  them required psychological treatment.  Illinois has
14  an interest in protecting its citizens from having
15  to do that.
16          It also has an interest in that every one of
17  its citizens be allowed to participate as jurors.
18  Here we are going to exclude -- probably the issues
19  will come up -- but a substantial number of the
20  citizens of this state have moral or religious or
21  conscientious objection to the death penalty and
22  they are not going to be allowed to sit in this
23  case.  Illinois has an interest in its citizens not
24  being excluded from the processes to whether another
25  of its citizen lives or dies because of their

feelings because of the death penalty.

They also have an interest in its resources,
I'll say.  And its resources are being used to a
large extent in this prosecution, not being used to
further a policy that this state's political policy
or whatever has rejected.  It has been rejected, but
Illinois' resources will be used in this case.

And it just has an interest as a respected
equal sovereign under the Constitution.  So those
are all strong interests.

The federal government's interest are very
marginal.  Every one of them.  And so, for that
reason, we submit that the Court should strike the
death penalty here.

Just because under the Tenth Amendment, you
are essentially -- if you allow this to go forward
under these circumstances, and the death penalty --
what does the Tenth Amendment really mean?  We have
all of this language in case after case.  Now this
has come up a couple times with the Supreme Court;
what the Supreme Court has done in talking about the
importance of federalism, federal state
relationships, interpreting statutes in such a
manner that don't infringe upon federal-state
relationships and interests as a sovereign; what

they have done is say this would raise significant,
significant issues under the Tenth Amendment.  And
so they just interpreted the statute basically in
*Jones* and *Bond* to avoid it.  Say, no, we are not
going to interpret this the way you want, as broadly
as you want, because this would clearly present
significant Tenth Amendment issues.

The Court is repeatedly in all four of the
cases that we have cited, have repeatedly the same
thing; talking about the importance of federalism.

Now the government comes in and says what
about the Supremacy Clause?  The Supremacy Clause,
that doesn't come into play, Your Honor.  If it is a
violation of the Tenth Amendment, then the Supremacy
Clause doesn't apply; that only applies if in fact
the underlying federal law is the Constitution.  If
it is not, that was decided directly in *Printz.*  It
would be circular.  The very first part of the
Supremacy Clause talks about federal laws passed in
pursuance of the Constitution.  A law that is
unconstitutional that is not in pursuance of the
Constitution; that federal government made that
issue in *Printz* and it was rejected for that very
specific reason.

The government says, Well, these arguments

have been rejected in four cases they cite.  None of
which are these arguments.  Every one of them are
different arguments.  Most of them are based on --
first of all, the Puerto Rico case doesn't even
apply because Puerto Rico is not a sovereign under
the Constitution.  But the other three -- three or
maybe four cases, each one of them involve broad
claims that the federal government simply cannot
seek the death penalty because the state is
abolished.  That's not our argument.  That's not our
argument.  We never made that argument.  That's the
argument that was made in these other three district
court cases -- maybe there are four -- that they
came in, so states abolished it so you can never
seek the death penalty under the Eighth Amendment.
And some of them said under the Tenth Amendment.  It
doesn't make any difference.  That's not our
argument here.  We are not saying that the federal
government cannot go into an abolitionist state --
can never go into an abolitionist state and seek the
death penalty.  What they can't do, our position is
that you cannot totally just write off, we don't
care what the state has to say.  And where their
interests are very marginal, very marginal, not
trying to -- not having a uniquely federal interest

 1  there, trying to satisfy, not having a very marginal
 2  claim of jurisdiction, at best, where their
 3  interests are very marginal, they cannot go in and
 4  seek the death penalty where the state has strong
 5  interest that outweigh that; that's our argument.
 6        The government, Your Honor, also they
 7  completely, completely dismiss the importance of the
 8  state's political process.  They don't care.  They
 9  said so what.  That's basically what they say; it
10  has nothing to do with anything.  They don't even
11  mention the word federalism in their reply.
12        If you look at, for instance, the Supreme
13  Court's decision in *Windsor*, which was the defense
14  of Mary Jack case, where the state of New York had a
15  conflict with the federal government and they ruled
16  that the -- throughout the federal government, and
17  one of the major things that was talked about in the
18  case was the importance of the state's political
19  process.  In fact, I think Justice Kennedy said
20  that's the starting point in the analysis; we have
21  to give importance to that.  We don't just ignore
22  it.
23        In fact, Chief Justice Roberts said the same
24  thing in *Bond*.  He said, quote, Here -- and this
25  applies right here -- Here in its zeal to prosecute

 1  *Bond*, the federal government has, quote, displaced
 2  the public policy of the Commonwealth of
 3  Pennsylvania enacted in its capacity as a sovereign.
 4          That's what is going on here; it is zeal in
 5  our view to seek the death penalty.  The federal
 6  government with a very marginal interest, no unique
 7  interest is coming in and seeking the death penalty
 8  and totally disregarding the judgment and the
 9  interest of the State of Illinois.  We submit that
10  there are limits to that and it's the Tenth
11  Amendment that is that limit and if that amendment
12  means anything, this is the case.
13          THE COURT:  Thank you.
14          Mr. Miller.
15          MR. MILLER:  I'm sure the Court is aware
16  from the briefing no court has held the Federal
17  Death Penalty Act to be unconstitutional.  Certainly
18  no court has held it to be unconstitutional under
19  the Tenth Amendment, so the defense is asking this
20  court to be the first.
21          As we noted in our reply not only do we
22  believe that the anti-commandeering argument is not
23  right, to which the defense does agree in the reply,
24  the interest of the federal government in this
25  case -- there is several state cases that address

1  this argument have said those are going to be

2  developed at trial, and, therefore, the argument is

3  not ripe, otherwise the Court would be rendering an

4  advisory opinion at this time.  But even taking the

5  defendant on the facts that they have thrown forward

6  at this point, the Federal Death Penalty Act does

7  not violate the Tenth Amendment.

8          The Tenth Amendment states the powers not

9  delegated to the United States by the Constitution

10 are those that are reserved to the state.  And if

11 the defense means what they say, which is, for the

12 purpose of this argument, to admit the

13 constitutionality of the statute under the Commerce

14 Clause, then this power has been delegated to the

15 federal government by the Constitution.  Under the

16 Commerce Clause, the Court may regulate interstate

17 commerce; that includes instrumentality of

18 interstate commerce.  We've already made that

19 argument.  Assuming the Court accepts that argument,

20 then the Tenth Amendment does not apply because

21 these are not powers that are reserved to the state.

22 And once the United States can criminalize activity

23 and also Congress can set the punishment for that

24 activity.  I don't think that's a remarkable

25 principle in citing *Estrada*; and also under the

 1 necessary and proper clause of the United States
 2 Constitution, Congress can set those penalties.  And
 3 certainly one of those penalties that may be set in
 4 a case, and this is briefed elsewhere, is the
 5 sentence of death; that is what *Gregg* says, that's
 6 what *Glossip* says.  So quite simply based on that,
 7 the Defendant's Tenth Amendment argument has to
 8 fail, but as we also note in there, his argument is
 9 also contrary to the Supremacy Clause and the
10 Sovereignty Doctrine.  The State of Illinois is
11 certainly entitled to criminalize the activities it
12 believes is appropriate and set the punishment for
13 those activities.  To suggest that because the
14 federal government also can criminalize things
15 within its power and set the punishment for that,
16 that we are somehow ignoring the state, is not
17 correct.  The state -- Congress does not consider
18 when it passes federal law whether we are going to
19 have the death penalty in this state because this
20 state has it, but we are not going to have in this
21 case.  Federal law applies uniformly.
22        The defendant's approach would require
23 federal law to apply differently depending on the
24 decisions of state legislatures and that's what the
25 Supremacy Clause says cannot happen.  It is clear.

 1  It shall be the supreme law of the land, federal
 2  law.  Judges are bound to anything in the
 3  Constitution or the laws of the states
 4  notwithstanding.  Thus, it's really that clear that
 5  the defendant's Tenth Amendment argument fails
 6  because if the Commerce Clause jurisdiction applies,
 7  and we believe it clearly does, then Congress has
 8  its power and this is not a power that is reserved
 9  to the states by the Tenth Amendment.
10          In fact, this balancing test that the
11  defendant really focuses on is no where -- there is
12  no juris prudence for this.  It is sort of a test
13  that the defense made up under Tenth Amendment law.
14  It's a novel argument; the idea that there are laws
15  that the federal government can pass; that they can
16  constitutionally pass and have jurisdiction for, but
17  if those laws aren't -- the federal government has
18  as strong interest as a state's, then the state's
19  interest take precedent.  The Supremacy Clause says
20  that's not the case.  If there is a federal law that
21  is validly passed, it is supreme into state law.
22          I will comment briefly, although we don't
23  believe that's part of the analysis, when the
24  defendant kept talking about the interest of
25  Illinois and having some jurors not -- if I

understood the argument correctly -- they have an
interest of having some jurors not serve as jurors
because of the affect on them, but they also have an
interest in having jurors who were against the death
penalty serve because they have an interest in
having those people on the jury, which sounds a lot
like the interest of Illinois that the defense is
saying are really the interests of Brendt
Christensen.

       The interest that the defense didn't state
were the interests of Yingying Zhang, the interest
of her family.  In fact if that is true, the defense
is true, Illinois has no interest in those; I think
that explains why we are in federal court.  We have
a Chinese national, not an Illinois citizen, who is
alleged to have been kidnapped and killed.  And to
suggest that the federal government -- a visiting
Chinese scholar here, that the federal government
doesn't have any interest at all in protecting the
lives of people who might come from foreign
countries to visit the United States; that we don't
have any interest in that; Illinois has more of an
interest in Brendt Christensen not having to face
the legal penalty for his crime than in protecting
the life of Yingying Zhang suggests this case is

1  precisely where it should be, which is in federal
2  court.

3          Perhaps -- because again the balancing test
4  we don't believe even applies here, I'm not aware
5  that the defense has argued that the defendant is
6  going to get life without parole in the state
7  system.  At least my experience has been that's not
8  necessarily the case.  Under the federal system --
9  so take the death penalty out of the equation here.
10 The defendant here faces, if convicted, a minimum
11 sentence of life without imprisonment.  We don't
12 believe that is the sentence that the defendant
13 would face in state court.  It may be a possibility.
14 I don't even know that that is a possibility.  I
15 don't think that it's a mandatory.  I'm not even
16 sure that it is a probability.  It's not clear that
17 that argument weighs in favor of the balancing test
18 that really doesn't apply either.

19          And there was also the discussion of the
20 problems with the death penalty, innocents being
21 convicted.  None of that goes to the penalty.  That
22 simply goes to -- with someone is the process, the
23 due process.  Illinois certainly has an interest in
24 making sure that innocent people are not convicted.
25 The United States government certainly has an

1   interest in innocent people not being convicted.  So

2   that really has no bearing on the balancing test

3   which, again, we don't believe even applies here.

4        The federal government has authority under

5   the Commerce Clause to amend the kidnapping statute

6   as it has.  It has authority to set the punishment

7   for that statute.  Illinois law under the Supremacy

8   Clause cannot frustrate federal law and therefore

9   the Tenth Amendment argument fails.

10        THE COURT:  Thank you.

11        Mr. Tucker, last word.

12        MR. TUCKER:  Briefly.  First of all, you

13  wouldn't have to be the first judge to declare the

14  Federal Death Penalty Act unconstitutional because

15  nobody is asking you to do that.  That's not the

16  issue.  The issue is whether it is as applied in

17  this particular case, given the minimal interest we

18  believe of the federal government, in relation to

19  the state's interest.  So nobody is asking for that

20  remedy at all.

21        Mr. Miller said, well, federal law is

22  applied differently based on state legislature.

23  Well, we know that happens every day.  You sentence

24  people all the time, for instance, for a crime of

25  violence and whether a state has defined a burglary.

1  For instance, there was a Supreme Court case decided
2  two days ago on that depending on how the state
3  defines its burglary statute or elements of the
4  offense.  It happens all the time.  So that's not
5  the issue here.
6          And as far as the weighing, I would just
7  note, Your Honor, that in *Printz*, if you look at
8  *Printz* at 932, the government argued that there
9  should be a weighing of interest.  They didn't
10 prevail on the weighing part, but they argued --
11 that was the *Brady* case, where there was a
12 requirement that the state do certain things to
13 enforce the Brady Bill.  And the government argued
14 at 932, the Brady Act serves important purposes, is
15 mostly administered by CLOs and places of minimum
16 and only temporary burden on state offices.  So they
17 argued the same thing, as far as that was a Tenth
18 Amendment case applying where they attempted to
19 prevail by arguing that it is proper to weigh the
20 interest.  That's all that I have.
21          THE COURT:  All right.  Thank you.
22          What I intend to do today is then have a
23 discussion or argument as to the 12 -- to disclosure
24 issues so that we can get some framework for that
25 given where we are at this stage, and then I thought

1  we might just take a few minute break.  I don't
2  intend to rule from the bench by any means at all,
3  but I think some indication from me as to where I
4  think we are ahead of Monday would be appropriate,
5  okay?
6       So with that in mind -- let's get right to
7  the points on the 12.2s.  You guys have briefed
8  these.
9       It appears -- and Miss Brain, why don't you
10 set forth for us please, if you would, the defense's
11 position.  And in response to the government's
12 position, and specific as to the government's
13 position, let's address that firewall issue that was
14 raised as well, okay?
15      MS. BRAIN:  Yes.  Absolutely, Your Honor.
16      THE COURT:  Because as I'm understanding
17 that from my case law -- my reading of case law is
18 that the firewall has generally been allowed when
19 parties have consented.  And so I want to address
20 that in the case there is no consent here.  Okay.
21 Go ahead.
22      MS. BRAIN:  Yes, Your Honor.  I would like
23 to note, I would like the opportunity to file a
24 written response to the government's pleadings,
25 because some of these issues require getting into

1  the weeds of some case law, and I probably would be

2  better at that in writing, but I will do my best

3  anyway here.

4        THE COURT:  Okay.  And then with that in

5  mind then we will see if we can just reach some

6  framework here to work with that, okay?

7        MS. BRAIN:  Perhaps then it might be useful

8  for me to say I think that there are six issues that

9  the Court needs to address.

10        The first one is the firewall counsel.

11        The second one is the scope of the proposed

12  examination and the notice that is required to be

13  provided about that scope.

14        Then there is the issue of the timing of the

15  government evaluation.

16        The issue of whether the defense counsel can

17  be present during that evaluation.

18        Whether we can be compelled to disclose

19  names and reports of experts that we have retained

20  but whose testimony we won't be presenting.

21        And whether the government can issue

22  subpoenas for our client's mental health records.

23        THE COURT:  When you say names of experts or

24  testimony that you "won't" be presenting?

25        MS. BRAIN:  "Won't" be presenting, right.

1            THE COURT:  What was the last one?

2            MS. BRAIN:  Whether the government can issue

3    subpoenas for our client's mental health records

4    from third parties.

5            THE COURT:  Okay.

6            MS. BRAIN:  As the Court requested I will

7    address the firewall issue.

8            So in parts of the government's motion they

9    rely heavily on Rule 12.2, and then when it comes to

10   the request for firewall counsel, they ask the Court

11   to completely disregard their comments of Rule 12.2.

12           There is only one case cited in their

13   pleading in which the Court has appointed firewall

14   counsel over the defense's objection and that was

15   the case of *Watts* in the Southern District of

16   Illinois.  In contrast, there are at least four

17   cases in which the courts have refused the

18   government's request for firewall counsel where the

19   defendant has not agreed to waive 12.2, which

20   obviously we are not doing here; and that is *Roof* in

21   South Carolina; *Ciancia* in California; *Richardson* in

22   Georgia; and *O'Reilly* in Michigan.  All of those

23   cases are in our pleadings.

24           And the remainder of the cases addressed

25   firewall issues, as the Court correctly notes, are

1  cases in which the defense -- either the defense has
2  requested firewall counsel or they have consented.
3  And that kind of covered the field.
4          The minority position --
5          THE COURT:  Let's see if we can clear this
6  up.  Who is going to argue this for the government?
7          MR. NELSON:  I will, Your Honor.
8          THE COURT:  Is your position going to be
9  that I can or I should or you are going to request
10 firewall counsel if there is no consent?
11         MR. NELSON:  Yes, Your Honor.
12         THE COURT:  Okay.  Go ahead.
13         MS. BRAIN:  The Court is not free to
14 disregard a Federal Rule of Criminal Procedure, as
15 the government is asking it to do.  These rules are
16 promulgated by the Supreme Court, approved by
17 Congress pursuant to the Rules Enabling Act, which
18 is 20 -- U.S.C. 2072.  Rule 1 of the rules
19 themselves say plainly, These rules govern procedure
20 in all criminal proceedings.
21         The Supreme Court held in *Bank of Nova*
22 *Scotia v. United States* with respect to Rule 52,
23 that the Rule in every pertinent respect is as
24 binding any statute duly enacted by Congress and the
25 federal courts have no more discretion to disregard

1    the rules mandate than they do to disregard a

2    constitutional or statutory provision.

3          We also point the Court to the opinion of

4    the Eighth Circuit in *United States v. Whitted*,

5    which is basically to the same effect; Federal Rules

6    of Criminal Procedure set forth the procedures to be

7    followed by the district court in conducting

8    criminal trials.  They have the force and effect of

9    law and are binding on the lower federal courts.

10         And so the Court is bound to deny the

11   government's request in the absence of the defense

12   waiving the application of the Rule; and as we

13   stated, we are not willing to waive that rule.

14         THE COURT:  Okay.

15         MS. BRAIN:  I would like to say that the

16   government's motion states that their request

17   mirrors the procedures that were granted in *Watts*.

18   This is really not the case.  As mentioned, they did

19   -- the court in *Watts* did order the appointment of

20   firewall counsel over objection, but that is really

21   where the similarities between what happened in

22   *Watts* and the government's request differ.

23         The court in *Watts* didn't require exposure

24   to expert reports and materials prior to the

25   government's rebuttal of evaluation, which is what

you are asking here.  The Court denied the
government's request for access to the defense
materials months and months before trial, which is
what they are asking here.  And it says nothing
about the scope of the evaluation that was ordered
there, because they went -- the Court wasn't asked
to rule on any of those issues.

So we can gain insight into what the Court
might have done if it had been asked because before
they addressed the penalty phase issues, the Court
in *Watts* addressed the government's rebuttal and
examination on an *Atkins* issue.  And in this case,
the opinion was filed June 28, 2016.  It
specifically quoted language of *Buchanan* and
*Cheever*, that the government's evaluation was to be
limited to a limited rebuttal purpose.  It also
cited *Power v. Texas* noting the Supreme Court held
in that case defendant --

THE COURT:  And a limited meaning to what in
your case, the psychotic -- the schizophrenia and
the psychotic disorder?

MS. BRAIN:  There is a number of different
limitations that we want, but, yes, limited to the
-- addressing the issue of the Schizophrenia
Spectrum Disorder, just as in *Watts* the court

 1  limited it to the issue of the client's intellectual

 2  disability.

 3          And so it held in *Watts* the sole purpose of

 4  the testing was to be to determine if the defendant

 5  was or was not intellectually disabled, and the

 6  expert's testing must be limited to testing

 7  inquiries relevant to that determination, and the

 8  expert may not administer the MMPI personality test

 9  unless he provided an affidavit setting forth why he

10  believed that was relevant to an assessment of

11  intellectual disability.

12          So the opinion in *Watts* when he was asked to

13  address the issues that we are asking this Court to

14  address came out very much in line with what we are

15  asking for here.

16          With respect to scope, it really comes as

17  two questions.  One is the notice that's required,

18  what notice we are entitled to about what the

19  defense -- the government proposes to do before they

20  do it.  And also what is the actual permissible

21  scope of an evaluation in this content.

22          The government's position is that they don't

23  have to give us any notice whatsoever, and they can

24  do whatever it is they choose to do.  This argument

25  is foreclosed by both the Fifth and Sixth Amendments

and is completely contradictory to the vast majority
of what district courts have done in this situation.

THE COURT:  How do I limit scope until
you've identified exactly where you're going?

MS. BRAIN:  In the ways we described in the
motion, Your Honor.  First, it's going to be limited
to answering the question of does Mr. Christensen
have or does he not have a disorder on the
Schizophrenia Spectrum.

THE COURT:  All right.

MS. BRAIN:  So they don't get to say --

THE COURT:  So you think at this point you
framed it sufficiently that there can be -- I can
limit the government's scope to the framework that
you have set out.

MS. BRAIN:  Yes.

THE COURT:  Because that's all that your
expert is going to exam Mr. Christensen on.

MS. BRAIN:  Yes.

THE COURT:  Okay.

MS. BRAIN:  Our experts have a different
role.  Our experts have to do the diagnosis and the
evaluation sort of ab initio.  To figure out what is
going on they have to look at the history, they have
to decide what diagnosis is appropriate.  Once we

1 have done that and once we have disclosed that, the

2 government's evaluation is limited.  It is limited

3 to rebutting what we -- what our evidence says.

4 They don't get to start all over and like do a brand

5 new diagnosis and look wherever they want to come up

6 with some other potential motive or explanation for

7 the defendant's actions; that's what the court in

8 *Williams*, the Hawaii case, explained so very well.

9        The government there argued much as they do

10 here that in order to do a diagnosis, they need to

11 be able to go as far and wide as they choose and to

12 look into any topic they choose in order to come up

13 with the diagnosis.  And the Court said, Well if

14 that was your job, if as the government you were

15 supposed to be coming up with a new diagnosis, then,

16 yeah, I might agree, but it is not; it's limited to

17 rebuttal.  And so, you don't get to go far and wide

18 and get to cabin your evaluation for the limited

19 rebuttal purposes, the language of *Buchanan* and

20 *Cheever*, and that's what they are limited to do.

21        THE COURT:  Okay.

22        MS. BRAIN:  Then the request for, you know,

23 carte blanche to go into any diagnosis at all is

24 also unsupported by clinical standards.  The

25 government claims that it is clinically required for

1  them to be able to ask anything and everything;
2  that's not true.  The way that they described the
3  differential diagnosis in the DSM-5 is just not how
4  it works.  The clinician doesn't go through every
5  diagnostic criterion for every potential
6  differential diagnosis in order to come up with the
7  diagnosis.  If they did that, they would be there
8  for a week, and that's just not what they do.
9         THE COURT:  Tell me about the timing.  The
10  timing of what you believe the government's
11  evaluation should be.
12         MS. BRAIN:  Yes, Your Honor.  Our position
13  is that it should be -- it should not occur until
14  after a verdict of guilt has been entered, if indeed
15  one is entered.  We recognize that it is a minority
16  position.  We're relying principally on the decision
17  of Judge Weinstein in *Taveras* in the Eastern
18  District of New York, where he decided to follow
19  that procedure in order to reduce unnecessary
20  litigation and also to avoid the possibility of
21  premature disclosure of the government's expert
22  report to the government inadvertently, and then the
23  enormous amount of litigation that would follow if
24  there was some suspicion of that had happened.  And
25  so -- and the Court said, you know, I don't see this

 1  is going to cause any kind of unnecessary delay.
 2  And he was right; it didn't.  They got a guilt
 3  verdict and then as scheduled the sentencing began
 4  eight days later.
 5          THE COURT:  How many days later?
 6          MS. BRAIN:  Eight, just as the Court had
 7  ordered.
 8          So that's our position that it would not
 9  cause any delay, and it avoids other problems.
10          THE COURT:  All right.  Go on to the next
11  one then.
12          You want the defense to be present, present
13  at the evaluation?
14          MS. BRAIN:  Yes, Your Honor.
15          THE COURT:  And what do you see the purpose
16  of that being?
17          MS. BRAIN:  It's particularly important in
18  this case, Your Honor, because of a related argument
19  that there are a number of areas of inquiry that the
20  government's expert should be prevented from going
21  into.  I'm talking about aggravating circumstances,
22  questions about the crime, so on and so forth.  Our
23  experts aren't talking about that, don't find that
24  relevant to their evaluations, so there is nothing
25  to rebut.  So the government shouldn't be --

1          THE COURT:  They won't know that.  The

2    government doesn't know that when they are

3    evaluating, right, because in your framework they

4    haven't seen your expert's examination.

5          MS. BRAIN:  True.  But we can absolutely

6    represent that there are no questions that will be

7    asked by any of our experts --

8          THE COURT:  So what happens if you think

9    they are going out of bounds?  You just shut it

10   down?

11         MS. BRAIN:  No, no.  I think we would simply

12   say we are not answering that question.

13         THE COURT:  If there was firewall counsel,

14   the two of you could argue about it and maybe

15   resolve it.

16         MS. BRAIN:  If -- well, but -- we wouldn't

17   resolve it, right?  What we are asking is specific

18   areas to be excluded.

19         THE COURT:  Okay.

20         MS. BRAIN:  And if the Court agrees with

21   that and grants our motion then there is nothing to

22   resolve, which is simply making sure that the

23   Court's order and the procedures adopted are adhered

24   to.

25         THE COURT:  Okay.

1          MS. BRAIN:  I don't necessarily anticipate
2    that will happen and certainly not in a great number
3    of questions.  It's not like a deposition that we
4    are imagining.  It would be outside of the line of
5    sight for -- the client would be completely silent,
6    unless it is absolutely necessary.  And we recognize
7    clearly there is no constitutional requirement that
8    we be present, but at the same time the Court has
9    discretion to order it.
10          And because of the issues that are present
11    in this case, because of the limitations that we are
12    asking the Court to impose, we submit that it be
13    particularly inappropriate in this case.
14          THE COURT:  Okay.
15          MS. BRAIN:  And there is no -- the
16    government doesn't cite any medical or scientific
17    support for its position that it's lower than
18    clinical standard and completely wrecks the
19    reliability of the examination, and there isn't any;
20    moreover, professional organizations in psychology,
21    psychiatry, neuropsychology so on, all recognize the
22    fact that there are certain circumstances under
23    which it is appropriate to have a third-party
24    observer present, and I can cite the court to all of
25    those in those papers and practice guidelines.

1          THE COURT:  And then you want something
2    about naming the -- or the names of the witnesses
3    that you won't or the examiners that you won't be
4    presenting.  So if I understand this right, if you
5    decide not to present certain witnesses, do you
6    think the government wants to know who that is?
7          MS. BRAIN:  Apparently, yes, that's what's
8    in their response.
9          THE COURT:  Who would that be?  Who do you
10   understand that to be?
11         MS. BRAIN:  Any experts that we have
12   retained that have interviewed Mr. Christensen that
13   we ultimately decide not to present.
14         THE COURT:  And then clearly you don't want
15   the government to be able to subpoena them.
16         MS. BRAIN:  No, absolutely not.
17         THE COURT:  So those are your last two
18   points.
19         So tell me how you see the expert situation
20   as it pertains to the guilt phase playing out.
21   Because you have said, am I right, that there is not
22   going to be any mental health issues addressed at
23   the trial phase?
24         MS. BRAIN:  That's correct, Your Honor.  We
25   have made no notice of guilt phase.

1          THE COURT:  And as far as you know at this
2   point don't intend to?
3          MS. BRAIN:  Absolutely.  That's correct.
4          THE COURT:  So at the guilt phase, tell me
5   how you see experts from both sides being laid out.
6          MS. BRAIN:  I don't think --
7          THE COURT:  In other words, when does your
8   expert, your expert can examine the defendant any
9   time he or she wants to?
10          MS. BRAIN:  Yes.
11          THE COURT:  And then are you -- you will
12   receive that report?
13          MS. BRAIN:  Yes.
14          THE COURT:  And you are not -- you don't
15   feel like you don't have to disclose it until you
16   have actually disclosed the expert, that you will
17   use that expert.
18          MS. BRAIN:  We don't disclose until there is
19   -- a verdict of guilt has been entered and we --
20   after 24 hours, or something reasonable, we reaffirm
21   our intention to present mental health evidence, and
22   we get disclosure of the government's report.
23          THE COURT:  And at this point, under your --
24   under the way that I'm listening to you, the
25   government wouldn't have a report yet because you

```
 1  don't want them to examine your client until after
 2  that guilt phase, correct?
 3          MS. BRAIN:  Yes.
 4          THE COURT:  So you are in possession of a
 5  report.  You will wait and see.  Then you will want
 6  the government to examine.
 7          MS. BRAIN:  Yes.
 8          THE COURT:  And then disclose their report.
 9          MS. BRAIN:  Yes.
10          THE COURT:  And then you disclose your
11  report based on who you want to use?
12          MS. BRAIN:  Yes; exactly, Your Honor;
13  precisely.
14          THE COURT:  Okay.
15          MS. BRAIN:  Okay.  There are some issues
16  with respect to notice, Your Honor.  We had asked --
17  we are asking the Court to order the government to
18  provide the names of their expert, the expert's
19  qualifications, the tests that the expert proposes
20  to give, and the referral question that they are
21  being asked to answer.
22          THE COURT:  And that's before the
23  examination but after the guilt phase?
24          MS. BRAIN:  These issues because we won't
25  have firewall counsel, these issues will be
```

1  litigated by the prosecution team, and they can be

2  litigated at any time, and we should do them

3  beforehand to set --

4          THE COURT:  And the purpose of wanting to

5  know the questions or the scope is so that you can

6  be prepared to argue that this is beyond the scope

7  of where you think it should be.

8          MS. BRAIN:  Exactly, Your Honor.  And the

9  Sixth Amendment requires that we be allowed to do

10  that; that is *Buchanan* that says that in order for

11  defense counsel to advise the client whether or not

12  to submit to a government evaluation, they have to

13  be informed of the scope and purposes to which it

14  may be used ahead of time, that's a Sixth Amendment

15  requirement.

16          And with respect to the identity of the

17  experts, it was in *Smith* that specifically held that

18  the biases and pre-relations of the particular

19  psychiatrist is part and parcel of that information

20  that defense counsel needs in order to properly

21  advise the client in accordance with the Sixth

22  Amendment.

23          Qualifications, obviously, tests; I know of

24  no court decision anywhere in the district courts

25  where the defense is requesting advanced notice of

1    tests and it has been denied.  There isn't -- for

2    fairly obvious reasons, the government has its,

3    like, stable personality tests that it likes to run

4    in and do and some pretty dubious instruments it

5    likes to administer if it can.  It makes much more

6    sense to fight about that ahead of time than to have

7    it done only to find out once the guilt verdict gets

8    in that the government has done things that it

9    shouldn't have done and they have to start back over

10   and then that can be a delay, and even just

11   litigating those issues, which has the potential to

12   cause significant delay.  So they should be required

13   to tell us what tests their expert proposes to do.

14          It is not just a question of the validity of

15   instruments.  There are also factors to be guided

16   against like the practice effect.  There is a lot of

17   literature that shows that if you give a person a

18   psychological test on one day, and then give it to

19   them again some period of time later, the scores

20   from the second test are going to be artificially

21   inflated because they come in with the familiarity

22   with the testing material and -- excuse me --

23   stimuli and so forth.  So it is important to make

24   sure they are not going to be duplicating tests that

25   we have done.

1          THE COURT:  So are you asking for the

2    specific questions or the general nature or theme of

3    the questions?

4          MS. BRAIN:  Just the general theme and

5    nature.  Because when I say "referral question," you

6    know, it shouldn't be, go in there and see and poke

7    around in the defendant's brain and see what you can

8    come up with that will help us put him to death.  It

9    should be to determine whether or not the defendant

10   has a diagnosis in the Schizophrenia Spectrum.  The

11   test should be tests that are appropriate for that

12   purpose and not tests of whether the defendant is a

13   psychopath, for example, which is a government

14   favorite.

15          So, you know, another point in regard to the

16   identity of the expert, the government says on page

17   five of its pleadings, fairness dictates the

18   defendant and the United States should learn the

19   identity of each other's experts at the same time

20   when they prepare to exchange the expert's report,

21   but that's not what they are asking for.  They are

22   asking for our reports before they even have their

23   expert go in.  So they are already sort of in

24   violation of their own fundamental fairness --

25          THE COURT:  So you're saying that it's --

1  you will disclose and they will disclose at the same
2  time?
3        MS. BRAIN:  No, I am saying that's what they
4  are suggesting in one part of the pleading, but by
5  the time you get to the back, they are saying we
6  should still disclose all of our stuff.
7        THE COURT:  Right.  Let's forget that for a
8  minute.  Are you agreeable to disclosing at the same
9  time or is it you want their disclosure first?
10        MS. BRAIN:  No, at the same time.  We are
11  agreeable to disclosure once the guilt verdict is
12  in, once we see their report, then if we are still
13  at that point intending to present mental health
14  evidence, then we disclose all of our materials
15  then.
16        THE COURT:  Okay.  So you want what they
17  want, you just want it for you; you want to see --
18  they want you to disclose first, you want them to
19  disclose first.
20        MS. BRAIN:  Yes, and the Constitution
21  requires that they go first.
22        THE COURT:  Okay.  All right.
23        MS. BRAIN:  We talked about tests and
24  qualifications.
25        THE COURT:  And we are not -- I'm not going

1   to decide this today.  I'm just -- I appreciate this
2   discussion today.  I think that in all areas, I
3   appreciate all of the briefing and the time that you
4   guys have -- and the clarity on the issues.  So I
5   just thought because April 2 will be here before we
6   know it, let's just keep things as cleaned up and do
7   as many things ahead of time as we can in advance.
8   So, you don't have to cover everything today.  I
9   just wanted framework here for us to work from.
10          MS. BRAIN:  I understood, Your Honor.
11          THE COURT:  I appreciate that.
12          MS. BRAIN:  One more point just briefly on
13  the question of scope.  There were some things about
14  scope that we can't address until the government
15  gives us the required notice and then we can object
16  if there is anything there that we think is outside
17  the scope.  But there are some things that are --
18  can be decided ahead of time and one is the general
19  scope of what is the question that they are going to
20  answer.  Because the situation and the analysis of
21  the caselaw is clear is the same as when a defendant
22  decides to take the stand.  The case is *Brown*.  It's
23  in our pleadings, the Supreme Court case.
24          When a defendant takes the stand he has a
25  waiver of his Fifth Amendment privilege, but it is

not a blanket waiver; it is not an absolute waiver.
It's a waiver to the extent of the issues that he
himself puts in play.  And the government
acknowledges this in a footnote in their pleading
but then ignores it and ignores the limitation that
necessarily requires or places on what they may ask
when we put a limited mental health issue in issue
or in play.  It's just the same if the defendant
testifies.  They don't get to --  if the defendant
gets up and testifies about an alibi, they don't get
to say, Never mind, let me ask you about all of
these other cases that we believe you are guilty of;
that is a clumsy example, but it makes the point.

        I talked about the *Williams* case.  The
*Williams* case is really the most analogous and the
most flushed-out analysis on the issues at scope and
it's very similar to ours.

        I have some specific responses to the
government -- the caselaw the government relies upon
and maybe the Court will prefer me to do that in
writing, but three specific cases that essentially
it asserts are the cases that hold that the
government's evaluation can be as wide and as broad
as the government wants it to be, and they simply do
not hold that.  The first one is *Wilson*, in which

1  the government asserts and stands for the
2  proposition that any perceived use in the government
3  examiner's choice of tests should be addressed after
4  the evaluation has been conducted, which it
5  interprets, says the district court, basically
6  giving the government's expert carte blanche to do
7  whatever it wants.  It did not do that, the *Wilson*
8  court did not do that.
9          First the Court had already required the
10 government to disclose exactly what we are asking
11 the Court to disclose here, the names and
12 qualifications of the experts, the tests that will
13 be done.  And based on these disclosures, the
14 defense then raised a series of very specific
15 objections to certain procedures.  For example, one
16 was the proposed use of -- in an intellectual
17 disability case -- proposed use of adapted behavior
18 scales that were administered directly to the
19 client.  I think the defense objected to that.  The
20 Court considered it very, very carefully.  It
21 reviewed the scientific literature on point and
22 decided that while the literature cautioned about
23 how much weight should be given to that kind of
24 administration, it didn't hold that there was no
25 relevance to it whatsoever, and so the Court decided

 1  to allow the testing be done and to have the parties
 2  argue about the weight.
 3          So by no means did the Court say, I will
 4  just worry about this after the examination and we
 5  will let the chips fall where they may.  The Court
 6  considered all of the particular objections from the
 7  defense ahead of time and denied them only where he
 8  found them to have merit.  *Hardy* is along the same
 9  lines, another pretrial intellectual disability
10  case.  The Court limited at the outset the
11  government's examination to the issue only of
12  intellectual disability or no intellectual
13  disability, and then found that it couldn't restrain
14  or restrict the examination further because it
15  didn't know what was relevant; that's a failure of
16  defense, frankly.  They should have litigated those
17  issues, as we are seeking to do before this Court,
18  and outline what is and what is not relevant so the
19  Court can place some broad strictures around what
20  the government seeks to do.
21          The third case is *Troya* and I don't -- what
22  the government cites is the Eleventh Circuit's
23  opinion that says that the defense sought to limit
24  the government's evaluation and the district court
25  denied it.  When you go back and look at the actual

case, there was one oral request by defense counsel
in the middle of a hearing on another issue that
said, oh, by the way, I think we ought to limit this
testing to IQ testing because that's what we are
doing.  And the judge said, I don't want to deal
with that now; I am just going to order testing as
required by the order.

When you look at the order, there is nothing
in there about testing.  And that is the sum and
substance of the litigation in the *Troya* case.  It
is nothing for the Court to hang its hat on by any
means.

THE COURT:  Let me hear from Mr. Nelson for
a moment and I will give you another shot,
Miss Brain.

MS. BRAIN:  Thank you.

MR. NELSON:  Thank you, Your Honor.

I wasn't sure I would get up here in time to
say good morning, but I did, just barely, so good
morning.

I think that it is interesting -- I want to
go right to the scope.  All of the cases that are
cited by defense, with regard to limiting the scope,
are intellectual disability cases, and that is
important.  And why it is important -- and, Your

1  Honor, may I approach briefly?  I brought copies of

2  the DSM-5.  I have a copy for defense counsel as

3  well.  These are just the pages that are cited by

4  the defense in their notice.  But what is

5  interesting about the intellectual disability cases

6  that are cited by the defense is that one of the

7  reasons why the scope of testing is limited in

8  intellectual disability cases is that intellectual

9  disability can be comorbid with a lot of other

10 things.

11        So a finding that, for example, that a

12 defendant has a personality disorder; well, that can

13 be comorbid with a diagnosis of intellectual

14 disability; and, therefore, the mere fact that

15 someone has a personality disorder is not relevant

16 to whether or not they have intellectual disability.

17 And so in cases where that scope has been limited,

18 it has been limited so that the constitutional

19 question of whether or not a defendant is

20 intellectually disabled and therefore cannot legally

21 be put to death can be focused on without

22 distraction; that's not the case here.  Here the

23 defense is raising as a mitigation to the penalty

24 phase 35 pages of DSM which cite 12 separate

25 disorders.  Those 12 disorders, in addition to

1  having differential diagnoses of the other diagnoses
2  of the spectrum, have 14 differential diagnoses,
3  meaning things that appear the same but are
4  completely different.  So the idea -- and that
5  doesn't count, Your Honor, the personality disorders
6  which are a differential diagnosis to at least one
7  of the diagnoses that they've cited.
8          THE COURT:  So tell me what you expect --
9  see your expert being expected to do?  Anything he
10 or she wants or limited --
11         MR. NELSON:  No, Your Honor.
12         THE COURT:  -- or limited in scope, but in
13 relation to?  In other words, I know in your
14 briefing you said that the psychotic disorder can be
15 masked as something or something else can mask it or
16 something.  So you just want limited with a range
17 that's related to.
18         MR. NELSON:  Your Honor, I think that if the
19 scope of the testing is limited to the 35 pages
20 cited by the defense, and all of the disorders and
21 differential diagnoses listed therein, then that is
22 perfectly fair and that is what we want and that is
23 what we ask for.  Anything in addition to that is a
24 mischaracterization of what we are arguing.  And I
25 think, frankly, Your Honor, if that is limited in

1 any way that is a violation of the Supreme Court

2 law.

3         THE COURT:  You are agreeable to being

4 limited to the 35?

5         MR. NELSON:  Yes, Your Honor.  All we want

6 to be able to do --

7         THE COURT:  Doesn't that resolve that issue,

8 Miss Brain?

9         MS. BRAIN:  To the extent -- yeah, if the

10 government's referral question to their expert is,

11 Does the defendant meet criteria for a diagnosis of

12 one of these disorders on Schizophrenia Spectrum,

13 then, yes, that's what we would be asking their

14 referral question be limited to and --

15         THE COURT:  I'm sure that we will have

16 further argument about what this is, but now we have

17 narrowed it to some framework here.

18         MS. BRAIN:  Yeah, I agree.

19         THE COURT:  And we are making progress.

20         MR. NELSON:  I believe so.  And it helps

21 when we are guided by the law.  I think that the

22 problem here is the defense is relying on *Naeem*

23 *Williams*.  *Naeem Williams* was decided before *Kansas*

24 *v. Cheever,* and they decided the same issue.  It's

25 not a stretch to say that Supreme Court law should

```
 1  govern.  So Naeem Williams, while interesting in a
 2  vacuum, is not the law; Kansas v. Cheever is the
 3  law.
 4       Kansas v. Cheever says that the brief
 5  rebuttal question is not limited to the single
 6  question.  Okay, I say he has this disease; does he
 7  have this disease; yes or no.  That's not the law.
 8  The law is, okay, if I'm going to cite 35 pages of
 9  DSM-5, which includes a variety of differential
10  diagnoses, then in order for the government to have
11  the right of confrontation that is guaranteed in
12  Buchanan, the government has to at the very least be
13  able to look at all of those differential diagnoses,
14  because the psychiatric literature says that those
15  things are -- are within the same scope.  And so
16  that is all we want is the opportunity to test
17  within the scope of what the defendant has given
18  notice of but the full scope, Your Honor.
19            THE COURT:  Got it.  Okay.
20            MR. NELSON:  So that's --
21            THE COURT:  So lay out for me -- I think
22  that I have an idea.  So from there lay out for me
23  how you see your experts.  I asked the defense the
24  same.  At what point does your expert enter and do
25  -- and when are disclosures made, just lay that out
```

1  for me.

2         MR. NELSON:  Yes, Your Honor.  And I think

3  that actually the procedure laid out by the defense

4  in their papers and the procedure laid out by us in

5  our papers with regard to when our experts came in

6  are pretty similar.  What they say in their papers

7  is that we should be allowed to examine and then our

8  experts will submit to you under seal, and you

9  basically will be keeper of the keys until such time

10 as a guilt phase comes up.  They changed that to

11 their argument said we should not be able to even

12 examine until after a guilty verdict is reached and

13 that, you know, it can being done in as quick as

14 eight days.  I would submit to Your Honor in a case

15 like this where the defense asks for and receive

16 five months of delay to give their notice so that

17 they can have additional testing, that limiting us

18 to eight days would serve as a substantial

19 inequality.  But in a situation like this, our

20 experts would come in, could come in, with Your

21 Honor's permission, and examine the defendant.

22        THE COURT:  With defense counsel present or

23 without out?

24        MR. NELSON:  No, Your Honor.  Absolutely

25 not.  And I will get to that.

1           And they would submit their reports either

2      to firewall counsel or to Your Honor under seal.

3           THE COURT:  Okay.

4           MR. NELSON:  And they would have to have

5      under rule -- and so this is an interesting piece of

6      this.  The reason why 12.2 gives protections about

7      the experts receiving information about the defense

8      expert's reports, et cetera, and where 12.2 and Rule

9      16 are being discussed in our paper comes together

10     had to do with basically with shielding us.  "Us"

11     meaning the government trial team from receiving

12     that information, because where they are only

13     raising it in the penalty phase, it's not proper for

14     us to have it; we shouldn't have it.  So frankly the

15     firewall counsel more effectively guarantees that we

16     won't be inadvertently tainted by any of this

17     because we will have been told by Your Honor and,

18     you know, the experts would have been told by Your

19     Honor that we are not to speak to each other until

20     the guilt phase is over and we will of course honor

21     that, and so that is one of the reasons why, I

22     think, in the *Watts* case -- and I don't want to

23     speak for Judge Gilbert -- but I think that's one of

24     reasons why he did what he did because it is frankly

25     just out of pure judicial economy; it makes sense.

1          THE COURT:  What do you see firewall counsel

2    doing, just receiving the examination report and

3    holding it until further order of the court?

4          MR. NELSON:  Basically supervising the

5    examinations.  So we raise in our motion --

6          THE COURT:  Firewall counsel would be in the

7    room during the examination?

8          MR. NELSON:  No.

9          THE COURT:  So how would they supervise it?

10   In other words, what if the defendant refused to

11   cooperate; firewall counsel would be told that and

12   then it would be brought to me?

13         MR. NELSON:  And then we would file a motion

14   with Your Honor saying that defendant is failing to

15   cooperate.  They are not going to be in the room.  I

16   wouldn't be in the room.  We don't want any counsel

17   in the room.  We don't want anyone in the room but

18   the defendant and the expert, which I imagine is the

19   exact scenario with when the defendant was examined

20   in this case.  It's the exact scenario in every one

21   of the *Atkins* cases that I have done where the

22   defendant is examined for intellectual disability;

23   no one is in the room except for the doctor and the

24   defendant.

25         THE COURT:  Okay.

1        MR. NELSON:  And that goes to *Byers* where

2   then Judge Scalia wrote, This issue has been raised

3   and rejected numerous times.  *Wilson* has found the

4   same thing.  *Sampson* cites a number of cases.  I'm

5   not aware of a case where the defense lawyer was

6   allowed to be in the room.  *Sampson* did say that

7   where there are concerns, as Miss Brain is raising

8   here, that government experts will defy the Court's

9   order and ask questions on the issue of guilt or

10  something else; you can have a video recording.

11  They say they don't want a video recording.  That's

12  fine.  We don't necessarily want one either.  But

13  that was the remedy *Sampson* offered for that concern

14  that the experts would somehow run far afield of

15  what the Court allowed them to do.

16        And I would submit that if there is a

17  concern about, you know, asking questions about the

18  issue of guilt or issue of aggravators, there is a

19  better remedy.

20        THE COURT:  To both of you, assume for a

21  moment that you are allowed to -- without firewall

22  counsel -- allowed to have your expert examine

23  Mr. Christensen ahead of trial for efficiency

24  purposes, so we don't get caught up here on the

25  backside.  And then that's under seal in my

1 possession.  And then when -- first of all, when do

2 you see it?  When do you see it disclosed as

3 compared to the defense, assuming then the guilt

4 phase is completed and if Mr. Christensen is found

5 guilty, then when does the disclosure take place?

6           MR. NELSON:  Disclosure to government trial

7 counsel of everything can't occur until the guilt

8 phase is over.

9           THE COURT:  Right.  So that phase is over

10 now.  Now how do you see it play out?

11           MR. NELSON:  The way that I see it play

12 out is --

13           THE COURT:  They turn it over to you?

14           MR. NELSON:  I think that basically once the

15 guilty verdict is reached, everything is given to

16 us.

17           THE COURT:  Okay.

18           MR. NELSON:  And then we have to sort it all

19 out and figure out how we are going to present it.

20           THE COURT:  Then you disclose first to them?

21           MR. NELSON:  Your Honor, I think that -- and

22 I don't have --

23           THE COURT:  I'm not tying you down.  I'm

24 just trying to get this --

25           MR. NELSON:  I think that what Your Honor

suggested is the best method is what we used, for
example, in the *United States v. Roland* case, which
was an intellectual disability case, where there
were simultaneous disclosures, and it was actually
recommended by defense and I think it worked out
really well.  And I'm not saying that they are bound
by that --

        THE COURT:  And Miss Brain, isn't it true
then that both of you then are freed up to say --
you are freed up to say, wait a minute, we have
reviewed this now he went way beyond the scope and
ask me to rein it back in or whatever.  Wouldn't
that be the way that it would work, both of you
would be freed up to --

        MS. BRAIN:  What would be simultaneous, one
thing, Your Honor; 12.2 requires that government be
disclosed first.  And then we disclose second.  It
is virtually simultaneous but they don't get to
review our report until we reaffirm that we are in
fact going to present mental illness at trial.

        THE COURT:  I get that.

        MS. BRAIN:  And it's -- I think it would be
willfully inefficient to put off all questions about
scope until after the government's report comes in.

        THE COURT:  I don't plan to do that, but I

1  know -- I don't know.  I'm pretty sure that there

2  will be additional objections or questions raised

3  after the disclosures.  It's just going to happen,

4  right?

5          MS. BRAIN:  I think Your Honor is right.

6          THE COURT:  And there will be questions

7  about admissibility or credibility.

8          MS. BRAIN:  Yeah.  They will be minimized if

9  disclosures that we are requesting are given to us

10  ahead of time because we will litigate a huge chunk

11  of that.  But, yes, probably something will come up,

12  doesn't it always.

13          THE COURT:  So it seems Mr. Nelson that

14  you're not going to have too much issue with some --

15  well, let me ask this of any disclosure ahead of

16  time on who your expert is, if I allow your expert

17  to examine ahead of the guilt phase and then it is

18  under seal, are you agreeable to disclosing that

19  with the framework as you have acknowledged it would

20  be within what they are asking and then that will

21  give the defense an opportunity to argue whatever

22  they want ahead of the examination and then we get

23  on with the examination as we've discussed.

24          MR. NELSON:  I suppose that's fine, Your

25  Honor.  I think that -- I would just note for the

1  record the irony of the, you know, shielding with
2  one hand and begging with the other, but we will
3  follow the Court's order --
4          MS. BRAIN:  That's because the Sixth
5  Amendment and Fifth Amendment protections apply to
6  Mr. Christensen particularly since his life is on
7  the line and not to the government.
8          MR. NELSON:  Respectfully, Your Honor, the
9  Fifth and Sixth Amendment have been waived.  They
10 have given notice of a mental health defense.  This
11 is Supreme Court case law.  They have waived
12 already.  There is no -- that's why they don't have
13 a constitutional right as Miss Brain concedes to
14 have counsel in the room because the Sixth Amendment
15 has been waived.  They don't have a Fifth Amendment
16 right.  It's been waived.  That's *Buchanan. And so*
17 *the issue here, Your Honor, is if -- and I don't*
18 *want to argue this all afternoon.  If Your Honor is*
19 *saying you will give notice, we will absolutely give*
20 *notice.  We haven't hired our experts yet.  They*
21 *just give notice.  We are trying to contract with*
22 *our experts.*
23         *I would ask Your Honor with regard to*
24 *timing, and I would note that the timing of the*
25 *government's examination is already in the*

scheduling order.  It is scheduled for not later
than January 18th.  I would respectfully ask that
given the impendency of the holidays and the fact
that the defendants asked for and received a
five-month continuance that we have until the end of
January on that date, assuming Your Honor proceeds
as we are discussing allowing us to examine the
defendant before the guilt phase is over.

        With regard to any other issues that I
haven't addressed --

        THE COURT:  So you want -- right now
January 18th says completion of the government's
testing, that's unrealistic you are saying.

        MR. NELSON:  I think, Your Honor, given the
lateness -- that was envisioning a notice in
September.  And so -- but I don't want to delay the
trial, and I will make sure that whoever we retain
can examine the defendant before the end of January.

        THE COURT:  We should probably spend some
time next week going over the scheduling order
again.  The Atkins defense is now no longer at
issue, right?

        MR. NELSON:  Yes, Your Honor.

        THE COURT:  So when the government should
have -- I mean if we are going to have a disclosure

1  *-- if I'm going to order disclosure as you're asking*
2  *first, I think we need to reserve some space for any*
3  *objection that you may have.  So that would*
4  *ultimately push back the examination if it's going*
5  *to be before the guilt phase, right?*
6          *MS. BRAIN:  Yes, Your Honor.*
7          *THE COURT:  So I think we can consider that*
8  *that's going to occur.  Maybe we will revisit it as*
9  *the week unfolds next week.*
10          *MR. NELSON:  Thank you, Your Honor.  With*
11  *respect to two other issues just to address what*
12  *Your Honor asked about in the beginning.*
13          *With respect to nontestifying experts in the*
14  *United States v. Pawlyk* case, I would just note the
15  reasoning of the Ninth Circuit, which is that Court
16  appointed experts, taxpayer-funded experts don't
17  work for defense counsel; they work for the court.
18  They have an obligation, just like any other officer
19  in court, to present the truth.  And if, as was
20  found by the Ninth Circuit and has happened in that
21  case, if the expert says, this gentlemen is not
22  legally insane, then the public and the jury and the
23  Court is entitled to that information.  And I would
24  just rest on our papers there.
25          With regards to subpoenas: again, the only

1  reason why legally the government can't obtain this

2  information prior to giving notice is the

3  psychotherapist/patient privilege.  He has now

4  waived that by putting his mental health at issue,

5  and I would note, Your Honor, that we are aware,

6  without going into it on the public record, we are

7  aware of conditions that the defendant has that have

8  been indicated to us by defense counsel.  Those are

9  listed as among the potential differential diagnoses

10  in DSM-5, and that is one of the reasons why we

11  would need that information that would go directly

12  to their claim, and that's why we want that

13  information so that we can make a meaningful

14  rebuttal to the Court and so that a jury can make

15  their determination of the punishment in this case

16  on all of the facts.

17        THE COURT:  Okay.  What I would like to do

18  is this:  Miss Brain, you wanted an opportunity to

19  reply to the government in writing.

20        MS. BRAIN:  Yes.

21        THE COURT:  How long do you think you need

22  to do that?

23        MS. BRAIN:  Fine question.  Because of the

24  holidays, Your Honor, it's going -- it would have to

25  be the very first week of January, if that's

1  acceptable.

2         THE COURT:  Okay.  Do you want to weigh in

3  on that, Mr. Nelson?

4         MR. NELSON:  No, Your Honor, I defer to the

5  Court.

6         THE COURT:  What's the Friday, January 5th

7  or something, 4th; is that too soon?

8         MS. BRAIN:  No, sir, that's fine.

9         THE COURT:  January 4th to reply.

10        So clearly that's going to -- so I think

11  maybe what we will do.  We will go through our

12  hearings on Monday and Tuesday and maybe Wednesday,

13  if we are still here.  And then at the conclusion of

14  that I think a visit about where we are scheduling

15  wise, and then we will regroup on finishing up on

16  the disclosures after the reply in some fashion to

17  argue.  I think that it's without -- obviously, I'm

18  not going to give any written ruling today, but I

19  think that for the public's sake and for your sake,

20  we should know that we are going forward on Monday

21  and Tuesday.  I believe that at the indictment stage

22  that at least the cell phone would be considered an

23  instrument in interstate commerce sufficient to

24  establish federal jurisdiction.  I'm going to review

25  my notes and the case law and things as to the

1  vehicle, again, but at least for the purposes of

2  that, we will be working on Monday and Tuesday.

3          Anybody disagree with that?

4          Okay.  And I will give some indication

5  orally as to the Tenth Amendment issue as well next

6  week and written orders will follow.

7          And I will give you some indication on the

8  car either, as well, with written orders to follow.

9          Okay.  So, with that in mind, have we set an

10  order for Monday on which ones are going first?

11          MS. POLLOCK:  We already have, Your Honor.

12          THE COURT:  Okay.  Anything else?

13  Mr. Taseff?

14          MR. TASEFF:  Your Honor, if I could render

15  the Court's attention.  This morning I transmitted

16  via email to Court's chambers and copied all counsel

17  regarding Docket Number 99, motion to suppress

18  eyewitness identification evidence.

19          This is a matter where the Court ordered us

20  to determine our expert witness's availability.

21  This is one of the motions we cannot hear next week

22  because Dr. Jeffrey Loftus, who works in Seattle,

23  Washington; University of Washington, Seattle; is

24  available to travel to Illinois on these two dates,

25  January 18th and February 1st of 2019.  That's

1   possible dates whereby he can appear and testify in

2   support of our motion.

3           So we would ask that the Court and counsel

4   consider those two dates when we can get a court

5   setting on that date for that motion so that I can

6   alert our expert and put him on notice to make

7   arrangements for that time.

8           THE COURT:  Okay.  Anybody wish to be heard

9   from the government side on that?

10          MR. MILLER:  Just the sooner the better,

11  Your Honor.

12          THE COURT:  So that was supposed to be heard

13  Monday?

14          MR. TASEFF:  It was one of the motions that

15  would be heard Monday or Tuesday.

16          THE COURT:  Right.  And we grouped 96, 97

17  and 100 together.

18          MR. TASEFF:  Yes.

19          THE COURT:  And were you planning to go on

20  those first on Monday?

21          MS. POLLOCK:  I have the order for Your

22  Honor.

23          On Monday, we decided on Number 96 and

24  Number 97, two motions to suppress.  And also a

25  motion Number 100, which is the motion to suppress.

1          THE COURT:  That's for Monday.

2          MS. POLLOCK:  Tuesday it would be 95 and 98,

3   Your Honor.

4          I think when we previously discussed the

5   issue of the eyewitness identification, we all

6   concurred in continuing that hearing.  It was not

7   actually scheduled due to the unavailability of the

8   expert.

9          THE COURT:  So 99 was the only one that is

10  left, and we will reschedule that, right?  Otherwise

11  we will take care of 96, 97, 100 on Monday; 95 and

12  98 on Tuesday.

13         How long do you think -- do you think we

14  will use all of Monday for 96, 97, 100?

15         MS. POLLOCK:  I believe we will, Your Honor.

16  There are a couple of witnesses who actually overlap

17  from our perspective between two different motions,

18  and so it is up to the Court how you want to put on

19  evidence on one motion and then recess and then have

20  the same witnesses testify again for the second

21  motion, or if you wanted to have each witness go

22  through everything and then sort of combine the

23  factual issues.

24         THE COURT:  When you say "overlap," you mean

25  overlap between 96, 97 and 100?

1         MS. POLLOCK:  That's correct, Your Honor.

2         THE COURT:  What's your preference, that

3 they testify once?

4         MS. POLLOCK:  I think that's probably best

5 for everyone, Your Honor, only because these people

6 who we have issued subpoenas, they are coming from

7 other locations.  We want to be able to get them in

8 and out without them having to stay over.

9         THE COURT:  What's the government's position

10 on that?

11         MR. FRERES:  Your Honor, we prefer as well

12 just to do it all at once.  It is easier than

13 breaking.

14         THE COURT:  I'm sure that we can keep track.

15         MS. POLLOCK:  If it helps, Your Honor, we

16 can delineate in the middle of our examinations when

17 the evidence is relevant to one motion versus to

18 another.

19         THE COURT:  Okay.  And Tuesday will be 95

20 and 98?

21         MR. MILLER:  Yes, and I believe we

22 discussed -- I hope that I am not incorrect, because

23 we subpoenaed our witness for then, there might be

24 some -- if there was going to be bleed over for

25 those three motions on Monday, it will go Tuesday

1  morning and so then we would save our witnesses

2  for -- I believe it is just one of -- the testimony

3  of CHS, as referred to, for 1:30 on Monday --

4  Tuesday in case --

5           THE COURT:  In case there is some --

6           MS. POLLOCK:  So I believe that we were

7  talking about the same witness that we had

8  subpoenaed for Monday, but if you want to do it

9  all --

10          MR. MILLER:  This is for Mr. Taseff for

11 Macon County.

12          MS. POLLOCK:  For the CHS.

13          MR. MILLER:  For the individual in Mason

14 Count.

15          MS. POLLOCK:  Okay.  Sorry.

16 Misunderstanding.  Different CHS.

17          THE COURT:  Okay.  So likely we are not

18 going to be using Wednesday, but we don't know that

19 for sure.

20          MR. MILLER:  We don't believe that we would

21 need to, Your Honor.

22          THE COURT:  But we have got it scheduled.

23          MS. POLLOCK:  Great.  Thank you.

24          THE COURT:  Okay.  Anything else we should

25 accomplish today?

1          MS. POLLOCK:  Lunch.

2          THE COURT:  We will recess now until Monday.

3          MR. MILLER:  I guess just to put the Court

4 on notice, this is the first -- if we are correct,

5 the other person they are talking about subpoenaing,

6 we may have a motion to quash filed.  Obviously, the

7 Court can rule on that as well.

8          THE COURT:  Do you want to address that now?

9 Shall we go in chambers for a moment?

10          MS. POLLOCK:  Sure.

11          THE COURT:  Let's do it.

12          (In Camera Hearing held and not

13           transcribed without Court order.)

14                    *****

15          (The following proceedings were held in open

16           court with all parties present.)

17          THE COURT:  Okay.  We will recess until

18 Monday morning.  And we are stating at 9:00 or 9:30?

19          MR. MILLER:  I believe 9:00 a.m.

20          THE COURT:  Thank you, everybody.

21          (Which were all of the proceedings had in

22           this case on this date

23                    *****

24

25

```
 1      I certify that the foregoing is a correct

 2   transcript from the record of proceedings in the

 3   above-entitled matter.

 4

 5

 6   s/Nancy Mersot          Date:  December 20, 2018

 7   Court Reporter

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```