1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF ILLINOIS
2

3

4   UNITED STATES OF AMERICA,   ) Docket No. 17-cr-20037
                                 )
5           Plaintiff,           )
    vs.                          )   Peoria, Illinois
6                                )   March 14, 2019
    BRENDT A. CHRISTENSEN,       )
7                                )
            Defendant.           )
8   _____ )

9

10                       RECORD OF PROCEEDINGS
11                          MOTION HEARING
           BEFORE THE HONORABLE JAMES E. SHADID
12              UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22                    Nancy Mersot, CSR, RPR
             United States District Court Reporter
23                  100 N.E. Monroe Street
                      Peoria, IL  61602
24
    Proceedings recorded by mechanical stenography,
25  transcript produced by computer-aided transcription.

<u>THE APPEARANCES</u>

BRYAN DAVID FRERES, ESQ.
Assistant U.S. Attorney
201 South Vine
Urbana, IL 61802
On behalf of the Plaintiff

JAMES B. NELSON, ESQ.
United States Department of Justice
Criminal Division Capital Case Section
Suite 625
1331 F. Street NW
Washington, DC  2004
On behalf of the Plaintiff

ELISABETH R. POLLOCK, ESQ.
Federal Public Defender
300 W. Main Street
Urbana, IL  61801
On behalf of the Defendant

GEORGE F. TASEFF, ESQ.
401 Main Street, Suite 1500
Peoria, IL  61602
On behalf of the Defendant

ROBERT L. TUCKER, ESQ.
7114 Washington Avenue
St. Louis, MO  63130
On behalf of the Defendant

JULIE C. BRAIN, ESQ.
916 S 2nd Street
Philadelphia, PA  19147
On behalf of the Defendant

MATTHEW RUBENSTEIN, ESQ.
Federal Public Defender District or Oregon
101 SW Main Street, Suite 1700
Portland, OR  97204
On behalf of the Defendant

1          (Proceedings were held in open court.)
2          THE COURT:  Good afternoon.
3          This is the United States v. Christensen,
4 17-20037.
5          Present in open court with Mr. Christensen
6 are his attorneys Mr. Tucker, Ms. Pollock,
7 Mr. Taseff, Miss Brain; and Mr. Rubenstein is
8 present as well.
9          Present for the government is Mr. Freres,
10 Mr. Nelson; correct?
11          MR. FRERES:  And Agent Huckstadt.
12          THE COURT:  And pardon me?
13          MR. FRERES:  Agent Huckstadt.
14          THE COURT:  Got it.  Okay.
15          A couple of matters to address today.
16          First, let me get to the jury selection
17 procedures, which are 223 and 229.  Those are to be
18 addressed.
19          The Motion to Reconsider by the government
20 its 12.2 experts is 258, and the response is 266.
21          So, maybe we should address that first.
22 Although, I will say, that given the filing in 263,
23 264, and 265, which was filed as sealed, and the
24 defense needing time to respond, I can see a
25 question or two might overlap given the government's

1  request and the reconsider.

2        Let's address those.  Let's get started on

3  that.

4        So, with regard to the Motion to Reconsider,

5  first, Number 258 from the government; who wishes to

6  be heard?

7        MR. NELSON:  I will, Your Honor.  And I will

8  keep my remarks brief and for the most part will

9  rely on the papers.

10        I will just note that with regard to the two

11  requests, which came in from Dr. Dietz, I would note

12  for Your Honor that we had not had Dr. Dietz fully

13  under contract when we had this first argument on

14  this topic back in December.

15        But with regard to questions about the

16  crime, if you look at Rule 12.2(c), the protections

17  don't make a lot of sense if the experts can't ask

18  about the crime, because there is really no reason

19  to wall off the trial prosecutors under those

20  circumstances.  And I understand from reading the

21  response that was filed, you know, an hour or two

22  ago; the defense is saying that they are not going

23  to ask about the crime, their experts aren't going

24  to ask about the crime.  It's hard to imagine that

25  just because it's not really mitigation if the

1  defendant didn't suffer from this condition at the
2  time of the offense, and if he wasn't affected by it
3  at the time of the offense.
4        And so, I will just state, Your Honor, that,
5  frankly, we think both parties' experts should be
6  able to ask about it.  And if the ruling is
7  otherwise, then we would ask for an order precluding
8  the defendant from presenting any evidence or
9  argument linking the condition to the crime.
10       THE COURT:  All right.  Talk to me about the
11  recording first.
12       MR. NELSON:  Sure.
13       THE COURT:  That I think might be simpler.
14  Are you anticipating an audio recording or a video
15  recording?
16       MR. NELSON:  Dr. Dietz has asked for both.
17  I have read the response.  Frankly, there are two
18  reasons here, Judge.  We are not asking for this for
19  evidentiary purposes.  There are two reasons why
20  we've asked for this.  One is efficiency, and one is
21  accuracy.  With regard to efficiency, it is not hard
22  to imagine the situation where the defense is
23  concerned about the amount of time this examination
24  is going to take.  Having stop to take notes or
25  refer to those notes during the interview is going

 1  to elongate the time.  By how much, I don't know.

 2          As for accuracy, certainly the defense is

 3  going to ask for our expert's notes.  They are going

 4  to go over those notes with a fine tooth comb and

 5  cross-examine them on any possible discrepancy

 6  between the notes in the reports and what they are

 7  testifying about.  If there is a recording,

 8  everything is going to be -- the accuracy of all of

 9  that is going to be a lot easier.

10          So for those reasons, Your Honor, if the

11  Court is disinclined to grant video recording, that

12  is fine; an audio recording will solve both of those

13  problems.

14          THE COURT:  Do you anticipate if it's

15  recorded that that recording then will also be

16  attached as part of the report to be reviewed at the

17  point where if disclosure is to be made after the

18  guilt phase that that would also include the

19  recording?

20          MR. NELSON:  Absolutely.  Absolutely.

21          THE COURT:  Okay.  What about the -- so

22  efficiency and accuracy.  So how is the -- how do

23  those relate to protecting the defendant?

24          MR. NELSON:  I think accuracy certainly

25  relates to protecting the defendant, Your Honor.

 1  If -- if someone is going to testify that the
 2  defendant said or didn't say something and based on
 3  that statement they made a diagnosis, a psychiatric
 4  diagnosis, I would submit that the accuracy of that
 5  was incredibly important.
 6           THE COURT:  And you cited a number of cases
 7  in support of this, correct?
 8           MR. NELSON:  Yes, Your Honor.
 9           THE COURT:  Okay.  I interrupted.  So go
10  ahead and finish.
11           MR. NELSON:  That's fine, Your Honor.
12  That's really -- with regard to the recording,
13  that's the reason why we are asking for it are those
14  two reasons.
15           And then with regard to questions about the
16  crime, I really -- I understand the defense's
17  position.  We disagree with it.  We think that it is
18  relevant.  And frankly as I mentioned, I don't see
19  how you can argue in mitigation that the defendant
20  suffered from a condition and that because he
21  suffered from a condition that mitigates -- the
22  effect of that condition mitigates whether he should
23  receive the death penalty for his crimes if you
24  can't prove that he did or did not suffer from the
25  condition at the time, and it did or did not affect

1  his actions on the day in question.

2       If the Court is inclined to say that our

3  experts should not ask about that, we would ask for

4  an order precluding the defense from doing the same

5  and precluding them from introducing any evidence

6  linking the existence of this condition with the

7  facts of the crime.  Because, as they say, it

8  wouldn't be rebuttal if that's what they are going

9  to do.

10       If they are going to rely the mitigation on

11  the fact that he had this condition and nothing

12  more, then that's fine.  But if they are going to

13  say that the condition caused him to commit the

14  offense or make it more likely to commit the offense

15  or anything like that, then we should be allowed to

16  ask questions.

17       THE COURT:  All right.  That issue leads to

18  me to the filing 263, which was under seal, which

19  hasn't been responded to yet because it was just

20  filed today.  So I do think we have to address it if

21  we can today; otherwise, we wait for an answer from

22  or a response from the defense.

23       So, let me just stop you there and let me

24  hear from the defense on why no video or audio

25  recording and why no questions about the offense

1  conduct.

2           MS. BRAIN:  Yes, Your Honor.

3           I have to say I see a little bit of an

4  inconsistency or at least a tension in the

5  government's position that on one hand they don't

6  want to be able to tape for evidentiary purposes,

7  but on the other they anticipate it being used to

8  fact check or cross-examine or direct examine,

9  redirect examine their expert on what is on the

10 tape.  So this is two different -- that's an

11 evidentiary purpose of which we should object at the

12 time.

13          But with respect to the accuracy reasons and

14 the efficiency reasons, as we've said in our

15 pleading, psychiatrists have been doing these kind

16 of evaluations, taking notes since the dawn of time.

17 It is standard practice.  There is no particular

18 reason alleged in this case for why a recording is

19 necessary and that's what courts have found.

20          Two things:  First, it's over

21 Mr. Christensen's objection.  And as the Court

22 alluded to the idea or the option of recording is

23 intended to be for the defendant's benefit.  It's --

24 according to the ABA guideline, it sets forth that

25 it is for the defendant.  Many courts, district

1  courts have since found and they have granted

2  requests when the defendant has asked for it.  And

3  there are two cases in particular, the *Nelson* case

4  in the Western District of Missouri, and the *Minerd*

5  case from Western District of Pennsylvania that when

6  the defense objected, the Court said, I have no

7  power -- not I have no power -- the government has

8  no right to insist upon this; it's for the

9  defendant, and he doesn't want it, I'm not going to

10 impose that over his objection.

11        THE COURT:  So the three, six, nine cases

12 cited by the government, did in each case the

13 defense agree?

14        MS. BRAIN:  Your Honor, if I may clarify.

15        Are you taking about the list of cases in

16 Dr. Dietz's affidavit.

17        THE COURT:  No, I'm talking about page five

18 of the motion for reconsideration where it says,

19 "Federal capital cases in which courts have

20 authorized my use of videotape and audiotape

21 during" -- yes, I'm sorry.  Yes, but it's page --

22        MS. BRAIN:  I see, Your Honor.  Yes, indeed.

23        THE COURT:  It is Mr. Dietz's declaration --

24 it is page five, where it's been authorized.

25        Was each of those over -- by agreement with

1  the defense or did -- were there any cases where the

2  defense objected and the Court ruled for the

3  government?

4          MS. BRAIN:  The only two that I can identify

5  were ruled for the government over the defendant's

6  objections were *Roof* and *Coonce*.

7          THE COURT:  Okay.  So do both parties agree

8  this is a discretionary matter for me?

9          MR. NELSON:  Yes, Your Honor.

10          MS. BRAIN:  Yes, Your Honor.

11          THE COURT:  Go ahead.

12          MS. BRAIN:  For the remainder of those

13  cases, either there weren't documents available to

14  definitively determine; and in the cases of *Donald*

15  *Fell*, that was at the defense request; *Lisa*

16  *Montgomery* and -- sorry -- the *Lisa Montgomery* case

17  the defense did not object.

18          THE COURT:  So tell me the harm -- I asked

19  Mr. Nelson about the protection of the defendant.

20  Tell me the harm that you see to the defendant.  I

21  understand the objection, but tell me the harm or

22  the prejudice to Mr. Christensen.

23          MS. BRAIN:  Yes, Your Honor.  Principally

24  based on the very real danger that -- knowledge that

25  there is going to be a video recording made can be

1  extremely inhibitory.  The types of subjects that

2  this evaluation is going to delve into is clear from

3  Dr. Dietz's affidavit: very personal, potentially

4  embarrassing intimate facts.  To be asked about

5  those things knowing that it's going to be recorded,

6  any number of people could potentially view it and

7  it may end up on CNN at some point if the government

8  tries to use it at trial is potentially extremely

9  inhibitory for someone to completely express their

10  innermost feelings and thoughts and experiences.

11        THE COURT:  Okay.  That's a point, but I

12  assume the government's expert, regardless of

13  audiotape or videotape, would testify at trial so it

14  would be public in that regard, but actually seeing

15  it you're saying.

16        How does the government, Mr. Nelson, think

17  that would be, that the audio or video could even be

18  used at a hearing in the penalty phase?

19        MR. NELSON:  Honestly, Your Honor, other

20  than the first piece which is Dr. Dietz would use it

21  for preparing his report to make sure that it is

22  accurate, the only way that I can even imagine it if

23  there is some dispute with regard to what the

24  defendant might have said during his, you know, that

25  interview.

```
 1          THE COURT:  And I'm thinking out loud if the
 2   defense had access to this because it was part of
 3   the report, that actually that it might be more
 4   available for the defense purpose if the government
 5   expert said something that you could impeach him
 6   with or contradicts what is actually on the
 7   videotape or audiotape.  So -- I'm just thinking out
 8   loud here.
 9          MS. BRAIN:  That's true.
10          THE COURT:  I'm just thinking out loud here.
11          MS. BRAIN:  I'm sorry to cut the Court off.
12          THE COURT:  Go ahead.
13          MS. BRAIN:  That's true.  What we are
14   concerned about is the process in the examination
15   room.  And if the very fact that Mr. Christensen is
16   going to be aware that the video camera is there, he
17   is going to see it probably, it will inhibit or has
18   a strong possibility of uninhibiting his responses
19   to the doctor's questions, which will undermine the
20   reliability of the evaluation.
21          So it is not so much what can be used -- it
22   is more to do with what is going on in the moment
23   and this constant reminder that anything I say could
24   be out in the public.  Of course, the Court is
25   correct that the doctor will testify to that, but it
```

 1  won't be the constant reminder of the video camera
 2  there or the threats of, you know, verbatim
 3  video-taped statements that would -- I think give
 4  anybody pause in talking about their most innermost
 5  secrets and experiences.
 6          THE COURT:  Do you think that practically
 7  speaking there will be some pause on
 8  Mr. Christensen's part to open up given the
 9  circumstance that he faces himself in and this is a
10  government expert that's actually examining him
11  without the videotape or audiotape?
12          MS. BRAIN:  I think that's most definitely a
13  concern, Your Honor, but not one that really can be
14  overcome.  But this is an extra layer on top of
15  that, that threatens to result in a skewed and not
16  truly representative interview.
17          THE COURT:  Mr. Nelson, anything further on
18  that?
19          MR. NELSON:  No, Your Honor.  I think this
20  is one of the situations where both sides have a
21  strongly held position and that's why the Court has
22  the discretion.
23          I would submit that an audio recorder seems
24  to solve the problem that Miss Brain is addressing,
25  while also protecting Dr. Dietz's interest in making

1    sure that everything gets done.

2         THE COURT:  If I were to be inclined to

3    allow some sort of recording, does the defense have

4    a position, and I really -- I don't know where this

5    is going to be -- does the defense have a position

6    on what would be preferable as opposed to video or

7    just audio?  Without waiving any objection to the

8    recording at all, I get that.

9         MS. BRAIN:  Understood, Your Honor.  I think

10   that video is somewhat more intrusive and more

11   threatening, but I think that the concerns apply

12   with -- to much the same degree with audio also

13   because they can play audio on CNN as well.  So

14   audio is a shade better but the problems are --

15   certainly don't go away.

16        THE COURT:  I would clearly want to avoid,

17   Mr. Nelson, an opinion from the government that if

18   there was a video that somehow responses, reactions,

19   facial, or other physical responses that you thought

20   somehow were inappropriate to certain questions, you

21   would think could be used for the jury.  You're not

22   asking for that though, right?

23        MR. NELSON:  No, Your Honor.  I think that

24   Dr. Dietz is the expert.  Dr. Dietz will be

25   testifying based on his expertise and his

examination.  We are not substituting the video for
that testimony.

        The purpose here really is just to preserve
the completeness and the accuracy of the
examination.

        THE COURT:  Okay.  Anything?  Last word.
Anything else?

        MS. BRAIN:  I will just note that Dr. Dietz
has used the videotapes in prior cases and precisely
that way.

        THE COURT:  How has it been used?  Tell me.

        MS. BRAIN:  Basically playing the
highlight --

        THE COURT:  In the penalty phase?

        MS. BRAIN:  Yes.

        THE COURT:  And for the purpose of -- give
me an example.

        MS. BRAIN:  For the purposes of sharing the
defendant in the most pejorative and prejudicial
light possible.

        THE COURT:  Mr. Nelson, has he used it --
you may disagree with the characterization, but has
it been used in the penalty phase to establish that,
maybe, something in aggravation.

        MR. NELSON:  I am aware of the case.  I

think it was the *Coonce* and *Hall* case, Your Honor,
where it was used as part of his presentation.
There was no objection to him using it.  The defense
has objected.  I'm telling Your Honor we are not
going to use it for those purposes.

      THE COURT:  Okay.  Any other arguments or
points anybody wants to make on that issue?

      MS. BRAIN:  Not on that question, Your
Honor.  But just briefly with respect to questioning
about the crime.

      As we said in our pleadings, based on false
premise our experts are not -- we have instructed
them not to ask about the crime.  There is no
requirement under the law that there be a proven
nexus between mitigation and the actual offense as
to not -- the cases that follow, so we are perfectly
entitled to present evidence of what
Mr. Christensen's mental condition was in the
pre-time leading up to this.

      There is, of course, an inference that it
didn't suddenly change on the date of the crime, but
we are not required to prove nexus in order to make
it relevant.  We are not going to do so.  And,
therefore, if the government expert questions on
that subject it is outside the scope of the Fifth

 1  Amendment waiver, Your Honor.

 2       THE COURT:  So that leads to -- in my mind I

 3  am not sure that I can rule on this today until I

 4  hear from the defense on 263, 264, and 265; and

 5  maybe most specifically 263, which was filed under

 6  seal.  And the purpose of filing under seal, because

 7  I don't see how we can have it completely under seal

 8  without then addressing this in open court, because

 9  the logical question is if -- it seems from 263 -- I

10  will just do it this way -- that that goes to -- has

11  some relevance to the offense conduct, and that's

12  the interaction of alcohol, medication, drugs.

13       So I think that we need to -- I need a

14  response from defense on that so that we can have a

15  full discussion on whether that is in fact the case

16  or not and the motion is to exclude, so for other

17  reasons as well.

18       Your thoughts on that, Mr. Nelson and

19  Miss Brain.

20       MR. NELSON:  I see them as distinct and the

21  reason I do, Your Honor, is because they were

22  presented as non-12.2 witnesses, so my impression is

23  hard for me to guess, but it appears to me as though

24  it's mitigation not related to the Rule 12.2(b)(2)

25  that they have already given notice of.  If it is

1  related to that, then it is improper because they
2  have already given their notice and this wasn't
3  included in that.
4        So, I think that they are distinct.  They
5  are certainly related and in terms of what
6  information the Court wants to have before it rules,
7  that's obviously up to the Court and we are happy to
8  do whatever the Court would like.
9        THE COURT:  I think so because I know that
10 both of you say they are non-Rule 12.2 experts, but
11 I see some blur here.  So, I think that maybe I will
12 wait for a response on those before addressing the
13 second issue.
14       I think I can make a determination on the
15 audio and that will -- that order will be
16 forthcoming and then address the other one after we
17 get a response.
18       Can the -- and because there is a request
19 for *Daubert* hearing -- let's address that right now
20 on 263, 264, and 265.  There are a number of issues
21 raised.  One is timeliness.
22       But can the defense respond to 263, 264, and
23 265 by March 21st; do you think?
24       MS. BRAIN:  March 21st --
25       THE COURT:  That's a week.

1          MS. BRAIN:  Yes, Your Honor.

2          THE COURT:  If necessary, could we do a

3   *Daubert* hearing on March 25th, which is a day that

4   we had scheduled but now we don't?

5          MS. POLLOCK:  Was that formerly the final

6   pretrial date?

7          THE COURT:  Yes, and we would do it in

8   Urbana.

9          MS. POLLOCK:  That would be fine, although

10  we have to first secure the appearance of our

11  witnesses.  We have not checked their schedules yet,

12  so counsel could be free but --

13         THE COURT:  If I made a ruling on one of the

14  -- on the timeliness issue, then maybe we -- but I

15  do believe that we should, to be cautious, make --

16  have it scheduled.

17         Mr. Nelson?

18         MR. NELSON:  I would request, Your Honor, if

19  it's at all possible to do the following week, the

20  first week of April.  Once things got moved, I

21  scheduled other work travel for that week.  I can

22  move it if I have to.

23         THE COURT:  We can move it.  We are not up

24  against any clock right now.  We have time.  It

25  probably would be the second week in April not the

1  first week in April because I have things scheduled

2  there as well.

3           But if -- and if you don't want to answer

4  this at this time, Miss Brain, I completely

5  understand.  I'm just trying to get a feel because

6  it is going to be an issue, if you'd rather wait

7  until you do a full reply.

8           But when were these three retained?

9           MS. BRAIN:  Gosh, Your Honor.  If the Court

10 wouldn't mind, I would rather -- prefer to do that

11 in the reply.  I don't have that information at my

12 fingertips.

13          THE COURT:  Tell me procedurally, how these

14 get filed under seal, and I understand why, and the

15 response under seal; but yet we have got to address

16 this in open court.

17          So how do you propose that we accomplish

18 both?

19          Clearly, Miss Pollock, if we had a *Daubert*

20 hearing, it's all coming out, right?

21          MS. POLLOCK:  Your Honor, if we have a

22 *Daubert* hearing, Your Honor, I believe that will

23 focus upon the qualifications of the witness in

24 order to pass the bar of expert testimony, which

25 will not necessary include the facts of the case.

1  My assumption, not speaking for the government, is
2  that there are certain facts represented in those
3  motions which has necessitated them being filed
4  under seal.  We -- I don't believe we need to file
5  our response under seal, because I believe that the
6  government doesn't fully understand the reasons why
7  we disclosed those witness as we did.  So we can, if
8  need be, file a response under seal; if not be, we
9  won't.
10         In terms of the hearing it only focuses on
11  their qualifications, I see no need to seal the
12  courtroom.
13         THE COURT:  Well, if you don't file under
14  seal, maybe the government was just being cautious
15  because these are defense tendered as experts and
16  didn't want to -- so tell me why you filed it under
17  seal.
18         MR. NELSON:  Given the factual allegations,
19  I thought the most prudent course.  You can always
20  unseal.  You can't unring a bell.  Rather that risk
21  things getting out, and there has been a lot of
22  press coverage in this case.  So I certainly didn't
23  want to be the one who exposed some of these defense
24  theories to the press this far in advance of trial.
25         THE COURT:  With that in mind, Ms. Pollock,

1  if you feel that you can file a response, that are

2  not under seal, then would there be any reason why

3  at that point then the government's motions would

4  then be unsealed as well?

5          MS. POLLOCK:  Well, Your Honor with

6  permission I would like to re-review the motions.

7          THE COURT:  Fine.

8          MS. POLLOCK:  They were just filed, and so

9  we have not fully reviewed them, but what I would

10 anticipate is that their legal arguments regarding

11 the applicability of these witnesses to potential

12 litigation could likely be unsealed, but to the

13 extent that there are specific facts referenced in

14 there that are at this point not disclosed, we would

15 request those to be kept sealed.

16         THE COURT:  So I am going to leave it up to

17 you, all right?  When you file your response, when

18 you choose how to do so, and we will regroup when we

19 have further argument on it.  So we won't schedule

20 the *Daubert* hearing on the 25th.  We will schedule a

21 day in the second week of April, and by then I will

22 have a response.  And if the government wanted to

23 reply, they can ask; and, you know, some of the

24 issues raised may not require a hearing as well.

25         I have Thursday, April 11th open all day.

1  We can go to Urbana that day if you want to
2  tentatively schedule the *Daubert* hearing if it is
3  necessary.
4         MR. NELSON:  That's fine, Your Honor.
5         MS. POLLOCK:  That's fine.
6         THE COURT:  Okay.  We will start it at, say,
7  9:30.
8         Okay.  Now, let's get to the jury issues.
9         All right.  So I'm going to rule on the
10  audio or video recording request.  I'm going to
11  reserve on the offense conduct issue.
12         And let's talk about the jury issues, right?
13         Is there anything else the parties need --
14  think that we should address first?
15         MR. NELSON:  Not for the government, Your
16  Honor.
17         MS. POLLOCK:  No, Your Honor.
18         THE COURT:  Okay.  Let me tell me you to
19  date, and we sent out 500, March 4th or 5th.  We
20  sent out another 500 of the questionnaires on the
21  10th, 11th, or 12th.  And to date --I'm not even
22  considering the second 500 since they went out a
23  couple days ago.  But of the first 500, we have had
24  -- and there is still time for responses, they are
25  given 14 days or so -- we've had 200 respond.  So we

have had quite a few responses right away.  I have
kept -- I've excused 14 -- 13 were deferred for
reasons of pregnancy or issues like that.  I've
excused 14.  So total of 27 have been excused.  I'm
keeping track so that the parties can review the
notes on the reason for the excuses, but they have
ranged from age, vacations planned with
verifications, disabilities, caregiving duties.  So,
I have addressed those.

        So going forward, I think that -- what I
would like to do is start to send to all of you when
we get a good batch like this, and we have 200 now.
Get them electronically to you with the protective
order previously in place and have you review them.
And my first thought is -- and then after this I
will open it up for discussion.  My first thought is
after -- as you can, get 200, get 400, get 600 -- as
you get them, after you've got a certain amount of
time to review them yourselves, I'm going to ask the
parties to confer.  And then if you can agree on who
should be excused then that will save us a lot of
time initially having people come here that don't
need to come here.  Okay?

        Now, with that in mind, from both sides I'm
open to have some thoughts.  I'm not going to share

1  them yet.  You will know it by the questions I ask,
2  but I'm open to what you think from there, from that
3  point on what you think this process should look
4  like.  And given that we should start June 3rd with
5  having people come in, tell me the time frame you
6  think this process looks like as well.

7          So who wants to go first, government or
8  defense?

9          MR. RUBENSTEIN:  I am happy to, Your Honor.

10          THE COURT:  Mr. Rubenstein.  Am I
11  pronouncing it correctly?

12          MR. RUBENSTEIN:  Yes.

13          THE COURT:  Okay.  Good.  Thank you.

14          MR. RUBENSTEIN:  I wanted to address four
15  issues.

16          One is the procedure generally for jury
17  selection that we propose; the issue of addressing
18  case-specific questions during jury selection,
19  during voir dire; third, the issue of ensuring
20  jurors understand the tremendous personal
21  responsibility each juror will have to decide
22  whether Mr. Christensen lives or dies, the
23  individual responsibility that they have; and
24  fourth, the issue of demonstrative aids, visual
25  aids.

1          And to start, if I can have the screen on.

2          The -- since 2010, by my count, there have

3  been 29 trials that have -- 29 federal capital

4  trials that have been tried.  Three of those have

5  been multiple defendant cases.  Twenty-seven of

6  those 29 cases the Court has permitted individual

7  questioning of perspective jurors on punishment

8  questions, so it is the prevailing practice.

9          THE COURT:  When you say "individual," tell

10  me what that means on punishment, individual on

11  punishment.

12          So are there any questions as a group.

13          MR. RUBENSTEIN:  Can I show you an order

14  that --

15          THE COURT:  Yeah.

16          MR. RUBENSTEIN:  Yes, generally often times

17  the Court will bring in a panel and do some general

18  questions on pretrial publicity.  Someone raises

19  their hand, "We don't want to blow up the whole

20  panel; we will get to that when we talk to you

21  individually, but thank you for letting us know."

22  Hardship, other types of bias.  And then the panel

23  goes to the jury room.  And then the Court brings

24  them out individually for questioning.

25          THE COURT:  All right.

1          MR. RUBENSTEIN:  So in the *Con-ui* case,
2   which was tried recently.  Here is an order from
3   Judge Caputo.  This is the Middle District of
4   Pennsylvania.  If I could just get this working.
5          So here we go.  So here is an order from
6   Judge Caputo which describes what you were just
7   describing in terms of the parties get the
8   questionnaire.  In March 13th, two weeks later the
9   parties provide a list of stipulated strikes to the
10  Court.  The Court reviewed those in paragraph five.
11  Two weeks later, the jury clerk, in paragraph six,
12  gave the parties a list of the jurors.  After the
13  Court had excused folks for statutory reasons and
14  for, I think there were agreed reasons, and then the
15  stipulated strikes, the parties get a list.  And
16  then paragraph seven, trial schedule for April 24th
17  of 2017, 12 jurors were brought in per day.
18          So the attorneys had ten days after they had
19  that final list to prepare for voir dire.
20          And here, more specifically to address the
21  Court's question for the general voir dire,
22  hardships, pretrial publicity, bias, prior contact
23  with the defendant, attorneys, and witnesses.  So
24  people would raise their hand, "Thank you, we are
25  going to keep track of that," then when the jurors

 1  would come, individually, there could be follow-up
 2  on those specific issues.
 3          The last issue here in Judge Caputo's order:
 4          Following general voir dire, the perspective
 5  jurors are excused and cause challenges are argued.
 6  If there is someone -- if one of those general
 7  issues arise -- brings that to the Court.
 8          THE COURT:  What were the cause challenges,
 9  they were addressed right on the spot, right?
10          MR. RUBENSTEIN:  For some folks in the
11  general -- so someone says, "Judge, I went to school
12  with you, I didn't -- I had some bias because of
13  that," we could excuse that juror and not bring them
14  in.
15          THE COURT:  And then when they are brought
16  in and then individually questioned, then if there
17  is a cause challenge; is that addressed then?
18          MR. RUBENSTEIN:  Yes, Judge.  Often times
19  the juror leaves and then there is a discussion.
20  Sometimes the parties would agree.  Sometimes there
21  is a signal that -- we are doing the questioning, we
22  look over, they agree, they move a cup somewhere; so
23  it is sort of agreed.  We would ask the Court, "I
24  think that we have an agreement, Your Honor."
25          The juror leaves and then you would rule,

1   and then bring the juror in and say "Thank you, but
2   you've been excused."
3           THE COURT:  All right.
4           MR. RUBENSTEIN:  Then after 70 jurors were
5   qualified -- so this so-called death qualification
6   and life qualification, the Court gave the
7   government and the defense two days to prepare -- to
8   prepare to exercise the preemptory challenges.
9           THE COURT:  How did they do that then?
10          MR. RUBENSTEIN:  How did they exercise
11  preemptory challenges?
12          THE COURT:  So if reduced it -- or if 70
13  jurors qualified, so we are at that point, and you
14  say that you have two days to review the 70 and then
15  exercise your preemptories.
16          First of all, can we agree on the number of
17  preemptories?  What do you think it is.
18          MR. NELSON:  Well, by statute it's 20 each,
19  and then we have to determine how many preemptories
20  there are and how many alternates there are.
21          THE COURT:  Okay.
22          MR. RUBENSTEIN:  Yes, Your Honor.
23          THE COURT:  So 20 each, we are starting
24  from, right?
25          MR. RUBENSTEIN:  Yes.

1          THE COURT:  Do you think that 20 includes
2    alternates?  So tell me -- let me let you keep
3    going.  Tell me what happens to this 70.
4          MR. RUBENSTEIN:  So we pre-qualify 70.
5    Normally, I think the government proposes this, they
6    get shuffled by the jury clerk.  So we then get a
7    list of the jurors 1 to 70, and those would be the
8    jurors that are coming into the box.  And, you know,
9    they don't really have to -- you don't have to put
10   them in the box, they could be seated in the
11   courtroom, and then generally there is paper and the
12   parties -- the government would strike first, then
13   we strike, then we go back and forth.
14         THE COURT:  Generally the causes have
15   already been taken care of, right?  So now it's just
16   exercising your 20.
17         MR. RUBENSTEIN:  Yes, Your Honor.
18         THE COURT:  Go on.
19         MR. RUBENSTEIN:  After the 12 are seated, if
20   the government has some preemptories leftover.  If
21   we have some leftover, they are gone.  You don't get
22   to use those for the --
23         THE COURT:  Alternates.
24         MR. RUBENSTEIN:  For the alternates.  Thank
25   you.

1          And they would get two more and we would get
2   two more, and then we would get pick -- depending on
3   the Court's concerns about how long the trial is --
4   but four to six alternates.
5          Okay.  That was Judge Caputo in the *Con-ui*
6   case.
7          THE COURT:  Is that what you're asking us to
8   do?
9          MR. RUBENSTEIN:  Yes.
10         THE COURT:  So on the 70, we go by juror
11  number.  And for the purpose of today, let's talk
12  about 1 through 70.
13         So Juror 1, you exercise a preemptory.  So
14  that juror is excused.
15         Juror 2, you don't.  The government doesn't.
16  So Juror 2 is going to be on the jury, right?
17         MR. RUBENSTEIN:  The --
18         THE COURT:  In other words, what I'm getting
19  at after we get through this, it's the first 12 that
20  haven't had a preemptory on them, that those are the
21  12 that we are going to start with?
22         MR. RUBENSTEIN:  It can work that way.  The
23  last time I struck a jury was in the *Sampson* case in
24  Massachusetts two years ago.  And we can -- as I
25  recall, we can strike anyone in -- the government

1 can strike Juror 62.

2          THE COURT:  I gotcha.

3          MR. RUBENSTEIN:  We could then strike 35.

4 You can strike anywhere in that range.  And then the

5 lowest 12 were in the box.

6          THE COURT:  Okay.

7          MR. RUBENSTEIN:  Here is --

8          THE COURT:  And then you do the same for the

9 alternates but -- except for people that have

10 already been struck, they are gone.  So whatever is

11 left, then exercise -- each of you two more to pick.

12          What are we going to do here, six

13 alternates?

14          MR. NELSON:  That would be our

15 recommendation, Your Honor.

16          MR. RUBENSTEIN:  Four or six, Your Honor.

17          THE COURT:  Okay.  Let's be safe and go six.

18 All right?  We good with that?  So now we have 18.

19 So we are good there.  All right.

20          MR. RUBENSTEIN:  This is the order from

21 *Fell*.  *Fell* had 15, 20 years of capital litigation.

22 He got a death sentence in Vermont.  The case was

23 just settled in October.

24          I was counsel of record in the *Fell* case,

25 and Judge Crawford in this order indicated that he

1  was bringing in ten jurors in a day; five in the
2  morning, five in the afternoon for the voir dire.
3        Judge Crawford held a five-day evidentiary
4  hearing, a challenge to the federal death penalty,
5  and heard testimony about the arbitrariness, the
6  statistics, about voir dire, about the challenges of
7  jurors actually following these relatively complex
8  principals and issued a pretty remarkable order.
9  Ultimately finding that he didn't have the power and
10 discretion to declare the statute unconstitutional,
11 but finding serious, serious problems with the
12 statute.  And that formed, I believe, the approach
13 to voir dire; that is allowing the parties and the
14 Court to go through a careful, deliberate,
15 comprehensive jury selection process.
16       THE COURT:  Okay.  Now in each of these
17 cases do you have any idea like how many allowed the
18 attorneys to ask questions, how many the Court
19 conducted examination on, or ball park?
20       MR. RUBENSTEIN:  Of the 29 cases since 2010,
21 I've been in this position, in a national position
22 in the defender program since 2010.  In 29 trials, I
23 think 27 of those included attorney questioning, not
24 exclusively, but allowed attorney questioning in 27
25 of those.

1          THE COURT:  Okay.

2          MR. RUBENSTEIN:  And then, Your Honor, just

3   in our pleadings, we cited to, you know, the common

4   practice in capital cases in the United States is to

5   permit attorney-conducted voir dire.

6          THE COURT:  And just so you guys know,

7   unless you -- maybe you have already, maybe you do

8   know -- I've allowed attorney voir dire in every

9   single case that I have tried in this court and the

10  state courts.  I do think in this case though that

11  we are going to rein in -- going to have some

12  guidelines, and I'm going to conduct some

13  questioning and ask some of the questions that you

14  wish to have asked, and then -- but I'm going to

15  have a circumstance where the attorneys will be able

16  to ask some questions, too.  I just haven't

17  completely thought that through, but I'm going to

18  try to do both.  Okay?

19         MR. RUBENSTEIN:  Thank you.

20         Moving on to the issue of the case-specific

21  type of questioning.  This is a chart of data from

22  the Capital Jury Project, and this was in our

23  pleadings relating to the juror questionnaire.

24         And the Capital Jury Project, Your Honor, is

25  a National Science Foundation, funded research

 1  organization.  They publish peer-reviewed articles.
 2  And they have interviewed over a thousand jurors who
 3  have served in capital cases.  So they have gone
 4  through voir dire; they've been qualified.  They
 5  have, you know, been through a trial where they
 6  received instructions, filled out the verdict form,
 7  and rendered life verdicts and death verdicts.
 8       And what this chart shows is that a number
 9  of these jurors that have served historically are
10  impaired, have constitutional impairments that they
11  should not have served.
12       So in this example, we see if a defendant
13  planned premeditated murder, 57 percent of the
14  jurors who served believed that death was the only
15  acceptable punishment for that kind of killer, for
16  that guilty killer.
17       THE COURT:  Why did they believe that?  They
18  were clearly informed otherwise, right?
19       MR. RUBENSTEIN:  I think it's because --
20  it's because the defense community has done a poor
21  job of eliciting their true feelings, of eliciting
22  their views.  I think that it's shallow voir dire
23  which is:
24       "Do you understand the two options here?
25  Can you consider both options?"

1          "Yes, I can."

2          "Thank you.  You're qualified."

3          That shallow kind of voir dire ends up with

4  folks who -- the other example here is murder during

5  another crime, during kidnapping.

6  Twenty-four percent of the jurors who served

7  believed that death is the only appropriate sentence

8  for that type of offender.

9          Just one other chart that we have --

10          THE COURT:  So tell me how you remedy that.

11  Give me an idea of the type of question that

12  addresses that issue.

13          MR. RUBENSTEIN:  Can you indulge me and let

14  me do that in two minutes?

15          THE COURT:  Yep.

16          MR. RUBENSTEIN:  Because that's precisely

17  what I want to try to provide you with examples of.

18          THE COURT:  All right.

19          MR. RUBENSTEIN:  Here is another chart from

20  the interpleadings.  These are -- these, you know,

21  the cites to the articles are here.  And in this

22  instance, "planned premeditated murder," again, only

23  acceptable punishment is over 50 percent; "killing

24  during another crime," 23 percent; a "rape with

25  permanent injury to the victim" is almost a quarter

1  of the jurors who have served.

2      So a lot of jurors who are serving in

3  capital cases in jurisdictions across the country,

4  and they addressed the three capital schemes:  the

5  weighing scheme, the non-weighing scheme, and the

6  directly-questioned scheme.  So defense counsel is

7  not doing a very good job, and we are not

8  historically having that bias come forward.

9      So, you know, the government cited an

10  article I wrote in the "Champion," which is a

11  defense criminal defense magazine, and I guess it's

12  nine years ago now.  And they cite to this portion

13  in the article that says, Rubenstein advocates that,

14  quote, Attorneys should discourage the Court from

15  using language that suggests the voir dire process

16  is designed to identify jurors who can be fair or

17  appropriate for the case.

18      And I think what they are doing is

19  suggesting this voir dire that the defense does is

20  trickery; it's not trying to get a good jury that is

21  going to render an appropriate, fair verdict.

22      In the article here is the language --

23  excuse me -- in the red brackets are what they

24  cited.  And what they left out is, "and avoid

25  language that conveys the message that the jurors

are being judged, interviewed, or otherwise
evaluated, because the language encourages jurors to
provide what they viewed as socially acceptable
rather than candid responses."

So what we want is to create -- what I
propose, Your Honor, is that we try to create an
atmosphere where jurors can share their feelings;
where they feel that they are not being judged; it's
not a test.  We are genuinely interested in where
they are coming from.  People in the community have
all sorts of views and we want to learn those
things.

And I guess the last portion of that
paragraph; this is the proposed language that we
have for the Court:

"You will all be treated with dignity and
respect, and I simply ask you to provide honest and
complete answers."

So we are not trying to trick folks.  We are
trying to create an atmosphere of candor and
respectability.

THE COURT:  So you're just asking that that
language be addressed as part of some kind of
introductory remarks?

MR. RUBENSTEIN:  Yes.  Yes.

```
 1          THE COURT:  Which -- and I don't know what
 2   the government's position on that is, but I use
 3   language similar to that in every case where I ask
 4   people to be open and honest with their answers so
 5   that the lawyers can make informed choices as to
 6   jury selection.  And then I go on to tell them if
 7   they think a question or an answer would be
 8   embarrassing to them or a family member or somebody,
 9   to please let me know and we will recess to the
10   privacy of the chambers or sidebar.
11          MR. RUBENSTEIN:  I think that's great.
12          THE COURT:  In that regard, with that as to
13   that, I'm not -- I don't have any issues with that.
14          Go ahead.
15          MR. RUBENSTEIN:  Your Honor, we also
16   attached --
17          THE COURT:  Do you think that that's the
18   answer?  That's all needs to be done to address --
19          MR. RUBENSTEIN:  No --
20          THE COURT:  I feel like you are getting to
21   some case type specific questions, too, right?
22          MR. RUBENSTEIN:  Yes, I am.
23          THE COURT:  Go ahead.
24          MR. RUBENSTEIN:  To take a short detour on
25   the language, Judge Sorokin in Massachusetts in the
```

*Sampson* case prepared -- I think it's probably a
four-page instruction to the panel of jurors before
they filled out the questionnaire, that's
target-gone-by, but he prepared another one and gave
it to the panels.  I think in Mr. Sampson's case we
had around 12 to 14 jurors come in.  He would hand
them the instruction in the morning and they would
read that before voir dire, so they were -- they
knew the context and they had this type of language
before they came into court.

THE COURT:  Okay.

MR. RUBENSTEIN:  So with regard to the
case-specific questioning.  The government's
pleading cites the *Johnson* case, and that is Judge
Bennett from Iowa, wrote a very comprehensive
decision in the *Johnson* case.  I think we heard
about Angela Johnson's case earlier.  The government
was saying something about case-specific questions
and cites *Johnson* and then seems to suggest abstract
questions, status questions, case-categorization
questions, case-specific questions, stake-out
questions, and kind of lumps them all together.

And then says, "This is an effort to
manufacture inconsistency in a potential juror's
answers and thus disqualify them from the jury."

1          That has never been in any jury selection
2     that I've been involved in; that has never been what
3     we've been trying to do.
4          And so they -- the government in their
5     pleadings cites the *Ramsey* case from the Eighth
6     Circuit, and Judge Bennett addresses the *Ramsey* case
7     and says, "Like the *Morgan* decision, it sheds little
8     light on the propriety or impropriety case-specific
9     questions because the defendant did not propose such
10    questions."  So *Ramsey* is not relevant to this
11    question.
12         And you look at Judge Bennett's experience
13    -- so Angela Johnson was tried with *Honken*, her
14    boyfriend, and they killed -- they were involved in
15    a drug deal and they killed some children.  So Judge
16    Bennett had firsthand experience with this jury
17    selection.
18         And says, "In *Honken* there were numerous
19    examples of the phenomenon that jurors agreed that
20    they could fairly consider both life and death
21    sentences in the abstract, but quickly acknowledged
22    that they could only consider one penalty in a case
23    involving certain facts."
24         In this case it was the murder of children.
25         So, where Judge Bennett comes out on is a

sensible rule, which is, you know, case-specific
questions are appropriate, indeed necessary to
impanel a fair and impartial juror.

So that, you know, the aggravating factors
alleged in this case by the government; a person who
is found guilty of kidnapping, sexual assault and
murder.

Some people might say for murder -- if a
person is guilty of murder, I can consider both
options.  But if you're telling me as a category
case, not getting into the specifics about where the
DNA was found and the instruments that might have
been used and everything else, but as a category
case, a person who kidnaps, sexually assaults and
kills a woman, yeah, for me the death penalty really
is the only appropriate sentence.  That helps the
Court evaluate that juror's bias.  Can they give
equal consideration of these options; are they
impaired under the standard?

The other nonstatutory aggravators the
government cited to:  no remorse, other serious acts
of violence, prior sexual assault.  There may be
people who say, Gosh, if there is a pattern, if I
find that these things are true, I would not be able
to consider life.  That is important for the Court

 1  to know.

 2          THE COURT:  So when you say "case-specific,"

 3  you mean this case specific?  What might be the

 4  general statement of facts of this case?  Or do you

 5  mean other cases, too?

 6          MR. RUBENSTEIN:  I have a number of examples

 7  that I can show the Court --

 8          THE COURT:  All right.

 9          MR. RUBENSTEIN:  -- in just a moment.

10          So, the *Johnson* decision -- the government

11  cites *Johnson* for suggesting somehow that

12  case-specific questions are not appropriate.  And

13  that's not -- that's not what the case stands for.

14  It would be permissible for defense counsel to frame

15  case-specific questions as life qualifying:  Could

16  you fairly consider a life sentence if the evidence

17  shows X?  If the evidence showed that victim's body

18  was never recovered, could you consider life in that

19  type of case?

20          No, I couldn't.

21          Or most people -- you know, most people

22  would say, Yes, I could.

23          But to give you specific examples, here's

24  from the *Con-ui case*, which was tried in 2017.  This

25  is not the same category of case as this case, Your

1  Honor.  In *Con-ui* it was a prison killing.

2          You were asked in the questionnaire, what

3  are your views on the death penalty for a prisoner

4  who intentionally kills a correctional officer with

5  premedication.  No legal excuse, no justification,

6  the person wasn't insane, not acting under heat of

7  passion.

8          Your answer was, I think he should get the

9  death penalty, yeah.

10          Do you feel that way today?

11          Yes.

12          So that's the category question, it's not --

13  in *Con-ui* there is a videotape of the assault and

14  the murder, kicking the correctional officer down

15  the stairs where he does this tumble down, sitting

16  on his chest while he is stabbing him, taking gum

17  out of his pocket and chewing the gum, taking a

18  drink, taking a break, then going back to his cell;

19  that's all stuff the government is going to run at

20  trial as aggravation; that is not appropriate to do

21  in voir dire.  That is stake-out.  That is very fact

22  specific, inappropriate.

23          But as a category case, as a prison killing

24  case, I think that it is appropriate to do that kind

25  of questioning.

1             In this example, this is the same juror.

2             We asked you -- and, frankly, the

3    questionnaire that -- unfortunately, the

4    questionnaire that we have is -- doesn't include any

5    of these -- the questionnaire that we have is very

6    bland.  And, unfortunately, if we had a better

7    questionnaire, the parties would be able to identify

8    jurors on both ends of the spectrum; the extreme

9    pro-death, death-biased jurors; and the extreme

10   never-consider-death, life-scruple jurors; and we

11   would be able to agree on those folks.

12            Our questionnaire --

13            THE COURT:  You don't know that yet.  You

14   haven't seen any answers yet.

15            MR. RUBENSTEIN:  Fair enough.

16            THE COURT:  Okay.  You might be surprised.

17            MR. RUBENSTEIN:  So for juror -- this is the

18   same juror:

19            We asked you on another part of the

20   questionnaire what types of premeditated murder you

21   think deserves death.  You said, Again, when a

22   person knew what they were doing, when they killed

23   the other person, correct?

24            Yes.

25            You had concerns about taxpayer dollars?

1              Yes.

2              So Juror 2 is excused for cause.  And this

3  juror is mitigation-impaired.

4              I have heard people say what happens as a

5  child, when you become an adult, you're responsible;

6  right?

7              Yes, I agree with that.

8              So this person is not open to considering

9  mitigation.

10             THE COURT:  So you're saying that these are

11  appropriate types of questions.

12             MR. RUBENSTEIN:  They are, yes.

13             THE COURT:  And all I'm asking is so on the

14  facts of this case -- I mean, you're not going to

15  ask -- you're not saying we should be asking

16  questions about other types of facts that have

17  nothing to do with this case, right?

18             MR. RUBENSTEIN:  No, Your Honor.  So it

19  would be along the lines of, I don't want to talk

20  about this case.  You haven't heard the facts in

21  this case, but let's assume that you were in a

22  different case and you were on the jury and you

23  heard evidence where the government was charging

24  someone with kidnapping, sexual assault, and murder;

25  and you were convinced that the evidence proved that

1  that person is guilty, and there was no legal excuse
2  or justification.  They weren't insane.  They
3  weren't under compulsion or duress.  It wasn't an
4  accident.  They did it because this was premeditated
5  and planned and they did it.  How do you feel about
6  the death penalty for that kind of guilty killer?
7         And some people will say, Yes, a life for a
8  life, an eye for an eye; that's the way I was
9  raised; those are my values.
10        And I would say, Thank you for sharing that
11 with us, that's consist with where your
12 questionnaire was at.  I think that the government
13 may have questions.
14        If the government agrees that they are the
15 extreme impaired juror, then we would agree.  If we
16 didn't, you'd do your questioning and make your
17 decision.
18        THE COURT:  Okay.
19        MR. RUBENSTEIN:  So just not to go too --
20 not to belabor this, but here is the *Duong* case,
21 which was tried in the Northern District of
22 California.  The reason that I'm citing to this is
23 this is -- Jeremy Fogel was the district court judge
24 in San Jose.  I was not counsel of record, but I was
25 present.  And Judge Fogel became the director of the

1  FJC, so he is involved in training your brothers and

2  sisters.

3          Here is a prosecutor:  My question to you,

4  as we go through this first phase, the guilt phase,

5  to prove to you that the defendant committed four

6  underlying state convictions, four murders.

7          So they are describing the type of case it

8  is.  Not getting into the facts that one of the

9  victims was disabled and sitting in his car.

10         But what I want to ask you, is at this point

11  the government has proved that the defendant

12  committed those murders, have you made up your mind

13  about what the sentence would be?

14         So that's the question that Judge Fogel

15  permitted.  The Court in fact followed up with it at

16  a different portion.  Mr. Duong was in an Asian

17  gang.

18         There is going to be evidence in this case

19  that he may have been involved in an Asian gang.

20  And that's Judge Fogel asking that question.

21         Example after example, the *Lujan* case, which

22  was tried in New Mexico, involved a murder of a

23  young man -- kidnapping and murder of a young man.

24  The defendant had killed two people previously.

25         The question that was permitted there:

1          Some folks would say if the government
2  presents evidence that there were multiple victims,
3  there is more than one person who is killed, a
4  person is killed before; I understand I'm supposed
5  to consider aggravation in mitigation but for me if
6  there is more than one victim, that other stuff
7  doesn't really matter, it is going to be death; is
8  that the where you are coming from?
9          There is an objection, and the Court
10  overrules the objection.
11          Here in the *Casey* case the prosecutor is
12  asking these types of case-category questions.  The
13  *Casey* case was tried in Puerto Rico.  It was the
14  killing of the police officer.
15          And AUSA Anderson:  "Let's assume, pretend
16  the person brings evidence of prior crimes, prior
17  rape, rape of an underage girl and then that person
18  murders a police officer, could you vote for death
19  if it is proven in that case?
20          So, child starvation case, a case that I was
21  involved in, counsel of record in the Western
22  District of Oklahoma:
23          Am I correct in saying if it is a child
24  victim, starvation of a child that caused the death,
25  that resulted in death; you have listened to the

1  evidence but for you based on the way you were

2  raised, the death sentence is really the only

3  appropriate sentence?

4          Yes.

5          And I don't recall specifically if that

6  juror was excused or not.

7          So it's common.  And the idea that the

8  government is suggesting this is designed to elicit

9  conflicting responses -- let's see -- that it's to

10 manufacture an inconsistency and disqualify them

11 from the jury, I submit is not accurate.

12         The third issue, Your Honor, was this issue

13 about voir dire and jurors and confirming that they

14 understand the tremendous responsibility that the

15 juror will have if they are seated in this case, and

16 asking -- finding out how they feel about that

17 responsibility, ensuring that they are willing to

18 take that responsibility on.  And then evaluate

19 their responses in terms of our cause, potential

20 cause challenges and preemptory challenges.

21         The government in their pleading:  The Court

22 should not allow the defendant to ask nullification

23 questions.  These are designed to encourage

24 potential jurors to employ their unique moral

25 judgment and nullifying the issue of punishment and

1  derogation of their duty to deliberate.

2         And I read this, I couldn't believe this.

3  I've been doing capital litigation for 20 years.  I

4  have never, never seen this argument made in a

5  capital case, in state court or federal court.  The

6  very bedrock of the Eighth Amendment in capital

7  sentencing is each juror has to make an individual

8  personal moral judgment about this man's life; is he

9  going to live or die.  And the law in every

10  jurisdiction, and certainly under the Federal Death

11  Penalty Act, requires each juror to understand they

12  have this man's life in their hands.  If they vote

13  for life, he lives.  He only gets executed -- he

14  only gets sentenced to death if every juror decides

15  in their weighing that they are convinced,

16  individually, based on their life experience, who

17  they are, their morality, that they decide this man

18  must die.  And if all 12 jurors decide that, then

19  the Court has to impose death.

20         So, this reminded me of this --

21         THE COURT:  Let me -- that's a good break

22  point for me to ask this question.

23         We've got other counts as well that have to

24  do with false statements.  So do you anticipate that

25  if, if there is a guilty verdict, and then if --

```
 1  then we go to the penalty phase and whatever it is
 2  life or death, that at that point after that, we are
 3  still then setting this matter down for a sentencing
 4  hearing or imposition; and then the other -- and the
 5  two counts that aren't life or death, what happens?
 6  Where do they fit in here?  We have another
 7  sentencing hearing?
 8           MR. RUBENSTEIN:  They are a nonissue, Your
 9  Honor.  If we end up --
10           THE COURT:  I understand, but they are in
11  the record here.  They are part of the charges,
12  right?
13           MR. RUBENSTEIN:  Yes.  If we end up in a
14  sentencing trial, if the jurors return a unanimous
15  life verdict or a nonunanimous death verdict and it
16  is by law the Court imposes life, the Court would
17  impose a life sentence.  The Court could run those
18  other counts --
19           THE COURT:  Without moving it down the road.
20  Do you agree with that?
21           MR. NELSON:  In terms of they become
22  essentially irrelevant?  I do.
23           THE COURT:  And whether it is done the day
24  that the jury decides that and then whatever it is
25  they decide.
```

1          MR. NELSON:  I think that's right, Your
2  Honor.  Either life or death, that exceeds the
3  five-year statutory maximum.
4          MR. RUBENSTEIN:  Your Honor, I've had the
5  experience of having a client sentenced to death in
6  federal court and the Court received the verdict,
7  and then set sentencing over for some period of
8  time.
9          THE COURT:  Right.
10          MR. RUBENSTEIN:  And the victims had an
11  opportunity to address the Court.  And my client's
12  family did, too.
13          THE COURT:  Okay.  Very good.  Thank you.
14          MR. RUBENSTEIN:  So the *Hooks* decision in
15  2010 is very relevant to this nullification
16  argument.  And this involved a Prosecutor Macy from
17  Oklahoma, who is infamous for prosecutorial
18  misconduct.  So in this case, this is a 2254 about
19  assessment of a death sentence from state court.
20          The prosecution's closing arguments were
21  presented in two parts.  The first part was
22  presented by Brad Miller.
23          As said to mislead the jury as to sentencing
24  role, I'm informing the jurors the jury's work would
25  be wasted if it failed to reach unanimous verdict;

1  any argument by defense counsel that it took one

2  vote, the vote of only one juror, prevented

3  imposition of the death penalty amounted to a

4  request for jury nullification; and three, the

5  failure to deliberate in the manner leading to

6  unanimous verdict would amount to operating outside

7  the law.

8       And here is -- they quote the language from

9  the argument.  I suggest defense counsel's probably

10 going to say something to the effect that someone on

11 this jury can hold up the decision.  They will

12 likely tell you that it just takes one person to

13 stop all of this, but that's just common argument

14 down here.  It has a name.  It is called jury

15 nullification.  To nullify a jury, a jury's job, a

16 jury's efforts -- sorry -- really requires only

17 convincing one or two people.

18      And then Macy, the infamous, concluded in

19 his closing argument by reaffirming this

20 misstatement of Oklahoma law:  Any result other than

21 an unanimous verdict would be anathema to the

22 principles underlying our legal system.

23      And the Tenth Circuit, you know, clearly --

24 this is not even close.  What the government is

25 asking you to do I think is reversible error, just

1  at the outset.

2       The -- immediately following the jury
3  instruction, which spoke only of unanimity, the
4  prosecutors engaged in intentional misconduct
5  designed to misinform the jurors that it is improper
6  for individual jurors to holdout against a majority
7  vote and thereby prevent a unanimous verdict.  There
8  is no doubt the intentional misconduct on the part
9  of Miller and Macy violated those constitutional
10 rights.

11      So here the *Briseno* case, when I've looked
12 for other cases that this Court might, you know,
13 identify as -- well, other cases in the Seventh
14 Circuit.  The only case in the last nine and a half
15 years is *Briseno*, which was tried in the Northern
16 District of Indiana.  And the Court provided a
17 lengthy discussion to the panel every day when the
18 panel jurors came in and here is the transcript.
19 And this is the judge advising the jurors before
20 voir dire:

21      So if after weighing all of the aggravating
22 and mitigating factors, 11 jurors believe that a
23 death sentence is justified, but one juror believes
24 it is not, then the defendant would receive a life
25 sentence -- I'm sorry -- life imprisonment.  That

1  would be the sentence.

2          The reason why this is a critical issue is

3  the jurors have to understand that unlike the normal

4  culpability trial where non-unanimous result is a

5  mistrial and they have to -- everyone has to come

6  back and try this thing again, by statute if it is

7  6-6 or 10-2, whichever direction, the Court has to

8  impose a life sentence.  It is critical for each

9  juror to understand that; to know that they have the

10  power to grant life; in some respects the power to

11  take life.

12          Here, Your Honor, Judge --

13          THE COURT:  Won't the jury instructions -- I

14  understand you're making this argument because you

15  believe -- to prohibit the government from saying

16  something that the jury -- misinforming or

17  misinterpreting the jury instruction, but won't the

18  jury instructions say that to the jury?

19          MR. RUBENSTEIN:  They do at the end.  This

20  in *Briseno*, the Court was providing this instruction

21  before voir dire even started so the jurors

22  understand that responsibility.  So sometimes when

23  I'm talking to a juror, asking questions of a juror,

24  and say, you know, do you understand if we get to

25  this final step by your vote, you will have --

1          THE COURT:  So your proposal is whatever
2  instruction is the right one to use, that it be
3  given ahead of voir dire on that issue of the
4  juror's responsibility?
5          MR. RUBENSTEIN:  I think it's critical
6  because -- and I have a transcript here, which I can
7  show you, where some -- I've had jurors say, I'm not
8  willing to do that.  I will work as a group, but if
9  you're saying individually I have to make this
10  decision, I'm not comfortable with that.
11          That's one issue where we would request that
12  you excuse such a juror.
13          But the other issue is a juror is qualified
14  -- appears to provide qualifying answers.  And I
15  say, Can I ask you how you feel with that kind of
16  responsibility, knowing that the law doesn't give
17  you this checklist; you check these boxes, you have
18  to give death; you check these, you have to give
19  life.  The law says look within you, weigh the
20  aggravation and the mitigation, and you decide does
21  the aggravation so sufficiently outweigh the
22  mitigation to justify death and you decide.  How
23  does that make you feel?
24          And some jurors say, I don't know.  I will
25  follow the law, it's not a problem.  Other jurors

1  say, Wow, I can't believe you're really telling me

2  that the law says I have to make this decision.

3  That's a tremendous responsibility.  That's makes my

4  frightened.

5         In terms of us evaluating who we want on

6  this jury in exercising our preemptory challenges,

7  one juror is pretty good for us, one juror maybe not

8  so much.

9         THE COURT:  All right.

10        MR. RUBENSTEIN:  And this is Mike Warbel, a

11 colleague of Mr. Nelson at the capital case section

12 DOJ in the *Lujan* case.

13        You have to makes that decision based on

14 your personal beliefs based on the evidence.  Based

15 on your personal beliefs and your morals about what

16 you think is the right punishment in this case.

17        This idea that there is jury nullification,

18 to tell jurors that they make this decision

19 individually is somehow inappropriate, is not

20 followed by Mr. Nelson's colleagues or the courts

21 that have considered this.

22        The last issue that I wanted to touch on --

23 okay -- was this instruction.  So this is from the

24 *Richardson* case, which was tried in Northern

25 District Georgia in 2012.  I was not counsel of

1  record, but I was present.

2          Here is Judge Cooper who video-taped the

3  instruction that he gave to the panels so that he

4  did not have to give it over and over again.  I just

5  wanted -- this is ten minutes.  I'm not going to

6  play the whole thing, just to show the beginning of

7  it.

8          Do we have sound?

9          (Playing video.)

10         MR. RUBENSTEIN:  Your Honor, that's the

11 beginning of the instruction.  The portion that I'm

12 going to play is an excerpt of this where he is

13 addressing this so-called nullification issue that

14 the government raised.

15         (Playing video.)

16         MR. RUBENSTEIN:  The last issue, Your Honor,

17 that I was hoping to address was the idea of the

18 visual aids that I think facilitated more efficient,

19 effective questioning in voir dire.  And here is the

20 -- this was filed in our -- 179, juror

21 questionnaire.  I think this is the juror

22 questionnaire pleading.

23         Here is voir dire of a juror.  I think this

24 is the *Lujan* case in New Mexico.

25         You know, if we all -- what I hear you

1    saying is, you know, if we all work together and

2    make a collective decision, I can do that.  But if

3    the law requires me to make up my individual

4    decision on this, really, I'm not going to do that.

5              Is that where you are coming from?

6              I guess that's where I'm coming from, yes.

7              So then the Court sort of takes over.  And

8    of course when we think in terms of juries, we

9    normally think in terms of 12 people arriving at a

10   decision through a deliberative process because

11   that's what we are exposed to, that's what we know,

12   that's what's described on TV.

13             What counsel is describing for you is a

14   slightly different process when you get down to this

15   third level.  And when he says "third level," the

16   connection is that visual aid that I want to show

17   the Court in just a moment, because it helps when

18   jurors can see on a big poster the schematic of how

19   a capital case may proceed.  It is easier to say,

20   "Do you understand if we get to this third weighing

21   portion?  "So the judge is asking, "The law says we

22   are going to take a different approach and everybody

23   individually looks at these mitigating factors.  You

24   look at them personally."

25             And at the end of that inquiry, "If that's

the way the law works and that's what the law
requires of you, could you do that?"

        "No, I could not do it."

        It was important to learn that then,
obviously, as opposed to never.

        So, here is the schematic that was -- oh,
shoot.  Have I been in the dark this whole time?

        Judge, do you see the transcript where --
okay.

        This is the visual aid that we had blown up
in New Mexico for the *Lujan* case.  And when the
judge was saying on that third page, Judge Brack was
pointing to the weighing determination in that
scale.

        The other visual aid that we had in court in
the *Lujan* case was this indictment.  So it allowed
us to ensure jurors understood the charge,
kidnapping resulting in death; what the statutory --
the statutory factors, aggravating factors, and what
the non-aggravating factors were.

        In our pleadings, again on the juror
questionnaire we filed here.  *United States v. Naeem
Williams,* a Hawaii case, a similar type of visual
aid.  This is Judge Seabright.

        In the *McCluskey* case in New Mexico, a

similar type of visual aid with an indictment
showing the capital counts in the *McCluskey* case.

Here is the *Connell Williams* case.  I was
counsel of record in this case in Oklahoma.

*Lashaun Casey*, is a different kind of
exhibit.  Again, showing the jurors, "If it is not
guilty, we stop.  We go home.  There is no more --
there is not a sentencing trial.  We only go to
sentencing trial if these things happen."

Here is the life or death decision making
chart that was used in the *Lashaun Casey* case in
Puerto Rico.  "No juror is ever required to impose
sentence of death."  Why is that permitted?  Because
a lot of jurors don't understand that.  And a lot of
jurors think that it is required and that they don't
have responsibility.  So being able to explain this
and say how does that make you feel and a juror
says, "Wow, that suggested it's really my decision
and I'm not comfortable with that, I don't want to
do that."

The last principle, if even one juror votes
for life, the sentence would be lifetime
imprisonment.  Again, that enhances their sense of
responsibility.

And then in the *Candelario* case, a similar

1   kind of visual aid with a similar principles chart.

2          The *Brian Richardson* case which we heard

3   Judge Cooper giving that instruction on.

4          And the *Larry Lujan* case which we talked

5   about already.

6          And then *Duong*, which is again Judge Fogel.

7          Judge, there were eight victims, eight

8   homicide victims in that case and the indictment

9   was -- indictment chart was five pages, five pages

10  long.

11         And the last -- so last night on the plane

12  out here, Your Honor -- I haven't shown this to the

13  government.  The trial is a ways out and I don't

14  have -- it's only on my computer, so, of course, I

15  will provide it to the government and the Court.

16  This was a rough proposal of what a schematic would

17  look like if the Court thought that it would be

18  helpful.  It helps us identify where the indictment

19  is.  If there is a not guilty at the bottom, the

20  trial stops.  If it moves forward, there is a

21  threshold determination of a mental intent and the

22  statute for aggravating, and then the weighing

23  determination with the aggravating and mitigating

24  factors.

25         I think importantly at the bottom, if they

are unanimous for death, the Court imposes death.

The Court doesn't have discretion and

Mr. Christensen will be executed.

          If they are unanimous for life, or if they

are not unanimous, then it's going to be life

without release.  And that quote there near the

bottom is the statute, you know, the ultimate issue

is the jurors are to consider whether the

aggravating factors sufficiently outweigh the

mitigating factors to justify death.

          So respectfully, we ask the Court to allow

us to use that visual aid with an indictment chart.

          THE COURT:  That visual aid you would use

would be at what point?

          MR. RUBENSTEIN:  I'm sorry?

          THE COURT:  At what point would the visual

aid be used.

          MR. RUBENSTEIN:  It would be -- ideally it

would be on a big easel and talking to a juror

saying so if we -- "Do you understand that the

aggravating factors have to be found unanimously?"

          "Yes, I understand that."

          In this case the government has alleged

that --

          THE COURT:  But you're saying that is when

```
 1  they are individually questioned or we have got the
 2  group, as a group?
 3          MR. RUBENSTEIN:  Individually.
 4          THE COURT:  All right.  Okay.
 5          MR. RUBENSTEIN:  Thank you, Your Honor.
 6          THE COURT:  Mr. Nelson.
 7          MR. NELSON:  Yes, Your Honor.  I
 8  understand --
 9          THE COURT:  And maybe if you would at some
10  point if you do have any agreement, let me know that
11  there is an agreement on a particular point or
12  issue, okay?
13          MR. NELSON:  Well, I agree that the Court
14  has the discretion to set up voir dire in the way
15  that the Court sees fit.  I agree that the proposal
16  that we put in our motion, which Mr. Rubenstein
17  seems to adopt, is appropriate.  I don't agree --
18          THE COURT:  Procedurally wise you're saying?
19          MR. NELSON:  Procedurally in terms of
20  calling in the number of jurors, asking the general
21  voir dire questions, and then bringing them in one
22  at a time.  I agree with what the Court summated
23  about keeping things reined in.
24          With regards to our argument on
25  nullification and stake-out questions, that was all
```

 1  litigated pretty heavily in the jury questionnaire.
 2  The government's position is that those were
 3  properly kept out of the questionnaire and that the
 4  Court would be proper in keeping those questions out
 5  of the voir dire as well.  It went no further than
 6  that.  And the suggestion that we are going to
 7  commit prosecutorial misconduct in closing argument
 8  is a little extreme.
 9          THE COURT:  Can you think of some -- all
10  right -- keep going.
11          MR. NELSON:  All right.  Let's see.  With
12  regard to Mr. Rubenstein's statement that he wishes
13  we had a better questionnaire.  I would take issue
14  with that as well.  This is a negotiated
15  questionnaire.  We sat down -- I sat down with
16  Miss Pollock for an hour, more than an hour hashing
17  this out.  We agreed.
18          THE COURT:  Well, that's really a nonissue
19  right now --
20          MR. NELSON:  I understand that, Your Honor.
21          THE COURT:  -- about 1500 people are
22  receiving it.  So that's out.  Whether you agree on
23  the type -- what my thought was on that matter was
24  to go with what mostly what you guys agreed upon,
25  and then I thought I was going to be asking you guys

```
 1  for then questions specific as follow-up to submit
 2  to me in advance, and then we will go through those
 3  and I fully expect to get most of those right back,
 4  and then we will address them.  I thought that if
 5  they are asked, in any way, shape or fashion, it
 6  would be better to address them when you can see the
 7  response.  So that's my thought process.
 8          So I'm not saying they are going to be
 9  asked, but ones that are going to be asked, that's
10  my thought process.  Okay.
11          MR. NELSON:  That's fair enough, Your Honor.
12  I would also submit --
13          THE COURT:  What about case-specific -- you
14  will get to it.  Keep going.
15          MR. NELSON:  Case-specific questions, Your
16  Honor --
17          THE COURT:  Clearly, they will have to be
18  advised of what is at issue here and what the theory
19  is and if it's proven, you know, it's a fair
20  question then to ask them in some fashion, right?
21          MR. NELSON:  I think that's right, Your
22  Honor.  I mean, we only had the questions that were
23  before us in the questionnaire to work with.
24          THE COURT:  Right.
25          MR. NELSON:  And we believe and continue to
```

believe that a lot of those are objectionable.
Obviously, the jury has to, you know, we gain
nothing by asking the jury no meaningful questions,
neither us nor the defense.  So the real issue is in
the tenor and tone of the question, the way in which
they are asked and asked by whom and over what
period of time.  I think that's the issue.

         The main issue is, you know, as the Court
has talked about in terms of timing of voir dire,
you know, a week or two weeks.  What Mr. Rubenstein
is proposing is not accomplished in less than a
month; it is just not.  So that will reshape the
entire schedule for the Court the way it is shaped
up.

         THE COURT:  Mr. Rubenstein, is that right?
Do you think what you are proposing will take a
month?

         MR. RUBENSTEIN:  It depends.  This is -- it
depends on --

         THE COURT:  I guess we will know that when
you submit all of questions that you want me to ask,
right, and I decide which ones will be asked,
basically.

         MR. RUBENSTEIN:  I think it depends how
quickly -- how many people are on the extreme -- how

many folks who come in here are on the extremes and
identified quickly and then are gone and we get to
the heartland, people in the middle.  *Briseno* took
ten days of jury selection.  The *Sampson* -- the
*Con-ui*, I believe, took 20 days; so that's four
weeks.

So, you know, I think the jury selection
could take, if the Court -- if the Court followed
the 27 to 29 cases that have been tried, if the
Court followed that general approach, I think the
voir dire would take two to four weeks.

THE COURT:  What was of the shortest time in
those 27 cases?

MR. RUBENSTEIN:  You know, the rocket docket
in Virginia, I think it was the Somali pirate cases,
I think it took two days.  And that's no attorney
conducted voir dire.  It's the judge talking to a
huge panel saying -- you know, from the defense
perspective.

THE COURT:  What was the verdict?

MR. RUBENSTEIN:  Life.

THE COURT:  Was it affirmed or was it
appealed?

MR. RUBENSTEIN:  It's life, so no.

THE COURT:  Okay.

1          MR. RUBENSTEIN:  Fortunately, it was.

2          There is case where a life sentence was

3    appealed, it's now being tried again.

4          THE COURT:  Go ahead, Mr. Nelson.

5          MR. NELSON:  This is all in footnote two of

6    our brief, you know.

7          Yes, there are a couple that are shorter.

8    There is also *Kaboni Savage* which took three months.

9          So, part of -- the less control the Court

10   exerts, the longer it is going to take.  That's just

11   nature.  You give attorneys time to talk, it is like

12   water, we will fill up the space.  So I think that

13   the Court's idea of reining things in and having

14   firm guidelines is a very good one.

15         I do take issue and continue to take issue

16   with the demonstratives.  And specifically the big

17   red stop sign.  I think that this is obviously a

18   decision for the Court to make, not for me.  But

19   encouraging the jurors or mentioning to the jurors

20   or pointing out to jurors that at some point they

21   can just sort of throw up their hands and stop

22   deliberating; obviously there are Eighth Amendment

23   concerns, and, obviously, there are personal

24   considerations they have to take into account.  And

25   the idea that we are sort of suggesting otherwise, I

1  think is a misinterpretation of our argument.

2       But the point is, is that telling the jurors

3  upfront that they don't have to deliberate is a

4  dangerous situation in a case like this or in any

5  case.  So I think that that has to be considered by

6  the Court in how you frame these procedures and how

7  you frame these questions.

8       THE COURT:  Do you guys think that you would

9  be able to agree, ultimately, on the jury

10 instructions that will be given on the issues and on

11 the -- and on the jury on their deliberations

12 towards reaching a verdict and that type of thing?

13      MR. NELSON:  I think for the most part, yes,

14 Your Honor.  I would guess within 90 percent --

15      THE COURT:  If that's the case, wouldn't

16 just something like that just be helpful ahead of

17 time to -- whether we call it a visual or not,

18 instead of a visual with stop signs, just what you

19 guys can agree on would be the law to the jury to

20 follow?

21      MR. NELSON:  I don't disagree with that,

22 Your Honor.

23      THE COURT:  Okay.  Because I'm not opposed

24 to the idea of a visual to inform the jury, but I

25 think where that fits, we will see.  Okay.

```
 1          MR. NELSON:  And, you know, Your Honor, this
 2  is really what our argument boils down to is that we
 3  think the Court is in a better position than
 4  Mr. Rubenstein is to determine how this should go
 5  forward and what procedure should be followed.
 6  Mr. Rubenstein is an advocate.  That's his job.
 7  That's fair.  He's a death-penalty abolitionist.
 8  That is his position.  He is entitled to it.  But
 9  there is a reason why those procedures are advocated
10  in all of these death penalty cases by this group.
11  That is just a fact of life.  So is the defendant
12  entitled to a fair voir dire?  Of course he is.
13  Does the Constitution require that he receive
14  individual voir dire?  No court has ever said so.
15          The appellate courts that have considered it
16  have ruled otherwise.  And the Supreme Court has
17  denied cert. in all of those cases.
18          *Mu'Min*, which is, I think, one of the key
19  Supreme Court decisions on voir dire in a death
20  penalty case is a paneled voir dire and it took a
21  day.  I think that the issue for the Court to
22  consider is that what has to be asked by a
23  constitutional standard and by a legal standard is
24  much smaller than what the defendant would like to
25  ask.  Are there advantages of asking some questions
```

1  and not others?  Of course.  But we would submit

2  that we -- the better practice would be to keep the

3  issues focussed on whether the juries can be

4  impartial and whether they can be impartial on the

5  issues that are in play in this court rather than me

6  spending hours and hours with each individual juror

7  about a series of questions that may not have

8  anything to do with that.

9          THE COURT:  Your thoughts were to have each

10 side have ten minutes with a juror, right?

11         MR. NELSON:  Yes, Your Honor.

12         THE COURT:  And you still think that?

13         MR. NELSON:  Yes, Your Honor.

14         THE COURT:  Okay.  So under 20 people -- you

15 can be seated.

16         You were talking 20 in the morning, 20 in

17 the afternoon of Monday, Tuesday, Wednesday,

18 Thursday, Friday; so that's 40.  Twenty minutes each

19 juror, how do we accomplish it that way?

20         MR. NELSON:  It is difficult, Your Honor.  I

21 realize we agreed to what we thought the principles

22 should be before we realized how much time there

23 really was.  And this is part of the problem.  You

24 know, if you look at it, you know, we were trying to

25 run the numbers with individual voir dire trying to

1  get it done in two weeks with the number of jurors
2  we have to reach.  You know, given the preemptories
3  and given alternates and everything else, we are
4  looking at maybe 20 minutes total per juror and that
5  is if we run seven hours a day with no breaks.  And
6  what may need to happen, candidly, is that we all
7  agree that one week is perhaps impossible unless we
8  do strict panel voir dire.  Two weeks is ambitious,
9  but there is a lot of ground between two weeks and
10 three months.  And the more efficiently we run the
11 process, I think, frankly, the better jury we will
12 get and the better off we will all be by not
13 spending days and weeks and months in voir dire.
14       THE COURT:  All right.  Let me just share a
15 few thoughts with you.
16       From what I've learned and gathered to this
17 point, and I think I'm trying to be very realistic
18 here and I realize that once we start trying a case,
19 it sometimes goes more quickly than we imagined,
20 sometimes it doesn't.  But if we stay on a pretty
21 regular schedule, which I will outline.  If we have
22 jury selection begin on June 3rd, then we are four
23 weeks, I believe from the 4th of July holiday break.
24       If we have picked a jury in the first week
25 or even the first couple of days of the next week

1  and then we start the evidence, it be seems to me

2  that we might finish the guilt phase before the 4th

3  of July holiday and that would be an appropriate

4  time to take if -- depending on the verdict, if we

5  are going to a penalty phase -- that would be an

6  appropriate time to take a week or two before we

7  started the penalty phase.  So, I'm just laying that

8  out.

9          We have sent out now a thousand

10 questionnaires.  The second batch just went out.  My

11 thought -- and I think to be safe we have ordered --

12 I'm going to order another 500 to go out, so 1500.

13 If we stay on the same pace of response that we have

14 so far, we are going to have, I believe, a

15 sufficient number of people to choose from.  My

16 thought was by March 30th, the end of this month to

17 electronically have sent to all of you everything

18 that we've received and if they are still some

19 coming in, they will keep coming to you.

20          And then maybe within a couple weeks after

21 that, if you could -- and I will set out some

22 guidelines, I think -- to confer and see who you

23 agree should be excused and those people would not

24 be brought in.

25          From the remainder then of those brought

1  in -- this is where we get to where both of you have
2  indicated, and I think Mr. Rubenstein, do you have a
3  preference on any certain number each morning?  I
4  like the morning and afternoon session issue or at
5  least have them here for all day.  But do you have a
6  request on a number?
7          MR. RUBENSTEIN:  I think realistically six
8  and six.  If things went faster or people were
9  bringing in hardships that they hadn't raised
10 earlier or people were, you know, learning the
11 nature of this case and then sharing extreme views
12 and we are losing more people more quickly then we
13 can up that number.
14         THE COURT:  Right.  But we have to give them
15 enough notice so that we have -- that's what I'm
16 struggling with here -- so that people know what day
17 they are coming in.  So I think the fewer we have in
18 -- and I'm thinking again this way -- I'm thinking
19 of whether it's 6 or 20, or 30, that they are all
20 going to be assembled and I'm going to ask a number
21 of preliminary questions that have to do with
22 hardship.  And we may, you know, we will lose
23 whatever we lose at that point, and then they
24 will -- the people that are remaining, the people
25 that can stay, can be with us for four or five, six,

1  seven eight weeks, whatever it is, then we will
2  start conducting some questions.  And I'm going to
3  conduct most of the questioning initially.  I'm
4  going to have you submit to me questions that you
5  wish to have asked and I will either decide to do so
6  or not, and if I do not, I will tell you why.  Then
7  I'm going to ask -- I'm going to do as much as we
8  can in open court.  But I do believe that there will
9  be a point that after we've conducted an open-court
10  examination, that we will ask a lot of the questions
11  you want asked individually but might be asked in
12  open court as well; that then we will go
13  individually, and we will have met first for any
14  follow-up that you wish asked individually, but
15  also I might recite some of the questions that I
16  have asked in open court individually to see if, now
17  that they're just with us and not in open court, if
18  their answers would be the same or if they are
19  different or if for some reason they didn't feel
20  like they could answer a certain way in open court.
21          So we are going to have a little hybrid here
22  that I'm going to try to keep relatively tight but
23  giving everybody a full and fair opportunity to
24  either ask the questions they wish or not because I
25  have said so.

1          I'm not opposed to some sort of visual.  I'm
2  not opposed to in some fashion a case-specific about
3  the facts of our case to the extent you -- maybe you
4  can even agree because -- and if I'm understanding
5  you right, it would be an example if the government
6  were to prove, and that's sort of our facts -- would
7  your verdict only be or would -- okay.  I think we
8  can phrase that to work so that it's acceptable to
9  both of you.  And I do believe if we do this, and
10 that's why I think the more that we have in
11 initially the better and that way if it turns out we
12 don't need to have as many brought in, it will be
13 easier to tell people to reduce the numbers then to
14 increase the numbers.
15         Go ahead, Mr. Nelson.
16         MR. NELSON:  I just had one question, Your
17 Honor, because it wasn't clear from what you just
18 laid out.
19         It's been the government's position with
20 regard to these jury questionnaires.  The parties
21 should not be given the potential jurors' names or
22 addresses or anything like that -- all of that is
23 redacted with just the juror number.
24         THE COURT:  Just the juror number, I think.
25 Although you may have -- no, because their names

 1  come back.  Their names come back as well.  We are
 2  not going to release those names to the public.  So
 3  I think you will have the names but the protective
 4  order, I believe, clearly makes it clear that it
 5  stays with you.
 6          MR. NELSON:  We would just request that it
 7  be redacted, Your Honor.  I think it is easier that
 8  way.
 9          THE COURT:  I'm not sure we can do it.  If
10  we are going to do all of this electronically.
11          MR. RUBENSTEIN:  Your Honor, we would like
12  to have the names under the protective order and the
13  only cases that -- the only case that I know of
14  where the name weren't provided, I think was the
15  *Basciano* case in New York, the organized crime case.
16  But every other case that I'm familiar with, we have
17  the names.  We can refer to the jurors by number
18  certainly in the public proceedings.
19          MR. NELSON:  I would just submit, Your
20  Honor, we are getting these questionnaires well in
21  advance of trial, which is very helpful.  I don't
22  mean to say otherwise, but there is no purpose in
23  acquiring the names and addresses of these people
24  other than to make use of that information.  There
25  is no reason to have it.

1          THE COURT:  But -- so tell me why, what use
2    would be made and why that should be different than
3    everything -- other cases we try in here?
4          MR. NELSON:  I don't.
5          THE COURT:  We get a book -- every other
6    case we get a booklet it has all of information and
7    you get that same booklet.
8          MR. NELSON:  But we don't get it months
9    before trial, and we don't have an opportunity to
10   research all of the potential jurors and go through
11   public records and all of those things.  I'm just
12   stating a concern, Your Honor.
13         THE COURT:  Okay.  That's a point made.  I
14   will keep that in mind.
15         All right.  Based upon what I have said, any
16   further thoughts or questions?
17         MR. NELSON:  No, Your Honor.
18         THE COURT:  How long do you think you need
19   once you start receiving -- and I'm not going to
20   wait until we get the whole batch.  We have got 200
21   we can send to you, but for the request to have the
22   names redacted, which might be difficult given that
23   it also asks about family members and things.  So I
24   don't know how we do that.  But I will think it
25   through.

1        But otherwise, I'm -- well, let me ask this:
2   The protective order doesn't address research on the
3   jurors, does it?
4        MR. RUBENSTEIN:  I don't believe so, Your
5   Honor.
6        THE COURT:  What are your thoughts on that?
7   Do you think that you're going to go through and
8   look through all of jurors' Facebook pages and
9   things?
10       MR. RUBENSTEIN:  I think if there is a
11  concern, if there is a reason to.  Certainly in the
12  in the *Sampson* case that was tried in Boston, the
13  prosecution and the defense were conducting some
14  social media investigation, and it was fruitful, not
15  often.  Most of it is, you know, dozens of pages of
16  timeline or whatever is on Facebook that is pictures
17  of dogs and whatever.  But occasionally there will
18  be someone who misrepresented information, and it
19  was better to learn about it during voir dire
20  upfront then it is -- you know, both -- *Sampson* was
21  a retrial because a juror lied, misrepresented
22  significant information about her life and her
23  daughter.
24       THE COURT:  What about that?  What is your
25  response to that?

```
 1          MR. NELSON:  I think that if you --
 2          THE COURT:  Wouldn't the government want to
 3   know some things, too?
 4          MR. NELSON:  Your Honor, I believe that what
 5   we want to know we can sort out through voir dire.
 6   I don't think that opening the door to Facebook
 7   research on potential jurors will do anything other
 8   than elongate the process.
 9          THE COURT:  Maybe I can address it through
10   some addition or supplement to the protective order
11   as well.  Let me think it through as well.
12          Go ahead.
13          MR. RUBENSTEIN:  With regard to the
14   questionnaires and the parties working together to
15   get a list to Your Honor.  In Fell, the Court put a
16   Dropbox together and had one paralegal from each
17   team have access to that Dropbox and got the
18   questionnaires.  I think the Court gave us ten days
19   to work in batches of 200.  We worked on them.  The
20   government worked on them.  We met and conferred a
21   few days before the deadline and then provided the
22   Court with that list.  We did those in batches and
23   it seemed to work fairly well.
24          MR. NELSON:  That seems reasonable, Your
25   Honor.
```

```
 1          THE COURT:  Okay.  What else?  Everybody is
 2   pretty agreeable today.
 3          Okay.  Anything --  let me just take a
 4   couple minutes and look at my notes, regroup, make
 5   sure that I have covered everything that I want to
 6   cover today.
 7              So let's take ten minutes.
 8              (A recess was taken.)
 9          THE COURT:  Okay.  Thank you.  Please be
10   seated.
11          Okay.  To the extent that we may add to the
12   protective order, I'm not quite sure yet, but
13   because I think first thing I'm going to do likely
14   look into redacting names, and, of course, in open
15   court they will be referred to by the juror number.
16   The other thing is as to a Dropbox, we will have IT
17   look into that, but it may be old school.  We may
18   just put it on a disk or a flash drive for you and
19   you will get them in batches.
20          Other on that, I'm going to try to clean
21   this up here in short order so that we have the
22   parameters, and I think we've covered everything
23   today.
24          Is there anything else the parties want to
25   address?
```

1          MR. TUCKER:  Just one quick question, Your
2  Honor.
3          On that April 11th date, I take it that was
4  the first date that you had available that week, I
5  had a little bit of a conflict, I will work around
6  it if I have to work around it.
7          THE COURT:  What did we set for April 11th?
8          MR. TUCKER:  You set the Daubert hearing, I
9  think for the motions that were filed last night.
10          THE COURT:  What day of the week was that?
11          MR. TUCKER:  That's a Thursday.
12          THE COURT:  Do you think that you can work
13  around it or not?
14          MR. TUCKER:  Well, I'll have to do whatever
15  I have to do, so I don't want to say that I can't
16  work around it.  I can change my plans, if I have
17  to, travel plans but --
18          THE COURT:  What does -- so March 21is st
19  going to be the response, and would the government
20  want to reply?  Do you think?
21          MR. NELSON:  It's hard to know, but
22  possibly.
23          THE COURT:  All right.  And if you wish to
24  reply, how long would you need?
25          MR. NELSON:  A couple days, a week is fine,

1   Your Honor.

2         THE COURT:  So March 21st is the reply -- or

3   the response and that is a Thursday.  So then what

4   is the Tuesday, March 26th?

5         MR. NELSON:  That's fine.

6         THE COURT:  Reply, March 26th.

7         MS. POLLOCK:  Your Honor, if I might, this

8   is all an exercise in "maybe" at this point, because

9   should any of us wish to call witnesses in the form

10  of experts, we still have to verify their

11  availability for any of these possibles.  So if we

12  left it set for -- instead of the 26th or 11th or

13  anytime, we are all still going to have to go back

14  to our experts and check their schedules.

15        THE COURT:  Do you just want to wait until I

16  get the replies and then --

17        MS. POLLOCK:  It might be prudent to have a

18  status conference by phone after that point anyway

19  just to check on outstanding matters, and then we

20  can look at schedules, at least check with their

21  availability prior to that.

22        THE COURT:  Do you wish to be heard on that?

23        MR. NELSON:  That's fine.

24        THE COURT:  That's fine.

25        We are not going to have the March 25th now,

1  right?

2        MS. POLLOCK:  Agreed.  Unless you want to,

3  Your Honor.

4        THE COURT:  Nope.  Let's have then the

5  replies by March 26th.  And then let's say the

6  following week we will have a phone call and see

7  where we are.

8        So let's make the reply then March 27th

9  since that came over a weekend that will be another

10 day.

11       Monday, April 8th we will have a phone call.

12 We will have a chance to digest all of the briefs

13 and responses by then.  What time works for

14 everybody, afternoon, 1:30 on April 8th?

15       MS. POLLOCK:  Will this be in Peoria or

16 Urbana?

17       THE COURT:  We will do it by phone.

18       MS. POLLOCK:  Oh, by phone.

19       THE COURT:  1:30.

20       MR. NELSON:  Yes, Your Honor.

21       THE COURT:  Central Standard Time.  Okay.

22 Have a good day.

23                    ****

24

25

88

1        I certify that the foregoing is a correct

2   transcript from the record of proceedings in the

3   above-entitled matter.

4

5

6   s/Nancy Mersot          Date: May 9, 2019

7   Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25