1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
2

3

4   UNITED STATES OF AMERICA,   ) Docket No. 17-cr-20037
                                )
5          Plaintiff,           )
    vs.                         )  Peoria, Illinois
6                               )  April 8, 2019
    BRENDT A. CHRISTENSEN,      )
7                               )
           Defendant.           )
8   _____)

9

10

11                  RECORD OF PROCEEDINGS
                   STATUS CONFERENCE
                      **REDACTED**
12        BEFORE THE HONORABLE JAMES E. SHADID
               UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20

21

22
                Nancy Mersot, CSR, RPR
23        United States District Court Reporter
                100 N.E. Monroe Street
24               Peoria, IL  61602

25  Proceedings recorded by mechanical stenography,
    transcript produced by computer-aided transcription.

1

2                    THE APPEARANCES

3

4                 EUGENE L. MILLER, ESQ.
                 BRYAN DAVID FRERES, ESQ.
5                 Assistant U.S. Attorney
                    201 South Vine
6                    Urbana, IL 61802
                 On behalf of the Plaintiff

7

8                 JAMES B. NELSON, ESQ.
         United States Department of Justice
9        Criminal Division Capital Case Section
                      Suite 625
10                1331 F. Street NW
                 Washington, DC  2004
11               On behalf of the Plaintiff

12              ELISABETH R. POLLOCK, ESQ.
                 Federal Public Defender
13                 300 W. Main Street
                   Urbana, IL  61801
14               On behalf of the Defendant

15

16                GEORGE F. TASEFF, ESQ.
             401 Main Street, Suite 1500
17                 Peoria, IL  61602
                 On behalf of the Defendant

18

19                ROBERT L. TUCKER, ESQ.
                 7114 Washington Avenue
20                St. Louis, MO  63130
                 On behalf of the Defendant

21

22                 JULIE C. BRAIN, ESQ.
                    916 S 2nd Street
23               Philadelphia, PA  19147
                 On behalf of the Defendant

24

25

1    (Proceedings were held in open court.)

2    THE COURT:  Good morning.  Thank you.

3 Please be seated.

4    This is the United States v. Brendt

5 Christensen.

6    Parties present for the government in

7 17-20037 are Mr. Freres, Mr. Miller, and Mr. Nelson.

8    For the defense:  Mr. Christensen is present

9 with his attorneys; Mr. Tucker, Miss Pollock, and

10 Mr. Taseff, Miss Brain.

11    Okay.  Thank you for regrouping on short

12 notice.  I want to take care of a housekeeping

13 matter or two.

14    The Motion for Leave to File Surreply, which

15 295 referencing 296, that would be granted.

16    Let me ask about 289 as to -- before we get

17 to Mr. Sorensen, let me ask about the filing under

18 seal, 264.  The response is 289.  The reply is 294.

19 It seems that there is some indication that maybe

20 this does not need to be under seal.  Clearly, any

21 records attached to the response or to the motions

22 would be.

23    But let me hear from the government as to --

24 because my thought is this:  Any matters that we are

25 going to address -- and there is going to be a

1  couple of them -- that we would normally address in

2  chambers, when that time comes, I'm just going to

3  ask that the courtroom be vacated so that we can

4  address them here.  But the matters that we should

5  address in public, will be addressed in public.

6        And then so I'm asking about this one

7  whether there is a need to have this addressed in

8  chambers or generally speaking in public.

9        Go ahead, Mr. Nelson.

10       MR. NELSON:  Your Honor, I think as we

11  mentioned the last time we were here, we filed it

12  under seal under the abundance of caution, and we

13  would defer to the Court as to what the proper

14  status of that should be.

15       THE COURT:  Does the defense wish to be

16  heard on this?

17       MR. TUCKER:  Your Honor, we think there is

18  -- we don't object to unsealing the motion.  We

19  think that the exhibits should be -- Exhibits A and

20  B in our Response should remain sealed.

21       THE COURT:  Okay.  With regard to that then,

22  anything, Mr. Nelson, from the government?

23       MR. TUCKER:  When I said "unseal the

24  motion," I mean unseal the motion and our Response

25  in the pleading but not the exhibits to our

1  response.

2          THE COURT:  Correct.

3          MR. NELSON:  No objection.

4          THE COURT:  So we will unseal 294 -- or 264,

5   the United States' Motion to Preclude the Testimony

6   of Dr. Susan Zoline.  We will unseal the Response

7   which is 289, but the attachments, which are mostly

8   medical records and related thereto, will remain

9   sealed.  And then 294, the United States' Reply

10  could then be unsealed as well.

11          Okay.  Very good.  With that in mind then,

12  let me ask one more thing and that is to the United

13  States' Motion, which is 263, to Preclude the

14  Testimony of Dr. Vos, or in the Alternative, for

15  *Daubert* Hearing.  That was also filed under seal.

16  So, again, let me first address the sealing nature

17  of it, and then address where we are going from

18  there, whether we are in chambers or not.

19          Mr. Nelson?

20          MR. NELSON:  Yes, Your Honor.  This is --

21  again, we filed it under seal out of the abundance

22  of caution just given the allegations in the notice

23  as to what he would testify to.  We would defer to

24  the Court.

25          I would note, Your Honor, that our Motion to

1  Exclude was not opposed, and we would submit that he

2  should be excluded.

3          THE COURT:  Mr. Tucker, I note that there

4  was no response from the defense on this so that is

5  going to lead to the second question.  The first one

6  is as to the sealed nature.  Does the defense have a

7  position on that?

8          MR. TUCKER:  We don't care.  It is up to

9  you.  It is fine to unseal it.

10          THE COURT:  Then let me ask -- then we will

11  unseal 263 as well.

12          And now I will ask, is it at issue?

13          MR. TUCKER:  No, we will withdraw Dr. Vos.

14          THE COURT:  Okay.  That takes care of 263;

15  the government's motion is moot given the

16  representation that Dr. Vos is being withdrawn.

17          Is that enough for you?

18          MR. NELSON:  Yes, sir.

19          THE COURT:  Okay.  Then shall we go to

20  argument on -- in order, I thought that we would

21  address Sorensen, and then Zoline, and then the ones

22  that I know should remain sealed beginning with 251,

23  278, 287, and 296, all related to 251.  Those we

24  will argue in chambers, at least for the time being.

25          Okay.  So as to Mr. Sorensen.

1        Mr. Nelson.

2        MR. NELSON:  Yes, Your Honor.

3        THE COURT:  Let me ask this:  Is there

4  anything else the parties believe that we should

5  address by way of cleanup order before we get into

6  argument as to Sorensen and Zoline.

7        Anything?

8        MR. NELSON:  I don't think so, Your Honor.

9        THE COURT:  Okay.  Very good.  Go ahead,

10 Mr. Nelson.

11        MR. NELSON:  Thank you, Your Honor.

12        For the most part we will rely on our papers

13 with regard to Dr. Sorensen.

14        MR. TUCKER:  I'm sorry, could I interrupt

15 you.  I will make your life much easier.

16        MR. NELSON:  I guess now that you have

17 interrupted me, you may interrupt me.

18        MR. TUCKER:  I will make your life a little

19 easier.

20        THE COURT:  Okay.  Go ahead.

21        MR. TUCKER:  In regard to the government's

22 reply, we are not going to introduce any evidence

23 through Dr. Sorensen.  What we did in our response,

24 we said we were not going to introduce -- get into

25 any of this evidence that is presented in a lot of

these case concerning ADX and all of the
super-controlled procedures that are available to
BOP.

We did leave in our response, we did say
that Dr. Sorensen will testify concerning, quote,
the variety of security measures available within
BOP to control recalcitrant inmates.  We included
that assuming that it would just be a very short one
sentence sort of testimony from Dr. Sorensen, but we
will withdraw that.

The government -- the government devotes
some time to that in its reply, and I could see
where that reply would open up a little broader
inquiry than we ever really intended, so that's
fine.  Sorry to interrupt you.

THE COURT:  That's okay.  So clarify for me
what you will use Dr. Sorensen for, if you're going
to.

MR. TUCKER:  You want me to go ahead now?

THE COURT:  Well, yeah, if you would define
for me what it is that you would use Dr. Sorensen
for.

And I guess the first issue that I have to
ask here, as to both Dr. Sorensen and Zoline, so
that we can get this argument out of the way, is the

1 timeliness.

2           So why don't I ask the defense to address

3 that issue first.  And then let's get into the

4 parameters of what their testimony should be.

5           MR. TUCKER:  I think as far as the

6 timeliness, the government made clear in their

7 replay that they were not moving to exclude on

8 timeliness grounds.

9           And we are still -- it's not like we sat on

10 these witnesses at all.  We have given notice pretty

11 much after we identified them and signed contracts

12 with them.  So that's not the case at all.

13           THE COURT:  Okay.

14           MR. TUCKER:  And we are still months out

15 from the penalty phase.  They would be penalty-phase

16 witnesses.  So there is no prejudice, and I don't

17 think the government is really attempting to argue

18 that so --

19           THE COURT:  If that's the case, we will get

20 by that.  Okay.

21           All right.  Mr. Nelson with that in mind,

22 then argument as to Sorensen.

23           MR. NELSON:  Thank you, Your Honor.

24           Again, Your Honor, I think we covered this

25 pretty well in our pleadings, and I will be happy to

1  answer any questions that you have.

2        THE COURT:  Let me ask this:  First of all,

3  do you concede at all that there is -- that the

4  Seventh Circuit in *Johnson*, for instance, said that

5  a witness like Sorensen might be introduced for

6  rebuttal?  And there is a Sixth Circuit case,

7  *Taylor*, that I found that nobody cited that seems to

8  support the government's position, but it's not

9  cited.  Are you aware of that?  That's out of the

10  Sixth Circuit.

11        MR. NELSON:  I may have overlooked that one,

12  Your Honor.

13        THE COURT:  Okay.  Anyway, go ahead.

14        MR. NELSON:  Well, Your Honor, I think this

15  is a situation, and both sides have cited cases, I

16  think because this is a situation that is not ruled

17  upon equally in every district.  Some cases have

18  kept it out.  Some cases have allowed it.  I think

19  that it, you know, goes to this issue of what is

20  proper rebuttal and proper mitigation as to this

21  issue of future dangerousness.

22        We submitted that, you know, what

23  Dr. Sorensen will testify about, the defense has

24  conceded that he will -- never have met with the

25  defendant.

1          THE COURT:  That he what?

2          MR. NELSON:  Never met with the defendant.

3    He is not a psychologist, so he would not have

4    examined the defendant or determined and particular

5    characteristics about the defendant that go to his

6    dangerousness in prison or out of prison or

7    anywhere.

8          What he will testify about are his own

9    studies with regard to what other inmates have done

10   in prison after having been convicted of other

11   crimes in other jurisdictions.  In that regard, it

12   is speculative at best, assuming the defendant will

13   do what other people have done in like or unlike

14   situations.

15         And, Your Honor, also it goes to

16   proportionality in terms of what, you know, we

17   should do what everyone else is doing.  He will do

18   -- he will follow what everyone else has done who

19   have been in prison around the country.  And I think

20   that it is really difficult, Your Honor, to extract

21   Dr. Sorensen's base rate testimony from the improper

22   BOP testimony, because, of course, tied up in all of

23   this has to do with where inmates are housed.  And

24   that's something which they now say they are not

25   going to raise, but Dr. Sorensen couldn't

1   meaningfully testify about anyway.  And, obviously,
2   if you are housed in the BOP in a particular
3   facility under a particular security clearance, it
4   stands to reason that you are going to be less able
5   to harm anyone other than a guard if you're kept
6   away from everyone.

7        But we are walking down a slippy slope now
8   to exactly the type of evidence that *Johnson* said
9   shouldn't be allowed, which is this idea that prison
10  is designed to keep everyone safe; and, therefore,
11  no one is a future danger; therefore, no one should
12  be sentenced to death.  And I think it only takes a
13  few steps down that line before we get into trouble
14  with the Seventh Circuit, Your Honor.

15       THE COURT:  Does some of his testimony rest
16  on what the government proposes to be on the issue
17  of future dangerousness?

18       MR. NELSON:  Your Honor, as I understand, we
19  are limited to the one paragraph notice that we've
20  received.  I know it was testified to in other
21  cases.  I don't know how that will be tailored to
22  the defendant, but, you know, this idea that he is
23  not a danger because other people aren't a danger.
24  I think there's a very strong argument that that is
25  not --

1          THE COURT:  What if Sorensen were able to
2     say, based upon his research people like
3     Mr. Christensen, or whatever the characteristics are
4     that he can name or identify, would be unlikely to
5     present future dangerousness?  What -- if he tied it
6     to Christensen, would you say that there would be
7     some relevance there?
8          MR. NELSON:  I think if Dr. Sorensen were a
9     psychologist, he could make those findings on some
10    sort of scientific basis, that might be one thing;
11    but what he is using, according to the defendant, in
12    comparison of age, prior criminal record.  This is
13    not the type of data that defines what a man is, or
14    what he is capable of, or what he will do in the
15    future.  And it is just biographical information.  I
16    don't think you can draw statistics about how
17    someone will act based on biographical information.
18          So to answer Your Honor's question, if he
19    were to say, "Well, because he has X, Y, Z diagnosis
20    or X, Y, Z personality trait, then he is less likely
21    to be violent in a particular type of situation,"
22    that might have some legs; but the defense has
23    conceded that is not what Dr. Sorensen is.
24          And based on all of that, Your Honor, we
25    think it should be stricken because now we are going

1  to go down into a mini-trial on statistics in a

2  penalty phase that has really, fundamentally,

3  nothing to do with the defendant as a person, and

4  that is what we are here to decide.

5          THE COURT:  Okay.  Thank you.

6          I'm going to hear from the defense and then

7  we may go back and forth here.

8          MR. TUCKER:  Your Honor, maybe it would be

9  best to start out precisely with what Dr. Sorensen

10  will testify to basically.

11          He will basically testify from analyzing the

12  data from the Bureau of Prisons, the latest data

13  that has, that -- what the base rate of violence is.

14  It is very low, far more than people would think;

15  number one.

16          Number two, that he would -- he would

17  analyze the data in terms of violence committed by

18  individuals sentenced to life without parole or life

19  without release versus defendants who are on death

20  row.  And also when death row inmates go back into

21  population, he would also analyze the data of

22  violent acts in terms of characteristics that will

23  be related directly to the defendant in terms of

24  education levels.  Statistics show that crimes of

25  violence are inversely, in prison, are inversely

 1  proportional to educational levels, to prior

 2  records; that they have no correlation between the

 3  offense of conviction and age.  These sort of

 4  factors that are particular to this defendant.

 5          Now, Dr. Sorensen is not going to offer any

 6  opinion, Your Honor, as to whether or not the

 7  defendant would present a danger in prison.  He is

 8  not going to offer that.

 9          THE COURT:  He is just going to say

10  particular to this defendant, these statistics would

11  indicate that he is less likely to be a future

12  danger.  Tell me how he is going to do that then.

13          MR. TUCKER:  The level of violence in

14  prison, in federal prisons is very, very low; number

15  one.

16          Number two, that there is no -- the evidence

17  suggests that individuals sentenced to life without

18  parole or life sentences are no more likely to be

19  violent than any other prisoner serving life

20  sentences.  And then he will connect the various

21  characteristics that would be applicable to

22  Mr. Christensen, which would otherwise be

23  established by the evidence.

24          He will not render any opinion -- he is not

25  going to say the government answers -- and they

1  almost kind of argued this a little bit too -- that

2  well, there is no assurance.  He is not going to say

3  there is any assurance.  We are not going to say

4  there is any assurance.

5        What the government neglects there, I think

6  the idea that a piece of evidence to be relevant

7  does not have to be conclusive of the proposition.

8  It just has to shed some light on whether or not the

9  proposition at issue here, future danger, that

10  evidence makes it more or less likely than it would

11  be without the evidence, not whether it makes it

12  more or less likely in and of itself, that is not

13  the test.  The test of relevance is when you analyze

14  evidence will a particular piece of evidence that if

15  relevant will -- if it is relevant -- does it make

16  the proposition at issue either more or less

17  probable than it would be without the evidence.

18        Obviously, Your Honor, it seems to us that

19  it is clear that the evidence is relevant.  Clear.

20  That a jury can sit there without the evidence and

21  say they know nothing about these factors that we

22  have just talked about.  With the evidence, they may

23  reject it.  The government is free to make all of

24  these arguments that they make to the jury.  They

25  can make every one of them.

1    But with all respect, Your Honor, the Fifth

2  Amendment, the Sixth Amendment, the Eighth

3  Amendment, the Federal Death Penalty Act, while you,

4  of course, sit as a gate-keeper to evidence, we

5  understand that, but it is more limited in a case

6  like this.  And what they really want you to do,

7  which we urge you not to do, is to essentially

8  direct verdicts for them on mitigation or help on

9  aggravation.  They have elected -- and you haven't

10  ruled on Docket 122 yet -- but they have elected

11  themselves to introduce this allegation of future

12  danger in this case, that they know, they have to

13  know that the evidence, every study shows that it is

14  unreliable.  The juries can't predict it.  The

15  prosecutors can't predict it.  The only evidence

16  that it really shows is reliable on future danger is

17  when you predict that he won't be a future danger,

18  that turns out to be 95 or 99 percent reliable.  The

19  others are almost never reliable.  But they have

20  elected to put that in evidence and there should be

21  no dispensation given to them to preclude us from

22  rebutting, because it's not true.  It is not

23  accurate evidence.  And we hope the Court just

24  excludes that.

25    In fact, there are some cases where the

1  government started backing off of future danger

2  evidence because they don't want this, but they

3  can't have it both ways.

4       A jury can very likely infer -- a juror can

5  say to themselves, you know, based on Dr. Sorensen,

6  I don't believe that he is a future danger.  He

7  doesn't have to go a psychologist.  He is not going

8  to ask the opinion.  They will draw their own

9  conclusion, and they will make whatever arguments

10  they will want to make to convince the jury not to

11  make that conclusion.

12       But as far as -- and let me tell you, this

13  disproportionately argument is a complete, complete

14  red herring.  It has nothing to do with it.

15  Proportionality cases involve -- and I can tell you

16  right here, a couple of cases that they cite.  One

17  was *Taylor*.  It was *Taylor*.  I have to say, I read

18  *Taylor*, but, you know, what I didn't do, which you

19  apparently did, I read the district court opinion,

20  because that's what they cited.  That's what they

21  cited.

22       But that is a proportionality case as is

23  *Sampson*, that was the only other case.  But they

24  involve cases where, you know, I have to admit the

25  defense is really reaching to try to introduce

1  evidence before a jury that somebody gets on the
2  stand and talks about every death penalty case and
3  the facts why they should have authorized this and
4  why they should have authorized that and how this
5  verdict in this case is inconsistent with that
6  verdict, that obviously is never coming in.  We
7  understand that.  That's what proportionality is.
8       THE COURT:  So you're not going to do that;
9  you have no intention of doing that with
10 Dr. Sorensen.  You intend, in fact, for -- based on
11 what I'm hearing here, his testimony wouldn't even
12 take very long.
13      MR. TUCKER:  Probably won't, because you
14 know what, there is no -- if you read there is no --
15 there is no need for a *Daubert* hearing, obviously.
16 They don't challenge the methodology.  They are not
17 going to put a statistician up there to contradict
18 that.  That's -- none of that is going to come into
19 play.  The statistics are what they are.
20      THE COURT:  Two issues in my mind here.
21      Mr. Nelson, you can stay right at that table
22 and answer.  Why do you think it has to be a
23 psychologist to testify, if it is particularly
24 related to the defendant?  In other words, education
25 levels, prior records, that type of thing, and make

1  that connection that, you know, that he's, I guess,

2  less likely to be -- how do you finish it if he is

3  not giving an opinion?  Does he say that he is less

4  likely to be a danger in the future or --

5          MR. TUCKER:  He is not going to comment on

6  it.  He is going to introduce the evidence --

7          THE COURT:  He is just going to say, people

8  with educational levels like Mr. Christensen, people

9  without prior records, have not been likely to

10  commit violent crimes in prison?

11          MR. TUCKER:  Have not committed, not whether

12  or not they are likely to.  Whether they have -- he

13  will testify -- I know the rules of evidence don't

14  necessarily exactly apply in this situation, but

15  they are a good guide to at least think about.  Rule

16  702, the expert witness doesn't have to give

17  opinions.  They can testify on their basis of

18  knowledge.  They can say -- they don't have to -- he

19  is not going to give that opinion.  That will be for

20  the jury to draw a conclusion; that will be for them

21  to argue that it doesn't fall.

22          THE COURT:  How does that turn into a

23  mini-trial on statistics?

24          MR. NELSON:  I understand that the defense

25  is telling us what we will and won't do.  We don't

1  have any of his information.  We don't have any of

2  his report or anything, so we don't know that we

3  will call a statistician because we don't know what

4  he is going to say.

5       And as we said, we are intending to call our

6  own psychologist, if he is admitted, to give a

7  couple of additional examinations linked to

8  psychopathy, which will throw out all of his

9  statistics, because how psychopaths operate in

10 prison differently than other inmates.  So we are

11 going to have a mini-trial on that.

12      THE COURT:  I know, but isn't that kind of

13 what this is about though?

14      MR. NELSON:  That's fine, Your Honor.  But,

15 you know, I just point out that, you know, we have a

16 right to call our rebuttal witnesses.

17      THE COURT:  I don't know that anybody is

18 arguing that.

19      And second of all, the second issue then

20 separate from the one that I would -- I'm defining

21 as particularly related:  educational, prior

22 records.  The base rate for violence and those that

23 are sentenced to life without release, that's a

24 separate issue.  Where do those figures come from

25 that Dr. Sorensen relies upon?

```
 1         MR. TUCKER:  From the government.  The
 2  government, from the Bureau of Prisons.  These have
 3  been provided by the government.
 4         THE COURT:  When would you anticipate his
 5  report being produced?
 6         MR. TUCKER:  I talked to them yesterday
 7  about this.  Actually, he is still going through all
 8  of the data and everything.
 9         The second week in May, hopefully, we will
10  be able to give them the slide show of -- whatever
11  you call it.  What you call it when you put a thing
12  up there?
13         MS. POLLOCK:  PowerPoint.
14         MR. TUCKER:  PowerPoint.  Thank you.  We
15  will hand that over.  That's fine.
16         And as far as this issue about who they are
17  going to call, what they are going to call, you
18  know, that's not what's on the table today.  If they
19  want to get notice to somebody, we will address it,
20  whether it is proper or not proper.  They've already
21  suggested some, that it might not be proper.  We
22  will address with that at the time.  The issue on
23  the table is Sorensen's testimony; is it relevant.
24         And one other thing that I do want to
25  mention, because the government continually both in
```

1  Sorensen and Zoline talk about this mini-trial
2  stuff.  I think Your Honor hit the point exactly.
3  It doesn't really make any difference in this
4  particular case and that's not only me just saying
5  that, philosophizing; that's in the rule, basically.
6  If you look at Rule 403, of course, that you apply
7  all the time.  There are six bases that you can --
8  even if the evidence is relevant, that you can
9  exclude evidence.  You know, if something is
10  prejudicial, misleading issues or confusing issues.
11        The last three -- those first three are all
12  in 3593(c) as a basis that the Court can use in a
13  capital case, but the last three provisions that are
14  in 403 are deliberately left out of 3593.  In other
15  words, the Court has no power to exclude evidence in
16  a capital sentencing hearing on the grounds of undue
17  delay, that's not a reason; that makes sense given
18  what's at stake; no authority to exclude for wasting
19  time.  The same thing, we are not here on time
20  issues in these kind of cases; and needlessly
21  presenting cumulative evidence.  If the defendant
22  wants to present 20 witnesses to talk about his
23  background, he can do that.  So, that is not a basis
24  for excluding evidence in these cases.
25        And finally, Your Honor, the cases -- and

1  the government has cited the case, when they want

2  evidence they cite the principal.  I guess, we could

3  also.  But the cases cited in a capital sentencing

4  hearing, citing that statute that reliability

5  requires more evidence, not less.  That's the

6  standard to apply: more evidence, not less.  We

7  think, as we said, in Rule 401, 702, even if this

8  was a regular case, it clearly meets those

9  standards.  And the rest of it is up to them to

10  argue, and they can make their argument, and we will

11  respond accordingly.

12          THE COURT:  Okay.  Do you want the last

13  word?

14          MR. NELSON:  Certainly.  I would suggest

15  that everything Mr. Tucker said is -- stating the

16  opinion that Dr. Sorensen is relevant to rebut only

17  future dangerousness, and that if that aggravator

18  were dropped, obviously, he would no longer be able

19  available to testify.

20          THE COURT:  What about that?  At this point

21  that's what it does seem.

22          MR. TUCKER:  Perhaps.  I've --

23          THE COURT:  Well, you're going to leave the

24  door open, you're going to leave the door open; and

25  when we are done today, I'm leaving the door open

today just so everybody knows.

      MR. TUCKER:  I will just respond.

      THE COURT:  Okay.

      MR. TUCKER:  We thought of this.  The question would then be whether we want to introduce lack of future dangerousness as a mitigator.  We'd probably think that through.  We might be willing to trade that off, actually.  So we will figure that out.

      THE COURT:  Last word.

      MR. NELSON:  The other thing, Your Honor, is if we are not given the report until May 4th, that puts us in a real bind to acquire rebuttal experts who may need to examine the defendant and be prepared in advance of the trial in the penalty phase.  And considering, as Mr. Tucker noted, Dr. Sorensen testifies all the time, it does seem odd that we would have to wait until May the 4th to get a report on statistics that are available, apparently, from BOP.

      MR. TUCKER:  He apparently does this as an individual case, Your Honor.  He does have the stats.  I talked to him yesterday about this, too. When he was going through hand-coding things, he decided that was a little slow.  So he has ordered

 1  this program -- I can't even remember the PowerPoint
 2  name, so you will understand -- but he has ordered a
 3  program that converts Adobe into XL files or
 4  whatever.  So that's what he said.
 5          He did -- he asked for the second week in
 6  May, but, he said that if pressed, you know, really
 7  pressed, he can try to get it done by the first week
 8  of May.  So we will try to get it to them as soon as
 9  possible.  It's straight-up stuff.
10          THE COURT:  What is that, May 4?  Is that a
11  Monday?  May 5th is a Monday, or is May 6th a
12  Monday?
13          MR. NELSON:  I think the 6th is a Monday,
14  Your Honor.
15          THE COURT:  May 6th, we will set that date
16  for a disclosure of his report.
17          MR. TUCKER:  Okay.
18          THE COURT:  At this point then it seems to
19  me that given that information before me as it
20  pertains to Dr. Sorensen, that he be allowed to --
21  the motion will be denied to exclude, will be denied
22  at this point.  But I don't think that I can set the
23  parameters just yet because there might be things
24  that come up in his report that the government may
25  want to argue again, but at this -- so I won't set

the parameters, but from what I heard today, the
parameters would be -- likely to testify as to
anything particularly related to Mr. Christensen,
that's the education levels, prior record.

And I think that it would be, depending on
the government's evidence on this issue of future
dangerousness, the statistics might be relevant.  So
that's where we are today with Dr. Sorensen.

Okay.  All right.  Shall we move on to
Dr. Zoline?

Let me start the questioning on Dr. Zoline.

Why -- let me ask the defense.  Why do you
have to -- does Dr. Zoline have to give an opinion
as to the standard of care that would be basically
medical negligence in a civil case for the purpose
of her testimony here?  Why is it that she couldn't
just based on her -- if she is otherwise qualified
-- based upon her review of the records in -- I
don't know, in her opinion that she believes that U
of I should have done A, B, and C, in addition to
whatever they did?  Why do we have to have the
standard of care for a civil medical negligence
involved here?

MR. TUCKER:  Well, we are not trying to --
we don't think that's really an issue, the civil --

 1  we are not trying to argue that they are civilly
 2  liable.  We don't care anything about that.
 3         You know, I haven't actually thought of that
 4  point to be honest with you.  I'm trying to think my
 5  way through that.  Basically what you're asking me
 6  is why can't she say that they should have contacted
 7  McKinley Health Center; they should have gathered
 8  the records; they should done an appropriate
 9  assessment of the danger that was presented; they
10  should have done an appropriate assessment of the
11  vulnerability factor.
12         THE COURT:  Right.
13         MR. TUCKER:  But she can't say that last
14  thing.
15         THE COURT:  Right.  I mean this is, from my
16  review, and, you know, is possibly a double-edged
17  sword anyway.
18         MR. TUCKER:  It is definitely a double-edged
19  sword on both sides.  There are advantages to
20  government, too.
21         THE COURT:  Let me ask -- I just posed that.
22  Have a seat.
23         Let me ask Mr. -- who is addressing this for
24  the government, Mr. Miller?  Let me ask Mr. Miller
25  to address the actual motion that was filed to

1 exclude.  But that's my -- I thought I would just
2 get that question out on the table.  I don't see if
3 she is allowed to testify that we need to go there.
4 So we will start there and work backwards.
5          MR. MILLER:  Your Honor, I think that you
6 have gotten directly to the point, which is much of
7 the response to our motion I think was getting into
8 the necessity from the defendant's point of view to
9 present all of the facts that happened regarding the
10 counseling.  We are not contesting the counseling
11 sessions can be introduced in the penalty phase.
12 What the university did or didn't do can be
13 introduced in the penalty phase.  And the defense
14 can make the argument that they want to make; that
15 somehow the failure of the university is mitigation
16 evidence.
17          So -- but this witness, Dr. Zoline, is --
18 the sole purpose to call her is to render an expert
19 opinion regarding the standard of care or the
20 failure to meet professional standards.  And that is
21 entirely separate from any background or
22 characteristic of the defendant or any circumstance
23 of the offense.  It is totally separate.  That is
24 basically a blame shifting that has nothing to do
25 with what the defendant did; whether that standard

1 exists or doesn't exist, there is no suggestion that

2 that would in any way change the defendant's

3 background, his character, or the circumstance of

4 the offense.

5          So this is -- really what we are doing is

6 weighing the probative value.  There is no probative

7 value regarding the jury's decision during the

8 selection phase regarding the professional standard

9 of care.  There just isn't.  This is a different

10 issue.  This is, as the Court's pointed out, this

11 would be like a civil malpractice claim that I think

12 the United States would be entitled to call a

13 witness to suggest we disagree with their responses.

14 It would be unlikely that it would be someone -- in

15 fact we've been consulting with individuals who have

16 said, given the disclosures made by the defendant,

17 that the university acted properly.  We would put

18 that evidence on.  But again that is a sideshow.

19 Now we are confusing the issues.  We are misleading

20 the jury that somehow during the selection phase,

21 whether the university complied with the standards.

22 That, again, the defendant doesn't know that at the

23 time what those standards are, he just knows what

24 happened.  And that's what should be presented to

25 the jury so --

1       THE COURT:  Do you think that Dr. Zoline

2   can't be that person that presents what happened?

3       MR. MILLER:  She doesn't have any knowledge

4   of what happened, Your Honor.  That's fine to

5   present what happened through the defendant, through

6   the counselors, through -- I don't think there is

7   going to be a real factual dispute as to what they

8   did.  And that facts -- those facts can absolutely

9   be presented to the jury.  We are not contesting

10  that.  But Dr. Zoline is -- the only reason for her

11  to even discuss those facts is to render an opinion,

12  which is completely irrelevant, is confusing, and is

13  misleading.

14      THE COURT:  What does the expert in place of

15  the counselors being called -- the five or six

16  counselors -- as the expert, she is able to review,

17  summarize what was done, and say, I think, based

18  upon that, that the U of I should have done A, B, C

19  in addition to or something --

20      MR. MILLER:  We do disagree to the "should"

21  part.  When she says "they should have done this,"

22  we think that's getting into the professional

23  judgment.  The standard of care, again, which is not

24  relevant because then we would present an expert

25  that will say, "Oh, no, they actually did exactly

1 what they were supposed to do."  But whether they
2 did or not, again, we don't believe has any
3 relevance to the actual factors the jury should be
4 considering in --
5           THE COURT:  But in some fashion don't you
6 see whether it's a counselor or Dr. Zoline,
7 cross-examination of a counselor that says that
8 given this information, why didn't you do this?
9           MR. MILLER:  I think you can ask them why
10 they didn't and why they did what they did, but it
11 wouldn't go to the level of "you violated a standard
12 of care," "you violated some professional" --
13           THE COURT:  It's going to stay short of
14 that, but I'm trying to find that balance here.
15           MR. MILLER:  I understand that and --
16           THE COURT:  Because that is where in the
17 case, I believe, the defense is going, it's
18 mitigation; they want to be able to say that maybe
19 if this was done -- I don't know how they are going
20 to frame it.
21           And the reason I say this is a double-edge
22 sword, because I reviewed the records too, and it is
23 going to cut both ways depending on how it plays
24 out.
25           MR. MILLER:  In our response notice, we

1  agreed that it is both mitigation and aggravation
2  evidence.  But we believe that it is occurrence
3  evidence and it is factual evidence; it is not
4  evidence that's amenable to having an expert witness
5  coming.  I agree with a report maybe pressing along
6  the lines of a summary witness.  I suppose in that
7  phase there could be summary witnesses, but I don't
8  know to have a doctor who is an expert who can't --
9  whose really sole basis -- as we understand in the
10  disclosure -- is to render an opinion as to what the
11  standard of care is, would be the person to call,
12  because as the Court has acknowledged, we are not
13  going to go there.
14          THE COURT:  Okay.  Mr. Tucker, do you want
15  to tell me what you think?
16          MR. TUCKER:  We don't -- I think that the
17  position that Your Honor suggested at the outset is
18  okay, actually.  I'm thinking a little bit more
19  about it.  We don't have to have her actually take
20  the last step to say whether or not it complies with
21  applicable standards of care.  As long as she
22  testifies according to what they should have done,
23  they didn't do this, they didn't do that.  They --
24  what they did, what they didn't do, that sort of
25  thing.

```
 1          She has clearly got to be able to testify to
 2  that, that is relevant, extremely relevant, both in
 3  mitigation and rebutted aggravation, too.  A juror
 4  could very well -- a future danger -- a juror could
 5  very well say, had they done this, that, and the
 6  other.  One juror can sit there and say, "When I
 7  hear this evidence," one juror can say, "I think
 8  that's mitigating.  I think that's a reason for me
 9  to save this young man's life.  Look what they
10  didn't do."
11          I'm a little surprised -- not to make the
12  government's arguments -- and it cuts both ways.
13  One thing, when this evidence comes in the jury is
14  going to wonder -- this is why 702 is so
15  important -- the jury is going to wonder -- it is
16  not going to go away by nobody saying anything.  The
17  jury is going to wonder, "What should have they
18  done?"
19          And some jurors will think, and Dr. Zoline
20  will, if asked about it, I think would say, "There
21  is no duty to warn third parties."  Some jurors are
22  going to say, "Why didn't they do this; why didn't
23  they do that; why didn't they have him committed?"
24  So -- and I don't think.
25          THE COURT:  And honestly, I'm not trying to
```

1   try either one of your cases, I'm trying to keep the

2   playing field level here so we can keep moving

3   forward.  But I can also see that if you don't put

4   that evidence in and those questions are asked --

5   could be helpful, that this would be a decision that

6   you all have to make.

7          MR. TUCKER:  Right.

8          THE COURT:  But I can see if you don't ask

9   those questions, or if she is not allowed to testify

10  to that and those questions are asked that could

11  also be helpful to you.  As opposed to if she does

12  opine in any way that they should have done A, B,

13  and C, that jurors might think, "Wow, are they

14  really going to blame?"

15         So this -- so I will find -- I think that I

16  can find the right parameter here.  But I do think

17  at this point the government concedes that the

18  seeking of the treatment is relevant to the

19  circumstances of the offense for the penalty phase,

20  right?

21         MR. MILLER:  Absolutely, Your Honor.

22         THE COURT:  Okay.

23         MR. TUCKER:  There won't be any blame.  We

24  are not going to take a "blame," but the jurors

25  should have the options.  I have already said, to

 1  conclude what they --

 2          THE COURT:  Has her report been provided?

 3          MR. TUCKER:  I think her notice is her

 4  report, basically.

 5          MS. POLLOCK:  That's correct, Your Honor.

 6          THE COURT:  Well, to the extent that it sets

 7  out a standard of care on what I'm just calling the

 8  civil medical negligence, that would be stricken or

 9  be amended.

10          MS. POLLOCK:  Right.

11          THE COURT:  Because we don't go there.  I

12  will try to define a parameter on where it can go.

13          Mr. Nelson, do you wish to be heard?

14          MR. NELSON:  It's one paragraph.  It says,

15  she will testify about the standard of care.  It

16  doesn't say what the standard of care is, what

17  treatment they should or shouldn't have done,

18  anything.  There is no analysis at all.

19          THE COURT:  Maybe we should have an amended

20  disclosure, and maybe we need to regroup on this at

21  that point if that disclosure -- because the basis

22  for your motion was that report that had to do with

23  standard of care.

24          So, in that regard, I will reserve on this.

25  Let's have an amended report disclosure and see if

 1  there is -- if anybody asks for any additional
 2  briefing.
 3          Okay.  Anything else to address on Zoline?
 4          MR. TUCKER:  I don't think so.
 5          THE COURT:  Okay.  Let me see where we are
 6  here.
 7          Okay.  In open court, while we've addressed
 8  the motions that need to be addressed, except for
 9  the one involving 251 and the answers, the responses
10  and replies:  287, 287, 296, which will remain
11  sealed and we will argue those in a moment.
12          Let me just jump ahead then for something
13  that we can still argue in open court.
14          First of all, I've been rearranging my
15  courtroom for layout.  Trying to find something that
16  works for everybody.  If we are going to have -- so
17  I'm going to ask you your thoughts on this.  We are
18  limited here.
19          But it's my -- if we are going to have, say,
20  18 jurors.  We have got 14 seats, so 12 plus two
21  alternatives.  It is going to be my thought that the
22  four other alternatives would sit in front of the
23  bar where the court services officers are sitting
24  there.  That's why we moved the tables around.  We
25  will move the podium a little bit more over as well

1  over towards you guys without blocking your view of
2  the jury.
3       So that they can continue -- they can see
4  all of the witnesses as well, and they won't be --
5  you won't be blocking their view if you're at a
6  podium, which I normally have at the end of the jury
7  bench.
8       So, that's the layout thing.  Those are
9  issues that I will be open to your thoughts as we go
10  forward so that you guys can be in a position to try
11  your case, okay?
12      We have a little over 600 that have
13  responded -- that have responded and not been
14  excused.  So I think we did pretty well out of the
15  thousand that were sent out.  We can send out some
16  more for responses if we need to.  We have time to
17  do so.  I thought this week I would get an order out
18  that would identify when these will be sent to you
19  guys.  They will likely be unredacted, but you will
20  have a short time frame in which to visit, and then
21  submit a list to me of those you agree don't need to
22  be called in.  So I'm going to ask you for a couple
23  of lists.  It will be clear.  I hope to get that
24  done before the week is up, okay?
25      With that in mind then I think that we

should address the next issue.

And go ahead, Mr. Tucker.

MR. TUCKER:  Okay.  Can I ask one quick question?

THE COURT:  Yep.

MR. TUCKER:  So what you just said then, we will each do our own separate lists.  We don't have to necessarily get together and confer.  We will do our own separate list, and you will not call in the people that appear on both lists; is that the way that you anticipate?

THE COURT:  I'm going to -- and I left my notes on that back in chambers.  And, you know, we can revisit that before the day is up.  Let's take care of a couple of matters -- let's take a short recess, and then we can revisit on some jury issues, jury selection issues.

Okay.  I'm going to ask -- we have one last thing.  I would normally just take all of the parties in -- I'm talking to the two young reporters.

I appreciate, from where you're sitting, the fact that you are covering this matter.  I think these are public matters and so I appreciate that. But these are matters that I normally would take in

1 chambers; but because of the number of the parties,
2 I'm just going to ask if you would please excuse
3 yourselves so that I can do it in the courtroom in
4 what will be considered "in chambers" but on the
5 record.
6          And if at some point it is ever unsealed, it
7 will be available.  All right?  And I think really
8 for all intents, you're welcome to stick around, but
9 I think that we are pretty much done with what we
10 are going to do today other than this, okay?
11          Thank you.
12 ███████████████████
13 █████████████████████████████████████████
14 ████████████████████████████████████████████
15 █████████████████████████████████
16 █████████████████████████████████████████
17 ██████████████████████████████████████████
18 ██████████████████████████████████████████
19 ████████████████████████████████████████
20 ████████████████████████████████████████
21 ████████████████████
22 ████████████████████████████████████████
23 ████████████████████████████████████
24 ████████████████████████████████████
25 ████████████████████████████████████





43























54



















63













21          (A recess was taken.)

22          THE COURT:  Okay.  I think that we've

23  covered everything.  If you have some thoughts, I

24  will take them.

25          Let me address one last thing.  If I was

1  unclear, I wasn't suggesting, when I was talking
2  about a plea, I meant that if there was a plea in
3  advance of the start of the jury selection then we
4  would likely postpone the jury selection to July
5  when the experts are available, so that we wouldn't
6  have any down time.  That's what I meant.  So for
7  Court scheduling purposes, docket management, if
8  that were to be the case.  Those are my thoughts.
9          We will have an order on the Motion to
10  Reconsider as well as the audio and the circumstance
11  of the offense as to the expert by the end of the
12  week.
13          MR. NELSON:  Thank you, Your Honor.
14          THE COURT:  So that will be good.  Okay.
15          Anything else the parties think we should
16  address today?
17          We hope to have -- there is no air
18  conditioning on today we learned that's why.  We are
19  going to have a lot of tune-ups here between now and
20  summer, I believe.  So we hope to have it right by
21  then.
22          Anything else the parties want to address
23  today?
24          MR. TUCKER:  No.  Thank you, Your Honor.
25          THE COURT:  Okay.  Thank you, everybody.

1          (Which were all of the proceedings held on

2            this day.)

3                              ****

4

5      I certify that the foregoing is a correct

6  transcript from the record of proceedings in the

7  above-entitled matter.

8

9

10  s/Nancy Mersot          Date: May 8, 2019

11  Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25