1             UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS
2

3

4  UNITED STATES OF AMERICA,   ) Docket No. 17-cr-20037
                               )
5        Plaintiff,            )
   vs.                         )  Peoria, Illinois
6                              )  May 13, 2019
   BRENDT A. CHRISTENSEN,      )
7                              )
         Defendant.            )
8  _____ )

9

10

11                 RECORD OF PROCEEDINGS
                   PRETRIAL CONFERENCE
                      **REDACTED**
12         BEFORE THE HONORABLE JAMES E. SHADID
               UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20

21

22              Nancy Mersot, CSR, RPR
           United States District Court Reporter
23              100 N.E. Monroe Street
                  Peoria, IL  61602
24

25  Proceedings recorded by mechanical stenography,
    transcript produced by computer-aided transcription.

1                    THE APPEARANCES

2

3               EUGENE L. MILLER, ESQ.
             BRYAN DAVID FRERES, ESQ.
4             Assistant U.S. Attorney
                  201 South Vine
5               Urbana, IL 61802
             On behalf of the Plaintiff

6

7               JAMES B. NELSON, ESQ.
        United States Department of Justice
8      Criminal Division Capital Case Section
                   Suite 625
9              1331 F. Street NW
             Washington, DC  2004
10           On behalf of the Plaintiff

11             ELISABETH R. POLLOCK, ESQ.
               Federal Public Defender
12               300 W. Main Street
                Urbana, IL  61801
13           On behalf of the Defendant

14

15              GEORGE F. TASEFF, ESQ.
           401 Main Street, Suite 1500
16                Peoria, IL  61602
             On behalf of the Defendant

17

18              ROBERT L. TUCKER, ESQ.
              7114 Washington Avenue
19              St. Louis, MO  63130
             On behalf of the Defendant

20

21               JULIE C. BRAIN, ESQ.
                  916 S 2nd Street
22             Philadelphia, PA  19147
             On behalf of the Defendant

23

24            MATTHEW RUBENSTEIN, ESQ.
        Federal Public Defender District or Oregon
25           101 SW Main Street, Suite 1700
                Portland, OR  97204
             On behalf of the Defendant

```
 1              (Proceedings were held in open court.)
 2              THE COURT:  Good morning, everybody.
 3              This is the United States v. Brendt
 4  Christensen.
 5              Mr. Christensen is present with his
 6  attorneys:  Mr. Tucker, Miss Pollock, Mr. Taseff,
 7  Miss Brain.  Mr. Rubenstein present as well.  Thank
 8  you, sir.
 9              Mr. Freres, Mr. Miller, Mr. Nelson, and
10  Miss Klayer present for the government.
11              This matter is a pretrial to continue the
12  matter -- move this matter in an orderly fashion.
13              First of all, on the jury selection matter,
14  I asked the parties to review questionnaires and
15  confer and try to reach some agreement as to those
16  that they believe should be stricken, and those that
17  they believe shouldn't be stricken, and those that
18  one side or the other wishes to have stricken but
19  the other side may have an objection to, and that
20  was done.  We will get to that momentarily.
21              But I want to thank both sides for what
22  clearly looks like a good-faith effort to address
23  that issue, so I appreciate that.
24              A couple of issues to address:
25              First, maybe the disclosure -- discussion on
```

1  deadlines for disclosure on penalty phase, witness

2  lists from each side, and defendant's list of

3  mitigating factors.

4      Second, I thought that we would maybe

5  address the sealed filings that have to do with --

6  that I reserved on -- that have to do with

7  Document 324 as it pertains -- and I thought maybe

8  we should address those in chambers.  And then

9  further as well as it pertains to Document 322.

10     And then I thought we would discuss -- well,

11  and we will get to that, but I thought maybe we

12  would first discuss specific jury selection

13  procedures.

14     You have each been handed a disk.  I have

15  some thoughts that I would like to share.  I'm going

16  to put something up on video for you to see as I

17  share my thoughts.  But we will get -- let's first

18  discuss deadlines, if we could, okay?

19     So from the -- either side first, maybe;

20  let's resume discussion.  We had this preliminarily.

21  Let's resume discussion on deadlines for disclosures

22  at the penalty phase, the witness list.

23     Who's first from the government?

24     MR. MILLER:  Your Honor, I believe our

25  position remains, I believe as it was last time.  We

1  would suggest disclosure of those witness lists,
2  they, obviously, could be supplemented at the same
3  time that we are disclosing the witness lists for
4  the guilt phase in the trial in, I believe, March --
5  I'm sorry, May 30th, I believe, or the 29th -- I
6  would have to look and see.
7         THE COURT:  May 29th.
8         MR. MILLER:  That was our suggestion.  Our
9  understanding is the defense would like that to be
10  later, but our thought was that would allow us to be
11  in a position -- allow both of our positions to
12  proceed with minimal delay between the guilt phase
13  and any potential penalty phase.
14         THE COURT:  And for the defendant, your
15  thoughts again.
16         MR. TUCKER:  Good morning, Your Honor.  I
17  think that May 29th is fine, in time for voir dire
18  for the disclosure of the penalty phase witnesses.
19         As far as the defendant's list of mitigating
20  factors, I don't recall the Court having ruled
21  whether we had to disclose those with our actual
22  mitigating factors we were going to submit, I guess
23  as part of our instructions perhaps; that of course
24  could change as the trial proceeds.
25         THE COURT:  So for starters you are okay

1  with May 29th to disclose penalty phase witnesses?

2      MR. TUCKER:  I think it has to be before

3  voir dire so the Court can inquire.  I don't think

4  we had any problem with that.

5      THE COURT:  And I'm reminded that actually

6  we set May 28 for the other disclosures, so May

7  28th.

8      All right.  So let's start with that.  For

9  at least for penalty phase witnesses, May -- witness

10 list from each side, May 28th.

11     And then as far as a list of mitigating

12 factors, at some point -- go ahead, Mr. Tucker.

13     MR. TUCKER:  No, I think what -- what I

14 think you were getting ready to say was at some

15 point that would be part of the instructions at some

16 point, but when that would be -- can we think about

17 that just a little bit longer?  I'm not sure, other

18 than through the vehicle of instructions, why the

19 government would be entitled to that.

20     THE COURT:  Mr. Miller, do you want to

21 respond to that?

22     MR. MILLER:  I guess, entitled -- at some

23 point we would be entitled to that because we have

24 to be able to --

25     THE COURT:  Prepare to rebut.

1        MR. MILLER: -- prepare to rebut those
2   factors.  Again, we are not trying to -- I
3   understand if they have things they want to add or
4   omit later, but it seems, again, this is trial; at
5   the time that we submit jury instructions in the
6   case, which I believe are due on the final pretrial
7   on May 30th, if they would include their expected
8   mitigating factors at that point --
9        THE COURT:  But that would be -- I would
10  anticipate for -- do you anticipate the jury
11  instructions to include a penalty phase or just the
12  guilt phase?
13       MR. MILLER:  We thought they were going to
14  include all of the instructions, Your Honor, at that
15  time on the 30th.  Again, to, you know, to have an
16  orderly progression of the trial.
17       THE COURT:  Mr. Tucker.
18       MR. TUCKER:  Well, I think that there
19  actually --  if there is going to be any disclosure
20  of the defense's mitigating factors other than
21  through instructions, I would think that disclosure
22  at the earliest would be after a guilt verdict.  I
23  don't know that the government is entitled to -- to
24  any preliminary notice as to how we are going to try
25  the case.  Of course they get to rebut.  They get to

1  rebut as in any case, but that doesn't mean --

2       THE COURT:  When you say "try that case,"

3  you mean the penalty portion of the case?

4       MR. TUCKER:  The penalty portion.  So I

5  would think the earliest it would be would be after

6  a guilty verdict.  Think in terms of, Your Honor,

7  analogize to the normal case.  Defendant puts on

8  evidence and the government hears it, and then has

9  to decide if they want to put on rebuttal.  There

10  are very few situations that they are entitled to

11  advanced notice of what the defense will be.

12       They are entitled to advanced notice under

13  12 -- whatever it is, 12.1, or whatever, alibi.

14  They are entitled to certain notices, very limited

15  as to official authorization, that sort of thing.

16  So I don't know what the authority is they are

17  citing for this.

18       THE COURT:  I think that my thought is that

19  the disclosure of mitigating factors from the

20  defense should come within 24 hours after a verdict

21  of guilty, if that were to be the case, if the

22  matter is actually tried to verdict at the guilt

23  phase.  If not, then we can regroup on disclosure

24  times.  But 24 hours after a verdict of guilt, if

25  that in fact occurs, to disclose mitigating factors;

1  fair enough?

2          MR. TUCKER:  I think we can live with that.

3  Thank you.

4          THE COURT:  All right.  I think maybe that

5  leads to a general discussion here at this point,

6  given we are talking about disclosures, to have a

7  general discussion before we go to the jury

8  selection procedures at this -- I've tried to stay

9  out of everybody's way at this point, just making

10 rulings and keep everybody between the baselines and

11 give you a framework for the trial.  I also intend

12 to stay out of your way as you try your case, that's

13 my practice to do so, making rulings as necessary

14 and as required to keep us moving towards a

15 resolution.

16          But now having said that, and as close as we

17 are, we are within a few weeks of starting this

18 matter with jury selection and then trial; I think

19 it's fair for me to ask, given we are at the

20 pretrial stage here, for the parties to address, and

21 for the government first to address how at this

22 point they see their case being laid out in terms of

23 time management.  So, if you are prepared to do

24 that, I would like to hear that today.  Now that

25 clearly is going to lead to some other matters that

1  we are going to address in chambers, I think, as to

2  -- might pertain to the sealed documents.  But for

3  now, I would like to hear that.

4        Now maybe we should talk jury selection

5  first to help give you a framework.  But without the

6  jury selection aspect of this being discussed, how

7  do you see your case in terms of time management

8  going forward?

9        MR. MILLER:  Thank you, Your Honor.

10        We see it in about the same time frame that

11  we have seen -- we have said, two and a half weeks.

12  Again, as we prepare, we are always hopeful we can

13  shorten that.

14        We think if we can reach -- we haven't had

15  those discussions yet with defense counsel, but if

16  there were stipulations regarding custodians of

17  record and some other matters that could shorten

18  that time.  So with stipulations, perhaps we could

19  even shorten as much, maybe one and a half weeks.

20  But without those, it may be more like two to two

21  and a half weeks of what we would see as guilt phase

22  evidence, factoring in cross-examination of our

23  witnesses.

24        THE COURT:  Okay.  And with that in mind,

25  then can the defense, based upon what you know of

1 the government's case, comment on first of all

2 whether you think that's a fair assessment from the

3 government; and second, then, as far as time

4 management.  And I realize you don't know at this

5 point whether you will put on a case-in-chief or

6 not, but to the extent you have thoughts, can you

7 share those?

8       MR. TUCKER:  Well, it's hard for us to

9 comment on the length of the government's case.  We

10 will certainly try to work with them where

11 appropriate on stipulations.  But other than that, I

12 don't know how I can comment on their case.

13       THE COURT:  Okay.

14       MR. TUCKER:  For one thing, I don't know how

15 they anticipate dividing their case between penalty

16 phase and guilt phase, assuming we have --

17       THE COURT:  Well, right now I'm just talking

18 about guilt phase.

19       MR. TUCKER:  Right, right.  But I mean you

20 are asking for my views.  I'm not sure how they are

21 going to present it.  So....

22       THE COURT:  And there will be a point in

23 time, for everybody's sake, to help this matter,

24 where I would ask the government to lay out the

25 witnesses for the next day or two, so the parties

 1    can prepare themselves.

 2         MR. TUCKER:  Now, of course, your question

 3    takes into account anticipated cross, which the

 4    government wouldn't know.  And that, probably, to

 5    some extent depends on a matter we are going to

 6    bring up with the Court at an appropriate time about

 7    the Motion in Limine rulings that the Court has made

 8    which seem to be, from the Court's Order, to pertain

 9    mostly to the guilt phase.

10         THE COURT:  Correct.

11         MR. TUCKER:  So we might want to clarify

12    that at the appropriate time in that that could --

13    will impact on the nature of how we proceed to

14    guilt.

15         THE COURT:  Okay.  That's fine.  We are

16    going to -- we will get to that then.

17         Let's get the jury selection.

18         First of all, is there anything that the

19    parties want to address today that I haven't

20    mentioned?  Otherwise I would like to get to start

21    to talk about the jury selection process a little

22    bit more here.  As things come up, you can raise

23    them.

24         So on your screens -- now from my gathering

25    of what you have done already, which I really do

1  appreciate the -- what clearly looks like good-faith

2  work together on this.  There are 469 potential

3  jurors.  You agreed to strike 175 of those.  And we

4  thought we would simply send -- the clerk would send

5  them a letter thanking them for filling out the

6  questionnaire and telling them that their service

7  would not be necessary for this trial.

8          Is that acceptable to both sides, those 175

9  that you have agreed on?

10          MR. MILLER:  Yes, Your Honor.

11          MR. RUBENSTEIN:  Yes, Your Honor.

12          THE COURT:  Then you have agreed -- between

13  you -- of 318 that neither -- that should clearly be

14  brought in to be interviewed; and that neither one

15  of you proposed, based upon the questionnaire, that

16  they be stricken.

17          Then there was a hundred that the government

18  proposed to be stricken that, apparently, the

19  defense did not agree with; and 51 that the defense

20  proposed to be stricken that the government did not

21  agree with.  So I have included those with the 318

22  that you agreed upon, and that's how I got to the

23  469.  And I believe that from those 469, those

24  should be the people that are called in to be

25  examined.

 1          Do the parties agree with that or is there
 2  some thought that the 318 would be sufficient that
 3  you do agree upon?
 4          MR. RUBENSTEIN:  Judge, we would --
 5          THE COURT:  This is Mr. Rubenstein, right?
 6          MR. RUBENSTEIN:  Yes, Your Honor.
 7          THE COURT:  Go ahead.
 8          MR. RUBENSTEIN:  469, we think would be the
 9  group that should be brought in.
10          THE COURT:  Mr. Miller?
11          MR. MILLER:  We had just before discussed
12  the 318 with the defense.  We would be satisfied
13  with the 318, which obviously would move matters
14  along and avoid for-cause strikes.  But we
15  understand, I mean, if the defense wants the 469
16  brought in, I'm not sure what else we could do if
17  there is no agreement.
18          THE COURT:  I think the 469 also makes some
19  sense at this point, even though I did mention and
20  do believe that both sides have really made a good
21  faith here to help widdle this down.  Then it just
22  eliminates any question that anybody played -- any
23  had -- there was any gamesmanship in the play of
24  this.  I don't believe there was.  But I think that
25  it just eliminates any question down the road or any

 1  perception.

 2          So 469 we will start with.  Now how do we do

 3  that?  My thought is to bring in 20 in the morning

 4  panel, 20 in the afternoon panel, so that would be

 5  40 a day.  If we go through the whole week that

 6  would be 200 out of that 469 that we would get to in

 7  the first week and see where we are after each day.

 8          And I thought the simplest thing is, because

 9  we are doing this by numbers, and I can tell you

10  that these numbers are in a sense random, already

11  shuffled back to the master jury wheel.  So that

12  nothing you could pick out from a number would

13  relate to or favor one side or the other.  And at

14  the same time my thought is this would allow an

15  orderly process of keeping track of who is coming up

16  next, and they include the 469.

17          So I'm going to ask Jeremy if he will make a

18  little click there and take these numbers so that

19  then it shows the -- have you done it already?

20          So look at number one.  We are not going to

21  open it but it is 100384674.  Okay.  Now they are in

22  order so that is the lowest number of the total.

23  And then the second lowest number is 100384856.  And

24  then 4905, and then 4969, and then 4978, then 4888;

25  and that will allow us then to take the first 20 of

1  the lowest numbers; you will see who's coming.  I'm

2  asking you for voir dire questions in advance.  It

3  will be easy for you to relate to those.

4       For instance, if we only got through 15 of

5  those or, say, we didn't get through everybody the

6  same day, we would know who is coming back tomorrow

7  or the next day; and then we just have an orderly

8  fashion.  Now, that's my thought.  I'm open to

9  suggestions.

10       MR. MILLER:  That's fine Your Honor.

11       MR. RUBENSTEIN:  Your Honor, in terms of the

12  ordering, that sounds fine.

13       One thought would be there may be jurors who

14  call and have an appointment and want to reschedule.

15  My suggestion would be at the end of the process,

16  they are still considered for the jury in the order

17  that -- the randomized order that they are in now,

18  so they could be voir-dired in a different order,

19  but they could be considered for peremptory

20  challenges and for service in the order that they

21  are in now.

22       THE COURT:  Okay.  To the extent that we can

23  manage or keep track of that, I'm not opposed to

24  that.

25       Government?

1          MR. MILLER:  We are not, although I think

2    that begs the next question of how we are going to

3    arrive at the final number.  I know that we have

4    thought this -- thought about it, and I don't know

5    exactly what the idea is, but the thought was if we

6    have -- I'll just do hypothetically -- we each have

7    20.  We know that we each have 20 peremptories for

8    the first 12.  If we had the equivalent number for

9    the remaining 6 alternates, that be would be 30

10   peremptories a side.  And once we qualified 78

11   jurors, if my math is correct, who were qualified

12   with no-for-cause challenges, if we then exercised

13   the 60 strikes, we end up with the 18 jurors.

14   Again, I'm not sure if that's how the Court intended

15   to proceed or --

16          THE COURT:  So you're saying 20 plus 10

17   makes 30 peremptories?

18          MR. MILLER:  Yes.

19          THE COURT:  Where did you come up with that

20   number?

21          MR. MILLER:  That was just if we gave the

22   equivalent number of peremptories for 6 alternates

23   that we were given for the 12 originally.  We get 20

24   peremptories for the original 12.  We are open for

25   whatever discussion, that was just applying the same

1    to be 30 on each side, and that would be 60 strikes

2    ultimately, which requires 78 jurors who would be

3    qualified and not stricken for cause.  In other

4    words, once we went through those 20 jurors and 20

5    jurors and 20 jurors, ultimately arrived at 78; we

6    would then have 78 jurors and then each side could

7    alternate striking peremptories to get down to the

8    18 jurors.  Again, we don't know if that's how the

9    Court envisioned getting to the final 18.

10          THE COURT:  What's your thought on that

11   process?  Forget the numbers for a second.

12          MR. RUBENSTEIN:  That process makes sense to

13   us, Your Honor.

14          THE COURT:  So when you say that then, both

15   of you, you are agreeing that all causes have been

16   taken care of by then and whatever number we are

17   bringing back here, 78, 70, those are going -- we

18   are going to have a jury out of that group, and then

19   you will exercise your peremptories and we will have

20   8 -- 18, correct?

21          MR. RUBENSTEIN:  That's our expectation.

22   They would be life qualified, death qualified.  If

23   they come back, we would ask the Court to inquire --

24          THE COURT:  If anything has changed?

25          MR. RUBENSTEIN:  Yes.

1          THE COURT:  Okay.

2          MR. RUBENSTEIN:  I think the number of

3 peremptory challenges we have on the alternates by

4 court rule is 3 each or 6.  So it would be 20 plus

5 20 plus 12 is 52 if -- if both sides exercise all

6 peremptories.  And if the Court has 6 alternates

7 that would require 12 more jurors; so 52 plus 12

8 gets us to 64.  I think there will be hardship

9 issues and other issues that come up, so the Court

10 may want to pre-qualify 70.

11          THE COURT:  70 is what I was thinking, and I

12 was thinking 20 plus 3.  So 23 for each side total.

13 And that would be, that would be actually 46.

14 Right?

15          MR. RUBENSTEIN:  Yes.

16          THE COURT:  I thought that we would get 70,

17 and then we would be safe.

18          MR. RUBENSTEIN:  46 plus 18.

19          THE COURT:  46 plus 18, right, makes 64, and

20 that gives us a cushion.  Agreed.

21          Now as far as jurors, we have 14 seats here.

22 You can see that I've rearranged the courtroom.  I'm

23 trying to get a feel for how we could do this in an

24 orderly fashion.  We have 14 seats, that would be 12

25 plus 2 alternates.  My thought would be to have 4

1  sitting where the court services officers and the
2  marshals are.  I thought it might be a little
3  inconvenient and awkward for them to be sitting in
4  front of the jury box and didn't want you guys
5  stumbling over them, didn't want them to feel like
6  they are out in the open there, and they wouldn't be
7  able to see the witness very well.  I thought by
8  moving the podium where I moved it, or even a
9  little, you know, move it around a little bit more,
10  they can see the jurors.  They are not in your way.
11  And you're not stumbling over them, and there is no
12  spacing issues.  That's -- I don't know -- I'm open
13  to suggestions, but that's the best I could come up
14  with watching trials in this courtroom over the last
15  few years.  Any thoughts?
16         MR. RUBENSTEIN:  In terms of the initial,
17  the group voir dire, that makes sense.
18         THE COURT:  No, I'm saying once we finally
19  have 18, for the trial.
20         So look it over and think about how this
21  courtroom works, and I'm open to further thoughts on
22  that.
23         As far as the initial voir dire, we are
24  going to have 20 in here in the morning, 20 in the
25  afternoon.  And I thought I would have them brought

1  in -- go ahead.  You want to say something first?

2          MR. RUBENSTEIN:  Can I --

3          THE COURT:  Follow-up with something?

4          MR. RUBENSTEIN:  -- address the 20 and 20?

5          THE COURT:  Yes.

6          MR. RUBENSTEIN:  That's a lot of -- that's a

7  lot of jurors to voir dire in a day, with all

8  respect, Your Honor.  In the *Briseno* case, which is

9  the last case --

10          COURT REPORTER:  Excuse me, counsel, could

11  you please speak into a microphone.

12          MR. RUBENSTEIN:  I'm sorry.

13          COURT REPORTER:  Thank you.

14          MR. RUBENSTEIN:  The *Briseno* case is the

15  case that I looked an the transcript in.  That judge

16  brought in 12 in the morning, 12 in the afternoon.

17          What is unique about this case, or one of

18  the things that is unique about the case is the

19  amount of knowledge of the case in the jury pool as

20  we've reviewed the questionnaires.  And a number of

21  jurors, you know, are quite candid about their

22  feeling that Mr. Christensen is guilty.  And a

23  number of them have even expressed a bias about

24  culpability issues and on punishment issues.

25          So compared to many other federal capital

1 cases where jurors are coming in having never heard

2 of the case, this is pretty unique.

3      In the -- so we have been preparing proposed

4 procedures -- the Court has outlined those now, of

5 course -- but I looked at the Court's procedures in

6 *Con-ui* and in *Briseno*.  In *Con-ui* they brought in 12

7 a day, and in *Briseno* 24.  But we would request that

8 the Court consider bringing in 20.  Do the panel

9 with 20, have 10 in the morning, 10 in the afternoon

10 and see how that goes.  And if -- if the Court is in

11 control in terms how much time the parties have, we

12 would ask for 15 minutes to do individual voir dire.

13 If there is extra time, then we could up that, the

14 Court would up that.  If the Court feels that it's

15 not productive, the Court, of course, can direct the

16 parties to change the -- have less time.  But I

17 think to do meaningful death qualification, from the

18 government's perspective, to ensure these jurors can

19 give fair consideration to death; and in this case,

20 this aggravated case, for us to do life

21 qualifications, to ensure that the jurors that you

22 seat can give meaningful consideration to life in

23 this case, will require the Court's general voir

24 dire and then will require some meaningful voir dire

25 from the parties.

```
 1          THE COURT:  So you're saying 10 in the
 2   morning, 10 in the afternoon, and 15 minutes per
 3   side for each individual juror?
 4          MR. RUBENSTEIN:  Yes, Your Honor.
 5          THE COURT:  So that would be 30 minutes per
 6   juror?
 7          MR. RUBENSTEIN:  Yes.
 8          THE COURT:  How does that math work to get
 9   through the morning?  What is 30 minutes per juror
10   for 10 jurors?
11          MR. RUBENSTEIN:  I'm assuming some of those
12   jurors would have hardships, and some of those
13   jurors very quickly have been -- I believe we did
14   work together in good faith to identify extremes,
15   but there are still some jurors that are fairly
16   extreme on both ends.  So some of those folks, the
17   government may do voir dire pretty quickly, and we
18   can -- the parties agree pretty quickly, so that's
19   not 30 minutes, that's 5 minutes.  But --
20          THE COURT:  What do you think can be done
21   generally by me to set that stage before we get to
22   the individual questioning?
23          MR. RUBENSTEIN:  I think the instructions
24   the Court gives that lays out in not tremendous
25   detail but outlines the process that this may end up
```

 1  in a sentencing trial, and the aggravation broadly

 2  defined and mitigation broadly defined; that death

 3  is never required; that it is an individual

 4  decision.  Those -- to the extent that the Court

 5  gives those instructions, and then the Court

 6  identifies the bias issues in the panel, that then

 7  speed up the process for individual, we know, right,

 8  if there is a hot-button, non-sentencing issue, we

 9  can get to that right away.  I think that will --

10  that is an efficient use of time in terms of

11  identifying the bias issues, non-sentencing; and

12  then if those don't exist, for the parties to do the

13  life qualification and the death qualification in a

14  way where the Court feels confident these are

15  qualified folks.

16          THE COURT:  So if I did that line of

17  questioning initially, then why couldn't we regroup

18  at that point, and based simply upon that general

19  line of questioning and the answers, see if people

20  want to raise challenges for cause?  I can make

21  determinations at that point before we even get back

22  and go then that one little step deeper.

23          MR. RUBENSTEIN:  I think --

24          THE COURT:  I think we should consider that

25  or trying that.  I think that will help expedite

 1   this.

 2         MR. RUBENSTEIN:  Certainly, Your Honor.  One

 3   of the challenges would be the knowledge of the

 4   case.  You know, to the extent the Court tries to

 5   inquire of an individual, "What all did you hear

 6   about?  Who did you talk about?  You have indicated

 7   in your questionnaire you talked with some family

 8   members about that, what all did you discuss?"

 9         That's problematic in the pool, in the

10   panel.

11         THE COURT:  Agreed.  I agree with that on

12   the pretrial publicity.  I thought -- my thoughts

13   would be to identify people that have knowledge of

14   it in some regards to the extent without details,

15   and then set them off to the side for further

16   questioning; that would be individual.

17         But as far as hardships, bias, prior

18   contacts, knowledge of the parties, some general

19   questions about principles of law and whether they

20   can follow those; and to the extent some

21   questioning, generally speaking, like the questions

22   they are asked about the death penalty, and then a

23   visit between us to see if that knocks the number

24   down some.

25         MR. RUBENSTEIN:  That would be very

1  efficient.  On those folks the parties can agree or

2  make cause challenges on those people.  I think,

3  absolutely, we agree with that.

4        THE COURT:  All right.  Go ahead.  Anything

5  else then -- because now it's about -- it's down in

6  my mind, assuming the government is in agreement,

7  semi, sort of, on the process that -- what number we

8  bring in here.

9        MR. MILLER:  Ahh --

10        THE COURT:  That's all right.  Maybe

11  something else will come up.  Let's move to the --

12        MR. MILLER:  Your Honor, as we understand

13  it, the Court's Order and Proposal, we are in

14  agreement.  I understand the concerns, that people

15  may know something about the case, but let's talk

16  about recent cases, certainly *Tsarnaev*, certainly

17  *Roof* are much more publicized cases than these

18  cases.  That was not the cases that he cited.  And

19  we have an extensive juror questionnaire, which I

20  think served the purpose which was for people who

21  elicited whether they formed an opinion about guilt

22  or what they knew about the case and many of those

23  were already removed for cause.  And even for a life

24  qualification and death qualification, a number of

25  questions in those questionnaires that were put to

1  the jurors to try to determine that and the parties

2  worked together to try to remove all of those for

3  cause.  So we are hopeful that the general

4  questioning that the Court has proposed will be able

5  to address most of the issues in the case.  So there

6  will be some individual circumstances where we may

7  need to call individuals back in, but I think the

8  Court has already ruled that it was going to conduct

9  this hybrid examination.  The defense seems to be

10  coming back and suggesting that they really want

11  individual voir dire for each individual juror.  We

12  continue to suggest that isn't necessary or

13  required; that the Court's proposed procedure will

14  be sufficient, and that we will suggest, and this

15  maybe we will learn, but we would suggest that

16  bringing in the 20 that the Court suggested is the

17  appropriate number.  We can just as well adjust that

18  number downward if it turns out that we do need more

19  time based on the procedure that is taking place.

20  But we would just suggest to start with the 20 and

21  then to see how that plays out and go from there.

22        THE COURT:  Okay.  Anything else on that,

23  Mr. Rubenstein?

24        MR. RUBENSTEIN:  No, Your Honor.  We did

25  prepare two visual aids when the Court would like to

 1 | have us discuss those.

 2 |     THE COURT:  We will get to those here in a

 3 | second.

 4 |     So my thought is that we will have the 20

 5 | brought in on June 3rd in the morning and scheduled

 6 | for the afternoon, that does make 40, and maybe that

 7 | is a little ambitious.  But I thought that we would

 8 | find out.  It's as simple as I think our clerk is

 9 | going to make calls -- we have to, I think, make

10 | them for the first two days.  So if that is

11 | ambitious, it might have caused us a little problem,

12 | but I'm not sure if it is.  But then after that if

13 | we need to adjust the numbers, we can adjust the

14 | numbers.

15 |     I thought that for starters we will see if

16 | we can't be cautiously optimistic about getting this

17 | off to a start where we are actually selecting

18 | jurors, maybe a little more quickly than we might

19 | think.

20 |     So, I will decide on the limit -- that's

21 | going to reduce the amount of time, but I'm also

22 | hopeful that based upon my questions, we will be

23 | able to reduce the numbers of the people that we

24 | then should follow-up with further questioning.  And

25 | I'm just confident we are going to get there.  So

1  let's start with that.

2          MR. MILLER:  Your Honor --

3          THE COURT:  Go ahead.

4          MR. MILLER:  I just wanted to make sure that

5  I was clear and I understood that we will through

6  that process, then at the end of each session there

7  will be a number of jurors who will be not stricken

8  for cause and will be in the venire and will

9  ultimately arrive at that number of 70; and it will

10  be after the number of 70 that the parties will then

11  exercise their peremptories.

12          THE COURT:  That's my understanding.

13          MR. RUBENSTEIN:  That's our understanding,

14  Your Honor.

15          THE COURT:  So whatever day that is at the

16  end of the week we have reached 70, then we will

17  visit and decide who it is going to be.

18          Okay.  Let's see the visual aid.

19          MR. RUBENSTEIN:  I handed the government one

20  when I came in this morning.

21          This is titled "Life or Death

22  Decision-Making in a Federal Capital Case."

23          And it has got -- this is -- perhaps I could

24  hang it up here.

25          THE COURT:  You can sure.  I thought for

 1  sure we had -- we have an easel.  We are going to

 2  grab it.

 3          MR. RUBENSTEIN:  This was used --

 4          THE COURT:  Do you want to wait until he

 5  gets the easel?

 6          MR. RUBENSTEIN:  Yes.

 7          THE COURT:  That's fine.  And the government

 8  has seen this?

 9          MR. RUBENSTEIN:  Just this morning, Your

10  Honor.

11          MR. NELSON:  Your Honor, we just received

12  it.

13          THE COURT:  Is there an objection to it?

14          MR. NELSON:  Yes, sir.

15          THE COURT:  While we are waiting, I'm told

16  that 476 is the total, some additional

17  questionnaires were added back in, which you have

18  reviewed, but 476.  I had the number wrong.

19          So where did Jeremy go to get that?

20          All right.

21          MR. RUBENSTEIN:  I can hold it and talk

22  about it.

23          THE COURT:  Okay.

24          MR. RUBENSTEIN:  This was used in the

25  *Candelario* case, which was tried in Puerto Rico.

 1  And our position, Your Honor, is that the Court used
 2  it in general voir dire and in describing the
 3  production of the process and as the parties used it
 4  in individual voir dire.  This addresses a number of
 5  -- the sort of core Eighth Amendment principles that
 6  many jurors don't understand all the way through the
 7  process.
 8          So, for example, the first one:
 9          "No juror is ever required to impose a
10  sentence of death."
11          That's an accurate statement of the law.  A
12  lot of jurors do not understand that.  They assume
13  that this process -- people refer to it as a capital
14  case, occasionally; some people may refer to it as a
15  death penalty case.  So jurors -- the social science
16  research suggests that -- end up believing that the
17  death penalty is required in many cases.
18          Thanks very much.
19          THE COURT:  Thank you, Jeremy.
20          MR. RUBENSTEIN:  And then -- so these are
21  principles that facilitate more efficient quick
22  questioning.  If a juror is -- appears to be death
23  qualified and life qualified, confirm that they
24  understand these, is faster to do with this.
25          "In the federal system, there is no parole,

so life means life."

Many jurors don't understand that, don't believe that.  The Court -- most courts instruct the jurors on that, but having the jurors understand that in the process of also asking them about their feelings about death and life is appropriate because it ensures that their answers are in an appropriate context.

"The decision is a moral one that each juror must decide for himself or herself."

That is very unique in a capital sentencing context.  Many jurors don't understand that.  Many jurors, frankly, aren't comfortable with that.  So I think that voir dire is the opportunity to learn from jurors, how they feel about that responsibility.

The juror says, Wait a second, you're telling me that Judge Shadid is going to tell me, he is going to give me this check-this-box form, and if I fill it out, it is going to tell me if I have to impose a death sentence or a life sentence on that man there?

No, actually, what the law says is you look within it, you make a moral judgment for yourself about life or death.

1       And that's the principle "Every juror's
2   views are entitled to the respect of every other
3   juror."
4       There are some jurors that say I'm happy to
5   vote as a group, but if someone is not voting with
6   the group, that's not appropriate.  And this will
7   help us identify those jurors.
8       It is going to help us learn about potential
9   bias.  It is also going to help us exercise our
10  peremptory challenges in a thoughtful rational
11  manner.
12      "The decision of the jury is final.  The
13  judge can't change it."
14      Again, we want the jurors to understand the
15  tremendous personal responsibility they have for
16  sentencing.  It is not a sentencing recommendation.
17  This is the life or death decision that each of the
18  jurors will have.
19      If all 12 vote for death, it will be a death
20  sentence.  And if one juror votes for life, the
21  sentence will be lifetime imprisonment.
22      These last two, Your Honor, I think are
23  critical because under *Caldwell*, the jurors who were
24  seated here have to understand that each of them by
25  recording their vote on the verdict form have this

1  man's life in their hands.

2       And, again, for a juror to actually be

3  sitting here saying, You're telling me serving as a

4  citizen to serve on this case, I may be in a

5  position where I have to make that decision?

6       Yes.

7       Some jurors do not want that responsibility

8  or are unwilling to perform that duty.  Some jurors

9  who can't perform it, you ask them how does that

10 make you feel?  And some jurors say, I can't --

11 that's an awesome responsibility.  It makes me -- it

12 makes me anxious, and I'm not looking forward to it,

13 but I think that I can do it.  That's one kind of

14 juror.

15      Other jurors:  Yeah, that's not a problem;

16 where do I sign up?  That's another kind of juror.

17      And for us to exercise peremptory challenges

18 in a rational thoughtful manner, it is helpful for

19 us to identify how jurors feel about this

20 responsibility.

21      So, I believe that this would facilitate a

22 more efficient, faster, more comprehensive --

23      THE COURT:  So if that is recited to

24 everybody, what do you see as follow-up questioning?

25      MR. RUBENSTEIN:  I saw in your

1  questionnaire, sir, that you had some -- you made a
2  statement about lifetime imprisonment.  You had some
3  question about that.  Do you understand that in the
4  federal system there is no parole?  So a life
5  sentence, if the jury returns life, it means that a
6  person will die in prison; do you understand that?
7           Well, I had some questions about that.
8           What were your questions?
9           Well, I heard about this case where, you
10  know, the guy got paroled after 20 years.
11           That doesn't happen in the federal system.
12  So now that you know, is that a sentence that you
13  are more willing to consider?  Yes or no.
14           "The decision of the jury is final."
15           If someone writes and has a comment in their
16  questionnaire about -- critical of the judicial
17  system, you know, there is lots of appeals or
18  something; and we would want to be able to convey to
19  the juror, you know, this is not a recommendation.
20  Judge Shadid, ultimately, by law is required to
21  follow the verdict of the jury.  And by your
22  individual vote and the decision made by the jurors,
23  that whether it's life or death, that's going to be
24  the sentence imposed.  Judge Shadid doesn't have the
25  discretion -- so, again, it heightens the personal

1  responsibility.

2         So you're asking how would we use this in

3  questioning?  It is following up from a

4  questionnaire that raises an issue that we believe

5  that there is some confusion or we'd like to make

6  the context clear.  So when we are saying, can you

7  do that; how does to make you feel; can you give a

8  consideration of life sentence in that scenario

9  knowing X knowing Y, it's a -- it's an accurate

10 context of the law.  We are getting responses from

11 jurors that are meaningful.

12         THE COURT:  Fair enough.

13         MR. RUBENSTEIN:  Can I touch on the other

14 chart?

15         THE COURT:  Yep.  Yep.

16         MR. RUBENSTEIN:  This is a schematic of the

17 of a trial.  And I think that we filed a

18 declaration.  Miss Pollock filed a declaration.  We

19 can present it to the Court this week with many

20 examples of these being used in federal court.

21         And I guess we should -- I can mark these

22 and put them in the record, but, basically, it shows

23 that there is a trial here, the three charges, only

24 one of them is capital.  If there is a not guilty on

25 the capital charge, the juror's job is done.  That's

1  part normally of the instruction that you might give
2  to the panel.
3        And then if we -- if he is convicted, we
4  move into the sentencing trial; jurors come back for
5  another portion of the trial.  This is all pretty
6  foreign to most folks.
7        Then there is the process, a threshold
8  determination where the jurors have to decide on
9  mental intent factor, on an aggravating factor, that
10 identifies what those aggravating factors are that
11 the government has alleged.  If they are unanimously
12 found, then we proceed to the weighing
13 determination.  If they not, then we stop.  The
14 juror's decision-making is done.  If we get to the
15 weighing determination, it then outlines the
16 aggravating factors on one side of the scale, the
17 mitigating factors on the other side of the scale,
18 and identifies what the aggravating factors are;
19 they have to be unanimous beyond a reasonable doubt.
20 And only those that are specifically listed.  And it
21 lists what the government has alleged.
22       And the mitigation, and this is an area
23 where jurors commonly in voir dire take a little
24 while for them to understand this and then for them
25 to respond how they would be able to do this.  But

it's an individual finding.  The standard is
different.  And it's listed by the Court or
identified by a juror.  And I've had jurors respond,
Your Honor, that they are willing to consider
mitigation if it is a group decision, but if it's
something that the law requires them to do
individually, they are not going to do that.  They
are not willing or able to do that.

And then the ultimate issue.  The ultimate
issue at the end of this case, if we get there, is
from the statute:

The jurors "shall consider whether all the
aggravating factor or factors found to exist
sufficiently outweigh all the mitigating factor or
factors found exist to justify a sentence of death."

And if the government proves that
unanimously, Mr. Christensen will be sentenced to
death, and he will be executed.  And if it is one or
more votes for life, then it is going to be life
imprisonment.

So as you go through your -- if you give the
panel an introductory overview of the case, you
introduce the case, the charges, and this may end up
in a sentencing trial.  And I would like to provide
the Court with the transcript from *Briseno* and from

*Con-ui*.  This I think is a schematic.  Some judges
have referred to it as they're giving that
instruction.  It would be something that would help,
I think, the government.  I know it would help us.

In terms of -- a juror -- we are talking
about a sentencing trial.  Could they consider a
life sentence in this kind of case.  And they say,
Yeah, because if it was -- if I wasn't sure the guy
did it, maybe if he -- or if it is in self-defense,
maybe I wouldn't be thinking about -- maybe I could
consider a life sentence.

Well, I think, I appreciate that, juror,
perspective juror, but that's here; that's at this
guilty/not guilty portion of the trial.  If we are
in the sentencing trial, you would have found the
person guilty.  You would know that they did it.
Self-defense is not an issue.  Insanity is not an
issue.  They did it.  And now we are in the
sentencing trial.  So given your response in the
questionnaire when you said, if he did it, an eye
for an eye; is it fair to say that for you really
death is the only appropriate sentence?

Yeah, I think you're right.

If it is a culpability, they won't use that
language.  But if it is self-defense, if it is

 1  insanity, I can consider life.  But if we found the
 2  person guilty, that's not an option for me; that
 3  helps the Court identify jurors who have a death
 4  bias and should be disqualified.  Thank you.
 5          THE COURT:  Thank you.  You all will have an
 6  opportunity once the government responds.
 7          Mr. Nelson.
 8          MR. NELSON:  Yes, Your Honor.  Is it all
 9  right if I argue from here?
10          THE COURT:  It is.
11          MR. NELSON:  Thank you, Your Honor.  I will
12  address the one up there now, the schematic.
13          In terms of helping the government, had we
14  seen it before today, had our input been requested
15  at any point, we might have been able to contribute
16  to this.  You know, there is a lot of obvious
17  problems with it.
18          The first we addressed actually the last
19  time we argued this with the big red stop sign, you
20  know, and encouraging jurors to not deliberate
21  before they even started.  I think that's a real
22  problem.
23          And again, you know, this sort of unanimous,
24  not unanimous at the bottom, life without release.
25  Again, the jury is going to be instructed on their

1  duty to deliberate under the instructions, the

2  pattern instructions.  And so I think anything that

3  is inconsistent with that is an issue.

4       I also think that listing out, for example,

5  words that are in bold or italics or underlined

6  based on things that the defense wants to highlight

7  or not highlight is prejudicial.  I think that if we

8  want to have a simple schematic drawing, you know,

9  guilt phase, this is what you can consider; penalty

10  phase, this is what you consider, you know, we are

11  not trifurcating here, you know, but first there is

12  the threshold determination, and then there is the

13  selection phase.  That all isn't necessarily a

14  problem, but I don't -- I don't think it can look

15  like this, and I don't think it can have a lot of

16  this stuff in it from the government' perspective,

17  Your Honor.

18       For example, this lists particular

19  aggravating factors.  Obviously, we are limited to

20  what's alleged in the notice, but we can dismiss

21  aggravators at any time.  So if we are telling the

22  jury in advance, You should expect to hear all of

23  these seven things, and if you don't, then that can

24  get into your weighing process, that's a problem

25  also.

1        THE COURT:  Tell me when you do expect to
2   make clear what the aggravating factors are going to
3   be if you want to proceed on.
4        MR. NELSON:  Well, Your Honor, we --
5        THE COURT:  For instance -- answer the
6   question.
7        MR. NELSON:  Well, I think certainly, Your
8   Honor, how things come in the guilt phase will have
9   an impact.  We can't add any.  We won't be trying to
10  add anything, obviously.  How things come in the
11  guilt phase, how certain witnesses perform on the
12  stand or under cross-examination might affect our
13  perspective on that as well.  It's hard to say at
14  this point, but we are not going to sandbag.  We are
15  not going to wait until the moment before closing
16  arguments to say that, but a circumstance could
17  happen where we decide we need to dismiss an
18  aggravator for one reason or another, and I don't
19  think we should be penalized in voir dire for that.
20        With respect to the other one, again, Your
21  Honor, I believe this is an attempt to have the
22  Court sanction the defense's proposed or perfected
23  voir dire questions.  I think it's interesting they
24  note *Candelario*.  *Candelario* is a case in Puerto
25  Rico where they did individual voir dire, and it

 1 | turned into a complete snail's case, and the
 2 | transcript showed that at some point Judge Fuste
 3 | threw up his hands and said, "We are not doing this
 4 | anymore.  This is ridiculous.  We are never going to
 5 | get a jury."
 6 |         And I think that sanctioning these questions
 7 | and putting them up, you know, from the Court is
 8 | problematic.  I think that's what jury instructions
 9 | are for.  And that's what -- how I interpreted the
10 | Court's proposals to be, an instruction on what the
11 | process is, that's obviously important.  Some of
12 | these questions are fine and certainly a lot of --
13 |         THE COURT:  Which ones at first glance are
14 | fine?
15 |         MR. NELSON:  Okay.  For example:
16 |         "The alternative sentence of death is a
17 | lifetime of imprisonment without possibly of
18 | release."  That's fine.
19 |         The second question -- the first question,
20 | "No juror is ever required to impose a sentence of
21 | death."  Technically true.  They are also never
22 | required to impose a sentence of life imprisonment.
23 | That's an argument.
24 |         The -- there is no parole is correct to a
25 | point.  After the comma, "so life means life."

1   That's not true.  Could be a change of law.  Could
2   be a pardon.  Could be a commutation.  Could be an
3   escape.  Could be a compassionate release.  So
4   that's not true.
5           The moral question, fine.  "Each juror's
6   views are entitled to the respect of other juror."
7   That's fine.
8           Okay.  But I mean -- okay.  My colleagues
9   disagree with the moral one.  We will say that that
10  is subject to interpretation.
11          "Decision of the jury is final.  The judge
12  cannot change it."  Well, appellate judges sure can.
13  So that's misleading as well.
14          And the last two on this point, again, they
15  are redundant to the others, and they are also
16  cutting into the duty to deliberate.  And I think
17  that anything that could even be perceived as
18  telling the jury that they can stop before we've
19  even started, runs counter to the interest of
20  justice in this case.  And it runs counter to all of
21  the work that we have done in this case.  And
22  certainly both sides and the Court should be
23  entitled to consider whether the jurors can perform
24  the task that is in front of them, because it is a
25  monumental one that most people haven't ever

considered.  That's all correct.  I agree with
Mr. Rubenstein on that all the way to the end.  But
how we go about that and what we put the Court's
name on and these -- they know how they are going to
ask these questions because he rattled them off off
the top of his head.  He doesn't need this
demonstrative to do that.  This is just to put it up
there so that they are sitting there for two hours
during voir dire looking at this, and, you know, it
is being planted in their mind.  Well, I can stop
before I even start.  I don't have to participate.
And that's not what this case should be about, Your
Honor, with all due respect.

        THE COURT:  What kind of visual -- so tell
me what a visual, if there is one in your mind, what
it looks like.

        MR. NELSON:  In my mind, Your Honor, it is
-- I actually like the idea of the one column and
the other column broken by a broken line just
because it is not really a trifurcation, it's a
bifurcation with two pieces to the second piece.
But in my mind, Your Honor, it's, you know, guilt
phase, penalty phase, or trial, sentencing trial,
however you want to put the header on there.  And
the first column is "Determine the defendant's guilt

1  beyond a reasonable doubt to the crimes charged."

2        And the second one is, you know, at the top,

3  sort of envisioning like a top bar and then broken

4  below it, at the top is "Determine the sentence."

5  And the first piece of that is determine whether he

6  is eligible for the death penalty, because of the

7  threshold determinations.  And the second is what --

8  what sentence the jury has decided to impose.  And

9  part of that would be weighing the aggravation and

10  mitigation, obviously.  But I don't know that it

11  needs to have, you know, all of these words in bold

12  and italics and specifying aggravation or

13  mitigation.

14        THE COURT:  So, in other words, it's a

15  process.  So if the guilt phase is concluded with

16  guilt, then you are saying a sentencing column would

17  identify first finding -- making certain findings to

18  determine if Mr. Christensen's eligible and if they

19  make that determination then they go on to determine

20  what sentence to impose.

21        MR. NELSON:  Yes, Your Honor.

22        THE COURT:  Okay.  Without the list of

23  statutory or nonstatutory factors, but telling them

24  that they would have to find certain statutory

25  factors to become eligible, which they would be

1  instructed as to what those were.

2      MR. NELSON:  I think that's right, Your

3  Honor.  By the time this point of the trial rolls

4  around, they will have the verdict form.  They will

5  be able to look at it.  It will be very clear what

6  they have to do.  And I understand that we haven't

7  put those instructions in yet, but the verdict forms

8  in these cases are very clear in terms of how far to

9  go.  If you reach this point, now you get back to

10 the judge, for example.  I think explaining the

11 process is wise.  I think as Mr. Rubenstein

12 suggested, if you get a juror who is confused about

13 which phase of the trial we are in, having a road

14 map, so to speak, could be helpful.  I don't know --

15 I think that it could be helpful.  I think that this

16 is confusing and misleading.

17      THE COURT:  Okay.  Last word,

18 Mr. Rubenstein.

19      This sounds like clearly we can have some

20 visual by agreement and have a road map of the

21 process.  So now it's a matter of what it looks

22 like.  Do you guys like to try to resolve that or do

23 you want to -- do you want me to decide it?  Because

24 I do agree that some visual could be helpful in --

25      MR. RUBENSTEIN:  Your Honor, why don't I try

 1  to take in consideration the government's comments,

 2  and we will send them a revised version by the end

 3  of the week, and they can object, make suggestions,

 4  and then if we resolve it, then we are in good

 5  shape; if not, then we ask the Court to consider the

 6  different positions.

 7          THE COURT:  Okay.  Fair enough.

 8          MR. NELSON:  That's fine, Your Honor.

 9          THE COURT:  I would ask the government if

10  you do end up with differences, each submit some

11  proposed visual.  All right.

12          Let's -- go ahead, Mr. Tucker.

13          MR. TUCKER:  Can I ask you one thing?  I

14  think that you're getting ready to change topics

15  here.

16          THE COURT:  Go ahead.

17          MR. TUCKER:  I would ask you to

18  reconsider -- rethink, perhaps not here, but to

19  rethink this idea of 20 jurors in a session.  You

20  have told us in prior orders, Your Honor, that your

21  practice is to give the lawyers some rein in

22  individual voir dire.  And as we had pointed out in

23  pleadings, individual voir dire in capital cases is

24  just standard.  It is almost in every case, some

25  degree of it.  So I think if you figure out the

```
 1  times here, 20 jurors per session just doesn't come
 2  close to working.  We were coming over here with the
 3  idea of 6 to 8 per session.  But regardless of that,
 4  I would just ask the Court to look at the times.  I
 5  don't know how long the Court believes that your
 6  panel questioning would be, but even with the panel
 7  questioning, I don't know how long that might be,
 8  whether you're going to do it in panels of the whole
 9  12 or divide that down into smaller panels, that's
10  not clear to me.  But I think if you figure out the
11  time, Your Honor, you're talking about less than
12  five minutes a side, less than that.  You're talking
13  about -- here, I was just calculating here some of
14  the times.  And even at ten minutes a side, ten
15  jurors per session would push it.  You're talking
16  about right under four hours.  And that's
17  assuming -- that's assuming you don't take a
18  15-minute break.
19          So if you calculate that out, you are really
20  allowing very, very little time.  And when you think
21  about how this process will work, as I understand
22  it, we are going to pass up written questions --
23  it's never been exactly clear to me -- I know we are
24  going to submit written questions on the 29th or
25  28th for voir dire, but how that would actually work
```

1  in practice here, because once you get into written
2  questions back and forth, then, you know, if you do
3  it with individual voir dire and questioning, it
4  goes much smoother, much quicker.  Otherwise, we
5  will be writing out questions that will take time
6  and submitting to you.  So I just ask the Court to
7  rethink this with the times.
8       THE COURT:  All right.  Let's start
9  rethinking it right now, starting with the written
10 questions, the proposed written questions.  What
11 would you understand those to be and how -- and who
12 would use them?  It's me to review to say, okay, you
13 can ask those questions, or me to use some of those
14 in the general questioning, or how do you anticipate
15 those being used?
16      MR. TUCKER:  Frankly, I wasn't sure what the
17 Court had in mind.  I wasn't sure, to be honest with
18 you.  That's part of the reason that I want to raise
19 it.  If we are talking about -- we are going to hear
20 certain responses even from the panel question.  We
21 are going to hear responses that would require a
22 follow-up.  Now perhaps that will be back in the
23 jury room, and as your order seems to imply, where I
24 assume the Court would not be wanting to do back and
25 forth written questions, that will seem to really

1  slow everything --

2      THE COURT:  Now we are not going to do that.

3  My thought about written questions was just to hear

4  from you that all -- both sides understand that

5  certain questions might be out of bounds or trying

6  to discuss that.  And if they were submitted and I

7  thought they were, then I would address them with

8  you ahead of time.  My understanding is these

9  questions that you would propose are questions that

10  you think that you might ask, one of them, two of

11  them, three of them, none of them, six of them.  And

12  I would be alerted or have a heads-up if I thought

13  something was not appropriate.  And so then we would

14  have that discussion ahead of time, I would say.  I

15  don't think five -- you know, I would give you a

16  chance to tell me why you think it is, but I don't

17  think you can ask five or you can ask five type of

18  thing, then you would be allowed to ask questions

19  without -- you're not submitting the written

20  questions to the juror.

21      MR. TUCKER:  Right.  I guess what I thought

22  that you had in mind, I wasn't sure, was that on the

23  28th, we would submit questions that you would ask

24  during voir dire, but I think what I'm hearing

25  now --

1          THE COURT:  I think that it can be both.  I
2    think when I get your questions that these are
3    questions that you think should be asked of Juror A
4    based upon their written questionnaire, some
5    follow-ups.  I know that there are going to be more
6    follow-ups based on answers, but I thought this
7    would be the first step of follow-ups based upon
8    what you thought, and I would review those.  Some I
9    might ask, some I would leave for you to ask.  Some
10   you might want me to ask.  Sometime the attorneys
11   want me to ask them so you don't ask them.  So I
12   thought that we would get that -- so I think the
13   process is continuing to be a framework starting
14   with what you guys have already done to reduce the
15   number of questions that ultimately are asked.
16          MR. TUCKER:  I understand that.  So what
17   you're saying now, to my interpretation, is that
18   that would take place back in the jury room, because
19   once you start addressing questions to particular
20   jurors, you are probably going to be doing that in
21   the jury room.
22          THE COURT:  Most likely.
23          MR. TUCKER:  For the most part.
24          THE COURT:  I think generally speaking some
25   will apply to all.

1      MR. TUCKER:  And the questions will depend,
2  for each juror, may be different, of course,
3  depending on as you just mentioned the
4  questionnaire.
5      THE COURT:  Correct.
6      MR. TUCKER:  I don't know.  What I think
7  that I'm hearing you say now is that you would like
8  us to submit questions for -- on the 28th that we
9  would like you to ask for the whole panel.  And then
10 questions for individual jurors, would we submit
11 them the night before, I mean, depending on -- I
12 mean, you're coming in -- because that is going to
13 vary per each juror.
14      Now it could be that, you know, we may ask a
15 question and you just decide that we shouldn't ask
16 that and maybe we can't ask any of the jurors that.
17 I don't know how that would play out.  But I was
18 just trying to figure out this in terms of time.
19 When you really think this through, Your Honor, I
20 mean, you are talking about, even if each side has
21 ten minutes, only ten minutes.  If you bring ten in
22 the morning, ten in the morning, say, you're talking
23 about going right to four hours right there.  And we
24 are talking about three hours and 25 minutes or so
25 for that.  And you are also talking about your panel

1  questioning.  So that's why I just asked the Court
2  maybe if you could reconsider that because I don't
3  think that that will work -- I gather from the
4  Court's previous rulings that you intended to give
5  us some meaningful individual voir dire and that was
6  your practice and certainly in a capital case that's
7  the practice, and so it doesn't work with 20.  It
8  really doesn't.

9       THE COURT:  Let's stay on the question for a
10 second.  I would expect that when you submit
11 proposed voir dire questions, you can do it both
12 ways, however you feel actually more comfortable.
13 So Juror A, you would like me to ask -- or to all
14 jurors to generally speaking, question -- these five
15 or six questions.  And then specific to A, B, C, and
16 D, you have these questions, which likely you will
17 be asking.

18      So, with that in mind, let me hear from the
19 government on it.

20      MR. MILLER:  Your Honor, and I think that's
21 how we envisioned it, when we list questions, they
22 would mostly be questions that would be asked of the
23 entire panel.  We would be asking to ask the entire
24 panel.  And our understanding too is also that it
25 was addressing the government's concern in response

1  to some of the questions the defendant submitted to

2  the juror questionnaires, what we refer to as the

3  Colorado Method, to ensure that overly specific

4  facts -- and I know the Court has already ruled it

5  will not be -- extensive detail allowed in the

6  questioning, but that that way that process could be

7  reviewed by the Court prior to those questions being

8  asked by defense.  So that makes sense to us,

9  questions that would be asked to all the jurors

10  would be submitted in advance.

11        We -- I don't think we did envision that it

12  would be specific questions that would be asked for

13  specific jurors, but certainly I think both sides

14  would be aware of any questions that might be close

15  to the line as far as whether they are appropriate

16  questions.  We would agree that those should be

17  submitted by the Court.

18        We still stand by our thought and the

19  Court's thought that this hybrid process can work.

20  I don't know that we will have individual questions

21  for every juror.  We have -- the extent, unlike a

22  typical case that the Court has where they get a

23  jury in half a day.  I know this is a capital case,

24  but we also have extensive juror questionnaire

25  responses that we don't have in those cases, and we

 1  have them well in advance of the jury selection
 2  process.  So that coupled with the Court's general
 3  question, we think will result in multiple jurors
 4  who are -- when we sit down is not going to have any
 5  individual questions for.  Because our goal here
 6  isn't to try to indoctrinate jurors as to what they
 7  should do.  The question is -- the goal is to make
 8  sure we get fair and impartial jurors.  And we think
 9  that we would be able to tell that through the
10  questionnaires.
11        We also know that the defense has stated
12  this and shall be allowed to do extensive
13  backgrounds on those jurors as well.
14        So when you couple all of that information
15  together, we think that there will be -- will not be
16  as much necessity for individual questioning and
17  lengthy individual questioning of all available
18  jurors, which is why we still believe that that
19  number of 20 is a good start in attempting to get
20  through the process each morning and each afternoon.
21        THE COURT:  Okay.  Mr. Tucker.
22        MR. TUCKER:  Well, if they are not going to
23  use their time, we would be happy to accept it.
24  They can donate it to us.
25        There are a few things about this case.

 1  Obviously, it's a death penalty case.  We all know
 2  that.  But you also have very extensive publicity,
 3  very prejudicial, and the Court recognized that.  I
 4  realize that you switched the venue over here for a
 5  lot of administrative reasons, but you also noted in
 6  your Order the significance of the extensive
 7  prejudicial publicity in this case.  Some of this is
 8  just ridiculous, some of the stuff that I read
 9  online about this, not even close to true.  People
10  are reading these things.  So you have that.  You
11  also have that this -- not only is it a death
12  penalty case, this is a case that involves
13  kidnapping, murder, and sexual assault.  Sexual
14  assault, that's significant, too.  So those are the
15  allegations.  And, Your Honor, this is just a case
16  where I realize, you know, that there is, you know,
17  the Court wants to get the case started in a timely
18  fashion, but I think there are other interests that
19  really override that -- I mean it has to be a
20  balance here.  I understand that.  We understand
21  that.  But, you know, I think when you're talking
22  about 20, you're really -- it's just going to limit
23  it so much that it almost amounts to nothing unless
24  the government wants to just give us their time, and
25  they are not going to want to.  I guarantee it as

1  they are standing here, they are going to be posing

2  individual questions, too.

3          THE COURT:  All right.  I will -- I have

4  heard what both of you said.  I will decide, and I

5  will stay open at all times.  And if whatever

6  decision I make, whether it is 10, 15, 20, it turns

7  out to be wrong or clearly on day one I find that

8  this is unworkable, we will adjust.  But I have

9  heard you.

10          Okay.  Now the question is, first of all, is

11  there anything else you think we should address

12  today, otherwise -- and maybe some things will come

13  up as we go in chambers now on some of these other

14  issues.  Do you want to break for a little bit and

15  then go into chamber?  Do you want to break for

16  lunch then come back at 1:15 and go in chambers.  Do

17  you want to keep going?  You tell me.

18          MR. MILLER:  We are ready to keep going,

19  Your Honor.

20          MR. TUCKER:  Keep going.

21          THE COURT:  Okay.  Let's keep going.

22  Everybody in agreement though we should recess to

23  chambers for these couple of issues as they pertain

24  to Document 324, and then the other one as to

25  Document 322?



1        MR. MILLER:  Yes, Your Honor.

2        THE COURT:  And then if we need to come back

3   out in open court for any record, we will do so.

4        Okay.  Thank you.

5        (Proceedings held in chambers.)

6        (







63





































































1

2

3

4              (Proceedings were held in open court.)

5              THE COURT:  Thank you.  Please be seated.

6              We concluded the session in chambers; that

7    does not need to be recited.  A record was made.

8    That should stay in chambers as it pertains to

9    sealed documents.  As rulings are made, they would

10   become public.

11             But for today, we have left it with the

12   parties and the Court is still to make a decision.

13             And with regard to one of them, 324, maybe

14   some further discussion between the parties in that

15   regard; otherwise, we would see everybody here again

16   on May 30th.

17             Parties are going to, to the extent they

18   can, and I'm going to do the same -- actually, I

19   think some visual aid about the process is

20   appropriate and see if we can come up with

21   something.

22             Anything else the parties believe needs to

23   be addressed today?

24             MR. NELSON:  No, Your Honor.

25             MS. BRAIN:  No, Your Honor.

1          THE COURT:  Okay.  Thank you, everybody.

2          Have a good day.

3          (Which were all of the proceedings had in

4          this case on this date.)

5                          ****

6

7          I certify that the foregoing is a correct

8  transcript from the record of proceedings in the

9  above-entitled matter.

10

11

12  s/Nancy Mersot          Date:  May 20, 2019

13  Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25