1        UNITED STATES DISTRICT COURT
         CENTRAL DISTRICT OF ILLINOIS
2

3

UNITED STATES OF AMERICA,
4                                    Docket No. 17-20037
              Plaintiff,
5
     vs.                             Peoria, Illinois
6                                    June 12, 2019
                                     9:00 a.m.
7    BRENDT A. CHRISTENSEN,

8              Defendant.

9

10

11        JURY TRIAL -- June 12, 2019 (Morning)
                    (Redacted)
12

13

14

         BEFORE THE HONORABLE JAMES E. SHADID
15
         UNITED STATES DISTRICT JUDGE
16

17

18

19

20        NANCY MERSOT, CSR-RPR
          Official Court Reporter
21        U.S. District Court
          100 N.E. Monroe Street
22        Peoria, Illinois 61602
             309-671-4244
23

24

Proceedings recorded by mechanical stenography;
25  transcript produced by computer.

```
 1
    For the Plaintiff:     EUGENE L. MILLER, ESQUIRE
 2                         BRYAN D. FRERES, ESQUIRE
                           Assistant United States
 3  Attorneys
                           201 South Vine Street
 4                         Urbana, Illinois 61802
                           217-373-5875
 5
                           JAMES B. NELSON, ESQUIRE
 6                         U.S. DEPARTMENT OF JUSTICE
                           Capital Case Section
 7                         1331 F Street NW, Suite 625
                           Washington, DC 20004
 8                         202-598-2872

 9
    For the Defendant:     GEORGE F. TASEFF, ESQUIRE
10                         Assistant Federal Public
    Defender
11                         401 Main Street, Suite 1500
                           Peoria, Illinois 61602
12                         309-671-7891

13                         ELISABETH R. POLLOCK, ESQUIRE
                           Assistant Federal Public
14  Defender
                           300 West Main Street
15                         Urbana, Illinois 61801
                           217-373-0666
16
                           ROBERT L. TUCKER, ESQUIRE
17                         Robert L. Tucker, Esq
                           7114 Washington Avenue
18                         St. Louis, Missouri 63130
                           703-527-1622
19
                           JULIE C. BRAIN, ESQUIRE
20                         Attorney at law
                           916 South 2nd Street
21                         Philadelphia, Pennsylvania
    19147
22                         267-639-0417

23

24

25
```

1                        I N D E X

2                                              Page
   OPENING STATEMENTS:

3          Government                          14

4          Defense                            44

5

6  GOVERNMENT'S WITNESSES:

7
         EZZARD HOSKINS
8  Direct Examination                         64

9        XIAOLIN HOU
   Direct Examination                         82

10
         RANDY FOUTS
11 Direct Examination                         97

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court, 9:00 a.m.)

2          THE COURT:  All right.  Good morning,

3  everybody.

4          Let me call the case the United States v.

5  Brendt Christensen, 17-20037.

6          Mr. Brendt Christensen is present in open

7  court his attorneys:  Mr. Tucker, Miss Brain,

8  Mr. Taseff, and Ms. Pollock.

9          The government is present by:  Mr. Miller;

10 Mr. Nelson; Mr. Freres; Agent Huckstadt; and Agent

11 Manganaro, assisting; as well as Staci Klayer.

12         With that in mind, before we begin, let me

13 address a matter.  The defense, as indicated

14 yesterday, would be filing a Motion to Continue.  It

15 is filed this morning, Docket Number 375:  a Motion

16 to Continue the trial based on the civil suit filed

17 on behalf of the Zhang family against Thomas

18 Miebach, Jennifer Maupin, and the defendant.

19         The government would not have had a chance

20 to respond as yet.  The government indicated

21 yesterday they would be opposed to the motion

22 without response, then the Court has considered the

23 motion.

24         Anybody wish to be heard further on the

25 matter before I address it?

US v. CHRISTENSEN 6/12/19 Vol 8A (Rough Draft)           5

1          MS. POLLOCK:  No, Your Honor, the motion
2     speaks for itself.
3          THE COURT:  Does the government wish to be
4     heard on the matter?
5          MR. MILLER:  No, I believe the Court knows
6     our position opposing the motion.
7          THE COURT:  An Order that we entered this
8     day reads as follows:
9          Defendant has filed a Motion to Continue
10    based on the civil suit that I just referenced.  The
11    civil suit was filed on June 7, 2019, on behalf of
12    the family and Miss Zhang, and against the defendant
13    and two counselors at the University of Illinois
14    Counseling Center.
15         The defendant asked for a continuance until
16    discovery closes in the civil case.  In effect, the
17    defense asked for what could be up to a two-year
18    continuance.  They allege mitigating evidence would
19    be produced in civil discovery, including, but not
20    limited to, depositions, interrogatories, and
21    document production.  Although it is true that the
22    defendant may not have been able to depose the two
23    counselors named in the civil suit or propounded
24    interrogatories, the defendant was able to subpoena
25    documents from the Counseling Center and will be

1  able to call two counselors to testify at trial.

2  The defendant has also secured an expert,

3  Dr. Zoline, to testify about the counseling that

4  Mr. Christensen received.

5          Given the timing of the request of the

6  continuance, the extensive preparation of both sides

7  for trial, the scheduling of witnesses for trial and

8  the overall history and posture of the case to this

9  point,  request to indefinitely reschedule or for

10  any other delay in the trial at this point does not

11  serve the interest of justice.

12          Accordingly, the motion is respectfully

13  denied.

14          With that in mind then is the government

15  ready for trial?

16          MR. MILLER:  We are, Your Honor.

17          THE COURT:  With in mind, has the defense in

18  consultation with your client, are you ready to

19  proceed to trial?

20          MS. POLLOCK:  Yes, Your Honor.

21          THE COURT:  Thank you.

22          All right.  Is there anything else that we

23  should address before we call in the jurors?

24          At this point, when the jurors are situated,

25  I will have them sworn in.  I will read some

1  preliminary instructions to them about rules for
2  criminal cases, about evidence, and about their
3  conduct.  And then we would proceed to opening
4  statements.
5          Are the parties ready for that.
6          MR. MILLER:  Yes, Your Honor.
7          MS. POLLOCK:  Yes, Your Honor.
8          THE COURT:  Okay.  Very good.  Let's bring
9  the jury in.
10          All right.  Thank you.  Please be seated.
11          Ladies and gentlemen, thank you for being
12  prompt this morning so we can start as schedule.
13          As you come in, you can be seated.  We will
14  remain standing as a courtesy to you and as a
15  courtesy to the process.
16          With that in mind, I know that you were
17  told, I hope that you were told that you could bring
18  bottle water down here with you, if you feel the
19  need to do so.
20          We are prepared to start the case of the
21  United States v. Brendt Christensen.  I have
22  previously introduced you to the parties.  I won't
23  introduce you again.
24          I have previously read to you the proposed
25  statement of the case and the indictment.  I will

1  read to you again the charges during the preliminary

2  instructions.

3         Before we begin, I'm going to give you some

4  preliminary instructions that will help you

5  understand the process and follow along with the

6  case.  There will be a complete set of written

7  instructions at the conclusion of the case so these

8  are not by any means the complete set of

9  instructions that you will receive.

10        Let me start:

11        Oh, first off let me have you sworn.

12        If you will stand and raise your right

13  hands.

14        (Jury sworn, 9:07 a.m.)

15        THE COURT:  Okay.  Thank you.  Please be

16  seated.

17        All right.  If at any time you cannot hear a

18  witness, although I do not believe that will be an

19  issue, please get our attention somehow.

20        Those of you that are the four alternates

21  sitting there, if that screen is blocking your view,

22  we can shift it so that it doesn't block your view

23  of the witness.

24        All right.  With that in mind, it will be

25  your duty to find from the evidence what the facts

 1  are.  You and you alone will be the judges of the

 2  facts.  You will then have to apply those facts to

 3  those -- you will then have to apply to those facts

 4  the law as I will give to you.  You must follow the

 5  law whether you agree with it or not.

 6          Nothing the Court says or does during the

 7  course of this trial is intended to indicate or

 8  should be taken by you as indicating what your

 9  verdict should be.

10          The evidence from which you will find the

11  facts will consist of the testimony of the

12  witnesses, documents, and other things received into

13  the record as exhibits and any facts that the

14  lawyers agree to or stipulate to or that the Court

15  may instruct you to find.

16          Certain things are not evidence and must not

17  be considered by you.  I will list them for you now:

18          Statements arguments and questions by

19  lawyers are not evidence.

20          Objections to questions are not evidence.

21  Lawyers have an obligation to their clients to make

22  objections when they believe evidence being offered

23  is improper under the rules of evidence.  You should

24  not be influenced by the objection or by the Court's

25  ruling on it.  If the objection is sustained, ignore

 1  the question.  If it is overruled, treat the answer
 2  like any other.  If you are instructed that some
 3  item of evidence is received for a limited purpose
 4  only, you must follow that instruction.
 5          Testimony that the Court has excluded or
 6  told you to disregard is not evidence and must not
 7  be considered.
 8          Anything that you may have seen other heard
 9  outside the courtroom is not evidence and must be
10  disregarded.  You are to decide the case solely on
11  the evidence presented here in the courtroom.
12          There are two kind of evidence:  direct and
13  circumstantial.  A direct evidence is proof of a
14  fact such as testimony of an eyewitness.
15  Circumstantial evidence is proof of facts from which
16  you may infer or conclude that other facts exist.  I
17  will give you further instructions on these as well
18  as other matters at the end of the case.  Keep in
19  mind that you may consider both kinds of evidence.
20          It will be up to you to decide which
21  witnesses to believe, which witnesses not to
22  believe, how much of any witness's testimony to
23  accept or reject.  I will give some guidelines for
24  determining the credibility of witnesses at the end
25  of the case.

 1          This is a criminal case.  I previously
 2   instructed you on three basic rules.  I will repeat
 3   them.
 4          First, the defendant is presumed innocent
 5   until proven guilty.  The indictment brought by the
 6   government against the defendant is an accusation,
 7   nothing more.  It is not proof of guilt or anything
 8   else.  The defendant therefore starts out with a
 9   clean slate.
10          Second, the burden of proof is on the
11   government until the very end of the case.  The
12   defendant has no burden to prove his or her
13   innocence or to present any evidence or to testify.
14   Since the defendant has the right to remain silent,
15   the law prohibits you from arriving at your verdict
16   by considering the defendant may not have testified.
17          Third, the government must prove the
18   defendant's guilt beyond a reasonable doubt.  I will
19   give you further instructions on this point later.
20          In this case, the defendant is charged in
21   three counts.
22          Count 1, kidnapping resulting in death.
23          Count 2, false statement.
24          Count 3, false statement.
25          The defendant has pleaded not guilty.

 1          I will give you detailed instructions on the
 2   law at the end of the case and those instructions
 3   will control your deliberations and decision.
 4          Now, a few words about your conduct as
 5   jurors:
 6          First, I instruct that you during the trial
 7   you are not to discuss the case with anyone or
 8   permit anyone to discuss it with you.  Until you
 9   retire to the jury room at the end of the case to
10   deliberate on your verdict you are simply not -- you
11   simply are not to talk about this case.
12          Second, do not read or listen or anything
13   touching on this case in any way.  If anyone tries
14   to talk to you about it, bring it to my attention
15   immediately.
16          Third, do not try to do any reach or make
17   any investigation on your own about the case.
18          Finally, do not form any opinion until all
19   of the evidence is in.  Keep an open mind until you
20   start your deliberations at the end of the case.
21          If you want to take notes during the course
22   of the trial, you may do so.  However, you may find
23   it difficult to take detailed notes and pay
24   attention to what the witnesses are saying at the
25   same time.  If you do take notes be sure that your

1  note taking does not interfere with your listening

2  and considering all of the evidence.  Also, if you

3  do take notes, do not discuss them with anyone else

4  before you begin your deliberations.  Do not take

5  your notes home with you at the end of the day.

6  Leave them in the jury room.  We will take care of

7  them.  If you choose not to take notes, remember it

8  is your own individual responsibility to listen

9  carefully to the evidence.  You cannot give this

10  responsibility to someone else who is taking nets.

11  We depend on the judgment of all members of the

12  jury.  You all must remember the evidence in this

13  case.

14          The trial will now begin.  The government

15  will make an opening statement, which is simply an

16  outline to help you understand the evidence as it

17  comes in.  The defendant may but does not have to

18  make an opening statement.  Opening statements are

19  neither evidence nor argument.  The government will

20  then present its witnesses, and counsel for the

21  defendant may cross-examine them.  Following the

22  government's case, the defendant may, if he wishes,

23  present witnesses whom the government may

24  cross-examine.  After of the evidence is in, the

25  attorneys will present their closing arguments to

1  summarize and interpret the evidence for you, and I
2  will instruct you on the law.  After that, you will
3  then deliberate to begin to reach your verdict.
4       With that in mind, opening statements from
5  the government.
6       Mr. Miller.
7       MR. MILLER:  Thank you, Your Honor.
8       Ladies and gentlemen of the jury, he
9  kidnapped her.  He murdered her.  He covered up his
10  crime.
11       Two years ago, on a pleasant June day,
12  Yingying Zhang was waiting for a bus on the
13  University of Illinois campus.
14       The defendant, Brendt Christensen, kidnapped
15  her and took her to his apartment where he raped
16  her, brutally assaulted her, and took her life.  He
17  then attempted to cover up his crime.  Her remains
18  have never been found.
19       He kidnapped her.  He murdered her.  He
20  covered up his crime.
21       As Judge Shadid told you, my name is Eugene
22  Miller.  It's my honor and privilege to represent
23  the United States of America in this case, and
24  especially to speak for Yingying Zhang, who can no
25  longer speak for herself.

1          It is also my honor and privilege to be
2  trying this case with federal fellow prosecutors:
3  James Nelson, Bryan Freres, and with Special Agents
4  Andrew Huckstadt and Anthony Manganaro of the
5  Federal Bureau of Investigation.
6          Because much of the evidence in this case
7  will be presented through electronic means, we are
8  also fortunate to have the assistance of Staci
9  Klayer, a paralegal with the U.S. Attorney's office.
10         On June 9, 2017, just over two years ago,
11 Yingying Zhang was 26 years old and she was pursuing
12 her dream.
13         If we can show Exhibit 1A.
14         Exhibit 1A is a photograph of Yingying
15 Zhang.  It was almost summer on the University of
16 Illinois campus and many of the students have gone
17 home, but Yingying had not gone home.  In fact, she
18 was far from home.  She had come to work and
19 research at the University of Illinois from her home
20 in China arriving on campus in late April.
21         She had already obtained a college degree,
22 advanced degree in China, and now Professor Kaiyu
23 Guan at the University of Illinois had provided her
24 with the opportunity to come to the university as a
25 visiting scholar where she could continue her

1 research in crop sciences, studying photosynthesis
2 in soybeans and corn.  She hoped to get the
3 doctorate degree and evidentially to return to China
4 where she could teach.

5       It was her first time in the United States.
6 It was her first time outside of China.  So she said
7 good-bye to her mom, and her dad, and her younger
8 brother and left them in her hometown of Nanping in
9 China.  And she said good-bye to her long time
10 boyfriend, Xiaolin Hou, who planned to marry
11 Yingying in October.

12       When she first arrived, she didn't know
13 anyone and she got housing at the University of
14 Illinois Orchard Downs housing complex located on
15 the southeast part of campus.  But by June 9th, she
16 was looking to move apartments to save some money
17 and maybe get a roommate.  So she put an application
18 in at the One North apartment complex north of
19 campus.  She arranged that morning of June 9th to
20 meet later in the day with Rontrez Stone, who was
21 the marketing manager for the One North apartment
22 complex.  She did have a problem, she didn't have a
23 car, so she had to navigate the summer bus schedule
24 to make her way from the south part of campus to the
25 north part of campus.

1         That morning she worked in her cubicle at
2  Turner Hall on campus, then returned to Orchard
3  Downs, where she lived, around lunch.
4         At 1:30 p.m. she texted Rontrez Stone and
5  told him that she was running late, and she would
6  plan to meet with him at 2:10 p.m. on Friday,
7  June 9th.  Five minutes later she got on the Teal
8  line MTD bus and took that from Orchard Downs to on
9  campus to the intersection of Springfield and
10 Mathews Streets where she got off the bus to catch a
11 connection to the 22 Limited, which would take her
12 to One North.
13        But when she got off the bus, she was on the
14 north side of Springfield and the bus was on the
15 south side, so she missed her bus.  She waved at it
16 as the bus went down the street.  She even ran after
17 the bus.  And as she ran after the bus on
18 Springfield Avenue headed east, a black Saturn Astra
19 passed her going west.  She followed the bus even as
20 the bus went a block down and turned on the next
21 block and went north on Goodwin Avenue.  And she
22 even ran up Goodwin Avenue, but she didn't catch the
23 bus and the bus went on.
24        So she went up to the next bus stop at Clark
25 and Goodwin Avenue, and she waited for the next bus.

1  While she waited, a man in a black Saturn Astra
2  pulled up alongside her.  He was a complete
3  stranger.  It was the defendant, Brendt Christensen.
4  And he would be the last person to see her alive.
5        You see, while Yingying was on campus
6  pursuing her dream on June 9th, the defendant was on
7  campus pursuing something dark, something evil; he
8  was pursuing a kidnapping and murder.
9        She didn't know when she was there that the
10  defendant had been driving around campus earlier
11  that morning looking to carry out his plan.  She
12  didn't know that before she even came to this
13  country, the defendant had gone down this dark path
14  that led to this very moment.
15        In the defendant's own words, he led a
16  double life.  Highly intelligent, he attended
17  University of Wisconsin at Stevens Point, University
18  of Wisconsin at Madison.  He was accepted into the
19  University of Illinois doctorate program in physics.
20  He met his wife, Michelle Zortman, while he was
21  attending college in Stevens Point, Wisconsin.  And
22  together in 2013, they moved to Champaign-Urbana.
23        They moved into an apartment on the west
24  side of Champaign, the Stonegate Village Apartments.
25  They moved into Apartment 2E at 2503 West

 1   Springfield Avenue.  They used one bedroom as an
 2   office that had desks and computers.  And the other
 3   bedroom was the master bedroom with two twin beds
 4   put together to form a king size bed.
 5           But by 2016, December of 2016, the defendant
 6   developed an interest beyond his marriage and beyond
 7   his interest in physics classes.  He developed an
 8   interest in serial killers.  Men acting alone, for
 9   their own gratification, engaging in multiple
10   murders over an extended period of time.  He was
11   particularly fascinated by serial killer Ted Bundy,
12   and by the book "American Psycho" where the main
13   character leads a double life as a serial killer.
14           With the defendant, again, planning how to
15   abduct and to kill someone; in the spring of 2017,
16   he did research on the internet on serial killers
17   with both his computer and his cell phone.  And
18   Judge Shadid will instruct you that cell phone was
19   an instrumentality of interstate commerce.  He
20   downloaded photos of women in bondage.  He visited
21   websites that discussed kidnapping and abductions,
22   even explored so-called consensual abductions
23   online.  He even ordered in March in return a six
24   foot long duffle bag from Amazon.
25           As the defendant traveled down this dark

path, his grades suffered, his marriage broke down,
and he dropped from the doctorate program to the
master's program.

        In February of 2017, his wife troubled by
his conduct, which also included abusing alcohol and
prescription drugs, began dating another man, Ryan
Vela, with the defendant's full agreement as they
engaged in what's called an "open marriage."  And
the defendant began dating other women, including a
woman named Terra Bullis, who he met on the website
OK Cupid.

        Terra introduced him to her BDSM community,
and that refers to individuals interested in erotic
bondage, disciple, dominance, and submission.  In
this relationship, the defendant was the dominant
and his girlfriend was the submissive.

        In March of 2017, the defendant revealed a
portion of his double life to a counselor at the
University of Illinois Counseling Center.  The
reason he visited he said was because his wife
wanted to separate and that she didn't like his
drinking.  But about 40 minutes into that interview,
the counselor asked him why he had noted on his
paperwork that he had thought of harming others.
And the defendant said he didn't want to mention

 1  this but he was always interested in bad guys.  He

 2  admitted that he had gone to online forums for

 3  serial killers that fascinated him.  He mentioned

 4  that Ted Bundy was really attractive and had killed

 5  people.  He admitted that he had gone pretty far

 6  down the path of thinking about abducting and

 7  killing someone, including how to do it, and

 8  admitted he'd identified the type of victim he would

 9  choose.  He claimed that he had not followed anyone

10  to this point.  And he claimed that he was done with

11  the thoughts, or he wouldn't be talking about them

12  now.

13          But the defendant wasn't done with the

14  thoughts.  Far from it.  His online fascination with

15  serial killers and abductions continued after that

16  time in March.  In April he texted his girlfriend

17  about purchasing bed restraints, a blindfold, and a

18  gag.

19          And by the end of May he had gone further

20  down that further dark path as he texted his

21  girlfriend:  "Fading into nothingness is the default

22  for most people.  You want to know what terrifies

23  me, it's that.  I will not fade away.  I refuse.  I

24  don't care how I will be remembered, just that I am:

25  good, bad, revered, infamous; I don't care.  Think

1  back over the past 2000 years, who do you know?  The
2  people who pushed the limits and those who supported
3  them.  Fading into nothingness is not an option.  I
4  would rather destroy humanity than let that happen;
5  I know most would disagree."
6          So by May the defendant had the intent and
7  he had the plan, but he needed the opportunity.
8  That opportunity came when he learned that his wife
9  would be leaving town the weekend of June 9th,
10  traveling to Wisconsin Dells with her boyfriend.  So
11  to prepare for that weekend, the defendant ordered
12  another large green duffle bag from Amazon.  He
13  ordered it online on Saturday, June 3rd, 2017.  It
14  was a super tough heavyweight cotton canvas duffle
15  bag, size colossal, six feet long and two feet high
16  and wide.  UPS delivered it to his apartment on
17  June 6th, three days before his wife left for the
18  weekend.
19          And the defendant had previously discussed
20  its usefulness online at a website called FetLife
21  using his cell phone.  He discussed on that website
22  an abduction fantasy involving kidnapping and rape
23  with a woman online.  And he said his plan was to
24  bind you, gag you, and likely put you in a large
25  duffle bag so no one could see you, and then get you

1  in my trunk, backseat.

2         Early the very early morning hours of

3  Friday, June 9th, the defendant's wife and her

4  boyfriend left town, leaving the defendant alone in

5  his apartment for the weekend.

6         On the morning of June 9, before 8:00 a.m.,

7  the defendant went to a Schnucks grocery store

8  located near his residence.  He was wearing a black

9  T-shirt, and he had mirrored aviator sunglasses in

10 his pocket, and he purchased a bottle of Admiral

11 Nelson's spiced rum.  He had facial hair at that

12 time but he went home and he shaved.

13        And while Yingying was researching at Turner

14 Hall that morning, the defendant spent the morning

15 driving around campus in his four-door 2008 Saturn

16 Astra hatchback.  He was looking for a victim.

17        And at 9:30 a.m., he saw Emily Hogan, a

18 graduate student at the University of Illinois.  She

19 was walking alone to a nearby bus stop.  He pulled

20 up next to her on Soughton Street, just east of

21 Lincoln Avenue.  He was wearing the black T-shirt.

22 He was wearing the mirrored aviator sunglasses.  He

23 told her that he was an undercover police officer.

24 And he pulled a badge out from under his shirt.  He

25 asked her if she would answer a few questions and

1 she walked over to the car, and said, "Yes."  Then

2 he asked her to get in the car.  She said, "No."

3 And he said, "Well, if you see anything suspicious,

4 call the police" and drove off.

5       Emily Hogan found this suspicious.  She

6 immediately called the police and reported this

7 incident with this individual in the black car,

8 which was the defendant.  She also posted a warning

9 on Facebook about someone driving around pretending

10 to be a police officer.  Doesn't appear Yingying

11 ever saw that warning.

12       The defendant does not give up on his plan

13 that day after Emily Hogan's failed abduction.

14       At noon, he responded to a text from his

15 girlfriend, noting "You don't do the anything casual

16 thing, from breathing to fine dining, to...murder."

17       At 1:30 p.m. the defendant was driving

18 around campus again.

19       And at 1:57 p.m. he was driving west on

20 Springfield when he saw Yingying running after the

21 bus.  He then drove down Springfield, circled around

22 ultimately heading up north on Wright Street, east

23 on University Avenue, and then coming south down

24 Goodwin Avenue seeing Yingying standing alone under

25 a tree at the bus stop at Clark and Goodwin.

1          The defendant then circled around the block
2    so that he was approaching Yingying from the south.
3    She was on the east side of the street.  He pulled
4    up in his black Saturn Astra.  And as he did with
5    Emily Hogan, he spoke with her for a minute, posing
6    as an undercover police officer.  Unlike Emily
7    Hogan, Yingying got in the car.  And shut the door.
8          The defendant drove north across University
9    Avenue in the direction of the One North apartments
10   but he didn't take her there.  Instead he executed
11   his plan to kidnap and murder her.
12         By 2:28 p.m., 20 minutes approximately after
13   she got in the car, he had disabled her iPhone and
14   was no longer receiving signals.
15         The defendant is about six foot tall, over
16   200 pounds.  Yingying was barely five foot four, 110
17   pounds.  He bound her hands.  And he took her back
18   to his apartment.  And he took her to his bedroom
19   where he raped her.  And he assaulted her.  And she
20   bled on his bed.  And her blood ran down the wall to
21   the baseboard, into the carpet underneath the bed.
22   He choked her, by his estimate, for about ten
23   minutes.  But she fought for her life against this
24   man she had never met before, in this place that she
25   had never been before.  And then he carried her to

his bathroom and put her in the bathtub.  He hit in
her in the head with the Louisville Slugger baseball
bat in his words "as hard as he could" and broke
open her head.  He then stabbed her in the neck.
And she grabbed for it, and he cut off her head.

Thousands of miles from the parents that
gave her life, alone, with a stranger, Yingying
Zhang breathes her last breath.

The defendant ended her life abruptly
without warning, without explanation.

Having ended Yingying's life, the
defendant's coverup began.  Still Friday, his wife
wasn't coming back until Monday or at least until
Sunday evening, so he had a couple of days to get
rid of the evidence.  He was smart.  He had planned
this.  So he was able to get rid of almost all of
the evidence.  He got rid of Yingying's iPhone, her
clothes, her backpack have never have been found.
He got rid of Yingying's remains.  They have never
been found.

But he kept the mattresses where he raped
her, and he kept the baseball bat that he used to
hit her in the head.  He spent much of the weekend
cleaning, and, again, he was able to get rid of
almost all of the evidence.  He cleaned the Saturn

 1  Astra.  Cleaned the blood off the mattresses.
 2  Cleaned the blood off the wall and the baseboard and
 3  the carpet.  He cleaned the blood off of the
 4  baseball bat.  He went to Walmart on Sunday and he
 5  bought Drano, and Swiffer pads.  He cleaned his
 6  carpet and his put Drano down the pipes, but he
 7  didn't clean behind the baseboard.  And he didn't
 8  clean under the carpet.

 9        By the time his wife returned to the
10  apartment on Sunday, there was no visible sign in
11  the Astra or the apartment that he had kidnapped and
12  murdered Yingying.  While there was no visible sign
13  of her murder.  Her disappearance is noted very
14  quickly.

15        Professor Guan and Yingying's co-workers
16  became concerned when she didn't return from lunch.
17  They couldn't reach her by phone.  They couldn't
18  find her.  Her finance, Xiaolin, who was in China
19  couldn't reach her.  And by Friday night, Professor
20  Guan reported Yingying missing to the University of
21  Illinois Police Department.

22        They took the report and began searching for
23  her.  They learned that she had not shown up for the
24  2:10 appointment with Rontrez Stone at the One north
25  apartments.  They began canvassing areas where she

1  might have gone.  They learned that the last her

2  cell phone had any contact with the cell tower was

3  around 2:28 p.m., possibly around downtown

4  Champaign.  And they looked for her there, but they

5  couldn't find her.  They reviewed hours of video in

6  the MTD bus system and from the University of

7  Illinois cameras.

8       And on Saturday, June 10th, Officer Tara

9  Hurless, of the University of Illinois Police

10  Department, identified video of Yingying getting on

11  the Teal line bus and going to Springfield and

12  Mathews.

13       Early on the morning of Monday, June 12th,

14  Telecommunication Officer Kenny Costa found video

15  that showed Yingying getting in a black Saturn Astra

16  at the stop at Clark and Goodwin Streets.

17       So on Monday with evidence Yingying had been

18  abducted in a Saturn Astra, which is an

19  instrumentality of interstate commerce, the FBI

20  became involved in the investigation treating it as

21  a potential federal kidnapping case.

22       The FBI publicized Yingying's disappearance

23  and publicized that they were looking for a black

24  Saturn Astra.  The FBI obtained a list of 2008

25  Saturn Astras that were registered in Champaign

1  County.

2         The Astra was only produced by Saturn for a
3  couple years, so there weren't very many.  In fact,
4  there were only about 26 that were registered in
5  Champaign County and out of those, there were only
6  about 18 that were four-door hatchbacks.

7         FBI agents then on the evening of Monday,
8  June 12th began interviewing all of the Saturn Astra
9  owners in Champaign County.  One of those registered
10  owners was the defendant, Brendt Christensen.  So on
11  Monday evening, three days after Yingying's murder,
12  FBI agent Michael Carter and Joel Smith went to the
13  defendant's apartment to interview him.  They met
14  with the defendant and his wife in the apartment.
15  They told them that they were searching for the
16  missing University of Illinois scholar.  The
17  defendant calmly replied that he heard about the
18  missing scholar and knew that the car resembled his
19  car.  So the agents asked him where he was between
20  the 2 and 3:00 p.m. on Friday when he was abducted.

21         He initially couldn't remember, he told the
22  agents.  So they asked him if he could check his
23  texts.  And he looked at his texts and said he had
24  got a text from his girlfriend, Terra Bullis, around
25  1:00 but he hadn't responded until around 4:00 p.m.

1  so he thought he must have been sleeping during that
2  time.  Ultimately, he told them that he stayed at
3  the apartment all day on Friday, then he slept and
4  played video games.

5       Agents asked to look around and to search
6  the Astra and that the defendant agreed.  So Agents
7  Carter and Smith briefly looked around the apartment
8  and didn't find anything.  They looked at the Astra,
9  also didn't find anything, so they left to go
10  interview other Saturn Astra owners.

11       Now before the agents had arrived to
12  interview him on Monday night, he had already gone
13  to Schnucks earlier that day to buy more Drano, to
14  buy kitchen garbage bags.  He also searched on
15  Google for information on iPhone tracking.  The
16  defendant didn't have an iPhone, but Yingying did.

17       After the agents left, the defendant further
18  cleaned his Saturn Astra, and the next morning he
19  cleared from his Google Chrome web browser all
20  browsing history.  He also put in a maintenance
21  request at his apartment to have the grout in his
22  bathroom treated for mold.

23       The search for Yingying continued on
24  Tuesday, June 13th and Wednesday June 14th.  FBI
25  agents assisted by UIPD officers continued to

1  canvass areas looking for Yingying.  They obtained

2  and reviewed video hoping to find some video of

3  Yingying with a black Saturn Astra.  They tried to

4  identify the license plate on the Astra, but they

5  were unable to from the video.

6          But on Wednesday, June 14th, U of I Police

7  Department, Officer James Carter, was reviewing

8  video when he noticed a defect in the front right

9  hubcap of the Saturn Astra that picked up Yingying:

10 a spot missing between the edge of the hubcap and

11 the edge of the tire.  He also noticed that the

12 Astra had a sunroof.

13         Special Agent Joel Smith of the FBI recalled

14 that the Astra that the defendant had had a sunroof.

15 So around 5:50 p.m. that day, he and Special Agent

16 Katherine Tenaglia of the FBI went out to the

17 defendant's apartment and looked at the Astra, and

18 they observed the front right hubcap defect on the

19 car that picked up Yingying was matched by the front

20 right hubcap of the defendant's Astra.  Based on

21 that information, the FBI obtained a federal search

22 warrant to seize the defendant's car.  And just

23 before midnight on June 14th, heading into Thursday,

24 June 15, seven FBI agents, along with UIPD officers,

25 went to the defendant's apartment.  They woke up the

 1  defendant, his wife.  They told him that they had a
 2  search warrant for the Astra, and they told the
 3  defendant if he would speak with them.  The
 4  defendant agreed.
 5       He had accompanied Special Agent Anthony
 6  Manganaro and Detective Eric Stiverson from the
 7  University of Illinois Police Department to the FBI
 8  office, which was located just a few blocks away
 9  from his apartment.  His wife stayed and spoke with
10  Special Agents Andy Huckstadt and Katie Tenaglia.
11  And the agents learned for the first time about the
12  defendant's relationship with his girlfriend, Terra
13  Bullis.
14       The defendant's wife signed a consent to
15  search the apartment.  The agents seized his
16  computer, the defendant's computer, and his cell
17  phone, along with a pair of mirrored aviator-style
18  sunglasses that they found.
19       Meanwhile Agent Manganaro and Detective
20  Stiverson interviewed the defendant.  That interview
21  was audio and video recorded.  During the interview,
22  the defendant acknowledged that he previously told
23  Joel Smith on June 12th that he was home all day
24  playing video games and taking a nap.  He repeated
25  that lie to the agents on the 15th.  In fact, he

1 expanded it.  He said that he was home playing video
2 games literally all day.

3          The agents told him that they had video of a
4 Saturn Astra driving around campus.  The defendant
5 said he had seen the videos but he didn't see
6 himself in the videos.  The defendant told the
7 agents that he wanted to see the videos.  Detective
8 Stiverson interrupted him.  He told him that he knew
9 that the defendant had picked up Yingying in his
10 Saturn Astra.  And the defendant's demeanor changed.
11 He took a long pause.  Began breathing heavy.  His
12 hands began to shake, and then he claimed that he
13 might have mixed up Friday and Saturday when he had
14 talked to the agents.

15          For the first time he admitted he did pick
16 up a girl, but he didn't think it was Yingying.  He
17 said that she was distressed and she was speaking
18 broken English.  He said that he gave her a short
19 ride a few blocks north, but he made a wrong turn
20 and she freaked out so she got out of the car.
21 Agents questioned him further about this story but
22 he stuck to it.

23          After he admitted that he picked up someone,
24 he was detained most of Thursday, June 15th.  During
25 this time officers obtained a search warrant for his

apartment.  And late that night and into the early
morning, Illinois State Police Crime Scene
Investigators, December Melville and Tim Lemasters,
processed his apartment as a crime scene.

They went to the defendant's bedroom where
they found three reddish stains on the defendant's
mattresses, two smaller stains in the middle of
mattress, and a large stain at the end of the
mattress near the wall.  They used wet cotton swabs
to test each of these stains and take samples to be
sent off for DNA testing.

The agents also found in that same bedroom
the baseball bat the defendant used to hit Yingying.
Now the agents didn't know that at the time, and
there were no visible stains on the bat, but they
used a substance called Starlight Bloodhound, which
is a name for a chemical that is called luminal.
And luminal is a chemical that can be used to flores
when it comes in contact with certain substances,
biological fluids, blood, and other fluid, like
cleaning products.  And the use of Starlight
Bloodhound revealed a stain on the baseball bat.  So
December Melville used another cotton swab, wet it
down to take a sample of that stain for DNA testing.

As the search for Yingying continued,

1  Special Agent Huckstadt approached the defendant's
2  girlfriend, Terra Bullis.  He had an interview with
3  her and asked her if she would assist in the
4  investigation by recording her conversations with
5  the defendant.  And although she said that she loved
6  the defendant, she agreed to assist, reasoning that
7  if he hadn't done this, it would help exonerate him.
8          The defendant was released from custody
9  early on Friday, June 16th.  For the next two weeks
10  he was under surveillance by the FBI 24 hours a day.
11  And for those next two weeks he also engaged in
12  recorded conversations with his girlfriend, Terra
13  Bullis.
14          On June 17th, the defendant came back into
15  the FBI office to speak with Special Agents Michael
16  Carter and Brian Schenkelberg, that conversation was
17  recorded as well.  The defendant said he wanted to
18  clear things up.  He offered an explanation for the
19  duffle bag that the agents had learned about.  He
20  said that he used it to transport a cat tree to his
21  girlfriend, Terra Bullis.  His girlfriend never saw
22  that duffle bag or any cat tree.
23          He also volunteered that he nicked his
24  finger when he was in the Saturn Astra and bled if
25  there was trace elements of blood in the car.

 1  Otherwise, he repeated the story he had told before.
 2  He had picked someone up and let them out a few
 3  blocks later.
 4       Agents asked him to go and show where he let
 5  this person out.  So they went with him to the area
 6  where she had been abducted at Goodwin and Clark,
 7  and he directed them around the area, ostensibly
 8  where he let her out, but he couldn't be definite
 9  and he couldn't be specific.
10       The defendant while he was under FBI
11  surveillance continued to speak with his girlfriend
12  and she continued to record those conversations
13  unbeknownst to him, meanwhile the search for
14  Yingying continued.
15       If we could publish Government's Exhibit 1D.
16       Yingying's finance, Xiaolin Hou, who was at
17  the very back, came to the United States with her
18  father, who is to the left, next to her mother on
19  the right, with Yingying in the middle.  Xiaolin and
20  her father came from China to the United States to
21  look for Yingying.  And Xiaolin, along with the
22  Chinese Students Association at the University of
23  Illinois helped organize a vigil, an event to try to
24  obtain more information about where Yingying might
25  be.  It was called a Memorial Walk.  And it was

scheduled on June 29th, 20 days after Yingying had
gone missing.

     The Memorial Walk started at the Cranden
Center on campus with the group then walking to the
location where Yingying had been abducted, and then
returning back to the Cranden Center for a concert.

     The defendant -- and this event was highly
publicized -- the defendant had been following
online the press coverage of the disappearance of
Yingying.  He decided to attend.  And he ordered his
submissive girlfriend, Terra Bullis, to attend with
him and she did, wearing an FBI wire.  The defendant
explained to her the reason that he wanted to go to
the Memorial Walk, "I just want to see how many
people were here.  They are here for me."

     He described over the next couple of hours
to her that he had kidnapped and murdered Yingying.
He described to her how hard Yingying had fought
against him and how hard she had fought for her
life.  He described how he cut her clothes off and
just started doing stuff to her, although he got
bored; just didn't care because there was nothing to
her and didn't orgasm.

     He described in detail how he choked her,
how he split her head open with the bat, how he

1  stabbed her, how he decapitated her.

2        Asked how the authorities would catch him,

3  he replied, "They have the bat I hit her head with,"

4  but he refused to tell what he did with Yingying's

5  remains.  He said, "Yingying is gone.  She is never

6  going to be found," he bragged.  "The FBI has looked

7  for her.  The police and FBI don't know where she

8  is.  I'm apparently very good at this."  He claimed

9  they will never find her.  "The family won't leave

10  until she is found.  They are going to leave

11  empty-handed because they will never find her.  She

12  is gone forever."

13        Now keep in mind that the defendant is only

14  on trial here for the kidnapping of Yingying

15  resulting in her death and for his false statements,

16  not for any other crimes.  But in discussing

17  Yingying's murder, the defendant also bragged at the

18  Memorial Walk that he had other victims.  In fact,

19  he told his girlfriend that he had been at this

20  since he was 19 years old; that Yingying was his

21  13th victim; that Yingying was the only person that

22  produced evidence that led back to him; and he

23  didn't know any of the other victims' names.

24        Now the FBI has not identified the names of

25  any other victims.  And they have not identified any

1  other evidence that does lead back to the defendant.
2  But nonetheless, the defendant bragged that killing
3  Yingying was his legacy.  And that the last serial
4  killer at his level was Ted Bundy.
5          The next day June 30th, the FBI arrested the
6  defendant, and they executed another search warrant
7  at his apartment.  The search started with the
8  Springfield FDR evidence response team and before
9  they began the search they called in McHenry County
10 Sheriff's Deputy Jeremy Bruketta.  He has a trained
11 cadaver detecting dog named Sage.  Sage detected
12 presence of the smell of cadaver in the bathroom
13 where the defendant murdered Yingying.  The
14 Emergency Response Team seized numerous items.  They
15 seized the defendant's laptop.  They seized duct
16 tape.  They seized the two mattresses.  They even
17 seized a trap from the sink underneath the bathtub.
18         On July 1st, the Chicago Emergency Response
19 Team from the FBI took over the search, and they
20 used something called an alternative light source,
21 like a black light that can reveal the presence of
22 biological fluids and other fluids.  In this case,
23 the alterative light source revealed handprints and
24 swabbing on the drywall and the carpet up against
25 and underneath the defendant's bed that made it

1  appear that someone had engaged in a lot of cleaning
2  in that area.
3        And so FBI Special Agent Doug Seccombe and
4  Courtney Corbett pulled up the carpet underneath the
5  bed revealing the dark reddish stain on the under
6  side of the carpet and the padding and along the
7  carpet tack board and the baseboard.  The stain
8  tested positive for blood and agents collected the
9  stained carpet and the tack strip and the baseboard
10 and the drywall and they sent them to the FBI
11 Laboratory in Quantico, Virginia, along with the
12 swabs that were taken from the stain on the baseball
13 bat and the three stains that were on the
14 defendant's mattress.
15        The FBI forensic biologist, Amanda Bakker,
16 conducted DNA testing on those items.  And I think
17 by now most know that DNA stands for
18 deoxyribonucleic acid, which is a unique identifier
19 of human beings.
20        Amanda Baker found DNA on all of those
21 items.  And she compared it to the known DNA of
22 Yingying Zhang.  She identified Yingying Zhang's DNA
23 on the swab taken from the baseball bat.  She
24 identified Yingying's DNA on the blood stained
25 carpet.  She identified Yingying's DNA on the

1  drywall behind the defendant's bed.  She identified
2  Yingying's DNA on the tack strip.  She identified
3  Yingying's DNA on all three swabs that were taken
4  from the three reddish stains on the defendant's
5  mattress.  She also interpreted serology or blood
6  tests.
7         She identified blood on the carpet that had
8  Yingying's DNA.  She identified blood on the
9  baseboard that had Yingying's DNA, and she
10  identified blood on the tack strip that had
11  Yingying's DNA.
12         The defendant is charged with kidnapping
13  Yingying Zhang resulting in her death and false
14  statements to FBI agents.
15         Kidnapping is a federal crime, whereas here
16  the defendant used instrumentality of interstate
17  commerce, including the Saturn Astra and the cell
18  phone, to plan and carry it out.
19         Because the FBI agents were investigating
20  the kidnapping, his false statements to them are
21  also federal crimes.
22         Now during the trial, you are going to have
23  the opportunity to hear from numerous witnesses.
24  For example, you will hear from Xiaolin Hou, from
25  Kaiyu Guan, from Rontrez Stone, about how Yingying

1 came to be at that bus stop at Clark and Goodwin on

2 June 9, 2017.

3        You will hear from the many FBI agents and

4 University of Illinois Police Department officers

5 who investigated Yinying's disappearance including

6 the multiple interviews that they had with the

7 defendant at various times.

8        You are going to hear from the crime scene

9 investigators that collected evidence, from Douglas

10 Seccombe, and Courtney Corbett, and Mike McGuire

11 from the FBI, and from December Melville and Timothy

12 Lamasters from the Illinois State Police.

13        You are going to hear from the FBI experts

14 who examined evidence, from computer forensic

15 examiner William O'Sullivan who examined the

16 electronic evidence, the phone, the computer from

17 the defendant.  From cell phone analyst, Greg Catey,

18 who analyzed phone records in this case; and

19 forensic biologist, Amanda Baker, who identified

20 blood and the victim's DNA on the numerous items

21 seized from the defendant's apartment.

22        And you will hear from the defendant's prior

23 girlfriend, Terra Bullis, regarding the numerous

24 conversations she had with the defendant that were

25 recorded by the FBI.

 1          Now -- and you will also hear from the case

 2  agents, from Special Agent Anthony Manganaro and

 3  Special Agent Andrew Huckstadt regarding the

 4  investigation and the numerous documents and

 5  evidence that established the defendant's guilt.

 6          During the trial you are also going to have

 7  the opportunity to see exhibits, both videos and

 8  audio recordings.  You will see video of the

 9  defendant admitting to the University of Illinois

10  counselor regarding being pretty far down the path

11  towards identifying the victim.  You will see video

12  of Yingying trying to catch the 22 Limited bus, and

13  video of Yingying getting into the defendant's black

14  Saturn Astra.

15          You will see photographs of the victim's

16  apartment.  You will see photographs of the multiple

17  searches of the defendant's apartment on June 15,

18  and June 30th and July 1st of 2018.  And importantly

19  you will hear the defendant's statements to his

20  girlfriend during the Memorial Walk for Yingying.

21          Now because there is some background noise

22  during these discussions that were out in with the

23  group, some are hard to hear, especially in a large

24  courtroom.  Therefore, we will have headphones for

25  you to be able to listen to these conversations, so

1  that you -- and we also have a transcript that will

2  aid you in listening to these conversations.  You

3  will hear from the defendant's own words and in

4  awful detail how he kidnapped, raped, tortured, and

5  murdered her.

6          The defendant committed these crimes beyond

7  any doubt, then he tried to cover them up.

8          Yingying's remains have never been

9  recovered.  Therefore, at the conclusion of this

10 case, this stage of the case, we will ask you to

11 return three verdicts of guilty.  Thank you.

12         THE COURT:  Thank you, Mr. Miller.

13         For the defense.  Mr. Taseff.

14         MR. TASEFF:  My name is George Taseff, and

15 together with my colleagues, Elisabeth Pollock,

16 Robert Tucker, and Julie Brain; it is our privilege

17 to represent the citizen accused in this case,

18 Brendt Christensen.

19         Folks, we meet today during the most tragic

20 and hostile of circumstances.  Circumstances that

21 are difficult to grasp and are incomprehensible in

22 every respect.

23         For the next several days we will come

24 face-to-face with the grim facts that the government

25 counsel has described to us that will frame the

1  issues you must decide from the evidence that will
2  be presented at this first stage of this case.
3          So let me just say here at the outset, it
4  will be startling for many of you to hear, Brendt
5  Christensen is responsible for the death of
6  Yingying.
7          Brendt Christensen killed Yingying.
8          And nothing that we say or do during this
9  phase of the trial is intended or will be meant to
10  sidestep or deny that Brendt is responsible for the
11  death of Miss Zhang.
12          So in view of what I just said, some of you
13  may be asking why are we having a trial in this
14  first stage?  The answer to that is that Brendt
15  Christensen is on trial for his life in this case.
16          And as Judge Shadid has explained to you, we
17  are going to have a trial at the first stage of the
18  case, and, if necessary, at the second stage of the
19  case.  This is a legal process that we must follow.
20  And we will proceed through both stages, if
21  necessary, so that you, the jury, can render facts,
22  find facts, and render verdicts on both guilt, and,
23  if necessary, the sentence.
24          Now, moreover, while we have acknowledged
25  that Brendt is responsible for the death of

1  Miss Zhang, we take serious issue with various

2  aspects of the government's version of what it

3  claims happened, and how those things happened, and

4  why those things happened.  So there are several

5  factual issues and disputes that will require your

6  resolution in a trial of this case and that is the

7  reason we are proceeding through this first phase of

8  this case.

9       Let me tell you about some of those things

10  where we take issue with the government and the

11  evidence at trial that will be presented.  The

12  government has just told you in great detail about a

13  recorded conversation between Terra Bullis and

14  Brendt Christensen on June 29, 2017, on the campus

15  of Illinois at Champaign-Urbana, where Brendt said

16  several things, terrible things about what he did to

17  Miss Zhang.  And I acknowledge, all of us

18  acknowledge, some of the things that you're going to

19  hear Brendt say on that tape-recorded conversation

20  are shocking and are horrible.

21       One of those matters that Mr. Miller has

22  said that the evidence will show that you're going

23  to hear is this mention by Brendt on the tape that

24  Miss Zhang is the 13th victim.  Ladies and

25  gentlemen, the evidence is going to show that that's

1 just false.  It is not only false, there is no way
2 that it can be proven.

3          But the evidence is going to show at the
4 time of this conversation on June 29th between
5 Miss Bullis and Brendt Christensen, Brendt had been
6 drinking heavily throughout the day.  In fact, the
7 tape-recorded conversation will reveal, you will
8 hear, that Miss Bullis explained, "You have been
9 drinking," and that she will admit when she
10 testifies that she believed that he was intoxicated.
11 In fact, during other portions of the taped-recorded
12 conversation, you will hear her say to Brendt that
13 Brendt is slurring his speech, and that she's having
14 trouble understanding what he is saying.

15          So the evidence that you're going to hear
16 during the trial of this case as to this
17 conversation of June 29th, which the government has
18 said in its opening statement is the linchpin about
19 what Brendt did, how he did it; it will have to be
20 resolved through your resolution of contested facts.

21          So it's very important at this stage of the
22 case that you keep an open mind and you listen to
23 all of the evidence, because the circumstances
24 surrounding the statement of June 29th will be an
25 issue that we will take issue with.

1        The evidence will also show with respect to

2  this statement about 12 other victims, that

3  following Brendt's arrest on June 30, 2017, the FBI

4  aggressively investigated Brendt's claim, launching

5  a multi-state search for any evidence that could

6  possibly link Brendt to any other unsolved crimes.

7  Their agents will admit to you when they testify

8  that as a result of all of this work over the past

9  two years, they have not found one shred of evidence

10  linking Brendt to any other case.  Certainly nothing

11  to corroborate or to support or to prove that there

12  were any other victims of Brendt Christensen.

13        So you need to know who Brendt was and what

14  he was going through in his state of mind on June

15  29th of 2017, and the nature of his relationship

16  with Terra Bullis, and his personal history over the

17  previous 18 months.  He was in a downward spiral in

18  his life.  You need to know these things to help you

19  decide whether you can believe some or all of that

20  portion of the conversation Brendt had with Terra

21  Bullis on June 29th.

22        Same goes for the tape-recorded counseling

23  session that government counsel mentioned that

24  Brendt had with counselors at the University of

25  Illinois Counseling Center on March 21st of 2017.

1  But what the evidence will show is that some ten
2  weeks before the faithful day of June 9th, Brendt
3  Christensen visited the counseling service to talk
4  to counselors about his alcohol and substance abuse
5  issues.
6          The reason he did that is because two days
7  earlier, as the evidence will show you, you will
8  hear from Michelle Zortman, his former wife; she had
9  given him an ultimatum; she said that she wanted a
10 divorce; that Brendt's drinking was causing serious
11 problems in their marriage and it was driving
12 depression and sleep issues and other problems that
13 Brendt had suffered through for much of his life.
14 And that he was failing in his school, he was
15 chronically depressed, sitting home watching --
16 playing video games and she had enough.
17         So Brendt decided two days after that, that
18 he would go and get help for his drinking.  You're
19 going to see reports, an intake record.  You're
20 actually going to watch and hear a tape-recorded
21 counseling session.  And the reason this was
22 tape-recorded is because the person who was
23 conducting the interview Carin Molenaar was a
24 doctoral intern at the University of Illinois
25 counseling, so they tape-recorded this training.

1 And you're going to watch the interview of Brendt
2 Christensen when he talks to the counselor in a
3 clinical context about why he was there.
4        What you're going to see from that video,
5 ladies and gentlemen, and hear in Brendt's own
6 words, he told the doctoral intern that he was
7 having trouble with alcohol; that it was ruining his
8 life.  You're going to hear him say how he was
9 experiencing problems with mixing the alcohol with
10 other medications.  And you're going to hear them
11 talk about experiencing thoughts, deeply intrusive
12 thoughts, persist thoughts of harming himself and
13 harming others.
14        So you're going to hear and see evidence
15 about that Counseling Center interview, and that
16 coupled with the tape-recorded conversation between
17 Miss Bullis and Mr. Christensen on June 29th, will
18 involve matters that we take great issue with, with
19 respect to the government's representations made to
20 you in its opening statement about his state of mind
21 and what actually happened in this case.
22        Let me tell you what the evidence will show
23 about Brendt Christensen and the events leading up
24 to June 9th of 2017, that will come through the
25 evidence in this case and the witnesses that you

1  will hear.

2       As background, Brendt was born in 1989.  So

3  he was 28 years old in 2017.  Born and raised in

4  Stevens Point, Wisconsin; his father, Mike; his

5  mother, Ellen; his older brother, Matt; his younger

6  sister, Andrea.  He graduated from high school in

7  Stevens Point.  Met his wife, Michelle, and married

8  her in 2011.

9       In the spring of 2013, Brendt graduated from

10  the University of Wisconsin Madison with a double

11  major in both math and physics.  He was admitted to

12  the University of Illinois doctoral program

13  following his graduation from the University of

14  Wisconsin.  U of I's program is considered, and you

15  will hear, one of the most prestigious in the

16  country.

17       The fall of 2013, Brendt and his wife,

18  Michelle, moved from Madison, Wisconsin to

19  Champaign-Urbana.  They got an apartment in

20  Champaign.  Michelle went to work as a loan officer

21  in a local bank.  Brendt went to work an a doctoral

22  candidate in the physics program, University of

23  Illinois.  And for three semesters in the doctoral

24  program, Brendt Christensen did really well, but in

25  his fourth semester, and thereafter, things began

1  falling apart.  His alcohol consumption increased.
2  Sleep issues arose.  Depression problems surfaced.
3  Problems that he has experienced from childhood
4  which came at him unrelentingly in 2015 and 2016.
5          These problems that he was experiencing
6  while studying for his doctoral program and handling
7  all of the workload and classes and readings
8  assigned began manifesting in his daily activities.
9  His work suffered.  He missed classes.  His academic
10  advisors began telling him that he needed to get
11  counseling.  Things were beginning to spiral.  And
12  then in the summer of 2016, he ceased work on his
13  doctoral degree, switching instead to get a master's
14  degree.  From there everything went downhill.
15  Indeed it hit rock bottom in the fall of 2016, when
16  Brendt, this brilliant graduate student, who starts
17  off strong and is making As during his first three
18  semesters; in the fall of 2016, ladies and
19  gentlemen, Brendt Christensen the doctoral candidate
20  gets straight Fs in all of his classes.
21          By this time and into early 2017, Michelle,
22  as she will tell you, became very unhappy in their
23  marriage.  Brendt's drinking was out of control.  He
24  was chronically depressed.  His sleep issues
25  rendered him dysfunctional.  His grades were

1  plummeting.  His future was gravely uncertain.

2        Michelle began seeing somebody, a friend of

3  hers at work, a guy named Ryan Vela.  In March of

4  2017, Michelle tells Brendt that she wants a

5  divorce.  She will tell you that Brendt was

6  devastated, because up to that point, the two of

7  them were practically inseparable.  They were each

8  other's universe.  They were all they had, Brendt in

9  particular.  They had no friends locally.  They did

10 not keep touch with childhood friends from

11 Wisconsin.  They were distant from their parents,

12 and especially Brendt's father, his siblings.  They

13 had no one there in Champaign-Urbana but each other.

14        When Michelle tells Brendt in March of 2018

15 that she wants a divorce, two days later Brendt goes

16 to the Counseling Center.  He goes to the Counseling

17 Center for help.  He goes for help because of his

18 alcohol and substance abuse.  He goes for help and

19 fills out an intake form at the Counseling Center on

20 March 21st.  And he's asked on the form, "Why are

21 you coming here?"  And you will see that form.  It

22 will be introduced in evidence.

23        Brendt Christensen indicates on that intake

24 form: "Alcohol and drugs are ruining my life."

25        He also indicates on the form that he's

1  having thoughts, thoughts of harming himself,
2  thoughts of harming others.  So when he sits down
3  with Carin Molenaar, the doctoral intern, during the
4  tape-recorded interview at the counseling service,
5  he tells her, and you're going to hear, that he
6  can't stop drinking; that he is abusing alcohol with
7  pain medications including Vicodin; that Michelle
8  doesn't like his drinking, and, in fact, it is
9  pushing her away from him.  And that it cost her
10  just two days earlier to tell him that she wants to
11  leave.  And the only reason they are going to stay
12  together, the only basis, is that they can have this
13  open relationship where they can see other people.
14  Michelle as that point was getting very interested
15  in a new boyfriend, Ryan, from work.
16          You are going to hear Brendt say in his own
17  word what impact that had upon him.  Michelle was
18  the only person in his life at that time.  And the
19  counselor says that, "Yes, you're isolated here on
20  campus and you're failing."
21          And that Brendt says, "I dropped out of the
22  doctoral program preferring just to get my master's
23  and he get on with life and get a job," which you're
24  going to hear him say, you're going to hear him say
25  to the counselor that for the first time in his

1  life, he considered himself a total failure in

2  everything.

3          Then the intern -- you're going to see this

4  and you're going to hear it from the tape -- the

5  intern asks, "What about these questions about

6  wanting to hurt yourself?"

7          Brendt says, "Yeah."

8          "What about, do you ever indicate" -- "You

9  indicate on the form, have you ever had thoughts of

10  hurting others?"  She asked, "Are those only

11  thoughts or plans?"

12          You hear Brendt say, "Well, I've made

13  plans."

14          "How far along are those plans that you've

15  had?"

16          "They are pretty far."

17          "Have you purchased anything for those

18  plans?"

19          "Yeah."

20          "Have you considered specific persons?"

21          "Not really; but types of people, yes."

22          And then you hear the intern say, "Thank you

23  for your candor."  Thank you for sharing those

24  matters with her.

25          And Brendt says, "Yeah, I know.  I know how

1  this makes me look.  I want to get help.  I'm not
2  that kind of person."
3          The counseling service made an appointment
4  for Brendt to come back on March 30th.  So nine days
5  later, after acknowledging to a clinical intern at
6  the Center that he was having persistent thoughts of
7  harming others, he comes back to the Counseling
8  Center, and this time meets with two licensed
9  counselors.
10          And you're going to hear and see the records
11  that he tells them the same thing.  He tells them
12  the same thing and more about these thoughts.
13          And as a result of what he told them on
14  March 30, one of the counselors sent him an email on
15  the university email system and it recommended that
16  he contact a facility called Rosecrance in
17  Champaign-Urbana.  It's a local addiction treatment
18  center.  And that the addiction's treatment center
19  Rosecrance had an array of services and that Brendt
20  could go there and seek counseling as a form of
21  one-stop shopping.
22          So Brendt left the counseling on March 30th
23  with the recommendation of the counselling service
24  that he go somewhere else to get help.
25          Before he can make any attempt to go look

elsewhere, he meets Terra Bullis.  Brendt had posted
on OK Cupid that he was interested in meeting other
people because his wife, Michelle, was seeing Ryan,
and he was desperate for some kind of companionship.

On April 2nd, Terra Bullis responds to his
OK Cupid post by saying, "I don't want to sound like
a creeper, but you look gorgeous."  The two of them
meet shortly thereafter.  They discuss and within a
week they have the beginnings of a relationship.
The relationship wherein Terra Bullis introduces
Brendt Christensen to BDSM, and takes him to places
and sexual context that he had never been.

So in that mental state, he launches into a
new relationship with Terra Bullis is based upon, as
the evidence will show, and Miss Bullis will explain
this is in large part role play.  With parties with
partners, consenting adults assume certain roles as
dominant and submissive.  And that their sexual
relations are based upon those roles involving power
and submission, and pain, and violence in a
consensual adult sexual context.

So within weeks of this relationship between
Brendt and Miss Bullis commencing, excessive
drinking continues.  And texts between him and
Miss Bullis, that you're going to see, reveal that

1  his depression, and his sense of hopelessness for
2  his life are worsening.
3          Indeed you will see one of those texts where
4  Brendt describes in detail how everything is falling
5  apart and he says just that:  "My life is falling
6  apart."
7          So the week of June 5th, Brendt learns that
8  his wife, Michelle, is leaving for a weekend retreat
9  with Ryan.  He learns that they are going to, of all
10 places, Wisconsin Dells for the weekend.  And they
11 are going to be staying at the very same resort that
12 Brendt and Michelle spent their honeymoon in 2011.
13         So in the early morning hours, Friday
14 June 9th, at about 2:00 a.m., Michelle leaves the
15 apartment with Brendt present to go with Ryan to
16 Wisconsin Dells.  And shortly thereafter, Brendt
17 gets a text from Terra Bullis that she's occupied
18 with another man having sex and unavailable for him
19 to talk with her.  So Brendt is alone in the
20 apartment.  No one anywhere to turn to.  And he hits
21 ground zero.  Rock bottom.  Gets up.  It is 7:30 in
22 the morning.  And you will see the surveillance
23 pictures.  He enters the Schnucks grocery store.
24 Proceeds directly to the liquor department where he
25 purchases the largest bottle of cheap rum and walks

US v. CHRISTENSEN 6/12/19 Vol 8A (Rough Draft)          59

 1  out the door as 7:45 a.m., the perfect storm has
 2  converged.
 3          Throughout the day, spends time drinking,
 4  driving around.  At 2:00 that afternoon, he does the
 5  unthinkable.  At the intersection of Clark and
 6  Goodwin, you will see the video of the black Astra
 7  pulling up.  You will see Miss Zhang getting in.  As
 8  I referenced earlier, Brendt takes her to his
 9  apartment where he kills her.
10          Within three days of Miss Zhang's
11  disappearance, the FBI and local authorities are
12  already making the case against Brendt Christensen.
13  The video surfaces of the black Astra.  The
14  authorities then identify the registered owners.
15  Information comes forward.  And within five days of
16  June 9th, the FBI had search warrants for Brendt's
17  car and for his apartment.
18          With all of this that you will hear there is
19  plenty of evidence to cause you to question what you
20  can believe about what Brendt says on that
21  tape-recorded conversation of June 29th because on
22  that tape he says that there are 12 other victims.
23  There is no evidence of this.  It will show that the
24  FBI has investigated this as thoroughly as they can
25  over two years and they have found not one shred of

1 evidence to link Brendt to any other crime or to

2 corroborate that false claim anywhere.

3        The statement Brendt made on that tape while

4 drunk and slurring of his speech, Miss Bullis was

5 wearing a wire, she was cooperating actively with

6 the FBI.  The evidence I believe will cause you to

7 cast doubt on the truthfulness of many of the things

8 that Brendt says on that tape as well.

9        This is a tragedy of immense proportions.

10 In sum, you're going to hear information at this

11 trial about Brendt's life's trajectory.  About how

12 his life was falling apart and disintegrating from

13 2015 to 2017, about his efforts of getting help for

14 his drinking at the university's counseling center

15 and his startling revelations to three professional

16 counselors of his persistent and intrusive thoughts

17 of harming others; and about his state of mind, his

18 life's status when he made those recorded statements

19 to Miss Bullis on June 29th.  And with all that,

20 you're going to have more comprehensive

21 understanding of these tragic events, how this

22 bright and promising and brilliant graduating

23 student with no history of violence committed this

24 horrible crime.

25        As the evidence in this case unfolds, ladies

1   and gentlemen, please, please, be vigilant to your

2   oath as jurors; that you will listen and consider

3   all of the evidence fairly and impartially while

4   serving on this case.  Keep your heart and your mind

5   open to all that you're going to hear.

6            Thank you.

7            THE COURT:  Thank you, Mr. Taseff.  At this

8   time why don't we take a 15 to 20 minute recess.  We

9   will get the courtroom ready for our first witness.

10            Okay.  Thank you.  Please do not discuss

11   this matter with anybody including yourselves.

12            Thank you.

13            (Jury absent, 10:28 a.m.)

14            THE COURT:  Counsel, just stay put for a

15   moment.

16            Can I see counsel in chambers for a minute?

17   Thank you.

18            (In chambers, 10:32 a.m.)

19   ████████████████████████████████████

20   ████████████████████████████████████████

21   ███████████████████████████████

22   ███████████████████████████████████

23   ██████████████████████████████████████████

24   ███████████████████████████████████████

25   ███████████████████████████████████████



20        (Open court, 10:32 a.m.)

21        (A recess was taken, 10:33 a.m. to

22        10:51 a.m.)

23        THE COURT:  But please be seated.

24        Thank you.  Please be seated.

25        All right.  Parties ready?  Government ready

```
 1   for their first witness?
 2           MR. FRERES:  Yes, Your Honor.
 3           THE COURT:  Anything to address before the
 4   jury is brought in?
 5           Okay.  Let's bring them in.
 6           (Jury present, 7:52 a.m.)
 7           THE COURT:  In the audience when the jury
 8   comes in, you notice we are standing, you don't have
 9   to stand.  We are standing as a courtesy to the
10   process and to them.
11           Thank you.
12           (Jury present, 10:52 a.m.)
13           THE COURT:  Okay.  Thank you.
14           Please be seated.  Okay.
15           First witness from the government please.
16           MR. FRERES:  Ezzard Hoskins, Your Honor.
17           THE COURT:  Sir, do you want come forward
18   please.  As you approach raise your right hand.
19           (Witness sworn.)
20           THE COURT:  Have a seat.  We will get you
21   situated, and then Mr. Freres, whenever you're
22   ready.
23                   EZZARD HOSKINS,
24   after having been duly sworn, testified as follows:
25                   DIRECT EXAMINATION
```

1  BY MR. FRERES:

2  Q.   Good morning.

3  A.   Good morning, sir.

4  Q.   Will you please state your name and spell your

5  last name for our record.

6  A.   My name is Ezzard Charles Hoskins, Jr.  My last

7  name is Hoskins, H-o-s-k-i-n-s.

8  Q.   How are you employed?

9  A.   I am a police officer, University of Illinois

10  Police Department.

11  Q.   What is your current title?

12  A.   In the Patrol Division.

13  Q.   Can you describe your duties for us please?

14  A.   Community policing, community relations,

15  calls -- answering calls for service.

16  Q.   How long have you been employed with what I'll

17  call UIPD?

18  A.   I have been with UIPD for 12 years now.

19  Q.   Have you ever worked with any other law

20  enforcement agencies?

21  A.   No, I have not.

22  Q.   Prior to working for UIPD what did you do?

23  A.   I was an United States Marine Corps.  I served

24  four years on active duty, Operation Decisive

25  Endeavor, Delivered Guard, and also served in

1  Illinois Army National Guard as a medic.

2  Q.   And the operation referencing, was that in

3  Bosnia, Albania in --

4  A.   Bosnia, Albania conflict, '09.

5  Q.   I'm going to direct your attention to June 9th

6  of 2017, were you employed by the U of I Police

7  Department at that time?

8  A.   Yes.

9  Q.   What were your duties -- scratch that.

10         Were your duties the same then as they are

11  today?

12  A.   They are, yeah.

13  Q.   In other words, you were a police officer

14  dealing with community policing?

15  A.   Same thing.

16  Q.   Were you working on June 9, 2017?

17  A.   Yes.

18  Q.   What shift were you working?

19  A.   Second shift, which goes from 4:00 p.m. to

20  2:00 a.m.

21  Q.   Now did something happen on the evening of

22  June 9th that prompted you to begin an

23  investigation?

24  A.   Yes.

25  Q.   And was that a meeting that you had?

1  A.   Yes, Professor Guan and his colleagues that came
2  to post U of I Police Department.
3  Q.   And who is Professor Guan?
4  A.   Professor Guan, he was reporting person
5  regarding this particular incident.
6  Q.   Is he a professor at the University of Illinois?
7  A.   Yes, he is.
8  Q.   Did he come to meet with you at the UIPD?
9  A.   Yes, him from his colleagues.
10  Q.   What he report to you?
11  A.   He reported to me that Yingying Zhang, that she
12  had been missing for several hours and that he was
13  concerned about her whereabouts.
14  Q.   Did he indicate that he had -- that Miss Zhang
15  had been working him?
16  A.   Yes, I indicated that.
17  Q.   And did he give you any idea on where he thought
18  she may be going?
19  A.   He had relayed to me that there was a high
20  probability that she may have went to One North
21  apartment complex in Urbana, and apparently she was
22  going there, I guess, to either see an apartment or
23  to sign a lease or something to that effect.
24  Q.   Did you get a phone number or any other ways of
25  methods of contacting Miss Zhang from Professor

 1  Guam?

 2  A.   Yes, he provided a name, also a phone number

 3  what-have-you, where she lived at.

 4  Q.   Roughly, how long would you say this meeting

 5  with Professor Guan last?

 6  A.   No more than, probably, no more, I would say,

 7  probably between 20, 30 minutes of that.

 8  Q.   After that meeting, did you attempt to gather

 9  any additional information about Yingying?

10  A.   Yes, also went inside -- we have a

11  telecommunication room, and I spoke to the

12  telecommunicators and I got her information we gave

13  it to them and then they also produced descriptors

14  of her and gave me a photograph of her.

15  Q.   What was that photograph from?

16  A.   It comes from the I-card system.  Any time we

17  have students register and come to the U of I,

18  whether faculty or staff or what-have-you.  They get

19  issued an identification card and it has a

20  photograph of them.

21  Q.   Were you able to obtain her I-card photo?

22  A.   Yes.

23  Q.   Now after meeting with Professor Guan did you

24  begin to search for Yingying?

25  A.   Yes, I did.

1  Q.   Did you start on campus?

2  A.   Yes, I did.

3  Q.   Can you tell us a little bit about that?

4  A.   Basically, I searched the main areas of --

5  basically, I started with looking at the Illini

6  Union, went inside of that building.  That is the

7  flagship building of U of I campus.  All of the

8  times you have a lot of traffic come through there,

9  so I started there.  I took her picture with me.  I

10  went inside the building.  Asked several people did

11  they know her.  Did they happen to see her.  I

12  walked down the hallways and looked around to see if

13  she was inside the building.

14  Q.   Did you check any other campus hot spots or

15  anywhere else on campus?

16  A.   Also went to a couple restaurants in the area

17  CoCo Creme, Cafe Bene, and several of the

18  restaurants.  And I chose these specific areas

19  because predominantly a lot of the Asian students,

20  they go to these restaurants, they are very popular

21  amongst Asian students.

22  Q.   Does the University of Illinois have a very

23  sizeable population of students from foreign

24  countries?

25  A.   Yes, it is very diverse.

1  Q.   Now at some point after -- well, let me I guess
2  ask one more question related to this.
3         When you were going to these restaurants
4  what were you doing?
5  A.   Of course, I had a picture.  I would walk up to
6  several people and say, have you seen this young
7  lady, do you happen to know her, you know, just kind
8  of canvassing the area.
9  Q.   Did you find anything during those interactions
10 on campus that helped your investigation?
11 A.   No, I did not.
12 Q.   After that, did you check any public
13 transportation areas in Champaign-Urbana?
14 A.   Yes, I went over to the Illinois bus terminal.
15 Q.   And explain what is the Illinois terminal for
16 us?
17 A.   The Illinois bus terminal is the main
18 transportation hub that is in the city of Champaign.
19 It's off in the university.  I have MTD, which is
20 the Mass Transit District, but you also have
21 Greyhound, Amtrak, Ubers, cabs, what-have-you.  This
22 is the main thoroughfare for traffic to go to and
23 from throughout the city.
24 Q.   And what did you do when you were at Illinois
25 terminal?

1  A.   I walked inside, spoke to staff, spoke to

2  security guards, spoke to just general patrons in

3  the area and asked have you seen them.  Also tried

4  to look at videotape that may be available,

5  what-have you.

6  Q.   Were you showing people the photo you had gotten

7  of Yingying?

8  A.   Yes, I was.

9  Q.   Had anybody there seen or heard of her?

10  A.   No, they did not.

11  Q.   Did any of your video reviews show her on any of

12  the video?

13  A.   No.

14  Q.   Now after the Illinois terminal, did you

15  eventually go to the Orchard Downs apartments?

16  A.   Yes, I did.

17  Q.   What is the Orchard Down apartments?

18  A.   The Orchard Downs apartments are a major

19  apartment complex that is owned, operated, and

20  maintained by the University of Illinois.

21  Q.   Is it student housing?

22  A.   It is student housing.  Also you have UIC

23  grades, just a diverse population, facility, staff,

24  what-have-you.

25  Q.   Did anybody know of Orchard Downs at the time?

1  A.   Has it was relayed to me that Miss Zhang,
2  Yingying Zhang, she stayed on Orchard Downs.
3  Q.   When you went out here for the first time, tell
4  us what you did on that first time you went to
5  Orchard Downs?
6  A.   When I went out the first time, I searched the
7  area, basically driving around.  If I saw someone on
8  the sidewalk, I asked could you come over here and
9  speak to me.  I showed the photograph.  I canvassed
10 the area basically and then after I went to
11 Miss Zhang's apartment.
12 Q.   Had you learned the identity of her apartment
13 from Professor Guan?
14 A.   Yes.
15       MR. FRERES:  Your Honor, may I approach the
16 witness?
17       THE COURT:  You may?
18 BY MR. FRERES:
19 Q.   Before I do that -- did you enter the apartment
20 this first time?
21 A.   No, I did not.
22 Q.   Did you leave anything before you left?
23 A.   Prior to me leaving, I went up to the apartment,
24 knocked on the door, and before I left, I left my
25 business card.

1  Q.   What was the purpose of doing that?

2  A.   Just in case Miss Zhang she came back, she would

3  have a point of contact, she could call me and

4  notify me that she was okay or where her whereabouts

5  were.

6  Q.   Where did you leave the business card?

7  A.   I left it up on -- by her front door.  There was

8  an area where I could place the card there and I

9  left it there.

10 Q.   I'm going to hand what you we've marked as

11 Government's Exhibit 12-1 and 12-5, and I'm just

12 going to ask you to take a look at those.

13        Do you recognize those photographs, Officer

14 Hoskins?

15 A.   Yes, I do.

16 Q.   What are you looking at there?

17 A.   A side view of the apartment complex where

18 Miss Zhang stayed.

19 Q.   Would that be the Orchard Downs apartments?

20 A.   Yes, that would be Orchard Downs.

21 Q.   And is that 12-1 that you are referring to?

22 A.   12-1, yes.

23 Q.   12-5, what are you looking at in that

24 photograph?

25 A.   I am looking at the car to the left, and also

1  I'm looking at the front door of Miss Zhang's

2  apartment.

3  Q.   Do those photographs fairly and accurately

4  depict what you observed on June 9th?

5  A.   Yes, they do.

6        MR. FRERES:  Your Honor, I'm moving to admit

7  12-1 and 12-5.

8        MS. POLLOCK:  No objection, Your Honor.

9        THE COURT:  Admitted.

10        MR. FRERES:  Can we publish these, Your

11  Honor.

12        THE COURT:  You may.

13  BY MR. FRERES:

14  Q.   We have now got Government Exhibit 12-1 up on

15  the screen.  Can you see that, Officer Hoskins?

16  A.   Yes.

17  Q.   Explain to us where Miss Zhang's apartment is on

18  this photograph?

19  A.   As you go up to the stairwell, her apartment is

20  directly to the right of top.

21  Q.   So it's on the second story?

22  A.   Second story.

23  Q.   Is it at the top of the stairwell there?

24  A.   At the top, yes.

25  Q.   All right.  Now we've got Government's

 1  Exhibit 12-5 here.  And tell us what we are looking
 2  at here Officer Hoskins.
 3  A.   You are looking at my business card.
 4  Q.   Would this have been what she left the first
 5  time that you went to Orchard Downs on June 9th?
 6  A.   Yes, it has my conduct information, my name.
 7  Q.   I believe you said that you testified that you
 8  knocked on the door and nobody answered; is that
 9  correct?
10  A.   Nobody answered.
11  Q.   And after first instance of Orchard Downs, did
12  you travel to another apartment complex in Urbana?
13  A.   Yes, I did.
14  Q.   Where did you go?
15  A.   I went to One North apartments in Urbana.
16  Q.   Where is One North in relation to Orchard Downs?
17  A.   At the intersection of Bradley and Lincoln.  It
18  sits on the northwest corner of the intersection.
19  Q.   And where is Orchard Downs, is it straight south
20  of One North?
21  A.   Orchard Downs is southeast of One North.  And it
22  sits off of Orchard and Florida Avenue.
23  Q.   Is it a significant distance between the two
24  locations?
25  A.   Yes.

75

1  Q.   Now what did you do when you were at One North?

2  A.   When I went into One North, I accessed, I went

3  inside the facility and I went into the welcome

4  center, which is pretty much like a complex.  It has

5  a swimming pool in it.  It also has several of the

6  areas where people can come inside the facility, and

7  it also has a leasing office.

8  Q.   What time did you go out there?

9  A.   I went out there approximately, probably -- I'm

10 trying to recall the exact time, but....

11 Q.   Was it after dark?

12 A.   It was dark.  It was dark at the time.

13 Q.   Was the leasing office open?

14 A.   The leasing office was closed.  There was no

15 staff in the leasing office out there.

16 Q.   Were you able to speak to anybody at One North?

17 A.   I spoke to a couple that was there; I showed

18 them the photo.  I showed photos of Miss Zhang, no

19 one knew of her.  And then also spoke to a security

20 guard that worked for security house.

21 Q.   And had he -- did he offer you anything that

22 assisted in your investigation?

23 A.   No, he did not.

24 Q.   Now at some point after -- still on June 9-- th

25 did you return to Orchard Downs?

1 A.   Yes, I did.

2 Q.   Tell us about this instance.

3 A.   I returned to Orchard Downs because I had

4 received a call from -- he basically had call to

5 post I, if what I believe, what I recall, called the

6 Post I, Dr., Professor Guan, and I met him and his

7 colleagues out at Orchard Downs.  They were in front

8 of Miss Zhang's apartment.

9 Q.   This would have been after your meeting with

10 them at the UIPD?

11 A.   Yes.

12 Q.   And once you were out at Orchard Downs, what, if

13 anything, did you do?

14 A.   I contacted housing staff, housing staff came

15 out and they gave us access to Miss Zhang's

16 apartment.

17 Q.   Before you did that, did you knock or anything

18 to see --

19 A.   We knocked.  We announced our presence just to

20 make sure, and I noticed that the card was still

21 there.  And we asked staff, housing staff come out

22 and they accessed the apartment for us.

23 Q.   Did you go inside the apartment?

24 A.   Me, and Officer Sanders, badge number 158, we

25 went inside the apartment.  Housing staff did not

1  come in the apartment with us.  We went need only.
2  Q.   Did Professor Guan or any of his colleagues go
3  up?
4  A.   No.
5  Q.   Once you were inside the apartment, was it dark?
6  A.   It was dark, yes.
7  Q.   Did you go walk through all of the room of the
8  apartment?
9  A.   Yes, I did.
10 Q.   Did you disturb anything while you were there?
11 A.   No, we did not.
12 Q.   Was there anything of note that you recall from
13 the living room area of the apartment?
14 A.   When I walked in the living room, came through
15 the front door.  There was an unassembled bicycle
16 that was in the living room, and then there was a
17 corridor.  And off to the corridor, off to my side
18 over here, there was a kitchen.  Saw several items
19 inside that, typical things, pots, pans,
20 what-have-you, dishes.  Went down the corridor.  Off
21 to the side, there was a bathroom.  Typical every
22 day bathroom.  One particular thing that I do
23 remember when I went in there, there was a trash can
24 on the floor and inside that trash can there was an
25 feminine pad, Tampon, what-have-you, and it was

 1  soiled.  Possibly indicating that Miss Zhang had
 2  been on menstrual cycle.  I left out of there and
 3  went further and turned off to the right, and I went
 4  into her bedroom.
 5  Q.   Did you observe her bed?
 6  A.   Yeah, her bed was directly in front of me and
 7  the covers were slightly pulled back as if someone
 8  had slept in it at some point.
 9  Q.   Was there anything on dressers or counters
10  inside the bedroom of note?
11  A.   Yes, I turned over here to my side to the left,
12  there was a dresser and on the dresser I saw some
13  currency, some money.
14  Q.   United States currency?
15  A.   I can't recall exactly.  I believe it was U.S.
16  currency.
17  Q.   And, again, I believe you testified to this
18  already.  Did you disturb anything while you were
19  inside?
20  A.   No, I did not.
21  Q.   Did you find Yingying?
22  A.   No, I did not.
23  Q.   So, what did you and the other officer do at
24  that point?
25  A.   At that point, we cleared -- we made sure that

1  everything was intact and we left out -- we secured
2  the residence.
3  Q.   How would you characterize what you observed
4  inside the apartment?
5  A.   The apartment had a system of organization as if
6  someone at the time currently was living there.  And
7  it looked as though they had probably planned to
8  come back.  It looked as though somebody had lived
9  there.
10 Q.   After that, you said you had gathered Yingying's
11 phon number; is that correct?
12 A.   Yes.
13 Q.   Did you attempt to call that number at any
14 point?
15 A.   Yes, I called it several times throughout the
16 today.
17 Q.   Okay.  What would happen when you called it?
18 A.   It would ring.  It would ring, and at some point
19 it would go to voice mail.
20 Q.   Did anybody ever answer?
21 A.   No one every answered.
22 Q.   As you were doing this, did you eventually ask
23 to distribute Yingying's photo to anybody else?
24 A.   Yes, I went inside the telecommunication office
25 of our police department and I relayed her

1  information to them, and I requested that they

2  disseminate what is called a message, MBC message

3  and sent it to surrounding police departments with

4  her information.

5  Q.   Did you actually work a extended shift that

6  night?

7  A.   Yes, I did.

8  Q.   Did it continue into the following morning?

9  A.   Yes, that shift ran from 2:00 a.m. to 7:00 in

10  the morning.

11  Q.   Right before your shift, your extended shift

12  ended 7:00 a.m. what eventually did you do?

13  A.   I went back out to Orchard Downs to Miss Zhang's

14  apartment.  Of course I went back up there to see if

15  she was there and knocked on the door.  No one

16  answered.

17  Q.   Was the card still there?

18  A.   The card was still there.

19  Q.   And then after that did your shift end, did you

20  go home to rest?

21  A.   My shift ended and I went home.

22  Q.   Did you return to duty later that evening on

23  June 10th?

24  A.   Yes.

25  Q.   And what, if anything, did you do once you

1  returned to duty?

2  A.    I came back on shift and then around about 5:30

3  I went back out to or Orchard Downs, and I had an

4  officer accompany -- Officer Lewis, badge number

5  131, we went to Miss Zhang's apartment and we

6  contacted housing staff, housing staff came out.

7  They once again opened the apartment for us.  They

8  did not come in.  We went inside.  We did not

9  disturb anything.  We just looked throughout the

10  apartment.  It still was in the same condition as it

11  was previously.

12  Q.   Had anything changed?

13  A.   Nothing changed.

14  Q.   Did you find Miss Zhang?

15  A.   No, we did not.

16          MR. FRERES:  Your Honor, I have no further

17  questions.

18          THE COURT:  Cross-examination.

19          MS. POLLOCK:  One moment, Your Honor.

20          No cross-examination.

21          THE COURT:  Okay.  You may step down, sir.

22  We will push that away.

23          Next witness.

24          MR. MILLER:  The United States will call

25  Xiaolin Hou.

```
 1          THE COURT:  Sir, do you want to come forward
 2  please.
 3          (Witness sworn.)
 4          THE COURT:  Thank you, sir.
 5          Please have a seat.  We will help you get
 6  situated.
 7          Mr. Miller, whenever you're ready.
 8                    XIAOLIN HOU,
 9  after having been duly sworn, testified as follows:
10                  DIRECT EXAMINATION
11  BY MR. MILLER:
12  Q.  Will you please tell the jurors your name and
13  spell your name for the court reporter.
14  A.  My name is Xiaolin Hou, X-i-a-o-l-i-n, H-o-u.
15  Q.  And how old are you?
16  A.  30 years old.
17  Q.  Where do you currently live?
18  A.  Beijing, China.
19  Q.  Were you born and raised in China?
20  A.  Yes.
21  Q.  What is your first language?
22  A.  Chinese.
23  Q.  You, obviously, speak and understand English as
24  well?
25  A.  Yes.
```

```
 1  Q.   When did you learn to speak English?
 2  A.   Primary school, about six years old.
 3  Q.   And will you please let us know if you don't
 4  understand the question?
 5  A.   Of course.
 6  Q.   Did you attend college?
 7  A.   Yes.
 8  Q.   Where did you attend college?
 9  A.   In Sun Yat-Sen Universi th in Guangdong, China.
10  Q.   And is that Sun Yat-Sen spelled S-u-n
11  Y-a-t-S-e-n?
12  A.   Yes.
13  Q.   And did you -- what year did you graduate from
14  Sun Yat-Sen University?
15  A.   2013.
16  Q.   Did you attend schooling after that?
17  A.   Yes.
18  Q.   Where did you go after that?
19  A.   I went to Peking University for my doctorate
20  degree.
21  Q.   How many -- let me ask, you when did you get
22  your doctorate from Peking University?
23  A.   This summer.
24  Q.   And what is your doctorate degree in what field?
25  A.   Environmental engineering.
```

1  Q.   Are you married?

2  A.   No.

3  Q.   Have you ever been married?

4  A.   No.

5  Q.   Was there a time that you were planning to be

6  married?

7  A.   Yes.

8  Q.   And when was the time you were planning to be

9  married?

10 A.   I plan to get marred with Yingying in October of

11 2017.

12 Q.   I'm going to show you what has been marked as

13 Government Exhibit 1A, 1B, 1C, and 1D.

14 A.   Okay.

15 Q.   First of all, do you recognize Government's

16 Exhibit 1A?

17 A.   Yeah.  This is my girlfriend, Yingying.

18        MR. MILLER: And we ask to admit and publish

19 Government's Exhibit 1A.

20        THE COURT:  Any objection?

21        MS. BRAIN:  No, Your Honor.

22        THE COURT:  You may publish.

23 BY MR. MILLER:

24 Q.   And do you know approximately when this

25 photograph was taken?

1   A.   Yes, it is about the summer of 2017.

2   Q.   And if you could look at Government's

3   Exhibit 1B.

4   A.   Yeah.

5   Q.   And do you recognize Government's Exhibit 1B?

6   A.   Yes.  This is Yingying.

7   Q.   And I would ask to admit and publish

8   Government's Exhibit 1B.

9           THE COURT:  Any objection?

10          MS. BRAIN:  No, Your Honor.

11          THE COURT:  You may publish.

12  BY MR. MILLER:

13  Q.   Can you describe for us what we see in

14  Government's Exhibit 1B?

15  A.   I see Yingying was at a supper with a friend in

16  Beijing.

17  Q.   That was before she came to the United States?

18  A.   Yes.

19  Q.   And if you could look at Government's

20  Exhibit 1C.

21          Do you recognize that?

22  A.   Yes.

23  Q.   And what is Government's Exhibit 1C?

24  A.   This Yingying.

25          MR. MILLER: Your Honor, we would ask and

1  admit Government's Exhibit 1.

2         THE COURT:  Any objection?

3         MS.  BRAIN:  No, Your Honor.

4         THE COURT:  It will be admitted.

5  BY MR. MILLER:

6  Q.   Can you please describe for us -- first of all,

7  down when they photograph was taken?

8  A.   Yes.  I took this photograph of Yingying just

9  before she left China about March of 2017, yes.

10  Q.   Where was this photograph taken?

11  A.   Summer Palace in Beijing.

12  Q.   Approximately, what year did you and Yingying

13  first meet?

14  A.   We meet in our first year of college, that is

15  2009, Sun Yat-Sen University.

16  Q.   And what were you studying at that time?

17  A.   Yes.  We are in the same class.  We share the

18  same major, environment science.

19  Q.   And physically, if you could tell us, how tall

20  was Yingying?

21  A.   159 centimeters.

22  Q.   And if I may is that approximately, if you know,

23  is that approximately five foot three inches at all?

24  A.   Yes.

25  Q.   And if you know, what was her size; how much did

1 she weigh?

2 A.   Size; small, I think.

3 Q.   Now did you eventually begin a dating

4 relationship with Yingying?

5 A.   Yeah.  I began to date with her during the first

6 of the year, the end of the first year of college.

7 Q.   Where was Yingying from originally before she

8 came to college?

9 A.   Fuijian Province in China.

10 Q.   And what city in the Fuijian Province?

11 A.   Nanping, Nanping city.

12 Q.   Did you visit her at her home?

13 A.   Yes.

14 Q.   And did you meet her parents there?

15 A.   Yes.

16 Q.   And do you know her father's name?

17 A.   Ronggao Zhang.

18 Q.   Can you spell his name for the court reporter?

19 A.   R-o-n-g-g-a-o, Z-h-a-n-g.

20 Q.   Can you identify him in the courtroom here

21 today?

22 A.   I see the father is sitting there.  Yes, in the

23 front row, yes.

24 Q.   Okay.  And do you know Yingying's mother's name?

25 A.   Lifeng Ye.

```
 1 Q.   Could you spell Li leave?
 2 A.   L-i-f-e-n-g, sorry.  L-i-f-e-n-g, Y-e.
 3 Q.   And is she here in -- has she traveled here to
 4 the United States for this trial as well?
 5 A.   Yes.
 6 Q.   I'm going to show you -- if you could look at
 7 Government's Exhibit 1D.
 8       Do you recognize that?
 9 A.   Yeah.
10 Q.   And what is Government's Exhibit 1D?
11       THE COURT:  Hold on one second.  If you want
12 to set them here for now.
13 A.   Thank you.  It is me and the family.
14       MR. MILLER: We would ask to admit and
15 publish Government Exhibit 1D.
16       THE COURT:  Any objection?
17       MS.  BRAIN:  No, Your Honor.
18       THE COURT:  Admitted, and you may publish.
19 BY MR. MILLER:
20 Q.   Can you then tell us approximately when this
21 photograph was taken?
22 A.   It is taken on the winter of 2013, I think.
23 Q.   And where was this taken?
24 A.   It is taken in the hometown the, Wuyi Mountains
25 in Nanping.
```

1  Q.  And I think you said this is you, and Yingying,

2  and her parents?

3  A.  Yes.

4  Q.  Did -- how would you describe the

5  relationship between Yingying and her parents?

6  A.  They have very good relationship.  And they take

7  care of each other.  I think all of the family

8  members are -- they are warm and nice and they live

9  a very, very happy life.

10  Q.  Does that include Yingying's younger brother as

11  well?

12  A.  Yes.

13  Q.  Did -- since you want to graduate school, I

14  assume you did as well at Sun Yat-Sen University?

15  A.  Yes.

16  Q.  Did Yingying do well -- also do well?

17  A.  Yes.

18  Q.  In fact, what were your class ranks when you

19  were at Sun Yat-Sen University.  I'm sorry, Sun

20  Yat-Sen university?

21  A.  Can you repeat that?

22  Q.  Yes, I apologize.  What were your class ranks

23  when you graduated.

24  A.  I'm the first one, and Yingying was the second

25  one.

 1  Q.   And where did you continue your schooling after

 2  graduating from the university?

 3  A.   We both went to the Peking University.

 4  Q.   And did you both continue to date at that time?

 5  A.   Yeah, of course.

 6  Q.   And did you each continue to study the same

 7  subject matter?

 8  A.   Yes.

 9  Q.   And that's environmental engineering?

10  A.   Yes.

11  Q.   What year did you and Yingying graduate from

12  Peking University?

13  A.   She graduated a little earlier than me.  She

14  graduated in 2016, and I just graduated this year.

15  Q.   Let me turn your attention to 2017.

16  A.   Okay.

17  Q.   Did Yingying leave China in 2017?

18  A.   Yes.

19  Q.   And so you had known Yingying approximately

20  eight years by this time?

21  A.   Yes.

22  Q.   What was the status of your relationship when

23  she left China?

24  A.   What is the relation of both of us?

25  Q.   Yes, what was your relationship with Yingying

US v. CHRISTENSEN 6/12/19 Vol 8A (Rough Draft)

1  when you left?

2  A.   Boyfriend and girlfriend.

3  Q.   Did you have any plans regarding your

4  relationship at the time she left?  I think you

5  mentioned before in October you had some plans with

6  Yingying.

7  A.   Yes, that's right.

8  Q.   What were those plans?

9  A.   We planned to have an engagement and get married

10  in October of 2017.

11  Q.   And do you know what her professional plans were

12  regarding your schooling when she came to the United

13  States?

14  A.   She planned to finish her PhD at UIC, and in the

15  future she may return to China and become a

16  professor at the university.

17  Q.   When did she leave China?

18  A.   In April 2017.

19  Q.   And when did you last see her?

20  A.   About 20 or 21 in April of 2017.

21  Q.   Now when Yingying came to the United States, did

22  she share bank accounts with a member of the family?

23  A.   Yes.

24  Q.   And could you please tell us about that?

25  A.   She shared bank account with my father because

1  at that time she did not have a credit card to pay
2  for daily life.  So my father gave his card to
3  Yingying and she bring that card here to the United
4  States.
5  Q.   Did you keep in touch with Yingying after she
6  came to the United States?
7  A.   Yes, almost every day.
8  Q.   And how did you do that?
9  A.   We keep in touch using the phone and also some
10 kind of social medias.
11 Q.   And what type of phone did she have?
12 A.   iPhone.
13 Q.   Was there -- was there some difficulty with the
14 time differences between Champaign and Beijing?
15 A.   Yes, of course.
16 Q.   What is the time difference?
17 A.   Thirteen hours.
18 Q.   Was there a day that took place in June of 2017
19 when you couldn't reach Yingying?
20 A.   Yeah, that is June 9th here and June 10th in
21 Beijing.
22 Q.   And how did you -- well, let me step back a
23 little bit.  Let me ask you about the day before,
24 the last time you had contact with Yingying.  How
25 did you have contact with her?

1  A.   I talked with her on the phone.

2  Q.   Did you discuss with her her plans the next day?

3  A.   Yes.

4  Q.   And what, what were her plans for the next day?

5  A.   She going to sign a lease for a new apartment.

6  Q.   And did she discuss why she was looking for a

7  new apartment?

8  A.   Yes.  She wanted to have a cheaper apartment to

9  save some money, and she also wants some roommates

10 together.

11 Q.   Did she express any intent to you to go anywhere

12 the next day besides to sign that new lease?

13 A.   Can you repeat that?

14 Q.   Did she -- did she suggest any other plans to

15 you the next day besides going to sign that new

16 lease?

17 A.   Suggest other plans?  What do you mean "other

18 plans"?

19 Q.   Did she say she was going to go somewhere else

20 besides -- did she say she was going to leave the

21 university?

22 A.   No, no, no, of course not, yeah.

23 Q.   Now after that conversation, did you ever speak

24 with her again?

25 A.   No.

1  Q.   Let me turn your attention then to how did you

2  first find out that Yingying was missing?

3  A.   I was told by a colleagues here at the U of I

4  and she told me they cannot get in touch with her.

5  So she knew I feel shocked and terrible because I

6  think Yingying is such a soulful girl and she never

7  let others worry about her so in my point of view

8  she face some difficulty.

9  Q.   Did you attempt to reach her?

10 A.   Of course, I call her phone again and again and

11 also try to contact her friends, her colleagues, but

12 nothing was found.

13 Q.   Did you eventually come to the United States to

14 look for her?

15 A.   Yes.

16 Q.   And when did you do that?

17 A.   I came here with Lifeng and her father in June

18 2017.

19 Q.   Had you been to the United States before that?

20 A.   No.

21 Q.   After you arrived in the United States, what did

22 you do to look for her?

23 A.   We do a lot of search.  Actually, we were

24 searching for her all the time when we are here in

25 the United States, almost every week I think.  We

1  searched the parks, the abandoned houses.  We don't
2  have a destination but we will never give up the
3  hope to find her.
4  Q.   I'm going to show what you has been previously
5  marked as Government's Exhibit 4B.  And do you
6  recognize Government's Exhibit 4B?
7  A.   Yes.  This is Yingying on the bus.
8         MR. MILLER:  And, Your Honor, we would ask
9  permission to admit and publish Government's Exhibit
10 4B?
11        THE COURT:  Any objection?
12        MS. BRAIN:  None, Your Honor.
13        THE COURT:  Be admitted.
14 BY MR. MILLER:
15 Q.   This is a photograph of Yingying getting on the
16 bus?
17 A.   Yes.
18 Q.   Twenty days after she was missing on June 29th,
19 had you found her yet?
20 A.   No.
21 Q.   Was there an event held for her on the
22 University of Illinois campus?
23 A.   Yes.
24 Q.   Can you describe that event for the members of
25 the jury?

 1  A.   I remember that day was 29, June 29th, and on

 2  that day we have a walk to through to the bus stop

 3  where Yingying got into the car, and then we walk

 4  back to the Cranden Center to have a small concert

 5  there to get people's attention to help us to find

 6  her.  About one or 200 people were there, I think.

 7  Q.   Now, have you had any contact with Yingying

 8  since June 8th?

 9  A.   No.

10  Q.   Did -- did she use her or anyone use her account

11  with your father's credit card since that date?

12  A.   No.

13  Q.   And have you continued to search for Yingying?

14  A.   Of course, yeah.

15  Q.   You have not found her yet?

16  A.   Yes, yes, I never found her.

17          MR. MILLER: No further questions.

18          THE COURT:  Cross-examination.

19          MS.  BRAIN:  No questions, Your Honor.

20  Thank you.

21          THE COURT:  You may step down, sir.  Let's

22  help you out there.

23          Push that back.  Thank you, sir.  Slide at

24  that back.  Thank you.

25          How do you feel we are on time as it

1  pertains to your next witness?

2          MR. FRERES:  Fifteen minutes, Your Honor.

3  Thank you.

4          THE COURT:  Call your next witness.

5          MR. FRERES:  Randy Fouts, Your Honor.

6          THE COURT:  Sir, will you come forward

7  please.

8                      RANDY FOUTS,

9  after having been duly sworn, testified as follows:

10                  DIRECT EXAMINATION

11  BY MR. FRERES:

12  Q.  Morning, sir.

13  A.  Morning.

14  Q.  Will you please state your name and spell your

15  last name for the our record?

16  A.  Randy Fouts, F-o-u-t-s.

17  Q.  Are you currently employed?

18  A.  Yes.

19  Q.  Where are you employed?

20  A.  Champaign-Urbana, Mass Transit District.

21  Q.  What is your currently title?

22  A.  I'm the assistant operations director.

23  Q.  Can you tell us a little about the

24  Champaign-Urbana Mass Transit District?

25  A.  It's a public transportation transit system for

1  Champaign-Urbana and parts of Savoy.

2  Q.   And what are you duties there?

3  A.   My duties include everything within the

4  operations department, scheduling, complaints,

5  dealing with operators, schedules, vacations, that

6  kind of thing.  We look at video complaints from the

7  public.  We look at video from reports that the

8  operators put in and handing insurance and claims

9  and things like that.

10  Q.   How long have you worked with -- what I'm going

11  to call MTD?

12  A.   I've been at MTD for nine years.  I've been in

13  this position for four.

14  Q.   What else have you done with MTD?

15  A.   I was driver for five years.

16  Q.   A bus driver?

17  A.   Yes.

18  Q.   Does that make you pretty familiar with the

19  routes that MTD services?

20  A.   Very much so.

21  Q.   Prior to working MTD, did you have any other

22  employment?

23  A.   I was -- I worked -- quite a bit of employment.

24  I worked for in marketing for seven years.  Prior to

25  that, I was a police officer in Urbana for nine

1  years.  And then I had little one-year stints with

2  different companies, Prudential and Philips

3  Lifeline.  Was also an athletic director at a Judah

4  Christian High School.

5  Q.  Did you attend college?

6  A.  Yes.

7  Q.  Where did you go?

8  A.  Taylor University in Upland, Indiana.

9  Q.  And what did you study?

10  A.  I studied mass communication.

11  Q.  And did you obtain a degree?

12  A.  Yes.  I have a bachelor's degree.

13  Q.  Now, you mentioned a little bit about what CUMTD

14  is.  What does MT primarily serve?  What does it do?

15  What is its function?

16  A.  Our function is transportation for those who

17  either cannot drive or don't wish to drive through

18  the city, Champaign-Urbana.  It's a district of

19  Champaign-Urbana and parts of Savoy.  We transport

20  people for whatever needs they have.

21  Q.  Is Savoy a city that's appended to the south end

22  of Champaign?

23  A.  It's a village on the south side.

24  Q.  And does MTD service the University of Illinois

25  campus?

 1  A.   Yes, we do.

 2  Q.   How many buses does MTD currently have?

 3  A.   Currently we have around 112 to 114.  I'm not

 4  sure -- we just got some new ones in, I'm not sure

 5  how many we got.

 6  Q.   Are there set routes what the buses service?

 7  A.   Yes.

 8  Q.   Does each route contain multiple buses?

 9  A.   Yes.

10  Q.   What is the purpose of that?

11  A.   Frequency of stops, the routes can be as long

12  as, technically, from one end to the other could be

13  two hours going one direction.  So we put several

14  buses on there so that the frequency is cut down to

15  -- majority of them are half hour on campus.  It's

16  more like 10 minutes, 10 15 minutes.

17  Q.   Could the frequency with which the buses stop,

18  does that change at various point during the year?

19  A.   Yeah, we are contracted with the University of

20  Illinois for when they are in session.  So, we have

21  several -- a lot more routes that are frequency in

22  routes during the U of I times.  When the U of I is

23  not in session, we reduce our service.

24  Q.   Does -- I believe you may have said this but

25  does the MTD have different types of buses in vans?

US v. CHRISTENSEN 6/12/19 Vol 8A (Rough Draft)                101

1  A.   We have vans which are 19 passenger vans.  And
2  then we have 30 foot buses.  We have 40 foot buses
3  which is the majority of our fleet, and then we also
4  have 60 foot articulated busses.
5  Q.   The big 60 foot busses do they have anything
6  sort of distinctive in the middle?
7  A.   The accordion thing in the middle because the
8  bus actually bends in the middle as it turns
9  corners.
10 Q.   Now does CUMTD maintain video surveillance as
11 part of its operations?
12 A.   Yes, we do.
13 Q.   What's the purpose of that?
14 A.   The purpose -- there are several purposes.  One
15 purpose is for insurance, for claims.  One is for
16 liability, for safety, for -- also for investigating
17 complaints or reports, and for insurance, that kind
18 of thing.
19 Q.   Where does your CUMTD maintain its cameras if at
20 all?
21 A.   The cameras are on the buses.  We have cameras
22 on the buses.  We also have cameras in our kiosks,
23 some off our kiosks and also in our facilities.
24 Q.   Do all of the buses have cameras?
25 A.   Yes.

US v. CHRISTENSEN 6/12/19 Vol 8A (Rough Draft)

1  Q.   Can you describe like approximately how many

2  cameras the buses each have?

3  A.   The 30 or 40 foot busses have eight cameras each

4  and the 60 foot busses have 15 cameras.

5  Q.   Do the cameras show different angles?

6  A.   Yes, they do.

7  Q.   Do the bus stops also -- I think you mentioned

8  this -- have cameras at the kiosks as well?

9  A.   Some do, select areas have cameras in the

10 kiosks, which will cover the immediate area of that

11 kiosk.

12 Q.   Does CUMTD use any specific software for its

13 camera systems?

14 A.   We have actually three different softwares that

15 we use.  The kiosks are used by -- it's a company

16 called Milestone.  The -- we are in the process now

17 -- half of our fleet uses Apollo, and half of our

18 fleet uses a company call Mobile View.  We are in

19 the process of switching over from Apollo to Mobile

20 View, so it is a process.

21 Q.   Sure.  In June of 2017, were the buses using any

22 software in particular?

23 A.   Most of them were Apollo at that time.  Every

24 bus that is age 2016 or newer was installed with

25 Mobile View but at that point in time, we had very

US v. CHRISTENSEN 6/12/19 Vol 8A (Rough Draft)

1  few of those.

2  Q.   How was the video footage stored?

3  A.   It's stored on a hard drive, DVR, within the bus

4  itself.  And so in order to view it, we -- with the

5  Apollo system, we have to actually physically remove

6  the hard drives out of the bus.

7  Q.   At some point in time does the system override?

8  A.   Yes, it has -- depending on how long -- how much

9  time the bus is out it will override.  It can give

10 us anywhere from a week and a half to two weeks.

11 Again, that would be the 60 foot buses, not quite

12 that much because, there is so many more cameras so

13 it overrides quicker.

14 Q.   Did -- you also mentioned the other software

15 system.  Are those stored on hard drives as well?

16 A.   They are -- well, the mobile -- I'm sorry -- the

17 Milestone 16, which is our kiosks and our facilities

18 are stored on a server within our facilities.  The

19 Mobile View is stored on a hard drive; however, it's

20 also accessible through Wi-Fi.

21 Q.   Whether we are talking about Apollo or Milestone

22 or Mobile View does CUMTD have any way to manipulate

23 or alter the video system?

24 A.   None whatsoever.  Each one has -- they may be a

25 little bit different but they are very similar

1  proprietary safeguards against that.  We have no

2  equipment that would be able to do that but even if

3  we did, according to what everybody has told us

4  within the companies that we are using this from, if

5  we were to try and override it or do anything with

6  it, it would become unusable.

7  Q.   Now do you -- do you -- does CUMTD frequently

8  work with law enforcement whenever there may be a

9  complaint or something on the bus?

10 A.   Quite frequently, yes.

11 Q.   As part of that can that involve retrieving

12 video footage from buses and kiosks?

13 A.   Yes.

14 Q.   Directing your attention to June of 2017, did

15 CUMTD provide various bus and kiosk footage to FBI

16 and UIPD law enforcement agents?

17 A.   Yes.

18       MR. FRERES:  Your Honor, may I approach the

19 witness?

20       THE COURT:  You may.

21 BY MR. FRERES:

22 Q.   Sir, I'm going to happened you what we have

23 marked as Government's Exhibit 4A, which is, I

24 believe is four disks in there.  Prior to your

25 testimony today, have you had an opportunity to look

1  at the contents of that exhibit?

2  A.   Yes.

3  Q.   And does that contain CUMTD bus and kiosk

4  footage that would have been stored on your servers

5  and hard drives?

6  A.   Yes.

7  Q.   And has it been manipulated altered in any way?

8  A.   No, it cannot be from what I know.

9         MR. FRERES:  Your Honor, I move to admit 4A?

10        THE COURT:  Any objection?

11        MS.  BRAIN:  No, Your Honor.

12        THE COURT:  It will be admitted.

13  BY MR. FRERES:

14  Q.   Staci, can you bring up 4A-1 please.

15        We are going to put up on the screen here

16  Government's 4A-1.

17        Can you see that, sir?

18  A.   Yes.

19  Q.   Tell us -- it look like if my math is correct,

20  15 cameras?

21  A.   Yes.

22  Q.   Tell us what we are looking at here.

23  A.   This would be the camera footage from one of our

24  60 foot buses, particularly from bus number 112.

25  Q.   When you say bus 112, do you know that because

US v. CHRISTENSEN 6/12/19 Vol 8A (Rough Draft)

1  of the number in the box?

2  A.   Is shows the bus number and the camera number up

3  in the top left-hand corner.

4  Q.   Do all of these cameras sort of operate in

5  conjunction at one time if the video were playing?

6  A.   Yes, they would all be at the same time.

7  Q.   And how would you -- if you wanted to look at

8  any individual one individual camera with your

9  system, how does it work?

10  A.   If you click on one camera, it will becomes full

11  screen and at that point it would also, the audio

12  would also engage.

13  Q.   Give us just a brief overview of what we looking

14  at with each of the angles here?

15  A.   Camera one is the front camera coming through

16  the windshield of the bus.  It's placed right down

17  on the dash, or, actually, it's the based off of

18  camera two; it's actually secured to the top part of

19  the windshield facing straight out.

20       Camera two is the behind the -- the

21  equipment box which is directly behind the driver

22  which shows us the view of the front door, parts of

23  the driver, and then various things right in front

24  of the front portion of the bus.

25       Camera three is a video from the front door

1  area and it shows back toward the rear of the bus,
2  the front part of the compartment.
3        Front four shows up the front -- the
4  articulated buses have three doors.  This would be
5  the middle door's section that you see in camera
6  four.
7  Q.   I'm going to pause you right there.  When you
8  are saying cameras one, two, three, four, are those
9  the four straight across the top?
10  A.   Yes, sir.
11  Q.   What about the second row there?
12  A.   Camera five is showing -- it's a mid section of
13  the bus.  The silver part in the middle would be a
14  the hub where the bus rotates.  And it is facing
15  toward the back.
16        Camera six is right next to camera five
17  except that it is facing the other direction and it
18  is going toward the front of the bus; you can see
19  the driver in the windshield portion of that.
20        Camera seven is covering the rear part of
21  the bus.  The doors that are in that frame are the
22  rear doors.  And in the back area.
23        Camera eight is a closer up view of that,
24  it's right next to the doors.  It's also showing the
25  back portion.

1          Then camera nine is just the portion above
2   the steps, which is the very back of the bus behind
3   the rear door.
4          Camera ten is from the back of the bus
5   moving toward the front or showing the rear doors
6   toward the front of the bus.
7          Then camera 11 is a external camera.  It
8   is -- it is on the front right above the door.  The
9   front door, and it shoots down the side of the bus.
10          Camera 12 is another one of the external
11   rear cameras.  It is -- I believe it's right close
12   to the doors shooting down the side of the bus.
13          Camera 13 is shooting the rear doors from
14   the side as well that -- all from the curb side.
15          And camera 14 and camera 15 are both
16   external camera on the driver side shooting down the
17   side of the camera.  One -- camera 14 is more toward
18   the front; camera 15 is more toward the back.
19   Q.   And would this -- thank you for that
20   explanation.
21          Would this picture here would that be on the
22   Apollo software?
23   A.   Yes, that is Apollo.
24   Q.   Is there ever a time where the Apollo timestamps
25   could be off a little bit?

 1  A.   We have been using the Apollo software for many,

 2  many years and it is -- some of the DVRs have been

 3  pulled multiple times and at times one might get

 4  pulled inappropriately by a supervisor which might

 5  adjust the timestamp.  We found that a few of the

 6  Apollo software or Apollo DVRs, the timestamp may be

 7  off by one our hour, and it will an hour ahead, for

 8  example, if it were actually 5:00, it might show the

 9  time of 6:00.

10          MR. FRERES:  May I approach, again, Your

11  Honor.

12  BY MR. FRERES:

13  Q.   Now Mr. Fouts, you also indicated that you drove

14  for CUMTD for a while?

15  A.   Correct.

16  Q.   Are you familiar with the bus routes?

17  A.   Yes, sir.

18  Q.   I'm going to hand you what I have marked as

19  Government's Exhibit 2C and ask you to take a look

20  at that.

21  A.   Yes.

22  Q.   Do you recognize that?

23  A.   Yes.

24  Q.   Tell us about what you're looking at there.

25  A.   This is actually a -- showing two of our routes,

1  the Teal and the 22 Illini Limited.  And it is also
2  showing us -- what it is showing us where the route
3  normally goes where it is scheduled to go, and it is
4  also because of that time frame it is construction
5  so it is showing you the reroute that we were taking
6  at that very time.
7  Q.   In that fair and accurate depictions for those
8  two bus routes in June of 2017?
9  A.   Yes, it is.
10 Q.   As well as today?
11 A.   Yes -- well, we are not doing the reroutes
12 today, but, yes.
13 Q.   Correct.  Thank you.
14       MR. FRERES:  Your Honor, I move to admit
15 Government's Exhibit 2C.
16       THE COURT:  Any objection?
17       MS. BRAIN:  No, Your Honor.
18       THE COURT:  It will be admitted.
19 BY MR. FRERES:
20 Q.   All right.  We have Exhibit 2C up on the screen
21 here.  And it look like there is purple and an
22 orangish-red line; do you see those, Mr. Fouts?
23 A.   Yes.
24 Q.   Is there a key up at the tope there on the upper
25 left corner there about which line is which?

US v. CHRISTENSEN 6/12/19 Vol 8A (Rough Draft)

1  A.   Yes, the purple is Teal and the orange is 22
2  Illini Limited.
3  Q.   Given your familiarity with MTD, if I were to
4  give you two locations in Champaign, would you be
5  able to tell my the optimal bus routes to get to
6  that location?
7  A.   Yes.
8  Q.   Are you familiar with the Orchard Downs
9  apartments in Champaign?
10  A.   Yes, I am.
11  Q.   Is that student housings?
12  A.   That is student housing on the southeast part of
13  campus.
14  Q.   And are you also familiar with the One North
15  apartment complex?
16  A.   Yes, I am.
17  Q.   Is that also primarily student housing?
18  A.   It's a mix.  It's student housing -- a lot of
19  students do live there, yes, but it is private
20  housing.  And it is up on North Lincoln, just north
21  of Bradley in Urbana.
22  Q.   If somebody were to ask you, how would I get
23  from Orchard Downs to One North would you tell them
24  any particular lines to take?
25  A.   Probably the quickest route to go, the most

1  efficient would be to take th Teal from Orchard

2  Downs to campus, at this time during -- it would be

3  the Illini Union, although that was closed at that

4  time, but then catch the 22 Illini Limited north to

5  the One North apartments.

6  Q.   Now I'm going to direct your attention going

7  back to June of 2017.  Was there a little bit

8  construction going back on campus?

9  A.   Yes.  Queen Street was completely closed which

10  included the U of I Union.

11  Q.   Did that prompt the MTD to alter the bus routes?

12  A.   Correct.  Instead of going down Green Street,

13  the Teal, which was going westbound, would have

14  proceeded straight north on Goodwin to Springfield,

15  and then turn west on Springfield to right straight

16  to regular route.  The Illini Limited, the Illini

17  Limited would have gone straight north on Wright

18  Street to Springfield, and then east to Goodwin and

19  then regular route.

20        MR. FRERES:  Okay.  Can we zoom back out for

21  a second, Staci.

22        Your Honor, does he have the capability to

23  do the screen touching?

24        THE COURT:  Yes.

25

 1  BY MR. FRERES:

 2  Q.   Sir, I'm going to ask you, if you can, that

 3  screen you should be able to touch and circle

 4  things.  Can you circle where the Orchard Downs

 5  apartments are on this map?

 6  A.   This area right here is Orchard Downs.

 7  Q.   And then how about the One North apartment?

 8  A.   One North is right here.

 9  Q.   And so is the purple line there, the Teal line

10  that will take someone to campus?

11  A.   Yes.

12  Q.   And is the reddish-orange line, the 22 Limited,

13  that would take someone from campus to --

14  A.   Yes.

15          THE COURT:  Mr. Freres, I think at the point

16  you would like that screen shot and saved.

17          MR. FRERES:  Can we do that, Your Honor, and

18  make this 2C-1.

19          THE COURT: Is it done.

20          MR. FRERES:  Yes.

21          THE COURT:  Very good.

22          MR. FRERES:  I don't have any further

23  questions of this witness, Your Honor.  Thank you.

24          THE COURT:  Cross-examination.

25          MS.  BRAIN:  No, Your Honor.  Thank you.

1          THE COURT:  Okay.  You may step down, sir.

2          Okay.  I think this would be a good time to

3  break for lunch.  We have witnesses available after

4  lunch, correct?  Should we resume about 1:20.  It is

5  10 to 12:00 now.

6          MR. MILLER:  That will be fine, Your Honor.

7          THE COURT:  Resume about 1:20.  Please do

8  not discuss this matter with anybody including

9  yourselves.

10          I think that we have made it so that your

11  cell phones can be available to you over the noon

12  hour so that you can catch up with work, family, but

13  please do not use them as I instructed you to not do

14  your own research, investigate, watch anything about

15  this case or read anything about the case.  As well,

16  you are welcome to stay in the jury room.  There is

17  a vending downstairs.  You are welcome to leave the

18  building.  If you are in the building, I just

19  caution you that other people are in the building

20  and if they are discussing the case, please do your

21  best to maybe move away from that or not pay

22  attention to it.

23          If it's raining and for some reason you

24  don't have umbrellas, I don't think the vending area

25  downstairs has sandwiches available, if you didn't

1  bring your lunch, but we will see what we can do on

2  that going forward, but I can't help you today.

3       Okay.  So be in recess until 1:20 at this

4  point.  Thank you.

5       (Jury absent, 11:53 a.m.)

6       THE COURT:  Anything?  We will be in recess.

7       (A recess was taken, 11:54 a.m.)

8                    *****