2:17-cr-20037-JES-JEH   # 521   Page 1 of 91

E-FILED
JURY TRIAL -- June 19, 2019 (Afternoon, Part 2)   Wednesday, 28 April, 2020 03:06:59 PM
Clerk, U.S. District Court, ILCD

1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF ILLINOIS
2

3
UNITED STATES OF AMERICA,
4                                    Docket No. 17-20037
               Plaintiff,
5
     vs.                             Peoria, Illinois
6                                    June 19, 2019
                                     2:54 p.m.
7  BRENDT A. CHRISTENSEN,

8              Defendant.

9

10

11     JURY TRIAL -- June 19, 2019 (Afternoon, Part 2)

12

13

14
          BEFORE THE HONORABLE JAMES E. SHADID
15
            UNITED STATES DISTRICT JUDGE
16

17

18

19

20              NANCY MERSOT, CSR-RPR
                Official Court Reporter
21               U.S. District Court
                100 N.E. Monroe Street
22              Peoria, Illinois 61602
                   309-671-4244
23

24
Proceedings recorded by mechanical stenography;
25 transcript produced by computer.

```
 1
    For the Plaintiff:        EUGENE L. MILLER, ESQUIRE
 2                            BRYAN D. FRERES, ESQUIRE
                              Assistant United States Attorneys
 3                            201 South Vine Street
                              Urbana, Illinois 61802
 4                            217-373-5875

 5                            JAMES B. NELSON, ESQUIRE
                              U.S. DEPARTMENT OF JUSTICE
 6                            Capital Case Section
                              1331 F Street NW, Suite 625
 7                            Washington, DC 20004
                              202-598-2872
 8

 9  For the Defendant:        GEORGE F. TASEFF, ESQUIRE
                              Assistant Federal Public Defender
10                            401 Main Street, Suite 1500
                              Peoria, Illinois 61602
11                            309-671-7891

12                            ELISABETH R. POLLOCK, ESQUIRE
                              Assistant Federal Public Defender
13                            300 West Main Street
                              Urbana, Illinois 61801
14                            217-373-0666

15                            ROBERT L. TUCKER, ESQUIRE
                              Robert L. Tucker, Esq
16                            7114 Washington Avenue
                              St. Louis, Missouri 63130
17                            703-527-1622

18                            JULIE C. BRAIN, ESQUIRE
                              Attorney at law
19                            916 South 2nd Street
                              Philadelphia, Pennsylvania 19147
20                            267-639-0417

21

22

23

24

25
```

1                          I N D E X

2    GOVERNMENT'S WITNESSES                            page

3              TERRA BULLIS

4    Direct Examination                                72

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (In open court, 2:54 p.m.)

 2            THE COURT:  Good afternoon.

 3            We are back on the record outside the presence

 4  of the jury in the United States v. Brendt Christensen,

 5  17-20037.

 6            It appears to me that we will go through today

 7  with either the direct or some of the direct examination

 8  of Miss Bullis, then recess until tomorrow morning to

 9  either conclude the direct and then the cross.  That's

10  my understanding that you have Agent Catey yet, and

11  Agent Huckstadt; and then do you anticipate resting at

12  that point sometime tomorrow?

13            MR. MILLER:  Yes, Your Honor.

14            THE COURT:  And then the defense may or may

15  not have a case.  You thought that you had at least

16  a couple of witnesses, maybe a third now?

17            MS. POLLOCK:  We do, Your Honor.  And we

18  will need time to make an oral motion and argument

19  as well.

20            THE COURT:  Understood.  Will you have those

21  witnesses available tomorrow afternoon?

22            MS. POLLOCK:  They will be.

23            THE COURT:  Then depending on their length,

24  it seems to me that we will be using all of

25  tomorrow, and then it was my thought that maybe we

1  would recess the jury until Monday morning for

2  closing arguments, use Friday morning for conference

3  on instructions.  And then give you time to prepare

4  for your closings on Monday morning.

5          Fair enough?

6          MR. MILLER:  It will be fine, Your Honor.

7  We may, depending on the defense, have a rebuttal

8  witness.

9          THE COURT:  Understood.

10          MS. POLLOCK:  Yes, Your Honor.

11          THE COURT:  So I think that I will tell the

12  jury tentatively that that's what we are thinking

13  today, all right?

14          Are we ready for the jury?

15          Thank you.

16          (Jury present 2:56 p.m.)

17          THE COURT:  These four come in and they know

18  just be seated.  You guys stay standing each time.

19  Just come in and be seated.

20          All right.  Thank you.

21          Please be seated, everyone.  Thank you very

22  much.

23          We will wait for one more.  Good.

24          Okay.  Please be seated, everyone.  Thank

25  you.

1          Ladies and gentlemen, let me give you a

2     tentative schedule here.  Expect that we will use up

3     the rest of the day today.  May go past 5:00 for a

4     few minutes, but we will see as the witnesses get

5     underway.  Either way then we will return tomorrow,

6     and I'm pretty sure that we will use up pretty much

7     all of the day tomorrow.

8          But it is possible that all of the evidence

9     could be in by the end of day tomorrow.  If that's

10    the case, and plan, tentatively planning to recess

11    until Monday morning and do closing arguments on

12    Monday morning that way we will use Friday to do the

13    things that we need to do, so that there is no delay

14    in the closing arguments.

15         If we were to come back Friday morning, it

16    would be because there would be some additional

17    evidence or testimony, and then at the conclusion of

18    that, we would still recess then until Monday

19    morning for closing arguments.

20         So, I anticipate this portion of the case

21    will be in your hands at some point late Monday

22    morning.  Okay?  If that works for everybody's

23    schedule, if that causes an issue when we take a

24    break here, I would like you to bring it to my

25    attention and we will address it.

1         Okay.  With that in mind, Mr. Nelson, your

2    next witness.

3         MR. NELSON:  Thank you, Your Honor.

4         The United States calls Terra Bullis.

5         THE COURT:  Miss Bullis, will you come

6    forward please and as you approach will you stand

7    and stop and raise your right hand please.

8         (Witness sworn.)

9         THE COURT:  Please come forward.  We will

10   help you get situated here.

11        As soon as she is situated, Mr. Nelson, the

12   witness is yours.

13        MR. NELSON:  Thank you, Your Honor.

14        THE COURT:  If you need water let me know, I

15   will get you some right here.

16        Go ahead, Mr. Nelson.

17        MR. NELSON:  Thank you.

18             TERRA BULLIS,

19   after having been duly sworn, testified as follows:

20             DIRECT EXAMINATION

21   BY MR. NELSON:

22   Q.   Good afternoon, ma'am.

23   A.   Good afternoon.

24   Q.   Will you please state and spell your name for

25   the record?

 1  A.   My name is Terra Bullis.  It's spelled
 2  T-e-r-r-a.  Last name is B-u-l-l-i-s.
 3  Q.   Where do you live?
 4  A.   Champaign.
 5  Q.   Did you grow up in Champaign?
 6  A.   No.
 7  Q.   Where did you grow up?
 8  A.   Various areas on the west coast and the midwest.
 9  Q.   Okay.  How far did you get in school?
10  A.   A bachelor's degree.
11  Q.   Where did you study?
12  A.   I studied environmental studies, agri-ecology.
13  Q.   I'm sorry to interrupt you.
14       What school did you attend?
15  A.   Goshen College.
16  Q.   Where is that?
17  A.   That's in Goshen, Indiana.
18  Q.   I would like to go back in time, if that's all
19  right, to the spring of 2017.
20       Where were you living then?
21  A.   I was living in Champaign.
22  Q.   Did you live alone?
23  A.   No.
24  Q.   Who did you live with?
25  A.   I had roommates.

```
 1  Q.   Would it be fair to say that this was a
 2  non-traditional arrangement?
 3  A.   Yes.
 4  Q.   What was the arrangement?
 5  A.   The arrangement was that the individuals in the
 6  household were all in various forms of
 7  relationships.
 8  Q.   Okay.  And was this something that everyone in
 9  your household consented to?
10  A.   Yes.
11  Q.   Are you familiar with the term polyamory?
12  A.   Yes.
13  Q.   What does that term mean?
14  A.   It means loving more than one more person.
15  Q.   Were you and your housemates polyamories?
16  A.   We were.
17  Q.   Did that include relationships outside of your
18  household?
19  A.   Yes.
20  Q.   Are you familiar with the term "BDSM"?
21  A.   Yes.
22  Q.   What does that mean?
23  A.   Bondage, domination, sadism, and masochism.
24  Q.   Do you participate in BDSM?
25  A.   I do.
```

 1  Q.   For how long have you done so?

 2  A.   About three years or so.

 3  Q.   Now, in your experience, ma'am, is BDSM

 4  something that only takes place in the bedroom?

 5  A.   No.

 6  Q.   Did you and your housemates practice BDSM?

 7  A.   We did.

 8  Q.   Can you explain that for us?

 9  A.   I was in a consensual power exchange with one of

10  the people that I lived with.

11  Q.   Okay.  What is a "power exchange"?

12  A.   A "power exchange" is when there is someone who

13  is in a dominant position, and someone is in a

14  submissive position, and that can vary.

15  Q.   Within you household which one were you?

16  A.   I was in a submissive position.

17  Q.   Now, other than dominants and submissives, are

18  there other roles within BDSM?

19  A.   Yes.

20  Q.   What are those?

21  A.   There are varying forms of dominance and

22  submission.  Some people do it 24/7.  Some people

23  only do it in small segments of time called scenes.

24  Q.   Okay.  And are you familiar with something

25  called a "switch"?

 1  A.   Yes.

 2  Q.   What is that?

 3  A.   That's someone who is capable and or desiring of

 4  being in either a dominant, submissive or both

 5  roles.

 6  Q.   And would that depend on the situation?

 7  A.   Yes.

 8  Q.   How do you identify?

 9  A.   I identify as a switch.

10  Q.   At some point in time did you begin a

11  relationship with someone named Brendt Christensen?

12  A.   I did.

13  Q.   When was that?

14  A.   That was in April of 2017.

15  Q.   Do you recognize the person that you know to be

16  Brendt Christensen here in the courtroom today?

17  A.   I do.

18  Q.   Please point him out to us by where he is

19  sitting and what he is wearing.

20  A.   He is to your right, wearing a blue collared

21  shirt.

22        MR. NELSON:  Your Honor, I'd ask the record

23  to reflect the identification of the defendant.

24        THE COURT:  It will.

25

 1  BY MR. NELSON:

 2  Q.   How did you first meet the defendant?

 3  A.   I met him on a dating website.

 4  Q.   Which one?

 5  A.   OkCupid.

 6  Q.   Does OkCupid have a chat feature?

 7  A.   It does.

 8  Q.   And did you use that feature to communicate with

 9  the defendant?

10  A.   Yes.

11  Q.   At some point did you go on a date with the

12  defendant?

13  A.   I did.

14  Q.   When was that in time?

15  A.   That was in April of 2017.

16  Q.   Now within your household, was there a protocol

17  that you had with regard to dating?

18  A.   I was able to date whomever I wanted, I just

19  needed to make sure that anybody I was currently

20  dating was aware of where I was and that I was on a

21  date and what would happen.

22  Q.   Now where did you go on your first date with the

23  defendant?

24  A.   We went to a cafe, and then we went to a book

25  shop.

1  Q.   What did you talk about?

2  A.   We talked about a variety of subjects.

3  Q.   Okay.  Did you talk about polyamory?

4  A.   We did.

5  Q.   What did the defendant say about that?

6  A.   He said that his wife and himself were in an

7  open relationship.

8  Q.   And did you explain your relationship to the

9  defendant as well?

10  A.   I did.

11  Q.   During that first conversation, did the

12  defendant express any reservations or reluctance

13  with regard to BDSM?

14  A.   No.

15  Q.   What did he express?

16  A.   He expressed interest.

17  Q.   At some point did you begin a sexual

18  relationship with the defendant?

19  A.   I did.

20  Q.   When was that?

21  A.   A few weeks into our relationship, maybe less.

22  Q.   Okay.  And did you and the defendant participate

23  in a BDSM power exchange?

24  A.   Yes.

25  Q.   Okay.  What was that?

```
 1  A.   He was dominant and I was submissive.
 2  Q.   Without saying what was said, prior to beginning
 3  a sexual relationship with the defendant, did you
 4  speak with his wife?
 5  A.   Yes.
 6  Q.   Why did you do that?
 7  A.   That's part of my protocol of ethics for
 8  polyamory is that any partner of anyone that I'm
 9  perspectively looking at dating needs to be fully
10  consenting of my involvement with that individual,
11  and I do need to communicate with them.
12  Q.   Did you talk to the defendant about that?
13  A.   Yes.
14  Q.   How did he react to that?
15  A.   He thought it might be a bit odd.
16  Q.   As part of your relationship with the defendant
17  was it allowed, so to speak, for either of you to
18  have sex with other people?
19  A.   Yes.
20  Q.   And you mentioned a power exchange.  Did you and
21  the defendant participate in BDSM together
22  throughout your relationship?
23  A.   We did a little bit after we got together.
24  And --
25  Q.   Okay.  And how did that dominant/submissive
```

1  relationship play out in the relationship.

2  A.   There were two different sides.  I did do

3  domestic service for him, which would be cleaning

4  and things like that, and then also we practiced

5  BDSM in the bedroom some.

6  Q.   Okay.  Now, when you were participating in the

7  household cleaning, was there any article of

8  clothing that you were expected to wear?

9  A.   I had a collar.

10 Q.   And was there any particular room in the house

11 that you cleaned in particular?

12 A.   The kitchen and the bathrooms.

13 Q.   Okay.  Why?

14 A.   Those were areas he indicated that he would

15 prefer me clean when I asked.

16 Q.   Did he say anything about whether he liked to

17 clean the bathroom?

18 A.   He said that he did not like to clean bathrooms.

19 Q.   As your dominant, did the defendant have control

20 over you?

21 A.   I did give him control over other aspects of my

22 life.

23 Q.   Was that both inside and outside of the bedroom?

24 A.   Yes.

25 Q.   Okay.  Now you mentioned that you did

1  participate in some BDSM in the bedroom.  And I
2  don't want to ask too many graphic particulars, but
3  generally speaking what was that all about?
4  A.   There were some times where he would direct me
5  as to what I was to do.  And there were other times
6  that we did experiment with impact play.
7  Q.   Now, I would like to show you briefly, it will
8  appear on your screen.  This is a picture that is
9  already in evidence it is Exhibit 36E.
10        Is that photograph representative of your
11  sex life with the defendant?
12  A.   No.
13  Q.   Now, as part of your BDSM, did you have a safe
14  word?
15  A.   Yes.
16  Q.   And how did your safe word system work?
17  A.   I used the stoplight system.
18  Q.   Could you explain that for the jury?
19  A.   At any point in time the dominant can ask what
20  the submissive's color is.  Saying "green" would
21  imply that everybody is fine, and everybody can
22  continue as is.  Saying "yellow" would mean that
23  whatever activity was occurring was nearing the edge
24  of limits.  And saying "red" would mean stop at all
25  costs, no matter what.

1  Q.   Now, you mentioned that the dominant could ask.
2  Could the submissive also say without being asked?
3  A.   Yes.
4  Q.   And did you ever say "red light" to the
5  defendant?
6  A.   Yes.
7  Q.   Can you describe that situation?
8  A.   There was an instance where I had a flogger and
9  he had used it on me.
10  Q.   I'm going to pause you a minute.  Can you just
11  tell us what a flogger is for those who might not
12  know?
13  A.   A flogger is an implement that is either leather
14  or some other material, string like, and it is
15  attached to either a handle or some sort of
16  centralized hub to hold it from.
17  Q.   Thank you.  I'm sorry to interrupt you.
18       You were experimenting with the flogger.
19       Will you please continue?
20  A.   There was a point at which the strikes were
21  hurting in a way that I was no longer comfortable
22  with, so I used the term "red."
23  Q.   How did the defendant react when you said "red
24  light"?
25  A.   He stopped flogging.

1  Q.   And did you react in any other way?

2  A.   We didn't really continue playing very much at

3  that point.

4  Q.   What do you mean you didn't continue playing

5  very much, what does that mean?

6  A.   Interactions seemed to slow down.

7  Q.   Okay.  Are we talking sexual interactions?

8  A.   Yes.

9  Q.   Did you get a feeling from your perspective

10  about how the defendant felt that you red-lighted?

11        MR. TUCKER:  Object to that, Your Honor.

12  Object to the feeling she got, how the defendant

13  felt.

14        MR. NELSON:  I'm asking about her

15  observation, Your Honor.

16        THE COURT:  As to her observation.

17        Overruled.

18  BY THE WITNESS:

19  A.   My observation was that he seemed a bit

20  dissatisfied.

21  BY MR. NELSON:

22  Q.   In you?

23  A.   May I clarify what are you asking?

24  Q.   Was he dissatisfied in you is that what --

25  A.   With the circumstances.

1  Q.  During your time with the defendant, did he
2  spend the night at your house?
3  A.  No.
4  Q.  Why not?
5  A.  My bed was not big enough, and I have sleeping
6  problems.
7  Q.  Did the defendant get along with your
8  housemates?
9  A.  Yes.
10  Q.  During your relationship with the defendant, did
11  you spend the night at his apartment?
12  A.  Yes.
13  Q.  Okay.  How much time do you think you spent at
14  his apartment?
15  A.  Each week a number of days, maybe two or three.
16  Q.  Okay.  Now, were you ever there at the same time
17  as his wife, Michelle?
18  A.  Yes.
19  Q.  Was there any hostility between you and
20  Michelle?
21  A.  No.
22  Q.  How was your physical health during this time?
23  A.  Not very good.
24  Q.  Why not?
25  A.  I was not eating.  I was on a crash diet, and I

1  was not feeling physically well.

2  Q.   Okay.  How was your mental health during this

3  time?

4  A.   Also not very good.

5  Q.   Were you taking medications?

6  A.   I was.

7  Q.   What kind of medications were you taking?

8  A.   Anti-anxiety and anti-depressant and sleep aids.

9  Q.   Did you also suffer from some PTSD symptoms?

10  A.   Yes.

11  Q.   What was the cause of that?

12  A.   I've had different instances of trauma

13  throughout my life.

14  Q.   Were you a victim?

15  A.   Yes.

16  Q.   Did you and the defendant ever talk about this?

17  A.   Yes.

18  Q.   Was he aware?

19  A.   Yes.

20  Q.   Did you ever observe the defendant using or even

21  abusing alcohol while you were in a relationship

22  with him?

23  A.   Yes.

24  Q.   And did the defendant ever tell you that he

25  wanted to quit drinking?

1  A.   No.
2  Q.   Did he ever talk to you about quitting drinking
3  under any circumstances?
4  A.   He said that he had told his wife that he would
5  contact a center or go for treatment.
6  Q.   Did you ever tell the defendant that he didn't
7  need to quit drinking?
8  A.   No.
9  Q.   Did you ever discourage the defendant from going
10 to rehab to quit drinking?
11 A.   No.
12 Q.   Did you ever in fact encourage him to quit
13 drinking?
14 A.   Yes.
15 Q.   Was there ever a time that you observed the
16 defendant drink so much that he became incoherent?
17 A.   Yes.
18 Q.   How many times?
19 A.   One time.
20 Q.   Could you describe that for the jury what you
21 observed?
22 A.   I was over at his apartment and we had been
23 drinking rum, shot for shot.
24 Q.   Okay.  And you drank enough that you observed
25 him -- he appeared incoherent to you?

 1  A.   Yes.

 2  Q.   And during that time, was he able to walk?

 3  A.   It seemed that he was swerving a bit when he

 4  walked.

 5  Q.   Was he able to talk clearly?

 6  A.   It was a bit slow.  It took him a moment to

 7  respond.

 8  Q.   Did you observe him to lose his train of

 9  thought?

10  A.   I didn't see him very long after that point.

11  Q.   Okay.  Did something happen that night?

12  A.   We were in the bedroom after we had been

13  drinking and we were in the bed and I heard the door

14  unlock and I knew it was his wife; and as part of my

15  protocols, I was saying we should greet her and get

16  up and he did not, so I did.

17  Q.   And after that conversation, did you stay at the

18  apartment?

19  A.   No.  I said that I would go home and --

20  Q.   I'm sorry, please continue.

21  A.   His wife drove me home.

22  Q.   Did that experience change the way that you

23  responded to the defendant's drinking?

24  A.   Yes.

25  Q.   In what way?

1  A.   I heard her say that he was supposed to have two

2  shots.

3  Q.   Okay.  Was that his limit, so to speak?

4  A.   As far as what she said, yes.

5  Q.   And did you enforce that when he was with you as

6  well?

7  A.   I did not know about it.

8  Q.   I'm sorry, after that point.

9  A.   After that point, when he would say he would

10 want to be drinking, I said, on at least one

11 occasion that if he was to choose to drink, then he

12 was in fact choosing not to spend time with me and

13 that was his choice.

14 Q.   Did you ever experience the defendant to become

15 angry when he drank?

16 A.   No.

17 Q.   Did you ever experience the defendant to become

18 violent when he drank?

19 A.   No.

20 Q.   Did his mood change when he drank?

21 A.   Yes.

22 Q.   How so?

23 A.   He was more talkative.

24 Q.   More talkative?

25 A.   Yes.

 1  Q.   Okay.  Now, are you familiar with the website
 2  FetLife.com?
 3  A.   I am.
 4  Q.   What is that?
 5  A.   It is a social networking website for people who
 6  are into kink and BDSM.
 7  Q.   Okay.  And have you ever had a FetLife account?
 8  A.   I have.
 9  Q.   Did the defendant have a FetLife account?
10  A.   Yes.
11  Q.   Have you ever gone online to look at his
12  account?
13  A.   Yes.
14       MR. NELSON:  Could we please publish
15  Exhibit 35, which is already in evidence?
16  BY MR. NELSON:
17  Q.   Do you recognize this to be the defendant's
18  FetLife account?
19  A.   Yes.
20       MR. NELSON:  Could we go to the second page
21  of this exhibit, please?
22  BY MR. NELSON:
23  Q.   What is the defendant's user name?
24  A.   Akuma689.
25  Q.   Do you know what "Akuma" means?

```
 1  A.   Yes.
 2  Q.   What is it?
 3  A.   It is the Japanese --
 4       MR. TUCKER:  Objection without a foundation
 5  as to how she knows it.
 6       MR. NELSON:  She said that she knows it.  I
 7  asked her if she knows it, she said yes.
 8       MR. TUCKER:  That doesn't mean that there is
 9  a foundation for how she knows it.  It could be flat
10  out hearsay from someone else.
11       THE COURT:  Ask her how she knows it.
12  BY MR. NELSON:
13  Q.   How do you know?
14  A.   I enjoy Japanese pop culture.
15  Q.   Did you come to this knowledge on your own?
16  A.   Yes.
17  Q.   What does Akuma mean?
18  A.   It is Japanese term used for a fire spirit that
19  is considered a demon or in Christianity, Japanese
20  Christianity, it would be the term used for Satan.
21       MR. NELSON: Could we use the next page of
22  this exhibit please?
23  BY MR. NELSON:
24  Q.   Now at the top of this screen, there is a
25  mention to the defendant being in a relationship
```

1  with someone referred to as Kanna_Kanina.
2          Do you know who that is?
3  A.   Yes.
4  Q.   Who is that?
5  A.   That's myself.
6  Q.   Okay.  On this page, there is also a reference
7  to something called the "BDSM test."
8          Do you know what a "BDSM test" is?
9  A.   Yes.
10 Q.   Okay.  Did you come by that knowledge on your
11 own?
12 A.   Yes.
13 Q.   What is a BDSM test?
14 A.   It is an online test that you can take that
15 provides information as to what type of labels might
16 apply to your interests.
17 Q.   Okay.  And are you familiar with those labels?
18 A.   Yes.
19 Q.   Is that from your personal experience in the
20 BDSM community?
21 A.   Yes.
22 Q.   Okay.  How much time have you spent in the BDSM
23 community?
24 A.   A few years.  As of present, it would probably
25 be more like four.

1  Q.   Okay.  Now, just to clarify, does FetLife

2  operate, if you know, in the confines of consensual

3  relationships?

4  A.   Always.

5  Q.   If you know, are consensual BDSM relationships

6  always sexual relationships?

7  A.   No.

8  Q.   Is consent important within the community?

9  A.   Yes.

10  Q.   From your perspective, why is that?

11  A.   Without consent some of the activities that take

12  place in that community would be considered damaging

13  and/or criminal.

14  Q.   Now, there is some terms listed here as results

15  from the BDSM test.  Are these terms that you're

16  familiar with?

17  A.   Yes.

18  Q.   This first one it says "98 percent dominant."

19  What is a "dominant"?

20  A.   A dominant is someone who likes to hold the

21  power.

22  Q.   And then there is the next one down is

23  "91 percent brat tamer."  What is a "brat tamer"?

24  A.   A brat tamer is someone who prefers to play with

25  individuals who tend to fight back and are bratty.

1  Q.   The next one says "91 percent sadist."  What is
2  a "sadist"?
3  A.   A sadist is someone who likes to give pain.
4  Q.   Down here it says "90 percent experimentalist."
5  What is an "experimentalist"?
6  A.   It is someone who is open to exploring different
7  things.
8  Q.   And then down a ways it says "89 percent
9  primal." And then in parenthesis it says "hunter."
10  What is a "primal hunter"?
11  A.   The term primal would refer to very instinctual
12  actions that are not based within the confines of
13  what people may or may not find socially
14  appropriate.  It may also be a little bit
15  animalistic.  It can either be hunter or prey.
16  Q.   And the defendant was a hunter?
17  A.   Yes.
18  Q.   And then down a ways it says "80 percent
19  degrader."  What is a "degrader"?
20  A.   Someone who enjoys giving degradation or
21  treating someone in a degraded way.
22        MR. NELSON:  Can we take this down please,
23  Miss Klayer?
24        Thank you.
25

1  BY MR. NELSON:

2  Q.   Are these results on the defendant's FetLife

3  page from the BDSM test, are these consistent with

4  your experience in a relationship with him?

5  A.   Yes.

6  Q.   How so?

7  A.   In my relationship with him, I was very

8  submissive, and I was almost pet like.

9  Q.   And in fact did he refer to you as a pet name?

10  A.   Yes.

11  Q.   What was your pet name?

12  A.   Kitten.

13  Q.   Did he refer to you by any other name?

14  A.   Yes.

15  Q.   What was that?

16  A.   Bunny.

17  Q.   Do you know from personal experience if the

18  defendant ever tried to set up a sexual encounter

19  through FetLife?

20  A.   Yes.

21  Q.   How did you learn that?

22  A.   Yes.  He told me about that.

23  Q.   What did he tell you?

24  A.   Said that there was somebody on the website that

25  he was talking to about an abduction fantasy.

 1  Q.   Did the defendant ever talk to you about the
 2  book "American Psycho"?
 3  A.   He did.
 4  Q.   Did he ever order you as your dominant to read
 5  it?
 6  A.   After I watched the movie.
 7  Q.   Did the defendant ever tell you his opinions on
 8  the main character of that book?
 9  A.   He did; that he was an attractive man and that
10  he was very intelligent.
11  Q.   Did the defendant ever have conversations with
12  you about testing his limits?
13  A.   Yes.
14  Q.   Could you describe those conversations for the
15  jury please?
16  A.   He expressed a desire that he wanted to know how
17  far he could push boundaries and still get away with
18  it.
19  Q.   How did you react when he told you that?
20  A.   Curiosity.
21  Q.   How did he respond to your curiosity?
22  A.   He spoke more.
23       MR. NELSON:  Now I would like to bring up,
24  please, Exhibit 34, Miss Klayer, and specifically
25  page three.  This is already in evidence.

1          And if we could please magnify the SMS text
2  exchanges starting on April 28th and going down to
3  the bottom of the page.
4  BY MR. NELSON:
5  Q.   And, specifically, I will touch the screen just
6  for your reference.
7          This first one here which is 4/28/2017, and
8  for the record it says 19:52:07.
9          SMS to Bunny: *Bought bed restraints,*
10 *blindfold, gag.*
11         Do you remember that text exchange?
12 A.   Yes.
13 Q.   How did you respond to that text exchange?
14 A.   I said that I had not used that type of
15 restraint or a gag.
16 Q.   And in fact it says that you will be the first
17 actually to use restraints or gag on me if you
18 choose to do so?
19 A.   Yes.
20 Q.   Okay.  If could you just read his response
21 there?
22 A.   *You'll need to prove that you are worth them.*
23 Q.   From your experience in the BDSM community, did
24 you understand what the defendant meant by "bed
25 restraints"?

1  A.   Yes.

2  Q.   What are those?

3  A.   They would be some type of apparatus that would

4  go around or through or under a mattress that would

5  attach to restraints on your body.

6  Q.   Did the defendant ever use bed restraints with

7  you?

8  A.   He used cuffs.

9  Q.   Okay.  What are those?

10 A.   It would be like handcuffs but made out of

11 leather, at least these ones.

12 Q.   But not the ones that went under the mattress?

13 A.   Not that I remember.

14 Q.   Did you understand what the defendant meant by a

15 "blindfold"?

16 A.   Yes.

17 Q.   Would that differ in any way from what everyone

18 thinks of when they think of a blindfold?

19 A.   Not really.

20 Q.   Did the defendant ever use a blindfold with you?

21 A.   Yes.

22 Q.   Did you understand what the defendant meant by

23 "gag"?

24 A.   Yes.

25 Q.   What did you understand that to mean?

1  A.   It would be an apparatus that would go around

2  your face kind of on the lower cheeks around your

3  head and in the mouth.  There would be some sort of

4  ball usually.

5  Q.   Did you say "ball"?

6  A.   Some sort of ball, spherical shape.

7  Q.   Did the defendant ever use that type of gag with

8  you?

9  A.   No.

10         MR. NELSON:  Miss Klayer, if we could

11  specifically magnify the text from May 24 to the

12  bottom of the page.

13  BY MR. NELSON:

14  Q.   This first text appears to be incomplete.  Could

15  you read that to the jury and then please finish the

16  thought, if you remember that text message.

17  A.   I said:  *I love you, but I can't support your*

18  *intentional choice to set aside the day for*

19  *drinking.  You've created a scenario in which my*

20  *option to be close to* -- and then it cuts off.

21  Q.   Okay.  Do you remember sending that text

22  message?

23  A.   Yes.

24  Q.   Okay.  I'm not going to ask you to remember

25  verbatim what you said, but what information were

 1  you trying to convey to the defendant?

 2  A.   I was trying to convey that I didn't support his

 3  choice or desire to set aside a day for drinking

 4  with me, and that it would take away my option to be

 5  close with him at the present time.

 6  Q.   Okay.  And could you read his response which

 7  came about 15 minutes after your text message.

 8  A.   *Describe the most horrific account you can think*

 9  *of to me.*

10  Q.   I'm sorry.

11  A.   Excuse me.

12  Q.   The next one down.

13  A.   I apologize.

14  Q.   In time about 15 minutes.  The one that says

15  11:09:42.

16          Could you read that please?

17  A.   *I want company.  I want to spend time with*

18  *someone and drink with them.*

19  Q.   Did he send another message right after that?

20  A.   Yes.

21  Q.   What was that?

22  A.   *I'm content with never finding that so I drink*

23  *alone.*

24  Q.   What was his next text message to you?

25  A.   *I want company because then instead of becoming*

1  *a sociopath, I'm in a good mood and have a good --*
2  *I'm in a good mood and have good times with someone.*
3  Q.   And then his next text message is the one that
4  you started to read a second ago.  What does that
5  say, please?
6  A.   *Describe the most horrific act you can think of*
7  *to me.*
8  Q.   How did you respond?
9  A.   *But to me any form of actual torture especially*
10  *involving but not limited to gang rape produce the*
11  *most unpleasant emotions.*
12  Q.   I'm going to stop you here.
13        Is this type of communication with the
14  defendant, was that unusual in your relationship?
15  A.   Can you please specify what type?
16  Q.   These communications on topics such as this.
17  Did you regularly communicate about things like that
18  with the defendant?
19  A.   Not this specific topic.
20  Q.   Okay.  But would it be fair to say that you were
21  comfortable speaking with the defendant and he was
22  comfortable with speaking with you about topics that
23  were darker in nature?
24  A.   Yes.
25  Q.   And up here at May 25th on 11:56.  It's the top

1  one here now that Miss Klayer has magnified it for

2  us.

3         What did the defendant say to you?

4  A.   *Thanks.  Emotional pain is typically worse than*

5  *physical pain so....*

6  Q.   Is the next one also from him?

7  A.   Yes.

8  Q.   What does it say?

9  A.   *Tomorrow we are going to explore certain things*

10  *that interest me, not physical.  I want you to learn*

11  *about some things that interest me.*

12  Q.   What is his next message to you?

13  A.   *Sometimes I like to do things I know are shitty.*

14  Q.   What is his next message to you?

15  A.   *I'm drinking and driving.  Not like literally*

16  *drunk but driving while drinking.  There is a cop*

17  *looking at me.  He won't come over here.*

18  Q.   What is his next message to you?

19  A.   *I feel horrible.  I hear sirens.  And part of me*

20  *wants them to be for me.*

21  Q.   And I want to correct what you said.  Does it

22  say *I like feeling horrible*?

23  A.   *I like feeling horrible.*

24  Q.   Okay.  And then it says *I hear sirens and part*

25  *of me wants them to be for me*?

1  A.   Correct.

2  Q.   What were you thinking when you received this

3  text messages?

4  A.   I was a bit confused.

5  Q.   What was his next text message?

6  A.   *I would never do anything so dumb to go to jail,*

7  *that would be very interesting.*

8  Q.   What was his next text message?

9  A.   *I did some things people would get fired for.*

10  Q.   And again these text messages are all on May 25,

11  2017?

12  A.   Yes.

13  Q.   Okay.  What was his next text message?

14  A.   *I have done this my entire life.  Rules don't*

15  *apply to me.  I'm being somewhat serious.  I do*

16  *stupid shit all the time.*

17  Q.   What is his next text message to you?

18  A.   *I know I'm horrible.  I don't hide it.  People*

19  *are almost attracted to it.  IRL.  It's like they*

20  *want to do what I do but won't.*

21  Q.   Do you know what the defendant meant by "IRL"?

22  A.   "In real life."

23  Q.   What is his next text message to you?

24  A.   *I don't deserve anything.  No one does.  That's*

25  *why I take what I want.*

 1   Q.   What's his next text message to you?
 2   A.   *Fading into nothingness is the default for most*
 3   *people.  If you want to know what terrifies me, it's*
 4   *that.*
 5   Q.   What is his next text message to you?
 6   A.   *I will not fade away.*
 7   Q.   And his next one?
 8   A.   *I refuse.  I don't care how I will be*
 9   *remembered, just that I am.*
10   Q.   And what was his next text message to you?
11   A.   *God, bad, revered infamous, I don't care.*
12   Q.   All of these text messages came in within a few
13   hours of each other on the same day?
14   A.   Yes.
15   Q.   And how did you feel when you received all of
16   these text messages?
17   A.   Conflicted.
18   Q.   Conflicted how?
19   A.   This was a man that I had allowed myself to get
20   very attached to emotionally and --
21   Q.   Go ahead.  Please continue.
22   A.   Those text messages are not necessarily
23   representative of someone who I would prefer to be
24   emotionally connected to, hence, the conflict.
25        MR. NELSON:  Can we go to the next page?

1        And can we magnify the top line down to the

2   text of May 30?

3            THE COURT:  There is water here, ma'am.

4            THE WITNESS:  Thank you.

5   BY MR. NELSON:

6   Q.   Is the next text message on this string also one

7   from him to you?

8   A.   Yes.

9   Q.   What does he say here?

10  A.   *Think back over the past 2000 years.  Who do you*

11  *know?  The people who push the limits and those who*

12  *supported them.*

13  Q.   What was his next text message to you?

14  A.   *Fading into nothingness is not an option.*

15  Q.   And his next text message?

16  A.   *I would rather destroy humanity than to let that*

17  *happen.  I know most would disagree.*

18  Q.   And his next text message?

19  A.   *I saw fear in everyone's eyes today.*

20  Q.   And just for the record, we've now moved from

21  May 25 to May 30; is that correct?

22  A.   Yes.

23  Q.   Okay.  What was his next text message to you?

24  A.   *Everyone who looked at me.*

25  Q.   And his next message?

1  A.  *Sometimes I don't understand that.*

2  Q.  And his next message?

3  A.  *Part of me wants and loathes it.  I know I look*
4  *frightening.*

5  Q.  And his next message?

6  A.  *Why does everyone feel so uncomfortable around*
7  *me?*

8  Q.  And his next one?

9  A.  *I see fear so often.  Those who I let in, fear*
10  *parts of me; they get uncomfortable.*

11  Q.  His next one?

12  A.  *I don't want fear.*

13  Q.  And his next one?

14  A.  *I've made it clear that I'm a junkie and an*
15  *alcoholic.*

16  Q.  Okay.  And now, finally, we get to a point where
17  you responded?

18  A.  Yes.

19  Q.  What did you respond?

20  A.  *I'm well aware.*

21  Q.  And how did he respond?

22  A.  *Do you know why I'm drinking tonight?*

23  Q.  What was his next message?

24  A.  *Because I'm afraid of giving up my lifestyle*
25  *with everything.*

1  Q.   His next message?

2  A.   *I've lived a certain way for the past eight*

3  *years.*

4  Q.   Okay.  Now, do you remember what the defendant's

5  birthday is?

6  A.   June 30th.

7  Q.   June 30th?

8  A.   Okay.

9  Q.   He was born in 1989?

10  A.   I believe so.

11  Q.   So on May 30th of 2017, he would be 27 years

12  old?

13  A.   Yes.

14  Q.   Okay.  And so for the past eight years when

15  would the "lived a certain way" would have begun?

16  A.   About 19.

17  Q.   And what was his next message to you?

18        We are on the one that starts "And now."

19  A.   *And now I need to get an 8 to 5 job or nothing.*

20  Q.   What was his next message?

21  A.   *I drank today because I think it's one of the*

22  *last times I will get to like this.*

23  Q.   And his next message?

24  A.   *I want to self-destruct right now.  It is*

25  *important to me.  Why will no one let me without*

 1  *abandoning me.*

 2  Q.   And his next message?

 3  A.   *I'm giving up my way of life for everyone.*

 4  Q.   And his next message?

 5  A.   *I don't even know if I can handle it.*

 6  Q.   And his final message on this string?

 7  A.   *I don't want this.*

 8  Q.   Were these text messages difficult for you to

 9  receive?

10  A.   Yes.

11  Q.   Do you know from your relationship with the

12  defendant whether he talked to you about things that

13  he didn't talk to his wife about?

14  A.   He did.

15  Q.   Were any of these text messages that we just

16  read through were they part of a BDSM role play

17  between you and the defendant?

18  A.   No.

19        MR. NELSON:  Could we bring this down,

20  please?

21  BY MR. NELSON:

22  Q.   Did the defendant ever make statements to you

23  about serial killers.

24  A.   Yes.

25  Q.   On how many occasions?

 1  A.   Multiple.
 2  Q.   Were those statements made over text message or
 3  in person?
 4  A.   Both.  But at first, at first verbally.
 5  Q.   Okay.  Where did that conversation take place?
 6  A.   In my bedroom.
 7  Q.   Could you explain that conversation for the
 8  jury, please?
 9  A.   He was sitting.  I was sitting.  And he started
10  talking about different people in history that are
11  remembered or that have made their mark, so to
12  speak.
13  Q.   Did he mention anyone in particular?
14  A.   Ted Bundy and Hitler.
15  Q.   Did you talk about them in specifics?
16  A.   Yes.
17  Q.   Do you happen to know personally whether he told
18  anyone else other than yourself about this?
19  A.   I don't know.
20  Q.   Was he joking when he told you these things?
21  A.   Not that I know of.
22  Q.   Did he appear to be joking?
23  A.   No.
24  Q.   Have you known him to joke at other times in
25  your relationship?

1            Meaning did you have knowledge to be able to
2  tell the difference?
3  A.   Yes.
4  Q.   Did the defendant ever tell you that he thought
5  that he could kill someone and get away with it?
6  A.   Yes.
7  Q.   Could you describe those conversations to the
8  jury?
9  A.   It was a hypothetical conversation, but he
10 described that it could be easy.
11 Q.   What did he say about it?
12            Tell me everything that you remember about
13 it, please.
14 A.   That it can be done without people knowing.
15 Q.   What was his demeanor when he was saying these
16 things to you?
17 A.   Conversational, maybe a little bit excited.
18 Q.   Did he seem like he was joking?
19 A.   No.
20 Q.   Did the defendant ever talk to you about a woman
21 that he observed in a shoe store?
22 A.   Yes.
23 Q.   What did he tell you about that?
24 A.   He said that he was with someone buying shoes
25 and while he was in line and she gave her

1  information over to the sales person, he memorized
2  her address and he went to that address later on.
3  Q.   Did he say what he did at that address?
4  A.   He just went to the address but then he left.
5  He didn't say he did anything.
6  Q.   Okay.  Do you remember when that conversation
7  occurred?
8  A.   Probably sometime in late May.
9  Q.   And this was 2017?
10 A.   Yes.
11 Q.   When he said that did he seem like he was joking
12 to you?
13 A.   No.
14 Q.   Was this part of a BDSM role play that you were
15 engaged in?
16 A.   No.
17 Q.   Why do you think the defendant told you these
18 things?
19      MR. TUCKER:  Objection to -- objection to
20 why she thinks it.
21      THE COURT:  Mr. Nelson, what is -- why does
22 she think, how is that admissible?
23      MR. NELSON:  She is testifying to her
24 observations and her beliefs.  She is entitled to
25 that, Your Honor.  She is not putting thoughts in

1 the defendant's mind.

2          THE COURT:  As to her observations and her

3 own thoughts, I will allow it.  Go ahead.

4 BY THE WITNESS:

5 A.   Can you please repeat the question?

6 BY MR. NELSON:

7 Q.   Sure.

8          Inside your own head, I'm not asking you to

9 think what other people might have been thinking.

10 Inside your own head, why did you think the

11 defendant told you these things?

12 A.   Because I listened.

13 Q.   Based on your observations, how would you

14 describe the defendant's personality from your

15 interactions with him?

16 A.   It depends on what time frame in our

17 relationship you are talking about.

18 Q.   Could you expand on that?

19 A.   When I met him our first date was whimsical.  It

20 was a pretty normal date, and I know the term

21 "normal" is subjective.  But we chatted, and then

22 walking around the book shop, it was very

23 flirtatious.  He seemed kind, courteous, amicable.

24 I enjoyed spending time with him and it was like

25 that for a while.

1  Q.   At some point did it change?

2  A.   Yes.

3  Q.   How did it change?

4  A.   Around the time the conversations about drinking

5  started happening.  It wasn't an immediate thing,

6  but I think gradually.  My desire to be with him

7  didn't stop because I had gotten attached, but

8  things weren't quite as lighthearted as they started

9  out.

10 Q.   I would like to take you back to June of 2017.

11       Were you living in Champaign then?

12 A.   Yes.

13 Q.   Do you remember if you saw the defendant in

14 person on June 9th, 2017, the day Yingying went

15 missing?

16 A.   I did not.

17 Q.   Did you exchange text messages with him on that

18 day?

19 A.   Yes.

20       MR. NELSON:  Your Honor, may I approach?

21       THE COURT:  You may.

22 BY MR. NELSON:

23 Q.   Miss Bullis, I've just handed you an exhibit

24 that is marked as Government's Exhibit 51-1.

25       Do you recognize what is contained in that

1  exhibit?

2  A.   Yes.

3  Q.   Are those text messages between you and the

4  defendant?

5  A.   Yes.

6  Q.   Were you present when those photographs were

7  taken?

8  A.   Yes.

9          MR. NELSON:  Your Honor, I'd offer 51-1.

10          THE COURT:  Any objection?

11          MR. TUCKER:  No, Your Honor.

12          THE COURT:  They will be admitted.

13          MR. NELSON:  Can we please publish that

14  exhibit?  Specifically page one.

15  BY MR. NELSON:

16  Q.   Now at the top of the screen here -- and I

17  recognize at the very top where it says the time,

18  that's the date it was photographed; is that right?

19  A.   Correct.

20  Q.   But down here there is a line that says "Friday

21  3:14 a.m."

22          Do you remember if that text was sent on

23  Friday, June 9th?

24  A.   It was.

25  Q.   What were you -- this is your phone, so the

1  green bubble on the iPhone -- the green bubble on

2  your phone would be a text message from you; is that

3  right?

4  A.   Correct.

5  Q.   Okay.  So what information were you conveying to

6  the defendant at 3:14 in the morning on Friday,

7  June 9th?

8  A.   I was explaining that I had someone over the

9  night before or early in the morning, and I wanted

10  to express to him that I had had that individual

11  over.  And despite the fact that Brendt and I had

12  arranged that we would be able to have other

13  partners without prior consent, I felt an obligation

14  because of how I practiced polyamory that he needed

15  to know that I had been with someone and that

16  message --

17  Q.   I'm sorry, ma'am.  You paused and I should have

18  waited.

19  A.   No, you're fine.  That's it.

20          MR. NELSON:  Will you please go to the next

21  page of this exhibit?

22  BY MR. NELSON:

23  Q.   How did the defendant respond to you saying that

24  you had been with another individual?

25  A.   He said, *No worries*, and sent a kissy face.

1  Q.   And that is at what time?

2  A.   6:31 in the morning.

3  Q.   And is this still Friday, June 9th?

4  A.   Yes.

5  Q.   And did you respond?

6  A.   Yes.

7  Q.   And these texts are still in the morning on June

8  the 9th?

9  A.   They are starting to be in the late morning down

10  in the bottom.

11  Q.   And here there is a text message from you, *I*

12  *can't believe I did that.*

13          What time was that sent?

14  A.   10:24 in the morning.

15  Q.   And when did he respond?

16  A.   11:34.

17  Q.   Okay.  Are there any text messages that you

18  received from the defendant between 6:31 a.m. on

19  June 9th and 11:34 a.m. on June 9th?

20  A.   No.

21          MR. NELSON:  Can we go to the next page,

22  please?

23  BY MR. NELSON:

24  Q.   Okay.  Now here, there is some more texts

25  between you and the defendant.  Are these still on

 1  June 9th?

 2  A.   Yes.

 3  Q.   I'm going to direct you to one here from the

 4  defendant.

 5          *From breathing to fine dining, to murder.*

 6          Do you remember receiving that text message?

 7  A.   Yes.

 8  Q.   Do you remember what you thought when you

 9  received that?

10  A.   I really didn't know what to think.

11  Q.   And you're talking about things that you do

12  casually?

13  A.   Yes.

14  Q.   Do you casually commit murder?

15  A.   No.

16  Q.   Was this text a little out of the ordinary to

17  you?

18  A.   Yes.

19          MR. NELSON:  Can we go to page eight,

20  please?

21  BY MR. NELSON:

22  Q.   Okay.  Now these are still text messages that

23  you sent to the defendant; is that right?

24  A.   Yes.

25  Q.   Okay.  And it doesn't say on here.

1          Do you remember from looking at this exhibit

2   what time you sent those text messages?

3   A.   It was some time before 1:00.

4   Q.   And that's 1:00 in the afternoon on June 9th?

5   A.   Yes.

6   Q.   If we go to page nine, the defendant responded

7   to your text messages at 4:53 p.m.?

8   A.   Correct.

9   Q.   And how did he respond?

10  A.   *How has your day been?*

11  Q.   What was his next text?

12  A.   *I'm exhausted.*

13  Q.   So did you receive any text messages from the

14  defendant between 1:00 p.m. on June 9th and

15  4:53 p.m. on June 9th?

16  A.   No.

17  Q.   Do any of your subsequent tests explain why the

18  defendant would be exhausted at 4:53 in the

19  afternoon on a Friday?

20  A.   No.

21  Q.   Can we take this down, please.

22          By the way did you know at the time you were

23  texting with the defendant on June 9th that his wife

24  was out of town?

25  A.   I might have.  I'm not sure.

1  Q.   You've learned about it since then?

2  A.   Yes.

3  Q.   Prior to June 9th, were there times when

4  Michelle was not there for an evening?

5  A.   Yes.

6  Q.   What happened on those evenings, if you know?

7  A.   Either he was there by himself in the apartment

8  or I would come over.

9  Q.   Had you ever spent the time with the defendant

10 in his apartment on a night when Michelle was not

11 there?

12 A.   Yes.

13 Q.   Did that happen on June 9th?

14 A.   No.

15 Q.   Did you have any plans in the morning and

16 afternoon of June 9th?

17 A.   No.

18 Q.   If the defendant had texted you at 1:00 p.m.

19 that afternoon said that he was home alone and

20 lonely, what would you have done?

21 A.   I would have asked him either to come over to my

22 place or if I could go over there.

23 Q.   Did that happen?

24 A.   No.

25 Q.   Now I want to fast forward just a little bit.

1        At some point were you interviewed by the
2  FBI in connection with this case?
3  A.   Yes.
4  Q.   Were you first interviewed on June 15th?
5  A.   Yes.
6  Q.   Where did that take place?
7  A.   On my front porch. `
8  Q.   Could you describe that interview for the jury?
9  I don't want the specific words that were said but
10 could you just describe that interview?
11 A.   The agents let me know that there was a missing
12 person.
13 Q.   Anything else?
14 A.   They said that one of my boyfriends might be
15 involved.
16 Q.   And did you exchange -- did they interview you,
17 basically?
18 A.   Yes, I spoke with them.
19 Q.   Okay.  And did they ask you for some
20 information.  I'm not asking you -- I'm sorry -- I
21 wasn't clear on my question.  I'm not asking you to
22 recall the exact information they asked you for but
23 did they ask you generally for information?
24 A.   Yes.
25 Q.   And did you cooperate with them?

1  A.   Yes.

2  Q.   Did they explain to you at that time that the

3  defendant had been arrested?

4  A.   That particular -- I can't quite recall on the

5  first visit.

6  Q.   Was there a second interview with the FBI?

7  A.   There were many.

8  Q.   Okay.  Were you interviewed the next day on

9  June 16th?

10  A.   Yes.

11  Q.   That second meeting, do you remember where that

12  was?

13  A.   On the -- at that point I went to their office.

14  Q.   Did you agree to let the FBI search your cell

15  phone on that day?

16  A.   Yes.

17  Q.   Did you also agree to make recordings of your

18  conversations on that day?

19  A.   Yes.

20  Q.   Why did you agree to make recordings?

21  A.   I was emotionally attached to this person, and I

22  wanted to know if they had done anything or not, and

23  no matter if they had or not, I feel like the

24  information that I would find out would be able to

25  inform both myself and potentially law enforcement.

1          MR. NELSON:  Could we please bring up
2   Government's Exhibit 51A?
3   BY MR. NELSON:
4   Q.   Is this your agreement with the FBI, ma'am?
5   A.   It is.
6          MR. NELSON:  Can we go to page two of this
7   exhibit?
8   BY MR. NELSON:
9   Q.   Did you sign this document?
10  A.   I did.
11  Q.   And when you signed this exhibit, did you have a
12  conversation with -- well, did you work with any
13  particular agent more than others?
14  A.   Agent Huckstadt was my contact person.
15  Q.   And when you signed this document, did you have
16  a conversation with Special Agent Huckstadt about
17  rules, so to speak, things that you were and weren't
18  allowed to do?
19  A.   Yes.
20  Q.   Did you understand those?
21  A.   Yes.
22  Q.   And as you understood it, what were you agreeing
23  to do for the FBI?
24  A.   I was agreeing to record any communication that
25  we had from that point forward.

1  Q.   Did they give you a recording device?

2  A.   Yes.

3  Q.   What did it look like?

4  A.   They gave me two at first.

5  Q.   Okay.  Can you describe them?

6  A.   One was a coffee mug, and the other was a small

7  device about the size of a small Post-It Note.

8  Q.   Did you use one more than the other?

9  A.   Yes.

10  Q.   Which one did you use?

11  A.   The small one that was like a Post-It Note.

12  Q.   Was there a particular reason for that?

13  A.   Because it was easy to hide.

14  Q.   Did you have an idea in your mind about how you

15  were going to have these conversations with the

16  defendant?

17  A.   He spoke rather freely with me, so if I just

18  continued to speak freely with him, then things

19  would potentially come up.

20  Q.   Do you remember how many conversations you

21  recorded between you and the defendant?

22  A.   Nine.

23  Q.   Have you had a chance to review all of those

24  conversations from the beginning to the end prior to

25  your testimony?

 1  A.   Yes.
 2  Q.   When you reviewed them, or even as they were
 3  happening, did you recognize any patterns in the
 4  conversations?
 5  A.   Yes.
 6  Q.   What did you recognize?
 7  A.   Over time the amount that he spoke, the number
 8  of words, the duration of time he spent speaking
 9  increased.
10  Q.   Did you do anything in particular during these
11  conversations to try to avoid being suspicious?
12  A.   If anything I hid behind my submissive nature in
13  that relationship.
14  Q.   What do you mean by that?
15  A.   Whenever I was frightened, overwhelmed, scared,
16  I would just act more submissive.
17  Q.   Were there times when you pretended not to
18  understand?
19  A.   Yes.
20  Q.   Was this part of this mechanism that you were
21  just describing?
22  A.   Yes.
23  Q.   Now I would like to go back to June the 16th,
24  the day you signed that form.
25            Bless you.

1          Do you have a telephone conversation with

2  the defendant on that same day?

3  A.   Yes.

4  Q.   June 16th?

5  A.   Yes.

6  Q.   And that's in evidence as Exhibit 20.

7          MR. NELSON:  Can we please publish that?

8          (Exhibit published to the jury.)

9  BY MR. NELSON:

10 Q.   I noticed at the end of that call, those pet

11 names you testified about earlier were mentioned.

12 Was that frequent in your communications?

13 A.   Yes.

14 Q.   Did you in fact meet with the defendant the

15 following day?

16 A.   Yes.

17 Q.   Would that have been June 17th?

18 A.   Yes.

19 Q.   Where did you meet?

20 A.   On the front porch.

21 Q.   Did you record that meeting?

22 A.   Yes.

23 Q.   Can you please tell the jury how you did that?

24 A.   I recorded it on the device that was about the

25 size of a Post-It Note.

1  Q.   How did you conceal that?

2  A.   I put it in my bra.

3  Q.   Was this a long conversation?

4  A.   Yes.

5  Q.   Okay.  Prior to your testimony, were there clips

6  of this recording made?

7  A.   Yes.

8  Q.   Are those clips just portions of the

9  conversation?

10  A.   Correct.  Correct.

11        MR. NELSON:  Can we please publish clip

12  22-1, Miss Klayer.

13        (Publishing exhibit.)

14  BY MR. NELSON:

15  Q.   Now during this conversation, did you discuss

16  the fact that they had taken your phone?

17  A.   Yes.

18  Q.   Who was "they"?

19  A.   The FBI.

20  Q.   And did the defendant suggest that the FBI might

21  have wanted something else?

22  A.   Yes.

23  Q.   What did he suggest?

24  A.   A DNA mouth swab.

25  Q.   Did you ask him about that or did he bring it

 1 | up?
 2 | A.   He brought it up.
 3 | Q.   During this clip, were you trying to convey
 4 | information to him?
 5 | A.   I was -- are you asking was I trying to convey
 6 | specific information?
 7 | Q.   Were you -- how would you describe this
 8 | conversation?  Let me ask it this way.
 9 | A.   He was talking to me about the investigation.
10 | Q.   Okay.
11 |         MR. NELSON:  And let's just move on to clip
12 | 22-2.
13 |         (Exhibit published to the jury.)
14 | BY MR. NELSON:
15 | Q.   Miss Bullis, during this clip what did the
16 | defendant say about cooperating?
17 | A.   That he was cooperating.
18 | Q.   And did he mention something about wanting to
19 | clear his name?
20 | A.   Yes.
21 | Q.   Okay.  What did you think it meant when he said
22 | he wanted to clear his name?
23 | A.   Basically get the investigation to stop
24 | investigating him.
25 | Q.   Now, you said during -- something during that

1  clip about wanting to be there for Michelle.  What
2  did you mean about that, by that?
3  A.   When I care about somebody, I care about anyone
4  that's close to them as well.  And I was concerned
5  about her and the stress that this was causing.
6  Q.   Now, you mentioned also a conversation that you
7  had about the defendant, about him saying that he
8  wanted to experience all of the things.  Do you
9  remember that conversation?
10  A.   Yes.
11  Q.   Could you relay that to the jury, please?
12  A.   He expressed an interest in wanting to
13  experience things that were outside the bounds of a
14  typical -- outside the bounds of what a lot of
15  people experience.
16        MR. TASEFF:  Your Honor, can we get a time
17  and place for that?
18        THE COURT:  Mr. Nelson.
19  BY MR. NELSON:
20  Q.   Do you remember when that conversation was?
21  A.   That was on -- I don't have dates.
22  Q.   Okay.
23  A.   So --
24  Q.   If you can remember in relation to those text
25  messages that we talked about on Exhibit 34, in the

1 last part of May of 2017; can you use that as a

2 landmark?

3 A.   It would have been after that.

4 Q.   Do you remember where that conversation took

5 place?

6 A.   Across the street from my house in his vehicle.

7 Q.   And at some point in that clip the defendant

8 discussed the surveillance that he was observing?

9 A.   Yes.

10 Q.   Did his demeanor change when he started talking

11 about the surveillance?

12 A.   His eyes got larger and the speed of his speech

13 got faster and it seemed excited to me; amused.

14        MR. NELSON:  Can we publish clip 22-4,

15 please.

16        (Exhibit published to the jury.)

17        THE COURT:  Now, at the very end of this

18 clip, the defendant talked about wanting to help

19 clear his name but also help you and Michelle and

20 help find this girl.

21        Did you understand -- did you understand

22 what he meant by "this girl"?

23 A.   Yingying.

24 Q.   Now, this clip that we heard, is this an example

25 of the power dynamic that existed between you and

1  the defendant?  Could you hear that on the clip?

2  A.   I did.

3  Q.   Okay.  Could you explain that for the jury?

4  A.   I'm not quite sure what you're referencing.  Can

5  you specify, please.

6  Q.   Sure.  A moment ago you testified about how you

7  sort of played up your submissive, in relation to

8  the defendant's dominance at times.  I was wondering

9  if you could explain that, put that in this example.

10  A.   So he was explaining what had happened with this

11  duffle bag that he was speaking about, and I had

12  limited information.  So as a default, I just kept

13  asking questions or being a bit diminutive in my

14  responses, too, because I was afraid if I seemed

15  like I knew too much about the investigation, or had

16  too many answers, I might not be safe myself.

17  Q.   At the time you were hearing it, did the duffle

18  bag story make sense to you?

19  A.   No.

20  Q.   Now you said -- you heard on the clip the

21  defendant said Michelle told them everything even

22  the stuff that scared her.  At the time had you had

23  any conversations with the defendant to where you

24  understood what he was talking about?

25  A.   Yes.

1  Q.   Could you explain that to the jury, please?

2  A.   He explained at one point that he had had a

3  conversation with his wife in which he had broached

4  the topic of violence and testing limits, serial

5  killers, and things of that nature.  And it had

6  frightened her.

7  Q.   And he told you that?

8  A.   Yes.

9  Q.   Is that why you said that doesn't look good?

10 A.   Yes.

11 Q.   Now, the day he was talking about in this clip,

12 the day involving the duffle bag.  Do you remember

13 that day?

14 A.   Yes.

15 Q.   Was that Monday, June the 12th?

16 A.   Yes.

17 Q.   Did you see the defendant in person that day?

18 A.   Yes.

19 Q.   Did he come to your house or did you go to him?

20 A.   He came to my house.

21 Q.   About what time did he come over?

22 A.   Sometime mid morning.

23 Q.   Okay.  How long did he stay?

24 A.   Long enough for us to watch a couple episodes of

25 a TV show.

 1  Q.  At some point did he arrive at your house that

 2  day?

 3  A.  Yes.

 4  Q.  When was that?

 5  A.  Sometime in the early afternoon.

 6  Q.  Okay.  And at any point that day did he return?

 7  A.  Yes.

 8  Q.  About how long was he gone?

 9  A.  Maybe an hour or two.

10  Q.  How long did he stay the second time?

11  A.  About the same amount of time as the first, long

12  enough to watch a few episodes.

13  Q.  Okay.  Did you ever see him with a green duffle

14  bag?

15  A.  No.

16  Q.  Did you ever see a green duffle bag outside your

17  house?

18  A.  No.

19  Q.  Do you remember anybody talking to anyone in

20  your neighborhood about a green duffle bag outside

21  your house?

22  A.  No.

23        MR. NELSON:  Could we please publish clip

24  22-5?

25        (Exhibit published to the jury.)

1  BY MR. NELSON:

2  Q.   In this clip, Miss Bullis, is the defendant

3  telling you that there was blood on a baseball bat

4  in his apartment?

5  A.   Yes.

6  Q.   Can you think of any reason why your blood would

7  be on a baseball bat in his apartment?

8  A.   No.

9  Q.   Is it possible that as the defendant described

10 you would have bled from your face without knowing

11 it?

12         MR. TUCKER:  Objection, as to what's

13 possible.

14         THE COURT:  As far as she would know.

15         Go ahead.  You may answer.

16 BY THE WITNESS:

17 A.   It would not be possible.

18 BY MR. NELSON:

19 Q.   Why not?

20 A.   I have two platelet disorders and both of them

21 keep my blood from clotting properly, so it takes a

22 very long time for me to stop bleeding.

23 Q.   Based on that, if you were bleeding would you

24 know it?

25 A.   Yes.

1  Q.  So when he told you this on -- this still would
2  be June 17th -- you knew it wasn't true?
3  A.  Correct.
4  Q.  Why didn't you confront him?
5  A.  I was scared, and I wanted to know why he was
6  lying.
7          MR. NELSON:  Can you play clip 22-, 6
8  please, Miss Klayer.
9          (Exhibit published to the jury.)
10  BY MR. NELSON:
11  Q.  Miss Bullis, why did you tell him that in this
12  moment?
13  A.  Because I meant it.
14  Q.  Did you turn this recording over to an FBI
15  agent?
16  A.  Yes.
17  Q.  Can you describe how you did that?
18  A.  I contacted an agent by phone, and they came and
19  got the device.
20  Q.  Do you remember which agent you called?
21  A.  Agent Huckstadt.
22  Q.  Do you need a tissue?
23  A.  I'm good.
24  Q.  Did you meet with the defendant again a couple
25  days later on June 19th?

 1  A.   Yes.

 2  Q.   Did you record that meeting?

 3  A.   Yes.

 4  Q.   Where did that one take place?

 5  A.   On the porch.

 6  Q.   Okay.  Could you explain how you recorded this

 7  one?

 8  A.   Same manner that I had been recording before.

 9  Q.   Were clips made of this recording also?

10  A.   Yes.

11        MR. NELSON:  Miss Klayer, could we please

12  publish clip 23-1?

13  BY MR. NELSON:

14  Q.   Miss Bullis, did the defendant tell you that it

15  wouldn't be good for the missing girl for you to

16  know more about the investigation?

17  A.   I'm sorry, could you rephrase that?

18  Q.   During this clip, did the defendant tell you

19  that it wouldn't be good for him or the missing girl

20  for you to know more about the investigation?

21  A.   Correct.

22  Q.   Who did you understand the missing girl to be?

23  A.   Yingying.

24  Q.   Okay.  Did the defendant ever explain how, why

25  it wouldn't be good for Yingying if you knew more

1  about the investigation?

2  A.   He basically said that he was trying to protect

3  me.

4  Q.   And at some point during this clip did he tell

5  you that he wanted to tell you, just not now?

6  A.   Correct.

7  Q.   Now, you sounded a little emotional during this

8  clip, was that just my hearing or was that correct?

9  A.   That's correct.

10  Q.   Could you tell us why?

11  A.   The conflict that was happening at that point in

12  time, it never really got to stop.

13  Q.   What conflict?

14  A.   I had explained in the earlier clip that when I

15  care about someone, I truly care about them.  But I

16  also cared about this missing person, and it's

17  painful.

18  Q.   Do you remember what the defendant's demeanor

19  was like during this conversation?

20  A.   Conversational, normal.

21          MR. NELSON:  Could we please publish clip

22  23-2?

23          PARALEGAL KLAYER:  24-2.

24          MR. NELSON:  I'm sorry.

25          (Exhibit published to the jury.)

 1  BY MR. NELSON:

 2  Q.   Now just for the record, I believe that was a

 3  clip from a different recording.

 4          MR. NELSON:  We are on June 19th, is that

 5  not Exhibit 23?

 6          PARALEGAL KLAYER:  Okay.  I'm sorry.

 7          MR. NELSON:  That's okay.

 8          Could we please play 23-2.

 9          (Exhibit published to the jury.)

10  BY MR. NELSON:

11  Q.   Miss Bullis, during your conversations with the

12  defendant, did he mention getting his belongings

13  back quite a bit?

14  A.   Yes.

15  Q.   And what was his demeanor when he was mentioning

16  those things?

17  A.   It varied from frustrated to a little bit

18  amused.

19          MR. NELSON:  Could we please publish clip

20  23-3, Miss Klayer?

21          (Exhibit published to the jury.)

22  BY MR. NELSON:

23  Q.   Miss Bullis, during this clip, was the defendant

24  telling you about the arrangements at his house at

25  this time?

1  A.   Yes.

2  Q.   What did he tell you about that?

3  A.   That his wife was sleeping in the den.

4  Q.   And this was, again, on June the 19th?

5  A.   Yes.

6  Q.   Now, you mention again here about checking in on

7  Michelle.  What did you mean by that?

8  A.   He was under suspicion of an investigation and

9  she had lost some possessions and I wanted to make

10 sure she was okay.

11 Q.   Was it uncommon in your relationship with the

12 defendant for you and he to talk about your

13 relationship with Michelle?

14 A.   About my relationship or his relationship?

15 Q.   Either.

16 A.   No.

17 Q.   Did you turn this recording over to an FBI

18 agent?

19 A.   Yes.

20 Q.   Could you describe that, please?

21 A.   I contacted the FBI and they retrieved the

22 device.

23 Q.   When you say you contacted the FBI, did you

24 always contact the same person?

25 A.   Yes.

 1  Q.   Who did you contact?

 2  A.   Agent Huckstadt.

 3  Q.   Now, we've talked about June 17th and June 19th.

 4  Did you meet with the defendant again the next day

 5  on June the 20th?

 6  A.   Yes.

 7  Q.   Did you record that meeting?

 8  A.   Yes.

 9  Q.   Did you record it in the same way that you

10  recorded the others?

11  A.   Yes.

12  Q.   Do you know if clips were made of this recording

13  also?

14  A.   Yes.

15          MR. NELSON:  Could we please publish clip

16  24-1?

17          (Exhibit published to the jury.)

18  BY MR. NELSON:

19  Q.   Miss Bullis, from your experience was the

20  defendant's demeanor in this conversation different

21  from the other conversations we were listening to a

22  moment ago?

23  A.   Yes.

24  Q.   Could you describe that please?

25  A.   He asked me to do something.  And I asked for

1 specifications or for clarification, and then he

2 kind of backed off.

3 Q.   What did that mean to you?

4 A.   At the time I'm not sure I knew how to take it.

5 Q.   Okay.

6          MR. NELSON:  Could you please publish clip

7 24-2?

8          (Exhibit published to the jury.)

9 BY MR. NELSON:

10 Q.   Miss Bullis, was this a continuation of the

11 conversation from the previous clip?

12 A.   Yes.

13 Q.   Did the defendant ever explain why it wouldn't

14 be in his best interest for you to cooperate?

15 A.   Not specifically.

16          MR. NELSON:  Could we please publish 24-3?

17          (Exhibit published to the jury.)

18 BY MR. NELSON:

19 Q.   Now you made a mention in this clip of being

20 "grounded."  What did that mean?

21 A.   It meant that in the household I lived in there

22 was an individual who I also gave power to, and if

23 that individual would have said that they had a

24 preference for something or me not doing something,

25 I would have respected it at that point because I

 1  deferred to their judgment at some times.

 2  Q.   Specifically to this case, was the defendant

 3  allowed in your house at this time?

 4  A.   No.

 5  Q.   Is that because of the power dynamic that you

 6  just described?

 7  A.   In part.

 8  Q.   What did the defendant say in this clip about

 9  when he would know that the investigation was over?

10  A.   That you really wouldn't.

11  Q.   Did you turn this recording over to an FBI

12  agent?

13  A.   Yes.

14  Q.   Did you do that in the same manner that you

15  described a moment ago?

16  A.   Yes.

17  Q.   Did you meet with the defendant again the next

18  day, June 21, 2017?

19  A.   Yes.

20  Q.   And did you do anything different on that day

21  than you had done on previous days?

22  A.   We watched a movie on the porch.

23  Q.   Did you record that meeting?

24  A.   Yes.

25  Q.   And because you watched a movie, is that a

1  particularly long recording?

2  A.  Yes.

3  Q.  Was a clip made of this recording as well?

4  A.  Yes.

5          MR. NELSON:  Could we please publish clip

6  25-1?

7          (Exhibit published to the jury.

8  BY MR. NELSON:

9  Q.  On beginning of this clip the defendant said,

10  *Michelle sometimes does this.*

11         What was he referring to?

12  A.  There was a string of text messages on his phone

13  that were back to back.

14  Q.  Now, at some point, you asked about the

15  relationship between the defendant and his wife,

16  that was in relation back to prior conversations

17  that we heard here?

18  A.  Yes.

19  Q.  What did he say about it?

20  A.  I'm sorry, I can't answer that question right

21  now.  I'm a little bit emotional.

22  Q.  Did you turn this recording over to an FBI

23  agent?

24  A.  Yes.

25  Q.  Do you need a moment?

1  A.   I think I'll be okay.

2         THE COURT:  Mr. Nelson, I'm also going to

3  leave it up to you to give me an idea of where you

4  are as we start getting near 5:00.  If you think

5  you're close, we will stay with it.  If not, we will

6  break.

7         MR. NELSON:  I have one more set of

8  recordings from the next day and at the end of that,

9  that might be a good time for the court to break.

10         THE COURT:  To break for the day?

11         MR. NELSON:  Yes, Your Honor.

12         THE COURT:  And resume tomorrow morning?

13         MR. NELSON:  Yes.

14         THE COURT:  Go ahead.

15         MR. NELSON:  Thank you.

16  BY MR. NELSON:

17  Q.   Miss Bullis, would you have met with the

18  defendant the next day?

19  A.   Yes.

20  Q.   Would that have been June 22nd?

21  A.   Yes.

22  Q.   Did you record your meeting with the defendant

23  that day?

24  A.   Yes.

25  Q.   Were clips made of that recording?

 1 A.   Yes.

 2          MR. NELSON:  Could we please publish clip

 3 Government's Exhibit 26-1?

 4 BY MR. NELSON:

 5 Q.   Miss Bullis, what was this conversation about?

 6 A.   It was about him talking about still believing

 7 he was under surveillance of some kind.

 8 Q.   And there is a conversation at the beginning.

 9 Was he talking about drinking?

10 A.   Yes.

11 Q.   Now you mention "sad, lonely place," I think

12 were your words.  What did you mean by that?

13 A.   I was concerned that if he were to drink on his

14 own, he would be putting himself in an emotional

15 state where it would be better if there was somebody

16 else around.

17 Q.   And is this consistent with what you said

18 earlier that you wanted to be that person?

19 A.   Yes.

20 Q.   The defendant said *When I drink too much my*

21 *mental faculties are slower and I become physically*

22 *inept*?

23          Did you experience that with him?

24 A.   Only once.

25 Q.   The defendant also said that drinking was an

1 escape.  Had you heard him mention that before, an

2 escape?

3 A.   Not necessarily that word.

4 Q.   Okay.  Could you elaborate on that?

5 A.   The way he spoke about it, it seems like

6 something that occurred when there was nothing else

7 to fill time with.

8 Q.   In your experience with the defendant, did you

9 understand that he might want to escape from certain

10 things in his life?

11       MR. TUCKER:  I'm having a hard time

12 understanding, but it sounded leading.

13       THE COURT:  Mr. Nelson, could you repeat the

14 question, please.

15       MR. NELSON:  Sure.

16 BY MR. NELSON:

17 Q.   In your experience with the defendant, did you

18 observe things that he wanted to escape from?

19 A.   Yes.

20 Q.   What was that?

21 A.   He was at a point where he needed to look for a

22 full-time job, and he had expressed that there were

23 some problems in his relationship with his wife.

24       MR. NELSON:  Could we please publish clip

25 26-2?

1          (Exhibit published to the jury.)

2 BY MR. NELSON:

3 Q.   That last point the defendant made:  *It's been*

4 *long enough.  They know it wasn't me.*

5          Do you know who he meant by "they"?

6 A.   The individuals investigating the case.

7 Q.   Okay.  Did he ever elaborate on that point

8 during this conversation?

9 A.   He just explained that he believed that he was

10 potentially under surveillance.

11 Q.   Okay.  And was this the fact that he was under

12 investigation, was this something that he talked

13 about a lot?

14 A.   Yes.

15 Q.   Did you turn over this recording to an FBI

16 agent?

17 A.   Yes.

18 Q.   Was that Special Agent Huckstadt?

19 A.   Yes.

20          MR. NELSON:  Your Honor, I can keep going or

21 we can break.  I'm at a good breaking point but I

22 can keep going.

23          THE COURT:  How long do you think you have

24 yet with Miss Bullis, just ball park?

25          MR. NELSON:  I would guess that I'm a little

1  less than halfway.

2          THE COURT:  Then why don't we continue

3  another 10 or 15 minutes.

4          MR. NELSON:  Yes, Your Honor.

5  BY MR. NELSON:

6  Q.  Did you have a telephone call with the defendant

7  the next day, June 23rd?

8  A.  Yes.

9  Q.  Did you record that call?

10  A.  Yes.

11          MR. NELSON:  Could we please publish

12  Exhibit 27?

13          (Exhibit published to the jury.)

14  BY MR. NELSON:

15  Q.  Miss Bullis, what was the defendant telling you

16  in this call in terms of the relationship between

17  what could he talk to his wife about and what he

18  could talk to you about?

19  A.  That he was unable to speak with his wife about

20  some of the things that he was speaking with me

21  about.

22  Q.  Did you continue this conversation over text

23  messages?

24  A.  Yes.

25          MR. NELSON:  May I approach, Your Honor?

 1           THE COURT:  You may.

 2           And then we will break after this.

 3  BY MR. NELSON:

 4  Q.  Miss Bullis, I've just handed you what is marked

 5  as Government's Exhibit 51-2.

 6           Do you have that?

 7  A.  Yes.

 8  Q.  What is that?

 9  A.  It is a record of some text messages.

10  Q.  Okay.  And who are those text messages between?

11  A.  The defendant and myself.

12  Q.  And are those screen shots?

13  A.  Yes.

14  Q.  Who took those screen shots?

15  A.  Myself.

16  Q.  What did you do when you took those screen

17  shots?

18  A.  I e-mailed them.

19  Q.  To who?

20  A.  The special agent that I had been working with.

21           MR. NELSON:  Your Honor, I'd offer

22  Government's Exhibit 51-2.

23           THE COURT:  Any objection?

24           MR. TUCKER:  I'm looking for it right now in

25  the book.  Just a second.

 1          THE COURT:  All right.

 2          MR. TUCKER:  My apologies, Your Honor.

 3          THE COURT:  That's all right.  Anybody have

 4  an extra copy Mr. Tucker can look at first to see if

 5  there are any objections?

 6          MR. TUCKER:  No objection.

 7          THE COURT:  Okay.  They will be admitted.

 8          MR. NELSON:  Could we please publish the

 9  first page of Exhibit 51-2?

10  BY MR. NELSON:

11  Q.   Now, Miss Bullis, can you tell us which -- whose

12  conversation is inside the green bubble on this

13  page?

14  A.   The green bubble would be me.

15  Q.   Okay.  Can you start by reading here?  There is

16  a series of text messages from the defendant.

17          Can you just read through them, please?

18  A.   *I mentioned getting some liquor tonight, and she*

19  *told me to never mention it again.  I want to share*

20  *my feelings with her, but I can't.  I get that other*

21  *people are affected if this goes south.  Everyone*

22  *deals with something shitty.  I go to prison for*

23  *fucking life.  Fuck her feelings.*

24  Q.   How did you respond?

25  A.   *What?*

1          MR. NELSON:  Can we go to the next page?

2          THE COURT:  What was the date of this?  I

3   missed it.

4          MR. NELSON:  I'm sorry.  These were also on

5   June 23rd.  I think I asked her if it was a

6   continuation.

7   BY MR. NELSON:

8   Q.   Was it the same day?

9   A.   Yes, it was after the phone call.

10          THE COURT:  Okay.  Thank you.

11          MR. NELSON:  My apologies, Your Honor.

12   BY MR. NELSON:

13   Q.   Did the conversation continue on to the next

14   page?

15   A.   Yes.

16   Q.   It looks as though on the screen there's four

17   text messages from you.  Would you read those

18   please?

19   A.   *Wait.  What?  What's going on?  I'm here.  I*

20   *promise I will always listen, alcohol or not.  I'm*

21   *worried about you.  Your not alone.  Okay.*

22   Q.   How did the defendant respond?

23   A.   *You can not tell this to anyone, literally no*

24   *one but Michelle and I.*

25   Q.   How did you respond?

1  A.   *Tell what?*

2  Q.   What did he say?

3  A.   *I was the one who picked that girl up.  I*

4  *dropped her off shortly after.*

5         MR. NELSON:  Can we go to page three,

6  please?

7  BY MR. NELSON:

8  Q.   What did he say after *I dropped her off shortly*

9  *after*?

10 A.   *I didn't do anything wrong.  But she is missing*

11 *and I'm officially the last person who saw her.*

12 *They took my car.  They took our computers.*

13 Q.   How did you respond?

14 A.   *I understand why you are frightened.*

15 Q.   And what did he say to that?

16 A.   *They haven't found her, if they get desperate.*

17        MR. NELSON:  Could we go to the next page,

18 please?

19 BY MR. NELSON:

20 Q.   What did you say to that?

21 A.   *I'll delete this conversation.  I believe you.*

22 Q.   And how did he respond?

23 A.   *I am the last person.  I am the last person.*

24 Q.   What did you say after that?

25 A.   *Why did you pick her up?*

 1  Q.   How did he answer?

 2  A.   *Michelle told them everything she knows about*

 3  *me, everything.  She look like she needed help and*

 4  *she did.*

 5  Q.   What was your response?

 6  A.   *Was she lost?*

 7  Q.   And what did the defendant say?

 8  A.   *They all my secrets.*

 9          MR. NELSON:  Can we go to the next page,

10  please?

11  BY MR. NELSON:

12  Q.   Did those texts continue from the defendant?

13  A.   Yes.

14  Q.   What did he say?

15  A.   *She was late for something.  Michelle loses a*

16  *husband if this goes wrong.  I will literally lose*

17  *my life.*

18  Q.   How did you respond?

19  A.   *No matter what I will be here, you will not lose*

20  *me.*

21  Q.   What did he say?

22  A.   *I know you will, Kitten.*

23  Q.   And what did you say in response?

24  A.   *I don't think they can put it in you without*

25  *hard evidence.*

1  Q.  Okay.  Does this text continue on to --
2  A.  Yes.
3  Q.  Looks like it breaks at the page.
4        Can we look at the next page?
5  A.  *I mean you let her out somewhere but there were*
6  *no cameras or anything to show that part.*
7  Q.  Was that a statement or a question?
8  A.  It was a question.
9  Q.  Okay.  How did he respond?
10 A.  *This is probably the biggest case in Illinois.*
11 *It gas been would two weeks.*
12 Q.  How did you respond?
13 A.  *They want the chief of police to resign.  They*
14 *will get desperate.*
15 Q.  How did you respond to that?
16 A.  *What?*
17 Q.  How did he respond to this?
18 A.  *This is a very little political case.  It is*
19 *national news.*
20 Q.  Does the text continue on to the next page?  How
21 did you respond to *it's national news.*
22 A.  *But you can't be sent to jail without evidence.*
23 *I mean, seriously, don't you have to have a trial*
24 *and all of that?*
25 Q.  What did he say to that?

1  A.   *They haven't charged me with anything, but they*

2  *still have me shit and no suspects.*

3  Q.   What did you say?

4  A.   *See they have nothing on you.*

5  Q.   What did he say to that?

6  A.   *And are still putting posters of my car every*

7  *where.  Won't be able to sell it.*

8  Q.   Does this conversation from June 23rd continue

9  on to the next day or the next page?

10  A.   Yes.

11  Q.   Okay.  What's that?

12  A.   *I bet you could in a different city or*

13  *something.*

14  Q.   Okay.  This is you speaking now?

15  A.   Yes.

16  Q.   How did the defendant respond?

17  A.   *Maybe.  Michelle told them everything.*

18  *Everything you know they know.*

19  Q.   How did you respond to that?

20  A.   *If you actually thought -- if they actually*

21  *thought you did it, wouldn't they have found*

22  *something?*

23  Q.   What did the defendant say to that?

24  A.   *I would think so.  But they still have my shit.*

25  Q.   Go to the next page, please?

```
 1          What -- please continue.  I'm sorry.
 2  A.   And they followed for days.  After that first
 3  night, she told me she was convinced I did it.
 4  Q.   And how did you respond?
 5  A.   Wait.  She thinks you did it?
 6  Q.   And how did he respond?
 7  A.   Probably not anymore.  She did right away.  She
 8  won't be alone with me until two nights ago.  She
 9  wouldn't sleep in the same bed as me.
10  Q.   And the next page?
11  A.   I respond.
12  Q.   Okay.  How did you respond?
13  A.   But she is now at least.  And that's a question.
14  Q.   And what did he say?
15  A.   She put shit in front of the doors so it would
16  make noise if I went in.  She is now.
17  Q.   How did you respond to that?
18  A.   Oh, Brendt, I'm so sorry.  You told them you
19  dropped her off, and they didn't believe you?
20  Q.   What did he say?
21  A.   I have no idea what they think now.
22  Q.   Thank you.
23          MR. NELSON:  Take that down, please.
24  BY MR. NELSON:
25  Q.   What were you thinking when you received these
```

1  text messages from the defendant?

2  A.   I was conflicted still.

3  Q.   Okay.  In the same way that you testified about

4  earlier?

5  A.   Yes.

6       MR. NELSON:  Your Honor, I'm about to move

7  on to the next day.

8       THE COURT:  Okay.  Why don't we recess for

9  the day and resume at 9:00 tomorrow morning.

10      I don't know what the weather is like out

11  there.  It was raining harder earlier.  Be safe

12  going home.

13      Please do not discuss this matter with

14  anybody, including yourselves.  Only decide this

15  case on what you hear in the courtroom.

16      Be safe.  See you tomorrow morning.

17      Thank you.

18      (Jury absent, 5:05 p.m.)

19      THE COURT:  Stay on the record here.

20      We will be in recess, folks.  Feel free to

21  leave.  I'm going to address some matters with the

22  attorneys.  You are free to stay if you wish.

23      MR. NELSON:  Should Miss Bullis be excused,

24  Your Honor?

25      THE COURT:  I'm sorry.  Miss Bullis, we will

1  see you tomorrow morning.

2          Thank you.  Be careful.

3          Just a quick matter.  You both tendered

4  Proposed Instructions.  We are going through those.

5  Most all of them are within a word or two of each

6  other.  I don't expect any issues.  There are a

7  handful from each side where the other side didn't

8  respond to.  We will set those out, and then when we

9  get around to instructions, we will discuss tomorrow

10 when that's going to be.

11         We will -- I'll tender to you what -- the

12 set I prepared based on your proposed, and then set

13 aside the ones and address the ones that you want to

14 submit, that one side or the other did and nobody

15 responded to, okay?  Fair enough?

16         See you tomorrow morning.

17         MR. NELSON:  Thank you, Your Honor.

18         (Which were all of the proceedings held on

19         this day, 5:06 p.m.)

20                         ****

21

22

23

24

25