1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
2

3

UNITED STATES OF AMERICA,
4                                    Docket No. 17-20037
           Plaintiff,
5
     vs.                             Peoria, Illinois
6                                    June 21, 2019
                                     8:29 a.m.
7  BRENDT A. CHRISTENSEN,

8          Defendant.

9

10

11          JURY TRIAL -- June 21, 2019
                 (Redacted)
12

13

14     BEFORE THE HONORABLE JAMES E. SHADID

15       UNITED STATES DISTRICT JUDGE

16

17

18

19

20          NANCY MERSOT, CSR-RPR
            Official Court Reporter
21          U.S. District Court
            100 N.E. Monroe Street
22          Peoria, Illinois 61602
                 309-671-4244
23

24
   Proceedings recorded by mechanical stenography;
25 transcript produced by computer.

```
 1
      For the Plaintiff:       EUGENE L. MILLER, ESQUIRE
 2                             BRYAN D. FRERES, ESQUIRE
                               Assistant United States Attorneys
 3                             201 South Vine Street
                               Urbana, Illinois 61802
 4                             217-373-5875

 5                             JAMES B. NELSON, ESQUIRE
                               U.S. DEPARTMENT OF JUSTICE
 6                             Capital Case Section
                               1331 F Street NW, Suite 625
 7                             Washington, DC 20004
                               202-598-2872
 8

 9    For the Defendant:       GEORGE F. TASEFF, ESQUIRE
                               Assistant Federal Public Defender
10                             401 Main Street, Suite 1500
                               Peoria, Illinois 61602
11                             309-671-7891

12                             ELISABETH R. POLLOCK, ESQUIRE
                               Assistant Federal Public Defender
13                             300 West Main Street
                               Urbana, Illinois 61801
14                             217-373-0666

15                             ROBERT L. TUCKER, ESQUIRE
                               Robert L. Tucker, Esq
16                             7114 Washington Avenue
                               St. Louis, Missouri 63130
17                             703-527-1622

18                             JULIE C. BRAIN, ESQUIRE
                               Attorney at law
19                             916 South 2nd Street
                               Philadelphia, Pennsylvania 19147
20                             267-639-0417

21

22

23

24

25
```

1                    I N D E X

2  DEFENDANT'S WITNESSES                        page

3        ANTHONY MANGANARO

4  Direct Examination                           26

5  Cross-Examination                            32

6  Redirect Examination                         36

7  Recross-Examination                          38

8        ALAN PROFANCIK

9  Direct Examination                           38

10 Cross-Examination                            43

11 Redirect Examination                         52

12       MICHELLE ZORTMAN

13 Direct Examination                           55

14 Cross-Examination                            95

15 Redirect Examination                        129

16       ANDREW HUCKSTADT

17 Direct Examination                          136

18 Cross-Examination                           148

19 Redirect Examination                        157

20 Recross-Examination                         159

21 GOVERNMENT'S REBUTTAL

22       LOREN MONEYPENNY

23 Direct Examination                          173

24 Cross-Examination                           175

25

JURY TRIAL -- June 21, 2019 (Redacted)      4

1          (In chambers, 8:29 a.m.)





JURY TRIAL -- June 21, 2019 (Redacted)        6

 1  ████████████████████████

 2                    *****

 3        (Open court, 8:37 a.m.)

 4        THE COURT:  Stay seated.

 5        While you're going over exhibits, I'm going

 6  to go over a couple of things.

 7        As we start to get ready for the day, I

 8  would just like to address a couple of matters.

 9        This is the matter -- first of all, we will

10  call the case of the United States v. Brendt

11  Christensen, 17-20037.

12        Mr. Christensen is present in open court

13  with his attorneys:  Mr. Tucker, Ms. Brain,

14  Ms. Pollock, Mr. Taseff.

15        Government by:  Mr. Miller, Mr. Nelson,

16  Mr. Freres, with Agents Huckstadt and Manganaro.

17        It's my understanding after the government

18  confirms that they have all of the exhibits in, that

19  they would be resting.

20        Is that still the case, Mr. Miller?

21        MR. MILLER:  That's correct, Judge.  We just

22  have two exhibits that we would move to admit in

23  front of the jury that they were stipulated to and

24  we will be resting.

25        THE COURT:  Maybe we can just admit those

JURY TRIAL -- June 21, 2019 (Redacted)      7

 1   now if they are stipulated to.  Which ones are they?

 2          MR. MILLER:  Exhibit 49A, they are Google

 3   records of the victim; and Exhibit 39A, which were

 4   FetLife records.

 5          THE COURT:  Ms. Pollock, anything?

 6          MS. POLLOCK:  No, Your Honor.

 7          THE COURT:  Okay.  We will admit those.

 8          Then after the government rests, we will

 9   entertain a motion from the defense.

10          But there are two matters to address as well

11   first.

12          Motion for mistrial or limiting instruction

13   as filed this morning by the defense, Document 392.

14          I have prepared and I just called them

15   Court's Jury Instructions.  They are proposed so you

16   just throw *proposed* on there for a moment.  And I

17   thought later in the day, after you have had a

18   chance to digest them, I would go through with you

19   what I have given to you and compare them to the

20   ones that both of you proposed.  Some are identical,

21   some just had a word change.  I think these are

22   pretty clean.  And then that would leave for

23   discussion the other ones that you both submitted

24   that we'll address and the reasons for using them or

25   not using them.

JURY TRIAL -- June 21, 2019 (Redacted)      8

```
 1        MR. MILLER:  Your Honor, there is one that I
 2  believe that we will have to address before the
 3  government would close its case, and that was the
 4  proposed instruction, which we believe is a matter
 5  of law, that the motor vehicle and the cellular
 6  telephone are instrumentalities of interstate
 7  commerce.  We didn't see the instruction in there.
 8        Obviously, if the Court were to rule that
 9  was not a matter of law in a factual matter, then
10  the government would need to recall a couple of
11  witnesses just to establish those facts.  But we
12  don't believe that they are actually facts because
13  it was litigated before trial and the Court had
14  ruled that a cell phone and a motor vehicle each are
15  instrumentalities of interstate commerce.
16        THE COURT:  You are saying that they are not
17  in my proposed?
18        MR. MILLER:  We didn't see them, Your Honor.
19        THE COURT:  Okay.  Well, we need to -- we
20  are going to have to address all of these before
21  closing because I will read them to the jury before
22  closing, but you're talking about before you rest,
23  right?
24        MR. MILLER:  We didn't know if there was a
25  -- if defense was taking the position that that was
```

1  as a factual matter or not.  If they were, we would
2  need a ruling from the Court before we could rest so
3  we could present the records.
4        THE COURT:  I did have a pretrial ruling, I
5  believe, found that both were instruments of
6  interstate commerce.  I thought the issue left for
7  trial was whether they are used in furtherance of.
8        So with that in mind, let me ask the defense
9  on that specific issue before the government rests
10  what is your thought on the Government's Proposed
11  Instruction.  Do you know the number off the top --
12  it is Number 24 that says a motor vehicle is an
13  instrumentality of interstate commerce; a cellular
14  telephone is an instrumentality of interstate
15  commerce.
16        MR. TUCKER:  I think our understanding is as
17  you stated -- that we don't agree to that
18  instruction -- but as you stated I think you ruled
19  pretrial that they were.  Of course, that leaves the
20  crucial fact here in regard to the phone, which we
21  would plan to address in the Rule 29 Motion.  So we
22  don't want to agree to that motion but we recognize
23  the Court's prior ruling.
24        THE COURT:  All right.  With that in mind, I
25  will show it over your objection.

 1        Okay.  So that takes care of that one, and

 2   then we can go through the others a little bit

 3   later.  That also leads me to ask if, if the parties

 4   are now ready to -- oh, and for the record before

 5   the government came in, I visited with Mr. Tucker,

 6   Miss Brain, Miss Pollock, and Mr. Taseff in my

 7   chambers outside the presence of the defendant and

 8   had the court reporter present on a matter that

 9   involved a security issue brought to my attention.

10        So, if the government wishes to see what

11   that is, you can.  I would be happy to allow you to

12   review the record.  Otherwise, it addressed that and

13   only that, and I would not -- I was going to wait

14   until you all arrived and go, but they were here.

15   So I'm just making a record because I would not have

16   had you in on that discussion.  Fair enough?

17        Okay.  With that in mind, then there is a

18   motion for a mistrial or a limiting instruction.

19   This comes up as a result of the issue earlier on

20   the 13 victims and discussion about other acts.

21        MS. BRAIN:  Your Honor, may I ask the Court

22   a question with respect to what the Court last said?

23        Did I understand correctly the government is

24   going to be allowed to review the transcript of the

25   in chambers proceeding?

1          THE COURT:  If they request to do so, I will

2    consider their request.  But if for some reason they

3    feel that they need to know what that was about,

4    other than my representation, I will consider the

5    request and then make a determination.  I would let

6    you weigh in as well.

7          MS. BRAIN:  Thank you, Your Honor.

8          THE COURT:  But I don't intend for it to, in

9    any event, to have anything to do with the remaining

10   of this trial, so, that's that.

11         So, the motion for mistrial was filed.  Did

12   somebody want to argue it?  And I think that we've

13   addressed it earlier, not in the form of a mistrial,

14   but in the form of a limiting instruction.

15         Is the government prepared to argue this if

16   the defense is ready to go?

17         MR. MILLER:  Sure, Your Honor.

18         THE COURT:  Somebody want to argue this

19   further, this motion?

20         MS. POLLOCK:  Your Honor, we will stand on

21   the motion.  We understand the Court's prior ruling

22   with regards to the mistrial.  We respect that

23   ruling.  We are making the record clear here, but I

24   think in the very least I think a limiting

25   instruction should be considered prior to the

1  closing argument in this case.

2        THE COURT:  Let me ask one question though,

3  is the video of Mr. Christensen making that

4  statement considered evidence?

5        MS. POLLOCK:  The video of which statement?

6        THE COURT:  The audio, I'm sorry, isn't that

7  evidence?

8        MS. POLLOCK:  It is.

9        THE COURT:  So the first sentence that, that

10 concludes your opening that there is no evidence

11 that Mr. Christensen has 12 prior victims, you're

12 just saying that there is no evidence that it in

13 fact occurred, not that it's --

14        MS. POLLOCK:  Correct.  There is no evidence

15 to corroborate that statement.

16        MR. MILLER:  And, Your Honor, if I may, we

17 just have a proposal that we had, we had worked with

18 the defense when this issue first arose to try to

19 arrive at an agreed limiting instruction.  We were

20 unsuccessful, but we did want to pose to the Court,

21 because we don't object to a limiting instruction

22 but we do object to their language of their limiting

23 instruction, so we would have our own language that

24 we would have proposed.

25        THE COURT:  And the limiting instruction

1  comes out of what?  Which --

2         MR. MILLER:  It's modeled after the Rule

3  404(b) instruction, Your Honor, but it's obviously

4  made -- ours is made specific to the facts of this

5  case.

6         THE COURT:  But it's as well a pattern

7  instruction, right?  Isn't there a pattern

8  instruction on this?

9         MR. MILLER:  There is, Your Honor.  I

10  apologize.  I don't have it.

11         THE COURT:  I had it in front of me.

12         MR. MILLER:  I believe the Court had a

13  pattern instruction included for other crimes as

14  well but we do believe that this is a somewhat --

15         THE COURT:  It's 3.11.

16         MS. POLLOCK:  And, Your Honor, we object to

17  that instruction because it does not go far enough

18  to remedy the harm that is caused by the inferences

19  that were made during the trial.  This is not like a

20  404(b) situation.  And the government has stated --

21  their stated purpose for admitting the evidence at

22  the penalty phase in any way was because it was

23  braggadocio; that it was not true; they couldn't

24  prove it, but they wanted to be able to use it to

25  establish the defendant's future dangerousness and

1  lack of remorse.  The fact that it has been

2  inserted in such a way where they are claiming now

3  that it is possible that it could be true, is not

4  the stated purpose for which the Court relied to

5  make its ruling excluding it from this phase in the

6  first place and letting it in the penalty phase.

7      THE COURT:  I ruled that it wouldn't come in

8  in the guilt phase.  The defense made its strategic

9  decision that if it was going to come in at the

10 penalty phase that they would allow it or they would

11 want it in at the guilt phase.  I recall, and I

12 don't have the transcript in front of me, further

13 stating though, that it would have to be the defense

14 to bring it up because the government is still

15 forbidden or prohibited from doing so.  And then

16 discussion ensued that the defense said without

17 waiving the objection that they would be okay with

18 the government bringing it up in their

19 case-in-chief.  So that's how it gets in the

20 government's case-in-chief in the first place.

21      In the second instance, I heard -- I think

22 both sides clearly made their positions on this.  I

23 heard the agents testify that there was no

24 corroboration.  I think they obviously -- well, they

25 never said they would completely agree that it

1  wouldn't be possible, but the cross-examination made

2  it very clear that there was no corroboration; there

3  was no information; there is no evidence; there is

4  nothing to support it.  I think that it is -- it has

5  been adequately addressed.  I think a simple

6  limiting instruction would further address it.  I

7  would like to stay as close to the pattern

8  instruction as possible.

9        I will tailor it to this, but I don't think

10  that it would include what you're asking for and

11  that is that they did not occur, whatever it is that

12  you're asking for.  I think that it's -- that's

13  where I am.  So with that --

14        MS. POLLOCK:  Your Honor, if we could

15  include the language about the defendant's state of

16  mind because the government's instruction does not

17  state that.  It simply says consider the defendant's

18  statements and put other statements in context.  We

19  have stated that it was for the purpose of

20  establishing his state of mind at the time.  That

21  has been the focus of cross-examination and the

22  evidence presented, and we would want that inserted

23  in instruction and we would request that.

24        THE COURT:  Tell me what you want it to say?

25  *You may only consider those statements to put the*

1  *defendant's other statements in context; you may not*

2  *consider those statements for any other purpose*

3  *during this stage of the trial.*  Tell me where you

4  want me to insert that, whatever it is that you're

5  asking for.

6        MS. POLLOCK:  I would think that it would be

7  part of the second sentence *you may consider those*

8  *statements to establish the -- to put the*

9  *defendant's state of mind in context and to give*

10  *context to his other statements during the walk.*

11        And we can make that language more artful if

12  we can consult with the government at a break.

13        MR. MILLER:  That's sound fine, Your Honor.

14        THE COURT:  I think that that's acceptable.

15        All right.  Very good.  Okay.

16        With that in mind then, the motion as it

17  pertains to a mistrial will be denied.  The motion

18  as to limiting instruction is granted.  And that

19  instruction could go with all of the instructions at

20  the same time or I could give it at any point you

21  want.  I would think maybe with all of the

22  instructions, it won't draw as much attention to it.

23  But I will leave that up to the defense, okay?

24        Okay.  So this morning then in

25  anticipation -- I mean the government can rest on

 1  the record but to address the motion that would be

 2  coming, I don't want to just bring the jury in and

 3  then excuse the jury.  So is the government -- would

 4  the government be resting?

 5          MR. MILLER:  We would be, Your Honor.  And

 6  we have admitted Government's Exhibit 49A and 39A.

 7          Yes, we would be resting.

 8          THE COURT:  With that in mind, is there a

 9  motion from the defense?

10          MR. TUCKER:  Yes, Your Honor.  We would move

11  for judgment of acquittal pursuant to Rule 29.

12          Alternatively, we would move to strike the

13  allegation from the indictment concerning the use of

14  the Motorola phone as there is no evidence that that

15  phone was used in any way whatsoever in furtherance

16  of the offenses charged here.

17          As far as the car, the Court, as we

18  discussed earlier today, is apparently going to --

19  as we understand it from the Court's prior

20  rulings -- is going to instruct that the car is an

21  instrumentality of interstate commerce.  And we

22  would object to that, but, regardless, regardless,

23  assuming that that's the case, the issue then comes

24  down to the use of the phone.  But if the Court is

25  going to instruct and then in reality as to the

1  issue of the jurisdictional element, that would

2  basically, you know, that would basically satisfy

3  that element.  So the issue -- the alternative issue

4  is to move, strike the actual phone itself; there is

5  no evidence that that phone whatsoever was used in

6  furtherance of this offense.

7        THE COURT:  Is there -- let me ask this

8  because when I was going through the proposed jury

9  instructions and given that I'm going to give the

10  instruction that the case law, based on my ruling,

11  that the car and phone are instruments and that the

12  further -- but we don't have anything other than

13  your argument or from the language of the

14  indictment, which will be in the elements, that *in*

15  *furtherance of*.  Is there a jury instruction that

16  defines *in furtherance of* or that we could fashion

17  that would clearly define or set up your argument?

18        MR. TUCKER:  Well, I think there could be

19  but for -- first of all, I think what in furtherance

20  of, you have to look at the language of other cases

21  and basically the language would have to be that

22  they would have to advance, move forward, promote or

23  facilitate the commission of the offense in some

24  way.  But because there is no evidence whatsoever of

25  that, that the Court, our motion is that the Court

 1  should strike that.

 2          THE COURT:  Understood.

 3          MR. TUCKER:  So this case should go to the

 4  jury solely on the issue of whether the car was used

 5  in the commission of the offense, and, Your Honor,

 6  is basically instructed that or informed us that

 7  you're going to instruct that the car is an

 8  instrumentality of interstate commerce.  But that

 9  doesn't mean the issue should even be put to the

10  jury.  There is no evidence and that should be

11  stricken at this point.

12          There is no evidence that that phone was

13  used in any way to advance this offense, to move it

14  forward, to promote it, to facilitate it, and if you

15  looked at other cases, Your Honor, if you look at

16  what *in furtherance of* means in other context, it

17  usually means that you would have to show that it is

18  an essential part of the plan, that it had a

19  substantial effect on the commission of the offense.

20  So things, where there is little or incidental

21  affect, that doesn't satisfy *in furtherance of*.

22          And in this case we have seen no evidence of

23  that.  The government has referred to Wikipedia

24  searches that were done months before, but, you

25  know, the evidence establishes that he was on

1  Wikipedia perhaps two minutes and skipping from page
2  to page.  There is no showing whatsoever that any of
3  these actual uses of that phone promoted or
4  facilitated the commission of this offense.  The
5  phone wasn't used to lure Miss Zhang.  The phone
6  wasn't used to seek a ransom.  The phone wasn't used
7  during the commission.  So it just comes down that
8  the government has to satisfy; and to survive, a
9  motion at this point has to show that there is
10 evidence in this record even considering whatever
11 inferences that are fair inferences that are shown;
12 that beyond a reasonable doubt that in fact that
13 phone was used in commission with this offense.  An
14 incidental use.  If you rob a bank, it doesn't make
15 any difference that you read a general article on
16 banks three months before; that's not sufficient.
17        And further, Your Honor, it's not a matter
18 of the statute; it's a matter of the constitution.
19 An incidental use of the phone, de minimis use of
20 the phone also would violate the interstate commerce
21 section of the constitution in that that's the whole
22 constitutional basis of the jurisdiction that the
23 government alleges here.  And it's not satisfied by
24 de minimis use.  So it fails for two reasons and
25 that should be stricken from the case.

JURY TRIAL -- June 21, 2019 (Redacted)    21

1          This case should go to the jury solely on
2    the issue of the car and whether that was used in
3    commission of the offense.
4          THE COURT:  Thank you, Mr. Tucker.
5          Mr. Freres.
6          MR. FRERES:  Your Honor, first of all, I
7    didn't hear any argument related as to any of the
8    other elements or anything related to the car
9    itself, so I presume those aren't at issue.  The
10   evidence is extraordinarily strong, and, of course,
11   the defense stood up on its own and said that he
12   acknowledged the defendant used his car and took her
13   back to his apartment where he murdered the victim.
14         When you're talking about the phone.  The
15   phone wasn't used pretty extensively in planning
16   this crime.  Not only was he researching potential
17   kidnappings -- abduction 101, planning a
18   kidnapping -- but he also critically explained
19   exactly his plan to a potential consent -- during
20   the course of a consensual kidnapping with
21   1LostAngel on FetLife, in that he described exactly
22   what he planned to do.  And as part of that, he is
23   feeling out the strengths and weaknesses of his
24   plan.
25         Using Mr. Tucker's example of a bank

1  robbery, I don't think anybody would argue that a

2  potential bank robber had a schematic of the bank

3  and were studying it, you know, to test the

4  weaknesses of the bank and to explore how to commit

5  the crime, that that is not part of the crime.  It

6  is just sort of ridiculous to suggest that.  And

7  that's exactly what the defendant was doing here.

8  He was exploring the weakness of his plan using the

9  duffle bag, binding and gagging someone, stuffing

10  them in the car, taking them to locations, that's

11  the whole purpose of that.

12        So I do think that there is ample evidence

13  to send the phone to the jury on that count, and, of

14  course, I'm happy to argue the rest of them.  The

15  evidence is pretty clear I think on all remainder

16  elements.  So I encourage the Court to deny that

17  motion.

18        Do you have questions, Your Honor.

19        THE COURT:  I do not.

20        Mr. Tucker.

21        MR. TUCKER:  As far as the reference to

22  1LostAngel, there is no showing that that

23  facilitated the commission of this offense or

24  furthered the offense.  That was the consensual

25  discussion was on a woman at FetLife two months

1  before and it did involve a reference to a duffle

2  bag.  But so what, it's not like he went out there

3  and actually had this encounter.  How did that

4  further anything?  It did not.  It was nothing.

5          There is no showing whatsoever that the

6  government can make that that discussion in any way

7  facilitated the commission of this offense simply

8  because he referred to a duffle bag -- so what? --

9  on a phone conversation.  What does that have to do

10  with anything?

11          So in general, Your Honor, and the

12  government does not really lay much emphasis on

13  those website searches or whatever for good reason.

14  There is no showing either that that is connected to

15  this offense, none whatsoever.  So that should be

16  stricken from the indictment.  This case should go

17  to the jury on the issue of the car.

18          THE COURT:  Okay.  Thank you, Mr. Tucker.

19          The motion at this point addressing

20  sufficient -- insufficiency of the evidence.  The

21  test would be if the jury could find beyond a

22  reasonable doubt that the essential elements of the

23  crime were proved and then a motion for acquittal

24  may not be granted; that test further reviews the

25  sufficiency of the evidence as to any rational trier

 1  of fact can find the defendant guilty of a
 2  reasonable doubt or guilt beyond a reasonable doubt
 3  viewing the evidence at this point in a light most
 4  favorable to the government.  So I think that it
 5  remains a question of fact for the jury as to
 6  whether the cell phone or the car advanced, moved
 7  forward, promoted, or facilitated the crime.  So the
 8  motion would be at this stage respectfully denied.
 9          With that in mind, are we ready to bring the
10  jury in, government rest on the record?
11          It's my understanding the first witness for
12  the defense would be your investigator.
13          MR. TASEFF:  It would be Anthony Manganaro.
14          THE COURT:  Okay.  And then you would move
15  on to Miss Zortman, I believe.
16          MR. TASEFF:  Then Mr. Profancik.
17          THE COURT:  Okay.
18          MR. TASEFF:  Then we will proceed with
19  Miss Zortman.
20          THE COURT:  And then we will see where we
21  are, and we will either break for lunch and conclude
22  this afternoon or we will see where we are.  We
23  definitely would, no matter where we are, break over
24  the noon hour day.  We have a juror that's arriving
25  momentarily, still five or ten minutes.  So why

 1  don't we just recess until that juror gets here.

 2          Okay.  All right.  Thank you.

 3          (Open court, 9:15 a.m.)

 4          THE COURT:  All right.  We are on the record

 5  in the matter of the United States v. Brendt

 6  Christensen.

 7          We have all jurors present.  It is Friday,

 8  June 21st.

 9          Are the parties ready to proceed?

10          MR. MILLER:  Yes, Your Honor.

11          THE COURT:  Okay.  Defense ready?

12          MS. POLLOCK:  Yes, Your Honor.

13          THE COURT:  We are waiting on Ms. Pollock.

14  Very good.  We have jurors.  Everybody is here.

15  Shall we bring the jury in?

16          MR. MILLER:  Yes, Your Honor.

17          (Jury present, 9:17 a.m.)

18          THE COURT:  Please be seated, everybody.

19          Ladies and gentlemen, we will conclude

20  evidence today.  It may be by noon.  It may be by

21  early to mid afternoon, but we will conclude

22  evidence today.

23          Anything further from the government?

24          MR. MILLER:  No, Your Honor.

25          The government rests at this time.

JURY TRIAL -- June 21, 2019 (Redacted)     26

1          THE COURT:  All right.  Government has
2  rested.
3          Is the defense prepared to go forward?
4          MR. TASEFF:  We are, Your Honor.
5          THE COURT:  Okay.  Mr. Taseff, first
6  witness.
7          MR. TASEFF:  Special Agent Anthony Morgan
8  Manganaro.
9          (Witness sworn.)
10         THE COURT:  All right.  Very good.  Have a
11  seat, sir.  As soon as -- we will help you get
12  situated.  As soon as you're situated, Mr. Taseff,
13  it's your witness.
14                   ANTHONY MANGANARO,
15  after having been duly sworn, testified as follows:
16                   DIRECT EXAMINATION
17  BY MR. TASEFF:
18  Q.  Will you please tell us again your full name and
19  your occupation?
20  A.  Good morning.  My name is Anthony Manganaro.
21  That's spelled M-a-n-g-a-n-a-r-o.  I'm a special
22  agent with the FBI.
23  Q.  And Special Agent Manganaro, you and Agent
24  Huckstadt are the two case agents assigned to this
25  case, U.S. United States v. Brendt Allen

1 Christensen?

2 A.   Correct.

3 Q.   You have been involved in this case in its

4 earliest stages in June of 2017?

5 A.   That's correct.

6 Q.   And as the joint case agent assigned to this

7 case, you have sat with us in this courtroom during

8 almost every session of this trial, correct?

9 A.   That's correct.

10 Q.   Including Tuesday, June 18, 2019, at which one

11 Charles Hill testified in this case, correct?

12 A.   Yes, I was present for his testimony.

13 Q.   And you witnessed and heard what Mr. Hill had to

14 say under oath during his testimony in this

15 courtroom, correct?

16 A.   That is correct, sir.

17 Q.   Sir, directing your attention to September 6,

18 2017, did you have occasion as case agent assigned

19 to this matter to go to the Macon County Sheriff's

20 Office in Decatur, Illinois?

21 A.   I did.

22 Q.   And for what purpose did you go to the Macon

23 County Sheriff's Office on that day?

24 A.   So I had received information through, I guess

25 you could say, a chain of events.  It went from a

1  correctional officer to another superior, and then

2  finally to, I believe, it was one of our task force

3  officers that's assigned to the Springfield

4  Division.  He is a local police officer, who is a

5  task force officer with the FBI; and was informed

6  that Charles Hill, who testified, potentially had

7  some information having been in contact with the

8  defendant while he was incarcerated there at Macon

9  County.

10 Q.   Did other law enforcement agents accompany you

11 to the jail or to the sheriff's office on that day?

12 A.   Yes.  So our two task force officers, the one

13 who reported to me, Trevor Stollis, and another task

14 force officer that we have who is with the

15 University of Illinois Police Department, the three

16 of us went to Macon County Jail to meet with

17 Mr. Miller.

18 Q.   And the third officer is?

19 A.   Barbara Robbins.

20 Q.   Barbara Robbins.  And is she with the University

21 of Illinois Police Department?

22 A.   She is.  She is no longer a task force officer

23 with us, but she was at the time.

24 Q.   Now did the three of you meet with Mr. Miller in

25 a room at the sheriff's office that day?

 1  A.   In the detention center, yes.

 2  Q.   Did you show Mr. Hill your identification?

 3  A.   I did.

 4  Q.   And did your fellow officers do the same?

 5  A.   Yes.

 6  Q.   And did you explain your purpose with meeting

 7  with him that day?

 8  A.   We did.

 9  Q.   Did you ask him questions?

10  A.   Yes.

11  Q.   And during the course of that conversation, were

12  you taking notes?

13  A.   I can't specifically recall.  It would have been

14  me taking notes, most likely.  I know that I was one

15  who subsequently wrote the report of that interview.

16  Q.   And during the course of the interview, did

17  Charles Hill at any time tell you that Brendt

18  Christensen had told him that Brendt possessed a

19  police radio or walkie-talkie devise on the day that

20  Miss Zhang purportedly entered the car?

21  A.   At the, I guess, risk of committing any sort of

22  hearsay, what I can say is within my report there is

23  no mention of a walkie-talkie, no.

24  Q.   Now you mention your report.  The FBI has a --

25          THE COURT:  Well, this is impeachment, or

1  this is, of Mr. Hill.  He can answer that question

2  without risk of hearsay if you want to.

3          MR. TASEFF:  Indeed.

4          THE COURT:  If you want him to answer that

5  question, he can answer it as opposed to his report

6  doesn't say it; you can ask him if he told him that.

7          MR. TASEFF:  I will rephrase.  Thank you,

8  Your Honor.

9  BY MR. TASEFF:

10  Q.  At no time during --

11          MR. MILLER:  I guess at this point it seems

12  -- he is on direct, so I don't think that he has

13  been hostile, so I think he shouldn't be asking

14  leading questions at this point.

15          THE COURT:  To some extent.

16          Go ahead, Mr. Taseff.  Ask a direct

17  question.

18  BY MR. TASEFF:

19  Q.  Did Mr. Hill at any time during the course of

20  the interview reference Mr. Christensen telling him

21  about a police radio or walkie-talkie device?

22  A.  No.  Throughout the conversation Mr. Hill did

23  not mention a walkie-talkie or restraining devices.

24  Q.  Did Mr. Hill during your interview at any time

25  reference zip ties or any kind of hand restraints?

1  A.   No, to me he had never mentioned that.

2  Q.   Had Mr. Hill told you and your fellow officers

3  at any time during the interview matters concerning

4  police radio, walkie-talkie, or zip ties and hand

5  restraints, what would you have done with that

6  information?

7  A.   That information would have been notable, like

8  the mention of the posing of the police officer and

9  the badge in my report; it would have followed

10  shortly after that line, most likely had that been

11  mentioned.

12  Q.   It would have gone in your report?

13  A.   Yes.

14  Q.   A 302?

15  A.   Correct.

16  Q.   What is a 302?

17  A.   The FD 302 is the document that we used to

18  memorialize substantial or really kind of all of our

19  investigative action, whether it be interviews or

20  the serving of warrants, things along those lines.

21  Q.   What does your 302 that you prepared in

22  connection with this case say with respect to zip

23  ties or police radios?

24  A.   There is no mention of zip ties or police radios

25  in my 302.

1  Q.  And that's because Charles Hill never told you
2  one word about those matters?
3  A.  That is correct.
4        MR. TASEFF:  No further questions.
5        THE COURT:  Mr. Miller.
6                  CROSS-EXAMINATION
7  BY MR. MILLER:
8  Q.  What did Charles Hill tell you on September 6,
9  2017?
10  A.  What he told me and what is memorialized in that
11  302, is that in his interactions with the defendant,
12  the defendant had disclosed to him that to get
13  Miss Zhang into his car, he presented a badge and
14  presented himself as a police officer.
15  Q.  And regarding the circumstances of that
16  interview, how would you describe Mr. Hill's
17  willingness to speak with you?
18  A.  He was very reluctant at first.  He didn't want
19  to talk to myself or the task force officers that
20  were with us.  He did eventually disclose to us and
21  kind of seemed to give the bare minimum, as it were.
22  That's not uncommon in my experiences both as a
23  police officer and a special agent to kind of have
24  that interaction.
25  Q.  Is it fair to say that he didn't reach out to

1  you, correct?

2  A.   No.  Like I said, he initially didn't even want

3  to talk to me after I explained who I was.

4  Q.   And you reached out to him?

5  A.   Yes.

6  Q.   And he wasn't offered any benefit to speak with

7  you?

8  A.   No.  No benefit was offered.

9  Q.   And you didn't offer him any promises?

10 A.   No.

11 Q.   And you didn't -- and this was September 6,

12 2017, correct?

13 A.   Correct.

14 Q.   So this was within weeks of when he had been in

15 the same jail area with the defendant.

16 A.   I believe that's accurate, yes.  I don't know

17 the exact time frame but it was short.

18 Q.   And then was Mr. Hill, if you know, interviewed

19 by FBI agents then in preparation for this trial?

20 A.   Yes, he was.

21 Q.   And at that time did he disclose additional

22 information?

23 A.   I have reviewed that report and additional

24 information was disclosed, yes.

25 Q.   And in that interview, did he repeat the same

1  information that he also disclosed to you

2  December 6th?

3         THE COURT:  Mr. Taseff, you are making an

4  objection?

5         MR. TASEFF:  Yes.

6         May we approach on sidebar?

7         THE COURT:  Sure.

8         (Proceedings held at sidebar.)

9         MR. TASEFF:  Judge, I apologize for the

10 sidebar, but I never received any subsequent report.

11        MR. MILLER:  Sure, 15373, 15374.

12        THE COURT:  I'm a little confused.  So he

13 didn't initially say anything about radio or things

14 like that.  Did he say it in subsequent --

15        MR. MILLER:  We can call that agent.

16        THE COURT:  -- interview --

17        MR. MILLER:  Yes.

18        THE COURT:  -- in preparation for the trial?

19        MR. MILLER:  Yes.

20        THE COURT:  Okay.  Do you want to confirm

21 that you have the report before we proceed or you

22 are just going to establish this?  Are you done?

23        MR. MILLER:  Yes, that's right.

24        THE COURT:  So, factually, he didn't say it

25 when he went in but when he came to be interviewed

```
 1  for trial he said it then, testified to it.
 2          MR. MILLER:  Right.
 3          THE COURT:  The number is?
 4          MR. MILLER:  15373 and 15374.
 5          MR. TUCKER:  May I take a look?  I will need
 6  a minute.
 7          THE COURT:  Okay.  Let's have a seat.
 8          (Proceedings held in presence of jury.)
 9          MR. TUCKER:  Can we have a minute?
10          THE COURT:  Yes.
11          Mr. Taseff, anything before we proceed?
12          MR. TASEFF:  No.
13          THE COURT:  Go ahead, Mr. Miller.
14  BY MR. MILLER:
15  Q.   Just to sum this up, Charles Hill provided you
16  the information that the defendant had pretended to
17  be a police officer on September 6th of 2017?
18  A.   Correct.
19  Q.   And provided you the information that the
20  defendant had a police badge on September 6th, 2017.
21  A.   That's correct.
22  Q.   And then did you understand from the
23  cross-examination then defense attorneys later went
24  and spoke to him after that occasion?
25  A.   Yes.
```

1 Q.   And then after that, Mr. Hill, again met with

2 FBI agents to repeat the information he had

3 provided?

4 A.   Correct.

5        MR. MILLER:  I have no further questions,

6 Your Honor.

7           THE COURT:  Mr. Taseff.

8                   REDIRECT EXAMINATION

9 BY MR. TASEFF:

10 Q.   When did you and your fellow agents re-interview

11 Mr. Hill in preparation for trial?

12 A.   I was not part of that interview, I'm aware that

13 interview took place in late May of this year.

14 Q.   Late May of 2019?

15 A.   Yes.  I believe the date was May 26, but I

16 cannot be absolutely certain without reviewing that

17 FD 302.

18 Q.   At the time that Mr. Hill was re-interviewed, he

19 was no longer in the custody of the State Department

20 of Corrections, was he?

21 A.   No, I do not believe he was.  I think that he

22 was out on parole or probation.  I can't remember

23 the exact word that was used to describe it.

24 Q.   But in May of 2019, just a month or so ago, you

25 heard him testify that he picked up a new felony

1 case in Macon County in March of this year, correct?

2 A.   Correct.  I think that was the larceny charge

3 that was mentioned.

4 Q.   Yes, the felony retail theft case.

5 A.   Yes.

6 Q.   That he committed on or about March 19th, 2019,

7 correct?

8 A.   Yes.

9 Q.   And that he testified in open court that he goes

10 to court again on July --

11       MR. MILLER:  Just to repeat with the agent

12 what Mr. Hill testified in open court it seems to be

13 inappropriate.  You can ask a question.

14       THE COURT:  Mr. Taseff, tie it up and then

15 make your point about the later interview, if that's

16 what you're going to do.

17 BY MR. TASEFF:

18 Q.   It was at that time he was interviewed that he

19 said those things about those matters that we

20 discussed, correct?

21 A.   If I'm following your line of questioning, yes,

22 he was then interviewed again in May.

23 Q.   Yes.

24 A.   Correct.

25 Q.   With a new felony on his head?

 1 | A.   Yes.
 2 |        MR. TASEFF:  Thank you, sir.  No further
 3 | questions.
 4 |        THE COURT:  Mr. Miller, anything?
 5 |              RECROSS EXAMINATION
 6 | BY MR. MILLER:
 7 | Q.   When he provided you the information on
 8 | September 6th though there was this information
 9 | regarding the felony that he faces now, he didn't
10 | face that back in 2017 when he talked to you, did
11 | he?
12 | A.   Correct.  That was -- that had not yet happened.
13 |        MR. MILLER:  Okay.  No further questions.
14 |        THE COURT:  Anything?
15 |        MR. TASEFF:  Nothing further.
16 |        THE COURT:  You may step down.  Thank you.
17 |        Next witness.
18 |        MR. TASEFF:  We call Alan Profancik.
19 |        THE COURT:  Okay.
20 |        (Witness sworn.)
21 |        Go ahead Mr. Taseff.
22 |              ALAN PROFANCIK,
23 | after having been duly sworn, testified as follows:
24 |              DIRECT EXAMINATION
25 |

JURY TRIAL -- June 21, 2019 (Redacted)      39

1  BY MR. TASEFF:

2  Q.   Sir, please tell us your name and spell your

3  name for the record?

4  A.    My name is Alan, A-l-a-n; Profancik,

5  P-r-o-f-a-n-c-i-k.

6  Q.   Sir, where do you live?

7  A.   I live in Salem, Illinois.

8  Q.   What is your business or occupation?

9  A.   I am an employee with Kevin McClain

10  Investigations out of Centralia, Illinois.

11  Q.   How long have you been employed with Kevin

12  McClain investigations?

13  A.   Sixteen and a half years.

14  Q.   What is the nature of your duties?

15  A.   I work as a private legal investigator primarily

16  locating, interviewing witnesses.  We get hired by

17  independent counsel, public defender's offices.

18  That's the primary work I do there.

19  Q.   Where -- Kevin McClain investigation is based in

20  Centralia, Illinois?

21  A.   Yes.

22  Q.   You have been employed there for 16 years?

23  A.   A little over that, 16 and a half, yeah.

24  Q.   What are your duties as a private investigator?

25  A.   Reviewing discovery on cases, locating and

1  interviewing witnesses, obtaining statements, if

2  necessary; sometimes could involve visiting crime

3  scenes, photographs, video documentation, and

4  service of court process.

5  Q.   Do you work for criminal defense lawyers?

6  A.   Yes.

7  Q.   Do you work for public defenders?

8  A.   Yes.

9  Q.   Do you work for civil attorneys on civil cases?

10  A.   Yes.

11  Q.   Have you ever worked for government prosecutors?

12  A.   A couple times, yes.

13  Q.   In what connection?

14  A.   The Attorney General's Office out of Springfield

15  just within the last couple of years we assisted

16  them in locating witnesses and serving them

17  subpoenas for a grand jury hearing, and then

18  followed up a few months later with serving trial

19  subpoenas on those same witnesses.

20  Q.   So you're a private investigator?

21  A.   Yes.

22  Q.   You were hired to assist lawyers in the

23  investigation of cases?

24  A.   Correct.

25  Q.   In December of 2018, was Kevin McClain

1  Investigations engaged by the Federal Public

2  Defender's Office to provide services in connection

3  with this case?

4  A.   Yes.

5  Q.   And pursuant to that retention of your services,

6  did you accompany me to the Centralia Correctional

7  Center in Centralia, Illinois on December 4, 2018?

8  A.   Yes.

9  Q.   Your office is located where?

10 A.   In Centralia.

11 Q.   And is there also a state prison located in

12 Centralia, Illinois?

13 A.   Yes.  Centralia Correctional Center.

14 Q.   Where is the state prison in relation to your

15 office?

16 A.   It is approximately seven miles west, directly

17 west of our office.

18 Q.   On December 4th, 2018 at approximately 1:00 p.m.

19 that day, did you meet with me at the Centralia

20 Correctional Center?

21 A.   Yes.

22 Q.   Did you meet with any other present?

23 A.   There was another attorney present from Decatur,

24 a Chris Amero.

25 Q.   And is Mr. Amero's last name, A-m-e-r-o?

1  A.   I believe that's how you spell it, yes.

2  Q.   Your understanding was that he had some

3  relationship to Mr. Charles E. Hill?

4  A.   Yes, I believe he was his previous counsel on

5  some county case out of Macon County.

6  Q.   What was your purpose for meeting me at the jail

7  along with Mr. Amero on December 4th of last year?

8  A.   My job was primarily to be as a prover or I

9  would sit in with the interview to basically witness

10 the interview of Charles Hill and document it

11 afterwards.

12 Q.   Were you and I and Mr. Amero allowed into the

13 institution that day?

14 A.   Yes, we were.

15 Q.   What happened once we were allowed entry to

16 Centralia Correctional Center on that day?

17 A.   Once we went in, Mr. Amero went in by himself

18 with Mr. Hill into an interview room and met with

19 him for a few moments.  After a number of minutes,

20 he came out and told us he was in agreement to speak

21 with us, so then we both went in there and sat with

22 Mr. Amero and Mr. Hill and proceeded to interview

23 Mr. Hill.

24 Q.   During the course of the interview with Charles

25 Hill, was Mr. Hill's lawyer, Mr. Amero, present

JURY TRIAL -- June 21, 2019 (Redacted)      43

1  during the entire interview?

2  A.   Yes, he was.

3  Q.   Were you present during the entire interview?

4  A.   Yes, I was there.

5  Q.   And was I present during the entire interview?

6  A.   Yes.

7  Q.   And during that interview of Mr. Hill, was he

8  asked if he had ever made comments to the FBI about

9  Brendt Christensen possessing a police officer's

10  badge?

11  A.   Yes, he was asked that question.

12  Q.   What did he say?

13  A.   He first answered with, *this is the first time I*

14  *have ever heard anything about that,* referring to

15  the badge, and then he followed up with he had never

16  made any such comment when he was interviewed by the

17  FBI.

18  Q.   Do you recall him saying those responses as

19  answers to the questions that he was posed about the

20  police badge?

21  A.   Yes.

22       MR. TASEFF:  Thank you, sir.  Those are my

23  questions.

24                  CROSS-EXAMINATION

25  BY MR. MILLER:

1  Q.   So in this case you are employed by the
2  defendant?
3  A.   By the Federal Public Defender's Office, yes.
4  Q.   And that's who pays you in this case?
5  A.   As far as pay goes, I'm not really sure how that
6  structure works.  I simply turn in my time and
7  that's it.
8  Q.   You're not a law enforcement officer?
9  A.   No, I am not.
10 Q.   And you understand that means that, for example,
11 if you go to interview someone, they don't have a
12 legal obligation to speak with you, right?
13 A.   Right.
14 Q.   They don't even have a legal obligation to tell
15 you the truth, right?
16 A.   It happens, that's correct.
17 Q.   In your -- you said 16 years, you have been
18 doing this work?
19 A.   Yes.
20 Q.   And you said you served some subpoenas for the
21 attorney general, but almost all of the work you do
22 is for public defender's offices, right?
23 A.   A lot of it is, yes.
24 Q.   So you're dealing a lot with your clients are
25 public defender's offices who are representing

1  criminal defendants, right?

2  A.   Correct.

3  Q.   I take it over 16 and a half years you have

4  learned that there are many defendants out there who

5  will cooperate with the prosecution maybe to help

6  themselves in their own case?

7  A.   I have encountered that, yes.

8  Q.   And certainly is not uncommon for inmates to

9  learn things when they are in custody from other

10 inmates?

11 A.   Yes.

12 Q.   And you probably heard the phrase if somebody

13 talks when they are in jail, they've been labeled a

14 snitch?

15 A.   Yes.

16 Q.   And you probably are familiar with the phrase

17 that *snitches get stitches*?

18 A.   Yes.

19 Q.   And what does that phrase mean?

20 A.   If you talk you get hurt.

21 Q.   And in fact Charles Hill -- you reviewed the

22 reports in this case for Charles Hill?

23 A.   Yes.

24 Q.   You are aware that he was in protective custody

25 in Macon County back in July and August when he was

1 with the defendant?

2 A.   Yes.

3 Q.   And that was because he was going to testify

4 against a co-defendant, right?

5 A.   Correct.

6 Q.   So that's why he was in protective custody to

7 make sure that snitches don't get stitches?

8 A.   Right.

9 Q.   And that's when he -- where he met the

10 defendant?  That's where he met the defendant when

11 he was in the protective custody if you know that?

12 A.   I believe he was in an adjacent cell is what he

13 said.

14 Q.   And so -- and you were aware from reviewing the

15 reports that on -- there was a report written on

16 September 6, 2017, that Mr. Hill had told Agent

17 Manganaro of the FBI that the defendant had used a

18 police badge and pretended to be a police officer to

19 lure the victim in his car?

20 A.   Yes, I read that.

21 Q.   And so then when you went to Centralia with the

22 defendant, this was, what, 15 months after Mr. Hill

23 had made that statement?

24 A.   Yes.

25 Q.   And you were going to approach Mr. Hill about

1  the statement?

2  A.   Yes.

3  Q.   Did you arrange for an attorney to be there with

4  Mr. Hill?

5  A.   I did not make the arrangements to be there.

6  Q.   But did you know was the reason that the

7  attorney was there to try to convince Mr. Hill to

8  cooperate with you?

9  A.   He was going to inquire with him -- he

10 basically, yeah, facilitated the visit.

11 Q.   Because Mr. Hill isn't the type of person who

12 would normally just talk to other people; is that

13 fair to say?

14        MR. TUCKER:  There's no basis for this man

15 to know that, Judge.

16 BY MR. MILLER:

17 Q.   Did you interview Mr. Hill?

18        THE COURT:  If he knows.

19 BY THE WITNESS:

20 A.   Okay.  Could we repeat the question, please?

21 BY MR. MILLER:

22 Q.   Yeah, yeah.  You interviewed Mr. Hill.  Did you

23 take it as the type of person who just wanted to

24 provide information freely?

25 A.   That was my first meeting with Mr. Hill.  I did

1  not conduct the interview.  I simply listened.

2  Q.   Fair enough.  But the purpose for you to be

3  there then was to follow-up on the interview that

4  the FBI had conducted back on September 6th, right?

5  A.   Yes.

6  Q.   And the purpose was to obtain information

7  hopefully that would be helpful if Mr. Hill ever

8  testified against the defendant?

9  A.   Yes.

10  Q.   And after his attorney that you contacted spoke

11  with Mr. Hill, then Mr. Hill spoke with you?

12  A.   Yes.

13  Q.   And it's fair to say that he was under no

14  obligation to speak with you, right?

15  A.   Right.

16  Q.   He wasn't under oath when he spoke to you?

17  A.   No.

18  Q.   He was under no legal obligation to tell you the

19  truth, correct?

20  A.   No.

21  Q.   So it's not like court when someone is

22  subpoenaed to come to court, they have to come to

23  court, right?

24  A.   Yes.

25  Q.   So like when you're testifying in court you are

1  under oath, correct?

2  A.   Yes.

3  Q.   So when you speak to him, he is incarcerated,

4  right?

5  A.   Yes.

6  Q.   And he is in the general population of

7  Centralia, right?

8  A.   I wasn't sure what capacity he was in there in.

9  Q.   But in the general population, that's the place

10  where snitches get stitches, right?

11  A.   Yes.

12  Q.   And so you show up, and you tell him that you're

13  representing the defendant, right, or somebody there

14  does?

15  A.   He was explained that, yes.

16  Q.   So he understands that he you are representing

17  the defendant and you didn't tell him, *Hey, whatever*

18  *you tell us is confidential, we won't tell the*

19  *defendant;* he wasn't told that, right?

20  A.   No.

21  Q.   He knew the information that he gave you was

22  going to be information that the defendant would

23  know, right?

24  A.   I don't know if he would or not.

25  Q.   You presume that, right, if you are there

1  representing the defendant?

2  A.   Yes.

3  Q.   So then you basically -- let me ask you:  From

4  your experience, if an inmate comes up to another

5  inmate in jail and says, *Hey, did you snitch on me?*

6  What is that inmate going to say?

7  A.   No.

8  Q.   Okay.  That's exactly right.  So here you are

9  representing the defendant, and you basically asked

10  the defendant, Hey, I'm sorry -- they are

11  interviewing Mr. Hill and you ask Mr. Hill, *Hey, did*

12  *you snitch on the defendant?*  That's not how you

13  phrase it, right?  You phrased it, *Hey, did you talk*

14  *to the FBI and tell them that he pretended to a*

15  *police officer,* right?

16  A.   Could you rephrase that whole question for me?

17  Q.   Yeah.  Very good.

18        You are asking Mr. Hill about his prior

19  interview with the FBI?

20  A.   Yes.

21  Q.   And you were asking him if he had told the FBI

22  that the defendant had pretended to be a police

23  officer?

24  A.   Yes.

25  Q.   And you're asking him if he told the FBI agent

1 whether the defendant had had a police badge?

2 A.   Yes.

3 Q.   Right.  And he said, *no,* right?

4 A.   He said that that's the first time that he ever

5 heard such a thing.

6 Q.   Right, he didn't snitch on the defendant, that's

7 what he told you, right?

8 A.   I'm not sure how to answer that.  Our purpose of

9 the whole interview was just to go over his meeting

10 with the FBI.

11 Q.   Got it.

12 A.   What did you tell him, what did they ask you,

13 what did you tell them.

14 Q.   Then you wrote a report on this, right?

15 A.   Yes.

16 Q.   And that was back on December 4th of 2018?

17 A.   Yes.

18 Q.   Are you aware of whether that report was ever

19 turned over to the prosecution prior to trial?

20 A.   No, I am not.

21 Q.   And was this the only the report that you wrote

22 in this case?

23 A.   No.

24 Q.   You wrote other reports in this case?

25 A.   Yes.

1  Q.   Regarding other witnesses?

2  A.   Yes.

3  Q.   About how many reports do you think you wrote?

4  A.   I would have to really go back and look.  I

5  really -- I don't know.

6  Q.   And you're unaware of whether any of those were

7  turned over to the prosecution?

8  A.   No, I am not.

9         MR. MILLER:  Okay.  I have no further

10  questions, Your Honor.

11         THE COURT:  Mr. Taseff, anything?

12                 REDIRECT EXAMINATION

13  BY MR. TASEFF:

14  Q.   Who was present with us during the interview

15  with Mr. Hill?

16  A.   Yourself and Attorney Chris Amero.

17  Q.   And prior to our talking to Mr. Hill on

18  December 4th, what did Mr. Amero do with Mr. Hill

19  before he even agreed to speak with us?

20         MR. MILLER:  I guess that I'm going to

21  object.  It's starting to get into attorney-client

22  between Mr. Hill and his attorney.

23         THE COURT:  Well, if it's limited to -- as I

24  learned on direct that if Mr. Amero went in and

25  talked to Mr. Hill and then brought in Mr. Taseff.

1  And Mr. Profancik then, I think that he can testify

2  to that, but if that's where you are going with

3  this.

4       MR. TASEFF:  Indeed.

5       THE COURT:  You already established it, but

6  I will allow you to answer it.

7       Go ahead.

8  BY THE WITNESS:

9  A.   Okay.  Mr. Amero explained to us that he was

10 going to try to talk to Charles Hill to explain the

11 purpose of our visit and interview.

12 BY MR. TASEFF:

13 Q.   And did he proceed to speak with Mr. Hill?

14 A.   Yes, he did.

15 Q.   Privately in the interview room?

16 A.   Yes.

17 Q.   Outside of our presence?

18 A.   Yes.

19 Q.   Indeed.  Where were we when Amero was speaking

20 with his client, Mr. Hill?

21 A.   We were sitting in the hallway on a bench.

22 Q.   Nowhere near that room?

23 A.   No.

24 Q.   After a period of time did Mr. Amero emerge from

25 the room?

```
 1  A.   Yes.

 2  Q.   Did he approach us?

 3  A.   Yes.

 4  Q.   Did we then go with him?

 5  A.   Yes.

 6  Q.   Into the room?

 7  A.   Into the room.

 8  Q.   And commence the interview?

 9  A.   Yes.

10  Q.   And Mr. Hill proceeded to answer our questions,

11  correct?

12  A.   Yes.

13         MR. TASEFF:  Those are my questions.

14         THE COURT:  Mr. Miller, anything?

15         MR. MILLER:  Nothing, Your Honor.

16         THE COURT:  Thank you, sir.  You may step

17  down.  Do you want to push that microphone away.

18  There you go.

19         Next witness.

20         MS. POLLOCK:  The defense calls Michelle

21  Zortman, Your Honor.

22         THE COURT:  Is somebody getting her?

23         MS. POLLOCK:  Yes.

24         THE COURT:  Michelle Zortman?

25         Miss Zortman, when you approach will you
```

1 please stop short of the witness stand and raise

2 your right hand please and be sworn.

3            (Witness sworn.)

4            THE COURT:  Go ahead have a seat.

5            All right, Ms. Pollock.

6                       MICHELLE ZORTMAN,

7 after having been duly sworn, testified as follows:

8                   DIRECT EXAMINATION

9 BY MS. POLLOCK:

10 Q.   Good morning.  Can you please state your name

11 and spell your last name for the record?

12 A.   Michelle Zortman, Z-o-r-t-m-a-n.

13 Q.   And, Michelle, how old are you?

14 A.   31.

15 Q.   You used to live in Champaign, Illinois,

16 correct?

17 A.   Yes.

18 Q.   Have you recently moved out of state?

19 A.   Yes.

20 Q.   Do you now reside with your mother?

21 A.   Yes.

22 Q.   And are you currently working?

23 A.   No.

24 Q.   You used to be married to Brendt Christensen,

25 correct?

1  A.   Yes.

2  Q.   And at that time your name was Michelle

3  Christensen?

4  A.   Yes.

5  Q.   When did you first meet Brendt?

6  A.   We went to high school together in Stevens

7  Point, Wisconsin.  We worked together at Kmart.  We

8  began dating in 2008.

9  Q.   2008.  Did you actually hang out when you were

10  in high school?

11  A.   No.

12  Q.   But you just knew who he was?

13  A.   Yes.

14  Q.   Were you ahead of him or behind him in school?

15  A.   One year ahead.

16  Q.   One year ahead.  And you stated that you worked

17  at Kmart with him?

18  A.   Yes.

19  Q.   What was your job?

20  A.   I was cashier.

21  Q.   What was his?

22  A.   Cashier.

23  Q.   Okay.  You started dating in 2008 you said?

24  A.   Yes.

25  Q.   How old would you have been at that time?

1  A.   I would have been 20.

2  Q.   And how old was he?

3  A.   He would have been 19.

4  Q.   So, if I remember correctly, when Brendt was 19

5  he had an accident; do you remember that?

6  A.   Yes.

7  Q.   Can you describe what that was?

8  A.   In June of 2008, he was working for a roofing

9  company and a board beneath him broke and he fell

10  many feet onto the concrete below.

11  Q.   What happened to him as a result of that?

12  A.   He had some minor back injuries and some severe

13  elbow and wrist injuries.

14  Q.   Did he break pretty much everything?

15  A.   Yes.  His surgeon called it the super bowl of

16  wrist injuries.

17  Q.   The super bowl?

18  A.   Yes.

19  Q.   And were you around him during that time frame

20  when he was recovering from that?

21  A.   Yes.

22  Q.   Where were you living at that time?

23  A.   I was living in Stevens Point with my mom.

24  Q.   And was he also in Stevens Point as well?

25  A.   Yes.

1  Q.  At some point, did he move to Madison,

2  Wisconsin?

3  A.  Yes.

4  Q.  When was that?

5  A.  In 2009.

6  Q.  And what was the purpose of his move?

7  A.  To attend U of W Madison for his bachelor's

8  degree.

9  Q.  Did you move with him?

10  A.  Yes.

11  Q.  Tell us about how that decision was made.

12  A.  I had recently dropped my major at the

13  university and was unsure of my career path, and I

14  was banking on that relationship being successful.

15  Q.  So you decided to move with him?

16  A.  Yes.

17  Q.  And you did move, correct?

18  A.  Yes.

19  Q.  When you moved to Madison, did you guys live

20  together or did you live separately?

21  A.  We lived separately, but we spent most of our

22  time together.

23  Q.  Okay.  So would you say that he spent more time

24  at your place or you spent more time at his place?

25  A.  We spent most of our time at my place.  We slept

1  there every night.
2  Q.   While you were living there, you stated that
3  Brendt was going to school.  Did you have a job or
4  did you go to school?
5  A.   I was working.
6  Q.   Where was that?
7  A.   As a bank teller.
8  Q.   A bank teller?
9  A.   Yes.
10 Q.   And at some point did you guys move in together?
11 A.   Yes.
12 Q.   Do you remember when that was?
13 A.   That would have been the fall of 2010.
14 Q.   So about a year after you moved down there?
15 A.   Yes.
16 Q.   So he was going for his second year of school
17 and were you continuing to work at the bank?
18 A.   Yes.
19 Q.   And when you moved to Madison, and Brendt was in
20 school and you were working, can you tell us what --
21 let's start with the time period when you guys were
22 in separate apartments.  What was a typical weekday
23 like for you?
24 A.   A typical bank job, 8 to 5, Monday through
25 Friday.  During that time he was going to school,

1 and then we would spend our nights and weekends
2 together.
3 Q.   Your apartment?
4 A.   Yes.  Sometimes at his but we would always turn
5 in to at mine; we slept together at mine.
6 Q.   And what kind of things would you guys do
7 together?
8 A.   Watch TV and play video games mostly.
9 Q.   Did you have an active social life at that time?
10 A.   No.
11 Q.   Would you say that you had any social life at
12 that time?
13 A.   Nope.
14 Q.   Did you spend all of your time together?
15 A.   Yes.
16 Q.   Did you ever travel with Brendt or by yourself?
17 A.   We would travel together for holidays to visit
18 family.
19 Q.   At that time where did both of your families
20 live?
21 A.   They were both in Stevens Point, Wisconsin.
22 Q.   How far a trip is that from Madison?
23 A.   An hour and a half, two hours depending on
24 traffic.
25 Q.   For that first year when you guys were in

1  Madison, technically in different apartments, can

2  you recall a time where you spent a night apart from

3  him?

4  A.   There was one night he had some friends visiting

5  from the Milwaukee area, and I stayed at my place

6  and he stayed at his that night.

7  Q.   Is that the only time that you remember?

8  A.   That's the only one that I remember, yes.

9  Q.   Can you think of any other time where you

10 traveled without him or he traveled without you?

11 A.   There was sometimes I drove to Milwaukee for job

12 training, but I would come back the same day so....

13 Q.   So that's a no?

14 A.   No.

15 Q.   What about after you moved in together; did you

16 change your patterns at all?

17 A.   No.

18 Q.   So describe a typical day weekday when you guys

19 were living together?

20 A.   I would go to work; he would go to class; I

21 would come back.  He was usually home by the time I

22 got back, and we'd spend time together at night.

23 Q.   And again the time you spent together was doing

24 what?

25 A.   Playing video games and watching TV and movies.

1  Q.   Okay.  When did you guys get married?

2  A.   In March of 2011.

3  Q.   Okay.  Were you still living in Madison at that

4  time?

5  A.   Yes.

6  Q.   How long overall did you guys stay in Madison?

7  A.   From 2009 to 2013.

8  Q.   And so you guys got married kind of smack dab in

9  the middle of that?

10  A.   Yes.

11  Q.   Can you tell us a little about your wedding?

12  A.   It was very simple.  We got married by a lawyer

13  in a hotel.

14  Q.   In a hotel?

15  A.   Yes, our parents were there as well as two

16  personal friends each.

17  Q.   That was it?

18  A.   That was it.

19  Q.   Okay.  What did you wear?

20  A.   I think I was wearing a green sweater and jeans.

21  Q.   Do you remember what he wore?

22  A.   No.

23  Q.   Okay.  You said that you lived in Madison until

24  2013.  In the time that you -- so I'm breaking this

25  up -- in 2009 you lived in separate apartments but

1  spent all of your time together, right?

2  A.   Yes, yes.

3  Q.   And after that you moved in together?

4  A.   Yes.

5  Q.   Before and after marriage?

6  A.   Yes.

7  Q.   So during that second time frame, can you recall

8  spending a night apart from him?

9  A.   No.

10  Q.   Did you ever travel separately?

11  A.   No.

12  Q.   Did you always travel together?

13  A.   Yes, yes.

14  Q.   Was it common for you guys to communicate with

15  each other during the day?

16  A.   Yes.

17  Q.   How would you do that?

18  A.   Text messages.

19  Q.   While you were at work and he was at school?

20  A.   Yes.

21  Q.   At some point you left Madison.  Can you tell us

22  about how that happened?

23  A.   He applied to several grad schools.  He was

24  accepted to U of I and decided to enroll there so we

25  moved to Champaign in 2013.

1  Q.   Did you support that decision?

2  A.   Yes.

3  Q.   When you came to Champaign, you said for the

4  fall semester of 2013?

5  A.   Yes.

6  Q.   When you guys moved down here, did you decide to

7  go to school or work?

8  A.   I went to school.

9  Q.   For what?

10  A.   Accounting.

11  Q.   And did you get a degree?

12  A.   Yes.

13  Q.   Where from?

14  A.   Parkland College.

15  Q.   Okay.  How long were you in school at Parkland?

16  A.   Two years.

17  Q.   Okay.  Then after you got done at Parkland, did

18  you get a job?

19  A.   Yes.

20  Q.   And where was that?

21  A.   At Busey Bank.

22  Q.   As what?

23  A.   Loan operations.

24  Q.   And did you hold that job until you moved out of

25  state?

1  A.   Yes.

2  Q.   Okay.  During the first couple of years that you

3  guys lived in Champaign, describe what a typical

4  weekday would be like for you.

5  A.   I would go to school or do school work at home;

6  he would go to campus to do his work.  When he came

7  home at night, same routine.

8  Q.   Same as in Madison?

9  A.   Yes; video games and TV.

10  Q.   Social life?

11  A.   None.

12  Q.   Friends outside of the two of you?

13  A.   Not really, no.

14  Q.   Okay.  Did you continue to email and text each

15  other throughout the day?

16  A.   Yes.

17  Q.   Weekends; what were weekends like for you guys?

18  A.   The same thing; we stayed in; we would play

19  video games, watch TV, watch videos, do chores,

20  grocery shopping.

21  Q.   Would you call yourself a private person?

22  A.   Yes.

23  Q.   Are you a fan of being in that chair right now?

24  A.   No.

25  Q.   Do you wish you were not here?

1  A.   Very much.

2  Q.   Okay.  When you guys lived in Champaign, you

3  said that you guys did chores together.  Who was

4  responsible for what?

5  A.   He did most of the cleaning.  I would help with

6  the cleaning he really didn't like to do.  We would

7  take turns cleaning the bathroom, laundry.  I did

8  most of the cooking and grocery planning.

9  Q.   Okay.  Did Brendt ever cook that you remember?

10  A.   He made a steak once in Stevens Point.

11  Q.   Once?

12  A.   Once.

13  Q.   Okay.  Would you consider yourself to enjoy

14  cooking?

15  A.   Yes.

16        MS. POLLOCK:  Your Honor, may I approach the

17  witness?

18        THE COURT:  You may.

19  BY MS. POLLOCK:

20  Q.   I've just handed you what has been marked as

21  Defense 9A, 9B, and 9C.

22        Can you take a look at those for a second?

23        Have you had a chance to look at them?

24  A.   Yes.

25  Q.   What's in those photos?

1  A.   9A appears to be my kitchen with lots of my

2  cooking equipment on shelves.

3          9B is several cookbooks that I owned.

4          9C appears to be the second half of a cookie

5  recipe.

6  Q.   Where was that cookie recipe located?

7  A.   On our fridge.

8  Q.   Okay.  And so this is --

9          MS. POLLOCK:  Your Honor, at this time I

10 move to admit Defendant's 9A, 9B, and 9C into

11 evidence.

12         THE COURT:  Any objection?

13         MR. MILLER:  No objection, Your Honor.

14         THE COURT:  It will be admitted.

15 BY MS. POLLOCK:

16 Q.   You can put those on the stand in front of you.

17         So is it fair to say that all of the cooking

18 equipment was your cooking equipment?

19 A.   Yes.

20 Q.   And the cookbooks were yours?

21 A.   Yes.

22 Q.   And the recipes were yours?

23 A.   Yes.

24 Q.   And Brendt never did any of that stuff?

25 A.   No.

JURY TRIAL -- June 21, 2019 (Redacted)        68

1  Q.  There has been evidence presented in this case
2  of a Google search on Brendt's computer for knife
3  sharpening.
4        Whose job was it to sharpen the knifes?
5  A.  It was mine.  I tried to sharpen them at home.
6  Wasn't very good at it.  And at the time he had more
7  free time, so I tasked him with the duty.
8  Q.  How did you try to do it?
9  A.  I had a wet stone at home.
10 Q.  You just couldn't get it done?
11 A.  No, wasn't very good at it.
12 Q.  You said that he had free time.  Do you remember
13 approximately when this was?
14 A.  This would have been at the tail end of his very
15 last semester at UIUC.  He was wrapping up classes
16 so he had time on his hands.
17 Q.  Did you ask him to take care of that for you?
18 A.  Yes.
19 Q.  Do you remember whether he did it or not?
20 A.  He didn't do.  The knives were very dull.
21 Q.  Okay.  At some point during your relationship,
22 did Brendt ever have a problem with alcohol?
23 A.  Yes.
24 Q.  Do you remember when that was?
25 A.  Started early on when we were still in Madison.

1  It began during winter and summer breaks when he had
2  unlimited time on his hands, he would fill it in
3  drinking.
4  Q.   And what about when he was in school, was he
5  able to stop?
6  A.   Yes.
7  Q.   Did that bother you in any way?
8  A.   It bothered me a little bit during the breaks
9  but because he was able to stop when his school work
10 started up again, didn't press the issue.
11 Q.   Okay.  Did it ever become a larger problem than
12 that?
13 A.   Yes.
14 Q.   And do you remember when that was?
15 A.   2016.
16 Q.   Can you describe a little bit about how that
17 came about?
18 A.   We were having some marital problems and he was
19 having some sleep problems and problems with
20 depression, so sometimes he began drinking during
21 the semester as well.
22 Q.   Okay.  And was he able to stop?
23 A.   Not really.  I asked him to and he would maybe
24 stop for a little bit, but then come up with an
25 excuse to keep drinking.

 1  Q.   Okay.  How did that make you feel?

 2  A.   Angry.

 3  Q.   Did you address it with him?

 4  A.   Yes.

 5  Q.   How many times?

 6  A.   Many times.

 7  Q.   Did it -- would you consider it to be a problem

 8  in your marriage?

 9  A.   Yes.

10  Q.   So I want to talk a little bit --

11       MS. POLLOCK:  Your Honor, can I have a

12  sidebar for a second?

13       (Proceedings held at sidebar.)

14       MS. POLLOCK:  We haven't ruled yet on

15  whether or not the marital privilege has been

16  breached by the statements elicited from

17  Miss Bullis, and I don't know what your position is

18  on that.  If you think that it's been breached, then

19  her conversation with her husband from December of

20  2016 is probably coming in.  But I don't want to ask

21  her if it hasn't been breached.  But if it has, then

22  I do want to ask.

23       MR. MILLER:  I believe that it has been

24  breached, but I don't believe that it is admissible

25  from the defense because it is going to be hearsay

1  statements from the defendant.

2       THE COURT:  A hearsay statement from the

3  defendant relating to his wife?

4       MR. MILLER:  Right, right.

5       MS. POLLOCK:  But it's not being offered for

6  the truth of the matter.  It is being offered to

7  show what was the state of mind.  We put in the

8  state of mind about killing an issue and that's what

9  it's about.  So it's not being offered for the

10  truth.  It's showing the degradation of the marriage

11  leading up to Miss Bullis, how his state of mind was

12  at the time.

13       MR. MILLER:  We will see kind of the answers

14  and --

15       MS. POLLOCK:  I just want to know from the

16  Court.  Our position is that Miss Bullis wasn't

17  specific, so we don't think that it is breached

18  but --

19       THE COURT:  Well, nobody has raised the

20  issue for me to rule, right?

21       MS. POLLOCK:  Well, if they want to, if they

22  are going to ask her about it in cross then I need

23  to deal with it.

24       THE COURT:  What do you plan?

25       MR. MILLER:  I think that we've briefed the

```
 1  issue.  I thought the Court had ruled anything that
 2  he had said to somebody else.  So to the extent that
 3  Miss Bullis testified three times to the things that
 4  Brendt told her about this conversation with her, so
 5  I think the nature of the conversation we believe it
 6  has been breached.
 7           THE COURT:  But conversations between Brendt
 8  and Michelle would be privileged though, right?
 9           MS. POLLOCK:  Right, but he told Miss Bullis
10  that he said some things that disturbed Michelle,
11  that that's specifically -- we haven't heard exactly
12  what that was.
13           THE COURT:  Can't they waive the privilege?
14           MR. MILLER:  They can waive.
15           MS. POLLOCK:  We can, but I'm saying if I do
16  that affirmatively then I just want to know if
17  someone is going to bring it up in cross because
18  then I won't ask her.
19           MR. MILLER:  Well.
20           THE COURT:  I assume if it comes up then he
21  is going to bring it up in cross.  Miss Pollock did
22  not bring it up then you're not going to bring it up
23  in cross.
24           MS. POLLOCK:  That's right.
25           MR. MILLER:  I think it comes up in cross.
```

1        MS. POLLOCK:  Only if the Court rules the
2  privilege has been breached.
3        THE COURT:  Well, I don't know.  I think
4  that there is a real balance here.  I'm not sure
5  that it has been breached completely.
6        So, the question is, Miss Bullis, you're
7  saying that Miss Bullis testified that conversations
8  with Michelle --
9        MR. MILLER:  No, no.
10        THE COURT:  Conversations with Brendt that
11  things that Brendt said to Michelle that disturbed
12  Michelle.  So if you want to explore that, then you
13  would be limited to that.  I think that we should
14  just stay there because I think that -- unless you
15  want it opened.  I don't think this door needs to be
16  as wide open.
17        MR. MILLER:  I think that it depends on how
18  they portray why she did what she did.  She told the
19  agents, you know, that that conversation was
20  precipitated a lot of what she did after that.
21        MS. POLLOCK:  Well, all I'm going to say is
22  did you and Brendt have a conversation and he said
23  some things to disturb you and in return you
24  distanced from him.
25        THE COURT:  Just limit it there.

1          MS. POLLOCK:  Yeah.

2          THE COURT:  Then there will be a little room

3  for you, but I think that we ought to keep it in

4  that frame if we can.

5          Okay.  Thank you.

6          (In open court.)

7          MS. POLLOCK:  Sorry about that.

8          THE COURT:  Go ahead.

9  BY MS. POLLOCK:

10  Q.   Do you recall December of 2016?

11  A.   Yes.

12  Q.   And there was a night in December of 2016 when

13  Brendt got really drunk.  Do you remember that?

14  A.   Yes.

15  Q.   And he said some things that really disturbed

16  you that night, right?

17  A.   Yes.

18  Q.   And after that were things ever the same in your

19  marriage?

20  A.   Never the same.

21  Q.   Okay.  And what happened in your marriage after

22  like starting the spring semester of 2017?

23  A.   His drinking was getting worse as well as abuse

24  of other substances.  And I had met someone at work

25  who propositioned me with the idea of an open

1  relationship.  I brought the idea to Brendt, and

2  after thinking of it, he agreed.

3  Q.   Let's take that apart a little bit.

4        Who was the person at work that you met?

5  A.   Ryan Vela.

6  Q.   You were interested in him romantically?

7  A.   Yes.

8  Q.   And he came to you with the idea of opening the

9  marriage?

10  A.   Yes.

11  Q.   Do you know what the state of his marriage was

12  at that time?

13  A.   He had an open marriage at the time, yes.

14  Q.   Had you ever considered this before?

15  A.   Fleeting thoughts.  No, never seriously.

16  Q.   But you and Brendt had never had other partners

17  in your whole relationship?

18  A.   No.

19  Q.   So you were intrigued by the idea?

20  A.   Yes.

21  Q.   And you brought it to Brendt?

22  A.   Yes.

23  Q.   What did he do?

24  A.   He said he needed time to think about it.  And

25  after a few days, he told me he would agree to it.

1  Q.   Okay.  You have known him for a really long
2  time, right?
3  A.   Yes.
4  Q.   How emotionally expressive is he in general?
5  A.   Not very.
6  Q.   Not very.  Would you say -- how would you
7  describe him in terms of his ability to express his
8  emotions?
9  A.   Weak.
10 Q.   Was that an issue in your marriage?
11 A.   Yes.
12 Q.   Okay.  And did anything about his response
13 indicate to you that he was upset or angry or
14 frustrated?
15 A.   No.
16 Q.   Would it have been typical for him to express
17 those emotions to you?
18 A.   Not really.
19 Q.   Okay.  So after he consented to your idea, do
20 you know whether or not he -- I assume you and Ryan
21 began dating as per your agreement?
22 A.   Yes.
23 Q.   Did Brendt immediately go out and start dating
24 somebody?
25 A.   No, not right away.

Q.   Do you know how long it took him to do that?

A.   A few weeks.

Q.   Do you know how he did it?

A.   I think that he had accounts I think on OkCupid
and some other dating services.  I didn't ask
specifics.

Q.   Did you guys have rules of engagement for dating
whoever you were going to date?

A.   Loosely, yes.

Q.   Do you remember what they were?

A.   We'd always spend more time with each other than
other people, and if we felt someone was becoming a
problem, we would talk it through.

Q.   Okay.  At some point did you get to the point
where there was a problem?

A.   Yes.

Q.   Can you tell us about that?

A.   In March I had told him that I was contemplating
divorce.

Q.   Do you remember why you felt that way?

A.   I felt like our marriage had hit a dead end with
his drinking and substance abuse.

Q.   Did you bring that topic up with him?

A.   Yes.

Q.   And this time how did he respond?

1  A.   He was very emotional.  He was very upset.  He

2  was crying.

3  Q.   Did you ever remember him crying before?

4  A.   No.

5  Q.   Not in all of the years you were with him?

6  A.   No.

7  Q.   How did that affect you when you saw his

8  reaction?

9  A.   I thought it was genuine.  I was surprised that

10 he had had that strong of a reaction.

11 Q.   Did it change your thinking about the possible

12 divorce?

13 A.   Yes, he had convinced me to stay.

14 Q.   Okay.  And you did, correct?

15 A.   Yes.

16 Q.   Up to that point in your relationship -- so from

17 when you began dating up until 2017 in the spring,

18 had the two of you ever engaged in, what I'll call,

19 alternative sexual practices?

20 A.   No.

21 Q.   Had you ever experimented in BDSM?

22 A.   No.

23 Q.   Was everything -- I mean would you characterize

24 it as normal?

25 A.   Yes.

 1  Q.  At some point in the spring of 2017, did you

 2  become aware of a woman named Terra Bullis?

 3  A.  Yes.

 4  Q.  And who is Terra Bullis?

 5  A.  That was his girlfriend at the time, Bunny.

 6  Q.  Bunny.  And was that nickname that people used

 7  with her?

 8  A.  Yes.

 9  Q.  Was it just Brendt or was it just more than one

10  person?

11  A.  It was my understanding that everybody called

12  her that.

13  Q.  Everybody called her Bunny?

14  A.  Yes.

15  Q.  Do you know how he me her?

16  A.  I think on an online dating site.

17  Q.  Did he discuss, without telling me exactly what

18  he said, but did he discuss his relationship with

19  Bunny with you at any point?

20  A.  Yeah, a few times.

21  Q.  And did he make you aware or were you aware that

22  Bunny and Brendt had done some experimenting

23  sexually?

24  A.  Yes.

25  Q.  And that -- how would you describe what you knew

1 | about that?

2 | A.   I knew that she was heavily into the BDSM scene,

3 | and that he was interested in it and they were

4 | exploring that.

5 | Q.   Okay.  And again --

6 |          MR. MILLER:  Strike the answer, foundation

7 | as to *heavily into it.*  I assume that is based on

8 | hearsay, Your Honor.

9 |          MS. POLLOCK:  That's fine.

10 |          THE COURT:  Any argument about that?

11 |          MS. POLLOCK:  No.  That's fine.

12 |          THE COURT:  All right.  Sustain as to

13 | *heavily into.*

14 | BY MS. POLLOCK:

15 | Q.   With regards to the BDSM or I'll just say

16 | alternative sexual practices, were you and Ryan also

17 | doing some experimenting?

18 | A.   Yes.

19 | Q.   Even while Brendt was doing whatever he was

20 | doing with Bunny and you were doing whatever you

21 | were doing with Ryan, did the two of you ever engage

22 | in that activity together?

23 | A.   No.

24 | Q.   Had you ever?

25 | A.   No.

1  Q.   Have you ever?

2  A.   No.

3  Q.   Why not?

4  A.   That was not what our relationship was.

5  Q.   Okay.  Now, we heard testimony that when the FBI

6  came to your apartment -- do you remember when they

7  came to your apartment in mid June?

8  A.   Yes.

9  Q.   On June 14th at midnight?

10  A.   Yes.

11  Q.   And during that search they located some items,

12  some restraints and some other items that looked

13  like BDSM gear.  Do you recall that?

14  A.   Yes.

15  Q.   Do you remember how it came about that those

16  items were in your apartment?

17  A.   He and Bunny had used them.  Some of them were

18  hers I think that she had brought from her house,

19  and I believe some he had purchased.

20  Q.   Did you ever use them?

21  A.   No.

22  Q.   Do you recall whether or not you ever had a

23  conversation with him about items like that?

24  A.   We had been talking about buying some bed

25  restraints.

 1  Q.   Okay.  And, but, again, were you going to use
 2  those with him?
 3  A.   No.
 4  Q.   Do you remember when that conversation was?
 5  A.   That spring.
 6  Q.   If I showed you a copy of a text message from
 7  that time would it refresh your recollection as to
 8  that?
 9  A.   Probably.
10       MS. POLLOCK:  Your Honor, may I approach?
11       THE COURT:  You may.
12  BY MS. POLLOCK:
13  Q.   I've just handed you what has been marked for
14  identification as Defendant's Exhibit Number 10.
15       Do you see text messages there?
16  A.   Yes.
17  Q.   And do you recognize your phone number there?
18  A.   Yes.
19  Q.   And do you see the conversation with Brendt's
20  phone number?
21  A.   Yes.
22  Q.   And does that cover the topic that we just
23  talked about, the purchasing of items?
24  A.   Yes.
25  Q.   Can you tell us the date that this conversation

1  took place?

2  A.   April 28, 2017.

3  Q.   Does that refresh your recollection with regards

4  to the time frame that you and Brendt had this

5  conversation?

6  A.   Yes, a bit.

7  Q.   Thank you.  So.

8          In terms of that spring, at some point did

9  you and Ryan decide to go out of town together?

10  A.   Yes.

11  Q.   Can you tell us about that?

12  A.   I believe it was early April or perhaps late

13  March we had decided we wanted to go on a road trip

14  over a long weekend.

15  Q.   Okay.  And where did you want to go?

16  A.   I decided I wanted to go to Wisconsin Dells.

17  Q.   Any particular reason?

18  A.   I had been there many times before in my life

19  and I liked it there.

20  Q.   Okay.  And was there any special significance to

21  that area for you and Brendt?

22  A.   We had gone there multiple times together

23  including our honeymoon.

24  Q.   Okay.  When you made the decision to visit the

25  Wisconsin Dells, did you think anything about Brendt

1  being upset about that?

2  A.   No.

3  Q.   Did it occur to you that he might be upset by

4  that?

5  A.   No.

6  Q.   Did you tell him at the time you decided to go

7  on this trip in March or April, did you tell him

8  that you were going to go?

9  A.   A couple weeks after we decided.  I wanted to

10 wait and see if the relationship was going to pan

11 out and the trip was actually going to happen before

12 telling him.

13 Q.   And when did you schedule that trip?

14 A.   That would have been early April.

15 Q.   No, but when were you going to go?

16 A.   In early June.

17 Q.   Was there a particular reason why that was a

18 good weekend for you?

19 A.   I just picked a day.

20 Q.   Okay.  And you said that you did not tell Brendt

21 immediately, correct?

22 A.   Correct.

23 Q.   When you told him, how did he respond to you?

24 A.   Didn't seem to bother him.  He said that it

25 would be fine if we took a short trip together.

1  Q.   Okay.  And is that consistent with what you

2  described as his lack of emotional expression?

3  A.   Yes.

4  Q.   At any point in time did he change that

5  emotional expression with regards to this trip?

6  A.   A few short days before I left on the trip.

7  Q.   And what changed?

8  A.   He was upset about it.

9  Q.   How did you come to know that?

10  A.   He told me.

11       MR. MILLER:  I guess the issue -- we can't

12  cross-examine on the statement because of the

13  defendant's emotion --

14       MS. POLLOCK:  I didn't.

15       MR. MILLER: -- so it makes a difficult.

16       MS. POLLOCK:  I asked what his emotional

17  response was and how she knew it.

18       THE COURT:  We will address this as we go

19  along here.

20       Move on.

21  BY MS. POLLOCK:

22  Q.   You said he was upset.

23  A.   Yes.

24  Q.   Did you in fact go on that trip?

25  A.   Yes.

1  Q.   Do you remember when you left?

2  A.   Very early in the morning Friday, June 9th.

3  Q.   Is there a reason why you decided to leave at --

4  was it, like, 1 or 2 in the morning?

5  A.   Ryan wanted to drive while it was still dark.

6  Q.   Okay.  And did you?

7  A.   Yeah.

8  Q.   And do you remember when you came home from that

9  trip?

10  A.   In the evening on that Sunday around maybe

11  5:00 p.m.

12  Q.   Okay.  And when you came back, describe the

13  state of your apartment at that time?

14  A.   Normal.  The same way it was when I left.

15  Q.   Did it smell funny?

16  A.   No.

17  Q.   Did it look funny?

18  A.   No.

19  Q.   Did you notice anything out of place?

20  A.   No.

21  Q.   Now, that next day the Monday and Tuesday, did

22  go to work or did you stay home?

23  A.   I stayed home Monday for sure.  I don't remember

24  if I stayed home on Tuesday.

25  Q.   And that Monday, did you observe Brendt remove

1  something from a closet in your apartment?

2  A.   I saw him leave with a duffle bag.

3  Q.   Okay.  And do you remember anything about the

4  duffle bag in particular?  How big it was or --

5  A.   It was a very large duffle bag, but it didn't

6  look like there was much in it.

7  Q.   How could you tell?

8  A.   I just took a brief glance at it.  I was playing

9  a video game at the time, and he said that he was

10 leaving, and I look over my shoulder, saw a duffle

11 bag with not much in it.

12 Q.   Okay.  Did anything strike you about the duffle

13 bag in terms of how it smelled?

14 A.   No.

15 Q.   How it looked?

16 A.   No.

17 Q.   Did he appear to struggle to lift it in any way?

18 A.   No.

19 Q.   Did he tell you where he was going with it?

20 A.   He said he was going to Bunny's house.

21 Q.   Okay.  Now, at some point -- we already talked

22 about the night of the 14th and -- June 14th and the

23 morning of June 15th you recall that the FBI came to

24 your place?

25 A.   Yes.

1  Q.   You do you remember what happened that night?

2  A.   Yes.

3  Q.   Can you tell us your recollection of it?

4  A.   From the beginning, the whole thing?

5  Q.   From when they knocked on the door, what

6  happened.

7  A.   They knocked on the door, we were both sleeping;

8  it woke us up.  Brendt got up and answered the door.

9  I went out into the hallway entrance to see who he

10 was talking to.  It was several FBI members and they

11 were shining flashlights, and they came into the

12 apartment talked to the both of us briefly before

13 leaving with Brendt.

14 Q.   Okay.  And then did you stay at the apartment?

15 A.   Yes.

16 Q.   Did you talk to the FBI?

17 A.   Yes.

18 Q.   Did they interview you?

19 A.   Yes.

20 Q.   And they were there for a long time, right?

21 A.   Several hours.

22 Q.   Okay.  During that interview, did you freely

23 speak to them about issues in your life and issues

24 with Brendt, et cetera?

25 A.   Yes.

1  Q.   Did you consent for them to search your

2  apartment?

3  A.   Yes.

4  Q.   And tell me if I'm misrecollecting this.  Did

5  you believe you had a choice in letting them search?

6  A.   I did not think that I had a choice.

7  Q.   But did you ultimately tell them okay?

8  A.   Yep.

9  Q.   Okay.  And did you continue communicating with

10 an FBI agent after that night?

11 A.   Yes.

12 Q.   Do you remember who it was?

13 A.   Katie Tenaglia.

14 Q.   Were you upset that night?

15 A.   Very.

16 Q.   Did you have concerns about the things that the

17 FBI was bringing up with you about your husband?

18 A.   Yes.

19 Q.   Would you say that you were weary or suspicious?

20 A.   Yes.

21 Q.   Ultimately did the two of you return to as

22 normal as possible as you could during that time?

23 A.   Yes.

24 Q.   Do you remember the date Brendt was arrested?

25 A.   Yes.

1  Q.   Do you remember that it was his birthday?

2  A.   Yes.

3  Q.   And do you remember where he was the night

4  before?

5  A.   Yes.

6  Q.   Where was he?

7  A.   He was out with Bunny.

8  Q.   Okay.  Do you remember seeing him later that

9  evening?

10  A.   Yes.

11  Q.   Describe that for us.

12  A.   I had just gotten home after spending some time

13  with Ryan, and he had called me and asked me to pick

14  them up because he was drunk.

15  Q.   Okay.  You picked him up?

16  A.   Yes.

17  Q.   And describe how he appeared to you?

18  A.   He was drunk.  He was very -- he wasn't being

19  serious.  He was joking around and he was drunk.

20  Q.   Is that -- we are going to go back and lay a

21  little by more foundation on that.

22        Over the years that you lived with him, had

23  you seen him consume alcohol?

24  A.   Yes.

25  Q.   Have you seen him become intoxicated?

```
 1  A.   Many times.
 2  Q.   Would you say that he is a good drunk in that he
 3  can maintain some sort of semblance of normalcy or
 4  is he a terrible drunk that falls down and can't
 5  speak?
 6  A.   He is a good drunk.
 7  Q.   How did his behavior change when he was
 8  intoxicated in your experience?
 9  A.   He was goofier, things were funnier.
10  Q.   Okay.  Could he still talk?
11  A.   Unless he was very drunk, yeah.
12  Q.   Okay.  And you at some point, I believe, told
13  him that you have to cut this out, right?
14  A.   Yes.
15  Q.   Do you remember when you drew that line?
16  A.   I think when I had told him I was seeking a
17  divorce one of the conditions for me staying was he
18  had to go to rehab.
19  Q.   Okay.  Do you know if he ever went?
20  A.   He told me he went once.
21  Q.   Okay.  So, the evening of June 29th when you
22  picked him up, you said he was drunk.  Can you
23  describe how you knew that?
24  A.   After we were all in the car and we were
25  driving, he began picking at the window tint on the
```

1  rear windshield, which smelled horribly, and he

2  would have known it would smell bad because we had

3  previously removed the tint from the passenger

4  driver side windows, which is a very laborious task,

5  so that's when I asked him, *Are you drunk?* because

6  why else would he do that.

7  Q.   And what did he say or what did anyone say?

8  A.   Yeah, he said that he was drinking.

9  Q.   Did Bunny agree with him?

10  A.   I don't remember what she said.

11  Q.   How did you feel about that?  What was your

12  reaction?

13  A.   Incredibly angry.

14  Q.   Did you yell at him?

15  A.   Yep.

16  Q.   Okay.  So, after Brendt was arrested, did you

17  continue to communicate with him?

18  A.   Yes.

19  Q.   And how would you do that?

20  A.   Phone calls.

21  Q.   From where he was staying to your phone?

22  A.   Yes.

23  Q.   Did you continue to support him in any way that

24  you could despite your reservations?

25  A.   Yeah.

1  Q.   Why would you do that?

2  A.   I didn't know what else to do.

3  Q.   We heard some evidence of a phone call that you

4  had with him, I believe, on July, either July 2nd or

5  July 4th of 2017, which would have been just a few

6  days after he was arrested; that phone call the two

7  of you discussed the website Reddit.

8        Do you remember that phone call?

9  A.   No.

10  Q.   If you heard it, would you be able to identify

11  your voice?

12  A.   Yeah.

13        MS. POLLOCK:  Okay.  Miss Klayer, is it

14  possible to play Government's Exhibit 52B-1, please?

15        (Publishing exhibit.)

16  BY MS. POLLOCK:

17  Q.   Can you hear your voice on that tape?

18  A.   Sort of.

19  Q.   Can you hear his voice?

20  A.   More clearly, yes.

21  Q.   Okay.  Do you recall after having heard that did

22  you hear yourself discuss the Reddit account?  You

23  have to say yes or no.

24  A.   Can you repeat that?

25  Q.   Sure.  Did you hear the word *Reddit* on that

1  tape?

2  A.   Yes.

3  Q.   And do you remember anything about that

4  conversation other than what you just heard?

5  A.   No.

6  Q.   Okay.  Did Brendt ask you to hide his Reddit

7  account from the FBI?

8  A.   No.

9  Q.   Based on what you heard, can you recall or at

10  least discern a little bit about what that

11  conversation was really about?

12  A.   It sounds like I was following UIUC at the time

13  and several people had posted they were trying to

14  figure out what his Reddit account was, that's what

15  it sounds like.

16  Q.   And you told him that?

17  A.   Yes.

18  Q.   Why do you think that that was significant?

19  A.   He was asking about what was going on in like

20  the news and stuff so.

21  Q.   So you were trying to update him?

22  A.   Yes.

23  Q.   And again would you characterize your

24  relationship with Brendt and yourself personally as

25  a private or public person?

1  A.   Public -- private, I'm sorry.

2  Q.   And I know you don't know what he was thinking,

3  but based on the context of that conversation, if

4  you did delete stuff on Reddit, why would you have

5  done that?

6  A.   Because he asked me to, and he said that he

7  wanted his privacy.

8  Q.   Now I note that the last year and a half, two

9  years of your life have been pretty awful and I

10  thank you for being here.  You now know, obviously,

11  that Brendt did in fact cause the death of

12  Miss Zhang, correct?

13  A.   Yes.

14  Q.   You still talk to him.

15  A.   Yes.

16  Q.   Why?

17  A.   He was the biggest person in my life for almost

18  a decade during my entire young adulthood, very

19  difficult to cut ties like that.

20  Q.   Do you still care about him?

21  A.   Yes.

22  Q.   As a person?

23  A.   Yes.

24  Q.   You divorced him, correct?

25  A.   Yes.

1  Q.   But you still care about him?

2  A.   Yes.

3        MS. POLLOCK:  Nothing further.  Thank you.

4        THE COURT:  Mr. Miller.

5                    CROSS-EXAMINATION

6  BY MR. MILLER:

7  Q.   Good morning.

8  A.   Good morning.

9  Q.   You -- talking about the offense in this case --

10 you left Champaign on Friday, June 9th?

11 A.   Correct.

12 Q.   And with Ryan Vela?

13 A.   Correct.

14 Q.   And I think it was the early morning hours?

15 A.   Yes.

16 Q.   Maybe around 2:00 a.m.?

17 A.   Yes.

18 Q.   And you took Ryan's car, right?

19 A.   That's correct.

20 Q.   And left the Saturn Astra behind?

21 A.   Yes.

22 Q.   And left the defendant behind, correct?

23 A.   Yes.

24 Q.   And I think you know this wasn't a surprise for

25 the defendant, was it, when you left that day?

1  A.   No, he knew.

2  Q.   He had known, in fact, you planned the trip you

3  said for weeks, right?

4  A.   Yeah, about six weeks.

5  Q.   He had known for --

6  A.   Maybe.

7  Q.   Four weeks?

8  A.   Yeah.

9  Q.   Okay.  Certainly knew before a week or two

10  beforehand, correct?

11  A.   Correct.

12  Q.   And he knew you were leaving on Friday?

13  A.   Yes.

14  Q.   He knew you were coming back on Sunday evening?

15  A.   That's correct.

16  Q.   And you returned around 5:00 p.m. on Sunday

17  evening, correct?

18  A.   Yes.

19  Q.   So you were gone for approximately two and a

20  half days?

21  A.   Yes.

22  Q.   And so you weren't in Illinois around 9:00 a.m.

23  on Friday, June 9th?

24  A.   No.

25  Q.   Or around 2:04 p.m. on Friday, June 9th.

1  A.   No.

2  Q.   Or all day on Saturday?

3  A.   Correct.

4  Q.   Now we talked about some of the defendant's

5  state of mind that time, the defendant was also

6  stressed around June, right, because he was going to

7  have to get a job?

8  A.   That's correct.

9  Q.   And like you said, you met while he was in

10  school at Stevens Point?

11  A.   Yes.

12  Q.   And he had basically attended school during the

13  entire period of your marriage?

14  A.   Yes.

15  Q.   Had not held an steady job during that time

16  period because he was in school?

17  A.   That's correct.

18  Q.   And you had worked during that time period,

19  right?

20  A.   Yes.

21  Q.   And does that mean that you were the financial

22  support for the two of you?

23  A.   Yes, until he got to U of I, he was being paid.

24  Q.   He finished his master's program in May?

25  A.   Yes.

1  Q.  So he needed to get a real job, so to speak?

2  A.  Yes.

3  Q.  And that was causing him some stress, right?

4  A.  Yes.

5  Q.  Because it would mean that he would -- his

6  lifestyle as you indicated was to be at home, watch

7  TV, play video games, sleep, right?

8  A.  Yes.

9  Q.  And now he was going to have to get a 9 to 5

10 job?

11 A.  Yes.

12 Q.  The -- each of you had computers in that

13 apartment?

14 A.  Yes.

15 Q.  And basically separate computers at that each of

16 you used?

17 A.  Yes.

18 Q.  And his computer had on it what is called a VPN.

19 A.  Yeah, yes.

20 Q.  A virtual private network?

21 A.  Yes.

22 Q.  And that's something that you can do to provide

23 basically private access when you're, say, surfing

24 the internet?

25 A.  Yes.

1  Q.   Does -- that's part of the privacy you're
2  talking about with the defendant to not have people
3  know where he is going on the internet?
4  A.   Yes, that was his idea.
5  Q.   And the defendant also -- did you know that he
6  didn't have any location monitoring on his phone
7  either?
8  A.   That I wouldn't have known about, no.
9  Q.   Did you know that he had, if you know, hidden
10  file on his computer?
11  A.   No, I never used his computer and I didn't snoop
12  either.
13  Q.   You were -- and you weren't aware, never saw him
14  viewing, for example, bondage photos?
15  A.   No.
16  Q.   When you left for Wisconsin, you left most of
17  your household items behind obviously?
18  A.   Yes.
19  Q.   And so when you left at that time you indicated
20  that there were leather restraints in the apartment?
21  A.   Yes.
22  Q.   There were changes in the apartment?
23  A.   Uh-huh.
24  Q.   There was a baseball bat in the apartment?
25  A.   Yes.

1  Q.   That was a Louisville Slugger baseball bat?

2  A.   Yes.

3  Q.   And one that you kept under the bed?

4  A.   That's correct, yeah.

5  Q.   And you had it for several years, right?

6  A.   Yes.

7  Q.   But you hadn't, to your knowledge, hadn't used

8  it -- you hadn't used it prior to June 9th, had you?

9  A.   Barely touched it.

10  Q.   And when you left, there was no reason you know

11  of for there to be any blood on that bat, right?

12  A.   Correct.

13  Q.   And you're not aware of any reason the defendant

14  would tell somebody that there would be blood on

15  that bat?

16  A.   That's correct.

17  Q.   And so when you left that apartment, left for

18  the weekend for those two and a half days, the

19  knifes, the leather restraints, the baseball bat,

20  they were all in the apartment?

21  A.   Yes.

22  Q.   And when you returned that bat was still in the

23  apartment, correct?

24  A.   I believe so.

25  Q.   And it was -- but it was normally kept under

 1  your bed?

 2  A.   Yes.

 3  Q.   Would it have been strange when you got back if

 4  the baseball bat was gone?

 5  A.   I wouldn't know if it wasn't under the bed.  I

 6  wouldn't have gone looking for it.

 7  Q.   On June 9th you and the defendant owned the

 8  Saturn Astra, right?  That was a 2008 model,

 9  correct?

10  A.   Yes.

11  Q.   Black car?

12  A.   Yes.

13  Q.   Four doors?

14  A.   Yes.

15  Q.   Hatchback?

16  A.   Yes.

17  Q.   Sunroof?

18  A.   Yep.

19  Q.   Were you aware that broken right front hubcap?

20  A.   Probably.

21  Q.   And when you were in Wisconsin, no one else

22  would have been driving this car besides the

23  defendant; is that fair to say?

24  A.   Yes.

25  Q.   And before you left you filled up that Saturn

1 Astra with gas, correct?

2 A.   Yes, I believe on that Wednesday.

3 Q.   Okay.  And you went to the Circle K?

4 A.   Yes, it was just down the block.

5 Q.   And you showed the agents in fact a receipt for

6 $21.07 worth of gas to fill up the tank?

7 A.   Yes.

8 Q.   And I don't know if you know it holds about

9 12 gallons; does that sound right?

10 A.   Yeah, I think.

11 Q.   The car gets about 24 miles to the gallon in

12 town?

13 A.   Something like that.

14 Q.   So maybe about -- if my math is right -- about

15 400 miles you might get on the tank?

16 A.   Yes.

17 Q.   When you came back from Wisconsin you found out

18 that car only had a half tank?

19 A.   The next time I drove it, which I think would

20 have been when I went to work, I noticed and I was

21 on my way to work, and I didn't think anything of

22 it.

23 Q.   So it would have been driven about -- between

24 the time you filled it up and drove it again, it

25 would have been driven around 200 miles or so?

1  A.   Yeah.

2  Q.   And you are driving about 30 miles an hour, that

3  would have been about six hours of driving, if

4  you're driving locally?

5  A.   Okay.  Yeah.

6  Q.   You said you didn't think anything of it when

7  you got in the car and noticed that?

8  A.   No, I was on my way to work.

9  Q.   Now, you were present on June 12th of 2017 when

10  Special Agents Michael Carter and Joel Smith came to

11  your apartment?

12  A.   Yes.

13  Q.   And the defendant was there as well?

14  A.   Yes.

15  Q.   And they came to your apartment?

16  A.   Yes.

17  Q.   And they identified themselves as FBI agents?

18  A.   Yes.

19  Q.   I take it that was the first time FBI agents had

20  come to your residence?

21  A.   Yes.

22  Q.   That was the first time that you had contact

23  with FBI agents?

24  A.   Yes.

25  Q.   And so it was somewhat unusual, correct?

1  A.   Yes.

2  Q.   And they told you they were there to talk about

3  -- they were looking for the missing student at the

4  University of Illinois?

5  A.   Yes.

6  Q.   There wasn't any doubt that that was the reason

7  that they were there, was there?

8  A.   No doubt.

9  Q.   They asked both of you where you were from 2 to

10 3:00 p.m. on Friday, June 9th, right?

11 A.   Yes.

12 Q.   And you let them know that you were in Wisconsin

13 with Ryan Vela, correct?

14 A.   Yes.

15 Q.   And you were there when the defendant initially

16 told him that he didn't remember what he was doing,

17 right?

18 A.   Yes.

19 Q.   And then they asked him to look at texts, and he

20 looked at some texts and he noticed that there was a

21 delay in responding to a text from Bunny, right?

22 A.   Yes.

23 Q.   And then he told them that he must have been

24 home playing video games or sleeping all day,

25 correct.

1  A.   Yes.

2  Q.   And he didn't tell them that he was out driving

3  around on Friday, June 9th?

4  A.   He did not.

5  Q.   And, again, they were there to try to find the

6  missing student, correct?

7  A.   Yes.

8  Q.   And he didn't tell them anything about picking

9  her up, did he?

10 A.   He did not.

11 Q.   In June of -- well, you described sort of the

12 defendant's emotions or how you would describe him

13 emotionally at that time, emotionally closed off; is

14 that a fair description --

15 A.   Yes.

16 Q.   -- in June?

17      Would you also describe him as selfish?

18 A.   Yes.

19 Q.   Didn't -- at that time didn't really care about

20 anyone else?

21 A.   Possibly me, but nobody else.

22 Q.   And that was true even when he was taking his

23 medicine?

24 A.   Yes.

25 Q.   And didn't socialize a lot on campus?

1  A.   Correct.

2  Q.   You said had no real close male friends?

3  A.   Correct.

4  Q.   And basically the people that he talked to at

5  that time in June were you and Miss Bullis, correct?

6  A.   Yes.

7  Q.   Is it fair to describe him as somewhat of a

8  loner?

9  A.   Yes.

10 Q.   So, you're aware now, right, that Miss Zhang got

11 in his Saturn Astra on June 9th?

12 A.   I'm aware that he is responsible for her death.

13 I don't know about it being in the Astra.

14 Q.   You don't know that -- well, let me just ask you

15 about that.

16       The way you described the defendant at that

17 time, it would be somewhat strange for him to want

18 to actually go out and have contact with somebody

19 that he didn't know; --

20 A.   Correct.

21 Q.   -- is that fair to say?

22       It certainly would be strange for him

23 actually to want to stop and pick up somebody who

24 needed a ride?

25 A.   Yes.

1  Q.   That would be completely out of character for

2  him at that time, right?

3  A.   Yes.

4  Q.   You talked about how you would text back and

5  forth with the defendant.  You did that in June of

6  -- on June 9, 2017, as well, correct?

7  A.   Yes.

8       MR. MILLER:  And in fact I'm going -- if we

9  could publish what's been admitted as Government's

10 Exhibit 55-A just to --

11      I'm sorry, if we could show page six.

12      If we could highlight the text here.

13 BY MR. MILLER:

14 Q.   And at that time was the defendant phone's

15 (715) 310-9880?

16 A.   Yes.

17 Q.   Was your phone (715) 570-1657?

18 A.   Yes.

19 Q.   And if you recall, do you recall receiving a

20 text from him around 11:34 in the morning on June

21 9th?

22 A.   Yes.

23 Q.   And it appears then that you would have been, at

24 least somewhat, do you recall then, returning four

25 separate texts to him after he had sent you one?

1  A.   Yes.

2  Q.   And appears then he didn't respond to you until

3  approximately 3:30 in the afternoon?

4  A.   Yes.

5  Q.   So there was that three and a half hour period

6  that he didn't respond or send any texts to you,

7  correct?

8  A.   Correct.

9  Q.   But you weren't aware that it was during that

10 period that's Miss Zhang had gotten into his Saturn

11 Astra?

12 A.   No, I was not aware, no.

13 Q.   Now, when you left on Friday, June 9th, do you

14 recall whether the defendant had a beard at that

15 time or not?

16 A.   No.

17 Q.   Do you recall when you returned on Sunday that

18 he was clean shaven?

19 A.   I don't remember.

20 Q.   Now, you also testified that besides noticing

21 there was only a half tank of gasoline in the Astra

22 when you got back, you noticed that at some point

23 that the defendant had a duffle bag that he was

24 carrying out of the apartment.

25 A.   Yes.

1  Q.   And that was on Monday, June 12th.

2  A.   Yes.

3  Q.   Did you notice the duffle bag prior to that?

4  A.   He had shown it to me once before when he first

5  got it.

6  Q.   Before you left for Wisconsin?

7  A.   Correct.

8  Q.   Do you recall when he showed it to you?

9  A.   It was just that it was before we left.

10  Q.   Could it have been -- was this -- was it within

11  the week before you left or do you think that it was

12  months before you left?

13  A.   Within the month, I would say.

14  Q.   Okay.

15  A.   A few weeks.

16  Q.   Okay.  And then you noticed it again -- did you

17  notice it in your utility room in the apartment?

18  A.   I didn't know that's where it was.  We rarely

19  went in there.

20  Q.   Okay.  So where was he when you saw him with the

21  duffle bag?

22  A.   He was on his way out the door and I was in the

23  room with the computers in it.

24  Q.   And just from seeing the pictures of the

25  apartment; from that room with the computers, you

 1 can't see the front door, right?

 2 A.   Not really.

 3 Q.   So where did you see him with the duffle bag?

 4 A.   He had come in like the entrance to say, *Hey,*

 5 *I'm leaving.*

 6 Q.   Okay.  And he had the duffle bag then?

 7 A.   Yes.

 8 Q.   You indicated this was an -- I think the term

 9 used on the bag itself as a *colossal* duffle bag?

10 A.   Yes, very large.

11 Q.   Six feet long?

12 A.   Sounds about right.

13 Q.   Two feet wide and high?

14 A.   Yeah.

15 Q.   You agree that a person could fit inside that

16 bag?

17 A.   Yes.

18 Q.   And you indicated that -- well, the defendant at

19 that time was he working out?

20 A.   Yes.

21 Q.   And could bench press, what?  Do you know how

22 much?

23 A.   He was doing dumb bell bench press for maybe 55

24 pound dumb bells at the time.  He was pretty strong.

25 Q.   How much for a bench press, do you know?

```
 1  A.  I don't know.

 2  Q.  More than 150 pounds?

 3  A.  Oh, easy.

 4  Q.  So he would not have had problem caring a duffle

 5  bag with 110 pounds in it?

 6  A.  No, probably not.

 7  Q.  Now at this time when you saw the duffle bag,

 8  you indicated that it didn't appear to be very full?

 9  A.  No, but I didn't get a good look at it.

10  Q.  It could have had, for example, a backpack in?

11  A.  A backpack?  Yes.

12  Q.  It could have had a cell phone?

13  A.  Yes.

14  Q.  Could have had clothes?

15  A.  Yes.

16  Q.  Could have had sheets?

17  A.  Yes.

18  Q.  Could have had cleaning supplies?

19  A.  Yes.

20  Q.  Could have had a knife?

21  A.  Possibly, yeah.

22  Q.  And you were not there on June 9th of 2017 in

23  the apartment, correct?

24  A.  Yes.

25  Q.  But, fair to say that the defendant wouldn't
```

1  have had a problem carrying a duffle bag with 110

2  pounds in it from the Saturn Astra into the

3  apartment?

4  A.   Yes.

5  Q.   Now, did you at some point notice baking soda

6  that was on the floor of the utility room?

7  A.   Yeah, I remember there being -- it was maybe a

8  box or two or maybe some spilled was in there.

9  Q.   Did -- and you say maybe some spilled.  Did you

10  put that baking soda in the utility room?

11  A.   No.

12  Q.   Did you see the defendant put the baking soda in

13  the utility room?

14  A.   I didn't see him do it, but I assume he did.

15  Q.   Because you didn't do it and he would have been

16  the only other person in the apartment?

17  A.   Yes.

18  Q.   Baking soda is used to -- one use of baking soda

19  would be to soak up odors, right?

20  A.   That's what we used it for in the fridge and

21  garbage can and stuff like that.

22  Q.   I think that you indicated on direct that you

23  weren't aware of any odors that were in the utility

24  room?

25  A.   Correct.

1  Q.   Was that baking soda, do you remember, seeing it

2  before you left before you went to Wisconsin?

3  A.   No, I don't remember it, no.

4  Q.   But you did see it after you got back from

5  Wisconsin?

6  A.   Yes.

7  Q.   Now when you returned from Wisconsin, did you

8  also then notice a -- referred to as a blood stain

9  on your mattress?

10 A.   Yes, he had showed me.  He told me that he had a

11 nose bleed.

12 Q.   So this was when you were gone from the weekend

13 and he came back and he showed you a blood stain and

14 told you that he had a blood stain on the mattress.

15 A.   Yes.

16 Q.   And I take it that he -- so you didn't notice

17 the blood stain first?

18 A.   No.

19 Q.   So he brought -- he was explaining to you why

20 there was a blood stain on the mattress when you

21 were gone?

22 A.   Yes.

23 Q.   Where was the blood stain on the mattress that

24 he showed you?

25 A.   It was on the head by the pillows.

1  Q.   Did he show you any blood stains in the middle
2  of the mattress?
3  A.   There might have been some there, but I don't
4  remember what he said about those.
5  Q.   And were those the stains that you had not seen
6  prior to leaving for the weekend?
7  A.   Correct.
8  Q.   Did he say how much -- well, were the blood
9  stains that were on the edge of the mattress was up
10 by the wall?
11 A.   Yes.
12 Q.   Fair to say that that was a maybe a five,
13 six-inch sized stain?
14 A.   I don't remember, but it was sizable, yeah.
15 Q.   Did he explain -- well, was that consistent you
16 thought with the nose bleed?  Did it look like a
17 nose bleed?
18 A.   I never had a nose bleed, so I don't know.  But
19 that was his explanation for it.
20 Q.   You discussed some that the defendant cleaned
21 the apartment at times.
22 A.   Yes.
23 Q.   And at times did he have Terra Bullis clean the
24 apartment for him?
25 A.   Yes, he had said that.

1  Q.   Now when you were, over the weekend though when

2  you were gone, you didn't see, obviously, if the

3  defendant cleaned the apartment while you were gone,

4  correct?

5  A.   Correct.

6  Q.   When you -- fair to say when I would say most

7  people when you clean an apartment if you're just

8  going to do a little bit of cleaning you start on

9  the visible areas; is that fair to say?

10 A.   Yes.

11 Q.   And if you are going to do a thorough cleaning

12 then, I guess, you would clean everything?

13 A.   Yes.

14 Q.   Did you ever know the defendant to clean the

15 areas that weren't visible rather than and not clean

16 the areas that were visible?

17 A.   No.

18 Q.   So you don't know any reason why he would clean

19 the wall behind the bed that wasn't visible?

20      MS. POLLOCK:  Objection; inspection.

21      MR. MILLER:  I just want to make sure.

22 She's testified as to her experience with the

23 defendant and his cleaning, and I'm establishing

24 this is --  what's in evidence would be unusual.

25      THE COURT:  If she can answer that question,

1  I will allow her to answer.

2          Go ahead.

3  BY THE WITNESS:

4  A.   Can you repeat the question?  I'm sorry.

5  BY MR. MILLER:

6  Q.   Sure.

7          You -- you have no reason -- you don't know

8  why the defendant would clean behind a bed that

9  wasn't -- where the wall wasn't visible and not

10 clean the wall where it was visible?

11 A.   Correct, right.

12 Q.   And I take it, that would be, I assume for the

13 carpet, you never knew the defendant to clean the

14 carpet under the bed where there is no foot traffic

15 while he is failing to clean the carpet in the rest

16 of the apartment?

17 A.   Correct.

18 Q.   Did his sort of duties also then include

19 cleaning the Saturn Astra?

20 A.   I may have asked him to clean out trash at some

21 point while we owned it, but no we never cleaned it.

22 Q.   And so prior to June 9, 2017, you can't recall

23 hardly ever cleaning out the Saturn Astra; fair to

24 say?

25 A.   Correct.

1  Q.   But you were aware then when you returned that

2  he actually cleaned the car twice during that time

3  frame, right?

4  A.   I believe so.

5  Q.   And the second time he went to clean it he was

6  gone for an extended period of time?

7  A.   I don't remember how long.

8  Q.   Maybe about an hour at least?

9  A.   Yeah.

10 Q.   Now you discussed the defendant's alcohol use.

11 I think one thing you indicated was that you thought

12 he got goofier and funnier when he drank?

13 A.   Yeah, he enjoyed stuff more, funny things were

14 funnier and goofier.

15 Q.   And when he drank did he ever get angry?

16 A.   No.

17 Q.   Did he get -- ever get violent that you saw?

18 A.   No.

19 Q.   Did he ever lose control?

20 A.   No.

21 Q.   And so is it fair to say at least from your

22 experience alcohol didn't make him violent?

23 A.   Correct.

24 Q.   It would be that it made him more calm?

25 A.   Yes.

1  Q.   Would you refer to him as a calm drinker?

2  A.   Yes.

3  Q.   So also true that the alcohol with him would

4  open up -- you said that he was emotionally closed,

5  right?

6  A.   Correct.

7  Q.   And sometime when he would drink he might be

8  more likely to share his thoughts with you, right?

9  A.   Still rarely.

10  Q.   Well, one of those occasions though I think that

11  you discussed now was in December of 2016, right?

12  A.   Yes.

13  Q.   He drank on that occasion?

14  A.   A lot.

15  Q.   You felt like he was drunk?

16  A.   Very.

17  Q.   And he provided you, I think as you put it,

18  information that was very disturbing to you?

19  A.   That's correct.

20  Q.   So during that conversation, is it fair to say,

21  you didn't think that that was very funny what he

22  shared with you?

23  A.   No.

24  Q.   Didn't think that it was goofy at all.

25  A.   No.

1  Q.   In fact, you didn't think that it was a joke,

2  did you?

3  A.   Correct.

4  Q.   In fact, it was very serious.

5  A.   Yes.

6  Q.   And it was something that scared you.

7  A.   Yes.

8  Q.   And that's when he had been drinking a lot of

9  alcohol, correct?

10 A.   Yes.

11 Q.   And in fact that affected, I think as you

12 testified, what he told you while he was, as you

13 said drunk, ended up affecting your marriage going

14 forward.

15 A.   Yes.

16 Q.   So you believed what he had shared with you at

17 that time was something that was serious.

18 A.   Yes.

19 Q.   And because of that incident you put down some

20 ground rules, right?

21 A.   Yes.

22 Q.   As far as he would only drink when you allowed

23 him to drink?

24 A.   Correct.

25 Q.   And drink as much as you would let him drink?

 1  A.   That's correct.

 2  Q.   Now he is a decent size person, right?

 3  A.   Yes.

 4  Q.   About six foot tall?

 5  A.   Yes.

 6  Q.   Over 200 pounds?

 7  A.   Correct.

 8  Q.   Fair to say by June of '17, he had a fairly high

 9  tolerance for alcohol?

10  A.   Yes.

11  Q.   Two shots of alcohol would not be a lot for the

12  defendant?

13  A.   It would do almost nothing.

14  Q.   Certainly not going to be able to keep him to

15  drive?

16  A.   Correct.

17  Q.   Or talk, like I said, do almost nothing.

18       And after that period when you were telling

19  him, you know, when not to drink in January and

20  February, did he mostly follow your instruction?

21  A.   Sometimes.

22  Q.   More often than not did he follow your

23  instruction?

24  A.   He would substitute alcohol with other

25  substances.

1  Q.   Prescription drugs?

2  A.   Correct.

3  Q.   So after this incident in 2017, that was

4  certainly one of the factors that caused your

5  marital problems in 2017, right?

6  A.   Yes.

7  Q.   And I do just want to stop you.  You indicated

8  that you went to marital counseling in 2016, right?

9          MS. POLLOCK:  Objection; not in evidence.

10         THE COURT:  Mr. Miller?

11         MR. MILLER:  Well, I'll withdraw that and

12 get there then as far as what she said.

13 BY MR. MILLER:

14 Q.   So these marital problems that you had in 2017,

15 it wasn't the first time that you had marital

16 problems, correct?

17 A.   Correct.

18 Q.   And you dealt with those in 2016?

19 A.   Correct.

20 Q.   And in 2016, it was fair to say that it was the

21 defendant that had --

22         MS. POLLOCK:  Objection.

23         MR. MILLER:  They are painting the picture,

24 Your Honor, as far as how -- I mean it's -- very

25 much a part of the direct was how the marriage

1 progressed and this is part of explaining how the

2 marriage --

3        MS. POLLOCK:  Your Honor, I'm sorry, but

4 first of all, counseling records are not in

5 evidence.

6        Second of all, it is privileged on two bases

7 including marital and doctor/patient.

8        MR. MILLER:  We are not getting into the

9 records themselves.

10        THE COURT:  Just generally asking about the

11 marital counseling.

12        MR. MILLER:  And I will even go outside -- I

13 won't even talk about the counseling.

14 BY MR. MILLER:

15 Q.  I will just say in 2016, was your understanding

16 that the defendant had soured on the marriage?

17 A.  Yes.

18 Q.  And then when we get to 2017, this incident

19 happened, I'm sorry, in December of 2016, correct?

20 A.  Yes.

21 Q.  And so, fair to say, what happened and what he

22 told you and scared you in December of 2016, played

23 a large part in you being open to Ryan Vela's

24 advances.

25 A.  Yes.

1  Q.   And also played a part in March when you talked
2  to the defendant about wanting to separate or
3  divorce.
4  A.   Yes.
5  Q.   And also played a part because that's why you
6  were with Ryan and you ultimately deciding to go to
7  Wisconsin with Ryan?
8  A.   Yes.
9  Q.   And is it fair to say that it also played a part
10 that after you returned from Wisconsin, you were
11 afraid of the defendant, correct?
12 A.   I don't know that I would say *afraid.*  I was
13 leery.
14 Q.   Okay.  I want to ask you:  Did you think about
15 on June 15, 2017, about getting a restraining order
16 against the defendant?
17 A.   I had thought about it, didn't do it.
18 Q.   And is it fair to say you wouldn't sleep in the
19 same bed with him at that time?
20 A.   No.
21 Q.   Meaning no you wouldn't sleep in the same bed
22 with him?  I asked a bad question.
23       Is it fair to say that you wouldn't sleep in
24 the same bed with him?
25 A.   Correct.

1  Q.   You wouldn't sleep in the same room, correct?

2  A.   Correct.

3  Q.   You would put something by the door so it would

4  make a noise if he came in at night?

5  A.   That's correct.

6  Q.   And you didn't sleep in your main bedroom,

7  right?

8  A.   Not during at that time, no.

9  Q.   You could have had the defendant go sleep

10 somewhere else besides you sleeping somewhere else,

11 right?

12 A.   I don't know where he would have gone.

13 Q.   Fair to say you didn't want to sleep in that

14 bedroom with the defendant?

15 A.   That's correct.

16 Q.   Now you did talk about the defendant being --

17 showing some emotion regarding going to Wisconsin

18 with Ryan.  And did you know that you had week's,

19 sort of, notice that you were going to do that,

20 right?

21 A.   Yes.

22 Q.   And during that time frame though he was seeing

23 Terra Bullis, right?

24 A.   That's correct, yes.

25 Q.   And your understanding was that they had both an

1  emotional and a sexual relationship?

2  A.   Yes.

3  Q.   And he was also pursuing other woman during that

4  time, right?

5  A.   Yes, I believe so.

6  Q.   And did -- was it your understanding during that

7  time that he had a one-night stand during that time

8  in your apartment?

9  A.   Yes.

10  Q.   And so, if I understand your testimony, he was

11  upset that you were going to Wisconsin with Ryan,

12  correct?

13  A.   Yes.

14  Q.   But he didn't have any problem during that time

15  period with him being with somebody else.

16  A.   That's correct.

17  Q.   When the FBI came to your apartment on

18  June 12th, is it fair to say that you were

19  cooperative with them?

20  A.   Yes.

21  Q.   And then when they returned on June 5th -- 15th,

22  you were cooperative with them, correct?

23  A.   Yes.

24  Q.   And in fact when the agents came in, I think as

25  you testified, you noted that the defendant left to

1  go speak with the agents?

2  A.   Yes.

3  Q.   Before he left in the presence of all of the

4  agents, he asked you what you thought he should do

5  and you told him you should go with them, right?

6  A.   Yes.

7  Q.   And then after that, you spoke at length with

8  the FBI to provide -- well, to answer their

9  questions?

10  A.   Yes.

11  Q.   And as you indicated, you did consent to a

12  search of the apartment?

13  A.   Yes.

14  Q.   And you indicated that you didn't realize that

15  you had the right to not consent, but you were

16  informed of that right?

17  A.   They didn't even discuss it, and I assumed FBI

18  agents are in my house, I'm going to cooperate.

19        MR. MILLER:  Okay.  If we could publish

20  what's in evidence as Government's Exhibit 15A.

21  BY MR. MILLER:

22  Q.   And, first, if you look towards the bottom.

23  There are two signatures there.

24  A.   Yes.

25  Q.   Is that your signature above Special Agent

1  Huckstadt's signature?

2  A.   Yes.

3  Q.   And it indicates here, the first one is:  *I've*

4  *been advised by special agents of the Federal Bureau*

5  *of Investigation to permit a complete search of 2503*

6  *West Springfield Avenue in apartment B2, Champaign,*

7  *Illinois 61821.*

8         That was your address on that date?

9  A.   Yes.

10 Q.   And then the second point says:  *I have been*

11 *advised of my right to refuse consent.*

12 A.   Yes.

13 Q.   So if you had read this form, you would have

14 been advised of your right to consent before you

15 signed it, correct?

16 A.   Yes.

17 Q.   In fact during that subsequent search, you

18 helped agents look for certain items?

19 A.   Yes.

20 Q.   Helped them look for a book that you had

21 discussed with them, a book called "American

22 Psycho"?

23 A.   Yes.

24 Q.   They also took a pair of aviator sunglasses

25 during that search?

1  A.   Yes.

2  Q.   You cooperated on June 15th by speaking with

3  agents, correct?

4  A.   Yes.

5  Q.   And the 16th and the 17th and the 18th; that all

6  correct?

7  A.   Yes.

8  Q.   You also exchanged texts with Special Agent

9  Tenaglia?

10 A.   Correct.

11 Q.   Is it fair to say your attitude towards the FBI

12 changed though as the investigation went on?

13 A.   They kept asking the same questions kind of over

14 and over, and eventually she kind she trailed off

15 and stopped asking questions.

16         MR. MILLER:  Just one second, Your Honor.

17         I have no further questions, Your Honor.

18         THE COURT:  Ms. Pollock.

19              REDIRECT EXAMINATION

20 BY MS. POLLOCK:

21 Q.   I just want to follow-up on a couple of things.

22         You told Mr. Miller that when you basically

23 instructed Brendt *you have to stop drinking,* that he

24 would substitute other substances for the alcohol;

25 is that right?

1  A.   Yes.

2  Q.   And Mr. Miller mentioned *tolerance* for alcohol?

3  A.   Yes.

4  Q.   What happens to your tolerance when you stop

5  drinking?

6  A.   It goes down.

7  Q.   It goes down?

8  A.   Yes.

9  Q.   So in your experience as a human is it fair to

10  say that when you drink a lot --

11         MR. MILLER:  I guess I'm going to object to.

12         THE COURT:  I'm going to allow the question.

13         Go ahead.

14  BY MS. POLLOCK:

15  Q.   If you drink a large amount of alcohol

16  frequently, your tolerance is higher, and what

17  happens if you stop drinking alcohol or you drink

18  less over less periods of time?

19  A.   Eventually goes down.

20  Q.   Okay.  You answered a question about marriage

21  counseling.  You and Brendt did go to marriage

22  counseling, right?

23  A.   Yes.

24  Q.   And after the marriage counseling would you say

25  that the counseling was successful or unsuccessful?

 1  A.   Successful.  It helped us.
 2  Q.   And you stayed married?
 3  A.   Yes.
 4  Q.   Would you say that your relationship, the issues
 5  that you went to counseling for, you had repaired
 6  those?
 7  A.   Somewhat, yes.
 8  Q.   And new ones happened and some old ones came
 9  back up, correct?
10  A.   Yes, correct.
11  Q.   So with regards to other women that Brendt might
12  have -- I think Mr. Miller said one-night-stands --
13  did he have any other consistent person that he
14  dated other than Ms. Bullis?
15  A.   No.
16  Q.   Did he have any emotional attachment that you're
17  aware of other than Miss Bullis?
18  A.   No.
19  Q.   Who was his primary emotional relationship with?
20  A.   Me.
21  Q.   And whose choice was it to do the open
22  relationship?
23  A.   It was mine because he agreed to it.
24  Q.   All right.  But you approached him with it,
25  correct?

1  A.   That's correct.

2  Q.   And who brought up divorce?

3  A.   I did.

4  Q.   And who fought that idea?

5  A.   He did.

6  Q.   Was he happy to let you go or resistant to let

7  you go?

8  A.   He was distraught.

9  Q.   Fair to say he wanted to stay married to you?

10  A.   Yes.

11  Q.   And he loved you?

12  A.   Yes.

13        MS. POLLOCK:  Nothing further.

14        THE COURT:  Mr. Miller, anything?

15        MR. MILLER:  No further questions, Your

16  Honor.

17        THE COURT:  Thank you.  You may step down.

18        All right.  Why don't we take 15 minutes,

19  and I will report to you where we are.  It's likely

20  that we will go into the early afternoon.

21        So we will take a lunch break.  But I still

22  believe that it will conclude today, the evidence,

23  and that opening or closing arguments will be

24  Monday.

25        Okay.  Let's take 15 minutes.

JURY TRIAL -- June 21, 2019 (Redacted)        133

 1          (Jury absent, 11:02 a.m.)

 2          THE COURT:  Okay.  One second, if I may.

 3          The next will be the video?

 4          MS. POLLOCK:  Yes.

 5          THE COURT:  Are there any issues as to the

 6  transcripts?

 7          MR. NELSON:  We did just get it this

 8  morning.  I didn't.

 9          MS. POLLOCK:  That is not true.  You've had

10  it weeks -- I e-mailed it to Staci last week.

11          MR. NELSON:  The first -- we got it this

12  morning.

13          MR. MILLER:  The answer is that we will

14  stipulate to the admissibility with the

15  understanding that it was a defense transcript that

16  the agent hasn't yet reviewed.

17          THE COURT:  Fine.

18          Does that work?

19          MS. POLLOCK:  Fine.

20          THE COURT:  Okay.  All right, then.

21          And the video itself is how long?

22          MS. POLLOCK:  It's an hour, but we are not

23  going to play the whole hour.  We are going to play

24  the first 45 minutes or so.

25          MR. NELSON:  Well, Your Honor, I believe the

1  purpose of them playing at all was because of the

2  rule of completeness and --

3          MS. POLLOCK:  The last several minutes are

4  blank --

5          THE COURT:  One at a time.  One at a time.

6          MS. POLLOCK:  There is ten minutes of

7  nothing, so if you want to have the jury sit there

8  and watch him sitting in the room by himself, feel

9  free.

10          THE COURT:  I will make the same ruling for

11  the government that I made for the defense.  If you

12  want to play it all, we can put it right back on and

13  you can play the rest of it.

14          MR. NELSON:  I would just note for the

15  record that the video is 85 minutes long, so the

16  last ten minutes would not cover the entirety of the

17  video.

18          THE COURT:  Are we done with all that?

19          MR. NELSON:  Yes, Your Honor.

20          THE COURT:  So then we will -- so clearly we

21  will get started, but then we will probably break

22  maybe quarter to 12 until 1:30 and then put the rest

23  of it on after the lunch.

24          So then does the defense anticipate anything

25  further?

JURY TRIAL -- June 21, 2019 (Redacted)     135

1          MS. POLLOCK:  No, Your Honor.  Probably
2   renewal of the Rule 29, and that's it.
3          THE COURT:  And I will have a short colloquy
4   with Mr. Christensen about his rights to testify and
5   ultimately that being his decision whether to or
6   rather not to.
7          And then at that point if you rest and the
8   renewal of the motion is denied does the government
9   anticipate any rebuttal?
10         MR. MILLER:  Very briefly.
11         THE COURT:  Who would that be, if you know.
12         MR. MILLER:  It may be because we didn't --
13  we will make a decision to see -- he is on his way
14  here -- the other agent that interviewed Mr. Hill to
15  perfect that conversation, and it may be just the
16  case agent then, just a small matter.
17         THE COURT:  All right.  But we will conclude
18  evidence today at -- no matter what, and then after
19  I recess the jury, likely we will stay and visit for
20  a little bit to go over, informally, jury
21  instructions.  And depending on where we are today,
22  how long we get to do that will depend on what time
23  closings start on Monday, that's why I asked you how
24  long it will take.
25         All right.  Thank you.

```
 1              (Recess, 11:06 a.m. to 11:21 a.m.)
 2              THE COURT:  Okay.  We are back in open
 3  court.
 4              Anything before we bring the jury back in?
 5              All right.  Let's bring the jury in.
 6              (Jury present, 11:23 a.m.)
 7              THE COURT:  Thank you.  Please be seated.
 8              MS. POLLOCK:  The defense calls Special
 9  Agent Andrew Huckstadt.
10              THE COURT:  Sir, do you want to come forward
11  please and be sworn.
12              (Witness sworn.)
13              THE COURT:  Okay.  Go ahead.  Have a seat.
14                   ANDREW HUCKSTADT,
15  after having been duly sworn, testified as follows:
16                   DIRECT EXAMINATION
17  BY MS. POLLOCK:
18  Q.   Hello.
19  A.   Hello.
20  Q.   For the fourth time.
21              Will you please tell us your name and spell
22  it again.
23  A.   My name is Andrew Huckstadt, H-u-c-k-s-t-a-d-t.
24  Q.   And as we've previously established, you are one
25  of the case agents on this case, correct?
```

1  A.   Yes, ma'am.

2  Q.   And during your testimony on direct much earlier

3  in the case, you were laying the foundation for a

4  video that was played to the jury of the defendant

5  at the Counseling Center at the University of

6  Illinois on March of 2017?

7  A.   Yes, I do.

8  Q.   Yet, again, that video was provided to the

9  government and to you by the defense, correct?

10  A.   Yes.

11  Q.   And we also at that time provided copies of the

12  written records from that meeting at the subsequent

13  meeting, correct?

14  A.   Yes.

15  Q.   And that clip that was played in the

16  government's case-in-chief, that was a small portion

17  of that video, right?

18  A.   Yes.

19      MS. POLLOCK:  Your Honor, may I approach?

20      THE COURT:  You may.

21  BY MS. POLLOCK:

22  Q.   Special Agent Huckstadt, I've just handed you

23  what has been previously marked for identification

24  as Defendant's Exhibits 12 and 13.

25      Do you see that?

1  A.   Yes, I do.

2  Q.   Now I know that you did not prepare that CD of

3  that -- of the video, correct?

4  A.   That's correct.

5        MS. POLLOCK:  But, Your Honor, we have a

6  stipulation as to it's admissibility.

7        THE COURT:  All right.  Very good.

8        MS. POLLOCK:  And may I approach one more

9  time?

10       THE COURT:  You may.

11  BY MS. POLLOCK:

12  Q.   I've just handed you what has been marked as

13  defense 12-TR.  You also did not prepare that

14  transcript, correct?

15  A.   That's correct.

16  Q.   Are you aware that it was prepared by someone

17  hired by the defense to make a transcript of the

18  video?

19  A.   Yes, I am.

20  Q.   And you have watched that video on multiple

21  occasions, correct?

22  A.   Yes.

23  Q.   And so you're familiar with it?

24  A.   Yes.

25       MS. POLLOCK:  Your Honor, we have a

1  stipulation as to the jury being able to have 12-TR

2  in their possession while the video is played.

3          THE COURT:  Do they have it?  Do you want to

4  pass it out?

5          MS. POLLOCK:  I will in just a moment.

6  BY MS. POLLOCK:

7  Q.  Okay.  Do you have a copy of Defendant's 13?

8  A.  Yes, I do.

9  Q.  And do you recognize what that is?  I know that

10 it is stapled on the wrong side.

11 A.  Yes, appears to be at least a portion of some

12 records obtained from the University of Illinois

13 Counseling Center.

14 Q.  Okay.  And you have received those from the

15 defense as previously before?

16 A.  Yes, that's correct.

17 Q.  And those are the records that were obtained

18 documenting the video interview that we are about to

19 watch, correct?

20 A.  Yes.

21 Q.  And also documenting the intake sheet that the

22 defendant filled out at that meeting?

23 A.  Yes, ma'am.

24 Q.  And also documents the follow-up meeting that he

25 had on March 30, 2017, correct?

 1 | A.   Yes, that's correct.
 2 | Q.   And all of that was previously disclosed to the
 3 | government by the defense?
 4 | A.   Yes.
 5 |        MS. POLLOCK:  All right.  Your Honor, if I
 6 | haven't formally done so, I move for the admission
 7 | of 12, 12-TR, and 13 in evidence.
 8 |        THE COURT:  Any objection?
 9 |        MR. NELSON:  We object to 13, Your Honor.
10 | It is laterally an entire exhibit of hearsay between
11 | people who aren't testifying.  And there is no
12 | foundation that this witness knows anything about it
13 | or is trained to know what the statements in there
14 | mean or whether they are complete records or
15 | anything at all.  Only that the defendant gave them
16 | to him.
17 |        MS. POLLOCK:  Your Honor, if I may?
18 |        THE COURT:  Yep.
19 |        MS. POLLOCK:  The -- what is contained in
20 | that exhibit is the paperwork that was filled out by
21 | Mr. Christensen at the Counseling Center, which the
22 | government has.  It also contains the narrative of
23 | the meeting, which the government has.  It is the
24 | narrative of the meeting that they are about to
25 | watch.  And it's relevant to the defendant's state

 1  of mind at this time, that has been raised by the

 2  defendant multiple times in this case.  We had, or I

 3  thought we had a stipulation as to the foundational

 4  elements of all of the exhibits that were going to

 5  be entered throughout this case.  So if the only

 6  objection is hearsay, then it's not --

 7          THE COURT:  Does 13 have anything to do with

 8  the ability to play the audio or the video, and then

 9  and the corresponding transcript?

10          MR. NELSON:  No, Your Honor.  In fact, 13

11  goes a step further than this video --

12          THE COURT:  I will reserve for the time

13  being.  I will reserve on 13.

14          MR. NELSON:  I'm sorry to interrupt you,

15  Your Honor.

16          THE COURT:  That's okay.  We will address

17  that then.

18          MS. POLLOCK:  Okay.  Thank you.

19          THE COURT:  Ladies and gentlemen, when you

20  receive a transcript, the audio from the video is

21  the actual evidence.  The transcript is meant to

22  assist you.

23          So 12 will be admitted.

24          13 will be reserved.

25          And the number on the transcript is what?

JURY TRIAL -- June 21, 2019 (Redacted)      142

1            MS. POLLOCK:  12-TR.

2            THE COURT:  12-TR.

3            MS. POLLOCK:  So at this time, Your Honor,

4   with the Court's permission, once the jury has

5   received the transcript, I am going to return to my

6   seat to play the video.

7            THE COURT:  Very good.

8            MS. POLLOCK:  But first Mr. Kelly needs to

9   turn it on for me, please.

10           THE COURT:  And we are going to get shortly

11  into it, we are going to break about quarter to

12  12:00.  We will resume at 1:30.  We are still going

13  to be done early to mid afternoon, okay?  Or 11:45.

14  I think that I said 12:15, 11:45.

15           (Exhibit published to the jury.)

16           THE COURT:  Ms. Pollock, let's stop right

17  there.  You need to make a notation and we will

18  resume right at that point.

19           Ladies and gentlemen, let's break for lunch.

20  Let's resume about 1:20.

21           And please do not discuss this matter with

22  anybody including yourselves.  You can leave the

23  transcripts right on your chair there.  If you have

24  a pen you can make a notation where we are,

25  otherwise, we will remind you when we start up

1   again.

2           Thank you.

3           (Recess, 11:48 a.m. to 1:22 p.m.)

4           (Open court.  Jury absent.)

5           THE COURT:  Please be seated.

6           All right.  Anything we need to address

7   before bringing the jury back in?

8           MS. POLLOCK:  No, Your Honor.

9           THE COURT:  Okay.  Let's bring the jury in.

10          Refresh me where we are resuming,

11  Miss Pollock?

12          MS. POLLOCK:  The video.

13          THE COURT:  Page.

14          MS. POLLOCK:  I'm not sure what the page

15  number is.  It's at 19 minutes 43 seconds.

16          MR. MILLER:  Top of page ten.

17          THE COURT:  See it.

18          (Jury present, 1:22 p.m.)

19          THE COURT:  Thank you, folks.

20          Please be seated.

21          Shall we resume?

22          Do you want Agent Huckstadt on the witness

23  stand or do you want to wait until it's over, the

24  video is over.

25          MS. POLLOCK:  I don't see any reason for him

JURY TRIAL -- June 21, 2019 (Redacted)      144

1  to sit up there while it plays, Your Honor.

2         THE COURT:  Okay.  Very good.  Let's resume.

3         It appears we are on top of page ten.

4         (Exhibit published to the jury.)

5         MS. POLLOCK:  Mr. Kelly, could we have the

6  screen?

7         THE CLERK:  Yes.

8         MS. POLLOCK:  Thank you.

9  BY MS. POLLOCK:

10 Q.   You're aware through your review of the records

11 that we provided that when the intern was clicking

12 away on her computer, she was typing for someone to

13 come in and give her a consultation?

14 A.   Yes.

15 Q.   And nobody ever came in, did they?

16 A.   I don't know for sure.

17 Q.   Not during the video?

18 A.   Not during the video, correct.

19 Q.   And are you aware, also based on your review of

20 the records, that Mr. Christensen returned to the

21 Counseling Center nine days later and repeated much

22 of what he said in this interview to a licensed

23 counselor?

24 A.   Yes.

25 Q.   Including more detailed information about his

1 plans to hurt someone?

2 A.   Yeah, I believe it was a little more detailed;

3 yes, that's correct.

4 Q.   And those are represented in the records that

5 have been submitted for review in Defendant's

6 Exhibit 13, correct?

7 A.   I don't have the records in front of me anymore

8 but I believe that's correct.

9 Q.   Okay.  Thank you.

10        Now, turning completely to other matters,

11 you testified several days ago that there were --

12 about the work that you had done to confirm or

13 disprove the statements that Brendt made during that

14 Memorial Walk tape right about other victims,

15 correct?

16 A.   Yes.

17 Q.   And at the time you stated that there were other

18 outstanding pieces of the investigation that had not

19 been completed?

20 A.   Yes.

21 Q.   And I asked you what those were after you had

22 testified, and did you in fact find out what those

23 were?

24 A.   There were a couple of instances where I had

25 submitted the defendant's DNA profile for comparison

1  to a couple of cases in Wisconsin.  I tried to

2  contact those investigators after you asked me.  One

3  of them did get back to me on a specific case and

4  said that the defendant's DNA profile didn't match

5  the suspect DNA in that case.  The other one I have

6  not heard back on.

7  Q.   And so after all that stuff that we discussed

8  about your investigation, there is one outstanding

9  case that you're waiting for information on?

10  A.   One out of that group, yes, ma'am.

11  Q.   Okay.  You were in court when you heard Miss

12  Bullis testify about the payments that she received

13  from the FBI?

14  A.   Yes.

15  Q.   And she appeared confused about the timeline of

16  when she first received her payments?

17  A.   Yeah.

18  Q.   Now, it is true that she was still employed as

19  of June 29, 2017, correct?

20  A.   Yes.

21  Q.   And in fact she told us that she had arranged a

22  special bus route to make it appear to Brendt that

23  she had come from work that day?

24  A.   Correct.

25  Q.   And you -- I believe that she acknowledged that

1  she received 7 or $8,000 total from FBI, which she

2  claimed was all compensation for expenditures that

3  she had made due to her needing things as a result

4  from her involvement in the case.

5        Do you recall her saying that?

6  A.   I believe she said something similar to that,

7  yes.

8  Q.   And as the person who was, for lack of a better

9  term, her handler, during this process, you are not

10  aware that she received a $1,000 cash payment the

11  week prior to the Memorial Walk tape, correct?

12  A.   That's correct.  She did receive the $1,000

13  payment for what we called services, and that was, I

14  believe, it was June 22nd, but it was some time

15  within about a week of the Memorial Walk, yes.

16  Q.   If you saw your paperwork on that, would it

17  refresh your recollection?

18  A.   Yes, it would.

19        MS. POLLOCK:  May I approach, Your Honor?

20        THE COURT:  You may.

21  BY MS. POLLOCK:

22  Q.   I hand you what has been marked as

23  identification as Defendant's Exhibit 11.

24        Is that your paperwork from the first

25  payment?

1  A.   Yes.

2  Q.   And does her name appear on there as something

3  other than Terra Bullis?

4  A.   Yes.  This is a form that I filled out in our

5  confidential human source data base, so we don't use

6  a person's true name.

7  Q.   And does it reflect a payment of $1,000 in cash

8  the week prior to the Memorial Walk?

9  A.   Yes.

10  Q.   And for what services rendered between which

11  dates?

12  A.   Between June 16, 2017, and June 21st, 2017.

13         MS. POLLOCK:  Nothing further, Your Honor.

14         THE COURT:  Mr. Nelson.

15         MR. NELSON:  Thank you, Your Honor.

16                  CROSS-EXAMINATION

17  BY MR. NELSON:

18  Q.   Good afternoon.

19  A.   Good afternoon.

20  Q.   How does an informant get paid by the FBI?

21  A.   An informant is paid based on paperwork that I

22  submit, and that goes through a couple of layers of

23  approval, has to be approved by my first-level

24  supervisor, and then it's ultimately approved by the

25  assistant special agent in charge of the division.

 1 Q.   And before it even gets there, it has to be
 2 approved by you, right?
 3 A.   I submit it for approval, and then there is two
 4 people that have to approve it.
 5 Q.   Okay.  So if Terra Bullis had just come up to
 6 you and said give me a thousand dollars, does she
 7 get the thousand dollars?
 8 A.   No.
 9 Q.   Now I just want clarify the timeline, because we
10 went through some of it in this counseling video,
11 and then also you were present when the defendant's
12 ex-wife testified; is that right?
13 A.   Yes.
14 Q.   So please correct me if I'm wrong on my
15 timeline, what I have got is that sometime in 2006
16 and this is based on the counseling video, the
17 defendant was dissatisfied in his marriage and
18 wanted to leave the marriage.
19       MS. POLLOCK:  Objection.  Misstates facts in
20 evidence, 2006 was not the year.
21 BY MR. NELSON:
22 Q.   I may have misspoken.  I meant 2016.
23 A.   Yes, that's correct.
24 Q.   And then, in fact, it's neither here nor there.
25 Then in December of 2016, the defendant shared some

1  scary thoughts with his wife, right?

2  A.   Yes.

3  Q.   And that's when she gave him an ultimatum on

4  drinking, right?

5  A.   Yes.

6  Q.   Then a few months later she broaches the idea of

7  opening the marriage, right?

8  A.   Yes.

9  Q.   And the defendant was receptive to that?

10  A.   Yes.

11  Q.   In fact they both have other relationships,

12  right?

13  A.   Correct.

14  Q.   And then on March 21st, he goes in for

15  counseling at the university.

16  A.   Yes.

17  Q.   And he says that a few days prior to that, she

18  had broached the idea of separating.

19  A.   Yes, I believe that's a couple days prior.

20  Q.   Okay.  And prior to that the defendant said that

21  he was seeing a psychiatrist who had given him

22  information on quitting drinking, right?

23  A.   I'm sorry, I didn't hear that last part.

24  Q.   That he was seeing a psychiatrist and the

25  psychiatrist gave him information on quitting

1  drinking.

2  A.   Yes.

3  Q.   And he didn't bother calling about that.

4  A.   I believe that's correct, yes.

5  Q.   And also in this counseling video, the defendant

6  stated that he only blacked out one time?

7  A.   Correct.

8  Q.   And that was notwithstanding his consuming up to

9  a bottle of alcohol at a time?

10  A.   Yes.

11  Q.   Okay.  That demonstrates a pretty high tolerance

12  for alcohol, wouldn't you say so?

13  A.   I would say so, yes.

14  Q.   In addition the defendant discussed his mood and

15  said that he was not violent, right?

16  A.   Correct.

17  Q.   And had no temper?

18  A.   Correct.

19  Q.   And again, this was on March 21st of 2017?

20  A.   Yes.

21  Q.   So this is almost three months prior to the

22  crime?

23  A.   Yes.

24  Q.   Now, at one point in this counseling video the

25  defendant said that he felt like a failure at

1  physics.  Do you recall that?

2  A.    I do.

3  Q.    He also said that he had lost his passion.

4  A.    Yes.

5  Q.    And in fact the defendant made similar

6  statements in the Facebook conversation, didn't he?

7  A.    Yes, he did.

8  Q.    In fact, this would have been March the 1st of

9  2017, so before he went to see the counselor, he

10  told Ms. Roules that he was just bored, right?

11  A.    Yes.

12  Q.    And in fact, *It's not depression anymore, it's*

13  *just a lack of anything worthwhile; why I'm not*

14  *getting a PhD because it started to bore me.*

15  A.    Correct.

16  Q.    *I already figured physics out, so it's not*

17  *interesting anymore.*

18  A.    That's correct.

19  Q.    But according to what the defendant said in this

20  counseling video and what we know from his text

21  messages and his internet history, serial killers

22  didn't bore the defendant; did they?

23  A.    They did not, that's correct.

24  Q.    In fact he told the counselor that they

25  fascinated him, right?

1  A.   Yes.

2  Q.   And that's what he told his wife.

3  A.   Yes.

4  Q.   And that's what he told Terra Bullis.

5  A.   Yes.

6  Q.   And when he was talking about his thoughts of

7  harming others --

8        THE COURT:  Let me interject something here.

9  All of this is a matter of record.  Terra Bullis has

10 testified to it.  Michelle Zortman has testified to

11 it.  In some regards, Agent Huckstadt has testified

12 to it.  I think that it's all fair game now at this

13 point for argument by both sides in the closing

14 argument to point out all of these things that

15 you're pointing out.  But I'm not sure asking Agent

16 Huckstadt what he said when we just heard it and

17 compared to what he heard Terra Bullis testify to or

18 Michelle Zortman testify to his accomplishing

19 anything more.  And I'm not sure that he's the right

20 person to be asked these questions.  He wasn't asked

21 them in the -- during -- leading up to the video or

22 after to the video, other than there were some

23 questions about 13 and the comparison.

24        So I'm not trying to short circuit anything

25 here but I'm just wondering out loud if this record

1  has already been made and it's wide open for

2  argument at this point.

3         MR. NELSON:  That is a fair point, Your

4  Honor, and I'm happy to move on.  I do have one

5  question based on his hearing and a discrepancy in

6  the transcript, if that's all right.

7         THE COURT:  That's fine.

8  BY MR. NELSON:

9  Q.   Do you have the transcript in front of you,

10  Special Agent Huckstadt?

11  A.   Yes, I do.

12  Q.   And you were listening and following along with

13  the transcript?

14  A.   Yes, sir.

15  Q.   If you refer to page 22 --

16         MS. POLLOCK:  Your Honor, I'm going to

17  object to this.  This lay opinion of what Agent

18  Huckstadt is irrelevant.  The jury heard the video.

19  The transcript is a guide only.

20         THE COURT:  What was the question going to

21  be?

22         MR. NELSON:  I was going to ask him

23  because --

24         THE COURT:  Referring what page what?

25         MR. NELSON:  Page 22.

 1          THE COURT:  Okay.

 2          MR. NELSON:  The sixth statement up from the

 3   bottom.

 4          THE COURT:  Right.

 5          MR. NELSON:  And there was inquiry yesterday

 6   of Miss Bullis based on what she heard the defendant

 7   say and whether it made sense to her at the time.

 8   And I'm going ask this witness whether this

 9   statement as it's typed makes sense to him or if

10   another word should have been inserted in favor of

11   the one that's listed.

12          THE COURT:  And you're at, what, 4826?

13          MR. NELSON:  4844.

14          THE COURT:  4844.

15          MS. POLLOCK:  Same objection.

16          THE COURT:  Well -- okay.  So you're going

17   to ask him if he heard a different word that's in

18   4844?

19          MR. NELSON:  Yes, Your Honor, because this

20   transcript -- this one received this morning and we

21   didn't have an opportunity to meaningfully challenge

22   it.

23          THE COURT:  This is the only question like

24   that in this line of questioning?

25          MR. NELSON:  Just the one, Your Honor.

1          THE COURT:  I will allow you to ask it.  I
2  will allow Ms. Pollock to redirect on it and just
3  remind the jury that what you hear and what you
4  heard is the evidence, not what the transcript says
5  or what we say it says.
6          Go ahead Mr. Nelson.
7          MR. NELSON:  Yes, Your Honor.
8  BY MR. NELSON:
9  Q.  So at 4844 on page 22, there is one sentence and
10 then it is broken by ellipses, and then it says the
11 biggest issue was thinking selfishly, is that if do
12 you it even *months*, m-o-n-t-h-s, or even as much as
13 I have, it's -- you can't deny it.
14         Now the word months sounds alike to the word
15 *once*, o-n-c-e, would you agree?
16 A.  Yes.
17 Q.  And based on just the syntax of this sentence,
18 would you agree that the word *once* makes more sense?
19         MS. POLLOCK:  Same objection.
20         THE COURT:  It makes more sense, it is not
21 going to be allowed.  If he wants to say that he
22 heard *once,* I will let you say it.
23         MR. NELSON:  Sure.
24 BY MR. NELSON:
25 Q.  What did you --

1  A.  Yes, I want to have to hear it again to make a
2  definitive statement on that?
3       MR. NELSON:  That's fine.  Thank you.
4       THE COURT:  Miss Pollock.
5            REDIRECT EXAMINATION
6  BY MS. POLLOCK:
7  Q.  You just referenced a Facebook message with the
8  woman named Jazmin Roules where Mr. Brendt
9  Christensen made statements about how he felt about
10 physics.  Do you recall that?
11 A.  Yes.
12 Q.  Now we've already talked about since it was just
13 brought up, let's refresh, Jazmin Roules is who?
14 A.  It was an individual that he had met online a
15 few years prior, and they had what appears to be an
16 online relationship.
17 Q.  Online friendship?
18 A.  Yes.
19 Q.  Never met her in person?
20 A.  That's my understanding.
21 Q.  She was interviewed in this case?
22 A.  Yes.
23 Q.  They are not close, correct?
24 A.  I don't know if I'd phrase it that way.  They
25 seemed to talk a lot on social media.  So it appears

1  on, I guess, what you mean by *close*.

2  Geographically, not close.

3  Q.   He never met her, right?

4  A.   Correct.

5  Q.   And chatting online when someone writes a

6  Facebook message, I don't suppose you have ever seen

7  anyone or heard anyone lie on an online message or

8  misrepresent something because of the person that

9  they are talking to and because of the message they

10 are trying to get across?

11 A.   I'm not saying that.  I think people say various

12 things.  They are either truthful or they are not

13 depending on the context.

14 Q.   And with regards to that statement, if you were

15 talking to somebody online who was only an online

16 friend, who you were not geographically close to,

17 and only chatted online over the years, that's not

18 the same thing as talking to someone, for example,

19 like a counselor, correct?

20 A.   Those are two different situations, correct.

21 Q.   And talking to somebody that you're married to,

22 correct?

23 A.   Yes, that's different.

24 Q.   It's different.  It's not under oath, is it?

25 A.   I don't think any of those situations are under

1  oath, no.

2  Q.   Not on Facebook?

3  A.   Correct.

4        MS. POLLOCK:  Nothing further.

5        THE COURT:  Anything else, Mr. Nelson?

6              REDIRECT EXAMINATION

7  BY MR. NELSON:

8  Q.   Was the defendant under oath at the Counseling

9  Center?

10  A.   No.

11        THE COURT:  Anything, Ms. Pollock?

12        MS. POLLOCK:  Nope.

13        THE COURT:  You may step down.  Thank you.

14  Push that aside.  Hand me those.

15        Any other witnesses from the defense?

16        MS. POLLOCK:  No, Your Honor.

17        THE COURT:  Does the government anticipate

18  any rebuttal?

19        MR. MILLER:  We do, just one very brief

20  witness.

21        THE COURT:  Okay.  Let's take a very short

22  recess here, and then the day will be concluding in

23  short order.

24        All right.  I would like to take 10 or 12

25  minutes.

1          (Jury absent, 2:24 p.m.)

2          THE COURT:  I will ask the parties to stay

3   put for a moment.

4          Please be seated.

5          All right.  Then if the defense -- you want

6   to make sure that you have all of your exhibits in

7   before you rest.  But I gather then that means that

8   Mr. Christensen will not testify.

9          MS. POLLOCK:  Correct.

10         THE COURT:  Is that correct?

11         I'm going to ask a few questions of

12  Mr. Christensen just to make sure that he

13  understands all of his rights.

14         Okay.  Mr. Christensen, if at any time you

15  don't hear me or you don't understand my question,

16  you won't need to be -- if at any time you don't

17  hear me or you don't understand the question, please

18  ask me to repeat it, you need a moment with your

19  lawyers, please ask for it.

20         Sir, you have a right to testify and a right

21  to choose not to testify.  Do you understand this?

22         THE DEFENDANT:  Yes.

23         THE COURT:  If you choose not to testify,

24  the jury will be instructed that no inference of

25  guilt could be drawn from your failure to testify

1  and it cannot be used against you in any way; do you

2  understand this?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Whether or not you testify is

5  your decision.  Do you understand that?

6          THE DEFENDANT:  Yes.

7          THE COURT:  It is not uncommon for a person

8  charged with a crime and defense counsel to disagree

9  as to whether or not a defendant should testify.  It

10 happens, and sometimes defense counsel wants a

11 defendant testifying and a defendant doesn't.

12 Sometimes a defendant wants to testify, defense

13 doesn't want him to or her to.  I don't know what

14 the situation is here.  I just want you to

15 understand that ultimately after consulting with

16 your attorneys, that decision is yours.

17          Do you understand that?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Okay.  Do you have any questions

20 about your rights to testify?

21          THE DEFENDANT:  No.

22          THE COURT:  Do you have any questions about

23 your rights to choose not to testify?

24          THE DEFENDANT:  No.

25          THE COURT:  Do you have questions about the

1  fact that it is your decision ultimately to decide

2  whether or not to testify?

3          THE DEFENDANT:  No.

4          THE COURT:  I'm told that you're choosing

5  not to testify.  And is that correct?

6          THE DEFENDANT:  That's correct.

7          THE COURT:  And is this your decision?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And are you making this decision

10  voluntarily?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Has anyone made any promises to

13  you of any kind or in any way as to what the outcome

14  might be if you testified or didn't testify?

15          THE DEFENDANT:  No.

16          THE COURT:  Has anyone threatened you in any

17  way to have you testify or not testify?

18          THE DEFENDANT:  No.

19          THE COURT:  Have you consulted with your

20  attorneys before making this decision?

21          DEFENDANT CHRISTENSEN:  Yes.

22          THE COURT:  And is this decision to not

23  testify yours?

24          DEFENDANT CHRISTENSEN:  Yes.

25          THE COURT:  Do you have any questions at

1 all?

2        DEFENDANT CHRISTENSEN:  No.

3        THE COURT:  Okay.  With that in mind, I will

4 accept that, and we will recess for a few minutes.

5        Mr. Tucker, did you want to be heard?

6        MR. TUCKER:  I did just very briefly, Your

7 Honor.

8        In regard to Mr. Nelson's questioning there

9 at the end of Agent Huckstadt about whether the word

10 said *months* or *once.*

11        I would point out that they are doing the

12 exact same thing that was the subject of our motion

13 for a mistrial this morning, and for the request for

14 the curative instruction.  They did -- they tried to

15 make the precisely the same suggestion by

16 substituting and making that *once.*  It did say did

17 you do it even once or even as much as I have; that

18 is exactly the implication they are trying to leave

19 with the jury by suggesting that that unintelligible

20 word was perhaps *once* instead of *months.*

21        And we renew the same motion we made this

22 morning about a mistrial.  They did it again, the

23 exact same thing.  They are trying to say that HE --

24 with an unintelligible word, at that, trying to

25 leave the impression that there are 13 victims.

1          THE COURT:  Well, go ahead.

2          MR. NELSON:  He is actually -- if you look

3    at the conversation about it -- he is talking about

4    his thoughts and his conversations.  It is not his

5    acts.  So I frankly disagree.

6          MR. MILLER:  I did just want to make the

7    record.  He is now referring it as an unintelligible

8    word.  They submitted the transcript saying that it

9    was a certain word.  And we had a disagreement on

10   the word.

11         THE COURT:  Both have made your record on

12   this point.  I've made my rulings on this point.  It

13   doesn't change based upon this.  Everybody has set

14   this up in a fashion that allows them to argue their

15   positions.

16         Mr. Taseff, do you want to be heard?

17         MR. TASEFF:  Just one.  May we inquire who

18   the rebuttal witness will be?

19         MR. MILLER:  Yes.  It's the agent who had

20   the second interview with Mr. Hill, which is Loren

21   Moneypenny, M-o-n-e-y-p-e-n-n-y.

22         MR. TASEFF:  Judge, with that

23   representation, we would move to bar the testimony

24   on grounds that that is not a proper prior

25   consistent statement.  801(d)(1)(B) governs

1   admissibility of prior consistent statements.  The

2   timeline here is that Mr. Hill was released from the

3   Illinois Department of Corrections on January 25th

4   of this year.

5            On March 4th he was charged in Macon County

6   Circuit Court with felony retail theft.  He

7   testified that he has an upcoming court date in July

8   in that matter and he has counsel on the case.

9            We learned that in May, late May there was a

10  witness prep session where it is alleged that

11  Mr. Hill made a statement to the agents and the

12  prosecutors consistent with the testimony that he

13  made at trial.

14           We respectfully submit to introduce the May

15  25th or whatever date that conversation occurred in

16  May as inadmissible under the authority of *Tome*,

17  T-o-m-e, *v. U.S.,* 513 US 150 from the Supreme Court.

18           Prior consistent statement must predate an

19  alleged fabrication, influence or motive to testify

20  falsely.  And it's our position that once he picked

21  up his new felony charge while on parole from the

22  Illinois Department of Corrections, he thereby would

23  have a motive to testify favorably for the

24  government when called to testify in this case,

25  thereby allowing him and his lawyer to try to broker

1  a better deal for him on his upcoming felony theft

2  case.  Because a motive to testify favorably for the

3  government arose in violation of *Tome,* prior

4  consistent statement was must pre-date to the

5  alleged fabrication in this instance --

6         THE COURT:  Well, then somebody is going to

7  have to clue me in first about what the rebuttal

8  witness is going to say, because I just listen to

9  the witnesses as they appear.  You guys know what

10 they are going to say apparently.  So tell me what

11 he is going to say first and I can decide this.

12        MR. MILLER:  Actually, he is going to say --

13 and, obviously, they have attacked the credibility

14 of Mr. Hill.  This is a prior consistent statement.

15        First of all, they allege that he never

16 spoke with the FBI agent, and also that he never

17 told him that the defendant had attempted to be a

18 police officer.  So, we brought in the one prior

19 consistent statement that was actually through cross

20 through Agent Manganaro on September 6th.  We have

21 the right to bring in another prior consistent

22 statement, the one in May, to show he didn't just

23 get on the stand here, as is suggested by defense

24 counsel, and say --

25        THE COURT:  And make up something new.

1            So in the May interview the issue, he
2    actually said the walkie-talkie and the police
3    radio.
4            MR. MILLER:  Right.  Yes, Your Honor.
5            MR. TASEFF:  Had that statement been made to
6    government counsel before March 4th when he picked
7    up his new felony, then there would be an argument
8    for its admissibility.
9            THE COURT:  You're saying that simply
10   because he has a pending charge, he cannot be
11   brought in as a prior consistent statement.
12           MR. TASEFF:  Yes, because he now has a
13   motive to testify favorably for the government to
14   create favor and help his resolution of this case.
15   This is --
16           THE COURT:  So bars his testimony as opposed
17   to allowing you to cross-examine him on it?
18           MR. TASEFF:  It would bar the introduction
19   of that statement as prior consist under 801(d)(a),
20   and I cite *Tome*, *Tome v. US*, 513 US 150.
21           THE COURT:  Mr. Miller, do you want the last
22   word on this?
23           MR. MILLER:  I'm not aware of the case he
24   cites, Your Honor, but clearly here the claim is
25   fabrication that Mr. Hill lied here at trial.  And

1  so we believe that both the September 6th statement

2  and the May statement because the implication was

3  given that he just made up at trial, this statement,

4  and so a prior consistent statement does rebut a

5  claim that he fabricated that information at trial.

6          THE COURT:  I will allow it over objection.

7          MR. TASEFF:  May we have a continuing

8  objection for that, so I need not object before the

9  jury, Judge?

10          THE COURT:  So we will just take a minute or

11  two here or are we would ready to go?  I can bring

12  the jury right back down and we will allow the

13  defense rest and then move right into the

14  government's case.  And then I would recess unless

15  there is nothing more from the defense.  I will

16  recess the jury.  We will spend some time this

17  afternoon on instructions, and I will recess the

18  jury maybe until 9:30 Monday morning.

19          MR. MILLER:  That's fine, Your Honor.  I

20  will have the witness come in.

21          THE COURT:  All right.  So let's --

22  anything?

23          All right.  Then let's bring the jury down.

24          And Mr. Miller, I'm going to ask you just to

25  hold your witness like right there until the defense

 1  has actually rested.

 2          MR. TASEFF:  All right.

 3          THE COURT:  All of your exhibits in from the

 4  defense side?

 5          MS. POLLOCK:  I believe that there is still

 6  a continuing objection from the government to

 7  Defendant's Exhibit 13.

 8          THE COURT:  Let's address 13.

 9          So do you think these are -- these are

10  records of Mr. Christensen, his questionnaire he

11  filled out; these are notes, counseling notes.  Do

12  you expect that they would go back to the jury or

13  are you just asking that they be admitted because

14  you referenced them?  How could the notes of the

15  counselor go back to the jury?

16          Okay.  Let's get to that when we get done

17  with this.

18          Then how could -- what was -- the objection

19  to 13 was what, Mr. Nelson?

20          MR. NELSON:  First of all, it's self-serving

21  hearsay.

22          Second of all, it's irrelevant to this phase

23  of trial.  We have an objection before the Court to

24  any of this being admitted, the defendant's waiver

25  of Rule of 12.2 notice, and it would be totally

1  improper for it to go back to the jury here based on

2  a call of the case agent in their case-in-chief.

3          THE COURT:  Miss Pollock.

4          MS. POLLOCK:  That is a lot of objections,

5  Your Honor.

6          First, with regards to relevance, I think

7  that it is relevant because the government chose to

8  introduce that statement.  They chose to play the

9  video.  We responded to that choice.

10          The defendant's mental state and alcohol

11  abuse at the time of the Memorial Walk is the

12  linchpin of the challenge to the statements that

13  were made therein.

14          The government wants to use this evidence

15  for evidence of premeditation and intent, and we are

16  hoping to use it to the jury to deal with the

17  credibility of the statements that Mr. Christensen

18  made during that June 29th recording.

19          So the fact, you know, the theme that has

20  been presented throughout the case has been that

21  Mr. Christensen was abusing alcohol in the spring of

22  2017; that it caused a riff between him and his

23  wife; that he had sought treatment for that and made

24  those statements that are the subject of the

25  Memorial Walk -- the background on his mental state

1 at the Memorial Walk and his counseling sessions;
2 and then that once he met Miss Bullis, he didn't
3 return to the Counseling Center at that point.
4          THE COURT:  And I think that you have been
5 allowed to explore that theory.  I'm just wondering
6 how, how records, notes of a counselor are
7 admissible or go back to a jury without at least the
8 counselor testifying.  But even that way then the
9 counselor would testify and necessarily the notes
10 wouldn't go back.
11          MS. POLLOCK:  They might.  They are a
12 business record kept by the University of Illinois.
13 They are non-hearsay that is maintained.  I know the
14 foundation for that hasn't been established.
15 However, it's pretty clear that that's what occurred
16 here.  And if we need to, I thought that we had
17 stipulations as to the foundation not for the
18 admissibility but at least for the authenticity of
19 the documents.  So in that respect, it's
20 non-hearsay.  I don't see why it wouldn't go back to
21 the jury as an exhibit.  I don't see a reason why it
22 should be excluded actually.
23          MR. NELSON:  If I may, I would just say,
24 let's assume for the sake of argument, that it is
25 admissible non-hearsay.  Let's assume for the sake

1 of argument it is relevant.  It would then fall

2 under 403 because it is an incomplete statement of

3 people who aren't here to explain those statements.

4 You know, you can't summarize what happened in a

5 paragraph.  These are just their notes.  And, you

6 know, we can't just walk into trial and, you know,

7 put the agent's notes on the stand and prove our

8 case that way.  We have to call witnesses to explain

9 what actually happened.  The same is true here, Your

10 Honor.  They have got the evidence in.  The

11 defendant's statement is made through the video.

12 They can certainly argue it, and they have obviously

13 formulated their argument.  I don't see how --

14         THE COURT:  I will stay reserved on this,

15 understanding that your exhibits are in.  This one

16 could still come in Monday.  I will stay reserved on

17 this for the time being.

18         Okay.  Thank you.

19         Okay.  Now, we will bring the jury in.  The

20 defense will rest.  And then the government will put

21 on their rebuttal witness.  You just have one?

22         MR. MILLER:  Yes, Your Honor.

23         (Jury present, 2:38 p.m.)

24         THE COURT:  Thank you.

25         Please be seated.

JURY TRIAL -- June 21, 2019 (Redacted)    173

1          Anything further from the defense?

2          MS. POLLOCK:  No, Your Honor.  The defense

3  rests.

4          THE COURT:  All right.  Rebuttal from the

5  government?

6          MR. MILLER:  The United States would call

7  Special Agent Loren Moneypenny.

8          THE COURT:  Okay.  Please come forward.

9          Ladies and gentlemen, I believe this will be

10  the last witness for the day.  And then we will

11  recess until Monday morning.  I will give you

12  further instructions as soon as this witness is

13  concluded.

14                  LOREN MONEYPENNY,

15  after having been duly sworn, testified as follows:

16                  DIRECT EXAMINATION

17  BY MR. MILLER:

18  Q.  Will you please tell the jurors your name and

19  spell your first and last name for the court

20  reporter.

21  A.  Loren Moneypenny; L-o-r-e-n,

22  M-o-n-e-y-p-e-n-n-y.

23  Q.  Where are you currently employed?

24  A.  FBI Champaign RA.

25  Q.  How long have you been employed there?

1  A.   I've been employed with the FBI since

2  September 16, 2018.  I'm been in Champaign since

3  February.

4  Q.   And were you employed by the FBI on May 24th of

5  2019?

6  A.   Yes, sir.

7  Q.   And on that date did you attend an interview

8  that took place of an individual by the name of

9  Charles Hill?

10  A.   Yes, sir.

11  Q.   And was that an interview that related to

12  preparing him to testify at trial?

13  A.   Yes, it did.

14  Q.   And did you attend the interview to document any

15  information that might be additional to information

16  previously provided by Mr. Christensen?

17  A.   Yes.

18  Q.   And during that interview, did Mr. Hill state

19  anything regarding statements made by the defendant

20  to him regarding, getting the individual into his

21  car?

22  A.   Yes, he did.

23  Q.   And what were those statements?

24  A.   He indicated that he had a conversation with the

25  defendant.  It involved -- the defendant's close to

1  him that he was able to get Miss Zhang into his

2  vehicle because he had a badge and a walkie-talkie.

3        MR. MILLER:  I have no further questions,

4  Your Honor.

5        THE COURT:  Mr. Taseff.

6              CROSS-EXAMINATION

7  BY MR. TASEFF:

8  Q.   May 24, 2019, correct?

9  A.   Sure.

10  Q.   That's the date of this interview?

11  A.   Yes, sir.

12  Q.   That you were present?

13  A.   Yes.

14  Q.   With Mr. Hill?

15  A.   Yes.

16  Q.   And with who else?

17  A.   And with Mr. Miller, and Mr. -- I'm sorry --

18  Q.   Mr. Freres and Mr. Miller?

19  A.   Yes.

20  Q.   Two prosecutors?

21  A.   Yes.

22  Q.   And in that interview Mr. Hill was asked various

23  questions?

24  A.   Yes.

25  Q.   Gave various answers?

1  A.   Yes.

2  Q.   You just testified to one of the answers that

3  Mr. Hill gave?

4  A.   Yes.

5  Q.   Did Mr. Hill at any time during this interview

6  on May 24, 2019, say that Mr. Christensen had told

7  him that he had zip ties, hand restraints, or some

8  kind of cuffs with him as well?

9  A.   I don't recall.

10  Q.   That never happened, did it, during the

11  interview of May 24th, Mr. Hill never said that, did

12  he?

13  A.   I can't say definitively.

14  Q.   And had he said that, would that be the kind of

15  information that would normally be found in your 302

16  interview that you prepared?

17  A.   It very well could have been.

18  Q.   And having reviewed your 302, there is not one

19  reference to that at all, zip ties, hand restraints

20  or cuffs, correct?

21  A.   Correct.

22         MR. TASEFF:  No further questions.

23         THE COURT:  Mr. Miller.

24         MR. MILLER:  Nothing further, Your Honor.

25         THE COURT:  Thank you, sir.  Push that you

1   microphone away.

2           Any further rebuttal?

3           MR. MILLER:  No, Your Honor.

4           THE COURT:  That concludes the government's

5   evidence?

6           MR. MILLER:  It does, Your Honor.

7           THE COURT:  Anything further from the

8   defense?

9           MS. POLLOCK:  No, Your Honor.

10          THE COURT:  Okay.  Ladies and gentlemen, all

11  of the evidence has come to a conclusion now.  We

12  will prepare this case for closing arguments.  We

13  will spend the rest of the afternoon on a conference

14  on jury instructions, so when you arrive Monday

15  morning, we will be prepared to have closing

16  arguments presented to you.  It is my policy to read

17  to you the written instructions of law ahead of the

18  closing arguments, so that if the lawyers wish then

19  they can reference them, because you will -- they

20  will know that you will receive them.

21          With that in mind, I'm thinking 9:30 Monday

22  morning.

23          And just ask you to be safe going home.

24          Please do not discuss this matter with

25  anybody including yourselves.  I know that for the

1   time, the alternates are still in place here.  You

2   will come here Monday, and you will hear closing

3   arguments as well, and we will make a determination

4   on your status at the conclusion of that.

5           With that in mind, I can't emphasize enough

6   to please do not discuss this matter.  Stay away

7   from news on it.

8           We are going to start at 9:30.  So that if

9   you could be here just, maybe, 9:20, we will be good

10  to go.

11          Okay.  Thank you very much.

12          We will be in recess.

13          (A recess was taken, 2:44 p.m.)

14          (Jury excused for the day.)

15          THE COURT:  I thought that we would take a

16  few minutes here and then regroup and then just have

17  an informal discussion about what instructions.  I

18  will show you the differences between the ones that

19  you guys propose and the ones that I prepared for

20  the bulk of them and then we will discuss the ones

21  that we are tendering and any others that you think

22  we may need.  And at some point then if we reached

23  agreement or resolution of the issue, we can prepare

24  a final set even yet today.  We will do it here if

25  you wish while we are visiting.  And then everybody

1 will be ready to go Monday morning about -- in the

2 event that Mr. Christensen would prefer not to stay,

3 we can make the record on Monday morning.  We can

4 make a record this afternoon as well.

5        But if you wish to excuse Mr. Christensen

6 then we will clearly make a record Monday morning on

7 which instructions are tendered, which ones have

8 been allowed, which ones are over objection, and any

9 other issue.

10        MS. POLLOCK:  He is going to stay put, Your

11 Honor.

12        THE COURT:  Okay.  Very good.  Take a few

13 minutes, and then take your coats off if you wish.

14 I like to do these informally in chambers, frankly,

15 but I hope since they are so many of us doing it,

16 wherever you want to do it.  We can do it right

17 here, and let's just do it in open court.

18        Okay.  I will be right back out.

19        (Recess taken, 2:46 p.m.)

20                    *****

21

22

23

24

25