1          UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF ILLINOIS

3
UNITED STATES OF AMERICA,
4                                    Docket No. 17-20037
                Plaintiff,
5
     vs.                             Peoria, Illinois
6                                    June 24, 2019
                                     8:41 a.m.
7    BRENDT A. CHRISTENSEN,

8                Defendant.

9

10

11          JURY TRIAL -- June 24, 2019

12

13

14      BEFORE THE HONORABLE JAMES E. SHADID

15        UNITED STATES DISTRICT JUDGE

16

17

18

19

20          NANCY MERSOT, CSR-RPR
            Official Court Reporter
21           U.S. District Court
            100 N.E. Monroe Street
22          Peoria, Illinois 61602
               309-671-4244
23

24
Proceedings recorded by mechanical stenography;
25  transcript produced by computer.

JURY TRIAL -- June 24, 2019                    2

```
 1
    For the Plaintiff:      EUGENE L. MILLER, ESQUIRE
 2                          BRYAN D. FRERES, ESQUIRE
                            Assistant United States Attorneys
 3                          201 South Vine Street
                            Urbana, Illinois 61802
 4                          217-373-5875

 5                          JAMES B. NELSON, ESQUIRE
                            U.S. DEPARTMENT OF JUSTICE
 6                          Capital Case Section
                            1331 F Street NW, Suite 625
 7                          Washington, DC 20004
                            202-598-2872
 8

 9  For the Defendant:      GEORGE F. TASEFF, ESQUIRE
                            Assistant Federal Public Defender
10                          401 Main Street, Suite 1500
                            Peoria, Illinois 61602
11                          309-671-7891

12                          ELISABETH R. POLLOCK, ESQUIRE
                            Assistant Federal Public Defender
13                          300 West Main Street
                            Urbana, Illinois 61801
14                          217-373-0666

15                          ROBERT L. TUCKER, ESQUIRE
                            Robert L. Tucker, Esq
16                          7114 Washington Avenue
                            St. Louis, Missouri 63130
17                          703-527-1622

18                          JULIE C. BRAIN, ESQUIRE
                            Attorney at law
19                          916 South 2nd Street
                            Philadelphia, Pennsylvania 19147
20                          267-639-0417

21

22

23

24

25
```

1          (In open court, 8:41 a.m.)

2          THE COURT:  All right.  We are in open court

3  in the matter of United States v. Brendt

4  Christensen, 17-20037.

5          As we get set up, jury arguments or closing

6  arguments are scheduled for 9:30.

7          Mr. Tucker, Ms. Pollock, Mr. Taseff,

8  Ms. Brain present with Mr. Christensen.

9          Mr. Miller, Mr. Nelson, Mr. Freres, Agents

10 Huckstadt and Manganaro for the government.

11         Resume our conference on jury instructions.

12 I prepared and tendered to the parties instructions

13 based on our conversation on Friday afternoon.

14         So let's start with the ones that have the

15 agreed changes that we were going to make.

16         And that is as follows -- that was the first

17 one, the Court's Instruction Number 4 where we

18 removed paragraph three about judicial notice.

19         Any issues there from either side?  Does

20 that seem like it is correct?

21         MR. MILLER:  No objection from the United

22 States, Your Honor.

23         MR. TASEFF:  No objection, Your Honor.

24         THE COURT:  So 4 is good.

25         Then let's go to Court's Instruction 9 where

JURY TRIAL -- June 24, 2019                4

1  we took out the part about -- in the first

2  paragraphing *in testimony*, and then after that,

3  *including that of the defendant*, so that was

4  removed.

5          Any issues there?

6          MR. MILLER:  No objection, Your Honor.

7          MR. TASEFF:  No objection.

8          THE COURT:  Okay.  The next one was Court's

9  Number 11, wherein we took out the last sentence of

10  *an earlier statement was made under oath, you can*

11  *consider*, et cetera, et cetera, because there were

12  no statements under oath, correct?

13          MR. MILLER:  Yes, Your Honor.

14          THE COURT:  Any issues there?

15          MR. MILLER:  No, Your Honor.

16          MR. TASEFF:  No objection, Your Honor.

17          THE COURT:  Okay.  And then it appears we

18  want to discuss Court's 14, which the objection from

19  the defense was to add Terra Bullis to that *made*

20  *statements to law enforcement officers and Terra*

21  *Bullis* and the Court is declining, so we will give

22  this over objection declining to add Terra Bullis to

23  the *as a law enforcement officer*.

24          Does the defense wish to make any further

25  record on that?

```
 1        MS. BRAIN:  Yes, Your Honor.  Not with
 2   respect to the ruling on that instruction, but we
 3   would ask to alter Court Instruction Number 9,
 4   that's the witness credibility instruction.  And I
 5   would like to alter it so it expressly includes
 6   Mr. Christensen's statements.  And so --
 7        THE COURT:  All right.  Why don't we get to
 8   those.  Just hold on to that for one second.
 9        MS. BRAIN:  Very good.
10        THE COURT:  Let's get to the change and then
11   we will go back to 9.
12        Okay.  So then we go to Court's 18 where we
13   took out the part about providing with the recording
14   and modified the last paragraph to include *if they*
15   *wish to listen, send a written message, and I will*
16   *make that available*.  It's my understanding the
17   defense objected to that as well, not wanting to
18   single out any particular piece of evidence; is that
19   correct?
20        MS. BRAIN:  That's correct, Judge.
21        THE COURT:  I'm going to give that over
22   defense objection.
23        Okay.  Then Number 19 was the next one that
24   would be removed, the second paragraph -- the
25   summaries or charts has been challenged.  We removed
```

JURY TRIAL -- June 24, 2019                    6

1  that.

2          Parties in agreement there?

3          MS. BRAIN:  Yes.

4          MR. MILLER:  Yes, Your Honor.

5          THE COURT:  Thank you.

6          Okay.  Then we changed Court's Instruction

7  Number 3, modified that:  *In deciding a verdict, you*

8  *should not consider the possible punishment for the*

9  *defendant at this time.  You're only to decide if*

10  *the government has proven the defendant guilty*

11  *beyond a reasonable doubt or the charges against him*

12  *at this stage.*

13          Now I can't recall if the defense still had

14  an objection to that or not.

15          MR. TASEFF:  This is Court's Number 3?

16          THE COURT:  Number 23.

17          MR. TASEFF:  23.

18          THE COURT:  Where we just modify it slightly

19  *not to consider the possible punishment.*

20          MS. BRAIN:  We didn't, Your Honor.

21          THE COURT:  Okay.  Thank you.

22          Then the next one was Court's 24, where we

23  took out in paragraph three where it says *interstate*

24  *commerce or foreign commerce.*  We removed foreign --

25  or foreign.

JURY TRIAL -- June 24, 2019                    7

1           Any objection there?

2           MR. MILLER:  No objection.

3           MR. TASEFF:  No objection.

4           THE COURT:  So then we were pretty good and

5    then I'm going to go offer some other things and

6    then go back to Number 9 here.

7           So that takes care of the minor matters.

8           Now I will tell you, you can see where I

9    inserted the defense's tendered instructions that

10   were approved.  The government's tendered

11   instructions.  But let's go to 15, Court's 15A and

12   B.  I have made options here and tried to conform

13   this to the facts of this case.

14           3.11 would read simply:  You have heard

15   evidence that before trial that -- wait a minute,

16   not that.  3.11 would say that *you have heard*

17   *evidence that the defendant made statements*

18   *regarding other crimes in addition to the charges*

19   *alleged against the defendant in this case.  You may*

20   *only consider those statements to put it --*

21   *defendant's other statements in context* -- well,

22   this was a proposed one -- but basically it talks

23   about other crimes.  I tried to specifically tailor

24   this to meet the defense's requests.  The defense

25   sent over the weekend the *Castillo* case which

```
 1  added -- would add specific language about
 2  non-theoretical -- something.  That was clearly
 3  stated by Judge Posner in there -- no, wait a
 4  minute, that's in furtherance -- I'm sorry.
 5          Let's go back to the limiting instruction
 6  and that addresses the motion in limine again filed
 7  by the defense as to this issue.  So, take a look at
 8  it.  I've proposed 15A that says crimes.  I have
 9  proposed 15B that actually says victims, since this
10  is exactly what it is about.  And I tried to tailor
11  it specific.  And this was another bracketed
12  material about hearing -- the government not
13  cooperating, the defense saying that there is no
14  evidence and it doesn't occur.  So I'm trying to be
15  specific to the issue here.
16          Take a look and tell me what you think.  And
17  it is specific to the statements on the recording,
18  correct, from the defense viewpoint?
19          MS. BRAIN:  That's right, Your Honor.
20          THE COURT:  Okay.
21          From the government?
22          MR. MILLER:  Yes, Your Honor.  As we
23  submitted over the weekend, and noted, we are
24  certainly concerned about any instruction that would
25  stray from 3.11 that would comment on the weight of
```

 1  the evidence.

 2        I think that it's clear the argument here

 3  that we anticipate to hear is that the statement --

 4  the relative veracity of the statement affects the

 5  veracity of the defendant's other statements.  We

 6  understand that that's the defense's argument in

 7  this case.  So for the Court then to begin to

 8  instruct the jury one way or the other regarding the

 9  veracity of the statement, it's a concern for us.  I

10  mean, it certainly is correct -- although I think

11  the language you have heard the government say that

12  they cannot corroborate the other crimes.  I think

13  that it may be more correct to say that you have

14  heard the government say that they have not

15  corroborated the other crimes.

16        As far as it is true they have heard the

17  defense says that there is no evidence other than

18  the defendant's statements.  The last provision, *and*

19  *if they did not occur;* I think that is their

20  argument but there is a concern that that is putting

21  before the jury something that's not in evidence;

22  that would imply that that was coming from the

23  defendant himself, at least that would be our

24  concern.  And so we would think that last provision

25  *and that they did not occur* would not be

1  appropriate, given what the attorneys say is not

2  evidence in the case.

3        THE COURT:  In your closing you expect to

4  reference it how or do you --

5        MR. MILLER:  I don't expect to reference it,

6  Your Honor, at all in our closing.  Obviously, it

7  will depend on the defendant's closing whether we

8  feel that there is some type of rebuttal that is

9  required, but we don't anticipate referencing it in

10  our closing.

11        THE COURT:  All right.  Let me hear from the

12  defense on these proposed instructions.

13        MS. BRAIN:  Your Honor, we would object to

14  the bracketed portion, the highlighted portion of

15  the instruction, because the import of it is that

16  the jury is free to make a finding whether this is

17  true or not and in fact they are not.

18        THE COURT:  Okay.  So -- right now I can

19  tell you that I'm good with eliminating that

20  bracketed portion.

21        MS. BRAIN:  Thank you.

22        THE COURT:  Then that would then start the

23  next sentence with *you may only consider.*

24        MS. BRAIN:  It would, Your Honor.

25        THE COURT:  Go ahead.

1        MS. BRAIN:  Then we would opt for the

2   language of *victims* as opposed to *crimes,* so that is

3   15B rather than 15A.

4        THE COURT:  Okay.

5        MS. BRAIN:  In the final sentence, we would

6   ask the Court to delete *during this stage of the*

7   *trial* because it suggests that they will have a

8   different option at some other stage of the trial,

9   which also isn't true; they are never going to be

10  allowed to make a finding one way or the other as to

11  whether these statements are true.  It will be

12  considered only for a very narrow purpose.

13       And in the place of the bracketed portion,

14  in order to address the issues that we have raised

15  in the motion for mistrial and orally, we would ask

16  that the Court say *there is no evidence that*

17  *Mr. Christensen has 12 prior victims and you're*

18  *prohibited from considering his statements or any*

19  *other testimony as suggesting that he did.*

20       THE COURT:  Miss Brain, why would any jury

21  ever be instructed to disregard any statement that

22  is evidence?

23       MS. BRAIN:  I think the language we are

24  proposing isn't instructing them to disregard it.

25  It is simply instructing them from using it to

 1  decide or determine whether or not the statements

 2  are actually true.  They are in evidence for a very

 3  limited purpose, so they are not to disregard it,

 4  but by the same token, also not to use it to

 5  consider whether it is true or not.

 6          THE COURT:  So you would substitute -- read

 7  it again to me.

 8          MS. BRAIN:  *There is no evidence that*

 9  *Mr. Christensen has 12 prior victims and you're*

10  *prohibited from considering his statements or any*

11  *other testimony as suggesting that he did.*

12          THE COURT:  Anything further from the

13  government on that?

14          MR. MILLER:  Your Honor, we would have no

15  objection to their request that it state *victims.*

16          We have no objection to removing the

17  bracketing portion.

18          And we have no objection to removing *during*

19  *this stage of the trial.*

20          We would object to the Court instructing the

21  jury basically on the defense theory; the defense

22  argument is that these statements are clearly not

23  true, and, therefore, the defendant was not telling

24  the truth when he made other statements.  And so we

25  think it would be improper for the Court to

 1  basically adopt the defense theory to instruct the
 2  jury on matters that are not in evidence.
 3          THE COURT:  Okay.
 4          MS. BRAIN:  Your Honor --
 5          THE COURT:  Go ahead, Miss Brain.
 6          MS. BRAIN:  I'm sorry to cut the Court off.
 7          The language is carefully crafted to avoid
 8  precisely what Mr. Miller is saying.  We are not
 9  saying that it didn't happen.  We are not asking
10  this jury to draw a conclusion.  It is simply that
11  there is no evidence in the record which is
12  absolutely factual and that they are prohibited from
13  considering it for an improper purpose.  I don't
14  think this language offends in the same way.
15          THE COURT:  I think the last language that
16  *you may only consider those statements to put the*
17  *defendant's state of mind and other statements in*
18  *context.  You may not consider those statements for*
19  *any other purpose.*
20          I believe that you guys have made this clear
21  throughout the trial.  You've made your positions
22  clear.  In fact, the cross-examination of Agent
23  Huckstadt ended on Friday -- or even maybe it was
24  direct -- ended with Ms. Pollock clarifying that the
25  one thing he said earlier in the week about still

1  under investigation, that she nailed that down that

2  the one investigation left showed nothing basically.

3  So it's all free for argument here to the extent you

4  want to argue it.  I think this limiting instruction

5  covers it.  So I will use the one with *victims.*  We

6  will eliminate the bracketed material and eliminate

7  *during this stage of the trial* and then give it as

8  15C over the objection of the defense.

9          MR. TASEFF:  And, Judge, as to perfecting

10  our record, we would tender, of course, the

11  instruction that is set forth in the motion for

12  mistrial.  We stand on our position and we want the

13  record to reflect that the Court is then giving 15C

14  over all objections raised previously.

15          THE COURT:  All right.  Government wish to

16  be heard?

17          MR. MILLER:  No, Your Honor.

18          THE COURT:  Let's go back to Court's

19  Instruction 34, which is after Government's 24.  And

20  it is my proposed modified 924(c).  I've read the

21  *Castillo* case.  The *Castillo* case did state -- Judge

22  Posner recited what *in furtherance of* meant and that

23  included non-theoretical -- I can't remember the

24  exact language.  It says here -- but I point out

25  that non-theoretical evidence.  It says:  *In*

1  *furtherance of instruction, the government must*

2  *present specific non-theoretical evidence to the*

3  *gun, to tie the gun to the crime.*  That was a gun

4  case.  That was Judge Posner's language but he

5  didn't say that it had to be in the form of a jury

6  instruction.  In fact, the language in *Castillo* and

7  used in context when Posner says *in furtherance of,*

8  what that means, it didn't say that it had to be

9  language used in an instruction.  In fact, the

10  instruction used in *Castillo* is the same one being

11  advanced here without the *mere presence* language

12  that I proposed, and they found that to be

13  sufficient and they found it to be sufficient to

14  only be given in one count as opposed to the two,

15  preferably it should have been in both, but it

16  wasn't.  But they said the instruction proposed, the

17  Court found the arguments to the jury for each side

18  substantially mitigated, any danger flowing from any

19  lack of elaboration and that was as to the mere

20  presence.  I've added, not only the mere presence

21  language, I put *mere use or possession* because use

22  of the cellular phone I think is at issue as well as

23  possession.  So I added *mere use or possession by*

24  *the defendant is insufficient of -- the*

25  *instrumentality is insufficient to establish that*

 1  *the instrumentality was used in furtherance of the*
 2  *crime.*
 3        And then the last one, the last sentence in
 4  the 924 instruction says *There must be a connection*
 5  *between the instrumentality and the crime* period.
 6  And I've added just one more time, even though it
 7  says it earlier in the body, I added that *the crime*
 8  *that advances, moves forward, promotes or*
 9  *facilitates the crime.*  So that's my proposed to try
10  to accomplish what should be done in this case.
11        Mr. Tucker.
12        MR. TUCKER:  Your Honor, I thought that we
13  proposed this language Friday.  I'm sorry.  I
14  misunderstood.  I thought you ended up granting the
15  language, but it would be after the end of that
16  instruction, *a remote, attenuated or speculative*
17  *connection between the instrumentality and the crime*
18  *is insufficient to establish that the*
19  *instrumentality furthered commission of the offense.*
20        THE COURT:  No.  I asked you to send me the
21  case that you cite or, you know, and I would think
22  about it over the weekend.  And I'm not going to
23  have that language or the non-theoretical language
24  that was proposed as well in open court on Friday.
25        Okay.  So I'm proposing this one.  And I'm

 1  sure it's over defense objection.

 2          What's the government's position?

 3          MR. MILLER:  We have no objection.

 4          THE COURT:  So I will give this one over

 5  objection of the defendant as to the one that the

 6  defense proposes that had the non-theoretical

 7  language and the language that Mr. Tucker just

 8  cited.

 9          Okay.  So now with that in mind, here is

10  what I did:  I placed Government 11 after Court

11  Number 11, so you can see that.  I placed Defendant

12  28 after Court 22.  I've placed Government 28 after

13  Court 25.  It seems to make the most sense to me.  I

14  placed Government 24 then after Government 28.  I've

15  placed Court 34 after Government 24.  Then I placed

16  Government 26 after Court 27, Government 27 after

17  Government 26, and then Government 29 after

18  Government 27.

19          Are there any other tendered instructions to

20  be given, otherwise I will make the changes quickly

21  to 15B, call it 15C, and take out the highlighted

22  part in 34 and get copies for everybody and clean

23  copies ready for the jury.

24          Are there any other proposed tendered

25  instructions?

JURY TRIAL -- June 24, 2019                    18

1          MS. BRAIN:  Just Court's 9.

2          THE COURT:  Number 9.  Gotcha.  Thank you.

3          So now Court 9, you wish to include some

4    factors.  Tell me where you want it, Miss Brain.

5          MS. BRAIN:  The very first paragraph says

6    including *the defendant.*  I think that may already

7    be gone.  If not, we ask the Court excise that part,

8    and just add on the bottom, *these same factors also*

9    *applied to your consideration of the believability*

10   *of Mr. Christensen's statements that were recorded*

11   *by Miss Bullis.  Based on these same factors, you*

12   *may accept all of what Mr. Christensen said or part*

13   *of it or none of it.  And you may -- you decide how*

14   *much weight to give to these statements.  You may*

15   *accept all, part, or none.*

16         Essentially, repeating the same language but

17   making clear that it applies also to those

18   statements.

19         THE COURT:  So where we took out in the

20   sentence, *you may -- and how much weight to give*

21   *each witness's testimony including that of the*

22   *defendant,* period.  You asked that that be taken

23   out, but you ask that it stay out at that point but

24   put in under the factors you may consider?

25         MS. BRAIN:  To say that, Your Honor, *the*

1 *same factors also apply to your consideration of the*
2 *believability of Mr. Christensen's statements that*
3 *were recorded by Miss Bullis.*  Just to make clear
4 that although it's not testimony by Mr. Christensen,
5 the same analysis, the same credibility analysis
6 must apply as if it were testimony.
7           MR. MILLER:  It certainly doesn't belong
8 here.  As we look through, it discusses the
9 witness's demeanor.  Obviously, they have heard him
10 discuss but the demeanor wasn't before the jurors.
11 It says whether the witness had reason to slant
12 testimony.  The defendant hasn't given testimony.
13 The truthful -- and actually the witness's
14 testimony.  So it clearly doesn't go here.  We would
15 have to completely amend this entire instruction
16 because it refers repeatedly to testimony.  And the
17 defendant did not provide testimony.  It appears
18 that they are really talking about perhaps Court
19 Instruction Number 14 where it talks about *you have*
20 *heard testimony or received evidence the defendant*
21 *made statements to law enforcement officers* -- and
22 that's what we talked about.  This is only added to
23 the context of whether a statement was coerced by
24 law enforcement.  So it's not proper.
25           I think the jury is probably instructed,

JURY TRIAL -- June 24, 2019                    20

1  obviously, they can make their argument as to what

2  he said at that time was correct, or not, but

3  certainly Pattern Instruction 3.01 does not apply to

4  this situation, and so we would object to that

5  amendment.

6          THE COURT:  Miss Brain, are you asking that

7  it reference the statements to law enforcement or

8  the audio or both?

9          MS. BRAIN:  The audio, Your Honor.  We

10  accepted the Court's ruling with respect to

11  statements to law enforcement and whether or not

12  Miss Bullis is an agent of law enforcement for the

13  purpose of that instruction, that's *Beske*

14  (phonetically).

15          But as it states in *Beske*, if the law

16  enforcement instruction does not apply, then the

17  credibility one does.  And for all intents and

18  purposes, Mr. Christensen's statements are testimony

19  in this case.  They were introduced by the

20  government as party opponent statements for the

21  truth of the matter asserted.

22          THE COURT:  Then why did we take it out?

23  Why didn't we just leave it in *including that of the*

24  *defendant* and just add *including that of the*

25  *defendant in his statements on both audio and video.*

1          MR. MILLER:  And we would have to expand *and*

2  *in texts.*  There are lots of statements of the

3  defendant that are in this case.  There are

4  admissions of the defendant, they were properly

5  admissible, but they are not covered by Instruction

6  3.01.

7          MS. BRAIN:  I think Your Honor's proposal is

8  getting at exactly what I was trying to get at which

9  is simply to make clear to the jury that even though

10 it's not testimony in as much as Mr. Christensen

11 didn't take the witness stand, nevertheless, his

12 statements were introduced into evidence are subject

13 to the same credibility assessment as witness

14 statements that did come from the witness stand.

15         THE COURT:  Well --

16         MS. BRAIN:  I do think that it is also

17 required by *Beske*.  The Court as part of its ruling

18 in that case said that it is fine to decline to

19 consider statements to law enforcement, but

20 nevertheless the jury was guided to assess the

21 credibility by the separate credibility instruction.

22         THE COURT:  Well, clearly both of you are

23 going to be arguing something about those

24 statements.

25         So, how do we fashion an instruction that

 1  addresses it?

 2         MR. MILLER:  I think that it's included in

 3  Pattern Instruction 2.02, Number 5, *give the*

 4  *evidence whatever weight you find is deserves.  Use*

 5  *your common sense in weighing the evidence and*

 6  *consider the evidence in light of your own everyday*

 7  *experiences.*  Certainly they are going to hear

 8  argument.

 9         I'm just not sure what is not part of the

10  charge that would require further instruction,

11  otherwise, again, we are just starting to highlight

12  certain pieces of evidence.  They want to highlight

13  the defendant's statements over other statements

14  that might be in the case and testimony of the

15  witnesses.

16         MS. BRAIN:  I beg your pardon?

17         Your Honor, it's not highlighting.  It is

18  simply including.  The instruction as it is applies

19  to every other witness in the case with the

20  exception of Mr. Christensen.  And so we are asking

21  that his statements be included in that.

22         And the jury won't otherwise know that this

23  instruction applies to those because it refers to

24  testimony and the natural inference is going to be

25  witness stand testimony.

JURY TRIAL -- June 24, 2019                    23

```
 1        THE COURT:  And you want the factors in 3.01
 2  to apply to Mr. Christensen's statements?
 3        MS. BRAIN:  Yes, to the extent -- obviously,
 4  none of them necessarily apply to every witness.  By
 5  the same token, they don't necessarily all apply to
 6  Mr. Christensen's statements, that's up for the jury
 7  to assess and decide.  But, yes, we want to make
 8  clear that the jury is to make the same assessment
 9  of the credibility of those statements as it is of
10  the testimony of other witnesses.
11        THE COURT:  So you want Mr. Christensen --
12  want to somehow -- we give an instruction that he
13  does not have to testify and that could not be used
14  against him, that's Number 8.  But you want some
15  instruction that says his -- his statements are in
16  evidence and his statements are to be applied to the
17  same factors or some -- the jury is free to apply
18  the factors as set out in 3.01.
19        MS. BRAIN:  Yes, Your Honor, precisely.
20        MR. MILLER:  Here is the obvious problem.
21  This instruction is for witnesses, because attorneys
22  cross-examine those witnesses to bring up these
23  points:  the witness' bias, their prejudice, their
24  memory; those things are all subject to
25  cross-examination.
```

 1          THE COURT:  I don't disagree with that.  Are

 2    you opposed to any kind of instruction that asks the

 3    defendant's statements to be given the same --

 4          MR. MILLER:  It would highlight a special

 5    assessment to the defendant's statements versus any

 6    other evidence that is brought in the case.

 7          THE COURT:  I agree with that.  I think that

 8    this is -- everybody is in a position to freely

 9    argue their positions on this.  I agree with that.

10    I don't see how we fashion an instruction specific

11    to the defendant's statements, and if we did, it

12    would be a separate instruction.  I wouldn't add it

13    to 3.01.

14          So if you want to fashion a separate

15    instruction to propose for consideration, we can

16    address that.  But as it pertains to adding it to

17    3.01, I would reject that.

18          So while you're thinking about that, let's

19    go back to Defendant's 13, which I took under

20    advisement.  That will not be -- it clearly wouldn't

21    go to the jury if it were admitted.  I don't see the

22    point in admitting it.  It's cumulative in some

23    regards because the defense got in what they wanted

24    from the video and some examination.

25          To the extent that -- there is also not --

1  it's not -- there is not -- there is not a lot --

2  any relevance, anything to the extent of relevance.

3  I believe that it would create -- simply create

4  confusion because there is so much information in

5  there that nobody testified to.  So I don't see how

6  sending records back just so -- a bunch of records

7  back to the jury accomplishes anything.

8          So, 13 will not be admitted.

9          Anything else to address today?  Otherwise,

10  I'm going to go change 15 and start to get clean

11  copies made.

12          Okay.  We will be in recess for 10 or 15.

13          (Recess, 9:14 a.m. to 9:21 a.m.)

14          THE COURT:  Please be seated.

15          Can I have the Order to Show Cause?

16          THE COURT:  All right.  Back on the record

17  in the matter of Mr. Christensen.  We have

18  representatives from the University of Illinois.

19          Mr. Smith is one of them, and, sir, what's

20  your name?

21          MR. SCHMADEKE:  Charles Schmadeke,

22  S-c-h-m-a-d-e-k-e.

23          THE COURT:  Okay.  The defense had

24  subpoenaed certain records as it pertains to the

25  University of Illinois Counseling Center,

 1  Mr. Christensen; it's my understanding the

 2  University of Illinois instead of moving to quash

 3  the subpoena told defense they wouldn't provide the

 4  information.  An Order to Show Cause was entered

 5  based upon that representation and parties are in

 6  court today.

 7          Mr. Schmadeke, or Mr. Smith, wish to be

 8  heard?

 9          MR. SCHMADEKE:  Yes, Your Honor.

10          THE COURT:  Please.

11          MR. SCHMADEKE:  Your Honor, what I have here

12  is all of the documents that may be responsive to

13  the subpoena.  In fact, it's questionable whether it

14  was responsive, so we decided to go overboard.  And

15  I'm going to tender this to you.  I would point out

16  that the material under the second orange page has

17  been produced to both parties.  And the first part

18  of the material is the part that we claim privilege

19  on.

20          In essence, Your Honor, it's communications

21  between Counseling Center staff and mostly the

22  in-house counsel for the University and sometimes

23  outside counsel, which would be our firm, Hinshaw

24  and Culbertson.

25          So we are glad to let you look at it.  I

1  would point out, Your Honor, that we did say we
2  object to producing attorney-client privilege, but
3  we were willing to discuss this further and consult
4  to see if we could resolve this difference; and
5  before we had a chance to do that, the motion was
6  filed so....
7           THE COURT:  Okay.  So Ms. Pollock, or
8  whoever filed the motion, this was -- the point of
9  this is for a penalty phase if we got to that point.
10          MS. POLLOCK:  That's correct, Your Honor.
11          THE COURT:  So we are not at that point.
12 Then with that understanding -- and if you didn't
13 get a chance to file a response or a Motion to Quash
14 the subpoena, because that's how I would prefer to
15 do it, then you set out your argument and why it is
16 privileged; the defense could respond; and then I
17 would have reviewed them in camera and made a
18 determination, but now we've jumped ahead of that,
19 but I still would like to hear, if you could, before
20 I reviewed them your positions on why you think they
21 are privileged and shouldn't be produced.
22          MR. SCHMADEKE:  Your Honor, I do have a
23 written response as well as a privilege log; that,
24 obviously, we are not a party to this case so we are
25 not allowed to file electronically, but I would be

1  glad to tender that to the Court and to the parties;
2  that sets forth our position.
3          In essence, Your Honor, the materials that
4  we have so far withheld are communications between
5  the Counseling Center and staff and primarily
6  in-house counsel for the University and sometimes
7  Hinshaw and Culbertson.  And those communications
8  relate to how to respond to subpoenas, and how to
9  deal with this Court and other potential matters
10 that have arisen.
11         I would point out, Your Honor, that two
12 employees have already been sued regarding this, so
13 our privilege is very important to the University.
14 But we are glad to let the Court review these pages
15 and see that, in fact, these are communications
16 between attorney and client with regards to legal
17 advice given in pursuit of subpoenas that have been
18 issued to the Counseling Center.
19         MS. POLLOCK:  Your Honor, if I may?
20         THE COURT:  You may.
21         MS. POLLOCK:  I take issue with the
22 representation that we did not work diligently to
23 pursue this matter.  I had multiple emails with the
24 in-house counsel at the University of Illinois who
25 told me in so many words *we will not be filing a*

1  *Motion to Quash; we are not required to; we gave you*
2  *everything we are going to give you.*  So that
3  terminated the negotiation as far as I was
4  concerned.  Not to mention the fact that we are in
5  the middle of a jury trial, and there is not a heck
6  of a lot of time for that; that's number one.
7          Number two:  We're not seeking legal advice
8  about how to respond to subpoenas for this court
9  hearing; that is not what we are looking for.  What
10  we are looking for is for communications between
11  Counseling Center staff, Counseling Center
12  supervisors, and the administration of the
13  University of Illinois, particularly the provost,
14  chancellors, president's office or someone like
15  that, and simply tacking on an email address of
16  somebody who is in the U of I Counselor's Office
17  does not necessarily render all of that privilege
18  and is not seeking legal advice; that's what we are
19  looking for.
20          So we would like for the Court to review the
21  documents in camera and see whether or not there is
22  anything within them that is responsive to our
23  subpoena.
24          MR. SCHMADEKE:  Your Honor, if there are no
25  such communications, but whatever is in here is all

1  that we have.  And we do have an affidavit that I

2  will be glad to provide --

3          THE COURT:  Okay.

4          MR. SCHMADEKE:  -- from the director of the

5  Counseling Center that says this is all that there

6  is.

7          THE COURT:  Okay.  With that in mind then,

8  can we leave it at that today?

9          MS. POLLOCK:  Yes, Your Honor.

10          THE COURT:  I will review -- consider that

11  -- the record will show that you appeared, produced,

12  and the Order to Show Cause not be acted upon.  And

13  we will review this --

14          MR. SMITH:  Your Honor, if the Court should

15  decide to disclose some of the documents, which we

16  have asserted privilege on, we would ask that a

17  Protective Order be entered limited to this.

18          THE COURT:  Well, frankly, I think that

19  after I review it, if I make those determinations, I

20  would actually schedule the matter for later this

21  week sometime; the parties can further argue their

22  positions.

23          And then, with that in mind, if there is any

24  disclosure, I wouldn't see that any Protective Order

25  would be a problem, but I don't think I would make a

JURY TRIAL -- June 24, 2019                    31

1 decision until I actually heard from the parties

2 again, to tell you the truth.  Fair enough?

3          MR. SCHMADEKE:  Thank you, Your Honor.

4          THE COURT:  I appreciate that.  Thank you.

5          MR. SCHMADEKE:  Let me give the privilege

6 log and the affidavits, if I may.

7          THE COURT:  That would be great.  Thank you.

8          So we will now recess for about 10 to 15

9 minutes and then prepare the Court for closing

10 arguments.

11          Thank you.

12          (Recess, 9:28 a.m. to 9:46 a.m.)

13          (Jury absent.)

14          THE COURT:  Okay.  Two things to address

15 before closing.

16          First of all, the Proposed Instruction from

17 the defense now which as to -- did the government

18 receive a copy of it?

19          MS. BRAIN:  My bad.

20          THE COURT:  Here take a look.

21          It's 3.01 applied to the defendant's

22 statements.

23          Government wish -- defense want to be heard

24 further?

25          MS. BRAIN:  No, Your Honor.  As the Court

 1  said, it's simply 3.01 made to apply to the

 2  statements, otherwise it's identical.

 3           THE COURT:  Anything from the government?

 4           MR. MILLER:  Again, Your Honor, this appears

 5  to apply to testimony.

 6           THE COURT:  Of witnesses.

 7           MR. MILLER:  And it also then highlights one

 8  piece of evidence, defendant's recorded statement.

 9  There were other statements.  There were texts that

10  were made.  There were statements that the defendant

11  made that were testified to by witnesses that were

12  not recorded.  So it singles out a piece of evidence

13  and it does not appear to be an applicable

14  instruction given that it refers to.

15           THE COURT:  At this point we have an

16  instruction about the defendant's statements to law

17  enforcement.  We have -- that's Number 14.  We have

18  an instruction about -- a limiting instruction that

19  is now 15C as it pertains to the audio recording as

20  to other victims.  I believe that this is

21  appropriate.  I don't know whether the statements,

22  whether there was a video of the Counseling Center,

23  and maybe referencing other statements on the audio,

24  but I don't think refashioning 3.01 as it pertains

25  to witnesses is the appropriate way to do it.  This

 1  should -- the fact that defendant's statements were

 2  going to be played in court is no surprise as of,

 3  apparently, a year ago.  So to receive a Proposed

 4  Instruction on the eve of closing as well is an

 5  issue but that's not the reason to be rejecting it.

 6  The reason to reject it is I don't think that's

 7  appropriate, so that will be declined.

 8          So, then Number 90- 395, was an Amended

 9  Motion in Limine to precluding improper argument

10  during closing, the argument as it pertains to other

11  victims.  It cautions that a death penalty case was

12  vacated due to bolstering by government agent,

13  exasperated by government misconduct in closing

14  argument.

15          Mr. Miller, it's my understanding that

16  you're not even going to reference that in your

17  closing argument.

18          MR. MILLER:  Certainly opening in our

19  opening closing argument, only as will be necessary

20  and appropriate to respond to any defense closing

21  argument.

22          THE COURT:  Ms. Pollock, wish to be heard

23  any further on that?

24          MS. POLLOCK:  Well, I suppose whether or not

25  the government is going to mention it in rebuttal is

 1 another issue.  I guess that door --

 2        THE COURT:  I guess that depends on what you

 3 say in yours and if you think they are out of bounds

 4 in rebuttal, I guess that you will object.

 5        At this point you are asking, what, the

 6 government do what, or not do what?

 7        MS. POLLOCK:  Be precluded from vouching for

 8 the truthfulness or in anyway inferring that these

 9 statements made about 12 other victims is truthful.

10        THE COURT:  Mr. Miller?

11        MR. MILLER:  Again, all we expect -- we are

12 going to have to hear what the defense argument

13 hjyu7iis, but I think that the defense argument is

14 that the argument is so preposterous that his other

15 statements were untrue, and I think that we would

16 want to be able to respond to that.  We certainly

17 don't intend to.

18        THE COURT:  How would you respond to that?

19 Because clearly that's -- somebody is going to argue

20 that his statements about 12 other victims are not

21 true, they are just embellishments.  They are just

22 making stuff up.  There is no evidence of it, et

23 cetera, et cetera, et cetera.  So how would you

24 respond to that or why would you respond to that?

25        MR. MILLER:  You said why?

```
 1            THE COURT:  Why?
 2            MR. MILLER:  I think, well, Your Honor, it
 3   will be an argument that simply because those
 4   statements were made does not mean his other
 5   statements are not true.  But I think --
 6            THE COURT:  The other statements about other
 7   things.
 8            MR. MILLER:  About what he did with
 9   Miss Zhang.
10            THE COURT:  Right.  That's fair.
11            Ms. Pollock, you agree that's fair, right?
12            MS. POLLOCK:  Sure.
13            THE COURT:  Okay.  Good enough.  All right.
14   With that in mind then, are we ready for the jury?
15            MS. POLLOCK:  Yes.
16            MR. MILLER:  Yes, Your Honor.
17            THE COURT:  It will be Mr. Miller for the
18   government, and then who for the defense?
19            MS. POLLOCK:  Me, Your Honor.
20            THE COURT:  Okay.  Very good.
21            Okay.  Let's bring the jury in.
22            I will be about 10 or 12 minutes reading
23   instructions to them first.
24            (Jury present, 9:52 a.m.)
25            THE COURT:  Okay.  Please be seated.
```

1          Thank you, ladies and gentlemen.

2          We are prepared and ready for closing

3   arguments.  I am going to first read the jury

4   instructions to you.  The instructions of law that I

5   told you at the beginning of the case you would

6   receive at the end of the case.  They will be on

7   your screen to follow.  I do this so that the

8   attorneys can reference them in their closing

9   arguments.

10          You will receive written instructions, for

11  those of you taking notes, if you don't want to try

12  to handwrite this out.  You will actually receive

13  these written instructions when you begin your

14  deliberations.

15          So, bear with me for the next ten minutes or

16  so, and then we will turn you over to Mr. Miller and

17  Ms. Pollock for closing arguments.

18          Okay.  Members of the jury, I will now

19  instruct you on the law that you must follow in

20  deciding this case.  Each of you has a copy of these

21  instructions to use in the jury room.  You must

22  follow all of my instructions about the law even if

23  you disagree with them.

24          This includes instructions -- the

25  instructions I gave you before the trial, any

1  instructions I gave you during the trial, and the

2  instructions I'm giving you now.

3          As jurors you have two duties, your first

4  duty is to decide the facts from the evidence that

5  you saw and heard here in court.  This is your job,

6  not my job, or anyone else's job.  Your second duty

7  is to take the law as I give it to you, apply it to

8  the facts, and decide if the government has proved

9  the defendant guilty beyond a reasonable doubt.

10         You must perform these duties fairly and

11  impartially.  Do not let sympathy, prejudice, fear

12  or public opinion influence you.  In addition, do

13  not let any persons race, color, religion, national

14  ancestry or gender influence you.  You must not take

15  anything I said or did during the trial as

16  indicating that I have an opinion about the evidence

17  or about what you think your verdict should be.

18         The charges against the defendant are in a

19  document called a superseding indictment.  You will

20  have a copy of the superseding indictment during

21  your deliberations.

22         The superseding indictment in this case

23  charges that the defendant committed the crimes of

24  kidnapping resulting in death, and two counts of

25  making false statements to FBI agents.

1          The defendant has pled not guilty to the

2     charges.

3          The superseding indictment is simply the

4     formal way of telling the defendant what crimes he

5     is accused of committing.  It is not evidence that

6     the defendant is guilty.  It does not even raise a

7     suspicion of guilt.

8          The superseding indictment I previously read

9     to you, so I'm not going to read that to you again

10    but it will go back to the jury room with you.

11         So we will go to the next instruction, which

12    is the defendant is presumed innocent of each and

13    every one of the charges.  This presumption

14    continues throughout the case, including during your

15    deliberations.  It has not overcome unless from all

16    of the evidence in the case, you are convinced

17    beyond a reasonable doubt that the defendant is

18    guilty as charged.

19         The government has the burden of proving the

20    defendant's guilt beyond a reasonable doubt.  This

21    burden of proof stays with the government throughout

22    the case.  The defendant is never required to prove

23    his innocence.  He is not required to produce any

24    evidence at all.

25         You must make your decision based solely on

1  the evidence that you saw and heard here in court.

2  Do not consider anything you may have seen or heard

3  outside of Court, including anything from the

4  newspaper, television, radio, the internet or any

5  other source.

6          The evidence includes only what the

7  witnesses said when they were testifying under oath,

8  the exhibits that I have allowed into evidence, and

9  the stipulations that the lawyers agreed to.  A

10 stipulation is an agreement that certain facts are

11 true or that a witness would have given certain

12 testimony.  Nothing else is evidence.  The lawyers'

13 statements and arguments are not evidence.  If what

14 a lawyer said is different from the evidence as you

15 remember it, the evidence is what counts.  The

16 lawyers questions and objections likewise are not

17 evidence.

18          A lawyer has a duty to object if he thinks a

19 question is improper.  If I sustained objections to

20 questions the lawyers asked, you must not speculate

21 on what the answers might have been.

22          If during the trial, I struck testimony or

23 exhibits from the record, or told you to disregard

24 something, you must not consider it.

25          Give the evidence whatever weight you decide

1  it deserves.  Use your common sense in weighing the

2  evidence and consider the evidence in light of your

3  own everyday experience.

4        People sometimes look at one fact and

5  conclude from it that another fact exists.  This is

6  call an inference.  You are allowed to make

7  reasonable inferences so long as they are based on

8  the evidence.

9        You may have heard the terms direct evidence

10 and circumstantial evidence.  Direct evidence is

11 evidence that directly proves a fact.

12 Circumstantial evidence is evidence that indirectly

13 proves a fact.

14        You are to consider both direct and

15 circumstantial evidence.  The law does not say that

16 one is better than the other.  It is up to you to

17 decide how much weight to give to any evidence,

18 whether direct or circumstantial.

19        Do not make any decisions simply by counting

20 the number of witnesses who testified about a

21 certain point.

22        You may find the testimony of one witness or

23 a few witnesses more persuasive and the testimony of

24 a larger number.  You need not accept the testimony

25 of the larger number of witnesses.

1        What is important is how truthful and

2   accurate the witnesses were, and how much weight you

3   think their testimony deserves.

4        A defendant has an absolute right not to

5   testify or present evidence.  You may not consider

6   in any way the fact that the defendant did not

7   testify or present evidence.  You should not even

8   discuss it in your deliberations.

9        Part of your jobs as jurors is to decide how

10  believable each witness was, and how much weight to

11  give each witness's testimony.  You may accept all

12  of what a witness says or part of it or none of it.

13       Some factors you may consider include the

14  intelligence of the witness, the witness's ability

15  and opportunity to see, hear or know the things the

16  witness testified about, the witness's memory, the

17  witness's demeanor, whether the witness had any

18  bias, prejudice or other reason to lie or slant the

19  testimony, the truthfulness and accuracy of the

20  witness's testimony in light of the other evidence

21  presented, an inconsistent or consistent statements

22  or conduct by the witness.

23       It is proper for an attorney to interview

24  any witness in preparation for trial.

25       You have heard evidence that before the

JURY TRIAL -- June 24, 2019                    42

 1  trial a witness made a statement that may be

 2  inconsistent with his or her testimony here in

 3  court.  You may consider an inconsistent statement

 4  made before the trial only to help you decide how

 5  believable a witness's testimony was here in court.

 6        You have heard testimony from witnesses who

 7  received or hoped to receive a benefit in return for

 8  his or her cooperation with the government; you may

 9  give these witnesses's testimony whatever weight you

10  believe is appropriate, keeping in mind that you

11  must consider that testimony with caution and great

12  care.

13        You may consider evidence that a witness was

14  convicted of a crime only in deciding the

15  believability of his testimony.  You may not

16  consider it for any other purpose.

17        You have heard testimony and received

18  evidence that the defendant made statements to law

19  enforcement officers.  You must decide whether the

20  defendant actually made the statement, and if so how

21  much weight to give to the statement.  In making

22  these decisions you should consider all of the

23  evidence, including the defendant's personal

24  characteristics and circumstances under which the

25  statement may have been made.

JURY TRIAL -- June 24, 2019          43

1          You have heard the defendant make statements
2    on a recording regarding other victims in addition
3    to the charges alleged against the defendant in the
4    case.  You may only consider those statements that
5    put the defendant's state of mind and other
6    statements in context.  You may not consider those
7    statements for any other purpose.
8          You have heard testimony of an
9    identification of a person.  Identification
10   testimony is an expression of the witnesses' belief
11   or impression.  In evaluating this testimony, you
12   should consider the opportunity the witness had to
13   observe the person at the time and to make a
14   reliable identification later.  You should also
15   consider the circumstances under which the witness
16   later made the identification.
17         The government must prove beyond a
18   reasonable doubt that the defendant is the person
19   who committed the crime that is charged.
20         You have heard witnesses namely Amanda
21   Bakker, William O' Sullivan, Greg Catey, and Jeremy
22   Bruketta who gave opinions and testimony about DNA
23   and serology analysis and identification, computer
24   forensics, phone location analysis, and cadaver dog
25   handling.  You do not have to accept these witness's

 1  opinions or testimony.  You should judge these

 2  witness's opinions and testimony the same way you

 3  judge the testimony of any other witness.  In

 4  deciding how much weight to give to these opinions

 5  and testimony, you should consider the witness's

 6  qualification, how they reached their opinions and

 7  conclusions, and the factors I have described for

 8  determining the believability of a witness.

 9        You have heard recorded conversations and

10  seen video recordings.  This is proper evidence that

11  you should consider together with and in the same

12  way you consider the other evidence.

13        You were also given transcripts of the

14  conversations on the video recordings to help you

15  follow the recordings as you listen to them.  The

16  recordings are the evidence of what was said and who

17  said it.  The transcripts are not evidence.  If you

18  noticed any difference between what you heard in a

19  conversation and what you read in the transcripts,

20  your understanding of the recording is what matters.

21  In other words, you must rely on what you heard, not

22  what you read.  And if you could not hear or

23  understand certain parts of a recording, you must

24  ignore the transcripts as far as those parts are

25  concerned.  You may consider a person's actions,

1  facial expresses, and lip movements that you are
2  able to observe on a video recording to help you
3  determine what was said and who said it.

4        If during your deliberations, you wish to
5  have another opportunity to listen to a recording,
6  send a written message to the Court Security
7  Officer, and I will make that available.

8        Certain summaries or charts were admitted in
9  evidence.  You may use those summaries or charts as
10 evidence even though the underlying documents or
11 evidence are not here.

12       It is up to you to decide how much weight to
13 give the summaries.

14       If you have taken notes during the trial,
15 you may use them during deliberations to help you
16 remember what happened during the trial.  You should
17 use your notes only as aids to your memory.  The
18 notes are not evidence.  All of you should rely on
19 your independent recollection of the evidence, and
20 you should not be unduly influenced by the notes of
21 other jurors.  Notes are not entitled to any more
22 weight than the memory or impressions of each juror.

23       You have heard evidence obtained from the
24 government's use of informants.  The government is
25 permitted to use these techniques.  You should

1  consider evidence obtained this way together with

2  and in the same way you consider the other evidence.

3       The indictment charges that the crimes

4  happened on or about June 9th, June 12th, and

5  June 15th.  The government must prove that the

6  crimes happened reasonably close to the dates.  The

7  government is not required to prove that the crimes

8  happened on those exact dates.

9       The defendant has been accused of more than

10  one crime.  The number of charges is not evidence of

11  guilt and should not influence your decision.

12       You must consider each charge and the

13  evidence concerning each charge separately.  Your

14  decision on one charge, whether it is guilty or not

15  guilty, should not influence your decision on any

16  other charge.

17       In deciding your verdict, you should not

18  consider the possible punishment for the defendant

19  at this time.  You are only to decide if the

20  government has proven the defendant guilty beyond a

21  reasonable doubt of the charges against him at this

22  stage.

23       Count 1 of the superseding indictment

24  charges the defendant with kidnapping resulting in

25  death.

 1          In order for you to find the defendant
 2   guilty of this charge, the government must prove
 3   each of the follow elements beyond a reasonable
 4   doubt:
 5          One, the defendant knowingly, willfully, and
 6   unlawfully seized, confined, inveigled, decoyed,
 7   kidnapped, abducted, or carried away Yingying Zhang
 8   as charged;
 9          And two, the defendant otherwise held
10   Yingying Zhang for his own benefit and purpose;
11          And three, the defendant used a means,
12   facility, or instrumentality of interstate commerce
13   in committing or in furtherance of the commission of
14   the offense;
15          And four, Yingying Zhang's death resulted.
16          If you find from your consideration of all
17   of the evidence that the government has proved each
18   of these elements beyond a reasonable doubt as to
19   the charge you are considering, then you should find
20   the defendant guilty of that charge.
21          If on the other hand, you find that from
22   your consideration of all of the evidence that the
23   government has failed to prove any one of these
24   elements beyond a reasonable doubt as to the charge
25   you are considering, then you should find the

1  defendant not guilty of that charge.

2          A person acts knowingly if he realizes what

3  he is doing and is aware of the nature of his

4  conduct, and does not act through ignorance,

5  mistake, or accident.

6          In deciding whether the defendant acted

7  knowingly, you may consider all of the evidence

8  including what the defendant did or said.

9          A person acts willfully if he acts

10 voluntarily and intentionally and with the intent to

11 do something the law forbids.

12         A motor vehicle is an instrumentality of

13 interstate commerce.  A cellular phone is an

14 instrumentality of interstate commerce.

15         A person uses an instrumentality of

16 interstate commerce, namely a motor vehicle or a

17 cellular telephone, in furtherance of a crime if the

18 instrumentality furthers, advances, moves forward,

19 promotes, or facilitates the crime.  The mere

20 presence of the instrumentality at the scene of the

21 crime is insufficient to establish that the

22 instrumentality was used in furtherance of the

23 crime.  There must be a connection between the

24 instrumentality and the crime that advances, moves

25 forward, promotes or facilitation the crime.

1          Count 2 of the superseding indictment
2    charges the defendant with making a false statement.
3          In order for you to find the defendant
4    guilty of this charge, the government must prove
5    each of the following elements beyond a reasonable
6    doubt:
7          First, the defendant knowingly and willfully
8    made the statement as charged;
9          Second, the statement was false;
10         Third, the statement concerned a material
11   fact;
12         Fourth, the statement was made about a
13   matter within the jurisdiction of the Federal Bureau
14   of Investigation;
15         And fifth, the defendant knew the statement
16   was not true at the time he made it.
17         If you find from your consideration of all
18   of the evidence that the government has proven each
19   of these elements beyond a reasonable doubt as to
20   the charge you are considering, then you should find
21   the defendant guilty of that charge.
22         If on the other hand, you find from your
23   consideration of all of the evidence that the
24   government has failed to prove any one of these
25   elements beyond a reasonable doubt as to the charge

1  you are considering, then you should find the

2  defendant not guilty of that charge.

3         Count 3 of the superseding indictment

4  charges the defendant with making a false statement.

5         In order for you to find the defendant

6  guilty of this charge, the government must prove

7  each of the follow elements beyond a reasonable

8  doubt:

9         First, the defendant knowingly and willfully

10  made the statement as charged;

11         Second, the statement was false;

12         Third, the statement concerned a material

13  fact;

14         Fourth, the statement was made about a

15  matter within the jurisdiction of the Federal Bureau

16  of Investigation;

17         And fifth, the defendant knew the statement

18  was not true at the time he made it.

19         If you find from your consideration of all

20  of the evidence that the government has proven each

21  of these elements beyond a reasonable doubt as to

22  the charge you are considering, then you should find

23  the defendant guilty of that charge.

24         If on the other hand, you find from your

25  consideration of all of the evidence that the

1  government has failed to prove any one of these

2  elements beyond a reasonable doubt as to the charge

3  you are considering, then you should find the

4  defendant not guilty of that charge.

5          A statement is false if it was untrue when

6  made.  A statement is material if it is capable of

7  influencing the actions of the body or agency, in

8  this case the FBI.  The government is not required

9  to prove that the statement actually influenced the

10 actions of the body or agency.

11         The Federal Bureau of Investigation is a

12 part of the executive branch of the Government of

13 the United States.  Statements or representations

14 concerning the investigation of Yingying Zhang's

15 kidnapping are within the jurisdiction of that

16 branch.

17         Once you are all in the jury room, the first

18 thing you should do is choose a foreperson.  The

19 foreperson should see to it that your discussions

20 are carried on in an organized way and that everyone

21 has a fair chance to be heard.  You may discuss the

22 case only when all jurors are present.

23         Once you start deliberating, do not

24 communicate about the case or your deliberations

25 with anyone except other members of your jury.  You

1 may not communicate with others about the case or

2 your deliberations by any means.  This includes oral

3 or written communication, as well as any electronic

4 method of communication such as telephone, cell

5 phone, smart phones, iPhone, blackberry, computer,

6 text messaging, instant messaging, internet, chat

7 rooms, blogs, web site or services like Facebook,

8 Instagram, LinkedIn, YouTube, Twitter, Snapchat or

9 any other method of communication.

10        If you need to communicate with me while

11 you're deliberating, send a note through the Court

12 Security Officer.  The note should be signed by the

13 foreperson or by one or more members of the jury.

14        To have a complete record of this trial, it

15 is important that you do not communicate with me

16 except by written note.  I may have to talk to the

17 lawyers about your message so it may take some time

18 for me to get back to you.  You may continue your

19 deliberations while you wait for my answer.

20        Please be advised that transcripts of trial

21 testimony are not available to you.  You must rely

22 on your collective memory of the testimony.

23        If you send me a message, do not include the

24 breakdown of any votes you may have conducted.  In

25 other words, do not tell me that you are split 6/6

1 or 8/4 or whatever your vote happens to be.

2          Verdict forms have been prepared for you.

3 You will take these forms with you to the jury room.

4          When you reach unanimous agreement, your

5 foreperson will fill in, date, and sign the

6 appropriate verdict forms.  Each of you will sign

7 them.  Advise the Court Security Officer once you

8 have reached a verdict.  When you come back to the

9 courtroom, I will read the verdicts aloud.

10          The verdict must represent the considered

11 judgment of each juror.  Your verdict, whether it is

12 guilty or not guilty, must be unanimous.

13          You should make every reasonable effort to

14 reach a verdict.  In doing so, you should consult

15 with each other, express your own views, listen to

16 your fellow jurors's opinion, discussing your

17 differences with an open mind.  Do not hesitate or

18 re-examine your own view and change your opinion if

19 you come to believe it is wrong, but you should not

20 surrender your honest beliefs about the weight or

21 affect of evidence just because of the opinions of

22 your fellow jurors or just so that there could be a

23 unanimous verdict.

24          The 12 of you should give fair and equal

25 consideration to all of the evidence.  You should

1  deliberate with the goal of reaching an agreement

2  that is consistent with the individual judgment of

3  each juror.

4       You are impartial judges of the facts.  Your

5  sole interest is to determine whether the government

6  has proved its case beyond a reasonable doubt.

7       The verdict forms look like this.  The first

8  one is as to Count 1, the offense of kidnapping

9  resulting in death.  There is a place for you to

10  fill in guilty or not guilty.  And then sign it and

11  date it.

12       Verdict two is specific to Count 2 as to the

13  making of a false statement.  Again a place for you

14  to put in guilty or not guilty and then all of you

15  to sign it.

16       Verdict three is specific to Count 3, the

17  false statement charged there.  And again a place

18  for you to fill in a guilty or not guilty verdict

19  and then all of you to sign it.

20       Okay.  With that in mind, Mr. Miller.

21       MR. MILLER:  Thank you, Your Honor.

22       THE COURT:  Ladies and gentlemen of the

23  jury, he kidnapped her; he murdered her; he covered

24  up his crime.  That's what we said during the

25  opening statement.  And that's what the evidence has

 1   shown.

 2          As tragic as this case is, this case, this

 3   trial is really that straight forward.

 4          The evidence overwhelmingly has shown that

 5   after months of planning and premeditation, the

 6   defendant picked up, lured Yingying Zhang into his

 7   Saturn Astra and he took her back to his apartment

 8   where he raped her, tortured her, and murdered her,

 9   and then he spent the next three weeks trying to

10   cover up his crime and lying to the FBI.

11          Thus, the defendant is guilty of the crimes

12   of kidnapping resulting in death and making false

13   statements to the FBI.  And that is the sole issue

14   before you:  Has the United States proven the

15   defendant's guilt of these three crimes beyond a

16   reasonable doubt?  And the undeniable answer is yes.

17          Before I proceed discussing the law and the

18   facts, I want to thank you for your attention during

19   this trial.  It's been a somewhat long trial and

20   sometimes it's a somewhat slow process.  But it's

21   clear that you have given it your full attention

22   when you were listening to recordings or viewing the

23   evidence, and the prosecution team appreciates very

24   much your attention, as well as does the victim's

25   family.

JURY TRIAL -- June 24, 2019                     56

1          As I discuss the facts during the closing

2    argument, let me assure you my intention is to be

3    accurate.  But if I do misstate a fact, I want to

4    assure you it is not intentional and it's your

5    memory that counts.  You're the ones that have heard

6    the evidence, you are the ones that have heard the

7    witnesses testify, so rely on your memories.

8          I'm going to summarize the facts first as we

9    believe the evidence has shown them to be and then

10   discuss applying the law to those facts.

11         This investigation, this case, has always

12   been about the search for Yingying.  The tragic

13   truth is that Yingying is gone, as the defendant has

14   said, bragged, gone forever.

15         And there is one person and only one person

16   that is responsible and he sits right there:  the

17   defendant, Brendt Christensen.

18         His responsibility is established by the

19   mountain of evidence that we have presented during

20   this trial, including his own repeated attempts to

21   cover up this crime and avoid being held responsible

22   for her kidnapping and death.

23         The defendant spent months planning and

24   preparing to abduct and murder someone, a someone

25   that turned out to be Yingying Zhang.

1         In the fall of 2016 and into the spring of
2    2017, the defendant had stopped doing his school
3    work; he dropped out of the PhD program; he slept;
4    he drank; abused prescription drugs; he played video
5    games, while his then wife, Michelle Zortman, worked
6    and financially supported them.  In opening
7    statements the defense called this a downward
8    spiral.  And that's a fair characterization.  But
9    remember that this downward spiral was caused by the
10   defendant's own decisions, not by anyone else's.
11        His stress, or downward spiral, was the
12   product of a 27-year-old married man afraid to give
13   up his way of life.  In fact, only ten days before
14   he abducted and murdered Yingying Zhang, the
15   defendant wrote to Terra Bullis.  He said, *Do you*
16   *know why I drank tonight?  Because I'm afraid of*
17   *giving up my lifestyle with everything.  I've lived*
18   *a certain way for the past eight years, and now I*
19   *need to get an 8 to 5 job or nothing.  I drank today*
20   *because I think that it's one of the last times I*
21   *will get to like this.  I want to self-destruct*
22   *right now.  It's important to me.  Why would no one*
23   *let me without abandoning me?  I'm giving up my way*
24   *of life to everyone.  I don't even know if I can*
25   *handle it.  I don't want this.*

1          There is an old proverb that says, *Idle*
2    *hands are the devil's workshop.*  And in the spring
3    of 2017, the defendant used his idle time to plan
4    and prepare for Yingying's abduction and murder.
5          Now to be sure, he didn't know her by name.
6    She was still in China when he began planning and
7    preparing.  But her name wasn't important to him.
8    He just wanted a certain type of victim:  a petite
9    woman, easy to subdue, easy to dispose of.
10         And his pursuit of murder did lead to the
11   disintegration of his marriage.  As we know from
12   multiple sources from Michelle Zortman's testimony,
13   from Terra Bullis's testimony, from the University
14   of Illinois counseling video, and from the
15   defendant's own text; in the December of 2016 he
16   revealed to his wife, Michelle Zortman, his wife at
17   the time, his murderous intent.  No doubt he had
18   been drinking when he did so.  But alcohol does not
19   put these thoughts in his head.  The evidence shows
20   that sober, or tipsy, or drunk, the defendant had
21   these dark thoughts.  Alcohol simply made this,
22   described by Michelle Zortman,
23   emotionally-closed-off man more likely to share
24   those dark thoughts with those few people that he
25   trusted.

1          And as he later told the student intern at
2   the University of Illinois Counseling Center, *one*
3   *night I told my wife about it and apparently it*
4   *terrified her and I understand why.*
5          Michelle Zortman certainly believed that he
6   was being serious about what he told her, not just
7   joking or making things up.  And she began to look
8   to leave the marriage.  She told him that he had to
9   stop drinking and he agreed.  But stopping drinking,
10  didn't stop his dark thoughts.  He still continued
11  to plan a murder, ultimately Yingying's murder.  He
12  just no longer shared those thoughts with Michelle
13  Zortman.
14          And the defendant, as the evidence shows
15  spent significant time planning the murder.  He
16  indulged his fascination with serial killers on the
17  internet.  He began identifying his ideal victim.
18  Again, we know this because he told the counselor at
19  the Counseling Center on March 21st -- by
20  March 21st, 2017, he already knew how to abduct and
21  kill someone.  And he'd already made plans to kill
22  and abduct someone, including picking out the type
23  of victim.  He said he was really far along.
24          Now the timing of this admission is
25  important, because it shows that he had already

 1  formed this intent to kill Yingying before Michelle
 2  Zortman ever told him that she was going to the
 3  Wisconsin Dells and before he ever met Terra Bullis.
 4  Thus, these events did not cause the death of
 5  Yingying; the defendant's planning and premeditation
 6  did.
 7          In fact, he later told Terra Bullis that he
 8  had seen an ideal victim at a shoe store.  He
 9  memorized her address and he had gone to her
10  residence.  And we know from his statements with
11  Terra Bullis during the Memorial Walk what his ideal
12  victim was, a petite woman who could easily be
13  disposed of.
14          FBI forensic examiner, William O'Sullivan,
15  testified regarding what he found on the defendant's
16  computer and his cell phone during the winter and
17  spring of 2017 research on serial killers, on
18  decomposition, on kidnappings, on abductions.  And
19  there was some cross-examination that pointed out
20  that from his search, he only found that these
21  searches on the websites last for short periods of
22  time.  But the evidence shoes that the time the
23  defendant spent was much more substantial.
24          Remember, as forensic examiner O'Sullivan
25  testified, the defendant had deleted his Google

1  Chrome web browsing history on both his phone and

2  his computer on June 13.

3          And in fact we know that he deleted his web

4  browsing history because his only tabs on his phone,

5  including his FetLife screen shots, were not

6  reflected on the web browsing history.  So we know

7  that he deleted information related to the

8  kidnapping and murder.  We also know that he was

9  computer savvy.  We know that he had a virtual

10 private network, a VPN, that allowed him to

11 anonymously surf the internet, and we also know that

12 he had hidden files on his computer.  Files that

13 Bill O'Sullivan had found in hidden directories; the

14 hidden bondage photos that we briefly saw during the

15 trial.

16         So the defendant's coverup included hiding

17 and deleting information on his computer and his

18 phone, but the problem for the defendant was that

19 some of that information was still able to be

20 recovered by the forensic examiner, William

21 O'Sullivan, and the defendant told the student

22 intern about the substantial planning and how he

23 used the internet.  He told the counselor in March

24 that he was on a huge forum about serial killers and

25 it just fascinated him.

1        One in particular that he was fascinated
2   with was serial killer Ted Bundy, who he said was
3   known for being really attractive and luring people.
4   And to dispel any doubt that he spent significant
5   time planning the murder, he further told the
6   student intern that I read so much about this for
7   months.
8        He was planning, like a thief, to steal
9   Yingying's future, to kill, to destroy.  Not only
10  was his intent in planning clear but so was his
11  motive for killing Yingying.  He previously
12  explained to the student intern that he was smart
13  but probably not a genius.  He realized he was never
14  going to be great at physics and he implied he could
15  be great at being a murderer.
16       He found serial killers interesting,
17  fascinating, as he noted to Terra Bullis.  He knew
18  that some women were even attracted to them, what he
19  described as a type of philia.  He further explained
20  his motive for killing Yingying in a text to Terra
21  Bullis: *I refuse to fade away; I don't care how I*
22  *will be remembered, just that I am.  Good, bad,*
23  *revered, infamous, I don't care.*
24       And in this fallen world, unfortunately,
25  serial killers are remembered, serial killers are

 1  infamous.

 2          Now he noted before that text that he was

 3  drinking, not literally drunk, but drinking prior to

 4  sending the text; but again alcohol didn't put these

 5  dark thoughts in his head and alcohol didn't cause

 6  him to lie.  It just made him more likely to share

 7  his dark thoughts with those that are trusted.

 8          Now, while it appears he was naturally

 9  concerned with getting caught and going to jail, he

10  believed that he could get away with it.  As he told

11  Terra Bullis, it would be easy to get away with

12  murder.  And as he told the student intern, I know

13  how to do it; it's not that hard.

14          And he studied the mistakes of his favorite

15  serial killer, Ted Bundy, who got caught when he

16  made a mistake and left the remains of one of his

17  victims where they could be found, resulting in

18  evidence that led back to him.  So the defendant's

19  plan naturally included getting rid of the victim's

20  remains.

21          The defendant's opportunity to execute his

22  plan came when Michelle Zortman told him around late

23  April that she was going to be leaving for the

24  weekend to go to the Wisconsin Dells.  And Michelle

25  Zortman leaving town was just that -- it was an

 1  opportunity for the defendant -- did not cause him
 2  to murder Yingying Zhang.  He had been planning,
 3  preparing for the murder before he knew she was
 4  leaving town.  In fact, Yingying still wasn't in the
 5  United States, but the defendant was still planning.
 6  Planning a murder which would become her murder.
 7          He had ordered a large duffle bag in early
 8  March.  A couple weeks later, after ordering this
 9  duffle bag, he confirmed to the student intern the
10  purpose for the purchase, noting that he had
11  purchased items related to his plans to abduct and
12  kill someone.  And because he had returned the first
13  duffle bag in April, he had to order it again in
14  June.  He waited until June 3rd, the Saturday before
15  his wife would be leaving town, and he ordered the
16  colossal canvas duffle bag from Amazon which was
17  delivered to him three days before he abducted and
18  killed Yingying Zhang.
19          How did he plan to use it?  He told us on
20  his cell phone.  Although he later deleted his
21  FetLife web browsing history, the tab was still open
22  when the FBI unexpectedly seized his cell phone.
23  And the tab shows that he was using his phone to
24  plan a real kidnapping with an unwitting woman who
25  thought she was part of some so-called consensual

1   kidnapping.  He said that he intended to put his
2   victim in the large duffle bag after abducting her,
3   and then cover her mouth with duct tape, and then
4   put her in the back of his car or the trunk of his
5   car.
6        As the evidence tragically shows, he
7   executed that plan on Friday, June 9, 2017, after
8   Michelle Zortman left town.  Although he bought a
9   bottle of rum that morning for some liquid courage,
10  he later told Terra Bullis he only had two shots
11  that day because he didn't want to get drunk.  After
12  all, he had a kidnapping, a murder, and coverup to
13  execute.  And as Michelle Zortman testified, two
14  shots would have no effect on the defendant.
15       He drove around campus looking for a victim.
16  And he found one just before 9:30 a.m., Emily Hogan.
17  And just like Ted Bundy, who he was fascinated with,
18  he showed her a police badge and pretended to be a
19  police officer to attempt to lure her into that car.
20  And in fact we know that Ted Bundy was the
21  inspiration for his decision to pretend to be a
22  police officer because later after Yingying's
23  kidnapping he posted on Reddit UIUC website, a
24  statement that someone pretended to be a police
25  officer was Bundy-esque even though he had that

1  entry deleted later by his wife after he was

2  arrested.

3         Fortunately for Emily Hogan, she said *no*

4  when he asked her to get in the car and he drove

5  away.

6         The defendant didn't give up on his plan.

7  He returned home and texted both Michelle Zortman

8  and Terra Bullis, no doubt keeping tabs on them, and

9  ensuring himself that neither would be coming back

10  to the apartment any time soon.  And showing what

11  was on his mind, the defendant texted Terra Bullis,

12  an oblique reference to murder, in a text at 11:39

13  a.m. shortly before he kidnapped Yingying.

14         The defendant was out driving the Saturn

15  again by 1:30 p.m., and it was at 1:57 p.m. when he

16  drove by Yingying who was running down Springfield

17  Avenue after the 22 Limited bus trying to catch it

18  to make her appointment at One North.  And as we

19  know, the defendant then circled around, went up

20  Wright Street to University and back down Goodwin to

21  see Yingying standing alone under a tree at the bus

22  stop.  And he circled the block again to pull up

23  next to her just like he did Emily Hogan.  Pretended

24  to be a police officer and he showed her a badge.

25         Now we don't know exactly what he told her.

We don't know if she fully understood him, but we do
know that she got in the car thinking that she was
getting a ride from a police officer to One North.
We know that she never arrived at One North.

Instead the defendant took her back to his
apartment where we know he later bragged in detail
how he sexually assaulted her, how he tortured her,
how he murdered her, how he hit her in the head with
a baseball bat, how he stabbed her, how he
decapitated her, how he caused her death.

Having kidnapped and murdered Yingying
Zhang, the defendant now needs to execute the
remainder of his plan, namely, to cover up her
murder.  The coverup included both getting rid of
evidence and lying to the FBI.

First, he needed to get rid of the evidence
of Yingying Zhang's abduction and murder as well as
come up with cover stories to explain any evidence
that was found.  We know this meant disposing of
anything related to Yingying including her backpack,
her glasses, her clothes, her ID, her cell phone,
and, of course, her remains; they have never been
found.  We know this also meant extensively cleaning
his apartment.

The alternative light source used by the FBI

1  Evidence Response Team from Chicago showed highly
2  unusual amounts of cleaning, and showed highly
3  unusual patterns of cleaning in the apartment.  He,
4  obviously, cleaned the mattresses where he assaulted
5  Yingying thus diluting the three blood stains on the
6  mattress.  One large stain was near the head of the
7  bed, located precisely where the blood had run down
8  the wall to the baseboard and the carpet below.

9          While the defendant cleaned it, it was still
10 visible to both Michelle Zortman when she returned
11 from her weekend in the Dells, and it was visible on
12 June 15th to crime scene investigator, December
13 Melville, and Timothy Lemasters from the Illinois
14 State Police.

15         Now the defendant lied to Michelle Zortman
16 and told her the stain was caused by him having a
17 nose bleed.  But this lie is interesting, because
18 the defendant was admitting that that stain was
19 caused by blood, and as the DNA results later showed
20 and suggested it was Yingying's blood.  You see,
21 each of those three stains contained Yingying's DNA.
22 But the defendant had diluted them to the point
23 where once they tested only two tested preliminarily
24 for blood.  The phenolphthalein test was done and
25 returned positive, but there wasn't enough material

1  for a positive confirmatory test.  But to those who

2  saw them, they appeared to be blood.  And the

3  defendant himself, by telling the story about his

4  nose bleed, was confirming that in fact they were

5  blood.

6          He also cleaned all of the visible blood off

7  the baseball bat.  But December Melville was able to

8  use the luminol light stuff, the Starlight

9  Bloodhound, to find a dark stain on the bat which

10  they tested and ultimately determined contained

11  Yingying's DNA.

12          We also know that that stain was caused by

13  Yingying's blood.  And how do we know that when the

14  stain was cleaned so well that there was not enough

15  material for a positive blood test.  Again, we know

16  from the defendant's own statements.

17          Remember that once the bat was seized, the

18  defendant felt the need to come up with a cover

19  story.  He knew that it had Yingying's blood on it

20  after he hit her in the head so he had to assume

21  that once it was seized that the lab would find

22  blood.  So in fact he later told Terra Bullis,

23  remember the blood on the bat, that's either yours

24  or mine or another girl's.  And then he later told

25  her she should remember that she had bled on the

1  bat.  Of course, she hadn't bled on the bat, as she

2  testified she didn't, and she would know if she was

3  bleeding because she had a platelet disorder.  In

4  fact, both Terra Bullis and Michelle Zortman said

5  that there was no reason there would have been blood

6  on that bat prior to June 9th.  But the defendant's

7  cover story was an acknowledgement by him that he

8  knew that there was blood on the bat.  And given the

9  presence of Yingying Zhang's DNA on that stain, it

10  was clearly hers.

11          As the alternative lightsource revealed, the

12  defendant also moved the bed and then cleaned the

13  blood off the drywall, off the baseboard, and very

14  much cleaned, really scrubbed the carpet next to the

15  wall.  We could see that on the alternative light

16  source of how it lit up.  And why would he do that?

17  Because the evidence showed that the blood that made

18  that stain, that large stain at the head of the bed,

19  had ran down the wall, down the baseboard, pooled in

20  the carpet, soaked through, and soaked through all

21  the way to the tack strip underneath the carpet.

22          And we know that the defendant did extensive

23  cleaning from those photos, which showed exactly

24  where he had cleaned next to the baseboard.

25          We also know this because of the testimony

1  of Amanda Bakker from the laboratory.  She knew that

2  blood was a rich sort of DNA.  When they did the

3  initial test, they did not find the DNA -- or

4  couldn't extract, I should say, the DNA from that

5  sample because of the PH level that had been changed

6  by the cleaning products.  So she then did the

7  manual extraction that located the single source DNA

8  of Yingying Zhang on that blood stain.

9         The defendant also tried to cover up by

10  cleaning the bathroom.  In fact, he put in a

11  maintenance request after that weekend to have John

12  Clark, from the Stonegate Village apartments, come

13  to that apartment and apply an acid wash to the

14  bathroom to put in new caulk.  When the FBI,

15  Evidence Response Team came, supervisory Special

16  Agent Courtney Corbett applied luminol and the

17  entire bottom of that bathtub lit up showing

18  extensive cleaning.

19         Not only was the defendant quite active in

20  cleaning his apartment immediately after that

21  weekend, he was also quite active in cleaning his

22  Saturn Astra, not just once but twice.  Once while

23  Michelle Zortman was in Wisconsin and once after she

24  returned with the second cleaning lasting an

25  extended period of time.  In fact he even admitted

1 to the FBI during one of the recordings that he had
2 cleaned the Saturn Astra after he had been visited
3 by the FBI on June 12th.  So he cleaned it once
4 after the abduction and second time after he was
5 visited by the FBI.

6         And once again he offered a cover story.  If
7 you recall during the interview he said to them, oh,
8 I want to let you know I cut myself while I was
9 cleaning the Astra and I bled there in case of trace
10 amounts of blood were found.  Once again the
11 defendant was unwittingly admitting that there was
12 blood in that Saturn Astra.  This cleaning was
13 clearly to cover up his abduction of Yingying Zhang.

14         Michelle Zortman said that they had almost
15 never cleaned the Astra since the time they had it,
16 and the defendant cleaned it twice after her
17 abduction.  And luminal used by the FBI during their
18 search of the Saturn Astra indicated that there was
19 extensive cleaning done on the passenger side of
20 that car where Yingying would have sat.

21         The defendant also got rid of the duffle bag
22 that he used to kidnap Yingying Zhang on June 9th.
23 Michelle Zortman saw him leave the apartment with it
24 on Monday, June 12th.  However, he needed to come up
25 with a cover story as to what he did with it and

 1   where it had gone.  His story was that he had

 2   purchased a cat tree for cash at a Walmart store.

 3   Now, no doubt he said cash because that's much

 4   harder to trace than credit cards.  He then also

 5   went on to say that he had taken this cat tree over

 6   to Terra Bullis, that he found out it was broken,

 7   just left the bag, maybe in the car or sidewalk.  He

 8   didn't really remember where, and it must have been

 9   stolen.

10         All of that story was absurd on its face.

11   The agents followed up and went to Walmart stores in

12   the Champaign-Urbana area and searched for sales of

13   all cat trees.  They reviewed surveillance video,

14   confirmed that none were made by the defendant.

15   There was no reason to tell such a demonstrably

16   false story unless a true story was more damaging.

17         The defendant used the duffle bag to kidnap

18   Yingying and then dispose of it before it could be

19   seized and examined for evidence.  And this story is

20   consistent with the defendant putting baking soda,

21   which absorbs odors, on the floor of the utility

22   room where he may have kept that duffle bag.  We

23   know from Michelle Zortman that she did not see the

24   baking soda on the floor when she left prior going

25   to Wisconsin Dells but saw it on the floor when she

 1  returned on Sunday.

 2      Now besides getting rid of the evidence and

 3  doing the extensive cleaning and making up cover

 4  stories, the defendant also lied and lied to the

 5  FBI.  The lies are too numerous to detail but the

 6  key lies that he told on June 12th and June 15th

 7  will be discussed shortly because they are the

 8  subjects of Counts 2 and Counts 3 of the indictment.

 9  And we will discuss how those facts prove the

10  defendant guilty beyond a reasonable doubt of each

11  of the three charged counts.

12      Before we discuss the law, I would note a

13  defendant has no burden to present any evidence;

14  and, therefore, a defense attorney has no obligation

15  to make an opening statement or discuss the evidence

16  in opening statement.  So in this case, when I made

17  the opening statement a couple of weeks ago, I did

18  not know the defense attorney was going to say and

19  admit in opening statement that the defendant picked

20  Yingying Zhang up, took her back to his apartment,

21  and killed her.

22      Arguably that is a testament to the strength

23  of the evidence in this case.  But that also may

24  cause you to wonder why did we need to hear eight

25  days of evidence?

1          THE COURT:  Mr. Miller and Ms. Pollock, can

2    I see you one second, and I really apologize for

3    this.

4          (Proceedings held at sidebar.)

5          THE COURT:  I just noticed something in the

6    instruction.  I read:  *The mere presence of the*

7    *instrumentality at the scene of a crime is*

8    *insufficient to establish that the instrumentality*

9    *was used in furtherance of the crime.*  It should

10   have said *use or possession*, and then by the

11   defendant and not scene of the crime.  So this is

12   the correct one.  And I didn't know if you guys were

13   going to reference the instruction.

14         MR. MILLER:  If you could just tell them

15   that this has nothing to do with what I said.

16         THE COURT:  Got it.

17         (Proceedings in open court.)

18         THE COURT:  Okay.  Thank you.  That had

19   nothing to do with what Mr. Miller just said or was

20   about to say.  It was a matter that I needed to

21   clean up from my end.

22         Okay.  Thank you.  Sorry about that,

23   Mr. Miller.

24         MR. MILLER:  No problem.  Thank you, Your

25   Honor.

JURY TRIAL -- June 24, 2019                    76

1          I believe the question we left with is why
2    did we need to hear eight days of evidence based on
3    the statement of defense counsel in opening
4    statements.  And the answers are contained in the
5    Court's jury instructions, which you just heard.
6          First, the defendant presumed innocent of
7    each and every one of the charges until you are
8    convinced beyond a reasonable doubt that the
9    defendant is guilty as charged.
10          Second, the lawyers' statements, arguments,
11   and questions are not evidence.  So as a legal
12   matter, a defense attorney stating that the
13   defendant killed Yingying does not relieve the
14   United States of its obligations.  The defendant
15   still enjoys his presumption of innocence, and the
16   United States has the burden of proving him guilty
17   beyond a reasonable doubt.
18          So let me now discuss how the United States
19   has easily met this burden by applying the law to
20   the evidence that was presented during the trial.
21          The defendant is charged with three counts
22   in the superseding indictment.
23          The first count is the charge of kidnapping
24   resulting in death.
25          Count 2 and 3 charge making false statements

 1  to the FBI.

 2         So I'm going to discuss those false

 3  statements first.  Counts 2 and 3 have five elements

 4  each of which the United States must prove beyond a

 5  reasonable doubt in which the judge has read to you.

 6  I show that the defendant knowingly and willfully

 7  made the statement, was charged, the statement was

 8  false, that the statement concerned a material fact,

 9  that the statement was made about a matter within

10  the jurisdiction of the Federal Bureau of

11  Investigation, and that the defendant knew that the

12  statement was not true at the time he made it.

13         Let's walk through each of these elements

14  for each of these counts, which will establish that

15  the defendant is guilty beyond a reasonable doubt of

16  these charges.

17         Count 2 charge that on June 12, 2017, the

18  defendant falsely told Special Agents Joel Smith and

19  Michael Carter of the FBI that he stayed in his

20  apartment and slept and played video games all day

21  on June 9th, 2017, when he knew full well that he

22  drove around campus in the afternoon and picked up

23  Yingying Zhang as she was waiting for a bus.

24         And let's discuss what the evidence has

25  shown actually took place.  On the evening of

 1  June 12, 2017, after Yingying Zhang had been
 2  identified on video getting into a back Saturn
 3  Astra, the FBI was canvassing the area for owners of
 4  Saturns.  And the defendant was listed as an owner,
 5  and, in fact, by coincidence happened to be the
 6  closest address to the FBI office.
 7          So Special Agents Smith and Carter went
 8  there first.  They went there and announced
 9  themselves as FBI agents.  They showed their
10  credentials, and they made it clear they were
11  looking for the Astra that picked up Yingying Zhang.
12  They then asked the defendant and Michelle Zortman
13  their whereabouts between 2 and 3:00 on June 9th.
14  The defendant said he didn't remember, but when he
15  looked at his text messages, he replied that he had
16  stayed at the apartment and slept and played video
17  games all day on June 9th so let's apply these facts
18  to the elements.
19          First, we must prove that the defendant
20  knowingly and willfully made the statement charged.
21  The evidence of that can't be disputed.  Here both
22  Joel Smith and Michael Carter testified during the
23  June 12th visit the defendant told him that he was
24  home all day, sleeping and playing video games.
25  Moreover, the third witness to the conversation,

1 Michelle Zortman, who testified for the defendant at
2 trial, testified that the defendant told this to the
3 FBI on June 12th.

4        Finally, during the later recorded
5 conversation the defendant had on June 15th, the
6 defendant admitted to Special Agent Tony Manganaro
7 and Detective Eric Stiverson of UIPD that he indeed
8 he had told Special Agent Smith and Carter on Monday
9 that he was sleeping and playing video games, as he
10 put it, literally all day on Friday June 9th.  So
11 the evidence proves without a doubt that he made the
12 statement charged -- the statement that is charged,
13 and it also establishes that he knowingly and
14 willfully made the statement.  There is no claim
15 that he didn't know what he was saying or didn't
16 mean to say it or that he was somehow forced or
17 coerced to talk to those agents.  Thus, the United
18 States has established the first element:  He
19 knowingly and willfully made the charged statement.

20        Second element:  United States must prove
21 that the statement was false.  This need not delay
22 us for long because there was tremendous amounts of
23 video showing that the defendant was driving around
24 campus on June 9, 2017, including video of his
25 picking up Yingying Zhang.  In fact, when confronted

1  with these facts on June 15th by Detective

2  Stiverson.  The defendant after a pause admitted

3  indeed that he had actually picked up someone on

4  June 9th.  Clearly, the defendant's statement that

5  he was at his apartment all day on June 9th was

6  false.

7          Third, the United States must prove that the

8  statement concerned what is called material facts.

9  As the judge instructed you, a statement is material

10 if it is capable of influencing the actions of the

11 FBI.  The government is not required to prove that

12 the statement actually influenced the actions of the

13 FBI.  Not only was this statement capable of

14 influencing the actions of the FBI, it did influence

15 their actions.  This was the first residence that

16 those agents went to on June 12th.

17         They were looking for the Saturn Astra that

18 picked up Yingying Zhang.  The defendant calmly,

19 after having kidnapped and murdered Ms. Zhang, told

20 him that he was home all day and the agents at that

21 time ruled him out and went on to interviewing other

22 owners.

23         The defendant had not made that statement

24 that would have substantially changed their

25 investigative efforts over the next two days, which

1  continued canvassing Saturn owners, reviewing hours

2  of video, tracking down Astras through dealerships,

3  rental facilities.  So clearly this was a material

4  fact.  In fact, it was the material fact for that

5  investigation, who had picked up Yingying Zhang.

6         Fourth, the United States must prove that

7  the statement was made about a matter within the

8  jurisdiction of the FBI.  And Judge Shadid has

9  instructed you, the FBI is part of the executive

10 brand of the Government of the United States.  And

11 the statement concerning investigation of Yingying

12 Zhang's kidnapping was within the jurisdiction of

13 that branch.

14         Here, the defendant is clear, Special Agents

15 Smith and Carter were there investigating Yingying

16 Zhang's disappearance.  So that statement was made

17 during the investigation of her kidnapping.

18         Fifth, and finally, as to this count, the

19 United States must prove that the defendant knew the

20 statement was not true at the time he made it.

21         Now, during the June 15th recorded

22 interview, once the defendant became convinced that

23 Detective Stiverson knew that he had picked up

24 Yingying Zhang, he tried to explain it away by

25 saying, *Ahh, I mixed up my days.*  This was another

cover story, and this is obviously preposterous.

As Michelle Zortman testified, there was no doubt when these agents were there at that apartment on June 12th of why they were there.  Their inquiry was to find who had picked up Yingying Zhang on Friday, June 9, 2017, and whether she had gotten into the defendant's Saturn Astra.  They weren't just there to find out what he was doing between 2 and 3:00 on Friday.  And the defendant, of course, when he talked to them knew what he had done; that he had kidnapped her that day.  It's obvious he didn't mix up his days.  He knowingly and willfully lied to the FBI.  And given what he had done, he, of course, had a very strong motive to do so.

As he later texted Terra Bullis, *If this goes south, I'm going to go to jail for the rest of my life or I could literally lose my life.*

The defendant knew the statement that he was home all day on June 9th was false at the time he made it.  Thus, the United States has proven the defendant's guilt on Count 2 of making a false statement to the FBI beyond any reasonable doubt.

So now let's look at Count 3, which has the exact same elements as Count 2 and then requires the same analysis.  Let's discuss the facts that

 1  underlie Count 3.

 2          In the early morning hours of June 15, 2017,

 3  after the FBI had obtained the search warrant for

 4  the defendant's Saturn Astra, Special Agents Anthony

 5  Manganaro and Detective Eric Stiverson interviewed

 6  the defendant at the FBI office.  And you have seen

 7  that interview; that interview was audio and video

 8  recorded.  And as I noted before at the beginning of

 9  the interview, the defendant repeated the lie that

10  he had given to Special Agents Carter and to Special

11  Agent Smith that he had stayed home all that day,

12  literally all day and played video games.

13          Then, as you recall, Detective Stiverson

14  told him, I knew, I know you picked her up.  I saw

15  you.  I know you picked her up.  We saw the

16  defendant pause.  Look down as Detective Stiverson

17  testified, his eyes began to dart from side to side.

18  We could see his head shake.  We could hear him

19  breathing heavily.

20          After a long time, he then said, *I did pick*

21  *somebody up that day.*  The first time he admitted

22  that he picked somebody up.  But then he said he

23  picked up an Asian female but then dropped her off

24  in a residential neighborhood shortly thereafter,

25  just somewhere north of where he'd picked her up.

1        Let's apply the elements of false statement
2   to see if that, too, qualifies for making a false
3   statement to the FBI.
4        First, again, we must prove that the
5   defendant knowingly and willfully made the statement
6   charged.  Here the evidence can't be disputed.  We
7   have seen it on the video of what he told Special
8   Agent Manganaro and Detective Stiverson that he
9   dropped her off after he picked her up.
10       Second, we must prove the statement was
11  false.  Again, this doesn't take a lot of argument.
12  He didn't drop her off in that residential
13  neighborhood.  He took Yingying Zhang back to his
14  apartment.  The forensic evidence established this
15  beyond any reasonable doubt.  Her DNA was identified
16  with three swabbings on the bed, the swabbing from
17  the baseball bat, the swabbing from the carpet and
18  from the tack strip.
19       As Amanda Bakker testified, the DNA analysis
20  resulted in these incredibly high, which she
21  referred to likelihood ratios.  For example, the
22  likelihood ratio of the DNA that was found under the
23  blood-stained carpet, which was a similar source
24  DNA, meaning one contributor to the DNA source, that
25  likelihood ratio was 9.7 times 10 to 28 or 97

 1  octillion, which is 97 with 27 zeros after it.
 2  Incredibly strong support, obviously, for the
 3  identification of Yingying's DNA in the defendant's
 4  apartment.  Moreover, the defendant admitted during
 5  his June 29th recorded statement at the Memorial
 6  Walk, obviously, that he brought Yingying Zhang back
 7  to his apartment where he murdered her.
 8       So the defendant took Yingying back to his
 9  apartment; that he let her out in a residential
10  neighborhood, it is clearly false.
11       We must also prove that this concerned a
12  material fact, and, again, that this statement was
13  capable of influencing the FBI.  In fact, it did
14  influence the FBI.  While the agents didn't
15  necessarily believe the defendant's story, it
16  required them to follow-up.  They would have been
17  derelict if they didn't go to that neighborhood,
18  which they did, canvassing all over that area
19  looking for any evidence that Yingying Zhang may
20  have been dropped off in that location, her phone,
21  talking to people who may have seen her in that
22  area, using resources in that area to try to find
23  her.  Moreover, Special Agents Brian Schenkelberg
24  and Michael Carter even went to the defendant on
25  June 17th and spent time driving around that area,

1   as the defendant essentially led them on a wild

2   goose chase telling them where it was he had dropped

3   off Yingying Zhang.

4          Further showing the influence of this, after

5   the defendant actually admitted that he brought her

6   back to the apartment, on June 29, a search warrant

7   was executed at his apartment on June 30th and July

8   1st.  Not for the defendant's lie, that search

9   warrant could have been executed sooner.

10          So the statement was clearly material.

11          Fourth, the United States must prove that

12   the statement was made about a matter within the

13   jurisdiction of the FBI.  We've already established

14   that this investigation was an investigation into

15   the disappearance of Yingying Zhang, which was

16   within the jurisdiction of the FBI.

17          Fifth, and finally, you must prove that the

18   defendant knew the statement was not true at the

19   time he made it.  And again, there could be no

20   reasonable doubt that the defendant knew when he

21   told the agents that he dropped an Asian female off

22   in that residential neighborhood that that was

23   false.  He was covering up.  He had brought Yingying

24   Zhang back to his apartment and he was trying to

25   mislead the FBI so that they would not know that he

1    had raped, and tortured, and murdered her.  Thus,
2    the United States has proven the defendant's guilt
3    beyond any reasonable doubt as to Count 3 of the
4    superseding indictment.
5         So now let's turn to Count 1.  Count 1 is
6    the charge of kidnapping resulting in death.  As the
7    judge instructed you, there are four elements, each
8    of which the United States must prove beyond a
9    reasonable doubt.
10        The first is that the defendant knowingly
11   willfully and unlawfully seized, confined,
12   inveigled, decoyed, kidnapped, abducted or carried
13   away Yingying Zhang, as charged.
14        Second, is that the defendant otherwise held
15   Yingying Zhang for his own benefit and purpose.
16        Third, is that the defendant used a means,
17   facility or instrumentality of interstate commerce
18   in committing or in furtherance of the commission of
19   the offense.
20        Fourth, that Yingying Zhang's death
21   resulted.
22        Let's discuss these one by one.  And let's
23   just start with the third element, which we
24   sometimes refer to as the jurisdictional element.
25        The United States must prove that the

1  defendant used a means, facility, or instrumentality
2  of interstate commerce in committing or in
3  furtherance of the commission of the offense.  And
4  this element has easily been proven beyond a
5  reasonable doubt.  As Judge Shadid has already
6  instructed you, both a motor vehicle and a cellular
7  telephone are instrumentalities of interstate
8  commerce.
9          Now, while the United States only has to
10  prove that one of these was used in committing or in
11  furtherance of the offense, it has proved both.
12  First, the evidence overwhelmingly shows that the
13  defendant used a motor vehicle, namely, his 2008
14  Saturn Astra, in both committing the offense and in
15  furtherance of the offense.  In fact, in this case,
16  the offense would not have been possible without the
17  use of that motor vehicle.  He spent much of the
18  morning and the afternoon driving around campus
19  attempting to locate a victim, then he used the car
20  to lure Yingying into it by pretending to be a
21  police officer willing to give her a ride to One
22  North.  And, of course, he further used the car to
23  then abduct her and carry her away to his apartment.
24          There is simply no doubt that the car was
25  used both in committing the offense and in

 1  furtherance of the commission of the offense.  It
 2  was indispensable to his kidnapping.
 3        And second, while the cellular telephone was
 4  not used to commit the offense, it was used in
 5  furtherance of the commission of the offense.
 6  Namely, the defendant's planning and preparation for
 7  the offense.
 8        As the judge has instructed you, a person
 9  uses an instrumentality of interstate commerce,
10  namely a motor vehicle or cellular telephone, in
11  furtherance of the crime if the instrumentality
12  furthers, advances, moves forward, promotes, or
13  facilitates the offense.  It must be some connection
14  between the instrumentality and the crime that
15  advances the offense.  Here the defendant's cell
16  phone was not merely present during the kidnapping,
17  it was used to further and facilitate the offense.
18  As computer forensic examiner William O'Sullivan
19  testified from analyzing the evidence that remained
20  on the defendant's cell phone despite, his attempts
21  to delete his history, the defendant used it to help
22  plan the kidnapping.
23        We know that he used the cell phone to visit
24  the Wikipedia serial killer website, which we know
25  from the counseling session resulted in him in his

1 words going really far down the path killing

2 someone, including making plans and purchasing

3 items.

4      He also discussed his plan of putting a

5 victim in a large duffle bag on the FetLife

6 abduction website using his cellular telephone.

7      By allowing him to plan this kidnapping, the

8 cell phone furthered it.

9      Also he used that cell phone that day and

10 the following days to text both Michelle Zortman and

11 Terra Bullis both before and after the kidnapping,

12 rape and murder.  And how did this further the

13 commission of the offense?  It facilitated the

14 offense by allowing him to stay in contact with them

15 and keep tabs on them, to make sure neither was

16 going to be come back to that apartment on neither

17 Friday or Saturday when he needed to be able to

18 clean up and get rid of evidence.

19      And finally the defendant's own actions show

20 his consciousness, that he used that cell phone in

21 furtherance of the offense.  As discussed before, on

22 June 13th, after the kidnapping, and after he was

23 visited by the FBI, he deleted his Google Chrome web

24 browsing history from that cell phone.  It shows

25 that he wanted to remove evidence of his planning

1  and his facilitating of the kidnapping of his phone.

2  So there could be no doubt that the defendant used

3  his Saturn Astra in the commission of the

4  kidnapping.

5          And that alone is enough to meet the United

6  States' burden on this count.  The evidence also

7  shows that the defendant used his cellular telephone

8  in furtherance of the commission of the kidnapping.

9          Therefore, the United States has proven the

10  third element beyond any reasonable doubt.

11          So now let's go back and discuss the other

12  three elements.  The first element, the United

13  States must prove that the defendant willfully,

14  knowingly, and unlawfully seized, confined,

15  inveigled, decoyed, kidnapped, abducted or carried

16  away Yingying Zhang, as charged.

17          So let's discuss this.  Let's first discuss

18  each of those seven verbs; that he seized, confined,

19  inveigled, decoyed, kidnapped, abducted, or carried

20  away.  He is charged with seven different means

21  under the statute.

22          Now, the United States is not required to

23  prove all of these means.  There is an *or* in there.

24  So the United States is only required to prove one

25  of these means.

 1         Nonetheless, we would submit to you that the
 2    evidence shows that in fact the defendant did all
 3    seven of these things in his kidnapping of Yingying
 4    Zhang.
 5         So let's look at the facts.  We know that
 6    Yingying Zhang had a 2:10 appointment with Rontrez
 7    Stone at the One North complex and that she was
 8    running late.  We know that she set up that meeting
 9    that morning by voicemail and that she had texted
10    that to Rontrez Stone.  Even when she was on the
11    bus, we saw on her way to the meeting.  We know that
12    she got off the Teal Line bus at Springfield and
13    Mathews, and then was switching to the 22 Limited
14    bus, which passed her by.  We know that she ran
15    after that bus and ran after it for a full block
16    before being unable to catch the bus.  And we know
17    that when she did so, the defendant drove by her.
18    And the surveillance video shows that he drove
19    around the block and eventually came up and found
20    her alone at the bus stop at Clark and Goodwin and
21    pulled up alongside her.  We know from all of the
22    evidence that this was not the defendant looking to
23    give someone a ride.  In fact, Michelle Zortman, who
24    the defense called, testified it would have been
25    completely out of character for him.  She described

JURY TRIAL -- June 24, 2019          93

1  him as someone that was selfish and didn't care
2  about anyone but himself.  No, this was the
3  defendant as we have already established executing
4  his plan, finding a distressed girl alone, circling
5  his prey and luring her into the car by pretending
6  to be a police officer and showing her a badge.
7       Now he wasn't able to lure Emily Hogan, but
8  we know that Yingying did not speak English as well
9  as Emily.  And she had only been in the United
10 States for a matter of weeks.  And after about a
11 minute of conversation, the defendant was able to
12 persuade her to get in that car.
13      The defendant had no intention of taking her
14 to One North and he never did.  Instead he took her
15 to his apartment which was always his intention, to
16 rape, torture, and murder her.
17      So let's look at these seven different means
18 of satisfying the kidnapping statute in light of
19 these facts.
20      For example, let's look at decoy.  "Decoy"
21 generally means to lure or entice a person away from
22 an intended course into perhaps a trap.  And that's
23 exactly what the defendant did here.  Yingying
24 Zhang, her intended course was to catch the 22
25 Limited bus on the way to One North, but the

1  defendant lured her into his car, with the offer of

2  a ride and began driving away.  Driving in a car, as

3  he testified, that had doors that automatically

4  locked once he began driving.

5          "Inveigled" means to persuade someone to do

6  something by means of deception.  We know that the

7  defendant deceived her in a couple ways.  First, he

8  no doubt led her to believe that he would take her

9  to One North, when he had no intention of doing

10 that.  Moreover, he persuaded her that it was safer

11 for her to get in the car with him by pretending to

12 be a police officer and showing a badge.

13          Now the other terms:  kidnap, seized,

14 confine, abduct or carry away have their common

15 meanings, which are very similar to each other,

16 which is what the defendant did in this case.  To

17 physically take and carry away Yingying Zhang

18 against her will and without her consent.  It's

19 beyond obvious that Yingying Zhang did not willfully

20 consent to go with the defendant to his apartment.

21 Even the defendant's -- to the lies to the FBI

22 agents revealed some grain of truth.  He said when

23 he began driving her, he made a wrong turn and that

24 she freaked out.  Especially since she could not get

25 out because the Astra doors automatically locked.

And it's chilling to think about the fear and panic
that she must have felt when she first realized in
that car that he wasn't a police officer and that he
wasn't taking her to One North, and that she was
locked in that car.  He did not however let her out
of that car like he falsely told the FBI.  As we
have discussed, the DNA evidence established
unequivocally that he brought her back to his
apartment.  And if he followed his plan, he did it
by subduing her and placing her in the colossal
green duffle bag that he had received three days
earlier.  This wouldn't have been difficult for the
six foot 200 pound defendant who could bench press
well over 150 pounds, since Yingying was around 5'4"
tall and very petite.  Just as it would not have
been difficult for him to carry that duffle bag from
his Astra to his apartment.  Thus, there is no doubt
that the defendant decoyed and inveigled Yingying
Zhang to get her into that Saturn Astra, and that he
kidnapped, seized, confined, abducted, and carried
her away to his apartment.

        But we are still not done with the first
element because the kidnapping must have been
knowingly, willfully, and unlawfully.  It clearly
was.  But let's discuss those terms.

 1        "Unlawfully" means that it was done with
 2 something the law forbids.  In other words, that
 3 this wasn't some consensual abduction fantasy; that
 4 this was against Yingying Zhang's will.  And we know
 5 that to be the case.  The defendant himself
 6 described how hard she fought.
 7        Second, it was done knowingly.  A person
 8 acts knowingly if he realizes what he is doing and
 9 is aware of the nature of his conduct.  It is not an
10 act through ignorance, mistake, or accident.  To
11 decide whether the defendant acted knowingly, you
12 may consider all of the evidence, including what the
13 defendant did or said.  Obviously, the defendant
14 obviously did this knowingly.
15        While the defense has pointed out through
16 the trial that the defendant has a drinking problem,
17 we know that he himself stated during that day that
18 he only had two shots that morning and he didn't
19 want to get drunk.  As we repeated, Michelle Zortman
20 said that two shots would have had no effect on the
21 defendant.  We know that the defendant was able to
22 drive around for hours that day.  So even if
23 intoxicated earlier in the day, and the evidence
24 doesn't show that, we know by 2:04 p.m. he knew
25 exactly what he was doing.

1          In fact, he tried the same thing with Emily

2    Hogan at 9:30 that morning.  And she did not

3    indicate that there was any evidence that the

4    defendant was intoxicated or didn't know what he was

5    doing.  On the contrary, he pretended to be a police

6    officer and clearly spoke to her.  The defendant

7    knew exactly what he was doing when he got Yingying

8    Zhang into that car.  It wasn't ignorance.  It

9    wasn't mistake.  It wasn't accident.  This was cold

10   and this was calculated.

11         Third, it was done willfully.  Meaning to do

12   an act voluntarily with the intent to do something

13   the law forbids.  Now most cases we can presume the

14   defendant knows that the law forbids kidnapping, but

15   even here we have direct evidence.  And discussing

16   the kidnapping plans he had at the Counselling

17   Center with the student intern, he said that one of

18   the reasons that he was no longer pursuing it

19   because of the possibility of prison.  And when the

20   defendant kidnapped Yingying Zhang, it was

21   voluntary, it was intentional, it was willful.

22   Thus, the United States has proven the first element

23   beyond any reasonable doubt.

24         So let's go to the second element.  There

25   the United States must prove that the defendant

 1  otherwise held Yingying Zhang for his own benefit

 2  and purpose.  Now this could be for any purpose, any

 3  reason which would benefit the defendant.  And the

 4  holding need not be long, just separate and distinct

 5  from the initial abduction.  And this element has

 6  been easily proved beyond a reasonable doubt.  The

 7  defendant did not just abduct Yingying Zhang in his

 8  Saturn Astra.  He then took her back to his

 9  apartment against her will.  And it's an obvious

10  inference that when you are holding someone against

11  their will and taking them against their will, that

12  you are then holding them against their will.

13          And we have forensic evidence and the

14  defendant's own statements to establish this.  For

15  example, we know from Special Agent Catey's

16  testimony, he is a cellular analysis survey team

17  member, the evidence shows that after the defendant

18  picked up Yingying Zhang at 2:04 p.m., he did not

19  return texts to Michelle Zortman or to Terra Bullis

20  until around 3:30 p.m.  This suggests that for one

21  and a half hours, the defendant was occupied with

22  holding Yingying Zhang.  And we know that when he

23  finally sent a text, he told Terra Bullis *I'm*

24  *exhausted.*

25          This is consistent with the defendant's own

1  statements to Terra Bullis during the Memorial Walk

2  regarding how hard she fought.  Without prompting,

3  he told Terra Bullis she was valiant.  She was.

4  Three times he repeated how hard she fought.  He

5  described how strong she was and he had trouble

6  subduing her.  Besides describing her fighting, he

7  described how he held her.  He said that he decided

8  that it was easier to just let her hands be in

9  front.  And we know from the searches of the

10 defendant that he had restraints in his bedroom.

11 And she would have been restrained when he in his

12 own words *cut her clothes off and just started doing*

13 *stuff to her.*

14      We certainly know that she was held long

15 enough in his apartment to bleed on his mattress in

16 three different locations and to her have blood run

17 down the wall and baseboard and pool on the carpet

18 and then seep through the carpet to the tack strip

19 below.  And by his own admissions, she was held long

20 enough to hit her in the head with the baseball bat,

21 and to cut her head off.

22      The evidence not only shows that he held

23 her, it also show that he did so for his own benefit

24 and purpose.  It was for no one else's.  Just as he

25 said at the Memorial Walk, this was all for him.  He

 1  had been planning and fantasizing about this moment
 2  for months and now here he was actually doing it:
 3  raping, torturing, and ultimately murdering another
 4  human being, not that he viewed her as another human
 5  being; she was an object to him to fulfill his dark
 6  desire which was to kill for the sake of killing.
 7  This was all for his own twisted benefit and dark
 8  purpose.
 9          Thus, the United States has proven beyond a
10  reasonable doubt, the defendant held Yingying Zhang
11  for his own benefit and purpose.
12          Finally, regarding the kidnapping charge,
13  the United States must prove that Yingying Zhang's
14  death resulted from the kidnapping.  Tragically, the
15  evidence of this is overwhelming.  First, we start
16  with the obvious circumstantial evidence.  Yingying
17  has never been seen again by anyone other than the
18  defendant after she got in his Saturn Astra.  She
19  missed her appointment with Rontrez Stone of One
20  North; it has been over two years since her
21  disappearance.  She never returned to her apartment.
22  She never returned to her contact, Professor Guan,
23  or her colleagues.  She never returned to or
24  contacted her mom or her dad or her brother or
25  fiance, Xiaolin.  Her family, her fiance, multiple

JURY TRIAL -- June 24, 2019                    101

1  law enforcement agencies, student groups, friends
2  all have searched for her and never found her.
3          They canvassed all of the campus in
4  Champaign-Urbana and not found her.  They have not
5  found any video showing her after the defendant
6  drove her away and not found anyone who saw her
7  after she got in the defendant's car.  Her phone was
8  no longer receiving signals 20 minutes after she got
9  in the defendant's car and it never has since.  It
10 has never been found.  She has never used her credit
11 cards, her bank account, her laptop, her phone,
12 anything since she got in the defendant's Saturn
13 Astra.  Neither she nor her remains have been found.
14          The second, in addition to this
15 circumstantial evidence, the evidence shows that the
16 defendant's intent and plan was always to murder
17 her, motivated by his interest and fascination with
18 serial killers.  There is simply no other motive for
19 the crime.  He abducted a complete stranger in the
20 middle of the afternoon.  Although he raped her,
21 this was not about sex.  And although he tortured
22 her, this was not about BDSM.  This was always about
23 murder.  And in fact this was borne out by the
24 defendant's desire to attend the Memorial Walk for
25 Yingying.  His statements indicate he took great

pleasure in being the only one there who knew, while
everyone else was looking for her alive, who knew
that she was dead.  As he said, *I am the one.*

Finally, the defendant himself described in
graphic details how he murdered her; how he tortured
her by choking her, forcing her to breathe
forcefully; how he hit her in the bed with the
baseball bat as hard as he could; how he stabbed her
in the neck; how he decapitated her; how he ensured
she was dead, as he grotesquely put it, *None of this
F'ing zombie s-h-i-t; she was done.*

His statements were corroborated by the
identification of her DNA on the mattresses at three
locations on the bat, on the drywall, on the carpet,
on the tack strip, and by identification of blood on
the baseboard and the carpet and the tack strip.
And in cold unfeeling fashion, he left no doubt that
he had killed her.  *Her family is going to leave
empty-handed.  Yingying is gone.  She is gone
forever.*

Regretfully, the evidence is overwhelming
that Yingying Zhang's death resulted from her
kidnapping by the defendant.  Because the defendant
has proven beyond a reasonable doubt that the
defendant's guilty of each and every element, of

1  each and every charge, we urge you to return a
2  verdict of guilty on Counts 1, 2, and 3 of the
3  indictment.
4         Now before I close, I do want to address a
5  few matters raised by the defendant during opening
6  statement in the trial.  Although defense counsel
7  has stated that the defendant picked up Yingying,
8  took her back to his apartment and killed her,
9  counsel went on to state the defense takes issue
10 with the facts as alleged by the United States.  And
11 some of those issues appear to center on the
12 defendant's voluntary use of alcohol as well as his
13 relationships with Michelle Zortman and Terra
14 Bullis.  The question appears to be is the defendant
15 just a poor drunk who was mistreated by Michelle
16 Zortman and Terra Bullis, as suggested by the
17 defense; or is the defendant a cold, calculated
18 murderer who covered up his crimes?  We submit the
19 evidence establishes the latter.
20        First, alcohol is not responsible for
21 Yingying Zhang's murder; the defendant is.  Notice I
22 didn't discuss alcohol when I discussed the elements
23 of the crime and there is a good reason for that
24 because alcohol doesn't absolve the defendant of his
25 guilt, for any of the three offenses, legally or

1  otherwise.  He hasn't claimed that he was under the

2  influence on June 12th or June 15th when he lied to

3  the FBI.  In fact, the evidence shows that he was

4  stone-cold sober.  But take note of something, when

5  he was sober, he was able to effectively lie to the

6  FBI.

7          More important, let's talk about the role of

8  alcohol during the kidnapping on June 9th and why

9  that didn't come up when I discussed the elements,

10 because it's not a defense.  It's an excuse.  He

11 said that he only had two shots on June 9th.  And as

12 we know, that would not have any affect on him, from

13 the testimony of his ex-wife.  Whether he had one or

14 two or three shots, he's still guilty of kidnapping

15 resulting in death.

16         Two shots, no shots, four shots; he still

17 persuaded Yingying Zhang to get in the Saturn Astra

18 by showing a badge and pretending to be a police

19 officer; and I would submit that if he had displayed

20 signs of intoxication, she would not have gotten in

21 that car.

22         Two shots, no shots, four shots; he still

23 abducted her and took her back to his apartment.

24         Two shots, no shots, four shots; he still

25 raped her.

 1          Two shots, no shots, four shots; he still
 2     murdered her.
 3          And not only is he guilty regardless of the
 4     alcohol excuse, but any claim that he wouldn't have
 5     done this if not for the alcohol is contrary to the
 6     evidence.  He was planning this for almost six
 7     months.  He wasn't drunk the entire six months.  He
 8     ordered the green duffle bag back in March and then
 9     again a week before the kidnapping.  He wasn't drunk
10     the entire week before the kidnapping.  Michelle
11     Zortman would not let him drink when she was around.
12     And we know from Michelle Zortman's and Terra
13     Bullis's testimony that alcohol didn't make him
14     angry or cause him to be violent.  It doesn't cause
15     him to lose his temper.  Michelle Zortman said he
16     was a calm drunk; this was not an impulsive drunken
17     act.  This was a planned, calculated kidnapping and
18     murder.  And if this was alcohol induced, we would
19     expect when he sobered up and realized what he did,
20     that he would have been horrified.  But we see
21     exactly the opposite.  We don't see that he was
22     horrified, indicated remorse; we instead heard the
23     statements he made at that Memorial Walk.
24          The contrary, he repeatedly attempted to
25     cover up his crime.  Alcohol did not make him kill

1  Yingying Zhang.  And it's not an excuse for his
2  crimes.
3          Second, Michelle Zortman is not responsible
4  for Yingying Zhang's murder, the defendant is.
5          In opening statements the defendant
6  suggested that he was heartbroken the weekend he
7  kidnapped and murdered Yingying Zhang because
8  Michelle Zortman left that weekend with Ryan Vela
9  and went to the same place that she had honeymooned
10 with the defendant.  And the way that defense
11 counsel described it, it sounded very cold of
12 Michelle Zortman.  But we now know from all of the
13 evidence that it is a little more complicated than
14 that.
15         First, the defendant himself had soured on
16 the marriage in 2016, she testified.  We know that
17 she worked and financially supported the defendant
18 for most of the marriage while he attended school.
19 We also know that this location was a place, as she
20 testified, where she went on lots of occasions.  It
21 wasn't simply a place she went only on their
22 honeymoon.
23         We also know as the defendant told the
24 student intern on March of 2017 that what really
25 irreparably damaged their marriage was when he

1  shared his desires to kill with Michelle Zortman;
2  that she was terrified.  Frankly, it's hard to
3  believe that she stayed with him through the spring
4  of 2017.  It was in this context that she approached
5  the defendant in February 2017 about having an open
6  marriage and he agreed.
7          And in fact, the last question that she was
8  asked when she testified was from the defense.  *It
9  was you that brought up the open marriage, right?*
10 And she said, *Yes, but he agreed.*  He not only
11 agreed, he began dating other women.  He began his
12 relationship with Terra Bullis.  He had a one-night
13 stand with another woman and pursued other
14 relationships.  In this context, it is a stretch to
15 say the least that the defendant was a wronged
16 spouse.  And regardless of the status of his
17 relationship with Michelle Zortman, what does that
18 have to do with whether the defendant is guilty of
19 the three crimes with which he is charged.  The
20 answer of course is nothing.  Not only is it not any
21 type of legal defense, it is a very poor excuse for
22 kidnapping, murdering, and lying about your crime.
23         Michelle Zortman did not make him kidnap
24 Yingying Zhang and is not an excuse for his crime.
25         So, finally, let's discuss Terra Bullis.  In

opening statements the defendant suggested that the
defendant was going to seek help for his drinking
problems but then Terra Bullis prevented him from
doing so.  This argument fails on many levels.
First, as I've already pointed out, alcohol is not
an excuse for his crimes.  That being the case,
there is no relevance as to whether in fact Terra
Bullis did have anything to do with the defendant
not seeking rehabilitation.

        But second, the defendant's argument is an
excuse built on an excuse.  In other words, he is
first claiming that alcohol is an excuse for his
crimes, which it is not, then he is claiming that
his relationship with Terra Bullis is an excuse for
not seeking treatment.

        He was a 27-year-old married graduate
student in physics who had just met a brand new
girlfriend on OkCupid, and he is blaming her for him
not seeking treatment.

        And third, this argument isn't just
logically unsound; it's factually unsupported.  As
we heard the evidence, Terra Bullis worked with
Michelle Zortman to get the defendant to stop
drinking and here is the defendant blaming the two
women in his life --

1          MS. POLLOCK:  Objection; misstates the

2    evidence; that was not stated during opening

3    statement.

4          THE COURT:  Do you want to respond?

5          MR. MILLER:  Well, I would, Your Honor.  I

6    think this is argument; fair inference as to what

7    the argument was during --

8          THE COURT:  Ladies and gentlemen,

9    post-arguments are not evidence.  The evidence is as

10   you remember it.  Closing arguments is what each

11   side recalls the evidence to be from their view.

12         Go ahead, Mr. Miller.

13         MR. MILLER:  As I was saying, any argument

14   that Terra Bullis is to blame for the defendant's

15   murder is not supported by the evidence.  She worked

16   with Michelle Zortman to get the defendant to stop

17   drinking.  Neither Michelle Zortman or Terra Bullis,

18   the two woman in his life that actually supported

19   him, are to blame for his cold, calculated decision

20   to kidnap, rape, and murder a third woman.

21         Terra Bullis did not make him kidnap and

22   murder Yingying Zhang.  The defendant is the one

23   responsible.  The defendant is the only one

24   responsible.

25         This overwhelming evidence shows the

 1  defendant's guilt on all three charges.  As Judge

 2  Shadid has noted, I will have an opportunity to

 3  respond to defense counsel in rebuttal, after her

 4  closing argument.  And at that time I will ask you

 5  to return three verdicts of guilty in this case.

 6          Thank you.

 7          THE COURT:  Thank you, Mr. Miller.

 8          Ms. Pollock.

 9          MS. POLLOCK:  Ms. Mersot, is this microphone

10  working for you?

11          COURT REPORTER:  Yes, it is.  Thank you.

12          MS. POLLOCK:  Thank you.

13          Ladies and gentlemen, thank you on behalf of

14  my colleagues and myself, and on behalf of Brendt;

15  we appreciate your attention to this matter.

16          We know how horrible it is to listen to some

17  of these things that you have had to listen to.  And

18  I want to tell again, how grateful we are for your

19  dedication to this process with us.

20          When my co-counsel, George Taseff, stood up

21  before you during his opening statement he told you

22  that we were not going to make excuses for Brendt's

23  killing of Yingying Zhang.  We were not going to

24  contest the fact that it happened; that on June 9th,

25  2017, Brendt picked her up in the Saturn Astra and

1  took her to his apartment where he killed her.  That
2  has never been an issue in this case.
3       What he did tell you is that we had a
4  problem with some of the government's evidence and
5  it was further shown by Mr. Miller's argument right
6  here, right now.  Because the facts are that there
7  are certain things that you don't know, that you
8  can't know, that they are asking you to assume that
9  you know, but that's not reliable.  We are here in
10  this trial in this case because the government wants
11  to take his life.
12       MR. MILLER:  Objection, Your Honor.  This
13  phase of the trial, they should not be considering
14  the punishment at all --
15       MS. POLLOCK:  I'm not asking them to
16  consider the punishment.  I'm explaining the reason
17  for going through the guilt phase, Your Honor.
18       THE COURT:  Ladies and gentlemen, you have
19  been instructed that you are not to consider the
20  possible punishment in reaching your verdict.
21       Let's move on, Ms. Pollock.
22       MS. POLLOCK:  It's necessary that the
23  evidence that the government presented to you that
24  you know what's true, that you know what's not true,
25  that you know it's reliable, and on the contrary

 1  what's not reliable.  And that's what we have
 2  endeavored to show you during the last two weeks of
 3  testimony is what you can believe and what you
 4  should question and why.
 5          Now, Mr. Miller just gave this very long
 6  narrative of what the government thinks happened in
 7  this case.  But the fact is that there is not
 8  evidence for a good portion of what he's told you;
 9  it's inference.  He is asking you to assume.  He is
10  asking you to assume that Brendt used a duffle bag
11  in this offense, but there is no evidence of that.
12  The duffle bag was sitting in the utility room
13  closet.  Michelle Zortman was home for three days.
14  Smelled nothing.  Saw nothing.  That doesn't make
15  any sense.
16          The government is asking you to assume that
17  the things that Brendt said on that tape are all
18  true, but we know that there is problems with that.
19  His alcohol-fueled terrible attempt to impress Terra
20  Bullis at that Memorial Walk; thirteen victims,
21  there is no evidence of that.
22          The FBI, you've seen the power of the FBI in
23  this case as we watched these agents testify.  They
24  have so many resources.  And they utilized them all
25  to catch Brendt in three days.  They knew who he was

1  in that brief period of time.  They used everything

2  at their disposal to try to locate these other

3  victims.  There is no evidence of it whatsoever.

4  With what he said about the horrible things that he

5  did to Miss Zhang in that apartment, the FBI, DNA

6  people were able to recover evidence from the

7  bedroom only, from nowhere else in the apartment.

8  And, yes, he cleaned, but he cleaned the bedroom,

9  too.  They were still able to find the DNA.  They

10  were able to find the blood.  They couldn't find it

11  anywhere else.

12        So, there is just not enough.  It's not

13  reliable.  And a case of this import, you can't rely

14  on assumption.  You have to know that it is true.

15  And you can't.  And that's what we have been trying

16  to show you.

17        Now, you may have listened to that tape, as

18  I'm sure all of us did, and thought to yourself, my

19  God, what person could say this?  How could you say

20  this, especially if it wasn't true?  What kind of

21  human being would express those things?  It's awful.

22  It's horrible.  It triggers your emotions and it

23  makes you hate him.  But that emotion cannot

24  overcome the facts.  So what we tried to show you

25  throughout this process was what kind of person

1  could say that and we did.  The kind of person who

2  started having these thoughts and struggling with

3  alcohol who started off as a happily married

4  successful student.  But at some point he got

5  consumed by alcohol and with these dark thoughts,

6  and he didn't hide them.  He told his wife.  He told

7  his wife that night in December and her natural

8  response was to be terrified.  And she pulled away

9  from him.

10        Now, we never said that it's her fault or

11 that it's Terra Bullis's fault that any of this

12 happened.  It isn't.  It's Brendt's fault.  There is

13 no excuse.  There is no justification for what he

14 did.  It is not alcohol's fault.  Or another

15 person's fault.  But we didn't say that.  We are

16 trying to show context.  To show you about what

17 happened around this time period so that you can

18 understand it, because you had somebody who -- he

19 lost control of his alcohol and his marriage and his

20 school and everything else.  And he was battling

21 those dark thoughts.  And you know it because you

22 saw the video from the U of I Counseling Center.  He

23 knew that alcohol was contributing to his problems,

24 and he went to get help for it.  And he sat in that

25 room with that intern and he told that intern about

JURY TRIAL -- June 24, 2019                     115

1  those thoughts.  Any reasonably intelligent person
2  would know that when you go into a counseling center
3  and you threaten suicide and you talk about wanting
4  to kill someone, that's a red flag.  That's
5  something that he knew or should -- any reasonable
6  person would have known is going to create a
7  problem.
8          You heard it in his own words, he said, *Of*
9  *course, she was terrified; I understand why.*  And he
10 said that he knows how this sounds.  And he said
11 that he didn't want to be that person.  He said, *I*
12 *don't want to be this person.*  He struggled against
13 those things.  And ultimately he didn't win.  And as
14 a result, an innocent young woman is gone, because
15 he could not get control of himself.  It's nobody's
16 fault but his.  But you saw him in that counseling
17 center tell them.  And, yes, he went back again and
18 told them the same things in more detail, this time
19 about the steps he had taken, the thoughts that he
20 was having, the fascination with it, the things he
21 purchased, the plans he made, and he walked back out
22 again out on to the street.  And when he did, and
23 again, this is not her fault; this is not Terra
24 Bullis's fault.
25          Some of you probably never heard of anything

 1  about this BDSM stuff that you have heard about in

 2  this trial, and probably not everyone's cup of tee.

 3  But if it's between two consenting adults who are

 4  healthy and mentally stable.  It is fine.  It's

 5  acceptable for those people.  It was not okay for

 6  Brendt.  And it's not her fault that it wasn't okay

 7  for him.  She didn't know.

 8          But when he met her and he delved into that

 9  world with her, there was a link established for him

10  between sex and violence.  Something that he

11  thought, *okay, maybe I can explore this in a safe*

12  *way*; but it didn't get rid of his thoughts; it

13  didn't stop them; he didn't stop drinking; he didn't

14  stop having them.  It's not her fault that she was

15  busy the night before.  It's not Michelle's fault

16  that she was in Wisconsin that weekend.  It's

17  Brendt's fault.  But you have to go in to the next

18  phase of this trial understanding --

19          MR. MILLER:  Objection --

20          THE COURT:  Ms. Pollock, this is a guilty or

21  not guilty phase.  Let's keep it at that.

22          Ladies and gentlemen, you are not to

23  consider the possible punishment for the defendant

24  at this time.  You're only to decide if the

25  government has proven the defendant guilty beyond a

1  reasonable doubt of the charge against him at this
2  stage.
3          MS. POLLOCK:  It's pretty clear from the
4  evidence that you have seen that there is not much
5  dispute about what happened.  All you need to find
6  Brendt guilty of the crimes is the elements that
7  Mr. Miller reviewed with you, and I expect that you
8  will.  But we are going to move on after that.
9          Now, I want you to remember when we were all
10 going through jury selection and everybody was
11 sitting back in chambers with us and every single
12 one of you answered to the judge or to one of the
13 attorneys that you were willing to keep your opinion
14 opened at this point; that you would not make
15 decisions at this point; and that you would be
16 receptive to the things that you don't know about
17 yet.  I'm asking you to do that now, so that when
18 this decision is made, that this is not the
19 decision, the ultimate decision; that you have to
20 realize that there is more that you don't know.  And
21 we ask you to keep your hearts and your minds open
22 for that, and remember that the government has their
23 version of events; they are entitled to that; they
24 want you to believe it.  But remember, what has been
25 proven and what has not.  And keep that in your

1  minds please.  Thank you.

2           THE COURT:  Thank you, Ms. Pollock.

3           Mr. Miller, anything?

4           MR. MILLER:  Briefly, Your Honor.

5           This is rebuttal and there obviously isn't a

6  lot to rebut.  But, again, keeping in mind what the

7  attorneys say, even though the defense has admitted

8  his guilt of all three counts, the reason we are

9  here is because we have the burden to prove those

10 beyond a reasonable doubt.  And we have done that as

11 I have explained.

12          I did want to just comment, Ms. Pollock

13 noted that *you have to know things are true,* I

14 believe is how she put it.  But I ask you to look at

15 the jury instructions.  You give the evidence what

16 weight it deserves.  And people sometimes look at

17 one fact and conclude from it that another fact

18 exists and this is call an inference.  You are

19 entitled to make reasonable inferences.  I suggest

20 to you that the inferences that the United States

21 has put before you are reasonable inferences.  And

22 also I do note that there were things in

23 Ms. Pollock's rebuttal, things that he wouldn't say

24 those things at counseling, that we suggest the

25 evidence says the opposite; he was told at the

 1  beginning that it was a confidential session, and

 2  towards the end he said, *I wouldn't say these things*

 3  *to you if I still felt them because I know then you*

 4  *would have to report them.*  So even then we believe

 5  that the evidence shows that the defendant knew

 6  exactly what he was doing.

 7          She also commented that a link was

 8  established between sex and violence with

 9  Miss Bullis.  We suggest that the evidence shows

10  that that link was there long before Miss Bullis got

11  involved with the defendant.

12          At the end of the day, today, you have one

13  task, one task.  And that is to determine whether

14  the government has proven the defendant guilty

15  beyond a reasonable doubt of each of these offenses.

16  You have heard overwhelming evidence that he is

17  guilty of all three of those offenses, and we urge

18  you to find him guilty of all three counts.

19          Thank you.

20          THE COURT:  All right.  Thank you.

21          Can I see Mr. Miller and Ms. Pollock about

22  the matter I addressed earlier?  Just stay put.  One

23  second, ladies and gentlemen.

24          (Proceedings held at sidebar.)

25          THE COURT:  What are we going to do with

1  this?  I read to them *the crime;* I should have read
2  *by the defendant;* this is the one.  I don't want to
3  single it out now, but I also want -- I can
4  substitute it out there.
5          MS. POLLOCK:  Just substitute it and send it
6  up.
7          MR. MILLER:  We have no objection to that.
8          THE COURT:  All right.  Thank you.  That's
9  what we are going to do.
10         Thank you.
11         (Open court; jury present.)
12         THE COURT:  Okay.  Ladies and gentlemen,
13 that concludes the evidence and the arguments.  You
14 will now go to the jury room to begin your
15 deliberations.
16         Let me ask the court services officers to
17 come forward please so that they can be joined.  I'm
18 going to send all of you up.  I've taken the liberty
19 to order lunch.  It will arrive between 12:00 and
20 12:15 for you so that you can begin deliberations.
21 After you go up, then I'm going to ask the six
22 alternates to come back down.  There are no issues
23 with the first 12 of you to continue?
24         All right.  I'm going to ask the six
25 alternates to come back down.  I've ordered lunch

 1  for you as well.  You will not be relieved of your

 2  admonitions or obligations at this time, but I will

 3  have that discussion with you when you return.

 4          So let's -- Jeremy, if you will swear the

 5  officers in please.

 6          (Court Service Officers sworn.)

 7          All right.  Thank you, gentlemen.

 8          Okay.  Ladies and gentlemen, Jeremy will

 9  help you, assist you up.  And it will take a few

10  minutes to gather evidence and exhibits that are

11  going to come up for you as well the written

12  instructions of law.

13          I want to thank you for time and attention.

14  Good luck to all of you.  And we will have the

15  alternates back down momentarily.

16          Okay.  Thank you.

17          (Jury retires to deliberate, 11:35 a.m.)

18          THE COURT:  Otherwise, ladies and gentlemen,

19  after the jury leaves the courtroom, we will be in

20  recess.

21                      *****

22          THE COURT:  Please be seated.

23          Because of the attention to this case, once

24  a verdict or once I receive word that a verdict has

25  been reached, I will contact the parties, and we

1  will notify through the District Court website the
2  media and I will hold the verdict for 30 minutes
3  before we reveal it in open court so that will give
4  people an opportunity to come back to court if you
5  wish to be present for the verdict.
6          Other than that, at this point we will be in
7  recess.  Thank you.
8          THE COURT:  Can we hold Mr. Christensen for
9  a second.
10          Let's have the six alternates back down
11  please.
12          (Juror alternates present.)
13          All right.  Thank you.
14          Folks, I appreciate your time.  At this
15  time, generally, in any other kind of a case I would
16  relieve you of all of the admonitions and you would
17  be freed up.  At this point though I'm not going to
18  do that.  Because we don't know yet if there is
19  going to be a second stage, and we will know that
20  depending on the deliberations of the 12 that are
21  deliberating or are beginning their deliberations
22  now.  I've ordered lunch for you.  We are going to
23  show you to a room where there is plenty of space,
24  and we are going to ask you to enjoy your lunch and
25  not talk about the case with anybody including

JURY TRIAL -- June 24, 2019                    123

1  yourselves in the event that you were to have to be

2  called up here over the course of the next, I don't

3  know what, and resume or begin deliberations.  But

4  then if the verdict is reached by the 12 ahead of

5  you, I will read the verdict aloud in open court.

6  If then there is a next stage to this trial, you

7  will participate in that as well, and I will give

8  you a further instruction on that as we go along.

9  But for the time being now use this -- lunch is

10  coming between 12:00 and 12:15.

11        We will know where you are, but if you need

12  to use your phone or something, feel free to do so

13  but the same admonitions about not doing any

14  research, investigating or discussing this matter

15  with anybody still apply.  And if you have any

16  questions, Jeremy or our court services officer will

17  answer them for you.  Okay.  Thank you.

18        (Court in recess at 11:40 a.m.)

19                      *****

20        (In open court, 2:00 p.m.)

21        THE COURT:  All right.  We have received a

22  note that says the jury has reached a verdict on all

23  three counts.

24        Is there anything the parties believe needs

25  to be addressed before we bring the jury in?

 1          MR. MILLER:  No, Your Honor.

 2          MS. POLLOCK:  No, Your Honor.

 3          THE COURT:  Okay.  Let's bring the jury in.

 4          Ladies and gentlemen, after the verdict is

 5  read, I will give some admonitions possibly to the

 6  jury, and then I would ask the parties to stay put.

 7  We will visit a few minutes after the jury has

 8  recessed.

 9          (Jury present, 2:00 p.m.)

10          THE COURT:  Please be seated, everyone.

11          ███████████  you're the foreperson?

12          THE FOREPERSON:  Yes.

13          THE COURT:  Without telling what the verdict

14  is, I see your note says the jury has reached a

15  verdict on all three counts; is that correct?

16          THE FOREPERSON:  That's correct.

17          THE COURT:  Will you please hand the verdict

18  forms to Mr. Kelly?

19          Thank you.

20          All right.  The Court has received the

21  verdict forms, all three counts.

22          They are as follows:

23          We, The Jury, find the defendant, Brendt

24  Christensen, guilty of the offense of kidnapping

25  resulting in death as charged in Count 1 of the

JURY TRIAL -- June 24, 2019                    125

1  superseding indictment.

2          We, The Jury, find the defendant,

3  Brendt A. Christensen, guilty of the offense of

4  making a false statement as charged in Count 2 of

5  the superseding indictment.

6          And We, The Jury, find the defendant,

7  Brendt A. Christensen, guilty of the offense of

8  making a false statement as charged in Count 3 of

9  the superseding indictment.

10         All of them purport to be signed by each

11 juror including the foreperson.  They are dated

12 today's date, June 24th, 2019.

13         Do either of the parties wish to have the

14 jury polled?

15         MR. MILLER:  No, Your Honor.

16         MS. POLLOCK:  No, Your Honor.

17         THE COURT:  All right.  Ladies and

18 gentlemen, that will -- now the verdicts are

19 received.  They will be entered of record.  That

20 will conclude the guilt phase of this process.  And

21 as we discussed in the jury selection process, that

22 will now necessitate that we move on to the

23 sentencing or the penalty phase.

24         I would like to recess until Monday,

25 July 8th at 1:00 in the afternoon and begin the

1  penalty phase at that time.  I expect the penalty
2  phase to last a week to a week and a half, that's
3  slightly less than we talked about when we were
4  having jury selection.  This will allow the parties
5  to and the Court to address all of the pre-penalty
6  issues that need to be addressed and prepare penalty
7  jury instructions.  And then as well, I was
8  concerned that if we started the penalty phase, we
9  would -- we couldn't start it at the very least
10 until the end of this week because we've got issues
11 to address, and then we would get into the 4th of
12 July week, and then we would recess over the 4th of
13 July and I would prefer not to start what,
14 essentially, is another trial, the penalty phase,
15 and then have to recess for three or four or five
16 days over the 4th of July.
17        So I think that it makes the most sense to
18 simply begin at 1:00 in the afternoon on June 8th,
19 that's a Monday and give all of you some breathing
20 space as well.
21        Now having said that, at the penalty phase,
22 as we discussed in the jury selection process, you
23 will hear -- the day will look a lot like these days
24 look -- you will hear testimony and evidence in
25 aggravation and in mitigation then from there both

JURY TRIAL -- June 24, 2019                    127

 1  sides.  We will run the day just like we have run
 2  these.  I may push the 5:00 button a little bit in
 3  the penalty phase unlike, where I didn't in this
 4  one, to help move it towards resolution and to your
 5  deliberations, but wouldn't do so at the expense of
 6  any of the parties.
 7         Now having set out the schedule and what it
 8  may look like, I almost hesitate to ask this
 9  question:  But are there any conflicts or issues
10  that have arisen since we started this trial that
11  might make the serving another week or week and a
12  half beginning July 8th problematic?  And if there
13  are, I would like to just address them today; that
14  may mean keeping you here a little longer while we
15  discuss those, but that way I'm certain that when we
16  return on July 8th, we're ready to go.
17         As for -- this applies to all of you.  The
18  alternates are still under an admonition as far as
19  the 12 of you who deliberated, to not discuss the
20  matter with anybody.  Please refrain from reading or
21  listening to news accounts.  That may be difficult
22  to do over the next couple of weeks.  There has been
23  a lot of attention and I believe there will continue
24  to be a lot of attention to this case.  But I ask
25  you please to do so.  I appreciate you're

1  willingness to do so so far, and I believe that it's
2  allowed for us to have a process that has been free
3  from influence or interference and got us to where
4  we are today.
5          So with that in mind, before I let you go,
6  let me ask if any of you think there will be any
7  conflicts or issues.  And of course, if some come up
8  after you leave today, you have the number to the
9  clerk's office to report any, but, otherwise, I
10 expect we would work the week of July 8th, and then
11 possibly a few days into the following week.  Both
12 sides have indicated they thought their cases could
13 last three to four days, possibly five.  But I
14 expect that it will be a week and into the second
15 week, possibly.
16         So, with that in mind, is there anything
17 that you want me to know?
18         All right.  With that in mind, be safe.
19         We'll see you back here Monday, July 8th.
20 If you can report about 12:30.  Will anybody need a
21 reminder?  I'm not sure -- but if you need a
22 reminder, we will actually try to send you one, but
23 July 8th at 12:30.  You are free to go now.
24         Again, all of you please do not discuss this
25 matter with anybody.  Please, again, I want you to

 1  make the next decision that you have to make based
 2  only on the information that you receive in this
 3  courtroom.  And thank you very much for your service
 4  and the time and attention that you have given us to
 5  this day.  Okay.  Thank you.
 6          (Jury excused, 2:07 p.m.)
 7          THE COURT:  All right.  And you can tell
 8  them we will meet at the same place the way they
 9  have been coming in.
10          All right.  Hold on one second.  We are
11  going to address some matters in open court, if the
12  marshals please.
13          Okay.  So the guilty verdicts in all three
14  counts are now received and entered of record.  We
15  will set the matter to begin the sentencing hearing
16  phase of this on July 8th at 1:00 p.m.
17          We have a couple of matters that I think we
18  should clean up procedurally today now given the
19  verdict.
20          We discussed preliminarily the list of the
21  mitigating factors the defense needs to file.  I'm
22  going to ask that to the extent you can if you can
23  file those by 5:00 tomorrow, and if any -- if there
24  needs to be an amendment to those or a supplement to
25  those, then I will be agreeable.  I just want to get

 1  it started.  So to the extent that you know that,

 2  any objections then to the list of the mitigating

 3  factors should be by Wednesday, June 26th at 5:00

 4  p.m.

 5          I would ask that both sides tender witness

 6  lists by -- we are going to try to do this all this

 7  week if we can because we have the 4th of July next

 8  week, so if both sides could -- do you think that

 9  both sides can enter witness lists by Wednesday

10  mid-morning or so.

11          MR. MILLER:  Yes, Your Honor.

12          MS. POLLOCK:  Yes, Your Honor.

13          THE COURT:  Okay.  So Wednesday at

14  10:00 a.m.

15          MS. POLLOCK:  Your Honor, may I ask for

16  clarification?  I believe you said tomorrow at 5:00

17  p.m. and then you said Wednesday at 5:00 p.m.

18          THE COURT:  For any objections.

19          MS. POLLOCK:  For objections, okay.

20          THE COURT:  Okay.  The defense has

21  propounded proposed jury instructions.  I will ask

22  the government to do so.  When does the government

23  think that they can do so?  And then, of course, if

24  any that you agree upon with the defense that have

25  been tendered, if you simply can say that, then that

JURY TRIAL -- June 24, 2019                    131

1  will take care of that.  But when do you think that
2  you can do so?
3          MR. MILLER:  I think that we will file our
4  instructions today, Your Honor, and then we can
5  address any objections to their instructions
6  whenever -- at the same time that they would address
7  objections to ours.
8          THE COURT:  Very good.  Then what I would
9  like to do -- and I don't know if there is anything
10 else that needs to be addressed except for there are
11 some pending motions that include Dr. Zoline and
12 Sorenson, and there is the issue that's been under
13 seal and there are a couple of others, and
14 anticipate further motions, maybe, and objections,
15 and a conference on jury instructions -- and what I
16 would like to do is set those to begin at 1:30 on
17 Thursday, if we could.  And then go into Friday if
18 need be.
19         I would -- I don't want to start on Friday
20 and if we didn't get through them, and then we are
21 getting into the 4th of July holiday.  So, I would
22 like to do that if we could on Thursday at 1:30
23 start hearing on pending motions, any additional
24 motions that are going to be filed and objections to
25 those motions and the conference on jury

 1  instructions.

 2         Now having said that, what motions do the

 3  parties anticipate being filed?  I can't imagine

 4  that setting forth a witness list that is going to

 5  be too much of an issue and there wouldn't be much

 6  in the way to address that.  There will be list of

 7  mitigating factors.  The government has filed their

 8  list of proposed aggravating factors, but we can

 9  address any objections or challenges to those.

10  We've addressed the ones I think already to the

11  extent that the government has filed their

12  aggravating, list of aggravating factors.  We have

13  addressed most of those.

14         So what other motions do you anticipate

15  there might be?

16         MR. MILLER:  I think that there are a couple

17  of -- well, we would say sort of stock motions, for

18  lack of a better way, in the penalty phase that

19  address issues such as unsworn allocution, use of a

20  mitigation specialist.  I think those are two main

21  ones we anticipate, Your Honor.

22         THE COURT:  What do you mean *unsworn*

23  *allocution?*

24         MR. MILLER:  We will put up motions

25  basically along the lines of what is appropriate to

1  present in the penalty phase regarding information

2  that may come from the defendant himself that might

3  be unsworn.

4         THE COURT:  And then when you say *use of*

5  *mitigation expert,* what do you mean?

6         MR. MILLER:  That is -- in some cases there

7  are attempts to present mitigation evidence through

8  a mitigation specialist, and we believe there are

9  certain parameters that the Court would allow.

10        THE COURT:  Understood.  Okay.

11        From the defense, Ms. Pollock?

12        MS. POLLOCK:  Your Honor, first of all, you

13 didn't set a deadline for disclosure of exhibit

14 list, which I believe is also outstanding from the

15 government at this time.  If we could set that for

16 the same time on the morning on Wednesday.

17        THE COURT:  Any issue with that from the

18 government?

19        MR. MILLER:  That's fine.

20        THE COURT:  So exhibit list by 10:00 a.m.,

21 Wednesday.  And the defense the same?

22        MS. POLLOCK:  Our exhibit list and witness

23 lists were already disclosed in full.

24        THE COURT:  Got it.  Very good.

25        Well, the government was going to propose

 1  their witnesses -- oh, yeah, 10:00 a.m. Wednesday.

 2          MS. POLLOCK:  Your Honor, I believe the

 3  government's witness list did have the penalty

 4  witnesses listed.  We just don't have the order of

 5  proof.  So if we could have them disclosed what

 6  order they intend to call people in and we can do

 7  the same.

 8          THE COURT:  Either that or we can address it

 9  when we are here Thursday and try to narrow it down.

10          Okay.  So, what other motions do you think

11  will come from the defense?

12          MS. POLLOCK:  Your Honor, it will mostly be

13  Motions in Limine regarding the scope of the

14  evidence that the government intends to present.

15  The Court has previously reserved ruling on several

16  of our Motions in Limine that we need to have orders

17  on.

18          In addition, the Court has previously denied

19  a motion to disclose what victim impact evidence and

20  the parameters of that victim impact evidence that

21  we will further need to further litigate.  So we

22  anticipate probably six-ish motions regarding the

23  type of evidence that needs to be ruled on.

24          THE COURT:  Okay.  And I appreciate that

25  both of you won't have much time to file in the way

1  of objections.  So if it's okay with you,

2  anticipating that there will be an objection or two,

3  we will just address those, your objections orally

4  and argument.  And if you can get one on file or can

5  then do so.

6      All right.  Anything else then you think

7  that we need to address today?  That will keep us

8  working this week and then we will be prepared on

9  the 8th.  I chose July 8th at 1:00 in the event that

10  we had some clean up to do when we come back after

11  the 4th of July, we will have the morning to do so.

12  But, otherwise, I think that we are in pretty good

13  shape.

14      Anything else the parties believe needs to

15  be addressed?

16      MR. MILLER:  No, Your Honor.

17      MS. POLLOCK:  Actually, yes, Your Honor.

18  The Court is aware that Mr. Christensen's father has

19  been present during the entire guilt phase of the

20  trial.  We had previously discussed with the

21  government whether or not they would consent to his

22  presence at the penalty phase as well.  The

23  government indicated that they would consent after

24  he testifies, that would preclude him from viewing

25  the government's case.  Pursuant to Rule 615, we

 1  would make a request of the Court that he be

 2  permitted to remain in the courtroom during the

 3  entire penalty phase.  I don't know see that the

 4  normal consideration surrounding Rule 615, listening

 5  to the other sides' evidence, would in any way,

 6  shape, or form, change his testimony.  So the normal

 7  considerations of that rule and banning a witness

 8  from the courtroom prior to testimony don't apply in

 9  this case.  And he has been very dedicated and

10  present for his son, and we would like him to be

11  able to continue to so.

12          THE COURT:  Mr. Miller, do you want to

13  address that today or do you want to address that

14  Thursday afternoon?

15          MR. MILLER:  We can address it Thursday

16  afternoon.  We just note that, for example, we had

17  Xiaolin Hou who testified and we do have him

18  excluded from the courtroom until after he

19  testified.  There are some concerns there, we can

20  address that further on Thursday.

21          THE COURT:  There might be another witness

22  or two that you might want to address these issues

23  with, so we will address them Thursday afternoon.

24          And it might be based on the type of

25  testimony that you anticipate them giving as well,

JURY TRIAL -- June 24, 2019                137

1  so we will be open for this.

2          MS. POLLOCK:  I would note for the record,

3  Your Honor, that the decision to have Mr. Hou

4  outside the courtroom was not one that was run by

5  the defendant.  We would not have objected if they

6  would have requested that he be in the courtroom

7  ahead of his testimony.

8          THE COURT:  Okay.  Understood.

9          All right.  Anything else?  The verdicts are

10 received.  They are entered of record.  I know I

11 said that.

12         We will recess court for the sentencing to

13 July 8th at 1:00 p.m.

14         We will recess until Thursday, June 27th at

15 1:30 for hearing on pending motions, and how far we

16 get regarding preparing this matter for the

17 sentencing hearing.

18         It's my understanding that at the sentencing

19 hearing, it will lay out the same way: opening

20 statements, evidence in aggravation, and then

21 evidence in mitigation, and closings.

22         MR. MILLER:  I do believe that depending on

23 the ruling on their experts, we may have rebuttal.

24         THE COURT:  Understood.  And I think our

25 instructions on our jury instruction conference will

1   be informative, too, as to our process.

2            Okay.  Thank you.  We will be in recess.

3            (Court adjourned, 2:17 p.m.)

4            (Which were all of the proceedings had in

5            this case on this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25