1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
2

3

UNITED STATES OF AMERICA,
4                                  Docket No. 17-20037
              Plaintiff,
5
     vs.                           Peoria, Illinois
6                                  July 9, 2019
                                   9:04 a.m.
7  BRENDT A. CHRISTENSEN,

8              Defendant.

9

10

11       SENTENCING -- July 9, 2019 (Morning)

12

13

14     BEFORE THE HONORABLE JAMES E. SHADID

15        UNITED STATES DISTRICT JUDGE

16

17

18

19

20          NANCY MERSOT, CSR-RPR
            Official Court Reporter
21          U.S. District Court
            100 N.E. Monroe Street
22          Peoria, Illinois 61602
               309-671-4244
23

24
   Proceedings recorded by mechanical stenography;
25 transcript produced by computer.

SENTENCING -- July 9, 2019 (Morning)       2

```
 1
    For the Plaintiff:      EUGENE L. MILLER, ESQUIRE
 2                          BRYAN D. FRERES, ESQUIRE
                            Assistant United States Attorneys
 3                          201 South Vine Street
                            Urbana, Illinois 61802
 4                          217-373-5875

 5                          JAMES B. NELSON, ESQUIRE
                            U.S. DEPARTMENT OF JUSTICE
 6                          Capital Case Section
                            1331 F Street NW, Suite 625
 7                          Washington, DC 20004
                            202-598-2872
 8

 9  For the Defendant:      GEORGE F. TASEFF, ESQUIRE
                            Assistant Federal Public Defender
10                          401 Main Street, Suite 1500
                            Peoria, Illinois 61602
11                          309-671-7891

12                          ELISABETH R. POLLOCK, ESQUIRE
                            Assistant Federal Public Defender
13                          300 West Main Street
                            Urbana, Illinois 61801
14                          217-373-0666

15                          ROBERT L. TUCKER, ESQUIRE
                            Robert L. Tucker, Esq
16                          7114 Washington Avenue
                            St. Louis, Missouri 63130
17                          703-527-1622

18                          JULIE C. BRAIN, ESQUIRE
                            Attorney at law
19                          916 South 2nd Street
                            Philadelphia, Pennsylvania 19147
20                          267-639-0417

21

22

23

24

25
```

1                          I N D E X

2                                                    Page

3

4  GOVERNMENT'S WITNESSES:

5

6           XIAOLIN HOU

7  Direct Examination                                9

8

9           ANTHONY MANGANARO

10  Direct Examination                               37
   Cross-Examination                                75
11  Redirect Examination                            84
   Recross-Examination                              87
12  Further Redirect Examination                    91

13

14

15

16

17

18

19

20

21

22

23

24

25

SENTENCING -- July 9, 2019 (Morning)      4

1          (In open court, 9:04 a.m.)

2          THE COURT:  Good morning.  We are on the

3    record in the matter of United States v. Brendt

4    Christensen in 17-C R20037.

5          Mr. Christensen is in open court with his

6    attorneys: Mr. Tucker, Ms. Brain, Ms. Pollock,

7    Mr. Taseff.

8          The government by Mr. Miller, Mr. Nelson,

9    Mr. Freres, with Agents Huckstadt and Manganaro.

10         Are the parties ready to proceed today?

11         MS. POLLOCK:  We are, Your Honor.

12         MR. MILLER:  Your Honor, just one brief

13   matter; hopefully, won't take long, but we did file

14   -- there was a subpoena issued on one of our

15   rebuttal experts that would require him to appear

16   tomorrow and we filed a Motion to Quash that and

17   we'd at least want to be able to have -- not have

18   him make travel plans to be here tomorrow.  We will

19   need to address that at some point.

20         MS. POLLOCK:  Your Honor, we may have

21   requested his appearance, assuming that he would

22   already be here to testify, but we don't need his

23   appearance in person.  We just wanted documents.

24         THE COURT:  Okay.  So let's address this at

25   the break.

 1          MR. MILLER:  Very good.

 2          THE COURT:  And it will be addressed in the

 3   form of documents?

 4          MS. POLLOCK:  Yes.

 5          THE COURT:  So nobody can notify him of

 6   that.

 7          MR. MILLER:  He's been notified.  It falls

 8   under Rule 16.

 9          THE COURT:  In other words, that he doesn't

10   need to appear.

11          MR. MILLER:  Very good.

12          THE COURT:  On the 10th; we are going to

13   discuss in terms of documents.

14          MS. POLLOCK:  Your Honor, we do have one

15   issue that we would like to discuss.

16          THE COURT:  And that is the filing of 453.

17          MS. POLLOCK:  No, I guess we have two issues

18   that we would like to discuss.

19          THE COURT:  Go ahead.

20          MS. POLLOCK:  The one that I would like to

21   discuss is yesterday Your Honor proposed that the

22   defendants would tender an instruction for the jury,

23   if we chose based on the fact that we haven't had

24   the adequate opportunity to review the videos, et

25   cetera, and we have prepared a draft instruction

 1  which I can read to the Court and then if the Court

 2  chooses to give it, we can forward it in a Word

 3  document.

 4          THE COURT:  All right.  Go ahead.

 5          MS. POLLOCK:  It states that:  There is a

 6  legal procedure under the Federal Rules of Evidence

 7  that permits a party to take the testimony of a

 8  witness outside of court in a manner similar to the

 9  manner in which the witnesses in China were

10  videotaped answering questions.  This out-of-court

11  testimony may then be played for the jury in court;

12  however, the government did not seek to use this

13  legal procedure in this instance.

14          The defense was not given any notice of

15  these interviews of the witnesses in China, although

16  these interviews were conducted over six months ago

17  in October of 2018.  The defense was not provided

18  the videos until last week and has not had the

19  opportunity to obtain an independent translation or

20  to review the many other portions of the videos that

21  the government has chosen not to play here in court.

22  You may take this into consideration when evaluating

23  this evidence.

24          THE COURT:  Okay.

25          MS. POLLOCK:  And I can email that to the

SENTENCING -- July 9, 2019 (Morning)      7

1  Court and the parties.

2        THE COURT:  At this point why don't you

3  email that to Miss Geier and with a note that I said

4  that she should print it for me and I will review

5  that over the break as well, and then we will hear

6  from the other side, and then we'll address a

7  limiting instruction of some sort.  Okay.

8        MS. POLLOCK:  Thank you, Your Honor.

9        THE COURT:  And then the Supplemental Motion

10  to Strike, we can address that at some point,

11  possibly over the break or later today as well.

12        Mr. Taseff?

13        MR. TASEFF:  Judge, before we commence, may

14  we have a continuing objection?

15        THE COURT:  Yes.  I thought that that was

16  understood yesterday so that you don't have to

17  continue to say it.

18        MR. TASEFF:  Thank you very much.

19        THE COURT:  That pertains to the video,

20  which there will be two more today?

21        MR. MILLER:  There is -- there are -- only

22  one more with this witness, and then we have one

23  with the -- three more total, then one with each of

24  the -- with the brother, one with the father, and

25  then also the mother's video.

SENTENCING -- July 9, 2019 (Morning)        8

 1          THE COURT:  Okay.  But the ones that are --
 2   the continuing objection have to do with the videos
 3   that Miss Pollock was just referencing in her
 4   limiting instruction, so that there are three more
 5   of those.
 6          MR. MILLER:  Yes, Your Honor.
 7          THE COURT:  That will be noted.
 8          Anything else?
 9          All right.  Let's bring the jury in.
10          (Jury present, 7:52 a.m.)
11          THE COURT:  Okay.  Thank you.  Please be
12   seated.
13          Before we begin, let me ask each of you,
14   again, and I may not need to do this individually
15   today, but have any of you since yesterday, since
16   you went home seen, read, or heard anything about
17   this case other than what you are hearing in this
18   courtroom?
19          THE JURORS:  No.
20          THE COURT:  All indicating "no."  Okay.
21   Very good.
22          Let's resume.
23          Mr. Miller.
24          MR. MILLER:  The United States would call
25   Xiaolin Hou.

SENTENCING -- July 9, 2019 (Morning)        9

```
 1         THE COURT:  Sir, you are still under oath.
 2  All right.
 3                   XIAOLIN HOU,
 4  after having been duly sworn, testified as follows:
 5                 DIRECT EXAMINATION
 6  BY MR. MILLER:
 7  Q.   Good morning.
 8  A.   Good morning.
 9  Q.   I think when we concluded, we had seen from, a
10  statement from Kaiyun Zhao.  Did you observe
11  Yingying and Kaiyun Zhao to be close friends?
12  A.   Yes.
13  Q.   Showing you what has been marked as Government's
14  Exhibit 112A through 112H for identification.
15         Do you recognize those photos?
16  A.   Yes.
17  Q.   And are those photos of Yingying with Kaiyun and
18  her other friend from Peking University?
19  A.   Correct.
20         MR. MILLER:  Your Honor, we move to admit
21  and publish 112A through 112H.
22         THE COURT:  They will be admitted.
23         MR. MILLER:  If we could publish
24  Government's Exhibit 112A.
25  BY MR. MILLER:
```

1  Q.  If you can identify for us Yingying in this
2  photo?
3  A.  Yingying is here, and on her right is Kaiyun
4  Zhao, and on her left is Shaung Wu.
5  Q.  And when you say "here," if you could maybe
6  identify for the jurors.
7  A.  In the white shirt and a blue dress, the blue
8  and white dress.
9  Q.  The only one wearing a dress --
10  A.  Yes, yes.
11        MR. MILLER:  And if we would publish
12  Government's Exhibit 112B.
13  BY MR. MILLER:
14  Q.  And if you could identify Yingying in this
15  photo?
16  A.  Yes.  Yingying is in the top left corner.
17        MR. MILLER:  And if we could publish
18  Government's Exhibit 112C.
19  BY MR. MILLER:
20  Q.  And do you see Yingying in this photo.
21  A.  Yes, in this part, in the top left part here.
22  Q.  Is she making a sign there?
23  A.  Yes, a victory sign.
24  Q.  Move on to Government's Exhibit 112D.  And is
25  this a close-up of Yingying from 112C?

1  A.   Yes.

2  Q.   If you know what is this event that this

3  photograph is taken in?

4  A.   Actually that was when they are graduating from

5  Peking University and they are all in uniform.

6        MR. MILLER:  If we could publish Exhibit

7  112E.

8  BY MR. MILLER:

9  Q.   Is this another graduation photo?

10  A.   Yes.

11  Q.   Where is Yingying in this photo?

12  A.   Is here on the right.

13        MR. MILLER:  Okay.  And if we could print

14  and mark this as Government's Exhibit 112E-1.

15        And if we could publish Government's

16  Exhibit 112F.

17  BY MR. MILLER:

18  Q.   Is this a close-up of 112G?

19  A.   Yes.

20        MR. MILLER:  If we could publish

21  Government's Exhibit 11G.

22        And where is this photo taken?

23  A.   Guilin, China.

24  Q.   And could you spell that for the court reporter?

25  A.   G-u-i-l-i-n.

1  Q.   And can you identify for us where Yingying is in

2  photo?

3  A.   Yingying is on the right and the three other

4  roommates.

5          MR. MILLER:  And if we could publish that

6  marked as Government's Exhibit 112G-1.

7          And if we could publish Government's

8  Exhibit 112H.

9  BY MR. MILLER:

10 Q.   And who is in this photograph?

11 A.   Yingying and her three roommates.  Yingying is

12 in the middle.

13         MR. MILLER:  And if we could publish this as

14 Government's Exhibit is 12H-1?

15         THE CLERK:  Mr. Miller, I apologize.  I

16 actually cleared the circle.  If you could please

17 circle it again.

18 BY MR. MILLER:

19 Q.   If you could mark again which individuals are

20 Yingying?

21         THE CLERK:  Thank you.

22         Okay.

23 BY MR. MILLER:

24 Q.   Did Yingying like to run for exercise?

25 A.   Yes.

 1  Q.   And was that something that the two of you did

 2  together?

 3  A.   Yeah.  We did several kinds of sports together,

 4  including running, ping pong, and badminton; yes,

 5  uh-huh.

 6  Q.   And was she good at those sports?

 7  A.   She is a good ping pong player, but not a good

 8  badminton player; but she enjoy that, yeah.

 9  Q.   And was one of the roommates that we saw in

10  those photographs Shuang Wu?

11  A.   Yes.

12  Q.   And did you ask her to give her statement

13  regarding the impact of Yingying's loss on video?

14  A.   Yes.

15        MR. MILLER:  And we would move to publish

16  now Government's Exhibit 110.

17        (Playing video, 9:24 a.m. to 9:33 a.m.)

18  BY MR. MILLER:

19  Q.   Did you personally observe Yingying and Shuang

20  Wu to be close friends.

21  A.   Yes.

22  Q.   If you could you look at Government's

23  Exhibit 110-A.

24        Is that a photograph of Yingying and her

25  friends at Peking University?

1  A.   Yes.

2          MR. MILLER:  Your Honor, we move to admit

3  and publish Government's Exhibit 110-A.

4          THE COURT:  You may.

5  BY MR. MILLER:

6  Q.   And could you identify Yingying in this

7  photograph?

8  A.   Yingying is here on the left.

9          MR. MILLER:  And if we could print that as

10  Government's Exhibit 110A-1.

11  BY MR. MILLER:

12  Q.   And if you could look at Government's

13  Exhibit 110E.

14          Do you recognize that?

15  A.   Yes.

16  Q.   And Government's Exhibit 110E is -- 110E is that

17  a photograph of Yingying with her --

18  A.   With Shuang Wu at the Bird's Nest Stadium.

19          MR. MILLER:  And we move to admit and

20  publish Government's Exhibit 110E.

21          THE COURT:  You may.

22  BY MR. MILLER:

23  Q.   And if you could point out, Yingying in this

24  exhibit, or just describe for the jury.

25  A.   Yingying is here and the Shuang is here, and

1  then they are at the stadium called Bird's Nest

2  Stadium.  That stadium is beautiful.  Only for the

3  games held in Beijing in 2008.  That was the first

4  for Beijing to have Olympic games.

5  Q.  And just to identify here for the record,

6  Yingying is the individual with the yellow scarf?

7  A.  Yes.

8  Q.  If you could look at Government's Exhibit 110B.

9       Do you see Government's Exhibit 110B, the

10  paper exhibit?

11  A.  Yeah, I see.

12  Q.  And what is Government's Exhibit 110B?

13  A.  It is some Ying's handwriting on the notebook on

14  the first page of the notebook.

15  Q.  You say that is notebook that she gave to Shuang

16  Wu?

17  A.  I think so.

18       MR. MILLER:  Your Honor, we move to publish

19  Government's Exhibit 110B.

20       THE COURT:  You may.

21  BY MR. MILLER:

22  Q.  And first at the bottom indicates from

23  "Justina"; is that right, J-u-s-t-i-n-a?

24  A.  Yes, that is the English name of Yingying.

25  Q.  You said that is the English name that she would

1 use?

2 A.   Yes, yes.

3 Q.   And what did Yingying write to Shuang Wu?

4 A.   She said, Dear Shuang Shuang -- she called

5 "Shuang" "Shuang Shaung" -- this is my favorite

6 notebook, one of my favorite notebook.  And now I

7 give it to you.  Please take good care of it and

8 make good use of it.  We stay together for a long

9 time together but you're so innocent and lovely

10 which impress me lot.  I wish I could met you

11 earlier, and I wish you could come back from Beijing

12 to stay with me, but anyway it is more important for

13 you to be comfortable and good.  Please take good

14 care of yourselves and I will, too.  Next time when

15 we met still be innocent and simple.  I wish I could

16 meet you sometime in Europe.  Hahaha.  From

17 Justina."

18 Q.   And if you could look at Government's

19 Exhibit 110C.

20       Is that the back of that notebook?

21 A.   Yes.

22       MR. MILLER:  And we move to admit and

23 publish Government's Exhibit 110C.

24       THE COURT:  You may.

25 BY MR. MILLER:

1 Q.   And what was indicated on the back of the
2 notebook?
3 A.   It says "Everything is beautiful."
4 Q.   How did Yingying feel about going to the United
5 States to do research and to study?
6 A.   She loved being here.  On one hand, she -- the
7 university here is very good.  Especially her major
8 in the university.  So she wants to do better
9 research and learn more knowledge and just make
10 contribution in her field in the future.
11       On the other hand, she wants to be here to
12 make more friends, learn different culture, learn a
13 lot of work.  And she said in her recent chat she
14 want to use her field to merit the work; yeah,
15 that's her.
16 Q.   Showing you Government's Exhibit 110B through
17 110F.
18       Do you recognize those photos?
19 A.   Yes.
20 Q.   And are those all photos of Yingying?
21 A.   Yes.
22       MR. MILLER:  Your Honor, we move to admit
23 Government's Exhibit 100B, C, D, E and F.
24 A.   You may.
25

 1  BY MR. MILLER:

 2  Q.   If we could publish 100B.

 3         And could you tell us what 100B shows.

 4  A.   Yingying is giving a presentation about her

 5  research in Peking University.

 6         MR. MILLER:  And if we could publish

 7  Government's Exhibit 100C.

 8  BY MR. MILLER:

 9  Q.   And what does this show?

10  A.   This shows Yingying as talking about her

11  research and some teachers are listening.

12         MR. MILLER:  And if we could publish

13  Government's Exhibit 100D.

14  BY THE WITNESS:

15  A.   Yingying in the library.

16         MR. MILLER:  And Government's Exhibit 100E.

17  BY THE WITNESS:

18  A.   Yingying, she was in the uniform and that was

19  when she was graduating from Peking University and

20  here is four characters of Peking University.

21         MR. MILLER:  And if we could publish 100F.

22  BY MR. MILLER:

23  Q.   And what does this show?

24  A.   I think this is Yingying is putting up her best

25  wishes on a paper and she just put the paper on this

1  wall.

2  Q.   And this was also at graduation?

3  A.   Yes.

4  Q.   Before Yingying left China to come to the United

5  States, had you and her made some plans?

6  A.   Yes, we had plans for the future.  At that time

7  I needed to finish my Ph.D. first, so I need another

8  two years to finish my Ph.D.  Then I would probably

9  apply for post-doctor to come here to the United

10 States to stay with her.  And after we all finish

11 our study, we will probably go back to China, work

12 in Beijing, and she planned to teach in the

13 university; yeah.

14 Q.   And did the two of you plan to get married?

15 A.   Yes, of course, we plan to get married on

16 October, in October 2017, yeah.

17 Q.   I show you Government's Exhibit 11B, which was

18 already entered into evidence as a journal that was

19 found in Yingying's apartment.

20       Do you recognize whose journal that is?

21 A.   Yes.

22 Q.   And whose journal is that?

23 A.   Ying's journal.

24 Q.   Do you recognize the handwriting?

25 A.   Yes.  It's Ying's handwriting.

SENTENCING -- July 9, 2019 (Morning)        20

1  Q.   Could you go to the very last entry in the
2  journal?
3          What is the date of that entry?
4  A.   June 1st, 2017.
5  Q.   And did she make some notation first in Chinese
6  characters?
7  A.   Yes.
8  Q.   What does she note on June 1st, 2017?
9  A.   She wrote her plan for the day.  She wrote just
10  practicing, spoke English for maybe 20 minutes, and
11  running for several minutes and study and for,
12  maybe, 30 minutes, and 40 minutes and then -- then
13  have the breakfast; yes, 20 minutes, something like
14  that.  That's her plan for the day.
15  Q.   And did she end that entry by writing in
16  English?
17  A.   Yes.
18  Q.   And what did she write in English at the end of
19  that day?
20  A.   "March on.  Life is too short to be ordinary."
21  Q.   Have you had the opportunity to observe
22  Yingying's parents since they learned that she is
23  gone?
24  A.   Yes.
25  Q.   What is the impact that you observed?

 1  A.   It's hard to describe.  The impact is too big
 2  and severe to them.  For the mom and for the dad of
 3  Ying, they both didn't get good education when
 4  they're very young.  Especially for the mom, she
 5  even cannot read or write in Chinese.  And their
 6  financial situation is also not good.  So -- but
 7  they make all their efforts to support their
 8  daughter for her study.  So Ying for them is a
 9  bright star:  their hope, their future, their
10  everything for them.
11          Ying is a promising girl, but now they lose
12  their future.  So in the rest of their lives, they
13  seem -- there seems no expectations.  That's too
14  painful and difficult for them, so that's why they
15  just cannot eat, they cannot sleep at night; it's
16  painful for the mom just -- she almost cried every
17  day and her health became worse and worse.  So in
18  the -- actually, in these two years I was so worried
19  about them, especially the mom, so I tried my best
20  to give them some company, give them some
21  encouragement, support as much as I can, but I
22  definitely feel that what I can do is too small
23  compared to their suffering.
24          I try to persuade them just to maybe so many
25  days to move on, but how can I persuade them without

1  finding her.

2        In this two years, I think the only desire

3  for them is to find her, to find any remains of her

4  and bring her back home; give her an honorable

5  burial.  That's only desire.  But just thought is

6  small and basically requirement of them, they even

7  cannot accomplish.  So they felt so, so helpless and

8  they think they incompetent parents.  They keep on

9  blaming themselves because they seem to need to

10  leave their daughter so far away from home forever.

11  So they keep on blaming themselves, they are not

12  good parents; that's too hard and miserable for

13  them, yeah.

14  Q.   How has it impacted you personally, that

15  Yingying is gone?

16  A.   It totally changed my track of life and take

17  away the most important person in my 30 years of

18  life.  Especially when I know for a fact the

19  criminal did to Yingying that was so -- was too

20  cruel and painful for young girl.  I wish that -- he

21  did everything --

22        MS. BRAIN:  Can we have a sidebar?

23        (Sidebar conference.)

24        MS. BRAIN:  That's a direct comment on the

25  crime; blatant violation of *Payne*.

SENTENCING -- July 9, 2019 (Morning)          23

1          We move for a mistrial, first of all.

2          MR. MILLER:  We didn't know that he was

3    going say that, but we can take a break and move

4    to strike that.  And we can talk to him to make sure

5    that he won't say that again.

6          MS. BRAIN:  He called him a criminal and how

7    cruel it was.  The evidence is disputed.

8          MS. POLLOCK:  The evidence is disputed in

9    terms of what occurred.  And that he is verifying

10   that he thinks that that's correct, so regardless --

11   and also we have the issue of the door opening with

12   regards to the burial.  We need to cabin this in

13   some way and they got -- the context is that we can

14   admit because he is saying that, the inference is

15   that Mr. Christensen never told them anything about

16   what happened; he never offered to help and --

17         THE COURT:  Let's take a break.  Let's take

18   five minutes.

19         (Jury present, 9:47 a.m.)

20         THE COURT:  We are going to take a

21   five-minute morning break at this point.

22         We will resume in 15 minutes.  All right.

23         (Jury absent, 9:47 a.m.)

24         THE COURT:  Okay.  Please be seated.

25         All right.  We took a break because of an

SENTENCING -- July 9, 2019 (Morning)          24

 1  objection being made by the defense.

 2          Miss Brain or Miss Pollock, who wishes to be

 3  heard?

 4          MS. POLLOCK:  Well --

 5          THE COURT:  And just one of you.

 6          MS. POLLOCK:  We are going to ask him to

 7  step down so that he doesn't have to sit up there

 8  the whole time, the witness, or not.

 9          THE COURT:  No, he's fine.

10          MS. POLLOCK:  We have two objections, Your

11  Honor.  The first objection is a violation of *Payne*;

12  that is improper victim impact evidence that was

13  just presented by the witness where he commented on

14  both the defendant and the nature of the crime.  It

15  is clearly a violation of established law.  We move

16  for a mistrial on that basis.  That bell cannot be

17  unrung.

18          Alternatively, if not a mistrial, then we

19  need to strike the testimony and instruct the jury

20  that they cannot consider that testimony, although I

21  don't know how anybody would unhear that.

22          Secondly, Your Honor, we've had -- we still

23  have not met, through no fault of the government or

24  our own, everybody has been busy, but we have not

25  met yet to finalize the stipulation with regards to

1  the evidence of the plea negotiation.

2        The inference that was just provided by the

3  witness --

4        THE COURT:  Tell me.  Let's go to that

5  before you talk about the inference.

6        Why is that so difficult to either agree or

7  not agree?  We've had this -- this has been going on

8  for a year.  We've discussed it the last few months.

9  We discussed it last week.  We discussed it

10 yesterday.  Either agree or don't agree.  I've ruled

11 on that issue.

12       So, now it's being raised here because of a

13 comment the gentleman makes on the witness stand,

14 and you think that it violates the context which

15 hasn't been established yet.

16       MS. POLLOCK:  That's not correct, Your

17 Honor.  We don't think it violates the context.  The

18 Court -- the government filed a motion to prevent us

19 from cross-examining any victim impact witness with

20 regards to the plea offer and with regards to the

21 lawsuit.  And we reserved and said that unless the

22 door was opened, we did not plan on addressing those

23 topics with the witness.

24       Well, the door has been opened because what

25 has occurred is that the inference exists that the

1  body is the most important issue to the family.  We

2  know that, that was Mr. Nelson's opening; it has

3  been consistent throughout the testimony of the

4  videos.  And the inference without being refuted by

5  us is Mr. Christensen never offered to provide

6  information about the body and never in fact did

7  provide information about the body.

8          So with regards to that, Your Honor, we now

9  have a situation where we would perhaps like to

10  cross-examine this witness about that, but without

11  an agreement of the government or guarantee of what

12  that context is, there are things in those plea

13  negotiations that I think both parties don't want to

14  be elicited in open court.  That just -- it would

15  blow up the issue.  This is supposed to be a simple

16  issue.  It is supposed to be offered to plea; he

17  offered to provide that information; the plea did

18  not go through.

19          I don't know why it's that hard either.  But

20  now we are in a situation where we have to confront

21  that because the witness opened the door.  So, if we

22  could just have a few minutes to discuss it maybe we

23  can reach that agreement.

24          THE COURT:  All right.  Let's do that before

25  we have any further argument.

 1          You may step down.  Thank you.

 2          (Recess, 9:51 a.m. to 10:06 a.m.)

 3          THE COURT:  Thank you.  Please be seated.

 4 All right.

 5          The parities tendered a stipulation.  Is

 6 this the stipulation that you want read to the jury?

 7          MS. POLLOCK:  Your Honor, we have reached an

 8 agreement but we do not wish it to be read at this

 9 time.

10          THE COURT:  Okay.  So how do we address then

11 the issue, the two issues?  First of all, we want to

12 revisit the -- what you believe is a reference to

13 the criminal conduct.

14          MS. BRAIN:  Yes, Your Honor.  We move for a

15 mistrial based on that.

16          THE COURT:  That will be denied.  So what

17 would be your second request?

18          MS. BRAIN:  The second request would be

19 asking for a remedy.  I don't think there is any

20 remedy that can fix that.  The jury heard it.  He

21 said, "What that criminal did.  What that criminal

22 did to Yingying was too painful and too awful for a

23 young girl."  They heard that.  I don't know how --

24          THE COURT:  They did hear it.  I heard it in

25 the context; he was asked on the impact that it had

1  on him.  But I'm asking if you wish to have some

2  reference to striking it or some request to strike

3  it or something like that.  I don't think it rises

4  to the level at this point of resulting in a

5  mistrial.  I'll be happy to provide another remedy

6  if you choose to do so.

7        MS. BRAIN:  Then we would ask that the Court

8  instruct the jury that the testimony has been

9  stricken and that they -- the victim's family's

10 opinions about the crime or the defendant are not

11 appropriate for them to consider when deciding

12 between life and death, life without release and a

13 death sentence.

14       THE COURT:  Government wish to be heard?

15       MR. MILLER:  That's fine, Your Honor.  We

16 would have no problem with moving to strike the

17 comment and however the Court wishes to fashion the

18 instruction to the jury is fine.

19       THE COURT:  All right.  Miss Brain, do you

20 want to give it to me again here so I instruct the

21 jury:  The testimony regarding the criminal

22 conduct --

23       MS. BRAIN:  Ask the Court not to repeat it

24 but to simply say "The last comment by the witness

25 is stricken" and then to generally instruct that

1  "any opinions of the victim's family regarding the

2  crime of the defendant are not appropriate for you

3  to consider in making your sentencing

4  determination."

5        THE COURT:  If you don't want me to draw

6  attention to it, I will do it this way if you wish.

7  I will instruct:  Ladies and gentlemen, the

8  testimony that you just heard or the testimony of

9  the -- or the last comment of Mr. Hou -- is that

10  pronounced right?

11        MS. BRAIN:  Yes.

12        THE COURT:  Mr. Hou.  Maybe "as to the

13  criminal conduct is stricken" and then going

14  forward, "ladies and gentlemen, opinions of the

15  victims or family would not, should not be, should

16  not be considered by you when you reach your

17  ultimate --

18        MR. NELSON:  The problem is, Judge, that's

19  not correct.  Respectfully, the opinions of the

20  family as in the testimony as to how this loss has

21  affected them are -- it's a valid nonstatutory

22  aggravator and the jury can and should consider it.

23        THE COURT:  Understood.  That's not --

24        MR. NELSON:  I think that the language needs

25  to be more carefully drafted than what Ms. Brain

 1 | suggested.

 2 |        THE COURT:  Both of you help me out there.

 3 |        MR. NELSON:  I would just say that the

 4 | testimony of the victim's family may only be

 5 | considered with regard to the impact that the loss

 6 | has had on them.

 7 |        MS. POLLOCK:  That's not the issue.

 8 |        MS. BRAIN:  That's just giving them an extra

 9 | instruction about victim impact testimony, that's

10 | not curing the blatant *Payne* violation that just

11 | occurred.

12 |        MR. MILLER:  I believe the case law we

13 | quoted, Your Honor, basically says that opinions,

14 | the victim's family's opinions and characterizations

15 | regarding the defendant, the defendant's conduct, or

16 | the appropriate sentence are not for the jury to

17 | consider.

18 |        MS. POLLOCK:  That's accurate.

19 |        MS. BRAIN:  That's what *Payne* said -- *Bosse*

20 | says.

21 |        THE COURT:  The victim's family's opinions

22 | and characteristics that the defendant, the

23 | defendant's conduct, and what else?

24 |        MR. MILLER:  The appropriate sentence.

25 |        MS. BRAIN:  That hasn't been said --

 1        THE COURT:  So just say the opinions of the
 2  victim's family or the victim's family's opinions
 3  and characterization of the defendant, and the
 4  defendant's conducts -- and the defendant's conduct
 5  is what?
 6        MS. BRAIN:  Is not appropriate for your
 7  consideration in your sentencing determination.
 8        THE COURT:  Mr. Miller?
 9        MR. MILLER:  That's fine, Your Honor.
10        THE COURT:  Okay.
11        MS. POLLOCK:  And, Your Honor, before you
12  bring the jury back in, can I make a quick
13  additional record?
14        THE COURT:  Yes.
15        MS. POLLOCK:  With regards to our motion for
16  mistrial, we have litigated this over and over and
17  over again with regards to the fact that the victim
18  impact evidence is most powerful evidence that the
19  jury is going to hear and it seems to be
20  government's entire case in aggravation presented at
21  this phase.  They are well aware of the fact that
22  the emotional nature of testimony could be overly
23  prejudicial, and this is why they elected to record
24  the defendant's mother or the victim's mother on
25  camera and cut it where it was appropriate.

1    We had previously asked for written notes
2  about what these witnesses were going to say.  They
3  chose not to give them to us.  The Court ruled that
4  they didn't have to.  We asked for a map of what was
5  going to be said, that was not provided; and they
6  chose to put this witness up live in open court,
7  presumably having prepared him well for his
8  testimony, and he still said what he said.  So, we
9  tried everything that we could do to prevent this
10  from happening.  We were not able to prevent it from
11  happening.  The bell cannot be unring.  We
12  understand the Court's ruling, but to preserve the
13  record for appeal, the mistrial motion persists.
14        THE COURT:  All right.  That record is made.
15        Mr. Miller, anything?
16        MR. MILLER:  It should responded to here.
17  We didn't have a written record on this case, as you
18  can perhaps imagine, as we prepared the witness.  We
19  said this is what we were going to ask you.  We are
20  going to ask you how has this -- how has the loss
21  impacted you that she -- how has her loss impacted
22  you personally.  One, that is difficult and, one,
23  that we actually don't go over in the preparation
24  stage, although there was an instruction that *should*
25  *not comment on the defendant, the defendant's*

1  *conduct or the appropriate sentence.*  My

2  understanding would be that the witness did not

3  think that that's what he had done.  But we

4  understand the motion to strike.  And -- but we

5  don't believe a mistrial would be appropriate.

6          THE COURT:  I don't believe a mistrial is

7  appropriate either.  You get the limiting

8  instruction here.  I don't believe it's a bell that

9  was rung to -- if that catches anybody by surprise,

10  the limiting instruction should work.

11          But let's go forward for a second on the

12  video of the mother.  You want to reconsider and

13  think about putting the mother on the witness stand

14  first, and then if she is not able to testify, we

15  can address it then, that would seem to me to be

16  what the defense is objecting to at this point; no

17  opportunity to review the entire transcript or an

18  entire video or to cross-examine the mother, so you

19  might want to think about that.

20          MS. BRAIN:  We are not asking that she be

21  put on the stand.  In fact, we would object to that.

22          THE COURT:  So you are agreeing to the

23  video.

24          MS. BRAIN:  We haven't heard it.  We have

25  heard it but it's in Chinese.  So what we have asked

SENTENCING -- July 9, 2019 (Morning)          34

1  for and the government has graciously agreed is to

2  allow us to listen to it and get a translation over

3  the lunch hour and then if there are any objections

4  to it then we would make them.

5          THE COURT:  Well, then maybe going forward

6  our objection should be a little more clear because

7  part of the reasoning that you argue about the video

8  is that you don't have an opportunity to have a live

9  witness to cross-examine.

10          So with that in mind, I will leave it at

11  that.  You will review the video and then if you

12  have issues, we will address them after the lunch

13  hour.

14          Are we ready for the jury now?

15          MS. BRAIN:  Yes, Your Honor.

16          MR. MILLER:  Just so we don't draw an

17  objection when they come back in.  That was the last

18  question he hadn't completed.  So I would propose to

19  ask it in the way of, without commenting on the

20  defendant's conduct, could you please tell us how --

21          MS. POLLOCK:  I would ask that he be

22  instructed outside the presence of the jury not to

23  re-emphasize that in front of the jury.

24          THE COURT:  We will ask that question.  I

25  believe the witness understands.

1          MS. BRAIN:  Just so the record is clear,

2   Your Honor, we object both to the fact that we

3   weren't present when the videotapes were made,

4   pursuant to Rule 15, as a separate issue.  We are

5   depending subject to --

6          THE COURT:  I can order her to testify.  Do

7   you want me to rule right now that the video is not

8   going to be played unless she cannot complete her

9   testimony?

10          MS. BRAIN:  No.

11          THE COURT:  I will order the government to

12   put her on the witness stand and start with her live

13   testimony.

14          MS. BRAIN:  No.

15          THE COURT:  If that's what you are asking.

16          MS. BRAIN:  That is not what we are asking.

17   I just want to be clear we have two separate

18   objections.

19          THE COURT:  Okay.  Let's bring the jury in.

20   Thank you.

21          (Jury present, 10:32 a.m.)

22          THE COURT:  Thank you.  Please be seated.

23          Mr. Hou, do you want to resume on the

24   witness stand?

25          And while Mr. Hou is resuming his place,

 1  ladies and gentlemen, let me say this to you:  The
 2  victim's family's opinions and characterizations of
 3  the defendant and/or the defendant's conduct is not
 4  appropriate for your consideration in a sentencing
 5  determination.  As such, Mr. Hou's comments or
 6  testimony in that regard as to opinion or
 7  characterization of the defendant or the defendant's
 8  conduct would be stricken.
 9          Okay.  With that in mind, Mr. Miller, let's
10  go forward.
11  BY MR. MILLER:
12  Q.   I believe you were answering and so we will ask
13  that question again.
14          How has Yingying's loss impacted you
15  personally?
16  A.   That totally changed my track of life, and take
17  away the most important person in my life, 30 years
18  of life.  And the fact I learned from the disaster
19  happened to Yingying is too cruel and painful to me,
20  to myself.  However, I'm not a person who always
21  look back.  I try the best to stay calm and active
22  because I know that I cannot breakdown.  I cannot
23  breakdown as her parents, because here there is
24  still a lot of things need me to do.  I know Ying
25  wants me to do this.  She need me to take good care

 1  of her parents and her brother.  She need me to give

 2  them comfort and stand in front of them.  I will.  I

 3  will do that.

 4       And at the same time I will never give up

 5  the hope to find her.  I will just continue to try

 6  everything that I can to find her, and I will not

 7  surrender to the difficulties.  Of course, if we

 8  don't find her, then everything seems endless,

 9  especially for the parents; yeah.

10       MR. MILLER:  I have no further questions,

11  Judge.

12       THE COURT:  Cross-examination.

13       MR. TASEFF:  No cross, Your Honor.

14       THE COURT:  No cross?

15       MR. TASEFF:  None.

16       THE COURT:  Thank you.  Sir, you may step

17  down.

18       Next witness.

19       MR. FRERES:  Anthony Manganaro.

20                ANTHONY MANGANARO,

21  after having been duly sworn, testified as follows:

22                DIRECT EXAMINATION

23  BY MR. FRERES:

24  Q.  Good morning.

25  A.  Good morning.

 1  Q.   I know you have testified before in this
 2  proceeding.  Will you please restate your name and
 3  spell your last name for our record?
 4  A.   Yes, Anthony Manganaro, M-a-n-g-a-n-a-r-o.
 5  Q.   And just so -- can you give us just a brief
 6  overview of your professional experience?
 7  A.   Certainly.  I started out as a police officer in
 8  2004 with the Tulsa Police Department, was there for
 9  six years in various capacities: patrol, detective,
10  and then if 2010, I joined the FBI starting out at
11  Quantico.  I served in three different field
12  offices:  Laredo out of San Antonio Division;
13  Champaign out of Springfield Division; and now in
14  our Criminal Investigation Division in our Child
15  Exploitation Unit.
16  Q.   And can you just remind us what your role was in
17  the initial parts of this investigation?
18  A.   Certainly.  While I was in Champaign, I was the
19  initial case agent on this investigation.
20  Q.   Is that a role you later handed off to Special
21  Agent Andy Huckstadt?
22  A.   Yes.  When I received a promotion in March of
23  that following year, Special Agent Huckstadt took
24  primary responsibility on the investigation and I
25  took ancillary.

 1  Q.   And as the case agent for this, were you

 2  involved in pretty much every aspect of this

 3  investigation while you were in Champaign?

 4  A.   Yes.

 5  Q.   And have you sat through the testimony of the

 6  guilt phase during this trial?

 7  A.   I have.

 8  Q.   And some of the evidence from that phase also

 9  relate to this phase of the trial as well?

10  A.   Yes.

11  Q.   So I just want to talk about some of that.

12  First a little background here.

13          Did the FBI first get involved in a search

14  for Yingying on June 12th?

15  A.   Yes, that's correct.

16  Q.   Can you remind us how long Yingying has been

17  missing at that time?

18  A.   At that point around three days.

19  Q.   Did the FBI engage in extensive search for

20  Yingying and her kidnapper after you got involved?

21  A.   Yes, we did.

22  Q.   Did your search eventually lead you to the

23  defendant on June 14th?

24  A.   It did.

25  Q.   And again, briefly, can you just describe how

1 that came about?

2 A.   Through a review of the surveillance footage we

3 noticed characteristics about the Saturn Astra that

4 Yingying had been observed getting into.  Through

5 our canvassing efforts, some of the agents assigned

6 to our division had recognized those, and we

7 returned to June 14th to effect a search warrant on

8 that vehicle.

9 Q.   And did you seize the defendant's vehicle on

10 June 14th?

11 A.   Yes.

12 Q.   That being the Saturn Astra?

13 A.   Yes.

14 Q.   Did you also interview the defendant in the

15 earlier morning hours of June 15th?

16 A.   Yes, shortly after midnight we conducted that

17 interview at the Champaign Resident Agency.

18 Q.   What was the goal for the June 15th interview?

19 A.   To find Yingying.

20 Q.   Did you tell the defendant from the outset with

21 the purpose was in speaking with him?

22 A.   Yes.

23        MS. POLLOCK:  Your Honor, objection as to

24 cumulative.  We have heard all of this evidence in

25 the guilt phase.  If we are going to rehash

 1  everything, we are going to be here for a week.

 2         THE COURT:  Given what I'm told, it doesn't

 3  sound like we are going to rehash everything, and we

 4  are not going to be here for week.

 5         So that in mind, you may proceed.

 6         Overruled.

 7  BY MR. FRERES:

 8  Q.  Now did you -- prior to June 15th, the defendant

 9  had been interviewed before, correct?

10  A.  Correct, by Agents Carter and Smith.

11  Q.  And was that on June 12?

12  A.  Yes.

13  Q.  And what, if anything, did the defendant tell

14  the two agents on June 12th that you're aware?

15  A.  That on the date of the June 9th he had been at

16  home, speculating, video games and napping.

17  Q.  Would that have been between 2:00 and 3:00 p.m.

18  on Friday June 9th?

19  A.  Yes.

20  Q.  Did you start your interview on June 15th by

21  asking the defendant about his interview from

22  June 12th?

23  A.  Yes, I asked him to briefly recap it for me.

24         MR. FRERES:  Okay.  Can we play

25  Exhibit 17B-13, please?

 1          (Playing video.)

 2 BY MR. FRERES:

 3 Q.   Was that response there pretty much the same as

 4 he had given two agents, Carter and Smith on June

 5 12th?

 6 A.   Yes.

 7 Q.   Did you and Detective Stiverson ask him about

 8 his entire day on June 9th, not just between 2 and

 9 3, during this interview?

10 A.   Yes.

11          MR. FRERES:  Could we play 17B-14, please.

12 BY MR. FRERES:

13 Q.   After this statement, did you and Detective

14 Stiverson confront the defendant about his comment

15 here?

16 A.   Yes, we did.

17 Q.   At any point prior to this conversation, was

18 there any mention of him picking up an Asian female

19 on June 9th or June 10th during the day?

20 A.   No.

21          MR. FRERES:  Could we play Exhibit 17B-15,

22 please?

23          (Playing video.)

24 BY MR. FRERES:

25 Q.   Now Agent Manganaro, during that exchange, did

 1  you hear Detective Stiverson discuss about how the

 2  UIPD would have access to bus stops, busses, and

 3  kiosks and buildings?

 4  A.   Yes.  They had video cameras on those spots,

 5  yes.

 6  Q.   At the end of that exchange, where did the

 7  defendant claim he let Yingying out?

 8  A.   In a residential area.

 9  Q.   Are residential areas more difficult for you to

10  canvass and search?

11  A.   From a surveillance video standpoint, yes; there

12  is typically less surveillance footage.  A lot of

13  businesses have cameras that we can access, not so

14  much in residential areas.

15  Q.   During that clip, did you also hear a reference

16  to Yingying's English skills?

17  A.   Yes.  I'm trying to remember the exact quote

18  but, yes.

19  Q.   Is that some discussion about broken English,

20  did that remain consistent throughout his story?

21  A.   It did.

22         MR. FRERES:  Can we play Government's

23  Exhibit 17B-16, please?

24         (Playing video.)

25

 1 BY MR. FRERES:

 2 Q.   Now after this, did you and Detective Stiverson

 3 ask the defendant why he didn't tell Agents Carter

 4 and Smith about this information about picking up

 5 Yingying?

 6 A.   Yes.

 7        MR. FRERES:  Can we play Exhibit 17B-19?

 8        (Video playing.)

 9 BY MR. FRERES:

10 Q.   Did the defendant claim later in this interview

11 that he did not recognize the photo that was shown

12 of him of Yingying?

13 A.   He did.

14        MR. FRERES:  Can we play 17B-20, please?

15        (Playing video.)

16 BY MR. FRERES:

17 Q.   Then finally with regards to this interview, did

18 you confront the defendant about his claim of

19 letting Yingying out in a residential area?

20 A.   I did.

21        MR. FRERES:  Can we play 17B-21?

22 BY MR. FRERES:

23 Q.   Did this interview on June 15th end shortly

24 after this?

25 A.   It did, yes.

1  Q.   During the course of that evening, did the FBI

2  search the defendant's apartment?

3  A.   Yes, through consent from Michelle Zortman.

4  Q.   Did that involve the seizure of several

5  electronic devises?

6  A.   Yes.

7  Q.   Including the defendant's computer and phone?

8  A.   Correct.

9  Q.   And during this interview was the defendant's

10  wife also being interviewed by Agents Huckstadt and

11  Tenaglia?

12  A.   Yes, she was.

13  Q.   And there was another search conducted at the

14  defendant's apartment later that day on June 15?

15  A.   Yes.  That was conducted by the University of

16  Illinois Police Department in conjunction with the

17  Illinois State Police.

18  Q.   And did that involve the seizure of trace

19  evidence inside the apartment?

20  A.   Correct.

21  Q.   Including a baseball bat and swabs from the

22  defendant's bed?

23  A.   Correct.

24  Q.   And then the following day on June 16th did the

25  FBI interview the defendant's girlfriend, Terra

1  Bullis?

2  A.   Yes.

3  Q.   And in this context, did something then happen

4  on June 17th?

5  A.   Yes.  The defendant made indications that he

6  wanted to re-engage conversation with the FBI.

7  Q.   And how did he characterize that process?

8  A.   He reached out to Special Agent Tenaglia

9  requesting to meet again.

10 Q.   And what was your role in that interview?

11 A.   I selected which agents would've conducted that

12 interview.  At that time I picked Special Agent

13 Brian Schenkelberg and Special Agent Michael Carter.

14 Q.   Did the interview take place on June 17th?

15 A.   Yes, in our offices.

16 Q.   Again, it was recorded as well?

17 A.   Yes.

18 Q.   Did you provide Agents Carter and Schenkelberg

19 any instructions prior to the interview?

20 A.   Briefly I instructed them to allow the defendant

21 to speak freely.

22 Q.   Did Agents Carter and Schenkelberg, did they ask

23 the defendant, again, about what he did on June 9th,

24 at the outset of this interview?

25 A.   Yes.

1          MR. FRERES:  Can we play Exhibit 21B-4,

2   please?

3          (Playing video.)

4   BY MR. FRERES:

5   Q.   Later in this interview, did the defendant bring

6   up cleaning his apartment?

7   A.   He did.

8          MR. FRERES:  Can we play 21B-5, please?

9          (Playing video.)

10  BY MR. FRERES:

11  Q.   There was a reference to Sunday there.  Would

12  that be June 11th?

13  A.   Correct.

14  Q.   Two days after the abduction?

15  A.   Yes.

16  Q.   Now did you follow, did the FBI follow-up on the

17  defendant's purchases in the days before and after

18  the abduction?

19  A.   Yes.  We obtained some receipts from the

20  Walmart.

21          MR. FRERES:  Could we just put up 48B,

22  please?

23  BY MR. FRERES:

24  Q.   And is this the receipt from Walmart?

25  A.   Yes, on June 11.

SENTENCING -- July 9, 2019 (Morning)          48

1  Q.  Does that show a purchase of Drano as well as
2  some other cleaning supplies?
3  A.  It does.  The Drano is the second item listed.
4        MR. FRERES:  And then can we also put up
5  Exhibit 47B.
6  BY MR. FRERES:
7  Q.  Can you remind us what this is, Agent Manganaro?
8  A.  Yes.  This is a receipt from Schnucks.  This one
9  was from June 12th, and it also shows a purchase for
10 Drano.  This would be the first item listed.
11 Q.  This would be the defendant purchased Drano a
12 second time, the following day on June 12th as well?
13 A.  Correct.
14 Q.  During the June 17th interview, was there
15 discussion about a missing green duffle bag?
16 A.  Yes, there was.
17        MR. FRERES:  Could we play 21B-6, please?
18 BY MR. FRERES:
19 Q.  Isn't it true the FBI never recovered any green
20 duffle bag in this investigation?
21 A.  No, we did not.
22 Q.  Did Agent Carter attempt to follow-up on this
23 information?
24 A.  Yes.  He canvassed the three Walmarts in the
25 Champaign-Urbana area, requested records of cat tree

1  purchases at those Walmart for, I believe it was

2  about an approximate 60 days time frame.  He got

3  those records.  Compared them to the video

4  surveillance footage of the people purchasing, and

5  the defendant was not observed purchasing a cat tree

6  at any of those Walmarts.

7  Q.   During the June 17th interview, did the

8  defendant also explain why there might be blood in

9  his Saturn Astra?

10  A.   He did.

11        MR. FRERES:  Could we play 21B-7?

12        (Playing video.)

13  BY MR. FRERES:

14  Q.   And you already mentioned that the Astra was

15  seized, correct?

16  A.   Yes.

17  Q.   Was it extensively searched?

18  A.   It was.

19  Q.   Was there any blood found during the search of

20  the car?

21  A.   Not to my knowledge, no.

22  Q.   What, if anything, was noted about the Astra

23  during the search?

24  A.   It did appear to be extensively cleaned.

25        MR. FRERES:  Could we put 14-7 on the

1  screen.

2  BY MR. FRERES:

3  Q.   What is this photo, Agent Manganaro?

4  A.   This is the inside of the door that would be on

5  the front passenger side.

6  Q.   What's this depicting here?

7  A.   It's being tested using some of the techniques

8  our Evidence Response Team uses.  This appears to be

9  either luminal or the alternate light source.

10  Q.   And is this indicative of extensive cleaning on

11  the passenger side of the car?

12  A.   Yes.

13  Q.   Now during the -- going back to the June 17th

14  interview, did the defendant try and explain why he

15  did not previously mention picking Yingying up to

16  the FBI?

17  A.   Yes.

18         MR. FRERES:  Could we play 21B-8?

19         (Playing video.)

20  BY MR. FRERES:

21  Q.   And then near the end of the interview, did the

22  defendant again offer an explanation for why he came

23  in for the June 17th interview?

24  A.   Yes.

25         MR. FRERES:  Could we play 21B-10, please?

 1          (Playing video.)

 2   BY MR. FRERES:

 3   Q.   At the conclusion of this interview, did the

 4   defendant agree to go with the agents and try and

 5   show him where he allegedly let Yingying out?

 6   A.   He did.

 7          MR. FRERES:  Pull up 2E, please.

 8   BY MR. FRERES:

 9   Q.   Is that what this map is showing?

10   A.   Correct.

11   Q.   Can you just kind of briefly describe it for us?

12   A.   So the blue lines are indicative of the route

13   that was initially taken by the defendant when he

14   was trying to convey to agents, Smith and

15   Schenkelberg -- I'm sorry --  Agents Carter and

16   Schenkelberg, the route that he believed that he

17   took into the neighborhood.

18          They ultimately settled on having gone north

19   from, north on Goodwin across University, and then

20   making a left on Besslyn Street where he alleged to

21   have dropped her off.

22   Q.   Was he ever able to identify any specific area

23   where he allegedly dropped her off?

24   A.   Just that area kind of that Besslyn/Goodwin

25   area.

1  Q.   Following this, did the FBI make a big push to

2  canvass this area?

3  A.   Yes.  So agents that come in for the command

4  post as well as a lot of officers with the

5  University of Illinois Police Department, we did a

6  lot of canvassing through that neighborhood to try

7  to identify any residents who may have seen anything

8  or may have had video cameras on their property.

9  Q.   Was that a large, time resource investment?

10 A.   It is.

11 Q.   Did it take over multiple days as well?

12 A.   I believe so, yes.

13 Q.   Did you ever find any sign of Yingying being let

14 out in that area?

15 A.   No.

16 Q.   Let's talk about other avenues that were used to

17 try and locate Yingying.  Did you attempt to track

18 her through her phone?

19 A.   Yes.  Attempts were made to locate her through

20 her phone records.

21 Q.   And, again, briefly, can you just describe how

22 that works?  How somebody can be identified through

23 their phone?

24 A.   Through legal process through the cell phone

25 companies, we receive records, and a lot of times

1 those records will contain digital location, data,

2 cell phone towers, things along those lines.

3 Special Agent Greg Catey I think is much more fluent

4 in explaining that.

5 Q.   Sure.

6       MR. FRERES:  Can we pull up Exhibit 55A,

7 page five?

8 BY MR. FRERES:

9 Q.   I believe this is the summary that you mentioned

10 from Special Agent Catey.

11       And what was the indication based on the

12 search for Yingying's phone?

13 A.   There was an outgoing message at 1:30 p.m., and

14 then about an hour later at 2:28 p.m. is when the

15 phone ceased communication data transfers with the

16 tower.

17 Q.   And at 2:28 p.m., would that have been on June

18 9th?

19 A.   Yes.

20 Q.   How long would that have been after Yingying got

21 in the defendant's car?

22 A.   Approximately 24 minutes.

23 Q.   Were the FBI able to determine what kind of

24 phone Yingying had?

25 A.   Yes.  The AT&T records indicated she had an

1  iPhone 5S.

2  Q.   You also searched the defendant's records on his

3  Google accounts, correct?

4  A.   Yes.

5        MR. FRERES:  Can you pull up Government's

6  Exhibit 40B, please, page two?

7  BY MR. FRERES:

8  Q.   There at the top, the two red lines there.  Is

9  this, again, the part of the summary from the

10 Defendant's Google records?

11 A.   Correct.

12 Q.   And just tell us what we are looking at here.

13 A.   It is a June 12th search for -- it was a Google

14 search for how iPhone tracking works.

15 Q.   This would have been the defendant searching for

16 that information?

17 A.   Yes.  It's on the lovemachine689@gmail.com

18 account.

19 Q.   Did either the defendant or his wife have an

20 iPhone?

21 A.   No.

22 Q.   Were you ever able to recover Yingying's phone?

23 A.   No.

24 Q.   Now, let's direct your attention to June 30th.

25 Did you arrest the defendant for kidnapping Yingying

1 on that day?

2 A.   I did.

3 Q.   And over the following days, did the FBI search

4 his apartment again?

5 A.   Yes.  Shortly, immediately following the arrest,

6 other agents conducted a search at his apartment

7 that continued for quite a while.

8 Q.   Did that involve forensic searching again for

9 trace evidence using alternative light sources and

10 luminol?

11 A.   It did.

12 Q.   And what, if anything, was noticed about the

13 apartment during those searches?

14 A.   Similar to the car, there was a lot of cleaning.

15       MR. FRERES:  Can we pull up Exhibit 33-2?

16 BY MR. FRERES:

17 Q.   Do you recognize this Agent Manganaro?

18 A.   I do.

19 Q.   Where was this in the apartment?

20 A.   This would have been behind where the two twin

21 beds were pushed together.  This would have been

22 behind those beds against the far wall.

23 Q.   And using the forensic techniques is this

24 indicative of cleaning in this area?

25 A.   Yes.

1        MR. FRERES:  Can we pull up 33-55?

2 BY MR. FRERES:

3 Q.   And where this was inside the apartment?

4 A.   This is an example of -- I think, during the

5 earlier testimony there were several spots on the

6 carpet that showed similar signs of cleaning.  This

7 is an example of that on the carpet in the

8 residence.

9 Q.   And then finally 33-57.  And what is this

10 showing?

11 A.   This is more indication, this was on the door,

12 the bathroom.

13 Q.   Again, cleaning in that area?

14 A.   Yes.  Sorry.

15 Q.   Now did you through the investigation learn

16 about any outside efforts the defendant took to

17 clean his apartment as well?

18 A.   I did.

19        MR. FRERES:  Can we put up Exhibit 53,

20 please?

21 BY MR. FRERES:

22 Q.   Is this record indicative of those outside

23 efforts?

24 A.   Yes.  This is a work order that the defendant

25 placed with his apartment complex to have the

1  bathroom, some maintenance done on the bathroom due

2  to mold.

3  Q.   And this was this done in the days after

4  Yingying's abduction?

5  A.   Yes.

6  Q.   If you are aware, did this result in an acid

7  wash solution being sprayed in the shower?

8  A.   It did.

9  Q.   Now, despite these efforts, was there trace

10  evidence recovered during the searches of June 30th

11  to July 2nd?

12  A.   There was.

13          MR. FRERES:  Can we pull up Exhibit 33-12.

14  BY MR. FRERES:

15  Q.   Are you familiar with this photo?

16  A.   I am.  The previous photo, which showed a lot of

17  that kind of luminol exposure or ALS exposure when

18  you pulled the carpet back there, this was

19  discovered.

20  Q.   This was at the base where the pooling area was

21  on that first photo we showed?

22  A.   Yes.

23  Q.   Was this Yingying's DNA pulled from this

24  location?

25  A.   Yes.

 1  Q.   And was this also positive for blood?

 2  A.   Yes.

 3  Q.   And this would have been underneath the carpet

 4  there, correct?

 5  A.   Yes, underneath the bed.

 6          MR. FRERES:  And Exhibit 33-18.

 7  BY MR. FRERES:

 8  Q.   And is this the tact strip from that same

 9  locate?

10  A.   Yes.

11  Q.   Does did this also contain Yingying's DNA?

12  A.   It did.

13  Q.   Was this also a -- tested positive for blood as

14  well?

15  A.   Correct.

16  Q.   And was Yingying's DNA also pulled from other

17  locations inside during the various searches of the

18  defendant's apartment?

19  A.   It was.

20  Q.   Would that be the drywall, the baseball bat, and

21  the bed?

22  A.   Correct.

23  Q.   Now after -- when the defendant was arrested on

24  June 30th, was he at a county jail awaiting trial in

25  those days after his arrest?

A.   Yes.  After I arrested him, we transported him
to the Macon County detention facility.
Q.   Did you, at least in this case, monitor his
calls on those days after he was arrested?
A.   Yes, those cars were monitored.
Q.   During those early calls, was there anyone in
particular that he was trying to reach?
A.   Yes.  He was trying to reach his girlfriend,
Terra Bullis.
Q.   And did he refer to her by any pet name?
A.   Yes, Bunny.
Q.   And I would direct your attention to July 2nd,
were there actually two calls between the defendant
and his wife discussing Miss Bullis?
A.   Yes.  I believe they were approximately at
4:00 p.m. or a little after 4:00 p.m., and then
again at a little after 6:00 p.m.
Q.   Just for reference here, on July 2nd, this would
have been three or four days after the Memorial
Walk, correct?
A.   Correct.
       MR. FRERES:  Can we play Exhibit 52A2-1,
please?
          (Playing audio.)

 1 BY MR. FRERES:

 2 Q.   Later in this same call, was there some other

 3 discussion of Ms. Bullis?

 4 A.   There was.

 5        MR. FRERES:  Can we play 52A2-3, please?

 6 BY MR. FRERES:

 7 Q.   Now earlier there was a reference to a rally in

 8 that clip, was that a reference to the Memorial Walk

 9 that the defendant would have been at with

10 Ms. Bullis?

11 A.   It was.

12 Q.   Was there a call, another call later that

13 afternoon where the defendant and his wife discussed

14 Ms. Bullis?

15 A.   Yes.

16        MR. FRERES:  Can we play 52A1-1, please?

17        (Playing audio.)

18 BY MR. FRERES:

19 Q.   Was there another portion of this call as well?

20 A.   Yes.

21        MR. FRERES:  Can we play 52A1-3 as well.

22        (Playing audio.)

23 BY MR. FRERES:

24 Q.   During the call on July 2nd.  Was there also

25 some discussion about a Reddit account?

 1  A.    Yeah.

 2  Q.    Can you remind us, briefly, what is Reddit?

 3  A.    It's like a social media, news aggregation site,

 4  people can post comments and there are threads on

 5  various comments.

 6          MR. FRERES:  Can we play 52A2-2, please?

 7  BY MR. FRERES:

 8  Q.    Was the "bacbac account" referenced, is that

 9  defendant's Reddit account?

10  A.    It is.

11  Q.    And two days later on July 4, was there another

12  discussion related to that bacbac account?

13  A.    Yes.

14  Q.    And this would have been again between the

15  defendant and his wife?

16  A.    Yes.

17          MR. FRERES:  Can we play 52B-1, please?

18          (Playing audio.)

19  BY MR. FRERES:

20  Q.    There was a mention of a "UIUC sub-Reddit."  Do

21  you know what that means?

22  A.    It would have been one of the threads that the

23  University of Illinois at Urbana-Champaign would

24  have referenced that thread.

25  Q.    Maybe a thread, an open posting forum where

1  people will post information related to University

2  of Illinois?

3  A.   Correct.

4  Q.   In the days after Yingying's kidnapping, was

5  there an active thread about her disappearance?

6  A.   There was.

7  Q.   And did the FBI obtain records from the

8  defendant's bacbac Reddit account?

9  A.   Yes, we did.

10        MR. FRERES:  Can we put up Exhibit 41B,

11 please?

12 BY MR. FRERES:

13 Q.   Is this a summary of the defendant's Reddit's

14 account information?

15 A.   Yes.

16 Q.   Can you tell us what this summary is here?

17 A.   Have the account name, the bacbac that was

18 mentioned on the call; you have the registration

19 date; the email address; the

20 brendtchristensen@gmail.com.  Below that you have a

21 comment of that made under that account on June 11th

22 in response to the UIUC thread on "international

23 student kidnapped."  And the comment is *that's very*

24 *Ted Bundy-esque, scary.*

25 Q.   Is that reflected on Reddit's account or was it

1  deleted?

2  A.   It had been deleted.

3  Q.   But it was still reflected still on the

4  defendant's records as something he had said?

5  A.   Yes.  Reddit still had that comment preserved.

6  Q.   Now shifting gears here a little bit.  Both

7  before and after the defendant's arrest, the FBI

8  gathered records related to his activities leading

9  up to Yingying's kidnapping?

10 A.   Yes, we did.

11 Q.   And did it involve getting records from various

12 business entities and such?

13 A.   Correct.

14 Q.   And also did you -- did the FBI, that is,

15 conducted forensic analysis of all of his electronic

16 devices?

17 A.   Yes.

18 Q.   Now through forensic analysis and other

19 information, did you learn that the defendant had an

20 account on FetLife.com?

21 A.   Yes.

22 Q.   And just briefly, what is FetLife?

23 A.   I believe it was described earlier as Facebook

24 for kinky people.

25          MR. FRERES:  And can we pull up Government's

SENTENCING -- July 9, 2019 (Morning)          64

1  Exhibit 35 page 7, please?

2          And just highlight the bottom portion there.

3  BY MR. FRERES:

4  Q.   Was this -- we've got Exhibit 35 page 7.

5          Is this one of the screen captures that was

6  pulled from the defendant's phone during forensic

7  analysis?

8  A.   Yes.

9  Q.   What is this?  What are we looking at here,

10 Agent Manganaro?

11 A.   It is a conversation between Akuma689, which was

12 identified as the account belonging to the

13 defendant, and another Reddit -- I'm sorry --

14 another FetLife user 1LostAngel.

15 Q.   And the bottom portion there, is that the

16 discussion of a, for lack of a better term, a

17 consensual, a proposed consensual kidnapping between

18 the defendant and this person?

19 A.   Yes.

20 Q.   What was the defendant's proposed method of

21 accomplishing that?

22 A.   Would you like me to read it?

23 Q.   Please.  Right there near the bottom.

24 A.   *I would bind, gag you and likely put you in a*

25 *large duffle bag so no one can see you.  After I get*

1  *you in my trunk, backseat, I think for safety*

2  *reasons I will check to make sure that you're okay,*

3  *and I think using something like a single piece of*

4  *duct tape during this part would be preferable since*

5  *if something bad happens, you'd actually be able to*

6  *take it off your mouth and get my attention.  I'd*

7  *take you to a motel.  We'd try to pick one where*

8  *neighbors won't be a huge concern.*

9  Q.   Would this have been -- would this have been a

10  discussion approximately two months or roughly two

11  months before Yingying was kidnapped?

12  A.   Yes.

13          MR. FRERES:  Can we pull up Exhibit 34 page

14  one?

15  BY MR. FRERES:

16  Q.   And I believe this is the summary chart from

17  Mr. O'Sullivan here and then highlight the portion

18  from April 18th at the bottom.

19          Can you just tell us about this, Agent

20  Manganaro?

21  A.   Yes, it indicates some of the user activity on

22  April 18, 2017, from approximately 7:13 to 7:17.

23  There are a clicks or visits to the abduction 101

24  and some questions and answers all related to

25  FetLife.  The last one is abduction play.

1  Q.   This would have been searches pulled from the

2  defendant's phones and computers that he would have

3  made on FetLife?

4  A.   Correct.

5          MR. FRERES:  Can we go to the next page,

6  Staci?

7  BY MR. FRERES:

8  Q.   All right.  And it looks like there is several

9  more searches over the 18th and the 25th on FetLife

10 related to an abduction 101 on FetLife that related

11 to an abduction?

12 A.   Yes.  Continuing on the 18th, there is

13 additional pages within FetLife visited.  And then

14 as you said, it continues in some of the days that

15 follow.  Again, some of the abduction 101 question

16 and answers.

17 Q.   And this would have been, again, just over a

18 month before Yingying's kidnapping?

19 A.   Yes.

20 Q.   And she wouldn't have been in the United States

21 very long at this point, correct?

22 A.   No.

23 Q.   Did you also gather records from Amazon and UPS

24 from this investigation?

25 A.   Yes.

1          MR. FRERES:  Can we pull up that 38A,

2  please?

3  BY MR. FRERES:

4  Q.   Now, we talked a little bit about a duffle bag.

5          Was this something that the FBI searched for

6  as part of this investigation?

7  A.   Yes, we did.

8  Q.   Can you tell us again, remind us on 38A what we

9  are looking at here?

10  A.   So this is a combination of the UPS and the

11  purchase return records that we received from

12  Amazon, kind of pulling out the data related to

13  those duffle bags.  There were two purchases that

14  were made, both for those large duffle bags.  One in

15  early March.  This one was ultimately determined to

16  have been returned.  And we see that in some of the

17  Busey Bank records as well as in this Amazon record.

18  It was purchased a second time on June 3rd, and

19  those UPS records indicate that was delivered a

20  couple days later to the defendant's apartment.

21          MR. FRERES:  Okay.  Can we go to the next

22  page here.

23          Next page of that exhibit.

24  BY MR. FRERES:

25  Q.   And roughly is this the size of the duffle bag

1  we are talking about there?

2  A.   Yes.  This is the Amazon identification number

3  associated with that March 3rd purchase.

4  Q.   And this would have been delivered to the

5  defendant's apartment just days before the

6  abduction?

7  A.   No, this one was -- this particular picture is

8  the one from March.

9  Q.   Okay.  Thank you.

10  A.   I believe.

11  Q.   The next --

12  A.   Yes, this was the June 3rd.  Again, different

13  Amazon identification number, slightly different but

14  it brought back the same item, the heavyweight

15  cotton canvas duffle back in the colossal size, and

16  this one through UPS records were determined to be

17  delivered.

18  Q.   Just days before June 9th?

19  A.   Yes.

20  Q.   We also talked a little bit about the Google

21  records.  Did the FBI go through pretty extensively

22  and search the defendant's records on his two Google

23  accounts?

24  A.   Yes.

25         MR. FRERES:  Can we pull up Exhibit 40B page

1 one, please?

2 BY MR. FRERES:

3 Q.   All of these things highlighted in yellow here

4 on Exhibit 40B, were these all things that were

5 searches that were made on the defendant's

6 lovemachine@gmail account?

7 A.   Yes.

8 Q.   And when did these searches take place?

9 A.   These took place the day before, on June 8th, it

10 looks like at approximately noon.  And there was

11 searches for sodium hypochlorite and oxygen bleach.

12 Q.   And are those all cleaning products?

13 A.   Yes.

14 Q.   Again, these would have been searches done the

15 day before Yingying's kidnapping?

16 A.   Correct.

17 Q.   And we've also discussed here the defendant's

18 phone as well.  Was that forensically examined as

19 well?

20 A.   Yes.

21 Q.   Were text messages between the defendant and

22 Ms. Bullis from before and after Yingying's

23 abduction able to be recovered?

24 A.   Yes.

25 Q.   Could we pull up Exhibit 34, page 3, please.

SENTENCING -- July 9, 2019 (Morning)          70

1  And focus on April 28th of 2017 at 19:52 it looks

2  like.

3          What is this text message, here the first

4  one that says 19:52:07, the one to Terra?

5  A.   It is a message to Terra and it states:  *Bought*

6  *bed restraints, blindfold, gag.*

7  Q.   And that's from the defendant to Terra?

8  A.   Yes.

9  Q.   Did you ever recover a blindfold or a gag during

10 your investigations?

11 A.   No.

12 Q.   And then can we just -- I believe it's the same

13 exhibit on page 3, from May 25th, 2017, at 12:15:02.

14 So from 12:15:02 there onward, can you just tell us

15 about that series of text messages, Agent Manganaro?

16 A.   The first message, and these are all from the

17 defendant to Bunny or Terra Bullis.  The first

18 purchase reads:  *Sometimes I like to do things I*

19 *know are shitty.  I'm drinking and driving not like*

20 *literally drunk but driving while drinking.  There*

21 *is a cop looking at me.  He won't come over here.*

22 *I, like, feeling horrible.  I hear sirens and part*

23 *of me wants them to be for me.  I would never do*

24 *anything so dumb I go to jail, though that would he*

25 *(sic) very, very interesting.*

SENTENCING -- July 9, 2019 (Morning)          71

1          Continuing on a couple hours later:  *I did*
2  *so many things people could get fired for.  I've*
3  *done this my entire life.  Rules don't apply to me.*
4  *I'm being somewhat serious.  I do stupid shit all*
5  *the time.*
6          And then about 20/30 minutes after that, the
7  conversation continues, and he writes:  I know I'm
8  horrible.  I don't hide it.  People are almost
9  attracted to it, IRL.  It's like they want to do
10  what I do but won't.
11          A little bit later he writes:  "I don't
12  deserve anything.  No one does.  That's why I take
13  what I want."
14          And then continuing on that evening he
15  writes:  *Fading into nothingness is the default for*
16  *most people.  If you want to know what terrifies*
17  *me....it's that.  I will not fade away.  I refuse.*
18  *I don't care how I will he (sic) remembered; just*
19  *that I am.  God, bad, revered, infamous; I don't*
20  *care.*
21  Q.  The next page, just finish out the text on the
22  25th.
23  A.  *Think back over the past 2000 years, who do you*
24  *know?  The people who push the limits and those who*
25  *supported them.  Fading into nothingness is not an*

1  *option.  I would rather destroy humanity than let*

2  *that happen.  I know most would disagree.*

3  Q.   Again, were these all text messages from the

4  defendant to Ms. Bullis?

5  A.   Yes.

6  Q.   All on May 25th?

7  A.   Yes.

8  Q.   A couple weeks before Miss Zhang's kidnapping

9  and murder?

10  A.   Yes.

11  Q.   Finally, we are not going to go through all of

12  the clips, but was there an extensive push by the

13  UIPD and the FBI to collect all of the video of the

14  Astra driving around on June 9th?

15  A.   Yes.

16  Q.   And the -- was there -- every single instance on

17  the Astra being sighted by various cameras on the

18  University of Illinois campus and other businesses

19  was that all logged and charted?

20  A.   Yes.

21  Q.   And maps were prepared of those instances,

22  correct?

23  A.   Correct.

24  Q.   We put up Exhibit 2F on the screen.

25          And this is the map from the morning of

1  June 9th.  And can you just remind us what this is
2  depicting?
3  A.   It depicts instances of observing the Saturn
4  Astra and believed driving routes that are going
5  through the campus from approximately 8:22 that
6  morning, continuing on until almost quarter to 9:00.
7  Q.   And was there anything of relevance in the
8  investigation that occurred on the morning of
9  June 9th?
10 A.   Yes, later that morning, another student
11 contacted the police to indicate that she had been
12 approached by a white male in a black sedan.
13 Q.   And would that have been in the area roughly up
14 by the four and five on this map?
15 A.   Yes.
16 Q.   And then was there -- so would it be fair to say
17 that based on this that the Saturn Astra was driving
18 all over campus the morning of June 9th?
19 A.   Yes, the Saturn Astra was driving on campus,
20 yes.
21        MR. FRERES:  Can we pull up Exhibit 2D.
22 BY MR. FRERES:
23 Q.   And this is from the afternoon of June 9th; is
24 that correct?
25 A.   Correct.

1  Q.   And just kind of -- is this the same thing?  Can
2  you remind us what this is depicting?
3  A.    Again, these are identifications of the Astra on
4  video surveillance from the afternoon to include the
5  camera from the parking garage where you see Miss --
6  Yingying get into the Saturn Astra.
7  Q.   Are number seven and number eight the ones that
8  lead to the abduction and immediately thereafter the
9  abduction?
10 A.   Yes.
11 Q.   And does this map show sort of what the Astra
12 did moments before the abduction?
13 A.   Yes.  So Box 3 on this, you observe the Astra
14 driving westbound on Springfield; that is the same
15 video you see Miss Zhang trying to chase after the
16 bus.  You see the Astra passing by here.  A couple
17 minutes later, in boxes four and five, you can see
18 the Astra pulling into what is the commercial
19 business and backing out.  The Astra is then seen
20 eastbound on University and then turning south on
21 Goodwin.  As that eastbound turn is made on Clark
22 Street, he passes in front of Yingying and then
23 circles the block and comes back up northbound and
24 pulls up along Yingying.
25 Q.   And Yingying, of course, gets in the car?

SENTENCING -- July 9, 2019 (Morning)      75

1  A.   Yes.

2  Q.   And she has never been seen since?

3  A.   No.

4        MR. MILLER:  Thank you, Your Honor.

5        No further questions.

6        THE COURT:  Would this be a good time to

7  break for lunch.

8        MS. POLLOCK:  At the Court's pleasure, I

9  have about ten minutes.

10        THE COURT:  Go ahead.  If you're ready, if

11  you want to, okay.

12                CROSS-EXAMINATION

13  BY MS. POLLOCK:

14  Q.   Good morning, Agent Manganaro?

15  A.   Good morning.

16  Q.   So the video that we saw of Mr. Christensen

17  giving interviews there were two of them, correct?

18  A.   Yes.  The 15th and the 17th.

19  Q.   Okay.  And Mr. Freres asked you particular

20  questions about the, quote, broken English portion

21  of those interviews; do you recall that?

22  A.   I do.

23  Q.   And Mr. Christensen had said on those videos

24  that the woman he picked up spoke broken English,

25  correct?

SENTENCING -- July 9, 2019 (Morning)       76

 1 | A.   Correct.
 2 | Q.   Now he lied to you on those videos, didn't he?
 3 | A.   He did.
 4 | Q.   Many times, in fact.
 5 | A.   There were several, instances, yes.
 6 | Q.   He lied about what he was doing on Friday the
 7 | 9th, correct?
 8 | A.   Correct.
 9 | Q.   He lied about what he was doing in terms of
10 | picking her up and dropping her off, correct?
11 | A.   Correct.
12 | Q.   Basically everything he said to you was a lie in
13 | that video, wasn't it?
14 | A.   There were a number of lies, yes.
15 | Q.   And potentially, if he is lying about every
16 | other thing, he might be lying about that, wouldn't
17 | you agree?
18 | A.   He could have been lying about that, yes.
19 | Q.   All right.  So, with regards to the apartment
20 | cleaning, you testified about the evidence that was
21 | located by various FBI and state recovery teams,
22 | UIPD recovery teams that went in the apartment on
23 | multiple occasions, right?
24 | A.   Yes.
25 | Q.   And you stated, I believe, Mr. Freres showed you

1  some photographs of the evidence that was located in

2  the bedroom of the apartment, right?

3  A.   Yes.

4  Q.   And in the bedroom there was blood found on the

5  carpet that possessed Miss Zhang's DNA inside of it,

6  correct?

7  A.   Yes.

8  Q.   That is how you identified that she was in the

9  apartment at some point in time, correct?

10 A.   Yes.  Her DNA was in the apartment, yes.

11 Q.   So, talking about the evidence that was

12 recovered, you've been present in court this entire

13 time, haven't you?

14 A.   Correct.

15 Q.   You have seen all of the forensic experts

16 testify?

17 A.   Yes.

18 Q.   Including the DNA expert?

19 A.   Yes.

20 Q.   Including all of people that collected all of

21 the evidence?

22 A.   Correct.

23 Q.   And you heard during that testimony that they

24 searched every inch of that bathroom, correct?

25 A.   I know that there was extensive searching of

1 that bathroom, yes.

2 Q.   And not a single shred of evidence linking

3 Miss Zhang's presence to the bathroom, correct?

4 A.   There was evidence of cleaning --

5 Q.   Excuse me, Agent Manganaro.  There was evidence

6 of cleaning in the bedroom, a lot of it, wasn't

7 there?

8 A.   Yes, there was evidence of cleaning in the

9 bedroom as well.

10 Q.   The FBI found a bunch of evidence in the

11 bedroom, didn't they?

12 A.   I don't know how I'd characterize a bunch, but

13 there was several spots throughout the bedroom where

14 her DNA was --

15 Q.   So what you're saying --

16 A.   -- yes.

17 Q.   -- is that you give very long answers, and I

18 appreciate that because usually you're very detailed

19 but just try to keep it yes or no.  We are trying to

20 move here so everybody can eat.

21          In terms of the bedroom, there was extensive

22 cleaning done, yet the FBI was able to recover

23 multiple samples linking Ms. Zhang's presence to

24 that apartment, correct?

25 A.   Yes.

1  Q.   And they searched as diligently through the rest

2  of the apartment and found no other evidence of her

3  presence, correct?

4  A.   I know there was no DNA recovered in that

5  bathroom.

6  Q.   Not just DNA, there was no hair, there was no

7  blood, there was no skin, there was no nothing;

8  isn't that correct?

9  A.   I don't recall any of those items being found in

10  the bathroom, no.

11  Q.   Thank you.

12       Now with regards to DNA expert Amanda

13  Bakker, who came and testified from Quantico; do you

14  recall that testimony, correct?

15  A.   Yes.

16  Q.   And you heard her testify that in conjunction

17  with or, I suppose, in consultation with the case

18  agents, she decided not to test certain items that

19  were recovered from the apartment; do you recall

20  that?

21  A.   I do.

22  Q.   And among the items that were not tested were

23  the kitchen sink, remember?

24  A.   I can't remember specifically.  I remember I

25  think the kitchen sink was mentioned.

 1  Q.   So the kitchen sink.  We've also mentioned
 2  knives, scissors, cameras, implements, tools, all of
 3  the things that were taken out of the apartment, a
 4  couple hundred items; none of those were tested; do
 5  you recall that?
 6  A.   Yes.
 7  Q.   With regard to the jail call that Mr. Freres
 8  played for you on the day after Mr. Christensen was
 9  arrested after the Reddit account, I believe he did
10  mention the UIUC Reddit, correct?
11  A.   Correct.
12  Q.   Do you recall witnessing Michelle Christensen's
13  testimony, or Michelle Zortman now, when she
14  testified that based on hearing that tape and her
15  and Brendt being private people, she recalled
16  wanting to delete that account to get rid of it so
17  that the public wouldn't locate him?  Do you
18  remember that?
19  A.   I remember her testimony, yes.
20  Q.   Did you hear on that tape, which I was able to
21  listen to most closely this time, where it stated
22  the UIUC sub-Reddit was trying to figure out your
23  account.  Do you recall that?
24  A.   That's what I heard, yes.
25  Q.   And that's not the FBI is trying to figure out

1  your account, correct?

2  A.   No, she mentioned the UIUC Reddit.

3  Q.   And not any law enforcement or anyone else,

4  correct?

5  A.   She did not mention any law enforcement agency.

6  Q.   Now at that point he'd been arrested and his

7  face and image had been projected on media and he

8  had been identified as the person suspected of

9  kidnapping Miss Zhang, correct?

10  A.   Correct.

11  Q.   So there was a lot of interest in the local

12  community about him personally, and by definition,

13  therefore, his wife also, right?

14  A.   I know that there was a lot of interest in him

15  personally.

16  Q.   Now talking about FetLife.com, we went over a

17  lot of this in the last phase, but we just did

18  again, so I want to make sure that we hit it again.

19        Those abduction 1010 FAG, frequently asked

20  questions, those type of pages, where are they and

21  have you seen them?

22  A.   Are you referring to the --

23  Q.   FetLife.com.

24  A.   -- the summary exhibit that --

25  Q.   No, I'm not referring to the summary exhibit.

1  I'm referring to the actual pages.  I want to see
2  what it says on those pages.  Do you have them?
3  A.   I do not.
4  Q.   Does anybody have them?
5  A.   I believe they are publically available on the
6  FetLife.
7  Q.   I can tell you that they are not because I
8  tried.  Are you saying that they are not in evidence
9  right now and you have never seen them.
10 A.   I said that I've not been to the FetLife web
11 page to see what they have or don't have.
12 Q.   Do you know what they say?
13 A.   No.
14 Q.   FAQ, frequently asked question, normally the
15 first place someone visits if they want just some
16 general background information on the subject matter
17 at issue, correct?
18 A.   Correct.  Usually there is an info page or an
19 FAQ.
20 Q.   Thank you.
21        Now the last thing I want to talk to you
22 about -- well, first two things:  The CART report,
23 that report of the list of text messages and
24 websites and all of the Google searches and
25 everything that was done on that.  We went over this

 1  earlier in the guilt phase with another witness.

 2  But if you could refresh our recollection, how long

 3  did he spend on each of those pages?

 4  A.   Again, I probably need it in front of me.  I

 5  know that some of those pages it was a brief short

 6  time.

 7  Q.   Minutes?

 8  A.   Yes.

 9  Q.   Not exactly extensive research, right?

10  A.   It depends on -- I don't know the extent of if

11  there was any sort of removal of search history that

12  would have obfuscated total amount time.

13  Q.   That's total speculation on your part, isn't it?

14  A.   It is.  It is.

15  Q.   The evidence presented says that he was on a few

16  minutes; isn't that correct?

17  A.   The documents that we have show minutes.

18  Q.   With regards to the text messages that you read

19  on the report from Ms. Bullis on, I think, May 25th,

20  you use the word "sic" several times when you were

21  talking.  Can you explain to the jury what that

22  means please?

23  A.   I'm sorry.  It's in reference to when there is

24  like a grammar type error.  Like if someone is

25  trying to type one thing, but it may be spelled

1  correctly but it's out of context, I think that a

2  common one is if someone uses to, t-o-o, instead of

3  to, t-o.  Sometimes on transcript forms you will see

4  in brackets "s-i-c" or "sic" to indicate what is

5  being read is what is being written to indicate bad

6  grammar.

7  Q.   Meaning there was a mistake?

8  A.   Correct.

9  Q.   Now, with regards to the spelling errors that

10 were in those text messages, I believe that you

11 actually -- you articulated those spelling errors

12 instead of "be," it was "he," and there were

13 basically a bunch of spelling and grammatical errors

14 in those text messages, correct?

15 A.   I think that there were two or three.

16 Q.   I think that I heard maybe four or five, but we

17 can disagree about that.  Kind of like somebody who

18 might be typing text messages while they are drunk,

19 right?

20 A.   I can't speculate as to his condition as he was

21 typing them.

22         MS. POLLOCK:  Thank you.  Nothing further.

23         THE COURT:  Mr. Freres.

24         MR. FRERES:  Thank you, Your Honor.

25

1                    REDIRECT EXAMINATION
2  BY MR. FRERES:
3  Q.   A couple things, Agent Manganaro.
4           First, you were asked about the defendant's
5  statements.  It's fair to say his statements to you
6  changed quite a bit as he was presented with new
7  information during those interviews, correct?
8  A.   Correct.
9  Q.   And he was sober during those interviews, wasn't
10 he?
11 A.   Yes.
12 Q.   Did his story about Yingying's ability to
13 communicate or navigate ever change during the
14 interviews?
15 A.   No.
16 Q.   Now, you were also asked about the bathroom and
17 what was or was not recovered in the defendant's
18 bathroom.  Do you recall that as well?
19 A.   Yes.
20 Q.   And is the bathroom, the shower, and everything,
21 is that filled with nonporous surfaces?
22 A.   Typically, usually a lot of porcelain.
23 Q.   And those are much easier to clean, are they
24 not?
25 A.   Yes.

1  Q.   In fact, did the defendant actually request and

2  receive professional cleaning on his bathroom in the

3  days after the abduction and murder?

4  A.   Yes.  The acid wash from the complex.

5  Q.   And that would have been acid wash applied in

6  the shower and in the tub?

7  A.   Correct.

8  Q.   In spite of all of this, there was a suggestion

9  there was no evidence of anything in the bathroom,

10  but there was information that was recovered during

11  the course from the bathroom, isn't that correct?

12  A.   Yes.  Although there was no, you know, DNA

13  recovered, Sage, the canine dog, did indicate in the

14  bathroom.

15  Q.   And that was the only place Sage alerted in the

16  apartment for the smell of cadaver?

17  A.   Correct.

18  Q.   You were also asked about FetLife and whether or

19  not you could find various things on FetLife.  Would

20  it be fair to say that the forensic analysis of the

21  defendant's phone or electronic devices showed that

22  he deleted much of his online electronic footprint?

23  A.   Correct.

24  Q.   And that would make it difficult, if not

25  impossible, to recover much of that; is that

SENTENCING -- July 9, 2019 (Morning)        87

1  correct?

2  A.   It could.

3  Q.   And nevertheless, there was still records and --

4  highlight FetLife in particular -- from FetLife that

5  was recovered, what he was doing on FetLife in the

6  months leading up to the abduction, correct?

7  A.   Correct.

8        MR. FRERES:  Just one more time here.  Can

9  we put up page Exhibit 35, page 7, please, Staci.

10 BY MR. FRERES:

11 Q.   In fact, this is indicative of what the

12 defendant was doing in planning on FetLife in the

13 weeks and month leading up to the Yingying's

14 conversation, wasn't it?

15 A.   Yes, this is the conversation that we read

16 earlier.

17 Q.   And the conversation where he is talking about

18 binding and gagging a woman and putting her in the

19 duffle bag.

20 A.   Correct.

21       MR. FRERES:  Thanks, Your Honor.  No further

22 questions.

23       MS. POLLOCK:  Recross, Your Honor.

24       THE COURT:  You may.

25

1                     RECROSS-EXAMINATION

2   BY MS. POLLOCK:

3   Q.   Let's go backwards to forwards this time;

4   FetLife.com.

5           You and your fellow agents, regardless of

6   what the defendant did with to his own telephone,

7   subpoenaed records from FetLife; correct?

8   A.   Correct.

9   Q.   Google?

10  A.   Correct.

11  Q.   Every other possible company you thought you

12  might be able to get information from, OKCupid,

13  PlentyOfFish, Reddit, et cetera, et cetera, correct?

14  A.   Yes, OKCupid, Reddit.

15  Q.   Right.  And you did get responses to most of

16  those search warrants and subpoenas that you issued,

17  correct?

18  A.   Yes.

19  Q.   Which he could not have done anything about

20  because they were not in his possession, right?

21  A.   Correct.  These were records maintained by those

22  companies.

23  Q.   Thank you.  So with regards to FetLife, I mean

24  you got FetLife information from some.  You also got

25  information from FetLife, correct?

 1  A.   Yes, we got some from FetLife.
 2  Q.   That included the conversation that Mr. Freres
 3  is he referring to by this consensual plan to have a
 4  fantasy with a woman?
 5  A.   I believe that was part of those records.
 6  Q.   Right.  And that was the only conversation he
 7  ever had on FetLife.com about that topic or really
 8  any other, isn't that right?
 9  A.   To my recollection that was the only one on that
10  topic.
11  Q.   Okay.  Just to refresh everyone's memory, how
12  many friends did he have on FetLife?
13  A.   Not very many.
14  Q.   Four or five, something like that?
15  A.   Yes.  I believe it was Terra Bullis, one of her
16  other friends; it wasn't very many.
17  Q.   Now, I think it was misspoken about the
18  bathroom.  Miss Zhang's DNA was never found in the
19  bathroom, correct?
20  A.   Correct.
21  Q.   But there was DNA found in the bathroom, wasn't
22  there?  It was Mr. and Mrs. Christensen's or, I
23  suppose, at least Mr. Christensen's but a
24  male/female mixture; do you recall that?
25  A.   No.

1  Q.   From the sink?  Do you remember the sink?

2  A.   Yes.

3  Q.   So, despite massive amounts of cleaning,

4  including, allegedly, Drano; DNA was still recovered

5  from the bathroom, correct?

6  A.   I believe it was in the sink trap.

7  Q.   You are correct it was the sink trap.  With

8  regards to -- let's see.  Oh, that's right, the dog.

9  Let's talk about the dog for a second because Sage

10  alerted in the bathroom as you stated.

11          A cadaver dog is trained to alert to sense

12  of blood, decomposition, human tissue, et cetera;

13  and also the residual odor that is left behind by

14  those substances, correct?

15  A.   I believe that's what Officer Bruketta testified

16  to, yes.

17  Q.   That's correct.  And in your work as an FBI

18  agent, you are obviously familiar with canines, you

19  have worked with them before?

20  A.   Yes, but I have never been a handler, so....

21  Q.   Understood.  But you were sitting here and you

22  acknowledged that that is what a K9 handler trains

23  their dog to alert to, correct?

24  A.   Correct.

25  Q.   One of the things that a K9, who is trained

1 adequately, might alert to, I don't know, a pile of

2 blood on the floor, wouldn't you say?

3 A.   Again, I can't, you know, testify as to why Sage

4 did not indicate to, you know, any other location.

5 Q.   So let's just do this.  If we are to believe

6 that Sage is reliable, that Sage alerted to the odor

7 of cadaver in the bathroom, that means that Sage

8 alerted to a place where nothing was and yet failed

9 to alert to the rest of the apartment where a ton of

10 biological evidence was, correct?

11 A.   All I can say is he alerted in the bathroom and

12 that was the only place.

13          MS. POLLOCK:  Nothing further.

14          THE COURT:  Mr. Freres.

15          MR. FRERES:  I will keep this brief, Your

16 Honor.

17               FURTHER REDIRECT EXAMINATION

18 BY MR. FRERES:

19 Q.   Fact:  Sage alerted.  It was underneath the

20 vanity in the bathroom, correct?

21 A.   Yes.

22 Q.   Not a common place they clean in the bathroom?

23 A.   No.

24 Q.   And the phone that you were discussing, there

25 was some discussion about FetLife records and what

1  was on FetLife; that was records that we just

2  discussed related to the consensual kidnapping and

3  the binding and the gagging and the duffle bag;

4  those were recovered from the defendant's phone,

5  correct?

6  A.   Correct.

7  Q.   It was a page that had been stored on his phone,

8  not from the records itself, correct?

9  A.   They were on his phone, yes.

10  Q.   And then finally, there was some discussion

11  about the search itself.  The search the FBI did in

12  the apartment was on June 30, correct?

13  A.   Correct.

14  Q.   This would have been three weeks after June 9,

15  correct?

16  A.   Correct.

17  Q.   And that would have been the day that Yingying

18  was abducted?

19  A.   Yes.

20        MR. FRERES:  Thank you.  No further

21  questions.

22        MS. POLLOCK:  No re-cross.

23        THE COURT:  Thank you.  You may step down.

24        All right.  Ladies and gentlemen, let's

25  break for lunch and resume at 1:30.  When you come

1  back, I will give you an idea of where we are with

2  the government's case, and at least the rest of the

3  day, and maybe what the next couple of days look

4  like, all right?

5          Please do not discuss this matter with

6  anybody, including yourselves.  We will see you at

7  1:30.

8          And, Counsel, if you will just stay put for

9  a minute, I need 60 seconds after the jury leaves.

10          (Jury absent, 12:11 p.m.)

11          THE COURT:  All right.  Thank you.  Please

12  be seated.

13          I want to address the three matters.  I'll

14  only need 60 seconds.

15          First, the defense with regard to the

16  Supplemental Order to Show Cause set with the

17  Illinois of University.  I have set that for noon on

18  Thursday.  You should have got an email on that.

19  The government was included on that email even

20  though you're not a party to it.

21          With regard to the government filing as to

22  the subpoena, 452.  I'm going to ask if the parties

23  can confer and see if there is some agreement that

24  can be reached on what can and cannot be or should

25  not be allowed before I address it.

 1          And with regard to 453, I realize the
 2 government hasn't had a chance to respond yet to the
 3 Supplemental Motion to Strike Victim Impact
 4 Evidence.  Let me say this:  First of all, having
 5 heard it now, I think my rulings are still correct
 6 in that it does not require that evidence of
 7 aggravating and mitigating factors be admissible
 8 under the rules of evidence, that the probative
 9 value not be outweighed by the danger of confusing
10 or prejudicing the jury.  But having said that, this
11 could have been -- all of these issues on victim
12 impact, and specifically this one as to the videos,
13 I believe could have been avoided or addressed any
14 time after October 2018 when the videos were made,
15 as I understand it, unless, and correct me if I'm
16 wrong, the defense was not aware of the videos until
17 just recently.  And if they had been disclosed or in
18 some fashion the defense made aware, we could have
19 addressed all of these issues well in advance of
20 doing so on the mornings of trial.
21          So having said that, I believe the defense
22 if they tender one, I've looked at the one you have
23 tendered; I've rewritten one, would be entitled or I
24 would give an instruction, which I think is
25 appropriate at the end of the case addressing the

 1  video.

 2        I'm not going to give the one that's

 3  tendered.  I will read something to this effect and

 4  let both parties weigh in in our conference on

 5  instruction.  It would be something like this:

 6        *You have presented victim impact testimony*

 7  *by way of video.  These videos were conducted,*

 8  *produced, translated and edited by the government.*

 9  *The defense had no opportunity to participate in any*

10  *aspect of the video production, translation or*

11  *editing.  The defense had no opportunity to question*

12  *or cross-examine the witnesses and was not provided*

13  *notice of the videos at the time they were made.  I*

14  *allowed the government to present the evidence to*

15  *you in this case as victim impact evidence.  You're*

16  *instructed now that during your deliberations you*

17  *can take into consideration -- you can take this*

18  *into consideration when evaluating this evidence, so*

19  *something to that effect.  If tendered, I would*

20  *consider both sides will weigh in on that; we will*

21  *address that, I think at the -- when we have our*

22  *conference on instructions.*

23        And if I've incorrectly stated the facts

24  leading up to this, we can address that as well.  If

25  either party wants to be heard now, we can do it.

 1  Otherwise, let's take our lunch recess.

 2          MR. NELSON:  Your Honor, if I may, I'm not

 3  going to address the proposed instruction, but we

 4  may submit a similar instruction with regards to

 5  Rule 12.2, information that we were not allowed to

 6  rebut.

 7          THE COURT:  Okay.  Let me ask what can I

 8  expect starting at 1:30?

 9          MR. MILLER:  I believe that we will have our

10  interpreter here and we will have the testimony from

11  the victim's brother and her father.

12          THE COURT:  Brother and father.

13          MR. MILLER:  And followed by testimony from

14  Agent Huckstadt.

15          So we will need -- we will see if we have an

16  agreement on the interpreter.  If not, I think that

17  we have to have her make a record and then have her

18  sworn by the Court before she --

19          THE COURT:  Well, the interpreter will be

20  here for the brother and the father, right?

21          MR. MILLER:  Yes.

22          THE COURT:  In court.

23          MR. MILLER:  Yes.

24          THE COURT:  And then you're expecting the

25  video of the mother, or do you think that we will

SENTENCING -- July 9, 2019 (Morning)        97

1  get to that today?

2          MR. MILLER:  Yes, I believe we will.

3          THE COURT:  You think that you might rest

4  today.

5          MR. MILLER:  We may.  Yes, Your Honor.

6          THE COURT:  Okay.  Very good.  We will see

7  you at 1:30.

8              (Recess, 12:16 p.m.)

9                      *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25