1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
2

3

UNITED STATES OF AMERICA,
4                                    Docket No. 17-20037
              Plaintiff,
5
      vs.                            Peoria, Illinois
6                                    July 11, 2019
                                     9:00 a.m.
7   BRENDT A. CHRISTENSEN,

8              Defendant.

9

10

11        SENTENCING -- July 11, 2019 (Morning)

12

13

        BEFORE THE HONORABLE JAMES E. SHADID
14
             UNITED STATES DISTRICT JUDGE
15

16

17

18

19             NANCY MERSOT, CSR-RPR
             Official Court Reporter
20             U.S. District Court
             100 N.E. Monroe Street
21           Peoria, Illinois 61602
                309-671-4244
22

23

24

Proceedings recorded by mechanical stenography;
25  transcript produced by computer.

SENTENCING -- July 11, 2019 (Morning)          2

```
 1
    For the Plaintiff:       EUGENE L. MILLER, ESQUIRE
 2                           BRYAN D. FRERES, ESQUIRE
                             Assistant United States Attorneys
 3                           201 South Vine Street
                             Urbana, Illinois 61802
 4                           217-373-5875

 5                           JAMES B. NELSON, ESQUIRE
                             U.S. DEPARTMENT OF JUSTICE
 6                           Capital Case Section
                             1331 F Street NW, Suite 625
 7                           Washington, DC 20004
                             202-598-2872
 8

 9  For the Defendant:       GEORGE F. TASEFF, ESQUIRE
                             Assistant Federal Public Defender
10                           401 Main Street, Suite 1500
                             Peoria, Illinois 61602
11                           309-671-7891

12                           ELISABETH R. POLLOCK, ESQUIRE
                             Assistant Federal Public Defender
13                           300 West Main Street
                             Urbana, Illinois 61801
14                           217-373-0666

15                           ROBERT L. TUCKER, ESQUIRE
                             Robert L. Tucker, Esq
16                           7114 Washington Avenue
                             St. Louis, Missouri 63130
17                           703-527-1622

18                           JULIE C. BRAIN, ESQUIRE
                             Attorney at law
19                           916 South 2nd Street
                             Philadelphia, Pennsylvania 19147
20                           267-639-0417

21

22

23

24

25
```

1                          I N D E X

2                                                    Page

3
     DEFENDANT'S WITNESSES:
4
             SMITHA VISHVESHWARA
5    Direct Examination                                6

6
             RITA GARRIDO-MENACHO
7    Direct Examination                               14
     Cross-Examination                                27
8
             DAVID BELK
9    Direct Examination                               39
     Cross-Examination                                52
10
             TELEMACHOS MOUSCHOVIAS
11   Direct Examination                               53
     Cross-Examination                                62
12
             ELAINE SCHULTE
13   Direct Examination                               65
     Cross-Examination                                77
14   Redirect Examination                             81

15           NADYA MASON
     Direct Examination                               81
16   Cross-Examination                               102
     Redirect Examination                            108
17
             LANCE COOPER
18   Direct Examination                              110
     Cross-Examination                               133
19

20

21

22

23

24

25

```
 1              (In open court, 8:57 a.m.)
 2         THE COURT:  Okay.  All the jurors have
 3  arrived.
 4         Let's go on the record of matter of the
 5  United States v. Mr. Christensen, 17-20037.
 6         Mr. Christensen present with his attorneys:
 7  Mr. Tucker, Ms. Brain, Ms. Pollock, Mr. Taseff.
 8         The government by Mr. Miller, Mr. Nelson,
 9  Mr. Freres, with Agents Manganaro and Huckstadt.
10         It's my understanding, Mr. Taseff, you're
11  waiting on what would be your first witness.
12         Mr. Taseff just stepped out to check?
13         MS. POLLOCK:  Yes.
14         THE COURT:  You are waiting on what would be
15  your first witness?  And Mr. Taseff, any reports on
16  when you think your witness will be available?
17         MR. TASEFF:  Any minute, Judge.  At
18  8:25 a.m. I called him and he was just turning off
19  Route 18 to Route 29 at or near Henry, Illinois.
20  And he is traveling due south on 29 through
21  Chillicothe, Peoria Heights, and into the city of
22  Peoria, so I told him to come straight on through.
23         He is a school teacher from Stevens Point.
24  He is teaching summer school, so he got up very
25  early this morning to drive from Stevens Point to
```

 1  Peoria.  He should be here very shortly.

 2         THE COURT:  Let me ask this:  Because we can

 3  wait, I don't know -- how long do you think that he

 4  will be as a witness?

 5         MR. TASEFF:  Very short.  Very short.

 6         THE COURT:  Maybe it makes sense to wait,

 7  but the second witness you plan to call, how long is

 8  that witness going to be?

 9         MS. POLLOCK:  15 to 20 minutes.

10         THE COURT:  Do you want to get one started,

11  15 to 20 minutes is not very long.

12         MS. POLLOCK:  At the Court's pleasure.

13         MR. TASEFF:  That's fine.

14         THE COURT:  Then when the gentleman comes

15  in, is this Mr. Belk?

16         MR. TASEFF:  Mr. Belk.

17         THE COURT:  Then somebody can help him to

18  get situated.  He won't have to rush right in and go

19  right to the witness stand.

20         With that, is there anything to address

21  before we bring the jury in?

22         MS. POLLOCK:  No, Your Honor.

23         THE COURT:  Okay.  Let's have the jury in.

24         (Jury present, 9:12 a.m.)

25         THE COURT:  Thank you.  Please be seated.

```
 1            All right.  Next witness for the defense.
 2            MS. POLLOCK:  Your Honor, the defense calls
 3  Smitha Vishveshwara.
 4            THE COURT:  Ma'am, will you please come
 5  forward.
 6                  SMITHA VISHVESHWARA,
 7  after having been duly sworn, testified as follows:
 8                  DIRECT EXAMINATION
 9  BY MS. POLLOCK:
10  Q.   Good morning.  Will you please state your full
11  name for the court reporter?
12  A.   Smitha Vishveshwara; S-m-i-t-h-a,
13  V-i-s-h-v-e-s-h-w-a-r-a.
14  Q.   And where are you employed?
15  A.   At the University of Illinois at
16  Urbana-Champaign.
17  Q.   What is your position at the U of I?
18  A.   I'm on the faculty in the Department of Physics.
19  Q.   Where did you do your undergrad education?
20  A.   Cornell University.
21  Q.   And what about your post-undergraduate?
22  A.   I did my graduate studies in University of
23  California at Santa Barbara, and then I came to U of
24  I as a full doctoral student, and I stayed on as
25  faculty there.
```

```
 1  Q.   What types of courses do you teach?
 2  A.   Well, the whole spectrum from introductory
 3  undergraduate to advanced undergraduate, and then
 4  also the graduate level.  I was advisor for my own
 5  Ph.D. students.
 6  Q.   So you're a Ph.D. advisor?
 7  A.   I am.
 8  Q.   What is the area of research?
 9  A.   It's called condensed matter physics.  It's a
10  particular branch of physics.
11  Q.   I don't think we'd probably understand any more
12  of that anyway so that's fine.
13          How many students do you have working under
14  you as a research advisor at any given time?
15  A.   So as far as mentoring my own doctoral students,
16  Ph.D. students, it would average anywhere between
17  two to four.
18  Q.   Okay.
19  A.   So that's the primary sort of one-on-one
20  mentoring that I would be doing.
21  Q.   Understood.  And were you employed in this
22  position at the University of Illinois in 2013, '14
23  and '15?
24  A.   Yes.
25  Q.   Do you know Mr. Christensen?
```

 1  A.   Yes.

 2  Q.   And how do you know him?

 3  A.   So, I have -- well, okay, so one of the

 4  introductory courses that I was teaching back then

 5  was Physics 101, mechanics and heat.  How much do

 6  you want me to describe, just what roles we had?

 7  Q.   Absolutely.

 8  A.   Do you want me to describe the course?

 9  Q.   Talk about the course a little bit and then what

10  it was like to teach the course?

11  A.   So, these are typically courses taken by

12  hundreds of students for a whole range of majors.

13  And typically, because it's such a large volume of

14  students, we would have a lecture.  We would also

15  have labs.

16       So the lectures would have these hundreds of

17  students attending, and then the lab sections would

18  have -- they would be broken down into smaller

19  sections of about 24 students each; and then after

20  that, we also would have discussion sections, which

21  were also broken down into about 24 students each.

22       So the lectures would have one or two

23  faculty members or instructors.  Both the lab and

24  discussions would have teaching assistants who were

25  almost always graduate students running each of

1  these.  And I was what is called a "discussion
2  coordinator," so I was in charge of all the teaching
3  assistants that were running these sections.  And so
4  then the teaching assistants were graduate students
5  including Brendt.  So I would meet with the whole
6  group, one-on-one -- sorry, not one-on-one -- I
7  would meet with the whole group once a week for
8  about an hour.
9  Q.   Let me ask you a question:  How many TAs does it
10 take to run the discussion and lab sections?
11 A.   Well, so, it takes about six, and so what they
12 would typically do is they would be in charge of
13 conducting, and I'll just talk about the discussion
14 because that was my job, they would conduct maybe
15 two or three sections a week so they would be
16 working with 24 students.  The idea there was to
17 help them work through problems.  And so, just to
18 get them to learn the material better you can't
19 learn it all from the lecture or just from the lab.
20         So typically what happens in a section is
21 that there would be a ten-minute presentation by the
22 teaching assistant on the concept, and then the
23 students would be all broken up into tables where
24 they discuss and work through problems.  So, then
25 there would be quizzes too, so then they get weekly

1 quizzes and they would get graded on this.  So in
2 our TA meetings -- and I would also run one such
3 discussion so I had hands-on experience doing this.
4 So in our TA meetings, we would typically get
5 together.  I would have six TAs, typically, and we
6 would go through the subject material for that
7 particular week.  We would try to think of teaching
8 methodologies.  We will break for how to grade the
9 quizzes, then also the other duties that the
10 teaching assistants had was to proctor exams.
11 Q.   Okay.  So it was in that capacity meeting with
12 yourself and with the six TA students getting them
13 ready for the week's work that you knew Brendt?
14 A.   Correct.
15 Q.   And how many interactions over the course of the
16 semester would you say that you had with him?
17 A.   So, it's about 14 weeks.  So typically that, and
18 usually before proctoring these exams, we would have
19 a very brief meeting where we would meet all of the
20 teaching assistants.  So maybe about between 12 to
21 18.
22 Q.   And just to get the time frame correct, do you
23 recall which semester you worked with Brendt?
24 A.   I believe it was fall 2015, so it would be from,
25 let's say, late August to perhaps mid December,

1  around that time frame in 2015.

2  Q.  Okay.  Thank you.

3       Now getting to know Brendt over the course

4  of this semester, did you form any impressions of

5  him as a teaching assistant?

6  A.  Yes, I would as of all teaching assistants.

7  Q.  What were those impressions?

8  A.  I would say -- so he was diligent, and so, like

9  I said, we haven't really, we didn't really meet

10 one-on-one, so it was a group, but of course each

11 person has their own personality and that would come

12 out.  And I would say he knew the material really

13 well, and sometimes when you have these discussions

14 like get long-winded because you're really trying to

15 understand the physics and understand how you would

16 teach the students and I would say that many times

17 he would be kind of the go-to person because he was

18 reserved but reliable.  And so, you know, sometimes

19 you just want a quick answer that summarizes the

20 heart of what that physics concept is and how you

21 would convey to the students, so he would do a good

22 job of that, yeah.

23 Q.  Was he effective as a teaching assistant in your

24 opinion?

25 A.  Yes.  And actually not just mine.  He did

1 receive -- so we all get ranked.  There is a -- what
2 is it called?  -- evaluation.  So there is an
3 evaluation that we get at the end, so he did very,
4 very well.  He was -- there is a list of instructors
5 ranked as excellent and he was on that list, and he
6 was also in the outstanding category, so....
7 Q.    Okay.  So fast forwarding to the summer of 2017,
8 were you made aware of his arrest in this case?
9 A.    Yes.
10 Q.    Did you have a reaction to seeing that on the
11 news?
12 A.    Yes.
13 Q.    What was that reaction?
14 A.    It was pretty shocking.
15 Q.    Why would you say that?
16 A.    Well, the whole circumstances is shocking in and
17 of itself.  I think we all agree.  Yeah, and then,
18 you know, obviously when you interact with somebody
19 in that capacity, you know, and I don't mean any
20 particular individual, you never know what happens
21 in their life outside, but if you just -- if I were
22 just to look at this particular individual, to me it
23 was just shocking that, you know, that, yeah, I
24 wouldn't have -- well, yeah.
25 Q.    Go ahead.  Finish your thought.

1  A.   I couldn't have imagined some situation like
2  this cropping up.
3  Q.   And is that based on your personal relationship
4  with him through your duties as his professor and
5  teaching?
6  A.   Yes, yes.
7           MS. POLLOCK:  Nothing further.  Thank you.
8           MR. FRERES:  No questions, Your Honor.
9           THE COURT:  Thank you.  You may step down.
10          Push that microphone away.  Thank you.
11          MS. POLLOCK:  Your Honor, if we could have a
12  minute.  At the Court's pleasure, I will see if the
13  one after that is available.
14          THE COURT:  And I just you can tell the
15  professor she -- I don't know if she was looking
16  whether she could stay or not.  She is free to stay
17  in court now.  Thank you.
18          MS. POLLOCK:  Your Honor, the defense calls
19  Rita Garrido-Menacho.
20          THE COURT:  Mrs. Garrido-Menacho, can you
21  come forward please and when you get to this point
22  raise your right hand.
23               RITA GARRIDO-MENACHO,
24  after having been duly sworn, testified as follows:
25               DIRECT EXAMINATION

 1  BY MS. POLLOCK:

 2  Q.   Good morning.

 3  A.   Morning.

 4  Q.   Can you please state your name and spell it for

 5  the court reporter?

 6  A.   First name is Rita, R-i-t-a.  Last name is two

 7  last names: Garrido, G-a-r-r-i-d-o; second last name

 8  is Menacho, M-e-n-a-c-h-o.

 9  Q.   Where do you currently live?

10  A.   I currently live in Champaign, Illinois.

11  Q.   And do you work?

12  A.   I worked at the University as a grad statute.

13  Q.   What graduate department are you in?

14  A.   Physics.

15  Q.   Are you finished yet?

16  A.   Not yet.

17  Q.   Almost?

18  A.   Almost.  Within a year or so.

19  Q.   Okay.  And who is your advisor at the University

20  of Illinois?

21  A.   Nayda Mason.

22  Q.   What is your area of study?

23  A.   It is condensed matter physics.

24  Q.   When did you begin attending the University of

25  Illinois?

1  A.   Fall of 2013.

2  Q.   Where are you from originally?

3  A.   Originally I'm from Peru, South America, but we

4  moved to Florida in 2003.

5  Q.   Okay.  Did you go to college, first, I assume?

6  A.   Yes.

7  Q.   Where was that?

8  A.   I did my undergraduate at Georgia Tech.

9  Q.   Once you finished at Georgia Tech, did you come

10  directly to the University of Illinois?

11  A.   Yes.

12  Q.   So you didn't take any time off in between?

13  A.   No.

14  Q.   Was the fall of 2013 also the year that Brendt

15  Christensen began the graduate program at the

16  University of Illinois?

17  A.   Yes.

18  Q.   So you two were in the same initial class?

19  A.   Yes.

20  Q.   So you know him from that time?

21  A.   Yes.

22  Q.   When you first arrived at the University of

23  Illinois, can you tell us sort of what your work

24  load was like and what your course load was like?

25  A.   So, initially -- for me it was a little

1 different because I came in with a fellowship.  So,

2 traditionally when you come in you TA, so you are a

3 teacher assistant, and you take classes, and you

4 look for a research group.  For me it was a little

5 different, since, because of my fellowship I didn't

6 have to TA, so I was mostly taking classes and

7 looking for a research group.

8 Q.   So when you come in, you take classes; are they

9 general, specific, undergrad, advanced; what kind of

10 classes do you take?

11 A.   So, there is only really three required courses

12 to take.  One of them is called Physics 596, which

13 is an intro class where professors come in and give

14 talks about their research to give the new students

15 a sense of the research that's happening in the

16 department.  And then the other two courses are

17 called breadth courses, and those you can choose out

18 of the list of courses.

19 Q.   So, when you said you had a fellowship, which

20 means you did not have to TA, does that mean that

21 that was kind of like a scholarship?

22 A.   Yes.  So I didn't TA -- I TA'd my first time my

23 third year of grad school.

24 Q.   I don't want to say regular, but when somebody

25 without having a fellowship does a teaching

1  assistantship, is that the way they get paid?

2  A.   Yes.

3  Q.   In order to support themselves during graduate

4  school, you have to teach or have some other source

5  of income?

6  A.   Yes.  So the other source of income would be a

7  research assistantship.  That is when you already

8  have advisors and they would pay you.

9  Q.   Okay.  Understood.  When you said you were

10 looking for an advisor looking for a group, can you

11 elaborate on that a little bit?

12 A.   Yes.  So coming in, unless you've talked to

13 professors ahead of time, you traditionally just

14 look at the website, look at what sort of research

15 interests you and then you kind of go talk to the

16 professor, so that's traditionally what you do, and

17 that's what I did.

18 Q.   When is it typical to join a research group?

19 A.   So it varies.  But ideally you want to do it end

20 of your first year, beginning of your second year.

21 Q.   So is the first year kind of like a get

22 acquainted time, take classes, get used to the

23 program, and then decide which direction you want to

24 go in?

25 A.   Yes.

Q.   And did you ultimately find a research group?

A.   I did.

Q.   And what was your research group?

A.   There was Nadya Mason's group, condensed matter physics.

Q.   Was Brendt also in that group?

A.   Yes.

Q.   Do you recall when you joined the Mason group?

A.   I would say I joined the spring of my first year, so that would be spring of 2014.

Q.   Do you recall when Brendt joined the group?

A.   Around the same time.

Q.   Around same time?

A.   Yep.

Q.   So when you join a group, does that mean that you are participating in research under the advisor's direction?

A.   Yes.

Q.   And do you pick your own research or does the advisor tell you what to research?

A.   Mostly the advisor tells you what projects you will be working on, yes.

Q.   Okay.  And when you -- the goal of a graduate program/doctoral program is to get a Ph.D.

A.   Yes.

 1  Q.  How do you go about getting that Ph.D.?  What
 2  process do you have to go through in order to
 3  graduate?
 4  A.  Yes.  So there is a few milestones that you have
 5  to hit along the way.  So first you have to have
 6  your required courses.
 7          Second, you have to take a qualifying exam
 8  at the end of your first year.
 9          Third, you have to take a preliminary exam,
10  which is a -- both you write a paper about what you
11  are proposing to do research on and you give a
12  presentation in front of a committee that you
13  choose.
14          And then the last thing is a thesis.
15  Q.  So that is the dissertation, the thesis, that's
16  the end game, right?
17  A.  Yes, uh-huh.
18  Q.  And about how long are dissertations in the
19  physics department generally?
20  A.  Average is six years.  But depending on what
21  group you join, if it's an experimental group, it
22  could take longer.  For me it will be about seven
23  years.  Sometimes it's less.  Sometimes it can be
24  five years, but on average, six.
25  Q.  Okay.  Thank you.  So, when you and Brendt

1  joined the group, what was your relationship like at

2  that time?

3  A.   When we joined the group, mostly for our group,

4  is an experimental group, so we have to get trained

5  on a lot of new equipment.  So our first semester

6  was just us signing up for training, getting trained

7  at the university.

8  Q.   And when you say "experimental group," can you

9  elaborate on that?

10 A.   Yes.  That means that we physically make

11 devices, that we test them; yeah, I don't know if

12 you want anything else; yeah.

13 Q.   So make devices for research in physics?

14 A.   Yes.

15 Q.   Understood.  What was he like during that time

16 frame when you guys were signing up for building

17 equipment and getting trained?

18 A.   When we first joined, I would say that he was

19 pretty driven.  I felt like he was actually ahead of

20 me getting trained.  Yes, so that's what I

21 remembered.

22 Q.   Did you have one-on-one interaction with him?

23 A.   Mostly when we were signing up for training or

24 just kind of getting used to the group, those would

25 be your interactions, talking about like what we

1  thought of the group and when we were getting
2  trained next.
3  Q.   Did Brendt talk a lot about his personal life?
4  A.   No.
5  Q.   Was he helpful in any way during that time?
6  A.   Yes, he was very helpful.
7  Q.   Can you describe how?
8  A.   So, when he would, like, for example, after we
9  were getting trained and we needed to use the
10  equipment, he would -- if I needed something, he
11  would let me know, like, *Oh, I can give you my time*
12  *if you like or I can switch my time around* -- that's
13  pretty common in our group.
14  Q.   When you were at work -- so I don't know that
15  everyone has a concept of what a physic's graduate
16  group looks like.  Can you describe where you worked
17  and what the setup was?
18  A.   Yes.  So, our specific lab is in the basement of
19  the Materials Research Laboratory on campus.  Our
20  lab, we do what is -- we do condensed matter
21  physics, so we have pretty complicated, pretty big
22  equipment in our lab that we do most of our
23  measurements, most of our experiments, and within
24  the same building on the third floor there is a lot
25  of micro-fabrication equipment.  That's where we

1  make the devices, then we measure them in our lab.

2  Q.   Okay.  So apart from where you make the devices

3  and where the large equipment is, did you have any

4  kind of an office or classroom or anything that you

5  worked in?

6  A.   Yes.  Not right away, but eventually we got an

7  office on the third floor of the same building.

8  Q.   Okay.  What was the set up like in there?

9  A.   It's mostly like a cubicle sort of set up.

10 There is about -- let's see -- like eight desks, so

11 we are all in the same office.

12 Q.   Okay.  So the whole group worked together in an

13 office?

14 A.   Mostly.  For the most part, for example, I would

15 spend most of my time in the lab, but a lot of

16 people used the office.  I personally don't, really,

17 uh-huh.

18 Q.   So did you have homework to do during that first

19 year and second year?

20 A.   Yes.

21 Q.   Did Brendt and you ever work together on

22 homework?

23 A.   Sometimes, yes.

24 Q.   Was he helpful to you during that time?

25 A.   Yes, he was helpful.

1  Q.   So, during the first year you said that he

2  appeared driven; the first year that you worked

3  together with him.  Did anything change after that?

4  A.   Yes.  I would say as we kind of got -- as we

5  went along in our Ph.D., maybe like the second, end

6  of our second year, maybe beginning of our third

7  year, I can't recall the exact time; but I feel like

8  maybe he had like a lull.  Definitely he was making

9  devices and they are very complicated devices, and

10  it just seemed like he was losing motivation.

11  Q.   Did it appear outwardly to you that he was

12  struggling with work?

13  A.   He never said anything to me but I just sort of

14  noticed that he stopped showing up to the meetings

15  or stopped showing up or work in the lab less,

16  that's what I've noticed.

17  Q.   Did he ever -- I guess the word is irritate

18  other group members with his behavior?

19  A.   I wouldn't say irritate.  I would say that

20  towards the end, I think towards the time where he

21  -- towards the end of his time in our group, the one

22  thing that came up was that he would be signing up

23  for time for this equipment, and this equipment,

24  just to give you a sense, is incredibly overbooked;

25  so you have to book it a week, two weeks ahead of

1  time.  So he would book time and not show up.  So
2  that would maybe bothersome to our lab mates just
3  because everybody is on a timeline.  So having to
4  wait a week to use the equipment is a big time sync
5  there.
6  Q.   Understood.  I think you mentioned earlier that
7  you did not have to TA initially because of your
8  fellowship but that you ultimately did choose to
9  teach.  Can you explain that decision?
10  A.   So I didn't choose -- so I didn't choose to
11  teach, actually.  It was my advisor she thought that
12  it was a good idea for me to have teaching
13  experience.
14  Q.   Is that for future employment purposes?
15  A.   Possibly, yeah, at the time I didn't know what I
16  wanted to do but for her being a professor, the
17  prestige she found, that that was a very powerful
18  skill.
19  Q.   Understood.  When you did begin to teach, were
20  you teaching the same courses as Brendt?
21  A.   That first time that I TA'd, yes.
22  Q.   And was that -- who was your supervisor at that
23  time?
24  A.   Smitha, she was the discussion coordinator.
25  Q.   That would have been in the fall of 2015?

1 A.   Yes, that would have been my third year, yeah.

2 Q.   Did you have any impressions of Brendt as a

3 teacher?

4 A.   For the most part there was one time that I did

5 -- was a substitute for him because he was out of

6 town or had something else going on.  I don't

7 remember why.  But for the most part his students

8 really liked him, is what I got when I substituted

9 for him.

10 Q.   What about socially, did Brendt hang out with

11 members of the group socially often?

12 A.   No, I would wouldn't say often.  We, as a group,

13 started having game nights, and he would, but those

14 were maybe two or three times and he was at those.

15 Q.   Two or three times, was that pretty much the

16 extent of your social interaction with him?

17 A.   Yes, I would say so.

18 Q.   And at the game nights, do you recall him

19 drinking alcohol at any time?

20 A.   Yes.

21 Q.   And on one of game nights, I think was it the

22 one at your house that he got drunk and had to wait

23 to drive?

24 A.   Yes, he had mentioned that he wasn't feeling --

25 he wanted to sober up before driving home.

 1  Q.   Okay.  So after he started to, I guess, slide

 2  downhill in term of his performance, were you aware

 3  of a time when he was asked to leave the Mason

 4  group?

 5           MR. NELSON:  Objection.  She's putting words

 6  in her mouth; that's not what she said.

 7           THE COURT:  You're asking:  There a time

 8  that he was asked to leave the group?

 9           MS. POLLOCK:  I thought it was a question.

10           THE COURT:  Go ahead.  You may answer.

11  BY THE WITNESS:

12  A.   I don't believe he was asked to leave the group,

13  not that I know of.  All I know is that it seems

14  that he hit a lull in the group, and at some point

15  there was a discussion with Nadya.

16  BY MS. POLLOCK:

17  Q.   So there was a discussion with Nadya.  Can you

18  talk about your knowledge of that?

19  A.   I don't know anything about it.  Sorry.

20  Q.   That's okay.

21  A.   This is me, like, I know that there was a

22  discussion at some point.  And eventually we found

23  out that he left the group, but I don't know if he

24  was asked to or if it was his choice.  I don't have

25  any knowledge of that.

1 Q.   Sure.  Can you summarize your understanding of
2 his performance from when you met him to when he
3 left the group?
4 A.   Yes.  So when I met him, I found him to be very
5 driven.  We joined the group at the same time.  We
6 were both making progress.  Eventually, after a
7 year, year and a half, it seemed like he had a lull
8 in his progress.  I would like to attribute -- I
9 think that it is partly due to the fact that his
10 assigned mentor at the time left the university.  So
11 he was sort of on his own for the better part of
12 that year.  So it seemed like he just kind of got
13 stuck and couldn't really, like, get it to work and
14 just sort of maybe grew frustrated at that point and
15 maybe lost some motivation.
16 Q.   What was his performance like at the end?
17 A.   Towards the end I definitely saw him less.  He
18 stopped showing to group meetings.  I saw him very,
19 very, very rarely in the office or in the lab, yeah.
20          MS. POLLOCK:  Okay.  Thank you.
21          THE COURT:  Cross-examination.
22          MR. NELSON:  Yes, Your Honor.  Thank you.
23                  CROSS-EXAMINATION
24 BY MR. NELSON:
25 Q.   Good morning.

 1  A.   Good morning.

 2  Q.   Now, you testified that you were in Professor

 3  Mason's group; is that right?

 4  A.   Yes.

 5  Q.   That's a competitive group; you have to apply to

 6  get in?

 7  A.   You don't have to apply.

 8  Q.   You don't have to apply?

 9  A.   No, I mean at least not in my case.  I just

10  talked to her and she just happened to have a

11  position available; so, yeah, I don't know the

12  process.  I don't know her process, uh-huh.

13  Q.   And other people and other students or reference

14  in the group included Steven Gill?

15  A.   Yes.

16  Q.   And also Malcolm Durkin?

17  A.   Yes.

18  Q.   Angela Chen?

19  A.   Yes.

20  Q.   And those people also had interactions with the

21  defendant?

22  A.   Yes.

23  Q.   Okay.  And at some point you have regular group

24  meetings for this research, right?

25  A.   For what reasons?

1  Q.   You have group meetings as part of your research

2  group?

3  A.   Yes.

4  Q.   And that's when you discuss your research and

5  your progress and people are working together as a

6  team; is that right?

7  A.   Everybody discusses their progress.  We all work

8  on different projects, so we don't necessarily work

9  together, but we use the same equipment so in that

10 sense we kind of give each other tips and advice,

11 but we are not physically working together on the

12 same project.

13 Q.   Okay.  At some point the defendant stopped

14 coming to these meetings, right?

15 A.   Yes.

16 Q.   I think that you said his drive lulled?

17 A.   Yes.

18 Q.   And that was sometime within the first year?

19 A.   I would say second year, maybe beginning of

20 third year.

21 Q.   Okay.  Do you recall being interviewed on

22 March 13, 2018?

23 A.   2018?

24 Q.   Yes, ma'am.  At the University of Illinois

25 Police Department?

1  A.   Yes.

2  Q.   Okay.  And do you recall saying that his drive

3  lulled in the first year, which would have been

4  around 2013, 2014?

5  A.   No, I do not remember.

6  Q.   Okay.  Now the defendant also had a reputation

7  in the group for being lazy, isn't that right?

8  A.   I don't think anybody ever said that.  I

9  personally thought that maybe he was losing drive.

10  I believe that I did call him a little lazy.

11  Q.   At some point he stopped trying?

12  A.   That was my impression, yes.

13  Q.   In fact he would book equipment time and not

14  show up, isn't that right?

15  A.   That's what we noticed.

16  Q.   And that equipment time, everybody needs that

17  equipment?

18  A.   Yes.

19  Q.   And if you reserve it, other people can't use

20  it?

21  A.   Yes.

22  Q.   Okay.  And everybody needs that equipment for

23  their research?

24  A.   Yes.

25  Q.   And so by reserving it and not using it, he's

1  basically screwing over the other people in the

2  research group, isn't that right?

3  A.   Yes.

4  Q.   And other people were trying, right?

5  A.   Yes.

6  Q.   And they are trying to get their Ph.D. and do

7  their research?

8  A.   Yes.

9  Q.   And the defendant never demonstrated any empathy

10 of blocking up this equipment and not using it, did

11 he?

12        MS. POLLOCK:  Objection.

13        THE COURT:  Overruled.  If she knows.

14        THE WITNESS:  Should I go ahead?

15        THE COURT:  You can answer.

16 BY THE WITNESS:

17 A.   Yes, he never showed any empathy, but at the

18 same time I personally didn't confront him with this

19 either.

20 BY MR. NELSON:

21 Q.   Okay.  That's fair enough.

22        And I understand you're just trying to get

23 your Ph.D., you're just trying to get your work and

24 move on; I understand.

25        Also there was another time when he set up a

1  measurement test with another research team, right?

2  A.   Yes.

3  Q.   And that other team made special time to meet

4  with him, help him out, right?

5  A.   Yes.

6  Q.   And he didn't show up for that meeting, did he?

7  A.   From what I was told, no.

8  Q.   And I believe you also said that he wasn't

9  particularly concerned with the results of his own

10  lab tests, isn't that right?

11  A.   It seemed like he was growing frustrated by the

12  lab tests, and, yeah.

13  Q.   He was also sort of careless with the equipment,

14  wasn't he?

15  A.   Careless in the sense he didn't show up, for

16  example, to that meeting that was set up with the

17  other research group.

18  Q.   I believe you said that it was your impression

19  that maybe in fact he sort of wanted his experiments

20  to fail.

21  A.   Yeah, I said that based on, like, sort of my own

22  experience.  Again, these devices are very hard to

23  make.  And at some point you make them like 20 times

24  and they still don't work and you're just sort of,

25  like, *what else do I need to do to make this work?*

1  And at some point you're just kind of like going

2  through the motions, yeah.

3  Q.   Sure.  I understand.  When his -- when it would

4  fail, would he just leave the lab, isn't that right?

5  A.   Yes.

6  Q.   And go home?

7  A.   Yep.

8  Q.   Now, you testified that you subbed for the

9  defendant as a TA on one occasion; is that right?

10 A.   I believe it was one, yes.

11 Q.   Okay.  And I think you said that there was a

12 quiz; is that right, when you subbed or you were

13 aware that there was a quiz?

14 A.   Yes, there is weekly quizzes, yes.

15 Q.   And on these quizzes the professors give two

16 forms, right, two quizzes?

17 A.   Yes.

18 Q.   And that's so the people can't cheat?

19 A.   Yes, that's the idea.

20 Q.   But if you only give one form, that's easier to

21 grade, right?

22 A.   Yes.

23 Q.   And I believe you said that the defendant only

24 gave the one form even though he was supposed to

25 give two, right?

1 A.   Yes, I believe so, yes.

2 Q.   And he was well liked by the people he TA'd for?

3 A.   Yes.

4 Q.   But I think you also said that he was more of a

5 buddy than a teacher?

6 A.   That's what I got from the students, yes.

7 Q.   Now, you also testified about these game nights.

8 A.   Yes.

9 Q.   Okay.  And there were a couple of those that the

10 defendant attended, isn't that right?

11 A.   Yes.

12 Q.   And this would have been 2015, 2016, give or

13 take?

14 A.   Around that time, I would say, yes.

15 Q.   Okay.  And during one of these game nights, the

16 defendant made a sexual advance at one of the other

17 students?

18        MS. POLLOCK:  Objection, Your Honor.

19 Violation of previous orders and Motion in Limine.

20        MR. NELSON:  We can approach, Your Honor.

21        THE COURT:  Let's approach.

22        (Proceedings held at sidebar.)

23        THE COURT:  Slow down.  All right.  First of

24 all --

25        MS. POLLOCK:  Angela Chen, which was

 1  excluded.

 2         MR. NELSON:  Her testimony was excluded but

 3  they've raised as a mitigator that he only

 4  participated in an open marriage because his wife

 5  made him and that he had to do it to save his

 6  marriage.  And a full year before they opened the

 7  marriage, he is making sexual advances at other

 8  students in his research group.

 9         THE COURT:  Why was Angela Chen's testimony

10  excluded?  Refresh me why.

11         MR. NELSON:  You excluded her from the guilt

12  phase because her relevance at the guilt phase would

13  have been that his attraction to Asian females would

14  have been useful to us in terms of demonstrating his

15  intent, which she was excluded by you for that

16  reason.

17         MS. POLLOCK:  She was excluded from the

18  penalty phase witnesses as well because it is

19  totally irrelevant and was prejudicial that he once

20  tried to kiss a girl in his group.

21         THE COURT:  What is her answer going to be?

22  Do we know what her answer is going to be?

23         MR. NELSON:  We interviewed her and she said

24  that he was in this group meeting and he texted

25  Angela Chen that he really wanted to kiss her.

SENTENCING -- July 11, 2019 (Morning)          36

1          THE COURT:  I don't know, is that a sexual
2   advance?

3          MR. NELSON:  Well, I've never offered to
4   kiss someone in a non-sexual way, personally, but
5   I'd defer to the Court's ruling on that.

6          MS. POLLOCK:  I still think that it is
7   overly prejudicial to bring in the fact that he was
8   attracted to an Asian female when that he got drunk
9   at a party.  We are talking about a game night, that
10  he persisted in saying that he was actually
11  intoxicated.  I don't think he's --

12         THE COURT:  So her testimony would be that
13  he said that he would like to kiss her or that he
14  tried to kiss her?

15         MR. NELSON:  No, I don't care that she was
16  Asian here; posed it as a mitigator.  That was
17  fundamentally --

18         MS. POLLOCK:  We posed it as a mitigator
19  that he only opened the marriage because his wife
20  asked him to, which is correct, and the fact that he
21  told her that he wanted to kiss --

22         MR. NELSON:  He's texting and hitting on
23  other women and he is opening the marriage.  There's
24  Facebook messages that he's interested in other
25  women and --

```
 1          THE COURT:  Why don't we rephrase it:  That
 2  night did you observe him making an advance to
 3  another woman?
 4          MR. NELSON:  I'm happy to do at that.  That
 5  was the only question.  And that will be it.
 6          (In the presence of the jury.)
 7          THE COURT:  Rephrase the question.
 8  BY MR. NELSON:
 9  Q.   During one of those game nights, did you observe
10  the defendant tell one of the other females in the
11  group that he wanted to kiss her?
12  A.   I didn't observe that; I was told after the fact
13  by the female student.
14  Q.   Okay.  Now, you also -- going ahead to June 29th
15  of 2017, you were at a bus stop when the Memorial
16  Walk was occurring.
17          MS. POLLOCK:  Objection; outside the scope.
18          MR. NELSON:  It is not outside the scope.
19          MS. POLLOCK:  It is, Your Honor.
20          MR. NELSON:  It's the observations of the
21  defendant, which is the entire scope.
22          THE COURT:  Go ahead.  I will allow the
23  question and see where it's going.
24  BY MR. NELSON:
25  Q.   You were present on campus the day of the
```

1 Memorial Walk; is that right?

2 A.   Yes.

3 Q.   And you saw the defendant that day participating

4 in the Memorial Walk?

5 A.   I did.  I was waiting at this bus stop across

6 from Krannert where the Memorial Walk happened and I

7 saw him there.

8 Q.   You said -- I believe you testified earlier that

9 he was not someone who would regularly attend social

10 gatherings on campus; is that right?

11 A.   Yes.

12 Q.   Based on that, did it strike you as odd that he

13 was participating in this?

14 A.   It did, yes, also, because I hadn't seen him in

15 a few months probably, yeah.

16 Q.   Okay.  But you don't know what reason he was

17 there for?

18 A.   No, I didn't know.

19       MR. NELSON:  Okay.  I have no further

20 questions, Your Honor.

21       MS. POLLOCK:  No redirect.

22       THE COURT:  All right.  You may step down.

23 Just push that microphone away.  You may step down.

24 Thank you.  You're free to stay or free to go,

25 whichever you choose.

1          MR. TASEFF:  Your Honor, we will call David

2   Belk.  I will go get him, please.

3          THE COURT:  Very good.

4          Sir, do you want to come forward please.

5                    DAVID BELK,

6   after having been duly sworn, testified as follows:

7                 DIRECT EXAMINATION

8   BY MR. TASEFF:

9   Q.   Sir, could you please tell us your name and

10  spell your last name for us?

11  A.   David Belk, B-e-l-k.

12  Q.   Could you make sure to speak up or maybe draw

13  the microphone a little towards your mouth?

14  A.   Okay.

15  Q.   Where do you live?

16  A.   Stevens Point, Wisconsin.

17  Q.   How far is Stevens Point, Wisconsin from Peoria,

18  Illinois?

19  A.   Almost five hours.

20  Q.   Did you experience that five-hour journey this

21  morning coming to court today?

22  A.   Yes, sir.

23  Q.   Are you single or married?

24  A.   Married.

25  Q.   How long have you been married?

 1  A.   Since '93.

 2  Q.   Do you have children?

 3  A.   No, sir.

 4  Q.   You and your wife live in Stevens Point?

 5  A.   Yes.

 6  Q.   How are you employed, sir?

 7  A.   I'm a teacher in the Stevens Point School

 8  District.

 9  Q.   How long have you been a teacher?

10  A.   27 years.

11  Q.   How long have you worked in Stevens Point?

12  A.   27 years.

13  Q.   Is the Stevens Point School District the one and

14  only district you have worked for as a teacher

15  during your career?

16  A.   Yes, sir.

17  Q.   Tell us about your education.

18  A.   My education?  I went to University of Stevens

19  Point.  From there, I also got a Master's Degree in

20  Education.

21  Q.   Were you born and raised in Stevens Point?

22  A.   No, sir.

23  Q.   Where were you born and raised?

24  A.   I was born in a town called Mauston, Wisconsin,

25  moved to Beaver Dam, then I went to college at the

1  University in Stevens Point.

2  Q.   And Stevens Point is one of the universities in

3  the University of Wisconsin system, correct?

4  A.   Yes, sir.

5  Q.   With Madison being the anchor campus?

6  A.   I believe so.

7  Q.   And branch campuses at Stevens Point and

8  elsewhere throughout the state?

9  A.   That is correct.

10  Q.   So you've spent a considerable amount of your

11  life living in Stevens Point then?

12  A.   Yes, sir.

13  Q.   Do you know the defendant in this case, Brendt

14  Christensen?

15  A.   Yes, sir.

16  Q.   Do you see him here in the courtroom today?

17  A.   Yes, sir.

18  Q.   Will you point him out?

19  A.   He's right there.

20       MR. TASEFF:  Let the record reflect the

21  witness has identified Mr. Christensen.

22       THE COURT:  It will.

23       Is he pointing to Mr. Brendt Christensen in

24  his white shirt, long sleeves, correct?

25       THE WITNESS:  Yes.

1            THE COURT:  Okay.  Go ahead.

2  BY MR. TASEFF:

3  Q.   How do you know Mr. Christensen?

4  A.   I coached him in track when he was in junior

5  high, and I also taught him in accelerated algebra

6  when he was also in junior high.

7  Q.   Would that have been around 2001, 2002?

8  A.   Yes.

9  Q.   When you taught him?

10  A.   Yes, it was right around 2002.

11  Q.   Sir, can you tell us what your initial

12  impressions or thoughts were?  Do you remember the

13  day that you learned that Brendt, one of your former

14  students, was charged in this case?

15  A.   I was surprised to hear it on the news.

16  Q.   Summer of 2017, a couple years ago?

17  A.   I think so.

18  Q.   You were surprised?

19  A.   Yes.

20  Q.   Were you shocked?

21  A.   It was hard to believe, yes.

22  Q.   Upon learning that news, did you recall the

23  young boy you taught in junior high?

24  A.   Yes.

25  Q.   Upon learning that he is now charged in federal

1  court with this very serious crime?

2  A.    Uh-huh.

3  Q.    Did you ever express that surprise to other

4  colleagues of yours in the teaching staff?

5  A.    Yes, a few colleagues talked about it.

6  Q.    Did they share your thoughts and sentiments?

7  A.    Yes.

8  Q.    They were shocked and surprised too?

9  A.    Uh-huh.

10  Q.    They recalled Brendt as well?

11  A.    A few of them that I talked to.

12  Q.    Back in 2002, you were teaching eighth grade

13  advanced algebra?

14  A.    It was a multi-level class, but, yeah, I believe

15  that Brendt was in eighth grade when he was in

16  there.

17  Q.    What kind of student was Brendt?

18  A.    He was a good student.  I remember a hard

19  working, quiet student.

20  Q.    Was he respectful to you?

21  A.    Yes.

22  Q.    Was he respectful to his other students?

23  A.    No.

24  Q.    Did he ever misbehave in class or require any

25  kind of disciplinary measures that you recall?

```
 1  A.   Not that I recall.
 2  Q.   Did you ever know him to be a troublemaker, a
 3  loud mouth or someone that was disrespectful of
 4  authority figures?
 5  A.   No, sir.
 6  Q.   Was he a good student?
 7  A.   Yes, sir.
 8  Q.   Now advanced algebra, I take it, that's for the
 9  advanced students in that grade?
10  A.   Yes.
11  Q.   An accelerated class?
12  A.   Yes.
13  Q.   A college prep type course?
14  A.   Yes.
15  Q.   Do you recall how Brendt did?
16  A.   I believe he was average, above average in the
17  class.
18  Q.   You mentioned that Brendt was also an athlete?
19  A.   Yes.
20  Q.   You coached at Stevens Point Elementary?
21  A.   Junior High.
22  Q.   Junior High.  The name of the junior high is
23  called what?
24  A.   P.J. Jacobs Junior High.
25  Q.   How many junior high schools are there in
```

 1  Stevens Point?

 2  A.    Two.

 3  Q.    Those two are?

 4  A.    Ben Franklin Junior High and then our junior

 5  high.

 6  Q.    So these are the two middle schools that would

 7  encompass grades what?

 8  A.    7, 8 and 9.

 9  Q.    Before students then matriculated to --

10  A.    To the high school, yes.

11  Q.    We've learned that another witness the Stevens

12  Point High School is called, it's name is Splits,

13  acronym, SPASH?

14  A.    Yes.

15  Q.    And that stands for what?

16  A.    Stevens Point Area Senior High.

17  Q.    So the two middle schools feed the high school?

18  A.    Yes.

19  Q.    Now back if 2002, how many students were at

20  Jacobs Middle School, approximately?

21  A.    I'm going to guess 800, somewhere around there.

22  Q.    Pretty good number?

23  A.    Yes.

24  Q.    And Stevens Point current population is what?

25  A.    I'm not positive on that one because there is

1 outlying communities that sometimes get thrown in,

2 I'm going to say 15,000.

3 Q.   Now, is the state university present in town as

4 well?

5 A.   Yeah.

6 Q.   Okay.  So you coached track at Jacobs Middle

7 School 2001, 2002?

8 A.   Yes.

9        MR. TASEFF:  May I approach, Judge?

10       THE COURT:  You may.

11 BY MR. TASEFF:

12 Q.   Sir, I'm going to show you Defense Exhibit 123;

13 123 and 124, and ask you to examine the 123.

14       Do you recognize the photograph, Defense

15 Exhibit 123?

16 A.   Looking like a track team.

17 Q.   And do you see Brendt Christensen in that track

18 picture?

19 A.   Yes.

20 Q.   Do you recall what year that might have been?

21 A.   Not exactly, but I'm -- it's 2002 or 2003.

22 Q.   Do you recall that particular track -- the track

23 team you coached at or about 2002, did that team

24 achieve any kind of success?

25 A.   Yes.

SENTENCING -- July 11, 2019 (Morning)      47

1  Q.   And what success was that?

2  A.   We were conference champions.

3  Q.   Your conference consisted of how many other

4  schools?

5  A.   Depending on the year, up to 11 teams.

6  Q.   Does 123 fairly and accurately depict the team

7  that you coached that won the conference that year?

8  A.   Yeah, I would say.

9        MR. TASEFF:  We move for admission and move

10  to publish 123, Judge.

11       MR. FRERES:  No objection.

12       THE COURT:  It will be admitted.

13  BY MR. TASEFF:

14  Q.   Showing you and asking you to examine 124 for

15  us.

16       Do you recognize the person depicted in that

17  photograph?

18  A.   Yes.

19  Q.   And who is that?

20  A.   Brendt receiving the baton.

21  Q.   What is Brendt doing in that photograph?

22  A.   Looks like he is running in the 4 by 100

23  receiving the baton.

24  Q.   And we see him with his SPASH uniform, his high

25  school uniform at that time?

SENTENCING -- July 11, 2019 (Morning)        48

1  A.    Correct, it says SPASH.

2  Q.    And he is accepting the baton from his teammate

3  in his left hand?

4  A.    Yes.

5  Q.    And he's in full stride?

6  A.    Yes.

7  Q.    What kind of athlete was Brendt when you coached

8  him?

9  A.    He was a very good athlete.

10         MR. TASEFF:  May I just have one moment,

11  Judge?

12         THE COURT:  You may.

13         MR. TASEFF:  Judge, if we may, we are having

14  technical problems.

15         THE COURT:  Do you want to switch it to the

16  ELMO or just display it?  Whatever you want to do.

17         MR. TASEFF:  I would like to switch it ELMO

18  if possible.

19         THE COURT:  Okay.  We can do that.

20         MR. TASEFF:  And if I may have the originals

21  from the witness, Judge.

22         THE COURT:  You may.

23         MR. TASEFF:  We move to publish 124 as well.

24         THE COURT:  You may publish both.

25         MR. TASEFF:  Thank you.

1 BY MR. TASEFF:

2 Q.   Sir, I'm going to place on the ELMO Defense

3 Exhibit 123, the team photograph.  Now you mention

4 that this is the team that you coached the

5 conference championship of 2002.  Do you recognize

6 many of these boys that appear there?

7 A.   I do recognize them.

8 Q.   Do you see Brendt Christensen in the photograph?

9 A.   In the upper left.

10 Q.   Would he be the upper left, which number from

11 the left?

12 A.   Second one.

13 Q.   So top row second from the left is the Brendt

14 Christensen you coached --

15 A.   Yes.

16 Q.   -- the conference championship then.

17        Now showing you also on the ELMO,

18 Exhibit 124.

19        Do you see Brendt Christensen in that

20 photograph?

21 A.   Yes, sir.

22 Q.   And is that him in the relay accepting the

23 baton?

24 A.   Yes.

25 Q.   And he's wearing his high school jersey?

1  A.   That is correct.

2  Q.   So he would have graduated from middle school

3  and continued in track at the high school level?

4  A.   Correct.  In 9th grade they go up to SPASH to

5  run track.

6  Q.   During the year that you coached Brendt

7  Christensen, there appears to be as many as, what,

8  20 boys on the team?

9  A.   From year to year fluctuates 20 to 50 boys.

10  Q.   Is track a pretty big program at Jacobs?

11  A.   I would say that it's a medium size program.

12  Q.   Back in 2002, when you coached this team, did

13  you expect -- did you expect a lot from your

14  athletes?

15  A.   I would say, yes, because every year I do.  And

16  that year we knew that we were going to do very well

17  in the conference.

18  Q.   Are the boys required to attend practices?

19  A.   Yes, sir.

20  Q.   Regular training?

21  A.   Yes, sir.

22  Q.   Some distance running?

23  A.   Occasionally.

24  Q.   Interval training?

25  A.   Yes.

1  Q.   Pretty demanding stuff for junior high boys,

2  isn't it?

3  A.   Uh-huh.

4  Q.   In terms of conditioning and dedication and

5  discipline?

6  A.   Yes.

7  Q.   Was Brendt a good athlete?

8  A.   Yes.

9  Q.   Was he respectful to you and your assistant

10  coaches?

11  A.   Yes.

12  Q.   Was he a team player?

13  A.   Yes.

14  Q.   Did he get along with his teammates?

15  A.   Yes.

16  Q.   Sir, is there anything else that you would want

17  the ladies and gentlemen of the jury to know about

18  the Brendt whom you knew and taught and coached back

19  in 2001, 2002?

20  A.   I just remember a quiet, respectful boy.  Didn't

21  say a lot in class but he worked.  He was a good

22  athlete.  He was one of our top triple jumpers and

23  he was a 100, 200 runner for us and he worked hard.

24  Q.   What is the triple jump?

25  A.   Some people call it the hop skip jump.  It's

1  where you have to take off with one foot, land on

2  that foot, hop to your other foot, and go into the

3  sand.

4  Q.   It's a pretty demanding physical activity, isn't

5  it?

6  A.   Yes.

7  Q.   And the sprints as well?

8  A.   Yes.

9  Q.   He was one of the top athletes you had?

10 A.   Yes.

11 Q.   In that event, in the sprints as well?

12 A.   Yes.

13        MR. TASEFF:  Thank you, sir.  Those are my

14 questions, Judge.

15        THE COURT:  Cross-examination, Mr. Freres.

16        MR. FRERES:  Yes, sir.

17        Thanks, Judge.

18                  CROSS-EXAMINATION

19 BY MR. FRERES:

20 Q.   Sir, did you have any contact with the defendant

21 after he left high school?

22 A.   The only contact I would have had is seeing him

23 at this SPASH track practice because our junior high

24 team would practice at the same facility as this

25 SPASH track.  After that, no.

 1 Q.   Do you know when that would have been?

 2 A.   That would have been when he would have been a

 3 sophomore, junior, senior, in high school.

 4 Q.   And so you're not really aware of the type of

 5 person that he chose to become after you dealt with

 6 him?

 7 A.   No, sir.

 8         THE COURT:  Mr. Taseff, anything?

 9         MR. TASEFF:  Nothing further, Judge.

10         THE COURT:  If you push that microphone

11 away.  You are excused.  If you are driving back

12 today, safe travels.

13         Next witness.

14         MS. POLLOCK:  Your Honor, the defense calls

15 Telemachos Mouschovias.

16              TELEMACHOS MOUSCHOVIAS,

17 after having been duly sworn, testified as follows:

18              DIRECT EXAMINATION

19 BY MS. POLLOCK:

20 Q.   Good morning, sir.  Can you please state your

21 name and spell it for our court reporter.

22 A.   Telemachos Mouschovias, T-e-l-e-m-a-c-h-o-s,

23 M-o-u-s-c-h-o-v-i-a-s.

24 Q.   Thank you, sir.

25         Where do you currently live?

 1  A.   In Urbana, Illinois.

 2  Q.   And are you employed?

 3  A.   Yes.

 4  Q.   Where at?

 5  A.   At the University of Illinois.

 6  Q.   What is your position at the U of I?

 7  A.   I am a professor with a joint appointment

 8  between physics and astronomy.

 9  Q.   What is area of study in physics?

10  A.   They're theoretical astrophysics.

11  Q.   Did you say theoretical astrophysics?

12  A.   Yes.

13  Q.   Do you teach courses?

14  A.   Yes.

15  Q.   What types of courses do you teach?

16  A.   From elementary ones to very advanced graduate

17  seminars, whatever I am assigned.

18  Q.   Okay.  How many courses do you teach per

19  semester?

20  A.   Typically, one.  Sometimes I accept an overload

21  because of traveling the following semester to have

22  some release for research abroad.

23  Q.   Understood.  Are some of the courses that you

24  teach large courses?

25  A.   Yes.

Q.   And when you teach those larger courses, are you
provided with teaching assistance from the
university?

A.   Sorry, yes.

Q.   Do you recall which courses you teach are large
enough that you get an assignment of TAs?

A.   The elementary physic courses are very large.
They have more than 1,000 students per semester.
The astronomy courses are typically the large ones
that I teach at, usually have 80 to a hundred
students.  In both of those we have teaching
assistants.

Q.   And when you have teaching assistants, what do
you expect from them?

A.   It depends on the course because the demands are
very different.

Q.   Can we talk about the physics, elementary
physics courses that you teach?

A.   Sure.

Q.   If you have over a thousand students per
semester taking a class, how many TAs are you
generally assigned to assist you?

A.   There were typically 19 or 20 TAs teaching
discussion sessions and that many teaching
laboratory sessions.  And there is one professor in

1 charge of the discussion sessions and another for

2 the laboratory ones.

3 Q.   Okay.  So in the spring semester of 2017, do you

4 recall teaching a course entitled Physics 211?

5 A.   Yes.

6 Q.   What is Physics 211?

7 A.   Elementary mechanics.

8 Q.   And approximately how many undergraduate

9 students were in that course?

10 A.   More than one thousand.

11 Q.   Did you have teaching assistants to assist you

12 that semester?

13 A.   Yes, 19 of them.

14 Q.   Was one of them Brendt Christensen?

15 A.   Yes, he was.

16 Q.   He is over here.  When you have teaching

17 assistants for a course that large, do you interact

18 personally with them?

19 A.   The students or the teaching assistants?

20 Q.   The teaching assistants.

21 A.   I try.  We have weekly -- at least my policy is

22 to have weekly meetings so as to discuss the

23 material of the next week and how they should

24 approach the sessions.

25        MS. POLLOCK:  May I approach, Your Honor?

 1          THE COURT:  You may.
 2   BY MS. POLLOCK:
 3   Q.   I've handed you what has been marked as
 4   Defendant's Exhibit 125.  It's several pages of
 5   emails.
 6          Do you recognize your email address on
 7   there?
 8   A.   Yes, I do.
 9   Q.   And do you recognize the email address of Brendt
10   Christensen?
11   A.   I do.
12   Q.   Can you look at the first page of Exhibit 125
13   and tell me what date that was sent?
14   A.   January 23, 2017, at 3:11 p.m.
15   Q.   3:11 p.m.  And who is that email between?
16   A.   It's from me to Brendt Christensen, and also has
17   an attachment below it from Brendt to me on the same
18   day at 2:32 p.m.
19          MS. POLLOCK:  Your Honor, permission to
20   admit and publish Defendant's 125.
21          MR. FRERES:  No objection.
22          THE COURT:  Admit and published.
23   BY MS. POLLOCK:
24   Q.   This email appears on the screen in front of you
25   also.  If you could look at that.

1            Is that the email that you are referring to

2    between yourself and Mr. Christensen at 3:11 p.m. on

3    January 23, 2017?

4    A.   Yes.

5    Q.   What is the content of the email that you're

6    discussing?

7    A.   Brendt informed me that there was a problem with

8    the transmission of his wife's car and he would not

9    be able to attend our weekly meetings for sometime.

10   Q.   And what did you respond to him?

11   A.   I offered to change the meeting time to a later

12   time so as to be able to pick up his wife which he

13   stated he needed to do on the days of our meetings.

14   Q.   Now this is in January of 2017, is this close to

15   the beginning of the semester?

16   A.   Yes.  The semester usually begins near the end

17   of the second week of January.

18   Q.   Okay.  And did you inform Brendt in these emails

19   that it was not acceptable for him to miss that many

20   meetings?

21   A.   Yes, I did.

22   Q.   Thank you.  All right.  So turn to the next page

23   of that please.  Can you tell me the date and time

24   of that next email?

25   A.   February 1, 2017 at 10:27 a.m.

 1 | Q.   Okay.  Go ahead.
 2 | A.   An email from Brendt to me and it has an
 3 | attachment below.  It appears to be a message from
 4 | me to the TA, the 19 TAs in the course.
 5 | Q.   Understood.  So if you look at the bottom of
 6 | that page, do you recognize a paragraph that says
 7 | Christensen?
 8 | A.   Yes.
 9 | Q.   And would that be a note that is directed
10 | directly to Brendt Christensen?
11 | A.   Yes.  I was addressing to him only because of
12 | the specific issue mentioned.
13 | Q.   What is the issue?
14 | A.   That he had missed a meeting.  We covered a lot
15 | of material and he should really talk with other TAs
16 | to find out what went on so as to be informed.  And
17 | I was bringing to his attention that he did not let
18 | me know whether pushing the starting time of the
19 | meeting from 6:00 to 6:30 or 7:00 would be helpful
20 | for his purposes of picking his wife up.
21 | Q.   Okay.  Now do you also state at the very bottom
22 | that this is not a viable option for him to continue
23 | missing meetings?
24 | A.   Yes, I do.
25 | Q.   Go around and flip to the next page of the

1  exhibit.

2           And what's the date on that one?

3  A.   March 31, 2017, at 11:45 a.m.

4  Q.   And who is this email between?

5  A.   At the top it's a response from me to another

6  one of the TAs by the name of Ryan Levy.  And it's a

7  response to what is shown at the bottom of the page

8  such that he was bringing to my attention that

9  Brendt was not fulfilling his obligations by keeping

10 his office hours.

11 Q.   Okay.  And you indicated to Mr. Levy that you

12 were also unable to reach Brendt?

13 A.   Yes.

14 Q.   And that you were worried?

15 A.   Yes, I did.

16 Q.   Go ahead and flip to the next page of the

17 exhibit and tell me the date and time of that email.

18 A.   It's an email from my colleague, Elaine Schulte,

19 March 31, 2017, at 12:50 p.m.

20 Q.   Okay.

21 A.   And it's a response to an email from me or --

22 here it is.  Of earlier that day bringing to her

23 attention because I was supposed to report to her

24 whenever any TA was not fulfilling an obligation or

25 not, and I did that, and I received the response

1  from her on top of the page.

2  Q.   Okay.  Now Professor Schulte, what was her

3  position at that time with respect to the TAs that

4  you're aware of?

5  A.   I'm not sure of her official title, but she is

6  the one who would take care of any discipline

7  actions, for example, or to talk with a TA

8  one-on-one as to why they are missing an assignment

9  or whatever.  I was explicitly instructed not to do

10 that myself, which I felt it was strange, but I had

11 to obey the rules.

12 Q.   Understood.  Can you flip to the next page of

13 the exhibit please.  And tell me the date and time

14 of that email.

15 A.   April 13, 2017, at 8:39 a.m.

16 Q.   Who is it between?

17 A.   From Elaine Schulte, again, to me and it's in

18 response to a report from me that two TAs, one of

19 whom was Mr. Brendt Christensen were missing

20 meetings.

21 Q.   This was further you providing that information

22 to Professor Schulte as a result of her need to deal

23 with the problem?

24 A.   There were probably one or two other oral

25 communications from me with her about TAs that did

1 not fulfill their obligations but this was a

2 returning one.

3 Q.  In this exhibit it looks like at least every

4 month you are either complaining about or receiving

5 complaints about Mr. Christensen's performance as a

6 teaching assistant for your class; is that accurate?

7 A.  That is correct.

8 Q.  Are you aware of whether or not there was ever

9 any action taken against him as a result of his

10 failures?

11 A.  I have never been informed by my colleague,

12 Elaine Schulte, as to what she did.

13        MS. POLLOCK:  Okay.  Thank you.  No further

14 questions.

15                CROSS-EXAMINATION

16 BY MR. FRERES:

17 Q.  Good morning, sir.

18 A.  Good morning.

19 Q.  Now the emails that you were just shown, you

20 still have this there in front of you.  And I

21 believe on it's January 23rd of 2017, the defendant

22 sent you an email claiming that he had a problem

23 with his wife's car; is that correct?

24 A.  Correct.

25 Q.  Were you aware that his wife's car was a Saturn

1  Astra?

2  A.   No, I did not have any other information other

3  than what is given in this email.

4  Q.   All right.  Then a little -- you responded to

5  him and informed him that him not showing up would

6  in fact be costly to his students, didn't you?

7  A.   Would be what?

8  Q.   Him not showing for these classes would be

9  costly to his students?

10  A.   I did that.

11  Q.   So it would have been an adverse impact on the

12  people that you would be teaching?

13  A.   Correct.

14  Q.   And he never responded to you, to your email

15  advising him of that, did he?

16  A.   All the communications are the ones that I

17  forwarded and testified on direct.  I don't have any

18  other communications from Mr. Christensen to me on

19  any other subject.

20  Q.   Yes, sir.  Thank you.

21       And then -- now just one final question

22  here.  Were you aware that prior to this point in

23  2017, that the defendant had already decided to

24  leave the physics Ph.D. program?

25  A.   No, I did not.

1          MR. FRERES:  Thank you, sir.

2          MS. POLLOCK:  No redirect, Your Honor.

3          THE COURT:  Thank you, sir.  If you want to

4  hand me those.  Thank you.  And you can push that

5  microphone away.  You're free to go.  Thank you.

6          MS. POLLOCK:  Your Honor, I believe now

7  would be an appropriate break point, if the Court

8  would like.

9          THE COURT:  Very good.  Let's take 15

10 minutes.

11         Please do not discuss this matter with

12 anyone, including yourselves.  Thank you.

13         (Recess, 10:22 a.m. to 10:39 a.m.)

14         THE COURT:  Okay.  Please be seated.

15         Anything we need to address before we bring

16 the jury in?

17         MS. POLLOCK:  Nope.

18         MR. MILLER:  No, Your Honor.

19         THE COURT:  Okay.  Let's bring the jury in.

20         Who is our next witness?

21         MS. POLLOCK:  Elaine Schulte, Your Honor.

22         (Jury present, 10:41 a.m.)

23         THE COURT:  All right.  Thank you, everyone.

24         Please be seated.

25         Call Ms. Schulte.

1          MS. POLLOCK:  The defense calls Elaine

2   Schulte.

3          Ms. Schulte, if you will come forward please

4   and raise your right hand.

5                      ELAINE SCHULTE,

6   after having been duly sworn, testified as follows:

7                   DIRECT EXAMINATION

8   BY MS. POLLOCK:

9   Q.   Good morning.

10  A.   Good morning.

11  Q.   Could you please state your name and spell your

12  it for the court reporter?

13  A.   Elaine Carol Schulte; E-l-a-i-n-e, C-a-r-o-l,

14  S-c-h-u-l-t-e.

15  Q.   Thank you.

16          And are you currently employed?

17  A.   Yes.

18  Q.   Where do you work?

19  A.   I work for the University of Illinois in the

20  Department of Physics.

21  Q.   You live in Champaign-Urbana?

22  A.   I do.

23  Q.   What is your current position at the Department

24  of Physics?

25  A.   I'm currently a senior lecturer and the

1 assistant director of undergraduate studies for the

2 Department of Physics.

3 Q.    How long have you held those titles?

4 A.    I held those titles starting on the 16th of

5 April 2019.

6 Q.    So that's a relatively new position for you?

7 A.    Correct.

8 Q.    What did you work as prior to obtaining that new

9 position?

10 A.    The previous title was -- excuse me -- manager

11 of -- excuse me -- manager of undergraduate of

12 introductory course.  It is the introductory course

13 manager with the rank of instructor.

14 Q.    So the manager of introductory courses, does

15 that have to do with those massive lectures where

16 thousands of people take the classes?

17 A.    That's correct.

18 Q.    And did you hold that position in 2017?

19 A.    I did.

20 Q.    So it sounds like you have kind of double duty:

21 you do teaching, and also manager managing; is that

22 correct?

23 A.    That's right.

24 Q.    Can you describe each of those for the jury

25 please?

1  A.   Certainly.  As an instructor, my primary role is
2  to lead groups of teaching assistants as they
3  perform their daily duties in their courses.  My
4  day-to-day duty has oscillated between two primary
5  activities:  the leader of discussions, called the
6  discussion coordinator, who leads a team of TAs.  In
7  my particular case my TA teams were usually between
8  five and six teaching assistants, as I taught one of
9  the smaller of the large classes; I have also been
10 the lab director, which does the same thing with the
11 teaching assistants with the labs.  Again, my
12 particular groups were somewhere in the neighborhood
13 of maybe five or six, maybe one or two more teaching
14 assistants.
15 Q.   So prior to starting this job at the University
16 of Illinois, did you have previous employment before
17 that?
18 A.   I did.
19 Q.   Where was that?
20 A.   I worked for Temple University in Philadelphia.
21 Q.   In what position?
22 A.   I was a research assistant professor.
23 Q.   And I assume you have a Ph.D. in physics?
24 A.   I do.
25 Q.   Where is that from?

 1  A.   University of Illinois, Urbana.

 2  Q.   When did you come from Temple to the University

 3  of Illinois?

 4  A.   In June of 2013.

 5  Q.   So that would have been two months before Brendt

 6  Christensen started graduate school at the

 7  University of Illinois?

 8  A.   To the best of my knowledge.

 9  Q.   So when you were acting as the introductory

10  course manager and supervising those teaching

11  assistants, you were in that role in the fall

12  semester of 2013?

13  A.   Yes.

14  Q.   Did you supervise Brendt Christensen as one of

15  those TAs?

16  A.   He was part of my TA team.

17  Q.   When you said "part of your TA team," would you

18  describe what your interactions would have been like

19  at that time?

20  A.   Certainly.  My interaction with the TA team,

21  which if I remember we had six or seven TAs that

22  particular semester, was to lead a weekly meeting.

23  I believe we led our meetings on Mondays once a week

24  where we went over the details of the tasks of the

25  week, this included making sure that the TAs

understood what the homework of the team was, how to
execute and answer questions about the discussion
problems the students were going to work in class,
what was on the quiz and how the quiz should be
graded.

Q.  And so you interacted with Brendt during that
first semester that he was there?

A.  I did.

Q.  Did you have an impression that has stayed with
you how he was or what he was like at that time?

A.  He seemed like every other teaching assistant in
the group.

Q.  Did he ever come to you with personal problems?

A.  Not that I can recall.

Q.  Did he ever come to you with a professional
problem that you can recall?

A.  Not that I can recall.

Q.  Just seemed like a normal person?

A.  I interacted with him as I interacted with the
other teaching assistants.

Q.  Did you have any contact with Brendt at all
after that semester until the spring semester of
2015?

A.  Only if he was teaching a course during those
intervening semesters as my other act -- my other

1  portion of my job is to manage the teaching

2  assistants on the whole, which includes doing things

3  like engaging in training activities, fielding

4  questions from the TAs as a whole, helping their

5  instructors who are leading the TA teams in other

6  courses, answering questions about absences,

7  scheduling office hours, things of that nature,

8  amongst many other duties.  So if he contacted or an

9  instructor contacted me about some issue that he

10  would have had or if he subbed for somebody, I might

11  have received a communication saying that he was

12  going to be a substitute, things of that nature.

13  Q.   Do you have any specific instances with personal

14  contact with Brendt between the fall of 2013 and the

15  spring of 2017?

16  A.   The only contact that I can recall during the

17  semester was actually during the semester of 2017.

18  Q.   We are going to get to that.

19  A.   Other than that, nothing other than routine

20  correspondence.

21  Q.   So you brought us right to the next point which

22  is that in the spring of 2017, you did have several

23  contacts with various individuals about Brendt

24  Christensen and his performance, correct?

25  A.   That's correct.

 1        MS. POLLOCK:  And Mr. Kelly, if I could have
 2   the screen.
 3        THE CLERK:  Ready, Ms. Pollock?
 4        MS. POLLOCK:  Yes.
 5   BY MS. POLLOCK:
 6   Q.   I'm showing you what has previously been
 7   admitted as Defense Exhibit Number 125.
 8        Do you recognize that email?
 9   A.   I do.
10   Q.   And do you remember the circumstances around
11   which this email occurred?
12   A.   I don't remember the specific details of what
13   happened for this email, specifically.  I do
14   remember that that particular semester we did have
15   several interactions with teaching assistants,
16   including Mr. Christensen in which we had some
17   similar difficulties usually surrounding not
18   attending office hours or meetings.
19   Q.   So this email is from Professor Mouschovias to
20   you on March 31, 2019, would be a standard
21   communication --
22   A.   That is fairly common communication.
23   Q.   One that you received from a professor if the
24   professor had an issue that they wanted you to
25   assist with?

SENTENCING -- July 11, 2019 (Morning)       72

 1 A.   Yes.

 2 Q.   And that would be in your capacity as at

 3 manager?

 4 A.   That's correct.

 5 Q.   So, you mentioned that there were several

 6 problems that semester?

 7        MS. POLLOCK:  Your Honor, may I approach the

 8 witness?

 9        THE COURT:  You may.

10 BY MS. POLLOCK:

11 Q.   Showing you what has been marked as for

12 identification as 126 and 127.

13        Can you take a brief look at those?

14 A.   Yes.

15 Q.   Do you see your email on that?  Do those

16 represent email communications that you had with or

17 regarding Mr. Christensen in the spring of 2017?

18 A.   That's correct.

19        MS. POLLOCK:  Your Honor, we move to admit

20 and publish 126 and 127.

21        MR. NELSON:  No objection.

22        THE COURT:  You may.

23        They will be admitted.

24 BY MS. POLLOCK:

25 Q.   I'm showing you on the screen an email on

1  March 9, 2017, between yourself and Mr. Christensen.

2  Do you see that?

3  A.   I do.

4  Q.   What is this email about?

5  A.   This email was about a list of students who had

6  missed TA meetings, one was these routine meetings

7  that I was trying to describe.  It was the

8  particular TA meetings in Physics 211, which was

9  being led by Mouschovias.  And he contacted me

10 informing me that the TAs, some of the TAs,

11 including Mr. Christensen, has not been attending

12 meetings.

13        In the course of my duties I contacted those

14 TAs to find out, in this case of Mr. Christensen,

15 why they had not attended the meeting.

16 Q.   Do you recall ever receiving a response from

17 that email?

18 A.   Not that I can recall.

19 Q.   Is that a common theme for you when you are

20 managing TAs for them just not to respond?

21 A.   It is not common for a TA not to respond at all.

22 Q.   All right.  I'm now going to put up an email

23 from May 9, 2017; do you see that?

24 A.   I do.

25 Q.   Can you describe the content and basis of this

1  email?

2  A.   Yes, this email surrounded an incident that

3  occurred during the final exam period of that

4  semester in which an exam had gone missing.

5  Q.   Why is that problem?

6  A.   That is a problem for two reasons.  In this

7  particular instance at the time we believed this to

8  be an exam that was assigned out to a particular

9  student, so we thought that a particular student's

10  final exam had gone missing.  In addition to this,

11  we do our best to recover all exams that are issued

12  to all of the teaching assistants to ensure the

13  security of the exam.

14  Q.   Security of the exam, is that so nobody can get

15  advance noticed of what's on it?

16  A.   That's correct.

17  Q.   And did he ever respond to that email with you?

18  A.   Not that I can recall.

19  Q.   Is that also --

20  A.   That was highly unusual.

21  Q.   Highly unusual.

22       So, during this spring semester of 2017, you

23  received other communications from various

24  individuals about Mr. Christensen's performance?

25  A.   Not that I can recall.  The things that I recall

1  were the ones that you presented and possibly one or

2  two others in the course of business as a name on a

3  list.

4  Q.   Okay.  What about phone calls, discussions,

5  communications with other people?

6  A.   Not that I can recall.

7  Q.   Okay.  Did you have an impression of Brendt's

8  performance as a teaching assistant during that

9  spring semester?

10 A.   As far as I knew his performance was acceptable.

11 Q.   Acceptable?

12 A.   Yes.

13 Q.   Did you think that it was unusual to miss as

14 many meetings as he missed?

15 A.   It is unusual for a teaching assistant to miss

16 all of the meetings without prior authorization or

17 most of the meetings without prior authorization

18 with the coordinating instructor who was the

19 coordinator for that lab.  It does happen usually

20 because there is some scheduling conflicts, student,

21 TA who is also a student might have a group meeting

22 or a class on his or her own that meet at the same

23 time.  Typically, they will inform us that they have

24 this problem.

25 Q.   Okay.  So you don't recall, other than the

emails that you had with Professor Mouschovias -- I

will never get that right -- that he was the one who

was teaching the course that Brendt was TA'g for

that semester, correct?

A.   Was the lead instructor for the discussions,

yes.

Q.   Did you have any knowledge of what Brendt's

status was in the doctoral program that semester?

A.   I had no knowledge of his status with his

doctoral.

Q.   Have you since?

A.   That he had left the program at the time that he

was a teaching assistant for us.

Q.   Okay.  And by "left the program" what do you

mean?

A.   He was no longer a doctoral student.

Q.   Are you aware that he had not been demoted but

taken a master's or gone back to the master's list

as opposed to getting a Ph.D.?

A.   Not at that time.  I learned it later.

Q.   You learned it later?  Okay.

In terms of the number of students that you

have to supervise every semester or did as a

manager, how many students was that?

A.   So of the graduate student teaching assistants,

1  overall there is between 100 or 120 teaching

2  assistants for the semester depending on student

3  enrollment, and there is in the order of 4 to 5,000

4  undergraduate students in our office at any one

5  time.

6  Q.   In one semester?

7  A.   In one semester.

8  Q.   That's a lot.  In terms of the number of

9  complaints that you received about Mr. Christensen,

10  which were -- I believe there was, there were two

11  from Professor Mouschovias, and then you had

12  additional emails with Mr. Christensen trying to

13  document where he was, why he wasn't showing up and

14  why he had misplaced or lost a final exam.  Do you

15  ever recall him getting back to you at all that

16  semester?

17  A.   I don't recall, no.

18            MS. POLLOCK:  Nothing further, Your Honor.

19            THE COURT:  Mr. Nelson.

20            MR. NELSON:  Yes, Your Honor.  Thank you.

21                  CROSS-EXAMINATION

22  BY MR. NELSON:

23  Q.   Good morning.

24  A.   Good morning.

25  Q.   Now you testified a moment ago that prior to

1  March of 2017, you didn't notice at the time, but

2  prior to March of 2017, the defendant had left the

3  Ph.D. program and moved to the master's degree

4  program?

5  A.   Correct.

6  Q.   And sometime thereafter he stopped going to

7  meetings?

8  A.   As far as I can tell.

9  Q.   And as far as you can tell, sometime after that

10  he lost an exam that he was proctoring?

11  A.   That's correct.

12  Q.   And the -- stop going to meetings, TA meetings,

13  and not going to office hours and things like that,

14  that is important because you're letting the

15  students down, right?

16  A.   Correct.

17  Q.   But losing the exam is a big deal because you're

18  letting the University down?

19  A.   That's correct.

20  Q.   In fact in this instance, the professor had to

21  rewrite the entire exam?

22  A.   I believe that's correct.

23  Q.   Because there was an exam out there and for

24  academic honesty you have to make sure that it is

25  just not out there being accessed?

1  A.   That's correct.

2  Q.   And there was never an apology from the

3  defendant about any of this?

4  A.   I didn't hear from him at all, no.

5  Q.   Now, you did testify that he wasn't the only TA

6  that didn't go to meetings, that was something that

7  happened?

8  A.   That was something that did happen that

9  semester, yes.

10  Q.   But you did say it was highly unusual that he

11  didn't respond to you at all.

12  A.   That was unusual, yes.

13  Q.   And in your experience, both in managing TAs and

14  as a human being, when somebody does something that

15  causes a hardship, maybe they apologize?

16  A.   We usually at least expect to hear from somebody

17  about where they were or why they missed the meeting

18  or explain what happened to the lost item.  We

19  usually expected something.

20  Q.   Some sort of empathy or remorse or something?

21  A.   Correct.

22        MS. POLLOCK:  Objection; motion to strike

23  "remorse."

24        THE COURT:  What was the question?

25        MR. NELSON:  She usually expected to hear,

1 somebody respond.  And I said some sort of empathy

2 or remorse or something in response to --

3          THE COURT:  We will leave it at empathy for

4 now.

5 BY MR. NELSON:

6 Q.  Now we talked about things that were common or

7 uncommon, and I'm just going back to my experience

8 here.  But in your experience, is it uncommon for

9 someone who has already gotten their degree locked

10 up and they are done -- they don't need letters of

11 recommendation, they don't need anything else from

12 anybody at the university -- is it uncommon for them

13 sort of to coast to the finish line?

14 A.  I'm not -- I'm not well versed in that

15 particular end of managing graduate students because

16 that's -- I work mostly with undergraduate.  I do

17 know that we have had graduate students who have

18 completed their degree and will stay on for a

19 semester and a summer and will be teaching

20 assistants as they look for further employment.

21 Other than that, that's the only cases that I'm

22 aware of.

23 Q.  But you are familiar with the term, I think it

24 is senioritis?

25 A.  Sure.

 1  Q.   So sometimes people do sort of coast to the end?

 2  A.   I'm sure they do.

 3         MR. NELSON:  Thank you, ma'am.

 4         THE COURT:  Ms. Pollock.

 5                  REDIRECT EXAMINATION

 6  BY MS. POLLOCK:

 7  Q.   In all of the years that you have managed

 8  graduate student TAs, you said that it was highly

 9  unusual for someone not to respond to an email like

10  the ones that you sent to Brendt?

11  A.   It is highly usual, particularly no more than

12  one.  One might get like this, but more than one is

13  unusual.

14  Q.   You would say that it is highly unusual even

15  people even with senioritis?

16  A.   Absolutely.

17         MS. POLLOCK:  Thank you.  Nothing further.

18         THE COURT:  Mr. Nelson.

19         MR. NELSON:  No, Your Honor.

20         THE COURT:  You can push that microphone

21  away.  I will take your papers and you're excused.

22         The next witness.

23         MS. POLLOCK:  The defense calls Nadya Mason.

24                  NADYA MASON,

25  after having been duly sworn, testified as follows:

```
 1                  DIRECT EXAMINATION
 2  BY MS. POLLOCK:
 3  Q.   Good morning.
 4  A.   Good morning.
 5  Q.   Can you please state your name and spell it for
 6  the court reporter?
 7  A.   Nadya Mason; N-a-d-y-a, M-a-s-o-n.
 8  Q.   And where do you live, Nadya?
 9  A.   Urbana, Illinois.
10  Q.   Are you employed?
11  A.   I am.
12  Q.   And where is that?
13  A.   At the University of Illinois at
14  Urbana-Champaign.
15  Q.   What is the your position there?
16  A.   I'm a physics professor.
17  Q.   What area of research do you engage in?
18  A.   Condensed matter experiment.  I work on
19  nanoscale quantum properties of materials, if that
20  makes sense.
21  Q.   Where did you attain your undergraduate degree?
22  A.   Harvard University.
23  Q.   How about your Ph.D.?
24  A.   Stanford University.
25  Q.   How did you end up in Illinois?
```

1  A.   It is the world's best condensed matter Physics

2  department, and I hope that goes on the record.  It

3  is a great place to work as far as collaborative,

4  and it has great research facilities and colleagues,

5  so I was happy to take a job there.

6  Q.   Okay.  Excellent.  When did you come to U of I?

7  A.   2005 -- 2005, right, 2005, yeah.

8  Q.   2005, got it.

9         So, in your capacity as a professor, and

10 this is my assumption so please correct me if I'm

11 wrong, is your emphasis on research or is your

12 emphasis on teaching?

13 A.   Teaching is very important, but I would say most

14 of our time is spent on research.

15 Q.   And for conducting your research, you must look

16 for and obtain funding for that research?

17 A.   That's correct.

18 Q.   And is that in the form of grants and other

19 things?

20 A.   Mostly grants.

21 Q.   And so when you're conducting that research is

22 your goal ultimately to not only to research

23 conclusions that matter to the physics world but

24 also to publish those conclusions?

25 A.   Yes.  If I can add it, we do have graduate

SENTENCING -- July 11, 2019 (Morning)        84

1  students that conduct the experiments and training
2  graduate students is also a key mission for ours, at
3  least my mission, so to attaining publications,
4  getting results, but also training the next
5  generation of scientists.
6  Q.   Okay.  And you run a research group at the
7  University of Illinois?
8  A.   I do.
9  Q.   Approximately how many graduate students are in
10 your group at a given time?
11 A.   Between 8 and 12 usually.
12 Q.   Okay.  How do you go about getting graduate
13 students to come into the group?
14 A.   There is a balance between students contacting
15 me because they hear about my research.  I give
16 talks to the incoming graduate class, usually talk
17 about my research.  And based on that research, I
18 ask the people who are interested to contact me.
19 Occasionally, I will contact someone just looking at
20 the record if they look like they are particularly
21 suited for the research they do.
22 Q.   And once someone contacts you or -- I assume if
23 you are contacting them, you're pretty sure that
24 they are going to fit in with your group well.  If
25 someone contacts you, a certain number of students

SENTENCING -- July 11, 2019 (Morning)      85

1  contact you, how do you select who joins the group?

2  A.    I look at their records and their letters of

3  recommendation, and then I meet with them and talk

4  to them about the research and I gauge their

5  response in terms of how interested they are.

6  Enthusiasm matters of lot in what we do in terms of

7  perseverance, and then they usually will work -- if

8  they seem suitable, they will work in my lab for a

9  trial period of a few months in that.  And if that

10  works out, I will probably take them on for longer.

11  Q.    Okay.  When in the process of graduate school do

12  you normally select a student to come and join the

13  group?

14  A.    Usually around the winter of their first year.

15  Q.    Okay.  Is it sometime later?

16  A.    Occasionally, yeah.

17  Q.    Okay.  At one point in your history as a group

18  leader, did you employ Brendt Christensen as a

19  student in your group?

20  A.    Well, it was -- I believe it was in the winter

21  of his first year.

22  Q.    And so you did employee him?

23  A.    So he had contacted me in the fall of 2013, I

24  guess, of his first year and said that he was

25  interested in my research group.  I had several

1   other students who were also interested in the
2   group, so I met with all of them and talked to all
3   of them and read all of their research materials and
4   decided to hire Brendt, at least for that next
5   winter and spring and see how it worked out.
6   Q.   Okay.  And when you met with him, you said that
7   you had reviewed his research materials?
8   A.   Yeah, that's right.  We have their CVs, letters
9   of recommendation for graduate school, so I read all
10  of that material.
11  Q.   Do you have to also take a look at project --
12  previous physics projects and papers that he had
13  written?
14  A.   We do, though some people come in with no
15  experience and our job is to train them, so I don't
16  necessarily base it on that, but I do look at -- I
17  believe that he had a publication -- I don't really
18  recall it, usually that comes in the letters, most
19  importantly.
20  Q.   Understood.  What was your impression of Brendt
21  when you met him for the first time?
22  A.   He seemed very enthusiastic about the research,
23  as I recall.  And based on his experience and other
24  things, he seemed like someone who could do the work
25  in a lab and would be excited about doing it and

1  would be successful in graduate school.

2  Q.   Do you recall when he first started working in

3  the lab?

4  A.   I believe it was spring of 2014.

5  Q.   What types of activities -- when you have a new

6  graduate student just joining the groups, what type

7  of activities do you ask them to engage in?

8  A.   We work on very small scale devices, nanoscale

9  things, so that requires a lot of specialized

10 training in fabricating nanoscale devices on

11 electron beam lithography and imaging techniques and

12 things.

13 Q.   Can I stop you for a second because I love my

14 court reporter and I would like you to spell that

15 word that you just said.

16 A.   I'm sorry.  I am trying to be non-technical,

17 electron beam lithography, l-i-t-h-o-g-r-a-p-h-y.

18 Sorry.  That's a method of imaging very small

19 things.  It is just one example that he -- so

20 usually in the spring the students are still TAs but

21 I have them training on all of the equipment so that

22 they can eventually use it.  The first spring is

23 just training on equipment and then even the next

24 summer is continuing to train on the equipment and

25 then working other graduate students to learn more

1  specialized techniques in the lab.
2  Q.   Do you have older graduate students work with
3  younger graduate students to assist them throughout
4  this training process?
5  A.   I do.
6  Q.   And is that -- the training process, who
7  conducts the training for the new students?
8  A.   We have staff in our building in terms of
9  research lab, so for the equipment that the
10  general-use equipment, to fabricate these devices
11  they are very expensive, so they are shared amongst
12  many people.  The staff usually trains them on and
13  then once they have done the training with the staff
14  then my older students step in and show them more
15  specialized training and then how to use the
16  specific lab equipment.
17  Q.   Did Brendt have a mentor or an older graduate
18  student to assist him that you recall?
19  A.   He did.
20  Q.   Do you know who it was?
21  A.   Yenling was the first one, I believe.  People
22  help with different aspects.  I mean like people
23  request help with many things but the project that
24  he was following up on was with -- we call her,
25  Clair, Clair's project, so she helped him first, I

1  believe.

2  Q.   And do you remember what the project was?  Is

3  that going to be a really loaded --

4  A.   No, no.  I'm trying for it not to be.  But

5  that's not the -- the first project was measuring

6  the electronic properties of a very thin material

7  called molybdenum disulfide.  You can call it MoS2,

8  if you want.

9          So they were -- the challenge was to make

10  electrical contact to it, which was hard to do.

11  Then measure it at low temperatures.  So Yenling had

12  started this and had gotten preliminary results,

13  then she was graduating and I needed someone to

14  follow-up on the project.

15  Q.   Did you ask Brendt to join that project because

16  you needed a person to do that?

17  A.   I did.  On top of that, I usually have them do a

18  small project first and then a larger project.  So

19  when Brendt came, I'd actually just gotten a large

20  NSF, a collaborative NSF grant, so the ultimate goal

21  was to have him work on this NSF, National Science

22  Foundation Grant.  That grant was on

23  superconductivity, which is materials that had zero

24  resistance in other quantum mechanical property.  So

25  the ultimate goal is to have them work on that grant

1  but as a starting project.  I had him work with

2  Clair so that he had something very specific to get

3  trained on, if that makes sense.

4  Q.   How was his performance during that first year

5  that he worked for you?

6  A.   So the first -- the spring was just training,

7  really, and I believe that he was probably TA'g at

8  the time also.  So I just wanted him to get trained.

9  And he seemed to get trained.  The summer he seemed

10  to work pretty well in training up on the project

11  and learning the things that I expected him to

12  learn.

13  Q.   Did he meet your expectations during that time

14  frame?

15  A.   During the spring and summer, he seemed to be

16  training as was appropriate for my expectations.  In

17  the fall, it went downhill.

18  Q.   Can you describe what you mean by that?

19  A.   So he worked pretty well, I believe, through the

20  end of the summer and then in the fall -- so summer

21  was mostly training.

22       In the fall he was really supposed to start

23  his project and be more independent, and he just

24  stopped coming to meetings as much.  You know, I

25  stopped seeing progress on his project.

SENTENCING -- July 11, 2019 (Morning)          91

1 Q.   Is it common to stumble a little bit in the

2 beginning of a project and fail all the time when

3 you're trying to build something?

4         MR. NELSON:  Objection to leading, Your

5 Honor.

6         THE COURT:  Overruled.

7 BY THE WITNESS:

8 A.   It is common to fail, but I should say that --

9 of course, it's training and they are learning, but

10 in the first year I do expect a certain amount of

11 work and a certain amount of attendance.  And so

12 what I judge people on is how many attempts they

13 seem to be making, how many during the lab, how many

14 -- how much -- when they come, I meet with my

15 students twice a week.  So when they come to me to

16 report on their progress, what are they talking

17 about, what have they been trying, what have they

18 been doing.  So when I say someone is not doing

19 well, it is based on the fact that if they don't

20 seem to be trying very hard, working very much or

21 making the efforts that I expect them to, then I

22 don't feel like they are doing well.

23 Q.   And when that happened with Brendt, what steps

24 did you take with him to address them?

25 A.   Well, I had a meeting with him and asked him,

1  first, if he -- you know, if there is anything going

2  on with him, because often there might be things

3  that I don't know about that are impacting his work.

4  So I want to know if there is anything there.  I

5  also asked him if he was sure that he wanted to be

6  in graduate school, is this what you wanted.  If

7  someone is not working then it's an indication that

8  maybe they are not happy with the work, they are not

9  happy with my lab.  And so I first wanted to

10  ascertain whether there was a problem with the lab,

11  with the situation, is there anything that I could

12  help address.

13          MS. POLLOCK:  Okay.  Your Honor, may I

14  approach the witness?

15          THE COURT:  You may.

16  BY MS. POLLOCK:

17  Q.  I've just handed you what has been marked for

18  identification as Defendant's Exhibit Number 128.

19          Do you recognize that?

20  A.  I do.

21  Q.  And is your email there?

22  A.  This is my email.

23  Q.  And what is the date on that first page of the

24  email?

25  A.  This is from March 2016.

SENTENCING -- July 11, 2019 (Morning)     93

1  Q.   What did you say?

2  A.   March 2016.

3  Q.   Was it March 24, 2016?

4  A.   March 24, 2016, sorry.

5       MS. POLLOCK:  Your Honor, move you to admit

6  and publish.

7       MR. NELSON:  No objection, Your Honor.

8       THE COURT:  Be admitted.

9       MS. POLLOCK:  Can I have the screen,

10 Mr. Kelly.  Thank you.

11 BY MS. POLLOCK:

12 Q.   So this is an email on March 24th from you to

13 Brendt Christensen.  And can you state what this is

14 regarding.

15 A.   This is one of those emails I sent to students

16 when they are not doing well.

17 Q.   Okay.

18 A.   So I have weekly -- I don't know what day --

19 that's a Thursday.  So on Thursdays I have

20 individual meetings with students.  It means that

21 Brendt must have missed an individual meeting where

22 the students tell me what they are doing for the

23 week and I wanted to see what he was doing.

24 Q.   Okay.  And so that was in the spring of 2016?

25 A.   That's right.

1  Q.   You mentioned that you had some issues with his
2  performance all the way back to his second year of
3  graduate school.  This would have been, I believe,
4  his fourth year of graduate school.  So how long --
5  are you sure about the time frame or is it possible
6  that he didn't start having problems until a little
7  later?
8  A.   As I recall, he had problems in that first fall
9  and then we had a discussion of whether he wanted to
10  be there and he assured me that he really wanted to
11  be there, that he was having issues that he had
12  dealt with, that he was going to do better, that he
13  was working on improving himself, and that he
14  really, really wanted to do this research.  And, you
15  know, this is, again, I feel like part of my job is
16  training students and giving them opportunities to
17  achieve their goals.
18      So when he assured me that he wanted to do
19  better then I took his word on that and kept him on
20  as a graduate student with the understanding that
21  between us that if he stopped showing up and things
22  didn't work out, then he would have to sort of leave
23  the lab if it wasn't working out.
24      So after, after the fall, that next spring,
25  he worked pretty hard as well and worked pretty hard

 1  as far as I recall.  And then I think the summer was

 2  okay.  I don't -- but the summer was okay.  Then I

 3  think he TA'd the next fall, so he was busy with

 4  sort of that.  Then, as I recall, that following

 5  fall of 2015 he started working less and things

 6  weren't progressing nearly as much as I hoped at

 7  that point.  And then by the following spring, he

 8  really just stopped showing up at some point.  It

 9  took me a while to tell him to really to make

10  decisions about what should be done.  I think that I

11  sent him emails and he would come in sometimes and,

12  you know, research is hard.  There are -- there are

13  failures that are -- people are slowly progressing,

14  and I certainly don't want to, you know, defer

15  someone's dreams of finishing graduate school just

16  because they are not as fast as I would hope or not

17  learning as well.  But by that spring, it became

18  pretty clear that it wasn't working out.  So this

19  email, I think, is part of that, that he just wasn't

20  showing up.

21  Q.  If I could summarize.  Man, you talk faster than

22  me, which is really hard to do.

23        In terms of his progress, he trained in --

24  let me get the timeline right.  He trained in the

25  spring of 2014 and that summer, and then started

1  working in the fall of 2014 where he maybe wasn't

2  making the progress or putting the effort in you

3  wanted to see so you talked to him and got better,

4  and then did for about a year did better and then it

5  went downhill; were those your words?

6  A.   Effectively, yes.

7  Q.   So in the spring of 2016 when you're sending him

8  this email, you know, saying why aren't you showing

9  up, what did you decide to do at that point?

10  A.   We had had this discussion about whether he

11  wanted to be there previously.  And I believe in the

12  interim we had discussions about progress, about how

13  things were going.  When he stopped showing up, you

14  know, I realized that it probably wasn't going to

15  work out and that he didn't want to be there anyway,

16  so I decided at some point that I needed to meet and

17  talk about what he was going to do next; that it

18  wasn't going to work out in my lab.

19  Q.   Okay.  And did he come to a meeting to discuss

20  his future?

21  A.   He did.

22  Q.   Do you recall that meeting?

23  A.   I do.

24  Q.   Do you recall when it was?

25  A.   I do not recall the date.  No.  We have a second

1  message here from May 30th.

2  Q.   You do?

3  A.   It was probably maybe a week or two before that,

4  close to that date.

5  Q.   And what was the title of that email?

6  A.   Summer TA/future.

7  Q.   So if we are talking about the future, you think

8  that might be sort of what that email is about?

9  A.   A hundred percent.  This email came after Brendt

10  and I had talked, because we -- that's what I'm

11  saying, we probably talked a couple weeks prior to

12  this email from May 30, 2016.

13  Q.   And what was that talk, when you had the -- I

14  mean, some people call it a come-to-Jesus talk --

15  what did you talk to him about during that meeting?

16  A.   Actually pretty simple:  "You're not showing up.

17  You don't seem to want to be here.  I don't see any

18  point in you putting the time into the work --

19  putting time to be in graduate school when that's

20  not what you want to do.  It's not good for you.

21  And it's not good for the group or the department or

22  anyone."  And basically, he just agreed with me.

23       He said, "Yes, I know; it's not working out.

24  I was waiting for you to contact me, let me know

25  that I couldn't be in the group anymore."

1        And I said, I recall saying, "Brendt, why
2   didn't you come to me first, because I -- we could
3   have made this -- we could have had you move on
4   earlier rather than wasting more time."
5        But it's hard for students to come to
6   faculty especially when they don't know what to do
7   next.  So I did understand that, but it was an
8   amenable discussion.  You know, he agreed that it
9   wasn't the right place for him, then we talked about
10  things that he could do next.  I think that I
11  recommend that he talk to Lance Cooper about
12  possibilities of what he could do next in terms of
13  getting a master's maybe, because he already worked
14  for several years and you can get a master's with
15  the classes so he wouldn't have to leave with
16  nothing and then thinking about what he wanted to do
17  in his future.
18  Q.   So, when you say "get a master's," do people
19  enroll at the University in the physics program --
20  is there a master's in physics program?
21  A.   There was not previously.  At this time there is
22  not, I don't think.
23  Q.   When you enroll in a doctoral program, but you
24  wash out, is it -- am I categorizing it correctly --
25  when they are letting you leave with a master's so

1 you have something?

2 A.   You have to earn a master's.  You have to take

3 classes and have, I believe, research.  I don't know

4 of the exact requirements.  There are requirement

5 for it.  If you meet those requirements, then you

6 get the master's.

7 Q.   Is it fair to say that a student that is working

8 for several years at that point would probably have

9 many of those requirements completed?

10 A.   Likely.  I think that -- I think he needed to

11 take some more classes, which is the context of this

12 email, but he was close to it.  So I believe that we

13 had discussed what was necessary to get the master's

14 so that -- yeah.

15 Q.   So he wouldn't leave with nothing.

16 A.   Well, he had done the work for a master's.  It

17 was worth getting that so that he could maybe get a

18 better position in the future.

19 Q.   Thank you.  During this whole time frame, fall

20 of 2015, spring of 2016, when you're saying that he

21 is going downhill; did you have any conversations

22 with him about his personal life?

23 A.   I did the first time.  When -- I think in that

24 fall of 2014, when it didn't look like things were

25 working out, I asked him -- that's when I asked him

SENTENCING -- July 11, 2019 (Morning)        100

1  what was going on, is there anything, why aren't you

2  showing up, what's happening.  And he told me that

3  he had been depressed, and that he'd never been like

4  this before, and he didn't know what was going on,

5  and he gained weight, and he just wasn't himself.

6        And then told me that he was getting

7  counseling and he was working on it and he thought

8  things were getting better, but that he'd just gone

9  through a phase of a hard time that never happened

10 before.

11 Q.   Did you have any other communications with him

12 after that about his mental health?

13 A.   I very likely would ask him -- it's not

14 something that -- usually we have research

15 discussions and, you know, I try not to pry but as

16 much as student mental health and other issues

17 impact the research, I do want to know about it and

18 I do want to help them.

19        So it's likely that at one time or another I

20 did say -- I certainly ask every time "Is everything

21 okay?  How are things going?"  as an open-ended

22 question.  If he says or if the student says "things

23 are fine," I often will take that as an answer if

24 things seem like they are fine.  I might

25 occasionally say, "Still going to counseling, is

1  that working out?"  I may have said that to Brendt.
2  I don't recall if I did.  But it's possible that I
3  did very likely.
4  Q.   Regarding the counseling issue, did you
5  encourage him to attend counseling?
6  A.   I believe that he told me that he was already
7  seeing a counselor.  So when he told me that things
8  had been rough and he had gone through some things,
9  he said -- I'm seeing -- I think I said, "Have you
10  gone to counseling?"  And he said, "I'm seeing
11  someone," so that was it.  If he hadn't, I would
12  have encouraged him to see a counselor.
13  Q.   All right.  If I told you that he didn't start
14  seeing a counselor until --
15        MR. NELSON:  Objection.  We are definitely
16  leading.
17        MS. POLLOCK:  I'm going to ask her if it is
18  inconsistent with her recollection.
19        THE COURT:  Go ahead.
20  BY MS. POLLOCK:
21  Q.   If I told you that he didn't start seeing a
22  counselor or he made an appointment with a counselor
23  in the fall of 2015, would that be consistent or
24  inconsistent with your recollection about that first
25  conversation?

 1  A.   That would -- well, I don't have access to any

 2  records; right, I absolutely cannot see students'

 3  medical records and I don't go with them to the

 4  counseling.

 5  Q.   Absolutely.  I'm talking about your general

 6  recollection?

 7  A.   That would be inconsistent if he didn't see a

 8  counselor until 2015 with what he told me at least.

 9  Q.   Okay.  Thank you.  So after the decision was

10  made for him to exit the program, to leave your lab

11  and obtain a master's, did you have further

12  interaction with him in either 2016 or 2017?

13  A.   I did not.

14  Q.   Did you have any other communications with any

15  faculty members in the Physics department after 2016

16  and into 2017?

17  A.   Not that I recall.

18  Q.   What was your opinion of him at the time or your

19  feelings about him at the time that you arranged for

20  him to exit your lab?

21  A.   My feeling was that he was not succeeding in the

22  physics Ph.D. program.

23  Q.   Did you have any feelings about him personally?

24  A.   I did not, no.  Nothing remarkable, if that's

25  what you mean.

1  Q.   That's what I'm asking.

2        Thank you very much.

3        MS. POLLOCK:  Nothing further, Your Honor.

4                   CROSS-EXAMINATION

5  BY MR. NELSON:

6  Q.   Good morning, professor.

7  A.   Good morning.

8  Q.   Now, I just want to make sure that we've got the

9  timeline straight.

10       So the defendant comes into your program,

11 and sometime around fall of 2014, there is a bit of

12 an issue, and then he recovers; and then sometime

13 about the fall of 2015, there was an issue, and then

14 he recovers; and then in May or so of '16, he

15 decides to leave the Ph.D. program; is that

16 essentially it?

17 A.   I didn't think there was an issue in the fall of

18 2015, I don't think.  I'm just saying that he wasn't

19 working as well.

20 Q.   I see.

21 A.   I don't know of any issues.

22 Q.   So basically those three date points.  This is

23 not a six-month discrete downward spiral; this is an

24 extended period of time?

25 A.   Again, I don't know.  I can tell you about what

1  was going on in the lab and how his work was

2  progressing, and it's hard for me to tell how much

3  of that was due to just problems in the lab and how

4  much was due to him not showing up and not working.

5  Q.   Sure.

6  A.   I do know at least in the fall of 2014 and the

7  spring of 2016, I noticed that he just wasn't

8  around.

9  Q.   Fair enough.  That's fair enough.  I think you

10  testified that for the most part when you have

11  regular interaction with your researchers, but the

12  day-to-day interaction, they're interacting with

13  each other.

14  A.   That's right.

15  Q.   At some point he stopped interacting with them?

16  A.   I don't know.

17  Q.   And did you ever receive reports from the other

18  researchers that he was, for example, not coming to

19  meetings or signed up for equipment that he wasn't

20  using, things like that?

21  A.   No, they never have told me that.

22  Q.   They never told you?

23  A.   They never told me that.  At some point students

24  have independent projects.  And so, I wouldn't --

25  you know, again, if -- whenever they have

1  independent projects, I expect them to be working

2  independently, so I believe at that stage Brendt

3  should have been working independently.  So it

4  wasn't like they came in together as a group to talk

5  to me or anything like that.  I noticed when Brendt

6  didn't show up for my meetings, but I was never told

7  anything from other students about any of his

8  behaviors at that time.

9  Q.   So do you recall a conversation that you may

10  have had with the researchers and the defendant, I

11  don't know who all was there, where this sort of all

12  came to a head and he gave something that you

13  referred to as the "Brendt smile," do you recall

14  that?

15  A.   I do not.  These things that you're telling me,

16  are things that I've heard from my group after we

17  found out about the crime.  I've never heard that

18  phrase before then.

19  Q.   Okay.

20  A.   It's -- I'm sorry for the impact this had on the

21  rest of my group and everyone else but --

22  Q.   I'm certainly not trying to make it more

23  difficult for you.  I'm just trying to understand.

24       So, for example, other people in your group

25  would have been Steven Gill?

1  A.   Yes.

2  Q.   And Malcolm Durkin?

3  A.   Yes.

4  Q.   So they would have had more day-to-day

5  interaction with the defendant than you did?

6  A.   Yes, absolutely.

7  Q.   Now, going to this May 2016, you had an

8  interaction with the defendant because he was

9  failing to return to the lab, failing to do the

10 things that he told you he was going to do?

11 A.   That's right.

12 Q.   And I believe your testimony was that he wanted

13 to withdraw from the program; you may have also

14 wanted him to withdraw from the program but --

15 A.   He never came to me to tell me that he was

16 withdrawing.  I had to make a meeting with him and

17 tell him that it wasn't working out, in which case

18 he responded:  "I was waiting for you to tell me

19 that I had to leave."

20       So I don't know what would have happened if

21 I hadn't told him he had to leave, but my impression

22 was that is he expected that.

23 Q.   I believe you said previously that -- when we

24 met previously -- that he had sort of a flat affect

25 on his face.  Do you recall that?

1 A.   I do.

2 Q.   How would you describe that?

3 A.   So, mostly I talk to my students about research

4 and other things.  But occasionally family, other

5 issues come into play.  And so I do have some sort

6 of a relationship with them or I know, I feel like I

7 have some understanding of them, of their situation,

8 of how they respond to things, of how they might

9 feel about different things.

10        Of course, over the course of a couple

11 years, you know, years, many years of working with

12 some of them.  In the case of Brendt, I believe that

13 I told you, it is true, that I didn't get that

14 feeling that I really understood him in any way or

15 had any sort of sense of how he might respond to

16 different situations, and that's what I meant by

17 flat affect.

18 Q.   And I think you said it was as though he was

19 wearing a mask; do you recall saying that?

20 A.   I do.

21 Q.   Now I believe that you testified on direct as

22 well that you attributed his withdrawal from the

23 program as a lack of interest on his part.

24 A.   I did.

25 Q.   And not a cry for help.

1  A.   That is how it seemed to me -- yes, I attributed

2  as a lack of interest in the program for sure.  Or

3  if I can amend that.  I mean, as I mentioned, he

4  also stated that he seemed interested in doing it,

5  but somehow it just wasn't working out.  It is a

6  lack of interest or lack of ability to focus on

7  something.  I can't tell what it is.  I just know

8  that it wasn't working for him, doing the things

9  that he was expected to.

10 Q.   With regard to the counseling, you don't know

11 when he was going to counseling or whether he

12 wasn't; you only know what he told you.

13 A.   That's correct.

14      MR. NELSON:  I have no further questions,

15 Your Honor.

16      THE COURT:  Ms. Pollock.

17           REDIRECT EXAMINATION

18 BY MS. POLLOCK:

19 Q.   You mention that over a period of time working

20 with students, you can become close to them, get to

21 know them, get to be able to judge what their

22 reactions might be in certain situations; is that

23 right?

24 A.   I can guess, but, yes.

25 Q.   You never had that with Mr. Brendt Christensen?

 1  A.   Not to the same extent.  He was in my lab for
 2  two years and it does vary with students.  These are
 3  a wide variety of students and they are physics
 4  students, you know.  Everyone has different focuses.
 5  So it depends on the student, it really does.
 6        But, yes, for many students I have been able
 7  to have some sense of relationship, yeah.
 8  Q.   So with Brendt, apart from that conversation
 9  where you talked about the counseling, did he ever
10  share anything else about what was going on in his
11  life at those moments?
12  A.   During that same first conversation where we
13  talked about where he said he was depressed and
14  having trouble, I did ask him how his family life
15  was.  He was married, which is not common for
16  graduate students at that stage, at least the ones
17  that I've had.  I never met his wife or anything,
18  but knowing that I asked him how his family life was
19  and how his marriage was just to be sure that wasn't
20  something that he needed to talk about or that was
21  going on.  And he told me that it was fine.  I
22  believe that on some several other occasions I did
23  ask him, you know, "How is everything going on at
24  home?"  And he said, "It's great."
25  Q.   Okay.  So apart from the things that he told

1  you, you don't know anything he talked about with

2  his counselors, right?

3  A.   I do not.

4  Q.   Do you know anything about what mental health

5  issues were going on at that time other than what he

6  told you?

7  A.   I do not.

8  Q.   Thank you.

9          MS. POLLOCK:  Nothing further.

10          THE COURT:  Mr. Nelson.

11          MR. NELSON:  No, Your Honor.  Thank you.

12          THE COURT:  Okay.  You can push that away.

13          Do we have another witness that we can do in

14  15 to 20 minutes.

15          MS. POLLOCK:  Yeah, we can squeeze it in.

16          THE COURT:  All right.

17          MS. POLLOCK:  The defense calls Lance

18  Cooper.

19          Sir, if you come forward and approach.

20          Please stop and raise your right hand and be

21  sworn.

22                  LANCE COOPER,

23  after having been duly sworn, testified as follows:

24                  DIRECT EXAMINATION

25  BY MS. POLLOCK:

1  Q.   Morning.

2  A.   Morning.

3  Q.   Can you please state your full name and spell

4  your last name for the court reporter?

5  A.   Steven Lance Cooper, C-o-o-p-e-r.

6  Q.   And are you currently employed?

7  A.   Yes.

8  Q.   Where at?

9  A.   University of Illinois, Department of Physics.

10 Q.   Okay.  What's your position in the Department of

11 Physics?

12 A.   I am a professor of physics and also the

13 assistant head of graduate programs.

14 Q.   Assistant head for graduate programs?

15 A.   Yes.

16 Q.   Can you describe what your job duties are as the

17 assistant head?

18 A.   I chair the admissions committee for the

19 department.  I oversee the graduate students, help

20 them choose, select classes and help them; assign

21 them teaching positions, help them find research

22 positions, try to solve any problems they have.  I

23 run a variety of programs at the -- to help

24 graduates with professional development.

25 Q.   So are you just kind of a, just a catch-all

1  general advisor for any graduate student that might

2  need you?

3  A.  Yes.  Particularly in the first year before they

4  have a research advisor.

5  Q.  Can you describe the admissions process and how

6  someone becomes admitted to the University of

7  Illinois physics program?

8  A.  We have a committee comprised of myself and then

9  representatives from each of the different research

10  groups.  We get upwards of 600, 700 applications

11  every year.  We go through and identify those that

12  look like they have an academic record that is

13  suitable for our program.  And then individual

14  representatives of the committee will evaluate the

15  research promise of the different students based on

16  what their preferred interests are, what research

17  area they are interested in.  And then we make the

18  selection that way.

19  Q.  How many students out of all of those applicants

20  do you admit per year?

21  A.  Roughly 140 with the expectation of getting 40

22  or 50 of them.  We are usually targeting a class of

23  40 or 50.

24  Q.  Out of 700-ish applicants, you will end up with

25  a class of 40 or 50 students in graduate school?

 1 | A.   Yes.
 2 |           MS. POLLOCK:  May I approach, Your Honor?
 3 |           THE COURT:  You may.
 4 | BY MS. POLLOCK:
 5 | Q.   I just handed you what has been marked prior for
 6 | identification as Defendant's Exhibit Number 130.
 7 |           MS. POLLOCK:  Mr. Kelly, 129 is coming next.
 8 | BY MS. POLLOCK:
 9 | Q.   Can you identify that please?
10 | A.   This is the application record of Brendt
11 | Christensen.
12 | Q.   Okay.  With this -- how do students submit their
13 | applications?  Is it online or is it in writing?
14 | A.   It's all online.
15 | Q.   All online.  And what material do you require in
16 | order for someone to become admitted to the physics
17 | graduate program?
18 | A.   We require a personal statement based on what
19 | their research interests are.  We require
20 | transcripts of any school they've attended after
21 | high school.  We require at least three letters of
22 | recommendation from, from someone who can comment on
23 | their academic record or research record, sometimes
24 | you can include resumes, et cetera, but those are
25 | the main.  We also require examination scores, the

1 general record examination, GRE scores.

2 Q.   Is that GRE, the general GRE, or is there a

3 particular physics GRE?

4 A.   We have both the general GRE and the physics

5 GRE.  At this time the physics GRE was required.  We

6 no longer require as of last year.  When Brendt

7 applied, we required that.

8        MS. POLLOCK:  Your Honor, move to admit and

9 publish Defendants 130.

10        THE COURT:  Admitted.  You may publish.

11 BY MS. POLLOCK:

12 Q.   If you look on the screen in front of you, I

13 have taken the application to the page where his

14 personal statement is located.  Do you see that?

15 A.   Yes.

16 Q.   I would like you to read it please.

17 A.   "One of my most memorable experiences in

18 elementary school was feeling an immense sense of

19 wonder while studying the different planets of the

20 solar system.  I was struck with this feeling of

21 passion and fascination over how an object such as

22 the great red spot on Jupiter works or how Saturn's

23 rings could even exist.  Questions like this have

24 stuck with me all of these years.  I now realize

25 that as soon as the question is answered, ten more

1  questions appear.

2          I'm applying to graduate school at the

3  University of Illinois in Urbana-Champaign because I

4  understand this journey cannot stop here; I must

5  continue my search for understanding."

6  Q.   Thank you.  We don't have to read the entire

7  thing.

8          So, based on Mr. Christensen's application,

9  was he admitted to the graduate program at the

10  University?

11  A.   He was.

12  Q.   What were your interactions with him during the

13  first year of his graduate school career?

14  A.   So, I would teach a required course for all of

15  the incoming students, an orientation course, where

16  different faculty were looking for -- the research

17  students will give presentations.  This is to help

18  the students identify a research area and an advisor

19  to work with.  We do that very first, the fall

20  semester, so that would have been fall of 2013.

21          In addition to that, we had various

22  professional development activities as part of this

23  course so the students have to design an abstract

24  that I review and give feedback on.  Then they have

25  a semester end project where they have to do what's

1  called a journal club assignment where they're

2  assigned to read a scientific paper as a team and

3  then they give a presentation at the end of the

4  class and the presentations are rated by the

5  students and we give feedback on how to give a good

6  scientific presentation.  So I interacted with

7  Brendt in the course of those assignments.  Met with

8  his team to go over a draft of his talk for this

9  journal club presentation.

10          Prior to the start of classes, I meet with

11 all of the incoming students to do an evaluation of

12 their record to try to decide what classes they were

13 taking.  So I met with him for 45 minutes to an hour

14 to discuss the classes that he was going to take and

15 to assign him a teaching position.

16 Q.   Do you recall that first meeting?

17 A.   Not in detail.

18 Q.   So you said "assign him a teaching position," is

19 that a requirement or something that the students

20 can choose to do?

21 A.   All of our students are supported by the

22 department one way or the other.  They are either

23 supported as teacher assistants, in which they teach

24 to get a stipend plus a tuition waiver which covers

25 their tuition, or they have a research assistantship

where a grant from an advisor will support them.
Some also come in with fellowships; that they have
their own support.

     The vast majority of students don't have an
advisor when they first come to our department, so
the vast majority of incoming students will teach,
at least their first semester, if not their first
year, while they are looking around for research
groups.  In that way they can support themselves and
get the tuition waiver so that they can take
classes.

Q.  What is a typical schedule for a first year
graduate student in terms of how many classes they
teach, how many classes they take and finding a
research group?

A.  So, it's very busy.  They will take two regular
courses in addition to the shorter course that I
teach, the orientation course; they will take two
graduate level courses typically.  They -- some
decide to take three.  My advice is usually to take
two their first semester until they get acclimated
to the program, but some will take more than two.

     In addition to that, if they are teaching,
they are teaching three sections of an introductory
physics course.  And that three sections, each

1  section is usually about almost two hours each; that

2  will require two hours in class time for each

3  section, maybe an hour and a half of grading for

4  that section each week, maybe an hour long office

5  hour they have to hold, and then maybe a 45 minute

6  TA meeting where they go over the problems they are

7  going to discuss as part of their class.

8  Q.   So basically it's a lot.

9  A.   It's a lot.  In addition to that, they are

10 supposed to be looking for a research group.  So

11 they -- that process, I recommend that they go and

12 talk to advisors, go attend seminars so that they

13 can go figure out what area they are interested in

14 and then, if possible, if they make a connection,

15 they might even start attending research group

16 meetings to try to get a sense of whether they like

17 that research or not.

18 Q.   Do you recall whether or not Brendt had come in

19 with a particular area of physics in mind?

20 A.   Well, his application -- his experience at the

21 University of Wisconsin was actually in high energy

22 physics.  In fact, the person who admitted him,

23 recommended admission, was the representative from

24 high energy at the time.  So he was admitted with

25 the thought that he was going to go into high energy

SENTENCING -- July 11, 2019 (Morning)          119

1  physics.

2          We don't require students to stick with

3  their plan.  In fact, the whole purpose of my

4  orientation course it to give them exposure to a

5  broader research area so they can make an informed

6  decision.  So even though he did decide -- he did

7  apply with an interest in high energy physics, he

8  ultimately went to condensed matter physics, which

9  is a little bit different area.

10  Q.  Do you remember approximately when he did find

11  the research group?

12  A.  He did individual study with a research advisor

13  the spring of 2014.  So he would have started

14  sometime that semester.

15  Q.  Is that pretty common for students?

16  A.  We have students that actually start right when

17  they arrive.  They know exactly what they want to

18  do; they talk to the advisor and they get started.

19  I would say half of the typical class by the end of

20  first semester will identify a research group, and

21  the remaining half will identify the advisor by the

22  end of the first year.  We want every incoming

23  student to have a research advisor by the end of his

24  first year, so his progress was very typical.

25          MS. POLLOCK:  May I approach, Your Honor?

 1          THE COURT:  You may.
 2  BY MS. POLLOCK:
 3  Q.   I've shown what you has been marked for
 4  identification as Defendant's 129.
 5          Do you recognize that?
 6  A.   Yes.
 7  Q.   Is it a typical transcript of grades for the
 8  University of Illinois?
 9  A.   Yes, it is.
10  Q.   And if you will flip to the last page of that
11  because the exhibit is a little hard to read, so I
12  have actually put it on a spreadsheet for you,
13  that's a little bit easier to read.  Do you see
14  that?
15  A.   Yes.
16          MS. POLLOCK:  Motion to admit and publish
17  Defendant's 129, Your Honor.
18          MR. FRERES:  No objection.
19          THE COURT:  It will be admitted.  You may
20  publish.
21  BY MS. POLLOCK:
22  Q.   I'm showing on the screen the actual form from
23  the registrar.
24          Is this Brendt Christensen's grades for the
25  time that he was enrolled in the graduate program in

 1  physics?

 2  A.   Yes.

 3  Q.   It looks like it is broken by -- from semester

 4  here.  There is fall of 2013, spring 2014, fall

 5  2014, et cetera; do you see that?

 6  A.   Yes.

 7  Q.   Is there anything about the grades that students

 8  receive in physics in terms of -- is it A through F

 9  just like in every other academic area?

10  A.   Yes.

11  Q.   How often do graduate students get Fs in

12  physics?

13  A.   Very rarely.

14  Q.   How often do they get Ds in physics?

15  A.   Rarely.

16  Q.   How about Cs?

17  A.   It happens, but it's not typical.

18  Q.   Okay.  Is that because -- let me ask you:  Why

19  is it that graduate students tend to get the As and

20  Bs?

21  A.   I think there is probably a little bit of grade

22  inflation for the graduate students because I think

23  the focus of the program is not course work; it's

24  research.  And the purpose of the course work is to

25  give students fundamental training in a particular

1  area so that they can move on to doing research and

2  so the grades are -- usually a C in a graduate level

3  course is considered a very bad grade.

4  Q.   Okay.  So if you will take a look at --  let me

5  see if I can get this a little bigger for everybody.

6        You take a look at that first semester in

7  the fall of 2013, what grades did Mr. Christensen

8  receive?

9  A.   He received a B plus in electromagnetic fields.

10  He received an A minus in Quantum Mechanics 1, and

11  he received an A in the graduate physics orientation

12  course.

13  Q.   Is Physics 596, is that the course that you

14  teach?

15  A.   Yes.

16  Q.   So, if you look at the following semester, you

17  will see there are only two grades on there.

18  A.   Yes.

19  Q.   One is for, it looks like a class, and the other

20  one is something called "individual study."

21  A.   Right.

22  Q.   Can you describe what "individual study" is,

23  please?

24  A.   Individual study would be the research credits

25  that he gets for working for a particular research

1  advisor.  So every student needs to have at least

2  eight credit hours each semester to be a full time

3  student.  For graduate students most of the time

4  they spend in graduate school is doing research.  So

5  there are courses, Physics 597 is one, Physics 599

6  is thesis research.  These are credits that you get

7  by doing research with a particular advisor.

8  Q.   So his advisor was Dr. Nadya Mason, correct?

9  A.   Correct.

10  Q.   Now there is a grade there for Physics 597,

11  there is a grade?

12  A.   Yes.

13  Q.   And who provides that grade to Mr. Christensen?

14  A.   The instructor, the advisor, would provide that

15  grade.

16  Q.   And that grade is based on what?

17  A.   It's based on the advisor's perception of how

18  they are doing in the research group.

19  Q.   Now, is it common for a graduate student to

20  receive anything less than an A in that individual

21  study?

22  A.   No.

23  Q.   And do you have any idea why that is?

24  A.   It varies some advisors are reluctant to give --

25  there are the occasional advisor that takes a grade

1  seriously and will give a low grade if their student

2  is not performing well, but in many cases they will

3  give an A just because they are reluctant to give a

4  low grade for that regular course.

5  Q.   It's not like a regular class, right?

6  A.   Right.  It's very, very subjective on that

7  grade.  You are doing research, which has its own

8  idiosyncrasies in terms of how long it takes to do

9  things and is how much progress is made.  So it is

10  not as easy to document progress in that kind of

11  endeavor then it is with a normal course.

12  Q.   Understood.  So I'm going to refer you back to

13  the exhibit here.  And it looks like in the spring

14  of 2014, he received a B minus in condensed matter

15  physics and in individual study.  That individual

16  study grade would have been provided by Dr. Mason?

17  A.   Correct.

18  Q.   And the condensed matter physics, is that just

19  one of the courses that he would have taken?

20  A.   Yes.

21  Q.   And a B minus, is that good or bad?

22  A.   That would not be a strong grade.

23  Q.   So if you'll look down to the fall of 2014, it

24  looks like the only thing that was done there was

25  individual study, correct?

1  A.   Correct.

2  Q.   So why is that?

3  A.   That's very typical.  It's very typical for

4  students to take their course work early on in their

5  first year, maybe a little bit in the second year,

6  very quickly they would realized the more courses

7  they take, the slower their progress in research.

8  And ultimately their progress in research is what

9  dictates how fast they graduate.

10  Q.   Okay.  So you said the first semester they do

11  just take regular classes, then they can choose to

12  take just regular classes after that?

13  A.   They could.

14  Q.   How many regular courses does a person in the

15  physics graduate program need to take in order to

16  graduate?

17  A.   The only requirement is that -- we only have two

18  specific courses they are required to take.  Now,

19  most students take many more than that, but they are

20  choosing those classes based on whether they need

21  them for a qualifying exam, whether they need them

22  for research, or whether they are just interested in

23  them.  So maybe the typical number is eight to ten

24  classes, but we really only require two specific

25  classes.  So they in principle -- although I can't

1  think of examples where they have done this in

2  principle, just take two classes and then dive into

3  research.

4  Q.   So it looks like from the transcript, excuse me,

5  that Mr. Christensen dove into research in the fall

6  of 2014 because there is no class there.  There is a

7  class in the spring of 2015 in nanoscience.  I can't

8  read the first word.  So -- but also individual

9  study, so does that mean that he was taking a class

10  and doing research in the spring of 2015?

11  A.   Correct.

12  Q.   What were his grades?

13  A.   He had an A minus in Physics 597, individual

14  study; and A minus in Physics 598, physic topics and

15  nanoscience.

16  Q.   And would you understand the A minus in

17  individual study to indicate anything?

18  A.   I would say that the advisor was not perfectly

19  satisfied with performance.

20  Q.   Thank you.  So switching over to the fall of

21  2015, look likes there were no additional classes

22  taken, just individual study, correct?

23  A.   Correct.

24  Q.   And then the spring of 2016 same?

25  A.   Correct.

1  Q.   So, something happens in 2016 because it looks

2  like in the fall he did not do individual study at

3  all.  Do you recall what that was that changed?

4  A.   Yes, so in May of 2016, I was contacted by

5  Professor Mason.  She said that she had talked to

6  Brendt and Brendt was thinking about leaving her

7  group.  And that she suggested that I meet with

8  Brendt.  So I reached out to Brendt, I think in late

9  May of 2016, and set up a meeting.  We talked.  He

10 indicated that he thought he didn't want to complete

11 the Ph.D. but he did want to finish a master's

12 degree.

13 Q.   Let me ask you about that.

14        So between the fall of 2013 when you

15 instructed his class and the spring of 2016 when you

16 met with him, did you have contact with him in that

17 interim time frame?

18 A.   No.

19 Q.   Did you receive any complaints about him in that

20 interim time frame?

21 A.   No.

22 Q.   So Dr. Mason reached out to you in the spring

23 and as a result of that, you met with Brendt.

24 A.   Correct.

25 Q.   Please proceed and tell us how that conversation

1  went.

2  A.   So Brendt had indicated that he didn't want to

3  continue with the Ph.D. program.  This is not

4  unusual.  We have maybe 20 percent of our students

5  on average will, will decide to get a master's

6  degree, do something else, change programs.  So we

7  talked about what his option were.  We recognize

8  that he could still get a master's degree if he got

9  additional credits, so he didn't have quite enough

10  credits to get a master's degree, which is a

11  non-thesis masters; that unlike the Ph.D. does

12  require course work.  So he needed to take two or

13  three more courses in order to get his master's

14  degree.  When somebody tells me that they are

15  interested in transitioning, we try to give them a

16  transition period, as long as they are performing

17  adequately in the program and they are teaching

18  well, we have no problem letting them continue

19  teaching, while they take courses and complete, look

20  for jobs, complete their credits for the requirement

21  for their master's degree.  And so that was the plan

22  to Brendt.  We agreed to hire him as a TA.  He had

23  been an excellent TA, so that was fine.  We --

24  Q.   Just to be clear that's for income, right?

25  A.   So that, that is both for income and also to

1 generate a tuition waiver so that he could take the

2 classes that he needed in order to get the master's

3 degree.

4 Q.   Okay.  Thank you.

5        So, so the plan was for him to get the

6 master's and he needed to take -- do you remember

7 how many additional credits?

8 A.   I believe he needed to take two or three,

9 three-or-four hour credits, so it was between ten

10 and 12 hours he still needed.  And because of the

11 nature of our master's degree, it didn't all have to

12 be in physics.  Those additional -- so the

13 requirements are that you have to have 32 credit

14 hours.  They have to be graduate credit, so they

15 have to be 400 or 500 level classes.  And only 16 of

16 them have to be in physics.  He already completed

17 that part of the requirement all he needed was 16

18 more credit hours of additional course work in any

19 400 or 500 level course, so it didn't have to be in

20 physics.

21 Q.   I'm going to refer you to the exhibit here in

22 the fall of 2016.  So this would have been after he

23 decided to leave with the master's.  And it looks

24 like he took three classes.  None of which are in

25 the Physics department, correct?

1  A.  Correct.

2  Q.  And what were his grades in those classes?

3  A.  F.

4  Q.  All Fs?

5  A.  Yes.

6  Q.  So, if you fail a course, do you get credit for

7  the course?

8  A.  Apparently.  I didn't realize that but that's

9  apparently -- this is up to the registrar's office,

10 so, yes, apparently you do.

11 Q.  Okay.  So in the -- that was the fall of 2016,

12 and then you see in the spring of 2017, did he take

13 additional courses?

14 A.  Yes.

15 Q.  Were any of them in physics?

16 A.  No.

17 Q.  What were his grades?

18 A.  B in environmental policy, D plus in biology of

19 dinosaurs, and F in insect pathology, and C plus in

20 sociology of deviance.

21 Q.  Again, none of those are physics classes, but he

22 didn't have to take physics, right?

23 A.  Right.

24 Q.  So having completed the course work, despite the

25 failing grades, did he, in fact, qualify for a

SENTENCING -- July 11, 2019 (Morning)      131

1  master's degree?

2  A.   Yes.  Yes, he did.

3        MS. POLLOCK:  May I approach?

4        THE COURT:  You may.

5  BY MS. POLLOCK:

6  Q.   Let me hand what you has been marked as

7  Defendant's Exhibit Number 131.  It is very

8  difficult to read, but do you recognize what that

9  is?

10  A.   I haven't seen this before but I think that I

11  understand what it is, yes.

12  Q.   And can you tell us what it is?

13  A.   So it's the certification that he's received his

14  master's degree as of May of 2017.

15  Q.   Is there a process that has to be gone through

16  in order to qualify for a master's degree?

17  A.   Students have to petition once they satisfy the

18  requirements, they have to simply fill out a

19  petition that petitions for their degree.  It has to

20  be approved by the graduate college and the

21  registrar's office and then you have to put your

22  name on a degree list for, in this case, it would be

23  for May.

24        MS. POLLOCK:  Okay.  Your Honor, permission

25  to admit and publish Defendant's 131.

1            THE COURT:  You may.

2   BY MS. POLLOCK:

3   Q.   So this is the form that we are looking at here.

4   And you see on sort of partially down to the

5   left-hand side with it as UIUC awarded degrees,

6   master's physics and a checkmark for okay.  So is

7   this the form that approved the May graduation

8   certification process for him to be able to leave

9   with that master's degree.

10  A.   Yes.

11  Q.   Did you have any role in obtaining that for him

12  or helping him?

13  A.   So when you petition for a degree, you have to

14  fill out a petition, and the advisor has to approve

15  it, the student's advisor, and then the department

16  has to approve it.  So I would have approved it as

17  the department representative.

18  Q.   Did he in fact obtain the master's?

19  A.   Yes.

20  Q.   What were your interactions with him like in the

21  spring of 2017?

22  A.   The only interaction I had with him was the one

23  that I've already described where I met with him in

24  late May to discuss his transition out of the

25  program.

1  Q.  Were you made aware of issues that he was having

2  as a teaching assistant in the spring of 2017 at any

3  time?

4  A.  No.

5  Q.  Do you know about them now?

6  A.  Yes.

7  Q.  And we heard testimony earlier, you were not

8  present in the courtroom, where Elaine Schulte told

9  us about how unlikely it was that a student would

10 simply blow her off and not respond to any emails

11 that she sent him.  To you, as the department head,

12 would you categorize it as likely or unlikely that a

13 student would blow off an email from their faculty

14 member or advisor?

15 A.  It's unlikely.

16      MS. POLLOCK:  I have nothing further at this

17 time, Your Honor.

18      THE COURT:  Mr. Freres.

19      MR. FRERES:  Yes, sir.

20           CROSS-EXAMINATION

21 BY MR. FRERES:

22 Q.  Good morning, sir.

23 A.  Good morning.

24 Q.  I believe you mentioned that you met with the

25 defendant in the spring of 2016 when you had this

SENTENCING -- July 11, 2019 (Morning)        134

1  discussion about his interest in programs; is that

2  correct?

3  A.   Correct.

4  Q.   And it was at that time that he told you that he

5  no longer wanted to pursue a Ph.D. in physics?

6  A.   Correct.

7  Q.   And at the time your impression of that was that

8  he wasn't interested anymore; is that a fair

9  assessment?

10  A.   That's correct.

11  Q.   You weren't aware of any other issues, just a

12  lack of interest, correct?

13  A.   Correct.

14  Q.   After he expressed this to you and was no longer

15  interested in physics, is that when his grades

16  started going down?

17  A.   It would have been the following semester.

18  Q.   The fall of 2016?

19  A.   Yes.

20       MR. FRERES:  Thank you.  No further

21  questions.

22       THE COURT:  Miss Pollock?

23       MS. POLLOCK:  No, redirect.

24       THE COURT:  Okay.  Thank you.  I will take

25  those from you.  You are free to go.  Thank you,

1  sir.  Push the microphone away.

2          You are free to go.

3          Let's take our lunch break.  Let's resume at

4  1:30.

5          Okay.  We will have a little extended lunch.

6  We are doing well here.  Let's please do not discuss

7  this matter with anyone, including yourselves.

8          Thank you.

9          I will give you a report this afternoon

10 where we are in the case.

11          (Jurors absent 11:54 a.m.)

12          THE COURT:  Okay.  Please be seated.

13          It appears this afternoon there is just

14 going to be two witnesses; is that correct?

15          MS. POLLOCK:  Correct.

16          THE COURT:  Pardon me?

17          MS. POLLOCK:  Yes.

18          THE COURT:  Matthew Herndon and Dr. Pearson.

19          MS. POLLOCK:  Yes, and possibly Michelle

20 Zortman.  I am not sure what her status is right now

21 on arrival.

22          THE COURT:  We have a matter to discuss with

23 the University of Illinois.  Okay.  Let's take a

24 break and resume here in ten minutes or so.

25          But let me say this, maybe the government

1 should, if you can come back in 5 or 10 minutes, too

2 because, I'm going to ask if you want to be part of

3 this.

4        MR. MILLER:  I believe we can answer.

5        THE COURT:  You don't want to?  That's fine.

6        MR. MILLER:  I don't believe we have

7 anything.

8        THE COURT:  Fair enough.  We will resume

9 let's resume here in 5 or 10.

10        MR. MILLER:  Thank you, Judge.

11        (The court took a recess at 11:55 a.m.)

12                    *****

13

14

15

16

17

18

19

20

21

22

23

24

25