1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF ILLINOIS.
2


3

UNITED STATES OF AMERICA,
4                                    Docket No. 17-20037
              Plaintiff,
5
    vs.                              Peoria, Illinois
6                                    July 11, 2019
                                     1:34 p.m.
7    BRENDT A. CHRISTENSEN,

8              Defendant.

9


10


11         SENTENCING -- July 11, 2019 (Afternoon)

12


13


14          BEFORE THE HONORABLE JAMES E. SHADID

15              UNITED STATES DISTRICT JUDGE

16


17


18


19


20              LISA KNIGHT COSIMINI, RMR-CRR
21               U.S. District Court
                 201 South Vine
22              Urbana, Illinois 61802
                 217-355-4227
23


24

Proceedings recorded by mechanical stenography;
25   transcript produced by computer.

SENTENCING -- July 11, 2019 (Afternoon)

```
 1   A P P E A R A N C E S :

 2   For the Plaintiff:        EUGENE L. MILLER, ESQUIRE
                               BRYAN D. FRERES, ESQUIRE
 3                             Assistant United States Attorneys
                               201 South Vine Street
 4                             Urbana, Illinois 61802
                               217-373-5875
 5
                               JAMES B. NELSON, ESQUIRE
 6                             U.S. DEPARTMENT OF JUSTICE
                               Capital Case Section
 7                             1331 F Street NW, Suite 625
                               Washington, DC 20004
 8                             202-598-2872

 9
     For the Defendant:        GEORGE F. TASEFF, ESQUIRE
10                             Assistant Federal publish Defender
                               401 Main Street, Suite 1500
11                             Peoria, Illinois 61602
                               309-671-7891
12
                               ELISABETH R. POLLOCK, ESQUIRE
13                             Assistant Federal publish Defender
                               300 West Main Street
14                             Urbana, Illinois 61801
                               217-373-0666
15
                               ROBERT L. TUCKER, ESQUIRE
16                             Robert L. Tucker, Esq
                               7114 Washington Avenue
17                             St. Louis, Missouri 63130
                               703-527-1622
18
                               JULIE C. BRAIN, ESQUIRE
19                             Attorney at Law
                               916 South 2nd Street
20                             Philadelphia, Pennsylvania 19147
                               267-639-0417
21

22

23

24

25
```

SENTENCING -- July 11, 2019 (Afternoon)

<u>I  N  D  E  X</u>

<u>Page</u>

<u>DEFENSE WITNESSES IN MITIGATION</u>:

MATTHEW HERNDON

    Direct Examination by Ms. Pollock ............... 143

    Cross-Examination by Mr. Nelson ................. 151

ARGUMENT (Re Pearson Testimony) .................... 153

```
 1                (In open court; jury absent; 1:34 p.m.)
 2                THE COURT:  All right.  Do I understand we're
 3      going with Mr. Herndon and then, because of a scheduling
 4      issue, we're going to have to take a break before Dr.
 5      Pearson can come on?
 6                MS. POLLOCK:  That's correct, Your Honor.  And
 7      I apologize to the Court and the government.  That was my
 8      mistake.  I had her thinking she was scheduled tomorrow.
 9      She's not.  I called.  They're going to come over as soon
10      as they can.
11                THE COURT:  Government have anything to say on
12      this?
13                MR. NELSON:  Not with regard to the order.
14                We do have an issue to address with regard to
15      Dr. Pearson.
16                THE COURT:  Well, we'll have time do it.
17                Okay.  So let's get Herndon on and then take an
18      extended break and address any issues and then --
19                MS. POLLOCK:  Let me just verify that he's
20      here, Your Honor.
21                THE COURT:  Okay.  I'm going to tell the jury
22      that the schedule we're on likely will have us concluding
23      evidence Monday or Tuesday.  Fair enough?
24                MS. POLLOCK:  I think Tuesday's safe, Your
25      Honor, because we'll be calling -- tomorrow it will be
```

SENTENCING -- July 11, 2019 (Afternoon)

1    Michelle Zortman in the morning, followed by the

2    counselors, followed by Dr. Zoline.

3          Then Monday will be the Livingston County

4    guards, followed by Mr. Christensen's mother and sister.

5          And then the defense should rest on Monday.

6          Dr. Sorensen is not going to go on.  We are

7    calling him off.

8          And so in terms of whatever rebuttal the

9    government wishes to put on and the Court allows, I'm

10   guessing that would be Tuesday; and then we can either

11   close Tuesday or Wednesday.

12          THE COURT:  Okay.

13          Sound right?

14          MR. NELSON:  Yes, Your Honor.

15          MR. MILLER:  Yes, Your Honor.

16          MR. NELSON:  Given that representation, that

17   will shorten our rebuttal.

18          THE COURT:  Okay.

19          MS. POLLOCK:  And Professor Herndon is here,

20   Your Honor.

21          THE COURT:  All right.  Let's have the jury

22   down.

23          (Brief pause in proceedings.)

24          (Jury present, 1:37 p.m.)

25          THE COURT:  All right, please be seated.  Thank

SENTENCING -- July 11, 2019 (Afternoon)

 1  you.
 2          Ladies and gentlemen, we're going to have a
 3  witness for the defense.  We've actually gotten ahead of
 4  ourselves today; so then we're going to take, maybe, an
 5  hour recess which you'll be allowed to leave the
 6  building, if you wish, and then come back.  And then Dr.
 7  Pearson will finish the day.
 8          We're probably going to have a relatively full
 9  day tomorrow and Monday as well.  But the parties think
10  that, if we stay on the schedule we're on, that evidence
11  would conclude sometime Tuesday at the latest.  And then
12  we would prepare the case -- maybe closing on Wednesday;
13  if that advanced some, we might move up a day.  But I
14  think for your scheduling purposes, we'll start with
15  that.  Okay?
16          So for now, we'll have Mr. Herndon?
17          MS. POLLOCK:  Yes.
18          THE COURT:  All right.  Sir, you want to come
19  forward.
20           MATTHEW HERNDON, sworn, 1:39 p.m.
21          MS. POLLOCK:  Good afternoon.
22          WITNESS HERNDON:  Good afternoon.
23          MS. POLLOCK:  Could you --
24          WITNESS HERNDON:  Can I ask that, when you
25  address me, you face me directly because I have hearing

SENTENCING -- July 11, 2019 (Afternoon)

1    loss?

2              MS. POLLOCK:  Certainly.

3              WITNESS HERNDON:  And try to speak, maybe, a

4    little louder than you usually do.

5              MS. POLLOCK:  Okay.  I will.

6              Can you hear me?

7              WITNESS HERNDON:  Yes.

8              THE COURT:  I wish every witness would show up

9    here and ask everybody to speak loud.  That's perfect.

10             Let's proceed.  Go ahead.

11               DIRECT EXAMINATION BY MS. POLLOCK:

12        Q    Can you please state your name and spell your

13   last name for the court reporter?

14        A    My name is Matthew Herndon, and that's

15   H-e-r-n-d-o-n.

16        Q    And, sir, where do you live?

17        A    I live in Verona, Wisconsin.

18        Q    Do you have a job?

19        A    Yes.

20        Q    Where do you work?

21        A    I'm a professor of physics at the University of

22   Wisconsin.

23        Q    How long have you been a physics professor at

24   Madison?

25        A    Since 2005.

1    Q    Did you work anywhere prior to that?

2    A    Yes.  I worked at Johns Hopkins University

3  before that; and before that, the University of Maryland;

4  and before that, the University of Texas.

5    Q    Okay.  Do you have a doctorate in physics?

6    A    I do.

7    Q    Where from?

8    A    I have a doctorate in physics from the

9  University of Maryland.

10    Q    Okay.  What area of physics do you research in?

11    A    Specifically I research particle physics.

12    Q    Okay.  And do you recall having Brendt

13  Christensen as a student at Madison?

14    A    I do.

15    Q    Can you tell us your recollection of him and

16  how you met him?

17    A    Brendt Christensen was a student in my particle

18  physics class for undergraduates when he was a junior, or

19  in the spring of 2012.

20         After he took the class from me, he asked to do

21  research for me; and I hired him as an undergraduate

22  researcher, and he worked for the year after that for me.

23    Q    Is it common to have undergraduates researching

24  for you as a junior in college?

25    A    Yes.  Typically, I have at least one

1  undergraduate researching for me at any time.

2      Q    When Brendt was a senior at the university,

3  were there any other undergraduate students working for

4  him -- working for you?  I'm sorry.

5      A    Sorry.  I didn't understand.

6      Q    Working for you, how many other undergraduates

7  worked for you?

8      A    At that point, I had three.

9      Q    And, specifically, what did you have him doing?

10      A    I had them doing a research project to try to

11  assess the potential of certain, observing certain

12  physics processes at the Large Hadron Collider in Geneva,

13  Switzerland.

14      Q    Did they actually have to travel to Europe?

15      A    No.  They did not.  Their work was on

16  computers.

17      Q    What -- can you be a little bit more specific

18  about what they were doing on the computers?

19      A    So they would run programs that would simulate

20  physics processes and then could study the process of

21  interest and any other related processes and try to

22  determine whether the detecter was capable of seeing that

23  and measuring it.

24      Q    Okay.  What was your impression of Brendt as a

25  student?

1      A      Brendt scored an A in my class and was one of

2    the higher As as I recall.  He was a good student.

3      Q      What about personally?  Did you ever interact

4    with him personally during the time he was your student?

5      A      No.  In general, I only interacted with him

6    professionally.

7      Q      Okay.  How -- so you said he approached you to

8    ask about research?

9      A      Yes.

10     Q      Is that usually how you get your student

11   researchers?  Or do you select them somehow?

12     A      Yes.  All, all the students I've ever hired

13   have approached me and asked to do research for me.

14     Q      Okay.  And was he paid for that position?

15     A      He was.

16            MS. POLLOCK:  Mr. Kelly, could you refresh my

17   recollection about what exhibit number I'm on, please?

18            COURTROOM DEPUTY:  132.

19            MS. POLLOCK:  May I approach, Your Honor?

20            THE COURT:  You may.

21   BY MS. POLLOCK:

22     Q      I've just handed you a, what's been marked for

23   identification as Defendant's Exhibit Number 132.  Can

24   you take a look at that, please?

25            Do you recognize that?

SENTENCING -- July 11, 2019 (Afternoon)

1      A      I do.  Yes.

2      Q      What is it?

3      A      This is a recommendation letter I wrote for Mr.

4  Christensen to get into graduate school.

5      Q      Okay.  Did you have any conversations with him

6  about graduate school before he applied?

7      A      I did.

8      Q      Can you describe those conversations?

9      A      In general, I indicated a list of graduate

10  schools that I thought would be good for him to apply and

11  probably discussed strategies for how to write your

12  application and so on.

13      Q      Okay.  Is that something that you would do

14  generally for students who were working for you?

15      A      Yes.

16      Q      And what universities did you recommend?

17      A      I can't recall all the universities, aside from

18  the University of Illinois.

19      Q      Was there a reason why the University of

20  Illinois was on that list?

21      A      Generally, I would pick a top-tier university

22  and maybe a second-tier and a third-tier -- just a

23  variety of things -- so that it's likely the student

24  would get into one of them.

25      Q      And was the University of Illinois the top tier

1    that you recommended?

2         A    I don't recall if I recommended something like

3    Harvard or Cornell or something, so it's possible it was

4    the top tier.  University of Illinois is very highly

5    rated.

6         Q    So you say Illinois is highly rated in physics?

7         A    I'm sorry; could you --

8         Q    Illinois is highly rated in physics?

9         A    Yes.

10        Q    Okay.

11        A    Specifically in my area.

12             MS. POLLOCK:  Your Honor, permission to admit

13   and publish 132?

14             MR. NELSON:  No objection, Your Honor.

15             THE COURT:  It can be admitted.  You may

16   publish.

17   BY MS. POLLOCK:

18        Q    Can you please read your letter to the jury?

19        A    Yes.

20             "To The Graduate Admissions Committee.

21             "Dear Members of the Graduate Admissions

22   Committee:  I am writing this letter in support of Brendt

23   Christensen's application for admission to your graduate

24   program.  Brendt has an excellent record of academic and

25   research achievement and a keen interest in the subject

SENTENCING -- July 11, 2019 (Afternoon)

1  of physics research.  I believe he will make an excellent

2  graduate student and urge you to admit him to your

3  program.

4          "I've worked closely with Brendt over the last

5  year.  Brendt asked me -- asked to work with me after

6  taking my introductory course in particle physics.  I was

7  very happy to take Brendt on as a student considering

8  that he was one of the best students in the class,

9  showing a superior grasp of the material.  Brendt had

10  worked with me -- Brendt has worked with me performing

11  research on the Compact Muon Solenoid experiment at the

12  Large Hadron Collider accelerator.  He has primarily

13  worked on an analysis project I describe below.

14          "Brendt is performing his undergraduate thesis

15  research on physics measurements involving two W boson

16  final states.  He is analyzing cases where the two W

17  bosons have opposite charge and where they have, both

18  have positive charge.  The latter is an exotic state in

19  particle physics that can produce a proton-proton

20  collider like the LHC.  Current theory predicting the

21  probability of producing these states has a critical

22  weakness, and the calculations show of probability

23  greater than unity at high energies.

24          "A process that could resolve this is

25  scattering by the Higgs boson, which would contribute

1    negatively to the process due to interference effects.

2    The recently discovered 125 GeV boson could play a role

3    in this type of process and is very sensitive in

4    determining the exact nature of the newly discovered

5    particle and demonstrating whether the boson is the Higgs

6    boson predicted by the standard model and nonstandard

7    model -- or the nonstandard model analog.

8          "While supervising Brendt's analysis research,

9    I have noted that he quickly learns and understands all

10    the tools of high energy physics research.  In addition,

11    Brendt is one of three undergraduate researchers I am

12    working with this semester, and I have noted that Brendt

13    takes the leading role among the three, integrating their

14    research efforts into an effective team effort.  This

15    type of leadership quality is extremely valuable in

16    experimental research where research is typically done by

17    a team of people who need to work together effectively.

18    Due to Brendt's skills, I expect this project to produce

19    a publishable piece of research.

20          "In summary, I think Brendt Christensen is an

21    excellent student with a record of accomplishment in both

22    academics and research, and I expect he will excel in

23    graduate school.  Therefore, I again urge you to admit

24    him to your program.

25          "Sincerely, Matthew F. Herndon, Professor of

SENTENCING -- July 11, 2019 (Afternoon)

1    Physics, University of Wisconsin-Madison."

2        Q    Thank you.

3             So during the year that Brendt performed

4    research for you, did you get a feel for his personality?

5        A    Other than what I've noted, that he seemed a

6    leader among the three students who was working for me.

7    I really primarily interacted with him professionally.

8    He seemed like any other physics student that I had.

9        Q    So you didn't socialize together?

10       A    No.

11       Q    Did you -- were you aware that he was married?

12       A    I was not.

13       Q    Okay.  After Brendt was accepted into the

14   program at the University of Illinois, did you have any

15   continuing contact with him after that point?

16       A    No.  I did not.

17            MS. POLLOCK:  Nothing further.  Thank you.

18             CROSS-EXAMINATION BY MR. NELSON:

19       Q    Good afternoon, sir.

20            At the time you knew him, the defendant was

21   smart?

22       A    Yes.

23       Q    And at the time you knew him, the defendant had

24   no obvious difficulties; he was a normal student?

25       A    He seemed a normal student.  Yes.

1      Q      Okay.  At the time you knew him, the defendant

2  was good at what he dedicated himself to?

3      A      Could you repeat the question, please?

4      Q      At the time you knew him, was the defendant

5  good at what he dedicated himself to?

6      A      He was.  Yes.

7      Q      Okay.  And after he left the University of

8  Wisconsin, you don't know anything about the choices that

9  he made?

10      A      Not until I saw him in the news.

11              MR. NELSON:  Okay.  Nothing further.

12              MS. POLLOCK:  No redirect, Your Honor.

13              THE COURT:  All right.  Sir, you want to

14  push -- hand me that.  I'll take this.  You want to push

15  that microphone away.  You're free to go.  Thank you,

16  sir.

17              (Witness Herndon excused, 1:49 p.m.)

18              THE COURT:  All right.  I think that at this

19  point, then, we'll take an extended break until 3:00.

20  So -- I don't know what to tell you to do, but you're

21  free to leave the building.  Just do not discuss the

22  matter with anybody, including yourselves.

23              If you need to make -- well, you could retrieve

24  your phones if you need to make phone calls, things like

25  that.  Has that been a problem, retrieving your phones?

1    Okay.

2            All right, we'll see you back here at 3:00.

3    All right?  Thank you.

4                    (Jury absent, 1:50 p.m.)

5            THE COURT:  3:00 works, right?  Did you want me

6    to make it, maybe, quarter to 3:00 just in case?  I guess

7    I could do that.  I don't see how, given --

8            MS. POLLOCK:  I think that given Dr. Pearson's

9    departure time that that might be risky.

10           THE COURT:  All right.  Okay, let's visit a

11   second about any issues that -- Mr. Nelson, you wanted to

12   raise an issue?

13           MR. NELSON:  Yes, Your Honor.  As the Court's

14   aware, we had filed a motion to exclude Dr. Pearson's

15   testimony under Rule 12.2.

16           THE COURT:  Uh-huh.

17           MR. NELSON:  And I'm looking at docket entry

18   432, the Court's order on this issue, indicating that, in

19   the Court's opinion, this did seem to fall under Rule

20   12.2 and asking the defense by July 8th -- so last

21   Monday -- to make a record regarding the timing of the

22   expert disclosure, which there has not been any, and the

23   actual dates of the records.

24           And so given all of this, I don't see -- I

25   don't see a reason why Dr. Pearson should be testifying

1   at all.  If the only reason she would be on the stand is

2   to testify as to her meetings with the defendant and her

3   diagnosis of him with a mental condition, that seems like

4   it would be pretty squarely excluded under Rule 12.2.

5           THE COURT:  Who's going to handle Dr. Pearson?

6           MS. BRAIN:  I am, Your Honor.

7           THE COURT:  Ms. Brain?

8           MS. BRAIN:  Yes.

9           THE COURT:  I think I expected to raise the

10  issue on the morning of July 8th and apparently didn't as

11  to the disclosure of any -- and the dates of the records.

12          So what are the dates of the records that, of

13  her treatment?

14          MS. BRAIN:  The dates -- the records begin in

15  January of 2016, and they end in February of 2017.

16          THE COURT:  Okay.  And you're expecting her to

17  testify to what?

18          MS. BRAIN:  Basically, the contents of the

19  records.  She saw him -- I believe it was nine times over

20  the course of the year.  She met with him -- it goes

21  through some extensive history the first time; met with

22  him every month, or other month, for the year; and

23  prescribed him medications, changed those medications on

24  a couple of occasions.

25          THE COURT:  All right.  Are you intending to

SENTENCING -- July 11, 2019 (Afternoon)

```
 1    elicit any opinions about connecting her treatment to his

 2    mental state on or near June of 2017?

 3              MS. BRAIN:  The only thing I would potentially

 4    ask her is if she had diagnosed him with persistent

 5    depressive disorder, and I think she would be able to say

 6    that that persistent -- a disorder of that kind typically

 7    would not go away overnight.  But that's as far as we

 8    would go.

 9              THE COURT:  See, I think she'd be able to say

10    that if there had been a 12.2 disclosure, but I don't

11    think she can say that without the disclosure and based

12    on the withdrawal of the mental health defense.

13              So if you ask that question -- I'm not going to

14    try to -- I think I've set the parameters.  I'm not going

15    to -- if that question's asked, if there's an objection

16    to that question, it's likely to be sustained.  I'll

17    first hear the question, but I think my order is that I

18    thought -- I think I'm being relatively liberal in my

19    interpretation and allowance of having Dr. Pearson be

20    able to testify as to Mr. Christensen's mental condition

21    as she saw it at the time that she was seeing him, but

22    that would end in February of 2017.

23              And I think any attempt to get an opinion, or

24    elicit an opinion as to whether that condition would

25    still be in effect in June, or at the time of the
```

SENTENCING -- July 11, 2019 (Afternoon)

1    offense, would not be appropriate.

2              So with that in mind, anything further, Mr.

3    Nelson?

4              MR. NELSON:  Yes, Your Honor.  Respectfully,

5    that doesn't go far enough, and there's a reason why.

6              First of all, you're going to let her put in a

7    record that says "persistent depressive disorder."

8    Everyone knows what "persistent" means.

9              Also, we know from jury selection that there

10   are members of this jury who have depression issues and

11   other issues like that, so people know that it doesn't

12   just go away overnight.  And so we're now letting the cat

13   out of the bag, and they did withdraw their mental health

14   notice.

15             So it either needs to be excluded wholesale,

16   including the records, or else -- I mean, you look at

17   the -- I've got the DSM-5 with me, and there are

18   differential diagnoses to persistent depressive disorder,

19   which include substance abuse, depressive disorder, and a

20   variety of personality disorders.

21             And so my cross-examination of this witness

22   will be very long and linked to the DSM-5 and a number

23   of, frankly, personality disorders which we would have

24   tested the defendant for had we been permitted to do so.

25   And I will need to lay a foundation for our rebuttal

1    expert witness to come in and testify that, in fact, he

2    did not have persistent depressive disorder; he had a

3    personality disorder.

4              And we're now litigating 12.2 issues without

5    the benefit of the actual 12.2 process; and the only way

6    that this doesn't create a serious problem on appeal for

7    everyone is to keep it out, which they elected to do,

8    fully aware of the consequences.

9              MS. BRAIN:  It's just not covered by 12.2, Your

10   Honor.  It's just not because -- I mean, let me put it in

11   another way.

12             It's not excludable under 12.2.  12.2 has two

13   basic requirements.  One is notice, that the government

14   will have notice of what the expert is going -- is --

15             THE COURT:  When did the government have notice

16   of Dr. Pearson's --

17             MS. BRAIN:  It was March 20th of this year.

18             MR. NELSON:  She was not noticed as a witness,

19   Your Honor.  She -- we never received -- they know what

20   they need to do with a 12.2 notice, because they did it,

21   and Dr. Pearson wasn't on the list; and there was no

22   notice given that Dr. Pearson was going to be testifying

23   about this condition.

24             MS. BRAIN:  Well, her records were turned over

25   at that time, March 14th of this year.  So her records --

1   which obviously revealed her identity.

2           We didn't put her in our 12.2 notice because

3   she wasn't -- she's not covered by 12.2.  We gave them

4   notice --

5           THE COURT:  What is she noticed by?

6           MS. BRAIN:  She's an historical witness.

7   Because her recollection is limited to the information

8   that's in the records, it would be a violation of Mr.

9   Christensen's Fifth Amendment rights to permit the

10  government to interrogate him based on -- when we don't

11  have an expert who --

12          THE COURT:  You keep saying that.  I don't, I

13  don't really know what you mean by that, to tell you the

14  truth.

15          Do you think that I would just allow the

16  government to go, walk into his cell and bring their

17  experts in and examine him and you -- and just like that?

18  Is that what you think happened over the last year?  I

19  don't know what you mean by it would be a violation of

20  his Fifth Amendment right to have him be examined.

21          MS. BRAIN:  I'm sure I'm being unclear, Your

22  Honor.

23          What I meant to say is the waiver of the Fifth

24  Amendment in the context of psychological evaluations is

25  perfectly coextensive with the waiver of the Fifth

1   Amendment privilege, such as when a defendant elects to

2   testify.

3           And so putting Dr. Pearson on the stand to

4   recount her limited knowledge wouldn't trigger the

5   government's right to put Mr. Christensen on the stand

6   and, equally so, doesn't trigger their right to have him

7   interrogated by an expert because 12.2 is a procedural

8   rule, but it's based upon the Fifth Amendment privilege

9   that the defendant has not to speak -- not to incriminate

10  himself with government experts.

11          There's an exception to that, obviously, for

12  rebuttal; but --

13          THE COURT:  You know, this was complicated by

14  the fact that I'm trying to make rulings that allow you

15  to present a defense and mitigating evidence factors for

16  Mr. Christensen at the same time that you -- and allowing

17  you to use what are clearly experts in doing so.

18          You would consider Dr. Pearson an expert in her

19  field, right?

20          MS. BRAIN:  In her field, yes, I would.

21          THE COURT:  Okay.  And do you believe that it's

22  this specialized knowledge that she has that her

23  testimony would assist the trier of fact?

24          MS. BRAIN:  Not in the same sense as a

25  traditional 702 expert, Your Honor, because her

1    information is purely historical.  You have to

2    remember --

3              THE COURT:  But you just said -- you just said

4    that you were going to ask her -- until I said you

5    weren't -- you were going to ask her that, to opine that

6    a person with this diagnosis would still have it, or it

7    wouldn't go away, connecting it to the day, or the month

8    of the inc-- the crime.

9              MS. BRAIN:  Yes, but that wouldn't be connected

10   to Mr. Christensen because she has no, no knowledge of

11   whether or not his disorder persisted or it didn't.

12             She would simply be talking about disorders in

13   general and what, what she knows as a psychiatrist.

14             She certainly -- as the Court correctly says,

15   she didn't see him after February, so that's the extent

16   of her knowledge.

17             THE COURT:  What do you think her testimony

18   bears on the -- what issue does it bear on?

19             MS. BRAIN:  The fact that he had symptoms of

20   mental illness, symptoms of the depression and anxiety

21   and panic attacks, and other --

22             THE COURT:  And your purpose for presenting

23   this is to argue what?

24             MS. BRAIN:  That that is a mitigating factor

25   the jury should find weighs against a sentence of death.

1            THE COURT:  As to his punishment.

2            So tell me why that isn't a 12.2(b) that says,

3    "If a defendant intends to introduce expert evidence

4    relating to a mental disease or defect or any other

5    mental condition of the defendant bearing on either (1)

6    the issue of guilt or (2) the issue of punishment in a

7    capital case, the defendant must -- within the time

8    provided for filing a pretrial motion -- notify an

9    attorney for the government in writing of this

10   intention."

11           So tell me why that doesn't apply here.

12           MS. BRAIN:  Our position is that because she's

13   an historical expert and hasn't examined him as part of

14   this litigation that she doesn't fall within the context

15   of that rule.

16           But even if the Court disagrees, what that

17   section does is trigger two requirements.  One is notice,

18   which they have had; and the other is an evaluation under

19   the, under certain circumstances.  And because this is

20   not the circumstances under which their right to an

21   evaluation is triggered -- because that would violate the

22   Fifth Amendment, Mr. Christensen's Fifth Amendment

23   privilege -- we have forgone our, our -- what's the

24   word? -- current assessment of --

25           THE COURT:  Well, okay, let's talk about the

1  notice.  Did you give notice?

2          MS. BRAIN:  We didn't give formal notice, Your

3  Honor; no, we did not.  We, we passed along the records,

4  and she's been on our witness list for a while, but we

5  did not give formal notice.

6          However, I would --

7          MR. MILLER:  Judge, if I -- on this notice

8  thing, this is not a secret.  This was a major issue of

9  whether they were going to give notice or not.  They gave

10  notice; they withdrew it.  We had a court hearing.  We

11  had the -- with you back in chambers.  They said they are

12  withdrawing the mental health defense.  They're

13  withdrawing their notice.

14          So I can't believe she's standing here

15  suggesting that they gave notice that Dr. Pearson was

16  going to be an expert witness, which would have allowed

17  us to examine him, which our doctors were ready to do

18  until the weekend before they were going to examine him

19  and they withdrew notice.

20          So I had to stand up to say:  The idea that

21  they gave notice of Dr. Pearson as an expert witness

22  under 12.2 is clearly wrong.

23          MS. BRAIN:  The issue of notice, Your Honor, we

24  would submit, we did not think she would be covered by

25  12.2.  But in any event, we gave them notice of her

1  existence, her records, the entire universe of knowledge

2  that she has.

3           And they are only permitted to rebut what they

4  have access to.  We only have access to those records,

5  and so they should only have access to those records.

6  They should not be able to then go above and beyond what

7  we have, violate Mr. Christensen's Fifth Amendment

8  rights, and --

9           THE COURT:  Well, you -- well, but that's a

10 decision you made because you just said that you didn't

11 think that Dr. Pearson was a 12.2 witness.

12          In other words, if you had noticed her as a

13 12.2 witness like you noticed 12.2 witnesses, the other

14 ones, then pursuant to (c) then I set out a procedure, or

15 a process, for your examinations and for the government's

16 examinations.  So --

17          MS. BRAIN:  Well, we --

18          THE COURT:  -- the fact that you chose to

19 decide on your own what you thought Dr. Pearson was

20 doesn't change the fact of what she's testifying to, does

21 it?

22          She's testifying as to mental health issues as

23 to the defendant; and the point of her testifying, you

24 said, was to be a factor in mitigation to argue the

25 possible punishment of the, to the defendant.

SENTENCING -- July 11, 2019 (Afternoon)

1          MS. BRAIN:  Could I have a second, Your Honor?

2          THE COURT:  Yeah.

3              (Brief pause in proceedings.)

4          MS. BRAIN:  I apologize, Your Honor.  Thank

5     you.

6          THE COURT:  That's okay.  Take your time.

7          MS. BRAIN:  And now I've forgotten the Court's

8     question.  Beg your pardon.

9          THE COURT:  My question was that, regardless of

10    what you thought, whether or not you thought she was a

11    12.2 witness or not, the 12.2 notice was withdrawn.

12             Now you're calling Dr. Pearson to testify as to

13    mental health issues, and that will be related to the

14    mit-- as you say, the mitigating factors as to the issue

15    of punishment.  So that is clearly defined in 12.2 and

16    the reason for 12.2.

17             Now, the fact that we've gotten this far

18    along -- and I have actually ruled previously that I'll

19    allow her to testify historically -- was based upon

20    representations as to what this testimony would be.

21             And then today, as Mr. Nelson raises the issue,

22    you say that you were going to ask her about whether a

23    person with this persistent depressive diagnosis, or

24    diagnosis of persistent depression -- I don't remember

25    exactly what it is -- would have -- would that person

1   still have that going forward, presumably, June of 2017?

2          I just don't see how that isn't bringing his

3   mental health issues in complete full circle as to his

4   condition and punishment.

5          MS. BRAIN:  Well, that would be a separate

6   issue, and I understand the Court's already ruled that we

7   need not ask that question.  I don't think that would

8   trigger 12.2.

9          But, nevertheless, even if there's no

10  connection but the crime [inaudible], there's a direct

11  line of cases where mitigation does not have to have an

12  explicit nexus to the crime.  Jurors can find that it's

13  mitigating.  They don't have to find that it caused the

14  crime or had some explicit connection in order to do

15  that.

16          And Dr. Pearson's more of a fact witness than

17  she is an expert in many ways because her universe of

18  knowledge is so limited, because it's historical, and

19  because it's all contained in those records.

20          Our notice was, was deficient -- if the Court

21  finds our notice was deficient, we submit that exclusion

22  is not a proper remedy for a problem with notice.  The

23  Rule commentary makes clear that exclusion is an extreme

24  remedy that should only be used in the narrowest of

25  circumstances.

1          The fact that they have had the records for

2     several months, that they know everything that we know

3     about Mr. Christensen based on those records they have

4     access to -- so it does not trigger an evaluation by

5     their own expert because we haven't had -- we're not

6     presenting that kind of evidence ourselves.  We --

7          THE COURT:  Well, you're not, you're not going

8     to present it -- or are you telling me that you're just

9     going to present it factually like that?

10          Or are you going to have her explain what that

11     diagnosis means?

12          Or what the reason for this prescription was?

13          Or what the -- or what this finding relates to?

14          MS. BRAIN:  I'm not going to ask her what the

15     diagnosis was.  I was simply anticipating walking through

16     her records and what symptoms she reported and noted,

17     what medications she prescribed.  I would intend to ask

18     her what the purpose of those medications are, but we're

19     not asking her to --

20          THE COURT:  What is -- what was her diagnosis?

21     Persistent what?

22          MS. BRAIN:  Persistent depressive disorder with

23     anxiety, symptoms of anxiety or anxious distress.

24          THE COURT:  So you can say when she testifies

25     to that your next question wouldn't be:  *Would you please*

1   *explain to the ladies and gentlemen of the jury what that*

2   *means?*

3           MS. BRAIN:  It probably should have been.

4           MS. POLLOCK:  Can I say something real quick?

5           THE COURT:  Uh-huh.

6           MS. POLLOCK:  Because I'm doing the closing in

7   this case.

8           THE COURT:  All right.

9           MS. POLLOCK:  And I can tell you what I'm going

10  to argue and what I'm not going to argue, and the purpose

11  of Dr. Pearson's testimony is to establish a chunk of

12  historical time in the life of Brendt Christensen, which

13  is that -- and we've heard the theme throughout the

14  trial, from the beginning to the end, from the open to

15  the close.  It is he started off as this successful guy.

16  At some point, something happened, and he took it down --

17  he went downhill.

18           This is part of that narrative because when

19  he -- when he was depressed and failing in school and

20  unable to deal with himself, he went to the doctor.  He

21  saw the doctor.  His wife encouraged him to go to the

22  doctor.  He did see the doctor.  He got treatment for

23  some symptoms of depression and ultimately ended up not

24  working, and he committed this crime.  That is the

25  narrative.

SENTENCING -- July 11, 2019 (Afternoon)

1          So we're really focused in on:  Is Dr. Pearson

2     being called as an expert witness to establish a mental

3     condition that at the time -- it's not the fact that he

4     had persistent depressive disorder that is the mitigating

5     factor.  It's the fact that he had all these symptoms of

6     depression and anxiety and everything else; and he tried

7     to take medication for it, and it didn't work.  That's

8     why we're presenting her testimony.

9          THE COURT:  But --

10         MS. POLLOCK:  And if you exclude her testimony,

11    then we have no way of getting this stuff in.

12         THE COURT:  But isn't it -- yes, you did; it

13    was a 12.2 notice.

14         Now, hear me out.  Isn't the part where you say

15    *but it didn't work,* isn't that the connection?

16         MS. POLLOCK:  No.  That's the -- no, no.

17         THE COURT:  How is it not?  How is that not

18    something that the government should have the ability to

19    have had their own experts make their independent

20    determination as to whether or not it worked or whether

21    or not it even existed?

22         MS. POLLOCK:  They can have an expert.  They

23    can review the records and testify to them.  That's

24    exactly --

25         THE COURT:  But that doesn't -- but how

1  would --

2          MS. POLLOCK:  Not --

3          THE COURT:  How does anybody say that it did or

4  did not work --

5          MS. POLLOCK:  Well, --

6          THE COURT:  -- without an, without an opinion

7  that it would still be in place?

8          MS. POLLOCK:  I see what the Court is saying,

9  and I think the answer to that question is that that's an

10 argument factor for the defense to make.  If we

11 don't have an expert -- we're not going to have an expert

12 say that.  That's going to be a reasonable inference that

13 we can argue, and the government can say no.

14         But -- and if the Court doesn't want me to

15 argue that, then that's fine; we won't argue it.

16         But the point is that he saw -- we gave them

17 the records.  He saw her for this period of time.  It's

18 the fact that he saw her, the fact that he was medicated.

19 That's all we want.

20         If they have a doctor who wants to look at the

21 records -- because Dr. Pearson hasn't examined him.  She

22 hasn't seen him in two and a half years.  So why should

23 the government get to examine him based on her records

24 when we're not presenting anybody that examined him based

25 on her records?  It's a reciprocity thing.

1          They can have a doctor.  They have doctors on

2     their rebuttal list.  If they want to look at Dr.

3     Pearson's records and say, "*According to my impression,*

4     *this is not persistent depressive disorder,*" or

5     "*According to my impression, this medication is*

6     *incorrect; it shouldn't have been prescribed,*" or "*He was*

7     *fine,*" or whatever, they can do that if they want to, but

8     that's the rebuttal.

9          THE COURT:  Then forget 12.2 a second.  Then

10    why isn't that, at the very least, a 702 disclosure?  But

11    *there's been no disclosure of Dr. Pearson made here* is

12    what I'm hearing.

13         MS. POLLOCK:  Well, we, we disclosed the

14    records and put her on the witness list.  We didn't --

15    she's not a 702 expert that we're calling to establish

16    her opinion that he had persistent depressive disorder.

17    That's not what we're saying.  We're not trying to get in

18    that that -- we're not saying:  *Did you diagnose him with*

19    *this?  And is that your opinion that this diagnosis is*

20    *correct?*  That's not what we're doing.

21         We're saying:  *You saw him.  He had these*

22    *symptoms.  You treated him.  You gave him this*

23    *medication.*

24         We're not trying to get a diagnosis out of her.

25         MS. BRAIN:  That's right.  The reason why I

 1  stumbled with the Court's question, Your Honor, is

 2  because I wasn't planning to ask him -- ask her, sorry --

 3  whether Mr. Christensen had persistent depressive

 4  disorder.

 5           In point of fact, we don't think he did.  We

 6  think he had something else entirely, but that's for a

 7  whole other day -- not in this trial.

 8           THE COURT:  I'm not, I'm not sure, then -- but

 9  you're, but you're going to --

10           MS. BRAIN:  Establish the symptoms she saw and

11  the information he told her -- the symptoms she saw, what

12  she called it, and what med-- and what medication she

13  gave him.

14           THE COURT:  And she called it a persistent

15  what?

16           MS. BRAIN:  Depressive disorder.

17           THE COURT:  But you just said you don't even

18  believe that's the case yourself; you think it was

19  something else?

20           MS. BRAIN:  That was misleading for me to say.

21  I personally?  Yeah, I do.  But that, of course, is not

22  relevant.

23           What I mean --

24           THE COURT:  That starts to raise more issues.

25  Go ahead.

SENTENCING -- July 11, 2019 (Afternoon)

1            MS. BRAIN:  Yeah.  I was just trying to explain

2    why --

3            THE COURT:  I understand that.  I understand

4    that.  But --

5            MS. BRAIN:  She's the expert, not me.  I

6    shouldn't have said that.

7            What I meant to say was, as Ms. Pollock

8    correctly said, we're not -- we're not trying to prove

9    that Mr. Christensen had persistent depressive disorder,

10   nor will we argue that.

11           What we're interested in is the symptoms that

12   he reported, the presentation, the fact that he went

13   there, went there regularly, was seeking help, got some

14   help; but his symptoms did not improve over the entire

15   slightly over a year that she treated him.  That's what

16   we're, we're interested in trying to prove.

17           They have the same access to this information

18   as we do because it's all contained within the universe

19   of Dr. Pearson's records.  So there's no, there's no

20   triggering of 12.2 allowance of potential government

21   evaluation because it's all in the records.

22           MR. NELSON:  Respectfully, Your Honor, that's

23   preposterous, and it's preposterous for this reason:  You

24   cannot -- psychiatrists diagnose people by examining them

25   in person, and they can only prescribe medicine ethically

1    and legally if they've diagnosed them.  So no expert can

2    look at her records without examining him and diagnosing

3    him any more than she could have looked at any other

4    records and diagnosed him without examining him.

5            And the four words that Ms. Pollock said that

6    were the most important were "when he was depressed,"

7    when he had a mental condition.  That's the only

8    relevance of this.  It's listed in their mitigating

9    factors in about five different ways that he had symptoms

10   of depression and anxiety.  So if that's what they're

11   putting it in for -- there's no other reason to put it

12   in.

13           And if you're putting in evidence of a mental

14   condition, then you need 12.2 notice.  No court has ever

15   ruled that the only way you get a notice and an

16   opportunity to examine is if they're calling a witness

17   that's, you know, examined him specifically in

18   preparation for litigation.  There's no court that holds

19   that.

20           What the courts do hold is that when you're

21   putting on this evidence, we have a right to examine and

22   put on an expert.  That's *Buchanan v. Kentucky.*

23           It's just -- it -- this is -- the issue is

24   exceedingly simple, and we're complicating it because

25   we're arguing all the way around it because they put in

SENTENCING -- July 11, 2019 (Afternoon)

1    their notice, and then they withdrew it.  And when they

2    withdrew it, we assumed all these mental health records

3    were now moot because they withdrew their mental health

4    defense.

5            So, like anything else, if they'd have had, you

6    know, 15,000 records of an alibi and then they said *We're*

7    *not going to present an alibi*, well, we don't worry about

8    those anymore.

9            And as soon as they put these witnesses on the

10   list, we filed a motion to exclude them under Rule

11   12.2(b)(2), which is how they're properly considered.

12           This is a very simple issue -- and the Court is

13   obviously all on top of it -- and there's no reason to

14   complicate it further.

15           THE COURT:  All right, last word and then I'm

16   going to recess for 20 minutes or so and think through

17   this.

18           MS. BRAIN:  Okay.  Just -- I don't want to

19   repeat myself.  Thank you, Your Honor.

20           THE COURT:  All right.  All right, let's be in

21   recess.  Thank you.

22           COURTROOM DEPUTY:  Court is in recess.

23               (Recess, 2:16 p.m. to 2:44 p.m.)

24           THE COURT:  Okay.  I'm going to share a few

25   thoughts.  Let me ask another question or two.

1          My order of June 28th addressed Dr. Pearson by

2     reserving on the issue.  I recall from notes that on

3     June 27th when this was argued that I reserved, based

4     upon representations from the defense as to what they

5     expect the testimony of Dr. Pearson to be and recall that

6     clearly it was always in the terms of historical context;

7     that Dr. Pearson wouldn't remember Mr. Christensen and

8     would just be testifying from her records.

9          I tried to grant, or find some leeway for the

10    defense in that regard -- or kept the door open, I guess

11    at the very least -- as to whether or not that testimony

12    could come in.

13         Based on what I'm hearing today, I think it's

14    going to be difficult to fashion some kind of a line to

15    be drawn without making this matter become really

16    complicated.  And there's just no question that, for Dr.

17    Pearson's testimony to make any sense, she has to rely on

18    her expertise, even if it's a review of her notes or her

19    records.  Her exper-- it was her expertise at the time

20    that made the findings that she made and the

21    recommendations that she made, or the diagnosis that she

22    made.

23         Now, having said that, the defense has

24    tendered -- has listed as a mitigating factor number 21,

25    and that was that Mr. Christensen sought medical

1    treatment and ultimately prescription medication for his

2    psychiatric issues at the University of Illinois in

3    January of 2016.

4              Is it fair to say that Dr. Pearson's testimony

5    is related to that specific mitigating factor?

6              MS. BRAIN:  That's the basis for it, Your

7    Honor.  Yeah.

8              THE COURT:  I would propose as a compromise to

9    the parties at this late stage, then -- and having heard

10   what Ms. Pollock proposes would be her argument in

11   closing as to that specific mitigating factor, I would

12   propose that this would be a fair resolution without

13   prejudicing either side and not causing any confusion to

14   the jury by having an expert testify but not be able then

15   to complete testimony -- that something like this:  *If*

16   *called to testify, Dr. Pearson can describe what her*

17   *title is,* I guess; *would say that she saw the defendant,*

18   *Brendt Christensen, in January of 2016,* to be consistent

19   here; *that he sought a medical treatment and prescription*

20   *for issues relating, or for -- related to his psychiatric*

21   *issues at the University of Illinois in January of 2016,*

22   or something to that effect.

23             MR. NELSON:  Your Honor, we actually had a very

24   similar idea during the break.  And if I may, we had

25   prepared a proposed stipulation.  If it's all right with

SENTENCING -- July 11, 2019 (Afternoon)

1    you, I'll hand one up to you and also to the defense.

2         THE COURT:  Very good.  So the two of you have

3    conferred, and this is just --

4         MR. MILLER:  We just drafted that, Your Honor,

5    so they haven't --

6         MR. NELSON:  We just drafted it over the break;

7    they haven't seen it.

8         THE COURT:  So, in my mind at this point -- and

9    I, and I'm going to tell you that -- I've made a lot of

10   rulings in this case over the last year and a half and

11   have tried to make rulings based upon the law, the

12   statutes, the rules.  There are sometimes where, even

13   though it might appear clear that there may be some room

14   for allowing the defense the opportunity to present a

15   mitigating factor, which in my mind, doesn't appear,

16   really, to be anything that catches anybody by surprise;

17   so that's why I'm proposing this and tried to figure out

18   a way to allow the defense to have Dr. Pearson testify,

19   or at least be part of a stipulation, which goes to the

20   mitigating factor the defense proposes.

21        So this proposed factual stipulation is

22   presented by the government.  Have you given this to the

23   defense yet?

24        MR. NELSON:  I just handed it to them.  We

25   prepared it as we were coming up the stairs.

SENTENCING -- July 11, 2019 (Afternoon)

```
1              THE COURT:  Why don't you guys -- given what I
2     said here, why don't we take a few minutes and you work,
3     confer with the defense and see where everybody is; and
4     then I'll -- but I'm prepared to make a ruling, but we'll
5     see where we are.
6              MR. NELSON:  Thank you, Your Honor.
7              THE COURT:  Thank you.
8              COURTROOM DEPUTY:  Court is in recess.
9                   (Recess, 2:50 p.m. to 3:01 p.m.)
10             THE COURT:  Please be seated.
11             MS. BRAIN:  Mr. Christensen's not here, Your
12     Honor.
13             THE COURT:  All right, thank you.
14                  (Brief pause in proceedings.)
15                  (Defendant enters courtroom, 3:02 p.m.)
16             THE COURT:  Okay.  Parties wish to be heard on
17     the issue?  Ms. Brain?
18             MS. BRAIN:  Yes, Your Honor.
19             We cannot accept the stipulation, Your Honor.
20     Essentially, what the stipulation is is just an
21     abbreviated, watered-down version of what she would
22     testify to.  They've got less opportunity to rebut this
23     than they would have if she testified.  So they're
24     plainly just trying to exclude our witness.
25             THE COURT:  Just a second.
```

SENTENCING -- July 11, 2019 (Afternoon)

1           MS. BRAIN:  What Mr. Nelson outlined in his

2    proposed rebuttal, proposed response to this -- i.e.,

3    cross-examining Dr. Pearson and calling their own

4    expert -- presented us a problem, but that's actually how

5    it's supposed to work.  That's how --

6           THE COURT:  What do you anticipate his

7    cross-examination to be?

8           MS. BRAIN:  He said he was going to

9    cross-examine her for hours with the DSM about

10   personality disorders and other diagnoses.

11          THE COURT:  And that would be only if you were

12   allowed to -- allowed to have Dr. Pearson testify as to

13   her diagnosis probably, correct?

14          MS. BRAIN:  Yeah.  Yes, Your Honor.  Yes.

15          THE COURT:  Okay.  And if she's allowed to

16   testify as to her diagnosis -- tell me this:  When you

17   withdrew the mental health defense, tell me what you were

18   doing.

19          MS. BRAIN:  We -- I'm not sure I understand --

20          THE COURT:  Well, tell me what you -- tell me

21   where you, where you thought you could bring mental

22   health in without the -- with the withdrawal of the

23   mental health defense pursuant to 12.2.

24          MS. BRAIN:  I understand, Your Honor.

25          Yeah, obviously, it would be a much weaker

SENTENCING -- July 11, 2019 (Afternoon)

1  presentation because we wouldn't have an expert who had

2  examined Mr. Christensen after the offense, come up with

3  a current diagnoses, and be able to testify to that.

4          We knew that we would be relying on historical

5  information instead without an expert to give a complete

6  and full diagnoses.

7          But we, we fully intended -- and I believe Mr.

8  Tucker said at the time that it was withdrawn that we

9  would be presenting historical mental health evidence,

10  just not evidence that triggered the government's right

11  to examine the client when -- they're asking for more

12  than we have.  We don't have -- and they're also asking

13  to force a Fifth Amendment waiver of Mr. Christensen

14  because -- and he hasn't, he has not made a waiver for

15  our experts, and he, he shouldn't be forced to do so for

16  theirs.

17          We made the choice to have the watered-down

18  presentation -- i.e., the historical as opposed to

19  current and thorough mental health evaluations for the

20  purposes of litigation as opposed to just a medical

21  evaluation in the Student Health Center, which is what

22  this was.  And --

23          THE COURT:  Okay.  So tell me today what you

24  believe that Dr. Pearson should be allowed to testify to.

25          MS. BRAIN:  To everything that's in her

SENTENCING -- July 11, 2019 (Afternoon)

 1  records, Your Honor.

 2          THE COURT:  I don't know what those are.

 3          MS. BRAIN:  Um --

 4          THE COURT:  So give me an idea on what you

 5  think her testimony will be.

 6          MS. BRAIN:  Yes.  Sorry, Your Honor.

 7          THE COURT:  That's all right.

 8          MS. BRAIN:  Of course, you don't.

 9          So she saw Mr. Christensen nine different

10  times.  She evaluated him by assessing his report of his

11  symptoms; that he'd been dealing with his symptoms and

12  trying to cope with them.  She would talk about her

13  observations of him with him, about -- she asked him

14  about stress, about family background, developed a

15  treatment plan, and then reviewed that plan, saw him

16  another nine times at different occasions over the next

17  year and a half until February, when she never saw him

18  again.

19          And she -- I missed a part, Your Honor.  Sorry.

20  She switched the medications because the first

21  medications that she, she prescribed did not fully

22  alleviate the symptoms that he was reporting.

23          THE COURT:  And the symptoms that he was

24  reporting were what?

25          MS. BRAIN:  They were things such as sad mood,

SENTENCING -- July 11, 2019 (Afternoon)

1    low motivation, decreased appetite, low energy, poor

2    memory, poor concentration, difficulties with, with his

3    prior -- his graduate program.

4            They also talked about his substance abuse, and

5    then she referred him to the Counseling Center.

6            THE COURT:  And family history of psychiatric

7    illnesses?

8            MS. BRAIN:  I don't believe so because I don't

9    think Mr. Christensen knew about them.  He described his

10   mother's substance abuse, but that was the only, the only

11   thing.

12           And then sleep symptoms, also.  The first

13   medications mitigated some of his symptoms but created

14   more with sleeping.

15           THE COURT:  Won't the jury want to know what

16   her diagnosis was?

17           MS. BRAIN:  Yes.  I think she should be

18   permitted to state what her diagnosis was.

19           THE COURT:  So let me get, understand this.  So

20   Dr. Pearson eval-- in her evaluation will be assessing

21   his symptoms, which would require expertise, correct?

22           MS. BRAIN:  It would.

23           THE COURT:  Develop a treatment plan --

24           MS. BRAIN:  Sorry.  I misspoke.  She's

25   reporting what he's reporting as symptoms, so -- but,

1    obviously, she knows what significant --

2             THE COURT:  Understood.

3             MS. BRAIN:  -- diagnostic --

4             THE COURT:  Understood.

5             But then making -- taking that, then, and

6    developing a treatment plan would require her expertise.

7             MS. BRAIN:  It would.

8             THE COURT:  And then switching medications

9    because she's not believing that one was fully

10   alleviating whatever the symptoms were, that would

11   require her expertise, correct?

12            MS. BRAIN:  It would.

13            THE COURT:  And then you believe that she

14   should be able to tell the jury what the diagnosis was,

15   which would require her psychological expertise.

16            MS. BRAIN:  It would.

17            THE COURT:  But somehow this is not an expert

18   testifying as to the mental health condition of the

19   defendant?

20            MS. BRAIN:  I, I think, Your Honor, that for

21   purposes of the notice provision of 12.2, I don't dispute

22   the Court's finding with respect to that.

23            The question is --

24            THE COURT:  What is that?  That there was no

25   notice?

1          MS. BRAIN:  Right.  Inadequate notice.  Because

2     they have had the records for months.  They have known

3     who she is, and they've known that we were going to put

4     this testimony on.  It may not have been her

5     specifically, but they knew what our -- where we were

6     going.

7          And the rule commentary is very clear that

8     exclusion -- exclusion of an entire witness's testimony

9     based on a notice violation is not appropriate.

10          So leaving aside the notice question, the only

11    other question under 12.2 is:  Does Dr. Pearson's

12    historical evaluation, made before this crime ever even

13    occurred, for medical purposes, does that constitute a

14    waiver of Mr. Christensen's post-litigation Fifth

15    Amendment rights?  And it -- to, not to be subjected to

16    evaluations by government experts.

17          And it just -- it doesn't because we forgo --

18    forewent the opportunity to have our expert go in and get

19    contemporaneous, full, thorough data.

20          THE COURT:  You had an expert or two examine --

21    at least one -- examine Mr. Christensen on two occasions,

22    and then you made a strategic decision to withdraw your

23    mental health notice, or defense, under 12.2.

24          MS. BRAIN:  So, and in doing that, what we,

25    what we forewent was the expert that we otherwise would

SENTENCING -- July 11, 2019 (Afternoon)

```
 1   have wanted to present with a complete and thorough
 2   evaluation designed to help Mr. Christensen in this
 3   litigation.
 4            And that is not what --
 5            THE COURT:  But you still get it with Dr.
 6   Pearson, from what I hear.
 7            MS. BRAIN:  No, Your Honor, we don't.  Not at
 8   all.
 9            It's a, a very brief evaluation on one, on one
10   occasion, follow medication regimen, management, visits
11   thereafter.  This is not a forensic, psychological, or
12   psychiatric examination by any means.
13            THE COURT:  You're not going to lead, lead the
14   jury to believe that Dr. Pearson's diagnosis ended in, as
15   it pertained to your client, in February of 2016; it did
16   not exist in June of -- or in February of 2017 and did
17   not exist in June of 2017, are you?
18            MS. BRAIN:  We want --
19            THE COURT:  You want the jury fully to believe
20   that he had a depressive disorder in June of 2017, don't
21   you?
22            MS. BRAIN:  We understand the Court's ruling
23   about that and certainly won't be putting on evidence of
24   that, and I think it's a fair inference; but, by far, the
25   stronger evidence would be to have an expert of our own
```

SENTENCING -- July 11, 2019 (Afternoon)

1   examine him, come, and say, *Yes, absolutely.  On June*

2   *the 9th of 2017, he was suffering from this, this, and*

3   *this; and this is what happened, and this is what it*

4   *looked like*, and, you know, connect it all up and the

5   whole, the whole shebang.

6          We forewent that.  We said, *No, we're not going*

7   *to do that.  We recognize that the evidence we're going*

8   *to present instead is going to be significantly weaker,*

9   *but* -- and so us having made that decision --

10          THE COURT:  What --

11          MS. BRAIN:  -- means that they can't come in

12   and get more than we have.

13          THE COURT:  Would you agree with me that if I

14   were to limit Dr. Pearson to simply testify as to what

15   your client reported to her and the medications that she

16   prescribed -- just at that -- that that would actually

17   confuse the jury, wouldn't it?  Because wouldn't they

18   want to know -- they would know that there's more to this

19   than that, right?

20          MS. BRAIN:  They would.  Yes.

21          THE COURT:  And so that would mislead them.

22          MS. BRAIN:  If she, if she -- if there was

23   simply a stipulation like this, yes.

24          THE COURT:  No.  If I let her testify but

25   restricted you to just those things:  what she heard him

SENTENCING -- July 11, 2019 (Afternoon)

1  say and the fact that she prescribed medications for him

2  based on that.

3          MS. BRAIN:  Yes.  That would be -- I believe

4  that would be misleading.  It certainly would be an

5  inadequate substitute --

6          THE COURT:  So --

7          MS. BRAIN:  -- for her proper testimony.

8          THE COURT:  So your request is that she testify

9  that she heard him out.  She made assessments.  She

10  developed a treatment plan.  She had made a diagnosis.

11  That she prescribed medications; and when she didn't

12  think those were working, she switched the medications.

13          MS. BRAIN:  Yes, Your Honor.

14          THE COURT:  Okay.  If that's what you are

15  calling Dr. Pearson to testify for, then she will be

16  barred from testifying as a violation of 12.2 because

17  that notice was withdrawn.

18          Now, if she's called to testify for something a

19  lot less and more limited, then we can address that issue

20  then.  I realize that is a significant decision to be

21  made at this stage, but the fact is that we made a clear

22  record that you were making a strategic decision to

23  withdraw the mental health defense; that you and your

24  client understood that at any point later if you were

25  going to raise it and it would fall under 12.2 that you

1    could be barred from it.

2            The testimony that you've described is, I

3    think, clearly within 12.2.  I believe that if it had

4    been addressed under the disclosure under the

5    circumstances that you raise that we could then have

6    addressed the issue of the, of an examination, or maybe

7    no examination.

8            But the point is -- because you're just jumping

9    ahead to say that if you had disclosed her the government

10   would get to examine your client.  That's not necessarily

11   true.  That would have been for argument and for

12   discussion and for further development based on the

13   disclosure.  So if your disclosure had been limited in

14   any form, like you're saying Dr. Pearson is today, then I

15   could have fashioned some kind of a different ruling than

16   I made before.

17           But the ruling I made before was based upon a

18   full disclosure of 12.2 and set out a process where your

19   client would be examined by your experts.  The government

20   would then go in.  The reports would all be sealed.  You

21   would have a chance to review them if he was found

22   guilty.  You would then have a chance to make a

23   determination whether you wanted to go through.  The

24   government would have not seen the reports yet.  If you

25   chose to withdraw at that point, then you could -- then

SENTENCING -- July 11, 2019 (Afternoon)

```
 1    it would have all have just gone away.
 2             But you chose to do it up, ahead of that, and
 3    now we're faced with a circumstance that we don't know
 4    exactly how I would have fashioned a 12.2 process if it
 5    was just as you say:  Dr. Pearson was without any further
 6    examination.
 7             But I can't get around the fact that Dr.
 8    Pearson, as you describe her, is going to introduce
 9    expert testimony relating to a mental condition of the
10    defendant for the purpose of punishment in a capital
11    case.
12             So I'll leave the door open again, but it can't
13    come in as you describe it; and if it's, if that's the
14    way you wish for it to come in, then she'll be excluded.
15             Now I'll recess again for a few minutes, and
16    maybe there is still some reasonable resolution to this,
17    given the stage of the trial that we're in and the
18    hardship -- or the decision that I just made.
19             MS. BRAIN:  Your Honor, if I, if I may, if the
20    Court is finding it's simply excluding her entirely on
21    the basis of the lack of notice --
22             THE COURT:  I'm also excluding her because you
23    withdrew -- you withdrew -- and I'm finding this is a
24    12.2 expert -- and you withdrew that mental health
25    defense.  It's not just the notice.  It's the whole --
```

SENTENCING -- July 11, 2019 (Afternoon)

1  it's, it's the whole thing related to 12.2 and the fact

2  that you withdrew that notice.

3          Dr. Pearson clearly could be allowed to

4  testify, but not under the circumstance that we face,

5  that we face ourselves today, at least not to the

6  testimony that you describe.

7          So I'm -- I don't think there's any question

8  about Mr. Christensen's mental health issues.  Lay person

9  after lay person has addressed it.  It's all come in.

10  I've allowed it to come in.  I've tried to fashion a way

11  for you to have mitigating factor 21.  The government's

12  proposed stipulation, I'm still open to it.

13          But, but as to the testimony of Dr. Pearson

14  under the circumstances that we find ourselves and as

15  that you describe simply would be a violation of 12.2.

16          Mr. Nelson, you want to be heard?

17          MR. NELSON:  I would just ask, Your Honor, if

18  you're willing, any future proffer of testimony that Dr.

19  Pearson might give, if we could have that in writing just

20  because the parameters seem to shift a little bit; and it

21  would be easier for us to respond if it's in writing.

22          THE COURT:  Well, we'll address that if that's

23  still at issue.

24          But for now we'll recess for -- and I'm leaving

25  the door open here, but -- that's all I'll say at this

1    point.

2                  MR. NELSON:  Thank you, Your Honor.

3                  THE COURT:  Thank you.

4                  COURTROOM DEPUTY:  Court is in recess.

5                  THE COURT:  So 10 -- maybe 12, 15 minutes.

6                     (Recess, 3:19 p.m. to 3:32 p.m.)

7                  THE COURT:  All right, thank you.  Please be

8    seated.

9                  Anything to report before we bring the jury in?

10                 MR. NELSON:  No, Your Honor.

11                 MS. BRAIN:  Yes, Your Honor.

12                 I went back and looked at 12.2 again; and the

13   commentary, 2005 commentary to the rule says that the

14   rule assumes that the sanction of exclusion will result

15   only where there's been a complete failure to disclose

16   the report.  If the report is disclosed, even if

17   untimely, other relief may be appropriate.

18                 We have, in effect, disclosed the report in

19   March.  We gave them her records, which is the sum and

20   substance of her testimony.  And so it's not -- to the

21   extent the Court's found that she's a 12.2 witness, the

22   notice was improper, but that the Court should --

23                 THE COURT:  Ms. Brain, Ms. Brain, what was the

24   date of the withdrawal of your 12.2 defense?

25                 MS. BRAIN:  Oh, gosh.  I want to say December

SENTENCING -- July 11, 2019 (Afternoon)

```
1    the 3rd.

2             THE COURT:  No, no.

3             MR. TUCKER:  April 30th.

4             THE COURT:  April something.

5             MR. TUCKER:  April 30th.

6             THE COURT:  So whatever report you're referring

7    to was in the hands of the government, right?

8             MS. BRAIN:  Yes.

9             THE COURT:  So then you withdrew your mental

10   health defense.

11            MS. BRAIN:  We withdrew our, our ex-- our

12   post-arrest litigation experts.  We did.

13            THE COURT:  Well, that -- I don't recall that

14   the notice of withdrawal limited it to post-arrest

15   experts.  You withdrew your mental health defense,

16   correct?

17            MS. BRAIN:  As, as it pertained to Rule 12.2,

18   yes.

19            THE COURT:  All right.

20            MS. BRAIN:  But we didn't withdraw our, what we

21   considered the evidence that wasn't 12.2.  I understand

22   the Court believes we're wrong on that, and we accept

23   that in terms of notice.

24            But complete exclusion as a remedy simply for a

25   notice violation, Your Honor, we --
```

SENTENCING -- July 11, 2019 (Afternoon)

1          THE COURT:  No, I -- no.  I don't.  I believe

2     this is a 12.2 witness as you've described here, and

3     you've withdrawn that defense; and I've tried to look for

4     every single possible way to allow you to still use this

5     witness to get into -- address mitigating factor 21.

6     I've even proposed something for you to get that.

7          You're -- you refused that.  You choose to

8     insist that Dr. Pearson should testify, that she should

9     be able to testify as to assessments, developing

10    treatment plans, switching medications, prescribing

11    medications, and making a diagnosis as to Mr.

12    Christensen's mental health condition.  That is a 12.2

13    expert.  You withdrew that.  You made a strategic

14    decision to do so, and today it's being enforced.

15         So, with that in mind, are we ready to proceed?

16         MS. BRAIN:  With that in mind, Your Honor,

17    would the Court consider asking us -- permitting us to

18    call Dr. Pearson, but not to have her testify to her

19    diagnoses?

20         MR. NELSON:  I believe they said a moment ago

21    that would be misleading to the jury, Your Honor, and I

22    don't think we should be misleading the jury.

23         MS. BRAIN:  The stipulation is what's

24    misleading because it's only four lines.

25              But if she could talk about the medications she

SENTENCING -- July 11, 2019 (Afternoon)

1  gave him, what she observed, and what he reported without

2  the diagnoses, I don't believe that the jury would see

3  anything remiss with that.

4          THE COURT:  You know, I think at this point

5  putting her on and trying to walk a tightrope around what

6  would be expert testimony/what wouldn't would not make

7  any sense at all.

8          The, just developing a treatment plan, just

9  making an assessment based upon what he says, just making

10  the, the decision on what medications to prescribe would

11  basically -- would be expert testimony; and I'm, was

12  giving you some way to get that in under the

13  circumstances.

14         But it's not going to be putting her on the

15  witness stand and then me making rulings on question

16  after question after question on whether there's -- she's

17  this or she's that.

18         As you've described her, she's a 12.2 witness.

19  You withdrew that notice.  I'm barring it.  I don't like

20  making that ruling, but I feel it's absolutely correct;

21  and it's the only one that can be made under the

22  circumstances we find us in today.

23         So with that in mind, do you want to call her

24  and have her removed?  I mean, because you can ask only a

25  few questions, but I don't know what good that would do.

1  Or do you wish to just move on for today, and we'll send

2  the jury home?  Tell me what you want to do.

3          MS. BRAIN:  Based on the Court's ruling, Your

4  Honor, we propose that we read the stipulation with the

5  instruction that her testimony's been precluded and

6  attach the records, her records of what she saw.

7          THE COURT:  So that's your -- that's your

8  counterproposal to the government's stipulation?

9          MS. BRAIN:  Only -- we think it's, you know, a

10  wholly inadequate substitute for the live testimony; but

11  given the Court's rulings, that would be better than

12  nothing.

13          THE COURT:  Well, I'm -- I guess I could recess

14  again for you to discuss this, but a stipulation is an

15  agreement between the parties that if someone was called

16  to testify, they would testify to A, B, and C; so that

17  would require an agreement.

18          Do we need to recess, Mr. Nelson?  You're

19  standing.

20          MR. NELSON:  No, Your Honor.  The thing is that

21  they've just said our stipulation is misleading; and, of

22  course, the records are what we tried to keep out in the

23  first place.  So what they're offering would not be

24  agreeable under any circumstances.

25          THE COURT:  All right.

 1              Okay, so with that in mind, are there any other
 2    witnesses today besides Ms. Pearson -- or Dr. Pearson?
 3              MS. POLLOCK:  No, Your Honor.
 4              MS. BRAIN:  No, Your Honor.
 5              THE COURT:  All right.  Let's call the jury in.
 6    I'll recess them until 9:00 tomorrow morning.
 7                   (Brief pause in proceedings.)
 8                   (Jury present, 3:39 p.m.)
 9              THE COURT:  Okay, please be seated.  Thank you,
10    everybody.
11              Are there any other witnesses today from the
12    defense?
13              MS. POLLOCK:  No, Your Honor.
14              THE COURT:  All right, ladies and gentlemen, we
15    are going to recess until tomorrow morning at 9:00.
16    We're still on the same schedule that I reported to you.
17              Please do not discuss this with anybody,
18    including yourselves, and we will see you tomorrow
19    morning.  All right?  Thank you.
20                   (Jury dismissed for the day, 3:39 p.m.)
21              THE COURT:  All right.  We'll see everybody
22    tomorrow morning at 9:00.
23              MR. NELSON:  Thank you, Your Honor.
24              THE COURT:  Thank you.
25              COURTROOM DEPUTY:  Court is adjourned.

SENTENCING -- July 11, 2019 (Afternoon)

1          (Trial adjourns, 3:40 p.m.)

2

3                 * * * * * * * * * *

4

5              REPORTER'S CERTIFICATE

6       I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

7  that the foregoing is a correct transcript from the

8  record of proceedings in the above-entitled matter.

9       Dated this 10th day of September, 2019.

10

11

12          _____ s/Lisa Knight Cosimini_____
            Lisa Knight Cosimini, RMR-CRR
13          Illinois License # 084-002998

14

15

16

17

18

19

20

21

22

23

24

25