1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
2

3

UNITED STATES OF AMERICA,
4                                    Docket No. 17-20037
                Plaintiff,
5
       vs.                           Peoria, Illinois
6                                    July 12, 2019
                                     8:58 a.m.
7    BRENDT A. CHRISTENSEN,

8                Defendant.

9

10

11        SENTENCING -- July 12, 2019 (Morning)

12

13

14      BEFORE THE HONORABLE JAMES E. SHADID

15         UNITED STATES DISTRICT JUDGE

16

17

18

19
                NANCY MERSOT, CSR-RPR
20             Official Court Reporter
                U.S. District Court
21            100 N.E. Monroe Street
               Peoria, Illinois 61602
22                309-671-4244

23

24
     Proceedings recorded by mechanical stenography;
25   transcript produced by computer.

SENTENCING -- July 12, 2019 (Morning)      2

```
 1
    For the Plaintiff:      EUGENE L. MILLER, ESQUIRE
 2                          BRYAN D. FRERES, ESQUIRE
                            Assistant United States Attorneys
 3                          201 South Vine Street
                            Urbana, Illinois 61802
 4                          217-373-5875

 5                          JAMES B. NELSON, ESQUIRE
                            U.S. DEPARTMENT OF JUSTICE
 6                          Capital Case Section
                            1331 F Street NW, Suite 625
 7                          Washington, DC 20004
                            202-598-2872
 8

 9  For the Defendant:      GEORGE F. TASEFF, ESQUIRE
                            Assistant Federal Public Defender
10                          401 Main Street, Suite 1500
                            Peoria, Illinois 61602
11                          309-671-7891

12                          ELISABETH R. POLLOCK, ESQUIRE
                            Assistant Federal Public Defender
13                          300 West Main Street
                            Urbana, Illinois 61801
14                          217-373-0666

15                          ROBERT L. TUCKER, ESQUIRE
                            Robert L. Tucker, Esq
16                          7114 Washington Avenue
                            St. Louis, Missouri 63130
17                          703-527-1622

18                          JULIE C. BRAIN, ESQUIRE
                            Attorney at law
19                          916 South 2nd Street
                            Philadelphia, Pennsylvania 19147
20                          267-639-0417

21

22

23

24

25
```

1                          I N D E X

2                                              Page

3
DEFENDANT'S WITNESSES:
4
            MICHELLE ZORTMAN
5    Direct Examination                          7
     Cross-Examination                          36
6    Redirect Examination                       45

7
             FELISHA LI
8    Direct Examination                         46
     Cross-Examination                          62
9
            JENNIFER MAUPIN
10   Direct Examination                         69
     Cross-Examination                         128
11   Redirect Examination                      138

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court, 8:58 a.m.)

 2          THE COURT:  Okay.  Let's go on the record in

 3  the matter of the United States v. Brendt

 4  Christensen, 17-20037.

 5          Mr. Christensen is present with his

 6  attorneys:  Mr. Tucker -- we will get sound here in

 7  a moment -- Ms. Brain, Mr. Taseff, Ms. Pollock.

 8          Mr. Freres, Mr. Miller, Mr. Nelson present

 9  for the government, with Agents Huckstadt and

10  Manganaro.

11          Are the parties ready to start the next day?

12          MS. POLLOCK:  We are, Your Honor, but first

13  we have an issue that we would like to bring up.

14          THE COURT:  All right.

15          MS. POLLOCK:  I think it was last week that

16  we sent a subpoena to one of the government's

17  rebuttal experts, Dr. Park Dietz, and the government

18  had filed a Motion to Quash.

19          THE COURT:  Correct.

20          MS. POLLOCK:  I think we said -- and I might

21  not remember it correctly -- but I believe we said

22  that we did not demand his appearance in person but

23  would still like him to produce the documents for in

24  camera review.  I think that we all forgot about it,

25  so I would like to raise that issue and ask that the

 1 | documents be provided for the Court so that we can
 2 | potentially use them if we need them.
 3 |         THE COURT:  I'm sure that we've been busy
 4 | the last couple of days, so I appreciate you
 5 | reminding me of this; and I think that we left it, I
 6 | was going to ask to see if you can confer and agree
 7 | on what documents should or shouldn't be produced,
 8 | and I don't know if you've had a chance to do that
 9 | either.
10 |         MR. NELSON:  We have not, Your Honor.
11 |         THE COURT:  Have not?
12 |         MR. NELSON:  Have not.
13 |         THE COURT:  Maybe today during a break if we
14 | get a chance.  Let's first see if there is some
15 | reason or some common ground there because it would
16 | seem it's the government's position that he
17 | shouldn't have to turn over any documents at this
18 | point.
19 |         MR. NELSON:  I don't know about -- the
20 | timing is a separate issue, but our first issue is
21 | there is a large number of documents on that list,
22 | which are not discoverable under any purposes, so I
23 | think that would be the first step, and timing we
24 | can work that out.
25 |         MR. MILLER:  And we requested some

SENTENCING -- July 12, 2019 (Morning)        6

1  reciprocal documents from their expert.  I believe

2  we did in our letter of response that we --

3          THE COURT:  And what expert is that?

4          MR. MILLER:  From -- Zoline is testifying

5  this afternoon as one of them.

6          THE COURT:  Maybe on the break, if you can,

7  otherwise we can address it at the break.

8          MS. POLLOCK:  That's fine, Your Honor.  The

9  only thing I think -- they asked for documents

10 regarding Dr. Zoline's prior expert testimony; there

11 are none.  So we don't have anything to produce for

12 that and she will disclose her contract with us

13 during her direct examination with her fees.

14         THE COURT:  Okay.

15         MS. POLLOCK:  And one more thing, Your

16 Honor.  We mentioned yesterday, I believe, that we

17 were withdrawing Dr. Sorenson as a witness in this

18 case.  We wanted to make the record that the reason

19 we elected to do that is because, we are -- based on

20 the Court's rulings about the applicable scope of

21 cross-examination for him, which we don't really

22 have notice of, we chose to withdraw him based on

23 that.

24         THE COURT:  Okay.  I'm not sure what that

25 means.  I don't know exactly what rulings or limits

SENTENCING -- July 12, 2019 (Morning)      7

1  or parameters were defined but....

2          MS. POLLOCK:  I don't have docket numbers,

3  Your Honor.  Based on the ruling about the

4  applicable scope of the government's

5  cross-examination and what we anticipate it to be

6  and not having sufficient notice of it, so we would

7  like to withdraw.

8          THE COURT:  Okay.  That's your decision.

9          All right.  Are we ready to proceed?

10          MS. POLLOCK:  We are, Your Honor.

11          THE COURT:  All right.  Thank you.

12          Let's have the jury in.

13          (Jury present, 9:03 a.m.)

14          THE COURT:  Thank you.  Please be seated.

15          All right.  Good morning, ladies and

16  gentlemen.  We are ready to proceed.

17          The defense, call your next witness, please.

18          MS. POLLOCK:  Your Honor, the defense calls

19  Michelle Zortman.

20                  MICHELLE ZORTMAN,

21  after having been duly sworn, testified as follows:

22                  DIRECT EXAMINATION

23  BY MS. POLLOCK:

24  Q.  Good morning.

25  A.  Good morning.

 1 | Q.   Can you refresh us as to your name and spell
 2 | your last name for the court reporter?
 3 | A.   Michelle Zortman, Z-o-r-t-m-a-n.
 4 | Q.   And Michelle, this is the second time that you
 5 | have been here in this trial, correct?
 6 | A.   Yes.
 7 | Q.   The first time was during the guilt phase?
 8 | A.   Yes.
 9 | Q.   And you're aware of what the verdict was in that
10 | case?
11 | A.   Yes.
12 | Q.   Can you just remind the jury who you currently
13 | reside with?
14 | A.   My mother.
15 | Q.   And you've moved out of state, correct?
16 | A.   Yes.
17 | Q.   So you have flown back in for the second time
18 | under subpoena?
19 | A.   Yes.
20 | Q.   Thank you.
21 |         Now, we already covered most of the years
22 | between 2013 and 2017 of the last phase of the
23 | trial, so I don't want to repeat that.  I want to
24 | focus on what happened before that with you and with
25 | Brendt, okay?

SENTENCING -- July 12, 2019 (Morning)        9

 1          At first, let's say a little background
 2  about you, so can you tell the jury where you were
 3  born?
 4  A.   In Stevens Point, Wisconsin.
 5  Q.   And who are your parents?
 6  A.   I'm sorry?
 7  Q.   Who are your parents?
 8  A.   Pamela Smith and David Zortman.
 9  Q.   Are they currently divorced?
10  A.   Yes.
11  Q.   When did they get divorced?
12  A.   1999.
13  Q.   How old were you in '99?
14  A.   11.
15  Q.   Do you have any siblings?
16  A.   One brother.
17  Q.   Older or younger?
18  A.   Five years old.
19  Q.   Five years older?
20  A.   Uh-huh.
21  Q.   And does he have any wife or partner or
22  children?
23  A.   He has one child.
24  Q.   Who is that?
25  A.   Samantha, my niece.

1  Q.   How old is Samantha?

2  A.   She's 19.

3  Q.   Where does she live?

4  A.   She lives with my mother.

5  Q.   So you and your niece and your mom live together

6  right now?

7  A.   Yes.

8  Q.   Where does your brother live?

9  A.   In Wisconsin.

10  Q.   So you were born in Stevens Point.  Did you

11  reside there for all of your childhood?

12  A.   Yes.

13  Q.   Did you go to Stevens Point Public Schools?

14  A.   Yes.

15  Q.   Did you attend high school at SPASH, S-P-A-S-H?

16  A.   Yes.

17  Q.   Remind us again what -- how old are you in

18  relation to Brendt?

19  A.   I'm one year older than he is.

20  Q.   Okay.  So when he was a junior in high school,

21  you would have been a senior?

22  A.   Yes.

23  Q.   Did you know him at all in high school?

24  A.   No.

25  Q.   How many kids go to Stevens Point High School?

 1 | A.   About 2,000.
 2 | Q.   So your graduating class would have been 500?
 3 | A.   600.
 4 | Q.   600, okay.  So when you were in school -- in
 5 | high school, what kinds of activities were you
 6 | engaged in, if any?
 7 | A.   I was in music and I studied marshal arts as
 8 | well.
 9 | Q.   What type of music?
10 | A.   I played the trombone.
11 | Q.   Were you in the concert band or something?
12 | A.   Yes.
13 | Q.   And you said "martial arts" also?
14 | A.   Yes.
15 | Q.   What kind?
16 | A.   Karate.
17 | Q.   What belt were you?
18 | A.   I was a second degree black belt.
19 | Q.   Okay.  Really, cool.  I didn't know that.
20 | A.   Yes.
21 | Q.   What about your favorite subjects in school?
22 | A.   Math and music.
23 | Q.   Okay.  And if I remember correctly, did you
24 | major in music performance?
25 | A.   Yes.

1  Q.   Was that for trombone?

2  A.   Yes.

3  Q.   So if you did not know Brendt in high school,

4  can you tell the jury about how you met him?

5  A.   We both worked at Kmart for a short period of

6  time.  I knew who he was; but at the time he was

7  working there, we didn't really talk; we weren't

8  friends.  And then some time after he had quit Kmart

9  he came back into the store and I recognized him and

10 we started a conversation.

11 Q.   Okay.  Do you remember where you were when that

12 happened?

13 A.   I was in the electronics department of Kmart.

14 Q.   Were you working in the electronics department?

15 A.   No.

16 Q.   What were you doing there?

17 A.   I was talking to a co-worker.

18 Q.   So you saw him come in and what did you say?

19 A.   I said "Brendt Christensen," and he turned

20 around and that sparked the conversation.

21 Q.   So about how long after that first real

22 conversation with him did you guys go on your first

23 date?

24 A.   Within days.

25 Q.   Do you remember what it was?

 1 A.   I believe we went to see a movie.
 2 Q.   And were you dating him exclusively at that
 3 time?
 4 A.   Yes.
 5 Q.   At some point after you began dating, did you
 6 break up for a little while?
 7 A.   Yes.
 8 Q.   Can you tell us about when that was?
 9 A.   That was around Thanksgiving of 2008.
10 Q.   So what's the time frame when you actually
11 started dating him?
12 A.   October of 2008.
13 Q.   So the break up was really early in the
14 relationship?
15 A.   Yes, it lasted a month.
16 Q.   And then how long did you guys -- you said that
17 it was a month before you got together?
18 A.   Yes.
19 Q.   Okay.  In October of 2008, what was Brendt's
20 physical condition like at that time?
21 A.   He still had injuries to this wrist and elbow
22 from his accident in June of 2008, so he was
23 recovering from that.
24 Q.   So that accident, can you refresh us as to what
25 that was?

1  A.   He was working for a roofing company and he fell

2  18 feet onto concrete after a board broke beneath

3  him.

4  Q.   Okay.  So he had had surgery but was still

5  recovering at the time that you met?

6  A.   Yes.

7  Q.   So once you guys got back together after the

8  holidays in 2008, were you ever apart again?

9  A.   No.

10         MS. POLLOCK:  May I approach, Your Honor?

11         THE COURT:  You may.

12  BY MS. POLLOCK:

13  Q.   I've just handed you what has been marked for

14  identification, Defendant's Exhibits 133 and 134.

15         Do you recognize those photographs?

16  A.   Yes.

17  Q.   Can you tell us what they are?

18  A.   These were taken very early on in our

19  relationship in Stevens Point in his apartment.

20         MS. POLLOCK:  Your Honor, motion to admit

21  and publish please.

22         THE COURT:  Any objection?

23         MR. MILLER:  No, Your Honor.

24         THE COURT:  You may.  They will be admitted.

25  BY MS. POLLOCK:

```
 1  Q.  So obviously Brendt's haircut is terrible in
 2  that picture.  You look like you have a lot shorter
 3  hair.  So about how old do you think you were in
 4  this?
 5  A.  I would have been probably 20.
 6  Q.  Okay.  And just so we clear it up, is that a
 7  photograph of Conan the Barbarian behind you on the
 8  poster?
 9  A.  Yes.
10  Q.  Is this the same evening?
11  A.  Yes.
12  Q.  Do you remember that apartment?
13  A.  Yes.
14  Q.  Can you describe it for us?
15  A.  It was a house that was split into an upper
16  apartment, a lower apartment; and he lived in the
17  upper apartment with his friend.
18  Q.  Who was the friend?
19  A.  Ben -- I don't remember his last name.
20  Q.  Was he somebody from high school or --
21  A.  Yeah, they must have been friends, I think, in
22  high school.
23  Q.  Okay.  And was Ben the same age as Brendt?
24  A.  I believe so.
25  Q.  Around that time at the beginning of your
```

1  relationship, you lived separately, right?

2  A.   Yes.

3  Q.   Where did you live?

4  A.   I lived in Plover, Wisconsin with my mother.

5  Q.   How far away is Plover from Stevens Point?

6  A.   Very close, ten minutes.

7  Q.   Did you guys begin to spend the majority of your

8  time together?

9  A.   Yes.

10  Q.   In terms of your living situation, did you spend

11  time in the evenings at his apartment or at your

12  mother's house?

13  A.   Both; but many evenings with him, yes.

14  Q.   And so this would have been in, you said late

15  2008 early 2009; when did Brendt decide to move to

16  Madison?

17  A.   The spring of 2009.

18  Q.   And that was for school, right?

19  A.   Yes.

20  Q.   So ya'll have been dating seriously for maybe

21  five or six months at that point?

22  A.   Yes.

23  Q.   And did he ask you to go with him?

24  A.   No.

25  Q.   What did you do?

1  A.   I chose to go with him.

2  Q.   Okay.  Did you get any flack from your family

3  about that?

4  A.   Not really.

5  Q.   What did your -- what was Brendt's relationship

6  like with your mom?

7  A.   It was good.

8  Q.   Did she like him?

9  A.   Yeah, she seemed to like him.

10  Q.   Did he know your father also?

11  A.   A little.

12  Q.   Where was your dad living at that time?

13  A.   Stevens Point.

14  Q.   Okay.  So you lived with your mom and Brendt had

15  a closer relationship with your mother than your

16  father; is that right?

17  A.   Yes.

18  Q.   So, how did that conversation happen when he

19  decided to move and you decided to go with him?

20  A.   He didn't ask me to move because he wanted it to

21  be my decision.  He didn't want to influence me

22  either way, and I chose to move because I had

23  recently dropped my major at the university and was

24  applying at UW Madison as well.

25  Q.   So when you guys decided to move to Madison, can

 1 | you describe, you know, the moving process and how
 2 | that worked?
 3 | A.   I found an apartment; he found an apartment; we
 4 | moved into our separate apartments, even though we
 5 | ended up spending most of the time at mine.
 6 | Q.   Was there a reason why you guys decided to live
 7 | separately?
 8 | A.   He had already applied and was accepted into the
 9 | student housing, and I couldn't go with him so I had
10 | to get a separate apartment.
11 | Q.   Okay.  Gotcha.
12 |        MS. POLLOCK:  Approach, Your Honor?
13 |        THE COURT:  You may.
14 |        MS. POLLOCK:  May I have continuing
15 | permission because there is going to be a lot of
16 | them.
17 |        THE COURT:  You may.
18 |        You can pull this around and towards you.
19 | BY MS. POLLOCK:
20 | Q.   I've just handed you what has been marked for
21 | identification as Defendant's Exhibit Number 135.
22 | Do you recognize that photograph?
23 | A.   Yes.
24 | Q.   Do you know approximately when it was taken?
25 | A.   Shortly after we moved to Madison.

1          MS. POLLOCK:  Your Honor, move to admit and

2    publish.

3          THE COURT:  Any objection?

4          MR. MILLER:  No, Your Honor.

5          THE COURT:  You may.

6    BY MS. POLLOCK:

7    Q.   So in this photograph, do you recognize the

8    building behind you by chance?

9    A.   I think that is my first apartment building in

10   Madison.

11   Q.   About how old would you have been when you moved

12   there?

13   A.   21.

14   Q.   21.  If I remember correctly, this is the fall

15   of 2009 when you moved, right?

16   A.   Yes.

17   Q.   And how long did you guys stay living in

18   separate places?

19   A.   Just for the one year.

20   Q.   And did you -- did he then move into your

21   apartment or did you guys get a different apartment

22   together?

23   A.   We got a different apartment together.

24   Q.   And tell us about what your life was like with

25   Brendt at that time?

 1  A.   He went to school during the day, I worked

 2  during the day.  And then in the evenings we would

 3  spend time at one of our apartments.  I would cook;

 4  we would play video games or watch TV together,

 5  listen to music.

 6  Q.   Okay.  Was working out big in your life then at

 7  that point?

 8  A.   Not yet.

 9  Q.   But it would become later?

10  A.   Yes.

11  Q.   So about a year or so into your relationship

12  with Brendt, what were your feelings about him at

13  that time?

14  A.   They were strong, yeah.

15  Q.   Did you love him?

16  A.   Yes.

17  Q.   Did he love you?

18  A.   Yes.

19  Q.   Did you tell each other that you loved each

20  other?

21  A.   Yes.

22  Q.   Okay.  What kind of emotional support did he

23  give you during that time?

24  A.   He was very supportive.  I was working during

25  the day and when I came home and had to vent, he was

1 there to listen.

2 Q.   Did you guys talk about your families with each

3 other?

4 A.   A little, yeah.

5 Q.   If you had a problem with your family, would he

6 be there for you?

7 A.   Yes.

8 Q.   So how long did you guys live together before

9 you were married?

10 A.   Two years.

11 Q.   And showing you what has been marked for

12 identification as Defendant's 136.

13       Where is that photograph taken?

14 A.   In the Best Western in Madison, Wisconsin.

15 Q.   The Best Western.  What were you doing there?

16 A.   Getting married.

17 Q.   Tell us a little bit about how you guys decided

18 to have such a non-traditional wedding.

19 A.   I'm not a big fan of fancy expensive weddings.

20 We wanted to keep it simple and inexpensive, and so

21 having pretty photos wasn't important to me.

22 Q.   And how -- excuse me -- how long did you guys

23 plan for the wedding?

24 A.   Two months.

25 Q.   So it was pretty quick?

1  A.   Yeah.

2  Q.   Did he formally propose to you or did you guys

3  decide to get married together?

4  A.   He proposed.

5  Q.   Can you tell us how he did that?

6  A.   It was in the Great Wolf Lodge in the Wisconsin

7  Dells.

8  Q.   And what's the Great Wolf Lodge?

9  A.   It's a hotel and water park resort.

10 Q.   So when we heard about you loving the Dells, is

11 that one of the places that you used to visit?

12 A.   Yes.

13 Q.   While you were at the lodge, how did he do it?

14 A.   He got down on one knee with the ring and asked

15 me to marry him.

16 Q.   And you said *yes*?

17 A.   Yes.

18 Q.   Okay.  So, when the wedding happened, how did

19 you guys decide who to invite?

20 A.   We decided we were each going to invite two

21 friends.

22 Q.   Two friends?

23 A.   Yeah.

24 Q.   And do you remember who Brendt's two friends

25 were?

1  A.   Andrew Kieper and Andrew Toldstedt.

2  Q.   Are where were they from in his life?

3  A.   High school friends.

4  Q.   What about yours?

5  A.   I invited my friend, Dave, and his wife, Amy.

6  Q.   How did you know them?

7  A.   From college.

8  Q.   Okay.  What about your families?  Who was

9  present from each of your families?

10 A.   My parents were there and I believe his parents

11 and both of his siblings were there.

12 Q.   Did your brother attend?

13 A.   My brother was there, yes.

14 Q.   Was he married at that time?

15 A.   He was married or engaged at the time, yes.

16 Q.   Okay.  And that's to your niece's mother?

17 A.   No.

18 Q.   Different woman?

19 A.   Yes.

20 Q.   I just handed you what has been marked for

21 identification as Defendant's Number 137.

22       Do you recognize that photograph?

23 A.   Yes.

24 Q.   And can you tell us what it is?

25 A.   It was a photo booth strip that we had taken on

1  our honeymoon.

2  Q.   I know this is hard, but I'm going to have to

3  ask you to speak up a little bit for Nancy because

4  she is recording what you're saying.

5  A.   Okay.

6  Q.   You said this was on your honeymoon?

7  A.   Yes.

8  Q.   Where did you take that photo?

9  A.   It was in the photo booth at the Kalahari Resort

10  in the Wisconsin Dells.

11        MS. POLLOCK:  Your Honor, motion to admit

12  136 and 137, and publish 137.

13        MR. MILLER:  No objection.

14        THE COURT:  You may.

15  BY MS. POLLOCK:

16  Q.   How old were you guys in this photograph?

17  A.   I would have been 23, so he would have been 22.

18  Q.   That's pretty young to get married.  Did anybody

19  ever tell you that?

20  A.   Oh, yeah.

21  Q.   Who told you?

22  A.   Anybody who heard about it.

23  Q.   Friends?

24  A.   Yeah.

25  Q.   Parents?

 1  A.   Yeah.

 2  Q.   So what did they say to you?

 3  A.   Just a couple offhand comments like, *Oh, you're*

 4  *kind of young.*

 5  Q.   What did you think about that?

 6  A.   I didn't care.

 7  Q.   Okay.  So, this is the honeymoon.  So this would

 8  have been in what year again?

 9  A.   2011.

10  Q.   And in 2011, Brendt would have been -- do you

11  remember what year in school he would have been at

12  that time?

13  A.   I think he was a junior.

14  Q.   Okay.  So he was studying a lot, right?

15  A.   Yes.

16  Q.   Were you aware of the research project that he

17  was doing with Professor Matthew Herndon?

18  A.   Yes.

19  Q.   Did he talk about work with you at home?

20  A.   Yes.

21  Q.   Did you ever get to meet anybody from the

22  Physics Department?

23  A.   No, I don't think I did.

24  Q.   In terms of your social interactions that you

25  had with friends around this time frame, did you

SENTENCING -- July 12, 2019 (Morning)      26

1  have any close girlfriends that you confided in and
2  went out with?
3  A.  No.
4  Q.  Did Brendt have any close guy friends that he
5  did that with?
6  A.  No.
7  Q.  Did you have casual friends that you would
8  sometimes have drinks with or something?
9  A.  I didn't.  He saw his friends once or twice.
10  Q.  Okay.  At that point in your life when you got
11  married, if you had a problem, who is the person
12  that you would talk to?
13  A.  Brendt.
14  Q.  Who was the person that you would call if you
15  needed something?
16  A.  Brendt.
17  Q.  Was it the same for him with you?
18  A.  Yes.
19  Q.  Would you characterize him as your best friend?
20  A.  Yes.
21  Q.  Also you were in love with him?
22  A.  Yes.
23  Q.  Now, at some point he got ready to graduate,
24  right?
25  A.  Yes.

 1  Q.  And let me ask you this:  What vehicle did you
 2  guys drive when you first moved to Madison?  Did you
 3  guys share a car?
 4  A.  For a while he had a different car.  I had a
 5  Chevy Lumina.  I don't remember what make/model his
 6  was, but he only kept it for a year, and then we
 7  solely drove my Lumina.
 8  Q.  After -- did the Lumina last well or did you
 9  eventually have to buy a new car?
10  A.  It was on its last leg before we bought the
11  Saturn.
12  Q.  I'm going to show you what has been marked for
13  identification as Defendant's 138.
14        Do you recognize that photograph?
15  A.  Yes.
16  Q.  What does it depict?
17  A.  That was right after we purchased the Saturn.
18  Q.  Was that the first big purchase as a married
19  couple that you guys made?
20  A.  Yes.
21  Q.  Whose names were on the title of that car?
22  A.  Both of ours.
23        MS. POLLOCK:  Motion to admit and publish,
24  Your Honor.
25        MR. MILLER:  No objection.

1           THE COURT:  It will be admitted.

2  BY MS. POLLOCK:

3  Q.   So I think if you look carefully I can see in

4  your left-hand there a packet that looks like

5  paperwork, and in the background it looks like with

6  a car dealership; would this photo have been taken

7  when you bought the car?

8  A.   Yes.

9  Q.   Okay.  So this was, again, your first real

10  grownup deal, right?

11  A.   Yes.

12  Q.   So, at some point, Brendt decided that he wanted

13  to apply to graduate school.  Do you recall how that

14  conversation happened with the two of you?

15  A.   He had applied to maybe half a dozen different

16  graduate schools and the two that he'd been

17  considering that he had been accepted to University

18  of Illinois and UW Madison.

19  Q.   So how did you guys decide to move?

20  A.   He came down to visit the University of

21  Illinois, and after visiting and considering the

22  pros and cons of both schools, he decided that he

23  wanted to attend U of I.

24  Q.   Was that a conversation that you had together

25  about potentially leaving the state that you had

1  both lived for your whole lives?

2  A.   I told him that I would support him whatever

3  decision he made.

4  Q.   So you did make that decision together?

5  A.   Yes.

6  Q.   Showing you what has been marked for

7  identification as Defendant's 139 and 140.

8        Do you recognize those photographs?

9  A.   Yes.

10  Q.   And when about in the time were those

11  photographs taken?

12  A.   Immediately after he graduated from UW Madison.

13        MS. POLLOCK:  Motion to admit and publish,

14  Your Honor.

15        MR. MILLER:  No objection.

16        THE COURT:  Admitted.  You may.

17  BY MS. POLLOCK:

18  Q.   So this is the first one.  Where are you guys in

19  this picture?

20  A.   In that first apartment we had together in

21  Madison.

22  Q.   Okay.  And so you said before or after he

23  graduated?

24  A.   After.

25  Q.   Who came to his graduation?

 1  A.   His parents.

 2  Q.   Anybody else?

 3  A.   I don't remember if any of his siblings were

 4  there.  His sister might have been there, yeah.

 5  Q.   Anybody from your family feel the need to come?

 6  A.   No.

 7  Q.   What did you guys do on that day?

 8  A.   We spent several hours at the graduation

 9  ceremony and we spent a little bit of time with his

10  parents.

11  Q.   So Madison is a gigantic school, so I'm assuming

12  that the graduation ceremony took quite a while; is

13  that right?

14  A.   Yes.

15  Q.   Do you remember how many people were graduating

16  that day?

17  A.   No.

18  Q.   Was it in the thousands?

19  A.   Probably, yeah.

20  Q.   Was there any kind of separate department

21  graduation for physics?

22  A.   I don't recall.

23  Q.   Sometimes they do that.  University of Illinois

24  does that so I just didn't know if Brendt had done

25  that.

1           The picture on the screen in front of you,
2    now where was that photograph taken?
3    A.   It was taken outside of the University
4    immediately after we had walked out of the building.
5    Q.   Do you remember who took it?
6    A.   His mother.
7    Q.   And there're several other photographs from
8    graduation that we've seen during the course of the
9    trial.  Were you and his family there and that was
10   it for him to graduate?
11   A.   Yes.
12   Q.   So the decision to move was made, and describe
13   how the moving process went, like who located the
14   apartment, who decided what to do.
15   A.   We went down together to visit a few different
16   apartments and we both agreed the one on Springfield
17   Avenue was the best, so we applied there, and were
18   accepted.
19   Q.   Okay.  And do you remember when you guys moved
20   was there a truck, a van, or did you just drive
21   cars?
22   A.   We had hired a moving service.
23   Q.   Okay.  Gotcha.  I just handed you what has been
24   marked for identification as Defendant's 141 and
25   142.

1          Do you recognize those photographs?

2 A.   Yes.

3 Q.   And they look like they are posed.  Do you

4 recall how they were taken?

5 A.   We had placed a camera on something in the

6 bedroom and put it on a timer to take those.

7 Q.   And do you remember what they were for?

8 A.   They were for my mother's calendar.

9 Q.   Can you describe her calendar?

10 A.   Every year she puts together a calendar with

11 family photographs on each month, and so she

12 requests photos from everybody once a year.

13 Q.   So these were for the calendar?

14 A.   Yes.

15 Q.   And did you try to comply every year to the best

16 of your ability to provide the photos?

17 A.   Yes.

18 Q.   One year did you and Brendt wear matching

19 Christmas sweaters?

20 A.   Yes, that sounds familiar.

21          MS. POLLOCK:  Your Honor, move to admit and

22 publish.

23          MR. MILLER:  No objection.

24          THE COURT:  You may.

25 BY MS. POLLOCK:

1  Q.  So this is the picture, one of the pictures that
2  you guys sent for the calendar.
3        What did your mother do with the calendars
4  when she made them?
5  A.  She had them printed out professionally and
6  distributed them to everybody at Christmas.
7  Q.  So, did you guys take several trial shots, to
8  try to get the correct photo?
9  A.  Yes.
10  Q.  And is this the second one of those trial shots?
11  A.  Yes.
12  Q.  We have gone over a lot of ground already with
13  you, and, again, I don't want to go there.  But I do
14  want to ask you because when we were in this phase
15  of the trial the government played a clip of you
16  talking from the recording at the Peoria County
17  Jail.
18        Now, you were not present when that clip was
19  played, right?
20  A.  Correct.
21  Q.  But I played it for you last night, didn't I?
22  A.  Yes.
23  Q.  And you heard what you said?
24  A.  Yes.
25  Q.  And you said derogatory things about one of the

 1 witnesses in the government's case, Terra Bullis?
 2 A.   Yes.
 3 Q.   Do you remember that phone call now that I
 4 played it for you?
 5 A.   Yes.
 6 Q.   And the clip we heard in court was one minute
 7 and 20 seconds; how long is this phone call?
 8 A.   Thirty minutes.
 9 Q.   Okay.  And immediately before you said the mean
10 thing that you said, what were you doing?
11 A.   Crying.
12 Q.   Where were you when that phone call took place?
13 A.   I was in my ex's guest room.
14 Q.   In what town?
15 A.   In Champaign.
16 Q.   Had you just gotten here from out of town?
17 A.   Yes.
18 Q.   Were you preparing here to come to testify in
19 the guilt phase?
20 A.   Yes.
21 Q.   And would you describe yourself as emotionally
22 out of sorts at that time?
23 A.   Yes.
24 Q.   How do you feel about the statements that you
25 made on that phone call?

1  A.   I regret them.

2  Q.   Why?

3  A.   I was emotional and I let that get the better of

4  me.

5  Q.   You understand that what Brendt did, that's not

6  Terra Bullis's fault, right?

7  A.   Right.

8  Q.   And if you could take back the words that you

9  said that were horrible, would you?

10  A.   Yes.

11  Q.   Have you probably said other things during the

12  course of these two years that you regret on the

13  phone?

14  A.   Yes.

15  Q.   Now, the number of phone calls that you and

16  Brendt have had with each other, do you know about

17  how many times you have talked to him since this

18  case started?

19  A.   Many.

20  Q.   Do you still consider him to know you as a

21  person?

22  A.   Yes.

23  Q.   Do you two talk about all kinds of things on the

24  phone?

25  A.   Mostly working out and video games, but, yeah.

1  Q.   Were those two of the hobbies that you engaged

2  in together for your life together?

3  A.   Yes.

4  Q.   Now, on that phone call, the one that we heard

5  after you said the nasty thing that you said, what

6  did you talk about with him?

7  A.   Working out and video games.

8  Q.   So you talked a little bit about what was

9  happening in the trial.  Did he say anything to you

10  about you testifying?

11  A.   I don't remember.

12  Q.   Do you remember him saying he wanted to support

13  you if he could?

14  A.   Yes.

15  Q.   Going forward, can you say in all honesty that

16  you understand that what Brendt did is no one's

17  fault but Brendt's?

18  A.   Yes.

19        MS. POLLOCK:  Thank you.  Nothing further.

20        THE COURT:  Cross-examination.

21                 CROSS-EXAMINATION

22  BY MR. MILLER:

23  Q.   You ended talking about the phone call that you

24  made with the defendant and you indicated you were

25  emotional at that time.

 1  A.   Yes.
 2  Q.   And you said you were staying at your ex's guest
 3  room?
 4  A.   Yes.
 5  Q.   Would that be Ryan Vela?
 6  A.   Yes.
 7  Q.   When you refer to him as your "ex," your ex?
 8  A.   Ex-boyfriend.
 9  Q.   And that was the boyfriend that you had towards
10  the end of your relationship with the defendant and
11  then carrying it on after that?
12  A.   Yes.
13  Q.   You have divorced the defendant, right?
14  A.   Yes.
15  Q.   While you're emotional when you were talking
16  with the defendant about Terra Bullis being carried
17  out of the courtroom on a stretcher, is it fair to
18  say that the defendant wasn't emotional then, was
19  he?
20  A.   He was; we were both emotional.
21  Q.   He was laughing, wasn't he, when you made those
22  statements?
23  A.   Probably in response to the emotional stress.
24  Q.   He was laughing about Terra Bullis being carried
25  out of the courtroom on a stretcher based on

1  emotional stress; is your testimony?

2  A.   Many people use laughter to hide pain.

3  Q.   You previously testified and described the

4  defendant as someone who is emotionally cut off,

5  right?

6  A.   Yes.

7  Q.   That -- you testified about the apartment that

8  you rented with the defendant in Champaign, correct?

9  A.   Yes.

10 Q.   You do understand that he murdered a woman in

11 that apartment?

12 A.   Yes.

13 Q.   You testified about the Saturn Astura that you

14 and the defendant bought in Wisconsin?

15 A.   Yes.

16 Q.   You understand that he kidnapped a woman in that

17 Saturn Astra?

18 A.   Yes.

19 Q.   You talked about that you and the defendant were

20 basically each other's best friends after you got

21 married.  So he didn't keep in touch with Andrew

22 Kieper after you got married?

23 A.   Very little.

24 Q.   Did you tell him not to keep in touch with

25 Andrew Kieper?

1  A.   No.

2  Q.   So he could have if he wanted to?

3  A.   Yes.

4  Q.   And do you know who Tom Mitchell is?

5  A.   Yes.

6  Q.   And did you tell him not to keep in touch with

7  Tom Mitchell?

8  A.   No.

9  Q.   You mentioned his roommate, Ben, before you got

10 married.  Did you tell him not to keep in touch with

11 him?

12 A.   No.

13 Q.   Also, with his family members.  I think you

14 testified before he wasn't close really to any of

15 his family members?

16 A.   Yes.

17 Q.   You didn't tell him though not to keep in touch

18 with his family members though, did you?

19 A.   No.

20 Q.   As far as you know, there was nothing that

21 prevented him from keeping in touch with his dad?

22 A.   Correct.

23 Q.   Or keeping in touch with his mom?

24 A.   Correct.

25 Q.   But because of that from age 19 to age 27 you

1  probably knew, is it fair to say, other than maybe

2  Terra Bullis, you knew the defendant better than

3  anyone during that time frame?

4  A.   Yes.

5  Q.   And in June of 2017, when he murdered

6  Miss Zhang, you believe that he was selfish?

7  A.   Yes.

8  Q.   And emotionally closed off?

9  A.   Yes.

10  Q.   And a very good liar?

11  A.   Yes.

12  Q.   And you said, I think, you're no expert in

13  psychology, right, but you'd describe --

14       MS. POLLOCK:  Objection, Your Honor; outside

15  the scope.

16       THE COURT:  Mr. Miller.

17       MR. MILLER:  Your Honor, just describing --

18  they were pointing out that she was the person who

19  spent the time with the defendant during the

20  relevant time frame and no one else and so it seems

21  like her opinions --

22       THE COURT:  Overruled.  You may.

23       MS. POLLOCK:  Your Honor, if I may.  This is

24  not new information.  We have gone over this all in

25  the guilt phase and I intentionally cabined the

1  testimony to end in 2013.

2          THE COURT:  I'll allow the line of

3  questioning.  This is cross-examination.

4          Go ahead.

5  BY MR. MILLER:

6  Q.  And the way you described his behaviors towards

7  the end of your marriage were like a psychopath?

8          MS. POLLOCK:  Objection, Your Honor.  Motion

9  to strike.

10          THE COURT:  Mr. Miller.

11          MR. MILLER:  It's her description of the

12  defendant's behavior.

13          MS. POLLOCK:  Sidebar, Your Honor.

14          (Proceedings held at sidebar.)

15          MS. POLLOCK:  That's a term the government

16  represented, Your Honor.  Not only are they going

17  against the Motion in Limine, the Motion in Limine

18  prohibits him from doing that and you granted that.

19          THE COURT:  What was the term, "psychopath"?

20          MS. POLLOCK:  That is a mistrialable

21  offense.  She is not a psychologist.  You have

22  excluded the evidence.  That is an intentional

23  violation of the order.

24          MR. MILLER:  I will withdraw the question.

25  I don't recall that being the Court's order for the

1  penalty phase; for the guilt phase.

2       MS. POLLOCK:  You got rid of that at the

3  guilt phase and you extended it.

4       THE COURT:  Why do we have to go through all

5  of this?

6       MR. MILLER:  I don't think that we are going

7  through it again.  I think that it was what kind of

8  person he was.

9       THE COURT:  Let's try to keep closer to

10 scope.

11      MS. POLLOCK:  Move to strike the question.

12 And motion for mistrial.  That cannot be unheard.

13 That bell cannot be unrung.  You know, "psychopath"

14 is a medical term from the DSN.

15      MR. MILLER:  We made it clear that it is a

16 colloquial phrase of how to describe somebody.

17      THE COURT:  You described him so far.  Did

18 she describe him that way?

19      MR. MILLER:  She did describe him that way.

20      THE COURT:  You just asked her if she

21 described him that way?

22      MR. MILLER:  Right, knowing that she is not

23 an expert.  I will withdraw the question.

24      THE COURT:  Withdraw the question and strike

25 it.

1           Motion for mistrial is denied.

2           (In the presence of the jury.)

3           THE COURT:  All right.  The objection is

4  sustained.  The question will be withdrawn and the

5  question will be stricken.  And you're disregarded

6  to -- you're instructed to disregard it.

7           Go ahead.

8           MR. MILLER:  Thank you, Your Honor.

9  BY MR. MILLER:

10 Q.  This is the -- just -- this is the third time

11 that you have testified for the defendant in this

12 case?

13 A.  Yes.

14 Q.  And besides earlier in this trial, you also

15 testified for him at a hearing on December 18th of

16 2018?

17 A.  Yes.

18 Q.  And I think -- is it fair to say that you'd

19 describe the defendant as somebody who likes to be

20 in control?

21 A.  Yes.

22 Q.  As a matter of fact, did he ask you to wear

23 certain clothing when you testified at the

24 December 18th hearing?

25 A.  Not that I recall.

```
 1  Q.   Did he ask you to wear a certain --
 2           MS. POLLOCK:  Objection; relevance.
 3           MR. MILLER:  Your Honor, this goes to the
 4  defendant wanting to be in control.
 5           THE COURT:  All right.  You may.
 6           MS. POLLOCK:  I didn't think that it was an
 7  element, Your Honor.
 8           THE COURT:  Pardon me?
 9           MS. POLLOCK:  I didn't think that was an
10  element.
11           MR. MILLER:  An element of what, Your Honor?
12  This is the penalty phase.  This is a penalty phase
13  witness.
14           THE COURT:  You may ask.  She may answer.
15  BY MR. MILLER:
16  Q.   You don't recall the defendant asking you in a
17  phone call to wear a certain red sweater and black
18  pants when you testified?
19  A.   I don't recall the conversation but it's
20  possible.
21  Q.   And do you recall wearing that to the
22  December 18th hearing?
23  A.   I think that I did wear a red sweater.
24  Q.   And did you then wear the same clothes when you
25  testified during the trial of this matter?
```

SENTENCING -- July 12, 2019 (Morning)      45

1  A.   I don't think it was the same outfit but it was

2  also a red sweater.

3          MR. MILLER:  I have no further questions,

4  Your Honor.

5          THE COURT:  Miss Pollock.

6                  REDIRECT EXAMINATION

7  BY MS. POLLOCK:

8  Q.   When you packed to come here for this trip, did

9  you pick out your own clothes like a big girl?

10 A.   Yes.

11         MS. POLLOCK:  Thank you.  Nothing further.

12         THE COURT:  Mr. Miller.

13         MR. MILLER:  Nothing further, Your Honor.

14         THE COURT:  You may step down.  Thank you.

15         Next witness.

16         MS.  BRAIN:  Your Honor, the defense would

17 call Miss Felicia Li.

18         THE COURT:  Miss Brain, would you retrieve

19 these exhibits please?

20         MS.  BRAIN:  Certainly.

21         THE COURT:  Never mind.  We got them.  Thank

22 you.

23         MS. POLLOCK:  Your Honor, the University

24 witnesses have wandered away for a moment.  This is

25 going to take one second to find them.

1                        FELISHA LI,

2   after having been duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4   BY MS. BRAIN:

5   Q.   Good morning.

6   A.   Good morning.

7   Q.   Can you please state your name and spell your

8   last name for the court reporter.

9   A.   My name is Felisha Li.  And my last name is L-i.

10  Q.   Where are you employed, Miss Li?

11  A.   I'm currently employed at the University of

12  Illinois Counseling Center.

13  Q.   What is your title?

14  A.   Title:  Clinical counselor, and also triage case

15  manager.

16  Q.   What are your duties and responsibilities in

17  that position?

18  A.   My duties include my day-to-day individual

19  counseling, handling triage phone calls, phone

20  consultation available for faculty, staff, or even

21  like a concerned third party or students; yeah; and

22  some outreach work as well.

23  Q.   How long have you been employed at the

24  University of Illinois Counseling Center?

25  A.   Coming to this August, three years.

 1  Q.   Were you on duty at the Counseling Center during
 2  the afternoon of March 21, 2017?
 3  A.   Yes.
 4  Q.   Did you have any contact with a student named
 5  Brendt Christensen that afternoon?
 6  A.   Yes.
 7  Q.   Can you tell us the nature of that contact?
 8  A.   The nature of that contact was Carin, the
 9  clinician, who was seeing him, asked for a
10  consultation with me and I went into her office to
11  consult with her, the clinician.
12  Q.   Okay.  Was Brendt in the room when you were
13  consulting?
14  A.   Yes.
15  Q.   When you say "Carin the clinician," what was her
16  job title?
17  A.   She's a doctorate intern.
18  Q.   What education did she have?
19  A.   I believe she has a Ph.D. that was going to
20  finish by the end -- according to her own timeline,
21  yeah.
22  Q.   How long had she been an intern at the
23  Counseling Center on March 21, 2017?
24  A.   Typically our doctorate interns start in August;
25  so I would say, approximately, like nine months.

 1 Q.   Whose counting.

 2 A.   Yeah.

 3 Q.   Are there limitations placed on what she could

 4 and couldn't do based on her status as an intern?

 5 A.   I'm not the training coordinator, so I'm not

 6 exactly sure.

 7 Q.   Are there any particular procedures as an intern

 8 she was required to follow when she saw a client?

 9      Did she have to be videotaped when she saw a

10 client as an intern?

11 A.   Yes.

12 Q.   Was she required to seek a consultation with a

13 licensed staff member every time she saw a client?

14 A.   No.

15 Q.   Why did Miss Carin consult with you about

16 Mr. Christensen's treatment on March 21st?

17 A.   She was concerned about possible suicide risk.

18 Q.   And also risk of harm to others?

19 A.   It wasn't covered in my consultation with her.

20 Q.   Okay.  She just talked about suicide risk?

21 A.   Uh-huh.

22 Q.   How much time did Miss Carin spend telling you

23 what the situation was before you went into the

24 office?

25 A.   I went to her office directly.

1  Q.   I see.  So before you went into the

2  consultation, you didn't have access, obviously, to

3  her report of the interview she did with

4  Mr. Christensen?

5  A.   No.

6  Q.   And you hadn't, obviously, had a chance to

7  review the videotape of her interview prior to going

8  into the room; is that right?

9  A.   No.  And I don't have authority to review the

10  tape at all because I'm not her supervisor.

11  Q.   Got it.  Tell us what happened when you first

12  went into the room; what did you do and what did

13  they do?

14  A.   I met with Carin, and she expressed some concern

15  about the risk of the client, and we kind of

16  discussed whether a voluntary hospitalization is

17  necessary.  And as we discussed that, the client was

18  not willing to go to the hospital, and we discussed

19  about whether -- what kind of plans that can be made

20  in terms of the consultation.

21  Q.   What plans did you discuss?

22  A.   As the client was credible and willing to

23  continue with following up an appointment, the

24  client was referred for an alcohol and -- I'm

25  sorry -- the alcohol assessment, yeah.

 1  Q.   So you're saying that you discussed with him

 2  whether he would be willing to accept inpatient

 3  psychiatric treatment for suicidal risk; is that

 4  right?

 5  A.   Uh-huh.

 6  Q.   From that you referred him for an alcohol

 7  assessment?

 8  A.   Yes, because, according to the consultation, she

 9  brought up that alcohol was a concern for the

10  client; and it seems like that it is also a risk

11  that kind of has been adding to his distress at that

12  point.

13  Q.   Did you refer him for any further treatment for

14  the suicide risk?

15  A.   We discussed and there was no clear intent and

16  plan, and we discussed about checking in on him

17  tomorrow; so I called him the next day.

18  Q.   He had told you that -- if he or not you, sorry,

19  or maybe he did in front of you -- but he had told

20  Miss Carin that he had thoughts of suicide very

21  recently, correct?

22  A.   There was some ideation.

23  Q.   And he said that if he did commit suicide, it

24  wouldn't be a gesture where he would be waiting for

25  someone to --

1       MR. NELSON:  Objection, Your Honor.  I think
2  that the witness, she wasn't able to review the tape
3  and wasn't there for the interview.
4       THE COURT:  Hold on -- I gather she's asking
5  if she heard this or what she knows.  So if she
6  knows, she can answer.
7       Go ahead, Ms. Brain.
8  BY MS. BRAIN:
9  Q.   Were you aware that Mr. Christensen had told
10  Miss Carin, that if he were to commit suicide, he
11  wouldn't do it in a way where somebody could rescue
12  him, but he would make sure that he would die before
13  he was found?
14  A.   No, I'm not aware.
15  Q.   Were you aware that he told her that if he was
16  going to commit suicide it would be by inhaling
17  concentrated nitrogen?
18  A.   No, I wasn't aware.
19  Q.   You weren't aware from the time that he left the
20  Counseling Center, Miss Carin had not told you that?
21  A.   No.
22  Q.   She didn't tell you anything about his thoughts
23  of harming other people?
24  A.   No.
25  Q.   She didn't tell you that he had formed a plan --

1  that -- sorry, let me backup.

2          She didn't tell you that -- she didn't tell

3  you that he had said that he had a fascination with

4  serial killers?

5  A.   No.

6  Q.   And that he had thoughts about committing a

7  crime like that?

8  A.   No.

9  Q.   She didn't tell you that she asked him, Did you

10  have a plan?"  And he said, "Yes, a plan to commit

11  homicide"?

12  A.   No.

13  Q.   Didn't tell you that she asked him how far along

14  with his plan and he said, "Pretty far"?

15  A.   No.

16  Q.   She didn't tell you that he had -- she asked him

17  if he had a specific victim; he said, "No, but I

18  have a type"?

19  A.   No.

20  Q.   She didn't tell you that she asked him had he

21  bought things to help him execute that plan?

22  A.   No.

23  Q.   And he had said, "Yes"?

24  A.   Can you repeat the question?

25  Q.   That was a bad question.

 1  A.   Yeah.
 2  Q.   She didn't tell you that she asked him if he had
 3  purchased items to be used in the execution of a
 4  plan to commit homicide, and he said, "Yes, I have";
 5  she didn't tell you that?
 6  A.   Carin has not told me any of that information.
 7  Q.   Okay.  When he left, he was instructed to call
 8  the Counseling Center --
 9  A.   Uh-huh.
10  Q.   -- the next day; is that right?
11  A.   Yes.
12  Q.   Did he call?
13  A.   No.
14  Q.   Did you call him?
15  A.   Yes.
16  Q.   Did you later review Mr. Christensen's file at
17  the Counseling Center?
18  A.   No.
19  Q.   You have never seen his intake paperwork?
20  A.   No.
21  Q.   Or his CCAP 62 profile that was generated for
22  him?
23  A.   No.
24  Q.   What is the CCAP 62?
25  A.   It's a measurement that all of the first time

1  clients at the Center will fill in a series of

2  questions and from that they measure maybe suicidal

3  ideation and homicidal ideations.

4  Q.   It also measures depression symptoms, right?

5  A.   Yes.

6  Q.   And anxiety symptoms?

7  A.   Yes.

8  Q.   Social anxiety symptoms?

9  A.   Yes.

10 Q.   Academic distress?

11 A.   Yes.

12 Q.   Had a scale for eating concerns?

13 A.   Yes.

14 Q.   Scale on hostility?

15 A.   Yes.

16 Q.   One on family distress?

17 A.   Yes.

18 Q.   One on substance abuse?

19 A.   Yes.

20 Q.   And an overall distress index, right?

21 A.   Overall in the distress, yes.

22 Q.   I want to talk now about the University's

23 policies as they apply to students who express

24 suicidal ideation.

25       As an employee of University of Illinois,

1  are you generally familiar with the Student Code?

2  A.   Generally, yes.

3  Q.   And the Student Code is a collection of rules,

4  regulations and policies that apply to, or otherwise

5  impact all students of the University of Illinois;

6  is that right?

7  A.   Yes.

8  Q.   And Article 2 Part 1 of the Code contains

9  medical policies, right?

10  A.   That I'm not familiar.

11  Q.   Okay.  Let me show you.

12        I show you what has been marked --

13        MS. BRAIN:  May I approach, Your Honor?

14        THE COURT:  You may.

15  BY MS.  BRAIN:

16  Q.   I hand you 151, is a copy of Article 2 of the

17  Student Code; is that right?

18  A.   Can you say that again?

19  Q.   Sorry.

20        The defense Exhibit that I just put up there

21  is Article 2 -- or a portion of Article 2 of the

22  Student Code, is it not; is that what that is?

23  A.   Yes.

24  Q.   And that Subsection 2-102 governs mandatory

25  assessment, does it not?

1 A.   The mandatory assessment part, yes.

2 Q.   And mandatory assessment, at least as it's

3 referred to in that section, is a compelled

4 assessment of a student's suicide risk; is that

5 right?

6 A.   Yes.

7 Q.   The Code states that whenever the University has

8 presented a credible report, the student has

9 threatened or attempted suicide, engaged in efforts

10 to commit suicide or expressed a preoccupation with

11 suicide, that student will be required to attend

12 four sessions of professional assessment; is that

13 right?

14 A.   Yes.

15        MS. BRAIN:  Move to admit and publish

16 Defense Exhibit 151.

17        MR. FRERES:  No objection.

18        THE COURT:  It will be admitted.  You may

19 publish.

20 BY MS. BRAIN:

21 Q.   According to Section (a)(1) --

22        MS. BRAIN:  Can you go to the first page?

23        There we go.

24 BY MS. BRAIN:

25 Q.   So if a University employee becomes aware that

1  one of those four situations are present -- meaning

2  the student's threatened attempted, engaged in

3  efforts to commit suicide, or expressed a

4  preoccupation with suicide -- they must report that

5  information to the director of the McKinley Health

6  Center; is that right?

7  A.   Can you say that again?

8  Q.   A University employee who becomes aware that a

9  student has threatened or attempted suicide, engaged

10 in efforts to prepare to commit suicide, or

11 expressed a preoccupation with suicide; then the

12 university employee must report that to the director

13 of the McKinley Health Center on campus, right?

14 A.   In my knowledge the answer is no.

15 Q.   Can you tell us why?

16 A.   In my knowledge that when we have a situation

17 where there is a -- screen went off -- yeah, where

18 there is an attempt or a threat, we fill out a

19 report called a Suicide Incident Referral Report,

20 and that report will be directly faxed to the

21 Counseling Center.

22 Q.   And what is that Suicide Incident Report?

23 A.   It is, according to when we receive, you know,

24 information -- or not necessarily me -- but it could

25 be a campus faculty staff or student that is aware

1  of a student with a threat, gesture, or attempt of

2  suicide; then they would fill out the report

3  indicating the information they have, including the

4  student's information, and they will directly send

5  the information to the Counseling Center.  Every day

6  there are clinicians on duty to review the report

7  together.

8  Q.   You said "threat, attempt or gesture," but it is

9  also employees and students are required to report

10 preoccupation with suicide, correct?

11 A.   My understanding is threat, attempt, gesture.

12 Q.   But the code says "preoccupation" also, right?

13 The Code, Student Code mandates assessment based on

14 preoccupation, right?

15 A.   It is on page 27 what the Code says.

16 Q.   So it is not just threat or gesture or attempt,

17 right?

18 A.   This is the first time that I'm seeing the

19 Student Code.

20 Q.   Wow.

21       When the Suicide Incident Referral Form is

22 completed, it goes to the Suicide Intervention Team,

23 isn't that right?

24 A.   Yes.

25 Q.   That's a team that's been set up to investigate

1  the -- any reports of threat, attempt, gesture or

2  preoccupation with suicide with regard to a

3  particular student, right?

4  A.   Yes.

5  Q.   You didn't fill out a Suicide Incident Referral

6  Form for Mr. Christensen, did you?

7  A.   No.

8  Q.   Miss Carin Molenaar also didn't fill out such a

9  form, did she?

10  A.   That I don't know.

11  Q.   And once again she didn't even tell you that he

12  had said that he had thoughts of harming others,

13  right?

14  A.   No, she did not tell me.

15  Q.   Okay.  You'd said that you had talked to him

16  about voluntary hospitalization for his suicidal

17  ideations; is that right?

18  A.   Yes.

19  Q.   You said that he didn't want to accept the offer

20  for voluntary hospitalization, right?

21  A.   Correct.

22  Q.   Did you record that fact in any of your

23  documentation of this case?

24  A.   Because that was a consultation, it will be up

25  to Carin to record that in the initial assessment.

1  Q.   And she didn't, did she?

2  A.   I don't know.

3  Q.   You didn't ever review her report to see what

4  she said that you told her?

5  A.   I didn't review the report because she was

6  present in the room as well.

7  Q.   After you discussed voluntary hospitalization,

8  did you discuss outpatient treatment for suicidal

9  ideation?

10  A.   No.

11  Q.   Did you discuss individual therapy for suicidal

12  ideation?

13  A.   We discussed continuation to service, and there

14  is also the client's concern of that day because of

15  alcohol and how it is adding more stress.  In

16  particular, I'm aware of his relationship with his

17  wife that was stressful for him at that point and,

18  hence, the increase in use of alcohol, and that's

19  why the referral was to do alcohol assessment, and,

20  thereafter, I usually -- usually it's up to the next

21  clinician to determine what continuing treatment

22  would be helpful.

23  Q.   Do you know if there was a continuing treatment

24  plan for Mr. Christensen?

25  A.   Can you repeat that again?

SENTENCING -- July 12, 2019 (Morning)          61

1 Q.   Are you aware if there was a continuing

2 treatment plan for Mr. Christensen developed?

3 A.   I'm aware that he was referred to a clinician in

4 the Counseling Center for the alcohol assessment,

5 and I'm aware that he attended the session.

6 Q.   Okay.  For alcohol.  But I'm talking about the

7 suicidality; was there any attempt to treat that?

8 A.   Typically when a clinician sees a form --

9 typically when the clinician sees a client, they

10 will assess risk, which include suicide as well.

11 And that is also part of the responsibility for all

12 clinicians which --

13 Q.   You are talking about risk; I'm talking about

14 treatment.

15 A.   Uh-huh.

16 Q.   Was there any attempt to address his suicidal

17 ideation?

18 A.   It would be up to the clinician.

19       MS.  BRAIN:  No further questions.  Thank

20 you.

21       THE COURT:  Mr. Freres.

22       MR. FRERES:  Thank you, Judge.

23              CROSS-EXAMINATION

24 BY MR. FRERES:

25 Q.   Good morning, ma'am.

SENTENCING -- July 12, 2019 (Morning)          62

1  A.    Good morning.

2  Q.    You talked little about the March 21st

3  interview.  That was an intake interview, correct?

4  A.    Yes.

5  Q.    And just tell us what the purpose of an intake

6  interview is.

7  A.    At the Counseling Center, the intake interview

8  will cover the initial assessment, usually about one

9  hour long, and it includes, like, a gathering data.

10 Students are supposed to come in 30 minutes before

11 the one hour time to meet the counselor.  So 30

12 minutes before the arrival at the Counseling Center

13 and fill out the database that we call the CCAP 62

14 and the demographic information.  And then they meet

15 with the counselor generally outlining their

16 presenting concerns what they want to address.  We

17 gather some background information as much as we can

18 during that day and we kind of also assess what, if

19 there is any risk presented by the client.

20 Q.    Okay.  And is it fair to say that the purpose of

21 that intake interview was just to collect

22 information so the person can be directed to the

23 clinician or whoever -- what may be necessary to be

24 on that?

25 A.    Correct.

1  Q.   And at the end of that interview with

2  Miss Molenaar, that's when you got involved briefly,

3  correct?

4  A.   Correct.

5  Q.   I think that you said that you didn't review

6  Miss Molenaar's reports or anything because you're

7  not authorized to because she is not a student under

8  your control or anything of that nature?

9  A.   I'm not authorized to review the tapes, yeah.

10  Q.   And now, at the end of that, the defendant was

11  asked to call the following day to the Counseling

12  Center to follow-up, correct?

13  A.   Yes, just to see how he is doing, and if there's

14  any extra steps that we need to take.

15  Q.   Of course he didn't call, did he?

16  A.   He did not call.

17  Q.   But you made the effort to call him?

18  A.   I called because I was concerned about his

19  safety and wanted to make sure that the client is

20  okay.

21  Q.   And then he reported at that time that he just

22  forgot to call?

23  A.   Yes, and that is indicated in my notes about the

24  phone call to the client.

25  Q.   And that after that you offered him another

1  appointment if he needed service and encouraged him
2  to walk in if he needed anything?
3  A.   Yes, that's pretty standard of what we tell
4  students; that if they are struggling, if they are
5  in distress, they can definitely walk in during the
6  office hours of the Counseling Center and also call
7  the hotline, which is like a crisis hotline or even
8  walk into an emergency room or 911.
9  Q.   And you inquired about his personal safety
10 during that call?
11 A.   I asked him, yes.
12 Q.   And he reported to you that there was no urgency
13 and that he was feeling fine?
14 A.   Yes, correct.
15 Q.   And he also said that he was willing to wait for
16 his assessment; he didn't need to move anything up,
17 correct?
18 A.   Yes, as indicated, in a note, he was credible in
19 the phone call; that he was willing to come back for
20 the next appointment.
21 Q.   So based on that does he have any -- would you
22 claim that that was a credible assessment that he
23 was okay based on his statement?
24 A.   It was a credible phone call that he responded.
25 Q.   Now you were asked several questions there by

 1  Ms. Brain about what you didn't know about

 2  Ms. Molenaar, do you remember that?  What you may or

 3  may not have known about what was said during the

 4  March 21st interview?

 5  A.   Can you repeat or rephrase that question?

 6  Q.   Let me just ask you the question:  Is it fair to

 7  say that given Miss Molenaar didn't tell you several

 8  things, that she also probably didn't tell you that

 9  the defendant had indicated during the March 21st

10  session that he was done with all of the thoughts

11  related to homicide and suicide, correct?

12  A.   Yeah, I have no information at that time.

13  Q.   And if somebody reports that they are done with

14  something, would that impact whether or not you

15  would consider that to be a credible threat?

16  A.   Can you repeat that question?

17  Q.   The Student Code that you saw, did you see in

18  the -- while it was up there, the first line of that

19  it talking about assessment being triggered when

20  there is a credible report.

21  A.   Uh-huh.

22  Q.   Do you recall that?

23  A.   Yes, I can see page 27.

24  Q.   If somebody tells you that they are done with

25  the thoughts, would you consider that as something

1  that would impact their credibility on how you would
2  go forward?
3  A.   If they tell me they are done with the
4  thoughts -- that might have an impact.
5          MR. FRERES:  Thank you.
6          I have no further questions, Your Honor.
7          THE COURT:  Ms. Brain.
8          MS.  BRAIN:  Nothing further, Your Honor.
9          THE COURT:  Thank you.  You may step down.
10  Just push this aside.  Thank you.
11          Next witness.
12          MS.  BRAIN:  Yes, Your Honor.
13          We call Miss Jennifer Maupin.
14          MR. NELSON:  Your Honor, can we approach for
15  a brief sidebar before the witness is sworn?
16          THE COURT:  Yes.
17          (Sidebar conference held.)
18          MR. NELSON:  We have seen as a list of
19  potential exhibits for the first time this
20  complaint, obviously a legal pleading; not a
21  relevant piece of evidence that should be admitted
22  in this case.  Whether or not she is allowed to be
23  asked about this, I would defer to your Court.  We
24  will certainly object, but they should not be
25  allowed under any circumstances to admit a complaint

1  as a piece of evidence.

2       THE COURT:  Ms. Brain.

3       MS. BRAIN:  It is direct evidence of bias.

4  She has been sued based on her actions in this case

5  and therefore she has a motive to shade her

6  testimony in order to present her actions in the

7  best light for liability.

8       THE COURT:  What about -- a couple of

9  questions along that line would be fine.  But what

10 about the actual document of the complaint, why is

11 that relevant?

12      MS.  BRAIN:  The strength of the

13 allegations, well, the serious allegations against

14 her are relevant to show the amount of bias that she

15 has.

16      MR. NELSON:  I apologize for interrupting.

17 I didn't mean to interrupt, but I recall several

18 conversations where Miss Pollock stated fortuitously

19 that they were not going to go into any civil

20 liability whatsoever.  She can ask the question

21 about bias.  You can't put in extrinsic evidence of

22 bias anyway.  She can ask the question.  The

23 complaint should not come in.

24      MS.  BRAIN:  Absolutely, being extrinsic

25 evidence --

 1          THE COURT:  What mitigator does that go to?

 2          MS. BRAIN:  It's not a question of a

 3 mitigator, it is a question of the bias of the

 4 witness.

 5          THE COURT:  And you are free to ask her if

 6 she's aware that she has been sued.  The fact that

 7 she has been sued, I don't know, whatever line of

 8 questioning that you want to ask, but I don't see

 9 the complaint itself going in, wouldn't have a

10 relevance to it.

11          MS. BRAIN:  We submit that it shows the

12 extent of bias.

13          THE COURT:  We don't even know if there was

14 a bias.  You can ask her, you can make a reasonable

15 inference argument if she said no, but I don't know

16 that the complaint.

17          MS. POLLOCK:  She is just standing there in

18 the presence of the jury.  She is just standing

19 there.

20          THE COURT:  We are done.

21          (In the presence of the jury.)

22          (Witness sworn.)

23          THE COURT:  Go ahead, Ms. Brain.

24                  JENNIFER MAUPIN,

25 after having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BRAIN:

Q.   Good morning.  Could you state your name and
spell your last name for the record?

A.   My name is Jennifer Maupin, M-a-u-p-i-n.

Q.   Thank you.

     Where are you employed, Miss Maupin?

A.   I'm currently self-employed as a private
therapist in Urbana.

Q.   Did you ever work at the Counseling Center for
the University of Illinois?

A.   Yes, from 2010 until 2017.

Q.   And what was your position at the Counseling
Center?

A.   I was a clinical counselor in the Alcohol and
Other Drug office.

Q.   Were you on duty at the Counseling Center during
the morning of March 30, 2017?

A.   Yes.

Q.   Did you have contact with a student named Brendt
Christensen that morning?

A.   Yes.

Q.   Can you tell us the nature of that contact?

A.   He was referred by the intake counselor, Carin
Molenaar, to meet with me for an alcohol and other

 1  drug assessment.

 2  Q.   What is an "alcohol and other drug assessment";

 3  tell us.

 4  A.   It's a specialized assessment focused on helping

 5  students determine what their best foot forward is

 6  related to their alcohol and other drug concerns; so

 7  students who have consequences related to their drug

 8  and alcohol use can come voluntarily to our office

 9  or are sometimes referred by another agency in the

10  university to have a conversation with a therapist

11  who will gather the information and then make the

12  appropriate clinical recommendation for further

13  treatment.

14  Q.   Okay.  Did you review Brendt's file, the

15  Counseling Center file, before you met with him?

16  A.   Yes.

17  Q.   So you reviewed his intake questionnaire; you

18  would have reviewed his intake questionnaire?

19  A.   I reviewed the intake note that Carin Molenaar

20  wrote.

21  Q.   Let me show you.  If I can find it.

22         MS. BRAIN:  May I approach?

23         THE COURT:  You may.

24  BY MS. BRAIN:

25  Q.   Showing you what is marked -- pretty sure -- as

 1  Defense 154.

 2          Will you take a look at that?

 3          Is that the file, the Counseling Center file

 4  or chart, for Brendt Christensen?

 5  A.   Yes.

 6          THE COURT:  You can maneuver this.

 7          Go ahead.

 8  BY MS. BRAIN:

 9  Q.   When students come to the Counseling Center,

10  they first fill out a questionnaire on the computer;

11  is that right?

12  A.   For an intake assessment, yes.

13  Q.   For an intake assessment, right?

14          MS. BRAIN:  Can we have page two?

15          MR. NELSON:  That exhibit isn't in evidence.

16          THE COURT:  Pardon me?

17          MR. NELSON:  That exhibit isn't in evidence.

18          MS.  BRAIN:  My bad.  Move to admit and

19  publish.

20          MR. NELSON:  I don't have the exhibit, Your

21  Honor, so I can't review it to see if we have an

22  objection.

23          THE COURT:  Is this 154?  Can you supply

24  Mr. Nelson with a copy for review?

25          MS.  BRAIN:  Certainly, Your Honor.  Your

1  Honor, I thought that we already had.  We previously

2  produced it.  This is the exhibit.

3       MR. NELSON:  No, you didn't.

4       No objection, Your Honor.

5       THE COURT:  Okay.  It will be admitted.

6       MS. BRAIN:  Can I have page two,

7  Ms. Pollock?

8  BY MS. BRAIN:

9  Q.   When you -- when the student has answered the

10 intake questionnaire, when it's printed out, it

11 looks sort of generally like this?

12 A.   I believe so, yes.  I didn't do intakes, general

13 intakes.

14 Q.   Okay.  But you did review the file before

15 meeting Mr. Christensen?

16 A.   I reviewed Carin's clinical note.

17 Q.   As part of answering his intake questionnaire,

18 Mr. Christensen reported that alcohol and drug abuse

19 is ruining his life; is that right?

20 A.   Yes.

21 Q.   And he also said that he attended counseling for

22 mental health concerns after starting college,

23 right?

24 A.   Yes.

25 Q.   And he said that he had taken a prescribed

1  medication for mental health concerns after starting

2  college, right?

3  A.   Yes.

4  Q.   He said that he had been hospitalized for mental

5  health concerns two to three times, isn't that

6  right?

7  A.   Yes.

8  Q.   The last time was five years previously?

9  A.   Yes.

10        MS. BRAIN:  Can we have the next page,

11 Ms. Pollock?

12 BY MS. BRAIN:

13 Q.   He said also that he had seriously considered

14 attempting suicide two to three times, right?

15 A.   Yes.

16 Q.   And the last time that he had done so was within

17 the last month; is that right?

18 A.   Yes.

19 Q.   He also said that he had considered causing

20 series physical injury to another person on one

21 occasion, correct?

22 A.   Yes.

23 Q.   And that was within the last year prior to

24 completing the questionnaire, right?

25 A.   Yes.

 1  Q.  He said also --

 2         MS. BRAIN:  Could I have the next page,

 3  Ms. Pollock?

 4  BY MS. BRAIN:

 5  Q.  That he was currently taking two medications,

 6  that he was taking Zolpidem, ten milligrams; is that

 7  right?

 8  A.  Yes.

 9  Q.  Do you know what Zolpidem is?

10  A.  No.

11  Q.  He also said he was taking Venlafaxine, three

12  pills a day at 37.5 milligrams, didn't he?

13  A.  Yes.

14  Q.  Do you know what Venlafaxine is?

15  A.  No.

16  Q.  Ever heard of Effexor?

17  A.  Yes, I have heard of that.

18  Q.  Okay.  Is Venlafaxine the generic for Effexor?

19         MR. NELSON:  Objection.  She said that

20  didn't know; the witness is testifying.

21         MS.  BRAIN:  I will move on.

22  BY MS.  BRAIN:

23  Q.  When they come to the Counseling Center, do

24  clients also take a test named the CCAP 62?

25  A.  Yes.

1  Q.   What does that acronym stand for?

2  A.   I'm not aware.

3  Q.   Do you know what type of a test the CCAP is?

4  A.   I know that it evaluates students' experiences

5  of symptoms across several domains.

6  Q.   And it generates --

7        MS. BRAIN:  Can we have page six, Lis?

8  BY MS. BRAIN:

9  Q.   When a student completes the CCAP 62, it

10  generates a profile that looks something like that,

11  right?

12  A.   Yes.

13  Q.   And to take the test the student has to review a

14  set of statements and notes whether a particular

15  statement applies to them; is that right?

16  A.   Yes.

17  Q.   On a scale of zero to four?

18  A.   Yes.

19  Q.   Then the test generates scores on nine scales,

20  right?

21  A.   Yes.

22  Q.   The higher the student's score is on each scale

23  --  can you move it down a little -- the more

24  distress they're experiencing.  The higher the

25  percentile score on each scale, the more distress

1  that the student is experiencing; is that right?

2  A.  Yes.

3  Q.  And Brendt scored in the 94th percentile on the

4  depression scale?

5  A.  Yes.

6  Q.  The 92nd percentile on the general anxiety

7  scale, right?

8  A.  Yes.

9  Q.  The 54th percentile on social anxiety, right?

10 A.  Yes.

11 Q.  The 83rd percentile on academic distress, right?

12 A.  Yes.

13 Q.  The 80th percentile on eating concerns?

14 A.  Yes.

15 Q.  Only the 29th percentile on the hostility scale;

16 is that right?

17 A.  Yes.

18 Q.  The 91st percentile on -- for the family

19 distress scale?

20 A.  Yes.

21 Q.  The 100th percentile on substance abuse scale,

22 right?

23 A.  Yes.

24 Q.  And the 95th percentile on the overall distress

25 index; is that right?

 1  A.   Yes.
 2  Q.   And some of the particular items he endorsed on
 3  the test were "I feel disconnected from myself"; is
 4  that right?
 5  A.   Yes.
 6  Q.   "I don't enjoy being around people as much as I
 7  used to," right?
 8  A.   Yes.
 9  Q.   "I feel isolated and alone," right?
10  A.   Yes.
11  Q.   "I lose touch with reality," right?
12  A.   Yes.
13  Q.   That question is in bold.  Do you know why that
14  question is in bold?
15  A.   No.
16  Q.   He said that "I feel worthless," didn't he?
17  A.   Yes.
18  Q.   I feel hopeless -- sorry, my bad -- "I feel
19  helpless," right?
20  A.   Yes.
21  Q.   There is a question about "I'm enthusiastic
22  about life" and he put a zero on that one, right?
23  A.   Yes.
24  Q.   He said, "I have unwanted thoughts I can't
25  control," right?

1  A.  Yes.

2  Q.  He also endorsed, "I feel sad all the time,"

3  right?

4  A.  Yes.

5  Q.  "I have thoughts of ending my life," right?

6  A.  Yes.

7  Q.  For the item "I like myself" he put zero, right?

8  A.  Yes.

9  Q.  He said there were "many things I'm afraid of,"

10 didn't he?

11 A.  I don't see that one.

12 Q.  I'm sorry.  It's at the top of the general

13 anxiety section on the left.

14 A.  Thank you.  Yes.

15 Q.  "My heart races for no good reason," right?

16 A.  Yes.

17 Q.  "I have sleep difficulties," he said?

18 A.  Yes.

19 Q.  "My thoughts are racing," he endorsed that one?

20 A.  Yes.

21 Q.  "I have spells of terror or panic"?

22 A.  Yes.

23 Q.  He endorsed that.

24        "I feel tense"?

25 A.  Yes.

1  Q.  He said, "I experience nightmares or

2  flashbacks," right?

3  A.  Yes.

4  Q.  Okay.  Thank you.

5       During his interview with Miss Molenaar,

6  Brendt talked about his history of substance abuse;

7  is that right?

8  A.  Yes.

9  Q.  He said it negatively impacted his relationship

10 with his wife?

11 A.  Yes.

12 Q.  He had periods of abstinence in the past he

13 reported?

14 A.  Yes.

15 Q.  But he'd always gone back to drinking?

16 A.  Yes.

17 Q.  He said that he always drinks alone, right?

18 A.  I don't remember that.

19 Q.  Okay.

20 A.  If I had her notes --

21 Q.  Yes.

22 A.  -- I could --

23       MS. BRAIN:  Put up page 18, Ms. Pollock.

24 BY THE WITNESS:

25 A.  It's in front of me.  But this is helping

 1  actually.
 2  BY MS. BRAIN:
 3  Q.   It's better, isn't it?  I should have
 4  highlighted it.
 5  A.   So can you repeat your question?
 6  Q.   Yeah.  Brendt told Miss Molenaar he always
 7  drinks alone -- I must have the wrong page.
 8         MS. BRAIN:  Thank you, Ms. Pollock.
 9  BY MS. BRAIN:
10  Q.   It's actually on this page right here; that
11  paragraph that begins "Brendt reported that his
12  alcohol use became problematic when he was an
13  undergraduate."
14  A.   Yes.
15  Q.   He stated that he "always drinks alone,"
16  correct?
17  A.   Yes.
18  Q.   And he drinks up to 15 to 20 shots of liquor
19  over the course of approximately eight hours?
20  A.   Yes.
21  Q.   He also reported abusing Vicodin in the past?
22  A.   Yes.
23  Q.   And abusing Ambien?
24  A.   Yes.
25  Q.   Abusing Benadryl, right?

1  A.   Yes.

2  Q.   And cough syrup?

3  A.   Yes.

4  Q.   He said his mother had a history of alcohol

5  dependence, right?

6  A.   Yes.

7  Q.   And his brother had a drinking problem in

8  college?

9       MS. BRAIN:  Can we have the page back,

10  Ms. Pollock.  I believe that was the previous page.

11  BY MS. BRAIN:

12  Q.   Paragraph that begins "family background."

13  A.   Yes, thank you.

14  Q.   He said that his sister used substances in

15  college and dropped out of university after her

16  first year, right?

17  A.   Yes.

18  Q.   He also told Miss Molenaar that three days prior

19  to the interview his wife had told him that he

20  wanted to separate, right -- she wanted to separate,

21  correct?

22  A.   Yes.

23  Q.   And his substance abuse was part of the reason

24  why she wanted to leave him?

25  A.   Yes.

1  Q.   Brendt also told Miss Molenaar that his wife was
2  his only social support, right?
3  A.   Yes.
4  Q.   He said that he hadn't made any friends, by
5  choice, because his wife has always been enough?
6  A.   Yes.
7  Q.   He said he had no contact with his father, his
8  brother or his sister, right?
9  A.   I remember that, so, yes.  I don't see it today
10 but I do remember that.
11 Q.   You do remember that.  Okay.  And that he spoke
12 to his mother but he wasn't close to her, didn't
13 have a close relationship with her, right?
14 A.   Yes.
15 Q.   And also during this interview Brendt reported
16 that he was experiencing depressive mood symptoms;
17 is that right?
18 A.   Yes.
19 Q.   He said that he had the symptoms since high
20 school, right?
21 A.   Yes.
22 Q.   And that he was presently experiencing thoughts
23 of guilt, right?
24       Probably previous page.
25       Paragraph beginning "Brendt connected his

 1  substance abuse" --

 2  A.   Yes, thank you.

 3  Q.   He said that he was experiencing thoughts of

 4  helplessness, right?

 5  A.   Yes.

 6  Q.   He was experiencing lethargy, right?

 7  A.   Yes.

 8  Q.   And disrupted sleep?

 9  A.   Yes.

10  Q.   He said that he gets approximately two to four

11  hours of restful sleep a night?

12  A.   Yes.

13  Q.   He said that his depressive symptoms were bad

14  enough that they began impacting his academic

15  performance after his first year in graduate school;

16  is that right?

17  A.   Yes.

18  Q.   He said in his second year of graduate school he

19  began drinking more, right?

20  A.   Yes.

21  Q.   And his passion for his academic work deceased,

22  right?

23  A.   Yes.

24  Q.   And he ended up not doing anything, right?

25  A.   Yes.

 1  Q.   He decided to quit the Ph.D. program and take a

 2  master's degree instead, right?

 3  A.   Yes.

 4  Q.   And he told Miss Molenaar he felt like a

 5  complete failure for the first time in his life?

 6  A.   Yes.

 7  Q.   Brendt also told Miss Molenaar that he had been

 8  hospitalized in the past for alcohol related

 9  anxiety, right?

10  A.   Yes.

11  Q.   He said that over five years ago he was

12  hospitalized for -- where did that go?

13          Anyway, he said that over five years ago he

14  had been hospitalized for dehydration and panic

15  attacks, right?

16  A.   Yes.

17  Q.   And he said that he was currently seeing a

18  psychiatrist at the McKinley Health Center; is that

19  right?

20  A.   Yes.

21  Q.   And that the psychiatrist had prescribed him

22  antidepressant medications; is that right?  Reports

23  meeting with --

24  A.   Yes.  Thank you.

25  Q.   And also Ambien, correct?

1  A.   Yes.

2  Q.   And that's a drug to help you sleep, isn't it?

3  A.   Yes.

4  Q.   He also said that he had two to three post

5  traumatic stress disorder experiences over five

6  years ago --

7        MS. BRAIN:  Can we have the next page,

8  Ms. Pollock?

9  BY MS. BRAIN:

10  Q.   Down at the bottom "under trauma."

11        MS. BRAIN:  It went away.  Further down

12  please.

13  BY THE WITNESS:

14  A.   Yes.

15  BY MS. BRAIN:

16  Q.   But the hour ran out before Miss Molenaar could

17  ask him about those, right?

18  A.   Yes.

19  Q.   Also reported that he began to experience

20  suicidal ideation the preceding Sunday before this?

21  A.   Yes.

22  Q.   On that day his wife told him that she wanted to

23  leave him, right?

24  A.   Yes.

25  Q.   He told Miss Molenaar he didn't want to live

1 without his wife, right?

2 A.   Yes.

3 Q.   He said that he had planned suicide which was

4 inhaling concentrated nitrogen, right?

5 A.   Yes.

6 Q.   And Miss Molenaar noted in her report that he

7 had limited protective factors should his wife

8 decide to follow through and leave him, right?

9 A.   Yes.

10 Q.   What is "protective factors"; what is she

11 referring to?

12 A.   You are asking my definition?

13 Q.   Yes.  Please.

14 A.   So I understand that to mean things that are

15 helpful in your circumstances, things that keep you

16 from getting worse.

17 Q.   Okay.  Brendt also reported that he had thoughts

18 of harming others, didn't he?

19 A.   Yes.

20 Q.   He said that those thoughts increased when he

21 had been drinking, right?

22 A.   Yes.

23        MR. NELSON:  Your Honor, if I may, I've been

24 wanting to object but we've gone on for quite some

25 time now with counsel just reading a document and

1  yes, yes, yes, yes, yes; this is all in evidence

2  already.  Perhaps we could fast forward to the part

3  where she did something and she can testify as to

4  what she did, if she remembers.

5          THE COURT:  I will allow the line of

6  questioning and assume that we are getting to that.

7          Go ahead, Ms. Brain.

8          MS.  BRAIN:  Thank you.

9  BY MS. BRAIN:

10  Q.   Brendt told Miss Molenaar that he developed a

11  fascination with serial killers, didn't he?

12  A.   Yes.

13  Q.   And he began to have homicidal ideation?

14  A.   Yes.

15  Q.   What is a homicidal ideation?

16  A.   Thoughts of wanting to hurt others, specifically

17  kill them.

18  Q.   And he told her how he would plan a similar act,

19  right?

20  A.   Yes.

21  Q.   Meaning a murder, right?

22  A.   Yes.

23  Q.   And he told Miss Molenaar during the interview

24  that he thought he knew how to do it already, right?

25  That may have been on the tape.

1            Did you know about that?

2  A.    No.

3  Q.    Did you know that he said that it wouldn't be

4  hard to do, meaning commit a homicide?

5  A.    No.

6  Q.    That he had made a plan to do it, you didn't

7  know that?

8  A.    No.

9  Q.    That his plan was pretty far along?

10  A.    No.

11  Q.    It's not in the report either, is it?

12  A.    No.

13  Q.    That he actually purchased things that he would

14  use in committing a murder; did you know that?

15  A.    So Carin mentioned that in our consult together

16  prior to the assessment.

17  Q.    Okay.  Good.

18            He told her that he never actually

19  identified a specific victim, but he had a type that

20  would be a suitable victim, correct?

21  A.    Yes.

22  Q.    He said that he told his wife about these

23  thoughts and it terrified her, right?

24  A.    Is that in the note?

25  Q.    That's on the tape, I believe.

 1  A.   I never viewed the tape.
 2  Q.   Ms. Molenaar didn't tell you about that part?
 3  A.   No.
 4  Q.   Okay.  Did she tell you that he said that he
 5  didn't want to hurt anyone and didn't want to be
 6  that kind of person?
 7  A.   Yes.
 8  Q.   But he still had the thoughts, right?
 9  A.   Yes.
10  Q.   She told you that?
11  A.   Yes.
12  Q.   All right.  So I want to talk about the
13  University's policies as they apply to students who
14  are potentially at risk of suicide.
15       As a University employee, are you familiar
16  with the Student Code, generally?
17  A.   Generally.
18  Q.   It is a collection of rules, regulations, and
19  policies that apply to or impact all students at the
20  University of Illinois; is that right?
21  A.   Yes.
22  Q.   Okay.  And a part of the Code, excuse me,
23  Article 2, that contains medical policies, right?
24  A.   I don't have a copy of the Code.
25  Q.   Let me give you one.  It might already be up

1  there actually.

2          Show you what is marked as 157 already in

3  evidence.

4          That is a part of a Student Code; is that

5  right?

6  A.   Yes.

7  Q.   And Section 2-102 concerns mandatory assessment;

8  is that right?

9  A.   Yes.

10  Q.   And in the event that the university has a

11  credible report, the student has threatened,

12  attempted, engaged in efforts of suicide or

13  expressed a preoccupation with suicide; there are

14  certain steps that the university personnel are

15  required to take; is that right?

16  A.   Yes.

17  Q.   What steps are required to be taken?

18  A.   As it reads in the Code, the students will be

19  required to attend four sessions of professional

20  assessment.

21  Q.   And what is "professional assessment"?  What is

22  that talking about?

23  A.   That's talking about that -- the risk of the

24  student hurting themselves or someone else, and kind

25  of monitoring that risk over several sessions.

 1  Q.   And by "mandatory," it means that a student
 2  doesn't have a choice; is that right?
 3  A.   Correct.
 4  Q.   The University has assembled a Suicide
 5  Intervention Team, do they not?
 6  A.   Yes.
 7  Q.   And that team is who implements the Mandatory
 8  Assessment Policy or oversees it?
 9  A.   I believe so, yes.
10  Q.   And they have a policy and procedure manual that
11  they have published, do they not?
12  A.   Yes.
13  Q.   Okay.  Let me show you what has been marked as
14  Defense Exhibit 150.
15          THE COURT:  What number is that?
16          MS.  BRAIN:  150, Your Honor.
17  BY MS.  BRAIN:
18  Q.   That is the policy and procedure manual of the
19  Suicide Intervention Team, is it not?
20  A.   Yes.
21          MS. BRAIN:  Permission to admit and publish
22  Defense 150.
23          MR. NELSON:  No objection, Your Honor.
24          THE COURT:  It will be admitted.
25

1  BY MS. BRAIN:

2  Q.  If a member of the campus community learns about

3  a student's suicide attempt, threat or

4  preoccupation, they are directed to file a Suicide

5  Incident Referral?

6  A.  Yes.

7  Q.  There is a form for that, standard form, is

8  there not?

9  A.  Yes.

10 Q.  It is called a Suicide Incident Referral Form?

11 A.  Yes.

12 Q.  Once that's filled out, the referral form is

13 sent to the Suicide Intervention Team; is that

14 correct?

15 A.  Yes.

16 Q.  And that's physically located in the Counseling

17 Center where you work, right?

18 A.  Yes.

19 Q.  And when it's -- when the form comes in, it is

20 reviewed by therapists at the Counseling Center who

21 was on the Suicide Intervention Team; is that right?

22 A.  Yes.

23 Q.  And if the person believes that the report made,

24 that's a credible report of a suicide attempt,

25 gesture or preoccupation, then that's what triggers

1  the mandatory assessment; is that right?

2  A.   Yes.

3  Q.   Miss Molenaar did not file a Suicide Incident

4  Referral Form after she saw him, saw Mr. Christensen

5  on March 21st, did she?

6  A.   No.  May I clarify something --

7  Q.   Sure.

8  A.   -- with my experience?

9  Q.   Sure.

10  A.   So in my experience, when a student talked about

11  risks to self or others in any therapeutic contacts

12  assessment -- in my case it was alcohol and other

13  drugs -- we were not required to trigger the system

14  of the Suicide Incident Report; the student was

15  already present and engaged in getting help, so we

16  were not required to do that.  I think the purpose

17  -- I did not generate this policy -- but my

18  understanding is the purpose of the policy was to

19  help other professionals around campus get students

20  into a Counseling Center environment so that they

21  could have the ongoing contact.

22       So she did hear him express ideas, and he

23  agreed to come back to have further assessment.  And

24  so that it wouldn't be -- if he had refused to come

25  back, then she might have -- I'm just speculating --

SENTENCING -- July 12, 2019 (Morning)        94

1  but in my own circumstance if a student was

2  returning, then there was no need to mandate them to

3  return.  The whole purpose of that program is to

4  make sure that students were interacting with the

5  Counseling Center to get support.

6  Q.   So the purpose is the Counseling Center would

7  address and treat the suicidal ideation?

8  A.   Yes.  That's the purpose, whether it was an

9  outside referral or whether it was something shared

10 in an assessment with the counselor, that they would

11 continue to pay attention to that risk.

12 Q.   As an employee of the University of Illinois,

13 particularly as a mental health professional, are

14 you generally familiar with the Campus Violence

15 Threat Assessment Policy?

16 A.   I was not generally aware of that.  And to

17 clarify, I'm no longer a University of Illinois

18 employee.

19 Q.   You told me that.  I beg your pardon.

20 A.   Thank you.

21        MS. BRAIN:  May I approach?

22        THE COURT:  You may.

23 BY MS. BRAIN:

24 Q.   I show you what has been marked as Defendant's

25 Exhibit 157.

 1          We are getting crowded up here.

 2   A.   We are.

 3   Q.   Is that the University's Campus Violence Threat

 4   Assessment Plan?

 5   A.   It is.  It is dated 2018, and my work ended in

 6   May of 2017, just for clarification.

 7   Q.   Very good.  But there has been previous versions

 8   of it.

 9   A.   Okay.

10   Q.   There's always been one in effect when you were

11   working there?

12   A.   I don't know.  I don't remember.

13   Q.   Was the one in effect in 2017 when you were

14   working there?

15   A.   I don't know.  I don't remember.

16   Q.   You don't know if there was a Threat Assessment

17   Plan in place?

18   A.   Since this says "edition," I'm assuming that

19   there were earlier ones.  I just don't want to say,

20   since I'm under oath, that I know something that I

21   don't.

22   Q.   Understood.  Understood.  But as part of your

23   work at the Counseling Center, weren't you required

24   to be aware of the Campus Violence Assessment Plan?

25   A.   I was required to be aware of when students were

 1  a risk to themselves or others.  And I understood

 2  that the policy was similar in terms of the response

 3  to that.

 4  Q.  Very good.

 5       MS. BRAIN:  Move to admit and publish 157,

 6  Your Honor.

 7       MR. NELSON:  Your Honor, I object.  She just

 8  said she doesn't know what it is; doesn't recognize

 9  it; hasn't seen the form for a year.  This was after

10  she wasn't an employee.  This is very clearly the

11  wrong witness for this exhibit.

12       THE COURT:  Miss Brain.

13       MS.  BRAIN:  It's a document that applies to

14  all of the University of Illinois employees and

15  students.  And she is a mental health -- was a

16  mental health employee, and she was required to be

17  familiar with the steps that needed to be taken when

18  somebody reports thoughts of harming others.

19       THE COURT:  Let me see this.

20       MS. POLLOCK:  Page 22, Your Honor.

21       THE COURT:  Pardon me?

22       MS. POLLOCK:  Page 22.

23       THE COURT:  The question is whether it can

24  be admitted based upon her testimony.  So I think

25  that you need to ask a few more questions.

1          MS.  BRAIN:  I do have a 2017 version.  I

2    don't have the page.

3          THE COURT:  I don't know that it's the

4    version.  I think it's whether she's aware of it.

5    And so I think that you need to clean that up.

6          MS.  BRAIN:  Okay.  Very good, Your Honor.

7    Understood.

8    BY MS. BRAIN:

9    Q.   Let me ask you:  Were you aware of the Campus --

10   what was it -- Threat Assessment Plan?

11   A.   What I was aware of was more related to kind of

12   bracketing the two under one umbrella.  I have a

13   specific memory of the Suicide Intervention Team and

14   their role.  I have very specific memories of that,

15   very specific memories of those conversations, and I

16   understood that it was to be under the same umbrella

17   of responding, so that if the occasion was that a

18   student expressed an interest in hurting someone

19   else, then you would respond accordingly by

20   consulting with the crisis team; that was my

21   understanding.

22   Q.   Very good.  Were you aware that the policy

23   identified specifically certain thresholds of

24   unacceptable conduct?

25   A.   No.

 1  Q.   Or they identified standardized responses to
 2  that conduct?
 3  A.   No.
 4  Q.   So you were also aware that one of the incidents
 5  or examples of unacceptable conduct under that
 6  policy is the expression of thoughts?
 7        MR. NELSON:  Objection, Your Honor.
 8        MS. BRAIN:  Can you pull the page up?  I'm
 9  sorry.
10        (Defense counsel conferring.)
11        THE COURT:  Before we get to the objection,
12  I'm not quite sure what just occurred, but is there
13  going to be another -- why don't you ask -- was
14  there another question you were going to ask?
15        MS.  BRAIN:  I was, Your Honor.
16        THE COURT:  Specific to her ability to
17  identify this policy or document so that it would
18  come into evidence?
19        MS.  BRAIN:  Yes.
20        THE COURT:  Let's do that.  Let's go to
21  that.
22        MS.  BRAIN:  If it helps, Your Honor.
23        Never mind, I will move on.
24        THE COURT:  Let me try to clean this up.
25        I think for this document to come in with

1 this witness, the witness is either going to have to
2 be aware of it or going to have to be shown to --
3 should have been aware of it, even if she's not
4 aware of it.  So --
5          MS. BRAIN:  Yes, Your Honor.
6          Can we have page four of the exhibit?
7          THE COURT:  Something that required her in
8 her position to know this.
9          MS.  BRAIN:  Right.
10          THE COURT:  Or to be aware of this document.
11          MS.  BRAIN:  Very good, Your Honor.
12          THE COURT:  If that's the case, then it will
13 come in.
14          MS.  BRAIN:  If you could turn to page four.
15 BY MS.  BRAIN:
16 Q.  Can you turn to page four of the exhibit please?
17 A.  Yes.
18 Q.  It says on that page that "this policy applies
19 to all members of the campus community," does it
20 not?
21 A.  Yes.
22 Q.  And in your previous position as a counselor at
23 the university, you would have been considered a
24 member of the campus community; is that right?
25 A.  Yes.

1 Q.  So you were required to follow that policy, were

2 you not?

3 A.  Yes.

4          MS. BRAIN:  Move to admit and publish.

5          THE COURT:  Mr. Nelson?

6          MR. NELSON:  I believe the word is

7 "applies," not is required to be made aware of.

8 Because what's going to happen is what happened with

9 the last one where Miss Brain just testifies from it

10 and she says "yes" ten times; I think that's

11 objectionable.

12          THE COURT:  I understand, but I'm going to

13 allow the admission of the document.  And we will

14 see what the line of questioning is, and if you have

15 further objections, you can make them.

16          MS.  BRAIN:  Very good, Your Honor.

17          THE COURT:  Thank you.

18 BY MS.  BRAIN:

19 Q.  So this policy governs the campus community's

20 responsibilities to report and respond to potential

21 indicators of and/or threats of violent behavior; is

22 that correct?

23          MR. MILLER:  Just to be clear for the jury,

24 this is a 2018 Edition, so it would be what would be

25 in effect --

 1          MS.  BRAIN:  Can we have the page that was
 2  in effect?
 3          THE COURT:  Understood.
 4  BY MS.  BRAIN:
 5  Q.   So this is the record of changes to the policy
 6  that have been made; is that right?
 7  A.   Yes.
 8          MS. BRAIN:  And if you go down to the very
 9  bottom, part of that -- well, the next page, I
10  should say, sorry.
11          And the next.
12          And the next.
13          And it shows this policy was in effect in
14  2017 with some minor changes, right?
15  A.   Yes.
16  Q.   This policy -- page eight, please -- is
17  particularly focused on preventing targeted
18  violence; is that right?
19  A.   Yes.
20  Q.   And that is a goal-directed behavior rather than
21  sudden impulsive violence; is that right?
22  A.   Yes.
23  Q.   The type of violence that is often planned in
24  advance?
25  A.   Yes.

SENTENCING -- July 12, 2019 (Morning)     102

 1  Q.   And where the planning process might leave signs
 2  or clues that a person is of an increasing risk of
 3  violence; is that right?
 4  A.   Yes.
 5  Q.   And the policy says it's founded on principles
 6  of early intervention of proactive engagement to
 7  prevent violence and provide supportive services; is
 8  that right?
 9  A.   Yes.
10  Q.   And to those ends, the policy identifies certain
11  thresholds of unacceptable conduct, does it not?
12  A.   Yes.
13  Q.   And one of those thresholds -- page four please
14  -- is one of these examples of unacceptable conduct
15  is acts and threats of violence towards a specific
16  person or persons, towards an unspecified person or
17  persons, and/or the campus as a whole, right?
18  A.   Yes.
19  Q.   So that is deemed unacceptable conduct for a
20  student at the University of Illinois, right?
21  A.   Yes.
22  Q.   And another is significant violent ideations or
23  the expression of violent ideas or the attempt to
24  harm others, right?
25  A.   Yes.

1  Q.   Tell us again what does an ideation mean in that

2  context?

3  A.   Ideas.  I take it to mean a synonym for ideas,

4  thoughts.

5  Q.   A third example -- the next page please -- is

6  the expression of thoughts, ideas, beliefs and/or

7  engaging in behaviors, which indicate an obsessive,

8  excessive and/or inappropriate focus on violence; is

9  that right?

10 A.   Yes.

11 Q.   Also unacceptable for a student on the campus,

12 right?

13 A.   Yes.

14 Q.   This plan, this Violence Prevention Plan also

15 establishes a campus violence prevention committee;

16 is that right?

17 A.   Yes.

18 Q.   And the committee oversees two campus threat

19 assessment teams; is that right?

20 A.   Yes.

21 Q.   One of them is focused on the risk of violence

22 posed by faculty staff, general public; right?

23 A.   Yes.

24 Q.   And one is focused on students?

25 A.   Yes.

SENTENCING -- July 12, 2019 (Morning)          104

1  Q.  And that's called the Behavioral Intervention

2  Team?

3        Page 11, please.

4  A.  Yes.  This is a piece of the policy that I am

5  most familiar with.

6  Q.  Okay.  Very good.  Thank you.

7        THE COURT:  I think maybe this would be a

8  good time to take our mid-morning break because it

9  appears she will be on for a little bit yet, so

10 let's do that.

11       I don't necessary like to break during the

12 middle of a witness but we are quarter to 11:00.

13 Let's take 15 minutes here.  Okay.

14          (Jury absent, 10:47 a.m.)

15       THE COURT:  Okay.  Please be seated for a

16 second.

17       Ma'am, you may step down.  You may step

18 down.

19       Just looking ahead here:  Where are we going

20 with this line of questioning?

21       MS.  BRAIN:  Just wanted to present the

22 contents of the plan that governs the employees and

23 students and every member of the Illinois campus

24 community.  She is a mental health professional and

25 is governed, required to abide by that plan.  And

1  there are certain, certain parts of that plan that

2  inform the community conduct that is unacceptable

3  and conduct that should be reported as risks for

4  violent conduct.

5        THE COURT:  Is there any -- going to be any

6  line of questioning specific to this witness about

7  her interaction with Mr. Christensen?

8        MS.  BRAIN:  There is, Your Honor; yeah.

9        THE COURT:  What will that be?

10        MS.  BRAIN:  I'm going to go back to her

11  interaction.  I was asking her based on the fact

12  that she had reviewed Ms. Molenaar's report; so that

13  was the first part of the question.  And I'm going

14  to go back to when she saw him and what she was told

15  and what her recollection is of the incident.

16        THE COURT:  Then connect the dots with me

17  based on that and then the policy; the questions

18  that you're asking about the requirements of the

19  policy.

20        MS.  BRAIN:  I believe that what the

21  evidence will show is that there were behaviors and

22  factors that she learned that were flagged as risk

23  factors and reasons to report or take action that

24  she actually did not.

25        THE COURT:  And ultimately then where is

 1   this going?  The fact that she did not take action

 2   or your belief that she did not take action?

 3        MS.  BRAIN:  It goes to mitigating factors,

 4   the fact that Mr. Christensen went to seek help and

 5   was not provided any.

 6        THE COURT:  And was not provided that help?

 7        MS.  BRAIN:  Uh-huh.

 8        THE COURT:  And that's where the line starts

 9   to get crossed when we start to talk about standard

10   of care or argument about what should or should not

11   have been done.  These witnesses were allowed to be

12   called for the relevant mitigators that he actively

13   sought help, that he needed help, that he was aware

14   that he needed help, that he was experiencing these

15   ideations and went out and sought help for that,

16   that be the mitigating.  Where the line gets crossed

17   is where we are now going to try to connect or argue

18   that or establish that the University didn't take

19   certain -- did or did not take certain actions that

20   could have helped him, I guess is your point.  So,

21   help me with that.

22        MS.  BRAIN:  We are not saying --

23        MS.  POLLOCK:  Can I say something for a

24   second?  When we moved on the admissibility of

25   Dr. Zoline's testimony, the Court ruled that we

1 could not get into the standard of care, but that we

2 could get into whether or not the University of

3 Illinois violated their own internal policy with

4 regards to their treatment.

5        THE COURT:  Uh-huh.

6        MS. POLLOCK:  That's exactly what this is.

7 So Dr. Zoline, the foundation for Dr. Zoline's

8 testimony is not about standard of care, liability,

9 third-party negligence; you have none of that.  This

10 is about the fact that he went and he sought help,

11 that there were things that they could have and

12 should have done under their own internal policies,

13 not the law, not a lawsuit, not negligence, where

14 they didn't -- he didn't get the care that he could

15 have gotten.

16        Now we are not going to argue that the

17 University Counseling Center is liable or

18 responsible for anything; that's not why we are here

19 and that is the limitation that the Court sought for

20 Dr. Zoline's testimony.

21        THE COURT:  Go ahead.

22        MS. BRAIN:  It's also the extras.

23        THE COURT:  What do you argue from the fact

24 that if you believe that you have established that

25 the University didn't do certain things, what do you

1  argue?  What do you argue from there, that he went

2  and got help and he sought help?

3          MS.  BRAIN:  Sought help.

4          THE COURT:  And then what?

5          MS. BRAIN:  And there were things that the

6  University could have done and didn't.  And we

7  submit that that's a mitigating factor.

8          THE COURT:  And I assume that you -- that

9  through Dr. Zoline you are going to establish what

10  those things are.  How is that a mitigating factor?

11          MS.  BRAIN:  It is institutional failure.

12  It is the same kind of thing, all of those cases in

13  which there were prison murders, for example, and

14  the defendant's allowed to put on as a mitigating

15  factor that the Bureau of Prisons really messed up.

16          THE COURT:  I'm going to allow you to get

17  there, but as I learned yesterday, that generally

18  hasn't been enough, and so, if there's objections --

19  I'm not going to do this by sidebar, but I'm

20  going -- I'm going to wait for objections, and if I

21  believe the objections are valid as to where that

22  line is, I'm simply going to sustain them.  I'm not

23  going to try to do this by sidebar.  I'm just giving

24  a heads up here because it will become mental health

25  conditions that will trigger 12.2.  As I said

1  yesterday, which you tried to do for Dr. Pearson,

2  I'm going to allow you leeway to get in what you

3  want, but you chose to not have that, and if it was

4  all or nothing; so I ruled.  And so today will be

5  the same.  There is a line, I'm going to do my best

6  to keep everybody at it.

7          Anybody wish anything other than that?

8          MR. NELSON:  Yes, sir.

9          MS.  BRAIN:  There won't be any of that, any

10  diagnosis testimony, mental health testimony; and to

11  be clear, the parts of the plan that I am about to

12  refer to are not requirements or directions.  I want

13  to refer to what the University has identified as

14  factors that its staff should be aware of as a

15  problem.  They are not saying, "and then you do

16  this," because it's not that clear.  And then I

17  would just ask her about things that they could have

18  done knowing that they had information that the

19  University has said "red flag"; that's all.

20          THE COURT:  Mr. Nelson.

21          MR. NELSON:  There is a couple of problems

22  with that, Your Honor, but it seems to me that if

23  they are going where they say they are going, the

24  more proper way might be to call these witnesses to

25  say what they actually know and what they actually

SENTENCING -- July 12, 2019 (Morning)          110

 1  did and they can call their expert to lay in all of
 2  this foundation, and whether in the expert's
 3  opinion, because the expert is the only one that is
 4  permitted to give their opinion, those things fit.
 5  That would be my suggestion.
 6          I also submit that going down the path of
 7  this Campus Violence Prevention Plan with this
 8  witness is completely inappropriate as her notes
 9  clearly state that she was the alcohol and other
10  drug counselor.  She reviewed him for substance
11  abuse and alcohol abuse.  There is another witness
12  who they've testified -- who's going to testify, or
13  they subpoenaed, is going to testify next, who did
14  all of the violence assessment and suicide
15  assessment.  So going down this path with this
16  witness is misleading to the jury because she didn't
17  assess him for this.
18          MS.  BRAIN:  She is required to comply with
19  the policy, however, as a university employee.
20          THE COURT:  She's already said that she is
21  not really aware -- we will just keep going and see
22  where it goes.  I just wanted to raise an issue that
23  I'm certain is coming and I'm certain we will
24  address again before the day's up.
25          Okay.  We will be in recess.

1           MR. NELSON:  When are we returning, Your

2    Honor?

3           THE COURT:  Five after 11:00.

4           MR. NELSON:  Thank you, Your Honor.

5           THE COURT:  We will break again for lunch no

6    matter where we are.  I'm not going to work into the

7    lunch hour today.

8           MR. NELSON:  Thank you, Your Honor.

9           (Recess, 10:55 a.m. to 11:05 a.m.)

10          MS. BRAIN:  Your Honor, would the Court

11   inquire whether the witness was consulted about her

12   testimony over the break?

13          THE COURT:  Over the break?

14          MS. BRAIN:  Yes, Your Honor.

15          THE COURT:  You want me to ask was the

16   witness consulted by the government over the break?

17          MS. BRAIN:  Not the government, anybody.

18          THE COURT:  Did you discuss your testimony

19   with anybody over the break?

20          THE WITNESS:  Not specifically.  I just got

21   an encouraging word:  "You are doing great."

22          MR. BECKETT:  I said "hello," Judge.

23          THE COURT:  Okay.

24          MR. BECKETT:  I know her cousin.

25          THE COURT:  All right.

SENTENCING -- July 12, 2019 (Morning)        112

1           Do you want to pull that microphone closer
2  to you?
3           Is that the -- was it Mr. Beckett you were
4  referring to or anybody?
5           MS.  BRAIN:  I wasn't aware, just general
6  question, Your Honor.
7           MR. MILLER:  I will put on the record
8  because she raised it that no one from the
9  prosecution team at all spoke with the witness at
10 all during the break.
11          MS. BRAIN:  No, no, no.  If I implied it was
12 government, that was not at all what I meant.
13          THE COURT:  Okay.  Let's bring the jury in.
14          MS.  BRAIN:  Oh, right, jury; right.
15          (Jury present, 11:07 a.m.)
16          THE COURT:  Thank you, everybody.  Please be
17 seated.
18          Go ahead, Ms. Brain.
19          MS. BRAIN:  Thank you, Your Honor.
20 BY MS. BRAIN:
21 Q.  Miss Maupin, you said that you were more
22 familiar with the Behavioral Intervention Team
23 aspect of it, right?
24 A.  Yes, okay.
25 Q.  Good.  The director of the Counseling Center is

1  part of the Behavioral Intervention Team Committee;

2  is that right?

3  A.   Yes.

4  Q.   Okay.  And the associate director's also on the

5  committee?

6  A.   Yes.

7  Q.   And the Behavioral Intervention Team provides

8  guidance for University staff about how to identify

9  behaviors or circumstances that might indicate a

10 student pose as a risk of violence; is that right?

11 A.   Yes.

12 Q.   Let me show you what has been marked as

13 Defendant's Exhibit 153.

14 BY MS. BRAIN:

15 Q.   That is from the Behavioral Intervention Team

16 website, is it not?

17        THE COURT:  If you know.

18 BY THE WITNESS:

19 A.   I don't know.

20 BY MS. BRAIN:

21 Q.   You've never seen that before?

22 A.   Your question was:  Is it on their website?

23 Q.   Right.

24        Have you ever seen it before regardless of

25 where it came from?

1  A.   I need to read it first to know.

2  Q.   Very good.

3  A.   Yes, I am familiar with this.

4  Q.   Thank you very much.

5        MS.  BRAIN:  Permission to admit and

6  publish.

7        MR. NELSON:  No objection.

8        THE COURT:  Admitted, and you may publish.

9  BY MS. BRAIN:

10 Q.   Thank you.  That document indicates a list of

11 risk factors that might indicate developing concerns

12 that a student may act violently; is that right?

13 A.   Yes.

14       MS. BRAIN:  If we could have page three --

15 actually, page three, please.

16       Wait, that's the wrong document.

17       Your Honor, I apologize.  I think that we

18 have the wrong document.

19       I apologize for the inconvenience, Judge.

20 Can we have five minutes?

21       MS. POLLOCK:  One minute.

22       THE COURT:  One minute.  Take your time.

23       Do you want some water?

24       COURTROOM CLERK:  Ms. Brain, I apologize.

25 Your microphone was off, the Court didn't hear you.

SENTENCING -- July 12, 2019 (Morning)      115

1          MS. BRAIN:  Sorry.  I was just apologizing
2   for the inconvenience, Your Honor.
3          THE COURT:  No worries.  Whenever you're
4   ready.
5          MS.  BRAIN:  Thank you so much, Your Honor.
6          May I approach?  I have a more recent
7   version of the Behavioral Intervention Team.  I
8   don't have a paper document.  If could you look at
9   the other one.
10          MR. NELSON:  Your Honor, I have no idea
11   what's on it.
12          THE COURT:  We are going to assume for a
13   moment it's 153?
14          MS.  BRAIN:  Yes, Your Honor.  We will
15   replace it.
16          MR. NELSON:  Is it an identical version of
17   153?
18          THE COURT:  First, let's see if the witness
19   recognizes it, then we will get to a review of it,
20   okay?
21   BY THE WITNESS:
22   A.   I'm not sure that I know the question.
23   BY MS. BRAIN:
24   Q.   Do you recognize that as from the Behavioral
25   Intervention Team?

 1          THE COURT:  Both of you, if you are away

 2   from the microphone, speak louder.

 3          Go ahead.

 4   BY THE WITNESS:

 5   A.   I recognize that this is similar to this

 6   document that you showed me and it is entitled

 7   Behavioral Intervention Team.

 8          MS.  BRAIN:  Okay.  Very good.

 9          Permission to admit and publish.

10          MR. NELSON:  Objection.  I don't have it.  I

11   haven't seen it.

12          THE COURT:  Why don't you see if you can

13   take a look.

14          MS. POLLOCK:  Jeremy just emailed it to you.

15          MR. NELSON:  I don't have my email.

16          THE COURT:  Is there a way that we can get

17   to another line of questioning until we get to this?

18          MS.  BRAIN:  I'm sorry, Your Honor.

19          THE COURT:  It's all right.  Let's do that.

20   Then maybe in the meantime we will get some --

21   somebody can retrieve it from the defense table or

22   we can -- Mr. Nelson will have a chance to review

23   it.

24          MS. BRAIN:  Thank you.

25          THE COURT:  Okay.  Thank you.

SENTENCING -- July 12, 2019 (Morning)       117

1  BY MS. BRAIN:

2  Q.   Let me go back for a minute to March 30, 2017.

3         You already told us you were on duty that

4  day, right?

5  A.   Yes.

6  Q.   And you saw Mr. Christensen?

7  A.   Yes.

8  Q.   During your meeting with him, Mr. Christensen

9  told you that he was taking Effexor, did he not?  I

10  can pull that up.  This one.  I can pull it up.

11  A.   I have not memorized my note.  That's why I'm

12  looking.

13         THE COURT:  Do you have your notes with you?

14         MS. BRAIN:  Can we have the Counseling

15  Center notes?

16         THE COURT:  Do you want her to have her

17  notes in front of her or not?

18         MS.  BRAIN:  That's fine.  I was going to

19  put it back up on her screen since I'm doing a poor

20  job of that, perhaps paper would be the best way.

21  BY MS. BRAIN:

22  Q.   There we go.  It's up on the screen, if that's

23  any use.

24  A.   Yes.

25  Q.   Great.  He was taking it as he was told to?

SENTENCING -- July 12, 2019 (Morning)        118

1  A.   Yes.
2  Q.   He told you also that a week prior to you seeing
3  him, his wife told him that she wanted to spend the
4  night with a new boyfriend, right?
5  A.   Yes.
6  Q.   And he -- so that he was distressed as a result
7  of that?
8  A.   Yes.
9  Q.   He felt that she was choosing someone that she'd
10  only known for a couple of weeks over him, who had
11  been her husband for nine years, right?
12  A.   Yes.
13  Q.   And he told you that he had broke down in tears
14  when talking to his wife about it?
15  A.   Yes.
16  Q.   And that he felt more at risk of committing
17  suicide as a result, right?
18  A.   In that moment, yes.
19  Q.   And this all happened after his first visit to
20  the Counseling Center on March 21st, right?
21  A.   Yes.
22  Q.   You discussed with him various options of
23  getting treatment for substance abuse issues, right?
24  A.   Yes.
25  Q.   You discussed residential treatment, right?

 1  A.   Yes.

 2  Q.   Intensive outpatient treatment, correct?

 3  A.   Yes.

 4  Q.   The possibility of joining support groups,

 5  right?

 6  A.   Yes.

 7  Q.   And also individual therapy with an abstinence

 8  focus was a potential option, right?

 9  A.   Yes.

10  Q.   Brendt didn't want to go to a residential

11  substance abuse facility, did he?

12  A.   I remember him expressing that, yes.

13  Q.   But he was open to intensive outpatient

14  treatment, right?

15  A.   Yes.

16  Q.   And also very interested in individual therapy,

17  right?

18  A.   Yes.

19  Q.   And you said that you would email him the names

20  of local therapists in the community and local

21  intensive outpatient facilities, right?

22  A.   Yes.

23  Q.   You did ask Brendt if he would be willing to

24  meet with another counselor, did you not?

25  A.   Yes.

1  Q.   Who was that?

2  A.   Tom Miebach.

3  Q.   You told him that Mr. Miebach would provide him

4  with ongoing support until he hooked up with one of

5  the treatment providers that you were going to

6  recommend, right?

7  A.   I told him Tom would be able to do that if he

8  wanted it, yes.

9  Q.   And he was willing to have a resource at the

10 center to continue to evaluate his risk of harm to

11 self and others, right?

12 A.   Yes.

13 Q.   Okay.  And Mr. Christensen agreed to go with you

14 to Mr. Miebach?

15 A.   We walked together, yes.

16 Q.   Together.  Okay.  Can we give -- can we go back

17 to the Behavioral Intervention Team document?  Has

18 counsel had a chance to review it?

19        MR. NELSON:  No, I have not been given it.

20        MS. BRAIN:  Oh.

21        MS. POLLOCK:  Your Honor, Mr. Kelly is

22 currently printing a copy for government counsel.

23        MS. BRAIN:  I didn't realize.  Sorry.  My

24 bad.

25

SENTENCING -- July 12, 2019 (Morning)        121

 1  BY MS. BRAIN:
 2  Q.   After he met with Mr. Miebach, Mr. Christensen
 3  was allowed to leave the Counseling Center, was he
 4  not?
 5  A.   Yes.
 6  Q.   And later that day you sent to Brendt an email?
 7  A.   Yes.
 8  Q.   And in the email you provided him contact
 9  information for Rosecrance, right?
10  A.   Yes.
11  Q.   What is Rosecrance?
12  A.   It was the local alcohol and other drug
13  treatment facility that would be able to provide him
14  the opportunity for comprehensive services related
15  to maintaining abstinence as well as psychiatric
16  concerns since they have psychiatrists and
17  counselors on staff as well as psychoeducation as
18  well.
19  Q.   You said that they have a menu of options, did
20  you not?
21  A.   Yes.
22  Q.   And therefore, that it would be ideal for --
23  excuse me -- one-stop shopping, right?
24  A.   Yes.
25          THE COURT:  And Miss Brain, I have a copy of

SENTENCING -- July 12, 2019 (Morning)     122

1  this now if you want to retrieve it and then

2  whatever you want.

3          MS. BRAIN:  Thank you very much, Your Honor.

4  BY MS.  BRAIN:

5  Q.   This is 157.  You looked at it on the screen.

6          THE COURT:  I think that everybody has a

7  copy.

8          MS.  BRAIN:  Move to admit and publish 157.

9          MR. NELSON:  I object, Your Honor.  The last

10 page of this document clearly states "copyright

11 2019," which was a time after this witness was

12 employed at the University and after a point in time

13 well after any facts happened in this trial.  So

14 this was obviously amended afterwards and won't be

15 relevant to anything in this investigation.

16         THE COURT:  I will allow Ms. Brain to

17 examine on any facts of the relevant portions that

18 were in place and the witness was aware of those in

19 March of 2017.

20         MS.  BRAIN:  That's okay, Your Honor.  I can

21 do it with the next witness who is still employed

22 there, so that's not a problem.

23         THE COURT:  Very good.

24 BY MS. BRAIN:

25 Q.   You could have -- after your interview with

SENTENCING -- July 12, 2019 (Morning)      123

1  Mr. Christensen, you could have asked him for

2  authorization to inform the Suicide Intervention

3  Team of what he had told you, right?

4          MR. NELSON:  Objection based on the prior

5  rulings.

6          THE COURT:  I will allow that question.

7  BY THE WITNESS:

8  A.   Would it have been possible to?

9  BY MS. BRAIN:

10 Q.   Right.  Also you could have gotten the

11 authorization to notify the Behavioral Intervention

12 Team, could you not?

13 A.   It could have been possible.

14 Q.   You knew that he was under treatment by a

15 psychiatrist?

16         MR. NELSON:  Objection.

17         MS. BRAIN:  She already testified to that, I

18 believe.

19         THE COURT:  Go ahead.  Finish your question.

20 BY MS.  BRAIN:

21 Q.   Did you know that he was under the care of a

22 psychiatrist at the McKinley Health Center?

23 A.   Yes.

24 Q.   So you could have got a release from him to

25 provide the information that you had to his

1  psychiatrist, right?

2  A.    That would have been possible.

3  Q.    That's possible.

4         There is actually a standard form that the

5  Counseling Center has for precisely that purpose?

6  A.    Yes.

7  Q.    To communicate between the Counseling Center and

8  McKinley Center?

9  A.    Yes.

10 Q.    And that way you could have given information to

11 his treating psychiatrist; it would have been

12 possible, right?

13 A.    Yes.

14 Q.    And to make sure that she was aware of the

15 things that Brendt had told you and also

16 Miss Molenaar?

17 A.    Yes.

18 Q.    So that way she's prescribing, as you said,

19 pretty significant psychotropic medication to him?

20        MR. NELSON:  Objection.  She didn't testify

21 to the significance of anything.

22        THE COURT:  Sustained.

23        MS. BRAIN:  She testified that he was being

24 prescribed psychotropic medication.

25        MR. NELSON:  Objection; it's an

1  antidepressant; she is misstating evidence.

2          THE COURT:  As I recall she was asked if

3  Mr. Christensen had indicated to her that he was

4  taking certain medications and they were identified

5  to that extent.  She may answer the question.

6  BY MS. BRAIN:

7  Q.  He had informed you that he was taking

8  medications prescribed by the psychiatrist, right?

9  A.  Yes.

10  Q.  And for the record what does "psychotropic"

11  mean?

12  A.  I know there are medications prescribed by

13  psychiatrists.

14  Q.  So because she was prescribing these and also

15  sleep drugs she was prescribing for him; is that

16  right?

17  A.  According to his report, yes.

18  Q.  According to his report, right.

19          So if you had contacted his psychiatrist,

20  you could have been on alert for signs --

21          MR. NELSON:  Objection.  We have now gone to

22  that second step.

23          THE COURT:  Sustained.

24  BY MS. BRAIN:

25  Q.  Is there a concern with people who are suicidal

1  that there is a possibility of pill hoarding?

2  A.   Are you asking generally speaking?

3  Q.   Generally speaking, yeah.

4  A.   I think it depends on the client.  If the client

5  is reporting that they are taking medications as

6  directed, and they are a credible reporter, that

7  they are there willingly; that would be less of a

8  concern.

9  Q.   Uh-huh, but it is possible that suicidal people,

10 suicidal people will kind of stockpile their

11 medications until they have enough to take an

12 overdose, right?

13 A.   I have heard of cases of clients behaving that

14 way.

15 Q.   And a person can overdose on Effexor and die if

16 they take enough, right?

17 A.   I don't know.

18 Q.   Okay.  You also could -- it also would have been

19 possible to talk to Mr. Christensen about the need

20 for specialized treatment for suicidal and homicidal

21 ideation, wouldn't it?

22 A.   I'm sorry, could you ask that again?  I want to

23 make sure that I'm answering it.

24 Q.   It would have been possible for you to explore

25 with Mr. Christensen whether he would have been

SENTENCING -- July 12, 2019 (Morning)          127

1  willing to receive treatment specifically for his

2  suicidal ideation and his homicidal ideation, right?

3  A.   Yes.  I have some context for that particular

4  part of this case.  In a meeting prior to my meeting

5  with Mr. Christensen, with the team of alcohol and

6  other drug professionals, we discussed the case and

7  the best path forward and the best treatment

8  recommendations in the case, and we determined

9  pretty early that another ongoing assessment for

10  risk to self and others was warranted and that is

11  why we made the treatment, that assessment decision,

12  because we referred him for a risk assessment with

13  Tom Miebach.

14  Q.   Okay.  Very good.  It would have been possible

15  to also refer him to a provider of mental health

16  treatment who had specialized in suicide and

17  homicide, would it not?

18  A.   That wouldn't have been possible for me to make

19  that recommendation.

20  Q.   Mr. Miebach could have after he saw him, right?

21  A.   Perhaps.

22       MR. NELSON:  The testimony about what

23  someone else could have done is irrelevant and

24  should be stricken.

25       THE COURT:  And is sustained.

1        MS.  BRAIN:  Very good, Your Honor.

2        I think that's all my questions.  Thank you.

3        THE COURT:  Thank you.

4        Mr. Nelson.

5        MR. NELSON:  Yes, Your Honor.  Thank you.

6        Mr. Kelly, can I have the ELMO?

7        THE COURT:  Yes, sir.

8                 CROSS-EXAMINATION

9   BY MR. NELSON:

10  Q.   Good morning, ma'am.

11  A.   Good morning.

12  Q.   Mr. Christensen came to the University of

13  Illinois Counseling Center willingly?

14  A.   Yes.

15  Q.   And he presented credible reports?

16  A.   Yes.

17  Q.   He was cooperative?

18  A.   Very.

19  Q.   Okay.  And in the counseling setting, is it

20  important to take the word of the person who's

21  communicating with you?

22  A.   Yes.

23  Q.   Are you a mind reader?

24  A.   No.

25  Q.   Okay.  So if someone tells you something, you

1 take it as true?

2 A.   Yes.

3 Q.   And if they don't tell you something, you have

4 no reason to suspect that it's true?

5 A.   Correct.

6 Q.   Now, I'm going to show you a document.  This is

7 in evidence.  I apologize.  I don't have the number.

8 It's the Suicide Intervention Team Policy Manual.

9        I believe you testified that the purpose of

10 this policy is so that if there's suicidal ideation

11 or threats observed in the community, generally

12 people can get to the Counseling Center?

13 A.   Yes.

14 Q.   And that's where you are?

15 A.   Yes.

16 Q.   So you don't need to refer someone from where

17 you are to where you are?

18 A.   Correct.

19 Q.   Also, this Campus Violence Prevention Plan, that

20 is to get someone from the community to the

21 Counseling Center?

22 A.   You mean U of I community.

23 Q.   Yes, U of I community.  I'm sorry.  But to the

24 Counseling Center, to you?

25 A.   Yes.

1  Q.   Okay.  Where Mr. Christensen already was?

2  A.   Yes.

3  Q.   Okay.  And likewise, the intake form and all of

4  those things that Ms. Brain asked you a lot of

5  questions about, that's also designed to help them

6  -- meaning clients, students in this case -- get the

7  treatment that they need?

8  A.   Yes.

9  Q.   So all of this is designed to get

10 Mr. Christensen to exactly where he was?

11 A.   Yes.

12 Q.   So that he could give you a reporting of what he

13 was feeling and thinking so that you could design a

14 treatment plan possible?

15 A.   Yes.

16 Q.   Now, is it important for a counselor to trust

17 the word of the person that they are counseling?

18        MS.  BRAIN:  Asked and answered, Your Honor.

19        THE COURT:  Pardon me?

20        MS.  BRAIN:  I beg your pardon.  Asked and

21 answered.

22        THE COURT:  Were you making an objection?

23        MS.  BRAIN:  I was, Your Honor.

24        THE COURT:  What is it?

25        MS.  BRAIN:  Asked and answered.  He's asked

 1  her that a few moments ago.

 2          THE COURT:  Go ahead.  You may answer.

 3  BY MR. NELSON:

 4  Q.   I will rephrase it.

 5          Why is it important for a counselor to

 6  listen to what their client is saying?

 7  A.   So they can make the best treatment

 8  recommendation based on the information that they

 9  are receiving.

10  Q.   Okay.  In your experience as a counselor, is it

11  common or uncommon for someone to have thoughts or

12  feelings that are new to them or perhaps confusing

13  to them?

14  A.   That's very common.

15  Q.   Is that something that you try and help them

16  work through?

17  A.   Yes.

18  Q.   And if someone comes in and says I'm feeling a

19  particular way, let's say suicidal, "I'm having --

20  and this is a hypothetical, just to be clear -- "I'm

21  having trouble in my marriage; I don't want to keep

22  going, and I want to hurt myself for the first time

23  ever"; and then later they come back and say, "I

24  don't feel that way anymore"; is that relevant to

25  you?

1  A.   Yes.

2  Q.   Why?

3  A.   Because it gives me an ongoing picture of how

4  the risk is ebbing and flowing, which it often does.

5  Q.   Okay.  So it's not uncommon for someone to say

6  something today and say something different

7  tomorrow?

8  A.   Correct.

9  Q.   And that is clinically relevant to you?

10  A.   Yes.

11  Q.   I believe that you testified near the end of

12  your direct examination that prior to your meeting

13  with the defendant, there was sort of a group

14  meeting of the other counselors to discuss how, what

15  your -- and this is not the word that you used --

16  but sort of what your plan of attack was going to

17  be?

18  A.   Yes.

19  Q.   What was your role to be?  What were you going

20  to do?

21  A.   In this case?

22  Q.   Yes.

23  A.   I was going to focus exclusively on delivering a

24  recommendation based on the alcohol and drug use and

25  abuse that Carin Molenaar had gathered, and I was

1  going to deliver that to -- collaborate with
2  Mr. Christensen about which would be the best option
3  for him.
4  Q.   Okay.  And so the other portions of what he
5  talked about with Miss Molenaar, that wasn't within
6  what your purpose was that day?
7  A.   Correct.  In fact we explicitly carved out a
8  role for me in this case because in that
9  conversation we determined it would be not in his
10  best interest for me to be doing the ongoing threat
11  to harm himself and others, of his care, that I
12  should focus exclusively on the ATPs.
13  Q.   And that was a clinical decision?
14  A.   Among four licensed counselors and students in
15  training.
16  Q.   When you met with the defendant, he told you
17  that he hadn't used any alcohol or drugs since
18  March 21st, right?
19  A.   Correct.
20  Q.   And he said that he was motivated to abstain?
21  A.   Yes.
22  Q.   And nevertheless you discussed alcohol treatment
23  programs with him?
24  A.   Yes.
25  Q.   Was that based on the fact that in your review

1  of his intake and at his first conversation that,

2  that was perhaps something that he, you know, needed

3  help with?

4  A.   Yes.

5  Q.   And the defendant said that he wasn't interested

6  in residential treatment?

7  A.   Correct.

8  Q.   He was open to intensive outpatient treatment

9  but he wasn't interested in group therapy, right?

10 A.   Correct.

11 Q.   In fact he said that he was unwilling to attend

12 AA?

13 A.   Yes.

14 Q.   And he specifically mentioned he didn't like the

15 emphasis on higher power or spirituality and things

16 like that?

17 A.   Yes.

18 Q.   But nevertheless you committed to emailing him a

19 list of counselors or providers?

20 A.   Yes.

21 Q.   Why?

22 A.   Because I wanted him to access treatment for --

23 to support his abstinence.

24 Q.   And you did do that?

25 A.   I sent an email, yes.

 1  Q.   And you sent him to Rosecrance, that was one of

 2  the places that you recommended, right?

 3  A.   Yes.

 4  Q.   Now, is the University of Illinois Counseling

 5  Center a short term treatment center or a long term

 6  treatment center?

 7  A.   Short term.

 8  Q.   Can you explain the difference to the jury?

 9  A.   So short term means time limited, particularly

10  with the size of the student body at the U of I.  It

11  is just not possible that everybody have weekly

12  counseling for the whole time that they are

13  students, so counseling is brief, session limited to

14  8 to 12 sessions at the Counseling Center.

15  Q.   Okay.  And the goal is to -- correct me if I'm

16  wrong, what I'm hearing you say is that the goal is

17  to identify problems in the student community, bring

18  them in, help assess what those problems are; and to

19  the extent you can, either help them yourselves or

20  to refer them to someone who can?

21  A.   Correct.

22  Q.   And that's what you did in this case?

23  A.   Yes.

24  Q.   And do you have any control over whether any of

25  your clients do what you recommend them to do?

1  A.   So, to be clear, sometimes when the University

2  is requiring students to come to an alcohol or other

3  drug assessment, they are sometimes, as of May of

4  2017, they are sometimes required to do what I

5  recommend.  Those requirements were limited to

6  psychoeducation classes.

7  Q.   Okay.  Was that the case here?

8  A.   No.

9  Q.   Now you also had a discussion with the defendant

10 about his marital situation?

11 A.   Yes.

12 Q.   And I believe that there was also a -- you

13 testified about a conversation where he felt that

14 his wife was choosing another man over him?

15 A.   Yes.

16 Q.   In the moment of that conversation, he felt like

17 his risk of suicide went up?

18 A.   Yes.  He reported that happened one evening and

19 it was more acute in that experience.

20 Q.   And he also reported that after that

21 conversation it ebbed, didn't he?

22 A.   Correct.

23 Q.   And in fact he told you during this interview

24 that he had a new romantic interest?

25 A.   Yes.

SENTENCING -- July 12, 2019 (Morning)       137

Q.   And that his new romantic interest resulted in a

significant reduction in his stress?

A.   Yes.

Q.   And I believe his words to you that he was

interested in the opportunity that his new opened

marriage might provide him?

A.   Yes.

Q.   At the time of your interview on March 30th, did

he appear to be in any distress?

A.   No.

Q.   Now, are you familiar as a psychologist with the

term "hindsight bias"?

A.   I'm a licensed clinical social worker.

Q.   I'm sorry.

       As a licensed clinical social worker, are

you familiar with the term "hindsight bias"?

A.   Vaguely.  You would have to define it for me,

please.

Q.   All right.  I don't want to define it for you.

I will just move on.

       Let me just ask this question:  As a

counselor, what are you trying to do?  What is your

goal?

A.   To help people and/or to get them the help that

they need.

SENTENCING -- July 12, 2019 (Morning)       138

1  Q.   Okay.  And to the best of your abilities as a
2  licensed clinical social worker, did you try to help
3  the defendant based on what he told you the problem
4  was?
5  A.   Yes.
6  Q.   Can you control anyone's intentional actions?
7  A.   No.
8         MR. NELSON:  I have no further questions.
9         THE COURT:  Ms. Brain.
10         MS.  BRAIN:  Just briefly.
11               REDIRECT EXAMINATION
12  BY MS. BRAIN:
13  Q.   What the Behavioral Intervention Team does is
14  not simply refer a person to the Counseling Center,
15  right?
16  A.   It's so important to me to be accurate so that
17  was the context for my pause.  My understanding of
18  the Behavioral Intervention Team is that they had a
19  variety of options available to them.  I was not a
20  member of that team.  I knew most -- it was more
21  familiar to me as a therapist; that it would be a
22  place that the professionals from the Counseling
23  Center there could hear information about potential
24  threats.  They couldn't share information without
25  the permission of a client.

1 Q.   Right.  You could always ask the client for

2 permission though, couldn't you?

3 A.   Correct.

4 Q.   But the Behavioral Intervention Team has a

5 number of options or steps and options for treatment

6 in responding to potential threats other than simply

7 sending him to the Counseling Center, right?

8 A.   I would have to refer to the policy to remind

9 myself.

10      MS. BRAIN:  If I may, Your Honor, if I may

11 approach?

12      Not that one.  The campus violence -- she

13 should have that on the stand.

14      THE COURT:  Ms. Brain, which one?

15      MS. BRAIN:  If we could have page eight of

16 that Exhibit 157, please?

17      The red one we can call it.

18 BY MS.  BRAIN:

19 Q.   So I'm referring you to page eight of this

20 exhibit.  It says Campus Violence Prevention Team.

21 So the Behavioral Intervention Team is one of those

22 campus violence prevention teams, right?

23 A.   Yes.

24 Q.   They conduct threat assessments, right?

25 A.   Yes.

SENTENCING -- July 12, 2019 (Morning)      140

```
 1  Q.   They address dangerous and threatening behavior,
 2  right?
 3  A.   Yes.
 4  Q.   And provide guidance and best practices for
 5  preventing violence and also providing supportive
 6  services; is that right?
 7  A.   Yes.
 8          MS.  BRAIN:  That's it.  Thank you, Your
 9  Honor.
10          THE COURT:  Mr. Nelson?
11          MR. NELSON:  Nothing further, Your Honor.
12  Thank you.
13          THE COURT:  You may step down.  You can push
14  this away from you.  Thank you.
15          Okay.  Maybe we should start with -- we have
16  two witnesses left for the day, as I understand it.
17  Maybe we should start them after the lunch hour.
18          MS.  BRAIN:  Very good, Your Honor.
19          THE COURT:  Anything?  Three?
20          Mr. Miebach and Miss Zoline.
21          MR. NELSON:  It is two, Your Honor.  We had
22  a miscommunication.
23          THE COURT:  Why don't we take a lunch hour
24  and resume at 1:30.  And please do not discuss this
25  with anybody including yourselves.  We have two
```

SENTENCING -- July 12, 2019 (Morning)     141

1  witnesses this afternoon before we recess.  All

2  right.  Thank you.

3          (Jury absent, 11:41 a.m.)

4          THE COURT:  Okay.  Please be seated.  As you

5  could see that one of the jurors, 7953, asked to see

6  me for a second as they were leaving the courtroom.

7  And he said that a number of them are having trouble

8  hearing you.  So, to ask you just to be mindful of

9  being near the microphone, or, if you want, we can

10  also give you lapel mics to have and have it covered

11  both ways.

12          So just said that they were having some

13  trouble hearing you.

14          MS. POLLOCK:  All of us or some of us?

15          THE COURT:  I gathered it was the last

16  witness.  Okay.

17          Thank you.

18                    ****

19          (Recess, 11:42 a.m.)

20                    *****

21

22

23

24     I certify that the foregoing is a correct

25  transcript from the record of proceedings in the

1  above-entitled matter.

2

3

4  s/Nancy Mersot          Date:  September 4, 2019

5  Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25