2:17-cr-20037-JES-JEH  # 536   Filed: 04/09/20   Page 1 of 176
SENTENCING -- July 12, 2019 (Afternoon)
E-FILED
Thursday, 09 April, 2020 01:17:48 PM
Clerk, U.S. District Court, ILCD
145

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF ILLINOIS.
 2

 3
     UNITED STATES OF AMERICA,
 4                                    Docket No. 17-20037
                 Plaintiff,
 5
        vs.                           Peoria, Illinois
 6                                    July 12, 2019
                                      1:31 p.m.
 7   BRENDT A. CHRISTENSEN,

 8               Defendant.

 9

10

11         SENTENCING -- July 12, 2019 (Afternoon)

12

13

14        BEFORE THE HONORABLE JAMES E. SHADID

15            UNITED STATES DISTRICT JUDGE

16

17

18

19

20
             LISA KNIGHT COSIMINI, RMR-CRR
21              U.S. District Court
                201 South Vine
22             Urbana, Illinois 61802
                217-355-4227
23

24
     Proceedings recorded by mechanical stenography;
25   transcript produced by computer.
```

SENTENCING -- July 12, 2019 (Afternoon)

1   A P P E A R A N C E S :

2   For the Plaintiff:        EUGENE L. MILLER, ESQUIRE
                              BRYAN D. FRERES, ESQUIRE
3                             Assistant United States Attorneys
                              201 South Vine Street
4                             Urbana, Illinois 61802
                              217-373-5875
5
                              JAMES B. NELSON, ESQUIRE
6                             U.S. DEPARTMENT OF JUSTICE
                              Capital Case Section
7                             1331 F Street NW, Suite 625
                              Washington, DC 20004
8                             202-598-2872

9
    For the Defendant:        GEORGE F. TASEFF, ESQUIRE
10                            Assistant Federal publish Defender
                              401 Main Street, Suite 1500
11                            Peoria, Illinois 61602
                              309-671-7891
12
                              ELISABETH R. POLLOCK, ESQUIRE
13                            Assistant Federal publish Defender
                              300 West Main Street
14                            Urbana, Illinois 61801
                              217-373-0666
15
                              ROBERT L. TUCKER, ESQUIRE
16                            Robert L. Tucker, Esq
                              7114 Washington Avenue
17                            St. Louis, Missouri 63130
                              703-527-1622
18
                              JULIE C. BRAIN, ESQUIRE
19                            Attorney at Law
                              916 South 2nd Street
20                            Philadelphia, Pennsylvania 19147
                              267-639-0417
21

22

23

24

25

SENTENCING -- July 12, 2019 (Afternoon)

<u>I N D E X</u>

<u>Page</u>

<u>DEFENSE WITNESSES IN MITIGATION</u>:

THOMAS MIEBACH

    Direct Examination by Ms. Brain ................. 150

    Cross-Examination by Mr. Nelson ................. 194

    Redirect Examination by Ms. Brain .............. 209

    Recross-Examination by Mr. Nelson .............. 215


SUSAN ZOLINE

    Direct Examination by Ms. Pollock .............. 218

    Cross-Examination by Mr. Miller ................ 275

    Redirect Examination by Ms. Pollock ............ 304

    Recross-Examination by Mr. Miller .............. 312

SENTENCING -- July 12, 2019 (Afternoon)

```
 1                    (In open court; jury absent; 1:31 p.m.)

 2              THE COURT:  Are we ready for the jury and our

 3   next witness?

 4              MS. POLLOCK:  Just a moment, Your Honor.

 5              THE COURT:  All right.

 6                    (Brief pause in proceedings.)

 7              MS. POLLOCK:  Your Honor, we have a request.

 8   Can I have just one more second?

 9              THE COURT:  Yes.

10                    (Brief pause in proceedings.)

11              MS. POLLOCK:  Judge, Mr. Christensen is

12   suffering from a pretty severe migraine headache right

13   now, and we've gone over the options with him.  He has

14   taken some migraine medication, but it's not functioning

15   yet.

16              And we've discussed the options, which we feel

17   are either that we break and leave, which we really don't

18   want to do because we have a witness here from Chicago

19   who really can only testify this afternoon.  Two, we

20   could waive his appearance, and the government has agreed

21   to stipulate to instruct the jury that he has a migraine

22   headache and has agreed to proceed in his absence.

23              Actually, maybe that's really the only two

24   options right now, if that's okay.

25              THE COURT:  Okay.
```

SENTENCING -- July 12, 2019 (Afternoon)

1          MS. POLLOCK:  And probably should admonish him

2   and get his consent for the record.

3          THE COURT:  All right.  First, we'll do it this

4   way.  Mr. Christensen, I'm told you're not feeling well?

5          DEFENDANT CHRISTENSEN:  Yeah.

6          THE COURT:  You can stay seated, sir.

7          And you heard Ms. Pollock indicate that they

8   would either -- could ask for a break, which they prefer

9   not to do, or ask to have, excuse you so that you can

10  leave the courtroom and, until you feel better; and, if

11  that's the case, you understand -- do you have a

12  preference?

13         DEFENDANT CHRISTENSEN:  No.  I'd prefer to

14  leave the courtroom, I suppose.

15         THE COURT:  All right.  You understand that you

16  don't have to, that this would be entirely up to you?  I

17  will instruct or admonish the jury.  I'll work with the

18  lawyers on a simple instruction to the jury that you're

19  not feeling well and that I've excused you from the

20  courtroom for the time being.

21         DEFENDANT CHRISTENSEN:  Okay.

22         THE COURT:  Is that all right with you?

23         DEFENDANT CHRISTENSEN:  Yes.

24         THE COURT:  Okay.

25         MS. POLLOCK:  Thank you, Your Honor.

148

SENTENCING -- July 12, 2019 (Afternoon)

1      THE COURT:  All right.  You want me to say

2  "migraine," or you want me to say that he's "not feeling

3  well"?

4      MS. POLLOCK:  I think the government requested

5  specificity.  We'd be fine with whatever.

6      MR. MILLER:  Whatever the Court would prefer

7  between those two.

8      THE COURT:  You know, I think, if it's okay,

9  I'd like to just say that he's not feeling well.  I

10  wouldn't want anybody one way or another to start to make

11  any judgment on whether they think that was sufficient

12  or -- not feeling well enough, a migraine.

13      So I'll just say the defendant is not feeling

14  well.  I've allowed him to be excused from the courtroom

15  at this time.  They should not consider this in any way

16  in arriving at a decision.

17      MR. MILLER:  [Nodding head up and down.]

18      THE COURT:  Fair enough, Ms. Pollock?

19      MS. POLLOCK:  Yes, Your Honor.

20      THE COURT:  All right.

21      Okay, with that in mind, if you wish to take

22  Mr. Christensen out.

23      MS. BRAIN:  Your Honor, might he be permitted

24  to be transported back to the jail?

25      THE COURT:  If you want him to do so.  But,

SENTENCING -- July 12, 2019 (Afternoon)

```
 1   frankly, what if after a half hour or so he feels better
 2   and would like to return to the courtroom?  I'm -- I'll
 3   leave that up to you at this point; but once he's gone
 4   from here, he's gone for the day, if that -- if he goes
 5   to the jail.
 6              MS. BRAIN:  He said, based on experience, it's
 7   going to take two to three hours before he would feel
 8   better; and he would prefer to go back to the jail, if
 9   it's okay with Your Honor.
10              THE COURT:  That's okay.
11              Government want to be heard on it?
12              MR. MILLER:  No.
13              THE COURT:  It's okay?
14              MR. MILLER:  Yeah.  As long as the record's
15   made that he's voluntarily waiving his appearance.
16              THE COURT:  Mr. Christensen, you understand
17   that if you're taken back you'll be voluntarily waiving
18   your appearance for the rest of the day?
19              DEFENDANT CHRISTENSEN:  Yes.
20              THE COURT:  And that's your request?
21              DEFENDANT CHRISTENSEN:  Yes.
22              THE COURT:  All right, very good.  Okay.
23                  (Brief pause in proceedings; Defendant
24                  Christensen exits the courtroom.)
25              THE COURT:  All right.  Anything else then?
```

SENTENCING -- July 12, 2019 (Afternoon)

```
1              Let's bring the jury in.

2                   (Brief pause in proceedings.)

3                   (Jury present, 1:38 p.m.)

4              THE COURT:  Okay.  Have a seat please,

5    everybody.  Thank you.

6              Ladies and gentlemen, Mr. Christensen is not

7    feeling well; and I have allowed him, after a short

8    discussion, to be excused from the courtroom at this

9    time.  You should not consider this in any way in

10   arriving at your decision.  Okay?

11             All right.  With that in mind, next witness

12   from the defense.

13             MS. BRAIN:  Yes, Your Honor.  The defense will

14   call Mr. Thomas Miebach.

15                  (Brief pause in proceedings.)

16             THE COURT:  Sir, if you'll come forward,

17   please; and as you approach, stop and raise your right

18   hand and be sworn.

19             TOM MIEBACH, sworn, 1:39 p.m.

20             DIRECT EXAMINATION BY MS. BRAIN:

21        Q    Good afternoon.  Could you please state your

22   name and spell your last name for the record, please?

23        A    My name is Tom Miebach.  Last name is spelled

24   M-i-e-b-a-c-h.

25        Q    Where are you employed, Mr. Miebach?
```

1        A     I'm employed at the University of Illinois at

2   Urbana-Champaign Counseling Center.

3        Q     And what's your position there?

4        A     My title is clinical counselor/crisis triage

5   case manager.

6        Q     And what do you do -- what are your duties and

7   responsibilities in that position?

8        A     I do multiple things.  I do normal counseling,

9   intake assessments.  That's the "clinical counselor"

10  part.  The "crisis triage" is I am a part of a team of

11  clinicians who oversee our Crisis Intervention Services,

12  so that means we might see students more frequently than

13  the other staff who might walk in for an emergency

14  appointment.  We help facilitate things like referrals

15  for hospitalization, that sort of things.

16       Q     Very good.

17             How long have you been employed at the

18  Counseling Center?

19       A     Four years and one month.

20       Q     Were you on duty there on the morning of

21  March 30, 2017?

22       A     I was.

23       Q     And did you interview Brendt Christensen that

24  day?

25       A     I did.

SENTENCING -- July 12, 2019 (Afternoon)

1      Q      Brendt was initially scheduled to see another

2  counselor that morning; is that right?

3      A      That's correct.

4      Q      And who was that?

5      A      Jennifer Maupin.

6      Q      She's also employed by the Counseling Center,

7  correct?

8      A      She was at the time.

9      Q      Was at the time.

10     A      Yes.

11     Q      And she was scheduled to conduct an AOD

12  assessment of Mr. Christensen; is that right?

13     A      That's correct.

14     Q      And what's an AOD assessment?  What does it

15  stand for?

16     A      AOD stands for "alcohol and other drugs."  So

17  Jennifer is one of a team of clinicians who specialize in

18  substance abuse.  So the AOD assessment would be what we

19  call a specialized assessment to focus on substance abuse

20  issues.

21     Q      So she was going to evaluate the severity of

22  his drug and/or alcohol dependence?

23     A      Yes.  I believe the purpose of an AOD

24  assessment would be to assess the problem and then

25  provide a recommendation for an appropriate level of

SENTENCING -- July 12, 2019 (Afternoon)

1   treatment.

2        Q    Very good.

3             But after Ms. Maupin met with Mr. Christensen,

4   the plan was changed; was it not?

5        A    She had met with me previously that morning,

6   prior to meeting with him; and, yes, she asked if,

7   following her AOD assessment, if I would be willing to

8   complete what we call a consultation appointment for the

9   purpose of assessing for risk.

10       Q    And what risks in particular were you going to

11  be assessing for?

12       A    Harm to self or others.

13       Q    And Brendt was asked if it was okay if you

14  interviewed him; is that right?

15       A    He did agree to that.  Yes.

16       Q    He agreed to it?  Yeah, okay.

17            How much time passed between when Ms. Maupin

18  contacted you and when you actually saw Brendt?

19       A    I think maybe two hours.  It was that morning.

20  Yeah.

21       Q    Okay.  Did you do anything to prepare to see

22  him at that time?

23       A    When she approached me, along with another of

24  her colleagues named Kurt Hageman, another AOD

25  specialist, we consulted; and so through that

SENTENCING -- July 12, 2019 (Afternoon)

1  consultation, I gathered some basic information.

2       Q    I see.

3       A    Yeah.

4       Q    But you didn't have time to review his chart or

5  his file, did you?

6       A    At that point, he had been seen once, the week

7  prior.  And following his initial assessment, I did

8  consult briefly with the intern who saw him, so I had

9  some prior knowledge as well --

10      Q    I see.

11      A    -- from meeting with her.  Yes.

12      Q    Very good, okay.

13           Have you read the intern's report?

14      A    I have.

15      Q    Nowhere in that report does it say that she and

16  Felicia Li asked Mr. Christensen about whether he'd be

17  willing to undergo voluntary hospitalization, does it?

18      A    To my recollection, it does not.  I would need

19  to see it to be sure.

20      Q    Can we pull that up, Ms. Pollock?

21           (Brief pause in proceedings.)

22      Q    Thank you.

23           If you can see what's been marked as -- we

24  don't have a sticker on it.  This is Ms. Molenaar's

25  report, isn't it?

SENTENCING -- July 12, 2019 (Afternoon)

1      A      That's what it appears to be.  Yes.

2      Q      Okay.  And do you see -- is there anywhere in

3  that report where she says, "We talked to Mr. Christensen

4  about voluntary hospitalization for his suicidality"?

5      A      I think -- is there a way to scroll further?

6      Q      There's another page.  There's three pages in

7  total.  There's the second page.

8             (Brief pause in proceedings.)

9      A      It references a Crisis Response Plan, but it

10  does not specifically discuss voluntary hospitalization.

11      Q      You talking about -- "crisis plan," you talking

12  about somewhere where you call up on the phone?

13      A      I lost the --

14      Q      Me, too.

15             Is that what you were referring to, where it

16  says --

17      A      That's one piece of a Crisis Response Plan, is

18  the 24-hour phone line.

19             It looks like they also talked about presenting

20  at an emergency room as needed, and he committed to doing

21  so.

22      Q      So that was just a, a plan for resources he

23  could access should his suicidal ideation worsen, right?

24      A      Yes.

25      Q      And --

SENTENCING -- July 12, 2019 (Afternoon)

1      A     That's what it appears to be.  I was not a part

2   of this particular interaction.

3      Q     And all three were outpatient services; is that

4   right?

5      A     Well, I suppose an emergency room is kind of

6   its own category; but, yes, it doesn't mention

7   in-patient.

8      Q     People don't generally stay in an emergency

9   room, do they?

10     A     Could you repeat that?

11     Q     Sorry, my bad.

12           People don't generally spend a long time in the

13   emergency room, right?

14     A     In my experience, they can be there for a

15   number of hours.

16     Q     Very good.

17           Thank you, Ms. Pollock.

18           Now, when you talked to him, Brendt denied

19   current suicidal ideation; is that right?

20     A     That's correct.

21     Q     But he did admit to recent passive suicidal

22   ideation; is that right?

23     A     He disclosed that approximately two weeks prior

24   to my meeting with him he did experience what I would

25   call passive thoughts of suicide, meaning no intentions

SENTENCING -- July 12, 2019 (Afternoon)

1  to act on them, no plans to do so, a passing thought.

2  And he described those as being in response to conflicts

3  within his marriage, and he denied any thoughts of

4  suicide since that time that I saw him.

5       Q    Did Ms. Maupin tell you that he'd had another

6  crisis with his wife a few days prior to your seeing him?

7       A    No.

8       Q    Did she --

9       A    She brought him immediately to see me after he

10  saw her.

11       Q    Okay.  And so she didn't tell you that his wife

12  had wanted to spend the night with another man and that

13  he had --

14            MR. NELSON:  Objection.

15       Q    -- increased --

16            MR. NELSON:  He just said she didn't tell him

17  that.

18            THE COURT:  And so you're just going through

19  what she was told that she didn't tell him?

20            MS. BRAIN:  Exactly.

21            THE COURT:  Go ahead.

22            WITNESS MIEBACH:  I was not aware of that.  No.

23            MS. BRAIN:  Okay, very good.

24  BY MS. BRAIN:

25       Q    Were you aware, in the prior interview with

SENTENCING -- July 12, 2019 (Afternoon)

1  Ms. Molenaar, Mr. Christensen told her if he did commit

2  suicide it wouldn't simply be a gesture, and he wouldn't

3  expect to be rescued; he'd do it in a manner that made

4  sure he would die before he was found?

5       Did you know that?

6   A   That's the first I've heard that.

7   Q   Okay.  Have you reviewed the videotape

8  recording of Ms. Molenaar's interview on the, March 21st

9  with Mr. Christensen?

10  A   I recently watched a few minutes of it after it

11  was publicly leaked; but prior to that, no.

12  Q   So were you aware that he told Ms. Molenaar

13  that the manner he had thought to kill -- thought about

14  to kill himself was inhaling nitrogen gas?

15  A   She did not mention that to me.  No.

16  Q   Were you aware that he also told her -- his

17  wife had told him three days previously she wanted to

18  leave him, and he could not see any reason to live

19  without her?

20  A   No.

21  Q   Okay.  When you talked to him about suicide,

22  did you ask him about the means he might use, or whether

23  he thought about the means he might use?

24  A   I asked him if he ever thought about how he

25  might kill himself or made any plans to do so, and he

SENTENCING -- July 12, 2019 (Afternoon)

1 denied ever doing that.

2          I asked him if he'd ever attempted suicide or

3 taken steps towards doing so, and he told me no.

4     Q    Did you ask him about his access to items that

5 could be used to take one's own life?

6     A    I asked him about access to weapons --

7 specifically, firearms -- which he denied.

8     Q    "Firearms," that's what you mean by weapons?

9     A    I asked him something along the lines of *Do you*

10 *have access to any weapons that you might have?*  This was

11 in the context of harming someone else, but I did

12 specifically mention firearms.

13     Q    I see, okay.

14          The Counseling Center has a Therapeutic

15 Services Manual; does it not?

16     A    It does.

17     Q    If I could show you what's been marked

18 Defendant's 155, could you tell us if this is a copy of

19 the Counseling Center's Therapeutic Services?

20     A    Yes.  It appears to be so.

21     Q    Very good.

22          MS. BRAIN:  Move to admit and publish, Your

23 Honor.

24          MR. NELSON:  No objection, Your Honor.

25          THE COURT:  You may.

SENTENCING -- July 12, 2019 (Afternoon)

1          (Brief pause in proceedings.)

2     BY MS. BRAIN:

3          Q     Well, while Ms. Pollock's doing that, could I

4     ask you to turn to page 16 in your paper copy?

5          A     16?

6          Q     Yes, please.

7          A     Okay.

8          Q     There's a list -- isn't there? -- of factors

9     that are important in assessing a client's risk of

10    committing suicide?

11         A     Yes.

12         Q     Did you go through those with Brendt?

13         A     I did not specifically go through this

14    particular list, but I do believe I asked about a number

15    of these.  Yes.

16         Q     And how many, how many factors are listed in

17    that manual?

18         A     In this particular section, where it says "List

19    of Factors"?

20         Q     Yeah.  How many?

21         A     Fifteen.

22         Q     And how many were, of those were present with

23    Mr. Christensen?

24         A     Well, let's see, he denied any past suicide

25    attempts, so that rules out the first three.

SENTENCING -- July 12, 2019 (Afternoon)

1          He denied any current thoughts of suicide.
2   That rules out number 4.
3          He did not present with severe hopelessness.
4      Q    Wait.  Let me stop you there.
5          Were you aware that he told Ms. Molenaar during
6   the first interview that he had been suffering depressive
7   symptoms; specifically, thoughts of hopelessness and
8   worthlessness?
9      A    I'm just speaking to what he told me when I saw
10  him, --
11     Q    Okay.
12     A    -- and he expressed a sense of optimism.
13     Q    Okay.
14     A    So I would not say that he was hopeless.  No.
15     Q    Did you know that though?
16     A    I'm sorry?
17     Q    Did you know that, though; that that's what he
18  told Ms. Molenaar two weeks before?
19     A    I did not know that specifically.  No.
20     Q    Okay.  Sorry.  Go ahead.  I interrupted you.
21     A    Depression, anxiety, hostility.  He referenced
22  a history of depression.
23          Psychotic processes.  I did assess for that.
24  He denied and did not exhibit any signs of psychosis.
25          Severe judgment or impulse control problems.

1    He did not exhibit any of those.  He appeared fully aware

2    of himself and in control of his actions.

3        Q    Did you know about his, the amount -- his

4    alcohol problem at that time?

5        A    When I saw him, he told me that he had been

6    able to abstain from drinking for a little over a month.

7        Q    But he also told Ms. Maupin -- sorry,

8    Ms. Molenaar that he had tried on five previous occasions

9    to abstain from using alcohol, and every time he had

10   started up drinking again; is that right?

11       A    He did not reference that to me, and I was not

12   aware of that.

13       Q    All right, very good.

14            Sorry.  I you cut you off again.

15       A    Health problems, he did not mention any.

16            Attraction to death, he did not speak of.

17            And, let's see, family history of suicide, that

18   was not assessed for the purpose of my consultation

19   appointment, but he did not mention any.

20            Use/dependence of alcohol.  Like I said, he did

21   reference struggles with those things; but on the date

22   that I saw him, he expressed feeling that that was

23   improving, and he was doing well.

24       Q    But somebody who has tried five prior occasions

25   to quit drinking and failed would be classified as

SENTENCING -- July 12, 2019 (Afternoon)

1   someone with alcohol dependence, wouldn't he be?

2        A    I can only speak to what he told me.

3             MR. NELSON:  [Standing.]

4             THE COURT:  Overruled.  The answer will stand.

5   BY MS. BRAIN:

6        Q    And you mentioned depression.  Do you know:

7   What is the CCAPS-62?

8        A    What is it in general?

9        Q    Yeah.

10       A    It's a measure that we, that College Counseling

11  Centers use that students -- it's a self-report measure

12  where students rank a number of symptoms based on a 0 to

13  4 scale.

14       Q    And were you aware that Mr. Christensen

15  completed that test when he saw Ms. Molenaar?

16       A    I was.  That's standard procedure.  Yeah.

17       Q    And did you know how -- that he scored in the

18  94th percentile on the depression scale of that

19  instrument?

20       A    I was aware of his scores that day.

21       Q    And he scored on the 85th percentile on the

22  anxiety scale, also.  Is that -- you knew that?

23       A    I would need to see it, but I, I am aware that

24  there were elevated measures on his initial CCAPS.

25       Q    And that his overall -- his overall distress

SENTENCING -- July 12, 2019 (Afternoon)

1    scale is the 95 percentile.  Did you know that?

2        A    Again, I did review the form.  I would need to

3    see it to reference specifics.

4        Q    That's okay.  Thank you.

5             You mentioned attraction to death.  Mr.

6    Christensen's statements to Ms. Molenaar that he had

7    considered killing himself with liquid nitrogen and he

8    would make sure that he did it and wouldn't be rescued,

9    that would indicate an attraction to death, wouldn't it?

10       A    Well, --

11       Q    I understand he didn't say those things to you,

12   but when he saw --

13       A    I'm not so sure I would characterize every

14   thought of suicide as an attraction to death.  I don't

15   know who wrote this list.  I'd be curious their

16   definition.

17            But, to me, that -- those don't feel like the

18   same thing.

19       Q    Okay.  Recent losses and separations.  Were you

20   aware that Mr. Christensen had -- well, you already said

21   his wife had told him she wanted to leave him, correct?

22       A    I --

23       Q    Did you know --

24       A    -- don't know that he said that specifically.

25            When I met with him, he said that there were

SENTENCING -- July 12, 2019 (Afternoon)

1   marital problems, which he attributed to his alcohol use;

2   but he didn't mention any more specifics than that.

3        Q    Okay.

4        A    And he also --

5        Q    Did you know he told Ms. Molenaar that, three

6   days prior to her interview with him, his wife had told

7   him that she wanted to leave him?

8        A    No.  Again, I don't know many of the details of

9   the specifics he told her on that date.

10       Q    Okay, very good.

11            Did you know that he had also decided to drop

12  out of his Ph.D. program and accept a master's instead?

13       A    Yes.  He did speak of that.

14       Q    And that he felt like a failure because of

15  that?

16       A    I, I don't believe he mentioned that.

17       Q    Okay.  What about his social support system?

18  Did he tell you that his only contact with anyone,

19  outside of work, was his wife?

20            MR. NELSON:  Objection, Your Honor.  Again,

21  this is direct examination.  She should not be leading

22  this witness.  She can ask the question.  He can answer

23  it.

24  BY MS. BRAIN:

25       Q    What did Mr. Christensen tell you about his

SENTENCING -- July 12, 2019 (Afternoon)

1    social support system?

2         A    He told me that he had limited support, meaning

3    not that many friends.

4         Q    He said "not that many friends"?

5         A    Yes.

6         Q    He didn't say "no friends"?

7         A    Not to my recollection, no.

8              He, he spoke primarily of his marriage and his

9    concerns there.  But, again, on the date I saw him, he

10   was feeling hopeful that things could be resolved.

11        Q    Okay.  So Brendt also told you not only was he

12   thinking of how he had had thoughts of harming himself,

13   he had recently been ruminating about murder?

14        A    I asked him about that because when I did

15   consult with Carin, the intern, following his initial

16   assessment, she did mention that he had disclosed some

17   thoughts of killing people.  So a primary function of my

18   consulting with him that day was to assess for those

19   thoughts, so I did.

20        Q    And you write in your report, "Mr. Christensen

21   had recently been ruminating about murder."  Did you not?

22        A    That's what he told me.  Yes.

23        Q    And that's what you wrote in your report?

24        A    I did.

25             And to specify, what he told me was roughly

SENTENCING -- July 12, 2019 (Afternoon)

1    five weeks, a little over a month, was the last time he

2    had experienced those thoughts; and that was in the

3    context of when he was drinking and experiencing marital

4    problems.

5        Q    "Ruminating" means thinking the same thoughts

6    over and over again, doesn't it?

7        A    That's fair to say.  Yes.

8        Q    And he told you that his thoughts began with a

9    fascination with serial killers and their methods, didn't

10   he?

11       A    I don't know if he said "their methods," but

12   something to that effect.  Yeah.

13       Q    Can we have up the Counseling Center records --

14   49, I believe, or close to it?

15           MS. POLLOCK:  Which ones?  CCAPS?

16           MS. BRAIN:  No.  The report of Mr. Miebach's

17   interview.

18           (Brief pause in proceedings.)

19   BY MS. BRAIN:

20       Q    So --

21       A    Oh, yes, you're right.  That is what I wrote.

22   Yeah.

23       Q    Where "the client admitted to a recent history

24   of ruminating about murder, which began as a

25   'fascination' with serial killers and their methods."

SENTENCING -- July 12, 2019 (Afternoon)

1    A    Correct.

2    Q    Did I read that right?

3    A    And I asked him to elaborate on that, and he

4    stated that he had an, what I would characterize as an

5    abstract, sort of intellectual curiosity about serial

6    killers and found himself thinking about how one might go

7    about killing a person and getting away with it.

8    Q    And you wrote, "He denied specific plans," but

9    you also wrote "he admitted that he had purchased items

10   to be used in a murder," didn't he?

11   A    Well, what he said to Carin in his -- well, let

12   me back up.

13        When I consulted with Carin following his

14   initial assessment, she had told me that he had disclosed

15   to her having purchased items that he would use to

16   transport or to dispose of a body.  So he didn't bring

17   that up to me.  I made a point to ask him about that.

18        And, again, he said he had those thoughts

19   roughly a month prior.

20        He did admit to purchasing those things.

21        I asked him to identify what those were, and he

22   didn't wish to discuss that.  He wouldn't tell me, but he

23   did say that he has since disposed of them; that he had

24   no intentions then, or currently, to use them.  He talked

25   about it as a fantasy of his.

SENTENCING -- July 12, 2019 (Afternoon)

```
1              And I made a couple attempts to get him to, to

2    say more; but he, he wouldn't tell me what the items

3    were.  He would just say that that's in the past; he has

4    gotten rid of them.

5              I asked if he would consider purchasing

6    something like that again.

7              He said no.

8              And he was -- he reiterated that he had, did

9    not want to hurt anybody and had never intended to, or

10   made plans to.

11      Q    Well, never intended to, but buying items that,

12   to be used in the commission of a homicide is a plan; is

13   it not?

14      A    Well, you're -- your suggestion that he bought

15   them for that purpose was not stated to me.  He just said

16   that he bought them.

17      Q    Well, it says that he bought items that would

18   be used in the transport and disposal of a body, right?

19             That's what you wrote in your report.

20      A    I did.  And he did say that.  But to state --

21      Q    So that's being used --

22             MR. NELSON:  Objection.  She's impeaching the

23   witness.  He's trying to answer, and she's cutting him

24   off.

25             MS. BRAIN:  I'm sorry.  I didn't mean to do
```

SENTENCING -- July 12, 2019 (Afternoon)

1    that.  Go ahead.

2         A    Well, I think, while it's concerning that he

3    purchased the items, --

4         Q    The question was:  Was that something that he

5    was going to use in a planned homicide?

6              And the fact that he said it would be used in

7    the transport and disposal of a body would suggest that

8    it was; is that fair to say?

9         A    I don't think so.  I asked him directly

10   multiple times if he had ever planned or intended to harm

11   anyone, and he always said no.

12        Q    Okay.  Never mind.  I'll move on.

13             Now, after you were finished with your

14   assessment, Ms. Maupin referred Brendt to an outside

15   provider?

16        A    That's correct.

17        Q    That's Rosecrance, right?

18        A    That's correct.

19        Q    But even though she made that referral, you

20   arranged to see Brendt again, didn't you?

21        A    Yes.  So at the end of my meeting with Brendt,

22   we reviewed treatment options, and I wasn't fully aware

23   yet of the AOD assessment and what Jennifer's conclusions

24   were, so --

25        Q    Or of what Ms. Molenaar had learned during her

SENTENCING -- July 12, 2019 (Afternoon)

1  interview in large part, correct?

2      A     She shared certain things with me.  I couldn't

3  speak to the quotes of his; but when we discussed

4  treatment options -- Brendt and I -- he told me that,

5  although he was hesitant to seek help because he felt

6  like things were getting better, he agreed that help was

7  needed and would follow through with the treatment

8  recommendations of, of Jennifer.

9          In addition to that, we also reviewed the

10  Crisis Response Plan, made sure that he was aware of how

11  he could seek immediate help should any of his problems

12  worsen --

13      Q     Okay.

14      A     -- reviewed.

15          And then I asked him if he would like to

16  schedule one more appointment for additional support as

17  he was establishing services with Rosecrance, and he

18  agreed.

19      Q     It's pretty unusual for a Counseling Center to

20  continue seeing a client who had been referred to an

21  outside source; isn't that right?

22      A     I wouldn't say so.  We often offer one more

23  appointment for follow-up, additional support.  I don't

24  know that that's standard procedure, but I don't think

25  it's uncommon.

SENTENCING -- July 12, 2019 (Afternoon)

1    Q    Well, you did that because of your concern
2  about his dangerousness, right?  To himself or to --
3  especially to others?
4    A    I did that to offer him additional support.  A
5  part of that would have been to reassess for risk, --
6    Q    All right.
7    A    -- but it was more so to, to assist him in
8  getting connected to the treatment provider that we felt
9  was a more appropriate level of care.
10    Q    Well, Ms. Maupin was about to send him the
11  telephone number, the address, and all the contact
12  information, correct?
13    A    That is our, our usual procedure, but --
14    Q    And that's what she did via email, right,
15  copying you on the email?
16    A    Yes.
17    Q    Okay.  So he knew how to contact Rosecrance?
18    A    Yes.  We spelled it out, and I don't know
19  exactly what Jennifer did; but I'm assuming she discussed
20  with him how to go about arranging those kind of
21  services.  But the email, yes, it gave him the tools he
22  would need to take the next steps.
23    Q    Very good.
24         Thank you, Ms. Pollock.
25         So you -- the appointment you made with him to

SENTENCING -- July 12, 2019 (Afternoon)

1   come back to you was April 7, 2017?

2       A    That sounds correct.  Yes.

3       Q    And after that, he was allowed to leave the

4   Counseling Center?

5       A    Well, I did review, prior to him leaving on the

6   30th, --

7       Q    He didn't stay there, correct?  After you had

8   talked to him, he left?

9       A    I reviewed treatment options with him, one of

10  which was a higher level of care, meaning in-patient or

11  residential.  He stated that he did not want to go stay

12  somewhere.

13      Q    That was in-patient treatment for drug and

14  alcohol abuse, though, correct?

15      A    No.  As well as psychiatric.  We talked about

16  that.  He declined that.

17           Based on what he told me on that day, he didn't

18  meet criteria for involuntary admission, so I had no

19  choice but to let him leave, --

20      Q    You had --

21      A    -- if that's what you're asking.

22      Q    Well, we'll get to that in a moment.

23           But you didn't write in your report anywhere

24  that you discussed with him psychiatric hospitalization

25  for suicidal and/or homicidal ideation, did you?

SENTENCING -- July 12, 2019 (Afternoon)

1      A      I don't believe I specifically wrote that.  No.

2      Q      Right.

3             So when it came to April 7th, Mr. Christensen

4    did not appear for his appointment, did he?

5      A      That's correct.

6      Q      You didn't call him to see where he was, right?

7      A      I did not.

8      Q      Or send him an email to see what the reason for

9    his nonappearance was?

10     A      I didn't.  The reason for that being when I met

11   with him in person I provided him with my personal

12   contact information, the 24-hour crisis line number; I

13   wrote it on the back of my business card.

14            I reviewed with him that, should he ever need

15   to, the Counseling Center offers emergency walk-in

16   appointments when we're open.

17            So I felt that he had what he needed to, to

18   seek the help that he needed.

19     Q      So he was on his own?

20     A      I'm sorry?

21     Q      So he was on his own, then, as far as you're

22   concerned?

23            MR. NELSON:  Objection, argumentative.

24            THE COURT:  He may answer if he wish.

25     A      We treat our students as adults, and our

SENTENCING -- July 12, 2019 (Afternoon)

1    services are voluntary; and I feel that we provided him

2    quite a bit of support and information.  So to say he is

3    on his own seems unfair.

4         Q    Okay.  In any event, after he didn't come on

5    April the 7th, there was no further follow-up with him

6    about his treatment, correct?

7         A    That's correct.

8         Q    Okay.

9         A    I was aware that he was leaving the University;

10   and, again, he was provided all the information he would

11   need to, to follow through on the services that he

12   committed to doing so with me.

13        Q    Okay.  The Counseling Center policy requires a

14   final disposition note whenever a client is terminated

15   from therapy; is that right?

16        A    Yes.

17        Q    And the file remains open until the disposition

18   note is created, effectively, right?

19        A    Essentially, yes.  But that doesn't mean they

20   can no longer seek services.  That's more of a

21   recordkeeping issue.

22        Q    No.

23             I'm saying:  The file, the case remains open

24   until the final disposition note is created, right?

25        A    I would say that it remains open even after a

SENTENCING -- July 12, 2019 (Afternoon)

1  final disposition note is written.  If, for example, a

2  client I was seeing decided to start seeing a private

3  provider and I anticipated that services were coming to

4  an end, I would write a final disposition note.  But

5  should that person present again at the Counseling

6  Center, the file would be immediately reopened.

7       Q    And in the disposition note, it's supposed to

8  include a reason for the termination of services,

9  correct?

10      A    I believe so.

11      Q    And "the disposition," meaning what the, the

12  outcome was for the client; is that right?

13      A    Yes.

14      Q    Okay.  And you never completed a final

15  disposition note in Brendt's case, did you?

16      A    Well, there's a reason for that.  This case was

17  highly unusual in that -- so our standard operating

18  procedures, we wait six months before we would write a

19  final disposition.  And since he was arrested --

20      Q    Six months, that's your procedure --

21      A    I think that's --

22      Q    -- before filing --

23      A    That's commonly how we practice.  Yes.

24           The reason I didn't get around to writing a

25  final disposition note for this particular case is

SENTENCING -- July 12, 2019 (Afternoon)

1    because it became public, and my supervisors locked the

2    file, so I no longer had access to it.

3         Q    Could we have page 46 of the Therapeutic

4    Services.

5              (Brief pause in proceedings.)

6         A    I'm sorry.  Did you -- were you talking to me?

7         Q    No.  I beg your pardon.  I'm sorry.  I was

8    asking my colleague to give us the page about final

9    disposition notes.

10             (Brief pause in proceedings.)

11   BY MS. BRAIN:

12        Q    As an employee of the University of Illinois,

13   particularly as a mental health professional, are you

14   generally familiar with the Campus Violence Prevention

15   Policy?

16        A    I'm aware that it exists, and I think I looked

17   at it once, but I wouldn't say I'm very familiar with its

18   contents.

19        Q    Well, the -- I think I said "Policy."  What I

20   mean to say is "Plan."  The Campus Violence Prevention

21   Plan applies to all individuals who are members of the

22   campus community; is that right?

23        A    Yes.  I'm aware of what you're referring to,

24   and I did review it when I was first employed.

25        Q    Okay.  And part of the threat assessment --

SENTENCING -- July 12, 2019 (Afternoon)

1    Violence Prevention Plan governs the campus community's

2    responsibilities to report and respond to potential

3    indicators and/or threats of violence; is that fair to

4    say?

5         A    Yes.

6         Q    And it's focused primarily on preventing

7    targeted violence; is that right?

8         A    Yes.

9         Q    Which is goal-directed, planned violence,

10   right?

11        A    For specific targets, --

12        Q    As opposed to --

13        A    -- right.

14        Q    -- a particular individual, right?

15        A    Correct.

16        Q    The type of violence that's often planned in

17   advance?

18        A    Could you say that again?

19        Q    That's the type of violence that's often

20   planned in advance?

21        A    Generally speaking, I believe so.  Yeah.

22        Q    And so the planning -- the thought behind the

23   focus on that is that the planning purposes might leave

24   signs or clues about violence that might allow prevention

25   before something happens?

SENTENCING -- July 12, 2019 (Afternoon)

1      A      Theoretically, yes.

2      Q      Because the policy says it's founded on

3   "principles of early intervention and proactive

4   engagement" to prevent violence and provide supportive

5   services.

6             Does that sound familiar?

7      A      I believe you.

8      Q      Okay.  And to those ends, the policy identifies

9   certain "thresholds of unacceptable conduct."  Do you

10  recall that?

11     A      I don't recall that specifically.  No.

12     Q      Okay.  Can we have page 4 of 157.

13            Thank you.

14            If you review the bottom part of that, does

15  that refresh your recollection as to whether the policy

16  identifies certain thresholds of unacceptable conduct?

17     A      It does.

18     Q      Okay.  And one of those thresholds is "acts and

19  threats of violence towards a specific person or persons,

20  towards an unspecified person or persons, or to the

21  campus as a whole"; is that right?

22     A      That is what it says.

23     Q      Okay.  And another of the thresholds of

24  unacceptable conduct is "significant violent ideations or

25  the expression of violent ideas or the intent to harm

180

1    others."  Is that right?

2         A    That is what it says.

3         Q    Okay.

4         A    I should clarify that I think the spirit of

5    this document is, is for nonclinical faculty and staff

6    members, those who aren't confidentiality bound.

7         Q    Well, it's every, every -- all members of the

8    campus community, right?

9         A    It is.  However, there are limitations --

10        Q    Sure, --

11        A    -- in my particular role.

12        Q    -- I understand.

13             But this, this is what the University has

14   identified as unacceptable conduct in relation to the

15   risk of violence?

16        A    That's what it states here.  Yes.

17        Q    Okay.  Can I have the next page, Ms. --

18             And another threshold is "the expression of

19   thoughts, ideas, beliefs, and/or engaging in behaviors

20   which indicate an obsessive, excessive, or inappropriate

21   focus on violence"?

22        A    It does say that.  Yes.

23        Q    Okay.  Under this Threat Assessment Plan,

24   the -- there is a Campus Violence Prevention Committee

25   that is set up; is that right?

SENTENCING -- July 12, 2019 (Afternoon)

1        A      Are you referring to the Behavioral

2    Intervention Team?

3        Q      Well, there's a committee that oversees two

4    different threat assessment teams.   Did you know that?

5        A      I'm not familiar with that.

6        Q      Okay.   The one that matters to us only is the

7    Behavior Intervention Team, which is the threat

8    assessment team for students; is that right?

9        A      Yes.

10        Q      Okay.   And your director of the Counseling

11    Center is on the committee, the Campus Violence

12    Prevention Committee; is that right?

13        A      My director, as well as the clinical associate

14    director.

15        Q      Yeah, okay.

16              The Behavioral Intervention Team publishes

17    guidance to University staff and students on how to

18    identify behaviors and circumstances that may indicate an

19    elevated risk of violence; does it not?

20        A      I believe it does.

21        Q      If I could -- may I approach, Your Honor?

22              If I could show you what's been marked as

23    Defendant's Exhibit 153, if you could take a look at

24    that.

25              (Brief pause in proceedings.)

SENTENCING -- July 12, 2019 (Afternoon)

1     Q     That's from the Behavior Intervention Team's

2   website; is it not?

3     A     It appears to be.  Yes.

4     Q     Okay.  Or at least it's published by the

5   Behavior --

6     A     Yeah.

7     Q     -- in some sense?

8          MS. BRAIN:  Permission to admit and publish,

9   Your Honor.

10          MR. NELSON:  Is this the one that Mr. Kelly

11   printed for me earlier?  In which case, I continue to

12   object, Your Honor.  This is copyright 2019, which is two

13   years after anything relevant in this case occurred.

14          THE COURT:  It's -- can you tie it back?

15          MS. BRAIN:  I --

16          THE COURT:  In other words, was this in

17   effect -- whatever "this" is -- in effect in March of

18   2017 when he was seen?

19          MS. BRAIN:  I'm not sure --

20          THE COURT:  Or in February?

21          MS. BRAIN:  -- whether that's referring to the

22   printing date or the publishing date.  I'm not able to

23   say definitely if it was.

24          But I think, nevertheless, the fact is that

25   what it identifies are relevant, whether they were

SENTENCING -- July 12, 2019 (Afternoon)

1  printed or not.

2         THE COURT:  No.  They're only relevant if they

3  were in effect in, at the time of February of 2017,

4  when -- or April of 2017 when he saw Mr. Christensen.

5         MR. NELSON:  And, in fact, Your Honor, there

6  are substantial material additions from the one that Ms.

7  Brain put into evidence earlier; so it's clear that at

8  some point they changed the policy.

9         THE COURT:  If -- whether or not they did, if

10 you can establish that whatever factors you're referring

11 to were in effect in April of 2017 and Mr. Miebach was

12 aware of them, then it would be admissible.  But unless

13 you can establish that, it won't be.

14        MS. BRAIN:  Okay, very good, Your Honor.

15 BY MS. BRAIN:

16    Q    Would you agree that the -- a student's

17 expression of homicidal ideas, violent fantasies, or

18 preoccupation should be a consideration in assessing

19 whether somebody might be at risk for acting violently?

20    A    Yes.

21    Q    And would you agree that homicidal ideation or

22 thoughts; preoccupation with violent themes, fantasies,

23 weapons, or violent groups; approval of violence; and

24 identification with perpetrators of violence -- that all

25 those things would be relevant in assessing risk?

SENTENCING -- July 12, 2019 (Afternoon)

1    A    Yes.

2    Q    So if a student said to you, "I've had thoughts

3    of harming others.  I've always been more interested in

4    the bad guys than the good guys, and I've recently found

5    a huge forum with serial killers that was fascinating to

6    me," that would suggest that that particular risk factor

7    may be present; is that fair to say?

8    A    That particular risk factor?

9    Q    Uh-huh.

10    A    I can't speak to how strong of a risk factor

11    that would be in particular.  There would need to be a

12    lot more assessment involved.

13         But, yes, that would be something that would

14    need assessed further.

15    Q    And if a student went on to say, "One in

16    particular, I was fascinated with Ted Bundy because he

17    was literally the worst person I ever heard of," that

18    would be additional evidence supporting approval --

19    supporting preoccupation with violent themes and

20    identification with perpetrators of violence; would that

21    be fair to say?

22    A    Would you repeat that?

23    Q    Yeah.

24         So if a student was to say to you, "I was

25    fascinated in particular with Ted Bundy because he was

SENTENCING -- July 12, 2019 (Afternoon)

1    the, literally the worst person I've ever heard of," that

2    would suggest that preoccupation with violent themes,

3    fantasies, and identification with perpetrators of

4    violence is present, wouldn't it?

5        A    I disagree.  I don't believe that "fascination"

6    and "identification" are the same.

7             I think a lot of people are curious and

8    intrigued by serial killers and might even say they're

9    fascinated.  But to say that *I want to be like that*

10   *person* seems like a different, a different matter; and he

11   never said anything to that effect to me.

12       Q    Not to you, but to Ms. Molenaar.  He said that

13   he thought about -- he had been thinking about how he

14   would commit a crime similar to those that he had seen

15   serial killers commit.

16       A    I'm not aware --

17       Q    You didn't know that?

18       A    -- that that's exactly what he said.  No.

19       Q    Okay.  Would you agree, also, that violent

20   intentions and expressed threats would be a risk factor

21   in considering violence, risk of violence?

22       A    Absolutely.

23       Q    Okay.  Including any threats, specific plans,

24   or expressed intentions?  Would you agree?

25       A    Yes.  Threats, plans, intentions are central to

1  assessing for risk.

2        Q    Also pre-attack planning and authorization is

3  something you'd want to consider?

4        A    Yes.

5        Q    Any behavior that's part of the research,

6  planning, preparation, or implementation of an attack?

7        A    All those things would be a concern.  Yes.

8        Q    And purchasing items to transport and dispose

9  of a body would fall into that category, wouldn't it?

10       A    If there's expressed intentions and plans to

11  use them for that purpose, then, yes.

12       Q    Would you also agree that in assessment for

13  risk of dangerousness, employee or student status related

14  problems is a factor to consider?

15       A    I didn't quite understand.

16       Q    Would you agree in assessing risk that employee

17  or student status related problems would be something to

18  consider?

19       A    Employee or student status?

20       Q    Or defined as "recent or likely termination,

21  suspension, dismissal, significant conduct performance,

22  employee/student status issues."

23       A    I suppose that could speak to a general

24  distress in a person's life.

25       Q    Last, "personal stresses and negative coping"

SENTENCING -- July 12, 2019 (Afternoon)

1   would also be a risk factor you should consider; would it

2   not?

3        A    They are risk factors.  There are lots of risk

4   factors, so I don't know that it's necessary to

5   exhaustively ask about each one of those to assess for

6   risk; but they are risk factors, yes.

7        Q    But if you had knowledge of the presence of

8   something like that, then it would be -- let me back up.

9            If you, if you had evidence that that factor

10  was present, then it would be something to consider in

11  making a risk assessment, correct?

12       A    It, it would be something to consider; but I

13  feel that there are much more important things to

14  consider than those types of risk factors.

15       Q    What about a person's social isolation?  Would

16  that be a risk factor that you should consider?

17       A    It, it can be.  Some people prefer to be alone,

18  so it's not always a risk factor; but, in combination

19  with other things, it could be.

20       Q    And what about desperation and suicidality?

21       A    Certainly.

22       Q    "Strong feelings of hopelessness or nothing to

23  lose, suicidal ideas," that would be a red flag and a

24  risk factor; would it not?

25       A    It would be a risk factor.  Yes.

SENTENCING -- July 12, 2019 (Afternoon)

1      Q      Okay.  And substance abuse, of course, is

2  something that rather dramatically increases a person's

3  risk for acting violent, doesn't it?

4      A      Well, I would need to see the research to

5  support the claim "dramatically"; but if there's been a

6  recent significant increase in substance abuse, then,

7  certainly, that increases the risk.

8      Q      So when -- when you saw Mr. Christensen, you

9  could have asked him to sign a release form giving you

10 authorization to disclose information to the suicide

11 intervention team, couldn't you?

12     A      I could have.

13     Q      And you could have even asked him to give you a

14 release form to disclose information to the Behavioral

15 Intervention Team, right?

16     A      I can't recall any students being asked to sign

17 a release specifically for the Behavioral Intervention

18 Team.  I think the concern there would be (A) it would

19 sabotage the rapport that we were building; that would

20 make them suspicious of us and less likely to continue

21 seeking help and opening up.  But, also, it might

22 undercut the effectiveness of the Behavioral Intervention

23 Team if the student is aware that certain things are

24 going to be disclosed to what could probably be viewed as

25 an authority at the University.

SENTENCING -- July 12, 2019 (Afternoon)

1     Q     Well, it wouldn't be.  You'd be asking for his

2  permission to disclose it, right, if you're asking for

3  the release form?

4     A     Correct.  To ask a student *Is it okay if I talk*

5  *about you to a team that includes the directors of*

6  *several departments at the University?* -- I think that a

7  lot of students would find that off-putting.

8     Q     Okay.  But you wouldn't have to describe it

9  like that.  If you were trying to persuade a client to

10  get some help; I mean, you wouldn't put it quite like

11  that, would you?

12     A     True.  I wouldn't put it that way.  But our

13  students are typically bright, and they ask questions

14  about:  *What is that?  What am I signing?*  So it would --

15  I would have to share.

16     Q     Of course.  But, nevertheless, what you're

17  asking is asking for permission, so you could have done

18  that, right?

19     A     I could have.

20     Q     Right.

21     A     Yes.

22     Q     But --

23     A     I was choosing to focus on assessing for risk

24  and building an alliance so that he would hopefully

25  continue to share things with me.

SENTENCING -- July 12, 2019 (Afternoon)

1    Q    Okay.  This is a man who just told you he

2    bought items to use in the transport and disposing a

3    body, right?

4    A    Again, he didn't express any intention to use

5    those items in that way.

6    Q    Okay.

7    A    He said he had purchased something as part of a

8    fantasy.

9    Q    You could also have gotten him to sign a

10   release to allow you to share the information he'd given

11   you with his psychiatrist at McKinley Health Center,

12   couldn't you?

13   A    I could have.  Yes.

14   Q    You have a specific form for that in the

15   Counseling Center, right?

16   A    That's true.

17        But given that he was on his way out at the

18   University and being referred to a treatment facility

19   that has psychiatric services, we chose to look forward.

20   Q    That was his treating psychiatrist who had been

21   seeing him for over a year, right?

22   A    I believe you.  He didn't share that with me.

23   Q    And she was prescribing him some fairly, some

24   fairly significant medications for depression and for

25   sleep issues, right?  Did you know that?

SENTENCING -- July 12, 2019 (Afternoon)

1    A    All I knew is that he was currently being

2   treated by a psychiatrist.  He didn't disclose any

3   specifics.

4    Q    You didn't see in the file that he was taking

5   Effexor and Ambien?

6    A    I don't recall seeing that.  No.

7    Q    You could also have encouraged Mr. Christensen

8   to seek additional care specialized towards suicide, risk

9   of suicide or homicidal ideation; could you not?

10    A    Well, I'm curious what that means to you.  I

11   think seeing --

12    Q    What does it mean to you?

13    A    -- how a therapist would -- all mental health

14   therapists would touch on those issues, and we did

15   encourage him to work with an individual therapist.

16    Q    Well, but he was sent to a, a substance abuse

17   treatment facility, right?  Rosecrance is primarily

18   devoted to substance abuse treatment?

19    A    Rosecrance offers a variety of services, and I

20   know this because I worked at the agency prior to it

21   being bought by Rosecrance; but it includes a crisis

22   team, psychiatrists, mental health counselors.  There is

23   a recent increase in their focus on substance abuse

24   treatment; that's true.  But to --

25    Q    And that's why he was referred there, to -- was

SENTENCING -- July 12, 2019 (Afternoon)

1  for help with his abstinence, right?

2      A    Well, I -- that was his main self-reported

3  concern, and I think -- I can't speak to what Jennifer

4  told him; but the thinking behind Rosecrance as a

5  referral option was that, in addition to substance abuse

6  treatment, they did have other options, psychiatry and

7  crisis staff and --

8      Q    But he was -- he was instructed by the email to

9  go there to get treatment for alcohol, right?

10     A    I would need to see the email to see what it

11  says exactly.

12     Q    That's all right.

13          After -- you could -- one other thing:  You

14  could have followed up when he failed to come in for his

15  second appointment; could you not?  You could have called

16  him or emailed him?

17     A    I could have.  Yes.

18     Q    After -- let me -- on June 7, 2019, a lawsuit

19  was filed against you --

20          MR. NELSON:  Objection.

21     Q    -- and Jennifer Maupin --

22          MR. NELSON:  Sidebar, Your Honor.  We've

23  covered this.

24          MS. BRAIN:  The Court said I couldn't introduce

25  the complaint, but I could question about it.

SENTENCING -- July 12, 2019 (Afternoon)

1          MR. NELSON:  If there was proof of bias, which
2    there hasn't been.  This is, this is completely out of
3    line.
4          THE COURT:  No.  I'm going to allow a question
5    of his awareness and whether or not it's affected his
6    testimony.
7          Go ahead, Ms. Brain.
8    BY MS. BRAIN:
9       Q    A lawsuit was filed against you and Jennifer
10   Maupin in Federal Court in Urbana; is that right?
11      A    Yes.
12      Q    Filed on behalf of the Estate of Yingying
13   Zhang?
14          MR. NELSON:  Objection.
15          THE COURT:  Well, this preliminary -- it's
16   going to be allowed to ask a couple of questions here.
17          Go ahead.
18   BY MS. BRAIN:
19      Q    It was filed on behalf of the Estate of
20   Yingying Zhang?
21      A    That's my understanding.  Yes.
22      Q    And it accuses both you and Ms. Maupin of
23   negligence and wrongful death?
24      A    It does.
25      Q    It seeks both compensatory --

SENTENCING -- July 12, 2019 (Afternoon)

1          THE COURT:  Now, we don't need to go into all

2    that.  We're just addressing whether it's affecting his

3    credibility or bias.

4          MS. BRAIN:  I think that's an inference for the

5    jury, Your Honor, but that's all my questions.

6          THE COURT:  All right.

7          MS. BRAIN:  Thank you.

8          THE COURT:  Thank you.

9          MR. NELSON:  Mr. Kelly, can I please have the

10   ELMO?

11         COURTROOM DEPUTY:  Yes, sir.

12         MR. NELSON:  Thank you.

13           CROSS-EXAMINATION BY MR. NELSON:

14   Q    Good afternoon, sir [providing document].

15   A    Thank you.

16   Q    Now, a moment ago, Ms. Brain was asking you

17   about an email, and you asked to see it; and she said,

18   "No, that's okay."

19         Do you recall that?

20   A    I do.  Yes.

21   Q    Okay.  I'm going to go ahead and put it on the

22   ELMO for you.

23         And so you see there where I've highlighted?

24   It says that "individual therapy is available at

25   Rosecrance"?

SENTENCING -- July 12, 2019 (Afternoon)

1    A    Yes.

2    Q    Is that what you were referencing?

3    A    Yes.

4    Q    Okay.  Now, you testified a moment ago about

5    not wanting to sabotage your rapport --

6    A    Yes.

7    Q    -- with Mr. Christensen.

8         Why was that important?

9    A    Given that I was attempting to assess for risk,

10   I wanted to make him feel as open and invite him to share

11   things with me; and a way to do that is to build a

12   rapport, a sense of trust, and -- welcoming so that he

13   might share some of his darker thoughts he might be

14   having.

15   Q    Okay.  And is confidentiality a part of that,

16   in your experience?

17   A    Absolutely.

18   Q    Why is that?

19   A    Well, it's part of our professional ethics;

20   and, without confidentiality, clients might be hesitant

21   to, to share things.

22        And I did review confidentiality with Brendt

23   Christensen before I started assessing for risk, just to

24   clarify with him that what he shared with me was between

25   us within these specific parameters, meaning if he

SENTENCING -- July 12, 2019 (Afternoon)

1    identified a specific risk of harm to someone else --

2    just the usual professional spiel that I give.

3          Q    Okay.  And am I understanding correctly that

4    you felt that going to him and saying, "Hey, I'd like to

5    take what you told me and go talk to the dean and a few

6    other people about it," you thought that that might

7    interfere with his belief that what he told you was

8    confidential?

9          A    I did.

10          Q    Okay.

11          A    Yes.

12          Q    And you didn't take any additional steps in

13    that regard; is that right?

14          A    Towards pursuing that?  No.

15          Q    Now, I want to go back to March 30th.  I

16    believe you wrote that the defendant appeared to you with

17    a calm demeanor; is that right?

18          A    That's correct.  Yes.

19          Q    Okay.  And I think you wrote "invasive eye

20    contact."  What does that mean?

21          A    More intense eye contact than usual.  Maybe a

22    bit intimidating.

23          Q    Okay.  And he was forthright and credible?

24          A    Yes.

25          Q    Did you think he was being honest with you?

SENTENCING -- July 12, 2019 (Afternoon)

1      A    Yes.

2      Q    Okay.  And as a counselor, is it important for

3  you to take your client at their word?

4      A    It is, --

5      Q    Why?

6      A    -- yeah.

7           I think a part of building that rapport that's

8  so important to the therapeutic process is to create an

9  environment where there's trust; so that's not to say

10  that we can't ask clarifying questions if we suspect

11  dishonesty, but we try to engender an atmosphere of

12  sharing.

13      Q    Okay.  And when a client comes to you and

14  they're sharing with you their thoughts or their concerns

15  or their feelings, are you trying to create a treatment

16  plan based on what they say or based on what you imagine

17  they mean, even though they're telling you how they feel?

18      A    Based on what they say, yes.

19      Q    And you testified to this also, but the

20  defendant said he hadn't used alcohol for a month?

21      A    Yes.

22      Q    And that he hadn't used prescription drugs for

23  two weeks?

24      A    That's correct.

25      Q    And he denied any past suicide attempts?

SENTENCING -- July 12, 2019 (Afternoon)

1      A      That's correct.

2      Q      Okay.  He didn't tell you about jumping out of

3   a window four feet and running into a van?

4      A      No.

5      Q      Okay.  Denied current or past suicidal plans or

6   intent?

7      A      That's correct.

8      Q      Okay.  And agreed to call the crisis line if he

9   had any problems?

10     A      Yes.

11     Q      Okay.  Based on what he told you on March 30th,

12   did you feel that the defendant was a present risk for

13   suicide?

14     A      No.

15     Q      Now, you were asked also whether the defendant

16   told you he was ruminating about murder.  Do you recall

17   that?

18     A      Yes.

19     Q      Okay.  And he did tell you he had a fascination

20   with suicide -- serial killers?

21     A      He did say that.  Yes.

22     Q      Okay.  I believe your notes indicate that he

23   was thinking about it in an analytical fashion?

24     A      Yes.  He spoke of it in terms of as an

25   abstract, intellectual curiosity of his.

SENTENCING -- July 12, 2019 (Afternoon)

1      Q    Okay.  And you asked him if he had specific
2  plans to commit a murder, didn't you?
3      A    Multiple times, yes.
4      Q    Okay.  And what did he say?
5      A    He said "no."  He said, "I have no desire or
6  intentions to hurt anybody."  He, multiple times,
7  described it as a fantasy that he would never act upon.
8      Q    Okay.  And did you ask him if he had specific
9  intent -- well, in fact, you just touched on this, but he
10  denied having intent to act on those plans as well?
11      A    Yes, both currently and in the past.
12      Q    All right.  And he denied having any violent
13  urges?
14      A    Yes.  I wanted to assess for his ability to
15  control his behavior; and so I asked if he ever felt an
16  urge to hurt somebody or felt as though he might lose
17  control, and he said no.
18      Q    Okay.  And with regard to the items that you
19  were asked about for transporting and disposing of a
20  body, the defendant told you that he had disposed of
21  those, right?
22      A    He did.
23      Q    Okay.  And based on that, did you feel like he
24  was a risk for acting on any homicidal ideation he might
25  be having?

SENTENCING -- July 12, 2019 (Afternoon)

1        A     To clarify, I asked him, "So, you got rid of
2    those"?
3               He said, "Yes."
4               I asked if he intended to ever buy something
5    like that again.
6               He said, "No."
7               And, yes, I asked if he had ever felt that he
8    might act on any of these fantasies of hurting people,
9    and he said "no" multiple times.
10       Q     Okay.  And you took him at his word?
11       A     I did.
12       Q     Okay.
13       A     Yeah.  I had no reason to suspect he was lying
14    to me.
15       Q     Okay.  And you said something that I wrote down
16    when Ms. Brain was asking you about a variety of factors.
17    You said there are "lots of risk factors."
18       A     There are.
19       Q     Okay.  When you're talking to a client, what
20    risk factors are you thinking about?  How do you go about
21    determining if the risk exists?
22       A     To me, the most important risk factors are:
23    Are they currently having thoughts of hurting themselves
24    or anyone else?
25               If not currently, when was the most recent time

1  they had those thoughts?

2           Did they ever have intentions to act on those

3  thoughts?

4           Have they ever made plans to do so or taken

5  steps towards doing so?

6           And are they experiencing any other psychiatric

7  symptoms that might lead to them losing control of their

8  behavior?

9      Q    Okay.  And based on any of those risk factors,

10 were you concerned about Brendt Christensen on March 30,

11 2017?

12     A    I was not.  No.

13     Q    Now, you were also asked about this document.

14 Do you recall that, --

15     A    Yes.

16     Q    -- the Campus Violence Prevention Plan?

17     A    Yes.

18     Q    Now, if we look here -- this is on page 4, and

19 there are some factors that begin at the bottom of the

20 page.  You were asked about those.  Do you recall that?

21     A    I do.

22     Q    Okay.  And then the list continues at the top

23 of page 5.  Do you see that?

24     A    Yes.

25     Q    Okay.  Well, you were asked about all seven

1  factors, but you weren't asked about this portion that

2  I've highlighted.  It says, "Cases are not necessarily

3  activated on the basis of a single behavioral threshold.

4  They are evaluated for activation based upon the

5  legitimacy and imminence of the threat, as well as the

6  level of risk posed to an individual and/or a broader

7  segment of the campus community."

8          Would you please explain to the jury what that

9  means?

10     A    Sure.

11         So I think, with risk factors, we can't take

12  them in isolation and say *If this thing is present, then*

13  *that means this person is at a -- we can predict that*

14  *they're going to do any particular thing.*  Human behavior

15  is complicated, and these things don't exist in a vacuum;

16  so we need to look at the context, multiple factors, and

17  I think the spirit of this passage is that we can't take

18  the presence of one of those things listed there as

19  evidence that a person is necessarily going to pose a

20  threat of harm.

21     Q    Okay.

22     A    And I should add:  The words "imminence" and

23  "threats" are important also when assessing for risk.

24  "Imminence" means present risk; it's going to happen

25  today, or soon.

SENTENCING -- July 12, 2019 (Afternoon)

1           And then specificity of threats.  So if a

2    person's having thoughts of harming someone else,

3    something we would ask about is:  "Anyone in particular

4    that you had thought about in harming?  Any targets?"

5           And I did ask Brendt Christensen that, and he

6    denied having ever -- currently or in the past --

7    specifically targeting someone he would want to harm.

8       Q    Okay.  So would it be safe to say that the

9    credibility of the risk is important?

10      A    Yes.

11      Q    Okay.  You have to determine -- you know, not

12   all, not all risks are created equal?

13      A    That's correct.

14      Q    Now, Mr. Christensen never came back to meet

15   with you; is that right?

16      A    That's right.

17      Q    Okay.  But he did take another CCAPS on

18   April 6th; is that right?

19      A    I learned that later.  Yes.

20      Q    Okay.  I'm going to put this on the screen.

21   This is page 47 of the Defendant's Exhibit --

22           MS. BRAIN:  I'm going to object to this, Your

23   Honor.  The testimony has been that Mr. Christensen never

24   went back; so whatever this document is, it's not

25   something that can be connected to Mr. Christensen.

SENTENCING -- July 12, 2019 (Afternoon)

1          MR. NELSON:  Well, it has his name on it --

2          THE COURT:  Well, let's -- hold on, Mr. Nelson.

3   I'm going to give you an opportunity to identify it, if

4   you can, and lay the foundation for it; and then I'll

5   make that determination then.

6          MR. NELSON:  Sure.

7          This is from the defense exhibit which they

8   handed to me, which is the file for Brendt Christensen,

9   and it's page 47 of the defendant's exhibit.

10         MS. BRAIN:  The witness just testified that Mr.

11  Christensen never came back on April the 7th; so that is

12  not admissible, whatever it is.

13         THE COURT:  Well, just tell me --

14         MR. NELSON:  It's been admitted, Judge.  It's

15  their exhibit; it's a page of their exhibit.

16         THE COURT:  Well, if it's been admitted, all

17  right then; you can ask about it.  We'll see what the

18  witness knows about it.  Go ahead.

19         MR. NELSON:  So, --

20         THE COURT:  Ms. Brain, you're not disputing it

21  was admitted; the exhibit was admitted?

22         MS. BRAIN:  It was included in what we got from

23  the Counseling Center, so we put it in the whole packet.

24  Yeah.  But --

25         THE COURT:  It's --

SENTENCING -- July 12, 2019 (Afternoon)

1           MS. BRAIN:  -- it's completely irrelevant.

2           THE COURT:  Okay.

3           MR. NELSON:  Well, that --

4           THE COURT:  We don't know that.  That's a

5    separate matter.  Go ahead.

6    BY MR. NELSON:

7        Q    That's Brendt Christensen's name; you see that?

8        A    I do.

9        Q    Okay.  He's the defendant in this case?

10       A    Yeah.

11       Q    And that's the date, April 6th?

12       A    Yes.

13       Q    That's his age, 27?  That was his age at the

14   time you knew him, right?

15       A    Yes.

16       Q    And that's his student ID number?  That's the

17   same student ID number he had before?

18       A    Yes.

19       Q    All right.  And this says:  *Baseline 3/21/2017,*

20   and that's the date -

21           MS. BRAIN:  I'm going to object to him going

22   into the details without explaining how Mr. Christensen

23   could have filled this out when he never went back to the

24   Counseling Center.

25           THE COURT:  Well, I think the problem is that

SENTENCING -- July 12, 2019 (Afternoon)

1   this is your exhibit.  You asked to have it admitted.  It

2   was admitted.  It's in evidence.

3           I believe that the government can cross-examine

4   on it to the extent the witness knows what it is.

5           MS. BRAIN:  Well, I don't think anybody knows

6   what it is, Your Honor.  That's the point.

7           We admitted it just simply for completeness so

8   we're not leaving pages out; but I would withdraw that

9   page because, like I said, it has no relevance, and it

10  was my mistake to --

11          THE COURT:  Well, --

12          MS. BRAIN:  -- include it along with everything

13  else.

14          THE COURT:  -- I'm just not sure there's any

15  rule of law that allows you to withdraw certain things

16  after they've been admitted under these circumstances.

17          So it's been admitted in your case.  I'm going

18  to allow Mr. Nelson some leeway here on it.

19          If there's a relevance argument, we can address

20  that.

21          MR. NELSON:  Thank you, Your Honor.

22  BY MR. NELSON:

23      Q   So you're aware of what a CCAPS is, though,

24  right?

25      A   I am.

SENTENCING -- July 12, 2019 (Afternoon)

1        Q    All right.  And this says "March 21, 2017."

2   That was the first day that the defendant met with Carin

3   Molenaar.

4        A    Yes.

5        Q    Do you recall that?

6        A    Yes, I do.

7        Q    You reviewed her notes?

8        A    Yes.

9        Q    And this says, "4/6/2017"?

10       A    Yes.

11       Q    And do you see over here these last two, that's

12   homicidal ideation and suicidal ideation, right?

13       A    Yes.

14       Q    Okay.  And scores for those are what?

15       A    Zeroes.

16       Q    All right.  Is that a high risk?

17       A    That's the lowest possible risk.

18       Q    Okay.  And do you see how the defendant's

19   scores for all of the other factors have either stayed

20   the same or gone down, with the exception of "eating

21   concerns"?

22       A    I would say they went down significantly.

23       Q    Okay.  Now, this lower portion, this is based

24   on specific answers to questions in the CCAPS; is that

25   right?

SENTENCING -- July 12, 2019 (Afternoon)

1    A    Yes.

2    Q    What did he write for "I feel worthless"?

3    A    Zero.

4    Q    What did he write for "I feel helpless"?

5    A    Zero.

6    Q    What did he right for "I have thoughts of

7  ending my life"?

8    A    Zero.

9    Q    Did that indicate to you a high level of

10  suicide risk?

11    A    No.  It indicates a very low risk.

12    Q    And for hostility, what does he write for "I am

13  afraid I may lose control and act violently"?

14    A    Zero.

15    Q    What does he write for "I have thoughts of

16  hurting others"?

17    A    Zero.

18    Q    Does that indicate to you a high risk of

19  harming others?

20    A    No.  It's the lowest possible risk.

21    Q    Okay.  Mr. Miebach, are you able to read minds?

22    A    No.

23    Q    Can you tell what someone's going to do other

24  than what they tell you?

25    A    Absolutely not.

SENTENCING -- July 12, 2019 (Afternoon)

```
 1        Q     Is it -- would it be accurate to say that your
 2   goal in working as a licensed clinical social worker is
 3   to help people?
 4        A     Yes.
 5        Q     If the defendant had posed what you believed to
 6   be a risk, would you have tried to help him?
 7        A     Absolutely.
 8        Q     Did you try to help him?
 9        A     I did.
10        Q     Do you believe that you're responsible for the
11   defendant's intentional actions?
12        A     Absolutely not.
13              MR. NELSON:  No further questions.
14              THE COURT:  Ms. Brain, any redirect?
15              MS. BRAIN:  Just briefly, Your Honor.
16                 REDIRECT EXAMINATION BY MS. BRAIN:
17        Q     So you say Mr. Christensen did come back for
18   your appointment on April the 7th?
19        A     Well, I can clarify.  On that date, I was under
20   the impression he did not show up because he was never
21   marked as present.  So about 15 minutes past the hour I
22   was supposed to meet with him, I checked the lobby; and
23   he wasn't there, so I was under the impression he
24   "no-showed."  Yes.
25              And then I later found out that he must have
```

SENTENCING -- July 12, 2019 (Afternoon)

1  shown up that day and --

2       Q    So he came to you again for help on April

3  the 7th, correct?

4       A    This is highly unusual for someone to,

5  apparently, show up, fill out a form, and leave; but that

6  seems to be what occurred here.

7       Q    What occurred here is that nobody went to go

8  and get him, right?

9       A    I was not under the impression he was there at

10  all that day.  I found out later that this was completed.

11      Q    Right.

12           So, but if he was there -- and we don't know

13  whether he was or not -- but if he was, then nobody went

14  to get him, and he left, right?

15      A    If I had an awareness that a client showed up

16  and then left, then I would have taken steps to try to

17  contact the person.

18      Q    No.  I'm not saying you were aware.  I'm just

19  saying that that's clearly -- that may or may not have

20  been what happened?

21      A    He was never marked as present by our reception

22  staff, so I don't know what happened that day.

23      Q    Okay.  Now, you said that an important factor

24  for the risk assessment would be if a person had made

25  plans to commit an act such as a homicide, correct?

SENTENCING -- July 12, 2019 (Afternoon)

1        A    Yes.

2        Q    Okay.  And were you aware he told Ms. Molenaar

3   during the interview that he thought he knew how to do

4   homicide already?

5        A    No.

6        Q    Were you aware that he said that it wouldn't be

7   hard?

8        A    No.

9        Q    That he had made a plan to do it?

10       A    No.

11       Q    Did you know that?

12            And that his plan was pretty far along?

13       A    I was not aware of that.

14       Q    Okay.  And you were aware he had actually

15   purchased things that he would use in committing a

16   murder, right?

17       A    He admitted to me having purchased, as part of

18   a fantasy, items that could be used in the transport and

19   disposal of a body.  Yes.

20       Q    And you said that he had never actually

21   identified -- you said he'd never identified a specific

22   person as a victim, right?

23       A    Yeah.  He denied ever having one.

24       Q    Right.

25            Were you aware that he told Ms. Molenaar that

SENTENCING -- July 12, 2019 (Afternoon)

1    there was a type of person who he would select as a

2    victim?  He had a type?

3        A    No.

4        Q    Okay.  Were you aware that he told Ms. Molenaar

5    he told his wife about these thoughts, and it terrified

6    her?

7        A    I was not aware of that specifically.  No.

8        Q    Okay.  He said -- he told her he didn't want to

9    hurt anyone, same as he told you, right?

10       A    He told me that.  Yes.

11       Q    Yeah.

12            But he still had -- and this is to

13   Ms. Molenaar -- but he still had these thoughts of

14   homicide?

15       A    All I can speak to is the responses I received

16   and, to the questions I asked him.

17       Q    Fair enough.

18            Mr. Nelson showed you the Campus Violence

19   Prevention Plan that lists seven thresholds of

20   unacceptable conduct, according to the University, right?

21       A    I saw that.  Yes.

22       Q    And he also had you read the part where it says

23   that one example of that would not necessarily be enough

24   to open a case, right?

25       A    Yes.

1        Q     If a person had three, it would be somewhat of

2    a different situation; would you agree?

3        A     It would be a different situation.  Yes.  I

4    can't speak to how the Behavioral Intervention Team --

5    what they decide to activate or not.

6        Q     Fair enough.

7              You said that if you asked Mr. Christensen, or

8    any student, to sign a release of information to give you

9    permission to share information that that might make him

10   think that what he told you was not confidential.

11             Do I have that right?

12       A     Well, it's clear that it's a waiver of

13   confidentiality.

14             What I'm saying is a release of information for

15   the Behavioral Intervention Team specifically, I think,

16   would be alarming to a student, considering that on that

17   team sits the director of the Disciplinary Office and

18   things of that nature.

19       Q     Right.

20             But you're asking for permission again?  I

21   mean, you'd be asking *May I?*  Right?

22       A     Yes.  But the act of asking for permission for

23   something is significant and I do think could sabotage

24   rapport.

25       Q     But you -- what you said was that it would make

SENTENCING -- July 12, 2019 (Afternoon)

1  him think that what he told you was not confidential,

2  right?

3      A    Well, perhaps I should clarify.  My --

4      Q    Well, that is what you testified to, though,

5  right?

6      A    I can't remember exactly what I said.

7      Q    Okay.  But the very fact of giving somebody a

8  release form and saying *Would you sign it?* conveys *What*

9  *you told me is absolutely confidential.  Only if you give*

10 *me your express permission can I share it with someone*

11 *else,* right?  Isn't that fair to say?

12     A    Yes.

13     Q    Okay.  Could I have the email, please.

14          Okay.  I'm showing you the email that Mr.

15 Nelson showed you a moment ago.  He asked you about what

16 it said for individual therapy, and then he removed it

17 rather quick.

18          What it actually says is, "individual therapy

19 with a focus on maintaining abstinence"; did it not?

20     A    "If you choose" is what it says.

21     Q    Right.

22          But the individual therapy that he was told

23 that he could choose was "with a focus on maintaining

24 abstinence"?

25     A    That's what it says.  Yes.

SENTENCING -- July 12, 2019 (Afternoon)

1    Q    So it's all about alcohol treatment, right?

2    That's what "abstinence" is referring to, --

3    A    It is.

4    Q    -- is staying away from alcohol?

5    A    Substance abuse and mental health are so

6    intertwined that it's not uncommon for a therapist to

7    address multiple things, --

8    Q    Okay.

9    A    -- and I think --

10   Q    I just wanted to say that what you said -- or

11   what Ms. Maupin said in the email that you were copied on

12   says "individual therapy with a focus on maintaining

13   abstinence."

14   A    It does say that.

15        MS. BRAIN:  Thank you.

16        That's all I have, Your Honor.  Thank you.

17        THE COURT:  Mr. Nelson, anything?

18        RECROSS-EXAMINATION BY MR. NELSON:

19   Q    Did you see the end of that email where it says

20   they have "a comprehensive menu of options available"?

21   A    I saw that.  Yes.

22   Q    Okay.  Now, if I come to you as your client and

23   I say on Monday, let's just say, that I have thoughts of

24   suicide and I have thoughts of homicide; and I come back

25   on Friday and I say I don't have those thoughts anymore,

SENTENCING -- July 12, 2019 (Afternoon)

```
 1    is that significant to you?

 2         A    Yeah.

 3              MR. NELSON:  Nothing further.

 4              THE COURT:  Ms. Brain, anything?

 5              MS. BRAIN:  No, thank you, Your Honor.

 6              THE COURT:  Thank you, sir.  You may step down.

 7    You're free to go now.

 8              (Witness Miebach is excused, 2:52 p.m.)

 9              THE COURT:  Why don't we take our afternoon

10    break, 15 minutes, and then we'll resume with the last

11    witness for the week.

12              (Jury absent, 2:52 p.m.)

13              THE COURT:  All right, 15.

14              (Recess, 2:53 p.m. to 3:08 p.m.)

15              THE COURT:  All right.  Are we ready to resume?

16              MS. POLLOCK:  We are, Your Honor.

17              THE COURT:  All right.  Do you believe that we

18    can get Dr. Zoline on and off today?

19              MS. POLLOCK:  I do, Your Honor.

20              THE COURT:  Okay, very good.  Let's have the

21    jury.

22              (Brief pause in proceedings.)

23              THE COURT:  Shut the door and hold them for

24    just one second; let me ask a question here.

25              So that I can inform the jury, what should we
```

SENTENCING -- July 12, 2019 (Afternoon)

1   expect for Monday, and what are your thoughts about when

2   you would finish your case?

3           MS. POLLOCK:  I think very likely we will.

4           THE COURT:  Okay.

5           MS. POLLOCK:  We should have one longish

6   witness plus four short ones in the morning and then two

7   in the afternoon; so I don't think there's any way we

8   won't.

9           THE COURT:  Okay.

10          MS. POLLOCK:  But now that I've said that, I

11  mean, don't hold me to it.

12          THE COURT:  I'm not.

13          But then you will discuss whether you have

14  rebuttal and what it looks like.

15          MR. NELSON:  Yes, Your Honor.

16          THE COURT:  Very good.  All right, thanks.

17              (Jury present, 3:10 p.m.)

18          THE COURT:  All right, thank you.  Please be

19  seated.

20          All right, ladies and gentlemen, we're still on

21  track.  It is likely that the defense may finish their

22  case on Monday.  If not, it will be first thing Tuesday

23  morning.  Monday, then, we would know if the government

24  would have any rebuttal.  If that were to occur, it will

25  occur Tuesday.  If it won't occur, then we'll address the

SENTENCING -- July 12, 2019 (Afternoon)

1  scheduling; but we're still on this, the same schedule.

2  All right?

3          Ms. Pollock, your next witness, please.

4          MS. POLLOCK:  Dr. Susan Zoline, Your Honor.

5          THE COURT:  All right.  Dr. Zoline, you want to

6  come forward, please; and as you approach, if you'll just

7  make a brief stop, raise your right hand, and be sworn.

8          (Brief pause in proceedings.)

9          **SUSAN ZOLINE, sworn, 3:11 p.m.,**

10         **DIRECT EXAMINATION BY MS. POLLOCK:**

11     Q    Good afternoon.

12     A    Good afternoon.

13     Q    Can you please state your name and spell your

14  last name for the court reporter?

15     A    Sure.  Dr. Susan Zoline, Z-- as in

16  zebra --o-l-i-n-e.

17     Q    Dr. Zoline, are you currently employed?

18     A    Yes, I am.

19     Q    Where at?

20     A    Adler University in Chicago.

21     Q    And what position do you hold at Adler?

22     A    I am a clinical faculty member in the doctoral

23  program in clinical psychology.

24     Q    Can you describe what your duties are --

25     A    Sure.

SENTENCING -- July 12, 2019 (Afternoon)

1    Q    -- in that position?

2    A    I teach graduate courses, including

3    professional ethics.  I oversee dissertation research,

4    and I contribute to the overall committees and

5    functioning of the university.

6    Q    Okay.  Prior to working at Adler University,

7    where were you employed?

8    A    I was employed at the Illinois School of

9    Professional Psychology at Argosy University, Chicago,

10   for 30 years.

11   Q    And what was your position there?

12   A    My last position was full professor in the

13   doctoral program in clinical psychology.

14   Q    Okay.  And did you have similar duties to those

15   that you currently hold?

16   A    Yes.

17   Q    Okay.  Let's talk a little bit about your

18   formal education.

19   A    Uh-huh.

20   Q    Did you receive an undergraduate degree?

21   A    Yes, I did.  I have a bachelor's degree in

22   psychology from the University of Michigan, 1975.

23   Q    Okay.  And any further education after that?

24   A    I have a Master's Degree in clinical psychology

25   from DePaul University in 1978 and a Doctorate Degree in

SENTENCING -- July 12, 2019 (Afternoon)

1    clinical psychology from DePaul University in 1981.

2         Q     Okay.  In addition to your doctorate, do you

3    hold any professional licenses in the State of Illinois?

4         A     Yes.  I am licensed as a clinical psychologist

5    in the State of Illinois.  I have been since 1982 or '3.

6         Q     Okay.

7         A     '83, I believe.

8         Q     Do you hold, have any professional affiliations

9    or associations in which you've been involved in?

10        A     Yes.  I've been a member of the American

11   Psychological Association throughout my career.  I've

12   been a member of the Illinois Psychological Association

13   throughout my career.  I have been a member of the

14   Illinois Psychological Association Ethics Committee for

15   approximately 20 years and have been the co-chair of the

16   Ethics Committee for, since 2010.

17             I also have, for the past two years, served as

18   the Academic Section Chair, which means that I also

19   represent academic psychologists throughout Illinois.

20        Q     Can you describe a little bit about what your

21   duties are as the co-chair of the Ethics Committee --

22        A     Sure.

23        Q     -- for the Illinois Psychological Association?

24        A     Our committee provides education and

25   consultation to psychologists throughout the state.  We

SENTENCING -- July 12, 2019 (Afternoon)

```
 1   provide regular education.  We take turns consulting when
 2   psychologists call with ethics dilemmas, and we work in
 3   collaboration with a mental health attorney.
 4        Q    Okay.  Do you have any clinical experience as a
 5   psychologist?
 6        A    Yes, I do.  I worked --
 7        Q    Can you describe it?
 8        A    Sure.  I worked from 1981 to 1987 as a
 9   counseling psychologist at the University of Illinois at
10   Chicago Counseling Center.  Subsequently, I had a private
11   clinical practice of my own from 1986 to 1996.  I had
12   prior employment as well, but I think that is most
13   relevant.
14        Q    Okay.  And you have been a teacher for a long
15   time, --
16        A    Uh-huh.
17        Q    -- right?
18        A    Uh-huh [nodding head up and down].
19        Q    Can you describe your teaching experience,
20   please?
21        A    Sure.  My graduate teaching experience?  Sure.
22   My area of specialty is professional ethics.  I have
23   taught coursework in professional ethics continuously
24   during my 30 years of teaching.  I have chaired numerous
25   dissertations, some of which are in the area of ethics.
```

1        I also teach adult development.  I teach

2    coursework in clinical supervision and have served on

3    various committees within the universities that I've

4    worked with.

5        Q     Okay.  Do you consult regularly with any

6    groups?

7        A     Yes, I do.  I also have a private consulting

8    practice, which I've had since 1989, and am frequently

9    called upon to provide informal consultation to private

10   practices, hospitals, clinics around ethical issues that

11   arise in their work and -- specifically relevant to

12   here -- have been invited to provide consultation or CE

13   workshops to College Counseling Centers.

14       Q     And when you say "CE workshop," can you tell

15   the jury what that means?

16       A     Sure.

17             Psychologists are required to obtain a number

18   of continuing education credits to maintain our license.

19   Each two-year cycle, there are three required credits in

20   ethics; and I have been asked to provide those workshops

21   in a variety of settings.

22       Q     In fact, were you just teaching at a workshop

23   earlier this week?

24       A     I returned last evening from Pittsburgh.  I

25   provided continuing education workshops in Ohio and

SENTENCING -- July 12, 2019 (Afternoon)

1    Pittsburgh this week.

2        Q    Have you previously published papers in

3    journals in your field of psychological ethics?

4        A    Yes, I have.  I have published on a variety of

5    topics related to ethics.

6        Q    Okay.  And I believe you said that you consult

7    with University Counseling Centers; --

8        A    Uh-huh.

9        Q    -- is that correct?

10       A    Uh-huh.

11       Q    And can you answer "yes" or "no" for our court

12   reporter, please?

13       A    Yes.  Sorry.

14       Q    She's got to take your response, and it's hard

15   to hear "uh-huh."

16            So when you consult with University Counseling

17   Centers, in what capacity do you try to assist them?

18       A    Sure.  I have been called to consult when a

19   specific dilemma has come up.  I have been called to

20   provide consultation around a high-risk case that has

21   emerged.  And I have been called to provide in-service

22   training to specific Counseling Centers.

23            There also is a consortium of training centers

24   that provide training to doctoral students in psychology

25   in Chicago and have been a keynote speaker at their

SENTENCING -- July 12, 2019 (Afternoon)

1    annual conventions as well.

2         Q    Thank you.

3              MS. POLLOCK:  Your Honor, may I approach?

4              THE COURT:  You may.

5              WITNESS ZOLINE:  Thank you.

6    BY MS. POLLOCK:

7         Q    I've just handed you what's been marked for

8    identification as Defendant's Exhibit Number 143.  Do you

9    recognize what that is?

10        A    Yes.  It's my curriculum vitae.

11        Q    Can you just hold it up and shake it a little

12   bit; see how big it is.

13        A    Oh, sure.  I believe it's about 25 pages.

14        Q    Okay.  And in that curriculum vitae, does it

15   list your publications, --

16        A    Yes, it does.

17        Q    -- teaching workshops provided, --

18        A    Uh-huh.

19        Q    -- and other professional background?

20        A    Conference presentations, uh-huh.

21        Q    And how many pages did you say that was?

22        A    I believe it's about 25.  I don't have numbers

23   on these pages.

24             MS. POLLOCK:  Move to admit 143, Your Honor.

25             THE COURT:  Any objection?

SENTENCING -- July 12, 2019 (Afternoon)

1          MR. MILLER:  No objection, Your Honor.

2          THE COURT:  It will be admitted.

3          MS. POLLOCK:  And if you'd like, you can set

4   that down right in front of you on the stand.

5          WITNESS ZOLINE:  Here?

6          MS. POLLOCK:  There you go.

7          WITNESS ZOLINE:  Okay.

8   BY MS. POLLOCK:

9      Q    So have you ever testified in court before?

10     A    I testified in 2004 and '5 around a case that

11  involved the revocation of a license of a psychologist in

12  the State of Illinois, so it was an Administrative Court

13  hearing through the Licensure Department of a clinical

14  psychologist.

15         MS. POLLOCK:  Thank you.

16         Your Honor, at this time, the defense tenders

17  Dr. Zoline as an expert in clinical psychology with an

18  expertise in professional ethics.

19         THE COURT:  Government wish to be heard?

20         MR. MILLER:  We'll cross-examine, but we have

21  no objection at this time, Your Honor.

22         THE COURT:  All right, very good.  Let's

23  proceed.

24         MS. POLLOCK:  Thank you.

25         THE COURT:  So tendered.

1  BY MS. POLLOCK:

2      Q    Now, you were retained by the defense team in

3  this case, correct?

4      A    Correct.

5      Q    And you were paid for your review of the

6  materials?

7      A    That's correct.

8      Q    Approximately how many hours did you work on

9  your review of the materials?

10     A    There were two phases.  I worked in

11 December/January, initially reviewing documents, and we

12 had phone consultations during that time.  And I believe

13 the total payment for that phase of service was $2,875.

14     Q    Okay.  And for the second phase, have you spent

15 more hours?

16     A    Yes.  I've spent many more hours on the second

17 phase -- of course, including today -- and I'm estimating

18 that, with the wrap-up today, that it will be in the

19 range of 25, but possibly as many as 30 hours.  I haven't

20 completed tabulation because we've had meetings

21 throughout the evenings this week.

22     Q    All right.  Now, you were hired by us for the

23 purposes of looking at the interactions between the

24 employees of the University of Illinois Counseling Center

25 and Brendt Christensen, correct?

SENTENCING -- July 12, 2019 (Afternoon)

1      A      Correct.

2      Q      And you already talked a little bit about your

3  experience with University Counseling Centers.

4      A      Uh-huh.

5      Q      Have you ever worked in one?

6      A      Yes.  As I indicated earlier in my employment

7  history, I worked as a counseling psychologist at the

8  University of Illinois-Chicago Counseling Center from

9  1981 to 1987.

10     Q      And you don't -- I don't want to rehash it all,

11  but you also provided multiple consultations to various

12  universities, particularly in the State of Illinois,

13  correct?

14     A      Yes, in the Chicago area.

15     Q      Okay.  Now, do you recall what materials you

16  reviewed in preparation for your testimony here today?

17     A      Yes.  I reviewed the mental health record of

18  Mr. Christensen.

19     Q      Okay.  And were you also provided with

20  documents that were tendered to you from the University

21  of Illinois?

22     A      Yes.  I also reviewed policy documents

23  regarding procedures at the Counseling Center.

24     Q      Okay.  And did those documents include the

25  Behavioral Intervention Team printout, the Suicide

SENTENCING -- July 12, 2019 (Afternoon)

1    Intervention Team Policy & Procedure, and the Therapeutic

2    Services Manual?

3        A    Yes.

4        Q    Okay.  Now, when was the last time you received

5    a new set of documents to review?

6        A    You emailed me on Saturday and said that you

7    had an additional document, and I reviewed it over the

8    weekend.  And that was the most recent.

9        Q    Okay.  Now, can you -- you did not ever meet or

10   speak with Mr. Christensen, correct?

11       A    I did not.  I have not evaluated him.  My

12   testimony is based on the written record of the

13   Counseling Center.

14       Q    Okay.  And the written record -- by that, you

15   did not review any of the discovery in this case,

16   correct?

17       A    Right.  Correct.

18       Q    So you didn't look at any police reports?

19       A    No.  Correct.

20       Q    And you didn't look at any, like, general

21   health medical records?

22       A    Correct.

23       Q    All right.

24       A    Well, the -- only the treatment at McKinley

25   Center by the psychiatrist.

SENTENCING -- July 12, 2019 (Afternoon)

1      Q     Okay.  Now, in general, what is the purpose of

2    a University Counseling Center?

3      A     Sure.

4            University Counseling Centers provide a variety

5    of services, all of them focused on, really, promoting

6    the success of the student at the University.  They

7    typically provide academic support services/testing to

8    see if there are disabilities that require ADA

9    accommodations, study skills programs, emotional

10   evaluations.

11           Generally, most Counseling Centers today

12   provide very short-term counseling.  It's more of a

13   triage model today, though some long-term counseling is

14   provided.  And they also provide, typically, walk-in

15   crisis counseling, or scheduled crisis counseling as

16   well.

17     Q     Okay.  Now, how -- if you're a student, are

18   there multiple ways that you can get an appointment at

19   the Counseling Center?

20     A     Sure.  You could be referred by someone, a

21   professor who voices concern or you express concern to.

22   You could be referred by someone at the Health Center.

23   In this case, the University has a separate Health

24   Center.  You could be a walk-in client and either call

25   and say, "I'd like to talk to someone."  Or, typically,

SENTENCING -- July 12, 2019 (Afternoon)

1    every Counseling Center, to my knowledge, also has,

2    typically, walk-in hours as well.

3         Q    Okay.  Now, in your experience, do most

4    universities adopt policies on how to deal with

5    psychological issues of their students?

6         A    Absolutely.

7         Q    And what type of issues tend to arise among

8    students and faculty in a university setting?

9         A    Well, they range.  We are seeing more and more

10   severe concerns coming up today.  But on the more benign

11   end, adjustment disorders to college, relationship

12   concerns, home sickness; but all the way up to eating

13   disorders, domestic violence, sexual assault,

14   suicidality, violence concerns, questions about sexual

15   orientation --

16        Q    Safe to say a wide range of --

17        A    A wide range.  In many ways, similar to that

18   seen in a community mental health center.

19        Q    Now, you mentioned violence --

20        A    Uh-huh.

21        Q    -- as one of those things.

22             Are you familiar with any consensus in your

23   field about the best way to prevent violence in a

24   university setting?

25        A    Sure.  The universities have really moved to a

SENTENCING -- July 12, 2019 (Afternoon)

1   threat assessment model.  In fact, an article by

2   Deisinger indicates in their survey that 94 percent of

3   College Counseling Centers in their survey indicated that

4   they use this protocol now which focuses more on

5   prevention of violence rather than only looking at risk

6   factors that assess how to accurately predict violence.

7   We can't accurately predict violence, and it's something

8   that occurs so rarely that it's even more difficult.  So

9   that model is currently what is in place.

10          In fact, here in Illinois, after the tragedy at

11  Northern Illinois University in 2008, a law was passed

12  requiring colleges and universities in Illinois to have a

13  threat assessment protocol in place.

14      Q    Is that the Campus Security Enhancement Act?

15      A    I believe so.  Yes.  I believe that is the

16  exact title.

17      Q    Now, you said "the tragedy at Northern

18  Illinois."  What are you referring to?

19      A    In 2008, there was a student who shot and

20  killed several people.  I believe it was on Valentine's

21  Day in 2008.

22      Q    Thank you.

23          Now, based on your review of the records that

24  were provided to you in this case, did the University of

25  Illinois have policies and procedures that were like the

SENTENCING -- July 12, 2019 (Afternoon)

1    one you just mentioned?

2         A    Yes, they did.

3         Q    Okay.  Now --

4              MS. POLLOCK:  Mr. Kelly, are there copies of

5    admitted exhibits up here?

6              COURTROOM DEPUTY:  Yes.  They should be at the

7    very bottom of the stack --

8              MS. POLLOCK:  Here at the bottom?

9              COURTROOM DEPUTY:  Yes, your stack.

10             MS. POLLOCK:  Thank you.

11             COURTROOM DEPUTY:  You're welcome.

12             MS. POLLOCK:  May I have continuing permission

13   to approach?

14             THE COURT:  You may.

15             MS. POLLOCK:  [Providing exhibit to witness.]

16             WITNESS ZOLINE:  Thank you.

17   BY MS. POLLOCK:

18        Q    I've just handed you what's already been

19   admitted into evidence as Defendant's Exhibit 150.

20             Do you recognize that document?

21        A    Yes, I do.  I've reviewed it.

22        Q    And you said you've reviewed it?

23        A    Uh-huh.

24        Q    And can you tell the jury what it is?

25        A    Yes.  It's a Suicide Intervention Team Policy

SENTENCING -- July 12, 2019 (Afternoon)

1    and Procedure Manual, which reviews protocols in the

2    event that a student expresses suicidal concerns.

3        Q    Okay.  And from the front page of that manual,

4    are you able to tell if it was in existence in some form

5    in 2017?

6        A    Yes.  It indicates here that the first version,

7    1.0, of this document was in 2013; 1.01 in June 2015;

8    1.02 in May 2016; and 1.03 in May 2019.

9             So I would take that to mean that the May 2016

10   version was the one in place at the time.

11       Q    Thank you.

12       A    Uh-huh.

13       Q    Can you please place that to the side.

14       A    Sure.

15       Q    I've just handed you a copy of the 2018 Campus

16   Violence Prevention Plan.

17       A    Uh-huh.

18       Q    I think it's Defendant's 157.

19       A    Correct.

20       Q    And can you flip to page 25 of that document?

21       A    Uh-huh.

22       Q    Now, the front page says "2018."  Can you tell

23   from the amendment list whether or not there was a

24   version of that in effect 2017?

25       A    Sure.  It says 2018 edition.  There was -- an

SENTENCING -- July 12, 2019 (Afternoon)

1   edition 57 was in October of 2016.  Version 58 was in

2   October of 2017, which would have been subsequent to the

3   events that I'm testifying around today.

4         Q     Okay, thank you.  And you may set that to side,

5   also.

6               During your review of the documents provided to

7   you by the University of Illinois, did you also become

8   familiar with something referred to as the "Behavioral

9   Intervention Team"?

10        A     Yes.

11        Q     And can you describe what your memory of that

12  team is and what they do?

13        A     Sure.  My memory is that that team is an

14  interdisciplinary team, made up of professionals who are

15  concerned with potential acts of violence by a student on

16  the university, at the university.

17        Q     Okay.  Now, I want to switch from talking about

18  the policies that you reviewed to talking about Mr.

19  Christensen.

20        A     Okay.

21        Q     So, you were able to review the records of his

22  from the Counseling Center, correct?

23        A     Correct.

24        Q     And are you aware of how he obtained an

25  appointment at the Counseling Center?

SENTENCING -- July 12, 2019 (Afternoon)

1        A    Yes.  He stated that his psychiatrist referred

2    him.

3        Q    Okay.  And are you aware of the purpose of the

4    referral?

5        A    It was specifically focused on drug-alcohol

6    concerns.

7        Q    I've just handed you what's in evidence as

8    Defendant's 154.  Do you recognize that as a copy of Mr.

9    Christensen's records from the University of Illinois

10   Counseling Center?

11       A    Yes, I do.

12       Q    All right.  So, when a person comes to the

13   Counseling Center for the first time, what is the normal

14   practice for what they do at that time?

15            MR. MILLER:  I guess I would just object to the

16   "normal practice" at the University of Illinois

17   Counseling Center.  Maybe she can testify to Counseling

18   Centers in general, but I'm not sure the foundation of --

19            THE COURT:  The question had to do with?

20            MS. POLLOCK:  The question's going to elicit

21   that they fill out an intake form, which I think is

22   pretty standard practice but --

23            THE COURT:  All right.  As long as we're

24   speaking generally and it's standard, go ahead.

25

SENTENCING -- July 12, 2019 (Afternoon)

1   BY MS. POLLOCK:

2       Q    Do you want me to repeat the question?

3       A    Well, I would say that, typically, paperwork is

4   filled out of some kind.

5            In this case, it involved an intake form and

6   some screening measures as well.

7       Q    Okay.  And do you recall looking at the intake

8   form and the screening measure?

9       A    Yes.

10      Q    Okay.  And do you recall what the screening

11  measure was?

12      A    Yes.  The screening measure asks about a number

13  of mental health symptoms that the student is asked to

14  rate on a scale.

15           Shall I read the categories or --

16      Q    Oh, no, you don't have to read them.

17      A    Okay.

18      Q    Is that --

19      A    And there are specific questions in each

20  category as well.

21      Q    All right.  And is that also referred to

22  commonly as a CCAPS-62?

23      A    Correct.

24      Q    And according to the CCAPS-62 in this case,

25  does it appear to you that Mr. Christensen was ranked

SENTENCING -- July 12, 2019 (Afternoon)

1    high in terms of certain risks or low in terms of certain

2    risks?

3         A    There's some of each.

4         Q    Can you go through those --

5         A    Sure.

6         Q    -- and tell us what they are?

7         A    He obtained a score of 94 out of 100 in

8    depression; 92 out of 100 in generalized anxiety; 54 out

9    of 100 in social anxiety; 83 out of 100 in academic

10   distress; 80 out of 100 in eating concerns; 29 out of 100

11   in hostility; 91 out of 100 in family distress; 100 out

12   of 100 in substance use; and an overall distress index of

13   95.

14            There are then separate screening indexes for

15   suicidal and homicidal ideation.

16        Q    All right.  So based on looking at Mr.

17   Christensen's CCAPS-62 profile that was filled out on

18   March 21, 2017, he was over the 90th percentile for

19   depression, anxiety, family distress, and substance abuse

20   and general distress, correct?

21        A    Correct.

22        Q    And would you consider those categories to be

23   elevated?

24        A    Yes.

25        Q    Okay.  You can put that down for a moment.

SENTENCING -- July 12, 2019 (Afternoon)

1    A    Thank you.

2    Q    Before a counselor would have met with Mr.

3  Christensen, is the purpose of this intake paperwork to

4  provide them with background with which to take and move

5  forward in their --

6    A    Correct.

7    Q    -- meeting?

8    A    Correct, so that they have some sense of what's

9  important to focus on.

10    Q    Okay.  Now, you said suicidality and harm to

11  others were also evaluated on the CCAPS?

12    A    Uh-huh.

13    Q    And did Mr. Christensen evidence either of

14  those on this?

15    A    I have to go back to the page to look at the

16  scores.

17    Q    It's on page 6.

18    A    He has a score of 3 out of 4 on homicidal

19  ideation and a score of 1 out of 4 on -- if I'm reading

20  this -- there's no SI underneath.

21         I'm sorry.  Excuse me.  3 out of 4 on suicidal

22  ideation, 1 out of 4 on homicidal ideation.

23         And then in the specific questions, there are

24  some elevated areas as well.

25    Q    Okay, thank you.

SENTENCING -- July 12, 2019 (Afternoon)

1    A    Uh-huh.

2    Q    So, in your experience as a psychologist, --

3    A    Uh-huh.

4    Q    -- having reviewed this standardized form and

5    having noted the percentiles that Mr. Christensen

6    presented, what would be your concern upon meeting with

7    him for the first time?

8    A    I would be concerned that this is a student who

9    was presenting some significant risk and that I would

10   want to evaluate that very carefully.

11   Q    Okay.  What about your review of the intake

12   sheet was significant to you?

13   A    Well, he made some statements that I think were

14   noted.  I presume that's what you are --

15   Q    Yes.  We can talk about that.

16   A    -- inquiring about.

17   Q    Are you talking about his meeting with doctoral

18   intern Carin Molenaar?

19   A    Yes, before -- the intake form you're referring

20   to?

21   Q    Yes.

22   A    Yes.

23        He indicates a number of things that would have

24   stood out for me.  He has a prior -- he endorses a prior

25   psychiatric hospitalization history.

SENTENCING -- July 12, 2019 (Afternoon)

1           He, under "seriously considered attempting

2      suicide," he wrote two to three times.

3           "Purposely injured yourself without suicidal

4      intent," one time.

5           "Considered causing serious physical injury to

6      another person," one time.  And that -- the time

7      dimension is within the past year.

8           "How many times have you had five or more

9      drinks?"  Let's see, I'm sorry.  I'm sorry, it's not that

10     question.

11          "Missed a class due to drinking," ten or more

12     times.

13          He's taking two medications that I would want

14     to be aware of, an antidepressant and a sleep aid.

15          And I don't see it on this form, but he makes a

16     statement -- I need to find it; I know it's on here -- to

17     the effect that alcohol and drug use is a major concern

18     for him.

19     Q    He said "ruining his life," didn't he?

20     A    Yes, "ruining his life."  I just don't see it

21     on this page, but I know it's there.

22     Q    That's okay.  We have already seen it.

23     A    Okay.

24     Q    And you're correct.

25     A    Okay.

SENTENCING -- July 12, 2019 (Afternoon)

1      Q     So the first interview -- the first meeting

2  with the intern, Carin Molenaar, was recorded on video.

3      A     Uh-huh.

4      Q     Is that standard practice in clinical

5  psychology practices?

6      A     She was a student in training, an intern in

7  training; and, therefore, she would be practicing under

8  the license of a licensed psychologist, and it is fairly

9  typical in training settings, for educational purposes,

10  for a student to be video-- audio- or videotaped.  But,

11  of course, it requires client consent.

12      Q     Okay.  And Mr. Christensen did, in fact,

13  consent?

14      A     He did consent.

15      Q     Okay.  So let's talk about some of the written

16  records that were presented through Carin Molenaar.

17            When he met with her, she wrote a report of

18  their meeting, correct?

19      A     Uh-huh.

20      Q     Even though it was a recorded meeting?

21      A     Uh-huh.

22      Q     You have to say "yes" or "no."

23      A     Yes.  I'm sorry.

24      Q     So, you reviewed the notes of Ms. Molenaar, --

25      A     Her summary.

SENTENCING -- July 12, 2019 (Afternoon)

1    Q    -- her recorded meeting?

2    A    Uh-huh.

3    Q    And when you look at those written notes and,

4  about some of the statements that Mr. Christensen made in

5  those written notes, can you direct us to what was the

6  most concerning for you?

7    A    Sure.  And now I see the statement, "Presenting

8  concern.  Brendt reported the following on his

9  paperwork" -- these are her words -- "about why he has

10  come to the Counseling Center.  'Alcohol and drug

11  addiction is ruining my life.'  Reported a history of

12  substance abuse; impacted his relationship with his wife.

13  He identified his wife as his only social support.  He

14  has 'not made friends' by choice because his wife has

15  'always been enough.'"

16         He reported a prior hospitalization experience

17  for alcohol-related anxiety.  He talked about his meeting

18  with psychiatrists.

19         She then assessed for harm to self or others.

20  He reported beginning to experience suicidal ideation two

21  days prior, on Sunday -- she saw him on a Tuesday -- when

22  his wife expressed desire to separate from him in their

23  marriage.

24         He stated that he does not want to live without

25  her.

SENTENCING -- July 12, 2019 (Afternoon)

```
1      Q    Let me ask you -- interrupt you --

2      A    Sure.

3      Q    -- for one second.

4           Why is the issue with his wife significant to

5  you?

6      A    Well, it's a major stress.  She is his only

7  support.  They've been married for nine years.  And she

8  informed him two days prior that she chose to -- would

9  like to separate from him.

10     Q    And so when you see something like that where

11 someone is -- maybe doesn't have good relationships at

12 home or has family problems, why is that important to

13 you?

14     A    She was his only -- per his report, she was his

15 only support.  He reported that he was not close with his

16 family and didn't have other friends.

17     Q    Okay.  Go ahead.  Please continue with the

18 statements that --

19     A    Sure.

20     Q    -- really grabbed your attention.

21     A    He indicated that he has self-injured once

22 approximately six months ago; denied intention to

23 physically hurt himself, saying it was curiosity after

24 seeing people slash their palms in movies.

25          Thoughts of hurting others.  He observed that
```

SENTENCING -- July 12, 2019 (Afternoon)

1  his thoughts of harming others began to increase as he

2  consumed alcohol.

3          He reported that he had developed a

4  "fascination with serial killers and began to experience

5  homicidal ideation and to hypothesize about how he would

6  plan a similar event."  He denied ever identifying anyone

7  specific to hurt.

8          He denied intent, stating he didn't want to

9  hurt anyone, and he didn't want to go to prison.

10          He stated is he is not -- "he stated that he

11  has not experienced homicidal ideation since

12  discontinuing alcohol use approximately a month ago.  I

13  strongly encouraged him not to continue to use alcohol.

14  He agreed that this was his intent."

15          And then with regard to substance abuse, a

16  history of substance abuse, which he began with drinking

17  alcohol in high school.  He stated that at age 19 he was

18  in an accident which resulted in his being prescribed

19  Vicodin; that while he had a supply of Vicodin, he would

20  abuse it by taking it "even when he was not in pain."

21          He stated that most recently his drinking

22  behavior would manifest as three to four days of

23  progressively heavier drinking, beginning with the

24  consumption of beer and progressing to the consumption of

25  rum due to it being "the cheapest liquor he could

SENTENCING -- July 12, 2019 (Afternoon)

1   tolerate" --

2        Q    Let me interrupt you for one second.

3        A    Sure.

4        Q    We're going to take things a little at a time.

5   Okay?

6             So with regards to his alcohol intake, it is

7   noted that his alcohol intake is dangerous for him

8   because of what?

9        A    Well, he stated that he has consumed as many as

10  15 to 20 shots; that he has blacked out; and that one

11  specific concern that the counselor noted is that this in

12  combination with his antidepressant medication could be

13  dangerous.

14       Q    Did he also indicate an increase in those

15  troubling thoughts while drinking?

16       A    Yes.  He indicated with regard to the homicidal

17  thoughts that he linked them to his alcohol use.

18       Q    Okay.  Now, what -- you've mentioned all of

19  this.  What about suicidality?  What caught your eye

20  about suicidality?

21       A    Okay.  And let's see where that -- I don't see

22  the specific statement here that I saw in the transcript

23  of the videotaped session, so I should only comment on

24  what I see here, correct?

25       Q    Well, you can comment on what you recall

1    because you've reviewed everything, right?

2         A    Yes.

3         Q    So what about suicidality do you recall, either

4    from the video or from --

5         A    Yes.

6              MR. MILLER:  I guess "from the video," I assume

7    she means from watching the video?

8              WITNESS ZOLINE:  No.  There was a written

9    transcription of the session.

10             MS. POLLOCK:  The same one that was entered

11   into evidence --

12             MR. MILLER:  But the transcript's not --

13             THE COURT:  Hold on; hold on.

14             Just as long as we first clear it up.

15             So you did not watch the video?

16             WITNESS ZOLINE:  I've watched the video and

17   read the transcript, --

18             THE COURT:  Okay.

19             WITNESS ZOLINE:  -- but I don't have it in

20   front of me.  Sorry.

21             THE COURT:  All right.  Go ahead.

22   BY MS. POLLOCK:

23        Q    Okay.  You can go ahead and answer the

24   question.  What about the suicidality?

25        A    In terms of here, the suicidality is linked to

1  his wife, his only support, indicating that she wants to

2  separate, which, to me, would be a significant concern.

3        In the video session, to my recollection, he

4  expressed, while he said that he would not do it

5  immediately, he recognized that he could do it and was

6  not sure he could -- he stated that he was not sure he

7  could live without his wife.

8        Q    Okay.  Did he ever express that he had thought

9  about how to do it?

10       A    Yes.  He talked about using nitro-- liquid

11 nitrogen and discussed the, understanding the underlying

12 mechanics of that.

13       Q    So he knew how inhaling nitrogen would kill

14 him?

15       A    Yes.  That was what he stated.

16       Q    Okay.  So what else with regards to the

17 homicidal ideation that grabbed your attention?

18       A    Well, what he described is not something you

19 typically hear in a College Counseling Center.

20       Q    Please explain.

21       A    Yes.  While students sometimes make vague

22 comments of, you know, *I'm really angry at this person* or

23 *I want to lash out*, I was really struck in this report by

24 the specificity and the seriousness of it and the fact

25 that he seemed to be concerned with going to prison but

SENTENCING -- July 12, 2019 (Afternoon)

1    did not make a statement specifically saying a

2    recognition that this would be wrong.

3         Q    Okay.  So in all of your years of teaching and

4    counseling and consulting and being an expert in ethics,

5    is this type of a statement one where he's outlined the

6    detail that he had in that moment?

7         A    I would take this as a very serious concern.

8         Q    Okay.  Is it -- you said it was uncommon.  Have

9    you ever had that level of specificity in your practice

10   that you can recall?

11        A    I have overseen students working in College

12   Counseling Centers where there have been serious threats,

13   more typically around rape or domestic violence.  But I

14   would say that this is fairly uncommon.

15        Q    Thank you.

16             Now, what -- when you're evaluating a threat

17   like that, --

18        A    Uh-huh.

19        Q    -- how do you do it?  I mean, what is the

20   standard that you think of?  What do you want to know?

21        A    Sure.

22             So, generally, we think of a 0 to 10 scale.

23   Low risk, medium risk, high risk -- zero, being minimal

24   risk; ten being, perhaps, imminent.

25             Is this evaluated to be low, medium, moderate,

SENTENCING -- July 12, 2019 (Afternoon)

1    high or imminent?  Of course, imminent risk would require

2    action.

3              How well thought out are the plans?

4              Do they have the means?

5              Is this someone who possesses impulse control?

6              Is this someone where there might be a

7    trigger? -- for instance, a cascading down of the marital

8    problems?  alcohol use? -- that might, even though they

9    may generally feel stable, sort of spin out of control?

10             Is there a specific victim?

11             Have there been an escalation of symptoms?

12             There are a number -- are there warning

13   statements made?

14        Q    Okay.  And so of all of those things that you

15   just identified, is it your opinion that the statements

16   that were made to Carin Molenaar triggered that level of

17   need to do a risk assessment?

18        A    Absolutely.

19        Q    And are they serious on that scale?

20        A    I would say that these are serious statements.

21        Q    Okay.  What's the point of doing a risk

22   assessment?  Why do you want to do it?

23        A    Well, you don't want someone to act out

24   violently.  You want to protect any possible victim.

25   And, of course, you want to protect the patient from

SENTENCING -- July 12, 2019 (Afternoon)

1   doing something that would be devastating.

2       Q    Okay.

3       A    Your first duty is protection.

4       Q    Okay.  Now, that priority, is that an ethical

5   obligation that a counselor has?

6       A    I would say absolutely.  We have an ethical

7   obligation to promote well-being and prevent harm.

8       Q    Okay.  Now, you said that on the scale of 0 to

9   10 -- we're not just looking at *yes, you're a risk,* or

10  *no, you're not a risk;* it's a sliding scale up and down?

11      A    Yeah.  Absolutely.

12      Q    And based on what you see here in this report,

13  would you say that we are at 10, imminent threat,

14  hospitalization required?

15      A    Yeah, --

16          MR. MILLER:  Your Honor, I'm sorry.  But I --

17  I'm not sure that the scale -- she's testified where the

18  scale comes from.  Or is this just her scale?  Or is this

19  a -- I'd just like some foundation.

20          THE COURT:  Well, I'll allow Ms. Pollock to

21  inquire or allow you to cross-examine on it.

22          Go ahead.

23          MS. POLLOCK:  I'll ask the question.

24  BY MS. POLLOCK:

25      Q    Would you like to describe your scale and where

1   it comes from?

2        A     Sure.

3             Perhaps I would use a word different than

4   "scale."  I might say that any -- I would imagine that

5   most clinicians would evaluate the severity of the risk,

6   whether they view it as low, medium, moderate, high,

7   imminent.

8             Even if I don't attach numeric ratings to it --

9   and others might use a different numeric rating -- I

10  would consider this to be serious risk.

11       Q     Okay.  And serious; but in your opinion, would

12  it require involuntary, mandatory involuntary

13  hospitalization?

14       A     I don't believe at this moment this would

15  qualify for involuntary hospitalization.

16            What concerns me here is the fluctuating nature

17  of the crisis going on; and I am not, cannot be positive

18  that drinking or substance use will not reoccur.  He said

19  that he had stopped substance use for two weeks.  That's

20  a fairly short amount of time, and he just found out two

21  days ago that his wife wishes a separation.

22            So putting together the vulnerable factors with

23  minimal protective factors -- his wife was his primary

24  protective factor -- that would cause me real concern.

25       Q     Okay.  Now, you said that at this point

SENTENCING -- July 12, 2019 (Afternoon)

1    involuntary hospitalization -- we have not gotten there

2    yet.

3            What are the other options for a counselor in

4    that situation where you have a serious threat, one that

5    you're very concerned about, but you have not reached the

6    level of imminence yet?

7    A     Sure.

8            So you might talk with the client about your

9    recommendation that he consider voluntary

10   hospitalization.

11           You might talk with him about what is called

12   intensive outpatient, sometimes also called a day

13   treatment program, which is a very intensive program,

14   often meeting daily, or at least during the weekdays.

15           You would want to provide a safety crisis plan,

16   which would involve off-hours coverage, an understanding

17   of the importance of calling 911 or going to the

18   emergency room if your symptoms escalate; and you want to

19   build in supports.

20           And, also, I would want to ask for him to -- I

21   would explain to him that I think it would be helpful if

22   he would be open to signing a release form to give me

23   consent to confer with his psychiatrist -- who is

24   overseeing his care, and he was being treated for

25   depression -- for a number of reasons.  One is he states

1  that he was abusing the Ambien sleep aid, and he

2  specifically stated that his physician was not aware of

3  this, his psychiatrist.  Also, perhaps, the

4  antidepressant dose needs to be reconsidered in light of

5  this information.

6      Q    Okay, thank you.

7           So when you look at what happened during that

8  first meeting with Carin Molenaar, --

9      A    Uh-huh.

10     Q    -- what do you identify as steps that were not

11 taken that might have been in Brendt's interests to

12 advise him do?

13     A    Sure.

14          Steps that were not taken.  So, she did

15 indicate that she asked his permission to consult, and

16 she consulted with a member of the Counseling Center

17 staff, and she discussed different treatment modalities.

18          And I don't recall the exact quote -- I don't

19 know that I have it in front me -- but she said something

20 to the effect of, "This is my favorite question.  If you

21 could choose a treatment, what would it be?"  Those were

22 not her exact words.

23          My own feeling is a professional should make a

24 recommendation of a treatment.  If I go to a

25 cardiologist, they don't typically say, "What treatment

SENTENCING -- July 12, 2019 (Afternoon)

1    would you like?"  They would say, "This is what I

2    recommend," or they might say, you know, "We might do

3    surgery, or we might take a cautious approach and

4    medicate."

5            She discussed not engaging in alcohol use or

6    other drug use.  She scheduled an alcohol-drug

7    assessment.  But she specifically said that she wanted to

8    seek out a consult with another staff about alcohol-drug

9    but did not mention that she wanted consultation -- and

10   she's a trainee -- regarding the suicidal or homicidal

11   ideation, which concerned me greatly.

12       Q    Okay.  Why is that a concern?

13       A    She's a trainee, and those are areas of

14   significant risk.

15       Q    Okay.  You were not present for testimony

16   earlier today --

17       A    No.

18       Q    -- that involved the counselors, some of whom

19   are mentioned in these records.

20            If you have an intern who is doing intake work

21   like this, who reviews that work?

22       A    Well, they'd be working under my license; and I

23   care about my license, so I would want to review their

24   work very carefully.

25       Q    Okay.  Now, is it common in Counseling Center

SENTENCING -- July 12, 2019 (Afternoon)

1  situations -- for example, we know that there were

2  multiple counselors who were involved in Mr.

3  Christensen's care.  We had the intern who did the

4  assessment.  He met with Jennifer Maupin for the alcohol

5  and drug, and then he met with Mr. Thomas Miebach for a

6  risk assessment, if I remember correctly.

7       A    And he also received a phone call.  He did not

8  show up -- part of the crisis plan was that he would have

9  a subsequent session, which he did not show up for.  And

10 I believe her name is Felice Li --

11      Q    Felicia Li.

12      A    She called him, so that would have been the

13 fourth person --

14      Q    Fourth person.

15      A    -- that he had contact with.

16      Q    So would it be typical for all of the persons

17 involved in his care to consult with each other and

18 review the records of each other prior to providing

19 additional care for him?

20      A    I would think that would be helpful, yes, a

21 collaborative approach.

22      Q    Right.

23      A    As well as, as I mentioned earlier, ideally

24 consultation with the treating psychiatrist.

25      Q    Okay.  So you're here in court today because we

SENTENCING -- July 12, 2019 (Afternoon)

1    asked you to take a look at what happened here, right?

2         A    Uh-huh.

3         Q    Are you here to discuss whether or not the

4    University broke a law?

5         A    No.  That's not my role.

6         Q    Are you here to discuss whether or not the

7    counselors at the University are liable for anything they

8    ever did?

9         A    No.  That's not my role.

10        Q    So what is your role?

11        A    My expertise is professional ethics;

12   specifically, suicide and violence prevention.

13             My role, as I understand it, is to review the

14   records and to offer commentary on whether I think --

15   what my analysis is of the services that were provided.

16        Q    Okay.  And whether or not Mr. Christensen

17   received services that were --

18        A    Optimal care.

19        Q    Okay, thank you.

20             So, you've, you reviewed the written record

21   from Ms. Molenaar's intake prior to watching the video of

22   her intake, correct?

23        A    Correct.  I received that early on and then got

24   the video more recently.

25        Q    All right.  So for the video, did anything

SENTENCING -- July 12, 2019 (Afternoon)

1   strike you as different watching the video as opposed to

2   reading the cold records?

3       A    Well, in the video, I saw Mr. Christensen on

4   the video.  What struck me in terms of him was that he

5   appeared to me to be open.  He brought these things up in

6   detail.  He seemed genuine.  He seemed cooperative and

7   responsive.  He agreed to be taped.  He agreed to have

8   consults.  He agreed to a follow-up appointment.  He

9   seemed responsive to it.

10      Q    Okay.  And what about anything about how the,

11  how Ms. Molenaar handled his statements about suicidality

12  and homicidality?

13      A    Well, one of the things that was concerning

14  about -- and I don't have the transcript in front of

15  me --

16      Q    That's okay.

17      A    -- I believe it was around -- it was around 46

18  or 50 minutes; he was describing in detail his ideas

19  about homicide.

20           And she stopped him at some point and asked

21  about risk.

22           And he presumed that she meant -- but she said

23  something about suicide, and he said, "You mean about the

24  homicide that I've been talking about?"  Those were not

25  his exact words.

1          And she said, "No, suicide.  You've already

2    indicated that there are protective factors around

3    homicide."

4          And she then went on to talk about suicidality,

5    and what I was struck by was it seemed that the topic of

6    his homicidal ideas was put aside.

7          And then at the end, she asked him permission

8    to seek consultation about alcohol/drugs but did not

9    mention seeking consultation about violence potential.

10   Q    Okay.  And as you said earlier, when someone

11   presents with these types of -- with this type of an

12   intake form and this type of an interview, would that be

13   something you would expect to occur?  That they receive a

14   consult about violence and suicide prevention?

15   A    Absolutely.

16   Q    Okay.  Now, you were aware that, through the

17   records, that Mr. Christensen returned to the Counseling

18   Center on March 30th of 2017, correct?

19   A    Correct.  That was a scheduled appointment with

20   Jennifer Maupin, if I'm pronouncing her name correctly.

21   Q    Correct.

22         And she is the alcohol and drug assessment

23   person?

24   A    Correct.

25   Q    And she -- he did meet with her, correct?

SENTENCING -- July 12, 2019 (Afternoon)

```
 1        A    Correct.

 2        Q    And he also then met again, right after her,

 3   with Thomas Miebach, correct?

 4        A    Yes.  She explained that she only worked part

 5   time, and she specifically thought it would be helpful

 6   for him to get a further consult around the suicide and

 7   violence concerns, --

 8        Q    So, --

 9        A    -- which he agreed to.

10        Q    Right.

11             And he did agree to that, correct?

12        A    Yes.

13        Q    So, between March 21st and March 30th, is there

14   anything that happened in Mr. Christensen's life that

15   would -- that he reported, that would trigger further

16   analysis by someone who's a clinical counselor?

17        A    He reported that his wife had declared to him

18   that she wanted to have an open marriage.

19        Q    And did she also spend the night with another

20   man?

21        A    Yes.  I don't know if it was a man or woman

22   since -- my understanding is she spent the night with

23   someone.  I don't know if it was detailed.

24        Q    Okay.  And why is that important to you?

25        A    Well, he indicated that he hoped to save this
```

SENTENCING -- July 12, 2019 (Afternoon)

1    marriage, and I think that -- I imagine that was

2    upsetting to him, --

3         Q    Okay.

4         A    -- but I can't --

5         Q    So --

6         A    -- put words in his mouth.

7         Q    So why is that a problem if something upsetting

8    happens to a person in between appointments?

9         A    Well, this is a person who is vulnerable right

10   now, who is expressing suicidality and potential

11   homicidal ideas, and this is one more stress.  And,

12   again, the one social support that he identified was his

13   wife, and she has now gone further from a step of *I want*

14   *to separate* to *I'm now involved with someone else.*

15        Q    Okay.  So, I believe that when he met with Mr.

16   Miebach, who is the second meeting of that day, that

17   Mr. Miebach described him as being optimistic and

18   comfortable and that he did not express the same level of

19   suicidal or homicidal ideation.

20             What do you think from reading Mr. Miebach's

21   report regarding that comment?

22        A    I would say that he was commenting on a moment

23   in time.

24        Q    Can you explain that?

25        A    Sure.

1          Suicidal and homicidal ideation is not -- I

2   think you described it before as "all or none."

3   Typically, these are feelings that can persist for long

4   periods of time, that can be activated by any risk, and

5   he is vulnerable.

6          And he may have, in that moment, been feeling

7   better; or he may have been motivated to state that he

8   was feeling better.  But I -- while I would be heartened

9   in that moment, I would not consider that the risk had,

10  was no longer present, by any means.

11         In fact, David Rudd, one of the people who

12  writes typically in this field -- specifically about

13  suicide -- talks about the fluid nature of suicide risk;

14  that it can fluctuate day to day.

15     Q    Okay.  So in other words, would you consider

16  that because Brendt said he was feeling better that day,

17  was his risk gone?

18     A    No, not at all.  In fact, there are cases where

19  people report that and suicide shortly thereafter.

20     Q    Okay.  So the fact that it was a good day, or

21  that he might have reported that it was a good day, does

22  that change your opinion about the need for services

23  following these meetings?

24     A    No.

25     Q    Okay.  What did Brendt tell Mr. Miebach about

1    his homicidal ideation?

2        A    Sure.

3            So, according to the report that Mr. Miebach

4    wrote, he writes, "Client admitted to a recent history of

5    ruminating about murder which began as 'a fascination

6    with serial killers and their methods.'  Client expressed

7    that he found himself thinking often about murder in an

8    analytic fashion, particularly ruminating about how one

9    might go about killing a person and 'get away with it.'

10   Client denied ever having any specific plans or intent to

11   act on these thoughts.  He denied having any violent

12   urges or history of violence toward others."

13           In our profession, we typically use the

14   phrasing "the client denied," meaning we don't really

15   know, but that's what they said.

16           "He denied violent urges.  He admitted to

17   having previously purchased items that would be used 'in

18   the transport and disposal of a body.'"

19       Q    Let me stop there for one second.

20       A    Uh-huh.

21       Q    Because, again, you weren't here, but let's

22   just pretend that if Mr. Miebach had said that because he

23   returned that item and because he expressed that at that

24   moment he was not feeling like he wanted to kill someone,

25   what's your opinion of his risk?

SENTENCING -- July 12, 2019 (Afternoon)

1    A    I would consider his risk still to be

2    significant.  He says that he -- this is a recent

3    history.  He's ruminating.  I would consider that this

4    risk has not evaporated, based on his statement in that

5    day.

6    Q    And, again, in your experience how many -- how

7    common is it for a student to walk into a Counseling

8    Center and say they're ruminating about murder and have

9    bought items to dispose of a victim?

10   A    I would consider that very rare.

11   Q    Thank you.

12        So, what -- what steps did Mr. Miebach take

13   after he met with Brendt on the 30th?

14   A    According to the record, he writes, "Due to

15   client denying any current suicidal or homicidal plans or

16   intent, hospitalization was not appropriate.  He agreed

17   to follow up with this writer for individual counseling

18   until he may be linked to a community provider for

19   long-term services.  Scheduled to return in a week."

20   Q    Okay.  Now, here's my question:  We know that

21   Brendt was basically done with school at this point; that

22   he was almost graduating.

23   A    He had, I believe -- well, when he -- I know

24   that at the point of intake he had seven weeks left, so

25   maybe five weeks left till graduation.

1      Q    Okay.  So why is that a concern for you as a,

2   as a person looking at this record?

3      A    Well, first of all, I'd be thinking about where

4   he might get follow-up services.  He will no longer be

5   eligible, I presume, at the end of the semester since he

6   won't be enrolled as a student, for what I'm guessing are

7   free counseling services and psychiatric services.  I

8   don't know geographically where he'll be living.

9           I would want to ask him about his future plans,

10  including whether he's researched medical insurance, and

11  would want to use that in terms of providing resources

12  that would be useful to him.

13          I believe the record somewhere indicates that

14  he stated he had no future plans and that finances were a

15  concern.

16     Q    Okay.  Was any -- were any of those questions

17  asked?

18     A    No.

19     Q    At any time?

20     A    Well, they're not written here, certainly.  No.

21  There's no indication that they were asked.

22     Q    And they were not asked in the video that you

23  viewed either?

24     A    No.

25     Q    So, when Mr. Miebach is done meeting with him,

SENTENCING -- July 12, 2019 (Afternoon)

1    what does the Counseling Center do with Brendt after

2    these, the series of three meetings?

3         A    Well, it states here that, "Following this

4    meeting, this writer consulted with Clinical Director

5    Dr. Bill Roberts to inform him the situation," which I

6    took to mean that Mr. Miebach recognized the risk

7    involved in this.

8              According the record, he was scheduled to

9    attend a session, a follow-up session, one week later,

10   which he, according to the record, did not attend.

11             And I was particularly concerned that there is

12   no indication of any follow-up or outreach to say, "You

13   didn't come for your session.  Are you okay?  How are you

14   doing?"  That was a concern for me as well.

15        Q    Okay.  So in the records, there is a second

16   CCAPS-62, --

17        A    Uh-huh.

18        Q    -- which apparently was filled out in April of

19   2017, even though there's no record of Mr. Christensen

20   being at the center that day.

21        A    It's dated the day that he was scheduled to

22   attend a follow-up session.

23        Q    Okay.  So even though we don't know how it got

24   filled out and we don't know where it came from, it's in

25   there?

SENTENCING -- July 12, 2019 (Afternoon)

1    A    Uh-huh.

2    Q    So, and the numbers are lower, right?

3    A    Uh-huh.

4    Q    Say "yes" or "no."

5    A    Yes.  I'm sorry.

6    Q    Okay.

7    A    Yes, they are.

8    Q    So, assuming that you compared the CCAPS from

9  March 21st to the CCAPS on April 6th and the CCAPS on

10 March 21st is you've got these 90th percentiles and the

11 CCAPS later, they're much, much lower -- so what does

12 that mean to you?

13    A    It could mean a variety of things.  It could

14 mean that at that moment in time he's feeling better.  It

15 could also mean that one of the options, you know, that

16 he recognized was hospitalization, and he may have been

17 afraid to go in the hospital.  And so he may have

18 minimized his distress because he knew that that would

19 trigger a response.

20        In my experience working with students, they

21 often say -- in a more general way, not around these kind

22 of concerns -- you know, "I just got to get through the

23 rest of the semester.  I can't deal with anything else.

24 Let's just get through."  And so it's also possible -- in

25 fact, one of the comments he made to Ms. -- Mopin? --

SENTENCING -- July 12, 2019 (Afternoon)

1    Q    Maupin.

2    A    -- Maupin was that he was really busy; and

3  because he was busy, he didn't at this time want to

4  commit to more intensive services.

5    Q    Okay.

6    A    So I think it could mean any number of things.

7    Q    Let me ask you if it means this.  Does the fact

8  that his CCAPS-62 from April 6th has much lower scores --

9  does that mean that he is not a risk?

10    A    I would not conclude that.

11    Q    Based on the three records from Ms. Molenaar,

12  Ms. Maupin, and Mr. Miebach -- based on the things he

13  said to each of them, the things he repeated to each of

14  them -- what is your opinion of his risk at that point?

15    A    I would consider him still a significant risk,

16  and I would not use one screening measure.

17        In fact, there is a statement in the most

18  recent protocol handbook near the end that says something

19  to the effect that CCAPS scores are not highly -- I don't

20  know if they use the word predictive or valid.

21    Q    And is that your experience in your

22  professional capacity?

23    A    I think it's -- it's a screening measure.

24    Q    So when you reviewed the policies, the

25  handbooks, the suicide intervention, the Campus Violence

1   Prevention Plan, the Behavioral Intervention Team -- all

2   the various things that you read --

3       A   All those acronyms.

4       Q   Correct.  And we've seen a lot of them already,

5   and I don't want to drag them all back out again.

6           But having reviewed the policies that were in

7   place for violence prevention at the University of

8   Illinois, including the risk factors to be aware of, what

9   is your opinion with regards to whether or not those

10  policies were effectuated with the treatment of Mr.

11  Christensen?

12      A   Well, there were two things that stood out

13  that, in the plan -- and I need to find what page they

14  are on -- that they seem to indicate would trigger

15  activation.

16          And you'll please forgive me; I need to find

17  that page.

18          Here.  Thresholds -- they --

19      Q   Dr. Zoline, I'm sorry.  Can you state for the

20  record what page you're on?

21      A   Sure.  I'm sorry.  Page 4 of the Campus

22  Violence Prevention Plan, dated 2018 edition.

23      Q   Thank you.

24      A   "The Campus Violence Prevention Plan is founded

25  on the premises of early intervention and proactive

1    engagement to prevent violence and provide supportive

2    services.  Based on the assessment that certain conduct

3    may be a precursor" -- meaning a sign -- "of violent

4    behavior," they have identified thresholds of acceptable

5    conduct in standardized responses to those who cross the

6    threshold.

7            Thresholds of unacceptable conduct, which

8    trigger -- on the next page -- certain actions, number 2

9    and number 7 stood out for me.  Number 2, "significant

10   violent ideations or the expression of violent ideas or

11   the intent to harm others."

12           What stood out for me there is even ideas was a

13   trigger.

14           And in number 7, "the expression of thoughts,

15   ideas, beliefs, and/or engaging in behaviors which

16   indicate an obsessive, excessive, and/or inappropriate

17   focus on violence."

18           He talked about the word "fascination."  He

19   talked about the word "rumination."  And so for me, those

20   two things stood out as fitting these criteria.

21       Q    Now, my question is:  We've heard that the

22   confidentiality concern of a counselor would prevent or

23   impede or maybe lead a counselor not to want to inquire

24   further about some of the options that you have described

25   here.

SENTENCING -- July 12, 2019 (Afternoon)

1    What is your opinion about the effect of

2 confidentiality on the need to seek further services for

3 somebody like Mr. Christensen?

4   A Sure.

5    If I understand your question correctly,

6 psychologists and other clinicians have a primary duty to

7 their patient, and confidentiality is the cornerstone of

8 the trust of the relationship.  They have permission --

9 or in some cases, a mandate -- to break confidentiality

10 in the case of imminent risk.

11    But in this case, they also certainly could at

12 least broach the idea of getting a signed consent from

13 him, giving permission to share this information for the

14 purpose of helping him not act on these ideas; that this

15 would be protective of him as well.

16   Q Okay.  Now, in your opinion, after -- well,

17 let's just say this:  After the 6th, he, according to the

18 records, did not show up --

19   A Uh-huh.

20   Q -- for his appointment, correct?

21   A The records indicate no further communication

22 between the Counseling Center and him.

23   Q Okay.  Why is that a problem?

24   A I'd be very concerned.  This is a young man

25 with, who's reporting significant homicidal ideation,

1    suicidal ideation.  For whatever reason, he did not

2    return.  Out of concern for his well-being and out of

3    concern for the campus community, I would think that

4    outreach would have been very important.

5         Q    Now, under the Suicide Intervention -- I forgot

6    the name, the long name -- Suicide Plan?

7         A    The Policy and Procedure.

8         Q    Yeah, that one.

9              Is there a remedy that is prescribed for a

10   patient or a student who comes in and expresses this kind

11   of suicidal ideation?

12        A    Yes.  This manual indicates as a requirement

13   that a patient be mandated to have four further sessions

14   of mandatory assessment -- they don't say "counseling";

15   they say "assessment" -- which I take to mean further

16   evaluation provided either by the Counseling Center, or

17   there is the possibility of it being provided with review

18   by an outside licensed provider.

19        Q    Okay.  Now, in this case, they did send him an

20   email that said that he could go to a place called

21   Rosecrance for what was "one-stop shopping."

22             In your opinion, was that email sufficient to

23   provide the appropriate level of service for him?

24        A    Well, Ms. Maupin indicated in the meeting with

25   him that she would provide him with three referrals and

SENTENCING -- July 12, 2019 (Afternoon)

1   in -- I believe it's this manual -- there is a statement

2   that three referrals should always be given.

3          In her follow-up email that day, which appeared

4   to arrive to him after his meeting with Mr. --

5   Miebech? --

6      Q     Miebach.

7      A     -- Miebach, excuse me, she said something to

8   the -- I have it here -- to the effect of "Upon further

9   reflection, I am just going to provide you a referral to

10  Rosecrance where you can get 'one-stop shopping.'"

11     Q     And here's a question:  When you, as a school

12  counselor, have encountered a student with an intake

13  sheet like Brendt had and you go through these meetings

14  and you say, "Okay, I'm going to give you an outside

15  referral," is that it?  Are you just done?

16     A     I wouldn't think so.

17     Q     Well, what, what do you think should or could

18  have been done after that point?

19     A     Well, first of all, the referral was framed in

20  terms of alcohol/drug counseling but did not address the

21  fact that there were other concerns going on.  He was

22  depressed.  In fact, he was being treated with medication

23  for depression.  He's expressing suicidal thoughts.  He's

24  expressing homicidal thoughts.

25          So while I think that alcohol/drug treatment is

SENTENCING -- July 12, 2019 (Afternoon)

1    essential, is necessary, I would not consider it

2    sufficient.

3         Q    Okay.  Is there a type of counselor or

4    psychiatrist or psychologist who -- I don't know --

5    specializes in helping people who suffer from these

6    suicidal and homicidal ideations?

7         A    Yes.

8              Within the field of psychology -- and I believe

9    within the field of psychiatry as well -- one can receive

10   board certification in forensic psychology or forensic

11   psychiatry, which are people with specialization in these

12   types of issues, and it's a specific certification.

13        Q    Okay.  Now, would you have considered a

14   referral or recommendation to see someone in those

15   fields --

16        A    Yeah.

17        Q    -- to be appropriate?

18        A    I would consider it for two reasons.  One is

19   for a more sophisticated -- perhaps that's not the

20   right -- a more detailed assessment and evaluation; but,

21   also, for more intensive treatment.

22        Q    Okay.  Now, are you here to say that if Brendt

23   had received better care he never would have committed

24   this crime?

25        A    Oh, we can't say -- I can't say that.

SENTENCING -- July 12, 2019 (Afternoon)

1    Q    Okay.  Can you say anything about that with any

2 certainty at all?

3    A    What I can say is that if more intensive

4 services were provided, there is a possibility that that

5 treatment could have been helpful and may have prevented

6 the tragedy that occurred.

7    Q    Okay.  In your opinion, when Brendt appeared at

8 the Counseling Center and filled out that intake form --

9    A    The initial.

10    Q    The initial one.

11    A    Uh-huh.

12    Q    -- was he in need of help?

13    A    Yes.  And he came willingly to the Counseling

14 Center.  He was recommended by a psychiatrist but not

15 mandated to attend.  He came voluntarily, and he shared

16 his concerns voluntarily.

17    Q    And in your opinion as a, an expert in the

18 field of psychology with a specialization in ethics, did

19 he receive the help he should have received?

20    A    I don't believe that he received the help that

21 he deserved and should have received.

22         MS. POLLOCK:  Thank you.  I have nothing

23 further.

24         THE COURT:  Mr. Miller.

25

SENTENCING -- July 12, 2019 (Afternoon)

```
1              CROSS-EXAMINATION BY MR. MILLER:

2       Q    You noted that he willingly went to the

3  Counseling Center?

4       A    Correct.

5       Q    And he could have willingly returned to the

6  Counseling Center?

7       A    Correct.

8       Q    And he could have willingly contacted

9  Rosecrance?

10      A    Correct.

11      Q    And he could have willingly contacted his

12  psychiatrist?

13      A    Correct.  And the reason that he didn't could

14  be for many reasons.

15      Q    Right.

16           It could be because he wanted to commit the

17  crime that he committed in June of 2017?

18      A    Possibly.  He could have also been home drunk.

19      Q    Yeah.

20      A    He could have been --

21      Q    He might have been drunk the entire time from

22  March until June and unable to go --

23           MS. POLLOCK:  Objection, mischaracterizes the

24  answer and argumentative.

25           THE COURT:  Well, --
```

SENTENCING -- July 12, 2019 (Afternoon)

```
1              MR. MILLER:  That's what she said.

2              THE COURT:  -- it's wide open, so let's go.

3              MR. MILLER:  Yeah.

4              THE COURT:  You're allowed to ask the question.

5    And then just wait for the question.  Then you can give

6    your answer.  Wait for her answer.  And then ask another

7    question.

8    BY MR. MILLER:

9         Q    Are you suggesting he was drunk from March 21st

10   till June 9th of 2017?

11        A    I didn't in any way mean to suggest that.

12        Q    Now, if I'm correct, your opinion is that in

13   March of 2017 the defendant presented -- and I think it

14   was your word -- a serious risk of future dangerousness?

15        A    I stand --

16             MS. POLLOCK:  Objection to the characterization

17   of "future danger."  That's a legal term here, Your

18   Honor, and she doesn't know that.

19             MR. MILLER:  That is what she testified to,

20   Judge.

21             MS. POLLOCK:  She testified with regards to the

22   risk, is what she testified to.  "Future danger" is a

23   specific aggravator --

24             MR. MILLER:  Serious risk --

25             THE COURT:  Did the witness say "serious risk"?
```

SENTENCING -- July 12, 2019 (Afternoon)

1    "Future danger"?  What was the actual --

2    BY MR. MILLER:

3        Q    What -- you testified he was a serious risk.

4    What was he a serious risk of?

5        A    I believe that he was at serious risk of

6    harming himself or harming someone else.

7        Q    Serious risk of harming someone else?

8        A    Or himself.

9        Q    And that was before he committed the murder in

10   this case, right?

11       A    Uh-huh.

12       Q    Fair to say your assessment of risk would go up

13   after he committed the murder?

14       A    Well, there's no more assessment at that point.

15       Q    You wouldn't assess --

16       A    I --

17       Q    You wouldn't assess him about his risk based on

18   his conduct?

19       A    He wasn't seen in the Counseling Center after

20   that date.

21       Q    Okay.  So you're just -- you're just talking

22   about the assessment at the Counseling Center?

23       A    Correct.

24       Q    Okay.  Now, you submitted a curriculum vitae in

25   this case, right?

SENTENCING -- July 12, 2019 (Afternoon)

1    A    Uh-huh.

2    Q    And I think the one we initially got listed

3  your address as the Illinois School of Professional

4  Psychology at Argosy University?

5    A    That's correct.

6    Q    And I think you testified you've taught at

7  Argosy University -- or you had -- since 1988?

8    A    That's correct.

9    Q    For, for approximately 30 years?

10   A    Correct.  It was originally the Illinois School

11 of Professional Psychology.  When the founder retired

12 around 2000, it was -- the school was sold to Argosy

13 University.

14   Q    And that's a -- that was a for-profit college?

15   A    At that point, yes.

16   Q    And there's a -- there's a difference between a

17 for-profit school, like Argosy, and a not-for-profit

18 school like the University of Illinois?

19   A    Difference in what way?

20   Q    Is there a difference between a nonprofit

21 school and a --

22   A    Yes.

23   Q    -- for-profit school?

24   A    Uh-huh.

25   Q    And Argosy closed its doors in March of this

SENTENCING -- July 12, 2019 (Afternoon)

1  year?

2       A    That's correct.

3       Q    And that was a fairly abrupt closing, correct?

4       A    Yes, it was.

5       Q    And, in fact, the students in the doctoral

6  program in psychology didn't have much advance notice?

7       A    That's correct.  Nor did we as faculty.

8       Q    All right.  And the U.S. Department of

9  Education ended the school's participation in --

10      A    Right.

11      Q    -- the financial student assistance program?

12      A    Uh-huh.

13      Q    And I think there are thousands of students

14  that have not been paid around 13 million in financial

15  aid --

16      A    Correct.

17      Q    -- from Argosy University?

18      A    Very tragic.

19      Q    And that was the school that you taught at for

20  the last 30 years?

21      A    That's correct.  Those decisions and events

22  were based on financial decisions by people high up, not

23  by faculty.

24           Our program was continuously accredited by the

25  American Psychological Association, and so it was a

SENTENCING -- July 12, 2019 (Afternoon)

1      tragedy for all of us.

2          Q     And you say you had an independent clinical

3      practice from 1986 to 1996?

4          A     Uh-huh.

5          Q     And that means -- "a clinical practice," that

6      means actually seeing patients?

7          A     Correct.

8          Q     And you stopped your clinical practice in 1996?

9          A     Uh-huh.

10         Q     Is it fair to say you haven't regularly seen

11     patients since 1996?

12         A     Not as a -- not as a practicing psychologist.

13     I've overseen clinical work as part of my duties at the

14     University.

15         Q     Right.

16               But actually seen patients --

17         A     Right.

18         Q     -- you haven't done for 23 years?

19         A     Correct.

20         Q     So your testimony here regarding what -- you're

21     testifying regarding what the people who actually saw the

22     patients should have done?

23         A     Uh-huh.  My expertise is in that area of

24     practice as -- yes.

25         Q     And part of that was developed around 23 years

SENTENCING -- July 12, 2019 (Afternoon)

1  ago when you were actually seeing patients?

2      A    Yes.  But I've remained current in that area

3  since.

4      Q    And you said you testified as an expert witness

5  before, about 14 years ago?

6      A    Uh-huh.

7      Q    And that was, you said, an Administrative Court

8  case?

9      A    Correct.

10      Q    So you have not testified as an expert witness

11  in --

12      A    Correct.

13      Q    -- Federal Court before?

14      A    No.

15      Q    Or in a criminal case before?

16      A    Correct.

17      Q    And so then -- so for the last 14 years, you

18  haven't regularly seen patients, correct?

19      A    Correct.

20      Q    Haven't testified as an expert witness?

21      A    Correct.

22      Q    And for most of that time, you were a teacher

23  at Argosy University?

24      A    I was a professor.

25      Q    And I think you testified the last time you

1  worked at a Counseling Center was 1981 to 1987?

2      A    Uh-huh.

3      Q    So that was about 32 years ago?

4      A    Uh-huh.

5      Q    Now, I know you haven't -- as you stated, you

6  aren't -- when you were an expert witness before, did you

7  ever issue a written report with your opinions in it?

8      A    That case did not involve a written report.

9      Q    And in this case, you didn't issue a written

10  report either, did you?

11      A    Correct.

12      Q    You do know that sometimes experts write down

13  what their opinions are --

14          MS. POLLOCK:  Objection, relevance.  That's not

15  her problem.

16          MR. MILLER:  It goes to her credibility, Your

17  Honor.

18          MS. POLLOCK:  Her cred--

19          THE COURT:  I'll allow the question.  Go ahead.

20  BY MR. MILLER:

21      Q    You did not write a written report in this

22  case, right?

23      A    I was not asked to write a written report.

24      Q    And because you weren't asked to, you didn't

25  write a written report?

SENTENCING -- July 12, 2019 (Afternoon)

1   A    Correct.

2   Q    So the opinions that you formed in this case

3   were opinions you basically formed in your head, right?

4   A    Well, even if I wrote a report, they would be

5   formed in my head.

6   Q    That's right.

7        But you never reduced them to paper, right?

8   A    I wasn't asked to.

9   Q    And so you didn't?

10  A    I made notes.  I have very copious notes on the

11  documents that I reviewed, but I did not submit -- I was

12  not asked to submit a written report.

13  Q    And we -- and you never turned those notes over

14  to anyone apparently?

15  A    I wasn't asked to.

16  Q    Okay.

17  A    Those are my own personal notes.

18  Q    That, maybe, have your opinions about this

19  case?

20  A    They're really more of a review of the record.

21  Q    Okay.  And speaking of that, you indicated that

22  you -- well, let me get to that.

23        You -- since you didn't write a written report,

24  you didn't tell anyone beforehand, for example, that --

25  you said you didn't like the question *What would you*

SENTENCING -- July 12, 2019 (Afternoon)

1    *recommend for your therapy?* that was, that Carin Molenaar

2    asked, right?

3          A    I don't believe I used the words "I didn't

4    like."  I -- this isn't about liking, but perhaps you

5    can --

6          Q    Okay.  Well, --

7          A    -- clarify.

8          Q    -- tell me what your response was when you

9    stated that you had a problem with that question?

10         A    I had -- please refresh what you're saying.

11         Q    Yeah.

12              I'm asking you:  There was a question from

13   Carin Molenaar that you criticized because you said that

14   you wouldn't ask someone you were having --

15         A    Oh, okay.

16         Q    -- being in a clinic with -- at least, I guess,

17   back when you were in a clinic --

18         A    Uh-huh.

19         Q    -- as to what they thought would be an

20   appropriate treatment.

21         A    I think you're referring to when he was giving

22   a detailed description of his homicidal ideation, and she

23   appeared to abruptly shift the topic to one of suicide.

24   Is that what you're referring to?

25         Q    That is not what I'm referring to.

1      A      Okay.

2      Q      I'm referring -- do you not recall a question

3  regarding -- a question regarding Carin Molenaar

4  discussing -- or I should say someone discussing

5  potential treatment options with the defendant?

6      A      Sure.

7      Q      And you stated you would recommend the

8  treatments; you wouldn't discuss with them what

9  treatments they thought might be appropriate?

10      A      I would discuss with them after making

11  recommendations what treatments they might think they --

12      Q      And my point is:  That wasn't something that

13  you had disclosed that that was your opinion before you

14  testified here today?  This is the first time that you're

15  referring to this, right?

16      A      This is my first time testifying here.  Yes.

17      Q      Because there was no written report that was

18  turned over?

19      A      Uh-huh.

20      Q      Right.

21            And you talked about the two criteria -- I

22  think it was number 2 and number 7 -- that you thought

23  showed that there was a, the University wasn't complying

24  with its policy, right?

25      A      I --

SENTENCING -- July 12, 2019 (Afternoon)

1      Q     Do you recall this?

2      A     I didn't use -- I don't believe I used the

3   words that "the University was not complying with

4   policy," but I believe I said that those, number 2 and

5   number 7, in my opinion would have merited or triggered a

6   response.

7      Q     Okay.  And this is the first time here today

8   that you've told anybody that opinion?

9      A     Well, I discussed the reports with the legal --

10  the defense team.

11     Q     Okay.

12           MS. POLLOCK:  Your Honor, I'm going to object

13  to this line of questioning.  There was an expert

14  disclosure given in this case which detailed the general

15  areas of her opinions, and the fact that she did not

16  produce a written report because one was not requested by

17  me is irrelevant.

18           MR. MILLER:  Well, --

19           THE COURT:  Mr. Miller.

20           MR. MILLER:  Well, what's relevant, Judge, is

21  they can say "general," but that's the point.  If they

22  don't disclose anything beforehand, we can question them

23  as to when they came up with this opinion.

24           THE COURT:  I agree.  Go ahead.

25

SENTENCING -- July 12, 2019 (Afternoon)

```
 1   BY MR. MILLER:
 2        Q    And you testified in your testimony -- well,
 3   let me ask:  Your testimony here today is based on your
 4   educational background, correct?
 5        A    And my experience in the field, particularly
 6   with College Counseling Centers.
 7        Q    Yeah.  I was going to get to that.
 8        A    Oh, I'm sorry.
 9        Q    So is it also based on your educational
10   background?
11        A    Yes.
12        Q    And is it based on your professional
13   experience?
14        A    Yes.
15        Q    And is -- and as we discussed, that was -- when
16   you last saw patients was 1996?
17        A    Uh-huh.
18        Q    And it's based on your experience as a
19   professor at Argosy University, correct?
20        A    Uh-huh.  And my various consulting activities
21   in this area as well.
22        Q    Now, as you made clear, it's not based on any
23   examination of the defendant?
24        A    Correct.
25        Q    And, in fact, as a member of the Ethics
```

1    Committee, you know it would be unethical to --

2         A    Absolutely.

3         Q    -- try to opine about a specific person who

4    you've never examined?

5         A    Absolutely.

6         Q    Okay.  And you noted -- you were contacted by

7    the defense in this case to give an opinion?

8         A    Uh-huh.

9         Q    You were hired by the defense?

10        A    Correct.

11        Q    And you were hired to render an opinion

12   regarding the records, correct?

13        A    Correct.

14        Q    And you were told that the defendant was facing

15   capital charges in this case?

16        A    Correct.

17        Q    And told that he was accused of kidnapping and

18   murdering someone?

19        A    Uh-huh.

20        Q    Correct?

21        A    Correct.

22        Q    And that you would be testifying as to your

23   opinion in this case?

24        A    My opinion about the mental health records.

25        Q    Right.

SENTENCING -- July 12, 2019 (Afternoon)

1          And that opinion is that -- relates to an

2    opinion that more could have been done for the defendant?

3          A    Correct.

4          Q    And that's basically why you were hired; is

5    that fair to say?

6          A    No.  I was hired to review the records and to

7    render an opinion, and I -- it was discussed when we

8    initially spoke that they would want the initial

9    feedback.  After the initial record reviews that were

10   available in December and January, we would consult.  And

11   if they felt that my judgments would be useful, then I

12   would proceed to be a witness.  It was not assumed that I

13   would testify.

14         Q    Right.

15              So in other words, it's fair to say:  You knew

16   that if your opinion was what it is today that you might

17   then be hired to actually testify?

18         A    That I might.  That would be their judgment,

19   not mine.

20         Q    Right.

21              Because if that wasn't your opinion, then you

22   likely wouldn't have been hired to testify?

23         A    I presume not.

24         Q    And you said you were being paid for your

25   testimony?

1    A    Uh-huh.

2    Q    And you said the initial payment for the review

3  was $2,875?

4    A    Correct.

5    Q    Now, I think initially I heard you say -- and

6  maybe I misheard -- you said that you did not watch the

7  video?

8    A    The video was only made available to me more

9  recently.

10    Q    Okay.  So it's --

11    A    It was -- I was not -- I did not have access to

12  the video in December, January, or February.

13    Q    Okay.  When did you review the video?

14    A    The video came in late June, I believe -- much

15  more recently.

16    Q    Okay.  And you have reviewed it?

17    A    Yes, I have.  And it was accompanied by a

18  transcript of the session.

19    Q    And you've specifically billed for reviewing

20  that video?

21    A    Yes, I did.

22    Q    And how long did it take you to review the

23  video?

24    A    The video -- the session was approximately an

25  hour, but I was taking notes while watching it.  So

SENTENCING -- July 12, 2019 (Afternoon)

1    probably an hour and a half to two hours.  I don't have

2    my records in front of me.  And then I reviewed the

3    transcript and made notes on that as well.

4         Q    And does that then include -- when you said

5    you've put 25 to 30 additional hours into the case since

6    you billed for the $2,875 -- does that include watching

7    the video?

8         A    Yes.

9         Q    And what is your hourly rate?

10        A    The government and I agreed on a rate of $250

11   per hour.

12        Q    Okay.  So you may have another approximately

13   $7500 coming in the case?

14        A    70-- well, with travel expenses and, you know,

15   miles, et cetera, 75 to 10,000 range.  I haven't

16   calculated today, of course.

17        Q    That's all right.

18             So your -- and do you -- is it the same rate

19   when you testify in court?

20        A    Yes.

21        Q    Now, you -- I think you did agree that the

22   first thing a clinician should do is that they must

23   assess the patient?  That's the first thing you do when a

24   patient comes in; they need to be assessed?

25        A    Yes.  As well as building a positive

SENTENCING -- July 12, 2019 (Afternoon)

1    relationship with them because the relationship is also

2    critically important to engaging someone in services.

3        Q    Although the -- there's the CCAPS form that we

4    talked about, right?

5        A    Uh-huh.

6        Q    And you would agree that's supported by dozens

7    of peer-reviewed publications?

8        A    I would agree that it's, it's been used widely

9    as a screening measure, but its predictive value is not

10   as clear.

11       Q    Sure.

12            And over 150 University Counseling Centers use

13   it?

14       A    That may be.  I can't verify that number.

15       Q    You're not suggesting that the University did

16   anything that was improper in using the screening method,

17   are you?

18       A    No.

19       Q    And you did mention a couple of things that the

20   defendant said, according to Carin Molenaar's report.

21       A    Uh-huh.

22       Q    You said that he blacked out from alcohol?

23       A    Uh-huh.

24       Q    But --

25       A    He said he blacked out one time.

SENTENCING -- July 12, 2019 (Afternoon)

1        Q     Yeah, right, one time.

2        A     Uh-huh.

3        Q     And that was the first time he had tried

4   tequila, right?

5        A     Uh-huh.

6        Q     Is that correct?

7        A     Yes.

8        Q     So it was just once that he blacked out?

9        A     Which suggests to me that he had built up a

10  fairly high tolerance level.

11       Q     Right.

12             Or, perhaps, even lying to the counselor,

13  right?

14       A     Or perhaps not fully disclosing.

15       Q     Or perhaps he had blacked out once?

16       A     Or perhaps he had blacked out once.  We can't

17  know.

18       Q     In fact, it's not uncommon for individuals to

19  lie to their counselors, is it?

20       A     I think it varies.  I wouldn't use the word

21  "lie."

22       Q     Okay.

23       A     Some people underreport.  Some people

24  overreport.

25       Q     Would you use the word "lie" if you knew that

SENTENCING -- July 12, 2019 (Afternoon)

1     the patient's wife described him as a very good liar?

2          A    I was not aware of that statement.

3          Q    And you testified about the, the timing of --

4     what you understood the counselor said the defendant said

5     regarding the timing of his open marriage with his wife,

6     but that --

7          A    I believe the wife reported having an open

8     marriage.  I don't believe he -- that she announced to

9     him an open marriage, not that he was having an open

10    marriage.

11         Q    Okay.  And you get that just from the records

12    that you reviewed?

13         A    That's all that I had knowledge of.

14         Q    And just make sure -- you limited, then, your

15    assessment in this case from what you reviewed in the

16    records, not from what you might have heard from any

17    other parties regarding this case?

18         A    Correct.

19         Q    Okay.

20         A    The records, the videotape, et cetera.

21         Q    Right.

22              And those records showed that, in fact, the

23    open marriage -- well, the open marriage was actually

24    before he first went to the Counseling Center.

25              Did you know that?

SENTENCING -- July 12, 2019 (Afternoon)

```
 1        A    I don't recall that.  I recall that he first
 2   mentioned it in the second session, --
 3        Q    In other words, --
 4        A    -- when it began.
 5        Q    So if he --
 6        A    Well, he reported that it began after the first
 7   session, --
 8        Q    So --
 9        A    -- that that's when his wife announced it.  I
10   can't know when it actually began.
11        Q    Right.
12        A    But he reported that his wife shared with him
13   sometime after the first session before the second
14   session --
15        Q    Right.
16        A    -- that information.
17        Q    So if she had shared that information with him
18   before the first session, then he just failed to tell the
19   counselor, correct?
20        A    Or the counselor didn't ask, or it didn't come
21   up.  It could be any number of things.
22        Q    Right, right.
23             Again, so your assessment is based on
24   information that the counselor recorded the defendant
25   told him -- or her -- back in March of 2017?
```

SENTENCING -- July 12, 2019 (Afternoon)

1      A    That's all I had to work with.

2      Q    Right.

3           The -- so after -- fair to say after he spoke

4   with Carin Molenaar, the student intern, she did ask for

5   a consult, right?

6      A    Correct.

7      Q    And did you know that --

8      A    She asked for a consult around alcohol/drug

9   consumption.

10     Q    Right.

11          And did you know that a consult actually

12  happened that very day?

13     A    Yes.  I believe that was made clear.

14     Q    So a consult did take place, right?

15     A    Yeah.  She asked him to wait in the waiting

16  room while she went to meet with someone.

17     Q    And then a consult did happen, didn't it?

18     A    Uh-huh.  Uh-huh.

19     Q    I'm sorry.  You have to answer "yes."

20     A    Yes.

21     Q    And then after that consult, there was an

22  interview scheduled the very next day, right?  I mean, --

23     A    The next week.

24     Q    He was supposed to call in the very next day,

25  right?

SENTENCING -- July 12, 2019 (Afternoon)

1    A    He was supposed to call in the next day, which

2  he did not do.

3    Q    Right.

4         He didn't call in the next day, right?

5    A    Correct.

6    Q    And as far as you know, that was a willing

7  decision by himself?

8    A    I don't know that I would characterize it as a

9  willing decision.  It happened for whatever reason.  We

10  can't know the reason.

11   Q    Well, we can know that the counselor called him

12  the next day, right?

13   A    Right.

14   Q    And he said, "Oh, I just forgot to call."

15   A    And he said that things were going okay.

16   Q    And he said things were going well.

17        So then he said there was no urgency, so they

18  scheduled a follow-up the next week?

19   A    For a week later, correct.

20   Q    Right.

21        And that follow-up wasn't just alcohol and

22  drugs; it also included risk assessment, correct?

23   A    He was scheduled to come in for an alcohol/drug

24  assessment.  That was the purpose of the meeting with

25  Ms. Molenaar.  She, then, at the end of the meeting

SENTENCING -- July 12, 2019 (Afternoon)

1  suggested that he also go down the hall to have a consult

2  specifically around the suicide/homicide concerns.  Is

3  that --

4       Q    Right.

5            But the, but the counselors actually had made

6  that decision before he came in?  Did you know that?

7       A    They may have.  Yes.

8       Q    Okay.  You just didn't know that when you were

9  assessing how the University did what they did, --

10      A    Uh-huh [nodding head up and down].

11      Q    -- right?

12           Correct?

13      A    Yes.

14      Q    Does it change your opinion regarding their --

15  what they did, the fact that they actually did talk

16  before he showed up about the need for a risk assessment?

17      A    They -- yes.  They saw that as something that

18  was important, which makes it even more concerning to me

19  that, when he didn't show afterwards, that there was no

20  follow-up.

21      Q    Right.

22           He didn't show up the next week, --

23      A    Correct.

24      Q    -- right?

25           But he was referred to a long-term facility,

SENTENCING -- July 12, 2019 (Afternoon)

1  right?

2         A    A facility that provides alcohol/drug

3  treatment.

4         Q    Provides comprehensive treatment?

5         A    Comprehensive treatment.  But when you look on

6  the website, it's not clear whether they have

7  specialization in persons struggling with violent

8  impulses.

9         Q    But the email to the defendant made it clear it

10  was providing comprehensive -- they could provide

11  comprehensive treatment, right?

12         A    The possibility of that, uh-huh.

13         Q    Is there anything more than a possibility of

14  providing treatment?

15         A    Well, they would need to evaluate him and

16  determine if his presenting concerns could be matched by

17  the services they offer.

18         Q    Exactly right.

19              And you haven't evaluated him, right?

20         A    No.

21         Q    Are you aware of something called the

22  iatrogenic -- I'm going to spell that,

23  i-a-t-r-o-g-e-n-i-c -- effect?

24         A    Uh-huh.

25         Q    And explain to the jury what that is.

SENTENCING -- July 12, 2019 (Afternoon)

1        A     Well, I'm not sure in what context you're

2   looking for an explanation.

3        Q     Okay.  Well, then, let me see if you would

4   agree then.  That's where an attempted intervention can

5   have the effect of dissuading a patient from

6   participating in further treatment, correct?

7        A     I think that could be thought of as an

8   iatrogenic effect.  I mean, that's --

9        Q     Well, it's a well-known phenomenon, isn't it?

10             MS. POLLOCK:  Objection.  Let her finish.

11             THE COURT:  Were you finished with your answer?

12             MR. MILLER:  Your Honor, I'm going to object to

13   Ms. Pollock, first, addressing me and, two, being rude in

14   front the jury.

15             THE COURT:  All right.  Let's -- it's been a

16   long week.  Let's see if we can finish it up.

17   Everybody's record has been made.

18             Let's go.  Ask your question.

19             WITNESS ZOLINE:  I would say that if you want

20   to use the word "iatrogenic" in terms of the fact that

21   something could happen in a session that could have

22   further effects, I would say that could go in a positive

23   or a negative direction.

24   BY MR. MILLER:

25        Q     And fair to say that when individuals

SENTENCING -- July 12, 2019 (Afternoon)

1   voluntarily seek treatment, imposing interventions

2   against their will may cause them to not seek or to

3   continue treatment?

4       A    It may.  But it may also cause them to

5   recognize the seriousness of the need for treatment.  It

6   could go either way.

7       Q    So it could go either way.

8            So you're taking a chance.  If you have someone

9   who comes in who is voluntarily seeking treatment and you

10  seek something that's not required -- you mandate, for

11  example, or go to them and ask them to waive

12  confidentiality so that information can be given, for

13  example, to law enforcement -- it's unlikely they're

14  going to seek treatment from you?

15      A    I wouldn't say it's unlikely.  I think it

16  depends on how that dialogue goes.

17           I would present it as *I care about you.  I care*

18  *about your safety.  I care about the safety of others.*

19  *And because I care about you, I think this is a step that*

20  *could be useful.*

21           So I think I would not assume that a more

22  intensive step would necessarily be met negatively by a

23  client.  In fact, this client was, up and to that point,

24  agreeable to many of the things that were asked of him.

25      Q    So, not necessarily.

SENTENCING -- July 12, 2019 (Afternoon)

1        So let's say in a case you were reviewing

2  records for an individual and they did what you suggested

3  and they said, "Hey, we want you to waive confidentiality

4  and let us refer what you just told us when you came to

5  voluntarily help -- to get voluntary help, to, to law

6  enforcement," and they go, "Um, no.  I'm not going to

7  waive that," and then they don't come back and get

8  treatment.

9        Would you be testifying here that your opinion

10  was that, "Hmm, they should have maybe done something

11  different and that possibly, maybe, when they went out

12  and committed a crime that it possibly could have been

13  prevented"?

14        MS. POLLOCK:  Objection.  Compound question,

15  improper hypothetical, and I don't even know what that

16  question is.

17        THE COURT:  Well, if the witness does, she may

18  answer it.

19        Go ahead.

20        WITNESS ZOLINE:  I would concur that you are

21  asking a chain of scenarios, and that makes it difficult

22  for me to answer the question.

23        MR. MILLER:  Of course.

24  BY MR. MILLER:

25    Q    Now, are you aware of the role of hindsight on

1   human judgment?

2       A    Meaning that we can always look back 50-50 and

3   wonder what might have been.

4       Q    Okay.  And when you say 50-50 --

5       A    Not necessarily 50-50.  Um --

6            THE COURT:  20-20?

7            WITNESS ZOLINE:  20-20 -- whatever the phrase

8   is.  It's been a long week.  You're right.  I've been in

9   four states this week.

10  BY MR. MILLER:

11      Q    Fair to say it's well established in the

12  psychological world that there's a tendency for people to

13  overestimate their ability to predict an event after that

14  event has already happened?

15      A    No.  I'm not sure that that's a well

16  established fact.  I would not concur with that.

17      Q    You don't think that once people know an event

18  has happened they tend to perceive that the event was

19  foreseeable?

20      A    No.  I don't agree with that.

21      Q    You don't think they tend to perceive that they

22  could have predicted it?

23           MS. POLLOCK:  Objection, asked and answered.

24           THE COURT:  Overruled.

25           MR. MILLER:  I'll ask again.

SENTENCING -- July 12, 2019 (Afternoon)

```
 1   BY MR. MILLER:
 2       Q    You don't think they tend to perceive that they
 3   could have predicted it?
 4       A    I think we already know that violence is very
 5   difficult to predict.
 6       Q    But after it happens, we hear people say all
 7   the time, "I knew that was going to happen," right?
 8       A    I don't think that would be my conclusion.
 9       Q    Okay.  You're not aware of rigorous experiments
10   that have explicitly demonstrated hindsight bias can
11   undermine retrospective assessments of violent risk?
12       A    I'm not aware of that particular line of
13   research.
14            MR. MILLER:  I have no further questions, Your
15   Honor.
16            THE COURT:  Ms. Pollock.
17            REDIRECT EXAMINATION BY MS. POLLOCK:
18       Q    Remind me again what your position is at the
19   Illinois Psychological Association.
20       A    Sure.  I co-chair the Ethics Committee, which I
21   have co-chaired for, since 2010, and have been a member
22   of the committee for approximately 20 years.
23            In that capacity, I have written scholarly
24   articles providing guidance to clinicians around issues
25   of ethics.  I have collaborated with a mental health
```

SENTENCING -- July 12, 2019 (Afternoon)

1  attorney when questions come up that require his input.

2  And I have regularly provided consultation to members of

3  the Association regarding ethical concerns that they

4  bring to me.

5       Q    Now, remind me:  The Illinois Psychological

6  Association is the premier licensing organization, or

7  organization that provides education for all

8  psychologists in the State of Illinois?

9       A    I would not call it a licensing organiz-- it is

10  the prime -- it is the largest and longest association

11  representing the interests of psychologists in Illinois,

12  of all of branches of psychology.

13       Q    Just like the Illinois Bar Association --

14       A    Exactly.

15       Q    -- is the one for lawyers.

16       A    It's the --

17       Q    And the Illinois Medical --

18       A    Illinois Social Worker Association, correct.

19       Q    Okay, thank you.

20       A    Yes.

21       Q    And that is, again, the preeminent organization

22  for doing so --

23       A    Correct.

24       Q    -- in the state?

25            And you've been on the Ethics Committee for

SENTENCING -- July 12, 2019 (Afternoon)

1   almost the last ten years?

2       A    I've been -- I'm sorry?  I didn't hear you.

3       Q    You've been on the Ethics Committee as the

4   co-chair for how long, you said?

5       A    Since 2010, yes.

6       Q    Okay, thank you.

7            Now, Mr. Miller emphasized the fact that you

8   have not had a private clinical practice --

9       A    Uh-huh.

10      Q    -- for a period of time.

11      A    That's correct.

12      Q    Do you remember that?

13      A    Uh-huh.

14      Q    So now, instead of seeing patients, you are

15  paid by Counseling Centers to come in and tell them how

16  to see patients.

17           Is that an accurate statement?

18           MR. MILLER:  That would be leading on the

19  redirect.

20           THE COURT:  I'll allow it.  Go ahead.

21      A    I would use slightly different wording.

22           I don't tell them how to work with patients,

23  but I provide guidance and consultation to them.

24      Q    And they pay you for that?

25      A    And they invite me in.  Yes.

SENTENCING -- July 12, 2019 (Afternoon)

1      Q     Okay.

2      A     And they pay me for that.  Sometimes.  I have

3  done pro bono services as well.

4      Q     All right, understood.

5            And, again, how many University Counseling

6  Centers have you worked with in the last 20 years?

7      A     I have worked with Northwestern University, the

8  University of Chicago, University of Illinois at Chicago,

9  Northern Illinois University; and Argosy University had

10 its own Psychological Services Center, or Counseling

11 Center, and I provided ongoing consultation in-house to

12 their Counseling Center as well.

13     Q     Okay.  How many states have you been in giving

14 lectures as a speaker on your area of expertise?

15     A     Pennsylvania, as of this week; Ohio;

16 Connecticut; Rhode Island; Maine; New Hampshire;

17 California; and I'm scheduled to go present in Missouri

18 next month.

19     Q     Okay.  So you -- again, your area of expertise

20 is ethics.  You teach it?

21     A     Uh-huh.

22     Q     You co-chair the Committee?

23     A     Uh-huh.

24     Q     And you consult, right?

25     A     And I've presented at conferences on the

SENTENCING -- July 12, 2019 (Afternoon)

```
 1   topic --

 2        Q    All right.

 3        A    -- as well.

 4        Q    So what is "ethics"?

 5        A    So ethics is about the professional practice

 6   responsibilities for psychologists, specifically with

 7   regard to our Code of Ethics which is put forth by the

 8   American Psychological Association.  It is the Ethics

 9   Code of our profession.

10             The laws that govern our practice in the State

11   of Illinois and the rules that govern our work as

12   psychologists is set forth by the Psychologists Licensure

13   Act, the act which -- with which we hold our license.

14        Q    Okay.  And tell me:  What happens to a

15   psychologist who behaves unethically, in violation of

16   your ethical standards?

17        A    So there are a variety of possibilities.  In

18   past years, our Committee was actually involved in

19   adjudication of cases when complaints were brought to the

20   Illinois Psych Association Ethics Committee, and I was

21   involved in that for some period of time.

22             Almost all states stopped that practice, and

23   currently complaints are primarily handled by the

24   American Psychological Association Ethics Committee and

25   the licensure board in each state, as well as, of course,
```

SENTENCING -- July 12, 2019 (Afternoon)

1  someone could bring a malpractice action as well.

2      Q    So, fair to say, there are consequences for

3  people in your profession who behave unethically?

4      A    Yes.

5      Q    And when you sit here on the stand and testify

6  today, is it your personal Code of Ethics that binds you

7  to tell the truth?

8      A    My personal Code of Ethics, as well as the APA

9  Code of Ethics, which requires us to act with integrity.

10     Q    Okay.  Now, Mr. Miller talked about the amount

11  of money that you've been making consulting with the

12  defense in this case.

13     A    Uh-huh.

14     Q    Do you recall when we first talked and you

15  asked me, "How much does an expert charge?"

16     A    Yes.

17     Q    Do you know the answer to that question?

18     A    I believe you said 250 to $350 per hour.  Is

19  that --

20     Q    Well, I'm asking you.  Do you remember?

21     A    That's my recollection.

22     Q    Okay.  And have you ever engaged in a situation

23  like this before where you've provided this type of

24  testimony?

25     A    Not at the federal level.  I was involved in

SENTENCING -- July 12, 2019 (Afternoon)

1    that one licensure case.

2        Q    And that was in what year?

3        A    2004 and '5.

4        Q    Okay.  Is it fair to say that you're not really

5    a, an expert witness by trade?

6        A    Yes.  That's not something that I regularly do.

7        Q    Okay.  Do you have any idea how much $250 an

8    hour is as compared to the money that the government has

9    contracted with their experts for?

10       A    I have no --

11            MR. MILLER:  Your Honor, --

12            MS. POLLOCK:  He impeached her on the basis of

13   it, and I'm simply asking; it's actually a relatively low

14   amount.

15            THE COURT:  So, now what are you asking her?

16   If she knows what the government experts are being paid?

17            MS. POLLOCK:  Well, how about if she knows

18   generally what other experts who testify at trials like

19   this are paid in general.

20            WITNESS ZOLINE:  I would imagine they're paid

21   substantially higher.

22   BY MS. POLLOCK:

23       Q    Okay.  Now, in terms of your evaluation of this

24   situation, --

25       A    Uh-huh.

SENTENCING -- July 12, 2019 (Afternoon)

1     Q     -- again, what were you asked to focus on?

2     A     I was asked to review the mental health records

3   and to bring my expertise to evaluate the services

4   provided specifically around the concerns of suicidal and

5   homicidal ideation expressed by Mr. Christensen.

6     Q     Does it give you any pleasure to sit here today

7   and look at another mental health worker and find that

8   their services were inadequate?

9     A     It concerns --

10          THE COURT:  There's been no opinion as to

11   inadequacy.

12          WITNESS ZOLINE:  Yeah.

13          THE COURT:  Her testimony is, as I understand

14   it, was restricted to conformance with the internal

15   policy manual.  I've allowed a lot of leeway here back

16   and forth to express a criticism of, or that she would

17   have recommended something else.

18          MS. POLLOCK:  Sure.  I can rephrase, Your

19   Honor.

20          THE COURT:  Okay.

21   BY MS. POLLOCK:

22     Q     So, as you sit here today, does it give you any

23   pleasure to look at the actions of the counselors in this

24   case and find fault with it?

25     A     It does not give me pleasure to have reviewed

SENTENCING -- July 12, 2019 (Afternoon)

1    the records and found that I believe that more optimal

2    services could have been provided.

3              MS. POLLOCK:  I have nothing further.

4              THE COURT:  Mr. Miller, anything?

5              MR. MILLER:  Just briefly.

6              THE COURT:  All right.

7               RECROSS-EXAMINATION BY MR. MILLER:

8        Q    If I understand, you were qualified initially

9    as an expert in psychological ethics, right?

10       A    Yes.

11       Q    Ethics, right?  And that was -- the question

12   was about your teaching is on ethics, correct?

13       A    Yes.  My --

14       Q    Your traveling around the states is on ethics?

15       A    Uh-huh.

16       Q    Is that correct?

17       A    Yes.

18       Q    And most of your -- and most of your

19   publications are on ethics, right?

20       A    But not all.

21       Q    Right.

22       A    I've also -- have expertise in the field of

23   supervision and --

24       Q    All right.

25       A    -- have done workshops, presentations, et

SENTENCING -- July 12, 2019 (Afternoon)

1    cetera, in the area of supervision.

2              And I would say:  Within the area of ethics,

3    suicide, violence, and abuse cross -- child abuse, elder

4    abuse, et cetera -- are specialties within the broad

5    frame of ethics.

6         Q    I understand that.

7              But the question from Ms. Pollock was to focus

8    on your expertise in ethics, right?

9         A    Uh-huh.

10        Q    And I want to make clear:  You're not

11   suggesting any ethical violations by Carin Molenaar, are

12   you?

13        A    I cannot evaluate that.

14        Q    Right.

15             And you can't evaluate ethics of Felicia Li,

16   correct?

17        A    [No response.]

18        Q    You said you can't evaluate that, right?

19             Are you looking at Ms. Pollock every time to

20   see what the answer should be when I ask you a question?

21        A    I -- my understanding is -- my only familiarity

22   with Felicia Li is that she made one phone call to Mr.

23   Christensen and was involved in consultation.

24        Q    And so is that a *Yes, I'm not commenting as an*

25   *expert in the field of ethics on her ethical activities?*

SENTENCING -- July 12, 2019 (Afternoon)

1    A    I think more could have been done.

2    Q    And you think that's an eth-- you think that's

3  an ethical violation then?  Is that how you view it?

4    A    In terms of thinking about optimal care and our

5  ethical responsibilities to promote well-being and avoid

6  harm, I would put it under that umbrella.  Yes.

7    Q    So you think if someone doesn't provide optimal

8  care, what you decide is optimal care, that's an ethical

9  violation?

10    A    I'm rendering an opinion, not a decision.  The

11  field of ethics includes understanding of what is

12  considered prevailing practice, and my professional

13  opinion is that optimal care was not provided.

14          MR. MILLER:  No further questions, Your Honor.

15          MS. POLLOCK:  No redirect, Your Honor.

16          THE COURT:  All right.  You may step down.

17  Thank you.

18          (Witness Zoline excused, 4:52 p.m.)

19          THE COURT:  Okay.  Nothing further for today.

20  We'll resume on Monday at 9:00 a.m., and we're on

21  schedule as I have indicated.

22          So, please do not discuss this matter with

23  anybody, including yourselves, over the weekend.

24          Please be safe in your travels home and your

25  travels back here Monday morning.

1              And I do appreciate your continued

2    participation and continued paying attention to this

3    entire process.  Thank you.

4              So we'll see you Monday morning.

5              (Jury dismissed for the day, 4:52 p.m.)

6              THE COURT:  Okay.  Please be seated.  I know

7    it's late.  I want 60 seconds is all for some cleanup

8    matters.

9              First of all, you indicated one longer witness,

10   Ms. Pollock, left.

11             MS. BRAIN:  She stepped out with the witness.

12             THE COURT:  All right.  Well, that's fine.  You

13   can tell me; somebody can answer me.  Is that --

14             MR. TASEFF:  It wouldn't be that long.

15             THE COURT:  No, but when is the mother going

16   on?  In the morning?

17             MR. TASEFF:  No.  We're going to start off with

18   Livingston County Jail staff.

19             THE COURT:  Okay.  So a number of short

20   witnesses and then the mother at some point late morning

21   or afternoon?  Or when did you think that will be?

22             MS. BRAIN:  It's difficult to anticipate how

23   long the jail staff will take, --

24             THE COURT:  All right.

25             MS. BRAIN:  -- but I think late morning or

SENTENCING -- July 12, 2019 (Afternoon)

1    early afternoon is a good bet.

2                THE COURT:  Okay.  Let me do a quick cleanup.

3                441 is the motion to preclude Sorensen and the

4    use of PowerPoint slides.  That's now moot now, given the

5    representation that he is not going to testify, correct?

6                MR. NELSON:  Yes, Your Honor.

7                THE COURT:  All right.  415 is a motion in

8    limine to prevent improper communication by the

9    government.  I'm going to just moot that.  We've

10   discussed that, during summation, I'm going to make

11   rulings on objections as they come up.  Okay?

12               454 is the motion to prevent or to give an

13   instruction regarding the videos.  I've indicated that

14   I'm going to give an instruction that's still yet to come

15   as to the videos, the fact that the defense didn't have

16   an opportunity to review, participate, et cetera.  So

17   I'll deny as to prevent the videos; grant as to the fact

18   that the Court will give and consider an instruction.

19               MR. MILLER:  And, Your Honor, --

20               THE COURT:  Yeah.

21               MR. MILLER:  -- I understand that and, the

22   instruction.  But we would hope it would be reflective of

23   the fact that there were two rulings by the Court that

24   the government did not have to provide the victim impact

25   evidence prior to the conclusion of the --

SENTENCING -- July 12, 2019 (Afternoon)

1          THE COURT:  And we can --

2          MR. MILLER:  Yeah.

3          THE COURT:  You know, we'll address that when

4    we include it in the instruction.

5          457 was the motion in limine regarding leading

6    questions, hostility of the Counseling Center people.

7    They've all testified now, so that's over with, right?

8    So we can moot that one.

9          And 442, then, is the government motion in

10   limine to prohibit improper cross of the victim's family.

11   The victim's family has all testified and, and if that

12   needs to be renewed, if they're coming back in on

13   rebuttal in any way -- otherwise, we'll moot that one.

14   Okay?

15          All right, everybody, thank you for the week.

16          We'll see you Monday morning.  All right?

17          MS. BRAIN:  Just one more thing, Your Honor, if

18   I could briefly.

19          THE COURT:  Yes, ma'am.

20          MS. BRAIN:  Defendant's Exhibit 152, the

21   complaint the Court excluded on the sidebar, I just

22   wanted to make it part of the record, for the record.

23          THE COURT:  As part of the record that I

24   excluded or denied you from presenting that in as an

25   exhibit?

SENTENCING -- July 12, 2019 (Afternoon)

1          MS. BRAIN:  Yes, Your Honor.

2          THE COURT:  Very good, all right.

3          MS. BRAIN:  Thank you.

4          COURTROOM DEPUTY:  Court is adjourned.

5              (Trial adjourns, 4:55 p.m.)

6

7                   * * * * * * * * * *

8

9                   REPORTER'S CERTIFICATE

10         I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

11    that the foregoing is a correct transcript from the

12    record of proceedings in the above-entitled matter.

13         Dated this 4th day of August, 2019.

14

15

16         _____   s/Lisa Knight Cosimini_____
                Lisa Knight Cosimini, RMR-CRR
17              Illinois License # 084-002998

18

19

20

21

22

23

24

25