1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS.
2

3

UNITED STATES OF AMERICA,
4                                    Docket No. 17-20037
              Plaintiff,
5
    vs.                            Peoria, Illinois
6                                  July 15, 2019
                                   1:17 p.m.
7  BRENDT A. CHRISTENSEN,

8              Defendant.

9

10

11        SENTENCING -- July 15, 2019 (Afternoon)

12

13

14        BEFORE THE HONORABLE JAMES E. SHADID

15            UNITED STATES DISTRICT JUDGE

16

17

18

19

20        LISA KNIGHT COSIMINI, RMR-CRR
21            U.S. District Court
              201 South Vine
22          Urbana, Illinois 61802
              217-355-4227
23

24

Proceedings recorded by mechanical stenography;
25  transcript produced by computer.

SENTENCING -- July 15, 2019 (Afternoon)

```
 1    A P P E A R A N C E S :

 2    For the Plaintiff:        EUGENE L. MILLER, ESQUIRE
                                BRYAN D. FRERES, ESQUIRE
 3                              Assistant United States Attorneys
                                201 South Vine Street
 4                              Urbana, Illinois 61802
                                217-373-5875
 5
                                JAMES B. NELSON, ESQUIRE
 6                              U.S. DEPARTMENT OF JUSTICE
                                Capital Case Section
 7                              1331 F Street NW, Suite 625
                                Washington, DC 20004
 8                              202-598-2872

 9
      For the Defendant:        GEORGE F. TASEFF, ESQUIRE
10                              Assistant Federal publish Defender
                                401 Main Street, Suite 1500
11                              Peoria, Illinois 61602
                                309-671-7891
12
                                ELISABETH R. POLLOCK, ESQUIRE
13                              Assistant Federal publish Defender
                                300 West Main Street
14                              Urbana, Illinois 61801
                                217-373-0666
15
                                ROBERT L. TUCKER, ESQUIRE
16                              Robert L. Tucker, Esq
                                7114 Washington Avenue
17                              St. Louis, Missouri 63130
                                703-527-1622
18
                                JULIE C. BRAIN, ESQUIRE
19                              Attorney at Law
                                916 South 2nd Street
20                              Philadelphia, Pennsylvania 19147
                                267-639-0417
21

22

23

24

25
```

SENTENCING -- July 15, 2019 (Afternoon)

<u>I N D E X</u>

<u>Page</u>

<u>DEFENSE WITNESSES IN MITIGATION</u>:

KURT EDWARD WILLIAMS

    Direct Examination by Ms. Brain ................. 140


ELLEN WILLIAMS

    Direct Examination by Ms. Brain ................. 145

    Cross-Examination by Mr. Freres ................. 179


ANDREA CHRISTENSEN

    Direct Examination by Ms. Pollock .............. 189

    Cross-Examination by Mr. Miller ................. 211

    Redirect Examination by Ms. Pollock ............. 214

SENTENCING -- July 15, 2019 (Afternoon)

```
 1              (In open court; jury absent; 1:17 p.m.)

 2              THE COURT:  All right.  We ready to resume the

 3   afternoon?

 4              MS. POLLOCK:  We are, Your Honor, but we have

 5   two matters first.

 6              THE COURT:  All right.  Go ahead.

 7              MS. POLLOCK:  First and foremost, we have filed

 8   over the lunch hour two offers of proof related to

 9   evidence which was excluded per the Court's ruling, just

10   to make a record.  I've provided both the government and

11   the Court Clerk with a jump drive, which has copies of

12   all the exhibits.  They were too large to file

13   traditionally on the ECF, so those have been filed.

14              Additionally, Your Honor, Mr. Taseff has

15   proposed a couple of alternative instructions for the

16   Court's consideration regarding the discussion of

17   demonology that occurred right before the break, and he's

18   prepared to present those at this point.

19              THE COURT:  Okay.  Government wish to be heard

20   on 462 or 463, the penalty phase offer of proof?

21              MR. MILLER:  On the offer of proof?  No, that's

22   fine, Your Honor.

23              THE COURT:  Well, I don't think the offer of

24   proof is accurate, though, as to 462.  So if one's going

25   to be filed, I expect that it should at least be
```

SENTENCING -- July 15, 2019 (Afternoon)

1    accurate.

2            I'm not taking exception to anything stated

3    from paragraph 2 on, if that's what you say the witness

4    would testify to.

5            But at the bottom of paragraph 1, it says the

6    basis for my ruling was that the defense counsel failed

7    to disclose Dr. Pearson as a witness to the government

8    under Federal Rule of Criminal Procedure 12.2(b), and

9    that's not entirely accurate.

10           I made a complete record on the matter and

11   struck Ms. Pearson.  As Ms. Brain represented her

12   testimony to be, I made a finding that she was a witness,

13   an expert witness under 12.2 and, therefore, given that

14   you made the strategic decision to withdraw that mental

15   health finding previously pursuant to 12.2, that she

16   would be barred.

17           In addition, I think I made clear the 3593

18   finding that if she tried to limit the testimony in any

19   way it would be to confuse and to cause prejudice -- or

20   confuse and mislead the jury.

21           In addition, I think that I made clear on the

22   record completely my findings with my exchange with Ms.

23   Brain so that to the extent that this offer of proof

24   simply says that the basis for my ruling was the single

25   failure to disclose Dr. Pearson as a witness, I'm going

SENTENCING -- July 15, 2019 (Afternoon)

1   to strike 462 and ask that if you're going to

2   characterize my remarks then to do so accurately and just

3   attach a complete transcript if you wish; and then if my

4   words and remarks or findings were wrong, at least

5   they'll be complete.

6           So as evidenced by your further 463, that is

7   noted and will be allowed to be made a part of the

8   record.

9           I might add that the offer of proof is what you

10  believe it is, but the fact is:  If you hadn't withdrawn

11  your notice, all of these likely would have come in as

12  well.

13          So, 463 is noted.

14          462 I would respectfully request that you

15  refile accurately stating my ruling as opposed to simply

16  saying it this way.

17          If you choose not to, or ask me not to strike

18  it based on that, I won't; but I'm making a record that I

19  don't believe it's an accurate representation of my

20  ruling.  So I'll actually put that ball in your court as

21  to whether you want to refile or not.

22          MS. POLLOCK:  Your Honor, we will look at that

23  and attempt to refile it accurately.  My question,

24  though, is:  Because we anticipate resting today, would

25  the Court give permission to file it after the defense

SENTENCING -- July 15, 2019 (Afternoon)                    132

```
 1    has rested its case?

 2              THE COURT:  Yeah.  You can file it because, as

 3    I understand it, you're making an offer of proof --

 4              MS. POLLOCK:  Yes, Your Honor.

 5              THE COURT:  -- on what you think the error was

 6    and why she should have been allowed to testify.  I

 7    understand that.

 8              Okay.  With regard to the limiting instruction,

 9    the government have a chance to --

10              MS. POLLOCK:  I'm very sorry, Your Honor.  I

11    completely forgot something.

12              THE COURT:  Yeah.

13              MS. POLLOCK:  The attachment to our 463, which

14    contains mental health records of the defendant and his

15    entire family, we would request that that be sealed from

16    public purview because of the contents of the records.

17              THE COURT:  Anything from the government on

18    that?

19              MR. MILLER:  We take no position, Your Honor.

20              THE COURT:  I agree.  It will be sealed.

21              MS. POLLOCK:  Thank you.

22              THE COURT:  All right.  As to the limiting

23    instruction, did you want this before the day was up to

24    be given?  From the defense?

25              MR. TASEFF:  Yes.
```

SENTENCING -- July 15, 2019 (Afternoon)

1          THE COURT:  All right.  I'll give the

2     government an opportunity to take a look at it and, and

3     represent what they believe -- or are you ready to do

4     that now?

5          MR. MILLER:  Well, we did want to make a record

6     ourselves, Your Honor, here.

7          For the record, I believe Ms. Pollock had used

8     the phrase "prosecutorial misconduct" and suggested that

9     there was no way that the defendant had any books that

10    discussed the occult in the Bureau of Prisons.

11         We're submitting, at least as an offer of

12    proof, Government Exhibit 134, which shows repeated

13    discussions of the defendant of such books, including

14    making a statement that the, on page 4 of the exhibit, to

15    his wife, "The occult book you sent me is perfect," and

16    then many other references throughout.  And this is just

17    a smattering.  We didn't, obviously, pull all of the

18    defendant's emails.

19         But it made it clear elsewhere that he asked

20    for another occult book and said he thought he could

21    probably get it in.  So we want to make it clear:  There

22    was a good-faith basis for asking the question and that

23    Ms. Pollock's representation was incorrect; that the

24    defendant -- his own statements indicate that he had in

25    the Livingston County Jail a book on the occult, and we

SENTENCING -- July 15, 2019 (Afternoon)

1  believe that it was certainly an invited question, given

2  the defense's attempt.

3          In their instruction they say, "There was no

4  evidence of what books Mr. Christensen did or did not

5  have in his possession or ever looked at while in

6  custody."

7          But the defense put that in the -- that's an

8  incorrect statement because they put into evidence the

9  statement from their witness that he discussed the

10  defendant reading -- *Did you discuss the books he was*

11  *reading?*

12          *Yes.*

13          *We discussed Goosebumps.*

14          So their proposed instruction is not correct

15  factually.  It was an invited question.

16          It was a question, also, that was not objected

17  to by defense counsel; and, frankly, at the end of the

18  day, I believe the witness answered "no."

19          So we're not -- we do not believe there was

20  anything improper done.  We don't believe that there's

21  actually evidence of it at this time in front of the

22  jury.  It was not objected to by the defense, and so we

23  don't believe this instruction would be appropriate.

24          MS. POLLOCK:  Where in this does it say that he

25  possessed the book?

SENTENCING -- July 15, 2019 (Afternoon)

1           MR. MILLER:  On page 4, Your Honor, as we

2    indicate, on this exhibit, he says to his wife, "The

3    occult book you sent me is perfect.  It" --

4           THE COURT:  This is January 29, 2019 --

5           MR. MILLER:  Yes, Your Honor.

6           THE COURT:  -- at 3:48?

7           MR. MILLER:  "It had exactly what I needed in

8    it.  It also has a lot of other interesting stuff in it,

9    like a bunch of stuff on numerology.  Most makes no

10   sense.  Lots of" -- I mean, it goes on and on and

11   describes, clearly, a book that he's read.  And he's been

12   in custody at this point for many, many, many months; and

13   he's telling his wife, "The book that you sent me on the

14   occult" -- "The occult book you sent me is perfect."

15          I believe that's certainly a good-faith basis

16   to ask if, in addition to reading books about *Goosebumps*,

17   the defendant was also reading books on the occult.

18          THE COURT:  Mr. Taseff, or whoever's arguing

19   this position.

20          MR. TASEFF:  Judge, the question was uncalled

21   for.  We objected when we could without drawing undue --

22          THE COURT:  Well, if, in fact, he did have a

23   book like that in his possession, why would the question

24   be uncalled for?

25          MR. TASEFF:  Well, because it would have passed

1  through the scrutiny of jail staff as being appropriate

2  reading.

3          THE COURT:  But so what difference does it

4  make?  All he did -- just, now, I'm going to assume for a

5  second that he had the book for the basis of this

6  question.  I don't know that he did.

7          But if he had the book and you had asked if he

8  read *Goosebumps*, why couldn't Mr. Nelson ask why -- did

9  he read --

10         MR. TASEFF:  He asked what books he read, and

11  the witness gave the answer but said the book he was

12  reading.

13         THE COURT:  Right.

14         MR. TASEFF:  But to invite that and say that

15  that's an invited response, to then ask a question about

16  occult and demonology --

17              (Multiple people speaking; reporter is

18              unable to hear/translate everything.)

19         THE COURT:  I mean, he might have read Louis

20  L'Amour Westerns; he could have been asked about those,

21  too, right?

22         MR. TASEFF:  Well, --

23         THE COURT:  So what -- if you're asking what

24  books he's reading, then isn't it all fair game?

25              I thought when you made the argument, or the

SENTENCING -- July 15, 2019 (Afternoon)

1  motion at first, that there was no basis for it because

2  he didn't have that book.  But it appears that either he

3  did, or it was sent to him or something, according to his

4  own email.  So, I mean --

5        MR. TASEFF:  We believe that at least one of

6  these alternative instructions are appropriate, given

7  what the Court had earlier ruled, and we'd ask that it be

8  given.

9        THE COURT:  Well, I'm willing to give some sort

10  of an instruction about books but not either one of these

11  as tendered at this time.  So we'll leave it at that for

12  now.

13        You can address it briefly.

14        MR. NELSON:  Your Honor, if I may add, I have

15  not briefed myself on the Illinois rules.  I'm licensed

16  in Nevada.  And allegations of prosecutorial misconduct

17  and unfounded allegations of attorney misconduct are

18  extremely serious matters.  Given that Ms. Pollock made a

19  factual representation that's contrary to the discovery

20  provided by her, I would ask for a finding by the Court

21  that there was no prosecutorial misconduct.

22        MS. POLLOCK:  I don't care what finding the

23  Court makes, Your Honor; but at the time that that

24  representation was made, the allegation was that it had

25  been barred by a previous ruling on a motion in limine

SENTENCING -- July 15, 2019 (Afternoon)

1   which is, in fact, correct.

2           THE COURT:  Well, I'm not going to make any

3   finding either way.  If I thought there was prosecutorial

4   misconduct, I would encourage further argument or

5   evidence on the issue, so I'm not prepared to make any,

6   any representation or finding in that regard at this

7   time, especially in light of the information just

8   provided by the government as well.

9           So, with that in mind, are we ready to go?

10          MS. BRAIN:  Just one more brief issue, Your

11  Honor, --

12          THE COURT:  Yes.

13          MS. BRAIN:  -- and that is the University of

14  Illinois filed a motion to quash the subpoena we served

15  upon it on Friday.  We obviously think the subpoena is

16  proper, and we want, want it to be complied with.  So we

17  would ask the Court to direct that they comply --

18          THE COURT:  So do you not want a chance to

19  reply to it in writing now?

20          MS. BRAIN:  No, Your Honor.  The only thing

21  that it says is that the, the subpoena is oppressive and

22  burdensome, which is a little ironic given that their

23  counsel was in court the other day saying that perhaps

24  there's a piece of paper somewhere in the University with

25  Mr. Christensen's name on it, and now they're claiming

SENTENCING -- July 15, 2019 (Afternoon)

1  that they've got so much stuff that it's difficult -- it

2  would be difficult for them to retrieve it.

3          MR. MILLER:  In some ways, we don't have a dog

4  in the fight, but I did read the response from the

5  University of Illinois, and that's not the only thing it

6  said.

7          It said they tried to narrow down the response

8  with Ms. Pollock; that they told her that they looked for

9  the item.  She had said that they did not have any of

10  those items and that she indicated that she was not going

11  to release them from the subpoena regardless of their

12  representations, and that's why they filed the motion to

13  quash subpoena.

14          So I just thought I would make the record clear

15  on what I read in the response by the University of

16  Illinois.

17          THE COURT:  I've read the response, and that's

18  why I asked this morning if the defense wished to reply

19  in writing, and now I'm being told they don't wish to do

20  so.  So we'll rule accordingly in due time -- in due

21  course.

22          Okay.  Are we ready to go?

23          MS. BRAIN:  I believe so.

24          THE COURT:  All right.  Let's have the jury in.

25          (Brief pause in proceedings.)

SENTENCING -- July 15, 2019 (Afternoon)

```
 1                    (Jury present, 1:30 p.m.)

 2              THE COURT:  Okay, thank you.  Please be seated.

 3          All right, our next witness for the defense.

 4              MS. BRAIN:  Yes, Your Honor.  The defense will

 5     call Mr. Kurt Williams, please.

 6                    (Brief pause in proceedings.)

 7              THE COURT:  Sir, if you'd come forward, please;

 8     and as you approach, please stop and raise your right

 9     hand and be sworn.

10              KURT EDWARD WILLIAMS, sworn, 1:31 p.m.

11              DIRECT EXAMINATION BY MS. BRAIN:

12         Q    Good afternoon.  Can you please tell us your

13     name and spell your last name for the court reporter?

14         A    My name is Kurt Edward Williams.  Spelling of

15     last name, W-i-l-l-i-a-m-s.

16         Q    Do you know Brendt Christensen?

17         A    Yes.

18         Q    How do you know him?

19         A    He is my son-in-law.

20         Q    Who are you married to?

21         A    [Gesturing.]

22         Q    Who are you married to?

23         A    I am married to Ellen Williams.

24         Q    And is that Brendt's mom?

25         A    Yes.
```

SENTENCING -- July 15, 2019 (Afternoon)

1       Q    Very good.

2            How long have you and Ellen been married?

3       A    Ellen and I -- we were married two years ago,

4    in two days.  So married July 17, 2017.

5       Q    Very good.

6            How did you meet?

7       A    Well, funny thing is we weren't really meant to

8    meet.  We met New Year's Eve 2015 at a gathering at a

9    recovery club in West Bend, Wisconsin, that I hadn't been

10   to in quite a, quite a few years.  I was quite sick, but

11   a friend called up and wanted to reacquaint.  We hadn't

12   seen each other in ten years since a friend's funeral,

13   and I finally relented and went there.  And that's when I

14   met Ellen.

15      Q    When you say "recovery event," what do you mean

16   by that?

17      A    Excuse me?

18      Q    Sorry.

19           When you say recovery event:  What do you mean

20   by that?  What's a recovery event?

21      A    It was a New Year's Eve party, and this was an

22   alcohol-free environment.  So people who were in

23   recovery, either Al-Anon, Alateen, AA -- so it was, it

24   was for people who were in recovery to get together,

25   share food.  There was a live band, so there would be

SENTENCING -- July 15, 2019 (Afternoon)

1    dancing.  So food, fun, and fellowship.

2         Q     Were you in recovery at that time?

3         A     Yes.

4         Q     Were you an alcoholic?

5         A     Among other things, yes.

6         Q     How long have you been sober?

7         A     I have been continuous sober and off of drugs

8    since June 6th of 1980, so a little over 39 years.

9         Q     Awesome.

10             Are you active in your local recovery

11   community?

12        A     Excuse me?  I'm having a hard time hearing you.

13        Q     You're not the first.

14             Are you active in your local recovery

15   community?

16        A     Yes.  Yeah.  I'm very active.  I generally go

17   to at least two AA meetings a week.  One meeting I've

18   been going there for 37 years now.  And then I generally

19   will attend at least one other meeting during the week

20   for AA.

21             And I'm also in another recovery group or

22   program called "Celebrate Recovery," which is run through

23   a bunch of churches.  It's the same twelve steps as

24   Alcoholics Anonymous and Al-Anon; but it's biblically

25   based, and you're much more open to speak about God,

SENTENCING -- July 15, 2019 (Afternoon)

1   Jesus Christ, and the Holy Spirit rather than in AA where

2   it just a "Higher Power" so it's more adaptable.

3       Q    Understood.  Very good.

4            In which town do you and Ellen live?

5       A    We live in West Bend, Wisconsin.

6       Q    And what do you do for work?

7       A    I am a construction contractor, do a lot of

8   remodeling, painting, drywalling.  When it comes to the

9   plumbing and electrical work, then I have friends who are

10  licensed in the trade, and I hire them to facilitate the

11  work.

12      Q    Have you -- what do you and Ellen like to do in

13  your spare time?

14      A    Well, we like cooking together.  We love

15  walking, taking long walks.  We enjoy traveling also.

16  But just a lot of times just sitting on the couch holding

17  hands watching some TV.

18      Q    Have you ever met Brendt?

19      A    Once.

20      Q    Can you tell us about that?

21      A    Sure.  That was -- I believe it was June 9th of

22  2016.  We met Brendt and his wife in Madison; went to the

23  Farmer's Market, so we spent probably two and a half or

24  three hours that morning with Brendt and his wife,

25  Michelle, at the Farmer's Market in Madison, just walking

SENTENCING -- July 15, 2019 (Afternoon)

1   around, checking all the different venues -- different

2   vendors, talking a little bit.

3        Q    And did Brendt make any comments to you

4   vis-à-vis your relationship with his mom?

5        A    Yeah.  At one, one point he -- I think Ellen

6   was talking to Michelle about something, probably over by

7   a little vendor, maybe some dresses or something.  And

8   Brendt come up and thanked me for being in his mom's

9   life; that it's the happiest that he had seen her, you

10  know, in a long time.

11           And I was, I was very protective for her, and

12  he thanked me for that.

13           MS. BRAIN:  That's all I have.  Thank you very

14  much.

15           MR. FRERES:  No questions, Your Honor.

16           THE COURT:  All right.  Thank you, sir.  You

17  may step down.

18           (Witness Kurt Williams excused, 1:36 p.m.)

19           MS. BRAIN:  Your Honor, if I could call Ellen

20  Williams.

21           THE COURT:  All right.

22           (Brief pause in proceedings.)

23           ELLEN WILLIAMS, sworn, 1:38 p.m.

24           THE COURT:  If you'll have a seat.  We'll get

25  you situated.

SENTENCING -- July 15, 2019 (Afternoon)

```
1              (Brief pause in proceedings.)

2              THE COURT:  All right, Ms. Brain, whenever

3    you're ready.

4              MS. BRAIN:  Thank you.

5                  DIRECT EXAMINATION BY MS. BRAIN:

6         Q    Could you tell us your name?

7         A    My name is Ellen Williams.

8         Q    And are you Brendt's mom?

9         A    I am Brendt's mom.

10        Q    When was Brendt born?

11        A    Brendt -- when?

12        Q    Yeah.

13        A    Brendt was born June 30, 1989.

14        Q    Who's his father?

15        A    Mike Christensen.

16        Q    Were you married to Mike Christensen at the

17   time that Brendt was born?

18        A    Yes, I was.

19        Q    And where were you living at that time?

20        A    Stevens Point, Wisconsin.

21        Q    Was Brendt born in Stevens Point?

22        A    He was.

23        Q    And what's Brendt's full name?

24        A    Brendt Allen Christensen.

25        Q    And how did you pick his name?
```

SENTENCING -- July 15, 2019 (Afternoon)

1    A    Brendt, because it's a nice strong, manly name.

2  It was between "Brendt" and "Brett," and we went with

3  "Brendt."  And "Allen" came from a book that, that I, I

4  liked a lot at the time.

5    Q    Was the --

6    A    In the book -- yeah, he was -- in the book --

7  it was called *The Sword of Shannara*.  It was a science

8  fiction fantasy.  And Allanon was the Druid who led Shea

9  on his quest to save the world, so Allanon was the

10 all-knowing Druid in the book.

11   Q    Do you have any other children?

12   A    I do.  I have Matt, who's older than Brendt,

13 and then Andrea.

14   Q    What year was Matt born?

15   A    Matt was born in -- March 28, 1987.

16   Q    And when was Andrea born?

17   A    September 13, 1994.

18   Q    Were they both born in Stevens Point?

19   A    Matt was born in Minneapolis; we were living

20 there at the time.  And Andrea was born in Stevens Point.

21   Q    Are you still married to Mike Christensen

22 today?

23   A    No, I'm not.

24   Q    When did you divorce?

25   A    September of 2013.

SENTENCING -- July 15, 2019 (Afternoon)

```
 1        Q     Have you remarried?

 2        A     Yes, I have.

 3        Q     Who's your husband now?

 4        A     Kurt Williams.

 5        Q     Okay.  How did you meet him?

 6        A     We met at an AA meeting on New Year's Eve in

 7   2015.

 8        Q     And when did you get married?

 9        A     It will be two years ago this coming Wednesday,

10   so 7/17 of 2017.

11        Q     And what town do you currently live in?

12        A     West Bend, Wisconsin.

13        Q     Now, are you employed?

14        A     I am.  Yes.

15        Q     Where do you work?

16        A     I work full time at an insurance Company.  It's

17   called West Bend Mutual Insurance.

18        Q     And what do you do for them?

19        A     I work in the claims, in the legal department.

20   I do support work, pay bills -- pay bills, do dictation.

21   I refer out files to outside counsel.

22        Q     Okay.

23        A     Pretty busy.

24        Q     And how long have you worked there?

25        A     Let's see, four years.
```

SENTENCING -- July 15, 2019 (Afternoon)

```
1        Q     Where were you born?

2        A     I was born in Milwaukee.

3        Q     Who are your parents?

4        A     My parents are Lorraine and Robert Lahmann.

5        Q     Do you -- did you know your grandparents?

6        A     I did, yes.  Casmer and Stella on my mom's

7   side.

8        Q     And where did they live when you were growing

9   up?

10       A     They lived in Oconto Falls, Wisconsin.

11       Q     Are either of them still living?

12       A     Pardon?

13       Q     Are either of them still living?

14       A     No.

15       Q     What about your grandparents on your father's

16  side?

17       A     That would be Oscar and Edna.  Edna we called

18  August.  And they are both deceased as well.  They lived

19  up in the Green Bay area.  And my -- they were divorced,

20  and my grandma ended up living with my Auntie Jean, my

21  dad's sister.

22       Q     All right, very good.

23             How many brothers and sisters do you have?

24       A     I have two brothers and one sister.

25       Q     And in what order were you born?
```

SENTENCING -- July 15, 2019 (Afternoon)

1      A     I'm the second oldest.

2      Q     And who, who is the -- who's the oldest?

3      A     The oldest is Bob.  He's about a year older

4  than me.  And then I've got a brother a year younger than

5  me, Pete; and then my sister, Emily, is nine years

6  younger than I am.

7      Q     Okay.  What's the first place that you remember

8  living?

9      A     I -- that would be Delafield, Wisconsin.

10     Q     Do you remember much about that?

11     A     No.  I was only there, like, the first couple

12 years of my life.  Maybe -- I think I was three when we

13 moved.

14     Q     And where did you move to?

15     A     We had a hobby farm.  We moved out to Monches,

16 Wisconsin.  We had three and a half acres, a barn; we had

17 animals.  It was an old drafty farmhouse.

18     Q     Did you live there in that house, that old

19 drafty farmhouse, until you left home?

20     A     Yes.  Yeah.

21     Q     And when did you leave, first leave home?

22     A     I was 17.

23     Q     And where did you go?

24     A     I went to college in Stevens Point.  I played

25 the cello, and I went to study music there.

SENTENCING -- July 15, 2019 (Afternoon)

```
 1        Q    Is that the University of Wisconsin--

 2        A    Yes, --

 3        Q    --Stevens Point?

 4        A    -- it was.  Yeah.  Sorry.

 5        Q    No, no.  You're good.

 6             Did you graduate with a degree?

 7        A    No.  I did not.

 8        Q    When did you leave the program?

 9        A    About two and a half years in.

10        Q    And why was that?

11        A    Money became a concern.

12        Q    When did you first meet Mike Christensen?

13        A    I met him while I was in college at Steve-- we

14   met in Stevens Point at bar.

15        Q    At a bar you said?

16        A    Yep.

17        Q    What were your first impressions of him?

18        A    He was cute, a charmer.

19        Q    And how long after you met him did you start

20   dating?

21        A    It was a good -- probably a year or so.

22        Q    How did you get back in touch?

23        A    We just ran -- we went to the same bar.  We

24   just hung out in the same groups.

25        Q    And did you eventually move in together?
```

SENTENCING -- July 15, 2019 (Afternoon)

1      A      Yes.

2      Q      Where was the first place that you lived

3  together?

4      A      We had a house in Stevens Point.  It was just a

5  one-bedroom rental.

6      Q      And what about -- did you at some point move to

7  Minneapolis?

8      A      Yes.  Yeah, we moved there after about a year.

9  His dad had an asphalt business that -- Mike went back to

10 work for him; and I went with, to work there, and we

11 ended up staying there.

12     Q      Where was the first place you lived in

13 Minneapolis?

14     A      We lived with his parents in their basement for

15 almost -- I don't think it was quite a year.  I want to

16 say, like, nine months.  I'm not really sure of the time

17 period on that.

18     Q      And who are Mike's parents?

19     A      Christian and Georgia Christensen.

20     Q      What was it like?  What was your experience

21 like living with them?

22     A      I don't -- I didn't know his dad very well.

23 His dad was not around a lot.  But his mom -- his mom

24 was, and she was -- she had a kidney disease, and she

25 wasn't, she wasn't happy.

SENTENCING -- July 15, 2019 (Afternoon)

1      Q      Would you say she was depressed?

2      A      She was depressed, very depressed.  She -- I

3   think she -- you know, she just wasn't happy with her

4   circumstances.  She did have to work full time.  She was

5   sick.  Her husband wasn't around a lot.  So I think -- my

6   impression was that she became very bitter.

7      Q      Was she a complainer?

8      A      She was a complainer.  Yeah.  It was hard.  So

9   I never gave myself -- I regretfully never gave myself a

10  good chance to get to know her because of that.

11     Q      And so you stayed in the basement for about

12  nine months or so, --

13     A      Yes.

14     Q      -- or thereabouts?

15     A      Uh-huh.

16     Q      Where did you move to then?

17     A      We had a -- we moved out to Big Lake, which is

18  about 30 miles north, into a mobile home.

19     Q      And how long did you live in the mobile home in

20  Big Lake?

21     A      About three years, four years -- four years.

22     Q      Four years?

23     A      Yeah.

24     Q      And then where did you move to from there?

25     A      Then we, we found a home in Minneapolis that

SENTENCING -- July 15, 2019 (Afternoon)

1    had -- it was a rental with an option to buy, so we ended

2    up buying that.

3         Q    And which of those places were you living when

4    you got married?

5         A    We were living in the mobile home out in Big

6    Lake.

7         Q    In Big Lake.

8              Can you tell us about -- when did you get

9    married.

10        A    August of '82.

11        Q    And tell us about your wedding.

12        A    We got, we got married by a Justice of the

13   Peace at the Como Park Conservatory in St. Paul.

14        Q    Was it a big wedding?

15        A    No, not at all.  It was a very small wedding,

16   just immediate family.

17        Q    Did anybody from your family come?

18        A    Yeah.  My parents, my sister, my brother, and a

19   few others.  It was really small, though.

20        Q    Okay.  And how long after you were married was

21   Matt born?

22        A    Matt was -- pardon?

23        Q    How long after you got married was Matt born?

24        A    Five years.

25        Q    Which house were you living in when Matt came

1  along?

2       A    We were in that, the home I mentioned, with the

3  rent with the option to buy.

4       Q    The rental?

5       A    Uh-huh.

6       Q    And then after you had Matt, did you move

7  again?

8       A    Yes.  We actually moved back to Stevens Point

9  in 1988, so Matt was about 18 months old when we moved

10  back to Stevens Point.  We made that decision because

11  Mike had a job offer there to manage some apartments,

12  which enabled me to stay home, be an at-home mom, which

13  is what we both wanted.

14       Q    Good.

15            So when you moved away, was Stevens Point the

16  place that you really wanted to move to?

17       A    No.  I always wanted to move back by my

18  parents, down, down in the West Bend/Hartford/Washington

19  County area.  That was home for me, so it was hard to be

20  away for so long.  Stevens Point became a compromise.  I

21  mean, it was close.  It was kind of a, kind of an

22  in-between point between Minneapolis and the West Bend

23  area.

24       Q    And why didn't, why didn't you go to your,

25  where your family is?

SENTENCING -- July 15, 2019 (Afternoon)

1       A     Because my husband wasn't interested in that.

2       Q     What was it like being married to Mike in the

3  early years?

4       A     We had, we had common interests.  We liked

5  doing the same things.  We liked watching movies, going

6  for walks; liked -- loved being outside.  We had a lot in

7  common.

8       Q     Did that change over time?

9       A     Yeah.  We grew apart.  Definitely.

10      Q     Did you work when your children were small?

11      A     I worked when I could, to help out, part time

12  mostly.  Yes.

13      Q     What kind of things did you do?

14      A     I did telephone sales.  I worked at Menards.  I

15  waitressed a lot.  Seasonal things.  Telephone sales.  I

16  stocked vending machines.  There was a lot of -- just

17  whatever I could find that, that worked around their

18  schedule, especially once they started -- well, when they

19  were in school.  Either way, you know, just whenever I

20  could.

21      Q     Yeah, understood.

22            Did you eventually get a full-time job?

23      A     I did.  I got a full-time job in 2008 at Sentry

24  Insurance.  I started in the Workers' Comp Department

25  there in Stevens Point.

SENTENCING -- July 15, 2019 (Afternoon)

1        Q      So Brendt would have been 19?

2        A      Right.

3        Q      And how old was your youngest, Andrea?

4        A      14.  Andrea was 14 then when I went to work

5  full time.

6        Q      So she was able to look after herself --

7        A      Oh, yeah.

8        Q      -- and get --

9        A      Get herself there and back --

10        Q      Yeah.

11        A      -- safely and be responsible, a very

12  responsible person.

13        Q      Yeah.  What, what did you do for the insurance

14  company?

15        A      I did -- I was in the Workers' Comp Department.

16  I did a lot of -- I did medical bills, coding, and data

17  entry.

18        Q      Did you and Mike ever record any home videos

19  when you had children?

20        A      Yeah.  We had home videos, yeah.  When it

21  worked, yeah, we used it.

22        Q      When it worked.

23        A      It was a tough thing to learn when to use that,

24  just the tapes.

25        Q      Have you since preserved the videos in digital

SENTENCING -- July 15, 2019 (Afternoon)

1   format?

2        A    I did, just last year -- or maybe a little bit

3   longer -- yeah, recently, I had them all transferred to a

4   flash drive.

5        Q    I'm going to show you -- if I may approach,

6   Your Honor -- what's been marked as Defense Number 146.

7             Can you tell us what's on that flash drive?

8        A    This flash drive is a little video snapshot of

9   our videos; and I did view that, and that's my -- that's

10  my initials on there.

11       Q    I was going to say:  How do you know that

12  that's what this is?

13       A    That's my handwriting.

14       Q    And did you watch this last night?

15       A    I did.

16            MS. BRAIN:  I'd move to admit and publish, Your

17  Honor.

18            THE COURT:  Any objection?

19            MR. FRERES:  We haven't seen it, Your Honor,

20  but I don't think we're going to have any objection.

21            THE COURT:  All right, then no objection.  It

22  will be admitted, and you may publish.

23            MS. BRAIN:  Thank you, Your Honor.

24            (Defense Exhibit 146 is published,

25            1:52 p.m. to 1:57 p.m.)

SENTENCING -- July 15, 2019 (Afternoon)

```
 1   BY MS. BRAIN:
 2        Q    During the portion of that video when you were
 3   in the hospital, was that right after you had Andrea?
 4        A    Yes.
 5        Q    And there was three little boys in there.  So
 6   there was Matt, and there was Brendt.  Who was the other
 7   little boy?
 8        A    That was Tom Mitchell, Brendt's friend.
 9        Q    Did you struggle with depression and anxiety --
10        A    I did.
11        Q    -- when Brendt was growing up?
12        A    Yes, I did.
13        Q    When did you first start having symptoms?
14        A    Probably around 1995/'96.  I'm not really sure
15   exactly when that -- I can't pinpoint exactly when that
16   started, but it was kind of a gradual.
17        Q    What was that like for you?
18        A    It was -- what was it like?  I was, I was
19   pretty sad and lonely.  Helpless.
20        Q    Was it hard to raise three children when you
21   were struggling like that?
22        A    Yeah.  It was hard.
23        Q    Did you ever get, seek medical help for your
24   depression?
25        A    Yeah, I did.  I did a couple of times.  I went
```

SENTENCING -- July 15, 2019 (Afternoon)

1  to the hospital for three days.

2      Q    Did you get medication?

3      A    I did get an antidepressant.  I was on a number

4  of antidepressants through, throughout.  A lot of SSRI

5  stuff -- you, know, Effexor and Celexa and -- I can't --

6  what's that one with the blue -- Paxil, I think.  Is that

7  Paxil?  Yeah.

8      Q    A punch of different med--

9      A    A bunch of different ones, yeah.

10      Q    How long all together were you taking them?

11      A    I was taking those for a good 15 years, until I

12  moved, probably around 2013.  I pretty much backed off of

13  them then.

14      Q    As a result of your mental health struggles,

15  did you also develop a dependence on alcohol?

16      A    I did.  Yeah.  Yeah.  Yeah.

17      Q    Are you currently sober?

18      A    I am.

19      Q    How long have you been sober?

20      A    One year and almost 11 months.

21      Q    Fantastic.

22          Are you active in your local AA group?

23      A    I am active.  I do service work for AA.  I am

24  the district -- so that's our big area -- I'm the

25  secretary, so I type up all the meeting minutes and

SENTENCING -- July 15, 2019 (Afternoon)

1  agenda and make sure everybody's registered and, and

2  whatnot.  And then on my home group -- home group, I am

3  the general service representative; so I take, take them

4  all the news and the events and the happenings.

5      Q    When your children were small, did you, did you

6  try to seek help with your alcohol dependence then?

7      A    I did.

8      Q    What did you do?

9      A    Well, I did go to the hospital.  I checked

10  myself in to try and get help to stop.

11      Q    Did it work?

12      A    It did not.  No.  I was really -- I was really

13  struggling, and I didn't know -- I didn't know how to get

14  out of it at that point.  I wasn't -- I don't think I had

15  the right tools and the right support and the right

16  guidance to help me.

17      Q    Okay.  Are there other members of your family

18  who struggled with mental illness?

19      A    Mental illness?  Probably my Grandpa Oscar.  I

20  know he had depression.  He drank a lot.  He's the one --

21  he did commit suicide.  My father-in-law, Christian, my

22  ex-husband's father -- well, he was an alcoholic.  My dad

23  was depressed a lot.  So, yes.

24      Q    And you mentioned that Christian Christensen

25  was an alcoholic?

SENTENCING -- July 15, 2019 (Afternoon)

1    A    Yes.

2    Q    Were there other members of your family, on

3  your side of the family?

4    A    On my side of the family?  That would be Oscar

5  and my dad I know for sure.

6    Q    Yeah.

7         Did you have any friends back then in Stevens

8  Point that you could turn to when things were hard?

9    A    I have one really close friend and -- yeah.

10 Her name is Deb Mitchell.

11   Q    And how did you meet Deb?

12   A    I met Deb at, down at the Stevens Point, at the

13 band show on I think it was -- I think it was a Wednesday

14 night band that they had.  And she was sitting there with

15 her family, her two boys and her husband, listening to

16 music; and I saw her, and she smiled at me.  And she just

17 looked like somebody I really wanted to get to know, and

18 we ended up being as close as two people can be who call

19 themselves sisters.  We had so much in common.

20   Q    Did you find out you actually had kids the same

21 age?

22   A    Yeah, yeah.  We found out shortly after that.

23 Now, the kids were 18 months old at the time when we met;

24 and on talking, we found out that our kids were born --

25 Tommy Mitchell and Brendt were born in the same hospital

SENTENCING -- July 15, 2019 (Afternoon)

1   on the same day.  We just never even saw each other until

2   a year and half later.

3       Q    And so did you become friends going forward?

4       A    Very -- yes.  We are still very close friends,

5   always will be.

6       Q    And did Brendt become friends with Tom?

7       A    Brendt became really good friends with Tommy,

8   yes.  Yeah.  They spent a lot of time together growing

9   up.

10      Q    And what kind of things did you and Deb and

11  your children do?

12      A    Well, we would, we would go to the park.  We

13  lived real close to the Wisconsin River, and there was a

14  nice playground down there.  We would go there and play.

15           Or we would take road trips to Green Bay to

16  see -- to go to Bay Beach.  It was this little amusement

17  park on the lake that, you know, all the rides were a

18  quarter; and we'd take a picnic along and spend the day.

19           We would go to the Dells and get a hotel room

20  and go hang out at Wisconsin Dells for a day.

21           Or one time we went to Baraboo at the circus

22  museum.

23           We just did a lot of, a lot of fun stuff

24  together that our husbands wouldn't necessarily have

25  liked to do.

SENTENCING -- July 15, 2019 (Afternoon)

1     Q    Did Brendt and Tom lose contact or spend less

2  time with each other as time went on?

3     A    They did grow apart a little bit as they were

4  growing up, yeah, middle school age.

5     Q    Tell us about Brendt growing up.  What kind of

6  a kid was he?

7     A    Brendt was -- and still is -- a very easygoing,

8  polite, kind, very kind young man.

9     Q    Was he smart?

10     A    Very smart.  Smarter than me.  I knew that.

11  But he never -- he always, always very polite about,

12  about his, his intelligence.

13     Q    Was he difficult to raise?

14     A    No, not at all.  No.  Quite the opposite.

15     Q    Did he have a lot of friends during his school

16  years?

17     A    Yeah, he did.  He got along well with a lot of

18  people.

19     Q    Do you remember any of his friends in

20  particular in addition to Tom?

21     A    Probably both Andys -- Andy Kieper and Andy

22  Tolsteadt -- are the two I really remember in Brendt's

23  growing-up years that had an influence on Brendt.

24     Q    Okay.  Was Brendt involved in any sports?

25     A    Brendt likes sports.  Yeah.  Yeah, he did.

SENTENCING -- July 15, 2019 (Afternoon)

1    Q    Did he play in any, get involved in any?

2    A    Wrestling, football, baseball; he was in track;

3  Taekwondo; did some gymnastics.

4    Q    Did he ever get injured playing sports?

5    A    He had a pretty -- he had at least a couple

6  pretty good knocks in wrestling that I recall that could

7  have been a concern.

8    Q    Knocks to where?

9    A    Pardon?

10   Q    Knocks -- you say knocks --

11   A    To his head.  To his head.  I'm sorry.

12   Q    No, no.  You're fine.

13        Did he have concussions?

14   A    Yeah.  He had at least one, from -- that one

15  was from wrestling, I believe.

16   Q    And what else did Brendt like to do in his

17  spare time when he was in school, in his school years?

18   A    Brendt liked to read, watch TV, do family

19  stuff.  We did a lot of stuff as a family, went camping.

20  Brendt liked -- we watched movies.  He'd play video

21  games.  You saw him play the piano; he was quite

22  accomplished at that.  Brendt was pretty passionate about

23  a lot of that stuff.

24   Q    Did Brendt suffer from night terrors --

25   A    He did --

SENTENCING -- July 15, 2019 (Afternoon)

1    Q    -- when he was a kid?

2    A    -- have night terrors.

3    Q    Can you tell us what that was like?

4    A    Well, the ones I remember -- I mean, my bedroom

5    was on the other side of the house, and his dad stayed up

6    a lot later than I did.  So as far as me witnessing them

7    one-on-one, there was only a few instances.  And Brendt

8    would wake up yelling in bed.  I would go in there, and

9    he's talk-- yelling, you know, just really scared,

10   talking.  His eyes were just wild.  I knew he couldn't

11   see me.  He kind of had that glazed-over look.  Just

12   totally freaked out.

13   Q    How old was he when they first started?

14   A    Two or three.  Pretty young.

15   Q    And how many years did they go on for?

16   A    Quite a few years.  I don't know if they ever

17   actually went away.

18   Q    Did he ever walk in his sleep?

19   A    Yes, he did.  Yeah.  Nothing dramatic happened

20   during those, those instances.  Those, those we could

21   handle easier.

22   Q    Did Brendt have migraines?

23   A    Brendt had a lot of headaches, yeah, migraines.

24   Nothing ever was -- we took him to the doctor a lot, but

25   there was nothing really that they could pinpoint that

SENTENCING -- July 15, 2019 (Afternoon)

1   really helped.

2       Q    What did you do for him when he got a migraine

3   like that?

4       A    Lay him down in a dark room with, with a rag on

5   his head, trying to keep him comfortable.

6       Q    How long would they last typically?

7       A    Hours.

8       Q    And how often did he get them?

9       A    Sometimes it was up to a couple times a month.

10      Q    Do you recall an incident in January of 2005

11  when Brendt was 15 and he had to go to the hospital?

12      A    Yes.

13      Q    Can you tell us what happened?

14      A    Yeah.  It was a night after school.  He --

15  Brendt didn't go to school because he was sick.  He had a

16  really bad fever.  I knew because he was really hot and

17  dry.  I could smell the fever on his breath.  And I was

18  concerned but not enough to take him to the hospital or

19  anything because, you know, kids get sick.  Brendt had a

20  lot of ear infections and had a lot of health struggles.

21      Q    Did you give him any medicine?

22      A    I gave him some -- I call it Tylenol because

23  that's my all-encompassing.  I'm not sure if it was

24  Tylenol, if it was Motrin, or even Aleve.  But I want to

25  think it was Tylenol.  And his fever did come down after,

SENTENCING -- July 15, 2019 (Afternoon)

1    maybe, a half an hour or so.

2              So I had to go over to my girlfriend's house,

3    who lived -- gosh, that was not even more than a half

4    mile away.  So I got in the pickup truck with my daughter

5    Andrea, and we went over there.  I don't even remember

6    what we went over there for, if we just had to drop

7    something off.  But we came back less than a half an hour

8    later, and our street was blocked off, the block itself.

9    I couldn't get to our home because there was a lot of --

10   ambulance, there was an ambulance and police cars just

11   blocking it off.  I couldn't get through.

12             So I got out of the pickup.  I ran into the

13   house.  The doors were all open.  There's cops all over

14   the place.  And I ran through to the back of the house,

15   which is the kitchen.  And my son, Brendt, was lying on

16   the floor, on one of those boards they put you on when

17   they don't know if you've got a neck injury or -- an

18   injury.  And he was just really scared, and they wouldn't

19   let me near him.

20        Q    Could you hear him?  Was he talking?

21        A    He was.  I don't remember what he was saying.

22   I think it was just all fear.

23             And so the paramedics were convinced he was on

24   some sort of drugs, that he was just strung out on PCP or

25   something -- something horrible.  So they were -- because

SENTENCING -- July 15, 2019 (Afternoon)

1   his heart rate was -- it was over 200.  It was really

2   fast.  So they got him to the hospital.  They got

3   everything --

4        Q    Let me stop you.

5             Did you find out what had happened, how he had

6   ended on your kitchen floor?

7        A    Oh, I'm sorry.  Yeah.  Okay.  I'm sorry.

8        Q    Go ahead.

9        A    Forgot that.  That's important.

10            Yeah.  Brendt was upstairs.  And upstairs there

11  was an exterior door because it used to be an apartment

12  rental; and on that, on that exterior door, there was a

13  deck.  So, and so Brendt went from his bedroom onto the

14  deck, and he jumped off the deck onto the deck on the

15  floor below.

16            We know this because it had just snowed, and it

17  was this light powder, so you could see everything that

18  happened afterwards.  And so he landed on the deck, and

19  then he ran out into the street and ran into a car,

20  physically ran into the car.

21            I just always thought he was delirious from

22  that fever, only to find out later that he might have

23  been trying to harm himself.

24        Q    When you got to the hospital, did they test him

25  for, to see if he was on any kind of drugs?

SENTENCING -- July 15, 2019 (Afternoon)

1      A      Yes, they did.  He was -- there was nothing

2    found in his system.  No drugs at all.

3      Q      Did he have to stay in the hospital?

4      A      They kept him overnight, yeah, and let him go

5    the next day without, without anything.  You know, just,

6    "You can take him home now."

7      Q      In 2008, on his 19th birthday, did something

8    happen to Brendt on that day?

9      A      Yeah.  Brendt -- that was the day I actually

10   started working at Sentry Insurance.  That morning before

11   I went, I got a phone call that Brendt -- he was working

12   for a roofing company.

13           That was -- was that your first day?  I think

14   it was your first day or something like that, right?  It

15   was close.  I don't think you were working there that

16   long, maybe a couple weeks.

17           And Brendt had been doing tear-off on this

18   roof.  I don't know if it was a restaurant.  It was a

19   flat roof.  But there were no safety -- there was

20   nothing -- Brendt didn't have a brace on, so he was up on

21   a roof.  And he was taking the old roofing, and he had to

22   throw -- his job was to throw it into the dumpster that

23   was on, on the ground.

24           And there was this board that was cantilevered

25   out that he was actually using as, like, a plank to get

SENTENCING -- July 15, 2019 (Afternoon)

1  closer to the garbage, to the dumpster; and that board

2  gave away, and so Brendt fell and landed full on his, on

3  his hands that day.

4       Q    Was he hurt?

5       A    Yeah.  He shattered both of his arms.  He

6  didn't -- I don't -- he didn't hit his head.  His knee

7  got a, took a pretty big bruise, but there was no

8  significant damage there.

9       Q    Did he go to the hospital?

10      A    He did.  Yeah.  That was a long -- he was there

11  for a quite a while.  There was a lot of rehab.  That was

12  a bad accident.

13      Q    What did they do for him at the hospital?

14      A    He was in surgery for quite a few hours, put

15  some pins in, set it -- you know, because I think a lot

16  of that was shattered, so they had to rebuild a lot.

17      Q    Did he have physical aftereffects from that

18  accident in the years that followed?

19      A    Pardon?

20      Q    Did he have physical effects from the accident

21  in the years that followed?

22      A    Physical?

23      Q    Uh-huh [nodding head up and down].

24      A    Yeah.  It hurt.

25      Q    Right.

SENTENCING -- July 15, 2019 (Afternoon)

1      A    You know, I mean with the weather, I mean, that

2  was -- that became arthritic really fast.

3      Q    How did the fall impact him psychologically?

4      A    Afterwards, I noticed that Brendt was

5  complaining about being able to sleep.  I would go into

6  his bedroom and he would be -- the only -- he told me the

7  only way he could fall asleep is if he's laying on his

8  stomach with the cat, Misty, on his back.  Then he felt

9  safe enough to fall asleep.  Otherwise, he just did not

10  feel safe enough to fall asleep.

11          And so Brendt confided in me that he did a

12  Google Search on his symptoms, and they came back as

13  schizophrenic.

14          MR. NELSON:  Objection.

15          MR. FRERES:  Objection, Your Honor.  We've been

16  down this road.  This is inappropriate.

17          WITNESS ELLEN WILLIAMS:  Oh.

18          THE COURT:  We'll move on.  The question's been

19  answered now.  Let's move on.

20          Go ahead, Ms. Brain.

21          MS. BRAIN:  Yes, Your Honor.

22          WITNESS ELLEN WILLIAMS:  Sorry.

23  BY MS. BRAIN:

24      Q    And so how did you respond when he said that?

25      A    I took him to the doctor, where he was told he

SENTENCING -- July 15, 2019 (Afternoon)

1  had PTSD, and he was given an antidepressant.

2        Q    He was given medication?

3        A    He was.

4        Q    When did Brendt graduate from high school?

5        A    2007.

6        Q    And how well did he do in high school?

7        A    He did pretty well.  He did very well.

8        Q    What about at the end?

9        A    At the end he did drop it off.  His, his GPA

10  went down pretty far.

11        Q    Where had he wanted to go after high school?

12        A    He wanted to go to Madison, but his grades were

13  not good enough at that point.

14        Q    Did he apply?

15        A    He did.

16        Q    And he was rejected?

17        A    Right.

18        Q    So what did Brendt do then?

19        A    He went to the, the technical college in town.

20        Q    And how long did he spend there?

21        A    A year.

22        Q    How did he do?

23        A    He got straight As in everything.

24        Q    And was he able to move on from the technical

25  college?

SENTENCING -- July 15, 2019 (Afternoon)

1      A      Yeah.  Then he went to University of

2   Wisconsin-Stevens Point.

3      Q      And how long did he go there?

4      A      It was over a year.

5      Q      And where did he go from there?

6      A      He did go to Madison then, and that's where he

7   graduated.

8      Q      He was accepted?

9      A      He was accepted.

10      Q      Good.

11             How long did he spend in Madison?

12      A      Two, three years.

13      Q      Did you know he was struggling with depression

14   and alcohol dependence when he was there?

15      A      Huh-uh [shaking head from side to side].

16      Q      Did he graduate from the University of

17   Wisconsin-Madison?

18      A      He did.

19      Q      What year did he graduate?

20      A      It was 2013.

21      Q      And what was his degree?

22      A      Physics.

23      Q      This is going to seem like a silly question

24   with this picture up here, but did you go to his

25   graduation?

SENTENCING -- July 15, 2019 (Afternoon)

1      A      Yeah.

2      Q      And did any other members of your family go,

3   too?

4      A      Yeah.  That's Andrea and Mike, his dad and

5   sister.

6      Q      How did you feel that day?

7      A      I was proud.  Very proud.  That was an

8   accomplishment.  He went through -- he realized he

9   needed, or wanted to do well.  He, he -- and he achieved

10  his goal.

11     Q      How did he feel on that day?

12     A      Very proud.  Look at him.

13     Q      Did Brendt already know where he was going

14  after he graduated from Madison?

15            You can take it down.

16     A      After he graduated?

17     Q      Did he know at that point where he was going

18  next?

19     A      He wanted to go -- he wanted to move on, so he

20  applied to a number of places and landed on University of

21  Illinois in Champaign-Urbana.

22     Q      For what?  What was he going to --

23     A      That was in physics.

24     Q      And was it a doctoral program?

25     A      It was.

SENTENCING -- July 15, 2019 (Afternoon)

1     Q     When did Brendt get married?

2     A     2011.

3     Q     Did you go to the wedding?

4     A     I did.

5     Q     What was it like?

6     A     That was in a hotel room.  That was a small

7  wedding, with his parents and us; Justice of the Peace, I

8  think it was.

9           I don't know exactly who it was that married

10 you.

11          But then we went to The Melting Pot for dinner.

12 So just -- it was just a nice, happy time, happy day.  It

13 was a good day.

14    Q     Were you happy that he was marrying Michelle?

15    A     Oh, yeah.  I loved Michelle.  They were just --

16 they are just so suited to each other.

17    Q     Is, is Brendt the type of person you thought

18 would do well by himself?

19    A     By himself?  No.  Brendt, no.  Even when Brendt

20 was little, I know that Brendt had -- you know, "Could

21 you come lay with me?"  He just always wanted to be by

22 us.

23          And I'm kind of like that, too.  I don't

24 like -- I don't do well alone, and I know that Brendt

25 wouldn't either.  Just that personality.

SENTENCING -- July 15, 2019 (Afternoon)

1    Q    Sure.

2         After Brendt left Stevens Point for Madison and

3    then Champaign, how often did you see him?

4    A    I didn't see him that often.  I moved -- I got

5    my divorce, and I moved to the West Bend area in 2013.

6    And the jobs I had -- I just didn't have the vacation

7    time, and it was a struggle with money, starting out all

8    on my own.  So I didn't get to see him but a couple times

9    when he was down there.

10   Q    Did you communicate with him --

11   A    Oh, yeah.

12   Q    -- in any way?

13   A    Texted and emailed and called a lot.  Yeah.

14   Q    Where was Brendt's older brother, Matt, living,

15   when Brendt went to Champaign?

16   A    Taiwan.  Still over --

17   Q    Is he still --

18   A    -- in Taiwan.  Yeah, he is.

19   Q    Did Brendt have any contact with Matt?

20   A    I -- Facebook and email, probably.

21   Q    Okay.  And where was Brendt's sister, Andrea,

22   when he went to Champaign?

23   A    Andrea was living in Stevens Point still.

24   Q    In the two years since his arrest when he's

25   been in jail, have you been in contact with Brendt?

SENTENCING -- July 15, 2019 (Afternoon)

1    A    Yes.

2    Q    How, how are you in contact?

3    A    Well, first, it was just mail and occasional

4  phone calls.  I figured out how to use the video chat.

5  So we were doing that for quite a while when he was

6  living in Livingston.  But since he's moved to Peoria,

7  it's been strictly phone calls.  I don't think we can

8  video chat.

9    Q    Okay.

10    A    At least weekly.

11    Q    Yeah.  I was going to say:  How often?  At

12  least weekly?

13    A    Yeah.

14    Q    How do you feel about the crime that Brendt has

15  been convicted of committing?

16    A    How do I feel?  It's horrible.  Sad.  I feel

17  bad.

18    Q    Do you ever think about Ms. Zhang's family?

19    A    Pardon?

20    Q    Do you ever think about Ms. Zhang's family?

21    A    Yeah.  I think about them at least -- at least

22  five times a day and how horrible this must be for them.

23    Q    When you talked to Brendt -- let me back up.

24        Does the crime and the effect on the family, do

25  those things cause you to stop loving your son?

SENTENCING -- July 15, 2019 (Afternoon)

1     A    No.  No.  My love for all my kids and

2  Brendt is -- it's -- I want to say pure, but that's not

3  really the right word.  It's certainly unconditional.

4  It's a love that no matter what is never going to, never

5  going to diminish.  I love my kids.  I love Brendt.

6     Q    When you talked to Brendt in the jail in the

7  first few months after he was arrested, did he tell you

8  he wasn't guilty of this crime, that it wasn't him?

9     A    Yes, he did.

10     Q    Do you now know that he wasn't telling you the

11  truth?

12     A    I suppose.  Yeah.

13     Q    Does that cause you to stop loving him?

14     A    That doesn't change anything.  Nothing.  Brendt

15  did what he felt he needed to do at the time to protect

16  himself, and I get that.  I have no animosity.  I have

17  no, no hard feelings.  I, I, I understand -- I

18  understand.  I understand Brendt.

19     Q    If Brendt were to be executed, how would it

20  affect you?

21     A    Well, it would be -- that would be horrible.

22  It would be, it would be -- you know, I don't know how

23  to -- you know, I think about what happened to -- it

24  would be just -- it would be devastating.

25     MS. BRAIN:  Thank you, Mrs. Williams.  That's

SENTENCING -- July 15, 2019 (Afternoon)

1    all my questions.

2              WITNESS ELLEN WILLIAMS:  Okay, thanks.

3              THE COURT:  One second.  There's going to be a

4    few questions.

5              WITNESS ELLEN WILLIAMS:  Oh.

6              THE COURT:  Mr. Freres, any questions?

7              MR. FRERES:  Yes, Your Honor.

8              THE COURT:  All right.

9                CROSS-EXAMINATION BY MR. FRERES:

10       Q    Good afternoon, ma'am.

11       A    Hi.

12       Q    It's fair to say, sitting here today, that

13   you'd support the defendant no matter what, wouldn't you?

14       A    Yes.

15       Q    And you've -- I believe you testified you've

16   supported him pretty significantly during his pretrial

17   detention in this case?

18       A    Uh-huh.

19       Q    And you'd do anything you could to help him,

20   wouldn't you?

21       A    Absolutely.

22       Q    Now, I think -- do you remember Ms. Brain

23   asking you about the incident when your son was 15?  Do

24   you recall that?

25       A    Uh-huh [nodding head up and down].

1      Q    And that he was taken to the hospital; is that

2  correct?

3      A    Yeah.

4      Q    And do you remember:  After that, there was no

5  psych referral for any psychiatric issues that was made

6  at that time, was there?

7      A    No.  I don't think so.  I don't think so.  Not

8  that I recall.

9      Q    And you didn't take him to any counseling or

10  anything after that?

11      A    No, we didn't.

12      Q    He was back to being the happy, healthy boy we

13  saw in these videos pretty quick after that, wasn't he?

14      A    I suppose.  Yeah.  Yeah.  I don't think at the

15  time we thought it was, that it was anything but being

16  sick.  You know, a, a -- the fever, --

17      Q    Right.

18      A    -- that kind of sick.

19      Q    You believed it was a fever; that was your

20  testimony, correct?

21      A    It was.  Yeah.

22      Q    Now, it's fair to say, also, that you raised

23  your kids in Stevens Point, correct?

24      A    Uh-huh.

25      Q    And it's fair to say the defendant liked where

SENTENCING -- July 15, 2019 (Afternoon)

1    he grew up there in Stevens Point, didn't he?

2         A    Yes.

3         Q    And he has told you that he never felt bad or

4    unsafe or anything like that during his childhood,

5    correct?

6         A    Correct.

7         Q    You've testified, again, that he's very

8    intelligent; that's accurate, right?

9         A    Yes.

10         Q    And was in a gifted program in elementary

11    school?

12         A    Yes.

13         Q    And was able to play sports in junior high and

14    high school?

15         A    Yes.

16         Q    And play piano, I think we saw as well,

17    correct?

18         A    Yes.

19         Q    And he was then able to go to college?

20         A    Yes.

21         Q    And graduated with a -- was it a dual degree

22    from the University of Wisconsin-Madison, physics and

23    mathematics; is that correct?

24         A    Yeah.  I forgot about the math part.

25         Q    And then was able to get married?

SENTENCING -- July 15, 2019 (Afternoon)

1      A      Yes.

2      Q      And lived on his own, correct?

3      A      Absolutely, yes.

4      Q      And he was -- as you mentioned, got into the

5  University of Illinois for the graduate physics program?

6      A      He did.

7      Q      And that's a very prestigious program, isn't

8  it?

9      A      Yes.

10      Q      And when he moved to Champaign, I believe you

11  testified that you didn't have much contact with him at

12  that point; is that correct?

13      A      Right.

14      Q      He was making decisions for himself at that

15  point, wasn't he?

16      A      He was married with Michelle, so I assumed that

17  they were -- and they were jointly making decisions that

18  needed to be made.  So he was, you know, he was with

19  someone.

20      Q      Sure.  He wasn't asking your advice --

21      A      Oh.

22      Q      -- for his decisions at that point; is that a

23  fair statement?

24      A      You are correct.

25      Q      Now, I believe you, you mentioned at one point

1    that -- you said that the defendant wouldn't do well

2    alone.  Do you recall that?

3        A    I do.

4        Q    Are you aware that he told his girlfriend in

5    2017 that he was -- he described himself as a loner?

6        A    No.

7        Q    And, again, you -- from 2013 to 2017, he was

8    living on his own in Champaign with Michelle, correct?

9        A    Uh-huh.

10       Q    And he really wasn't having significant input

11   with his parents, you or Mr. Christensen, was he?

12       A    Right.

13            I don't know about Mr. Christensen.  He wasn't

14   with me.

15       Q    Yes, ma'am.  Thank you.

16            Now, you've also had -- part of that support

17   that you've provided him while he's in jail, you've been

18   in contact with him pretty regularly on, over the phone

19   since he's been incarcerated pretrial; is that correct?

20       A    Yes.

21       Q    And during those calls, you've discussed, sort

22   of, his conditions of living and what he's been doing; is

23   that accurate?

24       A    Yes.

25       Q    And would it be fair to say he's told you that

SENTENCING -- July 15, 2019 (Afternoon)

1   he's not having any sleep issues in jail?

2       A    No.  I think he told me he's had some issues.

3       Q    Would it be accurate that he's told you he's

4   sleeping 12 or more hours a day?

5       A    I don't remember if that's a statement he made.

6       Q    Do you recall a conversation on October 31st of

7   2017 --

8       A    2017.

9       Q    -- the two of you would have had over the phone

10  while he was in custody at the Livingston County Jail?

11      A    Regarding his sleeping for 12 hours?  Is that

12  what --

13      Q    Where the defendant told you that he was

14  sleeping for 12 hours a day, and it wasn't a depressive

15  thing, and it was just because he wanted to?

16      A    Okay.

17      Q    Do you recall that conversation?

18      A    I might.  I know Brendt's always -- Brendt's

19  had sleep issues.  Sometimes he sleeps a lot, and

20  sometimes he doesn't.  So I guess that wouldn't be

21  uncommon.

22          MR. FRERES:  Thank you, ma'am.  I have no

23  further questions, Your Honor.

24          THE COURT:  Ms. Brain, anything?

25          MS. BRAIN:  No redirect, Your Honor.

SENTENCING -- July 15, 2019 (Afternoon)

```
1              THE COURT:  All right.  Thank you.

2              WITNESS ELLEN WILLIAMS:  Okay.

3                 (Witness Ellen Williams excused, 2:29 p.m.)

4              MS. POLLOCK:  Your Honor, before we call our

5    next witness, would this be an appropriate time for our

6    afternoon break?

7              THE COURT:  Sure.  Let's do that.  Let's take a

8    15-minute break at this time.  Let's not discuss this

9    matter with each other or yourselves.

10                (Jury absent, 2:30 p.m.)

11             THE COURT:  Okay.  Anything before we break?

12             MR. NELSON:  Yes, Your Honor.  Just to put on

13   the record, we've now had several instances -- first with

14   regard to the availability of a psychologist, then with

15   Ms., Dr. Pearson, then with a reference to the mercy

16   instruction in the opening statement, and now with this

17   reference to schizophrenia.  We think this is completely

18   across the line.  We will be proposing an instruction on

19   Rule 12.2.  The Court was very clear about this evidence

20   not coming in, and we think it's a further attempt to

21   end-run Rule 12.2 by the defense.

22             THE COURT:  All right.  Well, like the others,

23   we'll address that when you tender it.

24             Anything else to address before we break?

25             MS. BRAIN:  No, Your Honor.
```

SENTENCING -- July 15, 2019 (Afternoon)

```
 1              THE COURT:  All right, very good.

 2              COURTROOM DEPUTY:  Court is in recess.

 3              (Recess, 2:31 p.m. to 2:49 p.m.)

 4              THE COURT:  Does the defense have one more

 5    witness?

 6              MS. POLLOCK:  Yes, Your Honor.

 7              THE COURT:  And then does it appear we would

 8    break for a few minutes to address any issues that are

 9    going to be raised about rebuttal?

10              MS. POLLOCK:  I think that's correct, Your

11    Honor.  There are several issues that need to be

12    addressed outside the presence of the jury.

13              THE COURT:  So is it safe at this point to

14    assume that Mr. Christensen is not going to testify at

15    the sentencing?

16              MS. POLLOCK:  That's correct, Your Honor.

17              THE COURT:  All right.  Now, both of you have

18    tendered proposed instructions that address that, and all

19    I -- and so I think it's safe to address it here at this

20    time to make sure that Mr. Christensen understands he has

21    a right to do so if he were to choose to do so.

22              Does anybody want to take any issue with that?

23              MR. MILLER:  No, Your Honor.

24              MS. BRAIN:  No, Your Honor.

25              THE COURT:  Okay.  Mr. Christensen, just a
```

SENTENCING -- July 15, 2019 (Afternoon)

1  couple of questions.

2  　　　　　COURTROOM DEPUTY:  Ms. Brain, can you move the

3  microphone, please?

4  　　　　　THE COURT:  And you can remain seated, sir.

5  　　　　　Just a couple of questions as we did with the

6  first phase of the trial, although they won't be as

7  in-depth.

8  　　　　　But both parties have tendered proposed

9  instructions that indicate that if you do not testify

10  we'd tell the jury that you did not testify.  You'd have

11  an absolute right not to testify.  There's no burden on

12  you to prove that you should not be sentenced to death or

13  that a sentence of death is justified, and the fact that

14  you did not testify should not be considered by the jury

15  in arriving at their decision.  Okay?

16  　　　　　So with that in mind, though, sir, as I

17  discussed before with you, the right to testify is yours

18  and yours alone, made generally in consultation with your

19  attorneys.

20  　　　　　Do you understand that?

21  　　　　　DEFENDANT CHRISTENSEN:  Yes.

22  　　　　　THE COURT:  And as I discussed previously with

23  you:  Often, it's not uncommon that a defendant will want

24  to testify.  His attorneys will not want him to testify.

25  You discuss that; and, ultimately, that's your decision.

SENTENCING -- July 15, 2019 (Afternoon)

1    Do you understand that?

2            DEFENDANT CHRISTENSEN:  Yes.

3            THE COURT:  And vice versa.  Sometimes a person

4    does not want to testify.  Attorneys think they should

5    testify.  But, ultimately, that's your decision as well.

6    Do you understand that?

7            DEFENDANT CHRISTENSEN:  Yes.

8            THE COURT:  And I'm not saying that's the

9    circumstance here.  You may all be in agreement.  I just

10   want you to understand that the point is that I'm asking

11   you:  Is this decision to not testify yours, yours alone,

12   and, again, voluntarily and knowingly made after

13   consulting with your lawyers on the matter?

14           DEFENDANT CHRISTENSEN:  Yes.

15           THE COURT:  Do you have any questions about

16   your right to testify?

17           DEFENDANT CHRISTENSEN:  No.

18           THE COURT:  Do you have any question about your

19   right not to testify?

20           DEFENDANT CHRISTENSEN:  No.

21           THE COURT:  Do you have any questions at all?

22           DEFENDANT CHRISTENSEN:  No.

23           THE COURT:  Okay, very good.  I'll find that

24   that record has been made.  Mr. Christensen's aware of

25   his rights to testify -- well, and are you deciding not

SENTENCING -- July 15, 2019 (Afternoon)

1    to testify?

2            DEFENDANT CHRISTENSEN:  Yes.  No testifying.

3            THE COURT:  Okay, very good.

4            All right.  With that in mind, shall we bring

5    the jury back in?

6            MS. POLLOCK:  Yes, Your Honor.

7            THE COURT:  Okay.  Thank you.

8                (Brief pause in proceedings.)

9                (Jury present, 2:53 p.m.)

10           THE COURT:  All right.  Thank you.

11           Please be seated.

12           All right, next witness for the defense.

13           MS. POLLOCK:  Defense calls Andrea Christensen.

14           THE COURT:  All right, Ms. Christensen, if you

15   would come forward, please.

16           ANDREA CHRISTENSEN, sworn, 2:53 p.m.

17           THE COURT:  One second, Ms. Pollock.

18               (Brief pause in proceedings.)

19           THE COURT:  All right, Ms. Pollock, your

20   witness.

21           MS. POLLOCK:  Thank you.

22             DIRECT EXAMINATION BY MS. POLLOCK:

23       Q   Can you please state your name?

24       A   Andrea Christensen.

25       Q   I think at this point everybody knows how to

SENTENCING -- July 15, 2019 (Afternoon)

1    spell Christensen.

2              And, Andrea, how old are you?

3    A    24.

4    Q    Where do you live?

5    A    In Denton, Texas, right now.

6    Q    About how long have you lived in Denton, Texas?

7    A    About three years.

8    Q    Okay.  And before that, where did you live?

9    A    Before that, I lived in the Seattle area.

10   Q    Okay.  And you are Brendt's sister, right?

11   A    Yes.

12   Q    Younger sister?

13   A    Uh-huh [nodding head up and down].

14   Q    Okay.  I'm going to ask you to speak up just a

15   tiny bit for the court reporter.

16   A    Okay.

17   Q    And try to say "yes" or "no" instead of

18   "uh-huh" or "huh-uh," --

19   A    Okay.

20   Q    -- okay?

21              All right, so, Andrea, you said you're 24 years

22   old, which puts you born in what year?

23   A    1994.

24   Q    And who are your parents?

25   A    Mike and Ellen Christensen, or Ellen Lahmann.

SENTENCING -- July 15, 2019 (Afternoon)

1      Q     Okay.  And are you the youngest of your

2  siblings?

3      A     Yes.

4      Q     And who are your older siblings?

5      A     Matt and Brendt Christensen.

6      Q     And how old are they in relation to you?

7      A     Brendt is five years older than me, and Matt is

8  seven years older than me.

9      Q     So that's a pretty significant age gap?

10     A     It is.

11     Q     Did that affect you growing up with the two of

12  them?

13     A     Well, yes, with that significant age gap, we

14  weren't, you know -- we didn't have more of a friendship

15  relationship until I got a little older and it leveled

16  out and we were able to communicate.  You know, typical

17  sibling rivalries and things like that.

18     Q     Okay.  So can you tell us -- describe for us

19  what your relationship with your brothers was like around

20  when you were in elementary school.

21     A     Well, I was closer with Brendt because we were

22  closer in age.  I looked up to him a lot.  He was a role

23  model for me.

24           Matt just kind of teased me a lot.  You know,

25  he was a lot older, but we became good friends later on.

SENTENCING -- July 15, 2019 (Afternoon)

1      Q      Later on?

2      A      Yeah.

3      Q      Okay.  And so you said that you had, like, a

4    more playful sibling relationship.

5      A      Yes.

6      Q      Can you describe some of the things that you

7    would do together as kids?

8      A      We would play video games, and we'd go camping

9    with my dad and watch movies and play in the snow, things

10   like that.

11     Q      And did you -- did your brothers ever fight

12   with each other that you remember?

13     A      With each other?  Not much, no.

14     Q      With you?

15     A      Not much at all.

16            Well, it wasn't ever serious fighting, though;

17   it was just healthy.

18     Q      Okay.  And was it physical, or was it mostly

19   just teasing?

20     A      It was just teasing; never physical.

21     Q      What do you remember about your parents when

22   you were about elementary school aged?  How were they?

23     A      I don't remember them having much of a

24   relationship during that time.  They didn't start

25   fighting much until later, after my brothers had left.

1    Q    Okay.  Well, when you were in elementary

2    school, do you remember what their relationship with each

3    other was like?

4    A    My parents?

5    Q    Yes.

6    A    I suppose it was tense, you could say.

7    Q    Did you notice anything about your mother's

8    behavior that was strange to you during those years when

9    you were growing up?

10   A    Yes.  She wasn't very present.  She slept a

11   lot.  I didn't understand until later that it was

12   alcoholism.

13   Q    And when you said you understood later, how did

14   you come to understand that?

15   A    Well, I noticed her being drunk, and I found

16   alcohol around the house, things like that.

17   Q    Did you ever have discussions with your

18   brothers about that?

19   A    Not until we were all adults.

20   Q    And what about your father?

21   A    My dad was the one who helped me through the

22   most difficult time in that.

23   Q    Can you tell us what you mean by that?

24   A    Well, towards the end when I was an older

25   teenager, my brothers weren't present.  They were in

SENTENCING -- July 15, 2019 (Afternoon)

1    college.  It was just me, and things had gotten very

2    toxic.  My mom was very unhappy, so I was kind of stuck

3    in that situation; and, but Dad was kind of stuck in that

4    situation, trying to keep everything together for my

5    sake.  And him and I were very supportive of each other

6    during that time.  We started to become very good friends

7    as I became an adult.

8        Q    Okay.  Now, you said that you found alcohol in

9    the house and that she would be drunk.  Can you elaborate

10   a little bit on when and how that happened?

11       A    Yeah.  Well, when I was around eight or nine,

12   there was a coffee cup with a clear liquid in it, and I

13   went to drink it because I thought it was water.  And my

14   mom's like, "No, no, no.  That's vodka."

15            And then later on, I'd find bottles of -- you

16   know, the little spirits of cognac, things like that,

17   vodka under the sink.

18            Well, I noticed her behavior.  But first I

19   thought -- you know, when I really young, I had thought,

20   *Well, she's just old.  She's tired.*  It was passing out.

21   You know, things like that.

22            And she'd become emotional and -- emotionally

23   manipulative, I suppose, and angry.  She'd be a sloppy

24   drunk you could say.

25       Q    Okay.  And so you recall noticing that as early

SENTENCING -- July 15, 2019 (Afternoon)

1   as age eight?

2       A    Yeah, eight to ten, around there.

3       Q    Okay.  Now, do you know of anybody else in your

4   family that ever had alcohol issues?

5       A    I believe my dad's older brother did.

6       Q    Okay.  And that's Uncle Mark?

7       A    Yes.

8       Q    Did your brother Matt have any struggles while

9   you were growing up in the house together?

10      A    He had some anger issues.  Him and my mom

11  didn't see eye to eye.  He was significantly older than

12  me and Brendt, so he understood what was going on at a

13  much earlier age; and he had some, some difficulties with

14  that.

15      Q    Was that because of your mom's alcoholism?

16      A    Yes.

17      Q    And how did he react to that?

18      A    With anger.  He was a teenager.  Until he could

19  get away from it, you know.

20      Q    Okay.  What about his social support network?

21  Did he have friends?

22      A    Matt?

23      Q    Yeah.

24      A    No.

25      Q    Was he a loner?

SENTENCING -- July 15, 2019 (Afternoon)

```
 1        A    Yes.

 2        Q    Has -- have you and he communicated in, say,

 3   the last five years?

 4        A    Yes.

 5        Q    How would you communicate with him?

 6        A    Online.  He's in Taipei, so --

 7        Q    "Online," meaning like Facebook or --

 8        A    Yeah.  Or email.

 9        Q    Gotcha.

10             What about Brendt?  You said Matt had anger

11   issues?

12        A    Uh-huh.

13        Q    Did Brendt have any of those same issues?

14        A    No.

15        Q    What was Brendt like when you were young?

16        A    Brendt was a very gentle person.  He's one of

17   those men who you never see raise their voice, and you

18   kind of admire that.  You know, Brendt was always

19   extremely gentle and understanding.  He'd always listen

20   to me and be there for me as my big brother.

21        Q    Do you remember occasions when you were little

22   where you would try to tag along with he and his friends

23   and insert yourself?

24        A    Yes.

25        Q    Can you tell us about one of those?
```

SENTENCING -- July 15, 2019 (Afternoon)

1      A    I would go up to his room and hang out with him

2  while he played computer games or when he listened to

3  music, and I'd hang out with him when he was playing

4  video games with his friends or -- I always wanted to be

5  a part of his life.  As I said, I looked up to him.

6      Q    Do you ever remember him trying to get rid of

7  you or telling you to leave or anything like that?

8      A    No.

9      Q    Okay.  Do you remember an incident surrounding

10  a Beanie Baby fiasco?

11      A    I don't remember what, how old I was.  I was

12  really young because Brendt was about 12 or 13.  And I

13  wanted one of those huge stuffed tigers that you see at

14  Walmart, the big white stuffed tigers that are really

15  big.  And he, without me knowing, he went on his bike

16  across town and used his allowance money to go get it for

17  me.

18      Q    So he brought it back for you as a surprise?

19      A    Yes.

20      Q    Is that typical behavior from the Brendt that

21  you knew as your brother during that time frame?

22      A    Yes.

23      Q    So, when you got a little older, like when you

24  were in middle school, Brendt would have been later in

25  high school by then, right?

SENTENCING -- July 15, 2019 (Afternoon)

1      A     Yes.

2      Q     Did you two continue to share time together and

3  hang out?

4      A     Yes.

5      Q     And what, what kind of things would you do once

6  you reached sort of that preteen stage?

7      A     Well, I suppose we didn't hang out as much

8  then, you know.  He, he was getting busier.  He had work

9  and things like that.  But we would still watch movies

10  together and, and things like that; and he would talk to

11  me about music and shows that he had gone to.

12      Q     Okay.  Did he introduce you to certain movies

13  that you might not otherwise have seen?

14      A     Yes.

15      Q     Can you give us an example of one of those?

16      A     Well, things like *Teenage Mutant Ninja Turtles*

17  and *RoboCop* and *Die Hard* and things like that, from the

18  '80s.

19      Q     '80s movies?

20      A     '80s movies.  '80s music, '90s music.

21      Q     What about cartoons?

22      A     Yeah.  We like *Futurama* and *Sponge Bob* and

23  things like that.

24      Q     *Sponge Bob SquarePants*?

25      A     Yes.

SENTENCING -- July 15, 2019 (Afternoon)

1      Q      Okay.  So when Brendt got old enough to move
2  out of the house, about how old were you when that
3  happened?
4      A      I would have been 13 or 14.
5      Q      Okay.  And do you know where he went?
6      A      Yeah.  He went to Madison to live with
7  Michelle.
8      Q      Okay.  And after Brendt moved out, Matt, I
9  assume, was still gone?
10      A      Uh-huh.
11      Q      So -- you have to say "yes" or "no."
12      A      Yes.  Sorry.
13      Q      So were you alone in the house with your
14  parents at that time?
15      A      Yes.
16      Q      And did you -- did it stay that way up until
17  you moved out of the house?
18      A      Yes.  They were usually not there at the same
19  time.
20      Q      Can you describe --
21      A      Sometimes neither of them would be there.
22      Q      Can you describe what you would mean by that,
23  *They were never there at the same time?*
24      A      Well, I suppose it was their way of separating.
25  My mom went to live with her parents, and my dad -- well,

SENTENCING -- July 15, 2019 (Afternoon)

1    he had to keep paying for the house by himself, pretty

2    much, towards the end.  And he had to get everything

3    moved out of there and taken care of.  So he was there

4    like every other week usually.

5         Q    And when he was at the house getting stuff

6    taken care of, where was he going the rest of the time?

7         A    Up to his land to prepare that to be able to

8    live on.  He had no other option.

9         Q    So living in Michigan in the cabin?

10        A    Yes.

11        Q    And you've been there, I assume, right?

12        A    Yes.

13        Q    And -- fun family vacations?

14        A    Yeah.

15        Q    And how would you describe the house that's on

16   the property?

17        A    Well, it's -- it's jury-rigged.  It's bare

18   minimum, but it's home, I mean.

19        Q    Okay.  Now, after -- well, actually, let me ask

20   you this:  So, before you moved out for college and while

21   your dad was doing this back and forth and while your

22   mother was already gone, do you know whether or not the

23   house was being paid for or not?

24        A    I didn't know at that age.  No.

25        Q    Do you know now?

SENTENCING -- July 15, 2019 (Afternoon)

```
1        A    I never asked.

2        Q    Do you know if the house ever went into

3   foreclosure?

4        A    I'm pretty sure it did.

5        Q    Okay.  So --

6        A    But --

7        Q    When Brendt was living in Madison with

8   Michelle, did you ever visit them in Madison?

9        A    Yes.

10       Q    Can you tell us about that?

11       A    You know, it was once every couple of months.

12  And I would take the bus down there, and I'd go hang out

13  with them for a few days.

14       Q    And when you went to hang out with them, where

15  would you stay?

16       A    On their couch.

17       Q    In their apartment?

18       A    Yeah.

19       Q    And how do you feel about Michelle?

20       A    I think she's awesome.  She's very calm and

21  sweet, --

22       Q    Did you --

23       A    -- intelligent --

24       Q    Sorry.  Go ahead.

25       A    And intelligent and things.
```

SENTENCING -- July 15, 2019 (Afternoon)

1      Q    Do you consider her to be family?

2      A    Yes.

3      Q    Okay.  Now, was there any reason why you wanted

4  to take these trips regularly to visit with Brendt?

5      A    Because I love him.  He's my brother.

6      Q    And what would you guys talk about when you

7  were there?

8      A    Anything, if I can recall.

9      Q    Did you rely on him for support when your

10  parents were going through this difficult time?

11     A    I suppose somewhat in that way, through the

12  visits, it did help.

13     Q    Okay.  Did it give you a place to get away to?

14     A    Yes.

15     Q    Now, when did you first become aware that your

16  parents were getting divorced?

17     A    As it was happening.  They chose to wait for my

18  sake.

19     Q    You said they chose to wait for your sake?

20     A    Yeah.

21     Q    What's your opinion of that?

22     A    I don't think that was the best decision

23  because it put me through a lot more.  I was kind of

24  stuck in that situation without anybody necessarily.

25     Q    Except for when you would go to Madison, were

SENTENCING -- July 15, 2019 (Afternoon)

1   you always at home?

2        A    Yeah.

3        Q    Were -- sometimes were you home alone?

4        A    Oh, a lot.  Oh, most of the time.  Yeah.

5        Q    Okay.  Now, did you decide that you wanted to

6   try to go to college at any time?

7        A    I did.  I tried it out for a couple of months.

8        Q    Where did you go?

9        A    Eau Claire.

10       Q    Is that UW-Eau Claire?

11       A    Yes.

12       Q    Part of the Wisconsin State School System?

13       A    Yes.

14       Q    And how far away from Stevens Point is that?

15       A    A couple hours.

16       Q    So what happened when you went to Eau Claire?

17       A    It was not for me.  I felt very limited.  I

18   didn't feel like I was learning what I needed to to get

19   to where I wanted to be in life.  And so I -- it did not

20   take long for me to figure that out.  I just did it

21   because it was -- I didn't know what else to do --

22       Q    Okay.

23       A    -- at the time.

24       Q    So -- and Eau Claire, for the record, is E-a-u-

25   C-l-a-i-r-e.

SENTENCING -- July 15, 2019 (Afternoon)

1            So, when Eau Claire didn't work out, when

2    college was not your thing, how did you decide to go on

3    after that?  What did you decide to do?

4        A    I just started working -- but I still felt very

5    stuck, kind of trapped; so I decided that it would be

6    good to move somewhere out of the area which I grew up

7    in, and so I decided to move to Seattle.  And out there,

8    I found some good people and --

9        Q    What was your money situation like when you

10   were living in Seattle?

11       A    It was okay.  I had jobs here and there but not

12   all the time.  I hadn't quite learned everything yet, you

13   know.

14       Q    Did you have enough money to, say, fly back

15   home if you felt like it?

16       A    Not usually.

17       Q    Okay.  What kind of jobs were you working while

18   you were on the West Coast?

19       A    I worked on a couple of farms and things like

20   that.  I hadn't got into the restaurant industry yet, or

21   I hadn't started my art yet either really.

22       Q    Are you an artist now?

23       A    Yes.

24       Q    And have you also had experience in the

25   restaurant industry?

SENTENCING -- July 15, 2019 (Afternoon)

1    A    Yes.

2    Q    Okay.  So you said -- how long did you live in

3 Seattle before you moved to Texas?

4    A    It was a couple years.

5    Q    Okay.  And then you moved to Texas.  And have

6 you been in Texas ever since then?

7    A    Yes.

8    Q    While you were living in Seattle, describe for

9 us the kinds of contact that you had with your family or,

10 I guess, the lack of contact that you had with your

11 family.

12    A    Yeah.  It was minimal.  I didn't feel --

13    Q    Take your time.

14    A    I didn't feel -- I don't know -- okay to

15 contact the more important people in my life.  It was

16 something I got over eventually.

17    Q    Okay.  So when you say you got over it, I mean,

18 did you actively decide that you were going to try to not

19 have contact with people for a while?

20    A    It was not active.  No.  I wanted to, but I

21 just didn't feel, like, okay doing that just because of

22 myself.  I suppose I didn't feel like I was well enough

23 to be able to make that, cross that bridge.

24    Q    Okay.  Does that include your mom and your dad?

25    A    Yes.

SENTENCING -- July 15, 2019 (Afternoon)

1    Q    And does it include both of your brothers?

2    A    It includes everybody besides my dad.  I did

3  have minimal contact with -- I was able to -- it was

4  easier.

5    Q    Okay.

6    A    We had been close.

7    Q    So you said that you didn't feel okay enough

8  with yourself to reach out to people.  Did the time come

9  when you, when you started to feel like you could do

10  that?

11    A    Yes.

12    Q    And do you remember when that was?

13    A    It was about the time I started living in

14  Texas.  Maybe a year or so after.  When I started making

15  my art again, things like that.

16    Q    Okay.  And did you have some contact with

17  Brendt before he was arrested in this case?

18    A    No.  But I should have.  I wanted to, and I

19  waited too long.

20        MS. POLLOCK:  Your Honor, may I approach the

21  witness?

22        THE COURT:  Yes.

23  BY MS. POLLOCK:

24    Q    Andrea, I've just handed you what's marked for

25  identification as Defendant's Exhibit 149.  Do you

SENTENCING -- July 15, 2019 (Afternoon)

1    recognize that?

2        A    Yes.

3        Q    Can you tell us what it is?

4        A    It's a picture of Brendt and Matt that I've

5    kept in my wallet for the past ten years.

6             MS. POLLOCK:  Motion to admit and publish, Your

7    Honor.

8             MR. MILLER:  No objection.

9             THE COURT:  It will be admitted, and you may

10   publish.

11   BY MS. POLLOCK:

12       Q    So, Matt is -- is Matt wearing the glasses in

13   this photo?

14       A    Yes.

15       Q    And is that Brendt on the right?

16       A    Yes.

17       Q    And you said you've kept it in your wallet this

18   whole time?

19       A    Yes.

20       Q    In fact, did you just show it to me yesterday?

21       A    Uh-huh [nodding head up and down].

22       Q    So it's in your pocket right now?

23       A    It's in my purse.  My dad has it.

24       Q    Okay.  And did you keep this photograph with

25   you even while you were going through the emotional

1    things that you described to us?

2         A    Yes.

3         Q    And why did you do that?

4         A    Because I love -- because I loved them and I

5    missed them, and I might not have been okay enough to

6    feel like I could have -- reach out, but they were still

7    there.

8         Q    Thank you.

9              Thank you, Mr. Kelly.

10             COURTROOM DEPUTY:  Uh-huh.

11        Q    Now, you found out, obviously, during this

12   case -- you can set that down right in front of you.

13   There you go.

14             You found out -- well, let me just put it this

15   way:  Do you feel as though the move to Texas was good

16   for you?

17        A    Yes.

18        Q    And have you gotten some insights into your own

19   self emotionally since then?

20        A    Yes.

21        Q    And you felt -- you said you felt like you were

22   in a place where you could, you were going to reach out

23   to Brendt, but then this happened?

24        A    Yes.  I, I'd finally found some semblance of a

25   support network in Texas.  I was able to start talking to

SENTENCING -- July 15, 2019 (Afternoon)

1   my family again and start making my art again to the

2   point where I'm supporting myself with my art now.

3        Q   Okay.  Well, congratulations.

4        So, when you found out that, that Brendt had

5   been arrested in this case, how did you feel?

6        A   Shock and grief, empathy.  I felt very, very

7   sad that he was suffering enough to, to be going through

8   something like this, to --

9        Q   Now, you said that you feel -- I want to just

10  make sure I have it because you're a little quiet.  Okay?

11       A   Sorry.

12       Q   That's okay.

13       So, it was shock and grief and empathy and --

14       MR. MILLER:  Objection, Your Honor.  I mean,

15  repeating the witness's testimony --

16       MS. POLLOCK:  She's just very quiet, Your

17  Honor.  I just want to make sure --

18       MR. MILLER:  Well, then, we can have her --

19       THE COURT:  All right.  Point made.  Let's move

20  on.  Ask your question.

21  BY MS. POLLOCK:

22       Q   Now, you were not here in court earlier this

23  week, correct?

24       A   I was not.

25       Q   And you were not here during the guilt phase of

SENTENCING -- July 15, 2019 (Afternoon)

1    the trial, right?

2        A    No.

3        Q    And is that because of your financial

4    situation?

5        A    Yes.

6        Q    Are you, are you working right now?

7        A    Yes.

8        Q    Okay.  You weren't here when Ms. Zhang's family

9    testified, but have you heard about their testimony since

10   then?  Was it described to you?

11       A    Not in detail.

12       Q    But a little bit?

13       A    I believe so.

14       Q    So you know what Brendt's been convicted of?

15       A    Yes.

16            MR. MILLER:  Well, I guess I would ask for a

17   little foundation to describe who.  We don't know by

18   whom.

19            MS. POLLOCK:  That's fine.

20            THE COURT:  Go ahead.

21   BY MS. POLLOCK:

22       Q    I described it to you, didn't I?

23       A    Oh.  Yes.  You talking about the Zhangs'

24   testimony --

25       Q    Yes.

SENTENCING -- July 15, 2019 (Afternoon)

1    A    -- specifically?

2    Q    Yes.

3    A    Yes, yes.

4    Q    And I told you how hard it was, right?

5    A    Yes.

6    Q    And knowing what Brendt has been charged with

7 and knowing what he has done, how do you feel about your

8 brother in light of all that information?

9    A    Nothing changes my love for him.

10   Q    Will you continue to support him as he goes

11 through this process?

12   A    Yes.

13   Q    Does the fact that he has caused them so much

14 pain and the way it was described to you, does that

15 change your support of him in any way?

16   A    It does not change my support of him in any

17 way.

18   Q    You still love him?

19   A    Yes.

20        MS. POLLOCK:  Nothing further.  Thank you.

21        THE COURT:  Mr. Miller.

22        MR. MILLER:  Just briefly.

23           CROSS-EXAMINATION BY MR. MILLER:

24   Q    You had mentioned the expenses affecting your

25 ability to come here.  You understand that the United

SENTENCING -- July 15, 2019 (Afternoon)

1  States Marshal Service is paying for --

2        MS. POLLOCK:  Objection, relevance.  And if we

3  need to go into this, we can have a sidebar, Your Honor.

4        MR. MILLER:  Well, it's very relevant because

5  they brought it up, Judge.

6        MS. POLLOCK:  It's in regard to her working,

7  not with regards to her ability to travel here.

8        THE COURT:  Let's have a sidebar.

9             (Sidebar, 3:16 p.m.)

10        THE COURT:  Okay, my turn.  You paint a picture

11  somebody can't be here; you take off work; on and on and

12  on.  And the fact is the marshals are doing that.

13  They're paying for her travel to come here and to stay.

14        MS. POLLOCK:  They're not paying for her to

15  miss work.

16        THE COURT:  Okay.  So rehabilitate in that way,

17  but don't continue to paint pictures and then tell me the

18  other side can't bring it up.

19             (In open court, 3:16 p.m.)

20        THE COURT:  Overruled.

21        You can repeat the question.  She may answer.

22  BY MR. MILLER:

23    Q   You understand that the United States Marshal

24  Service is paying for your travel here as a witness?

25    A   I'm sorry.  Can you repeat the question?

SENTENCING -- July 15, 2019 (Afternoon)

1      Q    You understand that the United States Marshal
2    Service is paying for your travel --
3      A    Right.
4      Q    -- to come here as a witness?
5      A    Do I understand that they are?
6      Q    Yes.
7      A    Yes.
8      Q    And you understand that they're paying for your
9    lodging while you're here?
10     A    Yes.
11     Q    Now, I don't know if -- maybe I misheard it,
12   but when was it that you moved to Seattle from Wisconsin?
13     A    That would have been 2014, I believe.
14     Q    Okay.  And you stated that you found some, a
15   support network, then, when you moved to Texas, right?
16     A    Yes.
17     Q    But then you also did testify that -- I believe
18   your words were you moved to Seattle and found some good
19   people there?
20     A    Yes.
21     Q    So when you were in Seattle, you also had some
22   good people to provide support?
23     A    Yes, not to the same extent.
24     Q    Okay.  So you had support in Seattle, correct?
25     A    Yes.

SENTENCING -- July 15, 2019 (Afternoon)

1      Q     And you had support in Texas?

2      A     Yes.

3      Q     But as, I think as you indicated, that support

4  wasn't your family, right?  Other than your dad?

5      A     Correct.

6      Q     So from 2014 until after you heard about the

7  offense in this case, you didn't have any contact with

8  the defendant?

9      A     Not a lot.  Not, not regularly.

10     Q     Did you have any contact with the defendant?

11     A     Occasional Facebook messages, things like that.

12           MR. MILLER:  I have no further questions, Your

13  Honor.

14           THE COURT:  Ms. Pollock.

15           REDIRECT EXAMINATION BY MS. POLLOCK:

16     Q     When I asked you the question about being able

17  to afford to come here, --

18     A     Yeah.

19     Q     -- it's true that the United States Marshal

20  Service paid for your travel, correct?

21     A     Yes.

22     Q     Do they also pay your salary while you're out

23  of town?

24     A     No.

25     Q     Do they pay for your job in any way, or, or

SENTENCING -- July 15, 2019 (Afternoon)

1   your expenses in Texas if you miss work?

2        A    No.  They do not.

3             MS. POLLOCK:  Thank you.  Nothing further.

4             THE COURT:  Mr. Miller, anything?

5             MR. MILLER:  No, Your Honor.

6             THE COURT:  Okay, thank you.  You may step

7   down.

8                  (Andrea Christensen excused, 3:19 p.m.)

9             THE COURT:  Okay.  Anything further from -- any

10  further witnesses from the defense?

11            MS. POLLOCK:  Not at this time, Your Honor.

12            THE COURT:  All right.  Then why don't we take

13  another recess and -- is the defense resting?

14            MS. POLLOCK:  Your Honor, we have several

15  matters that need to be addressed prior to resting.

16            THE COURT:  Okay, very good.  Let's address

17  those then.

18            Take another 15 minutes -- or 20 minutes

19  maybe -- we'll address some issues, and then I'll report

20  to you where we are.  Okay?  Thank you.

21                 (Jury absent, 3:19 p.m.)

22            THE COURT:  Okay.  Please be seated.

23            Ms. Pollock.

24            MS. POLLOCK:  Your Honor, the evidentiary

25  matter that needs to be addressed at this time, we have

SENTENCING -- July 15, 2019 (Afternoon)

1  tendered to the government copies of Defendant's Exhibits

2  Number 147 and 148.

3       May I approach?

4       THE COURT:  You may.

5       MS. POLLOCK:  Your Honor, previously, when

6  asked, in regards to proposed mitigating factors numbers

7  4 and 5 how we would prove up the link between the

8  genetic -- the genetic issues of alcoholism and mental

9  illness, we told the Court we would be offering studies

10 that have been conducted by the National Institutes of

11 Health.  I'm asking the Court to take judicial notice of

12 those studies.  That is what Defendant's 147 and 148 are.

13      And, simply, the instruction that we would be

14 requesting, Your Honor, is to take judicial notice of the

15 fact that nationally endorsed scientific studies indicate

16 that there is a genetic link between alcoholism and

17 mental illness in families.

18      THE COURT:  Is the defense prepared to -- or

19 the government prepared to respond to this?

20      MR. MILLER:  We are -- obviously, we could file

21 a more lengthy response.  We do object, Your Honor.  As

22 an initial matter, this is -- I mean, we're back into

23 12.2 territory again.

24      As I -- both the articles they want you to take

25 judicial notice of -- one is called "Alcohol Use

SENTENCING -- July 15, 2019 (Afternoon)

1    Disorder," which is a mental disorder, and then "Common

2    Genetic Factors Found in Five Mental Disorders," so this

3    is about mental disorders.

4            And in this trial we have, per the Court's

5    ruling, we have no evidence, admissible evidence of any

6    diagnosis of any disorder.  Certainly, we have evidence

7    of alcohol use, and that's fine.

8            But, so, first, we don't have the evidence that

9    would be the basis for this inference that alcohol --

10   being an alcoholic, a mental disorder of being an

11   alcoholic could lead to some other mental disorder.

12           Moreover, this is certainly not something that

13   is the subject of judicial notice, something that's

14   commonly known, such as which direction a street runs or

15   that Peoria -- or that Champaign-Urbana is in Champaign

16   County.

17           This is -- these are scholarly articles that

18   would be the basis of expert testimony related to mental

19   health issues, which the Court has barred.

20           If it's, if it's so common -- I guess what the

21   defense is saying as common sense -- it would allow for

22   argument.  But it's not that common, which is why that

23   type of argument shouldn't even be allowed because,

24   again, it gets into 12.2.  It's arguing mental health

25   issues.  Plus, it's arguing facts outside of evidence

SENTENCING -- July 15, 2019 (Afternoon)

1  because there's no evidence that the defendant has an

2  alcohol use disorder, or some other mental disease or

3  disorder, because the defense chose not to present such

4  testimony.

5          THE COURT:  Go ahead, Ms. Pollock.

6          MS. POLLOCK:  Your Honor, the entire universe

7  is not covered by Rule 12.2.

8          There has been lots of testimony, lay

9  testimony, and the admission of an exhibit which was

10  admitted by the government in the guilt phase which has

11  established that Mr. Christensen suffers from depression

12  symptoms and anxiety symptoms.

13          There does not -- this is not an expert talking

14  about a current diagnosis or a past diagnosis.  That is

15  what 12.2 covers, is testimony about a diagnosis.

16          We have a lot of lay testimony just being

17  admitted from various witnesses, including evidence

18  permitted by -- or presented by the government, which

19  talks about the symptoms.

20          Now, if you take the government's argument as

21  far as it could possibly go down the, down the parade of

22  horribles, then we would have to eliminate years of Mr.

23  Christensen's life because he talked about being

24  depressed or having depressive symptoms.  That's just not

25  true.  That's lay evidence.

SENTENCING -- July 15, 2019 (Afternoon)

1          Now, this is commonly known.  I think it's

2    pretty -- anybody on the street will say that alcoholism

3    runs in families, and mental illnesses run in families.

4    The fact that his family has it makes it more likely that

5    he would have it.  That doesn't require expert testimony.

6    And these are produced by the United States Government

7    and are very clear that there is a genetic link.  That's

8    all that we want to argue, is that there is a possibility

9    that because his family was ill and alcoholic that he

10   could be ill and alcoholic.  We don't need expert

11   testimony to do that, and we are not presenting expert

12   testimony to do that.  That is what 12.2 covers.

13          THE COURT:  Just a question without you jumping

14   at me:  Do you think that these documents from the

15   National Institute of Health were written by lay people

16   researching lay people's testimony on this issue?

17          Or do you think they were written by people

18   that researched data from psychiatrists, psychologists,

19   scientists, and other people that actually have compiled

20   data that would know these things?

21          MS. POLLOCK:  Here's the distinction.  They

22   were researched by those people, but they are published

23   for public consumption on the National Institutes of

24   Health website that you can Google, which is exactly how

25   I got those things.

SENTENCING -- July 15, 2019 (Afternoon)

1          THE COURT:  Then what do you need them for?

2    Why can't you just argue that Mr. Christensen -- there's

3    evidence that Mr. Christensen suffered from such;

4    everybody knows that it runs in the family?

5          MS. POLLOCK:  You know what, Your Honor?  I

6    would love to do that; and if you can tell me that the

7    government's not going to object to me doing that, then I

8    will sit down and withdraw those exhibits.  But my

9    understanding is that they will not.

10          MR. MILLER:  Well, whether we object or not

11   doesn't make these exhibits more admissible; it makes

12   them less admissible.

13          And the real concern here, looking, is they

14   then cited an article that links this to schizophrenia.

15   There's been no credible evidence of that, Your Honor,

16   and so they really --

17          THE COURT:  Assume, assume Ms. Pollock can

18   argue -- first of all, you're saying these go to 4 and 5?

19          MS. POLLOCK:  Mitigating factors number 4 and

20   5, I believe --

21          THE COURT:  There is an extensive history of

22   mental illness on Mr. Christensen's mother's side of the

23   family and extensive history of mental illness on Mr.

24   Christensen's father's side of the family.

25          MS. POLLOCK:  And there is a linking factor

SENTENCING -- July 15, 2019 (Afternoon)

```
 1   later on.  The numbers were changed when we made some
 2   adjustments; I don't know what it is.  But it makes it
 3   more likely that he is predisposed to those --
 4              THE COURT:  And that would be 28.
 5              MS. POLLOCK:  Yes, Your Honor.
 6              THE COURT:  And, and maybe the -- suggesting
 7   the predisposition is maybe the issue.  Because I think
 8   there's plenty of testimony by Mark, by others, that
 9   indicate extensive history of mental illness and
10   alcoholism.  So maybe the question is, really, the
11   factors suggesting predisposition, so let's address that
12   for a minute, forgetting the admissibility of these for a
13   second.
14              Mr. Miller, if the reasonable inference to be
15   argued by the defense is that there's this history of
16   mental illness, they're aware -- the jury's aware that
17   even as of early 2017 he was, Mr. Christensen went to the
18   Counseling Center to address his mental health issues;
19   and they make some broad argument that he was suffering
20   from some mental health condition at the time of the
21   offense -- is that how you're going to, trying to do
22   this, Ms. Pollock?
23              MS. POLLOCK:  No, Your Honor.
24              We are not arguing that he was suffering from a
25   mental illness at the time of the offense.  What we're
```

SENTENCING -- July 15, 2019 (Afternoon)

1   saying is that it is a mitigating factor that someone

2   suffers from a mental illness, including symptoms of

3   depression and anxiety.

4            THE COURT:  So that he had mental health issues

5   and alcoholism issues and --

6            MS. POLLOCK:  Which could have contributed to

7   the downward spiral that led him to the point on June

8   9th.

9            THE COURT:  Okay.

10           MS. POLLOCK:  We're not saying that he was sick

11  during the offense or that his illness in any way caused

12  him to commit the offense.

13           THE COURT:  So if limited to that, Mr.

14  Miller -- and it would be fair, I think, for the

15  government, then, to argue that there's been no expert

16  testimony or opinions on this issue.  Forget these

17  proposed exhibits.  Wouldn't that be all fair game?

18           MR. MILLER:  Well, it would not.  I mean, we --

19  the defense focuses on the date of the offense.  That

20  would be the guilt phase, if this was an insanity

21  defense.

22           12.2 relies on any mental condition that goes

23  to mitigate the offense, and they're saying he had a

24  mental condition that mitigates the offense.  So this is

25  clearly straight 12.2, and that's what prevented us from

SENTENCING -- July 15, 2019 (Afternoon)

1   having examined him.  At the very least, we'll have to be

2   able to argue in response that they put on no expert

3   evidence.  We were unable to examine him with our own

4   expert.  And so, therefore, there is absolutely no expert

5   evidence to support their claim.

6           THE COURT:  Well, the rule -- well, how -- what

7   are they supposed to -- or what are we supposed to do at

8   this point with all of the lay testimony about Mr.

9   Christensen's alcohol and mental health issues?

10          MR. MILLER:  Well, they argue -- it says in

11  there that his mom had a history of alcoholism, and they

12  say that's a mitigating factor.  They can say his mom had

13  a history of alcoholism, and that's a mitigating factor.

14          THE COURT:  Okay.

15          MR. MILLER:  That's what they put as a

16  mitigating factor.

17          MS. POLLOCK:  Your Honor, --

18          MR. MILLER:  They didn't -- it's there as an

19  individualized mitigating factor; it's not linked to

20  anything else, so they can argue that that's a mitigating

21  factor.

22          MS. POLLOCK:  Your Honor, as I said before,

23  12.2 applies to expert testimony.  There -- it does

24  not -- you cannot ban all evidence that Mr. Christensen

25  has suffered from symptoms because we don't have a doctor

SENTENCING -- July 15, 2019 (Afternoon)

1    to say so.

2              And if the government were to be allowed to

3    comment on the fact that they were not permitted under

4    some procedure to examine Mr. Christensen, that's a Fifth

5    Amendment violation.

6              So the fact that there is -- the lay testimony

7    that's been produced, we get to rely on.  We abided by

8    the Court's ruling.  We don't have an expert.  You barred

9    a lot of the testimony as a result of that, and that's

10   fine.

11             But we presented the lay evidence of those

12   conditions; and just because it's not a doctor saying it

13   doesn't mean it doesn't exist.  We cannot erase his

14   entire life.  That's the point of mitigation, is to be

15   able to present his life, and that's a part of his life.

16             So, if it's as common sense as the Court

17   thinks -- which, frankly, I agree with; we were

18   overprepared for this because we thought the government

19   might object -- but it's common sense because it's

20   published on websites funded by the United States

21   Government.

22             And if you let us argue that because his family

23   has this history that it makes it more likely that he had

24   these issues, then that's fine.

25             THE COURT:  What's wrong with these is the

SENTENCING -- July 15, 2019 (Afternoon)

1  influence of the expertise -- or the -- that produces

2  them.  "Alcohol use disorder often seems to run in

3  families, and we hear scientific studies of an

4  'alcoholism gene'"; "Research shows . . . ."

5        And then on the other one, "Scientists have

6  long recognized that many psychiatric disorders tend to

7  run in families."

8        I think that 147 and 148 would not be something

9  that I would take judicial notice of for the purpose as

10  offered.

11        But having said that, I don't believe the

12  defense is going to be as limited as they think they are,

13  and I believe the government will have the opportunity to

14  argue that there's no expert testimony on any of the

15  subjects that would indicate that -- whatever it is

16  you're arguing.

17        And I'm sure I'm going to further define the

18  boundaries between now and closing arguments.  Okay?

19        Now, with that in mind, what -- where are we

20  with the defense?

21        MS. POLLOCK:  Your Honor, may I approach?

22        THE COURT:  You may.

23        MS. POLLOCK:  I promise I'll keep my jumping

24  shoes off.

25        THE COURT:  Why don't you bring it all up at

SENTENCING -- July 15, 2019 (Afternoon)

```
 1   once.

 2          MS. POLLOCK:  It's a different topic.  I want

 3   to delineate.

 4          THE COURT:  All right.

 5          MS. POLLOCK:  So, Your Honor, in your left hand

 6   is a copy of a stipulation that was reworked by the

 7   defense regarding the offer to plead guilty.  In your

 8   right hand is the original stipulation that we had agreed

 9   to with the government, I think, a week ago.

10          The problem that we have, Your Honor, is that

11   after we reviewed the stipulation a little more closely,

12   it looks to us as though there is actually blatantly

13   illegal inadmissible evidence in the government's version

14   of the stipulation.

15          So where we're at --

16          MR. MILLER:  It's not "the government's

17   version."  It's "the parties' version."

18          MS. POLLOCK:  Okay, I apologize.  The version

19   that we had agreed to prior to researching it.

20          THE COURT:  Which has been sitting right here

21   in front of me for four days with a note that says "to be

22   given when the parties tell me it is to be introduced."

23          MS. POLLOCK:  Correct, Your Honor.

24          THE COURT:  Okay.

25          MS. POLLOCK:  And so what we're in the
```

SENTENCING -- July 15, 2019 (Afternoon)

1    situation -- we've been over this and over this and over

2    this.  Here's what I'm going to propose.

3           There is stuff in the parties' stipulation that

4    references the feelings of the victim's family.  That is

5    blatantly inadmissible.  There's case law on that.  We

6    know that we had previously said, "Okay, we'll try to

7    deal with this," just to reach an agreement to get it

8    entered into evidence.  That is not going to work for us,

9    Your Honor, frankly, because it is just not admissible.

10          So what we're asking the Court to do is to look

11   at the differences between the two, to rule what the

12   Court thinks is admissible, inadmissible, and then we'll

13   go with whatever is left.  We want the stipulation in.

14   We tried really hard to get to it.  There are just

15   certain disagreements among the parties.  This is the

16   best version we could come up with.

17          We're trying to figure out what is the context

18   that the Court will allow in response to our offering the

19   information about the plea.  We're still kind of unclear

20   as to exactly how far the government will go.  We're

21   trying to guess, and we tried to guess, and this is what

22   we came up with.

23          But that being said, after we went over it, we

24   looked further into the case law; and it looks like some

25   of that stuff about the victim's family is just

SENTENCING -- July 15, 2019 (Afternoon)

1    straight-up inadmissible.  And so, obviously, we can't

2    stipulate to that.  We'd ask the Court to rule on it.

3            THE COURT:  Well, why can't you stipulate to

4    something that's inadmissible if you stipulate to it?

5            MS. POLLOCK:  Because it's bad for the

6    defendant, Your Honor, and we can't do that in our duty

7    as counsel.

8            MR. MILLER:  Well, we believe it's

9    inadmissible, the plea offer, at all; and by that theory,

10   then, we wouldn't stipulate at all either, and there

11   would be no stipulation.  And that would be a problem.

12           Just to cut this -- to make it clear, we're

13   only going to agree to the stipulation that we, both

14   parties agreed to days ago and that we, we've understood

15   as this trial has gone forward would be the stipulation

16   between the parties.

17           MS. POLLOCK:  And, Your Honor, as we've

18   previously discussed, we are in an absolutely impossible

19   situation because, to be able to present evidence that --

20   if the government's not going to agree -- we're between a

21   rock and a hard place.  Either we agree to stuff we

22   believe is inadmissible, or we don't agree -- in which

23   case we all become witnesses, and there's a mistrial, and

24   I get on the stand and testify to our conversations.

25           So we really don't have any other option.  The

SENTENCING -- July 15, 2019 (Afternoon)

1   option is either take the government's version or go to

2   Hades, and that's sort of where we're at.

3          THE COURT:  But the stipulation that was

4   tendered does accurately set forth what, what your

5   discussions were, correct?  But the, but you're having

6   concerns now about the part about the victims' wishes.

7          MS. POLLOCK:  The victims' wishes, and there's

8   another part missing from our version of the stipulation,

9   Your Honor, which is the part about the Attorney General

10  personally making the decision, the Capital Case Review

11  Committee.  We prefer it be referred to as "the

12  Department of Justice."

13         But regardless, you know, like I said, Your

14  Honor, it is factually accurate; but there are things in

15  there that, under existing law, are inadmissible and

16  harmful to the defendant.

17         THE COURT:  But, but you took out 32 as well,

18  and I don't see that that --

19         MS. POLLOCK:  It's basically the same

20  paragraph, if I remember correctly.

21         THE COURT:  No, 22, you removed, and that's the

22  part about "the family has requested the United States

23  do" such and such.  "Locating their remains is an

24  interest to them."  You removed that.

25         And then you took out 32 as well.

SENTENCING -- July 15, 2019 (Afternoon)

1          And then you took out the part about the email.

2          So here's where I am on stipulations.  I'm

3 not -- I don't feel that there's any way -- I mean, I've

4 ruled on this matter, and I don't feel that there is any,

5 anything that allows me to hear argument and then decide

6 what it should be, or evidence and decide what it should

7 be.

8          And so if the parties can or cannot reach a

9 stipulation, then that's, that's where it is at this

10 point.

11          MS. POLLOCK:  I have a suggestion, though, Your

12 Honor.

13          THE COURT:  Go ahead.

14          MS. POLLOCK:  You have ruled.  And you have

15 ruled that the offer to plead is inadmissible, subject to

16 admission by the government of appropriate context.  So

17 in terms of that, the Court can decide -- because it's --

18 to be fair, Your Honor, I know we've requested

19 clarification, and I know that this has been a very

20 challenging issue.

21          But we're still not 100 percent clear about the

22 breadth of the context that the government's permitted to

23 present.  Is it everything in that stipulation?  Or is

24 that outside the context that the Court wished to

25 establish?  That's where the Court has the ability to

SENTENCING -- July 15, 2019 (Afternoon)

1  tell us what we can and can't present because the Court

2  has said:  Subject to additional context provided by the

3  government, the offer to plead is admissible.

4            Well, how much context, and is that

5  appropriate?

6            Because just because it went back and forth in

7  an email does not mean that it's necessarily the

8  appropriate context.  So if the Court wanted to decide,

9  you have the ability to do that.

10           THE COURT:  The Court's position is that from

11  start to finish, if it's all accurate, then that would be

12  what would be appropriate for the jury to know.

13           The stipulation you said that you agreed to, I

14  accept as, at least as of that point.  I don't even know

15  if this is all the information.

16           MR. MILLER:  It's not.

17           THE COURT:  But I believe that, as I reviewed

18  the stipulation, if that's accurate, the more information

19  that puts it in context for both sides on how -- what

20  happened, how it played out, and why it failed,

21  apparently, is, is the appropriate presentation of

22  evidence to the jury.

23           MS. POLLOCK:  If that is the Court's ruling,

24  then we will accept the stipulation as previously written

25  with a notation for the record that we believe that a

1  good chunk of it is inadmissible and that we believe that

2  the Court's ruling should have been limited to just us

3  presenting the offer to plea.  Under the circumstances as

4  presented, we'll take the stipulation.

5        THE COURT:  Okay.  You make -- so I'm going

6  to -- we're going to recess -- is that all we have to

7  address just now?

8        MS. POLLOCK:  Um --

9        THE COURT:  I'm going to -- then we'll take our

10 recess and --

11       MS. POLLOCK:  One more matter, Your Honor.

12       THE COURT:  Go ahead.

13       MS. POLLOCK:  I am really sorry.

14       THE COURT:  That's all right.  We're good.

15       MS. POLLOCK:  There was a news article that was

16 just published today, actually, which was forwarded to

17 us, which indicates that there were some kind of formal

18 cooperation between the U.S. authorities and the Chinese

19 authorities in obtaining those videos which were the

20 subject of the victim impact testimony earlier in the

21 trial, and it indicates that this level of cooperation

22 and coordination was previously undisclosed.  I believe

23 it was a statement that was made by the Zhang family

24 attorney to a newspaper.

25        So we would just like the government to

SENTENCING -- July 15, 2019 (Afternoon)

1    represent for the record that they have done due

2    diligence in investigating and producing all potential

3    *Brady* material that is located with the Chinese

4    authorities.

5              THE COURT:  Do you wish to address that now, or

6    do you want some time to confer?

7              MR. MILLER:  We'll confer, Your Honor, but

8    we'll say on the record:  You do not go to a foreign

9    country and interview individuals without the knowledge

10   of that country's law enforcement.  And so we went

11   through the Office of International Affairs of the

12   Department of Justice for those interviews.

13             There would be nothing that would be *Brady*

14   material that I can think of that would be in those

15   requests to conduct interviews.

16             THE COURT:  Okay.

17             MR. MILLER:  But we can, we can provide a

18   further -- a further answer later if necessary.

19             THE COURT:  All right.  So before we break, a

20   couple of things, then:  Is there an issue -- are you

21   prepared to put on a rebuttal witness, and what are the

22   issues that are going to arise there?  And what -- or let

23   me ask:  What are the rebuttal witnesses that you tend --

24   or that you're thinking that you will call, on what

25   issues?

SENTENCING -- July 15, 2019 (Afternoon)

1           MR. MILLER:  And, Your Honor, -

2           THE COURT:  Because we have --

3           MR. MILLER:  -- we believe --

4           THE COURT:  -- we can do this tomorrow.

5           MR. MILLER:  We believe Special Agent

6    Huckstadt would, given what's transpired today.  We have

7    to make final decisions on -- we had notified experts of

8    Dr. Coogleman, Dr. Dietz, and Dr. Murray (names

9    phonetic).  And so we'll make final decisions on whether

10   we would call them or not tonight.

11          THE COURT:  And if they're to be called, then

12   the defense may want to be heard on whether it would be

13   proper scope of rebuttal, and so are you prepared to have

14   them here; and then if they're ruled to be otherwise able

15   to testify, that's just the way it's going to be?

16          MR. MILLER:  Yes, Your Honor.

17          THE COURT:  Okay.  And so do you believe you'd

18   want to put Agent Huckstadt on today or recess until

19   tomorrow and use tomorrow -- let's just talk about

20   scheduling for a minute.

21          MR. MILLER:  I think recess until tomorrow,

22   Your Honor.

23          THE COURT:  Okay.

24          MR. MILLER:  Given -- we could put on some

25   things, but we'd rather put him on without the

SENTENCING -- July 15, 2019 (Afternoon)

1    interruption.

2              THE COURT:  So you will have rebuttal tomorrow

3    of some sort regardless.  Then whenever it's over, we'd

4    recess, go through jury instructions -- maybe even

5    revisit jury instructions today -- see if, first, if the

6    defense had anything after that.  And if they do, we'll

7    get through it if we can.  But it appears that Wednesday

8    we would, may close this matter?

9              MR. MILLER:  Yes, Your Honor.

10             MS. POLLOCK:  Your Honor, that's fine.

11             And, you know, we certainly understand that the

12   government wants to discuss amongst themselves as to, you

13   know, the scope of any rebuttal.  But each of the doctors

14   that the government has noticed in their rebuttal witness

15   disclosure requires a serious amount of preparation.

16             We still don't have any response.  I have

17   emailed Mr. Miller asking, you know:  We, can we agree

18   regarding the disclosures for Dr. Park Dietz?  No

19   response.

20             MR. MILLER:  We did respond and ask --

21             THE COURT:  Just let her finish.

22             MR. MILLER:  Very good.

23             THE COURT:  Thank you.

24             MS. POLLOCK:  Well, if that response was last

25   night, I didn't see it.

SENTENCING -- July 15, 2019 (Afternoon)

1          Regardless, each of these doctors -- these

2    people all have significant histories of testimony, of

3    serving as experts, of subject matter which is

4    complicated; and it's -- we are going to have to do a lot

5    of work tonight to prep for them.  And if they're not

6    going to call them and they know they're not going to

7    call them, then we'd appreciate that now.

8          MR. MILLER:  And I'll say right here, Your

9    Honor.  I mean, my sense is, as one member of the trial

10   team, is that we don't need to call them; but we need to

11   make a final decision, so we'll inform them tonight of

12   our final decision.

13          THE COURT:  Okay.  All right, then, let's

14   fast-forward to something else.

15          Procedurally, after closings, the jury will

16   begin their deliberations.  It will be -- they'll take as

17   long as they need to take.

18          My practice was, when they said, indicated

19   they've reached a verdict, was to give everybody

20   30 minutes' notice so people could have time to

21   reassemble.  If you want more time than that, let's

22   discuss that.

23          But, the question is:  I want you to tell me

24   how you see this.  Once a verdict has been reached and

25   read in open court, then what, what do you see the

SENTENCING -- July 15, 2019 (Afternoon)

1  sentencing looks like as it pertains to the actual

2  imposition of the sentence?  Immediately?  The next day?

3  The parties have thoughts on that?

4            MR. MILLER:  We would think the following day,

5  Your Honor, would be, would be fine.  I think there would

6  be -- I think we do have to make sure -- although I

7  understand the Court will impose the sentence that is

8  found by the jury in the verdict -- that I believe the

9  defendant does have a right to allocute.

10            THE COURT:  Right.

11            MR. MILLER:  And I believe the victims would

12  have a right to address the Court if they would choose.

13            THE COURT:  And the parties would have a right

14  to make further statements --

15            MR. MILLER:  Yes, Your Honor.

16            THE COURT:  -- as well if you wish.

17            MR. MILLER:  Yes.

18            MS. POLLOCK:  Your Honor?

19            THE COURT:  You see it that way, Ms. Pollock?

20            MS. POLLOCK:  I don't, Your Honor, and I would

21  like a few moments to confer before we make a final

22  decision.

23            THE COURT:  All right.  And I'm not asking for

24  a final decision today.

25            And then, finally, I want somebody to tell me

SENTENCING -- July 15, 2019 (Afternoon)

1    what they think happens to Counts 2 and 3 so we can

2    address those as well.

3             MS. POLLOCK:  I assume there's a presentence

4    report, Your Honor.

5             THE COURT:  Okay.  All right.  So I'm going to

6    continue to recess for about -- why don't -- if there's

7    nothing more going to happen today, other than the issue

8    on the stipulation, then I can send the jury home.  We

9    can continue to talk about that.  The defense can

10   actually rest in the morning at some point if they wish.

11   How's that?

12            MS. POLLOCK:  That's fine, Your Honor.  Thank

13   you.

14            MR. MILLER:  That's fine, Your Honor.

15            THE COURT:  All right.  Let's bring the jury

16   in.

17                (Brief pause in proceedings.)

18                (Jury present, 3:45 p.m.)

19            THE COURT:  All right, thank you.  Please be

20   seated.

21            We're going to call it a day today.  We are on

22   schedule to -- if there will be rebuttal witnesses,

23   they'll be tomorrow.  If there's anything left from the

24   defense case, that will go first thing in the morning.

25   And -- if they wish to put another witness, or, or

SENTENCING -- July 15, 2019 (Afternoon)

1   evidence in.  And then if there's rebuttal, we'll move on

2   to that.

3           And then we would -- when that's done, we'll

4   call it a day tomorrow and recess until Wednesday

5   morning.  That will give us time to prepare this matter

6   for closing arguments, and closing arguments likely will

7   be Wednesday morning, and then it will be in your hands.

8   Okay?

9           So be safe going home.  Please do not discuss

10  this matter with anybody, including yourselves.  I

11  appreciate you continuing to follow my admonishments.  I

12  didn't ask you when you came in today; but nobody

13  discussed, read, heard anything about this?  Good.  All

14  saying no.

15          Continue to do so.  It's very important that

16  you do so, and I appreciate that.

17          We'll see you tomorrow morning.  Thank you.

18              (Jury dismissed for the day, 3:46 p.m.)

19          THE COURT:  Okay.  Now, let me ask one more

20  thing.  A thought occurred to me.

21          You'll have some rebuttal, whether it be Agent

22  Huckstadt, or you'll have --

23          MR. MILLER:  Yes.

24          THE COURT:  Okay.  Because I don't want them

25  showing up here tomorrow morning at 9:00 and be told

SENTENCING -- July 15, 2019 (Afternoon)

1  there's nothing --

2          MR. MILLER:  Okay.

3          THE COURT:  -- and then turn around and send

4  them home.

5          MR. MILLER:  Yes.

6          THE COURT:  Very good.

7          MR. MILLER:  We'll have some to offer.

8          THE COURT:  All right.  We'll see everybody

9  tomorrow at 9:00.

10          MR. MILLER:  Very good, Your Honor.

11          THE COURT:  Okay, thank you.

12              (Trial adjourns, 3:48 p.m.)

13

14              * * * * * * * * * *

15

16              REPORTER'S CERTIFICATE

17      I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

18  that the foregoing is a correct transcript from the

19  record of proceedings in the above-entitled matter.

20      Dated this 10th day of September, 2019.

21

22

23        _____  s/Lisa Knight Cosimini_____
              Lisa Knight Cosimini, RMR-CRR
24            Illinois License # 084-002998

25