E-FILED
Thursday, 09 April, 2020 01:29:45 PM
Clerk, U.S. District Court, ILCD

SENTENCING -- July 16, 2019 (Morning)

1       UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF ILLINOIS
2

3

UNITED STATES OF AMERICA,
4                               Docket No. 17-20037
            Plaintiff,
5
    vs.                         Peoria, Illinois
6                               July 16, 2019
                                9:02 a.m.
7   BRENDT A. CHRISTENSEN,

8           Defendant.

9

10

11      SENTENCING -- July 16, 2019 (Morning)

12

13

14      BEFORE THE HONORABLE JAMES E. SHADID

15          UNITED STATES DISTRICT JUDGE

16

17

18

19

20          NANCY MERSOT, CSR-RPR
            Official Court Reporter
            U.S. District Court
21          100 N.E. Monroe Street
            Peoria, Illinois 61602
22          309-671-4244

23

24

Proceedings recorded by mechanical stenography;
25  transcript produced by computer.

SENTENCING -- July 16, 2019 (Morning)    2

```
 1
     For the Plaintiff:        EUGENE L. MILLER, ESQUIRE
 2                             BRYAN D. FRERES, ESQUIRE
                               Assistant United States Attorneys
 3                             201 South Vine Street
                               Urbana, Illinois 61802
 4                             217-373-5875

 5                             JAMES B. NELSON, ESQUIRE
                               U.S. DEPARTMENT OF JUSTICE
 6                             Capital Case Section
                               1331 F Street NW, Suite 625
 7                             Washington, DC 20004
                               202-598-2872
 8

 9   For the Defendant:        GEORGE F. TASEFF, ESQUIRE
                               Assistant Federal Public Defender
10                             401 Main Street, Suite 1500
                               Peoria, Illinois 61602
11                             309-671-7891

12                             ELISABETH R. POLLOCK, ESQUIRE
                               Assistant Federal Public Defender
13                             300 West Main Street
                               Urbana, Illinois 61801
14                             217-373-0666

15                             ROBERT L. TUCKER, ESQUIRE
                               Robert L. Tucker, Esq
16                             7114 Washington Avenue
                               St. Louis, Missouri 63130
17                             703-527-1622

18                             JULIE C. BRAIN, ESQUIRE
                               Attorney at law
19                             916 South 2nd Street
                               Philadelphia, Pennsylvania 19147
20                             267-639-0417

21
                               MATTHEW RUBENSTEIN, ESQUIRE
22                             FPD District of Oregon
                               101 SW Main Street, Suite 1700
23                             Portland, Oregon 97204
                               503-780-3535
24

25
```

1                      I N D E X

2                                              Page

3
  GOVERNMENT'S REBUTTAL WITNESS:
4
          ANDREW HUCKSTADT
5  Direct Examination                          38
   Cross-Examination                           47
6  Redirect Examination                        54

7

8  JURY INSTRUCTION CONFERENCE                  61

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court, 9:02 a.m.)

2            THE COURT:  Good morning.

3            This is the United States v.

4  Brendt Christensen, in 17-20037.

5            Mr. Christensen present with Ms. Brain,

6  Mr. Tucker, Mr. Taseff, Ms. Pollock.

7            The government by Mr. Miller, Mr. Nelson,

8  Mr. Freres, assisted by Agents Huckstadt and

9  Manganaro.

10           The matter is set to continue our sentencing

11  hearing.  We are still in the defense case.

12           A number of matters were filed between

13  yesterday and this morning.  That may be it, seems

14  that we have to address before the defense rests

15  their filing of 469, possibly.

16           It sounds to me like maybe there is no

17  stipulation?

18           MS. POLLOCK:  That's correct, Your Honor.

19           THE COURT:  Okay.  So shall we address 469

20  before you rest so that you are aware of where this

21  is headed.

22           MS. POLLOCK:  I think that's right, Your

23  Honor.  I think we can address that also assuming

24  that the Court wants to bring the jury back in just

25  so the defense can rest and then proceed with the

 1  government's rebuttal case.  We also have several

 2  matters to address regarding the scope of rebuttal.

 3          THE COURT:  Okay.  Mr. Nelson, are you

 4  prepared to address 469, a Motion for Jury

 5  Instruction Regarding Defendant's Willingness to

 6  Enter a Plea of Guilty?

 7          MR. NELSON:  Certainly, Your Honor.  I'm

 8  happy to do that.  I think there's two major

 9  problems with this.

10          THE COURT:  First, let me, before you argue,

11  let me ask Ms. Pollock or somebody from the defense

12  team whether they have additional argument to make.

13          MS. POLLOCK:  Your Honor, no, the pleading

14  sums it up.  We stated orally on the record

15  yesterday afternoon why we believe we are in a

16  no-win situation with this.  Basically, we are being

17  told to stipulate to whatever the government wants;

18  they will not negotiate further with us at this

19  point, and we cannot stipulate to things that we

20  believe are inadmissible and prejudicial.  So we are

21  in between a rock and a hard place.

22          If the Court -- we have made the motion that

23  if the Court wishes to declare a mistrial, we can

24  become witnesses, and we can testify as to the

25  things we believe are within the proper scope, then

 1  object to the government when they try to define

 2  what they believe is the proper scope and context.

 3  Obviously, I believe the Court will deny that and I

 4  don't see any reason to proceed with that further.

 5  So in the situation we are currently in with us not

 6  being able to act as witnesses, and not being able

 7  to work with the government regarding the

 8  appropriate scope of the stipulation, we are at an

 9  impasse.

10          THE COURT:  Who would testify for the

11  government on something, on an issue like this?

12          MR. NELSON:  The case agents.

13          THE COURT:  They were present or part of the

14  negotiation?

15          MR. NELSON:  Yes, Your Honor.

16          THE COURT:  Okay.

17          MR. NELSON:  And I would state, Your Honor,

18  just for the record, I take issue with that factual

19  representation because we did work with the defense.

20  We believe this was inadmissible from the jump.  And

21  we did work with them and we reached a stipulation,

22  but then at the 11th hour they wanted to change the

23  stipulation, and we were not willing to negotiate

24  against ourselves in order to further reduce the

25  factual statements.

 1        The instruction they've presented is legally
 2  improper and also factually incorrect.  There are a
 3  number of problems with it.  It's not only
 4  incomplete but they're, you know, trying to suggest
 5  to the jury that the decision of whether or not to
 6  seek the death penalty or whether or not to accept
 7  the plea agreement rests at the prosecution table,
 8  and as the Court is well aware, that is just not
 9  true.  And any suggestion that it is, is misleading
10  to the jury.  There are a thousand reasons why that
11  instruction is improper.  I don't think the Court
12  needs me to list them all.
13        THE COURT:  I don't need anything more on
14  the subject on 469; it will be -- the request for a
15  jury instruction regarding the defendant's
16  willingness to enter a plea of guilty would be
17  denied for a couple of reasons:  One, the reference
18  to stipulations and the continued request to ask the
19  Court to enter into what would be mediation or
20  arbitration as to what a stipulation should be is
21  not part of my -- a stipulation is an agreement
22  between the parties.  That if, that they can reach,
23  that they have come to some agreement on, that then
24  is presented to the jury.  I don't conduct hearings
25  to determine stipulations, and don't take evidence

 1  to determine stipulations.  It's an agreement
 2  between the parties.  So if there is no agreement,
 3  then apparently there is no stipulation.
 4          Now, the second reason is, and looking
 5  forward, and I know I've said this on a number of
 6  issues, but, available to the defense at the time of
 7  the discussion, and I realize that it was way, way
 8  early, in the process, but for whatever reason the
 9  government apparently chose to make the case agents
10  available so that somebody would be able to testify
11  in the event this issue came up.  The defense it
12  appears did not do that.  There probably were a
13  number reasons why, including how early in the
14  process it was and generally speaking, when
15  negotiations are just between lawyers.  But the fact
16  of the matter is that, I don't think in this case
17  from what I have seen, every imaginable motion has
18  been filed, which I assume come out of, you know,
19  the capital defense way to defend capital cases, and
20  so maybe while going through all of the playbook,
21  the defense should have anticipated that if this
22  issue was going to be raised, that somebody besides
23  a lawyer should have been part of the discussion as
24  well so that somebody could testify on it;
25  especially given the fact that it is defense that is

 1 raising this issue and now has nobody, apparently,
 2 to testify on it.
 3        I appreciate the problem that creates for
 4 you but I've ruled.  My ruling did not include me
 5 telling you what a stipulation -- telling the
 6 parties what an agreement between you should look
 7 like.  So 469 is respectfully denied.
 8        With that in mind, there are a number of
 9 issues regarding rebuttal, but now does the defense
10 wish to have a few minutes before we call the jury
11 in and decide whether they are going forward with
12 anything further?
13        MS. POLLOCK:  No, Your Honor, we are not
14 going forward with any additional evidence at this
15 time.  But we would like to discuss the scope of the
16 government's rebuttal.
17        THE COURT:  So, shall we do that now and so
18 the jury is just brought in one time?  We can tell
19 the jury we are going to be a few minutes yet.
20        MS. POLLOCK:  I think that's fine, Your
21 Honor.
22        THE COURT:  All right.  I'll just ask Jeremy
23 if you go up and tell the jury we may be 15 or 20
24 minutes.  All right.  That we are cleaning things
25 up.

1          THE CLERK:  Uh-huh.

2          THE COURT:  Okay.  So, with that in mind,

3  there were a number of filings last night by the

4  government on the issue of rebuttal.  Should we take

5  those up first and maybe that will clear up some of

6  the scope that Ms. Pollock you're thinking of?

7          MS. POLLOCK:  Yes, Your Honor.

8          THE COURT:  All right.  Let me start

9  backwards:

10          468, United States of America Motion for

11  Instruction Regarding Defendant's Presentation of

12  Mental Health Testimony in Mitigation.  Mr. Nelson,

13  do you want to be heard further on it?

14          MR. NELSON:  Sure, Your Honor.  We think it

15  speaks for itself.  We are just basing this

16  instruction on --  first of all, we mirrored the

17  Defendant's Proposed Instruction with regard to the

18  videos, so that the form would be consistent.  But

19  considering the multiple times in which, albeit lay

20  testimony, although Dr. Zoline was an expert, was

21  presented, we thought though to complete the record

22  we would put an instruction; we would defer to the

23  Court.

24          THE COURT:  How about 12.2(e) that says that

25  it is inadmissible to admit evidence that a notice

SENTENCING -- July 16, 2019 (Morning)       11

1  was withdrawn.

2        MR. NELSON:  That's true, Your Honor.  I

3  don't believe the instruction mentions that it is

4  withdrawn, but no notice was given, and that is a

5  factually correct statement.  And should not fall

6  under 12.2(e) Your Honor.

7        THE COURT:  Ms. Pollock or whoever?

8        MS. POLLOCK:  Your Honor, this instruction

9  if given would create multiple reversible errors.

10  It impermissibly comments on the defense's strategy

11  with regard to the case.  It is a *Griffin v.*

12  *California* error and it comments on the defendant's

13  refusal to speak with mental health professionals of

14  the government's.  It is a Fifth Amendment violation

15  and its comment on the defendant's failure to

16  testify all wrapped into one.

17        THE COURT:  I'm going to deny 469 as

18  tendered.  And I believe that the matter is open for

19  argument.  Not that the defense withdrew, not that

20  the defendant refused to be examined, but that there

21  has been no expert testimony; there has been no

22  expert testimony presented on any of the issues the

23  defense would have you believe are mental health

24  issues, such to that effect.  But an instruction as

25  tendered will be denied.

 1        466, is the Motion to Admit Rebuttal
 2  Evidence Regarding the Defendant's Mental Health,
 3  Substance Abuse, and Self-Diagnosis.  The first one
 4  has to do with mental health treatment and substance
 5  abuse treatment and the fact that the jail handbook
 6  which notes that the jail offers mental health and
 7  substance abuse treatment is available to inmates.
 8  The government would propose that they be allowed to
 9  produce evidence that Mr. Christensen -- yeah, these
10  are sealed, and I'm not sure why, now come to think
11  of it.
12        MR. NELSON:  We filed it under seal,
13  basically, under the abundance of caution, Your
14  Honor.
15        THE COURT:  Any reason why this should be
16  under seal?
17        MS. POLLOCK:  We don't believe so, Your
18  Honor.
19        MR. MILLER:  No.
20        THE COURT:  This will be unsealed.  And so I
21  believe so -- this is the only one.
22        All right.  So yesterday that came up, I
23  sustained an objection.
24        Mr. Nelson, wish to be heard further?
25        MR. MILLER:  Yes, Your Honor.  We rely on

SENTENCING -- July 16, 2019 (Morning)      13

 1  the paper.  They opened the door to this with

 2  Dr. Zoline regarding the need for substance abuse

 3  treatment and the need for mental health treatment

 4  and that had further treatment been given, his many

 5  problems with mental health and substance abuse

 6  could have been solved and yet he refused to avail

 7  himself of that treatment; I think it is relevant to

 8  the jury both to give the jury a complete factual

 9  recitation but also to impeach Dr. Zoline's

10  testimony.

11        THE COURT:  Who would be arguing this for

12  the defense?

13        MS. POLLOCK:  I will, Your Honor.

14        Again, there are multiple reversible error

15  problems with this proposal.  First of all, with

16  regards to the mitigation presented through

17  Dr. Zoline.  It was limited in scope.  That scope

18  ended in the spring of 2017.  It is not relevant to

19  our mitigation case what substance abuse or mental

20  health treatment he received in the jail between a

21  year and two years after the testimony that we

22  presented in that regard.

23        Second of all, the fact that when

24  Mr. Christensen was incarcerated at the Macon County

25  Jail, he did avail himself of mental health

 1  treatment and saw a mental health professional
 2  within the jail.  Her name was Sharon Brown.
 3        Those records were produced by the jail to
 4  the government.  And it's well established that, and
 5  it was provided to us in discovery from the
 6  government, it's well established that when you're
 7  meeting with jail personnel, those meetings are not
 8  confidential.  And it was upon advice of counsel
 9  that Mr. Christensen declined to meet with staff at
10  the jail.  Because those documents would then be
11  provided or disclosed to the government and used
12  against him as a sword in this case.
13        Now, the government did not choose to
14  introduce the Macon County record but that's why he
15  do not meet with the jail staff at Livingston County
16  because those meetings were deemed not confidential;
17  it was upon the advice of counsel.  So if we get
18  into that, there is a Fifth Amendment issue with why
19  he chose not to meet with them.  Sixth Amendment
20  issues why he chose not to meet with him and the
21  fact that he did not make statements to a mental
22  health counselor, as a personal choice, is a common
23  -- it is a *Griffin* error because it is comment on
24  his willingness to speak with government staff.  And
25  it is also a *Doyle* error because it comments on his

1  silence after *Miranda* warnings were given.

2        So we believe that it's improper because it

3  exceeds the scope of the mitigation case that was

4  presented; it's improper on constitutional comment

5  on what he chose to do upon advice of counsel, and

6  it's a comment on his silence.

7        THE COURT:  Tell me, again, in closing

8  argument what you intend to do with all of the

9  mental health issues that were brought into play

10  through lay witness and through Dr. Zoline and

11  through the counseling center people.

12        MS. POLLOCK:  What I'm going to do is

13  basically express to the jury that this is not an

14  individual that you should execute because he was

15  suffering from symptoms of depression, anxiety, and

16  because he went for help and did not receive it.

17  The fact that he did not --

18        THE COURT:  And the fact then that he went

19  for help and did not receive it, and the

20  government's position, as I understand this, is that

21  there was still -- there is other available help for

22  him and he chose not to receive it except that

23  you're saying that you advised him not to seek it.

24        MS. POLLOCK:  Correct.

25        THE COURT:  So this is what -- this strategy

 1  that you have chosen has all kinds of dips and
 2  curves and windy roads and to try to -- it's really
 3  clear to me that you want to get in and clearly are
 4  entitled to all the lay testimony about mental
 5  health.  But you have, and I've allowed, so much
 6  that probably could have or should have been
 7  considered to be 12.2 expert testimony on the
 8  subject.  But out of an abundance of caution on my
 9  end to not preclude Mr. Christensen from presenting
10  as much or all of the mitigating evidence that he
11  should be allowed to do so, your strategy is
12  dictating my rulings.
13        In other words, you're telling me that we
14  can put all this in, Judge, but you can't allow this
15  because we told him not to seek this treatment.  You
16  see what I'm saying?  So how do I --
17        MS. POLLOCK:  I don't see how the fact that
18  he declined to seek treatment when he knew that that
19  treatment would be disclosed to the government --
20        THE COURT:  But you put in evidence that he
21  went to seek treatment.
22        MS. POLLOCK:  Before he was incarcerated.
23  His lack of treatment in the jail has nothing to do
24  with the fact that he went to the Counseling Center
25  in March of 2017.

SENTENCING -- July 16, 2019 (Morning)       17

1          THE COURT:  I know you want the jury to
2    infer or to believe that if he had these issues in
3    April, he had them in June and July and August and
4    up and through today.
5          MS. POLLOCK:  I do not plan on arguing that,
6    Your Honor.  We didn't bring anything about his stay
7    in the jail except for the fact that he has been
8    well behaved.  That's it.  That's all that we
9    brought up and it's with good regards to the
10   government's alleged aggravation for future
11   dangerousness is why that was brought in to rebut
12   that.
13         But in terms of the argument, we have no
14   comment in any way about what Mr. Christensen's
15   mental state is today, what it was in 2018, or what
16   it was after he was incarcerated.  What we have
17   presented is the trajectory of his life leading up
18   to the offense and why that trajectory is mitigative
19   of a death sentence, that's it.  I do not
20   understand.  I literally do not see the relevance of
21   why him choosing, whether it is upon advice of
22   counsel to not, to not avail himself of mental
23   health treatment in a facility where the facility is
24   going to report everything that he says to
25   government, why that is proper, and it's also

SENTENCING -- July 16, 2019 (Morning)      18

1  unconstitutional to comment on his choice not to
2  seek treatment, not to talk to an agent that is
3  employed by a jail which would then disclose to the
4  government.
5          THE COURT:  Mr. Miller?
6          MR. MILLER:  Part of it, the defense says
7  that's all we did, that's not all they did.  They
8  focused on he was up at night; he couldn't sleep.
9  They talked about that he'd be the only person up at
10 night.  There were clearly bringing an image to the
11 jury as to what his mental condition was while he
12 has -- since he has been incarcerated.  And so, I
13 just don't think that that's a correct statement
14 that they solely brought in -- we could have
15 stipulated that he hasn't had any disciplinary
16 violations.  They brought in a whole morning of
17 witnesses to talk about their interactions with
18 Mr. Christensen, and the way that he behaved in the
19 jail; the way that he was up at night, so I think
20 that they have put it at issue.
21          MS. POLLOCK:  That's not correct.  The fact
22 that he keeps strange hours or has sleep habits that
23 are different from the other inmates, the reason
24 that was presented is to show that he caused no
25 trouble.  He caused no trouble in the jail.  There

1  is no comment from any jail staff that he is

2  abnormal or appeared mentally ill or his sleep

3  habits were concerning or they were reported.  It

4  just was to literally show what his life was like in

5  the jail and that he is not a future danger.

6          THE COURT:  Let me jump ahead then because

7  it appears as we will have the same argument then as

8  to number three where the government wants to

9  present evidence that he was taking Effexor.  And as

10  of April 19, 2019, he chose to quit taking at

11  Effexor.

12          No, I wouldn't allow this to be connected to

13  the timing of the withdrawal, but what about that

14  issue, that was also -- is that something that the

15  defense told him to do, told him to quit taking his

16  Effexor.

17          MS. POLLOCK:  Your Honor, to be perfectly

18  honest, I believe our conversations about his

19  medications are privileged and I can't disclose

20  those right now.

21          THE COURT:  Fine.  Fine.  That's fine.  I

22  agree.

23          MS. POLLOCK:  Regardless, the fact that he

24  had a thought about not taking his medication or

25  taking his medication in 2019, two months prior to

1  trial, again, is relevant, because he has been well

2  behaved in the jail, medication or not, that's the

3  government's aggravator.  We have not talked about

4  his mental health in the jail.  And we do not intend

5  to argue that he is currently sick or currently

6  depressed or currently bipolar or anything else.  We

7  are not planning on commenting on his behavior in

8  the jail except to say that he is well behaved and

9  causes no problems.

10        So, whether or not he did something with his

11  medication almost two years after the crime, which

12  will not be brought up in closing argument, is again

13  irrelevant and prejudicial.  What is -- what does

14  the jury need to know about how his medication is

15  right now?

16        THE COURT:  And, Mr. Nelson, from my seat,

17  that doesn't give you that much -- doesn't that

18  contemplate that he was taking medication for the

19  two years since his arrest.

20        MR. NELSON:  Well, we've received that by

21  the dump truck load during the mitigation case.  And

22  they have put on this mitigation.  They have put on

23  this expert to say that he was a risk of danger; he

24  was a risk of harm to himself and others, even

25  though he was on medication because he didn't

SENTENCING -- July 16, 2019 (Morning)          21

1    receive enough treatment.  And now we have evidence

2    that he stopped taking and has continued to not take

3    his medication since April.  And he didn't have

4    treatment in jail, and he has been perfectly well

5    behaved.  So it is directly contrary to the expert's

6    testimony and that's why it is being offered to

7    impeach Dr. Zoline.  And the problem is, Your Honor,

8    and you hit the nail on the head with this, it is

9    mitigative under the microscope.  If we only look

10   right in front of us, we don't look at any of the

11   surrendering context, and that's not what criminal

12   trials are supposed to be, as Your Honor well knows,

13   and we know and you know and you said and they have

14   said they are going to stand here and say on June 9,

15   2017, this was a troubled, mentally ill man who is

16   taking medication, didn't get the treatment he

17   received, and, boom, as soon as it was -- he was in

18   a controlled environment, and he had access to all

19   this stuff at his whim, he didn't use it anymore.

20   And with regard to Macon County, we did want to put

21   that in, and they filed a Motion in Limine to keep

22   it out because that mental health treatment was

23   around his suicide note, and they didn't want it in.

24   So that's disingenuous to say that we could have put

25   it in and we did not.  And if they want to withdraw

 1  their mitigators, he's well behaved in jail and

 2  he's, you know, suffers from all of this mental

 3  health issue, that's fine, we don't need this

 4  anymore.  But the reality is they called an expert

 5  witness to say this man needed more treatment and he

 6  needed his medication, and low and behold --

 7          MS. POLLOCK:  Not what she said --

 8          MR. NELSON:  I believe she said --

 9          THE COURT:  What did she say?

10          MS. POLLOCK:  She said that when he came

11  into the Counseling Center, he expressed homicidal

12  and suicidal ideation which triggered her to believe

13  that that would have required additional evaluation

14  and it made her think that he could have been a high

15  risk at that time and she would have followed up

16  more heavily with him and then it didn't happen and

17  he went off for two months and did whatever the heck

18  he was going to do; that's what she testified to.

19  She didn't testify about his medication.  She didn't

20  testify about what medication he should be on.  She

21  didn't testify about his mental condition because

22  she wasn't permitted to do so under the Court's

23  order.  We didn't elicit that from her.

24          Second of all, if Mr. Nelson knows, I'd like

25  him to stand up right now and tell me exactly how

SENTENCING -- July 16, 2019 (Morning)      23

 1  much Effexor Brendt Christensen took this morning.
 2  Because this whole one phone call of maybe I should
 3  stop taking it and wean myself off of it or whatever
 4  the heck they said in that motion, he's on his
 5  medication right now.
 6          Now, go ahead and pull it up.
 7          MR. NELSON:  Here you go.  "I stopped taking
 8  it in April."  He said that he wasn't going to take
 9  it anymore.
10          THE COURT:  Everybody calm down.
11          MS. POLLOCK:  He took half of his dose.
12  He's still getting Effexor, 75 milligrams on all of
13  these dates.  And these are from April.  I said
14  after April, today, how much medication is he
15  taking?
16          We can call the Peoria County Jail
17  superintendant to come up here and talk about his
18  medication.
19          THE COURT:  Well, represent what is he
20  taking and how much of it and since when?  So he
21  started again?
22          MS. POLLOCK:  He said in April he did half a
23  dose for approximately one month, and then went --
24  transferred went right back up to the full dose
25  because he didn't want to go through withdrawal on

1  his medication.

2         THE COURT:  So if that's the case, if that's

3  the case, why wouldn't all of that come in then,

4  Mr. Nelson?

5         MR. NELSON:  Well, Your Honor, I don't

6  believe that's what these records say.  So, if

7  again, if we are going to get into this side

8  argument and all of these other things --

9         THE COURT:  That's not a side argument, but

10 if when he was taken to the Peoria County Jail if he

11 resumed his medication then why wouldn't that be

12 admissible for the defense to rebut your rebuttal?

13        MR. NELSON:  Well, I guess it would be, Your

14 Honor, frankly, there is no way to know any of that.

15 But the problem is more troubling, and I understand

16 Your Honor has already said that you wouldn't let it

17 in, but this idea --

18        THE COURT:  Here is what I'm going to do --

19        MR. NELSON:  That they stopped it right

20 before the examination --

21        THE COURT:  I know, but I don't know how

22 you're going to connect the dots on that.

23        So, here is what I'm going to do, strategy

24 or no strategy, I'm going to allow -- because

25 strategy -- you can't tell me because it's your

strategy I can't rule. It doesn't, it doesn't add up. You know, you decide how you want to try your case, but whatever the consequences are, they are. And so -- go ahead.

MS. POLLOCK: Your Honor prevented the testimony of Dr. Pearson under the parameters that were discussed in court. There is no evidence of a diagnosis of Mr. Christensen in this case. Persistent depressive disorder did not come in. The prescription amounts and changes and everything else did not come in. So I would like to know how are we supposed to address that Mr. Christensen has continued to be prescribed Effexor for persistent depressive disorder and other disorders with the disorder itself has not been admitted into evidence.

THE COURT: I'm not going to allow that. I'm not going to allow the request to say by the government that he wanted to discontinue his Effexor. I'm not going to allow that. What I am going to allow, and it will be simple, and it will be clearly defined, and it will be very, very limited because be careful what you ask for this, this I think creates more, could create more issues than what you're looking at, but under -- to rebut the mitigator, I'll allow you to offer that the

1  handbook indicates mental health and substance abuse

2  treatment was available to Mr. Christensen, and that

3  he did not partake in it in that regard.

4         MS. POLLOCK:  Your Honor, we would continue

5  to object to that as a constitutional violation of

6  his right to remain silent and not avail himself of

7  those services in violation of a *Estelle* and

8  *Griffin*.

9         THE COURT:  And that's based on the fact

10 that you think his conversations in these sessions

11 would be discoverable?

12        MS. POLLOCK:  Are discoverable as evidence.

13        THE COURT:  Does the government agree with

14 that?  Do you agree they are discoverable?

15        MR. NELSON:  I mean, in a sense, yes,

16 because there is no privacy in jail so....

17        THE COURT:  Well, then really why do you

18 want to open that door?  Why do you want to open

19 that door?  Is it that crucial that all rests on

20 this that you want that door opened on a matter that

21 would be discoverable that would allow arguments

22 like Ms. Pollock is being made.

23        MR. MILLER:  I think the question is, and

24 this is our concern, that we don't know what we are

25 going to hear in closing argument.

 1          THE COURT:  And I don't either.  And that's

 2     my concern.

 3          MR. MILLER:  We don't want to be in a

 4     position that we know facts that could rebut what is

 5     being argued during that closing argument that we

 6     were then precluded from putting in, so that's fine

 7     but then we will be objecting during closing

 8     arguments to any facts that they would suggest are

 9     argument that could be rebutted by that evidence.

10          THE COURT:  That's fine.  Let's address it

11     -- let's do it that way.

12          So then one is denied.  The handbook that

13     offers mental health, that will be denied.  The

14     refusal to take the request to allow his refusal to

15     wean himself off the Effexor will be denied.

16          Number 2, the lay witness testimony of

17     self-diagnosis of mental disorders.  You want to

18     testify from Ms. Zortman and Ms. Bullis who

19     described the defendant as a psychopath and to rebut

20     the defendant Googling some symptoms -- as I recall

21     he was a teenager when this occurred, right?

22          MS. POLLOCK:  Yes.

23          THE COURT:  So that request will be denied.

24     So that takes care of 466.

25          Now let's go to 467.  United States of

1  America Motion in Limine to Prohibit Improper

2  Closing Argument or in the Alternative Allow

3  Rebuttal Evidence.

4        All right.  The plea negotiations, I guess

5  that we've addressed now, based on my ruling.  It

6  apparently is not coming up at all in any way,

7  shape, or form; correct?

8        MS. POLLOCK:  Correct.

9        THE COURT:  Okay.  So does anybody need to

10 be heard further on that?

11       MR. MILLER:  No, Your Honor.

12       MS. POLLOCK:  No.

13       THE COURT:  The reading material in the

14 Livingston County Jail.  Now, I have a concern about

15 that.  First of all, was that a prohibited book?

16       MS. POLLOCK:  No.

17       MR. MILLER:  I guess we don't know.  The

18 jail staff reviews books and determines whether they

19 would get in, and we don't know if it was reviewed

20 by jail staff or if it was allowed.

21       THE COURT:  So what would be the purpose

22 then that he is -- that he -- because they procured

23 him as reading children's books, you want to make it

24 clear that he read something more than children's

25 books.  And it's in evidence that he read "American

1  Psycho" before he committed the murder, right?

2          MR. MILLER:  It's just to prevent, and maybe

3  defense will tell us this, to prevent argument -- in

4  fact I heard Ms. Pollock say earlier -- the only

5  reason that they presented the jail staff was to say

6  this he behaved in jail.  So if they are not going

7  to argue anything about the books that he was

8  reading while he was in jail, he was reading

9  Goosebumps or those kinds of things, then we don't

10 need the evidence.

11         THE COURT:  And if they do argue it --

12 Ms. Pollock, let me just stay ahead of this one --

13 if they do argue it, don't you think that it is fair

14 game for you to say, well, there is a recent

15 reformation because a month before the murder he is

16 reading "American Psycho."  I'm concerned about the

17 book in some fashion.  We are going to ask jurors to

18 certify that religion, et cetera, did not factor in

19 their decision and this is a book about demonology.

20 I just assume that we'd avoid that.

21         MR. MILLER:  Fair enough.

22         THE COURT:  So that would be denied as to

23 bringing up Occult and Demonology, or whatever the

24 name of it was.

25         With regard to the text message, you brought

 1  up Ms. -- you brought up Ms. Pollock's Sponge Bob

 2  Square Pants, I don't know when that was, then go

 3  back and point out that it's a book about --

 4          MS. POLLOCK:  I can categorically represent

 5  that I'm not mentioning Sponge Bob in my closing.

 6          THE COURT:  Thank you.  Okay.  That takes

 7  care of that.

 8          The credibility of Terra Bullis was

 9  challenged at one point and also said not to blame.

10  I'm not quite sure what the government's asking for

11  here.  I mean they can attack Terra Bullis if they

12  want to.  It's all fair game for you to remind the

13  jury what they heard, what they saw, how she

14  conducted herself.  I don't know what --

15          MR. MILLER:  So then -- we just wanted -- we

16  were trying to streamline the rebuttal, Your Honor.

17  And so that we can -- but it will be brief to

18  present the job applications that had that he listed

19  her as a reference.

20          MS. POLLOCK:  We are not bringing that up.

21          THE COURT:  Okay.  Then I don't know what

22  the ruling would be here.  They are not bringing it

23  up.  Do you still want to --

24          MS. POLLOCK:  I think it would be moot, Your

25  Honor.  I'm representing to the Court I'm not going

1  to attack Terra Bullis in closing.

2      MR. MILLER:  Very good, Your Honor.

3      THE COURT:  Okay.  Alcohol in the Bureau of

4  Prisons.  There is no evidence on this.  I don't

5  anticipate.  I don't know, Ms. Pollock I better not

6  say that, I don't anticipate -- I will hear from

7  you, do you plan to argue specifics about a Bureau

8  of Prisons or generally speaking that he is not a

9  danger because he's established himself as somebody

10 that can comply.

11     MS. POLLOCK:  B, Your Honor.

12     THE COURT:  What?

13     MS. POLLOCK:  He has established himself as

14 someone that can comply.

15     THE COURT:  So with that in mind.

16     MR. MILLER:  If they are not going to argue

17 it, that's fine, Your Honor.

18     THE COURT:  Okay.  Well, he had a pet cat.

19 So, Ms. Pollock, what does that do for you,

20 anything?  That's not coming up either?

21     MS. POLLOCK:  I mean, I think I have a

22 picture of him with a cat when he was 13.  I don't

23 see how that opens the door to statements made to

24 Miss Bullis about a guinea pig, which are also

25 uncorroborated statements, and the Court --

SENTENCING -- July 16, 2019 (Morning)        32

```
 1          THE COURT:  I trust that you're not going to
 2   make that the whole linchpin of your closing
 3   argument and rest your case on it.  Other than he
 4   was -- had a childhood and his childhood was this.
 5          So, I'll -- I don't think that opens the
 6   door to the guinea pig issue.
 7          Now back to the Counseling Center should
 8   have done more, that is the last issue.  I think
 9   I've already addressed it given where we are.
10          MR. MILLER:  I believe you've ruled on it,
11   Your Honor.
12          THE COURT:  Okay.  So now with that in mind,
13   were there any other issues -- any other issues from
14   the government?
15          MR. NELSON:  No, Your Honor.
16          THE COURT:  Any other issues, Ms. Pollock?
17          MS. POLLOCK:  Yes, Your Honor.
18          The government graciously informed us last
19   night that they plan on playing two jail calls of
20   Mr. Christensen's in their rebuttal case.  One of
21   the calls is between Mr. Christensen and his son,
22   Mike and Brendt Christensen on July 4th of 2017;
23   where there was a conversation about when you're
24   exonerated I'm going to find the Zhang family and
25   I'm going to tell them they should be ashamed of
```

 1  themselves.  That information was elicited on
 2  cross-examination of Mike Christensen.
 3        The transcript from July 10th clearly reads,
 4  the question was asked by Mr. Nelson during a phone
 5  call on July 4, 2017:
 6        "Did you tell your son that when he was
 7  exonerated you were going to find Yingying's father
 8  and tell him that he should be ashamed of himself.
 9        "Answer:  I don't recall saying I would find
10  him.  I remember saying and it just wasn't -- that
11  is a little out of context, I believe -- there are
12  other statements made in regard to all of the
13  comments made on line.  Brendt was arrested and
14  people assumed right away; the media, comments of
15  the U of I people that he was guilty right then and
16  there.  There was no doubt of innocence and yet
17  there were many situations I can think of, yeah, he
18  could have been innocent but everybody said he was
19  guilty.  Now if he was exonerated, yeah, I would
20  have told Mr. Zhang and all of the other" -- I think
21  it is commoners, that must be a typo -- "that I have
22  commoners saying, yeah, of course I would have."
23        So, this is supposed to be rebuttal.
24  Mr. Christensen admitted that on the stand.  So I
25  don't see the purpose of rehashing that, it's not

1 proper rebuttal, it's not impeaching him when he
2 admitted the statement.
3          THE COURT:  Ms. Nelson.
4          MR. NELSON:  It is impeaching him because
5 what he said on the stand is different than what he
6 said on the call.  He said he didn't make statements
7 that he would find him.  He did make those
8 statements in the call.  He also on the stand tried
9 to soften it by saying, *Oh, it was all of these*
10 *people on internet.*  He didn't mention all of those
11 people on the internet.  He said this family, the
12 victim's family, he was going to find them and tell
13 them they should be ashamed.  That is directly
14 impeaching to his testimony.
15          MS. POLLOCK:  I have the transcript.
16          THE COURT:  Of what?
17          MR. NELSON:  I have the transcript of the
18 telephone call.
19          MS. POLLOCK:  This statement by
20 Mr. Christensen.
21          THE COURT:  You have the transcript from the
22 trial?  I am more concerned right now --   I know
23 what he said in trial -- I'm concerned about whether
24 the jail call actually rebuts what he testified in
25 court, that's all; I'm just looking for what the

 1  jail call said.

 2          MR. MILLER:  I understand that, Your Honor.

 3  If I may, because I think that's almost a little

 4  side issue.  We are talking about putting on after

 5  four days of defense testimony less than an hour,

 6  less than a half hour of rebuttal.

 7          Part of that testimony was the sister

 8  testifying.  She didn't cabin how kind the defendant

 9  was.  That's how it ended; he's so kind, he's so

10  kind.  This jail call reflects that he is not so

11  kind and some of the other calls.  So this is not

12  only rebuttal to impeach a witness, it's to rebut --

13  again, this is very short -- the overall impression

14  given the four days of testimony as to the

15  defendant's behavior while he has been incarcerated.

16          THE COURT:  I'll allow the jail call.

17          What about the next one?

18          MS. POLLOCK:  I believe, Your Honor, the

19  next jail call that was provided to us is one

20  between the defendant and his mother where he told

21  her that he was sleeping 12 hours a day or more.

22  And I believe that Mrs. Williams went on the stand

23  and said it's possible he could have said that, she

24  didn't exactly remember.  I don't think that that's

25  proper rebuttal either.

 1          MR. MILLER:  We have to shore that up, Your

 2     Honor.  We made the indication to the jury that

 3     that's what was said and she didn't recall.

 4          THE COURT:  I'll allow it.

 5          What else is there going to be in rebuttal?

 6          MS. POLLOCK:  That's all that we know of,

 7     Your Honor.

 8          MR. NELSON:  We are going to impeach

 9     Michelle Zortman's testimony with regard to the

10     Terra Bullis jail call.  We are also going to

11     complete the record on the missing text messages

12     between Debra Mitchell and the defendant in her

13     Facebook messages.

14          MR. MILLER:  And then that's it.

15          THE COURT:  Okay.  So you have retrieved

16     those somehow?

17          MR. NELSON:  Yes, Your Honor.

18          THE COURT:  Those missing messages?

19          MR. MILLER:  When you say "retrieved," the

20     defense had them.  They just redacted them.

21          MS. POLLOCK:  We chose to present only what

22     is relevant, Your Honor, and I would like to know

23     exactly what they say so that we can decide whether

24     or not they are relevant at this point.  There is

25     still an issue of admissibility with those messages.

 1          MR. MILLER:  They suggested there are some
 2  cut off in contact between the defendant.  I think
 3  they I know what the messages are.  So, one, they
 4  show that this contact did continue.  I think that
 5  their messages, they are also -- demonstrate the
 6  relationship between the defendant and his sister,
 7  Andrea, which has been basically made one of the key
 8  mitigators for his relationship with his sister,
 9  Andrea, and his description of her.  So we think
10  that that is relevant.
11          THE COURT:  Okay.  I'll allow it.
12          All right.  Are we ready to go?  So bring
13  the jury down.  The defense will rest and we will go
14  into the government's case?
15          MR. NELSON:  Yes, Your Honor.
16          (Jury present, 9:41 a.m.)
17          THE COURT:  All right.  Thank you, ladies
18  and gentlemen.
19          It appears that we recessed yesterday with
20  the defense still in their case.  Is there anything
21  else to be presented from the defense?
22          MS. POLLOCK:  No, Your Honor.  The defense
23  rests.
24          THE COURT:  All right.  Does the government
25  have any rebuttal?

1          MR. NELSON:  Yes, Your Honor.

2          The United States call Special Agent Andrew

3   Huckstadt.

4          THE COURT:  All right.

5          (Witness sworn.)

6          THE COURT:  Whenever you're ready,

7   Mr. Nelson.

8          MR. NELSON:  Thank you, Your Honor.

9                ANDREW HUCKSTADT,

10  after having been duly sworn, testified as follows:

11                DIRECT EXAMINATION

12  BY MR. NELSON:

13  Q.   Good morning, sir.

14  A.   Good morning.

15  Q.   Would you please restate your name and spell

16  your last name for the record?

17  A.   Andrew Huckstadt, H-u-c-k-s-t-a-d-t.

18  Q.   Special Agent Huckstadt, you're the case agent

19  in this case presently?

20  A.   Yes.

21  Q.   Were you present in court for the defendant's

22  mitigation case?

23  A.   Yes, I was.

24  Q.   Were you present in court for Michelle Zortman's

25  testimony?

 1  A.   Yes.

 2  Q.   Do you recall her testimony about Exhibit 122 a

 3  recorded telephone call between her and the

 4  defendant?

 5  A.   Yes.

 6  Q.   Do you recall her testimony that the defendant

 7  was emotional during that call?

 8  A.   Yes.

 9  Q.   Do you remember her testimony that the defendant

10  did not laugh during that call?

11  A.   Yes.

12        MR. NELSON:  Miss Klayer, could we please

13  publish 122?

14        And, ladies and gentlemen, this might be a

15  good time --

16        MS. POLLOCK:  Your Honor -- excuse me --

17  objection.

18        I believe what she said was that his

19  laughter was his response to being under stress.  I

20  do not believe that she denied laughter.

21        MR. NELSON:  Her testimony was that he did

22  not laugh but if he did laugh, it may have been a

23  result of his emotion.

24        THE COURT:  Or being nervous?  I will allow

25  it.  The jury can decide for themselves.

1        MS. POLLOCK:  Your Honor, we will stipulate

2   that he did laugh on the call.  We know that.  It's

3   established.  There is no need to replay the tape.

4        MR. NELSON:  We would like to replay it,

5   Your Honor.

6        THE COURT:  Go ahead.  Do you want them to

7   use headphones?

8        MR. NELSON:  I think it might be easier.

9   These are one of those calls, unfortunately, that is

10  low in volume.

11       MS. POLLOCK:  Your Honor, if I may.  This

12  has already been played once in the penalty phase?

13  Can Mr. Nelson articulate a case that makes it

14  proper rebuttal to replay evidence already played?

15       MR. MILLER:  When it is disagreed by one of

16  the witnesses called by defense.

17       MR. NELSON:  I can complete the -- I can ask

18  the two questions of the witness but that seems

19  improper also, Your Honor.

20       THE COURT:  If you can get this running, we

21  will play it.

22       (Playing audio.)

23       MR. NELSON:  Your Honor, may I approach?

24       THE COURT:  You may.

25

 1  BY MR. NELSON:

 2  Q.   Special Agent Huckstadt, were you present in

 3  court for Debra Mitchell's testimony?

 4  A.   Yes, I was.

 5  Q.   Do you recall that the defense offered her

 6  Facebook messages with the defendant as an exhibit?

 7  A.   Yes.

 8  Q.   And were there messages missing from that

 9  exhibit?

10  A.   Yes.

11  Q.   Through your investigation have you been able to

12  review a complete set of Miss Mitchell's Facebook

13  messages with the defendant?

14  A.   Yes.

15  Q.   Can you please take a look and tell me if you

16  have what has been marked as 133?

17  A.   I do.

18  Q.   What is that?

19  A.   This is the more complete set of the

20  communications between the defendant and Miss

21  Mitchell.

22  Q.   How did you acquire that information, sir?

23  A.   Through a search warrant, through Facebook.

24       MR. NELSON:  Your Honor, I would offer

25  Exhibit 133.

```
 1          THE COURT:  Any objection?
 2          MS. POLLOCK:  Continuing objection; scope of
 3  rebuttal.
 4          THE COURT:  It will be admitted.
 5          MR. NELSON:  Permission to publish, Your
 6  Honor?
 7          THE COURT:  You may.
 8          MR. NELSON:  Miss Klayer, can you please
 9  publish page two, and specifically the messages on
10  February 3rd, 2015?
11  BY MR. NELSON:
12  Q.   Special Agent Huckstadt, were these messages
13  present on the Defendant's Exhibit?
14  A.   No.
15  Q.   Now these go in reverse chronological order
16  meaning that the older ones are at the bottom; is
17  that correct?
18  A.   Yes.
19  Q.   Would you please read the first message from
20  February 3rd from Deb Mitchell to the defendant?
21  A.   "Hi, Brendt.  I hope things are going well for
22  you.  I talked with your sister yesterday since she
23  won't answer your mom.  She was telling me all about
24  her chronic ailments and I basically told her she
25  needs to find work that she likes to keep her
```

1  occupied and she will feel better.  She then went on

2  to talk about all that she is self-diagnosing and

3  I'm guessing she is looking at trying to get on

4  disability.  I hope that I'm wrong but after several

5  conversations, I doubt it.  Maybe you will have some

6  better/some luck with convincing her she needs to be

7  a contributing member of society and can still be

8  her own person.  I hadn't spoken with her for over a

9  month because she makes me crazy and I told your mom

10  that I can't stand all of excuses so I don't talk to

11  her often.

12        "On another note, I hope school is all

13  you're wanting and that Michelle is doing well also.

14  I look forward to hearing from you when you have

15  some time to catch me up on your life.  Your mom was

16  really happy you came for Christmas and the next

17  time you come to see Michelle's folks, stop by here

18  for ten minutes so I can give you a hug."

19  Q.   Will you please read the defendant's response

20  also on February 3, 2015?

21  A.   "It wouldn't surprise me if she was trying to

22  get on disability.  I'll definitely try to talk to

23  her but she seems to be ignoring Michelle and I as

24  of late.  It probably stems from us being so

25  disapproving when she dropped out of school.  We

1  will definitely stop by next time we are in the

2  area.  It has been too long."

3  Q.   The top message also, please.

4  A.   "Yep.  She ignores people when we tell her

5  something she doesn't want to hear.  I'm hoping to

6  get her on phone some day or Skype where I can

7  actually have a real conversation with her.  You're

8  a good brother and sister-in-law."

9  Q.   Thank you, sir.

10         You can take that down.

11         Special Agent Huckstadt, were you present in

12  the courtroom for the testimony of Ellen Williams?

13  A.   Yes.

14  Q.   Do you recall her testimony about a telephone

15  call that she had with the defendant about his sleep

16  schedule?

17  A.   Yes.

18  Q.   Was she able to recall the specifics of that

19  telephone call?

20  A.   No.

21  Q.   And have you reviewed that call?

22  A.   I have.

23  Q.   Do you Exhibit 135 in front of you?

24  A.   Yes, I do.

25  Q.   What is that?

1  A.   This is a recording of the telephone call which

2  occurred on October 31, 2017.

3  Q.   Okay.  How do you know that that call is on

4  Exhibit 135?

5  A.   I reviewed it, initialed it, and dated it.

6  Q.   Do you also have 135 TR?

7  A.   Yes, I do.

8  Q.   What is that?

9  A.   That is a transcript of the recording.

10  Q.   Okay.  Have you reviewed that transcript?

11  A.   I have.

12  Q.   When you reviewed it, were you also listening to

13  the telephone call that is contained with 135?

14  A.   Yes.

15  Q.   Is it a fair and accurate transcription of that

16  call?

17  A.   It is.

18        MR. NELSON:  Your Honor, I offer 135 and 135

19  TR.

20        MS. POLLOCK:  Same objection.

21        THE COURT:  It will be admitted.

22        MR. NELSON:  Permission to publish, Your

23  Honor.

24        THE COURT:  You may.

25        (Playing audio.)

1  BY MR. NELSON:

2  Q.   Special Agent Huckstadt, were you present in the

3  courtroom for Michael Christensen's testimony?

4  A.   Yes.

5  Q.   Did you observe or listen to Michael

6  Christensen's testimony about a particular jail

7  call?

8  A.   Yes.

9  Q.   Did you hear him testify that he did not say

10 that he would make a specific effort to contact the

11 Zhang family if the defendant was exonerated?

12 A.   Yes.

13 Q.   Do you have Exhibit 130 in front of you?

14 A.   Yes.  It is a recording of the call on July 4,

15 2017, between the defendant and his father, Michael

16 Christensen.

17 Q.   Is that the telephone call that we referenced?

18 A.   Yes.

19 Q.   How do you know that that is what is contained

20 on Exhibit 130?

21 A.   I reviewed it, dated it, initialed it.

22 Q.   Do you also have 130 TR in front of you?

23 A.   Yes.

24 Q.   What is that?

25 A.   That is a transcript of that recording.

1  Q.   Have you reviewed that transcript?

2  A.   I have.

3  Q.   When you reviewed it, were you listening to the

4  call on 130?

5  A.   Yes.

6  Q.   Is 130 TR a fair and accurate transcription?

7  A.   It is.

8       MR. NELSON:  Your Honor, I'd offer 130 and

9  130 TR.

10       THE COURT:  Ms. Pollock.

11       MS. POLLOCK:  Same.

12       THE COURT:  It will be admitted.  You may

13  publish.

14       MR. NELSON:  Thank you, Your Honor.

15       (Playing audio.)

16       MR. NELSON:  Thank you, Special Agent

17  Huckstadt.

18       I have no further questions.

19       THE COURT:  Cross-examination.

20                CROSS-EXAMINATION

21  BY MS. POLLOCK:

22  Q.   Good morning.

23  A.   Good morning.

24  Q.   With regards to Exhibit Number 122, the phone

25  call with Michelle Zortman, you were present in the

1  courtroom when she testified, correct?

2  A.   I was.

3  Q.   You were present in the courtroom where she

4  testified that she was extremely emotionally upset

5  and sobbing on that phone call?

6  A.   Yes.

7  Q.   In fact she was, correct?

8  A.   She was for portions of it.

9  Q.   In fact she told you that the defendant was also

10 upset at certain times on that telephone call,

11 correct?

12 A.   That's what she said, yes.

13 Q.   And she was, correct?

14 A.   I don't recall that?

15 Q.   How long was that call?

16 A.   I believe that one was about 15 minutes.

17 Q.   One immediately following?

18 A.   I'm sorry?

19 Q.   The one immediately following?

20 A.   There were two phone calls on that day.  I can't

21 recall if it was prior or after that call.

22 Q.   So you can't recall that they basically spoke

23 for 30 minutes straight at that time?

24 A.   I believe it was in close proximity.  I think

25 the calls might have been 10 to 15 minutes apart, if

 1  I remember.

 2  Q.   And you elected to play one minute and 20

 3  seconds of that?

 4  A.   We did play one minute one 20 seconds, yes.

 5  Q.   Thank you.

 6        With regards to the Facebook messages

 7  between Brendt Christensen and Debra Mitchell, those

 8  were in what year?

 9  A.   Those were in 2015.

10  Q.   And you were in here when Andrea Christensen

11  testified yesterday, correct?

12  A.   Yes.

13  Q.   And you heard her testify that for about three

14  years when she lived in Seattle she was emotionally

15  unable to discuss things with her family because of

16  her mental state.

17  A.   Yes.

18  Q.   And you heard that she didn't contact Brendt

19  regularly during that time because she was pretty

20  messed up?

21  A.   Yes.  I believe she said -- and I think it was

22  in terms of in-person contact, but I think she did

23  mention some Facebook or other social media contact.

24  Q.   Now when you prepare exhibits to be presented in

25  court -- I know we've gone over some of this before

 1  -- remind me how many jail calls there are.
 2  A.    Over the course of a couple of years, there
 3  would be probably somewhere in the hundreds; I can't
 4  remember specifically.
 5  Q.    Now also when the evidence was presented
 6  regarding Mr. Christensen's web history and his
 7  internet searches that was a selected six to eight
 8  pages out of hundreds of thousands of web searches,
 9  correct?
10  A.    Yes, that's correct.
11  Q.    And when you presented his or when your team
12  presented his FetLife.com records, it was only a
13  portion of those records, correct?
14  A.    Yes.
15  Q.    That's because if we presented everything that
16  happened over the course of this entire case, we
17  would be here for years, correct?
18  A.    That's correct, yes.
19  Q.    So you select very small portions and elect not
20  to present the rest, correct?
21  A.    We select what we believe is relevant to the
22  case, and don't specifically jail calls, we are not
23  going to play everything because most of it is
24  irrelevant.
25  Q.    Including parts that confirm people's testimony

1  like Michelle Zortman crying, correct?

2  A.   I'm sorry?  She was crying on the portion that

3  we played.

4  Q.   She was crying for two minutes prior to the

5  portion you played, too, correct?

6  A.   Sure, yes.

7  Q.   With regards to the phone call with Ellen

8  Williams, how long was that call?

9  A.   I would have to go back and look.  Typically,

10  these calls range anywhere from 15 to 30 minutes.

11  Q.   How long was the snippet that you played for the

12  jury?

13  A.   A few seconds.

14  Q.   How many times during the course of hundreds and

15  hundreds of jail calls did he talk about his sleep

16  habits?

17  A.   I don't recall off the top of my head how many

18  there were.

19  Q.   Many?

20  A.   A few conversations, yes.

21  Q.   There were many conversations, correct?

22  A.   I don't remember the specific number off the top

23  of my head, but there were, over the course of

24  hundreds of calls, there were probably a few

25  conversations about that.

 1 | Q.   Okay.  Without going through the hundreds of
 2 | calls, what would you characterize as a few because
 3 | going through all of those calls it could be dozens,
 4 | correct?
 5 | A.   It's possible.
 6 | Q.   Now, he talked about that time sleeping a lot.
 7 | There were also times when he talked about sleeping
 8 | a little, correct?
 9 | A.   I would say that's fair, yes.
10 | Q.   Now, you were present in court when Mr. Michael
11 | Christensen testified, I think, on July 10, correct?
12 | A.   Yes.
13 | Q.   And you heard Mr. Nelson ask you a question that
14 | he denied certain things about that phone call that
15 | we just heard, correct?
16 | A.   Correct.
17 |        MS. POLLOCK:  May I approach, Your Honor?
18 |        THE COURT:  You may.
19 | BY MR. MILLER:
20 | Q.   I just handed you a transcript of that call or
21 | that day in court where Mr. Nelson asks the question
22 | that I just pointed out to you.  Will you please
23 | begin reading from there and then identify when you
24 | switch into Mr. Christensen's response?
25 |        MR. NELSON:  Objection, Your Honor.

1          MS. POLLOCK:  Your Honor, he said he didn't

2   admit it and he did.  Now this is the transcript.

3          THE COURT:  That he didn't admit what?

4          MS. POLLOCK:  About talking to the Zhang

5   family.

6          THE COURT:  Mr. Nelson?

7          MR. NELSON:  Two questions.  One, questions

8   by lawyers are not evidence.  Transcripts aren't

9   evidence.  Three, the call speaks for itself.

10          THE COURT:  Okay.  Well, the call speaks for

11   itself.  As I'm understanding this, you're asking

12   him to review Mr. Christensen's testimony in open

13   court to compare to the phone call.

14          MS. POLLOCK:  Correct.

15          THE COURT:  Go ahead.

16   BY THE WITNESS:

17   A.   The question was during a phone call on July 4

18   of 2017:  "Did you tell your son that when he was

19   exonerated you were going to find Yingying's father

20   and he tell him that he should be ashamed of

21   himself?"

22          The answer was:  "I don't recall saying I

23   would find him.  I remember saying -- and it wasn't

24   just -- that's a little out of context, I believe.

25   There are other statements made in regard to all of

SENTENCING -- July 16, 2019 (Morning)        54

1  the comments made on line.  Brendt was arrested and
2  people assumed right away, the media, comments on
3  the media by people that he was guilty right then
4  and there.  There's no doubt of innocence.  Any yet
5  there were many situations that I could think of
6  that, yeah, he could have been innocent, absolutely,
7  but everybody said that he was guilty.
8         Now, if he was exonerated, yeah, I would
9  have told Mr. Zhang, Xiaolin, and all of the other"
10  -- it says commoners -- "that I have hundreds saying
11  the opposite.  Yeah, of course, I would."
12  Q.  That call, again, was July 4th, 2017?
13  A.  That's correct.
14  Q.  Which was approximately how many days after his
15  arrest?
16  A.  Approximately five.
17         MS. POLLOCK:  Thank you.  Nothing further.
18         THE COURT:  Mr. Nelson, anything?
19         MR. NELSON:  Yes.
20                 REDIRECT EXAMINATION
21  BY MR. NELSON:
22  Q.  Correct me if I'm wrong, Special Agent
23  Huckstadt, but I believe Mr. O'Sullivan testified
24  that the defendant deleted his web search history?
25  A.  Yes.

 1  Q.   On both of his computers as well?

 2  A.   Yes.

 3  Q.   Did that limit the available evidence for you

 4  with regard to his searches and his internet usage?

 5  A.   Yes.

 6  Q.   All right.  And you've -- excuse me -- reviewed

 7  the defendant's jail calls?

 8  A.   Yes.

 9  Q.   All of them?

10  A.   It wouldn't be fair to say that I personally

11  revealed.  We have had people in the office amongst

12  -- in our entire office that have reviewed all of

13  them, and then I would get updates typically every

14  morning about what was said on the calls or the

15  texts and ones that I believe that I should listen

16  to or review more thoroughly then I would.

17  Q.   Is it fair to say that you have reviewed more

18  than a hundred jail calls?

19  A.   Yes.

20  Q.   On how many of those did the defendant express

21  emotion?

22          MS. POLLOCK:  Objection.

23          THE COURT:  Express emotion?

24          MR. NELSON:  Yes.

25          MS. POLLOCK:  Objection for a variety of

1  reasons.

2          THE COURT:  Let's see where we are going.

3           (Sidebar conference held.)

4          MR. NELSON:  I will withdraw it, Your Honor.

5          THE COURT:  Okay.

6          (Proceedings held in open court.)

7          MR. NELSON:  I have nothing further, Your

8  Honor.

9          THE COURT:  Okay.

10          MS. POLLOCK:  No recross, Your Honor.

11          THE COURT:  Thank you, sir.

12          You may step down.

13          Anything further?

14          MR. NELSON:  No, Your Honor.

15          THE COURT:  So anything from the defense

16  based on that?

17          MS. POLLOCK:  No, Your Honor.  May we take a

18  brief break just for a second to confer?

19          THE COURT:  Sure.

20          MS. POLLOCK:  Thank you.

21          THE COURT:  Let's take a few minutes --

22  well, maybe we won't need to.

23          Let's take a few minutes.

24          MS. POLLOCK:  Sorry.  That would be fine.

25  Thank you.

 1          THE COURT:  Let's take a few minutes.  I'll
 2   call you back down here in a few minutes and tell
 3   you where we are.
 4          (Jury absent 10:03 a.m.)
 5          (Recess, 10:03 a.m. to 10:14 a.m.)
 6          THE COURT:  All right.  Thank you.  Please
 7   be seated.
 8          Does the defense wish to present any
 9   rebuttal?
10          MS. POLLOCK:  No, Your Honor.
11          THE COURT:  All right.  So, we will --
12          MR. MILLER:  Your Honor, I'm sorry.  We
13   talked with defense to make sure the record is
14   clear, we had entered into evidence the full videos
15   of the interviews of the friends that were
16   interviewed in China as well as the full
17   transcripts, but we only played portions of those.
18   So to make sure the record is clear, we were going
19   to introduce into evidence as Government's Exhibits
20   -- the original full transcripts 106 TR though 112
21   TR so to make the record clear we are introducing
22   the portions that were played before the jury as
23   Exhibits 106 TR-2.
24          And then we also have a thumb drive to enter
25   into evidence as Government's Exhibit 129, which are

1  the exhibits that were -- this is for the record --
2  that were already played for the jury of both the
3  jail calls and then Exhibits 106 to 112, so these
4  were the clips of the videos that were played to the
5  jury.
6          THE COURT:  Anything from the defense on
7  that?
8          MS. POLLOCK:  No, Your Honor.  We concur
9  that both the full videos and the clips should be
10  preserved for the record.
11          THE COURT:  Okay.  Very good.  We will bring
12  the jury in.  I will ask the defense if -- I'll
13  confirm that the government has rested in their
14  rebuttal.  Ask the defense if they have any further
15  rebuttal.  Once you say no, then I will recess the
16  jury until -- I would say -- 9:00 tomorrow morning
17  for closing argument.  We will regroup here today on
18  conference on instructions.
19          Is there anything else you think that we
20  need to do today with the jury?
21          MR. MILLER:  No, Your Honor.
22          THE COURT:  Okay.  Very good.  Let's bring
23  the jury in.
24          (Jury present, 10:16 a.m.)
25          THE COURT:  All right.  Thank you.  Please

SENTENCING -- July 16, 2019 (Morning)      59

1  be seated.

2        Any further rebuttal evidence from the

3  government?

4        MR. MILLER:  No, Your Honor.

5        THE COURT:  Will there be anything further

6  the defense?

7        MS. POLLOCK:  No, Your Honor.

8        THE COURT:  All right.  Ladies and

9  gentlemen, that will conclude all of the evidence

10 for the sentencing phase of this trial.  We will now

11 have closing arguments, but we won't do those until

12 tomorrow morning at 9:00.

13        I'm going to recess you for the day.  We are

14 going to spend most, if not all of the rest of this

15 day, in a conference gathering jury instructions

16 together.  Like the last first phase, I will read

17 the instructions to you before the closing

18 arguments.  You will have a set that will go to the

19 jury room with you, but not while closing arguments

20 are made.  You will hear from both sides in the

21 morning.  And then once they have concluded closing

22 arguments, the matter will be in your hands and I

23 will address the situation with alternates at that

24 time.

25        So for now, we will recess until 9:00

1  tomorrow morning.  I appreciate you continuing to

2  abide by my admonishment not to discuss this matter

3  with anybody, including yourselves.

4         Be safe going home.  We will see you

5  tomorrow morning.  All right.  Thank you.

6         (Jury excused, 10:19 a.m.)

7         THE COURT:  All right.  Have a seat for one

8  second.

9         All right.  So maybe we will take, you know,

10  I don't know, 20 minutes or so, and then regroup for

11  -- start the conference on instructions.  What I

12  have done is taken both of your Proposed

13  Instructions, we've highlighted some things,

14  differences, small differences, large differences;

15  and I thought what we will start with -- we are

16  going to make copies for you with our color coding,

17  and then we will sit down first and start from the

18  beginning and work our way through and see where we

19  are.  Okay.  So --

20         MS. POLLOCK:  That's fine, Your Honor.  Just

21  so the Court is aware we previously had supplemented

22  our request for the non-unanimity instruction with a

23  giant stack of exhibits.  We have just a tiny bit

24  more new data that we will be filing now.

25         THE COURT:  That's fine.  In 20 minutes we

 1   will regroup.

 2          MR. NELSON:  Your Honor, if I may request,

 3   with Court's permission, to bring a cup of coffee

 4   for the conference.

 5          THE COURT:  Yes.  We have coffee.

 6          MR. NELSON:  I just wanted to ask before we

 7   showed up with it.

 8          ( Recess, 10:20 a.m. to 10:50 a.m.)

 9          THE COURT:  Thank you.  Please be seated.

10          Okay.  Outside the presence of the jury in

11   open court.  All parties present.

12          The initial Proposed Instructions that the

13   parties submitted just combined and I hope in a

14   semblance of order, and we are just going to call

15   these right now parties Proposed Penalty Phase

16   Instructions First Draft, and we will go through

17   them, if that's okay.  And I think I can help keep

18   track and you've received --  hand the copies to

19   them please.

20          THE CLERK:  One each?

21          THE COURT:  Yeah.  And then you have one.

22          So now, as you can see, page one is

23   Defendant's Proposed Instruction 2, Final

24   Instruction Number 1.  And then page two, three,

25   four, five, and top of six is the Government's

1  Instruction 1 but that was for the introduction to

2  the sentencing hearing.  So, I've left it in here

3  but it seems that, that would not be applicable now.

4  And then turning to page 11, Government's

5  Instruction 4 would be the Introduction to Final

6  Sentencing Instructions.

7          Go ahead, Ms. Pollock.

8          MS. POLLOCK:  Your Honor, would it be

9  possible to get a copy emailed because we only have

10  one and if a number of us could see it.

11          THE COURT:  Have her email it to both

12  parties.

13          MS. POLLOCK:  Thank you, Your Honor.

14          THE COURT:  So, my thought was that we would

15  take out the introduction to sentencing hearing, one

16  the government previously proposed and when we

17  compare, we would start with Government's 4 which is

18  the Introduction to Final Sentencing Instructions

19  does that make sense?

20          Mr. Nelson, you're following me?

21          MR. NELSON:  If I'm following you are saying

22  take out where you have got Government's Proposed

23  Instruction 1?

24          THE COURT:  Because that was the one you

25  proposed for the --

1          MR. NELSON:  Yes, Your Honor.  I just want
2    to make sure that I was agreeing to the same thing
3    you were talking about.
4          THE COURT:  And it is pages two through
5    actually the top of page six.
6          MR. NELSON:  I think that makes sense, Your
7    Honor.
8          THE COURT:  Okay.  So we'll show that
9    Government's 1, two through top of six will be
10   withdrawn as it was intended to be a preliminary
11   instruction.
12         Okay.  So I want to mark these up and
13   then -- so then Defendant's Instruction Number 1,
14   Introduction to Final Instructions, and then their
15   Number 2, "burden of proof," and then their Number
16   3, "evidence," is on page six.
17         Go ahead.
18         MR. MILLER:  I'm sorry.
19         THE COURT:  I thought you were going to
20   say --
21         MR. MILLER:  No, Your Honor.  I just noticed
22   that I had a wrong copy of something here, so I
23   apologize.
24         THE COURT:  So let's start this way then:
25   Let's compare Defendant's Instruction 1 with what is

 1  now Government's 4 which is the -- starts on the
 2  bottom of page 11.  And they appear to be -- and
 3  before we get to burden of proof in evidence, we
 4  will just do this one-by-one here.  All right?
 5          So Government's 4 is their introduction to
 6  Final Sentencing Instructions begins on the top of
 7  page 12, is the caption, the head note is on the
 8  bottom of page 11.  And the Defendant's 1 is on page
 9  one.  And does either side wish to argue a
10  preference?  They say pretty much the same thing.
11  It's just that -- it just begins "members of the
12  jury" and then it ends with on the Defendant 1
13  "begins your penalty deliberations," the Government
14  1 ends "will help you perform your duties properly."
15          MR. TASEFF:  Judge, I apologize we are
16  having trouble tracking Your Honor's methodology
17  with this.  We have the parties' exposed draft.
18          THE COURT:  Right.
19          MR. TASEFF:  And we are referring to page
20  numbers, I'm assuming relate solely to the proposed
21  penalty phase instructions which Your Honor gave us.
22  And then you are comparing that to government's
23  proposed --
24          THE COURT:  No, one set right there.  Just
25  in that one set; we combined them.

1            All right.  And as soon as we get started, I
2   think that you will see that it is relatively
3   orderly.  So the first one that you would see that
4   says Government's Instruction 1 at the top of page
5   two, you see that?
6            MR. TASEFF:  Yes.
7            THE COURT:  See where it says "introduction
8   to sentencing hearing"?
9            MR. TASEFF:  Yes.
10           THE COURT:  That's the one that the
11  government proposed for the preliminary
12  instructions.
13           MR. TASEFF:  Okay.
14           THE COURT:  So they are withdrawing that now
15  and that is pages two through five and the first
16  paragraph on the top of page six.
17           MR. TASEFF:  So we can strike that from the
18  Proposed Instructions Your Honor gave us pages two
19  through five and the top of six.
20           THE COURT:  The top of six.  So at the
21  bottom of the first paragraph on page six, you would
22  see Defendant's Instruction 2.  And that was simply
23  the proposed preliminary instruction that was then
24  again in the government's package, so that's coming
25  out.

1          Now you follow me.

2          MR. TASEFF:  I believe so.

3          THE COURT:  So once we get started.  I think

4   it will start to fall back into place.  So then I'm

5   setting that aside.  And then what I'm looking at is

6   the bottom of page 11 -- page one the Defendant's

7   Instruction Number 1, follow, you got it,

8   Mr. Taseff?

9          MR. TASEFF:  Yes.

10          THE COURT:  And then the bottom of 11 and

11  top of page is the government equivalent of that

12  which is now Government Instruction 4 there.  With

13  me?

14          MR. TASEFF:  Yes.

15          THE COURT:  So that's just the -- in your

16  case it's one long paragraph, in the government's

17  case it's three short paragraphs.  There is very

18  little difference.  I'm just asking if there is an

19  arguable preference either way.

20          MR. NELSON:  Your Honor, there seems to be

21  one addition at the end, "when I have finished"; we

22  don't object to that.  We do object to the insertion

23  of the words "extremely serious" in the sentence,

24  two sentences prior that begins "I have prepared

25  them."  Those are the only two changes, only two

1  differences between the two.  We are fine with "when

2  I have finished sentence," but "extremely serious"

3  doesn't need to be is there; superfluous.

4          MR. RUBENSTEIN:  Mr. Nelson, what is that?

5          THE COURT:  Mr. Nelson is saying,

6  Mr. Rubenstein, that down in --

7          MR. RUBENSTEIN:  Five lines from the bottom

8  there, Judge?

9          THE COURT:  Two, four, six lines from the

10 bottom, the sentence that "I've prepared them to

11 ensure that you are clear in your duties at this

12 extremely serious stage of the case."  And objecting

13 to "extremely serious stage of the case."  I guess

14 maybe no objection to "I have prepared them to

15 ensure you are clear in your duties" period?

16         MR. MILLER:  Or "at this stage of the case."

17         THE COURT:  Or "at this stage of the case."

18 So if the defense is agreeable to that, I will give

19 the Defendant's 1 with that change; if they are not,

20 then I'll just pick between the two.

21         MR. TASEFF:  Judge, we leave this to the

22 Court's discretion.  Again, we adopted Judge Simon's

23 instructions as we are given in *Briseno*, so we are

24 modeling our proposed on the *Briseno* instructions

25 from the Northern District.

 1          THE COURT:  So I will give Government's
 2  Number 4 as the first instruction.
 3          So then we will -- on page six is
 4  Defendant's Instruction Number 2 as to burden of
 5  proof.  And then this is what's going to be a little
 6  confusing to start with here.  The government's
 7  burden of proof -- proposed burden of proof --
 8  actually, I don't see it.
 9          Was it in that preliminary instruction?
10          MR. TASEFF:  Page 7 and 8, Judge.
11          MR. NELSON:  I believe our instruction --
12  they are right after each other, Your Honor.
13          THE COURT:  Right.  So, Defendant's
14  Instruction as to burden of proof, and Government's
15  Instruction as to burden of proof.  Defendant's is
16  on page six.  Government's is on page seven and
17  eight.  So thoughts from either side on which burden
18  of proof.
19          MR. NELSON:  Respectfully, Your Honor, I
20  wanted submit that our burden of proof instruction
21  is easier to read and clearer.  And based on that
22  reason should be given instead.  I don't know that
23  there are substantial amount of differences as to
24  the sentences -- the meaning of the words.  I just
25  think the one reads more easily.

SENTENCING -- July 16, 2019 (Morning)          69

1          MR. TASEFF:  Judge, we differ in that

2    respect.  I think ours reads more clearer.  It is

3    more objective and more straight forward, quite

4    frankly.

5          MR. MILLER:  We just -- some of the language

6    in the defendant's to me is confusing.  Instead of

7    referring to mitigating factors or aggravating

8    factors, the defendant does not have the burden of

9    disproving existence of anything the government

10   seeks to prove.  Then it says "the burden is wholly

11   upon the government," which ours says "the burden is

12   wholly upon the government" and it says "to prove

13   its contentions" which can get to be certainly an

14   argument you have contentions there are certain

15   things, aggravating factors we have to prove beyond

16   a reasonable doubt, but contentions seems to be a

17   little confusing as well.  So that's our concern

18   with the defendant's burden of proof is that they

19   use some terms that aren't defined and seem somewhat

20   loose and perhaps suggest to the jury that the

21   government has even a higher burden of proof than it

22   does have.

23          THE COURT:  Okay.  I would accept the

24   Government's Instruction 2 as being a little

25   clearer, more concise.  So, I will not give

1  Defendant's 2, but will give Government's 2, which

2  is burden of proof.

3      MR. TASEFF:  Judge, for preservation, we

4  believe it's our duty to object to every proposed

5  instruction not given, so for reasons stated, we

6  object.

7      THE COURT:  Understood.

8      MR. TASEFF:  Your Honor not giving

9  Defendant's Number 2, burden of proof.

10      THE COURT:  I understand.  So for the record

11  and you can repeat it each time if you wish, but

12  each instruction not given of a defense proposed

13  instruction, you're objecting to.  Understood.

14      So the burden of proof, and what I'm going

15  to do is highlight the ones that are given here.

16  Thank you.

17      So then the third one starts on page eight,

18  Defendant's Instruction Number 3, the evidence.  And

19  it's on page eight, and nine and ten.  And the

20  Government's Instruction Number 3, which is on page

21  11 "evidence."

22      MR. TASEFF:  Judge, it is our belief that

23  the Court's cautionary instructions contained in the

24  Defendant's Proposed Instruction are necessary.  The

25  governments's proposed instruction does not go into

1  that detail.  I think that is why defense proposed

2  ought to be given.  Each one of these cautionary

3  instructions as to how the Court, how the jury views

4  the evidence, needs to be instructed, as was done at

5  the guilt phase.

6          MR. MILLER:  And, Your Honor, we don't have

7  an objection to Defendant's Proposed Instruction

8  Number 3, although I do believe that there are some

9  lines that need to be filled in.  I think that that

10  would be -- the expert testimony I believe was Susan

11  Zoline:  "So you have heard witnesses that gave

12  opinions and testimony about certain subjects,

13  specifically Susan Zoline, who testified about what

14  steps" -- I will defer to them -- "what steps the

15  University of Illinois Counseling Center would have

16  taken."  I think was that her testimony.

17          THE COURT:  So Defendant's 3 from the

18  evidence will be given, and then specifically on

19  page ten should it be --  does the defense have any

20  objection to just filling in that blank with

21  Dr. Susan Zoline.

22          MR. MILLER:  Your Honor, and I know normally

23  this isn't, you know, someone isn't a doctor in a

24  way, but she is a Ph.D.  So perhaps it could say,

25  "Susan Zoline Ph.D." because that term can be

SENTENCING -- July 16, 2019 (Morning)      72

1  confusing if someone would think that she was a

2  medical doctor or a psychiatrist and she is not.

3         THE COURT:  Any objection to that from the

4  defense?

5         MR. TASEFF:  Judge, she testified to her

6  qualifications, was admitted as an expert witness.

7  She is Dr. Zoline.

8         THE COURT:  I'm just going to put Susan

9  Zoline and both sides can argue what her

10  qualifications are.

11         Now, what did she testify about?

12         MR. NELSON:  Probably depends on who you

13  ask, Your Honor.

14         MS. POLLOCK:  I would say, Your Honor, that

15  she testified about the treatment that

16  Mr. Christensen received through the University of

17  Illinois Counseling Center.  And the response to his

18  statements to various counselors and the sufficiency

19  of that response compared to their policies.

20         MR. FRERES:  Which I think is a long way of

21  saying what Mr. Miller said which is what could have

22  been done by the University of Illinois Counseling

23  Center.

24         MS. POLLOCK:  Could the Court repeat what

25  Mr. Miller said, I didn't hear the whole thing.

 1            THE COURT:  I didn't either.

 2            MR. MILLER:  I'm sorry.  I just said that I

 3    thought she testified about what steps the

 4    University of Illinois Counseling Center could have

 5    taken regarding the defendant.

 6            MS. POLLOCK:  I think we can say that she

 7    testified about her review of his treatment at the

 8    University of Illinois Counseling Center and the

 9    steps that they could have taken, that's fine.

10            THE COURT:  Okay.  About her review of the

11    defendant's records at U of I Counseling Center and

12    steps they could have taken; is that what you're

13    saying.

14            MS. POLLOCK:  Yes, Your Honor.

15            THE COURT:  Government okay with that?

16            MR. MILLER:  That's fine, Your Honor.

17            THE COURT:  Then that will be given that

18    way.

19            So that's Defendant's 3 that will be given

20    with that.

21            For the record here, for my clerks, I'm

22    highlighting the given ones in yellow and the ones

23    not given in pink and writing "not given."

24            So Defendant's 4 is on page 11.  And it is

25    defendant's right not to testify.  I know the

1 government had one in here in that regard.  I'm not

2 seeing it.  Pardon me?

3         MR. NELSON:  It's on page 36 of Docket Entry

4 399, Your Honor.

5         THE COURT:  All right, page 39 in these.

6 It's Government Instruction Number 15, it appears.

7         MR. NELSON:  They very similar, Your Honor.

8         THE COURT:  So we will go with Defendant's

9 Instruction 4.

10         MR. NELSON:  That's fine, Your Honor.

11         THE COURT:  All right.  Mr. Taseff and

12 Mr. Rubenstein, do you follow on this still?

13         MR. TASEFF:  So, the Court.

14         THE COURT:  Defendant's 4 is given and

15 that's on page 11.  The government one referencing

16 it is on page 39 and it's 15, and that won't be

17 given, page 39, Defendant's 15.

18         So Defendant's 4, "defendant's right not to

19 testify" will be given.

20         Any, Defendant's 5 is on page 12.  Your

21 findings -- the government's -- and that sets up the

22 introduction to all of the threshold intent factors

23 and aggravating factors.  I think the government's

24 is built into the -- did the government have one on

25 findings, it doesn't appear to me that that was the

 1  case.  Can the government recall if you had one like

 2  Defendant's Number 5 simple introduction to the

 3  findings?

 4          MR. NELSON:  I think it was built in, Your

 5  Honor.

 6          THE COURT:  I think it was.

 7          MR. NELSON:  I'm just looking at Government

 8  Instruction 4, which begins at the bottom of page 11

 9  and goes on to the top of 12.

10          THE COURT:  Right.

11          MR. NELSON:  I don't think we discussed

12  that, did we?

13          THE COURT:  That's the one that's going to

14  be given, that's going to be the first instruction,

15  that's going to be the opener.

16          MR. NELSON:  Okay.  Fine.  So we are going

17  to go Defendant's 4, Government's 4 in that order,

18  essentially?

19          THE COURT:  Except Government's 4 will be

20  the first one.

21          MR. NELSON:  I see, that's right, Your

22  Honor.

23          THE COURT:  That will be the first

24  instruction.

25          MR. NELSON:  I'm sorry.  We are going in

1  order of pages and I forgot that we have done that

2  first.  My apologies.

3        THE COURT:  So now Defendant's 5 is on page

4  12 and is just sets up the additional instructions

5  to be given.

6        I'm not sure -- it says on the top of page

7  13 that they are not to rely solely upon your guilt

8  phase verdict or factual determinations.  I don't

9  know if there is a corresponding one like this from

10  the government.  And I'm not sure this is actually

11  necessary or if it is, it can be maybe even simpler,

12  just telling them what's coming next, then it would

13  be addressing factors.

14        MR. NELSON:  And I think, Your Honor, some

15  of the issues within Defendant's Instruction,

16  Proposed Instruction 5 beginning on page 12 are

17  redundant, although not all, some are redundant of

18  Government's 4, and your suggestion that this can be

19  streamlined makes some sense.

20        THE COURT:  What does the defense think of

21  that, right above that in the body of Government 4,

22  which is going to be the first one given is going to

23  say the last four lines up, "the instructions I'm

24  giving you now are complete on the law applicable to

25  the sentencing decision."

 1        MR. TASEFF:  What page is Government 4,

 2  Judge?

 3        THE COURT:  It's right above your five there

 4  on page 12, in the last paragraph -- I'm asking what

 5  you want out of your 5 that isn't really said --

 6  your 5 simply says I'm going to provide now

 7  instructions on age, threshold, aggravating,

 8  mitigating.  I again stress the importance of your

 9  giving carful and thorough consideration of all of

10  the evidence before you.  I also remind you of your

11  obligation to strictly follow the law.  I'm good

12  with that.  I don't know that the second paragraph

13  or the third paragraph is necessary.

14        MS. POLLOCK:  Judge, Mr. Rubenstein, advised

15  me that the intent factor, the intent issues for

16  gateway factors is really different from the intent

17  issues at the guilt factor - guilt phase where the

18  jury was instructed.  So that's why we believe that

19  third paragraph of Defense Instruction 5 is

20  important.  We are allowed to rely on earlier

21  findings but the finding here on intent issues is

22  really separate and distinct from the intent matters

23  that were charged in the guilt phase.

24        THE COURT:  Okay.  So let's do this.  I can

25  see at the bottom of page 14, the last paragraph in

1  the Government's Proposed 5, "the threshold intent
2  factors," the government is using that language.  So
3  I'm good with, you know, you both agree on the
4  language.  So that takes care of that as far as I'm
5  concerned.  The question is whether or not now we
6  provide a separate instruction that says "I'm going
7  to now provide you with these instructions and
8  reference them."  I'm not sure that's necessary.
9        MR. TASEFF:  We believe it helps the jury to
10 the flow of the instructions, and then categorizes
11 the various sections that the Court is then going to
12 address and provide really detailed instructions
13 with each category of issues that follow.  So we
14 just set it up with an introduction to aid the
15 jury's understanding to help them as they follow
16 along this very lengthy set of instructions.
17        THE COURT:  Okay.  Any objection?
18        MR. NELSON:  Well, I would just make a
19 suggestion, not an objection, Your Honor, I would
20 defer to the Court.  If the purpose is for
21 introduction and to give some sense of context for
22 the jury, the best place for that statement might be
23 in Government's 4, which would be the first
24 instruction where we talk about the fact that they
25 can consider evidence from the guilt phase and the

1  sentencing phase and it may be a helpful reminder

2  there that although you can consider the evidence

3  from the first phase, you can't just rely on your

4  verdict from the first phase, you have to reconsider

5  the evidence as it applies to the aggravating and

6  mitigating factors.  I just make that a suggestion

7  and defer to the Court.

8       THE COURT:  I'll give Defendant's

9  Instruction 5 as a separate instruction.

10      MR. TASEFF:  The Court is giving Defense 5

11  and that will be the Court's instruction number?

12      THE COURT:  I don't know what instruction

13  number it would be yet.  But I'm going to give them

14  in the order we are going through these.  In fact

15  it's likely that on the -- that none of these will

16  be the Court's instructions unless I make changes.

17  And probably on the printed version it will show

18  Defendant's 5 or government's such and such, and

19  then the blank version will go to the jury in

20  corresponding order.  Fair enough?

21      MR. TASEFF:  Fair enough.

22      THE COURT:  Okay.  All right.  So then,

23  Government's 5 is a threshold intent factors on page

24  13, starting on page 13 and going through on 14.

25      Where is the government one first for age?

 1  Let me see something here.

 2          I was hopeful that by doing it this way,

 3  combining them, that once we got started, that maybe

 4  we would --

 5          MR. TASEFF:  As I understand, we are looking

 6  for a government's age issue, right?

 7          THE COURT:  Correct.

 8          MR. NELSON:  I'm not certain if it is in the

 9  instructions, Your Honor.  I know it was in our

10  special verdict form.

11          THE COURT:  In the preliminary and in the

12  special verdict it was.

13          So I would like to -- I mean, age is the

14  first step, and the only first step, right, they

15  have to determine that before they move on to Number

16  2?

17          MR. NELSON:  I mean that's correct, Your

18  Honor, I think the defendant's birthday has come up.

19          THE COURT:  Defendant's 6 works?

20          MR. NELSON:  Yes, Your Honor.  That's fine.

21          THE COURT:  Defendant's 6 is on page 15.

22          MR. NELSON:  We are giving Defendant's 5

23  "threshold intent factors."

24          THE COURT:  Not yet.  We're going to go to

25  that next.

SENTENCING -- July 16, 2019 (Morning)      81

1          6 at the age is given and that will be
2    inserted in.  Do both of you agree that the age one
3    should go in ahead of the threshold intent factors?
4          MR. TASEFF:  Yes.
5          MR. NELSON:  Yes, Your Honor.
6          THE COURT:  If that means that we have to
7    renumber verdict forms, then we will get it.
8          So 6 will go in ahead of threshold intent.
9          Okay.  Now let's do threshold intent.  And
10   that is Government's Instruction Number 5.  And
11   Defendant's Instruction 7, which is on page 17.  So
12   government's 5 is pages 13 and 14.  Defendant's 7 is
13   threshold intent, and that's pages 17 and 18 okay.
14   So let's compare and decide.
15         MR. TASEFF:  We believe that Defendant's 7
16   accomplishes a much smoother flow incorporating the
17   age factor that was previously mentioned and then
18   going into the threshold factors.  It would appear
19   for the most part that the various threshold factors
20   are identical in language.  We offer a little more
21   explanation about some of the terms.
22         MR. NELSON:  I disagree, Your Honor, because
23   this is disjointed.  It has the definitions of what
24   various terms mean within the -- and I agree the
25   four threshold intent factors are identical, they

1  should be, they're in the statute.  But the

2  definitions in the defendant's are disjointed.

3  Also, there is no reference to the paragraph within

4  Government's 5 that during your deliberations you

5  may consider and find more than one threshold intent

6  factor; your finding as to each must be unanimous.

7  It's important that they know that they don't have

8  to just pick just one.  They can pick all four if

9  they find them.  But they only have to -- they are

10  only required to find one and I think that that's

11  important.

12        MR. TASEFF:  Defense 7 clearly states "if

13  you find one or more of these intent factors," so,

14  again, I believe that issue is resolved in the

15  proposed instruction we've offered; you are not

16  required to find them all.

17        THE COURT:  I would give Government's 5 if

18  we added it before the first paragraph of the

19  sentence that said "if you have found" -- "if you

20  have unanimously beyond a reasonable doubt found

21  that the defendant was 18 years of age or older, 18

22  years old, at least 18 years old on the date."

23        MR. NELSON:  That's fine, Your Honor.

24        THE COURT:  Then the second step will be to

25  consider "in considering the imposition of the death

 1  penalty, you must also unanimously find"....okay?

 2       MR. MILLER:  Your Honor, just -- I just

 3  noticed for redundancy, I believe the last paragraph

 4  of Government's 5 is what is contained in the last

 5  paragraph of Defendant's 5, so we wouldn't need the

 6  last paragraph of Government's 5 to be given again.

 7       THE COURT:  Given my ruling over to pick

 8  Government's 5, do you agree on the defense

 9  viewpoint that the last paragraph on 14 is not

10  necessary since that's also given in your findings,

11  which is Defendant's Instruction 5, is at the top of

12  page 13?  Just don't want to repeat it.

13       MR. TASEFF:  That's fine, Judge.

14       THE COURT:  Okay.

15       MR. RUBENSTEIN:  Your Honor, in terms of the

16  language at the beginning of Government's 5, he

17  mentioned something along the lines of one sentence

18  and then it ended with something "in order to

19  consider imposing death, you must also find"

20  something along those lines.  And our concern is

21  that that could be -- I know that it's not the

22  Court's intention but it could be interpreted as

23  sort of a directive:  to get to death, you have to

24  do X; as opposed to:  if you find X, you will be

25  then asked to determine this next issue, or, you

 1  know, to proceed.  As opposed to --

 2          THE COURT:  Okay.  So tell me what you want.

 3          MR. RUBENSTEIN:  Do you want to read the end

 4  of language you were inserting at the top of

 5  Government's 5?

 6          THE COURT:  I was going to basically adopt

 7  your first sentence from your Instruction 7.

 8          MR. RUBENSTEIN:  That's great.

 9          THE COURT:  That says "in addition to the

10  required age finding, you may also not consider the

11  death penalty unless you first unanimously find" and

12  then it goes beyond -- then it picks up where the

13  government has it.

14          MR. RUBENSTEIN:  Thank you.

15          THE COURT:  Government okay with that?

16          MR. NELSON:  Yes, Your Honor.

17          THE COURT:  Okay.  So let me write it in

18  here.

19          MR. TASEFF:  Your Honor, may the record

20  reflect that we object to the Court giving

21  Government's 5 for the reasons briefly stated, so

22  that we can record that message and we can continue

23  playing throughout the morning.

24          THE COURT:  Yep.

25          Okay.  To adopt some language from

1  Defendant's seven.  This would now -- Government's 5
2  would start with this:  I would scratch the language
3  "before you may consider the imposition of the death
4  penalty, you must also."  So I'm scratching that,
5  and inserting language from Defendant's Instruction
6  7 that says:  "In addition to the required age
7  finding, you may also not consider the death penalty
8  unless you first unanimously find beyond a
9  reasonable doubt" then it picks right up.  So that's
10  the language directly from the Defendant's 7, but
11  given Government's 5, okay?  Over objection of the
12  defense.
13          And removing the last paragraph on page 14.
14  Okay?
15          So now there would be -- it would go to --
16  what would be the introduction to, on page 15, the
17  statutory aggravating factors is Government's
18  Proposed 6, which goes on page 15, 16, and the top
19  of page 17.  The corresponding one for the
20  defense --
21          MR. TASEFF:  Page 21.
22          THE COURT:  -- is page 21.  So the
23  Government's 7 as well starts on page 19, and I
24  assume that goes with 6, because 6 says it's
25  introduction to, and then 7 is or are the statutory

1  aggravating factors; Mr. Nelson; is that correct?

2        MR. NELSON:  I'm sorry, Your Honor.  I may

3  have misunderstood what you were saying.  We have

4  got an introduction, which is Government's

5  Exhibit 6, and then each individual statutory

6  aggravator has its own instruction terms to define

7  what it is to aid the jury.

8        THE COURT:  Yep.  You would want

9  Government's 6 and Government's 7 together.

10        MR. NELSON:  Yes, Your Honor.  They are

11  designed to work together.

12        THE COURT:  And the Defense's Instruction 7

13  or 8, I'm saying, on page 21, and 22, and top of 23.

14        Okay.  So, parties wish to be heard on

15  those?

16        MR. NELSON:  I would submit to the Court

17  that Government's 6 and 7 are clearer and more

18  detailed and contain more necessary definitions to

19  aid the jury's deliberations, and we would rest on

20  that.

21        THE COURT:  Okay.  The defense wish to be

22  heard?

23        MR. TASEFF:  Judge, we respectfully submit

24  that the Instruction Defense 8 on page 21, 22, sets

25  forth a more accurate definition of torture and

1  serious physical abuse, bottom of page 21, top of

2  22.  Whereas the government's --

3          THE COURT:  It's the same thing.

4          MR. TASEFF:  -- instruction pertinent

5  factors whether killing is especially includes

6  infliction of grat--

7          THE COURT:  I read -- isn't it the same for

8  torture.

9          MR. NELSON:  I would also note, Your Honor,

10  that the Defendant's Proposed Instruction does not

11  contain the unanimity with regard to the disjunctive

12  phrases "torture and physical abuse," which the

13  government's does.  And that would be basically a

14  built in legal error on appeal.

15          MS. POLLOCK:  Your Honor, we did not have

16  the definition "pertinent factors in," and without a

17  case relevant to support that, we don't think it

18  should be included.  It's a lot of extra verbiage,

19  which seems specifically tailored, in fact, to the

20  allegations of the case, not generally applicable to

21  the aggravator.

22          THE COURT:  Say that again.

23          MS. POLLOCK:  I'm wondering if there is a

24  case that defines this as such.  Because we don't

25  have that language.  It hasn't been in any of the

```
 1  jury instructions that is we have seen and I don't
 2  know that that definition is supported by the case
 3  law or where it comes from.
 4          THE COURT:  What language?
 5          MS. POLLOCK:  The pertinent factor language,
 6  Your Honor, page 20.
 7          THE COURT:  Oh, pertinent factors in
 8  determining whether --
 9          MS. POLLOCK:  It doesn't appear that serious
10  physical abuse appears to be accurate.  But that
11  next paragraph, I don't know where it comes from.
12          THE COURT:  You do both have the same
13  definitions torture and serious physical abuse.
14          MS. POLLOCK:  That's correct.
15          THE COURT:  Where does pertinent factors
16  come from, Mr. Nelson, and is that --
17          MR. NELSON:  Your Honor, I don't have the
18  precise case citing here.  We have cited to numerous
19  cases with regard to where this language is coming
20  from.  And I do know that these are the stock
21  instructions that we propose in every federal
22  capital case.  So to say that they are untested is
23  not quite accurate, whether the Court gives them or
24  not I have no control over but I am confident that
25  these are based on the suggestions of the Criminal
```

 1   Division Appellate Section in our office.

 2        THE COURT:  So define heinous and cruel.

 3        MS. POLLOCK:  Your Honor, this duplicates

 4   aggravating factors.  If you look at the definition

 5   of pertinent factors, it talks about the

 6   helplessness of the victim.  That goes to

 7   vulnerability.  It talks about mutilation of the

 8   body, that's obstruction by hiding the body.  We are

 9   basically adding aggravators into another aggravator

10   but that should not be included.

11        THE COURT:  I like the way to separate out

12   the introduction and to set out in shorter paragraph

13   form and a little more concise manner, the

14   Government's 6 and 7, and I will give that, but

15   striking the paragraph that says "pertinent factors"

16   because everything else is defined separately.

17   Okay?

18        MR. TASEFF:  Objection noted, please.

19        THE COURT:  It is.

20        So Defendant's 8 as to statutory factors,

21   which is on page 21, 22, on top of 23, would then

22   not be given.

23        Would it be helpful, I think --

24        MR. TASEFF:  Your Honor's rejecting

25   Defendant's 8 on page 21?

 1          THE COURT:  Pardon me?

 2          MR. TASEFF:  Is the Court rejecting Defense

 3 Instruction Number 8 on page 21?

 4          THE COURT:  I'm giving Government's 6 and 7.

 5          MR. TASEFF:  And then rejecting Number 8?

 6          THE COURT:  Which is your statutory

 7 aggravating.

 8          MR. TASEFF:  Yes.

 9          THE COURT:  Yes.

10          MR. TASEFF:  May our objection be noted.

11          THE COURT:  You just did that.

12          Okay.  Now we move on to the nonstatutory

13 aggravating factors, right?  We've covered age.

14 We've covered threshold intent.  We've covered

15 statutory.

16          Now, we are moving on to nonstatutory,

17 Government's Instruction 8, starts on page 23 and

18 goes on page 24.  And it ends at the top of page 25.

19          Defendant's Instruction Number 9 is your

20 nonstatutory aggravating factors.

21          So, let's take a look.

22          MR. TASEFF:  Judge, with respect to Defense

23 Instruction Number 9, we handed up this morning

24 before the instruction's conference our Revised

25 Defense Proposed Instruction Number 9.  And it

1  included some red lines to show where our original

2  version of 9 has been revised to strike various

3  language.

4        THE COURT:  And I brought this out with me,

5  and I don't know what I did with them.

6        MR. TASEFF:  Mr. Nelson, this is what we

7  gave you this morning.

8        THE COURT:  Yep.  I have it.

9        MR. NELSON:  May I be heard, Your Honor?

10        THE COURT:  You may.

11        MR. NELSON:  I think, procedurally, in terms

12  of what the procedure is, the instructions say the

13  same thing.  But whereas the Defense Proposed 9 is

14  in one large block paragraph, Government's Proposed

15  8 is in short, easy to digest statements.  With

16  regard to the substance of the language of the

17  nonstatutory aggravating factors themselves, ours is

18  copied and pasted directly from our notice of

19  intent.  The defendant has chosen to rewrite our

20  nonstatutory aggravating factors to apparently suit

21  their interest.  They are not entitled to do that.

22  We have alleged these in a legal filing.  We are

23  allowed to present them to the jury as written.

24        MR. TASEFF:  Judge, Mr. Rubenstein will jump

25  in as well on this, but the problem as we see is as

1  the government enumerates the nonstatutory

2  aggravating factors, there is this language in each

3  one "as evidenced by," and then further language as

4  to how it's -- that's argument.

5          MR. RUBENSTEIN:  Our concern, Your Honor, is

6  to the extent this is a Court's instruction, it

7  suggests that you have made the finding of this

8  evidence has been presented and that this evidence

9  supports that particular aggravating circumstance.

10         THE COURT:  What page "as evidenced by"?

11         MR. RUBENSTEIN:  On page 24, we are looking

12  at the nonstatutory aggs alleged by the government.

13  I hope that's correct.  So, for example, future

14  dangerousness of the defendant, their paragraph two;

15  we submit the first sentence should read "the

16  defendant is likely to commit criminal acts of

17  violence in the future that would constitute a

18  continuing and serious threat to the lives and

19  safety of others."  Period.  What the government is

20  suggesting is "as evidenced by at least demonstrated

21  lack of remorse, expressed desire to be known as a

22  killer, claims of additional victims, expertise in

23  avoiding detection."  These are all things that they

24  may argue as supportive of that aggravating

25  circumstance, but asking to instruct on it, it

1  suggests that you have made a finding as though

2  things do in fact support that aggravating

3  circumstance.  It is asking the Court to lend its

4  incriminator to that evidence.

5          MR. MILLER:  It's interesting, Judge, as in

6  the mitigating factors that are -- I think the Court

7  realizes this.  They separated these out into -- and

8  those were a factor, the defendant's demonstrated

9  lack of remorse for his acts of violence; he

10  demonstrated serious acts of violence; he's

11  demonstrated, expressed to be known as a killer.  So

12  they are attempting to limit the government's

13  aggravators smaller while they continue to expand

14  their mitigators to have this long list of

15  mitigators that are clearly, as the Court found when

16  it allowed them to introduce them are argumentative

17  mitigators to suggest, for example, that the

18  defendant's life has value.  And so our aggravators

19  are already very limited based on both the statutory

20  and the nonstatutory factors.  And this is how they

21  are alleged in the, in the notice of intent.  If the

22  language "as evidenced by" is somehow problematic,

23  it seems like that could be perhaps modified, but to

24  take them out as suggesting that's argument we think

25  is improper.

SENTENCING -- July 16, 2019 (Morning)        94

1        THE COURT:  So you provided these based --
2   verbatim to the notice that was produced?
3        MR. NELSON:  Yes, Your Honor, I'd also note,
4   Mr. Rubenstein was here at the time but we've
5   already litigated the duplicative nature of these
6   and the Court has ruled on that issue.
7        MS. POLLOCK:  Your Honor, I think the
8   concern is that it says "as evidenced by."  The
9   notice of intent is not evidence.  The notice of
10  intent are allegations as to why the government
11  believes the death penalty is appropriate.  It is
12  not evidence that those things were proved or that
13  intent --
14        THE COURT:  It's only in future
15  dangerousness, right?
16        MS. POLLOCK:  No, that's correct, Your
17  Honor.  Each -- the last sentence on each of them
18  says that these things tend to support the death
19  penalty.
20        MR. TASEFF:  Yes, Judge.  On the Proposed
21  Instruction we submitted this morning, this would be
22  Number 2, Number 4, and Number 6.  Where "at least
23  or as evidenced by" and then the entirety of number
24  four.
25        MS. POLLOCK:  And every single one says

 1  "tends to support the death penalty."  That is for

 2  argument.  The Court cannot instruct the jury that

 3  if they find these things that it tends to support

 4  the death penalty.

 5          MR. NELSON:  That's fine, Your Honor, but

 6  that language would have to go into the special

 7  verdict form because then the jury has to find that;

 8  they have to find that it supports the death penalty

 9  or supports life in imprisonment as part of their

10  conclusions.  It is a two-step process.  One that is

11  proved and one that supports a sentence.  I don't

12  know -- I'm not hearing any authority as to the

13  defense's ability to rewrite our nonstatutory

14  aggravating factors at this late stage.

15          MR. MILLER:  We believe that it is covered

16  by the heading, it says "the nonstatutory

17  aggravating factors alleged by the government are

18  that."  It is clear that each of these is an

19  allegation of the government.  It is not that the

20  Court found it.

21          MS. POLLOCK:  When you use the term "as

22  evidenced by" it lends congruity to the allegation.

23  It is just an allegation.  If it wants to say

24  "alleged to be these things," that's fine.  But it

25  can't say "as evidenced by" and I think the last

 1   line "tends to support the death penalty" is clearly
 2   indicative that if the jury finds these things that
 3   it tends to support the death penalty.  They don't
 4   have to find that, that is for the weighing process.
 5           MR. MILLER:  But we have to allege it.
 6           MS. POLLOCK:  Your Honor, if I might propose
 7   an alternative.  It should state, for example, of
 8   future dangerousness, that the defendant will commit
 9   criminal acts of violence in the future that will
10   constitute a continuing and serious threat to the
11   lives and safety of others.  Period.  The government
12   alleges that his demonstrative lack of remorse, et
13   cetera, et cetera, supports this factor.
14           MR. NELSON:  That's incorrect, because we
15   don't have to show that the defendant will commit,
16   that's rewriting the "is likely to will," that is
17   changing the standard.
18           THE COURT:  What about the proposed language
19   that says "the government alleges that his
20   demonstrated lack of remorse," et cetera, et cetera,
21   et cetera, tend -- "and is dangerousness tend to
22   support the death penalty."
23           MS. POLLOCK:  Not tends to support the death
24   penalty.  It would have to end there.  The
25   government alleges that the evidence in support are

1  these things.  If it says that it "tends to support
2  the death penalty," that tells the jury, look if you
3  find these things, that tends to support the death
4  penalty; that is not correct.  They have to find the
5  aggravators beyond a reasonable doubt and then they
6  weigh them.  It does not support the death penalty
7  unless the jury decides that it does.
8         THE COURT:  Okay.  Anything else?  I think
9  the language that the nonstatutory factor,
10  aggravating factors alleged by the government sets
11  up that they are alleging the evidence shows.  So
12  "as evidenced by" is okay.
13         I will adopt Government's 8 on nonstatutory
14  aggravating factors, but I will strike "tends to
15  support the death penalty" at the end of each.  But
16  I do believe that it is still open for argument that
17  each one of these allegations, but then the only
18  other -- I guess we need to do it one-by-one here.
19         Tends to support the death penalty and
20  victim impact can be stricken and a period can be
21  after family and that would still make sense.
22         And Number 2, future dangerousness --
23         MR. MILLER:  After detection.
24         THE COURT:  Would be after detection.
25         MS. POLLOCK:  Your Honor, with regard to the

 1  first paragraph", victim impact," the impact is said

 2  twice.  I think we should put the period after

 3  "co-workers."

 4        MR. NELSON:  If the defense can cite a case

 5  indicating they are entitled to rewrite our alleged

 6  nonstatutory aggravating factors that would be

 7  helpful.

 8        THE COURT:  I don't know that they need to

 9  cite a case, but I'm going to put the period after

10  family.  And then in the lack of remorse paragraph,

11  "defendant has demonstrated by statements he made

12  following the offense that he lacked remorse for the

13  kidnapping resulting in the death of Yingying

14  Zhang," period.

15        And, 4, "the victim, Yingying Zhang, was

16  particularly vulnerable due to her small stature and

17  limited ability to the communicate in English,"

18  period.

19        And then on the bottom of 24, obstruction:

20  "The defendant attempted to obstruct the

21  investigation of this offense by, at least, making

22  false statements to investigators; destroying or

23  concealing the victim's remains; and sanitizing the

24  crime scene."  Period.

25        MR. MILLER:  Your Honor, you didn't talk

 1  about that first paragraph.  I don't disagree with
 2  defense on the first paragraph.  In looking at that,
 3  I think that that is the --
 4          THE COURT:  Co-workers.
 5          MR. MILLER:  After co-corkers, yes.  To be
 6  consistent with the other paragraphs.
 7          THE COURT:  Okay.
 8          MR. TASEFF:  Your Honor, after the
 9  obstruction, number 6.
10          THE COURT:  Pardon me?
11          MR. TASEFF:  Is, Your Honor, at number 5
12  obstruction?
13          THE COURT:  Yes.
14          MR. TASEFF:  After the word "at least"?
15          THE COURT:  Yes.
16          MR. TASEFF:  The defense has tendered its
17  Proposed Instruction Number 9 revised that we
18  submitted this morning.
19          THE COURT:  On --
20          MR. TASEFF:  "Wherein the defendant
21  attempted to obstruct justice, obstruct the
22  investigation of the offense," period.  And then
23  striking everything thereafter, by "at least" and
24  then those various provisions.
25          THE COURT:  Mr. Nelson or Mr. Miller?

 1            MR. NELSON:  Same objection, Your Honor.

 2    They can't -- they should not be allowed to limit

 3    the alleged nonstatutory aggravating factors.

 4            THE COURT:  I don't know that they are

 5    attempting to limit it.  They are just -- what

 6    prohibits you from still arguing the obstruction

 7    included false statements, destroyed and concealed

 8    the victim's remains, sanitized the crime scene?  I

 9    don't see anything wrong with it either.  They are

10    asking the jury to unanimously find that these

11    things occurred.

12            MS. POLLOCK:  We have another issue with the

13    destroying or concealing the victim's remains.

14    Because of the inability of -- we were unable to

15    present the offer to provide information about the

16    victim's remains.

17            THE COURT:  That raises a real interesting

18    question because in opening statement when admitting

19    that he killed Miss Zhang, you told the jury that

20    you just disputed how it occurred.  And I never

21    heard any evidence whatsoever on that issue, on --

22    you told them that you disputed how it occurred, but

23    there was nothing from the defense that was

24    presented in cross-examination or otherwise -- there

25    was in cross, I guess, embellishment, that type of

1  thing.  So why wouldn't this aggravating factor be

2  appropriate under the government's theory?

3        MS. POLLOCK:  Well, I think the aggravating

4  factor is appropriate in terms of the false

5  statements and not cooperating for the first six

6  months after the offense was committed, but in terms

7  of what we presented in evidence, we did present

8  evidence that the allegation was that he beheaded

9  her and disposed of her body and we said that we

10  didn't believe that was correct there was no

11  evidence in the bathroom, et cetera, et cetera.  So

12  we did dispute that and we did present the only

13  evidence that was available to us was on

14  cross-examination.

15        THE COURT:  But the government presented

16  that evidence through his own words as well, so --

17  you just don't want the jury to believe that, I

18  understand that, so I don't see why this isn't as

19  though language for the nonstatutory aggravator?  I

20  don't see why that isn't appropriate; it is the

21  government's theory.  Maybe the jury will reject it.

22        MS. POLLOCK:  They can absolutely argue

23  that, Your Honor, but in terms of saying, at least

24  these things as far as concerning the victim's

25  remains it presents a false pretense that

SENTENCING -- July 16, 2019 (Morning)          102

 1  Mr. Christensen has held the body hostage for the
 2  last two years which is incorrect.  He did offer to
 3  assist.  And that offer was not accepted for
 4  whatever reason the plea negotiations failed and
 5  that's fine, but it is presenting evidence that is
 6  misleading about what the actual facts of case are.
 7  I believe if the government wants to argue that the
 8  body has never been found, that is absolutely true
 9  and that's fine; they can argue that.  And they can
10  argue about what he said on the tape.  But in terms
11  of making it apart of the aggravating factor of
12  obstruction, that is asking the jury to infer that
13  he refused to cooperate, refused to provide
14  information, and we know that that's not true.  It
15  is presenting a false pretext to them.
16          So they can argue that the body has never
17  been found, that's fine.  But in terms of, you know,
18  destroying, concealing, et cetera; we have not been
19  able to rebut that by lack of agreement because the
20  government's stipulation contained improper
21  information and we got put over a barrel, so I don't
22  think that they should be able to argue that to the
23  jury.
24          MR. MILLER:  I don't know about how they
25  couldn't rebut.  This relates to what he did in

 1  June.  We are certainly not going to argue anything

 2  to the jury that we know is untrue.  Certainly they

 3  will object if they think that we've crossed that

 4  line, but I think that the evidence is clear that he

 5  took actions in June of 2017 that resulted in her

 6  remains not being recovered to this day.  That's

 7  completely independent of anything that occurred six

 8  months later.  And so we believe that actions in

 9  June was part of his obstruction of justice and

10  that's what we would argue to the jury.

11          THE COURT:  I will give Government 8.

12          MS. POLLOCK:  Can we put the date then in?

13          THE COURT:  Can you what?

14          MS. POLLOCK:  Can we put the date in, June

15  of 2017; the obstruction in June of 2017?  That

16  would cure the issue.

17          MR. MILLER:  We still have --

18          THE COURT:  I have this awful feeling that

19  somehow during closing argument this issue, this

20  issue gets argued.

21          MR. NELSON:  And that's just right, Your

22  Honor.  We have this chronic need to have our cake

23  and eat it, too, on this.  And I would respectfully

24  urge the Court to make a ruling right now on that

25  issue.  They've had the opportunity to put it in

1  over our objection.  We reached a stipulation with

2  them, despite our frank desire not to do so, at the

3  Court's urging, and the Court's proper urging I

4  should note.  And they've decided then they didn't

5  want it.  Now they want something else.  And they

6  are now going to argue something that's completely

7  not in evidence.  It is totally improper.

8          MS. POLLOCK:  I don't know what we are

9  arguing anything that's not in evidence.  I think

10  that was a pretty accurate statement.

11          THE COURT:  I think that that's 8 with the

12  changes that I said.

13          MS.  BRAIN:  Your Honor, can I make one

14  point with respect to the "at least" language?  That

15  -- it reads to me like that is asking, inviting is

16  the jury to find the obstruction aggravator based on

17  something other than what is listed on there which

18  would be improper.

19          MR. NELSON:  We have litigated this, Your

20  Honor.  They challenged all of these nonstatutory

21  aggravating factors and Your Honor has ruled.

22          THE COURT:  I'm going to allow it as I've

23  said.  Defendant's 9 won't be given but was

24  withdrawn and substituted by Proposed 9 this morning

25  and that won't be given in light of my ruling to

 1  give Government's 8, and that will be over the
 2  objection of the defense.
 3          MR. TASEFF:  Objection.
 4          THE COURT:  All right.  So right now we are
 5  to the part where we are going to do introduction to
 6  mitigating factors.  Why don't we take a lunch
 7  break.  Okay.
 8          MS. POLLOCK:  Your Honor, could we make the
 9  Proposed Defendant's 9 part of the record?
10          THE COURT:  I have it as part -- I put it in
11  here.  It will be part of the record.
12          MS. POLLOCK:  Thank you, Your Honor.
13          THE COURT:  I put it in here right after
14  your other 9.
15          When we come back let's regroup maybe at --
16  how about 1:30, and I think what I will try to do is
17  recap where we are, then start with the mitigating
18  factors.  Okay?  Thank you.
19          MR. NELSON:  Thank you, Your Honor.
20          (A recess was taken, 12:02 p.m.)
21                      *****
22
23
24
25