1          UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF ILLINOIS
2

3
UNITED STATES OF AMERICA,
4                                  Docket No. 17-20037
              Plaintiff,
5
     vs.                           Peoria, Illinois
6                                  July 17, 2019
                                   8:41 a.m.
7  BRENDT A. CHRISTENSEN,

8               Defendant.

9

10

11          SENTENCING -- July 17, 2019

12

13

14

15     BEFORE THE HONORABLE JAMES E. SHADID

16        UNITED STATES DISTRICT JUDGE

17

18

19

20          NANCY MERSOT, CSR-RPR
21          Official Court Reporter
            U.S. District Court
22          100 N.E. Monroe Street
            Peoria, Illinois 61602
23             309-671-4244

24
Proceedings recorded by mechanical stenography;
25 transcript produced by computer.

```
 1
    For the Plaintiff:      EUGENE L. MILLER, ESQUIRE
 2                          BRYAN D. FRERES, ESQUIRE
                            Assistant United States Attorneys
 3                          201 South Vine Street
                            Urbana, Illinois 61802
 4                          217-373-5875

 5                          JAMES B. NELSON, ESQUIRE
                            U.S. DEPARTMENT OF JUSTICE
 6                          Capital Case Section
                            1331 F Street NW, Suite 625
 7                          Washington, DC 20004
                            202-598-2872
 8
 9  For the Defendant:      GEORGE F. TASEFF, ESQUIRE
                            Assistant Federal Public Defender
10                          401 Main Street, Suite 1500
                            Peoria, Illinois 61602
11                          309-671-7891

12                          ELISABETH R. POLLOCK, ESQUIRE
                            Assistant Federal Public Defender
13                          300 West Main Street
                            Urbana, Illinois 61801
14                          217-373-0666

15                          ROBERT L. TUCKER, ESQUIRE
                            Robert L. Tucker, Esq
16                          7114 Washington Avenue
                            St. Louis, Missouri 63130
17                          703-527-1622

18                          JULIE C. BRAIN, ESQUIRE
                            Attorney at law
19                          916 South 2nd Street
                            Philadelphia, Pennsylvania 19147
20                          267-639-0417

21

22

23

24

25
```

SENTENCING -- July 17, 2019                    3

```
 1              (In open court, 8:41 a.m.)
 2              THE COURT:  All right.  Good morning.
 3              This is the United States v. Brendt
 4    Christensen, 17-20037.
 5              Mr. Christensen present with Ms. Brain,
 6    Mr. Tucker, Ms. Pollock, Mr. Taseff.
 7              Government present by Mr. Miller,
 8    Mr. Nelson, Mr. Freres.
 9              Parties resuming conference on instructions.
10              Overnight the parties had a chance to look
11    at -- the defense's made a request.  The government
12    agrees in part; disagrees in part.  My
13    understanding, the government doesn't object to the
14    changes that reflect that life should be without
15    possibility of release, as opposed to parole; that
16    one you don't object to?
17              MR. FRERES:  No concern about that.  Then
18    Ms. Pollock sent a follow up, Your Honor, with
19    relation to the verdict form.  There's two
20    references to acts of violence.  We wouldn't object
21    to the second one being taken out of there as well.
22    We do object to the changing our language in the
23    future dangerousness non-statutory aggravating
24    factor in -- as it relates to acts of violence.
25              THE COURT:  Okay.  Wait a minute.  So first
```

 1  of all, then, under, which is under non-statutory

 2  aggravating factors, you're looking at future

 3  dangerousness of the defendant, and I'm looking at

 4  paragraph two, and it appears to be on what is now

 5  currently page 16, correct?

 6          MR. FRERES:  Yes, Your Honor.

 7          THE COURT:  Then there is, on page 37 in the

 8  verdict form, a future dangerousness as well; that

 9  is paragraph B, right?

10          MR. FRERES:  Yes, Your Honor.  That second

11  reference where it says "his serious acts of

12  violence," I think that could be stricken.

13          THE COURT:  Got it.

14          MR. FRERES:  We have no objection to that.

15  But we do object to changing the language from "for

16  his acts of violence" to "his offense."

17          THE COURT:  Okay.  Ms. Pollock, what about

18  that?

19          MS. POLLOCK:  We simply stand on our

20  suggestion.  We think it should be relevant to this

21  offense only and not reference to others.

22          THE COURT:  Okay.  The notice included acts

23  of violence.  I think under the circumstances, the

24  facts, the evidence, "acts of violence" works as

25  well.  I will agree with the government on leaving

 1  in "acts of violence," but we will strike on page 37
 2  the second portion that says "his serious acts of
 3  violence."
 4          Okay.  Are those all of the issues the
 5  parties believe need to be addressed?
 6          MR. FRERES:  Yes, Your Honor.
 7          MS. POLLOCK:  Yes, Your Honor.
 8          THE COURT:  Okay.  We are going to
 9  present -- we are going to print out for you now
10  another sheet that's being done now.  And I only --
11  I made just a couple of changes.  Nothing
12  substantive.  I'm inserting the instruction about
13  victim impact testimony by way of video after the
14  evidence instruction which starts on page three,
15  going to just insert it there.
16          Okay.  We will have that done for you.  I
17  just want to tell you what it is.  And then, I think
18  to organize a little better, I took paragraph 29 --
19  page 29, which was the Special Verdict Form,
20  Defendant's Instruction 14, and put it in front of
21  what is now 32 where the verdict forms actually
22  start, because it's an instruction to the verdict
23  forms.  And, actually, we are going to just separate
24  those out so that the jury has instructions and
25  verdict forms.  Okay?  So we will give them to you

 1  in two packets, if that's all right.

 2          MR. FRERES:  Yes, Your Honor.  Thank you.

 3          THE COURT:  And then the other thing is I

 4  just rearranged at the end so that the concluding

 5  instruction was in fact the last instruction.  The

 6  duty to deliberate then would go in right before

 7  that, and then the instruction about, which was

 8  Defendant's 16, would go in before that.  So I just

 9  rearranged those three to be at the end.  They seem

10  to make more sense.

11          Okay.  Anything then while we wait for

12  those?  They are coming out momentarily.  We will

13  have a clean sheet as well for you.  Then we will

14  get the clean sheet scanned in.

15          Is there anything the parties believe we

16  should address before closing arguments?

17          MS. POLLOCK:  No, Your Honor.

18          MR. FRERES:  No, Your Honor.

19          MR. TASEFF:  Judge, if we may, at the risk

20  of belaboring the point, we are very concerned, from

21  our perspective, the defense, about preserving our

22  record on instructions.  So at this time, we renew

23  all previous objections, motions and memoranda with

24  respect to those tendered instructions that we

25  submitted to the Court, that the Court has not given

1 or gave in a modified or revised manner.

2        Secondly, we object, and renew all

3 objections and memoranda motions previously made

4 with respect to government tendered instructions

5 that were given over our objections.  We are doing

6 this solely for the purpose of ensuring that we are

7 objecting at every opportunity as the appellate

8 process requires us to preserve these very critical

9 issues that we have litigated over these many weeks

10 and especially over the last day or two when we have

11 gone over the instructions and are narrowing down to

12 the jury.

13        With that, we believe that we have properly

14 preserved all grounds with respect to instructions

15 in the case and we ask that be noted.

16        THE COURT:  Okay.

17        MR. FRERES:  And we don't need to be heard

18 further, Your Honor.  We would just lodge our own

19 objection on Instruction 13, third paragraph and in

20 the corresponding verdict form instruction.  The

21 Court has already ruled.  We don't need to say any

22 more about it.

23        THE COURT:  Understood.  Let's discuss --

24 Ms. Pollock, did you want to --

25        MS. POLLOCK:  Separate matter, Your Honor,

 1  we can raise in a moment.

 2        THE COURT:  Let's follow-up on Mr. Freres's

 3  objection.

 4        That instruction is in part because the

 5  record I made yesterday, but I don't think that it

 6  should actually be any proper part of anybody's

 7  closing argument in the sense to argue that you can

 8  simply neglect your duties, because they are

 9  instructed to deliberate with a goal of reaching a

10  verdict; that is the instruction that will be given.

11  "It is your duty to consult with one another to

12  deliberate with a view to reaching agreement."

13        So, I think that any argument otherwise in

14  closing would be improper, and I think it would

15  require me then to reinforce to the jury that their

16  goal is to reach a verdict.  All right?  If they

17  have questions later at some point, then we will

18  address them depending on what the question is or

19  are.

20        As well, I intend to fully enforce the

21  withdrawal of the mental health notice.  So if there

22  are objections -- if there is a crossover of the

23  line, and there is an objection, and I believe the

24  objection is appropriate, I'm not going to stand

25  here and -- sit here and ask for argument on it in

 1  front of the jury.  I'm simply going to tell the
 2  jury that there is no expert testimony presented by
 3  the defense that puts Mr. Christensen's mental
 4  health at issue at the time of the offense.  I think
 5  that's a correct statement, and that is how they
 6  will be instructed.  So everybody has a heads-up on
 7  that.
 8          Okay.  With that in mind, giving you -- now,
 9  as we said, two packets with the changes made as we
10  just discussed, which on the non-statutory
11  aggravating factors, which is now page six of the
12  second packet, left in "acts of violence" but took
13  out that second one.
14          MS. BRAIN:  Your Honor, could we request
15  that the Court remove the labels as to who proposed
16  the instruction?  It says government --
17          THE COURT:  There is a clean copy as well --
18          MS. BRAIN:  I'm sorry.
19          THE COURT:  -- that will be provided to you
20  that will have all of those labels gone.
21          MS. BRAIN:  I'm sorry.  I beg your pardon.
22          THE COURT:  That's all right.  Isn't there a
23  clean copy on that?  There will be a clean copy that
24  removes all of the labels.  We will remove
25  "defendant's instruction such and such,"

1  "government's such and such," "defense page such and

2  such."  It will all be cleaned up.  You will get

3  those in a moment here.  We just want to make sure

4  that we have them in order.

5          Page -- it was brought to my attention here

6  page 17 --

7          (Court conferring with law clerks.)

8          THE COURT:  Okay.  Anything else to be

9  addressed?  Then we will get a clean copy off to you

10 for your review and compare to the other copies.

11         MS. POLLOCK:  Yes, Your Honor.

12         THE COURT:  What is it?

13         MS. POLLOCK:  We wanted to ask the Court's

14 preference for how you wish to handle any objections

15 that might need to be made during closing argument.

16 I know the Court just mentioned that if there was an

17 objection to the scope of mental health or the

18 argument regarding non-unanimity, that you simply

19 instruct the jury at the moment and not require

20 argument on that; but I would note for the record

21 that we are, you know, we filed an omnibus motion

22 regarding penalty argument.  We intend to object if

23 we believe the government states things that are

24 improper, but because of our review of the appellate

25 cases having to do with this, preserving the record

1  on appeal requires more than just an objection.  It
2  requires a motion to strike.  It requires, if
3  applicable, a motion for mistrial, and a potential
4  curative instruction; and if those motions are not
5  made and the instruction is proposed, then the
6  government appellate units have been arguing waiver
7  in the appellate courts as a result of that.  And
8  the cases have been reviewed for plain error as
9  opposed to preserved objections.
10         So we believe that it is important that we
11  be able to request the specific relief necessary to
12  preserve the record.  Now we don't want to do that
13  in front of the jury if the Court deems it
14  inappropriate, but we also don't have to have
15  sidebars unless the Court wishes us to, so we just
16  wanted to ask the Court's preference.
17         THE COURT:  Give me an example of what you
18  think might come up and then what --
19         MS. POLLOCK:  The motion was 90 pages, Your
20  Honor, so I don't know what's going to come up.  But
21  I just know that if something is argumentative and
22  we deem improper, if it references evidence that has
23  not been presented to the jury, that simply
24  objecting is not enough, not to preserve the record.
25         THE COURT:  So --

1        MR. NELSON:  Your Honor, may I make a brief
2   suggestion?
3        THE COURT:  Yes.
4        MR. NELSON:  This issue has come up,
5   obviously, in other cases, it was handled -- I know
6   for a fact, in the *Tsarnaev* case in Boston, if, in
7   the instance, of an objection regarding evidence
8   that wasn't or facts that weren't in evidence, those
9   timely objections could be made.  But with regard to
10  structural constitutional issues, what they did was
11  they had a sidebar after each argument to address
12  any structural constitutional type objections so as
13  to avoid the need to have lengthy sidebars in the
14  middle of argument.  I would just put that out there
15  for the Court's knowledge.
16       THE COURT:  Ms. Pollock.
17       MS. POLLOCK:  Your Honor, if Mr. Nelson is
18  representing that we will not be deemed to have
19  waived an objection or motion for mistrial or
20  petition for curative instruction because we don't
21  argue it in the moment, then that's fine; however, I
22  believe that if a curative instruction is necessary,
23  it should be given in the moment so that the jury
24  immediately disregards that argument.
25       THE COURT:  Mr. Nelson, your proposal is

1  that at the close of each argument then we take a

2  break and consult and make the record as to any

3  objectionable matters that, I mean, other than not

4  in evidence or things like that, and address them

5  then?

6         MR. NELSON:  I'm just positing that as an

7  option, Your Honor, as to avoid what Ms. Pollock is

8  -- I wouldn't think they would waive it if we

9  handled it afterwards.  I also don't think that it

10 will be an issue, but I just wanted to let the Court

11 know what they have done in other cases.

12        MS. POLLOCK:  Your Honor --

13        THE COURT:  I'm going to wait now and wait

14 and see if it becomes an issue, maybe that's a bad

15 idea.  But I think that you both know what you're

16 doing.  And if it starts to be disruptive, then

17 we'll have a sidebar and straighten it out --

18        MS. POLLOCK:  Thank you, Your Honor.

19        THE COURT:  -- going forward.

20        MS. POLLOCK:  I also wanted to note for the

21 record, in advance of beginning the closing argument

22 that, I will be giving the closing argument, but

23 both Ms. Brain and I plan on noting objections and

24 objecting if we deem appropriate; if that's okay

25 with the Court.

 1        THE COURT:  That's fine.

 2        MS. POLLOCK:  Thank you.

 3        THE COURT:  How about the government?  Who

 4  is giving the argument?

 5        MR. MILLER:  Mr. Nelson is doing the opening

 6  and I'm doing the rebuttal.  We will likewise object

 7  if we think something is improper.

 8        MS. POLLOCK:  While the instructions are

 9  being copied, can Mr. Miller and I have a very, very

10  brief moment of your time outside the presence of

11  the jury?

12        THE COURT:  Time with each other?

13        MS. POLLOCK:  With you and counsel.

14        THE COURT:  Like in my chambers?

15        MS. POLLOCK:  Yes, please.

16        THE COURT:  Let's do that now.

17          (Off the record, 8:55 a.m.)

18          (Proceedings held in open court.)

19        THE COURT:  Please be seated.  Thank you,

20  everybody.

21        All right.  Tendered now to the parties a

22  clean set of instructions.  Ask if you've had an

23  opportunity to take a quick look to see -- we've

24  double checked them as well.  I think they are all

25  in order.

1          Mr. Freres, you look like you want to say
2  something.
3          MR. FRERES:  No, Your Honor, we agree.
4          THE COURT:  The defense?
5          MR. TASEFF:  We have reviewed and we renew
6  all objections, motions, memoranda as previously
7  raised.
8          THE COURT:  Very good.
9          Then are we ready for the jury?
10          MS. POLLOCK:  Yes.
11          MR. MILLER:  Yes, Your Honor.
12          THE COURT:  Before I bring the jury in, let
13  me address the gallery.
14          Ladies and gentlemen, I've appreciated that
15  as you are well aware that this case has generated
16  much emotion.  I've appreciated the way that all of
17  you have conducted yourselves to this point when you
18  have been in court.  I would ask that you please be
19  just as respectful as you have been as we get to the
20  finish line here and as the parties deliver closing
21  arguments; I would just ask that if you feel that
22  you have to leave the courtroom for any reason
23  during the closing argument, that you please attempt
24  to do so with as little disruption as possible.
25  Thank you.

 1          All right.  With that in mind, shall we
 2   bring the jury in?
 3          MR. MILLER:  Yes, Your Honor.
 4          MS. POLLOCK:  Yes, Your Honor.
 5          THE COURT:  Great.
 6          (Jury present, 9:24 a.m.)
 7          THE COURT:  All right.  Please be seated,
 8   everybody.
 9          Ladies and gentlemen, we are now ready for
10   closing arguments in this case.  Before the closing
11   arguments are made, I'm going to read to you the
12   instructions of law.  Now these are relatively
13   lengthy, and, frankly, may take approximately 15
14   minutes or so for me to read to you, but I feel that
15   reading them to you now will then allow the
16   attorneys to reference any that they believe they
17   should in their closing argument.
18          And then when they are done with their
19   closing arguments, then you may begin your
20   deliberations, so, bear with me now.
21          As I've told you in the first phase of this
22   trial, wherein you found Mr. Christensen guilty, you
23   will receive written, these written instructions.
24   In this case I've set them out in two parts:  The
25   instructions of law, and then the actual verdict

1  forms where you will be asked to make certain

2  findings.

3         Okay.  So let me go through these.  They

4  should come up on your screen now.

5         It is my duty, again, to instruct you as to

6  the law applicable to this sentencing hearing

7  regardless of any opinion you may have as to what

8  the law may be or should be.  It would be a

9  violation of your oaths as jurors to base your

10 sentencing decision upon any view of the law other

11 than that given to you in these instructions.

12        Some of the legal principles that you must

13 apply to this sentencing decision duplicate those

14 you followed in reaching your verdict as to the

15 guilt of the defendant.  Others are different.  The

16 instructions I'm giving you now are a complete set

17 of instructions on the law applicable to the

18 sentencing decision.  I have prepared them to ensure

19 that you are clear in your duties at this stage of

20 the case.  I've also prepared a Special Verdict Form

21 that you must complete.  The form details special

22 findings that you must make in this case and will

23 help you perform your duties properly.

24        As I will instruct you, the government must

25 meet its burden of proving the age of the defendant,

SENTENCING -- July 17, 2019                    18

1    the threshold intent factors, statutory aggravating
2    factors, and non-statutory aggravating factors
3    beyond a reasonable doubt.  The defendant does not
4    have the burden of disproving the existence of
5    anything the government must prove beyond a
6    reasonable doubt.  The burden is wholly upon the
7    government; the law does not require the defendant
8    to produce any evidence at all.  As such, the
9    defendant is not required to assert or establish any
10   mitigating factor.
11           However, if mitigating factors are asserted,
12   it is the defendant's burden to prove any mitigating
13   factors by a preponderance of the evidence.
14   Preponderance of the evidence is a lesser standard
15   of proof than proof beyond a reasonable doubt.  To
16   prove something by the preponderance of the
17   evidence, is to prove that it is more likely true
18   than not true.  It is determined by considering all
19   of the evidence and deciding which of the evidence
20   is more believable.  If on any issue in the case the
21   evidence is equally balanced, you cannot find that
22   issue has been proved.
23           The existence of an aggravating factor or
24   mitigating factor is not necessarily determined by
25   the greater number of witnesses or exhibits

SENTENCING -- July 17, 2019          19

1  presented by the government or the defendant.

2  Rather, it is the quality and persuasiveness of the

3  evidence that controls.

4          In deciding the issues now before you, you

5  may consider the evidence to the extent you find it

6  credible and relevant, direct or circumstantial,

7  that was presented during the guilt phase of the

8  trial and any information that was presented during

9  the penalty phase of the trial, including any

10 matters to which the parties have stipulated.  As in

11 the guilt phase, the arguments of the attorneys and

12 the comments and rulings of the Court are not

13 evidence.

14         You must make your decision based only on

15 the evidence that you saw and heard here in court.

16 Do not consider anything you may have seen or heard

17 outside of court, including anything from the

18 newspaper, television, or radio, internet or any

19 other source.

20         The evidence includes only what the

21 witnesses said when they were testifying under oath,

22 the exhibits that I allowed into evidence, and any

23 stipulations the lawyers agreed to.  A stipulation

24 is an agreement that certain facts are true or that

25 a witness would have given certain testimony.

1          Nothing else is evidence.  The lawyers'
2   statements and arguments are not evidence.  If what
3   a lawyer said is different from the evidence as you
4   remember it, the evidence is what counts.  The
5   lawyers' questions and objections likewise are not
6   evidence.

7          A lawyer has a duty to object if he thinks a
8   question is improper.  If I sustained objections to
9   questions the lawyers asked, you must not speculate
10  on what the answers might have been.

11         If during the trial, I struck testimony or
12  exhibits from the record or told you to disregard
13  something, you must not consider it.

14         Give the evidence whatever weight you decide
15  it deserves.  Use your common sense in weighing the
16  evidence, and consider the evidence in light of your
17  own every day experience.

18         People sometimes look at one fact and
19  conclude from it that another fact exists.  This is
20  called an inference.  You are allowed to make
21  reasonable inferences so long as they are based on
22  the evidence.  You may have heard the terms "direct
23  evidence" and "circumstantial evidence."  Direct
24  evidence is evidence that directly proves a fact.
25  Circumstantial evidence is evidence that indirectly

SENTENCING -- July 17, 2019                    21

1  proves a fact.  You are to consider both direct and

2  circumstantial evidence.  The law does not say that

3  one is better than the other.  It is up to you to

4  decide how much weight to give to any evidence

5  whether direct or circumstantial.

6          Do not make any decisions simply by counting

7  the number of witnesses who testified about a

8  certain point.  You may find the testimony of one

9  witness or a few witnesses more persuasive than the

10 testimony of a larger number.  You need not accept

11 the testimony of the larger number of witnesses.

12 What is important is how truthful and accurate the

13 witnesses were and how much weight you think their

14 testimony deserves.

15         Part of your job as jurors is to decide how

16 believable each witness was, and how much weight to

17 give to each witness's testimony.  You may accept

18 all of what a witness says, or part of it, or none

19 of it.  Some factors you may consider include:

20         - the intelligence of a witness;

21         - the witness's ability and opportunity to

22 see, hear, or know the things that the witness

23 testified about;

24         - the witness's memory;

25         - the witness's demeanor;

1            - whether the witness had any bias,

2    prejudice, or other reason to lie or slant the

3    testimony;

4            - the truthfulness and accuracy of the

5    witness's testimony in light of the other evidence

6    presented;

7            - and inconsistent statements or conduct by

8    the witness.

9            You may consider evidence that a witness was

10   convicted of a crime only in deciding the

11   believability of his testimony.  You may not

12   consider it for any other purpose.

13           You have heard witnesses who gave opinions

14   and testimony about certain subjects.  Specifically,

15   Susan Zoline, who testified about her review of the

16   defendant's record at the University of Illinois

17   Counseling Center and steps they could have taken.

18           You do not have to accept these witnesses'

19   opinions or testimony.  You should judge these

20   witnesses' opinions and testimony the same way you

21   judge the testimony of any other witness.  In

22   deciding how much weight to give to these opinions

23   and testimony, you should consider each witness's

24   qualifications, how he or she reached his or her

25   opinions and conclusions, and the factors I have

1  described for determining the believability of

2  testimony.

3         If you have taken notes during trial, you

4  may use them during deliberations to help you

5  remember what happened during trial.  You should use

6  your notes only as aids to your memory.  The notes

7  are not evidence.  All of you should rely on your

8  independent recollection of the evidence.  And you

9  should not be unduly influenced by the notes of

10 other jurors.  Notes are not entitled to anymore

11 weight than the memory or impressions of each juror.

12         You have been presented with a victim impact

13 testimony by way of video.  These videos were

14 conducted, produced, translated, and edited by the

15 government.  The defense had no opportunity to

16 participate in any aspect of the video production

17 translation or editing.  The defense had no

18 opportunity to question or cross-examine the

19 witnesses and were not provided notice of the

20 videos.

21         I approved the presentation of these videos

22 by the government to you as a victim impact

23 evidence.

24         You are instructed that during your

25 deliberations, you can take this into consideration

1    when evaluating the evidence.

2         The defendant did not testify.  A defendant

3    has an absolute right not to testify.  There is no

4    burden upon a defendant to prove that he should not

5    be sentenced to death.  The burden is entirely on

6    the prosecution to prove that a sentence of death

7    should be imposed.  Accordingly, you may consider in

8    any way the fact that a defendant did not testify.

9    You may not even discuss it in your deliberations.

10        I will now provide with you additional

11   instructions on the age requirement, threshold

12   intent factors, aggravating factors, and mitigating

13   factors.  I again stress the importance of your

14   giving careful and thorough consideration to all

15   evidence before you.  I also remind you of your

16   obligation to strictly follow the applicable law.

17        You must deliberate and determine the

18   appropriate sentence for Count 1 of the superseding

19   indictment.  You will have a special -- you will

20   have a separate Special Verdict Form to complete for

21   Count 1.

22        You also may not rely solely upon your guilt

23   phase verdict or your factual determinations therein

24   instead you must now consider each issue and make

25   each determination described in these instructions

SENTENCING -- July 17, 2019          25

1  even if you considered similar issues during your
2  first deliberations in the guilt phase of this
3  trial.
4         The first step in your deliberations should
5  be to determine whether the government has proved
6  beyond a reasonable doubt that the defendant was at
7  least 18 years old on the date of the capital crime
8  you are considering was committed.  That date
9  suspect June 9, 2017.
10        If you find that the government failed to
11  prove that the defendant was at least 18 years old
12  on that date, then you will complete Section I of
13  the Special Verdict Form accordingly and your
14  deliberations will be over.  You will then sign the
15  final certification in Section VII of the Special
16  Verdict Form and you will advise the Court that you
17  have reached a verdict.
18        If, however, you find unanimously and beyond
19  a reasonable doubt that the defendant was at least
20  18 years old on the date the offense was committed,
21  you will fill in the Special Verdict Form
22  accordingly.  You should then proceed to the second
23  step in your deliberations, the determination of the
24  required intent factor or factors.
25        In addition to the required age finding you

may not consider the death penalty unless you also
unanimously find beyond a reasonable doubt that the
defendant intentionally caused the death of Yingying
Zhang in one of the manners described below.  If you
unanimously find that any of the threshold intent
factors described below have been proved beyond a
reasonable doubt, they should so indicate in Section
II of the Special Verdict Form and continue your
deliberations.  If you do not unanimously make that
finding, you should so indicate in Section II of the
he Special Verdict Form and follow the directions in
Section II.  No further deliberations will be
necessary.

          The government alleges that:

          A.  The defendant intentionally killed the
victim, Yingying Zhang.  To establish that the
defendant intentionally killed the victim, the
government must prove that the defendant killed the
victim with a conscious desire to cause the victim's
death.

          B.  The defendant intentionally inflicted
seriously bodily injury that resulted in the death
of the victim, Yingying Zhang.  The government must
prove that the defendant deliberately caused serious
injury to the victim's body which in turn caused the

 1  victim's death.  "Serious bodily injury" means a
 2  significant or considerable amount of injury which
 3  involves a substantial risk of death,
 4  unconsciousness, extreme physical pain, protracted
 5  and obvious disfigurement, or protracted loss or
 6  impairment of a body member, organ or mental
 7  faculty.
 8          C.  The defendant intentionally participated
 9  in an act, contemplating that the life of a person
10  would be taken and intending that lethal force would
11  be used in connection with a person other than
12  himself and the victim, Yingying Zhang, died as a
13  direct result of the act.  The government must prove
14  that the defendant deliberately kidnapped Yingying
15  Zhang with a conscious desire that she be killed or
16  that lethal force be employed against her.  The
17  phrase "lethal force" means an act, or acts, of
18  violence capable of causing death.
19          The defendant intentionally -- D. The
20  defendant intentionally and specifically engaged in
21  an act of violence knowing that the act created a
22  grave risk of death to a person, other than himself,
23  such that participation in the act constituted
24  reckless disregard for human life and Yingying Zhang
25  died as a direct result of the act.

1          Intent or knowledge may be proved like

2    anything else.  You may consider any statements made

3    and acts done by the defendant, and all the facts

4    and circumstances in evidence which may aid in a

5    determination of defendant's knowledge or intent.

6    You may but are not required to infer that a person

7    intends the natural and probable consequences of

8    acts knowingly done or knowingly omitted.

9          During your deliberations, you may consider

10   and find more than one threshold intent factor, but

11   your finding as to each must be unanimous and beyond

12   a reasonable doubt.  Any finding that one or more of

13   the threshold intent factors have been proven

14   unanimously and beyond a reasonable doubt must be

15   based upon the defendant's actions and intent.

16          If, and only if, you unanimously find beyond

17   a reasonable doubt that the defendant intentionally

18   committed the murder of, or committed acts resulting

19   in the death of the Yingying Zhang in the manner

20   described in Instruction 7, you must then proceed to

21   determine whether the government has proven beyond a

22   reasonable doubt the existence of any of the

23   following statutory aggravating factors with respect

24   to that murder.

25          If you unanimously find that the government

1  has proven any of the following statutory

2  aggravating factors beyond a reasonable doubt, you

3  should so indicate in Section III of the Special

4  Verdict Form and continue your deliberations.  If

5  you do not unanimously find the aggravating factors

6  have been proven beyond a reasonable doubt, you

7  should so indicate in Section III of the Special

8  Verdict Form and follow the directions in Section

9  III, and no further deliberations will be necessary.

10         The first statutory aggravating factors

11  alleged by the government is:

12         Death during the commission of another

13  crime.  The death or injury resulting in death

14  occurred during the commission of an offense under

15  Title 18, United States Code, Section 1201

16  (kidnapping).

17         The second statutory aggravating factor

18  alleged by the government is:

19         Heinous, cruel, or depraved manner of

20  committing the offense.  The defendant committed the

21  offense in an especially heinous, cruel, or depraved

22  manner, in that it involved torture or serious

23  physical abuse to the victim, Yingying Zhang.

24         The third statutory aggravating factor

25  alleged by the government is:

SENTENCING -- July 17, 2019                    30

1          Substantial planning and premeditation.  The
2   defendant committed the offense after substantial
3   planning and premeditation to call cause the death
4   of a person.
5          At this point, the law directs you to
6   consider and decide the existence or nonexistence of
7   statutory aggravating factors specifically claimed
8   by the government.  You are reminded that to find
9   the existence of a statutory aggravating factor,
10  your decision must be unanimous and beyond a
11  reasonable doubt.
12         During your deliberations you may consider
13  and find more than one statutory aggravating factor
14  but your finding as to each must be unanimous and
15  beyond a reasonable doubt.  Any finding that one or
16  more of the statutory aggravating factors have been
17  proven unanimously and beyond a reasonable doubt
18  must be based upon the defendant's actions and
19  intent.
20         The statutory aggravating factors are:
21         Death or injury resulting in death during
22  the commission of the kidnapping.
23         The United States alleges that the death of
24  Yingying Zhang occurred during the commission of the
25  crime of kidnapping, in violation of Title 18,

 1  United States Code.

 2       9.2.  The commission of an offense in an

 3  especially heinous, cruel, or depraved manner.

 4       The United States alleges the defendant

 5  committed the offense in an especially heinous,

 6  cruel, or depraved manner and that it involved

 7  torture or serious physical abuse to the victim,

 8  Yingying Zhang.  To establish the defendant killed

 9  the victim in an especially heinous, cruel, or

10  depraved manner, the government must prove that the

11  killing involved either torture or serious physical

12  abuse to the victim.  You must not find this factor

13  to exist unless you unanimously agree as to which

14  alternative -- torture or physical abuse -- has been

15  proven beyond a reasonable doubt.  In other words,

16  all 12 of you must agree that it involved torture

17  and was thus heinous, cruel, or depraved, or all 12

18  of you must agree that it involved serious physical

19  abuse to the victim and was this heinous, cruel, or

20  depraved -- I'm sorry.

21       "Heinous" means extremely wicked or

22  shockingly evil, where the killing was accompanied

23  by such additional acts of torture or serious

24  physical abuse of the victim as to set it apart from

25  other killings.

1          "Cruel" means that the defendant intended to

2    inflict a high degree of pain by torturing or

3    seriously physically abusing the victim in addition

4    to killing the victim.

5          "Depraved" means that the defendant relished

6    the killing or showed indifference to the suffering

7    of the victim, as evidenced by torture or serious

8    physical abuse of the victim.

9          "Torture" includes mental as well as

10   physical abuse of the victim.  In either case the

11   victim must have been conscious of the abuse at the

12   time it was inflicted.  The defendant must have

13   specifically intended to inflict severe mental or

14   physical pain or suffering upon the victim in

15   addition to the killing of the victim.  Severe

16   mental pain or suffering means prolonged mental

17   health caused by or resulting from intentionally

18   inflicting or threatening to inflict severe physical

19   pain or suffering or the threat of imminent death.

20         "Serious physical abuse" means a significant

21   or considerable amount of injury or damage to the

22   victim's body.  Serious physical abuse -- unlike

23   torture -- may be inflicted either before or after

24   death and does not require that the victim be

25   conscious of the abuse at the time it was inflicted.

1   However, the defendant must have specifically

2   intended the abuse in addition to the killing.

3          The word "especially" means highly or

4   unusually great, distinctive, peculiar, particular,

5   or significant, when compared to other killings.

6          Three, the commission of the offense after

7   substantial planning and premeditation.

8          The United States alleges that the defendant

9   committed the offense after substantial planning and

10  premeditation to cause the death of a person.

11         "Planning" means mentally formulating a

12  method for doing something or achieving some end.

13         "Premeditation" means thinking or

14  deliberating about something and deciding whether to

15  do it beforehand.

16         "Substantial planning" and "premeditation"

17  means a considerable or significant amount of

18  planning and premeditation.

19         Now, the non-statutory aggravating factors

20  and the introduction.

21         If, and only if, you have found that the

22  government has proven the existence of one or more

23  of the threshold intent factors and the existence of

24  one or more of the statutory aggravating factors

25  unanimously and beyond a reasonable doubt, you must

1  then consider whether the government has proven the

2  existence of any non-statutory aggravating factors.

3          As in the case for the statutory aggravating

4  factors, you must unanimously agree that the

5  government has proven beyond a reasonable doubt that

6  the existence of any of the alleged non-statutory

7  aggravating factors before you may consider such

8  factors in your deliberation on the appropriate

9  punishment for the defendant in this case.

10          In addition to any statutory aggravating

11  factors that you have found, the law permits you to

12  consider and discuss only the non-statutory

13  aggravating factors specifically claimed by the

14  government and listed below.  You are not free to

15  consider any other facts in aggravation which you

16  conceive of on you own.

17          During your deliberations you may consider

18  and find more than one non-statutory factor, but

19  your finding as to each must be unanimous and beyond

20  a reasonable doubt.

21          Any finding that one or more of the

22  non-statutory aggravating factors have been proven

23  unanimously and beyond a reasonable doubt must be

24  based upon the defendant's actions and intent.

25          The non-statutory aggravating factors

1  alleged by the government are:

2        1.  Victim impact.  The defendant caused

3  injury, harm, and loss to Yingying Zhang and loss to

4  her family, friends, and co-workers.  The injury,

5  harm, and loss caused by the defendant is evidenced

6  by Yingying Zhang's personal characteristics and by

7  the impact of her death upon her family, friends,

8  and co-workers.

9        2.  Future dangerousness of the defendant.

10 The defendant is likely to commit criminal acts of

11 violence in the future that would constitute a

12 continuing and serious threat to the lives and

13 safety of others as evidenced by his demonstrated

14 lack of remorse for his acts of violence; his

15 expressed desire to be known as a killer and his

16 claims of additional victims and expertise in

17 avoiding detection.

18        Lack of remorse.  The defendant has

19 demonstrated by statements he made following the

20 offense, that he lacked remorse for the kidnapping

21 resulting in the death of Yingying Zhang.

22        4.  Vulnerability of victim.  The victim,

23 Yingying Zhang, was particularly vulnerable due to

24 her small stature and limited ability to the

25 communicate in English.

 1          5.  Obstruction.  The defendant attempted to
 2   obstruct the investigation of the offense by at
 3   least making false statements to investigators;
 4   destroying or concealing the victim's remains; and
 5   sanitizing the crime scene.
 6          Unlike the requirement regarding statutory
 7   aggravating factors, the jury is it not required to
 8   find the existence of a non-statutory aggravating
 9   factors before proceeding to the weighing process.
10          The introduction to mitigating factors.
11   Before you may consider the appropriate punishment
12   for Count 1, you must consider whether the defendant
13   has established the existence of any mitigating
14   factors.  A mitigating factor is a fact about the
15   defendant's background, record, or character, or
16   about the circumstances surrounding the offense that
17   would suggest that a sentence of life imprisonment
18   without the possibility of release is the
19   appropriate punishment.  The law does not require
20   that a mitigating factor be connected to the crime.
21          Unlike aggravating factors, which you must
22   unanimously find proved beyond a reasonable doubt in
23   order for you to consider them in your
24   deliberations, the law does not require unanimity
25   with regard to mitigating factors.  Any juror

SENTENCING -- July 17, 2019                37

 1   persuaded of the existence of a mitigating factor by
 2   a preponderance of the evidence must consider it in
 3   the final weighing of aggravating and mitigating
 4   factors.
 5          It is the defendant's burden to establish
 6   any mitigating factors but only by a preponderance
 7   of the evidence.  This is a lesser standard of proof
 8   under the law than proof beyond a reasonable doubt.
 9   A factor is established by a preponderance of the
10   evidence if its existence is shown to be more likely
11   so than not so.  In other words, a preponderance of
12   the evidence means such evidence as, when considered
13   and compared with that opposed to it, produces in
14   your mind the belief that what is sought to be
15   established is more likely -- more likely true than
16   not true -- need to put the word "true" in there.
17          In Section V of the Special Verdict Form
18   relating to mitigating factors, you are asked, but
19   not required to report the total number of jurors
20   that find a particular mitigating factor established
21   by a preponderance of the evidence.
22          The mitigating factors which the defense has
23   -- asserts he has proved by a preponderance of the
24   evidence are:
25          Mr. Christensen has no prior criminal

 1  record, no prior arrest, no prior incarcerations.

 2          Mr. Christensen's mother struggled with

 3  severe suicidal depression and anxiety when he was

 4  growing up.

 5          Mr. Christensen's mother became a chronic

 6  alcoholic during his childhood and required

 7  inpatient and outpatient treatment for her

 8  alcoholism.

 9          There is an extensive history of mental

10  illness on Mr. Christensen's mother's side of the

11  family.

12          There is an extensive history of mental

13  illness on Mr. Christensen's father's side of the

14  family.

15          Mr. Christensen has demonstrated the

16  capacity to be a loving and caring person.

17          Mr. Christensen was a gentle child and

18  displayed no aggressive or violent behavior towards

19  others while growing up.

20          Mr. Christensen provided emotional support

21  to his sister, Andrea, while she was growing up.

22          Mr. Christensen's mother, Ellen, loves him

23  and cares about him and is willing to support him

24  during the sentence of life without release.

25          If Mr. Christensen is executed, his mother

1  will suffer grief and loss.

2          Mr. Christensen's father, Michael, loves him

3  and cares about him and is willing to support him

4  during the sentence of life, during a sentence of

5  life without release.

6          If Mr. Christensen is executed, his father

7  will suffer grief and loss.

8          Mr. Christensen's sister, Andrea, loves him

9  and cares about him and is willing to support him

10  during a sentence of life without release.

11          If Mr. Christensen is executed, his sister

12  will suffer grief and loss.

13          Mr. Christensen has a long history of brain

14  injury and dysfunction including sleep disorders,

15  including parasomnia, sleep terrors and sleep

16  paralysis; concussions; and chronic migraines.

17          Mr. Christensen suffered from symptoms of

18  depression throughout his life.

19          Mr. Christensen suffered from symptoms of

20  anxiety throughout his life.

21          Mr. Christensen struggled with addiction to

22  alcohol beginning in college.

23          Mr. Christensen struggled with addiction to

24  prescription drugs including Vicodin and Ambien

25  beginning in college.

1          Mr. Christensen and his wife, Michelle, did
2    not socialize with anyone else during their time
3    together, 2009 to 2017.
4          And Michelle was Mr. Christensen's best and
5    only friend.
6          Mr. Christensen sought medical treatment and
7    ultimately prescription medication for his
8    psychiatric issues at the University of Illinois in
9    January of 2016.
10         Mr. Christensen suffered from symptoms of
11   depression -- I'm sorry -- 22.  Mr. Christensen
12   accepted the advice of his wife, Michelle, an
13   advisor in seeking psychiatric treatment in January
14   of 2016.
15         Mr. Christensen suffered from symptoms of
16   depression, anxiety, and sleep problems despite
17   medical treatments from January 2016 through March
18   of 2017.
19         Mr. Christensen sought professional
20   counseling for his alcohol and drug abuse in March
21   of 2017 at the University of Illinois Counseling
22   Center.
23         During two separate meetings with the
24   University of Illinois Counseling Center staff in
25   March of 2017, Mr. Christensen repeated to the

1  counselors that he was having thoughts of suicide

2  and homicide.

3          Mr. Christensen confessed at UICC that he

4  had a plan for how to commit a murder; that he had

5  purchased items to facilitate his plan to commit a

6  murder; that he knew his thoughts were wrong and

7  disturbing to others; and that he did not want to be

8  that kind of a person.

9          Mr. Christensen sought professional

10 psychological counseling for his alcohol and drug

11 abuse in March of 2017 at the University of Illinois

12 Counseling Center where he told the counselor he

13 could not see a path forward without his wife.

14         There is an extensive history of alcoholism

15 and/or substance abuse on both sides of

16 Mr. Christensen's family, which is a factor

17 suggesting his own predisposition to alcoholism

18 and/or substance abuse.

19         Mr. Christensen abused alcohol and

20 prescription drugs in an attempt to self-medicate

21 and control his psychological problems.

22         The breakdown of Mr. Christensen's marriage

23 caused him severe emotional distress.

24         In order to save his marriage,

25 Mr. Christensen agreed to his wife Michelle's

proposal that they both be free to date and have sex with other people.

Mr. Christensen was particularly distressed the weekend of June 9, 2017, because his wife, Michelle, went on a weekend trip with another man to the place where they spent their honeymoon.

After Mr. Christensen sought help for his substance abuse and intrusive suicidal and homicidal thoughts in March of 2017, the University Counseling Center did not refer and coordinate with mental health professionals at the University Health Center.

After Mr. Christensen sought help for his substance abuse and intrusive suicidal and homicidal thoughts in March of 2017, the University Counseling Center did not obtain medical records and did not development a treatment and safety plan to address the homicidal and suicidal ideations he expressed.

After Mr. Christensen sought help for his substance abuse and intrusive suicidal and homicidal thoughts in March of 2017, the University Counsel Center did not conduct a follow-up with him.

After Mr. Christensen sought help for his substance abuse and intrusive suicidal and homicidal thoughts in March of 2017, the University Counseling

1  Center did not assess and evaluate the specifics of

2  the homicidal and suicidal ideations he expressed.

3          While incarcerated following his arrest on

4  June 30, 2017, Mr. Christensen has had no

5  disciplinary reports or violations.

6          During two years of pretrial incarceration,

7  Mr. Christensen has never possessed a weapon.

8          Mr. Christensen has never threatened jail

9  staff while incarcerated in jail.

10          Mr. Christensen has never threatened any

11  other prisoners while incarcerated at the jail.

12          Mr. Christensen has never attempted to

13  engage in criminal activity with outside persons

14  while at the jail.

15          Mr. Christensen has been respectful to all

16  male correctional officers when incarcerated at the

17  jail.

18          Mr. Christensen has been respectful to all

19  female correctional officers when incarcerated at

20  the jail.

21          Mr. Christensen has been respectful to all

22  of his fellow inmates and did not cause disturbances

23  within the jail.

24          Mr. Christensen has adapted very well to

25  being incarcerated.

1          Mr. Christensen is unlikely to commit a

2   serious act of violence while serving a sentence of

3   life without possibility of release.

4          Mr. Christensen behaved respectfully during

5   the trial in this case.

6          The penalty of life without the possibility

7   of release is a severe sentence.

8          All lives are valuable including

9   Mr. Christensen's life.

10          You are permitted to consider anything about

11   the commission of the crime or about the defendant's

12   background, record, or character that would mitigate

13   against imposition of the death penalty, which I

14   will call and from now on refer to as additional

15   mitigating factors.

16          If there are any such additional mitigating

17   factors, whether or not specifically argued by

18   defense counsel, which are established by a

19   preponderance of the evidence, any juror, either

20   individually or with other jurors, is free to

21   consider them during your deliberations.

22          In Section V of the Special Verdict Form you

23   are asked to identify any additional mitigating

24   factors that any one of you finds has been proved by

25   a preponderance of the evidence, but you are not

 1  required to do so.

 2        All right.  Weighing the aggravating and

 3  mitigating factors.

 4        Bear with me here.  We are getting near the

 5  end.

 6        With respect to the capital count you are

 7  considering in Count 1 of the superseding

 8  indictment, if you unanimously find that the

 9  government proved beyond a reasonable doubt:  One,

10  that the defendant was over 18 years of age at the

11  time of the crime; and, two, the existence of at

12  least one intent factor; and, three, the existence

13  of at least one statutory aggravating factor; and

14  after you then decide whether the government has

15  proved beyond a reasonable doubt the existence of

16  any of the alleged non-statutory aggravating factors

17  submitted to you, and whether the defendant proved

18  the existence of any mitigating factors by a

19  preponderance of the evidence, you will then engage

20  in a weighing process.

21        In determining the appropriate sentence, all

22  of you must weigh the aggravating factor or factors

23  that you unanimously found proved beyond a

24  reasonable doubt, and each of you must weigh any

25  mitigating factor or factors that you individually

 1  found to exist, and may weigh any mitigating factors
 2  that another fellow juror found to exist.  However,
 3  you are not required to weigh a mitigating factor
 4  that you have not personally found to be proven.
 5  Whether or not the circumstances in the case make
 6  death the appropriate sentence is a decision the law
 7  leaves entirely to you.
 8           Although I've previously instructed you that
 9  you will not consider a death sentence unless you
10  first unanimously find the age requirement and at
11  least one threshold intent factor proven beyond a
12  reasonable doubt, I instruct you now that the age
13  requirement and threshold intent factors shall not
14  be considered when weighing the aggravating and
15  mitigating factors.  You must only weigh the
16  statutory and non-statutory aggravating factors that
17  you unanimously find to exist against any mitigating
18  factors that any juror individually or with others
19  finds to exist.
20           In engaging in the weighing process, you
21  must avoid any influence of passion, prejudice, or
22  undue sympathy.  Your deliberations should be based
23  on the evidence you have seen and heard and the law
24  of which I have instructed you.
25           The process of weighing aggravating and

 1  mitigating factors against each other in order to
 2  determine the proper punishment is not a mechanical
 3  process.  In other words, you should not simply
 4  count the number of aggravating and mitigating
 5  factors and reach a decision based on which number
 6  is greater.  You should instead consider the weight
 7  and value of each factor to make a unique,
 8  individualized, and reasoned judgment about the
 9  sentence this defendant should receive for the
10  capital offense.
11        The law contemplates different factors may
12  be given different weights or values by different
13  jurors.  Thus, you may find that one mitigating
14  factor outweighs one or more aggravating factors.
15  Or you may find, even if you have found no
16  mitigating factors, that the aggravating factor or
17  factors proved do not, standing alone, justify
18  imposition of death.  On the other hand, you may
19  unanimously find that a particular aggravating
20  factor sufficiently outweighs all mitigating factors
21  combined to make a sentence of death the appropriate
22  sentence.  Each juror must decide what weight or
23  value is to be given to a particular aggravating or
24  mitigating factor in the decision-making process.
25        Again, whether or not the circumstances

justify a sentence of death is a decision the law
leaves entirely to you.  You are never required to
impose a death sentence.

If you unanimously determine that the
aggravating factors that you have found to exist
sufficiently outweigh the mitigating factors that
you have found to exist to justify a sentence of
death, you shall record your determination that
death is justified in Section VI of the Special
Verdict Form.

If you unanimously determine that the
aggravating factors that you have found to exist do
not sufficiently outweigh the mitigating factors
that you have found to exist to justify a sentence
of death, or you find that the aggravating factors
proven do not, standing alone, justify the
imposition of a sentence of death, you shall record
your determination that the defendant be sentenced
to life imprisonment without possibility of release
in Section VI of the Special Verdict Form.

If based upon your consideration of the
evidence, and in accordance with these instructions,
and after making all reasonable efforts, you are
unable to reach a unanimous decision in favor of a
life sentence or in favor of a death sentence, you

1  shall record your decision in Section VI of the
2  Special Verdict Form.
3       At the end of your deliberations, if you
4  unanimously determine that the defendant should be
5  sentenced to death or to life imprisonment without
6  the possibility of release, the Court is required to
7  impose that sentence.
8       In your consideration of whether the death
9  sentence is justified as to any count, you must not
10 consider the race, color, religious beliefs,
11 national origin, or sex of either the defendant or
12 the victim.  You are not to return a sentence of
13 death unless you would return a sentence of death
14 for the crime in question without regard to the
15 race, color, religious belief, national origin, or
16 sex of either the defendant or the victim.
17      To emphasize the importance of this
18 consideration, Section VII of the Special Verdict
19 Form contains a certification statement.  Each juror
20 should carefully read the statement and sign your
21 name in the appropriate place if the statement
22 accurately reflects the manner in which each of you
23 reached your individual decision.
24      Whether or not the circumstances in this
25 case persuade you that a sentence of death is called

1  for is a decision the law leaves entirely to you.

2  The law gives each of you the discretion to temper

3  justice with mercy as you weigh the aggravating

4  factors and the mitigating factors in determining

5  whether a sentence of death is called for in this

6  case.

7          As I've stated in these instructions, it is

8  your duty to consult with one another and to

9  deliberate with a view to reaching agreement if you

10 can do so without violence to your individual

11 judgment.  Of course you must not surrender your

12 honest convictions to the weight or effect of the

13 evidence solely because of the opinions of other

14 jurors or for the mere purpose of returning a

15 verdict.  Each of you must decide the case for

16 yourself but you should do so only after

17 consideration of the evidence with your fellow

18 jurors.

19          In the course of your deliberations, you

20 should not hesitate to re-examine your own views and

21 to change your opinion if you are convinced it is

22 wrong.  To bring 12 minds to a unanimous result, you

23 must examine the questions submitted to you openly

24 and frankly with proper regard for the opinions of

25 others and with a willingness to re-examine your own

 1  views.

 2        Remember that you are not partisans; you are

 3  judges -- judges of the facts.  Your sole interest

 4  is to seek the truth from the evidence.  You are

 5  judges of the credibility of the witnesses and the

 6  weight of the evidence.

 7        You may conduct your deliberations as you

 8  choose.  But I suggest that you carefully consider

 9  all of the evidence bearing upon the questions

10  before you.  You may take all the time you feel is

11  necessary.

12        Once you start deliberating, do not

13  communicate about the case or your deliberations

14  with anyone except other members of your jury.  You

15  may not communicate with others about the case or

16  your deliberations by any means.  This includes oral

17  or written communication as well as any electronic

18  method of communication, like your phones,

19  computers, or on the internet, or any other method

20  of communication.

21        If you need to communicate with me while

22  you're deliberating, send a note through the court

23  security officer.  The note should be signed by the

24  foreperson or by one or more persons of the jury.

25  To have a complete record of the trial, it is

1  important that you do not communicate with me except
2  by a written note.  I may have to talk to the
3  lawyers about your message so it may take some time
4  to get back to you.  You may continue your
5  deliberations while you wait for my answer.  Please
6  be advised that transcripts of trial testimony are
7  not available to you.  You must rely on your
8  collective memory of the testimony.
9          If you send me a message or question, you
10  should not tell me any details of your deliberations
11  or the breakdown of any votes you may have
12  conducted.
13          Let me remind you, again, that nothing that
14  I have said in these instructions and nothing that I
15  have said or done during either phase of the trial
16  has been said or done to suggest you -- to you what
17  I think your decision should be.  The decisions are
18  your exclusive responsibility.
19          It says you may retire now but that's not
20  the case.  You are going to hear closing arguments.
21  I'm just going to show you the special verdict forms
22  and they recite as the instructions, so the Special
23  Verdict Form gives you information and I will read
24  it and then we will go to the forms.
25          I have prepared a form entitled "Special

1   Verdict Form" to assist you during your
2   deliberations.  You are required to record your
3   decisions on the Special Verdict Form.  Section I of
4   the form is where you will record your finding of
5   the defendant's age.  Section II is where you will
6   record your findings on the threshold intent
7   factors.  Section III is where you will record your
8   findings on statutory aggravating factors.  Section
9   IV is where you will record your findings on
10  non-statutory aggravating factors.  Section V is
11  where you will record your findings on mitigating
12  factors.  Section VI is where you will record your
13  sentence determination.  Finally, Section VII
14  contains the nondiscrimination certification each
15  juror must read and sign.  You are each required to
16  sign the Special Verdict Form.
17          Once you have finished your deliberations
18  and filled in, signed, and dated the Special Verdict
19  Form, you will advise the Court that you have
20  reached a verdict.
21          All right.  Section I has to do with the
22  age.  You will answer yes or no.
23          If you say no, you're done.  You will go to
24  seven and fill out the certification.
25          If you say yes, you go to Section II.

1           Section II is the threshold intent factors.
2   You will go through these one by one.  It's A, B, C,
3   D, as I have previously read to you.
4           If you answer no to all, then you will stop
5   your deliberations and go to Section VII -- go to
6   the end of it, Jeremy.
7           If you indicate that one, at least one has
8   been established, then you will go to Section III.
9           Section III of the statutory aggravating
10  factors.  They are set out as I have previously read
11  to you.  You will answer yes or no.
12          If you answer no, then you will stop your
13  deliberations and proceed to Section VII, which is
14  the certification form.
15          If you answer yes, that -- have answered yes
16  that Mr. Christensen was at least 18 years of age
17  and at least one of the threshold factors, and at
18  least one of the statutory factors, then you will
19  proceed to Section IV to discuss non-statutory
20  aggravating factors.
21          And they are set out as I previously read to
22  you.  And then you are instructed at the end of
23  that, that regardless of whether you have found the
24  government has established any of the non-statutory
25  aggravating factors in Section IV, you will proceed

 1  to Section V, which are the mitigating factors.  You

 2  will go through the mitigating factors and they are

 3  set out as I previously read to you.  And at the end

 4  of the mitigating factors -- you will see in the

 5  mitigating factors it is not a yes or no.  There's

 6  lines there for the number of jurors that agree.

 7          So if 12 of you agree to a mitigating

 8  factor, you will just write the number 12 in there

 9  or the foreperson will.  If eight of you agree, you

10  will write the number eight in there.  If none of

11  you agree, you will write a zero in there.

12          Okay.  After concluding that, then you would

13  undertake the weighing process that I have

14  previously described to you, and then you will

15  proceed to the determination of the sentence.  And

16  you're instructed at the beginning of that to

17  consider whether the aggravating factor or factors,

18  if found to exist, sufficiently outweigh any

19  mitigating factor or factors found to exist, or in

20  the absence of any mitigating factors, whether the

21  aggravating factor or factors are themselves

22  sufficiently sufficient to justify a sentence of

23  death, and whether death is therefore the

24  appropriate sentence.

25          A sentence of death shall only be imposed if

1  your decision in favor of it is unanimous.  Based
2  upon that consideration, check one of the following.
3  And they are, as I previously instructed to you.
4        The next page then is the page where after
5  you've checked your sentence determination that you
6  will all sign.
7        And then the last thing to do is the
8  certification that I indicated to you, to review
9  carefully and sign if it accurately depicts or
10 represents your verdict and your consideration of
11 the verdict.
12       Okay.  Now with that in mind, I know I took
13 a little time here.  Is everybody all right?  We can
14 go right to closing arguments.  That may mean that
15 we don't have a morning break, mid-morning we would
16 have it at the conclusion of the closing argument
17 before the defense would present theirs.
18       So does anybody need a break now or are we
19 good?
20       Mr. Nelson.
21       MR. NELSON:  Yes, Your Honor.  Thank you.
22       THE COURT:  The floor is yours.
23       MR. NELSON:  Good morning.  The defendant
24 didn't kill Yingying Zhang because he was drunk.
25 The defendant didn't kill Yingying Zhang because he

1  was depressed.  The defendant killed Yingying Zhang
2  for sport.  He killed her because he thought he
3  could get away with it.  And for no reason, other
4  than he felt like it, he kidnapped her.  He raped
5  her.  He choked her.  He bludgeoned her.  He stabbed
6  her.  And he decapitated her.  And then he disposed
7  of her remains in a way in which they have never
8  been recovered.
9        There is only one just sentence for a crime
10  this horrific, and that is a sentence of death.
11        By now you know that Yingying Zhang
12  disappeared on June 9, 2017.  That was 767 days ago.
13  767 days without a smile, without a hug, without her
14  encouragement, without her thoughtfulness, without
15  her love.  767 days with the freshly inflicted
16  wounds as the people who loved her wonder whether
17  the fallen leaf will ever return to its roots.  So
18  today is a solemn day.  After 767 long days, finally
19  justice will be served.
20        Now it is easy to think about justice in the
21  abstract.  We all have an idea in our minds of what
22  justice is and what justice means.  And it is easy
23  to think that justice is a force of its own that
24  just happens.  But it doesn't just happen.
25  Individual human beings have to administer justice.

 1  And that is not easy.  But as Terra Bullis sat in
 2  that chair and told you, this trial is not about
 3  what is easy; it's about what is necessary.
 4        The law requires and you swore an oath to
 5  review the evidence fairly and honestly and you took
 6  an oath to deliberate.  You have been instructed to
 7  work together to render a unanimous verdict that in
 8  your opinion does justice in this case and any
 9  suggestion otherwise is contrary to the Court's
10  instructions.
11        Now when you review that evidence, when you
12  weigh the aggravating and mitigating factors, I
13  submit that you will have no difficulty in
14  determining a sentence in this case.  Justice will
15  be right there for you to find.  It will be shining
16  brightly in the darkness.
17        You have been instructed that your verdict
18  may only be based on the evidence that's before you
19  in this Court, and it's your job to determine what
20  that evidence means, and it's your job to determine
21  what that evidence weighs, and it's your job to
22  determine which witnesses were the most credible.
23  And ladies and gentlemen, you have all the evidence
24  you need to decide a sentence in this case.
25        And I would like to review some of that

evidence with you as we discuss the aggravating
factors and the mitigating factors.  The first step
in the process is to determine the eligibility
factors.  We can move through these fairly quickly.

The first is the defendant's age.  He has to
be 18 years or older.  Well, his passport is in
evidence for you.  It is Exhibit 56A.  And you have
seen numerous documents presented in evidence that
the defendant's birthday is June 30, 1989, which
makes him 27 years old on the date of the offense.
His age is proven.

Next, you must decide whether the threshold
intent factors, any one of them or the statutory
aggravating factors, at least one of them, have been
proven.  We will discuss one statutory aggravator
first and show how all of that is proven beyond a
reasonable doubt for you.

The death occurred during the course of a
kidnapping offense.  We know that.  We have
Exhibit 5C.  This is Yingying getting into the
defendant's car.  We have Exhibit 1914; this is the
defendant's bedroom with the restraints and the
baseball bat.  You have the baseball bat in
evidence; it is Exhibit 18E.

I will just hold on to that.

1          Exhibit 1931, picture of the mattresses with
2   Yingying's DNA, and Exhibit 1933.  Again, you've
3   heard testimony that these stains all contained
4   Yingying's DNA.  And by now we know that she died in
5   that apartment.
6          So, you can rely on those exhibits, and you
7   can rely on all of the evidence and the testimony
8   that you heard in the guilt phase in concluding that
9   the defendant was guilty of that offense.  And it
10  proves the defendant -- it proves the aggravating
11  factor of death during the commission of a
12  kidnapping offense beyond a reasonable doubt.  It
13  also proves all threshold intent factors.  The
14  defendant intentionally killed Yingying Zhang.  He
15  intentionally caused serious bodily injury that
16  eventually resulted in her death.  He intentionally
17  participated in the kidnapping offense,
18  contemplating that lethal force would be used and
19  Yingying Zhang died as a result.  And he
20  intentionally and specifically engaged in an act of
21  violence knowing that it created a grave risk of
22  Yingying Zhang's death such that participating in
23  the act constituted a regardless disregard of human
24  life and Yingying Zhang died as a result.
25          This evidence proves beyond a reasonable

 1  doubt all four of the threshold intent factors.  It
 2  proves that the defendant was 18 years of age at the
 3  time of the offense.  And it proves at least one
 4  statutory aggravating factor.  That means the death
 5  is eligible for the death penalty and you can
 6  consider and weigh all of the aggravating factors,
 7  both statutory and non-statutory.

 8          Now you should absolutely deliberate
 9  according to the Court's instructions in form but
10  for ease I would like to discuss the aggravating
11  factors and the order of their occurrence so that we
12  can track this case as it progressed.

13          We will first discuss substantial planning
14  and premeditation.  You have been instructed that
15  "planning" means mentally formulating a method for
16  doing something or achieving some end.  And that
17  "premeditation" means thinking or deliberating about
18  something and deciding whether to do it beforehand.

19          Well, we know that the defendant had a plan.
20  And his plan involved his idols.  He was fascinated
21  with Ted Bundy; idolized him.  That's what he told
22  the University of Illinois Counseling Center.
23  That's what he told Terra Bullis.  He was fascinated
24  with the main character from American Psycho; that
25  was his favorite book.  He described both people as

pure evil.  And he described himself similarly in
Exhibit 34.

He wrote in a text message to Terra Bullis,
"I know that I am horrible.  I don't hide it."
People are almost attracted to it in real life.
It's like they want to do what I do but won't."

Just like his idols, the defendant lived a
double life.  On the one hand smart and seemingly
normal; on the other hand, a cold-blooded killer.

The defendant had a plan for his ideal
victim.  He told Terra Bullis about his trip to the
shoe store where he witnessed an attractive woman
who he thought was petite and would be easy to
dispose of, then he followed her home, memorized her
address.  He described this again at the vigil
concert: a woman who was petite, would be easy to
dispose of.

The defendant had a plan for the ideal
method.  This is his text exchange on FetLife:

"I'd bind you, gag you and likely put you in
a large duffle bag so no one could see you."

And he told Tom Miebach that he bought items
for the transport and disposal of the body.  This is
Exhibit 38A.  There it is on March 3rd, 2017, he
bought the large green duffle bag which he later

1  returned and bought again on June 3, 2017.  And you

2  have an example of the bag itself here in evidence.

3            (Displaying Exhibit 38A to jury.)

4            MR. NELSON:  You can decide if that bag

5  would be large enough to transport and dispose of a

6  human body.

7            You also have the duct tape, Exhibit 30B,

8  which was referenced in his FetLife chat message.

9  And you have Exhibit 33-4.  The defendant had plenty

10  of restraints at home.  And as he mentioned in the

11  chat message, Exhibit 34, page three, in a chat to

12  Bunny, "I bought bed restraints and a blindfold and

13  a gag."

14            Well, you have seen the photographs of the

15  restraints.  And you have heard evidence of the

16  search warrant.  But there was no blindfold found

17  and no gag found.

18            The defendant also had a plan for a ruse, to

19  lure his victim, a very "Bundy-esque" plan indeed;

20  pretend to be an undercover police officer and lure

21  a woman into his car.

22            You've heard testimony from Emily Hogan and

23  Charles Hill.  Emily Hogan has a Ph.D. in

24  atmospheric sciences.  Charles Hill has a Ph.D. in

25  the street.  The only thing -- the one thing that

Emily Hogan and Charles Hill have in common on this

earth is that they both know that on June 9th, 2017,

that man was pretending to be an undercover police

officer.  And Emily Hogan testified.  She described

the badge around the defendant's neck.  Described

the way in which he asked her to get in the car and

answer questions.  She testified about the bad

feeling.  And that bad feeling saved her life

because we could just as easily be standing here

talking about her.  And you saw her testimony.

There was no doubt in her mind that the defendant

was the man she saw that morning.

And you've also heard that Yingying Zhang

was a vulnerable victim in this regard.  She had a

limited ability to communicate in English.  The

defendant says it nine or ten times in his

statements to the FBI and in his statements to Terra

Bullis.  She is a visiting scholar from a foreign

country.  She's only been here a couple of months

and she's late.  And who does she see?  A police

officer, the one person she would trust.  And the

defendant preyed on that vulnerability.

The defendant also had a plan to avoid

mistake, Exhibit 40B, researching oxygen bleach on

June 8, the day before the offense.  Researching

1  decomposition, Exhibit 36B.  And this is important

2  because he told Terra Bullis, he told her on June

3  27th, Exhibit 28, "Ted Bundy got caught because he

4  was just dumping bodies.  And he got caught because

5  he left a bite mark on one of them."

6         He told the University of Illinois

7  Counseling Center that he had a plan for how to do

8  it and that he bought things to transport and

9  dispose of bodies because he did not want to make

10 the same mistake that Ted Bundy made.  He had a plan

11 for getting rid of the body so that it wouldn't be

12 recovered and it never has been.

13        And Yingying Zhang was a vulnerable victim

14 in this regard.  She was 5'3".  She was a hundred

15 pounds.  The exact size that the defendant said

16 would be easy to get rid of.

17        Substantial planning and premeditation has

18 been proven beyond a reasonable doubt.

19        Vulnerable victim has been proven beyond a

20 reasonable doubt.

21        Death during the commission of a kidnapping

22 has been proven beyond a reasonable doubt.

23        And all three of those aggravating factors

24 support the death penalty.

25        But there is one thing that didn't go to

plan, because the defendant ultimately realized the
downside to getting away with murder is that no one
knows about it.  And you saw the text messages; he
wanted to be infamous.  Well, ladies and gentlemen,
you can't be infamous if no one knows what you did.
And you heard his conversations with Terra Bullis
from June 16th to June 29th, and you heard him
grooming her.  He wanted to make sure that he could
trust her, and you heard him little by little as the
time went on giving her more and more information
until he was sure that he could trust her.

     And he finally told her everything on
June 29th at the Memorial Walk.  And you've heard
it.  It's Exhibit 29.  And you heard her ask him if
he was trusting her.  And you heard his response.
"Of course I am, because you are mine.  And by the
end of the night, you will be even more mine."

     But the defendant made a mistake.  He
underestimated Terra Bullis.  He believed she was
weak because she had been a victim.  He believed she
would submit.  He told her, "The dom in me says that
you do what I want."  He believed she could be
controlled and he was certain that she wasn't strong
enough to do what she did.  But pride goes before
the fall.  The defendant's arrogance was his

1  undoing.

2          The next factor is heinous, cruel and

3  depraved.  You have been instructed that requires

4  the United States to prove that the defendant

5  committed the offense in an especially heinous,

6  cruel, or depraved manner in that it involved

7  torture or serious physical abuse to Yingying Zhang.

8          You have been instructed that "heinous"

9  means extremely wicked or shockingly evil, where the

10  killing is accompanied by such additional acts of

11  torture or serious physical abuse as to set it apart

12  from other killings.

13          You have been instructed that "cruel" means

14  that the defendant intended to inflict a high degree

15  of pain by torturing the victim in addition to

16  killing the victim.

17          You have been instructed that "depraved"

18  means that the defendant relished the killing and

19  showed indifference to the victim.

20          You have been instructed that "torture"

21  includes mental as well as physical abuse.  But that

22  the victim must be conscious, conscious, and that

23  the defendant must have intended to inflict the

24  mental or physical pain and suffering.

25          "Serious physical abuse" on the other hand

 1 | means a significant or considerable amount of injury
 2 | or damage to the victim's body, which includes
 3 | damage to the body after she's already passed away.
 4 | You have been instructed that you have to make a
 5 | unanimous finding as to whether you believe this
 6 | crime involved torture or serious physical abuse,
 7 | but you're entitled to find both.
 8 |        Now, we know about the manner of the killing
 9 | because the defendant told us.  These are quotes
10 | from Exhibit 29.  "I cut her clothes off and just
11 | started doing stuff to her.  And there is nothing
12 | there.  There was really nothing there.  Like I
13 | didn't give a shit, like for real.  I just didn't
14 | care.  So I stopped."
15 |        This is the definition of depraved.  This is
16 | the definition of torture.  "She fought more than
17 | anyone else.  She was stronger than anyone else.  At
18 | that moment I had to decide if I was going to
19 | literally knock her out or just kind of let her
20 | hands in front of her.  I decided it was easier to
21 | just let her hands be in front of her.  She was
22 | resilient.  Truly resilient.  I tried to choke her
23 | to death but she wouldn't die.  She was -- I
24 | couldn't believe it, like she just didn't die.  It
25 | was unbelievable, like supernatural almost how she

1  just didn't give up."

2          This is the definition of depraved.  This is

3  the definition of torture.

4          "I choked her for, must have been ten

5  minutes.  I couldn't believe it, that she was still

6  alive.  So I carried her into my bathtub.  I got the

7  bat and I hit her on the head as hard as I could and

8  it broke her head open."

9          Choking someone for ten minutes is torture.

10 Hitting someone on the head with a baseball bat is

11 both torture and serious physical abuse.  This is

12 the definition of heinous.  It is shockingly evil,

13 and this is the definition of cruel.

14         "At that point I wasn't sure if she was dead

15 or not, so I had a knife and I stabbed her in the

16 neck and she grabbed for it and tried to pull it out

17 of her fucking neck.  I don't know what killed her."

18         This is the definition of torture.  This is

19 the definition of serious physical abuse.

20         "It was unbelievable, like she was just --

21 so I chopped her head off, and I said that was the

22 end of it, right, like that was actually the end,

23 like, no, huh-huh, none of this fucking zombie shit.

24 She was done."

25         This is the definition of heinous, wicked,

1  and shockingly evil.  This is the definition of

2  depraved, indifferent to Yingying's suffering.  You

3  heard him laugh.  He thought it was a joke.

4       And the forensic evidence supports the

5  defendant's statements.  This is Exhibit 18E.  The

6  baseball bat, it had Yingying's DNA on it.

7       This is Exhibit 19-34 at the head of the

8  bed.  Yingying's DNA was within that stain.

9       This is Exhibit 19-35, stain in the middle

10  of the bed.  Yingying's DNA.

11       Exhibit 19-37, stain between the mattresses.

12  Yingying's DNA.

13       Exhibit 33-12, the underside of the carpet.

14       Exhibit 33-13, a close-up of that stain.

15  Yingying's DNA.

16       Exhibit 33-18, the tack strip underneath the

17  carpet.  Yingying's DNA.  There is also DNA on the

18  drywall and DNA on the baseboard, which are also in

19  evidence.  How much blood must there have been to

20  soak into the tack strip through the carpet.

21       The aggravator of heinous, cruel, and

22  depraved has been proven beyond a reasonable doubt

23  and that aggravator supports the death penalty.

24       Let's talk about obstruction.  Because the

25  defendant attempted to obstruct the investigation of

this by at least making false statements to
investigators, destroying or concealing the victim's
remains and sanitizing the crime scene, because the
whole point for the defendant was to get away with
it and show that he could outsmart the University of
Illinois Police Department and the FBI.

Step one, clean the apartment:  Exhibit 48B,
Drano Max purchased on June 11th from Walmart.

Exhibit 47B, a second bottle of Drano Max
purchased from Schnucks the following day.

June 12th, Exhibit 19-28, that is a picture
of one of those bottles.  You will see that it is
80 ounces.  That's an awful lot of Drano.  The fact
that he bought two of them is suggestive that he
needed to do a lot of drain cleaning on June 11th
and June 12th.  And you heard from Deputy Bruketta
who testified about the forensic K9, Sage; that Sage
pulled away from the drain of the bathtub as though
there was some smell that was burning the dog's
nose.

Exhibit 19-30, you heard the defendant tell
the FBI on the 17th, there was something smelling in
his apartment.

Exhibit 19-19 is a big pile of baking soda
in the furnace room.

1          Exhibit 31-27, he attempted to clean the
2     stain at the head of the bed.

3          Exhibit 31-28, handprints on the wall.

4          Exhibit 31-18, the defendant tried to clean
5     the stain in the middle of the bed.

6          Exhibit 33-2, this is where the blood ran
7     down into the carpet.

8          Exhibit 33-3, further down the wall, with
9     another handprint.

10         But OxiClean bleach did a good job,
11    Exhibit 33-10.  You can't see it with the naked eye.

12         Exhibit 33-8, so much bleach he is leaving
13    footprints as he walks around his apartment.  How
14    much cleaning must he have been doing.

15         Exhibit 33-24, another footprint elsewhere
16    in the apartment.

17         Exhibit 33-25, this is the bucket on the
18    floor; scrubbing the carpet and the walls.

19         Exhibit 33-35, this is the area between the
20    front door, would be on the left of the screen, and
21    the hallway back to the bedroom would be on the
22    right.  This is the path you would have to take to
23    drag a body out of the apartment.  That's the only
24    door.

25         33-36, back towards the hallway.

SENTENCING -- July 17, 2019                73

1            And 33-37, scrubbing on the bathroom door.

2            That same day, June 12th, Exhibit 40B, the

3    defense Googling "iPhone tracking" on his

4    lovemachine@gmail account.

5            Now we know what else happened on June 12.

6    We know the defendant disposed of the duffle bag on

7    that day.  We know that because both Terra Bullis

8    and Michelle Christensen told us.  And by now we

9    know there wasn't a cat tree in there.  By now we

10   know, that he didn't leave it on Terra's porch.

11           But, as Michelle Christensen testified,

12   there is plenty of room in the bag for an iPhone,

13   and a backpack, and books, and clothes, and sheets,

14   and knives.  And as the defendant said himself on

15   June 17, Exhibit 22, "I admit it looks suspicious."

16           But on June 12th, the defendant submitted to

17   an interview at his apartment with Special Agents

18   Carter and Smith; consented to the search of the

19   apartment; consented to a search of the car.  And we

20   now know the defendant already cleaned his

21   apartment.  He'd already cleaned the car.  He'd

22   already disposed of the duffle bag.  And that's when

23   the lies began.  "I was home all day.  I was playing

24   video games or taking an afternoon nap."

25           Well, the person who the defense claims

knows him best, Michelle Christensen, told you from

that stand "he is a good liar."  And he made every

attempt to obstruct the investigation.

        And on June 13th, the day after he spoke

with the special agents for the first time, he

deleted his browser history from his phone and his

computer, making it a little bit more difficult,

though not impossible, to recover electronic

evidence.  That same day, June 13th, he put in a

work order for an acid wash of his bathtub, that's

Exhibit 53.

        Now, the evidence shows that he did

something in that bathtub; he acid washed it and he

used two jugs of Drano.  And the defendant's

obstructive acts corroborate his description of the

offense.

        But that wasn't the end of it.  Same day,

June 13, 2017, the defendant goes out and cleans the

car again.  And we know this, Exhibit 14-4 is the

front driver door, and this is 14-05 with the

luminol.

        14-06, the front passenger door.  And here

is the front passenger door with the luminol.  And

the front passenger seat.  And you heard the

testimony from Mr. McGuire that it is extremely rare

1  for luminol to hit on a surface like a car seat

2  because it is absorbent, so anything that was on

3  that seat would have soaked in and it was noteworthy

4  to him that any luminol showed in the seat.

5           14-10 is the passenger side rear, and here

6  is the passenger side rear with the luminol.

7           The driver's door rear; driver's door rear

8  with luminol.

9           The trunk and the trunk with luminol.

10           And you know that on the evening of June

11  14th, 2017, the very next day, going into the

12  morning of June 15th, a search warrant was executed

13  for that car.  And the defendant agreed to be

14  interviewed by Special Agent Manganaro and Detective

15  Stiverson.  And you have heard that interview.  And

16  you have heard the lies in that interview.  But I

17  would like for you to listen again.  This is

18  Exhibit 17B.

19           (Playing video.)

20           MR. NELSON:  And you heard Detective

21  Stiverson's testimony that during that 20 seconds of

22  silence, the defendant's neck was getting red and

23  his eyes were going laterally; and that, according

24  to Detective Stiverson, it looked like he was

25  thinking of what to say next.

1          Let's bring up the next clip, 17B.

2          (Playing video.)

3          MR. NELSON:  This is where you start to see

4    the pattern.  First, deny everything.  But when

5    confronted with a fact that you cannot disprove,

6    admit to only what you know the FBI can prove and

7    create a cover story for the rest.

8          And we heard this again on June 17, 2017, in

9    the defendant's statements to Terra Bullis.  This is

10   Exhibit 22.  "The blood on the bat is yours."  The

11   evidence proves that's not true.  Terra Bullis told

12   you, that's not possible.  "There is a cat tree in

13   the duffle bag."  Well, the evidence proves that's

14   not true.  But on June 17th, that same day, the

15   defendant went back to FBI and he doubled-down on

16   his lie.  "I let her out of my car."  And he kept

17   using those cover stories; "Cat tree in the duffle

18   bag."

19         And he came up with a new one, trace amounts

20   of blood in the Astra.  He said that because he

21   expected them to find some.  Remember, they had just

22   seized it.  So he came up with a cover story for why

23   the blood would be there.  But you heard the

24   testimony.  The only thing they found was cleaning

25   product and a lot of it.

1        But then he took them out on a drive, that
2   is Exhibit 2E, the wild goose chase.  The defendant
3   said that he couldn't remember.  So over the course
4   of three tries, they drove around this area adjacent
5   to campus in an attempt to divert attention away
6   from the actual crime scene.

7        And you heard about the defendant's
8   statements to his wife after he was arrested, when
9   he tells Michelle to delete his Reddit account and
10  to delete his dumb comments, delete the very
11  Bundy-esque reference to the crime that he knew that
12  he committed in the exact same way that his idol had
13  committed it.

14       Ladies and gentlemen, obstruction has been
15  proven beyond a reasonable doubt.  And that
16  aggravator supports the death penalty.

17       The next aggravator is future dangerousness,
18  requires the government to prove that the defendant
19  is likely to commit criminal acts of violence in the
20  future that would constitute a continuing and
21  serious threat to the lives and safety of others, as
22  evidenced by at least his demonstrated lack of
23  remorse for his acts of violence, his express desire
24  to be known as a killer, and his claims of
25  additional victims, and his expertise in avoiding

 1  detection.

 2          Well, we know that the defendant was

 3  fascinated with serial killers.  And we know that

 4  that's how he identified himself.  And we've heard

 5  the quotes from Exhibit 29, "I really do live a

 6  double life.  I also want to do all of these things,

 7  I really do.  I still want to do it.  It's just my

 8  legacy.  I want to continue any work.  I haven't

 9  discovered what I want to discover.  I don't know

10  what I'm going after."

11          And he told Terra Bullis that she was safe,

12  unless, in her words, she was a complete idiot and

13  said something to somebody.  And you saw her

14  describe that moment on the stand.  And you saw her

15  describe the fear that she was feeling in that

16  moment because he didn't know what she was doing,

17  but she did.

18          And you heard from Dr. Zoline, the

19  defendant's own expert witness, that in March of

20  2017, he posed a high risk of causing harm to

21  himself and others, that's before he even carried

22  out this plan.

23          You've heard testimony that the defendant

24  has behaved himself in the Livingston County Jail,

25  while he's had every incentive to do so, while he is

1  facing trial in federal court, while he is facing
2  the death penalty, while he knows that every piece
3  of misbehavior he accomplishes will be presented to
4  a jury who determines his fate.  You also determine
5  -- you heard about the defendant's television, and
6  his video phone, and his tablet, and his Wi-Fi, and
7  his movies, and Rib Shack on Fridays.  The
8  defendant's submitted as a mitigator that he's
9  adapted well to this environment.  You're entitled
10 to ask yourself, is this a difficult environment to
11 adapt to?

12        MS. POLLOCK:  Your Honor, I'm going to
13 object.  Three hots and a cot is an impermissible
14 argument particularly when we're prohibited from
15 getting into conditions of confinement in the Bureau
16 of Prisons.  And we request a curative instruction;
17 that it is not to be considered for his future
18 confinement.

19        THE COURT:  I think that the argument is
20 appropriate under the circumstance.

21        Overruled.

22        MR. NELSON:  You heard testimony from
23 Supervisor Inman that motivations can change when
24 you're no longer facing trial.  And you get to
25 decide how the defendant is going to behave when his

1  misbehavior won't come before a jury.  And you get

2  to decide how he is going to behave when there isn't

3  a correctional officer who will get him a booster

4  for his Wi-Fi.  And you're entitled to use your

5  common sense, it's the most important thing you

6  bring with you to court.

7       Risk of future dangerousness has been proven

8  beyond a reasonable doubt and that aggravating

9  factor supports the death penalty.

10       The next aggravator is that the defendant

11  has demonstrated by his statements that he made

12  following the offense that he lacked remorse for the

13  kidnapping and murder of Yingying Zhang.

14       Well, we know that on June 9th, 2017, at

15  2:04 in the afternoon, the defendant picked Yingying

16  Zhang up in his car.  And based on his statements to

17  Terra Bullis that are within Exhibit 29, he killed

18  her and made her disappear within hours.

19       We have Exhibit 34, page five, at 4:53 in

20  the afternoon; the defendant texting Terra Bullis

21  that he's exhausted and he is just tired.  Lol.

22       And he continues on with these casual text

23  messages, which according to his timeline, would

24  have been just after he murdered and disposed of

25  Yingying Zhang.  And he continues on with these

1  texts until 9:15 p.m. at which time he goes to his

2  computer and opens pornography.

3         Let's go to Exhibit 19-31.  Because in the

4  days and weeks that followed the murder of Yingying

5  Zhang, the defendant continued to sleep on that

6  mattress with his wife, continued to go on as if

7  nothing had ever happened.

8         You heard the defendant brag about his crime

9  during the vigil for Yingying, but before we get

10 there, let's remember Exhibit 100H. Let's remember

11 what the vigil was because the family was there

12 desperately hoping to raise awareness, hoping

13 somehow they might find Yingying or find someone who

14 had seen her.

15        And let's remember 60D, because there's the

16 defendant in the upper right-hand corner lurking

17 over them thinking "This is all for me."

18        This is the perfect symbol for this case.

19 For the rest of their lives, whenever the family is

20 looking for Yingying or thinking of Yingying, they

21 will remember this image and the pride and the

22 remorselessness and the unrepentance.  This picture

23 is all you need to see, ladies and gentlemen.  This

24 is lack of remorse.

25        But there are also the quotes from

 1  Exhibit 29.  "We're going to the concert because
 2  that's also for me."  You heard the defendant was
 3  drinking at that concert and pointing out potential
 4  victims.  Petite women who would be easy to dispose
 5  of.  Women, who he told Terra Bullis, they should
 6  follow home.

 7          You heard that Xiaolin performed a song that
 8  he wrote for Yingying at that concert.  And at the
 9  conclusion of that song, there was a standing
10  ovation.  And you heard about the defendant's
11  version of the standing ovation.  Terra Bullis
12  demonstrated it for you.  "I wanted to see how many
13  people were here, because they are here for me."

14          Terra Bullis asked the defendant if it's a
15  power trip.  He says, "Yes.  All of these people
16  here tonight, they want her home safe and they have
17  no idea what happened.  Nobody knows what happened
18  except for me."

19          And again you heard him laugh as he told
20  Terra Bullis about cutting off Yingying's head and
21  that being, quote, the end of it.  And that there
22  would be, quote, none of this fucking zombie shit.

23          He said, "You saw the people there.  They
24  thanked me for being there.  Like, no, I was the
25  one.  They thanked me."

1          You heard him say Yingying is gone.  "I
2   won't tell you where she is.  I won't tell anyone
3   where she is.  She's gone.  The FBI has looked for
4   her.  The police and FBI don't know where she is.  I
5   am apparently very good at this.  They will never
6   find her.  The family, you know, they won't leave
7   until she's found, until they can recover her.  They
8   are going to leave empty-handed because no one will
9   ever know where she is.  I was able to do this
10  within hours.  She's gone forever.  And that is
11  apparently my expertise."

12          You heard in the defendant's statements
13  during the Memorial Walk, you heard the pride
14  dripping from his voice.  He was delighted.  There
15  was no remorse.  You heard the defendant's jail
16  calls.  They're Exhibits 113 through 122.  You heard
17  him saying "The FBI is desperate."  You heard him
18  saying "The case is political."  You heard him
19  saying "I didn't do anything."  You heard him saying
20  "Yingying might show up."  You heard him say
21  "Yingying is probably a sex slave."  You heard him
22  say -- you heard him laugh when Michelle said that
23  she hoped Terra Bullis passed out and had to be
24  carried out of this trial on a stretcher.
25          Lack of remorse has been proven beyond a

 1  reasonable doubt.  And that aggravator supports the
 2  death penalty.
 3        Finally, you heard about victim impact; that
 4  the defendant caused injury, harm, and loss to
 5  Yingying Zhang, and loss to her family and friends;
 6  that this loss is evidenced by Yingying's personal
 7  characteristics and by the impact of her death upon
 8  her family and her friends.  You heard this
 9  testimony and almost all of it was in Chinese.
10        And it's easy for us to focus on our
11  differences.  Differences in language, differences
12  in culture, differences in politics.  But what have
13  we seen in this case?  Pride in your children is the
14  same in every language.  Ambition to succeed is the
15  same in every language.  Falling in love is the same
16  in every language.  Taking care of your family is
17  the same in every language.  And grief is the same
18  in every language.
19        And you saw them, their pain is so visceral
20  and so overwhelming.  But what do they say about
21  Yingying?  Her smile.  It was the first thing
22  everyone noticed about her and the thing that
23  everyone remembers about her.  It's easy to imagine
24  Yingying flashing that same smile in the defendant's
25  Saturn Astura when she realized that a police

officer was going to help her, that she might not be
late to One North after all.

          But when you take a person's life, you're
not just killing them, you're extinguishing
everything that they ever were and everything that
they ever would be here on this earth.

          And you heard from the victim impact
witnesses.  And you heard what the defendant took
from this world when he made Yingying disappear.

          This is Exhibit 106R. Ye Cai testified that
Yingying had "a sunny disposition and was always
smiling.  She sent a postcard wherever she went."
One of those post cards read "How big is the world?
I will measure it with my feet."

          She replaced Ye Cai's notebook and wrote,
"Although you didn't blame me, I am still feeling
very sorry for you for losing your favorite
notebook; therefore, I am giving you my favorite
notebook.  I hope this one can replace the lost
one."

          She testified that Yingying didn't flinch
from adversity.  She said she would turn a challenge
into a driving force, a force that pushes her
forward.  Yingying didn't complain or make excuses.

          Lisha Fang, Exhibit 107C, "Even when

 1  Yingying was tired, she exuded a sense of joy.
 2  Yingying was always energetic and full of ideas."
 3          When Lisha Fang got her marriage
 4  certificate, Yingying wrote, "Getting married is
 5  such an important event in your life, how could I
 6  not be a part of it."
 7          They talked about Lisha Fang's baby and
 8  Yingying also wanting to be a mother, and Yingying
 9  said, "Pay attention while listening to music
10  because when you are listening, the baby is
11  listening also."
12          And when Yingying went to Illinois, Lisha
13  said, "Although she was in a new environment she may
14  encounter difficulties and challenges, I felt she
15  was very excited every day.  She was looking forward
16  to whatever came up next."
17          And Lisha Fang said she cried for three days
18  after she heard that Yingying had disappeared.
19          This is Exhibit 111A, Qi Zujuan gave us this
20  photograph and she talked about Yingying singing and
21  her band Cute Horse, and how Yingying won excellent
22  student three years in a row and outstanding
23  graduate.  And had a dream to study in the United
24  States because she knew that she needed to study in
25  the United States to become a professor, which is

 1   what she wanted to do so that she could reach out to

 2   younger students in the way that she had been

 3   inspired.

 4           This is Exhibit 112H Kaiyun Zhao gave us

 5   this picture and said that Yingying really liked to

 6   smile and was very good at connecting with people.

 7   She saved money to buy her parents appliances; was

 8   always generous and both her talents and her

 9   personality were multifaceted.  Kaiyun Zhao

10   testified in the video that the news of Yingying

11   going missing was like being hit by a bolt of

12   lightening.

13           Shuang Wu gave us this photograph,

14   Exhibit 110D.  Yingying -- she said Yingying was

15   very devoted to her family and had a strong

16   self-discipline to achieve her goals and dreams.

17   She always took initiative for the care of others

18   and had a positive energy and a passion for life to

19   influence others around her.

20           Yanyu Li gave us this photograph,

21   Exhibit 108D.  This is the photograph that Yingying

22   took after graduation and wrote "All of the hard

23   work was worth it.  So much beauty cannot be taken

24   away."  And she said that Yingying never had an ill

25   intention towards others.

1          Zujuan Qi gave us 100E.  She was Yingying's
2   teacher, and she said, "Whenever you see her, she
3   was smiling, smiling every day.  She was very
4   comforting and a very lovely girl."
5          This is Exhibit 1D.  You heard Xiaolin Hou
6   testify that Yingying was, in his words, "The best
7   girl I ever knew."  And they made long-term plans,
8   and they wanted a family.  And he said, "This took
9   away the most important person in my life.  And that
10  Yingying was the family's prize star, their hope,
11  their future, their everything."
12         Can we go back to 1D, please?
13         Because also in that photograph is Ronggao
14  Zhang, Yingying's father.  And you saw him break
15  down when he saw Yingying's picture on the monitor
16  on the stand.  And they talked about how proud he
17  was of her and how devastated he was for her loss
18  and how desperate he was for closure.  He said, "She
19  is part of me as if my life without her would never
20  be complete.  To tell you the truth, I do not know
21  how to live the rest of my life."
22         And Lifeng Ye, Yingying's mother, talked
23  about how Yingying volunteered to help less
24  fortunate children.  How she called her mother's
25  sister and crawled carefully into bed with her so as

1  to avoid waking her up.  And Lifeng talked about how
2  she wanted to be a grandmother, desperate for
3  Yingying to have a baby.  Said, "This wonderful
4  daughter of mine, she is my everything.  Our entire
5  family does not know how to carry on."
6          And ladies and gentlemen, that's why
7  Yingying fought so hard.  She had so much to live
8  for.  She just wanted to live.  She didn't want that
9  man to be the last thing that she saw on this earth.
10  She did not want her story to end with me, a
11  stranger, standing at this podium talking about her
12  in the past tense.  She deserved so much better than
13  that.  And the entire world is lessened by her
14  absence.
15          And the way the defendant erased her from
16  this earth was cold.  It was callus.  It was cruel.
17  Can anything mitigate that?  Victim impact evidence
18  has been proven beyond a reasonable doubt and that
19  supports the death penalty.
20          Now in weighing against the aggravating
21  factors, the defendant has proposed approximately 50
22  mitigating factors.  Many of those involve issues
23  that people deal with every day.  And none of them
24  mitigate the monstrosity of the defendant's actions.
25          I would urge you to not be swayed by

1  childhood photos and videos.  All murderers start
2  out as innocent children, but sometimes innocent
3  children grow up to be cruel adults.  And the
4  defendant is not here for what he did as a
5  12-year-old.  He is here because he butchered a
6  woman in his apartment.  Don't forget that.  Don't
7  lose sight of that.
8         The defendant has alleged that the
9  Counseling Center could have done more in this case.
10 But in his own words, he went there because his wife
11 was going to leave him.  And when things improved
12 and when he met a new romantic interest of his own,
13 he stopped going.
14        You heard Felicia Li tell you, "He didn't
15 call, so I called him and he was in good spirits."
16        Jennifer Maupin told you that she gave him
17 counseling on drug and alcohol abuse; that he was
18 abstaining on his own.  He asked for a referral and
19 she gave him one.  And he decided not to go.  And he
20 is a 27-year-old man.
21        Tom Miebach told you that he gave the
22 defendant a risk assessment and that the defendant
23 told him he had no plans and he had no present
24 intent, and he agreed to come back for counseling.
25        And you saw Defendant's Exhibit 154, page

 1  47, of that exhibit.  You might remember this
 2  exhibit.  This is the one they tried to withdraw
 3  when I put it on the screen because he came in on
 4  April 6th, filled out a second CCAP test and left.
 5  And this second test undercuts their entire theory,
 6  because all of his scores go down dramatically, and
 7  homicidal intent goes to zero and suicidal intent
 8  goes to zero.  And he answered the questions.
 9          Let's go to the bottom half please.
10          "Do I feel worthless?  Zero."
11          "Do I feel helpless?  Zero."
12          "Do I have thoughts of any ending of life?
13  Zero."
14          "I'm afraid I might lose control and act
15  violently.  Zero."
16          "I have thoughts of hurting others.  Zero."
17          Now the counselors told you they tried to
18  help, but they also told you they are not mind
19  readers.  They had to rely on what he said, and they
20  didn't know that they were talking to a very good
21  liar.  And what his actions said were "I don't want
22  to do this."  And so he didn't.
23          Now, you've also heard about the impact this
24  has had on the defendant's family and their pain is
25  legitimate.  They didn't ask for this.  This isn't

 1  their fault.  And I'm certain that they're in pain.
 2  And if the defendant is executed, I'm certain that
 3  they will grieve.  But the source of their pain sits
 4  in that chair, and he wasn't thinking of them when
 5  he did this to Yingying.
 6          And when weighing the aggravating factors
 7  and the mitigating factors and considering what they
 8  mean to you, I would urge you to remember there is
 9  no mitigating evidence that makes this murder less
10  heinous.  There is no mitigating evidence that makes
11  this murder less premeditated.
12          MS. BRAIN:  Objection.
13          THE COURT:  What is the objection?
14          MS. BRAIN:  It's urging the jury to find
15  that there has to be a nexus between mitigation and
16  the crime and that's not the case.
17          THE COURT:  I'm not hearing him say that.
18          Proceed, Mr. Nelson.
19          MR. NELSON:  There is no mitigating evidence
20  that makes this murder less heinous.  There is no
21  mitigating evidence that makes this murder less
22  premeditated.  There is no mitigating evidence that
23  lessens the defendant's obstruction.  There is no
24  mitigating evidence regarding the defendant's lack
25  of remorse.  And there is no mitigating evidence

1  that lessens the impact of the defendant's crime on

2  Yingying's family, friends, and fiancé.

3           And even if every single one of the

4  defendant's mitigators are proven, do they outweigh

5  any of these aggravating factors?  Let alone all of

6  them combined.

7           There is something else I would like you to

8  remember.  Under the law, life imprisonment is the

9  minimum sentence available for this offense.  Think

10 of what you have seen and heard.  Think of those

11 photographs.  Think of those statements.  Think of

12 that baseball bat.  Think of that carpet.  Is this a

13 minimum sentence case?

14          Ladies and gentlemen, I want to thank you.

15 Our system depends on people like you doing what you

16 have done, sacrificing your life, setting your life

17 on hold to hear this case, to render justice in this

18 case.  We could not have done it without you.  And

19 you have been attentive and you have been diligent

20 and now we are going to call on you one more time

21 because the time has come.  Justice must be done.

22 Sentence Brendt Christensen to death.

23          THE COURT:  Thank you, Mr. Nelson.

24          Ladies and gentlemen, let's take 10 to 15

25 minutes here and then you will hear from

 1  Ms. Pollock, all right?

 2          Please do not discuss this matter with

 3  anybody including yourselves.  You are not to begin

 4  your deliberations at this time.  Thank you.

 5          (Jury absent 11:09 a.m.)

 6          THE COURT:  Please be seated one second.

 7          Go to page 18 of the instructions and

 8  introduction to mitigating factors.  Look at the

 9  fourth line up.  Read it to me.  Or read it to

10  yourselves and tell me if we need to say "what is

11  sought to be established is more likely true than

12  not true" as opposed to "establishes more likely

13  than not true."

14          MS. POLLOCK:  We agree, Your Honor.

15          MR. NELSON:  That's fine.

16          THE COURT:  Take a look at them.  And then

17  is it okay if we just handwrite it on each one?

18          MS. POLLOCK:  That's fine.  I do have a

19  motion at this time, Your Honor.

20          THE COURT:  Go ahead.

21          MS. POLLOCK:  Your Honor, at this time the

22  defense moves to reopen our case-in-chief and

23  present evidence regarding conditions of confinement

24  in the Bureau of Prisons.

25          Mr. Nelson clearly argued and implied that

1  the conditions that Mr. Christensen will face if he

2  is sentenced to the Bureau of Prisons to life

3  imprisonment are identical to those in the

4  Livingston County Jail when everyone in this

5  courtroom knows is false.  There are no individual

6  tablets in the Bureau of Prisons.  He doesn't have

7  his own television or his own phone.  The conditions

8  are significantly more restrictive and dangerous and

9  worse.  And Mr. Nelson clearly gave the impression

10 to the jury that he will be in a setting like that

11 in Livingston County.

12         We are now entitled to present evidence of

13 what the conditions of confinement are in the Bureau

14 of Prisons to dispel that notion, which is a false

15 impression; or the Court can alternatively instruct

16 the jury as to what those conditions may be because

17 that impression with regards to his future

18 dangerousness and the lack of remorse and everything

19 else makes it the three hots and a cot argument,

20 Your Honor.  It is making it look as if he is in

21 some cushy facility for the rest of his life when

22 everyone knows is false and the jury cannot be

23 allowed to deliberate with that in their minds.

24         THE COURT:  Mr. Nelson.

25         MR. NELSON:  Yes, Your Honor.  I was

1  actually responding to the mitigating factor that
2  they have posited, that he has adapted well to
3  incarceration thus far.  Livingston Jail is the only
4  incarceration he's had to adapt himself to, so I was
5  directing my argument at that mitigating factor and
6  the weight that should be given by them in their
7  weighing process, which is of course proper.  I
8  didn't mention BOP.  I didn't mention conditions of
9  confinement.  The Seventh Circuit prohibits us from
10  mentioning conditions of confinement and I did not.
11  I addressed their factor and the testimony of their
12  witness.
13          THE COURT:  The defense has set forth eight
14  mitigating factors all about Mr. Christensen's
15  pretrial incarceration.  I heard Mr. Nelson argue
16  without implication about the Bureau of Prisons;
17  that he was saying that Mr. Christensen was behaving
18  while people were watching him, while he was
19  awaiting trial, and of course he would behave during
20  that time; that's what I heard.
21          Motion for the mistrial --
22          MS. POLLOCK:  I didn't move for mistrial,
23  Your Honor.
24          THE COURT:  The motion to reopen your
25  evidence is respectfully denied.  Thank you.

 1          We will be in recess.

 2          (A recess was taken at 11:12 a.m. to

 3           11:25 a.m.)

 4          THE COURT:  Please be seated.  Thank you.

 5          Okay.  First thing, I asked you to take a

 6  look at page 18.  Does everybody still agree we can

 7  handwrite the words "more likely true than not true"

 8  in there?

 9          MR. FRERES:  Yes, Your Honor.

10          MR. TASEFF:  Yes.

11          THE COURT:  Both sides saying yes, we'll do

12  that.

13          Other than that, are we ready for the jury?

14          Ms. Pollock, are you ready to go?

15          MS. POLLOCK:  Yes, Your Honor.

16          THE COURT:  Okay.  Let's bring the jury in.

17          (Jury present, 11:26 a.m.)

18          THE COURT:  Thank you.  Please be seated.

19          Ms. Pollock, closing argument.

20          MS. POLLOCK:  Thank you, Your Honor.

21          Good morning.  We are finally here.  We are

22  finally at the end of the weeks that we've been

23  waiting to get to for the ultimate decision that you

24  must all make in this case.

25          Before we get talking about the standards of

1   law and the evidence that you have heard, I want to

2   remind you of what each and every one of us has said

3   when we have stood up for Brendt over the last

4   several weeks.

5           First thing we told you is that we were not

6   going to deny the fact that Brendt Christensen

7   killed Yingying Zhang.  We admitted it from the

8   first day of trial because it's true and we couldn't

9   have done that without his permission to do that.

10          Second, we told you that we were not going

11  to make excuses or justifications or try to explain

12  why he committed this crime.  But what we were going

13  to do was try to present all of you with facts

14  bigger than the spring of 2017, dating all the way

15  back to the beginning of his life, not because it

16  excuses, justifies or explains what he did, but to

17  provide you with the information that you need to

18  make this decision which requires you to weigh the

19  aggravating factors and the mitigating factors.

20          So when you make this decision, you're going

21  to have two options and only two.  Mr. Nelson said

22  to you at the end of his closing argument that we

23  were going to ask you for the minimum sentence.  But

24  the truth is that there are only two sentences

25  available:  It's life without the possibility of

1  release or it's death.  It's life behind bars in a
2  federal penitentiary, not in a county jail, not --
3           MR. MILLER:  Your Honor, just so the jurors
4  aren't misled, I think this wouldn't be necessarily
5  any facility where he would be --
6           THE COURT:  I guess that should be
7  understood first that this isn't representative of a
8  facility where he may be.
9           And second, although I don't dispute the
10 point that Ms. Pollock is going to make to show you
11 a prison as opposed to whatever else is coming, but
12 this picture was not in evidence as well.
13          Okay.  Go forward.
14          MS. POLLOCK:  Thank you.  As I was saying,
15 he is not going to be in a county jail like the one
16 that Stuart Inman described to you, the one that Mr.
17 Nelson made so much hay over because the county jail
18 has privileges in it because people who are in
19 pretrial detention, who have not been convicted of a
20 crime, have privileges under the law in Illinois,
21 and it is not the same thing in the Federal Bureau
22 of Prisons where Mr. Christensen is going to spend
23 the rest of his life; no matter what you decide
24 today, he is going to spend the rest of his life.
25 The only question is whether or not that life ends

SENTENCING -- July 17, 2019                    100

1  with his natural life or if it ends with a needle

2  and drugs at a date set by the government.

3          MR. MILLER:  Again, this photo is not in

4  evidence either, Your Honor.

5          MS. POLLOCK:  It's off.

6          THE COURT:  Thank you.

7          MS. POLLOCK:  He's leaving prison in a

8  casket.  The only question is when and that's your

9  decision and I don't envy that decision because you

10  each hold a person's life in your hands and it is

11  the most serious decision that one could make under

12  the law, and it is difficult, and it is fraught with

13  all of the instructions that you have to go through

14  and these complicated legal terms that everybody is

15  throwing at you, you all have to look inside of

16  yourselves and you have to decide what weight to

17  give the evidence in this case.

18          Now, one thing that you need to remember,

19  which is in the instructions that you've received,

20  is that the law, the United States, is always

21  satisfied with the sentence of life imprisonment.

22  Nobody is going to judge you.  Nobody is going to

23  tell you that you are wrong if you choose life.

24  Nobody is going to demean that decision because that

25  is a decision, that is the sentence that you can

1 accept, that the law accepts, that the country

2 accepts, that the Constitution accepts; there is

3 never a requirement to vote for death.  Ever.

4         And you will see that in the set of

5 instructions that you are given where it says

6 "whether or not the circumstances justify a sentence

7 of death is a decision that the law leaves entirely

8 to you" and you're never required to vote for it.

9         Now, the instructions are also going to tell

10 you that a sentence of death must be unanimous.  It

11 has to be all 12.  And I know that there are

12 alternates here, if one of you happens to sit then

13 you'd be part of the 12.  It has to be all 12 of

14 you.  It has to be unanimous.  There cannot be

15 dissent in that decision.  And you are never, ever,

16 ever, required to sacrifice your own personal

17 convictions about your judgment in this case as to

18 what the appropriate sentence is.

19         The law in capital punishment dictates that

20 each of you, each of you is a judge.  You're your

21 own judge and this is 12 separate decisions.  You

22 evaluate based on your own conscience, your own

23 morality, your own internal judgment.  It's not

24 Judge Shadid's judgment.  It's not mine.  It's not

25 theirs.  It's not anybody else's.  It's only yours.

1   And it's different than what you expect because most
2   of the time the judge tells you what the law is and
3   tells you that if this is met and this is met then
4   you must do X, and that is not true in this case.
5   It's a much different type of standard, and I wanted
6   to try to explain it so that it's clear when you go
7   back into the jury room to deliberate.
8           The government has to prove every
9   aggravating factor that you find beyond a reasonable
10  doubt.  On the contrary, the mitigating factors must
11  be proved by what's called a preponderance of the
12  evidence.  That means more likely true than not
13  true.  So if you look on a scale, if it hits
14  51 percent you think it's true then you find for it;
15  that is what preponderance of the evidence means as
16  opposed to beyond a reasonable doubt.
17          Also, the aggravating factors have to be
18  unanimous.  So if you're going to find an
19  aggravating factor exists beyond a reasonable doubt,
20  all 12 of you must agree.  However, with a
21  mitigating factor, no agreement is required.  Each
22  of you can find each mitigator as you see fit, even
23  if it's just you.  Even if mitigation to you means
24  something different than to your neighbor, or if a
25  fact strikes you about the case but doesn't strike

1   the person three down from you.

2          As, an example, some of you may find that

3   the help that Brendt tried to get at the Counseling

4   Center, that that mitigates against a sentence of

5   death and some of you might disagree.  That's where

6   Judge Shadid instructed you where there's blanks on

7   the form where you can write the total amount of

8   people, whether it be one, three, 12, of all the

9   people that agreed that that mitigator was proven.

10  So the standards are different when you go back for

11  aggravation and mitigation.

12         Now, what does it mean that you have to make

13  this individual decision, this individual decision

14  of conscience, because there's safety in numbers.

15  And it may make some of you feel more secure if

16  everyone else on your jury believes the same and

17  feels the same as you, but, unfortunately, you

18  cannot allow that safety in numbers to dictate to

19  you what your true heart says because we make these

20  types of decisions everyday.  This is not like the

21  regular jury so much as it is like our regular

22  lives.  You make these decisions all the time:

23  Where do you go to church, where do you get married,

24  do you get married, do you have kids, how many kids

25  do you have, do you send them to public school,

1  private school, or do you home school them, and what

2  do you want to teach them, what values do you want

3  to view your children with.  These are all

4  individual personal decisions related to who you

5  are, how you grew up, who your parents were, the

6  support you had, your education level, your job

7  experience; these are individual decisions.  And

8  that is what is different than a normal jury

9  process.

10         MR. MILLER:  Your Honor, I'm going to object

11  at this point.  She -- the Court's instructed the

12  jury this is a normal process; they should

13  deliberate with the goal of reaching an agreement.

14  And she is --

15         MS. POLLOCK:  That slide is coming up, Your

16  Honor.

17         THE COURT:  That what?  Okay.  Tie it up.

18         MS. POLLOCK:  Once you go back into the jury

19  room, after you've examined all of the evidence and

20  you read through the verdict forms and you read

21  through the instructions, you are going to read the

22  list of aggravators and you're going to read the

23  list of mitigators.  And then you're going to

24  decide, first, have the aggravators been proven.

25  Second, have the mitigators been proven.  And then

1  comes the weighing process.  And this is what the
2  cover page of the weighing instruction looks like.
3  And it's different than -- I don't want say -- it's
4  not mechanical and your instructions tell you that.
5  It's not a computer algorithm where you feed in data
6  and you hit enter and is punches out a result for
7  you.  Everybody weighs according to their own
8  beliefs, their own feelings, and then you decide
9  what weight to put on those mitigators versus those
10 aggravators.  The instructions tell you this is a
11 unique, individualized, reasoned judgment about the
12 sentence.
13         The reason I'm highlighting this is because
14 it's so complicated and I want to make sure
15 everybody understands what the law says and what the
16 duties are when you return to the jury room.  So
17 what the law says is that every juror gives each
18 factor the weight that you think it deserves.
19 Different jurors have different opinions and that's
20 okay.  That is contemplated by the instructions and
21 by the law.  It also states that you can find that
22 any one mitigator outweighs any aggravator or vice
23 versa and the scale is your own.  There is no one
24 else's but yours and you decide for yourself what
25 weight and value is given to each factor when you're

1  making the decision.

2          So, some people learn by listening, some

3  people learn by reading, some people learn by

4  viewing; and I just want to make sure though that

5  it's clear how the process works.  Each of you

6  possesses your own scale.  You all are different

7  people.  And you all have different backgrounds.  So

8  you weigh the evidence based on your personal scale,

9  and then, and only then, do you deliberate and try

10  to discuss and see whose scales line up with whose

11  and what the decision is going to be at that point.

12  So each of you have the scale in your hands as

13  you're going back to deliberate.

14          So, let's define it.  Mitigation is not a

15  normal word.  People don't use it a ton in daily

16  parlance, but it has a specific meaning in this

17  case.  Now an aggravator is what the government

18  proposes as a reason to find for death.  And a

19  mitigator is a reason to find to life, and it can be

20  anything or it can be nothing.  It can be one of the

21  ones that we have suggested to you that we've

22  identified because of our representation of Brendt;

23  or it is one that we didn't point out to you, one

24  that you feel yourself that it exists; or it can

25  just be a feeling.  It can be something in the pit

of your stomach that you know is right or that you
feel is right, and if it tells you to lean for life,
then that's a mitigating factor.

         Even if there were no mitigating factors
presented, remember the place that you start from,
the place that we begin deliberations is life
without possibility of release.  And it is the
government's burden to prove that death is the only
appropriate punishment in this case.  So you start
at life --

         MR. MILLER:  I think that it is to prove
that death is the appropriate punishment in this
case.

         THE COURT:  I thought she said
"appropriate."

         MR. MILLER:  She said the "only appropriate
punishment," I believe.

         THE COURT:  Okay.  Go ahead.  That record
has been made.

         Go ahead.

         MS. POLLOCK:  Thank you.

         Your instructions will give you more
information about the mitigating factors and how to
consider them.  And as I told you, a mitigating
factor is anything that suggests that a sentence of

 1  life without the possibility of release is the
 2  appropriate punishment.  And it can be all of them,
 3  one of them, six of them, 28, 32, or none; whatever
 4  your personal scale tells you is what you are
 5  required to do.
 6         Now, the law does not require unanimity as I
 7  discussed before.  Each of you, your own scale is
 8  what applies.  The burden of proof on the defense is
 9  by a preponderance of the evidence.  And again that
10  just means more likely true than not.  So if you
11  feel that 51 percent of you believe that's true,
12  51 percent of yourself, then that met the burden; it
13  is not the same as beyond a reasonable doubt.
14         And as I told you, also, in the
15  instructions, if there are additional mitigating
16  factors that you find that we have not brought to
17  your attention for whatever reason, there is a space
18  on the verdict forms for you to write that down and
19  let the Court know that you have come to a
20  conclusion that is different than the one that has
21  been offered by us.
22         You also are receiving an instruction about
23  mercy.  Mercy is present in all of us in the
24  courtroom, in the world, in everyone.  And if you
25  recall during voir dire, a lot of you were asked

1  about that question, about what you believed about

2  mercy; and you are receiving this instruction that

3  the law gives each one of you the ability to temper

4  justice with mercy.

5          Now that brings me back to a point I wanted

6  to make.  When we went through the voir dire

7  process, all of you -- it took a long time -- and

8  all of you were asked similar questions.  And every

9  single one of you qualified to sit on this jury

10 because you agreed that you could impose the death

11 penalty, if appropriate, and you would consider life

12 without the possibility of release as an appropriate

13 sentence.  If any of you had said "I cannot consider

14 life" or "I cannot consider death," you would not be

15 here.  So you are the fair jury that has promised

16 the Court that you will give consideration to those

17 mitigating factors before rendering your decision

18 and making the decision that is true to you.  So

19 that's the law part.  And I tried to pull out pieces

20 of the instructions for you because it's a large

21 packet and you're going to be getting it when you go

22 into the jury room and it is complicated and it is

23 long and those are the pieces that I wanted to make

24 sure we understood because, frankly, some attorneys

25 don't even understand them; they are very

1  complicated.

2       But what we are really here about and what I

3  want to get into now is Brendt Christensen:  You

4  know, who is he; how did he get here; why did he get

5  here?  And to provide you with a fuller picture of

6  his life, because the government's case, as it

7  should, focused on a three-month period of that

8  life.  It focused on the events leading up to the

9  murder and the events immediately following the

10  murder.  And that's their job.  Their job is to show

11  you that.

12       You heard during the case when I would

13  cross-examine the FBI about the evidence that was

14  presented and I would say you only picked out this

15  little tiny piece and you gave that to the jury and

16  that's what they did.  That's actually their job.

17  But I wanted to make it clear that that's what

18  happened because my job and our job is to present

19  the whole picture, everything about Brendt

20  Christensen that could possibly help you to

21  understand who he is, and how he got here, and why,

22  so that you could take that information and make the

23  decision that you have to make.

24       Now, Mr. Nelson said in his closing, he said

25  that the fact that he was a drunk didn't cause him

1  to commit the murder; the fact that he had a
2  marriage breakdown didn't cause him to commit the
3  murder; and I'm going say something, which I
4  normally never say, which is, he's right.  He's
5  right about that.  It doesn't cause him to commit
6  the murder.  Brendt did that.  He did it on his own,
7  and it is inexcusable and we've never claimed
8  otherwise.  Any of the times that we stood before
9  you, we've never claimed otherwise because we can't,
10 because it's not true.  But those things are not
11 required to show you, the mitigation does not have
12 to show you why he committed the offense, and it
13 doesn't have to show you that there is a reason or a
14 justification for it.  Because if -- we're not here
15 to talk about an excuse and we are not here to talk
16 about a justification, that's something like
17 self-defense or insanity.  That's something that if
18 there was an excuse or there was a justification, we
19 wouldn't even be here because we would have gotten a
20 not guilty verdict on that basis; but we didn't
21 present that, because it isn't true.
22        The mitigation that we presented to you is
23 not meant to excuse what he did, it's not meant to
24 give you a reason or explain why he did what he did.
25 It is simply to give you a forward picture of who he

1  is as a person so that you can decide whether or not

2  he should die; that's the point of mitigation.

3         We are also not here to talk about blame.

4  You know, we are going to get to this a little bit

5  later when we talk about the Counseling Center, but,

6  you know, the inference was made that somehow we

7  were blaming during the trial.  It is not Michelle's

8  fault, it's not Terra Bullis's fault; we can't agree

9  more with that.  It is not anyone's fault but

10 Brendt.  He did it.  He did what he did.  And the

11 circumstances that we present to you about his

12 relationships and about his mental health and about

13 everything else is only meant to educate you, to try

14 to show you the full picture of who he is as a

15 person, as opposed to the very narrow picture that

16 was painted by the government, which paints him in

17 the worst light possible.  And the reason that

18 they've done that is because they want you to

19 execute him.  And they want you to find that that

20 narrow definition is all of Brendt Christensen;

21 that's all who he is, and that's all that he can be.

22 But that is not true.

23         Like I said, we are not here to talk about

24 causation.  We are not here to say because Brendt

25 was drunk it caused a murder or because he had

1  marital problems it caused a murder.  That's not

2  right.  That's not why we are here.  And I just want

3  to define that because that's a very fine line.  And

4  you could feasibly sit there and look at me and say,

5  "Well, of course, you're trying to blame somebody

6  else.  You talked about the Counseling Center or you

7  talked about how Michelle broke his heart and he had

8  an open marriage, and you are trying to excuse what

9  he did based on these factors"; but that is not --

10  it's just not the case.  No amount of marital

11  problems, no amount of alcohol, no amount of mental

12  health issues, none of the things that we are

13  presenting to you in mitigation could possibly

14  excuse what Brendt did.  I just want that to be very

15  clear.

16          This is supposed to be a process where we

17  tell you about his entire life.  He's not just a

18  cold-blooded killer.  In fact, I don't think he is

19  one at all.  And I will tell you why later.

20          But, first, we have to acknowledge what is

21  ultimately true about this case, which is just the

22  total and utter tragedy of it.  You all have sat

23  here and listened to all of the evidence from

24  Ms. Zhang's family and friends.  And if you have a

25  soul, then it pained you as much as it pained me

because it is horrible what they have gone through.
And nothing could ever repair it.  Giving Brendt a
death sentence won't repair it, sending him to life
in prison won't repair it because she's gone.  She
is not here anymore.  And her family will have to
live with that forever.

        And -- I'm sorry -- but this case, this case
is about more than just that.  This case is called
United States of America v. Brendt Christensen.  And
Brendt is more than just that three months of his
life.

        And I want to start talking a little bit
about some of the factors that we expect that all of
you will be able to find as a result of the evidence
that you received during the trial in this case.

        Number one, Brendt Christensen has never
been violent.  He has no history of violence in his
entire life.  And, you know, as an Officer of the
Court, on Brendt's behalf, I want to tell you the
truth about our position, about what our position is
here in this case.  And I told you from the
beginning when I agreed with the government's
evidence and why, and I have told you when I
disagreed with the government's evidence and why.
And Mr. Nelson, you know, he gives a very compelling

1  argument about the horrible things that Brendt said

2  on that Memorial Walk tape, and we talked about this

3  ad nauseam in the guilt phase about why we thought

4  some of the things on the tape you should not

5  believe.  And the fact of the matter is -- I'm not

6  going to go over every single piece of it, you guys

7  have been inundated with this evidence for weeks.

8  You know our position.  You know the government's

9  position.  But you cannot only rely on the tape by

10  itself in order to find what is true and what is not

11  true.  And the position that we have taken, and the

12  one that we think is correct, is that Brendt lied on

13  that tape.  He lied through his teeth and he did it

14  because he was twisted up.  He was so mentally

15  twisted at that time, and you have to believe that

16  -- ask yourself, who could say those things?  -- and

17  I think I said something similar during the closing

18  of the guilt phase -- you have to imagine, who could

19  possibly say those things if they are not true.

20  And, unfortunately, the answer is Brendt

21  Christensen.  Because he said on that tape, he said

22  that he had murdered 12 other people.  That is just

23  -- it's just wrong.  It's not true.  And the

24  government, you know, they didn't want, they didn't

25  want to flat out give me the answer that they know

 1  it's not true, but they know that it's not true.
 2  There is no evidence of it --
 3      MR. MILLER:  Your Honor, I'm objecting here.
 4  She is both vouching and commenting on what the
 5  government believes incorrectly.
 6      THE COURT:  And the jury has been instructed
 7  that arguments are not evidence.  And you will
 8  recall what the evidence is.  And let's go forward.
 9  Thank you.
10      MS. POLLOCK:  Thank you.
11      Brendt Christensen has never hurt anybody
12  before in his life until this incident and I think
13  the evidence very clearly establishes that for you.
14      Then we have the issue of the forensics, and
15  I just want to point out a couple things about it.
16  If you recall, the DNA expert, Amanda Bakker,
17  testified about the type of testing that was done on
18  the things from his apartment.  And she said that
19  she would have talked to the agents, they would have
20  told her what they were trying to prove, and she
21  would have tested the things that would have allowed
22  them to prove it.  They didn't test anything outside
23  of the bedroom and the bathroom.  They didn't test
24  the restraints.  They didn't test the implements on
25  the home.  They didn't test most of what they took,

1  including drains, the kitchen sink, etcetera.  And

2  although Brendt did try very hard to cover up what

3  he did, he couldn't because the FBI forensics people

4  are very talented and they found it anyway in the

5  bedroom, nothing in the bathroom.  No amount of

6  cleaning, no amount of acid wash, no amount of Drano

7  could erase what they say occurred in that bathroom

8  because it didn't.  And that's inconsistent with the

9  evidence.

10        Now, you know from the evidence that we

11  presented, no criminal record, he's never even had a

12  traffic ticket, no prior arrests, no prior

13  incarcerations.  And for his entire life, he's

14  followed the rules ever since he was a kid.  And I

15  remember specifically a message that the government

16  gave you between Miss Bullis and him when he said,

17  "Rules don't apply to me."  Well, I would submit to

18  you that that is just additional evidence of him

19  bragging about stuff that is not true because he did

20  follow the rules, his whole life all the way through

21  school up until his breakdown and his downward

22  spiral, that we are going to talk more about; and

23  since he's been in custody, since he's been in a

24  jail, since he's been controlled and isolated, he's

25  gone right back to following all the rules.  That

 1  text, those conversations with him, he was in a

 2  twisted fantasy land and was trying to act in a way

 3  that he thought was exciting even though it was so

 4  wrong, and he said these things and it was just

 5  theater; it's not who Brendt is.

 6          Now, how do we know that?  And we have to

 7  look at his character dating all the way back to

 8  when he was a kid because that's the evidence that

 9  we put on for you.  Brendt was a loving gentle

10  child.  You heard the testimony of his father, about

11  how he was never aggressive towards others, he never

12  got to respond to his brother when his brother

13  fought with him.  You heard Tommie Mitchell say that

14  he would never respond even when he was provoked.

15  He was just a gentle, respectful child.

16          You heard Jeanette Handrich say that he was

17  always the first kid in the class to try new things.

18  He was the boy who wouldn't leave Andrew Kieper

19  behind at track practice because he felt bad for his

20  friend and he did not want to abandon him.  He was

21  the boy who when his sister wanted a stuffed animal

22  so badly that he took his allowance money and rode

23  his bike across town to buy her the stuffed toy that

24  she wanted.  And he was the boy who David Belk

25  testified was so obedient in school, did his

1  homework, always respectful.  He was the boy who in

2  high school another kid punched him and he stood

3  there and took it and did not respond because he

4  didn't want to hurt him because he was bigger than

5  he was.  You've heard all of this testimony over the

6  course of the last couple of weeks.  And, yes, it

7  does not excuse the fact that Brendt Christensen

8  killed Yingying Zhang, but it is a piece that you

9  must consider when you look at the trajectory of his

10  life from the beginning until now; how did he get

11  here and what was he like before this crime?

12        This is what he was like:  He is the kid in

13  the kimono.  He is the kid whose friend was

14  paralyzed in an accident who he went to see in the

15  hospital and who he hung out with, maybe when the

16  rest of the kids would just go on their way that

17  stood behind the wheelchair in the gym of the high

18  school; that is who Brendt Christensen was.

19        You've also heard a lot of testimony about

20  the history of Brendt's life in terms of his family:

21  substance abuse, alcoholism, mental illness, dating

22  back to generations before Brendt was even alive.

23  And in particular we heard about Ellen and about the

24  depression that she suffered and about the

25  alcoholism that she endured.  We heard about how she

1  had to be inpatient and outpatient therapy and that

2  she tried for years and years, years to kick it, and

3  she couldn't kick it until very recently but she

4  did.  She did kick it.  She had 20 years to kick

5  alcoholism.

6            In the meantime, even when she was at risk

7  of hurting the kids, even when she was at the risk

8  of causing property damage, she still couldn't

9  defeat that demon.  And the reason why we present

10 this to you is not because the fact that Brendt's

11 mom was an alcoholic means that he is excused from

12 this crime, it doesn't mean the fact that he was an

13 alcoholic excuses him from this crime; what it means

14 is that you as lay people, as people who walk on the

15 street, you know it's a very commonly known fact --

16 you are allowed to use your common knowledge --

17 these kinds of things run in families.  And it

18 explains not why Brendt did what he did, but it

19 helps give context to his struggles with alcohol and

20 his struggles with his mental health.

21            We heard from Bob Lahmann and Mark

22 Christensen and other family members about the

23 suicides and the mental illnesses and all of the

24 other things that were dating all the way back in

25 his past, in his past relatives, and we know that

1  because it's just common knowledge that that means

2  that Brendt was predisposed to those things, too.

3  Now we may never know exactly what cracked in Brendt

4  Christensen that caused him to do this, but we know

5  that there was a background to it, and we know that

6  he was predisposed to those struggles as a result of

7  who his family was through no fault of his own and

8  through no fault of their own.

9         We also want to talk about his struggles

10  with substance abuse and mental health.  I think

11  that this is something that's really important

12  because if you look at Brendt and you see the guy

13  who made it in college and graduated from the

14  University of Wisconsin at Madison with a dual

15  degree in physics and math, and you see his grades

16  at that time and he got into the U of I and what a

17  successful student he is.  The fact of his

18  intelligence, which is very well established, does

19  not mean that he did not struggle.  He did struggle.

20  And we have shown you the evidence of that.

21         Starting from a very young age, you heard

22  his father and his mother talk about the sleep

23  terrors that he suffered from which never stopped.

24  Usually you grow out of them, but he didn't.  And

25  those terrors included waking up in the night

1  screaming, seeing forces that weren't present and

2  not being truly awake and expressing his fear of

3  being harmed by those forces.  We know about the

4  migraine headaches and the concussions that he

5  suffered which very well could have caused him to

6  have struggles with his brain.  He suffered from

7  symptoms of depression, hopelessness, helplessness,

8  anxiety, alcohol and drug abuse.

9          Now he was able, he still was able, because

10  of how smart he is; he was able to make it through

11  and push his way through these issues to be

12  successful academically, but the issues were never

13  gone.  They were always there, from the time he was

14  a little kid up until the time that he committed the

15  crime.  He tried hard to hide them.  He isolated

16  himself from society.  Spent only time with his

17  wife.  You can see the trend if you look at his

18  grades, and in high school he did very, very well

19  freshman and sophomore year.  And you heard his dad

20  say that junior year he tanked.  And what else

21  happened when he was around that age?  That was when

22  he tried to kill himself by running broadside into a

23  moving minivan after jumping off the roof of his

24  house.  Still, after junior year he recovered; he

25  managed to pull it out, not enough grades to get

1  into Madison but enough to go to tech school.  And

2  when he was there, he did well.  And he had a couple

3  of good years at tech school at Stevens Point, and

4  then finally at Madison where he graduates with a

5  dual degree and everything looks like it is going to

6  be perfect for his life.  But it isn't necessarily.

7  No.

8          You heard the testimony of Michelle, both at

9  the guilt phase and at the penalty phase about how

10  their life was together before 2017.  He was the

11  only person for her; she was the only person for

12  him.  They were alone together; them against the

13  world.  They never spent time with hardly anyone

14  else.  They enjoyed all the same things; they didn't

15  need anyone else.  You can see when he went to the

16  Counseling Center and he said, "My wife has always

17  been enough for me."  When asked, "Why don't you

18  have friends?  Why don't you have a support

19  network?"  "Because my wife has always been enough

20  for me" and they were, right up until she wasn't

21  anymore.

22          And you heard the testimony of all of the

23  people from the University of Illinois and Professor

24  Herndon from the University of Madison, and you see

25  this trend as it starts getting worse and worse and

1  worse over time where he starts off as a senior

2  honor student in physics with a -- working for the

3  preeminent professor in his lab, doing research,

4  getting published, all As.  Even in grad school when

5  he first came, he was sociable.  He helped Rita

6  Garrido-Menacho with her homework.  They spent time

7  in the office together.  Everything seemed to be

8  going fine.  And then all of a sudden he quit

9  trying.  He couldn't anymore.

10         Nadya Mason called him in her office and

11  said, "What is the matter with you?"

12         He says, "I know I need help."

13         Now Professor Mason said she thought that he

14  was already getting counseling at that point, but we

15  know from the records that he didn't start getting

16  counseling until 2016 in January, but regardless,

17  she knew about the problems he was having and she

18  knew that he knew that he needed help.

19         But it didn't work for him.  He could not

20  recover this time.  And he dropped out of the

21  program and he went to get his master's and they let

22  him stay teaching because that was the only way for

23  him to complete school.  But he just didn't do

24  anything.  He couldn't go to his staff meetings.  He

25  blew off every TA meeting.  He skipped office hours.

1  The staff complained about him.  The students
2  complained about him.  And the person that he became
3  during that time is somebody that is completely and
4  totally inconsistent with the Brendt from the
5  previous 26 years of his life.  This was a stranger.
6  He was in the midst of this complete plummeting
7  spiral and that is when he sought help at the
8  Counseling Center.
9          You can see this in the evidence from his
10  grades.  If you look at his grades from the first
11  couple of years, the first three, four years it's
12  all As and Bs, and then all of a sudden he is
13  getting straight Fs.  He can't pass any classes.
14  What kind of mental state did he have to be in, this
15  straight A student, this successful guy, this one
16  who had the whole future available to him; his world
17  was wide open and he can't pass a single class.  He
18  knew something was wrong with him.  He's always
19  known something was wrong with him but he knew.  We
20  can tell that he knew as late as December of 2016
21  when he had a phone call with his father and he had
22  been talking, his father talking to him about night
23  terrors and about the sleep problems and about all
24  the issues he's been having.  And he writes Mike an
25  email and the email says, "I didn't want to talk

1  about them yesterday because I was in earshot of

2  everyone, so sorry.  I'd love to hear what they used

3  to be like when I was younger.  I don't remember

4  them."  But then he goes on to describe the sleep

5  terrors that he is still having when he wakes up

6  screaming and wakes up his wife and there is an

7  ominous force approaching him, it's an ora that he

8  can feel but not see.  And he is scared to death of

9  it.  And it looks like a black staticy form that is

10 in his bedroom with him.

11         He knew something was wrong with him.  And

12 in fact he's always known.  Because when he was 15

13 years old, he had a fever, sure, but he remembers

14 jumping off the roof of his house --

15         MR. MILLER:  Again, this is not in evidence,

16 Your Honor.

17         MS. POLLOCK:  It is in evidence, Your Honor.

18 Mr. Christensen testified to it.

19         THE COURT:  Mr. Christensen testified to

20 something about this.

21         MR. MILLER:  That's correct.

22         THE COURT:  Right.  Go ahead.

23         MS. POLLOCK:  Thank you.

24         When he jumped off the roof of his house

25 down on to the deck and ran down the driveway in the

1  freezing cold and broadsided a mini van.  And

2  afterwards, after he was delirious and saying

3  strange things and unable to be comprehensible,

4  laying on the floor of his kitchen in his house, and

5  ripping his IVs out on the way to the hospital,

6  telling his father in the hospital "I was trying to

7  kill myself.  I'm afraid I'm going to hurt myself

8  and I'm afraid I'm going to hurt someone else."

9        Then age 19 when he was working for the roof

10  construction company and he falls and he has to have

11  surgery, and after the surgery he's unable to sleep,

12  Googles himself, ends up going to the doctor, and is

13  told that he has PTSD, but that's the first time he

14  gets medication for his issues.  He knows at that

15  point something is wrong with him.

16        Then you have him at age 26 when he is

17  almost done with graduate school.  But he can't hack

18  it and he goes and sees a psychiatrist and gets

19  medication and continues that medication because he

20  knows something is wrong with him.

21        And finally, we have him at age 27 when he

22  goes to the University of Illinois Counseling Center

23  and tells them all of the things that he told them

24  and asks for help with his alcohol abuse and his

25  drug abuse because he knows something is wrong with

1  him.  He told the people at the Counseling Center on
2  the intake form, he said "alcohol and drug addiction
3  is ruining my life."

4          And we heard from Michelle that the night in
5  December when he scared the pants off of her by
6  telling her about his dark twisted thoughts, that he
7  was drunk, because alcohol causes him to lose the
8  control that he had tried to establish over the
9  years.

10          We know that he told them at the Counseling
11  Center that he had major mental health concerns.
12  It's all on the intake forms.  You will have the
13  exhibits with you in the jury room.  We know from
14  the Counseling Center from the first visit that he
15  reported thoughts of suicide, losing touch with
16  reality.  You can read.  I'm not going to read them
17  all.

18          We know that he's had thoughts of hurting
19  others and we know that his CCAP profile was high
20  risk in almost every single category.

21          Now, the University of Illinois Counseling
22  Center had some communication issues surrounding
23  Brendt.  And we know from hearing the testimony that
24  when Felicia Li was consulted and was asked to
25  follow up with Brendt Christensen, that Carin

1  Molenaar did not convey all of the things that he
2  said to her.  Felicia said, "I have never heard that
3  before, that was the first time I heard that," about
4  his fascination with serial killers, his thoughts of
5  committing a crime like that, his plan to commit a
6  homicide that he was pretty far along in his
7  planning and had purchased items to execute that
8  plan.  Felicia Li was not told that.  Neither was
9  Tom Miebach told that.  He said on the stand, "I
10 didn't review her video.  I didn't review the video.
11 I didn't review her notes.  I met with her for a few
12 minutes and she told me some things to be concerned
13 about to get a risk assessment" but the depth of the
14 horror that he talked about on those tapes was not
15 given to him.

16        And of course, we have Tom Miebach and
17 Jennifer Maupin not communicating with anyone else
18 outside of their own Counseling Center after Brendt
19 walked out the door for the second time.  Now this
20 email, which was in evidence, is the email that
21 Jennifer sent to Brendt saying you should go to
22 Rosecrance; it's one stop shopping.

23        He told many people what he was feeling and
24 what he was afraid of and about his twisted
25 thoughts.  He told two people at the Counseling

1  Center.  He told his wife.  And he talked to Terra

2  Bullis about it, eventually about how fascinated he

3  was with these serial killers.  But the thing that

4  he told the counselors in that last portion is that

5  he did not want to be that person.  He wanted to

6  stop himself from being that person.

7          Now, you heard the testimony of Dr. Zoline

8  and she is the only expert witness to testify in

9  this case about these issues.  Dr. Zoline who is the

10 co-chair of the ethics committee of the Illinois

11 Psychological Association who is paid to consult

12 with counseling centers at universities for this

13 very reason to prevent risk, to prevent harm.  And

14 her testimony was relatively long, but I just want

15 to highlight a few pieces of it.  He appeared to be

16 open, cooperative and responsive.  He agreed to be

17 videotaped even though he didn't have to.  He agreed

18 to multiple additional consultations.  He agreed to

19 a follow-up appointment.  And he seemed responsive

20 to the help that would be offered from that

21 Counseling Center.

22          So, to say when Mr. Miebach testified that,

23 you know, he didn't want to confront him about

24 sharing information with the psychiatrist or about

25 going to the hospital or any of the things that they

1  elected not to do, it's really kind of inconsistent

2  because Brendt was really willing to do whatever

3  they wanted him to do at that time.

4          Now she is an expert in psychology with a

5  specialization in ethics.  And she reviewed

6  everything and she is of the opinion that he did not

7  receive the help that he deserved and should have

8  received.  She tried to make it clear and

9  particularly -- now Mr. Nelson highlighted the

10 second CCAP62 that was in the counseling records

11 where his risk was noted as being significantly

12 lower.  And Dr. Zoline highlighted why that doesn't

13 mean anything to her.  And the reason is because

14 these feelings -- it's not a yes or a no.  It's not

15 I'm suicidal or I'm not.  It's a continuum.  It's a

16 scale.  You know, people go up and people go down.

17 And anyone who lives normal human life during the

18 course of a day understands that your feelings can

19 ebb and flow.  And these types of feelings, these

20 risky feelings about killing yourself and hurting

21 others, they last for a long time.  They don't just

22 go away overnight.  And when he filled out that

23 second CCAP62, she said, "He may in that moment have

24 been feeling better.  He probably was, otherwise he

25 wouldn't have answered those questions that way."

 1  But I would be heartened in that moment but I could
 2  not consider that the risk was no longer present
 3  because these things fluctuate; they go up and they
 4  go down.
 5          When you have somebody who walks into your
 6  Counseling Center and said, "I've thought about
 7  killing myself and I know how I would do it; I would
 8  inhale nitrogen gas and I would never warn anyone; I
 9  would just die."  That is the kind of risk that you
10  follow-up on even if they are having a good day.
11  And for someone who comes in and says, "I fantasize
12  about committing a murder and I want to kill
13  someone" or "I had wanted to kill someone" and "I
14  bought things to dispose of a body"; that's the kind
15  of person where if they come in and say, "I'm
16  feeling better today," you don't let that risk go
17  unaddressed just because they are having a better
18  day.
19          There was never any further communication
20  even though Dr. Zoline said that out of concern for
21  both his well-being and concern for the campus
22  community, she would have thought that that outreach
23  would have been extremely important to follow-up on.
24  I asked her because, you know, on the stand
25  Mr. Miebach, Ms. Maupin, Felicia Li, they all said,

1  "Oh, we asked him, we said, 'Do you want to kill
2  somebody today?'  He said, 'No.'  And so he was
3  fine.  And we asked him 'Do you have any plans to
4  commit suicide today?'  'No, I don't have a plan."
5  Okay, he's fine.'"  And they said it was just okay
6  because he answered their questions correctly that
7  day.

8          But I asked Dr. Zoline, who has consulted
9  with University counseling centers for dozens of
10  years, how common is it for a student to walk in a
11  door of a counseling center and say these things?
12  "It's shocking that would he do that."  Anybody who
13  has ever gone to therapy or known somebody who's
14  gone to therapy -- that was the first time Brendt
15  had ever met that woman -- usually it takes time to
16  establish a relationship with your therapist or your
17  counselor or whoever, but he walked straight in the
18  door and sat down and said -- you know, how
19  desperate must he have been at that point if he was
20  willing to say that level of detail to those people
21  about his thoughts.  He knew, he knew that he was
22  going to trigger a response in them because he said
23  during that video, "I wondered when you were going
24  to ask me about that."  Because he knew something
25  was wrong with him.  And even though he said, "I

1  don't want to do that today, and I'm done with those
2  thoughts," the fact that he said those things is
3  extremely rare.

4         This is a fluctuating crisis; it can go up
5  and down, and Dr. Zoline identified that he had
6  severe risk factors for it going straight back down
7  again.  He had no protective factors except for his
8  wife.  And at that point she had asked him to
9  separate.

10        So what could they have done?  We talked
11  about all of these different things they could have
12  done.  They could have tried to get him into
13  treatment.  They could have recommended a specific
14  psychiatrist.  They could have talked to his
15  psychiatrist.  They could have provided a safety
16  crisis plan.  They could have done all of these
17  things.  They didn't do them.  And what Dr. Zoline
18  said is that if more intensive services were
19  provided, there is a possibility that maybe this
20  wouldn't have happened.

21        Now I want to be very, very clear with you
22  here because this is not about whether or not if the
23  university had done what they were supposed to do
24  that Yingying Zhang would be alive because we don't
25  know the answers to that.  We don't know what he

1  would have done.  We don't know if he could have

2  stopped drinking.  We don't know if he would have

3  gone back and done it anyway.  We don't know.  It's

4  possible, but we don't know.

5       And we are not blaming the University of

6  Illinois counselors.  That's not your job.  That's

7  for the lawsuit.  They have a lawsuit pending

8  against them for this.  That's on a different court,

9  a different jury, and a different day.  We are not

10  here to ask you to find anything about the conduct

11  of the University of Illinois counselors except for

12  this and that is that when you all go back into the

13  jury room and you are thinking about whether or not

14  Brendt Christensen deserves to die, let me -- I want

15  you to ask yourselves the question:  Does someone

16  deserve to die who went into a counseling center and

17  told them all of these thoughts and confessed to

18  them that he was fantasizing about it?  Does someone

19  who goes for help that recognizes that they are

20  having problems, who repeatedly over the years --

21  this is a lengthy history of him trying to get the

22  help that he needed and he didn't.  And it's too

23  late.  But you don't execute somebody who does that.

24  Somebody who tries.  And somebody who makes a

25  good-faith effort.  And somebody who discloses

1  something to a group of people that maybe could have
2  helped him.  That's why we are asking you to
3  consider this.  Not because the university is wrong,
4  not because of the errors that they made, but
5  because Brendt Christensen doesn't deserve to be
6  executed after the struggle that he had and the
7  effort that he made to stop himself.

8         Alcohol and drugs continued to ruin his
9  life.  He couldn't stop drinking; he didn't stop
10 drinking, very similar to his mother and other
11 members of his family, Uncle Mark and grandparents
12 and everybody else.  He couldn't kick it.  His
13 marriage did fall apart.  He was emotionally crushed
14 by Michelle, and not because Michelle did anything
15 to him, not because it was her fault, it's not.
16 Marriages break up.  But you heard Michelle testify
17 she never saw him cry until she separated from him,
18 until she said, "I want a separation," and then he
19 broke down sobbing.  That was the first time that
20 she'd ever seen it because that's how much it
21 affected him.

22        If you look back at her testimony and the
23 testimony of everybody in his family and everyone
24 that you heard from his side, it is not difficult to
25 imagine how that affected him because they literally

 1  didn't maintain contact with anybody else.  His
 2  family loves him and he loves them but Michelle was
 3  his life.  Michelle was his partner.  She was his
 4  best friend and they had this totally isolated
 5  relationship for years and years.  And all of a
 6  sudden, because of his drinking, because of his
 7  downward spiral and his falling off the edge, it
 8  didn't last.  And you can see that even though
 9  Michelle, she hates him for what he did, but she
10  loves him for who he was and the kind of person that
11  he was in her life for all of those years.  It's not
12  hard to see how losing that relationship at the time
13  under the circumstances with everything else going
14  on would cause him to spiral.
15          UICC didn't follow up with him, Rosecrance
16  was never notified to follow up with him.  So
17  because he was feeling better that day, when he
18  walked into the Counseling Center, maybe he thought,
19  well, feeling better today, I think I can go home
20  and I'll be okay.  And clearly he was not.  And he
21  met Terra, who he called Bunny.  And, you know, this
22  is, this is a situation that is the better storm of
23  circumstances all coming together at the wrong time.
24          He was introduced to alternative practices,
25  alternative sexual practices that he'd never tried

SENTENCING -- July 17, 2019                138

1  before, he never was exposed to before, and he

2  utilized that relationship to express these

3  thoughts; thinking with the woman on FetLife, maybe

4  it's safe if I do it this way, maybe if it's

5  consenting adults, it's okay, maybe I won't have the

6  urges back --

7          MR. MILLER:  Your Honor, she is --

8          MS. POLLOCK:  It's argument, Your Honor.

9  Please.

10         MR. MILLER:  She is saying this is -- so as

11  long as it's clear she is just arguing what she

12  suspects the defendant was seeking.

13         THE COURT:  I think that's clear.

14         Go ahead.

15         MS. POLLOCK:  Thank you.

16         It could have been the safe way for him to

17  explore these urges, but ultimately it was not

18  enough, and ultimately he broke anyway.  And

19  ultimately June 9th happened.  And Yingying is gone

20  as a result.

21         Now I want to talk about Brendt's behavior

22  in jail.  And I do want to make it clear, again, to

23  you that the county jail facility where Stuart Inman

24  works is, it's a jail.  It houses a couple hundred

25  people.  Prison is different.  And Brendt is not

 1  going back to county jail every again.  No matter
 2  what you decide, he is going to prison.  And he is
 3  going to a cage.  And he is going to lights on all
 4  the time.  And he is going to not the privileges
 5  that Stuart Inman is able to provide in the county
 6  jail.
 7          THE COURT:  All right.  I'm just asking you
 8  to move on.  There is no evidence of that in -- for
 9  the jury to make that determination.  And they don't
10  need to consider -- they can consider what he had,
11  but there is nothing to consider where he is going.
12  Move on.
13          MS. POLLOCK:  You heard testimony from the
14  correctional officers, all of whom testified -- you
15  know, Mr. Nelson says, well, he has an incentive to
16  behave because he knows that if he comes into court
17  and he was bad, that you guys are going to find out
18  about it.  But you heard the officers testify Brendt
19  was basically a perfect inmate with that one
20  exception.  Everyone else in that county jail, all
21  of whom are also facing trial, some of whom could
22  be, you know, the high profile Cook County inmates,
23  the ones from the big cases in Chicago, the federal
24  cases in Chicago, the ones that Stuart Inman houses
25  in administrative segregation because they fight and

SENTENCING -- July 17, 2019                  140

1  they can't behave and they don't follow the rules.

2          MR. MILLER:  There isn't any evidence of

3  that.

4          THE COURT:  Is there evidence of that?

5          MS. POLLOCK:  There is, Your Honor.  There

6  is administrative segregation in Livingston County

7  Jail where the problem people go.

8          THE COURT:  He didn't give details of all of

9  these people like you're doing.  So reasonable

10  inferences are fine and you're supposed to draw them

11  from the evidence but, let's --

12          MS. POLLOCK:  Let me ask this then.

13          THE COURT:  -- stay in what the evidence

14  was, all right?

15          MS. POLLOCK:  A county jail would not have

16  administrative segregation unless there were problem

17  inmates.

18          THE COURT:  Okay.

19          MS. POLLOCK:  And the problems that are

20  caused -- you saw the 100, 200, 300 level

21  violations, including murder, sexual assault,

22  stabbing, possession of shanks; all of those things

23  that you saw.  There are people in the county jails

24  that do those things which is why they have those

25  rules, which is why they have administrative

 1  segregation where they put them so that they can't
 2  hurt anybody else.  So all of the people who are in
 3  that pretrial detention facility, who are in
 4  administrative segregation, they have the same
 5  incentive Brendt has.  They are facing trial.  They
 6  can't follow the rules because they are dangerous.
 7  He can and did as you saw from the testimony of
 8  every single correctional officer that we put up
 9  there.  I know that got a little tedious and I'm
10  really sorry that you had to hear it five times.  We
11  had to do it five times because you needed to be
12  aware of the fact that Brendt has been perfect in
13  custody with that one exception of standing in front
14  of a window inappropriately.  No disciplinaries, no
15  weapons, no threats, no threats to stop, no threats
16  to prisoners, no criminal activity, totally
17  respectful to all male officers and female officers
18  at the jail.
19          Superintendant Inman testified, never
20  received a report that he has ever been
21  disrespectful in the 20 plus months, almost two
22  years that he was incarcerated at Livingston County
23  Jail.  Complied with every single rule.  Low
24  maintenance detainee and did everything expected of
25  him in the handbook.  Officers Burns, Keesha Burns

1  who had a really nice hair color; when she was on

2  that stand said, "I didn't have any problems with

3  him.  Never said or did anything inappropriate.

4  Never disrespectful.  Never used profanity.  Never

5  engaged in threatening behavior.  Never had to write

6  him up.  Never refused to follow a command or an

7  order."

8          Melvin:  "Well behaved.  Never an issue.

9  Never seen him make a violation."

10          Niles, Mr. Experience, who came from maximum

11  security Stateville Prison in Illinois to help Stu

12  Inman run his county jail.  "Never had a problem

13  with Brendt Christensen."

14          What did he do?  He slept, he read, and ate,

15  hung out; and that's pretty much it, and talked to

16  his family a lot more than the jail calls that we

17  heard in court.

18          When you consider the appropriate sentence,

19  you need to remember this because you cannot be

20  afraid that Brendt Christensen is going to be

21  released, because he isn't.  Because in federal

22  prison "life without release" is "life without

23  release."  Parole was abolished in federal court.

24  There is no parole.  Life without release.  He is

25  leaving in a coffin no matter what you do.  And I

1  would submit to you that the minimum sentence of

2  life; never, ever touching your family again; never

3  being out in public; never doing anything you want

4  to do when you want to do it; this is the last time

5  that he's going to wear clothes that are not given

6  to him by a prison; the last time that he is going

7  to eat or drink anything at a table that is not in a

8  prison because he is not getting out.  So don't go

9  in that jury room and think that you're worried that

10  he is going to be released, because he is not, no

11  matter what you do.

12        So why, why after all the emotionally

13  horrible things that you heard, that the government

14  played those tapes and painted him in this light,

15  why is life enough?

16        MR. MILLER:  Your Honor, this appears to be

17  a proportionality argument which the Court --

18        MS. POLLOCK:  It is not.

19        THE COURT:  Let's move on and see.  Go

20  ahead.

21        MS. POLLOCK:  The worst of the worst isn't

22  somebody who goes into a counseling center and asks

23  for help.  The worst of the worst isn't someone who

24  goes to a doctor and asks for help.  The worst of

25  the worst is not someone who tells his wife about

the horrible thoughts he's having.  The worst of the
worst is not someone like Brendt Christensen whose
entire trajectory of his life is law abiding,
nonviolent and good up until very recently.

He had tons of promise.  He recognized when
he was having the inappropriate thoughts and
obsessions that he was and he did tell people and he
tried to stop and he couldn't.  They didn't stop.
His drinking didn't stop.  And he committed this
crime.  And now his life is in your hands.

And the determination of the sentence --
this is the actual instruction that you're going to
be faced with.  You have to weigh, as we talked
about earlier, aggravators and mitigators.  And
there are three options on the jury form, on the
verdict form for you to fill out.  The first one is
that you unanimously find, all 12, the age factor,
intent factors, statutory aggravators all have been
proved beyond a reasonable doubt; and that nothing
in the defendant's mitigation case can outweigh
that.

Second option is that you all get together
and agree, after that whole same process, that
unanimously the mitigators outweigh the aggravators
and you want him to spend the rest of his life in

1  prison.

2         And there is a third option, which is if you

3  cannot reach an agreement, you do that option.

4         Now, you all have the duty to deliberate

5  with each other.  You are all individual judges, but

6  you do have the duty to talk and to hash out what

7  each of you believes is the most important thing

8  from this case and weigh it individually and then as

9  a group try to reach that decision.  But the

10 instructions tell you that you must never surrender

11 your honest convictions about whether or not you

12 think the sentence of life or death is appropriate

13 just to get to unanimity because you each have an

14 individual duty and you have all sworn an oath to be

15 true to your convictions even after deliberation.

16 If you deliberate and you cannot agree, then that is

17 okay.  The judge is okay with it, and the law is

18 okay with it.

19        You all have the individual obligation to

20 decide this case for yourselves and the reason is

21 that you are all going to walk out of here after

22 this trial is over, after you're done deliberating,

23 you're all going to go home, thankfully, finally

24 back to your jobs, back to your lives.  And I assume

25 that this will have been a life changing experience

SENTENCING -- July 17, 2019                146

1  for all of you as it has been for us.

2          I think that the weight of that decision is

3  a heavy one and it's one that needs to be very

4  carefully considered because you're going to walk

5  out of here and you're always going to remember how

6  it worked and how it went and what you did and how

7  you felt.  And it's --

8          MR. MILLER:  I am going to object to the

9  line, Your Honor.

10          THE COURT:  She's concluding.

11          Go ahead, Miss Pollock.

12          I think she is concluding.

13          MS. POLLOCK:  Julie and Bob and George and

14  I, we have stood with Brendt for almost two years.

15  And when you go to the jury room, you need to

16  remember he's a whole person.  He is not just the

17  worst thing he ever did.  He is a human being.  And

18  if you see -- if we have been able to show you in

19  any way his humanity, you cannot sentence him to

20  death.  Thank you.

21          THE COURT:  I'm going to have the rebuttal

22  now, and then we will -- do you want to take a break

23  or do you want -- or let's go.  Let's go.

24  Mr. Miller, if you're ready, let's go.

25          MR. MILLER:  Very good.

1          Jury all right with that?

2          Okay.

3          MR. MILLER:  Everyone is okay?

4          What the defendant did to Yingying, that

5   extraordinary young woman, it's so unthinkable and

6   so inhumane and so senseless that it's natural to

7   think either it isn't true or to look for an

8   explanation, to think that something must be to

9   blame or something must be wrong with the defendant;

10  how else could somebody do this.

11         But evil does exist.  It exists in this

12  world.  And what the defendant did to Yingying was

13  evil.  There's no other credible explanation.  And

14  despite this narrative that we've heard, which I'm

15  going to get into, was not supported by the evidence

16  or the facts.  Even if it were true, the defendant's

17  crime, the aggravating factors, cries out for the

18  maximum punishment in this case.

19         The defendant discussed many things in his

20  closing argument.  I tend to respond to as many as I

21  can but I don't have time to respond to all of them.

22  But before I do, I want to focus you on your actual

23  task here.  The defendant said this task is similar

24  to whether you decide to have a child.  That's not

25  what this task is similar to.  This is a court of

 1  law in the United States.  And we follow the rule of
 2  law.  And as jurors, that means following the
 3  Court's Instructions, and that means following all
 4  of the Court's Instructions.  And the Court's
 5  Instruction in this case specifically tells you that
 6  you should deliberate with the goal of reaching
 7  agreement, whatever that might be; whether you think
 8  it's a life sentence, whether you think it's a
 9  sentence of death.  Your goal is to reach an
10  agreement.  And it says in there, and it wasn't
11  highlighted by the defense, "Don't hesitate to
12  re-examine your own views in light of other jurors'
13  views."  So I urge you to follow those instructions
14  when you go back to the jury room.
15          It was discussed that what decision you
16  would make, and you have to make that decision, but
17  ultimately it's a decision you make collectively
18  because it has to be unanimous.  Make a collective
19  decision whether you believe a sentence of death is
20  appropriate or a sentence of life is appropriate.
21  So please deliberate together with the goal of
22  reaching an agreement.  And you have already done
23  that in this case.  We have every confidence that
24  you will do that in this stage of the case as well.
25          And while you deliberate with a goal towards

1 reaching agreement, you have a great tool at your

2 disposal.  I don't know if you play cards.  I

3 sometimes like to play Euchre.  Some people much

4 more advanced play Bridge.  But those games have

5 something called a "trump" card.  And when you play

6 the trump card, it takes all of the other cards.

7 And you have a trump card as jurors.  And that trump

8 card is common sense.

9         The judge has already instructed you on

10 that, to apply your common sense.  And when you go

11 back in that jury room and you deliberate with the

12 goal of reaching a unanimous verdict, play those

13 trump cards, play that common sense.

14         As I said, I won't have time to respond to

15 everything the defense said, but you will when you

16 discuss those issues that she raised; play your

17 common sense.  Play that trump card.  And see if the

18 narrative that was presented to you passes the

19 common sense test as you're discussing the

20 aggravators and the mitigators.

21         But before I get into the defense's

22 mitigators, let me note this:  Even if everything

23 that the defense argued was supported by the

24 evidence, we submit that a sentence of death is

25 still the appropriate verdict.

1           Even accepting that narrative, it's

2   undisputed that for months prior to her murder, the

3   defendant thought about, researched, and planned to

4   murder someone.

5           It's undisputed he is six foot tall over 200

6   pounds; Yingying was about 5'3" and 100 pounds.

7           It's undisputed that he kidnapped her in his

8   Saturn Astra and took her back to his apartment

9   against her will.

10          It's undisputed he assaulted her in his

11  bedroom causing her blood to run down the wall to

12  the carpet to the tack strip below.

13          It's undisputed that he hit her in the head

14  with a baseball bat resulting in her DNA later being

15  found on that bat.

16          It's undisputed that he killed her and then

17  disposed of her body.

18          Twenty days after murdering her, he attended

19  the Memorial Walk where he bragged about killing her

20  and bragged about wanting to kill again.

21          Her remains have never been found even two

22  years later.  The impact on her family has been

23  profound.

24          None of those arguments.  None of those

25  mitigating factors changed a single one of those

facts.  And I would suggest that after weighing all

of the mitigating and aggravating factors, this

undisputed conduct alone, because a single

aggravator can, you can find, warrant a sentence of

death; that these together do warrant that sentence.

        But let's address some of the things that

were raised by the defense here.  And as the judge

instructed you, the attorney's questions and

arguments are not evidence.  The evidence had to

come from that witness stand.  So I want to point

out a few things that I had written down.  I'm sure

that you will remember many more that was said by

the defense.

        She talked about Mr. Nelson said the

defendant was drunk.  He actually talked about just

using alcohol.

        She said they didn't test the kitchen sink.

As you recall, they actually did find some DNA in

the sink and that was an issue at trial.  They were

-- defense was trying to point out maybe he didn't

clean it that well.  Well, the test scene was -- the

sink was searched on June 30th.  The crime had

happened on June 9th.  The defendant had clearly

cleaned the sink, but then he was back in the

apartment with his wife, so after that DNA would get

1  in the sink, but it was a suggestion during trial
2  that, oh, he must not have cleaned the bathroom that
3  much because DNA was found.  Well, it was found
4  after the bathroom had been cleaned.  But the
5  statement that they didn't test the kitchen -- I'm
6  sorry, she was saying -- yeah, the kitchen sink.
7  They didn't test the kitchen sink.  They tested the
8  sink in the bathroom.  She talked about the
9  defendant going to the hospital with his friend.
10 There was no testimony of that during their case.
11 She said the records show that he got counseling in
12 January of 2016.  There is no records that show
13 that.
14        She talked about him talking about ripping
15 out his IV; telling his father things about the
16 incident when he was 15.  I don't recall evidence on
17 that.
18        She said he has something about PTSD but
19 there has been no evidence presented that he had
20 PTSD.
21        He said that he is going to a BOP where he
22 is in a cage.  There is no evidence of that at BOP.
23        And she testified that segregation is just
24 for the worst of the worst.  And we actually, I
25 believe, maybe even had some testimony that people

1  also get into segregation, for example, Charles Hill

2  when they are cooperating and they need to be

3  protected.  There is -- also people can go to

4  segregation if they are a suicide risk.  So there's

5  other reasons someone might be in segregation.  And

6  a reason that the defendant wouldn't be in

7  segregation.

8          Now, the defendant argued multiple factors,

9  49 factors that you will review when you're back in

10  the jury room, that he claims mitigate in favor of

11  the minimum sentence of life imprisonment.  As the

12  judge instructed you, it's not the number of

13  mitigators or aggravators; it's their weight that

14  you have to look at.

15          I would submit to you that the weight of all

16  of the defendant's mitigators combined just does not

17  equal the weight, frankly, even a single aggravating

18  factor in this case.

19          And the defense has said that they are not

20  excuses, they are not justifications; that's up to

21  you to determine what the defense was arguing.  But

22  before I address these specifically, I do just want

23  to discuss a couple of what I determine logical

24  fallacies regarding some of those mitigators.  For

25  example, if a mitigator applies, regardless of

 1  whether you enter a death sentence or a life

 2  sentence, then we would suggest that it doesn't

 3  mitigate against a death sentence any more than it

 4  mitigates against a life sentence --

 5          MS. BRAIN:  We object to that, Your Honor.

 6  It's a misstatement of the law.

 7          THE COURT:  How?

 8          MS. BRAIN:  Because he's saying if a

 9  mitigator applies, no matter what the sentence is,

10  then it's not a mitigator, but it absolutely is a

11  mitigator and it's --

12          THE COURT:  He is conceding that it might be

13  a mitigator; he is just saying this it doesn't

14  mitigate.  He is making the characterization.

15          MR. MILLER:  It is entitled to no weight.

16  When your weighing process --

17          THE COURT:  You may proceed.

18          MR. MILLER:  I will give you an example.

19  The one is that certain family members love him and

20  are willing to support him during a life sentence,

21  but as they testified, they also love him and will

22  support him no matter what.  They love him and

23  support him regardless of the sentence that he gets.

24  That being the case, we would suggest that's

25  entitled to no weight in favor of a life sentence

1  versus a death sentence because it would apply
2  equally in both situations.
3        Another one is that if a factor applies to
4  every single capital defendant, then I would submit
5  to you it's not really an argument for this
6  defendant; it's an argument against capital
7  punishment, which is not to be made here.
8        Obviously, you've all told the Court that
9  you can vote to impose a sentence of death if you
10 believe that it is warranted.  And, for example, one
11 of those is that all lives -- mitigating factor that
12 all lives are valuable.  That's true.  We don't
13 disagree with that.  In fact, we argue that because
14 all lives are valuable that we have a death penalty
15 saying how much we value the life of the victim.
16 But again that would be true in any case, so I would
17 suggest to you that he is not entitled to any
18 weight, actually, when you weigh that mitigating
19 factor.
20        A third fallacy, there is a Latin name "post
21 hoc ergo propter hoc," basically says that just
22 because event Y followed event X, doesn't mean that
23 event Y caused event X.  But that's a common fallacy
24 we see.  For example, the one I want to use, and I
25 think that we all agree, the fact that the defendant

1  murdered Yingying Zhang after an earthquake in

2  Alaska in the 1960s, doesn't mean that the

3  earthquake caused the defendant to murder her.  The

4  defense isn't saying that.

5        MS. BRAIN:  Your Honor, we object to that.

6  There's no requirement that our mitigating evidence

7  be shown to have caused the crime in this case.

8        THE COURT:  And the jury is being instructed

9  that the mitigating factor does not have to be

10 connected to the crime.

11       Go ahead, Mr. Miller.

12       MR. MILLER:  Absolutely.

13       Those are -- they can put in 50, they can

14 put in a hundred mitigating factors; that's up to --

15 that's up to the defense.  And they don't have to be

16 connected to the crime.  But you have to determine

17 how much weight to give those mitigating factors.

18 And I would suggest there's been some implication

19 here that, for example, the defendant having night

20 terrors as a child or because he was drinking, that

21 that somehow because it happened before he killed

22 Yingying Zhang, there is some connection there.

23       MS. BRAIN:  Objection.

24       MR. MILLER:  I guess the defense is agreeing

25 that there is no connection there.

 1          MS. BRAIN:  I object to characterizing my
 2    objections.  But there is no requirement there be a
 3    nexus.  It's improper, disparages mitigation by
 4    saying it has nothing to do with the crime; that's
 5    not the law.
 6          MS. POLLOCK:  *Tennard v. Draetke*, Your
 7    Honor.
 8          THE COURT:  I understand that.  And the
 9    jury's being instructed that the mitigating factor
10    does not have to be connected to the crime.  I
11    understand Mr. Miller's argument to be that to the
12    extent you're arguing or you're trying to
13    characterize a reasonable inference that there is a
14    connection to the crime, he's simply, I think,
15    arguing there isn't.
16          Go ahead.
17          MR. MILLER:  Precisely correct.
18          And there is simply zero evidence that most
19    of these events that we've talked about had any
20    connection to the defendant's crime in this case.
21    And it would be based on this common logical fallacy
22    that, oh, because this happened afterwards, it must
23    have been caused by this desire to want to explain
24    away evil actions.  So if you will keep that in mind
25    as you address the mitigators, because the fact is

 1  we all know as adults we are responsible for the
 2  actions that we take.
 3          In fact, the defendant himself pointed that
 4  out, I believe, during Michelle Zortman's testimony.
 5  I think the question asked of her was you packed
 6  your own luggage like a big girl.  I think that the
 7  implication was to say that Michelle Zortman made
 8  her decision as to what clothes she was going to
 9  wear even though the defendant asked her what
10  clothes to wear.  And that's a good point because as
11  adults we are responsible for the decisions that we
12  make.
13          Now, remember as you evaluate these
14  mitigators, too, that the defendant's goal in this
15  case was not only to kill, but it was to get away
16  with it so that he could kill again.  That's one of
17  the reasons he extensively covered up his crime so
18  he could do it again.  He killed in this case, and
19  we've said it, he killed for sport.  He fashioned
20  himself as a serial killer, and a serial killer
21  needs to keep killing.
22          In fact, he specifically told Tom Miebach he
23  not only thought about murdering someone but how to
24  get away with it.  And he later told Terra Bullis
25  that it would be easy to get away with it.  So as I

1  address these many arguments, we should look at them

2  through that lens as we are looking at the

3  defendant's conduct of his attempts to get away with

4  the murder.

5          Now, the main narrative I want to address

6  here is this narrative that defense said in opening,

7  that the defendant had fought against his demons and

8  lost.  We heard that repeated here in closing

9  argument that there was this downward spiral.  I

10  would suggest to you and submit to you that the

11  evidence doesn't support this.

12          He certainly sought help for himself when

13  his wife said that she was going to leave him.  He

14  didn't want to lose her.  Didn't want to lose

15  control of her.  But despite numerous opportunities,

16  the defendant never sought help for these dark

17  thoughts that, as they described it, against his

18  demons.  In fact, as I'll explain, the evidence

19  shows that it's just the opposite.  He was

20  entertaining those thoughts.  He was entertaining

21  those demons.

22          And second, the defendant claimed that he

23  shouldn't be held responsible for his admissions to

24  Terra Bullis because they aren't true and they can't

25  be proven, and I'll address that as well to show

1  that in fact the evidence shows that those

2  statements were true.

3         So, first, let's discuss that narrative that

4  he was fighting and looking for help for his

5  murderous desires.  Let's not confuse that with what

6  they call the demon, his desire to kill, with other

7  demons they put evidence in: symptoms of depression,

8  symptoms of anxiety, thoughts of suicide, sleeping

9  issues, alcohol abuse.  I would submit to you that

10  those claims, as we'll see, are overstated by the

11  defense and are not supported by credible evidence;

12  he didn't fight against his desire to kill.  And

13  regardless, these facts don't mitigate against the

14  sentence of death.

15         So, let's look at some of the things.  One

16  of the mitigators the defense has alleged, his

17  extensive history of mental illness on both his

18  mother's and father's side of the family.  We had

19  testimony from his mother and his father, a couple

20  of uncles to this.  We had no records on this.  We

21  had no medical professionals testify to this.  They

22  stressed the history of suicide in his family, but

23  on cross-examination we brought that out, again, not

24  to minimize that, but one was a 90-year-old

25  grandfather who had just stopped eating.

SENTENCING -- July 17, 2019          161

1        MS. BRAIN:  Objection; misstatement of the

2   evidence.

3        THE COURT:  The jury heard the evidence.

4   You will decide.  These are arguments of counsel.

5   You will decide what the evidence is, if you believe

6   otherwise.

7        MR. MILLER:  The other grandfather was also

8   elderly at the time.  I think that he was -- in the

9   70s was one, I think the 90-year-old grandfather.

10  He was in the 90s.  And so most of the testimony on

11  that was somewhat brief and sketchy.

12       We definitely heard about the cake incident.

13  I'm not sure exactly what that related to, but I

14  would suggest that the evidence does not show even

15  by a preponderance of the evidence -- by a

16  preponderance of the evidence standard that this was

17  extensive mental illness history in his parent's

18  family.  In fact, when the defendant later went to

19  the University of Illinois Counseling Center, he

20  didn't tell them about this alleged family history

21  of mental illness.

22       He also claims his mother suffered with

23  severe suicidal depression, anxiety, and was a

24  chronic alcoholic growing up.  There was some

25  testimony.  But it was interesting, as you probably

1   realize, the testimony from the defendant's father

2   and then from the best friend of his mother; his

3   mother actually didn't testify too much about this.

4   She testified some that she had gotten sober, but

5   she didn't testify about suicidal depression.  And

6   in fact her brother testified she -- he wasn't aware

7   at all of his alcoholism or depression.  Again,

8   there was no records, no medical testimony or

9   anything.

10          And we do know that both of -- the

11  defendant's father and mother would do anything for

12  him, as they came in here and testified; that Deb

13  Mitchell, her friend's testimony, did paint it

14  seemed to be a grim picture.  But then we find out

15  when her son testified that she allowed her son to

16  spend the night over there, more than her son spent

17  the night over at her house.

18          MS. BRAIN:  I'm going to object.  This is

19  beyond the scope of rebuttal.  We have a statutory

20  right to respond to arguments that the government

21  made; that's the reason they go first and we go

22  second.  And of course they get to rebut, but this

23  is arguments that were never addressed in the

24  initial opening statement so we've no opportunity to

25  come back and --

 1          THE COURT:  Are you saying Ms. Pollock did
 2   not address all of your mitigating factors in her
 3   closing?
 4          MS. BRAIN:  Right.  She addressed mitigators
 5   but --
 6          THE COURT:  That's what these are.  He is
 7   responding to mitigating factors, as I am hearing
 8   it.
 9          MS. BRAIN:  She didn't address like Deb
10   Mitchell.  She didn't address a lot of the details
11   that we have responses to, and we are not going to
12   be able to make.
13          THE COURT:  These are mitigating factors
14   that as a whole are being presented to the jury to
15   make findings on.  I think the rebuttal is proper.
16          Go ahead, Mr. Miller.
17          MR. MILLER:  Thank you, Your Honor.
18          In fact there was no mental health
19   professional who testified regarding that.  They
20   also claim in a mitigator.  You will see -- again, I
21   won't have time to go through all of these.  The
22   defendant has a long history of brain injury and
23   dysfunction.  I think you might have a medical
24   record when you have a brain injury.  Not a single
25   one was presented.  Same is true to the claims of

1  dysfunction.  Again, it's clear to think, hey,

2  somebody who did this, something must be wrong, but

3  we have simply no evidence of that.

4        The claims also then -- one of the

5  mitigators, the symptoms of depression and anxiety

6  throughout his life and medication for anxiety and

7  depression as a teenager.  Again, there were no

8  medical records or anything presented regarding

9  this.  His friend, Andrew Kieper didn't know

10  anything about him either abusing alcohol or any

11  mental health issues.

12        In fact, if we look at the record that was

13  shown regarding that childhood, it was a pretty good

14  childhood.  He was in a gifted program, with a

15  supportive teacher, had to have an IQ to get into

16  it.

17        His parents didn't divorce until 2013, which

18  was over four years after he left the home, which

19  put him in the lucky 50 percent that had at least a

20  mom and a dad in the home growing up.  He was 24

21  years old by the time that happened; and he told his

22  friend, Andrew Kieper, it doesn't bother him.

23        Now it's unclear what his relationship with

24  his brother Matt was like.  But his sister Andrea

25  testified that they never fought, although Deb

1  Mitchell said that Matt poked at the defendant.

2           The defendant certainly learned how to play

3  the piano.  His mom played the cello.  We had

4  evidence he was on a junior high school track team

5  that won a conference championship.  He did other

6  sports.  He did well at school.  He joined the Cub

7  Scouts.  So, certainly that evidence would seem to

8  suggest these symptoms of depression and anxiety

9  that were throughout his life did not appear to at

10 least show themselves during his childhood.  So we

11 haven't seen that evidence.  And we have this

12 evidence, that it's been brought up a couple of

13 times, this alleged incident when he was 15 years

14 old where he allegedly ran into the side of a

15 vehicle.  I believe the only evidence on this was

16 from his mom and his dad, neither were present when

17 this happened.  They testified they came back and

18 they saw him but neither of them saw him jump off a

19 deck or run into a vehicle.  They did testify that

20 he was there.  The doctors thought he was maybe on

21 PCP.  His mom testified before she had left he had a

22 fever.  He went to the hospital.  They released him.

23 They said they did toxicology screen.  We didn't

24 have any records of this toxicology screen.  We

25 didn't have any medical professional or medical

1  records on that.  According to the parents, they --
2  the doctor said that he's okay.  And let him leave.
3  So there is just really just no evidence of what
4  happened beyond the parent seeing him on the floor
5  when paramedics thought perhaps that he was using
6  some kind of drug.
7        We also have these claims that he struggled
8  with addiction to alcohol and prescription drugs
9  beginning in college.  I don't recall any testimony
10  as to that in college.  Again, Andrew Kieper, who
11  was his friend, testified that he never saw the
12  defendant drink to excess in college.
13        Again, no records or other evidence that
14  seemed to back that up.  In fact, Michelle Zortman,
15  his wife who testified, talked about his drinking
16  later but this is beginning in college in --
17        MS. POLLOCK:  Your Honor, objection;
18  mischaracterizes the evidence.  Michelle Zortman did
19  testify about his alcoholism in the beginning of his
20  drinking in college and this is going way beyond the
21  scope.
22        THE COURT:  Mr. Miller.  There was some
23  testimony on that.
24        MR. MILLER:  Sure.
25        We also have the discussion of PTSD.  Again,

1   no medical professional or any actual diagnosis of

2   PTSD.  So why are these claims here with so little

3   evidence?  I think we saw that -- right? --  to lay

4   this groundwork for this narrative that he was

5   struggling with these demons when he got into 2016

6   and was on a downward spiral.  We saw the graphic

7   that showed a straight line, but the testimony that

8   we saw when he was in college was much more of an up

9   and down than a straight line.

10          MS. POLLOCK:  Your Honor, I would like to

11  register an objection with regards to the comments

12  about the lack of evidence being presented.  The

13  defense has no obligation to present that evidence

14  and I would like a curative instruction that the

15  jury is to consider the evidence presented by the

16  witnesses only.

17          MR. MILLER:  They have an obligation to

18  prove their mitigators by a preponderance of the

19  evidence and I'm arguing that they did not.

20          MS. POLLOCK:  The defense has no obligation

21  to do that, Your Honor.

22          THE COURT:  And the jury has been instructed

23  as to burdens on both sides, and the defense has no

24  obligation to present any evidence.  And if they

25  choose to present evidence on mitigators then the

1  burden is by a preponderance of the evidence and

2  that has been set forth in the jury instructions.

3  And I think Mr. Miller is commenting on what he

4  thinks is a lack of proof on that evidence or those

5  mitigators.

6        Let's go forward.

7        MR. MILLER:  We know from his, again, his

8  friend Andrew Kieper testified that the defendant

9  was good at whatever he dedicated himself to.  So he

10 certainly took this when he came to the University

11 of Illinois to do physics.  And we know from Nadya

12 Mason who was his sponsor, his professor, that he

13 struggled in the fall of '14, did better, struggled,

14 then did better and struggled.  We know from others

15 during that time -- when we say "struggled," let's

16 be clear about this is.  For example, he signed up

17 for equipment and then wouldn't show up to use it,

18 which became a problem.

19       So by the spring of 2016 Nadya Mason had to

20 approach the defendant and tell him this isn't

21 working out; you don't seem to want to be for the

22 physics program.  I don't believe there was a

23 discussion of him spiraling downward, but there was

24 a discussion that he would leave the program and he

25 would instead get his master's degree.

1          And so while there has been some weight put
2   on his grades, those last two semesters, how did
3   someone who got straight As, and I think the record
4   showed As and Bs, which we learned, actually, when
5   you're in grad school is what you get if you show
6   up; you get As and Bs.  After that, in the fall of
7   '16 and spring of '17, he got Fs.  And the image
8   painted is one of someone spiraling down.  I would
9   suggest to you the evidence shows it was someone who
10  had checked out of the Ph.D. program.  They were
11  done with it.  They were now going to get their
12  master's.  He was going to get his master's no
13  matter -- as we found out, you can get Fs in all of
14  your classes and still get your master's.  So we
15  have someone that just didn't go to class and they
16  didn't show up to do their TA responsibilities.  And
17  they didn't return emails.  And so that's consistent
18  with Andrew Kieper saying that he was good at
19  whatever he dedicated himself to.  He was no longer
20  dedicating himself to his school work.  And this is
21  about the time that he began dedicating himself to
22  his dark thoughts, became dedicating himself to his
23  plan to murder someone.
24          And as we look at then the spring of 2017,
25  which led to the murder of Yingying Zhang in 2017;

1  we see this pattern that's taking place.  It is not
2  of someone who is seeking help for their demons, but
3  who is encouraging their demons.  I said that in the
4  guilt phase; "idle hands are the devil's workshop."
5  And that's what we see take place in the spring of
6  2017.  We see that he tells his -- Michelle Zortman
7  in December of 2016 about these desires.  She
8  doesn't respond well.  That's what causes ultimately
9  the breakdown of the marriage.  Now vise versa, the
10 breakdown of the marriage isn't contributing to the
11 defendant doing what he was doing; it was his desire
12 to kill that led to that breakdown of that marriage.
13         After she responds negatively, he doesn't
14 talk to her about that again.  That's not someone
15 who is seeking help; that is someone then who wants
16 to keep their ideas to themselves.
17         It's not then until we see this counseling
18 video in 2016, and that's what I want to address
19 here in this narrative, the idea is that he was
20 there seeking help and the Counseling Center somehow
21 did not give him what he deserved.  We believe that
22 the evidence shows to the contrary.  He went to that
23 Counseling Center and he ultimately met with three
24 different clinicians who saw him, actually saw him
25 and testified:  Felicia Li, Jennifer Maupin, and Tom

1  Miebach.  And remember these three witnesses were
2  the defendant's witnesses, called by the defendant.
3  They were not the prosecution's witnesses.  They
4  were each employed by the University of Illinois at
5  the time and they each testified that the defendant
6  came to them because his wife had told him she was
7  going to leave him.  He didn't go there because of
8  the dark thoughts.  He went there because his wife
9  was going to leave him and he claimed that the cause
10  of his wife leaving him was substance abuse.
11        Now, of course, this wasn't true information
12  he was giving to the counselors.  He knew that he
13  had told his wife in '16 about his desire to kill
14  and that's why she was now moving into this open
15  marriage.  But he told the counselors it was because
16  of his alcohol problems that his wife was leaving
17  him.  And he also didn't reveal to them that by that
18  point on March 21st, Michelle Zortman already had a
19  boyfriend and he already agreed to an open marriage.
20        And we know from his later texts with Terra
21  Bullis that he had various thoughts such as "I would
22  rather destroy humanity than fade away," but he
23  didn't share those thoughts with the counselor; if
24  he was looking for help, that would have been a time
25  to have shared those thoughts with the counselor.

1  In fact, he lied to the counselors and said that he
2  was done; "I'm done with those thoughts."  And
3  there's a reason for that as we look at this.  He
4  knew that the information that he was told, the
5  information that he told the counselors was
6  confidential.  It wasn't going to go somewhere else
7  unless he had a present intent to harm someone.  He
8  said that on the tape.  "I know that I'd be stupid
9  to tell you this if I still had these thoughts
10 because you would have to tell someone."  So he knew
11 that these statements weren't going to go anywhere
12 else and he knew, in fact, it could even mean
13 involuntarily being hospitalized, which he obviously
14 didn't want, because he didn't even want inpatient
15 treatment.  So he was not there to seek help for
16 these homicidal ideations.  In fact, he had gone to
17 a counselor with Michelle the year before, his wife,
18 Michelle Zortman, when he had soured on the marriage
19 and it put the marriage back on track.
20       And so, he was there because he was about to
21 lose his wife.  She was now seeing somebody else.
22 To go to counseling might be a way to get his wife
23 to keep from leaving him.  It was not until 40
24 minutes into that video as -- when the counselor,
25 Carin Molenaar, she then, to give her credit here,

1  this student intern brought it up with the
2  defendant.  She mentioned it.  He said -- he started
3  out by saying, "I wasn't going to talk about this."
4  And then he talked about it as if it was in the
5  past.

6         Nonetheless, I submit to you, the counselors
7  did a good job of identifying a possible risk in
8  identifying steps to minimize that.  They called --
9  the defendant was supposed to call the next day, as
10 you recall.  He didn't.  So, Felicia Li called him,
11 and then she looked to set up an appointment with
12 him.  He said that he's feeling better.  There is no
13 sense of urgency and said that he would come in the
14 next week, and so they scheduled an appointment for
15 the next week.

16        Now before he came in though to meet with
17 Jennifer Maupin, who was with the alcohol and drug
18 counseling, she actually pulled in Tom Miebach, who
19 is the risk assessment counselor.  So they took that
20 step, but the defendant wouldn't have known that at
21 the time.  He believes he is coming in for an
22 alcohol and drug assessment and he meets with
23 Jennifer Maupin and he tells her that he is doing
24 better and actually says that he has been abstaining
25 from any alcohol or drugs now for a good amount of

1  time.  But after she meets with him, then she walks

2  him down the hall to meet with Tom Miebach.

3        And so if the defendant truly wanted help

4  for his homicidal thoughts now was the time.  He was

5  meeting with somebody, given a one-on-one session

6  with somebody who is specialized in this.  And

7  because of confidentiality, unless he obviously

8  intended to hurt someone at the time, admitted that,

9  then it would have remained confidential, but he did

10  the exact opposite of someone who is seeking help,

11  right?  He told them he didn't have any current

12  thoughts and he -- and earlier with Jennifer Maupin,

13  denied any -- I'm sorry -- voluntary hospitalization

14  or inpatient treatment.  In fact, had refused even

15  to go to AA.

16        So he knew when he left there from that

17  treatment that he could still go forward with his

18  plans.  The defendant knew that.  If he wanted help,

19  it was there for him.

20        Nonetheless, both counselors still followed

21  up with him after that meeting.  Jennifer Maupin

22  referred him to Rosecrance, a long-term

23  comprehensive mental health facility.  He didn't

24  take any action on that, and Tom Miebach scheduled a

25  follow-up appointment with the defendant for the

1   next week.  But he ended up never meeting with the

2   defendant.  Instead the defendant filled out this

3   CCAP form on April 6th that we saw where his scores

4   showed they dramatically improved in every category

5   other than eating disorders.  And he had a score of

6   zero for homicidal ideation.  If he wanted help, he

7   would have been honest when he filled out that form.

8   He didn't want help.  He never sought help for his

9   homicidal thoughts.  He sought help to keep his

10  wife; that's what he sought help for.  He never

11  reached out to Rosecrance.  No evidence that he ever

12  reached out to any other mental health professional.

13        And then those three counselors, you heard

14  them all testify.  They all testified they were

15  trying to help the defendant.  They understood what

16  the university policy was.  They understood that

17  there were confidentiality requirements based on

18  what he told them; they believed that their actions

19  were reasonable.  They weren't mind readers, they

20  couldn't predict the future.  That was the evidence

21  they presented.

22        But the defendant also presented Susan

23  Zoline who testified that they didn't give him the

24  services he deserved, and I will discuss this

25  because the defense has submitted that this is

1  something for you to consider as mitigation on

2  whether the defendant should receive a sentence of

3  death.

4       Now, as Judge Shadid has instructed you, you

5  don't have to accept Susan Zoline's opinions or

6  testimony.  You should judge her opinions and

7  testimony the same way you judge the testimony of

8  any other witness.  Consider her qualifications, how

9  she reached her opinions and conclusions and the

10 factors previously described in determining the

11 believability of testimony.  And I would submit

12 under these standards, her testimony criticizing the

13 counselors is not entitled to much weight compared

14 to the actual testimony of the counselors.

15      We look at employment, the counselors are

16 employed by a world renowned university, the

17 University of Illinois.  She was employed by a

18 for-profit university, a business that went out of

19 business of March of 2019.  The counselors were

20 practicing clinicians who saw patients.  Susan

21 Zoline hadn't actually seen and treated patients for

22 about 23 years.  Their expertise was related to

23 their testimony.  Jennifer Maupin did -- had

24 expertise in alcohol and drugs, Tom Miebach in risk

25 assessment.  Her expertise was in psychological

1  ethics.

2        If we looked at how they reached their

3  opinions, their opinions, the U of I counselors,

4  were firsthand.  They saw the defendant.  In fact

5  you saw the counseling video, as I believe it was

6  described by the defense, that he was desperate, but

7  you saw how he appeared in that video.  Did not

8  appear to be someone who was desperate.  He was

9  there, someone who was discussing that his wife was

10 leaving him.  They saw him.  Susan Zoline never saw

11 the defendant.

12        University of Illinois clinicians had

13 written reports of what they saw and observed.

14 Susan Zoline didn't write a report.  U of I

15 counselors were not paid additional for their

16 testimony here.  Susan Zoline would be paid over

17 $10,000 for her opinions and testimony during the

18 trial.  And she admitted that she would not have

19 been here testifying if she didn't give the opinion

20 that the defense needed her to give.  The timing,

21 the testimony of the clinicians was based on their

22 observations in March and April of 2017, whereas her

23 testimony, Susan Zoline's, was two years after the

24 event.  And that's where we get into the questions,

25 at least that I attempted to ask, on hindsight bias.

 1  University of Illinois clinicians had to base their
 2  decisions on what they knew at that time and what
 3  they observed from the defendant.  Susan Zoline
 4  based her opinions knowing that the defendant had
 5  later been charged with kidnapping and murdering
 6  Yingying Zhang.  And it's -- we call that Monday
 7  morning quarterbacking.  We all know that if you're
 8  engaged in -- if you're a coach and you have to make
 9  a decision or you're an official and you have to
10  make a decision on the spot, if it doesn't turn out,
11  well, you're going to face questions.  You're going
12  to face Monday morning quarterbacking; you have to
13  make that decision on the spot based on the
14  information that you have.  And that's what those U
15  of I counselors did.  It's much easier for Susan
16  Zoline to come in here and give the testimony that
17  she gave when she has hindsight bias.

18          And there are other things to look at for
19  general witness factors, the manner and demeanor of
20  testimony.  I submit to you the U of I counselors
21  testified earnestly.  Susan Zoline seemed to be
22  amused during her testimony.  The U of I clinicians
23  answered the questions regardless of which side were
24  asking them the questions.  Susan Zoline answered
25  questions directly for the defense.  Suggest many of

1  the answers on cross-examination didn't respond to
2  the questions that were asked.  U of I clinicians
3  didn't look elsewhere for answers.  As we know,
4  Dr. Zoline looked constantly to the defense as she
5  responded to questions from the government.  In fact
6  on redirect, there was a question of her, does it
7  give you pleasure to say that University of Illinois
8  clinicians could have done more?  Her answer was,
9  no.  And when she did it, she had a smile on her
10 face.  It did not seem to be consistent with her
11 answer.  Her testimony was not that of a neutral
12 expert but that of a what we determine a hired gun
13 hired by the defense.  For example, she testified
14 about what the defendant told Carin Molenaar that he
15 blacked out when he drank, but she did admit then on
16 cross-examination, he actually said that he blacked
17 out once in his life when he drank, that was the
18 first time he had Tequila.
19       There is also this -- I'll not to go too
20 deep into it -- but this concept of the iatrogenic
21 effect, that is when I asked Miss Zoline about it.
22 She said that she did know about it but wanted me to
23 describe it to put it in context.  It's the idea
24 that if you have aggressive --
25       MS. BRAIN:  I object.  She didn't know about

1  it.  She said that -- she didn't give any testimony

2  about that, so there is no evidence in the record

3  about this other than the questions which we know

4  aren't evidence.

5          THE COURT:  I think she asked Mr. Miller to

6  explain.  I'm just going to see, wait and see where

7  he is going with it.

8          MR. MILLER:  It's the concept that attempted

9  aggressive interventions by a clinician can have the

10  undesired effect of dissuading a patient from

11  continuing the therapies.  I would suggest to you,

12  that's exactly in fact -- and she did not agree that

13  that would be something that applied in this case,

14  and I would suggest to you that that's what happened

15  here.  The defendant came back to the Counseling

16  Center because his wife was going to leave him and

17  because he was going for alcohol and drug

18  counseling.  When he comes back, he is surprised

19  that he not only has drug and alcohol counseling,

20  he's then taken to --

21          MS. POLLOCK:  Objection.  Not to evidence.

22          THE COURT:  He is surprised at what?  What's

23  not in evidence that he is surprised --

24          MS. POLLOCK:  That he is surprised about

25  anything that occurred at the Counseling Center.

1  There was no evidence or testimony that he was

2  surprised in any way by that.

3          MR. MILLER:  That's an inference, Judge.  I

4  will say there is no evidence that he knew that he

5  was going to meet with Tom Miebach, a threat

6  assessment, because he'd only been contacted by

7  Jennifer Maupin.  And so with no advanced knowledge,

8  he goes down and meets with a risk assessment

9  person.  Now this isn't about his wife and about

10 alcohol and drugs.  It's about what risk he might

11 have, both to himself or to others.  And after that

12 meeting, he never met with anyone at the Counseling

13 Center again.  But Dr. Susan Zoline did not think

14 that was an issue in the case.

15          And, finally, as far as all of the

16 information goes, Susan Zoline admitted she wasn't

17 aware that Tom Miebach and Jennifer Maupin had

18 conferred prior to these sessions with the defendant

19 by Jennifer Maupin.  So she didn't have all of the

20 information.  Ultimately, I would suggest to you her

21 opinion is just wrong.  Those counselors did not

22 fail the defendant.  They did what they could based

23 on the information he provided.  He was not seeking

24 help for those murderous thoughts.  He wanted to

25 carry them out.  We see that constantly throughout

1 his texts with Terra Bullis, both before and after

2 the counseling session, his research on the

3 internet.  He ordered the bag before he went to the

4 Counseling Center.  He ordered the duffle bag after

5 he went to the Counseling Center.  So we believe

6 that the narrative that he was fighting these demons

7 just is not supported by the evidence.

8        And think about it, between the time he told

9 his wife in December of 2016 and he murdered

10 Yingying Zhang in June of 2017, and he did all of

11 those activities we've seen, researching serial

12 killers, making plans, sending the text, discussing

13 murder, talking about idolizing Ted Bundy and

14 others.  And it shows that Michelle Zortman was

15 basically home all those weekends until she left on

16 June 9th.  In other words, the first time that she

17 left the apartment after the defendant had told her

18 what he wanted to do, he then carried out his

19 plan --

20        MS. POLLOCK:  Objection; mischaracterizes

21 the evidence.  The evidence in fact was that

22 Michelle Zortman was in a relationship with Ryan

23 Vela and spent multiple nights every week at his

24 house; that is an improper inference.

25        THE COURT:  And I think once again, ladies

1  and gentlemen, you have heard all of the evidence

2  and these are arguments of counsel, and you will

3  decide whether the evidence is supported by the

4  argument or the argument is supported by the

5  evidence.

6         Go ahead.

7         MR. MILLER:  I will, and it's interesting

8  because part of the defense argument was how upset

9  the defendant was when Michelle Zortman left for the

10  weekend on June 9th because they were always

11  together.  Apparently, a defense argument actually

12  now is that he may not have been quite so upset --

13         MS. POLLOCK:  Your Honor, I'm sorry.  This

14  is utterly a mischaracterization.

15         THE COURT:  Let's move on.

16         MR. MILLER:  This does not sound like

17  someone who was fighting his demons.  This is not

18  someone who was triggered because his wife left town

19  with another man that she had been spending a lot of

20  time with before that.  This is someone who took the

21  first opportunity they had to carry out a heinous

22  and cruel crime.

23         I know we are going long here, but I do need

24  to address this discussion that what he said during

25  the Memorial Walk, that he may have overstated what

 1  he said.  I think you've heard that discussion.  You
 2  understand the things that he said but there are
 3  some points I would like to make regarding the
 4  Memorial Walk in looking at the walk itself.
 5        Remember what his mind set was going into
 6  that Memorial Walk.  It was to avoid getting caught.
 7  We have seen lots of evidence of that, going into
 8  that.  We know that he was cold and calculated after
 9  he committed the crime, covering up the crime, lying
10  to the FBI, lying to the FBI, lots of phone calls,
11  recorded conversations with Terra Bullis where he
12  would not reveal.  He lied to the agents on June
13  12th.  He lied to the agents on June 15th.  He lied
14  to the agents on June 17th.
15        On June 17th he told Terra that he was going
16  to try to clear his name and that's when he brought
17  up Terra's blood might be on the bat.
18        Then on the 19th, he did show the first
19  signs of maybe he would tell something, "I'll
20  explain everything in detail when this is all over."
21  But he remained worried about getting caught.  "If
22  they question you, use your right to remain silent
23  please.  I don't know what they can ask you that can
24  be in my benefit."
25        This is the mindset.  This defendant very

1 careful attempting to not get caught during this

2 time period.

3        On June 22nd he said, "Well, maybe they are

4 not pursuing me anymore."  And so he starts to

5 wonder if he can tell her more.

6        On June 23rd he tells Terra Bullis that his

7 trust in her has increased, but it's still clear he

8 knows the consequences if he talks about his crime.

9 If I go -- "If this goes south," he writes in a

10 text, "I will go to prison for F'g life."  As he

11 said, "F Michelle's feelings.  They know all of my

12 secrets.  Michelle loses a husband if this goes

13 wrong.  I will literally lose my life."

14        He knew the consequences of talking in June

15 of 2017.  On June 27th, his trust continues though

16 as he remains cautious.  He says, "Maybe the FBI is

17 looking at someone else now."  He says, "Hey, I only

18 had two shots back on June 9th."

19        She says to him, "If you would confess to

20 me, I wouldn't hold it against you," which is

21 obviously to increase trust.

22        And he says, "The number one way people get

23 caught is they tell someone."  He is very aware of

24 the risk of talking.  He says, "Hypothetically, if I

25 told you and you talked to someone, then it could

implicate you."  He says, "I would trust you with
this more than anyone but that kind of loyalty that
I would need doesn't exist.  I would trust you more
than anyone else.  It is just impossible to wrap
your heard around that."  That is June 27th, two
days before the Memorial Walk, so he has been very
cautious.  He remains cautious, but he is now
developing trust in Terra Bullis.

           So someone who was so cautious before the
29th, who finally on the 29th, as Mr. Nelson said,
finally is at the point where at this Memorial Walk
he wants to reveal what he's done because he wants
to be infamous.  He wants someone to know.  Does it
makes sense that when they're finally going to
reveal something they know can get them in trouble,
now they are just going to exaggerate completely.
They are going to show up and say all of these
things that aren't true.  That doesn't make any
sense.

           In fact if we look at the statements
themselves, we will see that there are many true
statements in there, we can prove are true that are
not exaggerations.  He said -- again, he started out
by telling her "I'm trusting you, of course, because
you're mine.  By the end of night, you will be even

 1  more mine."  He is not at this point looking for
 2  help; as I've suggested, he is looking for a helper.
 3  He is looking for someone else who can maybe do this
 4  with him in the future.  She says --
 5          MS. BRAIN:  Objection.  This is improper
 6  speculation.  There is no evidence whatsoever that
 7  there was any suggestion that Miss Bullis was going
 8  to be involved in future --
 9          MR. MILLER:  Completely fair inference, Your
10  Honor.
11          THE COURT:  Go ahead.
12          MR. MILLER:  Then he reveals, "I want to
13  talk about it.  I wanted to talk with someone.  I've
14  been holding it in so long."  You've heard that
15  tape.  You heard how he sounds breathless with
16  excitement when he says -- people don't hold in
17  their lies and their exaggerations.  He is holding
18  in this truth that he has been living with for about
19  20 days that he now wants to tell somebody "I want
20  to continue my work.  I don't know what that means."
21  Again, "don't know what that means" that is a much
22  more honest statement than some exaggeration.  "I
23  have no concrete plan.  You're the only person that
24  I've have ever told.  I really mean that."  So the
25  first time you ever tell anybody about this, then

1  you're going to exaggerate.

2          He goes on, and importantly he also has
3  limits as he goes on.  He says, "I haven't got away
4  with it yet.  There are people that they randomly
5  get about three years later.  Yingying is gone.  I
6  won't tell you where she is."  Again, if he is just
7  making up a story, why not tell where Yingying is if
8  it's not true.  Why not completely tell that story.
9  No, he is still being cautious because he knew the
10 way people got caught, at least how Ted Bundy got
11 caught was when the victim was recovered.

12          So he is telling her things but he is not
13 telling her everything, that's not exaggerations,
14 that is someone who is finally telling what they
15 did.  And he even says to her -- she says, "I'm safe
16 unless I'm an idiot and say something."

17          He said, "That's true."

18          And again many of these statements then as
19 we turn out can be verified.  And I do want to
20 mention one more.  He said during that tape that he
21 didn't orgasm, that certainly isn't bragging in that
22 context.  Why would he say that?  He would say that?
23 Because he is reliving what happened.  He is telling
24 Terra Bullis that he didn't orgasm during this.

25          But there was a lot of truth in there.  The

 1  truth in there about that -- that we can verify, I

 2  should say.  We find that -- he said getting rid of

 3  a hundred versus 150 pounds.  She was approximately

 4  a hundred pounds.  And probably the thing that, if

 5  you read this right, if you hear these statements,

 6  the one that you might think is the most outrageous,

 7  they have talked about is this idea that he hit

 8  somebody in the head with a baseball bat.

 9          We could see somebody, you would sexually

10  assault someone based on his reasons for kidnapping.

11  You would choke somebody.  You would see that.  You

12  would see stabbing somebody, but that's sort of one

13  of those statements that maybe is a little more out

14  there, that he hit her in the head with a baseball

15  bat.

16          So he said, "I carried her to the bathroom,

17  hit her in the head as hard as I could and broke her

18  head open."  It makes you wonder if he exaggerated

19  about that statement.  And then they ask him, would

20  they catch you.  He says, "They have the bat I hit

21  her head with."  And of course he didn't know at

22  that time, he didn't know what was going to be

23  found -- well, he didn't know what would be found on

24  the bat.  He obviously feared that there would be

25  blood found on the bat because of what he said to

 1  Terra Bullis about pretend like your blood is on
 2  there.  That wasn't an exaggeration.  It tested
 3  positive for her DNA 3.3 times 10 of the 28, 33
 4  octillion.  If he was making things up, he wouldn't
 5  be talking about hitting her head with a baseball
 6  bat that turned out to have her DNA on it.
 7          There was -- they have argued that there is
 8  no evidence that he took her to the bathroom.  Why
 9  argue that?  Because of the heinous nature of the
10  crime that took place in the bathroom.  But as we
11  note Courtney Corbett saw that luminol acid wash
12  around the tub.  John Clark was called to clean mold
13  out.  There were two things of Drano bought in the
14  bathroom, and there was an indication of the cadaver
15  dog in the bathroom.  And the suggestion that you
16  couldn't clean up the bathroom if you couldn't clean
17  up the bedroom suggests that the evidence didn't
18  show that.  We had that from witnesses.  There is
19  porous materials.  The baseball bat, wood, a porous
20  material that DNA got into.  The drywall, porous
21  material, so you can put that into the drywall.
22  Obviously, the carpet underneath because where it
23  had flowed down into so they are able to find that.
24  In that bathroom you have porcelain.  The defendant
25  cleaned and cleaned.  And the agents were unable to

1  find any blood or DNA in the bathroom.  That is a

2  testament to the defendant's cleaning; that is a

3  testament to the defendant attempting to get away

4  with this crime; that is not an indication that the

5  statements that he made during that Memorial Walk

6  were not true especially when we know the statement

7  about the baseball bat was true.

8        And other statements during the walk are

9  corroborated.  I know that I'm going long here, I'm

10  going to try to get wrapped up for you.

11        But he said, "They saw me."  And there was

12  video of her getting into his car.  He said he made

13  her disappear.  Indeed she was never found.  He said

14  that Yingying had a public profile, which, of

15  course, she did.  He said, "All people who want her

16  home safe.  Nobody knows what happened except for

17  me.  I am the only one."  That was true.  His

18  evidence too.  "She was valiant."  "She fought."

19  "She was strong."  "She was a lot stronger

20  mentally."  "It was shocking."  "Truly she was

21  resilient."

22        How could he know the evidence, things we

23  heard from her friends that that's who she was?  If

24  he was just making this up, how would he be able to

25  know that was the kind of person that she was:

1 someone who would fight the way that she fought.  He

2 couldn't know that unless he did the things that he

3 said he did.

4        He said Yingying was the only one with

5 evidence that would lead back to him.  It's true,

6 the baseball bat in the video.  And again as we

7 noted, he boasted, "She is gone.  I won't tell you

8 where she is.  I won't tell anyone where she is.

9 She's gone.  I'm apparently very good at this.  They

10 are looking for a missing person.  She is gone.

11 They will never find her."  Was this an

12 exaggeration?  No.  She's never been found.  This is

13 correct.

14        So, this narrative that the defendant was

15 going down a downward spiral, we don't believe that

16 they have proven by a preponderance of the evidence

17 the mitigating factors that relate to that.  We

18 believe that we have proven all of the aggravating

19 factors beyond a reasonable doubt including those

20 that are based on the -- based on the Memorial Walk

21 statement, which is corroborated by all of the other

22 evidence.

23        So I do want, before I close here, to

24 address their request for mercy.  It's something you

25 can consider, something, as I understand mercy is

unmerited and undeserved.  And so because if it was
merited, right, and it was deserved, then it would
be just punishment.  It wouldn't be mercy.  So to
give the mercy in this case, you would need to give
the sentence that -- the defendant a sentence that
would say that he doesn't deserve but that you would
decide to give him.  And I would suggest to you that
that would not be appropriate in this case.

     If mercy were applied by imperfect men and
women instead of applying the rule of law, we would
have widely differing and varying punishments for
the exact same crime just based on individuals; how
merciful they thought they should be, and ultimately
if the law was not enforced in the name of mercy, we
would have anarchy.  And there is a cost.  There is
a cost to mercy.  The cost just isn't borne by the
one who actually deserves to bear the cost, that's
mercy.

     You see when someone is wrong it creates a
debt that justice demands be paid.  For example, if
a judge grants mercy to a thief and doesn't make him
pay back what he stole, there is still a cost.  It's
just borne by the victim of the crime instead of the
thief.  That's why I would suggest to you that true
mercy should be granted by those who are wronged and

1  who are willing to pay themselves the debt that the

2  trespasser owes them; that's why we do not believe

3  that mercy is an appropriate consideration.  It's an

4  appropriate consideration, it should not be applied

5  in this case in applying the rule of law.  The

6  defendant should pay any debt for his crimes, not

7  the Zhang family.

8          So the law says justice dictates.  We are in

9  a court of law in the United States of America, and

10  as Mr. Nelson told you, justice is the reason that

11  we are here.

12          I will say, it gives me no pleasure

13  whatsoever to request a sentence of death for this

14  defendant.  It does not.  And I dare say that every

15  single person in this courtroom feels the weight of

16  Yingying Zhang's murder, and the heavy weight of

17  holding the defendant accountable for that murder.

18  I wish that he did not kidnap her, but he did.  I

19  wish he did not torture her, but he did.  I wish

20  that he did not rape her.

21          MS. BRAIN:  Objection; relevance.  What

22  Mr. Miller wishes is no relevance to this case.  It

23  is personal opinion and it's improper.

24          THE COURT:  He is wrapping up his rebuttal.

25  I'll allow it.  The jury knows this is argument.

SENTENCING -- July 17, 2019                    195

1        MR. MILLER:  I wish his actions did not

2   demand a sentence of death, but they do.

3        Several weeks ago when we started jury

4   selection in this case you were asked the question,

5   each and every one of you, if the facts and

6   circumstances warranted it, would you be able to

7   vote for a sentence of death.  And each of you said

8   yes.  Well, the facts and the circumstances of this

9   case warrant it.

10        The defense said that you are 12 jurors

11  of -- 12 juries of one.  I believe you are one jury

12  of 12.  To impose the death penalty in this case,

13  your sentence must be unanimous.  As a consequence

14  of that, the individual, the decision does not rest

15  on any one individual's shoulder.  Each of you

16  individually told us you could sign a verdict form

17  but you do that ultimately as a group.  And as a

18  group, we've discussed there is collective wisdom

19  and common sense.  And as a group, the United States

20  asks you to go back and deliberate.

21        We know that this is a serious decision with

22  a serious consequence.  But when you weigh the

23  aggravating factors in this case, and you weigh the

24  mitigating factors in this case, there is only one

25  sentence that will do justice in this case and that

1  is a sentence of death.  Thank you.

2          THE COURT:  All right.  Thank you,

3  Mr. Miller.

4          All right.  Ladies and gentlemen, that will

5  conclude all of the evidence in the closing

6  arguments.  Now you will be allowed to begin your

7  deliberations.

8          Lunch is waiting for you.  So I would

9  suggest you start with that.

10          The six alternates, I want you to grab your

11  lunch and we are going to take you to another jury

12  room.  You will not deliberate.  You will not

13  discuss anything.  I'm not going to free you up from

14  any of your admonitions just yet.  I will regroup

15  with you a little bit later.  You are still on call

16  and still admonished as to not discuss this matter

17  with anybody, including yourselves.

18          The other 12, you will follow the

19  instructions of law as you did previously but for

20  now we'll gather evidence and exhibits and start to

21  prepare them up for you.

22          MS. POLLOCK:  Just a very brief sidebar,

23  Your Honor.

24          THE COURT:  Yep.

25          (Proceedings held at sidebar.)

1          MS. BRAIN:  We have several motions that we
2  need to make.  If we can take a break.
3          MS. POLLOCK:  I just want to make sure that
4  it gets on the record before the jury begins to
5  deliberate.
6          THE COURT:  Absolutely.
7          (In the presence of the jury.)
8          THE COURT:  Okay.  You will be taken up to
9  the jury room now.  You can -- I suggest that you
10  have your lunch first.
11          (Jury retires to deliberate, 1:31 p.m.)
12          THE COURT:  All right.  Please be seated.
13          You wanted to be heard before they begin
14  deliberations and --
15          MS. POLLOCK:  Yes, Your Honor.
16          THE COURT:  Go ahead.
17          MS. POLLOCK:  Well, there is really two main
18  issues that we want to bring to the Court's
19  attention.  The first one is -- are they good?
20          THE COURT:  We're good.  Go ahead.
21          MS. POLLOCK:  The first one is renewing our
22  objection to reopen the evidence with regards to the
23  Bureau of Prisons.  I still think that the inference
24  that was made that, you know, we cannot talk about
25  what it's like in the BOP, leaves the jury with the

1  only conclusion that life is a cupcake walk in

2  prison.  So we want to renew that motion.

3         Second of all, Your Honor, the government is

4  well aware of the fact that the reason that none of

5  the mental health records were presented it's

6  because they were barred by the Court.  The Court

7  gave the government permission --

8         THE COURT:  The mental health records were

9  not entered because you withdrew your mental health

10 defense.

11        MS. POLLOCK:  Understood.  And the Court

12 barred the records as a result of that decision.

13        THE COURT:  Correct.

14        MS. POLLOCK:  However, the government knew

15 that, and the argument that I think was the

16 appropriate scope of the rebuttal would be, "You

17 heard no expert testimony on this."  That's what the

18 Court told the government they were permitted to

19 say.  The Court did not permit the government to

20 mislead the jury to say "You saw no records of this"

21 because now the jury's inference is that no records

22 exist.  That's not the appropriate scope.  The scope

23 of rebuttal should have been, "You heard no expert

24 testimony on that because that's what was

25 prohibited," but to disregard the lay testimony by

1   saying "you saw no records" when they know the
2   records existed is misleading.
3          So we either ask permission to reopen the
4   case to rebut that presumption or a limited
5   instruction indicating that they did not see the
6   records by order of the Court, which was an
7   appropriate and proper order; but to have them
8   thinking that the records don't exist, it really, it
9   lends incredulity to the defense claim which we know
10  is supported and it's misrepresentative.
11         THE COURT:  Mr. Miller.
12         MR. MILLER:  Your Honor, it was an invited
13  response.  Ms. Pollock said that's what I was
14  commenting on is supported by the records that he
15  went to a psychiatrist in 2016.  There were no such
16  records in front of the jury.
17         MS. POLLOCK:  There are.  They are in the
18  counseling records --
19         MR. MILLER:  In front of the jury.  So she
20  got up and stated things that were not in evidence
21  to the jury and that was -- mine was correcting,
22  which is entirely correct, that there were no
23  records presented to the jury regarding --
24         THE COURT:  I don't think that the comment
25  that there were no records presented in evidence

1  infers that records don't exist --

2       MS. POLLOCK:  It wasn't just about -- I

3  apologize for interrupting -- but it us wasn't just

4  about the psychiatrist.  They said PTSD, the age 15

5  van incident, all of those things.  They said that

6  we basically failed to meet our burden of proof by

7  not presenting evidence that we all know exists but

8  we were not allowed to present --

9       THE COURT:  You keep saying -- see here is

10  the problem with all of this.  You keep saying that

11  you were not allowed to present.  I only enforced

12  your strategic decision to withdraw your notice.  So

13  they weren't coming in based on your decision.  And

14  I don't think there is any inference drawn that says

15  they didn't exist.  They are saying they weren't

16  presented.

17       MS. POLLOCK:  Your Honor, I don't want to

18  belabor the point, but the records from the

19  emergency room, when he was 15 years old, are not

20  really 12.2 evidence.

21       THE COURT:  Understood.  But that was going

22  to be put in through somebody you called a

23  mitigation specialist, right?  So I make a decision

24  based upon that.  But overall, we've covered this.

25  I appreciate the record you're making now.  But the

1 motion to reopen the evidence would be respectfully

2 denied.  And the motion for any limiting instruction

3 would be respectfully denied.

4          Is there anything else to address?

5          MS. BRAIN:  One issue very briefly, Your

6 Honor.

7          Mr. Miller just told the jurors that the

8 decision to impose a death sentence doesn't sit on

9 the juror's individually, it sits on them as a

10 group.  That's misleading under *Caldwell v.*

11 *Mississippi*, and we would request that the -- to

12 rebut that and to correct the record that the Court

13 instruct on the result of non-unanimity.

14          THE COURT:  I don't think anybody got

15 shortchanged here today based upon the rulings I

16 made about the instructions that are given to be

17 able to argue from your side that everybody has to

18 make this decision themselves and for the government

19 to argue, yes, but collectively.  So no limiting

20 instruction will be necessary or given there.

21          MS. POLLOCK:  One more, Your Honor.

22 Mr. Miller inferred in his rebuttal that the only

23 mercy that could be granted was by the victim's

24 family.  Mercy is in fact an instruction giving the

25 jury the right to infer mercy in any circumstances

1 that they deem is appropriate.  That is a

2 misrepresentation of the law and we'd request an

3 instruction.

4         MR. MILLER:  They have an instruction on

5 mercy.  I argued they should not exercise the

6 discretion to grant mercy, which I believe is an

7 appropriate argument.

8         THE COURT:  And the instruction allows them

9 the discretion to do so if they wish.  I think they

10 have been properly instructed.  I believe that both

11 of you have been given every opportunity to make all

12 of the arguments that were appropriate to be made

13 given the way this whole case laid out.

14         So with that in mind, we will be in recess

15 now.

16         For those in the gallery, I expect this will

17 take some time.  I have indicated on the -- I think

18 through the clerk's office on the website, that

19 there will be 30 minutes from the time of any

20 verdict to the announcement of the verdict.  I would

21 have no idea to tell you when that might be at this

22 point.

23         And for all of you, I would expect maybe we

24 should touch base back here or we might ask you to

25 regroup later in the afternoon if need be for

1  whatever reason.

2          Okay.  So, we need to swear in the Court

3  Service Officers.

4          I need you guys to make sure of what

5  exhibits you think should go up or what shouldn't.

6  It seems to me it might be the same as we did in the

7  guilt phase, pretty much.

8          Thank you.

9          (Court Security Officers sworn, 1:37 p.m.)

10         THE COURT:  All right.  Thank you.

11         And I would like -- I know you want to get

12  out of here.  I would like to see just one from each

13  side, if we could, for something that we addressed

14  yesterday.  If you want to make it on the record, we

15  can, but I would like to discuss how you see where

16  we go from here depending.

17         MS. POLLOCK:  We have an opinion of that,

18  Your Honor.

19         THE COURT:  Thank you.

20         (A recess was taken from 1:38 p.m. to

21         3:38 p.m.)

22         (Jury absent.)

23         THE COURT:  Thank you.  Please be seated.

24         All right.  Good afternoon.  In open court

25  outside the presence of the jury.

1          All present including Mr. Christensen.

2          The jury has a question that they signed by

3   the foreperson, has to do with -- parties have

4   received a copy of it?

5          MS. POLLOCK:  Yes, Your Honor.

6          THE COURT:  Has to do with future

7   dangerousness.

8          The question is:  "In prison??  Or if he was

9   free, we want to know if this aggravating factor

10  pertains to his time in prison or if he'd never been

11  caught."

12         Parties wish to be heard?

13         MS. POLLOCK:  Yes, Your Honor.

14         We believe that the appropriate answer to

15  this question is that "Yes, the future dangerousness

16  factor is limited to the prison context."

17         We filed a motion previously before the

18  start of jury selection or -- excuse me -- before

19  the start of the penalty phase witness.  That is the

20  state of the law.  And it would be duly improper for

21  them to consider the future dangerousness factor

22  when there is no possibility of release in this

23  case.

24         THE COURT:  Mr. Miller or Nelson?

25         MR. NELSON:  That's correct, Your Honor.

1  Our evidence isn't limited to violence in prison,

2  but that is, what Ms. Pollock just stated, is a

3  correct statement of law.

4          THE COURT:  What would you present as the

5  answer?

6          I proposed this --  let me just say what I

7  wrote.

8          "Given that the options available to you are

9  a sentence of death or life without release, you

10 should consider future dangerousness in the context

11 of a prison setting."

12         MS. POLLOCK:  Yes, Your Honor.

13         MR. NELSON:  That's fine, Your Honor.

14         THE COURT:  I will sign it and send it up.

15         MS. POLLOCK:  Can we say "prison setting

16 only"?

17         THE COURT:  Prison only setting?

18         MS. POLLOCK:  Yes.

19         MR. MILLER:  I guess from what Mr. Nelson

20 said, I'm trying to process what that answer means

21 as far as the evidence can relate to his showing his

22 future dangerousness or the things that we listed.

23 That is correct that it would relate to the prison

24 setting.  I guess I'm just trying to wonder if it

25 only makes it sound like they can't consider the

SENTENCING -- July 17, 2019                    206

1  evidence that's actually in the future dangerousness

2  instruction.

3        MS. POLLOCK:  I don't think that's what the

4  question reads, Your Honor.  I think the question

5  reads whether or not his future dangerousness should

6  be evaluated in terms of is he dangerous in prison

7  or is he dangerous outside of the prison.  I think

8  it is prison only and I think that makes it clear.

9        THE COURT:  Well --

10        MS. POLLOCK:  They did list alternatives,

11  Your Honor.  They said "in prison or," and so if we

12  said in prison only it negates the second part of

13  that question, that is the appropriate answer.

14        THE COURT:  Anything from the government?

15        MR. NELSON:  I would just say I think that

16  the word "only" is the only disagreement that we

17  have with each other.  I think it depends on what

18  the "only" is modifying.  So I would defer to the

19  Court.  Perhaps something along the lines of "you

20  may consider all of the evidence with regard to

21  future dangerousness to determine whether or not the

22  defendant would be a future danger in the prison

23  setting" or something along those lines.

24        MS. POLLOCK:  Or you could say "only in the

25  prison setting and not outside of prison."  I think

1  that's the alternative as they provided was in

2  prison, question, or if he was free, or if he had

3  never been caught.  They are suggesting

4  alternatives, the appropriate answer is prison only,

5  question, not the other alternatives.

6         MR. NELSON:  That raises the issue -- and

7  I'm not trying to argue -- it raises my point with

8  regard to the issue of what the "only" is

9  qualifying.  So perhaps you may "only" consider the

10 evidence presented for the purposes of determining

11 whether the defendant would be a future danger in

12 prison.  Because I don't want anything that suggests

13 that they can only consider whether the evidence

14 shows -- we presented evidence of him being a --

15 within the prison context his future dangerousness,

16 that's the point.

17        THE COURT:  All right.  I'm going to write

18 this out a couple ways.

19        Mr. Nelson your proposal is what?  You may

20 only consider future dangerousness --

21        MR. NELSON:  "You may only consider the

22 evidence presented with regard to the defendant's

23 future dangerousness to determine his -- or

24 determine the risk of future dangerousness in the

25 prison setting."

1        THE COURT:  "You may only consider the

2   evidence presented on the issue of future

3   dangerousness in a prison setting"; is that what you

4   said?

5        MR. NELSON:  I think what I said, Your

6   Honor, was "You may only consider the evidence

7   presented to determine the defendant's future

8   dangerousness within the prison setting."

9        THE COURT:  Ms. Pollock?

10        MS. POLLOCK:  Yes.

11        THE COURT:  There was an "only" in there.

12        MS. POLLOCK:  Fine.

13        THE COURT:  Then it will be.

14        MR. MILLER:  I think we probably misspoke,

15   Your Honor, in the sense of may only consider the

16   evidence, this evidence includes evidence that is

17   also used, I believe, in other aggravators.  So I

18   apologize, but I want to make sure that we are not

19   telling the jury you can't consider it for other

20   aggravators.  I'm open to how we can do that.

21        THE COURT:  Why don't I just say "in

22   prison."

23        MR. MILLER:  Just respond and say "in

24   prison"?

25        MS. POLLOCK:  Fine.

1          MR. MILLER:  That would be fine, Your Honor.

2          THE COURT:  I'm just going to circle it and

3   initial it.

4          MR. MILLER:  That's fine.

5          THE COURT:  And then I'm signing it.

6          Okay.  So I circled "in prison."  I signed.

7          MS. POLLOCK:  Cool.

8          THE COURT:  I'm going to date it and we are

9   going to say 3:15 p.m.

10          Jeremy, you will tell them not to dispose of

11   any note.

12          (A recess was taken, 3:17 p.m.)

13          (Open court, 3:34 p.m.)

14          THE COURT:  Please be seated.

15          Okay.  All present in open court outside the

16   presence of the jury.  It is 3:34.  Another two

17   questions titled "Mitigator Factor Section V."

18          First question:  "Are we to quantify the

19   number of jurors who agree that the defense proved

20   by a preponderance of the evidence each of the

21   listed mitigating factors?"

22          Second question:  "Are we to consider at

23   this stage whether we would personally consider the

24   listed factors to be mitigators in this case?"

25          Thoughts?

1        MS. POLLOCK:  Your Honor, I believe that the
2   first question, are we to quantify the number of
3   jurors that agree the proposed mitigators are
4   proven; the answer is yes.
5        And for the second question, are we to
6   consider at this stage whether we would personally
7   consider the listed factors to be mitigators; I
8   think the answer is no.  Refer them to the
9   instructions about how to find that the factors have
10  been proven and then the weighing which comes after.
11       THE COURT:  From the government?
12       MR. MILLER:  I think yes is the answer to
13  the first question.  I think the question is at what
14  stage are they at right when they ask us "at this
15  stage."  I presume it is at the quantifying stage.
16  I think that it would be appropriate to refer them
17  back to the instructions to answer number 2.  I
18  don't know if I would -- knowing yes -- would just
19  because I'm not sure exactly of the underlying
20  basis, but I think "yes" would be the answer to the
21  first question.
22       The second one would be "please refer to the
23  instruction to see at what stage you should weigh
24  the mitigating factors."
25       MS. POLLOCK:  That's fine.

SENTENCING -- July 17, 2019                    211

1          THE COURT:  Why don't we tell them which

2   instruction that is, that tells them at what stage.

3          So that would be the "weighing," page 24,

4   right?  So, the answer is "yes."  And then "please

5   refer to page 24, Section 12, weighing aggravating

6   and mitigating factors to determine."  Or we could

7   answer the question because it would be -- it does

8   say, but I think referring them back is very clear.

9   It tells them after they've gone through each stage

10  and after they've proved the -- after they've

11  determined the existence of any mitigating factors

12  then to engage in the weighing process.

13         So the answer to the first one is "yes."

14         And then to the second one is to "Please

15  refer to page 24, Section 12, weighing the

16  aggravating and mitigating factors to determine when

17  to engage in the weighing process."

18         Is that what the parties are in agreement to

19  send back?

20         MS. POLLOCK:  That's fine.

21         MR. MILLER:  That's fine, Your Honor.

22         THE COURT:  Okay.  Let me write that out.  I

23  think that I will write it out on the -- I think

24  that I will put "yes" to the first one right after

25  the question mark.  All right?  Is that okay with

1  everybody?

2          MS. POLLOCK:  Yes, Your Honor.

3          MR. MILLER:  Yes, Your Honor.

4          THE COURT:  And then sign it.  And then I

5  think that I will say after "in this case, question

6  mark," I'm going to say "over" and write and out on

7  the back.  Okay?

8          Okay, Jeremy, page 24, Section 12, weighing

9  aggravating and mitigating factors.

10         Okay.  Very good.  Sit tight until Jeremy

11  delivers that in case there is another question.

12         (Recess from 3:41 p.m. to 4:28 p.m.)

13         THE COURT:  Please be seated.

14         All right.  We are back on record outside

15  the presence of the jury.  A note at 4:19 from the

16  foreperson.

17         "We would like to break for the day at

18  5:00 p.m.  We will start at 9:00 a.m. tomorrow."

19         Anybody want to weigh in?

20         MS. POLLOCK:  Fine with us, Your Honor.

21         MR. MILLER:  Fine.

22         THE COURT:  All right.  Very good.  I think

23  that's a good idea.  And I think that's a positive

24  signal.

25         So I'm just going to say, "You may.  Thank

1  you.  See you tomorrow at 9:00.)

2           (Off the record.)

3           THE COURT:  All right.  We will see

4  everybody tomorrow.  You know something, let me make

5  a note.  I'm just going to remind them of my

6  admonishments.  Do you want me to do that in open

7  court or do you think I can do it here?

8           All right.  I will say that it probably

9  would be safe to go, and see you tomorrow morning at

10 9:00.  Okay.

11          (Which were all of the proceedings had in

12          this case on this date, 4:31 p.m.)

13                              *****

14

15     I certify that the foregoing is a correct

16 transcript from the record of proceedings in the

17 above-entitled matter.

18

19

20 s/Nancy Mersot          Date:  October 2, 2019

21 Court Reporter

22

23

24

25